UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL | § | Chapter 11 |
| MANAGEMENT, L.P. | § | |
| | § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § | |

## HUNTER MOUNTAIN INVESTMENT TRUST'S AMENDED NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 158(a) and Federal Rules of Bankruptcy Procedure 8001-8002, Appellant/Movant Hunter Mountain Investment Trust ("HMIT"), both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] appeals to the United States District Court for the Northern District of Texas, Dallas Division, from this Court's August 25, 2023 Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding  (Docs. 3903-3904) (attached to this notice as Exhibits 1 and 2) (the "Final Order"), and all associated interlocutory orders or decisions that merged into or preceded the Final Order, including but not limited to the following:

- March 31, 2023 Order Denying Application for Expedited Hearing (Doc. 3713) (attached to this notice as Exhibit 3);

- May 11, 2023 Order Fixing Briefing Schedule and Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented (Doc. 3781) (attached to this notice as Exhibit 4);

---

[1] And, in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Bankr. Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), and the supplement to the Emergency Motion [Bankr. Dkt. No. 3760] and the draft Complaint attached to the same [Bankr. Dkt. No. 3760-1].

- May 24, 2023 Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding (Doc. 3790) (attached to this notice as Exhibit 5);

- May 26, 2023 Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery Or, Alternatively, For Continuance of the June 8, 2023 Hearing (Doc. 3800) (attached to this notice as Exhibit 6);

- Evidentiary and other oral rulings, including but not limited to rulings associated with expert testimony, made at the June 8, 2023 Hearing;

- June 16, 2023 Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence (Doc. 3853) (attached to this notice as Exhibit 7); and,

- July 5, 2023 Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing (Doc. 3869), including the appended email ruling (attached to this notice as Exhibit 8).

The names of all other parties to the orders and decisions appealed from and their respective counsel are as follows:

- Appellant/Movant HMIT, represented by:

**PARSONS MCENTIRE MCCLEARY PLLC**

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel: (214) 237-4300
Fax: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Tel: (713) 960-7315
Fax: (713) 960-7347

- Appellees/Non-movants Highland Capital Management, L.P., and the Highland Claimant Trust, represented by:

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz

John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

- Appellee/Non-movant James P. Seery, Jr., represented by:

   **WILLKIE FARR & GALLAGHER LLP**

   Mark T. Stancil
   Joshua S. Levy
   1875 K Street, N.W.
   Washington, D.C. 20006
   Tel: (202) 303-1000
   mstancil@willkie.com
   jlevy@willkie.com

   **REED SMITH LLP**

   Omar J. Alaniz
   Texas Bar No. 24040402
   Lindsey L. Robin
   Texas Bar No. 24091422
   2850 N. Harwood St., Ste. 1500
   Dallas, Texas 75201
   Tel: (469) 680-4292

- Appellees/Non-movants Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management, L.L.C., and Stonehill Capital Management LLC, represented by:

**HOLLAND & KNIGHT LLP**

Brent R. McIlwain, TSB 24013140
David C. Schulte TSB 24037456
Christopher Bailey TSB 24104598
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
Fax: (214) 964-9521
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

Dated:  September 12, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    Texas State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    ***Attorneys for Hunter Mountain Investment Trust***

<u>**CERTIFICATE OF SERVICE**</u>

A true and correct copy of the foregoing document was served via ECF notification on September 12, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

3130876.2

# Exhibit 1



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 25, 2023**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| Reorganized Debtor. | § | |

**MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER
PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING
HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR
LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
[BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]**

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

---

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities.  Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation.  The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3]  The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein.  The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

### A.    Who is the Movant, HMIT?

Who is HMIT?  It is undisputed that it is a former equity owner of Highland.  It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement.  This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest.  As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022).  The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions."  In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

HMIT's only asset is its contingent interest in the Claimant Trust.  It has no employees or revenue.

HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness

owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero

("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his

family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees.  HMIT

vehemently disputes the suggestion that it is controlled by Dondero.

       *B.*     *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the

bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized

Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's

CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and

(2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who

purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the

Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later

further explained), the claims acquired by the Claims Purchasers were acquired by them after

extensive litigation, mediation, and settlements were approved by the bankruptcy court and after

the original claims-holders had voted on the Plan and after Plan confirmation.  As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file
the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave.  Nearly a month
later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary
Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that
"[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address
procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."
Supplement, ¶ 1 and Exhibit 1-A.  It is this revised proposed complaint to which this court will refer, when it uses the
defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5,
2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon");
Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured
claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"),
which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto.  In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

     *C.*    *Why Does HMIT Need to Seek Leave?*

     As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7]   The Gatekeeper Provision was not included in the Plan *sans raison*.  Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

D.    *Some Further Context Regarding Post-Confirmation Litigation Generally.*

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls.  To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan.  Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.  Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023:  six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery") in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place" after not achieving the results he wanted in the Highland bankruptcy case. Indeed, the Motion for Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers) through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202"). In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting that the list is "a summary of active pending actions only and does not include actions that were resolved by final orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, *three* of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the lack of bankruptcy appellate standing on behalf of the appellant. On July 19, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023). On July 31, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the same basis: Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023). The July 31, 2023 ruling followed the Fifth Circuit's ruling on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320 (5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided one or more of the Claims Purchasers with material nonpublic information to induce them to want to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that the Claims Purchasers were allegedly told they would make a hefty profit on the claims they purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as the Claimant Trustee of the Claimant Trust.  In sum, HMIT alleges this constituted wrongful "insider trading" of the bankruptcy claims.  In addition, certain lawyers for Dondero and Dugaboy sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are "colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of the Plan).  The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June 8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses both in support of and in opposition to the Motion for Leave.  Having considered the Motion for Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's request for leave to pursue its Proposed Claims.  The court's reasoning is set forth below.

## II.     BACKGROUND

### A. *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada").  It operated as a global investment adviser that provided investment management and advisory services and managed billions of dollars of assets, both directly and indirectly through numerous

affiliates. Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%), Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was wholly owned by Dondero and was the only general partner of Highland (0.25%). On October 16, 2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president, and portfolio manager, and facing a myriad of massive, business litigation claims – many of which had finally become or were about to be liquidated (after a decade or more of contentious litigation in multiple fora all over the world—filed for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December 2019. The official committee of unsecured creditors (the "Committee") (and later, the United States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over and distrust of Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

After many weeks under the specter of a possible appointment of a trustee, Highland and the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance settlement approved by this court on January 9, 2020.[11] As a result of this settlement, Dondero relinquished control of Highland and resigned his positions as officer or director of Highland and its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020 [Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

chosen to lead Highland through its chapter 11 case: Seery, John S. Dubel, and retired bankruptcy

judge Russell Nelms. Given the Debtor's perceived culture of constant litigation while Dondero

was at the helm, it was purportedly not easy to get such highly qualified persons to serve as

independent board members. At the hearing on the corporate governance settlement motion, the

court heard credible testimony that none of the Independent Directors would have taken on the

role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2)

indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere

negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation

against the Independent Directors without the bankruptcy court's prior authority. The gatekeeper

provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind
> against any Independent Director, any Independent Director's agents, or any
> Independent Director's advisors relating in any way to the Independent Director's
> role as an independent director of Strand without the Court (i) first determining
> after notice that such claim or cause of action represents a colorable claim of willful
> misconduct or gross negligence against Independent Director, any Independent
> Director's agents, or any Independent Director's advisors and (ii) specifically
> authorizing such entity to bring such claim. The Court will have sole jurisdiction to
> adjudicate any such claim for which approval of the Court to commence or pursue
> has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation

and did so "subject at all times to the supervision, direction and authority of the Independent

Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors

determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to

"not cause any Related Entity to terminate any agreements with the Debtor."[15] The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery acting in these roles. The gatekeeper provision in the July 2020 Order was essentially the same as the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

July 2020 Order, 3, ¶5. Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization plans, none of which were embraced by the Committee or the Independent Directors. When Dondero's plans failed to gain support, he and entities under his control engaged in substantial, costly, and time-consuming litigation for Highland.[17] As the Fifth Circuit described the situation, after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr. Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr. Dkt. No. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt. No. 1808] on January 22, 2021.[20] Highland had negotiated settlements with most of its major creditors following mediation and had amended its initially proposed plan to address the objections of most of its creditors, leaving only the objections of Dondero and entities under his control (the "Dondero Parties") at the time of the confirmation hearing,[21] which was held over two days in early February 2021. The Plan is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created: the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner). Highland's various servicing agreements were vested in the Reorganized Debtor, which continues to manage collateralized loan obligation vehicles ("CLOs") and various other investments postconfirmation. The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13. The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("<u>Disclosure Statement</u>") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries.  The Claimant Trust

is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan

and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package

as the CEO of the Reorganized Debtor and the Claimant Trustee.  Following their acquisition of

their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members

of the CTOB.[23]  Seery's compensation included the same base salary that he was receiving as CEO

and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the

creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests

in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each

holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust

Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership

interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

B. *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery, and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His Compensation as Claimant Trustee Post-Confirmation*

1. The December 17, 2020 MGM Email

Between Dondero's forced resignation from Highland in October 2020 and the

confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to

thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors

and the Committee.   In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

(the "MGM Email") that featured prominently in HMIT's Motion for Leave.  According to HMIT and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely by either Amazon or Apple.[25] At the time Dondero sent the MGM Email, Dondero sat on the board of directors of MGM, and the Debtor owned MGM stock directly.  The Debtor also managed and partially owned a couple of other entities that owned MGM stock and managed various CLOs that owned some MGM stock as well.  HMIT alleges now that Seery later misused and wrongfully disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in exchange for him providing this allegedly "insider" information that inspired them to purchase unsecured claims with an alleged expectation of future large profits).[26]  A timeline of events (in late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's departure from Highland, helps to put the email in full context:

- October 16: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- November 24: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- November 24–27: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- <u>November 30</u>: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- <u>December 3</u>: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- <u>December 10</u>: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- <u>December 16</u>: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- <u>December 17</u>: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero:  "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:

> [The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

June 8 Hearing Transcript, 273:13-22.

The MGM Email had the subject line "Trading Restriction re MGM – material non public information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he received the MGM Email. This was because, among other reasons, Dondero sent it ***after***: (i) unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of the disclosure statement; and (v) Highland's demand to collect on the demand notes for which Dondero and his entities were liable.[38] Highland's Chapter 11 case was fast approaching the finish line. Moreover, MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this.[39] Still further, as of December 17, 2020 (the date Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct and indirect control of the Debtor to the Independent Board as part of the corporate governance settlement[40] and having resigned from all roles at the Debtor and affiliates in October 2020. Still further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. ***My purpose was to alert Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades***.

It is noteworthy that ***Dondero's labeling of the MGM Email (in the subject line) as a communication containing "material non public information" did not make it so***. In fact, it appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for Leave that the MGM Email did not disclose information to Seery that was not already made available to the public at the time it was sent. Seery testified that he did not think the MGM Email contained MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier noted—"MGM was already on the restricted list at Highland Capital . . . before I got to Highland."[42] Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9. Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors of MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10. He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . . MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[44]  For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]  In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]  Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

them."[48]  Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email.  He did not "say anything about Amazon hitting the price."  He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them."  Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple. When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically ***did not*** communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed.  For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt."  The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers."[50] (*Id.* Ex. 27.) The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022.

---

[50] Highland Ex. 27.

[51] Highland Ex. 28.

[52] Highland Ex. 29.

[53] Highland Ex. 30.

2.  <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery.  HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers.  Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations.  HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable.  These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021).  Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57]  He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59]  The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4.  The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4.  The court has placed in a table and numbered each line for ease of reference.  The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63] Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65] Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66] Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67] Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69] Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims. Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure. The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended petition, the responses, the record, applicable authorities and having conducted a hearing on the petition on June 1, 2022.[72]

> 3. <u>Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories</u>

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202 Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks after his telephone calls with Linn and Patel—was true and accurate.  In it, he swore under oath as to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero acknowledged, as well, that his sworn statement that he filed in support of an amended verified Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May 2022), described the same telephone conversation he had with Linn, and it did not mention MGM at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Seery's say-so because they had made so much money in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin[n] of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Seery had testified in court, it made no sense to me that Mr. Lin[n] would think that the claims were worth more than what Seery testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.  Accordingly, "I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee."[76] Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary beneficiary."[77]  Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.

[76] *Id.*, ¶¶ 3-4.

[77] *Id.*, Ex. A, 1-2.

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78]  The U.S. Trustee's office took no action.  Dondero made a second and third attempt to get the U.S. Trustee's office to conduct an investigation into the same allegations laid out in Draper's letter, this time in "follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later, on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina wrote "to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged conversation with Linn, this time in support of a Verified Rule 202 Petition *filed by HMIT* ("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout 2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same allegations of misconduct by Seery and Farallon.[80]   In this new sworn statement, Dondero describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and Linn and *mentions MGM* and Farallon's alleged optimism about the *expected sale of MGM*:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Seery because they had made significant profits when Seery told them to purchase other claims in the past. They also stated that they were particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83] But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland]. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84] HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85] The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85] June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

*C.  Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the

Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured

claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were

approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and

(2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules

of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the

notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August

9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87] $23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88] $137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020 Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89] $80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

---

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90]<br><br>$125,000,000 in aggregate ($65,000,000 General | 8/9/2021<br>Bankr. Dkt. No. 2698 (Muck) and Bankr. Dkt. No. 2697 (Jessup) |

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91]   Dondero testified that it was **his** view that there was insufficient information in the public to justify the claims purchases.[92]   But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations.   In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93]   Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

---

[90] Bankr. Dkt. No. 2389.  The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases.  Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95] Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside. In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay **30 percent more** than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96] Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill **as creditors**, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12. The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See*, Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections. The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation. These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties. The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents *a colorable claim of any kind*, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

The Plan defines Protected Parties as,

> collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities), (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number of persons than the persons protected under the January 2020 Order (addressing the Independent Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as CEO and CRO of the Debtor).  But, at the same time, it is less restrictive than the gatekeeping provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful misconduct or gross negligence," effectively providing the protected parties under the prior orders with a limited immunity from claims of simple negligence or breach of contract that do not rise to the level of  "willful misconduct or gross negligence," whereas the Gatekeeping Provision under the Plan does not act as a release or exculpation of the Protected Parties in any way because it does not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are "colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

Dondero and some of the entities under his control appealed[100] the Confirmation Order directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and injunction provisions, including the Gatekeeper Provision (collectively, the "Protection Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge, purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-debtor discharges.  As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all remaining grounds."[101]  The Fifth Circuit specifically found the "injunction and gatekeeping provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that "exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions that the Protection Provisions were legal, necessary under the circumstances, and in the best interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision improperly extended to certain bankruptcy participants other than Highland, the Committee and its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero]." *Id.* at 434-35.

[101] *See supra* note 4.  The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022.  The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')."  In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424.  No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's **exculpation provision**."[102]  The Fifth Circuit then remanded to the Bankruptcy Court

"for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted

that the protection provisions in the January and July 2020 Orders appointing the Independent

Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have

the effect of exculpating the Independent Directors and Seery in his executive capacities" such that

"[d]espite removal from the exculpation provision in the confirmation order, the Independent

Directors' agents, advisors, and employees, as well as Seery in his official capacities are all

exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the

Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant

with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent
> Directors, (iii) the Committee, and (iv) members of the Committee (in their official
> capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the

exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and

that no other changes would be required to conform the Plan and Confirmation Order to the Fifth

Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform,

arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing

the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded." *Id.*

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]   The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

### E.  HMIT's Motion for Leave

HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.  On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]   The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding ***the post-confirmation, pre-Effective Date purchase of allowed unsecured claims***.   The Proposed Defendants would be:

**Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case).  Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

**Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case.  They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers").  The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021.  Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases.  The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

**John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

**Highland,** as a nominal defendant.  HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

**Claimant Trust**, as a nominal defendant.  HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

**HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests).  HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

    **Highland,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

    **Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111]  The gist of the Proposed Complaint is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112]  HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased.  HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants.  In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings.  As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months ***before*** certain of their claims—the UBS claims—were purchased).[113]  In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that:  (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest).  HMIT argues that Seery should be required to disgorge his compensation.  It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.  Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant Trustee. In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges claims which are substantially more than 'colorable' based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or abetting) breaches of fiduciary duty."[114]

F. *Is HMIT Really Dondero by Another Name?*

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a continuation of the harassing and bad-faith litigation by Dondero and his related entities that the Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been HMIT's administrator since August 2022. Patrick asserts that he is not influenced or controlled by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against Seery and the Claims Purchasers. However, the testimony elicited at the June 8 Hearing—the hearing at which HMIT had the burden of showing the court that its Proposed Claims were "colorable" such that it should be allowed to pursue them through the filing of the Proposed Complaint—paints a different picture. Somewhat tellingly, HMIT chose not to call Patrick— allegedly HMIT's only representative and control person—as a witness in support of its Motion for Leave. Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3. HMIT notes, in a footnote 6, that "Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors. Rather, the proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion

for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a

settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed

any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its

action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state

court.[122] HMIT's counsel argued that the point of this questioning was that "they're just trying to

draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact

that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202

proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First

Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where

HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting

the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in

objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and

dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to

the order as "an order denying *our second"* Rule 202 Petition.[124]  And, Dondero testified that his

warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had

traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence. *Id.*, 58:14-15.

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own agenda in the bankruptcy case is not new.  Rather, this has been part of Dondero's *modus operandi* since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued to lob objections and create obstacles to Highland's implementation of the Plan through entities he owns or controls.  As noted above, the Fifth Circuit specifically upheld this court's finding in the Confirmation Order that Dondero owned or controlled the various entities that had objected to confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related appellants made similar protestations that they are not owned or controlled by Dondero and asked the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him."[126]  Based on the totality of the evidence in this proceeding, the court finds that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving force behind HMIT's Motion for Leave and the Proposed Complaint.  The Motion for Leave is just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.
[126]  *Highland Capital*, 48 F.4th at 434-435.

### G. Opposition to Motion for Leave: Arguing No Standing and No "Colorable" Claims

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127]  The Claims Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on May 11, 2023, as well.[128]  In the Joint Opposition, the Highland Parties urge the court to deny HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have standing to bring them, directly or derivatively against the Proposed Defendants.  They argue, in the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims trading in the bankruptcy which occurred between sophisticated Claims Purchasers and sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional counsel.  Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the Claimant Trust were injured by the claims trading at issue because the Purchased Claims had already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the Plan on account of the Purchased Claims remain the same, the only difference being who holds the claims.  Moreover, even if HMIT could succeed in equitably subordinating the validly transferred ***allowed*** claims, HMIT would still be in the same position it is today:  the holder of a

---

[127] Bankr. Dkt. Nos. 3783.  Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint.  As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan. The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6). They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H.  HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132] Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT.  As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

    *I.   Litigation within the Litigation:  The Pre- June 8 Hearing Skirmishes*

    Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing.  HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice).  When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

    Next, there were multiple pleadings and hearings regarding ***what kind of hearing*** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134]  The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims.  HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim.  Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low.  Evidence is not allowed. . . .
[S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading –
in this case, the complaint, or now the revised complaint."[135]  Counsel for the Proposed Defendants
argued that the standard of review for colorability here, in the specific context of the court
exercising its gatekeeping function under the Plan, is more akin to the standards applied under the
Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a
higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing
on the motion for leave; if the standard of review presents no greater hurdle to the movant than the
12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean
nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put
in place to prevent.[137]  On May 22, 2023, after receipt of post-hearing briefing on the issue, the
court entered an order stating that "the court has determined that there may be mixed questions of
fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to
present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to
Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively
for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126
(1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the
appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the
Confirmation Order], that the costs and distraction of this litigation are substantial.  And if all we're doing is replicating
a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the
burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the
confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance
approval were meant to 'screen and prevent bad-faith litigation.'  Well that – if that means only what the Plaintiff[ ]
say[s] it does, then it really doesn't do anything at all to screen.  There's no gatekeeping because their version of what
that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion.  On May 26, 2023, this court held yet another status conference.  Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing.  The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour.  The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony).  Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits.  The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness).  The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have **standing** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "**colorable**."  But prior to getting into the weeds on **standing** and "**colorability,**" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of **improper** claims trading.

### A.    *Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?*

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.  Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive."  Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM.  Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*?  The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.]  Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.]  . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies.  In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140]  Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading:  The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141]  On the flipside, "[c]aims trading permits an entrance to the bankruptcy process for those investors who want to take the time and effort to monitor the debtor and contribute expertise to the reorganization process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions whatsoever regarding claims trading. The only thing resembling any regulation of claims trading during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current version of which went into effect in 1991—and it imposes extremely light regulation—if it could even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the transferee.  The transferor shall then be notified and given 21 days to object.  If there is an objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place. If there is no objection, nothing further needs to happen, and the transferee will be considered substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the opportunity to object is the ***transferor*** of the claim (presumably, in the situation of a dispute regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms").

by the alleged transferor).  Third, the ***economic consideration paid need not be disclosed to the court or anyone***.  Fourth, there is no requirement or definition of timeliness.  Finally, it explicitly does not apply with regard to publicly traded debt.  This, alone, means that many claims trades are not even reported in a bankruptcy case.  But it is not just publicly traded debt that will not be reflected with a Rule 3001(e) filing.  For example, bank debt, in modern times, is often syndicated (i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as the syndicated interests (participations) change hands, and they frequently do, there typically will not be a Rule 3001(e) notice filed.[143]  To be clear here, this syndication-of-bank-debt fact, along with the fact that there are financial products whereby bank debt might be carved up into economic interests separate and apart from legal title to the loan, means there are many situations in which trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed by the bankruptcy court. This is the world of modern bankruptcy.  Most of the claims trading that gets reported through a Rule 3001(e) notice is the trading of small vendor claims. And this is all regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a bankruptcy context.  Perhaps this is not surprising, since it is not prohibited and ***is mostly a matter of private contract between buyer and seller***.  The case law that does exist seems to arise in situations of perceived bad faith of a purchaser—for example, when there was an attempt to control voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991.  Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade.  Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as disallowing votes on a plan or even equitable subordination of a claim).[145]  Another type of case that has generated case law is where the purchaser of claims occupied a fiduciary status with the debtor.[146]  Still another type of case that has generated case law is where there is an attempt to cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading in different contexts.  Most of them imposed no adverse consequences on claims traders:  *In re Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for $16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2) notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of equitable subordination to the claim, stating:  "Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the Seventh Circuit further stated that it could "put to one side whether the court's finding of inequitable conduct was correct" because even if there was misconduct, it did not harm the other creditors, who were in the same position whether the original creditor or Garlin happened to own the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes of a claims purchaser who purchased to get a blocking position on a plan).  *But see In re First Humanics Corp.,* 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.,* 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147] *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated, Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the **transferor**; where there is no objection by the **transferor**, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading.  At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148] But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there **seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter**. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds.  No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery.  The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value.  And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.*, 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts.  *Contrast In re Lothian Oil Inc.*, 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may **recharacterize** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything. Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed. Second, the case at bar is unique in that the claims traded here **had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case**. Thus, the amounts that would be paid on them were "locked in," so to speak. There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan). Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] **This was post-confirmation, pre-effective date claims purchasing.** Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser. The rules of the road had been set. The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery). Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.] These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

were almost like passive investments, at this point—there was no risk of a claim objection and there was a confirmed plan, with a lengthy disclosure statement that described not only plan payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.      Breach of Fiduciary Duties (Seery)

II.     Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.    Conspiracy (all Proposed Defendants)

IV.     Equitable Disallowance (Claims Purchasers)

V.      Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.     Declaratory Judgment (all Proposed Defendants)

***The court struggles to fathom how any of these proposed causes of action or remedies can be applied in the context of:  (a) post-confirmation claims trading; (b) where the claims have all been litigated and allowed***.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom the following hypotheticals in which claims trading during a bankruptcy case might be somehow actionable:

**Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto. There would then be a contested hearing between purchaser and seller regarding the validity of the transfer with the bankruptcy court issuing an appropriate order after the hearing on the objection. ***As noted, there was no objection to the Rule 3001(e) notices here***.

**Hypothetical #2:** Alternatively, there could be a breach of contract suit between purchaser and seller if one thinks the other breached the purchase-sale agreement somehow.  Perhaps torts might also be alleged in such litigation. ***As noted, there is no dispute between purchasers and sellers here.***

**Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." *As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow. The time elapsed long ago to seek revocation of the Plan.*

**Hypothetical #4:** As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith"). *Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.*

**Hypothetical #5:** As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate **claims** to **other claims**. *See* Section 510(c) of the Bankruptcy Code. But here**,** HMIT is seeking either: (a) equitable subordination of the **claims** of the Claims Purchaser to HMIT's **Class 10 former equity interest** (in contravention of the explicit terms of section 510(c)) or, (b) **equitable disallowance** of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:** Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate **entered without a contest** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). Here there was most definitely "a contest" with regard to all of these purchased claims. *Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

**Hypothetical #7:** If a party believes "insider trading" occurred there are governmental agencies that investigate and police that. *Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview. Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing.*

**Hypothetical #8:** The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee. While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this***.

B. *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law? Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

1. **The Different Types of Standing:  Constitutional Versus Prudential**

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows:  a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153]  "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152] Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing.  In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence.  The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159]  In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160]  The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials.  After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff/mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161]  Thus, the district court's error was ***not*** in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's/mother's amended complaints.[162]  The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?"  As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing.  "Not one of our precedents holds that the inquiry is jurisdictional."  It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities.  In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304.  The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing.  As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy *appellate* standing originated in a statute in the Bankruptcy Act.  The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165]  The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166]  In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up).  The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited.*" *Id.* (cleaned up).

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark*[167] opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying— or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up). The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

standing requirement embodied in the 'person aggrieved' test."[172]  The district court noted that it

had an "independent obligation to consider constitutional standing before reaching its prudential

aspects."[173]  The district court dismissed the appeal as to Dugaboy and HCMFA for lack of

standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on

the merits.  The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did

not contest the district court's determination that NexPoint had standing to pursue the appeal, it

"may consider prudential standing issues *sua sponte*."[175]  In doing so, the Fifth Circuit recognized

the distinction between constitutional standing and the prudential "person aggrieved" test applied

to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard

than traditional constitutional standing," as it requires an appellant to show that it is "directly,

adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed

Claims, this court must ***first*** determine whether HMIT would have constitutional standing under

Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then ***additionally***

address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any

applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might

***limit*** who may sue.  Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).  The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied only in the context of bankruptcy *appellate* matters.[178]  As noted in its most recent opinion discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated that the "person aggrieved" test is a test for bankruptcy *appellate* standing, which is narrower than a party in interest's right to be heard in bankruptcy cases in general.[179]  The court rejected an argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter" confers *appellate* standing, noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for bankruptcy appellate standing is narrower than the test for determining one's standing to appear and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional standing to bring the Proposed Claims.

2.  <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional standing is necessary for a court to exercise subject matter jurisdiction.  It is only the first hurdle a party must clear before pursuing a claim in federal court.  HMIT, as  plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing.  The court is not being critical of this mistake.  As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing.  Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer *appellate* standing.")(emphasis added).

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

<u>Concrete and Particularized; Actual or Imminent</u>.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.

[182] *Lujan*, 504 U.S. at 560 (cleaned up).

[183] *Spokeo*, 578 U.S. at 339.

[184] *Id.* at 340.

[185] *Id.*

[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

      <u>Traceability - Causal Connection</u>.  As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188]  The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

      <u>Redressability</u>.  The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190]  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191]  "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

      The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here.  What is HMIT's concrete and particularized injury—that is "real" and is not abstract?  That is not conjectural or hypothetical?  That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest.  HMIT alleges the following injury:  it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194]  Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave.  It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation.  In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee).  The CTA now further governs his compensation.  The CTA, which was publicly filed *in advance of* the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law.  Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court. The issue cannot be forfeited or waived by a party.  *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.  Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered. HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a "success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the CTOB in setting the success fee and severance and the like.   A fully executed copy of the CTA was admitted into evidence at the June 8 Hearing.   HMIT is essentially arguing that its injury (i.e., diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a court-sanctioned and creditor-approved process for approving compensation to Seery.   Moreover, HMIT has failed to plead facts sufficient to show that, even if Seery received excessive compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust Interest will ever vest.   The district court and the Fifth Circuit in various appeals by Dugaboy, another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing based on the *speculative nature of its alleged injuries as a contingent beneficiary of the Claimant Trust under the Plan*.   For example, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]   The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."   The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional standing "because they have not identified any injury fairly traceable to the Order: ***the injuries identified are speculative at best and nonexistent at worst***."[196]  HMIT's allegations of injury are, without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future injury if its Contingent Claimant Trust Interest ever vests."[197]  The court finds that HMIT would not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing—whether HMIT could show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only a speculative injury.  Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing—whether HMIT can show "redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curiam*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is . . . a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of *equitable subordination* of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), *claims cannot be subordinated to interests*. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that *equitable disallowance* of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization" of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. *Thus, it would appear*

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to*

*section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

3. <u>HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims</u>.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if HMIT would lack prudential standing to bring them under applicable state or federal law.  HMIT argues that it does have prudential standing under both federal bankruptcy law and Delaware law to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to:  (a) Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b) *Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case addressing when a creditors committee may be granted standing to bring causes of action on behalf of a bankruptcy estate.  But, federal bankruptcy law does not confer standing *where the plaintiff otherwise lacks standing under applicable state law*. In other words, whether HMIT would have prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum. Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring a derivative action under the substantive law of Delaware.  Additionally, HMIT's reliance on *LWE* is misplaced: *LWE* permits creditors, in certain circumstances *during* a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).
[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue, derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former bankruptcy estate's assets.  Upon confirmation of the Plan, the bankruptcy estate of Highland ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE* did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue of prudential standing and does not supersede state-law requirements for standing.  In *LWE*, before addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors' committee in that case could assert its claims under Louisiana law.[205]  The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions."[206]  So, even under *LWE* (which the court does not think applies in this post-confirmation context), if HMIT would be barred from bringing a derivative action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops there.[207]  Thus, the court looks to Delaware law to determine if HMIT would have prudential standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

Trust."[212]  The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary:  that it *is* currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint.  The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213]  HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan); [215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212]*In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).  HMIT acknowledges this requirement in its Reply:  "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ." HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an **unvested** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law. HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216] The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple. The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA. It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee. Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

> b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.*[218]  To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership. HMIT **was** a limited partner in the original debtor (specifically, a holder of Class B/C Limited Partnership interests in Highland), but that limited partnership interest was extinguished on August 11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any partnership interest in the newly created Reorganized Debtor limited partnership.[220]  Because HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221]  HMIT likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t] standing to continue a derivative suit" on behalf of the Debtor.[222]  Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing. A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224] Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant Trust,[225] it also would lack standing to bring a double derivative action.

c)  Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As **Direct** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself, individually.[226]  But just because HMIT asserts that some or even all of the Proposed Claims are direct, not derivative claims, does not make it so:  "a claim is not 'direct' simply because it is pleaded that way."[227]  Rather, in determining whether claims are direct or derivative, a court must "look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization."[228]  And, under Delaware law, "whether a claim is solely derivative or

---

*SkyPort Global Commc'n's, Inc.)*, 2011 WL 111427, at \*25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Schmermerhorn*, 2011 WL 111427, at \*26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at \*7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Simon Enters., Inc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn ***solely*** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229]  "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230]  Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought:  "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231]  "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury.  It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, ***since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims***.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

   d)  Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso*, 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").
[234] *See supra* note 23 and accompanying text.

standing. Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

### C. *Are the Proposed Claims "Colorable"?*

1. <u>What is the Proper Standard of Review for a "Colorability" Determination?</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims—assuming HMIT somehow has standing—might be "colorable." This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss. In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation."  In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose.  The court would not require it.  It was up to the parties.  But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point.  HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238]  HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).

[237] Bankr. Dkt. Nos. 3815 and 3816.

[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running objection to the evidentiary format of the hearing).[239]

In determining what appropriate legal standard applies here in the "colorability" analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant.  In determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support for it, and made specific findings relating to Dondero's post-petition litigation and the need for inclusion of the Gatekeeper Provision in the Plan.[240]  This court observed that "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor."[241]  This court further found that: (1) Dondero's post-petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper Provision in place, "Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78.  *See supra* note 12.

costs and distraction such litigation or the threats of such litigation would cause,"[243] and, (3)

"unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant

Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will

present unacceptable risks to parties currently willing to serve in such roles." Thus, as set forth in

the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were

approved based on the same concerns regarding the threat of continued litigation by Dondero and

his related entities) required Dondero and related entities to make a threshold showing of

colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton
> Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881). The Gatekeeper Provision is
> also consistent with the notion of a prefiling injunction to deter vexatious litigants,
> that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon
> Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811
> (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan

injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland

Capital, its successors, and other bankruptcy participants that could disrupt the Plan's

effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the

purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] Asd noted at ¶ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so *without an exclusion for claims asserted by Mr. Dondero and his affiliates* required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

how "colorability" should work here.  It seems that applying HMIT's proposed Rule 12(b)(6)

"plausibility" standard would impose no hurdle at all to litigants and would render the threshold

for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of

the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6)

standard are inapposite.  HMIT has cited no authority that addresses the appropriate standard for

assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically,

one implemented in response to a demonstrated need to screen and prevent continued bad-faith,

harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of

a plan, which is what we have here.  HMIT relies on a bevy of cases that include benefits coverage

disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of

which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the

court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long

recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example,

that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002)
(assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered
a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid
Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods.
(In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted
class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson
v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was
"colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at
*3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional
defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3
(S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing
whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare
coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same);
*Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a
"colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842,
844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is "sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties. One example is *In re VistaCare Group, LLC*.[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252] To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

requirements of Rule 8."[253]  "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255]  The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation.  The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257]  The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)).  The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).  Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee.  Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss.  It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*.  Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave.  For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test."  The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2.  <u>HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.</u>

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties.  HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment.  But, even under the less stringent

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

> a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266] HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

of the Claimant Trust or Reorganized Debtor.  But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable").  HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill.  At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he *believed* that Seery *must have* communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims).  Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense."  Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction.  Dondero only

---

[270] Proposed Complaint  ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.

[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI. But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts. Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272] The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." But, the evidence showed that this information was widely reported in the financial press at the time. Thus, it could not have constituted MNPI as a matter of law.[273] Moreover, the evidence showed that Dondero *did not* communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser). Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing. In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive" and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence at the June 8 Hearing reflected that the allegations are completely speculative, without any foundation whatsoever, and lack merit. And they are also simply not plausible. HMIT fails to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

b) HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and, along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed Complaint.[277] Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is also governed by Delaware law.[278] HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]lthough the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]  In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.  Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281]  "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]  While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo*," and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] **must have** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287]  Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288] HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289]  Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a *sufficient* potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any significant* profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert.  Thus, the court only allowed Dondero to testify as to what data *he* (or entities he controls or controlled) would rely on, what *his* risk tolerance would have been, and what level of potential profits *he* would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit.  Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "***impossible*** for Stonehill and Farallon (in the absence of insider information) to forecast ***any*** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290]    HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence.  HMIT's allegations in the Proposed Complaint that ***Farallon*** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months ***after*** the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]   In addition, there are no allegations in the Proposed Complaint regarding

whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT

had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring

the Purchased Claims.[292]   The court finds and concludes that HMIT's allegations of aiding and

abetting and conspiracy in Counts II and III of the Proposed Complaint are based on

unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with

verifiable public facts.   Accordingly, HMIT has failed to show that these claims have a foundation

and merit and has also failed to show that they are plausible.

> c) HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V
> (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the
> Proposed Complaint

> i. Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims

acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent

over and above their initial investment," and, in the alternative, equitable subordination of their

claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust

Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims

based on material non-public information" and being "unfairly advantaged" in "earning significant

profits on their purchases."[293]   As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and

interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

subordination of a ***claim to other claims*** or an ***interest to other interests*** but does not permit equitable subordination of a ***claim to interests***.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following ***a contest*** (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case." But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure. HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements. Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

　　ii.　　Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;" thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).
[296] Proposed Complaint ¶¶ 89-93.

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  **Yet Seery's compensation is governed by express agreements** (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

    iii.    Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]  But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]  This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.  This court has also found and concluded that all of the Proposed Claims are without foundation or merit and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.  Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

> d)  HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.  But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.  And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

3. <u>HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness</u>.

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose.  Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings.  So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV.    CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons:  (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose.  Moreover,

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6) "plausibility" standard, the Proposed Claims are not plausible.

Accordingly,

**IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

**###End of Memorandum Opinion and Order###**

# Exhibit 2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 25, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| Reorganized Debtor. | § | |

### MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
### [BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

---

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities.  Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation.  The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3]  The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein.  The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

A.    Who is the Movant, HMIT?

Who is HMIT?  It is undisputed that it is a former equity owner of Highland.  It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement.  This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest.  As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022). The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions."  In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

HMIT's only asset is its contingent interest in the Claimant Trust. It has no employees or revenue. HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero ("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees. HMIT vehemently disputes the suggestion that it is controlled by Dondero.

### B. *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and (2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later further explained), the claims acquired by the Claims Purchasers were acquired by them after extensive litigation, mediation, and settlements were approved by the bankruptcy court and after the original claims-holders had voted on the Plan and after Plan confirmation. As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave. Nearly a month later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that "[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action." Supplement, ¶ 1 and Exhibit 1-A. It is this revised proposed complaint to which this court will refer, when it uses the defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5, 2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto.  In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

       *C.*     *Why Does HMIT Need to Seek Leave?*

As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7]   The Gatekeeper Provision was not included in the Plan *sans raison*.  Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

D.    *Some Further Context Regarding Post-Confirmation Litigation Generally.*

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls.   To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan.   Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.   Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023:  six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery") in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place" after not achieving the results he wanted in the Highland bankruptcy case.  Indeed, the Motion for Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers) through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202").  In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting that the list is "a summary of active pending actions only and does not include actions that were resolved by final orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, *three* of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the lack of bankruptcy appellate standing on behalf of the appellant.  On July 19, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023).  On July 31, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the same basis:  Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023).  The July 31, 2023 ruling followed the Fifth Circuit's ruling on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320 (5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided

one or more of the Claims Purchasers with material nonpublic information to induce them to want

to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that

the Claims Purchasers were allegedly told they would make a hefty profit on the claims they

purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as

the Claimant Trustee of the Claimant Trust.  In sum, HMIT alleges this constituted wrongful

"insider trading" of the bankruptcy claims.  In addition, certain lawyers for Dondero and Dugaboy

sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities

Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise

of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether

HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are

"colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of

the Plan).  The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June

8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses

both in support of and in opposition to the Motion for Leave.  Having considered the Motion for

Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the

arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's

request for leave to pursue its Proposed Claims.  The court's reasoning is set forth below.

## II.     BACKGROUND

### A.  *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada").  It

operated as a global investment adviser that provided investment management and advisory

services and managed billions of dollars of assets, both directly and indirectly through numerous

affiliates.   Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%),

Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was

wholly owned by Dondero and was the only general partner of Highland (0.25%).  On October 16,

2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president,

and portfolio manager, and facing a myriad of massive, business litigation claims – many of which

had finally become or were about to be liquidated (after a decade or more of contentious litigation

in multiple fora all over the world—filed for relief under chapter 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The

bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December

2019.  The official committee of unsecured creditors (the "Committee") (and later, the United

States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over

and distrust of Dondero, his numerous conflicts of interest, and his history of alleged

mismanagement (and perhaps worse).

After many weeks under the specter of a possible appointment of a trustee, Highland and

the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance

settlement approved by this court on January 9, 2020.[11]  As a result of this settlement, Dondero

relinquished control of Highland and resigned his positions as officer or director of Highland and

its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020
[Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of
Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course*
[Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with
Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of
Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures
for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

chosen to lead Highland through its chapter 11 case:  Seery, John S. Dubel, and retired bankruptcy

judge Russell Nelms.  Given the Debtor's perceived culture of constant litigation while Dondero

was at the helm, it was purportedly not easy to get such highly qualified persons to serve as

independent board members.  At the hearing on the corporate governance settlement motion, the

court heard credible testimony that none of the Independent Directors would have taken on the

role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2)

indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere

negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation

against the Independent Directors without the bankruptcy court's prior authority.  The gatekeeper

provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind
> against any Independent Director, any Independent Director's agents, or any
> Independent Director's advisors relating in any way to the Independent Director's
> role as an independent director of Strand without the Court (i) first determining
> after notice that such claim or cause of action represents a colorable claim of willful
> misconduct or gross negligence against Independent Director, any Independent
> Director's agents, or any Independent Director's advisors and (ii) specifically
> authorizing such entity to bring such claim. The Court will have sole jurisdiction to
> adjudicate any such claim for which approval of the Court to commence or pursue
> has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation

and did so "subject at all times to the supervision, direction and authority of the Independent

Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors

determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to

"not cause any Related Entity to terminate any agreements with the Debtor."[15]  The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery acting in these roles.  The gatekeeper provision in the July 2020 Order was essentially the same as the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Seery, and (ii) specifically authorizing such entity to bring such claim.  The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

July 2020 Order, 3, ¶5.  Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization plans, none of which were embraced by the Committee or the Independent Directors.  When Dondero's plans failed to gain support, he and entities under his control engaged in substantial, costly, and time-consuming litigation for Highland.[17]   As the Fifth Circuit described the situation, after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr. Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr. Dkt. No. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt. No. 1808] on January 22, 2021.[20]  Highland had negotiated settlements with most of its major creditors following mediation and had amended its initially proposed plan to address the objections of most of its creditors, leaving only the objections of Dondero and entities under his control (the "Dondero Parties") at the time of the confirmation hearing,[21] which was held over two days in early February 2021.  The Plan is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created:  the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner).  Highland's various servicing agreements were vested in the Reorganized Debtor, which continues to manage collateralized loan obligation vehicles ("CLOs") and various other investments postconfirmation.  The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13.  The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("Disclosure Statement") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries.  The Claimant Trust

is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan

and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package

as the CEO of the Reorganized Debtor and the Claimant Trustee.  Following their acquisition of

their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members

of the CTOB.[23]  Seery's compensation included the same base salary that he was receiving as CEO

and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the

creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests

in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each

holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust

Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership

interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

B.  *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery,
    and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an
    Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His
    Compensation as Claimant Trustee Post-Confirmation*

1.  The December 17, 2020 MGM Email

Between Dondero's forced resignation from Highland in October 2020 and the

confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to

thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors

and the Committee.   In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

(the "MGM Email") that featured prominently in HMIT's Motion for Leave.  According to HMIT and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely by either Amazon or Apple.[25] At the time Dondero sent the MGM Email, Dondero sat on the board of directors of MGM, and the Debtor owned MGM stock directly.  The Debtor also managed and partially owned a couple of other entities that owned MGM stock and managed various CLOs that owned some MGM stock as well.  HMIT alleges now that Seery later misused and wrongfully disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in exchange for him providing this allegedly "insider" information that inspired them to purchase unsecured claims with an alleged expectation of future large profits).[26]  A timeline of events (in late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's departure from Highland, helps to put the email in full context:

- <u>October 16</u>: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- <u>November 24</u>: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- <u>November 24–27</u>: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- <u>November 30</u>: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- <u>December 3</u>: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- <u>December 10</u>: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- <u>December 16</u>: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- <u>December 17</u>: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero: "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:

> [The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

June 8 Hearing Transcript, 273:13-22.

The MGM Email had the subject line "Trading Restriction re MGM – material non public information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he received the MGM Email.  This was because, among other reasons, Dondero sent it ***after***: (i) unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of the disclosure statement; and (v) Highland's demand to collect on the demand notes for which Dondero and his entities were liable.[38]  Highland's Chapter 11 case was fast approaching the finish line.  Moreover, MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this.[39]  Still further, as of December 17, 2020 (the date Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct and indirect control of the Debtor to the Independent Board as part of the corporate  governance settlement[40]  and  having resigned from all roles at the Debtor and affiliates in October 2020.  Still further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in

Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail

was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. ***My purpose was to alert Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades***.

It is noteworthy that ***Dondero's labeling of the MGM Email (in the subject line) as a***

***communication containing "material non public information" did not make it so***.  In fact, it

appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for

Leave that the MGM Email did not disclose information to Seery that was not already made available

to the public at the time it was sent. Seery testified that he did not think the MGM Email contained

MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed

on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier

noted—"MGM was already on the restricted list at Highland Capital . . . before I got to

Highland."[42]  Indeed, MGM was ultimately purchased by Amazon after a sale process that had

been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9.  Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors of MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10.  He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . . MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months **before** certain of their claims—the UBS claims—were purchased).[44]  For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]  In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]  Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

them."[48]  Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email.  He did not "say anything about Amazon hitting the price."  He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them."  Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple.  When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically *did not* communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed.  For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt."  The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers."[50] (*Id*. Ex. 27.) The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022.

---

[50] Highland Ex. 27.
[51] Highland Ex. 28.
[52] Highland Ex. 29.
[53] Highland Ex. 30.

2.  <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery.  HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers.  Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations.  HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable. These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021). Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57] He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59] The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4. The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4. The court has placed in a table and numbered each line for ease of reference. The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63]   Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65]   Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66]   Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67]   Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69]  Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims.  Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure.   The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended petition, the responses, the record, applicable authorities and having conducted a hearing on the petition on June 1, 2022.[72]

3. <u>Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories</u>

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202 Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks after his telephone calls with Linn and Patel—was true and accurate.  In it, he swore under oath as to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero acknowledged, as well, that his sworn statement that he filed in support of an amended verified Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May 2022), described the same telephone conversation he had with Linn, and it did not mention MGM at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Seery's say-so because they had made so much money in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin[n] of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Seery had testified in court, it made no sense to me that Mr. Lin[n] would think that the claims were worth more than what Seery testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights. Accordingly, "I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee."[76] Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary beneficiary."[77]   Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.
[76] *Id.*, ¶¶ 3-4.
[77] *Id.*, Ex. A, 1-2.

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78]  The U.S. Trustee's office took no action.  Dondero made a second and third attempt to get the U.S. Trustee's office to conduct an investigation into the same allegations laid out in Draper's letter, this time in "follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later, on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina wrote "to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged conversation with Linn, this time in support of a Verified Rule 202 Petition *filed by HMIT* ("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout 2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same allegations of misconduct by Seery and Farallon.[80]   In this new sworn statement, Dondero describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and Linn and *mentions MGM* and Farallon's alleged optimism about the *expected sale of MGM*:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Seery because they had made significant profits when Seery told them to purchase other claims in the past. They also stated that they were particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed.  The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83]  But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland].  The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84]  HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85]  The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85]  June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

### C. *Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and (2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August 9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87] $23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88] $137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020 Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89] $80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

---

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90]<br><br>$125,000,000 in aggregate ($65,000,000 General | 8/9/2021<br>Bankr. Dkt. No. 2698 (Muck) and Bankr. Dkt. No. 2697 (Jessup) |

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91]   Dondero testified that it was **his** view that there was insufficient information in the public to justify the claims purchases.[92]   But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations.   In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93]   Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

---

[90] Bankr. Dkt. No. 2389.  The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases.  Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95]  Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside.  In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay *30 percent more* than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96]  Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill *as creditors*, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12.  The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See*, Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections.  The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation.  These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties.  The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the  Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents *a colorable claim of any kind*, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

The Plan defines Protected Parties as,

> collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities), (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number of persons than the persons protected under the January 2020 Order (addressing the Independent Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as CEO and CRO of the Debtor). But, at the same time, it is less restrictive than the gatekeeping provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful misconduct or gross negligence," effectively providing the protected parties under the prior orders with a limited immunity from claims of simple negligence or breach of contract that do not rise to the level of "willful misconduct or gross negligence," whereas the Gatekeeping Provision under the Plan does not act as a release or exculpation of the Protected Parties in any way because it does not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are "colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

Dondero and some of the entities under his control appealed[100] the Confirmation Order

directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and

injunction provisions, including the Gatekeeper Provision (collectively, the "Protection

Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge,

purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-

debtor discharges.  As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large

part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11

U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all

remaining grounds."[101]   The Fifth Circuit specifically found the "injunction and gatekeeping

provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that

"exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions

that the Protection Provisions were legal, necessary under the circumstances, and in the best

interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision

improperly extended to certain bankruptcy participants other than Highland, the Committee and

its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero]." *Id.* at 434-35.

[101] *See supra* note 4.  The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022.  The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')."  In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424.  No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's **exculpation provision**."[102]  The Fifth Circuit then remanded to the Bankruptcy Court

"for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted

that the protection provisions in the January and July 2020 Orders appointing the Independent

Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have

the effect of exculpating the Independent Directors and Seery in his executive capacities" such that

"[d]espite removal from the exculpation provision in the confirmation order, the Independent

Directors' agents, advisors, and employees, as well as Seery in his official capacities are all

exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the

Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant

with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent
> Directors, (iii) the Committee, and (iv) members of the Committee (in their official
> capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the

exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and

that no other changes would be required to conform the Plan and Confirmation Order to the Fifth

Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform,

arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing

the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded." *Id.*

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]   The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

E.   *HMIT's Motion for Leave*

HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.   On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]   The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding ***the post-confirmation, pre-Effective Date purchase of allowed unsecured claims***.   The Proposed Defendants would be:

> **Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case).  Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

> **Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case.  They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers").  The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021. Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases.  The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

> **John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

> **Highland,** as a nominal defendant.  HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

> **Claimant Trust**, as a nominal defendant.  HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

> **HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests).  HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

**Highland,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111]  The gist of the Proposed Complaint is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112]  HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased. HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants.  In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings.  As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months ***before*** certain of their claims—the UBS claims—were purchased).[113]  In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that:  (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest).  HMIT argues that Seery should be required to disgorge his compensation.  It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.  Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant

Trustee.  In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges

claims which are substantially more than 'colorable' based upon plausible allegations that the

Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent

stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or

abetting) breaches of fiduciary duty."[114]

F.  *Is HMIT Really Dondero by Another Name?*

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a

continuation of the harassing and bad-faith litigation by Dondero and his related entities that the

Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the

Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been

HMIT's administrator since August 2022.  Patrick asserts that he is not influenced or controlled

by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against

Seery and the Claims Purchasers.  However, the testimony elicited at the June 8 Hearing—the

hearing at which HMIT had the burden of showing the court that its Proposed Claims were

"colorable" such that it should be allowed to pursue them through the filing of the Proposed

Complaint—paints a different picture.  Somewhat tellingly, HMIT chose not to call Patrick—

allegedly HMIT's only representative and control person—as a witness in support of its Motion

for Leave.  Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3.  HMIT notes, in a footnote 6, that "Neither this Motion nor the
proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor
the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would
adversely impact innocent creditors.  Rather, the proposed Adversary Proceeding seeks to benefit all innocent
stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state court.[122]  HMIT's counsel argued that the point of this questioning was that "they're just trying to draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202 proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to the order as "an order denying **our second"** Rule 202 Petition.[124]  And, Dondero testified that his warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence. *Id.*, 58:14-15.

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own agenda in the bankruptcy case is not new. Rather, this has been part of Dondero's *modus operandi* since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued to lob objections and create obstacles to Highland's implementation of the Plan through entities he owns or controls. As noted above, the Fifth Circuit specifically upheld this court's finding in the Confirmation Order that Dondero owned or controlled the various entities that had objected to confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related appellants made similar protestations that they are not owned or controlled by Dondero and asked the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him."[126] Based on the totality of the evidence in this proceeding, the court finds that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving force behind HMIT's Motion for Leave and the Proposed Complaint. The Motion for Leave is just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.

[126] *Highland Capital*, 48 F.4th at 434-435.

G.  *Opposition to Motion for Leave:  Arguing No Standing and No "Colorable" Claims*

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint

opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127]  The Claims

Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on

May 11, 2023, as well.[128]  In the Joint Opposition, the Highland Parties urge the court to deny

HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have

standing to bring them, directly or derivatively against the Proposed Defendants.  They argue, in

the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue

the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is

used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims

trading in the bankruptcy which occurred between sophisticated Claims Purchasers and

sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional

counsel.  Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the

Claimant Trust were injured by the claims trading at issue because the Purchased Claims had

already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the

Plan on account of the Purchased Claims remain the same, the only difference being who holds

the claims.  Moreover, even if HMIT could succeed in equitably subordinating the validly

transferred ***allowed*** claims, HMIT would still be in the same position it is today:  the holder of a

---

[127] Bankr. Dkt. Nos. 3783.  Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint.  As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan. The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6). They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H. *HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave*

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132] Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT. As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

I.  *Litigation within the Litigation: The Pre- June 8 Hearing Skirmishes*

Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing. HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice). When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

Next, there were multiple pleadings and hearings regarding ***what kind of hearing*** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134] The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims. HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim. Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low. Evidence is not allowed. . . . [S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading – in this case, the complaint, or now the revised complaint."[135] Counsel for the Proposed Defendants argued that the standard of review for colorability here, in the specific context of the court exercising its gatekeeping function under the Plan, is more akin to the standards applied under the Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing on the motion for leave; if the standard of review presents no greater hurdle to the movant than the 12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put in place to prevent.[137] On May 22, 2023, after receipt of post-hearing briefing on the issue, the court entered an order stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126 (1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the Confirmation Order], that the costs and distraction of this litigation are substantial. And if all we're doing is replicating a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance approval were meant to 'screen and prevent bad-faith litigation.' Well that – if that means only what the Plaintiff[ ] say[s] it does, then it really doesn't do anything at all to screen. There's no gatekeeping because their version of what that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion. On May 26, 2023, this court held yet another status conference. Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing. The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour. The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony). Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits. The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness). The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have ***standing*** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "***colorable***."  But prior to getting into the weeds on ***standing*** and "***colorability,***" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of ***improper*** claims trading.

### A.    *Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?*

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.  Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive." Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM. Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*? The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.]  Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.]  . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies.  In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140]  Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading:  The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141] On the flipside, "[c]aims trading permits an entrance to the bankruptcy process for those investors who want to take the time and effort to monitor the debtor and contribute expertise to the reorganization process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions whatsoever regarding claims trading. The only thing resembling any regulation of claims trading during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current version of which went into effect in 1991—and it imposes extremely light regulation—if it could even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the transferee.  The transferor shall then be notified and given 21 days to object.  If there is an objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place. If there is no objection, nothing further needs to happen, and the transferee will be considered substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the opportunity to object is the **_transferor_** of the claim (presumably, in the situation of a dispute regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms").

by the alleged transferor). Third, the ***economic consideration paid need not be disclosed to the court or anyone***. Fourth, there is no requirement or definition of timeliness. Finally, it explicitly does not apply with regard to publicly traded debt. This, alone, means that many claims trades are not even reported in a bankruptcy case. But it is not just publicly traded debt that will not be reflected with a Rule 3001(e) filing. For example, bank debt, in modern times, is often syndicated (i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as the syndicated interests (participations) change hands, and they frequently do, there typically will not be a Rule 3001(e) notice filed.[143] To be clear here, this syndication-of-bank-debt fact, along with the fact that there are financial products whereby bank debt might be carved up into economic interests separate and apart from legal title to the loan, means there are many situations in which trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed by the bankruptcy court. This is the world of modern bankruptcy. Most of the claims trading that gets reported through a Rule 3001(e) notice is the trading of small vendor claims. And this is all regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a bankruptcy context. Perhaps this is not surprising, since it is not prohibited and ***is mostly a matter of private contract between buyer and seller***. The case law that does exist seems to arise in situations of perceived bad faith of a purchaser—for example, when there was an attempt to control voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991. Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade. Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as disallowing votes on a plan or even equitable subordination of a claim).[145]  Another type of case that has generated case law is where the purchaser of claims occupied a fiduciary status with the debtor.[146]  Still another type of case that has generated case law is where there is an attempt to cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading in different contexts.  Most of them imposed no adverse consequences on claims traders:  *In re Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for $16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2) notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of equitable subordination to the claim, stating:  "Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the Seventh Circuit further stated that it could "put to one side whether the court's finding of inequitable conduct was correct" because even if there was misconduct, it did not harm the other creditors, who were in the same position whether the original creditor or Garlin happened to own the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes of a claims purchaser who purchased to get a blocking position on a plan).  *But see In re First Humanics Corp.,* 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147]*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated, Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the *transferor*; where there is no objection by the *transferor*, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading.  At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148] But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there **seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter**. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds.  No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery.  The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value.  And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.,* 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts.  *Contrast In re Lothian Oil Inc.,* 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may **recharacterize** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything.  Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed.  Second, the case at bar is unique in that the claims traded here **had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case**.  Thus, the amounts that would be paid on them were "locked in," so to speak.  There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan).  Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] ***This was post-confirmation, pre-effective date claims purchasing.***  Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser.  The rules of the road had been set.  The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery).  Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.]  These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

were almost like passive investments, at this point—there was no risk of a claim objection and
there was a confirmed plan, with a lengthy disclosure statement that described not only plan
payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.      Breach of Fiduciary Duties (Seery)

II.     Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.    Conspiracy (all Proposed Defendants)

IV.     Equitable Disallowance (Claims Purchasers)

V.      Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.     Declaratory Judgment (all Proposed Defendants)

***The court struggles to fathom how any of these proposed causes of action or remedies
can be applied in the context of:  (a) post-confirmation claims trading; (b) where the claims
have all been litigated and allowed***.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom
the following hypotheticals in which claims trading during a bankruptcy case might be somehow
actionable:

**Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim
files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto.
There would then be a contested hearing between purchaser and seller regarding
the validity of the transfer with the bankruptcy court issuing an appropriate order
after the hearing on the objection. ***As noted, there was no objection to the Rule
3001(e) notices here***.

**Hypothetical #2:** Alternatively, there could be a breach of contract suit between
purchaser and seller if one thinks the other breached the purchase-sale agreement
somehow.  Perhaps torts might also be alleged in such litigation. ***As noted, there is
no dispute between purchasers and sellers here.***

**Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party
in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." *As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow. The time elapsed long ago to seek revocation of the Plan.*

**Hypothetical #4:**  As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith"). *Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.*

**Hypothetical #5:**  As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate *claims* to *other claims*. *See* Section 510(c) of the Bankruptcy Code. But here*,* HMIT is seeking either: (a) equitable subordination of the *claims* of the Claims Purchaser to HMIT's *Class 10 former equity interest* (in contravention of the explicit terms of section 510(c)) or, (b) *equitable disallowance* of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:**  Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders).  The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . .  according to the equities of the case.").  The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added).  Here there was most definitely "a contest" with regard to all of these purchased claims. *Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

**Hypothetical #7:**  If a party believes "insider trading" occurred there are governmental agencies that investigate and police that.  *Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview.  Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing*.

**Hypothetical #8:**  The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee.  While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this***.

B. *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law? Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

1.  The Different Types of Standing:  Constitutional Versus Prudential

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows:  a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153]  "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152] Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing.  In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence.  The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159]  In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160]  The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials.  After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff/mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161]  Thus, the district court's error was ***not*** in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's/mother's amended complaints.[162]  The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?"  As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing.  "Not one of our precedents holds that the inquiry is jurisdictional."  It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities.  In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304.  The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing.  As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy **appellate** standing originated in a statute in the Bankruptcy Act.  The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165]  The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166]  In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up).  The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited*." *Id.* (cleaned up).

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark*[167] opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying—or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up).  The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

standing requirement embodied in the 'person aggrieved' test."[172]  The district court noted that it had an "independent obligation to consider constitutional standing before reaching its prudential aspects."[173]  The district court dismissed the appeal as to Dugaboy and HCMFA for lack of standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on the merits.  The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did not contest the district court's determination that NexPoint had standing to pursue the appeal, it "may consider prudential standing issues *sua sponte*."[175]  In doing so, the Fifth Circuit recognized the distinction between constitutional standing and the prudential "person aggrieved" test applied to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard than traditional constitutional standing," as it requires an appellant to show that it is "directly, adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed Claims, this court must ***first*** determine whether HMIT would have constitutional standing under Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then ***additionally*** address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might ***limit*** who may sue.  Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).  The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied

only in the context of bankruptcy **appellate** matters.[178]   As noted in its most recent opinion

discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated

that the "person aggrieved" test is a test for bankruptcy **appellate** standing, which is narrower than

a party in interest's right to be heard in bankruptcy cases in general.[179]   The court rejected an

argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise

and may appear and be heard on any issue in a case under this chapter" confers **appellate** standing,

noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept

distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for

bankruptcy appellate standing is narrower than the test for determining one's standing to appear

and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional

standing to bring the Proposed Claims.

2.   <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional

standing is necessary for a court to exercise subject matter jurisdiction.   It is only the first hurdle a

party must clear before pursuing a claim in federal court.   HMIT, as  plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing.  The court is not being critical of this mistake.  As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing.  Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer **appellate** standing.")(emphasis added).

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

<u>Concrete and Particularized; Actual or Imminent</u>.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]   "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.

[182] *Lujan*, 504 U.S. at 560 (cleaned up).

[183] *Spokeo*, 578 U.S. at 339.

[184] *Id.* at 340.

[185] *Id.*

[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

    <u>Traceability - Causal Connection</u>.  As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188]  The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

    <u>Redressability</u>.  The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190]  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191]  "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

    The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here.  What is HMIT's concrete and particularized injury—that is "real" and is not abstract?  That is not conjectural or hypothetical?  That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest.  HMIT alleges the following injury:  it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194]  Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave.  It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation.  In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee).  The CTA now further governs his compensation.  The CTA, which was publicly filed **in advance of** the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law.  Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court.  The issue cannot be forfeited or waived by a party.  *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.  Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered.  HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective

Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a

"success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the

CTOB in setting the success fee and severance and the like.   A fully executed copy of the CTA

was admitted into evidence at the June 8 Hearing.   HMIT is essentially arguing that its injury (i.e.,

diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a

court-sanctioned and creditor-approved process for approving compensation to Seery.   Moreover,

HMIT has failed to plead facts sufficient to show that, even if Seery received excessive

compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust

Interest will ever vest.   The district court and the Fifth Circuit in various appeals by Dugaboy,

another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest

in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for

a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing

based on the ***speculative nature of its alleged injuries as a contingent beneficiary of the Claimant

Trust under the Plan***.   For example, the Fifth Circuit affirmed the district court's dismissal of an

appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity

subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]   The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."   The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional

standing "because they have not identified any injury fairly traceable to the Order: ***the injuries***

***identified are speculative at best and nonexistent at worst***."[196]  HMIT's allegations of injury are,

without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future

injury if its Contingent Claimant Trust Interest ever vests."[197]  The court finds that HMIT would

not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury

in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing—whether HMIT could

show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection

between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only

a speculative injury.  Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims

Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there

is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of

a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing—whether HMIT can show

"redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curiam*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is . . . a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of *equitable subordination* of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), *claims cannot be subordinated to interests*. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that *equitable disallowance* of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization" of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. ***Thus, it would appear***

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to*

*section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

   3.  <u>HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims</u>.

      Even if HMIT would have constitutional standing to bring the Proposed Claims in an

adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if

HMIT would lack prudential standing to bring them under applicable state or federal law.  HMIT

argues that it does have prudential standing under both federal bankruptcy law and Delaware law

to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual

capacity.

      With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to:  (a)

Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies

to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b)

*Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case

addressing when a creditors committee may be granted standing to bring causes of action on behalf

of a bankruptcy estate.  But, federal bankruptcy law does not confer standing ***where the plaintiff***

***otherwise lacks standing under applicable state law***. In other words, whether HMIT would have

prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum.

Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to

'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring

a derivative action under the substantive law of Delaware.  Additionally, HMIT's reliance on *LWE*

is misplaced: *LWE* permits creditors, in certain circumstances ***during*** a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).

[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue,
derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former
bankruptcy estate's assets.  Upon confirmation of the Plan, the bankruptcy estate of Highland
ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the
Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE*
did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue
of prudential standing and does not supersede state-law requirements for standing.  In *LWE*, before
addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a
bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy
analysis to determine "as a threshold issue" whether the creditors' committee in that case could
assert its claims under Louisiana law.[205]  The court specifically addressed whether the creditors'
committee could pursue a derivative action under Louisiana law and concluded that "there is no
bar in Louisiana law to actions brought by or in the name of a corporation against the directors and
officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana
law specifically recognizes such actions."[206]  So, even under *LWE* (which the court does not think
applies in this post-confirmation context), if HMIT would be barred from bringing a derivative
action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops
there.[207]  Thus, the court looks to Delaware law to determine if HMIT would have prudential
standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where
the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware
LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

Trust."[212]  The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary:  that it *is* currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint.  The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213]  HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan); [215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212]*In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).  HMIT acknowledges this requirement in its Reply:  "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ."  HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an **unvested** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law.  HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216]  The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple.  The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA.  It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee.  Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

     b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring
Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is

a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del.

C. § 17-101, *et seq.*[218]   To bring "a derivative action" on behalf of a limited partnership, "the

plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of

the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership.

HMIT ***was*** a limited partner in the original debtor (specifically, a holder of Class B/C Limited

Partnership interests in Highland), but that limited partnership interest was extinguished on August

11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any

partnership interest in the newly created Reorganized Debtor limited partnership.[220]   Because

HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the

action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221]   HMIT

likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited

partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t]

standing to continue a derivative suit" on behalf of the Debtor.[222]   Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims

purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing.

A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce

a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under

Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224]

Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant

Trust,[225] it also would lack standing to bring a double derivative action.

> c) Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As ***Direct*** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself,

individually.[226] But just because HMIT asserts that some or even all of the Proposed Claims are

direct, not derivative claims, does not make it so: "a claim is not 'direct' simply because it is

pleaded that way."[227] Rather, in determining whether claims are direct or derivative, a court must

"look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the

Plaintiffs' characterization."[228] And, under Delaware law, "whether a claim is solely derivative or

---

*SkyPort Global Commc'n's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Simon Enters., Inc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn **solely** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229]  "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230]  Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought:  "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231]  "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury.  It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, **since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims**.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

d)  Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso,* 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").
[234] *See supra* note 23 and accompanying text.

standing.  Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

### C.  Are the Proposed Claims "Colorable"?

#### 1.  What is the Proper Standard of Review for a "Colorability" Determination?

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims—assuming HMIT somehow has standing—might be "colorable."  This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss.  In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation." In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose. The court would not require it. It was up to the parties. But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point. HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238] HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).

[237] Bankr. Dkt. Nos. 3815 and 3816.

[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running

objection to the evidentiary format of the hearing).[239]

    In determining what appropriate legal standard applies here in the "colorability" analysis,

the context in which the Gatekeeper Provision of the Plan was approved seems very relevant.  In

determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of

the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support

for it, and made specific findings relating to Dondero's post-petition litigation and the need for

inclusion of the Gatekeeper Provision in the Plan.[240]   This court observed that "prior to the

commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the

Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in

some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero

Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and

time-consuming litigation for the Debtor."[241]   This court further found that: (1) Dondero's post-

petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal

and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan

proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper

Provision in place, "Dondero and his related entities will likely commence litigation against the

Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero

and his related entities after the Effective Date will impede efforts by the Claimant Trust to

monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78.  *See supra* note 12.

costs and distraction such litigation or the threats of such litigation would cause,"[243] and, (3) "unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will present unacceptable risks to parties currently willing to serve in such roles." Thus, as set forth in the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were approved based on the same concerns regarding the threat of continued litigation by Dondero and his related entities) required Dondero and related entities to make a threshold showing of colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll*, 850 F.3d 811 (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] As noted at ¶ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so **without an exclusion for claims asserted by Mr. Dondero and his affiliates** required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

how "colorability" should work here.  It seems that applying HMIT's proposed Rule 12(b)(6)

"plausibility" standard would impose no hurdle at all to litigants and would render the threshold

for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of

the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6)

standard are inapposite.  HMIT has cited no authority that addresses the appropriate standard for

assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically,

one implemented in response to a demonstrated need to screen and prevent continued bad-faith,

harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of

a plan, which is what we have here.  HMIT relies on a bevy of cases that include benefits coverage

disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of

which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the

court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long

recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example,

that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002)
(assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered
a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid
Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods.
(In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted
class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson
v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was
"colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at
*3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional
defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3
(S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing
whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare
coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same);
*Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a
"colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842,
844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is "sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties. One example is *In re VistaCare Group, LLC*.[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252] To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

requirements of Rule 8."[253]  "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255]  The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation.  The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257]  The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)).  The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).  Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee.  Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss.  It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*.  Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave.  For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test."  The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2.  HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties.  HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment.  But, even under the less stringent

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266]  HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

of the Claimant Trust or Reorganized Debtor.  But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable"). HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill.  At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he ***believed*** that Seery ***must have*** communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims).  Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense."  Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction.  Dondero only

---

[270] Proposed Complaint  ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.
[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI. But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts. Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272] The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." But, the evidence showed that this information was widely reported in the financial press at the time. Thus, it could not have constituted MNPI as a matter of law.[273] Moreover, the evidence showed that Dondero **did not** communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser). Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing. In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive" and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence at the June 8 Hearing reflected that the allegations are completely speculative, without any foundation whatsoever, and lack merit.  And they are also simply not plausible.  HMIT fails to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

> b) HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and, along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed Complaint.[277]  Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is also governed by Delaware law.[278]  HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]  In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.  Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281] "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]  While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo,*" and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] ***must have*** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287]  Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288] HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289]  Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a ***sufficient*** potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any* ***significant*** profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert.  Thus, the court only allowed Dondero to testify as to what data ***he*** (or entities he controls or controlled) would rely on, what ***his*** risk tolerance would have been, and what level of potential profits ***he*** would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit.  Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "**impossible** for Stonehill and Farallon (in the absence of insider information) to forecast **any** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290]  HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence.  HMIT's allegations in the Proposed Complaint that **Farallon** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months **after** the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]  In addition, there are no allegations in the Proposed Complaint regarding whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring the Purchased Claims.[292]  The court finds and concludes that HMIT's allegations of aiding and abetting and conspiracy in Counts II and III of the Proposed Complaint are based on unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with verifiable public facts.  Accordingly, HMIT has failed to show that these claims have a foundation and merit and has also failed to show that they are plausible.

c)  HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the Proposed Complaint

i.  Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent over and above their initial investment," and, in the alternative, equitable subordination of their claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims based on material non-public information" and being "unfairly advantaged" in "earning significant profits on their purchases."[293]  As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

subordination of a ***claim to other claims*** or an ***interest to other interests*** but does not permit equitable subordination of a ***claim to interests***.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following ***a contest*** (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case."  But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure.  HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements. Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

> ii.    Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;"  thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).
[296] Proposed Complaint ¶¶ 89-93.

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  *Yet Seery's compensation is governed by express agreements* (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

    iii.    Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]  But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]  This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.  This court has also found and concluded that all of the Proposed Claims are without foundation or merit and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.  Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

> d)  HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.  But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.  And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

3. HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness.

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose. Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings. So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV.    CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons: (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose. Moreover,

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6) "plausibility" standard, the Proposed Claims are not plausible.

Accordingly,

**IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

**###End of Memorandum Opinion and Order###**

# Exhibit 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2023**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | § |
|  | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
|  | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
|  | § |

### <u>ORDER DENYING APPLICATION FOR EXPEDITED HEARING [DE # 3700]</u>

This Order is issued in response to the *Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* ("Expedited Haring Request") [DE # 3700] filed by Hunter Mountain Investment Trust ("HMIT" or "Movant") on March 28, 2023, at 4:09 p.m. C.D.T.  The Expedited Hearing Request seeks a hearing within three days, or as soon thereafter as counsel can be heard, on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* ("Motion for Leave") which was filed on March 28, 2023, at 4:02 p.m. C.D.T.

1

The court has concluded that no emergency or other good cause exists, pursuant to Fed. R. Bankr. Proc. 9006, and the *Expedited Hearing Request* will be denied. The *Motion for Leave* will be set in the ordinary course (after 21 days' notice to affected parties)—i.e., after April 18, 2023.

The *Motion for Leave* is 37 pages in length and contains 350 pages of attachments.  It seeks leave from the bankruptcy court—pursuant to the bankruptcy court's "gatekeeping" role[1] under the confirmed Chapter 11 plan of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor")—to sue at least the following parties:  Muck Holdings, LLC ("Muck"); Jessup Holdings, LLC ("Jessup"); Farallon Capital Management, LLC ("Farallon"); Stonehill Capital Management, LLC ("Stonehill"); James P. Seery, Jr. ("Seery"); and John Doe Defendant Nos. 1-10 (collectively, the "Affected Parties").  The conduct that is described as a basis for the desired lawsuit is certain trading of unsecured claims that occurred in 2021 during the Highland bankruptcy case.[2] It appears that millions of dollars of damages are sought by Movant, who was formerly the largest indirect (ultimate) equity holder of Highland.  The legal theories (e.g., breaches of fiduciary duties; fraud; conspiracy; equitable disallowance) are novel in the bankruptcy claims trading context.  The bankruptcy court, pursuant to the Highland plan, will need to analyze whether such claims are "colorable" such that leave to sue should be granted.

The Affected Parties—and other parties in interest in the underlying bankruptcy case, for that matter—should be afforded a reasonable opportunity to respond to the *Motion for Leave*. While Movant, HMIT, has alleged that it may be facing a statute of limitations defense as to

---

[1] The bankruptcy court's "gatekeeping" role was recently affirmed by the Fifth Circuit in *In re Highland Capital Management, L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Notice of the claims trading was provided in filings in Highland bankruptcy case, as follows: Claim No. 23 (DE ## 2211, 2212, and 2215), Claim Nos. 190 and 191 (DE ## 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (DE # 2263), Claim No. 81 (DE # 2262), Claim No. 72 (DE # 2261).

some claims after April 16, 2023, it appears that Movant has known about the conduct underlying the desired lawsuit for well over a year, based on activity that has occurred in the bankruptcy court.  *See, e.g., Memorandum Opinion and Order Granting James Dondero's Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request, and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon Capital Management LLC* [DE # 22], in Adv. Proc. # 21-03051 (January 4, 2022).  Thus, the need for an emergency hearing is dubious. Accordingly

IT IS ORDERED that the Expedited Hearing Request is denied.

Counsel shall contact the Courtroom Deputy for a setting on the *Motion for Leave*, which setting shall be no sooner than April 19, 2023.

* * * END OF ORDER * * *

# Exhibit 4



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 10, 2023**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj |
| Reorganized Debtor. | |

## ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE
## WITH RESPECT TO HUNTER MOUNTAIN INVESTMENT TRUST'S
## EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
## <u>ADVERSARY PROCEEDING AS SUPPLEMENTED</u>

The Court conducted a status conference on April 24, 2023, concerning the final scheduling

of *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699] and

Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Docket No.

3760] (collectively, the "<u>Underlying Motion</u>"), as well as whether the hearing on the Underlying

Motion would be evidentiary, and the Court having considered (i) the *Opposed Emergency Motion*

---

*to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3738] (the "Motion")[1] filed by Highland Capital Management, L.P., and the Highland Claimant Trust; (ii) the *Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3740] filed by Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management, L.L.C., and Stonehill Capital Management LLC; (iii) the *Response and Reservation of Rights* [Docket No. 3748] filed by Hunter Mountain Investment Trust; (iv) the *Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"* [Docket No. 3758] filed by Hunter Mountain Investment Trust, and (v) the arguments of counsel,

**IT IS HEREBY ORDERED** that:

1.    The hearing on Hunter Mountain Investment Trust's *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699] and Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Docket No. 3760] (collectively, the "Underlying Motion") shall be held in person on **June 8, 2023, at 9:30 a.m. (Central Time)** before the Honorable Stacey G. C. Jernigan, at **1100 Commerce Street, 14th Floor, Courtroom 1, Dallas, Texas**, and by Webex for those interested but not directly participating in the hearing.

2.    Any responses to the Underlying Motion shall be filed no later than May 11, 2023.

3.    Any replies in support of the Underlying Motion shall be filed no later than May 18, 2023.

4.    The Court will advise the parties on or reasonably after May 18, 2023, whether the Court intends to conduct the hearing on an evidentiary basis.

**###End of Order###**

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

**ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE WITH RESPECT TO HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERARY PROCEEDING AS SUPPLEMENTED**
Page 2

Approved as Form Only:

Parsons McEntire McCleary PLLC

/s/ Sawnie A. McEntire_____
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

Pachulski Stang Ziehl & Jones LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

Hayward PLLC

/s/ Zachery Z. Annable_____
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)

---

**ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE WITH RESPECT TO HUNTER
MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
ADVERARY PROCEEDING AS SUPPLEMENTED**

10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P. and the
Highland Claimant Trust*

HOLLAND & KNIGHT LLP

/s/ *Christopher A. Bailey*
Brent R. McIlwain, TSB 24013140
David C. Schulte TSB 24037456
Christopher A. Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
Fax (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

*Counsel for Muck Holdings, LLC,
Jessup Holdings LLC, Farallon
Capital Management, L.L.C., and
Stonehill Capital Management LLC*

REED SMITH LLP

/s/ Omar J. Alaniz
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
oalaniz@reedsmith.com
lrobin@reedsmith.com

WILLKIE FARR & GALLAGHER LLP

Mark T. Stancil
Joshua S. Levy
1875 K Street, N.W.
Washington, DC 20006
T: 202.303.1000
mstancil@willkie.com
jlevy@willkie.com

*Counsel for James P. Seery, Jr.*

# Exhibit 5



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 22, 2023**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §  Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

**ORDER PERTAINING TO THE HEARING ON HUNTER MOUNTAIN INVESTMENT
TRUST'S MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING**

**[DE ## 3699 & 3760]**

Based on the court's review of all of the parties' pleadings and briefing relating to the
above-referenced motion and supplemental motion ("Motion for Leave"), the court has determined
that there may be mixed questions of fact and law implicated by the Motion for Leave—and, in
particular, pertaining to the court's required inquiry into whether "colorable" claims may exist, as
described in the Motion for Leave.  Therefore, the parties will be permitted to present evidence
(including witness testimony) at the June 8, 2023 hearing if they so choose.  This may include

1

examining any witness for whom a Declaration or Affidavit has already been filed.  The parties

will be allowed no more than three hours of presentation time each (allocated three hours to the

movant and three hours to the aggregate respondents).  This allocated presentation time may be

spent in whatever manner the parties believe will be useful to the court (argument/evidence).

**# # # END OF ORDER # # #**

United States Bankruptcy Court
Northern District of Texas

| | |
|---|---|
| In re: | Case No. 19-34054-sgj |
| Highland Capital Management, L.P. | Chapter 11 |
| Debtor | |

# CERTIFICATE OF NOTICE

| District/off: 0539-3 | User: admin | Page 1 of 21 |
|---|---|---|
| Date Rcvd: May 23, 2023 | Form ID: pdf012 | Total Noticed: 1 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on May 24, 2023:**

| Recip ID | Recipient Name and Address |
|---|---|
| aty | + Alan J. Kornfeld, Pachulski Stang Ziehl & Jones LLPL, 10100 Santa Monica Blvd., 13 Fl, Los Angeles, CA 90067-4114 |

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: May 24, 2023          Signature:          /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on May 22, 2023 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| A. Lee Hogewood, III | on behalf of Interested Party NexPoint Real Estate Strategies Fund lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| A. Lee Hogewood, III | on behalf of Defendant NexPoint Advisors  L.P. lee.hogewood@klgates.com, matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| A. Lee Hogewood, III | on behalf of Interested Party NexPoint Strategic Opportunities Fund lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| A. Lee Hogewood, III | on behalf of Interested Party Highland/iBoxx Senior Loan ETF lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E |

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice 05/23 Page 4 of 23 Page 231 of 678    PageID 237

District/off: 0539-3                          User: admin                          Page 2 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                       Total Noticed: 1

mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Merger Arbitrage Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party NexPoint Advisors  L.P. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Total Return Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Global Allocation Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Funds I and its series lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Opportunistic Credit Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant Highland Income Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Fixed Income Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant NexPoint Capital  Inc. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant NexPoint Strategic Opportunities Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Small-Cap Equity Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Socially Responsible Equity Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Funds II and its series lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party NexPoint Capital  Inc. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice 05/23 Page 5 of 23    Page 232 of 678    PageID 238
District/off: 0539-3                          User: admin                                    Page 3 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                                 Total Noticed: 1

|  |  |
|---|---|
|  | on behalf of Interested Party Highland Healthcare Opportunities Fund lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| A. Lee Hogewood, III | |
|  | on behalf of Interested Party Highland Income Fund lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| Alexandre J. Tschumi | |
|  | on behalf of Interested Party Litigation Trustee of the Highland Capital Management  L.P. Litigation Sub-Trust alexandretschumi@quinnemanuel.com |
| Alyssa Russell | |
|  | on behalf of Creditor Committee Official Committee of Unsecured Creditors alyssa.russell@sidley.com efilingnotice@sidley.com;alyssa-russell-3063@ecf.pacerpro.com |
| Amanda Rush | |
|  | on behalf of Interested Party CCS Medical  Inc. asrush@jonesday.com |
| Amy K. Anderson | |
|  | on behalf of Creditor Issuer Group aanderson@joneswalker.com lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com |
| Andrew Clubok | |
|  | on behalf of Plaintiff UBS AG London Branch andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Andrew Clubok | |
|  | on behalf of Plaintiff UBS Securities LLC andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Andrew Clubok | |
|  | on behalf of Interested Party UBS Securities LLC andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Andrew Clubok | |
|  | on behalf of Interested Party UBS AG London Branch andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Annmarie Antoniette Chiarello | |
|  | on behalf of Creditor Acis Capital Management  L.P. achiarello@winstead.com, dgalindo@winstead.com;kknight@winstead.com |
| Annmarie Antoniette Chiarello | |
|  | on behalf of Creditor Acis Capital Management GP  LLC achiarello@winstead.com, dgalindo@winstead.com;kknight@winstead.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Fixed Income Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Small-Cap Equity Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Defendant Highland Income Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party NexPoint Real Estate Strategies Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Funds II and its series artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party NexPoint Capital  Inc. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Socially Responsible Equity Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland/iBoxx Senior Loan ETF artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party NexPoint Strategic Opportunities Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Total Return Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |

Artoush Varshosaz

on behalf of Defendant NexPoint Strategic Opportunities Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party NexPoint Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Defendant NexPoint Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Defendant NexPoint Capital  Inc. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Healthcare Opportunities Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Income Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Funds I and its series artoush.varshosaz@klgates.com  Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Global Allocation Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Merger Arbitrage Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com

Asif Attarwala

on behalf of Interested Party UBS Securities LLC asif.attarwala@lw.com

Asif Attarwala

on behalf of Interested Party UBS AG London Branch asif.attarwala@lw.com

Basil A. Umari

on behalf of Interested Party Meta-e Discovery  LLC BUmari@dykema.com, pelliott@dykema.com

Bennett Rawicki

on behalf of Defendant Alvarez & Marsal CRF Management  LLC brawicki@gibsondunn.com

Bojan Guzina

on behalf of Creditor Committee Official Committee of Unsecured Creditors bguzina@sidley.com

Brant C. Martin

on behalf of Creditor NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC brant.martin@wickphillips.com samantha.tandy@wickphillips.com

Brent Ryan McIlwain

on behalf of Defendant Farallon Capital Management  L.L.C. brent.mcilwain@hklaw.com, robert.jones@hklaw.com;brian.smith@hklaw.com

Brent Ryan McIlwain

on behalf of Creditor Muck Holdings LLC brent.mcilwain@hklaw.com  robert.jones@hklaw.com;brian.smith@hklaw.com

Brian D. Glueckstein

on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Defendant Mark Okada gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party Mark Okada gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #2 gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party The Okada Insurance Rabbi Trust gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party Okada Family Foundation  Inc. gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #1 gluecksteinb@sullcrom.com

Brian J. Smith
on behalf of Defendant Farallon Capital Management L.L.C. brian.smith@hklaw.com, robert.jones@hklaw.com;brent.mcilwain@hklaw.com

Bryan C. Assink
on behalf of Defendant James D. Dondero bryan.assink@bondsellis.com

Bryan C. Assink
on behalf of Creditor The Dugaboy Investment Trust bryan.assink@bondsellis.com

Bryan C. Assink
on behalf of Plaintiff James Dondero bryan.assink@bondsellis.com

Cameron A. Fine
on behalf of Defendant Hunter Mountain Investment Trust cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Cross Defendant DUGABOY INVESTMENT TRUST AND NANCY DONDERO AS TRUSTEE OF DUGABOY INVESTMENT TRUST cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Cross-Claimant Hunter Mountain Investment Trust cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Defendant STRAND ADVISORS INC cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Defendant DUGABOY INVESTMENT TRUST AND NANCY DONDERO AS TRUSTEE OF DUGABOY INVESTMENT TRUST cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Defendant GET GOOD TRUST AND GRANT JAMES SCOTT III AS TRUSTEE OF GET GOOD TRUST cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Defendant James D. Dondero cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Cross-Claimant RAND PE FUND I LP, SERIES 1 cameron.fine@us.dlapiper.com

Cameron A. Fine
on behalf of Defendant RAND PE FUND I LP, SERIES 1 cameron.fine@us.dlapiper.com

Candice Marie Carson
on behalf of Plaintiff UBS Securities LLC Candice.Carson@butlersnow.com

Candice Marie Carson
on behalf of Interested Party UBS AG London Branch Candice.Carson@butlersnow.com

Candice Marie Carson
on behalf of Plaintiff UBS AG London Branch Candice.Carson@butlersnow.com

Candice Marie Carson
on behalf of Interested Party UBS Securities LLC Candice.Carson@butlersnow.com

Chad D. Timmons
on behalf of Creditor COLLIN COUNTY TAX ASSESSOR/COLLECTOR bankruptcy@abernathy-law.com

Charles Martin Persons, Jr.
on behalf of Creditor Committee Official Committee of Unsecured Creditors cpersons@sidley.com txefilingnotice@sidley.com;charles-persons-5722@ecf.pacerpro.com

Charles W. Gameros, Jr.
on behalf of Creditor HCRE Partners LLC (n/k/a NexPoint Real Estate Partners, LLC) bgameros@legaltexas.com, lmilam@legaltexas.com;jrauch@legaltexas.com;wcarvell@legaltexas.com

Charles W. Gameros, Jr.
on behalf of Creditor NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC bgameros@legaltexas.com lmilam@legaltexas.com;jrauch@legaltexas.com;wcarvell@legaltexas.com

Christopher Andrew Bailey
on behalf of Creditor Jessup Holdings LLC Christopher.Bailey@hklaw.com hapi@hklaw.com

Christopher Andrew Bailey
on behalf of Creditor Stonehill Capital Management LLC Christopher.Bailey@hklaw.com hapi@hklaw.com

Christopher Andrew Bailey
on behalf of Creditor Farallon Capital Management LLC Christopher.Bailey@hklaw.com, hapi@hklaw.com

Christopher Andrew Bailey
on behalf of Creditor Muck Holdings LLC Christopher.Bailey@hklaw.com hapi@hklaw.com

Christopher J. Akin

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice 05/23 Page Page 6 of 23 235 of 678    PageID 241

District/off: 0539-3                                        User: admin                                        Page 6 of 21
Date Rcvd: May 23, 2023                                    Form ID: pdf012                                    Total Noticed: 1

| Christopher J. Akin | on behalf of Defendant Isaac Leventon cakin@lynnllp.com  cbaker@lynnllp.com |
|---|---|
| | on behalf of Defendant Scott Ellington cakin@lynnllp.com  cbaker@lynnllp.com |
| Clay M. Taylor | on behalf of Interested Party James Dondero clay.taylor@bondsellis.com  linda.gordon@bondsellis.com |
| Clay M. Taylor | on behalf of Plaintiff James Dondero clay.taylor@bondsellis.com  linda.gordon@bondsellis.com |
| Cortney C. Thomas | on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #2 cort@brownfoxlaw.com korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 cort@brownfoxlaw.com korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Defendant Mark Okada cort@brownfoxlaw.com  korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Interested Party Okada Family Foundation  Inc. cort@brownfoxlaw.com, korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 cort@brownfoxlaw.com  korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Interested Party The Okada Insurance Rabbi Trust cort@brownfoxlaw.com  korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Interested Party Mark Okada cort@brownfoxlaw.com  korourke@brownfoxlaw.com |
| Cortney C. Thomas | on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #1 cort@brownfoxlaw.com korourke@brownfoxlaw.com |
| Daniel P. Winikka | on behalf of Interested Party Jack Yang dan@danwinlaw.com  dan@danwinlaw.com |
| Daniel P. Winikka | on behalf of Interested Party Brad Borud dan@danwinlaw.com  dan@danwinlaw.com |
| David G. Adams | on behalf of Creditor United States (IRS) david.g.adams@usdoj.gov  southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov |
| David Grant Crooks | on behalf of Creditor Committee Official Committee of Unsecured Creditors dcrooks@foxrothschild.com etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com |
| David Grant Crooks | on behalf of Creditor PensionDanmark Pensionsforsikringsaktieselskab dcrooks@foxrothschild.com etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com |
| David Grant Crooks | on behalf of Debtor Highland Capital Management  L.P. dcrooks@foxrothschild.com, etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com |
| Davor Rukavina | on behalf of Defendant NexPoint Advisors  L.P. drukavina@munsch.com |
| Davor Rukavina | on behalf of Interested Party Highland Healthcare Opportunities Fund drukavina@munsch.com |
| Davor Rukavina | on behalf of Interested Party NexPoint Real Estate Strategies Fund drukavina@munsch.com |
| Davor Rukavina | on behalf of Interested Party Highland Global Allocation Fund drukavina@munsch.com |
| Davor Rukavina | on behalf of Interested Party Highland Funds I and its series drukavina@munsch.com |
| Davor Rukavina | on behalf of Interested Party NexPoint Strategic Opportunities Fund drukavina@munsch.com |
| Davor Rukavina | on behalf of Interested Party Highland Merger Arbitrage Fund drukavina@munsch.com |

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice 05/23 Page 7 Page 236 of 678    PageID 242
District/off: 0539-3                                    User: admin                                    Page 7 of 21
Date Rcvd: May 23, 2023                                Form ID: pdf012                                Total Noticed: 1

Davor Rukavina

on behalf of Interested Party Highland Total Return Fund drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Socially Responsible Equity Fund drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party NexPoint Capital  Inc. drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. drukavina@munsch.com

Davor Rukavina

on behalf of Defendant NexPoint Strategic Opportunities Fund drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Small-Cap Equity Fund drukavina@munsch.com

Davor Rukavina

on behalf of Defendant Highland Income Fund drukavina@munsch.com

Davor Rukavina

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party NexPoint Advisors  L.P. drukavina@munsch.com

Davor Rukavina

on behalf of Defendant NexPoint Capital  Inc. drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Fixed Income Fund drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Opportunistic Credit Fund drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Income Fund drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland Funds II and its series drukavina@munsch.com

Davor Rukavina

on behalf of Interested Party Highland/iBoxx Senior Loan ETF drukavina@munsch.com

Deborah Rose Deitsch-Perez

on behalf of Defendant Nancy Dondero deborah.deitschperez@stinson.com
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant Highland Capital Management Services  Inc. deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Plaintiff Dugaboy Investment Trust deborah.deitschperez@stinson.com
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Plaintiff Hunter Mountain Investment Trust deborah.deitschperez@stinson.com
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant James Dondero deborah.deitschperez@stinson.com
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant NexPoint Advisors  L.P. deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant The Dugaboy Investment Trust deborah.deitschperez@stinson.com
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Creditor The Dugaboy Investment Trust deborah.deitschperez@stinson.com
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Witness Nancy Dondero deborah.deitschperez@stinson.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Page 8 of 237    Page 237 of 678    PageID 243

District/off: 0539-3                              User: admin                              Page 8 of 21
Date Rcvd: May 23, 2023                          Form ID: pdf012                          Total Noticed: 1

patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Interested Party Highland CLO Management Ltd deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Debra A Dandeneau

on behalf of Creditor Scott Ellington  Thomas Surgent, Frank Waterhouse, Isaac Leventon debra.dandeneau@bakermckenzie.com,
blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant Frank Waterhouse debra.dandeneau@bakermckenzie.com  blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant Isaac Leventon debra.dandeneau@bakermckenzie.com  blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Interested Party CPCM  LLC debra.dandeneau@bakermckenzie.com, blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant CPCM  LLC debra.dandeneau@bakermckenzie.com, blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant Scott Ellington debra.dandeneau@bakermckenzie.com  blaire.cahn@bakermckenzie.com

Dennis M. Twomey

on behalf of Creditor Committee Official Committee of Unsecured Creditors dtwomey@sidley.com

Donna K. Webb

on behalf of Creditor Pension Benefit Guaranty Corporation donna.webb@usdoj.gov
brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov

Douglas J. Schneller

on behalf of Creditor Contrarian Funds LLC douglas.schneller@rimonlaw.com

Douglas S. Draper

on behalf of Creditor The Get Good Non Exempt Trust No 2 ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Get Better Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Canis Minor Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Get Good Non Exempt Trust No 1 ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor The Dondero Insurance Rabbi Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Get Good Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Dana Scott Breault ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor SLHC Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Defendant The Dugaboy Investment Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Defendant The Get Good Nonexempt Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor The Dugaboy Investment Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-Emaged Certificate of Notice 05/15/23 Page Page 238 of 678   PageID 244

District/off: 0539-3                          User: admin                          Page 9 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                       Total Noticed: 1

Douglas S. Draper
 on behalf of Creditor Dolomiti LLC ddraper@hellerdraper.com
 dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Edmon L. Morton
 on behalf of Creditor Committee Official Committee of Unsecured Creditors emorton@ycst.com

Edward J. Leen
 on behalf of Creditor Jessup Holdings LLC eleen@mkbllp.com

Edwin Paul Keiffer
 on behalf of Creditor Beacon Mountain  LLC pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor Atlas IDF  GP, LLC pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor Rand PE Fund Management  LLC pkeiffer@romclaw.com,
 bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Defendant Hunter Mountain Investment Trust pkeiffer@romclaw.com
 bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor Atlas IDF  LP pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor Hunter Mountain Investment Trust pkeiffer@romclaw.com
 bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor Rand PE Fund I  LP pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor John Honis pkeiffer@romclaw.com  bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Interested Party Hunter Mountain Trust pkeiffer@romclaw.com  bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
 on behalf of Creditor Rand Advisors  LLC pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Elizabeth Weller
 on behalf of Creditor Fannin CAD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Grayson County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Dallas County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Coleman County TAD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Allen ISD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Irving ISD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Tarrant County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Rockwall CAD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Kaufman County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
 on behalf of Creditor Upshur County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Eric A. Soderlund
 on behalf of Interested Party CPCM  LLC eric.soderlund@rsbfirm.com

Eric A. Soderlund
 on behalf of Interested Party Former Employees eric.soderlund@rsbfirm.com

Eric A. Soderlund
 on behalf of Creditor Scott Ellington  Thomas Surgent, Frank Waterhouse, Isaac Leventon eric.soderlund@rsbfirm.com

Eric A. Soderlund

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice    Page 12 of 239    Page 239 of 678    PageID 245
District/off: 0539-3                                    User: admin                                    Page 10 of 21
Date Rcvd: May 23, 2023                                 Form ID: pdf012                                Total Noticed: 1

on behalf of Creditor Frank Waterhouse  Scott B. Ellington, Isaac Leventon, Jean Paul Sevilla, Hunter Covitz and Thomas Surgent eric.soderlund@rsbfirm.com

Eric Thomas Haitz

on behalf of Defendant Alvarez & Marsal CRF Management  LLC ehaitz@gibsondunn.com, skoller@gibsondunn.com

Frances Anne Smith

on behalf of Interested Party CPCM  LLC frances.smith@rsbfirm.com, michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Plaintiff Scott Byron Ellington frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Creditor Frank Waterhouse frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Interested Party Former Employees frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Interested Party Matthew DiOrio  Scott Ellington, Isaac Leventon, Mary Kathryn Lucas (nee Irving), John Paul Sevilla, Stephanie Vitiello, and Frank Waterhouse frances.smith@rsbfirm.com, michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Creditor Scott Ellington frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Creditor Scott Ellington  Thomas Surgent, Frank Waterhouse, Isaac Leventon frances.smith@rsbfirm.com, michael.coulombe@rsbfirm.com

Gregory Getty Hesse

on behalf of Spec. Counsel Hunton Andrews Kurth LLP ghesse@huntonak.com kkirk@huntonak.com;tcanada@HuntonAK.com;creeves@HuntonAK.com

Gregory V. Demo

on behalf of Creditor Committee Official Committee of Unsecured Creditors gdemo@pszjlaw.com jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Gregory V. Demo

on behalf of Defendant Highland Capital Management  LP gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Gregory V. Demo

on behalf of Debtor Highland Capital Management  L.P. gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Gregory V. Demo

on behalf of Defendant Highland Capital Management  L.P. gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Greta M. Brouphy

on behalf of Creditor The Dugaboy Investment Trust gbrouphy@hellerdraper.com dhepting@hellerdraper.com;vgamble@hellerdraper.com

Greta M. Brouphy

on behalf of Defendant The Dugaboy Investment Trust gbrouphy@hellerdraper.com dhepting@hellerdraper.com;vgamble@hellerdraper.com

Greta M. Brouphy

on behalf of Creditor Get Good Trust gbrouphy@hellerdraper.com  dhepting@hellerdraper.com;vgamble@hellerdraper.com

Hayley R. Winograd

on behalf of Defendant Highland Capital Management  LP hwinograd@pszjlaw.com

Hayley R. Winograd

on behalf of Defendant Highland Capital Management  L.P. hwinograd@pszjlaw.com

Hayley R. Winograd

on behalf of Debtor Highland Capital Management  L.P. hwinograd@pszjlaw.com

Holland N. O'Neil

on behalf of Spec. Counsel Foley Gardere  Foley & Lardner LLP honeil@foley.com, jcharrison@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com

J. Seth Moore

on behalf of Creditor Siepe  LLC smoore@condontobin.com, jsteele@condontobin.com

Jaclyn C. Weissgerber

on behalf of Creditor Committee Official Committee of Unsecured Creditors bankfilings@ycst.com  jweissgerber@ycst.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice 5/18/23    Page 11 of 21    Page 240 of 678    PageID 246
District/off: 0539-3                                    User: admin                                    Page 11 of 21
Date Rcvd: May 23, 2023                            Form ID: pdf012                            Total Noticed: 1

Jason Bernstein
on behalf of Creditor BHH Equities LLC casey.doherty@dentons.com
dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com

Jason Bernstein
on behalf of Interested Party Jefferies LLC casey.doherty@dentons.com
dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com

Jason Alexander Enright
on behalf of Creditor Acis Capital Management  L.P. jenright@winstead.com

Jason Alexander Enright
on behalf of Creditor Acis Capital Management GP  LLC jenright@winstead.com

Jason Michael Hopkins
on behalf of Interested Party James Dondero jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Defendant James D. Dondero jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Defendant DUGABOY INVESTMENT TRUST AND NANCY DONDERO  AS TRUSTEE OF DUGABOY
INVESTMENT TRUST jason.hopkins@dlapiper.com, jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Creditor The Dugaboy Investment Trust jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Defendant RAND PE FUND I  LP, SERIES 1 jason.hopkins@dlapiper.com,
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Creditor Strand Advisors  Inc. jason.hopkins@dlapiper.com,
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Defendant GET GOOD TRUST AND GRANT JAMES SCOTT III  AS TRUSTEE OF GET GOOD TRUST
jason.hopkins@dlapiper.com, jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Creditor Get Good Trust jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Defendant STRAND ADVISORS  INC jason.hopkins@dlapiper.com,
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
on behalf of Defendant Hunter Mountain Investment Trust jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Patrick Kathman
on behalf of Creditor Patrick Daugherty jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
on behalf of Creditor Paul Kauffman jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
on behalf of Defendant Patrick Daugherty jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
on behalf of Creditor Todd Travers jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
on behalf of Defendant Patrick Hagaman Daugherty jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
on behalf of Creditor Davis Deadman jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason S. Brookner
on behalf of Creditor Patrick Daugherty jbrookner@grayreed.com  lwebb@grayreed.com;acarson@grayreed.com

Jason S. Brookner
on behalf of Defendant Patrick Daugherty jbrookner@grayreed.com  lwebb@grayreed.com;acarson@grayreed.com

Jason S. Brookner
    on behalf of Creditor Gray Reed & McGraw LLP jbrookner@grayreed.com  lwebb@grayreed.com;acarson@grayreed.com

Jeff P. Prostok
    on behalf of Creditor Acis Capital Management  L.P. jprostok@forsheyprostok.com,
calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
khartogh@ecf.courtdrive.com

Jeff P. Prostok
    on behalf of Creditor Joshua Terry jprostok@forsheyprostok.com
calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
khartogh@ecf.courtdrive.com

Jeff P. Prostok
    on behalf of Creditor Jennifer G. Terry jprostok@forsheyprostok.com
calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
khartogh@ecf.courtdrive.com

Jeff P. Prostok
    on behalf of Creditor Acis Capital Management GP  LLC jprostok@forsheyprostok.com,
calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
khartogh@ecf.courtdrive.com

Jeffrey Kurtzman
    on behalf of Creditor BET Investments II  L.P. kurtzman@kurtzmansteady.com

Jeffrey Nathan Pomerantz
    on behalf of Defendant Highland Capital Management  L.P. jpomerantz@pszjlaw.com

Jeffrey Nathan Pomerantz
    on behalf of Debtor Highland Capital Management  L.P. jpomerantz@pszjlaw.com

John A. Morris
    on behalf of Defendant Highland Capital Management  L.P. jmorris@pszjlaw.com

John A. Morris
    on behalf of Defendant Highland Capital Management  LP jmorris@pszjlaw.com

John A. Morris
    on behalf of Debtor Highland Capital Management  L.P. jmorris@pszjlaw.com

John J. Kane
    on behalf of Defendant CLO Holdco  Ltd. jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com

John J. Kane
    on behalf of Defendant Grant James Scott III jkane@krcl.com  ecf@krcl.com;jkane@ecf.courtdrive.com

John J. Kane
    on behalf of Creditor Grant James Scott III jkane@krcl.com  ecf@krcl.com;jkane@ecf.courtdrive.com

John J. Kane
    on behalf of Defendant Grant James Scott III jkane@krcl.com  ecf@krcl.com;jkane@ecf.courtdrive.com

John Kendrick Turner
    on behalf of Creditor City of Allen john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Tarrant County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Fannin CAD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Irving ISD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Dallas County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Upshur County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Allen ISD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Kaufman County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor City of Richardson john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
    on behalf of Creditor Grayson County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Filed 09/15/23   Page 13 of 242   Page 242 of 678   PageID 248
District/off: 0539-3                                     User: admin                                          Page 13 of 21
Date Rcvd: May 23, 2023                                 Form ID: pdf012                                      Total Noticed: 1

John Kendrick Turner

on behalf of Creditor Coleman County TAD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John T. Cox, III

on behalf of Defendant Alvarez & Marsal CRF Management  LLC tcox@gibsondunn.com,
WCassidy@gibsondunn.com;twesley@gibsondunn.com

Jonathan D. Sundheimer

on behalf of Creditor NWCC  LLC jsundhimer@btlaw.com

Jonathan E. Bridges

on behalf of Plaintiff PCMG Trading Partners XXIII LP jeb@sbaitilaw.com

Jonathan E. Bridges

on behalf of Plaintiff CLO Holdco  Ltd. jeb@sbaitilaw.com

Jonathan E. Bridges

on behalf of Interested Party CLO Holdco  Ltd. jeb@sbaitilaw.com

Jonathan E. Bridges

on behalf of Plaintiff Charitable DAF Fund  LP jeb@sbaitilaw.com

Jonathan E. Bridges

on behalf of Interested Party Charitable DAF Fund  LP jeb@sbaitilaw.com

Jonathan E. Bridges

on behalf of Creditor CLO Holdco  Ltd. jeb@sbaitilaw.com

Jordan A. Kroop

on behalf of Debtor Highland Capital Management  L.P. jkroop@pszjlaw.com, tcorrea@pszjlaw.com

Joseph E. Bain

on behalf of Creditor Issuer Group JBain@joneswalker.com
kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com

Joshua Seth Levy

on behalf of Other Professional James P. Seery  Jr. jlevy@willkie.com

Joshua Seth Levy

on behalf of Creditor James P. Seery  Jr. jlevy@willkie.com

Julian Preston Vasek

on behalf of Interested Party NexPoint Real Estate Strategies Fund jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Opportunistic Credit Fund jvasek@munsch.com

Julian Preston Vasek

on behalf of Defendant NexPoint Capital  Inc. jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Small-Cap Equity Fund jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Healthcare Opportunities Fund jvasek@munsch.com

Julian Preston Vasek

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Merger Arbitrage Fund jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party NexPoint Capital  Inc. jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Fixed Income Fund jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland/iBoxx Senior Loan ETF jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party Highland Funds I and its series jvasek@munsch.com

Julian Preston Vasek

on behalf of Interested Party NexPoint Advisors GP  LLC jvasek@munsch.com

Julian Preston Vasek

on behalf of Defendant NexPoint Strategic Opportunities Fund jvasek@munsch.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Filed 06/15/23    Page 15 of 243    Page 14 of 678    PageID 249

District/off: 0539-3                          User: admin                                    Page 14 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                                Total Noticed: 1

Julian Preston Vasek
                    on behalf of Interested Party NexPoint Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Interested Party Highland Socially Responsible Equity Fund jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Interested Party Highland Global Allocation Fund jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Interested Party Highland Total Return Fund jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Interested Party NexPoint Strategic Opportunities Fund jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Interested Party Highland Funds II and its series jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Interested Party Highland Income Fund jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Defendant NexPoint Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek
                    on behalf of Defendant Highland Income Fund jvasek@munsch.com

Juliana Hoffman
                    on behalf of Creditor Sidley Austin LLP jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Creditor Committee Official Committee of Unsecured Creditors jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Financial Advisor FTI Consulting  Inc. jhoffman@sidley.com,
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Plaintiff Official Committee of Unsecured Creditors jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Plaintiff Marc Kirschner jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Other Professional Teneo Capital  LLC jhoffman@sidley.com,
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Interested Party UBS Securities LLC jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Interested Party UBS AG London Branch jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Debtor Highland Capital Management  L.P. jhoffman@sidley.com,
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
                    on behalf of Interested Party Committee of Unsecured Creditors jhoffman@sidley.com
                    txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Kesha Tanabe
                    on behalf of Creditor Cedar Glade LP kesha@tanabelaw.com

Kevin Perkins
                    on behalf of Defendant MASSAND CAPITAL  LLC kperkins@vanacourperkins.com

Kevin Perkins
                    on behalf of Defendant MASSAND CAPITAL  INC. kperkins@vanacourperkins.com

Kimberly A. Posin
                    on behalf of Interested Party UBS Securities LLC kim.posin@lw.com  colleen.rico@lw.com

Kimberly A. Posin
                    on behalf of Plaintiff UBS AG London Branch kim.posin@lw.com  colleen.rico@lw.com

Kimberly A. Posin

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice Page 17 of 234    Page 7 of 24    of 678    PageID 250

District/off: 0539-3                         User: admin                              Page 15 of 21
Date Rcvd: May 23, 2023                      Form ID: pdf012                          Total Noticed: 1

Kimberly A. Posin
    on behalf of Interested Party UBS AG London Branch kim.posin@lw.com  colleen.rico@lw.com

    on behalf of Plaintiff UBS Securities LLC kim.posin@lw.com  colleen.rico@lw.com

Kristin H. Jain
    on behalf of Interested Party NexPoint Advisors  L.P. KHJain@JainLaw.com, dskierski@skijain.com

Kristin H. Jain
    on behalf of Interested Party NexPoint Real Estate Advisors  L.P. KHJain@JainLaw.com, dskierski@skijain.com

Larry R. Boyd
    on behalf of Creditor COLLIN COUNTY TAX ASSESSOR/COLLECTOR lboyd@abernathy-law.com
ljameson@abernathy-law.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Residential Trust  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Finance Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Creditor Eagle Equity Advisors  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Creditor Highland Capital Management Services  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party VineBrook Homes  Trust, Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Partners  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party Nexpoint Real Estate Capital  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Advisors VIII  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Advisors VI  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Creditor NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Advisors  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexBank lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Advisors III  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Multifamily Capital Trust  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party MGM Holdings  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexBank Securities Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexBank Title Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Creditor Advisors Equity Group  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Hospitality Trust lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Advisors VII  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Creditor HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexBank Capital Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn
    on behalf of Interested Party NexPoint Real Estate Advisors V  L.P. lkdrawhorn@gmail.com

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Page 16 of 245   Filed 09/15/23   Page 1 of 245 of 678   PageID 251

District/off: 0539-3                                    User: admin                                    Page 16 of 21
Date Rcvd: May 23, 2023                                 Form ID: pdf012                                 Total Noticed: 1

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors IV  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors II  L.P. lkdrawhorn@gmail.com

Laurie A Spindler

on behalf of Creditor Grayson County Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor Dallas County Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor Allen ISD Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor Kaufman County Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor Tarrant County Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor City of Allen Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor City of Richardson Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

on behalf of Creditor Irving ISD Laurie.Spindler@lgbs.com
Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Leslie A. Collins

on behalf of Creditor The Dugaboy Investment Trust lcollins@hellerdraper.com

Leslie A. Collins

on behalf of Defendant The Dugaboy Investment Trust lcollins@hellerdraper.com

Leslie A. Collins

on behalf of Creditor Get Good Trust lcollins@hellerdraper.com

Linda D. Reece

on behalf of Creditor Plano ISD lreece@pbfcm.com  lreece@ecf.courtdrive.com

Linda D. Reece

on behalf of Creditor City of Garland lreece@pbfcm.com  lreece@ecf.courtdrive.com

Linda D. Reece

on behalf of Creditor Wylie ISD lreece@pbfcm.com  lreece@ecf.courtdrive.com

Linda D. Reece

on behalf of Creditor Garland ISD lreece@pbfcm.com  lreece@ecf.courtdrive.com

Lindsey Lee Robin

on behalf of Other Professional James P. Seery  Jr. lrobin@reedsmith.com,
jkrasnic@reedsmith.com;anixon@reedsmith.com;ahinson@reedsmith.com

Lindsey Lee Robin

on behalf of Creditor James P. Seery  Jr. lrobin@reedsmith.com,
jkrasnic@reedsmith.com;anixon@reedsmith.com;ahinson@reedsmith.com

Lisa L. Lambert

on behalf of U.S. Trustee United States Trustee lisa.l.lambert@usdoj.gov

Louis M. Phillips

on behalf of Creditor Charitable DAF HoldCo  Ltd. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party Mary Jalonick louis.phillips@kellyhart.com
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Defendant Charitable DAF Fund  LP louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Filed 09/15/23   Page 17 of 246   Page 236 of 678    PageID 252

District/off: 0539-3                                     User: admin                                          Page 17 of 21
Date Rcvd: May 23, 2023                                  Form ID: pdf012                                      Total Noticed: 1

on behalf of Defendant CLO Holdco  Ltd. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Creditor CLO Holdco  Ltd. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party The Santa Barbara Foundation louis.phillips@kellyhart.com
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Defendant Highland Dallas Foundation  Inc. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party The Dallas Foundation louis.phillips@kellyhart.com
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party Charitable DAF Fund  LP louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Respondent Mark Patrick louis.phillips@kellyhart.com
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Creditor The Charitable DAF Fund  L.P. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party CLO Holdco  Ltd. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Creditor Charitable DAF GP  L.P. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party The Greater Kansas City Community Foundation louis.phillips@kellyhart.com
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party Highland Santa Barbara Foundation  Inc. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party Highland Kansas City Foundation  Inc. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Plaintiff CLO Holdco  Ltd. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Plaintiff Charitable DAF Fund  LP louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party Highland Dallas Foundation  Inc. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Interested Party The Charitable DAF Fund  L.P. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Defendant CLO HOLDCO  LTD.; CHARITABLE DAF HOLDCO, LTD. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Creditor Highland Dallas Foundation  Inc. louis.phillips@kellyhart.com,
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

on behalf of Creditor Hunter Mountain Investment Trust louis.phillips@kellyhart.com
june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

M. David Bryant, Jr.

on behalf of Interested Party Integrated Financial Associates  Inc. dbryant@dykema.com, csmith@dykema.com

Margaret Michelle Hartmann

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice Document 15-23 Page 2 of 247 of 678    PageID 253

District/off: 0539-3                        User: admin                                    Page 18 of 21
Date Rcvd: May 23, 2023                     Form ID: pdf012                                 Total Noticed: 1

on behalf of Defendant Scott Ellington michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Interested Party CPCM LLC michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Defendant Frank Waterhouse michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Defendant CPCM LLC michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Defendant Isaac Leventon michelle.hartmann@bakermckenzie.com

Mark Stancil

on behalf of Other Professional James P. Seery Jr. mstancil@robbinsrussell.com

Mark Stancil

on behalf of Creditor James P. Seery Jr. mstancil@robbinsrussell.com

Mark A. Platt

on behalf of Interested Party Redeemer Committee of the Highland Crusader Fund mplatt@fbtlaw.com
dwilliams@fbtlaw.com,mluna@fbtlaw.com

Martin A. Sosland

on behalf of Interested Party UBS AG London Branch martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Martin A. Sosland

on behalf of Plaintiff UBS AG London Branch martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Martin A. Sosland

on behalf of Interested Party UBS Securities LLC martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Martin A. Sosland

on behalf of Plaintiff UBS Securities LLC martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Matthew Gold

on behalf of Creditor Argo Partners courts@argopartners.net

Matthew A. Clemente

on behalf of Creditor Committee Official Committee of Unsecured Creditors mclemente@sidley.com
matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwom
ey@sidley.com

Matthew A. Clemente

on behalf of Interested Party Committee of Unsecured Creditors mclemente@sidley.com
matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwom
ey@sidley.com

Matthew G. Bouslog

on behalf of Interested Party Alvarez & Marsal CRF Management LLC, as Investment Manager of the Highland Crusader Funds
mbouslog@gibsondunn.com, nbrosman@gibsondunn.com

Mazin Ahmad Sbaiti

on behalf of Plaintiff CLO Holdco Ltd. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Interested Party Charitable DAF Fund LP mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Plaintiff PCMG Trading Partners XXIII LP mas@sbaitilaw.com
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Interested Party CLO Holdco Ltd. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Creditor The Charitable DAF Fund L.P. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Plaintiff Charitable DAF Fund LP mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Interested Party The Charitable DAF Fund L.P. mas@sbaitilaw.com,

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Filed 09/15/23   Page 21 of 23   Page 248 of 678   PageID 254

District/off: 0539-3                          User: admin                                    Page 19 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                                Total Noticed: 1

|  |  |
|---|---|
| | krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com |
| Mazin Ahmad Sbaiti | on behalf of Creditor CLO Holdco  Ltd. mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com |
| Megan Young-John | on behalf of Creditor Issuer Group myoung-john@porterhedges.com |
| Megan F. Clontz | on behalf of Creditor Todd Travers mclontz@spencerfane.com  lvargas@spencerfane.com |
| Megan F. Clontz | on behalf of Creditor Patrick Daugherty mclontz@spencerfane.com  lvargas@spencerfane.com |
| Melissa S. Hayward | on behalf of Defendant Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com |
| Melissa S. Hayward | on behalf of Debtor Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com |
| Melissa S. Hayward | on behalf of Defendant Highland Capital Management  LP MHayward@HaywardFirm.com, mholmes@HaywardFirm.com |
| Melissa S. Hayward | on behalf of Plaintiff Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com |
| Michael A. Rosenthal | on behalf of Defendant Alvarez & Marsal CRF Management  LLC mrosenthal@gibsondunn.com |
| Michael Justin Lang | on behalf of Interested Party James Dondero mlang@cwl.law  aohlinger@cwl.law;mbrown@cwl.law |
| Michael P. Aigen | on behalf of Plaintiff Hunter Mountain Investment Trust michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Creditor The Dugaboy Investment Trust michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Defendant James Dondero michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Plaintiff Dugaboy Investment Trust michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Defendant NexPoint Advisors  L.P. michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Defendant HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Defendant Highland Capital Management Services  Inc. michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Creditor Hunter Mountain Investment Trust michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Defendant Highland Capital Management Fund Advisors  L.P. michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Defendant Nancy Dondero michael.aigen@stinson.com |
| Michael P. Aigen | on behalf of Interested Party Highland CLO Management Ltd michael.aigen@stinson.com |
| Michael Scott Held | on behalf of Creditor Crescent TC Investors  L.P. mheld@jw.com, kgradney@jw.com;azuniga@jw.com |
| Michelle E. Shriro | on behalf of Interested Party California Public Employees Retirement System (CalPERS) mshriro@singerlevick.com scotton@singerlevick.com;tguillory@singerlevick.com |
| Nicole Skolnekovich | on behalf of Interested Party Hunton Andrews Kurth LLP nskolnekovich@hunton.com astowe@huntonak.com;creeves@huntonak.com |
| Omar Jesus Alaniz | on behalf of Other Professional James P. Seery  Jr. oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;jkrasnic@reedsmith.com;ahinson@reedsmith.com |
| Paige Holden Montgomery | on behalf of Creditor Committee Official Committee of Unsecured Creditors pmontgomery@sidley.com |

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Page 22 of 249   Page 249 of 678   PageID 255
District/off: 0539-3                                          User: admin                                          Page 20 of 21
Date Rcvd: May 23, 2023                                       Form ID: pdf012                                     Total Noticed: 1

txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Plaintiff Marc Kirschner pmontgomery@sidley.com
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Interested Party Committee of Unsecured Creditors pmontgomery@sidley.com
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Plaintiff Official Committee of Unsecured Creditors pmontgomery@sidley.com
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Interested Party Litigation Trustee of the Highland Capital Management  L.P. Litigation Sub-Trust
pmontgomery@sidley.com,
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paul M. Lopez

on behalf of Creditor COLLIN COUNTY TAX ASSESSOR/COLLECTOR bankruptcy@abernathy-law.com

Paul Richard Bessette

on behalf of Interested Party Highland CLO Funding  Ltd. pbessette@KSLAW.com,
ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com

Penny Packard Reid

on behalf of Creditor Committee Official Committee of Unsecured Creditors preid@sidley.com
txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com

Phillip L. Lamberson

on behalf of Creditor Acis Capital Management GP  LLC plamberson@winstead.com

Phillip L. Lamberson

on behalf of Creditor Acis Capital Management  L.P. plamberson@winstead.com

Rakhee V. Patel

on behalf of Creditor Acis Capital Management GP  LLC rpatel@sidley.com, dgalindo@winstead.com;achiarello@winstead.com

Rakhee V. Patel

on behalf of Creditor Acis Capital Management  L.P. rpatel@sidley.com, dgalindo@winstead.com;achiarello@winstead.com

Robert Joel Feinstein

on behalf of Debtor Highland Capital Management  L.P. rfeinstein@pszjlaw.com

Robert Joel Feinstein

on behalf of Defendant Highland Capital Management  LP rfeinstein@pszjlaw.com

Ryan E. Manns

on behalf of Interested Party UBS Securities LLC ryan.manns@nortonrosefulbright.com

Ryan E. Manns

on behalf of Interested Party UBS AG London Branch ryan.manns@nortonrosefulbright.com

Sarah A. Schultz

on behalf of Interested Party PetroCap  LLC sschultz@akingump.com,
mstamer@akingump.com;afreeman@akingump.com;dkazlow@akingump.com;aqureshi@akingump.com;dkrasa-berstell@akingu
mp.com;bkemp@akingump.com;brenda-kemp-7410@ecf.pacerpro.com

Sawnie A. McEntire

on behalf of Interested Party Hunter Mountain Trust smcentire@pmmlaw.com
gromero@pmmlaw.com;tmiller@pmmlaw.com;bcandis@pmmlaw.com

Sawnie A. McEntire

on behalf of Creditor Hunter Mountain Investment Trust smcentire@pmmlaw.com
gromero@pmmlaw.com;tmiller@pmmlaw.com;bcandis@pmmlaw.com

Sean M. Beach

on behalf of Creditor Committee Official Committee of Unsecured Creditors bankfilings@ycst.com  sbeach@ycst.com

Shawn M Bates

on behalf of Creditor Acis Capital Management  L.P. sbates@azalaw.com, tbyrd@azalaw.com

Shawn M. Christianson

on behalf of Creditor Oracle America  Inc. schristianson@buchalter.com, cmcintire@buchalter.com

Susheel Kirpalani

on behalf of Interested Party Litigation Trustee of the Highland Capital Management  L.P. Litigation Sub-Trust

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Filed 06/15/23    Page 23 of 250    Page 250 of 678    PageID 256

District/off: 0539-3                          User: admin                                Page 21 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                         Total Noticed: 1

| | |
|---|---|
| | susheelkirpalani@quinnemanuel.com, dian.gwinnup@haynesboone.com |
| Suzanne K. Rosen | on behalf of Creditor Acis Capital Management GP  LLC srosen@forsheyprostok.com, calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com;khartogh@forsheyprostok.com;khartogh@ecf.courtdrive.com |
| Suzanne K. Rosen | on behalf of Creditor Acis Capital Management  L.P. srosen@forsheyprostok.com, calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com;khartogh@forsheyprostok.com;khartogh@ecf.courtdrive.com |
| Thomas Albert Cooke | on behalf of Creditor Acis Capital Management  L.P. tcooke@azalaw.com, mflores@azalaw.com |
| Thomas C. Scannell | on behalf of Interested Party Sentinel Reinsurance Ltd. tscannell@foley.com acordero@foley.com;thomas-scannell-3441@ecf.pacerpro.com |
| Thomas Daniel Berghman | on behalf of Interested Party NexPoint Advisors  L.P. tberghman@munsch.com, amays@munsch.com |
| Thomas Daniel Berghman | on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. tberghman@munsch.com, amays@munsch.com |
| Thomas Daniel Berghman | on behalf of Defendant NexPoint Advisors  L.P. tberghman@munsch.com, amays@munsch.com |
| Thomas Daniel Berghman | on behalf of Defendant Highland Capital Management Fund Advisors  L.P. tberghman@munsch.com, amays@munsch.com |
| Thomas G. Haskins, Jr. | on behalf of Creditor NWCC  LLC thaskins@btlaw.com |
| Thomas M. Melsheimer | on behalf of Creditor Frank Waterhouse  Scott B. Ellington, Isaac Leventon, Jean Paul Sevilla, Hunter Covitz and Thomas Surgent tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com |
| United States Trustee | ustpregion06.da.ecf@usdoj.gov |
| Vickie L. Driver | on behalf of Creditor HarbourVest et al Vickie.Driver@crowedunlevy.com crissie.stephenson@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com |
| William R. Howell, Jr. | on behalf of Defendant James D. Dondero williamhowell@utexas.edu  williamhowell@utexas.edu |
| Zachery Z. Annable | on behalf of Defendant Highland Capital Management  LP zannable@haywardfirm.com |
| Zachery Z. Annable | on behalf of Defendant Highland Capital Management  L.P. zannable@haywardfirm.com |
| Zachery Z. Annable | on behalf of Other Professional Hayward PLLC zannable@haywardfirm.com |
| Zachery Z. Annable | on behalf of Plaintiff Highland Capital Management  L.P. zannable@haywardfirm.com |
| Zachery Z. Annable | on behalf of Other Professional Highland Claimant Trust zannable@haywardfirm.com |
| Zachery Z. Annable | on behalf of Debtor Highland Capital Management  L.P. zannable@haywardfirm.com |
| Zachery Z. Annable | on behalf of Other Professional Hayward & Associates PLLC zannable@haywardfirm.com |

TOTAL: 476

# Exhibit 6



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 26, 2023**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

-------------------------------------------------------------------------

In re:

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                Reorganized Debtor.

-------------------------------------------------------------------------

§
§
§
§
§
§
§

Chapter 11

Case No. 19-34054-sgj11

### ORDER REGARDING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY OR, ALTERNATIVELY, FOR CONTINUANCE OF THE JUNE 8, 2023 HEARING

### [Dkt. Nos. 3788 and 3791]

Having considered the *Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing* of Hunter Mountain Investment Trust ("HMIT") filed on May 24, 2023, at Dkt. No. 3788 ("Motion for Expedited Discovery"), and, separately, on May 25, 2023, at Dkt. No. 3791 ("Motion for Continuance," and, together with the Motion for Expedited Discovery, the "Motions"), and the arguments of counsel at the emergency hearing on the Motions held on Friday May 26, 2023, at 9:30 a.m.,

1

**IT IS ORDERED** that the Motion for Continuance be, and hereby is, **DENIED**;

**IT IS FURTHER ORDERED** that the Motion for Expedited Discovery be, and hereby is, **GRANTED**, in part and only to the extent as set forth below:

(1) To the extent any party would like to depose either James P. Seery, Jr. or James Dondero in advance of the June 8 hearing ("June 8 Hearing") on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. No. 3699] and *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. 3760] (together, the "Motion for Leave"), Mr. Seery and Mr. Dondero shall be made available for depositions ("Depositions") on a date and at a time agreeable to the parties that is no earlier than May 31, 2023, and no later than June 7, 2023, and no discovery or depositions of any other party or witness will be permitted prior to the June 8 hearing; and

(2) None of the parties shall be entitled to any other discovery, including the production of documents from Mr. Seery or Mr. Dondero, or any other party or witness pursuant to a subpoena *duces tecum*, or otherwise, prior to the conduct of the Depositions or to the court's ruling on the Motion for Leave following the June 8, 2023 hearing;

**IT IS FURTHER ORDERED** that, except as specifically set forth in this Order, HMIT's Motion for Expedited Discovery be, and hereby is, **DENIED**.

**# # # END OF ORDER # # #**

# Exhibit 7



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 16, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §   Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §   Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

### <u>MEMORANDUM OPINION AND ORDER GRANTING JOINT MOTION TO EXCLUDE EXPERT EVIDENCE [DE # 3820]</u>

I.      **<u>INTRODUCTION</u>**.

BEFORE THIS COURT is yet another dispute in the continuing saga of the Chapter 11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

The Reorganized Debtor has been operating under a confirmed Chapter 11 plan for approximately two years now—a plan having been confirmed on February 22, 2021.  The plan was never stayed; it went effective in August 2021; and it was affirmed almost in its entirety by

the United States Court of Appeals for the Fifth Circuit (in late summer 2022). A petition for writ of certiorari regarding the plan confirmation order has been pending at the United States Supreme Court since January 2023. Millions of dollars have been paid out to creditors under the plan, although the plan has not been completed.

This court uses the words "continuing saga" because there is a mountain of litigation that is still pending. First, there are numerous adversary proceedings still pending, in which the Reorganized Debtor and a Litigation Trustee appointed under the plan are seeking to liquidate claims that Highland has against others, in order to augment the pot of money available for unsecured creditors. Some of these adversary proceedings involve what seem like simple suits on promissory notes (albeit very large promissory notes), and others involve highly complex torts. There are numerous appeals pending and, from time to time, petitions for writs of mandamus have been filed post-confirmation. And there are new lawsuits popping up around every corner it seems.

To be sure, this post-confirmation litigation is not the "usual stuff," and the adverse parties in this ongoing post-confirmation litigation are not the "usual suspects." For example, the numerous post-confirmation adversary proceedings do not involve preference lawsuits or other Chapter 5 avoidance actions against non-insider creditors—as we so often see proliferate in Chapter 11 cases post-confirmation. And we do not have long-running proof of claim objections pending post-confirmation—because all of the proof of claim objections regarding non-insider creditors were resolved long ago (with major compromises reached and settlements approved by the court—some after formal mediation). And as for the myriad appeals, the non-insider creditors in this case—with proofs of claim asserted in the hundreds of millions of dollars—overwhelmingly supported Highland's confirmed plan and, therefore, they have not been appellants on any of the aforementioned appeals.

So who has been the adverse party in this deluge of post-confirmation litigation?  The founder and former Chief Executive Officer ("CEO") of Highland, Mr. James Dondero personally, and entities that he controls (*e.g.,* family trusts; investment advisory firms; managed funds; and other entities—frequently organized offshore—that were not themselves debtors in the Highland Chapter 11 case but assert party-in-interest status in various capacities).  To be clear, Mr. Dondero takes umbrage at the suggestion that **all** of the adverse parties in these numerous post-confirmation scuffles are controlled by him.

Which brings us to the current, post-confirmation contested matter before the court.  Currently, a party called Hunter Mountain Investment Trust ("HMIT"), a Delaware trust, has filed a "gatekeeper motion"—that is, a motion seeking leave from this court to file an adversary proceeding in the bankruptcy court against the Reorganized Debtor's CEO and certain investors who purchased allowed unsecured claims in this case post-confirmation and pre-Effective Date (as further described below).  HMIT's gatekeeper motion has given birth to a sideshow, so to speak, regarding **what, if any, evidence the court ought to consider in connection with HMIT's gatekeeper motion—the latest "act" in such sideshow focusing on the propriety of considering expert testimony.**

Who or what exactly is HMIT?  HMIT is an entity with no employees and no income whose only asset is a contingent right of recovery under the Highland confirmed plan—by virtue of HMIT having held a majority (99.5%) of the limited partnership interests in Highland pre-confirmation, which interests were classified in the plan in a "Class 10" (that was projected to receive no recovery).  Mr. Dondero asserts that he does not control HMIT.  HMIT represents that, since on or about August 2022, it has been solely controlled by a Mr. Mark Patrick (a former employee of Highland who left Highland one week after its Plan was confirmed and went to work for an entity

called "Skyview Group," that was formed by certain former Highland employees, and apparently now advises various affiliate entities of Mr. Dondero).[1]  While HMIT only has one asset (the "Class 10" contingent interest), Mark Patrick has testified that HMIT is liable on a $62.6 million-dollar indebtedness that it owes to The Dugaboy Investment Trust (a family trust of which Mr. Dondero is the lifetime beneficiary), pursuant to a promissory note made by HMIT in favor of Dugaboy, in 2015, in exchange for Dugaboy transferring to HMIT an ownership interest in Highland.  *See* Transcript 6/8/23 Hearing, at pp. 304-308 [DE # 3843]. *See also* Highland Exh. 51 from 6/8/23 Hearing [DE # 3817].  Mr. Patrick has testified that Dugaboy and HMIT have a settlement, pursuant to which, Dugaboy is paying HMIT's attorney's fees. Transcript 6/8/23 Hearing, at p. at 313:2-18 [DE # 3843].

## II.   **HMIT'S MOTION FOR LEAVE TO FILE LAWSUIT (a.k.a. THE "GATEKEEPER MOTION").**

To understand the procedural motion now before the court—***which deals with whether or not the bankruptcy court should allow or exclude expert witness testimony and documents*** (more fully described below)—one must understand the context in which it is being considered, which is the hearing on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* that was filed by HMIT (the "HMIT Motion for Leave"), which this court loosely refers to sometimes as the "Gatekeeping Motion."

The HMIT Motion for Leave, as alluded to, requests leave from the bankruptcy court to file a post-confirmation, post-Effective Date adversary proceeding pursuant to this bankruptcy court's "gatekeeping" orders and, specifically, the gatekeeping, injunction, and exculpation

---

[1] *See* DE # 2440 (Transcript of a 6/8/21 Hearing, at pp. 95:18-96:10).

provisions of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.
[DE # 1943], as modified (the "Plan").  The HMIT Motion for Leave, with attachments, as first
filed, was 387 pages in length, and the attachments included a proposed complaint and two sworn
declarations of the aforementioned former CEO of the Reorganized Debtor, Mr. Dondero.  The
HMIT Motion for Leave was later amended to eliminate the declarations of Mr. Dondero.  DE ##
3815 & 3816.  In a nutshell, HMIT desires leave to sue certain parties regarding ***the post-
confirmation, pre-Effective Date purchase of allowed unsecured claims***.  The proposed
defendants would be:

> **Mr. James P. Seery, Jr.,** who now serves as the CEO of the Reorganized
> Debtor and also serves as the Trustee of the Highland Claimant Trust created
> pursuant to the Plan, and also was previously Highland's Chief Restructuring
> Officer ("CRO") during the case, then CEO, and, also, an Independent Board
> Member of Highland's general partner during the Highland case.  Mr. Seery is best
> understood as the man who took Mr. Dondero's place running Highland—per the
> request of the Official Unsecured Creditors Committee.

> **Certain Claims Purchasers,** known as Farallon Capital Management, LLC
> ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity
> created by Farallon to purchase unsecured claims against Highland; Stonehill
> Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"),
> which was a special purpose entity created by Stonehill to purchase unsecured
> claims against Highland (collectively, the "Claims Purchasers").  The Claims
> Purchasers purchased $240 million face value of unsecured claims post-
> confirmation and pre-Effective Date—which claims had already been allowed
> during the Highland case—in the spring of 2021 and another $125 million face
> value allowed unsecured claims in August 2021.  Bankruptcy Rule 3001(e)
> notices—giving notice of same—were filed on the bankruptcy clerk's docket
> regarding these purchases.  The claims had previously been held by the creditors
> known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS
> (three of these four creditors formerly served on the Official Unsecured Creditors
> Committee during the Highland bankruptcy case).

> **John Doe Defendant Nos. 1-10**, which are described to be "currently
> unknown individuals or business entities who may be identified in discovery as
> involved in the wrongful transactions at issue."

> The proposed plaintiffs would be:

> **HMIT,** which represents that it was the largest equity holder in Highland
> and held a 99.5% limited partnership interest (specifically, Class B/C limited

partnership interests).  HMIT represents that it currently holds a Class 10 interest under the confirmed Highland plan, which gives it a contingent interest in the Claimant Trust created under the plan, and as defined in the Claimant Trust Agreement ("CTA").

**Reorganized Debtor,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Highland Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Highland Claimant Trust.

The gist of the complaint that HMIT seeks leave to file is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.  HMIT Motion for Leave, 7.  HMIT believes the Claim Purchasers paid around $160 million for the $365 million face amount of claims they purchased.  HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  Also, Mr. Dondero purports to have concluded from conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Mr. Seery must have given these claims purchasers material nonpublic information ("MNPI") regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Mr. Seery shared MNPI regarding the likely imminent sale of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), in which Highland had, directly and indirectly, substantial holdings.  Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in

media reports for several months[2] and that was officially announced to the public in late May 2021

(just a few weeks after the Claims Purchasers purchased some of their claims, but a few months

**before** certain of their claims—the UBS claims—were purchased).[3]   Note that Highland and

entities it controlled tendered their MGM holdings in connection with the Amazon transaction

(they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not

made public).   In summary, while HMIT's proposed complaint is lengthy and at times hard to

follow, it boils down to allegations that:  (a) Mr. Seery filed (or caused to be filed) deflated,

pessimistic, misleading projections regarding the value of the Debtor's estate in connection with

the Plan, (b) then induced very sophisticated unsecured creditors (who, incidentally, are not

complaining) to discount and sell their claims to the likewise very sophisticated Claims Purchasers,

(c) which Claims Purchasers are allegedly friendly with Mr. Seery, and are now happily approving

Mr. Seery's allegedly excessive compensation demands post-Effective Date (resulting in less

money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT

will realize any recovery on its contingent Class 10 interest).   HMIT argues that Mr. Seery should

be required to disgorge his compensation.   It appears that HMIT also seeks other damages.

     The individual counts that HMIT wants to allege are:

       I.      Breach of Fiduciary Duty (as to Mr. Seery)

---

[2] *See* Highland Exh. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . .   MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Exh. 26 (describing prospects of an MGM sale noting that, among its largest shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exhs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[3] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

II.      Breach of Fiduciary Duty and Knowing Participation in Breach of Fiduciary Duty (as to Claims Purchasers)

III.     Fraud by Misrepresentation and Material Nondisclosure (as to all proposed defendants)[4]

IV.     Conspiracy (as to all proposed defendants)

V.     Equitable Disallowance (as to Muck and Jessup)

VI.     Unjust Enrichment and Constructive Trust (as to all proposed defendants)

V.     Declaratory Judgment (as to all proposed defendants)


## III.  NEXT, THE DELUGE OF ACTIVITY, IN MULTIPLE COURTS, AFTER THE FILING OF THE HMIT MOTION FOR LEAVE.


After the HMIT Motion for Leave was filed on March 28, 2023, there was two-and-a-half months of activity regarding *what type of hearing the bankruptcy court would hold and when* on the HMIT Motion for Leave.  A timeline is set forth below.

**3/28/23**:  The HMIT Motion for Leave was filed, along with a request for emergency hearing on same.  DE ## 3699 & 3700.  HMIT requested that the court schedule a hearing on the motion "on three (3) days' notice, and that any responses be filed no later than twenty-four hours before the scheduled hearing sought."  DE # 3700, 2. The HMIT Motion for Leave was 37 pages in length, plus another 350 pages of supporting exhibits, including two sworn declarations of Mr. Dondero.

**3/31/23**:  Bankruptcy Court entered order denying an emergency hearing on the HMIT Motion for Leave. DE # 3713.  The court stated that it would set the hearing on normal notice (at least 21 days' notice), seeing no emergency.

**4/4/23-4/12/23:**  HMIT pursued an unsuccessful interlocutory appeal and then a petition for writ of mandamus regarding the Bankruptcy Court's denial of an emergency hearing at first the District Court and then the Fifth Circuit.

**4/13/23:**  Highland filed a motion asking the Bankruptcy Court to set a briefing schedule on the HMIT Motion for Leave, indicating that Highland's proposed timetable for same was opposed by HMIT. DE # 3738.  The Claims Purchaser and Mr. Seery joined in that motion.  DE ## 3740 & 3747. HMIT subsequently filed a response unopposed to a briefing schedule and status conference.  DE # 3748.

---

[4] This Count III has gone in and out of the various drafts HMIT has filed with the court and was included in the latest version of the proposed complaint that was filed at DE # 3816.

**4/21/23:**  HMIT filed a Brief [DE # 3758] before the status conference indicating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the Bankruptcy Court did not need evidence in order to exercise its gatekeeping function and determine if HMIT has a "colorable" claim.  Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

**4/24/23:**  The Bankruptcy Court held a status/scheduling conference; there was extensive discussion among all the parties regarding what type of hearing there needed to be on the HMIT Motion for Leave. HMIT was adamant there should be no evidence. Highland and Mr. Seery argued they ought to be able to cross-examine Mr. Dondero since his sworn declarations had been attached to the HMIT Motion for Leave as "objective evidence" that "supported" the HMIT Motion for Leave. DE #3699, p. 2. HMIT stated that it would withdraw Mr. Dondero's declarations, but not if the court was going to allow evidence.

**5/11/23:**  Bankruptcy Court entered Order [DE # 3781] fixing a briefing schedule for the parties and stating that the court would "advise the parties on or reasonably after May 18, 2023, whether the Court intend[ed] to conduct the hearing on an evidentiary basis."

**5/22/23:**  Bankruptcy Court issued an Order [DE # 3787] after receipt of briefing, stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave—and, in particular, pertaining to the court's required inquiry into whether 'colorable' claims may exist, as described in the Motion for Leave. Therefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing if they so choose. This may include examining any witness for whom a Declaration or Affidavit has already been filed. The parties will be allowed no more than three hours of presentation time each (allocated three hours to the movant and three hours to the aggregate respondents). This allocated presentation time may be spent in whatever manner the parties believe will be useful to the court (argument/evidence)."

**5/24/23:**  HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing.  [DE # 3788 & 3789]. HMIT continued to urge that it did not think presentation of evidence was appropriate in connection with the HMIT Motion for Leave, but that "subject to and without waiving its objections, HMIT requests immediate leave to obtain all of its requested discovery on or before the specific dates identified in each deposition notice (with duces tecum), failing which the hearing on HMIT's Motion for Leave should be continued until HMIT has obtained such discovery. The requested discovery is generally described in this Motion, but is set forth with particularity in the Deposition Notices with Duces Tecum attached as Exhibits A-E. [paragraph numbering omitted.] In summary, HMIT seeks expedited depositions of corporate representatives of Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup") and also seeks the deposition of James A. Seery, Jr. ("Seery")."  Deposition Notices were attached for each of these five parties.  Nothing was stated about a possible need for (or intention to present) expert testimony.

**5/26/23:**  The Bankruptcy Court held yet another status conference in response to HMIT's newest emergency motion.  The Bankruptcy Court referred to this as a "second hearing on what kind of hearing we were going to have" on the HMIT Motion for Leave.  The court heard more discussions on whether it was appropriate to consider evidence at the hearing on the HMIT Motion for Leave. Nothing was mentioned about possible experts.  The court, continuing to believe that

there could be mixed questions of fact and law inherent in deciding the HMIT Motion for Leave, granted in part and denied in part HMIT's request for expedited discovery it sought of Mr. Seery and the Claims Purchasers. The Bankruptcy Court issued a follow-up order [DE # 3800] that provided:  "(1) To the extent any party would like to depose either James P. Seery, Jr. or James Dondero in advance of the June 8 hearing ("June 8 Hearing") on HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. No. 3699] and Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. 3760] (together, the "Motion for Leave"), Mr. Seery and Mr. Dondero shall be made available for depositions ("Depositions") on a date and at a time agreeable to the parties that is no earlier than May 31, 2023, and no later than June 7, 2023, and no discovery or depositions of any other party or witness will be permitted prior to the June 8 hearing; and (2) None of the parties shall be entitled to any other discovery, including the production of documents from Mr. Seery or Mr. Dondero, or any other party or witness pursuant to a subpoena duces tecum, or otherwise, prior to the conduct of the Depositions or to the court's ruling on the Motion for Leave following the June 8, 2023 hearing"  The Bankruptcy Court issued this ruling with the expectation—based on everything it heard—that HMIT did not wish for the court to consider evidence but, if it did, it thought it should get to depose Mr. Seery and the Claims Purchasers.  The court reached what seemed like appropriate middle ground by allowing the deposition of Mr. Seery and allowing the other parties to depose Mr. Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour.  The court was aware that HMIT and Mr. Dondero had been seeking discovery from the Claims Purchasers in state court "Rule 202" proceedings for approximately two years.

**June 5, 2023 (10:10 pm)**:  HMIT filed its Witness and Exhibit List disclosing two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony).

**June 7, 2023 (4:07 pm):**  A Joint Motion to Exclude Expert Testimony and Documents was filed by Highland, Mr. Seery, and the Highland Claimant Trust ("Motion to Exclude Expert Evidence").

**June 8, 2023 (8:12 am):**  HMIT filed a Response to the Motion to Exclude Expert Evidence.

**June 8, 2023 (9:30 am):**  The Bankruptcy Court commenced its hearing on the HMIT Motion for Leave.  The parties desired for court to rule on whether the expert testimony and exhibits should be allowed into the record.  After much discussion, the court informed parties that it had not had the opportunity to study their eleventh-hour filings, and that the court would go forward with the hearing as the court had earlier contemplated (three hours per side; no experts for now) and the court would take the Motion to Exclude Expert Evidence under advisement and would schedule a "Day 2" for the hearing on the HMIT Motion for Leave for the experts if it determined that was appropriate.  The court gave Highland, Mr. Seery, and the Highland Claimant Trust a deadline of 6/12/23 to reply to HMIT's Response. They filed a Reply (in which the Claims Purchasers joined).  The Bankruptcy Court ordered no more pleadings would be considered. HMIT filed another pleading on this topic on 6/13/23 [DE # 3845] and Highland and Mr. Seery responded to the HMIT additional pleading [DE # 3846] and then HMIT replied to their response [DE # 3847].

## IV.   TURNING, FINALLY, TO THE MOTION TO EXCLUDE EXPERT EVIDENCE

As indicated in the timeline above, HMIT designated on June 5, 2023, at 10:10 pm CDT, two expert witnesses to testify at the hearing on the HMIT Motion for Leave.  The first one was Mr. Scott Van Meter, stating that he "may provide opinion testimony on issues relating to Mr. Seery's compensation and claims trading."  The second one was Mr. Steve Pully, stating that he "may provide opinion testimony on issues relating to Mr. Seery's claims trading."  To be clear, Mr. Seery is not alleged to have engaged in claims trading (i.e., he is not alleged to have either sold or purchased any claims in the Highland case).  Rather, it is surmised by HMIT that Mr. Seery might have shared MNPI with the Claims Purchasers.  Details about the two proposed experts' education, experience, and the likely substance of their testimony were provided.

Further, with regard to Mr. Van Meter, HMIT disclosed that he had analyzed the claims trading in the Highland case and holds the opinion that there are "red flags" plausibly indicating the use of MNPI in connection with the claim purchasers' investment in their claims –primarily among them the fact that the claims purchasers allegedly did not undertake due diligence. He also would apparently opine that Mr. Seery's compensation is not reasonable or excessive because not based on any market study and because the Claims Purchasers, as large creditors on the post-confirmation oversight committee, have the ability to control it.

Further, with regard to Mr. Pully, HMIT disclosed that the projections in the publicly available information (presumably the Disclosure Statement and Plan and accompanying exhibits, the Bankruptcy Schedules, and Monthly Operating Reports) would not have rewarded the Claims Purchasers with the type of economic return that hedge funds/private equity firms would expect to realize.  Thus, they must have had some MNPI to convince them that the claims purchasing was worthwhile.

There are procedural problems and substantive problems with the Proposed Experts (hereinafter so called).

### A.  The Procedural Problems.

The timeline set forth above is highly problematic.  Highland, Mr. Seery, and the Highland Claimant Trust refer to the timeline here as tantamount to "trial by ambush."

HMIT counters that it, in fact, complied with this court's local rules and national rules as well.  As to the local rules, Local Bankruptcy Rule 9014-1(c) of the Northern District of Texas requires, in contested matters, the exchange of exhibits and witness lists with opposing parties at least 3 calendar days before a scheduled hearing (unless a specific order otherwise applies).  The hearing on the HMIT Motion for Leave was scheduled for June 8, 2023, at 9:30 am CDT, and HMIT filed its exhibit and witness list on June 5, 2023, at 10:10 pm CDT—technically three calendar days before the hearing, albeit less than 72 hours before the hearing.  As for the national rules, HMIT states that it was under no duty to disclose the existence or substance of expert testimony prior to the exchange of witness lists, because national Rule 9014 of the Federal Rules of Bankruptcy Procedure ("FRBP"), applying to contested matters, does not incorporate Rule 26(a)(2) of the Federal Rules of Civil Procedure ("FRCP"), which defines the content and timing for expert disclosures (unless the court directs otherwise, which it did not here).

HMIT's focus on these rules is disingenuous.  The court does not view the Proposed Experts as having been appropriately and timely disclosed in light of the two-and-a-half-month timeline set forth above and—most importantly—the bankruptcy court's multiple prior conferences and orders setting the scope of the hearing and associated discovery. HMIT's revelation (approximately 60 hours before the hearing on the HMIT Motion for Leave) that it

sought to offer expert testimony came far too late. HMIT never raised even the prospect of expert testimony at any point in its multiple filings with the bankruptcy court (which consisted of many hundreds of pages) or during the two status/scheduling conferences on the HMIT Motion for Leave. During the two status/scheduling conferences, this court repeatedly asked HMIT what it wanted to do at the hearing on the HMIT Motion for Leave (as far as there being evidence or no evidence—zeroing in on the inconvenient complication for HMIT that it had already put in some evidence, through the filing of the declarations of Mr. Dondero in support of its motion, and this, at the very least, would entitle the parties to cross-examine him on the statements contained in the declarations). HMIT represented that it desired for the hearing to be conducted "on the pleadings only" and that it had or would withdraw the declarations of Mr. Dondero (it had not withdrawn the declarations as of the status/scheduling conferences). But, alternatively, if there would be evidence, HMIT wanted to conduct expedited discovery of documents, fact depositions, and corporate representative depositions. [DE # 3791]. *HMIT made no mention of any experts*. Only after the bankruptcy court had ruled on HMIT's request for expedited discovery—and expressly limited the scope of discovery—did HMIT reveal its Proposed Experts [DE # 3818]. Obviously, the court would have fully vetted with the parties at the status/scheduling conferences the need for experts and the need for any discovery of them if HMIT mentioned it as a possibility.

Additionally, while HMIT focuses on the fact that FRBP 9014 excludes FRCP 26(a)(2)(b)'s requirements regarding expert witness disclosures and reports (absent the court directing otherwise), FRBP 9014 *does* include *FRCP 26(b)(4)(A)*, in contested matters, which provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." *See* FRBP 9014(b); FRBP 7026. As alluded to above, this bankruptcy court had limited pre-hearing discovery to "depositions of Mr. Dondero and/or Mr. Seery" in reliance on

HMIT's representations, which omitted any reference to expert witnesses.  By waiting until roughly 60 hours before the hearing to disclose the Proposed Experts, this resulted in Highland, Mr. Seery, and the Highland Claimant Trust not having sufficient time to seek to modify the court's prior status/scheduling orders, let alone take two expert depositions.

    B.   *The Substantive Problems*.

Finally, on a substantive level, the Proposed Experts' testimony and documents are inadmissible because they will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  Federal Rule of Evidence 702(a) provides that a witness who is qualified as an expert may testify in the form of an opinion or otherwise if, among other requirements, "the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

The fact finder here at this stage, in the context of determining whether HMIT's proposed complaint asserts "colorable" claims under the gatekeeper provision of the Plan, obviously, is the bankruptcy judge.  The judge, thus, may decide whether the Proposed Experts would help her analyze or understand an issue. This court is well within its discretion to conclude that the Proposed Experts would not advance the judge's analysis. This bankruptcy judge has had years of experience (both before and after her 17 years as a bankruptcy judge) with the topic of claims purchasing that sometimes occurs during a bankruptcy case. The court notes, anecdotally, that the activity of investing in distressed debt (which frequently even occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and has, indeed, been for a couple of decades. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in

1978. [Citations omitted.] Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.] . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies. In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

ADAM J. LEVITIN, BANKRUPTCY MARKETS: MAKING SENSE OF CLAIMS TRADING, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010).

This judge has likewise had decades of experience with hedge funds and private equity funds. The court understands very well financial concepts such as return on investment, risk, and the handicapping of how certain events might impact recoveries. This court can take judicial notice that there was volatility in the capital markets during the time period of this case that would certainly factor into decisions to buy or sell claims.[5] This court understands the concepts of MNPI and fiduciary duties. The judge remembers very well when the possibility of an MGM-Amazon transaction flooded the news in late 2020 and 2021, and then became a reality. The court remembers asking the parties in the Highland case during open court about it, since it was widely known that Highland and its affiliates owned direct or indirect interests in MGM stock. This was before, by the way, certain of the claims purchases that are at issue here were made.

Finally, this judge has decades of experience with executive compensation in bankruptcy cases and in connection with post-confirmation trusts.[6] In fact, this court approved Mr. Seery's

---

[5] A court "can, of course, take judicial notice of stock prices." *Schweitzer v. Invs. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 193 n.3 (5th Cir. 2020).

[6] This court even ran across one article that the above-signing judge published on the topic before she was a judge. *Bringing Home the Bacon, or Just Being a Hog? Employee and Executive Compensation Issues in Chapter 11*, 22nd Annual Bankruptcy Conference, The University of Texas School of Law (Nov. 2003) (co-authored with Frances Smith). The bankruptcy judge does not mean to suggest that a 20-year-old article makes anyone per se an expert. It

compensation early on during the bankruptcy case (in 2020), and his compensation was negotiated by the former members of the Official Unsecured Creditors Committee, among others.  Mr. Seery's compensation during this bankruptcy case was obviously subject to a motion, notice and a hearing, and was fully disclosed.  Mr. Seery's base compensation now is the same as what this court approved back in 2020. Certainly, in a bankruptcy case, one size does not fit all.  Highland is a unique case that has involved great contentiousness and hundreds of millions of dollars of assets. Mr. Seery's compensation reflects these circumstances, among other things.

In summary, with all due respect to the Proposed Experts, it is hard for this court to conceive how they could help this court to understand the evidence or determine a fact in issue relative to the gatekeeping motion—as contemplated by Fed. R. Evid. 702(a)—when this court deals with the issues presented by motion, and similar issues, somewhat regularly.

Accordingly, the court will exercise its discretion under Fed. R. Evid 702(a) and exclude the Proposed Experts testimony and HMIT Exhibits 39-52 relating to same.

A further opinion and order will be forthcoming on the HMIT Motion for Leave.

### #### END OF MEMORANDUM OPINION AND ORDER####

---

is merely to further the point that a long-term bankruptcy judge with Chapter 11 experience typically has developed expertise regarding executive compensation issues pre-and post-confirmation in Chapter 11 cases.

# Exhibit 8



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 1, 2023**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Case No. 19-34054-sgj11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |
| | ) |

### ORDER STRIKING HMIT'S EVIDENTIARY PROFFER PURSUANT TO
### RULE 103(a)(2) AND LIMITING BRIEFING

The Court has reviewed Hunter Mountain Investment Trust's ("HMIT") *Evidentiary Proffer Pursuant to Rule 103(a)(2)* ("Proffer"; Dkt. No. 3858), the *Highland Parties' Joint Objections To And Motion To Strike HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2)* ("Motion"; Dkt. No. 3860) filed by Highland Capital Management, L.P., the Highland Claimant Trust, and James P. Seery, Jr. (collectively, the "Highland Parties"), and the *Claims Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike HMIT's Purported Proffer* (Dkt. No. 3861) filed by Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management,

L.L.C., and Stonehill Capital Management LLC (collectively with HMIT and the Highland Parties, the "Parties"). After due deliberation, the Court has determined that good and sufficient cause has been shown for the relief requested in the Motion. It is therefore **ORDERED** that:

1.      The Motion is **GRANTED**.

2.      The Proffer and its accompanying declarations are stricken from the record for the reasons set forth in the Court's June 27, 2023 email (attached hereto as Exhibit A). The Court directs the Clerk to remove docket entry 3858 from the docket.

3.      The Parties shall not file any additional briefs, motions, pleadings, proffers, or other submissions with the Court in connection with the Motion, the Highland Parties' *Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully* (Dkt. No. 3820), or any proposed/excluded expert evidence relative to HMIT's *Motion for Leave to File Verified Adversary Proceeding* (Dkt. No. 3699).

### END OF ORDER ###

# Exhibit A

From: Traci Ellison <Traci_Ellison@txnb.uscourts.gov>
Date: June 27, 2023 at 11:23 AM CDT

To: "Stancil, Marc S." <Marc.Stancil@hklaw.com>, "Donlin, Kimberly Sciarratta"
<zannable@haywardfirm.com>, "Sawnie A. McEntire" <smcentire@pmmlaw.com>, "Roger L. McCleary"
<rmccleary@pmmlaw.com>, "Omar J. Alaniz" <OAlaniz@reedsmith.com>, "McIlwain, Brent R (DAL - X59481)"
<Brent.McIlwain@hklaw.com>
Subject: 19-34054-sgj11 Highland Capital Management, L.P.


Dear Counsel:

Please see the following message from Judge Jernigan:

"With regard to the Evidentiary Proffer ("Proffer") of Hunter Mountain Investment Trust ("HMIT") filed at DE # 3858 on 6/19/23 (i.e.,
after the 6/8/23 hearing on HMIT's Motion for Leave to File Verified Adversary Proceeding [DE # 3699] and after the court's written
6/16/23 ruling regarding the admissibility of the proposed expert evidence), the court has determined that the Proffer is
unnecessary. Rule 103(a)(2) does not apply if the "substance" of the excluded evidence "was apparent from the context." Fed. R.
Evid. 103(a)(2). Here, "the substance" of the excluded evidence was quite apparent from the "context"--more specifically, the
witness and exhibit list filed by HMIT, the proposed exhibits offered [see DE # 3818], and the statements of HMIT's counsel on the
record at the 6/8/23 hearing.

The court is aware of the motion to strike the Proffer [DE # 3860] and the Joinder therein [DE # 3861]. The court concludes it is
appropriate to grant the motion to strike. The court directs counsel for movants to upload a form of order that grants their motion
to strike. The order shall direct the Clerk to mark DE # 3858 as stricken from the record as both filed without authority and
unnecessary pursuant to FRE 103(a)(2).

The parties are directed to file no more pleadings in the bankruptcy court regarding this issue of the proposed/excluded expert
evidence relative to DE # 3699. The court has ruled [at DE # 3854]."

Thank you,
Traci

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Reorganized Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S NOTICE OF APPEAL**

Pursuant to 28 U.S.C. § 158(a) and Federal Rules of Bankruptcy Procedure 8001-8002, Movant Hunter Mountain Investment Trust ("HMIT"), both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] appeals to the United States District Court for the Northern District of Texas, Dallas Division, from this Court's August 25, 2023 Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding  (Docs. 3903-3904) (attached to this notice as Exhibits 1 and 2) (the "Final Order"), and all associated interlocutory orders or decisions that merged into or preceded the Final Order, including but not limited to the following:

- March 31, 2023 Order Denying Application for Expedited Hearing (Doc. 3713) (attached to this notice as Exhibit 3);

- May 11, 2023 Order Fixing Briefing Schedule and Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented (Doc. 3781) (attached to this notice as Exhibit 4);

---

[1] And, in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Bankr. Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), and the supplement to the Emergency Motion [Bankr. Dkt. No. 3760] and the draft Complaint attached to the same [Bankr. Dkt. No. 3760-1].

- May 24, 2023 Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding (Doc. 3790) (attached to this notice as Exhibit 5);

- May 26, 2023 Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery Or, Alternatively, For Continuance of the June 8, 2023 Hearing (Doc. 3800) (attached to this notice as Exhibit 6);

- Evidentiary and other oral rulings, including but not limited to rulings associated with expert testimony, made at the June 8, 2023 Hearing;

- June 16, 2023 Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence (Doc. 3853) (attached to this notice as Exhibit 7); and,

- July 5, 2023 Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing (Doc. 3869), including the appended email ruling (attached to this notice as Exhibit 8).

The names of all other parties to the Orders and their respective counsel are as follows:

- Movant HMIT, represented by:

**PARSONS MCENTIRE MCCLEARY PLLC**

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel: (214) 237-4300
Fax: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Tel: (713) 960-7315
Fax: (713) 960-7347

- Non-movants Highland Capital Management, L.P., and the Highland Claimant Trust, represented by:

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz
John A. Morris
Gregory V. Demo

Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

- Non-movant James P. Seery, Jr., represented by:

**WILLKIE FARR & GALLAGHER LLP**

Mark T. Stancil
Joshua S. Levy
1875 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

**REED SMITH LLP**

Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
Tel: (469) 680-4292

- Non-movants Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management, L.L.C., and Stonehill Capital Management LLC, represented by:

**HOLLAND & KNIGHT LLP**

Brent R. McIlwain, TSB 24013140

David C. Schulte TSB 24037456
Christopher Bailey TSB 24104598
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
Fax: (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

Dated:  September 8, 2023          Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY
PLLC**

By:  */s/ Sawnie A. McEntire*
       Sawnie A. McEntire
       Texas State Bar No. 13590100
       smcentire@pmmlaw.com
       1700 Pacific Avenue, Suite 4400
       Dallas, Texas 75201
       Telephone: (214) 237-4300
       Facsimile: (214) 237-4340

       Roger L. McCleary
       Texas State Bar No. 13393700
       rmccleary@pmmlaw.com
       One Riverway, Suite 1800
       Houston, Texas 77056
       Telephone: (713) 960-7315
       Facsimile: (713) 960-7347

       ***Attorneys for Hunter Mountain
       Investment Trust***

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on September 8, 2023, on all parties receiving electronic notification.

                    */s/ Sawnie A. McEntire*
                    Sawnie A. McEntire

3130663.1

# Exhibit 1



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 25, 2023**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| Reorganized Debtor. | § | |

**MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
[BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]**

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

---

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities. Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation. The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3]  The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein.  The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

### A.    Who is the Movant, HMIT?

Who is HMIT?  It is undisputed that it is a former equity owner of Highland.  It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement.  This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest.  As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022). The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions." In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

HMIT's only asset is its contingent interest in the Claimant Trust.  It has no employees or revenue.

HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness

owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero

("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his

family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees.  HMIT

vehemently disputes the suggestion that it is controlled by Dondero.

       B.    *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the

bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized

Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's

CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and

(2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who

purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the

Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later

further explained), the claims acquired by the Claims Purchasers were acquired by them after

extensive litigation, mediation, and settlements were approved by the bankruptcy court and after

the original claims-holders had voted on the Plan and after Plan confirmation.  As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave.  Nearly a month later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that "[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action." Supplement, ¶ 1 and Exhibit 1-A.  It is this revised proposed complaint to which this court will refer, when it uses the defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5, 2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto. In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

C.     *Why Does HMIT Need to Seek Leave?*

As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7]   The Gatekeeper Provision was not included in the Plan *sans raison*. Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

D.      *Some Further Context Regarding Post-Confirmation Litigation Generally.*

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls.   To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan.   Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.   Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023:  six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings

or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery")

in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the

Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and

harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place"

after not achieving the results he wanted in the Highland bankruptcy case.  Indeed, the Motion for

Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then

HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers)

through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202").

In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting
that the list is "a summary of active pending actions only and does not include actions that were resolved by final
orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas
and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, *three*
of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which
upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the
lack of bankruptcy appellate standing on behalf of the appellant.  On July 19, 2023, the Fifth Circuit affirmed the
district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving
professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a
"person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In
re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023).  On July 31, 2023, the Fifth Circuit affirmed
the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this
Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent
interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the
same basis:  Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry
of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No.
22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023).  The July 31, 2023 ruling followed the Fifth Circuit's ruling
on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court
order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland
Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2623022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are
discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth
Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's
affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing
with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity
affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of
its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the
Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320
(5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided

one or more of the Claims Purchasers with material nonpublic information to induce them to want

to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that

the Claims Purchasers were allegedly told they would make a hefty profit on the claims they

purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as

the Claimant Trustee of the Claimant Trust.  In sum, HMIT alleges this constituted wrongful

"insider trading" of the bankruptcy claims.  In addition, certain lawyers for Dondero and Dugaboy

sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities

Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise

of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether

HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are

"colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of

the Plan).  The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June

8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses

both in support of and in opposition to the Motion for Leave.  Having considered the Motion for

Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the

arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's

request for leave to pursue its Proposed Claims.  The court's reasoning is set forth below.

## II.    BACKGROUND

### A.  *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada").  It

operated as a global investment adviser that provided investment management and advisory

services and managed billions of dollars of assets, both directly and indirectly through numerous

affiliates.   Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%),

Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was

wholly owned by Dondero and was the only general partner of Highland (0.25%).  On October 16,

2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president,

and portfolio manager, and facing a myriad of massive, business litigation claims – many of which

had finally become or were about to be liquidated (after a decade or more of contentious litigation

in multiple fora all over the world—filed for relief under chapter 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The

bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December

2019.  The official committee of unsecured creditors (the "Committee") (and later, the United

States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over

and distrust of Dondero, his numerous conflicts of interest, and his history of alleged

mismanagement (and perhaps worse).

After many weeks under the specter of a possible appointment of a trustee, Highland and

the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance

settlement approved by this court on January 9, 2020.[11]  As a result of this settlement, Dondero

relinquished control of Highland and resigned his positions as officer or director of Highland and

its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020
[Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of
Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course*
[Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with
Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of
Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures
for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

chosen to lead Highland through its chapter 11 case: Seery, John S. Dubel, and retired bankruptcy

judge Russell Nelms. Given the Debtor's perceived culture of constant litigation while Dondero

was at the helm, it was purportedly not easy to get such highly qualified persons to serve as

independent board members. At the hearing on the corporate governance settlement motion, the

court heard credible testimony that none of the Independent Directors would have taken on the

role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2)

indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere

negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation

against the Independent Directors without the bankruptcy court's prior authority. The gatekeeper

provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind
> against any Independent Director, any Independent Director's agents, or any
> Independent Director's advisors relating in any way to the Independent Director's
> role as an independent director of Strand without the Court (i) first determining
> after notice that such claim or cause of action represents a colorable claim of willful
> misconduct or gross negligence against Independent Director, any Independent
> Director's agents, or any Independent Director's advisors and (ii) specifically
> authorizing such entity to bring such claim. The Court will have sole jurisdiction to
> adjudicate any such claim for which approval of the Court to commence or pursue
> has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation

and did so "subject at all times to the supervision, direction and authority of the Independent

Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors

determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to

"not cause any Related Entity to terminate any agreements with the Debtor."[15] The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery acting in these roles. The gatekeeper provision in the July 2020 Order was essentially the same as the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

July 2020 Order, 3, ¶5. Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization plans, none of which were embraced by the Committee or the Independent Directors. When Dondero's plans failed to gain support, he and entities under his control engaged in substantial, costly, and time-consuming litigation for Highland.[17] As the Fifth Circuit described the situation, after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr. Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr. Dkt. No. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt. No. 1808] on January 22, 2021.[20]  Highland had negotiated settlements with most of its major creditors following mediation and had amended its initially proposed plan to address the objections of most of its creditors, leaving only the objections of Dondero and entities under his control (the "Dondero Parties") at the time of the confirmation hearing,[21] which was held over two days in early February 2021.  The Plan is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created:  the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner).  Highland's various servicing agreements were vested in the Reorganized Debtor, which continues to manage collateralized loan obligation vehicles ("CLOs") and various other investments postconfirmation.  The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13.  The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("Disclosure Statement") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries. The Claimant Trust

is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan

and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package

as the CEO of the Reorganized Debtor and the Claimant Trustee. Following their acquisition of

their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members

of the CTOB.[23] Seery's compensation included the same base salary that he was receiving as CEO

and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the

creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests

in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each

holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust

Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership

interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

> B. *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery, and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His Compensation as Claimant Trustee Post-Confirmation*

>> 1. The December 17, 2020 MGM Email

Between Dondero's forced resignation from Highland in October 2020 and the

confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to

thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors

and the Committee. In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

(the "MGM Email") that featured prominently in HMIT's Motion for Leave. According to HMIT and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely by either Amazon or Apple.[25] At the time Dondero sent the MGM Email, Dondero sat on the board of directors of MGM, and the Debtor owned MGM stock directly. The Debtor also managed and partially owned a couple of other entities that owned MGM stock and managed various CLOs that owned some MGM stock as well. HMIT alleges now that Seery later misused and wrongfully disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in exchange for him providing this allegedly "insider" information that inspired them to purchase unsecured claims with an alleged expectation of future large profits).[26] A timeline of events (in late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's departure from Highland, helps to put the email in full context:

- October 16: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- November 24: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- November 24–27: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- November 30: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- December 3: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- December 3: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- December 10: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- December 16: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- December 17: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero: "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:

> [The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

June 8 Hearing Transcript, 273:13-22.

The MGM Email had the subject line "Trading Restriction re MGM – material non public information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he received the MGM Email.  This was because, among other reasons, Dondero sent it *after*: (i) unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of the disclosure statement; and (v) Highland's demand to collect on the demand notes for which Dondero and his entities were liable.[38]  Highland's Chapter 11 case was fast approaching the finish line.  Moreover, MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this.[39]  Still further, as of December 17, 2020 (the date Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct and indirect control of the Debtor to the Independent Board as part of the corporate  governance settlement[40]  and  having resigned from all roles at the Debtor and affiliates in October 2020.  Still further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. ***My purpose was to alert Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades***.

It is noteworthy that ***Dondero's labeling of the MGM Email (in the subject line) as a communication containing "material non public information" did not make it so***.  In fact, it appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for Leave that the MGM Email did not disclose information to Seery that was not already made available to the public at the time it was sent. Seery testified that he did not think the MGM Email contained MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier noted—"MGM was already on the restricted list at Highland Capital . . . before I got to Highland."[42]  Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9.  Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors of MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10.  He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . .  MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[44]  For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]  In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]  Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

them."[48]  Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email.  He did not "say anything about Amazon hitting the price."  He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them."  Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple.  When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically *did not* communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed.  For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt."  The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers."[50] (*Id.* Ex. 27.)   The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is not enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022.

---

[50] Highland Ex. 27.

[51] Highland Ex. 28.

[52] Highland Ex. 29.

[53] Highland Ex. 30.

19

2. <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery. HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers. Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations. HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable.  These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021).  Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57]   He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59]   The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4.  The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4.  The court has placed in a table and numbered each line for ease of reference.  The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63] Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65] Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66] Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67] Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69]  Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims.  Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure.   The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended petition, the responses, the record, applicable authorities and having conducted a hearing on the petition on June 1, 2022.[72]

3. <u>Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories</u>

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202 Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks after his telephone calls with Linn and Patel—was true and accurate.  In it, he swore under oath as to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero acknowledged, as well, that his sworn statement that he filed in support of an amended verified Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May 2022), described the same telephone conversation he had with Linn, and it did not mention MGM at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Seery's say-so because they had made so much money in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin[n] of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Seery had testified in court, it made no sense to me that Mr. Lin[n] would think that the claims were worth more than what Seery testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.  Accordingly, "I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee."[76] Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary beneficiary."[77]  Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.

[76] *Id.*, ¶¶ 3-4.

[77] *Id.*, Ex. A, 1-2.

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78]  The U.S.

Trustee's office took no action.  Dondero made a second and third attempt to get the U.S. Trustee's

office to conduct an investigation into the same allegations laid out in Draper's letter, this time in

"follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later,

on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina

wrote "to provide additional information regarding the systemic abuses of bankruptcy process

occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged

conversation with Linn, this time in support of a Verified Rule 202 Petition ***filed by HMIT***

("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st

Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout

2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same

allegations of misconduct by Seery and Farallon.[80]   In this new sworn statement, Dondero

describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and

Linn and ***mentions MGM*** and Farallon's alleged optimism about the ***expected sale of MGM***:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital
> Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone
> calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to
> purchase the Acis and HarbourVest claims, which I understood to refer to claims
> that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and
> Mr. Linn stated that Farallon agreed to purchase these claims based solely on
> conversations with Seery because they had made significant profits when Seery told
> them to purchase other claims in the past. They also stated that they were
> particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed.  The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83]  But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland].  The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84]  HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85]  The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85]  June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

*C. Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the

Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured

claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were

approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and

(2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules

of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the

notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August

9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87]<br><br>$23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88]<br><br>$137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020<br><br>Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89]<br><br>$80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

---

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020 Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90] $125,000,000 in aggregate ($65,000,000 General | 8/9/2021 Bankr. Dkt. No. 2698 (Muck) and Bankr. Dkt. No. 2697 (Jessup) |

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91]   Dondero testified that it was *his* view that there was insufficient information in the public to justify the claims purchases.[92]   But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations.   In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93]   Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

---

[90] Bankr. Dkt. No. 2389.  The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases.  Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95]  Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside.  In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay *30 percent more* than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96]  Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill *as creditors*, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12.  The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See*, Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections. The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation. These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties. The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the  Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents *a colorable claim of any kind*, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

authorizing such Enjoined Party to bring such claim or cause of action against such
Protected Party.

The Plan defines Protected Parties as,

> collectively, (i) the Debtor and its successors and assigns, direct and indirect
> majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii)
> Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the
> Committee, (vii) the members of the Committee (in their official capacities), (viii)
> the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the
> Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities),
> (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the
> Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related
> Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero
> and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number

of persons than the persons protected under the January 2020 Order (addressing the Independent

Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as

CEO and CRO of the Debtor).  But, at the same time, it is less restrictive than the gatekeeping

provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders

shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful

misconduct or gross negligence," effectively providing the protected parties under the prior orders

with a limited immunity from claims of simple negligence or breach of contract that do not rise to

the level of  "willful misconduct or gross negligence," whereas the Gatekeeping Provision under

the Plan does not act as a release or exculpation of the Protected Parties in any way because it does

not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the

proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are

"colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller
universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

Dondero and some of the entities under his control appealed[100] the Confirmation Order

directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and

injunction provisions, including the Gatekeeper Provision (collectively, the "Protection

Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge,

purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-

debtor discharges.  As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large

part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11

U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all

remaining grounds."[101]   The Fifth Circuit specifically found the "injunction and gatekeeping

provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that

"exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions

that the Protection Provisions were legal, necessary under the circumstances, and in the best

interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision

improperly extended to certain bankruptcy participants other than Highland, the Committee and

its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero]." *Id.* at 434-35.

[101] *See supra* note 4.  The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022.  The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')."  In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424.  No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's *exculpation provision*."[102]  The Fifth Circuit then remanded to the Bankruptcy Court "for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted that the protection provisions in the January and July 2020 Orders appointing the Independent Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities" such that "[d]espite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent Directors, (iii) the Committee, and (iv) members of the Committee (in their official capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and that no other changes would be required to conform the Plan and Confirmation Order to the Fifth Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform, arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded." *Id.*

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]   The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

   *E.  HMIT's Motion for Leave*

         HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.  On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]   The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding ***the post-confirmation, pre-Effective Date purchase of allowed unsecured claims***.   The Proposed Defendants would be:

**Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case).  Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

**Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case.  They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers").  The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021.  Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases.  The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

**John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

**Highland,** as a nominal defendant.  HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

**Claimant Trust**, as a nominal defendant.  HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

**HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests).  HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

**Highland,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111]  The gist of the Proposed Complaint is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112]  HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased. HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants.  In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings.  As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[113]  In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that:  (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest).  HMIT argues that Seery should be required to disgorge his compensation.  It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.  Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant Trustee.  In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges claims which are substantially more than 'colorable' based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or abetting) breaches of fiduciary duty."[114]

    *F.  Is HMIT Really Dondero by Another Name?*

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a continuation of the harassing and bad-faith litigation by Dondero and his related entities that the Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been HMIT's administrator since August 2022.  Patrick asserts that he is not influenced or controlled by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against Seery and the Claims Purchasers.  However, the testimony elicited at the June 8 Hearing—the hearing at which HMIT had the burden of showing the court that its Proposed Claims were "colorable" such that it should be allowed to pursue them through the filing of the Proposed Complaint—paints a different picture.  Somewhat tellingly, HMIT chose not to call Patrick— allegedly HMIT's only representative and control person—as a witness in support of its Motion for Leave.  Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3.  HMIT notes, in a footnote 6, that "Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors.  Rather, the proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion

for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a

settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed

any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its

action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state

court.[122] HMIT's counsel argued that the point of this questioning was that "they're just trying to

draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact

that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202

proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First

Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where

HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting

the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in

objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and

dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to

the order as "an order denying *our second"* Rule 202 Petition.[124]  And, Dondero testified that his

warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had

traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of
questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint
on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's
counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they
might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence.
*Id.*, 58:14-15.

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own agenda in the bankruptcy case is not new.  Rather, this has been part of Dondero's *modus operandi* since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued to lob objections and create obstacles to Highland's implementation of the Plan through entities he owns or controls.  As noted above, the Fifth Circuit specifically upheld this court's finding in the Confirmation Order that Dondero owned or controlled the various entities that had objected to confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related appellants made similar protestations that they are not owned or controlled by Dondero and asked the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him."[126]  Based on the totality of the evidence in this proceeding, the court finds that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving force behind HMIT's Motion for Leave and the Proposed Complaint.  The Motion for Leave is just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.

[126] *Highland Capital*, 48 F.4th at 434-435.

### G. *Opposition to Motion for Leave: Arguing No Standing and No "Colorable" Claims*

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127] The Claims Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on May 11, 2023, as well.[128] In the Joint Opposition, the Highland Parties urge the court to deny HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have standing to bring them, directly or derivatively against the Proposed Defendants. They argue, in the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims trading in the bankruptcy which occurred between sophisticated Claims Purchasers and sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional counsel. Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the Claimant Trust were injured by the claims trading at issue because the Purchased Claims had already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the Plan on account of the Purchased Claims remain the same, the only difference being who holds the claims. Moreover, even if HMIT could succeed in equitably subordinating the validly transferred *allowed* claims, HMIT would still be in the same position it is today: the holder of a

---

[127] Bankr. Dkt. Nos. 3783. Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint. As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan. The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6). They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H.  HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132] Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT.  As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

I.  *Litigation within the Litigation:  The Pre- June 8 Hearing Skirmishes*

Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing.  HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice).  When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

Next, there were multiple pleadings and hearings regarding **what kind of hearing** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134]  The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims.  HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim.  Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low. Evidence is not allowed. . . . [S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading – in this case, the complaint, or now the revised complaint."[135] Counsel for the Proposed Defendants argued that the standard of review for colorability here, in the specific context of the court exercising its gatekeeping function under the Plan, is more akin to the standards applied under the Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing on the motion for leave; if the standard of review presents no greater hurdle to the movant than the 12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put in place to prevent.[137] On May 22, 2023, after receipt of post-hearing briefing on the issue, the court entered an order stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126 (1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the Confirmation Order], that the costs and distraction of this litigation are substantial. And if all we're doing is replicating a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance approval were meant to 'screen and prevent bad-faith litigation.' Well that – if that means only what the Plaintiff[ ] say[s] it does, then it really doesn't do anything at all to screen. There's no gatekeeping because their version of what that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion.  On May 26, 2023, this court held yet another status conference.  Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing.  The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour.  The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony).  Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits.  The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness).  The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have ***standing*** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "***colorable***."  But prior to getting into the weeds on ***standing*** and "***colorability,***" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of ***improper*** claims trading.

*A.  Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?*

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.  Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive." Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM. Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*? The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.] Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.] . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies. In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140] Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading: The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141]  On the flipside, "[c]aims trading permits an entrance to the bankruptcy process for those investors who want to take the time and effort to monitor the debtor and contribute expertise to the reorganization process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions whatsoever regarding claims trading. The only thing resembling any regulation of claims trading during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current version of which went into effect in 1991—and it imposes extremely light regulation—if it could even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the transferee.  The transferor shall then be notified and given 21 days to object.  If there is an objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place. If there is no objection, nothing further needs to happen, and the transferee will be considered substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the opportunity to object is the **_transferor_** of the claim (presumably, in the situation of a dispute regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms").

by the alleged transferor). Third, the **_economic consideration paid need not be disclosed to the court or anyone_**. Fourth, there is no requirement or definition of timeliness. Finally, it explicitly does not apply with regard to publicly traded debt. This, alone, means that many claims trades are not even reported in a bankruptcy case. But it is not just publicly traded debt that will not be reflected with a Rule 3001(e) filing. For example, bank debt, in modern times, is often syndicated (i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as the syndicated interests (participations) change hands, and they frequently do, there typically will not be a Rule 3001(e) notice filed.[143] To be clear here, this syndication-of-bank-debt fact, along with the fact that there are financial products whereby bank debt might be carved up into economic interests separate and apart from legal title to the loan, means there are many situations in which trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed by the bankruptcy court. This is the world of modern bankruptcy. Most of the claims trading that gets reported through a Rule 3001(e) notice is the trading of small vendor claims. And this is all regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a bankruptcy context. Perhaps this is not surprising, since it is not prohibited and **_is mostly a matter of private contract between buyer and seller_**. The case law that does exist seems to arise in situations of perceived bad faith of a purchaser—for example, when there was an attempt to control voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991. Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade. Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as
disallowing votes on a plan or even equitable subordination of a claim).[145]  Another type of case
that has generated case law is where the purchaser of claims occupied a fiduciary status with the
debtor.[146]  Still another type of case that has generated case law is where there is an attempt to
cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a
new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading
in different contexts.  Most of them imposed no adverse consequences on claims traders:  *In re
Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned
by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for
$16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2)
notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of
equitable subordination to the claim, stating:  "Equitable subordination is generally appropriate
only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the
Seventh Circuit further stated that it could "put to one side whether the court's finding of
inequitable conduct was correct" because even if there was misconduct, it did not harm the other
creditors, who were in the same position whether the original creditor or Garlin happened to own
the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the
debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny
Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes
of a claims purchaser who purchased to get a blocking position on a plan).  *But see In re First Humanics Corp.,* 124
B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to
file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147] *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006),
*vacated, Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp.
v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the ***transferor***; where there is no objection by the ***transferor***, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading. At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148] But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there **seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter**. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds. No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery. The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value. And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.*, 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts. *Contrast In re Lothian Oil Inc.*, 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may **recharacterize** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything.  Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed.  Second, the case at bar is unique in that the claims traded here ***had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case***.  Thus, the amounts that would be paid on them were "locked in," so to speak.  There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan).  Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] ***This was post-confirmation, pre-effective date claims purchasing.***  Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser.  The rules of the road had been set.  The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery).  Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.]  These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

were almost like passive investments, at this point—there was no risk of a claim objection and there was a confirmed plan, with a lengthy disclosure statement that described not only plan payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.      Breach of Fiduciary Duties (Seery)

II.     Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.    Conspiracy (all Proposed Defendants)

IV.     Equitable Disallowance (Claims Purchasers)

V.      Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.     Declaratory Judgment (all Proposed Defendants)

***The court struggles to fathom how any of these proposed causes of action or remedies can be applied in the context of:  (a) post-confirmation claims trading; (b) where the claims have all been litigated and allowed***.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom the following hypotheticals in which claims trading during a bankruptcy case might be somehow actionable:

> **Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto. There would then be a contested hearing between purchaser and seller regarding the validity of the transfer with the bankruptcy court issuing an appropriate order after the hearing on the objection. ***As noted, there was no objection to the Rule 3001(e) notices here***.

> **Hypothetical #2:** Alternatively, there could be a breach of contract suit between purchaser and seller if one thinks the other breached the purchase-sale agreement somehow.  Perhaps torts might also be alleged in such litigation. ***As noted, there is no dispute between purchasers and sellers here.***

> **Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." ***As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow.  The time elapsed long ago to seek revocation of the Plan.***

**Hypothetical #4:**  As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith").  ***Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.***

**Hypothetical #5:**  As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate ***claims*** to ***other claims***.  *See* Section 510(c) of the Bankruptcy Code. But here**,** HMIT is seeking either: (a) equitable subordination of the ***claims*** of the Claims Purchaser to HMIT's ***Class 10 former equity interest*** (in contravention of the explicit terms of section 510(c)) or, (b) ***equitable disallowance*** of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:**  Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders).  The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . .  according to the equities of the case.").  The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate ***entered without a contest*** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added).  Here there was most definitely "a contest" with regard to all of these purchased claims. ***Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.***

**Hypothetical #7:**  If a party believes "insider trading" occurred there are governmental agencies that investigate and police that.  ***Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview.  Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing***.

**Hypothetical #8:**  The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee.  While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this.***

B. *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law? Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

    1.   The Different Types of Standing:  Constitutional Versus Prudential

       The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

       Article III constitutional standing works as follows:  a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153]  "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152] Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing.  In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence.  The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159]  In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160]  The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials.  After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff/mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161]  Thus, the district court's error was ***not*** in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's/mother's amended complaints.[162]  The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?"  As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing.  "Not one of our precedents holds that the inquiry is jurisdictional."  It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities.  In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304.  The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing.   As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy *appellate* standing originated in a statute in the Bankruptcy Act.  The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165]   The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166]   In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up).  The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited.*" *Id.* (cleaned up).

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark[167]* opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying— or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up). The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

standing requirement embodied in the 'person aggrieved' test."[172]  The district court noted that it had an "independent obligation to consider constitutional standing before reaching its prudential aspects."[173]   The district court dismissed the appeal as to Dugaboy and HCMFA for lack of standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on the merits.  The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did not contest the district court's determination that NexPoint had standing to pursue the appeal, it "may consider prudential standing issues *sua sponte*."[175]  In doing so, the Fifth Circuit recognized the distinction between constitutional standing and the prudential "person aggrieved" test applied to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard than traditional constitutional standing," as it requires an appellant to show that it is "directly, adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed Claims, this court must **first** determine whether HMIT would have constitutional standing under Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then **additionally** address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might **limit** who may sue.  Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).  The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied

only in the context of bankruptcy *appellate* matters.[178]   As noted in its most recent opinion

discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated

that the "person aggrieved" test is a test for bankruptcy *appellate* standing, which is narrower than

a party in interest's right to be heard in bankruptcy cases in general.[179]   The court rejected an

argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise

and may appear and be heard on any issue in a case under this chapter" confers *appellate* standing,

noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept

distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for

bankruptcy appellate standing is narrower than the test for determining one's standing to appear

and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional

standing to bring the Proposed Claims.

2.   <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional

standing is necessary for a court to exercise subject matter jurisdiction.   It is only the first hurdle a

party must clear before pursuing a claim in federal court.   HMIT, as  plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing.   The court is not being critical of this mistake.   As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing.   Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer *appellate* standing.")(emphasis added).

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

Concrete and Particularized; Actual or Imminent.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.

[182] *Lujan*, 504 U.S. at 560 (cleaned up).

[183] *Spokeo*, 578 U.S. at 339.

[184] *Id.* at 340.

[185] *Id.*

[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

      Traceability - Causal Connection.  As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188]  The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

      Redressability.  The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190]  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191]  "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

      The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here. What is HMIT's concrete and particularized injury—that is "real" and is not abstract? That is not conjectural or hypothetical? That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest. HMIT alleges the following injury: it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194] Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave. It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation. In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee). The CTA now further governs his compensation. The CTA, which was publicly filed *in advance of* the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law. Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court. The issue cannot be forfeited or waived by a party. *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered. HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a "success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the CTOB in setting the success fee and severance and the like.   A fully executed copy of the CTA was admitted into evidence at the June 8 Hearing.  HMIT is essentially arguing that its injury (i.e., diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a court-sanctioned and creditor-approved process for approving compensation to Seery.  Moreover, HMIT has failed to plead facts sufficient to show that, even if Seery received excessive compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust Interest will ever vest.   The district court and the Fifth Circuit in various appeals by Dugaboy, another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing based on the *speculative nature of its alleged injuries as a contingent beneficiary of the Claimant Trust under the Plan*.   For example, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]   The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."  The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional

standing "because they have not identified any injury fairly traceable to the Order: ***the injuries

identified are speculative at best and nonexistent at worst***."[196]  HMIT's allegations of injury are,

without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future

injury if its Contingent Claimant Trust Interest ever vests."[197]  The court finds that HMIT would

not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury

in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

    With regard to the second requirement of constitutional standing—whether HMIT could

show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection

between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only

a speculative injury.  Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims

Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there

is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of

a distribution on a Contingent Claimant Trust Interest).

    With respect to the third requirement of constitutional standing—whether HMIT can show

"redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curiam*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is . . . a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of ***equitable subordination*** of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), ***claims cannot be subordinated to interests***. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that ***equitable disallowance*** of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization" of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate ***entered without a contest*** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. ***Thus, it would appear***

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to*

*section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

3.   <u>HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims</u>.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if HMIT would lack prudential standing to bring them under applicable state or federal law.  HMIT argues that it does have prudential standing under both federal bankruptcy law and Delaware law to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to:  (a) Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b) *Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case addressing when a creditors committee may be granted standing to bring causes of action on behalf of a bankruptcy estate.  But, federal bankruptcy law does not confer standing *where the plaintiff otherwise lacks standing under applicable state law*. In other words, whether HMIT would have prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum. Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring a derivative action under the substantive law of Delaware.  Additionally, HMIT's reliance on *LWE* is misplaced: *LWE* permits creditors, in certain circumstances *during* a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).

[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue,

derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former

bankruptcy estate's assets.  Upon confirmation of the Plan, the bankruptcy estate of Highland

ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the

Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE*

did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue

of prudential standing and does not supersede state-law requirements for standing.  In *LWE*, before

addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a

bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy

analysis to determine "as a threshold issue" whether the creditors' committee in that case could

assert its claims under Louisiana law.[205]  The court specifically addressed whether the creditors'

committee could pursue a derivative action under Louisiana law and concluded that "there is no

bar in Louisiana law to actions brought by or in the name of a corporation against the directors and

officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana

law specifically recognizes such actions."[206]  So, even under *LWE* (which the court does not think

applies in this post-confirmation context), if HMIT would be barred from bringing a derivative

action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops

there.[207]  Thus, the court looks to Delaware law to determine if HMIT would have prudential

standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where
the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware
LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

Trust."[212]  The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary:  that it *is* currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint.  The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213]  HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan); [215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212] *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).  HMIT acknowledges this requirement in its Reply:  "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ."  HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an **unvested** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law.  HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216]  The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple.  The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA.  It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee.  Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.*[218] To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership. HMIT ***was*** a limited partner in the original debtor (specifically, a holder of Class B/C Limited Partnership interests in Highland), but that limited partnership interest was extinguished on August 11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any partnership interest in the newly created Reorganized Debtor limited partnership.[220] Because HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221] HMIT likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t] standing to continue a derivative suit" on behalf of the Debtor.[222] Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims

purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing.

A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce

a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under

Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224]

Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant

Trust,[225] it also would lack standing to bring a double derivative action.

> c) Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As ***Direct*** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself,

individually.[226] But just because HMIT asserts that some or even all of the Proposed Claims are

direct, not derivative claims, does not make it so: "a claim is not 'direct' simply because it is

pleaded that way."[227] Rather, in determining whether claims are direct or derivative, a court must

"look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the

Plaintiffs' characterization."[228] And, under Delaware law, "whether a claim is solely derivative or

---

*SkyPort Global Commcn's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Simon Enters., Inc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn **solely** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229]  "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230]  Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought:  "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231]  "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury.  It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, **since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims**.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

> d)   Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso*, 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").
[234] *See supra* note 23 and accompanying text.

standing.  Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

### C. *Are the Proposed Claims "Colorable"?*

1. <u>What is the Proper Standard of Review for a "Colorability" Determination?</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims—assuming HMIT somehow has standing—might be "colorable."  This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss.  In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation." In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose. The court would not require it. It was up to the parties. But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point. HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238] HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).

[237] Bankr. Dkt. Nos. 3815 and 3816.

[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running objection to the evidentiary format of the hearing).[239]

In determining what appropriate legal standard applies here in the "colorability" analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant. In determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support for it, and made specific findings relating to Dondero's post-petition litigation and the need for inclusion of the Gatekeeper Provision in the Plan.[240] This court observed that "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor."[241] This court further found that: (1) Dondero's post-petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper Provision in place, "Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78. *See supra* note 12.

costs and distraction such litigation or the threats of such litigation would cause,"[243] and, (3) "unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will present unacceptable risks to parties currently willing to serve in such roles." Thus, as set forth in the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were approved based on the same concerns regarding the threat of continued litigation by Dondero and his related entities) required Dondero and related entities to make a threshold showing of colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] Asd noted at ¶ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so **without an exclusion for claims asserted by Mr. Dondero and his affiliates** required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

how "colorability" should work here.  It seems that applying HMIT's proposed Rule 12(b)(6)
"plausibility" standard would impose no hurdle at all to litigants and would render the threshold
for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of
the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6)
standard are inapposite.  HMIT has cited no authority that addresses the appropriate standard for
assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically,
one implemented in response to a demonstrated need to screen and prevent continued bad-faith,
harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of
a plan, which is what we have here.  HMIT relies on a bevy of cases that include benefits coverage
disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of
which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the
court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long
recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example,
that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002)
(assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered
a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid
Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods.
(In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted
class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson
v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was
"colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at
*3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional
defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3
(S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing
whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare
coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same);
*Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a
"colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842,
844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties. One example is *In re VistaCare Group, LLC.*[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252] To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

requirements of Rule 8."[253]  "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255]  The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation.  The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257]  The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)).  The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).  Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee.  Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss. It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*. Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave. For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test." The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2.  <u>HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.</u>

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties. HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment. But, even under the less stringent

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

      a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266]  HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

of the Claimant Trust or Reorganized Debtor.  But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable").  HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill.  At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he *believed* that Seery *must have* communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims).  Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense."  Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction.  Dondero only

---

[270] Proposed Complaint  ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.
[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI. But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts. Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272] The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." But, the evidence showed that this information was widely reported in the financial press at the time. Thus, it could not have constituted MNPI as a matter of law.[273] Moreover, the evidence showed that Dondero **did not** communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser). Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing. In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive" and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence at the June 8 Hearing reflected that the allegations are completely speculative, without any foundation whatsoever, and lack merit.  And they are also simply not plausible.  HMIT fails to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

> b) HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and, along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed Complaint.[277]  Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is also governed by Delaware law.[278]  HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] See *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] See *Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]  In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.  Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281]  "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]  While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo,*" and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] **must have** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287]   Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288] HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289]   Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a **sufficient** potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any* **significant** profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert.  Thus, the court only allowed Dondero to testify as to what data *he* (or entities he controls or controlled) would rely on, what *his* risk tolerance would have been, and what level of potential profits *he* would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit.  Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "***impossible*** for Stonehill and Farallon (in the absence of insider information) to forecast ***any*** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290]    HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence.  HMIT's allegations in the Proposed Complaint that ***Farallon*** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months ***after*** the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]  In addition, there are no allegations in the Proposed Complaint regarding whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring the Purchased Claims.[292]  The court finds and concludes that HMIT's allegations of aiding and abetting and conspiracy in Counts II and III of the Proposed Complaint are based on unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with verifiable public facts.  Accordingly, HMIT has failed to show that these claims have a foundation and merit and has also failed to show that they are plausible.

> c) HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the Proposed Complaint

> i. Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent over and above their initial investment," and, in the alternative, equitable subordination of their claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims based on material non-public information" and being "unfairly advantaged" in "earning significant profits on their purchases."[293]  As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

subordination of a ***claim to other claims*** or an ***interest to other interests*** but does not permit equitable subordination of a ***claim to interests***.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following ***a contest*** (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case."  But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure.  HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements.  Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

    ii.    Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;"  thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

[296] Proposed Complaint ¶¶ 89-93.

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  *Yet Seery's compensation is governed by express agreements* (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

   iii.    Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]  But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]  This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.  This court has also found and concluded that all of the Proposed Claims are without foundation or merit and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.  Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

### d)  HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.  But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.  And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

3. HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness.

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose.  Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings.  So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV.    CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons:  (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose.  Moreover,

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6) "plausibility" standard, the Proposed Claims are not plausible.

Accordingly,

**IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

### ###End of Memorandum Opinion and Order###

# Exhibit 2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 25, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| Reorganized Debtor. | § | |

### MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
### [BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

---

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities.  Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation.  The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3]  The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein.  The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

A.    Who is the Movant, HMIT?

Who is HMIT?  It is undisputed that it is a former equity owner of Highland.  It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement.  This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest.  As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022). The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions."  In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

HMIT's only asset is its contingent interest in the Claimant Trust.  It has no employees or revenue.

HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness

owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero

("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his

family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees.  HMIT

vehemently disputes the suggestion that it is controlled by Dondero.

     B.    *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the

bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized

Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's

CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and

(2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who

purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the

Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later

further explained), the claims acquired by the Claims Purchasers were acquired by them after

extensive litigation, mediation, and settlements were approved by the bankruptcy court and after

the original claims-holders had voted on the Plan and after Plan confirmation.  As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave.  Nearly a month later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that "[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action." Supplement, ¶ 1 and Exhibit 1-A.  It is this revised proposed complaint to which this court will refer, when it uses the defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5, 2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto.  In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

     C.    *Why Does HMIT Need to Seek Leave?*

     As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7]  The Gatekeeper Provision was not included in the Plan *sans raison*.  Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

D. *Some Further Context Regarding Post-Confirmation Litigation Generally.*

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls. To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan. Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors. Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023: six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery") in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place" after not achieving the results he wanted in the Highland bankruptcy case. Indeed, the Motion for Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers) through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202"). In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting that the list is "a summary of active pending actions only and does not include actions that were resolved by final orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, *three* of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the lack of bankruptcy appellate standing on behalf of the appellant. On July 19, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023). On July 31, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the same basis: Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023). The July 31, 2023 ruling followed the Fifth Circuit's ruling on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320 (5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided

one or more of the Claims Purchasers with material nonpublic information to induce them to want

to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that

the Claims Purchasers were allegedly told they would make a hefty profit on the claims they

purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as

the Claimant Trustee of the Claimant Trust.  In sum, HMIT alleges this constituted wrongful

"insider trading" of the bankruptcy claims.  In addition, certain lawyers for Dondero and Dugaboy

sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities

Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise

of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether

HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are

"colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of

the Plan).  The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June

8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses

both in support of and in opposition to the Motion for Leave.  Having considered the Motion for

Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the

arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's

request for leave to pursue its Proposed Claims.  The court's reasoning is set forth below.

## II.    BACKGROUND

### A.  *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada").  It

operated as a global investment adviser that provided investment management and advisory

services and managed billions of dollars of assets, both directly and indirectly through numerous

affiliates.   Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%), Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was wholly owned by Dondero and was the only general partner of Highland (0.25%).   On October 16, 2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president, and portfolio manager, and facing a myriad of massive, business litigation claims – many of which had finally become or were about to be liquidated (after a decade or more of contentious litigation in multiple fora all over the world—filed for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December 2019.   The official committee of unsecured creditors (the "Committee") (and later, the United States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over and distrust of Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

After many weeks under the specter of a possible appointment of a trustee, Highland and the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance settlement approved by this court on January 9, 2020.[11]   As a result of this settlement, Dondero relinquished control of Highland and resigned his positions as officer or director of Highland and its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020 [Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

chosen to lead Highland through its chapter 11 case:  Seery, John S. Dubel, and retired bankruptcy

judge Russell Nelms.  Given the Debtor's perceived culture of constant litigation while Dondero

was at the helm, it was purportedly not easy to get such highly qualified persons to serve as

independent board members.  At the hearing on the corporate governance settlement motion, the

court heard credible testimony that none of the Independent Directors would have taken on the

role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2)

indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere

negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation

against the Independent Directors without the bankruptcy court's prior authority.  The gatekeeper

provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind
> against any Independent Director, any Independent Director's agents, or any
> Independent Director's advisors relating in any way to the Independent Director's
> role as an independent director of Strand without the Court (i) first determining
> after notice that such claim or cause of action represents a colorable claim of willful
> misconduct or gross negligence against Independent Director, any Independent
> Director's agents, or any Independent Director's advisors and (ii) specifically
> authorizing such entity to bring such claim. The Court will have sole jurisdiction to
> adjudicate any such claim for which approval of the Court to commence or pursue
> has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation

and did so "subject at all times to the supervision, direction and authority of the Independent

Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors

determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to

"not cause any Related Entity to terminate any agreements with the Debtor."[15]  The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief
Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included
essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery
acting in these roles.  The gatekeeper provision in the July 2020 Order was essentially the same as
the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against
> Seery relating in any way to his role as the chief executive officer and chief
> restructuring officer of the Debtor without the Bankruptcy Court (i) first
> determining after notice that such claim or cause of action represents a colorable
> claim of willful misconduct or gross negligence against Seery, and (ii) specifically
> authorizing such entity to bring such claim.  The Bankruptcy Court shall have sole
> jurisdiction to adjudicate any such claim for which approval of the Court to
> commence or pursue has been granted.

July 2020 Order, 3, ¶5.  Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization
plans, none of which were embraced by the Committee or the Independent Directors.  When
Dondero's plans failed to gain support, he and entities under his control engaged in substantial,
costly, and time-consuming litigation for Highland.[17]   As the Fifth Circuit described the situation,
after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting
to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's
management, threatening employees, and canceling trades between Highland Capital and its
clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr. Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr. Dkt. No. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

affiliates in response to a demand by the Independent Directors made after Dondero's purported

threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of

reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt.

No. 1808] on January 22, 2021.[20]   Highland had negotiated settlements with most of its major

creditors following mediation and had amended its initially proposed plan to address the objections

of most of its creditors, leaving only the objections of Dondero and entities under his control (the

"Dondero Parties") at the time of the confirmation hearing,[21] which was held over two days in

early February 2021.  The Plan is essentially an "asset monetization" plan pursuant to which the

Committee was dissolved, and four new entities were created:  the Reorganized Debtor; a new

general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust

(administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc

Kirschner).  Highland's various servicing agreements were vested in the Reorganized Debtor,

which continues to manage collateralized loan obligation vehicles ("CLOs") and various other

investments postconfirmation.  The Claimant Trust owns the limited partnership interests in the

Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding

down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13.  The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("Disclosure Statement") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries.  The Claimant Trust

is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan

and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package

as the CEO of the Reorganized Debtor and the Claimant Trustee.  Following their acquisition of

their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members

of the CTOB.[23]  Seery's compensation included the same base salary that he was receiving as CEO

and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the

creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests

in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each

holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust

Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership

interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

    B. *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery, and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His Compensation as Claimant Trustee Post-Confirmation*

        1.  The December 17, 2020 MGM Email

    Between Dondero's forced resignation from Highland in October 2020 and the

confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to

thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors

and the Committee.   In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

(the "MGM Email") that featured prominently in HMIT's Motion for Leave.  According to HMIT and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely by either Amazon or Apple.[25] At the time Dondero sent the MGM Email, Dondero sat on the board of directors of MGM, and the Debtor owned MGM stock directly.  The Debtor also managed and partially owned a couple of other entities that owned MGM stock and managed various CLOs that owned some MGM stock as well.  HMIT alleges now that Seery later misused and wrongfully disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in exchange for him providing this allegedly "insider" information that inspired them to purchase unsecured claims with an alleged expectation of future large profits).[26]  A timeline of events (in late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's departure from Highland, helps to put the email in full context:

- October 16: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- November 24: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- November 24–27: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- <u>November 30</u>: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- <u>December 3</u>: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- <u>December 10</u>: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- <u>December 16</u>: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- <u>December 17</u>: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero: "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:

> [The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

June 8 Hearing Transcript, 273:13-22.

The MGM Email had the subject line "Trading Restriction re MGM – material non public information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he received the MGM Email. This was because, among other reasons, Dondero sent it ***after***: (i) unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of the disclosure statement; and (v) Highland's demand to collect on the demand notes for which Dondero and his entities were liable.[38]  Highland's Chapter 11 case was fast approaching the finish line.  Moreover, MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this.[39]  Still further, as of December 17, 2020 (the date Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct and indirect control of the Debtor to the Independent Board as part of the corporate  governance settlement[40]  and  having resigned from all roles at the Debtor and affiliates in October 2020.  Still further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in

Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail

was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then
> Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-
> public information regarding Amazon and Apple's interest in acquiring MGM. I
> became aware of this information due to my involvement as a member of the board
> of MGM. *My purpose was to alert Seery and others that MGM stock, which was
> owned either directly or indirectly by HCM, should be on a restricted list and not
> be involved in any trades*.

It is noteworthy that ***Dondero's labeling of the MGM Email (in the subject line) as a***

***communication containing "material non public information" did not make it so***.  In fact, it

appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for

Leave that the MGM Email did not disclose information to Seery that was not already made available

to the public at the time it was sent. Seery testified that he did not think the MGM Email contained

MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed

on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier

noted—"MGM was already on the restricted list at Highland Capital . . . before I got to

Highland."[42]   Indeed, MGM was ultimately purchased by Amazon after a sale process that had

been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9.  Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors of MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10.  He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . . MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[44]  For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]  In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]  Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

them."[48]  Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email.  He did not "say anything about Amazon hitting the price."  He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them."  Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple. When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically *did not* communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed.  For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt."  The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers."[50] (*Id*. Ex. 27.)  The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022.

---

[50] Highland Ex. 27.
[51] Highland Ex. 28.
[52] Highland Ex. 29.
[53] Highland Ex. 30.

2.   <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged
    MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery.  HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers.  Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations.  HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable.  These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021).  Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57]   He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59]  The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4.  The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4.  The court has placed in a table and numbered each line for ease of reference.  The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63]   Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65]   Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66]   Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67]   Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69]  Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims.  Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure.   The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended

petition, the responses, the record, applicable authorities and having conducted a hearing on the

petition on June 1, 2022.[72]

3. Underline: Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202

Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks

after his telephone calls with Linn and Patel—was true and accurate. In it, he swore under oath as

to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the

only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight

unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero

acknowledged, as well, that his sworn statement that he filed in support of an amended verified

Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May

2022), described the same telephone conversation he had with Linn, and it did not mention MGM

at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement

stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of

Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and

with no due diligence—100% relying on Seery's say-so because they had made so much money

in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave

them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin[n] of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Seery had testified in court, it made no sense to me that Mr. Lin[n] would think that the claims were worth more than what Seery testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.  Accordingly, "I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee."[76] Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary beneficiary."[77]   Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.

[76] *Id.*, ¶¶ 3-4.

[77] *Id.*, Ex. A, 1-2.

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78]  The U.S. Trustee's office took no action.  Dondero made a second and third attempt to get the U.S. Trustee's office to conduct an investigation into the same allegations laid out in Draper's letter, this time in "follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later, on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina wrote "to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged conversation with Linn, this time in support of a Verified Rule 202 Petition *filed by HMIT* ("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout 2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same allegations of misconduct by Seery and Farallon.[80]   In this new sworn statement, Dondero describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and Linn and *mentions MGM* and Farallon's alleged optimism about the *expected sale of MGM*:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Seery because they had made significant profits when Seery told them to purchase other claims in the past. They also stated that they were particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83] But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland]. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84] HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85] The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85] June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

*C. Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the

Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured

claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were

approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and

(2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules

of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the

notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August

9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87] $23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88] $137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020 Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89] $80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90]<br><br>$125,000,000 in aggregate ($65,000,000 General | 8/9/2021<br>Bankr. Dkt. No. 2698 (Muck) and Bankr. Dkt. No. 2697 (Jessup) |
|---|---|---|---|---|

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91] Dondero testified that it was *his* view that there was insufficient information in the public to justify the claims purchases.[92] But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations. In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93] Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

---

[90] Bankr. Dkt. No. 2389. The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases. Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95]  Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside.  In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay ***30 percent more*** than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96]  Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill ***as creditors***, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12.  The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See*, Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections.  The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation.  These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties.  The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the  Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents *a colorable claim of any kind*, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

The Plan defines Protected Parties as,

> collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities), (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number of persons than the persons protected under the January 2020 Order (addressing the Independent Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as CEO and CRO of the Debtor). But, at the same time, it is less restrictive than the gatekeeping provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful misconduct or gross negligence," effectively providing the protected parties under the prior orders with a limited immunity from claims of simple negligence or breach of contract that do not rise to the level of "willful misconduct or gross negligence," whereas the Gatekeeping Provision under the Plan does not act as a release or exculpation of the Protected Parties in any way because it does not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are "colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

Dondero and some of the entities under his control appealed[100] the Confirmation Order directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and injunction provisions, including the Gatekeeper Provision (collectively, the "Protection Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge, purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-debtor discharges.  As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all remaining grounds."[101]  The Fifth Circuit specifically found the "injunction and gatekeeping provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that "exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions that the Protection Provisions were legal, necessary under the circumstances, and in the best interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision improperly extended to certain bankruptcy participants other than Highland, the Committee and its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero].' *Id.* at 434-35.

[101] *See supra* note 4.  The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022.  The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')."  In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424.  No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's **exculpation provision**."[102]  The Fifth Circuit then remanded to the Bankruptcy Court

"for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted

that the protection provisions in the January and July 2020 Orders appointing the Independent

Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have

the effect of exculpating the Independent Directors and Seery in his executive capacities" such that

"[d]espite removal from the exculpation provision in the confirmation order, the Independent

Directors' agents, advisors, and employees, as well as Seery in his official capacities are all

exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the

Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant

with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent
> Directors, (iii) the Committee, and (iv) members of the Committee (in their official
> capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the

exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and

that no other changes would be required to conform the Plan and Confirmation Order to the Fifth

Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform,

arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing

the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the
protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such
a collateral attack is precluded." *Id.*

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]  The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

   E. *HMIT's Motion for Leave*

   HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.  On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]   The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding ***the post-confirmation, pre-Effective Date purchase of allowed unsecured claims***. The Proposed Defendants would be:

> **Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case). Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

> **Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case. They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers"). The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021. Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases. The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

> **John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

> **Highland,** as a nominal defendant. HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

> **Claimant Trust**, as a nominal defendant. HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

> **HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests). HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

**Highland,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111]  The gist of the Proposed Complaint is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112]  HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased.  HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants.  In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings. As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[113] In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that: (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest). HMIT argues that Seery should be required to disgorge his compensation. It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid. Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant Trustee.  In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges claims which are substantially more than 'colorable' based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or abetting) breaches of fiduciary duty."[114]

F.  *Is HMIT Really Dondero by Another Name?*

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a continuation of the harassing and bad-faith litigation by Dondero and his related entities that the Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been HMIT's administrator since August 2022.  Patrick asserts that he is not influenced or controlled by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against Seery and the Claims Purchasers.  However, the testimony elicited at the June 8 Hearing—the hearing at which HMIT had the burden of showing the court that its Proposed Claims were "colorable" such that it should be allowed to pursue them through the filing of the Proposed Complaint—paints a different picture.  Somewhat tellingly, HMIT chose not to call Patrick— allegedly HMIT's only representative and control person—as a witness in support of its Motion for Leave.  Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3.  HMIT notes, in a footnote 6, that "Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors.  Rather, the proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion

for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a

settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed

any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its

action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state

court.[122] HMIT's counsel argued that the point of this questioning was that "they're just trying to

draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact

that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202

proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First

Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where

HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting

the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in

objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and

dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to

the order as "an order denying *our second"* Rule 202 Petition.[124]  And, Dondero testified that his

warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had

traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence. *Id.*, 58:14-15.

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying

for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own

agenda in the bankruptcy case is not new.  Rather, this has been part of Dondero's *modus operandi*

since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster

in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued

to lob objections and create obstacles to Highland's implementation of the Plan through entities

he owns or controls.  As noted above, the Fifth Circuit specifically upheld this court's finding in

the Confirmation Order that Dondero owned or controlled the various entities that had objected to

confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related

appellants made similar protestations that they are not owned or controlled by Dondero and asked

the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording

to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely

independent from him."[126]  Based on the totality of the evidence in this proceeding, the court finds

that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving

force behind HMIT's Motion for Leave and the Proposed Complaint.  The Motion for Leave is

just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two

years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State

Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.

[126]  *Highland Capital*, 48 F.4th at 434-435.

G. *Opposition to Motion for Leave: Arguing No Standing and No "Colorable" Claims*

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127]  The Claims Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on May 11, 2023, as well.[128]  In the Joint Opposition, the Highland Parties urge the court to deny HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have standing to bring them, directly or derivatively against the Proposed Defendants.  They argue, in the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims trading in the bankruptcy which occurred between sophisticated Claims Purchasers and sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional counsel.  Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the Claimant Trust were injured by the claims trading at issue because the Purchased Claims had already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the Plan on account of the Purchased Claims remain the same, the only difference being who holds the claims.  Moreover, even if HMIT could succeed in equitably subordinating the validly transferred ***allowed*** claims, HMIT would still be in the same position it is today:  the holder of a

---

[127] Bankr. Dkt. Nos. 3783.  Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint.  As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan.  The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6).  They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H.  HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132]  Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT.  As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

I.   *Litigation within the Litigation:  The Pre- June 8 Hearing Skirmishes*

Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing.  HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice).  When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

Next, there were multiple pleadings and hearings regarding ***what kind of hearing*** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134]  The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims.  HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim.  Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low.  Evidence is not allowed. . . .
[S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading –
in this case, the complaint, or now the revised complaint."[135]  Counsel for the Proposed Defendants
argued that the standard of review for colorability here, in the specific context of the court
exercising its gatekeeping function under the Plan, is more akin to the standards applied under the
Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a
higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing
on the motion for leave; if the standard of review presents no greater hurdle to the movant than the
12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean
nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put
in place to prevent.[137]  On May 22, 2023, after receipt of post-hearing briefing on the issue, the
court entered an order stating that "the court has determined that there may be mixed questions of
fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to
present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to
Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively
for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126
(1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the
appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the
Confirmation Order], that the costs and distraction of this litigation are substantial.  And if all we're doing is replicating
a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the
burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the
confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance
approval were meant to 'screen and prevent bad-faith litigation.'  Well that – if that means only what the Plaintiff[ ]
say[s] it does, then it really doesn't do anything at all to screen.  There's no gatekeeping because their version of what
that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion.  On May 26, 2023, this court held yet another status conference.  Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing.  The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour.  The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony).  Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits.  The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness).  The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have ***standing*** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "***colorable***."  But prior to getting into the weeds on ***standing*** and "***colorability,***" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of ***improper*** claims trading.

### A.   *Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?*

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.  Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive."  Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM.  Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*?  The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.]  Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.]  . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies. In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140]  Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading:  The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141]  On the flipside, "[c]aims trading permits an entrance to the bankruptcy process for those investors who want to take the time and effort to monitor the debtor and contribute expertise to the reorganization process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions whatsoever regarding claims trading. The only thing resembling any regulation of claims trading during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current version of which went into effect in 1991—and it imposes extremely light regulation—if it could even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the transferee.  The transferor shall then be notified and given 21 days to object.  If there is an objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place. If there is no objection, nothing further needs to happen, and the transferee will be considered substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the opportunity to object is the ***transferor*** of the claim (presumably, in the situation of a dispute regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms").

by the alleged transferor).  Third, the *economic consideration paid need not be disclosed to the court or anyone*.  Fourth, there is no requirement or definition of timeliness.  Finally, it explicitly does not apply with regard to publicly traded debt.  This, alone, means that many claims trades are not even reported in a bankruptcy case.  But it is not just publicly traded debt that will not be reflected with a Rule 3001(e) filing.  For example, bank debt, in modern times, is often syndicated (i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as the syndicated interests (participations) change hands, and they frequently do, there typically will not be a Rule 3001(e) notice filed.[143]  To be clear here, this syndication-of-bank-debt fact, along with the fact that there are financial products whereby bank debt might be carved up into economic interests separate and apart from legal title to the loan, means there are many situations in which trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed by the bankruptcy court.  This is the world of modern bankruptcy.  Most of the claims trading that gets reported through a Rule 3001(e) notice is the trading of small vendor claims.  And this is all regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a bankruptcy context.  Perhaps this is not surprising, since it is not prohibited and *is mostly a matter of private contract between buyer and seller*.  The case law that does exist seems to arise in situations of perceived bad faith of a purchaser—for example, when there was an attempt to control voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991.  Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade.  Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as disallowing votes on a plan or even equitable subordination of a claim).[145]  Another type of case that has generated case law is where the purchaser of claims occupied a fiduciary status with the debtor.[146]  Still another type of case that has generated case law is where there is an attempt to cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading in different contexts.  Most of them imposed no adverse consequences on claims traders:  *In re Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for $16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2) notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of equitable subordination to the claim, stating:  "Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the Seventh Circuit further stated that it could "put to one side whether the court's finding of inequitable conduct was correct" because even if there was misconduct, it did not harm the other creditors, who were in the same position whether the original creditor or Garlin happened to own the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes of a claims purchaser who purchased to get a blocking position on a plan).  *But see In re First Humanics Corp.,* 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147] *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated, Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the ***transferor***; where there is no objection by the ***transferor***, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading. At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148] But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there **seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter**. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds. No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery. The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value. And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.*, 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts. *Contrast In re Lothian Oil Inc.,* 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may **recharacterize** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything.  Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed.  Second, the case at bar is unique in that the claims traded here **had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case**.  Thus, the amounts that would be paid on them were "locked in," so to speak.  There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan).  Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] **This was post-confirmation, pre-effective date claims purchasing.**  Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser.  The rules of the road had been set.  The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery).  Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.]  These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

were almost like passive investments, at this point—there was no risk of a claim objection and there was a confirmed plan, with a lengthy disclosure statement that described not only plan payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.     Breach of Fiduciary Duties (Seery)

II.    Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.   Conspiracy (all Proposed Defendants)

IV.    Equitable Disallowance (Claims Purchasers)

V.     Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.    Declaratory Judgment (all Proposed Defendants)

***The court struggles to fathom how any of these proposed causes of action or remedies can be applied in the context of:  (a) post-confirmation claims trading; (b) where the claims have all been litigated and allowed***.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom the following hypotheticals in which claims trading during a bankruptcy case might be somehow actionable:

**Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto. There would then be a contested hearing between purchaser and seller regarding the validity of the transfer with the bankruptcy court issuing an appropriate order after the hearing on the objection. ***As noted, there was no objection to the Rule 3001(e) notices here***.

**Hypothetical #2:** Alternatively, there could be a breach of contract suit between purchaser and seller if one thinks the other breached the purchase-sale agreement somehow.  Perhaps torts might also be alleged in such litigation. ***As noted, there is no dispute between purchasers and sellers here.***

**Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." *As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow. The time elapsed long ago to seek revocation of the Plan.*

**Hypothetical #4:** As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith"). *Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.*

**Hypothetical #5:** As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate *claims* to *other claims*. *See* Section 510(c) of the Bankruptcy Code. But here**,** HMIT is seeking either: (a) equitable subordination of the *claims* of the Claims Purchaser to HMIT's *Class 10 former equity interest* (in contravention of the explicit terms of section 510(c)) or, (b) *equitable disallowance* of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:** Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders).  The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . .  according to the equities of the case.").  The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added).  Here there was most definitely "a contest" with regard to all of these purchased claims. *Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

**Hypothetical #7:** If a party believes "insider trading" occurred there are governmental agencies that investigate and police that. *Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview.  Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing.*

**Hypothetical #8:** The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee.  While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this.***

B.  *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law? Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

    1.   <u>The Different Types of Standing:  Constitutional Versus Prudential</u>

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows:  a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153]   "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152] Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing.  In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that *in addition to* Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, *beyond those imposed by Article III*,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence.  The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159]  In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160]  The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials. After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff/mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161] Thus, the district court's error was ***not*** in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's/mother's amended complaints.[162] The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?" As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing. "Not one of our precedents holds that the inquiry is jurisdictional." It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities. In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304. The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing.  As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy **appellate** standing originated in a statute in the Bankruptcy Act.  The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165]   The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166]  In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up).  The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited*." *Id.* (cleaned up).

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark*[167] opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying— or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up).  The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

standing requirement embodied in the 'person aggrieved' test."[172]  The district court noted that it

had an "independent obligation to consider constitutional standing before reaching its prudential

aspects."[173]  The district court dismissed the appeal as to Dugaboy and HCMFA for lack of

standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on

the merits.  The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did

not contest the district court's determination that NexPoint had standing to pursue the appeal, it

"may consider prudential standing issues *sua sponte*."[175]  In doing so, the Fifth Circuit recognized

the distinction between constitutional standing and the prudential "person aggrieved" test applied

to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard

than traditional constitutional standing," as it requires an appellant to show that it is "directly,

adversely, and financially impacted by a bankruptcy order."[176]

      In summary, in analyzing whether HMIT would have standing to bring the Proposed

Claims, this court must ***first*** determine whether HMIT would have constitutional standing under

Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then ***additionally***

address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any

applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might

***limit*** who may sue.  Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).  The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied

only in the context of bankruptcy **appellate** matters.[178]   As noted in its most recent opinion

discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated

that the "person aggrieved" test is a test for bankruptcy **appellate** standing, which is narrower than

a party in interest's right to be heard in bankruptcy cases in general.[179]   The court rejected an

argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise

and may appear and be heard on any issue in a case under this chapter" confers **appellate** standing,

noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept

distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for

bankruptcy appellate standing is narrower than the test for determining one's standing to appear

and be heard in a bankruptcy proceeding.[180]

      Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional

standing to bring the Proposed Claims.

   2.  <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

      As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional

standing is necessary for a court to exercise subject matter jurisdiction.   It is only the first hurdle a

party must clear before pursuing a claim in federal court.   HMIT, as  plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing.  The court is not being critical of this mistake.  As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing.  Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer **appellate** standing.")(emphasis added).

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

<u>Concrete and Particularized; Actual or Imminent</u>.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]   "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.

[182] *Lujan*, 504 U.S. at 560 (cleaned up).

[183] *Spokeo*, 578 U.S. at 339.

[184] *Id.* at 340.

[185] *Id.*

[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

    <u>Traceability - Causal Connection</u>.  As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188]  The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

    <u>Redressability</u>.  The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190]  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191]  "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

    The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here.  What is HMIT's concrete and particularized injury—that is "real" and is not abstract?  That is not conjectural or hypothetical?  That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest.  HMIT alleges the following injury:  it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194]  Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave.  It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation.  In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee).  The CTA now further governs his compensation.  The CTA, which was publicly filed *in advance of* the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law.  Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court.  The issue cannot be forfeited or waived by a party.  *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.  Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered.  HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective

Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a

"success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the

CTOB in setting the success fee and severance and the like.   A fully executed copy of the CTA

was admitted into evidence at the June 8 Hearing.   HMIT is essentially arguing that its injury (i.e.,

diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a

court-sanctioned and creditor-approved process for approving compensation to Seery.   Moreover,

HMIT has failed to plead facts sufficient to show that, even if Seery received excessive

compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust

Interest will ever vest.   The district court and the Fifth Circuit in various appeals by Dugaboy,

another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest

in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for

a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing

based on the ***speculative nature of its alleged injuries as a contingent beneficiary of the Claimant

Trust under the Plan***.   For example, the Fifth Circuit affirmed the district court's dismissal of an

appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity

subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]   The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."   The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional

standing "because they have not identified any injury fairly traceable to the Order: ***the injuries***

***identified are speculative at best and nonexistent at worst***."[196]   HMIT's allegations of injury are,

without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future

injury if its Contingent Claimant Trust Interest ever vests."[197]   The court finds that HMIT would

not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury

in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing—whether HMIT could

show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection

between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only

a speculative injury.   Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims

Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there

is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of

a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing—whether HMIT can show

"redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curiam*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is . . . a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of ***equitable subordination*** of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), ***claims cannot be subordinated to interests***. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that ***equitable disallowance*** of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization" of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate ***entered without a contest*** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. ***Thus, it would appear***

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to*

*section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

3.  HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if HMIT would lack prudential standing to bring them under applicable state or federal law.  HMIT argues that it does have prudential standing under both federal bankruptcy law and Delaware law to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to:  (a) Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b) *Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case addressing when a creditors committee may be granted standing to bring causes of action on behalf of a bankruptcy estate.  But, federal bankruptcy law does not confer standing *where the plaintiff otherwise lacks standing under applicable state law*. In other words, whether HMIT would have prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum. Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring a derivative action under the substantive law of Delaware.  Additionally, HMIT's reliance on *LWE* is misplaced: *LWE* permits creditors, in certain circumstances *during* a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).
[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue,

derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former

bankruptcy estate's assets.  Upon confirmation of the Plan, the bankruptcy estate of Highland

ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the

Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE*

did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue

of prudential standing and does not supersede state-law requirements for standing.  In *LWE*, before

addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a

bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy

analysis to determine "as a threshold issue" whether the creditors' committee in that case could

assert its claims under Louisiana law.[205]  The court specifically addressed whether the creditors'

committee could pursue a derivative action under Louisiana law and concluded that "there is no

bar in Louisiana law to actions brought by or in the name of a corporation against the directors and

officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana

law specifically recognizes such actions."[206]  So, even under *LWE* (which the court does not think

applies in this post-confirmation context), if HMIT would be barred from bringing a derivative

action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops

there.[207]  Thus, the court looks to Delaware law to determine if HMIT would have prudential

standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

Trust."[212]  The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary:  that it *is* currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint.  The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213]  HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan); [215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212] *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).  HMIT acknowledges this requirement in its Reply:  "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ." HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an **unvested** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law.  HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216]  The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple.  The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA.  It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee.  Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

b)  HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring
Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is

a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del.

C. § 17-101, *et seq.*[218]  To bring "a derivative action" on behalf of a limited partnership, "the

plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of

the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership.

HMIT ***was*** a limited partner in the original debtor (specifically, a holder of Class B/C Limited

Partnership interests in Highland), but that limited partnership interest was extinguished on August

11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any

partnership interest in the newly created Reorganized Debtor limited partnership.[220]  Because

HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the

action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221]  HMIT

likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited

partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t]

standing to continue a derivative suit" on behalf of the Debtor.[222]  Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims

purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing.

A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce

a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under

Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224]

Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant

Trust,[225] it also would lack standing to bring a double derivative action.

> c) Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As **_Direct_** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself,

individually.[226] But just because HMIT asserts that some or even all of the Proposed Claims are

direct, not derivative claims, does not make it so: "a claim is not 'direct' simply because it is

pleaded that way."[227] Rather, in determining whether claims are direct or derivative, a court must

"look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the

Plaintiffs' characterization."[228] And, under Delaware law, "whether a claim is solely derivative or

---

_SkyPort Global Commcn's, Inc.)_, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); _In re WorldCom, Inc._, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] _Lambrecht v. O'Neal_, 3 A.3d 277, 282 (Del. 2010).

[224] _Sagarra_, 34 A.3d at 1079–81 (capitalization omitted) (citing _Lambrecht_, 3 A.3d at 282).

[225] _See supra_ pp. 80-82.

[226] _See e.g._, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); _id._ ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] _Schmermerhorn_, 2011 WL 111427, at *26 (quoting _Gatz v. Ponsoldt_, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)).

[228] _See id._ (citing _Armstrong v. Capshaw, Goss & Bowers LLP_, 404 F.3d 933, 936 (5th Cir. 2005)); _see also Moore v. Simon Enters., Inc._, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn **solely** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229]  "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230]  Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought:  "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231]  "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury.  It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, **since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims**.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

> d)  Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso*, 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").
[234] *See supra* note 23 and accompanying text.

standing.  Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring

a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law

and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here.

This is separate and apart from whether the claims are colorable.

C. *Are the Proposed Claims "Colorable"?*

1. <u>What is the Proper Standard of Review for a "Colorability" Determination?</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or

prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the

claims—assuming HMIT somehow has standing—might be "colorable."  This, in turn, requires

the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder,

the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and

July 2020 each required that, before a party may commence or pursue claims relating to the

bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy

court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders

did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple

"plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss.  In other words,

the court should simply assess whether the allegations of the Proposed Complaint, taken as true

and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e.,

colorable equals plausible), and that this standard does not allow for the weighing of evidence by

the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation."  In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose.  The court would not require it.  It was up to the parties.  But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point.  HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238]  HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).
[237] Bankr. Dkt. Nos. 3815 and 3816.
[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

Case 19-34054-sgj11    Doc 3904    Filed 08/25/23    Entered 08/25/23 16:05:41    Desc
Case 3:23-cv-02071-E    Document    Main Document    Filed 08/25/23    Page 471 of 678    PageID 477
of 205    Page 471 of 678    PageID 477

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running objection to the evidentiary format of the hearing).[239]

In determining what appropriate legal standard applies here in the "colorability" analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant.  In determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support for it, and made specific findings relating to Dondero's post-petition litigation and the need for inclusion of the Gatekeeper Provision in the Plan.[240]  This court observed that "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor."[241]  This court further found that: (1) Dondero's post-petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper Provision in place, "Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78.  *See supra* note 12.

costs and distraction such litigation or the threats of such litigation would cause,"[243] and,  (3)

"unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant

Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will

present unacceptable risks to parties currently willing to serve in such roles."  Thus, as set forth in

the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were

approved based on the same concerns regarding the threat of continued litigation by Dondero and

his related entities) required Dondero and related entities to make a threshold showing of

colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton
> Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881).  The Gatekeeper Provision is
> also consistent with the notion of a prefiling injunction to deter vexatious litigants,
> that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon
> Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811
> (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan

injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland

Capital, its successors, and other bankruptcy participants that could disrupt the Plan's

effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the

purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] Asd noted at ⁋ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so *without an exclusion for claims asserted by Mr. Dondero and his affiliates* required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

how "colorability" should work here.  It seems that applying HMIT's proposed Rule 12(b)(6)

"plausibility" standard would impose no hurdle at all to litigants and would render the threshold

for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of

the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6)

standard are inapposite.  HMIT has cited no authority that addresses the appropriate standard for

assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically,

one implemented in response to a demonstrated need to screen and prevent continued bad-faith,

harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of

a plan, which is what we have here.  HMIT relies on a bevy of cases that include benefits coverage

disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of

which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the

court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long

recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example,

that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is "sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties. One example is *In re VistaCare Group, LLC*.[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252] To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

requirements of Rule 8."[253]  "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255]  The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation.  The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257]  The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)).  The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).  Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee.  Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss. It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*. Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave. For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test." The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2.  HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties. HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment. But, even under the less stringent

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

        a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266] HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

of the Claimant Trust or Reorganized Debtor.  But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable").  HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill.  At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he *believed* that Seery *must have* communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims).  Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense."  Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction.  Dondero only

---

[270] Proposed Complaint  ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.
[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI. But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts. Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272] The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." But, the evidence showed that this information was widely reported in the financial press at the time. Thus, it could not have constituted MNPI as a matter of law.[273] Moreover, the evidence showed that Dondero **did not** communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser). Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing. In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive

regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive"

and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence

at the June 8 Hearing reflected that the allegations are completely speculative, without any

foundation whatsoever, and lack merit.  And they are also simply not plausible.  HMIT fails to

allege facts in the Proposed Complaint that would support a reasonable inference that Seery

breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other

intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

> b) HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach
>    of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of

fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and,

along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed

Complaint.[277]  Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its

aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is

also governed by Delaware law.[278]   HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]  In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.  Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281] "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]  While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo*," and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] **must have** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287]  Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288] HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289]  Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a **sufficient** potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any **significant*** profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert.  Thus, the court only allowed Dondero to testify as to what data **he** (or entities he controls or controlled) would rely on, what **his** risk tolerance would have been, and what level of potential profits **he** would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit.  Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "***impossible*** for Stonehill and Farallon (in the absence of insider information) to forecast ***any*** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290]   HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence.  HMIT's allegations in the Proposed Complaint that ***Farallon*** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months ***after*** the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]   In addition, there are no allegations in the Proposed Complaint regarding whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring the Purchased Claims.[292]   The court finds and concludes that HMIT's allegations of aiding and abetting and conspiracy in Counts II and III of the Proposed Complaint are based on unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with verifiable public facts.   Accordingly, HMIT has failed to show that these claims have a foundation and merit and has also failed to show that they are plausible.

  c)  HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the Proposed Complaint

  i.  Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent over and above their initial investment," and, in the alternative, equitable subordination of their claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims based on material non-public information" and being "unfairly advantaged" in "earning significant profits on their purchases."[293]   As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

subordination of a **claim to other claims** or an **interest to other interests** but does not permit equitable subordination of a **claim to interests**.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following **a contest** (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case."  But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure.  HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements. Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

     ii.    Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;"  thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).
[296] Proposed Complaint ¶¶ 89-93.

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  *Yet Seery's compensation is governed by express agreements* (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

    iii.    Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]  But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]  This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.  This court has also found and concluded that all of the Proposed Claims are without foundation or merit and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.  Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

> d)  HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.  But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.  And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

3. <u>HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness</u>.

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose. Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings. So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV.   CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons: (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose. Moreover,

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6)

"plausibility" standard, the Proposed Claims are not plausible.

    Accordingly,

    **IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

        **###End of Memorandum Opinion and Order###**

# Exhibit 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2023**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

------------------------------------------------------------------------

In re:       §
      §   Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P.,      §
      §   Case No. 19-34054-sgj11
             Reorganized Debtor.    §
      §

------------------------------------------------------------------------

### <u>ORDER DENYING APPLICATION FOR EXPEDITED HEARING [DE # 3700]</u>

This Order is issued in response to the *Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* ("Expedited Haring Request") [DE # 3700] filed by Hunter Mountain Investment Trust ("HMIT" or "Movant") on March 28, 2023, at 4:09 p.m. C.D.T. The Expedited Hearing Request seeks a hearing within three days, or as soon thereafter as counsel can be heard, on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* ("Motion for Leave") which was filed on March 28, 2023, at 4:02 p.m. C.D.T.

1

The court has concluded that no emergency or other good cause exists, pursuant to Fed. R. Bankr. Proc. 9006, and the *Expedited Hearing Request* will be denied. The *Motion for Leave* will be set in the ordinary course (after 21 days' notice to affected parties)—i.e., after April 18, 2023.

The *Motion for Leave* is 37 pages in length and contains 350 pages of attachments.  It seeks leave from the bankruptcy court—pursuant to the bankruptcy court's "gatekeeping" role[1] under the confirmed Chapter 11 plan of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor")—to sue at least the following parties:  Muck Holdings, LLC ("Muck"); Jessup Holdings, LLC ("Jessup"); Farallon Capital Management, LLC ("Farallon"); Stonehill Capital Management, LLC ("Stonehill"); James P. Seery, Jr. ("Seery"); and John Doe Defendant Nos. 1-10 (collectively, the "Affected Parties").  The conduct that is described as a basis for the desired lawsuit is certain trading of unsecured claims that occurred in 2021 during the Highland bankruptcy case.[2] It appears that millions of dollars of damages are sought by Movant, who was formerly the largest indirect (ultimate) equity holder of Highland.  The legal theories (e.g., breaches of fiduciary duties; fraud; conspiracy; equitable disallowance) are novel in the bankruptcy claims trading context.  The bankruptcy court, pursuant to the Highland plan, will need to analyze whether such claims are "colorable" such that leave to sue should be granted.

The Affected Parties—and other parties in interest in the underlying bankruptcy case, for that matter—should be afforded a reasonable opportunity to respond to the *Motion for Leave*. While Movant, HMIT, has alleged that it may be facing a statute of limitations defense as to

---

[1] The bankruptcy court's "gatekeeping" role was recently affirmed by the Fifth Circuit in *In re Highland Capital Management, L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).
[2] Notice of the claims trading was provided in filings in Highland bankruptcy case, as follows: Claim No. 23 (DE ## 2211, 2212, and 2215), Claim Nos. 190 and 191 (DE ## 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (DE # 2263), Claim No. 81 (DE # 2262), Claim No. 72 (DE # 2261).

some claims after April 16, 2023, it appears that Movant has known about the conduct underlying the desired lawsuit for well over a year, based on activity that has occurred in the bankruptcy court. *See, e.g., Memorandum Opinion and Order Granting James Dondero's Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request, and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon Capital Management LLC* [DE # 22], in Adv. Proc. # 21-03051 (January 4, 2022). Thus, the need for an emergency hearing is dubious. Accordingly

IT IS ORDERED that the Expedited Hearing Request is denied.

Counsel shall contact the Courtroom Deputy for a setting on the *Motion for Leave*, which setting shall be no sooner than April 19, 2023.

* * * END OF ORDER * * *

# Exhibit 4



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 10, 2023**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj |
| Reorganized Debtor. | |

### ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE
### WITH RESPECT TO HUNTER MOUNTAIN INVESTMENT TRUST'S
### EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
### <u>ADVERSARY PROCEEDING AS SUPPLEMENTED</u>

The Court conducted a status conference on April 24, 2023, concerning the final scheduling

of *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699] and

Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Docket No.

3760] (collectively, the "<u>Underlying Motion</u>"), as well as whether the hearing on the Underlying

Motion would be evidentiary, and the Court having considered (i) the *Opposed Emergency Motion*

---

*to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3738] (the "Motion")[1] filed by Highland Capital Management, L.P., and the Highland Claimant Trust; (ii) the *Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3740] filed by Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management, L.L.C., and Stonehill Capital Management LLC; (iii) the *Response and Reservation of Rights* [Docket No. 3748] filed by Hunter Mountain Investment Trust; (iv) the *Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"* [Docket No. 3758] filed by Hunter Mountain Investment Trust, and (v) the arguments of counsel,

**IT IS HEREBY ORDERED** that:

1.     The hearing on Hunter Mountain Investment Trust's *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699] and Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Docket No. 3760] (collectively, the "Underlying Motion") shall be held in person on **June 8, 2023, at 9:30 a.m. (Central Time)** before the Honorable Stacey G. C. Jernigan, at **1100 Commerce Street, 14th Floor, Courtroom 1, Dallas, Texas**, and by Webex for those interested but not directly participating in the hearing.

2.     Any responses to the Underlying Motion shall be filed no later than May 11, 2023.

3.     Any replies in support of the Underlying Motion shall be filed no later than May 18, 2023.

4.     The Court will advise the parties on or reasonably after May 18, 2023, whether the Court intends to conduct the hearing on an evidentiary basis.

### ###End of Order###

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

Approved as Form Only:

PARSONS MCENTIRE MCCLEARY PLLC

/s/ Sawnie A. McEntire_____
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

HAYWARD PLLC

/s/ Zachery Z. Annable_____
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)

10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P. and the
Highland Claimant Trust*

HOLLAND & KNIGHT LLP

/s/ *Christopher A. Bailey*
Brent R. McIlwain, TSB 24013140
David C. Schulte TSB 24037456
Christopher A. Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
Fax (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

*Counsel for Muck Holdings, LLC,
Jessup Holdings LLC, Farallon
Capital Management, L.L.C., and
Stonehill Capital Management LLC*

REED SMITH LLP

/s/ Omar J. Alaniz
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
oalaniz@reedsmith.com
lrobin@reedsmith.com

WILLKIE FARR & GALLAGHER LLP

Mark T. Stancil
Joshua S. Levy
1875 K Street, N.W.
Washington, DC 20006
T: 202.303.1000
mstancil@willkie.com
jlevy@willkie.com

*Counsel for James P. Seery, Jr.*

# Exhibit 5



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 22, 2023**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § § | |

## ORDER PERTAINING TO THE HEARING ON HUNTER MOUNTAIN INVESTMENT TRUST'S MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING

### [DE ## 3699 & 3760]

Based on the court's review of all of the parties' pleadings and briefing relating to the above-referenced motion and supplemental motion ("Motion for Leave"), the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave—and, in particular, pertaining to the court's required inquiry into whether "colorable" claims may exist, as described in the Motion for Leave. Therefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing if they so choose. This may include

1

examining any witness for whom a Declaration or Affidavit has already been filed.  The parties will be allowed no more than three hours of presentation time each (allocated three hours to the movant and three hours to the aggregate respondents).  This allocated presentation time may be spent in whatever manner the parties believe will be useful to the court (argument/evidence).

**# # # END OF ORDER # # #**

2

United States Bankruptcy Court
Northern District of Texas

In re:                                                                              Case No. 19-34054-sgj
Highland Capital Management, L.P.                                                    Chapter 11
    Debtor

# CERTIFICATE OF NOTICE

District/off: 0539-3                        User: admin                              Page 1 of 21
Date Rcvd: May 23, 2023                     Form ID: pdf012                          Total Noticed: 1

The following symbols are used throughout this certificate:

**Symbol**    **Definition**

+    Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on May 24, 2023:**

**Recip ID**    **Recipient Name and Address**
aty        + Alan J. Kornfeld, Pachulski Stang Ziehl & Jones LLPL, 10100 Santa Monica Blvd., 13 Fl, Los Angeles, CA 90067-4114

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: May 24, 2023        Signature:      /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on May 22, 2023 at the address(es) listed below:**

**Name**    **Email Address**

A. Lee Hogewood, III
    on behalf of Interested Party NexPoint Real Estate Strategies Fund lee.hogewood@klgates.com
    matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III
    on behalf of Defendant NexPoint Advisors  L.P. lee.hogewood@klgates.com,
    matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III
    on behalf of Interested Party NexPoint Strategic Opportunities Fund lee.hogewood@klgates.com
    matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III
    on behalf of Interested Party Highland/iBoxx Senior Loan ETF lee.hogewood@klgates.com
    matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice 05/23 Page 4 of 23 Page 506 of 678   PageID 512
District/off: 0539-3                          User: admin                               Page 2 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                          Total Noticed: 1

mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Merger Arbitrage Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party NexPoint Advisors  L.P. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Total Return Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Global Allocation Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Funds I and its series lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Opportunistic Credit Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant Highland Income Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Fixed Income Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant NexPoint Capital  Inc. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Defendant NexPoint Strategic Opportunities Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Small-Cap Equity Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Socially Responsible Equity Fund lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Funds II and its series lee.hogewood@klgates.com
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party NexPoint Capital  Inc. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. lee.hogewood@klgates.com,
matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;E
mily.mather@klgates.com;Artoush.varshosaz@klgates.com

A. Lee Hogewood, III

|  |  |
|---|---|
|  | on behalf of Interested Party Highland Healthcare Opportunities Fund lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| A. Lee Hogewood, III | |
|  | on behalf of Interested Party Highland Income Fund lee.hogewood@klgates.com matthew.houston@klgates.com;Sarah.bryant@klgates.com;Mary-Beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com |
| Alexandre J. Tschumi | |
|  | on behalf of Interested Party Litigation Trustee of the Highland Capital Management  L.P. Litigation Sub-Trust alexandretschumi@quinnemanuel.com |
| Alyssa Russell | |
|  | on behalf of Creditor Committee Official Committee of Unsecured Creditors alyssa.russell@sidley.com efilingnotice@sidley.com;alyssa-russell-3063@ecf.pacerpro.com |
| Amanda Rush | |
|  | on behalf of Interested Party CCS Medical  Inc. asrush@jonesday.com |
| Amy K. Anderson | |
|  | on behalf of Creditor Issuer Group aanderson@joneswalker.com lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com |
| Andrew Clubok | |
|  | on behalf of Plaintiff UBS AG London Branch andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Andrew Clubok | |
|  | on behalf of Plaintiff UBS Securities LLC andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Andrew Clubok | |
|  | on behalf of Interested Party UBS Securities LLC andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Andrew Clubok | |
|  | on behalf of Interested Party UBS AG London Branch andrew.clubok@lw.com andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,dclitserv@lw.com |
| Annmarie Antoniette Chiarello | |
|  | on behalf of Creditor Acis Capital Management  L.P. achiarello@winstead.com, dgalindo@winstead.com;kknight@winstead.com |
| Annmarie Antoniette Chiarello | |
|  | on behalf of Creditor Acis Capital Management GP  LLC achiarello@winstead.com, dgalindo@winstead.com;kknight@winstead.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Fixed Income Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Small-Cap Equity Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Defendant Highland Income Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party NexPoint Real Estate Strategies Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Funds II and its series artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party NexPoint Capital  Inc. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Socially Responsible Equity Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland/iBoxx Senior Loan ETF artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party NexPoint Strategic Opportunities Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |
|  | on behalf of Interested Party Highland Total Return Fund artoush.varshosaz@klgates.com  Julie.garrett@klgates.com |
| Artoush Varshosaz | |

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Document 105/23   Page 4 of 258   Page 508 of 678    PageID 514

District/off: 0539-3                                User: admin                                        Page 4 of 21
Date Rcvd: May 23, 2023                             Form ID: pdf012                                    Total Noticed: 1

Artoush Varshosaz

on behalf of Defendant NexPoint Strategic Opportunities Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party NexPoint Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Defendant NexPoint Advisors  L.P. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Defendant NexPoint Capital  Inc. artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Healthcare Opportunities Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Income Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Funds I and its series artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Global Allocation Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Artoush Varshosaz

on behalf of Interested Party Highland Merger Arbitrage Fund artoush.varshosaz@klgates.com Julie.garrett@klgates.com

Asif Attarwala

on behalf of Interested Party UBS Securities LLC asif.attarwala@lw.com

Asif Attarwala

on behalf of Interested Party UBS AG London Branch asif.attarwala@lw.com

Basil A. Umari

on behalf of Interested Party Meta-e Discovery  LLC BUmari@dykema.com, pelliott@dykema.com

Bennett Rawicki

on behalf of Defendant Alvarez & Marsal CRF Management  LLC brawicki@gibsondunn.com

Bojan Guzina

on behalf of Creditor Committee Official Committee of Unsecured Creditors bguzina@sidley.com

Brant C. Martin

on behalf of Creditor NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC brant.martin@wickphillips.com samantha.tandy@wickphillips.com

Brent Ryan McIlwain

on behalf of Defendant Farallon Capital Management  L.L.C. brent.mcilwain@hklaw.com, robert.jones@hklaw.com;brian.smith@hklaw.com

Brent Ryan McIlwain

on behalf of Creditor Muck Holdings LLC brent.mcilwain@hklaw.com  robert.jones@hklaw.com;brian.smith@hklaw.com

Brian D. Glueckstein

on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Defendant Mark Okada gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party Mark Okada gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #2 gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party The Okada Insurance Rabbi Trust gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party Okada Family Foundation  Inc. gluecksteinb@sullcrom.com

Brian D. Glueckstein

on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #1 gluecksteinb@sullcrom.com

Brian J. Smith
        on behalf of Defendant Farallon Capital Management  L.L.C. brian.smith@hklaw.com,
        robert.jones@hklaw.com;brent.mcilwain@hklaw.com

Bryan C. Assink
        on behalf of Defendant James D. Dondero bryan.assink@bondsellis.com

Bryan C. Assink
        on behalf of Creditor The Dugaboy Investment Trust bryan.assink@bondsellis.com

Bryan C. Assink
        on behalf of Plaintiff James Dondero bryan.assink@bondsellis.com

Cameron A. Fine
        on behalf of Defendant Hunter Mountain Investment Trust cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Cross Defendant DUGABOY INVESTMENT TRUST AND NANCY DONDERO  AS TRUSTEE OF DUGABOY
        INVESTMENT TRUST cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Cross-Claimant Hunter Mountain Investment Trust cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Defendant STRAND ADVISORS  INC cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Defendant DUGABOY INVESTMENT TRUST AND NANCY DONDERO  AS TRUSTEE OF DUGABOY
        INVESTMENT TRUST cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Defendant GET GOOD TRUST AND GRANT JAMES SCOTT III  AS TRUSTEE OF GET GOOD TRUST
        cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Defendant James D. Dondero cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Cross-Claimant RAND PE FUND I  LP, SERIES 1 cameron.fine@us.dlapiper.com

Cameron A. Fine
        on behalf of Defendant RAND PE FUND I  LP, SERIES 1 cameron.fine@us.dlapiper.com

Candice Marie Carson
        on behalf of Plaintiff UBS Securities LLC Candice.Carson@butlersnow.com

Candice Marie Carson
        on behalf of Interested Party UBS AG London Branch Candice.Carson@butlersnow.com

Candice Marie Carson
        on behalf of Plaintiff UBS AG London Branch Candice.Carson@butlersnow.com

Candice Marie Carson
        on behalf of Interested Party UBS Securities LLC Candice.Carson@butlersnow.com

Chad D. Timmons
        on behalf of Creditor COLLIN COUNTY TAX ASSESSOR/COLLECTOR bankruptcy@abernathy-law.com

Charles Martin Persons, Jr.
        on behalf of Creditor Committee Official Committee of Unsecured Creditors cpersons@sidley.com
        txefilingnotice@sidley.com;charles-persons-5722@ecf.pacerpro.com

Charles W. Gameros, Jr.
        on behalf of Creditor HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) bgameros@legaltexas.com,
        lmilam@legaltexas.com;jrauch@legaltexas.com;wcarvell@legaltexas.com

Charles W. Gameros, Jr.
        on behalf of Creditor NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC bgameros@legaltexas.com
        lmilam@legaltexas.com;jrauch@legaltexas.com;wcarvell@legaltexas.com

Christopher Andrew Bailey
        on behalf of Creditor Jessup Holdings LLC Christopher.Bailey@hklaw.com  hapi@hklaw.com

Christopher Andrew Bailey
        on behalf of Creditor Stonehill Capital Management LLC Christopher.Bailey@hklaw.com  hapi@hklaw.com

Christopher Andrew Bailey
        on behalf of Creditor Farallon Capital Management  LLC Christopher.Bailey@hklaw.com, hapi@hklaw.com

Christopher Andrew Bailey
        on behalf of Creditor Muck Holdings LLC Christopher.Bailey@hklaw.com  hapi@hklaw.com

Christopher J. Akin

Christopher J. Akin
    on behalf of Defendant Isaac Leventon cakin@lynnllp.com  cbaker@lynnllp.com

Christopher J. Akin
    on behalf of Defendant Scott Ellington cakin@lynnllp.com  cbaker@lynnllp.com

Clay M. Taylor
    on behalf of Interested Party James Dondero clay.taylor@bondsellis.com  linda.gordon@bondsellis.com

Clay M. Taylor
    on behalf of Plaintiff James Dondero clay.taylor@bondsellis.com  linda.gordon@bondsellis.com

Cortney C. Thomas
    on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #2 cort@brownfoxlaw.com
korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 AND LAWRENCE TONOMURA
AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #1 cort@brownfoxlaw.com
korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Defendant Mark Okada cort@brownfoxlaw.com  korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Interested Party Okada Family Foundation  Inc. cort@brownfoxlaw.com, korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Defendant MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2 AND LAWRENCE TONOMURA
IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST EXEMPT TRUST #2
cort@brownfoxlaw.com  korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Interested Party The Okada Insurance Rabbi Trust cort@brownfoxlaw.com  korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Interested Party Mark Okada cort@brownfoxlaw.com  korourke@brownfoxlaw.com

Cortney C. Thomas
    on behalf of Interested Party The Mark & Pamela Okada Family Trust - Exempt Trust #1 cort@brownfoxlaw.com
korourke@brownfoxlaw.com

Daniel P. Winikka
    on behalf of Interested Party Jack Yang dan@danwinlaw.com  dan@danwinlaw.com

Daniel P. Winikka
    on behalf of Interested Party Brad Borud dan@danwinlaw.com  dan@danwinlaw.com

David G. Adams
    on behalf of Creditor United States (IRS) david.g.adams@usdoj.gov  southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov

David Grant Crooks
    on behalf of Creditor Committee Official Committee of Unsecured Creditors dcrooks@foxrothschild.com
etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com

David Grant Crooks
    on behalf of Creditor PensionDanmark Pensionsforsikringsaktieselskab dcrooks@foxrothschild.com
etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com

David Grant Crooks
    on behalf of Debtor Highland Capital Management  L.P. dcrooks@foxrothschild.com,
etaylor@foxrothschild.com,rdietz@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com

Davor Rukavina
    on behalf of Defendant NexPoint Advisors  L.P. drukavina@munsch.com

Davor Rukavina
    on behalf of Interested Party Highland Healthcare Opportunities Fund drukavina@munsch.com

Davor Rukavina
    on behalf of Interested Party NexPoint Real Estate Strategies Fund drukavina@munsch.com

Davor Rukavina
    on behalf of Interested Party Highland Global Allocation Fund drukavina@munsch.com

Davor Rukavina
    on behalf of Interested Party Highland Funds I and its series drukavina@munsch.com

Davor Rukavina
    on behalf of Interested Party NexPoint Strategic Opportunities Fund drukavina@munsch.com

Davor Rukavina
    on behalf of Interested Party Highland Merger Arbitrage Fund drukavina@munsch.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Filed 05/23/23    Page 511 of 678    PageID 517

District/off: 0539-3                                    User: admin                                    Page 7 of 21
Date Rcvd: May 23, 2023                                 Form ID: pdf012                                 Total Noticed: 1

Davor Rukavina
      on behalf of Interested Party Highland Total Return Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Socially Responsible Equity Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party NexPoint Capital  Inc. drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. drukavina@munsch.com

Davor Rukavina
      on behalf of Defendant NexPoint Strategic Opportunities Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Small-Cap Equity Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Defendant Highland Income Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Defendant Highland Capital Management Fund Advisors  L.P. drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party NexPoint Advisors  L.P. drukavina@munsch.com

Davor Rukavina
      on behalf of Defendant NexPoint Capital  Inc. drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Fixed Income Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Opportunistic Credit Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Income Fund drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland Funds II and its series drukavina@munsch.com

Davor Rukavina
      on behalf of Interested Party Highland/iBoxx Senior Loan ETF drukavina@munsch.com

Deborah Rose Deitsch-Perez
      on behalf of Defendant Nancy Dondero deborah.deitschperez@stinson.com
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Defendant Highland Capital Management Services  Inc. deborah.deitschperez@stinson.com,
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Defendant Highland Capital Management Fund Advisors  L.P. deborah.deitschperez@stinson.com,
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Plaintiff Dugaboy Investment Trust deborah.deitschperez@stinson.com
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Plaintiff Hunter Mountain Investment Trust deborah.deitschperez@stinson.com
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Defendant James Dondero deborah.deitschperez@stinson.com
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Defendant NexPoint Advisors  L.P. deborah.deitschperez@stinson.com,
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Defendant The Dugaboy Investment Trust deborah.deitschperez@stinson.com
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Creditor The Dugaboy Investment Trust deborah.deitschperez@stinson.com
      patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez
      on behalf of Witness Nancy Dondero deborah.deitschperez@stinson.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Page 512 of 678    Page 8 of 21    PageID 518
District/off: 0539-3                                User: admin                                                Page 8 of 21
Date Rcvd: May 23, 2023                             Form ID: pdf012                                          Total Noticed: 1

patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Interested Party Highland CLO Management Ltd deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez

on behalf of Defendant HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) deborah.deitschperez@stinson.com,
patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Debra A Dandeneau

on behalf of Creditor Scott Ellington  Thomas Surgent, Frank Waterhouse, Isaac Leventon debra.dandeneau@bakermckenzie.com,
blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant Frank Waterhouse debra.dandeneau@bakermckenzie.com  blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant Isaac Leventon debra.dandeneau@bakermckenzie.com  blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Interested Party CPCM  LLC debra.dandeneau@bakermckenzie.com, blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant CPCM  LLC debra.dandeneau@bakermckenzie.com, blaire.cahn@bakermckenzie.com

Debra A Dandeneau

on behalf of Defendant Scott Ellington debra.dandeneau@bakermckenzie.com  blaire.cahn@bakermckenzie.com

Dennis M. Twomey

on behalf of Creditor Committee Official Committee of Unsecured Creditors dtwomey@sidley.com

Donna K. Webb

on behalf of Creditor Pension Benefit Guaranty Corporation donna.webb@usdoj.gov
brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov

Douglas J. Schneller

on behalf of Creditor Contrarian Funds LLC douglas.schneller@rimonlaw.com

Douglas S. Draper

on behalf of Creditor The Get Good Non Exempt Trust No 2 ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Get Better Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Canis Minor Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Get Good Non Exempt Trust No 1 ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor The Dondero Insurance Rabbi Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Get Good Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor Dana Scott Breault ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor SLHC Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Defendant The Dugaboy Investment Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Defendant The Get Good Nonexempt Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Douglas S. Draper

on behalf of Creditor The Dugaboy Investment Trust ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Page 1 of 23   Page 513 of 678   PageID 519

District/off: 0539-3                                   User: admin                                        Page 9 of 21
Date Rcvd: May 23, 2023                               Form ID: pdf012                                    Total Noticed: 1

Douglas S. Draper
on behalf of Creditor Dolomiti LLC ddraper@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Edmon L. Morton
on behalf of Creditor Committee Official Committee of Unsecured Creditors emorton@ycst.com

Edward J. Leen
on behalf of Creditor Jessup Holdings LLC eleen@mkbllp.com

Edwin Paul Keiffer
on behalf of Creditor Beacon Mountain  LLC pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor Atlas IDF  GP, LLC pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor Rand PE Fund Management  LLC pkeiffer@romclaw.com,
bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Defendant Hunter Mountain Investment Trust pkeiffer@romclaw.com
bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor Atlas IDF  LP pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor Hunter Mountain Investment Trust pkeiffer@romclaw.com
bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor Rand PE Fund I  LP pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor John Honis pkeiffer@romclaw.com  bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Interested Party Hunter Mountain Trust pkeiffer@romclaw.com  bwallace@romclaw.com,dsalinas@romclaw.com

Edwin Paul Keiffer
on behalf of Creditor Rand Advisors  LLC pkeiffer@romclaw.com, bwallace@romclaw.com,dsalinas@romclaw.com

Elizabeth Weller
on behalf of Creditor Fannin CAD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Grayson County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Dallas County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Coleman County TAD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Allen ISD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Irving ISD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Tarrant County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Rockwall CAD Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Kaufman County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Elizabeth Weller
on behalf of Creditor Upshur County Dora.Casiano-Perez@lgbs.com  dallas.bankruptcy@lgbs.com

Eric A. Soderlund
on behalf of Interested Party CPCM  LLC eric.soderlund@rsbfirm.com

Eric A. Soderlund
on behalf of Interested Party Former Employees eric.soderlund@rsbfirm.com

Eric A. Soderlund
on behalf of Creditor Scott Ellington  Thomas Surgent, Frank Waterhouse, Isaac Leventon eric.soderlund@rsbfirm.com

Eric A. Soderlund

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Page 12 of 23   Page 514 of 678   PageID 520
District/off: 0539-3                              User: admin                                    Page 10 of 21
Date Rcvd: May 23, 2023                           Form ID: pdf012                                Total Noticed: 1

on behalf of Creditor Frank Waterhouse  Scott B. Ellington, Isaac Leventon, Jean Paul Sevilla, Hunter Covitz and Thomas Surgent
eric.soderlund@rsbfirm.com

Eric Thomas Haitz

on behalf of Defendant Alvarez & Marsal CRF Management  LLC ehaitz@gibsondunn.com, skoller@gibsondunn.com

Frances Anne Smith

on behalf of Interested Party CPCM  LLC frances.smith@rsbfirm.com, michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Plaintiff Scott Byron Ellington frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Creditor Frank Waterhouse frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Interested Party Former Employees frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Interested Party Matthew DiOrio  Scott Ellington, Isaac Leventon, Mary Kathryn Lucas (nee Irving), John Paul
Sevilla, Stephanie Vitiello, and Frank Waterhouse frances.smith@rsbfirm.com, michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Creditor Scott Ellington frances.smith@rsbfirm.com  michael.coulombe@rsbfirm.com

Frances Anne Smith

on behalf of Creditor Scott Ellington  Thomas Surgent, Frank Waterhouse, Isaac Leventon frances.smith@rsbfirm.com,
michael.coulombe@rsbfirm.com

Gregory Getty Hesse

on behalf of Spec. Counsel Hunton Andrews Kurth LLP ghesse@huntonak.com
kkirk@huntonak.com;tcanada@HuntonAK.com;creeves@HuntonAK.com

Gregory V. Demo

on behalf of Creditor Committee Official Committee of Unsecured Creditors gdemo@pszjlaw.com
jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszj
law.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Gregory V. Demo

on behalf of Defendant Highland Capital Management  LP gdemo@pszjlaw.com,
jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszj
law.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Gregory V. Demo

on behalf of Debtor Highland Capital Management  L.P. gdemo@pszjlaw.com,
jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszj
law.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Gregory V. Demo

on behalf of Defendant Highland Capital Management  L.P. gdemo@pszjlaw.com,
jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszj
law.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Greta M. Brouphy

on behalf of Creditor The Dugaboy Investment Trust gbrouphy@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com

Greta M. Brouphy

on behalf of Defendant The Dugaboy Investment Trust gbrouphy@hellerdraper.com
dhepting@hellerdraper.com;vgamble@hellerdraper.com

Greta M. Brouphy

on behalf of Creditor Get Good Trust gbrouphy@hellerdraper.com  dhepting@hellerdraper.com;vgamble@hellerdraper.com

Hayley R. Winograd

on behalf of Defendant Highland Capital Management  LP hwinograd@pszjlaw.com

Hayley R. Winograd

on behalf of Defendant Highland Capital Management  L.P. hwinograd@pszjlaw.com

Hayley R. Winograd

on behalf of Debtor Highland Capital Management  L.P. hwinograd@pszjlaw.com

Holland N. O'Neil

on behalf of Spec. Counsel Foley Gardere  Foley & Lardner LLP honeil@foley.com,
jcharrison@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com

J. Seth Moore

on behalf of Creditor Siepe  LLC smoore@condontobin.com, jsteele@condontobin.com

Jaclyn C. Weissgerber

on behalf of Creditor Committee Official Committee of Unsecured Creditors bankfilings@ycst.com  jweissgerber@ycst.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Page 13 of 25    Page 515 of 678    PageID 521

District/off: 0539-3                                   User: admin                                     Page 11 of 21
Date Rcvd: May 23, 2023                                Form ID: pdf012                                 Total Noticed: 1

Jason Bernstein
    on behalf of Creditor BHH Equities LLC casey.doherty@dentons.com
dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com

Jason Bernstein
    on behalf of Interested Party Jefferies LLC casey.doherty@dentons.com
dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com

Jason Alexander Enright
    on behalf of Creditor Acis Capital Management  L.P. jenright@winstead.com

Jason Alexander Enright
    on behalf of Creditor Acis Capital Management GP  LLC jenright@winstead.com

Jason Michael Hopkins
    on behalf of Interested Party James Dondero jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Defendant James D. Dondero jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Defendant DUGABOY INVESTMENT TRUST AND NANCY DONDERO  AS TRUSTEE OF DUGABOY
INVESTMENT TRUST jason.hopkins@dlapiper.com, jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Creditor The Dugaboy Investment Trust jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Defendant RAND PE FUND I  LP, SERIES 1 jason.hopkins@dlapiper.com,
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Creditor Strand Advisors  Inc. jason.hopkins@dlapiper.com,
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Defendant GET GOOD TRUST AND GRANT JAMES SCOTT III  AS TRUSTEE OF GET GOOD TRUST
jason.hopkins@dlapiper.com, jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Creditor Get Good Trust jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Defendant STRAND ADVISORS  INC jason.hopkins@dlapiper.com,
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Michael Hopkins
    on behalf of Defendant Hunter Mountain Investment Trust jason.hopkins@dlapiper.com
jen.westin@dlapiper.com;jason-hopkins-2248@ecf.pacerpro.com

Jason Patrick Kathman
    on behalf of Creditor Patrick Daugherty jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
    on behalf of Creditor Paul Kauffman jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
    on behalf of Defendant Patrick Daugherty jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
    on behalf of Creditor Todd Travers jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
    on behalf of Defendant Patrick Hagaman Daugherty jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason Patrick Kathman
    on behalf of Creditor Davis Deadman jkathman@spencerfane.com
gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com

Jason S. Brookner
    on behalf of Creditor Patrick Daugherty jbrookner@grayreed.com  lwebb@grayreed.com;acarson@grayreed.com

Jason S. Brookner
    on behalf of Defendant Patrick Daugherty jbrookner@grayreed.com  lwebb@grayreed.com;acarson@grayreed.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Filed 09/15/23    Page 14 of 23    Page 516 of 678    PageID 522

District/off: 0539-3                                    User: admin                                          Page 12 of 21
Date Rcvd: May 23, 2023                                Form ID: pdf012                                     Total Noticed: 1

Jason S. Brookner
                    on behalf of Creditor Gray Reed & McGraw LLP jbrookner@grayreed.com  lwebb@grayreed.com;acarson@grayreed.com

Jeff P. Prostok
                    on behalf of Creditor Acis Capital Management  L.P. jprostok@forsheyprostok.com,
                    calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
                    khartogh@ecf.courtdrive.com

Jeff P. Prostok
                    on behalf of Creditor Joshua Terry jprostok@forsheyprostok.com
                    calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
                    khartogh@ecf.courtdrive.com

Jeff P. Prostok
                    on behalf of Creditor Jennifer G. Terry jprostok@forsheyprostok.com
                    calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
                    khartogh@ecf.courtdrive.com

Jeff P. Prostok
                    on behalf of Creditor Acis Capital Management GP  LLC jprostok@forsheyprostok.com,
                    calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@forsheyprostok.com;
                    khartogh@ecf.courtdrive.com

Jeffrey Kurtzman
                    on behalf of Creditor BET Investments II  L.P. kurtzman@kurtzmansteady.com

Jeffrey Nathan Pomerantz
                    on behalf of Defendant Highland Capital Management  L.P. jpomerantz@pszjlaw.com

Jeffrey Nathan Pomerantz
                    on behalf of Debtor Highland Capital Management  L.P. jpomerantz@pszjlaw.com

John A. Morris
                    on behalf of Defendant Highland Capital Management  L.P. jmorris@pszjlaw.com

John A. Morris
                    on behalf of Defendant Highland Capital Management  LP jmorris@pszjlaw.com

John A. Morris
                    on behalf of Debtor Highland Capital Management  L.P. jmorris@pszjlaw.com

John J. Kane
                    on behalf of Defendant CLO Holdco  Ltd. jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com

John J. Kane
                    on behalf of Defendant Grant James Scott III jkane@krcl.com  ecf@krcl.com;jkane@ecf.courtdrive.com

John J. Kane
                    on behalf of Creditor Grant James Scott III jkane@krcl.com  ecf@krcl.com;jkane@ecf.courtdrive.com

John J. Kane
                    on behalf of Defendant Grant James Scott III jkane@krcl.com  ecf@krcl.com;jkane@ecf.courtdrive.com

John Kendrick Turner
                    on behalf of Creditor City of Allen john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Tarrant County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Fannin CAD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Irving ISD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Dallas County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Upshur County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Allen ISD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Kaufman County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor City of Richardson john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner
                    on behalf of Creditor Grayson County john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E  Imaged Certificate of Notice  Page 15 of 23 Page 537 of 678   PageID 523
District/off: 0539-3                                    User: admin                                    Page 13 of 21
Date Rcvd: May 23, 2023                          Form ID: pdf012                          Total Noticed: 1

John Kendrick Turner
    on behalf of Creditor Coleman County TAD john.turner@lgbs.com  Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John T. Cox, III
    on behalf of Defendant Alvarez & Marsal CRF Management  LLC tcox@gibsondunn.com,
    WCassidy@gibsondunn.com;twesley@gibsondunn.com

Jonathan D. Sundheimer
    on behalf of Creditor NWCC  LLC jsundhimer@btlaw.com

Jonathan E. Bridges
    on behalf of Plaintiff PCMG Trading Partners XXIII LP jeb@sbaitilaw.com

Jonathan E. Bridges
    on behalf of Plaintiff CLO Holdco  Ltd. jeb@sbaitilaw.com

Jonathan E. Bridges
    on behalf of Interested Party CLO Holdco  Ltd. jeb@sbaitilaw.com

Jonathan E. Bridges
    on behalf of Plaintiff Charitable DAF Fund  LP jeb@sbaitilaw.com

Jonathan E. Bridges
    on behalf of Interested Party Charitable DAF Fund  LP jeb@sbaitilaw.com

Jonathan E. Bridges
    on behalf of Creditor CLO Holdco  Ltd. jeb@sbaitilaw.com

Jordan A. Kroop
    on behalf of Debtor Highland Capital Management  L.P. jkroop@pszjlaw.com, tcorrea@pszjlaw.com

Joseph E. Bain
    on behalf of Creditor Issuer Group JBain@joneswalker.com
    kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com

Joshua Seth Levy
    on behalf of Other Professional James P. Seery  Jr. jlevy@willkie.com

Joshua Seth Levy
    on behalf of Creditor James P. Seery  Jr. jlevy@willkie.com

Julian Preston Vasek
    on behalf of Interested Party NexPoint Real Estate Strategies Fund jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Opportunistic Credit Fund jvasek@munsch.com

Julian Preston Vasek
    on behalf of Defendant NexPoint Capital  Inc. jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Small-Cap Equity Fund jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Healthcare Opportunities Fund jvasek@munsch.com

Julian Preston Vasek
    on behalf of Defendant Highland Capital Management Fund Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Capital Management Fund Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Merger Arbitrage Fund jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party NexPoint Capital  Inc. jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Fixed Income Fund jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland/iBoxx Senior Loan ETF jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party Highland Funds I and its series jvasek@munsch.com

Julian Preston Vasek
    on behalf of Interested Party NexPoint Advisors GP  LLC jvasek@munsch.com

Julian Preston Vasek
    on behalf of Defendant NexPoint Strategic Opportunities Fund jvasek@munsch.com

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Document 5 filed 06/15/23   Page 15 of 23   Page 518 of 678    PageID 524

District/off: 0539-3                                User: admin                                            Page 14 of 21
Date Rcvd: May 23, 2023                             Form ID: pdf012                                        Total Noticed: 1

Julian Preston Vasek
   on behalf of Interested Party NexPoint Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek
   on behalf of Interested Party Highland Socially Responsible Equity Fund jvasek@munsch.com

Julian Preston Vasek
   on behalf of Interested Party Highland Global Allocation Fund jvasek@munsch.com

Julian Preston Vasek
   on behalf of Interested Party Highland Total Return Fund jvasek@munsch.com

Julian Preston Vasek
   on behalf of Interested Party NexPoint Strategic Opportunities Fund jvasek@munsch.com

Julian Preston Vasek
   on behalf of Interested Party Highland Funds II and its series jvasek@munsch.com

Julian Preston Vasek
   on behalf of Interested Party Highland Income Fund jvasek@munsch.com

Julian Preston Vasek
   on behalf of Defendant NexPoint Advisors  L.P. jvasek@munsch.com

Julian Preston Vasek
   on behalf of Defendant Highland Income Fund jvasek@munsch.com

Juliana Hoffman
   on behalf of Creditor Sidley Austin LLP jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Creditor Committee Official Committee of Unsecured Creditors jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Financial Advisor FTI Consulting  Inc. jhoffman@sidley.com,
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Plaintiff Official Committee of Unsecured Creditors jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Plaintiff Marc Kirschner jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Other Professional Teneo Capital  LLC jhoffman@sidley.com,
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Interested Party UBS Securities LLC jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Interested Party UBS AG London Branch jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Debtor Highland Capital Management  L.P. jhoffman@sidley.com,
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Juliana Hoffman
   on behalf of Interested Party Committee of Unsecured Creditors jhoffman@sidley.com
   txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Kesha Tanabe
   on behalf of Creditor Cedar Glade LP kesha@tanabelaw.com

Kevin Perkins
   on behalf of Defendant MASSAND CAPITAL  LLC kperkins@vanacourperkins.com

Kevin Perkins
   on behalf of Defendant MASSAND CAPITAL  INC. kperkins@vanacourperkins.com

Kimberly A. Posin
   on behalf of Interested Party UBS Securities LLC kim.posin@lw.com  colleen.rico@lw.com

Kimberly A. Posin
   on behalf of Plaintiff UBS AG London Branch kim.posin@lw.com  colleen.rico@lw.com

Kimberly A. Posin

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Filed 08/15/23    Page 17 of 239    Page 17 of 678    PageID 525
District/off: 0539-3                              User: admin                              Page 15 of 21
Date Rcvd: May 23, 2023                           Form ID: pdf012                          Total Noticed: 1

Kimberly A. Posin

on behalf of Interested Party UBS AG London Branch kim.posin@lw.com  colleen.rico@lw.com

on behalf of Plaintiff UBS Securities LLC kim.posin@lw.com  colleen.rico@lw.com

Kristin H. Jain

on behalf of Interested Party NexPoint Advisors  L.P. KHJain@JainLaw.com, dskierski@skijain.com

Kristin H. Jain

on behalf of Interested Party NexPoint Real Estate Advisors  L.P. KHJain@JainLaw.com, dskierski@skijain.com

Larry R. Boyd

on behalf of Creditor COLLIN COUNTY TAX ASSESSOR/COLLECTOR lboyd@abernathy-law.com
ljameson@abernathy-law.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Residential Trust  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Finance Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Creditor Eagle Equity Advisors  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Creditor Highland Capital Management Services  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party VineBrook Homes  Trust, Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Partners  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party Nexpoint Real Estate Capital  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors VIII  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors VI  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Creditor NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexBank lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors III  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Multifamily Capital Trust  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party MGM Holdings  Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexBank Securities Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexBank Title Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Creditor Advisors Equity Group  LLC lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Hospitality Trust lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors VII  L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Creditor HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexBank Capital Inc. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

on behalf of Interested Party NexPoint Real Estate Advisors V  L.P. lkdrawhorn@gmail.com

Case 19-34054-sgj11 Doc 3790 Filed 05/24/23 Entered 05/24/23 23:21:14 Desc
Case 3:23-cv-02071-E Imaged Certificate of Notice Page 521 of 678 Page 16 of 21 PageID 526

District/off: 0539-3                                      User: admin                                          Page 16 of 21
Date Rcvd: May 23, 2023                                  Form ID: pdf012                                      Total Noticed: 1

Lauren Kessler Drawhorn

    on behalf of Interested Party NexPoint Real Estate Advisors IV L.P. lkdrawhorn@gmail.com

Lauren Kessler Drawhorn

    on behalf of Interested Party NexPoint Real Estate Advisors II L.P. lkdrawhorn@gmail.com

Laurie A Spindler

    on behalf of Creditor Grayson County Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor Dallas County Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor Allen ISD Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor Kaufman County Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor Tarrant County Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor City of Allen Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor City of Richardson Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Laurie A Spindler

    on behalf of Creditor Irving ISD Laurie.Spindler@lgbs.com
    Dora.Casiano-Perez@lgbs.com;Olivia.salvatierra@lgbs.com;Michael.Alvis@lgbs.com;dallas.bankruptcy@lgbs.com

Leslie A. Collins

    on behalf of Creditor The Dugaboy Investment Trust lcollins@hellerdraper.com

Leslie A. Collins

    on behalf of Defendant The Dugaboy Investment Trust lcollins@hellerdraper.com

Leslie A. Collins

    on behalf of Creditor Get Good Trust lcollins@hellerdraper.com

Linda D. Reece

    on behalf of Creditor Plano ISD lreece@pbfcm.com lreece@ecf.courtdrive.com

Linda D. Reece

    on behalf of Creditor City of Garland lreece@pbfcm.com lreece@ecf.courtdrive.com

Linda D. Reece

    on behalf of Creditor Wylie ISD lreece@pbfcm.com lreece@ecf.courtdrive.com

Linda D. Reece

    on behalf of Creditor Garland ISD lreece@pbfcm.com lreece@ecf.courtdrive.com

Lindsey Lee Robin

    on behalf of Other Professional James P. Seery Jr. lrobin@reedsmith.com,
    jkrasnic@reedsmith.com;anixon@reedsmith.com;ahinson@reedsmith.com

Lindsey Lee Robin

    on behalf of Creditor James P. Seery Jr. lrobin@reedsmith.com,
    jkrasnic@reedsmith.com;anixon@reedsmith.com;ahinson@reedsmith.com

Lisa L. Lambert

    on behalf of U.S. Trustee United States Trustee lisa.l.lambert@usdoj.gov

Louis M. Phillips

    on behalf of Creditor Charitable DAF HoldCo Ltd. louis.phillips@kellyhart.com,
    june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

    on behalf of Interested Party Mary Jalonick louis.phillips@kellyhart.com
    june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

    on behalf of Defendant Charitable DAF Fund LP louis.phillips@kellyhart.com,
    june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Filed 09/15/23   Page 521 of 678   PageID 527

District/off: 0539-3                              User: admin                                    Page 17 of 21
Date Rcvd: May 23, 2023                           Form ID: pdf012                                Total Noticed: 1

Louis M. Phillips
 on behalf of Defendant CLO Holdco  Ltd. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Creditor CLO Holdco  Ltd. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party The Santa Barbara Foundation louis.phillips@kellyhart.com
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Defendant Highland Dallas Foundation  Inc. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party The Dallas Foundation louis.phillips@kellyhart.com
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party Charitable DAF Fund  LP louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Respondent Mark Patrick louis.phillips@kellyhart.com
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Creditor The Charitable DAF Fund  L.P. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party CLO Holdco  Ltd. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Creditor Charitable DAF GP  L.P. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party The Greater Kansas City Community Foundation louis.phillips@kellyhart.com
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party Highland Santa Barbara Foundation  Inc. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party Highland Kansas City Foundation  Inc. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Plaintiff CLO Holdco  Ltd. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Plaintiff Charitable DAF Fund  LP louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party Highland Dallas Foundation  Inc. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Interested Party The Charitable DAF Fund  L.P. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Defendant CLO HOLDCO  LTD.; CHARITABLE DAF HOLDCO, LTD. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Creditor Highland Dallas Foundation  Inc. louis.phillips@kellyhart.com,
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

Louis M. Phillips
 on behalf of Creditor Hunter Mountain Investment Trust louis.phillips@kellyhart.com
 june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com

M. David Bryant, Jr.
 on behalf of Interested Party Integrated Financial Associates  Inc. dbryant@dykema.com, csmith@dykema.com

Margaret Michelle Hartmann

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Page 20 of 23   Page 522 of 678    PageID 528
District/off: 0539-3                                    User: admin                                    Page 18 of 21
Date Rcvd: May 23, 2023                                 Form ID: pdf012                                Total Noticed: 1

on behalf of Defendant Scott Ellington michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Interested Party CPCM LLC michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Defendant Frank Waterhouse michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Defendant CPCM LLC michelle.hartmann@bakermckenzie.com

Margaret Michelle Hartmann

on behalf of Defendant Isaac Leventon michelle.hartmann@bakermckenzie.com

Mark Stancil

on behalf of Other Professional James P. Seery Jr. mstancil@robbinsrussell.com

Mark Stancil

on behalf of Creditor James P. Seery Jr. mstancil@robbinsrussell.com

Mark A. Platt

on behalf of Interested Party Redeemer Committee of the Highland Crusader Fund mplatt@fbtlaw.com
dwilliams@fbtlaw.com,mluna@fbtlaw.com

Martin A. Sosland

on behalf of Interested Party UBS AG London Branch martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Martin A. Sosland

on behalf of Plaintiff UBS AG London Branch martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Martin A. Sosland

on behalf of Interested Party UBS Securities LLC martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Martin A. Sosland

on behalf of Plaintiff UBS Securities LLC martin.sosland@butlersnow.com
ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

Matthew Gold

on behalf of Creditor Argo Partners courts@argopartners.net

Matthew A. Clemente

on behalf of Creditor Committee Official Committee of Unsecured Creditors mclemente@sidley.com
matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwom
ey@sidley.com

Matthew A. Clemente

on behalf of Interested Party Committee of Unsecured Creditors mclemente@sidley.com
matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwom
ey@sidley.com

Matthew G. Bouslog

on behalf of Interested Party Alvarez & Marsal CRF Management LLC, as Investment Manager of the Highland Crusader Funds
mbouslog@gibsondunn.com, nbrosman@gibsondunn.com

Mazin Ahmad Sbaiti

on behalf of Plaintiff CLO Holdco Ltd. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Interested Party Charitable DAF Fund LP mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Plaintiff PCMG Trading Partners XXIII LP mas@sbaitilaw.com
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Interested Party CLO Holdco Ltd. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Creditor The Charitable DAF Fund L.P. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Plaintiff Charitable DAF Fund LP mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Interested Party The Charitable DAF Fund L.P. mas@sbaitilaw.com,

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Page 21 of 523    Page 523 of 678    PageID 529

District/off: 0539-3                                    User: admin                                    Page 19 of 21
Date Rcvd: May 23, 2023                                Form ID: pdf012                                Total Noticed: 1

krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Mazin Ahmad Sbaiti

on behalf of Creditor CLO Holdco  Ltd. mas@sbaitilaw.com,
krj@sbaitilaw.com;jeb@sbaitilaw.com;mgp@sbaitilaw.com;mgp@sbaitilaw.com

Megan Young-John

on behalf of Creditor Issuer Group myoung-john@porterhedges.com

Megan F. Clontz

on behalf of Creditor Todd Travers mclontz@spencerfane.com  lvargas@spencerfane.com

Megan F. Clontz

on behalf of Creditor Patrick Daugherty mclontz@spencerfane.com  lvargas@spencerfane.com

Melissa S. Hayward

on behalf of Defendant Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Melissa S. Hayward

on behalf of Debtor Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Melissa S. Hayward

on behalf of Defendant Highland Capital Management  LP MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Melissa S. Hayward

on behalf of Plaintiff Highland Capital Management  L.P. MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Michael A. Rosenthal

on behalf of Defendant Alvarez & Marsal CRF Management  LLC mrosenthal@gibsondunn.com

Michael Justin Lang

on behalf of Interested Party James Dondero mlang@cwl.law  aohlinger@cwl.law;mbrown@cwl.law

Michael P. Aigen

on behalf of Plaintiff Hunter Mountain Investment Trust michael.aigen@stinson.com

Michael P. Aigen

on behalf of Creditor The Dugaboy Investment Trust michael.aigen@stinson.com

Michael P. Aigen

on behalf of Defendant James Dondero michael.aigen@stinson.com

Michael P. Aigen

on behalf of Plaintiff Dugaboy Investment Trust michael.aigen@stinson.com

Michael P. Aigen

on behalf of Defendant NexPoint Advisors  L.P. michael.aigen@stinson.com

Michael P. Aigen

on behalf of Defendant HCRE Partners  LLC (n/k/a NexPoint Real Estate Partners, LLC) michael.aigen@stinson.com

Michael P. Aigen

on behalf of Defendant Highland Capital Management Services  Inc. michael.aigen@stinson.com

Michael P. Aigen

on behalf of Creditor Hunter Mountain Investment Trust michael.aigen@stinson.com

Michael P. Aigen

on behalf of Defendant Highland Capital Management Fund Advisors  L.P. michael.aigen@stinson.com

Michael P. Aigen

on behalf of Defendant Nancy Dondero michael.aigen@stinson.com

Michael P. Aigen

on behalf of Interested Party Highland CLO Management Ltd michael.aigen@stinson.com

Michael Scott Held

on behalf of Creditor Crescent TC Investors  L.P. mheld@jw.com, kgradney@jw.com;azuniga@jw.com

Michelle E. Shriro

on behalf of Interested Party California Public Employees Retirement System (CalPERS) mshriro@singerlevick.com
scotton@singerlevick.com;tguillory@singerlevick.com

Nicole Skolnekovich

on behalf of Interested Party Hunton Andrews Kurth LLP nskolnekovich@hunton.com
astowe@huntonak.com;creeves@huntonak.com

Omar Jesus Alaniz

on behalf of Other Professional James P. Seery  Jr. oalaniz@reedsmith.com,
omar-alaniz-2648@ecf.pacerpro.com;jkrasnic@reedsmith.com;ahinson@reedsmith.com

Paige Holden Montgomery

on behalf of Creditor Committee Official Committee of Unsecured Creditors pmontgomery@sidley.com

Case 19-34054-sgj11   Doc 3790   Filed 05/24/23   Entered 05/24/23 23:21:14   Desc
Case 3:23-cv-02071-E   Imaged Certificate of Notice   Filed 11/15/23   Page 20 of 21   Page 524 of 678   PageID 530
District/off: 0539-3                                          User: admin                                          Page 20 of 21
Date Rcvd: May 23, 2023                                      Form ID: pdf012                                      Total Noticed: 1

txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Plaintiff Marc Kirschner pmontgomery@sidley.com
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Interested Party Committee of Unsecured Creditors pmontgomery@sidley.com
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Plaintiff Official Committee of Unsecured Creditors pmontgomery@sidley.com
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paige Holden Montgomery

on behalf of Interested Party Litigation Trustee of the Highland Capital Management  L.P. Litigation Sub-Trust
pmontgomery@sidley.com,
txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;spencer.stephens@sidley.com;ebromagen@sidley.com;e
filingnotice@sidley.com

Paul M. Lopez

on behalf of Creditor COLLIN COUNTY TAX ASSESSOR/COLLECTOR bankruptcy@abernathy-law.com

Paul Richard Bessette

on behalf of Interested Party Highland CLO Funding  Ltd. pbessette@KSLAW.com,
ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com

Penny Packard Reid

on behalf of Creditor Committee Official Committee of Unsecured Creditors preid@sidley.com
txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com

Phillip L. Lamberson

on behalf of Creditor Acis Capital Management GP  LLC plamberson@winstead.com

Phillip L. Lamberson

on behalf of Creditor Acis Capital Management  L.P. plamberson@winstead.com

Rakhee V. Patel

on behalf of Creditor Acis Capital Management GP  LLC rpatel@sidley.com, dgalindo@winstead.com;achiarello@winstead.com

Rakhee V. Patel

on behalf of Creditor Acis Capital Management  L.P. rpatel@sidley.com, dgalindo@winstead.com;achiarello@winstead.com

Robert Joel Feinstein

on behalf of Debtor Highland Capital Management  L.P. rfeinstein@pszjlaw.com

Robert Joel Feinstein

on behalf of Defendant Highland Capital Management  LP rfeinstein@pszjlaw.com

Ryan E. Manns

on behalf of Interested Party UBS Securities LLC ryan.manns@nortonrosefulbright.com

Ryan E. Manns

on behalf of Interested Party UBS AG London Branch ryan.manns@nortonrosefulbright.com

Sarah A. Schultz

on behalf of Interested Party PetroCap  LLC sschultz@akingump.com,
mstamer@akingump.com;afreeman@akingump.com;dkazlow@akingump.com;aqureshi@akingump.com;dkrasa-berstell@akingu
mp.com;bkemp@akingump.com;brenda-kemp-7410@ecf.pacerpro.com

Sawnie A. McEntire

on behalf of Interested Party Hunter Mountain Trust smcentire@pmmlaw.com
gromero@pmmlaw.com;tmiller@pmmlaw.com;bcandis@pmmlaw.com

Sawnie A. McEntire

on behalf of Creditor Hunter Mountain Investment Trust smcentire@pmmlaw.com
gromero@pmmlaw.com;tmiller@pmmlaw.com;bcandis@pmmlaw.com

Sean M. Beach

on behalf of Creditor Committee Official Committee of Unsecured Creditors bankfilings@ycst.com  sbeach@ycst.com

Shawn M Bates

on behalf of Creditor Acis Capital Management  L.P. sbates@azalaw.com, tbyrd@azalaw.com

Shawn M. Christianson

on behalf of Creditor Oracle America  Inc. schristianson@buchalter.com, cmcintire@buchalter.com

Susheel Kirpalani

on behalf of Interested Party Litigation Trustee of the Highland Capital Management  L.P. Litigation Sub-Trust

Case 19-34054-sgj11    Doc 3790    Filed 05/24/23    Entered 05/24/23 23:21:14    Desc
Case 3:23-cv-02071-E    Imaged Certificate of Notice    Filed 06/15/23    Page 23 of 225    of 678    PageID 531
District/off: 0539-3                          User: admin                                    Page 21 of 21
Date Rcvd: May 23, 2023                       Form ID: pdf012                              Total Noticed: 1

susheelkirpalani@quinnemanuel.com, dian.gwinnup@haynesboone.com

Suzanne K. Rosen

on behalf of Creditor Acis Capital Management GP LLC srosen@forsheyprostok.com, calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com;khartogh@forsheyprostok.com;khartogh@ecf.courtdrive.com

Suzanne K. Rosen

on behalf of Creditor Acis Capital Management L.P. srosen@forsheyprostok.com, calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com;khartogh@forsheyprostok.com;khartogh@ecf.courtdrive.com

Thomas Albert Cooke

on behalf of Creditor Acis Capital Management L.P. tcooke@azalaw.com, mflores@azalaw.com

Thomas C. Scannell

on behalf of Interested Party Sentinel Reinsurance Ltd. tscannell@foley.com acordero@foley.com;thomas-scannell-3441@ecf.pacerpro.com

Thomas Daniel Berghman

on behalf of Interested Party NexPoint Advisors L.P. tberghman@munsch.com, amays@munsch.com

Thomas Daniel Berghman

on behalf of Interested Party Highland Capital Management Fund Advisors L.P. tberghman@munsch.com, amays@munsch.com

Thomas Daniel Berghman

on behalf of Defendant NexPoint Advisors L.P. tberghman@munsch.com, amays@munsch.com

Thomas Daniel Berghman

on behalf of Defendant Highland Capital Management Fund Advisors L.P. tberghman@munsch.com, amays@munsch.com

Thomas G. Haskins, Jr.

on behalf of Creditor NWCC LLC thaskins@btlaw.com

Thomas M. Melsheimer

on behalf of Creditor Frank Waterhouse Scott B. Ellington, Isaac Leventon, Jean Paul Sevilla, Hunter Covitz and Thomas Surgent tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com

United States Trustee

ustpregion06.da.ecf@usdoj.gov

Vickie L. Driver

on behalf of Creditor HarbourVest et al Vickie.Driver@crowedunlevy.com crissie.stephenson@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com

William R. Howell, Jr.

on behalf of Defendant James D. Dondero williamhowell@utexas.edu williamhowell@utexas.edu

Zachery Z. Annable

on behalf of Defendant Highland Capital Management LP zannable@haywardfirm.com

Zachery Z. Annable

on behalf of Defendant Highland Capital Management L.P. zannable@haywardfirm.com

Zachery Z. Annable

on behalf of Other Professional Hayward PLLC zannable@haywardfirm.com

Zachery Z. Annable

on behalf of Plaintiff Highland Capital Management L.P. zannable@haywardfirm.com

Zachery Z. Annable

on behalf of Other Professional Highland Claimant Trust zannable@haywardfirm.com

Zachery Z. Annable

on behalf of Debtor Highland Capital Management L.P. zannable@haywardfirm.com

Zachery Z. Annable

on behalf of Other Professional Hayward & Associates PLLC zannable@haywardfirm.com

TOTAL: 476

# Exhibit 6



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 26, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

--------------------------------------------------------------------------------

In re:                                              §
                                                    §    Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P.,                  §
                                                    §    Case No. 19-34054-sgj11
                      Reorganized Debtor.           §
                                                    §
                                                    §

--------------------------------------------------------------------------------

## ORDER REGARDING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY OR, ALTERNATIVELY, FOR CONTINUANCE OF THE JUNE 8, 2023 HEARING

### [Dkt. Nos. 3788 and 3791]

Having considered the *Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing* of Hunter Mountain Investment Trust ("HMIT") filed on May 24, 2023, at Dkt. No. 3788 ("Motion for Expedited Discovery"), and, separately, on May 25, 2023, at Dkt. No. 3791 ("Motion for Continuance," and, together with the Motion for Expedited Discovery, the "Motions"), and the arguments of counsel at the emergency hearing on the Motions held on Friday May 26, 2023, at 9:30 a.m.,

1

**IT IS ORDERED** that the Motion for Continuance be, and hereby is, **DENIED**;

**IT IS FURTHER ORDERED** that the Motion for Expedited Discovery be, and hereby is, **GRANTED**, in part and only to the extent as set forth below:

(1) To the extent any party would like to depose either James P. Seery, Jr. or James Dondero in advance of the June 8 hearing ("June 8 Hearing") on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. No. 3699] and *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. 3760] (together, the "Motion for Leave"), Mr. Seery and Mr. Dondero shall be made available for depositions ("Depositions") on a date and at a time agreeable to the parties that is no earlier than May 31, 2023, and no later than June 7, 2023, and no discovery or depositions of any other party or witness will be permitted prior to the June 8 hearing; and

(2) None of the parties shall be entitled to any other discovery, including the production of documents from Mr. Seery or Mr. Dondero, or any other party or witness pursuant to a subpoena *duces tecum*, or otherwise, prior to the conduct of the Depositions or to the court's ruling on the Motion for Leave following the June 8, 2023 hearing;

**IT IS FURTHER ORDERED** that, except as specifically set forth in this Order, HMIT's Motion for Expedited Discovery be, and hereby is, **DENIED**.

**# # # END OF ORDER # # #**

# Exhibit 7



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 16, 2023**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., |  | Case No. 19-34054-sgj11 |
| Reorganized Debtor. |  |  |

## <u>MEMORANDUM OPINION AND ORDER GRANTING JOINT MOTION TO EXCLUDE EXPERT EVIDENCE [DE # 3820]</u>

I.     **INTRODUCTION**.

BEFORE THIS COURT is yet another dispute in the continuing saga of the Chapter 11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

The Reorganized Debtor has been operating under a confirmed Chapter 11 plan for approximately two years now—a plan having been confirmed on February 22, 2021. The plan was never stayed; it went effective in August 2021; and it was affirmed almost in its entirety by

the United States Court of Appeals for the Fifth Circuit (in late summer 2022).  A petition for writ of certiorari regarding the plan confirmation order has been pending at the United States Supreme Court since January 2023. Millions of dollars have been paid out to creditors under the plan, although the plan has not been completed.

This court uses the words "continuing saga" because there is a mountain of litigation that is still pending.  First, there are numerous adversary proceedings still pending, in which the Reorganized Debtor and a Litigation Trustee appointed under the plan are seeking to liquidate claims that Highland has against others, in order to augment the pot of money available for unsecured creditors.  Some of these adversary proceedings involve what seem like simple suits on promissory notes (albeit very large promissory notes), and others involve highly complex torts. There are numerous appeals pending and, from time to time, petitions for writs of mandamus have been filed post-confirmation.  And there are new lawsuits popping up around every corner it seems.

To be sure, this post-confirmation litigation is not the "usual stuff," and the adverse parties in this ongoing post-confirmation litigation are not the "usual suspects."  For example, the numerous post-confirmation adversary proceedings do not involve preference lawsuits or other Chapter 5 avoidance actions against non-insider creditors—as we so often see proliferate in Chapter 11 cases post-confirmation.  And we do not have long-running proof of claim objections pending post-confirmation—because all of the proof of claim objections regarding non-insider creditors were resolved long ago (with major compromises reached and settlements approved by the court—some after formal mediation).  And as for the myriad appeals, the non-insider creditors in this case—with proofs of claim asserted in the hundreds of millions of dollars—overwhelmingly supported Highland's confirmed plan and, therefore, they have not been appellants on any of the aforementioned appeals.

So who has been the adverse party in this deluge of post-confirmation litigation?  The founder and former Chief Executive Officer ("CEO") of Highland, Mr. James Dondero personally, and entities that he controls (*e.g.,* family trusts; investment advisory firms; managed funds; and other entities—frequently organized offshore—that were not themselves debtors in the Highland Chapter 11 case but assert party-in-interest status in various capacities).  To be clear, Mr. Dondero takes umbrage at the suggestion that ***all*** of the adverse parties in these numerous post-confirmation scuffles are controlled by him.

Which brings us to the current, post-confirmation contested matter before the court.  Currently, a party called Hunter Mountain Investment Trust ("HMIT"), a Delaware trust, has filed a "gatekeeper motion"—that is, a motion seeking leave from this court to file an adversary proceeding in the bankruptcy court against the Reorganized Debtor's CEO and certain investors who purchased allowed unsecured claims in this case post-confirmation and pre-Effective Date (as further described below).  HMIT's gatekeeper motion has given birth to a sideshow, so to speak, regarding ***what, if any, evidence the court ought to consider in connection with HMIT's gatekeeper motion—the latest "act" in such sideshow focusing on the propriety of considering expert testimony.***

Who or what exactly is HMIT?  HMIT is an entity with no employees and no income whose only asset is a contingent right of recovery under the Highland confirmed plan—by virtue of HMIT having held a majority (99.5%) of the limited partnership interests in Highland pre-confirmation, which interests were classified in the plan in a "Class 10" (that was projected to receive no recovery).  Mr. Dondero asserts that he does not control HMIT.  HMIT represents that, since on or about August 2022, it has been solely controlled by a Mr. Mark Patrick (a former employee of Highland who left Highland one week after its Plan was confirmed and went to work for an entity

called "Skyview Group," that was formed by certain former Highland employees, and apparently now advises various affiliate entities of Mr. Dondero).[1]  While HMIT only has one asset (the "Class 10" contingent interest), Mark Patrick has testified that HMIT is liable on a $62.6 million-dollar indebtedness that it owes to The Dugaboy Investment Trust (a family trust of which Mr. Dondero is the lifetime beneficiary), pursuant to a promissory note made by HMIT in favor of Dugaboy, in 2015, in exchange for Dugaboy transferring to HMIT an ownership interest in Highland.  *See* Transcript 6/8/23 Hearing, at pp. 304-308 [DE # 3843]. *See also* Highland Exh. 51 from 6/8/23 Hearing [DE # 3817].  Mr. Patrick has testified that Dugaboy and HMIT have a settlement, pursuant to which, Dugaboy is paying HMIT's attorney's fees. Transcript 6/8/23 Hearing, at p. at 313:2-18 [DE # 3843].

II.    **HMIT'S MOTION FOR LEAVE TO FILE LAWSUIT (a.k.a. THE "GATEKEEPER MOTION")**.

To understand the procedural motion now before the court—***which deals with whether or not the bankruptcy court should allow or exclude expert witness testimony and documents*** (more fully described below)—one must understand the context in which it is being considered, which is the hearing on HMIT's  *Emergency Motion for Leave to File Verified Adversary Proceeding* that was filed by HMIT (the "HMIT Motion for Leave"), which this court loosely refers to sometimes as the "Gatekeeping Motion."

The HMIT Motion for Leave, as alluded to, requests leave from the bankruptcy court to file a post-confirmation, post-Effective Date adversary proceeding pursuant to this bankruptcy court's "gatekeeping" orders and, specifically, the gatekeeping, injunction, and exculpation

---

[1] *See* DE # 2440 (Transcript of a 6/8/21 Hearing, at pp. 95:18-96:10).

provisions of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [DE # 1943], as modified (the "Plan"). The HMIT Motion for Leave, with attachments, as first filed, was 387 pages in length, and the attachments included a proposed complaint and two sworn declarations of the aforementioned former CEO of the Reorganized Debtor, Mr. Dondero. The HMIT Motion for Leave was later amended to eliminate the declarations of Mr. Dondero. DE ## 3815 & 3816. In a nutshell, HMIT desires leave to sue certain parties regarding *the post-confirmation, pre-Effective Date purchase of allowed unsecured claims*. The proposed defendants would be:

**Mr. James P. Seery, Jr.,** who now serves as the CEO of the Reorganized Debtor and also serves as the Trustee of the Highland Claimant Trust created pursuant to the Plan, and also was previously Highland's Chief Restructuring Officer ("CRO") during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case. Mr. Seery is best understood as the man who took Mr. Dondero's place running Highland—per the request of the Official Unsecured Creditors Committee.

**Certain Claims Purchasers,** known as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers"). The Claims Purchasers purchased $240 million face value of unsecured claims post-confirmation and pre-Effective Date—which claims had already been allowed during the Highland case—in the spring of 2021 and another $125 million face value allowed unsecured claims in August 2021. Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases. The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Official Unsecured Creditors Committee during the Highland bankruptcy case).

**John Doe Defendant Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

The proposed plaintiffs would be:

**HMIT,** which represents that it was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited

partnership interests).  HMIT represents that it currently holds a Class 10 interest under the confirmed Highland plan, which gives it a contingent interest in the Claimant Trust created under the plan, and as defined in the Claimant Trust Agreement ("CTA").

**Reorganized Debtor,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Highland Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Highland Claimant Trust.

The gist of the complaint that HMIT seeks leave to file is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.  HMIT Motion for Leave, 7.  HMIT believes the Claim Purchasers paid around $160 million for the $365 million face amount of claims they purchased.  HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  Also, Mr. Dondero purports to have concluded from conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Mr. Seery must have given these claims purchasers material nonpublic information ("MNPI") regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Mr. Seery shared MNPI regarding the likely imminent sale of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), in which Highland had, directly and indirectly, substantial holdings.  Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in

media reports for several months[2] and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[3]  Note that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).  In summary, while HMIT's proposed complaint is lengthy and at times hard to follow, it boils down to allegations that:  (a) Mr. Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors (who, incidentally, are not complaining) to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Mr. Seery, and are now happily approving Mr. Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest).  HMIT argues that Mr. Seery should be required to disgorge his compensation.  It appears that HMIT also seeks other damages.

The individual counts that HMIT wants to allege are:

    I.       Breach of Fiduciary Duty (as to Mr. Seery)

---

[2] *See* Highland Exh. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . .  MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Exh. 26 (describing prospects of an MGM sale noting that, among its largest shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exhs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[3] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

II.     Breach of Fiduciary Duty and Knowing Participation in Breach of Fiduciary Duty (as to Claims Purchasers)

III.    Fraud by Misrepresentation and Material Nondisclosure (as to all proposed defendants)[4]

IV.     Conspiracy (as to all proposed defendants)

V.      Equitable Disallowance (as to Muck and Jessup)

VI.     Unjust Enrichment and Constructive Trust (as to all proposed defendants)

V.      Declaratory Judgment (as to all proposed defendants)


## III.   NEXT, THE DELUGE OF ACTIVITY, IN MULTIPLE COURTS, AFTER THE FILING OF THE HMIT MOTION FOR LEAVE.


After the HMIT Motion for Leave was filed on March 28, 2023, there was two-and-a-half months of activity regarding *what type of hearing the bankruptcy court would hold and when* on the HMIT Motion for Leave.  A timeline is set forth below.

**3/28/23**:  The HMIT Motion for Leave was filed, along with a request for emergency hearing on same.  DE ## 3699 & 3700.  HMIT requested that the court schedule a hearing on the motion "on three (3) days' notice, and that any responses be filed no later than twenty-four hours before the scheduled hearing sought."  DE # 3700, 2. The HMIT Motion for Leave was 37 pages in length, plus another 350 pages of supporting exhibits, including two sworn declarations of Mr. Dondero.

**3/31/23**:  Bankruptcy Court entered order denying an emergency hearing on the HMIT Motion for Leave. DE # 3713.  The court stated that it would set the hearing on normal notice (at least 21 days' notice), seeing no emergency.

**4/4/23-4/12/23:**  HMIT pursued an unsuccessful interlocutory appeal and then a petition for writ of mandamus regarding the Bankruptcy Court's denial of an emergency hearing at first the District Court and then the Fifth Circuit.

**4/13/23:**  Highland filed a motion asking the Bankruptcy Court to set a briefing schedule on the HMIT Motion for Leave, indicating that Highland's proposed timetable for same was opposed by HMIT. DE # 3738.  The Claims Purchaser and Mr. Seery joined in that motion.  DE ## 3740 & 3747. HMIT subsequently filed a response unopposed to a briefing schedule and status conference.  DE # 3748.

---

[4] This Count III has gone in and out of the various drafts HMIT has filed with the court and was included in the latest version of the proposed complaint that was filed at DE # 3816.

**4/21/23:** HMIT filed a Brief [DE # 3758] before the status conference indicating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the Bankruptcy Court did not need evidence in order to exercise its gatekeeping function and determine if HMIT has a "colorable" claim. Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

**4/24/23:** The Bankruptcy Court held a status/scheduling conference; there was extensive discussion among all the parties regarding what type of hearing there needed to be on the HMIT Motion for Leave. HMIT was adamant there should be no evidence. Highland and Mr. Seery argued they ought to be able to cross-examine Mr. Dondero since his sworn declarations had been attached to the HMIT Motion for Leave as "objective evidence" that "supported" the HMIT Motion for Leave. DE #3699, p. 2. HMIT stated that it would withdraw Mr. Dondero's declarations, but not if the court was going to allow evidence.

**5/11/23:** Bankruptcy Court entered Order [DE # 3781] fixing a briefing schedule for the parties and stating that the court would "advise the parties on or reasonably after May 18, 2023, whether the Court intend[ed] to conduct the hearing on an evidentiary basis."

**5/22/23:** Bankruptcy Court issued an Order [DE # 3787] after receipt of briefing, stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave—and, in particular, pertaining to the court's required inquiry into whether 'colorable' claims may exist, as described in the Motion for Leave. Therefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing if they so choose. This may include examining any witness for whom a Declaration or Affidavit has already been filed. The parties will be allowed no more than three hours of presentation time each (allocated three hours to the movant and three hours to the aggregate respondents). This allocated presentation time may be spent in whatever manner the parties believe will be useful to the court (argument/evidence)."

**5/24/23:** HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing. [DE # 3788 & 3789]. HMIT continued to urge that it did not think presentation of evidence was appropriate in connection with the HMIT Motion for Leave, but that "subject to and without waiving its objections, HMIT requests immediate leave to obtain all of its requested discovery on or before the specific dates identified in each deposition notice (with duces tecum), failing which the hearing on HMIT's Motion for Leave should be continued until HMIT has obtained such discovery. The requested discovery is generally described in this Motion, but is set forth with particularity in the Deposition Notices with Duces Tecum attached as Exhibits A-E. [paragraph numbering omitted.] In summary, HMIT seeks expedited depositions of corporate representatives of Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup") and also seeks the deposition of James A. Seery, Jr. ("Seery")." Deposition Notices were attached for each of these five parties. Nothing was stated about a possible need for (or intention to present) expert testimony.

**5/26/23:** The Bankruptcy Court held yet another status conference in response to HMIT's newest emergency motion. The Bankruptcy Court referred to this as a "second hearing on what kind of hearing we were going to have" on the HMIT Motion for Leave. The court heard more discussions on whether it was appropriate to consider evidence at the hearing on the HMIT Motion for Leave. Nothing was mentioned about possible experts. The court, continuing to believe that

there could be mixed questions of fact and law inherent in deciding the HMIT Motion for Leave, granted in part and denied in part HMIT's request for expedited discovery it sought of Mr. Seery and the Claims Purchasers. The Bankruptcy Court issued a follow-up order [DE # 3800] that provided:  "(1) To the extent any party would like to depose either James P. Seery, Jr. or James Dondero in advance of the June 8 hearing ("June 8 Hearing") on HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. No. 3699] and Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. 3760] (together, the "Motion for Leave"), Mr. Seery and Mr. Dondero shall be made available for depositions ("Depositions") on a date and at a time agreeable to the parties that is no earlier than May 31, 2023, and no later than June 7, 2023, and no discovery or depositions of any other party or witness will be permitted prior to the June 8 hearing; and (2) None of the parties shall be entitled to any other discovery, including the production of documents from Mr. Seery or Mr. Dondero, or any other party or witness pursuant to a subpoena duces tecum, or otherwise, prior to the conduct of the Depositions or to the court's ruling on the Motion for Leave following the June 8, 2023 hearing"  The Bankruptcy Court issued this ruling with the expectation—based on everything it heard—that HMIT did not wish for the court to consider evidence but, if it did, it thought it should get to depose Mr. Seery and the Claims Purchasers.  The court reached what seemed like appropriate middle ground by allowing the deposition of Mr. Seery and allowing the other parties to depose Mr. Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour.  The court was aware that HMIT and Mr. Dondero had been seeking discovery from the Claims Purchasers in state court "Rule 202" proceedings for approximately two years.

**June 5, 2023 (10:10 pm)**:  HMIT filed its Witness and Exhibit List disclosing two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony).

**June 7, 2023 (4:07 pm):**  A Joint Motion to Exclude Expert Testimony and Documents was filed by Highland, Mr. Seery, and the Highland Claimant Trust ("Motion to Exclude Expert Evidence").

**June 8, 2023 (8:12 am):**  HMIT filed a Response to the Motion to Exclude Expert Evidence.

**June 8, 2023 (9:30 am):**  The Bankruptcy Court commenced its hearing on the HMIT Motion for Leave.  The parties desired for court to rule on whether the expert testimony and exhibits should be allowed into the record.  After much discussion, the court informed parties that it had not had the opportunity to study their eleventh-hour filings, and that the court would go forward with the hearing as the court had earlier contemplated (three hours per side; no experts for now) and the court would take the Motion to Exclude Expert Evidence under advisement and would schedule a "Day 2" for the hearing on the HMIT Motion for Leave for the experts if it determined that was appropriate.  The court gave Highland, Mr. Seery, and the Highland Claimant Trust a deadline of 6/12/23 to reply to HMIT's Response. They filed a Reply (in which the Claims Purchasers joined).  The Bankruptcy Court ordered no more pleadings would be considered. HMIT filed another pleading on this topic on 6/13/23 [DE # 3845] and Highland and Mr. Seery responded to the HMIT additional pleading [DE # 3846] and then HMIT replied to their response [DE # 3847].

### IV.    TURNING, FINALLY, TO THE MOTION TO EXCLUDE EXPERT EVIDENCE

As indicated in the timeline above, HMIT designated on June 5, 2023, at 10:10 pm CDT, two expert witnesses to testify at the hearing on the HMIT Motion for Leave.  The first one was Mr. Scott Van Meter, stating that he "may provide opinion testimony on issues relating to Mr. Seery's compensation and claims trading."  The second one was Mr. Steve Pully, stating that he "may provide opinion testimony on issues relating to Mr. Seery's claims trading."  To be clear, Mr. Seery is not alleged to have engaged in claims trading (i.e., he is not alleged to have either sold or purchased any claims in the Highland case).  Rather, it is surmised by HMIT that Mr. Seery might have shared MNPI with the Claims Purchasers.  Details about the two proposed experts' education, experience, and the likely substance of their testimony were provided.

Further, with regard to Mr. Van Meter, HMIT disclosed that he had analyzed the claims trading in the Highland case and holds the opinion that there are "red flags" plausibly indicating the use of MNPI in connection with the claim purchasers' investment in their claims –primarily among them the fact that the claims purchasers allegedly did not undertake due diligence. He also would apparently opine that Mr. Seery's compensation is not reasonable or excessive because not based on any market study and because the Claims Purchasers, as large creditors on the post-confirmation oversight committee, have the ability to control it.

Further, with regard to Mr. Pully, HMIT disclosed that the projections in the publicly available information (presumably the Disclosure Statement and Plan and accompanying exhibits, the Bankruptcy Schedules, and Monthly Operating Reports) would not have rewarded the Claims Purchasers with the type of economic return that hedge funds/private equity firms would expect to realize.  Thus, they must have had some MNPI to convince them that the claims purchasing was worthwhile.

There are procedural problems and substantive problems with the Proposed Experts (hereinafter so called).

## A.   *The Procedural Problems.*

The timeline set forth above is highly problematic.  Highland, Mr. Seery, and the Highland Claimant Trust refer to the timeline here as tantamount to "trial by ambush."

HMIT counters that it, in fact, complied with this court's local rules and national rules as well.  As to the local rules, Local Bankruptcy Rule 9014-1(c) of the Northern District of Texas requires, in contested matters, the exchange of exhibits and witness lists with opposing parties at least 3 calendar days before a scheduled hearing (unless a specific order otherwise applies).  The hearing on the HMIT Motion for Leave was scheduled for June 8, 2023, at 9:30 am CDT, and HMIT filed its exhibit and witness list on June 5, 2023, at 10:10 pm CDT—technically three calendar days before the hearing, albeit less than 72 hours before the hearing.  As for the national rules, HMIT states that it was under no duty to disclose the existence or substance of expert testimony prior to the exchange of witness lists, because national Rule 9014 of the Federal Rules of Bankruptcy Procedure ("FRBP"), applying to contested matters, does not incorporate Rule 26(a)(2) of the Federal Rules of Civil Procedure ("FRCP"), which defines the content and timing for expert disclosures (unless the court directs otherwise, which it did not here).

HMIT's focus on these rules is disingenuous.  The court does not view the Proposed Experts as having been appropriately and timely disclosed in light of the two-and-a-half-month timeline set forth above and—most importantly—the bankruptcy court's multiple prior conferences and orders setting the scope of the hearing and associated discovery. HMIT's revelation (approximately 60 hours before the hearing on the HMIT Motion for Leave) that it

sought to offer expert testimony came far too late. HMIT never raised even the prospect of expert testimony at any point in its multiple filings with the bankruptcy court (which consisted of many hundreds of pages) or during the two status/scheduling conferences on the HMIT Motion for Leave. During the two status/scheduling conferences, this court repeatedly asked HMIT what it wanted to do at the hearing on the HMIT Motion for Leave (as far as there being evidence or no evidence—zeroing in on the inconvenient complication for HMIT that it had already put in some evidence, through the filing of the declarations of Mr. Dondero in support of its motion, and this, at the very least, would entitle the parties to cross-examine him on the statements contained in the declarations). HMIT represented that it desired for the hearing to be conducted "on the pleadings only" and that it had or would withdraw the declarations of Mr. Dondero (it had not withdrawn the declarations as of the status/scheduling conferences). But, alternatively, if there would be evidence, HMIT wanted to conduct expedited discovery of documents, fact depositions, and corporate representative depositions. [DE # 3791]. ***HMIT made no mention of any experts***. Only after the bankruptcy court had ruled on HMIT's request for expedited discovery—and expressly limited the scope of discovery—did HMIT reveal its Proposed Experts [DE # 3818]. Obviously, the court would have fully vetted with the parties at the status/scheduling conferences the need for experts and the need for any discovery of them if HMIT mentioned it as a possibility.

Additionally, while HMIT focuses on the fact that FRBP 9014 excludes FRCP 26(a)(2)(b)'s requirements regarding expert witness disclosures and reports (absent the court directing otherwise), FRBP 9014 ***does*** include ***FRCP 26(b)(4)(A)***, in contested matters, which provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." *See* FRBP 9014(b); FRBP 7026. As alluded to above, this bankruptcy court had limited pre-hearing discovery to "depositions of Mr. Dondero and/or Mr. Seery" in reliance on

HMIT's representations, which omitted any reference to expert witnesses. By waiting until roughly 60 hours before the hearing to disclose the Proposed Experts, this resulted in Highland, Mr. Seery, and the Highland Claimant Trust not having sufficient time to seek to modify the court's prior status/scheduling orders, let alone take two expert depositions.

B. *The Substantive Problems*.

Finally, on a substantive level, the Proposed Experts' testimony and documents are inadmissible because they will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Federal Rule of Evidence 702(a) provides that a witness who is qualified as an expert may testify in the form of an opinion or otherwise if, among other requirements, "the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

The fact finder here at this stage, in the context of determining whether HMIT's proposed complaint asserts "colorable" claims under the gatekeeper provision of the Plan, obviously, is the bankruptcy judge. The judge, thus, may decide whether the Proposed Experts would help her analyze or understand an issue. This court is well within its discretion to conclude that the Proposed Experts would not advance the judge's analysis. This bankruptcy judge has had years of experience (both before and after her 17 years as a bankruptcy judge) with the topic of claims purchasing that sometimes occurs during a bankruptcy case. The court notes, anecdotally, that the activity of investing in distressed debt (which frequently even occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and has, indeed, been for a couple of decades. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in

> 1978. [Citations omitted.] Claims trading has revolutionized bankruptcy by making
> it a much more market-driven process. [Citations omitted.]  . . . The development
> of a robust market for all types of claims against debtors has changed the cast of
> characters involved in bankruptcies. In addition to long-standing relational
> creditors, like trade creditors or a single senior secured bank or bank group,
> bankruptcy cases now involve professional distressed debt investors, whose
> interests and behavior are often quite different than traditional relational
> counterparty creditors.

Adam J. Levitin, Bankruptcy Markets: Making Sense of Claims Trading, 4 Brook. J.

Corp. Fin. & Com. L. 64, 65 (2010).

This judge has likewise had decades of experience with hedge funds and private equity

funds.  The court understands very well financial concepts such as return on investment, risk, and

the handicapping of how certain events might impact recoveries. This court can take judicial notice

that there was volatility in the capital markets during the time period of this case that would

certainly factor into decisions to buy or sell claims.[5]  This court understands the concepts of MNPI

and fiduciary duties.  The judge remembers very well when the possibility of an MGM-Amazon

transaction flooded the news in late 2020 and 2021, and then became a reality.    The court

remembers asking the parties in the Highland case during open court about it, since it was widely

known that Highland and its affiliates owned direct or indirect interests in MGM stock.  This was

before, by the way, certain of the claims purchases that are at issue here were made.

Finally, this judge has decades of experience with executive compensation in bankruptcy

cases and in connection with post-confirmation trusts.[6]  In fact, this court approved Mr. Seery's

---

[5] A court "can, of course, take judicial notice of stock prices." *Schweitzer v. Invs. Comm. of Phillips 66 Savings Plan*,
960 F.3d 190, 193 n.3 (5th Cir. 2020).

[6] This court even ran across one article that the above-signing judge published on the topic before she was a judge.
*Bringing Home the Bacon, or Just Being a Hog?  Employee and Executive Compensation Issues in Chapter 11*, 22nd
Annual Bankruptcy Conference, The University of Texas School of Law (Nov. 2003) (co-authored with Frances
Smith).  The bankruptcy judge does not mean to suggest that a 20-year-old article makes anyone per se an expert.  It

compensation early on during the bankruptcy case (in 2020), and his compensation was negotiated

by the former members of the Official Unsecured Creditors Committee, among others.  Mr. Seery's

compensation during this bankruptcy case was obviously subject to a motion, notice and a hearing,

and was fully disclosed.  Mr. Seery's base compensation now is the same as what this court

approved back in 2020. Certainly, in a bankruptcy case, one size does not fit all.  Highland is a

unique case that has involved great contentiousness and hundreds of millions of dollars of assets.

Mr. Seery's compensation reflects these circumstances, among other things.

     In summary, with all due respect to the Proposed Experts, it is hard for this court to

conceive how they could help this court to understand the evidence or determine a fact in issue

relative to the gatekeeping motion—as contemplated by Fed. R. Evid. 702(a)—when this court

deals with the issues presented by motion, and similar issues, somewhat regularly.

     Accordingly, the court will exercise its discretion under Fed. R. Evid 702(a) and exclude

the Proposed Experts testimony and HMIT Exhibits 39-52 relating to same.

     A further opinion and order will be forthcoming on the HMIT Motion for Leave.

### **#### END OF MEMORANDUM OPINION AND ORDER####**

---

is merely to further the point that a long-term bankruptcy judge with Chapter 11 experience typically has developed
expertise regarding executive compensation issues pre-and post-confirmation in Chapter 11 cases.

# Exhibit 8



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 1, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Case No. 19-34054-sgj11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |
| | ) |

## ORDER STRIKING HMIT'S EVIDENTIARY PROFFER PURSUANT TO
## RULE 103(a)(2) AND LIMITING BRIEFING

The Court has reviewed Hunter Mountain Investment Trust's ("HMIT") *Evidentiary Proffer Pursuant to Rule 103(a)(2)* ("Proffer"; Dkt. No. 3858), the *Highland Parties' Joint Objections To And Motion To Strike HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2)* ("Motion"; Dkt. No. 3860) filed by Highland Capital Management, L.P., the Highland Claimant Trust, and James P. Seery, Jr. (collectively, the "Highland Parties"), and the *Claims Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike HMIT's Purported Proffer* (Dkt. No. 3861) filed by Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management,

L.L.C., and Stonehill Capital Management LLC (collectively with HMIT and the Highland Parties, the "Parties"). After due deliberation, the Court has determined that good and sufficient cause has been shown for the relief requested in the Motion. It is therefore **ORDERED** that:

1.      The Motion is **GRANTED**.

2.      The Proffer and its accompanying declarations are stricken from the record for the reasons set forth in the Court's June 27, 2023 email (attached hereto as Exhibit A). The Court directs the Clerk to remove docket entry 3858 from the docket.

3.      The Parties shall not file any additional briefs, motions, pleadings, proffers, or other submissions with the Court in connection with the Motion, the Highland Parties' *Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully* (Dkt. No. 3820), or any proposed/excluded expert evidence relative to HMIT's *Motion for Leave to File Verified Adversary Proceeding* (Dkt. No. 3699).

### ### END OF ORDER ###

# Exhibit A

From: Traci Ellison <Traci_Ellison@txnb.uscourts.gov>
Date: June 27,
To: "Stancil, Ma
<zannable@haywardfirm.com>, "Sawnie A. McEntire" <smcentire@pmmlaw.com>, "Roger L. McCleary"
<rmccleary@pmmlaw.com>, "Omar J. Alaniz" <OAlaniz@reedsmith.com>, "McIlwain, Brent R (DAL - X59481)"
<Brent.McIlwain@hklaw.com>
Subject: 19-34054-sgj11 Highland Capital Management, L.P.


Dear Counsel:

Please see the following message from Judge Jernigan:

"With regard to the Evidentiary Proffer ("Proffer") of Hunter Mountain Investment Trust ("HMIT") filed at DE # 3858 on 6/19/23 (i.e.,
after the 6/8/23 hearing on HMIT's Motion for Leave to File Verified Adversary Proceeding [DE # 3699] and after the court's written
6/16/23 ruling regarding the admissibility of the proposed expert evidence), the court has determined that the Proffer is
unnecessary. Rule 103(a)(2) does not apply if the "substance" of the excluded evidence "was apparent from the context." Fed. R.
Evid. 103(a)(2).  Here, "the substance" of the excluded evidence was quite apparent from the "context"--more specifically, the
witness and exhibit list filed by HMIT, the proposed exhibits offered [see DE # 3818], and the statements of HMIT's counsel on the
record at the 6/8/23 hearing.

The court is aware of the motion to strike the Proffer [DE # 3860] and the Joinder therein [DE # 3861].  The court concludes it is
appropriate to grant the motion to strike.  The court directs counsel for movants to upload a form of order that grants their motion
to strike. The order shall direct the Clerk to mark DE # 3858 as stricken from the record as both filed without authority and
unnecessary pursuant to FRE 103(a)(2).

The parties are directed to file no more pleadings in the bankruptcy court regarding this issue of the proposed/excluded expert
evidence relative to DE # 3699. The court has ruled [at DE # 3854]."

Thank you,
Traci



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed August 25, 2023

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| **Reorganized Debtor.** | § | |

### MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
### [BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

_____

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities.  Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation.  The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3]  The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein.  The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

A.      *Who is the Movant, HMIT?*

Who is HMIT?  It is undisputed that it is a former equity owner of Highland.  It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement.  This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest.  As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022). The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions."  In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

HMIT's only asset is its contingent interest in the Claimant Trust.  It has no employees or revenue. HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero ("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees.  HMIT vehemently disputes the suggestion that it is controlled by Dondero.

       *B.*     *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and (2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later further explained), the claims acquired by the Claims Purchasers were acquired by them after extensive litigation, mediation, and settlements were approved by the bankruptcy court and after the original claims-holders had voted on the Plan and after Plan confirmation.  As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave.  Nearly a month later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that "[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action." Supplement, ¶ 1 and Exhibit 1-A.  It is this revised proposed complaint to which this court will refer, when it uses the defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5, 2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto.  In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

     C.    *Why Does HMIT Need to Seek Leave?*

As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7]  The Gatekeeper Provision was not included in the Plan *sans raison*.  Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

D.        *Some Further Context Regarding Post-Confirmation Litigation Generally.*

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls.   To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan.   Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.   Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023:  six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery") in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place" after not achieving the results he wanted in the Highland bankruptcy case.  Indeed, the Motion for Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers) through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202").  In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting that the list is "a summary of active pending actions only and does not include actions that were resolved by final orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, ***three*** of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the lack of bankruptcy appellate standing on behalf of the appellant.  On July 19, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023).  On July 31, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the same basis:  Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023).  The July 31, 2023 ruling followed the Fifth Circuit's ruling on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320 (5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided one or more of the Claims Purchasers with material nonpublic information to induce them to want to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that the Claims Purchasers were allegedly told they would make a hefty profit on the claims they purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as the Claimant Trustee of the Claimant Trust.   In sum, HMIT alleges this constituted wrongful "insider trading" of the bankruptcy claims.   In addition, certain lawyers for Dondero and Dugaboy sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are "colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of the Plan).   The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June 8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses both in support of and in opposition to the Motion for Leave.   Having considered the Motion for Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's request for leave to pursue its Proposed Claims.   The court's reasoning is set forth below.

## II.    BACKGROUND

### A.  *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada").   It operated as a global investment adviser that provided investment management and advisory services and managed billions of dollars of assets, both directly and indirectly through numerous

affiliates.   Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%), Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was wholly owned by Dondero and was the only general partner of Highland (0.25%).   On October 16, 2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president, and portfolio manager, and facing a myriad of massive, business litigation claims – many of which had finally become or were about to be liquidated (after a decade or more of contentious litigation in multiple fora all over the world—filed for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December 2019.   The official committee of unsecured creditors (the "Committee") (and later, the United States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over and distrust of Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

After many weeks under the specter of a possible appointment of a trustee, Highland and the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance settlement approved by this court on January 9, 2020.[11]   As a result of this settlement, Dondero relinquished control of Highland and resigned his positions as officer or director of Highland and its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020 [Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

chosen to lead Highland through its chapter 11 case:  Seery, John S. Dubel, and retired bankruptcy judge Russell Nelms.  Given the Debtor's perceived culture of constant litigation while Dondero was at the helm, it was purportedly not easy to get such highly qualified persons to serve as independent board members.  At the hearing on the corporate governance settlement motion, the court heard credible testimony that none of the Independent Directors would have taken on the role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the Independent Directors without the bankruptcy court's prior authority.  The gatekeeper provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation and did so "subject at all times to the supervision, direction and authority of the Independent Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to "not cause any Related Entity to terminate any agreements with the Debtor."[15]  The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery acting in these roles. The gatekeeper provision in the July 2020 Order was essentially the same as the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

July 2020 Order, 3, ¶5. Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization plans, none of which were embraced by the Committee or the Independent Directors. When Dondero's plans failed to gain support, he and entities under his control engaged in substantial, costly, and time-consuming litigation for Highland.[17] As the Fifth Circuit described the situation, after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr. Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr. Dkt. No. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt. No. 1808] on January 22, 2021.[20]  Highland had negotiated settlements with most of its major creditors following mediation and had amended its initially proposed plan to address the objections of most of its creditors, leaving only the objections of Dondero and entities under his control (the "Dondero Parties")[21] at the time of the confirmation hearing, which was held over two days in early February 2021.  The Plan is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created:  the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner).  Highland's various servicing agreements were vested in the Reorganized Debtor, which continues to manage collateralized loan obligation vehicles ("CLOs") and various other investments postconfirmation.  The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13.  The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("<u>Disclosure Statement</u>") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries.  The Claimant Trust is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package as the CEO of the Reorganized Debtor and the Claimant Trustee.  Following their acquisition of their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members of the CTOB.[23]  Seery's compensation included the same base salary that he was receiving as CEO and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

   B.  *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery, and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His Compensation as Claimant Trustee Post-Confirmation*

      1.  The December 17, 2020 MGM Email

   Between Dondero's forced resignation from Highland in October 2020 and the confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors and the Committee.   In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

(the "MGM Email") that featured prominently in HMIT's Motion for Leave.  According to HMIT and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely by either Amazon or Apple.[25]  At the time Dondero sent the MGM Email, Dondero sat on the board of directors of MGM, and the Debtor owned MGM stock directly.  The Debtor also managed and partially owned a couple of other entities that owned MGM stock and managed various CLOs that owned some MGM stock as well.  HMIT alleges now that Seery later misused and wrongfully disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in exchange for him providing this allegedly "insider" information that inspired them to purchase unsecured claims with an alleged expectation of future large profits).[26]  A timeline of events (in late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's departure from Highland, helps to put the email in full context:

- October 16: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- November 24: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- November 24–27: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- November 30: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- December 3: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- December 3: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- December 10: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- December 16: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- December 17: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero:  "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:
    [The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.
June 8 Hearing Transcript, 273:13-22.

The MGM Email had the subject line "Trading Restriction re MGM – material non public information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he received the MGM Email. This was because, among other reasons, Dondero sent it ***after***: (i) unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of the disclosure statement; and (v) Highland's demand to collect on the demand notes for which Dondero and his entities were liable.[38] Highland's Chapter 11 case was fast approaching the finish line. Moreover, MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this.[39] Still further, as of December 17, 2020 (the date Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct and indirect control of the Debtor to the Independent Board as part of the corporate governance settlement[40] and having resigned from all roles at the Debtor and affiliates in October 2020. Still further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. ***My purpose was to alert Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades***.

It is noteworthy that ***Dondero's labeling of the MGM Email (in the subject line) as a communication containing "material non public information" did not make it so***.  In fact, it appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for Leave that the MGM Email did not disclose information to Seery that was not already made available to the public at the time it was sent. Seery testified that he did not think the MGM Email contained MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier noted—"MGM was already on the restricted list at Highland Capital . . . before I got to Highland."[42]  Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9.  Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors of MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10.  He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . . MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[44]  For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]  In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]  Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

them."[48]  Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email.  He did not "say anything about Amazon hitting the price."  He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them."  Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple.  When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically ***did not*** communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed.  For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt."  The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers."[50] (*Id*. Ex. 27.)  The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022.

---

[50] Highland Ex. 27.
[51] Highland Ex. 28.
[52] Highland Ex. 29.
[53] Highland Ex. 30.

2.  <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery.  HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers.  Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations.  HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable.  These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021).  Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57]   He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59]   The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4.  The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4.  The court has placed in a table and numbered each line for ease of reference.  The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63]   Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65]   Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66]   Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67]   Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69] Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims. Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure. The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended petition, the responses, the record, applicable authorities and having conducted a hearing on the petition on June 1, 2022.[72]

    3.  <u>Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories</u>

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202 Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks after his telephone calls with Linn and Patel—was true and accurate.  In it, he swore under oath as to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero acknowledged, as well, that his sworn statement that he filed in support of an amended verified Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May 2022), described the same telephone conversation he had with Linn, and it did not mention MGM at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Seery's say-so because they had made so much money in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin[n] of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Seery had testified in court, it made no sense to me that Mr. Lin[n] would think that the claims were worth more than what Seery testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.  Accordingly, "I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee."[76] Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary beneficiary."[77]  Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.

[76] *Id.*, ¶¶ 3-4.

[77] *Id.*, Ex. A, 1-2.

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78]  The U.S. Trustee's office took no action.   Dondero made a second and third attempt to get the U.S. Trustee's office to conduct an investigation into the same allegations laid out in Draper's letter, this time in "follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later, on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina wrote "to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged conversation with Linn, this time in support of a Verified Rule 202 Petition *filed by HMIT* ("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout 2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same allegations of misconduct by Seery and Farallon.[80]   In this new sworn statement, Dondero describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and Linn and *mentions MGM* and Farallon's alleged optimism about the *expected sale of MGM*:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Seery because they had made significant profits when Seery told them to purchase other claims in the past. They also stated that they were particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed.  The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83]  But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland].  The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84]  HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85]  The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85]  June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

### C. *Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and (2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August 9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87] <br><br> $23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88] <br><br> $137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020 <br><br> Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89] <br><br> $80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

---

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90]<br><br>$125,000,000 in aggregate ($65,000,000 General | 8/9/2021<br>Bankr. Dkt. No. 2698 (Muck) and Bankr. Dkt. No. 2697 (Jessup) |
|---|---|---|---|---|

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91]   Dondero testified that it was **his** view that there was insufficient information in the public to justify the claims purchases.[92]   But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations.   In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93]   Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

---

[90] Bankr. Dkt. No. 2389.  The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases.  Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95]  Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside.  In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay *30 percent more* than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96]  Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill *as creditors*, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12.  The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See*, Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections.  The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back.  This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation.  These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties.  The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the  Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents ***a colorable claim of any kind***, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

The Plan defines Protected Parties as,

collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities), (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number of persons than the persons protected under the January 2020 Order (addressing the Independent Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as CEO and CRO of the Debtor). But, at the same time, it is less restrictive than the gatekeeping provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful misconduct or gross negligence," effectively providing the protected parties under the prior orders with a limited immunity from claims of simple negligence or breach of contract that do not rise to the level of "willful misconduct or gross negligence," whereas the Gatekeeping Provision under the Plan does not act as a release or exculpation of the Protected Parties in any way because it does not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are "colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

Dondero and some of the entities under his control appealed[100] the Confirmation Order directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and injunction provisions, including the Gatekeeper Provision (collectively, the "Protection Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge, purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-debtor discharges.  As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all remaining grounds."[101]   The Fifth Circuit specifically found the "injunction and gatekeeping provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that "exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions that the Protection Provisions were legal, necessary under the circumstances, and in the best interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision improperly extended to certain bankruptcy participants other than Highland, the Committee and its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero].'" *Id.* at 434-35.

[101] *See supra* note 4.  The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022.  The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')."  In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424.  No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's *exculpation provision*."[102]   The Fifth Circuit then remanded to the Bankruptcy Court "for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted that the protection provisions in the January and July 2020 Orders appointing the Independent Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities" such that "[d]espite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent Directors, (iii) the Committee, and (iv) members of the Committee (in their official capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and that no other changes would be required to conform the Plan and Confirmation Order to the Fifth Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform, arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded." *Id.*

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]   The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

E.   *HMIT's Motion for Leave*

HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.   On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]   The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding ***the post-confirmation, pre-Effective Date purchase of allowed unsecured claims***.   The Proposed Defendants would be:

> **Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case).  Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

> **Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case.  They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers").  The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021. Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases.  The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

> **John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

> **Highland,** as a nominal defendant.  HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

> **Claimant Trust**, as a nominal defendant.  HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

> **HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests).  HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

**Highland,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111]  The gist of the Proposed Complaint is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112]  HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased. HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants.  In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings.  As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months ***before*** certain of their claims—the UBS claims—were purchased).[113]  In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that:  (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest).  HMIT argues that Seery should be required to disgorge his compensation.  It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.  Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant Trustee.  In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges claims which are substantially more than 'colorable' based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or abetting) breaches of fiduciary duty."[114]

   F.   *Is HMIT Really Dondero by Another Name?*

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a continuation of the harassing and bad-faith litigation by Dondero and his related entities that the Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been HMIT's administrator since August 2022.  Patrick asserts that he is not influenced or controlled by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against Seery and the Claims Purchasers.  However, the testimony elicited at the June 8 Hearing—the hearing at which HMIT had the burden of showing the court that its Proposed Claims were "colorable" such that it should be allowed to pursue them through the filing of the Proposed Complaint—paints a different picture.  Somewhat tellingly, HMIT chose not to call Patrick—allegedly HMIT's only representative and control person—as a witness in support of its Motion for Leave.  Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3.  HMIT notes, in a footnote 6, that "Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors.  Rather, the proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state court.[122] HMIT's counsel argued that the point of this questioning was that "they're just trying to draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202 proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to the order as "an order denying *our second"* Rule 202 Petition.[124]  And, Dondero testified that his warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence. *Id.*, 58:14-15.

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying

for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own

agenda in the bankruptcy case is not new.  Rather, this has been part of Dondero's *modus operandi*

since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster

in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued

to lob objections and create obstacles to Highland's implementation of the Plan through entities

he owns or controls.  As noted above, the Fifth Circuit specifically upheld this court's finding in

the Confirmation Order that Dondero owned or controlled the various entities that had objected to

confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related

appellants made similar protestations that they are not owned or controlled by Dondero and asked

the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording

to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely

independent from him."[126]  Based on the totality of the evidence in this proceeding, the court finds

that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving

force behind HMIT's Motion for Leave and the Proposed Complaint.  The Motion for Leave is

just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two

years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State

Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.
[126] *Highland Capital*, 48 F.4th at 434-435.

G. *Opposition to Motion for Leave:  Arguing No Standing and No "Colorable" Claims*

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127]  The Claims Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on May 11, 2023, as well.[128]  In the Joint Opposition, the Highland Parties urge the court to deny HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have standing to bring them, directly or derivatively against the Proposed Defendants.  They argue, in the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims trading in the bankruptcy which occurred between sophisticated Claims Purchasers and sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional counsel.  Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the Claimant Trust were injured by the claims trading at issue because the Purchased Claims had already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the Plan on account of the Purchased Claims remain the same, the only difference being who holds the claims.  Moreover, even if HMIT could succeed in equitably subordinating the validly transferred ***allowed*** claims, HMIT would still be in the same position it is today:  the holder of a

---

[127] Bankr. Dkt. Nos. 3783.  Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint.  As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan.  The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6).  They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H.  HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132]  Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT.  As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

I.  *Litigation within the Litigation:  The Pre- June 8 Hearing Skirmishes*

Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing.  HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice).  When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

Next, there were multiple pleadings and hearings regarding ***what kind of hearing*** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134]  The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims.  HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim.  Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low. Evidence is not allowed. . . . [S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading – in this case, the complaint, or now the revised complaint."[135] Counsel for the Proposed Defendants argued that the standard of review for colorability here, in the specific context of the court exercising its gatekeeping function under the Plan, is more akin to the standards applied under the Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing on the motion for leave; if the standard of review presents no greater hurdle to the movant than the 12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put in place to prevent.[137] On May 22, 2023, after receipt of post-hearing briefing on the issue, the court entered an order stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126 (1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the Confirmation Order], that the costs and distraction of this litigation are substantial. And if all we're doing is replicating a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance approval were meant to 'screen and prevent bad-faith litigation.' Well that – if that means only what the Plaintiff[ ] say[s] it does, then it really doesn't do anything at all to screen. There's no gatekeeping because their version of what that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion. On May 26, 2023, this court held yet another status conference. Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing. The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour. The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony). Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits. The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness). The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have **standing** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "**colorable**."  But prior to getting into the weeds on **standing** and "**colorability,**" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of **improper** claims trading.

### A.  Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.  Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

48

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive." Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM. Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*?  The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.]  Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.]  . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies.  In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140]  Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading:  The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141]  On the flipside, "[c]aims trading permits an entrance to the bankruptcy process for those investors who want to take the time and effort to monitor the debtor and contribute expertise to the reorganization process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions whatsoever regarding claims trading. The only thing resembling any regulation of claims trading during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current version of which went into effect in 1991—and it imposes extremely light regulation—if it could even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the transferee.  The transferor shall then be notified and given 21 days to object.  If there is an objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place. If there is no objection, nothing further needs to happen, and the transferee will be considered substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the opportunity to object is the ***transferor*** of the claim (presumably, in the situation of a dispute regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms").

by the alleged transferor).  Third, the ***economic consideration paid need not be disclosed to the court or anyone***.  Fourth, there is no requirement or definition of timeliness.  Finally, it explicitly does not apply with regard to publicly traded debt.  This, alone, means that many claims trades are not even reported in a bankruptcy case.  But it is not just publicly traded debt that will not be reflected with a Rule 3001(e) filing.  For example, bank debt, in modern times, is often syndicated (i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as the syndicated interests (participations) change hands, and they frequently do, there typically will not be a Rule 3001(e) notice filed.[143]  To be clear here, this syndication-of-bank-debt fact, along with the fact that there are financial products whereby bank debt might be carved up into economic interests separate and apart from legal title to the loan, means there are many situations in which trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed by the bankruptcy court. This is the world of modern bankruptcy.  Most of the claims trading that gets reported through a Rule 3001(e) notice is the trading of small vendor claims. And this is all regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a bankruptcy context.  Perhaps this is not surprising, since it is not prohibited and ***is mostly a matter of private contract between buyer and seller***.  The case law that does exist seems to arise in situations of perceived bad faith of a purchaser—for example, when there was an attempt to control voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991.  Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade.  Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as disallowing votes on a plan or even equitable subordination of a claim).[145]  Another type of case that has generated case law is where the purchaser of claims occupied a fiduciary status with the debtor.[146]  Still another type of case that has generated case law is where there is an attempt to cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading in different contexts.  Most of them imposed no adverse consequences on claims traders:  *In re Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for $16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2) notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of equitable subordination to the claim, stating:  "Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the Seventh Circuit further stated that it could "put to one side whether the court's finding of inequitable conduct was correct" because even if there was misconduct, it did not harm the other creditors, who were in the same position whether the original creditor or Garlin happened to own the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes of a claims purchaser who purchased to get a blocking position on a plan).  *But see In re First Humanics Corp.,* 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147] *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated, Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the **transferor**; where there is no objection by the **transferor**, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading.  At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148]  But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there **seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter**. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds.  No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery.  The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value.  And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.,* 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts.  *Contrast In re Lothian Oil Inc.,* 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may **recharacterize** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything.  Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed.  Second, the case at bar is unique in that the claims traded here **had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case**.  Thus, the amounts that would be paid on them were "locked in," so to speak.  There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan).  Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] **This was post-confirmation, pre-effective date claims purchasing.**  Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser.  The rules of the road had been set.  The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery).  Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.]  These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

were almost like passive investments, at this point—there was no risk of a claim objection and there was a confirmed plan, with a lengthy disclosure statement that described not only plan payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.      Breach of Fiduciary Duties (Seery)

II.     Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.    Conspiracy (all Proposed Defendants)

IV.     Equitable Disallowance (Claims Purchasers)

V.      Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.     Declaratory Judgment (all Proposed Defendants)

*The court struggles to fathom how any of these proposed causes of action or remedies can be applied in the context of:  (a) post-confirmation claims trading; (b) where the claims have all been litigated and allowed*.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom the following hypotheticals in which claims trading during a bankruptcy case might be somehow actionable:

**Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto. There would then be a contested hearing between purchaser and seller regarding the validity of the transfer with the bankruptcy court issuing an appropriate order after the hearing on the objection. *As noted, there was no objection to the Rule 3001(e) notices here*.

**Hypothetical #2:** Alternatively, there could be a breach of contract suit between purchaser and seller if one thinks the other breached the purchase-sale agreement somehow.  Perhaps torts might also be alleged in such litigation. *As noted, there is no dispute between purchasers and sellers here.*

**Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." ***As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow. The time elapsed long ago to seek revocation of the Plan.***

**Hypothetical #4:** As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith"). ***Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.***

**Hypothetical #5:** As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate ***claims*** to ***other claims***. *See* Section 510(c) of the Bankruptcy Code. But here**,** HMIT is seeking either: (a) equitable subordination of the ***claims*** of the Claims Purchaser to HMIT's ***Class 10 former equity interest*** (in contravention of the explicit terms of section 510(c)) or, (b) ***equitable disallowance*** of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:** Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate ***entered without a contest*** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). Here there was most definitely "a contest" with regard to all of these purchased claims. ***Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.***

**Hypothetical #7:** If a party believes "insider trading" occurred there are governmental agencies that investigate and police that. ***Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview. Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing***.

**Hypothetical #8:** The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee. While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

own interests above those of the estate, here, there are a couple of points that seem noteworthy.  One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case.  It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see.  The whole notion of "insider information" (just after confirmation here) feels a bit off-point.  Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process.  And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust.  *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3).  In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this.***

B. *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself.  Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law?  Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself.  HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

1.   The Different Types of Standing:  Constitutional Versus Prudential

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows:  a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153]   "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152]  Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing.  In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence.  The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159]  In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160]  The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials.  After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff/mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161]  Thus, the district court's error was ***not*** in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's/mother's amended complaints.[162]  The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?"  As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing.  "Not one of our precedents holds that the inquiry is jurisdictional."  It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities.  In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304.  The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing.  As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy *appellate* standing originated in a statute in the Bankruptcy Act.  The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165]   The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166]   In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up).  The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited*." *Id.* (cleaned up).

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark*[167] opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying—or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up).  The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

standing requirement embodied in the 'person aggrieved' test."[172]  The district court noted that it had an "independent obligation to consider constitutional standing before reaching its prudential aspects."[173]  The district court dismissed the appeal as to Dugaboy and HCMFA for lack of standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on the merits.  The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did not contest the district court's determination that NexPoint had standing to pursue the appeal, it "may consider prudential standing issues *sua sponte*."[175]  In doing so, the Fifth Circuit recognized the distinction between constitutional standing and the prudential "person aggrieved" test applied to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard than traditional constitutional standing," as it requires an appellant to show that it is "directly, adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed Claims, this court must *first* determine whether HMIT would have constitutional standing under Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then *additionally* address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might *limit* who may sue.  Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).  The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

66

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied only in the context of bankruptcy *appellate* matters.[178]  As noted in its most recent opinion discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated that the "person aggrieved" test is a test for bankruptcy *appellate* standing, which is narrower than a party in interest's right to be heard in bankruptcy cases in general.[179]  The court rejected an argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter" confers *appellate* standing, noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for bankruptcy appellate standing is narrower than the test for determining one's standing to appear and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional standing to bring the Proposed Claims.

2.  <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional standing is necessary for a court to exercise subject matter jurisdiction.  It is only the first hurdle a party must clear before pursuing a claim in federal court.  HMIT, as  plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing.  The court is not being critical of this mistake.  As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing.  Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer *appellate* standing.")(emphasis added).

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

Concrete and Particularized; Actual or Imminent.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]   "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.
[182] *Lujan*, 504 U.S. at 560 (cleaned up).
[183] *Spokeo*, 578 U.S. at 339.
[184] *Id.* at 340.
[185] *Id.*
[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

Traceability - Causal Connection.  As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188]  The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

Redressability.  The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190]  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191]  "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here.  What is HMIT's concrete and particularized injury—that is "real" and is not abstract?  That is not conjectural or hypothetical?  That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest. HMIT alleges the following injury:  it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194]  Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave.  It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation.  In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee).  The CTA now further governs his compensation.  The CTA, which was publicly filed *in advance of* the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law.  Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court. The issue cannot be forfeited or waived by a party.  *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.  Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered. HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a "success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the CTOB in setting the success fee and severance and the like.   A fully executed copy of the CTA was admitted into evidence at the June 8 Hearing.   HMIT is essentially arguing that its injury (i.e., diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a court-sanctioned and creditor-approved process for approving compensation to Seery.   Moreover, HMIT has failed to plead facts sufficient to show that, even if Seery received excessive compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust Interest will ever vest.   The district court and the Fifth Circuit in various appeals by Dugaboy, another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing based on the *speculative nature of its alleged injuries as a contingent beneficiary of the Claimant Trust under the Plan*.   For example, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]  The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."  The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional standing "because they have not identified any injury fairly traceable to the Order: ***the injuries identified are speculative at best and nonexistent at worst***."[196]   HMIT's allegations of injury are, without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future injury if its Contingent Claimant Trust Interest ever vests."[197]   The court finds that HMIT would not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing—whether HMIT could show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only a speculative injury.   Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing—whether HMIT can show "redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curiam*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is . . . a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."
[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).
[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of *equitable subordination* of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), *claims cannot be subordinated to interests*. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that *equitable disallowance* of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization" of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. *Thus, it would appear*

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

3.   <u>HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims</u>.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if HMIT would lack prudential standing to bring them under applicable state or federal law.  HMIT argues that it does have prudential standing under both federal bankruptcy law and Delaware law to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to:  (a) Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b) *Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case addressing when a creditors committee may be granted standing to bring causes of action on behalf of a bankruptcy estate.  But, federal bankruptcy law does not confer standing *where the plaintiff otherwise lacks standing under applicable state law*.  In other words, whether HMIT would have prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum.  Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring a derivative action under the substantive law of Delaware.  Additionally, HMIT's reliance on *LWE* is misplaced: *LWE* permits creditors, in certain circumstances *during* a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).
[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue, derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former bankruptcy estate's assets.  Upon confirmation of the Plan, the bankruptcy estate of Highland ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE* did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue of prudential standing and does not supersede state-law requirements for standing.  In *LWE*, before addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors' committee in that case could assert its claims under Louisiana law.[205]  The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions."[206]  So, even under *LWE* (which the court does not think applies in this post-confirmation context), if HMIT would be barred from bringing a derivative action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops there.[207]  Thus, the court looks to Delaware law to determine if HMIT would have prudential standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

Trust."[212]  The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust

and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust.

HMIT argues to the contrary:  that it *is* currently, and was at all relevant times, a "beneficial owner"

of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative

claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed

Complaint.  The disagreement turns on the nature of HMIT's interest under the Plan and the

Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered

a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was

cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant

Trust Interest," as defined under the Plan.[213]  HMIT argues that its Contingent Claimant Trust

Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present

"beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust;

rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214]

which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims"

(which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are

in Class 9 under the Plan); [215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212]*In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).  HMIT acknowledges this requirement in its Reply:  "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ." HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an **_unvested_** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law.  HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216]  The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple.  The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA.  It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee.  Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.*[218]  To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership. HMIT ***was*** a limited partner in the original debtor (specifically, a holder of Class B/C Limited Partnership interests in Highland), but that limited partnership interest was extinguished on August 11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any partnership interest in the newly created Reorganized Debtor limited partnership.[220]  Because HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221]  HMIT likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t] standing to continue a derivative suit" on behalf of the Debtor.[222]  Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing. A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224] Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant Trust,[225] it also would lack standing to bring a double derivative action.

c) Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As **Direct** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself, individually.[226] But just because HMIT asserts that some or even all of the Proposed Claims are direct, not derivative claims, does not make it so: "a claim is not 'direct' simply because it is pleaded that way."[227] Rather, in determining whether claims are direct or derivative, a court must "look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization."[228] And, under Delaware law, "whether a claim is solely derivative or

---

*SkyPort Global Commc'n's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Simon Enters., Inc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn **solely** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229]  "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230]  Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought:  "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231]  "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury.  It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, **since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims**.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

d)   Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso,* 152 A.3d at 1260– 61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").
[234] *See supra* note 23 and accompanying text.

standing.  Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

C.  *Are the Proposed Claims "Colorable"?*

1.  <u>What is the Proper Standard of Review for a "Colorability" Determination?</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims—assuming HMIT somehow has standing—might be "colorable."  This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss.  In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation."  In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose.  The court would not require it.  It was up to the parties.  But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point.  HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238]  HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).
[237] Bankr. Dkt. Nos. 3815 and 3816.
[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running objection to the evidentiary format of the hearing).[239]

In determining what appropriate legal standard applies here in the "colorability" analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant.  In determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support for it, and made specific findings relating to Dondero's post-petition litigation and the need for inclusion of the Gatekeeper Provision in the Plan.[240]  This court observed that "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor."[241]  This court further found that: (1) Dondero's post-petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper Provision in place, "Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78.  *See supra* note 12.

costs and distraction such litigation or the threats of such litigation would cause,"[243] and, (3) "unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will present unacceptable risks to parties currently willing to serve in such roles." Thus, as set forth in the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were approved based on the same concerns regarding the threat of continued litigation by Dondero and his related entities) required Dondero and related entities to make a threshold showing of colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll*, 850 F.3d 811 (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] Asd noted at ⁋ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so *without an exclusion for claims asserted by Mr. Dondero and his affiliates* required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

how "colorability" should work here.  It seems that applying HMIT's proposed Rule 12(b)(6)

"plausibility" standard would impose no hurdle at all to litigants and would render the threshold

for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of

the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6)

standard are inapposite.  HMIT has cited no authority that addresses the appropriate standard for

assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically,

one implemented in response to a demonstrated need to screen and prevent continued bad-faith,

harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of

a plan, which is what we have here.  HMIT relies on a bevy of cases that include benefits coverage

disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of

which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the

court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long

recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example,

that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties. One example is *In re VistaCare Group, LLC.*[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252] To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

requirements of Rule 8."[253]  "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255]  The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation.  The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257]  The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)).  The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).  Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee.  Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss. It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*. Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave. For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test." The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2. <u>HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.</u>

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties. HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment. But, even under the less stringent

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

> a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266] HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

of the Claimant Trust or Reorganized Debtor.  But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable").  HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill.  At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he *believed* that Seery *must have* communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims).  Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense."  Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction.  Dondero only

---

[270] Proposed Complaint  ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.
[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI.  But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts.  Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272]  The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM."  But, the evidence showed that this information was widely reported in the financial press at the time.  Thus, it could not have constituted MNPI as a matter of law.[273]  Moreover, the evidence showed that Dondero *did not* communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser).  Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing.  In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive" and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence at the June 8 Hearing reflected that the allegations are completely speculative, without any foundation whatsoever, and lack merit. And they are also simply not plausible. HMIT fails to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

> b) HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and, along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed Complaint.[277] Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is also governed by Delaware law.[278] HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]lthough the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]  In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.  Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281]  "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]  While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo,*" and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] ***must have*** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287]  Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288]  HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289]  Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a ***sufficient*** potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any **significant*** profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert.  Thus, the court only allowed Dondero to testify as to what data ***he*** (or entities he controls or controlled) would rely on, what ***his*** risk tolerance would have been, and what level of potential profits ***he*** would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit.  Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "***impossible*** for Stonehill and Farallon (in the absence of insider information) to forecast ***any*** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290]   HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence.   HMIT's allegations in the Proposed Complaint that ***Farallon*** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months ***after*** the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]   In addition, there are no allegations in the Proposed Complaint regarding whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring the Purchased Claims.[292]   The court finds and concludes that HMIT's allegations of aiding and abetting and conspiracy in Counts II and III of the Proposed Complaint are based on unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with verifiable public facts.   Accordingly, HMIT has failed to show that these claims have a foundation and merit and has also failed to show that they are plausible.

> c)   HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the Proposed Complaint

> i.   Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent over and above their initial investment," and, in the alternative, equitable subordination of their claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims based on material non-public information" and being "unfairly advantaged" in "earning significant profits on their purchases."[293]   As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

subordination of a *claim to other claims* or an *interest to other interests* but does not permit equitable subordination of a *claim to interests*.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following *a contest* (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case."  But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure.  HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements. Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

  ii. Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;" thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).
[296] Proposed Complaint ¶¶ 89-93.

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  *Yet Seery's compensation is governed by express agreements* (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

 iii. Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]  But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]  This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.  This court has also found and concluded that all of the Proposed Claims are without foundation or merit and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.  Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

### d)  HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.  But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.  And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

3. <u>HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness</u>.

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose. Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings. So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV.      CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons: (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose. Moreover,

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6) "plausibility" standard, the Proposed Claims are not plausible.

Accordingly,

**IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

**###End of Memorandum Opinion and Order###**

SEALEDEXH, DirectAppeal, ADVAPL, 5thCircuitAppeal, APPEAL, SealedDocument, FUNDS,
TRANSIN, REFORM, ClaimsAgent, EXHIBITS, COMPLEX

# U.S. Bankruptcy Court
## Northern District of Texas (Dallas)
## Bankruptcy Petition #: 19-34054-sgj11

| | |
|---|---|
| *Date filed:* | 10/16/2019 |
| *Date Plan Confirmed:* | 02/22/2021 |
| *Date transferred:* | 12/04/2019 |
| *Plan confirmed:* | 02/22/2021 |
| *341 meeting:* | 01/09/2020 |
| *Deadline for filing claims:* | 04/08/2020 |
| *Deadline for filing claims (govt.):* | 04/13/2020 |

*Assigned to:* Chief Bankruptcy Jud Stacey G Jernigan
Chapter 11
Voluntary
Asset

*Debtor*
**Highland Capital Management, L.P.**
100 Crescent Court
Suite 1850
Dallas, TX 75201
DALLAS-TX

represented by **Zachery Z. Annable**
Hayward PLLC
10501 N. Central Expressway
Suite 106
Dallas, TX 75231
(972) 755-7108
Fax : (972) 755-7108
Email: zannable@haywardfirm.com

**Kenneth H. Brown**
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111-4500
415-263-7000
Fax : 415-263-7010
Email: sdhibbard@JonesDay.com

**David Grant Crooks**
Fox Rothschild LLP
5420 LBJ Freeway, Suite 1200
Dallas, TX 75240
(972) 991-0889
Fax : (972) 404-0516
Email: dcrooks@foxrothschild.com

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones L.L.P.
780 Third Avenue
New York, NY 10017-2024
(212) 561-7700
Fax : (212) 561-7777
Email: gdemo@pszjlaw.com

**Jeffrey M. Dine**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, NY 10017

212-561-7755
Fax : 212-561-7777

**Robert Joel Feinstein**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
(212) 561-7700
Fax : (212) 561-7777
Email: rfeinstein@pszjlaw.com

**Eric Thomas Haitz**
Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, TX 77002
346-718-6648
Email: ehaitz@gibsondunn.com
*TERMINATED: 12/09/2019*

**Melissa S. Hayward**
Hayward PLLC
10501 N. Central Expry, Ste. 106
Dallas, TX 75231
972-755-7104
Fax : 972-755-7104
Email: MHayward@HaywardFirm.com

**Hayward & Associates PLLC**
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

**Juliana Hoffman**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
(214) 969-3581
Fax : (214) 981-3400
Email: jhoffman@sidley.com

**Ira D Kharasch**
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067
310-227-6910
Fax : 310-201-0760
Email: ikharasch@pszjlaw.com

**Alan J. Kornfeld**
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067
310-277-6910
Fax : 301-201-0760

**Jordan A. Kroop**
PACHULSKI STANG ZIEHL &
JONES LLP
780 Third Avenue
34th Floor
New York, NY 10017-2024
212-561-7700
Fax : 212-561-7777
Email: jkroop@pszjlaw.com

**Maxim B Litvak**
Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111
415-263-7000
Email: mlitvak@pszjlaw.com

**John A Morris**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
Ste 34th Floor
New York, NY 10017
212-561-7760
Fax : 212-561-7777
Email: jmorris@pszjlaw.com

**James E. O'Neill**
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801
302-652-4100
Fax : 302-652-4400
Email: joneill@pszjlaw.com

**Jeffrey N. Pomerantz**
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
310-277-6910
Fax : 310-201-0760
Email: jpomerantz@pszjlaw.com

**Jeffrey Nathan Pomerantz**
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067
(310) 277-6910
Fax : (310) 201-0760
Email: jpomerantz@pszjlaw.com

**Mark Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, NW

Washington, DC 20006
202-303-1133
Fax : 202-303-2133
Email: mstancil@willkie.com

**Elissa A. Wagner**
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
310-277-6910
Fax : 310-201-0760

**Hayley R Winograd**
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
212-561-7732
Email: hayleywinograd@gmail.com

| | | |
|---|---|---|
| *U.S. Trustee*<br>**United States Trustee**<br>1100 Commerce Street<br>Room 976<br>Dallas, TX 75202<br>214-767-8967 | represented by | **Lisa L. Lambert**<br>Office of the United States Trustee<br>1100 Commerce St., Rm. 976<br>Dallas, TX 75242<br>(214) 767-8967 ext 1080<br>Fax : (214) 767-8971<br>Email: lisa.l.lambert@usdoj.gov |
| *Creditor Committee*<br>**Official Committee of Unsecured Creditors** | represented by | **Sean M. Beach**<br>YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>302-571-6600<br>Email: bankfilings@ycst.com |

**Jessica Boelter**
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212-839-5300
Fax : 212-839-5599
Email: jboelter@sidley.com

**Matthew A. Clemente**
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7539
Email: mclemente@sidley.com

**David Grant Crooks**
(See above for address)

**Gregory V. Demo**
(See above for address)

**Bojan Guzina**
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
312-853-7323
Fax : 312-853-7036
Email: bguzina@sidley.com

**Bojan Guzina**
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
3128537323
Email: bguzina@sidley.com

**Juliana Hoffman**
(See above for address)

**Paige Holden Montgomery**
Sidley Austin LLP
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
214-969-3500
Fax : 214-981-3400
Email: pmontgomery@sidley.com

**Edmon L. Morton**
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
1000 North King Street
Wilmington, DE 19801
302-571-6637
Fax : 302-571-1253
Email: emorton@ycst.com

**Michael R. Nestor**
YOUNG CONAWAY STARGATT &
TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801
302-571-6600
Email: mnestor@ycst.com

**Charles Martin Persons, Jr.**
Sidley Austin LLP
2020 McKinney Avenue, Suite 2000
Dallas, TX 75210
(214) 981-3300
Fax : (214) 981-3400

Email: cpersons@sidley.com

**Jeffrey N. Pomerantz**
(See above for address)

**Penny Packard Reid**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
(214) 981-3413
Fax : (214) 981-3400
Email: preid@sidley.com

**Alyssa Russell**
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7422
Fax : (312) 853-7036
Email: alyssa.russell@sidley.com

**Dennis M. Twomey**
Sidley Austin, LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7438
Fax : (312) 853-7036
Email: dtwomey@sidley.com

**Jaclyn C. Weissgerber**
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
302-571-6600
Email: bankfilings@ycst.com

**Sean M. Young Conway Stargatt &
Taylor, LLP**
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
302-571-6600
Email: sbeach@ycst.com

| Filing Date | Docket Text |
|---|---|
| 12/04/2019 | 1 (2 pgs) Order transferring case number 19-12239 from U.S. Bankruptcy Court for the District of Delaware Filed by Highland Capital Management, L.P. (Okafor, M.) |

| 12/04/2019 | 🔘 **2** (15 pgs) DOCKET SHEET filed in 19-12239 in the U.S. Bankruptcy Court for Delaware . (Okafor, M.) |
|---|---|
| 12/04/2019 | 🔘 **3** (106 pgs; 2 docs) Chapter 11 Voluntary Petition . Fee Amount $1717. Filed by Highland Capital Management, L.P.. (Attachments: # **1** Creditor Matrix) [ORIGINALLY FILED AS DOCUMENT #1 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 **4** (31 pgs; 2 docs) Motion to Pay Employee Wages /Motion of the Debtors for Entry of Order (I) Authorizing the Debtor to (A) Pay and Honor Prepetition Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (II) Granting Related Relief Filed Filed by Debtor Highland Capital Management, L.P. (Attachments: # **1** Exhibit A - Proposed Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #2 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 **5** (23 pgs; 2 docs) Motion to Pay Critical Trade Vendor Claims /Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing Debtor to Pay Prepetition Claims of Critical Vendors and (B) Granting Related Relief Filed By Highland Capital Management, L.P. (Attachments: # **1** Exhibit A - Proposed Order)(O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #3 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] |
| 12/04/2019 | 🔘 **6** (9 pgs; 2 docs) Motion to Extend Deadline to File Schedules or Provide Required Information Filed by Highland Capital Management, L.P.(Attachments: # **1** Exhibit A - Proposed Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #4 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | 🔘 **7** (24 pgs; 2 docs) Motion to Maintain Bank Accounts /Motion of the Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System and Brokerage Relationships, (B) Continued Use of the Prime Account, (C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting Related Relief Filed By Highland Capital Management, L.P. (Attachments: # **1** Exhibit A - Interim Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #5 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 **8** (32 pgs; 2 docs) **WITHDRAWN** - 10/29/2019. SEE DOCKET # 72. Motion to Approve Use of Cash Collateral /Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Authorizing the Liquidation of Securities, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing Filed By Highland Capital Management, L.P. (Attachments: # **1** Exhibit A - Order)(O'Neill, James) Modified on 10/30/2019 (DMC) [ORIGINALLY FILED AS DOCUMENT #6 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] |
| 12/04/2019 | 🔘 **9** (36 pgs; 4 docs) Application to Appoint Claims/Noticing Agent KURTZMAN CARSON CONSULTANTS, LLC Filed By Highland Capital Management, L.P. (Attachments: # **1** Exhibit A - Engagement Agreement # **2** Exhibit B - Gershbein Declaration # **3** Exhibit C - Proposed Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #7 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 **10** (10 pgs; 2 docs) Motion to File Under Seal/Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to File Under Seal Portions of Its Creditor Matrix Containing Employee Address Information Filed by Highland Capital Management, L.P.. (Attachments: # **1** Exhibit A - Proposed Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #8 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |

| | |
|---|---|
| 12/04/2019 | �“ **11** (44 pgs) Affidavit/Declaration in Support of First Day Motion /Declaration of Frank Waterhouse in Support of First Day Motions Filed By Highland Capital Management, L.P. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #9 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | �“ **12** (3 pgs) Notice of Hearing on First Day Motions (related document(s)2, 3, 5, 6, 7, 8, 9 [ON DELAWARE DOCKET]) Filed by Highland Capital Management, L.P.. Hearing scheduled for 10/18/2019 at 10:00 AM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #11 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **13** (15 pgs; 2 docs) Notice of Hearing // Notice of Interim Hearing on Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Authorizing the Liquidation of Securities, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing (related document(s)6 Filed by Highland Capital Management, L.P.. Hearing scheduled for 10/18/2019 at 10:00 AM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. (Attachments: # **1** Exhibit A) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #12 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **14** (3 pgs) Notice of Agenda of Matters Scheduled for Hearing Filed by Highland Capital Management, L.P.. Hearing scheduled for 10/18/2019 at 10:00 AM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #13 ON 10/16/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **15** (3 pgs) Notice of appearance Filed by Alvarez & Marsal CRF Management, LLC, as Investment Manager of the Highland Crusader Funds (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #14 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **16** (1 pg) Motion to Appear pro hac vice of Marshall R. King of Gibson, Dunn & Crutcher LLP. Receipt Number 2757354, Filed by Alvarez & Marsal CRF Management, LLC, as Investment Manager of the Highland Crusader Funds. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #15 ON 10/1/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **17** (1 pg) Motion to Appear pro hac vice of Michael A. Rosenthal of Gibson, Dunn & Crutcher LLP. Receipt Number 2624495, Filed by Alvarez & Marsal CRF Management, LLC, as Investment Manager of the Highland Crusader Funds. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #16 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **18** (1 pg) Motion to Appear pro hac vice of Alan Moskowitz of Gibson, Dunn & Crutcher LLP. Receipt Number 2624495, Filed by Alvarez & Marsal CRF Management, LLC, as Investment Manager of the Highland Crusader Funds. (Beach, Sean) ) [ORIGINALLY FILED AS DOCUMENT #17 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **19** (1 pg) Motion to Appear pro hac vice of Matthew G. Bouslog of Gibson, Dunn & Crutcher LLP. Receipt Number 2581894, Filed by Alvarez & Marsal CRF Management, LLC, as Investment Manager of the Highland Crusader Funds. (Beach, Sean)) [ORIGINALLY FILED AS DOCUMENT #18 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | �“ **20** (3 pgs) Notice of Appearance and Request for Notice by Louis J. Cisz filed by Interested Party California Public Employees Retirement System (CalPERS) . (Okafor, M.) [ORIGINALLY FILED AS DOCUMENT #19 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] |

| | |
|---|---|
| 12/04/2019 | 🔵 21 (1 pg) Motion to Appear pro hac vice (Jeffrey N. Pomerantz). Receipt Number 2564620, Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #20 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 22 (1 pg) Motion to Appear pro hac vice (Maxim B. Litvak). Receipt Number 2564620, Filed by Highland Capital Management, L.P. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #21 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 23 (1 pg) Motion to Appear pro hac vice (Ira D. Kharasch). Receipt Number DEX032537, Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #22 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 24 (1 pg) Motion to Appear pro hac vice (Gregory V. Demo). Receipt Number DEX032536, Filed by Highland Capital Management, L.P. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #23 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 25 (1 pg) Motion to Appear pro hac vice of Marc B. Hankin. Receipt Number 2757358, Filed by Redeemer Committee of the Highland Crusader Fund. (Miller, Curtis) [ORIGINALLY FILED AS DOCUMENT #24 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | 🔵 26 (1 pg) Order Approving Motion for Admission pro hac vice Marshall R. King of Gibson(Related Doc # 15) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #25 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 27 (1 pg) Order Approving Motion for Admission pro hac vice Michael A. Rosenthal (Related Doc # 16) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #26 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 28 (1 pg) Order Approving Motion for Admission pro hac vice Alan Moskowitz (Related Doc # 17) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #27 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 29 (1 pg) Order Approving Motion for Admission pro hac vice Matthew G. Bouslog(Related Doc # 18) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #28 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 30 (1 pg) Order Approving Motion for Admission pro hac vice Jeffrey N. Pomerantz (Related Doc # 20) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #29 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 31 (1 pg) Order Approving Motion for Admission pro hac vice Maxim B. Litvak (Related Doc # 21) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #30 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 32 (1 pg) Order Approving Motion for Admission pro hac vice Ira D. Kharasch (Related Doc # 22) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #31 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 33 (1 pg) Order Approving Motion for Admission pro hac vice Gregory V. Demo(Related Doc # 23) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #32 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |

| | |
|---|---|
| 12/04/2019 | 🔵 34 (1 pg) Order Approving Motion for Admission pro hac vice Marc B. Hankin(Related Doc # 24) Order Signed on 10/17/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #33 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 35 (7 pgs) Certificate of Service of: 1) Notice of Hearing on First Day Motions; 2) Notice of Interim Hearing on Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Authorizing the Liquidation of Securities, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing; and 3) Notice of Agenda for Hearing of First Day Motions Scheduled for October 18, 2019 at 10:00 a.m. (related document(s)11, 12, 13) Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #34 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 36 (1 pg) Motion to Appear pro hac vice (John A. Morris). Receipt Number 2635868, Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #35 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | 🔵 37 (3 pgs) Notice of Appearance and Request for Notice by Richard B. Levin , Marc B. Hankin , Kevin M. Coen , Curtis S. Miller filed by Interested Party Redeemer Committee of the Highland Crusader Fund . (Miller, Curtis) [ORIGINALLY FILED AS DOCUMENT #36 ON 10/17/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | 🔵 38 (1 pg) Order Approving Motion for Admission pro hac vice John A. Morris(Related Doc # 35) Order Signed on 10/18/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #38 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 39 (5 pgs) Order (I) Authorizing the Debtor to (A) Pay and Honor Prepetition Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (II) Granting Related Relief. (related document(s)2) Order Signed on 10/18/2019. (NAB) [ORIGINALLY FILED AS DOCUMENT #39 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 40 (9 pgs; 2 docs) Interim Order (A) Authorizing the Debtor to Pay Certain Prepetition Claims of Critical Vendors and (B) Granting Related Relief (Related Doc 3) Order Signed on 10/18/2019 (Attachments: # 1 Agreement)) (NAB) Modified Text on 10/21/2019 (LB) [ORIGINALLY FILED AS DOCUMENT #40 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 41 (3 pgs) Notice of Appearance and Request for Notice by Eric Thomas Haitz filed by Debtor Highland Capital Management, L.P.. (Haitz, Eric) |
| 12/04/2019 | 🔵 42 (7 pgs) Interim Order Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting Related Relief. (Related Doc 5) Order Signed on 10/18/2019. (JS) Modified Text on 10/21/2019 (LB). [ORIGINALLY FILED AS DOCUMENT #42 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 43 (6 pgs) Order Appointing Kurtzman Carson Consultants, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. §156(C), 11 U.S.C. §105(A), and Local Rule 2002-1(F) (Related Doc # 7) Order Signed on 10/18/2019. (JS) [ORIGINALLY FILED AS DOCUMENT #43 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔵 44 (3 pgs) Interim Order Authorizing the Debtor to File Under Seal Portions of Its Creditor Matrix Containing Employee Address Information. (Related Doc # 8) Order Signed on 10/18/2019. (JS) |

[ORIGINALLY FILED AS DOCUMENT #44 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.)

| | |
|---|---|
| 12/04/2019 | 🔘 45 (1 pg) Notice of Appearance and Request for Notice by Elizabeth Weller filed by Irving ISD , Grayson County , Upshur County , Dallas County , Tarrant County , Kaufman County , Rockwall CAD , Allen ISD , Fannin CAD , Coleman County TAD . (Okafor, M.) |
| 12/04/2019 | 🔘 46 (4 pgs) Notice of hearing/*scheduling conference* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1 Order transferring case number 19-12239 from U.S. Bankruptcy Court for the District of Delaware Filed by Highland Capital Management, L.P. (Okafor, M.)). Status Conference to be held on 12/6/2019 at 09:30 AM at Dallas Judge Jernigan Ctrm. (Haitz, Eric) |
| 12/04/2019 | 🔘 47 (40 pgs; 3 docs) Notice of Service // Notice of Entry of Order on Motion of Debtor for Entry of Order (I) Authorizing the Debtor to (A) Pay and Honor Prepetition Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (II) Granting Related Relief (related document(s)2, 39) Filed by Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #47 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 48 (83 pgs; 4 docs) Notice of Service // Notice of Entry of Order on Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. §156(C), 11 U.S.C. §105(A), and Local Rule 2002-1(F) (related document(s)7, 43) Filed by Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #48 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) Additional attachment(s) added on 12/9/2019 (Okafor, M.) |
| 12/04/2019 | 🔘 49 (13 pgs; 2 docs) Notice of Hearing // Notice of Motion of Debtor for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs, and (II) Granting Related Relief (related document(s)4) Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019.(Attachments: # 1 Exhibit 1) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #49 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 50 (37 pgs; 3 docs) Notice of Hearing // Notice of Entry of Interim Order and Final Hearing on Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Debtor to Pay Prepetition Claims of Critical Vendors and (B) Granting Related Relief (related document(s)3, 40) Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #50 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 51 (36 pgs; 3 docs) Notice of Hearing // Notice of Entry of Interim Order and Final Hearing on Motion of Debtor for Entry of Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System and Brokerage Relationships, (B) Continued Use of the Prime Account, (C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting Related Relief (related document(s)5, 42) Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019 (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #51 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🔘 52 (22 pgs; 3 docs) Notice of Hearing // Notice of Entry of Interim Order and Final Hearing on Motion of Debtor for Entry of Interim and Final Orders Authorizing Debtor to File Under Seal Portions of Its |

| | |
|---|---|
| | Creditor Matrix Containing Employee Address Information (related document(s)8, 44) Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #52 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🌐 53 (36 pgs; 2 docs) Notice of Hearing // Notice of Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Authorizing the Liquidation of Securities, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing (related document(s)6) Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/7/2019 at 03:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 10/31/2019. (Attachments: # 1 Exhibit 1) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #53 ON 10/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🌐 54 (7 pgs) Affidavit/Declaration of Service for service of (1) [Signed] Order Approving Motion for Admission pro hac vice Jeffrey N. Pomerantz [Docket No. 29]; (2) [Signed] Order Approving Motion for Admission pro hac vice Maxim B. Litvak [Docket No. 30]; (3) [Signed] Order Approving Motion for Admission pro hac vice Ira D. Kharasch [Docket No. 31]; (4) [Signed] Order Approving Motion for Admission pro hac vice Gregory V. Demo [Docket No. 32]; (5) [Signed] Order Approving Motion for Admission pro hac vice John A. Morris [Docket No. 38]; (6) Notice of Entry of Order on Motion of Debtor for Entry of Order (I) Authorizing the Debtor to (A) Pay and Honor Prepetition Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (II) Granting Related Relief [Docket No. 47]; (7) Notice of Entry of Order on Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. §156(C), 11 U.S.C. §105(A), and Local Rule 2002-1(F) [Docket No. 48]; (8) Notice of Motion of Debtor for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs, and (II) Granting Related Relief [Docket No. 49]; (9) Notice of Entry of Interim Order and Final Hearing on Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Debtor to Pay Prepetition Claims of Critical Vendors and (B) Granting Related Relief [Docket No. 50]; (10) Notice of Entry of Interim Order and Final Hearing on Motion of Debtor for Entry of Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System and Brokerage Relationships, (B) Continued Use of the Prime Account, (C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting Related Relief [Docket No. 51]; (11) Notice of Entry of Interim Order and Final Hearing on Motion of Debtor for Entry of Interim and Final Orders Authorizing Debtor to File Under Seal Portions of Its Creditor Matrix Containing Employee Address Information [Docket No. 52]; and (12) Notice of Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Authorizing the Liquidation of Securities, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing [Docket No. 53] (related document(s)29, 30, 31, 32, 38, 47, 48, 49, 50, 51, 52, 53) Filed by Highland Capital Management, L.P. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #55 ON 10/21/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M) |
| 12/04/2019 | 🌐 55 (4 pgs; 2 docs) Notice of Appearance and Request for Notice by Josef W. Mintz , John E. Lucian , Phillip L. Lamberson , Rakhee V. Patel filed by Acis Capital Management, L.P. , Acis Capital Management GP, LLC . (Attachments: # 1 Certificate of Service) (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #56 ON 10/22/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | 🌐 56 (1 pg) Motion to Appear pro hac vice of Rakhee V. Patel of Winstead PC. Receipt Number 3112761165, Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P.. (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #57 ON 10/22/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🌐 57 (1 pg) Motion to Appear pro hac vice of Phillip Lamberson of Winstead PC. Receipt Number 3112761165, Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P.. (Mintz, Josef) |

| | ORIGINALLY FILED AS DOCUMENT #58 ON 10/22/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
|---|---|
| 12/04/2019 | 58 (1 pg) Motion to Appear pro hac vice of John E. Lucian of Blank Rome LLP. Receipt Number 3112548736, Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P.. (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #59 ON 10/22/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 59 (4 pgs; 3 docs) Notice of Appearance and Request for Notice by Michael I. Baird filed by Interested Party Pension Benefit Guaranty Corporation . (Attachments: # 1 Certification of United States Government Attorney # 2 Certificate of Service) (Baird, Michael) [ORIGINALLY FILED AS DOCUMENT #60 ON 10/23/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) |
| 12/04/2019 | 60 (1 pg) Order Granting Motion for Admission pro hac vice for Rakhee V. Patel (Related Doc # 57) Order Signed on 10/24/2019. (DRG) [ORIGINALLY FILED AS DOCUMENT #61 ON 10/24/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 61 (1 pg) Order Granting Motion for Admission pro hac vice of John E. Lucian (Related Doc # 59) Order Signed on 10/24/2019. (DRG) [ORIGINALLY FILED AS DOCUMENT #62 ON 10/24/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 62 (1 pg) Order Granting Motion for Admission pro hac vice of Phillip Lamberson (Related Doc # 58) Order Signed on 10/24/2019. (DRG) [ORIGINALLY FILED AS DOCUMENT #63 ON 10/24/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 63 (2 pgs) Notice of Appearance and Request for Notice by Michael L. Vild filed by Creditor Patrick Daugherty . (Vild, Michael) [ORIGINALLY FILED AS DOCUMENT #64 ON 10/24/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 64 (1 pg) Notice of Appointment of Creditors' Committee Filed by U.S. Trustee. (Leamy, Jane) [ORIGINALLY FILED AS DOCUMENT #65 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 65 (1 pg) Request of US Trustee to Schedule Section 341 Meeting of Creditors November 20,2019 at 9:30 a.m. Filed by U.S. Trustee. (Leamy, Jane) [ORIGINALLY FILED AS DOCUMENT #66 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 66 (2 pgs) Notice of Meeting of Creditors/Commencement of Case Filed by Highland Capital Management, L.P.. 341(a) meeting to be held on 11/20/2019 at 09:30 AM at J. Caleb Boggs Federal Building, 844 King St., Room 3209, Wilmington, Delaware. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #67 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 67 (27 pgs; 4 docs) Motion to Authorize /Motion of the Debtor for Entry of an Order (I) Authorizing Bradley D. Sharp to Act as Foreign Representative Pursuant to 11 U.S.C. Section 1505 and (II) Granting Related Relief Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Exhibit A - Proposed Form of Order # 3 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #68 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 68 (48 pgs; 8 docs) Application/Motion to Employ/Retain Foley Gardere, Foley & Lardner LLP as Special Texas Counsel Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. |

| | |
|---|---|
| | Objections due by 11/12/2019 (Attachments: # 1 Notice # 2 Exhibit A # 3 Exhibit B # 4 Exhibit B - Proposed Order # 5 2016 Statement # 6 Declaration Frank Waterhouse # 7 Certificate of Service) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #69 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) |
| 12/04/2019 | 🌐 69 (37 pgs; 7 docs) **WITHDRAWN per #437. Application/Motion to Employ/Retain Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Exhibit A - Hurst Declaration # 3 Exhibit B - Proposed Order # 4 2016 Statement # 5 Declaration Frank Waterhouse # 6 Certificate of Service) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #70 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) Modified on 2/11/2020 (Ecker, C.). (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 70 (35 pgs; 7 docs) Application/Motion to Employ/Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession Nunc Pro Tunc to the Petition Date Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019(Attachments: # 1 Notice # 2 Rule 2016 Statement # 3 Declaration of Jeffrey N. Pomerantz in Support # 4 Declaration of Frank Waterhouse # 5 Proposed Form of Order # 6 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #71 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Main Document 70 replaced on 2/16/2022) (Okafor, Marcey). Additional attachment(s) added on 2/16/2022 (Okafor, Marcey). (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 71 (9 pgs; 2 docs) Notice of Withdrawal of Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Authorizing the Liquidation of Securities, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing (related document(s)6) Filed by Highland Capital Management, L.P. (Attachments: # 1 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #72 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 72 (28 pgs; 4 docs) Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Exhibit A - Proposed Order # 3 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #73 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 73 (41 pgs; 5 docs) Application/Motion to Employ/Retain Kurtzman Carson Consultants as Administrative Advisor Effective Nunc Pro Tunc to the Petition Date Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Exhibit A - Proposed Order # 3 Exhibit B - Gershbein Declaration # 4 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #74 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 74 (48 pgs; 6 docs) Application/Motion to Employ/Retain Development Specialists, Inc. as Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc As of the Petition Date Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Exhibit A - Engagement Letter # 3 Exhibit B - Sharp Declaration # 4 Exhibit C - Proposed Order # 5 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #75 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |

| | |
|---|---|
| 12/04/2019 | 🔘 75  (37 pgs; 6 docs) Motion to Authorize /Motion for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Exhibit A - Proposed Order # 3 Exhibit B - OCP List # 4 Exhibit C - Form of Declaration of Disinterestedness # 5 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #76 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 76  (99 pgs; 6 docs) **WITHDRAWN by # 360** Motion to Approve /Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/12/2019. (Attachments: # 1 Notice # 2 Appendix I # 3 Appendix II # 4 Proposed Form of Order # 5 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #77 ON 10/29/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) Modified on 1/16/2020 (Ecker, C.). (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 77  (2 pgs) Notice of Appearance and Request for Notice by William A. Hazeltine filed by Interested Party Hunter Mountain Trust . (Okafor, M.) (Hazeltine, William) [ORIGINALLY FILED AS DOCUMENT #78 ON 10/30/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.). (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 78  (2 pgs) Notice of Meeting of Creditors/Commencement of Case (Corrected) Filed by Highland Capital Management, L.P.. 341(a) meeting to be held on 11/20/2019 at 09:30 AM at J. Caleb Boggs Federal Building, 844 King St., Room 3209, Wilmington, Delaware. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #79 ON 10/30/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 79  (1 pg) Motion to Appear pro hac vice of Brian P. Shaw of Rogge Dunn Group. Receipt Number 0311-27677, Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P. (Bibiloni, Jose) [ORIGINALLY FILED AS DOCUMENT #80 ON 10/30/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 80  (4 pgs; 2 docs) Amended Notice of Appearance. The party has consented to electronic service. Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P. (Attachments: # 1 Certificate of Service) (Bibiloni, Jose) [ORIGINALLY FILED AS DOCUMENT #81 ON 10/30/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 81  (3 pgs) Notice of Appearance and Request for Notice by Jessica Boelter , Alyssa Russell , Matthew A. Clemente , Bojan Guzina filed by Creditor Committee Official Committee of Unsecured Creditors . (Guzina, Bojan) [ORIGINALLY FILED AS DOCUMENT #82 ON 10/30/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 82  (21 pgs; 2 docs) Initial Reporting Requirements /Initial Monthly Operating Report of Highland Capital Management, LP Filed by Highland Capital Management, L.P.. (Attachments: # 1 Certificate of Service and Service List) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #83 ON 10/31/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔘 83  (1 pg) Order Approving Motion for Admission pro hac vice Brian P. Shaw(Related Doc # 80) Order Signed on 11/1/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #84 ON 11/01/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |

| | |
|---|---|
| 12/04/2019 | 🔵 84 (4 pgs; 2 docs) Notice of Appearance and Request for Notice by Sarah E. Silveira , Michael J. Merchant , Asif Attarwala , Jeffrey E. Bjork filed by Interested Parties UBS AG London Branch , UBS Securities LLC . (Attachments: # 1 Certificate of Service) (Merchant, Michael) [ORIGINALLY FILED AS DOCUMENT #85 ON 11/01/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 85 (159 pgs; 6 docs) Motion to Change Venue/Inter-district Transfer Filed by Official Committee of Unsecured Creditors. (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E - Certificate of Service) (Guzina, Bojan)[ORIGINALLY FILED AS DOCUMENT #86 ON 11/01/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 86 (15 pgs; 3 docs) Emergency Motion to Shorten Notice With Respect To The Motion Of Official Committee Of Unsecured Creditors To Transfer Venue Of This Case To The United States Bankruptcy Court For The Northern District Of Texas (related document(s)86) Filed by Official Committee of Unsecured Creditors. (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit B - Certificate of Service) (Guzina, Bojan) [ORIGINALLY FILED AS DOCUMENT #87 ON 11/01/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 87 (1 pg) Order Denying Emergency Motion to Shorten Notice With Respect to The Motion of Official Committee of Unsecured Creditors to Transfer Venue of This Case to the United States Bankruptcy Court for the Northern District of Texas (Related Doc # 87) Order Signed on 11/4/2019. (JS) [ORIGINALLY FILED AS DOCUMENT #88 ON 11/04/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 88 (3 pgs) Notice of Appearance. The party has consented to electronic service. Filed by Jefferies LLC. (Bowden, William) [ORIGINALLY FILED AS DOCUMENT #89 ON 11/04/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 89 (1 pg) Motion to Appear pro hac vice of Patrick C. Maxcy. Receipt Number 2770240, Filed by Jefferies LLC. (Bowden, William) [ORIGINALLY FILED AS DOCUMENT #90 ON 11/04/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 90 (1 pg) Motion to Appear pro hac vice of Lauren Macksoud. Receipt Number 2770389, Filed by Jefferies LLC. (Bowden, William) [ORIGINALLY FILED AS DOCUMENT #91 ON 11/04/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 91 (3 pgs) Notice of Appearance. The party has consented to electronic service. Filed by INTEGRATED FINANCIAL ASSOCIATES, INC. (Carlyon, Candace) [ORIGINALLY FILED AS DOCUMENT #92 ON 11/04/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 92 (1 pg) Order Approving Motion for Admission pro hac vice Patrick C. Maxcy(Related Doc # 90) Order Signed on 11/5/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #93 ON 11/05/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 93 (1 pg) Order Approving Motion for Admission pro hac vice Lauren Macksoud(Related Doc # 91) Order Signed on 11/5/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #94 ON 11/05/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 94 (11 pgs; 2 docs) HEARING CANCELLED. Notice of Agenda of Matters not going forward. The following hearing has been cancelled. Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/7/2019 at 03:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. (Attachments: # 1 Certificate of Service) (O'Neill, James) [ORIGINALLY FILED AS |

Case 3:23-cv-02071-E Document 1-1 Filed 09/15/23 Page 672 of 678 PageID 678

| | |
|---|---|
| | DOCUMENT #95 ON 11/05/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 95 (3 pgs; 2 docs) Notice of Appearance. The party has consented to electronic service. Filed by BET Investments, II, L.P.. (Attachments: # 1 Certificate of Service) (Kurtzman, Jeffrey) (Attachments: # 1 Certificate of Service) [ORIGINALLY FILED AS DOCUMENT #96 ON 11/05/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 96 (3 pgs; 2 docs) Certification of Counsel Regarding Order Scheduling Omnibus Hearing Date Filed by Highland Capital Management, L.P.. (Attachments: # 1 Proposed Form of Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #97 ON 11/07/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 98 (1 pg) Order Scheduling Omnibus Hearings. Omnibus Hearings scheduled for 12/17/2019 at 11:00 AM US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Signed on 11/7/2019. (CAS) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #98 ON 11/07/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 101 (17 pgs; 4 docs) Exhibit(s) // Notice of Filing of Amended Exhibit B to Motion for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized By the Debtor in the Ordinary Course of Business (related document(s)76) Filed by Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Certificate of Service) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #99 ON 11/07/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 102 (8 pgs) Affidavit/Declaration of Service for service of [Signed] Order Scheduling Omnibus Hearing Date [Docket No. 98] (related document(s)98) Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #100 ON 11/07/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 103 (10 pgs) Notice of Deposition - Notice to Take Rule 30(b)(6) Deposition Upon Oral Examination of the Debtor, Highland Capital Management, L.P. Filed by Official Committee of Unsecured Creditors. (Guerke, Kevin) [ORIGINALLY FILED AS DOCUMENT #101 ON 11/10/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 104 (2 pgs) Notice of Deposition of Frank Waterhouse Filed by Official Committee of Unsecured Creditors. (Guerke, Kevin) [ORIGINALLY FILED AS DOCUMENT #102 ON 11/10/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 106 (2 pgs) Notice of Service - Notice of Intent to Serve Subpoena Filed by Official Committee of Unsecured Creditors. (Guerke, Kevin) [ORIGINALLY FILED AS DOCUMENT #103 ON 11/10/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 107 (10 pgs; 2 docs) Notice of Substitution of Counsel Filed by Alvarez & Marsal CRF Management, LLC, as Investment Manager of the Highland Crusader Funds. (Attachments: # 1 Certificate of Service) (Ryan, Jeremy) [ORIGINALLY FILED AS DOCUMENT #104 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 108 (3 pgs) Amended Notice of Appearance. The party has consented to electronic service. Filed by Official Committee of Unsecured Creditors. (Beach, Sean) . [ORIGINALLY FILED AS DOCUMENT #105 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |

| | |
|---|---|
| 12/04/2019 | 🖥 110 (1 pg) Motion to Appear pro hac vice Of Bojan Guzina of Sidley Austin LLP. Receipt Number 2775584, Filed by Official Committee of Unsecured Creditors. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #106 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 111 (1 pg) Motion to Appear pro hac vice of Alyssa Russell of Sidley Austin LLP. Receipt Number 2620330, Filed by Official Committee of Unsecured Creditors. (Beach, Sean)[ORIGINALLY FILED AS DOCUMENT #107 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 112 (1 pg) Motion to Appear pro hac vice of Matthew A. Clemente of Sidley Austin LLP. Receipt Number 2775584, Filed by Official Committee of Unsecured Creditors. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #108 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 113 (1 pg) Motion to Appear pro hac vice of Paige Holden Montgomery. Receipt Number 2775584, Filed by Official Committee of Unsecured Creditors. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #109 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 114 (1 pg) Motion to Appear pro hac vice of Penny P. Reid of Sidley Austin. Receipt Number 2775584, Filed by Official Committee of Unsecured Creditors. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #110 ON 11/11/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 115 (1 pg) Order Approving Motion for Admission pro hac vice Bojan Guzina(Related Doc # 106) Order Signed on 11/12/2019. (CAS [ORIGINALLY FILED AS DOCUMENT #111 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 116 (1 pg) Order Approving Motion for Admission pro hac vice Alyssa Russell (Related Doc # 107) Order Signed on 11/12/2019. (CAS [ORIGINALLY FILED AS DOCUMENT #112 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 117 (1 pg) Order Approving Motion for Admission pro hac vice Matthew A. Clemente (Related Doc # 108) Order Signed on 11/12/2019. (CAS [ORIGINALLY FILED AS DOCUMENT #113 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 118 (1 pg) Order Approving Motion for Admission pro hac vice Paige Holden(Related Doc # 109) Order Signed on 11/12/2019. (CAS [ORIGINALLY FILED AS DOCUMENT #114 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 119 (1 pg) Order Approving Motion for Admission pro hac vice Penny P. Reid(Related Doc # 110) Order Signed on 11/12/2019. (CAS [ORIGINALLY FILED AS DOCUMENT #115 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🖥 120 (94 pgs; 11 docs) Limited Objection to the Debtors: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date (related document(s)69, 70) Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P. |

Case 3:23-cv-02071-E Document 1-1 Filed 09/15/23 Page 674 of 678 PageID 680

(Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Certificate of Service) (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #116 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019)

| | |
|---|---|
| 12/04/2019 | 🔵 121 (26 pgs; 3 docs) Limited Objection and Reservation of Rights of Jefferies LLC to Debtor's Motion for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business (related document(s)77) Filed by Jefferies LLC (Attachments: # 1 Exhibit A # 2 Certificate of Service) (Bowden, William) [ORIGINALLY FILED AS DOCUMENT #117 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 122 (27 pgs) Objection of the Debtor to Motion of Official Committee of Unsecured Creditors to Transfer Venue of This Case to the United States Bankruptcy Court for the Northern District of Texas (related document(s)86) Filed by Highland Capital Management, L.P. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #118 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 123 (5 pgs) Limited Objection to Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employee, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business (related document(s)76) Filed by Official Committee of Unsecured Creditors (Weissgerber, Jaclyn) [ORIGINALLY FILED AS DOCUMENT #119 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 124 (6 pgs) **WITHDRAWN per # 456** Limited Objection to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Pinker Cox & Hurst as Special Texas Counsel and Special Litigation Counsel, Nunc Pro Tunc to the Petition Date (related document(s)69, 70) Filed by Official Committee of Unsecured Creditors (Weissgerber, Jaclyn) [ORIGINALLY FILED AS DOCUMENT #120 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) Modified on 2/19/2020 (Ecker, C.). (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 125 (4 pgs) Limited Objection to the Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Debtor to Pay Prepetition Claims of Critical Vendors and (B) Granting Related Relief (related document(s)3) Filed by Official Committee of Unsecured Creditors (Weissgerber, Jaclyn) [ORIGINALLY FILED AS DOCUMENT #121 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 126 (11 pgs) Joinder to Motion of the Official Committee of Unsecured Creditors For an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas (related document(s)86) Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P.. (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #122 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 127 (12 pgs; 3 docs) Motion to File Under Seal of the Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtors (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, and (III) Precautionary Motion for Approval of Protocols for Ordinary Course Transactions Filed by Official Committee of Unsecured Creditors. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. Objections due by 11/19/2019. (Attachments: # 1 Notice # 2 Proposed Form of Order) [ORIGINALLY FILED AS DOCUMENT #123 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🔵 128 [SEALED in Delaware Bankruptcy Court] Omnibus Objection to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, and (III) Precautionary Motion for Approval of Protocols for "Ordinary Course" Transactions (related document(s)5, 75, 77, 123) |

Filed by Official Committee of Unsecured Creditors (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E) (Weissgerber, Jaclyn) [ORIGINALLY FILED AS DOCUMENT #124 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019)

| | |
|---|---|
| 12/04/2019 | 📄 130 (162 pgs; 6 docs) Objection to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, and (III) Precautionary Motion for Approval of Protocols for "Ordinary Course" Transactions (Redacted) (related document(s)5, 75, 77, 123, 124) Filed by Official Committee of Unsecured Creditors (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit D # 5 Exhibit E)(Weissgerber, Jaclyn) [ORIGINALLY FILED AS DOCUMENT #125 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 131 (2 pgs) Notice of Service of Discovery Filed by Official Committee of Unsecured Creditors. (Guerke, Kevin) [ORIGINALLY FILED AS DOCUMENT #126 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 132 (5 pgs) Objection Motion of Debtor for Entry of Order Authorizing Debtor to File Under Seal Portions of Creditor Matrix Containing Employee Address Information (related document(s)8) Filed by U.S. Trustee (Leamy, Jane) [ORIGINALLY FILED AS DOCUMENT #127 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 133 (7 pgs) Certificate of Service of Objection of the Debtor to Motion of Official Committee of Unsecured Creditors to Transfer Venue of This Case to the United States Bankruptcy Court for the Northern District of Texas (related document(s)118) Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #128 ON 11/12/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE](Okafor, M.) Modified text on 12/5/2019 (Okafor, M.). (Entered: 12/05/2019) |
| 12/04/2019 | 📄 134 (5 pgs) Certificate of Service of Acis's Joinder in Motion to Transfer Venue (related document(s)122) Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P.. (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #129 ON 11/13/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 135 (7 pgs; 2 docs) Objection U.S. Trustee's Objection to the Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Provide a Chief Restructuring Officer, Additional Personnel and Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date (related document(s)75) Filed by U.S. Trustee (Attachments: # 1 Certificate of Service)(Leamy, Jane) [ORIGINALLY FILED AS DOCUMENT #130 ON 11/13/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 136 (1 pg) Certificate of Service of United States Trustees Objection to Motion of Debtor for Entry of Order Authorizing Debtor to File Under Seal Portions of Creditor Matrix Containing Employee Address Information (related document(s)127) Filed by U.S. Trustee. (Leamy, Jane) [ORIGINALLY FILED AS DOCUMENT #131 ON 11/13/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 📄 137 (17 pgs; 3 docs) Certification of Counsel Regarding Debtor's Motion Pursuant to Sections 105(A), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for the Interim Compensation and Reimbursement of Expenses of Professionals (related document(s)73) Filed by Highland Capital Management, L.P.. (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit B - Blackline Order)(O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #132 ON 11/13/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |

| 12/04/2019 | 138 (17 pgs; 2 docs) Certificate of No Objection Regarding Debtor's Application for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Administrative Advisor Effective Nunc Pro Tunc to the Petition Date (related document(s)74) Filed by Highland Capital Management, L.P.. (Attachments: # 1 Exhibit A - Proposed Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #133 ON 11/13/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
|---|---|
| 12/04/2019 | 139 (5 pgs; 2 docs) Certificate of No Objection Regarding Motion of the Debtor for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs, and (II) Granting Related Relief (related document(s)4) Filed by Highland Capital Management, L.P.. (Attachments: # 1 Exhibit A - Proposed Order) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #134 ON 11/13/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 140 (2 pgs) Notice of Appearance. The party has consented to electronic service. Filed by Crescent TC Investors, L.P.. (Held, Michael) [ORIGINALLY FILED AS DOCUMENT #135 ON 11/14/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 141 (6 pgs) ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMI3URSEMENT OF EXPENSES OF PROFESSIONALS(Related Doc # 73) Order Signed on 11/14/2019. (DRG) [ORIGINALLY FILED AS DOCUMENT #136 ON 11/14/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 142 (14 pgs) ORDER AUTHORIZING THE DEBTOR TO EMPLOY AND RETAIN KURTZMAN CARSON CONSULTANTS LLC AS ADMINISTRATIVE ADVISOR EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE (Related Doc # 74) Order Signed on 11/14/2019. (DRG) [ORIGINALLY FILED AS DOCUMENT #137 ON 11/14/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 143 (2 pgs) ORDER (I) EXTENDING TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES, SCHEDULES OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND STATEMENTOF FINANCIAL AFFAIRS, AND (II) GRANTING RELATED RELIEF (Related Doc # 4) Order Signed on 11/14/2019. (DRG) [ORIGINALLY FILED AS DOCUMENT #138 ON 11/14/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 144 (3 pgs) Notice of Appearance. The party has consented to electronic service. Filed by Intertrust Entities. (Desgrosseilliers, Mark) [ORIGINALLY FILED AS DOCUMENT #139 ON 11/14/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 145 (3 pgs) Notice of Appearance. The party has consented to electronic service. Filed by CLO Entities. (Desgrosseilliers, Mark) [ORIGINALLY FILED AS DOCUMENT #140 ON 11/14/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 146 (11 pgs) Notice of Deposition Upon Oral Examination Under Rules 30 and 30(b)(6) of the Debtor, Highland Capital Management, L.P. Filed by Official Committee of Unsecured Creditors. (Guerke, Kevin) [ORIGINALLY FILED AS DOCUMENT #141 ON 11/15/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 147 (18 pgs; 2 docs) Notice of Agenda of Matters Scheduled for Hearing Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware (Attachments: # 1 Certificate of Service) [ORIGINALLY FILED AS DOCUMENT #142 ON 11/15/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |

| | |
|---|---|
| 12/04/2019 | 148 (7 pgs) Affidavit/Declaration of Service for service of (1) [Signed] Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 136]; (2) [Signed] Order Authorizing the Debtor to Employ and Retain Kurtzman Carson Consultants LLC as Administrative Advisor Effective Nunc Pro Tunc to the Petition Date [Docket No. 137]; and (3) [Signed] Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs, and (II) Granting Related Relief [Docket No. 138] (related document(s)136, 137, 138) Filed by Highland Capital Management, L.P.. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #143 ON 11/15/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 149 (2 pgs) Notice of Hearing regarding Motion to Change Venue/Inter-district Transfer (related document(s)86, 87, 88) Filed by Official Committee of Unsecured Creditors. Hearing scheduled for 12/2/2019 at 10:00 AM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #144 ON 11/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 150 (9 pgs; 2 docs) Notice of Rescheduled 341 Meeting (related document(s)67, 79) Filed by Highland Capital Management, L.P.. 341(a) meeting to be held on 12/3/2019 at 10:30 AM (check with U.S. Trustee for location) (Attachments: # 1 Certificate of Service) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #145 ON 11/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 151 (17 pgs; 2 docs) Agenda of Matters Scheduled for Telephonic Hearing (related document(s)142) Filed by Highland Capital Management, L.P.. Hearing scheduled for 11/19/2019 at 12:00 PM at US Bankruptcy Court, 824 Market St., 5th Fl., Courtroom #6, Wilmington, Delaware.(Attachments: # 1 Certificate of Service) (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #146 ON 11/18/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 152 (2 pgs) Notice of Appearance. The party has consented to electronic service. Filed by CLO Holdco, Ltd.. (Kane, John) [ORIGINALLY FILED AS DOCUMENT #149 ON 11/19/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 153 (2 pgs) Amended Notice of Deposition of Frank Waterhouse Filed by Official Committee of Unsecured Creditors. (Guerke, Kevin) [ORIGINALLY FILED AS DOCUMENT #150 ON 11/19/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 154 (3 pgs) Notice of Appearance and Request for Notice by Sally T. Siconolfi , Joseph T. Moldovan filed by Interested Party Meta-e Discovery, LLC . (Moldovan, Joseph)[ORIGINALLY FILED AS DOCUMENT #152 ON 11/20/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 156 (4 pgs) Affidavit/Declaration of Service regarding Notice of Hearing regarding Motion to Change Venue/Inter-district Transfer (related document(s)144) Filed by Official Committee of Unsecured Creditors. (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #153 ON 11/20/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 158 (5 pgs; 2 docs) Motion to Appear pro hac vice of Annmarie Chiarello of Winstead PC. Receipt Number 0311-27843, Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P.. (Bibiloni, Jose) [ORIGINALLY FILED AS DOCUMENT #154 ON 11/20/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) Additional attachment(s) added on 12/5/2019 (Okafor, M.). (Entered: 12/05/2019) |

| | |
|---|---|
| 12/04/2019 | 🌐 159   (2 pgs; 2 docs) Order Approving Motion for Admission pro hac vice Annmarie Chiarello (Related Doc # 154) Order Signed on 11/21/2019. (CAS) [ORIGINALLY FILED AS DOCUMENT #155 ON 11/21/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) Additional attachment(s) added on 12/5/2019 (Okafor, M.). (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 162   (8 pgs) Reply in Support of Motion to Transfer Venue of This Case to the United States Bankruptcy Court for the Northern District of Texas (related document(s)86, 118) Filed by Official Committee of Unsecured Creditors (Beach, Sean) [ORIGINALLY FILED AS DOCUMENT #156 ON 11/21/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 163   (7 pgs) Reply in Support of the Motion of the Official Committee of Unsecured Creditors For an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas (related document(s)86, 118, 122, 156) Filed by Acis Capital Management GP LLC, Acis Capital Management, L.P. (Mintz, Josef) [ORIGINALLY FILED AS DOCUMENT #157 ON 11/21/2019 IN U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE] (Okafor, M.) (Entered: 12/05/2019) |
| 12/04/2019 | 🌐 164   (4 pgs) Response of the Debtor to Acis's Joinder to Motion to Transfer Venue (related document(s)86, 122) Filed by Highland Capital Management, L.P. (O'Neill, James) [ORIGINALLY FILED AS DOCUMENT #15 |