**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| | § | |
| Appellee | § | |

[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.

# Volume 4

# APPELLANT RECORD

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

## APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
### STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

2.  the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

    4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

    [*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2.  Appellant's claims or allegations are not "plausible";

    3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT and the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10.  Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.  Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.  Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

  1. ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

  2. determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.  Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.  Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.  Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.  Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.  Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.  Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

  1. there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

  2. there is no evidence to support the alleged quid pro quo;

  3. the material shared was *public* information; and/or

  4. the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.    **Notice of Appeal**

*000001*    a.    Notice of Appeal **[Dkt. 3906]**;

*000276*    b.    Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*    c.    Second Amended Notice of Appeal **[Dkt. 3945]**

2.    **The judgment, order, or decree appealed from:**

a.    Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

**a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*

*Vol. 3*
*001849*
*Thru   Vol 4*
*Vol 4*
*002236*

*002243*
*002248*

| | | | |
|---|---|---|---|
| 03/30/2023 | 3706 | | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708<br>(3708-1 — 3708-8) | | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718<br>(3718-1 — 3718-4) | | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719<br>(3719-1) | | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721<br>(3721-1 — 3721-2) | | HMIT Notice of Appeal |
| 04/06/2023 | 3726<br>(3726-1) | | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738<br>(3738-1) | | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

Handwritten annotations in left margin:
Vol. 10
003281
003286
003291
003294
003296
003299
003302
003311
003314
003323
003368
003430

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| *Vol. 10* *003458* | | | Holdings LLC, Stonehill Capital Management LLC |
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *003463* *Vol. 11* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *003537* *Thru Vol. 16* | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Vol. 17* *004465* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *004712* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004714* | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *004808* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *004813* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004836* | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18* *004930* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *004931* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18

004939.

004959

004961

004984

005049

005114

Vol. 26

006608

Thru Vol. 25

Thru Vol. 39

Vol. 39

009273

009290

009416

009424

| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*
*Vol. 42*
*009841* — *Thru Vol. 41*

*009901*

*009905*

*009908*

*009912*

*Vol. 42*
*009928*
*009944*
*010013*
*010023*
*010025*
*010029*
*010035*
*010047*
*010059*
*Vol. 43*
*010062*

| Date | Docket | Description |
|---|---|---|
| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

| | | | |
|---|---|---|---|
| 09/11/2023 | 3907 | | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

Vol. 43
010135
010136

**B.    Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| HMIT Exhibits (Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9) |
|---|
| HMIT Exhibits 1-4, 6-80 |
| HCM Exhibits (Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5) |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: /s/ Sawnie. A. McEntire
     Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 3699-2   Filed 03/28/23   Entered 03/28/23 16:02:23   Desc
Case 3:23-cv-02071-E   Document Exhibit Filed Page 16 of 216   PageID 1249

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20   Entered 12/23/20 22:25:24   Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

### RELEVANT BACKGROUND

#### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

## B.     Overview of HarbourVest's Claims

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.      **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19. Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20. After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21. On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.     The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.     On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.     The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.     HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.,* Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.     Settlement Discussions**

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

    30.    During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

    31.    After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.    Summary of Settlement Terms

    32.    The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## **BASIS FOR RELIEF REQUESTED**

33.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court."  *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'"  *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.    There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.    First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.    The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.    Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.    Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.    No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: December 23, 2020.                  **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

**Page A-44**
**002061**

# Exhibit 1

## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS**, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

EXECUTION VERSION

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Case</u>"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "<u>May Settlement Parties</u>"), entered into a Settlement Agreement (the "<u>May Settlement</u>") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "<u>UBS Claim</u>"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "<u>Mediators</u>"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "<u>Redeemer Committee</u>"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

EXECUTION VERSION

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**A G R E E M E N T**

1.      **Settlement of Claims.** In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)      The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

EXECUTION VERSION

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

(d)   Redeemer Appeal.

(i)   On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

EXECUTION VERSION

(ii)   The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)   As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)   On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)   On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

2.   **Definitions.**

(a)   "<u>Agreement Effective Date</u>" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)   "<u>HCMLP Parties</u>" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)   "<u>Order Date</u>" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)   "<u>UBS Parties</u>" shall mean UBS Securities LLC and UBS AG London Branch.

3.   **Releases.**

(a)   **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

**EXECUTION VERSION**

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

   (c) **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

   **4.** **No Third Party Beneficiaries**. Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

   **5.** **UBS Covenant Not to Sue.** Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.  **Agreement Subject to Bankruptcy Court Approval.**

(a)  The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.  **Representations and Warranties**.

(a)  Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)  Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)  Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

**EXECUTION VERSION**

**8.    No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.    Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.    Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

ㅗ ㆍ                                                    **EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
          Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
      sarah.tomkowiak@lw.com

        **11.**    **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been
adequately represented by independent legal counsel of its own choice, throughout all of the
negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon
the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms
and conditions contained herein without any reservations; and (d) had the opportunity to have
this Agreement and all the terms and conditions contained herein explained by independent
counsel, who has answered any and all questions asked of such counsel, or which could have
been asked of such counsel, including, but not limited to, with regard to the meaning and effect
of any of the provisions of this Agreement.

        **12.**    **Entire Agreement**.  This Agreement contains the entire agreement and
understanding concerning the subject matter of this Agreement, and supersedes and replaces all
prior negotiations and agreements, written or oral and executed or unexecuted, concerning such
subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or
attorney for any such Party, has made any promise, representation, or warranty, express or
implied, written or oral, not otherwise contained in this Agreement to induce any Party to
execute this Agreement.  The Parties further acknowledge that they are not executing this
Agreement in reliance on any promise, representation, or warranty not contained in this
Agreement, and that any such reliance would be unreasonable.  This Agreement will not be
waived or modified except by an agreement in writing signed by each Party or duly authorized
representative of each Party.

        **13.**    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this
Agreement are contractual and are the result of arm's-length negotiations between the Parties
and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation
of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be
construed against any Party.

        **14.**    **Future Cooperation**.  The Parties agree to cooperate and execute such further
documentation as is reasonably necessary to effectuate the intent of this Agreement.

        **15.**    **Counterparts**.  This Agreement may be executed in counterparts with the same
force and effect as if executed in one complete document.  Each Party's signature hereto will
signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

                                            12

ₗₜ

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

16.     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:

Name: James P. Seery, Jr.

Its: Authorized Signatory

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

**STRAND ADVISORS, INC.**

By:

Name: James P. Seery, Jr.

Its: Authorized Signatory

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz _____

Its: Authorized Signatory _____

By: _____

Name: Elizabeth Kozlowski _____

Its: Authorized Signatory _____

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler _____

Its: Authorized Signatory _____

By: _____

Name: Elizabeth Kozlowski _____

Its: Authorized Signatory _____

15

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

### Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**


SFChronicle/SFGate/Liz Hafalla


Robert: Holmgren


no caption

https://hf.com/warren-hellman/ 1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020



# Grosvenor Capital Management

In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**
Financial Services

**STATUS**
Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)      INFO@HF.COM (MAILTO:INFO@HF.COM)      LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)      BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)      TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-&-FRIEDMAN)
©2021 HELLMAN & FRIEDMAN LLC



**CORNER OFFICE**

# GCM Grosvenor to Go Public

Julie Segal

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

**August 03, 2020**



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

**Farallon was a Significant Borrower for Lehman**

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and**  **Farallon Capital Management**

| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |



**Transaction Overview**

- In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

- The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had an in-line occupancy of 99.5%.

**Lehman Brothers Role**

- Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

- Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

**Sponsorship Overview**

- The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**                    32

**Mr. Seery Represented Stonehill While at Sidley**

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

|                          |   |                       |
|--------------------------|---|-----------------------|
| In re:                   | : | Chapter 11            |
|                          | : |                       |
| BLOCKBUSTER INC., *et al.*, | : | Case No. 10-14997 (BRL) |
|                          | : |                       |
| Debtors.                 | : | (Jointly Administered) |
|                          | : |                       |

------------------------------------------------------------ X

## THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!



https://www.linkedin.com/in/josephnesler/



<u>Investor Communication to Highland Crusader Funds Stakeholders</u>



**Alvarez & Marsal
Management, LLC** 2029 Cer
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

**Page A-70**
002087

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million.  Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021.  Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director

4873-5382-0418v.1 019717.00001



**Alvarez & Marsal CRF
Management, LLC** 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

**EXHIBIT**
002089
C

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____
    Steven Varner
    Managing Director

002090

**On investor letterhead, please use the template below to provide Alvarez & Marsal CRF Management, LLC and SEI your updated wire information.**

| Information Needed | Wire Information Input |
|---|---|
| Investor name (as it reads on monthly statements) | |
| Fund(s) Invested | |
| Contact Information (Phone No. and Email) | |
| Updated Wire Information <br> • Beneficiary Bank <br> • Bank Address <br> • Beneficiary (Account) Name <br> • ABA/Routing # <br> • Account # <br> • SWIFT Code <br><br> International Wires <br> • Correspondent Bank <br> • ABA/Routing # <br> • SWIFT Code | |

Signed By: _____          Date: _____

# Exhibit 3

002092

CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| HUNTER MOUNTAIN | § | |
| INVESTMENT TRUST | § | 191ST JUDICIAL DISTRICT |
| | § | |
| *Petitioner,* | § | |
| | § | DALLAS COUNTY, TEXAS |

<u>DECLARATION OF JAMES DONDERO</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to <mark>Texas Civil Practice & Remedies Code § 132.001</mark> and declares as follows:

1. My name is James Dondero. I am over twenty-one (21) years of age. I am of sound mind and body, and I am competent to make this declaration. The facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I previously served as the Chief Executive Officer ("CEO") of Highland Capital Management, L.P. ("HCM"). Jim Seery succeeded me in this capacity following the entry of various orders in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. My purpose was to alert Mr. Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades. A true and correct copy of this email is attached hereto as Exhibit "1".

4.  In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. They also stated they were particularly optimistic because of the expected sale of MGM.

5.  During one of these calls involving Mr. Linn, I asked whether they would sell the claims for 30% more than they had paid. Mr. Linn said no because Mr. Seery said they were worth a lot more. I asked Mr. Linn if he would sell at any price and he said that he was unwilling to do so. I believe these conversations with Farallon were taped by Farallon.

6.  My name is James Dondero, my date of birth is June 29, 1962, and my address is 3807 Miramar Ave., Dallas, Texas 75205, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

002094

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the 15th day of February 2023.

_____

JAMES DONDERO

# Exhibit 1

**From:** Jim Dondero <JDondero@highlandcapital.com>

**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin" <JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>

**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>

**Subject:** Trading restriction re MGM - material non public information

**Date:** Thu, 17 Dec 2020 14:14:39 -0600

**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.

Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

Sent from my iPhone

002097

# Exhibit 4

002098

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |

## DECLARATION OF SAWNIE A. MCENTIRE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to 28 U.S.C. 1746 and declares

as follows:

1. My name is Sawnie A. McEntire. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I am a licensed attorney in good standing with the State Bar of Texas. I am a Director and Shareholder at the firm Parsons McEntire McCleary PLLC. I serve as lead counsel for Hunter Mountain Investment Trust ("HMIT") in these proceedings in regard to the motion described in Paragraph 3 below. I also served as lead counsel for HMIT in Rule 202 Proceedings filed in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004 ("Rule 202 Proceedings").

3. I submit this declaration in support of HMIT's Emergency Motion for Leave to File Adversary Proceeding ("Emergency Motion") to which this Declaration is attached.

1

002099

4. On January 20, 2023, HMIT filed its Verified Rule 202 Petition in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004. **A true and correct copy of HMIT's Verified Rule 202 Petition, with accompanying exhibits, is attached to this declaration as Exhibit 4-A.**

5. HMIT served notice of the Rule 202 Petition and hearing on Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings LLC ("Muck"), and Jessup Holdings LLC ("Jessup") in February 2023. Farallon and Stonehill entered an appearance, responded to the proceedings, and were represented by David Shulte of the law firm of Holland & Knight. Among other things, the Rule 202 Petition sought discovery related to Farallon and Stonehill's due diligence, if any, concerning the sale and transfer of four allowed bankruptcy claims in the above-referenced bankruptcy proceedings from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021.[1]

6. On February 22, 2023, HMIT's Verified Rule 202 Petition was heard by the Honorable Gena Slaughter of the 191st District Court of Dallas County, Texas. **A true and correct copy of the Hearing Transcript of the Rule 202 Proceedings on February 22, 2023, is attached to this declaration as Exhibit 4-B** ("Transcript'). At this hearing, I argued on behalf of HMIT and Mr. Shulte argued on behalf of Farallon and Stonehill. During this hearing, Farallon and Stonehill admitted they acquired the Claims through their respective "special purpose entities," as reflected in the Transcript. Farallon resisted the requested discovery in the state district court.

7. A true and correct copy of a certified copy of Muck's formation papers in the State of Delaware, showing Muck was created on March 9, 2021, is attached to this Declaration as **Exhibit 4-D**. A true and correct copy of a certified copy of Jessup's formation papers in Delaware, showing Jessup was created on April 8, 2021, is attached to this Declaration as **Exhibit 4-E**. Muck and Jessup's corporate formation documents do not identify their respective members or managing members. *See* Exhibit 4-D and 4-E.

8. On March 8, 2023, the state district court denied and dismissed HMIT's Verified Rule 202 Petition. This ruling was necessarily without prejudice. A true and correct copy of the related Order, dated March 8, 2023, is attached to this declaration as **Exhibit 4-C**.

---

[1] *See* Notices of Transfers [Docs. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

002100

9. On March 9, 2023, my law partner, Roger McCleary sent correspondence to Mr. Schulte, as Farallon and Stonehill's counsel, requesting disclosure of the details of their respective legal relationships to Muck and Jessup. Farallon and Stonehill never responded to this inquiry. A true and correct copy of this email correspondence, dated March 9, 2023, is attached to this declaration as **Exhibit 4-F.**

10. I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 27, 2023.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the ___27___ day of March 2023.

Sawnie A. McEntire

3

002101

# Exhibit 4-A

FILED
1/20/2023 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

DC-23-01004

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | 191st |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner*, | § | |
| | § | **DALLAS COUNTY, TEXAS** |

**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**
**VERIFIED RULE 202 PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, Hunter Mountain Investment Trust ("HMIT"), files this Verified
Petition ("Petition") pursuant to Rule 202 of the Texas Rules of Civil Procedure, seeking
pre-suit discovery from Respondent Farallon Capital Management, LLC ("Farallon") and
Respondent Stonehill Capital Management, LLC ("Stonehill") (collectively
"Respondents"), to allow HMIT to investigate potential claims against Respondents and
other potentially adverse entities, and would respectfully show:

**PARTIES**

1.     HMIT is a Delaware statutory trust that was the largest equity holder in
Highland Capital Management, L.P. ("HCM"), holding a 99.5% limited partnership
interest. HCM filed chapter 11 bankruptcy proceedings in 2019 and, as a result of these

1

002103

proceedings,[1] HMIT held a Class 10 claim which, post-confirmation, was converted to a Contingent Trust Interest in HCM's post-reorganization sole limited partner.

2.      Farallon is a Delaware limited liability company with its principal office in California, which is located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

3.      Stonehill is a Delaware limited liability company with its principal office in New York, which is located at 320 Park Avenue, 26th Floor, New York, NY 10022.

## VENUE AND JURISDICTION

4.      Venue is proper in Dallas County, Texas, because all or substantially all of the events or omissions giving rise to HMIT's potential common law claims occurred in Dallas County, Texas. In the event HMIT elects to proceed with a lawsuit against Farallon and Stonehill, venue of such proceedings will be proper in Dallas County, Texas.

5.      This Court has jurisdiction over the subject matter of this Petition pursuant to Texas Rule of Civil Procedure 202.[2] The amount in controversy of any potential claims against Farallon or Stonehill far exceeds this Court's minimum jurisdictional requirements. Without limitation, HMIT specifically seeks to investigate potentially actionable claims for unjust enrichment, imposition of a constructive trust with

---

[1] These proceedings were initially filed in Delaware but were ultimately transferred to and with venue in the U.S. Bankruptcy Court for the Northern District of Texas.

[2] The discovery relief requested in this Petition does not implicate the HCM bankruptcy court's jurisdiction. Furthermore, this Rule 202 Petition is not subject to removal because there is no amount in actual controversy and there is no cause of action currently asserted.

002104

disgorgement, knowing participation in breaches of fiduciary duty, and tortious interference with business expectancies.

6.      This Court has personal jurisdiction over the Respondents from which discovery is sought because both Farallon and Stonehill are doing business in Texas under Texas law including, without limitation, Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ §17.042. Consistent with due process, Respondents have established minimum contacts with Texas, and the assertion of personal jurisdiction over Respondents complies with traditional notions of fair play and substantial justice. HMIT's potential claims against Respondents arise from and/or relate to Farallon's and Stonehill's contacts in Texas. Respondents also purposefully availed themselves of the privilege of conducting business activities within Texas, thus invoking the benefits and protections of Texas law.

## SUMMARY

7.      HMIT seeks to investigate potential claims relating to the sale and transfer of large, unsecured creditors' claims in HCM's bankruptcy to special purpose entities affiliated with and/or controlled by Farallon and Stonehill (the "Claims"). Upon information and belief, Farallon and Stonehill historically had and benefited from close relationships with James Seery ("Seery"), who was serving as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") at the time of the Claims purchases. Furthermore, still upon information and belief, because Farallon and Stonehill acquired or controlled the acquisition of the Claims under highly questionable

circumstances. HMIT seeks to investigate whether Respondents received material non-public information and were involved in insider trading in connection with the acquisition of the Claims.

8.     The pre-suit discovery which HMIT seeks is directly relevant to potential claims, and it is clearly appropriate under Rule 202.1(b). HMIT anticipates the institution of a future lawsuit in which it may be a party due to its status as a stakeholder as former equity in HCM or in its current capacity as a Contingent Trust Interest holder, as well as under applicable statutory and common law principles relating to the rights of trust beneficiaries. In this context, HMIT may seek damages on behalf of itself or, alternatively, in a derivative capacity and without limitation, for damages or disgorgement of monies for the benefit of the bankruptcy estate.

9.     HMIT currently anticipates a potential lawsuit against Farallon and Stonehill as defendants and, as such, Farallon and Stonehill have adverse interests to HMIT in connection with the anticipated lawsuit. The addresses and telephone numbers are as follows: **Farallon Capital Management LLC**, One Maritime Plaza, Suite 2100, San Francisco, CA 94111, Telephone: 415-421-2132; **Stonehill Capital Management**, LLC, 320 Park Avenue, 26th Floor, New York, NY 10022, 212-739-7474 . Additionally, the following parties also may be parties with adverse interests in any potential lawsuit: **Muck Holdings LLC**, c/o Crowell & Moring LLP, Attn: Paul B. Haskel, 590 Madison Avenue, New York, NY 10022, 212-530-1823; **Jessup Holdings LLC**, c/o Mandel, Katz and Brosnan

002106

LLP, Attn: John J. Mandler, 100 Dutch Hill Road, Suite 390, Orangeburg, NY 10962, 845-6339-7800.

