**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 5

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its

individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital

Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and

files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in

the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

2.  the colorability analysis is "akin to the standards applied under the ... *Barton* doctrine";

3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

    4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT and the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.    Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.    Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.    ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.    determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.    Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.    Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.    Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.    Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.    Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.    Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.    there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.    there is no evidence to support the alleged quid pro quo;

3.    the material shared was *public* information; and/or

4.    the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.   Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.   Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.   Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave?  [*See* Dkt. 3713].

O.   Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.   Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

1.   declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

2.   concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.   **Notice of Appeal**

*000001*   a.   Notice of Appeal **[Dkt. 3906]**;

*000276*   b.   Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*   c.   Second Amended Notice of Appeal **[Dkt. 3945]**

2.   **The judgment, order, or decree appealed from:**

a.   Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

**a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru Vol. 4*
*Vol 4*
*002236*
*002243*
*002248*

*Vol. 5*
*002251*

*002254*

*002262*

*002341*

*002355*

*002358*

*002391*

*002398*

*002400*

*Vol. 6*
*002826*

*Thru Vol. 7*

*Vol 9*
*003257*

*Thru Vol. 9*

*003260*

*003270*

*003278*

| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| *Vol. 10* *003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

*VOL. 10*

*003458*

*003463*

*VOL. 11*

*003537*

*Thru Vol. 16*

*VOL. 17*

*004465*

*004712*

*004714*

*004808*

*004813*

*004836*

*VOL. 18*

*004930*

*004931*

|  |  |  |  |
|---|---|---|---|
|  |  |  | Holdings LLC, Stonehill Capital Management LLC |
|  | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
|  | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
|  | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
|  | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
|  | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
|  | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
|  | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
|  | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
|  | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
|  | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
|  | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18
004939.

004959

004961

004984

005049

005114

Vol. 26
006608

Vol. 39
009273

009290

009416

009424

| | Date | Doc No. | Description |
|---|---|---|---|
| | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 06/05/2023 | 3817 (3817-1 — 3817-5) Thru Vol. 25 | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| | 06/05/2023 | 3818 (3818-1 — 3818-9) Thru Vol. 39 | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*

*Vol. 41*

*Thru Vol. 41*

*009847*

*009901*

*009905*

*009908*

*009912*

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|---|
| | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

*Vol. 43*

*010135*

*010136*

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.**   **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits** **(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits** **(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023               Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
     Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S AMENDED CERTIFICATE OF
CONFERENCE REGARDING ITS OPPOSED APPLICATION FOR EXPEDITED
HEARING ON EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
<u>ADVERSARY PROCEEDING</u>**

Hunter Mountain Investment Trust ("HMIT"), files this Amended Certificate of

Conference Regarding its Opposed Application for Expedited Hearing on Emergency

Motion for Leave to File Verified Adversary Proceeding (the "Application") (Doc. 3700).

002251

This amended certificate is submitted at the insistence of one of the opposing counsel, and HMIT is doing so without agreeing that the certificate requires an amendment to this effect.

## Amended  Certificate of Conference Regarding the Application

Beginning on March 24, 2023, and also on March 27, 2023, counsel for Hunter Mountain Investment Trust ("HMIT") conferred either by telephone or via email with counsel for all Respondents regarding the relief requested in the foregoing Application, including John A. Morris, on behalf of James P. Seery, and Brent McIlwain, on behalf of Muck Holdings, LLC, Jessup Holdings, LLC, Stonehill Capital Management, LLC, and Farallon Capital Management, LLC. Mr. Morris advised that James P. Seery is opposed to an expedited hearing regarding Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding and the relief requested in the Application.

Mr. Morris has requested that the certificate be amended to state as follows: "Mr. Seery, the Reorganized Debtor, and the Highland Clamant [sic] Trust (together, the 'Highland Defendants') [are] 'opposed' . . . ."

In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor or the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of, the substantive content of, or any procedural need for Mr. Morris's requested inclusion, but HMIT is filing this amended certificate solely to accommodate Mr. Morris's request.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

DATED: March 30, 2023.                          Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com

2

002252

1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner*
*Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on the 30th day of March 2023, a true and correct copy of the foregoing Amended Certificate of Conference was served on all counsel of record via the Court's CM/ECF system or, as appropriate, on the Respondents directly.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

3118925

002253

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P., the Highland
Claimant Trust, and James P. Seery, Jr., solely in his capacity
as Chief Executive Officer of Highland Capital Management,
L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj |
| Reorganized Debtor. | |

## THE HIGHLAND PARTIES' OBJECTION
## TO HUNTER MOUNTAIN INVESTMENT TRUST'S OPPOSED APPLICATION FOR
## EXPEDITED HEARING ON EMERGENCY MOTION FOR LEAVE TO FILE
## <u>VERIFIED ADVERSARY PROCEEDING</u>

Highland Capital Management, L.P. ("<u>HCMLP</u>"), the reorganized debtor in the above-

referenced bankruptcy case, the Highland Claimant Trust (the "<u>Trust</u>"), and James P. Seery, Jr.,

002254

solely in his capacities as Chief Executive Officer of HCMLP and the Claimant Trustee ("Mr. Seery", and together with HCMLP and the Trust, the "Highland Parties"), by and through their undersigned counsel, hereby submit this response (the "Response") to the *Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3700] (the "Motion to Expedite") filed by Hunter Mountain Investment Trust ("HMIT"). In support of the Response, the Highland Parties represents as follows:

## OBJECTION

1.     Through its Motion to Expedite, HMIT desperately seeks a lifeline, asking this Court to (a) hold a hearing on three days' notice (or as soon thereafter as counsel can be heard) of its separate motion for leave to commence an adversary proceeding,[1] and (b) require the putative defendants to provide substantive responses to the Underlying Motion twenty-four hours before the hearing. Given that the so-called "emergency" is entirely of HMIT's own making and the putative defendants would be severally prejudiced by the granting of the Motion to Expedite, the Court should enforce Rule 7007-1(e) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* ("Local Rule 7007-1"), grant defendants 21 days (*i.e.*, until April 18, 2023) to respond to the Underlying Motion, and otherwise deny the Motion to Expedite.[2]

2.     HMIT baldly contends that "[g]ood cause exists because of a fast-approaching date (April 16, 2023) that one or more of the Respondents, as identified in the Emergency Motion, *may* argue constitutes the expiration of the statute of limitation concerning some of the common law

---

[1] *See Hunter Mountain Investment Trust's Emergency Motion for Leave to File an Adversary Proceeding* [Docket No. 2699] (the "Underlying Motion").

[2] Given the scope of the pleadings (and attachments), allegations, and claims, the Highland Parties reserve the right to seek additional time beyond that provided under Local Rule 7007-1 and to seek discovery prior to any hearing on the Underlying Motion pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure (collectively, the "Reservations").

claims available to the Movant."  Motion to Expedite ¶ 4 (emphasis in original, footnote omitted).
But courts do not exist to protect litigants from the consequences of their own considered,
deliberate decisions.

3.      Here, it is indisputable that by June 2021, Mark Patrick (HMIT's titular head) and
James Dondero (HMIT's actual control person) knew that gatekeeping orders existed because they
were held in contempt of court at that time for violating them.[3]  Thus, Messrs. Patrick and Dondero
have known for nearly two years that obtaining leave of court is a prerequisite to pursuing claims
against Mr. Seery.

4.      It is also indisputable that Mr. Dondero and his myriad lawyers[4] had all the alleged
"information" and formed all the supposed "beliefs" needed to prepare the proposed Complaint
attached to the Underlying Motion because they were the foundation of (a) two self-serving and
materially false letters sent in 2021 to the Executive Office for U.S. Trustees in Washington, D.C.,
and (b) separate petitions filed by Mr. Dondero and HMIT pursuant to Texas Rule of Civil
Procedure 202, each of which was denied.

5.      In light of the forgoing, the so-called "emergency" is entirely of Mr. Dondero's
(and HMIT's) own making.  He decided to "commission investigations," send irresponsible and
false letters to the U.S. Trustee's office, and file petitions in Texas state court rather than timely
seeking leave of this Court under the "gatekeeper" to pursue claims against Mr. Seery.  The Court

---

[3] HMIT is a supposed investment trust created by Mr. Dondero in 2015 and effectively controlled by him since that time.  HMIT was created to, among other things, accept the transfer of Mr. Dondero and Mark Okada's interests in HCMLP and shield the former HCMLP partners from substantial tax liabilities.  HMIT is a defendant in the Litigation Trustee's action and owes the estate more than $90 million.

[4] Parsons McEntire McCleary PLLC is the third law firm to appear on behalf of HMIT in just the last four months, following Kelly Hart Pitre [*see*, *e.g.*, Docket No. 3638] and Mr. Dondero's long-time personal counsel at Stinson LLP [*see*, *e.g.*, Docket No. 3662].

002256

should not save Mr. Dondero, Mr. Patrick, and HMIT from the consequences of their own deliberate, strategic decisions.

6.      To do so would be highly prejudicial to the putative defendants for two simple reasons.  First, because the Underlying Motion is voluminous and seeks permission to assert numerous and significant (although meritless) claims, the putative defendants should not be deprived of their rights under Local Rule 7007-1 to have adequate time to analyze the issues and consider and prepare their responses on the "colorability" issues, and those responses are expected to be significant.  Second, and more fundamentally, the putative defendants would be severely prejudiced if this Court effectively interfered with affirmative defenses that will ripen shortly.

7.       For the forgoing reasons, and those set forth below, the Highland Parties respectfully request that the Court enter an order enforcing Local Rule 7007-1 and denying the Motion to Expedite, subject to the Reservations.

## ARGUMENT

### A.      Messrs. Dondero and Patrick Have Long Known of the Gatekeeper

8.      Messrs. Dondero and Patrick have long known that "gatekeeping" provisions exist requiring leave of this Court before claims can be pursued against Mr. Seery because:

- In June 2021, each of them was found in contempt of court for violating "gatekeeper" provisions;[5] and

- Entities controlled by Mr. Dondero are using all available means to overturn the "gatekeeper" provision in Highland's Plan.[6]

---

[5] *See Memorandum Opinion and Order Holding Certain Parties and Their Attorneys in Civil Contempt of Court for Violation of Bankruptcy Court Orders* [Docket No. 2660], *aff'd*, Case No. 3:21-cv-01974-X [Docket No. 49] (N.D. Tex. 2022).

[6] *See, e.g.*, *Statement by NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. of Issues on Appeal* [Docket No. 3693] ¶3.  *See generally NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.*, No. 22-669 (U.S. Sup. Ct.).

002257

9.      Consequently, HMIT cannot claim that it was unaware of the need to seek leave of this Court before pursuing claims against Mr. Seery.

**B.      HMIT's Alleged "Information and Beliefs" Have Long Been Known**

10.      HMIT's alleged "information and beliefs" that are the foundation of the Complaint subject of the Underlying Motion have been known since 2021:

- On December 17, 2020, in violation of an existing temporary restraining order, Mr. Dondero (then no longer an employee of HCMLP) sent an unsolicited email to Mr. Seery (and others) disclosing what he claims was "material, non-public inside information" that he obtained in his capacity as a member of the MGM board;[7]

- In July 2021, Mr. Dondero personally verified a petition in Texas state court in which he baselessly alleged that Mr. Seery used material, non-public information to entice his "age-old" friends at Farallon to unlawfully purchase claims in order to enrich himself [**Morris Dec. Ex. A ¶¶20-23**];

- In October 2021, Douglas Draper sent a 12-page letter (with dozens of pages of attachments) to the Executive Office of U.S. Trustees requesting an investigation into, among other things, "the circumstances surrounding the sale of claims" by UCC members and whether "non-public inside information was furnished to claims purchasers" [**Morris Dec. Ex. D**];

- In November 2021, Davor Rukavina sent a 19-page letter (with dozens of pages of attachments) to the Executive Office of U.S. Trustee providing more "information" about alleged unlawful claims trading, insider trading, and breaches of fiduciary duties [**Morris Dec. Ex. E**];

- In May 2022, Mr. Dondero personally verified an amended petition (the "First 202 Petition") which added more baseless allegations of supposed wrongdoing that ultimately formed the basis for the Complaint subject to the Underlying Motion [**Morris Dec. Ex. B ¶¶ 17-29**];

- On June, 1, 2022, the First 202 Petition was denied and the case was dismissed [**Morris Dec. Ex. C**];

- In January 2023, HMIT filed a petition (verified by Mr. Patrick) in Texas state court (the "Second 202 Petition") that laid out even more allegations of unlawful claims

---

[7] *See Declaration of James Dondero, sworn to February 15, 2023* [¶ 3, Ex. 1] attached as **Exhibit G** to the *Declaration of John A. Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* ("Morris Dec.") being filed simultaneously with this Response.

002258

trading, insider trading, and breaches of fiduciary duties that formed the basis for the Complaint subject to the Underlying Motion [**Morris Dec. Ex. F ¶¶16-24**];

- In January 2023, Mr. Dondero filed a declaration in support of the Second 202 Petition in which he swore under oath to seemingly significant facts that were curiously omitted from his original verified petition or his verified amended petition [*Compare* **Morris Dec. Ex. G** *with* **Morris Dec. Exs. A and B**]; and

- On March, 8, 2023, the Second 202 Petition was denied and the case was dismissed [**Morris Dec. Ex. C**].

11.     Based on the forgoing, it is indisputable that Mr. Dondero knew of the bases of HMIT's alleged claims no later than 2021.  Rather than seeking leave to pursue claims against Mr. Seery, Mr. Dondero knowingly and intentionally chose to press his allegations to the Executive Office of the U.S. Trustees and before two different state courts, albeit to no avail.[8]

## C.     The Defendants Would Be Severely Prejudiced if the Motion to Expedite Were Granted

12.     The putative defendants would be severely prejudiced if the Motion to Expedite were granted because it would (a) deprive them of the time needed to prepare, and (b) would likely impair what will otherwise be valid affirmative defenses.

### 1.     The Underlying Motion Is Substantial

13.     While baseless, the Underlying Motion is substantial, with the main pleading measuring 36 pages long, including 61 footnotes.  There are approximately 350 pages of exhibits, including the draft *Verified Adversary Complaint* (the "Complaint").

14.     The Complaint itself is 28 pages long and purports to assert six causes against five different defendants.  For added measure, HMIT seeks punitive damages and purports to bring claims derivatively on behalf of HCMLP and the Trust.

---

[8] To date, the Highland Parties have never received any communications or requests for information from the Executive Office of the U.S. Trustees or any other branch or office of the United States Trustee concerning any of the false allegations at issue.

002259

15.     The "gatekeeper" exists for a reason.  It is intended to prevent third parties from bringing frivolous claims.  The purpose of the "gatekeeper" will be eviscerated if the Highland Parties are not given adequate time to analyze the potential claims and provide a detailed response. The Highland Parties will be severely prejudiced if forced to respond on a tightened time frame— prejudice that cannot possibly be justified under "emergency" circumstances of HMIT's own making.

### 2. The Defendants Will Be Prejudiced if the Court Effectively Strips an Affirmative Defense from Them

16.     The sole basis for the Motion to Expedite is that HMIT's failure to timely bring its action will supposedly cause the statute of limitations to run on certain causes of action.  The Court should decline HMIT's plea for a lifeline.

17.     According to HMIT, the statute of limitations may run on certain causes of action if the Motion to Expedite is not granted.  It is hard to imagine a greater prejudice that could be imposed on a putative defendant than a court intervening to thwart a complete and valid affirmative defense that is on the cusp of ripening—particularly where, as here, the "emergency" is of the plaintiff's own doing.

### CONCLUSION

WHEREFORE, the Highland Parties respectfully request that the Court enter an order enforcing Local Rule 7007-1 and denying the Motion to Expedite, subject to the Reservations.

002260

Dated: March 30, 2023　　　　　**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
　　　　jmorris@pszjlaw.com
　　　　gdemo@pszjlaw.com
　　　　hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
　　　　ZAnnable@HaywardFirm.com

*Counsel for the Highland Parties*

002261

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice)*
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., the Highland Claimant Trust, and James P. Seery, Jr., solely in his capacity as Chief Executive Officer of Highland Capital Management, L.P.*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

<div align="center">

**DECLARATION OF JOHN A. MORRIS IN SUPPORT
OF THE HIGHLAND PARTIES' OBJECTION TO
HUNTER MOUNTAIN INVESTMENT TRUST'S OPPOSED APPLICATION FOR
EXPEDITED HEARING ON EMERGENCY
MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING**

</div>

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

I, John A. Morris, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.       I am a partner in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P. ("HCMLP"), the reorganized debtor in the above-referenced bankruptcy case, the Highland Claimant Trust (the "Trust"), and James P. Seery, Jr., solely in his capacity as Chief Executive Officer of HCMLP ("Mr. Seery", and together with HCMLP and the Trust, the "Highland Parties"), and I submit this declaration (the "Declaration") in support of the Highland Parties' response (the "Response") to *Hunter Mountain Investment Trust's Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3700] (the "Motion to Expedite") being filed simultaneously with this Declaration. This Declaration is based on my personal knowledge and review of the documents listed below.

2.       Attached as **Exhibit A** is a true and correct copy of the *Verified Petition to Take Deposition Before Suit and Seek Documents* filed by James Dondero in Cause No. DC-21-09534 on July 22, 2021.

3.       Attached as **Exhibit B** is a true and correct copy of the *Verified Amended Petition to Take Deposition Before Suit and Seek Documents* filed by James Dondero in Cause No. DC-21-09534 on May 2, 2022 (the "First 202 Petition").

4.       Attached as **Exhibit C** is a true and correct copy of an *Order* dated June 1, 2022 entered in Cause No. DC-21-09534 denying the First 202 Petition and dismissing the case.

5.       Attached as **Exhibit D** is a true and correct copy of a letter (excluding attachments) from Douglas S. Draper to Nan R. Eitel of the Office of General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021.

6.       Attached as **Exhibit E** is a true and correct copy of a letter (excluding attachments) from Davor Rukavina to Nan R. Eitel of the Office of General Counsel, Executive Office for U.S. Trustees, dated November 3, 2021.

7.       Attached as **Exhibit F** is a true and correct copy of *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* filed by Hunter Mountain Investment Trust in Cause No. DC-23-01004 on January 20, 2023 (the "Second 202 Petition").

8.       Attached as **Exhibit G** is a true and correct copy of the *Declaration of James Dondero* (with Exhibit 1) dated January 15, 2023, filed in Cause No. DC-23-01004.

9.       Attached as **Exhibit H** is a true and correct copy of an *Order* dated March 8, 2023 entered in Cause No. DC-23-01004 denying the Second 202 Petition and dismissing the case.

Dated: March 30, 2023

                                  */s/ John A. Morris*
                                   John A. Morris

002264

# EXHIBIT A

2 CIT- ESERVE Case 19-34054-sgj11 Doc 13-8 Filed 08/09/21 Entered 08/09/21 03:30:37 Page 74 of 215

Case 3:23-cv-02071-E   Document 28-5   Filed 02/07/23   Page 30 of 214   PageID 1479

FILED
7/22/2021 5:53 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JAVIER HERNANDEZ DEPUTY

DC-21-09534

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE JAMES DONDERO, | § | IN THE DISTRICT COURT |
| | § | 95th |
| *Petitioner*. | § | _____ JUDICIAL DISTRICT |
| | § | |
| | § | DALLAS COUNTY, TEXAS |

## VERIFIED PETITION TO TAKE DEPOSITION BEFORE SUIT AND SEEK DOCUMENTS

Petitioner James Dondero respectfully requests that this Court order, pursuant to Texas Rule of Civil Procedure 202, the deposition of the corporate representatives of Alvarez & Marsal CRF Management, LLC, and of Farallon Capital Management, LLC. Petitioner further requests that the Court order certain limited, yet relevant documents to be provided under Texas Rule of Civil Procedure 199.2 as set forth below.

Petitioner would respectfully show the Court that:

### I.

### PARTIES

1.    Petitioner James Dondero ("Petitioner") is an individual resident in Dallas County, Texas and is impacted by the potential acts and omissions alleged herein.

2.    Respondent Alvarez & Marsal CRF Management, LLC ("A&M") is a Delaware limited liability company serving as an investment adviser, with offices in Dallas County, Texas, at 2100 Ross Ave., 21st Floor, Dallas, Texas 75201.

3.    Respondent Farallon Capital Management LLC is a limited liability company with its primary place of business in California ("Farallon" and together with A&M, the "Respondents") which is an investment fund located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

002266

## II.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this matter pursuant to Texas Rule of Civil Procedure 202. The anticipated lawsuit would include common law claims.

5.      The Court has personal jurisdiction over A&M because it maintains a regular place of business in Dallas County. Personal jurisdiction is also proper under TEX. CIR. PRAC. REM. CODE § 17.003, and under § 17.042(1)-(3) because its acts on behalf of the Crusader Funds (as defined below), would constitute a tort in this state. Furthermore, it participated in substantial acts in this state which are the subject of the investigation. Moreover, this Court has quasi *in rem* jurisdiction over any potential claims because the action concerns the sale of personal property that was located in Dallas County, and in which Plaintiff claims an interest.

6.      The Court has personal jurisdiction over Farallon because it, acting on behalf of itself or one of its subsidiaries/affiliates, communicated with representatives of Highland Capital Management, LP which is located in Dallas County, and with representatives of Acis and Josh Terry (both of whom are residents in Dallas County), to purchase claims in the Highland Capital Management, LP ("Highland") Chapter 11 bankruptcy case (the "Highland Bankruptcy Case"). Such acts, if shown to have occurred could constitute a tort in this state. Moreover, this Court has quasi *in rem* jurisdiction over any potential claims because the action concerns the sale of personal property that was located in Dallas County, and in which Plaintiff claims an interest.

7.      Venue is proper in Dallas County, Texas, where venue of the anticipated lawsuit may lie and where the property at issue exists, and where a substantial amount of the acts and omissions underlying the potential suit occurred.

