**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

|  |  |  |
|---|---|---|
| | Appellant | § |
| vs. | | § |
| **Highland Capital Management, L.P, et al** | | § |
| | Appellee | § |

**3:23-CV-2071-E**

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 6

# APPELLANT RECORD

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

## APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
## SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
## DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its

individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital

Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and

files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in

the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.      Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

         1.     the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

         2.     the colorability analysis is "akin to the standards applied under the ... *Barton* doctrine";

         3.     the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

    4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.     Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.     Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT and the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

---

D.  Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.  Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.  ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.  determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.  Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.  Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.  Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.  Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.  Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.  Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.  there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.  there is no evidence to support the alleged quid pro quo;

3.  the material shared was *public* information; and/or

4.  the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

---

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.   Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.   Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.   Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.   Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.   Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

   1.   declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

   2.   concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1.   **Notice of Appeal**

     *000001*   a.   Notice of Appeal **[Dkt. 3906]**;

     *000276*   b.   Amended Notice of Appeal **[Dkt. 3908]**; and

     *000551*   c.   Second Amended Notice of Appeal **[Dkt. 3945]**

2.   **The judgment, order, or decree appealed from:**

     a.   Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

**a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*

*Vol. 3*
*001849*
*Thru Vol 4*

*Vol 4*
*002236*
*002243*
*002248*

| | | | |
|---|---|---|---|
| 03/30/2023 | 3706 | | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

*Handwritten annotations in left margin:*
*Vol. 5*
*002251*
*002254*
*002262*
*002346*
*002355*
*002358*
*002391*
*002398*
*002400*
*Vol. 6*
*002826* — *Thru Vol. 7*
*Vol. 9* — *Thru Vol. 9*
*003257*
*003260*
*003270*
*003278*

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10*<br>*003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760<br>(3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

*Vol. 10*

*003458*

*003463*

*Vol. 11*

*003537*

*Thru Vol. 16*

*Vol. 17*

*004465*

*004712*

*004714*

*004808*

*004813*

*004836*

*Vol. 18*

*004930*

*004931*

| | | | Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| 05/11/2023 | 3781 | | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| 05/11/2023 | 3783 | | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| 05/11/2023 | 3784 (3784-1 — 3784-46) | | Declaration of John Morris in Support of Highland Parties' Joint Response |
| 05/18/2023 | 3785 | | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| 05/22/2023 | 3787 | | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 05/24/2023 | 3788 (3788-1 — 3788-5) | | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 05/24/2023 | 3789 | | HMIT's Application for Expedited Hearing |
| 05/24/2023 | 3790 | | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 05/25/2023 | 3791 (3791-1 — 3791-5) | | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 05/25/2023 | 3792 | | Order Setting Expedited Hearing |
| 05/25/2023 | 3795 | | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 18*
*0049 39.*

| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| --- | --- | --- |
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*0049 59*
*0049 61*
*0049 84*
*0050 49*
*0051 14*
*Vol. 26*
*006608    Thru Vol. 25*
*Vol. 39    Thru Vol. 39*
*0092 73*
*0092 90*
*0094 16*
*0099 24*

*Vol. 40*

*009426*

*009436*

*009444*

*009445*

*009446*

*009456*

*009458* *Thru Vol. 41*

*Vol. 42*
*009841*

*009901*

*009905*

*009908*

*009912*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| --- | --- | --- |
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|---|
| | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.    Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                    Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
        Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

## V. Background

26.     As part of this Court's Governance Order, an independent board of directors—which included Seery as one of the selections of the Unsecured Creditor's Committee—was appointed to the Board of Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors"), the Original Debtor's general partner. Following approval of the Governance Order, the Board then appointed Seery as the Original Debtor's CEO and CRO. [34] Following the Effective Date of the Plan, Seery now serves as Trustee of the Claimant Trust (the Reorganized Debtor's sole post-reorganization limited partner), and continues to serve as the Reorganized Debtor's CEO. [35]

27.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of several settlements prior to the Effective Date, resulting in the following approximate allowed claims (hereinafter "Claims"):[36]

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

---

[34] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[35] *See* Doc. 1943, Order Approving Plan, p. 34.

[36] Orders Approving Settlements [Doc. 1273, Doc. 1302, Doc. 1788, Doc. 2389].

002451

Each of the settling parties curiously sold their Claims to Farallon or Stonehill (or their affiliated special purpose entities) shortly after they obtained court approval of their settlements. One of these "trades" occurred within just a few weeks before the Effective Date. Farallon and Stonehill coordinated and controlled the purchase of these Claims through Muck and Jessup, and they admitted in open court that Muck and Jessup were created to allow their purchase of the Claims.[37]

28.     HMIT alleges that Seery filed (or caused to be filed) deflated, misleading projections regarding the value of the Debtor's Estate,[38] while inducing unsecured creditors to discount and sell their Claims to Farallon and Stonehill. But as reflected in the attached declarations, it is now known that Seery provided material, non-public information to Farallon. The circumstantial evidence is also clear that both Farallon and Stonehill had access to and used this non-public information in connection with their purchase decisions.

29.     Farallon and Stonehill are registered investment advisors who have their own fiduciary duties to their investors, and they are acutely aware of what these duties entail. Yet, upon information and belief, they collectively invested over $160 million dollars to purchase the Claims in the absence of any publicly available information that

---

[37] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[38] The pessimistic projections were issued as part of the Plan Analysis on February 2, 2021. [Doc. 1875-1]. The Debtor projected 0% return on Class 9 claims and only 71.32% return on Class 8 Claims.

could rationally justify such investments. These "trades" become even more suspect because, at the time of confirmation, the Plan provided pessimistic projections advising stakeholders that the Claim holders would never receive full satisfaction:

- From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million.[39]

- HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[40]

  - This meant that Farallon and Stonehill invested more than $103 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

- In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%*;[41]

30.    In the third financial quarter of 2021, just over $6 million of the projected $205 million available to satisfy general unsecured creditors was disbursed.[42] No additional distributions were made to the unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—**$45 million more than was *ever* projected**.[43]

---

[39] Doc. 1473, Disclosure Statement, p. 18.

[40] Doc. 1875-1, Plan Supplement, p. 4.

[41] Doc 2949.

[42] Doc 3200.

[43] Doc 3582.

[18]

31.     According to Highland Capital's Motion for Exit Financing,[44] and a recent motion filed by Dugaboy Investment Trust,[45] there remain **substantial** assets to be monetized for the benefit of the Reorganized Debtor's creditors. Thus, upon information and belief, Stonehill and Farallon, stand to realize significant profits on their wrongful investments. In turn, Stonehill and Farallon will garner (and already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the Claims. Upon information and belief, HMIT also alleges that Seery has received excessive compensation and bonuses approved by Farallon (Muck) and Stonehill (Jessup) as members of the Oversight Board.

32.     As evidenced in the supporting declarations (Exs. 2 and 3):

- Farallon admitted it conducted no due diligence and relied upon Seery in making its multi-million-dollar investment decisions at issue.[46]

- Farallon admitted it was unwilling to sell its stake in these Claims at any price because Seery assured Farallon that the Claims were tremendously valuable.[47]

- Farallon bragged about the value of its investment referencing non-public information regarding Amazon, Inc.'s ("Amazon") interest in acquiring Metro-Goldwyn-Mayer Studios Inc. ("MGM").[48]

---

[44] Doc 2229.

[45] Doc 3382.

[46] *See* Ex. 2, 2022 Dondero Declaration.

[47] *See* Ex. 2, 2022 Dondero Declaration, Ex. 3, 2023 Dondero Declaration.

[48] *See* Ex. 3, 2023 Dondero Declaration.

002454

- Farallon was unwilling to sell its stake in the newly acquired Claims even though publicly available information suggested that Farallon would lose millions of dollars on its investment.[49]

Farallon can offer **no credible explanation** to explain its significant investment, and its refusal to sell at any price, **except** Farallon's access to material non-public information. In essence, Seery became the guarantor of Farallon's significant investment. Farallon admitted as much in its statements to James Dondero.

33.     The same holds true for Stonehill. Given the negative, publicly available information, Stonehill's multi-million-dollar investments make no rational sense unless Stonehill had access to material non-public information.

34.     Fed. R. Bank. P. 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." However, no public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks." [50]

35.     Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, Seery acquired material non-public information regarding Amazon's interest in acquiring MGM.[51] Upon receipt of this material non-public

---

[49] See Ex. 3, 2023 Dondero Declaration, see also Doc. 1875-1.

[50] Doc. 1905, February 3, 2021, Hearing Transcript, 49:5-21.

[51] See Adversary No. 20-3190-sgj11, Doc. 150-1.

002455

information, MGM should have been placed on the Original Debtor's "restricted list," but Seery continued to move forward with deals that involved MGM stock and notes.[52] Because the Original Debtor additionally held direct interests in MGM,[53] the value of MGM was of paramount importance to the value of the estate.

36.     Armed with this and other insider information, Farallon—through Muck—proceeded to invest in the Claims and, acting through Muck, acceded to a powerful position on the Oversight Board to oversee future distributions to Muck and itself. It is no coincidence Seery invited his business allies into these bankruptcy proceedings with promises of great profits. Seery's allies now oversee his compensation.[54]

37.     The Court also should be aware that the Texas States Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation

---

[52] As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM. The HCLOF interest was not to be transferred to the Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements. Doc. 1625, p. 9, n. 5. Doc. 1625.

[53] *See* Doc. 2229, Motion for Exit Financing.

[54] Amazon closed on its acquisition of MGM in March 2022, but the evidence strongly suggests that agreements for the trades already had been reached - while announcement of the trades occurred strategically after the MGM news became public. Now, as a result of their wrongful conduct, Stonehill and Farallon profited significantly on their investments, and they stand to gain substantially more profits.

underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely "colorable."

## VI.    Argument

### A.    HMIT has asserted Colorable Claims against Seery, Stonehill, Farallon, Muck, and Jessup.

38.    Unlike the terms "Enjoined Party," "Protected Party," or "Exculpated Party," the Plan does not define what constitutes a "colorable" claim. Nor does the Bankruptcy Code define the term. However, relevant authorities suggest that a Rule 12(b)(6) standard is an appropriate analogue.

39.    The Fifth Circuit has held that a "colorable" claim standard is met if a [movant], such as HMIT, has asserted claims for relief that, on appropriate proof, would allow a recovery. A court need not and should not conduct an evidentiary hearing but must ensure that the claims do not lack any merit whatsoever. *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 248 (5th Cir. 1988). Stated differently, the Court need not be satisfied there is an evidentiary basis for the asserted claims but instead should allow the claims if they *appear* to have *some* merit.

40.    Other federal appellate courts have reached similar conclusions. For example, the Eighth Circuit holds that "creditors' claims are colorable if they would survive a motion to dismiss." *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008); *accord In Re Foster,* 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), aff'd 602 Fed. Appx. 356 (8th Cir. 2015) (*per curiam*). The Sixth Circuit has adopted a similar test requiring that the court

look ***only*** to the face of the complaint to determine if claims are colorable. *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995) (emphasis added).

41.    Although there is a dearth of federal court authorities in Texas, other federal courts have adopted the same standard—*i.e.*, a claim is colorable if it is "plausible" and could survive a motion to dismiss. *See In re America's Hobby Center, Inc.*, 223 B.R. 273, 282 (S.D.N.Y 1998). In addition, in the non-bankruptcy context, the District Court for the Northern District of Texas explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff must have an '*arguable* claim' and not that the plaintiff must be able to succeed on that claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (Emphasis added).

42.    Thus, in this instance, this Court's gatekeeping inquiry is properly limited to whether HMIT has stated a plausible claim on the face of the proposed pleadings involving "bad faith," "willful misconduct," or "fraud." Because the face of the Adversary Complaint alleges plausible facts, HMIT's Motion is properly granted. Clearly, the attached Adversary Proceeding would survive a Rule 12(b)(6) challenge. Furthermore, the supporting declarations and documentary evidence provide additional support, and the circumstantial evidence proves that Farallon and Stonehill, strangers to the bankruptcy on the petition date, would not have leaped into these proceedings without undisclosed assurances of profit.

002458

### B. Fraud

43.     As set forth in the proposed Adversary Proceeding, HMIT alleges a colorable claim for fraud—both fraud by knowing misrepresentation and fraud by omission of material fact. Here, these allegations of fraud are appropriately governed by Texas law under appropriate choice of law principals.[55]

44.     Seery had a duty to not provide material inside information to his business allies. But, he did so. At the latest, Seery became aware of the potential sale of MGM in December 2020 when he received an email from Jim Dondero.[56] Thus, Seery knew at that time that this potential sale would likely yield significant value to the Original Debtor's Estate. Yet, the financial disclosures associated with the Plan's confirmation, which were provided only a month later, presented an entirely different outlook for both Class 8 and Class 9 unsecured creditors.[57] Seery knew at that time that these pessimistic disclosures were misleading, if not inaccurate.

45.     There is no credible doubt Seery intended that innocent stakeholders would rely upon the pessimistic projections set forth in the Plan Analysis. Indeed, the singular purpose of the Plan Analysis was to advise stakeholders. As such, HMIT alleges that Seery knowingly made misrepresentations with the intention that innocent stakeholders

---

[55] However, Delaware law is substantially similar on the elements of fraud. *See Malinals v. Kramer*, No. CIV.A. CPU 6-11002145, 2012 WL 174958, at 2 (Del. Com. Pl. Jan. 5, 2012)

[56] *See,* Dondero 2022 Dec., Ex. 2-1.

[57] *See* Doc. 1875-1, Plan Analysis, February 1, 2021.

002459

would rely, and that he failed to disclose material information concerning his entanglements with Farallon and Stonehill, as well as the related negotiations that were chock full of conflicts of interest.

46. On the flip side of this conspiracy coin, Farallon and Stonehill were engaged in negotiations to acquire the Claims at discounted prices; and, they successfully did so. HMIT alleges that their success was based on knowledge that the financial disclosures associated with the Plan Analysis were significantly understated. Otherwise, it would make no financial sense for Farallon and Stonehill to do the deals at issue. Indeed, Farallon admitted that it would not sell the Claims at any price, expressing great confidence in the substantial profits it expected even in the absence of any supporting, publicly available information.[58]

47. All of the Proposed Defendants had a duty of affirmative disclosure under these circumstances. Seery always had this duty. Muck, Jessup, Farallon, and Stonehill assumed this duty when they became non-statutory "insiders." Thus, all of the Proposed Defendants are liable for conspiring to perpetrate a fraud by omission of material facts.

48. HMIT also claims that Seery and the other Proposed Defendants failed to disclose material information concerning Seery's involvement in brokering the Claims in exchange for *quid pro quo* assurances of enhanced compensation. Seery's compensation

---

[58] Ex. 3, 2023 Dondero Declaration.

should be disgorged or, alternatively, such compensation constitutes a damage recoverable by the Reorganized Debtor and Claimant Trust as assignees (or transferees) of the Original Debtor's causes of action. This compensation was the product of the alleged self-dealing, breaches of fiduciary duty, and fraud.

### C. Breaches and Aiding and Abetting Breaches of Fiduciary Duties

49.     It is beyond dispute Seery owed fiduciary duties to the Estate. *See Xtreme Power*, 563 B.R. at 632-33 (detailing fiduciary duties owed by corporate officers and directors under Delaware law);[59] *Louisiana World*, 858 F.2d at 245-46 (5th Cir. 1988) (detailing duties owed by debtors-in-possession). Although Seery did not buy the Claims at issue, he stood to profit from these sales because his close business allies would do his bidding after they had acceded to positions of power and control on the Oversight Board. Muck and Jessup were essentially stepping into the shoes of three of the largest unsecured creditors who were already slated to serve on the Oversight Board. Thus, by acquiring their Claims, all of the Proposed Defendants knew that Muck and Jessup would occupy these powerful oversight positions after the Effective Date.

