**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 10

# APPELLANT RECORD

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

**APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S**
**SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND**
**DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD**

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

**I.**
**STATEMENT OF THE ISSUES**

A.    Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.    the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.    the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3.    the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

      4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

      1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

      2. Appellant's claims or allegations are not "plausible";

      3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

      4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

      5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

      6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

      7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

      8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

      9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

     10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.     Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.     Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.     Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.     Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.     Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

　　1.   declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

　　2.   concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1.   **Notice of Appeal**

*000001*     a.   Notice of Appeal [**Dkt. 3906**];

*000276*     b.   Amended Notice of Appeal [**Dkt. 3908**]; and

*000551*     c.   Second Amended Notice of Appeal [**Dkt. 3945**]

2.   **The judgment, order, or decree appealed from:**

　　a.   Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

001049

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

Vol. 2

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594
001660
001821
001830
Vol. 3
001849
Thru Vol. 4
Vol 4
002236
002243
002248

*Vol. 5*
*002251*
*002254*
*002262*
*002341*
*002355*
*002358*
*002391*
*002398*
*002400*
*Vol. 8*  *Thru Vol. 7*
*002826*
*Vol. 9*  *Thru Vol. 9*
*003257*
*003260*
*003270*
*003278*

| Date | Doc No. | Description |
|---|---|---|
| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10* *003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

[3] A duplicate of Doc 3758.

*Vol. 10*

*003458*

*003463*

*Vol. 11*

*003537*

*Thru Vol. 16*

*Vol. 17*

*004665*

*004712*

*004714*

*004808*

*004813*

*004836*

*Vol. 18*
*004930*

*004931*

| | | | |
|---|---|---|---|
| | | | Holdings LLC, Stonehill Capital Management LLC |
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18
004939.

| | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| 004959 | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004961 | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004984 | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005049 | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005114 | 06/05/2023 | 3817 (3817-1 — 3817-5) Thru Vol. 25 | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| Vol. 26 006608 | 06/05/2023 | 3818 (3818-1 — 3818-9) Thru Vol. 39 | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| Vol. 39 009273 | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009290 | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009416 | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 009424 | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 40

009426

009436

009444

009445

009446

009456

009458

Vol. 42

009847   Thru Vol. 41

009901

009905

009908

009912

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (See Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

Vol. 42

009928

009944

010013

010023

010025

010029

010035

010047

010059

Vol. 43

010062

| | | | |
|---|---|---|---|
| 06/16/2023 | 3854 | | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

B.    **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| --- |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023              Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
     Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

<u>**NOTICE OF HEARING**</u>

PLEASE TAKE NOTICE that the following matter is scheduled for hearing on

**Monday, April 24, 2023, at 1:30 a.m. (Central Time)** (the "Hearing") in the above-

captioned matter:

1) Hunter Mountain Investment Trust ("HMIT" or "Movant") Emergency Motion
for Leave to File Adversary Proceeding [Docket No. 3699] (the "Motion for
Leave")

003281

The Hearing on the Motion for Leave will be held via WebEx videoconference before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge. The WebEx video participation/attendance link for the Hearing is: https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing is attached hereto as Exhibit A; alternatively, the WebEx Hearing Instructions for the Hearing may be obtained from Judge Jernigan's hearing/calendar site at: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judgejernigans-hearing-dates.

DATED: April 13, 2023

*[Remainder of Page Intentionally Left Blank]*

003282

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  _/s/ Sawnie A. McEntire_____
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Hunter Mountain Investment Trust*

[3]

003283

# Exhibit A

Case 3:23-cv-02071-E   Document 20-1   Filed 12/27/23   Page 19 of 270   PageID 2568

# WebEx Hearing Instructions
## Judge Stacey G. Jernigan

Pursuant to General Order 2020-14 issued by the Court on May 20, 2020, all hearings before Judge Stacey
G. Jernigan are currently being conducted by WebEx videoconference unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:    https://us-courts.webex.com/meet/jerniga

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In: 1.650.479.3207
Meeting ID: 479 393 582

**Participation/Attendance Requirements:**

- Counsel and other parties in interest who plan to actively participate in the hearing are encouraged
  to attend the hearing in the WebEx video mode using the WebEx video link above.  Counsel and
  other parties in interest who will <u>not</u> be seeking to introduce any evidence at the hearing and who
  wish to attend the hearing in a telephonic only mode may attend the hearing in the WebEx
  telephonic only mode using the WebEx dial-in and meeting ID above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time.  Please
  be advised that a hearing may already be in progress.  <u>During hearings, participants are required to
  keep their lines on mute at all times that they are not addressing the Court or otherwise actively
  participating in the hearing</u>. **The Court reserves the right to disconnect or place on permanent
  mute any attendee that causes any disruption to the proceedings**.  For general information and
  tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://
  www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode and live testimony
  will only be accepted from witnesses who have the WebEx video function activated**.
  Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.

- All WebEx hearing attendees are required to comply with Judge Jernigan's Telephonic
  and Videoconference Hearing Policy (included within Judge Jernigan's Judge-Specific
  Guidelines): https://www.txnb.uscourts.gov/content/judge-stacey-g-c-jernigan

**Exhibit Requirements:**

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in
  the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual
  attachment thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- If the number of pages of such exhibits exceeds 100, then such party <u>must</u> also deliver two (2) sets
  of such exhibits in exhibit binders to the Court by no later than twenty-four (24) hours in advance
  of the hearing.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice
  that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above
  WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing
  Instructions or provide notice that they may be obtained from Judge Jernigan's hearing/calendar
  site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-
  courts.webex.com/meet/jerniga" as the location of the hearing</u> (note: this option appears
  immediately after the first set of Wichita Falls locations).  Do <u>not</u> select Judge Jernigan's Dallas
  courtroom as the location for the hearing.

003285

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

**NOTICE OF HEARING**

PLEASE TAKE NOTICE that the following matter is scheduled for hearing on **Monday, April 24, 2023, at 1:30 p.m. (Central Time)** (the "Hearing") in the above-captioned matter:

1) Hunter Mountain Investment Trust ("HMIT" or "Movant") Emergency Motion for Leave to File Adversary Proceeding [Docket No. 3699] (the "Motion for Leave")

003286

The Hearing on the Motion for Leave will be held via WebEx videoconference before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge. The WebEx video participation/attendance link for the Hearing is: https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing is attached hereto as Exhibit A; alternatively, the WebEx Hearing Instructions for the Hearing may be obtained from Judge Jernigan's hearing/calendar site at: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judgejernigans-hearing-dates.

DATED: April 13, 2023

*[Remainder of Page Intentionally Left Blank]*

003287

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  _/s/ Sawnie A. McEntire_____
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    ***Attorneys for Hunter Mountain Investment Trust***

[3]

003288

Case 19-34054-sgj11   Doc 3742   Filed 04/13/23   Entered 04/13/23 18:23:18   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 23 of 270   PageID 2572
Main Document   Page 22 of 5   Page 23 of 270

# Exhibit A

# WebEx Hearing Instructions

## Judge Stacey G. Jernigan

Pursuant to General Order 2020-14 issued by the Court on May 20, 2020, all hearings before Judge Stacey G. Jernigan are currently being conducted by WebEx videoconference unless ordered otherwise.

**For WebEx Video Participation/Attendance**:

Link:    https://us-courts.webex.com/meet/jerniga

**For WebEx Telephonic Only Participation/Attendance**:

Dial-In: 1.650.479.3207
Meeting ID: 479 393 582

**Participation/Attendance Requirements:**

- Counsel and other parties in interest who plan to actively participate in the hearing are encouraged to attend the hearing in the WebEx video mode using the WebEx video link above.  Counsel and other parties in interest who will <u>not</u> be seeking to introduce any evidence at the hearing and who wish to attend the hearing in a telephonic only mode may attend the hearing in the WebEx telephonic only mode using the WebEx dial-in and meeting ID above.

- Attendees should join the WebEx hearing at least 10 minutes prior to the hearing start time.  Please be advised that a hearing may already be in progress.  <u>During hearings, participants are required to keep their lines on mute at all times that they are not addressing the Court or otherwise actively participating in the hearing</u>.  **The Court reserves the right to disconnect or place on permanent mute any attendee that causes any disruption to the proceedings**.  For general information and tips with respect to WebEx participation and attendance, please see Clerk's Notice 20-04: https://www.txnb.uscourts.gov/sites/txnb/files/hearings/Webex%20Information%20and%20Tips_0.pdf

- **Witnesses are required to attend the hearing in the WebEx video mode and live testimony will only be accepted from witnesses who have the WebEx video function activated**.  Telephonic testimony without accompanying video will <u>not</u> be accepted by the Court.

- All WebEx hearing attendees are required to comply with Judge Jernigan's Telephonic and Videoconference Hearing Policy (included within Judge Jernigan's Judge-Specific Guidelines):  https://www.txnb.uscourts.gov/content/judge-stacey-g-c-jernigan

**Exhibit Requirements:**

- Any party intending to introduce documentary evidence at the hearing <u>must</u> file an exhibit list in the case with a true and correct copy of each designated exhibit filed as a <u>separate, individual attachment thereto</u> so that the Court and all participants have ready access to all designated exhibits.

- If the number of pages of such exhibits exceeds 100, then such party <u>must</u> also deliver two (2) sets of such exhibits in exhibit binders to the Court by no later than twenty-four (24) hours in advance of the hearing.

**Notice of Hearing Content and Filing Requirements:**

<u>IMPORTANT: For all hearings that will be conducted by WebEx only</u>:

- The Notice of Hearing filed in the case and served on parties in interest must: (1) provide notice that the hearing will be conducted by WebEx videoconference only, (2) provide notice of the above WebEx video participation/attendance link, and (3) attach a copy of these WebEx Hearing Instructions or provide notice that they may be obtained from Judge Jernigan's hearing/calendar site: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-jernigans-hearing-dates.

- When electronically filing the Notice of Hearing via CM/ECF <u>select "at https://us-courts.webex.com/meet/jerniga" as the location of the hearing</u> (note: this option appears immediately after the first set of Wichita Falls locations).  Do <u>not</u> select Judge Jernigan's Dallas courtroom as the location for the hearing.

003290

Omar J. Alaniz – SBT# 24040402          Mark T. Stancil (*Pro Hac Pending*)
Lindsey L. Robin – SBT# 24091422        Joshua S. Levy (*Pro Hac Pending*)
**REED SMITH LLP**                      **WILLKIE FARR & GALLAGHER LLP**
2850 N. Harwood Street, Suite 1500      1875 K Street, N.W.
Dallas, Texas 75201                     Washington, DC 20006
T:  469.680.4200                        T: 202.303.1000
F: 469.680.4299                         mstancil@willkie.com
oalaniz@reedsmith.com                   jlevy@willkie.com
lrobin@reedsmith.com

*Attorneys for James P. Seery, Jr.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § § § | **Case No. 19-34054-sgj11** |
| **Debtors** |  |  |

### <u>NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS</u>

PLEASE TAKE NOTICE that Reed Smith LLP and Willkie Farr & Gallagher LLP, appearing on behalf of James P. Seery, Jr., hereby submit this Notice of Appearance in the above-captioned case and request notice of all hearings and conferences herein and make demand for service of all papers herein, including, without limitation, all papers and notices pursuant to Bankruptcy Rules 2002, 3017, 9007, and 9010, and Section 342 of the Bankruptcy Code. All notices given or required to be given in this case shall be served upon James P. Seery, Jr. as follows:

Omar J. Alaniz
Lindsey L. Robin
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
oalaniz@reedsmith.com
lrobin@reedsmith.com

Mark T. Stancil (*Pro Hac Pending*)
Joshua S. Levy (*Pro Hac Pending*)
**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, N.W.
Washington, DC 20006
T: 202.303.1000
mstancil@willkie.com
jlevy@willkie.com

This notice of appearance is not a waiver of any right to challenge the eligibility of the Debtors for relief under the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the foregoing demand includes not only the notices and papers referred to in the Bankruptcy Rules and sections of the Bankruptcy Code specified above, but also includes, without limitation, the schedules, statement of financial affairs, operating reports, any plan of reorganization or disclosure statement, any notice of fee applications, any letter, application, motion, complaint, objection, claim, demand, hearing, petition, pleadings or request, whether transmitted or conveyed by mail, electronic delivery, hand delivery, telephone, facsimile, telegraph, telex or otherwise filed with or delivered to the Bankruptcy Clerk, Clerk, Court, or Judge (as those terms are defined in Bankruptcy Rule 9001) in connection with and with regard to the above-referenced bankruptcy case and any adversary proceeding related thereto.

**DATED:** April 13, 2023

---

003292

Respectfully submitted,

By:  /s/ Omar J. Alaniz
     Omar J. Alaniz
     Texas Bar No. 24040402
     Lindsey L. Robin
     Texas Bar No. 24091422
     **REED SMITH LLP**
     2850 N. Harwood Street, Suite 1500
     Dallas, Texas 75201
     T:  469.680.4200
     F: 469.680.4299
     oalaniz@reedsmith.com
     lrobin@reedsmith.com

     Mark T. Stancil (Pro Hac Pending)
     Joshua S. Levy (Pro Hac Pending)
     **WILLKIE FARR & GALLAGHER LLP**
     1875 K Street, N.W.
     Washington, DC 20006
     T: 202.303.1000
     mstancil@willkie.com
     jlevy@willkie.com

     **ATTORNEYS FOR JAMES P. SEERY, JR.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on **April 13, 2023**, a true and correct copy of the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

     /s/ Omar J. Alaniz
     Omar J. Alaniz

003293

Omar J. Alaniz – SBT# 24040402
Lindsey L. Robin – SBT# 24091422
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
oalaniz@reedsmith.com
lrobin@reedsmith.com

Mark T. Stancil (*Pro Hac Pending*)
Joshua S. Levy (*Pro Hac Pending*)
**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, N.W.
Washington, DC 20006
T: 202.303.1000
mstancil@willkie.com
jlevy@willkie.com

*Attorneys for James P. Seery, Jr.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL** | § | **Case No. 19-34054-sgj11** |
| **MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | |
| **Debtor.** | § | |

### JAMES SEERY'S JOINDER TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S
### EMERGENCY MOTION TO MODIFY AND FIX BRIEFING SCHEDULE
### AND SET HEARING DATE WITH RESPECT TO HUNTER
### MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE
### <u>VERIFIED ADVERSARY PROCEEDING</u>

James P. Seery, Jr. ("**Mr. Seery**") joins and adopts the Debtor Highland Capital

Management, L.P.'s *Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing*

*Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File*

*Verified Adversary Proceeding* [Docket No. 3738] (the "**Scheduling Motion**"). For the reasons

set forth in the Scheduling Motion, Mr. Seery respectfully requests the Court grant the relief

requested therein.

Mr. Seery also joins in the relief requested in the Debtor's *Emergency Motion to Expedite*

*Hearing on the Scheduling Motion* [Docket No. 3739].

---

**JAMES SEERY'S JOINDER TO THE SCHEDULING MOTION**                                         **PAGE 1**

Mr. Seery respectfully requests that this Court enter an order (i) granting the relief requested in the Scheduling Motion, and (ii) for any such other and further relief the Court deems just and appropriate.

**DATED:** April 15, 2023

Respectfully submitted,

By:  /s/ Omar J. Alaniz
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
oalaniz@reedsmith.com
lrobin@reedsmith.com

Mark T. Stancil (Pro Hac Pending)
Joshua S. Levy (Pro Hac Pending)
**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, N.W.
Washington, DC 20006
T: 202.303.1000
mstancil@willkie.com
jlevy@willkie.com

**ATTORNEYS FOR JAMES P. SEERY, JR.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on **April 15, 2023**, a true and correct copy of the foregoing will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

/s/ Omar J. Alaniz
Omar J. Alaniz

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S**
**RESPONSE AND RESERVATION OF RIGHTS**

Hunter Mountain Investment Trust ("HMIT") submits this Response and Reservation of Rights ("Response") related to Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary

003296

Proceeding ["Doc. 3738"] and Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Managements, L.L.C., and Stonehill Capital Management LLC's Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding ["Doc. 3740] (collectively, "Motion to Fix Briefing Schedule"). In support of this Response, HMIT states the following:

1.      Following discussions with various parties, HMIT hereby provides notice it does not oppose the "Proposed Schedule" as set forth in the Motion to Fix Briefing Schedule, subject to and without waiving its procedural and substantive rights, including, without limitation, its rights to amend and/or supplement its Emergency Motion for Leave to File Verified Adversary Proceeding [Doc. 3699] and/or the proposed Verified Adversary Complaint [Doc. 3699-1].

DATED: April 17, 2023

                            Respectfully Submitted,

                            **PARSONS MCENTIRE MCCLEARY PLLC**

                            By:  /s/ Sawnie A. McEntire
                                 Sawnie A. McEntire
                                 State Bar No. 13590100
                                 smcentire@pmmlaw.com
                                 1700 Pacific Avenue, Suite 4400
                                 Dallas, Texas 75201
                                 Telephone: (214) 237-4300
                                 Facsimile: (214) 237-4340

003297

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

**Attorneys for Hunter Mountain
Investment Trust**

### CERTIFICATE OF SERVICE

I certify that on the 17th day of April 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

_/s/ Sawnie A. McEntire_
Sawnie A. McEntire

003298

Sawnie A. McEntire

State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

## NOTICE OF STATUS CONFERENCE

PLEASE TAKE NOTICE that a status conference is scheduled in the above-captioned matter for **Monday, April 24, 2023, at 1:30 p.m. (Central Time)** (the "Status Conference") regarding the hearing requested by the Respondents regarding Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding [Docket No. 3699].

[1]

003299

The Status Conference will be held via WebEx videoconference only before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge. The WebEx video participation/attendance link for the Status Conference is: https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx instructions pertaining to Participation/Attendance for the Status Conference may be obtained from Judge Jernigan's hearing/calendar site at:

https://www.txnb.uscourts.gov/judges-info/hearing-dates/judgejernigans-hearing-dates.

DATED: April 19, 2023

*[Remainder of Page Intentionally Left Blank]*

003300

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY
PLLC**

By:  /s/ *Sawnie A. McEntire*
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    ***Attorneys for Hunter Mountain
    Investment Trust***

[3]

003301

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S OBJECTION REGARDING
EVIDENTIARY HEARING AND BRIEF CONCERNING GATEKEEPER
PROCEEDINGS RELATING TO "COLORABILITY"**

Hunter Mountain Investment Trust ("HMIT"), Movant, files this Objection

Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating

to "Colorability," and respectfully shows:

003302

### OVERVIEW

1.      HMIT objects to any evidentiary hearing regarding its Emergency Motion
for Leave to file Adversary Proceeding (Doc. 3699), and the related attached declarations
(Docs. 3699-2, 3699-3, and 3699-4) and the proposed Adversary Complaint (Doc. 3699-1)
("Adversary Complaint") (collectively the "Emergency Motion for Leave").[1]

2.      The Emergency Motion for Leave does *not* involve a summary judgment
standard; it does *not* involve a substantive inquiry into the merits; it is *not* a test of the
credibility of witnesses. Rather, as the Fifth Circuit, the Northern District of Texas and
circuit courts outside of Texas have concluded: it is a threshold determination involving
a standard that is *not stringent*.

3.      Here, HMIT need show nothing more than some possible validity of its
claims. *At most*, courts analogize "colorable" to a FED. R. CIV. P. 12(b)(6) ("12(b)(6)")
standard.  In assessing a complaint, a court must accept all well-pleaded facts as true and
liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey
v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Courts do not consider evidence outside of
the pleadings under 12(b)(6) and, if they do so, then the motion is converted to one under
FED. R. CIV. P. 56, and "the parties must be allowed to fully develop the facts, through
discovery or otherwise, to support their record."  *Hilgeman v. Nat'l Ins. Co. of Am.*, 444
F.2d 446, 448 (5th Cir. 1971); *see* FED. R. CIV. P. 56(d)(2).  Yet here, the Court proposes to

---

[1] The proposed Adversary Complaint is attached as Exhibit 1 to the Emergency Motion for Leave.

003303

conduct an evidentiary hearing on "colorableness"—not just before discovery has been

fully developed, but before the case is even *filed*.

4.      "Colorableness" must be construed according to its ordinary meaning

which, at the highest standard, is analogous to a 12(b)(6) standard which is expressly *not*

evidentiary.  The Emergency Motion for Leave readily satisfies this standard.

<u>ARGUMENT AND AUTHORITIES</u>

**The Plan Does Not Require An Evidentiary Hearing.**

5.      The Fifth Amended Plan of Reorganization of Highland Capital

Management includes various "gatekeeping" provisions ("Gatekeeping Provisions").[2]

These Gatekeeping Provisions provide for a determination, after notice and hearing,

whether certain claims are "colorable."[3] Pursuant to these Gatekeeping Provisions, HMIT

filed its Emergency Motion for Leave, attaching the proposed Adversary Complaint as

Exhibit 1 to the Motion.  The Emergency Motion for Leave and proposed Adversary

Complaint include substantial, detailed allegations demonstrating that the potential

adversary claims are more than "colorable"—that is, the claims exceed the minimal

*gatekeeping* threshold for filing.

---

[2] Fifth Amended Plan of Reorganization of Highland Capital Management (Doc. 1808) at Article IX(F), pp. 51-52.

[3] *Id*.

003304

6.      A "gatekeeping" protocol, by its own terms, occurs in advance of filing a claim and prior to any Fed. R. Civ. P. 12(b)(6) motion. A Rule 12(b)(6) motion is grounded on whether a Complaint "fails to state a claim upon which relief can be granted" and is considered prior to any discovery **and without an evidentiary hearing**. *See Broyles v. Torres*, 2009 WL 2215781 (S.D. Tex. 2009) (distinguishing Rule 12(b)(6) standard from "frivolous" standard and finding that frivolous standard is a lower bar than Rule 12(b)(6) and does not require discovery or an evidentiary hearing), *aff'd*, 381 Fed. Appx. 370, 373 (5th Cir. 2010) (affirming that discovery and evidentiary hearing were not necessary under either a "frivolous" or Rule 12(b)(6) determination).

7.      Similarly here, as required under Rule 12(b)(6), the Court's determination of whether HMIT's proposed claims are "colorable" should be made in advance of any discovery and without an evidentiary hearing.  *See Broyles v. Torres*, 618 F. Supp. 2d 661, 683 (S.D. Tex. 2009) (Rule 12(b)(6) only requires a complaint to allege facts showing the pleader is entitled to relief). As a general rule, when considering a motion to dismiss under Rule 12(b)(6), "a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir. 2000). The court may consider documents attached to or referred to in the complaint without converting the motion to one for summary judgment.  *See id*.

8.      Nothing in the Gatekeeping Provisions of the Plan provides for, much less requires, an evidentiary hearing on whether a proposed claim is "colorable." Further,

HMIT objects that any requirement of an evidentiary hearing or evidentiary basis for HMIT's "gatekeeping" motion is contrary to applicable legal standards.

***An Evidentiary Hearing on Colorablility is Improper and an Abuse of Discretion.***

9.     The Fifth Circuit quoted *Richardson v. United States*, 468 U.S. 317 (1984), for a definition of a "colorable claim" as one with "***some possible validity***." *See In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) (quoting *Richardson*, 468 U.S. at 326 n. 6). The Fifth Circuit also has made clear that whether a claim is colorable is based on *allegations* rather than merits-based proof: "There is a distinction here between whether a claim is colorable and whether it is meritorious. A plaintiff's claim is colorable if he can *allege* standing and the elements necessary to state a claim on which relief can be granted—whether or not his claim is ultimately meritorious—whether he can *prove* his case." *Id*. at 341 (emphasis in original, bold emphasis added).

10.     A court need not conduct an evidentiary hearing, but must ensure that the claims do not lack any merit whatsoever. To put it another way, the Court need not be satisfied there is an evidentiary basis on the merits of the claims to be asserted. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 and n. 15 (5th Cir. 1988) (allegations were sufficient, and no evidentiary hearing was necessary, to determine that breach of fiduciary duty claim against bankruptcy estate's officers and directors for

mismanagement of estate was colorable claim).[4] In *Louisiana World Exposition*, the Fifth

Circuit explained: "In light of our analysis, we find that the debtor-in-possession's refusal

to pursue LWE's cause of action against its officers and directors for negligent

management was indeed unjustified. The Committee outlined a colorable claim which, if

pursued successfully, could have greatly increased the value of the estate." *Id*.

11.     "To determine whether a plaintiff has stated a valid or colorable claim, the

Fifth Circuit has **instructed district courts to utilize a similar standard applied to a**

**motion to dismiss under Rule 12(b)(6)**." *Trippodo v. SP Plus Corp*., No. 4:20-CV-04063,

2021 WL 2446204, at *3 (S.D. Tex. May 21, 2021), *report and recommendation adopted*, No.

4:20-CV-04063, 2021 WL 2446191 (S.D. Tex. June 15, 2021) (emphasis added); *Reyes v.*

*Vanmatre*, No. 4:21-CV-01926, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 14, 2021)(quoting the

same); *see also Family Rehabilitation, Incorporated v. Azar*, 886 F.3d 496, 504 n. 15 (5th Cir.

2018) (quoting *Abraham v. Exxon Corp*., 85 F.3d 1126, 1129 (5th Cir. 1996) ("the requirement

of a colorable claim is not a stringent one"). "A plaintiff need show nothing more than

"some possible validity." *Id*. (quoting *Richardson*, 468 U.S. at 326 n. 6).

12.     Other circuit courts have reached similar conclusions. For example, the

Eighth Circuit held that "creditors' claims are colorable if they would survive a motion

to dismiss." *In Re Foster*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), *aff'd* 602 Fed. Appx. 356

---

[4] In *Louisiana World Exposition*, when stating that an evidentiary hearing was unnecessary, the court noted
that there were no objections to the claim other than the debtor-in- possession's "grave" conflict of interest
and his unjustified refusal to bring the claims. *Id*.

(8th Cir. 2015) (per curium); *see also Sabhari v. Mukasy,* 522 F.3d 842, 844 (8th Cir. 2008).

The Ninth Circuit also has held that a claim is considered colorable when it has "some

possible validity."); *See Stanley v. Gonzalez,* 476 F.3d 653, 657 (9th Cir. 2007) ("A colorable

claim is one which is not 'wholly insubstantial, immaterial, or frivolous.'"). The Sixth and

Seventh Circuits have adopted a similar test requiring that the court look only to the face

of the complaint to determine if claims are colorable. *See In re The Gibson Group, Inc.,* 66

F.3d 1436, 1446 (6th Cir. 1995) (relying on similar standard applied in the Second Circuit);

*Panaras v. Liquid Carbonic Indus. Corp.,* 74 F.3d 786, 790 (7th Cir. 1996)("The requirement

of a colorable claim is not a stringent one. This circuit has noted that 'jurisdiction depends

on an arguable claim, not on success' and that only if 'any claim ... must be frivolous is

jurisdiction lacking.'")

13.     In the non-bankruptcy context, the Northern District of Texas District Court

also explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff

must have an 'arguable claim' and not that the plaintiff must be able to succeed on that

claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.,* 207 F. Supp. 2d 570,

577 (N.D. Tex. 2002). Other district courts have reached similar conclusions. *Harry v.*

*Colvin* 2013 WL 12174300, at *5 (W.D. Tex., Nov. 6, 2013, No. 1:13-CV-490-LY)("a claim is

considered colorable when it has some possible validity" and "is not wholly

insubstantial, immaterial, or frivolous"); *American Medical Hospice Care, LLC v. Azar,* 2020

003308

WL 9814144, at *5 (W.D. Tex., Dec. 9, 2020, No. 5:20-CV-757 DAE) ("The requirement of

a colorable claim is not a stringent one.").

14.     There is good reason for a non-evidentiary standard. If this Court were to

allow evidence, then the issue turns from whether the underlying proposed complaint

presents colorable claims to whether HMIT will ultimately be successful in its

prosecution of the asserted claims. But, as the cited authority makes clear, that would

turn the judicial process on its head. Both proposed plaintiffs and potential defendants

must have access to all discovery that would be available in the event of a live adversary

proceeding or civil action. Here, this means the Court should not place itself and the

parties in the position of having a full pre-trial process and trial to determine whether a

complaint can be filed in the first instance. Such an approach would be clear error and an

abuse of discretion, constituting a ruling far afield from the standards articulated by the

Fifth Circuit.

15.     For these reasons, HMIT objects that an evidentiary hearing on the

"colorability" of HMIT's prospective adversary proceeding would be inappropriate and

contrary to established law. It would involve introduction of evidence that is not only

unnecessary and irrelevant to the "colorability" determination, but also would have to be

of broadest scope, so as not to deny HMIT of its right to present its full case on the merits

after discovery (if the decision is to be evidence based). Further, HMIT objects that an

evidentiary approach would irrationally require putative trial to determine mere

colorability, which would subject HMIT to higher burdens (both from a legal standard

standpoint and from a burden - including associated costs – standpoint) than legally

required.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: /s/ Sawnie A. McEntire
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    Texas State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

### CERTIFICATE OF SERVICE

I certify that on the 21st day of April 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

    /s/ Sawnie A. McEntire
    Sawnie A. McEntire

[9]

003310

Sawnie A. McEntire

State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

## NOTICE OF RESCHEDULING OF HEARING

PLEASE TAKE NOTICE that the following matter previously scheduled for

hearing on **Monday, April 24, 2023, at 1:30 p.m. (Central Time)** (the "Hearing") in the

Notice of Hearing [Dkt. 3742] in the above-captioned matter, on Hunter Mountain

Investment Trust's ("HMIT" or "Movant") Emergency Motion for Leave to File

003311

Adversary Proceeding [Docket No. 3699] (the "Motion for Leave"), is rescheduled to a future date to be confirmed at the Status Conference now scheduled on April 24, 2023.

This Notice of Rescheduling of Hearing does not change or effect the Notice of Status Conference [Dkt. 3751], filed April 19, 2023, regarding the Status Conference now scheduled for **Monday, April 24, 2023, at 1:30 p.m. (Central Time)**.

This Notice of Rescheduling of Hearing is subject to and without waiving HMIT's procedural and substantive rights and objections, including, without limitation, those stated in HMIT's Response and Reservation of Rights [Docket No. 3748].

DATED: April 21, 2023

*[Remainder of Page Intentionally Left Blank]*

003312

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/ Sawnie A. McEntire_

    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    ***Attorneys for Hunter Mountain Investment Trust***

003313

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340

Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S OBJECTION REGARDING
EVIDENTIARY HEARING AND BRIEF CONCERNING GATEKEEPER
PROCEEDINGS RELATING TO "COLORABILITY"**

Hunter Mountain Investment Trust ("HMIT"), Movant, files this Objection

Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating

to "Colorability," and respectfully shows:

003314

## OVERVIEW

1.        HMIT objects to any evidentiary hearing regarding its Emergency Motion for Leave to file Adversary Proceeding (Doc. 3699), and the related attached declarations (Docs. 3699-2, 3699-3, and 3699-4) and the proposed Adversary Complaint (Doc. 3699-1) ("Adversary Complaint") (collectively the "Emergency Motion for Leave").[1]

2.        The Emergency Motion for Leave does ***not*** involve a summary judgment standard; it does ***not*** involve a substantive inquiry into the merits; it is ***not*** a test of the credibility of witnesses. Rather, as the Fifth Circuit, the Northern District of Texas and circuit courts outside of Texas have concluded: it is a threshold determination involving a standard that is ***not stringent***.

3.        Here, HMIT need show nothing more than some possible validity of its claims. ***At most***, courts analogize "colorable" to a FED. R. CIV. P. 12(b)(6) ("12(b)(6)") standard.  In assessing a complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Courts do not consider evidence outside of the pleadings under 12(b)(6) and, if they do so, then the motion is converted to one under FED. R. CIV. P. 56, and "the parties must be allowed to fully develop the facts, through discovery or otherwise, to support their record." *Hilgeman v. Nat'l Ins. Co. of Am.*, 444 F.2d 446, 448 (5th Cir. 1971); *see* FED. R. CIV. P. 56(d)(2).  Yet here, the Court proposes to

---

[1] The proposed Adversary Complaint is attached as Exhibit 1 to the Emergency Motion for Leave.

003315

conduct an evidentiary hearing on "colorableness"—not just before discovery has been

fully developed, but before the case is even *filed*.

4.      "Colorableness" must be construed according to its ordinary meaning

which, at the highest standard, is analogous to a 12(b)(6) standard which is expressly *not*

evidentiary.  The Emergency Motion for Leave readily satisfies this standard.

## ARGUMENT AND AUTHORITIES

*The Plan Does Not Require An Evidentiary Hearing.*

5.      The Fifth Amended Plan of Reorganization of Highland Capital

Management includes various "gatekeeping" provisions ("Gatekeeping Provisions").[2]

These Gatekeeping Provisions provide for a determination, after notice and hearing,

whether certain claims are "colorable."[3] Pursuant to these Gatekeeping Provisions, HMIT

filed its Emergency Motion for Leave, attaching the proposed Adversary Complaint as

Exhibit 1 to the Motion.  The Emergency Motion for Leave and proposed Adversary

Complaint include substantial, detailed allegations demonstrating that the potential

adversary claims are more than "colorable"—that is, the claims exceed the minimal

*gatekeeping* threshold for filing.

---

[2] Fifth Amended Plan of Reorganization of Highland Capital Management (Doc. 1808) at Article IX(F), pp. 51-52.

[3] *Id*.

003316

6.      A "gatekeeping" protocol, by its own terms, occurs in advance of filing a claim and prior to any Fed. R. Civ. P. 12(b)(6) motion. A Rule 12(b)(6) motion is grounded on whether a Complaint "fails to state a claim upon which relief can be granted" and is considered prior to any discovery **and without an evidentiary hearing**. *See Broyles v. Torres*, 2009 WL 2215781 (S.D. Tex. 2009) (distinguishing Rule 12(b)(6) standard from "frivolous" standard and finding that frivolous standard is a lower bar than Rule 12(b)(6) and does not require discovery or an evidentiary hearing), *aff'd*, 381 Fed. Appx. 370, 373 (5th Cir. 2010) (affirming that discovery and evidentiary hearing were not necessary under either a "frivolous" or Rule 12(b)(6) determination).

7.      Similarly here, as required under Rule 12(b)(6), the Court's determination of whether HMIT's proposed claims are "colorable" should be made in advance of any discovery and without an evidentiary hearing.  *See Broyles v. Torres*, 618 F. Supp. 2d 661, 683 (S.D. Tex. 2009) (Rule 12(b)(6) only requires a complaint to allege facts showing the pleader is entitled to relief). As a general rule, when considering a motion to dismiss under Rule 12(b)(6), "a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir. 2000). The court may consider documents attached to or referred to in the complaint without converting the motion to one for summary judgment.  *See id*.

8.      Nothing in the Gatekeeping Provisions of the Plan provides for, much less requires, an evidentiary hearing on whether a proposed claim is "colorable." Further,

HMIT objects that any requirement of an evidentiary hearing or evidentiary basis for HMIT's "gatekeeping" motion is contrary to applicable legal standards.

***An Evidentiary Hearing on Colorablility is Improper and an Abuse of Discretion.***

9.      The Fifth Circuit quoted *Richardson v. United States*, 468 U.S. 317 (1984), for a definition of a "colorable claim" as one with "***some possible validity***." *See In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) (quoting *Richardson*, 468 U.S. at 326 n. 6). The Fifth Circuit also has made clear that whether a claim is colorable is based on *allegations* rather than merits-based proof: "There is a distinction here between whether a claim is colorable and whether it is meritorious. A plaintiff's claim is colorable if he can *allege* standing and the elements necessary to state a claim on which relief can be granted—whether or not his claim is ultimately meritorious—whether he can *prove* his case." *Id*. at 341 (emphasis in original, bold emphasis added).

10.      A court need not conduct an evidentiary hearing, but must ensure that the claims do not lack any merit whatsoever. To put it another way, the Court need not be satisfied there is an evidentiary basis on the merits of the claims to be asserted. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 and n. 15 (5th Cir. 1988) (allegations were sufficient, and no evidentiary hearing was necessary, to determine that breach of fiduciary duty claim against bankruptcy estate's officers and directors for

[5]

003318

mismanagement of estate was colorable claim).[4] In *Louisiana World Exposition*, the Fifth

Circuit explained: "In light of our analysis, we find that the debtor-in-possession's refusal

to pursue LWE's cause of action against its officers and directors for negligent

management was indeed unjustified. The Committee outlined a colorable claim which, if

pursued successfully, could have greatly increased the value of the estate." *Id*.

11.    "To determine whether a plaintiff has stated a valid or colorable claim, the

Fifth Circuit has **instructed district courts to utilize a similar standard applied to a**

**motion to dismiss under Rule 12(b)(6)**." *Trippodo v. SP Plus Corp*., No. 4:20-CV-04063,

2021 WL 2446204, at *3 (S.D. Tex. May 21, 2021), *report and recommendation adopted*, No.

4:20-CV-04063, 2021 WL 2446191 (S.D. Tex. June 15, 2021) (emphasis added); *Reyes v.*

*Vanmatre*, No. 4:21-CV-01926, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 14, 2021)(quoting the

same); *see also Family Rehabilitation, Incorporated v. Azar*, 886 F.3d 496, 504 n. 15 (5th Cir.

2018) (quoting *Abraham v. Exxon Corp*., 85 F.3d 1126, 1129 (5th Cir. 1996) ("the requirement

of a colorable claim is not a stringent one"). "A plaintiff need show nothing more than

"some possible validity." *Id*. (quoting *Richardson*, 468 U.S. at 326 n. 6).

12.    Other circuit courts have reached similar conclusions. For example, the

Eighth Circuit held that "creditors' claims are colorable if they would survive a motion

to dismiss." *In Re Foster*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), *aff'd* 602 Fed. Appx. 356

---

[4] In *Louisiana World Exposition*, when stating that an evidentiary hearing was unnecessary, the court noted that there were no objections to the claim other than the debtor-in- possession's "grave" conflict of interest and his unjustified refusal to bring the claims. *Id*.

(8th Cir. 2015) (per curium); *see also Sabhari v. Mukasy,* 522 F.3d 842, 844 (8th Cir. 2008).

The Ninth Circuit also has held that a claim is considered colorable when it has "some

possible validity."); *See Stanley v. Gonzalez,* 476 F.3d 653, 657 (9th Cir. 2007) ("A colorable

claim is one which is not 'wholly insubstantial, immaterial, or frivolous.'"). The Sixth and

Seventh Circuits have adopted a similar test requiring that the court look only to the face

of the complaint to determine if claims are colorable. *See In re The Gibson Group, Inc.,* 66

F.3d 1436, 1446 (6th Cir. 1995) (relying on similar standard applied in the Second Circuit);

*Panaras v. Liquid Carbonic Indus. Corp.,* 74 F.3d 786, 790 (7th Cir. 1996)("The requirement

of a colorable claim is not a stringent one. This circuit has noted that 'jurisdiction depends

on an arguable claim, not on success' and that only if 'any claim ... must be frivolous is

jurisdiction lacking.'")

13.     In the non-bankruptcy context, the Northern District of Texas District Court

also explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff

must have an 'arguable claim' and not that the plaintiff must be able to succeed on that

claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.,* 207 F. Supp. 2d 570,

577 (N.D. Tex. 2002). Other district courts have reached similar conclusions. *Harry v.*

*Colvin* 2013 WL 12174300, at *5 (W.D. Tex., Nov. 6, 2013, No. 1:13-CV-490-LY)("a claim is

considered colorable when it has some possible validity" and "is not wholly

insubstantial, immaterial, or frivolous"); *American Medical Hospice Care, LLC v. Azar,* 2020

003320

WL 9814144, at *5 (W.D. Tex., Dec. 9, 2020, No. 5:20-CV-757 DAE) ("The requirement of a colorable claim is not a stringent one.").

14.    There is good reason for a non-evidentiary standard. If this Court were to allow evidence, then the issue turns from whether the underlying proposed complaint presents colorable claims to whether HMIT will ultimately be successful in its prosecution of the asserted claims. But, as the cited authority makes clear, that would turn the judicial process on its head. Both proposed plaintiffs and potential defendants must have access to all discovery that would be available in the event of a live adversary proceeding or civil action. Here, this means the Court should not place itself and the parties in the position of having a full pre-trial process and trial to determine whether a complaint can be filed in the first instance. Such an approach would be clear error and an abuse of discretion, constituting a ruling far afield from the standards articulated by the Fifth Circuit.

15.    For these reasons, HMIT objects that an evidentiary hearing on the "colorability" of HMIT's prospective adversary proceeding would be inappropriate and contrary to established law. It would involve introduction of evidence that is not only unnecessary and irrelevant to the "colorability" determination, but also would have to be of broadest scope, so as not to deny HMIT of its right to present its full case on the merits after discovery (if the decision is to be evidence based). Further, HMIT objects that an evidentiary approach would irrationally require putative trial to determine mere

[8]

003321

colorability, which would subject HMIT to higher burdens (both from a legal standard standpoint and from a burden - including associated costs – standpoint) than legally required.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/ Sawnie A. McEntire_
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on the 21st day of April 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

_/s/ Sawnie A. McEntire_
Sawnie A. McEntire

[9]

003322

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S
SUPPLEMENT TO EMERGENCY MOTION FOR LEAVE TO FILE
<u>VERIFIED ADVERSARY PROCEEDING</u>**

Hunter Mountain Investment Trust ("<u>HMIT</u>"), Movant, files this Supplement to

Emergency Motion for Leave to File Verified Adversary Proceeding (the "<u>Supplement</u>"),

both in its individual capacity and on behalf of the Reorganized Debtor, Highland Capital

Management, L.P. ("<u>HCM</u>" or "<u>Reorganized Debtor</u>") and the Highland Claimant Trust

003323

("Claimant Trust") (the Reorganized Debtor and Claimant Trust are collectively the "Highland Parties") against Muck Holdings, LLC ("Muck"), Jessup Holdings LLC ("Jessup"), Farallon Capital Management, L.L.C. ("Farallon"), Stonehill Capital Management LLC ("Stonehill"), James P. Seery, Jr. ("Seery") and John Doe Defendants Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendants Nos. 11-10 are collectively "Respondents" or "Proposed Defendants").[1]

## OVERVIEW

1.      This Supplement is not intended to amend or supersede the Emergency Motion for Leave to File Verified Adversary Proceeding (Doc. 3699) ("Emergency Motion for Leave"); rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action.

2.      Recent events make clear that (1) Seery, as Trustee, has a conflict of interest which precludes him from bringing the proposed claims; and (2) Seery, as Trustee, has abandoned and actively attempted to avoid a merits-based determination of the proposed claims. These facts are set forth in a revised Adversary Complaint attached to this Supplement as Exhibit 1-A.

---

[1] All capitalized terms not otherwise defined herein have the meaning ascribed to them in HMIT's Emergency Motion for Leave.

003324

3.      The revised Adversary Complaint also re-postures the Highland Parties as nominal defendants to address any procedural issues. Although the Court may authorize HMIT to bring the derivative action on behalf of the Highland Parties as Plaintiffs, their joinder as nominal defendants is also a recognized pleading practice. This recharacterization ***does not change*** the substance of the derivative action, which remains for the benefit of the Highland Parties.

4.      Additional factual allegations are set forth in the revised Adversary Complaint. These additional allegations do not alter the substantive nature of the proposed causes of actions.

5.      This Supplement is timely. The hearing will be scheduled no earlier than May 18, 2023. As such, the Respondents have at least 25 days from the filing of this Supplement before any scheduled hearing.

## RECENT EVENTS RELATED TO EMERGENCY MOTION FOR LEAVE

6.      On March 28, 2023, HMIT filed its Emergency Motion for Leave, seeking leave to represent the Highland Parties in a derivative capacity and seeking damages and other relief on behalf of itself, individually, as well as on behalf of the Reorganized Debtor and the Claimant Trust.

7.      HMIT also filed its Application for Expedited Hearing on its Emergency Motion for Leave ("Application") seeking a hearing prior to April 16, 2022. In its Application, HMIT presented what it believed was good cause under Rule 9006 of the

003325

Federal Rules of Bankruptcy Procedure to authorize a shortened time for a response and hearing.

8.     On March 30, 2023, the so-called "Highland Parties," which then also included Seery (Doc. 3707), and separately, Muck, Jessup, Farallon, and Stonehill (Doc. 3704), filed their Objections to the Application. One of the arguments advanced in these Objections by counsel for the "Highland Parties" was that the Court should delay a ruling on HMIT's Application so Seery and other parties could develop a potential statute of limitations defense.

9.     Regarding the proposed claims, Seery attempted to avoid the claims to protect his own self-interest *at the expense of* the Highland Parties and HMIT. Seery unilaterally characterized the Highland Parties as the "Highland Defendants" and claimed they were opposed to HMIT's Emergency Motion for Leave. To be clear, HMIT seeks to assert its proposed claims *on behalf of* the Highland Parties, *not against* them.

10.    Because recent events clearly establish HMIT's capacity and standing to bring its derivative claims, a revised Adversary Complaint is attached hereto as **Exhibit 1-A**. In addition to new factual allegations, the revised Adversary Complaint also includes allegations regarding fraudulent concealment and the discovery rule because

003326

these recent events make clear that the Proposed Defendants seek to fabricate a limitations argument which otherwise would not exist.

### ARGUMENTS & AUTHORITIES

11.     Seery has known about HMIT's proposed claims for some time, yet, as Claimant Trustee with a duty to protect the Estate, Seery has made no attempt to prosecute these claims, is possessed of a debilitating conflict of interest and, in fact, has urged this Court to weaponize the gatekeeping protocol to make certain he and the other defendants can better take advantage of a purported statute of limitations defense. *See* Motion, n. 14. (Doc. 3707, ¶¶ 6, 17). Seery has opposed the Emergency Motion for Leave to advance his personal self-interest. Aware that "[t]he Plan does not release . . . Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence," Seery is clearly seeking other means by which to insulate himself.

12.     Seery's recent conduct confirms he is disqualified to bring the Proposed Claims due to his manifest conflict of interest. His recent actions are to the detriment of the Highland Parties and HMIT, making it all the more necessary for the Court to grant HMIT leave to bring the proposed claims. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 (5th Cir. 1988) (granting leave to creditors' committee to bring breach of fiduciary duty claim against bankruptcy estate's officers and directors for mismanagement of the bankruptcy estate due to debtor-in-possession's incapacity to do so due to apparent conflict of interest).

003327

13.     In *Louisiana World Expedition*, the Fifth Circuit explained: "In light of our analysis, we find that the debtor-in-possession's refusal to pursue LWE's cause of action against its officers and directors for negligent management was indeed unjustified. The Committee outlined a colorable claim which, if pursued successfully, could have greatly increased the value of the estate. While the debtor-in-possession's refusal was understandable given the grave conflict of interest implications, we cannot ignore the fact that the creditors' interests in seeing the property of the estate collected were not protected. Where the interests of an estate and its creditors are impaired by the refusal of a trustee or a debtor-in-possession to initiate adversary proceedings to recover property of the estate, we must consider that refusal unjustified." *Id*. at 252.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court:

1. grant HMIT leave authorizing it to file the Adversary Complaint, attached as Exhibit 1-A, as an Adversary Proceeding in this United States Bankruptcy Court for the Northern District of Texas, in its own name and as a derivative action on behalf of the Debtor Highland Capital Management, L.P. and the Highland Claimant Trust, against Muck Holdings, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, Stonehill Capital Management, LLC, James P. Seery, Jr., and John Doe Defendants Nos. 1 – 10 (and against Highland Capital Management, L.P. and the Highland Claimant Trust as nominal defendants to the extent necessary); and

2. further grant HMIT all such other and further relief to which HMIT may be justly entitled.

[6]

003328

Dated: April 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:   <u>*/s/ Sawnie A. McEntire*</u>
       Sawnie A. McEntire
       Texas State Bar No. 13590100
       smcentire@pmmlaw.com
       1700 Pacific Avenue, Suite 4400
       Dallas, Texas 75201
       Telephone: (214) 237-4300
       Facsimile: (214) 237-4340

       Roger L. McCleary
       Texas State Bar No. 13393700
       rmccleary@pmmlaw.com
       One Riverway, Suite 1800
       Houston, Texas 77056
       Telephone: (713) 960-7315
       Facsimile: (713) 960-7347

       ***Attorneys for Hunter Mountain Investment Trust***

003329

## CERTIFICATE OF CONFERENCE

On April 21, 2023,  Hunter Mountain Investment Trust's counsel conferred by telephone, via email, or both with counsel for all Respondents regarding the relief requested in this filing, including John A. Morris, who purports to be representing and acting on behalf of the Reorganized Debtor and the Highland Claimant Trust, Josh Levy and Lindsay Robin on behalf of James P. Seery, and David Schulte on behalf of Muck Holdings, LLC, Jessup Holdings LLC, Stonehill Capital Management LLC, and Farallon Capital Management, L.L.C.  Mr. Morris indicated it can be assumed his clients are opposed until he reviews this filed instrument.  Mr. Levy and Mr. Schulte indicated that their respective clients are neither opposed nor agreed until their counsel has reviewed the contents of this filing.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire


## CERTIFICATE OF SERVICE

I certify that on the 23rd day of April 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

003330

**<u>Exhibit 1-A to Emergency Motion</u>**

Sawnie A. McEntire

Texas State Bar No. 13590100

smcentire@pmmlaw.com

1700 Pacific Avenue, Suite 4400

Dallas, Texas 75201

Telephone: (214) 237-4300

Facsimile: (214) 237-4340


Roger L. McCleary

Texas State Bar No. 13393700

rmccleary@pmmlaw.com

One Riverway, Suite 1800

Houston, Texas 77056

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | |
| **HUNTER MOUNTAIN INVESTMENT** | § | |
| **TRUST, INDIVIDUALLY, AND ON** | § | |
| **BEHALF OF THE DEBTOR** | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P., AND THE** | § | **Adversary Proceeding No. _____** |
| **HIGHLAND CLAIMANT TRUST** | § | |
| | § | |
| **PLAINTIFFS,** | § | |

1

003331

|   |   |
|---|---|
|  | § |
| **v.** | § |
|  | § |
| **MUCK HOLDINGS, LLC, JESSUP** | § |
| **HOLDINGS LLC, FARALLON** | § |
| **CAPITAL MANAGEMENT, L.L.C.,** | § |
| **STONEHILL CAPITAL** | § |
| **MANAGEMENT LLC, JAMES P.** | § |
| **SEERY, JR., JOHN DOE** | § |
| **DEFENDANTS NOS. 1-10,** | § |
|  | § |
| **DEFENDANTS** | § |
|  | § |
| **and** | § |
|  | § |
| **HIGHLAND CAPITAL** | § |
| **MANAGEMENT, L.P., AND THE** | § |
| **HIGHLAND CLAIMANT TRUST,** | § |
|  | § |
| **NOMINAL DEFENDANTS.** | § |

## <u>VERIFIED ADVERSARY COMPLAINT</u>

Hunter Mountain Investment Trust ("<u>HMIT</u>") files this Verified Adversary Complaint ("<u>Complaint</u>") in its individual capacity and as a derivative action on behalf of the Reorganized Debtor, Highland Capital Management, L.P. ("<u>HCM</u>" or "<u>Reorganized Debtor</u>"), and the Highland Claimant Trust ("<u>Claimant Trust</u>") (the Claimant Trust and Reorganized Debtor are collectively referred to as "Nominal Defendants"), (collectively the Nominal Defendants and HMIT, in its various capacities, are referred to as "<u>Plaintiffs</u>") complaining of Muck Holdings, LLC ("<u>Muck</u>"), Jessup Holdings LLC ("<u>Jessup</u>"), Farallon Capital Management, L.L.C. ("<u>Farallon</u>"), Stonehill

003332

Capital Management LLC ("Stonehill"), James P. Seery, Jr., ("Seery"), and John Doe

Defendants Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery, and the John Doe

Defendants Nos. 1-10 are collectively "Defendants"), and would show:

## I. Introduction

### A.   *Preliminary Statement*

1.      HMIT brings this Verified Adversary Complaint ("Complaint") on behalf

of itself, individually, and as a derivative action benefitting and on behalf of the

Reorganized Debtor and the Highland Claimant Trust, as defined in the Claimant Trust

Agreement (Doc. 3521-5) ("CTA").[1] This action has become necessary because of the

wrongful conduct of the Defendants, involving self-dealing, breaches of fiduciary duties,

and aiding and abetting those breaches of duty.

2.      This lawsuit focuses on a scheme involving Seery and his close business

associates and allies. Seery held command of the Debtor, Highland Capital Management,

L.P., in a complex bankruptcy. The Debtor's business involved hundreds of millions of

dollars in assets that were held by the Debtor's Estate in a variety of entities, managed

funds, and other investments. It was not and still is not a narrowly focused business with

---

[1] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate. Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed in HMIT's Emergency Motion for Leave (Doc. 3699).

003333

the type of uncomplicated, transparent assets that almost any potential claim purchaser could meaningfully evaluate. Seery effectively enjoyed despotic control over how these assets were managed, sold, or monetized, and many of his activities were never subject to judicial scrutiny or accountability. Indeed, Seery failed to cause the Debtor to make the financial disclosures required in such proceedings.

3.    Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants ("Defendant Purchasers"), with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims. The Defendant Purchasers paid well over a hundred million dollars to buy these claims without the kind of independent due diligence that would be reasonably expected, if not required, because of their own fiduciary duties to their investors. It made no sense for the Defendant Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk. The counter-intuitive nature of the purchases at issue compels the conclusion that the Defendant Purchasers acted on inside information and Seery's secret assurances of great profits. Indeed, based upon publicly available information, their investment was projected to yield a small return with virtually no margin for error. But as they must have anticipated, they have already recovered the purchase price *and* returns far greater than what was publicly projected,

003334

with the expectation of significant more profits if not deterred. These facts fit classic insider trading activity.

4.      As part of the scheme, the Defendant Purchasers obtained a position to approve Seery's ongoing compensation - to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT. Initially, Seery's compensation package was composed of a flat monthly pay. Now, however, it is also performance based. This allows the Defendant Purchasers to satisfy the *quid pro quo* at the heart of the scheme. Seery would help the Defendant Purchasers make large profits and they would help enrich Seery with big pay days.

5.      To further advance their scheme, the Defendants have participated in the pursuit of contrived litigation against HMIT and others, through litigation sponsored by the Litigation Sub Trust. Upon information and belief, Seery also directed or authorized legal counsel for the Reorganized Debtor and Claimant Trust (who, tellingly, also represented Seery) to oppose HMIT's efforts to obtain leave to file this adversary proceeding. These obstructive tactics are self-serving, with the apparent goals of attempting to: (a) exhaust financial resources in an effort to delay recognition of the vesting of HMIT's interests under the terms of the CTA; (b) reduce the value of HMIT's interests under the CTA; and (c) deprive HMIT of claims relating to breaches of fiduciary duty stemming from the scheme. The Defendants and Litigation Sub Trust have used millions of dollars of assets to finance these obstructive tactics. Every dollar misapplied

003335

by Defendants to further this scheme is damaging to HMIT, the Reorganized Debtor, and the Claimant Trust.

6.    This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and B. R. Rule 7023.1. At the time of the transactions at issue, HMIT held a 99.5% limited partnership in Highland Capital Management, L.P., the Original Debtor. This derivative action is not a collusive effort to confer jurisdiction that the Court would otherwise lack.

7.    This action also is brought subject to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (Doc. 1943, Exhibit A) (the "Plan") Article IX.F. Consistent with such provisions, this action is *not* brought *against* the nominal party Reorganized Debtor or the nominal party Claimant Trust, but as a derivative action on their behalf and for their benefit.[2] Additionally, HMIT is a person or party aggrieved by the conduct of the Defendants and, therefore, HMIT has constitutional standing to bring this action.

**B.    *The Claimant Trust, the Derivative Action, the Futility of Further Demand, Abandonment of Claims, and Conflict of Interest***

8.    Upon the Effective Date, the assets of the bankruptcy estate of Highland Capital Management, L.P., as the Original Debtor (the "Debtor's Estate"), were transferred to the Highland Claimant Trust under the terms of the Plan, and as defined

---

[2] To the extent the Reorganized Debtor and the Claimant Trust are considered necessary parties for the purposes of this derivative action, they have been included as nominal defendants.

003336

in the CTA. These assets include all "causes of action" that the Debtor's Estate had before the Effective Date including, without limitation, the causes of action set forth in this Adversary Proceeding. Furthermore, the Claimant Trust is also managed by the Claimant Trustee, Seery, who has self-servingly and falsely characterized the claims as allegedly meritless (Doc. 3707).

9.        Seery, as Claimant Trustee, breached his fiduciary duties and abandoned the current claims in this Adversary Complaint by objecting to HMIT's Emergency Motion for Leave to File this Adversary Complaint (Doc. 3699) and Application for Emergency Hearing (Doc. 3700). Seery is attempting to weaponize the gatekeeping protocols in the Plan to arm himself and others with potential defense arguments to avoid a merits-based determination of the claims against Seery and the other Defendants. In other words, Seery is attempting to protect his own self-interest *at the expense of* the Reorganized Debtor, the Claimant Trust, and HMIT. Therefore, any demand upon Seery to prosecute the claims in this Complaint would be futile because Seery is a Defendant.

10.      Similarly, the Oversight Board exercises supervision over Seery as Claimant Trustee, and Muck and Jessup are controlling members of the Oversight Board. Any demand upon Muck and Jessup to prosecute these claims would be equally futile because they also filed objections to the expedited prosecution of these or similar claims (falsely characterizing the claims as an alleged waste of judicial resources) (Doc. 3704). Upon

information and belief, Muck and Jessup are also controlled by Farallon and Stonehill, further evidencing the futility of any such demand on Muck and Jessup.

11. All conditions precedent to bringing this derivative action have otherwise been satisfied or waived, and the Defendants are estopped from asserting otherwise. HMIT is an appropriate party to bring this action on behalf of the Reorganized Debtor and the Claimant Trust.

**C.** *Nature of the Action*

12. The insider trading scheme was implemented after confirmation of the Plan, but before the Effective Date. Prior to the Effective Date, HMIT owned 99.5% of the limited partnership interest in the Debtor and was the beneficiary of fiduciary duties owed by Seery.

13. Seery, the Original Debtor's Chief Executive Officer ("CEO") and former Chief Restructuring Officer ("CRO"), wrongfully facilitated and promoted the insider trades by providing material non-public information to Defendant Purchasers concerning the value of assets in the Debtor's Estate. Farallon and Stonehill, who were otherwise strangers to the bankruptcy proceedings, wrongfully purchased the claims through their special purpose entities, Muck and Jessup, based upon this inside information. Seery's dealings with the Defendant Purchasers were not arm's-length, but instead were covert, undisclosed, and collusive.

003338

14.     Motivated by corporate greed, the Defendant Purchasers aided and abetted or, alternatively, knowingly participated in Seery's wrongful conduct. They also breached their own duties as "non-statutory insiders." Because of their long-standing, historical relationships with Seery, and their use of material non-public information, the Defendant Purchasers obtained effective control over various affairs of the Debtor's bankruptcy, including compensation awards to Seery. As such, they became non-statutory insiders.

15.     HMIT was formerly the largest equity holder in the Debtor, holding a 99.5% limited partnership interest. As part of the scheme, Seery is attempting to delay recognition of HMIT's vesting of its interests under the CTA. As an allowed Class 10 Class B/C Limited Partnership Interest and Contingent Trust Interest holder, HMIT's right to recover from the Claimant Trust would be junior to the Reorganized Debtor's unsecured creditors, now known as Claimant Trust Beneficiaries. However, the vast majority of the approved unsecured claims superior to HMIT's interest are those claims wrongfully acquired by the insider trading and the breaches of duty at issue in this proceeding.

16.     By wrongfully soliciting, fostering, and encouraging the wrongful insider trades at issue, Seery violated his fiduciary duties to the Debtor's Estate and to HMIT, including specifically his duty of loyalty and his duty to avoid self-dealing. But Seery was motivated out of self-interest to garner personal benefit by strategically "planting" his allies onto the Oversight Board which, as a consequence, does not act as an independent

board in the exercise of its responsibilities. Rather, imbued with powers to effectively control Seery's compensation, the Defendant Purchasers are postured to reward Seery for their illicit dealings and, upon information and belief, they have done so.

17.     By receiving and acting upon material non-public information concerning the financial condition of the Debtor's Estate, Stonehill and Farallon, acting individually and through special purpose shell entities they created and controlled, directly or indirectly, are also liable for aiding and abetting Seery's breaches of fiduciary duties. By acquiring the claims at issue, Muck and Jessup, the shell entities created and controlled by Stonehill and Farallon, also became non-statutory insiders, and also aided and abetted Seery's breaches of fiduciary duties.

18.     Because of their willful, inequitable misconduct and bad faith, Plaintiffs ask the Court to require the Defendant Purchasers to disgorge their ill-gotten profits and equitably disallow the remaining unpaid balances on the following allowed claims: Claim Nos. 23, 72, 81, 143, 147, 149, 150, 153, 154, 190, and 191 (the "Claims") currently held by Muck and Jessup. Because the Defendant Purchasers received substantial distributions from the Claimant Trust in connection with these Claims, HMIT seeks to disgorge from Defendant Purchasers all such distributions above the Defendant Purchasers' initial investment—compelling restitution of such funds to the Claimant Trust for the benefit of other creditors and former equity pursuant to the waterfall established under the Plan and the CTA. Plaintiffs also ask the Court to require Seery to

003340

disgorge all compensation from the date his collusive conduct first occurred. Alternatively, Plaintiffs seek damages on behalf of the Claimant Trust in an amount equal to all compensation paid to Seery from the onset of his collusive conduct to present.

19.     By this Complaint, Plaintiffs do not seek to challenge the Plan or the Order confirming the Plan.

## II. Jurisdiction and Venue

20.     Pursuant to *Misc. Order No. 33 Order of Reference of Bankruptcy Cases, U.S. District Court for N.D. Texas* (the "Order of Reference"), this Complaint is commenced in the Bankruptcy Court because it is "related to a case under Title 11." The filing of this Complaint is expressly subject to and without waiver of Plaintiffs' rights and ability to seek withdrawal of the reference pursuant to 28 U.S.C. § 157(d), FED. R. BANKR. P. 5011, and Local Bankruptcy Rule 5011-1. Plaintiffs hereby demand a right to a trial by jury of all claims asserted herein and nothing in this Complaint, nor Plaintiffs' compliance with the Order of Reference, shall be deemed a waiver of this right. To the extent necessary, Plaintiffs seek to withdraw the reference at this time.

21.     This Court has jurisdiction of the subject matter and the parties as a "related to" proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and Articles IX.F., and XI. of the Plan.

22.     Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs do **not** consent to the entry of final orders or judgment by the bankruptcy court.

003341

23.    Venue is proper in this district and division pursuant to <mark>28 U.S.C. §§ 1408</mark>
and 1409, and Articles IX.F., and XI. of the Plan.

### III. <u>Parties</u>

24.    HMIT is a Delaware statutory trust that was the largest equity holder in the
Original Debtor, holding a 99.5% limited partnership interest. HMIT is also the holder of
a Contingent Trust Interest in the Claimant Trust, but HMIT should be treated as a vested
Claimant Trust Beneficiary due to Defendants' wrongful conduct and considering the
current value of the Claimant Trust Assets before and after the relief requested herein.
Due to Seery's abandonment of the claims asserted herein, and his patent conflict of
interest, HMIT has constitutional standing and capacity to bring these claims both
individually and derivatively.

25.    The Reorganized Debtor, Highland Capital Management, L.P., is a limited
partnership formed under the laws of Delaware and may be served at its principal place
of business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201. The
Reorganized Debtor is a nominal defendant only, and a primary beneficiary of this
lawsuit.

26.     Pursuant to the Plan and the CTA, the Claimant Trust holds the assets of
the Reorganized Debtor, including the causes of action that accrued to the Debtor's Estate
before the Effective Date. The Claimant Trust is established in accordance with the
Delaware Statutory Trust Act and Treasury Regulatory Section 301.7701-4(d). The

003342

Claimant Trust may be served at its Principal Office where the Claimant Trust is maintained: 100 Crescent Court, Suite 1850, Dallas, Texas 75201. The Claimant Trust is a nominal defendant only, and a primary beneficiary of this lawsuit.

27.    Muck is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Muck has made prior appearances in the Debtor's bankruptcy.

28.    Jessup is a Delaware limited liability company, with its principal office in New York, and may be served with process via its registered agent, Vcorp Services, LLC, at 108 W. 13th Street Suite 100, Wilmington, Delaware 19801. Jessup has made prior appearances in the Debtor's bankruptcy.

29.    Farallon is a Delaware limited liability company, with its principal office in California, and may be served with process at One Maritime Plaza, Suite 2100, San Francisco, CA 94111. Farallon is a capital management company that manages hedge funds and is a registered investment advisor. This Court has personal jurisdiction over Farallon because Farallon's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts requirements and due process considerations.

30.    Stonehill is a Delaware limited liability company, with its principal office in New York, and may be served with process at 320 Park Avenue, 26th Floor, New York, NY 10022. Stonehill is a capital management company managing hedge funds and is a

003343

registered investment advisor. This Court has personal jurisdiction over Stonehill because Stonehill's conduct giving rise to or relating to the claims in this Adversary Proceeding occurred in Texas, thereby satisfying all minimum contacts and all due process considerations.

31.     Seery is an individual citizen and resident of the State of New York. Mr. Seery may be served with process at 100 Crescent Court, Suite 1805, Dallas, Texas 75201.

32.     HMIT separately seeks recovery against John Doe Defendants Nos. 1-10. Farallon has actively concealed the precise legal relationship between itself and Muck. Stonehill also actively concealed the precise legal relationship between itself and Jessup. What is known, however, is that Farallon and Stonehill created these special purpose shell entities, on the eve of the insider trades to acquire ownership of the Claims and to otherwise control the affairs of the Oversight Board. Both Farallon and Stonehill rejected inquiries concerning the exact nature of their relationship with these special purpose entities. Accordingly, HMIT seeks equitable tolling of any statute of limitations concerning claims against unknown business entities or individuals that Farallon and Stonehill may have created and inserted as intermediate corporate layers in the transactions at issue. John Doe Defendants Nos. 1-10 are currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue.

003344

## IV. <u>Facts</u>

### A. *Procedural Background*

33.     On October 16, 2019, the Debtor filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court,[3] which was later

transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on

December 4, 2019.[4]

34.     On October 29, 2019, the U.S. Trustee's office appointed a four-member

Unsecured Creditors Committee ("<u>UCC</u>") consisting of three judgment creditors—the

Redeemer Committee of the Highland Crusader Fund ("<u>Redeemer</u>"); Acis Capital

Management, L.P., and Acis Capital Management GP, LLC (collectively "<u>Acis</u>"); and UBS

Securities LLC and UBS AG London Branch (collectively "<u>UBS</u>")—and an unpaid vendor,

Meta-E Discovery.

35.     Following the venue transfer to Texas on December 27, 2019, the Debtor

filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

---

[3] Doc. 3. Unless otherwise referenced, all documents referencing "Doc." refer to the docket maintained in
Case No. 19-34054-sgj11 (Bankr. N.D. Tex.).

[4] Doc. 1.

003345

*Ordinary Course* ("<u>Governance Motion</u>").[5] On January 9, 2020, the Court signed a

Governance Order granting the Governance Motion.[6]

36.     As part of the Governance Order, an independent board of directors—

which included Seery as one of the selections of the Unsecured Creditors Committee—

was appointed to the Board of Directors (the "<u>Board</u>") of Strand, the Original Debtor's

general partner. The Board then appointed Seery as the Chief Executive Officer in place

of the previous CEO, Mr. James Dondero, as well as the CRO.[7] Seery currently serves as

Trustee of the Claimant Trust under the terms of the CTA and as CEO of the Reorganized

Debtor.[8]

    **B.**   *The Targeted Claims*

37.     In his capacity as the Original Debtor's CEO and CRO, Seery negotiated

and obtained court approval for settlements with several large unsecured creditors

including Redeemer, Acis, UBS, and another major unsecured creditor, HarbourVest

(Redeemer, Acis, UBS, and HarbourVest are collectively the "<u>Settling Parties</u>"), resulting

in the following allowed Claims:

| Creditor | Class 8 | Class 9 |
|----------|---------|---------|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |

---

[5] Doc. 281.

[6] Doc. 339.

[7] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[8] *See* Doc. 1943, Order Approving Plan, p. 34.

003346

| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

As reflected in these settlements, HarbourVest and UBS owned Class 9 claims in addition to Class 8 claims. Class 9 claims were subordinated to Class 8 claims in the distribution waterfall in the Plan.

38.     Each of the Settling Parties sold their Claims to Farallon and Stonehill (or affiliated special purpose entities) shortly after receiving court approval of the settlements. One of these "trades" took place within just a few weeks before the Plan's Effective Date.[9] All of these trades occurred when HMIT held its 99.5% equity stake in the Debtor. Notice of these trades was first provided in filings in the records of the Original Debtor's bankruptcy proceedings, as follows: Claim No. 23 (Doc. 2211, 2212, and 2215), Claim Nos. 190 and 191 (Doc. 2697 and 2698), Claim Nos. 143, 147, 149, 150, 153 and 154 (Doc. 2263), Claim No. 81 (Doc. 2262), Claim No. 72 (Doc. 2261).

39.     Farallon and Stonehill, both of whom are registered investment advisors that manage hedge funds, are acutely aware that they owe fiduciary duties to their investors. Yet, they both invested many tens of millions of dollars, directly or indirectly, to acquire the Claims in the absence of any publicly available information that could provide any economic justification for their investment decisions.

---

[9] Docs. 2697, 2698.

003347

40.     Upon information and belief, Stonehill and Farallon collectively invested an estimated amount exceeding $160 million to acquire the Claims with a face amount of $365 million, but a far lower publicly projected value at the time, and they did so in the absence of any meaningful due diligence. Indeed, Farallon has admitted that it conducted no due diligence but relied on Seery's profit guarantees.

41.     The Defendant Purchasers' investments become even more suspicious because the Debtor, through Seery, provided the *only* publicly available information which, at the time, included pessimistic projections that certain of the Claims would receive partial payment, while the subordinated class of Claims would receive no distribution:

   a.   From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the projected value of HCM's assets dropped over $200 million from $566 million to $364 million.[10]

   b.   HCM's Disclosure Statement publicly projected payment of only 71.32% of Class 8 claims, and 0% of claims in Classes 9-11.[11]

      o   This meant that the Defendant Purchasers invested more than an estimated $160 million in the Claims when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par value on their Class 8 Claims. At best, the Defendant Purchasers would receive a marginal return that could not justify the risk.

_____

[10] Doc. 1473, Disclosure Statement, p. 18.

[11] Doc. 1875-1, Plan Supplement, Ex. A, p. 4.

003348

    c.  Despite the stark decline in the value of the Debtor's Estate and in the midst of substantial reductions in the percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively, again, the "<u>Claims</u>") in April and August of 2021 in the combined estimated amount of at least $163 million.[12]

42.    Upon information and belief, Stonehill, through its special purpose entity, Jessup, acquired the Redeemer Committee's claim for $78 million.[13] Upon information and belief, the $23 million Acis claim[14] was sold to Farallon/Muck for $8 million. Upon information and belief, HarbourVest sold its combined $80 million in claims to Farallon/Muck for $27 million. UBS sold its combined $125 million in claims for $50 million to both Stonehill/Jessup and Farallon/Muck. In the instance of UBS, ***the total projected payout was only $35 million***. Indeed, as part of these transactions, both Farallon and Stonehill purchased Class 9 Claims at a time when the Debtor's Estate projected a zero dollar return on all such Claims.

43.    Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment, Farallon, upon information and belief, indicated it would refuse to sell its stake in the Claims for a 40%

---

[12] Notices of Transfers [Docs. 2212, 2215, 2261, 2262, 2263, 2215, 2297, 2298]. The Acis claim was transferred on April 16, 2021; the Redeemer, Crusader, and HarbourVest claims were transferred on April 30, 2021; and the UBS claims were transferred on August 9, 2021.

[13] July 6, 2021, letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

[14] Seery/HCM have argued that $10 million of the Acis claim is self-funding.

003349

premium or more above its investment—claiming that its stake was far more valuable based upon Seery's assurances. This is a striking admission that Farallon had and used material non-public inside information.

     **C.**    *Material Non-Public Information is Disclosed to Seery's Affiliates at Stonehill and Farallon*

44.    One of many significant assets of the Debtor's Estate was the Debtor's direct and indirect holdings in Metro-Goldwyn-Mayer Studios, Inc. ("MGM").[15]

45.    On December 17, 2020, James Dondero sent an email to Seery. At that time, Dondero was a member of the MGM board, and the email contained material non-public information regarding Amazon and Apple's interest in acquiring MGM.[16] Of course, any such sale would significantly enhance the value of the Debtor's Estate.

46.    Upon receipt of this material non-public information, Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in the Bankruptcy Court seeking approval of the Debtor's settlement with HarbourVest - resulting in a transfer to the Debtor's Estate of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("HCLOF"), which held substantial MGM debt and equity.[17] Conspicuously, the HCLOF interest was not transferred to the Debtor's Estate for distribution as part of the bankruptcy estate, but rather to "to an entity to be

---

[15] *See* Doc. 2229, p. 6.

[16] *See* Adversary Case No. 20-3190-sgj11, Doc. 150-1, p. 1674.

[17] Doc. 1625. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM.

003350

designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[18]

47.      Upon information and belief, aware that the Debtor's stake in MGM afforded a new profit center, Seery saw this and the value of other assets as an opportunity to increase his own compensation. He then enlisted the help of Stonehill and Farallon to extract further value from the Debtor's Estate. This *quid pro quo* included, at a minimum, an understanding that Seery would be well-compensated for the scheme once the Defendant Purchasers, acting through Muck and Jessup, obtained control of the Oversight Board following the Effective Date.

48.      Until 2009, Seery was the Global Head of Fixed Income Loans at Lehman Brothers[19] where, upon information and belief, he conducted substantial business with Farallon. Following the collapse of Lehman Brothers, Seery continued to work with, and indeed represented Farallon as its legal counsel. Seery ultimately joined a hedge fund, River Birch Capital,[20] which, along with Stonehill, served on the creditors committee in other bankruptcy proceedings. GCM Grovesnor, a global asset management firm, held four seats on the Redeemer Committee[21] and, upon information and belief, is a significant investor in Stonehill and Farallon. Grovesnor, through Redeemer, played a large part in

---

[18] Doc. 1625.

[19] Seery Resume [Doc. 281-2].

[20] *Id.*

[21] Declaration of John A. Morris [Doc. 1090], Ex. 1, pp. 15.

003351

appointing Seery as a director of Strand Advisors. Seery was beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farallon.

49.    As successful capital management firms, with advisory and fiduciary duties to their own clients, Stonehill and Farallon typically engage in robust due diligence before making significant investments. Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any* significant profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.

50.    Seery shared with Stonehill and Farallon material *non-public* information concerning certain assets of the Debtor's Estate. Otherwise, it makes no sense that the Defendant Purchasers would have made their multi-million-dollar investments under these circumstances.

51.    Fed. R. Bank. P. 2015.3(a) requires "periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or debtor . . . in which the estate holds a substantial of controlling interest." The purpose of Rule 2015.3 is "to assist parties in interest taking steps to ensure that the debtor's interest in any entity . . . is used for payment of allowed claims against the debtor." Pub. L. 109-8 § 419(b) (2005). However, these reports were not provided, thereby giving the Defendant Purchasers the added benefit of being insiders having access to information that was not made publicly available to other stakeholders.

003352

52.     When questioned at the confirmation hearing regarding the failure to file these reports, Seery explained that he "did not get it done and it fell through the cracks" (Doc. 1905 at 49:18-21). Yet even now—two years later—complete reports identifying the asset values and profitability of each non-publicly traded entity (in which the Reorganized Debtor has or held interests) have not been disclosed. Upon information and belief, this includes several entities including, but not limited to: Highland Select Equity Fund; Highland Select Entity Fund, L.P., Highland Restoration Capital Partners, L.P.; Highland CLO Funding, Ltd.; Highland Multi Strategy Credit Fund, L.P.; Highland Capital Management Korea Limited; Cornerstone Healthcare; Trussway Industries, LLC; Trussway Holdings, LLC; OmniMax International; Targa; CCS Medical; JHT Holdings; and other entities.[22] Upon information and belief, the Reorganized Debtors' interest in some of these entities has been sold,[23] but the sales prices have not been fully disclosed (except as reported by certain purchasers in public SEC filings).

53.     Rather than providing the required reports, only generic information was provided (by way of examples, as "private security," "private portfolio company," and "private equity fund") with a total reported value of $224,267,777.21.[24] Entities were sold

---

[22] *See* Doc. 2229, pp. 6-7; January 29, 2021, Deposition of James P. Seery, Jr., 28:7-29:25.

[23] *See, e.g.*, https://trussway.com/2022/09/01/trussway-joins-builders-firstsource/ (sale of Trussway); https://www.prnewswire.com/news-releases/scionhealth-completes-acquisition-of-cornerstone-healthcare-group-301728275.html (sale of Cornerstone; unsurprisingly, Sidley Austin served as counsel for the purchaser); https://www.prnewswire.com/news-releases/svpglobal-completes-acquisition-of-omnimax-international-301151365.html (sale of OmniMax).

[24] Doc. 247 at p. 12.

003353

without Court approval and without any 2015.3 report filings. In sum, upon information and belief, the Debtor had and the Reorganized Debtor has significant assets in a variety of funds and investments that were not publicly disclosed.

54.    By wrongfully exploiting such material non-public insider information, Stonehill and Farallon—acting through Muck and Jessup—became the largest holders of unsecured claims in the Debtor's Estate with resulting control over the Oversight Board and a front row seat to the reorganization and distribution of Claimant Trust Assets. As such, they were given control (through Muck and Jessup) to approve discretionary bonuses and success fees for Seery from these assets.

      D.    *Distributions*

55.    The MGM sale was ultimately consummated in March 2022 for $6.1 billion in cash, plus $2.5 billion in debt that Amazon assumed and immediately repaid.[25]

56.    HCM and its wholly owned subsidiary, HCMLP Investments, own 50.612% of HCLOF, which, as of December 31, 2021, had a total net asset value of $76.1 million, a substantial amount of which has been monetized.[26] Upon information and belief, HCM's interest in HCLOF was worth at least $38 million.

---

[25] Amazon Q1 2022 10-Q.

[26] Doc. 3584-1, pp. 2, 9, 13, 21.

003354

57.    On or about September 1, 2022, upon information and belief, Trussway was sold to Builder's First Source for $274.8 million, net of cash.[27] Prior to the sale, upon information and belief, Highland Select Equity Fund, L.P. ("HSEF") owned "approximately 90%" of Trussway, and HCM owned 100% of HSEF.[28] Upon information and belief, HCM should have netted at least $247.8 million from the sale of Trussway.

58.    According to HCM's most recent Form ADV, filed on March 31, 2023, HCM currently owns at least $127.5 million in Highland Multi Strategy Credit Fund, L.P., Highland Restoration Capital Partners Master, LP, Highland Restoration Capital Partners, L.P., and Stonebridge-Highland Healthcare Private Equity Fund (collectively, the "Private Funds"), in addition to interests in HCM's client-CLOs and other non-regulatory assets.

59.    Accordingly, and upon information and belief, and based solely on the Reorganized Debtor's interests in Trussway, HCLOF, and the Private Funds, the Reorganized Debtor has over **$413.3 million** in estimated liquid or monetizable assets—which alone exceeds the $397.5 million in general unsecured claims, and indeed *all* allowed claims[29]—notwithstanding the value realized from the Reorganized Debtor's

---

[27] BLDR Q3 2022 10-Q.

[28] Doc. 2229, n. 8.

[29] Doc. 3757, p. 7.

003355

interests in MGM, Trussway, Cornerstone, and other substantial assets that may remain to be monetized.[30]

60.     By the end of Q3 2021, just over $6 million of the projected $205 million available for general unsecured claimants had been disbursed.[31] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[32] Thus, Stonehill (Jessup) and Farallon (Muck) already have received returns that far eclipse their estimated investments. They also stand to make further significant profits on their investments, including distributions on their Class 9 Claims.

61.     As of March 31, 2023, the Claimant Trust has distributed $270,205,592.[33] On a *pro rata* basis, this means that other creditors (excluding Muck and Jessup) have received an estimated $24,332,361.07 in distributions against the stated value of their allowed claims.[34] That leaves an estimated unpaid balance of only $2,456,596.93.

---

[30] See Doc 3662, p. 4 (projecting assets worth at least $663.72 million as of June 1, 2022); *see also* supra, n. 22-23.

[31] Doc. 3200.

[32] Doc. 3582.

[33] Doc. 3757, p. 7.

[34] Stonehill (Jessup) and Farallon (Muck)'s Claims collectively represent an estimated 91% of all Class 8 claims. The other creditors therefore represent an estimated 9%. Upon information and belief, Stonehill (Jessup) and Farallon (Muck) hold 100% of the Class 9 claims.

003356

## V. Causes of Action

**A.**    *Count I (against Seery): Breach of Fiduciary Duties*

62.    The allegations in paragraphs 1-61 above are incorporated herein as if set forth verbatim.

63.    As CEO and CRO of a debtor-in-possession, Seery owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate, including, without limitation, the duty of loyalty and the duty to avoid conflicts of interests, but Seery willfully and knowingly engaged in conduct which conflicted with his fiduciary duties—and he did so out of financial self-interest.

64.    By disclosing material non-public information to Stonehill and Farallon in an effort to gain personal financial benefit, Seery willfully and knowingly breached his fiduciary duties. By failing to disclose the inside trades at issue, including his role in those inside trades, Seery willfully and knowingly breached his fiduciary duties.

65.    As a result of his willful misconduct, Seery was unfairly advantaged by receiving assurances of additional undisclosed compensation and bonuses from the assets of the Debtor's Estate and from the Claimant Trust Assets—to the detriment of other stakeholders, including HMIT.

66.    Seery's misconduct constituted fraud, willful misconduct, and bad faith.

67.    Plaintiffs sue for all actual damages caused by Seery's misconduct. Seery should also be held liable for disgorgement of all compensation he received since his

003357

collusion with the Defendant Purchasers first began. Alternatively, Seery should be disgorged of all compensation paid to him under the terms of the CTA since the Effective Date of the Plan in August 2021.

68.     Alternatively, Plaintiffs are entitled to recover damages measured by all ill-gotten compensation which Seery has received since his first collusive conduct began.

**B.      *Count II (against all Defendant Purchasers and the John Doe Defendants): Knowing Participation in Breach of Fiduciary Duties***

69.     The allegations in paragraphs 1-68 above are incorporated herein as if set forth verbatim.

70.     Seery owed fiduciary duties to HMIT and the Debtor's Estate, and he willfully and knowingly breached these duties. Without limiting the foregoing, Seery owed a duty of loyalty which he willfully and knowingly breached. Seery also owed a duty to not engage in self-interested conduct to the detriment of the Debtor's Estate and innocent stakeholders. Seery willfully and knowingly breached this duty.

71.     The Defendant Purchasers were aware of Seery's fiduciary duties and, by purchasing the Claims and approving bonuses and other compensation for Seery, Stonehill (acting through Jessup) and Farallon (acting through Muck), willfully and knowingly participated in Seery's breaches or, alternatively, willfully aided and abetted such breaches.

72.     Stonehill (Jessup) and Farallon (Muck) unfairly received many millions of dollars in profits and fees—and stand to earn even more profits and fees.

003358

73.     The Defendant Purchasers' misconduct constitutes bad faith, fraud, and willful misconduct.

74.     Plaintiffs sue for all actual damages caused by the Defendant Purchasers' wrongful conduct. The Defendant Purchasers are also liable for disgorgement of all profits Defendant Purchasers earned from their participation in the purchase of the Claims. Plaintiffs also seek damages against the Defendant Purchasers for excessive compensation paid to Seery as part of the covert *quid pro quo* with Seery.

**C.     *Count III (against all Defendants): Conspiracy***

75.     The allegations in paragraphs 1-74 above are incorporated herein as if incorporated herein verbatim.

76.     Defendants conspired with each other to unlawfully breach fiduciary duties to HMIT and the Debtor's Estate, and to conceal their wrongful trades.

77.     Seery's disclosure of material non-public information to the Defendant Purchasers and Seery's receipt of additional compensation as a *quid pro quo* for the insider-claims trading are overt acts in furtherance of the conspiracy.

78.     HMIT's interest in the residual of the Claimant Trust Assets has been adversely impacted by this conspiracy. The assets have been depleted by virtue of Seery's compensation awards.

79.     All Defendants' misconduct constitutes bad faith, fraud, and willful misconduct.

003359

80.     Plaintiffs sue for all actual damages caused by the Defendants' wrongful

conduct. All Defendants should be disgorged of their ill-gotten profits and gains.

81.     Plaintiffs sue all Defendants for damages associated with Seery's

compensation awards pursuant to the scheme.

**D.     *Count IV (against Muck and Jessup): Equitable Disallowance***

82.     The allegations in paragraphs 1-81 above are incorporated herein as if set

forth verbatim.

83.     By purchasing the Claims based on material non-public information,

Stonehill and Farallon, through Jessup and Muck, engaged in inequitable conduct.

84.     By earning significant profits on their purchases, Muck and Jessup have

been unfairly advantaged.

85.     Muck and Jessup's misconduct constitutes bad faith, fraud, and willful

misconduct.

86.     Given this willful, inequitable, and bad faith conduct, equitable

disallowance of Muck's and Jessup's Claims to the extent over and above their initial

investment is appropriate and consistent with the purposes of the Bankruptcy Code.

87.     Pleading in the alternative only, subordination of Muck's and Jessup's

General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all

other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is

003360

necessary and appropriate to remedy Muck's and Jessup's wrongful, willful, and bad
faith conduct, and is also consistent with the purposes of the Bankruptcy Code.

> **E.**    *Count V (against all Defendants): Unjust Enrichment and Constructive Trust*

88.    The allegations in paragraphs 1-87 above are incorporated herein as if set
forth verbatim.

89.    By acquiring the Claims using material non-public information, Stonehill
and Farallon were unjustly enriched and gained an undue advantage over other creditors
and former equity.

90.    All Defendants' misconduct constitutes bad faith, fraud, and willful
misconduct.

91.    Allowing Stonehill, Farallon, Muck, and Jessup to retain their ill-gotten
benefits would be unconscionable.

92.    Stonehill, Farallon, Muck, and Jessup should be forced to disgorge all
distributions over and above their original investment in the Claims as restitution for
their unjust enrichment.

93.    The proceeds Stonehill, Farallon, Muck, and Jessup have received from the
Claimant Trust are traceable and identifiable. A constructive trust should be imposed on
such proceeds to secure the restitution of these improperly retained benefits.

94.    Seery was also unjustly enriched by his participation in this scheme and he
should be required to disgorge or restitute all compensation he has received from the

003361

outset of his collusive activities. Alternatively, he should be required to disgorge and restitute all compensation received since the Effective Date. A constructive trust should be imposed on all such funds to secure the restitution of these improperly obtained benefits.

**F.**     *Count VI (Against all Defendants): Declaratory Relief*

95.     The allegations in paragraphs 1-94 above are incorporated herein as if set forth verbatim.

96.     HMIT seeks declaratory relief. The Court has jurisdiction to provide declaratory judgment relief when there is an actual controversy that has arisen and exists relating to the rights and duties of the parties.

97.     Bankruptcy Rule 7001 provides that "a proceeding to recover property or money," may include declaratory relief. *See*, Fed. R. Bank P. 7001(1), (9).

98.     The CTA  is governed under Delaware law. The CTA incorporates and is subject to Delaware trust law.

99.     HMIT seeks a declaration, as follows:

   a.  There is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement;

   b.  HMIT has standing to bring an action even if its interest is considered contingent and because it is an aggrieved party and enjoys constitutional standing;

   c.  HMIT has capacity and standing to bring these claims derivatively because Seery, as Trustee, has abandoned the claims;

003362

d. HMIT has capacity and standing to bring these claims derivatively because Seery, as Trustee, and Muck and Jessup have a conflict of interest;

e. HMIT is an appropriate party to bring the derivative action on behalf of the Reorganized Debtor and the Claimant Trust;

f. Alternatively, HMIT's status as a Claimant Trust Beneficiary is fully vested now;

g. HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement by Muck and Jessup, and by extension, Farallon and Stonehill, of their ill-gotten profits;

h. HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments. Alternatively, HMIT's status as a Claimant Trust Beneficiary is fully vested when all of Muck's and Jessup's trust interests are subordinated to the trust interests held by HMIT;

i. Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of Seery's conduct, bad faith, willful misconduct, and unclean hands;

j. Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct, and unclean hands; and

k. All Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct, and unclean hands.

003363

## VI. <u>Punitive Damages</u>

100.    The allegations in paragraphs 1-99 above are incorporated herein as if set forth verbatim.

101.    The Defendants' misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others. An award of punitive damages as allowed by law is appropriate and necessary under the facts of this case.

## VII. <u>Conditions Precedent</u>

102.    All conditions precedent to recovery herein have been satisfied or have been waived.

## VIII. <u>Fraudulent Concealment and Equitable Tolling</u>

103.    The allegations in paragraphs 1-102 above are incorporated herein as if set forth verbatim.

104.    The illicit conduct of Defendants as described herein was concealed from Plaintiffs, who did not know, and could not reasonably discover, either that conduct of Defendants or the injury that would result. Specifically, as described herein, Defendants conspired to trade on material nonpublic information in breach of duties to the Original Debtors and Debtor's Estate. Defendants used deception to conceal the causes of action alleged herein and continue to refuse formal and informal discovery requests of facts, information, and documents related to the Plaintiffs' claims. HMIT reasonably relied on

003364

Defendants' deceptive representations, and otherwise exercised all diligence in this matter, yet the causes of action were inherently undiscoverable.

105.    Defendants continued to engage in the illicit practices described herein, and consequently, Plaintiffs were continually injured by Defendants' illicit conduct. Therefore, Plaintiffs submit that each instance that one or more of the Defendants engaged in the conduct complained of in this action constitutes part of a continuing violation and operates to toll the statutes of limitation applicable to all causes of action in this matter.

106.    Defendants' conduct was and is, by its nature, self-concealing. In addition, Defendants, through a series of affirmative acts and omissions, suppressed the dissemination of truthful information regarding their illicit conduct, and have actively foreclosed Plaintiffs from learning of their illicit, unfair, self-dealing, disloyal, and/or deceptive acts.

107.    To the extent that one or more of the Defendants asserts a defense of statute of limitations or other time-based defense, they are estopped from doing so and Plaintiffs affirmatively pleads fraudulent concealment should toll or otherwise prevent application of any alleged statute of limitation defense. Plaintiffs further affirmatively plead equitable estoppel.

108.    By reason of the foregoing, Plaintiffs' claims on behalf of itself and on behalf of the Highland Parties are timely under any applicable statute of limitations, pursuant

003365

to the discovery rule, pursuant to the equitable tolling doctrine, pursuant to fraudulent concealment, and/or pursuant to any other applicable tolling doctrine.

## IX. <u>Jury Demand</u>

109.    Plaintiffs hereby demand a right to a trial by jury of all claims asserted herein involving triable issues of fact.

## X. <u>Prayer</u>

WHEREFORE, Plaintiffs pray for judgment against each of the Defendants as follows:

1.    That all Defendants be cited to appear and answer herein;

2.    Finding that HMIT has capacity and standing to bring these claims individually and derivatively because Seery, as trustee, has abandoned the claims and has a conflict of interest;

3.    Finding that HMIT has capacity and standing to bring these claims individually and derivatively because Muck and Jessup have a conflict of interest;

4.    Awarding equitable disallowance of the Claims over and above Muck's and Jessup's original investments (or, alternatively, subordination of their Claimant Trust Interests, as addressed herein);

5.    Awarding disgorgement of all funds distributed from the Claimant Trust to the Defendant Purchasers and any John Doe Defendants over and above their original investments;

6.    Awarding disgorgement of all compensation paid to Seery from the date of his first collusive activities, or alternatively, from the Effective Date;

7.    Imposition of a constructive trust as to all ill-gotten profits received by the Defendant Purchasers and any John Doe Defendants;

8.    Awarding declaratory relief as described herein;

003366

9.      Awarding actual damages as described herein;

10.      Awarding exemplary damages as described herein;

11.      Awarding pre-judgment and post-judgment interest at the highest rate allowed by law; and

12.      Awarding all such other and further relief to which Plaintiffs may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: /s/ _____

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

003367

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )   Case No. 19-34054-sgj-11
    In Re:                          )   Chapter 11
                                    )
    HIGHLAND CAPITAL                 )   Dallas, Texas
    MANAGEMENT, L.P.,                )   April 24, 2023
                                    )   1:30 p.m. Docket
        Reorganized Debtor.          )
                                    )   - DUGABOY INVESTMENT TRUST AND
                                    )     HUNTER MOUNTAIN INVESTMENT
                                    )     TRUST'S MOTION FOR LEAVE TO
                                    )     FILE PROCEEDING (3662)
                                    )   - STATUS CONFERENCE RE: MOTION
                                    )     FOR LEAVE TO FILE VERIFIED
                                    )     ADVERSARY PROCEEDING FILED
                                    )     BY CREDITOR HUNTER MOUNTAIN
                                    )     INVESTMENT TRUST (3699)
    _____)

                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.

    WEBEX APPEARANCES:

    For the Reorganized           John A. Morris
    Debtor:                       PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
                                  (212) 561-7700

    For The Dugaboy               Deborah Rose Deitsch-Perez
    Investment Trust, et al.:     STINSON, LLP
                                  2200 Ross Avenue, Suite 2900
                                  Dallas, TX  75201
                                  (214) 560-2201

    For Hunter Mountain           Sawnie A. McEntire
    Investment Trust:             PARSONS MCENTIRE MCCLEARY, PLLC
                                  1700 Pacific Avenue, Suite 4400
                                  Dallas, TX  75201

    For Hunter Mountain           Roger L. McCleary
    Investment Trust:             PARSONS MCENTIRE MCCLEARY, PLLC
                                  One Riverway, Suite 1800
                                  Houston, TX  77056
                                  (713) 960-7305
```

2

```
 1   WEBEX APPEARANCES, cont'd.:

 2   For Muck Holdings, et al.:   Brent Ryan McIlwain
                                  HOLLAND & KNIGHT, LLP
 3                                300 Crescent Court, Suite 1100
                                  Dallas, TX  75201
 4                                (214) 964-9481

 5   For James P. Seery, Jr.:     Mark Stancil
                                  Joshua Seth Levy
 6                                WILLKIE FARR & GALLAGHER, LLP
                                  1875 K Street, NW
 7                                Washington, DC  20006
                                  (202) 303-1133
 8
     For James P. Seery, Jr.:     Omar Jesus Alaniz
 9                                REED SMITH
                                  2850 N. Harwood Street, Suite 1500
10                                Dallas, TX  75201
                                  (469) 680-4292
11
     Recorded by:                 Michael F. Edmond, Sr.
12                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
13                                Dallas, TX  75242
                                  (214) 753-2062
14
     Transcribed by:              Kathy Rehling
15                                311 Paradise Cove
                                  Shady Shores, TX  76208
16                                (972) 786-3063

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

003369

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 26-10   Filed 12/07/23   Page 104 of 270   PageID 2653
Main Document   Page 107 of 62

3

1                    DALLAS, TEXAS - APRIL 24, 2023 - 1:39 P.M.

2            THE COURT:  I will now turn to our Highland matters.

3    We have two of them.  The first one we had scheduled I think

4    may have been worked out, but it is the Dugaboy and Hunter

5    Mountain adversary proceeding -- or, well, not adversary

6    proceeding, a motion for leave to file an adversary proceeding

7    regarding valuation.  This is Case No. 19-34054.

8        Who do we have appearing for the Movant this afternoon?

9            MS. DEITSCH-PEREZ:  Good morning, Your Honor.  This

10   is Deborah Deitsch-Perez from Stinson for the Movants.

11           THE COURT:  All right.  Thank you.  Do we have you

12   representing both Movants, Ms. Deitsch-Perez?

13           MS. DEITSCH-PEREZ:  That's correct.

14           THE COURT:  All right.  Mr. Morris, I see you have

15   your video turned on.  You're representing the Debtor today,

16   or Reorganized Debtor; is that correct?

17           MR. MORRIS:  Yes, Your Honor.  Good afternoon.

18           THE COURT:  Good afternoon.

19       Do we have any other appearances on this matter?

20       All right.  Well, am I correct you've worked out something

21   procedurally on this?

22           MS. DEITSCH-PEREZ:  Yeah, let me report.  We have

23   been negotiating over several weeks about information to be

24   provided to the Movants, and additional information was indeed

25   provided on Friday.  I don't know if you've noticed, but the

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 26-10    Filed 12/07/23    Page 105 of 270    PageID 2654
Main Document    Page 107 of 62

4

1    reports have an additional section with some additional

2    information.

3        We're going through it.  We think there are probably still

4    some -- some additional information that we need, and so we

5    will first reach out to Mr. Morris and attempt to negotiate

6    over that information.  And if we are successful, wonderful.

7    If we are unsuccessful, because the Debtor has agreed that a

8    gatekeeper motion is not necessary since the adversary would

9    just be seeking a valuation and not monetary or other relief,

10    we will then proceed to -- if we cannot work things out with

11    the Debtor, we'll proceed to file an adversary, which will be

12    slightly different than the one that was attached to the

13    gatekeeper motion because we will explain what additional

14    information is needed and why the information we have is not

15    sufficient.  So it should narrow the scope of the adversary.

16            THE COURT:  All right.  Thank you.  Mr. Morris,

17    anything you want to add??

18            MR. MORRIS:  Yes, just briefly, Your Honor.  The

19    Reorganized Debtor does not believe Hunter Mountain or Dugaboy

20    is entitled to any information whatsoever.  They certainly

21    have no legal right to the information.  It's why they have to

22    pursue equitable -- an equitable claim.  Not an equitable

23    right, but an equitable claim.

24        Counsel is certainly correct that we negotiated in good

25    faith to try to provide the information that the Reorganized

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 26-10    Filed 12/07/23    Page 106 of 270    PageID 2655
Main Document    Page 107 of 232

5

| | |
|---|---|
| 1 | Debtors believed was -- might be useful to the extent that |
| 2 | someone was really interested in settling the case.  We were |
| 3 | unable to come to an agreement.  So, under Mr. Seery's |
| 4 | leadership, we acted unilaterally.  We produced a wealth of |
| 5 | information on Friday night, including claims data, cash, cash |
| 6 | in reserve, cash in the Claimant Trust, assets, general |
| 7 | descriptions of assets that remain. |
| 8 | If they want to pursue a lawsuit, we'll accept service, |
| 9 | with the proviso that we set forth in our opposition to the |
| 10 | original motion, and that is everybody will be held |
| 11 | accountable for unsupported and unsubstantiated allegations. |
| 12 | But the ball is in their court.  We have produced what |
| 13 | we're prepared to produce.  If they want to continue with |
| 14 | litigation, I guess that's what we'll do. |
| 15 | MS. DEITSCH-PEREZ:  Well, we hope that the Debtor |
| 16 | will continue to negotiate and will hear why we explain -- |
| 17 | when we explain why the information isn't enough.  So, ever |
| 18 | the optimist, I hold out some hope that we will be able to do |
| 19 | this, if not through this proceeding, through the motion for a |
| 20 | greater stay and for mediation that's also before Your Honor. |
| 21 | So, one way or the other, we do hope to resolve this.  If |
| 22 | we can't, we will bring the adversary.  And I thank you, Mr. |
| 23 | Morris, for agreeing to accept service. |
| 24 | THE COURT:  All right.  Just a procedural question. |
| 25 | Ms. Deitsch-Perez, will you be actually withdrawing this |

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/06/23    Page 107 of 270    PageID 2656
Main Document    Page 107 of 270

6

1  motion for leave, or are you all doing some sort of order

2  setting forth what you've all agreed to and announced?  Just

3  let me know, so I know what to be expecting.

4          MS. DEITSCH-PEREZ:  I think we will try to have an

5  agreed order to enforce what we're doing.  If we fail in that,

6  I don't suppose it matters very much.  We can withdraw the

7  application and just proceed to file the adversary.  I'd

8  rather get an agreed order up, though, setting forth that the

9  Debtor has agreed that a gatekeeper is not necessary and that,

10  as a result, we'll be filing the adversary.  So, that's what I

11  hope, Your Honor, we'll get.

12          THE COURT:  All right.  Well, just for the record, it

13  doesn't really matter to me whether you withdraw it or I have

14  an agreed order.  I'm just trying to simplify life.  I know

15  sometimes the Clerk's Office personnel will reach out -- we

16  need an order, we need an order, we need an order -- if

17  there's a motion pending that doesn't have an order to match

18  to it, and I'm just trying to avoid headaches in that regard.

19          MS. DEITSCH-PEREZ:  That's why we'll make it clear

20  what we do one way or the other.

21          THE COURT:  Very good.

22          MR. MORRIS:  Your Honor, just for the Court's

23  convenience, I apologize that I don't have the docket numbers,

24  but the information that we posted and we intended to and did

25  post it on the docket so that it was available to everybody

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10 Filed 12/07/23    Page 108 of 270    PageID 2657

7

1    equally, it's at the back of the two quarterly operating

2    reports.  There's one filed on behalf of the Reorganized

3    Debtor and then there's one filed on behalf of the Claimant

4    Trust.  But I believe the information in the back of each of

5    those reports is the same.

6        So, just in case the Court has any curiosity about what

7    we've disclosed, I just wanted to make sure Your Honor knew

8    where to find it.

9            THE COURT:  Okay.  I've got the docket right in front

10   of me, and I see on Friday Docket No. 3756 was filed by the

11   Reorganized Debtor, Post-Confirmation Report, and then Docket

12   3757 was filed by the Claimant Trust.  So, thank you.  I've

13   noted those if we want to go back and look.

14       All right.  Well, that concludes this Dugaboy/Hunter Trust

15   motion for leave.

16       Let's now turn to the other Hunter Mountain motion for

17   leave.  We have a status conference -- I think it's a hearing

18   on what kind of hearing we're going to have -- on Docket Entry

19   No. 3699.  So we probably have a larger appearance list on

20   this one, so I'll do roll call.

21       Appearing for Hunter Mountain, who do we have?

22           MR. MCENTIRE:  Good afternoon, Your Honor.  This is

23   Sawnie McEntire and my partner Roger McCleary with Parsons

24   McEntire McCleary representing Hunter Mountain.

25           THE COURT:  Okay.  Now I'm going to just do a roll

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 26-10   Filed 12/07/23   Page 109 of 270   PageID 2658
Main Document   Page 107 of 62

8

 1   call.  For the Reorganized Debtor, Mr. Morris, will you be

 2   taking the lead on that?

 3         MR. MORRIS:  Yes, I will, Your Honor.  Good

 4   afternoon.

 5         THE COURT:  Good afternoon.

 6     All right.  We have four, potentially, named Claims

 7   Purchasers.  So I'll ask, who do we have representing Muck

 8   Holdings?

 9         MR. MCILWAIN:  Your Honor, Brent McIlwain here from

10   Holland & Knight.  I represent Farallon Capital Management,

11   Stonehill Capital Management, Muck Holdings, and Jessup

12   Holdings, LLC.

13         THE COURT:  Okay.  So you represent all four of the

14   Claims Purchasers?

15         MR. MCILWAIN:  That's correct, Your Honor.

16         THE COURT:  All right.  James Seery is a potential

17   Defendant identified.  Who do we have representing Mr. Seery?

18         MR. STANCIL:  Good afternoon, Your Honor.  This is

19   Mark Stancil from Willkie Farr & Gallagher.  I'm joined by my

20   colleague Josh Levy and our co-counsel from Reed Smith, Omar

21   Alaniz.

22         THE COURT:  All right.  Thank you.

23     Do we have any other lawyers appearing in this?

24         MR. STANCIL:  I think that's it, Your Honor.

25         THE COURT:  All right.  Well, so, again, I think

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 26-10    Filed 12/07/23    Page 110 of 270    PageID 2659
Main Document    Page 110 of 270

9

1   we're having a hearing on what kind of hearing we're going to

2   have on your motion for leave, Mr. McEntire.  What did you

3   want to say?

4           MR. MCENTIRE:  Well, that's correct, Your Honor.

5   Good afternoon again.

6       I think there are several issues before the Court during

7   this status conference.  One is the date of the hearing.  I

8   think we certainly preliminarily had agreed over the last 10

9   days that May 18 was the logical date in light of the motion

10  practice.

11      The length of the hearing, Mr. Morris has suggested over

12  four hours or approximately four hours.  I've suggested one

13  and a half hours.

14      And then there is an issue about whether or not evidence

15  should be allowed.

16      There is a fourth issue that I just want to make sure that

17  the Court is aware.  I don't want to be accused of waiting

18  this issue as the proceedings progress.  And that is we have

19  raised an issue about Mr. Morris's representation and whether

20  he has a conflict of interest.  We did this in writing in our

21  reply brief several weeks ago.  As a consequence, Mr. Seery

22  now has new counsel, Mr. Morris of course to represent the

23  Highland parties, the Reorganized Debtor and the Claimant --

24  the Highland Claimant Trust.  We are concerned that he has a

25  conflict of interest.  It is unclear from whom he is taking

003376

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 111 of 270   PageID 2660

10

1    his direction or from whom he is deriving his authority.

2        And equally important if not more important, he is taking

3    positions that are inconsistent with the best interests of the

4    Reorganized Debtor and the Claimant Trust.

5        I don't think this is the type of issue that could be

6    resolved today.  However, I want to make sure it's on the

7    record so I'm not accused of waiting as we proceed.  But

8    otherwise, it's the date of the hearing, the length of the

9    hearing, and whether or not evidence is allowed.

10        I'm prepared to address the merits of our thoughts on each

11    of those last three -- the date, the length, and the evidence

12    issues -- if the Court wishes, or I could wait until after

13    other counsel have made their comments.  But I'm prepared to

14    move forward as the Court wishes.

15            THE COURT:  All right.  Well, I am not going to

16    address a conflicts of interest issue today.  I think I heard

17    you saying you don't anticipate the Court would.  But I don't

18    have any sort of pleading in front of me on that, so we'll

19    just make that clear from the get-go.

20        One of the reasons I'm making that clear from the get-go

21    is I have not read the brief you filed I don't know what time

22    on Friday, Docket No. 3758, Mr. McEntire.  And then I see an

23    objection you filed Friday, Docket No. 3761.  And then last

24    night at 9:30 a supplemental support document.  I take it none

25    of --

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 112 of 270   PageID 2661

11

1          MR. MCENTIRE:  Right.

2          THE COURT:  -- these issues raised the conflict of

3     interest issue.

4          MR. MCENTIRE:  We addressed the conflicts of issues

5     in -- certainly in our filing last night.  But the brief on

6     Friday and the objection on Friday is addressing the Court's

7     email and Mr. Morris's request to hold an evidentiary hearing.

8     And we oppose that.  We object to the conduct of an

9     evidentiary hearing.  And the brief that we filed -- the

10    objection we filed was supported by case law.  I've seen

11    nothing from Mr. Morris or any of the other counsel in the

12    case responding to our objection or the cases we've cited.

13       But Your Honor, if you wish, I could just move forward

14    right now and address the evidentiary issue, if you wish.

15         THE COURT:  All right.  Well, I'm backing up.  This

16    shows 9:10 a.m. this morning, the 3761.  Am I on the wrong

17    thing?

18         MR. MCENTIRE:  I think you're -- what we did this

19    morning at Mr. Morris's request is we sent in a redline

20    version of the revised complaint to the Court's attention.

21    The actual revised complaint was filed last night, and all

22    that was done this morning was, at Mr. Morris's request, to

23    facilitate his review of the new complaint, was to redline it.

24         THE COURT:  All right.  Well, and then, okay, the

25    brief you filed was at 4:55 p.m. Friday.

003378

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 113 of 270   PageID 2662

12

1        MR. MCENTIRE:  Yes, ma'am.

2        THE COURT:  I can assure you, we were still all

3   working then, but unless you notify my courtroom deputy that

4   you have filed something sort of on the eve of a hearing,

5   we're not necessarily in chambers going to go back and scroll

6   the docket.  We had court on other matters this morning, so we

7   were focused on that.  I've not seen your brief.  But anyway,

8   you can argue obviously what you want to argue.

9      Okay.  So let's talk about -- I think you wanted to talk

10  about evidence first.

11       MR. MCENTIRE:  Yes, ma'am.

12       THE COURT:  So I'm happy to hear about that topic

13  first.  Because, obviously, the other issues -- length of

14  hearing, date of hearing -- hinge on that.  So what do you --

15       MR. MCENTIRE:  I agree.

16       THE COURT:  What do you say about this?

17       MR. MCENTIRE:  All right.  Well, earlier, I think,

18  last week, or perhaps it was the end of the previous week, Mr.

19  Morris had issued an email requesting a four-hour hearing

20  because he wanted to cross-examine Mr. Dondero and otherwise

21  have a full-blown evidentiary hearing.  Opening statements,

22  final argument, and witness examinations.

23      We responded immediately by email objecting to the

24  evidentiary format.  There was a series of exchanges between

25  my office, Mr. Morris's office, and your chambers, Your Honor,

003379

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10 ePartFiled 2/07/23  PageID 2663
Main Document   Page 114 of 270   Page 114 of 270

13

1   where Ms. Ellison indicated that you were initially inclined

2   to grant an evidentiary hearing.

3       That was followed by an email on April 19th of last week

4   where you suggested in your email that the issue of

5   colorability, which is really the gatekeeper function that the

6   Court's serving, as the Court is aware, that the standard for

7   colorability was somehow greater than the standard for

8   plausibility under a 12(b)(6) motion.

9       In the email, Ms. Ellison suggested that it was perhaps

10  the Court's initial thinking that there was a higher hurdle

11  associated with the gatekeeping function than a traditional

12  12(b)(6) inquiry.

13      We have done substantial research following that email

14  exchange, and I will also point out to the Court we actually

15  briefed the 12(b)(6) standard in our original emergency motion

16  for leave.  So this is not new to us.  We had actually briefed

17  it originally in our original motion that was filed back in

18  late March.  March 28th, I believe.

19      But in light of the Court's communication, we did further

20  research.  We have found no cases that suggest that the

21  inquiry for colorability is greater than the plausibility

22  standard under *Twombly*.  In fact, we found cases that suggest

23  just the opposite.  The *Gonzalez* case which was cited is a

24  Northern District of Texas case.  It was a gatekeeper case.

25  Not a bankruptcy case.  But it was a gatekeeper case on an

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10 Filed 12/07/23 Page 115 of 270   PageID 2664
Main Document    Page 107 of 82

14

1   ERISA claim that simply said that the plaintiff simply had to

2   be able to establish an arguable claim.

3        The *Deepwater Horizon* case, which is a Fifth Circuit case,

4   also states that the case -- the claim must only have some

5   possible validity.

6        So the threshold inquiry is very, very low.  Evidence is

7   not allowed.

8        The *Gonzalez* case also suggested that the Court, similar

9   to a 12(b)(6) inquiry, is limited to the four corners of the

10  principal pleading -- in this case, the complaint, or now the

11  revised complaint.

12       So we don't believe that --

13            THE COURT:  So, Mr. McEntire, --

14            MR. MCENTIRE:  Yes, Your Honor.

15            THE COURT:  -- let me -- help me with this.  I'm

16  walking through -- because obviously the question we're

17  drilling down on is what is the appropriate legal standard for

18  the Court to apply --

19            MR. MCENTIRE:  Yes.

20            THE COURT:  -- in performing the gatekeeping

21  function.  So I started the same place I guess you and

22  everyone else started, and that is with the plan, the

23  gatekeeping provision in the plan.  And it starts on the

24  bottom of Page 50 and goes over to 51.

25       And you probably discovered, the same as I discovered,

Case 19-34054-sgj11 Doc 3765 Filed 04/25/23 Entered 04/25/23 11:44:33 Desc
Case 3:23-cv-02071-E Document 28-10 Filed 12/07/23 Page 116 of 270 PageID 2665
Main Document Page 107 of 82

15

1   that it doesn't give the appropriate legal standard. It just

2   says that the Bankruptcy Court -- that no enjoined party may

3   commence or pursue a claim or cause of action of any kind

4   against any protected party without the Bankruptcy Court --

5   turn over to Page 51 -- first determining, after notice and a

6   hearing, that such claim or cause of action represents a

7   colorable claim of any kind. And then the last sentence of

8   that paragraph: "The Bankruptcy Court will have sole and

9   exclusive jurisdiction to determine whether a claim or cause

10  of action is colorable."

11      Okay? So all that really tells us is that there has to be

12  notice and a hearing. That doesn't say what kind of hearing,

13  evidentiary or otherwise, and doesn't elaborate on colorable.

14      So, beyond that, here was my legal thinking. And maybe

15  this is all fully explored in your brief. I just don't know.

16  I thought, well, what legal standard do Bankruptcy Courts

17  apply in the *Barton Doctrine* context when someone is seeking

18  leave to sue a bankruptcy trustee? And then I thought, what

19  legal standard do Bankruptcy Courts apply in a *Louisiana World*

20  *Exposition*-type context if an unsecured creditors' committee

21  or other party brings a *Louisiana World Exposition* motion,

22  saying, we'd like leave to sue a party because the debtor-in-

23  possession is conflicted or whatever reason.

24      And so before we get to *Deepwater Horizon* and the other

25  cases, did you find any legal authority in the *Barton Doctrine*

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Main Document   Filed 12/07/23   Page 107 of 82   Page 117 of 270   PageID 2666

16

1   context that you think sheds light?  Because that seems to me

2   the most analogous context, right?

3           MR. MCENTIRE:  Specifically to answer -- to respond

4   to your question directly, the answer is no.  What we did find

5   specifically, though, was the case, as I'd indicated, the

6   Fifth Circuit directs that a 12(b)(6) standard be applied to

7   the issue of colorability.  And that's the *Trippodo* case.

8           THE COURT:  The what case?

9           MR. MCENTIRE:  And that's also cited -- the *Trippodo*.

10  T-R-I-P-P-E-D-O [sic].  That is a Southern District of Texas

11  case that cites a Fifth Circuit precedent that directs that a

12  12(b)(6) standard be used as a template, if you will, for

13  determining colorability.  And we've also cited that in our

14  brief.

15          THE COURT:  And that, was that the one that was in an

16  ERISA context?

17          MR. MCENTIRE:  No, ma'am.  That was *Gonzalez*.  And

18  that's cited on Page 7 of our brief.

19          THE COURT:  And so --

20          MR. MCENTIRE:  That was a gatekeeper -- a gatekeeper

21  issue.  Before you -- you have to satisfy certain criteria

22  before the Court will allow the ERISA to even be filed, the

23  ERISA claim to even be filed.  And so it was akin to a

24  gatekeeper function.  And they applied specifically a

25  colorability or 12(b)(6) standard.

1          THE COURT:  I'm sorry.  What was the context?  What

2    was -- who was seeking to sue whom over what in the *Trippodo*

3    case?

4          MR. MCENTIRE:  The -- it was an ERISA claim.  It was

5    in the -- I believe it's the Northern --

6          THE COURT:  Oh, I thought you said is not an ERISA

7    claim.

8          MR. MCENTIRE:  Well, no, I apologize.  I may have

9    sorted my words.  It was an ERISA claim.  It was in the

10   Northern District of Texas, I believe.  I have it right here.

11   One second.  Yes, it's Northern District of Texas.  It's a

12   2002 case.  It was dealing with the amendment of pleadings to

13   bring forth an ERISA claim.  And the issue there is whether or

14   not there's a colorable claim or whether it was frivolous or

15   futile.  And the court determined that a -- that before you

16   even get to the 12(b)(6) level -- this case can actually stand

17   for the proposition that it's -- that it's even less than a

18   12(b)(6) standard.  But before you even get there, you have to

19   address it from a futility or frivolity or is there any

20   evidence.  The actual words that are used are, one second,

21   "any arguable claim."

22          THE COURT:  Okay.

23          MR. MCENTIRE:  Not plausibility.  Not on the merits.

24   But any arguable claim.  It's the lowest of possible

25   thresholds.

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Main Document   Filed 12/05/23   Page 107 of 82   Page 119 of 270   PageID 2668

18

```
 1                THE COURT:  All right.  Well, --

 2                MR. MCENTIRE:  And that's --

 3                THE COURT:  -- so, but just to be clear, you didn't

 4      find anything in the Barton Doctrine context out there?

 5                MR. MCENTIRE:  I did not.

 6                THE COURT:  And what about --

 7                MR. MCENTIRE:  Now, to be honest --

 8                THE COURT:  Say again?

 9                MR. MCENTIRE:  To be clear, I did not -- I did not --

10      I apologize.  We did not specifically look at Barton.  I'll be

11      glad to do that and supplement as necessary.

12                THE COURT:  Okay.  And Louisiana World, you didn't

13      find anything that would shed light in that line of cases?

14                MR. MCENTIRE:  I think we did.  I believe Louisiana

15      World supports our position here.

16                THE COURT:  It says what legal standard applies?

17                MR. MCENTIRE:  One second.  One second, Your Honor,

18      please.

19           (Counsel confer.)

20                MR. MCENTIRE:  One moment, please, Your Honor.

21           (Counsel confer.)

22                MR. MCENTIRE:  Can I -- I might have to supplement

23      that.  I have someone looking for it right this second.

24           (Counsel confer.)

25                MR. MCENTIRE:  It was a conflict issue.
```

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 120 of 270    PageID 2669
Main Document    Page 107 of 82

19

1           (Counsel confer.)

2           MR. MCENTIRE:  The *Louisiana World* case, it was a

3    little bit off topic.  It had to do with a conflict of

4    interest where the creditors' committee had a conflict on

5    (inaudible) and the Court determined that the case should go

6    forward.  And --

7           THE COURT:  I know it was a different context.  I'm

8    just trying to find something analogous to this gatekeeper

9    motion.  And the most analogous things I could think of was

10   motions for leave that have been filed in a Bankruptcy Court

11   pursuant to the *Barton Doctrine*, wanting to sue a bankruptcy

12   trustee, where the Bankruptcy Court acts as a gatekeeper, and

13   then a *Louisiana World*-type situation where a creditors'

14   committee files a motion seeking leave to sue somebody,

15   arguing the debtor is not doing it, for either conflicts or

16   some other reason.

17      All right.  So, assuming your case authority is the

18   guiding authority here and it's a Rule 12(b)(6)-type context,

19   you're saying I should look at the four corners of the

20   documents, or anything else the Fifth Circuit has said I can

21   look at, take judicial notice of, in a 12(b)(6) context and

22   not hear evidence?

23      But part of the reason we're having this dispute, right,

24   is because you've put forward some evidence?  Do I understand

25   that correctly?  And I have not dove into weeds on this yet,

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Main Document   Filed 12/07/23   Page 120 of 82   Page 121 of 270   PageID 2670

20

1   but I understand there were affidavits submitted by you.

2   Correct?

3           MR. MCENTIRE:  In order to make this determination,

4   you do not need to consider the Dondero affidavits that Mr.

5   Morris has raised.  You do not need to consider any of the

6   documents that are actually associated with our motion.

7       We recognize that the application under the 12(b)(6)

8   standard, you'd be relegated to the four corners of the actual

9   complaint itself -- in this case, the revised complaint.

10      The 12(b)(6) standard is a guide.  We take that to mean

11  that it's a low standard.  It's, at most, a plausibility

12  standard, but we believe actually less.

13      We've provided the Dondero declaration -- declarations,

14  plural; there were two -- together with some documents to give

15  -- provide additional background for the Court.  But Mr.

16  Morris has raised an objection.  And under the circumstances,

17  assuming the Court follows the guideline of the *Trippodo* case,

18  then we would understand the Court would not consider the

19  actual Dondero declarations.

20          THE COURT:  Does that mean you're withdrawing the

21  affidavits?

22          MR. MORRIS:  I object to that, Your Honor.  I really

23  -- I'll let counsel finish.  This is just not right.

24          THE COURT:  Okay.

25          MR. MCENTIRE:  Well, I'm not sure what --

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 23-10    Filed 12/07/23    Page 122 of 270    PageID 2671

21

1          THE COURT:  Your response to that?

2          MR. MCENTIRE:  I think what we're doing is the

3    correct legal statement and articulation of what the law is.

4    Whether Mr. Morris likes it or not, I suppose, you know, with

5    all due deference to Mr. Morris, it's not a question of

6    whether I'm doing something that he likes.  It's what I think

7    is legally correct.  And I think that I've presented that as

8    best as I can to the Court.

9          THE COURT:  Okay.  Well, you never --

10          MR. MCENTIRE:  By the way, --

11          THE COURT:  Assuming I would allow withdrawal of the

12    affidavits, is that what you're seeking to do?

13          MR. MCENTIRE:  Yes.  If the Court is suggesting that

14    if I leave the affidavits attached to the motion that the

15    Court is going to allow this to become, effectively, a trial

16    on the merits -- when it shouldn't be, because that's not what

17    this is about, this is not a test of witness credibility, this

18    is not a test of the ultimate merits of the claim -- if that

19    is the situation that I'm being placed, then the answer is we

20    would not want to withdraw them but we will.

21          THE COURT:  Okay.  Well, you don't want to but you

22    will?  I mean, I --

23          MR. MCENTIRE:  Yes, correct.  We do.

24          THE COURT:  I feel like that means I need to explore

25    this a little, because I don't want -- well, any time

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 123 of 270    PageID 2672
Main Document    Page 123 of 132

22

1    affidavits are put forward in this Court, or I think any other

2    court I know of, parties are always given the chance to cross-

3    examine an affiant or a declarant.  Okay?  We always allow

4    that if there's an objection to the underlying motion.  So, --

5              MR. MCENTIRE:  Well, here, --

6              THE COURT:  -- I just want to make sure you're clear,

7    you put it in and then the other side said, well, we want a

8    chance to cross-examine the affiant.  I allow that --

9              MR. MCENTIRE:  Then --

10             THE COURT:  -- always, a hundred percent, as does

11   every other judge I know.  If there's an affidavit, if someone

12   wants to cross-examine them, obviously, there might be two

13   sides of the story.  So I just want to be clear on what your

14   desired outcome is --

15             MR. MCENTIRE:  Fair enough.  I understand.

16             THE COURT:  -- and request is.

17             MR. MCENTIRE:  I understand the Court's statement.

18   We withdraw the Dondero affidavits for purposes of this

19   exercise and your consideration.

20             THE COURT:  Okay.

21             MR. MORRIS:  Can I be heard, Your Honor?

22             THE COURT:  Yes.  I'm going to let you be heard on

23   that.  But any other argument you want to make, Mr. McEntire?

24             MR. MCENTIRE:  Yes.  One last thing.  We did find the

25   reference to *Louisiana World*, and it was determined that no

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 124 of 270    PageID 2673
Main Document    Page 123 of 82

23

1  evidence was appropriate and that the court should limit its

2  inquiry based upon the allegations in the pleading, and in

3  that case, to determine whether it was a colorable claim,

4  which would, if pursued successfully, could have increased the

5  value of the estate.  So, the *Louisiana World* case does

6  suggest that there's not an evidentiary component to this

7  inquiry.

8           THE COURT:  Okay.  Let me be clear.  You first said

9  it held no evidence was appropriate, and then you said

10  suggest.  So, did the court actually tackle what is the legal

11  standard and is evidence appropriate?  Did it actually tackle

12  those specific issues?  That's all I really care about.

13  Because I've read the case.

14          MR. MCENTIRE:  Yes.  The citation in our brief is

15  that the Court need not be satisfied that there's an

16  evidentiary basis on the merits of the claim to be asserted.

17  And we have cited the *Louisiana World* case at Pages 252 and

18  253.  Allegations were sufficient and no evidentiary hearing

19  was necessary to determine -- in this case it was a breach of

20  fiduciary duty claim -- whether it had -- whether it was

21  appropriately colorable to move forward.

22          THE COURT:  Okay.  Courtney, you can be drilling down

23  on that.

24      All right.  Anything else?

25          MR. MCENTIRE:  On the evidence issue, no, Your Honor.

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 125 of 270    PageID 2674
Main Document    Page 124 of 182

24

1    We would, again, if the Court has time, we would encourage the

2    Court to read our brief.  We believe we've laid out the law

3    fairly succinctly and clearly, and we stand by our brief --

4        THE COURT:  All right.

5        MR. MCENTIRE:  -- and our objection.

6        THE COURT:  Well, of course I have time and I will

7    read it, but I just, given when it was filed and that I wasn't

8    alerted to it being there, I'm just explaining why I have not

9    read it yet.

10       All right.  Mr. Morris, your argument?

11       MR. MORRIS:  Good afternoon, Your Honor.  John Morris

12   for the Claimant Trust and for the Reorganized Debtor.

13       Your Honor, we understood this to be a status conference.

14   We didn't understand this to be a day for rulings by the

15   Court.  We didn't understand there was an issue for the Court

16   to determine today.  Hunter Mountain has now filed two briefs

17   on the topic of the standard of colorability, and they've made

18   an exhaustive argument, doing all of this before we -- before

19   any of the objecting parties have had an opportunity to be

20   heard.

21       Our brief is due on May 4th, and we respectfully request

22   that the Court, subject to other comments that I have this

23   afternoon, withhold judgment on anything that's happened here

24   today.

25       Mr. McEntire has completely misstated the law.  He has no

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10  Main Document  Filed 11/07/23  Page 126 of 270   PageID 2675
Page 125 of 82

25

1   understanding, apparently, of what a gatekeeper is and how it

2   functions under *Barton*.  And there's been no reference at all

3   to the purpose of the gatekeeper, which is set forth

4   explicitly, clearly, and in great detail in the Court's

5   confirmation order.  Okay?

6        12(b)(6), I don't want to -- I don't want to get too far

7   ahead of myself, but 12(b)(6) has nothing to do with this

8   case.  Of course this has turned into a bit of a circus, Your

9   Honor, as it always does in Highland.  This was a very simple

10  matter.  Hunter Mountain filed a motion for leave to file a

11  complaint under the gatekeeper provision of Highland's plan.

12  They attached a copy of their proposed complaint.  And

13  Paragraph 1 of their motion says, The motion is separately

14  supported by the declarations of James Dondero dated May 22nd

15  -- May 2022 and February 2023.

16       And these aren't just two declarations, Your Honor.

17  There's almost 400 pages of attachments to these declarations.

18  And now, 10 days before our opposition is due, because Mr.

19  Dondero fears being cross-examined, Hunter Mountain just

20  willy-nilly thinks they can withdraw those affidavit and

21  declarations?  That is greatly prejudicial, and I just can't

22  believe what I just heard.

23       They don't want to do it, they don't want to subject their

24  client to some cross-examination, when they put their

25  declarations into evidence, when they said that their motion

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 127 of 270    PageID 2676
Main Document    Page 127 of 270

26

1  was based on these declarations.

2      We should have that opportunity, Your Honor.  Forget about

3  the standard.  As Your Honor rightly pointed, the rule is very

4  clear.  You offer declarations; we get to cross-examine.

5      On Friday night, we got Hunter Mountain's objection.

6  Their, really, their second attempt to deal with colorability.

7  Last night, they filed what they characterize as support or a

8  supplemental document, which Hunter Mountain insists is not an

9  amendment of their pleading.

10      Your Honor, I've had Hunter Mountain provide the Court

11  with a blackline.  I would respectfully request that the Court

12  instruct Hunter Mountain to file it on the docket so that it

13  becomes part of the official record in this case.  If Your

14  Honor reviews the blackline version, which is not on the

15  docket but was emailed earlier today at my request, the Court

16  will see just how extensive the changes are to this pleading.

17  So here they are, without leave of Court, without filing a

18  motion to amend, without anything, they simply dump a brand

19  new complaint on us 10 days before our opposition is due, and

20  today tell us they're not going to include the Dondero

21  declarations.

22      This is all terribly wrong, Your Honor.  This is not the

23  way the process is supposed to work.  I've seen a lot in this

24  case, but this is a new standard for chaos.

25      The changes are extensive.  And I just want to point out a

003393

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10 Filed 12/07/23 of 82    Page 128 of 270    PageID 2677

27

 1    couple of them.  They now claim that Mr. Seery exercised

 2    "despotic control" over the Debtor.  I believe I have the

 3    right to inquire as to the factual basis for that ridiculous

 4    allegation.

 5         They allege in Paragraph 2 of the newly-amended complaint

 6    that Seery "failed to cause the Debtor to make financial

 7    disclosures, as required."

 8         Your Honor has been in this case since December of 2019.

 9    As this Court is aware, the single only financial disclosure

10    that was not filed with the Court was pursuant to Rule 2015.3.

11    Mr. Dondero commissioned his investigation.  As his

12    declarations say, he caused Mr. Rukavina and Mr. Draper to

13    complain to the U.S. Trustee's Office.  Nothing.

14         They objected to confirmation.  They made a motion.  They

15    went to the District Court.  They went to the Fifth Circuit.

16    That one single document is not a basis to say that Mr. Seery

17    failed to cause the Debtor to make financial disclosures.

18         We have the right, Your Honor, under the -- under the

19    gatekeeper, under this Court's confirmed plan -- which, by the

20    way, is worth nothing that in their newly-amended proposed

21    complaint they specifically say they do not challenge the

22    confirmation order.  And I would encourage the Court to look

23    at Paragraphs 77 through 80.  They don't challenge that order.

24    And that order tells us that we have the ability to inquire as

25    to the good faith nature of these allegations.  It has nothing

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 129 of 270   PageID 2678

28

1    to do with 12(b)(6).

2          Because these changes are so extensive, Your Honor, we

3    think we need a further change to the schedule.  We believe

4    the law says that this is an amendment that requires a

5    resetting of the clock.  But we don't need that much time,

6    Your Honor.  We need just a brief adjustment to the schedule.

7    And we specifically propose that the objection deadline be

8    extended by one week, from May 4th to May 11th.  The reply

9    deadline should be extended by one week, from May 11th to May

10   18th.  And the hearing date should be extended by one week,

11   from May 18th to May 25th, or any day the following week after

12   Memorial Day.

13         The objecting parties should not be prejudiced by Hunter

14   Mountain's continued evolution of their claims.  This is --

15   and this approach is completely fair and reasonable.

16         And we want to touch just for a moment on this concept of

17   derivative standing.  Again, Your Honor, we plan on addressing

18   this in detail in our submission.  We shouldn't be required to

19   set forth all of our arguments before they're fully

20   formulated, pursuant to the Court's scheduling order.  But I

21   do want to make a couple of points.

22         Another attorney representing Hunter Mountain filed what

23   it called the valuation motion.  The first iteration, Your

24   Honor will recall, was actually filed by Doug Draper on behalf

25   of Dugaboy last summer.  Then Louis Phillips represented

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10  Filed 12/07/23   Page 130 of 270   PageID 2679
Main Document   Page 129 of 82

29

1    Hunter Mountain.  When that motion was denied, the Stinson

2    firm came in and represented Hunter Mountain.  They filed a

3    new valuation motion.

4         Here's the irony, Your Honor.  Mr. Dondero and Hunter

5    Mountain and Dugaboy keep telling the Court assets exceed

6    liabilities.  Assets exceed liabilities.  And you know our

7    position on that, Your Honor.  They may; they may not.  It's

8    also irrelevant at the end of the day because of the

9    indemnification claims.  And we'll talk about that more in a

10   moment.

11        But the important thing is that, if assets exceed

12   liabilities, how could anybody other than, according to Hunter

13   Mountain, Hunter Mountain have been harmed by anything?

14   Creditors, according to Mr. Dondero, are getting paid in full.

15   How could any of these allegations have harmed any beneficial

16   holder of an interest in the Claimant Trust today?  According

17   to Mr. Dondero, they're going to get paid a hundred cents on

18   the dollar.  Where's the damages?

19        There's no derivative claim here.  This is a -- this is an

20   action by and for Hunter Mountain and nobody else.  And it's

21   frivolous.  And we will prove that.

22        Make no mistake.  The Trust and the Reorganized Debtor has

23   a substantial outcome in this motion, and that's why I'm here.

24   I'm here because the Trust has substantial indemnification

25   obligations.  Mr. Dondero seems to forget that.  But those

003396

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Main Document Page 107/30 of 92   Page 131 of 270   PageID 2680

30

1   indemnification obligations are real, and the Trust and the

2   Reorganized Debtor have an affirmative duty on behalf of the

3   Claimant Trust beneficiaries to make sure that baseless

4   litigation is nipped in the bud.  And that's why I'm here.

5       There is no rule of law that says you let the fox into the

6   henhouse simply because the fox fabricates a story that the

7   henhouse is on fire.  The henhouse is not on fire, and an

8   evidentiary hearing will prove that.

9       As for the subject at hand, it's important to remember

10  that the underlying motion is not a defendant's motion to

11  dismiss, but rather it's Hunter Mountain's motion for leave to

12  file a complaint under the gatekeeper.  The burden has

13  shifted.  They have the burden, not the putative defendants,

14  but Hunter Mountain.

15      The gatekeeper provision was contained in Highland's plan,

16  it was confirmed by this Court, and it was confirmed -- it was

17  affirmed by the Fifth Circuit Court of Appeals.

18      We appreciate the Court's preliminary view that an

19  evidentiary hearing is appropriate here, and we understand why

20  there's two reasons for that:  Because they put declarations

21  into the record; and more importantly, because the gatekeeper

22  provision requires it.

23      Hunter Mountain's objection to an evidentiary hearing is

24  disingenuous.  Mr. Patrick, Mr. Dondero, Hunter Mountain, they

25  all know the gatekeeper analysis is not a 12(b)(6) analysis,

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 132 of 270    PageID 2681
Main Document    Page 132 of 270

31

1    for at least the following reasons.  Mr. Dondero and his

2    affiliates have been fighting the gatekeeper provision since

3    the moment it was proposed.  They fought it at confirmation,

4    they appealed it to the Fifth Circuit, they objected when this

5    Court entered an order approving the gatekeeper without

6    modification, in conformity with the Fifth Circuit's decision,

7    and then going back to the Fifth Circuit to challenge the

8    gatekeeper.

9        Why would you do all of that?  Why would you spend that

10   money?  Why would you exhaust every potential avenue?  If you

11   thought it meant nothing, if you thought it was a less

12   standard than 12(b)(6), who would do that?  I think their

13   conduct proves that they know the standard is substantially

14   higher.  And if they only read the Court's confirmation order,

15   they would know that for certain.

16       Hunter Mountain's own pleadings prove that they know this

17   is not a 12(b)(6) standard.  If they thought it was a 12(b)(6)

18   standard, they wouldn't have specifically and expressly asked

19   the Court to look beyond the four corners of the complaint.

20   Right?  That's what they did in Paragraph 1 of their motion,

21   the very first document filed here, Docket No. 3699, Paragraph

22   1:  The motion is supported by the declarations of Jim

23   Dondero.

24       Why would you do that if you thought all the Court had to

25   do was look at the four corners?  They'll never be able to

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Main Document   Filed 12/07/23   Page 107 of 82   Page 133 of 270   PageID 2682

32

1  rationally explain that.  They're attempting to, and I hope

2  the Court won't let them, they're attempting to withdraw the

3  declarations today because they found out afterwards that when

4  you put declarations into the record people are allowed to

5  cross-examine.

6      The Court should not allow Hunter Mountain to play these

7  games.

8      There's more.  They know they don't have the goods here.

9  How do you know they don't have the goods here?  Because the

10 facts are based on Mr. Dondero and Mr. Dondero alone.  This

11 email that he sent to Mr. Seery in December 2017, as well as

12 this phone call or phone calls that he allegedly had with one

13 or two representatives of Farallon.  This is all Mr. Dondero.

14 He had all of this information in the spring of 2021.  Did he

15 bring anything to this Court's attention?  No.  You know what

16 he did?  He sought discovery.  And he filed a 202 petition in

17 Texas state court.

18     If you have the goods, if you have the evidence, bring

19 your claim.  He didn't do that because he knew he didn't have

20 the evidence.  He knew he didn't have the goods.  So they went

21 fishing.  They went fishing to state -- Texas state court, and

22 they came up with nothing.  Right?  It was removed to this

23 Court.

24     Your Honor will recall that in early 2022 Your Honor had a

25 hearing and remanded it back to state court.  Mr. Dondero

003399

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Main Document    Filed 12/07/23    Page 3 of 82    Page 134 of 270    PageID 2683

33

1    filed another declaration with another version of his phone

2    call with Farallon.  And Texas state court dismissed the

3    petition.

4        Hunter Mountain waits seven months.  I don't know why they

5    wait seven months, but they wait seven months.  They have the

6    same evidence.  They don't file a complaint.  Instead, Hunter

7    Mountain files another 202 petition, searching for evidence.

8    They went fishing again, and again went home empty, with Mr.

9    Dondero's third recitation of his conversation with Farallon,

10   but a second and different Texas state court said, no dice, no

11   discovery.

12       That's why they're here now, because they swung and they

13   missed twice.  They have no better evidence today than they

14   did in the spring of 2001 [sic] when a decision was made that

15   they didn't have enough to bring an action.  They know

16   12(b)(6) is not the standard here, Your Honor.

17       Mr. Stancil is here today on behalf of Mr. Seery.  I

18   understand Mr. Stancil wants to introduce himself to the Court

19   and provide some very preliminary views on the gatekeeper

20   standard and related matters.  Highland -- Holland & Knight is

21   here on behalf of the Claim Purchasers, and I'm sure they'll

22   want to weigh in.

23       In the end, Your Honor, this was supposed to be a status

24   conference.  There's nothing for the Court to decide.  A

25   scheduling order was in place, and we'd respectfully request

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 23-10 Filed 12/07/23   Page 135 of 270   PageID 2684
Main Document   Page 135 of 270

34

1    that it be adjusted in light of, you know, these amended

2    pleadings.  I don't know why they -- you know, their amended

3    pleadings.  Just look at the blackline.

4        We should have the allotted time to respond to these

5    issues, and we will do so.  And I'm very confident that at the

6    completion of briefing the Court will find it not only

7    appropriate but necessary to hear evidence on this motion.

8        That's all I have, Your Honor.

9            THE COURT:  All right.  Let me be clear.  The

10   redline, should I have it somehow?  It was not filed on the

11   docket.  You're wanting --

12           MR. MORRIS:  It was not, Your Honor, --

13           THE COURT:  Okay.

14           MR. MORRIS:  -- just to be clear.  I think -- I

15   brought to Mr. McEntire's attention this morning that the

16   Court's prior instruction in this case was that when you were

17   going to file amended documents, when you were going to use

18   amended documents, that blacklines should be filed with the

19   Court.  And a blackline was sent I believe to Ms. Ellison and

20   to all counsel of record, but it wasn't filed on the docket.

21   And I respectfully request that it be put on the docket,

22   because I think that needs to be part of the record of this

23   case.

24           THE COURT:  Okay.  I just -- I got from Traci the

25   redline.

003401

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 136 of 270   PageID 2685

35

1              MR. MORRIS:  Yeah.  Just open it up.  You'll see.

2              THE COURT:  It was not sent to her until 12:00 noon,

3    and then she sent it to me at 1:00-something.  So I've got it

4    now.  All right.  There it is.  It's 43 pages.

5              MR. MCENTIRE:  Your Honor?  May I respond very

6    quickly to the --

7              MR. MORRIS:  No.  Your Honor?  Your Honor?

8              THE COURT:  I'll let you have rebuttal argument at

9    the end, --

10             MR. MCENTIRE:  Fair enough.

11             THE COURT:  -- after I've heard from all of the other

12   parties in interest.

13        So, who wants to go next?  Mr. McIlwain or counsel for Mr.

14   Seery, Mr. Stancil?  Who wants to go next?

15             MR. STANCIL:  Your Honor, I think it's -- well, this

16   is Mark Stancil for Mr. Seery.  I think it's my turn.

17             THE COURT:  Okay.

18             MR. STANCIL:  And I'll try to be brief, Your Honor.

19   I think it'd be helpful mostly to explain just in a little bit

20   of detail why we agree completely with Mr. Morris's statement

21   that Your Honor should await full briefing on this issue.

22   Just in response to certain of the comments made earlier by

23   the Plaintiffs, I'd like to just sort of maybe level-set a

24   little bit.

25        For starters, I was confused that Mr. McEntire said he did

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 137 of 270   PageID 2686
Main Document   Page 136 of 82

36

1  not look for cases under *Barton*, because Your Honor

2  specifically cited *Barton* in the confirmation order in

3  approving the gatekeeper provision, which I believe it's in

4  Paragraph 80 in the confirmation order on Page 58.  That's

5  Docket No. 1943.  And Your Honor specifically cites the

6  Supreme Court's *Barton Doctrine*.

7      Moreover, that followed recitation of the extensive

8  factual findings that supported the requirement of a rigorous

9  gatekeeping requirement, including Paragraph 77, which the

10  Court found as fact that Mr. Dondero and the Dondero-related

11  entities have harassed the Debtor, which has resulted in

12  further substantial, costly, and time-consuming litigation for

13  the Debtor.

14      And as particularly relevant here, the Court further found

15  that this harassment had been specifically directed at Mr.

16  Seery, among others.

17      The Court further found in Paragraph 78 that Mr. Dondero's

18  abuse of litigation "was consistent with his comments as set

19  forth in Mr. Seery's credible testimony that if Mr. Dondero's

20  plan proposal was not accepted he would 'burn down the

21  place.'"

22      So, accordingly, Your Honor, the reference to *Barton* is

23  very much a robust gatekeeping entity -- requirement.  And

24  we're exactly today where the Court had predicted in entering

25  this order, that the costs and distraction of this litigation

003403

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10  Filed 12/05/23    Page 138 of 270    PageID 2687
Main Document    Page 137 of 182

37

1  are substantial.  And if all we're doing is replicating a

2  12(b)(6) hearing on a motion for leave, we're actually not

3  doing anything to reduce, as the Court made clear, the

4  burdens, distractions, of litigation.

5      The Fifth Circuit likewise cited *Barton* in its order

6  affirming the confirmation order.  Specifically, it also

7  explained that the provisions, these gatekeeper provisions

8  requiring advance approval were meant to "screen and prevent

9  bad-faith litigation."  Well, that -- if that means only what

10  the Plaintiffs say it does, then it really doesn't do anything

11  at all to screen.  There's no gatekeeping because their

12  version of what that means is always policed under 12(b)(6)

13  standards.

14      Moreover, the essence of bad faith is saying things in a

15  complaint that are not true and are easily proved to be false.

16  You know, the irony of their position is if you lard a

17  complaint up with absolute falsehoods and lies, well, those

18  have to be taken as true, and so, you know, they'll survive

19  the motion to dismiss, and so therefore we can file it.  That

20  would turn the bad faith essence of the gatekeeping provisions

21  here on their head.

22      So we think this is all about *Barton* and its progeny.  But

23  I would also provide Your Honor with maybe a 30-second preview

24  of why we think *Barton* does have clear support for evidentiary

25  hearings.

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 139 of 270   PageID 2688

38

1      We -- I will refer Your Honor to a recent decision of the

2   Fifth Circuit in a case *In re Foster*, 2023 WL 20872.  And that

3   was from January of this year, in which the Fifth Circuit

4   affirmed a determination that a post-effective-date litigation

5   could not be brought against the trustee.  It's got a little

6   bit of a complicated history, but I would -- I'll summarize to

7   say the suit was filed in the state court, removed to federal

8   court, and then there was a bankruptcy hearing, evidentiary

9   hearing, and ultimately the Bankruptcy Court's decision was

10  affirmed.

11     And we know there's an evidentiary hearing because if we

12  look at the District Court's appeal opinion in that case, 2022

13  WL 160240 at *3, it specifically notes an evidentiary hearing

14  because they had put a factual question before the Court.

15     But as a further preview to a brief that you'll be

16  receiving from us, I think our count is up to nine circuits

17  that apply an abuse of discretion standard to reviews of

18  determinations under *Barton*.  And of course, an abuse of

19  discretion standard on appeal makes no sense if one is

20  applying a mere 12(b)(6) standard, which, of course, is *de*

21  *novo*.

22     One brief word on *Louisiana World*, Your Honor, because I

23  believe the analogy they were drawing there is akin to a

24  creditors' committee standing analysis.  We're not at all

25  agreeing that that level of analysis is appropriate here, but

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10mentPagerilead P240f/25/23 of 82age 140 of 270    PageID 2689

39

1   I would add just a couple of things about that case.

2       First of all, that's a pre-effective-date question of a

3   committee's standing to bring a cause of action.  This, we're

4   talking about repeated findings of abuse of process, giving

5   rise to a gatekeeper action that applies beyond the effective

6   date.

7       But that aside for the moment, even in the creditors'

8   committee context, those creditors also have to show that the

9   underlying action is both colorable and also that the party

10  that didn't bring it was unjustified.  So the Court looks

11  beyond the mere 12(b)(6) standard in that context.

12      And I would just flatly disagree with Mr. McEntire's

13  characterization of that decision as saying that evidence is

14  not required.  If Your Honor looks at Footnote 15 in that

15  decision, which is at Page 248, so we're at 858 F.2d 233 at

16  248, the court explained why "an evidentiary hearing was

17  unnecessary under the circumstances."  And the circumstances

18  the court goes on to note are that the officers and directors

19  "did not object at any time to the committee's application"

20  and further found that the committee had demonstrated the

21  existence of a potential cause of action, and the officers and

22  directors neither refuted any of the committee's claims nor

23  objected to them.  "Under the circumstances, we are at a loss

24  to understand just what could have been gained from an

25  evidentiary hearing on an application which drew no

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 141 of 270   PageID 2690
Main Document   Page 40 of 82

40

1   objections."

2       So, respectfully, Your Honor, I don't think that case

3   could possibly stand for a blanket rule that evidence is not

4   appropriate in support of this, this -- even that analysis.

5       I think, Your Honor, the most important thing I'd like to

6   ask for is the opportunity, as Mr. Morris mentioned, to write

7   all this down for you instead of reading case snippets for

8   you.  We're in the middle of writing our brief.  And it has

9   changed quite a bit.  We think the brief will be very helpful.

10      I would add, moreover, that there's no harm to be had by

11  having an evidentiary hearing.  If after full briefing Your

12  Honor were to decide, you know what, this is a 12(b)(6)

13  standard -- we don't think you will; we think it's actually a

14  slam dunk to the contrary -- but the Court can, like in many

15  bench trials, decline to rely on evidence and just say, hey,

16  I'm not going to look at that, and here's -- here's where we

17  go.  But at least then the hearing will be -- we'll have it,

18  and we'll have the record.

19      More importantly, we actually think there's enormous value

20  in getting this right, as the Court of Appeals has told us

21  getting it right under *Barton* and applying the correct

22  scrutiny is required.

23      So, unless the Court has questions, I can turn it back to

24  Mr. Morris or to Mr. McIlwain.

25          THE COURT:  All right.  I don't think I have

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 142 of 270    PageID 2691
Main Document    Page 142 of 270

41

1    questions at the moment of you, but I'll turn to Mr. McIlwain

2    and see if I have any questions for the collective group at

3    that point.  And of course, I'll go back to Mr. McEntire as

4    well.

5         All right.  Mr. McIlwain, go ahead.

6              MR. MCILWAIN:  Thank you, Your Honor.  Brent McIlwain

7    here, again, from Holland & Knight for the Claim Purchasers.

8    Your Honor, I'll be brief and just echo what Mr. Stancil and

9    Mr. Morris said.

10        I guess, from a practical standpoint, though, what I'm

11   most concerned about here is the procedure by which we've

12   gotten to where we've gotten.  It started with a motion for

13   leave to file this complaint on what was supposed to be three

14   days' notice.  The Court denied that, rightly.  That was

15   appealed, and then there was a *mandamus* to the Fifth Circuit,

16   all -- all of which were denied.

17        Here we are on the eve of this status conference,

18   objections are filed, new pleadings are filed.  I think what's

19   being demonstrated is precisely why this Court has a

20   gatekeeper order in place.  Mr. Dondero and his counsel are

21   vexatious litigators, and they're looking for any opportunity

22   to get a leg up on us.  On anybody in their path, frankly.

23   And the Court should give us a reasonable opportunity to brief

24   this, should give us a reasonable opportunity to present our

25   case, and we should know what we're fighting against.  Are we

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 143 of 270   PageID 2692

42

1    fighting against a motion for leave that's supported by

2    affidavit or not?  And if we're not, they need to file a new

3    motion or strike the affidavits on the record.

4        We can't have this ever-evolving pushing against a rope to

5    determine what exactly we're fighting against.  And the Court,

6    the Court and the parties who are the subject, frankly, of

7    what are fantastical make-believe theories from Mr. Dondero

8    are entitled to know what the story is.  And we're entitled to

9    know what the pleading is.  And if the pleading is -- as soon

10    as the pleading is set, then we can respond.

11        So we're here to ask the Court, if we want to set a

12    hearing, let's close the pleadings as it relates to Hunter

13    Mountain.  They shouldn't be even filing any further.  Because

14    if they're going to file something further, we need more time.

15    And I'm okay with the schedule that Mr. Morris has outlined,

16    but, frankly, it's generous to Hunter Mountain.

17        Anyway, Your Honor, I don't have anything substantively to

18    add, but we will include a comprehensive response in our

19    responsive brief whenever that filing, whenever we can

20    determine exactly what we're responding to.

21        Thank you, ma'am.

22            THE COURT:  All right.  Mr. McEntire, you're the

23    Movant, you have the last word.

24            MR. MCENTIRE:  Yes, ma'am.  Thank you.  I'll try to

25    be brief here.

1    Mr. Morris says -- I wrote down his words -- if you have

2    the evidence, bring the claim.  The revised --

3         THE COURT:  I'm sorry, I did not -- I didn't hear

4    what you said.  Could you repeat what you just said?

5         MR. MCENTIRE:  Yes, ma'am.  Mr. Morris just told the

6    Court that if they have the evidence, bring the claim.  We

7    have the evidence.  And all you need to do is to look at the

8    four corners of the revised claim that is before you.  And you

9    do not need to look at the Dondero declarations.

10        THE COURT:  Let me --

11        MR. MCENTIRE:  And we withdraw the Dondero --

12        THE COURT:  Let me -- can I stop you right there?  I

13   mean, --

14        MR. MCENTIRE:  Yes.

15        THE COURT:  -- the point was made by I forget which

16   lawyer now that your original motion for leave attached

17   something like 387 pages of not just Dondero affidavits, but

18   other evidentiary support.  So I'd just like you to respond to

19   that.

20        MR. MCENTIRE:  Sure.

21        THE COURT:  Why did you initially out of the gate

22   think the Court needed to consider 387 pages of attachments?

23   And --

24        MR. MCENTIRE:  We never saw this, Your Honor, we

25   never saw this as an evidentiary inquiry.

Case 19-34054-sgj11 Doc 3765 Filed 04/25/23 Entered 04/25/23 11:44:33 Desc
Case 3:23-cv-02071-E Document 28-10 Main Document Filed 12/07/23 Page 145 of 270 PageID 2694 Page 207 of 82

44

1              THE COURT:  But --

2              MR. MCENTIRE:  That was simply background for the

3    Court.  The allegations themselves can --

4              THE COURT:  But stop.  Why would you -- call it

5    background, evidence, whatever you want to call it -- why

6    would you submit all of that if you think I just need to look

7    at the four corners and apply a 12(b)(6) standard?

8              MR. MCENTIRE:  I would suggest -- fair enough.  I

9    would suggest that probably 80 to 90 percent if not more of

10   those documents are from the Court's docket.  They are simply

11   docket references in the Court's docket.  Very little is

12   outside the four corners of the proceedings that you've been

13   administering, Your Honor.

14        They're also referenced in the four corners of our

15   pleading.  The allegations are set forth in the four corners

16   of our pleading.  You don't need to go to the docket -- you

17   may, if you wish -- but you don't need to go to the docket to

18   look at those documents, because the allegations speak for

19   themselves.

20        And the revised complaint that is before you or that was

21   with our motion -- and by the way, responding to one of other

22   counsel's statements, I don't have to seek leave to amend a

23   complaint that has not been filed yet.  What we're seeking to

24   do is we're seeking to bring forth to the Court a complaint

25   for your consideration as to whether we state a colorable

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10 Main Document Filed 12/07/23   Page 146 of 270   PageID 2695
Page 145 of 182

45

1    claim.  And we don't need Mr. Dondero's declarations, and we

2    don't -- you don't need to go look at all those documents.

3    You can look at the four corners of our complaint and make

4    that decision.

5        And to -- so we -- Mr. Morris's invitation is we have the

6    evidence, bring the claim.  That's exactly what we're doing.

7    Because if you review the claim, much of which is financial in

8    nature -- and by the way, the -- with all due deference to Mr.

9    Morris, I've heard the name Mr. Dondero probably 50 times

10   during this hearing.  And we don't need Mr. Dondero to support

11   the four corners of this complaint.  And if you look at the

12   complaint itself, there's no reference to Mr. Dondero -- or if

13   there is, it's very few -- in the complaint itself.  And this

14   is -- Mr. Dondero is not bringing this particular motion.

15   This is a motion by Hunter Mountain.  Mr. Dondero is not

16   directing the filing of this motion.  This is a motion filed

17   on behalf of Dondero and -- excuse me, on behalf of Hunter

18   Mountain, and hopefully on behalf of the Reorganized Debtor

19   and the Claimant Trust.

20       And so when we hear Mr. Dondero, it's an attempt to

21   distract the Court.  And what we need to do is just take a

22   step back, not have distractions, look at the complaint, and

23   under a 12(b)(6) standard, which is the appropriate standard

24   at most, I think the Court will find that we have stated far

25   more than a colorable claim.

003412

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10 Filed 12/07/23 of 82ge 147 of 270   PageID 2696

46

1          I will also point out that Mr. Morris has not identified

2     one single case suggesting or supporting his position.  Not

3     one single case.  And counsel for Mr. Seery has really not

4     addressed the *Louisiana* case that we've identified in an

5     effective way.

6               THE COURT:  He said -- he said --

7               MR. MCENTIRE:  If he wants additional --

8               THE COURT:  He said that was in a pre-confirmation

9     context, and he pointed out the recent *Foster* case.  What is

10    your response to the recent *Foster* case?

11              MR. MCENTIRE:  The issue here is colorability.  And I

12    don't have the recent *Foster* case before me.  The issue is

13    colorability.  There's nothing in the Court's gatekeeping

14    protocols in the plan that changes the standard.  The standard

15    is the same as the Fifth Circuit has articulated, and that is

16    to -- that it's not a fruitless claim, --

17              THE COURT:  But the question is, --

18              MR. MCENTIRE:  -- that there's some evidence.

19              THE COURT:  The question is whether the hearing that

20    is required by the plan -- which said the Bankruptcy Court,

21    after notice and a hearing, will determine whether an action

22    should go forward -- whether the hearing contemplates

23    evidence.  Does the Court need to hear evidence?  And to me,

24    that partly turns on what my legal standard is.

25         In *Foster Mortgage*, --

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 148 of 270   PageID 2697
Main Document   Page 143 of 82

47

1          MR. MCENTIRE:  Yes.

2          THE COURT:  -- the court heard evidence.  And it was

3    a *Barton* motion, which, as I identified, I think is a pretty

4    darn analogous situation.

5      And I'll just let you know, my law clerk found a case from

6    the Third Circuit, *Barton Creek*, where they considered

7    evidence.  *Vistacare Group*, 678 F.3d 218 (3rd Cir. 2012).

8      So, again, I am just here to figure out what kind of

9    hearing we set.  And maybe --

10         MR. MCENTIRE:  That --

11         THE COURT:  Maybe it's just -- maybe it's premature.

12   Maybe I can't make that decision today because I have

13   apparently very different views on whether evidence is

14   appropriate and what my legal standard is.  Maybe we need to

15   just hear the briefing --

16         MR. MCENTIRE:  We will take a look at the *Foster*

17   case, Your Honor.  And, as appropriate, I will -- we'll

18   provide counsel our views on that.  He's raised the issue, and

19   we would like to be able to respond.

20     With regard to the schedule, I would suggest to the Court

21   that the schedule as it exists is appropriate and sufficient

22   because there's more than 24 or 25 days to respond to this

23   pleading.  And -- number one.  Number two, regardless of how

24   Mr. Morris liked to characterize the redline or the blackline

25   or whatever-line, the bottom line is the pleading has actually

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Main Document    Filed 12/07/23    Page 149 of 270    PageID 2698    Page 207 of 282

48

1    been streamlined.  We've actually dropped a claim.  We dropped

2    one of the causes of action.  And what has been included --

3              THE COURT:  Which one was dropped?

4              MR. MCENTIRE:  -- is the fraud that --

5              THE COURT:  Which one was dropped?

6              MR. MCENTIRE:  Fraud.  We dropped fraud.  We

7    reorganized the pleading with a very large introductory

8    section.  And so what appears to be a lot of redline is a lot

9    of just procedural reorientation of the pleading.

10         And the other thing I would point out, we have asserted a

11    fraudulent concealment discovery rule allegation, and we have

12    enhanced our conflict allegations against Mr. Seery.

13         We have also taken advantage of the financial data that

14    just came out last week and incorporated some of that.

15         So a lot of this has occurred and a lot of our changes to

16    the pleading have occurred or additions have occurred since

17    the filing of the original motion.  And so we don't believe

18    there's -- the substantive nature of our allegations have not

19    changed.  We have added one or two additional declaratory

20    judgment actions, and that's it.

21         And so setting aside attempts to mischaracterize

22    expediently what may or may not be, I simply ask the Court to

23    look at what's before it and to try to kind of pierce through

24    the argument and perhaps a misdirection.  Because, very

25    clearly, the case has actually been lessened and is more

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Main Document Filed 12/07/23    Page 207 of 270    Page 150 of 270    PageID 2699

49

1  streamlined than anything.

2      With that, Your Honor, I would simply go back and say

3  this.  I don't believe we need to extend the briefing deadline

4  any further.  Mr. Dondero is not necessary for this Court's

5  inquiry to determine what the appropriate standard is and

6  whether evidence is required.  We believe we are correct.  We

7  will brief the *Foster* case and take a look at it since counsel

8  has raised it.

9      And I would, again, underscore the fact that Mr. Morris

10  came in here today, talked for 30 minutes, and didn't offer

11  the Court one single case citation.

12      Thank you.

13          THE COURT:  All right.  Well, he did start out by

14  saying he didn't think we were going to discuss legal

15  authority today.

16          MR. STANCIL:  Your Honor, I don't want to reopen the

17  wound, but if Your Honor wants cases, I've got -- I think I'm

18  -- I have nine I could cite at the moment for the standard of

19  review under *Barton*.  It is not a 12(b)(6) standard.  I assume

20  Your Honor will ask if she wants those today or just wants to

21  get those in our brief.

22          THE COURT:  I want to --

23          MR. STANCIL:  But I would hate for the record --

24          THE COURT:  I want to get briefs.  And in thinking

25  through what kind of mini-scheduling order we're going to

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Main Document    Filed 12/05/23    Page 207 of 82    Page 151 of 270    PageID 2700

50

1   have, I'm going to think out loud a bit.  I will just tell

2   you, I feel like this is -- deciding what is a colorable

3   claim, I just strongly am inclined to think it's a mixed

4   question of fact and law.  Okay?  And I am strongly inclined

5   to think the Court's best guidance is from the *Barton Doctrine*

6   cases.

7       And, again, I remember that *Foster* case from January.

8   It's been three months since I've read it and I can't remember

9   if they talked about legal standard or what kind of hearing

10  you have to any great extent.  But I do know the Court in Fort

11  Worth heard evidence on that.

12      And, again, this Third Circuit case, *Vistacare* -- hang on.

13  The court, just in Footnote 12, the Third Circuit points out

14  evidence was presented and considered.

15      So I tend to think those are the most analogous cases, the

16  *Barton Doctrine* cases.  So I am going to allow briefing on (a)

17  is it appropriate for the Court to hear evidence, and (b) any

18  authority you can find regarding what is the appropriate legal

19  standard.  Colorable.  I mean, those are actually closely

20  overlapping issues, right?  I guess they're one and the same,

21  right?  Because plausible, Rule 12(b)(6), you usually stick

22  within the four corners of the documents, although you can

23  take judicial notice of pleadings and the record in the case.

24  But it looks like most of these *Barton Doctrine* cases have

25  allowed evidence, suggesting it's at least a different

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 152 of 270   PageID 2701

51

1  standard than 12(b)(6).

2      So I'm going to allow briefing on that, and we're going to

3  talk about dates.  But I'm just, I'm trying to decide -- and

4  maybe I should get your comments on this, actually -- should

5  we have legal briefing on other issues besides just what does

6  the colorability standard entail.

7      Because here are a couple of things that just kind of make

8  me wonder, do we need an evidentiary hearing or not?  Do we

9  have a legal question here about is all of this -- is this

10  complaint, the claims in the complaint, would these be

11  administrative expense claims that should have been asserted a

12  long time ago?  Does anyone want to talk about that?  I mean,

13  maybe I'm getting way ahead of myself.  But the whole idea of

14  Hunter Mountain is bringing these derivatively on behalf of

15  the Reorganized Debtor.  Well, maybe that negates my theory.

16  I don't know.  But I just think is this something -- maybe I'm

17  all off.  Maybe you all have thought about this a little more.

18          MR. MORRIS:  Your Honor, yeah, if I may.

19          THE COURT:  Okay.

20          MR. MORRIS:  Number one, I hope whatever schedule the

21  Court decides upon, that we stick to the schedule and that we

22  don't have random briefs getting filed.

23      At this point, Your Honor, whether it's May 4th or May

24  11th, I think the objecting parties are going to address the

25  two issues that you've identified, whether or not this should

003418

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 153 of 270    PageID 2702
Main Document    Page 153 of 82

52

 1   be an evidentiary hearing and the standard of colorability.

 2   I'm also quite confident that other legal issues will be

 3   addressed, including whether or not Hunter Mountain has a

 4   legal right to even assert a derivative claim, whether or not

 5   duties are owed that would support some of these causes of

 6   action.

 7        So there are other legal issues that we plan to address.

 8   But I would respectfully request that, whether it's May 4th or

 9   May 11th, you allow the objecting parties to file their

10   papers, and then whether it's May 11th or May 18th, Hunter

11   Mountain gets one and only one chance to respond in their

12   reply.  That's what the scheduling order is intended to do.

13        And I heard Mr. McEntire refer to yet another so-called

14   supplement, and I don't want to chase a new brief every two

15   days.  That's not the way the process --

16              THE COURT:  Well, --

17              MR. MORRIS:  -- is intended to work.

18              THE COURT:  -- absolutely.  We're going to have --

19              MR. MORRIS:  And -- and --

20              THE COURT:  -- a firm scheduling order.  But what I

21   was thinking out loud about was would I hear or consider,

22   entertain briefing on any subject besides the legal standard

23   and do we have evidence.  Because there are a couple legal

24   issues out there swirling around.  I don't know if my

25   administrative expense argument/concern even makes sense,

003419

1    because I'm not sure who's saying who was harmed here.  But

2    maybe it just doesn't make sense.

3        But another thing swirling around is do we have

4    essentially complaints about claims trading?  Claims trading?

5    And I don't know if we want to get into that or not, but

6    claims trading in bankruptcy is a pretty unregulated -- it's

7    just kind of between the claims trader and the transferee.

8    And so as far as do we have a colorable claims here, I'm

9    wondering if there's some legal briefing with regard to the

10   nature of the claims.

11       Thoughts?

12            MR. MORRIS:  Well, --

13            THE COURT:  Do we want to keep this solely legal

14   standard and evidence, or allow briefing of a broader nature?

15   I'm trying to be clear up front because I don't want one party

16   giving me a huge brief going into 14 issues if that's not what

17   --

18            MR. MORRIS:  Yeah.  And I would only say, Your Honor,

19   that this motion is, in certain respects, no different than

20   any other motion.  A party files a motion, people are allowed

21   to object, there's a reply, and there's a hearing.  And we

22   don't want that process to change one bit.

23       We think that there's a legal issue.  If any objecting

24   party believes that there's a legal issue that they feel like

25   bringing to the Court's attention, it'll be contained in the

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10  Main Document  Filed 12/07/23   Page 155 of 270   PageID 2704
                                                                              Page 207 of 82

54

1   opposition brief.  If Hunter Mountain wants to reply to that,

2   they may.  If they don't, they don't.

3       We have a schedule.  You know, we'll just ask you for a

4   one-week adjustment to take into account the latest pleadings

5   that have been filed.  But otherwise, this is a motion,

6   there's an opposition, there's a reply, and there's a hearing.

7   And we really would prefer to just keep it that way.

8           MR. MCENTIRE:  Well, I agree with Mr. Morris, Judge,

9   at least on the issue of the sequencing of the objection and

10  the reply.

11      We still believe that May 4th is an appropriate date and

12  we ought to keep the original schedule as they requested

13  because of the nature of the pleadings that are before the

14  Court, as I mentioned.

15          THE COURT:  All right.  Well, I've been scrolling

16  through the redline.  I see a lot of red.  I know you say some

17  of it's just rearranged, but I see a lot of red.  So I think

18  their request for a little more time is appropriate.

19      So, May 11th for objections and any briefs in support of

20  objections.  May 18th for a reply of Hunter Mountain and any

21  briefing in support of the reply.  And then a hearing May 25th

22  or thereafter.  Speak up, anyone who disagrees with this

23  scheduling.

24          MR. MCENTIRE:  Our statement, I just note it for the

25  record, Your Honor.

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10 Main Document Filed 12/07/23    Page 2557 of 82 Page 156 of 270    PageID 2705

55

1      So, with regard to the evidentiary issue, obviously, if

2    the Court determines that it's going to be an evidentiary

3    hearing, which we object to and oppose, I would reserve the

4    opportunity to revisit the issue of withdrawing Mr. Dondero's

5    declarations.

6      I will tell the Court, we're prepared to do so if this is

7    not an evidentiary hearing, and we do not believe it should be

8    an evidentiary hearing.

9            THE COURT:  All right.

10           MR. MCENTIRE:  I believe -- I think my position --

11           THE COURT:  Wait.  I'm hearing argument again.  Right

12    now, I'm just talking about dates.

13           MR. MCENTIRE:  Understood.

14           THE COURT:  And May 25th or as soon thereafter as you

15    can be heard.  Any opposition to that?  I mean, basically, I'm

16    just asking you to speak up, Mr. Morris's suggestion of these

17    new dates:  Anything you want to say about that?

18           MR. MCENTIRE:  I do believe that my corporate

19    representative is going to be unavailable on May 25th, and so

20    we would ask that we keep the original schedule.

21           MR. MORRIS:  Your Honor, I would propose, as an

22    alternative to the 25th, since the 26th is the Friday before

23    Memorial Day weekend, either the 30th, the 31st, or June 1st,

24    with the 31st and the 1st being ideal, so we don't have to

25    travel on the holiday weekend.  I don't know what other folks'

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/07/23   Page 157 of 270   PageID 2706

56

1   schedules look like, but --

2           THE COURT:  Okay.

3           MR. MORRIS:  -- that seems to make sense to me.

4           THE COURT:  What about May 31st or June 1st?  And

5   Traci, please let me know if I'm offering something I can't.

6           THE CLERK:  Judge Jernigan, will you be giving a full

7   day for the hearing?  If so, neither one of those dates work.

8   You could do the day after Memorial Day, May 30th.  Or Friday

9   of that week, May 2nd.  I'm sorry, June 2nd.

10          MR. MORRIS:  I'd prefer May 30th.

11          THE COURT:  All right.

12          MR. MCENTIRE:  My corporate representative -- my

13  corporate representative is not available on May 30th.  He's

14  returning on the 31st from a vacation.  And so, under the

15  circumstances, we would request June 2nd.

16          THE COURT:  Anyone have a problem with June 2nd?

17          MR. MORRIS:  Can we go -- can we go with May 24th?

18          MR. MCENTIRE:  My corporate representative is out the

19  week from May 21st to May 31st.

20          THE COURT:  Okay.  Say again.

21          MR. MCENTIRE:  I just received an --

22          MR. MORRIS:  June 2nd.

23          THE COURT:  Wait.  Wait, wait, wait, wait.  May 21st

24  through May 31st?

25          MR. MCENTIRE:  Yes, ma'am.

1            THE COURT:  Okay.  I'm just --

2            MR. MCENTIRE:  So, under the circumstances, we would

3     request --

4            THE COURT:  I'm just letting you know, I am going to

5     set aside a whole day.  Okay?  I don't know positively is it

6     going to be evidentiary.  What I'll do is, after the reply

7     briefs, shortly after May 18th, I'll notify people you're

8     going to be allowed to put on evidence or not.

9         But for your planning purposes, based on what I've looked

10    at right now, again, the *Barton Doctrine* cases by analogy, it

11    looks like the Court has discretion to hear evidence.  Okay?

12    So if people want to put on evidence, they're entitled to put

13    on evidence.  Okay?  You don't have to.  Nobody has to.  But I

14    think the Court in its discretion is going to hear it.

15        So I may read the briefs and do research, and if I change

16    my mind, I'll let you all know May 19th or 20th.

17        All right.  So, that being the case, it's difficult,

18    because we're trying to find a whole day just in case we need

19    the whole day.  You just said your client representative,

20    which is -- who is your client representative?

21           MR. MCENTIRE:  Mr. Patrick.

22           THE COURT:  He's gone May 21st through 31st?

23           MR. MCENTIRE:  Yes, Your Honor.

24           THE COURT:  All right.  Did I hear June 2nd did not

25    work for somebody else?

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Filed 12/05/23    Page 159 of 270    PageID 2708
Main Document    Page 158 of 82

58

 1          MR. MORRIS:  Correct.  Yeah, Your Honor.  I'll be --

 2    I'll be out of the country beginning the evening of the 2nd,

 3    returning the following Tuesday, so whatever date that is.  I

 4    think the 6th.  So I'd be prepared to go on the 8th or the 9th

 5    of June.

 6          THE COURT:  Okay.  So, I'm sorry, you're out the 2nd

 7    through 9th?  Is that what I heard?

 8          MR. MORRIS:  The 2nd -- the 2nd through the 6th, but

 9    I wouldn't want to do it on the 7th.

10          THE COURT:  Okay.  Well, --

11          MR. MORRIS:  Or Thursday or Friday, June 8 or 9.

12          THE COURT:  Okay.  Anyone have a problem with June 8

13    or 9?

14          MR. MCENTIRE:  Your Honor, the 8th is vastly

15    superior, but I will confess the 9th is a college friend who

16    will be staying at my house with my wife and kids, and my wife

17    shouldn't be subjected to having to host him, but -- so if the

18    8th is available, I will beg for the Court's indulgence.  But

19    I'll be here on the 9th if that's requested.

20          THE COURT:  Okay.  Everyone good, --

21          MR. MCENTIRE:  I might need a note.

22          THE COURT:  -- June 8th?  Everybody good with that?

23      Okay.  I'm hearing no objection.  Traci, am I available?

24          THE CLERK:  Yes.  You have a Chapter 13 docket that

25    afternoon, but I am sure we can work something out with Mr.

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10   Filed 12/05/23   Page 160 of 270   PageID 2709
Main Document   Page 159 of 82

59

1    Powers.

2                   THE COURT:  Okay.  So --

3                   MR. MCENTIRE:  Your Honor?  Your Honor, this is

4    Sawnie McEntire.  For the record, I do need to lodge my

5    objection, but I understand the conflicts.  And so, subject to

6    my objection, we agree to that date.

7                   THE COURT:  All right.  So we'll start 9:30 in the

8    morning, June 8th.  And so I'm going to look for a scheduling

9    order that uses these revised dates that I think I've heard

10   you all will live with.  May 11th for objections to the motion

11   for leave, and that will include any briefs in support of the

12   objections.  And then May 18th for Hunter Mountain's reply and

13   any briefing in the reply that responds to the objections.

14   And shortly after that my courtroom deputy will let lawyers

15   know, yes, she's going to hear evidence, or no, she's not

16   going to have evidence.  And the hearing will be June 8th at

17   9:30 in the morning.

18        Any other housekeeping matters while we are here?  I mean,

19   these are the only pleadings that are going to be allowed.

20   How about that, among other things, as a housekeeping matter?

21   Just these pleadings, except, obviously, if we have live

22   witnesses and evidence on the 8th, you'll be bound by the

23   Local Rule that says witness and exhibit lists are due three

24   days before.  Anything else that you all can think of?

25                  MR. MORRIS:  Your Honor, if I may, I greatly

003426

Case 19-34054-sgj11    Doc 3765    Filed 04/25/23    Entered 04/25/23 11:44:33    Desc
Case 3:23-cv-02071-E    Document 28-10    Main Document    Filed 12/05/23    Page 160 of 82    Page 161 of 270    PageID 2710

60

1  appreciate your patience today.  But I did want to just

2  inquire as to the status of the decisions on the SE

3  Multifamily HCRE matter as well as the motion to dismiss that

4  was argued back in January.  Not because I intentionally or

5  unintentionally seek to pressure the Court, but I do think

6  that those decisions will be helpful one way or the other

7  resolving, you know, or getting some clarity in this case.

8          THE COURT:  All right.  Well, the next of those two

9  items that comes out will be the SE Multihousing matter.  My

10  law clerk that's working on that is right over here to my

11  right.  And we think before the end of the week, but we are

12  juggling lots of things, as you might imagine.  So that one is

13  next, and I'm hesitating to give you a time estimate on the

14  other one, but it'll be next in the queue.  We've had lots of

15  different adversary proceedings in other cases that we've had

16  to --

17          MR. MORRIS:  Yeah.

18          THE COURT:  -- work on.  But I think, again, SE is

19  probably towards the end of this week.

20          MR. MORRIS:  All right.  We appreciate the guidance,

21  Your Honor.

22          THE COURT:  Okay.  She's giving me a thumbs up like

23  I'm not overpromising.  You can't see her from the video.

24      All right.  So, everyone clear?  I want to say in the

25  strongest terms that I don't want an avalanche of pleadings.

Case 19-34054-sgj11   Doc 3765   Filed 04/25/23   Entered 04/25/23 11:44:33   Desc
Case 3:23-cv-02071-E   Document 28-10 Filed 12/07/23   Page 162 of 270   PageID 2711

61

1   Is everyone a hundred percent clear that we get the objections

2   with supportive briefing May 11th, reply with supportive

3   briefing on the 18th, and that's it?  That's it.  Other than

4   witness and exhibit lists, --

5           MR. MORRIS:  Yes, Your Honor.

6           THE COURT:  -- if we have evidence.  Everybody clear?

7   Any questions?

8           MR. MCENTIRE:  No, ma'am.  Thank you.  Thank you for

9   your time.

10           THE COURT:  Okay.  Thank you.  We are adjourned.

11           THE CLERK:  All rise.

12       (Proceedings concluded at 3:12 p.m.)

13                           --oOo--

14

15

16

17

18

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                              **04/25/2023**

24   _____        _____
    Kathy Rehling, CETD-444                         Date
25   Certified Electronic Court Transcriber

62

INDEX

PROCEEDINGS                                                                3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Dugaboy Investment Trust and Hunter Mountain Investment         7
Trust's Motion for Leave to File Proceeding (3662)

Status Conference re: Motion for Leave to File Verified        49
Adversary Proceeding filed by Creditor Hunter Mountain
Investment Trust (3699)

END OF PROCEEDINGS                                                         61

INDEX                                                                      62

003429

Brent R. McIlwain, TSB 24013140
David C. Schulte    TSB 24037456
Christopher A. Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
Tel.:    (214) 964-9500
Fax:    (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

COUNSEL TO MUCK HOLDINGS, LLC,
JESSUP HOLDINGS LLC,
FARALLON CAPITAL MANAGEMENT, L.L.C., AND
STONEHILL CAPITAL MANAGEMENT LLC

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Case No. 19-34054 (SGJ) |
| Highland Capital Management, L.P.[1] | Chapter 11 |
| Debtor. | (Jointly Administered) |

### CLAIM PURCHASERS' OBJECTION TO HUNTER MOUNTAIN INVESTMENT TRUST'S (I) EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING; AND (II) SUPPLEMENT TO EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING

---

[1]    The last four digits of Debtor's taxpayer identification number are (6725). The headquarters and service address for Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

003430

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND .........................................................................................................4

    A.    Claims are Filed, Settled, Allowed, and Transferred at Arms-Length ...........................4

    B.    Plan is Filed, Confirmed and Goes Effective ...............................................6

    C.    Dondero and HMIT Unsuccessfully Seek Discovery in State Court...........................7

OBJECTION.............................................................................................................8

    A.    HMIT has no standing to assert the causes of action in the Proposed Complaint...........8

    B.    Equitable disallowance and equitable subordination are not available to HMIT. .........12

    C.    HMIT has not established a legally cognizable claim. ..................................14

    i.    Claim Purchasers owed no duty owed to HMIT.....................................15

    ii.    Claim Purchasers are not "non-statutory" insiders ..................................15

    D.    The Alleged Claims Must be "Colorable" to Overcome the Gatekeeper Provision......18

    E.    The Claims in the Proposed Complaint are not Plausible or Colorable. .......................19

    i.    The Proposed Complaint fails to plead facts which lead to the inference that the
Claim Purchasers engaged in *quid pro quo* with Seery. ...........................................20

    ii.    The Proposed Complaint fails to plead facts which lead to the inference that
Seery provided the Claim Purchasers with material, non-public information..........21

003431

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acis Capital Mgmt., L.P.*,
   604 B.R. 484 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Capital Mgmt.,
   L.P.,* 850 F. App'x 302 (5th Cir. 2021) ........................................................ *passim*

*In re Adelphia Commc'ns Corp.*,
   365 B.R. 24 (Bankr. S.D.N.Y. 2007)........................................................................13

*Barton v. Barbour*,
   104 U.S. 126 (1881)..............................................................................................19, 20

*In re Christensen*,
   598 B.R. 658 (Bankr. D. Utah 2019) .....................................................................19, 20

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge,
   LLC*,
   138 S. Ct. 960 (2018)..................................................................................................16

*DaimlerChrysler Corp. v. Inman*,
   252 S.W.3d 299 (Tex. 2008).......................................................................................11

*In re Exec. Office Ctrs., Inc.*,
   96 B.R. 642 (Bankr. E.D. La. 1988) ..........................................................................15

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
   95 F.3d 358 (5th Cir. 1996) ..........................................................................................8

*Heckman v. Williamson Cnty.*,
   369 S.W.3d 137 (Tex. 2012)..........................................................................................9

*In re Highland Capital Management, L.P.*,
   Case No. 19-12239 (Bankr. D. Del. Oct. 16, 2019)....................................................4

*Highland capital Management, L.P. v. James Dondero, et al.*,
   Adv. No. 21-03003-SGJ (Bankr. N.D. Tex. Jan. 22, 2021)...................................1, 3

*In re Hunter Mountain Investment Trust*,
   Cause No. DC-23-01004 ...............................................................................................7

*In re James Dondero*,
   Cause No. DC-21-09534 ...............................................................................................7

*In re LightSquared Inc.*,
   504 B.R. 321 (Bankr. S.D.N.Y. 2013) .......................................................................13

003432

*Little v. KPMG LLP*,
 575 F.3d 533 (5th Cir. 2009) ...................................................................11

*In re Lorraine Castle Apartments Bldg. Corp.*,
 149 F.2d 55 (7th Cir. 1945) .....................................................................15

*In re Mobile Steel Co.*,
 563 F.2d 692 (5th Cir. 1977) ...................................................................12

*Nobles v. Marcus*,
 533 S.W.2d 923 (Tex. 1976) ....................................................................15

*In re Olmos Equip., Inc.*,
 601 B.R. 412 (Bankr. W.D. Tex. 2019) ..............................................17, 19

*Pepper v. Litton*,
 308 U.S. 295 (1939) ..................................................................................13

*In re Perry*,
 425 B.R. 323 (Bankr. S.D. Tex. 2010) ....................................................14

*SED Holdings, LLC v. 3 Star Props., LLC*,
 2019 WL 13192236 (S.D. Tex. Sept. 11, 2019) ......................................14

*Stalnaker v. Gratton (In re Rosen Auto Leasing)*,
 346 B.R. 798 (8th Cir. BAP 2006) ...........................................................17

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
 549 U.S. 443 (2007) ..................................................................................13

*Vichi v. Koninklijke Philips Elecs. N.V.*,
 62 A.3d 26 (Del. Ch. 2012) ..................................................................9, 11

*In re Washington Mut., Inc.*,
 461 B.R. 200 (Bankr. D. Del. 2011) .........................................................13

*In re Winstar Commc'ns, Inc.*,
 554 F.3d 382 (3d Cir. 2009) .....................................................................14

**Statutes**

11 U.S.C. § 502(b) ............................................................................................13

11 U.S.C. § 510(b) ............................................................................................11

11 U.S.C. § 510(c) ............................................................................................14

003433

**Other Authorities**

Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of Chapter 11s*, Am. Bankr. Inst. J. 62 (July/Aug. 2010) ...........................................................6

Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, The Wall Street Journal (Dec. 21, 2020, 6:38 p.m.) .............................................22

Fed. R. Bankr. P. 3001(e) .........................................................................................6, 7

Fed. R. Bankr. P. 3001(e)(2) ........................................................................................1

Fed. R. of Civ. P. 12(b)(6) ...................................................................................19, 20

Fed. R. of Bankr. P. 3001 .........................................................................................1, 4

Tex. R. Civ. P. 202 .......................................................................................................7

iv

003434

Muck Holdings, LLC ("Muck"), Jessup Holdings LLC ("Jessup"), Farallon Capital Management, L.L.C. ("Farallon"), and Stonehill Capital Management LLC ("Stonehill", and collectively, with Muck, Jessup, and Farallon, the "Claim Purchasers") file this *Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* (the "Objection"). In support, the Claim Purchasers respectfully state as follows:

## PRELIMINARY STATEMENT

1.        Hunter Mountain Investment Trust's ("HMIT") *Emergency Motion for Leave to File Verified Adversary Proceeding* ("Motion to File Complaint") is a continuation of James Dondero's ("Dondero") relentless barrage of meritless litigation against the bankruptcy estate of Highland Capital Management, L.P. ("HCMLP" or the "Debtor"). Brought almost two years after the alleged "wrongdoing," the Motion to File Complaint seeks leave for HMIT, a Dondero affiliate, to file an adversary proceeding against the Claim Purchasers, James P. Seery, the post-effective date trustee of the Debtor's estate ("Seery"), and others based upon *private bilateral claim sales* between the Claim Purchasers and third-party sellers ("Claims Sellers"). HMIT lacks standing to complain about  transactions between the Claim Purchasers and Claims Sellers, and for that reason alone, the Motion to File Complaint should be denied.

2.        In addition, the Claims Purchasers owed no duties to the bankruptcy estate or any equity holders of the bankruptcy estate (including Dondero or HMIT) at the time of the claims transfers. As this Court knows, the trading of claims is not a process that involves the Court or the bankruptcy estate, other than the perfunctory filing of notice under Fed. R. Bankr. P. 3001(e)(2). The Claim Purchasers filed Rule 3001 notices (most more than two years ago) and not one objection, response, or statement was filed with in response to those notices.

003435

3.      Moreover, none of the third-party Claims Sellers (who are sophisticated parties represented by skilled bankruptcy and transactional counsel) has ever made any allegation that the claims transfers damaged them or were in any way not valid, appropriately informed, arms-length transactions. The record shows that the Claims Sellers were well familiar with the circumstances of the Highland bankruptcy, having litigated for many years with Highland and Dondero themselves. The Claims Sellers sold their claims and have put their involvement behind them.

4.      The structure of the bankruptcy estate shows that HMIT cannot better its position by pursuing the claims in the Proposed Complaint. Fundamentally, and fatally—whether HMIT could upend the transfers, or whether it could succeed in equitably subordinating the validly transferred claims—HMIT would be in the same position it is today: an equity holder with a speculative interest in the residual rump of the bankruptcy estate. With this Proposed Complaint, it is obvious that HMIT does not seek to bring justice to the Claims Sellers or even to the estate; it wants to bring nuisance against Seery and the Claim Purchasers. The law does not allow such actions, and the gatekeeper process should preclude HMIT from filing its Proposed Complaint.

5.      Setting aside HMIT's lack of standing and lack of cognizable claims, which should cause the Proposed Complaint to fail even under a motion to dismiss standard, the claims HMIT seeks to assert are not colorable and thus cannot pass through the Plan's gatekeeper provision. The gravamen of the Proposed Complaint is that Seery provided the Claim Purchasers with "material non-public information" concerning Amazon's potential acquisition of MGM Holdings, Inc. ("MGM"), prompting the Claim Purchasers to acquire certain claims asserted in the bankruptcy case. The claims are not securities, of course, and HMIT's pleading fails to allege an information disparity between the transferors and Claims Purchasers. But why would Seery, an individual who *did* owe fiduciary duties to the bankruptcy estate, take such an unprecedented risk that would

003436

imperil his role in the case and irreparably damage his reputation? HMIT alleges that Seery took

such action to benefit himself by replacing the claims transferors with the Claim Purchasers, who

allegedly agreed to "rubber stamp" Seery's compensation requests post-effective date. In other

words, HMIT dreamed-up a "*quid pro quo*" where "inside information" was exchanged for an

agreement to excessively compensate Seery later. There is no plausibility to that outlandish claim.

6.      HMIT must establish a "prima facie" case that its claims have foundation. This

standard requires that HMIT do more than simply plead speculative "facts" and have the Court

treat them as true. Rather, HMIT must show that its allegations are "plausible on their face";

otherwise, the Plan's gatekeeper provision has no practical limitation on vexatious litigation.

HMIT has not met this standard. Indeed, HMIT alleges no plausible facts supporting an inference

that Seery shared non-public information with the Claim Purchasers, that the Claims Sellers were

deceived in selling their claims, or that Seery and the Claim Purchasers agreed to a "*quid pro quo.*"

7.      Allowing HMIT to proceed with litigation, after more than a year of harassing the

Claim Purchasers in Texas state court (with no success), flies in the face of the central purpose of

the Plan's gatekeeper provision. The HCMLP bankruptcy estate, led by Seery, is engaged in

substantive litigation against Dondero and his affiliated entities to recoup losses arising from

various breaches and malfeasance allegedly committed by Dondero and his affiliated entities.[2]

HMIT and Dondero are vexatious litigants who are desperately attempting to gain leverage in the

litigation pending against them. They seek to send a message to the market that participation in

the Highland liquidation case and in related adversary proceedings will come at great cost and with

substantial downside to anyone who dares attempt to recoup losses caused by Dondero and his

---

[2]      *See, e.g.*, *Highland capital Management, L.P. v. James Dondero*, et al., Adv. No. 21-03003-SGJ
(Bankr. N.D. Tex. Jan. 22, 2021).

003437

entities and thereby profit from the vestiges of the HCMLP estate that Dondero no longer controls. This Court should deliver to HMIT and Dondero the stronger message that the gatekeeper terms were designed to control exactly this kind of baseless and damaging litigation.

## **BACKGROUND**

8.        On October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of Delaware (the "Delaware Court"), instituting a voluntary chapter 11 bankruptcy case styled *In re Highland Capital Management, L.P.*, Case No. 19-12239 (Bankr. D. Del. Oct. 16, 2019) (the "Delaware Case"). On November 11, 2019, the Official Committee of Unsecured Creditors filed its *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of This Case to the United States Bankruptcy Court for the Northern District of Texas* [Delaware Case at Dkt. No. 86] (the "Venue Motion"). On December 4, 2019, the Delaware Court granted the Venue Motion [Delaware Case at Dkt. No. 184], transferring the Debtor's case to the Bankruptcy Court for the Northern District of Texas (the "Court").

### A.        **Claims are Filed, Settled, Allowed, and Transferred at Arms-Length**

9.        As set forth below, the claims transferred by the Claims Sellers were filed, settled, and ultimately allowed by this Court. Further, at every turn, Dondero and his affiliated entities objected to the settlements and were overruled. The Claim Purchasers acquired the claims through various arm's-length transactions, after the respective claims were allowed by this Court, and in each case, Rule 3001 notices were filed as reflected below:

003438

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed Amount | Rule 3001 Notice Filed |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019<br><br>Claim No. 23 | $23,000,000 | Yes [Dkt. No. 1302][3]<br><br>$23,000,000 | Dkt. No. 2215 (Muck) |
| Redeemer Committee Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020<br><br>Claim No. 72 | $190,824,557 | Yes [Dkt. No. 1273]<br><br>$137,696,610 | Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (collectively, the "HarbourVest Parties") | April 8, 2020<br><br>Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes [Dkt. No. 1788][4]<br><br>$80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | Dkt. No. 2263 (Muck) |
| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | June 26, 2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes [Dkt. No. 2389][5]<br><br>$125,000,000 in aggregate ($65,000,000 General | Dkt. No. 2698 (Muck) and Dkt. No. 2697 (Jessup) |

[3]    The Debtor's settlement with Acis was approved over the objection of James Dondero [Dkt. No. 1121].

[4]    The Debtor's settlement with the HarbourVest Parties was approved over the objections of James Dondero [Dkt. No. 1697] and The Dugaboy Investment Trust and Get Good Trust [Dkt. No. 1706].

[5]    The Debtor's settlement with the UBS Parties was approved over the objections of James Dondero [Dkt. No. 2295], and the Dugaboy Investment Trust and Get Good Trust [Dkt. Nos. 2268, 2293].

003439

| | | | Unsecured Claim and $60,000,000 subordinated claim) | |
|---|---|---|---|---|

10.     HMIT hypothesizes, without alleging any credible facts, that the Claim Purchasers acquired the claims based on "inside information" disclosed by Seery in return for an agreement to approve excessive compensation for Seery at some point in the future. Indeed, while HMIT bears the burden of satisfying the gatekeeper standard, the record shows that the Claims Sellers, who are the only possible victims under HMIT's theories, have expressed no interest whatsoever in HMIT's allegations. And only the Claims Sellers have standing to dispute a claim sale. *See, e.g.*, Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of Chapter 11s*, Am. Bankr. Inst. J. 62 (July/Aug. 2010) ("In 1991, Fed. R. Bankr. P. 3001(e) was amended to limit the court's oversight on claims trading" such that "only the transferor may object to a transfer.").

### B.     Plan is Filed, Confirmed and Goes Effective

11.     On November 24, 2020, the Debtor filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. No. 1472] (the "Plan"). With respect to the claims held by the Claim Purchasers, the Plan provided, *inter alia*, that "[o]n or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim" will receive interests in the Claimant Trust.[6] Plan at Art. III(H)(8). Further, the Plan provides

> Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with

---

[6]     The Plan includes substantially similar language with respect to Class 9 Subordinated Claims.  Plan, Art. III(H)(9).

003440

respect to any General Unsecured Claim, *except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court*.

*Id.* (emphasis added).[7]

12.     On February 22, 2021, the Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Dkt. No. 1943] (the "Confirmation Order").

13.     All of the claim trades were consummated *after* the Confirmation Order was entered.

14.     On August 11, 2021, the Debtor filed its *Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. No. 2700], indicating that the Plan went effective on August 11, 2021.

### C.     Dondero and HMIT Unsuccessfully Seek Discovery in State Court

15.     In July of  2021, Dondero filed a pre-suit discovery request, targeting Farallon and Alvarez & Marsal ("A&M"), under TEX. R. CIV. P. 202 ("Rule 202"): *In Re: James Dondero*, Cause No. DC-21-09534, in the 95th Judicial District Court of Dallas County, Texas ("First 202"). While the First 202 did not seek discovery from Seery directly, Farallon and A&M removed that case to this Court, as it was clear that the purpose of the First 202 was to impugn Seery's conduct. After extensive briefing and a hearing, due to misalignment of Rule 202 proceedings and bankruptcy cases, the Court remanded the First 202 to the Texas state court "with grave misgivings." The state court ultimately denied and dismissed the First 202 on June 1, 2022.

16.     As the Court is aware, Dondero waited over six months and filed a new Rule 202 petition through his affiliate HMIT – raising the same issues related to claims trading as in the

---

[7]     The Plan includes substantially similar language with respect to Class 9 Subordinated Claims.  Plan at Art. III(H)(8)-(9)

003441

First 202, based on the same allegations of misconduct by Seery – but now in a different Texas state court: *In re: Hunter Mountain Investment Trust*, Cause No. DC-23-01004, in the 191st Judicial District of Dallas County, Texas ("Second 202"). The recipient of the Second 202 was once again Farallon, with the addition of Stonehill. HMIT, undeterred by the dismissal of the First 202, carefully avoided not only this Court, but also the 95th Judicial District Court that dismissed the First 202, and it sought to convince yet another state court judge that it had a valid basis to "investigate" claims purchases in a bankruptcy proceeding. After briefing and a hearing, the Second 202 met the same fate as the first: it was denied and dismissed on March 8, 2023.

17.     Only after Dondero and HMIT failed to obtain state-court permission to harass the Claim Purchasers with broad discovery in support of futile theories did HMIT file its Motion to File Complaint, which is supported primarily with affidavits from Dondero, making the same baseless allegations that he and his lawyers have made for more than two years.

## OBJECTION

18.     HMIT's Motion to File Complaint [Dkt. No. 3699] should be denied because (i) HMIT lacks standing to pursue the claims asserted in the verified complaint attached as Exhibit 1-A to HMIT's *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. No. 3760] (the "Proposed Complaint"), (ii) HMIT has no cognizable claims against the Claims Purchasers, (iii) the Claim Purchasers are protected by the "Gatekeeper Provision" of the Plan, and (iv) the claims alleged by HMIT are not colorable.

A.     **HMIT has no standing to assert the causes of action in the Proposed Complaint.**

19.     For a party to have standing to assert a cause of action, *inter alia*, the alleged injury must be fairly traceable to the defendant's conduct. *See, e.g., Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360 (5th Cir. 1996) ("To demonstrate that [plaintiffs] have

8

003442

standing, [plaintiffs] must show that: 1) its members have suffered an actual or threatened injury;

2) the injury is 'fairly traceable' to the defendant's actions; and 3) the injury will likely be redressed

if it prevails in the lawsuit."); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 155 (Tex. 2012)

("The second element of the standing test requires that the plaintiff's alleged injury be

'fairly traceable' to the defendant's conduct."); *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d

26, 38 (Del. Ch. 2012) ("there must be a causal connection between the injury and the conduct

complained of-the injury has to be fairly traceable to the challenged action of the [respondent]…").

20.     HMIT lacks standing to pursue the claims asserted in the Proposed Complaint

because (i) neither HMIT nor the Bankruptcy Estate was affected or harmed by the Claim

Purchasers' acquisition of the claims; and (ii) the Proposed Complaint fails to allege a cause of

action against the Claim Purchasers because it lacks a theory of cognizable damages to the

Debtor's bankruptcy estate, the Claimant Trust (as defined in the *Fifth Amended Plan of

Reorganization of Highland Capital Management, L.P.* [Dkt. No. 1808] (the "Plan")[8]), and/or the

beneficiaries of the Claimant Trust, such that HMIT has been injured.

21.     Under the Plan, HMIT held a Class 10 claim which was converted post-

confirmation to a contingent trust interest in the Claimant Trust. HMIT admits that the requisite

conditions have not been satisfied to convert its contingent trust interest into a beneficial interest,

and that more than $9.5 million must be paid to creditors other than the Claim Purchasers before

HMIT becomes a Claimant Trust Beneficiary.[9] In an attempt to bridge this gap, HMIT asserts that

it (or the bankruptcy estate) is entitled to the equitable disallowance, equitable subordination,

---

[8]     Capitalized terms used herein but not otherwise defined have the meanings ascribed in the Plan.

[9]     *See, e.g.*, Motion to File Complaint, ¶ 17 (stating that creditors other than the Claim Purchasers are owed at least $9.627 million).  This $9.5 million does not include the tens of millions still owed to the Claim Purchasers.

003443

disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims. Yet the transactions with which HMIT takes issue are private claim sales between the Claim Purchasers and various creditors of the Debtor's estate (the Claim Sellers). Neither HMIT nor the bankruptcy estate (including the Claimant Trust) has standing to challenge these sales.[10] Even assuming that the allegations in the Proposed Complaint are true (which is disputed), it is the Claim Sellers who potentially would have been damaged, not the bankruptcy estate. Whether the claims are held by the Claim Purchasers or the Claim Sellers, the economic effect on the bankruptcy estate (and thus on HMIT and its rights under the Plan) is the same.[11]

22.     Perhaps realizing this deficiency in the Proposed Complaint, HMIT asserts that the Claim Purchasers and their proposed co-defendants are liable for excess compensation paid to Seery in furtherance of an alleged fraudulent scheme.[12] Yet HMIT has not pleaded facts sufficient to show that, even if Seery received extraordinary and excess compensation and such compensation was returned, HMIT's contingent interests in the Claimant Trust would vest. In fact, the Proposed Complaint is devoid of any factual assertions regarding the magnitude of the excess compensation Seery has received or will receive. HMIT admits that creditors, other than the Claim Purchasers, are owed more than $9.627 million and remain ahead of HMIT in priority, which creditors must be paid before HMIT becomes a Claimant Trust Beneficiary.[13] Accordingly, even if everything in the Proposed Complaint were true (which is disputed), HMIT failed to plead facts showing that it has been damaged, and thus it lacks standing.

---

[10]     *See* Motion to File Complaint, ¶ 27.

[11]     Notably, the Claim Sellers have not alleged that improper conduct occurred with respect to the relevant claim sales, despite having the greatest economic incentive to do so.

[12]     *See, e.g.*, Proposed Complaint, ¶¶ 4, 14, 16, 65, 69.

[13]     *See, e.g.*, Plan, Art. I.B.44; Motion to File Complaint, ¶ 17 (stating that creditors other than the Claim Purchasers are owed at least $9.627 million).

003444

23.     Further, because HMIT's alleged injury is not actual or imminent—but rather, is
hypothetical and contingent, as it depends on HMIT becoming a Claimant Trust Beneficiary at
some future date—it lacks standing to prosecute the causes of action it threatens (or such
threatened claims are not ripe because they depend on contingent or hypothetical facts or events
that have not yet occurred). *See, e.g.*, *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009)
("However, allegations of injury that is merely conjectural or hypothetical do not suffice to confer
standing."); *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-05 (Tex. 2008) ("For standing,
a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized,
actual or imminent, not hypothetical."); *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 38
(Del. Ch. 2012) (stating that for a claimant to have standing, the alleged injury must be "concrete
and particularized," "actual or imminent," and "not conjectural or hypothetical"). HMIT must
identify "an existing—rather than future or speculative—right that may be presently asserted." *Id*.
Here, as any interest it has in the Claimant Trust is contingent, HMIT has no such right to assert.
For this additional reason, HMIT's Motion to File Complaint should be denied. *Id.*

24.     In addition, the Plan specifically reserves *only* to the Debtor, the Reorganized
Debtor, and the Claimant Trustee the right to seek equitable subordination:

> The allowance, classification, and treatment of all Claims under the Plan ***shall take into
> account and conform to the contractual, legal, and equitable subordination rights
> relating thereto, whether arising under general principles of equitable subordination,
> section 510(b) of the Bankruptcy Code, or otherwise.*** Upon written notice and hearing,
> the ***Debtor the Reorganized Debtor, and the Claimant Trustee*** reserve the right to seek
> entry of an order by the Bankruptcy Court ***to re-classify or to subordinate any Claim in
> accordance with any contractual, legal, or equitable subordination relating thereto, and
> the treatment afforded any Claim under the Plan that becomes a subordinated Claim at
> any time shall be modified to reflect such subordination***.

Resp. Ex. 3 (Plan), Art. III.J. (emphasis added). There is no independent right under the Plan for
creditors like HMIT to seek to equitably subordinate other creditors' claims. HMIT lacks standing
to assert the proposed claims because the Plan does not authorize these claims by such parties.

11

003445

**B.** **Equitable disallowance and equitable subordination are not available to HMIT.**

25.      As an initial matter, the Claim Purchasers no longer have claims which could be subordinated and/or disallowed. All of the relevant claims were settled and allowed prior to the Effective Date of the Plan.[14] Pursuant to the terms of the Plan, on the Effective Date of the Plan, such claims were exchanged for interests in the Claimant Trust, and thus there are no claims left which could be subordinated or disallowed. *See* Plan at Art. III(H)(8)-(9).

26.      Further, the Plan provides that *only* the Debtor, the Reorganized Debtor and the Claimant Trustee reserved the right to seek to reclassify or subordinate claims. Plan, Art. III(J). However, any rights or defenses the Debtor's estate had with respect to the relevant claims were expressly disclaimed under the Plan, since all of the relevant claims were allowed by a final order of the Court, and thus no party has standing to seek to subordinate or disallow the Claim Purchasers' claims. *See, e.g.*, Plan at Art. III(H)(8)-(9) ("Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, *except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court*.") (emphasis added).

27.      Even if the relevant claims still remain subject to challenge, the remedies sought by HMIT are either not available, or cannot benefit HMIT. HMIT primarily seeks the equitable disallowance of the Claim Purchasers' claims. Proposed Complaint, ¶¶ 82-87. However, the Fifth Circuit has recognized that "equitable considerations can justify only the subordination of claims, not their disallowance." *In re Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir. 1977). Further, the

---

[14] *See* Dkt. Nos. 1273, 1302, 1788, 2389.

003446

Supreme Court has indicated that the only grounds for disallowing a claim are those enumerated in section 502(b) of the Bankruptcy Code. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 444 (2007) ("But even where a party in interest objects, the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b)."). Inequitable conduct, as alleged by HMIT, is not one of the enumerated grounds for disallowance under section 502(b). *See* 11 U.S.C. § 502(b).

28.     The cases cited by HMIT in support of equitable disallowance, in addition to being out of circuit and counter to Fifth Circuit precedent, are inapposite. First, as the Southern District of New York has noted, "[w]hile courts … have permitted claims for equitable disallowance to survive motions to dismiss, no court has ever employed equitable disallowance as a remedy or sanction under the Bankruptcy Code." *In re LightSquared Inc.*, 504 B.R. 321, 338 (Bankr. S.D.N.Y. 2013). Notably, the statement from *Lightsquared* **specifically** cites to each of the cases that HMIT uses to advance its equitable disallowance argument. *Id.*

29.     Further, in each of the cited cases, the claims for which equitable disallowance was sought belonged to estate fiduciaries. *See Pepper v. Litton*, 308 U.S. 295, 311 (1939) (analyzing the ability to disallow claims of a fiduciary); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 71 (Bankr. S.D.N.Y. 2007) (same); *In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011) (same). Here, the claims were filed and settled by non-fiduciaries, and were allowed while the claims were still held by non-fiduciaries. Further, the claims were acquired by the Claim Purchasers well before they became members of the Claimant Trust Oversight Committee, and thus before they were estate fiduciaries. *Id*. Thus, the considerations discussed in *Adelphia*, *Pepper*, and *Washington Mutual* do not apply under the circumstances.

003447

30.     In the alternative, HMIT seeks equitable subordination of the Claim Purchasers'

claims. Proposed Complaint, ¶ 87 ("Pleading in the alternative only, subordination of Muck's and

Jessup's [claims] to all other interests in the Claimant Trust … is necessary and appropriate."). But

the plain language of section 510(c) of the Bankruptcy Code precludes the relief sought by HMIT:

"under principles of equitable subordination, [the court may] subordinate for purposes of

distribution all or part of an allowed claim to all or part of another allowed claim or all or part of

an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c).

31.     "Under the express language of 11 U.S.C. § 510(c), the Court may not subordinate

a claim to an equity interest; it may only subordinate one claim to another claim and one equity

interest to another equity interest." *In re Perry*, 425 B.R. 323, 380 (Bankr. S.D. Tex. 2010); *see

also SED Holdings, LLC v. 3 Star Props., LLC*, 2019 WL 13192236, *2 (S.D. Tex. Sept. 11, 2019)

("the claim may only be subordinated, but not disallowed."); *In re Winstar Commc'ns, Inc.*, 554

F.3d 382, 414 (3d Cir. 2009) ("Finally, Lucent contends that the Bankruptcy Court's equitable

subordination holding was inconsistent with the Bankruptcy Code because § 510(c) does not

permit the subordination of debt to equity. We agree.").

32.     HMIT's claims are based upon its previous equity interests in the Debtor. *See, e.g.*,

Motion to File Complaint, ¶ 8 ("HMIT was the largest equity holder in the Original Debtor and

held a 99.5% limited partnership interest."). Because the claims held by the Claim Purchasers

cannot be subordinated to HMIT's interests, equitable subordination would not benefit HMIT.

**C.     HMIT has not established a legally cognizable claim.**

33.     HMIT does not allege that it has any interest in the claims that were transferred to

Muck and Jessup, yet HMIT still seeks to challenge such transfers based on conclusory allegations

devoid of substance. Here, the Claim Sellers were creditors of the Debtor, and they were entitled

003448

to sell their claims to Muck and Jessup (or to any other buyer) on whatever terms (including price) the parties agreed to. HMIT has no right to second-guess those terms.

### i.    Claim Purchasers owed no duty owed to HMIT

34.    HMIT has not identified any legal duty that the Claim Purchasers owed to HMIT related to the claims transfers; nor has HMIT identified any authority for a private cause of action belonging to HMIT related to the claims transfers. The Claim Purchasers owed no duty (fiduciary or otherwise) to the bankruptcy estate, creditor, or equity holder at the time of the claim transfers. *See, e.g.*, *In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 651 (Bankr. E.D. La. 1988) (finding that an acquirer of a claim had no fiduciary duty to third parties, and the claim's effect on the bankruptcy estate before or after the claim's acquisition was the same, and "[t]herefore, there are no grounds for this Court to invoke its equitable powers to disallow or limit the claim of [the claim acquirer] in this bankruptcy case."); *In re Lorraine Castle Apartments Bldg. Corp.*, 149 F.2d 55, 57 (7th Cir. 1945) (finding that claim purchasers had no fiduciary duties to the estate or its beneficiaries).

35.    This is not a mere academic point. HMIT must have sustained a legal injury as a result of a breach of a legal duty. *See, e.g.*, *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976) ("It is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for an injury. … Without breach of a legal right belonging to the plaintiff no cause of action can accrue to his benefit."). This is fatal to HMIT's proposed claims.

### ii.    Claim Purchasers are not "non-statutory" insiders

36.    HMIT tries to avoid the fact that no duty was owed to it by the Claim Purchasers by alleging that the Claim Purchasers were non-statutory insiders at the time of the claim transfers. Proposed Complaint, ¶¶ 14, 17. This Court has addressed similar arguments in another case. *See, e.g.*, *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 535 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Capital Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

15

003449

37.     In deciding whether a person is a non-statutory insider, this Court has considered two factors: (i) the closeness of the relationship between the putative insider and the debtor; and (ii) whether the transactions between the putative insider and the debtor were conducted at arm's length. *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 535. "Under this test, because prongs one and two are conjunctive, a court's conclusion that the relevant transaction was conducted at arm's length necessarily defeats a finding of non-statutory insider status, regardless of how close a person's relationship with the debtor is or whether he is otherwise comparable to a statutorily enumerated insider." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 970 (2018) (concurrence). Here, HMIT fails to plead facts sufficient to show that the Claim Purchasers are non-statutory insiders.

38.     One prong of the test requires a showing that the transactions between the putative insider **and the debtor** were not conducted at arm's length. *See, e.g.*, *Acis Capital Mgmt*, 604 B.R. at 535. Here, the complained-of transactions are between the Claim Purchasers and the Claim Sellers, not the Debtor. *See, e.g.*, Proposed Complaint, ¶ 14 ("Because of their long-standing, historical relationships with Seery, **and their use of material non-public information**, the Defendant Purchasers obtained effective control over various affairs of the Debtor's bankruptcy, including compensation awards to Seery. As such, they became nonstatutory insiders.") (emphasis added); *id.*, ¶ 17 ("By acquiring the claims at issue, Muck and Jessup, the shell entities created and controlled by Stonehill and Farallon, also became non-statutory insiders, and also aided and abetted Seery's breaches of fiduciary duties."). HMIT's allegations miss the necessary element that the debtor be a party to the contested transaction.

39.     On the other prong of the test, showing an unwholesome relationship between the third party and the debtor, the factual bases upon which HMIT asserts that Claim Purchasers are

non-statutory insiders of the Debtors are insufficient. Essentially, HMIT argues that because Seery and the Claim Purchasers had business dealings in the past, including Seery allegedly representing Farallon as its legal counsel, that the Claim Purchasers should be deemed non-statutory insiders. *See* Proposed Complaint, ¶ 48. But prior business dealings alone is insufficient to confer non-statutory insider status on a non-debtor third party. *See Stalnaker v. Gratton (In re Rosen Auto Leasing)*, 346 B.R. 798, 801 (8th Cir. BAP 2006) (finding that a social relationship turned business relationship between a debtor's chairman and a third party was insufficient for such third party to be deemed a non-statutory insider of the debtor). Neither is a prior attorney-client relationship. *In re Olmos Equip., Inc.*, 601 B.R. 412, 426 (Bankr. W.D. Tex. 2019) (finding that a prior attorney-client relationship was insufficient to deem a third party a non-statutory insider). Accordingly, HMIT fails to meet the first prong of the non-statutory insider test.

40.     And, even assuming that the Claim Purchasers' acquisitions of the claims were the type of transaction that might confer non-statutory insider status on the Claim Purchasers, HMIT has not pleaded credible facts sufficient to show that the Claim Purchasers' acquisitions of the relevant claims were not at arm's-length. And, aside from conclusory implausible statements, the Proposed Complaint fails to set forth facts about any transactions between the Claim Purchasers, Seery, and/or the Debtor regarding Seery's compensation that can give rise to a reasonable inference that compensation decisions were not negotiated and agreed at arm's-length. HMIT's Proposed Complaint on its face fails to meet the second prong of the non-statutory insider test.

41.     Simply put, there is no meritorious, legally cognizable claim related to the transferred claims for HMIT to pursue, and thus the Motion to File Complaint should be denied.

003451

D.    **The Alleged Claims Must be "Colorable" to Overcome the Gatekeeper Provision.**

42.    The Claim Purchasers are protected by the "gatekeeper provision" in the Plan. Due to concerns about Dondero and his affiliates inundating the Debtor's bankruptcy estate with vexatious litigation,[15] the Plan contains a provision which requires any entity seeking to assert a claim against a "Protected Party"[16] to first obtain leave of the Bankruptcy Court before filing an action. *See* Plan, Art. IX(f). Specifically, the Plan states as follows:

> Subject in all respects to ARTICLE XII.D, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party . . . .

---

[15]    *See* Confirmation Order, ¶ 79 ("The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ('AON'), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.")

[16]    "Protected Party" is defined as "collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term 'Protected Party.'" Plan, Art. I(B)(104).

003452

*Id*.

43.     Here, as members of the Claimant Trust Oversight Committee (or Related Persons[17] of members of the Claimant Trust Oversight Committee), the Claim Purchasers are "Protected Parties." Because the allegations in the Proposed Complaint hinge on the Claim Purchasers acting as members of the Claimant Trust Oversight Committee to overpay Seery, the Claim Purchasers are Protected Parties.[18] Accordingly, all of the causes of action that HMIT seeks to assert against the Claim Purchasers in the Proposed Complaint are gated by the gatekeeper provision.

### E.     The Claims in the Proposed Complaint are not Plausible or Colorable.

44.     HMIT has argued that it must only satisfy the Rule 12(b)(6) pleading standard to establish that a colorable claim exists sufficient to overcome the gatekeeper provision. But if that were the case, HMIT's allegations would be presumed true, and the gatekeeper provision would have no practical effect. Rather, the proper inquiry is found under the *Barton* doctrine.

45.     In 1881, the Supreme Court established the *Barton* doctrine, which precluded suit being filed against court-appointed receivers absent the permission of the appointing court. *See Barton v. Barbour*, 104 U.S. 126, 127 (1881) ("It is a general rule that before suit is brought against a receiver leave of the court by which he was appointed must be obtained."). The *Barton* doctrine has since been expanded to protect, *inter alia*, court-appointed bankruptcy trustees. *See In re Christensen*, 598 B.R. 658, 664 (Bankr. D. Utah 2019) (stating that the *Barton* doctrine "precludes suit against a bankruptcy trustee for claims based on alleged misconduct in the discharge of a

---

[17]     As defined in the Plan, "Related Persons" means "with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case solely in their capacity as such." Plan, Art. I(B)(110).

[18]     *See, e.g.*, Proposed Complaint, ¶¶ 4, 14, 16, 18, 47, 65.

003453

trustee's official duties absent approval from the appointing bankruptcy court."). Because HMIT

seeks to file suit against Seery for alleged misconduct committed in furtherance of his official

duties, and because these allegations are inextricably intertwined with the allegations against the

Claim Purchasers, HMIT must satisfy *Barton* before its claims can move forward.

46.      The *Barton* doctrine is strictly a "jurisdictional gatekeeping doctrine," and it strips

all courts—except the bankruptcy court that appointed the trustee—of subject-matter jurisdiction

to hear a lawsuit against the trustee unless the bankruptcy court orders otherwise. *Id*. Under the

*Barton* Doctrine, a court must determine if the party seeking to sue a trustee made "a prima facie

case showing that [their claims are] not without foundation." *Id*.  Failure to establish a prima facie

case results in denial of leave to sue. *Id*. Although similar to the standard for a motion to dismiss

for failure to state a claim under FED. R. CIV. P. 12(b)(6), the "not without foundation" standard is

more flexible, and the proposed plaintiff must allege facts sufficient to state a claim to relief that

is "plausible on its face." *Id*. The Proposed Complaint fails to state facially plausible claims.

        **i.        The Proposed Complaint fails to plead facts which lead to the inference
                that the Claim Purchasers engaged in *quid pro quo* with Seery.**

47.      The Proposed Complaint asserts that the Claim Purchasers were "given control

(through Muck and Jessup) to approve discretionary bonuses and success fees for Seery from [the

Debtor's assets]." Proposed Complaint, ¶ 54; *see also id.*, ¶¶ 4, 14, 16, 65, 71. The Proposed

Complaint is devoid of any factual assertions as to how the Claim Purchasers have affected Seery's

compensation, and for this reason alone, the Proposed Complaint fails to assert a colorable cause

against the Claim Purchasers for "knowing participation in Breach of Fiduciary Duties" (Count II)

or "Conspiracy" (Count III), as each relies on the Claim Purchasers providing *quid pro quo* in

exchange for allegedly receiving material non-public information. Proposed Complaint, ¶¶ 71, 77.

003454

> ii.   **The Proposed Complaint fails to plead facts which lead to the inference that Seery provided the Claim Purchasers with material, non-public information.**

48.     The allegations in the Proposed Complaint against the Claim Purchasers rely on the conclusory assertion that Seery provided the Claim Purchasers with material, non-public information that the Claim Purchasers used to their benefit in purchasing the claims. *See, e.g.*, Proposed Complaint, ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants, with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."). In support of that allegation, however, HMIT offers no factual support, and in fact admits that a logical leap is required to arrive at the conclusion that the Claim Purchasers were involved in nefarious activity:

> It made no sense for the Defendant Purchasers to invest millions of dollars for assets that –per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk. ***The counter-intuitive nature of the purchases at issue compels the conclusion that the Defendant Purchasers acted on inside information and Seery's secret assurance of great profits.***

*Id.* (emphasis added). Unsubstantiated claims of "counter-intuitive," "secret," unprofessional actions by the respected professional this Court appointed are not plausible. For this reason alone, the Proposed Complaint fails to assert a colorable claim. Yet the Proposed Complaint suffers from other deficiencies rendering the causes of action it seeks to assert non-colorable.

49.     The Proposed Complaint admits that when the Claim Purchasers acquired the relevant claims, they would have turned a profit based upon then-existing projections. *See, e.g.*, *id.*, ¶ 3 (arguing only that the purchased claims "did not offer sufficient potential profit" to justify their purchase); *id.* ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); *id.* ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any* **significant** profit at the time of their multi-million-dollar investments

003455

given the publicly available, negative financial information.") (bold added). HMIT's speculation about what level of projected return would be sufficient for the Claims Purchasers to purchase the claims does not give rise to a plausible inference that they acted improperly.

50.     Second, contrary to the Proposed Complaint's statement that it would have been "*impossible* for Stonehill and Farallon (in the absence of insider information) to forecast *any* significant profit at the time of their multi-million-dollar investments," there was already media reporting that MGM was engaging with Apple and others on selling its media portfolio. *See, e.g.*, Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.), https://www.wsj.com/articles/mgm-holdings-studio-behind-james-bond-explores-a-sale-11608588732.  Far from material non-public information, the fact that MGM was negotiating a potential transaction was publicly known. HMIT's suggestion that the Claims Purchasers had information not known to the Claims Sellers is not plausible.

51.     Finally, the Claim Purchasers acquired the UBS Claims approximately two and a half months *after* the announcement of the Amazon/MGM transaction, a fact which the Proposed Complaint neither discloses nor attempts to harmonize with its overall theory of the Claim Purchasers profiting from inside information. The Proposed Complaint's lack of internal consistency, as well as its lack of consistency with verifiable public facts, renders it implausible.

52.     Accordingly, the Proposed Complaint is devoid of necessary factual assertions, and what facts are pleaded do not take the causes of action in the Proposed Complaint from the realm of "conceivable" to being "plausible," as required under relevant law.

For these reasons, the Claim Purchasers respectfully request that the Court deny the Motion to File Complaint, and grant the Claim Purchasers such other and further relief as is just and proper.

003456

Dated:  May 11, 2023        HOLLAND & KNIGHT LLP

By: */s/ Christopher A. Bailey*
Brent R. McIlwain, TSB 24013140
David C. Schulte    TSB 24037456
Christopher A. Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
Tel.:   (214) 964-9500
Fax     (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com


COUNSEL TO MUCK HOLDINGS, LLC,
JESSUP HOLDINGS LLC, FARALLON
CAPITAL MANAGEMENT, L.L.C., AND
STONEHILL CAPITAL MANAGEMENT LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk

of Court using the CM/ECF system, and served upon all parties receiving notice pursuant to the

CM/ECF system on this the 11th day of May, 2023.


*/s/ Christopher A. Bailey*
Christopher A. Bailey

23

003457



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 10, 2023**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj |
| Reorganized Debtor. | |

## ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE
## WITH RESPECT TO HUNTER MOUNTAIN INVESTMENT TRUST'S
## EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
## <u>ADVERSARY PROCEEDING AS SUPPLEMENTED</u>

The Court conducted a status conference on April 24, 2023, concerning the final scheduling

of *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699] and

Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Docket No.

3760] (collectively, the "<u>Underlying Motion</u>"), as well as whether the hearing on the Underlying

Motion would be evidentiary, and the Court having considered (i) the *Opposed Emergency Motion*

---

003458

*to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3738] (the "Motion")[1] filed by Highland Capital Management, L.P., and the Highland Claimant Trust; (ii) the *Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3740] filed by Muck Holdings, LLC, Jessup Holdings LLC, Farallon Capital Management, L.L.C., and Stonehill Capital Management LLC; (iii) the *Response and Reservation of Rights* [Docket No. 3748] filed by Hunter Mountain Investment Trust; (iv) the *Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"* [Docket No. 3758] filed by Hunter Mountain Investment Trust, and (v) the arguments of counsel,

**IT IS HEREBY ORDERED** that:

1.      The hearing on Hunter Mountain Investment Trust's *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699] and Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding [Docket No. 3760] (collectively, the "Underlying Motion") shall be held in person on **June 8, 2023, at 9:30 a.m. (Central Time)** before the Honorable Stacey G. C. Jernigan, at **1100 Commerce Street, 14th Floor, Courtroom 1, Dallas, Texas**, and by Webex for those interested but not directly participating in the hearing.

2.      Any responses to the Underlying Motion shall be filed no later than May 11, 2023.

3.      Any replies in support of the Underlying Motion shall be filed no later than May 18, 2023.

4.      The Court will advise the parties on or reasonably after May 18, 2023, whether the Court intends to conduct the hearing on an evidentiary basis.

**###End of Order###**

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

**ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE WITH RESPECT TO HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERARY PROCEEDING AS SUPPLEMENTED**
Page 2

003459

Approved as Form Only:

PARSONS MCENTIRE MCCLEARY PLLC

/s/ Sawnie A. McEntire_____
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Counsel for Hunter Mountain Investment Trust*

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

HAYWARD PLLC

/s/ Zachery Z. Annable_____
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)

---

**ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE WITH RESPECT TO HUNTER
MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
ADVERARY PROCEEDING AS SUPPLEMENTED**
Page 3

10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P. and the*
*Highland Claimant Trust*

HOLLAND & KNIGHT LLP

/s/ *Christopher A. Bailey*
Brent R. McIlwain, TSB 24013140
David C. Schulte TSB 24037456
Christopher A. Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
Tel.: (214) 964-9500
Fax (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

*Counsel for Muck Holdings, LLC,*
*Jessup Holdings LLC, Farallon*
*Capital Management, L.L.C., and*
*Stonehill Capital Management LLC*

REED SMITH LLP

/s/ Omar J. Alaniz
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood Street, Suite 1500
Dallas, Texas 75201
T: 469.680.4200
F: 469.680.4299
oalaniz@reedsmith.com
lrobin@reedsmith.com

WILLKIE FARR & GALLAGHER LLP

---

**ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE WITH RESPECT TO HUNTER
MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
ADVERARY PROCEEDING AS SUPPLEMENTED**
Page 4

003461

Mark T. Stancil
Joshua S. Levy
1875 K Street, N.W.
Washington, DC 20006
T: 202.303.1000
mstancil@willkie.com
jlevy@willkie.com

*Counsel for James P. Seery, Jr.*

**ORDER FIXING BRIEFING SCHEDULE AND HEARING DATE WITH RESPECT TO HUNTER
MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED
ADVERARY PROCEEDING AS SUPPLEMENTED**
Page 5

003462

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris *(*admitted *pro hac vice)*
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

REED SMITH LLP
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for Highland Capital Management, L.P.,
and the Highland Claimant Trust*

*Counsel for James P. Seery, Jr.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND
JAMES P. SEERY, JR.'S JOINT OPPOSITION TO HUNTER MOUNTAIN
INVESTMENT TRUST'S MOTION FOR LEAVE TO FILE
<u>VERIFIED ADVERSARY PROCEEDING</u>**

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for
Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTUAL BACKGROUND ............................................................................... 5

    A.    The Gatekeeper Provision Was Adopted To Prevent Baseless Litigation............. 5

    B.    Dondero, Patrick, And HMIT Unsuccessfully Search For Allegations To Manufacture A Complaint. ................................................................................ 6

    C.    The Premise Of HMIT's Proposed Complaint—An Alleged *Quid Pro Quo* Between Seery And The Claims Purchasers—Is Demonstrably False................. 8

    D.    The Allegations Concerning MGM and Insider Trading Have No Basis In Fact............................................................................................................. 9

    E.    HMIT's Allegations Concerning Seery's Alleged Relationships With The Claims Purchasers Are Unsupported And Provide No Foundation For The Purported Inferences. ................................................................................ 17

    F.    HMIT's "Insider Trading" Allegations Are Unsupported And Provide No Foundation For The Purported Inferences. .................................................. 19

    G.    A Rational Basis Exists For the Claims Purchases—Although Only the Claim Sellers Could Have Been Harmed in Any Event. .................................... 23

    H.    Seery's Compensation Structure Is Consistent With The Plan And The Trust Agreement, And Was The Product Of Arms'-Length Negotiations. ......... 25

RELEVANT PROCEDURAL HISTORY ............................................................................. 29

LEGAL STANDARD ............................................................................................................... 32

    A.    HMIT Misconstrues The "Colorability" Standard Established In The Gatekeeper Provision. ............................................................................... 32

    B.    Evidentiary Hearing ................................................................................... 36

    C.    Exculpation and Release .............................................................................. 38

ARGUMENT ............................................................................................................................. 38

I.    HMIT LACKS STANDING TO BRING DERIVATIVE CLAIMS UNDER DELAWARE LAW. ............................................................................................ 38

    A.    HMIT Lacks Standing To Bring Derivative Claims On Behalf Of The Trust. ............................................................................................................ 39

    B.    HMIT Lacks Standing To Bring Derivative Claims On HCMLP's Behalf......... 40

    C.    HMIT Lacks Standing To Bring A "Double Derivative" Action. ...................... 42

II.    HMIT LACKS STANDING TO BRING DERIVATIVE CLAIMS UNDER FEDERAL BANKRUPTCY LAW. ................................................................... 42

    A.    Federal Law Does Not Confer Standing Prohibited By Delaware Law. ............. 43

B.      HMIT Cannot Meet The *Louisiana World* Standard Governing Derivative
        Actions By Creditors In Bankruptcy................................................................... 44

C.      HMIT Lacks Standing To Bring Derivative Claims Challenging Pre-
        Confirmation Conduct. ...................................................................................... 47

III.    HMIT DID NOT SATISFY THE PROCEDURAL REQUIREMENTS TO
        BRING A DERIVATIVE ACTION. .................................................................... 48

A.      HMIT Failed To Include The Litigation Trust As A Party.................................. 48

B.      HMIT Failed To Make Any Demand To The Litigation Trustee And Fails
        To Plead Demand Futility With Particularity. ..................................................... 49

C.      HMIT Cannot "Fairly And Adequately" Represent The Interests of
        Claimant Trust Beneficiaries. ............................................................................. 51

IV.     HMIT HAS NO DIRECT CLAIMS AGAINST THE HIGHLAND PARTIES. ............ 52

V.      HMIT'S PROPOSED COMPLAINT FAILS TO PLAUSIBLY ALLEGE ANY
        CLAIMS AGAINST THE PROPOSED DEFENDANTS. ............................................ 55

A.      HMIT Does Not Adequately Allege Any Breach Of Fiduciary Duties
        (Count I)............................................................................................................ 55

B.      HMIT's Theories Of Secondary Liability Fail (Counts II and III)...................... 58

C.      HMIT Seeks Remedies That Are Not Available As A Matter Of Law
        (Counts IV, V, and VI). ...................................................................................... 60

CONCLUSION............................................................................................................... 62

003465

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abraham v. Exxon Corp.,*
85 F.3d 1126 (5th Cir. 1996) ................................................................36

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC,*
580 S.W.3d 136 (Tex. 2019) ................................................................59

*Alexander v. Hedback,*
718 F.3d 762 (8th Cir. 2013) ................................................................37

*Am. Med. Hospice Care, LLC v. Azar,*
2020 WL 9814144 (W.D. Tex. Dec. 9, 2020) ......................................36

*Anderson v. United States,*
520 F.2d 1027 (5th Cir. 1975) ..............................................................33

*Armstrong v. Capshaw, Goss & Bowers LLP,*
404 F.3d 933 (5th Cir. 2005) ................................................................53

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................55, 56, 60

*Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.,*
2020 WL 2521557 (Del. Super. May 18, 2020) ...................................55

*Barton v. Barbour,*
104 U.S. 126 (1881) ...........................................................................3, 32

*BCC Merch. Sols., Inc. v. Jet Pay, LLC,*
129 F. Supp. 3d 440 (N.D. Tex. 2015) .................................................48

*In re Beck Indus., Inc.,*
725 F.2d 880 (2d Cir. 1984) .................................................................37

*In re Bednar,*
2021 WL 1625399 (B.A.P. 10th Cir. Apr. 27, 2021) ...........................37

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................55, 56, 60

*Benjamin v. Diamond (In re Mobile Steel Co.),*
563 F.2d 692 (5th Cir. 1977) ...........................................................60, 61

003466

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.,*
   247 F. Supp. 3d 377 (S.D.N.Y. 2017) ..................................................................49

*Brooks v. United Dev. Funding III, L.P.,*
   2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ......................................................56

*Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.),*
   539 B.R. 31 (S.D.N.Y. 2015) ...............................................................................61

*Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)* ,
   66 F.3d 1436 (6th Cir. 1995) ...................................................................35, 45, 46

*CFTC v. Hunter Wise Commodities, LLC,*
   2020 WL 13413703 (S.D. Fla. Mar. 5, 2020) ......................................................33

*CML V, LLC v. Bax,*
   28 A.3d 1037 (Del. 2011) ...............................................................................39, 41

*CML V, LLC v. Bax,*
   6 A.3d 238 (Del. Ch. 2010) ..................................................................................41

*Collins Cnty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods,*
   915 F.2d 167 (5th Cir. 1990) ................................................................................61

*Davis v. Comed, Inc.,*
   619 F.2d 588 (6th Cir. 1980) ................................................................................51

*El Paso Pipeline GP Co. v. Brinckerhoff,*
   152 A.3d 1248 (Del. 2016) ........................................................................41, 53, 54

*Energytec, Inc. v. Proctor,*
   2008 WL 4131257 (N.D. Tex. Aug. 29, 2008) ...............................................51, 52

*English v. Narang,*
   2019 WL 1300855 (Del. Ch. Mar. 20, 2019) .......................................................59

*Family Rehab., Inc. v. Azar,*
   886 F.3d 496 (5th Cir. 2018) ................................................................................36

*Fin. Indus. Assoc. v. SEC,*
   2013 WL 11327680 (M.D. Fla. July 24, 2013) ....................................................33

*Fortune Prod. Co. v. Conoco, Inc.,*
   52 S.W.3d 671 (Tex. 2000) ...................................................................................61

*Foster v. Aurzada (In re Foster),*
   2023 WL 20872 (5th Cir. Jan. 3, 2023) ...............................................................36

*Gatz v. Ponsoldt*,
    2004 WL 3029868 (Del. Ch. Nov. 5, 2004) ...............................................53

*Gerber v EPE Holdings, LLC*,
    2013 WL 209658 (Del. Ch. Jan. 18, 2013) ..............................................54

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006) ............................................................62

*Gilbert v El Paso Co.*,
    1988 WL 124325 (Del. Ch. Nov. 21, 1988) ...........................................56

*Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*,
    207 F. Supp. 2d 570 (N.D. Tex. 2002) ..................................................36

*Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*,
    716 F.3d 404 (6th Cir. 2013) ...............................................................37

*Green v. Wells Fargo Home Mtg.*,
    2016 WL 3746276 (S.D. Tex. June 7, 2016) .........................................61

*Hargrove v. WMC Mortg. Corp.*,
    2008 WL 4056292 (S.D. Tex. Aug. 29, 2008) ......................................60

*Harry v. Colvin*,
    2013 WL 12174300 (W.D. Tex. Nov. 6, 2013) .....................................36

*Hartsel v. Vanguard Grp., Inc.*,
    2011 WL 2421003 (Del. Ch. Jun. 15, 2011) .....................................39, 40

*In re Highland Cap. Mgmt., L.P.*,
    2021 WL 2326350 (Bankr. N.D. Tex. June 7, 2021) .............................52

*Hill v. Keliher*,
    2022 WL 213978 (Tex. App. Jan. 25, 2022) .........................................59

*Howell v. Adler (In re Grodsky)*,
    2019 WL 2006020 (Bankr. E.D. La. Apr. 11, 2019) ............................36

*In re Hunter Mt. Inv. Tr.*,
    No. 23-10376 (5th Cir. Apr. 12, 2023) .................................................62

*Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*,
    2020 WL 967942 (Del. Ch. Feb. 28, 2020) ..........................................56

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ...............................................................................43

003468

*Kashani v. Fulton (In re Kashani)*,
  190 B.R. 875 (B.A.P. 9th Cir 1995)...................................................................33, 36

*Klaassen v Allegro Dev. Corp.*,
  2013 WL 5967028 (Del. Ch. Nov. 7, 2013) ................................................................56

*Klinek v. LuxeYard, Inc.*,
  596 S.W.3d 437 (Tex. App. – Houston [14th Dist.] 2020)......................................59

*La. World Expo. v. Fed. Ins. Co.*,
  858 F.2d 233 (5th Cir. 1988) ................................................................... *passim*

*Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*,
  732 F.3d 326 (5th Cir. 2013) ................................................................................36

*Lambrecht v. O'Neal*,
  3 A.3d 277 (Del. 2010) ...............................................................................42, 49

*Larson v. Foster (In re Foster)*,
  516 B.R. 537 (B.A.P. 8th Cir. 2014)........................................................................35

*Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*,
  2000 WL 1761020 (N.D. Ill. Nov. 30, 2000) ...........................................................34

*In re Lightsquared Inc.*,
  504 B.R. 321 (Bankr. S.D.N.Y. 2013)......................................................................60

*In re Linton*,
  136 F.3d 544 (7th Cir. 1998) ....................................................................................37

*In re Lupo*,
  2014 WL 4653064 (B.A.P. 1st Cir. Sept. 17, 2014) ..................................................37

*Marucci Sports, L.L.C. v. NCAA*,
  751 F.3d 368 (5th Cir. 2014) ...................................................................................62

*McMillan .v Intercargo Corp.*,
  768 A.2d 492 (Del. Ch. 2000)..................................................................................58

*Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*,
  912 F.3d 291 (5th Cir. 2019) ............................................................................53, 54

*In re Nat'l Coll. Student Loan Tr. Litig.*,
  251 A.3d 116 (Del. Ch. 2020)............................................................................39, 40

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
  48 F.4th 419 (5th Cir. 2022) ..................................................................... *passim*

003469

*Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.),*
225 B.R. 275 (Bankr. S.D.N.Y. 1998) ...........................................................35, 46

*In re On-Site Fuel Serv., Inc.,*
2020 WL 3703004 (Bankr. S.D. Miss. May 8, 2020) ..................................................45

*Panaras v. Liquid Carbonic Indus. Corp.,*
74 F.3d 786 (7th Cir. 1996) ...........................................................36

*Pfeffer v. Redstone,*
965 A.2d 676 (Del. 2009) ...........................................................58

*Pike v. Texas EMC Mgmt., LLC,*
610 S.W.3d 763 (Tex. 2020) ...........................................................54

*PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.),*
540 F.3d 892 (8th Cir. 2008) ...........................................................*passim*

*Reed v. Cooper (In re Cooper),*
405 B.R. 801 (Bankr. N.D. Tex. 2009) ...........................................................43, 45

*Reed v. Linehan (In re Soporex, Inc.),*
463 B.R. 344 (Bankr. N.D. Tex. 2011) ...........................................................57

*Reyes v. Vanmatre,*
2021 WL 5905557 (S.D. Tex. Dec. 13, 2021) ...........................................................36

*Richardson v. United States,*
468 U.S. 317 (1984) ...........................................................36

*Sabhari v. Mukasey,*
522 F.3d 842 (8th Cir. 2008) ...........................................................36

*Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.,*
34 A.3d 1074 (Del. 2011) ...........................................................38, 42, 49

*Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commcn's, Inc.),*
2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011) ...........................................................41, 52, 53

*Schwab v. Oscar (In re SII Liquidation Co.),*
2012 WL 4327055 (Bankr. S.D. Ohio Sept. 20, 2012) ...........................................................49

*SEC v. Cuban,*
2013 WL 791405 (N.D. Tex. Mar. 5, 2013) ...........................................................57

*SEC v. Mayhew,*
121 F.3d 44 (2d Cir. 1997) ...........................................................57

003470

*SEC v. N. Am. Clearing, Inc.*,
    656 F. App'x 969 (11th Cir. 2016) ................................................. 37

*SED Holdings, LLC v. 3 Star Props., LLC*,
    2019 WL 13192236 (S.D. Tex. Sept. 11, 2019) ........................... 60

*Sherer v. Sherer*,
    393 S.W.3d 480 (Tex. App. 2013) ................................................. 61

*Silver v. City of San Antonio*,
    2020 WL 3803922 (W.D. Tex. July 7, 2020) ............................... 34

*Silver v. Perez*,
    2020 WL 3790489 (W.D. Tex. July 7, 2020) ............................... 34

*In re Six Flags Ent. Corp. Deriv. Litig.*,
    2021 WL 1662466 (N.D. Tex. Apr. 28, 2021) ............................. 50

*Smith v. Ayres*,
    977 F.2d 946 (5th Cir. 1992) ......................................................... 51

*Stanley v. Gonzales*,
    476 F.3d 653 (9th Cir. 2007) ......................................................... 36

*In re STN Enterps.*,
    779 F.2d 901 (2d Cir. 1985) ......................................................... 46

*Taylor v. Trevino*,
    569 F. Supp. 3d 414 (N.D. Tex. 2021) ......................................... 61

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996) ......................................................... 59

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ........................................................... 53

*Tow v. Amegy Bank, N.A.*,
    976 F. Supp. 2d 889 (S.D. Tex. 2013) .................................... 40, 41

*Trippodo v. SP Plus Corp.*,
    2021 WL 2446204 (S.D. Tex. June 15, 2021) ............................. 36

*United Food & Comm. Workers Union v. Zuckerberg*,
    250 A.3d 862 (Del. Ch. 2020) ....................................................... 50

*In re VistaCare Grp., LLC*,
    678 F.3d 218 (3d Cir. 2012) ................................................ *passim*

003471

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.),*
   714 F.3d 860 (5th Cir. 2013) ...........................................................47, 48

*In re World Mktg. Chi., LLC,*
   584 B.R. 737 (Bankr. N.D. Ill. 2018) ........................................................34

*In re WorldCom, Inc.,*
   351 B.R. 130 (Bankr. S.D.N.Y. 2006)........................................................41

*Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power),*
   563 B.R. 614 (Bankr. W.D. Tex. 2016).......................................................59

*Yowell v. Granite Operating Co.,*
   630 S.W.3d 566 (Tex. App. 2021)..............................................................61

**Statutes**

6 Del. C. § 17-211(h) ........................................................................................41

6 Del. C. § 17-1002 ...................................................................................40, 42

12 Del C. § 3803(b) ..........................................................................................55

12 Del C. § 3803(c) ..........................................................................................55

12 Del C. § 3816(b) ..........................................................................................39

11 U.S.C. § 541(a)(1) .......................................................................................53

28 U.S.C. § 2072(b) ..........................................................................................43

**Rules**

Fed. R. Bankr. P. 7012(b) .................................................................................49

Fed. R. Bankr. P. 7019 ......................................................................................49

Fed. R. Bankr. P. 7023.1 ........................................................................43, 50, 51

Fed. R. Civ. P. 12(b)(6) .............................................................................. *passim*

Fed. R. Civ. P. 12(b)(7) .....................................................................................49

Fed. R. Civ. P. 17(a) .........................................................................................48

Fed. R. Civ. P. 19(a)(1) .....................................................................................49

Fed. R. Civ. P. 23.1 ................................................................................43, 50, 51

003472

Tex. R. Civ. P. 202.......................................................................................................... *passim*

**Other Authorities**

Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of
    Chapter 11s*,
    29 Am. Bankr. Inst. J. 61 (July/Aug. 2010)............................................................56

Michael H. Whitaker, *Regulating Claims Trading in Chapter 11 Bankruptcies: A
    Proposal for Mandatory Disclosure*,
    3 Cornell J.L. & Pub. Pol'y 303 (1994)..................................................................56

003473

Highland Capital Management, L.P. ("HCMLP" or, as applicable, the "Debtor"), the reorganized debtor in the above-referenced bankruptcy case, the Highland Claimant Trust (the "Trust"; together with HCMLP, "Highland"), and James P. Seery, Jr., HCMLP's Chief Executive Officer and the Claimant Trustee of the Trust ("Seery"; together with Highland, the "Highland Parties"), by and through their undersigned counsel, hereby file this opposition (the "Opposition") to *Hunter Mountain Investment Trust's* ("HMIT") *Emergency Motion for Leave to File Verified Adversary Petition* ("Initial Motion" or "Mot."; Docket No. 3699) and *Hunter Mountain Investment Trust's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplemental Motion" or "Supp. Mot."; Docket No. 3760; collectively, the "Motion"). In support of their Opposition, the Highland Parties state as follows:

## PRELIMINARY STATEMENT[1]

1.      This Motion is the latest attempt by James Dondero ("Dondero") to make good on his threat to "burn down the place." This iteration involves baseless and personal attacks against the Proposed Defendants,[2] harassing those individuals charged with maximizing value for creditors while (perversely) wasting Highland's resources. Dondero's demonstrated hostility to Highland's legitimate goals is precisely why this Court entered the Gatekeeper Provision at issue here, and the current Motion vividly illustrates the wisdom of installing that prophylaxis. HMIT's Motion should be denied.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] "Proposed Defendants" refers to, collectively, Seery, Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"; collectively with Muck, Jessup, and Farallon, the "Claims Purchasers"), and John Doe Defendant Nos. 1–10.

003474

2.      HMIT's proposed Complaint ("Compl."; Docket No. 3760-1) is long on rhetoric,

unsupported conspiracy theories, and conclusory statements, but short on actual factual

allegations. For all its bluster, the Complaint rests entirely on the following assertions:

- On December 17, 2021, Dondero sent an unsolicited email to Seery regarding a potential acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). At the time, the Debtor owned MGM stock directly and managed an entity that owned, among numerous other assets, subordinated debt in other entities that owned MGM stock (Compl. ¶¶ 44–45);

- Seery purportedly communicated with principals at Farallon and Stonehill, entities with which Seery allegedly did "substantial business" more than a decade before he assumed his roles at Highland. (*Id.* ¶ 48.) The Complaint contains no allegations regarding *when* these communications supposedly occurred, but speculates that Seery provided "material non-public information" about MGM and vague "assurances of great profits" on Highland claims (*id.* ¶¶ 3, 13–14, 47, 50);

- In April 2021 (four months after Dondero's unsolicited email), Farallon and Stonehill purchased "approved unsecured claims" of Highland at a 65% discount to face value. Based on the "publicly projected" estimates in Debtor's November 30, 2020, Disclosure Statement—which the Complaint touts as the only public source of information regarding the claims' potential value—Farallon and Stonehill stood to earn at least an 18% return on those purchases (*id.* ¶¶ 3, 37, 42); and

- In August 2021 (eight months after Dondero's unsolicited email), Farallon and Stonehill became members of the Claimant Oversight Board ("COB"). Under the Court-approved Chapter 11 Plan, Seery earned a set base salary and a performance-based bonus. The Complaint speculates that negotiations over the latter component "were not arm's-length," but contains no allegations about the negotiation process or the terms of Seery's final compensation package (*id.* ¶¶ 4, 13, 54.

The remainder of the Complaint consists of rhetorical rehash of these basic contentions, *ad*

*hominem* attacks, or a self-serving (and utterly unsupported) claim by Dondero that a Farallon

principal confessed this purported scheme to Dondero.

3.      The Motion should be denied for three, independently sufficient reasons. **First**, as

a threshold legal matter, HMIT, as a holder of unvested, contingent interests, lacks standing to

bring derivative claims on behalf of the Trust or HCMLP under applicable state law and the

003475

Claimant Trust Agreement ("<u>Trust Agreement</u>" or "<u>Trust Agmt.</u>"). HMIT cannot escape this

reality by alternatively asserting its claims as nonexistent direct claims.

4.      ***Second***, HMIT's claims are not "colorable" as that term is used in the Court-

approved Plan and the Gatekeeper Provision included in this Court's Confirmation Order. (Plan

Art. IX.F; Confirmation Order ¶¶ 72, 76, 81.) As the Confirmation Order expressly stated, the

Gatekeeper Provision requires Dondero to make a threshold showing consistent with the (i) "the

Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))," and (ii) "the notion

of a prefiling injunction to deter vexatious litigants, that has been approved by Fifth Circuit." (*Id.*

¶¶ 76–81.) The Fifth Circuit confirmed as much when it rejected (in relevant part) Dondero's

confirmation appeal, holding that the Gatekeeper Provision "screen[s] and prevent[s] bad-faith

litigation against Highland Capital, its successors, and other bankruptcy participants that could

disrupt the Plan's effectiveness." *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re

Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

5.      It is well-settled that "colorability" in this context requires HMIT to demonstrate

***more*** than the bare-bones Fed. R. Civ. P. 12(b)(6) "plausibility" standard. HMIT must demonstrate

the "foundation" for its "*prima facie* case." *In re VistaCare Grp., LLC*, 678 F.3d 218, 232 (3d Cir.

2012). Accordingly, and contrary to HMIT's contention, evidentiary hearings are routinely

conducted in this setting—particularly where (as here) the movant has larded its complaint with

unsupported, conclusory assertions that cannot withstand even passing scrutiny and has attached

hundreds of pages of exhibits and two self-serving declarations in support of its motion. HMIT's

proffered gatekeeping standard, by contrast, would impose no hurdle at all and would render the

threshold entirely duplicative of the motion to dismiss standard that every litigant already faces.

In addition to ignoring the stated purposes and intent of the Gatekeeper Provision (which are long

since beyond collateral attack) and the factual bases upon which it was adopted, HMIT offers no reason why litigants whose serial abuses earned the imposition of the Gatekeeper Provision should be subject to the same standard as everyone else. To state that absurd contention is to refute it, and would essentially nullify this Court's authority to police its own docket.

6.      ***Third***, even if the Rule 12(b)(6) standard applied, HMIT's bare-bones Complaint would fail. Even accepting the sparse factual allegations as true for purposes of this Motion, its central conclusions collapse under their own weight. For example, assuming that Dondero's unsolicited December 17, 2020 email, which violated this Court's TRO, included confidential information regarding MGM, the Complaint does not allege that such information remained nonpublic at the unidentified time Seery supposedly communicated with Farallon and Stonehill— and the Complaint acknowledges that neither entity purchased claims before April 2021. Likewise, although the Complaint's central thesis is that Farallon and Stonehill would not have purchased the Highland claims without knowing the supposedly secret MGM information, the Complaint acknowledges that the November 30, 2020 Disclosure Statement predicted a recovery ***significantly above*** what Farallon and Stonehill allegedly paid for the claims in April 2021.

7.      While such self-contradictory and sparse allegations ordinarily might counsel in favor of denying the Motion under the Rule 12(b)(6) standard (*i.e.*, obviating the need to decide whether the *Barton*/vexatious-litigant standard applies), the Highland Parties respectfully request that this Court conduct the Rule 12(b)(6) analysis only in the alternative. Given the litigiousness of Dondero and his affiliated entities, who inevitably will appeal any adverse decision, the Fifth Circuit will benefit from a full record. Applying the correct heightened standard will also serve important interests going forward. This Motion is unlikely to be the last to require application of

the Gatekeeper Provision, and significant interests of judicial economy will be served by
definitively establishing the threshold standard and propriety of an evidentiary hearing.

## RELEVANT FACTUAL BACKGROUND

### A.    The Gatekeeper Provision Was Adopted To Prevent Baseless Litigation.

8.    HMIT was required to file the Motion in accordance with a provision in Highland's
confirmed Plan known as the "gatekeeper" (the "Gatekeeper Provision"). (Morris Dec. Ex. 1 at
51–52.)[3] The Gatekeeper Provision states, in pertinent part, that:

> [N]o Enjoined Party may commence or pursue a claim or cause of
> action of any kind against any Protected Party that arose or arises
> from or is related to the Chapter 11 Case . . . ***without the Bankruptcy
> Court (i) first determining, after notice and a hearing, that such
> claim or cause of action represents a colorable claim*** of any kind,
> including, but not limited to, negligence, bad faith, criminal
> misconduct, willful misconduct, fraud, or gross negligence against
> a Protected Party and (ii) specifically authorizing such Enjoined
> Party to bring such claim or cause of action against such Protected
> Party.

(*Id*. (emphasis added).)[4]

9.    The Gatekeeper Provision is not a garden-variety plan provision. Rather, as this
Court stated in its order confirming the Plan,[5] the Gatekeeper Provision was adopted as a direct
result of Dondero's history of harassing, costly litigation. In describing the factual support for the
Gatekeeper Provision, this Court observed that "prior to the commencement of the Debtor's

---

[3] References to the "Plan" are to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*. (Morris Dec. Ex. 1.) Citations to "Morris Dec. Ex. __" are to the exhibits attached to the *Declaration of John A. Morris In Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* accompanying this Opposition.

[4] Under the Plan, HMIT is an "Enjoined Party," and HCMLP, the Trust, Seery (in various capacities), Farallon, and Stonehill (in their capacities as members of the COB approving Seery's compensation) are "Protected Parties." (Plan Arts. I.B.56, I.B.105.)

[5] (Morris Dec. Ex. 2 (the "Confirmation Order").)

003478

bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation some of which had gone on for years and, in some cases, over a decade . . . . During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor." (Confirmation Order ¶ 77.)

10.    The Court further found that the "Dondero Post-Petition Litigation [as defined] was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would 'burn down the place.'" (*Id*. ¶ 78.)

11.    These findings of fact—all of which the Fifth Circuit left undisturbed while affirming, in relevant part, the Confirmation Order—were the foundation upon which the Gatekeeper Provision was adopted:

> Approval of *the Gatekeeper Provision will prevent baseless litigation* designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will *avoid abuse of the Court system and preempt the use of judicial time* that properly could be used to consider the meritorious claims of other litigants.

(*Id*. ¶ 79 (emphasis added).)

**B.    Dondero, Patrick, And HMIT Unsuccessfully Search For Allegations To Manufacture A Complaint.**

12.    HMIT's proposed Complaint is premised on two primary allegations emanating from Dondero: (i) Seery supposedly shared with the Claims Purchasers "material, non-public inside information" that he had obtained from Dondero as part of a *quid pro quo* pursuant to which the Claims Purchasers would someday return the favor by joining the COB and "rubber-stamping" Seery's compensation package, and (ii) a representative of Farallon essentially confessed to the arrangement in one or more phone calls with Dondero in the late Spring of 2021. Despite knowing

of these alleged "facts," Dondero, Mark Patrick ("Patrick"),[6] HMIT's purported manager, and

HMIT did not bring any claims but instead sought discovery—which two different Texas state

courts denied.

1.   The First Rule 202 Petition

13.   On July 22, 2021, Dondero filed a petition in Texas state court seeking pre-suit

discovery against Farallon and Alvarez & Marsal pursuant to Tex. R. Civ. P. 202 (the "First

Rule 202 Petition"). (Morris Dec. Ex. 3.) The First Rule 202 Petition was based, in part, on

Dondero's allegations that (i) Seery possessed "non-public, material information" that "[u]pon

information and belief . . . was the basis for instructing Farallon to purchase the Claims," and that

(ii) he had a telephone call with Michael Linn ("Linn"), a representative of Farallon, in which Linn

allegedly told Dondero that "Farallon had purchased the claims sight unseen—relying entirely on

Mr. Seery's advice solely because of their prior dealings." (Id. ¶¶ 21, 23.)[7]

14.   After the targets of the First Rule 202 Petition removed it to the Bankruptcy Court,

this Court held a hearing, after which it entered an Order remanding the proceeding back to Texas

state court despite having "grave misgivings." (Morris Dec. Ex. 6 at 20.) In doing so, the Court

noted that it was "familiar with the concept of claims-trading in bankruptcy (including the fact

that, for decades now, since a rule change in the last century, no court approval and order is

necessary unless the transferor objects)" and that it appeared that Dondero's motives were "highly

suspect." (Id. at 21.)

---

[6] Patrick has worked closely with Dondero for over a decade. Patrick was hired by Highland in 2008 and now serves as manager of the "Charitable DAF," which is controlled by Dondero. On August 3, 2021, this Court held Patrick "in civil contempt of court" after "basically abdicating responsibility" for "executing the litigation strategy" to Dondero. (Aug. 3, 2021 Order at 20–21, 30, Docket No. 2660.)

[7] As described in more detail below, Dondero later amended the First Rule 202 Petition (Morris Dec. Ex. 4) to, among other things, modify his description of his conversation with Linn and, several weeks after doing so, offered his third sworn version of his purported communication(s) with Farallon (id. Ex. 5).

003480

15.    After remand, the Texas state court slammed the gate closed, denying the First

Rule 202 Petition (as amended) and dismissing Dondero's case. (Morris Dec. Ex. 7.)

2.    <u>The Second Rule 202 Petition</u>

16.    Seven months later, in January 2023, HMIT filed another petition in a different

Texas state court again seeking pre-suit discovery regarding, among other things, alleged

wrongdoing in connection with the Claims Purchasers' acquisition of claims in the Debtor's

bankruptcy case. (Morris Dec. Ex. 8 (the "<u>Second Rule 202 Petition</u>").) While the Second Rule 202

Petition was embellished and contained a few more speculative and conclusory assertions, it was

based on many of the same allegations contained in the First Rule 202 Petition. Indeed, Dondero

submitted yet another sworn statement, this one in support of the Second Rule 202 Petition, which

included the fourth version of his purported communication(s) with Farallon. (Morris Dec. Ex. 9.)

17.    On March 8, 2023, the Texas state court again slammed the gate closed, denying

the Second Rule 202 Petition and dismissing HMIT's case. (Morris Dec. Ex. 10.)

18.    Having been refused entry by two different Texas state courts, HMIT finally

knocked on this Court's door on March 28, 2023 by filing the Motion, on an emergency basis, and

contending that its 18-month detour in the Texas state court system left it at risk of blowing the

statute of limitations on certain claims. The Motion is largely based on the same threadbare facts

and speculative and conclusory statements that were insufficient to obtain discovery in both the

First Rule 202 Petition and the Second Rule 202 Petition.

**C.    The Premise Of HMIT's Proposed Complaint—An Alleged *Quid Pro Quo* Between Seery And The Claims Purchasers—Is Demonstrably False.**

19.    HMIT asserts various legal theories resting on the assertion that Seery passed on

material, non-public information concerning MGM to his purportedly "past business partners and

close allies" Farallon and Stonehill, so that they could buy claims on the cheap and later reward

-8-

003481

Seery by "rubber-stamp[ing]" an oversized compensation package. (Mot. ¶¶ 22, 24; *see also*
Compl. ¶¶ 3–4, 16, 47, 54, 71, 77.)

20.     HMIT primarily relies on: (i) an email Dondero sent to Seery on December 17,
2020, in which Dondero purportedly disclosed material, non-public inside information;
(ii) Dondero's prior sworn statements concerning, among other things, his supposed recollection
of one or more telephone calls he had with one or more representatives of Farallon in the late
Spring of 2021; and (iii) two letters summarizing "investigations" commissioned by Dondero, the
results of which were apparently delivered to the Executive Office of the United States Trustee
("EOUST"). (Mot. ¶ 1 ("This Motion is separately supported by . . . the declarations of James
Dondero, dated May 2022 (Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A.
McEntire with attached evidence (Ex. 4).").)

21.     Based on the facts set forth below, and as will further be demonstrated at the
upcoming hearing, HMIT cannot meet its burden of establishing that there is a good faith basis for
the allegations concerning the "*quid pro quo.*"

**D.      The Allegations Concerning MGM and Insider Trading Have No Basis
In Fact.**

22.     As a member of MGM's Board, Dondero was admittedly the source of the so-called
material, non-public inside information. (Compl. ¶ 45.) On December 17, 2020, Dondero—in
violation of an existing temporary restraining order—sent an email to Seery and others with the
subject line "Trading Restriction re MGM – material non public information" stating:

> Just got off a pre board call, board call at 3:00. Update is as follows:
> Amazon and Apple actively diligencing in Data Room. Both
> continue to express material interest. Probably first quarter event,
> will update as facts change. Note also any sales are subject to a
> shareholder agreement.

003482

(Morris Dec. Ex. 11 (the "MGM E-Mail").)[8]

       1.     Dondero Had An Axe To Grind When He Sent The MGM E-Mail.

23.     By December 17, 2020, Dondero viewed Seery as his enemy. The MGM E-Mail was initially just another clumsy and improper attempt to impede the Debtor's asset sales (*see infra* ¶ 25), but when that failed, Dondero shifted gears and began peddling the "inside information" angle, in multiple forums, hoping to make life difficult for Seery and anyone Dondero perceived to be supporting him.[9] But viewed in context, the MGM E-Mail and related allegations provide no basis for the assertion of "colorable" claims.

24.     After causing the Debtor to file for bankruptcy protection in October 2019, Dondero was forced to surrender his control positions at the Debtor—including his positions as President and Chief Executive Officer—in January 2020 as part of a broader corporate governance settlement entered into to avoid the appointment of a Chapter 11 trustee. (Morris Dec. Ex. 12.) He remained an unpaid employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he then held titles, subject to the authority of the newly-appointed independent board of directors (the "Independent Board").[10]

25.     By the Fall of 2020, however, the Independent Board demanded (and obtained) Dondero's resignation, and the Debtor had (1) reached proposed settlements with certain of its larger creditors, (2) proposed an asset-monetization plan, (3) obtained court approval of its

---

[8] Notably, the MGM E-Mail is internally inconsistent because it simultaneously purports to impose a "[t]rading [r]estriction" while also stating that "sales are subject to a shareholder agreement," which permits sales in certain circumstances.

[9] Neither Dondero nor HMIT ever explain how Dondero could have disclosed "material non-public inside information" that he purportedly obtained as a member of the MGM Board without violating his own fiduciary duties to MGM. The absence of any explanation is further indication that Dondero did not believe that the MGM E-Mail contained "material non-public inside information."

[10] In July 2020, Seery was appointed Chief Executive Officer and Chief Structuring Officer of the Debtor. (Morris Dec. Ex. 36.)

003483

Disclosure Statement, and (4) begun to solicit votes in support of its proposed Plan. In response to these developments and others, Dondero began disrupting preparations for the implementation of the proposed Plan. The events in the weeks leading up to the MGM E-Mail are as follows:

- <u>October 9</u>: In accordance with the Independent Board's demand, made after threats and disruptions to the Debtor's operations, Dondero is forced to resign from all positions with the Debtor and its affiliates (Morris Dec. Ex. 13);

- <u>October 16</u>: Dondero's affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets (*id.* Ex. 14; *id.* Ex. 15 at 13–15);

- <u>November 24</u>: This Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief (*id.* Ex. 16);

- <u>November 24–27</u>: Dondero personally interferes with certain securities trades ordered by Seery (*id.* Ex. 15 at 30–36);

- <u>November 30</u>: The Debtor provides written notice of termination of shared services agreements with Dondero's affiliates, NexPoint Advisors, L.P. ("<u>NexPoint</u>") and Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"; together with NexPoint, the "<u>Advisors</u>") (*id.* Ex. 17);

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes that had an aggregate face amount of more than $60 million (*id.* Exs. 18–21);

- <u>December 3</u>: Dondero responds by threatening Seery in a text message: "***Be careful what you do -- last warning***" (*id.* Ex. 22 (emphasis added));

- <u>December 10</u>: Dondero's interference and threat cause the Debtor to seek and obtain a temporary restraining order ("<u>TRO</u>") against Dondero (*id.* Ex. 23);

- <u>December 16</u>: The Court denies as "frivolous" a motion filed by certain Dondero affiliates in which they sought "temporary restrictions" on certain asset sales (*id.* Ex. 24); and

- <u>December 17</u>: After exhausting other avenues to curtail the asset sales Debtor conducted in furtherance of the proposed Plan, Dondero sends the MGM E-Mail to Seery (*id.* Ex. 11).

003484

>        2.    Dondero Had No Duty To Send The MGM E-Mail To Seery And He
>              Violated An Existing TRO When He Did So.

26.     With his efforts to disrupt the proposed Plan stymied, Dondero sent the MGM

E-Mail to Seery. While HMIT alleges that Dondero disclosed "material non-public information

regarding Amazon and Apple's interest in acquiring MGM" to Seery on December 17, 2020

(Compl. ¶ 45), HMIT does not state or suggest why Dondero did so.

27.     That failure is unsurprising. As of December 17, 2020, Dondero owed no duty of

any kind to the Debtor or any entity controlled by the Debtor because (i) in January 2020, he

surrendered direct and indirect control of the Debtor to the Independent Board as part of the

corporate governance settlement (*see* Docket Nos. 339, 354-1 (Term Sheet)), and (ii) in

October 2020, he resigned from all roles at the Debtor and affiliates.

28.     Notably, Dondero admitted elsewhere that his goal in sending the MGM E-Mail

was to impede the Debtor and Seery from engaging in any transactions involving MGM:

>        On December 17, 2020, I sent an email to employees at HCM,
>        including the then Chief Executive Officer and Chief Restructuring
>        Officer Jim Seery, containing non-public information regarding
>        Amazon and Apple's interest in acquiring MGM. I became aware of
>        this information due to my involvement as a member of the board of
>        MGM. ***My purpose was to alert Mr. Seery and others that MGM
>        stock, which was owned either directly or indirectly by HCM,
>        should be on a restricted list and not be involved in any trades***.

(Morris Dec. Ex. 9 ¶ 3 (emphasis added).)

29.     Dondero had no relationship of any kind with the Debtor when he sent the MGM

E-Mail, and he directly violated the TRO by sending it to Seery without copying Debtor's

counsel.[11] Particularly against the backdrop of Dondero's attempted interference with the Debtor's

---

[11] The TRO enjoined Dondero from, among other things, "communicating… with any Board member" (including
Seery) without including Debtor's counsel. (Morris Dec. Ex. 23 ¶ 2(a).)

003485

trading activities just weeks before and just days after December 17, 2020,[12] the MGM E-Mail was another transparent attempt to impede asset sales and undermine Seery's efforts to bring the Debtor's bankruptcy to a close.

3.   The MGM E-Mail Did Not Disclose Material, Non-Public Inside Information.

30.   HMIT's contention that the MGM E-Mail contained "material non-public inside information" is belied by press reports issued *before* December 17, 2020.

31.   For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies." (Morris Dec. Ex. 25.)

32.   In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company. Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board. The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers. (*Id.* Ex. 26.)

33.   The forgoing is a small sample of publicly available information showing that MGM and Anchorage faced substantial pressure in 2020 and were contemplating a sale, and that Amazon and Apple were expected to be among interested bidders. No one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.

---

[12] (Morris Dec. Ex. 15 at 30–36.)

-13-

003486

34. Even if the MGM E-Mail contained "material non-public information" when Dondero sent it on December 17, 2020 (which it did not), its substance was fully and publicly disclosed to the market in the days and weeks that followed.

35. For example, on December 21, 2020, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale* (the "Wall Street Journal Article"), reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt." The Wall Street Journal Article reiterated that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers." (*Id.* Ex. 27.)

36. The Wall Street Journal article thus contained more information than the MGM E-Mail, insofar as the former (i) disclosed that investment bankers had been retained; (ii) disclosed the identity of the investment bankers; (iii) reported that MGM had commenced a "formal sales process"; (iv) provided an indication of market value; and (v) reiterated that Anchorage, MGM's largest shareholder, was under pressure to sell its illiquid position and was actively "working toward a deal for the studio."

37. The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The World is net enough! Amazon Joins other Streaming services in £4bn Bidding war for Bond films as MGM Considers Selling Back Catalogue*, cited the Wall Street Journal Article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime" (*id.* Ex. 28);

003487

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder (*id.* Ex. 29); and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition (*id.* Ex. 30).

    4.    <u>Dondero's Conduct Confirms That He Did Not Believe He Disclosed Material, Non-Public Inside Information To Seery; The MGM E-Mail Played No Role In The HarbourVest Settlement.</u>

38.    Dondero's conduct further demonstrates that he did not believe he disclosed material, non-public information to Seery in December 2020.

39.    HMIT contends that, upon receipt of the MGM E-Mail, "Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in the Bankruptcy Court seeking approval of the Debtor's settlement with HarbourVest – resulting in a transfer to the Debtor's Estate of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("<u>HCLOF</u>"), which held substantial MGM debt and equity." (Compl. ¶ 46.) These allegations do not withstand scrutiny for several reasons.

40.    ***First***, the Debtor and HarbourVest had already reached an agreement in principle—including the core question of consideration—to settle their disputes on December 10, 2020, ***a week before*** Dondero sent the MGM E-Mail to Seery. (*See* Morris Dec. Ex. 31.)[13] Thus, even assuming that the MGM E-Mail contained "material non-public inside information" (which it did

---

[13] In its motion for approval of the HarbourVest settlement, Highland valued the interest in HCLOF that it was receiving as part of the settlement of HarbourVest's claim at $22.5 million. Dondero and other affiliates ostensibly controlled by Patrick have previously alleged that the valuation was "stale." It was not; rather, it was based on the then most recent report made available to holders of interests in HCLOF, including Dondero. (Morris Dec. Ex. 31-a.) In any event, HCLOF did not directly own any "MGM debt and equity."

003488

not), the substance of that communication played no role in Seery's negotiations, which had concluded before he received the MGM E-Mail.

41.    **Second,** *neither Dondero nor any of his affiliates ever raised this issue with the Court when lodging objections to the HarbourVest settlement*, which were filed just weeks after Dondero sent the MGM E-Mail to Seery. In fact, Dondero contended that the Debtor was **overpaying** HarbourVest via the settlement to buy votes and that the settlement was neither reasonable nor in the best interests of the Debtor's estate. (Morris Dec. Ex. 32.)

42.    Dondero and HMIT cannot reconcile their current assertion that Seery misused allegedly "material, non-public inside information" with their failure to object to the HarbourVest settlement on that basis.

        5.    <u>The Texas State Securities Board Has Determined That No Action Is Warranted.</u>

43.    In its Motion, HMIT claimed that the Texas State Securities Board (the "<u>TSSB</u>") "opened an investigation into the subject matter of the insider trades at issue," and argued that the "continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'" (Mot. ¶ 37.)

44.    HMIT's characterization is misleading because the TSSB never "opened an investigation"; rather, the TSSB reviewed a "complaint" (undoubtedly filed at Dondero's direction). That review is now complete. On May 9, 2023, the TSSB issued the following statement:

> The staff of the Texas State Securities Board (the "Staff") has completed its review of the complaint received by the Staff against Highland Capital Management, L.P. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time.

003489

(Morris Dec. Ex. 33.)

45.    The TSSB's decision that no further action is warranted underscores the Highland Parties' position that the claims described in the proposed Complaint are neither plausible nor "colorable."

### E.    HMIT's Allegations Concerning Seery's Alleged Relationships With The Claims Purchasers Are Unsupported And Provide No Foundation For The Purported Inferences.

46.    HMIT asserts that Seery and the Claims Purchasers had substantial pre-existing relationships that provided the foundation for the alleged "*quid pro quo*." (*See*, *e.g.*, Compl. ¶¶ 14, 47–48.) These allegations appear to be based solely on a review of Seery's resume and some internet searches conducted as part of the "investigation" commissioned by Dondero, the results of which were presented to the EOUST in an unsuccessful effort to convince that agency to investigate further. (*See* Mot. Ex. 2 ¶ 4 & Exs. A–B.) As HMIT's pleadings and the documents presented to the EOUST show, and as will be further established at the hearing, these conclusory allegations have no basis in fact.

### 1.    HMIT's Allegations Concerning Stonehill

47.    HMIT's conclusory allegation that Seery and Stonehill had a "close business relationship" is based on two alleged "facts."

48.    ***First***, HMIT contends that Seery "joined a hedge fund, River Birth Capital," that "served on the creditors committee in other bankruptcy proceedings" with Stonehill. (Compl. ¶ 48.) But HMIT fails to (i) identify those proceedings or when they occurred; (ii) allege that Seery was aware of, let alone participated in, any "bankruptcy proceedings" with Stonehill; or (iii) suggest how the unidentified "bankruptcy proceedings" resulted in a relationship close enough to support the wide-ranging conspiracy HMIT imagines.

003490

49.     HMIT tries to bolster this supposed connection by pointing to a decade-old court filing showing that the law firm for which Seery worked (Sidley Austin LLP) represented a "Steering Group of Senior Secured Noteholders" in the Blockbuster bankruptcy, and that, at some point, Stonehill was one of five members of that group. (Mot. Ex. 2 at A-66.)[14] There is no evidence or non-conclusory allegation that Seery (or his then-firm) ever represented Stonehill individually or that any individual involved in the Blockbuster bankruptcy on Stonehill's behalf had any involvement in Stonehill's decision to purchase claims in the Highland bankruptcy.

50.     **Second**, HMIT alleges that (i) a global asset management firm called GCM Grovesnor held four seats on the Redeemer Committee; (ii) "upon information and belief" GCM Grovesnor "is a significant investor in Stonehill and Farallon"; (iii) Grovesnor "through Redeemer, played a large part in appointing Seery as a director of Strand Advisors"; and (iv) Seery was therefore "beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farralon [*sic*]." (*Id.*)

51.     These allegations, however, are based on unsupported speculation and tortured inferences, and certain of them make no sense.[15]

        2.     HMIT's Allegations Concerning Farallon

52.     Likewise, the speculative and unsupported allegations concerning Seery's alleged relationship with Farallon cannot withstand scrutiny.

---

[14] The Complaint incorrectly claims that "Seery represented Farallon as its legal counsel" (Compl. ¶ 48), but its Motion appends a court filing referring to Stonehill (Mot. Ex. 2 at A-66).

[15] For example, HMIT alleges that Grovesnor is a "significant investor" in Stonehill and Farallon and that Grovesnor is an "affiliate" of Stonehill and Farallon, while also effectively alleging that Stonehill and Farallon fleeced the Redeemer Committee by buying its claim while in possession of "material, non-public inside information." Notably, the Redeemer Committee—the actual party that would have been harmed if HMIT's allegations had any merit (which they do not)—has never sought to intervene in this matter even though Dondero first floated these allegations in 2021 as part of the First Rule 202 Petition (nor, for that matter, has Acis, UBS, or HarbourVest ever voiced any concerns about supposedly being victimized by the Claims Purchasers).

53.     HMIT alleges "upon information and belief" that Seery "conducted substantial business with Farallon" while he was the Global Head of Fixed Income Loans at Lehman Brothers. (Compl. ¶ 48.) But the only "fact" supposedly supporting this broad allegation is a single page taken from (what appears to be) a Lehman Brothers real estate group promotional document stating that Farallon participated in a secured real estate loan in 2007. (Mot. Ex. 2 at A-65.) HMIT does not allege that Seery knew of, let alone participated in, this transaction, nor does it identify any other business (let alone "substantial business") that Seery allegedly conducted with Farallon while at Lehman Brothers.

**F.      HMIT's "Insider Trading" Allegations Are Unsupported And Provide No Foundation For The Purported Inferences.**

54.     One of HMIT's principal allegations is that, as part of the purported *quid pro quo*, Seery disclosed to the Claims Purchasers "material non-public inside" information concerning MGM that he obtained from Dondero to entice them to buy claims in Highland's bankruptcy case. (*See*, *e.g.*, Compl. ¶¶ 13, 47, 50, 83, 89.)

1.      Dondero's Description Of His Communication(s) With Farallon Have Changed Over Time.

55.     HMIT's Motion is based in substantial part on Dondero's description of communication(s) he purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's acquisition of certain claims in the Highland bankruptcy. (Mot. ¶ 1 & Ex. 3; Morris Dec. Ex. 9.)

56.     Because (i) Dondero's description of his communication(s) with Farallon has substantially changed over time, (ii) neither HMIT nor Dondero offer any rational reason why Farallon would voluntarily confess to improprieties to a third party with a well-earned reputation

003492

for using overly aggressive litigation tactics, and (iii) certain aspects of his various descriptions are contradicted by documentary evidence, they cannot be the basis for any claim.[16]

57.    In the First Rule 202 Petition filed in July 2021, Dondero swore, among other things, that:

> [Seery] has an age-old connection to Farallon and, upon information and belief, advised Farallon to purchase the claims.
>
> On a telephone call between [Dondero] and a representative of Farallon, Michael Lin [*sic*], Mr. Lin [*sic*] informed [Dondero] that Farallon had purchased the claims sight unseen—relying entirely on Mr. Seery's advice solely because of their prior dealings.
>
> As Highland's current CEO, Mr. Seery had non-public, material information concerning Highland. Upon information and belief, such non-public, material information was the basis for instructing Farallon to purchase the Claims.

(Morris Dec. Ex. 3 ¶¶ 20–21, 23 ("Version 1").)

58.    Version 1 is notable because it (i) did not state what Dondero said, if anything, (ii) referred to a single phone call, (iii) made no mention of MGM, (iv) made no mention of Raj Patel (who features later); and (v) stated only "upon information and belief" that Farallon purchased the Claims based on "non-public, material information."[17]

59.    On May 2, 2022, Dondero amended the First Rule 202 Petition. In his new verified pleading, Dondero swore, among other things, that:

> [Seery] has an age-old connection to Farallon and, upon information and belief, advised Farallon to purchase the claims.

---

[16] Notably, there is no allegation that anyone ever communicated with Stonehill about its claims purchases (let alone obtained a "confession"); thus, HMIT's "conspiracy" theory against Stonehill rests on nothing but rank speculation based on unsupportable inferences.

[17] Later in 2021, Dondero "commissioned an investigation by counsel" who produced written reports to the EOUST. The first such report was prepared by Douglas Draper, counsel to Dondero's family trusts, and delivered to the EOUST on October 5, 2021. Draper provided several reasons to support his speculation that "Farallon and Stonehill may have been provided material, non-public information to induce their purchase of claims" and to justify his request for further investigation—but conspicuously failed to mention Dondero's telephone call(s) with Farallon. (Mot. Ex. 2-A at 7.)

On a telephone call between [Dondero] and Michael Lin [*sic*], a representative of Farallon, Mr. Lin [*sic*] informed [Dondero] that Farallon had purchased the claims sight unseen ***and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims***.

In other words, ***Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit***.

(*Id.* Ex. 4 ¶¶ 22–24 ("Version 2") (emphasis added).)

60.     Like Version 1, Version 2 also (i) did not state what Dondero said, if anything; (ii) referred to a single phone call; (iii) made no mention of MGM; and (iv) made no mention of Raj Patel. But in contrast to Version 1, Version 2 embellished Linn's alleged comments and—more importantly—now expressly asserted that Seery "shared" inside information with "no one but Farallon" rather that adopting Version 1's statement that "upon information and belief," Farallon purchased the Claims based on "non-public, material information."[18]

61.     About four weeks later, Dondero provided yet another version of his discussion with Linn. In a declaration sworn to on May 31, 2022, Dondero stated, among other things, that:

Last year, I called Farallon's Michael Lin [*sic*] about purchasing their claims in the bankruptcy. ***I offered them 30% more than what they paid***. I was told by Michael Lin [*sic*] of Farallon that they purchased the interests ***without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid***.

(*Id.* Ex. 5 ¶ 2 ("Version 3") (emphasis added).)

62.     Version 3 introduces several new topics. For example, Dondero asserts for the first time that he called Linn because he was interested in purchasing Farallon's claims. Dondero also

---

[18]If, as Dondero contends, Seery "shared" inside information with "no one but Farallon," then he did not share the inside information with Stonehill.

Case 3:23-cv-02071-E    Document 28-10    Filed 12/07/23    Page 229 of 270    PageID 2778
Main Document    Page 207 of 74

asserts that he offered "30% more than what they paid."[19] Finally, and significantly, Dondero

asserts for the first time that Linn reported Seery telling him that the "interests would be worth far

more than what Farallon paid."

63.    On February 15, 2023, Dondero filed yet another sworn statement concerning his

2021 discussion(s) with Farallon, this time in support of HMIT's Verified Rule 202 Petition. (*Id.*

Ex. 9.) In this version, Dondero stated that:

> In late Spring of 2021, I had phone calls with two principals at
> Farallon Capital Management, LLC ("Farallon"), **Raj Patel** and
> Michael Linn. During these phone calls, Mr. Patel and Mr. Linn
> informed me that Farallon had a deal in place to purchase the **Acis
> and HarbourVest claims**, which I understood to refer to claims that
> were a part of settlements in the HCM Bankruptcy Proceedings.
> Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these
> claims based solely on conversations with Mr. Seery because they
> had made significant profits when Mr. Seery told them to purchase
> other claims in the past. **They also stated that they were particularly
> optimistic because of the expected sale of MGM**.

(*id*. Ex. 9 ¶ 4 ("Version 4") (emphasis added).)

64.    Version 4 introduces still more new topics. For example, Dondero asserted for the

first time that (i) more than one telephone call occurred; (ii) Raj Patel also participated in these

calls on Farallon's behalf; (iii) he was told that "Farallon had a deal in place to purchase the Acis

and HarbourVest claims"; and (iv) he learned that Farallon was "**particularly optimistic because

of the expected sale of MGM**."

65.    Finally, in its Motion, HMIT attributes statements to Farallon that even Dondero

never described. For example, HMIT contends that "Farallon bragged about the value of its

investment referencing non-public information regarding Amazon, Inc.'s ('Amazon') interest in

---

[19] Ironically, Dondero appears to have offered to purchase Farallon's claims without conducting any due diligence because (i) he provides no indication that he knew at that time how much Farallon paid for its claims yet he blindly offered to pay "30% more than what" Farallon paid, and (ii) HMIT alleges that the Debtor was not transparent. (*See* Compl. ¶¶ 51–53.)

003495

acquiring Metro-Goldwyn-Mayer Studios Inc." (Mot. ¶ 32.)[20] While HMIT cites Version 4 as support, neither that version nor any prior version is consistent with HMIT's description of Dondero's purported communication(s) with Farallon.[21]

> 2.   Dondero's Offer to Purchase Farallon's and Stonehill's Claims In 2022 Contradicts HMIT's Allegations.

66.   According to HMIT, Dondero offered to buy Farallon's claims in the Highland bankruptcy for 30% more than what Farallon was paid, but that Farallon insisted it would not sell at any price. (Morris Dec. Ex. 5 ¶ 2.)

67.   Yet, on October 14, 2022, before the Second Rule 202 Petition was filed, HCMFA (one of Dondero's advisory firms) made written offers to Stonehill and Farallon to purchase their claims at cost "plus a five percent (5%) return." (Morris Dec. Ex. 35.) Dondero's offer to purchase claims at 5% above cost is inconsistent with his purported knowledge that Farallon would not sell at any price.

**G.   A Rational Basis Exists For the Claims Purchases—Although Only the Claim Sellers Could Have Been Harmed in Any Event.**

68.   HMIT insists that it "made no sense" for the Claims Purchasers to buy claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with

---

[20] This purported statement that HMIT attributes to Farallon makes little sense because the MGM-Amazon deal was publicly announced on May 26, 2021 (Morris Dec. Ex. 34), before Dondero and Farallon ever spoke.

[21] Conspicuously absent from HMIT's pleadings is any evidence corroborating any of the five versions of Dondero's conversation(s) with Farallon. Given the importance of the Farallon's alleged confessional, one would have expected Dondero to contemporaneously (i) send a confirming e-mail to Farallon to make sure there was a written record of the discussion, (ii) send an e-mail to a colleague so that others were informed, (iii) make notes to himself; or (iv) tell someone what happened. Yet, no such corroborating evidence was presented or referred to in the First Rule 202 Petition, either of the EOUST Letters, the Second Rule 202 Petition, the Motion, the original proposed Complaint, the Supplement, or the amended proposed Complaint.

003496

virtually no margin for error." (Compl. ¶ 3.) HMIT's arguments are belied by the publicly available

facts and its own allegations.

69.    In advance of Plan confirmation, the Debtor projected that Class 8 general

unsecured creditors would recover 71.32% on their allowed claims. (Docket No. 1875 Ex. A.) In

its proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for

their claims. (Compl. ¶ 42.) Taking into account the face amount of the allowed claims, the Claims

Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[22] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |
| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

70.    As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late

spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis,

Redeemer, and HarbourVest. (Compl. ¶ 41 n.12.)[23] Based on an aggregate purchase price of

$113 million, the Claims Purchasers would have expected to net over $33 million in profits, or

nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would

make even more money if Highland beat its projections because they also purchased the Class 9

claims, and would therefore capture any upside. In this context, HMIT assertions in its proposed

Complaint lack any rational basis.

---

[22] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

[23] The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed
upon and the MGM-Amazon deal was announced. (Morris Dec. Ex. 34.)

003497

71.     Notably, none of the selling claimholders—all of which are sophisticated parties that were represented by sophisticated counsel—have raised any objections or complaints. In fact, three of the four selling claimholders (Redeemer, Acis, and UBS) were members of the Official Committee of Unsecured Creditors.

72.     Finally, even if HMIT's allegations had any merit (they do not), only the selling claimholders would have cause to complain. The estate (and HMIT) would not have been harmed because it made (and may in the future make) the exact same distributions to claimholders regardless of what entity owns the claims.

**H.     Seery's Compensation Structure Is Consistent With The Plan And The Trust Agreement, And Was The Product Of Arms'-Length Negotiations.**

73.     According to HMIT, Seery provided "material non-public information" to the Claims Purchasers so that he could someday "plant friendly allies onto the [COB] to rubber stamp compensation demands." (Mot. ¶ 22; *see also id.* ¶¶ 3, 24, 48.) HMIT alleges in its revised Complaint:

> As part of the scheme, the Defendant Purchasers obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT. Initially, Seery's compensation package was composed of a flat monthly pay [sic]. Now, however, it is also performance based. This allows the Defendant Purchasers to satisfy the *quid pro quo* at the heart of the scheme. Seery would help the Defendant Purchasers make large profits and they would help enrich Seery with big pay days.

(Compl. ¶ 4.)

74.     Notably, these allegations (i) describe a compensation structure that is ***entirely consistent with*** the incentive compensation plan structure in the Court-confirmed Plan and set forth in the Trust Agreement; and (ii) are devoid of any actual facts (*e.g.*, the terms of Seery's compensation plan or how it was calculated or negotiated). In reality, Seery's compensation

003498

package was the product of arm's-length negotiations with the COB (including the active participation of the COB's independent member) over a four-month period, the result of which was an incentive compensation plan that aligned Seery's interests with those of the Claimant Trust Beneficiaries (*i.e.*, to maximize value and creditor recoveries).

75.    As a threshold matter, HMIT's allegation that "[i]nitially, Seery's compensation package was composed of a flat monthly pay [*sic*]" (Compl. ¶ 4]) is plainly wrong. Seery was appointed Highland's Chief Executive Officer (effective as of March 15, 2020) pursuant to a Bankruptcy Court order entered on July 16, 2020 without objection. (Morris Dec. Ex. 36 (the "<u>July Order</u>").) The July Order approved the terms of a separate employment agreement (a copy of which was included in the Debtor's motion (<mark>Docket No. 774</mark> Ex. A-1) and attached to the July Order) (the "<u>Original Employment Agreement</u>").

76.    Under the Original Employment Agreement, Seery was to receive (i) Base Compensation in the amount of $150,000 per month, ***plus*** (ii) a Restructuring Fee, the amount of which would be determined by whether a Case Resolution Plan (*i.e.*, a plan with substantial creditor support) or a Monetization Vehicle Plan (*i.e.*, a plan lacking substantial creditor support) was achieved (as those terms are defined in the Original Employment Agreement).

77.    On November 24, 2020, after notice and a hearing, the Bankruptcy Court entered an Order (<mark>Docket No. 1476</mark>) approving the adequacy of *The Disclosure Statement of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Morris Dec. Ex. 37 (the "<u>Disclosure Statement</u>").) The Disclosure Statement provided in pertinent part that:

> The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . . The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(*Id.* Art. III.F.2(e); *see* Plan Art. IV.B.6 (incorporating identical language).)

003499

78.     The Trust Agreement was part of a Plan Supplement (as amended) filed in advance

of the confirmation hearing (Morris Dec. Ex. 38), and provided in pertinent part:

> <u>Compensation</u>. As compensation for any services rendered by the
> Claimant Trustee in connection with this Agreement, the Claimant
> Trustee shall receive compensation of $150,000 per month (the
> "<u>Base Salary</u>"). Within the first forty-five days following the
> Confirmation Date, the Claimant Trustee on the one hand, and the
> Committee, if prior to the Effective Date, or the Oversight Board, if
> on or after the Effective Date, on the other, will negotiate go-forward
> compensation for the Claimant Trustee which will include (a) the
> Base Salary, (b) a success fee, and (c) severance.

(Trust Agmt. § 3.13(a)(i).)[24]

79.     The Plan went effective on August 11, 2021, and, as a result, the COB was formed.

The COB ultimately had three members: a representative of Farallon (Michael Linn), a

representative of Stonehill (Christopher Provost), and an independent member (Richard Katz).

80.     On August 26, 2021, the COB held a regularly scheduled meeting during which it

discussed the incentive compensation program ("<u>ICP</u>"). The minutes of this meeting reflect that:

> Mr. Seery also presented the Board with an overview of his
> Incentive Compensation Program proposal which would include not
> only Mr. Seery but the current HCMLP team. (The terms and
> structure of the proposal had been previewed with the Board in prior
> operating models presented by Mr. Seery.) Mr. [Seery] reviewed the
> proposal and stated his view that the proposal was market based and
> was designed to align incentives between himself and the HCMLP
> team on the one hand and the Claimant Trust [B]eneficiaries on the
> other. ***The Board asked questions regarding proposal and
> determined that is [sic] would consider the proposal and revert to
> Mr. Seery with a counter proposal***.

(Morris Dec. Ex. 39 (emphasis added).)

---

[24] Seery was designated as the "Claimant Trustee" under the Trust Agreement. (Trust Agmt. 38 §1.1(e).

003500

81.     Far from being a "rubber stamp," the minutes show that the COB did not simply accept Seery's initial proposed ICP but "asked questions" and indicated that it would provide a "counter proposal."

82.     On August 30, 2021, the COB convened for "an off-cycle (non-regular) meeting." As reflected in the minutes of this meeting, the COB again discussed the ICP:

> Mr. Katz began the meeting by walking the Oversight Board and Mr. Seery through the Oversight Board's counter-proposal to the HCMLP incentive compensation proposal, including the review of a spreadsheet and summary of the counter-proposal. Discussion was joined by Mr. Linn and Mr. Stern. Mr. Seery asked numerous questions and received detailed responses from the Oversight Board. ***Mr. Seery and the Oversight Board agreed to continue the discussion and negotiations regarding the proposed incentive compensation plan for the Claimant Trustee and the HCMLP [employees]***.

(*Id.* Ex. 40 (emphasis added).)

83.     Seery and the COB continued to exchange and discuss additional proposals and counter-proposals over the coming months.[25] Finally, on December 6, 2021, Seery and the COB executed a Memorandum of Agreement stating that:

> In accordance with the provisions of the Highland Claimant Trust Agreement and the Highland Capital Management, L.P. ("HCMLP") Plan of Reorganization, ***the Oversight Board of the Highland Claimant Trust and the Claimant Trustee/Chief Executive Officer of HCMLP engaged in robust, arm's length and good faith negotiations regarding the incentive compensation program for the Claimant Trust/CEO*** and the HCMLP post-effective date operating team ("HCMLP Team"). ***After considering various structures and incentives to motivate performance on behalf of the Claimant Trust***, the parties reached the binding

---

[25] In particular, (i) Seery delivered another proposal to the COB on October 9, 2021, which he further revised later in the month; (ii) Katz (the independent COB member) responded on behalf of the COB on October 26 and proposed that the parties agree upon the structure of the proposal before addressing the specific numbers; (iii) Seery responded on November 3; (iv) further discussions were held on November 9; (v) on November 17, Linn provided a "wholesome response" in which he "updated the term sheet" and raised certain issues that he did not believe would have "much a difference for this negotiation"; (vi) Seery wrote to the COB indicating that he wanted to "finalize the ICP" but had "a couple of asks and one question"; and (vii) still further negotiations took place thereafter.

003501

agreement reflected in the attached HCMLP and Claimant Trust
Management Incentive Compensation Program.

(Morris Dec. Ex. 41 (emphasis added).)

84.     Notably, in November 2021, one of the "investigative reports" commissioned by
Dondero incorrectly speculated that "Mr. Seery's success fee presumably will be based on whether
the Plan outperforms what was disclosed in the Plan Analysis." (Mot. Ex. 2-B at 14.) In fact,
Seery's bonus is tied to creditor recoveries so that the interests of stakeholders are aligned.

85.     Dondero's commissioned report also incorrectly "estimate[d] that, based on the
estate's [alleged] $600 million value today, ***Mr. Seery's success fee could be approximate [sic]
$50 million***." (*Id.*) In reality, under the negotiated terms of the ICP (Morris Dec. Ex. 41), the
maximum bonus Seery can receive is approximately $8.8 million—which would require all
Class 8 and 9 claimholders to receive cash distributions for the full amount of their claims plus
interest—82.4% less than the baseless success fee presented to the EOUST on Dondero's behalf.

## RELEVANT PROCEDURAL HISTORY

86.     To avoid the appointment of a Chapter 11 trustee, on January 9, 2020, this Court
approved a settlement (the "January Order"; Docket No. 339) removing Dondero from control of
Highland and appointing an Independent Board consisting of John Dubel, Russell Nelms, and
Seery (the "Independent Directors"). The January Order prohibited litigation against the
Independent Directors without this Court's prior authorization and limited claims to those arising
from willful misconduct or gross negligence.[26]

---

[26] (January Order ¶ 10 ("No entity may commence or pursue a claim or cause of action of any kind against any
Independent Director . . . relating in any way to the Independent Director's role as an independent director . . . without
the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful
misconduct or gross negligence against Independent Director . . . .").)

003502

87.    Highland later moved to have Seery appointed its Chief Executive Officer and Chief Restructuring Officer. This Court approved his appointment in the July Order (Morris Dec. Ex. 36), which like the January Order, prohibited litigation against Seery without this Court's prior authorization and limited claims to those arising from willful misconduct or gross negligence.[27]

88.    On February 22, 2021, this Court issued the Confirmation Order confirming the Plan. The confirmed Plan included the Gatekeeper Provision prohibiting Enjoined Parties, including HMIT, from bringing claims against Protected Parties, including Seery, unless, after notice and a hearing, this Court found the claims "colorable." (Plan Art. IX.F.) The Gatekeeper Provision was affirmed by the Fifth Circuit. *NexPoint*, 48 F.4th at 425–26, 435–39. The detail factual findings in the Confirmation Order supporting the Gatekeeper Provision were not challenged or disturbed on appeal.

89.    On August 11, 2021, the Plan became effective (Docket No. 2700), and pursuant to the Plan:

- All prepetition partnership interests in the Debtor, including HMIT's, were cancelled;

- HCMLP was reorganized as a Delaware limited liability partnership;

- The Trust, a Delaware statutory trust, was established pursuant to the Trust Agreement;

- HCMLP's limited partnership interests were issued to the Trust;

- HCMLP's general partnership interests were issued to HCMLP GP LLC, a newly-established Delaware limited liability company;

---

[27] (July Order ¶ 5 ("No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery . . . .").)

003503

- The majority of HCMLP's assets, including its "Causes of Action,"[28] were transferred to the Trust;

- Seery was appointed reorganized HCMLP's Chief Executive Officer and trustee of the Trust (the "Claimant Trustee");

- "Estate Claims" (*i.e.*, Causes of Action against HCMLP's insiders)[29] were transferred to the newly-established Highland Litigation Sub-Trust (the "Litigation Trust"), a Delaware statutory trust and subsidiary of the Trust;

- An oversight board was appointed to oversee the management of the Trust, reorganized HCMLP, and the Litigation Trust;

- Holders of allowed general and subordinated unsecured claims (*i.e.*, Class 8 and 9) received interests in the Trust (collectively, the "Trust Interests") and became "Claimant Trust Beneficiaries" (as defined in the Plan); and

- Holders of the Debtor's prepetition partnership interests (*i.e.*, Class 10 and 11) were allocated unvested contingent interests (the "Contingent Interests") in the Trust that vest if, and only if, the Claimant Trustee certifies that all Claimant Trust Beneficiaries (*i.e.*, Class 8 and 9) have been paid in full, Class 8 have received post-petition interest, and all disputed claims in Class 8 and 9 have been resolved.

(*See* Plan Art. IV.)

90.    On October 8, 2021, the Trust irrevocably transferred and assigned to the Litigation Trust "any and all Causes of Action not previously transferred or assigned by operation of the Plan, the Litigation Sub-Trust Agreement, or otherwise" except for causes of action then being

---

[28] "Causes of Action" are defined in the Plan as: "any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law." (Plan Art. I.B.19.)

[29] "Estate Claims" are defined in the Plan as "estate claims and causes of action against Dondero, Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing" other than causes of action against any current employee of Highland other than Dondero. (Plan Art. I.B.61.)

003504

pursued by the Trust or which the Trust intended to pursue on behalf of entities managed by reorganized HCMLP. (*See* Morris Dec. Ex. 42.)[30]

91.     On March 28, 2023, HMIT filed its Initial Motion with a proposed Verified Adversary Complaint totaling 387 pages with exhibits. This Court scheduled a conference for Monday, April 24, 2023. (Docket No. 3751.) On Friday, April 21, 2023, HMIT filed objections to any evidentiary hearing or briefing on its Initial Motion. ("Objs."; Docket No. 3758.) On Sunday, April 23, 2023, HMIT filed a Supplemental Motion with an amended proposed Verified Adversary Complaint, which added HCMLP and the Trust as nominal defendants and dropped a claim for "fraud by misrepresentation and material nondisclosure." (Docket No. 3760.) On April 24, 2023, this Court held a conference, set a briefing schedule on the Motion, and scheduled a hearing for June 8, 2023. (Docket Nos. 3763–64.)

## LEGAL STANDARD

92.     HMIT concedes, as it must, that its proposed lawsuit is subject to this Court's "gatekeeping protocol," and "the injunction and exculpation provision in the Plan." (Mot. ¶¶ 1, 4, 14; Supp. Mot. ¶ 11.) But HMIT fundamentally misunderstands the threshold showing it must make to clear that hurdle.

**A.     HMIT Misconstrues The "Colorability" Standard Established In The Gatekeeper Provision.**

93.     This Court made extensive factual findings and approved the Gatekeeper Provision on two grounds: (i) "the Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))," and (ii) "the notion of a prefiling injunction to deter vexatious litigants[] that has been approved by Fifth Circuit." (Confirmation Order ¶¶ 76–81.) Those doctrines operate to "prevent

---

[30] The October 8, 2021 transfer was publicly disclosed by the Litigation Trust in its litigation with HMIT, among others. *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Docket No. 211 (Bankr. N.D. Tex. Sept. 9, 2022).

003505

baseless litigation designed merely to harass the post-confirmation entities," "avoid abuse of the court system," and "preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants." (*Id.* ¶ 79.) The Fifth Circuit confirmed that "the injunction and gatekeeping provisions are sound," explaining that "[c]ourts have long recognized bankruptcy courts can perform a gatekeeping function," including "[u]nder the '*Barton*' doctrine." *NexPoint*, 48 F.4th at 435, 438–39 (collecting cases). The Fifth Circuit further recognized that the Gatekeeper Provision here was necessary to prevent "bad-faith litigation" from consuming the resources of the reorganized debtor and those working to maximize claims of legitimate stakeholders. *Id.*

94.    Under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation." *VistaCare*, 678 F.3d at 232 (cleaned up) (citing *Anderson v. United States*, 520 F.2d 1027, 1029 (5th Cir. 1975); *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 885 (B.A.P. 9th Cir 1995)); *see also, e.g.*, *CFTC v. Hunter Wise Commodities, LLC*, 2020 WL 13413703, at *1 (S.D. Fla. Mar. 5, 2020) ("Under the *Barton* doctrine, . . . before leave to sue a receiver or trustee is granted, the plaintiff must demonstrate that he has a *prima facie* case against the trustee or receiver.") (citing *Anderson*, 520 F.2d at 1029); *Fin. Indus. Assoc. v. SEC*, 2013 WL 11327680, at *4 (M.D. Fla. July 24, 2013) (same). Contrary to HMIT's contention, this standard "involves a greater degree of flexibility" than a "Rule 12(b)(6) motion to dismiss," because "the bankruptcy court, which, ***given its familiarity with the underlying facts and the parties***, is uniquely situated to determine whether a claim against the trustee has merit," and "[t]he bankruptcy court is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate." *VistaCare*, 678 F.3d at 233 (emphasis added).

95.     To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading requirements of Rule 8." *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases). "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless." *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000). "To apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision. *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

96.     Similarly, courts in the vexatious litigant context require the movant to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment." *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same). "[T]o protect courts and innocent parties from abusive and vexatious litigation[,] . . . courts may apply whatever standard deemed warranted when reviewing the proposed complaint." *Silver*, 2020 WL 3803922, at *6. "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion. *Id.* Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ." *Id.*

003507

97.     HMIT argues that "a claim is colorable if it is 'plausible' and could survive a motion to dismiss" under Rule 12(b)(6). (Mot. ¶¶ 38–42.) But HMIT's motion does not even mention the specific bases this Court invoked in the Confirmation Order—the *Barton* doctrine and vexatious-litigant provisions—as supporting the Gatekeeper Provision, much less has HMIT identified a single case in the *Barton* doctrine or vexatious litigant context that supports its interpretation. (*Id.*; *see also* Morris Dec. Ex. 43 at 15:25–16:4 (THE COURT: "[D]id you find any legal authority in the *Barton* doctrine context that you think sheds light? Because that seems to me the most analogous context, right?" MR. MCENTIRE: "Specifically to answer -- to respond to your question directly, the answer is no.").) HMIT relies instead on cases from inapposite contexts, such as whether a bankruptcy court should grant a creditor's committee derivative standing after a trustee or debtor-in-possession declined to pursue a claim.[31] None of those cases, of course, involves gatekeeping orders entered in response to a pattern of abusive conduct that specifically rely on *Barton* and vexatious-litigant authorities. Moreover, and as discussed below, even those cases recognize that a claim must not only be likely to survive a motion to dismiss, but also that the debtor has "unjustifiably" refused to pursue it. *La. World*, 858 F.2d at 247–48. That requirement demands that the proposed claims be subjected to a realistic cost-benefit analysis, which here would be fatal to HMIT's speculative, Hail Mary conspiracy theory.

98.     HMIT also relies on a series of cases that are even farther afield from the Gatekeeper Provision here. Those include benefits coverage disputes under ERISA, Medicare

---

[31] *See La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 247–48 (5th Cir. 1988); *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008); *Larson v. Foster (In re Foster)*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014); *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)*, 66 F.3d 1436, 1446 (6th Cir. 1995); *Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*, 225 B.R. 275, 282 (Bankr. S.D.N.Y. 1998).

003508

coverage disputes, and constitutional challenges.[32] None of those cases implicate the *Barton* doctrine and vexatious-litigant concerns. (*See* Mot. ¶¶ 39–41; Objs. ¶¶ 9–13.)

### B.    Evidentiary Hearing

99.    Courts in the *Barton* doctrine context regularly conduct an evidentiary hearing to determine whether a proposed complaint meets the necessary threshold. "Whether to hold a hearing is within the sound discretion of the bankruptcy court." *VistaCare*, at 232 n.12 "[T]he decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing. *Id.* at 233 (quoting *Kashani*, 190 B.R. at 886–87). In *VistaCare*, for example, the bankruptcy court "held a hearing on CGL's motion for leave" in which "the sole owner of CGL, and the Trustee, testified." *Id.* at 223, 232. The Fifth Circuit has affirmed a colorability analysis in the *Barton* context, which involved an evidentiary hearing, without any concern that the inquiry was somehow improper. *See Foster v. Aurzada (In re Foster)*, 2023 WL 20872, at *1 (5th Cir. Jan. 3, 2023) (affirming dismissal of an action to sue a trustee under *Barton* "[a]fter a hearing [by] the bankruptcy court"); *Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a

---

[32] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

003509

close examination" of the evidence revealed only that the trustee "acted within the scope of [his] duties"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

100.    Recognizing that the *Barton* doctrine requires more than a mere Rule 12(b)(6) analysis, courts of appeals routinely review "a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard." *VistaCare*, 678 F.3d at 224 (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).[33] Application of the Rule 12(b)(6) standard, of course, is subject to *de novo* review. Indeed, as this Court noted at the April 24, 2023 status conference, HMIT's "original motion for leave attached something like 387 pages of not just Dondero affidavits, but other evidentiary support," which is inconsistent with HMIT's position that this Court "just need[ed] to look at the four corners and apply a 12(b)(6) standard." (Morris Dec. Ex. 43 at 43:16–18, 44:4–7.) Although HMIT's belatedly counsel suggested it might seek to "withdraw the Dondero affidavits" (*id.* at 22:17–18), HMIT has filed no such motion and "reserve[d] the opportunity to revisit the issue of withdrawing Mr. Dondero's declarations" (*id.* at 55:1–5). As this Court noted, "parties are always given the chance to cross-examine an affiant or a declarant." (*Id.* at 22:2–3.) This Court should exercise its discretion to hold an evidentiary hearing to permit the parties to present evidence, including through cross-examination of Dondero—even if HMIT now engages in gamesmanship by seeking to withdraw the Dondero declarations before the hearing.

---

[33] Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

003510

C.    **Exculpation and Release**

101.    This Court's January Order and July Order exculpated Seery from all claims except "those alleging willful misconduct and gross negligence." (January Order ¶ 10; July Order ¶ 5.) The Plan's exculpation provision also limited claims against Seery, in his role as an Independent Director, to those arising "from willful misconduct, criminal misconduct…or gross negligence." (Plan Art. IV.D; Confirmation Order ¶¶ 72–73.) The Trust Agreement similarly limits claims against Seery to "fraud, willful misconduct, or gross negligence." (Trust Agmt. § 8.1; *see also id.* §§ 8.3–8.4.) Thus, HMIT cannot assert claims other than those expressly permitted under these Orders and court-approved documents.

## ARGUMENT

102.    HMIT lacks standing to bring the derivative claims alleged in the Complaint (*see infra* Sections I–II), did not satisfy the procedural requirements to bring derivative claims (*see infra* Section III), and cannot bring derivative claims under the guise of direct claims (*see infra* Section IV). Even if HMIT could assert claims (which it cannot), they fail under any standard (*see infra* Section V).

I.    **HMIT Lacks Standing To Bring Derivative Claims Under Delaware Law.**

103.    HMIT acknowledges that any "fiduciary duties and claims involving breaches of those duties" with respect to HCMLP and the Claimant Trust are "governed by Delaware law" under the "Internal Affairs Doctrine." (Motion ¶ 21 & n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity)); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). HMIT lacks standing to bring any such claims under Delaware law.

003511

A.    **HMIT Lacks Standing To Bring Derivative Claims On Behalf Of The Trust.**

104.    The Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29. (Compl. ¶ 26.) "[T]o proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action." *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b). This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the Trust." *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).

105.    HMIT is not a "beneficial owner" of the Trust and therefore lacks standing to bring derivative claims on its behalf. The "beneficial owners" of the Trust are the "Claimant Trust Beneficiaries." (*See* Trust Agmt. § 2.8 ("The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . .").) The Claimant Trust Beneficiaries are "the Holders of Allowed General Unsecured Claims" and "Holders of Allowed Subordinated Claims." (Plan Art. I.B.44; *see also* Trust Agmt. § 1.1(h).)[34] HMIT is neither. HMIT was an "equity holder in the

---

[34] (*See* Morris Dec. Ex. 1, Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); Trust Agmt. at 1 n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.").)

003512

Original Debtor" and now holds only an unvested "Contingent Trust Interest in the Claimant Trust." (Compl. ¶ 24.) HMIT argues, without justification, that it "should be treated as a vested Claimant Trust Beneficiary." (*Id.*) But, under the Trust Agreement, "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and Trust Agreement. (Trust Agmt. § 5.1(c).) Because it is undisputed that the Contingent Trust Interests have not vested, HMIT is not a "beneficial owner" and lacks standing to bring derivative claims under Delaware law. *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").[35]

**B.      HMIT Lacks Standing To Bring Derivative Claims On HCMLP's Behalf.**

106.    Reorganized HCMLP is a Delaware a limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.* (Compl. ¶ 25.) To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action." 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another

---

[35] If HMIT were a Claimant Trust Beneficiary (which it is not), its claims must be brought in this Court and it has "waived any right to a trial jury." (Trust Agmt. § 5.10(d).) HMIT would also be required to reimburse the Claimant Trustee and any member of the COB if its suit fails (*id.* § 5.10(b)), and this Court could require HMIT "to post a bond ensuring that the full costs of a legal defense can be reimbursed" (*id.* § 5.10(c)). The Highland Parties reserve the right to seek reimbursement and posting of a bond commensurate with the enormous burdens this litigation would impose.

003513

party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010),
*aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265
n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the
corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

107.    HMIT is not a partner of reorganized HCMLP and therefore lacks standing to bring
derivative claims on its behalf. "HMIT held a 99.5% limited partnership in Highland Capital
Management, L.P., the Original Debtor." (Compl. ¶ 6; *see id.* ¶¶ 12, 15, 24.) But that limited
partnership interest was extinguished by the Plan on August 11, 2021 (the Effective Date of the
Plan) and HMIT does not own any partnership interest in reorganized HCMLP. (Plan Art. IV.A.)
Because HMIT would not hold a partnership interest at "the time of bringing the action," it "lacks
derivative standing" to bring claims "on the partnership's behalf." *Tow*, 976 F. Supp. 2d at 904
(dismissing derivative claims by creditor on behalf of partnership for lack of standing).

108.    HMIT also cannot satisfy "the continuous ownership requirement." When HMIT's
partnership interest was extinguished on the Plan's Effective Date, HMIT "los[t] standing to
continue a derivative suit" on behalf of the Debtor.[36] *El Paso*, 152 A.3d at 1265 (cleaned up)
(dismissing derivative action for lack of standing where plaintiff's partnership interest was
extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re SkyPort
Global Commcn's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding
that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law
because they "had their equity interests in the company extinguished pursuant to the merger under
the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation

---

[36] Even before its partnership interest was extinguished, HMIT would have been required to obtain the Debtor's consent or court approval before it could have brought a derivative suit on behalf of the estate.

003514

of WorldCom shares under the Plan … prevents the required continuation of shareholder status

through the litigation.") (cleaned up).

      **C.**      **HMIT Lacks Standing To Bring A "Double Derivative" Action.**

      109.    "[A] double derivative suit is one brought by a shareholder of a parent corporation

to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled."

*Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010). Under "Delaware's 'double derivative'

standing jurisprudence," "parent level standing is required to enforce a subsidiary's claim

derivatively." *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at

282).

      110.    To the extent HMIT seeks to bring a double derivative action on behalf of the Trust

based on claims purportedly held by its wholly owned subsidiary, HCMLP, HMIT lacks standing.

Because HMIT lacks derivative standing to bring claims on behalf of the parent Trust, it also lacks

standing to bring a double derivative action. (*See supra* Section I.A.)

      111.    The Trust also lacks standing to bring these claims on behalf of HCMLP. The

Claimant Trust received limited partnership interests in Highland on August 11, 2021, the

Effective Date of the Plan. (*See supra* ¶ 79.) HMIT challenges trades that occurred in April and

August 2021 (Compl. ¶ 41 & n.12), which predate the Effective Date of the Plan. Because the

Trust did not hold limited partnership interests "[a]t the time of the transaction of which the

plaintiff complains," 6 Del. C. § 17-1002, it cannot bring a derivative action based on these trades,

and HMIT lacks standing to bring a double derivative action.

**II.**     **HMIT Lacks Standing To Bring Derivative Claims Under Federal
       Bankruptcy Law.**

      112.    HMIT ignores its inability to proceed derivatively under Delaware law and instead

insists it has derivative standing as a matter of federal bankruptcy law. (Mot. ¶¶ 9–14.) HMIT also

lacks derivative standing under federal bankruptcy law because (i) HMIT's lack of standing under Delaware law is dispositive regardless of forum, and (ii) HMIT, in any event, cannot meet the requirements for suing on behalf of a debtor under the federal bankruptcy case law it cites.

### A. Federal Law Does Not Confer Standing Prohibited By Delaware Law.

113.    HMIT's invocation of federal bankruptcy law cannot remedy HMIT's lack of derivative standing under Delaware law. HMIT cites Fed. R. Civ. P. 23.1, which "applies to this proceeding pursuant to" Fed. R. Bankr. P. 7023.1. (Mot. ¶ 10.) But Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (quoting 28 U.S.C. § 2072(b)). Thus, the question of whether HMIT has a right to proceed derivatively is governed not by Rule 23.1, but by the "source and content of the substantive law" governing the requirements for derivative actions, which is Delaware law. *Id.* at 96–97.

114.    HMIT's own authority (*see* Mot. ¶¶ 12–13) further supports that Delaware law governs the standing analysis and precludes HMIT's suit. *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233 (5th Cir. 1988), on which HMIT relies, "is the leading case from the Fifth Circuit . . . articulating when a creditors committee may be permitted standing to pursue estate causes of action." *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009). To the extent *Louisiana World* applies post-Effective Date,[37] it does not supersede state law requirements for derivative standing. Before addressing the requirements a creditors' committee must meet to sue derivatively as a matter of federal bankruptcy law (discussed below), the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors'

---

[37] *Louisiana World*, in certain circumstances, allows creditors to "file suit on behalf of a debtor-in-possession or a [bankruptcy] trustee." *La. World*, 858 F.2d at 247. HCMLP is no longer a debtor-in-possession; it has been reorganized.

003516

committee in that case could assert its claims under Louisiana law. 858 F.2d at 236–45. The court

specifically addressed whether the creditors' committee could pursue a derivative action under

Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the

name of a corporation against the directors and officers of the corporation which benefit only the

creditors of the corporation; indeed, Louisiana law specifically recognizes such actions." *Id.* at

243. The opposite is equally true: where state law imposes such a bar, a creditor cannot flout that

prohibition because it is in bankruptcy court. *See In re Dura Automotive Sys., LLC*, No. 19-123728

(Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 ("To determine that the third party may

bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue

them, the Court must look to the law of the debtors' state of incorporation or formation.") (denying

creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the

committee lacked standing under the Delaware LLC Act).

115.    Because HMIT lacks standing to bring derivative claims under Delaware law (*see*

*supra* Section I), it cannot satisfy the "threshold issue" to proceed derivatively, whether in state or

federal court.

### B.    HMIT Cannot Meet The *Louisiana World* Standard Governing Derivative Actions By Creditors In Bankruptcy.

116.    Even if Delaware law did not preclude HMIT from suing derivatively (it does),

HMIT still would lack standing under federal bankruptcy law. Under Fifth Circuit precedent, a

bankruptcy court may authorize a creditor to proceed derivatively only if: (i) the creditor's claims

are "colorable"; (ii) the trustee or debtor-in-possession "refused unjustifiably to pursue the claim";

and (iii) the creditor "first receive[d] leave to sue from the bankruptcy court." *La. World*, 858 F.2d

at 247; *see also, e.g.*, *PW Enters.*, 540 F.3d at 899 (same). "These requirements ensure that

derivative standing does not risk interfering with the debtor or trustee and prevents creditors from

pursuing weak claims." *In re On-Site Fuel Serv., Inc.*, 2020 WL 3703004, at *9 (Bankr. S.D. Miss.

May 8, 2020). HMIT does not and cannot satisfy these requirements.

117.    HMIT focuses solely on the first of these three requirements—asserting that its

claims are "colorable." (*See* Mot. ¶¶ 12–14, 38–42; Objs. ¶¶ 3–4, 7–15; Supp. Mot. ¶ 13.) Even if

HMIT could satisfy the "colorable claim" requirement under *Louisiana World*, which it cannot

(*see infra* Section V), it does not even try to satisfy the second requirement—that Highland

"refused unjustifiably to pursue the claim"—because it cannot.

118.    To assess whether a debtor's refusal was unjustified, courts "must look to whether

the interests of creditors were left unprotected as a result" by conducting a "cost-benefit analysis"

that takes into account whether the potential action is "valid and profitable." *La. World*, 858 F.2d

at 253 n.20; *see also Reed*, 405 B.R. at 810 (same); *Canadian Pac.*, 66 F.3d at 1442 ("[I]f a creditor

pleads facts to support the conclusion that it has a colorable claim . . . and if the bankruptcy court

finds that the claim will likely benefit the estate based on a cost-benefit analysis, then the creditor

has raised a rebuttable presumption that the debtor-in-possession's failure to bring that claim is

unjustified."). This requirement is not easily met. Under HMIT's own authority (*see* Mot. ¶ 40)

"the real challenge for the creditor will be to persuade the bankruptcy court that the trustee

unjustifiably refuses to bring its claim." *PW Enters.*, 540 F.3d at 900. As the Eighth Circuit

explained:

> To satisfy its burden, the creditor, at a minimum, must provide the
> bankruptcy court with *specific* reasons why it believes the trustee's
> refusal is unjustified. A creditor thus does not meet its burden with
> a naked assertion that 'the trustee's refusal is unjustified.' . . . The
> creditor, *not the bankruptcy court*, has the onus of establishing the
> trustee unjustifiably refuses to bring the creditor's claim.

*Id.* (emphasis in original).

003518

119.    In conducting the "cost/benefit" analysis required to determine if a debtor's refusal to sue is unjustified, courts consider (i) the probability of success on the claims and the financial recovery to the estate, (ii) the proposed cost of the litigation, and (iii) the delay and expense of bringing the litigation. *PW Enters.*, 540 F.3d at 901; *see also Official Comm.*, 225 B.R. at 282 ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and 'the terms relative to attorneys' fees on which suit might be brought.'") (quoting *In re STN Enterps.*, 779 F.2d 901, 905 (2d Cir. 1985)). A creditor seeking to proceed derivatively must establish "a sufficient likelihood of success" to "'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'" *Official Comm.*, 225 B.R. at 282 (quoting *STN*, 779 F.2d at 906. If the creditor carries its burden, it shifts to the debtor to refute by a preponderance of the evidence. *PW Enters.*, 540 F.3 at 900 n.9; *Canadian Pac.*, 66 F.3d at 1442; *see also La. World*, 858 F.2d at 248 n.15 (noting that an "evidentiary hearing was unnecessary under the circumstances," where the debtor-in-possession's officers and directors "neither refuted any of the Committee's claims nor objected to them").

120.    HMIT does not even attempt to meet its burden to establish that HCMLP or the Trust unjustifiably refused to pursue HMIT's claims, or to present facts to enable the Court to conduct a cost-benefit analysis and conclude that HMIT's proposed claims are "valid and profitable." *La. World*, 858 F.2d at 253 n.20. Under HMIT's own authority (*see* Mot. ¶¶ 39–41), courts permitted creditors to sue derivatively on behalf of debtors ***only*** after conducting such an evidentiary analysis. For example, in *Louisiana World*, the court found that "the Committee demonstrated"—and the debtor-in-possession did not "refute[]" or "rebut[]"—"the existence of a potential cause of action, a demand on the debtor-in-possession, a refusal or inability on the part

of the debtor-in-possession to bring suit, the possibility of a sizeable monetary recovery and, given the contingent nature of the attorney's fee schedule, a limited cost factor." 858 F.2d at 248 n.15.

121.    Here, as discussed at length above, the evidence shows that HMIT's "claims" are spurious, would be a waste of time, money, and effort, and have no purpose but to further Dondero's crusade to burn Highland down, and make good on his explicit thread against Seery. (*See supra* ¶¶ 8–85.)

122.    HMIT's vague assertion that the COB has "conflicts of interest" does not excuse HMIT from having to ask HCMLP and/or the Trust to pursue HMIT's alleged claims or from proving that any refusal to do so was "unjustified." (Mot. ¶¶ 12–14.) In *Louisiana World*, the court conducted the cost-benefit analysis even though the directors and officers of the debtor-in-possession were conflicted. *La. World*, 858 F.2d at 234.[38]

C.    **HMIT Lacks Standing To Bring Derivative Claims Challenging Pre-Confirmation Conduct.**

123.    "When a Chapter 11 plan is confirmed," the debtor loses "its authority to pursue claims as through it were trustee," unless it makes a "specific and unequivocal" "reservation of claims." *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) (cleaned up; collecting cases). "Without an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved." *Id.* (cleaned up).

124.    HCMLP did not reserve any claims against Seery or any other Proposed Defendant. (Docket No. 1875-3.) Therefore, neither HCMLP nor the Trust has standing to bring claims against Seery based on conduct occurring before August 11, 2021, the Effective Date of the Plan. *Wooley*, 714 F.3d at 864. Because HMIT seeks to bring derivative claims on behalf of both HCMLP and

---

[38] Moreover, HMIT did not ask the COB's independent member to pursue its proposed "claims," even though the independent member is empowered to make decisions on behalf of the COB if the other members are conflicted. (Trust Agmt. § 4.6(c).)

003520

the Trust, HMIT's "standing is contingent upon" HCMLP's and the Trust's standing." *Id.* ("[A]

creditor can derive standing to bring a debtor's claim only if the debtor itself could bring the

claim."). HMIT therefore lacks standing to challenge any pre-confirmation conduct. Other than

the "success fee" portion of Seery's compensation, every single allegation against Seery, including

the alleged breaches of fiduciary duties, is based on pre-effective date conduct.[39]

## III.    HMIT Did Not Satisfy The Procedural Requirements To Bring A Derivative Action.

### A.    HMIT Failed To Include The Litigation Trust As A Party.

125.    It is settled law that "[a]n action must be prosecuted in the name of the real party in

interest." Fed. R. Civ. P. 17(a); *see BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440,

450 (N.D. Tex. 2015) ("The Rule 17(a) requirement is in essence a codification of the prudential

standing requirement that a litigant cannot sue in federal court to enforce the rights of third

parties.") (cleaned up; collecting cases). "The real party in interest is the person with the right to

sue under substantive law, and the determination whether one is the real party in interest with

respect to a particular claim is based on the controlling state or federal substantive laws." *BCC*,

129 F. Supp. 3d at 453 (cleaned up; collecting cases).

126.    HMIT seeks to bring a "derivative action benefitting and on behalf of the

Reorganized Debtor [HCMLP] and the [] Claimant Trust." (Compl. ¶¶ 1, 11.) But the Claimant

Trustee transferred to the Litigation Trust "any and all Causes of Action," with limited exceptions

not relevant here. (*See supra* ¶ 89.) The Litigation Trust is therefore the "real party in interest,"

---

[39] The movant in *Wooley* also alleged that (i) the complained-of breaches of fiduciary duty were kept "secret," (ii) the movant did not discover the claims until after confirmation, and (iii) it would therefore be inequitable to preclude its lawsuits. 714 F.3d at 865–66. The Fifth Circuit denied standing, notwithstanding later discovered "facts," because "[a]llowing [movant] to assert these claims simply because some of the underlying facts were unknown at the time the Plan was confirmed would be inconsistent with the 'nature of a bankruptcy which is designed primarily to secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time." *Id.* at 866. Here, HMIT had knowledge of at least some of the "facts," including Dondero's alleged disclosure of MGM's inside information to Seery, before confirmation and did not object.

003521

and HMIT lacks prudential standing to bring derivative claims on behalf of Highland. *See, e.g.,*
*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*, 247 F. Supp.
3d 377, 414–15 (S.D.N.Y. 2017) (holding that plaintiff "lacks standing to bring a derivative claim
against Defendant" because it "transferred all rights to such claim").

127.    The Litigation Trust is likewise "an indispensable party to a [beneficiary's]
derivative suit," so HMIT cannot bring a derivative action without including the Litigation Trust.
*Schwab v. Oscar (In re SII Liquidation Co.)*, 2012 WL 4327055, at *8 (Bankr. S.D. Ohio Sept. 20,
2012) (cleaned up) (dismissing derivative action); *see also* Fed. R. Civ. P. 19(a)(1) (requiring
joinder of indispensable party); Fed. R. Bankr. P. 7019; Fed. R. Civ. P. 12(b)(7) (permitting
dismissal for "failure to join a party under Rule 19"); Fed. R. Bankr. P. 7012(b).

128.    HMIT's footnoted assertion that it "seeks standing to bring this action as a
derivative action on behalf of the Litigation Sub-Trust" (Compl. ¶ 1 n.1) fails because, as discussed
above, HMIT lacks standing to bring such "double derivative" claims (*see supra* Section I.C). The
Litigation Trust is wholly owned by the Trust and, as matter of Delaware law, HMIT must
demonstrate "parent level standing" to bring a "double derivative" claim that belongs to the
Litigation Trust. *Sagarra*, 34 A.3d at 1079–81; *Lambrecht*, 3 A.3d at 282. Because HMIT lacks
standing to bring a derivative claim on behalf of the Trust (*see supra* Section I.A), it also lacks
standing to bring a double derivative claim.

**B.    HMIT Failed To Make Any Demand To The Litigation Trustee And
Fails To Plead Demand Futility With Particularity.**

129.    HMIT's failure to include the Litigation Trust as a party was no accident. The
Litigation Trust is a Delaware statutory trust and wholly-owned subsidiary of the Trust. (Litigation
Sub-Trust Agmt. § 1.1(e).) Even if HMIT had standing under Delaware law to bring a derivative
action on behalf of the Litigation Trust, which it does not (*see supra* ¶ 128), HMIT can proceed

-49-

003522

derivatively only "if (i) [HMIT] demanded that the [Trustee] pursue the corporate claim and [he] wrongfully refused to do so or (ii) demand is excused because the [Trustee is] incapable of making an impartial decision regarding the litigation." *United Food & Comm. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) (collecting cases). Accordingly, to allege a derivative action under Rule 23.1, which HMIT claims governs (*see* Compl. ¶ 6), HMIT must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); Fed. R. Bankr. P. 7023.1. HMIT failed to do so.

130.    This Court approved Marc Kirschner ("Kirschner") as Litigation Trustee. (Confirmation Order ¶ 45; *see also* Morris Dec. Ex. 44 (the "Litigation Sub-Trust Agreement") § 1.1(r).) HMIT admits that it did not make any effort to make a pre-filling demand to Kirschner regarding this action. (Compl. ¶ 1 n.1.) Instead, HMIT asserts that "[a]ny demand on the Litigation Sub-Trust would be [] futile" because "the Litigation Trustee serves at the direction of the Oversight Board." (*Id.* ¶ 1 n.1; Mot. ¶ 11 n.13.) This conclusory assertion does not allege a single fact casting "reasonable doubt" on Kirschner's objectivity or showing that he was "dominate[d]" by interested parties, let alone with particularity. *Zuckerberg*, 250 A.3d at 877–91 (surveying Delaware demand futility law); (Mot. ¶ 11).[40] Because HMIT has not satisfied either the demand requirement or demand futility, it cannot bring a derivative action. *See, e.g.*, *Zuckerberg*, 250 A.3d at 900–901 (granting "motion to dismiss under Rule 23.1"); *In re Six Flags Ent. Corp. Deriv. Litig.*, 2021 WL 1662466, at *8 (N.D. Tex. Apr. 28, 2021) (dismissing derivative action with

---

[40] As discussed *supra* note 38, HMIT also does not explain its failure to make any pre-filing demand to the independent member of the COB, who it does not allege is conflicted. (Compl. ¶ 10.)

003523

prejudice for failure to plead demand futility under Delaware law "under Rule 23.1's heightened standard").

### C.    HMIT Cannot "Fairly And Adequately" Represent The Interests of Claimant Trust Beneficiaries.

131.    Rule 23.1 provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a); Fed. R. Bankr. P. 7023.1. To be an adequate representative, "a plaintiff in a [] derivative action must not have ulterior motives and must not be pursuing an external personal agenda." *Energytec, Inc. v. Proctor*, 2008 WL 4131257, at *6 (N.D. Tex. Aug. 29, 2008) (cleaned up) (quoting *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992)). To determine adequacy, courts evaluate, *inter alia*, "economic antagonisms between representative and class," "other litigation pending between the plaintiff and defendants," "plaintiff's vindictiveness towards the defendant," and "the degree of support plaintiff was receiving from the [beneficiaries] he purported to represent." *Id.* *6–7 (quoting *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir. 1980)).

132.    HMIT is an inadequate representative. HMIT is effectively controlled by Dondero, and the Plan recognizes HMIT as a Dondero Related Entity (Plan Art. I.B.110). This Court found that "Mr. Dondero and the Dondero Related Entities have harassed the Debtor," including with "substantial, costly, and time-consuming litigation." (Confirmation Order ¶ 77.) This Court also found that Dondero threatened to "burn down the place" if he did not get his way and that "Mr. Dondero and his related entities," including HMIT, "will likely commence litigation against the Protected Parties," including Seery. (*Id.* ¶ 78.) This Court has even referred to Dondero as an "antagonist" whose conduct has made this bankruptcy "contentious, protracted, and unpleasant," and akin to a "corporate divorce." *In re Highland Cap. Mgmt., L.P.*, 2021 WL 2326350, at *1, *25

003524

(Bankr. N.D. Tex. June 7, 2021) (holding Dondero in "civil contempt of court"). The Fifth Circuit similarly recognized that Dondero and his related entities sought to "frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients." *NexPoint*, 48 F.4th at 426; *see also id.* at 427–28. Dondero's own written threats confirm these findings: "Be careful what you do -- last warning." (*See supra* ¶ 25.) Dondero-controlled HMIT is pursuing this derivative action for "ulterior motives" of "antagonism" and "vindictiveness," cannot "fairly and adequately the interests" of the Claimant Trust Beneficiaries, and should be not be permitted to "bring a derivative suit on their behalf." *Energytec*, 2008 WL 4131257, at *6–7 (dismissing derivative action by former CEO on adequacy grounds because he sought to "revers[e] the events leading to his removal" and was in litigation with other shareholders).[41]

## IV.   HMIT Has No Direct Claims Against The Highland Parties.

133.   Throughout its Motion and Complaint, HMIT makes vague references to unspecified direct claims against the Proposed Defendants. (*See, e.g.*, Motion ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Compl. ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").) But "a claim is not 'direct' simply because it is pleaded that way." *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)). "Fifth

---

[41] HMIT and Dondero also have a "personal economic interest" and other claimants "do not share this interest." *Energytec*, 2008 WL 4131257, at *7. Specifically, HMIT has asserted in another proceeding that Highland has sufficient assets "to pay class 8 and class 9 creditors 100 cents on the dollar." (Docket No. 3662 ¶ 5.) If true, HMIT's proposed claims will benefit only HMIT and, potentially, The Dugaboy Investment Trust (controlled by Dondero) and Mark Okada (HCMLP's co-founder) as the holders of Class 11 interests. Proposed Defendants reserve the right to contest HMIT's assertion.

003525

Circuit precedent [] dictates that," to determine whether claims are direct or derivative, "this Court look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization." *Id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)).

134.    Under Delaware law, "whether a claim is solely derivative or may continue as a dual-natured claim 'must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'" *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original). "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'" *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

135.    Similarly, in the bankruptcy context, "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate." *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)). "In that situation, only the bankruptcy trustee has standing to pursue the claim for the estate . . . ." *Id.* "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate." *Id.*

136.    Even if HMIT had viable claims (it does not), they would be derivative, not direct, under both Delaware law and federal bankruptcy law. HMIT argues that the Proposed Defendants' "alleged actions devalued HMIT's interest in the Debtor's Estate, including, without limitation, payment of excessive compensation to Seery." (Mot. ¶ 67.) Thus, by its own admission, any

alleged harm to HMIT "comes about only because of harm to the debtor," so the alleged "injury is derivative." *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso,* 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC,* 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").

137.     HMIT's reliance on *Pike v. Texas EMC Management, LLC,* 610 S.W.3d 763 (Tex. 2020), is misplaced. The fact that "a partner or other stakeholder in a business organization has **constitutional** standing to sue for an alleged loss in the value of its interest in the organization" (Mot. ¶ 67 (quoting *Pike,* 610 S.W.3d at 778) (emphasis added)) is irrelevant. As the Court explained, it is "the statutory provisions that define and limit a stakeholder's ability to recover certain measures of damages, which protect the organization's status as a separate and independent entity," and therefore considered the matter under Texas partnership law. *Pike,* 610 S.W.3d at 778–79. Here, HMIT admits that both the Trust and HCMLP are governed by Delaware law, which does not recognize any direct (or derivative) claims by HMIT.

138.     Even assuming, *arguendo*, that HMIT could bring direct claims (it cannot), the Highland Parties cannot be held liable for them. "Under the Delaware Statutory Trust Act, 'a trustee, when acting in such capacity, shall not be personally liable to any person other than the statutory trust or a beneficial owner for any act, omission or obligation of the statutory trust or any trustee thereof' except 'to the extent otherwise provided' by the trust's governing document."

003527

*Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2020 WL 2521557, at \*8 (Del. Super. May 18,

2020) (quoting 12 Del C. §§ 3803(b)–(c)). The Trust Agreement likewise limits "personal

liability" "to the fullest extent provided under Section 8303 of the Delaware Statutory Trust Act."

(Trust Agmt. § 8.3.) Because, as discussed above, HMIT is not a "beneficial owner" of the

Claimant Trust (*see supra* Section I.A), it cannot bring direct claims against Proposed Defendants

under Delaware law.

## V.    HMIT's Proposed Complaint Fails To Plausibly Allege Any Claims Against The Proposed Defendants.

139.    Because HMIT lacks standing, this Court need not reach the merits of HMIT's

proposed Adversary Complaint. As a matter of judicial economy, however, the Highland Parties

respectfully request that this Court address the lack of merit as an alternative basis to deny the

Motion. HMIT fails to adequately allege its claims under any standard. HMIT's claims are not

colorable because they lack foundation, and HMIT's "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements," fail to "[]cross the line from

conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp.

v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

### A.    HMIT Does Not Adequately Allege Any Breach Of Fiduciary Duties (Count I).

140.    HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material

non-public information to Stonehill and Farallon" before their purchase of certain Highland claims,

and (ii) by receiving "compensation paid to him under the terms of the [Trust Agreement] since

the Effective Date of the Plan in August 2021." (Compl. ¶¶ 64–67.) Under Delaware law, which

HMIT admits governs (*see* Mot. ¶ 21 n.24), "[t]o bring a claim for breach of fiduciary duty, a

plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that

duty.'" *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at \*30 (N.D. Tex. Apr. 15,

-55-

003528

2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)). HMIT fails to plausibly allege either element.

141.    ***First***, HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate" (Compl. ¶ 63) "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders. *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same). Because Seery did not owe any "duty" to HMIT directly and individually, the Complaint fails to state a claim for breach of fiduciary duty to HMIT.

142.    ***Second***, to the extent Seery owed any fiduciary duties to HMIT or the Debtor, he did not breach them by allegedly communicating with Farallon and Stonehill. (*See* Compl. ¶ 64.) As this Court recognized, "claims trading in bankruptcy is [] pretty unregulated—it's just kind of between the claims trader and the transferee." (Morris Dec. Ex. 43 at 53:6–7.) In fact, this Court recognized that "for decades now, since a rule change in the last century, no court approval and order is necessary unless the transferor objects." (Morris Dec. Ex. 6 at 20); *see also* Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of Chapter 11s*, 29 Am. Bankr. Inst. J. 61 (July/Aug. 2010) ("In 1991, Fed. R. Bankr. P. 3001(e) was amended to limit the court's oversight on claims trading" such that "only the transferor may object to a transfer.") (quoting Michael H. Whitaker, *Regulating Claims Trading in Chapter 11 Bankruptcies: A Proposal for Mandatory Disclosure*, 3 Cornell J.L. & Pub. Pol'y 303, 320 (1994)). Because none of the

003529

transferors objected to the claims trades at issue, Seery's alleged actions in connection with them cannot constitute a breach of any fiduciary duties.

143.    ***Third***, HMIT's "conclusory allegations" and "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief." *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up). As to Seery's discussions with Farallon and Stonehill, HMIT asserts that Seery "disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits." (Compl. ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.) HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, or what "assurances" he made. The few facts HMIT provides contradict its own allegations. The only purportedly "material non-public information" identified is the Complaint is the MGM E-Mail Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." (Compl. ¶ 45.) This information was widely reported in the financial press at the time (*see supra* ¶¶ 30–37), so it cannot constitute material non-public information as a matter of law. *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)). HMIT asserts that Farallon and Stonehill's purchases "made no sense" without access to "material non-public information." (Compl. ¶¶ 3, 50.) But HMIT admits that Farallon and Stonehill purchased Highland claims at discounts of 43% to 65% to their allowed amounts, so they would therefore receive at least an 18% return based on publicly available estimates in Highland's Court-approved Disclosure Statement. (*Id.* ¶¶ 3, 37, 42.)

144.    As to Seery's compensation, HMIT asserts that it was "excessive," and speculates that compensation negotiations between Seery and the COB "were not arm's-length." (Compl. ¶¶ 4, 13, 54, 74.) But HMIT does not say one word about the process for negotiating and approving Seery's compensation. Nor does HMIT allege what Seery's compensation actually is, let alone compare it to others' compensation to show that it is "excessive." HMIT's assertion that Seery's compensation package was initially "composed of a flat monthly pay" but now "is also performance based" (*id.* ¶ 4) is wrong and contradicted by Court-approved documents. The structure of Seery's post-effective date compensation, which includes a "Base Salary," "success fee," and "severance," was fully disclosed in the Trust Agreement, which was publicly filed in advance of the Plan confirmation hearing and approved by this Court and the Fifth Circuit as part of the Plan (*see supra* ¶¶ 78–79).

145.    Thus, HMIT fails to allege facts that, even if true (and they are not), support a reasonable inference that Mr. Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty. *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]lthough the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.")

### B.    HMIT's Theories Of Secondary Liability Fail (Counts II and III).

146.    HMIT seeks to hold Proposed Defendants secondarily liable for Seery's alleged breach of fiduciaries duties on an aid/abet theory (Compl. ¶¶ 69–74) and conspiracy theory of liability (*id.* ¶¶ 75–81). As a threshold matter, HMIT has not plausibly alleged any primary breach

003531

of fiduciary duties, so it cannot pursue secondary liability for the same alleged wrongdoing. *See English v. Narang*, 2019 WL 1300855, at \*14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at \*10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).[42]

147.    Even if HMIT could pursue secondary liability, it has not plausibly alleged any civil conspiracy. Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.* at 141 (cleaned up).

148.    HMIT has not plausibly alleged any "meeting of the minds." HMIT asserts that "Defendants conspired with each other to unlawfully breach fiduciary duties" (Compl. ¶ 76), which is precisely the sort of "legal conclusion" the Supreme Court held is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66). HMIT repeats four times that Seery provided information to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation" (Compl. ¶ 77; *see also id* ¶¶ 4, 47, 74), but never provides

---

[42] Because HMIT breach of fiduciary duty claim is governed by Delaware law, its aid/abet theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas); By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

003532

"nonconclusory factual allegations" in support. *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 565–66). HMIT vaguely alleges "upon information and belief" that Seery "did business with Farallon" and "served on [a] creditors committee" with Stonehill. (Compl. ¶ 48.) HMIT also asserts "[u]pon information and belief" that Farallon "conducted no due diligence but relied on Seery's profit guarantees." (*Id.* ¶ 40.) These allegations "upon information belief" are "wholly speculative and conclusory," and therefore do "not satisfy the pleading requirements under Rule 8(a)." *Hargrove v. WMC Mortg. Corp.*, 2008 WL 4056292, at *3 (S.D. Tex. Aug. 29, 2008) (citing *Twombly*, 550 U.S. at 555).

### C.   HMIT Seeks Remedies That Are Not Available As A Matter Of Law (Counts IV, V, and VI).

149.   HMIT seeks a grab bag of unavailable remedies, including (1) equitable disallowance (Compl. ¶¶ 82–87), (2) unjust enrichment (*id.* ¶¶ 88–94), (3) declaratory relief (*id.* ¶¶ 95–99), (4) punitive damages (*id.* ¶¶ 100–01), and (5) equitable tolling (*id.* ¶¶ 103–08), several of which are incorrectly pleaded as causes of action. None of these remedies are available under applicable law.

150.   ***First***, Seery does not have any bankruptcy claims that can be subordinated or disallowed. (*Id.* ¶¶ 82–87.) In any event, the Fifth Circuit has expressly rejected equitable disallowance as remedy available under the Bankruptcy Code. *See SED Holdings, LLC v. 3 Star Props., LLC*, 2019 WL 13192236, at *2 (S.D. Tex. Sept. 11, 2019) ("[T]he claim may only be subordinated, but not disallowed.") (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 (5th Cir. 1977)); *see also In re Lightsquared Inc.*, 504 B.R. 321, 339–40 (Bankr. S.D.N.Y. 2013) ("[T]he Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b).") (citing *Mobile Steel*, 563 F.2d at 699 n.10).

-60-

003533

151.   **Second**, under Texas law, "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).[43] Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)). Here, Seery's compensation is governed by express agreements (*see supra* ¶¶ 78–79), so unjust enrichment is unavailable as a theory of recovery.

152.   **Third**, HMIT brings "claims for declaratory relief, but a request for declaratory relief is not an independent cause of action, [and] in the absence of any underlying viable claims such relief is unavailable." *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collins Cnty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)).

153.   **Fourth**, HMIT has no basis to seek punitive damages. HMIT abandoned its fraud claim so its sole claim for primary liability is breach of fiduciary duty. As a matter of Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action." *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

---

[43] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

003534

154.    ***Finally***, HMIT cannot invoke "the discovery rule," "equitable tolling doctrine," "fraudulent concealment," or "any other applicable tolling doctrine" to toll the statute of limitations (Compl. ¶ 108), because this Court has held that that HMIT "has known about the conduct underlying the desired lawsuit for well over a year, based on activity that has occurred in the bankruptcy court" (Docket No. 3713 at 2–3); *see also* Order at 2–3, *In re Hunter Mt. Inv. Tr.*, No. 23-10376 (5th Cir. Apr. 12, 2023) (declining to disturb this Court's "appropriate" Order, because HMIT "approached the brink of the limitations period before seeking leave to assert its claim").

## CONCLUSION

155.    For the foregoing reasons, the Highland Parties respectfully request that this Court deny the Motion in its entirety and grant such other relief this Court deems just and proper.[44]

---

[44] Denial should be ***with prejudice***. HMIT "has known about the conduct underlying the desired lawsuit for well over a year" (Docket No. 3713 at 2–3) and has already filed two proposed Complaints. It should not be permitted to file a third (or more), which "would be futile." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 378 (5th Cir. 2014) (affirming denial of leave to amend as futile) (collecting cases).

003535

Dated: May 11, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:     jpomerantz@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

/s/ *Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.,*
*and the Highland Claimant Trust*

**WILLKIE FARR & GALLAGHER LLP**
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com


-and-

**REED SMITH LLP**

/s/ *Omar J. Alaniz*
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for James P. Seery, Jr.*

003536