UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**
**Hunter Mountain Investment Trust**

|  |  |  |
|---|---|---|
| | Appellant | § |
| vs. | | § |
| **Highland Capital Management, L.P, et al** | | § **3:23-CV-2071-E** |
| | Appellee | § |

**[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 12

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.      Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.    the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.    the colorability analysis is "akin to the standards applied under the ... *Barton* doctrine";

    3.    the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

    4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

*[See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

*[See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

*[See* Dkt. Nos. 3903-04].

D.    Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

      [*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.    Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

      1.  ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

      2.  determining that state court "Rule 202" proceedings supported the denial of discovery?

      [*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.    Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.    Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.    Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.    Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

      [*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.    Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

      [*See* Dkt. No. 3869].

K.    Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

      1.  there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

      2.  there is no evidence to support the alleged quid pro quo;

      3.  the material shared was *public* information; and/or

      4.  the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L. Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M. Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N. Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O. Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P. Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

1. declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

2. concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1. **Notice of Appeal**

*000001*

a. Notice of Appeal **[Dkt. 3906]**;

*000276*

b. Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*

c. Second Amended Notice of Appeal **[Dkt. 3945]**

2. **The judgment, order, or decree appealed from:**

a. Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

   **b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

  **3. Docket sheet.**

*001049*

   **a.** Bankruptcy Case No. 19-34054

  **4. Other Items to be included:**

   **a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

| *Vol. 2* | **FILE DATE** | **DOCKET NO.** (INCLUDING ALL ATTACHMENTS AND APPENDICES) | **DESCRIPTION** |
|---|---|---|---|
| *001594* | 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| *001660* | 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| *001821* | 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| *001830* | 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| *Vol. 3* *001849* *Thru* | 03/28/2023 | 3699 (3699-1 — 3699-5) *Vol 4* | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *Vol 4* *002236* | 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| *002243* | 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| *002248* | 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

| | | | |
|---|---|---|---|
| *Vol. 5* 002251 | 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
| 002254 | 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 002262 | 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 002348 | 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 002355 | 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 002358 | 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 002391 | 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 002398 | 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 002400 | 04/05/2023 | 3721 (3721-1 — 3721-2) *Thru Vol. 7* | HMIT Notice of Appeal |
| *Vol. 8* 002826 *thru Vol. 9* | 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| *Vol. 9* 003257 | 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 003260 | 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 003270 | 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 003278 | 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| VOL. 10 003280 | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| 003286 | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| 003291 | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| 003294 | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| 003296 | 04/17/2023 | **3748** | HMIT's Response and Reservation of Rights |
| 003299 | 04/19/2023 | 3751 | Notice of Status Conference |
| 003302 | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| 003311 | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| 003314 | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| 003323 | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 003366 | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| 003430 | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| *Vol. 10*<br>*003458* | | | Holdings LLC, Stonehill Capital Management LLC |
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *003463* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *Vol. 11*<br>*003537*<br>*Thru Vol. 16* | 05/11/2023 | 3784<br>(3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Vol. 17*<br>*004465* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *004712* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004714* | 05/24/2023 | 3788<br>(3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *004808* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *004813* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004836* | 05/25/2023 | 3791<br>(3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18*<br>*004930* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *004931* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18
004939.

| | 05/25/2023 | 3798<br>(3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| 004959 | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004961 | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004984 | 06/05/2023 | 3815<br>(3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005049 | 06/05/2023 | 3816<br>(3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005114<br>*Thru Vol. 25* | 06/05/2023 | 3817<br>(3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| Vol. 26<br>006608<br>*Thru Vol. 39* | 06/05/2023 | 3818<br>(3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| Vol. 39<br>009273 | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009290 | 06/07/2023 | 3821<br>(3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009416 | 06/07/2023 | 3822<br>(3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 009424 | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|
| *009436* | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| *009444* | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| *009445* | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| *009446* | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009456* | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *009458* *Vol. 41* | 06/13/2023 *Thru Vol. 41* | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| *009847* | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| *009901* | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| *009905* | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| *009908* | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| *009912* | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

| | | | |
|---|---|---|---|
| *009928* | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| *009944* | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| *010013* | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| *010023* | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| *010025* | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| *010029* | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| *010035* | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| *010047* | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| *010059* | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| *Vol. 43* *010062* | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43

010135

010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.  Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5, 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
    Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue. Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

Appellant/Movant HMIT's Second Supplemental Statement of Issues
and Designation of Items for Inclusion in the Appellate Record

Page 12

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

**Appellant/Movant HMIT's Second Supplemental Statement of Issues
and Designation of Items for Inclusion in the Appellate Record**

**Page 13**

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 15 of 214   PageID 3048
Case 19-34054-sgj11   Doc 3543   Filed 02/24/25   Entered 02/24/25   16:28:26   Page 15 of
Exhibit 2    Page 127 of 162

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

003737

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 16 of 214   PageID 3049
Case 19-34054-sgj11 Doc 1808-1 Filed 02/22/21 Entered 02/22/21 18:26:26 Page 130 of
Exhibit 2   Page 128 of 162

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.   *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.   *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

003738

Case 3:23-cv-02071-E  Document 23-12   Filed 12/07/23   Page 17 of 214   PageID 3050
Case 19-34054-sgj11 Doc 3363-1 Filed 02/01/23  Entered 02/01/23 22:26:42  Page 130 of
Exhibit 2    Page 129 of 162

11.  *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.  *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.  *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.  *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

31

003739

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. **The Reorganized Debtor**

### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

003740

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 19 of 214 PageID 3052
Case 19-34054-sgj11 Doc 1808-1 Filed 02/22/21 Entered 02/05/16:28:26 Page 135 of
Exhibit 2    Page 131 of 162

4.    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

003741

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 20 of 214   PageID 3053
Case 19-34054-sgj11 Doc 3936-1 Filed 02/22/23   Entered 02/25/16/23 20:20:29   Page 1 of 1
Exhibit 2   Page 132 of 162

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

### D.   **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person.  On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

34

003742

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 21 of 214 PageID 3054
Case 19-34054-sgj11 Doc 9338 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 132 of
Exhibit 2 Page 133 of 162

### E. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F. Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G. Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H. Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

003743

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 22 of 214   PageID 3055
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:23:26 Page 22 of
Exhibit 2   Page 134 of 162

**I.**     **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.**     **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.**     **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

003744

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 23 of 214    PageID 3056
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 135 of
Exhibit 2    Page 135 of 162

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

003745

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 24 of 214   PageID 3057
Case 19-34054-sgj11 Doc 9336 Filed 02/22/21 Entered 02/05/16:23:26:26 Page 135 of
Exhibit 2    Page 136 of 162

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.      Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

003746

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.  Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.  Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

003747

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 26 of 214   PageID 3059
Case 19-34054-sgj11 Doc 3384 Filed 02/21/22 Entered 02/21/22 16:28:26 Page 125 of
Exhibit 2     Page 138 of 162

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.   **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.   **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.   **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.   **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

40

003748

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 27 of 214   PageID 3060
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/22/21 16:26:26 Page 139 of
Exhibit 2    Page 139 of 162

**G.** _**De Minimis**_ **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. _De minimis_ distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.** **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.** **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.** **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.** **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

003749

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 28 of 214    PageID 3061
Case 19-34054-sgj11  Doc 3384 Filed 02/22/21  Entered 02/22/21 16:28:20  Page 142 of
Exhibit 2    Page 140 of 162

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.    Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.    Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however,* that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.    Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

003750

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 29 of 214   PageID 3062
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 29 of
Exhibit 2   Page 141 of 162

**O.**     **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.**     **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**     **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**     **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

003751

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 30 of 214 PageID 3063
Case 19-34054-sgj11 Doc 3936-4 Filed 02/22/21 Entered 02/16/23 26:26 Page 143 of
Exhibit 2    Page 142 of 162

**D.**    **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

003752

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 31 of 214   PageID 3064
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 142 of
Exhibit 2    Page 143 of 162

ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

### ARTICLE VIII.
### EFFECTIVENESS OF THIS PLAN

**A.**    **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

45

003753

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 32 of 214   PageID 3065
Case 19-34054-sgj11   Doc 3936-4 Filed 02/04/25 Entered 02/05/16/23 16:26:49   Page 145 of
Exhibit 2   Page 144 of 162

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    **Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

003754

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 33 of 214 PageID 3066
Case 19-34054-sgj11 Doc 3484 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 145 of
Exhibit 2 Page 145 of 162

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

**A.**     **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**     **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**C.**     **Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided, however,* the foregoing

003755

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 34 of 214   PageID 3067
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 146 of
Exhibit 2   Page 146 of 162

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.    **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

48

003756

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 35 of 214   PageID 3068
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/25/16:28:26 Page 146 of
Exhibit 2   Page 147 of 162

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.   Preservation of Rights of Action**

1.   *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2.   *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

003757

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 36 of 214   PageID 3069
Case 19-34054-sgj11 Doc 3384 Filed 02/22/23 Entered 02/22/23 16:28:26 Page 146 of
Exhibit 2   Page 148 of 162

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

F.     **Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

003758

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 37 of 214   PageID 3070
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 148 of
Exhibit 2   Page 149 of 162

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

### G.    Duration of Injunctions and Stays

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

### H.    Continuance of January 9 Order

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

003759

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 38 of 214 PageID 3071
Case 19-34054-sgj11 Doc 1943-5 Filed 02/02/21 Entered 02/05/10:48:26 Page 149 of
Exhibit 2    Page 150 of 162

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided, however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

003760

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 39 of 214 PageID 3072
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 155 of
Exhibit 2 Page 151 of 162

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

003761

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 40 of 214   PageID 3073
Case 19-34054-sgj11 Doc 3384 Filed 02/22/21 Entered 02/16/23 13:26:26 Page 153 of
Exhibit 2   Page 152 of 162

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.     Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.     Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.     Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

003762

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 41 of 214 PageID 3074
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 152 of
Exhibit 2 Page 153 of 162

**D.**     **Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.**     **Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.**     **Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**G.**     **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.**     **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

003763

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 42 of 214   PageID 3075
Case 19-34054-sgj11 Doc 1943-1 Filed 02/22/21 Entered 02/22/21 16:03:25 Page 155 of
Exhibit 2   Page 154 of 162

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.   **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.   **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.   **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

### If to the Claimant Trust:

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

003764

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 43 of 214   PageID 3076
Case 19-34054-sgj11 Doc 1963-4 Filed 02/22/21 Entered 02/22/21 16:26:26 Page 159 of

Exhibit 2    Page 155 of 162

Dallas, Texas 75201
Attention:  James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
       Ira D. Kharasch, Esq.
       Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
       Ira D. Kharasch, Esq.
       Gregory V. Demo, Esq.

**L.**  **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

003765

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 44 of 214 PageID 3077
Case 19-34054-sgj11 Doc 1943-1 Filed 02/22/21 Entered 02/22/21 16:28:20 Page 135 of
Exhibit 2 Page 156 of 162

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.     Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.     Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.     Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.     Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however,* that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

003766

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 45 of 214    PageID 3078
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:28:26    Page 156 of
Exhibit 2    Page 157 of 162

Dated: January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

003767

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 46 of 214   PageID 3079
Case 19-34054-sgj11 Doc 3384 Filed 02/20/25 Entered 02/20/25 16:28:26 Page 157 of
Exhibit 2   Page 158 of 162

## Exhibit B

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

003768

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 47 of 214   PageID 3080
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:28:26 Page 158 of
Exhibit 2    Page 159 of 162

### Schedule of CLO Management Agreements and Related Contracts to Be Assumed

1.  Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.  Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.  Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.  Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.  Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.  Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.  Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.  Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.  Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

003769

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 48 of 214   PageID 3081
Case 19-34054-sgj11 Doc 3384 Filed 02/02/21 Entered 02/02/21 16:26:26 Page 159 of
Exhibit 2   Page 160 of 162

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

2

003770

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 49 of 214   PageID 3082
Case 19-34054-sgj11   Doc 3384-2   Filed 02/22/25   Entered 02/05/16/23:26:46   Page 160 of
Exhibit 2   Page 161 of 162

36.  Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37.  Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38.  Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39.  Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40.  Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41.  Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42.  Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43.  Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44.  Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45.  Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46.  A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47.  A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48.  Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49.  Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50.  Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

003771

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 50 of 214    PageID 3083
Case 19-34054-sgj11 Doc 3384 Filed 02/21/19 Entered 02/21/19 16:26:26 Page 161 of
Exhibit 2    Page 162 of 162

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

003772

# EXHIBIT 3

FILED
12/22/2021 5:53 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JAVIER HERNANDEZ DEPUTY

**DC-21-09534**

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE JAMES DONDERO, | § | IN THE DISTRICT COURT |
| | § | 95th |
| *Petitioner.* | § | _____ JUDICIAL DISTRICT |
| | § | |
| | § | DALLAS COUNTY, TEXAS |

### VERIFIED PETITION TO TAKE DEPOSITION BEFORE SUIT AND SEEK DOCUMENTS

Petitioner James Dondero respectfully requests that this Court order, pursuant to Texas Rule of Civil Procedure 202, the deposition of the corporate representatives of Alvarez & Marsal CRF Management, LLC, and of Farallon Capital Management, LLC. Petitioner further requests that the Court order certain limited, yet relevant documents to be provided under Texas Rule of Civil Procedure 199.2 as set forth below.

Petitioner would respectfully show the Court that:

## I.

### PARTIES

1.     Petitioner James Dondero ("Petitioner") is an individual resident in Dallas County, Texas and is impacted by the potential acts and omissions alleged herein.

2.     Respondent Alvarez & Marsal CRF Management, LLC ("A&M") is a Delaware limited liability company serving as an investment adviser, with offices in Dallas County, Texas, at 2100 Ross Ave., 21st Floor, Dallas, Texas 75201.

3.     Respondent Farallon Capital Management LLC is a limited liability company with its primary place of business in California ("Farallon" and together with A&M, the "Respondents") which is an investment fund located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

---

003774

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 53 of 214   PageID 3086
Case 19-3406-sgj   Doc 17-3 Filed 08/09/21 Entered 08/09/21 04:08:22 Page 5 of 21 Desc
Exhibit 3   Page 3 of 9

## II.

## JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction over this matter pursuant to Texas Rule of Civil Procedure 202. The anticipated lawsuit would include common law claims.

5.    The Court has personal jurisdiction over A&M because it maintains a regular place of business in Dallas County. Personal jurisdiction is also proper under TEX. CIR. PRAC. REM. CODE § 17.003, and under § 17.042(1)-(3) because its acts on behalf of the Crusader Funds (as defined below), would constitute a tort in this state. Furthermore, it participated in substantial acts in this state which are the subject of the investigation. Moreover, this Court has quasi *in rem* jurisdiction over any potential claims because the action concerns the sale of personal property that was located in Dallas County, and in which Plaintiff claims an interest.

