**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

|  |  |  |
|---|---|---|
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.

# Volume 13

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.     Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

      1.   the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

      2.   the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

      3.   the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

    4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2.  Appellant's claims or allegations are not "plausible";

    3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.  Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.  Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.  ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.  determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.  Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.  Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.  Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.  Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.  Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.  Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.  there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.  there is no evidence to support the alleged quid pro quo;

3.  the material shared was *public* information; and/or

4.  the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.  Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.  Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.  Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.  Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.  Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

   1. declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

   2. concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.  **Notice of Appeal**

   *000001*   a.  Notice of Appeal **[Dkt. 3906]**;

   *000276*   b.  Amended Notice of Appeal **[Dkt. 3908]**; and

   *000551*   c.  Second Amended Notice of Appeal **[Dkt. 3945]**

2.  **The judgment, order, or decree appealed from:**

   a.  Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*Vol. 2*
*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru Vol. 4*
*Vol 4*
*002236*
*002243*
*002248*

*Vol. 5*
*002251*

*002254*

*002262*

*002340*

*002355*

*002358*

*002391*

*002398*

*002400*

*Vol. 6*
*002826*

*Thru Vol. 7*

*Thru Vol. 9*

*Vol. 9*
*003257*

*003260*

*003270*

*003278*

| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10* *003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

---

*Vol. 10*

*003458*

*003463*

*Vol. 11*

*003537*

*Thru Vol. 16*

*Vol. 17*

*004465*

*004712*

*004714*

*004808*

*004813*

*004836*

*Vol. 18*
*004930*

*004931*

| | | | |
|---|---|---|---|
| | | | Holdings LLC, Stonehill Capital Management LLC |
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 18*

*004939.*

*004959*

*004961*

*004984*

*005049*

*005114*

*Vol. 26*

*006608*

*Vol. 39*

*009273*

*009290*

*009416*

*009424*

| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| --- | --- | --- |
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) *Thru Vol. 25* | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) *Thru Vol. 39* | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|
| *009436* | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| *009444* | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| *009445* | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| *009446* | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009456* | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *009458* *Vol. 42* *Thru Vol. 41* | 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| *009841* | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| *009901* | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| *009905* | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| *009908* | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| *009912* | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.      Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023          Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
      Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF." *See, e.g.,* Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.,* Morris Dec. Exhibit 2 ¶4.

      25.    Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

      26.    On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

      27.    On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.**    **Settlement Discussions**

      28.    In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

      29.    In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.    Summary of Settlement Terms

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

9

*See generally* Morris Dec. Exhibit 1.

## **BASIS FOR RELIEF REQUESTED**

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement. Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age*

*Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,*

*Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power*

*Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson*

*Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the

form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such

other relief as is just and proper.

Dated:  December 23, 2020.  **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

**Page A-44**
**003943**

# <u>Exhibit 1</u>

## Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS,** the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS,** in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS,** prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS,** on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS,** Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS,** on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS,** Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

**EXECUTION VERSION**

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**AGREEMENT**

**1.    Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

EXECUTION VERSION

(b)    Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)    Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

EXECUTION VERSION

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

       (d)    Redeemer Appeal.

           (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

**EXECUTION VERSION**

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.     Definitions.

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.     Releases.

**(a)     UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

EXECUTION VERSION

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

          (b)    **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4.     **No Third Party Beneficiaries**.     Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5.     **UBS Covenant Not to Sue.**  Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

> **6.      Agreement Subject to Bankruptcy Court Approval.**

> (a)      The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

> **7.      Representations and Warranties.**

> (a)      Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

> (b)      Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

> (c)      Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

**8.** **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice**. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
            Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
       sarah.tomkowiak@lw.com

**11.    Advice of Counsel.** Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.    Entire Agreement.** This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.    No Party Deemed Drafter.** The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.    Future Cooperation.** The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.    Counterparts.** This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

ı ʀ

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**    **Governing Law; Venue; Attorneys' Fees and Costs.** The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____James P. Seery, Jr._____

Its: _____Authorized Signatory_____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____

Name: _____James P. Seery, Jr_____

Its: _____Authorized Signatory_____

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____

Name: _____James P. Seery, Jr_____

Its: _____Authorized Signatory_____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____

Name: _____James P. Seery, Jr_____

Its: _____Authorized Signatory_____

**STRAND ADVISORS, INC.**

By: _____

Name: _____James P. Seery, Jr._____

Its: _____Authorized Signatory_____

17

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____
Name: John Lantz
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____
Name: William Chandler
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

15

-.

**EXECUTION VERSION**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

## Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

# Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**


SF Chronicle/SFGate/Liz Hafalia


Robert Holmgren


no caption

https://hf.com/warren-hellman/                                                                                      1/2

### Hellman & Friedman Owned a Portion of Grosvenor until 2020

## Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

www.gcmlp.com (http://www.gcmlp.com)

CONTACT (HTTPS://HF.COM/CONTACT/)      INFO@HF.COM (MAILTO:INFO@HF.COM)      LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)      BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)      TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-
&-
FRIEDMAN)

©2021 HELLMAN & FRIEDMAN LLC



CORNER OFFICE

# GCM Grosvenor to Go Public

Julie Segal

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

Farallon was a Significant Borrower for Lehman

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and <mark>Farallon Capital Management</mark>**



| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |



### Transaction Overview

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between <mark>Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon")</mark> secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had an in-line occupancy of 99.5%.

### Lehman Brothers Role

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. <mark>The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.</mark>

◆ <mark>Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield.</mark> The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

LEHMAN BROTHERS                    32

## Mr. Seery Represented Stonehill While at Sidley

**James P. Seery, Jr.**
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
In re:                                                   :   Chapter 11
                                                         :
BLOCKBUSTER INC., *et al.*,                              :   Case No. 10-14997 (BRL)
                                                         :
                          Debtors.                       :   (Jointly Administered)
                                                         :
-------------------------------------------------------- X

### THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!





Investor Communication to Highland Crusader Funds Stakeholders



**Alvarez & Marsal
Management, LLC** 2029 Cen
Park East Suite 2060
Angeles, CA 9

July 6, 2021

### Re: Update & Notice of Distribution

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC


By: _____

Steven Varner
Managing Director



**Alvarez & Marsal CRF
Management, LLC** 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

EXHIBIT
C

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million.  Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021.  Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____
      Steven Varner
      Managing Director

**On investor letterhead, please use the template below to provide Alvarez & Marsal CRF Management, LLC and SEI your updated wire information.**

| Information Needed | Wire Information Input |
|---|---|
| Investor name (as it reads on monthly statements)<br><br>Fund(s) Invested<br><br>Contact Information (Phone No. and Email)<br><br>Updated Wire Information<br>  • Beneficiary Bank<br>  • Bank Address<br>  • Beneficiary (Account) Name<br>  • ABA/Routing #<br>  • Account #<br>  • SWIFT Code<br><br>International Wires<br>  • Correspondent Bank<br>  • ABA/Routing #<br>  • SWIFT Code | |

Signed By: _____        Date: _____

003973

# EXHIBIT 6

003974

Case 19-34054-sgj11 Doc 3784-01/04/22 Filed Filed 05/28/23 2:22:49 of 29c
Case 3:23-cv-02071-E Document 20135 Filed 12/07/23 Page 53 of 214 PageID 5300
Docket #0023 Date Filed 1/4/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 4, 2022**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| | § |
| Reorganized Debtor. | § |
| | § |
| JAMES DONDERO, | § |
| | § |
| Petitioner, | § |
| | § |
| vs. | § Adversary Proceeding No. 21-03051 |
| | § |
| ALVAREZ & MARSAL CRF MANAGEMENT, | § |
| LLC, and FARALLON CAPITAL | § |
| MANAGEMENT LLC, | § |
| | § |
| Respondents. | § |

---

## <u>MEMORANDUM OPINION AND ORDER GRANTING JAMES DONDERO'S MOTION TO REMAND ADVERSARY PROCEEDING TO STATE COURT, DENYING FEE REIMBURSEMENT REQUEST, AND RELATED RULINGS</u>

1



## I.  Introduction

Before this court is a motion to remand the above-referenced adversary proceeding (the "Removed Proceeding" or, sometimes, the "Rule 202 Proceeding") back to the 95th Judicial District Court of Dallas County, Texas[1] ("Texas State Court"), where it was originally filed.

The Removed Proceeding is what is sometimes referred to, historically, as a request for an "equitable bill of discovery"—that is, *a pre-suit discovery request,* pursuant to Texas Rule of Civil Procedure 202 ("Rule 202").  It was commenced by James Dondero ("Dondero")—the founder and former chief executive officer ("CEO") of Highland Capital Management, L.P. (the "Reorganized Debtor" or "Highland").[2]  It was commenced against Alvarez & Marsal CRF Management, LLC ("Alvarez") and Farallon Capital Management LLC ("Farallon").

As further explained below, Dondero seeks discovery from Alvarez and Farallon regarding certain *claims-trading* that occurred shortly after the Chapter 11 plan was confirmed in the Highland bankruptcy case.  Alvarez and Farallon removed the Rule 202 Proceeding to this court, pursuant to 28 U.S.C. § 1452(a)—asserting that it is "related to" the Highland bankruptcy case, as contemplated by 28 U.S.C. § 1334(b).  Dondero argues in his motion to remand that a *pre-suit discovery mechanism under Rule 202* is not a "claim" or "cause of action" in a "civil action" that is subject to removal under 28 U.S.C. § 1452(a)—specifically, he urges that there is no actual, live case or controversy yet.

---

[1] Cause No. DC-21-09534.

[2] Dondero no longer controls Highland, as a result of a new corporate governance structure negotiated with the unsecured creditors committee and approved by the bankruptcy court during the bankruptcy case.

003976

The court heard oral arguments on the motion to remand[3] on October 12, 2021 and took the matter under advisement. The court now rules that—in spite of the apparent relatedness to the Highland bankruptcy case—the Rule 202 Proceeding is not removable and the motion to remand must be granted. This shall constitute the court's findings of fact and conclusions of law regarding the same.

## II. Relevant Facts.

Highland filed a voluntary Chapter 11 bankruptcy petition on October 16, 2019. The bankruptcy case has been extremely contentious. After numerous skirmishes, global mediation, major settlements, and more skirmishes, the bankruptcy court confirmed a Chapter 11 plan on February 22, 2021. The plan was supported by the Official Committee of Unsecured Creditors ("UCC") and an overwhelming dollar amount of creditors. Dondero (again, founder and former CEO of Highland), and certain entities related to him, objected to the plan. Their objections were overruled, and they have appealed the Confirmation Order. There was no stay pending appeal, and the plan went effective on August 11, 2021. DE # 2700.

The UCC members in the bankruptcy case originally consisted of: (i) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), (ii) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (collectively, "Acis"), (iii) UBS Securities LLC and UBS AG London Branch (collectively, "UBS"), and (iv) Meta-E Discovery LLC.

---

[3] *See* DE # 4 in the RP as well as the Objection, Response, and Reply at DE ## 11, 14 & 16 in the RP. Note: all references herein to "DE # ___" shall refer to the docket entry number at which a pleading appears in the docket maintained in the Highland main bankruptcy case. All references to "DE # ___ in the RP" refer to the docket entry number at which a pleading appears in the docket maintained in the Removed Proceeding.

003977

After confirmation, but prior to the effective date of the plan, certain UCC members sold their proofs of claim that they filed in the bankruptcy case (which claims had at one time been objected-to but were later compromised after mediation). Specifically, on April 16, 2021, UCC member Acis filed certain notices indicating that it had transferred its proofs of claims in the bankruptcy case to an entity known as **Muck Holdings, LLC.** DE ## 2211, 2212, & 2215. On April 30, 2021, another UCC member, the Redeemer Committee, filed certain notices[4] that it had transferred its proofs of claims in the bankruptcy case to an entity known as **Jessup Holdings, LLC**. DE ## 2261 & 2262. The U.S. Trustee later filed a notice with the bankruptcy court on June 25, 2021 indicating that Acis and the Redeemer Committee had resigned their positions on the UCC[5] (note that the UCC was still in place—albeit in a post-confirmation phase of the case—since the effective date of the plan had not yet occurred). DE # 2485. Finally, on August 9, 2021, another UCC member, UBS, filed certain notices that it had transferred a **portion** of its proofs of claims in the bankruptcy case to **Muck Holdings, LLC.** DE ## 2697 & 2698. All transfers of the above-mentioned claims were done without the need for bankruptcy court approval. *See* Fed. R. Bankr. Proc. 3001(e)(2) (merely requiring a notice and evidence of any transfer of a proof of claim to be filed by the transferee and 21-days' notice to be given to the **transferor;** the **transferor** shall have 21 days to object or else the transferee shall be substituted as the claimant in place of the transferor; if the **transferor** files an objection, the court will hold a hearing on notice and enter an appropriate order).

---

[4] One of the notices is actually for a $50,000 proof of claim filed by Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd.

[5] The Notice does not indicate on what date they resigned.

003978

Dondero filed the Removed Proceeding wanting pre-suit discovery from Alvarez and Farallon regarding these transfers of claims. Why Alvarez and Farallon?

***Farallon*** is an investment fund which is affiliated with ***Muck Holdings***, the entity that purchased the claims of Acis and UBS. Muck Holdings also purchased proofs of claim from other creditors who were not UCC members during the same time frame.[6]

***Alvarez*** acts as the current investment manager to the ***Highland Crusader Funds***,[7] which, again, sold their proofs of claim to ***Jessup Holdings***. Alvarez and Farallon assert that they have no affiliation with Jessup Holdings, although Dondero has asserted that Jessup Holdings is related to Farallon.

In the Rule 202 Proceeding filed by Dondero, he seeks an order directing corporate representatives of Farallon and Alvarez to sit for depositions and, also, to produce certain documents. Dondero seeks to investigate the sale of the proofs of claim by the Redeemer Committee through its investment manager, Alvarez, as well as the sale of other proofs of claim to Jessup Holdings or Muck Holdings.

In the Rule 202 Proceeding, Dondero alleges that something was "highly irregular" with regard to the claims-trading set forth above (including possible torts, such as breaches of fiduciary duties by UCC members). Further, in the Rule 202 Proceeding, Dondero states that James Seery (the man who replaced him as Highland's CEO during the bankruptcy case, and is now the

---

[6] The proofs of claim include those of : (i) Harbour Vest 2017 Global Fund, LP., HarbourVest 2017 Global AIF LP., HarbourVest Dover Street IX Investment, LP., HV International VIII Secondary LP., HarbourVest Skew Base AIF LP., and HarbourVest Partners, LP (collectively, "HarbourVest"); and (ii) Josh Terry (the current owner of Acis who purchased his equity through initiating and prosecuting the involuntary bankruptcy of Acis filed in 2018, while Acis was under Highland and Dondero's control).

[7] Highland previously managed the Highland Crusader Funds. Dondero represents that he personally is an investor in the Highland Crusader Funds.

003979

Claimant Trustee of the post-confirmation Claimant Trust created under the confirmed plan) has

an "age-old connection to Farallon" and was the catalyst behind the sale of the proofs of claim, to

benefit himself through the sales (*e.g.,* Seery allegedly wanted creditors who were friendly to him

and Farallon is allegedly friendly to him).[8] It appears that Dondero may be seeking discovery as a

means to craft a lawsuit against Seery (as well as Farallon and Alvarez)—despite being previously

sanctioned, along with related parties,[9] by this court when he attempted to add Seery to a lawsuit

filed in the United States District Court for the Northern District of Texas in violation of this

court's prior gatekeeping orders.[10] The gatekeeping orders prevent Seery from being sued for his

actions taken in the bankruptcy case, in his role as CEO and CRO of the Highland, without the

bankruptcy court first finding that the claims sought to be brought against him are colorable.

Disturbingly, Seery again appears to be at the center of Dondero's allegations of wrongful acts, as

his name appears nine times in the petition that commenced the Rule 202 Proceeding.

The Rule 202 Proceeding was removed by the Defendants pursuant to 28 U.S.C. § 1452

and Dondero promptly filed a motion for remand back to the state court. The relevant case law

suggests that this court must engage in a two-part analysis in deciding the motion for remand.

---

[8] The Rule 202 Petition even alleges that Seery may have violated the "Registered Investment Advisor Act 15 U.S.C. § 80b-1 et seq., among other things" in connection with Farallon's purchase of claims, supposedly because he had material non-public information at the time that he recommended that Farallon purchase such claims. Verified Petition to Take Deposition Before Suit and Seek Document, Appendix to Notice of Removal, Exhibit 1 at ¶ 23, DE # 1 in the RP. The Rule 202 Petition also alleges that "there is reason to doubt" that Alvarez sought or obtained the highest price for the sale of its claims which "would have injured Dondero as an investor in the Crusader Funds." *Id.* ¶ 24. Finally, the Rule 202 Petition contends that certain non-parties failed to "obtain[] Court approval to sell their respective claims." *Id.* ¶ 18. As noted above, no court approval was necessary under Fed. R. Bankr. Proc. 3001(e)(2)—something of which a typical state court judge (without bankruptcy law expertise) might be unaware.

[9] Along with Dondero, this court found Charitable DAF Fund, L.P., CLO Holdco, Ltd., Mark Patrick, and Sbaiti & Company, PLLC (the same firm that filed the Removed Proceeding) in contempt of court for violating gatekeeper orders in the bankruptcy case.

[10] Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Bankruptcy Case No. 19-34054, DE # 339; Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Bankruptcy Case No. 19-34054, DE # 854.

003980

First, this court must decide whether a proceeding under Rule 202 is a "claim" or "cause of action" in a "civil action," as contemplated by 28 U.S.C. § 1452. Further, assuming it is, the bankruptcy court must determine whether the court has subject matter jurisdiction over the Rule 202 Proceeding as either "related to," "arising in," or "arising under" the Bankruptcy Code pursuant to 28 U.S.C. § 1334(b).

Guided by the case law described below, the bankruptcy court holds that the Rule 202 Proceeding is not choate enough to be a "claim" or "cause of action" in a "civil action." It is also not choate enough for bankruptcy subject matter jurisdiction to exist. While this court has grave concerns about the ultimate direction the Rule 202 Proceeding might be leading (as further explained below), the motion for remand must be **granted**.

### III. Bankruptcy Removal Pursuant to 28 U.S.C. § 1452

Removal of the Rule 202 Proceeding was effectuated under 28 U.S.C. § 1452 by Alvarez and Farallon. The language under Section 1452(a) provides:

> A party may remove any **claim** or **cause of action** in a **civil action** other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has **jurisdiction** of such claim or cause of action **under section 1334** of this title.

28 U.S.C. § 1452(a) (emphasis added). Thus, to properly effectuate removal under this statute, there must be a **claim** or **cause of action** in a **civil action** over which there would be bankruptcy subject matter jurisdiction, pursuant to 28 U.S.C. § 1334—which, in turn, provides that there will be bankruptcy subject matter jurisdiction over "*civil proceedings arising under* title 11 or *arising in* or *related to* a case under title 11." 28 U.S.C. § 1334(b). Alvarez and Farallon argue that the Rule 202 Proceeding most definitely is "related to" the Highland bankruptcy case, as it

003981

directly impacts the administration of the bankruptcy case and estate and implicates orders of the

bankruptcy court.  Alvarez and Farallon also argue that the Rule 202 Proceeding is a "core"

matter pursuant to 28 U.S.C. § 157(b)(2)(A) & (O).

Dondero stresses that this court's removal jurisdiction is limited to "claims" or "causes of

action" that are part of a "civil action." He argues that, since a petition brought under Rule 202 is

simply a pre-suit discovery mechanism and not a stand-alone cause of action seeking remedies, it

is not a "civil action" subject to removal. He also states that there is no ripe controversy. As

such, he argues that the bankruptcy court lacks subject matter jurisdiction over the Rule 202

Proceeding and remand is therefore mandatory.

## IV.   Whether a Texas Rule 202 Proceeding is a Removable "Claim" or "Cause of Action" in a "Civil Action"

So what exactly is a Rule 202 proceeding? What is its nature? Is it something that can be

removed or not?

As for its nature, Rule 202 is a discovery tool that was added to the Texas Rules of Civil

Procedure in the year 1999 and is a combination of two earlier rules (former Tex. R. Civ. Pro.

183—allowing for a deposition to perpetrate testimony—and former Tex. R. Civ. Pro. 737—the

equitable bill of discovery).[11]  Specifically, Texas Rule 202.1 permits a petitioner to seek a state

court order permitting it to conduct pre-litigation depositions to investigate potential claims.  It is

phrased as follows:

> 202.1 Generally. A person may petition the court for an order authorizing the taking
> of a deposition on oral examination or written questions either:

---

[11] For a good historical description of its origin, *see In re Does* 1-10, 242 S.W.3d 805, 816 (Tex. App.—Texarkana 2007).  *See also* JEFFREY LIANG, REVERSE ERIE AND TEXAS RULE 202:  FEDERAL IMPLICATIONS OF TEXAS PRE-SUIT DISCOVERY, 89 TEX. L. REV. 1491, 1493 (2011) (mentioning Texas is the only state granting such broad pre-suit discovery powers to investigate a potential claim, even when said claim is "highly speculative").

003982

(a) to perpetuate or obtain the person's own testimony or that of any other person for use in an anticipated suit; or

(b) to investigate a potential claim or suit.

Thus, subsection (a) essentially contemplates that if a witness is expected to become unavailable due to such things as death or leaving a jurisdiction, and there is an *anticipated suit* on the horizon, a person might seek to take discovery before the anticipated lawsuit is even filed, utilizing this rule. Alternatively, pursuant to subsection (b), a person may even seek pre-suit discovery to investigate whether a legal action *might be warranted*. It appears to be this latter situation that is motivating Dondero's Rule 202 Proceeding.

The case law regarding removal of a Rule 202 petition in a *bankruptcy* context (*i.e.*, pursuant to 28 U.S.C. § 1452) is almost non-existent. Perhaps this is because the scenario before this court rarely presents itself. Instead, a person seeking pre-suit discovery might file a motion to take a Bankruptcy Rule 2004 examination.[12] Or, perhaps a person seeking pre-suit discovery might file a request to take an examination pursuant to Fed. R. Civ. Pro. 27.[13] In any event, the parties here have only cited one relevant opinion in a bankruptcy context (and it happens to be an unpublished opinion). The opinion involved former employees of the bankrupt Enron Corporation, who were wanting to take Rule 202 depositions of representatives of several banks and other third parties regarding what these persons knew and when, pertaining to Enron's business transactions, and to explore whether the former Enron employees might have claims against them.

