**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| In Re: **Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 14

# APPELLANT RECORD

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

**APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD**

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its

individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital

Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and

files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in

the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

**I.
STATEMENT OF THE ISSUES**

A.    Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the
court to consider evidence and other non-pleading materials including, but not limited to,
the court's reasoning that:

1.    the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type
analysis;

2.    the colorability analysis is "akin to the standards applied under the … *Barton*
doctrine";

3.    the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts
have applied when considering motions to file suit when a vexatious litigant bar
order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File
Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the
Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on
10/23/2023.

      4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.      Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.      Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

     1.  ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

     2.  determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.      Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.      Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.      Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.      Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.      Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.      Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

     1.  there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

     2.  there is no evidence to support the alleged quid pro quo;

     3.  the material shared was *public* information; and/or

     4.  the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

   1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

   2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.    **Notice of Appeal**

*000001*    a.    Notice of Appeal **[Dkt. 3906]**;

*000276*    b.    Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*    c.    Second Amended Notice of Appeal **[Dkt. 3945]**

2.    **The judgment, order, or decree appealed from:**

   a.    Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3.** **Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4.** **Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru Vol 4*
*Vol 4*
*002236*
*002243*
*002248*

---

Vol. 5
002251

002254

002262

002340

002355

002358

002391

002398

002400
Thru Vol. 7

Vol. 8
002826
Thru Vol. 9

Vol. 9
003257

003260

003270

003278

| Date | Doc No. | Description |
|---|---|---|
| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10* *003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

---

| | | | |
|---|---|---|---|
| **Vol. 10** | | | Holdings LLC, Stonehill Capital Management LLC |
| **003458** | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| **003463** | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| **Vol. 11** **003537** | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| **Thru Vol. 16** **Vol. 17** **004665** | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| **004712** | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| **004714** | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| **004808** | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| **004813** | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| **004836** | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| **Vol. 18** **004930** | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| **004931** | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

| | Date | Doc No. | Description |
|---|---|---|---|
| *Vol. 18* *004939.* | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| *004959* | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *004961* | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *004984* | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *005049* | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *005114* *Thru Vol. 25* | 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| *Vol. 26* *006608* *Thru Vol. 39* | 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| *Vol. 39* *009273* | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009290* | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009416* | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| *009424* | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*
*Vol. 42*  *Thru Vol. 41*
*009841*

*009901*

*009905*

*009908*

*009912*

| | | | |
|---|---|---|---|
| 06/07/2023 | 3824 | | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| 06/08/2023 | 3828 | | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.**    **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
|---|
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                              Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
    Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire

# VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1. Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8. Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9. Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

004137

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12.  If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13.  If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14.  The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15.  Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16.  If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17.  Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18.  Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19.  Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20.  No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

004138

22.   The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

004139

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

### CLASS 11 BALLOT – Class A Limited Partnership Interests

### PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended)(the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

004140

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "Voting Deadline"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "Record Date"), the undersigned was the holder of a Class 11 A Limited Partnership Interests in the aggregate outstanding amount of $_____.[2]

## <u>CHECK ONE BOX</u>

☐ I hereby vote the above Interest to ACCEPT the Plan

☐ I hereby vote the above Interest to REJECT the Plan

**NOTE: You must vote <u>all</u> of your Class 11 Class A Limited Partnership Interests <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2. Certification**

By signing this Ballot, the undersigned certifies with respect to the Class 11 Class A Limited Partnership Interests identified in Item 1, above, that:

(i)    such person or entity is the holder of the aggregate amount of the Class 11 Class A Limited Partnership Interests set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)    such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only. Subject to tabulation rules.

(iii)     such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 11 Class A Limited Partnership Interests;

(iv)     no other Ballots with respect to the Class 11 Class A Limited Partnership Interests identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 11 Class A Limited Partnership Interests such earlier Ballots are hereby revoked;

(v)     all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

ADDRESS: _____

_____

TEL. NO. (      ) _____ - _____        DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

004142

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

**Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique Electronic Ballot ID #:_____**
**Unique Electronic Ballot PIN #: _____**

**Each Electronic Ballot ID# is to be used solely for voting on those Interests in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

---

004143

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1. Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8. Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9. Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12.     If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13.     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14.     The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15.     Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16.     If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17.     Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18.     Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19.     Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20.     No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21.     The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

004145

22.    The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

**EXHIBIT B**

**Confirmation Hearing Notice**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### NOTICE OF: (I) ENTRY OF ORDER APPROVING DISCLOSURE STATEMENT; (II) HEARING TO CONFIRM PLAN; AND (III ) RELATED IMPORTANT DATES[2]

On [•], 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered its *Order (a) Approving the Adequacy of the Disclosure Statement; (b) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization; (c) Establishing Deadline for Filing Objections to Confirmation of Plan; (d) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; and (e) Approving Form and Manner of Notice* (the "Disclosure Statement Order"). The Disclosure Statement Order approved the *Disclosure Statement for the Ffith Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement"), as containing adequate information required

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms have the meanings given to them in the Plan.

004148

under section 1125(a) of the Bankruptcy Code, and authorized the Debtor to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").

**HEARING TO CONFIRM PLAN**. A hearing to confirm the Plan (the "Confirmation Hearing") will commence on **January 13, 2021, at 9:30 a.m., prevailing Central Time**, before the Bankruptcy Court. The Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.

**PLAN OBJECTION DEADLINE**. The Bankruptcy Court has established **January 5, 2021, at 5:00 p.m., prevailing Central Time**, as the last date and time for filing and serving objections to the confirmation of the Plan (the "Plan Objection Deadline"). All objections must state with particularity the legal and factual grounds for such objection.

In order to be considered by the Bankruptcy Court, objections, if any, must: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of Texas; (iii) be filed with the United States Bankruptcy Court for the Northern District of Texas; and (iv) be served upon by the following parties: (a) counsel for the Debtor, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo, Emails: jpomerantz@pszjlaw.com, ikharasch@pszjlaw.com, gdemo@pszjlaw.com; (b) counsel for the Debtor, Hayward & Associates PLLC, 10501 N. Central Expy, Ste. 106, Dallas, Texas 75231, Attn: Melissa S. Hayward and Zachery Z. Annable, Emails: ZAnnable@HaywardFirm.com, MHayward@HaywardFirm.com; (c) counsel to the official committee of unsecured creditors, Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603, Attn: Matthew A. Clemente and Alyssa Russell, Emails: mclemente@sidley.com, Alyssa.russell@sidley.com; and (d) counsel for the Office of the United States Trustee, U.S. Department of Justice, Region 6: Northern District of Texas, Office of The United States Trustee, Earle Cabell Federal Building, 1100 Commerce Street, Room 976, Dallas, TX 75242, Attn: Lisa L. Lambert, Emails: Email: Lisa.L.Lambert@usdoj.gov (collectively, the "Notice Parties").

**VOTING RECORD DATE**. **November 23, 2020**, is the record date for purposes of determining which parties are entitled to vote on the Plan.

**VOTING DEADLINE**. **January 5, 2021** (the "Voting Deadline"), is the deadline for casting a ballot ("Ballot") to accept or reject the Plan. All Ballots accepting or rejecting the Plan must be received by the Notice and Balloting Agent by 5:00 p.m., prevailing Central Time, on the Voting Deadline at the following address, whether by First Class Mail, hand delivery, or overnight courier: HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245. If you require a Ballot, or if your Ballot is lost, damaged or destroyed, contact the Notice and Balloting Agent to obtain a replacement Ballot.

**RULE 3018 MOTION DEADLINE AND HEARING**. It shall be the responsibility of each party who files a motion for an order pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of a claim for voting purposes to (a) file such motion with evidence in support thereof by no later than **January 5, 2021**, (b) schedule a hearing on such motion, and (c) schedule the hearing on or prior to the Confirmation Hearing.

004149

Dated: _____, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

---

**If you require additional information, you may contact the Debtor's Solicitation Agent, KCC, by calling 877-573-3984 (U.S. and Canada) or 310-751-1829 (International), by email at HighlandInfo@kccllc.com, or through the case website: http://www.kccllc.net/HCMLP.**

---

004150

**EXHIBIT C**

**Notice of Non-Voting Status**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### NOTICE OF NON-VOTING STATUS WITH RESPECT TO
### UNIMPAIRED CLASSES DEEMED TO ACCEPT THE PLAN [2]

TO:  ALL HOLDERS OF CLAIMS IN CLASS 1 (JEFFERIES SECURED CLAIM), CLASS 3 (OTHER SECURED CLAIMS); CLASS 4 (PRIORITY NON-TAX CLAIMS); CLASS 5 (RETAINED EMPLOYEE CLAIMS); AND CLASS 6 (PTO CLAIMS)

On [•], 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered its *Order (A) Approving the Adequacy of the Disclosure Statement; (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of*

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]  Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

004152

*Ballots, Voting Deadline and Solicitation Procedures; and (E) Approving Form and Manner of Notice* (the "Disclosure Statement Order"). The Disclosure Statement Order approved the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement"), as containing adequate information required under section 1125(a) of the Bankruptcy Code, and authorized the Debtor to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").

In accordance with the terms of the Plan and the Bankruptcy Code, holders of claims in Classes 1, 3, 4, 5 and 6 are unimpaired under § 1124 of the Bankruptcy Code and, therefore, pursuant to § 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. You have been sent this notice because you have been identified as a holder of a claim in Class 1, 3, 4, 5 or 6. This notice and the Confirmation Hearing Notice are provided to you for informational purposes only.

If you have any questions regarding the status of your claim or wish to obtain additional information, including a copy of the Plan and Disclosure Statement free of charge, you may contact KCC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to receive copies of these documents by (i) **email transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

004153

Dated: _____, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

004154

**EXHIBIT D**

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

004155

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**NOTICE OF (I) EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED BY THE**
**DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (III) CURE AMOUNTS,**
**IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

     **PLEASE TAKE NOTICE THAT** on _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") entered an order [Docket No. __] (the "<u>Disclosure Statement Order</u>") that, among other things: (a) approved the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125(a)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[2]

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on January 13, 2021 at 9:30 a.m. prevailing Central Time, before the Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496.

PLEASE TAKE FURTHER NOTICE THAT you are receiving this notice because the Debtor's records reflect that you are a party to a contract that will be assumed by the Debtor or, alternatively, assumed by the Debtor and assigned to and assignee.  Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

PLEASE TAKE FURTHER NOTICE THAT the Debtor is proposing to assume, or alternatively assume and assign, your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto to which you are a party.[3]

PLEASE TAKE FURTHER NOTICE THAT section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption/assignment.  Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto.  Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

PLEASE TAKE FURTHER NOTICE THAT absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption.  If an objection to the proposed assumption or related cure amount is

---

[2]  Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[3]  Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, or assumption and assignment, that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement.  Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption or assumption and assignment by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

004157

sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

 **PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption and/or assignment of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is January 5, 2021, at 5:00 p.m., prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the **Confirmation Objection Deadline**.

 **PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption and/or assignment of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION AND/OR ASSIGNMENT OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND/OR ASSIGNMENT AND CURE AMOUNT.**

 **PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION AND/OR ASSIGNMENT OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTOR OR REORGANIZED DEBTOR ASSUMES OR ASSIGNS SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

 **PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also

004158

obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to receive copies of these documents by (i) **email transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Dated: _____, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

/s/ Zachery Z. Annable
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

004159

**Schedule A**

**Schedule of Assumed Contracts and Leases and Proposed Cure Cost**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost | Proposed Assignee of Contract or Lease |
|--------|--------------|--------------------------------------------|-----------|----------------------------------------|
|        |              |                                            |           |                                        |

004161

# EXHIBIT 17

November 30, 2020

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel

> **RE:** **Termination of Second Amended and Restated Shared Services Agreement, effective as of February 8, 2013, by and among Highland Capital Management, L.P. ("HCMLP"), and Highland Capital Management Fund Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.02 of the Agreement, the Agreement is terminable at will upon at least 60 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> **RE:     Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT 18

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

     Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland
Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable
upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest
and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which
represents all accrued and unpaid interest and principal through and including December 11,
2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date
will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information
is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes
or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are
expressly reserved. Interest, including default interest if applicable, on the Notes will continue to
accrue until the Notes are paid in full. Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

004166

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        D. Michael Lynn

004167

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

004168

# EXHIBIT 19

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

　　　　Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

004170

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

004171

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 20

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
c/o NexPoint Advisors, LP
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 11/27/13 | $100,000 | $171,542.00 | $526.10 | $172,068.10 |
| 10/12/17 | $2,500,000 | $3,149,919.12 | $41,423.60 | $3,191,342.72 |
| 10/15/18 | $750,000 | $874,977.53 | $10,931.23 | $885,908.76 |
| 9/25/19 | $900,000 | $750,279.14 | $12,662.24 | $762,941.38 |
| **TOTALS** | **$4,250,000** | **$4,946,717.79** | **$65,543.17** | **$5,012,260.96** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:      Fred Caruso
            James Romey
            Jeffrey Pomerantz
            Ira Kharasch
            Gregory Demo
            DC Sauter

004175

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 21

004177

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| **TOTALS** | **$900,000** | **$934,330.79** | **$13,188.64** | **$947,519.43** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

004178

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo

004179

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:   Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 22



JD

Jim

office until Monday and
will speak with me then.

From Lynn

Tue, Nov 24, 10:39 AM

Update on UBS please

Tue, Nov 24, 1:01 PM

No update. Will let you
know if something
changes. Assume that you
and Lynn are pushing on
the Pot plan. Thanks

Tied up this afternoon

Delivered

Today 5:26 PM

Be careful what you do –
last warning.

  iMessage 

# EXHIBIT 23



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed December 10, 2020

_____
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Debtor. | § |  |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |  |
|  | § |  |
| Plaintiff, | § | Adversary Proceeding |
|  | § |  |
| vs. | § |  |
|  | § | No. 20-03190-sgj |
| JAMES D. DONDERO, | § |  |
|  | § |  |
| Defendant. | § |  |

## ORDER GRANTING DEBTOR'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER AGAINST JAMES DONDERO

Having considered the *Debtor's Motion for a Temporary Restraining Order and*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



*Preliminary Injunction against James Dondero* [Docket No. 6] (the "Motion"), the *Memorandum of Law* (the "Memorandum of Law")[2] in support of the Motion, and the *Declaration of James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order against James Dondero* [Docket No. 4] (the "Seery Declaration"), including the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and the Memorandum of Law establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.     The Motion is **GRANTED** as set forth herein.

2.     James Dondero is temporarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.

2

employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[3]

3.      James Dondero is further temporarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

4.      All objections to the Motion are overruled in their entirety.

5.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

---

[3] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in the above-referenced bankruptcy case.

004186

# EXHIBIT 24

```
                     IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
 2
                                      )    Case No. 19-34054-sgj-11
 3   In Re:                           )    Chapter 11
                                      )
 4   HIGHLAND CAPITAL                 )    Dallas, Texas
     MANAGEMENT, L.P.,                )    Wednesday, December 16, 2020
 5                                    )    1:30 p.m. Docket
            Debtor.                   )
 6                                    )    - MOTION FOR ORDER IMPOSING
                                      )    TEMPORARY RESTRICTIONS [1528]
 7                                    )    - DEBTOR'S EMERGENCY MOTION TO
                                      )    QUASH SUBPOENA AND FOR ENTRY
 8                                    )    OF PROTECTIVE ORDER [1564,
                                      )    1565]
 9                                    )    - JAMES DONDERO'S MOTION FOR
                                      )    ENTRY OF ORDER REQUIRING
10                                    )    NOTICE AND HEARING [1439]
     _____)
11
                          TRANSCRIPT OF PROCEEDINGS
12              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
13
     WEBEX APPEARANCES:
14
     For the Debtor:              Jeffrey N. Pomerantz
15                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
16                                 13th Floor
                                  Los Angeles, CA  90067-4003
17                                (310) 277-6910

18   For the Debtor:              John A. Morris
                                  Gregory V. Demo
19                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
20                                New York, NY  10017-2024
                                  (212) 561-7700
21
     For the Official Committee   Matthew A. Clemente
22   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
23                                Chicago, IL  60603
                                  (312) 853-7539
24

25
```

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 12/07/23   Page 67 of 214   PageID 3528
Exhibit 14   Page 207 of 337

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          D. Michael Lynn
                                 Bryan C. Assink
 3                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
 4                               420 Throckmorton Street,
                                   Suite 1000
 5                               Fort Worth, TX  76102
                                 (817) 405-6900
 6
     For the Issuer Group:       James E. Bain
 7                               JONES WALKER, LLP
                                 811 Main Street, Suite 2900
 8                               Houston, TX  77002
                                 (713) 437-1820
 9
     For the NexPoint Parties:   James A. Wright, III
10                               K&L GATES
                                 State Street Financial Center
11                               One Lincoln Street
                                 Boston, MA  02111
12                               (617) 261-3193

13   For Highland CLO Funding,   Rebecca Matsumura
     Ltd.:                       KING & SPALDING, LLP
14                               500 West 2nd Street, Suite 1800
                                 Austin, TX  78701
15                               (512) 457-2024

16   Recorded by:               Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
17                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
18                               (214) 753-2062

19   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
20                               Shady Shores, TX  76208
                                 (972) 786-3063
21

22

23

24
            Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 24/07/23   Page 68 of 214   PageID 3529

3

1          <u>DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.</u>

2              THE COURT:  All right.  This is Judge Jernigan.  We

3    have settings in Highland.  We have -- I guess the very first

4    thing that we had set today was a motion of Dondero, Mr.

5    Dondero wanting some sort of revised procedures for "future

6    estate transactions occurring outside the ordinary course of

7    business."  Then, related to that, we received the other day

8    -- I'm not showing it on the calendar, I'm not sure if that

9    means it's moot now or not, but we had a motion for protective

10   order and a motion to quash with regard to certain depositions

11   that Mr. Dondero wanted in connection with his motion.  The

12   Debtor filed that motion to quash.  It was to quash a

13   deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14   Caruso.  And then we have the CLO Motion, what I'm calling the

15   CLO Motion, of --

16        (Interruption.)

17             THE COURT:  Okay.  Let's --

18             MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19   The first two motions have been resolved.  And after Your

20   Honor takes appearances, I'm happy to inform the Court of the

21   proposed resolution, and there's an agreed order that we would

22   upload after the hearing.

23             THE COURT:  Okay.  Well, that is certainly music to

24   my ears.  All right.  So I was just trying to lay out the

25   program for what I thought was set, potentially three motions,

004190

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 06/07/23   Page 69 of 214   PageID 3530

4

1   one of which was a deposition dispute.

2       All right.  So let's go ahead and get appearances.  Mr.

3   Pomerantz, you're obviously appearing for the Debtor team.

4           MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5   good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6   Ziehl & Jones.  Also on the video with me today are John

7   Morris and Greg Demo.  They will be handling the CLO Motion,

8   and I will be reporting to the Court on the resolution of Mr.

9   Dondero's motion and our corollary discovery motions.

10          THE COURT:  Okay.  All right.  Well, why don't I take

11  an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12  there.

13          MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14  Assink, who will replace me after the preliminaries when our

15  business is done.  Other than concurring with Mr. Pomerantz, I

16  wanted to advise Your Honor that in the last 30 minutes we

17  filed an additional motion where we're seeking a clarification

18  with respect to the temporary restraining order that the Court

19  entered last week.

20          THE COURT:  All right.  Well, I did see an email from

21  my courtroom deputy right before walking in about that motion,

22  and so that's why I was a little surprised and said "Music to

23  my ears" that there was an agreed order on the Dondero

24  motions.  But I'll get the details --

25          MR. LYNN:  Well, we're --

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 06/07/23   Page 70 of 214   PageID 3531

5

1      THE COURT:  I'll get the details about that in a

2  minute.  Let me go ahead and get the other appearances.

3    For the Movants on what I've called the CLO Motion, who do

4  we have appearing?

5      MR. WRIGHT:  Good afternoon, Your Honor.  It's James

6  Wright of K&L Gates for the -- I guess I'll call them the

7  Movant for this motion.

8      THE COURT:  Yes.  Sometimes you're referred to as the

9  Advisors and the Funds and -- but Movants on Docket Entry

10  1528.

11    All right.  For the Committee, I know you have weighed in

12  on a couple of these motions.  Who do we have?

13      MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14  Clemente with Sidley Austin on behalf of the Committee.

15      THE COURT:  All right.  Well, we have a lot of folks

16  on the phone.  I think I've covered everybody who filed a

17  pleading for today.  Is there anyone else who would like to

18  appear?  I'd really like to restrict it only to those who have

19  filed pleadings today.

20      MS. MATSUMURA:  This is Rebecca Matsumura from King &

21  Spalding representing Highland CLO Funding, Ltd.  I don't

22  expect I'll be weighing in today, but there are a couple

23  issues that I may say a sentence on, so I want to go ahead and

24  make my appearance now.

25      THE COURT:  All right.  Thank you.  Anyone else?

1          MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2     Walker; on behalf of the CLO Issuers.

3          THE COURT:  All right.

4          MR. BAIN:  And Your Honor, if we may make certain

5     comments at the requisite time, we'd appreciate it.