## BACKGROUND[3]

### A.    *Procedural Background*

10.    On or about October 16, 2019, HCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.

11.    On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM in the hundreds of millions of dollars; Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS") - and an unpaid vendor, Meta-E Discovery.

12.    Following the venue transfer to Texas on December 27, 2019, HCM filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary*

---

[3] All footnote references to evidence involve documents filed in the HCM bankruptcy proceedings and are cited by "Dkt." reference. HMIT asks the Court to take judicial notice of the documents identified by these docket entries.

002107

*Course* ("HCM's Governance Motion").[4] On January 9, 2020, the Court signed an order

approving HCM's Settlement Motion (the "Governance Order").[5]

13.      As part of the Governance Order, an independent board of directors—

which included Seery as one of the UCC's selections—was appointed to the Board of

Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors") HCM's general

partner. Following the approval of the Governance Order, the Board then appointed

Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer

("CRO") in place of the previous CEO.[6]  Seery currently serves as Trustee of the Claimant

Trust (HCM's sole post-reorganization limited partner) and, upon information and belief,

continues to serve as CEO of HCM following the effective date of the HCM bankruptcy

reorganization plan ("Plan").[7]

**B.      *Seery's Relationships with Stonehill and Farallon***

14.      Farallon and Stonehill are two capital management firms (similar to HCM)

that, upon information belief, have long-standing relationships with Seery. Upon

information and belief, they eventually participated in, directed and/or controlled the

acquisition of hundreds of millions of dollars of unsecured Claims in HCM's bankruptcy

on behalf of funds which they manage. It appears they did so without any meaningful

---

[4] Dkt. 281.
[5] Dkt. 339.
[6] Dkt. 854, Order Approving Retention of Seery as CEO/CRO.
[7] *See* Dkt. 1943, Order Approving Plan, p. 34.

002108

due diligence, much less reasonable due diligence, and *ostensibly* based their investment decisions only on Seery's input.

15.     Upon information and belief, Seery historically has had a substantial business relationship with Farallon and he previously served as legal counsel to Farallon in other matters. Upon information and belief, Seery also has had a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee[8] (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

**C.     Claims Trading**

16.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of settlements with Redeemer, Acis, UBS, and another major creditor, HarbourVest[9] (the "Settlements") (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed claims:[10]

---

[8] Declaration of John A. Morris [Dkt. 1090], Ex. 1, pp. 15.
[9] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.
[10] Orders Approving Settlements [Dkt. 1273, Dkt. 1302, Dkt. 1788, Dkt. 2389].

002109

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |

17.    Although these Settlements were achieved after years of hard-fought litigation,[11] each of the Settling Parties *curiously* sold their claims to Farallon or Stonehill (or affiliated special purpose entities) shortly after they obtained court approval of their Settlements. One of these "trades" occurred within just a few weeks before the Plan's Effective Date.[12] Upon information and belief, Farallon and Stonehill coordinated and controlled the purchase of these Claims through special purpose entities, Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup") (collectively "SPEs").[13] Upon information and belief, both of these SPEs were created on the eve of the Claims purchases for the ostensible purpose of taking and holding title to the Claims.

18.    Upon information and belief, Farallon and Stonehill directed and controlled the investment of over $160 million dollars to acquire the Claims in the absence of any publicly available information that could rationally justify this substantial investment. These "trades" are even more surprising because, at the time of the confirmation of HCM's Plan, the Plan provided only pessimistic estimates that these Claims would ever receive full satisfaction:

---

[11] Order Confirming Plan, pp. 9-11.
[12] Dkt. 2697, 2698.
[13] *See* Notice of Removal [Dkt 2696], ¶ 4.

002110

a. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[14]

i. This meant that Farallon and Stonehill invested more than $163 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

b. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%* (down approximately $328.3 million);[15]

c. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million;[16]

d. Despite the stark decline in the valuation of the HCM bankruptcy estate and reduction in percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "<u>Claims</u>") in April and August of 2021[17] in the combined amount of approximately $163 million; and

e. Upon information and belief:

i. Stonehill, through an SPE, Jessup, acquired the Redeemer Committee's claim for approximately $78 million;[18]

---

[14] Dkt. 1875-1, Plan Supplement, Exh. A, p. 4.

[15] Dkt. 2949.

[16] Dkt 1473, Disclosure Statement, p. 18.

[17] Notices of Transfers [Dkt. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

[18] July 6, 2021 Letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

    ii.   The $23 million Acis claim[19] was sold to Farallon/Muck for approximately $8 million;

    iii.  HarbourVest sold its combined approximately $80 million in claims to Farallon/Muck for approximately $27 million; and

    iv.  UBS sold its combined approximately $125 million in claims for approximately $50 million to both Stonehill/Jessup and Farallon/Muck *at a time when the total projected payout was only approximately $35 million*.

19.    In Q3 2021, just over $6 million of the projected $205 million available to satisfy general unsecured claims was disbursed.[20] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[21] According to HCM's Motion for Exit Financing,[22] and a recent motion filed by Dugaboy Investment Trust,[23] there remain *substantial* assets to be monetized for the benefit of HCM's creditors. Thus, upon information and belief, the funds managed by Stonehill and Farallon stand to realize significant profits on their Claims purchases. In turn, upon information and belief, Stonehill and Farallon will garner (or already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the purchase of the Claims.

---

[19] Seery/HCM have argued that $10 million of the Acis claim is self-funding. Dkt. 1271, Transcript of Hearing on Motions to Compromise Controversy with Acis Capital Management [1087] and the Redeemer Committee of the Highland Crusader Fund [1089], p. 197.

[20] Dkt. 3200.

[21] Dkt. 3582.

[22] Dkt. 2229.

[23] Dkt. 3382.

002112

## D.   *Material Information is Not Disclosed*

20.   Bankruptcy Rule 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." No public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks."[24]

21.   As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction.[25] Approximately 19.1% of HCLOF's assets were comprised of debt and equity in Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). The HCLOF interest was not to be transferred to HCM for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[26]

22.   Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, upon information and belief, it appears that Seery may have acquired material non-public information regarding Amazon's now-consummated interest in acquiring MGM,[27] yet there is no record of Seery's disclosure of such

---

[24] Dkt. 1905, February 3, 2021 Hearing Transcript, 49:5-21.
[25] Dkt. 1625, p. 9, n. 5.
[26] Dkt. 1625.
[27] Dkt. 150-1.

002113

information to the Court, HCM's creditors, or otherwise. Upon the receipt of this material non-public information, HMIT understands, upon information and belief, that MGM was supposed to be placed on HCM's "restricted list," but Seery nonetheless continued to move forward with deals that involved MGM assets.[28]

23. As HCM additionally held its own direct interest in MGM,[29] the value of MGM was of paramount importance to the value of HCM's bankruptcy estate. HMIT believes, upon information and belief, that Seery conveyed material non-public information regarding MGM to Stonehill and Farallon as inducement to purchase the Claims.

E. *Seery's Compensation*

24. Upon information and belief, a component of Seery's compensation is a "success fee" that depends on the actual liquidation of HCM's bankruptcy estate assets versus the Plan projections. As current holders of the largest claims against the HCM estate, Muck and Jessup, the SPEs apparently created and controlled by Stonehill and Farallon, were installed as two of the three members of an Oversight Board in charge of monitoring the activities of HCM, as the Reorganized Debtor, and the Claimant Trust.[30] Thus, along with a single independent restructuring professional, Farallon and

---

[28] *See* Dkt. 1625, Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, filed December 23, 2020
[29] Motion for Exit Financing.[Dkt.2229]
[30] Dkt. 2801.

002114

Stonehill's affiliates oversee Seery's go-forward compensation, including any "success" fee.[31]

DISCOVERY REQUESTED

25.     HMIT seeks to investigate whether Farallon and Stonehill received material non-public information in connection with, and as inducement for, the negotiation and sale of the claims to Farallon and Stonehill or its affiliated SPEs. Discovery is necessary to confirm or deny these allegations and expose potential abuses and unjust enrichment.

26.     The requested discovery from Farallon is attached as Exhibit "A", and includes the deposition of one or more of its corporate representatives and the production of documents. The requested discovery from Stonehill is attached as Exhibit "B", and includes the deposition of Stonehill's corporate representative(s) and the production of documents.

27.     Pursuant to Rule 202.2(g), the requested discovery will include matters that will allow HMIT to evaluate and determine, among other things:

   a.  The substance and types of information upon which Stonehill and Farallon relied in making their respective decisions to invest in or acquire the Claims;

   b.  Whether Farallon and Stonehill conducted due diligence, and the substance of any due diligence when evaluating the Claims;

---

[31] Claimant Trust Agreement [Dkt. 1656-2].

002115

c. The extent to which Farallon and Stonehill controlled the SPEs, Muck and Jessup, in connection with the acquisition of the Claims;

d. The creation and organizational structure of Farallon, Stonehill, Muck, and Jessup, as well as the purpose of creating Muck and Jessup as SPEs to hold the Claims;

e. Any internal valuations of Muck or Jessup's net asset value (NAV);

f. Any external valuation or audits of the NAV attributable to the Claims;

g. Any documents reflecting expected profits from the purchase of the Claims;

h. All communications between Farallon and Seery concerning the value and purchase of the Claims;

i. All communications between Stonehill and Seery concerning the value and purchase of the Claims;

j. All documents reflecting the expected payout on the Claims;

k. All communications between Farallon or Stonehill and HarbourVest concerning the purchase of the Claims;

l. All communications between Farallon or Stonehill and Acis regarding the purchase of the Claims;

m. All communications between Farallon or Stonehill and UBS regarding the purchase of the Claims;

n. All communications between Farallon or Stonehill and The Redeemer Committee regarding the purchase of the Claims;

o. All communications between Farallon and Stonehill regarding the purchase of the Claims;

002116

p.  All communications between Farallon and Stonehill and investors in their respective funds regarding purchase of the Claims or valuation of the Claims;

q.  All communications between Seery and Stonehill or Farallon regarding Seery's compensation as the Trustee of the Claimant Trust;

r.  All documents relating to, regarding, or reflecting any agreements between Seery and the Oversight Committee regarding compensation;

s.  All documents reflecting the base fees and performance fees which Stonehill has received or may receive in connection with management of the Claims;

t.  All documents reflecting the base fees and performance fees which Farallon has received or may receive in connection with management of the Claims;

u.  All monies received by and distributed by Muck in connection with the Claims;

v.  All monies received by and distributed by Jessup in connection with the Claims;

w.  All documents reflecting whether Farallon is a co-investor in any fund which holds an interest in Muck; and

x.  All documents reflecting whether Stonehill is a co-investor in any fund which holds an interest in Jessup.

**BENEFIT OUTWEIGHS THE BURDEN**

28.  The beneficial value of the requested discovery greatly outweighs any conceivable burden that could be placed on the Respondents. The requested information

002117

also should be readily available because the Respondents have been engaged in the bankruptcy proceedings relating to the matters at issue for several years.

29. The important benefit associated with this requested discovery is also clear – it is reasonably calculated to determine whether the Respondents have unjustly garnered tens of millions of dollars of benefit based upon insider information. If this occurred, the monies received as a result of such conduct are properly subject to a constructive trust and disgorged. This would result in substantial funds available for other creditors, including those creditors in Class 10, which includes HMIT as a beneficiary. This significant benefit, in addition to the value of bringing proper light to the activities of Farallon and Stonehill as discussed in this petition, far outweighs any purported burden associated with requiring Respondents to sit for focused depositions concerning the topics and documents identified in Exhibits A and B.

## REQUEST FOR HEARING AND ORDER

30. After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on this Petition.

## PRAYER FOR RELIEF

31. Petitioner Hunter Mountain Investment Trust respectfully requests that the Court issue an order pursuant to Texas Rule of Civil Procedure 202 authorizing HMIT to take a deposition of designated representatives of Farallon Capital Management, LLC and Stonehill Capital Management, LLC. HMIT additionally requests authorization to

002118

issue subpoenas duces tecum compelling the production of documents in connection with the depositions in compliance with Tex. R. Civ. P. 205, and asks that the Court grant HMIT all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:   _/s/ Sawnie A. McEntire_____
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    Ian B. Salzer
    State Bar No. 24110325
    isalzer@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Petitioner Hunter Mountain Investment Trust*

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Before me, the undersigned notary, on this day personally appeared Mark Patrick, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

> "My name is Mark Patrick. I am the Administrator of Hunter Mountain Investment Trust, and I am authorized and capable of making this verification. I have read Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition ("Petition"). The facts as stated in the Petition are true and correct based on my personal knowledge and review of relevant documents in the proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054, in the United States Bankruptcy Court in the Northern District of Texas, Dallas Division ."

Mark Patrick

Sworn to and subscribed before me by Mark Patrick on January 20, 2023.

Notary Public in and for
the State of Texas



DEBORAH COLE
Notary ID #134079165
My Commission Expires
November 23, 2026

3116424.1

18

002120

**EXHIBIT "A"**

**CAUSE NO. _____**

| IN RE: | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

<u>**NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC**</u>

TO:    Farallon Capital Management, LLC, by and through its attorney of record _____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205, Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral examination under oath of Farallon Capital Management, LLC ("Farallon") on _____, 2023 at _____ _.m. before a notary public or other person authorized to administer a proper oath and will be recorded by stenographic means. The deposition will take place at _____ before a court reporter and videographer and will continue from day to day until completed. The deposition may also be recorded by non-stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Farallon is requested to designate one or more person(s) most knowledgeable and prepared to testify on behalf of Farallon concerning the topics identified on Exhibit "1", and to produce the documents described in Exhibit "2", attached hereto.

002121

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain*
*Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on January ___, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

002122

EXHIBIT "A"
## TO NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

## RULES OF CONSTRUCTION

1.    The terms "all" and "each" shall be construed as all and each.

2.    The terms "all" and "any" shall be construed as all and any.

3.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.    The use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

002123

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents*. The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI*. The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate*. The term "Estate" means HCM's bankruptcy estate.

*Farallon*, *you*, and *your*. The terms "Farallon," "you," and "your" shall mean Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

002124

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill*. The term "Stonehill" refers to Stonehill Capital Management, LLC.

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

*UBS*. The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

002126

## EXHIBIT "1"

## TOPIC CATEGORIES

The witness(es) designated by Farallon to testify on its behalf  is (are) requested to testify concerning the following Topic Categories:

a. The substance, types, and sources of information Farallon considered in making any decision to invest in any of the Claims on behalf of itself, Muck, and/or any fund with which Farallon is connected;

b. Whether Farallon conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c. Any and all communications with James Dondero;

d. The extent to which Farallon was involved in creating and organizing Muck in connection with the acquisition of any of the Claims;

e. The organizational structure of Muck (including identification of all members, managing members), as well as the purpose for creating Muck, including, but not limited to, regarding holding title to any of the Claims;

f. Any internal valuations of Muck's Net Asset Value (NAV), as well as all assets owned by Muck;

g. Any external valuation or audits of the NAV attributable to any of the Claims;

h. Any documents reflecting profit forecasts relating to any of the Claims;

i. All communications between Farallon and Seery relating to  any of the Claims;

002127

j.   All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.   All communications between Farallon and any of the Settling Parties concerning any of the Claims;

l.   Any negotiations between Farallon and any of the Settling Parties concerning any of the Claims;

m.   All communications between Farallon and Stonehill regarding any of the Claims;

n.   All communications between Farallon and any investors in any fund managed by Farallon regarding any of the Claims or valuation of the Claims;

o.   All communications between Seery and Farallon regarding Seery's compensation as Trustee of the Claimant Trust;

p.   All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.   All base fees and performance fees which Farallon has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.   All monies received by Muck in connection with any of the Claims and any distributions made by Muck to any members of Muck relating to such Claims;

s.   Whether Farallon is a co-investor in any fund which holds an interest in Muck or otherwise holds a direct interest in Muck and all documents reflecting the same;

t.   All communications between Farallon and any of the following entities concerning any of the Claims:

    i.   UCC;

002128

     ii.    Highland;

     iii.   Grosvenor;

     iv.   Muck;

     v.   the Oversight Board.

u. The sources of funds used by Muck for the acquisition of any of the Claims;

v. The terms and conditions of any agreements governing the transfers of any of the Claims to Muck;

w. Representations made by Farallon, Muck, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x. Farallon's valuation or evaluation of HCM's Estate;

y. Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z. The appointment of Muck to the Oversight Board;

aa. Farallon's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Muck.

002129

## EXHIBIT "2"

## <u>DOCUMENT REQUESTS</u>

1. Any and all documents created by, prepared for, or received by Farallon concerning any of the following topics:

    a.  the transfer of the Claims;

    b.  negotiation and/or consummation of any agreement regarding the transfer of the Claims;

    c.  valuation of the Claims or the assets underlying the Claims;

    d.  promises and representations made in connection with the transfer of the Claims;

    e.  any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

    f.  consideration for the transfer of the Claims;

    g.  the value of HCM's Estate;

    h.  the projected future value of HCM's Estate;

    i.  past distributions and projected distributions from HCM's Estate;

    j.  compensation earned by or paid to Seery in connection with or relating to the Claims;

    k.  compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l.  any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Farallon, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Stonehill, (vi) Grosvenor or, (vii) the Oversight Board, concerning any of the following topics:

    a.  the transfer of the Claims;

    b.  negotiation and/or consummation of any agreement regarding the transfer of the Claims;

    c.  valuation of the Claims or the assets underlying the Claims;

002130

    d.   promises and representations made in connection with the transfer of the Claims;

    e.   any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

    f.   consideration for the transfer of the Claims;

    g.   the value of HCM's Estate;

    h.   the projected future value of HCM's Estate;

    i.   past distributions and projected distributions from HCM's Estate;

    j.   compensation earned by or paid to Seery in connection with or relating to the Claims;

    k.   compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l.   any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3.   All correspondence and/or other documents by or between Farallon and/or Muck and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4.   Any and all documents reflecting the sources of funding used by Muck to acquire any of the Claims.

5.   Organizational and formation documents relating to Muck including, but not limited to, Muck's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6.   Company resolutions prepared by or on behalf of Muck approving the acquisition of any of the Claims.

7.   Any and all documents reflecting any internal or external audits regarding Muck's NAV.

8.   Agreements between Farallon and Muck regarding management, advisory, or other services provided to Muck by Farallon.