---

002267

8.      Removal is not proper because there is no basis for federal jurisdiction because a Rule 202 petition, as a pre-suit mechanism, does not meet Article III of the United States Constitution's standing requirement of an actual, live case or controversy.

## III.

## FACTUAL BACKGROUND

9.      This matter arises out of Farallon's purchase of certain bankruptcy claims in the Highland Bankruptcy Case, pending in the Northern District of Texas bankruptcy court, from three sources: HarbourVest, Acis Capital Management, LP, and the Crusader Funds (as defined below).

10.     Petitioner is the founder and former CEO of Highland and is an adviser and/or manager of several trusts who own the equity in Highland. In addition, Petitioner is an investor in Highland Crusader Fund, Ltd. and several of its companion and affiliated funds (the "Crusader Funds").

11.     Until recently, the Crusader Funds were managed by Highland, but are now managed and advised by A&M.

12.     Shortly after the commencement of the Highland Bankruptcy Case, the Office of the United States Trustee solicited Highland's twenty largest unsecured creditors to serve on the Official Committee of Unsecured Creditors in the Highland Bankruptcy Case (the "UCC").

13.     As set forth below, the Information Sheet attached to such solicitation provided, *inter alia*,

>    **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any**

002268

> **other reason the United States Trustee believes is proper in the exercise of her discretion**. (Emphasis in Original)

14.     The UCC was originally populated by four members, (i) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), (ii) Acis Capital Management, L.P. (iii) UBS Securities LLC and UBS AG London Branch (together, "UBS") and (iv) Meta-E Discovery LLC.

15.     Upon information and belief, two of Highland's creditors – the Redeemer Committee (a member of the UCC) and the Crusader Funds, who between them held approximately $191 million in claims in the Highland Bankruptcy Case (the "Crusader Claims")–sold their claims to Jessup Holdings LLC ("Jessup"), a newly established limited liability company established by Farallon right before the sale. It was formed for the purpose of holding claims Farallon purchased in the Highland Bankruptcy Case.

16.     Upon information and belief, two other Highland creditors—Joshua Terry and Acis Capital Management (another member of the UCC), who between them held approximately $25 million in claims (the "Acis Claims")—sold their claims to Muck Holdings LLC ("Muck"), a newly established limited liability company set up by Farallon solely for the purpose of holding the Acis Claims that Farallon purchased.

17.     Finally, another group of affiliated creditors, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P. (collectively, "HarbourVest") also sold $80 million worth of their claims (the "HarbourVest Claims", together with the Crusader Claims and Acis Claims, the "Claims") to Muck.

002269

18.     Notwithstanding the instructions issued by the Office of the United States Trustee, no one—not Farallon, nor the Redeemer Committee, HarbourVest or Acis Capital Management—ever sought, much less obtained Court approval to sell their respective claims.

19.     Upon information and belief, a substantial amount of time passed between the agreement to sell the Claims and the consummation of such sales.  Notwithstanding their agreement to sell their respective claims, neither the Redeemer Committee nor Acis Capital Management resigned from the UCC.

20.     The current CEO of Highland, James Seery, has an age-old connection to Farallon and, upon information and belief, advised Farallon to purchase the claims.

21.     On a telephone call between Petitioner and a representative of Farallon, Michael Lin, Mr. Lin info rmed Petitioner that Farallon had purchased the claims sight unseen—relying entirely on Mr. Seery's advice solely because of their prior dealings.

22.     Mr. Seery had much to gain by brokering a sale of the Claims to Jessup and Muck—namely, his knowledge that Farallon—as a friendly investor—would allow him to remain as Highland's CEO with virtually unfettered discretion to administer Highland. In addition, Mr. Seery's rich compensation package incentivized him to continue the bankruptcy for as long as possible.

23.     As Highland's current CEO, Mr. Seery had non-public, material information concerning Highland. Upon information and belief, such non-public, material information was the basis for instructing Farallon to purchase the Claims, in violation the Registered Investment Advisor Act 15 U.S.C § 80b-1 et seq., among other things.

24.     Additionally, A&M, upon information and belief, did not put the Crusader Claims on the open market prior to selling them to Farallon. The sale of the Crusader Claims by A&M

002270

was not pursuant to normal means and there is reason to doubt that A&M sought or obtained the highest price for the assets that it sold. This would have injured Petitioner as an investor in the Crusader Funds.

## IV.

## RELIEF SOUGHT

1.    Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of A&M, and to depose Michael Lin, on the following topics, to investigate any potential claims by Petitioner arising out of the highly irregular manner in which the Claim were marketed (if at all) and sold, within ten days of the Court's Order, or as agreed by the parties:

    a.  A&M's agreements with the Crusader Funds, and the agreement(s) of those funds with their respective investors;

    b.  The valuation, marketing and sale of the Claims to Farallon (or its subsidiaries/. affiliates);

    c.  The negotiations and communications leading up to the purchase or sale of the Claims;

    d.  Any discussions with James Seery regarding the Claims;

    e.  Any prior relationship with James Seery.

2.    As part of the Court's Order, Petitioner requests this Court to require Respondents to produce the following documents at their respective depositions:

    a.  All agreements, contracts, or other documents (including any e-mails, correspondence, texts, drafts, term sheets, or communications related to same) related to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

    b.  All communications with James Seery regarding the Claims;

    c.  All communications with, between or among A&M, Seery, HarbourVest, Joshua Terry, Acis, or Highland Capital Management ,LP (or any agent or

002271

representative thereof), regarding or related to the Claims (or any subset or portion thereof);

d. All communications regarding filing any notice with the Bankruptcy Court overseeing the Highland Bankruptcy Case or seeking such Court's approval for the sale or purchase of the Claims;

e. All offers to sell or purchase the Claims and/or all correspondence regarding same;

## V.

## HEARING

21.    After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on the Petition.

22.    FOR THESE REASONS, Petitioner asks the Court to set a date for hearing on this Petition, and after the hearing, to find that the likely benefit of allowing Petitioner to take the requested depositions outweighs the burden or expense of the procedure. Petitioner further asks the Court to issue an Order authorizing Petitioner to take the oral depositions of Michael Lin and a designated representative or representatives of A&M after proper notice and service at the offices of Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, Texas 75201, within ten (10) days of the Court's Order, or as agreed by the parties, and to produce the requested documents at said deposition. Petitioner also seeks any further relief to which he may be justly entitled.

002272

Dated: July 22, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

/s/ *Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Brad J. Robinson**
Texas Bar No. 24058076
J.P. Morgan Chase Tower
2200 Ross Avenue Suite 4900W
Dallas, Texas 75205
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
    bjr@sbaitilaw.com

**Counsel for Petitioner**

## VERIFICATION

I, the undersigned, have reviewed attached *Verified Petition to Take Deposition Before Suit and Seek Documents* and verify, pursuant to Tex. Civ. Prac. Rem. Code § 132.001 under penalty of perjury, that the factual statements therein, as stated, are true and correct, and are within the best of my personal knowledge as stated therein. The date of my birth is June 29, 1962, and my address is 2515 McKinney Avenue, Suite 1100, Dallas, Texas 75201.

Verified this 22nd Day of July, 2021.

**James Dondero**

002273

# EXHIBIT B

002274

FILED
5/2/2022 9:27 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Martin Reyes DEPUTY

CAUSE NO. DC-21-09534

| | | |
|---|---|---|
| IN RE JAMES DONDERO, | § | IN THE DISTRICT COURT |
| | § | |
| *Petitioner.* | § | 95th JUDICIAL DISTRICT |
| | § | |
| | § | DALLAS COUNTY, TEXAS |

## VERIFIED AMENDED PETITION TO TAKE DEPOSITION BEFORE SUIT AND SEEK DOCUMENTS

Petitioner James Dondero respectfully requests that this Court order, pursuant to Texas Rule of Civil Procedure 202, the deposition of the corporate representatives and/or employees of Alvarez & Marsal CRF Management, LLC, and of Farallon Capital Management, LLC. Petitioner further requests that the Court order certain limited, yet relevant, documents to be provided under Texas Rule of Civil Procedure 199.2 as set forth in below.

Petitioner would respectfully show the Court that:

### I.

### PARTIES

1.      Petitioner James Dondero ("Petitioner") is an individual resident in Dallas County, Texas, and is impacted by the potential acts and omissions.

2.      Respondent Alvarez & Marsal CRF Management, LLC ("A&M") is a Delaware limited liability company serving as an investment adviser, with offices in Dallas County, Texas, at 2100 Ross Ave., 21st Floor, Dallas, Texas 75201.

3.      Respondent Farallon Capital Management, L.L.C. ("Farallon") is an investment fund located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111, and Respondent Michael Lin is a principal at Farallon.

---

002275

## II.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this matter pursuant to Texas Rule of Civil Procedure 202. The anticipated lawsuit would include common law claims.

5.      The Court has personal jurisdiction over Respondent Alvarez & Marsal because it maintains a regular place of business in Dallas County. Personal jurisdiction is also proper under Tex. Cir. Prac. Rem. Code § 17.003, and under §17.042(1)-(3) because A&M contracted with counterparties, Joshua Terry and Acis Capital Management, L.P., both of whom at the time had their principal place of business in Dallas County, Texas, and because its acts on behalf of the Crusader Funds (as defined below), if they occurred as believed they did, will have been tortious as to Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

6.      The Court has personal jurisdiction over Farallon because it contracted with A&M to purchase claims in the Highland Capital Management, L.P. Chapter 11 bankruptcy ("Highland bankruptcy") upon the recommendation of James Seery, Highland's CEO. Such acts, if shown to have occurred as believed and under the alleged circumstances, will have been tortious as to the Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

7.      Venue is proper in Dallas County, Texas, where venue of the anticipated lawsuit may lie and where the property at issue exists, and where a substantial amount of the acts and omissions underlying the potential suit occurred.

---

8.       Removal is not proper because there is no basis for federal jurisdiction because a Rule 202 petition does not meet Article III of the United States Constitution's standing requirement.

## III.

## FACTUAL BACKGROUND

9.       This matter arises out of purchase of certain bankruptcy claims in the Highland Bankruptcy.

10.      Petitioner is the founder and former CEO of Highland Capital Management, L.P., currently a bankrupt debtor. He is also an investor in Highland Crusader Fund, Ltd. and several of its companion and affiliated funds (the "Crusader Funds"). Therefore, Petitioner has an interest in seeing to it that A&M properly marketed the claims for proper purposes and for the right price.

11.      Until recently, the Crusader Funds were managed by Highland, and then by A&M when those funds went into liquidation.

12.      Petitioner has an interest in the bankruptcy estate by virtue of his affiliation, and the fact that he is an adviser and/or manager of several trusts who own the equity of the debtor and therefore has an interest in seeing the equity properly protected in bankruptcy.

13.      Shortly after the Highland bankruptcy was filed, the Chapter 11 Trustee issued an invitation to creditors to serve on the unsecured creditors committee (the "UCC").

14.      The Trustee's invitation included a condition: namely, that anyone who served on the committee would have to agree that they would not sell their claims or in any way alienate them (including allowing them to be used as security) without leave of Court. Specifically, the United Trustee's instruction sheet stated:

> Creditors wishing to serve as fiduciaries on any official committee are advised that may not purchase, sell or otherwise trade in or transfer

claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed questionnaire and accepting membership on official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from the committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violation, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.

15.     Upon information and belief, two of the Highland creditors – the Redeemer Committee and the Crusader Fund, who between them owned approximately $191 million in claims in the bankruptcy as well as other assets (the "Crusader Claims") – sold their Claims and assets to Jessup Holdings LLC, a subsidiary of Stonehill Capital Management, LLC. Alvarez and Marsal made this sale, which was in violation of the foregoing order.

16.     Alvarez and Marsal arguably owe fiduciary duties to the funds and funds investors, and may have violated those duties by failing to conduct a sale for proper value, and/or by engaging in other acts that resulted in a sale of assets that was not authorized and/or not allowed by the terms of the funds or by law.

17.     Around the same time, another Highland creditor—Joshua Terry and Acis Capital Management, who have approximately $25 million in claims—also sold their claims to Muck Holdings, LLC, set up by Farallon Capital Management (the "Acis Claims").

18.     And a third creditor, HarbourVest, sold its $80 million worth of claims (the "HarbourVest Claims") to Muck Holding as well.

19.     The above interests are generally referred to hereinafter as the "Claims".

20.     The sales of the Claims were not reported contemporaneously as they were supposed to have been, nor was leave of the bankruptcy court ever sought, much less obtained, for the sales.

21.    However, Acis/Terry, and Crusader continued to serve on the UCC for a substantial period of time as if they hadn't sold their claims at all.

22.    As was discovered by the Petitioner, the current CEO of Highland, James Seery, has an age-old connection to Farallon and to Stonehill and, upon information and belief, advised Farallon and Stonehill to purchase the Claims.

23.    On a telephone call between Petitioner and Michael Lin, a representative of Farallon, Mr. Lin informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims.

24.    In other words, Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit.

25.    Mr. Seery's management duties come with a federally-imposed fiduciary duty under the Advisers Act of 1940.

26.    Mr. Seery had much to gain by Farallon holding the claims—namely, his knowledge that Farallon—as a friendly investor—would allow him to remain as CEO while Highland remains bankrupt and get paid (whereas plainly, the selling members of the UCC were ready to move on, thus truncating Seery's supposed gravy train). Mr. Seery's rich compensation package incentivized him to continue the bankruptcy for as long as possible.

27.    However, Mr. Seery is privy to material non-public information (i.e., "Inside Information") of many of the securities that Highland deals in, as well as in the funds that Mr. Seery manages through Highland. One of the assets was a publicly traded security that Highland was an insider of, and therefore, should not have traded (whether directly or indirectly), given its possession of insider information.

28.     Thus, his confidential tip to Farallon to purchase the claims may have violated certain of his duties as a Registered Investment Adviser, federal Securities laws, and his duties to the bankruptcy estate.

29.     Mr. Seery's duties also involve duties to manage the bankruptcy estate in a manner that would expeditiously resolve the bankruptcy. If the Unsecured Creditor Committee members (Acis, HarbourVest, and Redeemer) were indeed interested in selling their claims for less than the notional amount, then that would have been publicized in the required court filing. By failing to file them publicly and seeking court approval, the bankruptcy has been prolonged whilst Farallon seeks to reap a massive windfall return on its investment—a return that Seery apparently promised.

30.     The sale of assets authorized by A&M was not pursuant to normal means, and there is reason to doubt that A&M sought or obtained the highest price for the assets that it sold.

## IV.

## **RELIEF SOUGHT FROM ALVAREZ AND MARSAL**

31.     Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of A&M, on the following topics, and to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

  a.   A&M's rights and responsibilities and duties, including, but not limited to, under A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

  b.   The solicitation, offer, valuation, marketing, negotiation, and sale of the Highland bankruptcy claims or other assets by A&M on behalf of the Crusader Funds (and/or the Redeemer Committee) to any or all of Farallon, Stonehill Capital Management, LLC, Muck Holdings, LLC, Jessup Holdings, LLC, or any third party;

---

c.  A&M's valuation, and negotiation of the price, of the Claims, its bases therefor, and what it communicated to potential purchasers about the value of the Claims, if anything;

d.  The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to:

    i.  Any discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P., the Creditors Committee, Sidley Austin, LLP, and/or F.T.I. Consulting, regarding the Claims, any plans with regards to Highland Capital Management, L.P., the liquidation or the value of the Claims, the likelihood of and quantum of payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation;

    ii.  Any discussions with the purchasers of the Claims or other assets to, including, but not limited to, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC or Muck Holdings, LLC, regarding the Claims or other assets, Highland Capital Management, L.P., the value of the Claims, the likely payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation.

32.  As part of the Court's Order, Petitioner requests this Court to require A&M to produce the following documents at their respective depositions:

a.  All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.  A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

c.  Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

d.  Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims;

e.  All documents, agreements, contracts (including any drafts, letters of intent, confidentiality agreements, term sheets) or communications related to same,

relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

f.  Communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC, or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the claims, the liquidation of the Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

g.  Proofs of purchase of the Claims and other assets of the Crusader entities.

## V.

## RELIEF SOUGHT FROM FARALLON CAPITAL MANAGEMENT, L.L.C., MUCK HOLDINGS, LLC AND MICHAEL LIN

33.    Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of Farallon Capital Management, L.L.C. or Muck Holdings, LLC, and to depose Michael Lin, on the following topics, to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

a.  Farallon, Muck Holdings, LLC, and/or Lin's understanding of the value of the Claims, the assets held or controlled by or to be acquired by Highland Capital Management, L.P.., the liquidation value of the Estate of Highland Capital Management, L.P., and/or Claims, how and when the claims were expected to be paid and what the expected percentage payoff was going to be, and the bases for such understanding or belief, and what was communicated to them about the value of the Claims;

b.  The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to, any discussions with sellers of any of the Claims regarding the Claims and the sale/purchase of the Claims, discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P. regarding the Claims and his plans with regards to Highland, the value of the Claims, the likely payout of the Claims, the

pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation, or any disclosures by James Seery or Highland Capital Management, L.P. regarding how the Claims were going to be paid;

c.  Farallon and Michael Lin's awareness of material non-public information regarding Highland Capital Management, L.P. or securities held by Highland Capital Management, L.P.;

d.  Farallon and Michael Lin's relationship with James Seery or Highland Capital Management, L.P. and their knowledge of his role and their ongoing relationship with him.

34.  As part of the Court's Order, Petitioner requests this Court to require Farallon Capital Management, L.L.C., Muck Holdings LLC, and Michael Lin to produce the following documents at their respective depositions:

a.  All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.  Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

c.  Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims.

d.  All agreements, contracts, or other documents (including any drafts, letters of intent, confidentiality agreements, term sheets, or communications related to same) relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

e.  All communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings, LLC or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the Claims, the liquidation of the

Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

f.     Proofs of purchase of the Claims and other assets of the Crusader entities.

## VI.

## **REQUEST FOR HEARING & ORDERS**

35.     After service of this Amended Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on the Petition and order the requested relief.

36.     Document discovery is permitted by Rule 199.2. Rule 202.5 states that "depositions authorized by this Rule are governed by the rules applicable to depositions of nonparties in a pending suit. The scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed…." Rule 199.2 governs such actions and "expressly allows a party noticing a deposition to include a request for production of documents or tangible things within the scope of discovery and within the witness's possession, custody, or control." *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App.—Tyler 2018) (holding that district court properly ordered document discovery in Rule 202 action). *See also* Tex. R. Civ. P. 205.1(c) (authorizing party to compel discovery from a nonparty by court order or subpoena, including a request for production served with a deposition notice). *See also City of Dall. v. City of Corsicana*, Nos. 10-14-00090-CV, 10-14-00171-CV, 2015 Tex. App. LEXIS 8753, at *15-16 (Tex. App.—Waco Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition…. Accordingly, the trial court's order is not an abuse of discretion to the extent that it allows Navarro to obtain documents in an oral deposition under rule 199 or a deposition on written questions under rule 200."); *In re Anand*, No. 01-12-01106-CV, 2013 Tex. App. LEXIS 4157, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2013) ("the language of these rules when read together

permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents").

37.     **FOR THESE REASONS**, Petitioner asks the Court to set a date for hearing on this Amended Petition, and after the hearing, to find that the likely benefit of allowing Petitioner to take the requested depositions outweighs the burden or expense of the procedure.  Petitioner further asks the Court to issue an Order authorizing Petitioner to take the oral depositions of the Respondents after proper notice and service at the offices of Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, Texas 75201, within ten (10) days of the Court's Order, or as otherwise agreed to by the parties, and to produce the requested documents prior to said deposition. Petitioner also seeks any further relief to which he may be justly entitled.

Dated:  May 2, 2022                              Respectfully submitted,

                                                 **SBAITI & COMPANY PLLC**

                                                 */s/  Mazin A. Sbaiti*
                                                 **Mazin A. Sbaiti**
                                                 Texas Bar No. 24058096
                                                 **Brad J. Robinson**
                                                 Texas Bar No. 24058076
                                                 2200 Ross Avenue – Suite 4900W
                                                 Dallas, TX  75201
                                                 T:  (214) 432-2899
                                                 F:  (214) 853-4367
                                                 E:  mas@sbaitilaw.com
                                                      bjr@sbaitilaw.com

                                                 *Counsel for Petitioner*

                              **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on this 2nd day of May, 2022.

                                                 */s/ Mazin A. Sbaiti*
                                                 Mazin A. Sbaiti

---

**VERIFICATION**

STATE OF TEXAS   §
                 §
DALLAS COUNTY   §

Before me, the undersigned Notary Public, on this day personally appeared James Dondero
(hereinafter "Affiant"), who is over the age of 21 and of sound mind and body, who being by me
duly sworn, on his oath deposed and said that he has read the foregoing Amended Verified
Petition to Take Deposition Before Suit, and that the statements of fact therein are within his
personal knowledge and are true and correct as stated, Further, Affiant stated that the Affiant has
personal knowledge because of Affiant's relationships and interactions as described therein.



James Dondero

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of April, 2022, to certify which
witness my hand and official seal.

My commission expires on _____.

Notary Public of the State of Texas

seal

Robin Morrison
My Commission Expires
12/9/2025
Notary ID
133483390

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim James on behalf of Mazin Sbaiti
Bar No. 24058096
krj@sbaitilaw.com
Envelope ID: 64114982
Status as of 5/3/2022 2:58 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mazin Sbaiti | | MAS@SbaitiLaw.com | 5/2/2022 9:27:04 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| Kim James | | krj@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Jonathan Bridges | | jeb@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Brad Robinson | | bjr@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Charlotte Casso | | bcc@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |

# EXHIBIT C

002288

CAUSE NO. DC-21-09534

| | § | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| JAMES DONDERO, | § | DALLAS COUNTY, TEXAS |
| | § | |
| Petitioner. | § | 95TH JUDICIAL DISTRICT |
| | § | |

## ORDER

Came on for consideration the *Verified Amended Petition to Take Deposition Before Suit and Seek Documents* ("Petition") filed by petitioner James Dondero ("Dondero"). The Court, having considered the Petition, the responses filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Alvarez & Marsal CRF Management, LLC ("A&M"), the record, and applicable authorities, and having conducted a hearing on the Petition on June 1, 2022, concludes that Dondero's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that Dondero's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this ___ day of June, 2022.