50.     Thus, the alleged conspiracy was successfully implemented before the Effective Date. Farallon and Stonehill now occupy control positions through the shell

---

[59] The *Xtreme* case also notes that "several Delaware courts have recognized that 'directors who are corporate employees lack independence because of their substantial interest in retaining their employment." 563 B.R. at 633-34. Because Muck and Jessup are now in control of Seery's compensation, it follows that Seery is beholden to them, and Seery's disclosure of inside information to Stonehill and Farallon confirms his conflict of interest.

002461

entities (Muck and Jessup) overseeing large compensation packages for Seery. Of course, this control (and the opportunity to control) presented a patent conflict of interest which Seery should have avoided, but instead knowingly created, fostered, and encouraged. HMIT alleges that Seery breached his duty to avoid this conflict or otherwise disclose this conflict and Farallon and Stonehill aided and abetted this breach.

51.    The Original Debtor, as an investment adviser registered with the SEC, is also required to make public disclosures on its Form ADV, the uniform registration form for investment advisers required by the SEC. These Form ADV disclosures, which were in effect at the time of the insider trades at issue, explicitly forbade "any access person from trading either personally or on behalf of others . . . on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party."[60] It now appears these representations were false when made. Seery's alleged conduct also violated, at minimum, the duties Seery owed in his various capacities with the Original Debtor under the Form ADV disclosures.

52.    Although initially strangers to the original bankruptcy, by accepting and using inside information, Farallon and Stonehill became "temporary insiders" and thus owed separate duties to the Estate. *See S.E.C. v. Cuban*, 620 F.3d 551 (5th Cir. 2010) ("[E]ven

---

[60] *See, e.g.,*
https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=77
7026.

002462

an individual who does not qualify as a traditional insider may become a 'temporary insider' if by entering 'into a special confidential relationship in the conduct of the business of the enterprise [they] are given access to information solely for corporate purposes." *In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (finding that equity committee stated colorable claim for equitable disallowance against creditors who "became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization"; vacated in part as a condition of settlement only);[61] *See also, In re Smith*, 415 B.R. 222, 232-33 (Bankr. N.D. Tex. 2009) ("[a]n insider is an entity or person with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.' 'Thus, the term "insider" is viewed to encompass two classes: (1) per se insiders as listed in the Code and (2) extra-statutory insiders that do not deal at arm's length.'" (citations omitted)). Farallon, Stonehill, Muck, and Jessup clearly fall into this latter category.

---

[61] Although the *Washington Mutual* case was subsequently vacated, the Court's intellectual reasoning remains valid because the vacatur was mandated by a mediated settlement, not because the court's logic was flawed or changed, and the court expressly noted that the parties' settlement was conditioned on vacatur. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan*," and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

002463

53.     Because Farallon and Stonehill (acting through Muck and Jessup) now hold the majority of the seats on the Oversight Board, they, along with Seery, exercise control of the reorganization proceedings. At no time were Farallon, Stonehill, or Seery's plans disclosed to the other creditors or equity. In fact, the only inference that can be reasonably drawn is that Farallon and Stonehill brazenly sought to conceal their involvement by establishing shell entities—Muck and Jessup—to nominally hold the Claims and create an opaque barrier to any effort to identify the "*Oz behind the curtain*." Such conduct aligns precisely with the inequitable conduct detailed in *Citicorp* and *Adelphia* (discussed below).

54.     In sum, the proposed Adversary Proceeding sets forth plausible allegations that Stonehill and Farallon were aware of Seery's fiduciary duties. Indeed, as registered investment advisors, both Farallon and Stonehill were acutely aware of Seery's fiduciary obligations, including, without limitation, the duty to act in the best interests of the Original Debtor's Estate and the duty not to engage in insider trading that would benefit Seery, as an insider, and themselves, as non-statutory insiders. By accepting and then acting on material non-public information, Farallon and Stonehill (as well as Muck and Jessup) aided and abetted breaches of these fiduciary duties. By placing themselves in positions to control Seery's compensation, Farallon and Stonehill (acting through Muck and Jessup) induced, encouraged, aided and abetted Seery's self-dealing.

002464

Case 1:23-mi-99999-UNA Document 1218-11 Filed 04/28/23 Page 31 of 692
Case 19-34054-sgj11 Doc 3702 Filed 04/28/23 Entered 04/28/23 16:05:30 Desc
Exhibit B-MV-Emergency Motion to Authorize Appeal Page 30 of 192

### D. Equitable Disallowance is an Appropriate Remedy

55.     HMIT also seeks equitable disallowance. Although the Fifth Circuit in *Matter of Mobile Steel Co.* generally limited the court's equitable powers to subordination rather than disallowance,[62] the Fifth Circuit **did *not* foreclose** the viability of equitable disallowance as a potential remedy. *See* 563 F.2d 692, 699 n. 10 (5th Cir. 1977). Binding U.S. Supreme Court precedent in *Pepper v. Litton* also permits bankruptcy courts to fashion disallowance remedies. 308 U.S. 295, 304-11 (1939). Bankruptcy Code § 510, which supplies the authority for equitable subordination, was "intended to codify case law, such as *Pepper v. Litton . . . and is not intended to limit the court's power in any way…. Nor does [it] preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances.*" *In re Adelphia Commun. Corp.*, 365 B.R. 24, 71-72 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration,* 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (emphasis and omissions in original).[63]

56.     The Fifth Circuit's decision in *Mobile Steel* also was premised on the notion that disallowance would not add to the quiver of defenses to fight unfairness because

---

[62] Equitable subordination is an inadequate remedy in this instance.

[63] In *Washington Mutual,* the Court's intellectual reasoning when imposing disallowance is instructive. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan,*" and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

creditors "are fully protected by subordination" and "[i]f the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then *surely* the claim is either invalid or the bankrupt possesses a clear defense against it." *Mobile Steel*, 563 F.2d at 699 n. 10 (emphasis added). Importantly, however, the factual scenarios considered in *Mobile Steel* do not exist here.

57. Here, Muck and Jessup purchased both Class 8 and Class 9 Claims, and they now effectively occupy more than 90% of the entire field of unsecured creditors in these two claimant tiers. Thus, subordination cannot effectively address the current facts where the Original Debtor's CEO and CRO conspired directly with close business allies who acquired the largest unsecured claims to the detriment of other innocent creditors and *former equity*. The reasoning in published cases from other circuits supports this conclusion. *See Adelphia*, 365 B.R. at 71-73; *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir. 1998).

58. The purpose of equitable subordination is to assure that the wrongdoer does not profit from bad conduct. In the typical case, subordination to other creditors will achieve this deterrence. But, it is clear that the Third Circuit's decision in *Citicorp* was structured to use subordination as just one tool in a larger tool box to make sure "at a minimum, the remedy here should deprive – [the fiduciary] of its profit on the purchase of the notes." *Id* at 991. In *Adelphia*, the Southern District of New York also used equitable

002466

subordination as a remedy to address wrongs of non-insiders who aided and abetted breaches a fiduciary duty by the debtor's management. 365 B.R. at 32.

59.     But subordination cannot adequately address the wrongful conduct at issue. This is because subordination is typically limited to instances where one creditor is subordinated to other creditors, not equity. Here, for all practical purposes, there are only a few other unsecured creditors with relatively small stakes. Therefore, subordination as a weapon of deterrence is neutered.

60.     In sum, by engaging in the alleged wrongful acts, including aiding and abetting Seery's breaches of fiduciary duty, Farallon, Stonehill, Muck, and Jessup should not be rewarded. The Proposed Defendants engaged in alleged conduct which damaged the Original Debtor's estate, including improper agreements to compensate Seery under the terms of the CTA. Equitable disallowance is an appropriate remedy which, when combined with disgorgement of all ill-gotten profits, will deprive the Proposed Defendants of their ill-gotten gains.

### E.  Disgorgement and Unjust Enrichment

61.     The law is clear that disgorgement is an available remedy for breach of fiduciary duty both under Texas Law, see *Kinzbach Tool Co. v. Corbett-Wallace Corporation*, 160 S.W. 2d 509 (Tex. 1942), and under Delaware law, see *Metro Storage International, LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022). Disgorgement is also an appropriate remedy for unjust enrichment under Texas law, *Hunter v. Shell Oil Co.,* 198 F.2d 485 (5th Cir. 1952),

002467

and under Delaware law, *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 919
A.2d 563 (Del. Ch. 2007).[64]

62.    Likewise, the imposition of a constructive trust is proper for addressing
unjust enrichment under both Delaware and Texas law, see *Teacher's Retirement System of
Louisiana v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006) and *Hsin-Chi-Su v. Vantage Drilling
Company*, 474 S.W. 3d 384 (Tex. App. – 14th Dist. 2015), pet. denied. The elements of unjust
enrichment are: (1) the defendant must have gained a benefit (2) at the expense of
plaintiff, (3) and retention of that benefit must be shown to be unjust. *See Restatement
(Third) of Restitution and Unjust Enrichment* §321, cmt. e (2011).

63.    Here, the imposition of a constructive trust and disgorgement are clearly
appropriate to provide redress for the alleged breaches of fiduciary duty and the knowing
participation in (or aiding and abetting) those breaches. Furthermore, the imposition of a
constructive trust and disgorgement are appropriate to disgorge the improper benefits
that all of the Proposed Defendants received by virtue of collusion and insider trading.

64.    As set forth in the proposed Adversary Proceeding, Seery gained the
opportunity to have his compensation demands rubber stamped. The other Defendants
gained the opportunity to purchase valuable claims at a discount knowing that

---

[64] It is likely that the Internal Affairs Doctrine will dictate that Delaware choice of law governs the breach
of fiduciary duty claims.

002468

pessimistic financial projections were false and that the upside investment potential was great. Retention of the benefits they received would be unjust and inequitable.

65.     Clearly, the Debtor's Estate was damaged by virtue of the claimed conduct. Seery obtained profits and compensation to the detriment of that estate as well as the estate of the Reorganized Debtor, other innocent creditors and HMIT, as former equity and as a contingent Claimant Trust Beneficiary.

### F. Declaratory Relief

66.     HMIT also seeks declaratory relief pursuant to Fed. R. Bank P. 7001(9). Specifically, HMIT seeks a declaratory judgment that: (a) there is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement; (b) as a general matter, HMIT has standing to bring an action against a trustee even if its interest is considered "contingent;" (c) HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill; (d) HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments; (e) Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of fraudulent conduct, bad faith, willful misconduct, and unclean hands; (f) Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized

002469

Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct, and unclean hands; and (g) all of the Proposed Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct, and unclean hands.

### G. HMIT has Direct Standing.

67.     The Texas Supreme Court recently held that "a partner or other stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization." *Pike v. Texas EMC Mgt., LLC*, 610 S.W.3d 763, 778 (Tex. 2020). In so holding, the Court considered federal law and found that the traditional "incantation that a shareholder may not sue for the corporation's injury" is really a question of capacity, which goes to the merits of a claim, rather than an issue of standing that would impact subject matter jurisdiction. *Id.* at 777 (noting that the 5th Circuit and "[o]ther federal circuits agree that a plaintiff has standing to sue for the lost value of its investment in a corporation"). Because Seery, Muck, Jessup, Stonehill, Farallon's alleged actions devalued HMIT's interest in the Debtor's Estate, including, without limitation, payment of excessive compensation to Seery, HMIT has standing to pursue its common law claims directly. HMIT also has direct standing to seek declaratory relief as set forth in the proposed Adversary Proceeding.

002470

## VII.    Prayer

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave authorizing it to file the Adversary Complaint, attached as Exhibit 1, as an Adversary Proceeding in this United States Bankruptcy Court for the Northern District of Texas, in its own name and as a derivative action on behalf of the Debtor Highland Capital Management, L.P., against Muck Holdings, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, Stonehill Capital Management, LLC, James P. Seery, Jr., and John Doe Defendants Nos. 1 – 10, and further grant HMIT all such other and further relief to which HMIT may be justly entitled.

Dated: March 28, 2023

<div style="margin-left:40%">

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie A. McEntire*
     Sawnie A. McEntire
     Texas State Bar No. 13590100
     smcentire@pmmlaw.com
     1700 Pacific Avenue, Suite 4400
     Dallas, Texas 75201
     Telephone: (214) 237-4300
     Facsimile: (214) 237-4340

     Roger L. McCleary
     Texas State Bar No. 13393700
     rmccleary@pmmlaw.com
     One Riverway, Suite 1800
     Houston, Texas 77056

</div>

[36]

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

**Attorneys for Hunter Mountain
Investment Trust**

## CERTIFICATE OF CONFERENCE

Beginning on March 24, 2023, and also on March 27, 2023, the undersigned counsel conferred either by telephone or via email with all counsel for all Respondents regarding the relief requested in the foregoing Motion, including John A. Morris on behalf of James P. Seery, and Brent McIlwain on behalf of Muck Holdings LLC, Jessup Holdings LLC, Stonehill Capital Management, and Farallon Capital Management.  Mr. Seery is opposed to this Motion. Based upon all communications with Mr. McIlwain, it is reasonably believed his clients are also opposed and we advised him that this recitation would be placed in the certificate of conference.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

## CERTIFICATE OF SERVICE

I certify that on the 28th day of March 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

002472

# Exhibit 1

<u>**Exhibit 1 to Emergency Motion**</u>

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

</div>

| | | |
|---|---|---|
| | § | |
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | |
| **HUNTER MOUNTAIN INVESTMENT** | § | |
| **TRUST, INDIVIDUALLY, AND ON** | § | |
| **BEHALF OF THE DEBTOR** | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P. AND THE** | § | **Adversary Proceeding No. _____** |
| **HIGHLAND CLAIMANT TRUST** | § | |
| | § | |
| **PLAINTIFFS,** | § | |

1

002474

| | § | |
| **v.** | § | |
| | § | |
| **MUCK HOLDINGS, LLC, JESSUP** | § | |
| **HOLDINGS, LLC, FARALLON** | § | |
| **CAPITAL MANAGEMENT, LLC,** | § | |
| **STONEHILL CAPITAL** | § | |
| **MANAGEMENT, LLC, JAMES P.** | § | |
| **SEERY, JR., AND JOHN DOE** | | |
| **DEFENDANTS NOS. 1-10** | | |
| | | |
| **DEFENDANTS.** | | |

## VERIFIED ADVERSARY COMPLAINT

Hunter Mountain Investment Trust ("HMIT") files this Verified Adversary Complaint in its individual capacity and, as a derivative action on behalf of the Reorganized Debtor, Highland Capital Management L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust (collectively "Plaintiffs"), complaining of Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr., ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendants Nos. 1-10 are collectively "Defendants"), and would show:

### I. Introduction

1.      HMIT brings this Verified Adversary Complaint ("Complaint") on behalf of itself, individually, and as a derivative action benefitting the Reorganized Debtor and

002475

on behalf of the Highland Claimant Trust ("Claimant Trust"), as defined in the Claimant

Trust Agreement (Doc. 3521-5) ("CTA").[1] This derivative action is specifically brought

pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and B. R. Rule 7023.1. At

the time of the transactions at issue, HMIT held a 99.5% limited partnership in Highland

Capital Management, LP, the Original Debtor, as described herein. This derivative action

is not a collusive effort to confer jurisdiction that the Court would otherwise lack.

2.      Upon the Effective Date, the assets of the bankruptcy estate of Highland

Capital Management, L.P., as the Original Debtor (the "Debtor's Estate") were

transferred to the Highland Claimant Trust under the terms of the Fifth Amended Plan

of Reorganization of Highland Capital Management, L.P. (as Modified) [Doc. 1943,

Exhibit A] (the "Plan") and as defined in the CTA. These assets include all "causes of

action" that the Debtor's Estate had before the Effective Date including, without

limitation, the causes of action set forth in this Adversary Proceeding. Furthermore, the

Claimant Trust is managed by the Claimant Trustee, Seery. Therefore, any demand upon

Seery to prosecute the claims set forth in this Complaint would be futile because Seery is

a Defendant. Similarly, the Oversight Board exercises supervision over Seery as Claimant

---

[1] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate. Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed in HMIT's Emergency Motion for Leave (Doc. __).