6.    The Court has personal jurisdiction over Farallon because it, acting on behalf of itself or one of its subsidiaries/affiliates, communicated with representatives of Highland Capital Management, LP which is located in Dallas County, and with representatives of Acis and Josh Terry (both of whom are residents in Dallas County), to purchase claims in the Highland Capital Management, LP ("Highland") Chapter 11 bankruptcy case (the "Highland Bankruptcy Case"). Such acts, if shown to have occurred could constitute a tort in this state. Moreover, this Court has quasi *in rem* jurisdiction over any potential claims because the action concerns the sale of personal property that was located in Dallas County, and in which Plaintiff claims an interest.

7.    Venue is proper in Dallas County, Texas, where venue of the anticipated lawsuit may lie and where the property at issue exists, and where a substantial amount of the acts and omissions underlying the potential suit occurred.

---

Petitioner's Verified Petition to Take Deposition Before Suit                              Page 2

003775

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 54 of 214   PageID 3087
Case 19-30083-sgj7 Doc 3784-3 Filed 08/09/21 Entered 08/09/21 04:08:27 Page 96 of 21 Desc
Exhibit 3   Page 4 of 9

8.      Removal is not proper because there is no basis for federal jurisdiction because a Rule 202 petition, as a pre-suit mechanism, does not meet Article III of the United States Constitution's standing requirement of an actual, live case or controversy.

## III.

## FACTUAL BACKGROUND

9.      This matter arises out of Farallon's purchase of certain bankruptcy claims in the Highland Bankruptcy Case, pending in the Northern District of Texas bankruptcy court, from three sources: HarbourVest, Acis Capital Management, LP, and the Crusader Funds (as defined below).

10.     Petitioner is the founder and former CEO of Highland and is an adviser and/or manager of several trusts who own the equity in Highland. In addition, Petitioner is an investor in Highland Crusader Fund, Ltd. and several of its companion and affiliated funds (the "Crusader Funds").

11.     Until recently, the Crusader Funds were managed by Highland, but are now managed and advised by A&M.

12.     Shortly after the commencement of the Highland Bankruptcy Case, the Office of the United States Trustee solicited Highland's twenty largest unsecured creditors to serve on the Official Committee of Unsecured Creditors in the Highland Bankruptcy Case (the "UCC").

13.     As set forth below, the Information Sheet attached to such solicitation provided, *inter alia,*

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any**

---

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 55 of 214   PageID 3088
Case 19-34054-sgj Doc 3137-3 Filed 03/09/21 Entered 03/09/21 04:08:22 Page 97 of 215 Desc
Exhibit 3    Page 5 of 9

**other reason the United States Trustee believes is proper in the exercise of her discretion.** (Emphasis in Original)

14.    The UCC was originally populated by four members, (i) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), (ii) Acis Capital Management, L.P. (iii) UBS Securities LLC and UBS AG London Branch (together, "UBS") and (iv) Meta-E Discovery LLC.

15.    Upon information and belief, two of Highland's creditors – the Redeemer Committee (a member of the UCC) and the Crusader Funds, who between them held approximately $191 million in claims in the Highland Bankruptcy Case (the "Crusader Claims")–sold their claims to Jessup Holdings LLC ("Jessup"), a newly established limited liability company established by Farallon right before the sale. It was formed for the purpose of holding claims Farallon purchased in the Highland Bankruptcy Case.

16.    Upon information and belief, two other Highland creditors—Joshua Terry and Acis Capital Management (another member of the UCC), who between them held approximately $25 million in claims (the "Acis Claims")—sold their claims to Muck Holdings LLC ("Muck"), a newly established limited liability company set up by Farallon solely for the purpose of holding the Acis Claims that Farallon purchased.

17.    Finally, another group of affiliated creditors, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P. (collectively, "HarbourVest") also sold $80 million worth of their claims (the "HarbourVest Claims", together with the Crusader Claims and Acis Claims, the "Claims") to Muck.

---

Petitioner's Verified Petition to Take Deposition Before Suit                                    Page 4

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 56 of 214   PageID 3089
Case 19-34054-sgj11 Doc 3137-60 Filed 08/09/21 Entered 08/09/21 04:08:27 Page 8 of 21 Desc
Exhibit 3   Page 6 of 9

18.     Notwithstanding the instructions issued by the Office of the United States Trustee, no one—not Farallon, nor the Redeemer Committee, HarbourVest or Acis Capital Management—ever sought, much less obtained Court approval to sell their respective claims.

19.     Upon information and belief, a substantial amount of time passed between the agreement to sell the Claims and the consummation of such sales.   Notwithstanding their agreement to sell their respective claims, neither the Redeemer Committee nor Acis Capital Management resigned from the UCC.

20.     The current CEO of Highland, James Seery, has an age-old connection to Farallon and, upon information and belief, advised Farallon to purchase the claims.

21.     On a telephone call between Petitioner and a representative of Farallon, Michael Lin, Mr. Lin info rmed Petitioner that Farallon had purchased the claims sight unseen—relying entirely on Mr. Seery's advice solely because of their prior dealings.

22.     Mr. Seery had much to gain by brokering a sale of the Claims to Jessup and Muck—namely, his knowledge that Farallon—as a friendly investor—would allow him to remain as Highland's CEO with virtually unfettered discretion to administer Highland. In addition, Mr. Seery's rich compensation package incentivized him to continue the bankruptcy for as long as possible.

23.     As Highland's current CEO, Mr. Seery had non-public, material information concerning Highland. Upon information and belief, such non-public, material information was the basis for instructing Farallon to purchase the Claims, in violation the Registered Investment Advisor Act 15 U.S.C § 80b-1 et seq., among other things.

24.     Additionally, A&M, upon information and belief, did not put the Crusader Claims on the open market prior to selling them to Farallon. The sale of the Crusader Claims by A&M

Petitioner's Verified Petition to Take Deposition Before Suit                                    Page 5

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 57 of 214   PageID 3090
Case 19-34054-sgj11 Doc 3137-88 08/09/21 05 Entered 08/09/21 04:18:27 Page 99 of 21 Desc
Exhibit 3   Page 7 of 9

was not pursuant to normal means and there is reason to doubt that A&M sought or obtained the highest price for the assets that it sold. This would have injured Petitioner as an investor in the Crusader Funds.

## IV.

## RELIEF SOUGHT

1.    Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of A&M, and to depose Michael Lin, on the following topics, to investigate any potential claims by Petitioner arising out of the highly irregular manner in which the Claim were marketed (if at all) and sold, within ten days of the Court's Order, or as agreed by the parties:

     a.   A&M's agreements with the Crusader Funds, and the agreement(s) of those funds with their respective investors;

     b.   The valuation, marketing and sale of the Claims to Farallon (or its subsidiaries/. affiliates);

     c.   The negotiations and communications leading up to the purchase or sale of the Claims;

     d.   Any discussions with James Seery regarding the Claims;

     e.   Any prior relationship with James Seery.

2.    As part of the Court's Order, Petitioner requests this Court to require Respondents to produce the following documents at their respective depositions:

     a.   All agreements, contracts, or other documents (including any e-mails, correspondence, texts, drafts, term sheets, or communications related to same) related to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

     b.   All communications with James Seery regarding the Claims;

     c.   All communications with, between or among A&M, Seery, HarbourVest, Joshua Terry, Acis, or Highland Capital Management ,LP (or any agent or

representative thereof), regarding or related to the Claims (or any subset or portion thereof);

d.  All communications regarding filing any notice with the Bankruptcy Court overseeing the Highland Bankruptcy Case or seeking such Court's approval for the sale or purchase of the Claims;

e.  All offers to sell or purchase the Claims and/or all correspondence regarding same;

V.

**HEARING**

21.  After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on the Petition.

22.  FOR THESE REASONS, Petitioner asks the Court to set a date for hearing on this Petition, and after the hearing, to find that the likely benefit of allowing Petitioner to take the requested depositions outweighs the burden or expense of the procedure.  Petitioner further asks the Court to issue an Order authorizing Petitioner to take the oral depositions of Michael Lin and a designated representative or representatives of A&M after proper notice and service at the offices of Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, Texas 75201, within ten (10) days of the Court's Order, or as agreed by the parties, and to produce the requested documents at said deposition.  Petitioner also seeks any further relief to which he may be justly entitled.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 59 of 214   PageID 3092
Case 21-03054-sgj Doc 17-3 Filed 08/09/21 Entered 08/09/21 05/08/23 22:34:91 of 21c
Exhibit 3   Page 9 of 9

Dated: July 22, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

/s/ *Mazin A. Sbaiti*
**Mazin A. Sbaiti**
 Texas Bar No. 24058096
**Brad J. Robinson**
 Texas Bar No. 24058076
J.P. Morgan Chase Tower
2200 Ross Avenue Suite 4900W
Dallas, Texas 75205
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
 bir@sbaitilaw.com

**Counsel for Petitioner**

## VERIFICATION

I, the undersigned, have reviewed attached *Verified Petition to Take Deposition Before Suit and Seek Documents* and verify, pursuant to Tex. Civ. Prac. Rem. Code § 132.001 under penalty of perjury, that the factual statements therein, as stated, are true and correct, and are within the best of my personal knowledge as stated therein. The date of my birth is June 29, 1962, and my address is 2515 McKinney Avenue, Suite 1100, Dallas, Texas 75201.

Verified this 22nd Day of July, 2021.

**James Dondero**

003781

# EXHIBIT 4

003782

FILED
5/2/2022 9:27 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Martin Reyes DEPUTY

## CAUSE NO. DC-21-09534

| | | |
|---|---|---|
| **IN RE JAMES DONDERO,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Petitioner.* | § | **95th JUDICIAL DISTRICT** |
| | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## VERIFIED AMENDED PETITION TO TAKE DEPOSITION BEFORE SUIT AND SEEK DOCUMENTS

Petitioner James Dondero respectfully requests that this Court order, pursuant to Texas Rule of Civil Procedure 202, the deposition of the corporate representatives and/or employees of Alvarez & Marsal CRF Management, LLC, and of Farallon Capital Management, LLC. Petitioner further requests that the Court order certain limited, yet relevant, documents to be provided under Texas Rule of Civil Procedure 199.2 as set forth in below.

Petitioner would respectfully show the Court that:

### I.

### PARTIES

1.      Petitioner James Dondero ("_Petitioner_") is an individual resident in Dallas County, Texas, and is impacted by the potential acts and omissions.

2.      Respondent Alvarez & Marsal CRF Management, LLC ("_A&M_") is a Delaware limited liability company serving as an investment adviser, with offices in Dallas County, Texas, at 2100 Ross Ave., 21st Floor, Dallas, Texas 75201.

3.      Respondent Farallon Capital Management, L.L.C. ("_Farallon_") is an investment fund located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111, and Respondent Michael Lin is a principal at Farallon.

003783

## II.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this matter pursuant to Texas Rule of Civil Procedure 202. The anticipated lawsuit would include common law claims.

5.      The Court has personal jurisdiction over Respondent Alvarez & Marsal because it maintains a regular place of business in Dallas County. Personal jurisdiction is also proper under Tex. Cir. Prac. Rem. Code § 17.003, and under §17.042(1)-(3) because A&M contracted with counterparties, Joshua Terry and Acis Capital Management, L.P., both of whom at the time had their principal place of business in Dallas County, Texas, and because its acts on behalf of the Crusader Funds (as defined below), if they occurred as believed they did, will have been tortious as to Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

6.      The Court has personal jurisdiction over Farallon because it contracted with A&M to purchase claims in the Highland Capital Management, L.P. Chapter 11 bankruptcy ("Highland bankruptcy") upon the recommendation of James Seery, Highland's CEO. Such acts, if shown to have occurred as believed and under the alleged circumstances, will have been tortious as to the Petitioner. Moreover, this Court has quasi *in rem* jurisdiction because the action concerns the sale of personal property located in Dallas County in which Plaintiff claims an interest.

7.      Venue is proper in Dallas County, Texas, where venue of the anticipated lawsuit may lie and where the property at issue exists, and where a substantial amount of the acts and omissions underlying the potential suit occurred.

---

003784

8.      Removal is not proper because there is no basis for federal jurisdiction because a Rule 202 petition does not meet Article III of the United States Constitution's standing requirement.

## III.

## FACTUAL BACKGROUND

9.      This matter arises out of purchase of certain bankruptcy claims in the Highland Bankruptcy.

10.     Petitioner is the founder and former CEO of Highland Capital Management, L.P., currently a bankrupt debtor. He is also an investor in Highland Crusader Fund, Ltd. and several of its companion and affiliated funds (the "Crusader Funds"). Therefore, Petitioner has an interest in seeing to it that A&M properly marketed the claims for proper purposes and for the right price.

11.     Until recently, the Crusader Funds were managed by Highland, and then by A&M when those funds went into liquidation.

12.     Petitioner has an interest in the bankruptcy estate by virtue of his affiliation, and the fact that he is an adviser and/or manager of several trusts who own the equity of the debtor and therefore has an interest in seeing the equity properly protected in bankruptcy.

13.     Shortly after the Highland bankruptcy was filed, the Chapter 11 Trustee issued an invitation to creditors to serve on the unsecured creditors committee (the "UCC").

14.     The Trustee's invitation included a condition: namely, that anyone who served on the committee would have to agree that they would not sell their claims or in any way alienate them (including allowing them to be used as security) without leave of Court. Specifically, the United Trustee's instruction sheet stated:

> Creditors wishing to serve as fiduciaries on any official committee are advised that may not purchase, sell or otherwise trade in or transfer

claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed questionnaire and accepting membership on official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from the committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violation, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.

15.     Upon information and belief, two of the Highland creditors – the Redeemer Committee and the Crusader Fund, who between them owned approximately $191 million in claims in the bankruptcy as well as other assets (the "Crusader Claims") – sold their Claims and assets to Jessup Holdings LLC, a subsidiary of Stonehill Capital Management, LLC. Alvarez and Marsal made this sale, which was in violation of the foregoing order.

16.     Alvarez and Marsal arguably owe fiduciary duties to the funds and funds investors, and may have violated those duties by failing to conduct a sale for proper value, and/or by engaging in other acts that resulted in a sale of assets that was not authorized and/or not allowed by the terms of the funds or by law.

17.     Around the same time, another Highland creditor—Joshua Terry and Acis Capital Management, who have approximately $25 million in claims—also sold their claims to Muck Holdings, LLC, set up by Farallon Capital Management (the "Acis Claims").

18.     And a third creditor, HarbourVest, sold its $80 million worth of claims (the "HarbourVest Claims") to Muck Holding as well.

19.     The above interests are generally referred to hereinafter as the "Claims".

20.     The sales of the Claims were not reported contemporaneously as they were supposed to have been, nor was leave of the bankruptcy court ever sought, much less obtained, for the sales.

21. However, Acis/Terry, and Crusader continued to serve on the UCC for a substantial period of time as if they hadn't sold their claims at all.

22. As was discovered by the Petitioner, the current CEO of Highland, James Seery, has an age-old connection to Farallon and to Stonehill and, upon information and belief, advised Farallon and Stonehill to purchase the Claims.

23. On a telephone call between Petitioner and Michael Lin, a representative of Farallon, Mr. Lin informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims.