---

[12] Bankruptcy Rule 2004(a) provides that, on motion of any party in interest, the court may order the examination of any entity. Bankruptcy Rule 2004(b) elaborates that the scope of any such examination may relate to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate," among other things. Fed. R. Bankr. Pro. 2004(a) & (b). Bankruptcy Rule 2004 is arguably a much broader rule than Texas Rule 202.

[13] Federal Rule 27 (applicable in bankruptcy cases, pursuant to Fed. R. Bankr. Pro. 7027) permits a person who wants to perpetuate testimony to file a verified petition asking permission to depose a named person if the petitioner expects to be a party to an action but cannot presently bring it or cause it to be brought." Fed. R. Civ. Pro. 27(a). Rule 27 actually appears to be narrower than Texas Rule 27.

9

*In re Enron Corporation Securities*, MDL-1446, Civil Action No. H-01-3624 Consolidated Cases, Civil Action No. H-02-3193, DE # 1106 (S.D. Tex. Oct. 23, 2002). The Enron employees had filed their Rule 202 petition in a Harris County, Texas (Houston) state court. The targets of the desired discovery removed the Rule 202 petition to the federal district court in the Southern District of Texas—citing several statutes, including 28 U.S.C. §§ 1331, 1334, 1441 and 1452. The District Judge (Melinda Harmon) stated that "[b]oth Texas and federal district courts have held that a Rule 202 request is an ancillary proceeding, not a separate civil suit, and not appropriate for removal." *Id.* at p. 3 (citing numerous cases involving removal pursuant to 28 U.S.C. §§ 1441 and 1442). Judge Harmon's comments regarding Rule 202 petitions were actually *dicta*, since the issue before the court was whether to **consolidate** the removed Rule 202 petition with other seemingly related litigation (*i.e.*, certain securities and ERISA litigation involving some of the same persons/entities that were named in the Rule 202 petition), and another District Judge (Sim Lake) had a pending motion for remand before him. But Judge Harmon essentially denied the motion to consolidate, assuming that Judge Lake would ultimately remand the Rule 202 petition. After citing the various cases that had held that a Rule 202 petition is not a "civil action," she then held: "[B]ecause Petitioners seek pre-suit depositions only to determine whether they may have any claims against Respondents prior to consideration of whether to file a civil action, this Court finds that this proceeding is too inchoate, premature, and attenuated to 'conceivably affect' Enron Corporation's bankruptcy and thus provide the court with 'related to' jurisdiction, although if it leads to a civil suit that may be 'related to' Enron's bankruptcy, the issue may be raised in that action." *Id.* at p. 5.

Outside of the bankruptcy context, several federal district courts and magistrates have examined removal and remand of Rule 202 petitions, pursuant to 28 U.S.C. § 1441. Section 1441

is, of course, the general federal removal statute constructed to enable parties to remove an action from state court to federal court if such federal court would have jurisdiction over the matter. Section 1441(a) provides the following language:

> Except as otherwise expressly provided by Act of Congress, **_any civil action_** brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

The key term to be interpreted in both Sections 1441 and 1452 is "civil action"—although Section 1452 speaks in terms of removal of any **_claim_** or **_cause of action_** in a **_civil action_** (in other words, with bankruptcy removal, one may remove subparts or portions of a civil action, as opposed to the whole civil action). In any event, both statutes are similar in requiring a state court matter to be a "civil action" in order for it to be properly removed to federal court. However, neither statute provides a definition of a "civil action."

Almost all of the Texas federal courts that have examined the issue have determined that a petition under Rule 202 is not a "civil action" as contemplated by Section 1441 and, thus, removal is improper and remand is proper. Some of the cases have focused on whether a Rule 202 petition is a "civil action" (usually finding it is not) and some have focused more on the "federal subject matter jurisdiction" prong (again, usually finding no federal subject matter jurisdiction when there is not even an actual claim or cause of action articulated yet to evaluate). The cases that have opined that a Rule 202 petition is not removable as a civil action include the following: _In re Enable Commerce, Inc.,_ 256 F.R.D. 527, 533 (N.D. Tex. 2009) (involving removal of a Rule 202 petition based on diversity jurisdiction; in remanding, Judge Fitzwater first noted that "[t]he majority of Texas courts that have considered whether a Rule 202 proceeding is removable have held that it is not" (citing various cases); the court thereafter determined that remand was appropriate because

003985

the party seeking discovery did not allege a claim that was likely greater than $75,000 and the removing party had not adduced facts that satisfied the minimum jurisdictional amount for federal jurisdiction; Judge Fitzwater noted that this was a problem with removal of Rule 202 proceedings—since a claim has technically not been asserted yet, the minimum threshold for diversity cannot be met); *Linzy v. Cedar Hill Indep. Sch. Dist.*, 2001 U.S. Dist. LEXIS 11845, \*5 (N.D. Tex. Aug. 8, 2001) (Magistrate Judge Sanderson holding that a Rule 202 petition is not a "civil action" for purposes of establishing claims subject to removal and remanding the same for lack of subject matter jurisdiction; the context was a motion for summary judgment in a civil rights lawsuit brought pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and also pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction); the plaintiff in the civil rights lawsuit had argued that a Rule 202 investigatory proceeding that his child's school district had previously filed against him was malicious prosecution; in evaluating the nature of a Rule 202 proceeding, Judge Sanderson stated: "Notwithstanding Plaintiff's characterization of the Rule 202 proceeding as a lawsuit, it is clear under Texas state law that such a proceeding does not constitute a civil proceeding brought against Plaintiff, and thus there is no genuine issue of fact from which a jury could find that [any member of the school district] instituted a civil action against him. Thus, no malicious prosecution and summary judgment will be granted in their favor"), *aff'd on other grounds,* 37 Fed. Appx. 90, 2002 WL 1021883, at \*2 (5th Cir. May 9, 2002) ("We affirm the dismissal of Linzy's malicious prosecution claim because the state court granted [the] Rule 202 petition . . . We need not decide whether Texas courts would characterize a Rule 202 petition as a 'proceeding' that can form the basis of a wrongful prosecution action."); *Mayfield-George v. Texas Rehabilitation Comm'n,* 197 F.R.D. 280, 283 (N.D. Tex. 2000) (Judge Kendall) (a Rule 202 petition sought depositions of respondents' employees to investigate whether petitioners could

12

003986

bring causes of action against Respondents under the Texas Tort Claims Act, 28 U.S.C. § 1983, Titles VII and IX of the Civil Rights Act of 1964, and Title II of the Americans with Disabilities Act; respondents removed the Rule 202 petition to the federal district court pursuant to 28 U.S.C. § 1441(b) and petitioners sought remand; the court held "the Petition is not a 'civil action' under § 1441(b) because it asserts no claim or cause of action upon which relief can be granted. . . . It is merely a petition for an order authorizing the taking of a deposition for use in an anticipated suit, maybe with federal question jurisdiction, maybe not"); *Sawyer v. E.I. du Pont de Nemours & Co.,* No. CIV.A. 06-1420, 2006 WL 1804614, *2 (S.D. Tex. June 28, 2006) (in a motion for remand context, the court agreed with various cited decisions holding that a Texas Rule 202 proceeding ordinarily is not a removable "civil action" over which the federal courts have jurisdiction, noting that the Rule 202 petition "is simply a request for discovery that may or may not eventually lead to federal claims over which this Court would have subject matter jurisdiction, and it therefore belongs where it was filed—in state court"); *Davidson v. S. Farm Bureau Cas. Ins. Co.*, No. H-05-03607, 2006 WL 1716075 (S.D. Tex. 2006) (this case arose from Ms. Davidson's claims for insurance benefits following an automobile accident involving an underinsured motorist; after coverage was denied, she filed a Rule 202 petition in state court, seeking discovery from the insurance company and the insurance adjuster to determine what, if any, claims Davidson may have had arising out of the accident and the denial of her insurance claim; after removal by the discovery targets, pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441—asserting that the amount in controversy requirement was satisfied because, although Davidson's Rule 202 petition had made no claim for any specific monetary amount, a letter from Davidson's counsel had previously demanded the "available limits" of the underinsured motorist policy, which totaled over $75,000— and on a subsequent motion for remand by Ms. Davidson, the court held that removal of the

petition to federal court was improper, and that remand to state court was required: "Because this Court concludes that a petition for discovery under Rule 202 does not constitute the filing of a civil lawsuit, the Court joins others within this district, which have held that a Rule 202 petition is not a 'civil action' removable under 28 U.S.C. § 1441. . . . Alternatively, even if a petition for discovery under Rule 202 were removable to federal court, the Court cannot conclude that it has subject matter jurisdiction over the instant petition, because the parties lack complete diversity."); *McCrary v. Kansas City S. R.R.*, 121 F. Supp. 2d 566, 569 (E.D. Tex. 2000) ("Rule 202 Requests are not generally removable under § 1441," but notes at footnote 4 that: "The court makes no determination of whether Rule 202 Requests are removable pursuant to other federal statutes such as the All Writs Act, 28 U.S.C. § 1651.").

On the opposite side, there are four cases cited by Alvarez and Farallon in which federal district courts determined that an action under Rule 202 *is* a "civil action" which can be removed. The primary case is *In re Texas*, 110 F. Supp. 2d 514, 519 (E.D. Tex. 2000), *rev'd on other grounds*, 259 F.3d 387 (5th Cir. 2001). *In re Texas* contains a compelling analysis but, ultimately, this court does not find it to be very helpful—particularly because of certain words of the Fifth Circuit on appeal (although the Fifth Circuit did not specifically rule on the "civil action" question). The other three cases cited by Alvarez and Farallon appear to be anomalies, for reasons that will be explained below. *Cong v. ConocoPhillips Co.*, 2016 WL 6603244 (S.D. Tex. 2016) (Judge Lynn Hughes); *Advanced Orthopedic Designs, L.L.C. v. Shinseki*, 886 F. Supp. 2d 546, 552–53 (W.D. Tex. 2012); *Page v. Liberty Life Assur. Co. of Bos.*, 2006 WL 2828820, at *1–3 (N.D. Tex. Oct. 3, 2006) (Judge McBryde).

*In re Texas* involved a Rule 202 petition that was filed after the much-publicized federal lawsuit that the former Texas Attorney General filed against the tobacco industry to hold them

003988

accountable for the deaths and sickness of thousands of Texans, attributable to cigarettes. The former Attorney General had hired various lawyers in the private sector ("Private Counsel") to file the lawsuit (the "Tobacco Litigation"). During the 22 months that followed, the Tobacco Litigation generated nineteen hundred docket entries, including thousands of pages of briefing. Approximately 23 million documents were produced; hundreds of depositions were taken; 50,000 exhibits were listed; and 1,500 witnesses were designated. Four hundred seventy-two motions were filed, and 21 hearings were conducted. The State and the Tobacco Industry defendants ultimately achieved a settlement before trial. The settlement called for the State to dismiss its claims against the Tobacco Industry in exchange for $15.3 billion. The terms of the settlement were memorialized in the Comprehensive Settlement and Release ("CSA"). Finalization of the CSA was made contingent upon the federal district court's approval. The federal court ultimately entered a final judgment in the Tobacco Litigation and adopted and incorporated the CSA as an enforceable order. The approval order stated, among other things:

> It is [ ] ordered that this Court shall have exclusive jurisdiction over the provisions of the Comprehensive Settlement Agreement and Release, this Order[,] and the Final Judgment. Agreement and Release, this Order[,] and the Final Judgment. All persons in privity with the parties, including all persons represented by the parties, who seek to raise any objections or challenges in any forum to any provision of this Judgment are hereby enjoined from proceeding in any other state or federal court.

*In re Texas*, 110 F. Supp. 2d at 515-516. Later, Private Counsel submitted a motion for approval of their attorneys' fees and the federal court entered a memorandum opinion and order which concluded that the amount of attorneys' fees that Private Counsel was due under the engagement agreement with the State of Texas—about $2.3 billion—was reasonable.

Suffice it to say there were many disputes in the federal district court regarding this matter for some time. Certain representatives of the State of Texas thought the former Attorney General

003989

had exceeded his authority in making his deal with Private Counsel. In the midst of all of these disputes, the State (through certain members of the Texas legislature and the Governor intervening) filed a Rule 202 petition in state court (*i.e.,* the district court of Harris County, Texas). The Rule 202 petition moved the state district court to allow the State to "investigate potential claims it believes it may possess for conversion and breach of fiduciary duty" against Private Counsel.  Specifically, the State sought to depose Private Counsel as to such things as whether the parties to the engagement agreement engaged in the improper exchange of consideration so that Private Counsel could obtain the contract; whether Private Counsel knew or should have known that the engagement agreement was unenforceable; and whether Private Counsel used the relationship to benefit their own personal interests to the detriment of the State.  Not surprisingly, Private Counsel removed the state court proceeding to the federal district court,  contending that the court that had presided over the Tobacco Litigation had jurisdiction over the State's Rule 202 petition because (1) the petition raised a question of federal law and was therefore removable pursuant to 28 U.S.C. § 1441; (2) the matters raised in the petition were ancillary and supplemental to the Tobacco Litigation and the court's orders entered therein; and (3) the petition implicated the orders of the court in the Tobacco Litigation and was therefore subject to removal under the All Writs Act, 28 U.S.C. § 1651.  Soon thereafter, the State filed a motion to remand, arguing, among other things, that the federal district court lacked jurisdiction over the Rule 202 proceeding because the proceeding was not a "civil action"—it lacked the characteristics of a "full-blown lawsuit."

The federal district court (Judge Folsom) issued a very well-reasoned opinion, noting among other things, that "civil action" was not defined in the statute, parsing through various other statutes in Title 28, and opined that the term "civil action" might be meant ***not*** to define a civil proceeding with a certain level of involvement, but instead ***to distinguish civil proceedings from***

003990

*criminal ones*. Since the statute is less-than-definitive on the question of what is a civil action, the court turned to certain legislative history and case law, dating back to the nineteenth century. The court ultimately concluded that a Rule 202 proceeding is a "civil action" because it possesses all the elements of a judicial proceeding: there is a controversy between parties; there are pleadings; relief is sought (the petitioner prays for a court order authorizing the taking of depositions); a judicial determination is required—specifically, whether authorizing depositions may prevent injustice or, on balance, will not be unduly burdensome; and both parties will be required to adhere to the state court's orders. The district court also held that it had federal subject matter jurisdiction pursuant to the All Writs Act. The district court denied the motion for remand.

The Fifth Circuit reversed on appeal, focusing on the exercise of federal subject matter jurisdiction pursuant to the All Writs Act: "We find no basis in this case for removal jurisdiction under the All Writs Act. We further conclude that the Texas Rule 202 discovery proceeding presents a premature basis for asserting the district court's jurisdiction to protect the settlement agreement. We therefore reverse with instructions to remand this action to the state court from whence it came." *Texas v. Real Parties in Interest*, 259 F.3d 387, 388-89 (5th Cir. 2001). While the Fifth Circuit focused primarily on the All Writs Act, its language in doing so hints at its overall view of the removability of Rule 202 proceedings:

> Even accepting the remote proposition that removal still can be proper under the All Writs Act in the face of "extraordinary circumstances," and further accepting that the procedural requirements for removal under § 1441 pose no barrier to the use of the All Writs Act to bring a state court matter into federal court, the Rule 202 proceeding in this case clearly does not present such facts or circumstances. ***The proceeding is only an investigatory tool***. Both the State and Private Counsel can only speculate as to the eventual outcome of the probe. This pending state court action over which the district court exercised § 1651 jurisdiction ultimately may or may not pose an actual threat to the federal tobacco settlement. The investigation could lead to no further action, or it could result in a cause of action not contemplated or covered by the settlement agreement; or, indeed, it may

17

003991

lead to the institution of a cause of action for which the invocation of, at least, the injunctive powers of the All Writs Act would be timely and appropriate. In any event, the federal courts cannot preclude the State of Texas from investigating potential claims in the milieu of the Texas courts—pursuant to Texas law—unless and until such investigation poses an actual threat to the settlement agreement. Private Counsel's claim that such a threat exists is premature.

*Id.* at 394-95 (emphasis added).  Bottom line, while the Fifth Circuit reversed on the basis of improper utilization of the All Writs Act, it still seemed to echo the theme of most federal district courts that have held that a Rule 202 proceeding is "only an investigatory tool" and is simply too inchoate to constitute a removable cause of action.

As the court indicated earlier, three other cases cited by Alvarez and Farallon as supportive of their position seem to be anomalies: *Cong v. ConocoPhillips Co.*, 2016 WL 6603244 (S.D. Tex. 2016) (in a two-page opinion, Judge Lynn Hughes denied remand of a Rule 202 proceeding that had been filed by 167 Chinese fishermen against ConocoPhillips pertaining to an oil leak that occurred in China's Bohai Bay; not only did the court consider the motion for remand untimely, but the discovery also seemed related to an already-pending matter in federal court and implicated federal maritime law and no Texas law); *Page v. Liberty Life Assur. Co. of Bos.*, 2006 WL 2828820, at *1–3 (N.D. Tex. 2006) (Judge McBryde first ruled that a Rule 202 Proceeding is a removable civil action, citing the *In re Texas* district court opinion, but the court nevertheless granted remand, concluding that the discovery target did not carry its burden to demonstrate that the petitioner's potential cause of action (that was ERISA-related) was subject to the complete federal preemption doctrine so as to potentially justify removal); *Advanced Orthopedic Designs, L.L.C. v. Shinseki*, 886 F. Supp. 2d 546, 552–53 (W.D. Tex. 2012) (dealt with removal under section 1442, not section 1441, which pertains to removal when a federal agency or federal officer is involved as defendant/target; on **November 9, 2011** there was an **amendment** to 28 U.S.C. § 1442 which provided that the term "civil action" includes "any proceeding (whether or not

18

003992

ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a

subpoena for testimony or documents is sought or issued"; in light of this amendment, the

magistrate judge rejected the petitioner's argument that a petition for pre-suit discovery sought in

state court pursuant to Rule 202 is not removable, where a federal agency or officer is the target).

## V.    Conclusion

This court is obviously duty-bound to follow the law. The vast majority of the reported

case law dealing with motions to remand Rule 202 petitions holds that removal of these petitions

to federal courts is not proper and, thus, remand is required. There is one compelling opinion to

the contrary (*In re Texas*), and the Fifth Circuit ultimately reversed the opinion—although focusing

more on the federal subject matter conundrum than the question of whether a Rule 202 proceeding

is a "civil action" subject to removal. As indicated earlier, these removal/remand situations require

a two-prong analysis: (a) is a Rule 202 proceeding a "civil action"? (the majority of courts hold

no); and (b) assuming it is a "civil action," would there be federal subject matter jurisdiction in the

federal courts? (again, the majority of courts hold no). The vexing part of the analysis is that often,

the courts have focused less on the "civil action" prong and ultimately more on the "subject matter

jurisdiction" prong—determining no subject matter jurisdiction exists because no federal cause of

action has clearly been articulated yet. And in these holdings, there is a strong theme of federalism.

As Judge Fitzwater noted in the *Enable Commerce* case, [f]ederal courts are courts of limited

jurisdiction." *Enable Commerce, Inc.*, 256 F.R.D. at 533 (citing *Howery v. Allstate Ins. Co.*, 243

F.3d 912, 916 (5th Cir.2001)). A federal court "must presume that a suit lies outside [its] limited

jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal

forum." *Id.* "The federal removal statute, 28 U.S.C. § 1441 (1997), is subject to strict construction"

and "implicates important federalism concerns." *Id.* (citing *Frank v. Bear Stearns & Co.*, 128 F.3d

919, 922 (5th Cir.1997)). "The removing party bears the burden of establishing that federal jurisdiction exists." *Id.* (citing *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995)). "[D]oubts about whether removal jurisdiction is proper should be resolved against federal jurisdiction." *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir.2000) (citing Willy v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir.1988)).

The vexing part of all this is that, as noted earlier, ***only one of the cases cited by the parties herein involved a bankruptcy case (Enron) where there might have been "related to" jurisdiction pursuant to 28 U.S.C. § 1334***. The court in *Enron* nevertheless thought remand was always appropriate with regard to Rule 202 petitions. This court has some doubt whether the reasoning of all the numerous non-bankruptcy-context removal cases cited herein should apply with regard to ***bankruptcy*** removals—since 28 U.S.C. § 1334(b) grants much broader subject matter jurisdiction than either 28 U.S.C. §§ 1331 or 1332 (*i.e.,* 28 U.S.C. § 1334(b) contemplates "related to" jurisdiction, not merely "arising under" jurisdiction).[14] Does a removal pursuant to 28 U.S.C. § 1452 implicate the same federalism concerns as a removal pursuant to 28 U.S.C. § 1441— given the breadth of section 1334(b)'s "related to" jurisdiction? This court has some doubts. However, as cited above, the Fifth Circuit has generally instructed that "[a]ny doubts as to the Court's subject matter jurisdiction should be resolved by remanding the case to state court. *Acuna*, 200 F.3d at 339.

In summary, while remand appears to be the correct result under the law, it is done here with grave misgivings. The Highland bankruptcy case has been pending more than two years.

---

[14] On the other hand, it should be noted here that "related to" bankruptcy subject matter jurisdiction is more ***limited*** in a post-confirmation context. The Fifth Circuit has stated that, in order for ***post-confirmation*** bankruptcy subject matter jurisdiction to exist, the dispute must bear on the interpretation, execution, or implementation of a confirmed plan. *E.g., Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.),* 266 F.3d 388, 390-91 (5th Cir. 2001).