6          THE COURT:  All right.  Thank you.  Anyone else?

7       All right.  Well, Mr. Pomerantz, let's hear about the

8     agreements you have on the Dondero-related motions.

9          MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10    Lynn is correct, we saw also an emergency motion that came

11    through that I'll have a couple of comments at the end of my

12    presentation.

13      So, as I mentioned before, Your Honor, I'm pleased to

14    report that with respect to the two motions that Your Honor

15    scheduled for today's hearing, we have an agreement with Mr.

16    Dondero.  One was the motion of Mr. Dondero requiring

17    transactions out of the ordinary course to be brought before

18    this Court.  The second was the Debtor's motion to quash a

19    series of subpoenas that had been issued in the last two days,

20    requiring board members and others to testify.

21      As part of the agreement, we have agreed with Mr. Dondero

22    that his motion, which is presently set for today, shall be

23    continued to January 4th, which is the same date set as the

24    continued hearing on the preliminary injunction relating to

25    the TRO that Your Honor had entered last week.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 09/07/23   Page 72 of 214   PageID 3533

7

1       As part of that agreement, the Debtor has agreed that it

2   will provide Mr. Dondero with three business days' notice

3   before selling any non-security assets from any managed funds

4   accounts through and including January 13th, which is the date

5   set for confirmation.

6       While, as the Court is aware, the Debtor doesn't believe

7   that any notice, opportunity for hearing, or an order from the

8   Court is required in connection with such transactions, as the

9   Debtor does not have any current plans to sell non-security

10  assets from managed funds before confirmation, it was willing

11  to agree to the notice requirement as essentially a way of

12  resolving the motion before Your Honor today and continuing

13  until the 4th.

14      As part of the agreement as well, Your Honor, the parties

15  have agreed that there will be no further discovery in

16  connection with the motion that is set.  That'll be no

17  additional discovery by Mr. Dondero, so he is withdrawing the

18  subpoenas as it relates to this motion, and there will be no

19  further discovery as -- by the Debtor.  As Your Honor, I

20  think, is aware, there were depositions conducted of both Mr.

21  Seery and Mr. Dondero on Monday in connection with this

22  motion, but the discovery will not happen over the next couple

23  of weeks.

24      Mr. Dondero wanted to make sure, and the Debtor didn't

25  have any opposition, that that agreement with respect to no

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 09/07/23   Page 73 of 214   PageID 3534

8

1    discovery only relates to the pending motion before the Court.

2    And in connection with any other matters relating to this

3    bankruptcy case, Mr. Dondero would reserve the right to pursue

4    discovery, and of course the Debtors would reserve the right

5    to challenge discovery if we believed it was inappropriate or

6    unduly burdensome.

7         With respect to the motion that was just filed, Your

8    Honor, we had a chance to briefly review it.  We haven't had a

9    chance to discuss it with the board.  In any event, we don't

10   think there's an emergency.  Mr. Dondero wants the opportunity

11   to approach and communicate with the board.  I've told Mr.

12   Lynn that communications regarding the plan are to go through

13   Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14   He's the chief restructuring officer.  And at this point, the

15   board doesn't see a reason or have a desire to meet with Mr.

16   Dondero to talk about his plan, but, again, would be happy to

17   receive any written communications that Mr. Dondero has.

18        Mr. Dondero has sought to modify the TRO to allow him to

19   speak to the board.  Again, if the board agreed to speak with

20   Mr. Dondero, that wouldn't violate the TRO, provided that

21   counsel would be present.  But at this point, the board has

22   decided that it would be inappropriate and not a good use of

23   anyone's time to have that communication and that Mr. Dondero

24   should continue to communicate through Mr. Seery, the Debtor's

25   chief executive officer.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 31-24   Filed 11/07/23   Page 74 of 214   PageID 3535

9

1      If Your Honor, after reading the motion and hearing my

2   comments, and I'm sure Judge Lynn's comments that he will make

3   to Your Honor, Your Honor wants to set it for hearing, we

4   would submit, Your Honor, there's no emergency and that a

5   hearing could be set next week, but we would think Your Honor

6   might be able to dispose of the motion just on the papers and

7   the limited argument that would go on today.

8              THE COURT:  All right.

9              MR. POMERANTZ:  Thank you, Your Honor.

10             THE COURT:  All right.  Mr. Lynn, first, could you

11  confirm the terms of the agreed order that Mr. Pomerantz just

12  announced are consistent with what you and your client

13  believed was negotiated?

14             THE CLERK:  He's on mute.

15             THE COURT:  You're on mute, sir.

16             MR. LYNN:  Mr. Pomerantz has correctly stated the

17  agreement of the parties.  I am pleased to advise Your Honor

18  that I expect that we will withdraw the motion that is

19  presently pending to be heard on January 4th, since all we

20  were asking for was notice until confirmation date.  If those

21  sales are going to take place before then, we don't have a

22  problem any longer with the pre-confirmation activity of Mr.

23  Seery.

24      With regard to the motion that we filed requesting that

25  the temporary restraining order be modified, we would point

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 21-14   Filed 12/07/23   Page 75 of 214   PageID 3536

10

1    out, respectfully, that the independent board is the board of

2    directors of Strand Advisors.  Strand Advisors belongs to Mr.

3    Dondero.  It is not unreasonable for the sole stockholder of

4    Strand Advisors to ask the board questions or present thoughts

5    to the board or ask its advice.  Mr. Seery, on the other hand,

6    while being a member of the board of Strand, is the chief

7    executive officer and the chief restructuring officer of

8    Highland, which is not the same as Strand.

9        Furthermore, Your Honor, Mr. Dondero has been attempting

10   for several months to negotiate an arrangement by which the

11   Debtor can continue as a going concern.  It is his desire to

12   discuss further with the board as a whole what he can do in

13   that regard.  I think the Court, by directing him originally

14   to participate in the mediation that took place in September,

15   expected him to do so.  He has attempted to do so.  And while

16   he has not gotten a response from the Creditors' Committee

17   that is definitive, he has at least caught the interest of Mr.

18   Seery, though that interest may have died for a variety of

19   reasons in recent weeks.

20       And by the way, next week is fine with us.  We're not in a

21   hurry beyond that if the Court feels further discussion would

22   be useful.

23          MR. POMERANTZ:  Your Honor, just a couple of points

24   in response.

25       Mr. Dondero has the right to request an audience with the

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 201-14   Filed 12/07/23   Page 76 of 214   PageID 3537

11

1  board.  He has requested the audience with the board.  The

2  board has considered it and decided not to communicate in that

3  fashion with Mr. Dondero at this time.  There is nothing that

4  Your Honor can do in the TRO that would change that, other

5  than ordering the board to speak with Mr. Dondero, which I

6  highly doubt Your Honor would do.

7      Having said that, this board in general and Mr. Seery in

8  particular have been very supportive of an overall resolution

9  to this case, not only with the creditors, but with Mr.

10  Dondero.  Mr. Seery has spent tens if not hundreds of hours

11  over the last several months working with Mr. Dondero to try

12  to get him in a position to present something that would have

13  traction with the Unsecured Creditors.  Unfortunately, that

14  hasn't occurred.  We understand there have been communications

15  between Mr. Lynn and Mr. Clemente.  And if there is any hope

16  of a plan and any traction with the creditors, this Debtor in

17  general and Mr. Seery in particular stands ready, willing, and

18  able to do anything within the Debtor's power to help that

19  out.

20      So, it's not really the Debtor standing in the way.  It's

21  an economic agreement ultimately that needs to be reached with

22  Mr. Clemente and his constituents and Mr. Lynn.  And if that

23  can be reached, we will be the first to jump on that bandwagon

24  and do everything humanly possible to have that occur.

25      Thank you, Your Honor.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 201-24   Filed 12/30/23   Page 77 of 214   PageID 3538

12

1          THE COURT:  All right.  Well, again, I've not read

2     the motion.  I've just seen an email that I have this motion.

3     I'm a little bit confused.  I don't want to spend too long on

4     this because we have another motion to get to.  But I'm a

5     little bit confused on how Dondero wants the TRO to be

6     modified.  If he has the right already to request an audience

7     of the board, what is it that is problematic about the TRO

8     that he wants modified?

9          THE CLERK:  He's on mute.

10          THE COURT:  You're on mute.

11          MR. LYNN:  Sorry, Your Honor.  As I told you before,

12     you must forgive me, my command of technology is not great.

13       In response, I would say that I question whether it is

14     appropriate, in advance of a meeting with the board of his

15     company, that what he wants to talk about should be screened.

16     And that is what has occurred in our effort to meet by

17     telephone with the board.

18       Any such meeting would, of course, be subject to the

19     restraints that are included in the temporary restraining

20     order, in that both Mr. Pomerantz or his designee and I would

21     participate in any such discussion.  I respectfully submit

22     Strand is his.  Nobody may like that, but it is his, and he

23     ought to be able to talk to his own board.

24          THE COURT:  Is this about having a conversation

25     without the Committee's involvement?  I just don't -- hmm.  I

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 23-14   Filed 11/07/23   Page 78 of 214   PageID 3539

13

1   just need to see the motion.

2       Mr. Clemente, anything you want to add at this juncture?

3   Have you even reviewed the motion yet?

4           MR. CLEMENTE:  Your Honor, I apologize.  I haven't

5   actually even seen the motion.  And so I have no comment on

6   it, Your Honor.  I apologize for not having been able to look

7   at it.

8           THE COURT:  Okay.  Well, what about the agreed order

9   that's been announced?  Any comment on that?

10          MR. CLEMENTE:  Your Honor, we support the resolution

11  that Mr. Pomerantz announced on the record.

12          THE COURT:  Okay.  All right.  Well, I assume there's

13  nothing further, then, on the Dondero motions that were

14  scheduled today?

15      All right.  So I will happily accept the agreed order that

16  has been announced.  For now, we will continue the Dondero

17  motion that was Docket Entry No. 1439 to January 4th, when the

18  preliminary injunction hearing is set.  And we -- I understand

19  there are going to be no more discovery requests in connection

20  with these matters that were set today.

21      And I will review the motion that Mr. Dondero has filed

22  shortly before today's hearing in chambers later, and I will

23  have my courtroom deputy communicate to the lawyers whether I

24  see fit to set it for an emergency hearing next week or rule

25  on the pleadings or set it for January 4th.  Those are, I

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 20-14   Filed 12/07/23   Page 79 of 214   PageID 3540

14

1   guess, the three possibilities I can think of that I might

2   decide upon.

3       So, again, I'm not making any ruling at all on a motion I

4   haven't read yet.  So I'll -- the courtroom deputy will let

5   you all know, if not later today, tomorrow.  Probably

6   tomorrow, because I have a confirmation hearing set later

7   today in another case.

8       All right.  So, thank you all for working these issues

9   out.  And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10  Lynn, anything further on the Dondero disputes?

11          MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

12          MR. LYNN:  Your Honor, nothing from Mr. Dondero.  May

13  I be excused?

14          THE COURT:  Is anyone anticipating needing Mr.

15  Dondero's counsel for the other matter?  All right.  If not,

16  then I certainly have no problem with you dropping off the

17  line, Mr. Lynn.  Thank you.

18          MR. LYNN:  Thank you, Your Honor.

19          THE COURT:  Okay.  All right.  So let's turn next to

20  the CLO Motion.  I take it there are no agreements on this

21  one?

22          MR. POMERANTZ:  There are not, Your Honor.

23          MR. WRIGHT:  There are not, Your Honor.  I can

24  confirm that.

25          THE COURT:  All right.  Mr. Wright, do you have

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 20-14   Filed 12/07/23   Page 80 of 214   PageID 3541

15

1    anything you want to say as far as an opening statement before

2    we go to the evidence?

3         MR. WRIGHT:  I don't, Your Honor.  My intention, if

4    it's okay with you, you asked me to bring a witness, so I do

5    have Mr. Norris from my client, and I was going to just remind

6    the Court who I am and state the name of all of my Movants,

7    and then I was going to move directly to put him on the stand

8    and go through a brief direct.

9         THE COURT:  All right.  I think I heard Mr. Morris is

10   going to handle this phase of the hearing.

11        MR. DEMO:  And Your Honor, this is Greg Demo from

12   Pachulski on behalf of the Debtor.

13        THE COURT:  Oh, okay.

14        MR. DEMO:  We would like to make a brief opening

15   statement before we have witnesses, if that's all right with

16   Your Honor.

17        THE COURT:  All right.  I'm fine with that.  So, --

18        MR. DEMO:  All right.

19        THE COURT:  -- go ahead.

20        MR. DEMO:  All right.  Well, thank you, Your Honor.

21   Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22     We are here today on what really amounts to the third of

23   three motions that deal with Mr. Dondero's attempts, either

24   directly or through a proxy, to transfer control away from the

25   Debtor and back to Mr. Dondero.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 231-24   Filed 12/07/23   Page 81 of 214   PageID 3542

16

1      The current motion is filed by NexPoint Capital and

2    Highland Capital Management Fund Advisors and three of their

3    managed funds:  Highland Income Fund, NexPoint Capital, and

4    NexPoint Strategic Opportunities Funds.

5      Mr. Dondero owns and controls NexPoint Capital and

6    Highland Capital Management Fund Advisors.  While both

7    NexPoint Capital and Highland Capital Management Fund Advisors

8    are governed by boards, the boards have no investment

9    authority with respect to the funds they manage, nor was the

10   boards' approval necessary to file the motion, or obtained.

11     Mr. Dondero is the sole portfolio manager for NexPoint

12   Strategic Opportunities Fund and Highland Income Fund.  Mr.

13   Dondero is one of three portfolio managers for NexPoint

14   Capital.  Mr. Dondero's decisions are not subject to

15   oversight.

16     The Movants disclosed these facts in their recent SEC

17   filings, and there can be no dispute that Mr. Dondero is the

18   controlling figure behind the Movants in the relief being

19   sought in the motion which seeks to impede the Debtor's

20   efforts to exercise its rights as a CLO manager.

21     The fact that this motion was even filed is quite

22   surprising, since on December 7th the Debtor filed a complaint

23   and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24   the Debtor's efforts to sell assets from the very CLOs that

25   are the subject of this motion.

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 20-14    Filed 12/07/23    Page 82 of 214    PageID 3543

17

1      The Court granted the TRO on December 10th.  Mr. Dondero

2  also filed a motion seeking similar relief in November, which

3  has now been adjourned to January 4th.

4      The Movants are essentially now seeking an order from this

5  Court enjoining the Debtor from exercising its rights as a CLO

6  manager and requiring the Debtor to seek the Movants' and Mr.

7  Dondero's permission to fulfill its obligations as a manager

8  for the CLOs.

9      The Movants, however, do not come right out and say this,

10  and instead couch the motion as seeking to simply pause the

11  CLOs' asset sales while the Movants and the Debtor engage in

12  discussions regarding the future of the CLOs' management.

13      In the motion, the Movants also argue the Debtor has made

14  decisions detrimental to the interests of the preference

15  shareholders because the Debtor is trying to monetize its

16  assets in a manner inconsistent with the preference shares'

17  objectives.

18      The Movants simply mischaracterize the facts, the parties'

19  respective rights under contracts, and the law.

20      First, to the extent the Movants hold interests, they hold

21  only preference shares in the CLOs and are minority investors

22  in the preference shares of 12 of the 15 CLOs at issue.  In

23  one third of the CLOs, the Movants' interests sit behind

24  senior debt which must be paid first.

25      Notably, Your Honor, no other investors in the CLOs are

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 21-14    Filed 12/07/23    Page 83 of 214    PageID 3544
Exhibit 24    Page 210 of 267

18

1    here or have expressed support for the Movants' position.

2         Second, the Movants simply have no right under the

3    contracts governing the CLOs to the relief they are

4    requesting.  The CLOs are governed by a series of agreements

5    which were agreed to long ago and dictate the rights of all

6    investors of the CLOs.  The enforceability of those agreements

7    is relied on by all investors, not just the Movants.

8         Under these agreements, investment discretion is given to

9    the CLOs' manager -- in this case, the Debtor -- and no

10   investor has the right to direct the CLO manager.  The manager

11   was chosen to manage the CLOs' assets.  No individual investor

12   was chosen to manage the CLOs' assets.

13        Simply said, there will be no evidence that the Movants

14   have the right to do what they're trying to do, and there will

15   be no evidence that the Movants' preferences with respect to

16   the CLOs' assets is in line with that of the other investors

17   in the CLOs.

18        Under the relevant agreements, if an investor is not happy

19   with a manager's performance, the investor's rights are

20   generally limited to replacing the manager.  The investors

21   here -- excuse me, the Movants here -- have not done that and

22   cannot do that.  Under the agreements, replacement requires at

23   least the majority of the preference shares that are not

24   affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25   hold a substantial minority interest position.  They are not

004205

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 23-14    Filed 07/26/7    Page 84 of 214    PageID 3545

19

1   the majority.  In the three CLOs in which they are the

2   majority, the Movants still cannot replace the Debtor as the

3   investment manager because they are the Debtor's affiliates.

4        It is indisputable that, prior to January 9th, when Mr.

5   Dondero was removed from control of the Debtor, that the

6   Debtor, NexPoint Advisors, Highland Capital Management Fund

7   Advisors, and the three funds were the Debtor's affiliates

8   because of Mr. Dondero's common control.

9        After January 9th, where the Court removed Mr. Dondero

10  from control of the Debtor, the Debtor is arguably, under the

11  documents, not an affiliate.  However, Your Honor, the Movants

12  have disclosed in their recent proxy statements filed in 2020

13  that they still consider themselves the Debtor's affiliate,

14  and they should be bound by that statement.  The Movants, by

15  virtue of Mr. Dondero's being removed from control of the

16  Debtor, should not be able to use that removal to reassert

17  control over the CLOs that were taken away from Mr. Dondero

18  when he was removed in January 2020.

19       The Debtor believes that additional briefing may be needed

20  on this issue, and that a ruling specifically on this issue

21  and the parties' relative rights under the CLO management

22  agreements may be needed.  The Debtor reserves its right to

23  brief this issue and to bring it before this Court, either as

24  a declaratory judgment or any other procedurally-appropriate

25  motion.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 231-14   Filed 2/07/267   Page 85 of 214   PageID 3546

20

1   Because the Debtor -- excuse me.  The Movants have no

2   right to the relief requested.  They argue that the relief is

3   justified because of the mismatch between the investors'

4   timelines and the Movants'.  This is not true.  The Movants

5   cite to three transactions to justify their statement in the

6   motion:  SSP, OmniMax, and certain recent transactions.

7   The recent transactions were the attempted sales of two

8   public equities immediately before Thanksgiving that Mr.

9   Dondero interfered with.  You'll hear testimony from Mr. Seery

10  about each of these transactions and how each was in the best

11  interest of the CLOs.

12  First, SSP.  SSP is a steel business that was suffering

13  for a number of reasons.  The Debtor's investment team

14  believed SSP should be sold since 2019.  The Debtor received

15  multiple offers for SSP, the Debtor evaluated these offers,

16  and the Debtor choose the one that was the best.  The SSP sale

17  closed in early November.

18  Notably, Your Honor, none of the CLOs held an equity

19  interest in SSP, its parent, or in Trussway.  Instead, they

20  held debt, and they got exactly what they bargained for,

21  repayment of their debt obligations in full.

22  OmniMax, Your Honor, is the second one.  It is a

23  fabricator of building materials.  The CLOs and the Movants

24  held an interest in OmniMax debt which they have been trying

25  to refinance or equitize since 2019.  That deal was intended

004207

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 21-24   Filed 12/07/23   Page 86 of 214   PageID 3547

21

1   to include the Movants, but instead of working with the

2   Debtor, Mr. Dondero held out and used the threat of litigation

3   against OmniMax to secure a higher price for the Movants, to

4   the detriment of the CLOs.

5       As Mr. Seery will testify, these two transactions were all

6   about maximizing value and have nothing to do with investment

7   timelines.

8       Finally, Your Honor, the Movants reference the

9   Thanksgiving transactions.  These transactions were discussed

10   in the context of Mr. Dondero's TRO.  Mr. Seery directed

11   Debtor personnel, on the advice of his investment team, to

12   sell these securities.  Mr. Dondero blocked those trades.  Now

13   the Movants argue that the reason those trades were blocked

14   was because of a mismatch between the Movants' and the

15   Debtor's investment timelines.  That is not the case.  Mr.

16   Seery will testify as to these trades.  The Debtor is an

17   investment manager and appreciates that its decisions with

18   respect to how it manages its assets are -- is a judgment

19   call.  The evidence, however, will show that the Debtor at all

20   times exercised that judgment in good faith based on all

21   available information.