9.   Any and all documents reviewed by Farallon as part of its evaluation and due diligence regarding any of the Claims.

10.  Any documents reflecting any communications with James Dondero;

11.  Annual fund audits relating to Muck.

002131

12. Muck's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Farallon in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

002132

**EXHIBIT "B"**

**CAUSE NO. _____**

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner*, | § | |
| | § | **DALLAS COUNTY, TEXAS** |

<u>**NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC**</u>

TO:   Stonehill Capital Management, LLC, by and through its attorney of record

_____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205,

Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral

examination under oath of Stonehill Capital Management, LLC ("Stonehill") on

**_____, 2023 at _____ _.m.** before a notary public or other person authorized to

administer a proper oath and will be recorded by stenographic means. The deposition

will take place at _____ before a court reporter and videographer and will

continue from day to day until completed. The deposition may also be recorded by non-

stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Stonehill is

requested to designate one or more person(s) most knowledgeable and prepared to testify

on behalf of Stonehill concerning the topics identified on Exhibit "1", and to produce the

documents described in Exhibit "2", attached hereto.

002133

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on January \_\_\_, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

002134

## EXHIBIT "A"
## TO NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

## RULES OF CONSTRUCTION

1.    The terms "all" and "each" shall be construed as all and each.

2.    The terms "all" and "any" shall be construed as all and any.

3.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.    The use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

002135

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents*. The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI*. The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate*. The term "Estate" means HCM's bankruptcy estate.

*Farallon*. The term "Farallon," refers to Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees, representatives, attorneys, predecessors, successors,

002136

assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill," "you," and "your."* The terms "Stonehill", "you," and "your" shall mean Stonehill Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to Jessup Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

002137

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Stonehill is a general partner or owns an entities' general partner, or anyone else acting on Stonehill's behalf, now or at any time relevant to the response .

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

*UBS*. The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

002138

## EXHIBIT "1"

## <u>TOPIC CATEGORIES</u>

The witness(es) designated by Stonehill to testify on its behalf is (are) requested to testify concerning the following Topic Categories:

a.  The substance, types, and sources of information Stonehill considered in making any decision to invest in any of the Claims on behalf of itself, Jessup, and/or any fund with which Stonehill is connected;

b.  Whether Stonehill conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c.  Any and all communications with James Dondero;

d.  The extent to which Stonehill was involved in creating and organizing Jessup in connection with the acquisition of any of the Claims;

e.  The organizational structure of Jessup (including identification of all members, managing members), as well as the purpose for creating Jessup, including, but not limited to, regarding holding title to any of the Claims;

f.  Any internal valuations of Jessup's Net Asset Value (NAV), as well as all assets owned by Jessup;

g.  Any external valuation or audits of the NAV attributable to any of the Claims;

h.  Any documents reflecting profit forecasts relating to any of the Claims;

i.  All communications between Stonehill and Seery relating to any of the Claims;

002139

j.  All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.  All communications between Stonehill and any of the Settling Parties concerning any of the Claims;

l.  Any negotiations between Stonehill and any of the Settling Parties concerning any of the Claims;

m.  All communications between Stonehill and Farallon regarding any of the Claims;

n.  All communications between Stonehill and any investors in any fund managed by Stonehill regarding any of the Claims or valuation of the Claims;

o.  All communications between Seery and Stonehill regarding Seery's compensation as Trustee of the Claimant Trust;

p.  All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.  All base fees and performance fees which Stonehill has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.  All monies received by Jessup in connection with any of the Claims and any distributions made by Jessup to any members of Jessup relating to such Claims;

s.  Whether Stonehill is a co-investor in any fund which holds an interest in Jessup or otherwise holds a direct interest in Jessup and all documents reflecting the same;

t.  All communications between Stonehill and any of the following entities concerning any of the Claims:

    i.  UCC;

002140

      ii.    Highland;

      iii.   Grosvenor;

      iv.   Jessup;

      v.   the Oversight Board.

u.  The sources of funds used by Jessup for the acquisition of any of the Claims;

v.  The terms and conditions of any agreements governing the transfers of any of the Claims to Jessup;

w.  Representations made by Stonehill, Jessup, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x.  Stonehill's valuation or evaluation of HCM's Estate;

y.  Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z.  The appointment of Jessup to the Oversight Board;

aa. Stonehill's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Jessup.

002141

EXHIBIT "2"

## DOCUMENT REQUESTS

1. Any and all documents created by, prepared for, or received by Stonehill concerning any of the following topics:

   a.  the transfer of the Claims;

   b.  negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c.  valuation of the Claims or the assets underlying the Claims;

   d.  promises and representations made in connection with the transfer of the Claims;

   e.  any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

   f.  consideration for the transfer of the Claims;

   g.  the value of HCM's Estate;

   h.  the projected future value of HCM's Estate;

   i.  past distributions and projected distributions from HCM's Estate;

   j.  compensation earned by or paid to Seery in connection with or relating to the Claims;

   k.  compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

   l.  any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Stonehill, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Farallon, (vi) Grosvenor, or, (vii) the Oversight Board, concerning any of the following topics:

   a.  the transfer of the Claims;

   b.  negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c.  valuation of the Claims or the assets underlying the Claims;

002142

    d.  promises and representations made in connection with the transfer of the Claims;

    e.  any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

    f.  consideration for the transfer of the Claims;

    g.  the value of HCM's Estate;

    h.  the projected future value of HCM's Estate;

    i.  past distributions and projected distributions from HCM's Estate;

    j.  compensation earned by or paid to Seery in connection with or relating to the Claims;

    k.  compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l.  any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3.  All correspondence and/or other documents by or between Stonehill and/or Jessup and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4.  Any and all documents reflecting the sources of funding used by Jessup to acquire any of the Claims.

5.  Organizational and formation documents relating to Jessup including, but not limited to, Jessup's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6.  Company resolutions prepared by or on behalf of Jessup approving the acquisition of any of the Claims.

7.  Any and all documents reflecting any internal or external audits regarding Jessup's NAV.

8.  Agreements between Stonehill and Jessup regarding management, advisory, or other services provided to Jessup by Stonehill.

9.  Any and all documents reviewed by Stonehill as part of its evaluation and due diligence regarding any of the Claims.

10.  Any documents reflecting any communications with James Dondero;

11.  Annual fund audits relating to Jessup.

002143

12. Jessup's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Stonehill in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

002144

# Exhibit 4-B

1
2
3
**REPORTER'S RECORD**

**VOLUME 1 OF 1**

4          **COURT OF APPEALS CAUSE NO. 00-00-00000-CV**

5           **TRIAL COURT CAUSE NO. DC-23-01004-J**

6
IN RE:                              )  IN   THE   DISTRICT COURT
7                                    )
                                     )
8  HUNTER MOUNTAIN                   )
   INVESTMENT TRUST,                 )  OF DALLAS COUNTY, TEXAS
9                                    )
                                     )
10       Petitioner.                 )  191ST JUDICIAL DISTRICT

11

12

13      **PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

14                    **RULE 202 PETITION**

15                   **which was heard on**

16            **Wednesday, February 22, 2023**

17

18

19      On the 22nd day of February 2023, the following

20  proceedings came on to be heard in the above-entitled

21  and numbered cause before the Honorable Gena Slaughter,

22  Judge Presiding, held in Dallas, Dallas County, Texas,

23  and the following proceedings were had, to wit:

24          Proceedings reported by machine shorthand

25  utilizing computer-assisted realtime transcription.

```
 1   APPEARANCES:

 2

 3   MR. SAWNIE A. McENTIRE              ATTORNEYS FOR PETITIONER
     State Bar No. 13590100             Hunter Mountain
 4   PARSONS McENTIRE                   Investment Trust
         McCLEARY, PLLC
 5   1700 Pacific Avenue
     Suite 4400
 6   Dallas, Texas  75201
     Telephone:  (214) 237-4300
 7   Facsimile:  (214) 237-4340
     Email:  smcentire@pmmlaw.com
 8
     and
 9
     MR. ROGER L. McCLEARY
10   State Bar No. 13393700
     PARSONS McENTIRE
11       McCLEARY, PLLC
     One Riverway
12   Suite 1800
     Houston, Texas  77056
13   Telephone:  (713) 960-7315
     Facsimile:  (713) 960-7347
14   Email:  rmccleary@pmmlaw.com

15

16

17   MR. DAVID C. SCHULTE              ATTORNEY FOR RESPONDENTS
     State Bar No. 24037456            Farallon Capital
18   HOLLAND & KNIGHT, LLP             Management, LLC, and
     1722 Routh Street                Stonehill Capital
19   Suite 1500                       Management LLC
     Dallas, Texas  75201
20   Telephone:  (214) 964-9500
     Facsimile:  (214) 964-9501
21   Email:  david.schulte@hklaw.com

22

23

24                       *        *        *

25
```

 1

 2

 3                    **VOLUME 1 INDEX**

 4

 5       **PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

 6                    **RULE 202 PETITION**

 7                    **which was heard on**

 8              **Wednesday, February 22, 2023**

 9

10  PROCEEDINGS:                                    Page   Vol

11  Proceedings on the record...................... 8      1

12  Argument by Mr. Sawnie A. McEntire............. 9      1

13  Response by Mr. David C. Schulte............... 37     1

14  Response by Mr. Sawnie A. McEntire............. 65     1

15  Response by Mr. David C. Schulte............... 73     1

16  Response by Mr. Sawnie A. McEntire............. 76     1

17  The court takes the matter under consideration. 77    1

18  Adjournment.................................... 78     1

19  Reporter's Certificate......................... 79     1

20

21

22

23

24

25

## PETITIONER'S EXHIBITS INDEX

| Number | Description | Offered | (Excluded)<br>Admitted | Vol |
|--------|-------------|---------|------------------------|-----|
| P-1 | Declaration of<br>Mark Patrick | 36 | 42 | 1 |
| P1-A | Claimant<br>Trust Agreement | 36 | 42 | 1 |
| P1-B | Division of<br>Corporations - Filing | 36 | 42 | 1 |
| P1-C | Division of<br>Corporations - Filing | 36 | 42 | 1 |
| P1-D | Order Approving<br>Debtor's Settlement | 36 | 42 | 1 |
| P1-E | Order Approving<br>Debtor's Settlement | 36 | 42 | 1 |
| P1-F | Order Approving<br>Debtor's Settlement | 36 | 42 | 1 |
| P1-G | Order Approving<br>Debtor's Settlement | 36 | 42 | 1 |
| P1-H | July 6, 2021, Alvarez<br>& Marsal letter to<br>Highland Crusader<br>Funds Stakeholder | 36<br>-- | 41<br>42 | 1<br>1 |
| P1-I | United States Bankruptcy<br>Court Case No. 19-34054 | 36 | 42 | 1 |

```
 1              PETITIONER'S EXHIBITS INDEX   continued

 2
                                                    (Excluded)
 3    Number    Description                 Offered Admitted  Vol

 4

 5    PI-J      Exhibit A                      36      42      1
                Highland Capital
 6              Management, L.P.
                Disclaimer for
 7              Financial Projections

 8
      PI-K      United States Bankruptcy       36      42      1
 9              Court Case No. 19-34054

10
       P-2     Declaration of                 36      42      1
11             James Dondero

12
      P2-1     Jim Dondero email              36     (41)     1
13             dated Thursday,
               December 2020
14

15

16

17

18

19

20

21

22

23

24

25
```

<u>RESPONDENT'S EXHIBITS INDEX</u>

| Number | Description | Offered | (Excluded) Admitted | Vol |
|--------|-------------|---------|---------------------|-----|
| R-1 | Cause No. DC-21-09543 Verified Amended Petition | 41 | 44 | 1 |
| R-2 | Cause No. DC-21-09543 Order | 41 | 44 | 1 |
| R-3 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-4 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-5 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-6 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-7 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-8 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-9 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |
| R-10 | United States Bankruptcy Court Case No. 19-34054 | 41 | 44 | 1 |

```
1              RESPONDENT'S EXHIBITS INDEX continued

2
                                              (Excluded)
3    Number    Description              Offered Admitted Vol

4

5    R-11      United States Bankruptcy      41      44       1
               Court Case No. 19-34054
6

7    R-12      United State Bankruptcy       41      44       1
               Court Case No. 19-12239
8

9    R-13      United States Bankruptcy      41      44       1
               Court Case No. 19-34054
10

11   R-14      United States Bankruptcy      41      44       1
               Court Case No. 19-34054
12

13   R-15      United States Bankruptcy      41      44       1
               Court Case No. 19-34054
14

15   R-16      United States Bankruptcy      41      44       1
               Court Case No. 19-34054
16

17   R-17      United States Bankruptcy      41      44       1
               Court Case No. 19-34054
18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              THE COURT:  Okay.  Good morning, Counsel.

 4              We are here in DC-23-01004, In re:

 5   Hunter Mountain Investment Trust.

 6              And who is here for the plaintiff?

 7              MR. McENTIRE:  For the petitioner,

 8   Your Honor, Sawnie McEntire and my partner

 9   Roger McCleary.

10              THE COURT:  Okay.  And then for Farallon?

11              MR. SCHULTE:  My name is David Schulte and

12   I represent both of the respondents.  It's Farallon

13   Capital Management, LLC, and Stonehill Capital

14   Management, LLC.

15              THE COURT:  We are here today on a request

16   for a 202 petition.  I know one of the issues is the

17   related suit, but let's just plow into it and we'll

18   go from there.

19              Okay.  Counsel?

20              MR. McENTIRE:  May I approach the bench?

21              THE COURT:  Yes, you may.

22              MR. McENTIRE:  And I've given Mr. Schulte

23   copies of all these materials.

24              In the interest of time, I have all the

25   key pleadings here, which I will give you a copy of.
```

1          THE COURT:  Thank you.

2          MR. McENTIRE:  And this is the evidentiary

3   submission that we submitted about a week ago.

4          THE COURT:  Right.

5          MR. McENTIRE:  To the extent you are

6   interested, it is cross-referenced by exhibit number

7   to the references in our petition to the docket in the

8   bankruptcy court.

9          THE COURT:  I appreciate that.  Otherwise,

10  I go hunting for stuff.

11          MR. McENTIRE:  This is a PowerPoint.

12          THE COURT:  Okay.

13          MR. McENTIRE:  And, lastly, a proposed

14  order.

15          THE COURT:  Wonderful.

16          MR. McENTIRE:  And Mr. Schulte has copies

17  of it all.

18          THE COURT:  Okay.

19          MR. McENTIRE:  May I proceed, Your Honor?

20          THE COURT:  You may.

21          MR. McENTIRE:  All right.  Your Honor,

22  we are here for leave of court to conduct discovery

23  under Rule 202 to investigate potential claims.

24          The issue before the court is not whether

25  we have an actual claim.

```
 1                    THE COURT:  Right.
 2                    MR. McENTIRE:  We do not even need to
 3    state a cause of action.  It is simply the investigation
 4    of potential claims.
 5                    Mr. Mark Patrick is here with us today.
 6    He's behind me.  Mr. Patrick is the administrator of
 7    Hunter Mountain, which is a Delaware trust.
 8                    THE COURT:  Okay.
 9                    MR. McENTIRE:  He is the manager of
10    Rand Advisors, which is also an investment manager
11    of the trust.  And, in effect, for all intents and
12    purposes, Mr. Patrick manages the assets of the trust on
13    a daily basis.
14                    THE COURT:  Okay.
15                    MR. McENTIRE:  There are potential claims
16    that we're investigating.  And I'll go through some
17    of these because I know opposing counsel has raised
18    standing issues.
19                    THE COURT:  Right.
20                    MR. McENTIRE:  And I think we can address
21    all those standing issues.
22                    Insider trading is in itself a wrong
23    as recognized by courts.  And I'll refer you to the
24    opinions.  We believe there's a breach of fiduciary
25    duties, and that may take a little explanation.
```

1            At the time that Farallon and Stonehill

2    acquired these claims, through their special purpose

3    entities Muck and Jessup, they were outsiders.

4            THE COURT:  Right.

5            MR. McENTIRE:  But by acquiring the

6    information in the manner in which we believe they did,

7    they became insiders.  And when they became insiders,

8    under relevant authorities they owe fiduciary duties.

9            And at the time they acquired the claims,

10   my client Hunter Mountain Investment Trust was the

11   99.5 percent interest holder or stakeholder in

12   Highland Capital.

13           THE COURT:  Right.

14           MR. McENTIRE:  We also believe a knowing

15   participation of breach of fiduciary duties under

16   another name, aiding and abetting.  But Texas recognizes

17   it as knowing participation.  Unjust enrichment,

18   constructive trust, and tortious interference.

19           THE COURT:  Okay.

20           MR. McENTIRE:  Farallon and Stonehill are

21   effectively hedge funds.  And so is Highland Capital.

22           They were created.  They actually did

23   create Muck and Jessup.  Those are the two entities

24   that actually are titled with the claims.  They

25   acquired it literally days before the transfers.

 1                    So the reason we're focusing our discovery

 2    effort on Farallon and Stonehill, we are confident

 3    that any meaningful discovery -- emails, letters,

 4    correspondence, document drafts, things of that

 5    nature -- probably predated the existence of

 6    Muck and Jessup.

 7                    THE COURT:  Right.

 8                    MR. McENTIRE:  That's why we're focusing

 9    our discovery effort on Farallon and on Stonehill.

10                    But, needless to say, Farallon, Stonehill,

11    Muck and Jessup, having all participated in this

12    acquisition, they're all insiders for purposes

13    of assuming fiduciary duties.

14                    And as I said, outsiders become insiders

15    under the relevant authority.  And one key case is the

16    Washington Mutual case --

17                    THE COURT:  Right.

18                    MR. McENTIRE:  -- which we cited in our

19    materials.

20                    I would also just let you know, this is

21    not something in total isolation.  We understand we're

22    not privy to the details.  But we understand the Texas

23    State Security Board also has an open investigation that

24    has not been closed.

25                    THE COURT:  Okay.

 1              MR. McENTIRE:  And that's by way of

 2  background.

 3              202 allows presuit discovery for a couple

 4  of reasons.  And I won't belabor the point.  One is to

 5  investigate potential claims.

 6              There is no issue of notice or service

 7  here.  There's no issue of personal jurisdiction.

 8  Farallon and Stonehill made a general appearance.

 9              THE COURT:  Right.

10              MR. McENTIRE:  There's no issue concerning

11  subject-matter jurisdiction.  They actually concede that

12  the court has jurisdiction on page 8 of their response.

13              The court's inquiry today is a limited

14  judicial inquiry.  There are really two avenues which

15  I'll explain, but, first, I think the salient avenue

16  is does the benefit of the discovery outweigh the

17  burden.

18              And I think as I will hopefully

19  demonstrate, I think that we clearly do.