HONORABLE MONICA PURDY

002289

# EXHIBIT D

# HELLER, DRAPER & HORN, L.L.C.

### *ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA  70130-6103
TELEPHONE: (504) 299-3300   FAX: (504) 299-3399

Douglas S. Draper
Direct Dial: (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

> ### *Re:   Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11*

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers.  Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

{00376610-1}



Case 19-34054-sgj11   Doc 3709-2   Filed 03/20/23   Entered 03/20/23 16:02:27   Desc
Case 3:23-cv-02071-E   Document 13-5   Filed 10/30/23   Page 56 of 214   PageID 1505

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

### 1.     The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires."  *See*
http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)).  And
Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession
shall file periodic financial reports of the value, operations, and profitability of each entity that is
not a publicly traded corporation or a debtor in a case under title 11, and in which the estate
holds a substantial or controlling interest."  This rule requires the trustee or a debtor in
possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and
every six months thereafter until the effective date of a plan of reorganization.  Fed R. Bankr. P.
2015.3(b).  Importantly, the rule does not absolve a debtor from filing reports due prior to the
effective date merely because a plan has become effective.[3]  Notably, the U.S. Trustee has the
duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C.
§ 1112(b)(4)(F), (H).

        The entire purpose of these guidelines and rules is to ensure that external stakeholders
can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal
requirements.  In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share
information it receives with those who "hold claims of the kind represented by the committee"
but who are not appointed to the committee.  In the case of the Highland bankruptcy, the
transparency that the EOUST mandates and that creditors' committees are supposed to facilitate
has been conspicuously absent.  I have been involved in a number of bankruptcy cases
representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's
structure here.  In those cases, when asked by third parties (shareholders or potential claims
purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3
reports.  In this case, however, no Rule 2015.3 reports were filed, and financial information that
might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large
number of documents were filed under seal or heavily redacted.  As a result, the only means to
make an informed decision as to whether to purchase creditor claims and what to pay for those
claims had to be obtained from non-public sources.

        It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of
the reports required under Bankruptcy Rule 2015.3.  There should have been at least four such
reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings.  The
U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

        The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention
of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office.  During the hearing on Plan
confirmation, the Debtor was questioned about the failure to file the reports.  The sole excuse
offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was
that the task "fell through the cracks."[4]  This excuse makes no sense in light of the years of
bankruptcy experience of the Debtor's counsel and financial advisors.  Nor did the Debtor or its
counsel ever attempt to show "cause" to gain exemption from the reporting requirement.  That is
because there was no good reason for the Debtor's failure to file the required reports.  In fact,
although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a
"byzantine empire," the assets of the estate fall into a handful of discrete investments, most of
which have audited financials and/or are required to make monthly or quarterly net-asset-value
or fair-value determinations.[5]   Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for
cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e]
reporting requirements, or that the information required by subdivision (a) is publicly available."  Fed. R. Bankr.
2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets
"[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

Case 19-34054-sgj11   Doc 3709-2   Filed 03/30/23   Entered 03/30/23 16:02:27   Desc
Case 3:23-cv-02071-E   Document 13-16   Filed 09/07/23   Page 58 of 214   PageID 1507

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

## 2.   There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6]   The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).
[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]  Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information.  Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3. The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court.  On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.  The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses.  In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level.  Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out."  Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise).  These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.  While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat").  Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9]  That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute.  Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims.  In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10]  If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor.  The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11]  It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12]  This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.    Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases.  Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions.  Several parties have appealed this issue to the Fifth Circuit.

### 4.    The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information.  The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely.  But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup").  The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill").  As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; see Appendix, p. A-57.
[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.
[11] See Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, In re Purdue Pharma, L.P., Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.
[12] See id. at 22.
[13] See Appendix, p. A-25.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

19 *See* Appendix, pp. A-25, A-28.

20 *See* Appendix, pp. A-2; A-62 – A-69.

{00376610-1}

October 5, 2021
Page 9

> committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] See Appendix, pp. A-70 – A-71.

**In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.**

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d) The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e) The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

Case 19-34054-sgj11   Doc 3709-4   Filed 03/30/23   Entered 03/30/23 16:02:23   Desc
Case 3:23-cv-02071-E   Document 28-1 Filed 09/14/23   Page 65 of 214   PageID 1514
Exhibit B and D   Page 204 of 177

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming.  Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery.  The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer.  If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties.  The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim.  The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members.  At the very least, there is enough credible evidence to warrant an investigation.  It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent.  The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders.  A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate.  In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

002301

# EXHIBIT E



**MUNSCH HARDT**

DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main  214.855.7500
Fax  214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530
Nan.r.Eitel@usdoj.gov

Re:    Highland Capital Management, L.P. Bankruptcy Case
       Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

**EXHIBIT**

002303

exhibitsticker.com

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

### Highland Capital Management and its Founder, James Dondero

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

### Circumstances Precipitating Bankruptcy

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are:  (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

002304

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

#### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b).  Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports.  28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### In Highland's Bankruptcy, the Regulatory Framework Is Ignored

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).
[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ☐2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).

[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.

[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

002310

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here.  In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.

[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] See Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

       The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

       While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

    a)    The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

    b)    Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

    c)    The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

    d)    There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

       An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

       Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

    (1)    If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 14

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)   If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization.  Some of these offers were valued at $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.
[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.
[30] Dkt. 854, ¶ 4 & Exh. 1.

Case 19-34054-sgj11   Doc 3699-2   Filed 03/30/23   Entered 03/30/23 16:02:23   Desc
Case 3:23-cv-02071-E   Document 52   Page 82 of 214   PageID 1531
Exhibit Exhibit 2 Page 100 of 172

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds— i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).
[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.
[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.
[34] *Id.* at 26-28.
[35] *See id.* at 22.

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.
[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____
       Davor Rukavina, Esq.

DR:pdm

# EXHIBIT F

002321

FILED
1/20/2023 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

DC-23-01004

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | 191st |
| HUNTER MOUNTAIN | § | |
| INVESTMENT TRUST | § | ____th JUDICIAL DISTRICT |
| | § | |
| *Petitioner*, | § | |
| | § | DALLAS COUNTY, TEXAS |

**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**
**VERIFIED RULE 202 PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, Hunter Mountain Investment Trust ("HMIT"), files this Verified

Petition ("Petition") pursuant to Rule 202 of the Texas Rules of Civil Procedure, seeking

pre-suit discovery from Respondent Farallon Capital Management, LLC ("Farallon") and

Respondent Stonehill Capital Management, LLC ("Stonehill") (collectively

"Respondents"), to allow HMIT to investigate potential claims against Respondents and

other potentially adverse entities, and would respectfully show:

**PARTIES**

1.      HMIT is a Delaware statutory trust that was the largest equity holder in

Highland Capital Management, L.P. ("HCM"), holding a 99.5% limited partnership

interest. HCM filed chapter 11 bankruptcy proceedings in 2019 and, as a result of these

002322

proceedings,[1] HMIT held a Class 10 claim which, post-confirmation, was converted to a Contingent Trust Interest in HCM's post-reorganization sole limited partner.

2.      Farallon is a Delaware limited liability company with its principal office in California, which is located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

3.      Stonehill is a Delaware limited liability company with its principal office in New York, which is located at 320 Park Avenue, 26th Floor, New York, NY 10022.

## VENUE AND JURISDICTION

4.      Venue is proper in Dallas County, Texas, because all or substantially all of the events or omissions giving rise to HMIT's potential common law claims occurred in Dallas County, Texas. In the event HMIT elects to proceed with a lawsuit against Farallon and Stonehill, venue of such proceedings will be proper in Dallas County, Texas.

5.      This Court has jurisdiction over the subject matter of this Petition pursuant to Texas Rule of Civil Procedure 202.[2] The amount in controversy of any potential claims against Farallon or Stonehill far exceeds this Court's minimum jurisdictional requirements. Without limitation, HMIT specifically seeks to investigate potentially actionable claims for unjust enrichment, imposition of a constructive trust with

---

[1] These proceedings were initially filed in Delaware but were ultimately transferred to and with venue in the U.S. Bankruptcy Court for the Northern District of Texas.

[2] The discovery relief requested in this Petition does not implicate the HCM bankruptcy court's jurisdiction. Furthermore, this Rule 202 Petition is not subject to removal because there is no amount in actual controversy and there is no cause of action currently asserted.

002323

disgorgement, knowing participation in breaches of fiduciary duty, and tortious interference with business expectancies.

6.     This Court has personal jurisdiction over the Respondents from which discovery is sought because both Farallon and Stonehill are doing business in Texas under Texas law including, without limitation, TEX. CIV. PRAC. & REM. CODE §17.042. Consistent with due process, Respondents have established minimum contacts with Texas, and the assertion of personal jurisdiction over Respondents complies with traditional notions of fair play and substantial justice. HMIT's potential claims against Respondents arise from and/or relate to Farallon's and Stonehill's contacts in Texas. Respondents also purposefully availed themselves of the privilege of conducting business activities within Texas, thus invoking the benefits and protections of Texas law.

## SUMMARY

7.     HMIT seeks to investigate potential claims relating to the sale and transfer of large, unsecured creditors' claims in HCM's bankruptcy to special purpose entities affiliated with and/or controlled by Farallon and Stonehill (the "Claims"). Upon information and belief, Farallon and Stonehill historically had and benefited from close relationships with James Seery ("Seery"), who was serving as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") at the time of the Claims purchases. Furthermore, still upon information and belief, because Farallon and Stonehill acquired or controlled the acquisition of the Claims under highly questionable

002324

circumstances. HMIT seeks to investigate whether Respondents received material non-public information and were involved in insider trading in connection with the acquisition of the Claims.

8.      The pre-suit discovery which HMIT seeks is directly relevant to potential claims, and it is clearly appropriate under Rule 202.1(b). HMIT anticipates the institution of a future lawsuit in which it may be a party due to its status as a stakeholder as former equity in HCM or in its current capacity as a Contingent Trust Interest holder, as well as under applicable statutory and common law principles relating to the rights of trust beneficiaries. In this context, HMIT may seek damages on behalf of itself or, alternatively, in a derivative capacity and without limitation, for damages or disgorgement of monies for the benefit of the bankruptcy estate.

9.      HMIT currently anticipates a potential lawsuit against Farallon and Stonehill as defendants and, as such, Farallon and Stonehill have adverse interests to HMIT in connection with the anticipated lawsuit. The addresses and telephone numbers are as follows: **Farallon Capital Management LLC**, One Maritime Plaza, Suite 2100, San Francisco, CA 94111, Telephone: 415-421-2132; **Stonehill Capital Management**, LLC, 320 Park Avenue, 26th Floor, New York, NY 10022, 212-739-7474 . Additionally, the following parties also may be parties with adverse interests in any potential lawsuit: **Muck Holdings LLC**, c/o Crowell & Moring LLP, Attn: Paul B. Haskel, 590 Madison Avenue, New York, NY 10022, 212-530-1823; **Jessup Holdings LLC**, c/o Mandel, Katz and Brosnan

002325

LLP, Attn: John J. Mandler, 100 Dutch Hill Road, Suite 390, Orangeburg, NY 10962, 845-6339-7800.

## BACKGROUND[3]

### A.    *Procedural Background*

10.    On or about October 16, 2019, HCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.

11.    On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM in the hundreds of millions of dollars; Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS") - and an unpaid vendor, Meta-E Discovery.

12.    Following the venue transfer to Texas on December 27, 2019, HCM filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary*

---

[3] All footnote references to evidence involve documents filed in the HCM bankruptcy proceedings and are cited by "Dkt." reference. HMIT asks the Court to take judicial notice of the documents identified by these docket entries.

002326

*Course* ("HCM's Governance Motion").[4] On January 9, 2020, the Court signed an order

approving HCM's Settlement Motion (the "Governance Order").[5]

13.      As part of the Governance Order, an independent board of directors—

which included Seery as one of the UCC's selections—was appointed to the Board of

Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors") HCM's general

partner. Following the approval of the Governance Order, the Board then appointed

Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer

("CRO") in place of the previous CEO.[6]  Seery currently serves as Trustee of the Claimant

Trust (HCM's sole post-reorganization limited partner) and, upon information and belief,

continues to serve as CEO of HCM following the effective date of the HCM bankruptcy

reorganization plan ("Plan").[7]

**B.      *Seery's Relationships with Stonehill and Farallon***

14.      Farallon and Stonehill are two capital management firms (similar to HCM)

that, upon information belief, have long-standing relationships with Seery. Upon

information and belief, they eventually participated in, directed and/or controlled the

acquisition of hundreds of millions of dollars of unsecured Claims in HCM's bankruptcy

on behalf of funds which they manage. It appears they did so without any meaningful

---

[4] Dkt. 281.
[5] Dkt. 339.
[6] Dkt. 854, Order Approving Retention of Seery as CEO/CRO.
[7] *See* Dkt. 1943, Order Approving Plan, p. 34.

002327

due diligence, much less reasonable due diligence, and *ostensibly* based their investment decisions only on Seery's input.

15.     Upon information and belief, Seery historically has had a substantial business relationship with Farallon and he previously served as legal counsel to Farallon in other matters. Upon information and belief, Seery also has had a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee[8] (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

## C.     *Claims Trading*

16.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of settlements with Redeemer, Acis, UBS, and another major creditor, HarbourVest[9] (the "Settlements") (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed claims:[10]

---

[8] Declaration of John A. Morris [Dkt. 1090], Ex. 1, pp. 15.
[9] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.
[10] Orders Approving Settlements [Dkt. 1273, Dkt. 1302, Dkt. 1788, Dkt. 2389].

002328

| Creditor | Class 8 | Class 9 |
|----------|---------|---------|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |

17. Although these Settlements were achieved after years of hard-fought litigation,[11] each of the Settling Parties *curiously* sold their claims to Farallon or Stonehill (or affiliated special purpose entities) shortly after they obtained court approval of their Settlements. One of these "trades" occurred within just a few weeks before the Plan's Effective Date.[12] Upon information and belief, Farallon and Stonehill coordinated and controlled the purchase of these Claims through special purpose entities, Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup") (collectively "SPEs").[13] Upon information and belief, both of these SPEs were created on the eve of the Claims purchases for the ostensible purpose of taking and holding title to the Claims.

18. Upon information and belief, Farallon and Stonehill directed and controlled the investment of over $160 million dollars to acquire the Claims in the absence of any publicly available information that could rationally justify this substantial investment. These "trades" are even more surprising because, at the time of the confirmation of HCM's Plan, the Plan provided only pessimistic estimates that these Claims would ever receive full satisfaction:

---

[11] Order Confirming Plan, pp. 9-11.
[12] Dkt. 2697, 2698.
[13] *See* Notice of Removal [Dkt 2696], ¶ 4.

002329

a. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[14]

    i. This meant that Farallon and Stonehill invested more than $163 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

b. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%* (down approximately $328.3 million);[15]

c. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million;[16]

d. Despite the stark decline in the valuation of the HCM bankruptcy estate and reduction in percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021[17] in the combined amount of approximately $163 million; and

e. Upon information and belief:

    i. Stonehill, through an SPE, Jessup, acquired the Redeemer Committee's claim for approximately $78 million;[18]

---

[14] Dkt. 1875-1, Plan Supplement, Exh. A, p. 4.

[15] Dkt. 2949.

[16] Dkt 1473, Disclosure Statement, p. 18.

[17] Notices of Transfers [Dkt. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

[18] July 6, 2021 Letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

002330

    ii.   The $23 million Acis claim[19] was sold to Farallon/Muck for approximately $8 million;

    iii.   HarbourVest sold its combined approximately $80 million in claims to Farallon/Muck for approximately $27 million; and

    iv.   UBS sold its combined approximately $125 million in claims for approximately $50 million to both Stonehill/Jessup and Farallon/Muck *at a time when the total projected payout was only approximately $35 million*.

19.    In Q3 2021, just over $6 million of the projected $205 million available to satisfy general unsecured claims was disbursed.[20] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[21] According to HCM's Motion for Exit Financing,[22] and a recent motion filed by Dugaboy Investment Trust,[23] there remain **substantial** assets to be monetized for the benefit of HCM's creditors. Thus, upon information and belief, the funds managed by Stonehill and Farallon stand to realize significant profits on their Claims purchases. In turn, upon information and belief, Stonehill and Farallon will garner (or already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the purchase of the Claims.

---

[19] Seery/HCM have argued that $10 million of the Acis claim is self-funding. Dkt. 1271, Transcript of Hearing on Motions to Compromise Controversy with Acis Capital Management [1087] and the Redeemer Committee of the Highland Crusader Fund [1089], p. 197.
[20] Dkt. 3200.
[21] Dkt. 3582.
[22] Dkt. 2229.
[23] Dkt. 3382.

002331

### D.    *Material Information is Not Disclosed*

20.    Bankruptcy Rule 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." No public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks."[24]

21.    As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction.[25] Approximately 19.1% of HCLOF's assets were comprised of debt and equity in Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). The HCLOF interest was not to be transferred to HCM for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[26]

22.    Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, upon information and belief, it appears that Seery may have acquired material non-public information regarding Amazon's now-consummated interest in acquiring MGM,[27] yet there is no record of Seery's disclosure of such

---

[24] Dkt. 1905, February 3, 2021 Hearing Transcript, 49:5-21.
[25] Dkt. 1625, p. 9, n. 5.
[26] Dkt. 1625.
[27] Dkt. 150-1.

002332

information to the Court, HCM's creditors, or otherwise. Upon the receipt of this material non-public information, HMIT understands, upon information and belief, that MGM was supposed to be placed on HCM's "restricted list," but Seery nonetheless continued to move forward with deals that involved MGM assets.[28]

23.    As HCM additionally held its own direct interest in MGM,[29] the value of MGM was of paramount importance to the value of HCM's bankruptcy estate. HMIT believes, upon information and belief, that Seery conveyed material non-public information regarding MGM to Stonehill and Farallon as inducement to purchase the Claims.

**E.    *Seery's Compensation***

24.    Upon information and belief, a component of Seery's compensation is a "success fee" that depends on the actual liquidation of HCM's bankruptcy estate assets versus the Plan projections. As current holders of the largest claims against the HCM estate, Muck and Jessup, the SPEs apparently created and controlled by Stonehill and Farallon, were installed as two of the three members of an Oversight Board in charge of monitoring the activities of HCM, as the Reorganized Debtor, and the Claimant Trust.[30] Thus, along with a single independent restructuring professional, Farallon and

---

[28] *See* Dkt. 1625, Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, filed December 23, 2020
[29] Motion for Exit Financing.[Dkt.2229]
[30] Dkt. 2801.

002333

Stonehill's affiliates oversee Seery's go-forward compensation, including any "success" fee.[31]

## DISCOVERY REQUESTED

25.    HMIT seeks to investigate whether Farallon and Stonehill received material non-public information in connection with, and as inducement for, the negotiation and sale of the claims to Farallon and Stonehill or its affiliated SPEs. Discovery is necessary to confirm or deny these allegations and expose potential abuses and unjust enrichment.

26.    The requested discovery from Farallon is attached as Exhibit "A", and includes the deposition of one or more of its corporate representatives and the production of documents. The requested discovery from Stonehill is attached as Exhibit "B", and includes the deposition of Stonehill's corporate representative(s) and the production of documents.

27.    Pursuant to Rule 202.2(g), the requested discovery will include matters that will allow HMIT to evaluate and determine, among other things:

  a.  The substance and types of information upon which Stonehill and Farallon relied in making their respective decisions to invest in or acquire the Claims;

  b.  Whether Farallon and Stonehill conducted due diligence, and the substance of any due diligence when evaluating the Claims;

---

[31] Claimant Trust Agreement [Dkt. 1656-2].

002334

c. The extent to which Farallon and Stonehill controlled the SPEs, Muck and Jessup, in connection with the acquisition of the Claims;

d. The creation and organizational structure of Farallon, Stonehill, Muck, and Jessup, as well as the purpose of creating Muck and Jessup as SPEs to hold the Claims;

e. Any internal valuations of Muck or Jessup's net asset value (NAV);

f. Any external valuation or audits of the NAV attributable to the Claims;

g. Any documents reflecting expected profits from the purchase of the Claims;

h. All communications between Farallon and Seery concerning the value and purchase of the Claims;

i. All communications between Stonehill and Seery concerning the value and purchase of the Claims;

j. All documents reflecting the expected payout on the Claims;

k. All communications between Farallon or Stonehill and HarbourVest concerning the purchase of the Claims;

l. All communications between Farallon or Stonehill and Acis regarding the purchase of the Claims;

m. All communications between Farallon or Stonehill and UBS regarding the purchase of the Claims;

n. All communications between Farallon or Stonehill and The Redeemer Committee regarding the purchase of the Claims;

o. All communications between Farallon and Stonehill regarding the purchase of the Claims;

002335

    p.   All communications between Farallon and Stonehill and investors in their respective funds regarding purchase of the Claims or valuation of the Claims;

    q.   All communications between Seery and Stonehill or Farallon regarding Seery's compensation as the Trustee of the Claimant Trust;

    r.   All documents relating to, regarding, or reflecting any agreements between Seery and the Oversight Committee regarding compensation;

    s.   All documents reflecting the base fees and performance fees which Stonehill has received or may receive in connection with management of the Claims;

    t.   All documents reflecting the base fees and performance fees which Farallon has received or may receive in connection with management of the Claims;

    u.   All monies received by and distributed by Muck in connection with the Claims;

    v.   All monies received by and distributed by Jessup in connection with the Claims;

    w.   All documents reflecting whether Farallon is a co-investor in any fund which holds an interest in Muck; and

    x.   All documents reflecting whether Stonehill is a co-investor in any fund which holds an interest in Jessup.