002476

Trustee, and Muck and Jessup are members of the Oversight Board. Any demand upon Muck and Jessup to prosecute these claims would be equally futile. All conditions precedent to bringing this derivative action have otherwise been satisfied.

3.    This action has become necessary because of Defendants' tortious conduct. This tortious conduct occurred before the Effective Date of the Plan, but its effects have caused damage both before and after the Effective Date. Prior to the Effective Date, HMIT owned 99.5% of the limited partnership interest in the Original Debtor and was the beneficiary of fiduciary duties owed by Seery.

4.    Seery, the Original Debtor's CEO and former Chief Restructuring Officer ("CRO"), wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends, Farallon and Stonehill. He did so by providing material non-public information to them concerning the value of the Original Debtor's Estate that other stakeholders did not know. Farallon and Stonehill, who were otherwise strangers to the bankruptcy proceedings, wrongfully purchased the claims through their special purpose entities, Muck and Jessup, based upon this inside information, and they are now profiting from their misconduct. Seery's dealings with the other Defendants were not arm's length, but instead were covert, undisclosed, and collusive.

5.    Motivated by corporate greed, the other Defendants aided and abetted or, alternatively, knowingly participated in Seery's wrongful conduct. They also breached their own duties as "non-statutory insiders." Because of their long-standing, historical

002477

relationships with Seery, and their use of material non-public information, Farallon, Stonehill, Muck, and Jessup assumed positions of control over the affairs of the Debtor's bankruptcy, including compensation awards to Seery. As such, they became non-statutory insiders.

6.      HMIT was formerly the largest equity holder in the Debtor, holding a 99.5% limited partnership interest. HMIT now holds an Allowed Class 10 Class B/C Limited Partnership Interest and a Contingent Trust Interest under the CTA. Given HMIT's' position as former equity, HMIT's right to recover from the Claimant Trust is junior to the Reorganized Debtor's unsecured creditors, now known as Claimant Trust Beneficiaries. However, the vast majority of the approved unsecured claims superior to HMIT's interest are the claims wrongfully acquired by insider trading and the breaches of duty at issue in this proceeding.

7.      By wrongfully soliciting, fostering, and encouraging the wrongful insider trades, Seery violated his fiduciary duties to the Debtor's Estate, specifically his duty of loyalty and his duty to maximize the value of the Estate with corresponding recovery by legitimate creditors and former equity. Seery was motivated out of self-interest to garner personal benefit (to the detriment of the Debtor's Estate) by strategically benefitting his business allies with non-public information. He then successfully "planted" his allies onto the Oversight Board, which, as a consequence does not act as an independent board in the exercise of its responsibilities. Rather, imbued with powers to oversee Seery's

002478

future compensation, the other Defendants are postured to reward Seery financially regarding Defendants' illicit dealings and, upon information and belief, they have done so.

8.      By receiving and acting upon material non-public information concerning the financial condition of the Debtor's Estate, Stonehill and Farallon, acting individually and through special purpose shell entities they created and controlled, directly or indirectly, are also liable for aiding and abetting Seery's breaches of fiduciary duties. By acquiring the claims at issue, Muck and Jessup, the shell entities created and controlled by Stonehill and Farallon, also became non-statutory insiders owing duties of disclosure which they also breached.

9.      HMIT separately seeks recovery against John Doe Defendant Nos. 1-10. Farallon actively concealed the precise legal relationship between Farallon and Muck. Stonehill actively concealed the precise legal relationship between Stonehill and Jessup. What is known, however, is that Farallon and Stonehill created these special purpose shell entities on the eve of the insider trades to acquire ownership of the claims and to otherwise control the affairs of the Oversight Board. Both Farallon and Stonehill rejected inquiries concerning the exact nature of their relationship with these special purpose entities. Accordingly, HMIT seeks equitable tolling of any statute of limitations concerning claims against unknown business entities that Farallon and Stonehill may have created and inserted as intermediate corporate layers in the transactions at issue.

002479

10.    HMIT seeks to disgorge all Defendants' ill-gotten profits and equitable disallowance of the remaining unpaid balances on the following allowed claims: Claim Nos. 23, 72, 81, 143, 147, 149, 150, 153, 154, 190, and 191 (the "Claims") currently held by Muck and Jessup. Because Defendants received substantial distributions from the Claimant Trust in connection with these Claims, HMIT seeks to disgorge all such distributions above Defendants' initial investment—compelling restitution of such funds to the Claimant Trust for the benefit of innocent creditors and former equity pursuant to the waterfall established under the Plan and the CTA. HMIT also seeks to disgorge Seery's compensation from the date his collusive conduct first occurred. Alternatively, HMIT seeks damages on behalf of the Claimant Trust in an amount equal to all compensation paid to Seery from the onset of his collusive conduct to present.

## II. Jurisdiction and Venue

11.    Pursuant to *Misc. Order No. 33 Order of Reference of Bankruptcy Cases, U.S. District Court for N.D. Texas* (the "Order of Reference"), this Complaint is commenced in the Bankruptcy Court because it is "related to a case under Title 11."  The filing of this Complaint is expressly subject to and without waiver of Plaintiff' rights and ability to seek withdrawal of the reference pursuant to 28 U.S.C. § 157(d), FED. R. BANKR. P. 5011, and Local Bankruptcy Rule 5011-1. Plaintiffs hereby demand a right to a trial by jury of all claims asserted herein and nothing in this Complaint, nor Plaintiffs' compliance with the Order of Reference, shall be deemed a waiver of this right.

002480

12.     This Court has jurisdiction of the subject matter and the parties as a "related to" proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and Articles IX.F, and XI. of the Plan.

13.     Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs do **not** consent to the entry of final orders or judgment by the bankruptcy court.

14.     Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1408 and 1409, and Articles IX.F, and XI. of the Plan.

### III. Parties

15.     HMIT is a Delaware statutory trust that was the largest equity holder in the Original Debtor, holding a 99.5% limited partnership interest. HMIT is also the holder of a Contingent Trust Interest in the Claimant Trust, but should be treated as a vested Claimant Trust Beneficiary due to Defendants' wrongful conduct.

16.     Pursuant to the Plan and the CTA, the Claimant Trust holds the assets of the Reorganized Debtor, including the causes of action that accrued to the Original Debtor before the Effective Date. The Claimant Trust is established in accordance with the Delaware Statutory Trust Act and Treasury Regulatory Section 301.7701-4(d).

17.     Muck is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Muck has made prior appearances in the Debtor's bankruptcy.

002481

18.     Jessup is a Delaware limited liability company, with its principal office in New York, and may be served with process via its registered agent, Vcorp Services, LLC, at 108 W. 13th Street Suite 100, Wilmington, Delaware 19801. Jessup has made prior appearances in the Debtor's bankruptcy.

19.     Farallon is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Farallon is a capital management company that manages hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Farallon because Farallon's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts requirements and due process considerations.

20.     Stonehill is a Delaware limited liability company, with its principal office in New York, and may be served with process at 320 Park Avenue, 26th Floor, New York, NY 10022. Stonehill is a capital management company managing hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Stonehill because Stonehill's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts and all due process considerations.

21.     Seery is an individual citizen and resident of the State of New York. Mr. Seery may be served with process at 100 Crescent Court, Suite 1805, Dallas, Texas 75201.

002482

22.     John Doe Defendant Nos. 1-10 are currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue.

### IV. <u>Facts</u>

#### A.     *Procedural Background*

23.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court,[2] which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.[3]

24.     On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("<u>UCC</u>") consisting of three judgment creditors—the Redeemer Committee of the Highland Crusader Fund ("<u>Redeemer</u>"); Acis Capital Management, L.P. and Acis Capital Management GP, LLC (collectively "<u>Acis</u>"); and UBS Securities LLC and UBS AG London Branch (collectively "<u>UBS</u>")—and an unpaid vendor, Meta-E Discovery.

25.     Following the venue transfer to Texas, on December 27, 2019, the Debtor filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of*

---

[2] Doc. 3. Unless otherwise referenced, all documents referencing "Doc." refer to the docket maintained in Case No. 19-34054-sgj11 (Bankr. N.D. Tex.).

[3] Doc. 1.

002483

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* ("Governance Motion").[4] On January 9, 2020, the Court signed a Governance Order granting the Governance Motion.[5]

26.     As part of the Governance Order, an independent board of directors—which included Seery as one of the selections of the Unsecured Creditors Committee—was appointed to the Board of Directors (the "Board") of Strand, the Original Debtor's general partner. The Board then appointed Seery as the Chief Executive Officer in place of the previous CEO, Mr. James Dondero, as well as the CRO.[6] Seery currently serves as Trustee of the Claimant Trust under the terms of the CTA and the CEO of the Reorganized Debtor.[7]

**B.     *The Targeted Claims***

27.     In his capacity as the Original Debtor's CEO and CRO, Seery negotiated and obtained court approval for settlements with several large unsecured creditors including Redeemer, Acis, UBS, and another major unsecured creditor, HarbourVest (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed Claims:

| Creditor | Class 8 | Class 9 |
|----------|---------|---------|
| Redeemer | $137 mm | $0 mm |

---

[4] Doc. 281.

[5] Doc. 339.

[6] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[7] *See* Doc. 1943, Order Approving Plan, p. 34.

002484

| Acis | $23 mm | $0 mm |
|------|--------|-------|
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

As reflected in these settlements, HarbourVest and UBS owned Class 9 claims in addition to Class 8 Claims. Class 9 Claims were subordinated to Class 8 Claims in the distribution waterfall in the Plan.

28.    Each of the Settling Parties sold their Claims to Farallon and Stonehill (or affiliated special purpose entities) shortly after receiving court approval of the settlements. One of these "trades" took place within just a few weeks before the Plan's Effective Date.[8] All of these trades occurred when HMIT held its 99.5% equity stake in the Debtor. Notice of these trades was first provided in filings in the records of the Original Debtor's bankruptcy proceedings, as follows: Claim No. 23 (Doc. 2211, 2212, and 2215), Claim Nos. 190 and 191 (Doc. 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (Doc. 2263), Claim No. 81 (Doc. 2262), Claim No. 72 (Doc. 2261).

29.    Farallon and Stonehill, both of whom are registered investment advisors that manage hedge funds, have fiduciary duties to their own investors. As such, they are acutely aware of their duties and obligation as fiduciaries. Yet, they both invested many tens of millions of dollars, directly or indirectly, to acquire the Claims in the absence of

---

[8] Docs. 2697, 2698.

002485

any publicly available information that could provide any economic justification for their investment decisions.

30.     Upon information and belief, Stonehill and Farallon collectively invested an estimated $160 million to acquire the Claims with a face amount of $365 million, and they did so in the absence of any meaningful due diligence. Indeed, Farallon has admitted that it conducted no due diligence but relied on Seery's guarantees.

31.     Stonehill and Farallon's investments become even more suspicious because the Plan provided the *only* publicly available information, which, at the time, included pessimistic projections that the Claims would ever receive full payment:

    a.   From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the projected value of HCM's assets dropped over $200 million from $566 million to $364 million.[9]

    b.   HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11.[10]

       o   This meant that Farallon and Stonehill invested more than $163 million in Claims when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims.

    c.   In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% to 54%.

---

[9] Doc. 1473, Disclosure Statement, p. 18.

[10] Doc. 1875-1, Plan Supplement, Ex. A, p. 4.

002486

      d. Despite the stark decline in the value of the estate and in the midst of substantial reductions in the percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively, again, the "Claims") in April and August of 2021 in the combined amount of $163 million.[11]

32. Upon information and belief, Stonehill, through its special purpose entity, Jessup, acquired the Redeemer Committee's claim for $78 million.[12] Upon information and belief, the $23 million Acis claim[13] was sold to Farallon/Muck for $8 million. Upon information and belief, HarbourVest sold its combined $80 million in claims to Farallon/Muck for $27 million. UBS sold its combined $125 million in claims for $50 million to both Stonehill/Jessup and Farallon/Muck. In the instance of UBS, *the total projected payout was only $35 million*. Indeed, as part of these transactions, both Farallon and Stonehill purchased Class 9 Claims at a time when the Debtor's Estate projected a zero dollar return on all such Claims.

---

[11] Notices of Transfers [Docs. 2212, 2215, 2261, 2262, 2263, 2215, 2297, 2298]. The Acis claim was transferred on April 16, 2021; the Redeemer, Crusader, and HarbourVest claims were transferred on April 30, 2021; and the UBS claims were transferred on August 9, 2021.

[12] July 6, 2021, letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

[13] Seery/HCM have argued that $10 million of the Acis claim is self-funding.

002487

**C.** *Material Non-Public Information is Disclosed to Seery's Affiliates at Stonehill and Farallon.*

33.     One of the significant assets of the Debtor's Estate was the Debtor's direct and indirect holdings in Metro-Goldwyn-Mayer Studios, Inc. ("MGM").[14]

34.     On December 17, 2020, James Dondero, sent an email to Seery. At that time, Dondero was a member of the MGM board, and the email contained material non-public information regarding Amazon and Apple's interest in acquiring MGM.[15] Of course, any such sale would significantly enhance the value of the Original Debtor's estate.

35.     Upon receipt of this material non-public information, Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in this Court seeking approval of the Original Debtor's settlement with HarbourVest - resulting in a transfer to the Original Debtor of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("HCLOF"), which held substantial MGM debt and equity.[16] Conspicuously, the HCLOF interest was not transferred to the Original Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[17]

---

[14] *See* Doc. 2229, p. 6.

[15] *See* Adversary Case No. 20-3190-sgj11, Doc. 150-1, p. 1674.

[16] Doc. 1625. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM.

[17] Doc. 1625.

002488

36.     Upon information and belief, aware that the Debtor's stake in MGM afforded a new profit center, Seery saw an opportunity to increase his own compensation and enlisted the help of Stonehill and Farallon to extract further value from the Original Debtor's Estate at the expense of other innocent creditors and equity. This *quid pro quo* included, at a minimum, a tacit, if not express, understanding that Seery would be well-compensated.

37.     Until 2009, Seery was the Global Head of Fixed Income Loans at Lehman Brothers[18] where, on information and belief, he conducted substantial business with Farallon. Following the collapse of Lehman Brothers, Seery continued to work with, and indeed represented Farallon as its legal counsel. Seery ultimately joined a hedge fund, River Birch Capital,[19] which, along with Stonehill, served on the creditors committee in other bankruptcy proceedings. GCM Grovesnor, a global asset management firm, held four seats on the Redeemer Committee[20] and, upon information and belief, is a significant investor in Stonehill and Farallon. Grovesnor, through Redeemer, played a large part in appointing Seery as a director of Strand Advisors. Seery was beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farallon.

---

[18] Seery Resume [Doc. 281-2].

[19] *Id*.

[20] Declaration of John A. Morris [Doc. 1090], Ex. 1, pp. 15.

002489

38.     As successful capital management firms, with advisory and fiduciary duties to their own clients, Stonehill and Farallon typically engage in robust due diligence before making significant investments. Yet, in this case, it would have been *impossible* for Stonehill and Farallon to forecast *any* profit at the time of their multi-million-dollar investments given the negative financial information disclosed by the Original Debtor's Estate. Seery, as the CEO, was aware of and involved in approving these negative financial projections. In doing so, Seery intentionally caused the publication of misleading, false information.