24. In other words, Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit.

25. Mr. Seery's management duties come with a federally-imposed fiduciary duty under the Advisers Act of 1940.

26. Mr. Seery had much to gain by Farallon holding the claims—namely, his knowledge that Farallon—as a friendly investor—would allow him to remain as CEO while Highland remains bankrupt and get paid (whereas plainly, the selling members of the UCC were ready to move on, thus truncating Seery's supposed gravy train). Mr. Seery's rich compensation package incentivized him to continue the bankruptcy for as long as possible.

27. However, Mr. Seery is privy to material non-public information (i.e., "Inside Information") of many of the securities that Highland deals in, as well as in the funds that Mr. Seery manages through Highland. One of the assets was a publicly traded security that Highland was an insider of, and therefore, should not have traded (whether directly or indirectly), given its possession of insider information.

---

003787

28.    Thus, his confidential tip to Farallon to purchase the claims may have violated certain of his duties as a Registered Investment Adviser, federal Securities laws, and his duties to the bankruptcy estate.

29.    Mr. Seery's duties also involve duties to manage the bankruptcy estate in a manner that would expeditiously resolve the bankruptcy. If the Unsecured Creditor Committee members (Acis, HarbourVest, and Redeemer) were indeed interested in selling their claims for less than the notional amount, then that would have been publicized in the required court filing. By failing to file them publicly and seeking court approval, the bankruptcy has been prolonged whilst Farallon seeks to reap a massive windfall return on its investment—a return that Seery apparently promised.

30.    The sale of assets authorized by A&M was not pursuant to normal means, and there is reason to doubt that A&M sought or obtained the highest price for the assets that it sold.

## IV.

## RELIEF SOUGHT FROM ALVAREZ AND MARSAL

31.    Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of A&M, on the following topics, and to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

      a.    A&M's rights and responsibilities and duties, including, but not limited to, under A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

      b.    The solicitation, offer, valuation, marketing, negotiation, and sale of the Highland bankruptcy claims or other assets by A&M on behalf of the Crusader Funds (and/or the Redeemer Committee) to any or all of Farallon, Stonehill Capital Management, LLC, Muck Holdings, LLC, Jessup Holdings, LLC, or any third party;

003788

    c.    A&M's valuation, and negotiation of the price, of the Claims, its bases therefor, and what it communicated to potential purchasers about the value of the Claims, if anything;

    d.    The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to:

        i.    Any discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P., the Creditors Committee, Sidley Austin, LLP, and/or F.T.I. Consulting, regarding the Claims, any plans with regards to Highland Capital Management, L.P., the liquidation or the value of the Claims, the likelihood of and quantum of payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation;

        ii.    Any discussions with the purchasers of the Claims or other assets to, including, but not limited to, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC or Muck Holdings, LLC, regarding the Claims or other assets, Highland Capital Management, L.P., the value of the Claims, the likely payout of the Claims, the pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation.

32.    As part of the Court's Order, Petitioner requests this Court to require A&M to produce the following documents at their respective depositions:

    a.    All offers to sell or purchase the Claims and/or all correspondence regarding same;

    b.    A&M's agreement(s) with the Crusader Funds and the Agreement(s) of those funds governing Petitioner's rights and duties as an investor (whether directly or indirectly);

    c.    Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

    d.    Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims;

    e.    All documents, agreements, contracts (including any drafts, letters of intent, confidentiality agreements, term sheets) or communications related to same,

---

003789

relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

f.  Communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings LLC, or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur, the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the claims, the liquidation of the Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

g.  Proofs of purchase of the Claims and other assets of the Crusader entities.

## V.

### RELIEF SOUGHT FROM FARALLON CAPITAL MANAGEMENT, L.L.C., MUCK HOLDINGS, LLC AND MICHAEL LIN

33.  Petitioner asks this Court to issue an Order authorizing Petitioner to take a pre-suit deposition of a designated representative, or representatives, of Farallon Capital Management, L.L.C. or Muck Holdings, LLC, and to depose Michael Lin, on the following topics, to investigate any potential lawsuits arising out of the highly irregular manner in which the assets were marketed and sold, within ten days of the Court's Order, or as agreed by the parties:

a.  Farallon, Muck Holdings, LLC, and/or Lin's understanding of the value of the Claims, the assets held or controlled by or to be acquired by Highland Capital Management, L.P.., the liquidation value of the Estate of Highland Capital Management, L.P., and/or Claims, how and when the claims were expected to be paid and what the expected percentage payoff was going to be, and the bases for such understanding or belief, and what was communicated to them about the value of the Claims;

b.  The negotiations and communications leading up to the purchase or sale of the Claims, including, but not limited to, any discussions with sellers of any of the Claims regarding the Claims and the sale/purchase of the Claims, discussions with James Seery or anyone at or on behalf of Highland Capital Management, L.P. regarding the Claims and his plans with regards to Highland, the value of the Claims, the likely payout of the Claims, the

003790

pricing of the Claims, and/or the assets that would secure the Claims or be liquidated to fund the Claims' liquidation, or any disclosures by James Seery or Highland Capital Management, L.P. regarding how the Claims were going to be paid;

c.    Farallon and Michael Lin's awareness of material non-public information regarding Highland Capital Management, L.P. or securities held by Highland Capital Management, L.P.;

d.    Farallon and Michael Lin's relationship with James Seery or Highland Capital Management, L.P. and their knowledge of his role and their ongoing relationship with him.

34.    As part of the Court's Order, Petitioner requests this Court to require Farallon Capital Management, L.L.C., Muck Holdings LLC, and Michael Lin to produce the following documents at their respective depositions:

a.    All offers to sell or purchase the Claims and/or all correspondence regarding same;

b.    Any document reflecting the purported assets of, or valuation of, Highland Capital Management, L.P. at the time of the sale or marketing of the Claims;

c.    Marketing materials, presentations, decks, information sheets, spreadsheets, or other documents sent to or provided to any purchaser, whether in a data room or as part of any marketing pitch, or during any due diligence process, relating to or concerning the liquidation value, potential or likely return on investment, asset valuation, purchase, marketing or sale of the Claims.

d.    All agreements, contracts, or other documents (including any drafts, letters of intent, confidentiality agreements, term sheets, or communications related to same) relating to or concerning the valuation, purchase, marketing or sale of the Claims (or any subset of the Claims);

e.    All communications with James Seery or any other person on behalf of the Debtor, the U.S. Trustee's office, the Unsecured Creditors Committee, Joshua Terry, Acis Capital Management, LLC, Farallon, Stonehill Capital Management, LLC, Jessup Holdings, LLC or Muck Holdings, LLC (or anyone representing or signing on behalf of the foregoing) regarding the sale of the Claims or other assets, the value thereof, the expected amount or percentage of the Claims that would be paid and when such payment was expected to occur; the liquidation value of Highland Capital Management, L.P., potential sources of other cash to pay the Claims, the liquidation of the

003791

Claims, the likely return from purchasing the Claims, the underlying assets securing the Claims.

f.      Proofs of purchase of the Claims and other assets of the Crusader entities.

**VI.**

**<u>REQUEST FOR HEARING & ORDERS</u>**

35.    After service of this Amended Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on the Petition and order the requested relief.

36.    Document discovery is permitted by Rule 199.2. Rule 202.5 states that "depositions authorized by this Rule are governed by the rules applicable to depositions of nonparties in a pending suit. The scope of discovery in depositions authorized by this rule is the same as if the anticipated suit or potential claim had been filed...." Rule 199.2 governs such actions and "expressly allows a party noticing a deposition to include a request for production of documents or tangible things within the scope of discovery and within the witness's possession, custody, or control." *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App.—Tyler 2018) (holding that district court properly ordered document discovery in Rule 202 action). *See also* Tex. R. Civ. P. 205.1(c) (authorizing party to compel discovery from a nonparty by court order or subpoena, including a request for production served with a deposition notice). *See also City of Dall. v. City of Corsicana*, Nos. 10-14-00090-CV, 10-14-00171-CV, 2015 Tex. App. LEXIS 8753, at *15-16 (Tex. App.—Waco Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition.... Accordingly, the trial court's order is not an abuse of discretion to the extent that it allows Navarro to obtain documents in an oral deposition under rule 199 or a deposition on written questions under rule 200."); *In re Anand*, No. 01-12-01106-CV, 2013 Tex. App. LEXIS 4157, at *9 (Tex. App.—Houston [1st Dist.] Apr. 2, 2013) ("the language of these rules when read together

**003792**

permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents").

37.     **FOR THESE REASONS,** Petitioner asks the Court to set a date for hearing on this Amended Petition, and after the hearing, to find that the likely benefit of allowing Petitioner to take the requested depositions outweighs the burden or expense of the procedure. Petitioner further asks the Court to issue an Order authorizing Petitioner to take the oral depositions of the Respondents after proper notice and service at the offices of Sbaiti & Company PLLC, 2200 Ross Avenue, Suite 4900W, Dallas, Texas 75201, within ten (10) days of the Court's Order, or as otherwise agreed to by the parties, and to produce the requested documents prior to said deposition. Petitioner also seeks any further relief to which he may be justly entitled.

Dated:  May 2, 2022                                   Respectfully submitted,

                                                      **SBAITI & COMPANY PLLC**

                                                      */s/ Mazin A. Sbaiti*
                                                      **Mazin A. Sbaiti**
                                                      Texas Bar No. 24058096
                                                      **Brad J. Robinson**
                                                      Texas Bar No. 24058076
                                                      2200 Ross Avenue – Suite 4900W
                                                      Dallas, TX  75201
                                                      T:  (214) 432-2899
                                                      F:  (214) 853-4367
                                                      E:  mas@sbaitilaw.com
                                                          bjr@sbaitilaw.com

                                                      ***Counsel for Petitioner***

                          **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on this 2nd day of May, 2022.

                                                      */s/ Mazin A. Sbaiti*
                                                      Mazin A. Sbaiti

## VERIFICATION

STATE OF TEXAS      §
                    §
DALLAS COUNTY    §

Before me, the undersigned Notary Public, on this day personally appeared James Dondero (hereinafter "Affiant"), who is over the age of 21 and of sound mind and body, who being by me duly sworn, on his oath deposed and said that he has read the foregoing Amended Verified Petition to Take Deposition Before Suit, and that the statements of fact therein are within his personal knowledge and are true and correct as stated, Further, Affiant stated that the Affiant has personal knowledge because of Affiant's relationships and interactions as described therein.



James Dondero


SUBSCRIBED AND SWORN TO BEFORE ME on this ⎯ day of April, 2022, to certify which witness my hand and official seal.


My commission expires on ⎯⎯⎯⎯⎯⎯⎯ .


Notary Public of the State of Texas

seal

Robin Morrison
My Commission Expires
12/9/2025
Notary ID
133465390

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim James on behalf of Mazin Sbaiti
Bar No. 24058096
krj@sbaitilaw.com
Envelope ID: 64114982
Status as of 5/3/2022 2:58 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mazin Sbaiti | | MAS@SbaitiLaw.com | 5/2/2022 9:27:04 PM | SENT |
| Andrew Bean | | ABean@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| John T.Cox | | TCox@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| Wendy Cassidy | | WCassidy@gibsondunn.com | 5/2/2022 9:27:04 PM | SENT |
| Kim James | | krj@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Jonathan Bridges | | jeb@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Brad Robinson | | bjr@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |
| Charlotte Casso | | bcc@sbaitilaw.com | 5/2/2022 9:27:04 PM | SENT |

003795

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 74 of 214   PageID 3107
Case 19-34054-sgj11   Doc 3784-5   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Exhibit 5 (part 1)   Page 1 of 117

# EXHIBIT 5 (part 1)

## CAUSE NO. DC-21-09534

| | | |
|---|---|---|
| IN RE JAMES DONDERO, | §<br>§ | IN THE DISTRICT COURT |
| *Petitioner.* | §<br>§<br>§ | 95th JUDICIAL DISTRICT |
| | § | DALLAS COUNTY, TEXAS |

### DECLARATION OF JAMES DONDERO

| | |
|---|---|
| COUNTY OF DALLAS | §<br>§ |
| STATE OF TEXAS | § |

Mr. James Dondero provides this unsworn declaration under TEXAS CIVIL PRACTICE & REMEDIES CODE § 132.001.

1. My name is James Dondero. I declare under penalty of perjury that I am over the age of 18 and of sound mind and competent to make this declaration.

2. Earlier this year I retained investigators to look into certain activities involving the respondents in the above-styled case and the related bankruptcy proceedings. Last year, I called Farallon's Michael Lin about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Mr. Seery had testified in court, it made no sense to me that Mr. Lin would think that the claims were worth more than what Mr. Seery testified under oath was the value of the bankruptcy claims.

3. In addition to my role as equity holder in the Crusader Funds, I have an interest in ensuring that the claims purchased by Respondents are not used as a means to deprive the equity holders of their share of the funds. It has become obvious that despite the fact that the bankrupt estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights.

4. Accordingly, I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee. True and correct copies of the reports, which were created in the ordinary course, and their attachments, are attached hereto as Exhibits A and B. A true and correct copy of the letter I received from Alverez and Marsal is attached as Exhibit C hereto.

---

**003797**

My name is James Dondero, my birthday is on June 29, 1962. My address is 300 Crescent Court, Suite 700, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing testimony is true and correct and is within my personal knowledge.

James Dondero

May 31, 2022

**Date**

Declaration of James Dondero                                    Page 2

003798

# HELLER, DRAPER & HORN, L.L.C.

*ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA 70130-6103
TELEPHONE: (504) 299-3300  FAX: (504) 299-3399

Douglas S. Draper
Direct Dial: (504) 299-3333
E-mail: ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

October 5, 2021

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

    *Re:    Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11*

Dear Nan,

      The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor"). As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers. Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy. Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office. This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

      By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities. The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan. Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1] After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis. To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager. The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

{00376610-1}



EXHIBIT

A

003799

October 5, 2021
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

### 1.   The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

{00376610-1}

003800

October 5, 2021
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

October 5, 2021
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

2.    **There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates**

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6] The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A dispute later arose between HarbourVest

{00376610-1}

October 5, 2021
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million. In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well as information relating to its disposition; all the public saw was the filed valuation of the asset. The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE and apparently just deferred to the judgment of the Creditors' Committee about whether this was appropriate.[7]  Again, when the U.S. Trustee's Office does not require transparency, lack of transparency significantly increases the need for non-public information.  Because the HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without insider information could possibly ascertain how the acquisition would impact the estate.

### 3. The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a channeling injunction requiring that any permitted causes of action to be vetted and resolved by the Bankruptcy Court. On their face, these provisions violate *Pacific Lumber*, in with the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses. The U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of third parties against such exculpation clauses. In this case, the U.S. Trustee's Office objected to the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now barred from asserting or channeled into the Bankruptcy Court to assert any claim against the Debtor or its management for transactions that occurred at the non-debtor affiliate level. Those investors' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims, nor given the opportunity to "opt out." Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise).  These releases are directly at odds with investors' expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.  While the agreements executed by investors may limit the exposure of fund managers, typically those provisions require the fund manager to obtain a third-party fairness opinion where there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat").  Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by "independent legal counsel" in the negotiation of the settlement.[9]  That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to damages allegedly due to HarbourVest as a result of that dispute.  Although the Debtor initially placed no value on HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the Bankruptcy Court—which entitled HarbourVest to $80 million in claims.  In return, HarbourVest agreed to convey its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.