003994

There are 3,100+ docket entries in the main bankruptcy case—which doesn't include the 17 adversary proceedings that have been filed so far (nor the countless appeals). This court is not only familiar with the facts and parties, but there is a mechanism in the bankruptcy rules (Fed. R. Bankr. Pro. 2004; *see also* Fed. R. Civ. Pro. 27) to seek pre-suit discovery. This court can relate to the predicament (and obvious frustration) that District Judge Folsom experienced in the Tobacco Litigation described earlier. Moreover, this court is familiar with the concept of claims-trading in bankruptcy (including the fact that, for decades now, since a rule change in the last century, no court approval and order is necessary unless the ***transferor*** objects). This court is also familiar with fiduciary duties of unsecured creditor committees and what may or may not be problematic. Moreover, Dondero's standing in filing the Rule 202 Proceeding would appear to be highly questionable and his motives highly suspect. If judicial efficiency and economy were the only considerations that mattered here, clearly remand would ***not*** be the correct result. In any event, while this court finds that the Rule 202 Proceeding is too inchoate, premature, and attenuated to provide the court with "related to" bankruptcy subject matter jurisdiction, if the Rule 202 Proceeding leads to any civil suit, this may ultimately be "related to" the Highland confirmed plan and the issue may be raised in that civil suit.

All other relief requested is denied.[15]

---

[15] Dondero has requested reimbursement of fees and expenses for having brought his motion to remand. *See* 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."). Central to the determination of whether attorneys' fees should be granted is the propriety of the defendant's decision to remove." *Garcia v. Amfels, Inc.*, 254 F.3d 585, 587 (5th Cir. 2001) (imposing fees and costs on defendants in the absence of persuasive case law). The Fifth Circuit generally holds that defendants will be liable for the fees and costs of improper removal unless their arguments in favor of removal are "objectively reasonable." *Renegade Swish, L.L.C. v. Wright*, 857 F.3d 692, 701 (5th Cir. 2017). Here, the court believes that the arguments of Alvarez and Farallon should be considered "objectively reasonable" since there was a dearth of authority in the bankruptcy context regarding Rule 202 petitions and the Fifth Circuit has not squarely addressed the removability to federal courts of Rule 202 petitions. Thus, the request for fees and expense reimbursement is denied.

**\* \* \* \* END OF MEMORANDUM OPINION AND ORDER \* \* \* \***

003996

| Filing Date | Docket Text |
|---|---|
| 01/04/2022 | 22 (22 pgs) Memorandum of opinion (RE: related document(s)4 Motion for remand filed by Plaintiff James Dondero). Entered on 1/4/2022 (Okafor, Marcey) |

# EXHIBIT 7

CAUSE NO. DC-21-09534

| | § | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| JAMES DONDERO, | § | DALLAS COUNTY, TEXAS |
| | § | |
| Petitioner. | § | 95TH JUDICIAL DISTRICT |
| | § | |

## ORDER

Came on for consideration the *Verified Amended Petition to Take Deposition Before Suit and Seek Documents* ("Petition") filed by petitioner James Dondero ("Dondero"). The Court, having considered the Petition, the responses filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Alvarez & Marsal CRF Management, LLC ("A&M"), the record, and applicable authorities, and having conducted a hearing on the Petition on June 1, 2022, concludes that Dondero's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that Dondero's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this **1** day of June, 2022.

_____
HONORABLE MONICA PURDY

003999

# EXHIBIT 8

004000

Case 19-34054-sgj11   Doc 3784-9   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 26.13   Filed 12/07/23   Page 79 of 214   PageID 3326
Exhibit 13   Page 2 of 23
FILED
1/20/2023 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

DC-23-01004

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | 191st |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner*, | § | |
| | § | **DALLAS COUNTY, TEXAS** |

**PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S
<u>VERIFIED RULE 202 PETITION</u>**

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, Hunter Mountain Investment Trust ("HMIT"), files this Verified

Petition ("Petition") pursuant to Rule 202 of the Texas Rules of Civil Procedure, seeking

pre-suit discovery from Respondent Farallon Capital Management, LLC ("Farallon") and

Respondent Stonehill Capital Management, LLC ("Stonehill") (collectively

"Respondents"), to allow HMIT to investigate potential claims against Respondents and

other potentially adverse entities, and would respectfully show:

**PARTIES**

1.      HMIT is a Delaware statutory trust that was the largest equity holder in

Highland Capital Management, L.P. ("HCM"), holding a 99.5% limited partnership

interest. HCM filed chapter 11 bankruptcy proceedings in 2019 and, as a result of these

1

004001

proceedings,[1] HMIT held a Class 10 claim which, post-confirmation, was converted to a Contingent Trust Interest in HCM's post-reorganization sole limited partner.

2.      Farallon is a Delaware limited liability company with its principal office in California, which is located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

3.      Stonehill is a Delaware limited liability company with its principal office in New York, which is located at 320 Park Avenue, 26th Floor, New York, NY 10022.

## VENUE AND JURISDICTION

4.      Venue is proper in Dallas County, Texas, because all or substantially all of the events or omissions giving rise to HMIT's potential common law claims occurred in Dallas County, Texas. In the event HMIT elects to proceed with a lawsuit against Farallon and Stonehill, venue of such proceedings will be proper in Dallas County, Texas.

5.      This Court has jurisdiction over the subject matter of this Petition pursuant to Texas Rule of Civil Procedure 202.[2] The amount in controversy of any potential claims against Farallon or Stonehill far exceeds this Court's minimum jurisdictional requirements. Without limitation, HMIT specifically seeks to investigate potentially actionable claims for unjust enrichment, imposition of a constructive trust with

---

[1] These proceedings were initially filed in Delaware but were ultimately transferred to and with venue in the U.S. Bankruptcy Court for the Northern District of Texas.

[2] The discovery relief requested in this Petition does not implicate the HCM bankruptcy court's jurisdiction. Furthermore, this Rule 202 Petition is not subject to removal because there is no amount in actual controversy and there is no cause of action currently asserted.

004002

disgorgement, knowing participation in breaches of fiduciary duty, and tortious interference with business expectancies.

6.      This Court has personal jurisdiction over the Respondents from which discovery is sought because both Farallon and Stonehill are doing business in Texas under Texas law including, without limitation, TEX. CIV. PRAC. & REM. CODE §17.042. Consistent with due process, Respondents have established minimum contacts with Texas, and the assertion of personal jurisdiction over Respondents complies with traditional notions of fair play and substantial justice. HMIT's potential claims against Respondents arise from and/or relate to Farallon's and Stonehill's contacts in Texas. Respondents also purposefully availed themselves of the privilege of conducting business activities within Texas, thus invoking the benefits and protections of Texas law.

## SUMMARY

7.      HMIT seeks to investigate potential claims relating to the sale and transfer of large, unsecured creditors' claims in HCM's bankruptcy to special purpose entities affiliated with and/or controlled by Farallon and Stonehill (the "Claims"). Upon information and belief, Farallon and Stonehill historically had and benefited from close relationships with James Seery ("Seery"), who was serving as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") at the time of the Claims purchases. Furthermore, still upon information and belief, because Farallon and Stonehill acquired or controlled the acquisition of the Claims under highly questionable

004003

circumstances. HMIT seeks to investigate whether Respondents received material non-public information and were involved in insider trading in connection with the acquisition of the Claims.

8.  The pre-suit discovery which HMIT seeks is directly relevant to potential claims, and it is clearly appropriate under Rule 202.1(b). HMIT anticipates the institution of a future lawsuit in which it may be a party due to its status as a stakeholder as former equity in HCM or in its current capacity as a Contingent Trust Interest holder, as well as under applicable statutory and common law principles relating to the rights of trust beneficiaries. In this context, HMIT may seek damages on behalf of itself or, alternatively, in a derivative capacity and without limitation, for damages or disgorgement of monies for the benefit of the bankruptcy estate.

9.  HMIT currently anticipates a potential lawsuit against Farallon and Stonehill as defendants and, as such, Farallon and Stonehill have adverse interests to HMIT in connection with the anticipated lawsuit. The addresses and telephone numbers are as follows: **Farallon Capital Management LLC**, One Maritime Plaza, Suite 2100, San Francisco, CA 94111, Telephone: 415-421-2132; **Stonehill Capital Management**, LLC, 320 Park Avenue, 26th Floor, New York, NY 10022, 212-739-7474 . Additionally, the following parties also may be parties with adverse interests in any potential lawsuit: **Muck Holdings LLC**, c/o Crowell & Moring LLP, Attn: Paul B. Haskel, 590 Madison Avenue, New York, NY 10022, 212-530-1823; **Jessup Holdings LLC**, c/o Mandel, Katz and Brosnan

LLP, Attn: John J. Mandler, 100 Dutch Hill Road, Suite 390, Orangeburg, NY 10962, 845-6339-7800.

## BACKGROUND[3]

A.    *Procedural Background*

10.    On or about October 16, 2019, HCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on December 4, 2019.

11.    On October 29, 2019, the U.S. Trustee's office appointed a four-member Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM in the hundreds of millions of dollars; Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London Branch (collectively "UBS") - and an unpaid vendor, Meta-E Discovery.

12.    Following the venue transfer to Texas on December 27, 2019, HCM filed its *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary*

---

[3] All footnote references to evidence involve documents filed in the HCM bankruptcy proceedings and are cited by "Dkt." reference. HMIT asks the Court to take judicial notice of the documents identified by these docket entries.

*Course* ("HCM's Governance Motion").[4] On January 9, 2020, the Court signed an order

approving HCM's Settlement Motion (the "Governance Order").[5]

13.    As part of the Governance Order, an independent board of directors—

which included Seery as one of the UCC's selections—was appointed to the Board of

Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors") HCM's general

partner. Following the approval of the Governance Order, the Board then appointed

Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer

("CRO") in place of the previous CEO.[6]  Seery currently serves as Trustee of the Claimant

Trust (HCM's sole post-reorganization limited partner) and, upon information and belief,

continues to serve as CEO of HCM following the effective date of the HCM bankruptcy

reorganization plan ("Plan").[7]

**B.    *Seery's Relationships with Stonehill and Farallon***

14.    Farallon and Stonehill are two capital management firms (similar to HCM)

that, upon information belief, have long-standing relationships with Seery. Upon

information and belief, they eventually participated in, directed and/or controlled the

acquisition of hundreds of millions of dollars of unsecured Claims in HCM's bankruptcy

on behalf of funds which they manage. It appears they did so without any meaningful

---

[4] Dkt. 281.
[5] Dkt. 339.
[6] Dkt. 854, Order Approving Retention of Seery as CEO/CRO.
[7] *See* Dkt. 1943, Order Approving Plan, p. 34.

6

004006

due diligence, much less reasonable due diligence, and *ostensibly* based their investment decisions only on Seery's input.

15.     Upon information and belief, Seery historically has had a substantial business relationship with Farallon and he previously served as legal counsel to Farallon in other matters. Upon information and belief, Seery also has had a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee[8] (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

C.      *Claims Trading*

16.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of settlements with Redeemer, Acis, UBS, and another major creditor, HarbourVest[9] (the "Settlements") (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed claims:[10]

---

[8] Declaration of John A. Morris [Dkt. 1090], Ex. 1, pp. 15.
[9] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.
[10] Orders Approving Settlements [Dkt. 1273, Dkt. 1302, Dkt. 1788, Dkt. 2389].

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |

17.     Although these Settlements were achieved after years of hard-fought litigation,[11] each of the Settling Parties *curiously* sold their claims to Farallon or Stonehill (or affiliated special purpose entities) shortly after they obtained court approval of their Settlements. One of these "trades" occurred within just a few weeks before the Plan's Effective Date.[12] Upon information and belief, Farallon and Stonehill coordinated and controlled the purchase of these Claims through special purpose entities, Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup") (collectively "SPEs").[13] Upon information and belief, both of these SPEs were created on the eve of the Claims purchases for the ostensible purpose of taking and holding title to the Claims.

18.     Upon information and belief, Farallon and Stonehill directed and controlled the investment of over $160 million dollars to acquire the Claims in the absence of any publicly available information that could rationally justify this substantial investment. These "trades" are even more surprising because, at the time of the confirmation of HCM's Plan, the Plan provided only pessimistic estimates that these Claims would ever receive full satisfaction:

---

[11] Order Confirming Plan, pp. 9-11.
[12] Dkt. 2697, 2698.
[13] *See* Notice of Removal [Dkt 2696], ¶ 4.

004008

    a. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[14]

        i. This meant that Farallon and Stonehill invested more than $163 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

    b. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from *71% to 54%* (down approximately $328.3 million);[15]

    c. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million;[16]

    d. Despite the stark decline in the valuation of the HCM bankruptcy estate and reduction in percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021[17] in the combined amount of approximately $163 million; and

    e. Upon information and belief:

        i. Stonehill, through an SPE, Jessup, acquired the Redeemer Committee's claim for approximately $78 million;[18]

---

[14] Dkt. 1875-1, Plan Supplement, Exh. A, p. 4.

[15] Dkt. 2949.

[16] Dkt 1473, Disclosure Statement, p. 18.

[17] Notices of Transfers [Dkt. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

[18] July 6, 2021 Letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

    ii.   The $23 million Acis claim[19] was sold to Farallon/Muck for approximately $8 million;

    iii.   HarbourVest sold its combined approximately $80 million in claims to Farallon/Muck for approximately $27 million; and

    iv.   UBS sold its combined approximately $125 million in claims for approximately $50 million to both Stonehill/Jessup and Farallon/Muck *at a time when the total projected payout was only approximately $35 million*.

19.    In Q3 2021, just over $6 million of the projected $205 million available to satisfy general unsecured claims was disbursed.[20] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[21] According to HCM's Motion for Exit Financing,[22] and a recent motion filed by Dugaboy Investment Trust,[23] there remain **substantial** assets to be monetized for the benefit of HCM's creditors. Thus, upon information and belief, the funds managed by Stonehill and Farallon stand to realize significant profits on their Claims purchases. In turn, upon information and belief, Stonehill and Farallon will garner (or already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the purchase of the Claims.

---

[19] Seery/HCM have argued that $10 million of the Acis claim is self-funding. Dkt. 1271, Transcript of Hearing on Motions to Compromise Controversy with Acis Capital Management [1087] and the Redeemer Committee of the Highland Crusader Fund [1089], p. 197.

[20] Dkt. 3200.

[21] Dkt. 3582.

[22] Dkt. 2229.

[23] Dkt. 3382.

004010

### D.    *Material Information is Not Disclosed*

20.    Bankruptcy Rule 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." No public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks."[24]

21.    As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction.[25] Approximately 19.1% of HCLOF's assets were comprised of debt and equity in Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). The HCLOF interest was not to be transferred to HCM for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[26]

22.    Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, upon information and belief, it appears that Seery may have acquired material non-public information regarding Amazon's now-consummated interest in acquiring MGM,[27] yet there is no record of Seery's disclosure of such

---

[24] Dkt. 1905, February 3, 2021 Hearing Transcript, 49:5-21.
[25] Dkt. 1625, p. 9, n. 5.
[26] Dkt. 1625.
[27] Dkt. 150-1.

004011

information to the Court, HCM's creditors, or otherwise. Upon the receipt of this material non-public information, HMIT understands, upon information and belief, that MGM was supposed to be placed on HCM's "restricted list," but Seery nonetheless continued to move forward with deals that involved MGM assets.[28]

23.     As HCM additionally held its own direct interest in MGM,[29] the value of MGM was of paramount importance to the value of HCM's bankruptcy estate. HMIT believes, upon information and belief, that Seery conveyed material non-public information regarding MGM to Stonehill and Farallon as inducement to purchase the Claims.

E.     *Seery's Compensation*

24.     Upon information and belief, a component of Seery's compensation is a "success fee" that depends on the actual liquidation of HCM's bankruptcy estate assets versus the Plan projections. As current holders of the largest claims against the HCM estate, Muck and Jessup, the SPEs apparently created and controlled by Stonehill and Farallon, were installed as two of the three members of an Oversight Board in charge of monitoring the activities of HCM, as the Reorganized Debtor, and the Claimant Trust.[30] Thus, along with a single independent restructuring professional, Farallon and

---

[28] *See* Dkt. 1625, Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, filed December 23, 2020
[29] Motion for Exit Financing.[Dkt.2229]
[30] Dkt. 2801.

004012

Stonehill's affiliates oversee Seery's go-forward compensation, including any "success" fee.[31]

## DISCOVERY REQUESTED

25.     HMIT seeks to investigate whether Farallon and Stonehill received material non-public information in connection with, and as inducement for, the negotiation and sale of the claims to Farallon and Stonehill or its affiliated SPEs. Discovery is necessary to confirm or deny these allegations and expose potential abuses and unjust enrichment.

26.     The requested discovery from Farallon is attached as Exhibit "A", and includes the deposition of one or more of its corporate representatives and the production of documents. The requested discovery from Stonehill is attached as Exhibit "B", and includes the deposition of Stonehill's corporate representative(s) and the production of documents.

27.     Pursuant to Rule 202.2(g), the requested discovery will include matters that will allow HMIT to evaluate and determine, among other things:

   a.  The substance and types of information upon which Stonehill and Farallon relied in making their respective decisions to invest in or acquire the Claims;

   b.  Whether Farallon and Stonehill conducted due diligence, and the substance of any due diligence when evaluating the Claims;

---

[31] Claimant Trust Agreement [Dkt. 1656-2].

004013

c.  The extent to which Farallon and Stonehill controlled the SPEs, Muck and Jessup, in connection with the acquisition of the Claims;

d.  The creation and organizational structure of Farallon, Stonehill, Muck, and Jessup, as well as the purpose of creating Muck and Jessup as SPEs to hold the Claims;

e.  Any internal valuations of Muck or Jessup's net asset value (NAV);

f.  Any external valuation or audits of the NAV attributable to the Claims;

g.  Any documents reflecting expected profits from the purchase of the Claims;

h.  All communications between Farallon and Seery concerning the value and purchase of the Claims;

i.  All communications between Stonehill and Seery concerning the value and purchase of the Claims;

j.  All documents reflecting the expected payout on the Claims;

k.  All communications between Farallon or Stonehill and HarbourVest concerning the purchase of the Claims;

l.  All communications between Farallon or Stonehill and Acis regarding the purchase of the Claims;

m.  All communications between Farallon or Stonehill and UBS regarding the purchase of the Claims;

n.  All communications between Farallon or Stonehill and The Redeemer Committee regarding the purchase of the Claims;

o.  All communications between Farallon and Stonehill regarding the purchase of the Claims;

14

004014

p.  All communications between Farallon and Stonehill and investors in their respective funds regarding purchase of the Claims or valuation of the Claims;

q.  All communications between Seery and Stonehill or Farallon regarding Seery's compensation as the Trustee of the Claimant Trust;

r.  All documents relating to, regarding, or reflecting any agreements between Seery and the Oversight Committee regarding compensation;

s.  All documents reflecting the base fees and performance fees which Stonehill has received or may receive in connection with management of the Claims;

t.  All documents reflecting the base fees and performance fees which Farallon has received or may receive in connection with management of the Claims;

u.  All monies received by and distributed by Muck in connection with the Claims;

v.  All monies received by and distributed by Jessup in connection with the Claims;

w.  All documents reflecting whether Farallon is a co-investor in any fund which holds an interest in Muck; and

x.  All documents reflecting whether Stonehill is a co-investor in any fund which holds an interest in Jessup.

**BENEFIT OUTWEIGHS THE BURDEN**

28.    The beneficial value of the requested discovery greatly outweighs any

conceivable burden that could be placed on the Respondents. The requested information

004015

also should be readily available because the Respondents have been engaged in the bankruptcy proceedings relating to the matters at issue for several years.

29.     The important benefit associated with this requested discovery is also clear – it is reasonably calculated to determine whether the Respondents have unjustly garnered tens of millions of dollars of benefit based upon insider information. If this occurred, the monies received as a result of such conduct are properly subject to a constructive trust and disgorged. This would result in substantial funds available for other creditors, including those creditors in Class 10, which includes HMIT as a beneficiary. This significant benefit, in addition to the value of bringing proper light to the activities of Farallon and Stonehill as discussed in this petition, far outweighs any purported burden associated with requiring Respondents to sit for focused depositions concerning the topics and documents identified in Exhibits A and B.

## REQUEST FOR HEARING AND ORDER

30.     After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on this Petition.

## PRAYER FOR RELIEF

31.     Petitioner Hunter Mountain Investment Trust respectfully requests that the Court issue an order pursuant to Texas Rule of Civil Procedure 202 authorizing HMIT to take a deposition of designated representatives of Farallon Capital Management, LLC and Stonehill Capital Management, LLC. HMIT additionally requests authorization to

issue subpoenas duces tecum compelling the production of documents in connection with the depositions in compliance with Tex. R. Civ. P. 205, and asks that the Court grant HMIT all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  _/s/ Sawnie A. McEntire_____
    Sawnie A. McEntire
    State Bar No. 13590100
    smcentire@pmmlaw.com
    Ian B. Salzer
    State Bar No. 24110325
    isalzer@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056
    Telephone: (713) 960-7315
    Facsimile: (713) 960-7347

    *Attorneys for Petitioner Hunter Mountain Investment Trust*

004017

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Before me, the undersigned notary, on this day personally appeared Mark Patrick, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

> "My name is Mark Patrick. I am the Administrator of Hunter Mountain Investment Trust, and I am authorized and capable of making this verification. I have read Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition ("Petition"). The facts as stated in the Petition are true and correct based on my personal knowledge and review of relevant documents in the proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054, in the United States Bankruptcy Court in the Northern District of Texas, Dallas Division ."

_____

Mark Patrick

Sworn to and subscribed before me by Mark Patrick on January 20, 2023.

_____
Notary Public in and for
the State of Texas



DEBORAH COLE
Notary ID #134079165
My Commission Expires
November 23, 2026

3116424.1

004018

# EXHIBIT 9

CAUSE NO. DC-23-01004

| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | 191ST JUDICIAL DISTRICT |
| | § | |
| *Petitioner,* | § | |
| | § | DALLAS COUNTY, TEXAS |

## DECLARATION OF JAMES DONDERO

| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to <mark>Texas Civil Practice & Remedies Code § 132.001</mark> and declares as follows:

1. My name is James Dondero. I am over twenty-one (21) years of age. I am of sound mind and body, and I am competent to make this declaration. The facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I previously served as the Chief Executive Officer ("CEO") of Highland Capital Management, L.P. ("HCM"). Jim Seery succeeded me in this capacity following the entry of various orders in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. My purpose was to alert Mr. Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades. A true and correct copy of this email is attached hereto as Exhibit "1".