22       The Movants may disagree with the Debtor's judgment, Your

23   Honor, but that is irrelevant.  The Movants have no right to

24   interfere with the Debtor's management of the CLOs.  There is

25   simply no statutory or contractual basis for this, not under

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 231-24    Filed 12/07/23    Page 87 of 214    PageID 3548
Exhibit 24    Page 237 of 267

22

1   Section 363 and not under the CLO agreements.

2        Finally, Your Honor, -- I guess not finally.  There's one

3   more point I want to make.  But Your Honor, this -- what we're

4   here on today is notably similar to the Acis bankruptcy that

5   Your Honor noted last time we were here last week.  In that

6   bankruptcy, HCLOF tried to direct the collateral manager to

7   take certain actions that HCLOF thought were in the best

8   interest of the CLOs.  In this case, the Movants, through Mr.

9   Dondero, are trying to file an action that functionally seeks

10  to direct the Debtor to take interests that the Movants

11  believe are in their best interest.  There is substantial

12  overlap between the litigation in Acis and the litigation

13  here.

14       Finally, Your Honor, the Debtor has been in discussions

15  with the CLOs' counsel on this issue.  And the Debtor has been

16  informed that the CLOs' position is that the Debtor's ability

17  to operate under the management agreements should not be

18  interfered with, not by the Movants or not by any other party.

19       Thank you, Your Honor.  With that, I will turn it over to

20  Mr. Norris.  Or, I'm sorry, Mr. Wright.

21            THE COURT:  All right.  Mr. Wright, you may call your

22  witness.

23            MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24  should be -- should be dialed in and should be available on

25  screens.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 23-24   Filed 24/07/23   Page 88 of 214   PageID 3549

Norris - Direct                          23

 1              THE COURT:  Okay.  I'm going to --

 2              MR. WRIGHT:  I'll pause and have him confirm that.

 3              THE COURT:  I'm going to ask you, Mr. Wright, to

 4      speak up or closer to your device.  I didn't hear the name of

 5      your witness.

 6              MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

 7      last time, you were having trouble hearing me, and so I'm

 8      trying a different device this time.  I actually followed the

 9      instructions that I found very helpful, so I'm trying my phone

10      in hopes that it will work better.

11              THE COURT:  All right.

12              MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13      I-N, N-O-R-R -- N-O-R-R-I-S.

14              THE COURT:  All right.  Mr. Norris, can you say

15      "Testing one two" so we pick up your video?

16              MR. NORRIS:  Testing one two.

17              THE COURT:  All right.

18              MR. NORRIS:  Testing one two.

19              THE COURT:  All right.  Please raise your right hand.

20              DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21              THE COURT:  All right.  Mr. Wright, you may proceed.

22              MR. WRIGHT:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24      BY MR. WRIGHT:

25      Q    Mr. Norris, you're employed by NexPoint Advisors?

1   A    I am.  That's correct.

2   Q    And what is your title and role there?

3   A    Yeah.  I am the executive vice president of NexPoint

4   Advisors.  In that role, I oversee business development,

5   marketing, sales, investor relations.  And as far as the funds

6   advised by the advisor, I'm the liaison with the independent

7   board on the business side.

8   Q    Thank you.  Do you also have a role for Highland Capital

9   Management Fund Advisors?

10  A    I do.  I'm also the same executive vice president and

11  fulfill that same role as it pertains to business development,

12  sales, investor relations.  And in both, I'm also working on

13  product development.  So, launching, developing new products

14  and investment funds.

15  Q    Do you also have a role for Highland Income Fund, NexPoint

16  Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17  A    I do.  I'm also executive vice president for each of those

18  funds.

19  Q    Thank you.  Have you ever served on the boards of these

20  three funds?

21  A    I have.  I've served as the interested trustee, sole

22  interested trustee for each of these funds.  I'm no longer the

23  board member or interested trustee, but still serve as an

24  officer, executive vice president, for each fund.

25  Q    At times, I'm going to refer to NexPoint Advisors, LP and

004211

Norris - Direct                          25

1   Highland Capital Management Fund Advisors, LP simply as the

2   Advisors, to avoid having to keep saying their long names.

3   And similarly with the three funds that are part of the

4   motion, I may just call them the Funds.

5       Can you explain the relationship between the Advisors and

6   the Funds, briefly?

7   A   Yeah.  So, each of these are investment companies that are

8   registered under the Investment Company Act of 1940.  So, with

9   that comes a unique relationship between an investment advisor

10  and the funds themselves.  The Funds don't have employees.

11  They rely on the investment advisor and investment advisor

12  employees.  And between the Funds and the Advisors is an

13  investment advisory agreement.  And the Funds themselves are

14  also overseen by an independent board, and that's by statute

15  by the 1940 Act.

16  Q   Okay.  And just to be clear, when you said that these are

17  -- entities are investment companies, you meant that the three

18  Funds are investment companies?

19  A   Correct.  Correct.  The three Funds are investment

20  companies.  The investment advisors are not investment

21  companies.

22  Q   Thank you.  Can you explain the role of the board for the

23  Funds?

24  A   Yeah.  So, as prescribed by the Investment Company Act of

25  1940, there are certain obligations related to an investment

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 20-14   Filed 12/07/23   Page 91 of 214   PageID 3552
Exhibit 24   Page 270 of 267

Norris - Direct                              26

1   company, and one of those is they must be overseen by an

2   independent board.  And the independent board has a

3   responsibility to oversee the -- certain material agreements,

4   including the advisory agreement.  And we meet regularly with

5   the boards.  They overseas certain processes and, again, all

6   material contracts.  And the board is, by Section 15(c) of the

7   1940 Act, required by law to annually review the capabilities

8   of the Advisor and to either approve or reject the advisory

9   contracts.  So, each year, those contracts are renewed by the

10  independent board.

11       There are certain obligations of the Fund and operations

12  that are delegated responsibility to the investment advisors.

13  That includes portfolio management and investment decisions.

14  But all those are overseen by the board.

15  Q    Okay.  And are the boards involved in the day-to-day

16  operations of the Funds?

17  A    They're not.

18  Q    Okay.  And do you know who the members of the boards of

19  these three Funds are?

20  A    I do.

21  Q    Could you share that with us?

22  A    Yeah.  So, the -- there is one interested trustee of each

23  board, and that's John Honis.  And then for the Highland

24  Income Fund and the NexPoint Strategic Opportunities Fund --

25  sorry, for NexPoint -- for Highland Income Fund and NexPoint

004213

```
 1    Capital, we have the same three disinterested or independent
 2    trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan
 3    Powell.  And for NexPoint Strategic Opportunities Fund, we
 4    have the same four trustees, one interested, three
 5    independent, but there's another fourth independent trustee,
 6    Ed Constantino.
 7    Q    And when you refer to independent trustees, do you mean
 8    independent for purposes of the Investment Company Act of
 9    1940, as amended?
10    A    That's correct.  They, by statute, they are independent
11    trustees.  They also have an independent legal counsel.  Stacy
12    Louizos represents them from Blank Rome.  And also two of
13    these Funds are listed on the New York Stock Exchange, and the
14    New York Stock Exchange has various independence requirements
15    that each independent director has met.
16    Q    Thank you.  And which are the two Funds that are listed on
17    NYSE?
18    A    The Highland Income Fund and the NexPoint Strategic
19    Opportunities Fund are both NYSE-listed.
20    Q    And I know you probably haven't memorized everybody who
21    invests in the Funds, but can you give us a general idea of
22    who invests in these Funds?
23    A    Certainly.  I definitely have not memorized them.  There
24    are thousands of individual investors in each of these Funds.
25    Part of my role overseeing investor relations and sales, I do
```

004214

1    talk to a lot of those investors.  But the majority of the

2    investors in each of these Funds are individual investors.

3         As '40 Act Funds, almost anybody with a brokerage account

4    can buy them.  They have tickers, particularly the Funds that

5    are listed.  Closed-end funds.  And so, with that, it is mom-

6    and-pop investors.  It's retail investors, including myself.

7    I've allocated my 401(k) to these funds, the majority of my

8    401(k) to these funds.  But there are also institutional

9    investors.  There's hedge funds.  There's ETFs.  There are

10   large high-net-worth individuals.  But the majority of it is

11   individual investors that have invested through their

12   brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13   These are -- these are -- these are the individual investors.

14   Q    Thank you.  Does Mr. Dondero have investments in the

15   Funds?  Do you know?

16   A    He does.  He's invested in each of the Funds.

17   Q    Does he have a majority investment in any of the Funds?

18   A    He does not have a majority investment in any of the

19   Funds.

20   Q    Thank you.  Does Mr. Dondero have a control relationship

21   with the two Advisors?

22   A    Yes.  He does.  With the Advisors.

23   Q    And does he have a control relationship with the Funds?

24   A    As it pertains to portfolio management, he is a portfolio

25   manager of each Fund.  But as discussed, as I mentioned, the

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 20-14   Filed 02/07/23   Page 94 of 214   PageID 3555

Norris - Direct                    29

1    independent board on an annual basis has the ability to

2    terminate or renew our advisory contracts, and that -- that

3    dynamic removes the control, overall control, of the Funds in

4    that regard.

5    Q    Are you familiar with the motion that the Court I think

6    has accurately referred to as the CLO Motion that was filed by

7    the two Advisors and the three Funds?

8    A    Yes.  I am familiar with it.

9    Q    And I'm going to ask you a question now that I think is of

10   interest to the Court, based on the last time I was in front

11   of Judge Jernigan.  Were any employees of the Debtor involved

12   in deciding to bring this motion or in preparing the motion?

13   A    No.  None of the HCMLP employees, to my knowledge, were

14   involved in preparing or deciding to bring the motion.

15   Q    Okay.  And you investigated who was involved in preparing

16   the motion, so your knowledge is pretty good on this point?

17   A    Correct.  I have.  And none were involved, based on that

18   investigation.

19   Q    (garbled) involved in deciding to bring a motion,

20   preparing it, other than outside counsel and my firm?

21   A    Yeah.  So, the initial cause for concern was raised by Mr.

22   Dondero himself to our legal -- internal legal team and

23   compliance team.  And working together with them, myself, and

24   outside counsel, and senior management of Highland Capital

25   Management Fund Advisors, including Joe Sowin, we prepared the

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 20-14   Filed 12/07/23   Page 95 of 214   PageID 3556
Exhibit 24   Page 207 of 267

Norris - Direct                              30

1    order.  Or, sorry, not the order, the motion.

2    Q    All right.  Thank you.  Were the boards of the three Funds

3    involved at all with bringing the motion?

4    A    They were not involved in the preparation of the motion

5    itself.  They were aware and supportive, but they did not

6    prepare the motion.

7    Q    You provided a (audio gap), correct?

8    A    Sorry.  You did cut out there.  I didn't hear the

9    question.

10   Q    I'll try again.  You provided a declaration (garbled)

11   motion, correct?

12   A    I did, yes.

13   Q    And there are two exhibits to your declaration.  There's

14   an Exhibit A and an Exhibit B.

15   A    Correct.

16   Q    Exhibit A, does this reflect the current repayment status

17   of the various CLOs as we -- as you understand it to be as of

18   December 1st?

19   A    Yes, it does.

20   Q    And does Exhibit (garbled) of the three Funds --

21          THE COURT:  Okay.  Mr. --

22   BY MR. WRIGHT:

23   Q    -- and the various CLOs, --

24          THE COURT:  Mr. Wright?

25   BY MR. WRIGHT:

1  Q    -- as you understand it?

2            THE COURT:  Mr. Wright, time out.  Two things.

3  First, I don't know what you can do to improve --

4            MR. WRIGHT:  Sure.

5            THE COURT:  -- your connection, but you're

6  occasionally breaking up a little.

7        But second, can we be clear for myself, the record,

8  everyone else, what you're referring to right now?  We have an

9  Advis... your witness and exhibit list is at Docket 1573.  Is

10  that what I should be looking at first?

11            MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12  Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13  It may be the only exhibit on our exhibit list, frankly.

14            THE COURT:  Okay.  So you're talking about his

15  declaration now, not the witness and exhibit list with the

16  attachments to it?  Actually, it is attached here.  Exhibit A.

17  Okay.  I'm there.  I went to Exhibit A in your attachments to

18  your exhibit list at 1573.

19        All right.  Let's try again with your question you just

20  asked.

21            MR. WRIGHT:  Sure.

22  BY MR. WRIGHT:

23  Q   So, Mr. Norris, Exhibit A, this reflects the current

24  repayment status of the CLOs that are the subject of the

25  motion as of December 1.  Correct?

Norris - Direct                         32

1   A    Correct.

2   Q    And then --

3          MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4   which is just a couple pages forward.

5          MR. MORRIS:  Your Honor, I would ask that this be put

6   up on the screen, if possible.

7          THE COURT:  Yes.  Can you do that, please?

8          MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9          THE COURT:  He asked if you could --

10         MR. MORRIS:  I would --

11         THE COURT:  -- share your screen.  Can you share your

12  screen as to what you're looking at?

13         MR. WRIGHT:  Can I share my screen?  Last time I was

14  using a computer and you were having trouble hearing me, so

15  this time I'm doing it on my phone.  So my phone, no, I don't

16  have this on my phone to share my screen that way.  It's

17  ==Docket 1522-1==, and it's the only exhibit that was on our

18  exhibit list.

19         MR. MORRIS:  No objection, Your Honor.

20         MR. WRIGHT:  All it shows is the holdings in Funds in

21  the CLOs.  That's all it is.

22         MR. MORRIS:  No objection, Your Honor.

23         THE COURT:  Okay.

24         MR. NORRIS:  I'm sorry, John.  I didn't hear.

25         THE COURT:  Give me a minute, because I was at 1573,

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 20-14   Filed 2/07/267   Page 98 of 214   PageID 3559

Norris - Direct                          33

1   your witness and exhibit list.

2        (Pause.)

3            THE COURT:  Okay.  That's not the correct docket

4   number.

5            MR. MORRIS:  Your Honor?

6            THE COURT:  Yes?

7            MR. MORRIS:  If I may, it's John -- it's John Morris.

8   It's ==Docket No. 1528==.  And the declaration can be found at

9   Page 12 of 26.

10           MR. WRIGHT:  Thank you.

11           THE COURT:  1528?

12           MR. WRIGHT:  That's bizarre, because I have a

13   printout of it and it says ==Docket 1522-1==.

14           THE COURT:  Okay.  1528 is the -- the actual motion

15   we've set for hearing.

16           MR. MORRIS:  And it's attached to that, yes.  If you

17   -- if you go to PDF Page 12, it's the first page of the

18   declaration.

19           THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20   that declaration.  And then you were having the witness look

21   first at Exhibit A to that declaration.  And then where are

22   you having him look next?  Exhibit B, which is entitled

23   "Holdings of Preferred Shares in CLOs"?

24           MR. WRIGHT:  Exhibit B, Your Honor.

25           THE COURT:  Okay.  Continue.

1          MR. WRIGHT:  (garbled) I think some of the exhibits

2     that I have had the wrong docket number printed on the top,

3     and I --

4     BY MR. WRIGHT:

5     Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6     shows the holdings of the preference shares of the Funds in

7     the various CLOs that are the subject of the motion, correct?

8     A    That's correct.  One clarification.  It shows the

9     percentage ownership of each of those preference share

10    tranches that each Fund owns.

11    Q    Thank you.  Mr. Norris, do the three Funds have a date by

12    which they have to liquidate their investments?

13    A    Sorry, you did skip out there.  If you could you repeat

14    the question.  I apologize.

15    Q    It's frustrating.  Do the three Funds have a date by which

16    they must liquidate their investments?

17    A    No.  They do not.

18    Q    Okay.  Can you briefly explain why the Advisors and the

19    Funds brought this motion?

20    A    Yeah.  The Advisors and the Funds were concerned with

21    certain transactions, as described in the motion.  As

22    preference share owners, we own the majority or a substantial

23    portion of the economics of most of these CLOs, and in three

24    instances the majority of the economic benefit.  And there was

25    concern with the way that the sales were executed.  And so,

004221

Norris - Cross                           35

1    with that, we're simply asking for a temporary relief in order

2    to benefit and to maximize the recovery for our preference

3    shares that we own.

4    Q    Thank you.

5         MR. WRIGHT:  All right, Your Honor.  I have no

6    further questions for Mr. Norris, although I guess I reserve

7    the right to redirect.

8         THE COURT:  All right.  Cross-examination?

9         MR. MORRIS:  Thank you, Your Honor.

10                   CROSS-EXAMINATION

11   BY MR. MORRIS:

12   Q    Good afternoon, Mr. Norris.  Can you hear me?

13   A    I can.  Thank you, Mr. Morris.

14   Q    All right.  I'm going to go into a little bit more detail

15   about some of the topics that you discussed.  To be clear

16   here, there are five moving parties; is that right?

17   A    That's correct.  The two Advisors and the three Funds.

18   Q    And one of the advisory firms is Highland Capital

19   Management Fund Advisors, LP; is that right?

20   A    That's correct.

21   Q    And I'll refer to that as Fund Advisors; is that okay?

22   A    That's great.

23   Q    James Dondero and Mark Okada are the beneficial owners of

24   Fund Advisors, correct?

25   A    That is my understanding, yes.

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 28-14    Filed 12/07/23    Page 101 of 214    PageID 3562
Exhibit 44    Page 307 of 367

Norris - Cross                              36

 1  Q    And your understanding is that Mr. Dondero controls Fund

 2  Advisors, correct?

 3  A    That's correct.

 4  Q    And the other advisory firm that brought the motion is

 5  NexPoint Advisors, LP; is that right?

 6  A    That is correct.

 7  Q    And Mr. Dondero is the beneficial owner of NexPoint; is

 8  that right?

 9  A    A family trust where Jim is the sole beneficiary, I

10  believe, controls or owns NexPoint Advisors.

11  Q    Okay.  And Mr. Dondero --

12  A    Or 99.9 percent of NexPoint Advisors.

13  Q    Thank you for the clarification.  Mr. Dondero controls

14  NexPoint; is that right?

15  A    Correct.

16  Q    All right.  And I'm going to refer to Fund Advisors and

17  NexPoint as the Advisors going forward; is that fair?

18  A    That's fair.

19  Q    Each of the Advisors manages certain funds; is that right?

20  A    That is correct.

21  Q    And three of those funds that are managed by the Advisors

22  are the Movants on this motion, correct?

23  A    Correct.

24  Q    All right.  The Advisors caused these three Funds to

25  invest in CLOs that are managed by the Debtor; is that right?

1   A    The portfolio managers working for the Advisors did.

2   That's correct.

3   Q    And Mr. Dondero is the portfolio manager of the Highland

4   Income Fund; is that right?

5   A    He is one of the portfolio managers for that Fund.

6   Q    And he's also --

7   A    I believe there are two.

8   Q    And he's also a portfolio manager of NexPoint Capital,

9   Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 09/07/23   Page 103 of 214   PageID 3564
Exhibit 24   Page 297 of 367

Norris - Cross                                    38

1   A    To my knowledge, that is correct.

2   Q    And in fact, the boards were not required to approve the

3   filing of this motion, correct?

4   A    I'm not -- I believe that's a legal question, but to my

5   knowledge, there was not a requirement of the board to -- or,

6   to adopt a resolution for that.

7   Q    Okay.  Let's talk a little bit about your background.  I

8   think you testified that you're the executive vice president

9   at NexPoint Advisors, one of the Movants.  Is that right?

10  A    That's right.

11  Q    Who's the president of NexPoint Advisors, LP?

12  A    Mr. Dondero.

13  Q    And you report directly to him; is that right?

14  A    I do.

15  Q    You're also the executive vice president of Fund Advisors,

16  another Movant; is that right?

17  A    Correct.

18  Q    And Mr. Dondero is the president of Fund Advisors; is that

19  right?

20  A    He is not.  There is no president of Fund Advisors.  But

21  he -- yeah.

22  Q    You're the president of another entity called NexPoint

23  Securities; is that right?

24  A    That's correct.

25  Q    And you're also the executive vice president of the 11 or

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 24/07/23   Page 104 of 214   PageID 3565
Exhibit 14   Page 40 of 67

Norris - Cross                                  39

1    12 funds that are managed by the Advisors here, right?

2    A    Yes.   That is correct.

3    Q    Okay.   You've been working for Highland Capital Management

4    or other Highland-related entities for a little more than a

5    decade; is that right?

6    A    That's correct.   Since June 2010.

7    Q    Okay.   Now, you don't personally make any investment

8    decisions for -- for the Funds.   Is that right?

9    A    That's correct.

10   Q    And you don't hold yourself out as an investment manager,

11   do you?

12   A    I do not.

13   Q    And you've never worked for a CLO, have you?

14   A    Never worked for a -- for a C -- employed by a CLO.

15   Worked on accounting, various other aspects, but never worked

16   for a CLO.

17   Q    Okay.   You referred earlier to the declaration that you've

18   submitted in support of the motion.   Do you remember that?

19   A    I do.

20   Q    I've got an assistant on the line here.

21        MR. MORRIS:   Ms. Cantey, can we put up onto the

22   screen Debtor's Exhibit C, which I believe was Mr. Norris's

23   declaration?   And if we could go to Page 12 of 26.   Oh, all

24   right.