20              THE COURT:  Okay.

21              MR. McENTIRE:  The merits of a potential

22  claim, the case law is clear, is not before the court.

23              Much of their brief and their response

24  is devoted to trying to attack the fact that there

25  is no duty or things such as standing.

1          But the reality of it is we are not

2    required to actually prove up a cause of action to

3    this court although I think I can.  In this process,

4    I probably certainly can identify a potential cause of

5    action.  That's not our obligation to carry our burden.

6          There was an issue about timely submission

7    of evidence they raised in a footnote, but I think that

8    was resolved before the court took the bench.

9          THE COURT:  Okay.

10         MR. McENTIRE:  I've handed you a binder

11   with Mr. Mark Patrick's affidavit and Jim Dondero's

12   affidavit.

13         As I understand it, correct me if I'm

14   wrong, you're not objecting to the submission of that

15   evidence.  Is that correct?

16         MR. SCHULTE:  Almost.

17         THE COURT:  Okay.

18         MR. SCHULTE:  Your Honor, I do object

19   to the two declarations that were submitted I believe

20   five days before the hearing.

21         THE COURT:  Okay.

22         MR. SCHULTE:  As Your Honor is aware,

23   Rule 202 contemplates 15 days' notice.  The petition

24   itself was required to be verified.  It was verified

25   and then new substance was added by way of these

1  declarations five days before the hearing.

2             And so we would argue that that has the

3  effect of amending or supplementing the petition within

4  that 15-day notice period.

5             All that said, I don't have any issue with

6  the majority of the documents attached to Mr. Patrick's

7  declaration.

8             THE COURT:  Okay.

9             MR. SCHULTE:  So I do object on the

10  grounds of hearsay and timeliness to the declarations.

11             On Exhibit H to Mr. Patrick's declaration,

12  I object to that document on the grounds of hearsay.

13             THE COURT:  Okay.  Which one?

14             MR. SCHULTE:  Exhibit H to Mr. Patrick's

15  declaration on the basis of hearsay.

16             All the other documents are I believe

17  file-stamped copies of the pleadings filed in the

18  bankruptcy, which I don't have any issue with that.

19             And then the exhibit to Mr. Dondero's

20  declaration is an email that's objected to on the basis

21  of hearsay.  And it hasn't been proven up as a business

22  record or any other way that will get past hearsay.

23             THE COURT:  Okay.

24             MR. SCHULTE:  So those are the limited

25  objections I have to what's in that filing, Your Honor.

1          MR. McENTIRE:  And I will address those

2   objections.  And we're prepared to put Mr. Patrick on

3   the stand, if necessary.

4          I would point out that the case law is

5   very clear that there's no 15-day rule here.

6          THE COURT:  Okay.

7          MR. McENTIRE:  We have asked the court

8   to take judicial notice of all of our evidence in our

9   petition itself.

10          The 15 days is the amount of time you have

11   to give notice before the hearing --

12          THE COURT:  Right.

13          MR. McENTIRE:  -- but the case law

14   is clear that I can put live testimony on, I can

15   put affidavit testimony on.

16          THE COURT:  This is an evidentiary

17   hearing.

18          MR. McENTIRE:  That's correct.

19          And that includes affidavits.  And

20   affidavits are routinely accepted in these types of

21   proceedings and I have the case law I can cite to the

22   court.

23          MR. SCHULTE:  Your Honor, in contrast,

24   I think if this were, for example, an injunction

25   hearing, I don't believe that an affidavit would be

```
 1    the substitute in an injunction hearing for live
 2    testimony.
 3               And so if this is an evidentiary standard,
 4    I don't think that these affidavits should come in for
 5    the truth of the matter asserted.  The witnesses should
 6    testify to the facts that they want to prove up.
 7               MR. McENTIRE:  I could give the court a
 8    cite.
 9               THE COURT:  Okay.
10               MR. McENTIRE:  It's Glassdoor, Inc. versus
11    Andra Group.
12               THE COURT:  What was the name of it?
13               MR. McENTIRE:  Glassdoor, Inc. versus
14    Andra Group.  It is 560 S.W.3d 281.  It specifically
15    addresses the use and relies upon affidavits in the
16    record for purposes of a Rule 202.
17               So, with that said, I will address it in
18    more detail in a moment.  The evidentiary rule, to be
19    clear, is it has to be supported by evidence.  Seven
20    days was the date that I picked because it was well
21    in advance.  It's the standard rule that's used for
22    discovery issues.  It's seven days before a hearing.
23               So I picked it.  He's had it for seven
24    days.  He's never filed any written objections to my
25    evidence.  None.
```

1              And under the Local Rules I would think

2    he would have objected within three business days.

3    He did not do that, and so I'm a little surprised

4    by the objection.

5              THE COURT:  Okay.

6              MR. McENTIRE:  All right.  We do have

7    copies of all the certified records, but I gave you

8    the agenda on that.  And we talked about the two

9    declarations.

10             So the limited judicial inquiry is the

11   only issue before the district court.  It's whether

12   or not to allow the discovery, not the merits of any

13   claim yea or nay.

14             THE COURT:  Right.

15             MR. McENTIRE:  There's no need for us to

16   even plead a cause of action, although we did.

17             Mr. Schulte goes to great length in

18   his response to take issue with our cause of action,

19   suggesting we had none.  We do.  But we're not even

20   under an obligation to plead it; nevertheless, we did.

21             This is actually a two-part test.  The

22   first part was allowing the petitioner -- in this case,

23   Hunter Mountain -- to take the requested deposition may

24   prevent a failure or delay of justice, or the likely

25   benefit outweighs the burden.  Both apply here.

 1              These trades took place in April of 2021,

 2    three of the four.  The fourth I think took place in the

 3    summer.

 4              And our goal is to obtain the discovery

 5    in a timely manner so we do not have any argument, valid

 6    or invalid, that there's a limitations issue.

 7              THE COURT:  Okay.

 8              MR. McENTIRE:  And so any further delay,

 9    such as transferring this to another court or back to

10    the bankruptcy court, which it does not have

11    jurisdiction, would cause tremendous delay.

12              THE COURT:  Okay.

13              MR. McENTIRE:  Hunter Mountain, a little

14    bit of background.  It is an investment trust.  When

15    it has money, it participates directly in funding the

16    Dallas Foundation --

17              THE COURT:  Okay.

18              MR. McENTIRE:  -- which is a very I think

19    well-respected and recognized charitable foundation.

20              Certain individuals and pastors from

21    various churches are actually here because Hunter

22    Mountain indirectly, but ultimately, provides a

23    significant source of funding for their outreach

24    programs and their charitable functions and programs.

25              THE COURT:  Okay.

1          MR. McENTIRE:  The empirical evidence in

2   the documents that are before the court, regardless of

3   what's in the affidavits, just screams that there was

4   no due diligence here.

5          Now, we know in Mr. Dondero's affidavit

6   he had a conversation with representatives of Farallon,

7   which would be admissions against interest.  They're

8   admissions basically against interest that they

9   effectively did no due diligence.

10          Yet we believe, upon information and

11   belief, that they invested over $167 million.  There

12   are two sets of claims.  There's a Class 8 claim and

13   a Class 9 creditor claim.

14          THE COURT:  Right.

15          MR. McENTIRE:  Their expectations at the

16   time that they acquired these claims was that Class 9

17   would get zero recovery.

18          So who spends $167 million when their

19   expectation on return of investment is zero?  Who spends

20   $167 million even in Class 8 when the expected return is

21   just 71 percent and is actually declining?  And I think

22   it's actually admitted in the affidavit that Mr. Dondero

23   provided.

24          So without being hyperbolic or

25   exaggerating, the data that was available publicly

 1    was extremely pessimistic and doubtful that there would

 2    be any recovery.

 3              We have direct information -- admissions,

 4    frankly -- that Farallon had access to non-public

 5    material, non-public information.  And that was

 6    the fact that MGM Studios was up for sale.

 7              Mr. Dondero was on the board of directors.

 8              THE COURT:  Okay.

 9              MR. McENTIRE:  He communicated, because

10    of his responsibilities, this information to Mr. Seery.

11              And Mr. Seery, apparently, would have been

12    restricted.  He couldn't use it or distribute it.

13              THE COURT:  Right.

14              And I don't know a lot about securities

15    law but, yeah, that would be insider information.

16    Right?

17              MR. McENTIRE:  Yes.

18              And it appears from the affidavit that

19    Mr. Dondero submitted that Farallon was aware of the

20    information before the sale closed, before they closed

21    their acquisitions.

22              And Mr. Dondero asked the question are

23    you willing to even sell your claims and they said no.

24    Or even 30 percent more and they said no.  We're told

25    that they're going to be very valuable.

1              Well, no one else had this information, so
2   we have a problem here that we have two outsiders who
3   are now insiders.  They've acquired potentially very
4   valuable claims with the sale of MGM.
5              They also acquired information concerning
6   the portfolios of these companies over which Highland
7   Capital managed and had ownership interests, so we're
8   talking about having access to information that any
9   other bidder or suitor would not have.
10             So this is how they were divided up.
11  $270 million in Class 8.  Each of the creditors
12  right here are the unsecured creditors who sold.
13  They were the sellers.
14             THE COURT:  Right.
15             MR. McENTIRE:  And these are the claims in
16  the Class 9.
17             So you have $95 million in Class 9 claims
18  that are being acquired when the expectation is that
19  there will be zero return on investment.  You have
20  $270 million where the expectation was extremely
21  low and pessimistic.
22             And here are the documents.  And
23  Mr. Schulte has not objected to these.  This particular
24  document is Exhibit 1-J to Mr. Patrick's affidavit.
25             THE COURT:  Okay.

1          MR. McENTIRE:  This came out of the plan.

2  So when the bankruptcy plan was confirmed in February

3  2021, Farallon, Stonehill, Muck and Jessup, the latter

4  two weren't even in existence.

5          THE COURT:  Right.

6          MR. McENTIRE:  Farallon and Stonehill were

7  complete strangers to the bankruptcy proceedings, yet

8  they come in in the wake of this information and

9  they invest tens if not hundreds of millions of

10 dollars with no apparent due diligence.

11         The situation gets even worse.  And this

12 is Exhibit 1-I to Mr. Patrick's affidavit.  And as

13 I understand, Mr. Schulte does not object to these

14 documents.  It's declining.  And then, suddenly,

15 they're in the money.

16         And at the end of the third quarter last

17 year, they're already making 255 million bucks.  And

18 that's a far cry from the original investment.  This

19 is for both Class 8 and Class 9.

20         So Mr. Patrick states the purpose of

21 this is to seek cancellation.  Another word for it

22 in bankruptcy-ese would be disallowance.  But the

23 cancellation of these claims and disgorgement.

24         If these are ill-gotten gains, regardless

25 of the rubric or the monicker that you place on it --

1   breach of fiduciary duty as insiders, aiding and

2   abetting or knowing participation in fiduciary duties,

3   because a lot of people have fiduciary duties on this

4   stuff.  No matter what you call it, disgorgement is a

5   remedy.

6             Wrongdoers should not be entitled to

7   profit from their wrongdoing.

8             Mr. Schulte makes a big point that we

9   can't prove damages.  Well, first of all, I don't agree

10  with the conclusion.

11            THE COURT:  Right.

12            MR. McENTIRE:  But even if he was right,

13  disgorgement is a proxy for damages.  And we have an

14  entitlement and a right to explore how much they have

15  actually received, when did they receive it.

16            The weathervane is tilting in one

17  direction here, Judge.

18            Clearly, there is a creditor trust

19  agreement.  That's a very important document.  It spells

20  out rights and obligations.  It's part of the plan.

21            There's a waterfall.  And on page 27 of

22  the creditor trust agreement a waterfall is exactly

23  what it suggests.  You have one bucket gets full,

24  you go to the next bucket all the way down.

25            THE COURT:  Class 1 or tier 1.

 1              I can't remember the category.  I don't

 2   do bankruptcy.  But, yeah, those get paid, then the

 3   next level, then the next level.

 4              So by the time you get down to

 5   level 10, which I think is what Hunter Mountain was,

 6   theoretically, there wouldn't have been anything left.

 7              MR. McENTIRE:  That's correct.

 8              But here, if Class 8 and Class 9 -- and

 9   I will say the big elephant in those two classes are

10   Farallon and Stonehill or their special purpose entity

11   bucket Jessup -- they have 95 percent of that category.

12              And suddenly they're not entitled to keep

13   what they've got, and suddenly there's a disallowance,

14   or suddenly a cancellation regardless of the theory

15   or the cause of action -- and we have several avenues

16   here -- a lot of money is going to flow into the

17   coffers of Hunter Mountain, and a lot of money will flow

18   into the Dallas Foundation, and a lot of money will flow

19   into the coffers of charities.

20              So there is standing here.  Standing

21   requires the existence of a duty.  We think we have

22   duties.

23              And a concrete injury.  And if these

24   claims were manipulated, we have a concrete injury

25   and our proxy is disgorgement.

1           We've been deprived of an opportunity to

2    share in category 10 or as we just described it in the

3    waterfall under the creditor trust agreement.

4           THE COURT:  Right.

5           MR. McENTIRE:  Their burden is to show

6    that this discovery has no benefit.  No.  That's my

7    burden to show benefit.  But their burden would be

8    to show that it's overly burdensome to them.

9           And I find that difficult to understand

10   since part of their response is devoted to the fact

11   that, hey, judge in Dallas County, you should turn

12   this over to Judge Jernigan in the bankruptcy court.

13          THE COURT:  Because it's bankruptcy,

14   you know.

15          MR. McENTIRE:  In bankruptcy, that's their

16   invitation.

17          THE COURT:  Right.

18          MR. McENTIRE:  Well, if they're inviting

19   us to go do the discovery in bankruptcy court, it

20   doesn't seem to be that burdensome because it's

21   going to be the same discovery.

22          And, by the way, Judge Jernigan actually

23   does not have jurisdiction over these proceedings.

24   The other earlier proceeding, as you know, they

25   attempted to remove it to her court and it was remanded.

1    Clearly, she does not have jurisdiction.

2              The problem with bankruptcy involved,

3    in addition, if I wanted to do Rule 2004 discovery like

4    they're suggesting, that's their invitation.  They would

5    like you to push us down the road.

6              Well, we can't afford to push it down the

7    road.  Because if they push it down the road, I've got

8    to go file a motion with Judge Jernigan, get leave to

9    issue subpoenas.

10             THE COURT:  Right.

11             MR. McENTIRE:  They have 14 days to file

12   a motion to quash, then I have to file another motion.

13   And it's 21 days before their response is even filed.

14   And there's another 14 or 15 days before the reply is

15   filed.  We're looking at 60, 70 days.  And that's one

16   of the reasons we selected this procedure.

17             And, by the way, you hear the phrase forum

18   shopping a lot.  Well, without engaging in the negative

19   inference that that term suggests, a plaintiff, a

20   petitioner, has the right to select its venue for a

21   variety of reasons.

22             Our venue is the state district courts

23   of Texas because it has an accelerated procedure.  And

24   that's why we're here.

25             THE COURT:  Right.

1            MR. McENTIRE:  I've identified the

2    potential causes of action.  Entities or people that

3    breach fiduciary duties and receive ill-gotten gains

4    a constructive trust may be imposed, disgorgement.

5    Then we do run into bankruptcy concepts.

6            But it's important to know that some of

7    these are not bankruptcy.  Some of these are common law.

8            I suggest to the court, I don't have to

9    go get Judge Jernigan's permission to sue Farallon or

10   Stonehill for breach of fiduciary duties.  I don't have

11   to get her permission to sue for knowing participation.

12           If I'm actually looking for equitable

13   disallowance, probably, maybe.  But I can do the

14   discovery here and then make that decision whether

15   I need to go back to bankruptcy court.

16           I'm not foolish.  I'm not going to run

17   afoul of Judge Jernigan's orders.  If I have to go back

18   to Judge Jernigan to get permission, I will do it.

19           THE COURT:  Right.  Because only an

20   idiot runs afoul of the bankruptcy court.

21           MR. McENTIRE:  Hopefully, I'm not that.

22           So I clearly understand what both my

23   ethical and lawyer obligations are.  And I'm not

24   going to run afoul of any court orders.

25           But some of these remedies don't require

1   an overview by Judge Jernigan or the bankruptcy court.

2            THE COURT:  Okay.

3            MR. McENTIRE:  They have a duty not to

4   commit fraud, whether it's commit fraud against us or

5   commit fraud against the estate.

6            They have a duty not to interfere with

7   the expectancies that we have as a B/C beneficiary.

8   That's a code name for a former Class 10 creditor.

9            They have a duty not to trade on inside

10  information, and that's the Washington Mutual case.

11           And I've just already mentioned that

12  because they were outsiders, they're insiders now.

13           These are their arguments.  Our evidence

14  is timely.  It's not untimely.  It's not speculative.

15  It's not speculative because the events have already

16  taken place.  I'm not talking about something

17  hypothetical.

18           THE COURT:  Right.

19           MR. McENTIRE:  My remedy flows from that.

20           So we're not projecting that I might have

21  a claim later on.  I have a claim today.  If I have a

22  claim today, I have it today.  I have it and I want to

23  confirm it by this discovery.  Because their wrongdoing

24  has already taken place, it's not hypothetical, it's not

25  futuristic, it's already occurred.

 1              When they say they have no duty to us,

 2     they're just wrong.  They have duties not to breach

 3     fiduciary duties.  We have direct standing I believe to

 4     bring a claim in that regard.

 5              We have a right to bring direct standing

 6     under the Washington Mutual case, which I'll discuss.

 7              And we also have a right to bring a

 8     derivative action.

 9              THE COURT:  Right.

10              MR. McENTIRE:  And I notice that

11     they made a comment about that in their response.

12     But I can sue individually.

13              And I can also bring an action in the

14     alternative as a derivative action for the estate.

15     And these are all valid claims for the estate.

16              THE COURT:  Okay.

17              MR. McENTIRE:  Transfer.  This is not a

18     related case because it's not the litigation.

19              So if you just go to the very first

20     instance and you look at the Local Rule, it talks

21     about litigation and causes of action.

22              THE COURT:  Right.

23              MR. McENTIRE:  We don't have a cause

24     of action.  We're not asserting one in this petition.

25     So this is not a related case that falls within the

1    four corners of the Local Rule.

2              THE COURT:  Well, I guess the thing

3    is it's still a related case.  Like if you file a 202

4    and then you file a lawsuit, that would be considered

5    related.

6              I looked at it and you're right.

7    Technically, it's different parties.  I'll just say it's

8    a grey zone at best.

9              MR. McENTIRE:  That's correct.

10             This is not a lawsuit in terms of causes

11   of action.  It might be a related case if Mr. Dondero

12   had come in and filed a lawsuit.  That would be a

13   related case.  Mr. Dondero is not involved in this

14   process, other than as a fact witness.