## BENEFIT OUTWEIGHS THE BURDEN

28.    The beneficial value of the requested discovery greatly outweighs any conceivable burden that could be placed on the Respondents. The requested information

002336

also should be readily available because the Respondents have been engaged in the bankruptcy proceedings relating to the matters at issue for several years.

29.    The important benefit associated with this requested discovery is also clear – it is reasonably calculated to determine whether the Respondents have unjustly garnered tens of millions of dollars of benefit based upon insider information. If this occurred, the monies received as a result of such conduct are properly subject to a constructive trust and disgorged. This would result in substantial funds available for other creditors, including those creditors in Class 10, which includes HMIT as a beneficiary. This significant benefit, in addition to the value of bringing proper light to the activities of Farallon and Stonehill as discussed in this petition, far outweighs any purported burden associated with requiring Respondents to sit for focused depositions concerning the topics and documents identified in Exhibits A and B.

## REQUEST FOR HEARING AND ORDER

30.    After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on this Petition.

## PRAYER FOR RELIEF

31.    Petitioner Hunter Mountain Investment Trust respectfully requests that the Court issue an order pursuant to Texas Rule of Civil Procedure 202 authorizing HMIT to take a deposition of designated representatives of Farallon Capital Management, LLC and Stonehill Capital Management, LLC. HMIT additionally requests authorization to

002337

issue subpoenas duces tecum compelling the production of documents in connection with the depositions in compliance with Tex. R. Civ. P. 205, and asks that the Court grant HMIT all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/ Sawnie A. McEntire_____
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    Ian B. Salzer
    State Bar No. 24110325
    isalzer@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Petitioner Hunter Mountain Investment Trust*

002338

## VERIFICATION

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

Before me, the undersigned notary, on this day personally appeared Mark Patrick, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

> "My name is Mark Patrick. I am the Administrator of Hunter Mountain Investment Trust, and I am authorized and capable of making this verification. I have read Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition ("Petition"). The facts as stated in the Petition are true and correct based on my  personal knowledge and review of relevant documents in the proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054, in the United States Bankruptcy Court in the Northern District of Texas, Dallas Division ."

_____

Mark Patrick


Sworn to and subscribed before me by Mark Patrick on January 20, 2023.

_____          

Notary Public in and for
the State of Texas

DEBORAH COLE
Notary ID #134079165
My Commission Expires
November 23, 2026


3116424.1

002339

# EXHIBIT G

002340

CAUSE NO. DC-23-01004

| IN RE: | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **191ST JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

### DECLARATION OF JAMES DONDERO

| STATE OF TEXAS | § |
|---|---|
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to <mark>Texas Civil Practice & Remedies Code § 132.001</mark> and declares as follows:

1. My name is James Dondero. I am over twenty-one (21) years of age. I am of sound mind and body, and I am competent to make this declaration. The facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I previously served as the Chief Executive Officer ("CEO") of Highland Capital Management, L.P. ("HCM"). Jim Seery succeeded me in this capacity following the entry of various orders in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. My purpose was to alert Mr. Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades. A true and correct copy of this email is attached hereto as Exhibit "1".

4. In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. They also stated they were particularly optimistic because of the expected sale of MGM.

5. During one of these calls involving Mr. Linn, I asked whether they would sell the claims for 30% more than they had paid. Mr. Linn said no because Mr. Seery said they were worth a lot more. I asked Mr. Linn if he would sell at any price and he said that he was unwilling to do so. I believe these conversations with Farallon were taped by Farallon.

6. My name is James Dondero, my date of birth is June 29, 1962, and my address is 3807 Miramar Ave., Dallas, Texas 75205, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the 15th day of February 2023.

_____

JAMES DONDERO

# Exhibit 1

002344

**From:** Jim Dondero <JDondero@highlandcapital.com>
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin" <JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>
**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>
**Subject:** Trading restriction re MGM - material non public information
**Date:** Thu, 17 Dec 2020 14:14:39 -0600
**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.
Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

Sent from my iPhone

002345

# EXHIBIT H

002346

CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § § § § § § § | IN THE DISTRICT COURT |
| HUNTER MOUNTAIN INVESTMENT TRUST, | | DALLAS COUNTY, TEXAS |
| Petitioner. | | 191ST JUDICIAL DISTRICT |

## ORDER

Came on for consideration *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* ("Petition") filed by petitioner Hunter Mountain Investment Trust ("HMIT"). The Court, having considered the Petition, the joint verified response in opposition filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"), HMIT's reply, the evidence admitted during the hearing conducted on February 22, 2023, the argument of counsel during that hearing, Farallon's and Stonehill's post-hearing brief, the record, and applicable authorities, concludes that HMIT's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that HMIT's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this _____ day of March, 2023.

_____
HONORABLE GENA SLAUGHTER

002347

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS OPPOSED APPLICATION FOR EXPEDITED HEARING AND RESPONSE TO <u>OBJECTIONS FILED BY RESPONDENTS</u>**

Hunter Mountain Investment Trust ("<u>HMIT</u>"), Movant, on behalf of itself and

derivatively on behalf of the Reorganized Debtor and the Highland Capital Trust, files

this Reply in Support of its Opposed Application for Expedited Hearing and Response to

the Objections filed by Respondents ("Reply"), which responds to the (1) Objection to

002348

Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3704) filed by Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), and Stonehill Capital Management, LLC ("Stonehill") (collectively the "Muck/Jessup Objection") and (2) Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3707) which states that it is filed by Highland Capital Management, L.P. ("HCMLP"), the Reorganized Debtor, and the Highland Claimant Trust (the "Trust"), as well as James P. Seery, Jr. solely in his capacities as Chief Executive Officer of HCMLP and the Claimant Trustee ("Seery") (collectively, the "Objection").[1] By this Reply in Support of its Opposed Application for Expedited Hearing ("Application") (Doc. 3700), HMIT seeks an accelerated hearing on its Emergency Motion for Leave to File Verified Adversary Proceeding ("Motion") (Doc. 3699), and states as follows:

A.    **Objection Filed by The "Highland Parties"**

1.        The Objection filed on behalf of the so-called "Highland Parties" distorts the reality and nature of the proposed Adversary Proceeding. HMIT seeks leave to represent the Reorganized Debtor, Highland Capital Management, L.P. ("Reorganized

---

[1] The Objection incorrectly and expediently attempts to recharacterize or limit the capacity in which Mr. Seery may be sued in the proposed Adversary Proceedings.

002349

Debtor") and the Highland Capital Trust ("Claimant Trust") in a derivative capacity. They are not defendants against whom any relief is sought; rather, HMIT seeks damages and other relief *on behalf of* both the Reorganized Debtor and the Claimant Trust.

2.      Mr. Morris and the Pachulski law firm should consider whether they have an apparent conflict in their attempt to represent the Reorganized Debtor and the Claimant Trust while concurrently representing Mr. Seery in proceedings relating to the proposed Adversary Proceeding. To the extent Mr. Morris seeks to represent the Reorganized Debtor and the Claimant Trust in these current proceedings, his attempt to do so confirms the futility of any further demand to the representatives of the Claimant Trust or the Reorganized Debtor to prosecute the claims (as set forth in the proposed Adversary Proceeding) against Mr. Seery and others. No further proof of futility is needed. The Objection, on its face, reinforces and further confirms the need and propriety of HMIT's request to bring this action as a derivative action against Mr. Seery and others.

**B.      Weaponized Gatekeeping Order**

3.      One of the principal arguments advanced in the Objection is stunning. The Objection urges this Court to delay a ruling on HMIT's Application so Mr. Seery can develop a potential statute of limitations defense. In essence, counsel is using the Court's Gatekeeping orders as a sword to create an opportunity (where none currently exists) to assert that one or more of the proposed claims are time-barred. To be clear, HMIT is

002350

seeking to comply with the Court's Gatekeeping orders, and counsel seeks to punish HMIT for doing so.

4.       There should be no doubt that HMIT's proposed Adversary Proceeding would be filed already *but for* HMIT's efforts to comply with the Court's Gatekeeping requirements and the injunction provisions of the Plan.[2] Thus, the Objection is attempting to abuse the Court's gatekeeping procedures in a way that betrays any concept of fairness and justice.

5.       Furthermore, the Objection, if indulged, will potentially injure the Reorganized Debtor and the Claimant Trust further indicating an apparent conflict of interest.

6.       Mr. Seery's Objection also continues to distort the relationship between Mr. Dondero and HMIT. Mr. Dondero is a fact witness in HMIT's proposed Adversary Proceeding. The rhetoric about Mr. Dondero and Mr. Patrick is irrelevant and a mere distraction in the context of the pending Application.

## C.       The "Muck, Jessup" Objection

7.       The Muck/Jessup Objection consists of four pages, three of which are devoted to rhetoric regarding Jim Dondero that is irrelevant to the issues before the Court. The Muck/Jessup Objection also states that HMIT's Rule 202 Proceedings should

---

[2] Doc. 1943, The Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

002351

not have been filed, and that HMIT should have requested discovery in these bankruptcy proceedings. However, as reflected in the transcript attached to HMIT's Motion for Leave, at Exhibit 4-B, the decision to pursue Rule 202 discovery in Texas state court was based on the notion that the process and procedures in state court would be comparatively less time consuming. Now, Muck, Jessup, Farallon, and Stonehill seek further unwarranted, self-serving delays.

8.     Muck, Jessup, Farallon, and Stonehill are familiar with the exhibits attached to HMIT's Motion; they are also acutely familiar with the claims identified in HMIT's Motion and the proposed Adversary Proceeding. This is because they defended the recent Rule 202 Proceedings which involved many of the same issues and exhibits. Any suggestion they need substantially more time to respond is yet another thinly veiled attempt to fabricate a statute of limitations defense—where none should exist.

**D.     Good Cause for an Expedited Hearing**

As outlined in the Application and Motion, good causes exists under Rule 9006 of the Federal Rules of Bankruptcy Procedure to authorize a shortened time for a response and hearing. The objections focus on criticisms rather than providing the Court with any compelling arguments against an expedited hearing. Again, an expedited hearing is intended to benefit the Reorganized Debtor and the Claimant Trust.

002352

E.      **Request for Expedited Hearing**

HMIT again requests that the Court schedule HMIT's Motion for Leave for the earliest time convenient to the Court during the week of April 3. HMIT's request is reasonable, and it seeks an expedited hearing to avoid creating a potential defense that would not otherwise exist. Accordingly, HMIT requests its Application be granted.

DATED: March 31, 2023.                     Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie A. McEntire*
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    Texas State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Hunter Mountain Investment Trust*

002353

## CERTIFICATE OF SERVICE

I certify that on the 31st day of March 2023, a true and correct copy of the foregoing Amended Certificate of Conference was served on all counsel of record via the Court's CM/ECF system or, as appropriate, on the Respondents directly.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

002354



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §    Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §    Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## ORDER DENYING APPLICATION FOR EXPEDITED HEARING [DE # 3700]

This Order is issued in response to the *Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* ("Expedited Haring Request") [DE # 3700] filed by Hunter Mountain Investment Trust ("HMIT" or "Movant") on March 28, 2023, at 4:09 p.m. C.D.T. The Expedited Hearing Request seeks a hearing within three days, or as soon thereafter as counsel can be heard, on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* ("Motion for Leave") which was filed on March 28, 2023, at 4:02 p.m. C.D.T.

1

002355

The court has concluded that no emergency or other good cause exists, pursuant to Fed. R. Bankr. Proc. 9006, and the *Expedited Hearing Request* will be denied. The *Motion for Leave* will be set in the ordinary course (after 21 days' notice to affected parties)—i.e., after April 18, 2023.

The *Motion for Leave* is 37 pages in length and contains 350 pages of attachments.  It seeks leave from the bankruptcy court—pursuant to the bankruptcy court's "gatekeeping" role[1] under the confirmed Chapter 11 plan of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor")—to sue at least the following parties:  Muck Holdings, LLC ("Muck"); Jessup Holdings, LLC ("Jessup"); Farallon Capital Management, LLC ("Farallon"); Stonehill Capital Management, LLC ("Stonehill"); James P. Seery, Jr. ("Seery"); and John Doe Defendant Nos. 1-10 (collectively, the "Affected Parties").  The conduct that is described as a basis for the desired lawsuit is certain trading of unsecured claims that occurred in 2021 during the Highland bankruptcy case.[2] It appears that millions of dollars of damages are sought by Movant, who was formerly the largest indirect (ultimate) equity holder of Highland.  The legal theories (e.g., breaches of fiduciary duties; fraud; conspiracy; equitable disallowance) are novel in the bankruptcy claims trading context.  The bankruptcy court, pursuant to the Highland plan, will need to analyze whether such claims are "colorable" such that leave to sue should be granted.

The Affected Parties—and other parties in interest in the underlying bankruptcy case, for that matter—should be afforded a reasonable opportunity to respond to the *Motion for Leave*. While Movant, HMIT, has alleged that it may be facing a statute of limitations defense as to

---

[1] The bankruptcy court's "gatekeeping" role was recently affirmed by the Fifth Circuit in *In re Highland Capital Management, L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Notice of the claims trading was provided in filings in Highland bankruptcy case, as follows: Claim No. 23 (DE ## 2211, 2212, and 2215), Claim Nos. 190 and 191 (DE ## 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (DE # 2263), Claim No. 81 (DE # 2262), Claim No. 72 (DE # 2261).

002356

some claims after April 16, 2023, it appears that Movant has known about the conduct

underlying the desired lawsuit for well over a year, based on activity that has occurred in the

bankruptcy court.  *See, e.g., Memorandum Opinion and Order Granting James Dondero's*

*Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request,*

*and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon*

*Capital Management LLC* [DE # 22], in Adv. Proc. # 21-03051 (January 4, 2022).  Thus, the

need for an emergency hearing is dubious. Accordingly

      IT IS ORDERED that the Expedited Hearing Request is denied.

      Counsel shall contact the Courtroom Deputy for a setting on the *Motion for Leave*, which

setting shall be no sooner than April 19, 2023.

<div align="center">* * * END OF ORDER * * *</div>

002357

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR
LEAVE TO FILE INTERLOCUTORY APPEAL**

Hunter Mountain Investment Trust ("HMIT" or "Movant") files this Emergency

Motion for Leave to File Interlocutory Appeal ("Emergency Motion") of this Court's

orders: (1) denying Hunter Mountain Investment Trust's Opposed Application for

Expedited Hearing on its Emergency Motion for Leave to File Verified Adversary

002358

Proceeding (Doc. 3700)[1] ("Expedited Hearing Request"), and (2) requiring HMIT to contact the Court's clerk to set a hearing no sooner than April 19, 2023, both of which are contained in the "Order Denying Application for Expedited Hearing [DE #3700]" (Doc. 3713) ("Order") entered in this matter on March 31, 2023,[2] and respectfully shows as follows:

## BACKGROUND

1.     Under the Fifth Amended Plan of Reorganization of Highland Capital Management, the Bankruptcy Court holds a gatekeeping role with exclusive authority to predetermine the colorability of any civil action to be brought against "Protected Parties" (as defined in the confirmed Plan) before such an action can be filed ("Gatekeeping Order").[3] The gatekeeping protocol requires the Bankruptcy Court, after notice, to conduct a hearing upon a motion for leave to file an action, if there is a dispute.[4]

2.     After first attempting to conduct related discovery on an expedited basis in Texas state court, which was denied, on March 8, 2023, HMIT filed its Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699) ("Emergency Motion For

---

[1] Unless otherwise referenced, all references to evidence involving documents filed in the Debtor's bankruptcy proceedings (Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)) are cited by "Doc." reference. HMIT asks the Court to take judicial notice of the documents identified by such entries.

[2] A copy of the Order is attached hereto as an exhibit to the Notice of Appeal attached hereto as Exhibit 1.

[3] Fifth Amended Plan of Reorganization of Highland Capital Management (Doc. 1808) at Article IX(F), pp. 51-52.

[4] Id.

002359

Leave"), attaching thereto the proposed Verified Adversary Proceeding as Exhibit 1 (Doc. 3699-1) (the "Adversary Proceeding").[5] The Emergency Motion For Leave and proposed Adversary Proceeding included lengthy and detailed allegations and evidence supporting HMIT's proposed claims. In the proposed Adversary Proceeding, HMIT seeks to sue in its individual capacity and in a derivative capacity on behalf of the Reorganized Debtor, Highland Capital Management, L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust ("Claimant Trust") against Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr. ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendant Nos. 1-10 (collectively, "Proposed Defendants")) asserting, *inter alia*, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and fraud.[6]

3.      On March 28, 2023, HMIT filed its Application for Expedited Hearing on the Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3700) ("Application"). The principal justification for the emergency hearing requested in the Application was because of a fast-approaching date (April 16, 2023) that one or more of

---

[5] HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699), including the proposed Verified Adversary Proceeding attached as Exhibit 1 (Doc. 3699-1) to that motion, are on file in this matter and are  incorporated herein by reference.

[6] *See* the proposed Adversary Proceeding.

the Proposed Defendants will argue constitutes the expiration of the statute of limitations concerning some of the common law claims available to Movant. Although HMIT previously offered to enter into tolling agreements with each of the Proposed Defendants with whom they have successfully contacted, this offer was either rejected or HMIT did not receive an affirmative agreement to do so. While conferring regarding this Emergency Motion and HMIT's related application for expedited hearing on Monday, April 3, 2023, HMIT reiterated its request for a tolling agreement – but the Proposed Defendants have either rejected this request or not responded (and are presumed to have rejected it per the related correspondence) as of the filing of this Emergency Motion. *See* e-mail correspondence from Mr. John Morris dated April 2, 2023, with included e-mail chain, a true and correct copy of which is attached to and incorporated in this Emergency Motion as Exhibit 2;[7] *see also* e-mail correspondence from HMIT counsel Roger McCleary to counsel for Farallon, Stonehill, Muck, and Jessup, dated April 2, 2023, with included e-mail chain, a true and correct copy of which is attached to and incorporated in this Emergency Motion as Exhibit 3.

---

[7] In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor or the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of, the substantive content of, or any procedural need for Mr. Morris's request to be identified as counsel for the Reorganized Debtor and Highland Claimant Trust in the certificate of conference related to this Emergency Motion. Exhibit 2 is attached for the limited purposes of this Emergency Motion and HMIT makes no admission of any kind in this regard to Exhibit 2.

002361

4.      Accordingly, this Emergency Motion has become necessary. Because the Emergency Motion For Leave is necessary, given the Bankruptcy Court's Gatekeeping Order and the injunction provisions of the Plan, emergency leave is required. Expedited consideration of the Emergency Motion For Leave and of this Emergency Motion seeking interlocutory appeal is necessary and appropriate to protect and preserve the rights of the Reorganized Debtor, the Highland Claimant Trust, and HMIT.[8]

5.      On March 30, 2023, Muck, Jessup, Farallon, and Stonehill filed objections claiming they needed time to evaluate the claims. The Objection filed on behalf of Mr. Seery argued that the Court should not grant the Application or agree to an expedited hearing on the Emergency Motion for Leave, and invited the Court to allow an argument that limitations bars some of HMIT's claims without considering the merits (together, "Objections").[9]

6.      On March 31, 2023, HMIT filed its Reply In Support of Its Opposed Application for Expedited Hearing and Response to Objections Filed by Respondents

---

[8]  HMIT respectfully requests that this Emergency Motion be addressed and decided on an expedited basis that provides HMIT sufficient time to bring the proposed action or to seek review/relief timely. In the event the Court denies the requested relief, HMIT respectfully requests prompt notice of the Court's ruling to allow HMIT sufficient time to seek, if necessary, appropriate review/relief. In order to have a fair opportunity to seek such relief on a timely basis and protect HMIT's rights and the rights of the Reorganized Debtor, HMIT anticipates it will need to seek review/relief as soon as possible in the event HMIT's application for expedited hearing on this Emergency Motion is not granted on or before April 5, 2023, or in the event this Emergency Motion has not been or cannot be resolved by on or before Monday, April 10, 2023. However, HMIT reserves its rights to pursue appropriate review/relief at any time.

[9] As stated, despite claiming that they needed more time to evaluate the claims, the Proposed Defendants refused to enter into a tolling agreement.

002362

(Doc. 3712) ("Reply"), stating in reply to the Objections that the Proposed Defendants had ample notice of the proposed claims because they were the subject of pre-litigation discovery requests and that the Proposed Defendants should not be allowed to weaponize the Gatekeeping Order and gatekeeping protocol to fashion a possible limitations defense (as an attempt to avoid a merits-based consideration of the claims).[10]

7.      Within an hour after HMIT filed its Reply, the Bankruptcy Court entered the Order denying HMIT's emergency request and *sua sponte* ordering HMIT to contact the Court's clerk to schedule the hearing no sooner than April 19, 2023.[11]

## PRELIMINARY STATEMENT

8.      Since the filing of the Emergency Motion for Leave, HMIT has become aware of authority holding that the filing of the Emergency Motion for Leave, with the attached proposed Adversary Proceeding, likely tolls the applicable statutes of limitations as to at least one of the Proposed Defendants, so that the hearing date set by the Bankruptcy Court may be irrelevant as to that Proposed Defendant. However, it is also clear that at least one of the Proposed Defendants does not agree. HMIT still has a valid concern about the need for an expedited hearing because counsel for Mr. Seery is aggressively arguing  that all Proposed Defendants should be given the advantage of an

---

[10] HMIT's Reply is incorporated herein by reference in its entirety.

[11] As stated, one or more of the Proposed Defendants will argue that HMIT's claims will be barred by limitations as of April 16, 2023.

002363

opportunity to argue the running of the applicable statute of limitations.[12] It is also clear that all of the Proposed Defendants have refused HMIT's request for a tolling agreement or refused to respond to the request to do so.