39.     Seery shared with Stonehill and Farallon *non-public* information concerning the value of the Original Debtor's Estate which was higher than publicly available information. Thus, the only logical conclusion is that all Defendants knew that the publicly available projections, which accompanied the Plan, were understated, false, and misleading. Otherwise, Farallon, Muck, Stonehill and Jessup would not have made their multi-million-dollar investments. None of the Defendants disclosed their knowledge of the misleading nature of these financial projections when they had a duty to do so. None of the Defendants disclosed the nature of their dealings in acquiring the Claims.

40.     By wrongfully exploiting non-public insider information, Stonehill and Farallon—acting through Muck and Jessup—became the largest holders of unsecured claims in the Debtor's Estate with resulting control over the Oversight Board and a front row seat to the reorganization and distribution of Claimant Trust Assets. As such, they

002490

were given control (through Muck and Jessup) to approve discretionary bonuses and success fees for Seery from these assets.

### D.  *Distributions*

41.    The MGM sale was ultimately consummated in March 2022 for $6.1 billion in cash, plus $2.5 billion in debt that Amazon assumed and immediately repaid.[21]

42.    By the end of Q3 2021, just over $6 million of the projected $205 million available for general unsecured claimants had been disbursed.[22] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[23] Thus, Stonehill (Jessup) and Farallon (Muck) have already received returns that far eclipse their investment. They also stand to make further significant profits on their investments, including payments on Class 9 Claims.

43.    As of December 31, 2022, the Claimant Trust has distributed $255,201,228. On a pro rata basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000.

---

[21] Amazon Q1 2022 10-Q.

[22] Doc. 3200.

[23] Doc. 3582.

002491

44.     Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary.

45.     It is clear Seery facilitated the sale of the Claims to Stonehill (Jessup) and Farallon (Muck) at discounted prices and used misleading financial projections to facilitate these trades. This was part of a larger strategy to install Stonehill (Jessup) and Farallon (Muck), his business allies, onto the Oversight Board where they would oversee lucrative bonuses and other compensation for Seery in exchange for hefty profits they expected to receive.

## V. <u>Causes of Action</u>

### A.     *Count I (against Seery): Breach of Fiduciary Duty*

46.     The allegations in paragraphs 1-45 above are incorporated herein as if set forth verbatim.

47.     As CEO and CRO of a debtor-in-possession, Seery owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate, including, without limitation, the duty of loyalty. Seery also was under a duty to avoid conflicts of interests, but Seery willfully and knowingly engaged in conduct which conflicted with his fiduciary duties—and he did so out of financial self-interest.

002492

48.     By fraudulently providing and/or approving negative projections of the Debtor's Estate when he knew otherwise, Seery willfully and knowingly breached his fiduciary duties.

49.     By misusing and disclosing confidential, material non-public information to Stonehill and Farallon, Seery willfully and knowingly breached his fiduciary duties.

50.     By failing to disclose his role in the inside trades at issue, Seery willfully and knowingly breached his fiduciary duties.

51.     As a result of his willful misconduct, Seery was unfairly advantaged by receiving additional undisclosed compensation and bonuses from the assets of the Debtor's Estate and from the Claimant Trust Assets—to the detriment of other innocent stakeholders, including HMIT, as former equity and a contingent Claimant Trust Beneficiary.

52.     To remedy these breaches, Seery is liable for disgorgement of all compensation he received since his collusion with Farallon and Stonehill first began. Alternatively, Seery should be disgorged of all compensation paid to him under the terms of the CTA since the Effective Date of the Plan in August 2021.

53.     Alternatively, Plaintiffs are entitled to recover damages measured by all ill-gotten compensation which Seery has received since his first collusive conduct began.

002493

**B.** **Count II (against Stonehill, Farallon, Jessup and Muck): Breaches of Fiduciary Duty and Knowing Participation in Breach of Fiduciary Duty**

54.     The allegations in paragraphs 1-53 above are incorporated herein as if set forth verbatim.

55.     Seery owed fiduciary duties to HMIT and the Debtor's Estate, and he willfully and knowingly breached these duties. Without limiting the foregoing, Seery owed a duty of loyalty which he willfully and knowingly breached. Seery also owed a duty to not engage in self-interested conduct to the detriment of the Debtor's Estate and innocent stakeholders. Seery also willfully and knowingly breached this duty.

56.     Stonehill and Farallon were aware of Seery's fiduciary duties and, by purchasing the Claims and approving bonuses and other compensation for Seery, Stonehill (acting through Jessup) and Farallon (acting through Muck), willfully and knowingly participated in Seery's breaches or, alternatively, willfully aided and abetted such breaches.

57.     Stonehill (Jessup) and Farallon (Muck) unfairly received many millions of dollars in profits and fees—and stand to earn even more profits and fees—to the detriment of innocent stakeholders, including HMIT.

58.     Stonehill and Farallon are liable for disgorgement of all profits earned from their purchase of the Claims. In addition, they are liable in damages for excessive compensation paid to Seery as part of the covert *quid pro quo* with Seery.

### C. Count III (against all Defendants): Fraud by Misrepresentation and Material Nondisclosure

59.     The allegations in paragraphs 1-58 above are incorporated herein as if set forth verbatim.

60.     Based on Seery's duties as CEO and CRO of a debtor-in-possession, and the other Defendants' duties as non-statutory insiders, Seery, Stonehill (Jessup), and Farallon (Muck) had a duty to disclose Stonehill and Farallon's plans to purchase the Claims, but they deliberately failed to do so. Seery also had a duty to disclose correct financial projections but, rather, misrepresented such values or failed to correct false and misleading projections. These factual misrepresentations and omissions were material.

61.     The withheld financial information was material because it has had an adverse impact on control over the eventual distributions to creditors and former equity, as well as the right to control Seery's compensation. By withholding such information, Seery was able to plant friendly business allies on the Oversight Board to the detriment of innocent stakeholders.

62.     Defendants knew that HMIT and other creditors were ignorant of their plans, and HMIT and other stakeholders did not have an equal opportunity to discover their scheme. HMIT and the other innocent stakeholders justifiably relied on misleading information relating to the value of the Original Debtor's Estate.

002495

63.     By failing to disclose material information, and by making or aiding and abetting material misrepresentations, Seery, Stonehill, Farallon, Muck, and Jessup intended to induce HMIT to take no affirmative action.

64.     HMIT justifiably relied on Seery, Stonehill, Farallon, Muck, and Jessup's nondisclosures and representations, and HMIT was injured as a result and the Debtor's Estate was also injured.

65.     As a result of their frauds, all Defendants should be disgorged of all profits and ill-gotten compensation derived from their fraudulent scheme. Seery is also liable for damages measured by excessive compensation he has received since he first engaged in willful misconduct.

### D.    Count IV (against all Defendants): Conspiracy

66.     The allegations in paragraphs 1-65 above are incorporated herein as if incorporated herein verbatim.

67.     Defendants conspired with each other to unlawfully breach fiduciary duties to HMIT and the Debtor's Estate, to conceal their fraudulent trades, and to interfere with HMIT's entitlement to the residual of the Claimant Trust Asset.

68.     Seery's disclosure of material non-public information to Stonehill and Farallon, and Muck and Jessup's purchase of the Claims, are each overt acts in furtherance of the conspiracy.

002496

69.     HMIT's interest in the residual of the Claimant Trust Assets has been

adversely impacted by this conspiracy. The assets have been depleted by virtue of Seery's

compensation awards.

###### E.       Count V (against Muck and Jessup): Equitable Disallowance

70.     The allegations in paragraphs 1-69 above are incorporated herein as if set

forth verbatim.

71.     By purchasing the Claims based on material non-public information,

Stonehill and Farallon, through Jessup and Muck, engaged in inequitable conduct.

72.     By earning significant profits on their purchases, Muck and Jessup have

been unfairly advantaged to the detriment of the remaining stakeholders, including

HMIT.

73.     Given this inequitable conduct, equitable disallowance of Muck's and

Jessup's Claims to the extent over and above their initial investment is appropriate and

consistent with the purposes of the Bankruptcy Code.

74.     Pleading in the alternative only, subordination of Muck's and Jessup's

General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all

other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is

necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also

consistent with the purposes of the Bankruptcy Code.

002497

**F.**   *Count VI (against all Defendants): Unjust Enrichment and Constructive Trust*

75.   The allegations in paragraphs 1-74 above are incorporated herein as if set forth verbatim.

76.   By acquiring the Claims using material non-public information, Stonehill and Farallon breached a relationship of trust with the Original Debtor's Estate and other innocent stakeholders and were unjustly enriched and gained an undue advantage over other creditors and former equity.

77.   Allowing Stonehill, Farallon, Muck and Jessup to retain their ill-gotten benefits at the expense of other innocent stakeholders and HMIT, as former equity, would be unconscionable.

78.   Stonehill, Farallon, Muck, and Jessup should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment.

79.   The proceeds Stonehill, Farallon, Muck, and Jessup have received from the Claimant Trust are traceable and identifiable. A constructive trust should be imposed on such proceeds to secure the restitution of these improperly retained benefits.

**F.**   *Count VI (Against all Defendants): Declaratory Relief*

80.   The allegations in paragraphs 1-79 are incorporated herein as if set forth verbatim.

002498

81.     HMIT seeks declaratory relief. The Court has jurisdiction to provide declaratory judgment relief when there is an actual controversy that has arisen and exists relating to the rights and duties of the parties.

82.     Bankruptcy Rule 7001 provides that "a proceeding to recover property or money," may include declaratory relief. *See*, Fed. R. Bank P. 7001(1), (9).

83.     The Claimant Trust Agreement is governed under Delaware law. The Claimant Trust Agreement incorporates and is subject to Delaware trust law. HMIT seeks a declaration, as follows:

a.  There is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement;

b.  As a general matter, HMIT has standing to bring an action against a trustee even if its interest is considered contingent;

c.  HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill;

d.  HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments. Alternatively, HMIT's status as a Claimant Trust Beneficiary is fully vested when all of Muck's and Jessup's trust interests are subordinated to the trust interests held by HMIT;

e.  Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of Seery's fraudulent conduct, bad faith, willful misconduct and unclean hands;

26

002499

Case 19-34054-sgj11   Doc 3699-2   Filed 03/08/23   Entered 03/08/23 16:00:20   Desc
Exhibit 2 MDV-Emergency Motion to Enforce Flagstar Doc Appendix Page 93 of 137
Case 3:23-cv-02071   Document 1-3   Filed 11/07/23   Page 64 of 214   PageID 1737

    f.   Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct and unclean hands;

    g.   All Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct and unclean hands.

## VI. <u>Punitive Damages</u>

84.    The allegations in paragraphs 1-74 are incorporated herein as if set forth verbatim.

85.    The Defendants' misconduct was intentional, knowing, willful and fraudulent and in total disregard of the rights of others. An award of punitive damages is appropriate and necessary under the facts of this case.

86.    All conditions precedent to recovery herein have been satisfied.

## VII. <u>Prayer</u>

WHEREFORE, HMIT prays for judgment as follows:

1.    Equitable disallowance of the Claims over and above Muck's and Jessup's original investments (or, alternatively, subordination of their Claimant Trust Interests, as addressed herein);

2.    Disgorgement of all funds distributed from the Claimant Trust to Muck and/or Jessup over and above their original investments;

3.    Disgorgement of compensation paid to Seery in managing or administering the Original and Reorganized Debtor's Estate;

4.    Imposition of a constructive trust;

002500

5.      Declaratory relief as described herein;

6.      An award of actual damages as described herein;

7.      An award of exemplary damages as allowed by law;

8.      Pre- and post-judgment interest; and,

9.      All such other and further relief to which HMIT may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/_____
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    Texas State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Hunter Mountain Investment Trust*

002501

# Exhibit 2

002502

CAUSE NO. DC-21-09534

| | | |
|---|---|---|
| **IN RE JAMES DONDERO,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Petitioner.* | § | **95th JUDICIAL DISTRICT** |
| | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## DECLARATION OF JAMES DONDERO

| | |
|---|---|
| **COUNTY OF DALLAS** | § |
| | § |
| **STATE OF TEXAS** | § |

Mr. James Dondero provides this unsworn declaration under <mark>Texas Civil Practice & Remedies Code § 132.001</mark>.

1. My name is James Dondero. I declare under penalty of perjury that I am over the age of 18 and of sound mind and competent to make this declaration.

2. Earlier this year I retained investigators to look into certain activities involving the respondents in the above-styled case and the related bankruptcy proceedings. Last year, I called Farallon's Michael Lin about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Mr. Seery had testified in court, it made no sense to me that Mr. Lin would think that the claims were worth more than what Mr. Seery testified under oath was the value of the bankruptcy claims.

3. In addition to my role as equity holder in the Crusader Funds, I have an interest in ensuring that the claims purchased by Respondents are not used as a means to deprive the equity holders of their share of the funds. It has become obvious that despite the fact that the bankrupt estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.

4. Accordingly, I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee. True and correct copies of the reports, which were created in the ordinary course, and their attachments, are attached hereto as Exhibits A and B. A true and correct copy of the letter I received from Alverez and Marsal is attached as Exhibit C hereto.

Declaration of James Dondero                                                                 Page 1

My name is James Dondero, my birthday is on June 29, 1962. My address is 300 Crescent Court,
Suite 700, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing testimony is
true and correct and is within my personal knowledge.


_____

James Dondero

_____May 31, 2022_____

Date

002504

# HELLER, DRAPER & HORN, L.L.C.

*ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA 70130-6103
TELEPHONE: (504) 299-3300   FAX: (504) 299-3399

Douglas S. Draper
Direct Dial:  (504) 299-3333
E-mail:  ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

> ### Re: *Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11*

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor").  As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers. Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy.  Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office.  This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities.  The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan.  Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1]  After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis.  To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager.  The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

{00376610-1}



EXHIBIT

A

002505

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

1.    **The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To The Debtor's Failure To File Rule 2015.3 Reports**

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And **Federal Rule of Bankruptcy Procedure 2015.**3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

2.    **There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates**

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6]    The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

{00376610-1}

Case 19-34054-sgj11 Doc 3699-2 Filed 03/06/23 Entered 03/06/23 16:00:20 Desc
Exhibit B-14 IV-D-2007 Agency Motion with Exhibit B-1 Filed 02/16/21 Page 73 of 214 Page 20 of 438

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]  Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information. Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3. The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court. On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses. The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses. In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level. Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out." Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so. While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9] That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute. Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims. In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

002509

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10] If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11] It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release. Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases. Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions. Several parties have appealed this issue to the Fifth Circuit.

### 4. The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely. But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims that were sold comprise the largest claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
| --- | --- | --- | --- | --- |
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

002511

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million;
  indeed, just between the time the Debtor's disclosure statement was approved on
  November 24, 2020, and the time the Debtor's exhibits were introduced at the
  confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the
  allowed claims amount, the ultimate projected recovery for creditors in
  bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial
claims out of the Highland estate based on this publicly-available information without
conducting thorough due diligence to be satisfied that the assets of the estate would not continue
to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon
and Stonehill) had access to material, non-public information that influenced their claims
purchasing. In particular, there are close relationships between the claims purchasers, on the one
hand, and the selling Creditors' Committee members and the Debtor's management, on the other
hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships
  with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery
  formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its
  collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of
  business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley &
  Austin as co-head of the corporate restructuring and bankruptcy group, where he
  worked with Matt Clemente, counsel to the Creditors' Committee in these
  bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the
  Redeemer Committee (which appointed Seery as its independent director) both
  played a substantial role on the Creditors' Committee and is a large investor in
  Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr.
  Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the
  Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John
  Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment
  Partner of River Birch Capital, a hedge fund founded by his former Lehman
  colleagues. He left River Birch in October 2017 just before the fund imploded.
  In 2017, River Birch and Stonehill Capital were two of the biggest note holders in
  the Toys R Us bankruptcy and were members of the Toys R Us creditors'

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of
$74 million in December 2020.