[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a non-reporting SPE.

[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).

[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

{00376610-1}

October 5, 2021
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10]  If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor.   The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11]  It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12]  This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.   Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases.  Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions.  Several parties have appealed this issue to the Fifth Circuit.

## 4.        The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information.  The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely.  But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup").  The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill").  As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

{00376610-1}

October 5, 2021
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

{00376610-1}

003805

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 84 of 214 PageID 3117
Case 19-34054-sgj11 Doc 3699-2 Filed 05/28/23 Entered 05/28/23 20:00:29 Desc
Exhibit 5 (part 2) Page 11 of 177

October 5, 2021
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[19] See Appendix, pp. A-25, A-28.

[20] See Appendix, pp. A-2; A-62   A-69.

{00376610-1}

003806

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 85 of 214   PageID 3118
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 12 of 117

October 5, 2021
Page 9

     committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

     Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

     The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

     Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

     The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70   A-71.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 86 of 214   PageID 3119
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 13 of 117

October 5, 2021
Page 10

> In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a) The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b) Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c) The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d) The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e) The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f) There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

{00376610-1}

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 87 of 214   PageID 3120
Case 19-34054-sgj11   Doc 3699-2   Filed 05/18/23   Entered 05/18/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 14 of 177

October 5, 2021
Page 11

members had a fiduciary duty to respond that a response was forthcoming. Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer. If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties. The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim. The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members. At the very least, there is enough credible evidence to warrant an investigation. It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent. The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders. A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate. In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

003809

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 88 of 214   PageID 3121
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 15 of 117

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ...........................................2

Debtor Protocols [Doc. 466-1] ......................................................................................................3

Seery Jan. 29, 2021 Testimony ....................................................................................................15

Sale of Assets of Affiliates or Controlled Entities .........................................................................24

20 Largest Unsecured Creditors ..................................................................................................25

Timeline of Relevant Events .......................................................................................................26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ......................................................27

Updated Liquidation Analysis (Feb. 1, 2021) ...............................................................................28

Summary of Debtor's January 31, 2021 Monthly Operating Report ................................................29

Value of HarbourVest Claim .......................................................................................................30

Estate Value as of August 1, 2021 (in millions) ...........................................................................31

HarbourVest Motion to Approve Settlement [Doc. 1625] ..............................................................32

UBS Settlement [Doc. 2200-1] ...................................................................................................45

Hellman & Friedman Seeded Farallon Capital Management ..........................................................62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ....................................................63

Farallon was a Significant Borrower for Lehman ..........................................................................65

Mr. Seery Represented Stonehill While at Sidley .........................................................................66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............67

Investor Communication to Highland Crusader Funds Stakeholders ...............................................70

Case 19-34054-sgj11    Doc 3789-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit Exhibit 2    Page 16 of 17

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers



003811

*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?

Page A-2

Case 3:23-cv-02071-E  Document 23-12  Filed 12/07/23   Page 90 of 214  PageID 3123
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 17 of 177

## Debtor Protocols [Doc. 466-1]

I. **Definitions**

    A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

    B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

    C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

    D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

    E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

    F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

    G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

    H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 91 of 214    PageID 3124
Case 19-34054-sgj11    Doc 3699-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 18 of 177

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.    "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.    "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.    "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.    **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.    **Covered Entities:** N/A (See entities above).

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 92 of 214    PageID 3125
Case 19-34054-sgj11    Doc 3099-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 19 of 117

          (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

   3.    Third Party Transactions (All Stages)

        a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

  C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**   **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

  A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

  B.    **Operating Requirements**

   1.    Ordinary Course Transactions do not require Court approval (All Stages).

        a)     Stage 1 and Stage 2: ordinary course determined by the CRO.

        b)     Stage 3: ordinary course determined by the Debtor.

   2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

      a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)    Stage 3:

          (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

          (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

   3.    Third Party Transactions (All Stages)

      a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 94 of 214   PageID 3127
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 21 of 177

IV. **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

           a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

           b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

           a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

           b)    <u>Stage 3</u>:

               (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

               (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.    Third Party Transactions (All Stages):

           a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 95 of 214   PageID 3128
Case 19-34054-sgj11   Doc 3099-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 22 of 117

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.    **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

VI.    **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VII.   **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VIII.  **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

IX.    **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 97 of 214 PageID 3130
Case 19-34054-sgj11 Doc 3689-2 Filed 05/28/23 Entered 05/28/23 20:00:29 Desc
Exhibit 5 (part 2) Page 24 of 117

### X. Representations and Warranties

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 99 of 214   PageID 3132
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 26 of 117

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 100 of 214   PageID 3133
Case 19-34054-sgj11   Doc 3699-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 27 of 177

Schedule B

**Related Entities Listing (other than natural persons)**

<u>Schedule C</u>

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

Page 1

```
 1    IN THE UNITED STATES BANKRUPTCY COURT

 2    FOR THE NORTHERN DISTRICT OF TEXAS

 3    DALLAS DIVISION

 4    ------------------------------)

 5    In Re:                Chapter 11

 6    HIGHLAND CAPITAL         Case No.

 7    MANAGEMENT, LP,          19-34054-SGJ 11

 8

 9         Debtor

10    -------------------------------------

11

12

13     REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23
       Reported by:
24     Debra Stevens, RPR-CRR
       JOB NO. 189212
25
```

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 103 of 214 PageID 3136
Case 19-34054-sgj11 Doc 3686-2 Filed 05/28/23 Entered 05/28/23 20:00:29 Desc
Exhibit 5 (part 2) Page 30 of 177

Page 2

```
 1              January 29, 2021
 2              9:00 a.m. EST
 3
 4       Remote Deposition of JAMES P.
 5   SEERY, JR., held via Zoom
 6   conference, before Debra Stevens,
 7   RPR/CRR and a Notary Public of the
 8   State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   REMOTE APPEARANCES:
 2
 3   Heller, Draper, Hayden, Patrick, & Horn
 4   Attorneys for The Dugaboy Investment
 5   Trust and The Get Good Trust
 6          650 Poydras Street
 7          New Orleans, Louisiana 70130
 8
 9
10   BY:    DOUGLAS DRAPER, ESQ
11
12
13   PACHULSKI STANG ZIEHL & JONES
14   For the Debtor and the Witness Herein
15          780 Third Avenue
16          New York, New York 10017
17   BY:    JOHN MORRIS, ESQ.
18          JEFFREY POMERANTZ, ESQ.
19          GREGORY DEMO, ESQ.
20          IRA KHARASCH, ESQ.
21
22
23
24          (Continued)
25
```

Page 4

```
 1   REMOTE APPEARANCES:   (Continued)
 2
 3   LATHAM & WATKINS
 4   Attorneys for UBS
 5          885 Third Avenue
 6          New York, New York 10022
 7   BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9   JENNER & BLOCK
10   Attorneys for Redeemer Committee of
11   Highland Crusader Fund
12          919 Third Avenue
13          New York, New York 10022
14   BY:    MARC B. HANKIN, ESQ.
15
16   SIDLEY AUSTIN
17   Attorneys for Creditors' Committee
18          2021 McKinney Avenue
19          Dallas, Texas 75201
20   BY:    PENNY REID, ESQ.
21          MATTHEW CLEMENTE, ESQ.
22          PAIGE MONTGOMERY, ESQ.
23
24          (Continued)
25
```

Page 5

```
 1   REMOTE APPEARANCES:   (Continued)
 2   KING & SPALDING
 3   Attorneys for Highland CLO Funding, Ltd.
 4          500 West 2nd Street
 5          Austin, Texas 78701
 6   BY:    REBECCA MATSUMURA, ESQ.
 7
 8   K&L GATES
 9   Attorneys for Highland Capital Management
10   Fund Advisors, L.P., et al.:
11          4350 Lassiter at North Hills
12          Avenue
13          Raleigh, North Carolina 27609
14   BY:    EMILY MATHER, ESQ.
15
16   MUNSCH HARDT KOPF & HARR
17   Attorneys for Defendants Highland Capital
18   Management Fund Advisors, LP; NexPoint
19   Advisors, LP; Highland Income Fund;
20   NexPoint Strategic Opportunities Fund and
21   NexPoint Capital, Inc.:
22          500 N. Akard Street
23          Dallas, Texas 75201-6659
24   BY:  DAVOR RUKAVINA, ESQ.
25          (Continued)
```

Page 6

```
1    REMOTE APPEARANCES (Continued)
2
3    BONDS ELLIS EPPICH SCHAFER JONES
4    Attorneys for James Dondero,
5    Party-in-Interest
6         420 Throckmorton Street
7
8         Fort Worth, Texas 76102
9    BY:   CLAY TAYLOR, ESQ.
10        JOHN BONDS, ESQ.
11        BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16        1900 North Pearl Street
17
18        Dallas, Texas 75201
19   BY:   MICHELLE HARTMANN, ESQ.
20        DEBRA DANDENEAU, ESQ.
21
22
23
24             (Continued)
25
```

Page 7

```
1    REMOTE APPEARANCES: (Continued)
2
3    WICK PHILLIPS
4    Attorneys for NexPoint Real Estate
5    Partners, NexPoint Real Estate Entities
6    and NexBank
7         100 Throckmorton Street
8         Fort Worth, Texas 76102
9    BY:   LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15        700 N. Pearl Street
16        Dallas, Texas 75201
17   BY:   FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
1
2        E X A M I N A T I O N S
3    WITNESS                        PAGE
4    JAMES SEERY
5      By Mr. Draper                  9
6      By Mr. Taylor                 75
7      By Mr. Pukavina               165
8      By Mr. Draper                 217
9
10           E X H I B I T S
11   SEERY DVD
     EXHIBIT    DESCRIPTION      PAGE
12
     Exhibit 1   January 2021 Material    11
13
     Exhibit 2   Disclosure Statement     14
14
     Exhibit 3   Notice of Deposition     74
15
16   INFORMATION/PRODUCTION REQUESTS
17   DESCRIPTION                    PAGE
     Subsidiary ledger showing note  22
18   component versus hard asset
     component
19   Amount of D&C coverage for      131
     trustees
20
     Line item for D&O insurance     133
21
22       MARKED FOR RULING
         PAGE    LINE
23        85      20
24
25
```

Page 9

```
1
2         COURT REPORTER:  My name is
3    Debra Stevens, court reporter for TSG
4    Reporting and notary public of the
5    State of New York.  Due to the
6    severity of the COVID-19 pandemic and
7    following the practice of social
8    distancing, I will not be in the same
9    room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14        Whereupon,
15        J A M E S    S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20        Q.    Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 105 of 214   PageID 3138
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:08:29   Desc
Exhibit 5 (part 2)   Page 32 of 177

Page 14

```
1                    J. SEERY
2    the screen, please?
3         A.   Page what?
4         Q.   I think it is page 174.
5         A.   Of the PDF or of the document?
6         Q.   Of the disclosure statement that
7    was filed.  It is up on the screen right
8    now.
9              COURT REPORTER:  Do you intend
10   this as another exhibit for today's
11   deposition?
12             MR. DRAPER:  We'll mark this
13   Exhibit 2.
14             (So marked for identification as
15   Seery Exhibit 2.)
16        Q.   If you look to the recovery to
17   Class 8 creditors in the November 2020
18   disclosure statement was a recovery of
19   87.44 percent.
20        A.   That actually says the percent
21   distribution to general unsecured
22   creditors was 87.44 percent.  Yes.
23        Q.   And in the new document that was
24   filed, given to us yesterday, the recovery
25   is 62.5 percent?
```

Page 15

```
1                    J. SEERY
2         A.   It says the percent distribution
3    to general unsecured creditors is
4    62.14 percent.
5         Q.   Have you communicated the
6    reduced recovery to anybody prior to the
7    date -- to yesterday?
8              MR. MORRIS:  Objection to the
9    form of the question.
10        A.   I believe generally, yes.  I
11   don't know if we have a specific number,
12   but generally yes.
13        Q.   And would that be members of the
14   Creditors' Committee who you gave that
15   information to?
16        A.   Yes.
17        Q.   Did you give it to anybody other
18   than members of the Creditors' Committee?
19        A.   Yes.
20        Q.   Who?
21        A.   HarbourVest.
22        Q.   And when was that?
23        A.   Within the last two months.
24        Q.   You did not feel the need to
25   communicate the change in recovery to
```

Page 16

```
1                    J. SEERY
2    anybody else?
3         A.   I said Mr. Doherty.
4         Q.   In looking at the two elements,
5    and what I have asked you to look at is
6    the claims pool.  If you look at the
7    November disclosure statement, if you look
8    down Class 8, unsecured claims?
9         A.   Yes.
10        Q.   You have 176,000 roughly?
11        A.   Million.
12        Q.   176 million.  I am sorry.  And
13   the number in the new document is 313
14   million?
15        A.   Correct.
16        Q.   What accounts for the
17   difference?
18        A.   An increase in claims.
19        Q.   When did those increases occur?
20   Were they yesterday?  A month ago?  Two
21   months ago?
22        A.   Over the last couple months.
23        Q.   So in fact over the last couple
24   months you knew in fact that the recovery
25   in the November disclosure statement was
```

Page 17

```
1                    J. SEERY
2    not accurate?
3         A.   Yes.  We secretly disclosed it
4    to the Bankruptcy Court in open court
5    hearings.
6         Q.   But you never did bother to
7    calculate the reduced recovery; you just
8    increased --
9              (Reporter interruption.)
10        Q.   You just advised as to the
11   increased claims pool.  Correct?
12             MR. MORRIS:  Objection to the
13   form of the question.
14        A.   I don't understand your
15   question.
16        Q.   What I am trying to get at is,
17   as you increase the claims pool, the
18   recovery reduces.  Correct?
19        A.   No.  That is not how a fraction
20   works.
21        Q.   Well, if the denominator
22   increases, doesn't the recovery ultimately
23   decrease if --
24        A.   No.
25        Q.   -- if the numerator stays the
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 106 of 214   PageID 3139
Case 19-34054-sgj11   Doc 3600-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 33 of 117

Page 26

```
1              J. SEERY
2    were amended without consideration a few
3    years ago.  So, for our purposes we didn't
4    make the assumption, which I am sure will
5    happen, a fraudulent conveyance claim on
6    those notes, that a fraudulent conveyance
7    action would be brought.  We just assumed
8    that we'd have to discount the notes
9    heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12       Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15       A.    Yes.
16       Q.    Now --
17       A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for F and I.
22       Q.    But in fact as of January you
23   have accelerated those notes?
24       A.    Just one of them, I believe.
25       Q.    Which note was that?
```