4. In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. They also stated they were particularly optimistic because of the expected sale of MGM.

5. During one of these calls involving Mr. Linn, I asked whether they would sell the claims for 30% more than they had paid. Mr. Linn said no because Mr. Seery said they were worth a lot more. I asked Mr. Linn if he would sell at any price and he said that he was unwilling to do so. I believe these conversations with Farallon were taped by Farallon.

6. My name is James Dondero, my date of birth is June 29, 1962, and my address is 3807 Miramar Ave., Dallas, Texas 75205, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

004021

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the 15th day of February 2023.

_____

JAMES DONDERO

# Exhibit 1

004023

**From:** Jim Dondero <JDondero@highlandcapital.com>
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin" <JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>
**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>
**Subject:** Trading restriction re MGM - material non public information
**Date:** Thu, 17 Dec 2020 14:14:39 -0600
**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.
Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

Sent from my iPhone

004024

# EXHIBIT 10

004025

CAUSE No. DC-23-01004

| | § | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | DALLAS COUNTY, TEXAS |
| | § | |
| Petitioner. | § | 191ST JUDICIAL DISTRICT |
| | § | |

## ORDER

Came on for consideration *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* ("Petition") filed by petitioner Hunter Mountain Investment Trust ("HMIT"). The Court, having considered the Petition, the joint verified response in opposition filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"), HMIT's reply, the evidence admitted during the hearing conducted on February 22, 2023, the argument of counsel during that hearing, Farallon's and Stonehill's post-hearing brief, the record, and applicable authorities, concludes that HMIT's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that HMIT's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this _____ day of March, 2023.

_____
HONORABLE GENA SLAUGHTER

# EXHIBIT 11

**From:** Jim Dondero <JDondero@highlandcapital.com>
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin" <JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>
**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>
**Subject:** Trading restriction re MGM - material non public information
**Date:** Thu, 17 Dec 2020 14:14:39 -0600
**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.
Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

Sent from my iPhone

004028

# EXHIBIT 12

January 9, 2020

**HAND DELIVERY**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Re:    Resignation of James Dondero

To Whom It May Concern:

I, James Dondero, hereby give notice of my resignation as, and do resign as, the President and Chief Executive Officer of Highland Capital Management, L.P. (the "HCMLP").

My resignation is effective January 9, 2020.

Please ensure that HCMLP's records and any filings with any state or federal authorities are modified as necessary to reflect my resignation.

Sincerely,

James Dondero

004030

January 9, 2020

**HAND DELIVERY**

Strand Advisors, Inc.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:    Resignation of James Dondero

To Whom It May Concern:

I, James Dondero, hereby give notice of my resignation as, and do resign as: (1) an officer of Strand Advisors, Inc. (the "Company"), in any and all capacities now or formerly held by me, including as president, and (2) a director of the Company, including as Chairman of the Board of Directors.

My resignation is effective January 9, 2020.

Please ensure that the Company's records and any filings with any state or federal authorities are modified as necessary to reflect my resignation.

Sincerely,

James Dondero

# EXHIBIT 13

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**Date:** October 9, 2020 at 4:43:44 PM EDT
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** John Dubel <jdubel@dubel.com>, Russell Nelms <rfargar@yahoo.com>, "D. Lynn (Judge Lynn)"
<michael.lynn@bondsellis.com>
**Subject: Re:  HCMLP Roles**

Counsel has advised me that according to January 9 order, I must at your request resign from
Highland. So Therefore, based on your request below I resign.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com


On Oct 2, 2020, at 5:52 PM, James Seery <jpseeryjr@gmail.com> wrote:


Jim:

Further to our discussion on September 24, Michael Lynn has advised the Pachulski firm that
you or an entity controlled or affiliated with you will be objecting to the HCMLP settlement
with Acis and Josh Terry.  In addition, one of your trusts has filed a claim against HCMLP
related to the management of Multi-Strat.

In light of these facts, we believe it is time for you to resign your portfolio manager position at
HCMLP, any remaining roles at Multi-Strat, and certain other positions at entities managed or
controlled by HCMLP.  As you stated on our call, I agree that over the last few months the PM
role has been in title only with most ultimate authority vested in the Board.  Nonetheless, it is
untenable for you to have a role at the Debtor or the major funds managed by the Debtor
while at the same time taking positions in court contrary to what the Board has determined is
in the best interest of the estate.

I appreciate your desire to challenge the Acis agreement and obtain final court determination
on its reasonableness.  Hopefully when that hearing is complete and there is a determination
by the court, we will have an opportunity to consider a larger settlement of the case with
you.  But until the legal fighting is resolved, the Board believes it is in the best interests of the
estate, its employees, and all other interested parties that you not be on both sides of the
issues, even if in name only.

Please let me know if it preferable to you to resign or if removal by the board at this time is
better.  Specifically, we would like you to resign or be removed from the portfolio manager
role at HCMLP and all roles at the Multi-Strat/Credit Opportunities entities.

004033

I look forward continuing our discussions to resolve the case.  If we are unable to do that, I am confident that together we can engineer a smooth and efficient transition that facilitates value maximization for the estate and all of its stakeholders.


Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

004034

# EXHIBIT 14

# NEXPOINT

October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements"). As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors. These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements. These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020. If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements. We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan. Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

308062413.3

004036

NexPoint, HCMFA and/or their affiliates.   The sale of such assets has the potential to negatively affect the valuation of the Funds.  Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value.  Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates.  We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# EXHIBIT 15

004038

Docket #0190 Date Filed: 6/7/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed June 7, 2021

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | Case No. 20-03190-sgj11 |
| | § | |
| JAMES D. DONDERO, | § | |
| Defendant. | § | |
| | § | |
| | § | |

---

## MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION TO HOLD JAMES DONDERO IN CIVIL CONTEMPT OF COURT FOR ALLEGED VIOLATION OF TRO[2]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Order addresses the Motion filed at DE # 48 in above-referenced Adversary Proceeding.



1934054210607000000000000004

004039

*You know, this is -- I hate to say it, but I feel like I've been in the role of a divorce judge today.  We have very much a corporate divorce that has been in the works . . . and I'm a judge having to enter interim orders keeping one spouse away from the other, keeping one spouse out of the house, keeping one spouse away from the kids.  It's not pleasant at all.*

Transcript from 1/8/21 Hearing at 194:1-9. [DE # 80, Exh. 36].

## I.      Introduction.

The above quote aptly describes the above-referenced 20-month-old corporate bankruptcy case:  it has, at times, become very much like a nasty divorce—in which one spouse (here, the company) is very much at odds with the other spouse (here, the company's former CEO).  It is contentious, protracted, and unpleasant.

For a while, things were a bit like a situation where one spouse has filed for divorce, but both spouses remain living under the same roof for a while—rather than physically separating—for the perceived best interests of the family. This co-habitation eventually became untenable.

Next, things developed similarly to a situation in which one spouse wants to keep the family vacation home, boat, or mutual funds (*i.e.*, the husband), but the other spouse (*i.e.,* the one who happens to have custody and control over them) thinks the assets need to be liquidated to pay off the family's expenses or debt.

Also, this corporate divorce, sadly, is similar to a situation in which one spouse criticizes the other's new partner who has moved into the family home and also bears animus towards the spouse's lawyers. He thinks they are, collectively, mismanaging everything and taking actions towards him out of pure spite.

004040

It's also similar to a situation in which one spouse is endeavoring to have members of the other spouse's household assist or cooperate with him in various ways, in his efforts to get what he perceives to be his fair share in the divorce.

And, finally, it is similar to a situation in which one spouse finally decides to seek a TRO against the other—for fear (legitimate or not) that the ex-spouse is about to burn the house down.

There is a bit of irony in all of this because the spouse (*i.e.,* former CEO) who is the alleged antagonist is the one who signed the divorce (*i.e.,* bankruptcy) petition to start the proceedings.

Divorce metaphors aside, this Order relates to a request by Chapter 11 Debtor Highland Capital Management, L.P. (the "Debtor" or "Highland"), made shortly before its Chapter 11 plan was confirmed,[3] that its co-founder, former President, former Chief Executive Officer ("CEO"), and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero")—be held in civil contempt of court for allegedly violating a temporary restraining order ("TRO") of this court.[4] The TRO that Mr. Dondero is alleged to have violated arose in the above-referenced adversary proceeding ("Adversary Proceeding") that the Debtor filed December 7, 2020. A brief summary of the circumstances leading up to the Adversary Proceeding and the TRO is set forth below.

---

[3] As of the date of issuance of this Order, the Debtor's confirmed plan has not yet gone effective.

[4] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case. Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460 in main bankruptcy case]. The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days." Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

004041

## II.     Background: The Chapter 11 Case.

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the business of buying, selling, and managing assets on behalf of its managed investment vehicles.  It manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major change in corporate governance[5]—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in fraudulent schemes to put Highland's assets out of the reach of creditors).  Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[6] The settlement and term sheet contemplated a complete overhaul of the corporate governance structure of the Debtor.  Mr. Dondero resigned from his role as an officer and director of the Debtor and of its general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new

---

[5] The UST was steadfast in wanting a Trustee.

[6] *See* DE ## 281 & 339 in main bankruptcy case.  *See also* Dondero Exh. 8 (DE # 106 in the Adversary Proceeding).

004042

Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery). As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[7] As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor.[8] The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board.[9] Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand

---

[7] "CRO" means Chief Restructuring Officer. *See* DE # 854 in main bankruptcy case, entered July 16, 2020.

[8] Although not discussed at the time, the court has become aware that Mr. Dondero has been a paid employee of the Non-Debtor Highland-Related Entities known as NexPoint and/or NexBank postpetition. *See* 1/8/21 Hearing Transcript, Debtor Exh. 36 (DE # 80) at 107:20-23.

[9] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 2, at Exh. 1 thereto, at 3 of 62 (DE # 80).

004043

still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are ***not*** subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision-making power and are not the mere "puppets" of Mr. Dondero (for ease of reference, these numerous entities will be referred to as the "Non-Debtor Dondero-Related Entities"). This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities (such a chart would, no doubt, be the size of a football field), but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity. Various events occurred that led to the termination of his employment with the Debtor. For one thing, Mr.

004044

Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent Board including: (a) objecting to a significant settlement that the Debtor had reached in court-ordered mediation[10] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b) pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland Multi Strategy Credit Fund, L.P. ("MSCF"), with respect to the sale of certain of its assets during the bankruptcy case (in May of 2020).[11] The Debtor's Independent Board and management considered these two actions to create a conflict of interest—if Mr. Dondero was going to litigate significant issues against the Debtor in court, that was his right, but he could not continue to work for the Debtor (among other things, having access to its computers and office space) while litigating these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand, and the Debtor on the other (as further described below).

III.    **The Impetus for the Adversary Proceeding**.

The Adversary Proceeding centers significantly around two Non-Debtor Dondero-Related Entities known as NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors")—both of which, like

---

[10] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

[11] *See, e.g.,* Proof of Claim No. 177 and DE # 1154 in main bankruptcy case.

004045

Highland, are registered investment advisors.  Mr. Dondero is President of NexPoint and has an ownership interest in it.[12] Mr. Dondero is President of HCMFA and has an ownership interest in it as well.[13]

A. Alleged Interference with the Debtor's Management of the Highland CLOs.

The Advisors separately manage three funds ("NexPoint/HCMFA Funds").  The Advisors and these NexPoint/HCMFA Funds own, among other things, equity interests in certain pooled **collateralized loan obligation** ("CLO") vehicles that are managed by the Debtor (hereinafter the "Highland CLOs").  A key fact here to remember is that the CLO vehicles are managed by the Debtor (pursuant to contracts and neither the Advisors nor the NexPoint/HCMFA Funds are parties to such contracts).

Generally speaking, the term/acronym "CLO" is loosely used in the investment world to refer to a special purpose entity ("CLO SPE"), in which a manager (here, Highland) purchases a basket of loans to be held in the CLO SPE.  The loans in the basket would typically be obligations of large well-known public companies and, collectively, provide a variable rate of interest. The CLO manager typically has discretion to buy and sell different loans to go into the pool of assets, with certain restrictions. There are, meanwhile, tranches of investors who invest funds into the CLO SPE, pursuant to an indenture (with an independent, third-party indenture trustee in place) so that the CLO SPE can purchase the loans, and those investors receive fixed interest from the CLO SPE (with the CLO SPE earning income on the "spread" between: (a) the variable interest being earned on the pool of loans in the CLO SPE's portfolio and (b) the amount of fixed interest the CLO SPE must pay out to its tranches of investors).  This description, again, is a bit of a generalization.  In

---

[12] 1/8/21 Hearing Transcript, Debtor's Exh. 36 at 35:9-25 (DE # 80).

[13] 1/8/21 Hearing Transcript, Debtor's Exh. 36 at 36:10-14 (DE # 80).

004046

the case of the Highland CLOs (there are approximately 16 of them), many of them are quite old and do not have the typical diverse portfolio of loans that CLOs commonly have.  Many of the CLOs are structured as closed-end investment funds and, in fact, own equity in post-reorganization companies (that are publicly traded and quite liquid) and some even own real estate.[14] In any event, as mentioned, the Debtor serves as portfolio manager on the numerous Highland CLOs (there more than a dozen), pursuant to *separate portfolio management agreements* that Highland has with the CLO SPEs.  There are about $1 billion of assets in these CLO SPEs that Highland manages.[15] And, to be clear, the Advisors and NexPoint/HCMFA Funds own *equity* (*i.e.,* the bottom tranche) in most if not all of these Highland CLOs.

The Debtor has alleged in this Adversary Proceeding that the Advisors, acting under the direction of their President Mr. Dondero, have interfered multiple times with Mr. Seery's attempts to sell various assets in the CLO SPEs, by, among other things, exerting pressure on certain of the Debtor's employees to halt trades that were ordered by Mr. Seery. To be clear, the Advisors have no contractual right to do that—they are not party to the portfolio management agreements that Highland has with the CLO SPEs. The Advisors simply purport to speak for various investors (*i.e.,* the investors in the NexPoint/HCMFA Funds) who have invested in (*i.e.,* own the equity) in the Highland CLOs.  However, it appears that the majority of these investors are yet *other Non-Debtor Dondero-Related Entities*, including but not limited to the entities known as Charitable DAF HoldCo, Ltd. and CLO Holdco, Ltd.[16] In any event, various examples of communications that

---

[14] *See* 1/26/21 Hearing Transcript, Debtor's Exh. 37 at 155:9-18 (DE # 80).

[15] *See id.* at 202: 3-7.

[16] *See* Debtor's Exh. 2, Exh. 7 thereto (DE # 80). There may be some "mom and pop" or unrelated institutional investors in certain of these Highland CLOs (indirectly through the NexPoint/HCMFA Funds), *see* 1/26/21 Hearing Transcript, Debtor Exh. 37 (DE # 80), at 201:14-22, but *none* have ever come forward during the Highland bankruptcy. Moreover, the Debtor aptly notes that there is nothing preventing unhappy investors from simply selling their investments in the Highland CLOs if they are not happy with management decisions of the portfolio manager.

004047

allegedly constituted interference were described in the Adversary Proceeding.[17] The court notes, anecdotally, that Mr. Dondero was continuing, well after his October 9, 2020 termination with the Debtor, to use an email address showing he was an employee of Highland in many of the communications introduced into evidence.[18]

B. Alleged Threats When Debtor Attempted to Collect Demand Notes from Mr. Dondero.

Additionally, the Adversary Proceeding describes that there are certain demand notes on which Mr. Dondero, personally, and certain Non-Debtor Dondero-Related Entities owe significant money to the Debtor. The Debtor made demand upon Mr. Dondero for payment on these demand notes on December 3, 2020, demanding payment by December 11, 2020, so that the Debtor could have these funds to use in its Chapter 11 plan that was set for confirmation in January 2021. Mr. Dondero is alleged to have sent a threatening text to Mr. Seery, just a few hours after the demand letters were sent to him.

After describing Mr. Dondero's alleged conduct, the complaint in the Adversary Proceeding sought injunctive relief preventing Mr. Dondero from interfering with the Debtor's operations, management of assets, and pursuit of a plan of reorganization, to the detriment of the Debtor, its estate, and its creditors, relying on 11 U.S.C. § 105 and Fed. R. Bankr. Pro. 7065. The Debtor has argued that Mr. Dondero's actions have jeopardized the Debtor's ability to effectively wind down its business in the Chapter 11 proceedings—to the detriment of its creditors.

---

[17] Debtor's Exh. 3, DE # 80 (10/16/20 letter from counsel for Advisors expressing "concerns" about the Debtor's management of the Highland CLOs and a desire that management be transitioned over to the Advisors); Debtor's Exh. 4, DE # 80 (11/24/20 letter from counsel for the Advisors further expressing "concerns" about the Debtor's management of Highland CLOs, especially the selling of assets therein); Debtor's Exh. 5, DE # 80 (11/24/20-11/27/20 emails of Mr. Dondero instructing Highland employee Hunter Covitz not to trade SKY equity as he had been instructed by James Seery); Debtor's Exh. 14, DE # 80 (12/24/20 letter of Debtor's counsel to counsel for the Advisors addressing some of their clients' actions).

[18] *See, e.g.,* Debtor's Exh. 5 (DE # 80).

004048

IV.     **Motion for TRO [DE # 6].**

Almost immediately after filing the Adversary Proceeding, the Debtor sought entry of a TRO enjoining Mr. Dondero from: (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Independent Board member *unless* Mr. Dondero's counsel and counsel for the Debtor were included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's employees, except as it specifically related to shared services currently provided by the Debtor to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").  It was supported by a Memorandum of Law[19] and a Declaration of Mr. Seery.[20]

The court held a hearing on December 10, 2020 on the Motion for TRO.

A.  The Evidence at the TRO Hearing.

At the hearing on the Motion for TRO, the Debtor relied upon the Declaration of Mr. Seery and all exhibits that had been attached thereto (which the court admitted with no objection).[21] The court also heard a small amount of additional live testimony from Mr. Seery.  Mr. Dondero's

---

[19] *See* DE # 6.

[20] *See* DE # 4 (with 29 exhibits attached, 177 pages in total length).

[21] *Id.*

004049

counsel appeared and made some statements but did not file a responsive pleading or put on any evidence.

Mr. Seery credibly testified that, pursuant to the January 2020 Corporate Governance Settlement, Mr. Dondero surrendered control of the Debtor to the Independent Board. After that January 2020 Corporate Governance Settlement, Mr. Dondero's responsibilities with the Debtor were to be, in all cases, as determined by the Independent Board and subject at all times to the supervision, direction and authority of the Independent Board. In the event the Independent Board was to determine for any reason that the Debtor should no longer retain Mr. Dondero as an employee, Mr. Dondero agreed to resign immediately upon such determination.[22] By resolution passed on January 9, 2020, the Independent Board authorized Mr. Seery to work with the Debtor's traders and approve trades of certain of the Debtor's and funds' assets.[23] However, up until mid-March 2020, Mr. Dondero controlled certain of the Debtor's managed funds and accounts (as he still maintained the title of portfolio manager). Mr. Seery credibly testified that "[w]e took them away after they lost considerable amounts of money, about ninety million bucks. Real money. So we took over control of those accounts since then, and we've been managing to sell them down to create cash where we think the market opportunity is correct."[24]

Later, however, during the summer of 2020, the Independent Board determined that it was in the best interests of the Debtor's estate to formally appoint Mr. Seery as the Debtor's CEO and CRO (*i.e.,* not just an Independent Board member with trading authority). The bankruptcy court approved Mr. Seery's appointment as CEO and CRO on July 16, 2020.[25] Mr. Seery's appointment

---

[22] Debtor's Exh. 1, at pp. 2-3 (DE # 80).

[23] Debtor's Exh. 3, at p. 2 (DE # 80).

[24] 12/10/20 Transcript from TRO Hearing, at p. 51:21-25 (DE # 19).

[25] DE # 854 in main bankruptcy case.

004050

as CEO and CRO formalized his role and his authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its managed investment vehicles, funds, and subsidiaries. Mr. Seery credibly represented that he has routinely carried out such responsibilities during the case.

On August 12, 2020, the Debtor filed its Plan of Reorganization with the court[26] (as subsequently amended, the "Plan").  The Plan provided for, among other things, the gradual monetization of the Debtor's assets for the benefit of the Debtor's creditors.  Also in August 2020, the Debtor entered into court-ordered mediation with certain of its creditors which resulted in, among other things, the Acis Settlement (mentioned earlier). After the Acis Settlement was publicly announced, Mr. Dondero voiced his displeasure with not just the terms of the Acis Settlement, but that a settlement had been reached at all. On October 5, 2020, Mr. Dondero objected to the Debtor's motion seeking approval of the Acis Settlement, which the Debtor believed created an actual conflict with the Independent Board and the Debtor.[27]  Additionally, one of Mr. Dondero's family trusts also filed a proof of claim alleging the Debtor and Mr. Seery were mismanaging the assets of a subsidiary of the Debtor.[28]  Concluding that this situation was untenable, Mr. Dondero was asked to resign from the Debtor, and he did on October 9, 2020.[29]

Subsequent to Mr. Dondero's termination from the Debtor, he began engaging in activities that the Debtor perceived to be interference with its business judgment and management of the Highland CLOs.  Approximately one week after Mr. Dondero resigned, the Advisors began writing letters to Mr. Seery requesting, among other things, that "no [Highland] CLO assets be sold without

---

[26] DE # 944 in main bankruptcy case.

[27] DE # 1121 in main bankruptcy case; Debtor's Exh. 2 (Mr. Seery's Decl.) at ¶ 11; DE # 80.

[28] *Id.* at ¶ 12.

[29] Debtor's Exhs. 4-5 (DE # 80).