25   BY MR. MORRIS:

Exhibit 24   Page 40 of 37

 1   Q    And, again, Mr. Norris, as we did in the deposition

 2   yesterday, I'll remind you of the difficulty of doing a

 3   virtual examination.  And if at any time I ask you a question

 4   about your declaration that prompts you to think you need to

 5   see another portion of the declaration, will you let me know

 6   that?

 7   A    Yes, I will.

 8   Q    Okay.  Because I'm not here to test your memory.  I'm just

 9   here to ask you certain questions.  So please let me know if

10   you need to see something that's not on the screen itself.

11        You didn't write any portion of this declaration; is that

12   right?

13   A    I did not.

14   Q    And you didn't provide any substantive comments to the

15   declaration as drafted because you agreed with -- with the

16   declaration as written by others; is that fair?

17   A    Correct.

18   Q    And all of the key information in your declaration was

19   supplied by NexPoint's management; isn't that right?

20   A    Correct.

21   Q    The individuals who provided the information that's in

22   your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23   and outside counsel at K&L Gates; is that right?

24   A    Correct.

25   Q    And Mr. Sauter is in-house counsel at the Advisors; is

1   that right?

2   A    That is right.

3   Q    And Mr. Post is the chief compliance officer at NexPoint;

4   is that right?

5   A    That's correct.

6   Q    The whole idea for this motion initiated with Mr. Dondero;

7   isn't that right?

8   A    The concern, yes, the concern originated, and his concern

9   was voiced to our legal and compliance team.

10  Q    Okay.

11           MR. MORRIS:  Can we take the declaration down for --

12  oh, actually, no, I'm sorry, leave it there, and let's talk

13  about Exhibit B.  Now we can all see it.  If you can scroll

14  down to Exhibit B, please.  Okay.

15  BY MR. MORRIS:

16  Q    This page is attached to your declaration, right?

17  A    That's correct.

18  Q    And this page is intended to show the percentage of

19  preferred shares owned by each of the Movant Funds and the 15

20  different CLOs, right?

21  A    That's right.

22  Q    And the Debtor is the portfolio manager for each of these

23  CLOs; is that right?

24  A    Yes.

25  Q    And it's your understanding that the Debtor's management

1  of the CLOs on this page is governed by written agreements

2  between the Debtor and each of the CLOs, right?

3  A    Yes.

4  Q    None of the Movants are parties to the agreements between

5  the Debtor and each of the CLOs pursuant to which the Debtor

6  serves as portfolio manager; is that correct?

7  A    I believe that is correct.  One, I think, important --

8  even though they're not subject to the agreement, they are the

9  -- they have the economic ownership of each of these CLOs.

10 Q    But they're not party to the agreement; is that right?

11 A    Not that I'm aware of.

12 Q    Okay.  And in preparing for this motion and preparing for

13 your testimony, you didn't personally review any of the

14 agreements between the Debtor and any of the CLOs listed on

15 this page, right?

16 A    No.  I relied on legal counsel for that review.

17 Q    Okay.  And, but even though you didn't review the

18 agreements, it's your understanding that among the

19 responsibilities that the Debtor has as the portfolio manager

20 is buying and selling assets on behalf of the CLOs; is that

21 right?

22 A    Yes.  And I believe I specifically stated in my statement,

23 if you want to turn to it, what I (audio gap) to regarding the

24 CLOs' duties under the agreements.

25 Q    Okay.  It's your understanding, in fact, that nobody other

1    than the Debtor has the right or the authority to buy and sell

2    assets on behalf of the CLOs listed on Exhibit B, correct?

3    A    That's my understanding.

4    Q    Okay.  And it's also your understanding, your specific

5    understanding, that holders of preferred shares do not make

6    investment decisions on behalf of the CLO; is that right?

7    A    Correct.

8    Q    And that's something that the Advisors knew when they

9    decided to invest in the CLOs on behalf of the Movant Funds;

10   is that fair?

11   A    That's right.  And at that time, the knowledge in the

12   purchase was with Highland Capital Management, LP and the

13   portfolio management team at that time.

14   Q    And it's still with Highland Capital Management, LP; isn't

15   that right?

16   A    That's correct.  I'm not sure that the portfolio

17   management team looks the same, but it was HCMLP.

18   Q    Okay.  Let's just look at this document for a second.  The

19   first column has the list of the CLOs in which the Movant

20   Funds have invested; is that right?

21   A    Correct.

22   Q    And the second column, HIF, that stands for Highland

23   Income Fund; is that right?

24   A    Yes, sir.

25   Q    And Highland Income Fund is one of the Funds who are the

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 24/57/23   Page 109 of 214   PageID 3570

Norris - Cross                                  44

1    Movants here, right?

2    A    That is correct.

3    Q    And the percentages below that show the percentage of the

4    preference shares of each of the CLOs that that particular

5    fund holds; is that right?

6    A    That's right.

7    Q    And then the third column relates to NexPoint Strategic

8    Opportunities Fund, one of the Movants here; is that right?

9    A    That's correct.

10   Q    And the next column, the fourth column, relates to

11   NexPoint Capital, Inc.'s holding of preference shares in the

12   15 CLOs, right?

13   A    That's right.

14   Q    So, NexPoint Capital doesn't hold any preference shares in

15   any of the CLOs except for a less-than-one-percent interest in

16   Grayson; am I reading that correctly?

17   A    Yes, that's correct.

18   Q    Okay.  And then the last column is intended to show the

19   aggregate portion or percentage of preference shares that the

20   three moving Funds have in each of the 15 CLOs; is that right?

21   A    Yes, that's right.

22   Q    Okay.  Am I reading this correctly that, for 12 of the 15

23   Funds, the moving Funds own less than a majority of the

24   outstanding preferred shares?

25   A    Yes, that's correct.

Norris - Cross                          45

1    Q    And is it also -- am I also reading this correctly to

2    conclude that the moving Funds owned less than 70 percent of

3    every one of these CLOs; is that right?

4    A    That's correct.

5    Q    You don't know who owns the preferred shares in the CLOs

6    that are not owned by the Movant Funds, do you?

7    A    I don't know any -- any specific owners.

8    Q    And some of these CLOs still have notes that are

9    outstanding; is that right?

10   A    Yes.  Very small amounts as a percentage of the overall

11   CLO original capital structure, but yes, some still have small

12   --

13   Q    So, --

14   A    -- notes.  Small amounts of notes.

15   Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16   if we took the time to look at Exhibit A, Exhibit A would

17   show, for each of the 15 CLOs, which of those CLOs still had

18   notes outstanding and the amount of out -- the dollar value of

19   those notes.  Is that right?

20   A    That's correct.

21   Q    Okay.  And your understanding is that -- your

22   understanding -- withdrawn.  The payment -- the distributions

23   from the CLOs are made pursuant to a waterfall; is that right?

24   A    Yes, that's correct.

25   Q    And your understanding of the waterfall process is that

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 24/07/23   Page 111 of 214   PageID 3572
Exhibit 24   Page 107 of 37

Norris - Cross                                    46

1  the notes that are still outstanding at any CLO must be paid

2  -- must be paid in full before the preferred shares receive

3  any recovery; is that right?

4  A   So, I would say that my understanding is slightly

5  different.  It's going to be dependent on each indenture.

6  But, in general, interest payments are made to the debt

7  holders, and anything extra is then allocated to the equity.

8  But ultimate recovery, to your point, would be once those --

9  once the debt is paid off.  And that's the critical thing

10 here, where the preference shares here now with most of these

11 CLOs almost all the way wound down, with the exception of a

12 small piece of debt.  The equity owns the lion's share of the

13 economic interest of every one of these CLOs.  And I think

14 that's important.

15 Q   Okay.  Some of the CLOs still have outstanding notes.  Is

16 that right?

17 A   Yes.  As we discussed on -- Exhibit A will have the notes

18 that are -- that are remaining on those.

19 Q   And you don't know who holds the notes in the other CLOs,

20 right?

21 A   I don't.

22 Q   The only holders of preferred shares that are pursuing

23 this motion are the three Funds managed by the Advisors,

24 right?

25 A   In this motion, yes.

004233

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 12/28/23   Page 112 of 214   PageID 3573
Exhibit 24   Page 48 of 67

Norris - Cross                              47

1   Q    You're not aware of any holder of preferred shares

2   pursuing this motion other than the three Funds managed by the

3   Advisors, correct?

4   A    No, I'm not aware of any others.

5   Q    You didn't personally inform any holder of preferred

6   shares, other than the Funds that are the Movants, that this

7   motion would be filed, did you?

8   A    No, I did not.

9   Q    You're not aware of any steps taken by either of the

10  Advisors to provide notice to holders of preferred shares that

11  this motion was going to be filed, are you?

12  A    I'm not, no.

13  Q    And you're not aware of any attempt that was made to

14  obtain the consent of all of the holders of the preferred

15  shares to seek the relief sought in this motion, correct?

16  A    That's correct.

17  Q    You don't have any personal knowledge, personal knowledge,

18  as to whether any holder of preferred shares other than the

19  Funds managed by the Advisors wants the relief sought in the

20  motion, correct?

21  A    Correct.

22  Q    You don't have any personal knowledge as to whether any of

23  the CLOs that are subject to the contracts that you described

24  want the relief that's being requested in this motion, right?

25  A    That's correct.  I have not spoken or been involved at all

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 12/07/23   Page 113 of 214   PageID 3574
Exhibit 44   Page 497 of 637

Norris - Cross                                    48

1    directly with the CLOs.  I'm representing the Funds.

2    Q    Okay.  Now, two of the Funds, two of the three Movant

3    Funds, I believe you testified are publicly traded; is that

4    right?

5    A    That's correct.

6    Q    And that's the Highland Income Fund and the NexPoint

7    Strategic Opportunities Fund; is that right?

8    A    That's right.  That's right.

9    Q    And because they are publicly-traded, the shareholders in

10   those two funds can sell their shares any time the market is

11   open; is that right?

12   A    If they're willing to take the price that the market is

13   willing to give, yes.

14   Q    Yes.

15   A    Between market hours.

16   Q    And if they -- if they don't like the way the assets that

17   are -- that the Funds have been invested, one of the things

18   they could do is simply sell their shares, right?

19   A    Yes.

20   Q    And the third fund, the shareholders in the third fund

21   have the right to sell out not on a public market but on a

22   quarterly basis; is that right?

23   A    Correct.

24   Q    That third Movant Fund is NexPoint Capital; do I have that

25   right?

Norris - Cross                                    49

1    A    Correct.

2    Q    So they also have the ability to exit if they don't like

3    management on a quarterly basis; is that right?

4    A    Correct.

5    Q    All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6    of your declaration?  Okay.  Paragraph 8 describes a

7    transaction that's been referred to as OmniMax; is that right?

8    A    Yes.

9    Q    And Paragraph 9 refers to a transaction involving SSP

10   Holdings, LLC; do I have that right?

11   A    That's correct.

12   Q    Do you know what SSP stands for?

13   A    See if we say it in there.  SSP Holdings, LLC.

14   Q    Right.  Do you know what SSP stands for?

15   A    I don't.  Something Steel Products.  I --

16   Q    Okay.  You don't need to guess.  These are the only two

17   transactions that the Movants question; is that right?

18   A    These transactions, as well as certain transactions around

19   Thanksgiving time.

20   Q    Okay.  We'll talk about those.  But those transactions

21   about -- around Thanksgiving time aren't in your declaration,

22   are they?

23   A    Not specifically mentioned by name.

24   Q    Okay.  Let's talk about the two that are mentioned by

25   name, Trussway and SSP.  The Movants do not contend that

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 05/07/23   Page 115 of 214   PageID 3576
Exhibit 44   Page 115 of 167

                          Norris - Cross                          50

1    either transaction was the product of fraudulent conduct, do

2    they?

3    A    No.

4    Q    The Movants do not contend that the Debtor breached any

5    agreement by effectuating these transactions, do they?

6    A    I don't believe so.

7    Q    In fact, the Movants do not contend that the Debtor

8    violated any agreement at any time in the management of the

9    CLOs listed on Exhibit B; is that right?

10   A    That's right.

11   Q    The Movants don't even question the Debtor's business

12   judgment, only the results of the trans -- of these two

13   transactions.  Is that right?

14   A    That's right.  And results is the key here and the

15   approach.

16   Q    I see.  And the reason the Movants do not question the

17   Debtor's business judgment is because you don't know what

18   factor or factors the Debtor considered in executing these

19   transactions, right?

20   A    That's right.  I can't look into the mind or know the

21   business judgment and the inputs that went into this.  We do

22   know the outcomes.  And to us, that's troubling, right, as the

23   owners of the lion's share or the majority or even significant

24   amounts of the economic ownership of the CLOs.  And having

25   insight into those transactions, as mentioned in my statement,

Norris - Cross                              51

1    really just trying to maximize recoveries for our Funds.

2             MR. MORRIS:  Your Honor, I move to strike the portion

3    of his answer following that which was responsive to the

4    question.

5             THE COURT:  All right.  I grant that motion.

6             MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Sir, you never asked the Debtor what factors it considered

9    in making these trades, right?

10   A    I did not.

11   Q    And you have no reason to believe that anyone on behalf of

12   the Movants ever asked the Debtor why it executed these

13   trades, right?

14   A    I don't have any knowledge.  There could have been

15   somebody from -- from the Movants.  But I did not.

16   Q    Okay.  On OmniMax, the Movants disagree with the price at

17   which the Debtor effectuated the trade, right?

18   A    Correct.

19   Q    And I believe there was a meeting of the boards of the

20   Funds back in August at which Mr. Seery appeared.  Do I have

21   that right?

22   A    I believe it was August, but he did appear.

23   Q    And the purpose of the appearance was so that Mr. Seery

24   could give an update on the bankruptcy; is that right?

25   A    That's correct, and on the services provided by Highland

004238

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 12/21/23   Page 117 of 214   PageID 3578

Exhibit 14   Page 253 of 367

Norris - Cross                                    52

1   Capital Management, LP to our Advisor.  Advisors.  They

2   provide various shared services.

3   Q    And it was during that meeting that Mr. Seery forthrightly

4   told the boards the price at which he was planning to execute

5   the OmniMax transaction, correct?

6   A    Correct.

7   Q    The transaction hadn't yet occurred, right?

8   A    I'm not sure if it had been finalized.  He had a price,

9   and these -- these things are negotiated.  This was, I

10  believe, a company in restructuring.  So I don't know whether

11  it had been transacted or not.

12  Q    Okay.  The board didn't ask Mr. Seery not to execute the

13  transaction, did it?

14  A    Not to my knowledge.  The board wouldn't -- I don't think

15  the board would have that authority, either.

16  Q    Okay.  But it's here asking the Court to cause the Debtor

17  to pause in the execution of any trades in the CLOs; is that

18  right?

19  A    I think the order speaks in that regard.

20  Q    Yeah.  Okay.  Let's talk about the SSP transaction for a

21  moment.  It's your understanding that Trussway Holdings, LLC

22  owned a majority interest in SSP Holdings, LLC, right?  That's

23  in Paragraph 9.

24  A    Yes.  The statement in Paragraph 9 is what I believe is

25  correct.

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 28-14    Filed 11/14/24    Page 118 of 214    PageID 3579

Norris - Cross                                            53

 1  Q    Okay.  And it's also your understanding that Trussway is a

 2  wholly-owned subsi... I'm sorry, that SSP Holdings is a

 3  wholly-owned subsidiary -- withdrawn.  It's also your

 4  understanding that Trussway is a wholly-owned subsidiary of

 5  the Debtor, right?

 6  A    Yes.

 7  Q    But Trussway is not a debtor in bankruptcy, right?

 8  A    I'm not sure.

 9  Q    Okay.  You have no reason to believe that; is that fair?

10  A    That it's not a debtor in bankruptcy?  That Trussway is

11  not in bankruptcy itself?

12  Q    Correct.

13  A    Yeah.  I have no knowledge of Trussway's situation.

14  Q    Okay.  But you -- but according to your declaration that

15  was prepared by the Advisors' management team, Trussway and

16  not the Debtor owned SSP Holdings, LLC.  Is that right?

17  A    I'm looking here at the statement just to make sure.

18  Q    Sure.

19       (Pause.)

20  A    I -- again, I -- the statement is correct, and I believe

21  speaks for itself regarding entity ownership.

22  Q    The only things you know about the SSP transaction are,

23  one, that you believe it was made without a formal bidding

24  process; and two, that it resulted in a $10 million loss.  Is

25  that right?

004240

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 05/02/37   Page 119 of 214   PageID 3580
Exhibit 44   Page 55 of 67

Norris - Cross                                54

1    A    Correct.

2    Q    Okay.  But, again, neither you, or to the best of your

3    knowledge, anybody at Advisors, ever spoke with anybody at the

4    Debtor about the circumstances concerning either of the

5    transactions, right?

6    A    I don't know the conversations that were had at anyone

7    else from our Advisors, but this is the knowledge that -- that

8    I have.

9    Q    Okay.  And it's the only knowledge you have, right?  You

10   don't know anything about the SSP transaction other than those

11   two facts, right?

12   A    Correct.

13   Q    In fact, I think you testified yesterday that you've been

14   very remote from the SSP transaction, right?

15   A    That's correct.

16   Q    And that it's not a transaction that you have much

17   knowledge on.  Fair?

18   A    Fair.

19   Q    Let's just talk briefly about the transactions that

20   occurred (garbled) Thanksgiving.  They're not specifically

21   referred to in your declaration; is that right?

22   A    That's correct.

23   Q    And you have no knowledge about any transaction that Mr.

24   Seery wanted to execute around Thanksgiving; is that right?

25   A    I know there were transactions and there were concerns

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 05/07/23   Page 120 of 214   PageID 3581
Exhibit 14   Page 2367 of 237

Norris - Cross                           55

 1  from our management team, but I'm not aware of what the

 2  transactions were.

 3  Q   In fact, you can't even identify the assets that Mr. Seery

 4  wanted to sell around Thanksgiving, or at least you couldn't

 5  at the time of your deposition yesterday.  Is that right?

 6  A   That's correct.

 7  Q   And you have no knowledge as to why Mr. Seery wanted to

 8  make those particular trades at around Thanksgiving?

 9  A   No, I don't.

10  Q   And in fact, you don't even know if the transactions that

11  Mr. Seery wanted to close around Thanksgiving ever in fact

12  closed.  Is that fair?

13  A   Correct.

14  Q   Okay.  Let's just -- let's just finish up with a few

15  questions about the boards.

16          MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17  Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18  BY MR. MORRIS:

19  Q   This particular page identifies the directors for each of

20  the three Movant Funds; is that right?

21  A   Let me take a look and confirm.  (Pause.)  Yes.  That

22  looks correct.

23  Q   Okay.  And this was prepared by the Movants; is that

24  right?

25  A   I'm not sure who prepared it.

004242

```
 1  Q   Okay.  To the best of your knowledge, does this document
 2  accurately reflect the composition of the boards of each of
 3  the three Movant Funds?
 4  A   Yes, it does.
 5  Q   Okay.  John Honis, I think you mentioned him earlier.
 6  He's on all three boards.  Is that right?
 7  A   That's correct.  And the reason being we have a unitary
 8  board structure, so -- which is very common in '40 Act Fund
 9  land, where the board sits, for efficiency purposes, on
10  multiple fund boards, and there's a lot of economies of scale
11  from an operating standpoint.  So, yes, they sit on multiple
12  boards.
13  Q   Okay.  And for purposes of the '40 Act, Mr. Honis has been
14  deemed to be an interested trustee.  Is that right?
15  A   That's correct.
16  Q   Okay.  But you don't specifically know what facts caused
17  that designation; you only know that the designation exists.
18  Right?
19  A   That's right.  And I know they are disclosed in the proxy
20  -- or, in the -- the relative filings related to those Funds.
21  Q   Okay.  Three other people are common to all three of the
22  Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,
23  --
24  A   Froehlich.
25  Q   Froehlich.  Ethan Powell and Bryan Ward.  Right?
```

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 05/07/25   Page 122 of 214   PageID 3583
Exhibit 14   Page 58 of 67

Norris - Cross                              57

1   A    That is correct.

2   Q    Okay.  All three of those individuals actually serve on

3   the 11 or 12 boards that you mentioned earlier that are

4   managed by the Advisors, right?

5   A    Yes, that is correct.

6   Q    And they're the same Funds for which you serve as an

7   executive vice president, right?

8   A    Yes.  That's correct.

9   Q    So, for all of the Funds that are managed by the Advisors,

10  you serve as executive vice president and all four of these

11  directors -- trustees serve as trustees on the boards, right?

12  A    Yes, that's correct.

13  Q    Okay.  In exchange for serving on all of these boards, the

14  three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15  -- each receive $150,000 a year for services across the

16  Highland complex; is that right?

17  A    That's correct.

18  Q    Dr. Froehlich has been serving as a board member across

19  the Highland complex for seven or eight years now; is that

20  right?

21  A    That's correct.

22  Q    Mr. --

23  A    I believe it's about seven or eight years.

24  Q    And Mr. Powell, he actually was employed by Highland or

25  related entities from about 2007 or 2008 until 2015, right?