15             These are all the evidentiary issues

16   that perhaps he's raised.  Live testimony, affidavit

17   testimony is admissible.

18             The court considered numerous affidavits

19   filed with the court.  And that's as recently as 2017.

20   These are all good cases, good law.

21             Equitable disallowance.  It's kind of a

22   fuzzy image.  This is a bankruptcy court case, but this

23   is simply to underscore the fact that in addition to

24   my common law remedies there is a very substantial

25   remedy in bankruptcy court.

1           It's not one I necessarily have to pursue,

2  but if I wanted to I could.  But what it does do is it

3  helps to find some duties.

4           And here, the court has the right

5  to disallow a claim on equitable grounds in extreme

6  instances, perhaps very rare, where it is necessary

7  as a remedy.  And they did it in this case.

8           THE COURT:  Okay.

9           MR. McENTIRE:  This is simply an analogy

10  to securities fraud and the 10b-5 statute.

11           Insiders of a corporation are not limited

12  to officers and directors, but may include temporary

13  insiders who have entered into a special confidential

14  relationship in the conduct of the business of the

15  enterprise and are given access to information solely

16  for corporate purposes.

17           Well, what about the MGM stock?  The court

18  finds that the Equity Committee -- so here's the

19  equity -- has stated a colorable claim.  We were

20  99.5 percent equity.

21           The Equity Committee has stated a

22  colorable claim that the settlement noteholders became

23  temporary insiders because they acquired information

24  that was not of public knowledge in connection with

25  their acquisition.

1              And allowed them to participate in

2    negotiations with JPMC -- JPMorgan Chase -- for the

3    shared goal of reaching a settlement.

4              So these were outsiders that suddenly

5    became temporary insiders because of access to inside

6    information.

7              This is not a new concept.  It comes

8    from the United States Supreme Court.  Fiduciaries

9    cannot utilize inside information.

10             THE COURT:  Right.

11             MR. McENTIRE:  And we believe we

12   have enough before the court to support and justify

13   a further investigation that this may have occurred.

14             THE COURT:  Okay.

15             MR. McENTIRE:  Now, not a related case.

16   The Jim Dondero case is actually closed.

17             THE COURT:  Right.

18             MR. McENTIRE:  And I'll be frank with you.

19   In all candor, I never thought this was a possible

20   related case.

21             THE COURT:  I mean, we're talking about

22   the same events, but there are differences, I agree.

23             MR. McENTIRE:  We're talking about one

24   similar event dealing with Farallon.  Other events

25   are different.

1          THE COURT:  Okay.

2              MR. McENTIRE:  So we have different dates.

3          THE COURT:  Right.

4              MR. McENTIRE:  Different parties on the

5   petitioner's side, different law firms.

6              The only common party is Farallon.

7   Alvarez & Marsal are not parties to this but Stonehill

8   is.  Stonehill was not a party to the prior proceedings.

9              And the standing is manifest.  With no

10  criticism of Mr. Dondero's lawyer, I searched in his

11  argument where he was articulating standing.

12             And without going further, I will tell

13  you I think our standing is clear.  We're in the money.

14         THE COURT:  Okay.

15             MR. McENTIRE:  We are in the money if

16  there's a disgorgement or a disallowance.

17             THE COURT:  Okay.

18             MR. McENTIRE:  We have all types of

19  claims, including insider trading and a creation of

20  fiduciary duties.

21             Our remedies, as far as I can tell, he

22  didn't identify any.  We have several.  Disgorgement,

23  disallowance, subordination, a variety.  And damages.

24             So we suggest strongly that it is not a

25  related case.

1              And I must tell you, the reference

2    to say send this to bankruptcy court or defer to the

3    bankruptcy court or send us over to Judge Purdy, with

4    all due respect to opposing counsel, it's really just

5    a delay mechanism.

6              And what they're seeking to do through

7    their invective, their criticisms, the references to

8    these other courts, is seeking an opportunity to push us

9    down the road and put us in a bad position potentially

10   and a not enviable position in connection with statute

11   of limitations.

12             Your Honor, we would offer the binder

13   of exhibits that we submitted on February 15, 2022,

14   including the affidavits and all the attached exhibits.

15             I would ask the court to take judicial

16   notice of all the exhibits that we referred to in our

17   petition, which I think is appropriate since we were

18   specifying with particularity what we were requesting

19   the court to take judicial notice of.  And that's the

20   large index, that's the list.

21             THE COURT:  Obviously, I can take

22   judicial notice of any kind of court pleadings,

23   whether they're state or federal.

24             MR. McENTIRE:  That's correct.

25             THE COURT:  That's clear.

1              MR. McENTIRE:  We would offer both

2    affidavits and all the attachments into evidence

3    at this time.

4              THE COURT:  Okay.  Do you have exhibit

5    numbers for them?

6              MR. McENTIRE:  Yes.  It's Exhibit 1 with

7    attachments.  1-A, 1-B, 1-C, 1-D, 1-E, 1-F and then

8    Exhibit 1-G, Exhibit 1-H, Exhibit 1-J, Exhibit 1-K.

9              Everything in the binder, Your Honor.

10   It's Exhibit 1 and Exhibit 2 with the attachments.

11             THE COURT:  Okay.

12             MR. McENTIRE:  I believe they're all

13   identified.  I can put a sticker on them, if you'd like.

14             THE COURT:  Yeah.  To admit them, it will

15   need a sticker.

16             So I'm going to hold off on admitting

17   them for just a minute because I do want to hear his

18   objections and then we can go back to it.  So just make

19   sure we do that.

20             I'm not trying to not admit them, but I do

21   want to let him have his objections.

22             Okay.  Anything else, Counsel?

23             MR. McENTIRE:  That's all I have right

24   now, Judge.

25             THE COURT:  Okay.  Counsel?

1          MR. SCHULTE:  Should I start with those

2   exhibits, Your Honor?

3          THE COURT:  Why don't you do that.  That's

4   probably the easiest way.

5          MR. SCHULTE:  In light of the authorities

6   that Mr. McEntire shared about the affidavits, I'll

7   withdraw the objections to the affidavits or the

8   declarations.

9          THE COURT:  Okay.

10          MR. SCHULTE:  I'm taking Mr. McEntire's

11   word that those cases say what he says they say.

12          THE COURT:  I'll tell you because 202

13   is not a lawsuit, you don't necessarily have a right

14   to cross-examine, et cetera.  So, yeah, affidavits are

15   frequently used on 202s.

16          MR. SCHULTE:  And that's fine, Your Honor.

17   I'll take Mr. McEntire's word what those cases say.

18          But I will maintain the objection to

19   Exhibit H -- it's the declaration of Mr. Patrick --

20   on the grounds of hearsay.  That is not a court record

21   or a file-stamped pleading from federal or state court.

22   It's just a letter.  So that's hearsay.  And it hasn't

23   been properly authenticated.

24          The other issue is the exhibit to

25   Mr. Dondero's declaration.  That's just an email

 1   from Mr. Dondero, so I object on the grounds of hearsay.

 2                    THE COURT:  Mr. McEntire, what's your

 3   response specifically to Exhibit H as attached to

 4   the Patrick declaration and then the attachment

 5   to the Dondero declaration?

 6                    MR. McENTIRE:  Exhibit H to Mr. Patrick's

 7   affidavit would be hearsay, but there's an exception

 8   that it's not controversial.

 9                    THE COURT:  Okay.

10                    MR. McENTIRE:  And there's no indication

11   that there's any challenge of the reliability of the

12   document.

13                    THE COURT:  What is the exhibit?

14   I'm trying to pull it up.  Sorry.

15                    MR. McENTIRE:  It's Exhibit 1-H.  It is

16   a letter from Alvarez & Marsal simply indicating what

17   they paid for the claim.

18                    THE COURT:  Is it the July 6th, 2021,

19   letter?

20                    MR. McENTIRE:  Yes, Your Honor.

21                    THE COURT:  I've got it.

22                    MR. McENTIRE:  And the exhibit to

23   Mr. Dondero's is not being offered for the truth of

24   the matter asserted, just the state of mind of Farallon.

25                    THE COURT:  Okay.

 1              MR. McENTIRE:  He has proved it up

 2  that it's authentic.  It's a true and accurate copy.

 3              And it goes to the state of mind of

 4  Farallon and it goes to the state of mind of Mr. Seery

 5  as well who are basically individuals who are trading on

 6  inside information.

 7              And Mr. Seery would not have known about

 8  the MGM sale but for that email.  And Farallon and

 9  Stonehill would not know about MGM but for Mr. Seery.

10              THE COURT:  Okay.  So the response to

11  hearsay is that it goes to state of mind.

12              MR. McENTIRE:  It goes to state of mind.

13              THE COURT:  Okay, Counsel.  How do you

14  respond to that?

15              MR. SCHULTE:  I'll start with the last

16  one, Your Honor.  I think that's the definition of

17  hearsay, is that you're purporting to establish the

18  state of mind of the parties who are not before the

19  court.

20              It's been emphasized that Mr. Dondero has

21  no relation to HMIT.  And none of the recipients of the

22  email are parties to this proceeding.

23              This purports to establish the state of

24  mind of Mr. Seery, who is not before the court, and the

25  state of mind of Farallon, just based on the say so of

1    Mr. Dondero in this email.  That's hearsay.

2              And as for the first letter, this is a

3    letter on the letterhead of A&M which, by the way, is

4    one of the parties in the Dondero Rule 202 petition.

5              And it's not on the letterhead of any of

6    the parties to this case so the letter isn't properly

7    authenticated.

8              And I'm not aware of the not controversial

9    exception to hearsay.

10             THE COURT:  Well, there is a thing that

11   talks about if you're admitting something that's just

12   not controverted.  Right?  It's everybody agrees "X"

13   happened.  We're just admitting evidence to have that.

14   So what this basically is is just showing the claim of

15   the funds.

16             And I guess my question is what's the

17   objection.  Is there an objection to the substance of

18   it?

19             MR. SCHULTE:  I don't think there's any

20   dispute that Farallon and Stonehill, through their

21   respective special purpose entities, purchased the

22   claims that are at issue here.

23             And if that's the sole purpose

24   of admitting this letter into evidence, I don't

25   think that's a matter that's genuinely in dispute.

```
 1                    THE COURT:  Okay.

 2                    MR. SCHULTE:  So if that's the only issue

 3   as raised by this letter, I don't know that there's a

 4   dispute there.

 5                    THE COURT:  Right.  Well, that's the whole

 6   thing.

 7                    MR. McENTIRE:  I think we're almost

 8   solving the issue on the fact of how much they paid,

 9   $75 million.

10                    THE COURT:  Okay.  So I will sustain the

11   objection to the email to Mr. Dondero's declaration,

12   Exhibit P 2-1.

13                    I am going to overrule the objection

14   to -- I don't know what the letter is of the attachment.

15                    MR. McENTIRE:  It's Exhibit P 1-H to

16   Mr. Patrick's affidavit.

17                    THE COURT:  Correct.  Sorry.

18                    Okay, Counsel.  If you'll proceed.

19                    MR. SCHULTE:  May I approach the bench,

20   Your Honor?  I have a binder of exhibits also.

21                    THE COURT:  Yes, you may.

22                    MR. SCHULTE:  These have all been

23   marked with exhibit stickers already.  There are tabs

24   for each of the exhibits.  They're marked R1 through 17,

25   I believe.  And "R," of course, stands for Respondents.
```

```
 1                    THE COURT:  I take the shortcut of calling
 2   everybody "Plaintiff" and "Defendant" just because
 3   I'm so used to using that language in court.
 4                    But I do agree.  It's Petitioner
 5   and Respondent.  You're not technically a defendant.
 6                    Okay.  So, first of all, I'm going to
 7   admit Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2,
 8   with the sole exception of the email to Mr. Dondero's
 9   declaration that I sustained.
10                    And then are there objections to the
11   respondent's exhibits?
12                    MR. McENTIRE:  Very few.
13                    I object to Exhibit No. 1 and
14   Exhibit No. 2 as irrelevant.
15                    THE COURT:  What's the objection to 1?
16                    MR. McENTIRE:  They're offering the order
17   from Judge Purdy.
18                    THE COURT:  Okay.  I can take judicial
19   notice of that.  I mean, it's a court record from
20   Dallas County.  So I don't think that that's
21   particularly relevant.
22                    To be bluntly honest, I looked at it last
23   night.  Right?  Because of the issue that there's
24   a related case, I pulled that file too and looked
25   at everything.
```

1            So I can take judicial notice of that.

2   Whether it's relevant or not, I can look at it.  And,

3   obviously, if it's not relevant, I'll disregard it.

4            MR. McENTIRE:  Fair enough.

5            THE COURT:  I'll overrule that objection.

6            What's next?

7            MR. McENTIRE:  The only other objections

8   are Exhibit 12 and 13.  I just don't know what they

9   are or for what purpose they would be offered.

10            THE COURT:  Okay.  So 12 is a notice of

11  appearance and request for service in the bankruptcy

12  court on behalf of Hunter Mountain Trust.

13            So what's the issue, Counsel?

14            MR. SCHULTE:  Your Honor, these are

15  notices of appearance filed by Hunter Mountain in the

16  bankruptcy court.

17            And the purpose of these notices is simply

18  to show -- and maybe this is not genuinely in dispute --

19  that Hunter Mountain, through its counsel, would have

20  received notice of all the activity that was going on

21  in the bankruptcy court.

22            THE COURT:  It's the same issue I've

23  got with everything that Plaintiff submitted.  It's a

24  bankruptcy pleading.  I can take notice of it.  If it's

25  irrelevant, I'll disregard it.

1          So I'll overrule that objection.

2          And then what's 13?

3          MR. McENTIRE:  The same objection.

4          THE COURT:  I'll overrule it because

5 again, I can take judicial notice of those.

6          MR. McENTIRE:  No other objections,

7 Your Honor.

8          THE COURT:  So Respondent's Exhibits

9 1 through 17 are so admitted.

10          MR. SCHULTE:  May I proceed, Your Honor?

11          THE COURT:  Yes, you may.

12          MR. SCHULTE:  HMIT -- Hunter Mountain --

13 races into this court seeking extensive and burdensome

14 presuit discovery about claims trading that took place

15 in the Highland bankruptcy two years ago.

16          Mr. McEntire has talked about the harm

17 that would result from delay if a different court were

18 to consider this request for presuit discovery.  That is

19 a function of waiting two years after the subject claims

20 transfers to seek relief in this court.

21          The exact same allegations of claims

22 trading and misconduct by Jim Seery -- those allegations

23 are not on the slides that you looked at.  But those

24 allegations are common in Mr. Dondero's Rule 202

25 petition and this petition.

1              THE COURT:  Right.  They're common.

2              I know you make the allegation that

3    Dondero is related to Hunter Mountain, but I guess

4    I don't have any evidence of that.

5              Or do you have evidence of that?  Because

6    otherwise, while it involves some of the same issues in

7    the sense of the underlying facts, technically Farallon

8    is the common respondent.

9              But there's a different respondent and

10   there's a different petitioner in that case.

11             MR. SCHULTE:  Yes.  That's true,

12   Your Honor.  And we've said that on information and

13   belief.

14             THE COURT:  Okay.

15             MR. SCHULTE:  That's our suspicion.

16             We believe that to be the case, but

17   I don't have evidence of it.  I didn't hear a denial

18   of it, but, nevertheless, that is where things stand.

19             But what's important about the case is

20   even if this court and Judge Purdy determined that the

21   cases are not related, what is important is that the

22   same allegations related to this claims trading and the

23   same allegations of inside information being shared by

24   Mr. Seery, those were front and center in the July 2021

25   petition filed by Mr. Dondero.

1            Even if there are other dissimilarities

2      between the cases, those are issues that are common.

3            THE COURT:  Okay.

4            MR. SCHULTE:  And it's important to note

5      that as HMIT has filed this petition, it has glossed

6      over issues of its own standing and the assertion of

7      viable claims that will justify this discovery.

8            Now, I know that HMIT has cited these

9      cases that say, Your Honor, I don't have to state a

10     really specific claim right now.

11           But you do have to articulate some ground

12     for relief, some theory, that would justify the expense

13     and the burden that you're trying to put the respondents

14     to in responding to all this discovery.

15           And this isn't simple discovery.

16     We're talking about deposition topics with I believe

17     29 topics each and 13 sets of really broad discovery

18     requests with a bunch of subcategories.

19           THE COURT:  Right.

20           MR. SCHULTE:  We're not talking about some

21     minimal burden here.  This is an intrusion into entities

22     that are not parties to a lawsuit, but rather this

23     investigation.

24           And HMIT has ignored that there is

25     a specific mechanism in the bankruptcy court that's

1    available to it under federal bankruptcy Rule 2004 and

2    that the substance of HMIT's petition, which is claims

3    trading and bankruptcy, falls squarely within the

4    expertise of Judge Jernigan, the presiding bankruptcy

5    judge.

6                    THE COURT:  And I agree.  You could do

7    this in federal court.  But there's a lot of things

8    that can be done in state court or done in federal

9    court.

10                   They get to choose the method of getting

11   the information, so why should I say, theoretically,

12   yes, this is a good thing, I should do it, but, hey,

13   send it to bankruptcy.  Why?

14                   MR. SCHULTE:  The bankruptcy judge has

15   actually answered that question directly.

16                   THE COURT:  Okay.

17                   MR. SCHULTE:  It is true, as HMIT

18   has said, the federal bankruptcy court doesn't have

19   jurisdiction over a Rule 202 proceeding.  That's not in

20   dispute.

21                   THE COURT:  Right.

22                   MR. SCHULTE:  We tried to remove the

23   last case to federal bankruptcy court and it was a state

24   claim.

25                   But what the bankruptcy judge pointed out

 1  when she remanded the case back to Judge Purdy, who

 2  ended up dismissing Dondero's petition, is it pointed

 3  out, one, there's this mechanism in bankruptcy where

 4  they can do the exact same thing, Rule 2004.

 5            And the bankruptcy judge pointed out that

 6  it is in the best position to consider Hunter Mountain's

 7  request.

 8            It pointed out when it remanded the

 9  case that it had grave misgivings about doing so.

10  It confirmed that it is in the best position to

11  consider this presuit discovery.

12            THE COURT:  Okay.  This is part of one of

13  the exhibits?

14            MR. SCHULTE:  Yes, Your Honor.  This is

15  in one of the opinions that I included in the binder,

16  a courtesy copy of one of those opinions.

17            THE COURT:  Oh, at the back?

18            MR. SCHULTE:  Yes, Your Honor.

19            THE COURT:  Okay.

20            MR. SCHULTE:  It's 2022 Bankruptcy

21  Lexis 5.

22            THE COURT:  Okay.  I got it.

23            And real quick, for the record,

24  it's <u>Dondero versus Alvarez & Marsal</u>.  It's

25  2022 Bankruptcy Lexis 5.