9.    HMIT therefore finds itself in an incongruous situation. On the one hand, the filing of the Emergency Motion for Leave likely tolls the running of any applicable limitations periods as to at least one of the Proposed Defendants. On the other hand, HMIT's concerns about the limitations defense are clearly well founded, as Proposed Defendants' counsel is otherwise arguing that the Bankruptcy Court should provide all Proposed Defendants the affirmative defense of limitations by scheduling the gatekeeping hearing on a date that they claim constitutes the expiration of the limitations period on various common law claims.

## QUESTIONS PRESENTED

10.    Does the threat of a potential limitations defense potentially barring some of HMIT's proposed Adversary Proceeding claims justify an interlocutory appeal of the Order denying an expedited hearing upon the HMIT Motion for Leave?

11.    Does the threat of a potential limitations defense potentially barring some of HMIT's proposed Adversary Proceeding claims justify an interlocutory appeal of the Bankruptcy Court's Order requiring that a hearing be set no sooner than April 19, 2023,

---

[12] This argument could be extended, of course, to include the assertion that the Bankruptcy Court should withhold ruling on the Emergency Motion for Leave until all applicable limitations periods have run, and then deny leave to file the proposed Adversary Proceeding due to the running of the limitations period.

002364

when it is clear that the Proposed Defendants will argue that at least certain of the claims
in the proposed Adversary Proceeding must be dismissed because of the running of
applicable statutes of limitations as of April 16, 2023 (three days before the Bankruptcy
Court's scheduled hearing date)?

12.     Does *Newby v. Enron Corp.*, <mark>542 F.3d 463, 470</mark> (5th Cir. 2008) require a finding
by the Honorable District Court that the filing of the Motion for Leave tolled the
applicable statutes of limitations so that (i) the date of the Bankruptcy Court's scheduled
hearing on the Emergency Motion for Leave is irrelevant and (ii) therefore, this
Emergency Motion for leave to appeal should be denied?

## STANDARD

13.     An appeal from an interlocutory order or decree of a bankruptcy court is
governed by <mark>28 U.S.C. §158(a)(3)</mark>. Section 158(a)(3) does not articulate the standard a
district court must use in deciding whether to grant leave in its discretion, but "[c]ourts
in the Fifth Circuit ... have applied <mark>28 U.S.C. § 1292(b)</mark>, the standard governing
interlocutory appeals generally." *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-
1902-G, <mark>2013 WL 524418</mark>, at *2 (N.D. Tex. Feb. 11, 2013)(*citing In re Ichinose*, <mark>946 F.2d 1169,</mark>
<mark>1177</mark> (5th Cir. 1991)). The decision whether to grant an interlocutory appeal is firmly
within the district court's discretion. *Id.*; *Ryan v. Flowserve Corp.*, <mark>444 F.Supp.2d 718, 723-</mark>
<mark>24</mark> (N.D. Tex. 2006) (internal citation omitted).

002365

14.    "Section 1292(b) expressly permits a district court to certify an order for interlocutory appeal only if it 'involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.' 28 U.S.C.A. § 1292(b) (1994 & Supp. 2005). This terminology was intended to restrict the category of cases suitable for permissive appeal, but courts have not always agreed on the contours of the stated limitations. *See* 16 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3929 at 366–67 (2d ed.1996). *See generally Ahrenholz v. Bd. of Trustees of the Univ. of Illinois,* 219 F.3d 674, 676 (7th Cir. 2000) ("The [§ 1292(b) criteria, unfortunately, are not as crystalline as they might be...."). For example, at times, courts including the Fifth Circuit have held that § 1292(b) appeals are appropriate under only "exceptional" circumstances or in "big" cases. *Clark–Dietz and Associates-Engineers v. Basic Constr. Co.,* 702 F.2d 67, 69 (5th Cir.1983) (explaining that interlocutory appeals are permitted only under "exceptional" circumstances); *see Gottesman v. Gen. Motors Corp.,* 268 F.2d 194, 196 (2d Cir.1959) (clarifying that certification should be "strictly limited to the precise conditions stated in the law"); WRIGHT & MILLER, *supra,* § 3929 at 365 & n. 10 (internal citations omitted) (collecting cases holding interlocutory appeal appropriate only in "big" or "exceptional" cases). Conversely, at other times courts—the Fifth Circuit included—have employed a more flexible approach to § 1292(b) appeals." *Ryan,* 444 F. Supp. at 721.

15.     For more clarification, courts have found substantial ground for difference of opinion (justifying an interlocutory appeal) where a court order determines a matter which appears contrary to the rulings of Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented. *Id.* at 723-24 (internal citation omitted). Here, in a case substantially similar to this case, the Fifth Circuit has found that a court order which requires a proposed claim to be filed more than 21-days in advance of the limitations date is improper. *See, e.g.*, *Newby v. Enron Corp.*, 542 F.3d 463, 470 (5th Cir. 2008).

### RIGHT TO INTERLOCUTORY APPEAL SHOULD BE GRANTED, OR, ALTERNATIVELY, SHOULD BE DENIED BASED UPON *NEWBY v. ENRON CORP.*, 542 F.3d 463, 470 (5th Cir. 2008)

16.     The controlling issue of law is whether good cause exists to require an emergency hearing on HMIT's proposed Adversary Proceeding. Fed. R. Bank P. 9006 (c)(1) authorizes a shortened time for a response and hearing for good cause.  As set forth in its Application seeking an expedited hearing upon its Emergency Motion For Leave, in addition to a potential limitations consideration, good cause exists and separately justifies expedited action on the Emergency Motion For Leave, to hasten HMIT's right to

002367

pursue prompt relevant discovery (which the Proposed Defendants refused in pre-litigation), and reduce the threat of loss of potentially key evidence.[13]

17.    The proposed Adversary Proceeding alleges claims which are substantially more than "colorable" based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding and abetting) breaches of fiduciary duty. The proposed Adversary Proceeding also alleges that the Proposed Defendants did so collectively by falsely representing the value of the Debtor's Estate, failing to timely disclose accurate values of the Debtor's Estate, and trading on material non-public information regarding such values. HMIT also alleges that the Proposed Defendants colluded to manipulate the Debtor's Estate—providing Seery the opportunity to plant close business allies into positions of control to approve Seery's compensation demands following the Effective Date.

18.    Relief upon this Emergency Motion is justified because it is now clear that one or more of the Proposed Defendants will argue, depending upon choice of law, that the statute of limitations may bar some of the common law claims, and further that the Bankruptcy Court should act to assist them in creating a statute of limitations defenses.[14]

---

[13] Upon information and belief, Proposed Defendant Seery has been deleting text messages on his personal iPhone via a rolling, automatic deletion setting.

[14] The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

The proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan. Allowing any potential limitations to bar any of the claims would result in a substantial injustice which far outweighs any potential harm to the Proposed Defendants.[15] *See Newby*, 542 F.3d at 470.

19.    *Newby v. Enron* held that the district court erred when finding it would not adjudicate a motion for leave before the applicable statute of limitations ran. In other words, as shown below, *Newby v. Enron* held that a motion for leave should be heard prior to any applicable limitations deadline. While HMIT is under no illusion that the Bankruptcy Court grounded its ruling in *Newby*, it is the position of HMIT that perhaps, in fact, the scheduled hearing date is irrelevant. Counsel for Proposed Defendants has clearly threatened (i) that the running of the limitations periods continues and (ii) that Proposed Defendants should be given access to the affirmative defenses through scheduling (which as stated could easily extend to date of ruling).[16]

---

[15] As of December 31, 2022, the Claimant Trust has distributed $255,201,228.[15] On a *pro rata* basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000. Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary. The benefits to the Reorganized Debtor, the Claimant Trust and innocent stakeholders are undeniable. Further, under the present circumstances and time constraints, an interlocutory appeal should be granted to avoid the prospect of the loss of some of HMIT's and the Claimant Trust's claims and denial of due process.

[16] *See* Highland Parties' Objection to Expedited Hearing on the Emergency Motion for Leave (Doc. 3707).

002369

20.     Therefore, HMIT briefs the issue of whether the Bankruptcy Court could facilitate a defendant's affirmative defense of statute of limitations by delaying adjudication of HMIT's motion.

21.     In *Newby v. Enron*, a district court enjoined a law firm from filing any new actions related to a Chapter 11 debtor without leave of court. The law firm then moved to file 34 lawsuits in state court. There, the motion for leave was filed on October 14, 2005 and the statute of limitations of some of the claims expired on October 17, 2005. The district court denied the motion, in part finding that these claims would be barred by the applicable statute of limitations by the time the motion was considered on November 3, 2005. The law firm appealed. The Fifth Circuit explained that:

> The district court was incorrect, however, in denying the motion for leave to file suit for the claims that have a four-year statute of limitations. The court did not cite any authority for using its own local rules to dictate the state's filing date for purposes of Texas's relation-back principle. In effect, the district court was requiring the Fleming Firm either to file a motion for leave at least twenty days before the statute of limitations expired—or perhaps even earlier if the district court did not rule on the motion in time— or to violate the injunction by filing in state court within the limitations period. *Cf. Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 334 (7th Cir. 2005) ("The logic underlying [using the date of filing for limitations purposes as opposed to the date the court rules on the motion] is that defendants are on notice of the amendment when the motion is filed and it would be unfair to plaintiffs if a trial court waited months or years to rule."). Thus, the district court should have allowed the Texas state courts to decide whether the filing of the state petitions relates back to the filing of the motion for leave to file suit (for the claims that have a four-year statute of limitations), meaning that these claims might not be futile. Because the Fleming Firm sought to file these claims before the statute of limitations expired, it is up to the state court to determine how to proceed. In sum, the district court improperly denied the motion for leave to file the claims involving common

002370

law fraud and fraud-on-the-market (Count I), statutory fraud (Count III), and aiding and abetting common law fraud (Count VI), because these claims all have a four-year statute of limitations, and the Fleming Firm submitted its motion for leave to file suit before that limitations period expired.

*Newby v. Enron Corp.*, 542 F.3d at 470.

24.    Despite binding precedent that precludes a Bankruptcy Court from effectively shortening a state law statute of limitations based on its local practice for setting motions, this is exactly what the Proposed Defendants have asked the Bankruptcy Court to do (in fact, arguing that if the Bankruptcy Court did not do so, it would fundamentally prejudice the Proposed Defendants). The Bankruptcy Court did what the Proposed Defendants asked of it, and therefore, this raises the issue of whether an interlocutory appeal should be granted to correct any assertion that the Bankruptcy Court could provide an affirmative defense of statute of limitations through its local motion practice, or, should be denied on the basis that the Fifth Circuit has already instructed that it cannot.

### **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave to file an interlocutory appeal of the Order, and all such other and further relief to which HMIT may be justly entitled.

Dated: April 4, 2023.

002371

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:   */s/ Sawnie A. McEntire*
       Sawnie A. McEntire
       Texas State Bar No. 13590100
       smcentire@pmmlaw.com
       1700 Pacific Avenue, Suite 4400
       Dallas, Texas 75201
       Telephone: (214) 237-4300
       Facsimile: (214) 237-4340

       Roger L. McCleary
       Texas State Bar No. 13393700
       rmccleary@pmmlaw.com
       One Riverway, Suite 1800
       Houston, Texas 77056
       Telephone: (713) 960-7315
       Facsimile: (713) 960-7347

       *Attorneys for Hunter Mountain Investment Trust*

002372

## **CERTIFICATE OF CONFERENCE**

Counsel for Mr. Seery, who also claims to represent the Reorganized Debtor and the Highland Claimant Trust in these instant proceedings, states that he is opposed to this Emergency Motion. In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor and the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of or the substantive content of Mr. Mr. Morris's requested identification as counsel for the Reorganized Debtor and the Highland Claimant Trust, but HMIT is filing this certificate in this manner solely to accommodate Mr. Morris's request.

Although we conferred with counsel for the other respondents on April 3, 2023, we were told they would try to respond by the afternoon of April 3, 2023, but they have not done so. We, therefore, assume they are opposed to this Emergency Motion.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

## **CERTIFICATE OF SERVICE**

I certify that on the 4th day of April 2023, a true and correct copy of the foregoing motion was served on all counsel of record or, as appropriate, on the Respondents directly.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

002373

# Exhibit 1

002374

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

### HUNTER MOUNTAIN INVESTMENT TRUST'S NOTICE OF APPEAL

**TO THE HONORABLE COURT:**

**NOTICE IS HEREBY GIVEN** that, pursuant to 28 U.S.C. § 158(a) and Rules 8002 and 8003 of the Federal Rules of Bankruptcy Procedure, Hunter Mountain Investment Trust ("HMIT") hereby appeals to the United States District for the Northern District of Texas from the *Order Denying Opposed Application for Expedited Hearing on its Emergency Motion for Leave to File Verified Adversary Proceeding [DE #3700]* (Doc. 3713) (the "Order"), entered by the United States Bankruptcy Court for the Northern District on March 31, 2023. A true and correct copy of the Order is attached hereto as **Exhibit A**.

1

To comply with Official Form 417A, HMIT submits the following:

**Part 1: Identify the appellant(s)**

1. Name(s) of appellants:

   **Hunter Mountain Investment Trust**

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject

   of this appeal:

   **HMIT is a former equity owner in Debtor and a contingent Claimant Trust Interest**

   **holder.**

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

   ***Order Denying Opposed Application for Expedited Hearing on its Emergency Motion***

   ***for Leave to File Verified Adversary Proceeding [DE #3700]*** **(Doc. 3713)**

2. State the date on which the judgment, order, or decree was entered:

   **March 31, 2023**

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names,

addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:                              Attorney**:**

   **APPELLEES**

   Muck Holdings, LLC, Jessup        HOLLAND & KNIGHT LLP
   Holdings, LLC, Farallon           Brent R. McIlwain, TSB 24013140
   Capital Management, LLC,          David C. Schulte, TSB 24037456
   Stonehill Capital Management,     Christopher Bailey, TSB 24104598
   LLC                               Holland & Knight LLP
                                     1722 Routh Street, Suite 1500
                                     Dallas, TX 75201
                                     Tel.: (214) 964-9500
                                     Fax: (214) 964-9501

002376

|  | brent.mcilwain@hklaw.com |
|  | david.schulte@hklaw.com |
|  | chris.bailey@hklaw.com |
| Highland Capital Management, L.P., the Highland Claimant Trust, and James P. Seery, Jr., solely in his capacity as Chief Executive Officer of Highland Capital Management, L.P.[1] | PACHULSKI STANG ZIEHL & JONES LLP |
|  | Jeffrey N. Pomerantz (CA Bar No. 143717) |
|  | John A. Morris (NY Bar No. 2405397) |
|  | Gregory V. Demo (NY Bar No. 5371992) |
|  | Hayley R. Winograd (NY Bar No. 5612569) |
|  | 10100 Santa Monica Blvd., 13th Floor |
|  | Los Angeles, CA 90067 |
|  | Telephone: (310) 277-6910 |
|  | Facsimile: (310) 201-0760 |
|  | Email: jpomerantz@pszjlaw.com |
|  | jmorris@pszjlaw.com |
|  | gdemo@pszjlaw.com |
|  | hwinograd@pszjlaw.com |
|  | -and- |
|  | HAYWARD PLLC |
|  | Melissa S. Hayward (Texas Bar No. 24044908) |
|  | Zachery Z. Annable (Texas Bar No. 24053075) |
|  | 10501 N. Central Expy., Ste. 106 |
|  | Dallas, Texas 75231 |
|  | Telephone: (972) 755-7100 |
|  | Facsimile: (972) 755-7110 |
|  | Email: MHayward@HaywardFirm.com |
|  | ZAnnable@HaywardFirm.com |

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

**Not applicable**

---

[1] The law firm of Pachulski Stang Ziehl & Jones LLP claims to represent Highland Capital Management, LP and Highland Claimant Trust. However, given the nature of the proceedings at issue, Appellant disagrees and does not admit that any such representation is substantively or procedurally appropriate in this appeal.

002377

**Part 5: Sign below**

*/s/ Sawnie A. McEntyre*
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this April 4, 2023.

*/s/ Sawnie A. McEntyre*
Sawnie A. McEntyre

002378

# Exhibit A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2023**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: § | Chapter 11 |
| § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | Case No. 19-34054-sgj11 |
| § | |
| Reorganized Debtor. § | |

### ORDER DENYING APPLICATION FOR EXPEDITED HEARING [DE # 3700]

This Order is issued in response to the *Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* ("Expedited Haring Request") [DE # 3700] filed by Hunter Mountain Investment Trust ("HMIT" or "Movant") on March 28, 2023, at 4:09 p.m. C.D.T.  The Expedited Hearing Request seeks a hearing within three days, or as soon thereafter as counsel can be heard, on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* ("Motion for Leave") which was filed on March 28, 2023, at 4:02 p.m. C.D.T.

1

002380

The court has concluded that no emergency or other good cause exists, pursuant to Fed.
R. Bankr. Proc. 9006, and the *Expedited Hearing Request* will be denied. The *Motion for Leave*
will be set in the ordinary course (after 21 days' notice to affected parties)—i.e., after April 18,
2023.

The *Motion for Leave* is 37 pages in length and contains 350 pages of attachments.  It
seeks leave from the bankruptcy court—pursuant to the bankruptcy court's "gatekeeping" role[1]
under the confirmed Chapter 11 plan of Highland Capital Management, L.P. ("Highland" or
"Reorganized Debtor")—to sue at least the following parties:  Muck Holdings, LLC ("Muck");
Jessup Holdings, LLC ("Jessup"); Farallon Capital Management, LLC ("Farallon"); Stonehill
Capital Management, LLC ("Stonehill"); James P. Seery, Jr. ("Seery"); and John Doe Defendant
Nos. 1-10 (collectively, the "Affected Parties").  The conduct that is described as a basis for the
desired lawsuit is certain trading of unsecured claims that occurred in 2021 during the Highland
bankruptcy case.[2] It appears that millions of dollars of damages are sought by Movant, who was
formerly the largest indirect (ultimate) equity holder of Highland.  The legal theories (e.g.,
breaches of fiduciary duties; fraud; conspiracy; equitable disallowance) are novel in the
bankruptcy claims trading context.  The bankruptcy court, pursuant to the Highland plan, will
need to analyze whether such claims are "colorable" such that leave to sue should be granted.

The Affected Parties—and other parties in interest in the underlying bankruptcy case, for
that matter—should be afforded a reasonable opportunity to respond to the *Motion for Leave*.
While Movant, HMIT, has alleged that it may be facing a statute of limitations defense as to

---

[1] The bankruptcy court's "gatekeeping" role was recently affirmed by the Fifth Circuit in *In re Highland Capital
Management, L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).
[2] Notice of the claims trading was provided in filings in Highland bankruptcy case, as follows: Claim No. 23 (DE ##
2211, 2212, and 2215), Claim Nos. 190 and 191 (DE ## 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and
154 (DE # 2263), Claim No. 81 (DE # 2262), Claim No. 72 (DE # 2261).

002381

some claims after April 16, 2023, it appears that Movant has known about the conduct

underlying the desired lawsuit for well over a year, based on activity that has occurred in the

bankruptcy court.  *See, e.g., Memorandum Opinion and Order Granting James Dondero's*

*Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request,*

*and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon*

*Capital Management LLC* [DE # 22], in Adv. Proc. # 21-03051 (January 4, 2022).  Thus, the

need for an emergency hearing is dubious. Accordingly

IT IS ORDERED that the Expedited Hearing Request is denied.

Counsel shall contact the Courtroom Deputy for a setting on the *Motion for Leave*, which

setting shall be no sooner than April 19, 2023.

* * * END OF ORDER * * *

002382

# Exhibit 2

002383

| From: | John A. Morris |
|---|---|
| To: | Roger L. McCleary |
| Cc: | Jeff Pomerantz; Gregory V. Demo; Sawnie A. McEntire |
| Subject: | [EXTERNAL] RE: Meet and Confer on HMIT Emergency Motion/Application and follow-up request for tolling agreement |
| Date: | Monday, April 3, 2023 12:54:54 PM |
| Attachments: | image002.png |

Roger,

Highland Capital Management, L.P. ("HCMLP"), the Highland Claimant Trust (the "Trust"), and Mr. Seery, in his capacity as CEO of Highland and Claimant Trustee (together, the "Highland Parties"), all oppose the relief requested in item 1 below.

To eliminate any question, HCMLP and the Trust (like all parties in interest) had the right to be heard on the underlying Emergency Motion pursuant to 11 U.S.C. §1109(b), and have the right to be heard on the matters referenced below.  We therefore request that you inform the Court in your certificate of conference that HCMLP and the Trust are opposed to the relief to be requested.

Finally, the Highland Parties decline to agree to toll any statutes of limitation.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Roger L. McCleary [mailto:rmccleary@pmmlaw.com]
**Sent:** Monday, April 3, 2023 1:19 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Sawnie A. McEntire <smcentire@pmmlaw.com>
**Subject:** Meet and Confer on HMIT Emergency Motion/Application and follow-up request for tolling agreement

John,

In follow-up to our phone call and conference this morning, we look forward to hearing from you regarding:

1. Whether Mr. Seery is opposed, regarding Judge Jernigan's Order Denying Application for Expedited Hearing (Doc. 3713) late Friday afternoon, to (a) an emergency motion for expedited leave for interlocutory appeal; and, (b) a related emergency application for expedited hearing on the same (collectively "Emergency Motion/Application");

2. Whether Mr. Seery will agree to a tolling agreement regarding all claims and causes of action asserted in or related to the claims, causes of action, and matters that are the subject of the proposed adversary complaint (Doc. 3699-1), attached as Exhibit 1 to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699) ("Motion for Leave to File Adversary Proceeding"), until 14 days (we propose) after a final ruling on the Motion for Leave to File Adversary Proceeding and exhaustion of all related appeal(s) and/or mandamus(es).