[19] See Appendix, pp. A-25, A-28.

[20] See Appendix, pp. A-2; A-62 – A-69.

{00376610-1}

October 5, 2021
Page 9

   committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

  Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

  The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

  Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

  The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

October 5, 2021
Page 10

> **In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending.** <mark>Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition.</mark> **The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.**

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d) The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e) The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

002514

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming. Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer. If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties. The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim. The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members. At the very least, there is enough credible evidence to warrant an investigation. It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent. The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders. A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate. In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

002515

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ............................................................................................................... 3

Seery Jan. 29, 2021 Testimony .............................................................................................................. 15

Sale of Assets of Affiliates or Controlled Entities ................................................................................ 24

20 Largest Unsecured Creditors ............................................................................................................ 25

Timeline of Relevant Events ................................................................................................................. 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] .......................................................... 27

Updated Liquidation Analysis (Feb. 1, 2021) ....................................................................................... 28

Summary of Debtor's January 31, 2021 Monthly Operating Report .................................................... 29

Value of HarbourVest Claim ................................................................................................................. 30

Estate Value as of August 1, 2021 (in millions) ................................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] .................................................................... 32

UBS Settlement [Doc. 2200-1] ............................................................................................................. 45

Hellman & Friedman Seeded Farallon Capital Management ................................................................ 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ......................................................... 63

Farallon was a Significant Borrower for Lehman .................................................................................. 65

Mr. Seery Represented Stonehill While at Sidley ................................................................................. 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders .................................................... 70

Case 19-34054-sgj11   Doc 3691-2   Filed 03/08/23   Entered 03/08/23 16:00:20   Desc
Exhibit HMIT Emergency Motion to Expedite Exhibit 30 Flagship Exhibit A Appeal   Page 110 of 418

002517

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?
Page A-2



Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers

## Debtor Protocols [Doc. 466-1]

I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.   "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.   "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.   "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.  **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.   **Covered Entities**: N/A (See entities above).

B.   **Operating Requirements**

1.   Ordinary Course Transactions do not require Court approval (All Stages).

a)   Stage 1 and Stage 2:  ordinary course determined by the CRO.

b)   Stage 3: ordinary course determined by the Debtor.

2.   Related Entity Transactions

a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   Stage 3:

(1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.     Third Party Transactions (All Stages)

        a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

    C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

  **III.**    <u>**Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**</u>

    A.    **Covered Entities**: See <u>Schedule A</u> hereto.  <u>Schedule A</u> includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

    B.    **Operating Requirements**

        1.     Ordinary Course Transactions do not require Court approval (All Stages).

        a)     <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

        b)     <u>Stage 3</u>: ordinary course determined by the Debtor.

        2.     Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) <u>Stage 3</u>:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.   **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

   A.   **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

   B.   **Operating Requirements**

      1.   Ordinary Course Transactions do not require Court approval (All Stages).

         a)   Stage 1 and Stage 2: ordinary course determined by the CRO.

         b)   Stage 3: ordinary course determined by the Debtor.

      2.   Related Entity Transactions

         a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         b)   Stage 3:

            (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

      3.   Third Party Transactions (All Stages):

         a)   Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

002522

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)  The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.  **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.  Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.  **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.  Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.  Ordinary Course Transactions (All Stages): N/A

C.  Operating Requirements: N/A

D.  Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

VI.  **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.  Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.  Ordinary Course Transactions (All Stages): N/A

    C.  Operating Requirements: N/A

    D.  Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VII.  **Transactions involving Non-Discretionary Accounts**

    A.  Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.  Ordinary Course Transactions (All Stages): N/A

    C.  Operating Requirements: N/A

    D.  Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VIII.  **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.  DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.  The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

IX.  **Shared Services**

    A.  The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.  The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**X.**   **Representations and Warranties**

A.   The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.   The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.   The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

002526

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

**Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

**Transactions involving Non-Discretionary Accounts**

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

**Schedule B**

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

002529

Seery Jan. 29, 2021 Testimony

```
                                                            Page 1
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   -----------------------------)

 5   In Re:                  Chapter 11

 6   HIGHLAND CAPITAL         Case No.

 7   MANAGEMENT, LP,          19-34054-SGJ 11

 8

 9        Debtor

10   -------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14            January 29, 2021

15            10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

```
                                              Page 2
 1              January 29, 2021
 2              9:00 a.m. EST
 3
 4         Remote Deposition of JAMES P.
 5   SEERY, JR., held via Zoom
 6   conference, before Debra Stevens,
 7   RPR/CRR and a Notary Public of the
 8   State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 3
 1   REMOTE APPEARANCES:
 2
 3   Heller, Draper, Hayden, Patrick, & Horn
 4   Attorneys for The Dugaboy Investment
 5   Trust and The Get Good Trust
 6         650 Poydras Street
 7         New Orleans, Louisiana 70130
 8
 9
10   BY:    DOUGLAS DRAPER, ESQ
11
12
13   PACHULSKI STANG ZIEHL & JONES
14   For the Debtor and the Witness Herein
15         780 Third Avenue
16         New York, New York 10017
17   BY:    JOHN MORRIS, ESQ.
18         JEFFREY POMERANTZ, ESQ.
19         GREGORY DEMO, ESQ.
20         IRA KHARASCH, ESQ.
21
22
23
24              (Continued)
25
```

```
                                              Page 4
 1   REMOTE APPEARANCES:   (Continued)
 2
 3   LATHAM & WATKINS
 4   Attorneys for UBS
 5         885 Third Avenue
 6         New York, New York 10022
 7   BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9   JENNER & BLOCK
10   Attorneys for Redeemer Committee of
11   Highland Crusader Fund
12         919 Third Avenue
13         New York, New York 10022
14   BY:    MARC B. HANKIN, ESQ.
15
16   SIDLEY AUSTIN
17   Attorneys for Creditors' Committee
18         2021 McKinney Avenue
19         Dallas, Texas 75201
20   BY:    PENNY REID, ESQ.
21         MATTHEW CLEMENTE, ESQ.
22         PAIGE MONTGOMERY, ESQ.
23
24              (Continued)
25
```

```
                                              Page 5
 1   REMOTE APPEARANCES:   (Continued)
 2   KING & SPALDING
 3   Attorneys for Highland CLO Funding, Ltd.
 4         500 West 2nd Street
 5         Austin, Texas 78701
 6   BY:    REBECCA MATSUMURA, ESQ.
 7
 8   K&L GATES
 9   Attorneys for Highland Capital Management
10   Fund Advisors, L.P., et al.:
11         4350 Lassiter at North Hills
12         Avenue
13         Raleigh, North Carolina 27609
14   BY:    EMILY MATHER, ESQ.
15
16   MUNSCH HARDT KOPF & HARR
17   Attorneys for Defendants Highland Capital
18   Management Fund Advisors, LP; NexPoint
19   Advisors, LP; Highland Income Fund;
20   NexPoint Strategic Opportunities Fund and
21   NexPoint Capital, Inc.:
22         500 N. Akard Street
23         Dallas, Texas 75201-6659
24   BY:  DAVOR RUKAVINA, ESQ.
25              (Continued)
```

## Page 6

```
 1   REMOTE APPEARANCES (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6        420 Throckmorton Street
 7
 8        Fort Worth, Texas 76102
 9   BY:  CLAY TAYLOR, ESQ.
10        JOHN BONDS, ESQ.
11        BRYAN ASSINK, ESQ.
12
13
14   BAKER MCKENZIE
15   Attorneys for Senior Employees
16        1900 North Pearl Street
17
18        Dallas, Texas 75201
19   BY:  MICHELLE HARTMANN, ESQ.
20        DEBRA DANDENEAU, ESQ.
21
22
23
24             (Continued)
25
```

## Page 7

```
 1   REMOTE APPEARANCES: (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7        100 Throckmorton Street
 8        Fort Worth, Texas 76102
 9   BY:  LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15        700 N. Pearl Street
16        Dallas, Texas 75201
17   BY:  FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

## Page 8

```
 1
 2   E X A M I N A T I O N S
 3   WITNESS                              PAGE
 4   JAMES SEERY
 5     By Mr. Draper                        9
 6     By Mr. Taylor                       75
 7     By Mr. Rukavina                    165
 8     By Mr. Draper                      217
 9
          E X H I B I T S
10   SEERY DYD
     EXHIBIT    DESCRIPTION              PAGE
11
     Exhibit 1  January 2021 Material      11
12
     Exhibit 2  Disclosure Statement       14
13
     Exhibit 3  Notice of Deposition       74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                         PAGE
17   Subsidiary ledger showing note       22
     component versus hard asset
18   component
19   Amount of D&O coverage for          131
     trustees
20
     Line item for D&O insurance         133
21
22          MARKED FOR RULING
            PAGE    LINE
23           85      20
24
25
```

## Page 9

```
 1
 2        COURT REPORTER:  My name is
 3   Debra Stevens, court reporter for TSG
 4   Reporting and notary public of the
 5   State of New York.  Due to the
 6   severity of the COVID-19 pandemic and
 7   following the practice of social
 8   distancing, I will not be in the same
 9   room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14        Whereupon,
15        J A M E S    S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20   Q.   Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

```
                                          Page 14                                              Page 15
 1              J. SEERY                              1              J. SEERY
 2      the screen, please?                           2         A.   It says the percent distribution
 3         A.   Page what?                            3    to general unsecured creditors is
 4         Q.   I think it is page 174.               4    62.14 percent.
 5         A.   Of the PDF or of the document?        5         Q.   Have you communicated the
 6         Q.   Of the disclosure statement that      6    reduced recovery to anybody prior to the
 7    was filed.  It is up on the screen right        7    date -- to yesterday?
 8    now.                                            8              MR. MORRIS:  Objection to the
 9              COURT REPORTER:  Do you intend         9    form of the question.
10    this as another exhibit for today's           10         A.   I believe generally, yes.  I
11    deposition?                                    11    don't know if we have a specific number,
12              MR. DRAPER:  We'll mark this         12    but generally yes.
13    Exhibit 2.                                      13         Q.   And would that be members of the
14              (So marked for identification as     14    Creditors' Committee who you gave that
15    Seery Exhibit 2.)                              15    information to?
16         Q.   If you look to the recovery to       16         A.   Yes.
17    Class 8 creditors in the November 2020         17         Q.   Did you give it to anybody other
18    disclosure statement was a recovery of         18    than members of the Creditors' Committee?
19    87.44 percent?                                 19         A.   Yes.
20         A.   That actually says the percent       20         Q.   Who?
21    distribution to general unsecured              21         A.   HarbourVest.
22    creditors was 87.44 percent.  Yes.             22         Q.   And when was that?
23         Q.   And in the new document that was     23         A.   Within the last two months.
24    filed, given to us yesterday, the recovery     24         Q.   You did not feel the need to
25    is 62.5 percent?                               25    communicate the change in recovery to
```

```
                                          Page 16                                              Page 17
 1              J. SEERY                              1              J. SEERY
 2    anybody else?                                   2    not accurate?
 3         A.   I said Mr. Doherty.                   3         A.   Yes.  We secretly disclosed it
 4         Q.   In looking at the two elements,       4    to the Bankruptcy Court in open court
 5    and what I have asked you to look at is         5    hearings.
 6    the claims pool.  If you look at the            6         Q.   But you never did bother to
 7    November disclosure statement, if you look      7    calculate the reduced recovery; you just
 8    down Class 8, unsecured claims?                 8    increased --
 9         A.   Yes.                                  9              (Reporter interruption.)
10         Q.   You have 176,000 roughly?            10         Q.   You just advised as to the
11         A.   Million.                             11    increased claims pool.  Correct?
12         Q.   176 million.  I am sorry.  And       12              MR. MORRIS:  Objection to the
13    the number in the new document is 313          13    form of the question.
14    million?                                       14         A.   I don't understand your
15         A.   Correct.                             15    question.
16         Q.   What accounts for the                16         Q.   What I am trying to get at is,
17    difference?                                    17    as you increase the claims pool, the
18         A.   An increase in claims.               18    recovery reduces.  Correct?
19         Q.   When did those increases occur?      19         A.   No.  That is not how a fraction
20    Were they yesterday?  A month ago?  Two        20    works.
21    months ago?                                    21         Q.   Well, if the denominator
22         A.   Over the last couple months.         22    increases, doesn't the recovery ultimately
23         Q.   So in fact over the last couple      23    decrease if --
24    months you knew in fact that the recovery      24         A.   No.
25    in the November disclosure statement was       25         Q.   -- if the numerator stays the
```

| Page 26 | |
|---|---|
| | J. SEERY |
| 1 | |
| 2 | were amended without consideration a few |
| 3 | years ago.  So, for our purposes we didn't |
| 4 | make the assumption, which I am sure will |
| 5 | happen, a fraudulent conveyance claim on |
| 6 | those notes, that a fraudulent conveyance |
| 7 | action would be brought.  We just assumed |
| 8 | that we'd have to discount the notes |
| 9 | heavily to sell them because nobody would |
| 10 | respect the ability of the counterparties |
| 11 | to fairly pay. |
| 12 | Q.    And the same discount was |
| 13 | applied in the liquidation analysis to |
| 14 | those notes? |
| 15 | A.    Yes. |
| 16 | Q.    Now -- |
| 17 | A.    The difference -- there would be |
| 18 | a difference, though, because they would |
| 19 | pay for a while because they wouldn't want |
| 20 | to accelerate them.  So there would be |
| 21 | some collections on the notes for P and I. |
| 22 | Q.    But in fact as of January you |
| 23 | have accelerated those notes? |
| 24 | A.    Just one of them, I believe. |
| 25 | Q.    Which note was that? |

Page 27

J. SEERY

2 A.    NexPoint, I said.  They
3 defaulted on the note and we accelerated
4 it.
5 Q.    So there is no need to file a
6 fraudulent conveyance claim with respect to
7 that note.  Correct, Mr. Seery?
8 MR. MORRIS:  Objection to the
9 form of the question.
10 A.    Disagree.  Since it was likely
11 intentional fraud, there may be other
12 recoveries on it.  But to collect on the
13 note, no.
14 Q.    My question was with respect to
15 that note.  Since you have accelerated it,
16 you don't need to deal with the issue of
17 when it's due?
18 MR. MORRIS:  Objection to the
19 form of the question.
20 A.    That wasn't your question.  But
21 to that question, yes, I don't need to
22 deal with when it's due.
23 Q.    Let me go over certain assets.
24 I am not going to ask you for the
25 valuation of them but I am going to ask

Page 28

J. SEERY

2 you whether they are included in the asset
3 portion of your $257 million number, all
4 right?  Mr. Morris didn't want me to go
5 into specific asset value, and I don't
6 intend to do that.
7 The first question I have for
8 you is, the equity in Trustway Highland
9 Holdings, is that included in the
10 $257 million number?
11 A.    There is no such entity.
12 Q.    Then I will do it in a different
13 way.  In connection with the sale of the
14 hard assets, what assets are included in
15 there specifically?
16 A.    Off the top of my head -- it is
17
18 Trustway Holdings and all the value that
19 flows up from Trustway Holdings.  It
20
21 flows up from Targa.  It includes CCS
22
23 to the Debtor from CCS Medical.  It
24 includes Cornerstone and all the value
25 that would flow from Cornerstone.  It

Page 29

J. SEERY

2 includes any other securities and all the
3 value that would flow from Cornerstone.
4 It includes HCLOF and all the value that
5 would flow up from HCLOF.  It includes
6
7 from Korea.
8 There may be others off the top
9 of my head.  I don't recall them.  I don't
10 have a list in front of me.
11 Q.    Now, with respect to those
12 assets, have you started the sale process
13 of those assets?
14 A.    No.  Well, each asset is
15 different.  So, the answer is, with
16 respect to any securities, we do seek to
17 sell those regularly and we do seek to
18 monetize those assets where we can
19 depending on whether there is a
20 restriction or not and whether there is
21 liquidity in the market.
22 With respect to the PE assets or
23 the companies I described -- Targa, CCS,
24 Cornerstone, JHT -- we have not --
25 Trustway.  We have not sought to sell

**Page 38**