Page 27

```
1              J. SEERY
2        A.    NexPoint, I said.  They
3    defaulted on the note and we accelerated
4    it.
5        Q.    So there is no need to file a
6    fraudulent conveyance suit with respect to
7    that note.  Correct, Mr. Seery?
8            MR. MORRIS:  Objection to the
9        form of the question.
10       A.    Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14       Q.    My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18           MR. MORRIS:  Objection to the
19       form of the question.
20       A.    That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23       Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

Page 28

```
1              J. SEERY
2    you whether they are included in the asset
3    portion of your $257 million number, all
4    right?  Mr. Morris didn't want me to go
5    into specific asset value, and I don't
6    intend to do that.
7            The first question I have for
8    you is, the equity in Trustway Highland
9    Holdings, is that included in the
10   $257 million number?
11       A.    There is no such entity.
12       Q.    Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16       A.    Off the top of my head -- it is
17
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20
21   flows up from Targa.  It includes CCS
22
23   to the Debtor from CCS Holdings.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

Page 29

```
1              J. SEERY
2    includes any other securities and all the
3    value that would flow from Cornerstone.
4    It includes HCLOF and all the value that
5    would flow up from HCLOF.  It includes
6
7    from Korea.
8            There may be others off the top
9    of my head.  I don't recall them.  I don't
10   have a list in front of me.
11       Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14       A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22           With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 107 of 214   PageID 3140
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 34 of 177

**Page 38**

```
1                   J. SEERY
2        A.   I don't recall the specific
3   limitation on the trust.  But if there was
4   a reason to hold on to the asset, if there
5   is a limitation, we can seek an extension.
6        Q.   Let me ask a question.  With
7   respect to these businesses, the Debtor
8   merely owns an equity interest in them.
9   Correct?
10       A.   Which business?
11       Q.   The ones you have identified as
12  operating businesses earlier?
13       A.   It depends on the business.
14       Q.   Well, let me -- again, let's try
15  to be specific.  With respect to SSP, it
16  was your position that you did not need to
17  get court approval for the sale.  Correct?
18       A.   That's correct.
19       Q.   Which one of the operating
20  businesses that are here, that you have
21  identified, do you need court authority
22  for a sale?
23            MR. MORRIS:  Objection to the
24       form of the question.
25       A.   Each of the businesses will be
```

**Page 39**

```
1                   J. SEERY
2   different analysis that we'll undertake
3   with bankruptcy counsel to determine what
4   we would need depending on when it is
5
6   either under the code are or under the
7   plan.
8        Q.   Is there anything that would
9   stop you from selling these businesses if
10  the Chapter 11 went on for a year or two
11  years?
12            MR. MORRIS:  Objection to form
13       of the question.
14       A.   Is there anything that would
15  stop me?  We'd have to follow the
16  strictures of the code and the protocols,
17  but there would be no prohibition -- let
18  me finish, please.
19            There would be no prohibition
20  that I am aware of.
21       Q.   Now, in connection with your
22  differential between the liquidation of
23  what I will call the operating businesses
24  under the liquidation analysis and the
25  plan analysis, who arrived at the discount
```

**Page 40**

```
1                   J. SEERY
2   or determined the discount that has been
3   placed between the two, plan analysis
4   versus liquidation analysis?
5            MR. MORRIS:  Objection to form
6       of the question.
7        A.   To which document are you
8   referring?
9        Q.   Both the June -- the January and
10  the November analysis has a different
11  estimated proceeds for monetization for
12  the plan analysis versus the liquidation
13  analysis.  Do you see that?
14       A.   Yes.
15       Q.   And there is a note under there.
16  "Assumes Chapter 7 trustee will not be
17  able to achieve the same sales proceeds as
18  Claimant trustee."
19       A.   I see that, yes.
20       Q.   Do you see that note?
21       A.   Yes.
22       Q.   Who arrived at that discount?
23       A.   I did.
24       Q.   What percentage did you use?
25       A.   Depended on the asset.  Each one
```

**Page 41**

```
1                   J. SEERY
2   is different.
3        Q.   Is the discount a function of
4   capability of a trustee versus your
5   capability, or is the discount a function
6   of timing?
7            MR. MORRIS:  Objection to form.
8        A.   It could be a combination.
9        Q.   So, let's -- let me walk through
10  this.  Your plan analysis has an
11  assumption that everything is sold by
12  December 2022.  Correct?
13       A.   Correct.
14       Q.   And the valuations that you have
15  used here for the monetization assume a
16  sale prior to December
17  of 2022.  Correct?
18       A.   Sorry.  I don't quite understand
19  your question.
20       Q.   The 257 number, and then let's
21  take out the notes.  Let's use the 210
22  number.
23            MR. MORRIS:  Can we put the
24       document back on the screen, please?
25       Sorry, Douglas, to interrupt, but it
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 108 of 214   PageID 3141
Case 19-34054-sgj11   Doc 3699-8   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 35 of 177

| | Page 42 | | Page 43 |
|---|---|---|---|

**Page 42**

J. SEERY

```
1                   J. SEERY
2   would be helpful.
3        MR. DRAPER:  That is fine, John.
4        (Pause.)
5        MR. MORRIS:  Thank you very
6   much.
7        Q.   Mr. Seery, do you see the 257?
8        A.   In the one from yesterday?
9        Q.   Yes.
10       A.   Second line, 257,941.  Yes.
11       Q.   That assumes a monetization of
12   all assets by December of 2022?
13       A.   Correct.
14       Q.   And so everything has been sold
15   by that time; correct?
16       A.   Yes.
17       Q.   So, what I am trying to get at
18   is, there is both the capability between
19   you and a trustee, and then the second
20   issue is timing.  So, what discount was
21   put on for timing, Mr. Seery, between when
22   a trustee would sell it versus when you
23   would sell it?
24       MR. MORRIS:  Objection.
25       Q.   What is the percentage you
```

**Page 43**

J. SEERY

```
1                   J. SEERY
2   applied?
3        A.   Each of the assets is different.
4        Q.   Is there a general discount that
5   you used?
6        A.   Not a general discount, no.  We
7   looked at each individual asset and went
8   through and made an assessment.
9        Q.   Did you apply a discount for
10   your capability versus the capability of a
11   trustee?
12       A.   No.
13       Q.   So a trustee would be as capable
14   as you are in monetizing these assets?
15       MR. MORRIS:  Objection to the
16   form of the question.
17       Q.   Excuse me?  The answer is?
18       A.   The answer is maybe.
19       Q.   Couldn't a trustee hire somebody
20   as capable as you are?
21       MR. MORRIS:  Objection to the
22   form of the question.
23       A.   Perhaps.
24       Q.   Sir, that is a yes or no
25   question.  Could the trustee hire somebody
```

**Page 44**

J. SEERY

```
1                   J. SEERY
2   as capable as you are?
3        MR. MORRIS:  Objection to the
4   form of the question.
5        A.   I don't know.
6        Q.   Is there anybody as capable as
7   you are?
8        MR. MORRIS:  Objection to the
9   form of the question.
10       A.   Certainly.
11       Q.   And they could be hired.
12   Correct?
13       A.   Perhaps.  I don't know.
14       Q.   And if you go back to the
15   November 2020 liquidation analysis versus
16   plan analysis, it is also the same note
17   about that a trustee would bring less, and
18   there is the same sort of discount between
19   the estimated proceeds under the plan and
20   under the liquidation analysis.
21       MR. MORRIS:  If that is a
22   question, I object.
23       Q.   Is that correct, Mr. Seery,
24   looking at the document?
25       A.   There are discounts, yes.
```

**Page 45**

J. SEERY

```
1                   J. SEERY
2        Q.   Again, the discounts are applied
3   for timing and capability?
4        A.   Yes.
5        Q.   Now, in looking at the November
6   plan analysis number of $190 million and
7   the January number of $257 million, what
8   accounts for the increase between the two
9   dates?  What assets specifically?
10       A.   There are a number of assets.
11   Firstly, the HCLOF assets are added.
12       Q.   How much are those?
13       A.   Approximately 22 and a half
14   million dollars.
15       Q.   Okay.
16       A.   Secondly, there is a significant
17
18   assets over this time period.
19       Q.   Which assets, Mr. Seery?
20       A.   There are a number.  They
21   include MGM stock, they include Trustway,
22   they include Terga.
23       Q.   And what is the percentage
24   increase from November to January,
25   November of 2020 to January of 2021?
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 109 of 214   PageID 3142
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 36 of 177

**Page 46**

```
 1              J. SEERY
 2      A.   Do you mean what is the
 3  percentage increase from 190 to 257?
 4      Q.   No.  You just identified three
 5  assets.  MGM stock, we can go look at the
 6  exchange and figure out what the price
 7  increase is; correct?
 8      A.   No.
 9      Q.   Why not?  Is the MGM stock
10  publicly traded?
11      A.   Yes.  It doesn't trade on --
12      Q.   Excuse me?
13      A.   It doesn't trade on an exchange.
14      Q.   Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17      A.   There is a semipublic market;
18  yes.
19      Q.   So it is a number that is
20  readily available between the two dates?
21      A.   It's available.
22      Q.   Now, you identified Targa and
23  Trustway.  Correct?
24      A.   Yes.
25      Q.   Those are not readily available
```

**Page 47**

```
 1              J. SEERY
 2  markets; correct?
 3      A.   No.
 4      Q.   Those are operating businesses?
 5      A.   Correct.
 6      Q.
 7  the November 2020 liquidation analysis?
 8      A.   We use a combination of the
 9  value that we get from Houlihan Lokey for
10
11
12      Q.   And the adjustment was up or
13  down?
14      A.   When?
15      Q.
16
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19          MR. MORRIS:  Objection to form
20      of the question.
21      A.
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
```

**Page 48**

```
 1              J. SEERY
 2      Q.
 3
 4  valuation for those two businesses showed
 5  a significant increase between November of
 6
 7          MR. MORRIS:  Objection to form
 8      of the question.
 9      A.   I didn't say that.
10      Q.   I am trying to account for the
11
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18      A.   I gave you three examples.  I
19  never said "readily."  That is your word,
20
21  had a significant change in their
22  valuation.
23      Q.   So let's now go back to the
24  question.  There is an increase in value
```

**Page 49**

```
 1              J. SEERY
 2  of 2021, the magnitude being roughly 60
 3  some odd million dollars.  Correct?
 4      A.   Correct.
 5      Q.   We can account for $22 million
 6
 7          MR. MORRIS:  Objection to form.
 8      A.   Correct.
 9      Q.
10  settlement, so that leaves roughly
11
12          MR. MORRIS:  Objection to the
13      form of the question if that is a
14      question.  It is accounted for.
15      Q.   What makes up that difference,
16  Mr. Seery?
17      A.   A change in the plan value of
18  the assets.
19      Q.   Okay.  Which assets?  Let's sort
20
21      A.   There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
```

**Page 50**

```
 1              J. SEERY
 2    for one.  On the operating businesses, we
 3    looked at each of them and made an
 4    assessment based upon where the market is
 5    and the like in those areas and we would
 6    have moved those valuations.
 7        Q.   Let me look at some numbers
 8    again.  In the liquidation analysis in
 9    November of 2020, the liquidation value is
10    $149 million.  Correct?
11        A.   Yes.
12        Q.   And in the liquidation analysis
13    in January of 2021, you have $191 million?
14        A.   Yes.
15        Q.   You see that number.  So there
16    is $51 million there, right?
17        A.   No.
18        Q.   What is the difference between
19    191 and -- sorry.  My math may be a little
20    off.  What is the difference between the
21    two numbers, Mr. Seery?
22        A.   Your math is off.
23        Q.   Sorry.  It is 41 million?
24        A.   Correct.
25        Q.   $22 million of that is the
```

**Page 51**

```
 1              J. SEERY
 2    HarbourVest settlement, right?
 3        A.   I believe that's correct.
 4        Q.   Is that fair, Mr. Seery?
 5        A.   I believe that is correct, yes.
 6        Q.   And part of that differential
 7    are publicly traded or ascertainable
 8    securities.  Correct?
 9        A.   Yes.
10        Q.   And basically you can get, or
11    under the plan analysis or trustee
12    analysis, if it is a marketable security
13    or where there is a market, the
14    liquidation number should be the same for
15    both.  Is that fair?
16        A.   No.
17        Q.   And why not?
18        A.   We might have a different price
19    target for a particular security than the
20    current trading value.
21        Q.   I understand that, but I mean
22    that is based upon the capability of the
23    person making the decision as to when to
24    sell.  Correct?
25             MR. MORRIS:  Objection to form
```

**Page 52**

```
 1              J. SEERY
 2    of the question.
 3        Q.   Mr. Seery, yes or no?
 4        A.   I said no.
 5        Q.   What is that based on, then?
 6        A.   The person's ability to assess
 7    the market and timing.
 8        Q.   Okay.  And again, couldn't a
 9    trustee hire somebody as capable as you to
10    both, A, assess the market and, B, make a
11    determination as to when to sell?
12             MR. MORRIS:  Objection to form
13    of the question.
14        A.   I suppose a trustee could.
15        Q.   And there are better people or
16    people equally or better than you at
17    assessing a market.  Correct?
18        A.   Yes.
19             MR. MORRIS:  Objection to form
20    of the question.
21        Q.   So, again, let's go back to
22    that.  We have accounted for, out of
23    $41 million where the liquidation analysis
24    increases between the two dates,
25    $22 million of it.  That leaves
```

**Page 53**

```
 1              J. SEERY
 2    $18 million.  How much of that is publicly
 3    traded or ascertainable assets versus
 4    operating businesses?
 5        A.   I don't know off the top of my
 6    head the percentages.
 7        Q.   All right.  The same question
 8    for the plan analysis where you have the
 9    differential between the November number
10    and the January number.  How much of it is
11    marketable securities versus an operating
12    business?
13        A.   I don't recall off the top of my
14    head.
15             MR. DRAPER:  Let me take a
16    few-minute break.  Can we take a
17    ten-minute break here?
18             THE WITNESS:  Sure.
19             (Recess.)
20    BY MR. DRAPER:
21        Q.   Mr. Seery, what I am going to
22    show you and what I would ask you to look
23    at is in the note E, in the statement of
24    assumptions for the November 2020
25    disclosure statement.  It discusses fixed
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 111 of 214   PageID 3144
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 38 of 177

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate. We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 112 of 214    PageID 3145
Case 19-34054-sgj11    Doc 3600-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 39 of 177

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

**003834**

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 113 of 214   PageID 3146
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 40 of 177

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets. The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 114 of 214   PageID 3147
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 41 of 177

## Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
| | | |
| Less: Claims paid in full | | |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]: General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS. Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 115 of 214   PageID 3148
Case 19-34054-sgj11   Doc 3699-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 42 of 117

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 116 of 214   PageID 3149
Case 19-34054-sgj11   Doc 3699-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 43 of 177

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable |  | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
|  |  |  |  |
| **Liabilities and Partners' Capital** |  |  |  |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable |  | $900,000 | $3,010,000 |
| Secured debt |  |  |  |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees |  | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 117 of 214   PageID 3150
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 44 of 117

## Value of HarbourVest Claim





Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 118 of 214   PageID 3151
Case 19-34054-sgj11   Doc 3099-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 45 of 117

### Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 119 of 214   PageID 3152
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 46 of 117

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § | |

DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE,

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 120 of 214   PageID 3153
Case 19-34054-sgj11   Doc 3600-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 47 of 177

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20   Entered 12/23/20 22:25:24   Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 121 of 214   PageID 3154
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 48 of 177

## RELEVANT BACKGROUND

### A.     Procedural Background

3.     On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.     On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.     In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.     On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 122 of 214   PageID 3155
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 49 of 117

B.     **Overview of HarbourVest's Claims**

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the **Debtor**: (1) failed to disclose that it never intended to pay **an** arbitration award obtained by a former portfolio manager, (2) **failed** to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager **from collecting** on his **arbitration award and misrepresented the reasons** changing the **portfolio** manager for HCLOF immediately **prior to the Investment, (3)** indicated that **the** dispute **with the former** portfolio manager would **not impact investment** activities, **and** (4) **expressed** confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess **of $300 million** based on theories of fraud, **fraudulent inducement, fraudulent concealment,** fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes **of this Motion, and not** for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 123 of 214   PageID 3156
Case 19-34054-sgj11   Doc 3699-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 50 of 117

## C.     Summary of HarbourVest's Factual Allegations

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 124 of 214 PageID 3157
Case 19-34054-sgj11 Doc 3690-2 Filed 09/28/23 Entered 09/28/23 20:00:29 Desc
Exhibit 5 (part 2) Page 51 of 117

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "<u>Preliminary Injunction</u>").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.** **The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.   On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "<u>Proofs of Claim</u>").  Morris Dec. Exhibits 2-7.