004051

prior notice and consent from the Advisors."[30] Not only is the Advisors' consent for Highland CLO assets sales not contractually required, but the Debtor's Chapter 11 plan (then on file, now confirmed) contemplates the gradual wind down of Highland's business over time so that it will have funds to pay its creditors.  In fact, Mr. Seery credibly testified that the business model of Highland in recent years (under the direction of Mr. Dondero—and with its web and layers of entities) has not allowed Highland itself to operate at a profit.[31]  Thus, interference with assets sales in the Highland CLOs seemed equivalent to interference with, not just the Debtor's efforts to manage the business in ways that allowed it to pay its expenses, but also interference with the Debtor's Chapter 11 plan.

In the November 24-27, 2020 time period (again, just a few weeks after Mr. Dondero's termination from the Debtor), Mr. Dondero sent various emails to both Debtor and Advisor employees (*e.g.,* Matt Pearson, Hunter Covitz, Joe Sowin, and Tom Surgent) telling them he had instructed the Debtor not to engage in trades of Highland CLO assets and that they should not engage in certain trades of Highland CLO assets that Mr. Seery had instructed them to make.[32]  A review of this correspondence makes apparent the underlying conflicts of interest present— Highland was attempting to gradually wind down its business and monetize its managed assets for the benefit of its creditors (and this court believes—all the while—balancing its fiduciary duties to investors in such funds) and, meanwhile, Mr. Dondero (wearing his hat as a portfolio manager for, and indirect equity owner in, certain of the Non-Debtor Dondero-Related Entities—*i.e.,* the

---

[30] Debtor's Exh. 6, p.2 (DE # 80); *see also* Debtor's Exh. 7 (DE # 80).

[31] Apparently, the Debtor even **offered to assign Highland's CLO management agreements to Mr. Dondero's affiliate, NexPoint (in early December 2020)**, but Mr. Dondero thought the proposed terms were untenable. *See* DE # 50, John Morris Decl., Exh. Z thereto (January 5, 2021 Deposition Transcript of Mr. Dondero, at 101:11-25).

[32] Debtor's Exh. 8 (DE # 80).

14

004052

Advisors and the NexPoint/HCMFA Funds) did not want assets sold as part of a wind down. Mr. Dondero, it appears to this court, was putting his own and the Non-Debtor Dondero-Related Entities' interests (as investors in the Highland CLOs) ahead of Highland's creditors and the Highland CLOs, as a whole. But, Highland had duties to its creditors and to the Highland CLOs *as a whole*, and not to the Advisors or their funds (as investors in or equity owners in the Highland CLOs). Mr. Seery further credibly explained the situation, and the harm the interference caused the bankruptcy estate, as follows: "We intend to continue to manage the CLOs, we intend to assume those contracts [*i.e.,* the portfolio management agreements for the Highland CLOs], we intend to manage them post-confirmation, after exit from bankruptcy. And causing confusion among the employees, preventing the Debtor from consummating trades in the ordinary course, deferring those transactions, we thought put the estate at significant risk, in addition to the cost."[33] The Highland CLOs generate fee income for the Debtor. Not all of them have liquid assets that are able to pay quarterly fees. Some owe deferred fees to Highland.[34]

The Debtor thereafter sent communications instructing the Advisors and Mr. Dondero to cease and desist their interference, indicating that Mr. Dondero's actions interfered with the management of the Debtor's bankruptcy estate and the property of such estate, in violation of the Bankruptcy Code and the January 9, 2020 Order.[35]

Meanwhile, around this same time period, the Debtor sent demand letters[36] to Mr. Dondero and certain Non-Debtor Dondero-Related Entities, each of whom are obligated to the Debtor on various demand notes, pursuant to which approximately $30 million is collectively owed to the

---

[33] Debtor's Exh. 37 at 166:6-13 (DE # 80).

[34] *Id.* 166-167.

[35] Debtor's Exhs. 9 & 10 (DE # 80).

[36] Debtor's Exhs. 24-27 (DE # 80).

004053

Debtor.[37] Collection on these notes was part of the Debtor's liquidity plan, to help pay creditors under its Chapter 11 plan. Mr. Seery credibly testified that Mr. Dondero's response was a text message that stated: "Be careful what you do, last warning."[38]

The next day, Debtor's counsel sent Mr. Dondero's counsel correspondence demanding that he "cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." The letter put Mr. Dondero on notice that the above-referenced Adversary Proceeding and Motion for TRO would be filed.

B. Entry of the TRO.

After hearing the evidence at the TRO Hearing, the court determined that the Debtor had met its burden of proving the need for a TRO. The court issued the TRO[39] which temporarily enjoined Mr. Dondero from "(a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the

---

[37] Debtor's Exhs. 11-23 (DE # 80).

[38] Debtor's Exh. 28 (DE # 80).

[39] *See* DE # 10; *see also* Debtor's Exh. 11 (DE # 80).

004054

Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the 'Prohibited Conduct')." Mr. Dondero was further temporarily enjoined "from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct."

### V.      The Contempt Motion Now Before the Court.

Less than a month after entry of the TRO, on January 7, 2021, Highland filed *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Contempt Motion"),[40] which was supported by a Memorandum of Law[41] and a Declaration of John Morris with Exhs. G, K, L, M, N, P, Q, R, S, U, W, X, Y, Z attached.[42] Highland alleges Mr. Dondero violated the TRO as follows: (a) he willfully ignored it by not reading the TRO, the underlying pleadings, and allegations that supported it, nor did he listen to the hearing at which it was entered or make any meaningful effort to understand the scope of it; (b) he threw in the garbage his Highland-furnished cell phone, in what the Debtor believes was an attempt to evade discovery; (c) he trespassed on the Debtor's property after the Debtor had evicted him because the Debtor believed he was interfering with the Debtor's business; (d) he interfered with the Debtor's trading of Highland CLO assets; (e) he pushed and encouraged the Advisors and NexPoint/HCMFA Funds to make further demands and threats against the Debtor regarding the trading of Highland CLO assets; (f) he communicated with the Debtor's inhouse

---

[40] DE # 48.

[41] DE # 49.

[42] DE # 50.

004055

counsel, Scott Ellington and Isaac Leventon, before they were terminated from Highland, to coordinate legal his own strategy against the Debtor; and (g) he interfered with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody and control.

The court held an evidentiary hearing on the Contempt Motion on March 22, 2021 (with closing arguments March 24, 2021). The court considered dozens of exhibits[43] and testimony from two witnesses (Mr. Dondero and the Debtor's current CEO, James Seery). The Debtor asserted that there were seventeen different violations of the TRO. To be clear, this Contempt Motion *deals solely with whether Mr. Dondero violated the TRO after its entry on December 10, 2020 at 1:31 pm CST, up through the time of the filing of the Contempt Motion on January 7, 2021*.[44] In fact, the court has subsequently entered a Preliminary Injunction[45] and Agreed Injunction[46] resolving this Adversary Proceeding but reserved jurisdiction to rule on the earlier-filed Contempt Motion.

    A. <u>The Evidence Regarding Whether Mr. Dondero Willfully Ignored the TRO by Not Reading It or the Underlying Pleadings and Allegations that Supported It; by Not Attending the Hearing Thereon; and by Not Making Any Meaningful Effort to Understand the Scope of the TRO.</u>

The Debtor argues that Mr. Dondero's willful ignorance of both the TRO, and the underlying evidence presented in connection with the TRO, is in and of itself contemptible.

---

[43] The court admitted Debtor's Exhibits #1, #2, #7, #8, #9, #10, #11, #12, #13, #14, #15, #17, #18, #19, #20, #21, #22, #24, #25, #26, #27, #28, #33, #35, #36, #37, #38, #39, #47 through #57 (found at DE ## 80, 101, & 128), and Mr. Dondero's Exhibits #1 through #20 (found at DE # 106).

[44] The Debtor initially sought an expedited hearing on the Contempt Motion for January 8, 2021—the same day that the Debtor's request for a preliminary injunction was set for hearing. The court denied the request for an expedited hearing on the Contempt Motion—believing this was not enough notice to Mr. Dondero. So, there was a hearing on a request for a preliminary injunction only on January 8, 2021 (which was granted ultimately). To be clear, Mr. Dondero and his counsel had approximately 75 days to prepare for the hearing on this matter.

[45] DE # 59.

[46] DE # 182.

004056

Case 19-03400-sgj1 Doc 180 Filed 05/10/21 Entered 05/10/21 15:51:33 Page 19 of 55
Case 3:23-cv-02071-E   Document 18-15   Filed 02/07/23   Page 135 of 214   PageID 3382
Exhibit 15   Page 207 of 256

The evidence on this point is that Mr. Dondero testified multiple times in connection with this Adversary Proceeding[47] that he had not: (a) reviewed the Declaration of James P. Seery, Jr., the Debtor's Chief Executive Officer, in support of the TRO Motion; (b) attempted to learn of the allegations made against him; (c) thought about the fact that the Debtor was seeking a restraining order against him; (d) listened to the hearing where the court admitted evidence and heard argument on the Debtor's motion; (e) read the transcript of the hearing at which the court granted the Debtor's motion for the TRO; (f) read the TRO after it was entered; or (g) made any meaningful effort to understand the scope of the TRO.[48]

But on later examination by his counsel at the Hearing on the Contempt Motion itself, Mr. Dondero testified as follows:

Q Did you have an opportunity to ask your counsel questions about the TRO?

A Yes.

Q And did you rely on your counsel to explain to you what the TRO meant?

A Yes.

Q And in the weeks that followed the entry of the TRO, did you continue to seek advice from your counsel regarding what you could and could not do under the TRO?

A Yes.

Q And why did you do that?

A Again, to stay compliant, not -- to stay compliant any specific tripwires or any trickery that might have been in the agreement.[49]

---

[47] The court will refer frequently herein to three Transcripts and hereinafter use the following defined terms for ease of reference: (a) the January 5, 2021 Transcript from Mr. Dondero's deposition in connection with this matter, found as an attachment to the John Morris Declaration, DE # 50, at Exh. Z ("1/5/21 Transcript"); (b) the January 8, 2021 Transcript from the hearing on the Motion for Preliminary Injunction, which was admitted as Debtor's Exh. 36 at the Hearing on the Contempt Motion ("1/8/21 Transcript"); and (c) the March 22, 2021 Transcript from the Hearing on the Contempt Motion, which is found at DE # 138 ("3/22/21 Transcript").

[48] *See* 1/5/21 Transcript at 12:17-15:14; 1/8/21 Transcript at 23:10-12 and 101:13-14; 3/22/21 Transcript at 30:20-22; 35:6-16. *See also* 1/5/21 Transcript at 84:8-16; 3/22/21 Transcript at 35:20-36:1.

[49] 3/22/21 Transcript at 130:6-19.

19

Case 19-34054-sgj11 Doc 3378-106 Filed 05/01/23 Entered 05/01/23 15:51:35 Page 20 of 55
Case 3:23-cv-02071-E   Document 20-15   Filed 12/07/23   Page 136 of 214   PageID 3383
Exhibit 15   Page 20 of 56

Mr. Dondero went on to testify: "Yeah, I -- again, I take seriously anything that comes from the Court, and I did adjust my behavior, but the overall theme, that somehow I was doing something to hurt the creditor or hurt the Debtor or hurt investors I viewed as incongruent with any of my behavior. So I didn't think it was going to require much adjustment."[50]

The court concludes that Mr. Dondero's testimony was very inconsistent on when and how carefully he read the TRO. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

B. The Evidence Regarding Whether Mr. Dondero Disposed of His Highland-Furnished Cell Phone to Evade Discovery.

*First, the Highland Cell Phone Policy.*

The evidence is undisputed that Highland had a cell phone policy for all of its employees dated March 27, 2012 that still remained in place at all relevant times during this bankruptcy case.[51] Employees could, among other things, have their cell phone expenses reimbursed by Highland. Mr. Dondero participated in this program. To be clear, Highland actually purchased and paid for Mr. Dondero's cell phone (in contrast, some employees used their own cell phones and obtained expense reimbursement). The policy stated as follows:

> Your obligations under this policy shall terminate upon the termination of your employment, ***provided that you will remain obligated to furnish historical call records covering the period through the date of your termination***, as requested following the termination of your employment. Employees participating in this policy should have no expectation of privacy regarding e-mail, voice mail, ***text messages***, graphics, and other electronic data composed, sent, and/or received on their cell phones. Notwithstanding the foregoing, Highland agrees not to review any call records on an employee's bill other than those associated with the phone number of employee. Further, regardless of whether employees choose to participate in this policy, ***all e-mail, voice mail, text messages, graphics, and other***

---

[50] 3/22/21 Transcript at 129:6-11; *see more generally, id.* at 130-136.
[51] Debtor's Exh. 54 (DE # 101).

004058

*electronic data composed, sent, and/or received related to company business remain the property of Highland.*"[52]

Mr. Dondero certified in January 2020 and again on October 7, 2020, that he had read the Employee Handbook.[53] Mr. Dondero testified that he reviewed it and the company's Compliance Manual once a year in connection with required compliance training.[54]

It is undisputed that as of the day that the TRO was entered (December 10, 2020), Mr. Dondero had a cell phone that was bought and paid for by the Debtor.[55] Mr. Dondero testified that he would sometimes use it for business texts.[56]

From this evidence, the court finds that the cell phone that Mr. Dondero used for the majority of the Chapter 11 case (and as of the date of the TRO, December 10, 2020) was property of the bankruptcy estate, as was the data thereon related to company business.

*Mr. Dondero's Cell Phone Goes Missing Immediately After Entry of the December 10, 2020 TRO. Coincidence or Not?*

Soon after the entry of the December 10, 2020 TRO, on December 23, 2020, Debtor's counsel sent Mr. Dondero's counsel a letter informing him that Highland would:

> terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the 'Cell Phones'). [Highland] demands that Mr. Dondero immediately turn over the Cell Phones to [Highland] by delivering them to [Mr. Dondero's counsel]; we can make arrangements to recover the phones from [Mr. Dondero's counsel] at a later date. The Cell Phones and the accounts are property of [Highland]. [Highland] further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. [Highland], as the owner of the account

---

[52] *Id.* (emphasis added). *See also* Debtor's Exh. 55, at 12-13 (DE # 101).

[53] Debtor's Exhs. 56 & 57 (DE # 101).

[54] 3/22/21 Transcript at 37:1-23; 42:1-25. *See also* Debtor's Exh. 55 (Employee Handbook); Debtor's Exhs. 56 & 57 (Compliance Certificates) (DE # 80).

[55] 3/22/21 Transcript at 51:17-21

[56] *Id.* at 51:22-25.

004059

and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.[57]

On December 29, 2020, Mr. Dondero's counsel sent a letter replying to the December 23, 2020 letter, stating that Mr. Dondero had recently acquired a new phone and they were not sure where Mr. Dondero's old Highland-provided phone was at the moment.[58] Mr. Dondero was copied on that letter. Nothing was ever mentioned in that letter about the disposal or wiping of the old cell phone. And yet, in discovery that soon unfolded, as well as the hearing on the Contempt Motion, Mr. Dondero testified that his old company cell phone had been wiped of data and disposed.

When Mr. Dondero was asked specifically about what happened to the cell phone he had that was "bought and paid for by the debtor," he testified that it "was disposed of as part of getting a replacement phone in anticipation of potentially a transition."[59] He testified that there was a historical practice at Highland of destroying old phones when he obtained a new one.[60] He testified that "[a]s far as I know, it was disposed of in the garbage, but I don't know if it was recycled or whatever."[61] He said he did not know specifically who threw it away.[62] When asked if he was aware that the UCC had asked for his phone messages, he testified no and that no one had ever told him.[63] He further testified that maybe an employee named Jason Rothstein (an employee in Highland's technology group) was involved with getting him a new phone and disposing of his old phone, but he was equivocal.[64] Mr. Dondero was insistent that disposing of old phones was always

---

[57] Debtor's Exh. 12, at pp. 2-3 (DE # 80).

[58] Debtor's Exh. 22 (DE # 80).

[59] 1/5/21 Transcript at 72:5-7.

[60] Id. at 72:9-13.

[61] Id. at 72:18-20.

[62] Id. at 73: 4-18.

[63] Id. at 74:19-25.

[64] Id. at 75:7-11.

004060

Case 19-34054-sgj11 Doc 3784-106 Filed 05/10/23 Entered 05/10/23 15:51:25 Page 423 of 55
Case 3:23-cv-02071-E   Document 20-15   Filed 24/02/36   Page 139 of 214   PageID 3386
Exhibit 15

the protocol at Highland and, also, employees routinely kept their old phone numbers (as he had done after leaving Highland and getting a new phone).[65] He further testified that he thought that he and all senior executives had to "move their phones in the next 30 days or next 25 days, based on Seery's termination notice."[66] ("Seery's termination notice" presumably was a reference to Highland sending a letter on November 30, 2020 that Highland was terminating the shared services agreements among Highland and the Advisors effective January 30, 2021.[67] Of course, Mr. Dondero had been terminated as a Highland employee back on October 9, 2020).

An exhibit was shown to Mr. Dondero[68] during a January 5, 2021 deposition which was a text from Jason Rothstein (the aforementioned Debtor employee in the technology group) to Mr. Dondero dated December 10, 2020 at 6:25 pm. The TRO had been entered earlier that same day at 1:31 pm (after a 9:30 am hearing). Jason Rothstein's text stated, "I left your old phone in the top drawer of Tara's [Mr. Dondero's assistant's] desk" to which Mr. Dondero replied "[o]k."[69]

When questioned about this text and asked whether Mr. Dondero had told Jason Rothstein to do anything with the phone, he replied, "I don't—all I know is the phone's been disposed of. That's all I know."[70] He then specifically testified that he did not tell either Jason Rothstein or his assistant Tara to throw the phone in the garbage.[71] When later asked if he disposed of the phone "somewhere around December 10, 2020" he replied "I—I don't know. Probably."[72] Later at the

---

[65] Id. at 76:8-77:2.

[66] Id. at 79:25-80:4.

[67] Dondero's Exhs. 4 & 5 (DE # 106).

[68] Debtor's Exh. 8 (DE # 80).

[69] While this timing seems very coincidental, Mr. Dondero testified that he had ordered his new cell phone a couple of weeks before December 10, 2020. 3/22/21 Transcript at 147:17-148:7.

[70] 1/5/21 Transcript at 80:18-81:8.

[71] Id. at 81:9-15.

[72] Id. at 85:15-17.

004061

hearing on the Contempt Motion on March 22, 2021, Mr. Dondero answered more ambiguously as to what happened to the cell phone: "I don't know what happened to the phone. I don't know what Jason did or did not do."[73] Nobody called Jason Rothstein to testify at the hearing on the Contempt Motion. In any event, Mr. Dondero was insistent that he did nothing wrong—stating that he turned the cell phone over to the "tech group" for the Debtor (Jason Rothstein) as he was supposed to do and that he wiped it in accordance with company protocol.[74] Mr. Dondero further testified:

> Q Do you have any personal knowledge about what happened to your phone after Jason Rothstein texted you that he left it in Tara's desk?
>
> A No.
>
> Q Did you ever look to see if it was in Tara's desk?
>
> A No.
>
> Q Did you -- you -- you didn't take the phone out of Tara's desk?
>
> A No.
>
> Q So did you ever see the phone again after you turned it over to Jason Rothstein?
>
> A No.
>
> Q Do you know where the phone is today?
>
> A But, again, I don't know why this is relevant. They can get the text messages from the phone company if they think it's that big of a deal.[75]
>
> Q When you previously testified that the phone was disposed of, what did you mean?

---

[73] 3/22/21 Transcript at 57:3-4.

[74] *Id.* at 58:1-16.

[75] The court did not have any expert evidence of this, but the court believes without much doubt that this is incorrect. While this may have been true long ago (in the days before iPhones and WiFi communications), Mr. Dondero testified that he had an iPhone. Whether he uses the iPhone "Messages" text app or some other messaging app such as "WhatsApp" or "Signal," his phone company (which he testified was AT&T) would not have his text messages since text messages are sent through these apps—not the AT&T phone service.

A I mean, that's -- that's the last step. That's what always happens to the old phones. But to say it was tossed in the garbage, I have no idea. I have no idea what happened to it after it went back to Tara's desk.

Q So do you have any personal knowledge that your phone was actually disposed of?

A I don't know.[76]

*Is the Missing Phone Any Big Deal?*

Mr. Dondero is rather adamant that this is all much ado about nothing. Is the missing cell phone a big deal? The answer is "maybe or maybe not." It depends on what was on it and whether the data on it was responsive to numerous discovery requests in this bankruptcy case. And in any event, the phone and any data on it related to Highland was "property of the estate," pursuant to section 541 of the Bankruptcy Code.

With regard to discovery requests, there have actually been many discovery requests in the bankruptcy case for which **any relevant data on Mr. Dondero's phone would have been responsive**, starting from almost the very beginning, when the UCC sought, among other things, electronically stored information ("ESI") from the Debtor and key custodians including Mr. Dondero.

For example, back on November 10, 2019 (when the bankruptcy case was still pending in Delaware), the UCC served its first document request **while Mr. Dondero was still CEO and during which time all original management and inhouse counsel were still intact**.[77] This first UCC document request, in seeking communications about numerous topics, defined "Communications" as including **electronic communications such as texts**. And the "Instructions" therein to the Debtor

---

[76] 3/22/21 Transcript at 150:5-151:4.

[77] Debtor's Exh. 15 (DE # 80).

004063

provided at paragraph 4 that: "You are requested to produce not only those documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf."[78] To be clear, this was approximately two months before the January 2020 Corporate Governance Settlement was reached, with the subsequent installment of the Independent Board. Mr. Dondero was still in control of the Debtor when this document request would have been served. The UCC served a second document request on February 3, 2020 (with the same definitions and instructions);[79] a third document request on February 24, 2020 (same definitions and instructions),[80] and a fourth document request on July 8, 2020 (same definition and instructions).[81]

At the same time as the UCC's fourth request for document production (on July 8, 2020), the UCC also filed a motion to compel.[82] This motion to compel brought to the court's attention for the first time that problems were brewing with the UCC's efforts to obtain documents that might be relevant to estate causes of action, and in particular, the UCC motion to compel sought assistance from the court in the UCC's efforts to obtain ESI from various custodians of documents of the Debtor.