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 28-14    Filed 09/06/23    Page 123 of 214    PageID 3584

Exhibit 14    Page 597 of 367

Norris - Cross                                    58

1    A    That's correct.

2    Q    And Mr. Ward, the third of the independent trustees, he's

3    been serving as a board member on various Highland-related

4    funds on a continuous basis since about 2004.  Do I have that

5    right?

6    A    Yeah, I believe that's correct.

7    Q    Okay.  Just a couple of final questions.  You would agree,

8    would you not, sir, that portfolio managers have an obligation

9    to effectuate transactions concerning the assets that they

10   manage based on their business judgment?

11   A    Yes.  And in accordance with whatever governing documents

12   govern the fund structure.

13   Q    And you would personally expect a portfolio manager to

14   execute a transaction that he or she reasonably believes in

15   good faith and in their business judgment would maximize value

16   for the CLO, even if the CLO did not need cash at that

17   particular time.  Is that right?

18   A    I think it would come down to the governing documents.

19   And I think what you're getting at here is, in this instance,

20   these sales and the intent of the portfolio manager.  And our

21   view, again, is -- and the request for the motion is simply

22   there is a lot at play here.  Several negotiations.  And in

23   order to maximize returns, simply asking for a pause on

24   transactions.

25   Q    All right.  Let me -- let me ask the question again, and I

004245

 1   would ask that you please listen carefully to the question.

 2   You would expect a portfolio manager would execute a

 3   transaction that he or she believes maximizes value, even if

 4   the CLO didn't need cash at that particular moment in time.

 5   Correct?

 6   A    Yeah.  As long as that is maximizing value for the

 7   stakeholders, and in the instance of a CLO, the economic

 8   interest is owned by the equity holders.  So, to their

 9   benefit, yes, that -- that would be the idea.

10          MR. MORRIS:  Your Honor, I have no further questions.

11          THE COURT:  Any redirect, Mr. Wright?

12          MR. WRIGHT:  Only briefly, Your Honor.

13                      REDIRECT EXAMINATION

14   BY MR. WRIGHT:

15   Q    Mr. Norris, I think you were asked at one point about how

16   long you'd been working for Highland Capital Management, which

17   there's -- there's Highland Capital Management Fund Advisors

18   and then there's Highland Capital Management, LP, Debtor.  And

19   I wanted to give you an opportunity to just explain when and

20   what years you worked for HCMLP and then when and what years

21   you worked for NexPoint Advisors or Highland Capital

22   Management Fund Advisors.

23   A    Yes.  From June 2010, I was employed by Highland Capital

24   Management, LP, until July or August of 2012, at which time I

25   was then hired by Highland Capital Management Fund Advisors,

Norris - Redirect                            60

1    not HCML -- no longer employed by HCMLP, and have worked since

2    that time for HCMFA and NexPoint Advisors and not for the

3    Debtor, HCMLP.

4    Q   Okay.  So -- and I'm sorry if I missed a year, but it's

5    been about ten years since you had worked for HCMLP or been an

6    employee of HCMLP, correct?

7    A   Yeah.  It's been over eight years since I have left

8    employment by HCMLP.  Ten and a half years ago, I started

9    working for HCMLP, and then two years after that transitioned

10   away and started working for the Advisors that are part of

11   this motion.

12   Q   Thank you for clarifying.

13            MR. WRIGHT:  Your Honor, I hope -- you directed us to

14   have a witness here today, and so we do.  And I know that you

15   had asked me at the last hearing some questions about the

16   involvement of people at HCMLP, which I tried to address with

17   Mr. Norris in my direct.  But I, you know, I do want to make

18   sure that we've answered any questions that you have.

19            THE COURT:  All right.  Yes, that's fine.  Are you

20   -- does that conclude your redirect?

21            MR. WRIGHT:  It does, Your Honor.

22            THE COURT:  Any recross, Mr. Morris, on that

23   redirect?

24            MR. MORRIS:  No, thank you, Your Honor.

25            THE COURT:  All right, then.  That concludes the

004247

61

1  testimony of Mr. Norris.

2      Any other evidence, Mr. Wright?

3          MR. WRIGHT:  I do not, Your Honor, although I guess I

4  would offer the Exhibit A and Exhibit B to Mr. Norris's

5  declaration --

6          THE COURT:  Any objection to that?

7          MR. WRIGHT:  -- into evidence.

8          MR. MORRIS:  No, Your Honor.

9          THE COURT:  All right.  Those are admitted.

10      (Movants' Exhibits A and B are received into evidence.)

11          THE COURT:  All right.  Well, Mr. Morris, did you

12  want to put on any evidence?

13          MR. MORRIS:  Does the -- do the Movants rest, Your

14  Honor?

15          THE COURT:  I understood that they rest.  Correct,

16  Mr. Wright?

17          MR. WRIGHT:  That's correct, Your Honor.

18          MR. MORRIS:  Your Honor, I would move, effectively,

19  for a directed verdict here.  The Movants have the burden of

20  establishing a *prima facie* case to entitlement to the relief

21  that's been requested, and they have failed to meet that

22  burden.  The Debtor has -- we -- the undisputed facts are the

23  Debtor has the contractual right, and indeed, the obligation,

24  to serve as the portfolio manager of the CLOs pursuant to

25  written agreements.

1        The Movants are not parties to those agreements.  The

2   testimony is undisputed that there are many holders of

3   preferred shares and notes that have had no notice of this

4   proceeding that will undoubtedly be impacted by the tying of

5   the hands of the portfolio manager.  The chart that was

6   attached as Exhibit B expressly shows just what a large

7   portion of interested parties and people who would be affected

8   by this motion are not -- they didn't get notice.  There was

9   no attempt to get notice.  There was no attempt to get their

10  consent.  All of that testimony is now in the record, and I

11  think due process alone would prevent the entry or even the

12  consideration of an order of this type.

13       There is nothing improper that's been alleged.  There is

14  no -- there is no allegation of fraud.  There is no allegation

15  of breach of contract of any kind.  There's not even a

16  question of business judgment.  The Movants didn't even do

17  their diligence to ask the Debtor why they made these

18  transactions.  There is nothing in the record that shows that

19  the Debtor, as the portfolio manager of the CLOs, did anything

20  improper.

21       The only thing that the Movants care about is that they

22  don't like the results in two particular trades.  I don't

23  think that that meets their burden of persuasion that the

24  Court should enter an order of this type, and I would like to

25  relieve Mr. Seery of the burden, frankly, and the Court, of

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 04/01/25   Page 128 of 214   PageID 3589
Exhibit 14   Page 264 of 367

63

1   having to put on testimony to justify transactions that really

2   aren't even being questioned, Your Honor.

3       So the Debtor would respectfully move for the denial of

4   the motion and the relief sought therein.

5           THE COURT:  All right.  Your request for a directed

6   verdict, something equivalent to a directed verdict here, is

7   granted.  I agree that the Movant has wholly failed to meet

8   its burden of proof here today to show the Court, persuade the

9   Court that, as Mr. Morris said, I should essentially tie the

10  hands of the Debtor as a portfolio manager here, as stated.

11  Nothing improper has been alleged.  There has been no showing

12  of a statutory right here, or a contractual right here, on the

13  part of the Movants.

14      I am -- I'm utterly dumbfounded, really.  I agree with the

15  -- I was going to say innuendo; not really innuendo -- I agree

16  with part of the theme, I think, asserted by the Debtor here

17  today that this is Mr. Dondero, through different entities,

18  through a different motion.  I feel like he sidestepped the

19  requirement that I stated last week that if we had a contested

20  hearing on his motion, Dondero's motion, that I was going to

21  require Mr. Dondero to testify.  He apparently worked out an

22  eleventh hour agreement with the Debtor on his motion to avoid

23  that.  But, again, these so-called CLO Motions very clearly,

24  very clearly, in this Court's view, were pursued at his sole

25  direction here.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 09/08/23   Page 129 of 214   PageID 3590
Exhibit 24   Page 265 of 367

64

1      This is almost Rule 11 frivolous to me.  You know, we're
2   -- we didn't have a Rule 11 motion filed, and, you know, I
3   guess, frankly, I'm glad that a week before the holidays begin
4   we don't have that, but that's how bad I think it was, Mr.
5   Wright and Mr. Norris.  This is a very, very frivolous motion.
6   Again, no statutory basis for it.  No contractual basis.  You
7   know, you didn't even walk me through the provisions of the
8   contracts.  I guess that would have been fruitless.  But you
9   haven't even shown something equitable, some lack of
10  reasonable business judgment.
11     Bluntly, don't waste my time with this kind of thing
12  again.  You wasted my time.  We have 70 people on the video.
13  Utter waste of time.
14     All right.  So, motion is denied.  Mr. Morris, please
15  upload an order.
16          MR. MORRIS:  Thank you, Your Honor.
17          THE COURT:  All right.  Do we have any other business
18  to accomplish today?
19          MR. POMERANTZ:  I don't think so, Your Honor.  I know
20  we will see you tomorrow in connection with Mr. Daugherty's
21  relief from stay motion.
22          THE COURT:  Well, yeah, we do have that.  Okay.  We
23  will see you tomorrow.  We stand adjourned.
24          MR. CLEMENTE:  Thank you, Your Honor.
25          MR. MORRIS:  Thank you, Your Honor.

Case 19-34054-sgj11   Doc 3784-25   Filed 05/11/23   Entered 05/11/23 22:26:49   Desc
Case 3:23-cv-02071-E   Document 28-14   Filed 06/07/23   Page 130 of 214   PageID 3591

65

1              THE CLERK:  All rise.

2              (Proceedings concluded at 3:05 p.m.)

3                            --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22    **/s/ Kathy Rehling**                              **12/17/2020**

23 _____        _____

   Kathy Rehling, CETD-444                            Date
24 Certified Electronic Court Transcriber

25

004252

Case 19-34054-sgj11    Doc 3784-25    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 28-14    Filed 09/07/23    Page 131 of 214    PageID 3592

66

                              INDEX

1

  PROCEEDINGS                                                  3

2

  WITNESSES

3

  Movants' Witnesses

4

5 Dustin Norris
  - Direct Examination by Mr. Wright                          23

6 - Cross-Examination by Mr. Morris                           35
  - Redirect Examination by Mr. Wright                        59

7

  EXHIBITS

8

  Movants' Exhibits A and B                          Received 61

9

  RULINGS

10

11 Debtor's Emergency Motion to Quash Subpoena and for         13
   Entry of a Protective Order or, in the Alternative,
12 for an Adjournment (1564, 1565) - *Agreed Order*

13 James Dondero's Motion for Entry of an Order Requiring      13
   Notice and Hearing for Future Estate Transactions
14 Occurring Outside the Ordinary Course of Business (1439)
   - *Continued to 01/04/2021*

15 Motion for Directed Verdict - *Granted*                     63

16 Motion for Order Imposing Temporary Restrictions on         63
   Debtor's Ability, as Portfolio Manager, to Initiate Sales
17 by Non-Debtor CLO Vehicles Highland Capital Management Fund
   Advisors, L.P., Highland Fixed Income Fund, NexPoint
18 Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
   Opportunities Fund (1528) - *Denied*
19

   END OF PROCEEDINGS                                          65
20

   INDEX                                                       66
21

22

23

24

25

# EXHIBIT 25



**TECH**

# MGM leads 2020 media acquisition targets as the entertainment world splits into haves and have-nots

PUBLISHED SUN, JAN 26 2020•9:01 AM EST



**Alex Sherman**
@SHERMAN4949

WATCH LIVE

SHARE

## KEY POINTS

Apple, Amazon, AT&T, Comcast, Disney and Netflix may be a new "Big 6" among global media companies.

MGM has held preliminary talks with Apple, Netflix and other larger media companies about an acquisition as the biggest streaming companies consider strengthening their content libraries.

ViacomCBS and Discovery are in limbo: They are potentially big enough to hang with the Big 6, but too small in their current form to compete effectively.

MARKETS                    CNBC TV                    WATCHLIST                    MENU

004255

WATCH LIVE

**Sean Connery, as James Bond.**
*Bettmann | Getty Images*

There is now significant and potentially irreversible inequality in the world of media. If you're looking for an equalizing force, don't bet on it happening in 2020.

Two major shifts in the past year have made scale — the concept of being as big as possible — more important than ever for media companies. The first is the transition from linear cable TV to streaming services, which are expensive to build out and run and require premium content to stand out.

The second is major consolidation — Disney buying Fox, Comcast acquiring Sky, AT&T purchasing Time Warner and Viacom merging with CBS — that has put media companies with enterprise valuations under $50 billion at a severe disadvantage to their peers.

The result leaves a handful of companies, including AMC Networks    (enterprise value: $5.2 billion), Discovery    (~$40 billion), Lions Gate    (~$6 billion), MGM (private), Sony Pictures (part of larger company, Sony    ), and even the merged ViacomCBS    (~$25 billion), in positions of relative weakness.

MARKETS             CNBC TV             WATCHLIST             MENU

004256

WATCH LIVE

bundled cable TV to a world of a la carte services that can be watched anywhere on any device. If Comcast, Charter/Time Warner Cable, Dish and DirecTV were the Big 4 of the media distribution world for the past decade, Amazon, Apple, AT&T, Comcast, Disney and Netflix look like the Big 6 of the streaming era.

MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010. The funds have made a brilliant decision to sit on their asset for nearly a decade, turning a bankrupt content library into an asset likely worth more than $10 billion, according to people familiar with the matter. And unlike family-owned media companies like AMC (the Dolan family) or ViacomCBS (the Redstone family), the company's owners are probably less likely to be deterred from selling.

MGM has held preliminary talks with a number of companies, including Apple and Netflix, to gauge their interest in an acquisition, two of the people said. MGM owns the James Bond catalog and its studio has made several current hit shows including "The Handmaid's Tale," which streams on Hulu, and "Live PD," a reality police show that has frequently been the most watched show on cable TV and airs on A&E. It also owns premium cable network Epix. MGM had revenue of more than $1 billion for the first nine months of the year consisting primarily of about $600 million in TV and film licensing revenue and $300 million from Epix subscriptions. For the nine months ended September 30, 2019, MGM reported adjusted earnings before interest, taxes, depreciation and amortization of $123 million.

Representatives for MGM, Apple and Netflix declined to comment.

## The 'arms dealer' could soon be extinct

The bifurcation of media into haves and have-nots could lead to several outcomes.

The default is smaller companies will simply license their content to the bigger companies' streaming services. This is the foundation of what built Netflix and Amazon Prime Video.

But the shift to streaming could make the so-called "arms dealer" extinct over time. Disney will want Disney content for its streaming services, AT&T will want WarnerMedia content,

WATCH LIVE

edge over each other. That's good news for the little guys, which may see their values spike if they turn into juicy acquisition targets.

Apple, for example, is brand new to media production and distribution and has started Apple TV+ without an existing library of series and movies to entice consumers. Buying an existing studio with experienced media executives may make sense, especially if the company, such as MGM, is heavy on intellectual property and light on people. (Apple is historically averse to corporate integrations that may result in culture clashes.) Apple, of course, also has a balance sheet that dwarfs virtually every other media company and could make a sizable acquisition without betting the company.

Netflix is the only pure play entertainment streaming video company, meaning it will have to churn out content at rates far faster than its competition, which still gets billions of dollars from a declining yet formidable traditional cable TV model with 80 million U.S. households. Buying a studio could help jump start Netflix's original productions, particularly for time-consuming movies. Netflix has an internal goal to make 95 movies in a year, according to people familiar with the matter. That's nearly four times what a studio like Universal Pictures makes in a year.

MGM's studio and library of content, which also includes movies such as "Rocky," "Mad Max," and "Hot Tub Time Machine," would be an appealing add to any company looking to bolster its streaming offerings, including traditional companies like Disney, WarnerMedia and NBCUniversal. But each of those companies is still digesting enormous acquisitions from last year, potentially opening the door for a large, unchallenged bid by one of the big technology companies. If it happens, it would be the first time a big tech company makes a sizable legacy media acquisition.

The catch is that Apple and Netflix have always been averse to big acquisitions. Netflix has never done a material acquisition in the history of the company. Apple's largest deal ever was a $3 billion purchase of Beats in 2014, an almost laughably small "record deal" given Apple's size and cash hoard.

Still, things stay the same until they change. Until 2017, Amazon's biggest deal was online shoe-seller Zappos, which it bought for $1.2 billion in 2009. Then it dropped $13.4 billion on Whole Foods. Just because a company hasn't made a large acquisition doesn't mean it

WATCH **LIVE**

There's one other option to arms dealer and mass consolidation: bundling.

Smaller players like Starz, Discovery and ViacomCBS could partner with members of the Big 6 to bundle their streaming services together for a discount. WarnerMedia CEO John Stankey said he was open to this idea in a CNBC interview last year, with HBO Max serving as the centralized hub to access not only WarnerMedia content, but also programming from other services.

In this scenario, instead of distributors such as Comcast, Charter, Dish and DirecTV all offering basically the same bundled service, consumers could have choices of bundles among different streaming services. It's conceivable the Big 6 could each market a different bundle centered around the user experience of their technology. Comcast could have an Xfinity streaming bundle, Apple could have an iOS bundle with Apple Music and Games, Amazon could sell a Prime-based bundle and so on.

Lions Gate CEO Jon Feltheimer alluded to this in his company's second-quarter earnings call in November.

"Rather than watching our traditional business ratchet down with each new unwinding of the television bundle, we're embracing the realities of the evolving marketplace, collaborating with our linear partners to grow our respective businesses and transitioning our customers on an innovative and orderly path to an a la carte environment together," Feltheimer said.

## ViacomCBS and Discovery in limbo

It's possible the Big 6 could turn into a Big 7 if ViacomCBS and Discovery merged their assets. They're currently too small to effectively compete toe-to-toe against the Big 6, but big enough where both companies feel they can survive in a streaming world.

Viacom, under current ViacomCBS CEO Bob Bakish, was interested in buying Scripps in 2017, but it was ultimately outbid by Discovery. Bringing the companies together would add strength to a global company that has a movie studio (Paramount), live sports (NFL, Premiere League), and non-fiction programming (HGTV, Discovery, Food Network).

Still, the structure of a deal could be challenging, with potential ownership challenges

WATCH LIVE

seller. Moreover, Viacom and CBS just merged and are still integrating the companies, which could make a second large deal untenable for a while.

That could lead ViacomCBS and Discovery to either sell or look for smaller acquisitions to build scale, such as Lions Gate's Starz.

It's highly unlikely we'll see the same type of mega-media merger action of 2019 in 2020. Companies will instead focus on marketing their streaming services and bidding on professional sports rights, including the NFL, in the second half of the year.

But the stratification of media has already taken place, and the lines have been drawn. If you're a media have-not, chances are organic growth, efficient operations and shrewd strategy won't get you very far. Fortunately for them, there are some very big fish that may finally be hungry enough to bite.

*Disclosure: CNBC and NBC are owned by Comcast's NBCUniversal unit.*

**WATCH: Liberty Media's John Malone: Streaming content will eventually thin out**



**VIDEO** 10:09

Liberty Media's John Malone: Streaming content will eventually thin out

○ WATCH **LIVE**

UP NEXT | **Fast Money Halftime** 12:00 pm ET

## TRENDING NOW

 **Cash App founder Bob Lee reportedly killed in San Francisco stabbing, sources say**

 **Private payrolls rose by 145,000 in March, well below expectations, ADP says**

 **Jeep unveils 2024 Wrangler SUV in next stage of off-road sales battle with Ford Bronco**

 **The salary you need to live comfortably in 15 major U.S. cities**

 **Harvard expert shares her No. 1 'undesirable' trait CEOs see in employees: It's 'a huge red flag'**

004261



○ WATCH **LIVE**

**FROM THE WEB**

## Former Goldman Sachs VP Says Move Your Money Before This Major Event

**Investing Outlook**

## 50-Year Wall Street Legend: "You have 90 days to move your money"

**Chaikin Report**

CCPA Notice



Subscribe to CNBC PRO

CNBC Councils

CNBC on Peacock

Supply Chain Values

Closed Captioning

News Releases

Corrections

Ad Choices

Podcasts

Help

Licensing & Reprints

Select Personal Finance

Join the CNBC Panel

Select Shopping

Digital Products

Internships

About CNBC

Site Map

Careers

Contact

News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

Advertise With Us

PLEASE CONTACT US

CNBC Newsletters

004262

○ WATCH **LIVE**

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy

Do Not Sell My Personal Information

CA Notice

Terms of Service

© 2023 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by

# EXHIBIT 26

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/its-no-time-to-die-for-hedge-fund-manager-ulrichs-big-james-bond-bet-11602408601

◆ WSJ NEWS EXCLUSIVE

# It's 'No Time to Die' for Hedge-Fund Manager Ulrich's Big James Bond Bet

Pressure on MGM Holdings and Anchorage Capital Group is mounting with delay of film's premiere

*By Juliet Chung*  [Follow]

Oct. 11, 2020 5:30 am ET

Hedge-fund manager Kevin Ulrich has a lot riding on the latest James Bond film. But after the coronavirus pandemic destroyed movie-theater attendance and pushed "No Time to Die" out to next year, the odds of a big payday anytime soon are getting longer.