1              MR. SCHULTE:  Right.

2              And in particular, Your Honor, I'm looking

3    at pages 31 to 32 of that order.

4              THE COURT:  Okay.

5              MR. SCHULTE:  What the judge is pointing

6    out here is it has grave misgivings about remanding the

7    case because it knows a thing or two about the Highland

8    bankruptcy, having presided over the case and all the

9    related litigation for over what's now three years.

10             And it's familiar with the legal

11   and factual issues.  It's familiar with the parties.

12   It's familiar with claims trading in a bankruptcy case,

13   which was the very crux of the Dondero petition.  It's

14   also the crux of this petition by Hunter Mountain.

15             And it observed, the bankruptcy court

16   did, that any case that could be fashioned from the

17   investigation would end up in bankruptcy court anyway

18   because it would be related to the Highland bankruptcy.

19             So you ask a really good question,

20   Your Honor.  Why should I ship it off to the bankruptcy

21   court.  The answer is Judge Jernigan is in a position

22   to efficiently and practically deal with this request

23   because she deals with it all the time and she is

24   intimately familiar with the legal and factual

25   issues and with claims trading.

1          It's not like Hunter Mountain gets poured

2     out if it goes to bankruptcy court.  It has a mechanism

3     to seek the exact same discovery from Judge Jernigan who

4     is very familiar with these very particular issues.

5          Now, Hunter Mountain says, well,

6     bankruptcy court is too time-consuming and cumbersome.

7     It's going to take 60 days to even get this before the

8     bankruptcy court.

9          Well, we're talking about the fact that

10    they've waited two years to file this proceeding related

11    to these claims transfers that took place in 2021.

12         So, again, what HMIT is asking this court

13    to do is inefficient and is impractical.  This court

14    would need to devote a lot of resources to understand

15    what the proper scope of any discovery should be,

16    whether the claims are cognizable.

17         And that's just a tall order, Your Honor.

18    The request is more appropriately dealt with by the

19    bankruptcy judge, according to a proper bankruptcy

20    filing.

21         It's undisputed that while the bankruptcy

22    court doesn't have jurisdiction over a 202 petition,

23    there's no question that it has jurisdiction over a Rule

24    2004 request for discovery, which is the counterpart

25    for this type of discovery in bankruptcy court.

1              THE COURT:  Right.

2              MR. SCHULTE:  The real issue, Your Honor,

3    and this is the part that Hunter Mountain is dancing

4    around, is that Hunter Mountain doesn't want to be

5    in front of Judge Jernigan.

6              Judge Jernigan held Mark Patrick --

7    that is HMIT's principal who verified this petition.

8    She held him along with Dondero and Dondero's counsel

9    and others in civil contempt and sanctioned them nearly

10   $240,000 for trying to join Seery to a lawsuit in

11   violation of Judge Jernigan's gatekeeping orders.

12             HMIT is trying to dodge the bankruptcy

13   court and its scrutiny of what HMIT is doing as this

14   petition also targets Seery and the inside information

15   that he purportedly gave to Farallon and Stonehill.

16             This is forum shopping, plain and simple.

17   And the court should dismiss the petition so that HMIT

18   can seek this discovery in bankruptcy court.

19             Now, I don't want to spend a lot of time

20   on the related case, but I will emphasize just what I've

21   mentioned, which is while some of the parties may be

22   different, we're still talking about the same claims

23   trading activity that took place in 2021 and the same

24   allegations of insider dealing by Seery.

25             And Judge Purdy, on remand, dismissed

1   that petition where some of the same arguments were made

2   about judicial efficiency and that the case should be

3   filed in bankruptcy court.

4            And it bears noting, by the way, that

5   after Judge Purdy dismissed Dondero's Rule 202 petition,

6   where we had argued that this ought to be in the

7   bankruptcy court, Dondero didn't file in the bankruptcy

8   court, which sort of makes the point that they didn't

9   want to be in front of Judge Jernigan on this either.

10           Okay.  Now let's turn to the merits,

11  Your Honor.  While Mr. McEntire has gone to great

12  lengths to say we don't have to state claims, he stated

13  five or six on that PowerPoint presentation of claims

14  that he envisions.

15           But what made it all really crystal clear

16  is in that notice of supplemental evidence, and that

17  includes the declaration of Mr. Patrick, there in

18  paragraphs 15 and 16 it's made clear what Hunter

19  Mountain really wants.

20           THE COURT:  Okay.

21           MR. SCHULTE:  What the goal of this

22  discovery is is to invalidate the claims that Farallon

23  and Stonehill's entities purchased.

24           So let's unpack what it is they purchased.

25           THE COURT:  Okay.

 1                MR. SCHULTE:  These are claims that were

 2   not ever held by Hunter Mountain.  These are claims

 3   that were held by Redeemer, Acis, UBS, and HarbourVest.

 4                THE COURT:  Right.  They were the Class 8

 5   and 9.  Right?

 6                MR. SCHULTE:  I believe that's correct.

 7                THE COURT:  Okay.

 8                MR. SCHULTE:  Those claims were always

 9   superior to whatever it was that Hunter Mountain held.

10                So Redeemer, Acis, UBS, and HarbourVest

11   held those claims.  The parties in the bankruptcy had

12   the opportunity to file objections to those claims.

13   And they did.

14                And Seery, on behalf of the debtor,

15   negotiated with Redeemer, Acis, UBS, and HarbourVest

16   and reached settlements that resolved the priority and

17   amounts of those claims.

18                THE COURT:  Right.

19                MR. SCHULTE:  And then filed what's

20   referred to -- and I'm sure Your Honor knows this --

21   as a Rule 9019 motion to approve those settlements in

22   the bankruptcy court.

23                THE COURT:  Actually, I don't.  I've never

24   done bankruptcy but I read it.  I know the general

25   process and I did read it.

1                  MR. SCHULTE:  All right.

2                  THE COURT:  Just FYI, I've never done

3    bankruptcy law.  They've got their own rules.

4                  MR. SCHULTE:  Well, the parties in

5    the bankruptcy had the opportunity to object to those

6    settlements and some did so.

7                  And after evidentiary hearings, the

8    bankruptcy court granted those motions and allowed

9    and approved those claims.

10                 That is really important, Your Honor.

11                 THE COURT:  Okay.

12                 MR. SCHULTE:  That's Exhibits 14 through

13   17 in the binder that I handed you.

14                 And these are the same exhibits that are

15   referenced in Hunter Mountain's petition.  And it bears

16   noting that the U.S. District Court affirmed those

17   orders after appeals were taken.

18                 But the bankruptcy court's approval of

19   the very same claims that Hunter Mountain now seeks to

20   investigate and invalidate is entitled to res judicata.

21                 HMIT can't now second-guess the bankruptcy

22   court's orders approving those very same claims.  That's

23   the effect of the investigation that Hunter Mountain

24   seeks, the invalidation of claims that are already

25   bankruptcy court approved.

 1              And it bears noting that each of those

 2    four orders, Exhibits 14 through 17, provides the

 3    following:  quote, "The court" -- the bankruptcy

 4    court -- "shall retain exclusive jurisdiction to

 5    hear and determine all matters arising from the

 6    implementation of this order."

 7              This would include HMIT's stated goal

 8    of conducting discovery to try to invalidate these

 9    very claims.

10              This is yet another reason, Your Honor, to

11    answer your question earlier of why this request for

12    discovery should be posed to the bankruptcy court.

13              Judge Jernigan, I suspect, would have

14    views on whether her own orders authorizing these claims

15    should be overturned.

16              Okay.  So HMIT -- Hunter Mountain --

17    alleges that after the bankruptcy court approved these

18    claims, Seery disclosed inside information to Farallon

19    and to Stonehill to encourage them to buy these claims

20    from the original claimants.  Again, UBS, Redeemer,

21    Acis, and HarbourVest.

22              Farallon, through Muck, which is its

23    special purpose entity, and Stonehill through Jessup,

24    which is Stonehill's special purpose entity, acquired

25    those transferred claims in 2021.

1              And there's no magic in bankruptcy court

2   to claims transfers.  It's a contractual matter between

3   the transferors and the transferees.  It's strictly

4   between them.

5              THE COURT:  Okay.

6              MR. SCHULTE:  And there's no bankruptcy

7   court approval that's even required.

8              The transferee, so in this case Muck and

9   Jessup, had simply to file under federal bankruptcy

10  Rule 3001(e) a notice saying these claims were

11  transferred to us.  And they did so.

12             Your Honor, that's Exhibit 6 through 11 in

13  the binder that I handed to you.

14             THE COURT:  Okay.

15             MR. SCHULTE:  The filings evidencing those

16  claims transfers were public.  And Hunter Mountain

17  received the claims transfer notices.

18             And that's the exhibits that we were

19  talking about, Exhibits 12 through 13, where Hunter

20  Mountain's lawyers had appeared in the case before those

21  claims transfer notices were filed.

22             So not surprisingly, Hunter Mountain did

23  not file any objections to those claims transfers.  And

24  that's not surprising because under Rule 3001, the only

25  party that could object to the claims transfers were

1  the transferors themselves.

2              THE COURT:  Right.

3              MR. SCHULTE:  Essentially saying, hold on.

4  We didn't transfer these claims.  But of course there's

5  no dispute that the transfers were made.

6              Here, HMIT was neither the transferor nor

7  the transferee of the claims.  It had no interest in

8  these claims.  It never did.  It didn't before the

9  claims transfers and it didn't after the claims

10 transfers.

11             The claims originally belonged to

12 Redeemer, Acis, UBS, and HarbourVest, and they were then

13 transferred to Muck and Jessup, which are Farallon's and

14 Stonehill's entities.

15             THE COURT:  Right.

16             MR. SCHULTE:  So why does that matter?

17 That matters because these claims were approved by the

18 bankruptcy court.  The claims didn't change or become

19 more valuable after they were transferred.  The only

20 difference is who is holding the claims.

21             So Hunter Mountain says, hold on.  What

22 we're alleging here is that the claims that Farallon and

23 Stonehill purchased with the benefit of this purported

24 inside information from Mr. Seery, they're secretly

25 worth more than expected.

1          Those allegations, they're disputed, to be

2   sure.  But let's assume they're true.  That situation

3   has zero impact on Hunter Mountain.

4          THE COURT:  Okay.

5          MR. SCHULTE:  And that's because this is a

6   matter that's strictly between the parties to the claims

7   transfers.  Again, Redeemer, Acis, UBS, and HarbourVest

8   on the one hand and Farallon and Stonehill on the other.

9          And the way we know this is let's

10  pretend that Muck and Jessup didn't buy these claims,

11  Your Honor, and that the claims instead have remained

12  with UBS, HarbourVest, Acis, and whatever the other

13  one I'm forgetting.  The claims wouldn't have been

14  transferred, and they would have remained with those

15  entities.

16          In that case, the original claimants would

17  have held those claims for longer than they wanted.  And

18  if HMIT is right, then the claims would have ended up

19  being worth more than even they expected.

20          So why does that matter?  Well, that

21  matters because if that is all true, Hunter Mountain

22  would be in the exact same place today.  Neither better

23  nor worse off, it would be in the exact same place.

24          Either Farallon and Stonehill's entities

25  are gaining more on these claims than they expected

1  or UBS, HarbourVest, Acis, and Redeemer, they are

2  realizing more on these claims than they expected.

3            But Hunter Mountain never stood to be paid

4  on these claims to which it was a stranger.  These are

5  claims in which Hunter Mountain never had any interest.

6            THE COURT:  So presuming that Hunter

7  Mountain had expressed interest in buying these claims

8  and there was insider trading, you don't think that

9  would be a tortious interference in a potential

10 contract?

11           MR. SCHULTE:  If there was insider trading

12 of the type that Hunter Mountain alleges in this case,

13 it would have no impact on the rights of Hunter

14 Mountain.

15           If that's true, maybe there was a fraud on

16 the bankruptcy court.  The bankruptcy court would surely

17 be interested in that.  Maybe there was a fraud on the

18 transferors.  I mean, maybe UBS, Redeemer, Acis -- why

19 do I always forget the third one? -- and HarbourVest.

20           THE COURT:  Like I said, I had a chart

21 last night of all the names.  Obviously, I haven't been

22 involved in this case up until now, and there's a lot of

23 names.

24           MR. SCHULTE:  Yes.

25           The transferors of the claims might say,

1   well, wait a minute.  I wish I would have known this

2   inside information.  I'm the one that was really injured

3   here.

4              Because if there was really meat on this

5   bone, Your Honor, then the injured parties would be

6   the transferors of the claims:  Redeemer, Acis, UBS,

7   and HarbourVest.

8              Because the crux of HMIT's petition is

9   that those entities, the transferors, were duped into

10  selling their claims for too little when the claims were

11  secretly worth more.

12             Well, if that's true, you would expect

13  that the transferors would be screaming up and down

14  the hallway, saying we didn't get paid enough.

15             THE COURT:  Right.

16             MR. SCHULTE:  We are the injured parties

17  here, we are the ones with damages, we want to unwind

18  these claims transfers, or we want to be paid more on

19  these claims transfers.

20             But the rights of those entities,

21  the transferors, to complain about these allegations

22  doesn't mean that Hunter Mountain can also stand up and

23  say, well, I want to complain too.  Because Hunter

24  Mountain never stood to be paid on these claims.

25             The question is if somebody was duped,

 1  if somebody was injured, if anybody it was the

 2  transferors, not Hunter Mountain.  The transferors would

 3  be the only real parties in interest that would have

 4  been injured by what Hunter Mountain alleges.

 5              But it's notable that none of those

 6  transferors has filed an objection to these transfers.

 7              THE COURT:  Right.

 8              MR. SCHULTE:  None of them has filed a

 9  Rule 202 proceeding.  None of them has filed a Rule 2004

10  proceeding seeking discovery about inside information

11  that Farallon and Stonehill allegedly had.  It is

12  Hunter Mountain who is an absolute stranger to

13  these claims trading transactions.

14              And so HMIT is trying to inject itself

15  into a transaction to which it was never a party and

16  which it never had any interest.

17              The sellers were entitled to sell those

18  claims to any buyer they wanted to on whatever terms

19  they agreed to.

20              And if there was some information that

21  they didn't have the benefit of that the buyers did,

22  you would expect the transferors, if anyone at all,

23  to be the ones complaining about it.  But that's not

24  what we have here.

25              THE COURT:  Okay.

 1              MR. SCHULTE:  All right.  Another note

 2  that Hunter Mountain glosses over is duty.

 3              So all the claims that were listed on

 4  the PowerPoint all require that there must have been

 5  some kind of a duty owed by Farallon and Stonehill to

 6  Hunter Mountain.  But there's no duty owed to a stranger

 7  to a claims trading transaction.

 8              Yet again, if anybody were to have a

 9  duty owed to it, I guess it would be the transferors

10  of the claims even though that was an arm's length

11  transaction.

12              But it's not a stranger to the transaction

13  and a stranger that has no interest in the claims that

14  we're talking about here.

15              THE COURT:  Okay.

16              MR. SCHULTE:  Nor has Hunter Mountain

17  identified any authority for a private cause of action

18  belonging to Hunter Mountain related to these claims

19  transfers.

20              Hunter Mountain doesn't have the right to

21  assert claims on behalf of other parties.  It only has

22  the right to assert claims on behalf of itself when it

23  has been personally aggrieved.

24              I heard Mr. McEntire say several times

25  during his presentation that Hunter Mountain had a

 1   99.5 percent equity interest in Highland Capital.

 2                   THE COURT:  Right.

 3                   MR. SCHULTE:  I think it's important to

 4   point out that that equity interest was completely

 5   extinguished by the confirmed plan in the bankruptcy

 6   case.

 7                   As Your Honor pointed out, we have the

 8   waterfall, and Classes 1 through 9 have to be paid in

 9   full.  And you know what Classes 8 and 9 are?  General

10   unsecured claims and subordinated claims.

11                   And the only way that Hunter Mountain

12   is ever in the money, as Mr. McEntire was saying, with

13   its Class 10 claim is if Seery, the claimant trustee,

14   certifies that all claims in 1 through 9 are paid in

15   full 100 percent with interest and all indemnity claims

16   are satisfied.

17                   There has been no such certification by

18   Mr. Seery, and there may never be such a certification

19   by Mr. Seery.

20                   THE COURT:  Okay.

21                   MR. SCHULTE:  So that is real important

22   because the idea that Hunter Mountain stands to somehow

23   gain from this transaction is flawed for the reasons

24   we've already talked about.

25                   But it's also flawed because they have

 1    what is, at best, a contingent interest.  It's

 2    contingent on things that have not yet occurred.  And

 3    under the case law, they don't have standing conferred

 4    on them in that interest.

 5               THE COURT:  Okay.

 6               MR. SCHULTE:  So for all those reasons why

 7    there is no interest in the claims, no legal damages, no

 8    duty owed to it, no private cause of action belonging

 9    to it and a hypothetical and contingent interest, HMIT

10    lacks standing to investigate or challenge these claims

11    and claims transfers to which it was not a party and in

12    which it had zero interest.

13               And for any or all of the reasons

14    we've talked about, Your Honor, their petition should be

15    dismissed.  I welcome any questions the court may have.

16               THE COURT:  No.  My head is kind of

17    spinning.  Like I said, I spent all day yesterday

18    reading stuff.  As I said, I will admit I've never

19    practiced bankruptcy law.

20               I mean, my joking statement is I pretty

21    much know enough to not be in contempt of bankruptcy

22    court.  Because I have cases where one of the defendants

23    or one of the parties ends up in bankruptcy court and

24    whether or not I can proceed with my case, et cetera.

25    That's my whole goal is not to be in contempt of court.

 1                  MR. SCHULTE:  That should be the goal, is

 2     to not be in contempt of the bankruptcy court.

 3                  MR. McENTIRE:  May I have just five or ten

 4     minutes?

 5                  THE COURT:  I don't have another hearing,

 6     so we're fine on time.

 7                  MR. McENTIRE:  All right.  In all due

 8     deference to Mr. Schulte, the last 15 minutes of his

 9     argument misstates the law.

10                  THE COURT:  Okay.

11                  MR. McENTIRE:  The Washington Mutual case

12     addresses almost 90 percent of what he just talked

13     about.  Their equity was entitled to bring an action

14     to basically disallow an interest that was acquired by

15     inside information.

16                  Okay.  And so he has not addressed the

17     Washington Mutual case at all.

18                  THE COURT:  Well, okay.  So my question

19     is let's say that the insider trading didn't happen.

20                  I mean, when I was playing with the

21     numbers last night, it doesn't appear that Hunter

22     Mountain, being Class 10, would have gotten anything

23     anyways even if.  Right?