We understand you are attempting to contact Mr. Seery regarding the above and to respond by mid-afternoon today, if possible. If we have not heard from you before we file the Emergency Motion/Application, we will note in the certificate of conference that we reached out to you; we have not heard back from you; and we presume Mr. Seery is opposed - as you suggested.

Thank you, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmclaw.com

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit 3

002386

| From: | Roger L. McCleary |
|---|---|
| To: | McIlwain, Brent R (DAL - X59481); Schulte, David C (DAL - X59419) |
| Cc: | Sawnie A. McEntire |
| Subject: | Meet and Confer on HMIT Emergency Motion/Application and follow-up request for tolling agreement and information |
| Date: | Monday, April 3, 2023 2:44:09 PM |

Brent and David,

       This follows our conversation this morning and addresses some of the topics we
addressed. We request that you respond as soon as possible today regarding the following:

1.   Please let us know if your clients will voluntarily identify and provide service of
     process information for any and all affiliates, if any, of Farallon Capital
     Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"),
     Muck Holdings, LLC ("Muck"); and/or Jessup Holdings, LLC ("Jessup"), in the chain
     of sale or other transfer of one or more of the Claims that are the subject of and
     described in Hunter Mountain Investment Trust's proposed adversary complaint
     (Doc. 3699-1), attached as Exhibit 1 to Hunter Mountain Investment Trust's
     Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699)
     ("Motion for Leave to File Adversary Proceeding"). If so, we request that easily
     provided information be provided to us by return e-mail as soon as possible. If
     there are none, we request that you confirm this on behalf of your clients by return
     e-mail as soon as possible;

2.   Whether Farallon, Stonehill, Muck, Jessup, and/or John Does $1-10$ (to the extent
     they exist and may be applicable) are opposed, regarding Judge Jernigan's Order
     Denying Application for Expedited Hearing (Doc. 3713) late Friday afternoon, to (a)
     an emergency motion for expedited leave for interlocutory appeal; and, (b) a
     related emergency application for expedited hearing on the same (collectively
     "Emergency Motion/Application");

3.   Whether Farallon, Stonehill, Muck, Jessup, and/or John Does $1-10$ (to the extent
     they exist and may be applicable) will agree to a tolling agreement regarding all
     claims and causes of action asserted in or related to the claims, causes of action,
     and matters that are the subject of the proposed adversary complaint (Doc. 3699-
     1), attached as Exhibit 1 to the Motion for Leave to File Adversary Proceeding, until
     14 days (we propose) after a final ruling on the Motion for Leave to File Adversary
     Proceeding and exhaustion of all related appeal(s) and/or mandamus(es).

       We understand you will attempt to respond by this afternoon today, if possible. If we
have not heard from you before we file the Emergency Motion/Application, we will note in the
certificate of conference that we reached out to you; we have not heard back from you; and

we presume your clients are opposed to the Emergency Motion/Application; that they do not agree to a tolling agreement of any kind regarding item 3 above, and that they do not agree to provide the information requested in item 1 above.

Thank you, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmclaw.com

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**ORDER GRANTING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY
MOTION FOR LEAVE TO FILE INTERLOCUTORY APPEAL**

Upon consideration of the Emergency Motion for Leave to File Interlocutory Appeal

("Motion"), filed by Hunter Mountain Investment Trust ("HMIT"), and the Court's Order Denying

Application for Expedited Hearing [DE #3700] (Doc. 3713) ("Order") and the specific orders: (1)

denying Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on its

Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3700), and (2) requiring

HMIT to contact the Court's clerk to set a hearing no sooner than April 19, 2023, both of which

002389

orders are contained in the Order, and having considered any responses thereto, the Court finds

that Motion should be granted. It is therefore:

**ORDERED** that the Motion is **GRANTED**; and

**IT IS FURTHER ORDERED** that HMIT is granted leave to file an interlocutory appeal

of the Order and the included orders: (1) denying Hunter Mountain Investment Trust's Opposed

Application for Expedited Hearing on its Emergency Motion for Leave to File Verified Adversary

Proceeding (Doc. 3700), and (2) requiring HMIT to contact the Court's clerk to set a hearing no

sooner than April 19, 2023.

### ### End of Order ###

Submitted by:
PARSONS MCENTIRE MCCLEARY PLLC

*/s/ Sawnie A. McEntire*_____
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

*3118994.1*

002390

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner Hunter Mountain Investment Trust*

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

<div align="center">

**HUNTER MOUNTAIN INVESTMENT TRUST'S OPPOSED APPLICATION FOR
EXPEDITED HEARING ON EMERGENCY MOTION FOR LEAVE
<u>TO FILE INTERLOCUTORY APPEAL</u>**

</div>

Hunter Mountain Investment Trust ("HMIT" or "Movant"), submits this Application for an Expedited Hearing ("Application for Expedited Hearing") on its Emergency Motion for Leave to File Interlocutory Appeal ("Emergency Motion"). In support of this Application, Movant states the following:

002391

1.      All respondents have received notice of this Application. This Application for Expedited Hearing and the Emergency Motion are opposed.

2.      The Emergency Motion seeks leave to file an appeal from an interlocutory order or decree of a bankruptcy court under 28 U.S.C. §158(a)(3) and pursuant to the Court's "gatekeeping" orders, as well as the injunction and exculpation provisions in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Doc. 1943), as modified (the "Plan").

3.      An expedited hearing is permitted under Fed. R. Bank P. 9006 (c)(1), which authorizes a shortened time for a response and hearing for good cause. For the reasons set forth fully in the Emergency Motion, and as set forth herein, Movant has shown good cause and requests that the Court schedule a hearing on the Emergency Motion on three (3) days' notice, and that any responses be filed no later than twenty-four hours before the scheduled hearing.

4.      Good cause exists because of a fast-approaching date (April 16, 2023) that at least one of the Proposed Defendants will argue, depending upon choice of law, that the statute of limitations may bar some of the common law claims. Although HMIT offered to enter tolling agreements with each of the Proposed Defendants with whom they have successfully contacted, this offer was either rejected or HMIT did not receive an affirmative agreement to do so. Accordingly, this Application for Expedited Hearing has become necessary. Expedited consideration of the Emergency Motion is necessary

002392

and appropriate to protect and preserve the rights of the Reorganized Debtor, the Highland Claimant Trust, and HMIT.

5.      Movant requests that the Emergency Motion be scheduled for an expedited hearing within (3) days of the filing of this Application for Expedited Hearing. Alternatively, if such a setting is not possible, Movant requests that the Emergency Motion be scheduled for an expedited hearing on the Court's earliest available date, and that any responses be filed no later than twenty-four hours before the scheduled hearing. Movant requests a 30-minute hearing.

WHEREFORE, Hunter Mountain Investment Trust, as Movant, respectfully requests this Court (i) grant this Application for Expedited Hearing, (ii) set an expedited hearing on the Emergency Motion within three (3) days of the filing of this Application for Expedited Hearing and set a response and objection deadline no later than twenty-four hours before the scheduled hearing or as set by the Court; (iii) in the event such a setting is not possible, and in the alternative, set an expedited hearing on the Emergency Motion on the Court's earliest available date and time thereafter, and that any responses be filed no later than twenty-four hours before the scheduled hearing, and (iv) grant such other and further relief as is just and proper.

DATED: April 4, 2023

002393

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:   /s/ *Sawnie A. McEntire*
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Hunter Mountain*
    *Investment Trust*

## <u>CERTIFICATE OF CONFERENCE</u>

Counsel for Mr. Seery, who also claims to represent the Reorganized Debtor, and the Highland Claimant Trust (together, the 'Highland Defendants'), states that he is opposed to this Application. In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor and the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of, the substantive content of, or any procedural need for Mr. Morris's request to be identified as counsel for the Reorganized Debtor and the Highland Capital Trust, but HMIT is filing this certificate solely to accommodate Mr. Morris's request. Although we specifically conferred with counsel for all other respondents on April 3, 2023, they have not confirmed

[4]

their position related to this Application. We, therefore, assume they are opposed to the Application.

_/s/ Sawnie A. McEntire_
Sawnie A. McEntire

## CERTIFICATE OF SERVICE

I certify that on the 4th day of April 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

_/s/ Sawnie A. McEntire_
Sawnie A. McEntire

002395

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |

**ORDER GRANTING APPLICATION FOR EXPEDITED HEARING
ON EMERGENCY MOTION FOR LEAVE
<u>TO FILE INTERLOCUTORY APPEAL</u>**

Upon the Application for Expedited Hearing on Emergency Motion for Leave to File

Verified Adversary Proceeding ("Application for Expedited Hearing"), filed by Hunter Mountain

Investment Trust ("HMIT"), requesting expedited and emergency consideration of the Emergency

Motion for Leave to File Interlocutory Appeal ("Emergency Motion"), and the Court, having

[1]

reviewed the Application for Expedited Hearing, finds that proper notice was given and that good

cause exists for entry of this Order. It is therefore:

**ORDERED** that the Application for Expedited Hearing is **GRANTED**; and

**IT IS FURTHER ORDERED** that the hearing on the Emergency Motion shall be held on

_____, 2023, at _____ _.m. (Central Time) before the Honorable Stacey

G. C. Jernigan. Any responses to the Emergency Motion shall be filed by _____, at

_____.

### End of Order ###

Submitted by:

PARSONS MCENTIRE MCCLEARY PLLC

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

002397



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 4, 2023**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §   Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §   Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## ORDER DENYING HUNTER MOUNTAIN INVESTMENT TRUST'S OPPOSED APPLICATION FOR EXPEDITED HEARING ON EMERGENCY MOTION FOR LEAVE TO FILE INTERLOCUTORY APPEAL [DE # 3719]

This Order is issued in response to *Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Interlocutory Appeal* ("Expedited Hearing Request") [DE # 3719] on April 4, 2023, at 2:06 p.m. C.D.T. The Expedited Hearing Request seeks a hearing in the bankruptcy court within three days, or as soon thereafter as counsel can be heard, on *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Interlocutory Appeal* ("Motion for Leave to File Interlocutory Appeal") [DE # 3718] which was filed on April 4, 2023, at 2:01 p.m. C.D.T.

1

002398

The bankruptcy court has no authority to rule on the Motion for Leave to File Interlocutory Appeal; thus, there is no purpose in the bankruptcy court granting an expedited hearing on the same.  See Fed. R. Bankr. P. 8004(a)-(c).

Pursuant to Fed. R. Bankr. P. 8004(a), movant must file a Notice of Appeal "as prescribed by Rule 8003(a)," and file with it an accompanying motion for leave to appeal interlocutory order. Once that occurs, the bankruptcy clerk will promptly transmit those items to the District Clerk to be assigned to a District Judge to consider.  Movant has not filed a Notice of Appeal on the docket (nor paid the required filing fee).  It has merely attached one to the Motion for Leave to File Interlocutory Appeal as an Exhibit 1.

Accordingly,

IT IS ORDERED that the Expedited Hearing Request is **denied**.

* * * END OF ORDER * * *

002399

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S NOTICE OF APPEAL**

**TO THE HONORABLE COURT:**

**NOTICE IS HEREBY GIVEN** that, pursuant to 28 U.S.C. § 158(a) and Rules 8002,

8003, and 8004 of the Federal Rules of Bankruptcy Procedure, Hunter Mountain Investment Trust

("HMIT") hereby appeals to the United States District for the Northern District of Texas from the

*Order Denying Opposed Application for Expedited Hearing on its Emergency Motion for Leave*

*to File Verified Adversary Proceeding [DE #3700]* (Doc. 3713) (the "Order"), entered by the

United States Bankruptcy Court for the Northern District on March 31, 2023.  A true and correct

002400

copy of the Order is attached hereto as **Exhibit A**. Pursuant to Rule 8004, HMIT's Emergency

Motion for Leave to File Interlocutory Appeal is attached hereto as **Exhibit B**.

To comply with Official Form 417A, HMIT submits the following:

**Part 1: Identify the appellant(s)**

1. Name(s) of appellants:

   **Hunter Mountain Investment Trust**

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject

   of this appeal:

   **HMIT is a former equity owner in Debtor and a contingent Claimant Trust Interest**

   **holder.**

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

   ***Order Denying Opposed Application for Expedited Hearing on its Emergency Motion***

   ***for Leave to File Verified Adversary Proceeding [DE #3700]*** **(Doc. 3713).**

2. State the date on which the judgment, order, or decree was entered:

   **March 31, 2023**

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names,

addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:                                  Attorney**:**

   **APPELLEES**

   Muck Holdings, LLC, Jessup        HOLLAND & KNIGHT LLP
   Holdings, LLC, Farallon            Brent R. McIlwain, TSB 24013140
   Capital Management, LLC,           David C. Schulte, TSB 24037456
   Stonehill Capital Management,      Christopher Bailey, TSB 24104598
   LLC                                Holland & Knight LLP

002401

1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
Fax: (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

Highland Capital Management, L.P., the Highland Claimant Trust, and James P. Seery, Jr., solely in his capacity as Chief Executive Officer of Highland Capital Management, L.P.[1]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com
-and-
HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

**Not applicable.**

---

[1] The law firm of Pachulski Stang Ziehl & Jones LLP claims to represent Highland Capital Management, LP and Highland Claimant Trust. However, given the nature of the proceedings at issue, Appellant disagrees and does not admit that any such representation is substantively or procedurally appropriate in this appeal.

002402

**Part 5: Sign below**

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this April 5, 2023.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

4

002403

# Exhibit A

002404



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2023**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § § |

### ORDER DENYING APPLICATION FOR EXPEDITED HEARING [DE # 3700]

This Order is issued in response to the *Application for Expedited Hearing on Emergency
Motion for Leave to File Verified Adversary Proceeding* ("Expedited Haring Request") [DE #
3700] filed by Hunter Mountain Investment Trust ("HMIT" or "Movant") on March 28, 2023, at
4:09 p.m. C.D.T.  The Expedited Hearing Request seeks a hearing within three days, or as soon
thereafter as counsel can be heard, on HMIT's *Emergency Motion for Leave to File Verified
Adversary Proceeding* ("Motion for Leave") which was filed on March 28, 2023, at 4:02 p.m.
C.D.T.

1

002405

The court has concluded that no emergency or other good cause exists, pursuant to Fed. R. Bankr. Proc. 9006, and the *Expedited Hearing Request* will be denied. The *Motion for Leave* will be set in the ordinary course (after 21 days' notice to affected parties)—i.e., after April 18, 2023.

The *Motion for Leave* is 37 pages in length and contains 350 pages of attachments. It seeks leave from the bankruptcy court—pursuant to the bankruptcy court's "gatekeeping" role[1] under the confirmed Chapter 11 plan of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor")—to sue at least the following parties: Muck Holdings, LLC ("Muck"); Jessup Holdings, LLC ("Jessup"); Farallon Capital Management, LLC ("Farallon"); Stonehill Capital Management, LLC ("Stonehill"); James P. Seery, Jr. ("Seery"); and John Doe Defendant Nos. 1-10 (collectively, the "Affected Parties"). The conduct that is described as a basis for the desired lawsuit is certain trading of unsecured claims that occurred in 2021 during the Highland bankruptcy case.[2] It appears that millions of dollars of damages are sought by Movant, who was formerly the largest indirect (ultimate) equity holder of Highland. The legal theories (e.g., breaches of fiduciary duties; fraud; conspiracy; equitable disallowance) are novel in the bankruptcy claims trading context. The bankruptcy court, pursuant to the Highland plan, will need to analyze whether such claims are "colorable" such that leave to sue should be granted.

The Affected Parties—and other parties in interest in the underlying bankruptcy case, for that matter—should be afforded a reasonable opportunity to respond to the *Motion for Leave*. While Movant, HMIT, has alleged that it may be facing a statute of limitations defense as to

---

[1] The bankruptcy court's "gatekeeping" role was recently affirmed by the Fifth Circuit in *In re Highland Capital Management, L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Notice of the claims trading was provided in filings in Highland bankruptcy case, as follows: Claim No. 23 (DE ## 2211, 2212, and 2215), Claim Nos. 190 and 191 (DE ## 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (DE # 2263), Claim No. 81 (DE # 2262), Claim No. 72 (DE # 2261).

002406

some claims after April 16, 2023, it appears that Movant has known about the conduct underlying the desired lawsuit for well over a year, based on activity that has occurred in the bankruptcy court. *See, e.g., Memorandum Opinion and Order Granting James Dondero's Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request, and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon Capital Management LLC* [DE # 22], in Adv. Proc. # 21-03051 (January 4, 2022). Thus, the need for an emergency hearing is dubious. Accordingly

IT IS ORDERED that the Expedited Hearing Request is denied.

Counsel shall contact the Courtroom Deputy for a setting on the *Motion for Leave*, which setting shall be no sooner than April 19, 2023.

<div align="center">* * * END OF ORDER * * *</div>

002407

# Exhibit B

002408

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

### HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE INTERLOCUTORY APPEAL

Hunter Mountain Investment Trust ("HMIT" or "Movant") files this Emergency

Motion for Leave to File Interlocutory Appeal ("Emergency Motion") of this Court's

orders: (1) denying Hunter Mountain Investment Trust's Opposed Application for

Expedited Hearing on its Emergency Motion for Leave to File Verified Adversary

002409

Proceeding (Doc. 3700)[1] ("Expedited Hearing Request"), and (2) requiring HMIT to contact the Court's clerk to set a hearing no sooner than April 19, 2023, both of which are contained in the "Order Denying Application for Expedited Hearing [DE #3700]" (Doc. 3713) ("Order") entered in this matter on March 31, 2023,[2] and respectfully shows as follows:

## BACKGROUND

1.      Under the Fifth Amended Plan of Reorganization of Highland Capital Management, the Bankruptcy Court holds a gatekeeping role with exclusive authority to predetermine the colorability of any civil action to be brought against "Protected Parties" (as defined in the confirmed Plan) before such an action can be filed ("Gatekeeping Order").[3] The gatekeeping protocol requires the Bankruptcy Court, after notice, to conduct a hearing upon a motion for leave to file an action, if there is a dispute.[4]

2.      After first attempting to conduct related discovery on an expedited basis in Texas state court, which was denied, on March 8, 2023, HMIT filed its Emergency Motion

---

[1] Unless otherwise referenced, all references to evidence involving documents filed in the Debtor's bankruptcy proceedings (Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)) are cited by "Doc." reference. HMIT asks the Court to take judicial notice of the documents identified by such entries.

[2] A true and correct copy of the Order Denying Application for Expedited Hearing [DE #3700] is attached hereto as **Exhibit 1**.

[3] Fifth Amended Plan of Reorganization of Highland Capital Management (Doc. 1808) at Article IX(F), pp. 51-52.

[4] *Id.*

002410

for Leave to File Verified Adversary Proceeding (Doc. 3699) ("Emergency Motion For

Leave"), attaching thereto the proposed Verified Adversary Proceeding as Exhibit 1 (Doc.

3699-1) (the "Adversary Proceeding").[5] The Emergency Motion For Leave and proposed

Adversary Proceeding included lengthy and detailed allegations and evidence

supporting HMIT's proposed claims. In the proposed Adversary Proceeding, HMIT

seeks to sue in its individual capacity and in a derivative capacity on behalf of the

Reorganized Debtor, Highland Capital Management, L.P. ("HCM" or "Reorganized

Debtor") and the Highland Claimant Trust ("Claimant Trust") against Muck Holdings,

LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC

("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr.

("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and

the John Doe Defendant Nos. 1-10 (collectively, "Proposed Defendants") asserting, *inter

alia*, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust

enrichment, and fraud.[6]

3.     On March 28, 2023, HMIT filed its Application for Expedited Hearing on

the Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3700)

("Application"). The principal justification for the emergency hearing requested in the

---

[5] A true and correct copy of HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699), and all attachments, including the proposed Verified Adversary Proceeding attached as Exhibit 1 (Doc. 3699-1) to that motion, is attached hereto as **Exhibit 4**.

[6] *See* the proposed Adversary Proceeding.

002411

Application was because of a fast-approaching date (April 16, 2023) that one or more of the Proposed Defendants will argue constitutes the expiration of the statute of limitations concerning some of the common law claims available to Movant. Although HMIT previously offered to enter into tolling agreements with each of the Proposed Defendants with whom they have successfully contacted, this offer was either rejected or HMIT did not receive an affirmative agreement to do so. While conferring regarding this Emergency Motion and HMIT's related application for expedited hearing on Monday, April 3, 2023, HMIT reiterated its request for a tolling agreement – but the Proposed Defendants have either rejected this request or not responded (and are presumed to have rejected it per the related correspondence) as of the filing of this Emergency Motion. *See* e-mail correspondence from Mr. John Morris dated April 2, 2023, with included e-mail chain, a true and correct copy of which is attached to and incorporated in this Emergency Motion as **Exhibit 2**;[7] *see also* e-mail correspondence from HMIT counsel Roger McCleary to counsel for Farallon, Stonehill, Muck, and Jessup, dated April 2, 2023, with included e-mail chain, a true and correct copy of which is attached to and incorporated in this Emergency Motion as **Exhibit 3**.

---

[7] In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor or the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of, the substantive content of, or any procedural need for Mr. Morris's request to be identified as counsel for the Reorganized Debtor and Highland Claimant Trust in the certificate of conference related to this Emergency Motion. Exhibit 2 is attached for the limited purposes of this Emergency Motion and HMIT makes no admission of any kind in this regard to **Exhibit 2**.