```
 1                    J. SEERY
 2        A.    I don't recall the specific
 3   limitation on the trust.  But if there was
 4   a reason to hold on to the asset, if there
 5   is a limitation, we can seek an extension.
 6        Q.    Let me ask a question.  With
 7   respect to these businesses, the Debtor
 8   merely owns an equity interest in them.
 9   Correct?
10        A.    Which business?
11        Q.    The ones you have identified as
12   operating businesses earlier?
13        A.    It depends on the business.
14        Q.    Well, let me -- again, let's try
15   to be specific.  With respect to SSP, it
16   was your position that you did not need to
17   get court approval for the sale.  Correct?
18        A.    That's correct.
19        Q.    Which one of the operating
20   businesses that are here, that you have
21   identified, do you need court authority
22   for a sale?
23              MR. MORRIS:  Objection to the
24   form of the question.
25        A.    Sort of the same answer as I
```

**Page 39**

```
 1                    J. SEERY
 2   different analysis that we'll undertake
 3   with bankruptcy counsel to determine what
 4   we would need depending on when it is
 5   going to happen and what we're going to do
 6   either under the code are or under the
 7   plan.
 8        Q.    Is there anything that would
 9   stop you from selling these businesses if
10   the Chapter 11 went on for a year or two
11   years?
12              MR. MORRIS:  Objection to form
13   of the question.
14        A.    Is there anything that would
15   stop me?  We'd have to follow the
16   strictures of the code and the protocols,
17   but there would be no prohibition -- let
18   me finish, please.
19              There would be no prohibition
20   that I am aware of.
21        Q.    Now, in connection with your
22   differential between the liquidation of
23   what I will call the operating businesses
24   under the liquidation analysis and the
25   plan analysis, who arrived at the discount
```

**Page 40**

```
 1                    J. SEERY
 2   or determined the discount that has been
 3   placed between the two, plan analysis
 4   versus liquidation analysis?
 5              MR. MORRIS:  Objection to form
 6   of the question.
 7        A.    To which document are you
 8   referring?
 9        Q.    Both the June -- the January and
10   the November analysis has a different
11   estimated proceeds for monetization for
12   the plan analysis versus the liquidation
13   analysis.  Do you see that?
14        A.    Yes.
15        Q.    And there is a note under there.
16   "Assumes Chapter 7 trustee will not be
17   able to achieve the same sales proceeds as
18   Claimant trustee."
19        A.    I see that, yes.
20        Q.    Do you see that note?
21        A.    Yes.
22        Q.    Who arrived at that discount?
23        A.    I did.
24        Q.    What percentage did you use?
25        A.    Depended on the asset.  Each one
```

**Page 41**

```
 1                    J. SEERY
 2   is different.
 3        Q.    Is the discount a function of
 4   capability of a trustee versus your
 5   capability, or is the discount a function
 6   of timing?
 7              MR. MORRIS:  Objection to form.
 8        A.    It could be a combination.
 9        Q.    So, let's -- let me walk through
10   this.  Your plan analysis has an
11   assumption that everything is sold by
12   December 2022.  Correct?
13        A.    Correct.
14        Q.    And the valuations that you have
15   used here for the monetization assume a
16   sale between -- a sale prior to December
17   of 2022.  Correct?
18        A.    Sorry.  I don't quite understand
19   your question.
20        Q.    The 257 number, and then let's
21   take out the notes.  Let's use the 210
22   number.
23              MR. MORRIS:  Can we put the
24   document back on the screen, please?
25   Sorry, Douglas, to interrupt, but it
```

| Page 42 | | Page 43 | |
|---|---|---|---|

**Page 42**

J. SEERY

1  
2  would be helpful.
3        MR. DRAPER: That is fine, John.
4  (Pause.)
5        MR. MORRIS: Thank you very
6  much.
7        Q.    Mr. Seery, do you see the 257?
8        A.    In the one from yesterday?
9        Q.    Yes.
10       A.    Second line, 257,941. Yes.
11       Q.    That assumes a monetization of
12  all assets by December of 2022?
13       A.    Correct.
14       Q.    And so everything has been sold
15  by that time; correct?
16       A.    Yes.
17       Q.    So, what I am trying to get at
18  is, there is both the capability between
19  you and a trustee, and then the second
20  issue is timing. So, what discount was
21  put on for timing, Mr. Seery, between when
22  a trustee would sell it versus when you
23  would sell it?
24       MR. MORRIS: Objection.
25       Q.    What is the percentage you

**Page 43**

J. SEERY

1  
2  applied?
3        A.    Each of the assets is different.
4        Q.    Is there a general discount that
5  you used?
6        A.    Not a general discount, no. We
7  looked at each individual asset and went
8  through and made an assessment.
9        Q.    Did you apply a discount for
10  your capability versus the capability of a
11  trustee?
12       A.    No.
13       Q.    So a trustee would be as capable
14  as you are in monetizing these assets?
15       MR. MORRIS: Objection to the
16  form of the question.
17       Q.    Excuse me? The answer is?
18       A.    The answer is maybe.
19       Q.    Couldn't a trustee hire somebody
20  as capable as you are?
21       MR. MORRIS: Objection to the
22  form of the question.
23       A.    Perhaps.
24       Q.    Sir, that is a yes or no
25  question. Could the trustee hire somebody

**Page 44**

J. SEERY

1  
2  as capable as you are?
3        MR. MORRIS: Objection to the
4  form of the question.
5        A.    I don't know.
6        Q.    Is there anybody as capable as
7  you are?
8        MR. MORRIS: Objection to the
9  form of the question.
10       A.    Certainly.
11       Q.    And they could be hired.
12  Correct?
13       A.    Perhaps. I don't know.
14       Q.    And if you go back to the
15  November 2020 liquidation analysis versus
16  plan analysis, it is also the same note
17  about that a trustee would bring less, and
18  there is the same sort of discount between
19  the estimated proceeds under the plan and
20  under the liquidation analysis.
21       MR. MORRIS: If that is a
22  question, I object.
23       Q.    Is that correct, Mr. Seery,
24  looking at the document?
25       A.    There are discounts, yes.

**Page 45**

J. SEERY

1  
2        Q.    Again, the discounts are applied
3  for timing and capability?
4        A.    Yes.
5        Q.    Now, in looking at the November
6  plan analysis number of $190 million and
7  the January number of $257 million, what
8  accounts for the increase between the two
9  dates? What assets specifically?
10       A.    There are a number of assets.
11  Firstly, the HCLOF assets are added.
12       Q.    How much are those?
13       A.    Approximately 22 and a half
14  million dollars.
15       Q.    Okay.
16       A.    Secondly, there is a significant
17  
18  assets over this time period.
19       Q.    Which assets, Mr. Seery?
20       A.    There are a number. They
21  include MGM stock, they include Trustway,
22  they include Targa.
23       Q.    And what is the percentage
24  increase from November to January,
25  November of 2020 to January of 2021?



Page 46
```
1                    J. SEERY
2         A.    Do you mean what is the
3    percentage increase from 190 to 257?
4         Q.    No.  You just identified three
5    assets.  MGM stock, we can go look at the
6    exchange and figure out what the price
7    increase is; correct?
8         A.    No.
9         Q.    Why not?  Is the MGM stock
10   publicly traded?
11        A.    Yes.  It doesn't trade on --
12        Q.    Excuse me?
13        A.    It doesn't trade on an exchange.
14        Q.    Is there a public market for the
15   MGM stock that we could calculate the
16   increase?
17        A.    There is a semipublic market;
18   yes.
19        Q.    So it is a number that is
20   readily available between the two dates?
21        A.    It's available.
22        Q.    Now, you identified Targa and
23   Trustway.  Correct?
24        A.    Yes.
25        Q.    Those are not readily available
```

Page 47
```
1                    J. SEERY
2    markets; correct?
3         A.    No.
4         Q.    Those are operating businesses?
5         A.    Correct.
6         Q.
7    the November 2020 liquidation analysis?
8         A.    We use a combination of the
9    value that we get from Houlihan Lokey for
10
11
12        Q.    And the adjustment was up or
13   down?
14        A.    When?
15        Q.
16
17   adjusted it.  Did you adjust it up or did
18   you adjust it down?
19             MR. MORRIS:  Objection to form
20   of the question.
21        A.
22   adjusted it down, and for January we
23   adjusted it down.  I don't recall off the
```

Page 48
```
1                    J. SEERY
2         Q.
3
4    valuation for those two businesses showed
5    a significant increase between November of
6
7             MR. MORRIS:  Objection to form
8    of the question.
9         A.    I didn't say that.
10        Q.    I am trying to account for the
11
12   identified three assets.  You identified
13   MGM stock, which has, I can guess, as you
14
15   Then you identified two others that the
16   valuation is based upon something Houlihan
17   Lokey provided you.  Correct?
18        A.    I gave you three examples.  I
19   never said "readily."  That is your word,
20
21   had a significant change in their
22   valuation.
23        Q.    So let's now go back to the
24   question.  There is an increase in value
```

Page 49
```
1                    J. SEERY
2    of 2021, the magnitude being roughly 60
3    some odd million dollars.  Correct?
4         A.    Correct.
5         Q.    We can account for $22 million
6
7             MR. MORRIS:  Objection to form.
8         A.    Correct.
9         Q.
10   settlement, so that leaves roughly
11
12             MR. MORRIS:  Objection to the
13   form of the question if that is a
14   question.  It is accounted for.
15        Q.    What makes up that difference,
16   Mr. Seery?
17        A.    A change in the plan value of
18   the assets.
19        Q.    Okay.  Which assets?  Let's sort
20
21        A.    There are numerous assets in the
22   plan formulation.  I gave you three
23   examples of the operating businesses.  The
24   securities, I believe, have increased in
```

Page 50

```
1              J. SEERY
2    for one.  On the operating businesses, we
3    looked at each of them and made an
4    assessment based upon where the market is
5    ─── ── ── ── ── ─── ── ── ── ─── ── and we
6    have moved those valuations.
7         Q.    Let me look at some numbers
8    again.  In the liquidation analysis in
9    November of 2020, the liquidation value is
10   $149 million.  Correct?
11        A.    Yes.
12        Q.    And in the liquidation analysis
13   in January of 2021, you have $191 million?
14        A.    Yes.
15        Q.    You see that number.  So there
16   is $51 million there, right?
17        A.    No.
18        Q.    What is the difference between
19   191 and ── sorry.  My math may be a little
20   off.  What is the difference between the
21   two numbers, Mr. Seery?
22        A.    Your math is off.
23        Q.    Sorry.  It is 41 million?
24        A.    Correct.
25        Q.    $22 million of that is the
```

Page 51

```
1              J. SEERY
2    HarbourVest settlement, right?
3         A.    I believe that's correct.
4         Q.    Is that fair, Mr. Seery?
5         A.    I believe that is correct, yes.
6         Q.    And part of that differential
7    are publicly traded or ascertainable
8    securities.  Correct?
9         A.    Yes.
10        Q.    And basically you can get, or
11   under the plan analysis or trustee
12   analysis, if it is a marketable security
13   or where there is a market, the
14   liquidation number should be the same for
15   both.  Is that fair?
16        A.    No.
17        Q.    And why not?
18        A.    We might have a different price
19   target for a particular security than the
20   current trading value.
21        Q.    I understand that, but I mean
22   that is based upon the capability of the
23   person making the decision as to when to
24   sell.  Correct?
25             MR. MORRIS:  Objection to form
```

Page 52

```
1              J. SEERY
2    of the question.
3         Q.    Mr. Seery, yes or no?
4         A.    I said no.
5         Q.    What is that based on, then?
6         A.    The person's ability to assess
7    the market and timing.
8         Q.    Okay.  And again, couldn't a
9    trustee hire somebody as capable as you to
10   both, A, assess the market and, B, make a
11   determination as to when to sell?
12             MR. MORRIS:  Objection to form
13   of the question.
14        A.    I suppose a trustee could.
15        Q.    And there are better people or
16   people equally or better than you at
17   assessing a market.  Correct?
18        A.    Yes.
19             MR. MORRIS:  Objection to form
20   of the question.
21        Q.    So, again, let's go back to
22   that.  We have accounted for, out of
23   $41 million where the liquidation analysis
24   increases between the two dates,
25   $22 million of it.  That leaves
```

Page 53