23.   The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.   HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 126 of 214   PageID 3159
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 53 of 117

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.,* Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

E.     Settlement Discussions

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

8

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 127 of 214   PageID 3160
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 54 of 117

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

   30. During follow up meetings, the parties' interests became **more** defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

   31. After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

**F. <u>Summary of Settlement Terms</u>**

   32. The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

**Page A-40**

**003849**

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 129 of 214   PageID 3162
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 56 of 117

attendant expense, inconvenience and delay, and **(3)** All other factors bearing **on the wisdom of** the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Cont. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, **and not of fraud or collusion.**" *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 130 of 214   PageID 3163
Case 19-34054-sgj11   Doc 3090-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 57 of 117

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 131 of 214   PageID 3164
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 58 of 177

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 132 of 214   PageID 3165
Case 19-34054-sgj11    Doc 3690-2    Filed 05/28/23    Entered 05/28/23 20:00:29    Desc
Exhibit 5 (part 2)   Page 59 of 177

<u>UBS Settlement [Doc. 2200-1]</u>

Case 19-34054-sgj11 Doc 2200-1 Filed 04/15/21   Entered 04/15/21 14:37:56   Page 1 of 17

# **Exhibit 1**

# **Settlement Agreement**

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 133 of 214   PageID 3166
Case 19-34054-sgj11   Doc 3699-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 60 of 117

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 134 of 214   PageID 3167
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 61 of 177

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS**, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 135 of 214   PageID 3168
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 62 of 177

EXECUTION VERSION

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

WHEREAS, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

WHEREAS, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

WHEREAS, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

WHEREAS, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

WHEREAS, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

WHEREAS, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

WHEREAS, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

WHEREAS, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 136 of 214   PageID 3169
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 63 of 177

**EXECUTION VERSION**

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Settlement of Claims.** In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 137 of 214   PageID 3170
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit E (part 1)   Page 64 of 117

**EXECUTION VERSION**

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows:  (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 138 of 214   PageID 3171
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 65 of 117

**EXECUTION VERSION**

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

(d)   Redeemer Appeal.

(i)   On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 139 of 214   PageID 3172
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:08:29   Desc
Exhibit 5 (part 2)   Page 66 of 177

EXECUTION VERSION

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.     Definitions.

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.     Releases.

(a)     **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 140 of 214   PageID 3173
Case 19-34054-sgj11   Doc 3600-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 67 of 117

EXECUTION VERSION

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 141 of 214   PageID 3174
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 68 of 177

EXECUTION VERSION

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)   **Multi-Strat Release.**   Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4.   **No Third Party Beneficiaries.**   Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5.   **UBS Covenant Not to Sue.**   Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 142 of 214   PageID 3175
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 69 of 117

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.     **Agreement Subject to Bankruptcy Court Approval.**

(a)     The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.     **Representations and Warranties.**

(a)     Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)     Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)     Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 143 of 214   PageID 3176
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 70 of 117

**EXECUTION VERSION**

     **8.**    **No Admission of Liability.** The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

     **9.**    **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

     **10.**    **Notice.** Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 144 of 214   PageID 3177
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 71 of 117

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
           Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
      sarah.tomkowiak@lw.com

     **11.**    **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

     **12.**    **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

     **13.**    **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

     **14.**    **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

     **15.**    **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

EXECUTION VERSION

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

16.     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 146 of 214   PageID 3179
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 73 of 177

**IT IS HEREBY AGREED.**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

HIGHLAND MULTI STRATEGY CREDIT
FUND, L.P. (f/k/a Highland Credit
Opportunities CDO, L.P.)

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO,
Ltd.

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO
ASSET HOLDINGS, L.P.

By:
Name: James P. Seery, Jr
Its: Authorized Signatory

STRAND ADVISORS, INC.

By:
Name: James P. Seery, Jr.
Its: Authorized Signatory

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 147 of 214   PageID 3180
Case 19-34054-sgj11   Doc 3700-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 74 of 117

17

EXECUTION VERSION

**UBS SECURITIES LLC**

By:

Name: John Lantz

Its:   Authorized Signatory

By:

Name: Elizabeth Kozlowski

Its:   Authorized Signatory

**UBS AG LONDON BRANCH**

By:

Name: William Chandler

Its:   Authorized Signatory

By:

Name: Elizabeth Kozlowski

Its:   Authorized Signatory

15

Page A-60

003869

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 148 of 214   PageID 3181
Case 19-34054-sgj11   Doc 3690-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 75 of 117

--

**EXECUTION VERSION**

### APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 149 of 214   PageID 3182
Case 19-34054-sgj11   Doc 3600-8   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 76 of 177

## Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)



SFChronicle/SFBeat/Lisi Hafalia



Robert Holmgren


no caption

https://hf.com/warren-hellman/

1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

### Grosvenor Capital Management

 GROSVENOR

In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)      INFO@HF.COM (MAILTO:INFO@HF.COM)      LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)      BACK
CP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)      TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)

(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-&-FRIEDMAN)

©2021 HELLMAN & FRIEDMAN LLC

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 151 of 214    PageID 3184
Case 19-34054-sgj11    Doc 3700-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 78 of 117



CORNER OFFICE

# GCM Grosvenor to Go Public

Julie Segal

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

August 03, 2020



Chicago, Il. (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

https://www.institutionalinvestor.com/article/b1mabf4t9f1g/GCM-Grosvenor-to-Go-Public

1/3

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 152 of 214    PageID 3185
Case 19-34054-sgj11    Doc 3699-3    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 1)    Page 79 of 117

<u>Farallon was a Significant Borrower for Lehman</u>

# Case Study – Large Loan Origination



**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**

| Date | June 2007 |
|---|---|
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million<br>JP Morgan: $200 million |

### Transaction Overview

- In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

- The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.



### Lehman Brothers Role

- Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

- Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

- The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

**LEHMAN BROTHERS**    32

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 153 of 214   PageID 3186
Case 19-34054-sgj11   Doc 3600-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 80 of 117

Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

In re:                                                    :   **Chapter 11**
                                                          :
BLOCKBUSTER INC., *et al.*,                               :   Case No. 10-14997 (BRL)
                                                          :
                              Debtors.                    :   (Jointly Administered)
                                                          :

--------------------------------------------------------- X

**THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO
ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT
STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE**

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc, (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

**Page A-66**

**003875**

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 154 of 214   PageID 3187
Case 19-34054-sgj11   Doc 3690-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 81 of 177

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 155 of 214    PageID 3188
Case 19-34054-sgj11    Doc 3699-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 82 of 177

 Joseph H. Nesler (He/Him)
General Counsel

( More )  ( 🔒 Message )



## Joseph H. Nesler (He/Him) ·

 Yale Law School

3rd

General Counsel

Winnetka, Illinois, United States ·

Contact info

500+ connections

( 🔒 Message )  ( More )

Open to work
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations.        ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 156 of 214   PageID 3189
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 83 of 177



**Joseph H. Nesler (He/Him)**
General Counsel



More   🔒 Message

**General Counsel**
Dalpha Capital Management, LLC
Aug 2020 – Jul 2021 · 1 yr



**Of Counsel**
Winston & Strawn LLP
Sep 2018 – Jul 2020 · 1 yr 11 mos
Greater Chicago Area

**Principal**
The Law Offices of Joseph H. Nesler, LLC
Feb 2016 – Aug 2018 · 2 yrs 7 mos

**Grosvenor Capital Management, L.P.**
11 yrs 9 mos

**Independent Consultant to Grosvenor Capital Management, L.P.**
May 2015 – Dec 2015 · 8 mos
Chicago, Illinois

**General Counsel**
Apr 2004 – Apr 2015 · 11 yrs 1 mo
Chicago, Illinois

Managing Director, General Counsel and Chief Compliance
Officer (April 2004 – April 2015)

<u>Investor Communication to Highland Crusader Funds Stakeholders</u>



Alvarez & Marsal
Management, LLC 2029 Cer
Park East Suite 206C
Angeles, CA 9

**July 6,** 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, **in** October 2020, the **Bankruptcy Court** approved a settlement **of the** Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("<u>HCM</u>"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM **and the Crusader Funds were allowed a general unsecured** claim of $50,000 against HCM (collectively, the "<u>Claims</u>"). In addition, as part of the settlement, various interests in **the Crusader Funds held by HCM and** certain of its **affiliates are** to be extinguished (the "<u>Extinguished Interests</u>"), and the Redeemer Committee and the Crusader Funds **received a general release from HCM and a waiver by HCM of any claim to distributions or fees** that it might otherwise receive from the Crusader Funds (the "<u>Released Claims</u>" and, collectively with the Extinguished Interests, the "<u>Retained Rights</u>").

A timely appeal of the settlement was taken by UBS (the "<u>UBS Appeal</u>) in the United States **District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court** subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("<u>Jessup</u>") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "<u>Settlement Agreement</u>"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("<u>A&M CRF</u>"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds **from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no** reserves for the Extinguished Claims or the Released Claims. In addition, **the distribution will** include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 158 of 214   PageID 3191
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit E (part 2)   Page 85 of 117

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before July 20, 2021. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before July 20, 2021 to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC

By: _____
    Steven Varner
    Managing Director



**MUNSCH HARDT**
DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main  214.855.7500
Fax  214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530
Nan.r.Eitel@usdoj.gov

Re:     Highland Capital Management, L.P. Bankruptcy Case
        Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

**EXHIBIT**

003881

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 160 of 214 PageID 3193
Case 19-34054-sgj11 Doc 3699-2 Filed 09/28/23 Entered 09/28/23 20:00:29 Desc
Exhibit 5 (part 1) Page 87 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

### Highland Capital Management and its Founder, James Dondero

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

### Circumstances Precipitating Bankruptcy

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 161 of 214   PageID 3194
Case 19-34054-sgj11   Doc 3690-2   Filed 05/28/23   Entered 05/28/23 20:08:29   Desc
Exhibit 5 (part 2)   Page 88 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

#### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.

[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

[4] *See* Stipulation in Support of Motion for the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 162 of 214   PageID 3195
Case 19-34054-sgj11   Doc 3600-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 1)   Page 89 of 177

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the
Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he
immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of
Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's
appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly
represented that his goal was to restructure the Debtor's business and enable it to emerge as a going
concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's
appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time
its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets
by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court
confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There
are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently
pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is
transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the
receipt, administration, and disposition of all property; provide information concerning the estate and the
estate's administration as parties in interest request; and file periodic reports and summaries of a
debtor's business, including a statement of receipts and disbursements, and such other information as
the United States Trustee or the United States Bankruptcy Court requires." *See*
http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule
of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic
financial reports of the value, operations, and profitability of each entity that is not a publicly traded
corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling
interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor
affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a
plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from
filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the
U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required
reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly
evaluate the progress of bankruptcy proceedings, including compliance with legal requirements.
Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention
of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc
Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As
Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for
cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e]
reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr.
2015.3(d).

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 163 of 214   PageID 3196
Case 19-34054-sgj11   Doc 3600-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 90 of 177

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor.  Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.  This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries.  The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.  Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well.  As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 164 of 214   PageID 3197
Case 19-34054-sgj11   Doc 3590-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 91 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining □2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] See *"Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 165 of 214   PageID 3198
Case 19-34054-sgj11   Doc 3600-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 92 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." *See* Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 167 of 214   PageID 3200
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:02:29   Desc
Exhibit 5 (part 2)   Page 94 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 9

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost'" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here. In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 168 of 214    PageID 3201
Case 19-34054-sgj11    Doc 3699-3    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 95 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|----------|---------------|----------------|---------------------|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|-----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] See Ex. D.

[21] See Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 169 of 214   PageID 3202
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 96 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[23] *See* Ex. F.

003891

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 170 of 214   PageID 3203
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:08:29   Desc
Exhibit E (part 2)   Page 97 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] See Ex. E.

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 171 of 214    PageID 3204
Case 19-34054-sgj11    Doc 3699-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 98 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim.  No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a)    The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)    Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)    The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d)    There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1)    If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 172 of 214 PageID 3205
Case 19-34054-sgj11 Doc 3690-2 Filed 09/28/23 Entered 09/28/23 20:00:29 Desc
Exhibit 5 (part 2) Page 99 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 14

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)     If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization. Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] See Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 173 of 214    PageID 3206
Case 19-34054-sgj11    Doc 3699-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit 5 (part 2)    Page 100 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed Plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.
[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.
[30] Dkt. 854, ¶ 4 & Exh. 1.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 174 of 214   PageID 3207
Case 19-34054-sgj11   Doc 3680-3   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 101 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds— i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).
[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.
[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.
[34] *Id.* at 26-28.
[35] *See id.* at 22.

003896

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.
[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 176 of 214   PageID 3209
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit E (part 2)   Page 103 of 117

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT, KOPF & HARR, P.C.

By: _____
　　　Davor Rukavina, Esq.