The UCC's motion to compel reminded the court that the January 2020 Corporate Governance Settlement explicitly granted the UCC standing to pursue bankruptcy estate claims, defined as "any and all estate claims and causes of actions against Mr. Dondero, Mr. Okada, other

---

[78] *Id.*

[79] Debtor's Exh. 30 (DE # 80).

[80] Debtor's Exh. 31 (DE # 80).

[81] Debtor's Exh. 32 (DE # 80).

[82] Debtor's Exh. 33 (DE # 80).

004064

insiders of the Debtor, and each of the Related Entities, including promissory notes held by any of the foregoing."[83]  The parties also agreed in the January 2020 Corporate Governance Settlement that the UCC would receive any privileged documents or communications that relate to the "Estate Claims" so that the UCC could bring those claims.  In short, the UCC, pursuant to the January 2020 Corporate Governance Settlement, stands in Debtors' shoes with respect to the "Estate Claims." In fact, the January 2020 Corporate Governance Settlement set forth a "Document Production Protocol," which stated that ESI was included within the documents being sought and stated that "***Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data***."[84] Thus, whether Mr. Dondero and inhouse counsel paid attention or not, they were on notice very early in this case that they had a duty to preserve ESI.

The UCC motion to compel (again, filed July 8, 2020) further stated that for approximately eight months, the UCC had attempted to work cooperatively with the Debtor to obtain documents and communications needed to investigate those claims, and, despite the UCC's efforts, the Debtor had not yet provided the UCC with the ESI it had requested. In particular, the UCC alleged that it had spent a considerable amount of time attempting to obtain "***production of emails, chats, texts, or other ESI or communications from the Debtor.***"  In summary, the UCC, in July 2020 (some five months before Mr. Dondero's cell phone was disposed) moved to compel production of documents and communications of nine custodians pursuant to a protocol proposed by the UCC and these nine custodians were Patrick Boyce, Jim Dondero, Scott Ellington, David Klos, Isaac

---

[83] *Id.* at 4.

[84] Debtor's Exh. 2, Exh. 1.C. thereto (DE # 80).

004065

Leventon, Mark Okada, Trey Parker, Tom Surgent, and Frank Waterhouse. The UCC specifically stated that for "avoidance of doubt," it was requesting "all ESI for the nine custodians, including without limitation, email, chat, text, Bloomberg messaging, or any other ESI attributable to the custodians."[85]

Notably, Mr. Dondero filed a responsive pleading to this UCC motion to compel—which would be some indication that he knew about it.[86] In his response, he argued that he did not want Josh Terry (Acis's manager, with whom he had been in long-running litigation) to get any documents that might be produced pursuant to the UCC motion to compel.

Finally, the Debtor also sought document production from Mr. Dondero including ESI in a formal document request it sent to him dated December 23, 2020.[87] More pointedly, on December 23, 2020, Debtor's counsel sent Mr. Dondero's counsel the letter mentioned above, in which the Debtor specifically asked that Mr. Dondero turn over his Highland-purchased cell phone.[88]

With regard to awareness about discovery requests, Mr. Dondero testified at his deposition on January 5, 2021 that he was aware of a document request sent to his lawyers for documents of his and that he delegated to his lawyers and his assistant, Tara Loiben, the task of responding by saying, "she has full access to my email, and I gave her my phone for the better part of a couple of days in the office."[89] He also testified that he understood that the Debtor's document requests called for the production of all text messages that were responsive to the requests.[90]  When asked if he

---

[85] *Id.*

[86] Debtor's Exh. 40 (DE # 101).

[87] Debtor's Exh. 7 (DE # 80).

[88] Debtor's Exh. 12 (DE # 80).

[89] *See* 1/5/21 Transcript at 67:20-69:9. *See also* Debtor's Exh. 9 (DE # 80).

[90] *Id.* at 70:1-6.

004066

understood the document request was for the time period of December 10, 2020 to the end of the month, he replied "I didn't need the details of this. I didn't get into it. I didn't do the document production that I believe was completed and responsive. I delegated it."[91]

Mr. Dondero's testimony about awareness as to discovery requests has been inconsistent. Mr. Dondero testified at the hearing on the Contempt Motion that no one ever asked him to preserve his text messages.[92]

The court concludes that Mr. Dondero exercised control over property of the estate (*i.e.,* his Highland-provided cell phone and the company-related data thereon) and potentially spoliated evidence thereon that was responsive to multiple, pending discovery requests. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

The Evidence Regarding Whether Mr. Dondero Trespassed.

In the December 23, 2020 letter that Debtor's counsel sent to Mr. Dondero's counsel mentioned earlier (that demanded turn over of Mr. Dondero's cell phone), it also stated that Highland:

> has concluded that Mr. Dondero's presence at the [Highland] office suite and his access to all telephonic and information services provided by [Highland] are too disruptive to [Highland's] continued management of its bankruptcy case to continue. As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.[93]

---

[91] *Id.* at 70:17-20.

[92] 3/22/21 Transcript at 152:1-11.

[93] Debtor's Exh. 12 (DE # 80).

004067

Case 19-34054-sgj11 Doc 3784-106 Filed 05/01/23 Entered 05/06/23 15:53:23 Page 490 of 55
Case 3:23-cv-02071-E   Document 20-15   Filed 10/06/23   Page 146 of 214   PageID 3393
Exhibit 15   Page 3076.56

The letter went on to warn that: "Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by [Highland] will be viewed as an act of trespass, theft, and/or an attempted breach of [Highland's] security protocols."[94]

Mr. Dondero testified that he was aware of this and he nevertheless went into the office on January 5, 2021, to give a deposition regarding this Adversary Proceeding:

> I went through my phone, the January 5th deposition that has somehow become important, even though there were no Highland employees in the office other than the receptionist, is memorialized by a calendar invite on my phone -- which will also be in the Highland system -- where it was an invite a week earlier from Sarah Goldsmith, who was one of the Highland employees supporting the legal team that was largely supporting Jim Seery, sent me a calendar invite to the conference room at Highland for the deposition on the 5th. It's right front and center in my calendar. It'll be on the Highland Outlook program. And Sarah Smith -- I mean, Sarah Goldsmith works directly for Jim Seery.[95]

The court concludes that Mr. Dondero was trespassing against the Debtor's wishes and instructions at the Highland offices on January 5, 2020. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

### The Evidence Regarding Whether Mr. Dondero Interfered with Trading of Highland CLO Assets.

It is undisputed that Mr. Dondero resigned (at the Debtor's request) completely from Highland on October 9, 2020. About a week later, on October 16, 2020, a law firm representing the Advisors and the NexPoint/HCMFA Funds sent its first of several letters complaining about the Debtor's supposed rush to sell assets in the Highland CLOs at so-called fire sale prices and

---

[94] *Id.* at 3.

[95] 3/22/21 Transcript at 179:7-18.

004068

expressing a desire that the Debtor not sell the Highland CLO assets without prior notice and consent of the Advisors. The second in this series of letters was sent in November 2020. Mr. Dondero testified that he supported these letters being sent.[96]

What was this about?  The Debtor sought during certain times in November and December 2020 to cause the Highland CLOs to sell certain publicly-traded equity securities, including "AVYA" and "SKY' (stock tickers).  Mr. Dondero disagreed that these securities should be sold. At issue here, in particular, are the Debtor's attempted sales in late December 2020—after entry of the TRO.  Mr. Dondero testified at a deposition on January 5, 2021, that he gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it.[97] He also testified that he communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing not to sell any CLO underlying assets. There is potential liability.  Don't do it again."[98] Matt Pearson, in response, canceled scheduled sales of SKY as well as AVYA.[99] Mr. Dondero also communicated with an employee of one of the Advisors named Joe Sowin regarding stoppage of trades of CLO assets. Mr. Dondero explained: "My intent was to prevent trades that weren't in the best interests of investors, that investors—the beneficial holders had articulated they didn't want sold while these funds were in transition, and that the–there was no business purpose to benefit the debtor to sell these assets."[100]  To be clear, the so-called investors/beneficial holders were Non-

---

[96] 1/26/21 Transcript at 61:4-18.

[97] 1/5/21 Transcript at 41:22-43:11.

[98] *Id.* at 43:15-44:08.

[99] *Id.*

[100] *Id.* at 50:8-14; *see also, id.* at 89:8-25.

004069

Debtor Highland Related Entities under the control of Mr. Dondero. And the Debtor, indeed, **did** have a business purpose—despite Mr. Dondero's belief that Mr. "Seery had no business purpose and he was doing it to tweak myself and everybody else."[101] For one thing, the Debtor is owed fees from managing these Highland CLOs and it cannot just defer them indefinitely—Highland needed liquidity to fund its Chapter 11 plan. Moreover, Mr. Seery credibly testified that he had consulted with many advisors on the Highland and Advisors team, and he concluded it was a good time to sell the AYVA and SKY securities. In any event, Mr. Dondero also communicated with Debtor employee Thomas Surgent, the Chief Compliance Officer, to inform him that he thought Mr. Seery was engaging in improper trades of Highland CLO assets and told Mr. Surgent he might face personal liability over this.[102] Finally, Mr. Dondero communicated with a text to Mr. Seery that stated: "Be careful what you do, last warning."[103] As a result of this conduct, the Debtor notified Mr. Dondero's counsel that they were essentially evicting Mr. Dondero from access to the Highland offices effective December 31, 2020 and terminating his Highland email account.[104]

Mr. Dondero stated that he communicated as he did regarding the Highland CLO asset sales because he thought Mr. Seery was acting improperly with the trades he was attempting to execute.[105] Mr. Dondero testified at the hearing on the Contempt Motion that he may have interfered with trades the week of Thanksgiving, but he did not after entry of the TRO. The evidence does not seem to support this testimony.[106]

---

[101] *Id.* at 55:5-6.

[102] *Id.* at 60:23-61-25.

[103] *Id.* at 62:25.

[104] *See* Debtor's Exh. 12 (DE # 80).

[105] 1/5/21 Transcript at 63:1-64:20.

[106] 3/22/21 Transcript at 80-81.

004070

Mr. Dondero testified that he only talked to Jason Post about trades in late December and that Jason Post was not a Debtor employee but rather an employee of NexPoint.[107]

What was at the bottom of this? Mr. Dondero said he "viewed it as a violation of the Advisers Act and the spirit of the Advisers Act, when the beneficial holders have told you they're going to change managers and don't want their account liquidated."[108] Mr. Post inconsistently testified at one hearing that he believed the trades violated Advisors' policies and procedures because they were not initiated through an electronic system called the OMS (Order Management System).[109] It appears to this court that Mr. Dondero wanted these funds to be kept intact and not have any assets liquidated until he could get a new company up and running (or maybe one of his existing companies) to hopefully take over Highland's role of managing these Highland CLOs.

In any event, the Debtor pointed out, in response to Mr. Dondero's "defense" of his interference—that he was looking out for investors—that Mr. Dondero himself, during January-October 2020, while still an employee of Highland, traded a significantly larger amount of the AVYA stock that was held in the Highland CLOs, sometimes at a lower price than Mr. Seery did or attempted.[110] Mr. Seery, in fact, credibly testified that the original impetus to sell AVYA came from Mr. Hunter Covitz, one of the Highland CLO portfolio managers, who had been looking at this security and noticed it had started moving up after performing extremely poorly post its own Chapter 11. Mr. Covitz, during the summer of 2020, believed Highland should "start lightening up" on the AVYA holdings, and Mr. Seery also had the following additional personnel look into it: Kunal Sachdev (Highland analyst); Joe Sowin (head trader at HCFMA) and Matthew Gray (another

---

[107] *Id.* at 162.

[108] 3/22/21 Transcript at 168:22-25.

[109] 1/26/21 Transcript at 223:11-16.

[110] *Id.* at 106:9-20, 159-161.

004071

senior analyst). They determined (Mr. Sachdev, in particular) that AVYA had reached its peak and even though it could continue to go up, they just did not think the value was there and thought it should be sold. A similar analytical process was undertaken with the SKY equity holdings.[111]

One might wonder, if Mr. Dondero and the Advisors and the NexPoint/HCMFA Funds believed that Mr. Seery and the Debtor were mismanaging the Highland CLOs, why not offer to take them over during Highland's case (or as part of Highland' Chapter 11 plan)? Mr. Seery credibly testified that:

> Q Has the Debtor made any attempt to transfer the CLO management agreements to the Defendants or to others?
>
> A Well, our original construct of our plan was to do that. We've since determined, when we tried to do that, we got virtually no response from the Dondero interests. The structure of the original thought of the plan was if we didn't get a grand bargain we would effectively transition a significant part of the business to Dondero entities, they would assume employee responsibilities and the operations, and then assure that the third-party funds were not impacted.
>
> As I think I testified on the -- I can't recall if it was the deposition or my prior testimony in court -- Mr. Dondero, true to his word, told me that would be very difficult, he would not agree, and he has made that very difficult.
>
> So we examined it. We've determined that we're going to maintain the CLOs and assume them. But we originally tried to contemplate a way to assign those management agreements.[112]

What's really going on here? These Highland CLOs are one of the ways that the Debtor earns revenue. Specifically, the CLO SPEs must pay fees to the Debtor. Highland's management of the CLO SPEs generates about $4.5-$5 million of fees for it per year.[113] That sometimes requires liquidation of assets in the CLO SPEs to pay the fees, since not all of the assets in the CLO SPEs

---

[111] *Id.* at 156-157.

[112] *Id.* at 163:5-22.

[113] *Id.* at 187:5-12.

004072

are cash-generative.[114] To be more specific, these are very old CLOs that are no longer in a reinvestment period. The manager (Highland) can no longer sell assets and reinvest cash in new assets. Thus, the manager must either hold them or sell them. But the assets are for the most part not loans anymore—they are equity (such as MGM stock) and real estate. Many of the assets, as stated, do not regularly generate cash, so the only way Highland can generate cash to pay management fees is to sell assets (presumably at prudent times). When there is interference with liquidation of assets in the CLO SPEs, it interferes with Highland's revenue stream. Yes, it also reduces the assets in the CLO SPEs ultimately available for the equity tranche. ***But there would appear to be nothing in any contract (or any law presented to the court) that precludes Highland from liquidating assets in the CLO SPEs, from time to time, to pay its fees or otherwise as it deems fit—and the evidence was not at all convincing that there was any sort of bad decision making ongoing in that regard***. Most importantly, it was Highland's decision to make when and how to liquidate assets. It is easy to see a conflict of interest here. To the extent assets in a Highland CLO are not cash-generative, they will not have liquid funds to pay Highland, as portfolio manager, its management fees. That's not optimal for Highland to indefinitely defer/accrue management fees. But it *would* be optimal for Mr. Dondero and the Advisors as equity holders—they would rather see assets kept in the Highland CLOs longer to hopefully grow their investment. And it also might be optimal for Mr. Dondero and the Advisors for Highland to decide they do not want to manage these Highland CLOs anymore (because of inconsistent ability to pay management fees) and perhaps agree to assign their management agreements over to the Advisors so Mr. Dondero could once again have ultimate, total control over the Highland CLOs. Conspicuously absent on this issue are the indenture trustees and other ultimate equity holders of the Highland CLOs. Only

---

[114] *Id.* at 189:12-18.

004073

Non-Debtor Dondero-Related equity holders have complained. The indenture trustees for the Highland CLOs even agreed to Highland continuing to be the portfolio manager on these CLOs post-confirmation.

The court concludes that Mr. Dondero interfered with the Debtor's trading of Highland CLO assets after entry of the TRO. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

> The Evidence Regarding Mr. Dondero's Communications with Debtor Employees—in Particular, with Inhouse Counsel—to Coordinate His Own Legal Strategy Against the Debtor.

It is apparent from the evidence (numerous emails) that Mr. Dondero communicated with Highland inhouse general counsel Scott Ellington (who was terminated from Highland in January 2021) about all kinds of things post-TRO *other* than shared services, including Mr. Dondero's own personal litigation strategies.[115] As a reminder, Section 2(c) of the TRO stated that Mr. Dondero was enjoined, "from communicating with any of the Debtor's employees, except as it specifically relates to *shared services provided to affiliates* owned or controlled by Mr. Dondero" (emphasis added).

Mr. Dondero asserts that after entry of the TRO, he never spoke with any Debtor employees, including Mr. Ellington, regarding anything other than shared services, a "pot plan," and to Mr. Ellington in connection with his role as settlement counsel. In other words, Mr. Dondero's defense is that, yes, he conversed with Scott Ellington regarding things other than shared services provided to affiliates—such as Mr. Dondero's desire to propose a "pot plan" in the case and maybe a few other subjects—but this was permissible because Mr. Ellington was understood by all to be in some

---

[115] *See, e.g.,* Debtor's Exhs. 17, 18, 21 (DE # 80); Debtor's Exhs. 48, 49, 50, 52, 53 (DE # 101). *See also* 3/22/21 Transcript at 122:1-124:7; 124:15-125:12.

004074

sort of role of "settlement counsel" in the case: "Scott Ellington, as my settlement counsel, or as

the go-between with Seery and with the creditors, was an important piece of trying to get something

done."[116] But this is simply not accurate. This court never would have approved that role for Mr.

Ellington. Moreover, Mr. Seery, the current Highland CEO, credibly testified as follows:

> Q Did you task Mr. Ellington with the role of a go-between between the
> board and Mr. Dondero?
>
> A No. This -- this settlement counsel is something I'd never heard until
> Dondero raised it and made it up. It -- it's wholly fictitious.
>
> Now, what Ellington did do is he was on a number of calls with me and
> Dondero, and he had a communication line with Dondero. This was through
> the first half of the case and into -- into the summer. But as it started to
> become more adversarial, particularly around the mediation, he wasn't
> invited. So, for example, Mr. Ellington was not invited to -- to participate
> in the mediation. He asked. I said no.
>
> The -- in addition, this idea that he was drafting the pot plan, well, not to
> my knowledge or understanding, because I drafted it for Dondero and his
> lawyers because you guys [Pachulski] couldn't.[117]

Mr. Seery further credibly testified as follows:

> Q So you're denying Mr. Dondero's testimony to the contrary?
>
> A Yes.
>
> Q Did Mr. Dondero send messages to you through Mr. Ellington?
>
> A No. Mr. Ellington often came back and gave me messages. They were
> often critical of Mr. Dondero. I didn't always believe them, because I
> figured Mr. Ellington had an ulterior motive. But he took a number of, you
> know, shots at Mr. Dondero and he came back and gave his color of what
> he thought was going on in Mr. Dondero's mind.[118]

---

[116] 3/22/21 Transcript at 135:3-5.

[117] Id. at 257:6-21.

[118] Id. at 258:2-12.

37

004075

In addition to this testimony, the documentary evidence reflects that just two days after the TRO was entered, Mr. Dondero was communicating with Scott Ellington seeking advice regarding an appropriate witness to support his interests at an upcoming hearing.[119]  And just six days after entry of the TRO, Mr. Dondero was emailing Mr. Ellington telling him "I'm going to need you to provide leadership here" and Ellington replies "[o]n it."[120]  Additionally, there are emails reflecting that inhouse lawyers Scott Ellington and Isaac Leventon were receiving and responding to information requests from Mr. Dondero[121] and were being copied on draft joint defense agreement prepared by the Dugaboy and Get Good Trusts' counsel.[122]  And Mr. Dondero emailed with Scott Ellington on December 24, 2020 regarding his unhappiness and intention to object to a settlement between HarbourVest and Debtor.[123]

> The Evidence Regarding Interference with Debtor's Duty to Produce Documents to the UCC.

On December 16, 2020, at 5:18 pm Mr. Dondero sent Melissa Schroth, a Highland employee (executive accountant), a text stating: "No dugaboy details without subpoena."[124]  This was a reference to document requests from the UCC in which they were seeking documents that were on the Highland server concerning Mr. Dondero's family trust, the Dugaboy Trust.

---

[119] Debtor's Exh. 17 (DE # 80) (Scott Ellington email to Mr. Dondero and his counsel on 12/12/20 at 11:55 pm suggesting JP Sevilla for a witness for some unknown hearing). *See also* Debtor's Exh. 26 (DE # 80).

[120]  *See* Debtor's Exh. 18 (DE # 80).

[121]  *See* Debtor's Exh. 20 (DE # 80).

[122]  *See* Debtor's Exh. 24 (DE # 80).

[123]  Debtor's Exh. 21 (DE # 80).

[124]  *See* Debtor Exh. 19 (DE # 80).

004076

## VI.  Conclusions of Law

### A.  Jurisdiction and Authority.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order. Section 105 of the Bankruptcy Code and the cases construing it are the substantive legal authority.

The Contempt Motion seeks for this court to hold Mr. Dondero in civil contempt of court for violating an order of this court (the TRO).  It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers.  "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[125] A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[126]  Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[127]

---

[125] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley,* 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir.1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust Co. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[126] *SkyPort Global,* 2013 WL 4046397, at *1.

[127] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

004077

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[128] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal.  If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[129]  It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to Mr. Dondero's alleged violations of the TRO, and to coerce compliance going forward.[130]

B.   Type of Civil Contempt:  Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here).  "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[131] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[132]  "(1) that a

---

[128] *Bradley*, 588 F.3d at 263.

[129] *Id.* (internal citations omitted).

[130] Highland seeks the following relief in the Contempt Motion: an order (i) finding and holding Mr. Dondero in contempt for violating the TRO; (ii) directing Mr. Dondero to produce to the Debtor and the UCC within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) directing Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion and addressing Mr. Dondero's conduct that lead to the imposition of the TRO and this Motion (e.g., responding to the K&L Gates Clients' frivolous motion and related demands and threats and taking Mr. Dondero's deposition), payable within three (3) calendar days of presentment of an itemized list of expenses, (iv) imposing a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (iv) granting the Debtor such other and further relief as the court deems just and proper under the circumstances.

[131] *Travelhost*, 68 F.3d at 961.