Mr. Ulrich's New York hedge fund, Anchorage Capital Group, is the largest shareholder of the studio that owns the Bond franchise, MGM Holdings Inc. Its hope was that a blockbuster release would increase MGM's value, while creating publicity that could spark interest from a buyer for the company.

But MGM earlier this month delayed the film's global premiere to April 2021, from this November.

As the catalyst for a potential payoff is delayed, pressure is mounting on Mr. Ulrich, who is chairman of MGM's board. Some Anchorage clients have asked the hedge fund whether the perks and privileges that come with being a Hollywood chieftain have influenced Mr. Ulrich's call to stay with MGM, the lengthiest and largest investment in Anchorage's history. Other MGM investors have asked the same.

MGM's private stock hovers around $75 a share, far north of the $17 a share it commanded coming out of bankruptcy in 2010 but well below the roughly $120 it traded around in 2018 in hopes of a deal. It has had no chief executive for more than two years.

Mr. Ulrich declined several requests for an interview.

He has told investors he should be involved in MGM given its status as Anchorage's largest investment, clients said. As of September, it was a more than $1 billion position making up

14% of the firm's $8.4 billion hedge fund. He also told clients before the pandemic that he limits his travels to Los Angeles and conducts much of MGM's business by phone.



Kevin Ulrich, chairman of MGM's board, at the Golden Globe Awards in 2018.
PHOTO: STEFANIE KEENAN/GETTY IMAGES FOR FIJI WATER

In recent months, Mr. Ulrich has said he is working toward a deal and has cited Amazon.com Inc.,  AMZN **-2.47%** ▼   Apple Inc.,  AAPL **-1.59%** ▼   Comcast Corp.  CMCSA **0.38%** ▲   and Facebook Inc. as possible buyers. He has also said that while MGM's production business has suffered because of the pandemic, its library of more than 4,000 titles has become more valuable because of the dearth of new content.

Apple declined to comment, and Comcast didn't have an immediate comment. Amazon and Facebook didn't reply to requests for comment Saturday.

004266

A person close to Anchorage said Mr. Ulrich believes MGM is a more-attractive asset because it hasn't released "No Time to Die," giving a buyer control over its launch and distribution.

MGM has a deal with Universal Pictures to distribute "No Time to Die" internationally; a new owner would likely need to compensate Universal if it decided to work with another distribution partner, said a person familiar with how the distribution landscape works.

MGM's fate takes on outsize importance at Anchorage, which like other investors in distressed or beaten-down assets has struggled during a technology-led bull market. Assets in Anchorage's flagship fund have shrunk by more than 40% in less than three years, from $14.6 billion at the end of 2017. A person close to Anchorage said the hedge fund stopped taking in new money in 2017, and added that other parts of Anchorage's business have grown, bringing the firm's overall size to $25 billion.

Despite a management restructuring at the hedge fund last fall, Anchorage has continued to struggle. This year through September, the flagship fund was down 1.4%, said a person familiar with the firm.

Mr. Ulrich's big bet on Hollywood had its beginnings in 2010.

MGM was emerging from bankruptcy at the time, and a group of hedge funds that had been creditors became shareholders. Chief among them was Mr. Ulrich's Anchorage.



Lashana Lynch, left, and Léa Seydoux in 'No Time to Die.' MGM delayed the film's global premiere until April 2021.
PHOTO: MGM STUDIOS

The plan—a prescient bet that forms of distribution would change and there was a benefit to owning content—was to boost the value of MGM's languishing film and television library with new hits and then exit through an initial public offering or the sale of the studio. The vast

library includes the James Bond and Rocky franchises and would serve as collateral, limiting potential losses for the funds.

Anchorage started buying up senior debt in MGM for about 50 cents on the dollar. The troubled studio had been struggling to service some $4 billion in debt as DVD sales plummeted. It filed for bankruptcy and emerged in December 2010 under new management, including Hollywood veteran Gary Barber as chief executive. Mr. Ulrich took a seat on the board at the time.

Davidson Kempner Capital Management LP, Highland Capital Management LP and Solus Alternative Asset Management LP also converted their debt to equity, with Highland and Solus taking board seats in 2010. Other funds, including Litespeed Management LLC and Owl Creek Asset Management LP, bought shares after MGM emerged from bankruptcy.

MGM was close to a deal with a Chinese buyer in 2016 for roughly $8 billion, said people familiar with the matter. Mr. Ulrich, a board member at the time, was supportive of the deal, said a person close to him. The deal fell apart as China cracked down on overseas investments, the person said.

In 2018, Mr. Ulrich, by then the board chairman, and others on the board fired Mr. Barber for having early, unsanctioned conversations with Apple to sell the studio for more than $6 billion. The preliminary talks fell apart when he was ousted. Minority shareholders protested, with Owl Creek founder Jeffrey Altman sending a letter to the board saying Owl Creek and other shareholders wanted a deal.

Mr. Ulrich told unhappy investors he could sell the studio for more than $8 billion in two to three years, MGM investors said.

An MGM spokeswoman last week said, "The Apple deal was a rumor."



A trailer for 'No Time to Die' was displayed in London last December.

PHOTO: LISI NIESNER/REUTERS

Anchorage's investment has come with myriad perks for the 50-year-old Mr. Ulrich, a film and television buff who speaks about the glamorous legacy of MGM.

After hiring a boutique public-relations firm to bolster his Hollywood profile, he has become a familiar presence on star-studded red carpets and at Hollywood parties. The firm, Frank PR, has caused frustration inside MGM over time by frequently asking MGM executives for help getting Mr. Ulrich into events, including InStyle's party at the Toronto film festival and pre-awards show parties at talent agencies Creative Artists Agency and WME, a unit of Endeavor Group Holdings, said people familiar with the matter.

Anchorage and MGM declined to say who paid Frank PR for its work for Mr. Ulrich. Frank PR didn't respond to requests for comment.

Mr. Ulrich frequently calls into MGM's office of the CEO—a structure that has included roughly a dozen people—to ask about the casting of specific actors and actresses in MGM projects, said people familiar with the matter.

MGM has been a controversial investment inside Anchorage.

Tony Davis, Anchorage's co-founder, voiced concern about how large a position MGM had become for the hedge fund, said people familiar with the matter. Mr. Davis retired from Anchorage in 2015, leaving few who would challenge Mr. Ulrich as directly.

Mr. Ulrich's decision to sit on MGM's board also sparked discussion inside the firm. Others from Anchorage had frequently taken on directorships, but it was the first time Mr. Ulrich had

004269

done so. Mr. Ulrich took his second-ever board role this September, serving as chairman of J.Crew Group Inc. when it emerged from bankruptcy.

Despite hits such as "Creed," the 007 films and the critically acclaimed TV shows "The Handmaid's Tale" and "Fargo," MGM has suffered in recent years from declining cash flow and a high debt load, which stood at $2.3 billion as of August. The debt relates to its 2017 acquisition of and investment in the pay-television channel Epix, investments in big film projects and the studio's repeated share buybacks.



MGM in recent years had declining cash flow and a high debt load despite some hits, such as 'The Handmaid's Tale.'
PHOTO: JASPER SAVAGE/HULU

The length of time MGM has gone without a deal has frustrated some other hedge funds that effectively remain locked into the studio while they await a deal. A poison pill implemented in 2013 allows MGM to dilute the voting stake of shareholders working as a group, limiting the ability of minority investors to exert their influence.

"At the end of the day, the stock price has come down pretty significantly since Gary was removed. The market has kind of spoken," said an investor.

Still, he said, the lengthy investment could prove worthwhile if MGM sold soon for $9 billion or more.

—R.T. Watson contributed to this article.

**Write to** Juliet Chung at juliet.chung@wsj.com

*Appeared in the October 12, 2020, print edition as 'Fund Chief's Wager On James Bond, MGM Riles Clients'.*

004270

# EXHIBIT 27

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For
non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/mgm-holdings-studio-behind-james-bond-explores-a-sale-11608588732

◆ WSJ NEWS EXCLUSIVE | MEDIA & MARKETING

# MGM Holdings, Studio Behind 'James Bond,' Explores a Sale

Movie studio has tapped bankers to find a buyer, as media companies look to stock up on content

*By Benjamin Mullin* [Follow] *, Cara Lombardo* [Follow] *and Juliet Chung* [Follow]

Updated Dec. 21, 2020 6:38 pm ET

MGM Holdings Inc., the movie studio behind the "James Bond" franchise, is exploring a sale, according to people familiar with the matter, betting that its library of content will prove attractive to companies pursuing growth in streaming video.

Closely held MGM has tapped investment banks Morgan Stanley  MS **1.62%** ▲  and LionTree LLC and begun a formal sale process, the people said. The company has a market value of around $5.5 billion, based on privately traded shares and including debt, some of the people said.

The studio has contemplated a sale at various points over the past few years, but potential suitors have previously balked at the price MGM was seeking. MGM is hopeful the current process will generate interest beyond Hollywood's traditional players, from international media companies, private-equity investors and blank-check companies, one of the people familiar with the matter said.

MGM's biggest shareholder, New York hedge fund Anchorage Capital Group, has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks.

MGM's exploration of a possible sale comes amid a bidding war for content to fill a new wave of streaming-video services. MGM's library of titles could make it an attractive target, its investors say.

004272



Elisabeth Moss in 'The Handmaid's Tale,' a dystopian TV show distributed by MGM's TV unit and shown on video-streaming service Hulu.

PHOTO: GEORGE KRAYCHYK/HULU/ZUMA PRESS

The film studio has produced or distributed movies and TV shows including the "Rocky" franchise, "The Handmaid's Tale" and "Vikings." It has struck deals to license movies from its library, including "Silence of the Lambs," "Dances with Wolves," "Rain Man" and "The Terminator."

MGM's biggest asset is the "James Bond" franchise, which it shares with Danjaq LLC, a holding company owned by the Wilson/Broccoli family, that co-owns the copyright to existing "Bond" movies and controls the future of the franchise.

MGM also owns Epix, a premium TV channel and video-streaming service, and purchased an ownership stake in "Survivor" producer Mark Burnett's production ventures.

In 2018, MGM fired its then-chief executive, Hollywood veteran Gary Barber, for having early, unsanctioned conversations with Apple Inc. to sell the studio for more than $6 billion. The preliminary talks fell apart when he was ousted. MGM board chairman Kevin Ulrich, co-founder of Anchorage, told studio investors at the time he could sell MGM for more than $8 billion in two to three years, The Wall Street Journal previously reported.

But the price of the company's shares, which are privately traded, has dropped steeply since then. It trades around $80, well above the $17 a share it commanded coming out of bankruptcy in 2010 but below the about $120 it traded around in 2018 in hopes of the Apple deal.

Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers, investors have said.

Anchorage and several other hedge funds bought MGM's debt before it filed for bankruptcy in 2010 and then became shareholders of the restructured studio. They and other hedge funds that later got involved made a canny bet that distributors would make a land-grab for content.

Their plan was to boost the value of MGM's library with new hits and then exit through an initial public offering or the sale of the studio. Few expected to remain in MGM a decade on.



In addition to the 'James Bond' franchise, MGM has also produced or distributed movies and TV shows.

PHOTO: MGM STUDIOS

Mr. Ulrich and other investors had been hoping for a deal around the release of "No Time to Die," expecting the film's release would increase the library's value while creating publicity that could spark interest from a buyer. MGM's postponing the premiere of "No Time to Die" from November to April 2021 so it could be seen in theaters is expected to deliver a blow to MGM's 2020 earnings before interest, taxes, depreciation and amortization, a measure of cash flows.

While movie theaters have remained dark for most of the year as a result of capacity restrictions, the pandemic has proved a boon in some ways for MGM. Its production business suffered earlier in the year, but its library has benefited from strong demand because of the broad dearth of new content, MGM said earlier this year.

In a third-quarter earnings call, Chief Operating Officer Christopher Brearton said production had picked back up and that MGM was possibly on track to have its biggest year for new content in 2021.

004274

4/17/23, 8:30 AM

Case 19-34054-sgj11    Doc 3784-28    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Case 3:23-cv-02071-E    Document 29-11    Filed 05/10/23    Page 153 of 214    PageID 3614

In the first three quarters of 2020, MGM reported $181 million in adjusted Ebitda, compared with $123 million over the same period last year. It attributed the growth to the studio's stronger television-licensing revenue and lower marketing expenses, though MGM noted it was partially offset by film releases delayed by the pandemic.

Possible suitors expressed interest in MGM this spring as people stayed home and demand for streaming picked up, a person familiar with the process said. Interest has picked up recently as companies look ahead to a long winter and an uncertain time frame for reopening, this person said.

*—Joe Flint*
*contributed to this article.*

**Write to** Benjamin Mullin at Benjamin.Mullin@wsj.com, Cara Lombardo at cara.lombardo@wsj.com and Juliet Chung at juliet.chung@wsj.com

*Appeared in the December 22, 2020, print edition as 'Film Studio MGM Puts Itself on The Block'.*

# EXHIBIT 28

# The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue



## He has fought Blofeld and defeated Scaramanga but James Bond could be heading for his most dramatic assignment yet: a bidding war.

The studio behind the 007 franchise is considering a sale of its back catalogue – and possibly the rights to produce future films – for around £4billion.

004277

MGM hopes to spark a battle that could interest streaming services such as Amazon Prime.

Its biggest asset is the James Bond franchise – which it shares with the Broccoli family, who co-own the copyright. Interest in Bond spiked in October after the death of Sir Sean Connery, the first and, many would argue, the best actor to play the role.

MGM has also produced or distributed films such as the Rocky franchise, Dances With Wolves and The Silence of The Lambs, as well as TV shows including The Handmaid's Tale. It has toyed with a sale before but the pandemic and growth in the use of streaming services has made it think that this time they could cash in, with private equity investors a possible rival to the streaming giants in a bidding battle.

Advertisement

MGM, which has a film library of 4,000 titles and more than 17,000 hours of television programmes, has already been the subject of speculation, with Apple and Amazon touted as potential buyers.

On Monday, the Wall Street Journal reported that the studio – whose biggest shareholder is a New York hedge fund – has recruited Morgan Stanley and LionTree LLC to advise on the process of a formal sale.

A source close to the company told the newspaper: 'MGM is hopeful the process will generate interest beyond Hollywood's traditional players.' US TV networks have spent billions of dollars this year for content to promote their own streaming services to rival Netflix and Hulu.

NBCUniversal splashed £372million to reclaim The Office and WarnerMedia paid £316million to get back Friends for HBO Max.

The Bond franchise suffered a setback this year with the repeated delays to the latest film, No Time To Die – the final outing with Daniel Craig as 007.

It was due to be released in April but that has now been postponed by at least a year because of the coronavirus pandemic. In October, reports claimed that the Broccoli family were considering selling the rights to stream the movie for a year to either Netflix or Apple for £450million.

Instead they hung on for a traditional theatrical release, partly because they did not want to jeopardise future releases in cinemas.

Neither MGM nor Eon Productions, the Broccoli-owned company which produces the Bond films, were available for comment.

004278

# EXHIBIT 29

# Could Apple Be Ready to Gobble Up MGM Studios Entirely?

*Tim Cook Could Be the Next "M"*

By Jesse Hollington

5 Min Read Published: Dec 24th, 2020



Credit: LeStudio / Shutterstock

Text Size

**Toggle Dark Mode**

We're living more than ever in an era marked by moments of transition, and nowhere is this more apparent than the rise (and impending fall) of many iconic Hollywood studios as the world shifts more and more into the realm of streaming services.

While many studios have bowed to the inevitable and launched their own streaming services, it seems like this approach hasn't been available to the legendary MGM, which has spent the past couple of years trying to partner with some of the other big players in the game, or possibly even sell itself off wholesale — apparently without much success.

In fact, it was almost exactly a year ago that we first head that Apple and MGM were reportedly in talks that among other things were said to have included the possibility of bringing its substantial movie library to Apple TV+.

At the time MGM was also looking for a digital streaming partner for its Epix cable channel, and had also been shopping itself around to the likes of Amazon and Netflix, however the deal looked like it might be promising for Apple thanks that MGM's ownership of large swaths of popular content such as the James Bond franchise.

004280

Unlike its rivals, however, Apple has also shown a reluctance to license content from other studios, since it wants to own and control all the pieces and not be held hostage by content owners. A content licensing deal with MGM seemed unlikely, but some reports suggested that a full-scale acquisition may have been on the table as well.

# Up for Grabs

While those earlier reports were merely rumours from industry insiders, it's now become apparent that MGM is actually up on the auction block, with *The Wall Street Journal* (via <u>Apple News+</u>) reporting that the studio has begun a formal sale process.

MGM still expects to court one of the major streaming companies, with the *WSJ* reporting that it believes that the content library that it has to offer will "prove attractive to companies pursuing growth in streaming video."

The studio has reportedly contemplated an outright sale in the past, but most potential buyers — presumably including Apple — have balked at the price tag it was asking for.

At this point, however, MGM has an estimated market value of around $5.5 billion, and with it beginning a more public sale process, most analysts are estimating an asking price of around $5 billion, which could be a bargain unless a bidding war ensues.

Which could happen, considering that many streaming providers are frantically jockeying for position, especially as big studios like Disney, CBS, and NBCUniversal have launched their own services and begun clawing back on content licensing deals with independent providers like Netflix and Amazon Prime.

In fact, these latest rounds in the streaming content wars actually makes Apple's choice to eschew licensing third-party content seem somewhat prescient. While Netflix and Amazon Prime do have enough original content in their arsenal to survive the loss of other big-name licensed shows, it's still been a rough road as massively popular franchises like Marvel Cinematic Universe and Star Wars move to Disney+; Apple, on the other hand, has nothing to lose.

On the other hand, if Apple were to *buy* MGM outright, this wouldn't be a content licensing deal — instead all of MGM's properties would become Apple's own, including not only the entire *James Bond* franchise (and some related rights to producing *new* James Bond content), but also the *Rocky* franchise, *The Handmaid's Tale*, and *Vikings*.

Apple would also gain the entire back-catalog of MGM movies — something that <u>rumours have suggested Apple is willing to do under the right circumstances</u> — and that's no small amount of legendary content, including such films as *Dances with Wolves*, *Silence of the Lambs*, *Rain Man*, and *The Terminator*.

# A Better Deal

According to the *WSJ* report, Apple and MGM were in talks as far back as 2018, when <u>MGM actually fired its then-CEO Gary Barber as a result</u>, since the Board of Directors hadn't authorized the conversations.

While Barber was asking for more than $6 billion at the time, that all fell apart after he was shown the door, and MGM Chairman Kevin Ulrich felt the asking price was too little, as he told investors that MGM would easily be worth more than $8 billion in the next two to three years.

While Apple was invited back to the table by MGM back in 2019, those talks didn't appear to bear any fruit, and it's possible Apple may be playing the long game and simply waiting MGM out. As the *WSJ* notes, at this point MGM's privately traded shares have dropped to about two-thirds of their previous value, and in fact the 2018 high point of $120 per share seems to have been bolstered primarily by the rumours of a possible deal with Apple.

MGM has also been hoping to bolster its image with the release of the latest Bond film, *No Time to Die*, expecting that the release of the film would increase the company's value and spark interest from a potential buyer. However, its decision to delay the film into early next year as a result of the ongoing pandemic is going to result in a big hit to its 2020 earnings, making it a good time to try and pick the studio up at a bargain price.

That is if $5 billion can be considered a "bargain," but with what MGM brings to the table, it really is, and considering that Apple has extremely deep pockets and a willingness to spend huge amounts of money on its own original productions compared to its rivals, there's no doubt that if Apple wants MGM in its portfolio it should have no problem acquiring it.

That said, even though Apple has acquired many smaller companies over the years, there have been very few massive acquisitions, and in fact MGM would be the biggest. Apple famously acquired Beats for $3 billion back in 2014, as well as Intel's 5G modem business for $1 billion last year, which was a bargain when you consider that it cost $4.5 billion to settle its fight with Qualcomm, so $5 billion for everything that MGM has to offer doesn't seem all of that unreasonable.

# EXHIBIT 30

004283

Sign In

Close Menu

**JOIN BULWARK+**

- Podcasts
- Newsletters
- Articles
- Video
- About
- Bulwark+

Sign In
**JOIN BULWARK+**
Follow The Bulwark on TwitterThe Bulwark on SnapchatThe Bulwark
FacebookThe Bulwark InstagramThe Bulwark YouTube
PodcastsNewslettersArticlesVideoAboutBulwark+
SearchMobile Menu
IDEAS, ARTS, AND CULTURE

# MGM Is For Sale (Again)

But a different marketplace with cash-rich suitors means
that MGM might be the first domino to fall — and a pricey
one, at that.