24                  Like I said, I did a lot of reading last

25     night, so I want to make sure I understand.

 1                    MR. McENTIRE:  Fair enough.  I think I can

 2   address that.

 3                    The bottom line is a wrongdoer should

 4   not be entitled to profit from his wrong.  That's

 5   the fundamental premise behind the restatement on

 6   restitution.  That's the fundamental purpose of

 7   the <u>Washington Mutual</u> case.

 8                    You have remedies, including disgorgement,

 9   disallowance or subordination.

10                    THE COURT:  I'm just trying to be devil's

11   advocate because I'm trying to work through this.

12                    So let's say it did happen and the court

13   ordered disgorgement and invalidated these transfers,

14   then the money would just go to the Class 8 and

15   Class 9.  Right?  To Acis, UBS, HarbourVest, etc.

16                    MR. McENTIRE:  No, they would not.

17   Because those claims have already been traded.

18                    THE COURT:  Okay.  Well, that's

19   what I'm saying.

20                    If the court said there was insider

21   trading and to disallow the transfer and ordered

22   disgorgement, theoretically, back to Highland Capital,

23   then the money is there.

24                    Okay.  So then it would just go to Acis

25   and UBS.  Right?

 1              MR. McENTIRE:  The remedy here is to

 2   subordinate their claims.  HarbourVest, UBS, Acis, and

 3   the Redeemer committee have sold their claims.  They can

 4   intervene if they want and that's up to them.  If they

 5   want to take the position that they were defrauded,

 6   that's up to them.

 7              THE COURT:  Okay.

 8              MR. McENTIRE:  Otherwise, the remedy is to

 9   disgorge the proceeds and put them back into the coffers

10   of the bankruptcy court in which case Category 8 and 9

11   would be brimful, overflowing, and flow directly into

12   the coffers in Class 10.

13              And that's the purpose of 15 and 16 in

14   Mr. Patrick's affidavit.

15              THE COURT:  Okay.

16              MR. McENTIRE:  I find it amazing that he

17   refers to Judge Jernigan's orders where he said anything

18   dealing with these claims must come back to me.  I have

19   exclusive jurisdiction.  I recall that argument.

20              THE COURT:  Right.

21              MR. McENTIRE:  Well, she could have

22   accepted the removal of Mr. Dondero in that other

23   proceeding.  She didn't.  She said I don't have

24   jurisdiction over this.  I'm sending it back to

25   the state court.

1          THE COURT:  Okay.  Because it was filed

2     as a 202.  If it had been filed as a Rule 404, then she

3     would have had jurisdiction because you're specifically

4     invoking a state court process.  Right?

5          MR. McENTIRE:  I'm invoking exclusively

6     a state court process because of the benefit it

7     provides.  That is a strategic choice that this

8     petitioner has elected.  It has nothing to do with

9     bankruptcy court, other than bankruptcy court is too

10    slow.

11         All the invective about the prior contempt

12    order has nothing to do with these proceedings.

13    Mr. Dondero is not involved in these proceedings.

14         If HarbourVest and UBS want to intervene

15    in some subsequent lawsuit, they have a right to do so.

16    I can't stop them.

17         But until then, we have stated a cause

18    of action or at least a potential cause of action which

19    is insider trading.  That from an outsider makes them an

20    insider that owes fiduciary duties to the equity.

21         Washington Mutual allowed equity to come

22    in and disallow those claims.  And if those claims are

23    disallowed, the Class 10 is going to be overflowing on

24    the waterfall.  And that's my client.

25         A couple of other things.  Hunter Mountain

```
 1   is not a stranger.  Hunter Mountain was the big elephant
 2   in the room until the effective date of the plan.
 3              We held 99.5 percent of the equity stake
 4   and when all of these wrongdoings occurred, Hunter
 5   Mountain was still the 99.5 percent equity stakeholder.
 6              It's only after the bankruptcy plan had
 7   gone effective, after these claims had already been --
 8              THE COURT:  Wait.  The insider trading
 9   happened after the bankruptcy had been filed but before
10   the bankruptcy was resolved.
11              So it's during that process.  Right?
12              MR. McENTIRE:  You have filing a
13   bankruptcy.  You have a bankruptcy plan.  You have
14   confirmation of the plan, but it doesn't go effective
15   until six months later.
16              THE COURT:  Right.
17              MR. McENTIRE:  After the bankruptcy
18   plan was confirmed and they had dismal estimates of
19   recovery -- 71 percent on Class 8, zero percent on
20   Class 9 -- that's when Farallon and Stonehill purchased
21   the claims.
22              But they purchased the claims at a time
23   before the bankruptcy wasn't effective.  And so the
24   so-called claimant trust agreement had not gone into
25   effect until several months later.
```

```
 1                    THE COURT:  Okay.

 2                    MR. McENTIRE:  And during this period of

 3   time Hunter Mountain was the very, very largest

 4   stakeholder.

 5                    THE COURT:  Okay.

 6                    MR. McENTIRE:  And so to call it a

 7   stranger is just not right and it's not fair because

 8   we're anything but a stranger.

 9                    They make an argument that Hunter Mountain

10   didn't object to the settlements.  Well, so what?

11   I'm not attacking the underlying settlements.

12   I'm attacking the claims transfers.

13                    And then he says, well, why didn't they

14   object to the claims transfers.  Well, he finally

15   conceded that the claims transfers are not actually

16   subject to a judicial scrutiny by the bankruptcy court.

17                    This court is uniquely qualified to

18   review these claims transfers as is Judge Jernigan.

19   Insider information is insider information as a rose

20   is a rose is a rose.  And any court of law is qualified

21   to determine whether insider information was used.

22                    Judge Jernigan did not say, okay,

23   Farallon, you can buy this claim.  There was no

24   judicial process here.

25                    THE COURT:  Right.  I mean, it's a motion.
```

 1  We want to do this, just get approval.

 2                MR. McENTIRE:  They don't even have to get

 3  approval.

 4                THE COURT:  Okay.

 5                MR. McENTIRE:  All they have to do is file

 6  notice.

 7                THE COURT:  Okay.  File the notice.

 8                MR. McENTIRE:  Judge Jernigan was not

 9  involved at all.

10                We had no reason to object.  All we know

11  there's a claims transfer.  It's not until later that

12  we discover that inside information was used and that's

13  why we're here.

14                So we didn't object to the original

15  claims.  There was no need to.  The original settlements

16  rather.  There was no need to.  There was no objection

17  to the claims transfers.

18                There was no mechanism to object, other

19  than what we're doing here today.  This is our

20  objection.  This is our attempt to object.

21                Because we believe that they have acquired

22  hundreds of millions of dollars of ill-gotten gain and

23  if that is true, not only will Hunter Mountain be

24  benefited tremendously, but other unsecured creditors.

25  They are very few but they will be also benefited.

 1                    Frankly, Judge Jernigan may want that to
 2    happen.
 3                    THE COURT:  Okay.
 4                    MR. McENTIRE:  But we're here to get the
 5    discovery so I can pull it all together within the next
 6    30 days or 40 days.  So I can make decisions before
 7    somebody might suggest, hey, well, you should have
 8    filed this a little bit earlier.
 9                    And so, Judge, that's why we're here,
10    in the interest of time.  And that was my decision.
11    That was my strategic decision to bring it here.
12                    THE COURT:  Right.
13                    MR. McENTIRE:  He says that Rule 3001 is
14    the exclusive remedy.  Only transferors can complain
15    about transferees or vice versa.
16                    THE COURT:  You're not necessarily
17    complaining about the actual transfer.  It's how
18    the transfer came about.
19                    MR. McENTIRE:  That's right.
20                    And to suggest that that is the governing
21    principle that this court should consider is an absolute
22    contradiction to the Washington Mutual case.
23                    Because if fraud is in play, if inside
24    information is in play, then it impacts everyone who
25    is a stakeholder.  Everyone.

 1                    THE COURT:  Okay.

 2                    MR. McENTIRE:  And we are one of the

 3    largest stakeholders in the bankruptcy proceedings,

 4    even today.  So that's all I have.

 5                    I thank you for your attention,

 6    Your Honor.  Clearly, the benefit here is we get to

 7    uncover some things that need to be uncovered.  And

 8    we'd like to do it so in a timely fashion.

 9                    And if we don't have a claim, we don't

10    have a claim.  If we have a claim, then we may file it

11    in a state district court.

12                    And if Judge Jernigan and her gate-keeping

13    orders require us to go there, we'll go there.  I'm not

14    going to run afoul of any rule she has, but we need to

15    get this underway.

16                    THE COURT:  Okay.

17                    MR. SCHULTE:  Your Honor, may I make some

18    rifle-shot responses?

19                    THE COURT:  Yeah.  That's fine.

20                    MR. SCHULTE:  Okay.  Mr. McEntire has said

21    that they are one of the largest stakeholders in the

22    Highland bankruptcy based on this 99.5 percent equity.

23    That equity was extinguished in the fifth amended plan.

24                    That's Exhibit 3 that I handed you,

25    Your Honor.  That plan was filed in January of 2021

1   before any of these claims transfers took place.

2   The equity was extinguished by virtue of the plan.

3                THE COURT:  Okay.

4                MR. SCHULTE:  Mr. McEntire was talking

5   about this <u>Washington Mutual</u> case.  I read the case.

6                But what he said repeatedly, and I think

7   it's really important to listen to what Mr. McEntire

8   said about this case, is that that court allowed the

9   equity to come in and talk about these transfers.

10               Hunter Mountain doesn't have any equity.

11  That equity was extinguished in the plan for reasons

12  I just discussed.  So for being the largest stakeholder,

13  according to Mr. McEntire, in the bankruptcy what does

14  Hunter Mountain have to show for that?  A Class 10.

15               As Your Honor pointed out, a Class 10

16  interest, that is below everybody else.  And that's

17  where they've been relegated.

18               And to answer your question, Your Honor,

19  that you posed to Mr. McEntire that I'm not sure was

20  ever answered, HMIT -- Hunter Mountain -- at Class 10

21  stood to gain nothing when the plan was put together.

22  So the largest stakeholder stood to gain nothing.

23               I've pointed to the language in the

24  court's order about how the court has exclusive

25  jurisdiction.

```
 1                    And Your Honor nailed the answer to the
 2    concern raised by Mr. McEntire, which is the bankruptcy
 3    court didn't have jurisdiction over a 202 proceeding.
 4    But it unquestionably has authority over the
 5    counterpart, 2004 in bankruptcy court.
 6                    THE COURT:  Right.
 7                    MR. SCHULTE:  Finally, I have never argued
 8    and if I did say this, I apologize.  I have never argued
 9    that Hunter Mountain is somehow a stranger to the
10    bankruptcy.
11                    THE COURT:  Right.  They were obviously
12    involved in the bankruptcy, but they're a stranger to
13    these transfers.
14                    MR. SCHULTE:  Exactly.  They were a
15    stranger to these transactions.  They didn't have any
16    interest in these claims.
17                    They don't stand to gain anything if
18    the claims are either rescinded or if the claims are
19    invalidated or the transfers are invalidated.  They
20    don't stand to get anything because they never had
21    any interest in these claims.
22                    The claims are the claims and either UBS,
23    Redeemer, Acis, and HarbourVest stood to gain more than
24    expected or Farallon and Stonehill stand to gain more
25    than expected.
```

```
1                   And if anybody is really injured here,

2   it's not Hunter Mountain.  It's the transferors who

3   were duped into these transfers, according to Hunter

4   Mountain.  And they would be the ones that would have

5   damage and have a claim along the lines of what

6   Hunter Mountain is trying to assert on behalf

7   of all stakeholders.

8                   Your Honor, I have a proposed order, as

9   Mr. McEntire does.

10                  May I bring it up?

11                  THE COURT:  Yes, you may.

12                  Okay, Mr. McEntire.  Anything else?

13                  MR. McENTIRE:  His last few statements are

14  inconsistent with the law, Your Honor.

15                  THE COURT:  Okay.

16                  MR. McENTIRE:  Because the law clearly,

17  clearly indicates that we are a beneficiary.  And

18  that's what the Washington Mutual case stands for.

19                  THE COURT:  Okay.  Wait.  Let me make sure

20  I know which one.

21                  Do you have a cite for that case?

22                  MR. McENTIRE:  Yes, ma'am.  It's in the

23  PowerPoint.

24                  THE COURT:  That's fine.  I just wanted

25  to make sure I could find it.
```

```
 1                    MR. McENTIRE:  There's also a Fifth
 2   Circuit case that talks about subordination where
 3   a Class 8 and Class 9 would actually be subordinated,
 4   Your Honor, to our claim.
 5                    So that's another approach to this, is
 6   subordination.
 7                    THE COURT:  Okay.
 8                    MR. McENTIRE:  And that's the In re Mobile
 9   Steel case out of the Fifth Circuit.  I think there's a
10   cite in our brief.
11                    THE COURT:  Okay.
12                    MR. McENTIRE:  I acknowledge that
13   we're now classified with a different name.  We're
14   a B/C limited partner.  And we're, in effect, a Class 10
15   beneficial interest.
16                    But we're there having been a 99.5.  And
17   the lion share of any money, 99.5 percent of any money
18   that overflows into bucket No. 10 is ours.
19                    THE COURT:  Right.
20                    Okay.  I am processing.  Obviously, I need
21   to take this into consideration.  I haven't had a chance
22   to go through Respondent's exhibits.
23                    I've looked through the plaintiff's
24   exhibits, but now I have much more of a focus of what
25   I'm doing.
```

1                        So I will try to get you all a ruling

2     by the end of next week.  I apologize.  I've got a

3     special setting next week that's going to be kind

4     of crazy, but I will do everything I can.

5                        If you all haven't heard from me by next

6     Friday afternoon, call my coordinator Texxa and tell

7     her to bug me.

8                        MR. McENTIRE:  Thank you for your time.

9                        THE COURT:  You all are excused.  Have

10    a great day.

11

12

13                        (This completes the Reporter's Record,

14                        Petitioner Hunter Mountain Investment

15                        Trust's Rule 202 Petition, which was

16                        heard on Wednesday, February 22, 2023.)

17

18

19

20

21

22

23

24

25

```
 1   STATE  OF  TEXAS  )

 2   COUNTY OF DALLAS  )

 3            I, Gina M. Udall, Official Court Reporter

 4   in and for the 191st District Court of Dallas County,

 5   State of Texas, do hereby certify that the above and

 6   foregoing contains a true and correct transcription of

 7   all portions of evidence and other proceedings requested

 8   in writing by counsel for the parties to be included in

 9   this volume of the Reporter's Record in the above-styled

10   and numbered cause, all of which occurred in open court

11   and were reported by me.

12            I further certify that this Reporter's Record

13   of the proceedings truly and correctly reflects the

14   exhibits, if any, offered by the respective parties.

15            I further certify that the total cost for the

16   preparation of this Reporter's Record is $750.00 and was

17   paid by the attorney for Respondents.

18            WITNESS MY OFFICIAL HAND on this the 1st day of

19   March 2023.

20

21                    /S/    Gina M. Udall
                     Gina M. Udall, Texas CSR  #6807
22                   Certificate Expires: 10-31-2024
                     Official Reporter, 191st District
23                   Court of Dallas County, Texas
                     George Allen Sr. Courts Building
24                   600 Commerce St., 7th Floor
                     Dallas, Texas  75202
25                   Telephone:  (214) 653-7146
```

GINA M. UDALL, CSR, RPR
Official Reporter, 191st District Court

002224

# Exhibit 4-C

002225

CAUSE NO. DC-23-01004

|  |  |  |
|---|---|---|
| IN RE: | § § § § § § § | IN THE DISTRICT COURT |
| HUNTER MOUNTAIN INVESTMENT TRUST, |  | DALLAS COUNTY, TEXAS |
| Petitioner. |  | 191ST JUDICIAL DISTRICT |

## ORDER

Came on for consideration *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* ("Petition") filed by petitioner Hunter Mountain Investment Trust ("HMIT"). The Court, having considered the Petition, the joint verified response in opposition filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"), HMIT's reply, the evidence admitted during the hearing conducted on February 22, 2023, the argument of counsel during that hearing, Farallon's and Stonehill's post-hearing brief, the record, and applicable authorities, concludes that HMIT's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that HMIT's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this ⏢ day of March, 2023.

_____

HONORABLE GENA SLAUGHTER

002226

# Exhibit 4-D

002227

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:24 AM 03/09/2021
FILED 09:24 AM 03/09/2021
SR 20210838989 - File Number 5421257

## CERTIFICATE OF FORMATION

### OF

### Muck Holdings, LLC

FIRST:  The name of the limited liability company is:

### Muck Holdings, LLC

SECOND:  Its registered office in the State of Delaware is to be located at 251 Little Falls Drive, in the City of Wilmington, Delaware, 19808, and its registered agent at such address is CORPORATION SERVICE COMPANY.

IN WITNESS WHEREOF, the undersigned, being the individual forming the Company, has executed, signed and acknowledged this Certificate of Formation this 9th day of March, 2021.

By: /s/ Hanchang Sohn
    Name: Hanchang Sohn
    Title:  Authorized Person

6109645v.1 344/05975

002228

# Exhibit 4-E

002229

# CERTIFICATE OF FORMATION

## OF

## Jessup Holdings LLC

**FIRST:**      The name of the limited liability company is Jessup Holdings LLC.

**SECOND:**    The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:**      Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

      **IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation on April 08, 2021.

                                          */s/Taylor Lolya*
                                     Taylor Lolya, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:10 PM 04/08/2021
FILED 01:10 PM 04/08/2021
SR 20211222936 - File Number 5822640

002230

# Exhibit 4-F

| From: | Roger L. McCleary |
|---|---|
| To: | Schulte, David C (DAL - X59419) |
| Cc: | Sawnie A. McEntire |
| Subject: | HMIT — court's order/HMIT's request for information |
| Date: | Thursday, March 9, 2023 3:46:00 PM |

David,

Thank you. This ruling denies Hunter Mountain Investment Trust ("HMIT") the investigatory discovery sought from Farallon Capital Management, LLC ("Farallon") and Stonehill Capital Management, LLC ("Stonehill") under Tex. R. Civ. P. 202. Accordingly, HMIT requests that Farallon and Stonehill advise whether they will *voluntarily* provide some or all of the information and documents requested in HMIT's Rule 202 Petition and, if so, under what terms. Please let us know by Tuesday, March 14th, whether Farallon and Stonehill will consider doing so. If so, we are available to discuss this at your earliest convenience.