002412

4.      Accordingly, this Emergency Motion has become necessary. Because the
Emergency Motion For Leave is necessary, given the Bankruptcy Court's Gatekeeping
Order and the injunction provisions of the Plan, emergency leave is required. Expedited
consideration of the Emergency Motion For Leave and of this Emergency Motion seeking
interlocutory appeal is necessary and appropriate to protect and preserve the rights of
the Reorganized Debtor, the Highland Claimant Trust, and HMIT.[8]

5.      On March 30, 2023, Muck, Jessup, Farallon, and Stonehill filed objections
claiming they needed time to evaluate the claims. The Objection filed on behalf of Mr.
Seery argued that the Court should not grant the Application or agree to an expedited
hearing on the Emergency Motion for Leave, and invited the Court to allow an argument
that limitations bars some of HMIT's claims without considering the merits (together,
"Objections").[9]

6.      On March 31, 2023, HMIT filed its Reply In Support of Its Opposed
Application for Expedited Hearing and Response to Objections Filed by Respondents

---

[8]  HMIT respectfully requests that this Emergency Motion be addressed and decided on an expedited basis
that provides HMIT sufficient time to bring the proposed action or to seek review/relief timely. In the event
the Court denies the requested relief, HMIT respectfully requests prompt notice of the Court's ruling to
allow HMIT sufficient time to seek, if necessary, appropriate review/relief. In order to have a fair
opportunity to seek such relief on a timely basis and protect HMIT's rights and the rights of the
Reorganized Debtor, HMIT anticipates it will need to seek review/relief as soon as possible in the event
HMIT's application for expedited hearing on this Emergency Motion is not granted on or before April 5,
2023, or in the event this Emergency Motion has not been or cannot be resolved by on or before Monday,
April 10, 2023. However, HMIT reserves its rights to pursue appropriate review/relief at any time.

[9] As stated, despite claiming that they needed more time to evaluate the claims, the Proposed Defendants
refused to enter into a tolling agreement.

(Doc. 3712) ("Reply"), stating in reply to the Objections that the Proposed Defendants had ample notice of the proposed claims because they were the subject of pre-litigation discovery requests and that the Proposed Defendants should not be allowed to weaponize the Gatekeeping Order and gatekeeping protocol to fashion a possible limitations defense (as an attempt to avoid a merits-based consideration of the claims).[10]

7.     Within an hour after HMIT filed its Reply, the Bankruptcy Court entered the Order denying HMIT's emergency request and *sua sponte* ordering HMIT to contact the Court's clerk to schedule the hearing no sooner than April 19, 2023.[11]

## PRELIMINARY STATEMENT

8.     Since the filing of the Emergency Motion for Leave, HMIT has become aware of authority holding that the filing of the Emergency Motion for Leave, with the attached proposed Adversary Proceeding, likely tolls the applicable statutes of limitations as to at least one of the Proposed Defendants, so that the hearing date set by the Bankruptcy Court may be irrelevant as to that Proposed Defendant. However, it is also clear that at least one of the Proposed Defendants does not agree. HMIT still has a valid concern about the need for an expedited hearing because counsel for Mr. Seery is aggressively arguing  that all Proposed Defendants should be given the advantage of an

---

[10] HMIT's Reply is incorporated herein by reference in its entirety.

[11] As stated, one or more of the Proposed Defendants will argue that HMIT's claims will be barred by limitations as of April 16, 2023.

002414

opportunity to argue the running of the applicable statute of limitations.[12] It is also clear that all of the Proposed Defendants have refused HMIT's request for a tolling agreement or refused to respond to the request to do so.

9.      HMIT therefore finds itself in an incongruous situation. On the one hand, the filing of the Emergency Motion for Leave likely tolls the running of any applicable limitations periods as to at least one of the Proposed Defendants. On the other hand, HMIT's concerns about the limitations defense are clearly well founded, as Proposed Defendants' counsel is otherwise arguing that the Bankruptcy Court should provide all Proposed Defendants the affirmative defense of limitations by scheduling the gatekeeping hearing on a date that they claim constitutes the expiration of the limitations period on various common law claims.

## QUESTIONS PRESENTED

10.     Does the threat of a potential limitations defense potentially barring some of HMIT's proposed Adversary Proceeding claims justify an interlocutory appeal of the Order denying an expedited hearing upon the HMIT Motion for Leave?

11.     Does the threat of a potential limitations defense potentially barring some of HMIT's proposed Adversary Proceeding claims justify an interlocutory appeal of the Bankruptcy Court's Order requiring that a hearing be set no sooner than April 19, 2023,

---

[12] This argument could be extended, of course, to include the assertion that the Bankruptcy Court should withhold ruling on the Emergency Motion for Leave until all applicable limitations periods have run, and then deny leave to file the proposed Adversary Proceeding due to the running of the limitations period.

002415

when it is clear that the Proposed Defendants will argue that at least certain of the claims in the proposed Adversary Proceeding must be dismissed because of the running of applicable statutes of limitations as of April 16, 2023 (three days before the Bankruptcy Court's scheduled hearing date)?

12.      Does *Newby v. Enron Corp.*, 542 F.3d 463, 470 (5th Cir. 2008) require a finding by the Honorable District Court that the filing of the Motion for Leave tolled the applicable statutes of limitations so that (i) the date of the Bankruptcy Court's scheduled hearing on the Emergency Motion for Leave is irrelevant and (ii) therefore, this Emergency Motion for leave to appeal should be denied?

### STANDARD

13.      An appeal from an interlocutory order or decree of a bankruptcy court is governed by 28 U.S.C. §158(a)(3). Section 158(a)(3) does not articulate the standard a district court must use in deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit ... have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals generally." *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(*citing In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991)). The decision whether to grant an interlocutory appeal is firmly within the district court's discretion. *Id.*; *Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006) (internal citation omitted).

002416

14.     "Section 1292(b) expressly permits a district court to certify an order for

interlocutory appeal only if it 'involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate appeal from the order

may materially advance the ultimate termination of the litigation.' 28 U.S.C.A. § 1292(b)

(1994 & Supp. 2005). This terminology was intended to restrict the category of cases

suitable for permissive appeal, but courts have not always agreed on the contours of the

stated limitations. *See* 16 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER,

FEDERAL PRACTICE AND PROCEDURE § 3929 at 366–67 (2d ed.1996). *See generally Ahrenholz*

*v. Bd. of Trustees of the Univ. of Illinois,* 219 F.3d 674, 676 (7th Cir. 2000) ("The [§ 1292(b)

criteria, unfortunately, are not as crystalline as they might be...."). For example, at times,

courts including the Fifth Circuit have held that § 1292(b) appeals are appropriate under

only "exceptional" circumstances or in "big" cases. *Clark–Dietz and Associates-Engineers v.*

*Basic Constr. Co.,* 702 F.2d 67, 69 (5th Cir.1983) (explaining that interlocutory appeals are

permitted only under "exceptional" circumstances); *see Gottesman v. Gen. Motors*

*Corp.,* 268 F.2d 194, 196 (2d Cir.1959) (clarifying that certification should be "strictly

limited to the precise conditions stated in the law"); WRIGHT & MILLER, *supra,* § 3929 at

365 & n. 10 (internal citations omitted) (collecting cases holding interlocutory appeal

appropriate only in "big" or "exceptional" cases). Conversely, at other times courts—the

Fifth Circuit included—have employed a more flexible approach to § 1292(b) appeals."

*Ryan,* 444 F. Supp. at 721.

15.     For more clarification, courts have found substantial ground for difference of opinion (justifying an interlocutory appeal) where a court order determines a matter which appears contrary to the rulings of Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented. *Id.* at 723-24 (internal citation omitted). Here, in a case substantially similar to this case, the Fifth Circuit has found that a court order which requires a proposed claim to be filed more than 21-days in advance of the limitations date is improper. *See, e.g.*, *Newby v. Enron Corp.*, 542 F.3d 463, 470 (5th Cir. 2008).

## RELIEF REQUESTED: RIGHT TO INTERLOCUTORY APPEAL SHOULD BE GRANTED, OR, ALTERNATIVELY, SHOULD BE DENIED BASED UPON *NEWBY v. ENRON CORP.*, 542 F.3d 463, 470 (5th Cir. 2008)

16.     The controlling issue of law is whether good cause exists to require an emergency hearing on HMIT's proposed Adversary Proceeding. Fed. R. Bank P. 9006 (c)(1) authorizes a shortened time for a response and hearing for good cause.  As set forth in its Application seeking an expedited hearing upon its Emergency Motion For Leave, in addition to a potential limitations consideration, good cause exists and separately justifies expedited action on the Emergency Motion For Leave, to hasten HMIT's right to

002418

pursue prompt relevant discovery (which the Proposed Defendants refused in pre-litigation), and reduce the threat of loss of potentially key evidence.[13]

17.     The proposed Adversary Proceeding alleges claims which are substantially more than "colorable" based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding and abetting) breaches of fiduciary duty. The proposed Adversary Proceeding also alleges that the Proposed Defendants did so collectively by falsely representing the value of the Debtor's Estate, failing to timely disclose accurate values of the Debtor's Estate, and trading on material non-public information regarding such values. HMIT also alleges that the Proposed Defendants colluded to manipulate the Debtor's Estate—providing Seery the opportunity to plant close business allies into positions of control to approve Seery's compensation demands following the Effective Date.

18.     Relief upon this Emergency Motion is justified because it is now clear that one or more of the Proposed Defendants will argue, depending upon choice of law, that the statute of limitations may bar some of the common law claims, and further that the Bankruptcy Court should act to assist them in creating a statute of limitations defenses.[14]

---

[13] Upon information and belief, Proposed Defendant Seery has been deleting text messages on his personal iPhone via a rolling, automatic deletion setting.

[14] The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

The proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan. Allowing any potential limitations to bar any of the claims would result in a substantial injustice which far outweighs any potential harm to the Proposed Defendants.[15] *See Newby,* 542 F.3d at 470.

19.     *Newby v. Enron* held that the district court erred when finding it would not adjudicate a motion for leave before the applicable statute of limitations ran. In other words, as shown below, *Newby v. Enron* held that a motion for leave should be heard prior to any applicable limitations deadline. While HMIT is under no illusion that the Bankruptcy Court grounded its ruling in *Newby*, it is the position of HMIT that perhaps, in fact, the scheduled hearing date is irrelevant. Counsel for Proposed Defendants has clearly threatened (i) that the running of the limitations periods continues and (ii) that Proposed Defendants should be given access to the affirmative defenses through scheduling (which as stated could easily extend to date of ruling).[16]

---

[15]As of December 31, 2022, the Claimant Trust has distributed $255,201,228.[15] On a *pro rata* basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000. Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary. The benefits to the Reorganized Debtor, the Claimant Trust and innocent stakeholders are undeniable. Further, under the present circumstances and time constraints, an interlocutory appeal should be granted to avoid the prospect of the loss of some of HMIT's and the Claimant Trust's claims and denial of due process.

[16] *See* Highland Parties' Objection to Expedited Hearing on the Emergency Motion for Leave (Doc. 3707).

20.     Therefore, HMIT briefs the issue of whether the Bankruptcy Court could facilitate a defendant's affirmative defense of statute of limitations by delaying adjudication of HMIT's motion.

21.     In *Newby v. Enron*, a district court enjoined a law firm from filing any new actions related to a Chapter 11 debtor without leave of court. The law firm then moved to file 34 lawsuits in state court. There, the motion for leave was filed on October 14, 2005 and the statute of limitations of some of the claims expired on October 17, 2005. The district court denied the motion, in part finding that these claims would be barred by the applicable statute of limitations by the time the motion was considered on November 3, 2005. The law firm appealed. The Fifth Circuit explained that:

> The district court was incorrect, however, in denying the motion for leave to file suit for the claims that have a four-year statute of limitations. The court did not cite any authority for using its own local rules to dictate the state's filing date for purposes of Texas's relation-back principle. In effect, the district court was requiring the Fleming Firm either to file a motion for leave at least twenty days before the statute of limitations expired—or perhaps even earlier if the district court did not rule on the motion in time— or to violate the injunction by filing in state court within the limitations period. *Cf. Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 334 (7th Cir. 2005) ("The logic underlying [using the date of filing for limitations purposes as opposed to the date the court rules on the motion] is that defendants are on notice of the amendment when the motion is filed and it would be unfair to plaintiffs if a trial court waited months or years to rule."). Thus, the district court should have allowed the Texas state courts to decide whether the filing of the state petitions relates back to the filing of the motion for leave to file suit (for the claims that have a four-year statute of limitations), meaning that these claims might not be futile. Because the Fleming Firm sought to file these claims before the statute of limitations expired, it is up to the state court to determine how to proceed. In sum, the district court improperly denied the motion for leave to file the claims involving common

law fraud and fraud-on-the-market (Count I), statutory fraud (Count III), and aiding and abetting common law fraud (Count VI), because these claims all have a four-year statute of limitations, and the Fleming Firm submitted its motion for leave to file suit before that limitations period expired.

*Newby v. Enron Corp.*, 542 F.3d at 470.

24.     Despite binding precedent that precludes a Bankruptcy Court from effectively shortening a state law statute of limitations based on its local practice for setting motions, this is exactly what the Proposed Defendants have asked the Bankruptcy Court to do (in fact, arguing that if the Bankruptcy Court did not do so, it would fundamentally prejudice the Proposed Defendants). The Bankruptcy Court did what the Proposed Defendants asked of it, and therefore, this raises the issue of whether an interlocutory appeal should be granted to correct any assertion that the Bankruptcy Court could provide an affirmative defense of statute of limitations through its local motion practice, or, should be denied on the basis that the Fifth Circuit has already instructed that it cannot.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave to file an interlocutory appeal of the Order, and all such other and further relief to which HMIT may be justly entitled.

Dated: April 5, 2023.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY
PLLC**

By: _/s/ Sawnie A. McEntire_
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    Texas State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    ***Attorneys for Hunter Mountain
    Investment Trust***

002423

**CERTIFICATE OF CONFERENCE**

Counsel for Mr. Seery, who also claims to represent the Reorganized Debtor and the Highland Claimant Trust in these instant proceedings, states that he is opposed to this Emergency Motion. In light of the nature of the proposed proceedings, whereby HMIT proposes to represent the Reorganized Debtor and the Highland Claimant Trust derivatively, HMIT does not agree with (and does not admit) the propriety of or the substantive content of Mr. Mr. Morris's requested identification as counsel for the Reorganized Debtor and the Highland Claimant Trust, but HMIT is filing this certificate in this manner solely to accommodate Mr. Morris's request.

Although we conferred with counsel for the other respondents on April 3, 2023, we were told they would try to respond by the afternoon of April 3, 2023, but they have not done so. We, therefore, assume they are opposed to this Emergency Motion.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

**CERTIFICATE OF SERVICE**

I certify that on the 5th day of April 2023, a true and correct copy of the foregoing motion was served on all counsel of record or, as appropriate, on the Respondents directly.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

# Exhibit 1

002425



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

### ORDER DENYING APPLICATION FOR EXPEDITED HEARING [DE # 3700]

This Order is issued in response to the *Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding* ("Expedited Haring Request") [DE # 3700] filed by Hunter Mountain Investment Trust ("HMIT" or "Movant") on March 28, 2023, at 4:09 p.m. C.D.T. The Expedited Hearing Request seeks a hearing within three days, or as soon thereafter as counsel can be heard, on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* ("Motion for Leave") which was filed on March 28, 2023, at 4:02 p.m. C.D.T.

1

002426

The court has concluded that no emergency or other good cause exists, pursuant to Fed. R. Bankr. Proc. 9006, and the *Expedited Hearing Request* will be denied. The *Motion for Leave* will be set in the ordinary course (after 21 days' notice to affected parties)—i.e., after April 18, 2023.

The *Motion for Leave* is 37 pages in length and contains 350 pages of attachments. It seeks leave from the bankruptcy court—pursuant to the bankruptcy court's "gatekeeping" role[1] under the confirmed Chapter 11 plan of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor")—to sue at least the following parties: Muck Holdings, LLC ("Muck"); Jessup Holdings, LLC ("Jessup"); Farallon Capital Management, LLC ("Farallon"); Stonehill Capital Management, LLC ("Stonehill"); James P. Seery, Jr. ("Seery"); and John Doe Defendant Nos. 1-10 (collectively, the "Affected Parties"). The conduct that is described as a basis for the desired lawsuit is certain trading of unsecured claims that occurred in 2021 during the Highland bankruptcy case.[2] It appears that millions of dollars of damages are sought by Movant, who was formerly the largest indirect (ultimate) equity holder of Highland. The legal theories (e.g., breaches of fiduciary duties; fraud; conspiracy; equitable disallowance) are novel in the bankruptcy claims trading context. The bankruptcy court, pursuant to the Highland plan, will need to analyze whether such claims are "colorable" such that leave to sue should be granted.

The Affected Parties—and other parties in interest in the underlying bankruptcy case, for that matter—should be afforded a reasonable opportunity to respond to the *Motion for Leave*. While Movant, HMIT, has alleged that it may be facing a statute of limitations defense as to

---

[1] The bankruptcy court's "gatekeeping" role was recently affirmed by the Fifth Circuit in *In re Highland Capital Management, L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).
[2] Notice of the claims trading was provided in filings in Highland bankruptcy case, as follows: Claim No. 23 (DE ## 2211, 2212, and 2215), Claim Nos. 190 and 191 (DE ## 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (DE # 2263), Claim No. 81 (DE # 2262), Claim No. 72 (DE # 2261).

002427

some claims after April 16, 2023, it appears that Movant has known about the conduct

underlying the desired lawsuit for well over a year, based on activity that has occurred in the

bankruptcy court.  *See, e.g., Memorandum Opinion and Order Granting James Dondero's*

*Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request,*

*and Related Rulings, Dondero v. Alvarez & Marsal CRF Management, LLC and Farallon*

*Capital Management LLC* [DE # 22], in Adv. Proc. # 21-03051 (January 4, 2022).  Thus, the

need for an emergency hearing is dubious. Accordingly

      IT IS ORDERED that the Expedited Hearing Request is denied.

      Counsel shall contact the Courtroom Deputy for a setting on the *Motion for Leave*, which

setting shall be no sooner than April 19, 2023.

<div align="center">* * * END OF ORDER * * *</div>

002428

# Exhibit 2

002429

| From: | John A. Morris |
|-------|----------------|
| To: | Roger L. McCleary |
| Cc: | Jeff Pomerantz; Gregory V. Demo; Sawnie A. McEntire |
| Subject: | [EXTERNAL] RE: Meet and Confer on HMIT Emergency Motion/Application and follow-up request for tolling agreement |
| Date: | Monday, April 3, 2023 12:54:54 PM |
| Attachments: | image002.png |

Roger,

Highland Capital Management, L.P. ("HCMLP"), the Highland Claimant Trust (the "Trust"), and Mr. Seery, in his capacity as CEO of Highland and Claimant Trustee (together, the "Highland Parties"), all oppose the relief requested in item 1 below.

To eliminate any question, HCMLP and the Trust (like all parties in interest) had the right to be heard on the underlying Emergency Motion pursuant to 11 U.S.C. §1109(b), and have the right to be heard on the matters referenced below. We therefore request that you inform the Court in your certificate of conference that HCMLP and the Trust are opposed to the relief to be requested.

Finally, the Highland Parties decline to agree to toll any statutes of limitation.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Roger L. McCleary [mailto:rmccleary@pmmlaw.com]
**Sent:** Monday, April 3, 2023 1:19 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Sawnie A. McEntire <smcentire@pmmlaw.com>
**Subject:** Meet and Confer on HMIT Emergency Motion/Application and follow-up request for tolling agreement

John,

In follow-up to our phone call and conference this morning, we look forward to hearing from you regarding:

1. Whether Mr. Seery is opposed, regarding Judge Jernigan's Order Denying Application for Expedited Hearing (Doc. 3713) late Friday afternoon, to (a) an emergency motion for expedited leave for interlocutory appeal; and, (b) a related emergency application for expedited hearing on the same (collectively "Emergency Motion/Application");

2. Whether Mr. Seery will agree to a tolling agreement regarding all claims and causes of action asserted in or related to the claims, causes of action, and matters that are the subject of the proposed adversary complaint (Doc. 3699-1), attached as Exhibit 1 to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699) ("Motion for Leave to File Adversary Proceeding"), until 14 days (we propose) after a final ruling on the Motion for Leave to File Adversary Proceeding and exhaustion of all related appeal(s) and/or mandamus(es).

We understand you are attempting to contact Mr. Seery regarding the above and to respond by mid-afternoon today, if possible. If we have not heard from you before we file the Emergency Motion/Application, we will note in the certificate of conference that we reached out to you; we have not heard back from you; and we presume Mr. Seery is opposed - as you suggested.

Thank you, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmclaw.com

This e-mail message is for the sole use of the intended  recipient(s) and may contain confidential and privileged  information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Case 19-34054-sgj11   Doc 3721-2   Filed 04/05/23   Entered 04/05/23 11:56:10   Desc
Exhibit HMIT Emergency Motion for Leave to File Interlocutory Appeal 2 Page 25 of 41
Case 3:23-cv-00169 Document 23-3 Filed 12/01/23 Page 196 of 214 PageID 4645

# Exhibit 3

| From: | Roger L. McCleary |
|---|---|
| To: | McIlwain, Brent R (DAL - X59481); Schulte, David C (DAL - X59419) |
| Cc: | Sawnie A. McEntire |
| Subject: | Meet and Confer on HMIT Emergency Motion/Application and follow-up request for tolling agreement and information |
| Date: | Monday, April 3, 2023 2:44:09 PM |

Brent and David,

     This follows our conversation this morning and addresses some of the topics we addressed. We request that you respond as soon as possible today regarding the following:

1. Please let us know if your clients will voluntarily identify and provide service of process information for any and all affiliates, if any, of Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings, LLC ("Muck"); and/or Jessup Holdings, LLC ("Jessup"), in the chain of sale or other transfer of one or more of the Claims that are the subject of and described in Hunter Mountain Investment Trust's proposed adversary complaint (Doc. 3699-1), attached as Exhibit 1 to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699) ("Motion for Leave to File Adversary Proceeding"). If so, we request that easily provided information be provided to us by return e-mail as soon as possible. If there are none, we request that you confirm this on behalf of your clients by return e-mail as soon as possible;

2. Whether Farallon, Stonehill, Muck, Jessup, and/or John Does 1 – 10 (to the extent they exist and may be applicable) are opposed, regarding Judge Jernigan's Order Denying Application for Expedited Hearing (Doc. 3713) late Friday afternoon, to (a) an emergency motion for expedited leave for interlocutory appeal; and, (b) a related emergency application for expedited hearing on the same (collectively "Emergency Motion/Application");

3. Whether Farallon, Stonehill, Muck, Jessup, and/or John Does 1 – 10 (to the extent they exist and may be applicable) will agree to a tolling agreement regarding all claims and causes of action asserted in or related to the claims, causes of action, and matters that are the subject of the proposed adversary complaint (Doc. 3699-1), attached as Exhibit 1 to the Motion for Leave to File Adversary Proceeding, until 14 days (we propose) after a final ruling on the Motion for Leave to File Adversary Proceeding and exhaustion of all related appeal(s) and/or mandamus(es).