```
1              J. SEERY
2    $18 million.  How much of that is publicly
3    traded or ascertainable assets versus
4    operating businesses?
5         A.    I don't know off the top of my
6    head the percentages.
7         Q.    All right.  The same question
8    for the plan analysis where you have the
9    differential between the November number
10   and the January number.  How much of it is
11   marketable securities versus an operating
12   business?
13        A.    I don't recall off the top of my
14   head.
15             MR. DRAPER:  Let me take a
16   few-minute break.  Can we take a
17   ten-minute break here?
18             THE WITNESS:  Sure.
19             (Recess.)
20   BY MR. DRAPER:
21        Q.    Mr. Seery, what I am going to
22   show you and what I would ask you to look
23   at is in the note E, in the statement of
24   assumptions for the November 2020
25   disclosure statement.  It discusses fixed
```

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate. We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets. The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

## Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]: General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS. Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

## Value of HarbourVest Claim





#### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING**
**SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3699-2 Filed 03/08/23 Entered 03/08/23 16:00:26 Desc
Exhibit 23-MV-E207, Emergency Motion for Exhibit Filed Under Seal of Party Appeal 2 Page 141 of 175

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20 Entered 12/23/20 22:25:24 Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.     Procedural Background

       3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

       4.      On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

       5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

       6.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

       7.      In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

       8.      On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

       9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

## B.     Overview of HarbourVest's Claims

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

002550

**C.**   **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").   Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.   Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes").  The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.   The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

      19.    Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

      20.    After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

      21.    On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LL*C, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "<u>Preliminary Injunction</u>").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.      The Parties' Pleadings and Positions Concerning HarbourVest's
Proofs of Claim**

22.      On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "<u>Proofs of Claim</u>").  Morris Dec. Exhibits 2-7.

23.      The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.,* Morris Dec. Exhibit 2 ¶3.

24.      HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.,* Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

### E.     Settlement Discussions

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of
perspectives concerning the facts and the law.

   30. During follow up meetings, the parties' interests became more defined.

Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the

Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its

perceptions of the facts and law.

   31. After the parties' interests became more defined, the principals engaged in

a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement,

whose terms are summarized below.

### F. Summary of Settlement Terms

   32. The Settlement Agreement contains the following material terms, among

others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the

form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such

other relief as is just and proper.


Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com


-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*


13

UBS Settlement [Doc. 2200-1]

# Exhibit 1
## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS**, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

EXECUTION VERSION

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

EXECUTION VERSION

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.      **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)     The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

EXECUTION VERSION

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

(d)    Redeemer Appeal.

(i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

**2.     Definitions.**

(a)     "<u>Agreement Effective Date</u>" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "<u>HCMLP Parties</u>" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "<u>Order Date</u>" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "<u>UBS Parties</u>" shall mean UBS Securities LLC and UBS AG London Branch.

**3.     Releases.**

**(a)     UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)   **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c) **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4. **No Third Party Beneficiaries**.   Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5. **UBS Covenant Not to Sue.**   Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.     **Agreement Subject to Bankruptcy Court Approval.**

(a)     The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.     **Representations and Warranties**.

(a)     Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)     Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)     Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

**EXECUTION VERSION**

**8.** **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice**. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
         Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
      sarah.tomkowiak@lw.com

**11.** **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.** **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.** **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.** **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.** **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**    <u>Governing Law; Venue; Attorneys' Fees and Costs</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<center>*[Remainder of Page Intentionally Blank]*</center>

<center>13</center>

**IT IS HEREBY AGREED.**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

HIGHLAND MULTI STRATEGY CREDIT
FUND, L.P. (f/k/a Highland Credit
Opportunities CDO, L.P.)

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO,
Ltd.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO
ASSET HOLDINGS, L.P.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

STRAND ADVISORS, INC.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____
Name: John Lantz
Its:  Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its:  Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____
Name: William Chandler
Its:  Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its:  Authorized Signatory

15

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

## Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**






SFChronicle/SFGate/Liz Hafalia

Robert Holmgren

no caption

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

### Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**
Financial Services

**STATUS**
Past

**www.gcmlp.com (http://www.gcmlp.com)**

CONTACT (HTTPS://HF.COM/CONTACT/)     INFO@HF.COM (MAILTO:INFO@HF.COM)     LP LOGIN (HTTPS://SERVICES.SUNGARDOX.COM/CLIENT/HELLMAN)     BACK
CP LOGIN (HTTPS://SERVICES.SUNGARDOX.COM/DOCUMENT/2720045)     TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN
&
FRIEDMAN)
©2021 HELLMAN & FRIEDMAN LLC



**CORNER OFFICE**

# GCM Grosvenor to Go Public

Julie Segal

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

**August 03, 2020**



Chicago, Il. (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

**Farallon was a Significant Borrower for Lehman**

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million<br>JP Morgan: $200 million |



### Transaction Overview

- In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

- The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

- Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

- Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

- The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

LEHMAN BROTHERS                    32

<u>Mr. Seery Represented Stonehill While at Sidley</u>

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| BLOCKBUSTER INC., *et al.*, | : | **Case No. 10-14997 (BRL)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------- X

### THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

## Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!



### About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations.          ... see more

### Activity
522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/



## Investor Communication to Highland Crusader Funds Stakeholders



**Alvarez & Marsal
Management, LLC** 2029 Cer
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director



**MUNSCH
HARDT**

DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530
Nan.r.Eitel@usdoj.gov

      Re:    Highland Capital Management, L.P. Bankruptcy Case
             Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

      I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

      I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

      The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

**EXHIBIT**

002587

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

### Highland Capital Management and its Founder, James Dondero

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

### Circumstances Precipitating Bankruptcy

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

002588

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

#### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

### Transparency Problems Pervade the Bankruptcy Proceedings

#### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—
former Highland employee Patrick Daugherty—without seeking court approval of the settlement
pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr.
Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's
withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that
effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the
effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee
also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the
spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and
historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee
advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and
the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate
the estate for the benefit of a handful of insiders, seemingly in contravention of law.

### Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested
parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could
not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in
assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In
addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent
financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset
value reflected actual realized losses or merely temporary mark-downs precipitated by problems
experienced by certain assets during the pandemic (including labor shortages, supply-chain issues,
travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require
Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding
reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the
worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a
private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy,
HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a
Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A
charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and
the remaining ⬚2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy
proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was
duped into making the investment because Highland allegedly failed to disclose key facts relating to the
investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] *See* "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter
11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the
EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and
business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed.
Reg. 82906.

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] See Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." See Ex. B.

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

002594

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here. In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

002595

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] *See* Ex. D.

[21] *See* Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] See Ex. E.

002598

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1) If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)    If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization.  Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.

[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.

[30] Dkt. 854, ¶ 4 & Exh. 1.

Case 19-34054-sgj11   Doc 3629-2   Filed 03/08/23   Entered 03/08/23 16:50:20   Desc
Exhibit 2B MV-02007 Encl Exhibit 28a Declaration Page 166 of 214   Page 195 of 189

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information on which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds— i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two
funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement,
MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First,
Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial
payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor
investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment,
but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made
little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by
"independent legal counsel" in the negotiation of the settlement, a representation that was patently
untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had
economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and
its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement
unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and
exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when
they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat
settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to
resolve conflicts of interest.

### Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the
settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of
multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered
investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act
imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part
of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties
means that investment advisors cannot buy securities for their account prior to buying them for a client,
cannot make trades that may result in higher commissions for the advisor or their investment firm, and
cannot trade using material, non-public information. In addition, investment advisors must ensure that
they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from
breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any
registered investment advisor from trading on material, non-public information. The Act also conveys a
private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may
have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that
  interest in an SPE designated by the Debtor) without disclosing the true value of the
  interest and without first offering it to other investors in the fund;

---

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch)
at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.
[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent
legal counsel.

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT, KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.

DR:pdm

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ........................................................................................................ 3

Seery Jan. 29, 2021 Testimony ....................................................................................................... 15

Sale of Assets of Affiliates or Controlled Entities ......................................................................... 24

20 Largest Unsecured Creditors ..................................................................................................... 25

Timeline of Relevant Events ........................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] .................................................. 27

Updated Liquidation Analysis (Feb. 1, 2021) ................................................................................ 28

Summary of Debtor's January 31, 2021 Monthly Operating Report ............................................ 29

Value of HarbourVest Claim ........................................................................................................... 30

Estate Value as of August 1, 2021 (in millions) ............................................................................ 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ............................................................ 32

UBS Settlement [Doc. 2200-1] ....................................................................................................... 45

Hellman & Friedman Seeded Farallon Capital Management ....................................................... 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ................................................. 63

Farallon was a Significant Borrower for Lehman .......................................................................... 65

Mr. Seery Represented Stonehill While at Sidley ......................................................................... 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders ........................................... 70

002606



Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?

Page A-2

## Debtor Protocols [Doc. 466-1]

I.    **Definitions**

A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.   "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.   "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.   "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.   **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.   **Covered Entities**: N/A (See entities above).

B.   **Operating Requirements**

   1.   Ordinary Course Transactions do not require Court approval (All Stages).

      a)   Stage 1 and Stage 2:  ordinary course determined by the CRO.

      b)   Stage 3: ordinary course determined by the Debtor.

   2.   Related Entity Transactions

      a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)   Stage 3:

         (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See <u>Schedule A</u> hereto.  <u>Schedule A</u> includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

    b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

002609

         a)     <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         b)     <u>Stage 3</u>:

             (1)     Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

             (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.     Third Party Transactions (All Stages)

         a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

  C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV. **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

            a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

            b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

            a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            b)    <u>Stage 3</u>:

                (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

                (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.    Third Party Transactions (All Stages):

            a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

002611

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)  The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.  **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.  **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.  Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.  Ordinary Course Transactions (All Stages): N/A

C.  Operating Requirements: N/A

D.  Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VI. Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII. Transactions involving Non-Discretionary Accounts**

A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII. Additional Reporting Requirements – All Stages (to the extent applicable)**

A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX. Shared Services**

A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**002613**

X.   **Representations and Warranties**

A.   The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.   The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.   The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

002614

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

002615

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

## Schedule B

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

002618

Seery Jan. 29, 2021 Testimony

```
                                                           Page 1
 1    IN THE UNITED STATES BANKRUPTCY COURT

 2    FOR THE NORTHERN DISTRICT OF TEXAS

 3    DALLAS DIVISION

 4    -----------------------------)

 5    In Re:              Chapter 11

 6    HIGHLAND CAPITAL        Case No.

 7    MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9         Debtor

10    -------------------------------------

11

12

13     REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14            January 29, 2021

15             10:11 a.m. EST

16

17

18

19

20

21

22

23
      Reported by:
24    Debra Stevens, RPR-CRR
      JOB NO. 189212
25
```

---

**Page 2**

```
 1              January 29, 2021
 2              9:00 a.m. EST
 3
 4         Remote Deposition of JAMES P.
 5  SEERY, JR., held via Zoom
 6  conference, before Debra Stevens,
 7  RPR/CRR and a Notary Public of the
 8  State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  REMOTE APPEARANCES:
 2
 3  Heller, Draper, Hayden, Patrick, & Horn
 4  Attorneys for The Dugaboy Investment
 5  Trust and The Get Good Trust
 6         650 Poydras Street
 7         New Orleans, Louisiana 70130
 8
 9
10  BY:    DOUGLAS DRAPER, ESQ
11
12
13  PACHULSKI STANG ZIEHL & JONES
14  For the Debtor and the Witness Herein
15         780 Third Avenue
16         New York, New York 10017
17  BY:    JOHN MORRIS, ESQ.
18         JEFFREY POMERANTZ, ESQ.
19         GREGORY DEMO, ESQ.
20         IRA KHARASCH, ESQ.
21
22
23
24         (Continued)
25
```

**Page 4**

```
 1  REMOTE APPEARANCES:  (Continued)
 2
 3  LATHAM & WATKINS
 4  Attorneys for UBS
 5         885 Third Avenue
 6         New York, New York 10022
 7  BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9  JENNER & BLOCK
10  Attorneys for Redeemer Committee of
11  Highland Crusader Fund
12         919 Third Avenue
13         New York, New York 10022
14  BY:    MARC B. HANKIN, ESQ.
15
16  SIDLEY AUSTIN
17  Attorneys for Creditors' Committee
18         2021 McKinney Avenue
19         Dallas, Texas 75201
20  BY:    PENNY REID, ESQ.
21         MATTHEW CLEMENTE, ESQ.
22         PAIGE MONTGOMERY, ESQ.
23
24         (Continued)
25
```

**Page 5**

```
 1  REMOTE APPEARANCES:  (Continued)
 2  KING & SPALDING
 3  Attorneys for Highland CLO Funding, Ltd.
 4         500 West 2nd Street
 5         Austin, Texas 78701
 6  BY:    REBECCA MATSUMURA, ESQ.
 7
 8  K&L GATES
 9  Attorneys for Highland Capital Management
10  Fund Advisors, L.P., et al.:
11         4350 Lassiter at North Hills
12         Avenue
13         Raleigh, North Carolina 27609
14  BY:    EMILY MATHER, ESQ.
15
16  MUNSCH HARDT KOPF & HARR
17  Attorneys for Defendants Highland Capital
18  Management Fund Advisors, LP; NexPoint
19  Advisors, LP; Highland Income Fund;
20  NexPoint Strategic Opportunities Fund and
21  NexPoint Capital, Inc.:
22         500 N. Akard Street
23         Dallas, Texas 75201-6659
24  BY:  DAVOR RUKAVINA, ESQ.
25         (Continued)
```

**Page 6**

```
 1   REMOTE APPEARANCES  (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6          420 Throckmorton Street
 7
 8          Fort Worth, Texas 76102
 9   BY:    CLAY TAYLOR, ESQ.
10          JOHN BONDS, ESQ.
11          BRYAN ASSINK, ESQ.
12
13
14   BAKER MCKENZIE
15   Attorneys for Senior Employees
16          1900 North Pearl Street
17
18          Dallas, Texas 75201
19   BY:    MICHELLE HARTMANN, ESQ.
20          DEBRA DANDENEAU, ESQ.
21
22
23
24               (Continued)
25
```

**Page 7**

```
 1   REMOTE APPEARANCES:  (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7          100 Throckmorton Street
 8          Fort Worth, Texas 76102
 9   BY:    LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15          700 N. Pearl Street
16          Dallas, Texas 75201
17   BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1
 2         E X A M I N A T I O N S
 3   WITNESS                            PAGE
 4   JAMES SEERY
 5     By Mr. Draper                      9
 6     By Mr. Taylor                     75
 7     By Mr. Rukavina                  165
 8     By Mr. Draper                    217
 9
            E X H I B I T S
10   SEERY DYD
     EXHIBIT     DESCRIPTION          PAGE
11
     Exhibit 1   January 2021 Material  11
12
     Exhibit 2   Disclosure Statement   14
13
     Exhibit 3   Notice of Deposition   74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                       PAGE
17   Subsidiary ledger showing note     22
     component versus hard asset
18   component
19   Amount of D&O coverage for        131
     trustees
20
     Line item for D&O insurance       133
21
22         MARKED FOR RULING
            PAGE    LINE
23           85      20
24
25
```

**Page 9**

```
 1
 2         COURT REPORTER:  My name is
 3   Debra Stevens, court reporter for TSG
 4   Reporting and notary public of the
 5   State of New York.  Due to the
 6   severity of the COVID-19 pandemic and
 7   following the practice of social
 8   distancing, I will not be in the same
 9   room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14         Whereupon,
15         J A M E S   S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20   Q.   Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

```
                                          Page 14
1                J. SEERY
2        the screen, please?
3        A.    Page what?
4        Q.    I think it is page 174.
5        A.    Of the PDF or of the document?
6        Q.    Of the disclosure statement that
7   was filed.  It is up on the screen right
8   now.
9              COURT REPORTER:  Do you intend
10  this as another exhibit for today's
11  deposition?
12             MR. DRAPER:  We'll mark this
13  Exhibit 2.
14             (So marked for identification as
15  Seery Exhibit 2.)
16       Q.    If you look to the recovery to
17  Class 8 creditors in the November 2020
18  disclosure statement was a recovery of
19  87.44 percent?
20       A.    That actually says the percent
21  distribution to general unsecured
22  creditors was 87.44 percent.  Yes.
23       Q.    And in the new document that was
24  filed, given to us yesterday, the recovery
25  is 62.5 percent?
```

```
                                          Page 15
1                J. SEERY
2        A.    It says the percent distribution
3   to general unsecured creditors is
4   62.14 percent.
5        Q.    Have you communicated the
6   reduced recovery to anybody prior to the
7   date -- to yesterday?
8              MR. MORRIS:  Objection to the
9   form of the question.
10       A.    I believe generally, yes.  I
11  don't know if we have a specific number,
12  but generally yes.
13       Q.    And would that be members of the
14  Creditors' Committee who you gave that
15  information to?
16       A.    Yes.
17       Q.    Did you give it to anybody other
18  than members of the Creditors' Committee?
19       A.    Yes.
20       Q.    Who?
21       A.    HarbourVest.
22       Q.    And when was that?
23       A.    Within the last two months.
24       Q.    You did not feel the need to
25  communicate the change in recovery to
```

```
                                          Page 16
1                J. SEERY
2        anything else?
3        A.    I said Mr. Doherty.
4        Q.    In looking at the two elements,
5   and what I have asked you to look at is
6   the claims pool.  If you look at the
7   November disclosure statement, if you look
8   down Class 8, unsecured claims?
9        A.    Yes.
10       Q.    You have 176,000 roughly?
11       A.    Million.
12       Q.    176 million.  I am sorry.  And
13  the number in the new document is 313
14  million?
15       A.    Correct.
16       Q.    What accounts for the
17  difference?
18       A.    An increase in claims.
19       Q.    When did those increases occur?
20  Were they yesterday?  A month ago?  Two
21  months ago?
22       A.    Over the last couple months.
23       Q.    So in fact over the last couple
24  months you knew in fact that the recovery
25  in the November disclosure statement was
```

```
                                          Page 17
1                J. SEERY
2        not accurate?
3        A.    Yes.  We secretly disclosed it
4   to the Bankruptcy Court in open court
5   hearings.
6        Q.    But you never did bother to
7   calculate the reduced recovery; you just
8   increased --
9              (Reporter interruption.)
10       Q.    You just advised as to the
11  increased claims pool.  Correct?
12             MR. MORRIS:  Objection to the
13  form of the question.
14       A.    I don't understand your
15  question.
16       Q.    What I am trying to get at is,
17  as you increase the claims pool, the
18  recovery reduces.  Correct?
19       A.    No.  That is not how a fraction
20  works.
21       Q.    Well, if the denominator
22  increases, doesn't the recovery ultimately
23  decrease if --
24       A.    No.
25       Q.    -- if the numerator stays the
```