DR:pdm

003898

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 177 of 214   PageID 3210
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 104 of 117

Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................ 2

Debtor Protocols [Doc. 466-1] ................................................................................................................. 3

Seery Jan. 29, 2021 Testimony ............................................................................................................... 15

Sale of Assets of Affiliates or Controlled Entities .................................................................................. 24

20 Largest Unsecured Creditors ............................................................................................................. 25

Timeline of Relevant Events ................................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ............................................................ 27

Updated Liquidation Analysis (Feb. 1, 2021) ......................................................................................... 28

Summary of Debtor's January 31, 2021 Monthly Operating Report ...................................................... 29

Value of HarbourVest Claim ................................................................................................................... 30

Estate Value as of August 1, 2021 (in millions) ..................................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ...................................................................... 32

UBS Settlement [Doc. 2200-1] ............................................................................................................... 45

Hellman & Friedman Seeded Farallon Capital Management ................................................................. 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ........................................................... 63

Farallon was a Significant Borrower for Lehman .................................................................................... 65

Mr. Seery Represented Stonehill While at Sidley ................................................................................... 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders ..................................................... 70

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers



Page A-2

003900

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 179 of 214   PageID 3212
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 106 of 117

Debtor Protocols [Doc. 466-1]

I.    **Definitions**

A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.  "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.  **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities:** N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

    a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

    b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

    a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)  Stage 3:

        (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 181 of 214   PageID 3214
Case 19-34054-sgj11   Doc 3690-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 108 of 117

      (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See <u>Schedule A</u> hereto. <u>Schedule A</u> includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

    b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 182 of 214   PageID 3215
Case 19-34054-sgj11   Doc 3690-2   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 109 of 177

a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) Stage 3:

  (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

  (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

  a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

  b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

  c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 183 of 214   PageID 3216
Case 19-34054-sgj11   Doc 3590-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 110 of 177

IV.  **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A.  **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

   a)  Stage 1 and Stage 2: ordinary course determined by the CRO.

   b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

   a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)  Stage 3:

      (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages):

   a)  Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

        Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.   Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.    **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 185 of 214   PageID 3218
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 112 of 117

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

X. **Representations and Warranties**

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(I)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 187 of 214   PageID 3220
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit E (part 2)   Page 114 of 177

### Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 188 of 214   PageID 3221
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 115 of 117

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 189 of 214   PageID 3222
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 116 of 117

## Schedule B

**Related Entities Listing (other than natural persons)**

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 190 of 214   PageID 3223
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit 5 (part 2)   Page 117 of 117

## <u>Schedule C</u>

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 191 of 214    PageID 3224
Case 19-34054-sgj11    Doc 3784-6    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Exhibit 5 (part 2)    Page 1 of 61

# EXHIBIT 5 (part 2)

003913

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 192 of 214   PageID 3225
Case 19-34054-sgj11   Doc 3600-8   Filed 09/28/23   Entered 09/28/23 16:00:29   Desc
Exhibit Exhibit (part 2) Page 13 of 17

Seery Jan. 29, 2021 Testimony

Page 1

```
 1    IN THE UNITED STATES BANKRUPTCY COURT

 2    FOR THE NORTHERN DISTRICT OF TEXAS

 3    DALLAS DIVISION

 4    ------------------------------)

 5    In Re:                Chapter 11

 6    HIGHLAND CAPITAL       Case No.

 7    MANAGEMENT, LP,        19-34054-SGJ 11

 8

 9         Debtor

10    ------------------------------------

11

12

13      REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14             January 29, 2021

15             10:11 a.m. EST

16

17

18

19

20

21

22

23

      Reported by:
24    Debra Stevens, RPR-CRR
      JOB NO. 189212
25
```

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 193 of 214    PageID 3226
Case 19-34054-sgj11    Doc 3699-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit E (part 2) Page 19 of 67

Page 2

```
 1              January 29, 2021
 2              9:00 a.m. EST
 3
 4       Remote Deposition of JAMES P.
 5   SEERY, JR., held via Zoom
 6   conference, before Debra Stevens,
 7   RPR/CRR and a Notary Public of the
 8   State of New York,
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   REMOTE APPEARANCES:
 2
 3       Heller, Draper, Hayden, Patrick, & Horn
 4       Attorneys for The Dugaboy Investment
 5       Trust and The Get Good Trust
 6           650 Poydras Street
 7           New Orleans, Louisiana 70130
 8
 9
10   BY:    DOUGLAS DRAPER, ESQ
11
12
13   PACHULSKI STANG ZIEHL & JONES
14   For the Debtor and the Witness Herein
15           780 Third Avenue
16           New York, New York 10017
17   BY:    JOHN MORRIS, ESQ.
18           JEFFREY POMERANTZ, ESQ.
19           GREGORY DEMO, ESQ.
20           IRA KHARASCH, ESQ.
21
22
23
24              (Continued)
25
```

Page 4

```
 1   REMOTE APPEARANCES:   (Continued)
 2
 3   LATHAM & WATKINS
 4   Attorneys for UBS
 5           885 Third Avenue
 6           New York, New York 10022
 7   BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9   JENNER & BLOCK
10   Attorneys for Redeemer Committee of
11   Highland Crusader Fund
12           919 Third Avenue
13           New York, New York 10022
14   BY:    MARC B. HANKIN, ESQ.
15
16   SIDLEY AUSTIN
17   Attorneys for Creditors' Committee
18           2021 McKinney Avenue
19           Dallas, Texas 75201
20   BY:    PENNY REID, ESQ.
21           MATTHEW CLEMENTE, ESQ.
22           PAIGE MONTGOMERY, ESQ.
23
24              (Continued)
25
```

Page 5

```
 1   REMOTE APPEARANCES:   (Continued)
 2   KING & SPALDING
 3   Attorneys for Highland CLO Funding, Ltd.
 4           500 West 2nd Street
 5           Austin, Texas 78701
 6   BY:    REBECCA MATSUMURA, ESQ.
 7
 8   K&L GATES
 9   Attorneys for Highland Capital Management
10   Fund Advisors, L.P., et al.:
11           4350 Lassiter at North Hills
12           Avenue
13           Raleigh, North Carolina 27609
14   BY:    EMILY MATHER, ESQ.
15
16   MUNSCH HARDT KOPF & HARR
17   Attorneys for Defendants Highland Capital
18   Management Fund Advisors, LP; NexPoint
19   Advisors, LP; Highland Income Fund;
20   NexPoint Strategic Opportunities Fund and
21   NexPoint Capital, Inc.:
22           500 N. Akard Street
23           Dallas, Texas 75201-6659
24   BY:    DAVOR RUKAVINA, ESQ.
25              (Continued)
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 194 of 214   PageID 3227
Case 19-34054-sgj11   Doc 3699-0   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit Eh (part 2) Page 20 of 617

Page 6

```
 1   REMOTE APPEARANCES (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6        420 Throckmorton Street
 7
 8        Fort Worth, Texas 76102
 9   BY:  CLAY TAYLOR, ESQ.
10        JOHN BONDS, ESQ.
11        BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16        1900 North Pearl Street
17
18        Dallas, Texas 75201
19   BY:  MICHELLE HARTMANN, ESQ.
20        DEBRA DANDEREAU, ESQ.
21
22
23
24             (Continued)
25
```

Page 7

```
 1   REMOTE APPEARANCES: (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7        103 Throckmorton Street
 8        Fort Worth, Texas 76102
 9   BY:  LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15        700 N. Pearl Street
16        Dallas, Texas 75201
17   BY:  FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
 1
 2        E X A M I N A T I O N S
 3   WITNESS                           PAGE
 4   JAMES SEERY
 5        By Mr. Draper                  9
 6        By Mr. Taylor                 75
 7        By Mr. Pokavina              165
 8        By Mr. Draper                217
 9
         E X H I B I T S
10   SEERY DVD
     EXHIBIT   DESCRIPTION            PAGE
11
     Exhibit 1  January 2021 Material  11
12
     Exhibit 2  Disclosure Statement   14
13
     Exhibit 3  Notice of Deposition   74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                       PAGE
17   Subsidiary ledger showing note     22
     component versus hard asset
18   component
19   Amount of D&O coverage for        131
     trustees
20
     Line item for D&O insurance      133
21
22        MARKED FOR RULING
          PAGE   LINE
23         85     20
24
25
```

Page 9

```
 1
 2        COURT REPORTER:  My name is
 3   Debra Stevens, court reporter for TSG
 4   Reporting and notary public of the
 5   State of New York.  Due to the
 6   severity of the COVID-19 pandemic and
 7   following the practice of social
 8   distancing, I will not be in the same
 9   room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14        Whereupon,
15        J A M E S   S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20        Q.   Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

Page 14

```
          J. SEERY
 1
 2    the screen, please?
 3        A.    Page what?
 4        Q.    I think it is page 174.
 5        A.    Of the PDF or of the document?
 6        Q.    Of the disclosure statement that
 7    was filed.  It is up on the screen right
 8    now.
 9            COURT REPORTER:  Do you intend
10    this as another exhibit for today's
11    deposition?
12            MR. DRAPER:  We'll mark this
13    Exhibit 2.
14            (So marked for identification as
15    Seery Exhibit 2.)
16        Q.    If you look to the recovery to
17    Class 8 creditors in the November 2020
18    disclosure statement was a recovery of
19    87.44 percent?
20        A.    That actually says the percent
21    distribution to general unsecured
22    creditors was 87.44 percent.  Yes.
23        Q.    And in the new document that was
24    filed, given to us yesterday, the recovery
25    is 62.5 percent?
```

Page 15

```
          J. SEERY
 1
 2        A.    It says the percent distribution
 3    to general unsecured creditors is
 4    62.14 percent.
 5        Q.    Have you communicated the
 6    reduced recovery to anybody prior to the
 7    date -- to yesterday?
 8            MR. MORRIS:  Objection to the
 9    form of the question.
10        A.    I believe generally, yes.  I
11    don't know if we have a specific number,
12    but generally yes.
13        Q.    And would that be members of the
14    Creditors' Committee who you gave that
15    information to?
16        A.    Yes.
17        Q.    Did you give it to anybody other
18    than members of the Creditors' Committee?
19        A.    Yes.
20        Q.    Who?
21        A.    HarbourVest.
22        Q.    And when was that?
23        A.    Within the last two months.
24        Q.    You did not feel the need to
25    communicate the change in recovery to
```

Page 16

```
          J. SEERY
 1
 2    anybody else?)
 3        A.    I said Mr. Gertzky.
 4        Q.    In looking at the two elements,
 5    and what I have asked you to look at is
 6    the claims pool.  If you look at the
 7    November disclosure statement, if you look
 8    down Class 8, unsecured claims?
 9        A.    Yes.
10        Q.    You have 176,000 roughly?
11        A.    Million.
12        Q.    176 million.  I am sorry.  And
13    the number in the new document is 313
14    million?
15        A.    Correct.
16        Q.    What accounts for the
17    difference?
18        A.    An increase in claims.
19        Q.    When did those increases occur?
20    Were they yesterday?  A month ago?  Two
21    months ago?
22        A.    Over the last couple months.
23        Q.    So in fact over the last couple
24    months you knew in fact that the recovery
25    in the November disclosure statement was
```

Page 17

```
          J. SEERY
 1
 2    not accurate?
 3        A.    Yes.  We secretly disclosed it
 4    to the Bankruptcy Court in open court
 5    hearings.
 6        Q.    But you never did bother to
 7    calculate the reduced recovery; you just
 8    increased --
 9            (Reporter interruption.)
10        Q.    You just advised as to the
11    increased claims pool.  Correct?
12            MR. MORRIS:  Objection to the
13    form of the question.
14        A.    I don't understand your
15    question.
16        Q.    What I am trying to get at is,
17    as you increase the claims pool, the
18    recovery reduces.  Correct?
19        A.    No.  That is not how a fraction
20    works.
21        Q.    Well, if the denominator
22    increases, doesn't the recovery ultimately
23    decrease if --
24        A.    No.
25        Q.    -- if the numerator stays the
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 196 of 214   PageID 3229
Case 19-34054-sgj11   Doc 3699-2   Filed 09/28/23   Entered 09/28/23 20:00:29   Desc
Exhibit E (part 2) Page 22 of 177

**Page 26**

```
 1                J. SEERY
 2   were amended without consideration a few
 3   years ago. So, for our purposes we didn't
 4   make the assumption, which I am sure will
 5   happen, a fraudulent conveyance claim on
 6   those notes, that a fraudulent conveyance
 7   action would be brought. We just assumed
 8   that we'd have to discount the notes
 9   heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12        Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them. So there would be
21   some collections on the notes for P and I.
22        Q.    But in fact as of January you
23   have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

**Page 27**

```
 1                J. SEERY
 2        A.    NexPoint, I said. They
 3   defaulted on the note and we accelerated
 4   it.
 5        Q.    So there is no need to file a
 6   fraudulent conveyance suit with respect to
 7   that note. Correct, Mr. Seery?
 8        MR. MORRIS: Objection to the
 9        form of the question.
10        A.    Disagree. Since it was likely
11   intentional fraud, there may be other
12   recoveries on it. But to collect on the
13   note, no.
14        Q.    My question was with respect to
15   that note. Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18        MR. MORRIS: Objection to the
19        form of the question.
20        A.    That wasn't your question. But
21   to that question, yes, I don't need to
22   deal with when it's due.
23        Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

**Page 28**

```
 1                J. SEERY
 2   you whether they are included in the asset
 3   portion of your $257 million number, all
 4   right? Mr. Morris didn't want me to go
 5   into specific asset value, and I don't
 6   intend to do that.
 7        The first question I have for
 8   you is, the equity in Trustway Highland
 9   Holdings, is that included in the
10   $257 million number?
11        A.    There is no such entity.
12        Q.    Then I will do it in a different
13   way. In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16        A.    Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings. It
20   includes Targa and all the value that
21   flows up from Targa. It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical. It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone. It
```

**Page 29**

```
 1                J. SEERY
 2   includes any other securities and all the
 3   value that would flow from Cornerstone.
 4   It includes HCLOF and all the value that
 5   would flow up from HCLOF. It includes
 6   Korea and all the value that would flow up
 7   from Korea.
 8        There may be others off the top
 9   of my head. I don't recall them. I don't
10   have a list in front of me.
11        Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14        A.    No. Well, each asset is
15   different. So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22        With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway. We have not sought to sell
```

Page 38

```
 1               J. SEERY
 2      A.   I don't recall the specific
 3  limitation on the trust.  But if there was
 4  a reason to hold on to the asset, if there
 5  is a limitation, we can seek an extension.
 6      Q.   Let me ask a question.  With
 7  respect to these businesses, the Debtor
 8  merely owns an equity interest in them.
 9  Correct?
10      A.   Which business?
11      Q.   The ones you have identified as
12  operating businesses earlier?
13      A.   It depends on the business.
14      Q.   Well, let me -- again, let's try
15  to be specific.  With respect to SSP, it
16  was your position that you did not need to
17  get court approval for the sale.  Correct?
18      A.   That's correct.
19      Q.   Which one of the operating
20  businesses that are here, that you have
21  identified, do you need court authority
22  for a sale?
23           MR. MORRIS:  Objection to the
24      form of the question.
25      A.   Each of the businesses will be a
```

Page 39