[132] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

004078

court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[133]

C. <u>Specificity of the Order</u>.

"To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated."[134] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[135]

D. <u>Possible Sanctions</u>.

To be clear, if the court ultimately determines that Mr. Dondero is in contempt of court, for not having complied with the TRO, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order.[136] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the TRO was in effect; (2) the TRO required certain conduct by Mr. Dondero; and (3) that Mr. Dondero failed to comply with the TRO.[137] "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in

---

[133] *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir.1992) (same); *Travelhost*, 68 F.3d at 961 (same).

[134] *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[135] *Id.*

[136] *In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).

[137] *In re LATCL&F, Inc.*, 2001 WL 984912. *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 400 (5th Cir. 1987)).

004079

disregarding the court's order."[138] "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of [their] adversary's noncompliance."[139] Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[140]

E.   Knowledge of the Order.

"An alleged contemnor must have had knowledge of the order on which civil contempt is to be based.  The level of knowledge required, however, is not high. And intent or good faith is irrelevant."[141] To be clear, "intent is not an element in civil contempt matters.  Instead, the basic rule is that all orders and judgments of courts must be complied with promptly."[142]

F.   Willfulness of Actions.

For civil contempt of a court order to be found, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."[143] For a stay violation, the complaining party need not show that the contemnor intended to violate the stay. Rather, the complaining party must show that the contemnor intentionally committed the acts which violate the stay. Nevertheless, in determining whether damages should be awarded under the court's

---

[138] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

[139] *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976); *see also Travelhost,* 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.,* 43 F.3d 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[140] *Am. Airlines,* 228 F.3d at 585; *see also F.D.I.C.,* 43 F.3d 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[141] *Kellogg v. Chester,* 71 B.R. at 38.

[142] *In re Unclaimed Freight of Monroe, Inc.,* 244 B.R. 358, 366 (Bankr. W.D. La. 1999).  *See also In re Norris,* 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[143] *Id.* (citing *N.L.R.B. v. Trailways, Inc.,* 729 F.2d 1013, 1017 (5th Cir.1984)).

42

004080

contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[144]

    G.  <u>Applying the Evidence to the Literal Terms of the TRO.</u>

The court concludes that there is clear and convincing evidence that Mr. Dondero violated the specific wording of the TRO in certain ways and, thus, is in contempt of the court as follows.

> **1. The TRO states in Section 2(c) that Mr. Dondero is enjoined, "from communicating with any of the Debtor's employees, except as it specifically relates to shared services provided to affiliates owned or controlled by Mr. Dondero."**

There are several examples of violations of this provision. And many of the communications appeared to be adverse to the Debtor's interests.

First, notably, Mr. Dondero actually admitted that he had conversations with some Debtor employees, including Scott Ellington, after December 10, 2020, regarding things other than "shared services," including a "pot plan" and, more generally, in connection with Mr. Ellington's role as "settlement counsel": "Scott Ellington, as my settlement counsel, or as the go-between with Seery and with the creditors, was an important piece of trying to get something done."[145] As indicated earlier, this court never would have approved that role for Mr. Ellington, and Mr. Seery credibly testified that this was never approved by him or the Independent Board. There was no exception for this in the TRO. As for Mr. Dondero's desire to pursue a pot plan, again, there's nothing in the TRO that allowed Mr. Dondero to speak with any of the Debtor's employees about the pot plan. It is clear that he knew that because on December 16, 2020, just six days after the TRO was entered, Mr. Dondero filed a motion seeking to modify the TRO to allow Mr. Dondero to speak directly with the Independent Board about a pot plan. He later withdrew that motion.[146]

---

[144] *In re All Trac Transport, Inc.*, 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

[145] 3/22/21 Transcript at 135:3-5.

[146] *See* DE # 24.

004081

Additionally, as noted earlier in this Opinion, it appears that Mr. Dondero communicated with inhouse lawyer Scott Ellington about all kinds of other things such as: (a) reporting to him about his intention to object to the settlement by the Debtor of the HarbourVest claim;[147] (b) reporting to him about his desire to collaborate with UBS and its counsel to give them "evidence of Seery ineptitude" and they would "run with it";[148] (c) forwarding email conversations to Scott Ellington that Mr. Dondero was having with his counsel (and thereby eviscerating attorney-client privilege as to those emails) about various disputes involving certain Non-Debtor Dondero-Related Entities and regarding the Debtor's desire to seek discovery from Mr. Dondero;[149] (d) reviewing a joint defense agreement that the lawyer for his family trusts (Dugaboy and Get Good) had drafted;[150] and (e) "showing leadership"—whatever that meant—but likely meaning coordinating of all the many lawyers involved for Mr. Dondero's interests.[151]

Finally, Mr. Dondero communicated with Highland employee (executive accountant) Melissa Schroth about resisting production of Dugaboy documents that were on the Highland server without a subpoena[152] and Jason Rothstein about his phone.[153]

In summary, Mr. Dondero violated Section 2(c) of the TRO numerous times.[154] His intent does not matter. He knew about the TRO. Thus, he was in contempt for these numerous violations.

---

[147] Debtor's Exh. 21 (DE # 80).

[148] Debtor's Exh. 50 (DE # 101).

[149] Debtor's Exh. 52 & 53 (DE # 101).

[150] *See* Debtor's Exh. 24 (DE # 80).

[151] Debtor's Exh. 18 (DE # 80). *See also* 3/22/21 Transcript at 122:1-124:7; 124:15-125:12.

[152] *See* Debtor Exh. 19 (DE # 80) (on December 16, 2020, at 5:18 pm: "No dugaboy details without subpoena.").

[153] Debtor's Exh. 8 (DE # 80); 1/5/21 Transcript at 80-55; 3/22/21 Transcript at 57-58.

[154] The court notes that there was also clear and convincing evidence to suggest various conversations occurred between Mr. Dondero and his assistant Tara Loiben after December 10, 2020. However, it is not clear from the record if Tara Loiben was a Highland employee or an employee of one of the Non-Debtor Dondero-Related Entities. Moreover, there was evidence to suggest Mr. Dondero communicated with Mr. Ellington on December 11-12, 2020 regarding who should be a witness for Mr. Dondero at an upcoming hearing. However, the evidence of this was not

004082

> 2. *The TRO states at Section 3(a) that Mr. Dondero is "enjoined from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct" (and the "Prohibited Conduct" includes "interfering with or otherwise impeding" the Debtor's "decisions concerning disposition of assets controlled by the Debtor").*

The court concludes that there is clear and convincing evidence that Mr. Dondero violated this provision.

Things had grown very awkward at Highland, to say the least, by October 2020 when Mr. Dondero was terminated.  It is clear from the evidence that Mr. Dondero did not like the way the bankruptcy case was playing out (his pot plan was not getting the attention or reception he hoped for from the UCC and the Debtor) and he did not like certain trading decisions that Mr. Seery was making.  Conflicts of interest between the Debtor and Mr. Dondero (and the Non-Debtor Dondero-Controlled Entities) were seeming more and more problematic. It was against this backdrop that the TRO was entered.  It was also against this backdrop that Mr. Dondero and his Non-Debtor Dondero-Related Entities began hiring armies of lawyers.  In the midst of all of this, Mr. Dondero gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it.[155]  He also communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing not to sell any CLO underlying assets. There is potential liability.  Don't do it again."[156]   Matt Pearson, in response, canceled scheduled sales of SKY, as well as AVYA.  Mr.

---

clear and convincing that Mr. Dondero spoke directly with Mr. Ellington (as opposed to being copied on conversations among Mr. Ellington and Mr. Dondero's counsel). *See* Debtor's Exhs. 17 (DE # 80), 48 & 49 (DE # 101).

[155] 1/5/21 Transcript at 41:22-43:11.

[156] *Id.* at 43:15-44:08.

004083

Dondero also communicated with an employee of one of the Advisors named Joe Sowin regarding stoppage of trades of CLO assets.[157] Mr. Dondero also communicated with Debtor employee Thomas Surgent, the Chief Compliance Officer, to inform him that he thought Mr. Seery was engaging in improper trades of Highland CLO assets and told Mr. Surgent he might face personal liability over this.[158] Finally, Mr. Dondero communicated with a text to Mr. Seery that stated: "Be careful what you do, last warning."[159]

Mr. Dondero's "defense" of his interference—that he was looking out for investors—is neither relevant nor entirely credible. As earlier indicated, intent does not matter with civil contempt. Moreover, the evidence was credible that Mr. Dondero himself, postpetition, while still an employee of Highland, traded a significantly larger amount of the AVYA stock that was held in the Highland CLOs, sometimes at a lower price than Mr. Seery did or attempted.[160]

In summary, Mr. Dondero violated Section 3 of the TRO. His intent does not matter. He knew about the TRO. Thus, he was in contempt of court for interfering with or otherwise impairing the Debtor's business, including its decisions concerning disposition of assets controlled by the Debtor.

3. ***The TRO states in Section 2(e) that Mr. Dondero shall not violate section 362(a) of the Bankruptcy Code***.

The Debtor has argued that Mr. Dondero's actions with regard to the disappearing cell phone provided to him by the Debtor amounted to a violation of the automatic stay, section 362(a)(3) (as an exercise of control over property of the estate—*i.e.,* the phone and its data thereon) and, thus, a

---

[157] *Id.* at 50:8-14; *see also id.* at 89:8-25.

[158] *Id.* at 60:23-61-25.

[159] *Id.* at 62:25.

[160] *Id.* at 106:9-20, 159-161.

004084

violation of this provision of the TRO. While the court is more than a little troubled by the mysterious disappearance of the cell phone—just hours after entry of the TRO and after a year of numerous ESI requests by the UCC during the case—the court cannot conclude that the disappearance was a clear and convincing violation of the TRO. There may or may not be a later evaluation of whether a spoliation of evidence has occurred, but for now, this is simply a matter of whether the TRO was violated.

As earlier stated, "To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated."[161] While the court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated,"[162] the court concludes that the TRO simply was not specific enough with regard to the phone. The TRO did not specifically state "turn over your cell phone." A letter on December 23, 2020 from Debtor's counsel to Mr. Dondero's counsel later made such a demand,[163] but this was not the same as there being a mandate in the four corners of the TRO. Additionally, the Highland Employee Handbook made it clear that the phone and its data were the Debtor's.[164] But this, too, is not the same as the TRO's literal terms.

Mr. Dondero should not consider this to be a victory. ***The court reiterates that it is highly concerned about possible spoliation of evidence that may or not be presented in a contested matter later***.[165] At the same time, no one else should consider "spoliation" to be a foregone

---

[161] *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[162] *Id.*

[163] Debtor's Exh. 12 (DE # 80).

[164] Debtor's Exhs. 54 & 55 (DE # 101).

[165] *See* Fed. R. Civ. Proc. 37(e) (dealing with failure to preserve electronically stored information); *Hawkins v. Gresham*, No. 3:13-CV-00312-P, 2015 WL 11122118, at *3 (N.D. Tex. Jan. 16, 2015) (dealing with the question of whether a defendant's sale of his phone containing relevant text messages after being notified of a lawsuit was a breach of his duty to preserve evidence); *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 230-237 (D. Minn. 2019) (dealing with whether two defendants' loss of relevant text messages resulting from their phones' auto-delete function

004085

conclusion here. The court never heard testimony from Jason Rothstein or Tara Loiben (who seem to have been involved with the disappearing phone). The court never heard evidence as to whether the inhouse lawyers (*e.g.,* Scott Ellington, Isaac Leventon) properly addressed with Highland employees, such as Mr. Dondero, as they should have, the preservation notice and document requests served on the Debtor by the UCC.[166] The court also cannot be sure at this time whether there was even relevant and retrievable information on the phone. The court has many lingering questions, but it cannot find contempt of the TRO based on the TRO's lack of specificity where the cell phone was concerned.

   4. ***Other Allegations of TRO Violations***.

   The Debtor has cited various other instances of Mr. Dondero's behavior that it believes were violative of the TRO. For example: (a) Mr. Dondero's alleged willful ignorance of it by not reading it or underlying pleadings associated with it; (b) trespassing on the Debtor's property after the Debtor had evicted him; and (c) allegedly interfering with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody, and

---

constituted spoliation of evidence when the defendants had explicitly discussed the possibility of litigation before the deletion and were principals of the company being sued); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC,* No. 15-CV-1893-HRL, 2016 WL 5870218, at *3-4 (N.D. Cal. Oct. 7, 2016) (dealing with whether Defendants' intentional deletion of text messages after they had discussed the likelihood of litigation was spoliation of evidence under Rule 37(e); also, whether sanctions were warranted when it was unclear whether the information contained in the deleted text messages would have been critical to plaintiff's claims); *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.,* No. 14-CV-62216, 2016 WL 1105297, at *1-2, 4-7 (S.D. Fla. Mar. 22, 2016) (dealing with whether the deletion of text messages from Defendant's cell phone as a result of the phone's auto-delete feature after he reasonably anticipated litigation was spoliation of evidence that prejudiced the Plaintiff; also, whether Defendant's failure to disable the auto-delete feature that resulted in the deletion of text messages was evidence of his intent to deprive Plaintiff of relevant evidence.); *Clear-View Tech., Inc. v. Rasnick,* No. 5:13-CV-02744-BLF, 2015 WL 2251005, at *2, 7-11 (N.D. Cal. May 13, 2015) (whether Defendants spoliated text message evidence by purposefully deleting emails and discarding cell phones after receiving messages threatening a lawsuit from Plaintiff and discussing the possibility of litigation); *Kan-Di-Ki, LLC v. Suer,* No. CV 7937-VCP, 2015 WL 4503210, at *30 (Del. Ch. July 22, 2015) (whether Plaintiff's deletion of relevant emails and loss of his cell phone constituted spoliation and whether sanctions were warranted).

[166] Debtor's Exhs. 29-33 (DE # 80).

004086

Case 19-34054-sgj11 Doc 3781-4 Filed 06/07/21 Entered 06/07/21 15:53:13 Page 449 of 556
Case 3:23-cv-02071-E   Document 28-15   Filed 07/23   Page 165 of 214   PageID 3412
Exhibit 15   Page 250 of 256

control.  While the allegations are problematic, the court does not conclude these actions constituted civil contempt of the TRO.[167]

With regard to Mr. Dondero's alleged "willful ignorance" of the TRO, it is technically not a violation of any term of the TRO. The most important thing here is that Mr. Dondero cannot claim lack of knowledge of the TRO's contents. As mentioned earlier, "[a]n alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high."[168] When Mr. Dondero testified that he had not read the TRO (or the underlying pleadings supporting it), maybe he was trying to imply lack of knowledge of its terms as some sort of defense?  Or maybe he really did not care to read the TRO and was relying entirely upon his counsel to tell him all of its terms. Whatever the explanation, it really does not matter much.  The court determines that Mr. Dondero had the necessary knowledge of the TRO, for purposes of holding him accountable for compliance with it, but—even if he was somewhat cavalier in not actually reading the TRO line-for-line—this alone is not a violation of the TRO's terms.

With regard to Mr. Dondero's trespassing on the Debtor's property after the Debtor had evicted him, the problem here is that the "eviction" of Mr. Dondero occurred pursuant to the letter that Debtor's counsel sent to Mr. Dondero's counsel on December 23, 2010—not pursuant to the actual terms of the TRO.[169]  The TRO itself did not specifically enjoin Mr. Dondero from going to

---

[167] The court should add that it does not conclude that letters sent by counsel for the Advisors and the NexPoint/HCMFA Funds, seeking to stop the sale of Highland CLO assets, and a motion that they filed to address Highland CLO management issues, constituted contempt of court by Mr. Dondero. *See* Debtor's Exh. 25 (DE # 80). While Mr. Dondero, as the President and portfolio manager of these Non-Debtor Dondero-Related entities, was/is no doubt in control of them, and while it is a very close call as to whether—through these lawyers' actions—Mr. Dondero was causing "(a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf," to interfere with the disposition of assets controlled by the Debtor, the court ultimately believes that hiring lawyers to file motions (and those lawyers taking steps leading up to the filing of the motions, such as sending letters previewing that they may take legal actions), should not be viewed as having crossed the line into contemptuous behavior. Again, this was a close call.

[168] *Kellogg v. Chester,* 71 B.R. at 38.

[169] Debtor's Exh. 12 (DE # 80).

004087

the Highland offices.  The later preliminary injunction entered on January 8, 2021 for the first time

contained such an injunction.[170]  Thus, even though Mr. Dondero showed up in the Debtor's offices

on January 5, 2021 to sit for the Debtor's virtual deposition of him, the court does not conclude that

this violated a term of the TRO.

With regard to Mr. Dondero's allegedly interfering with the Debtor's obligation to produce

certain documents that were requested by the UCC and that were in the Debtor's possession,

custody, and control, the court understands this to be a reference to Mr. Dondero texting Highland

employee Melissa Schroth and instructing her not to turn over documents concerning the Dugaboy

Trust (that were on Highland's server) without a subpoena.[171]  The court has already addressed this

as a TRO violation, ***since it was a communication with a Highland employee regarding matters

other than "shared services."***  For the avoidance of doubt, there was no shared services agreement

between the Dugaboy Trust and Highland.  This clearly was a TRO violation.

**V. Damages**.

The Contempt Motion requests that the court (i) find and hold Mr. Dondero in contempt for

violating the TRO; (ii) direct Mr. Dondero to produce to the Debtor and the UCC, within three days

all financial statements and records of Dugaboy and Get Good for the last five years; (iii) direct Mr.

Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual

expenses incurred in bringing this Motion, payable within three calendar days of presentment of an

itemized list of expenses; (iv) impose a penalty of three times the Debtor's actual expenses incurred

in connection with any future violation of any order of this Court, and (v) grant the Debtor such

other and further relief as the court deems just and proper under the circumstances.

---

[170] DE # 59 at ¶ 5.

[171] Debtor's Exh. 19 (DE # 101).

004088

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to the TRO and Contempt Motion. The Debtor did not attempt to quantify any potential economic harm to the Debtor from Mr. Dondero's prohibited conversations with Debtor employees and attempted interference with trading. Should this matter? Once again, is this much ado about nothing? In answering this question, context matters. Recall that the Corporate Governance Settlement between the Debtor and UCC from January 2020 was ***all about removing Mr. Dondero from control of the Debtor but avoiding the drastic remedy of a Chapter 11 Trustee***. It was heavily negotiated and extremely detailed in its terms. Ultimately, Mr. Dondero was kept around at the company in a non-control capacity, but eventually conflicts between the Debtor and him (and between the Debtor and the Non-Debtor Dondero-Related Entities) became intolerable. Mr. Dondero was, therefore, terminated. But almost immediately, he essentially began instructing Debtor employees to ignore their boss (Mr. Seery) and do as Mr. Dondero said instead. All of this was occurring at a critical time when the Debtor had filed a Chapter 11 plan, was still negotiating it with creditors, and was set for a confirmation hearing—and, meanwhile, Mr. Dondero was trying

004089

to gain support for his own pot plan that would involve him regaining control of the company and/or transitioning the Debtor's managed funds over to his control. His interference—even if not ultimately resulting in quantifiable harm to the Debtor's balance sheet or cash flow—posed a risk to the Debtor's plan of reorganization that, ultimately ended up being supported by hundreds of millions of dollars-worth of creditors (in fact, all creditors except the Non-Debtor Dondero-Related Entities). The reality is that the Debtor's counsel acted quickly in bringing the Contempt Motion before much damage could be done. The fact that they acted swiftly—before the Debtor had incurred any quantifiable damage other than significant attorneys' fees—should not preclude the Debtor from alleging harm and receiving reimbursement of its attorneys' fees and expenses incurred relating to the TRO and Contempt Motion.

As far as the attorneys' fees incurred relating to the TRO and Contempt Motion, the Debtor presented invoices of the fees incurred by its primary bankruptcy counsel, Pachulski Stang, during December 2020 and January 2021, pertaining to "Bankruptcy Litigation"—much of which it represented related to its attorney time devoted to the Contempt Motion. The Debtor admitted that there were some other litigation matters mixed in these invoices.[172] Total December fees were $526,686. The court has reviewed the December invoice and conservatively estimates that **$170,919** of the fees reflected in the December invoice related to the TRO and Contempt Motion (other fees appeared to relate to other litigation matters such as the HarbourVest settlement, Pat Daugherty issues, UBS, demand note litigation, and Dugaboy claims). Total January fees were $698,770. The court has reviewed this invoice and conservatively estimates that **$195,002** of the fees reflected in the January 2021 invoice related to the TRO and Contempt Motion (again, other

---

[172] Debtor's Exhs. 38 & 39 (DE # 128).

004090

fees appeared to relate to other litigation matters such as UBS and other litigation).  These two sums total **$365,921**.

However, the hearing on this matter (as a result of continuances sought by Mr. Dondero) did not occur until March 22 & 24, 2021.  The court was presented with no invoices for February or March. The court estimates that the hearing on this matter (March 22 & 24, 2021) required 10 hours of in-court time.  The primary attorney handling this matter for the Debtor (Mr. Morris) charged at $1,245 per hour and his paralegal (Ms. Canty) charged $425 per hour. The court will assume that they each spent 10 hours during the day or two before the hearing preparing for it.  This would amount to an additional **$33,400** of fees, bringing the total now to **$399,321**. The court stresses that it used conservative math when scrutinizing the invoices.  Moreover, this represents fees only.  The court assumes that the various depositions and transcripts required as a result of this litigation resulted in many thousands of dollars of additional expenses.  Also, Pachulski had local counsel (Hayward & Associates) whose invoices were not submitted.  Additionally, the UCC had counsel monitoring all of this (Sidley & Austin)—whose fees and expenses are reimbursed by the bankruptcy estate—and their fees and expenses have not been included.  In summary, the $399,321 number is extremely conservative, and it does not include likely significant add-ons (expenses; local counsel; and UCC counsel). The court determines that it is reasonable to round the $399,321 number up approximately $50,000, to **$450,000** because of these extra items. In considering the probable effectiveness of the sanction, the financial resources of Mr. Dondero and the burden the sanctions may impose, and the willfulness of Mr. Dondero in disregarding the court's TRO, the court believes—based on information it has learned at numerous hearings about Mr. Dondero's compensation and the size of the companies he has been running for almost 30 years—he has substantial resources, and this $450,000 compensatory sanction will not place much of a burden on

004091

him at all. The court believes that there was willfulness with regard to many of Mr. Dondero's actions. The court has no idea about the probability of these sanctions being effective. Time will tell.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that Mr. Dondero may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

Accordingly, it is hereby ORDERED that:

(i)    Mr. Dondero is in civil contempt of court in having violated the court's December 10, 2020 TRO—the court having found by clear and convincing evidence that: (1) the TRO was in effect and Mr. Dondero knew about it; (2) the TRO required certain conduct by Mr. Dondero; and (3) Mr. Dondero failed to comply with the TRO;

(ii)    In order to compensate the Debtor's estate for loss and expense resulting from Mr. Dondero's non-compliance with the TRO, Mr. Dondero is directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$450,000;**

(iii)    The court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that Mr. Dondero may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by him and are not successful;

(iv)    Other sanctions are denied at this time; and

(v)    The court reserves jurisdiction to interpret and enforce this Order.