*by* **JAMES EMANUEL SHAPIRO**

JANUARY 15, 2021 9:31 AM



**AUCTION PADDLE---03/26/07---A auction paddle in action illustration, March 26, 2007. (Photo by Steve Russell/Toronto Star via Getty Images)**

Share on FacebookShare on TwitterShare via emailPrint

Back in December of 2017, when Disney first reached an agreement to buy Twentieth Century Fox, Disney and Netflix had essentially entered a race that would define this moment in time for distribution. Could Disney become Netflix before Netflix became Disney? We know the answer now, here at the beginning of 2021: Disney could soon be both the leader of the theatrical business—with *Marvel, Star Wars, Pixar* and their animated remakes—and can <u>mine their properties</u> (including Fox's rich vein of intellectual property like *Die Hard Planet of the Apes*, *Alien*, *Night at the Museum*, and *Ice Age*) for additional streaming content. They launched Disney+ shortly thereafter and are closing in on 100 million worldwide subscribers ahead of schedule. Everyone else, Netflix included, is playing catch up.

When the long-expected news broke that <u>MGM had hired consultants to facilitate a sale</u>, it opened the door to more consolidation by the biggest studios in Hollywood as streaming continues to grow into the primary way viewers watch movies. MGM has been bought and sold and bounced around so many times it's comical. In fact, a big chunk of their library is permanently at Warner now (check out MGM's <u>wikipedia page</u> for the full history), but their current, still-large library will always have real value in the entertainment world. MGM also offers several intriguing parts beyond their library like full production and distribution capabilities for both movies and television, the streaming company EPIX, a 50 percent ownership share in the *James Bond* franchise (which is currently the largest movie franchise not being released by a major studio), and additional franchises that can be mined in the streaming world like *Rocky*, *Poltergeist*, *Carrie*, *Pink Panther*, *Legally Blonde*,*Robocop*, and  *Poltergeist*. While this means they have something to offer everyone, in theory, it's better to think of this opportunity as one-stop shopping for any company that wants to get in at the ground floor and become a fully functional studio overnight.

Where will they end up? Lets make some educated guesses based on the following criteria:

1. You need at least $5.5 billion in cash on hand. Yes, you can be creative, but for the purposes here, I want to narrow the list down some. This eliminates Lionsgate ($0.5b cash on hand) and ViacomCBS/Paramount ($3b cash on hand), but I'm going to pitch one idea that includes them below.

2. You have a need for MGM's:

1. Library;

2. Stake in *James Bond*;

3. Production capacities;

4. Distribution capacities;

5. Additional IPs for new content;

6. Streaming service EPIX.

The more needs MGM fills, the better the fit, and therefore the more likely I think a sale will happen. Let's start with the companies I feel have the worst odds to buy MGM and finish with my bet on the likely home.



**PODCAST · APRIL 07 2023**
**Tim Miller: Tennessee's Idiocracy**
*The Tennessee GOP lives in such a bubble, they thought it was a good idea…*

# DISNEY (50 to 1)

*Cash on Hand: $18b*

*Needs: Stake in James Bond*

*Does not need: Library, Production capacities, Distribution capacities, Additional IPs for new content, EPIX*

Disney will certainly be interested in a franchise as large as *James Bond*, but given the uncertainty in the theatrical market and the simple fact they are overflowing with the biggest movie properties already, I think their interest in *Bond* will be somewhat limited. The MGM library has some PG content but also a lot of adult fare that Disney is indicating will not go to Disney+ and their Hulu/Star strategy is strangely complicated. They are probably content to sit this one out. It's good to be the king.

## AT&T/WARNER MEDIA (30 to 1)

*Cash on Hand: $10b*

*Needs: Stake in James Bond, Additional IPs for new content*

*Does not need: Production capacities, Distribution capacities, Additional IPs for new content, EPIX*

AT&T would love to have *Bond*, but they are feeling the heat from announcing they are <u>dumping their entire 2021 theatrical slate to HBO Max</u>. They are also selling assets right now, a process that started with the <u>anime streaming site Crunchy</u>

004288

<u>Roll</u> and will likely continue with DirecTV. Dropping billions on MGM for *Bond* would reverse their current strategy, which is why I think it's unlikely MGM will end up with the Burbank studio. Their current library is even more extensive and valuable than MGM's, though they've yet to utilize it well on HBO Max. In fact, everything about HBO Max right now is troubled and their focus should be—and likely will be—righting that ship. This could be a major distraction and that suggests they'll sit this one out.

# SONY (20 to 1)

*Cash on Hand: $42b*

*Needs: Stake in James Bond, Additional IPs for new content, Library, EPIX*

*Does not need: Production capacities, Distribution capacities*

If you want a good book about the current state of the movie business, you have to read <u>Ben Fritz's *The Big Picture: The Fight for the Future of Movies*,</u> which studied the emails made available from the <u>Sony hack in 2014</u> and was able to tell the story of the decline in Sony's movie business through those emails. It's fascinating, and for our purposes here, it can detail how the MGM purchase could help cure what ails Sony. They would be able to enter the streaming age with EPIX and be armed with a complete catalog as well as being able to roll out new movies or shows around the MGM properties. The reason they aren't higher given

all the fits is because Sony has noticeably avoided getting into the streaming wars so their internal strategy might preclude them from buying MGM (again). Sooner or later, however, Sony will want to own its own streaming platform (besides Crackle, <u>which they just exited</u>). This would give them an opportunity that's better than launching an entirely new platform with zero subs, but I don't think they'll go for it now given they haven't indicated a shift in their overall thinking toward streaming.

## NETFLIX (12 to 1)

*Cash on Hand: $8b*

*Needs: Stake in James Bond, Library, Additional IPs for new content*

*Does not need: Production capacities, Library, EPIX, Distribution capacities*

For Netflix, being able to reboot something like *Robocop* is important, but let's be honest: This is all about *Bond* for Netflix. Netflix has been trying to build their own big franchises and has been largely unsuccessful, save for *Stranger Things*. They don't want to directly compete with other studios (they see Youtube and video games as their main competitors), but they do see their growth now dependent on being a lot like Disney in that they want to control several large, mainstream IPs. Being able to land something like *Bond* is a holy grail for them. Disney may have beaten them and built a successful streaming branch before they

could collect a number of high demand franchises, but this is the chance for them to make a splash. We've already known they kicked the tires with MGM on buying *No Time to Die*, but I do wonder if the price tag for buying all of MGM is too much given their primary interest in MGM is just in one franchise. However, we have to acknowledge they are going to be one of the bidders. If the price tag goes to ten or eleven billion, they probably can't compete.


# AMAZON (10 to 1)

*Cash on Hand: $64b*

*Needs: Stake in James Bond, Additional IPs for new content, Library, EPIX, Distribution capacities*

*Does not need: Production capacities*

Amazon is working with several third party producers and they produce some content, including their *Lord of the Rings* series that is right around the corner, themselves. They also had their own theatrical distribution team under Bob Berney until a string of unsuccessful releases had them turn their focus away from theatrical. (Berney left Amazon in 2019.) These elements of MGM aren't as interesting to Amazon but everything else is. The MGM library and the ability to make series or movies from all the existing IPs would boost their Prime streaming. They also have a second window deal with EPIX that they could bring in-house and away from Hulu so that content could become exclusive and now

first window. But all that pales in comparison to getting something like *Bond* at Amazon. They are going to take a long, hard look at MGM.

## COMCAST/UNIVERSAL (7 to 1)

*Cash on Hand: $14b*

*Needs: Stake in James Bond, Additional IPs for new content, Library*

*Does not need: Production capacities, EPIX, Distribution capacities*

Comcast isn't as good as Disney in terms of being forward thinking, but they are close. They came in second for Fox back in 2017, but they were smart enough to get the European premium network Sky as a consolation prize. They also place a huge value on big IPs and they have all international rights on *Bond*. I think they are going to go after MGM after losing out on Fox and they are going to be aggressive. While they don't need EPIX, they do need original content for Peacock and the MGM library and its IPs present a lot of opportunity there as well.

## APPLE (3 to 1)

*Cash on Hand: $192b*

*Needs: Stake in James Bond, Additional IPs for new content, Library, Production capacities, Distribution capacities*

*Does not need: EPIX*

This is Apple's moment of truth. MGM can give them everything they need to become a fully operational studio overnight: the library, lots of IPs, production, distribution, and *Bond* is the cherry on the cake. Like Netflix, they have already shown interest in James Bond and this would give them the ability to go from being an afterthought to a real player. Their original content so far hasn't drawn in a ton of paying subs as most of their base has the service through a free trial and most of those folks aren't even using it despite it being free. They've shifted gears in 2020 to go after big titles like <u>Greyhound</u> and <u>Emancipation</u>and I think they are only going to double down in that space. MGM's production and distribution capabilities would give them the ability to be a lot like Netflix and create a lot of their own movies and shows themselves.

Finally, given how much money Apple has, I can see them in the near future going after several studios that aren't in the best position (including Lionsgate, Paramount, and Sony), as those assets are greater under one roof than being sold to multiple companies and Apple is frankly the only place that can do them all.

There you have it. MGM is for sale and its assets are going to be too valuable for it to go unsold. On paper, I think Apple is the best fit given their needs and what MGM has, but it's not often something as big as *Bond* hits the open market so that's enough

004293

for everyone to at least have internal conversations and preliminary talks with the banks representing MGM. If it goes for a lot—ten billion or more isn't out of the question—I suspect smaller studios will follow suit and end up for sale. There's gold in them thar streaming hills, but it's only going to be for a select few and who those few will be clearer after this sale.

Share on FacebookShare on TwitterShare via emailPrint

## James Emanuel Shapiro

*James Emanuel Shapiro (*_@JamesEmShapiro_*) is a 20-year veteran of the entertainment industry. He's been the COO of NEON and Drafthouse Films and most recently started the analytics department at the Alamo Drafthouse. His gravestone will read "Made the only other offer to buy PARANORMAL ACTIVITY."*

### *More in Ideas, Arts, and Culture*

004294



## What Makes an 'Easter Movie'?

**CLARE COFFEY**



**David Koresh, the KKK, and Donald Trump**

BILL LUEDERS



**'Inside Llewyn Davis' and the Beginning of the Coens' End**

<span style="color:red">BILL RYAN</span>
***Trending Articles***

. ***1***

---

## Judge Luttig Has a Warning for America

<span style="color:red">CHARLIE SYKES</span>

---

. ***2***

---

## 'Inside Llewyn Davis' and the Beginning of the Coens' End

**BILL RYAN**

. *3*

## The Stupidity. It Burns.

**CHARLIE SYKES**

. *4*

## As the Debt Ceiling Crisis Looms, Republicans Resort to a Gimmick

**JAMES C. CAPRETTA**

. *5*

## Orange Is the New Orange

**JONATHAN V. LAST**

004298



# The Bulwark Store is OPEN!

Who is always right? Sarah? JVL? Or do you Beg to Differ? Show your support with Bulwark merchandise. Whichever side you choose, we'll be back tomorrow, and we'll do this all over again.

**SHOP NOW →**

COPYRIGHT 2023, BULWARK MEDIA. ALL RIGHTS RESERVED. PRIVACY POLICY

004299

# EXHIBIT 31

**From:** James Seery [mailto:jpseeryjr@gmail.com]
**Sent:** Tuesday, December 8, 2020 6:46 PM
**To:** John Dubel <jdubel@dubel.com>; Russell Nelms <rfargar@yahoo.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Settlement Discussions

All:

As discussed yesterday, after consultation with John Morris regarding litigation risks, this evening I made and offer to Harbourvest to settle their claims. Following are the proposed terms:

- Harbourvest entities transfer all interests in HCLOF to a TBN subsidiary of HCMLP. The interest have a **marked value of $22.5mm** according to Hunter Covitz
    - The estate would then liquidate the interests and add the proceeds to distributable assets
        - The assets are illiquid, so we would have to work to monetize them
    - HCLOF is invested in ACIS 3-6 (managed by ACIS) and ACIS 7 (managed by HCMLP)
        - Covitz believes there in value in ACIS 3 (as marked)
        - He believes there is potential up-side in 4, 5, and 6 of a few million if all went well
        - He believes that ACIS 7 has upside potential of $4-5mm (again, assuming all goes well)
- Harbourvest receives a general unsecured claim in the case of **$45,000,000**
    - Based on today's marks and where we believe estimated settlements will come in, we believe the claim is worth 72 cents or **$32.5mm**
        - Assumes UBS at $38.5mm and Daugherty at $7mm
        - We believe there may be some upside in the assets
    - If marked value is realized and settlements come in the range of expectations, this would provide Harbourvest with at **approximately $9.9mm in value** to cover claims, costs, etc.
- Harbourvest also receives a claim of $35mm to be treated in [Class 9]
    - Class 9 receives Junior interests the trust
    - It is the class with the HCMLP equitable interests
    - It is unlikely to receive a distribution from the assets liquidation, but could benefit from any successful litigation against Dondero and his entities
        - Share with Hunter Mountain $60mm claim (this claim is admittedly worth virtually zero) and the former partners who have potential tax claims

Harbourvest is considering the offer.

Happy to discuss.

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

1

004301

# EXHIBIT 31-A



Highland CLO Funding, Ltd.
Statement of Financial Position
30 November 2020

004303

004304

Case 19-34054-sgj1    Doc 3784-33    Filed 05/11/23    Entered 05/11/23 22:26:49    Desc
Exhibit 31a    Page 3 of 4

Highland CLO Funding, Ltd.
Statement of Comprehensive Income
30 November 2020



004305

**Highland CLO Funding, Ltd.**
**Statement of Changes in Equity**
**30 November 2020**

|  | At 30 Nov 2020 USD |
|---|---|
| Net assets/(liabilities) brought forward | 85,736,156.34 |
| Comprehensive income/(loss) for the period | (40,544,527.30) |
| Issue and redemption of Shares | - |
| **Net assets/(liabilities) carried forward** | **45,191,629.04** - |

# EXHIBIT 32

Case 19-34054-sgj11 Doc 1697 Filed 01/06/25 Entered 01/06/25 01:23:22 Page 1 of 45
Case 3:23-cv-02071-E   Document 28-14   Filed 12/07/23   Page 185 of 214   PageID 3646
Docket #1697 Date Filed: 01/06/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

ATTORNEYS FOR JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054 |
| L.P., | § | |
| | § | |
| Debtor. | § | Chapter 11 |

## JAMES DONDERO'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY
## OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
### [Relates to Docket No. 1625]

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this Objection to *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154)* [Docket No. 1625] (the "Motion") filed by Highland Capital Management, L.P. (the "Debtor"). Through the Motion, the Debtor seeks approval of its compromise with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the Federal

1934054210106000000000029
004307

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this objection, Respondent respectfully represents as follows:

## I. INTRODUCTION

1. Under Bankruptcy Rule 9019, the Bankruptcy Court is tasked with making an independent judgment on the merits of a proposed settlement to ensure that the proposed settlement is "fair, equitable, and in the best interest of the estate."[1] While Respondent recognizes the Debtor's efforts in arranging a settlement, there are at least three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim (as hereinafter defined); (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a significant claim to which it would not otherwise be entitled; and (iii) the proposed settlement seeks to improperly classify the HarbourVest Claim[2] in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. Moreover, the proposed settlement does not satisfy the factors for approval fixed by case law. On information and belief, Debtor's CEO/CRO, Mr. Seery, has previously asserted on multiple occasions that the HarbourVest Claim had no value and that the Debtor could resolve such claim for no more than $5 million. While Respondent and Mr. Seery have had a number of disagreements in this case, Respondent agrees with Mr. Seery's initial conclusion that the HarbourVest Claim is substantially without merit. Respondent understands that any settlement will not necessarily provide the best possible outcome for the Debtor, but in this instance the proposed settlement far exceeds the bounds of reasonableness and, on its face, is an attempt by the Debtor to purchase votes in favor

---

[1] See In re Jackson Brewing Co., 624 F.2d 599, 602 (5th Cir. 1980).

[2] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. See Claim Nos. 143, 147, 149, 150, 153, and 154.

of confirmation of its Plan. Given the Debtor's prior positions as to the merits of HarbourVest Claim it is necessary for the Court to closely scrutinize the settlement to determine why the Debtor now believes granting HarbourVest a net claim of nearly \$60 million[3] resulting from HarbourVest's investment in a non-debtor entity (which was and is managed by a non-debtor) to be in the best interest of the estate. Upon close scrutiny, Respondent believes the Court will find that the proposed settlement is not reasonable or in the best interest of the estate and the Motion therefore should be denied.

## II.     **BACKGROUND**

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].

5.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

---

[3] The proposed settlement provides that HarbourVest shall receive an allowed general unsecured (Class 8) claim in the amount of \$45 million and an allowed subordinated general unsecured (Class 9) claim in the amount of \$35 million. As part of the settlement, HarbourVest will then transfer its entire interest in Highland CLO Funding, Ltd. ("HCLOF") to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately \$22 million as of December 1, 2020.

6.       In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, for the Debtor's general partner, Strand Advisors, Inc. (the "Board").  The members of the Board are James P. Seery, Jr., John S. Dubel, and Russell F. Nelms.

7.       On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. *See* Docket No. 854.

8.       On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[4].

9.       On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

10.      On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response").

11.      On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. Docket No. 1625.

### III.       LEGAL STANDARD

12.      The merits of a proposed compromise should be judged under the criteria set forth in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). *TMT Trailer* requires that a compromise must be "fair and equitable." *TMT Trailer*, 390

---

[4] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

U.S. at 424; *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984). The terms "fair and equitable,"

commonly referred to as the "absolute priority rule," mean that (i) senior interests are entitled to

full priority over junior interests; and (ii) the compromise is reasonable in relation to the likely

rewards of litigation. *In re Cajun Electric Power Coop.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re*

*Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

13.      In determining whether a proposed compromise is fair and equitable, a Court should

consider the following factors:

(i)      the probabilities of ultimate success should the claim be litigated;

(ii)     the complexity, expense, and likely duration of litigating the claim;

(iii)    the difficulties of collecting a judgment rendered from such litigation; and,

(iv)     all other factors relevant to a full and fair assessment of the wisdom of the

compromise.

*TMT Trailer*, 390 U.S. at 424.

14.      In considering whether to approve a proposed compromise, the bankruptcy judge

"may not simply accept the trustee's word that the settlement is reasonable, nor may he merely

'rubber stamp' the trustee's proposal." *In re Am. Res. Corp.*, 841 F.2d 159, 162 (7th Cir. 1987).

"[T]he bankruptcy judge must apprise himself of all facts necessary to evaluate the settlement and

make an informed and independent judgment about the settlement." *See TMT Trailer*, 390 U.S. at

424, 434.

15.      While the trustee's business judgment is entitled to a certain deference, "business

judgment is not alone determinative of the issue of court approval." *See In re Endoscopy Ctr. of S.*

*Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011). Further, the business judgment rule does not

provide a debtor with "unfettered freedom" to do as it wishes. *See In re Pilgrim's Pride Corp.*, 403

B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("[A]s a fiduciary holding its estate in trust and responsible

to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight."). The Court must conduct an "intelligent, objective and educated evaluation"[5] of the proposed settlement "to ensure that the settlement is fair, equitable, and in the best interest of the estate and creditors." *See In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006) (quoting *Conn. Gen. Life Ins. Co. v. Foster Mortgage Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)).

## IV.   ARGUMENT AND AUTHORITIES

16.     As discussed in detail below, there are three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim; (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a substantial claim to which it is not entitled; and (iii) the proposed settlement seeks to improperly classify HarbourVest's one claim in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. For these and certain additional reasons as discussed below, the Motion should be denied.

### A. Through its Claim, HarbourVest Seeks to Revisit this Court's Orders in the Acis Case

17.     As an initial matter, through its proofs of claim, HarbourVest appears to be second guessing the Court's judgment in the Chapter 11 case of Acis Capital Management, LP and Acis Capital Management GP, LLC (collectively, "Acis") and seeking to revisit the Court's orders entered in that case years ago. HarbourVest appears to being arguing that the TRO and injunction

---

[5] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) ("To assure a proper compromise the bankruptcy judge, must be apprised of all the necessary facts for an intelligent, objective and educated evaluation. He must compare the terms of the compromise with the likely rewards of litigation.").

entered in the Acis case that prevented redemptions or resets in the CLOs are now the root cause of the decrease in value of its investment in HCLOF.

18.     Specifically, the claim states that HarbourVest incurred "financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF."[6]

19.     Essentially, HarbourVest is saying that the orders entered in the Acis case did not actually protect the investors and their investments, but instead were a triggering cause for the alleged diminution in value of its investment in HCLOF. Nevertheless, even though the value of HCLOF dropped dramatically only after the Effective Date of Acis's Plan, years later and despite the lack of Debtor involvement in managing HarbourVest's investment, HarbourVest now seeks to impute liability to the Debtor through a flimsy narrative designed to recoup investment losses unrelated to the Debtor and for which the Debtor owed HarbourVest no duty.

20.     That HarbourVest now, years later, seeks to revisit this Court's Acis orders raises a number of issues, including those as to HarbourVest's involvement (or lack thereof) in the Acis case, whether the orders, Plan, or Confirmation Order in the Acis case may bar some of the relief requested by HarbourVest here, and questions related to the merits of the HarbourVest Claim and the legal grounds allegedly supporting it.