In any event, HMIT also requests that Farallon and Stonehill *voluntarily* respond to the following two specific requests, which they can answer in a matter of minutes:

1. A simple description of the legal relationship: a) between Farallon and Muck Holdings, LLC ("Muck"), and b) between Stonehill and Jessup Holdings, LLC ("Jessup").
2. Whether: a) Farallon is a co-investor in any fund in which Muck holds an interest related to the Claims at issue in the Rule 202 Petition; b) Stonehill is a co-investor in any fund which Jessup holds an interest related to the Claims at issue in the Rule 202 Petition.

We would also appreciate prompt written responses to these two specific requests. To the extent we do not receive written responses to these two requests by close of business on Tuesday, March 14th, this will be taken as Farallon and Stonehill's refusal to provide the requested responses. Similarly, to the extent we do not receive a written confirmation of Farallon and Stonehill's willingness to discuss voluntary production of more of the information and documents requested in HMIT's Rule 202 Petition by then, this will be taken as their refusal to consider doing so.

Please let us know if you or your clients have any questions about this request. Thank you.

Regards, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmlaw.com

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you

are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of
the original message.

---

**From:** Schulte, David C (DAL - X59419) <David.Schulte@hklaw.com>
**Sent:** Wednesday, March 8, 2023 9:08 PM
**To:** Sawnie A. McEntire <smcentire@pmmlaw.com>; Roger L. McCleary <rmccleary@pmmlaw.com>
**Cc:** Timothy J. Miller <tmiller@pmmlaw.com>
**Subject:** [EXTERNAL] HMIT — court's order

Counsel--attached is a copy of the court's order in this case.

Dave

**David C. Schulte** | **Holland & Knight**
Partner
Holland & Knight LLP
1722 Routh St., Suite 1500 | Dallas, TX 75201
Cell 214-274-4141
Phone 214-964-9419
Fax 214-964-9501
david.schulte@hklaw.com | www.hklaw.com

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the
individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender
immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an
existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific
statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you
properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in
confidence in order to preserve the attorney-client or work product privilege that may be available to protect
confidentiality.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

<u>**ORDER GRANTING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY
MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING**</u>

Upon consideration of the *Emergency Motion for Leave to File Adversary Proceeding*

[Dkt. __] (the "<u>Motion</u>") filed by Hunter Mountain Investment Trust ("<u>HMIT</u>"), and having

considered any responses thereto, the Court finds that: (1) the claims alleged in HMIT's Proposed

Adversary Complaint [Dkt. __-1] against James P. Seery ("Seery"), Stonehill Capital

Management, LLC, Farallon Capital Management, LLC, Muck Holdings, LLC, and Jessup

Holdings, LLC (the "<u>Claims</u>") are colorable; (2) any demand on any other persons or entities to

002234

prosecute the Claims would be futile; (3) HMIT is an appropriate party to bring the Claims on

behalf of the Reorganized Debtor and the Highland Claimant Trust; and (4) HMIT's Motion should

be granted.

It is therefore **ORDERED THAT:**

1. The Motion is GRANTED.

2. HMIT is granted leave to file its Proposed Adversary Complaint [Dkt. __-1] as an

adversary proceeding in this Court.

### ###END OF ORDER###

Submitted by:
**Parsons McEntire McCleary PLLC**

/s/ Sawnie A. McEntire
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

002235

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S OPPOSED APPLICATION FOR
EXPEDITED HEARING ON EMERGENCY MOTION FOR LEAVE
TO FILE VERIFIED ADVERARY PROCEEDING**

Hunter Mountain Investment Trust ("HMIT"), both in its individual capacity and

as a derivative action on behalf of the Reorganized Debtor, Highland Capital

Management, L.P. ("Reorganized Debtor") and the Highland Claimant Trust (collectively

"Movant"), submits this Application for an Expedited Hearing ("Application") on its

Emergency Motion for Leave to File Verified Adversary Proceeding ("Emergency Motion"). In support of this Application, Movant states the following:

1.      All respondents have received notice of this Application. This Application and the Emergency Motion are opposed.

2.      The Emergency Motion[1] seeks leave to file an Adversary Proceeding in accordance with the Court's "gatekeeping" orders, as well as the injunction and exculpation provisions in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Doc. 1943), as modified (the "Plan").

3.      An expedited hearing is permitted under Fed. R. Bank P. 9006 (c)(1), which authorizes a shortened time for a response and hearing for good cause. For the reasons set forth fully in the Emergency Motion, and as set forth herein, Movant has shown good cause and requests that the Court schedule a hearing on the Emergency Motion on three (3) days' notice, and that any responses be filed no later than twenty-four hours before the scheduled hearing.

4.      Good cause exists because of a fast-approaching date (April 16, 2023) that one or more of the Respondents, as identified in the Emergency Motion, *may* argue constitutes the expiration of the statute of limitations concerning some of the common

---

[1] A copy of the Emergency Motion is filed simultaneously with this Application for Expedited Hearing.

002237

law claims available to Movant.[2] Although HMIT offered to enter tolling agreements with each of the Proposed Defendants with whom they have successfully contacted, this offer was either rejected or HMIT did not receive an affirmative agreement to do so. Accordingly, this Application has become necessary. Because the Emergency Motion is subject to the Court's "gatekeeping" orders and the injunction provisions of the Plan, emergency leave is required. Expedited consideration of the Emergency Motion is necessary and appropriate to protect and preserve the rights of the Reorganized Debtor, the Highland Claimant Trust, and HMIT.

5.    Movant requests that the Emergency Motion be scheduled for an expedited hearing within (3) days of the filing of this Application. Alternatively, if such a setting is not possible, Movant requests that the Emergency Motion be scheduled for an expedited hearing on the Court's earliest available date, and that any responses be filed no later than twenty-four hours before the scheduled hearing.  Movant requests a 90-minute hearing.

WHEREFORE, Hunter Mountain Investment Trust, as Movant, respectfully requests this Court (i) grant this Application for Expedited Hearing, (ii) set an expedited hearing on the Emergency Motion within three (3) days of the filing of this Application for Expedited Hearing and set a response and objection deadline no later than twenty-

---

[2] The statute of limitations issue is also dependent upon the resolution of state choice of law issues. The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

002238

four hours before the scheduled hearing or as set by the Court; (iii)  in the event such a

setting is not possible, and in the alternative, set an expedited hearing on the Emergency

Motion on the Court's earliest available date and time thereafter, and that any responses

be filed no later than twenty-four hours before the scheduled hearing, and (iv) grant such

other and further relief as is just and proper.

DATED: March 28, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  _/s/ Sawnie A. McEntire_
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Hunter Mountain Investment Trust*

[4]

002239

## CERTIFICATE OF CONFERENCE

Beginning on March 24, 2023, and also on March 27, 2023, the undersigned counsel conferred either by telephone or via email with all counsel for all Respondents regarding the relief requested in the foregoing application, including John A. Morris on behalf of James P. Seery, and Brent McIlwain on behalf of Muck Holdings LLC, Jessup Holdings LLC, Stonehill Capital Management, and Farallon Capital Management.  Counsel for James P. Seery has advised that it opposes an expedited hearing on the Emergency Motion and also opposes the Emergency Motion. Based upon all communications with Mr. McIlwain, it is reasonably believed his clients are also opposed and we advised him that this recitation would be placed in the certificate of conference.

　　　　　　　　　　　　　　　　 /s/ Sawnie A. McEntire　　　　　　　　
　　　　　　　　　　　　　　　　Sawnie A. McEntire

## CERTIFICATE OF SERVICE

I certify that on the 28th day of March 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

　　　　　　　　　　　　　　　　 /s/ Sawnie A. McEntire　　　　　　　　
　　　　　　　　　　　　　　　　Sawnie A. McEntire

002240

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**ORDER GRANTING APPLICATION FOR EXPEDITED HEARING
ON EMERGENCY MOTION FOR LEAVE
<u>TO FILE VERIFIED ADVERSARY PROCEEDING</u>**

Upon the Application for Expedited Hearing on Emergency Motion for Leave to File

Verified Adversary Proceeding ("Application for Expedited Hearing"), filed by Hunter Mountain

Investment Trust ("HMIT"), both in its individual capacity and as a derivative action on behalf of

the Reorganized Debtor, Highland Capital Management, L.P. ("Reorganized Debtor") and the

Highland Claimant Trust, requesting expedited and emergency consideration of the Emergency

002241

Motion for Leave to File Verified Adversary Proceeding ("Emergency Motion"), and the Court,

having reviewed the Application for Expedited Hearing, finds that proper notice was given and

that good cause exists for entry of this Order. It is therefore:

**ORDERED** that the Application for Expedited Hearing is **GRANTED**; and

**IT IS FURTHER ORDERED** that the hearing on the Emergency Motion shall be held on

_____, 2023, at _____ _.m. (Central Time) before the Honorable Stacey

G. C. Jernigan. Any responses to the Emergency Motion shall be filed by _____, at

_____.

### ### End of Order ###

Submitted by:
PARSONS MCENTIRE MCCLEARY PLLC

*/s/ Sawnie A. McEntire*_____
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

002242

Brent R. McIlwain, TSB 24013140
David C. Schulte    TSB 24037456
Christopher Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.:    (214) 964-9500
Fax:    (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

COUNSEL TO MUCK HOLDINGS, LLC,
JESSUP HOLDINGS LLC,
FARALLON CAPITAL MANAGEMENT, L.L.C., AND
STONEHILL CAPITAL MANAGEMENT LLC

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>Highland Capital Management, L.P.[1]<br><br>Debtor. | Case No. 19-34054 (SGJ)<br><br>Chapter 11<br><br>(Jointly Administered) |

## MUCK HOLDINGS, LLC, JESSUP HOLDINGS LLC, FARALLON CAPITAL MANAGEMENT, L.L.C., AND STONEHILL CAPITAL MANAGEMENT LLC'S OBJECTION TO HUNTER MOUNTAIN INVESTMENT TRUST'S OPPOSED APPLICATION FOR EXPEDITED HEARING ON EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING

Muck Holdings, LLC ("Muck"), Jessup Holdings LLC ("Jessup"), Farallon Capital

Management, L.L.C. ("Farallon"), and Stonehill Capital Management LLC ("Stonehill", and

collectively, with Muck, Jessup, and Farallon, the "Claims Purchasers") hereby file this *Objection*

---

[1]    The last four digits of Debtor's taxpayer identification number are (6725). The headquarters and service address for Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

*to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* (the "Objection").[2] In further support of the Objection, the Claims Purchasers respectfully state as follows:

## OBJECTION

1. This proceeding is yet another attempt by James Dondero ("Dondero") and his affiliates to exact revenge on any person or entity that obtains a recovery from the company he sought to destroy as his control was wrested away. In the process, he has wasted countless judicial resources as he forum shopped to try and find any court but this Court to address his complaints. Now, without any further options, Dondero, through HMIT, seeks to burden this Court with an emergency hearing that deprives the Claims Purchasers of their procedural rights.

2. Dondero's first attempt began in July 2021 with a pre-suit discovery request, targeting Farallon and Alvarez & Marsal, under Texas Rule of Civil Procedure 202 ("Rule 202"): *In Re: James Dondero*, Cause No. DC-21-09534, in the 95th Judicial District Court of Dallas County Texas (the "First 202"). This Court is well aware of the First 202, as Farallon and Alvarez & Marsal removed the case to this Court. After extensive briefing and a hearing, due to misalignment of the caselaw to the uniqueness of a Rule 202 proceeding as applied to a bankruptcy case, the Court remanded the First 202 to the Texas state court "with grave misgivings." The state court ultimately denied and dismissed the First 202 on June 1, 2022.

---

[2] Hunter Mountain Investment Trust ("HMIT") filed its *Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. No. 3699] (the "Motion for Leave") on March 28, 2023. The Motion for Leave was coupled with HMIT's *Opposed Application for Expedited Hearing on Emergency Motion for Leave to file Verified Adversary Proceed* [Dkt. No. 3700] (the "Motion to Expedite"). This Objection is limited to the Motion to Expedite and will not address in detail the substantive issues raised in the Motion for Leave. Rather, as explained below, the Claims Purchasers should have a reasonable period of time, on a normal briefing schedule, to fully address the Motion for Leave.

#205075243

002244

3.      Rather than come back to this Court to seek pre-suit discovery under Rule 2004, Dondero waited more than six months and filed a new Rule 202 petition through his affiliate HMIT—raising the exact same issues related to claims trading as in the First 202, based on the same allegations of misconduct by Seery—but now in a different Texas state court: *In re: Hunter Mountain Investment Trust*, Cause No. DC-23-01004, in the 191st Judicial District of Dallas County Texas (the "Second 202"). The target of the Second 202 was once again Farallon, with the addition of Stonehill.  HMIT, undeterred by the dismissal of the First 202, carefully avoided not only this Court (through a proper request for discovery under Rule 2004), but also the 95th Judicial District Court that dismissed the First 202, and sought to convince yet another state court judge that it had a valid basis to "investigate" claims purchases in a bankruptcy proceeding.  The Second 202 met the same fate as the first: it was denied and dismissed on March 8, 2023.

4.      It is against this backdrop that now, after more than a year from the date this Court issued its opinion on the First 202, stating that "[t]his court is not only familiar with the facts and parties, but there is a mechanism in the bankruptcy rules (Fed. R. Bankr. Pro. 2004; *see also* Fed. R. Civ. Pro. 27) to seek pre-suit discovery," and further stated that "Dondero's standing in filing the Rule 202 Proceeding would appear to be highly questionable and his motives highly suspect,"[3] HMIT is requesting that this Court treat its Motion for Leave as an emergency.  It simply is not.

5.      The Motion for Leave is hundreds of pages long (inclusive of exhibits), with detailed, self-serving affidavits and reports from lawyers who Dondero and his affiliates have employed in his solipsistic effort to resurrect a recovery from the company he destroyed. But the

---

[3]      *Memorandum Opinion and Order Granting James Dondero's Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request, and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon Capital Management LLC,* Dkt. No. 22, 21-03051 (January 4, 2022), pg. 21 [emphasis added].

only emergency here is one of Dondero and HMIT's own making. They had every opportunity to seek discovery in this Court, and file the Motion for Leave on a reasonable timeframe. Instead, fixated on avoiding the scrutiny that this Court would apply, and the warranted skepticism as to the potential merits of the claims that this Court has already expressed, they "ran out the clock" and now seek to burden Claims Purchasers, the other targets, and this Court with an "emergency." As but one recent example of this approach, HMIT waited 20 days after the dismissal of the Second 202 to file the Motion for Leave, seeking expedited consideration on an "emergency" basis.

6.      The Claims Purchasers are entitled to a reasonable opportunity to respond to the Motion for Leave. While HMIT's allegations are baseless,[4] responding to the scattershot Motion for Leave will require substantial time. Indeed, the standard under the "Gatekeeper Order" for a "colorable claim" requires a more detailed analysis than would be required by a typical motion heard on an emergency basis. While perhaps not perfectly analogous, the response will be similar to motion to dismiss under Fed. R. Civ. 12(b)(6). Requiring the Claims Purchasers to prepare and argue what is tantamount to a dispositive motion on anything less than regular notice would be prejudicial to the Claims Purchasers. Prejudice is exactly what Dondero and HMIT are seeking. They should not be rewarded for their obstreperous behavior.

WHEREFORE, the Claims Purchasers respectfully request that the Court deny the Motion to Expedite and grant the Claims Purchasers such other and further relief as is just and proper.

---

[4]      While the underlying allegations of HMIT's Motion for Leave will be addressed by separate pleading, the Claims Purchasers will demonstrate that the factual predicates for the allegations are objectively false. Moreover, the "evidence" that forms the basis for the Motion for Leave and its associated verified pleading is largely based upon affidavits from Dondero and his counsel, which on its face should call into question the credibility of the assertions. Finally, it should be noted that the Office of the United States Trustee has had the allegations of Dondero—now HMIT—in the form of an alleged "investigatory" letter for more than a year, and no action has been taken.

002246

Dated:  March 30, 2023

HOLLAND & KNIGHT LLP

By: /s/ Christopher A. Bailey
Brent R. McIlwain, TSB 24013140
David C. Schulte, TSB 24037456
Christopher Bailey, TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
Tel.:   (214) 964-9500
Fax:   (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com


COUNSEL TO MUCK HOLDINGS, LLC,
JESSUP HOLDINGS LLC, FARALLON
CAPITAL MANAGEMENT, L.L.C., AND
STONEHILL CAPITAL MANAGEMENT LLC


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk

of Court using the CM/ECF system, and served upon all parties receiving notice pursuant to the

CM/ECF system on this the 30th day of March, 2023.


/s/ Christopher A. Bailey
Chris Bailey


#205075243

002247

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S AMENDED CERTIFICATE OF
CONFERENCE REGARDING HUNTER MOUNTAIN INVESTMENT TRUST'S
EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY
PROCEEDING**

Hunter Mountain Investment Trust ("HMIT"), files this Amended Certificate of

Conference Regarding Hunter Mountain Investment Trust's Emergency Motion for

Leave to File Verified Adversary Proceeding (the "Motion") (Doc 3699). This amended

002248

certificate is submitted at the insistence of one of the opposing counsel, and HMIT is

doing so without agreeing that the certificate requires an amendment to this effect.

### Amended Certificate of Conference Regarding the Motion

Beginning on March 24, 2023, and also on March 27, 2023, counsel for Hunter Mountain Investment Trust ("HMIT") conferred either by telephone or via email with counsel for all Respondents regarding the relief requested in the foregoing Motion, including John A. Morris, on behalf of James P. Seery, and Brent McIlwain, on behalf of Muck Holdings, LLC, Jessup Holdings, LLC, Stonehill Capital Management, LLC, and Farallon Capital Management, LLC. Mr. Morris advised that James P. Seery is opposed to an expedited hearing regarding Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding ("Motion"). Based upon all communications with Mr. McIlwain, it is reasonably believed his clients are also opposed and we advised him that this recitation would be placed in the certificate of conference.

Mr. Morris has requested that the certificate be amended to state as follows: "Mr. Seery, the Reorganized Debtor, and the Highland Clamant [sic] Trust (together, the 'Highland Defendants') [are] 'opposed' . . . ."

In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor or the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of, the substantive content of, or any procedural need for Mr. Morris's requested inclusion, but HMIT is filing this amended certificate solely to accommodate Mr. Morris's request.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

DATED: March 30, 2023.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: /s/ Sawnie A. McEntire
Sawnie A. McEntire
Texas State Bar No. 13590100

2

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

***Attorneys for Petitioner***
***Hunter Mountain Investment Trust***

## CERTIFICATE OF SERVICE

I certify that on the 30th day of March 2023, a true and correct copy of the foregoing Amended Certificate of Conference was served on all counsel of record via the Court's CM/ECF system or, as appropriate, on the Respondents directly.

/s/ *Sawnie A. McEntire*

Sawnie A. McEntire

3118921

002250