     We understand you will attempt to respond by this afternoon today, if possible. If we have not heard from you before we file the Emergency Motion/Application, we will note in the certificate of conference that we reached out to you; we have not heard back from you; and

we presume your clients are opposed to the Emergency Motion/Application; that they do not agree to a tolling agreement of any kind regarding item 3 above, and that they do not agree to provide the information requested in item 1 above.

Thank you, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmclaw.com

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit 4

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | Chapter 11 |
| **MANAGEMENT, L.P.** | § | |
| | § | Case No. 19-34054-sgj11 |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR
LEAVE TO FILE VERIFIED ADVERARY PROCEEDING**

Hunter Mountain Investment Trust ("HMIT"), Movant, files this Emergency

Motion for Leave to File Verified Adversary Proceeding ("Motion"), both in its individual

capacity and as a derivative action on behalf of the Reorganized Debtor, Highland Capital

Management, L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust

against Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon

[1]

002436

Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr. ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendant Nos. 11-10 are collectively "Respondents" or "Proposed Defendants").

## I.      Good Cause for Expedited Relief

1.      HMIT seeks leave to file an Adversary Proceeding pursuant to the Court's "gatekeeping" orders, as well as the injunction and exculpation provisions in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Doc. 1943), as modified (the "Plan").[1] A copy of HMIT's proposed Verified Adversary Proceeding ("Adversary Proceeding") is attached as Exhibit 1 to this Motion. This Motion is separately supported by objective evidence derived from historical filings in the bankruptcy proceedings,[2] as well as the declarations of James Dondero, dated May 2022 (Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A. McEntire with attached evidence (Ex. 4).[3]

---

[1] The exculpation provisions were recently modified by a decision of the Fifth Circuit. Such provisions apply to James P. Seery, Jr. only and are limited to his capacity as an Independent Director. *Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Unless otherwise referenced, all references to evidence involving documents filed in the Debtor's bankruptcy proceedings (Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)) are cited by "Doc." reference. HMIT asks the Court to take judicial notice of the documents identified by such entries.

[3] The supporting declarations will be cited as Dondero 2022 Dec. (Ex. 2), Dondero 2023 Dec. (Ex. 3), and McEntire Dec. (Ex. 4).

[2]

002437

2.     The expedited nature of this Motion is permitted under Fed. R. Bank P. 9006

(c)(1), which authorizes a shortened time for a response and hearing for good cause. For

the reasons set forth herein, HMIT has shown good cause and requests that the Court

schedule a hearing on this Motion on three (3) days' notice, and that any responses be

filed no later than twenty-four hours before the scheduled hearing.[4]

3.     HMIT brings this Motion on behalf of itself and derivatively on behalf of

the Reorganized Debtor and the Highland Claimant Trust ("Claimant Trust"), as defined

in the Claimant Trust Agreement (Doc. 3521-5) ("CTA").[5] Upon the Plan's Effective Date,

Highland Capital Management, LP, as the original Debtor ("Original Debtor"),

transferred its assets, including its causes of action, to the Claimant Trust, including the

causes of action set forth in the attached Adversary Proceeding. The attached Adversary

Proceeding alleges claims which are substantially more than "colorable" based upon

plausible allegations that the Proposed Defendants, acting in concert, perpetrated a

fraud,[6] including a fraud upon innocent stakeholders, as well as breaches of fiduciary

---

[4] Expedited action on this Motion is also warranted to hasten Movants' opportunity to file suit, pursue prompt relevant discovery, and reduce the threat of loss of potentially key evidence. Upon information and belief, Seery has been deleting text messages on his personal iPhone via a rolling, automatic deletion setting.

[5] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate.

[6] Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors. Rather, the

002438

duties and knowing participation in (or aiding and abetting) breaches of fiduciary duty. The Adversary Proceeding also alleges that the Proposed Defendants did so collectively by falsely representing the value of the Debtor's Estate, failing to timely disclose accurate values of the Debtor's Estate, and trading on material non-public information regarding such values. HMIT also alleges that the Proposed Defendants colluded to manipulate the Debtor's Estate—providing Seery the opportunity to plant close business allies into positions of control to approve Seery's compensation demands following the Effective Date.

4.     Emergency relief is needed because of a fast-approaching date (April 16, 2023) that one or more of the Proposed Defendants *may* argue, depending upon choice of law, constitutes the expiration of the statute of limitations concerning some of the common law claims available to the Claimant Trust, as well as to HMIT.[7] Although HMIT offered to enter tolling agreements from each of the Proposed Defendants, they either rejected HMIT's requests or have not confirmed their willingness to do so, thereby necessitating the expedited nature of this Motion.[8] Because this Motion is subject to the

---

proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement.

[7] The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

[8] HMIT has been diligent in its efforts to investigate the claims described in this Motion, including the filing of a Tex. R. Civ. P. Rule 202 proceeding in January 2023, which was not adjudicated until recently in March 2023. Those proceeding were conducted in the 191st Judicial District Court in Dallas County, Texas, under Cause DC-23-01004. *See* McEntire Dec. Ex. 4 and the attached Ex. 4-A. Farallon and Stonehill defended those proceedings by aggressively arguing, in significant part, that the discovery issues were better undertaken in this Court.[8] The Rule 202 Petition was recently dismissed (**necessarily without prejudice**)

Court's "gatekeeping" orders and the injunction provisions of the Plan, emergency leave is required.

5.    This Motion will come as no surprise to the Proposed Defendants. Farallon and Stonehill were involved in recent pre-suit discovery proceedings under Rule 202 of the Texas Rules of Civil Procedure relating to the same insider trading allegations described in this Motion. Muck and Jessup, special purpose entities created and ostensibly controlled by Farallon and Stonehill, respectively, also were provided notice of these Rule 202 Proceedings in February 2023.[9] Like this Motion, the Rule 202 Proceedings focused on Muck, Jessup, Farallon, and Stonehill and their wrongful purchase of large, allowed claims in the Original Debtor's bankruptcy based upon material non-public information. Seery is also aware of these insider trading allegations because of a prior written demand.

6.    In light of the Proposed Defendants' apparent refusal to enter tolling agreements, or their failure to fully affirm their willingness to do so, HMIT is forced to seek emergency relief from this Court to proceed timely with the proposed Adversary Proceeding before the expiration of any *arguable* limitations period.[10]

---

on March 8, 2023, ostensibly based on such arguments. However, it is telling that Stonehill and Farallon admitted during the Rule 202 Proceedings to their "affiliation" with Muck and Jessup and that they bought the Claims through these entities.

[9] *See* Dec. of Sawnie McEntire, Ex. 4.

[10] HMIT respectfully requests that this Motion be addressed and decided on an expedited basis that provides HMIT sufficient time to bring the proposed action timely. In the event the Court denies the requested relief, HMIT respectfully requests prompt notice of the Court's ruling to allow HMIT sufficient

002440

## II.    Summary of Claims

7.    HMIT requests leave to commence the proposed Adversary Proceeding, attached as Exhibit 1, seeking redress for breaches of duty owed to HMIT, breaches of duties owed to the Original Debtor's Estate, aiding and abetting breaches of those fiduciary duties, conspiracy, unjust enrichment, and fraud. HMIT also alleges several viable remedies, including (i) imposition of a constructive trust; (ii) equitable disallowance of any unpaid balance on the claims at issue;[11] (iii) disgorgement of ill-gotten profits (received by Farallon, Stonehill, Muck and Jessup) to be restituted to the Claimant Trust; (iv) disgorgement of ill-gotten compensation (received by Seery) to be restituted to the Claimant Trust; (v) declaratory judgment relief; (vi) actual damages; and (vii) punitive damages.

## III.    Standing

8.    **HMIT.** Prior to the Plan's Effective Date, HMIT was the largest equity holder in the Original Debtor and held a 99.5% limited partnership interest. HMIT currently holds a Class 10 Claim as a contingent Claimant Trust Interest under the CTA

---

time to seek, if necessary, appropriate relief in the United States District Court. In order to have a fair opportunity to seek such relief on a timely basis and protect HMIT's rights and the rights of the Reorganized Debtor, HMIT will need to seek such relief on or before Wednesday, April 5, 2023, if this Motion has not been resolved.

[11] In the alternative only, subordination of Muck's and Jessup's General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also consistent with the purposes of the Bankruptcy Code.

002441

(Doc. 3521-5). Upon information and belief, all conditions precedent to HMIT's
certification as a vested Claimant Trust Beneficiary would be readily satisfied but for the
Defendants' wrongful actions and conduct described in this Motion and the attached
Adversary Proceeding.

9.      **Reorganized Debtor.** Although HMIT has standing as a former Class B/C
Equity Holder, Class 10 claimant, and now contingent Claimant Trust Interest under the
CTA,[12] this Motion separately seeks authorization to prosecute the Adversary Proceeding
derivatively on behalf of the Reorganized Debtor and Claimant Trust. All conditions
precedent to bringing a derivative action are satisfied.

10.     Fed. R. Civ. P. 23.1 provides the procedural steps for "derivative actions,"
and applies to this proceeding pursuant to Fed. R. Bank. P. 7023.1. Applying Rule 7023.1,
the Proposed Defendants' wrongful conduct occurred, and the improper trades
consummated, in the spring and early summer of 2021, before the Effective Date in
August 2021. During this period, HMIT was the 99.5% Class B/C limited partner in the
original Debtor. As such, HMIT has individual standing to bring this action because Seery
owed fiduciary duties directly to HMIT at that time, and the other Proposed Defendants
aided and abetted breaches of those duties at that time.

---

[12] The last transaction at issue involved Claim 190, the Notice for which was filed on August 9, 2021. (Doc.
2698).

002442

11.     The derivative nature of this proceeding is also appropriate because any demand on Seery would be futile.[13] Seery is the Claimant Trustee under the terms of the CTA. Furthermore, any demand on the Oversight Board to prosecute these claims would be equally futile because Muck and Jessup, both of whom are Proposed Defendants, dominate the Oversight Board.[14]

12.     The "classic example" of a proper derivative action is when a debtor-in-possession is "unable or unwilling to fulfill its obligations" to prosecute an otherwise colorable claim where a conflict of interest exists. *Cooper*, 405 B.R. at 815 (quoting *Louisiana World*, 858 F.2d at 252). Here, because HMIT's proposed Adversary Proceeding includes claims against Seery, Muck, and Jessup, the conflicts of interest are undeniable. Seery is the Trustee of the Claimant Trust Assets under the CTA, and he also serves as the "Estate Representative."[15] Muck and Jessup, as successors to Acis, the Redeemer Committee and UBS, effectively control the Oversight Board, with the responsibility to "monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance . . . ."[16]

---

[13] Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed herein, since the Litigation Trustee serves at the direction of the Oversight Board.

[14] *See* Footnote 8, *infra.* In December 2021, several stakeholders made a demand on the Debtor through James Seery, in his capacity as Trustee to the Claimant Trust, to pursue claims related to these insider trades.

[15] *See* Claimant Trust Agreement (Doc. 3521-5), Sec. 3.11.

[16] *Id.* at Sec. 4.2(a) and (b).

002443

13.     Creditors' committees frequently bring suit on behalf of bankruptcy estates.

Yet, it is clear that any ***appropriately designated party*** also may bring derivative claims.

*In re Reserve Prod., Inc.*, 232 B.R. 899, 902 (Bankr. E.D. Tex. 1999) (citations omitted); *see In*

*re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004). As this Court has held in *In Re*

*Cooper*:

> In Chapter 11 [cases], there is both a textual basis . . . and, frequently, a non-
> textual, equitable rationale for granting a creditor or creditors committee
> derivative standing to pursue estate actions (*i.e.*, the equitable rationale
> coming into play when the debtor-in-possession has a conflict of interest in
> pursuing an action, such as in the situation of an insider-defendant).

*In re Cooper*, 405 B.R. 801, 803 (Bankr. N.D. Tex. 2009) (also noting that "[c]onflicts of

interest are, of course, frequently encountered in Chapter 11, where the metaphor of the

'fox guarding the hen house' is often apropos"); *see also In re McConnell*, 122 B.R. 41, 43-

44 (Bankr. S.D. Tex. 1989) ("[I]ndividual creditors can also act in lieu of the trustee or

debtor-in-possession . . . ."). Here, the Proposed Defendants are the "*foxes guarding the hen*

*house*," and their conflicts of interest abound.[17] Proceeding in a derivative capacity is

necessary, if not critical.

---

[17] *See Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir.
1998) (settlement noteholders purchased Debtors' securities with "the benefit of non-public information
acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in
[their] own self-interest."), *see also, Wolf v. Weinstein*, 372 U.S. 633, 642, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)
("Access to inside information or strategic position in a corporate reorganization renders the temptation to
profit by trading in the Debtor's stock particularly pernicious.").

14.     The proposed Adversary Proceeding also sets forth claims that readily satisfy the Court's threshold standards requiring "colorable" claims, as well as the requirements for a derivative action. This Motion, which is supported by objective evidence contained in historical filings in the bankruptcy proceedings, also incorporates sworn declarations. At the very least, this additional evidence satisfies the Court's threshold requirements of willful misconduct and fraud set forth in the "gatekeeping" orders, as well as the injunction and exculpation provisions in the Plan.[18] This evidence also supports well-pleaded allegations exempted from the scope of the releases included in the Plan.

15.     HMIT is an appropriate party to bring this action on behalf of the Reorganized Debtor and the Claimant Trust. If successful, the Adversary Proceeding will likely recover well over $100 million for the Claimant Trust, thereby enabling the Reorganized Debtor and Claimant Trust to pay off any remaining innocent creditors and make significant distributions to HMIT as a vested Claimant Trust Beneficiary.

16.     As of December 31, 2022, the Claimant Trust had distributed 64.2% of the total $397,485,568 par value of all Class 8 and Class 9 unsecured creditor claims. The

---

[18] HMIT recognizes that it is an "Enjoined Party" under the Plan. The Plan requires a showing, *inter alia*, of bad faith, willful misconduct, or fraud against a "Protected Party." Seery is a "Protected Party" and an "Exculpated Party" in his capacity as an Independent Director. Muck and Jessup *may* be "Protected Parties" as members of the Oversight Committee, but they were not "protected" when they purchased the Claims before the Effective Date. While it is HMIT's position that Farallon and Stonehill do not qualify as "Protected Parties," they are included in this Motion in the interest of judicial economy.

002445

Claims acquired by Muck and Jessup have an allowed par value of $365,000,000. Based on these numbers, the innocent unsecured creditors hold approximately $32 million in allowed claims. [19]

17.    As of December 31, 2022, the Claimant Trust has distributed $255,201,228. [20] On a *pro rata* basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000.

18.    Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary. The benefits to the Reorganized Debtor, the Claimant Trust and innocent stakeholders are undeniable. [21]

19.    Seery and the Oversight Board should be estopped from challenging HMIT's status to bring this derivative action on behalf of the Claimant Trust. Seery, Muck and Jessup have committed fraud, acted in bad faith and have unclean hands, and they should not be allowed to undermine the proposed Adversary Proceeding - which seeks

---

[19] Doc. 3653.

[20] *Id.*

[21] Further, under the present circumstances and time constraints, this Motion should be granted to avoid the prospect of the loss of some of HMIT's and the Claimant Trust's claims and denial of due process.

to rectify significant wrongdoing. To hold otherwise would allow Seery, Muck, Jessup, Stonehill, and Farallon the opportunity to not just "guard the hen house," but to also open the door and take what they want.[22] HMIT seeks a declaratory judgment of its rights, accordingly.

## IV.    The Proposed Defendants

20.    Seery acted in several capacities during relevant times. He served as the Debtor's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"). He also served as member of the Debtor's Independent Board.[23] He currently serves as Claimant Trustee under the CTA and remains the CEO of the Reorganized Debtor.

21.    There is no doubt Seery owed the Original Debtor's Estate, as well as equity, fiduciary duties, including the duty of loyalty and the duty to avoid conflicts of interest. *See In re Xtreme Power Inc.*, 563 B.R. 614, 632-33 (Bankr. W.D. Tex. 2016) (detailing fiduciary duties owed by corporate officers and directors under Delaware law); *Louisiana World*, 858 F.2d at 245-46 (detailing duties owed by debtors-in-possession).[24]

---

[22] "The doctrine of 'unclean hands' provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy ... forfeits his right to have the court hear his claim, regardless of its merit. [T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (citations omitted) (internal quotations omitted for clarity).

[23] Seery is the beneficiary of the Court's "gatekeeping" orders and is an "exculpated" party in his capacity as an Independent Director. He is also a "Protected Party."

[24] The Internal Affairs Doctrine dictates choice of law. Here, the Debtor, Highland Capital Management, was organized under the law of Delaware. As much, Seery's fiduciary duties and claims involving breaches of those duties will be governed by Delaware law.

002447

22.     Farallon and Stonehill are capital management companies which manage hedge funds; they are also Seery's close business allies with a long history of business ventures and close affiliation. Although they were strangers to the Original Debtor's bankruptcy on the petition date, and were not original creditors, they became entangled in this bankruptcy at Seery's invitation and encouragement—and then knowingly participated in the wrongful insider trades at issue. By doing so, Seery was able to plant friendly allies onto the Oversight Board to rubber stamp compensation demands. The proposed Adversary Proceeding alleges that Farallon and Stonehill bargained to receive handsome pay days in exchange.

23.     Muck and Jessup are special purpose entities, admittedly created by Farallon and Stonehill on the eve of the alleged insider trades, and they were used as vehicles to assume ownership of the purchased claims.[25] The record is clear that Muck and Jessup *did not exist* before confirmation of the Plan in February 2021.[26] Now, however, Muck and Jessup serve on the Oversight Board with immense powers under the CTA.[27] When they purchased the claims at issue, Muck and Jessup were *not* acting in their official capacities on the Oversight Committee and, therefore, they were not "Protected Persons" under the Plan.

---

[25] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[26] *See* McEntire Dec., Ex. 4, Ex. 4-D, Ex. 4-E. Muck was created on March 9, 2021 before the Effective Date. Jessup was created on April 8, 2021, before the Effective Date.

[27] *See* Doc. 3521-5, Sec. 4(a) and 4(b).

002448

24.     By trading on the alleged material non-public information, Farallon, Stonehill, Muck, and Jessup became non-statutory "insiders" with duties owed directly to HMIT at a time when HMIT was the largest equity holder.[28] *See S.E.C. v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010) ("The corporate insider is under a duty to 'disclose or abstain'—he must tell the shareholders of his knowledge and intention to trade or abstain from trading altogether."). In this context, there is no credible doubt that Farallon's and Stonehill's dealings with Seery were ***not*** arms-length. Again, Farallon and Stonehill were Seery's past business partners and close allies.[29] By virtue of the insider trades at issue, Farallon and Stonehill acquired control (acting through Muck and Jessup) over the Original Debtor and Reorganized Debtor through Seery's compensation agreement and awards, as well as supervisory powers over the Claimant Trust. This makes Farallon and Stonehill paradigm non-statutory insiders.

25.     HMIT also seeks recovery against John Doe Defendant Nos. 1 through 10.[30] It is clear Farallon and Stonehill refuse to disclose the precise details of their legal

---

[28] Because of their "insider" status, this Court should closely scrutinize the transactions at issue.

[29] Farallon and Stonehill are two capital management firms (similar to HCM) with whom Seery has had substantial business relationships. Also, Seery previously served as legal counsel to Farallon. Seery also has a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. GCM Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

[30] Farallon and Stonehill consummated their trades concealing their actual involvement through Muck and Jessup as shell companies. Farallon's and Stonehill's identities were not discovered until much later after the fact.

002449

relationships with Muck and Jessup. They resisted such discovery in the prior Rule 202

Proceedings in state district court.[31] They also refused to disclose such details in response

to a prior inquiry to their counsel.[32] Furthermore, the corporate filings of both Muck and

Farallon conspicuously omit the identity of their respective members or managing

members.[33] Accordingly, HMIT intends to prosecute claims against John Doe Defendant

Nos. 1 -- 10 seeking equitable tolling pending further discovery whether Farallon and

Stonehill inserted intermediate corporate layers between themselves and the special

purpose entities (Muck and Jessup) they created. *See In re ATP Oil & Gas Corp.,* No. 12-

36187, 2017 WL 2123867, *4 (Bankr. S.D. Tex. May 16, 2017) (lsgur .J.); *see also In re IFS Fin.*

*Corp.* No. 02-39553, 2010 WL 4614293, *3 (Bankr. S.D. Tex. No. 2, 2010) ("The identity of

the party concealing the fraud is immaterial, the critical factor is whether any of the

parties involved concealed property of the estate." "In either case, the trustee must

demonstrate that despite exercising diligence, he could not have discovered the identity

of the [unnamed] defendants prior to the expiration of the limitations period.") *ATP Oil,*

2017 WL 2123867 at *4. That burden is easily satisfied here.

---

[31] *See* McEntire Dec., Ex. 4.

[32] *See* McEntire Dec., Ex. 4, *see also,* Ex. 4-F.

[33] *See* Ex. 4-D, Ex. 4-E.

002450