Page 26

```
1                     J. SEERY
2    were amended without consideration a few
3    years ago.  So, for our purposes we didn't
4    make the assumption, which I am sure will
5    happen, a fraudulent conveyance claim on
6    those notes, that a fraudulent conveyance
7    action would be brought.  We just assumed
8    that we'd have to discount the notes
9    heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12        Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for P and I.
22        Q.    But in fact as of January you
23   have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

Page 27

```
1                     J. SEERY
2        A.    NexPoint, I said.  They
3    defaulted on the note and we accelerated
4    it.
5        Q.    So there is no need to file a
6    fraudulent conveyance suit with respect to
7    that note.  Correct, Mr. Seery?
8             MR. MORRIS:  Objection to the
9        form of the question.
10       A.    Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14       Q.    My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18            MR. MORRIS:  Objection to the
19       form of the question.
20       A.    That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23       Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

Page 28

```
1                     J. SEERY
2    you whether they are included in the asset
3    portion of your $257 million number, all
4    right?  Mr. Morris didn't want me to go
5    into specific asset value, and I don't
6    intend to do that.
7             The first question I have for
8    you is, the equity in Trustway Highland
9    Holdings, is that included in the
10   $257 million number?
11       A.    There is no such entity.
12       Q.    Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16       A.    Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20   includes Targa and all the value that
21   flows up from Targa.  It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

Page 29

```
1                     J. SEERY
2    includes any other securities and all the
3    value that would flow from Cornerstone.
4    It includes HCLOF and all the value that
5    would flow up from HCLOF.  It includes
6    Korea and all the value that would flow up
7    from Korea.
8             There may be others off the top
9    of my head.  I don't recall them.  I don't
10   have a list in front of me.
11       Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14       A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22            With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

**Page 38**

```
 1                  J. SEERY
 2       A.    I don't recall the specific
 3   limitation on the trust.  But if there was
 4   a reason to hold on to the asset, if there
 5   is a limitation, we can seek an extension.
 6       Q.    Let me ask a question.  With
 7   respect to these businesses, the Debtor
 8   merely owns an equity interest in them.
 9   Correct?
10       A.    Which business?
11       Q.    The ones you have identified as
12   operating businesses earlier?
13       A.    It depends on the business.
14       Q.    Well, let me -- again, let's try
15   to be specific.  With respect to SSP, it
16   was your position that you did not need to
17   get court approval for the sale.  Correct?
18       A.    That's correct.
19       Q.    Which one of the operating
20   businesses that are here, that you have
21   identified, do you need court authority
22   for a sale?
23             MR. MORRIS:  Objection to the
24   form of the question.
25       A.    Some of the businesses would be
```

**Page 39**

```
 1                  J. SEERY
 2   different analysis that we'll undertake
 3   with bankruptcy counsel to determine what
 4   we would need depending on what we're
 5   going to happen and what the restrictions
 6   either under the code are or under the
 7   plan.
 8       Q.    Is there anything that would
 9   stop you from selling these businesses if
10   the Claimant wants to buy one in a year or two
11   years?
12             MR. MORRIS:  Objection to form
13   of the question.
14       A.    Is there anything that would
15   stop me?  We'd have to follow the
16   strictures of the code and the protocols,
17   but there would be no prohibition -- let
18   me see that, please.
19             There would be no prohibition
20   that I am aware of.
21       Q.    Now, in connection with your
22   differential between the liquidation of
23   what I will call the operating businesses
24   under the liquidation analysis and the
25   plan analysis, who arrived at the discount
```

**Page 40**

```
 1                  J. SEERY
 2   or determined the discount that has been
 3   placed between the two, plan analysis
 4   versus liquidation analysis?
 5             MR. MORRIS:  Objection to form
 6   of the question.
 7       A.    To which document are you
 8   referring?
 9       Q.    Both the June -- the January and
10   the November analysis has a different
11   estimated proceeds for monetization for
12   the plan analysis versus the liquidation
13   analysis.  Do you see that?
14       A.    Yes.
15       Q.    And there is a note under there.
16   "Assumes Chapter 7 trustee will not be
17   able to achieve the same sales proceeds as
18   Claimant trustee."
19       A.    I see that, yes.
20       Q.    Do you see that note?
21       A.    Yes.
22       Q.    Who arrived at that discount?
23       A.    I did.
24       Q.    What percentage did you use?
25       A.    Depended on the asset.  Each one
```

**Page 41**

```
 1                  J. SEERY
 2   is different.
 3       Q.    Is the discount a function of
 4   capability of a trustee versus your
 5   capability, or is the discount a function
 6   of timing?
 7             MR. MORRIS:  Objection to form.
 8       A.    It could be a combination.
 9       Q.    So, let's -- let me walk through
10   this.  Your plan analysis has an
11   assumption that everything is sold by
12   December 2022.  Correct?
13       A.    Correct.
14       Q.    And the valuations that you have
15   used here for the monetization assume a
16   sale between -- a sale prior to December
17   of 2022.  Correct?
18       A.    Sorry.  I don't quite understand
19   your question.
20       Q.    The 257 number, and then let's
21   take out the notes.  Let's use the 210
22   number.
23             MR. MORRIS:  Can we put the
24   document back on the screen, please?
25             Sorry, Douglas, to interrupt, but it
```

Page 42

```
 1                 J. SEERY
 2     would be helpful.
 3          MR. DRAPER:  That is fine, John.
 4          (Pause.)
 5          MR. MORRIS:  Thank you very
 6     much.
 7          Q.  Mr. Seery, do you see the 257?
 8          A.  In the one from yesterday?
 9          Q.  Yes.
10          A.  Second line, 257,941.  Yes.
11          Q.  That assumes a monetization of
12     all assets by December of 2022?
13          A.  Correct.
14          Q.  And so everything has been sold
15     by that time; correct?
16          A.  Yes.
17          Q.  So, what I am trying to get at
18     is, there is both the capability between
19     you and a trustee, and then the second
20     issue is timing.  So, what discount was
21     put on for timing, Mr. Seery, between when
22     a trustee would sell it versus when you
23     would sell it?
24          MR. MORRIS:  Objection.
25          Q.  What is the percentage you
```

Page 43

```
 1                 J. SEERY
 2     applied?
 3          A.  Each of the assets is different.
 4          Q.  Is there a general discount that
 5     you used?
 6          A.  Not a general discount, no.  We
 7     looked at each individual asset and went
 8     through and made an assessment.
 9          Q.  Did you apply a discount for
10     your capability versus the capability of a
11     trustee?
12          A.  No.
13          Q.  So a trustee would be as capable
14     as you are in monetizing these assets?
15          MR. MORRIS:  Objection to the
16     form of the question.
17          Q.  Excuse me?  The answer is?
18          A.  The answer is maybe.
19          Q.  Couldn't a trustee hire somebody
20     as capable as you are?
21          MR. MORRIS:  Objection to the
22     form of the question.
23          A.  Perhaps.
24          Q.  Sir, that is a yes or no
25     question.  Could the trustee hire somebody
```

Page 44

```
 1                 J. SEERY
 2     as capable as you are?
 3          MR. MORRIS:  Objection to the
 4     form of the question.
 5          A.  I don't know.
 6          Q.  Is there anybody as capable as
 7     you are?
 8          MR. MORRIS:  Objection to the
 9     form of the question.
10          A.  Certainly.
11          Q.  And they could be hired.
12     Correct?
13          A.  Perhaps.  I don't know.
14          Q.  And if you go back to the
15     November 2020 liquidation analysis versus
16     plan analysis, it is also the same note
17     about that a trustee would bring less, and
18     there is the same sort of discount between
19     the estimated proceeds under the plan and
20     under the liquidation analysis.
21          MR. MORRIS:  If that is a
22     question, I object.
23          Q.  Is that correct, Mr. Seery,
24     looking at the document?
25          A.  There are discounts, yes.
```

Page 45

```
 1                 J. SEERY
 2          Q.  Again, the discounts are applied
 3     for timing and capability?
 4          A.  Yes.
 5          Q.  Now, in looking at the November
 6     plan analysis number of $190 million and
 7     the January number of $257 million, what
 8     accounts for the increase between the two
 9     dates?  What assets specifically?
10          A.  There are a number of assets.
11     Firstly, the HCLOF assets are added.
12          Q.  How much are those?
13          A.  Approximately 22 and a half
14     million dollars.
15          Q.  Okay.
16          A.  Secondly, there is a significant
17     increase in the value of certain of the
18     assets over this time period.
19          Q.  Which assets, Mr. Seery?
20          A.  There are a number.  They
21     include MGM stock, they include Trustway,
22     they include Targa.
23          Q.  And what is the percentage
24     increase from November to January,
25     November of 2020 to January of 2021?
```

Page 46

```
1                    J. SEERY
2        A.    Do you mean what is the
3   percentage increase from 190 to 257?
4        Q.    No.  You just identified three
5   assets.  MGM stock, we can go look at the
6   exchange and figure out what the price
7   increase is; correct?
8        A.    No.
9        Q.    Why not?  Is the MGM stock
10  publicly traded?
11       A.    Yes.  It doesn't trade on --
12       Q.    Excuse me?
13       A.    It doesn't trade on an exchange.
14       Q.    Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17       A.    There is a semipublic market;
18  yes.
19       Q.    So it is a number that is
20  readily available between the two dates?
21       A.    It's available.
22       Q.    Now, you identified Targa and
23  Trustway.  Correct?
24       A.    Yes.
25       Q.    Those are not readily available
```

Page 47

```
1                    J. SEERY
2   markets; correct?
3        A.    No.
4        Q.    Those are operating businesses?
5        A.    Correct.
6        Q.    Who provided the valuation for
7   the November 2020 liquidation analysis?
8        A.    We use a combination of the
9   value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12       Q.    And the adjustment was up or
13  down?
14       A.    When?
15       Q.    For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19            MR. MORRIS:  Objection to form
20  of the question.
21       A.    I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.
```

Page 48

```
1                    J. SEERY
2        Q.    And if I understand what you
3   just said, it is that the Houlihan Lokey
4   valuation for those two businesses showed
5   a significant increase between November of
6   2020 and January of 2021.
7            MR. MORRIS:  Objection to form
8   of the question.
9        A.    I didn't say that.
10       Q.    I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18       A.    I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23       Q.    So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 22nd
```

Page 49

```
1                    J. SEERY
2   of 2021, the magnitude being roughly 60
3   some odd million dollars.  Correct?
4        A.    Correct.
5        Q.    We can account for all realign
6   of it easily, right?
7            MR. MORRIS:  Objection to form.
8        A.    Correct.
9        Q.    That is the Harbourvest
10  settlement, so that leaves roughly
11  59 million, thereabouts?
12            MR. MORRIS:  Objection to the
13  form of the question if that is a
14  question.  It is accounted for.
15       Q.    What makes up that difference,
16  Mr. Seery?
17       A.    A change in the plan value of
18  the assets.
19       Q.    Okay.  Which assets?  Let's not
20  go back to where we were.
21       A.    There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up
```

Page 50

```
1                    J. SEERY
2    for one.  On the operating businesses, we
3    looked at each of them and made an
4    assessment based upon where the market is
5    and what we believe the values are, and we
6    have moved those valuations.
7        Q.    Let me look at some numbers
8    again.  In the liquidation analysis in
9    November of 2020, the liquidation value is
10   $149 million.  Correct?
11       A.    Yes.
12       Q.    And in the liquidation analysis
13   in January of 2021, you have $191 million?
14       A.    Yes.
15       Q.    You see that number.  So there
16   is $51 million there, right?
17       A.    No.
18       Q.    What is the difference between
19   191 and -- sorry.  My math may be a little
20   off.  What is the difference between the
21   two numbers, Mr. Seery?
22       A.    Your math is off.
23       Q.    Sorry.  It is 41 million?
24       A.    Correct.
25       Q.    $22 million of that is the
```

Page 51

```
1                    J. SEERY
2    HarbourVest settlement, right?
3        A.    I believe that's correct.
4        Q.    Is that fair, Mr. Seery?
5        A.    I believe that is correct, yes.
6        Q.    And part of that differential
7    are publicly traded or ascertainable
8    securities.  Correct?
9        A.    Yes.
10       Q.    And basically you can get, or
11   under the plan analysis or trustee
12   analysis, if it is a marketable security
13   or where there is a market, the
14   liquidation number should be the same for
15   both.  Is that fair?
16       A.    No.
17       Q.    And why not?
18       A.    We might have a different price
19   target for a particular security than the
20   current trading value.
21       Q.    I understand that, but I mean
22   that is based upon the capability of the
23   person making the decision as to when to
24   sell.  Correct?
25            MR. MORRIS:  Objection to form
```

Page 52

```
1                    J. SEERY
2    of the question.
3        Q.    Mr. Seery, yes or no?
4        A.    I said no.
5        Q.    What is that based on, then?
6        A.    The person's ability to assess
7    the market and timing.
8        Q.    Okay.  And again, couldn't a
9    trustee hire somebody as capable as you to
10   both, A, assess the market and, B, make a
11   determination as to when to sell?
12            MR. MORRIS:  Objection to form
13   of the question.
14       A.    I suppose a trustee could.
15       Q.    And there are better people or
16   people equally or better than you at
17   assessing a market.  Correct?
18       A.    Yes.
19            MR. MORRIS:  Objection to form
20   of the question.
21       Q.    So, again, let's go back to
22   that.  We have accounted for, out of
23   $41 million where the liquidation analysis
24   increases between the two dates,
25   $22 million of it.  That leaves
```

Page 53

```
1                    J. SEERY
2    $18 million.  How much of that is publicly
3    traded or ascertainable assets versus
4    operating businesses?
5        A.    I don't know off the top of my
6    head the percentages.
7        Q.    All right.  The same question
8    for the plan analysis where you have the
9    differential between the November number
10   and the January number.  How much of it is
11   marketable securities versus an operating
12   business?
13       A.    I don't recall off the top of my
14   head.
15            MR. DRAPER:  Let me take a
16       few-minute break.  Can we take a
17       ten-minute break here?
18            THE WITNESS:  Sure.
19            (Recess.)
20   BY MR. DRAPER:
21       Q.    Mr. Seery, what I am going to
22   show you and what I would ask you to look
23   at is in the note E, in the statement of
24   assumptions for the November 2020
25   disclosure statement.  It discusses fixed
```

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate. We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

002628

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

002629

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim – UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.

- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.

- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

## Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]: General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS. Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Value of HarbourVest Claim





### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div style="text-align:center">

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

<div style="text-align:center">

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING**
**SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

</div>

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3729-2 Filed 03/08/23 Entered 03/08/23 16:00:20 Desc
Exhibit 2 - Documents Relied on Brief Appeal Page 201 of 214

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20 Entered 12/23/20 22:25:24 Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

2

## RELEVANT BACKGROUND

### A.    Procedural Background

3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.      On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.      In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.      On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

## B.     Overview of HarbourVest's Claims

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

## C.     Summary of HarbourVest's Factual Allegations

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19. Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20. After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21. On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LL*C, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim"). Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any
and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*,
Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the
grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response
articulated specified claims under U.S. federal and state and Guernsey law, including claims for
fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent
misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law
Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt
Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair
prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest
Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest
Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance
of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018
Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for
voting purposes in the amount of more than $300 million (based largely on a theory of treble
damages).

**E.      Settlement Discussions**

28.     In October, the parties discussed the possibility of resolving the Rule 3018
Motion.

29.     In November, the parties broadened the discussions in an attempt to reach
a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.     **Summary of Settlement Terms**

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

9

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement. Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36. There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37. First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38. The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

002646

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.    Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.    Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

### NO PRIOR REQUEST

41.    No previous request for the relief sought herein has been made to this, or any other, Court.

### NOTICE

42.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: December 23, 2020.      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

# Exhibit 1
## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

WHEREAS, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

WHEREAS, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

WHEREAS, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

WHEREAS, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

WHEREAS, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

WHEREAS, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

WHEREAS, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;