```
 1               J. SEERY
 2  different analysis that we'll undertake
 3  with bankruptcy counsel to determine what
 4  we would need depending on what it is
 5  going to happen and what the restrictions
 6  either under the code are or under the
 7  plan.
 8      Q.   Is there anything that would
 9  stop you from selling these businesses if
10  the Chapter 7 went in for a year or two
11  years?
12           MR. MORRIS:  Objection to form
13      of the question.
14      A.   Is there anything that would
15  stop me?  We'd have to follow the
16  strictures of the code and the protocols,
17  but there would be no prohibition -- let
18      please.
19           There would be no prohibition
20  that I am aware of.
21      Q.   Now, in connection with your
22  differential between the liquidation of
23  what I will call the operating businesses
24  under the liquidation analysis and the
25  plan analysis, who arrived at the discount
```

Page 40

```
 1               J. SEERY
 2  or determined the discount that has been
 3  placed between the two, plan analysis
 4  versus liquidation analysis?
 5           MR. MORRIS:  Objection to form
 6      of the question.
 7      A.   To which document are you
 8  referring?
 9      Q.   Both the June -- the January and
10  the November analysis has a different
11  estimated proceeds for monetization for
12  the plan analysis versus the liquidation
13  analysis.  Do you see that?
14      A.   Yes.
15      Q.   And there is a note under there.
16  "Assumes Chapter 7 trustee will not be
17  able to achieve the same sales proceeds as
18  Claimant trustee."
19      A.   I see that, yes.
20      Q.   Do you see that note?
21      A.   Yes.
22      Q.   Who arrived at that discount?
23      A.   I did.
24      Q.   What percentage did you use?
25      A.   Depended on the asset.  Each one
```

Page 41

```
 1               J. SEERY
 2  is different.
 3      Q.   Is the discount a function of
 4  capability of a trustee versus your
 5  capability, or is the discount a function
 6  of timing?
 7           MR. MORRIS:  Objection to form.
 8      A.   It could be a combination.
 9      Q.   So, let's -- let me walk through
10  this.  Your plan analysis has an
11  assumption that everything is sold by
12  December 2022.  Correct?
13      A.   Correct.
14      Q.   And the valuations that you have
15  used here for the monetization assume a
16  sale between -- a sale prior to December
17  of 2022.  Correct?
18      A.   Sorry.  I don't quite understand
19  your question.
20      Q.   The 257 number, and then let's
21  take out the notes.  Let's use the 210
22  number.
23           MR. MORRIS:  Can we put the
24      document back on the screen, please?
25      Sorry, Douglas, to interrupt, but it
```

Case 3:23-cv-02071-E    Document 23-12    Filed 12/07/23    Page 198 of 214    PageID 3231
Case 19-34054-sgj11    Doc 3090-2    Filed 09/28/23    Entered 09/28/23 20:00:29    Desc
Exhibit Sh (part 2) Page 24 of 617

**Page 42**

```
1                    J. SEERY
2        would be helpful.
3             MR. DRAPER:  That is fine, John.
4        (Pause.)
5             MR. MORRIS:  Thank you very
6        much.
7        Q.   Mr. Seery, do you see the 257?
8        A.   In the one from yesterday?
9        Q.   Yes.
10       A.   Second line, 257,941.  Yes.
11       Q.   That assumes a monetization of
12       all assets by December of 2022?
13       A.   Correct.
14       Q.   And so everything has been sold
15       by that time; correct?
16       A.   Yes.
17       Q.   So, what I am trying to get at
18       is, there is both the capability between
19       you and a trustee, and then the second
20       issue is timing.  So, what discount was
21       put on for timing, Mr. Seery, between when
22       a trustee would sell it versus when you
23       would sell it?
24            MR. MORRIS:  Objection.
25       Q.   What is the percentage you
```

**Page 43**

```
1                    J. SEERY
2        applied?
3        A.   Each of the assets is different.
4        Q.   Is there a general discount that
5        you used?
6        A.   Not a general discount, no.  We
7        looked at each individual asset and went
8        through and made an assessment.
9        Q.   Did you apply a discount for
10       your capability versus the capability of a
11       trustee?
12       A.   No.
13       Q.   So a trustee would be as capable
14       as you are in monetizing these assets?
15            MR. MORRIS:  Objection to the
16       form of the question.
17       Q.   Excuse me?  The answer is?
18       A.   The answer is maybe.
19       Q.   Couldn't a trustee hire somebody
20       as capable as you are?
21            MR. MORRIS:  Objection to the
22       form of the question.
23       A.   Perhaps.
24       Q.   Sir, that is a yes or no
25       question.  Could the trustee hire somebody
```

**Page 44**

```
1                    J. SEERY
2        as capable as you are?
3             MR. MORRIS:  Objection to the
4        form of the question.
5        A.   I don't know.
6        Q.   Is there anybody as capable as
7        you are?
8             MR. MORRIS:  Objection to the
9        form of the question.
10       A.   Certainly.
11       Q.   And they could be hired.
12       Correct?
13       A.   Perhaps.  I don't know.
14       Q.   And if you go back to the
15       November 2020 liquidation analysis versus
16       plan analysis, it is also the same note
17       about that a trustee would bring less, and
18       there is the same sort of discount between
19       the estimated proceeds under the plan and
20       under the liquidation analysis.
21            MR. MORRIS:  If that is a
22       question, I object.
23       Q.   Is that correct, Mr. Seery,
24       looking at the document?
25       A.   There are discounts, yes.
```

**Page 45**

```
1                    J. SEERY
2        Q.   Again, the discounts are applied
3        for timing and capability?
4        A.   Yes.
5        Q.   Now, in looking at the November
6        plan analysis number of $190 million and
7        the January number of $257 million, what
8        accounts for the increase between the two
9        dates?  What assets specifically?
10       A.   There are a number of assets.
11       Firstly, the HCLOF assets are added.
12       Q.   How much are those?
13       A.   Approximately 22 and a half
14       million dollars.
15       Q.   Okay.
16       A.   Secondly, there is a significant
17       increase in the value of certain of the
18       assets over this time period.
19       Q.   Which assets, Mr. Seery?
20       A.   There are a number.  They
21       include MGM stock, they include Trustway,
22       they include Targa.
23       Q.   And what is the percentage
24       increase from November to January,
25       November of 2020 to January of 2021?
```

Case 3:23-cv-02071-E   Document 23-12   Filed 12/07/23   Page 199 of 214   PageID 3232
Case 19-34054-sgj11   Doc 3690-8   Filed 05/28/23   Entered 05/28/23 20:00:29   Desc
Exhibit Esh (part 2) Page 25 of 177

**Page 46**

```
 1                    J. SEERY
 2      A.   Do you mean what is the
 3 percentage increase from 190 to 257?
 4      Q.   No.  You just identified three
 5 assets.  MGM stock, we can go look at the
 6 exchange and figure out what the price
 7 increase is; correct?
 8      A.   No.
 9      Q.   Why not?  Is the MGM stock
10 publicly traded?
11      A.   Yes.  It doesn't trade on --
12      Q.   Excuse me?
13      A.   It doesn't trade on an exchange.
14      Q.   Is there a public market for the
15 MGM stock that we could calculate the
16 increase?
17      A.   There is a semipublic market;
18 yes.
19      Q.   So it is a number that is
20 readily available between the two dates?
21      A.   It's available.
22      Q.   Now, you identified Targa and
23 Trustway.  Correct?
24      A.   Yes.
25      Q.   Those are not readily available
```

**Page 47**

```
 1                    J. SEERY
 2 markets; correct?
 3      A.   No.
 4      Q.   Those are operating businesses?
 5      A.   Correct.
 6      Q.   Who provided the valuation for
 7 the November 2020 liquidation analysis?
 8      A.   We use a combination of the
 9 value that we get from Houlihan Lokey for
10 mark purposes and then we adjust it for
11 plan purposes.
12      Q.   And the adjustment was up or
13 down?
14      A.   When?
15      Q.   For both November and January.
16 You got a number from Houlihan Lokey.  You
17 adjusted it.  Did you adjust it up or did
18 you adjust it down?
19           MR. MORRIS:  Objection to form
20 of the question.
21      A.   I believe that for November we
22 adjusted it down, and for January we
23 adjusted it down.  I don't recall off the
24 top of my head but I believe both of them
25 were adjusted down.
```

**Page 48**

```
 1                    J. SEERY
 2      Q.   And if I understand what you
 3 just said, it is that the Houlihan Lokey
 4 valuation for those two businesses showed
 5 a significant increase between November of
 6 2020 and January of 2021?
 7           MR. MORRIS:  Objection to form
 8 of the question.
 9      A.   I didn't say that.
10      Q.   I am trying to account for the
11 increase between the two dates, and you
12 identified three assets.  You identified
13 MGM stock, which has, I can guess, as you
14 have said, a readily ascertainable value.
15 Then you identified two others that the
16 valuation is based upon something Houlihan
17 Lokey provided you.  Correct?
18      A.   I gave you three examples.  I
19 never said "readily."  That is your word,
20 not mine.  And I didn't say that Houlihan
21 had a significant change in their
22 valuation.
23      Q.   So let's now go back to the
24 question.  There is an increase in value
25 from November 24th of 2020 to January 28th
```

**Page 49**

```
 1                    J. SEERY
 2 of 2021, the magnitude being roughly 60
 3 some odd million dollars.  Correct?
 4      A.   Correct.
 5      Q.   We can account for $22 million,
 6 of it easily, right?
 7           MR. MORRIS:  Objection to form.
 8      A.   Correct.
 9      Q.   That is the Harbourvest
10 settlement, so that leaves roughly
11 $40 million unaccounted for?
12           MR. MORRIS:  Objection to the
13 form of the question if that is a
14 question.  It is accounted for.
15      Q.   What makes up that difference,
16 Mr. Seery?
17      A.   A change in the plan value of
18 the assets.
19      Q.   Okay.  Which assets?  Let's sort
20 of go back to where we were.
21      A.   There are numerous assets in the
22 plan formulation.  I gave you three
23 examples of the operating businesses.  The
24 securities, I believe, have increased in
25 value since the plan, so those would go up
```

| Page 50 | | Page 51 |
|---|---|---|

**Page 50**

J. SEERY

1
2  for one. On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7       Q.    Let me look at some numbers
8  again. In the liquidation analysis in
9  November of 2020, the liquidation value is
10 $149 million. Correct?
11      A.    Yes.
12      Q.    And in the liquidation analysis
13 in January of 2021, you have $191 million?
14      A.    Yes.
15      Q.    You see that number. So there
16 is $51 million there, right?
17      A.    No.
18      Q.    What is the difference between
19 191 and -- sorry. My math may be a little
20 off. What is the difference between the
21 two numbers, Mr. Seery?
22      A.    Your math is off.
23      Q.    Sorry. It is 41 million?
24      A.    Correct.
25      Q.    $22 million of that is the

**Page 51**

J. SEERY

1
2  HarbourVest settlement, right?
3       A.    I believe that's correct.
4       Q.    Is that fair, Mr. Seery?
5       A.    I believe that is correct, yes.
6       Q.    And part of that differential
7  are publicly traded or ascertainable
8  securities. Correct?
9       A.    Yes.
10      Q.    And basically you can get, or
11 under the plan analysis or trustee
12 analysis, if it is a marketable security
13 or where there is a market, the
14 liquidation number should be the same for
15 both. Is that fair?
16      A.    No.
17      Q.    And why not?
18      A.    We might have a different price
19 target for a particular security than the
20 current trading value.
21      Q.    I understand that, but I mean
22 that is based upon the capability of the
23 person making the decision as to when to
24 sell. Correct?
25           MR. MORRIS: Objection to form

**Page 52**

J. SEERY

1
2  of the question.
3       Q.    Mr. Seery, yes or no?
4       A.    I said no.
5       Q.    What is that based on, then?
6       A.    The person's ability to assess
7  the market and timing.
8       Q.    Okay. And again, couldn't a
9  trustee hire somebody as capable as you to
10 both, A, assess the market and, B, make a
11 determination as to when to sell?
12           MR. MORRIS: Objection to form
13 of the question.
14      A.    I suppose a trustee could.
15      Q.    And there are better people or
16 people equally or better than you at
17 assessing a market. Correct?
18      A.    Yes.
19           MR. MORRIS: Objection to form
20 of the question.
21      Q.    So, again, let's go back to
22 that. We have accounted for, out of
23 $41 million where the liquidation analysis
24 increases between the two dates,
25 $22 million of it. That leaves

**Page 53**

J. SEERY

1
2  $18 million. How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5       A.    I don't know off the top of my
6  head the percentages.
7       Q.    All right. The same question
8  for the plan analysis where you have the
9  differential between the November number
10 and the January number. How much of it is
11 marketable securities versus an operating
12 business?
13      A.    I don't recall off the top of my
14 head.
15           MR. DRAPER: Let me take a
16 few-minute break. Can we take a
17 ten-minute break here?
18           THE WITNESS: Sure.
19           (Recess.)
20 BY MR. DRAPER:
21      Q.    Mr. Seery, what I am going to
22 show you and what I would ask you to look
23 at is in the note E, in the statement of
24 assumptions for the November 2020
25 disclosure statement. It discusses fixed

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|-------|-------------|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate. We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]:  General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS.  Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

Updated Liquidation Analysis (Feb. 1, 2021)[2]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1. 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,887,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable |  | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
|  |  |  |  |
| **Liabilities and Partners' Capital** |  |  |  |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable |  | $900,000 | $3,010,000 |
| Secured debt |  |  |  |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees |  | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Value of HarbourVest Claim





## Estate Value as of August 1, 2021 (in millions)[d]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[d] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

HarbourVest Motion to Approve Settlement [Doc. 1625]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 3:23-cv-02071-E Document 23-12 Filed 12/07/23 Page 210 of 214 PageID 3243
Case 19-34054-sgj11 Doc 3600-8 Filed 09/28/23 Entered 09/28/23 20:00:29 Desc
Exhibit Exhibit 22) Page 30 of 517

Case 19-34054-sgj11 Doc 1625 Filed 12/23/20 Entered 12/23/20 22:25:24 Page 2 of 13

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

### JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

2

## RELEVANT BACKGROUND

### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

B.    **Overview of HarbourVest's Claims**

10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.    **Summary of HarbourVest's Factual Allegations**

14.    At the time HarbourVest made its Investment, the Debtor was embroiled
in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and
limited partner of Acis Capital Management, L.P. ("Acis LP"). Through Acis LP, Mr. Terry
managed Highland's CLO business, including CLO-related investments held by Acis Loan
Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the
Debtor terminated Mr. Terry and commenced an action against him in Texas state court. Mr.
Terry asserted counterclaims for wrongful termination and for the wrongful taking of his
ownership interest in Acis LP and subsequently had certain claims referred to arbitration where
he obtained an award of approximately $8 million (the "Arbitration Award") on October 20,
2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award
by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of
which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of
the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped
out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes").
The Debtor allegedly told HarbourVest that it made these changes because of the "reputational
harm" to Acis LP resulting from the Arbitration Award. The Debtor further told HarbourVest
that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset
them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of
allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

      19.    Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

      20.    After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

      21.    On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

003936