004092

### End of Memorandum Opinion and Order ###

004093

# EXHIBIT 16



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed November 24, 2020

_United States Bankruptcy Judge_

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### ORDER (A) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (B) SCHEDULING A HEARING TO CONFIRM THE FIFTH AMENDED PLAN OF REORGANIZATION; (C) ESTABLISHING DEADLINE FOR FILING OBJECTIONS TO CONFIRMATION OF PLAN; (D) APPROVING FORM OF BALLOTS, VOTING DEADLINE AND SOLICITATION PROCEDURES; AND (E) APPROVING FORM AND MANNER OF NOTICE

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor-in-possession

(the "Debtor") seeking entry of an order:   (a) approving the adequacy of the _Disclosure_

_Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P._,

filed on November 24, 2020 (as amended or modified, the "Disclosure Statement"); (b)

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed thereto in the Motion.



1934054201124000000000005
004095

scheduling a hearing to confirm the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as amended or modified, the "Plan"); (c) fixing an objection deadline to the Plan; (d) approving the forms of ballots, the voting deadline and solicitation procedures; and (e) approving the form and manner of notices related thereto; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given; and after due deliberation and it appearing that sufficient cause exists for granting the requested relief and that such relief is in the best interests of the Debtor's estate and creditors; it is hereby **ORDERED THAT**:

1.  The Motion is **GRANTED** as set forth herein.

2.  The Disclosure Statement is hereby **APPROVED** for solicitation as provided for herein.

3.  A hearing to confirm the Plan (the "Confirmation Hearing") will commence on **January 13, 2021, at 9:30 a.m. (prevailing Central Time)**.

4.  The Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise, all without further notice to parties-in-interest.

5.  The deadline to file and serve objections to the confirmation of the Plan (the "Plan Objection Deadline") shall be on **January 5, 2021, at 5:00 p.m. (prevailing Central Time)**.

6.  All objections to the confirmation of the Plan, if any, must:  (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the Northern District of Texas (the "Local Rules"); (iii) be filed with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"); and (iv) be served upon by the following parties: (a) counsel for the Debtor, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA  90067, Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo, Emails: jpomerantz@pszjlaw.com, ikharasch@pszjlaw.com, and gdemo@pszjlaw.com; (b) counsel for

004096

the Debtor, Hayward & Associates PLLC, 10501 N. Central Expy, Ste. 106, Dallas, Texas 75231, Attn: Melissa S. Hayward and Zachery Z. Annable, Emails: MHayward@HaywardFirm.com and ZAnnable@HaywardFirm.com; (c) counsel to the official committee of unsecured creditors, Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603, Attn: Matthew A. Clemente and Alyssa Russell, Emails: mclemente@sidley.com and Alyssa.russell@sidley.com; and (d) counsel for the Office of the United States Trustee, U.S. Department of Justice, Region 6: Northern District of Texas, Office of The United States Trustee, Earle Cabell Federal Building, 1100 Commerce Street, Room 976, Dallas, TX 75242, Attn: Lisa L. Lambert, Email: Lisa.L.Lambert@usdoj.gov (collectively, the "Notice Parties").

7.       The Debtor shall be allowed to file a brief in support of confirmation of the Plan on or before **January 11, 2021, at 5:00 p.m. (prevailing Central Time)** and a reply to any objections to the Plan on or before **January 11, 2021, at 5:00 p.m. (prevailing Central Time)**.

8.       The Court shall consider only written objections to the Plan that are timely filed by the Plan Objection Deadline and served upon the Notice Parties.

9.       All objections to the Plan must (a) conform to the Bankruptcy Rules, the Local Rules and any orders of the Court in this chapter 11 case, (b) state with particularity the legal and factual grounds for such objection, (c) provide, where applicable, the specific text that the objecting party believes to be appropriate to insert into the Plan, and (d) describe the nature and amount of the objector's claim or interest.

10.      Objections to the Plan not timely filed and served in accordance with the provisions of this Order shall not be heard and shall be overruled.

11.      The Voting Record Date is **November 23, 2020**.

12.      The deadline for casting a Ballot to accept or reject the Plan (the "Voting Deadline") shall be **January 5, 2021, at 5:00 p.m. (prevailing Central Time)**.

13.      All Ballots accepting or rejecting the Plan must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by no later than **5:00 p.m. (prevailing Central Time) on the Voting Deadline** at the following address, as specified on each Ballot, whether sent by

004097

first class mail, personal delivery, or overnight courier:

<div align="center">

HCMLP Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

</div>

14.     Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions solely through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

15.     The Debtor or the Court may extend the period during which votes will be accepted by the Debtor, in which case the Voting Deadline for such solicitation shall mean the last time and date to which such solicitation is extended.

16.     The forms of Ballots and voting instructions thereto, substantially in the form attached hereto as **Exhibit A**, are hereby approved.

17.     All votes to accept or reject the Plan must be cast by using the appropriate Ballot.

18.     The Solicitation Procedures are hereby approved; *provided, however*, the Debtor reserves the right to modify, amend or supplement the Solicitation Procedures subject to Court approval.

19.     No later than four (4) business days after entry of this Order, (or as soon as reasonably practicable thereafter), the Debtor shall cause the following solicitation materials (the "Solicitation Package") to be distributed to (i) all known holders of claims and interests in Classes 2, 7, 8, 9, 10 and 11 as of the Voting Record Date who are entitled to vote on the Plan, (ii) the U.S. Trustee, and (iii) the Securities and Exchange Commission:

a.     A CD Rom or a flash drive containing the Plan, the Disclosure Statement and a copy of this Disclosure Statement Order (without exhibits);

b.     the appropriate Ballot and voting instructions;

c.     the Confirmation Hearing Notice;

d.     any supplemental solicitation materials filed with the Court;  and

<div align="center">4</div>

004098

e.    a pre-addressed return envelope.

20.    The Debtor shall cause to be served on members of Classes 1, 3, 4, 5 and 6 only with (i) the Confirmation Hearing Notice, and (ii) the Notice of Non-Voting Status. Service of such documents under the procedures set forth in the Motion and this Order shall constitute adequate transmission of materials required under Bankruptcy Rule 3017(d).

21.    Creditors who have more than one claim within the same Class shall receive only one Solicitation Package and one Ballot for each claim.

22.    Each holder of a claim shall be entitled to vote to accept or reject the Plan in the amount of such claim as is held on the Voting Record Date.

23.    With respect to claims, and solely for purposes of voting on the Plan:

    a.    If an objection has not been filed to a claim, the amount of such claim for voting purposes shall be the non-contingent, liquidated and undisputed claim amount contained on a timely filed proof of claim or, if no timely filed proof of claim was filed, the non-contingent, liquidated and undisputed amount of such claim listed in the Debtor's schedules filed with the Court;

    b.    If a claim for which a proof of claim has been timely filed is wholly contingent, unliquidated or disputed, undetermined or unknown in amount, such claim shall be temporarily allowed in the amount of $1.00 for voting purposes only, and not for purposes of allowance or distribution;

    c.    If a claim is partially liquidated and partially unliquidated, such claim shall be allowed for voting purposes only in the liquidated amount;

    d.    If an objection to a timely filed claim is filed, such claim shall be disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection;

    e.    Proofs of claim filed for $0.00 are not entitled to vote;

    f.    Notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased one or more duplicate claims within the same Class shall be provided with only one Solicitation Package and one Ballot for voting a single claim in such Class, regardless of whether the Debtor has objected to such duplicate claims;

    g.    If a claim is the subject of an amended proof of claim, the originally filed proof of claim shall be deemed superseded by the later filed amended proof of claim, regardless of whether or not the Debtor has objected to such claim, and only the amended proof of claim shall be used for the

004099

purpose of determining voting eligibility in accordance with the provisions herein;

    h.    For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

    i.    If a claim has been disallowed by agreement of the applicable creditor or order of the Court at any time before the Voting Deadline, such claim shall also be disallowed for voting purposes; and

    j.    If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution.

24.    Creditors seeking temporary allowance of their claims for voting purposes must serve the Notice Parties and file with the Court a motion seeking temporary allowance for voting purposes. Any such motion, with evidence in support thereof, must be filed no later than such date that will enable a hearing thereon to be held on or prior to the Voting Deadline. It shall be the responsibility of each creditor filing such a motion to schedule a hearing thereon to occur at or prior to the Voting Deadline.

25.    The following general voting procedures and standard assumptions are to be used in tabulating Ballots:

    a.    Except to the extent the Debtor otherwise determines, or as permitted by the Court, Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

    b.    Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

    c.    Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

    d.    Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

    e.    Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

    f.    Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

g.     The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

h.     Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal. The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; (b) overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

i.     Ballots submitted by facsimile, email or other means of electronic transmission, other than the online balloting portal, will not be counted;

j.     No Ballot sent to the Debtor or the Debtor's financial or legal advisors shall be accepted or counted;

k.     The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with section 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms of the Plan, the Debtor will disseminate additional solicitation materials and will extend the solicitation in each case to the extent directed by the Court;

l.     If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

m.     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

n.     The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

004101

o.      Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor in its sole discretion, which determination shall be final and binding;

p.      If a designation is requested under section 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

q.      Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

r.      Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

s.      Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

t.      No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

u.      The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

v.      The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

26.      The Confirmation Hearing Notice, substantially in the form attached hereto as **Exhibit B**, is hereby approved.

27.      The Debtor shall serve the Confirmation Hearing Notice by no later than **four (4) business days following the entry of this Order (or as soon as reasonably practicable thereafter)**, on (i) the U.S. Trustee, (ii) counsel to the official committee of unsecured creditors (iii) the Securities and Exchange Commission, (iv) all creditors on the list of creditors and equity security holders maintained by the Balloting Agent in this chapter 11 case, and (v) those parties who requested notice pursuant to Bankruptcy Rule 2002.

28.     The Notice of Non-Voting Status, substantially in the form attached hereto as **Exhibit C**, is hereby approved.

29.     The Assumption Notice, substantially in the form attached hereto as **Exhibit D**, is hereby approved.

30.     Consistent with section 1126 and Bankruptcy Rule 3017(d), Solicitation Packages shall not be distributed to holders of claims in the Non-Voting Classes (*i.e.*, Classes 1, 3, 4, 5 and 6); *provided, however*, that members of Classes 1, 3, 4, 5 and 6 shall receive the Confirmation Hearing Notice and Notice of Non-Voting Status, which includes instructions on how to obtain copies of the Solicitation Package, if so desired.

31.     To the extent that the Debtor, in its sole discretion, elects to publish the Confirmation Hearing Notice, such publication, substantially in the form of Confirmation Hearing Notice attached hereto as **Exhibit B**, is approved, and the Debtor, to the extent that it elects to publish the Confirmation Hearing Notice, shall publish the Confirmation Hearing Notice in the national edition of the *Wall Street Journal* or similar paper of national circulation on or before **December 6, 2020,** and may pay the costs of such publication.

32.     The Debtor is excused from re-mailing Solicitation Packages, the Confirmation Hearing Notice, or Notice of Non-Voting Status, as the case may be, to those entities whose addresses differ from the addresses in the claims register or the Debtor's records as of the Voting Record Date.

33.     The Debtor is authorized and empowered to take all actions and execute such other documents as may be necessary to implement the relief granted herein.

34.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

<div align="center">

### ### END OF ORDER ###

</div>

## EXHIBIT A

**Forms of Ballot for Classes 2, 7, 8, 9, 10 and 11**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 2 BALLOT – Frontier Secured Claim**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

## BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "<u>Voting Deadline</u>"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "<u>Record Date</u>"), the undersigned was the holder of a Class 2 Frontier Secured Claim in the aggregate outstanding amount of $_____.[2]

### <u>CHECK ONE BOX</u>

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE: You must vote <u>all</u> of your Class 2 Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2. Certification**

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)     such person or entity is the holder of the aggregate amount of the Class 2 Claim set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)     such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only. Subject to tabulation rules.

004106

        (iii)    such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of the Class 2 Claim;

        (iv)    no other Ballots with respect to the Class 2 Claim identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 2 Claim, such earlier Ballots are hereby revoked;

        (v)    all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

        If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
                    (If appropriate)

TITLE: _____
                    (If appropriate)

ADDRESS: _____

_____

TEL. NO. (    ) _____ - _____     DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

<div align="center">

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

</div>

004107

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique Electronic Ballot ID #:_____

Unique Electronic Ballot PIN #: _____

Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.

---

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1. Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8. Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9. Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

004109

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

004110

22. The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

004111

Case 19-34054-sgj11 Doc 1472 Filed 11/24/20 Entered 11/24/20 15:23:22 Page 18 of 67
Case 3:23-cv-02071-E Document 36-136 Filed 11/24/20 Page 190 of 214 PageID 3437
Exhibit 136 Page 1970

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT

## BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.*

## CLASS 7 BALLOT – Convenience Claims

## PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "<u>Balloting Agent</u>") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "<u>Voting Deadline</u>"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended.  Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

**Item 1.  Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "<u>Record Date</u>"), the undersigned was the holder of a Class 7 Convenience Claim in the aggregate outstanding amount of $_____.[2]

**<u>CHECK ONE BOX</u>**

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE:  You must vote <u>all</u> of your Class 7 Convenience Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2.  GUC Election – Optional and Voluntary Election to Receive the Treatment Provided to Class 8 General Unsecured Claims.**

If you check the box below, your Claim will receive the treatment provided to Class 8 General Unsecured Claims and you will receive (i) your Pro Rata share of the Claimant Trust Interests or (ii) such other less favorable treatment as to which you and the Claimant Trustee shall have agreed upon in writing.

If you check the box below and elect to have your Class 7 Convenience Claim treated as a Class 8 General Unsecured Claim; (i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 7 with respect to the Plan, but your Claim will receive the treatment afforded to Class 8 General Unsecured Claims; and (ii) you will be giving up all distributions to Class 7 Convenience Class Claims in exchange for the treatment provided to Class 8 General Unsecured Claims.

I hereby elect to have my Class 7 Convenience Claim identified in Item 1 treated

---

[2]  For voting purposes only.  Subject to tabulation rules.

as a Class 8 General Unsecured Claim for all purposes.

**Item 3.  Certification**

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i) such person or entity is the holder of the aggregate amount of the Class 7 Convenience Claim(s) set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii) such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

(iii) such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 7 Convenience Claims;

(iv) no other Ballots with respect to the Class 7 Convenience Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 7 Convenience Claims, such earlier Ballots are hereby revoked;

(v) all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

ADDRESS: _____

_____

TEL. NO. (    ) _____ - _____      DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a

004114

claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE
VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL
COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER
ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT,
KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE
"HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR
BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL:
(310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE
THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING
AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED
BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit
http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website
and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your
customized electronic Ballot:

Unique Electronic Ballot ID #:_____
Unique Electronic Ballot PIN #: _____

Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of
your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot
ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online
portal should NOT also submit a paper Ballot.

---

004115

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1.  Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2.  Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3.  Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4.  Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5.  Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6.  Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7.  The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8.  Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery.  Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9.  Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10.  No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11.  The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification).  If the Debtor makes material changes in the terms

Case 19-34054-sgj11 Doc 1487-1 Filed 11/24/20 Entered 11/24/20 15:43:22 Page 23 of 67
Case 3:23-cv-02071-E   Document 13-16   Filed 02/07/23   Page 195 of 214   PageID 3442
Exhibit 16   Page 4 of 68

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12.     If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13.     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14.     The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15.     Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16.     If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17.     Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18.     Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19.     Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20.     No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21.     The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

004118

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 8 BALLOT – General Unsecured Claims**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

004119

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "<u>Voting Deadline</u>"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended.  Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

**Item 1.  Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "<u>Record Date</u>"), the undersigned was the holder of a Class 8 General Unsecured Claim in the aggregate outstanding amount of $_____.[2]

**<u>CHECK ONE BOX</u>**

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE:  You must vote <u>all</u> of your Class 8 General Unsecured Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Convenience Class Election – Optional and Voluntary Election to Receive the Treatment Provided Class 7 Convenience Claims.**

If your Claim is liquidated on or before the Confirmation Date, you are eligible to make the Convenience Class Election.  If you are eligible and you check the box below, your Claim will be reduced to $1,000,000 (to the extent your claim is in excess of that amount), and you will receive the treatment provided to Class 7 Convenience Claim, which is the lesser of  (a) 85% of the Allowed amount of your Claim (as reduced) or (b) your pro rata share of the Convenience Claims Cash Pool ($13,150,000).

If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; (i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims; and (ii) you will be giving up all distributions to Class 8 General Unsecured Claims in exchange for the treatment provided to Class 7 Convenience Claims

---

[2]  For voting purposes only.  Subject to tabulation rules.

004120

I hereby elect to reduce my Claim and to receive the treatment provide to a Class 7 Convenience Claim.

## Item 2.  Certification

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)      such person or entity is the holder of the aggregate amount of the Class 8 General Unsecured Claim(s) set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)     such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

(iii)    such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 8 General Unsecured Claims;

(iv)     no other Ballots with respect to the Class 8 General Unsecured Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 8 General Unsecured Claims, such earlier Ballots are hereby revoked;

(v)      all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER:  _____

SIGNATURE:  _____

BY: _____
<div align="center">(If appropriate)</div>

TITLE: _____
<div align="center">(If appropriate)</div>

004121

ADDRESS: _____

_____

TEL. NO. (    ) _____ - _____          DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

<div align="center">

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

</div>

Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique Electronic Ballot ID #: _____
Unique Electronic Ballot PIN #: _____

Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.

004122

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1.  Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2.  Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3.  Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4.  Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5.  Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6.  Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7.  The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8.  Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9.  Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

004123

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

22.    The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 9 BALLOT – Subordinated Claims**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "<u>Voting Deadline</u>"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "<u>Record Date</u>"), the undersigned was the holder of a Class 9 Subordinated Claim in the aggregate outstanding amount of $_____.[2]

**<u>CHECK ONE BOX</u>**

        I hereby vote the above Claim to ACCEPT the Plan

        I hereby vote the above Claim to REJECT the Plan

**NOTE: You must vote <u>all</u> of your Class 9 Subordinated Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2. Certification**

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)      such person or entity is the holder of the aggregate amount of the Class 9 Subordinated Claim(s) set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)      such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only. Subject to tabulation rules.

004127

Case 19-34054-sgj11 Doc 4678-17 Filed 11/24/20 Entered 11/24/20 15:23:22 Page 34 of 67
Case 3:23-cv-02071-E   Document 36-16 Filed 03/20/23   Page 206 of 214   PageID 3453
Exhibit 16   Page 235 of 268

        (iii)     such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 9 Subordinated Claims;

        (iv)     no other Ballots with respect to the Class 9 Subordinated Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 9 Subordinated Claims, such earlier Ballots are hereby revoked;

        (v)     all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

        If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
                     (If appropriate)

TITLE: _____
                     (If appropriate)

ADDRESS: _____

_____

TEL. NO. (     ) _____ - _____     DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

**Alternatively, you may submit your Ballot via the Balloting Agent's online portal.  Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique Electronic Ballot ID #:_____**
**Unique Electronic Ballot PIN #: _____**

**Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of your electronic ballot.  Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable.  Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

---

004129

<u>**VOTING INSTRUCTIONS**</u>

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1.  Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2.  Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3.  Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4.  Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5.  Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6.  Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7.  The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8.  Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9.  Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

004131

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or
proof of interest or an assertion or admission of a claim or equity security interest.

004132

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE
OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN
THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS
AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 10 BALLOT – Class B/C Limited Partnership Interests**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS
CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended)(the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "Voting Deadline"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1.  Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "Record Date"), the undersigned was the holder of a Class 10 Class B/C Limited Partnership Interests in the aggregate outstanding amount of $_____.[2]

**<u>CHECK ONE BOX</u>**

I hereby vote the above Interest to ACCEPT the Plan

I hereby vote the above Interest to REJECT the Plan

**NOTE:  You must vote <u>all</u> of your Class 10 Class B/C Limited Partnership Interests <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2.  Certification**

By signing this Ballot, the undersigned certifies with respect to the Class 10 Class B/C Limited Partnership Interests identified in Item 1, above, that:

(i)    such person or entity is the holder of the aggregate amount of the Class 10 Class B/C Limited Partnership Interests set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)    such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only.  Subject to tabulation rules.

(iii)    such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 10 Class B/C Limited Partnership Interests;

(iv)    no other Ballots with respect to the Class 10 Class B/C Limited Partnership Interests identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 10 Class B/C Limited Partnership Interests, such earlier Ballots are hereby revoked;

(v)    all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

ADDRESS: _____

_____

TEL. NO. (      ) _____ - _____     DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING**

004135

**AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED
BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245**

---

**Alternatively, you may submit your Ballot via the Balloting Agent's online
portal.  Please visit http://www.kccllc.net/hcmlp and click on the "Submit
Electronic Ballot" section of the website and follow the instructions to submit
your Ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve
and submit your customized electronic Ballot:**

**Unique Electronic Ballot ID #:_____
Unique Electronic Ballot PIN #: _____**

**Each Electronic Ballot ID# is to be used solely for voting on those Interests in
Item 1 Below of your electronic ballot.  Please complete and submit an
electronic ballot for each Electronic Ballot ID# you receive, as applicable.
Parties who cast a Ballot using the Balloting Agent's online portal should
NOT also submit a paper Ballot.**

---

004136