---

[6] See Proof of Claim 143, para. 3 ("Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF.").

### B. The HarbourVest Claim Lacks Merit and the Proposed Settlement is Not Reasonable

21.     Based on the HarbourVest Claim and its filed response to the Debtor's objection, Respondent believes that the HarbourVest claim is meritless and the proposed settlement is not reasonable, fair and equitable, or in the best interest of the estate.

22.     First, the proposed settlement is concerning particularly because HarbourVest's bare bones proof of claim contains very little in terms of allegations of specific conduct against the Debtor that would give rise to a $60 million claim against this estate. While HarbourVest's response to the Debtor's claim objection is lengthy, it contains very little in real substance supporting its right to such a claim against the estate. The response also omits a number of key facts that are relevant and potentially fatal to its claim for damages against the Debtor's estate. Among them is the fact that Acis (and thereafter Reorganized Acis), along with Mr. Joshua Terry, managed HarbourVest's investment for years after it was made.[7] Despite this fact, HarbourVest's alleged damages appear to be based largely on the difference between the value of its initial investment at confirmation of Acis's Plan and the current value of the investment—which amount was directly determined by the performance of the CLOs that Acis managed during this time.[8] Neither the claim nor the response directly address the implications of Acis's management of the CLOs during the period following HarbourVest's investment. Nor does HarbourVest address or discuss performance of the CLOs, the market forces that may have caused HarbourVest's investment to lose value, or other factors influencing the current value of its investment. The

---

[7] *See, e.g.*, HarbourVest Proof of Claim 143, p. 5 ("The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.").

[8] *See* HarbourVest Response, Docket No. 1057, para. 40 ("HarbourVest has been injured from the Investment: not only has the Investment failed to accrue value, its value plummeted. The Investment's current value is far less than HarbourVest's initial contribution.").

---

speculative nature of the damages and the lack of specificity of the HarbourVest Claim and the role of Acis in the loss of value to HarbourVest all call into question the reliability of the allegations and the legal basis for the claim amount awarded in the settlement.

23. Also absent from Harbourvest's papers is any discussion of any contract or agreement between (i) HarbourVest and the Debtor; and (ii) any agreement that was executed in conjunction with HarbourVest's initial investment. While the proof of claim references a number of agreements, there is no explanation in the claim or in HarbourVest's response to the Debtor's claim objection of how these agreements give rise to liability against the *Debtor*. For example, neither the claim nor the HarbourVest Response (which includes more than 600 pages of attachments) attach *any* written agreement between HarbourVest and **any other party**. While HarbourVest has alleged a number of claims sounding in tort, many of those claims cannot exist absent a contract or other express relationship between the parties. Moreover, the terms of the relevant contracts themselves likely contain a number of provisions that may call into question Debtor's liability or would be otherwise relevant to merits of the HarbourVest Claim. For example, HarbourVest in its papers appears to assert or imply that the Debtor made a number of false or fraudulent representations to solicit HarbourVest's investment, but then fails to discuss or even identify the applicable agreements it alleges it was induced into signing in connection with its investment (this despite the substantial value of the investment when the Acis plan was confirmed).

24. Given these issues, among many others, the HarbourVest Claim is unsustainable both from a liability and damages standpoint and there are many very high hurdles HarbourVest would have to clear in seeking to prove liability against the Debtor and in proving its damages. For a long period of time, its investment was managed by Acis and the investment's performance was directly tied to Acis's inadequate performance as portfolio manager. Further, the value of

HarbourVest's investment is also directly tied to various market forces that may have impacted its value. The HarbourVest Claim is largely lacking in relevant facts and omits much salient information, such as who it contracted with in connection with its investment, the terms of such agreements, who controlled its investment during the entire period from November 2017 to the present, and the performance of its investment during the last two years. Given these issues, HarbourVest will be unable to demonstrate a causal connection between any conduct of the Debtor and the alleged damages it suffered from a reduction in value of its investment.

25.     Because of the speculative nature of the HarbourVest Claim, and the fact that very little pleading or litigation has occurred, the proposed settlement in granting such a large claim is unreasonable, not fair and equitable, and not in the best interest of the estate. The lack of pending litigation, narrowing of threshold questions, and lack of detail in HarbourVest Claim make it impossible to determine whether the huge claim awarded under the proposed settlement is justified under the facts. Accordingly, the Motion should be denied.

**C. The Proposed Settlement is an Improper Attempt by the Debtor to Purchase Votes in Support of its Plan and the Separate Classification of the HarbourVest Claim Constitutes Gerrymandering in Violation of 11 U.S.C. § 1122**

26.     The proposed settlement is a flagrant attempt by the Debtor to purchase votes in support of its Plan by giving HarbourVest a significant claim to which it has not shown itself entitled. Moreover, the separate classification of the HarbourVest Claim into two separate classes constitutes impermissible gerrymandering in violation of section 1122 of the Bankruptcy Code. The proposed settlement essentially gives HarbourVest a claim it is not entitled to in exchange for votes in two separate classes. This is not a proper basis for a settlement and the Court should deny the Motion.

27.     Section 1122 of the Bankruptcy Code provides as follows:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

28.    "Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991).

29.    "Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections suggests that ordinarily substantially similar claims, those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id.* at 1278.

30.    The Fifth Circuit has stated that there is "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1279. The Court observed:

> There must be some limit on a debtor's power to classify creditors in such a manner. . . . Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986)).

31.     Here, the HarbourVest settlement and the classification of the HarbourVest Claim
under the Plan blatantly violate the Fifth Circuit's "one rule" concerning the classification of
claims under section 1122. To the extent that HarbourVest even has a legitimate claim, not only
should its claim be classified together with other unsecured creditors, its claim should be classified
solely in one class. To allow the Debtor to do otherwise as proposed is improper gerrymandering
in order to obtain a consenting class in express violation of section 1122.

**D.  There Are Other Reasons for the Court to Closely Scrutinize the Proposed Settlement that May Warrant Denial of the Motion**

32.     There are a number of other reasons for the Court to closely scrutinize the proposed
settlement that may warrant denial of the Motion.

33.     First, the granting to HarbourVest of a claim in the total amount of $80 million
potentially allows HarbourVest to achieve a significant windfall at the expense of other creditors
and equity holders. The Debtor has asserted numerous times that the estate is solvent and, for this
reason, the purported subordinated claim of $35 million (if allowed and approved) may be worth
just as much as its general unsecured claim. This is a huge figure in this case, outshined only by
the Redeemer Committee, which has an actual arbitration award obtained after lengthy litigation.
By contrast, the HarbourVest Claim contains only a few paragraphs of generalized allegations that
essentially argue that the Debtor's alleged actions related to the Acis bankruptcy, and this Court's
orders in the Acis case, are a "but for" cause of the loss of its investment. While the HarbourVest
Response is lengthy, it lacks necessary details for the Court to determine whether HarbourVest
*may* be entitled to the relief requested by the Motion. The other significant creditors in this case—
*inter alia*, Redeemer, UBS and Acis—all had pending claims that were litigated. Nor is
HarbourVest a trade creditor, vendor, or other contract counter-party of the Debtor. The
HarbourVest Claim is thus uniquely situated in this case and, given the size and the nature of its

claims, should invite close scrutiny. Under these facts, the potential allowance of an $80 million claim (less the value of its share in HCLOF, which may suffer by continued management by Acis) against the estate for an investment which was not held or managed by the Debtor would be a huge undue windfall.

34.     Second, the Motion states that HarbourVest will vote its proposed allowed Class 8 (proposed at $45 million) and Class 9 (proposed at $35 million) claims in support of confirmation. There are at least two potential issues with this proposal. First, the deadline for parties to submit ballots was January 5, 2021, and as of the close of business on January 5, the HarbourVest Claim has not been allowed for voting purposes.[9] Second, the Motion and proposed settlement agreement state that the HarbourVest Claim will be allowed for voting purposes only as a general unsecured claim in the amount of $45 million. It is unclear how HarbourVest can, or would be authorized to, vote its purported Class 8 and 9 Claims in support of the Plan after the voting deadline and when the settlement provides only for a voting claim in Class 8.

35.     Third, while the Motion addresses the factor of probability of success in the litigation, it does not discuss in detail the cost of doing so in relation to the amount to be paid to HarbourVest under the settlement or the likelihood that the Debtor will succeed in the litigation. In addition, unlike the claims filed by Acis and UBS, the HarbourVest Claim does not arise from pending litigation. At this point, relatively little litigation has occurred and the parties have not addressed threshold issues that might dramatically narrow the scope of the HarbourVest Claim. Rule 9019 requires an analysis as to whether the probability of success in litigation is outweighed by the consideration achieved under the settlement. *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (The Court must "compare the terms of the compromise with the likely rewards

---

[9] The hearing on the 3018 and 9019 motions are set concurrently with confirmation.

of litigation."). Given the excessive amount to be paid under the settlement and the weakness of the HarbourVest Claim, this factor weighs in favor of denial of the Motion.

36.    Fourth, it is unclear from the settlement papers whether the transfer by HarbourVest of its interest in HCLOF to the Debtor or an entity the Debtor designates will cause the value of the investment to be received by the Debtor's estate. Further, the interest of HCLOF being conveyed under the proposed settlement may be subject to the Acis plan injunction, which could potentially prevent the Debtor's estate from realizing the value of this interest. In the event the Court is inclined to approve the settlement, the order should make clear that the available value of the investment should be realized by the Debtor's estate.

## CONCLUSION

For the reasons set forth above, Respondent respectfully requests that the Court enter an order denying the Motion and providing Respondent such other and further relief to which he may be justly entitled.

**[Remainder of Page Intentionally Left Blank]**

Case 19-34054-sgj11 Doc 1674-31 Filed 01/15/23 Entered 01/06/20 14:22:29 Page 15 of 15
Case 3:23-cv-02071-E   Document 81-32   Filed 10/06/23   Page 199 of 214   PageID 3660
Exhibit 32 Page 1670216

Dated: January 6, 2021        Respectfully submitted,

                          */s/ D. Michael Lynn*
                          D. Michael Lynn
                          State Bar I.D. No. 12736500
                          John Y. Bonds, III
                          State Bar I.D. No. 02589100
                          John T. Wilson, IV
                          State Bar I.D. No. 24033344
                          Bryan C. Assink
                          State Bar I.D. No. 24089009
                          BONDS ELLIS EPPICH SCHAFER JONES LLP
                          420 Throckmorton Street, Suite 1000
                          Fort Worth, Texas 76102
                          (817) 405-6900 telephone
                          (817) 405-6902 facsimile
                          Email: michael.lynn@bondsellis.com
                          Email: john@bondsellis.com
                          Email: john.wilson@bondsellis.com
                          Email: bryan.assink@bondsellis.com

                          **ATTORNEYS FOR JAMES DONDERO**

### CERTIFICATE OF SERVICE

    I, the undersigned, hereby certify that, on January 6, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

                          */s/ Bryan C. Assink*
                          Bryan C. Assink

# EXHIBIT 33

TRAVIS J. ILES
SECURITIES COMMISSIONER

CLINTON EDGAR
DEPUTY SECURITIES COMMISSIONER

Mail: P.O. BOX 13167
AUSTIN, TEXAS 78711-3167

Phone: (512) 305-8300
Facsimile: (512) 305-8310

E. WALLY KINNEY
CHAIR

KENNY KONCABA
MEMBER

ROBERT BELT
MEMBER

MELISSA TYROCH
MEMBER

EJIKE E OKPA II
MEMBER

## *Texas State Securities Board*

208 E. 10th Street, 5th Floor
Austin, Texas  78701-2407
www.ssb.texas.gov

May 9, 2023

Dan Waller, Esq.
Glast, Phillips & Muarry
14801 Quorum Drive, Suite 500
Dallas, TX 75254

*Sent via e-mail to*
*DWaller@gpm-law.com*

RE: Complaint Filed

Dear Mr. Waller:

The staff of the Texas State Securities Board (the "Staff") has completed its review of the complaint received by the Staff against Highland Capital Management, L.P. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time.

If you have any questions regarding the foregoing, please contact me via e-mail at cedgar@ssb.texas.gov.

Sincerely,

Clint Edgar
Deputy Securities Commissioner

004323

# EXHIBIT 34

TECH

# Amazon's $8.45 billion deal for MGM is historic but feels mundane

PUBLISHED WED, MAY 26 2021·10:28 AM EDT·UPDATED WED, MAY 26 2021·11:10 AM EDT



**Alex Sherman**
@SHERMAN4949

WATCH LIVE
SHARE

## KEY POINTS

- Amazon announced a deal to acquire MGM Studios for $8.45 billion on Wednesday.

- The deal adds content to Amazon Prime Video and a studio to produce more TV series and films.

- It marks the first time a large technology company has acquired a legacy media company, but it doesn't feel particularly historic.

Follow your favorite stocks    CREATE FREE ACCOUNT

In this article

AMZN -0.01 (-0.01%)



MGM Studios Plaza entrance on February 28, 2015 in Niagara Falls, Ontario, Canada.
*Raymond Boyd | Michael Ochs Archives | Getty Images*

It finally happened. After years of waiting, a large technology company finally acquired a significant legacy media company. Amazon    has purchased legendary MGM Studios for $8.45 billion.

So why does it feel so underwhelming?

004325

Perhaps it's because this is, in essence, a bolt-on acquisition for Amazon. There's nothing about the MGM deal that's particularly revolutionary or leans into cutting-edge technology.

Rather, Amazon needs more content for Prime Video to stay relevant against Netflix,   Disney+,   Hulu, HBO Max and the many other streaming services competing for eyeballs. Buying MGM not only gives it library favorites like "James Bond," "Rocky," "Real Housewives" and "Survivor." It also improves its odds of making better originals with a fully fledged studio that has made recent hits such as "The Handmaid's Tale" and "Fargo."

Perhaps it's because the essence of this deal isn't about media or technology at all. Amazon is playing a different game than every other entertainment company. The primary rationale behind buying MGM is getting more consumers to pay for Prime.

More than 175 million Prime subscribers have streamed TV shows and movies in the past year, Amazon revealed last month. While paying a monthly subscription fee for a digital service was novel in 2005, when Amazon launched Prime, the rest of the world has caught on 16 years later.

Amazon has an incredible foothold into people's wallets by offering free shipping for Prime members, but even the shipping discount has become more common among major retailers. Buying MGM is a churn-reduction mechanism. Doesn't reducing churn get you excited?

Perhaps it's that Amazon is spending $8.45 billion on MGM because regulators will allow it, and there are few other things Amazon can strategically acquire that wouldn't lead the government to proverbially storm the company's Seattle headquarters.

Just this week, District of Columbia Attorney General Karl Racine announced he's suing Amazon on antitrust grounds, alleging Amazon illegally maintained monopoly power by unfairly raising prices and suppressing competition. Congress grilled Amazon founder Jeff Bezos last year about Amazon's history of using data on third-party products to promote its own private-label brands. But they didn't spend any time talking about Amazon's dominant position in media and entertainment.

That's because Amazon doesn't have a dominant position in media and entertainment. While Amazon is likely to be one of the global giants in the next five years, it will have plenty of competition. There's no certainty regulators will allow this deal, but it's probably more likely they'll approve this than letting Amazon buy into any other industry for $8.45 billion.

Perhaps it's because MGM has been shopping itself for years, owned by a group of secured lenders who have been looking to monetize their investment ever since the company emerged from bankruptcy in 2010. While WarnerMedia's deal with Discovery last week shocked the media world, it was a foregone conclusion MGM would find a home housed in a larger entity with global streaming video aspirations.

And perhaps it's because Amazon has already taken strides to buy traditional media even if this is the first example of acquiring a media company outright. Earlier this year, Amazon struck an unprecedented deal to exclusively air Thursday Night Football games beginning next season. That marked the first time an entire package of National Football League games will be broadcast by a streaming service. Amazon has also announced landmark deals in the past year to stream soccer matches and New York Yankees baseball games. To some degree, Amazon has already crossed the Rubicon into what used to be territory reserved for legacy media.

Maybe Amazon will do something unexpected with MGM's content.

There's no doubt that Amazon has noticed Disney's flywheel to mold intellectual property into crossover episodes between characters and new sequels. Amazon doesn't own theme parks, but perhaps there's something it can do with MGM's intellectual property and the rest of its behemoth company that's new and unexpected.

But until then, Amazon's second-largest acquisition ever — and the first Big Tech purchase of old media — feels a bit anticlimactic.

**WATCH: Jim Cramer on Amazon buying MGM for $8.45 billion**

004326

# EXHIBIT 35

004327



# MUNSCH HARDT

DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main  214.855.7500
Fax  214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

***RULE 408 CONFIDENTIAL SETTLEMENT COMMUNICATION***

October 14, 2022

***Via Overnight Delivery***

Stonehill Capital Management
c/o Mandel, Katz and Brosnan LLP
Attn: John J. Mandler
100 Dutch Road, Suite 390
Orangeburg, NY 10962

Re:    **Jessup Holdings LLC**

Dear Mr. Mandler:

I write as counsel to NexPoint Advisors, L.P. ("NexPoint"). This correspondence is intended solely as a confidential settlement communication made pursuant to Federal Rule of Evidence 408 and Texas Rule of Evidence 408.

As part of a broader effort to bring the Highland Capital Management, L.P. ("HCMLP") bankruptcy proceedings (and related adversary proceedings) to a close, my client would like to extend an offer to purchase one hundred percent of the equity interest in Jessup Holdings LLC ("Jessup Holdings"). This is the first step in a proposed structure to resolve the bankruptcy proceedings and satisfy the claims of all creditors holding interests in the HCMLP Claimant Trust. In the interest of transparency, but without waiving our right to maintain the confidentiality of this settlement offer, our client is simultaneously making a substantially similar offer to purchase one hundred percent of the equity interest in Muck Holdings LLC.

The basic terms of this offer are as follows:

- In exchange for 100% of the equity interest in Jessup Holdings, NexPoint—through a new entity to be created ("NewCo")—will pay to your client an amount equal to the purchase price paid by Jessup Holdings to acquire allowed claims in the HCMLP bankruptcy, plus a five percent (5%) return.

- The parties will execute a Purchase and Sale Agreement in a format agreeable to both parties within a reasonable time after execution of an initial term sheet.

- Upon agreement by all relevant parties on the terms of the purchase of the equity interests in both Jessup Holdings and Muck Holdings, NewCo will make a good faith, public offer designed to satisfy the remaining Claimant Trust Beneficiaries and to resolve the HCMLP bankruptcy proceedings.

004328

Stonehill Capital Management
October 14, 2022
Page 2

    For the avoidance of doubt, nothing in this offer shall be deemed binding until the execution of a long form Purchase and Sale Agreement.  This offer will remain open until 5:00 p.m. Central on October 28, 2022.

    If you have any questions, please do not hesitate to contact me.

                                        Best Regards

                                        MUNSCH HARDT KOPF & HARR, P.C.


                              By: _____
                                        Davor Rukavina, Esq.


DR:pdm

# EXHIBIT 36

004330

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 Page 1 of 12
Case 3:23-cv-02071-E Document 28-36 Filed 12/07/23 Page 209 of 214 PageID 3670
Docket #0854 Date Filed: 07/16/2020



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 16, 2020**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 19-34054** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | **Chapter 11** |
| | § | |
| | § | **Re: Docket No. 774** |
| Debtor. | § | |

## ORDER APPROVING DEBTOR'S MOTION UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020

Upon the *Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.



1934054200716000000000000007

004551

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, and DECREED** that:

1.       The Motion is **GRANTED**.

2.       Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as **Exhibit 1** and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.       The Debtor is hereby authorized to enter into and perform under the Agreement.

4.       The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph. For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

DOCS_SF:103156.19 36027/002

004332

5.      No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.      Notwithstanding anything in the Motion, the Agreement or the Order to the contrary, the Agreement shall be deemed terminated upon the effective date of a confirmed plan of reorganization unless such plan provides otherwise.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

9.      The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative. All other provisions of the Foreign Representative Order shall remain in full force and effect.

### ###END OF ORDER###

DOCS_SF:103156.19 36027/002

004333

## EXHIBIT 1

**Engagement Agreement**

004334

June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Re:   Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in Chapter 11 including, directing the reorganization and restructuring of the Company, monetization of assets, resolution of claims, development and negotiation of a plan of reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the Company as I determine should report to directly to me. In the event that the Board determines to restructure the reporting lines or functions of the Company, my direct reports will be amended in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than those on which I am conflicted.

004335

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO.  I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services.  For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees.  The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company.  I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
   a. Base Compensation:  As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation").  Base Compensation shall be due and payable at the start of each calendar month.  Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt.  Payment of the Base Compensation will be retroactive to March 15, 2020.
   b. Bonus Compensation/Restructuring Fee:
      i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
      ii. Case Resolution Restructuring Plan
         1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
            a. $1,000,000 on confirmation of the Case Resolution Plan;
            b. $500,000 on the effective date of the Case Resolution Plan; and
            c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

004336