**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

Appellant § 

vs. §

**Highland Capital Management, L.P, et al** §   **3:23-CV-2071-E**

Appellee §

**[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 21

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.   Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.   the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.   the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3.   the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

      4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

      1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

      2.  Appellant's claims or allegations are not "plausible";

      3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

      4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

      5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

      6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

      7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

      8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

      9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

     10.  Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

    1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

    2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

**1.  Notice of Appeal**

*000001*    a.  Notice of Appeal **[Dkt. 3906]**;

*000276*    b.  Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*    c.  Second Amended Notice of Appeal **[Dkt. 3945]**

**2.  The judgment, order, or decree appealed from:**

    a.  Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

| | FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|---|
| *Vol. 2* | | | |
| *001594* | 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| *001660* | 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| *001821* | 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| *001830* | 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| *Vol. 3* *001849* *Thru Vol. 4* | 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *Vol 4* *002236* | 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| *002243* | 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| *002248* | 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

| | 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|---|
| | 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| | 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| | 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| | 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| | 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| | 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| | 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| | 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| | 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| | 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| | 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| | 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

*Handwritten annotations in left margin:*
Vol. 5
002251
002254
002262
002346
002355
002358
002391
002398
002400
Vol. 6   Thru Vol. 7
002826   Thru Vol. 9
Vol. 9
003257
003260
003270
003278

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

*Handwritten annotations in left margin:*
Vol. 10
003281
003286
003291
003294
003296
003299
003302
003311
003314
003323
003368
003430

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| Vol. 10 | | | Holdings LLC, Stonehill Capital Management LLC |
| 003458 | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| 003463 | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| Vol. 11 003537 Thru Vol. 16 | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| Vol. 17 004465 | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| 004712 | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 004714 | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 004808 | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| 004813 | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 004836 | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| Vol. 18 004930 | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| 004931 | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18
004939.

004959

004961

004984

005049

005114

Vol. 26
006608

Thru Vol. 25

Thru Vol. 39

Vol. 39
009273

009290

009416

009424

| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|
| | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| | 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Handwritten annotations in left margin:*
Vol. 40
009426
009436
009444
009445
009446
009456
009458
Vol. 42    Thru Vol. 41
009847
009901
009905
009908
009912

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | | | |
|---|---|---|---|
| 06/16/2023 | 3854 | | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

---

**Appellant/Movant HMIT's Second Supplemental Statement of Issues**
**and Designation of Items for Inclusion in the Appellate Record**                         Page 11

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.      Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
      Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

# EXHIBIT 13

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**Date:** October 9, 2020 at 4:43:44 PM EDT
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** John Dubel <jdubel@dubel.com>, Russell Nelms <rfargar@yahoo.com>, "D. Lynn (Judge Lynn)"
<michael.lynn@bondsellis.com>
**Subject: Re:  HCMLP Roles**

Counsel has advised me that according to January 9 order, I must at your request resign from
Highland. So Therefore, based on your request below I resign.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com


On Oct 2, 2020, at 5:52 PM, James Seery <jpseeryjr@gmail.com> wrote:


Jim:

Further to our discussion on September 24, Michael Lynn has advised the Pachulski firm that
you or an entity controlled or affiliated with you will be objecting to the HCMLP settlement
with Acis and Josh Terry.  In addition, one of your trusts has filed a claim against HCMLP
related to the management of Multi-Strat.

In light of these facts, we believe it is time for you to resign your portfolio manager position at
HCMLP, any remaining roles at Multi-Strat, and certain other positions at entities managed or
controlled by HCMLP.  As you stated on our call, I agree that over the last few months the PM
role has been in title only with most ultimate authority vested in the Board.  Nonetheless, it is
untenable for you to have a role at the Debtor or the major funds managed by the Debtor
while at the same time taking positions in court contrary to what the Board has determined is
in the best interest of the estate.

I appreciate your desire to challenge the Acis agreement and obtain final court determination
on its reasonableness.  Hopefully when that hearing is complete and there is a determination
by the court, we will have an opportunity to consider a larger settlement of the case with
you.  But until the legal fighting is resolved, the Board believes it is in the best interests of the
estate, its employees, and all other interested parties that you not be on both sides of the
issues, even if in name only.

Please let me know if it preferable to you to resign or if removal by the board at this time is
better.  Specifically, we would like you to resign or be removed from the portfolio manager
role at HCMLP and all roles at the Multi-Strat/Credit Opportunities entities.

005609

I look forward continuing our discussions to resolve the case.  If we are unable to do that, I am confident that together we can engineer a smooth and efficient transition that facilitates value maximization for the estate and all of its stakeholders.


Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

005610

# EXHIBIT 14

005611



October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements").  As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors.  These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements.  These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020.  If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements.  We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan.  Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

NexPoint, HCMFA and/or their affiliates.   The sale of such assets has the potential to negatively affect the valuation of the Funds.  Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value.  Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates.  We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# EXHIBIT 15

Case 19-34054-sgj11 Doc 0190 Filed 06/07/21 Entered 06/07/21 10:53:51 Page 1 of 55
Case 3:23-cv-02071-E Document 23-64 Filed 12/07/23 Page 22 of 214 PageID 5052
Docket #0190 Date Filed: 6/7/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 7, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | Case No. 20-03190-sgj11 |
| | § | |
| JAMES D. DONDERO, | § | |
| Defendant. | § | |
| | § | |
| | § | |

_____

### MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION TO HOLD JAMES DONDERO IN CIVIL CONTEMPT OF COURT FOR ALLEGED VIOLATION OF TRO[2]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Order addresses the Motion filed at DE # 48 in above-referenced Adversary Proceeding.



*You know, this is -- I hate to say it, but I feel like I've been in the role of a divorce judge today. We have very much a corporate divorce that has been in the works . . . and I'm a judge having to enter interim orders keeping one spouse away from the other, keeping one spouse out of the house, keeping one spouse away from the kids. It's not pleasant at all.*

Transcript from 1/8/21 Hearing at 194:1-9. [DE # 80, Exh. 36].

## I.    Introduction.

The above quote aptly describes the above-referenced 20-month-old corporate bankruptcy case:  it has, at times, become very much like a nasty divorce—in which one spouse (here, the company) is very much at odds with the other spouse (here, the company's former CEO).  It is contentious, protracted, and unpleasant.

For a while, things were a bit like a situation where one spouse has filed for divorce, but both spouses remain living under the same roof for a while—rather than physically separating—for the perceived best interests of the family. This co-habitation eventually became untenable.

Next, things developed similarly to a situation in which one spouse wants to keep the family vacation home, boat, or mutual funds (*i.e.*, the husband), but the other spouse (*i.e.,* the one who happens to have custody and control over them) thinks the assets need to be liquidated to pay off the family's expenses or debt.

Also, this corporate divorce, sadly, is similar to a situation in which one spouse criticizes the other's new partner who has moved into the family home and also bears animus towards the spouse's lawyers. He thinks they are, collectively, mismanaging everything and taking actions towards him out of pure spite.

005616

It's also similar to a situation in which one spouse is endeavoring to have members of the other spouse's household assist or cooperate with him in various ways, in his efforts to get what he perceives to be his fair share in the divorce.

And, finally, it is similar to a situation in which one spouse finally decides to seek a TRO against the other—for fear (legitimate or not) that the ex-spouse is about to burn the house down.

There is a bit of irony in all of this because the spouse (*i.e.,* former CEO) who is the alleged antagonist is the one who signed the divorce (*i.e.,* bankruptcy) petition to start the proceedings.

Divorce metaphors aside, this Order relates to a request by Chapter 11 Debtor Highland Capital Management, L.P. (the "Debtor" or "Highland"), made shortly before its Chapter 11 plan was confirmed,[3] that its co-founder, former President, former Chief Executive Officer ("CEO"), and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero")—be held in civil contempt of court for allegedly violating a temporary restraining order ("TRO") of this court.[4] The TRO that Mr. Dondero is alleged to have violated arose in the above-referenced adversary proceeding ("Adversary Proceeding") that the Debtor filed December 7, 2020. A brief summary of the circumstances leading up to the Adversary Proceeding and the TRO is set forth below.

---

[3] As of the date of issuance of this Order, the Debtor's confirmed plan has not yet gone effective.

[4] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case. Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460 in main bankruptcy case]. The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days." Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

005617

## II.    Background: The Chapter 11 Case.

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the business of buying, selling, and managing assets on behalf of its managed investment vehicles.  It manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major change in corporate governance[5]—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in fraudulent schemes to put Highland's assets out of the reach of creditors).  Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[6] The settlement and term sheet contemplated a complete overhaul of the corporate governance structure of the Debtor.  Mr. Dondero resigned from his role as an officer and director of the Debtor and of its general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new

---

[5] The UST was steadfast in wanting a Trustee.

[6] *See* DE ## 281 & 339 in main bankruptcy case.  *See also* Dondero Exh. 8 (DE # 106 in the Adversary Proceeding).

005618

Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery). As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[7] As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor.[8] The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board.[9] Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand

---

[7] "CRO" means Chief Restructuring Officer. *See* DE # 854 in main bankruptcy case, entered July 16, 2020.

[8] Although not discussed at the time, the court has become aware that Mr. Dondero has been a paid employee of the Non-Debtor Highland-Related Entities known as NexPoint and/or NexBank postpetition. *See* 1/8/21 Hearing Transcript, Debtor Exh. 36 (DE # 80) at 107:20-23.

[9] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 2, at Exh. 1 thereto, at 3 of 62 (DE # 80).

5

005619

still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are ***not*** subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision-making power and are not the mere "puppets" of Mr. Dondero (for ease of reference, these numerous entities will be referred to as the "Non-Debtor Dondero-Related Entities"). This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities (such a chart would, no doubt, be the size of a football field), but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity. Various events occurred that led to the termination of his employment with the Debtor. For one thing, Mr.

Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent

Board including: (a) objecting to a significant settlement that the Debtor had reached in court-

ordered mediation[10] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis

Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b)

pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging

that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland

Multi Strategy Credit Fund, L.P. ("MSCF"), with respect to the sale of certain of its assets during

the bankruptcy case (in May of 2020).[11] The Debtor's Independent Board and management

considered these two actions to create a conflict of interest—if Mr. Dondero was going to litigate

significant issues against the Debtor in court, that was his right, but he could not continue to work

for the Debtor (among other things, having access to its computers and office space) while litigating

these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor

and Mr. Dondero. In fact, a week after his termination, litigation posturing and disputes began

erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand,

and the Debtor on the other (as further described below).

III.    **The Impetus for the Adversary Proceeding**.

The Adversary Proceeding centers significantly around two Non-Debtor Dondero-Related

Entities known as NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund

Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors")—both of which, like

---

[10] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

[11] *See, e.g.,* Proof of Claim No. 177 and DE # 1154 in main bankruptcy case.

005621

Highland, are registered investment advisors. Mr. Dondero is President of NexPoint and has an ownership interest in it.[12] Mr. Dondero is President of HCMFA and has an ownership interest in it as well.[13]

### A. Alleged Interference with the Debtor's Management of the Highland CLOs.

The Advisors separately manage three funds ("NexPoint/HCMFA Funds"). The Advisors and these NexPoint/HCMFA Funds own, among other things, equity interests in certain pooled **collateralized loan obligation** ("CLO") vehicles that are managed by the Debtor (hereinafter the "Highland CLOs"). A key fact here to remember is that the CLO vehicles are managed by the Debtor (pursuant to contracts and neither the Advisors nor the NexPoint/HCMFA Funds are parties to such contracts).

Generally speaking, the term/acronym "CLO" is loosely used in the investment world to refer to a special purpose entity ("CLO SPE"), in which a manager (here, Highland) purchases a basket of loans to be held in the CLO SPE. The loans in the basket would typically be obligations of large well-known public companies and, collectively, provide a variable rate of interest. The CLO manager typically has discretion to buy and sell different loans to go into the pool of assets, with certain restrictions. There are, meanwhile, tranches of investors who invest funds into the CLO SPE, pursuant to an indenture (with an independent, third-party indenture trustee in place) so that the CLO SPE can purchase the loans, and those investors receive fixed interest from the CLO SPE (with the CLO SPE earning income on the "spread" between: (a) the variable interest being earned on the pool of loans in the CLO SPE's portfolio and (b) the amount of fixed interest the CLO SPE must pay out to its tranches of investors). This description, again, is a bit of a generalization. In

---

[12] 1/8/21 Hearing Transcript, Debtor's Exh. 36 at 35:9-25 (DE # 80).

[13] 1/8/21 Hearing Transcript, Debtor's Exh. 36 at 36:10-14 (DE # 80).

005622

the case of the Highland CLOs (there are approximately 16 of them), many of them are quite old and do not have the typical diverse portfolio of loans that CLOs commonly have. Many of the CLOs are structured as closed-end investment funds and, in fact, own equity in post-reorganization companies (that are publicly traded and quite liquid) and some even own real estate.[14] In any event, as mentioned, the Debtor serves as portfolio manager on the numerous Highland CLOs (there more than a dozen), pursuant to *separate portfolio management agreements* that Highland has with the CLO SPEs. There are about $1 billion of assets in these CLO SPEs that Highland manages.[15] And, to be clear, the Advisors and NexPoint/HCMFA Funds own *equity* (*i.e.,* the bottom tranche) in most if not all of these Highland CLOs.

The Debtor has alleged in this Adversary Proceeding that the Advisors, acting under the direction of their President Mr. Dondero, have interfered multiple times with Mr. Seery's attempts to sell various assets in the CLO SPEs, by, among other things, exerting pressure on certain of the Debtor's employees to halt trades that were ordered by Mr. Seery. To be clear, the Advisors have no contractual right to do that—they are not party to the portfolio management agreements that Highland has with the CLO SPEs. The Advisors simply purport to speak for various investors (*i.e.,* the investors in the NexPoint/HCMFA Funds) who have invested in (*i.e.,* own the equity) in the Highland CLOs. However, it appears that the majority of these investors are yet *other Non-Debtor Dondero-Related Entities*, including but not limited to the entities known as Charitable DAF HoldCo, Ltd. and CLO Holdco, Ltd.[16] In any event, various examples of communications that

---

[14] *See* 1/26/21 Hearing Transcript, Debtor's Exh. 37 at 155:9-18 (DE # 80).

[15] *See id.* at 202: 3-7.

[16] *See* Debtor's Exh. 2, Exh. 7 thereto (DE # 80). There may be some "mom and pop" or unrelated institutional investors in certain of these Highland CLOs (indirectly through the NexPoint/HCMFA Funds), *see* 1/26/21 Hearing Transcript, Debtor Exh. 37 (DE # 80), at 201:14-22, but *none* have ever come forward during the Highland bankruptcy. Moreover, the Debtor aptly notes that there is nothing preventing unhappy investors from simply selling their investments in the Highland CLOs if they are not happy with management decisions of the portfolio manager.

005623

allegedly constituted interference were described in the Adversary Proceeding.[17] The court notes, anecdotally, that Mr. Dondero was continuing, well after his October 9, 2020 termination with the Debtor, to use an email address showing he was an employee of Highland in many of the communications introduced into evidence.[18]

        <u>B. Alleged Threats When Debtor Attempted to Collect Demand Notes from Mr. Dondero.</u>

Additionally, the Adversary Proceeding describes that there are certain demand notes on which Mr. Dondero, personally, and certain Non-Debtor Dondero-Related Entities owe significant money to the Debtor. The Debtor made demand upon Mr. Dondero for payment on these demand notes on December 3, 2020, demanding payment by December 11, 2020, so that the Debtor could have these funds to use in its Chapter 11 plan that was set for confirmation in January 2021. Mr. Dondero is alleged to have sent a threatening text to Mr. Seery, just a few hours after the demand letters were sent to him.

After describing Mr. Dondero's alleged conduct, the complaint in the Adversary Proceeding sought injunctive relief preventing Mr. Dondero from interfering with the Debtor's operations, management of assets, and pursuit of a plan of reorganization, to the detriment of the Debtor, its estate, and its creditors, relying on 11 U.S.C. § 105 and Fed. R. Bankr. Pro. 7065. The Debtor has argued that Mr. Dondero's actions have jeopardized the Debtor's ability to effectively wind down its business in the Chapter 11 proceedings—to the detriment of its creditors.

---

[17] Debtor's Exh. 3, DE # 80 (10/16/20 letter from counsel for Advisors expressing "concerns" about the Debtor's management of the Highland CLOs and a desire that management be transitioned over to the Advisors); Debtor's Exh. 4, DE # 80 (11/24/20 letter from counsel for the Advisors further expressing "concerns" about the Debtor's management of Highland CLOs, especially the selling of assets therein); Debtor's Exh. 5, DE # 80 (11/24/20-11/27/20 emails of Mr. Dondero instructing Highland employee Hunter Covitz not to trade SKY equity as he had been instructed by James Seery); Debtor's Exh. 14, DE # 80 (12/24/20 letter of Debtor's counsel to counsel for the Advisors addressing some of their clients' actions).

[18] *See, e.g.,* Debtor's Exh. 5 (DE # 80).

005624

## IV. Motion for TRO [DE # 6].

Almost immediately after filing the Adversary Proceeding, the Debtor sought entry of a TRO enjoining Mr. Dondero from: (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Independent Board member *unless* Mr. Dondero's counsel and counsel for the Debtor were included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's employees, except as it specifically related to shared services currently provided by the Debtor to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct"). It was supported by a Memorandum of Law[19] and a Declaration of Mr. Seery.[20]

The court held a hearing on December 10, 2020 on the Motion for TRO.

A. <u>The Evidence at the TRO Hearing.</u>

At the hearing on the Motion for TRO, the Debtor relied upon the Declaration of Mr. Seery and all exhibits that had been attached thereto (which the court admitted with no objection).[21] The court also heard a small amount of additional live testimony from Mr. Seery. Mr. Dondero's

---

[19] *See* DE # 6.

[20] *See* DE # 4 (with 29 exhibits attached, 177 pages in total length).

[21] *Id.*

005625

counsel appeared and made some statements but did not file a responsive pleading or put on any evidence.

Mr. Seery credibly testified that, pursuant to the January 2020 Corporate Governance Settlement, Mr. Dondero surrendered control of the Debtor to the Independent Board. After that January 2020 Corporate Governance Settlement, Mr. Dondero's responsibilities with the Debtor were to be, in all cases, as determined by the Independent Board and subject at all times to the supervision, direction and authority of the Independent Board. In the event the Independent Board was to determine for any reason that the Debtor should no longer retain Mr. Dondero as an employee, Mr. Dondero agreed to resign immediately upon such determination.[22] By resolution passed on January 9, 2020, the Independent Board authorized Mr. Seery to work with the Debtor's traders and approve trades of certain of the Debtor's and funds' assets.[23] However, up until mid-March 2020, Mr. Dondero controlled certain of the Debtor's managed funds and accounts (as he still maintained the title of portfolio manager). Mr. Seery credibly testified that "[w]e took them away after they lost considerable amounts of money, about ninety million bucks. Real money. So we took over control of those accounts since then, and we've been managing to sell them down to create cash where we think the market opportunity is correct."[24]

Later, however, during the summer of 2020, the Independent Board determined that it was in the best interests of the Debtor's estate to formally appoint Mr. Seery as the Debtor's CEO and CRO (i.e., not just an Independent Board member with trading authority). The bankruptcy court approved Mr. Seery's appointment as CEO and CRO on July 16, 2020.[25] Mr. Seery's appointment

---

[22] Debtor's Exh. 1, at pp. 2-3 (DE # 80).

[23] Debtor's Exh. 3, at p. 2 (DE # 80).

[24] 12/10/20 Transcript from TRO Hearing, at p. 51:21-25 (DE # 19).

[25] DE # 854 in main bankruptcy case.

005626

as CEO and CRO formalized his role and his authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its managed investment vehicles, funds, and subsidiaries. Mr. Seery credibly represented that he has routinely carried out such responsibilities during the case.

On August 12, 2020, the Debtor filed its Plan of Reorganization with the court[26] (as subsequently amended, the "Plan").  The Plan provided for, among other things, the gradual monetization of the Debtor's assets for the benefit of the Debtor's creditors.  Also in August 2020, the Debtor entered into court-ordered mediation with certain of its creditors which resulted in, among other things, the Acis Settlement (mentioned earlier). After the Acis Settlement was publicly announced, Mr. Dondero voiced his displeasure with not just the terms of the Acis Settlement, but that a settlement had been reached at all. On October 5, 2020, Mr. Dondero objected to the Debtor's motion seeking approval of the Acis Settlement, which the Debtor believed created an actual conflict with the Independent Board and the Debtor.[27]  Additionally, one of Mr. Dondero's family trusts also filed a proof of claim alleging the Debtor and Mr. Seery were mismanaging the assets of a subsidiary of the Debtor.[28]   Concluding that this situation was untenable, Mr. Dondero was asked to resign from the Debtor, and he did on October 9, 2020.[29]

Subsequent to Mr. Dondero's termination from the Debtor, he began engaging in activities that the Debtor perceived to be interference with its business judgment and management of the Highland CLOs.  Approximately one week after Mr. Dondero resigned, the Advisors began writing letters to Mr. Seery requesting, among other things, that "no [Highland] CLO assets be sold without

---

[26] DE # 944 in main bankruptcy case.

[27] DE # 1121 in main bankruptcy case; Debtor's Exh. 2 (Mr. Seery's Decl.) at ¶ 11; DE # 80.

[28] *Id.* at ¶ 12.

[29] Debtor's Exhs. 4-5 (DE # 80).

005627

prior notice and consent from the Advisors."[30] Not only is the Advisors' consent for Highland CLO assets sales not contractually required, but the Debtor's Chapter 11 plan (then on file, now confirmed) contemplates the gradual wind down of Highland's business over time so that it will have funds to pay its creditors. In fact, Mr. Seery credibly testified that the business model of Highland in recent years (under the direction of Mr. Dondero—and with its web and layers of entities) has not allowed Highland itself to operate at a profit.[31] Thus, interference with assets sales in the Highland CLOs seemed equivalent to interference with, not just the Debtor's efforts to manage the business in ways that allowed it to pay its expenses, but also interference with the Debtor's Chapter 11 plan.

In the November 24-27, 2020 time period (again, just a few weeks after Mr. Dondero's termination from the Debtor), Mr. Dondero sent various emails to both Debtor and Advisor employees (*e.g.,* Matt Pearson, Hunter Covitz, Joe Sowin, and Tom Surgent) telling them he had instructed the Debtor not to engage in trades of Highland CLO assets and that they should not engage in certain trades of Highland CLO assets that Mr. Seery had instructed them to make.[32] A review of this correspondence makes apparent the underlying conflicts of interest present— Highland was attempting to gradually wind down its business and monetize its managed assets for the benefit of its creditors (and this court believes—all the while—balancing its fiduciary duties to investors in such funds) and, meanwhile, Mr. Dondero (wearing his hat as a portfolio manager for, and indirect equity owner in, certain of the Non-Debtor Dondero-Related Entities—*i.e.,* the

---

[30] Debtor's Exh. 6, p.2 (DE # 80); *see also* Debtor's Exh. 7 (DE # 80).

[31] Apparently, the Debtor even **offered to assign Highland's CLO management agreements to Mr. Dondero's affiliate, NexPoint (in early December 2020)**, but Mr. Dondero thought the proposed terms were untenable. *See* DE # 50, John Morris Decl., Exh. Z thereto (January 5, 2021 Deposition Transcript of Mr. Dondero, at 101:11-25).

[32] Debtor's Exh. 8 (DE # 80).

005628

Advisors and the NexPoint/HCMFA Funds) did not want assets sold as part of a wind down. Mr. Dondero, it appears to this court, was putting his own and the Non-Debtor Dondero-Related Entities' interests (as investors in the Highland CLOs) ahead of Highland's creditors and the Highland CLOs, as a whole. But, Highland had duties to its creditors and to the Highland CLOs ***as a whole***, and not to the Advisors or their funds (as investors in or equity owners in the Highland CLOs). Mr. Seery further credibly explained the situation, and the harm the interference caused the bankruptcy estate, as follows: "We intend to continue to manage the CLOs, we intend to assume those contracts [*i.e.,* the portfolio management agreements for the Highland CLOs], we intend to manage them post-confirmation, after exit from bankruptcy. And causing confusion among the employees, preventing the Debtor from consummating trades in the ordinary course, deferring those transactions, we thought put the estate at significant risk, in addition to the cost."[33] The Highland CLOs generate fee income for the Debtor. Not all of them have liquid assets that are able to pay quarterly fees. Some owe deferred fees to Highland.[34]

The Debtor thereafter sent communications instructing the Advisors and Mr. Dondero to cease and desist their interference, indicating that Mr. Dondero's actions interfered with the management of the Debtor's bankruptcy estate and the property of such estate, in violation of the Bankruptcy Code and the January 9, 2020 Order.[35]

Meanwhile, around this same time period, the Debtor sent demand letters[36] to Mr. Dondero and certain Non-Debtor Dondero-Related Entities, each of whom are obligated to the Debtor on various demand notes, pursuant to which approximately $30 million is collectively owed to the

---

[33] Debtor's Exh. 37 at 166:6-13 (DE # 80).

[34] *Id.* 166-167.

[35] Debtor's Exhs. 9 & 10 (DE # 80).

[36] Debtor's Exhs. 24-27 (DE # 80).

005629

Debtor.[37] Collection on these notes was part of the Debtor's liquidity plan, to help pay creditors under its Chapter 11 plan. Mr. Seery credibly testified that Mr. Dondero's response was a text message that stated: "Be careful what you do, last warning."[38]

The next day, Debtor's counsel sent Mr. Dondero's counsel correspondence demanding that he "cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." The letter put Mr. Dondero on notice that the above-referenced Adversary Proceeding and Motion for TRO would be filed.

### B. Entry of the TRO.

After hearing the evidence at the TRO Hearing, the court determined that the Debtor had met its burden of proving the need for a TRO. The court issued the TRO[39] which temporarily enjoined Mr. Dondero from "(a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the

---

[37] Debtor's Exhs. 11-23 (DE # 80).

[38] Debtor's Exh. 28 (DE # 80).

[39] *See* DE # 10; *see also* Debtor's Exh. 11 (DE # 80).

005630

Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the 'Prohibited Conduct')." Mr. Dondero was further temporarily enjoined "from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct."

### V.    The Contempt Motion Now Before the Court.

Less than a month after entry of the TRO, on January 7, 2021, Highland filed *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Contempt Motion"),[40] which was supported by a Memorandum of Law[41] and a Declaration of John Morris with Exhs. G, K, L, M, N, P, Q, R, S, U, W, X, Y, Z attached.[42] Highland alleges Mr. Dondero violated the TRO as follows: (a) he willfully ignored it by not reading the TRO, the underlying pleadings, and allegations that supported it, nor did he listen to the hearing at which it was entered or make any meaningful effort to understand the scope of it; (b) he threw in the garbage his Highland-furnished cell phone, in what the Debtor believes was an attempt to evade discovery; (c) he trespassed on the Debtor's property after the Debtor had evicted him because the Debtor believed he was interfering with the Debtor's business; (d) he interfered with the Debtor's trading of Highland CLO assets; (e) he pushed and encouraged the Advisors and NexPoint/HCMFA Funds to make further demands and threats against the Debtor regarding the trading of Highland CLO assets; (f) he communicated with the Debtor's inhouse

---

[40] DE # 48.

[41] DE # 49.

[42] DE # 50.

005631

counsel, Scott Ellington and Isaac Leventon, before they were terminated from Highland, to coordinate legal his own strategy against the Debtor; and (g) he interfered with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody and control.

The court held an evidentiary hearing on the Contempt Motion on March 22, 2021 (with closing arguments March 24, 2021). The court considered dozens of exhibits[43] and testimony from two witnesses (Mr. Dondero and the Debtor's current CEO, James Seery). The Debtor asserted that there were seventeen different violations of the TRO. To be clear, this Contempt Motion **deals solely with whether Mr. Dondero violated the TRO after its entry on December 10, 2020 at 1:31 pm CST, up through the time of the filing of the Contempt Motion on January 7, 2021**.[44] In fact, the court has subsequently entered a Preliminary Injunction[45] and Agreed Injunction[46] resolving this Adversary Proceeding but reserved jurisdiction to rule on the earlier-filed Contempt Motion.

A. <u>The Evidence Regarding Whether Mr. Dondero Willfully Ignored the TRO by Not Reading It or the Underlying Pleadings and Allegations that Supported It; by Not Attending the Hearing Thereon; and by Not Making Any Meaningful Effort to Understand the Scope of the TRO.</u>

The Debtor argues that Mr. Dondero's willful ignorance of both the TRO, and the underlying evidence presented in connection with the TRO, is in and of itself contemptible.

---

[43] The court admitted Debtor's Exhibits #1, #2, #7, #8, #9, #10, #11, #12, #13, #14, #15, #17, #18, #19, #20, #21, #22, #24, #25, #26, #27, #28, #33, #35, #36, #37, #38, #39, #47 through #57 (found at DE ## 80, 101, & 128), and Mr. Dondero's Exhibits #1 through #20 (found at DE # 106).

[44] The Debtor initially sought an expedited hearing on the Contempt Motion for January 8, 2021—the same day that the Debtor's request for a preliminary injunction was set for hearing. The court denied the request for an expedited hearing on the Contempt Motion—believing this was not enough notice to Mr. Dondero. So, there was a hearing on a request for a preliminary injunction only on January 8, 2021 (which was granted ultimately). To be clear, there was a hearing on Mr. Dondero and his counsel had approximately 75 days to prepare for the hearing on this matter.

[45] DE # 59.

[46] DE # 182.

18

005632

The evidence on this point is that Mr. Dondero testified multiple times in connection with this Adversary Proceeding[47] that he had not: (a) reviewed the Declaration of James P. Seery, Jr., the Debtor's Chief Executive Officer, in support of the TRO Motion; (b) attempted to learn of the allegations made against him; (c) thought about the fact that the Debtor was seeking a restraining order against him; (d) listened to the hearing where the court admitted evidence and heard argument on the Debtor's motion; (e) read the transcript of the hearing at which the court granted the Debtor's motion for the TRO; (f) read the TRO after it was entered; or (g) made any meaningful effort to understand the scope of the TRO.[48]

But on later examination by his counsel at the Hearing on the Contempt Motion itself, Mr. Dondero testified as follows:

> Q Did you have an opportunity to ask your counsel questions about the TRO?
>
> A Yes.
>
> Q And did you rely on your counsel to explain to you what the TRO meant?
>
> A Yes.
>
> Q And in the weeks that followed the entry of the TRO, did you continue to seek advice from your counsel regarding what you could and could not do under the TRO?
>
> A Yes.
>
> Q And why did you do that?
>
> A Again, to stay compliant, not -- to stay compliant any specific tripwires or any trickery that might have been in the agreement.[49]

---

[47] The court will refer frequently herein to three Transcripts and hereinafter use the following defined terms for ease of reference: (a) the January 5, 2021 Transcript from Mr. Dondero's deposition in connection with this matter, found as an attachment to the John Morris Declaration, DE # 50, at Exh. Z ("1/5/21 Transcript"); (b) the January 8, 2021 Transcript from the hearing on the Motion for Preliminary Injunction, which was admitted as Debtor's Exh. 36 at the Hearing on the Contempt Motion ("1/8/21 Transcript"); and (c) the March 22, 2021 Transcript from the Hearing on the Contempt Motion, which is found at DE # 138 ("3/22/21 Transcript").

[48] *See* 1/5/21 Transcript at 12:17-15:14; 1/8/21 Transcript at 23:10-12 and 101:13-14; 3/22/21 Transcript at 30:20-22; 35:6-16. *See also* 1/5/21 Transcript at 84:8-16; 3/22/21 Transcript at 35:20-36:1.

[49] 3/22/21 Transcript at 130:6-19.

005633

Mr. Dondero went on to testify: "Yeah, I -- again, I take seriously anything that comes from the Court, and I did adjust my behavior, but the overall theme, that somehow I was doing something to hurt the creditor or hurt the Debtor or hurt investors I viewed as incongruent with any of my behavior. So I didn't think it was going to require much adjustment."[50]

The court concludes that Mr. Dondero's testimony was very inconsistent on when and how carefully he read the TRO. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

B. <u>The Evidence Regarding Whether Mr. Dondero Disposed of His Highland-Furnished Cell Phone to Evade Discovery.</u>

*<u>First, the Highland Cell Phone Policy.</u>*

The evidence is undisputed that Highland had a cell phone policy for all of its employees dated March 27, 2012 that still remained in place at all relevant times during this bankruptcy case.[51] Employees could, among other things, have their cell phone expenses reimbursed by Highland.  Mr. Dondero participated in this program. To be clear, Highland actually purchased and paid for Mr. Dondero's cell phone (in contrast, some employees used their own cell phones and obtained expense reimbursement).  The policy stated as follows:

> Your obligations under this policy shall terminate upon the termination of your employment, ***provided that you will remain obligated to furnish historical call records covering the period through the date of your termination***, as requested following the termination of your employment. Employees participating in this policy should have no expectation of privacy regarding e-mail, voice mail, ***text messages***, graphics, and other electronic data composed, sent, and/or received on their cell phones.  Notwithstanding the foregoing, Highland agrees not to review any call records on an employee's bill other than those associated with the phone number of employee. Further, regardless of whether employees choose to participate in this policy, ***all e-mail, voice mail, text messages, graphics, and other***

---

[50] 3/22/21 Transcript at 129:6-11; *see more generally, id.* at 130-136.

[51] Debtor's Exh. 54 (DE # 101).

005634

*electronic data composed, sent, and/or received related to company business remain the property of Highland.*"[52]

Mr. Dondero certified in January 2020 and again on October 7, 2020, that he had read the Employee Handbook.[53] Mr. Dondero testified that he reviewed it and the company's Compliance Manual once a year in connection with required compliance training.[54]

It is undisputed that as of the day that the TRO was entered (December 10, 2020), Mr. Dondero had a cell phone that was bought and paid for by the Debtor.[55] Mr. Dondero testified that he would sometimes use it for business texts.[56]

From this evidence, the court finds that the cell phone that Mr. Dondero used for the majority of the Chapter 11 case (and as of the date of the TRO, December 10, 2020) was property of the bankruptcy estate, as was the data thereon related to company business.

> *Mr. Dondero's Cell Phone Goes Missing Immediately After Entry of the December 10, 2020 TRO. Coincidence or Not?*

Soon after the entry of the December 10, 2020 TRO, on December 23, 2020, Debtor's counsel sent Mr. Dondero's counsel a letter informing him that Highland would:

> terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the 'Cell Phones'). [Highland] demands that Mr. Dondero immediately turn over the Cell Phones to [Highland] by delivering them to [Mr. Dondero's counsel]; we can make arrangements to recover the phones from [Mr. Dondero's counsel] at a later date. The Cell Phones and the accounts are property of [Highland]. [Highland] further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. [Highland], as the owner of the account

---

[52] *Id.* (emphasis added). *See also* Debtor's Exh. 55, at 12-13 (DE # 101).

[53] Debtor's Exhs. 56 & 57 (DE # 101).

[54] 3/22/21 Transcript at 37:1-23; 42:1-25. *See also* Debtor's Exh. 55 (Employee Handbook); Debtor's Exhs. 56 & 57 (Compliance Certificates) (DE # 80).

[55] 3/22/21 Transcript at 51:17-21

[56] *Id.* at 51:22-25.

005635

and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.[57]

On December 29, 2020, Mr. Dondero's counsel sent a letter replying to the December 23, 2020 letter, stating that Mr. Dondero had recently acquired a new phone and they were not sure where Mr. Dondero's old Highland-provided phone was at the moment.[58] Mr. Dondero was copied on that letter.  Nothing was ever mentioned in that letter about the disposal or wiping of the old cell phone. And yet, in discovery that soon unfolded, as well as the hearing on the Contempt Motion, Mr. Dondero testified that his old company cell phone had been wiped of data and disposed.

When Mr. Dondero was asked specifically about what happened to the cell phone he had that was "bought and paid for by the debtor," he testified that it "was disposed of as part of getting a replacement phone in anticipation of potentially a transition."[59]  He testified that there was a historical practice at Highland of destroying old phones when he obtained a new one.[60]  He testified that "[a]s far as I know, it was disposed of in the garbage, but I don't know if it was recycled or whatever."[61]  He said he did not know specifically who threw it away.[62]  When asked if he was aware that the UCC had asked for his phone messages, he testified no and that no one had ever told him.[63]  He further testified that maybe an employee named Jason Rothstein (an employee in Highland's technology group) was involved with getting him a new phone and disposing of his old phone, but he was equivocal.[64]  Mr. Dondero was insistent that disposing of old phones was always

---

[57] Debtor's Exh. 12, at pp. 2-3 (DE # 80).

[58] Debtor's Exh. 22 (DE # 80).

[59] 1/5/21 Transcript at 72:5-7.

[60] *Id.* at 72:9-13.

[61] *Id.* at 72:18-20.

[62] *Id.* at 73: 4-18.

[63] *Id.* at 74:19-25.

[64] *Id.* at 75:7-11.

005636

the protocol at Highland and, also, employees routinely kept their old phone numbers (as he had done after leaving Highland and getting a new phone).[65] He further testified that he thought that he and all senior executives had to "move their phones in the next 30 days or next 25 days, based on Seery's termination notice."[66] ("Seery's termination notice" presumably was a reference to Highland sending a letter on November 30, 2020 that Highland was terminating the shared services agreements among Highland and the Advisors effective January 30, 2021.[67] Of course, Mr. Dondero had been terminated as a Highland employee back on October 9, 2020).

An exhibit was shown to Mr. Dondero[68] during a January 5, 2021 deposition which was a text from Jason Rothstein (the aforementioned Debtor employee in the technology group) to Mr. Dondero dated December 10, 2020 at 6:25 pm. The TRO had been entered earlier that same day at 1:31 pm (after a 9:30 am hearing). Jason Rothstein's text stated, "I left your old phone in the top drawer of Tara's [Mr. Dondero's assistant's] desk" to which Mr. Dondero replied "[o]k."[69]

When questioned about this text and asked whether Mr. Dondero had told Jason Rothstein to do anything with the phone, he replied, "I don't—all I know is the phone's been disposed of. That's all I know."[70] He then specifically testified that he did not tell either Jason Rothstein or his assistant Tara to throw the phone in the garbage.[71] When later asked if he disposed of the phone "somewhere around December 10, 2020" he replied "I—I don't know. Probably."[72] Later at the

---

[65] Id. at 76:8-77:2.

[66] Id. at 79:25-80:4.

[67] Dondero's Exhs. 4 & 5 (DE # 106).

[68] Debtor's Exh. 8 (DE # 80).

[69] While this timing seems very coincidental, Mr. Dondero testified that he had ordered his new cell phone a couple of weeks before December 10, 2020. 3/22/21 Transcript at 147:17-148:7.

[70] 1/5/21 Transcript at 80:18-81:8.

[71] Id. at 81:9-15.

[72] Id. at 85:15-17.

005637

hearing on the Contempt Motion on March 22, 2021, Mr. Dondero answered more ambiguously as to what happened to the cell phone: "I don't know what happened to the phone. I don't know what Jason did or did not do."[73] Nobody called Jason Rothstein to testify at the hearing on the Contempt Motion. In any event, Mr. Dondero was insistent that he did nothing wrong—stating that he turned the cell phone over to the "tech group" for the Debtor (Jason Rothstein) as he was supposed to do and that he wiped it in accordance with company protocol.[74] Mr. Dondero further testified:

> Q Do you have any personal knowledge about what happened to your phone after Jason Rothstein texted you that he left it in Tara's desk?
>
> A No.
>
> Q Did you ever look to see if it was in Tara's desk?
>
> A No.
>
> Q Did you -- you -- you didn't take the phone out of Tara's desk?
>
> A No.
>
> Q So did you ever see the phone again after you turned it over to Jason Rothstein?
>
> A No.
>
> Q Do you know where the phone is today?
>
> A   But, again, I don't know why this is relevant. They can get the text messages from the phone company if they think it's that big of a deal.[75]
>
> Q When you previously testified that the phone was disposed of, what did you mean?

---

[73] 3/22/21 Transcript at 57:3-4.

[74] *Id.* at 58:1-16.

[75] The court did not have any expert evidence of this, but the court believes without much doubt that this is incorrect. While this may have been true long ago (in the days before iPhones and WiFi communications), Mr. Dondero testified that he had an iPhone. Whether he uses the iPhone "Messages" text app or some other messaging app such as "WhatsApp" or "Signal," his phone company (which he testified was AT&T) would not have his text messages since text messages are sent through these apps—not the AT&T phone service.

005638

A I mean, that's -- that's the last step. That's what always happens to the old phones. But to say it was tossed in the garbage, I have no idea. I have no idea what happened to it after it went back to Tara's desk.

Q So do you have any personal knowledge that your phone was actually disposed of?

A I don't know.[76]

*Is the Missing Phone Any Big Deal?*

Mr. Dondero is rather adamant that this is all much ado about nothing. Is the missing cell phone a big deal? The answer is "maybe or maybe not." It depends on what was on it and whether the data on it was responsive to numerous discovery requests in this bankruptcy case. And in any event, the phone and any data on it related to Highland was "property of the estate," pursuant to section 541 of the Bankruptcy Code.

With regard to discovery requests, there have actually been many discovery requests in the bankruptcy case for which *any relevant data on Mr. Dondero's phone would have been responsive*, starting from almost the very beginning, when the UCC sought, among other things, electronically stored information ("ESI") from the Debtor and key custodians including Mr. Dondero.

For example, back on November 10, 2019 (when the bankruptcy case was still pending in Delaware), the UCC served its first document request *while Mr. Dondero was still CEO and during which time all original management and inhouse counsel were still intact*.[77] This first UCC document request, in seeking communications about numerous topics, defined "Communications" as including *electronic communications such as texts*. And the "Instructions" therein to the Debtor

---

[76] 3/22/21 Transcript at 150:5-151:4.

[77] Debtor's Exh. 15 (DE # 80).

005639

provided at paragraph 4 that: "You are requested to produce not only those documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf."[78] To be clear, this was approximately two months before the January 2020 Corporate Governance Settlement was reached, with the subsequent installment of the Independent Board. Mr. Dondero was still in control of the Debtor when this document request would have been served. The UCC served a second document request on February 3, 2020 (with the same definitions and instructions);[79] a third document request on February 24, 2020 (same definitions and instructions),[80] and a fourth document request on July 8, 2020 (same definition and instructions).[81]

At the same time as the UCC's fourth request for document production (on July 8, 2020), the UCC also filed a motion to compel.[82] This motion to compel brought to the court's attention for the first time that problems were brewing with the UCC's efforts to obtain documents that might be relevant to estate causes of action, and in particular, the UCC motion to compel sought assistance from the court in the UCC's efforts to obtain ESI from various custodians of documents of the Debtor.

The UCC's motion to compel reminded the court that the January 2020 Corporate Governance Settlement explicitly granted the UCC standing to pursue bankruptcy estate claims, defined as "any and all estate claims and causes of actions against Mr. Dondero, Mr. Okada, other

---

[78] *Id.*

[79] Debtor's Exh. 30 (DE # 80).

[80] Debtor's Exh. 31 (DE # 80).

[81] Debtor's Exh. 32 (DE # 80).

[82] Debtor's Exh. 33 (DE # 80).

005640

insiders of the Debtor, and each of the Related Entities, including promissory notes held by any of the foregoing."[83]   The parties also agreed in the January 2020 Corporate Governance Settlement that the UCC would receive any privileged documents or communications that relate to the "Estate Claims" so that the UCC could bring those claims.   In short, the UCC, pursuant to the January 2020 Corporate Governance Settlement, stands in Debtors' shoes with respect to the "Estate Claims." In fact, the January 2020 Corporate Governance Settlement set forth a "Document Production Protocol," which stated that ESI was included within the documents being sought and stated that "*Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data*."[84] Thus, whether Mr. Dondero and inhouse counsel paid attention or not, they were on notice very early in this case that they had a duty to preserve ESI.

The UCC motion to compel (again, filed July 8, 2020) further stated that for approximately eight months, the UCC had attempted to work cooperatively with the Debtor to obtain documents and communications needed to investigate those claims, and, despite the UCC's efforts, the Debtor had not yet provided the UCC with the ESI it had requested. In particular, the UCC alleged that it had spent a considerable amount of time attempting to obtain "*production of emails, chats, texts, or other ESI or communications from the Debtor.*"   In summary, the UCC, in July 2020 (some five months before Mr. Dondero's cell phone was disposed) moved to compel production of documents and communications of nine custodians pursuant to a protocol proposed by the UCC and these nine custodians were Patrick Boyce, Jim Dondero, Scott Ellington, David Klos, Isaac

---

[83] *Id.* at 4.

[84] Debtor's Exh. 2, Exh. 1.C. thereto (DE # 80).

005641

Leventon, Mark Okada, Trey Parker, Tom Surgent, and Frank Waterhouse. The UCC specifically stated that for "avoidance of doubt," it was requesting "all ESI for the nine custodians, including without limitation, email, chat, text, Bloomberg messaging, or any other ESI attributable to the custodians."[85]

Notably, Mr. Dondero filed a responsive pleading to this UCC motion to compel—which would be some indication that he knew about it.[86] In his response, he argued that he did not want Josh Terry (Acis's manager, with whom he had been in long-running litigation) to get any documents that might be produced pursuant to the UCC motion to compel.

Finally, the Debtor also sought document production from Mr. Dondero including ESI in a formal document request it sent to him dated December 23, 2020.[87] More pointedly, on December 23, 2020, Debtor's counsel sent Mr. Dondero's counsel the letter mentioned above, in which the Debtor specifically asked that Mr. Dondero turn over his Highland-purchased cell phone.[88]

With regard to awareness about discovery requests, Mr. Dondero testified at his deposition on January 5, 2021 that he was aware of a document request sent to his lawyers for documents of his and that he delegated to his lawyers and his assistant, Tara Loiben, the task of responding by saying, "she has full access to my email, and I gave her my phone for the better part of a couple of days in the office."[89] He also testified that he understood that the Debtor's document requests called for the production of all text messages that were responsive to the requests.[90] When asked if he

---

[85] *Id.*

[86] Debtor's Exh. 40 (DE # 101).

[87] Debtor's Exh. 7 (DE # 80).

[88] Debtor's Exh. 12 (DE # 80).

[89] *See* 1/5/21 Transcript at 67:20-69:9. *See also* Debtor's Exh. 9 (DE # 80).

[90] *Id.* at 70:1-6.

005642

understood the document request was for the time period of December 10, 2020 to the end of the month, he replied "I didn't need the details of this. I didn't get into it. I didn't do the document production that I believe was completed and responsive. I delegated it."[91]

Mr. Dondero's testimony about awareness as to discovery requests has been inconsistent. Mr. Dondero testified at the hearing on the Contempt Motion that no one ever asked him to preserve his text messages.[92]

The court concludes that Mr. Dondero exercised control over property of the estate (*i.e.,* his Highland-provided cell phone and the company-related data thereon) and potentially spoliated evidence thereon that was responsive to multiple, pending discovery requests. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

The Evidence Regarding Whether Mr. Dondero Trespassed.

In the December 23, 2020 letter that Debtor's counsel sent to Mr. Dondero's counsel mentioned earlier (that demanded turn over of Mr. Dondero's cell phone), it also stated that Highland:

> has concluded that Mr. Dondero's presence at the [Highland] office suite and his access to all telephonic and information services provided by [Highland] are too disruptive to [Highland's] continued management of its bankruptcy case to continue. As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.[93]

---

[91] *Id.* at 70:17-20.

[92] 3/22/21 Transcript at 152:1-11.

[93] Debtor's Exh. 12 (DE # 80).

005643

The letter went on to warn that: "Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by [Highland] will be viewed as an act of trespass, theft, and/or an attempted breach of [Highland's] security protocols."[94]

Mr. Dondero testified that he was aware of this and he nevertheless went into the office on January 5, 2021, to give a deposition regarding this Adversary Proceeding:

> I went through my phone, the January 5th deposition that has somehow become important, even though there were no Highland employees in the office other than the receptionist, is memorialized by a calendar invite on my phone -- which will also be in the Highland system -- where it was an invite a week earlier from Sarah Goldsmith, who was one of the Highland employees supporting the legal team that was largely supporting Jim Seery, sent me a calendar invite to the conference room at Highland for the deposition on the 5th. It's right front and center in my calendar. It'll be on the Highland Outlook program. And Sarah Smith -- I mean, Sarah Goldsmith works directly for Jim Seery.[95]

The court concludes that Mr. Dondero was trespassing against the Debtor's wishes and instructions at the Highland offices on January 5, 2020. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

### The Evidence Regarding Whether Mr. Dondero Interfered with Trading of Highland CLO Assets.

It is undisputed that Mr. Dondero resigned (at the Debtor's request) completely from Highland on October 9, 2020. About a week later, on October 16, 2020, a law firm representing the Advisors and the NexPoint/HCMFA Funds sent its first of several letters complaining about the Debtor's supposed rush to sell assets in the Highland CLOs at so-called fire sale prices and

---

[94] *Id.* at 3.

[95] 3/22/21 Transcript at 179:7-18.

005644

expressing a desire that the Debtor not sell the Highland CLO assets without prior notice and consent of the Advisors. The second in this series of letters was sent in November 2020. Mr. Dondero testified that he supported these letters being sent.[96]

What was this about?  The Debtor sought during certain times in November and December 2020 to cause the Highland CLOs to sell certain publicly-traded equity securities, including "AVYA" and "SKY' (stock tickers).  Mr. Dondero disagreed that these securities should be sold. At issue here, in particular, are the Debtor's attempted sales in late December 2020—after entry of the TRO.  Mr. Dondero testified at a deposition on January 5, 2021, that he gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it.[97] He also testified that he communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing not to sell any CLO underlying assets. There is potential liability.  Don't do it again."[98] Matt Pearson, in response, canceled scheduled sales of SKY as well as AVYA.[99] Mr. Dondero also communicated with an employee of one of the Advisors named Joe Sowin regarding stoppage of trades of CLO assets. Mr. Dondero explained: "My intent was to prevent trades that weren't in the best interests of investors, that investors—the beneficial holders had articulated they didn't want sold while these funds were in transition, and that the–there was no business purpose to benefit the debtor to sell these assets."[100]  To be clear, the so-called investors/beneficial holders were Non-

---

[96] 1/26/21 Transcript at 61:4-18.

[97] 1/5/21 Transcript at 41:22-43:11.

[98] *Id.* at 43:15-44:08.

[99] *Id.*

[100] *Id.* at 50:8-14; *see also, id.* at 89:8-25.

005645

Debtor Highland Related Entities under the control of Mr. Dondero. And the Debtor, indeed, **did** have a business purpose—despite Mr. Dondero's belief that Mr. "Seery had no business purpose and he was doing it to tweak myself and everybody else."[101] For one thing, the Debtor is owed fees from managing these Highland CLOs and it cannot just defer them indefinitely—Highland needed liquidity to fund its Chapter 11 plan. Moreover, Mr. Seery credibly testified that he had consulted with many advisors on the Highland and Advisors team, and he concluded it was a good time to sell the AYVA and SKY securities. In any event, Mr. Dondero also communicated with Debtor employee Thomas Surgent, the Chief Compliance Officer, to inform him that he thought Mr. Seery was engaging in improper trades of Highland CLO assets and told Mr. Surgent he might face personal liability over this.[102] Finally, Mr. Dondero communicated with a text to Mr. Seery that stated: "Be careful what you do, last warning."[103] As a result of this conduct, the Debtor notified Mr. Dondero's counsel that they were essentially evicting Mr. Dondero from access to the Highland offices effective December 31, 2020 and terminating his Highland email account.[104]

Mr. Dondero stated that he communicated as he did regarding the Highland CLO asset sales because he thought Mr. Seery was acting improperly with the trades he was attempting to execute.[105] Mr. Dondero testified at the hearing on the Contempt Motion that he may have interfered with trades the week of Thanksgiving, but he did not after entry of the TRO. The evidence does not seem to support this testimony.[106]

---

[101] *Id.* at 55:5-6.

[102] *Id.* at 60:23-61-25.

[103] *Id.* at 62:25.

[104] *See* Debtor's Exh. 12 (DE # 80).

[105] 1/5/21 Transcript at 63:1-64:20.

[106] 3/22/21 Transcript at 80-81.

005646

Mr. Dondero testified that he only talked to Jason Post about trades in late December and that Jason Post was not a Debtor employee but rather an employee of NexPoint.[107]

What was at the bottom of this? Mr. Dondero said he "viewed it as a violation of the Advisers Act and the spirit of the Advisers Act, when the beneficial holders have told you they're going to change managers and don't want their account liquidated."[108] Mr. Post inconsistently testified at one hearing that he believed the trades violated Advisors' policies and procedures because they were not initiated through an electronic system called the OMS (Order Management System).[109]  It appears to this court that Mr. Dondero wanted these funds to be kept intact and not have any assets liquidated until he could get a new company up and running (or maybe one of his existing companies) to hopefully take over Highland's role of managing these Highland CLOs.

In any event, the Debtor pointed out, in response to Mr. Dondero's "defense" of his interference—that he was looking out for investors—that Mr. Dondero himself, during January-October 2020, while still an employee of Highland, traded a significantly larger amount of the AVYA stock that was held in the Highland CLOs, sometimes at a lower price than Mr. Seery did or attempted.[110] Mr. Seery, in fact, credibly testified that the original impetus to sell AVYA came from Mr. Hunter Covitz, one of the Highland CLO portfolio managers, who had been looking at this security and noticed it had started moving up after performing extremely poorly post its own Chapter 11.  Mr. Covitz, during the summer of 2020, believed Highland should "start lightening up" on the AVYA holdings, and Mr. Seery also had the following additional personnel look into it: Kunal Sachdev (Highland analyst); Joe Sowin (head trader at HCFMA) and Matthew Gray (another

---

[107] *Id.* at 162.

[108] 3/22/21 Transcript at 168:22-25.

[109] 1/26/21 Transcript at 223:11-16.

[110] *Id.* at 106:9-20, 159-161.

005647

senior analyst). They determined (Mr. Sachdev, in particular) that AVYA had reached its peak and even though it could continue to go up, they just did not think the value was there and thought it should be sold. A similar analytical process was undertaken with the SKY equity holdings.[111]

One might wonder, if Mr. Dondero and the Advisors and the NexPoint/HCMFA Funds believed that Mr. Seery and the Debtor were mismanaging the Highland CLOs, why not offer to take them over during Highland's case (or as part of Highland' Chapter 11 plan)? Mr. Seery credibly testified that:

> Q Has the Debtor made any attempt to transfer the CLO management agreements to the Defendants or to others?
>
> A Well, our original construct of our plan was to do that. We've since determined, when we tried to do that, we got virtually no response from the Dondero interests. The structure of the original thought of the plan was if we didn't get a grand bargain we would effectively transition a significant part of the business to Dondero entities, they would assume employee responsibilities and the operations, and then assure that the third-party funds were not impacted.
>
> As I think I testified on the -- I can't recall if it was the deposition or my prior testimony in court -- Mr. Dondero, true to his word, told me that would be very difficult, he would not agree, and he has made that very difficult.
>
> So we examined it. We've determined that we're going to maintain the CLOs and assume them. But we originally tried to contemplate a way to assign those management agreements.[112]

What's really going on here? These Highland CLOs are one of the ways that the Debtor earns revenue. Specifically, the CLO SPEs must pay fees to the Debtor. Highland's management of the CLO SPEs generates about $4.5-$5 million of fees for it per year.[113] That sometimes requires liquidation of assets in the CLO SPEs to pay the fees, since not all of the assets in the CLO SPEs

---

[111] *Id.* at 156-157.

[112] *Id.* at 163:5-22.

[113] *Id.* at 187:5-12.

005648

are cash-generative.[114] To be more specific, these are very old CLOs that are no longer in a reinvestment period. The manager (Highland) can no longer sell assets and reinvest cash in new assets. Thus, the manager must either hold them or sell them. But the assets are for the most part not loans anymore—they are equity (such as MGM stock) and real estate. Many of the assets, as stated, do not regularly generate cash, so the only way Highland can generate cash to pay management fees is to sell assets (presumably at prudent times). When there is interference with liquidation of assets in the CLO SPEs, it interferes with Highland's revenue stream. Yes, it also reduces the assets in the CLO SPEs ultimately available for the equity tranche. ***But there would appear to be nothing in any contract (or any law presented to the court) that precludes Highland from liquidating assets in the CLO SPEs, from time to time, to pay its fees or otherwise as it deems fit—and the evidence was not at all convincing that there was any sort of bad decision making ongoing in that regard***. Most importantly, it was Highland's decision to make when and how to liquidate assets. It is easy to see a conflict of interest here. To the extent assets in a Highland CLO are not cash-generative, they will not have liquid funds to pay Highland, as portfolio manager, its management fees. That's not optimal for Highland to indefinitely defer/accrue management fees. But it ***would*** be optimal for Mr. Dondero and the Advisors as equity holders—they would rather see assets kept in the Highland CLOs longer to hopefully grow their investment. And it also might be optimal for Mr. Dondero and the Advisors for Highland to decide they do not want to manage these Highland CLOs anymore (because of inconsistent ability to pay management fees) and perhaps agree to assign their management agreements over to the Advisors so Mr. Dondero could once again have ultimate, total control over the Highland CLOs. Conspicuously absent on this issue are the indenture trustees and other ultimate equity holders of the Highland CLOs. Only

---

[114] *Id.* at 189:12-18.

005649

Non-Debtor Dondero-Related equity holders have complained. The indenture trustees for the Highland CLOs even agreed to Highland continuing to be the portfolio manager on these CLOs post-confirmation.

The court concludes that Mr. Dondero interfered with the Debtor's trading of Highland CLO assets after entry of the TRO. Whether this amounted to contempt of the TRO will be addressed in the Conclusions of Law section below.

<u>The Evidence Regarding Mr. Dondero's Communications with Debtor Employees—in Particular, with Inhouse Counsel—to Coordinate His Own Legal Strategy Against the Debtor.</u>

It is apparent from the evidence (numerous emails) that Mr. Dondero communicated with Highland inhouse general counsel Scott Ellington (who was terminated from Highland in January 2021) about all kinds of things post-TRO *other* than shared services, including Mr. Dondero's own personal litigation strategies.[115] As a reminder, Section 2(c) of the TRO stated that Mr. Dondero was enjoined, "from communicating with any of the Debtor's employees, except as it specifically relates to **shared services provided to affiliates** owned or controlled by Mr. Dondero" (emphasis added).

Mr. Dondero asserts that after entry of the TRO, he never spoke with any Debtor employees, including Mr. Ellington, regarding anything other than shared services, a "pot plan," and to Mr. Ellington in connection with his role as settlement counsel. In other words, Mr. Dondero's defense is that, yes, he conversed with Scott Ellington regarding things other than shared services provided to affiliates—such as Mr. Dondero's desire to propose a "pot plan" in the case and maybe a few other subjects—but this was permissible because Mr. Ellington was understood by all to be in some

---

[115] *See, e.g.,* Debtor's Exhs. 17, 18, 21 (DE # 80); Debtor's Exhs. 48, 49, 50, 52, 53 (DE # 101). *See also* 3/22/21 Transcript at 122:1-124:7; 124:15-125:12.

005650

sort of role of "settlement counsel" in the case: "Scott Ellington, as my settlement counsel, or as the go-between with Seery and with the creditors, was an important piece of trying to get something done."[116]  But this is simply not accurate. This court never would have approved that role for Mr. Ellington. Moreover, Mr. Seery, the current Highland CEO, credibly testified as follows:

> Q Did you task Mr. Ellington with the role of a go-between between the board and Mr. Dondero?
>
> A No.  This -- this settlement counsel is something I'd never heard until Dondero raised it and made it up.  It -- it's wholly fictitious.
>
> Now, what Ellington did do is he was on a number of calls with me and Dondero, and he had a communication line with Dondero.  This was through the first half of the case and into -- into the summer.  But as it started to become more adversarial, particularly around the mediation, he wasn't invited.  So, for example, Mr. Ellington was not invited to  -- to participate in the mediation.  He asked.  I said no.
>
> The -- in addition, this idea that he was drafting the pot plan, well, not to my knowledge or understanding, because I drafted it for Dondero and his lawyers because you guys [Pachulski] couldn't.[117]

Mr. Seery further credibly testified as follows:

> Q So you're denying Mr. Dondero's testimony to the contrary?
>
> A Yes.
>
> Q Did Mr. Dondero send messages to you through Mr. Ellington?
>
> A No.  Mr. Ellington often came back and gave me messages.  They were often critical of Mr. Dondero.  I didn't always believe them, because I figured Mr. Ellington had an ulterior motive.  But he took a number of, you know, shots at Mr. Dondero and he came back and gave his color of what he thought was going on in Mr. Dondero's mind.[118]

---

[116] 3/22/21 Transcript at 135:3-5.

[117] *Id.* at 257:6-21.

[118] *Id.* at 258:2-12.

37

Case 19-34054-sgj11 Doc 3787-6 Filed 06/07/21 Entered 06/07/21 06:55:19 Page 48 of 55
Case 3:23-cv-02071-E   Document 36-42   Filed 03/08/60   Page 59 of 214   PageID 5089
Exhibit 36-42   Page 203/860

In addition to this testimony, the documentary evidence reflects that just two days after the TRO was entered, Mr. Dondero was communicating with Scott Ellington seeking advice regarding an appropriate witness to support his interests at an upcoming hearing.[119]  And just six days after entry of the TRO, Mr. Dondero was emailing Mr. Ellington telling him "I'm going to need you to provide leadership here" and Ellington replies "[o]n it."[120]  Additionally, there are emails reflecting that inhouse lawyers Scott Ellington and Isaac Leventon were receiving and responding to information requests from Mr. Dondero[121] and were being copied on draft joint defense agreement prepared by the Dugaboy and Get Good Trusts' counsel.[122]  And Mr. Dondero emailed with Scott Ellington on December 24, 2020 regarding his unhappiness and intention to object to a settlement between HarbourVest and Debtor.[123]

> ### The Evidence Regarding Interference with Debtor's Duty to Produce Documents to the UCC.

On December 16, 2020, at 5:18 pm Mr. Dondero sent Melissa Schroth, a Highland employee (executive accountant), a text stating: "No dugaboy details without subpoena."[124]  This was a reference to document requests from the UCC in which they were seeking documents that were on the Highland server concerning Mr. Dondero's family trust, the Dugaboy Trust.

---

[119] Debtor's Exh. 17 (DE # 80) (Scott Ellington email to Mr. Dondero and his counsel on 12/12/20 at 11:55 pm suggesting JP Sevilla for a witness for some unknown hearing). *See also* Debtor's Exh. 26 (DE # 80).

[120]  *See* Debtor's Exh. 18 (DE # 80).

[121]  *See* Debtor's Exh. 20 (DE # 80).

[122]  *See* Debtor's Exh. 24 (DE # 80).

[123]  Debtor's Exh. 21 (DE # 80).

[124]  *See* Debtor Exh. 19 (DE # 80).

005652

Case 19-34054-sgj11 Doc 3867 Filed 06/07/21 Entered 06/07/21 06:53:25 Page 49 of 55
Case 3:23-cv-02071-E    Document 36-42    Filed 12/04/23    Page 60 of 214    PageID 5090
Exhibit 36-42    Page 104/08609

## VI.    Conclusions of Law

A.    Jurisdiction and Authority.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order. Section 105 of the Bankruptcy Code and the cases construing it are the substantive legal authority.

The Contempt Motion seeks for this court to hold Mr. Dondero in civil contempt of court for violating an order of this court (the TRO).  It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers.  "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[125] A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[126]  Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[127]

---

[125] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley,* 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir.1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust Co. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[126] *SkyPort Global,* 2013 WL 4046397, at *1.

[127] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

005653

Case 19-34054-sgj11 Doc 1807 Filed 06/07/21 Entered 06/07/21 06:55:19 Page 40 of 55
Case 3:23-cv-02071-E   Document 36-42   Filed 11/05/2360   Page 61 of 214   PageID 5091
Exhibit 242   Page 217/360

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[128] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal.  If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[129]  It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to Mr. Dondero's alleged violations of the TRO, and to coerce compliance going forward.[130]

B.   Type of Civil Contempt:  Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here).  "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[131] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[132]  "(1) that a

---

[128] *Bradley*, 588 F.3d at 263.

[129] *Id.* (internal citations omitted).

[130] Highland seeks the following relief in the Contempt Motion: an order (i) finding and holding Mr. Dondero in contempt for violating the TRO; (ii) directing Mr. Dondero to produce to the Debtor and the UCC within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) directing Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion and addressing Mr. Dondero's conduct that lead to the imposition of the TRO and this Motion (e.g., responding to the K&L Gates Clients' frivolous motion and related demands and threats and taking Mr. Dondero's deposition), payable within three (3) calendar days of presentment of an itemized list of expenses, (iv) imposing a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (iv) granting the Debtor such other and further relief as the court deems just and proper under the circumstances.

[131] *Travelhost*, 68 F.3d at 961.

[132] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

005654

court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[133]

    C. <u>Specificity of the Order</u>.

"To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated."[134] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[135]

    D. <u>Possible Sanctions</u>.

To be clear, if the court ultimately determines that Mr. Dondero is in contempt of court, for not having complied with the TRO, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order.[136] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the TRO was in effect; (2) the TRO required certain conduct by Mr. Dondero; and (3) that Mr. Dondero failed to comply with the TRO.[137] "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in

---

[133] *F.D.I.C. v. LeGrand,* 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir.1992) (same); *Travelhost,* 68 F.3d at 961 (same).

[134] *Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[135] *Id.*

[136] *In re Gervin,* 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947).

[137] *In re LATCL&F, Inc.,* 2001 WL 984912. *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 400 (5th Cir. 1987)).

005655

disregarding the court's order."[138] "Compensatory civil contempt reimburses the injured party for

the losses and expenses incurred because of [their] adversary's noncompliance."[139] Ultimately,

courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[140]

    E.   <u>Knowledge of the Order.</u>

    "An alleged contemnor must have had knowledge of the order on which civil contempt is

to be based.  The level of knowledge required, however, is not high. And intent or good faith is

irrelevant."[141] To be clear, "intent is not an element in civil contempt matters.  Instead, the basic

rule is that all orders and judgments of courts must be complied with promptly."[142]

    F.   <u>Willfulness of Actions.</u>

    For civil contempt of a court order to be found, "[t]he contemptuous actions need not be

willful so long as the contemnor actually failed to comply with the court's order."[143] For a stay

violation, the complaining party need not show that the contemnor intended to violate the stay.

Rather, the complaining party must show that the contemnor intentionally committed the acts which

violate the stay. Nevertheless, in determining whether damages should be awarded under the court's

---

[138] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

[139] *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976); *see also Travelhost,* 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.,* 43 F.3d 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[140] *Am. Airlines,* 228 F.3d at 585; *see also F.D.I.C.,* 43 F.3d 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[141] *Kellogg v. Chester,* 71 B.R. at 38.

[142] *In re Unclaimed Freight of Monroe, Inc.,* 244 B.R. 358, 366 (Bankr. W.D. La. 1999).  *See also In re Norris,* 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[143] *Id.* (citing *N.L.R.B. v. Trailways, Inc.,* 729 F.2d 1013, 1017 (5th Cir.1984)).

005656

contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[144]

G. <u>Applying the Evidence to the Literal Terms of the TRO.</u>

The court concludes that there is clear and convincing evidence that Mr. Dondero violated the specific wording of the TRO in certain ways and, thus, is in contempt of the court as follows.

*1. The TRO states in Section 2(c) that Mr. Dondero is enjoined, "from communicating with any of the Debtor's employees, except as it specifically relates to shared services provided to affiliates owned or controlled by Mr. Dondero."*

There are several examples of violations of this provision. And many of the communications appeared to be adverse to the Debtor's interests.

First, notably, Mr. Dondero actually admitted that he had conversations with some Debtor employees, including Scott Ellington, after December 10, 2020, regarding things other than "shared services," including a "pot plan" and, more generally, in connection with Mr. Ellington's role as "settlement counsel": "Scott Ellington, as my settlement counsel, or as the go-between with Seery and with the creditors, was an important piece of trying to get something done."[145] As indicated earlier, this court never would have approved that role for Mr. Ellington, and Mr. Seery credibly testified that this was never approved by him or the Independent Board. There was no exception for this in the TRO. As for Mr. Dondero's desire to pursue a pot plan, again, there's nothing in the TRO that allowed Mr. Dondero to speak with any of the Debtor's employees about the pot plan. It is clear that he knew that because on December 16, 2020, just six days after the TRO was entered, Mr. Dondero filed a motion seeking to modify the TRO to allow Mr. Dondero to speak directly with the Independent Board about a pot plan. He later withdrew that motion.[146]

---

[144] *In re All Trac Transport, Inc.,* 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

[145] 3/22/21 Transcript at 135:3-5.

[146] *See* DE # 24.

005657

Additionally, as noted earlier in this Opinion, it appears that Mr. Dondero communicated with inhouse lawyer Scott Ellington about all kinds of other things such as: (a) reporting to him about his intention to object to the settlement by the Debtor of the HarbourVest claim;[147] (b) reporting to him about his desire to collaborate with UBS and its counsel to give them "evidence of Seery ineptitude" and they would "run with it";[148] (c) forwarding email conversations to Scott Ellington that Mr. Dondero was having with his counsel (and thereby eviscerating attorney-client privilege as to those emails) about various disputes involving certain Non-Debtor Dondero-Related Entities and regarding the Debtor's desire to seek discovery from Mr. Dondero;[149] (d) reviewing a joint defense agreement that the lawyer for his family trusts (Dugaboy and Get Good) had drafted;[150] and (e) "showing leadership"—whatever that meant—but likely meaning coordinating of all the many lawyers involved for Mr. Dondero's interests.[151]

Finally, Mr. Dondero communicated with Highland employee (executive accountant) Melissa Schroth about resisting production of Dugaboy documents that were on the Highland server without a subpoena[152] and Jason Rothstein about his phone.[153]

In summary, Mr. Dondero violated Section 2(c) of the TRO numerous times.[154] His intent does not matter. He knew about the TRO. Thus, he was in contempt for these numerous violations.

---

[147] Debtor's Exh. 21 (DE # 80).

[148] Debtor's Exh. 50 (DE # 101).

[149] Debtor's Exh. 52 & 53 (DE # 101).

[150] *See* Debtor's Exh. 24 (DE # 80).

[151] Debtor's Exh. 18 (DE # 80). *See also* 3/22/21 Transcript at 122:1-124:7; 124:15-125:12.

[152] *See* Debtor Exh. 19 (DE # 80) (on December 16, 2020, at 5:18 pm: "No dugaboy details without subpoena.").

[153] Debtor's Exh. 8 (DE # 80); 1/5/21 Transcript at 80-55; 3/22/21 Transcript at 57-58.

[154] The court notes that there was also clear and convincing evidence to suggest various conversations occurred between Mr. Dondero and his assistant Tara Loiben after December 10, 2020. However, it is not clear from the record if Tara Loiben was a Highland employee or an employee of one of the Non-Debtor Dondero-Related Entities. Moreover, there was evidence to suggest Mr. Dondero communicated with Mr. Ellington on December 11-12, 2020 regarding who should be a witness for Mr. Dondero at an upcoming hearing. However, the evidence of this was not

> 2. *The TRO states at Section 3(a) that Mr. Dondero is "enjoined from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct" (and the "Prohibited Conduct" includes "interfering with or otherwise impeding" the Debtor's "decisions concerning disposition of assets controlled by the Debtor").*

The court concludes that there is clear and convincing evidence that Mr. Dondero violated this provision.

Things had grown very awkward at Highland, to say the least, by October 2020 when Mr. Dondero was terminated. It is clear from the evidence that Mr. Dondero did not like the way the bankruptcy case was playing out (his pot plan was not getting the attention or reception he hoped for from the UCC and the Debtor) and he did not like certain trading decisions that Mr. Seery was making. Conflicts of interest between the Debtor and Mr. Dondero (and the Non-Debtor Dondero-Controlled Entities) were seeming more and more problematic. It was against this backdrop that the TRO was entered. It was also against this backdrop that Mr. Dondero and his Non-Debtor Dondero-Related Entities began hiring armies of lawyers. In the midst of all of this, Mr. Dondero gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it.[155] He also communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing not to sell any CLO underlying assets. There is potential liability. Don't do it again."[156] Matt Pearson, in response, canceled scheduled sales of SKY, as well as AVYA. Mr.

---

clear and convincing that Mr. Dondero spoke directly with Mr. Ellington (as opposed to being copied on conversations among Mr. Ellington and Mr. Dondero's counsel). *See* Debtor's Exhs. 17 (DE # 80), 48 & 49 (DE # 101).

[155] 1/5/21 Transcript at 41:22-43:11.

[156] *Id.* at 43:15-44:08.

005659

Dondero also communicated with an employee of one of the Advisors named Joe Sowin regarding stoppage of trades of CLO assets.[157] Mr. Dondero also communicated with Debtor employee Thomas Surgent, the Chief Compliance Officer, to inform him that he thought Mr. Seery was engaging in improper trades of Highland CLO assets and told Mr. Surgent he might face personal liability over this.[158] Finally, Mr. Dondero communicated with a text to Mr. Seery that stated: "Be careful what you do, last warning."[159]

Mr. Dondero's "defense" of his interference—that he was looking out for investors—is neither relevant nor entirely credible. As earlier indicated, intent does not matter with civil contempt. Moreover, the evidence was credible that Mr. Dondero himself, postpetition, while still an employee of Highland, traded a significantly larger amount of the AVYA stock that was held in the Highland CLOs, sometimes at a lower price than Mr. Seery did or attempted.[160]

In summary, Mr. Dondero violated Section 3 of the TRO. His intent does not matter. He knew about the TRO. Thus, he was in contempt of court for interfering with or otherwise impairing the Debtor's business, including its decisions concerning disposition of assets controlled by the Debtor.

3. ***The TRO states in Section 2(e) that Mr. Dondero shall not violate section 362(a) of the Bankruptcy Code***.

The Debtor has argued that Mr. Dondero's actions with regard to the disappearing cell phone provided to him by the Debtor amounted to a violation of the automatic stay, section 362(a)(3) (as an exercise of control over property of the estate—*i.e.,* the phone and its data thereon) and, thus, a

---

[157] *Id.* at 50:8-14; *see also id.* at 89:8-25.

[158] *Id.* at 60:23-61-25.

[159] *Id.* at 62:25.

[160] *Id.* at 106:9-20, 159-161.

005660

violation of this provision of the TRO. While the court is more than a little troubled by the mysterious disappearance of the cell phone—just hours after entry of the TRO and after a year of numerous ESI requests by the UCC during the case—the court cannot conclude that the disappearance was a clear and convincing violation of the TRO. There may or may not be a later evaluation of whether a spoliation of evidence has occurred, but for now, this is simply a matter of whether the TRO was violated.

As earlier stated, "To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated."[161] While the court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated,"[162] the court concludes that the TRO simply was not specific enough with regard to the phone. The TRO did not specifically state "turn over your cell phone." A letter on December 23, 2020 from Debtor's counsel to Mr. Dondero's counsel later made such a demand,[163] but this was not the same as there being a mandate in the four corners of the TRO. Additionally, the Highland Employee Handbook made it clear that the phone and its data were the Debtor's.[164] But this, too, is not the same as the TRO's literal terms.

Mr. Dondero should not consider this to be a victory. ***The court reiterates that it is highly concerned about possible spoliation of evidence that may or not be presented in a contested matter later***.[165] At the same time, no one else should consider "spoliation" to be a foregone

---

[161] *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[162] *Id.*

[163] Debtor's Exh. 12 (DE # 80).

[164] Debtor's Exhs. 54 & 55 (DE # 101).

[165] *See* Fed. R. Civ. Proc. 37(e) (dealing with failure to preserve electronically stored information); *Hawkins v. Gresham*, No. 3:13-CV-00312-P, 2015 WL 11122118, at *3 (N.D. Tex. Jan. 16, 2015) (dealing with the question of whether a defendant's sale of his phone containing relevant text messages after being notified of a lawsuit was a breach of his duty to preserve evidence); *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 230-237 (D. Minn. 2019) (dealing with whether two defendants' loss of relevant text messages resulting from their phones' auto-delete function

005661

conclusion here. The court never heard testimony from Jason Rothstein or Tara Loiben (who seem to have been involved with the disappearing phone). The court never heard evidence as to whether the inhouse lawyers (*e.g.,* Scott Ellington, Isaac Leventon) properly addressed with Highland employees, such as Mr. Dondero, as they should have, the preservation notice and document requests served on the Debtor by the UCC.[166] The court also cannot be sure at this time whether there was even relevant and retrievable information on the phone. The court has many lingering questions, but it cannot find contempt of the TRO based on the TRO's lack of specificity where the cell phone was concerned.

### 4. *Other Allegations of TRO Violations*.

The Debtor has cited various other instances of Mr. Dondero's behavior that it believes were violative of the TRO. For example: (a) Mr. Dondero's alleged willful ignorance of it by not reading it or underlying pleadings associated with it; (b) trespassing on the Debtor's property after the Debtor had evicted him; and (c) allegedly interfering with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody, and

---

constituted spoliation of evidence when the defendants had explicitly discussed the possibility of litigation before the deletion and were principals of the company being sued); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC,* No. 15-CV-1893-HRL, 2016 WL 5870218, at *3-4 (N.D. Cal. Oct. 7, 2016) (dealing with whether Defendants' intentional deletion of text messages after they had discussed the likelihood of litigation was spoliation of evidence under Rule 37(e); also, whether sanctions were warranted when it was unclear whether the information contained in the deleted text messages would have been critical to plaintiff's claims); *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.,* No. 14-CV-62216, 2016 WL 1105297, at *1-2, 4-7 (S.D. Fla. Mar. 22, 2016) (dealing with whether the deletion of text messages from Defendant's cell phone as a result of the phone's auto-delete feature after he reasonably anticipated litigation was spoliation of evidence that prejudiced the Plaintiff; also, whether Defendant's failure to disable the auto-delete feature that resulted in the deletion of text messages was evidence of his intent to deprive Plaintiff of relevant evidence.); *Clear-View Tech., Inc. v. Rasnick,* No. 5:13-CV-02744-BLF, 2015 WL 2251005, at *2, 7-11 (N.D. Cal. May 13, 2015) (whether Defendants spoliated text message evidence by purposefully deleting emails and discarding cell phones after receiving messages threatening a lawsuit from Plaintiff and discussing the possibility of litigation); *Kan-Di-Ki, LLC v. Suer,* No. CV 7937-VCP, 2015 WL 4503210, at *30 (Del. Ch. July 22, 2015) (whether Plaintiff's deletion of relevant emails and loss of his cell phone constituted spoliation and whether sanctions were warranted).

[166] Debtor's Exhs. 29-33 (DE # 80).

005662

control. While the allegations are problematic, the court does not conclude these actions constituted civil contempt of the TRO.[167]

With regard to Mr. Dondero's alleged "willful ignorance" of the TRO, it is technically not a violation of any term of the TRO. The most important thing here is that Mr. Dondero cannot claim lack of knowledge of the TRO's contents. As mentioned earlier, "[a]n alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high."[168] When Mr. Dondero testified that he had not read the TRO (or the underlying pleadings supporting it), maybe he was trying to imply lack of knowledge of its terms as some sort of defense? Or maybe he really did not care to read the TRO and was relying entirely upon his counsel to tell him all of its terms. Whatever the explanation, it really does not matter much. The court determines that Mr. Dondero had the necessary knowledge of the TRO, for purposes of holding him accountable for compliance with it, but—even if he was somewhat cavalier in not actually reading the TRO line-for-line—this alone is not a violation of the TRO's terms.

With regard to Mr. Dondero's trespassing on the Debtor's property after the Debtor had evicted him, the problem here is that the "eviction" of Mr. Dondero occurred pursuant to the letter that Debtor's counsel sent to Mr. Dondero's counsel on December 23, 2010—not pursuant to the actual terms of the TRO.[169] The TRO itself did not specifically enjoin Mr. Dondero from going to

---

[167] The court should add that it does not conclude that letters sent by counsel for the Advisors and the NexPoint/HCMFA Funds, seeking to stop the sale of Highland CLO assets, and a motion that they filed to address Highland CLO management issues, constituted contempt of court by Mr. Dondero. *See* Debtor's Exh. 25 (DE # 80). While Mr. Dondero, as the President and portfolio manager of these Non-Debtor Dondero-Related entities, was/is no doubt in control of them, and while it is a very close call as to whether—through these lawyers' actions—Mr. Dondero was causing "(a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf," to interfere with the disposition of assets controlled by the Debtor, the court ultimately believes that hiring lawyers to file motions (and those lawyers taking steps leading up to the filing of the motions, such as sending letters previewing that they may take legal actions), should not be viewed as having crossed the line into contemptuous behavior. Again, this was a close call.

[168] *Kellogg v. Chester,* 71 B.R. at 38.

[169] Debtor's Exh. 12 (DE # 80).

005663

the Highland offices. The later preliminary injunction entered on January 8, 2021 for the first time contained such an injunction.[170] Thus, even though Mr. Dondero showed up in the Debtor's offices on January 5, 2021 to sit for the Debtor's virtual deposition of him, the court does not conclude that this violated a term of the TRO.

    With regard to Mr. Dondero's allegedly interfering with the Debtor's obligation to produce certain documents that were requested by the UCC and that were in the Debtor's possession, custody, and control, the court understands this to be a reference to Mr. Dondero texting Highland employee Melissa Schroth and instructing her not to turn over documents concerning the Dugaboy Trust (that were on Highland's server) without a subpoena.[171] The court has already addressed this as a TRO violation, ***since it was a communication with a Highland employee regarding matters other than "shared services."*** For the avoidance of doubt, there was no shared services agreement between the Dugaboy Trust and Highland. This clearly was a TRO violation.

  **V. Damages**.

    The Contempt Motion requests that the court (i) find and hold Mr. Dondero in contempt for violating the TRO; (ii) direct Mr. Dondero to produce to the Debtor and the UCC, within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) direct Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion, payable within three calendar days of presentment of an itemized list of expenses; (iv) impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (v) grant the Debtor such other and further relief as the court deems just and proper under the circumstances.

---

[170] DE # 59 at ¶ 5.

[171] Debtor's Exh. 19 (DE # 101).

005664

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from Mr. Dondero's non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to the TRO and Contempt Motion. The Debtor did not attempt to quantify any potential economic harm to the Debtor from Mr. Dondero's prohibited conversations with Debtor employees and attempted interference with trading. Should this matter? Once again, is this much ado about nothing? In answering this question, context matters. Recall that the Corporate Governance Settlement between the Debtor and UCC from January 2020 was ***all about removing Mr. Dondero from control of the Debtor but avoiding the drastic remedy of a Chapter 11 Trustee***. It was heavily negotiated and extremely detailed in its terms. Ultimately, Mr. Dondero was kept around at the company in a non-control capacity, but eventually conflicts between the Debtor and him (and between the Debtor and the Non-Debtor Dondero-Related Entities) became intolerable. Mr. Dondero was, therefore, terminated. But almost immediately, he essentially began instructing Debtor employees to ignore their boss (Mr. Seery) and do as Mr. Dondero said instead. All of this was occurring at a critical time when the Debtor had filed a Chapter 11 plan, was still negotiating it with creditors, and was set for a confirmation hearing—and, meanwhile, Mr. Dondero was trying

005665

to gain support for his own pot plan that would involve him regaining control of the company and/or transitioning the Debtor's managed funds over to his control. His interference—even if not ultimately resulting in quantifiable harm to the Debtor's balance sheet or cash flow—posed a risk to the Debtor's plan of reorganization that, ultimately ended up being supported by hundreds of millions of dollars-worth of creditors (in fact, all creditors except the Non-Debtor Dondero-Related Entities). The reality is that the Debtor's counsel acted quickly in bringing the Contempt Motion before much damage could be done. The fact that they acted swiftly—before the Debtor had incurred any quantifiable damage other than significant attorneys' fees—should not preclude the Debtor from alleging harm and receiving reimbursement of its attorneys' fees and expenses incurred relating to the TRO and Contempt Motion.

As far as the attorneys' fees incurred relating to the TRO and Contempt Motion, the Debtor presented invoices of the fees incurred by its primary bankruptcy counsel, Pachulski Stang, during December 2020 and January 2021, pertaining to "Bankruptcy Litigation"—much of which it represented related to its attorney time devoted to the Contempt Motion. The Debtor admitted that there were some other litigation matters mixed in these invoices.[172] Total December fees were $526,686. The court has reviewed the December invoice and conservatively estimates that **$170,919** of the fees reflected in the December invoice related to the TRO and Contempt Motion (other fees appeared to relate to other litigation matters such as the HarbourVest settlement, Pat Daugherty issues, UBS, demand note litigation, and Dugaboy claims). Total January fees were $698,770. The court has reviewed this invoice and conservatively estimates that **$195,002** of the fees reflected in the January 2021 invoice related to the TRO and Contempt Motion (again, other

---

[172] Debtor's Exhs. 38 & 39 (DE # 128).

fees appeared to relate to other litigation matters such as UBS and other litigation). These two sums total **$365,921**.

However, the hearing on this matter (as a result of continuances sought by Mr. Dondero) did not occur until March 22 & 24, 2021. The court was presented with no invoices for February or March. The court estimates that the hearing on this matter (March 22 & 24, 2021) required 10 hours of in-court time. The primary attorney handling this matter for the Debtor (Mr. Morris) charged at $1,245 per hour and his paralegal (Ms. Canty) charged $425 per hour. The court will assume that they each spent 10 hours during the day or two before the hearing preparing for it. This would amount to an additional **$33,400** of fees, bringing the total now to **$399,321**. The court stresses that it used conservative math when scrutinizing the invoices. Moreover, this represents fees only. The court assumes that the various depositions and transcripts required as a result of this litigation resulted in many thousands of dollars of additional expenses. Also, Pachulski had local counsel (Hayward & Associates) whose invoices were not submitted. Additionally, the UCC had counsel monitoring all of this (Sidley & Austin)—whose fees and expenses are reimbursed by the bankruptcy estate—and their fees and expenses have not been included. In summary, the $399,321 number is extremely conservative, and it does not include likely significant add-ons (expenses; local counsel; and UCC counsel). The court determines that it is reasonable to round the $399,321 number up approximately $50,000, to **$450,000** because of these extra items. In considering the probable effectiveness of the sanction, the financial resources of Mr. Dondero and the burden the sanctions may impose, and the willfulness of Mr. Dondero in disregarding the court's TRO, the court believes—based on information it has learned at numerous hearings about Mr. Dondero's compensation and the size of the companies he has been running for almost 30 years—he has substantial resources, and this $450,000 compensatory sanction will not place much of a burden on

005667

him at all. The court believes that there was willfulness with regard to many of Mr. Dondero's actions. The court has no idea about the probability of these sanctions being effective. Time will tell.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that Mr. Dondero may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

Accordingly, it is hereby ORDERED that:

(i)     Mr. Dondero is in civil contempt of court in having violated the court's December 10, 2020 TRO—the court having found by clear and convincing evidence that: (1) the TRO was in effect and Mr. Dondero knew about it; (2) the TRO required certain conduct by Mr. Dondero; and (3) Mr. Dondero failed to comply with the TRO;

(ii)    In order to compensate the Debtor's estate for loss and expense resulting from Mr. Dondero's non-compliance with the TRO, Mr. Dondero is directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$450,000;**

(iii)   The court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that Mr. Dondero may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by him and are not successful;

(iv)    Other sanctions are denied at this time; and

(v)     The court reserves jurisdiction to interpret and enforce this Order.

005668

### End of Memorandum Opinion and Order ###

005669

# EXHIBIT 16

Case 19-34054-sgj11 Doc 1476 Filed 11/24/20 Entered 11/24/20 15:54:16 Page 1 of 7
Case 3:23-cv-02071-E   Document 36-42   Filed 12/07/23   Page 78 of 214   PageID 5108
Docket #1476  Date Filed: 11/24/2020



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

Signed November 24, 2020

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

### ORDER (A) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (B) SCHEDULING A HEARING TO CONFIRM THE FIFTH AMENDED PLAN OF REORGANIZATION; (C) ESTABLISHING DEADLINE FOR FILING OBJECTIONS TO CONFIRMATION OF PLAN; (D) APPROVING FORM OF BALLOTS, VOTING DEADLINE AND SOLICITATION PROCEDURES; AND (E) APPROVING FORM AND MANNER OF NOTICE

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor-in-possession

(the "Debtor") seeking entry of an order:   (a) approving the adequacy of the *Disclosure*

*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*,

filed on November 24, 2020 (as amended or modified, the "Disclosure Statement"); (b)

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed thereto in the Motion.



scheduling a hearing to confirm the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as amended or modified, the "Plan"); (c) fixing an objection deadline to the Plan; (d) approving the forms of ballots, the voting deadline and solicitation procedures; and (e) approving the form and manner of notices related thereto; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given; and after due deliberation and it appearing that sufficient cause exists for granting the requested relief and that such relief is in the best interests of the Debtor's estate and creditors; it is hereby **ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The Disclosure Statement is hereby **APPROVED** for solicitation as provided for herein.

3. A hearing to confirm the Plan (the "Confirmation Hearing") will commence on **January 13, 2021, at 9:30 a.m. (prevailing Central Time)**.

4. The Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise, all without further notice to parties-in-interest.

5. The deadline to file and serve objections to the confirmation of the Plan (the "Plan Objection Deadline") shall be on **January 5, 2021, at 5:00 p.m. (prevailing Central Time)**.

6. All objections to the confirmation of the Plan, if any, must:  (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the Northern District of Texas (the "Local Rules"); (iii) be filed with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"); and (iv) be served upon by the following parties: (a) counsel for the Debtor, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA  90067, Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo, Emails: jpomerantz@pszjlaw.com, ikharasch@pszjlaw.com, and gdemo@pszjlaw.com; (b) counsel for

Case 19-34054-sgj11 Doc 1437 Filed 11/24/20 Entered 11/24/20 13:54 Page 3 of 67
Case 3:23-cv-02071-E   Document 36-42   Filed 11/04/860   Page 80 of 214   PageID 5110
Exhibit 26-2   Page 214/860

the Debtor, Hayward & Associates PLLC, 10501 N. Central Expy, Ste. 106, Dallas, Texas 75231, Attn: Melissa S. Hayward and Zachery Z. Annable, Emails: MHayward@HaywardFirm.com and ZAnnable@HaywardFirm.com; (c) counsel to the official committee of unsecured creditors, Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603, Attn: Matthew A. Clemente and Alyssa Russell, Emails: mclemente@sidley.com and Alyssa.russell@sidley.com; and (d) counsel for the Office of the United States Trustee, U.S. Department of Justice, Region 6: Northern District of Texas, Office of The United States Trustee, Earle Cabell Federal Building, 1100 Commerce Street, Room 976, Dallas, TX 75242, Attn: Lisa L. Lambert, Email: Lisa.L.Lambert@usdoj.gov (collectively, the "<u>Notice Parties</u>").

7. The Debtor shall be allowed to file a brief in support of confirmation of the Plan on or before **January 11, 2021, at 5:00 p.m. (prevailing Central Time)** and a reply to any objections to the Plan on or before **January 11, 2021, at 5:00 p.m. (prevailing Central Time)**.

8. The Court shall consider only written objections to the Plan that are timely filed by the Plan Objection Deadline and served upon the Notice Parties.

9. All objections to the Plan must (a) conform to the Bankruptcy Rules, the Local Rules and any orders of the Court in this chapter 11 case, (b) state with particularity the legal and factual grounds for such objection, (c) provide, where applicable, the specific text that the objecting party believes to be appropriate to insert into the Plan, and (d) describe the nature and amount of the objector's claim or interest.

10. Objections to the Plan not timely filed and served in accordance with the provisions of this Order shall not be heard and shall be overruled.

11. The Voting Record Date is **November 23, 2020**.

12. The deadline for casting a Ballot to accept or reject the Plan (the "<u>Voting Deadline</u>") shall be **January 5, 2021, at 5:00 p.m. (prevailing Central Time)**.

13. All Ballots accepting or rejecting the Plan must be received by Kurtzman Carson Consultants LLC (the "<u>Balloting Agent</u>") by no later than **5:00 p.m. (prevailing Central Time) on the Voting Deadline** at the following address, as specified on each Ballot, whether sent by

005673

first class mail, personal delivery, or overnight courier:

HCMLP Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

14.     Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions solely through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.

15.     The Debtor or the Court may extend the period during which votes will be accepted by the Debtor, in which case the Voting Deadline for such solicitation shall mean the last time and date to which such solicitation is extended.

16.     The forms of Ballots and voting instructions thereto, substantially in the form attached hereto as **Exhibit A**, are hereby approved.

17.     All votes to accept or reject the Plan must be cast by using the appropriate Ballot.

18.     The Solicitation Procedures are hereby approved; *provided, however*, the Debtor reserves the right to modify, amend or supplement the Solicitation Procedures subject to Court approval.

19.     No later than four (4) business days after entry of this Order, (or as soon as reasonably practicable thereafter), the Debtor shall cause the following solicitation materials (the "Solicitation Package") to be distributed to (i) all known holders of claims and interests in Classes 2, 7, 8, 9, 10 and 11 as of the Voting Record Date who are entitled to vote on the Plan, (ii) the U.S. Trustee, and (iii) the Securities and Exchange Commission:

    a.    A CD Rom or a flash drive containing the Plan, the Disclosure Statement and a copy of this Disclosure Statement Order (without exhibits);

    b.    the appropriate Ballot and voting instructions;

    c.    the Confirmation Hearing Notice;

    d.    any supplemental solicitation materials filed with the Court;  and

4

005674

      e.    a pre-addressed return envelope.

20.    The Debtor shall cause to be served on members of Classes 1, 3, 4, 5 and 6 only with (i) the Confirmation Hearing Notice, and (ii) the Notice of Non-Voting Status. Service of such documents under the procedures set forth in the Motion and this Order shall constitute adequate transmission of materials required under Bankruptcy Rule 3017(d).

21.    Creditors who have more than one claim within the same Class shall receive only one Solicitation Package and one Ballot for each claim.

22.    Each holder of a claim shall be entitled to vote to accept or reject the Plan in the amount of such claim as is held on the Voting Record Date.

23.    With respect to claims, and solely for purposes of voting on the Plan:

    a.    If an objection has not been filed to a claim, the amount of such claim for voting purposes shall be the non-contingent, liquidated and undisputed claim amount contained on a timely filed proof of claim or, if no timely filed proof of claim was filed, the non-contingent, liquidated and undisputed amount of such claim listed in the Debtor's schedules filed with the Court;

    b.    If a claim for which a proof of claim has been timely filed is wholly contingent, unliquidated or disputed, undetermined or unknown in amount, such claim shall be temporarily allowed in the amount of $1.00 for voting purposes only, and not for purposes of allowance or distribution;

    c.    If a claim is partially liquidated and partially unliquidated, such claim shall be allowed for voting purposes only in the liquidated amount;

    d.    If an objection to a timely filed claim is filed, such claim shall be disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection;

    e.    Proofs of claim filed for $0.00 are not entitled to vote;

    f.    Notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased one or more duplicate claims within the same Class shall be provided with only one Solicitation Package and one Ballot for voting a single claim in such Class, regardless of whether the Debtor has objected to such duplicate claims;

    g.    If a claim is the subject of an amended proof of claim, the originally filed proof of claim shall be deemed superseded by the later filed amended proof of claim, regardless of whether or not the Debtor has objected to such claim, and only the amended proof of claim shall be used for the

005675

purpose of determining voting eligibility in accordance with the provisions herein;

> h. For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

> i. If a claim has been disallowed by agreement of the applicable creditor or order of the Court at any time before the Voting Deadline, such claim shall also be disallowed for voting purposes; and

> j. If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution.

24. Creditors seeking temporary allowance of their claims for voting purposes must serve the Notice Parties and file with the Court a motion seeking temporary allowance for voting purposes. Any such motion, with evidence in support thereof, must be filed no later than such date that will enable a hearing thereon to be held on or prior to the Voting Deadline. It shall be the responsibility of each creditor filing such a motion to schedule a hearing thereon to occur at or prior to the Voting Deadline.

25. The following general voting procedures and standard assumptions are to be used in tabulating Ballots:

> a. Except to the extent the Debtor otherwise determines, or as permitted by the Court, Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

> b. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

> c. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

> d. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

> e. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

> f. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

g.      The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

h.      Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal.  The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; (b) overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery.  Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

i.      Ballots submitted by facsimile, email or other means of electronic transmission, other than the online balloting portal, will not be counted;

j.      No Ballot sent to the Debtor or the Debtor's financial or legal advisors shall be accepted or counted;

k.      The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with section 1127 and the terms of the Plan regarding modification).  If the Debtor makes material changes in the terms of the Plan, the Debtor will disseminate additional solicitation materials and will extend the solicitation in each case to the extent directed by the Court;

l.      If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

m.     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

n.      The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

005677

o.    Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor in its sole discretion, which determination shall be final and binding;

p.    If a designation is requested under section 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

q.    Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

r.    Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

s.    Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

t.    No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

u.    The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

v.    The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

26.    The Confirmation Hearing Notice, substantially in the form attached hereto as **Exhibit B**, is hereby approved.

27.    The Debtor shall serve the Confirmation Hearing Notice by no later than **four (4) business days following the entry of this Order (or as soon as reasonably practicable thereafter)**, on (i) the U.S. Trustee, (ii) counsel to the official committee of unsecured creditors (iii) the Securities and Exchange Commission, (iv) all creditors on the list of creditors and equity security holders maintained by the Balloting Agent in this chapter 11 case, and (v) those parties who requested notice pursuant to Bankruptcy Rule 2002.

28.     The Notice of Non-Voting Status, substantially in the form attached hereto as **Exhibit C**, is hereby approved.

29.     The Assumption Notice, substantially in the form attached hereto as **Exhibit D**, is hereby approved.

30.     Consistent with section 1126 and Bankruptcy Rule 3017(d), Solicitation Packages shall not be distributed to holders of claims in the Non-Voting Classes (*i.e.*, Classes 1, 3, 4, 5 and 6); *provided, however*, that members of Classes 1, 3, 4, 5 and 6 shall receive the Confirmation Hearing Notice and Notice of Non-Voting Status, which includes instructions on how to obtain copies of the Solicitation Package, if so desired.

31.     To the extent that the Debtor, in its sole discretion, elects to publish the Confirmation Hearing Notice, such publication, substantially in the form of Confirmation Hearing Notice attached hereto as **Exhibit B**, is approved, and the Debtor, to the extent that it elects to publish the Confirmation Hearing Notice, shall publish the Confirmation Hearing Notice in the national edition of the *Wall Street Journal* or similar paper of national circulation on or before **December 6, 2020,** and may pay the costs of such publication.

32.     The Debtor is excused from re-mailing Solicitation Packages, the Confirmation Hearing Notice, or Notice of Non-Voting Status, as the case may be, to those entities whose addresses differ from the addresses in the claims register or the Debtor's records as of the Voting Record Date.

33.     The Debtor is authorized and empowered to take all actions and execute such other documents as may be necessary to implement the relief granted herein.

34.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

### ### END OF ORDER ###

005679

**EXHIBIT A**

**Forms of Ballot for Classes 2, 7, 8, 9, 10 and 11**

005680

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE
OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN
THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS
AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 2 BALLOT – Frontier Secured Claim**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS
CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan").  All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

005681

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

> **This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "Voting Deadline"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "Record Date"), the undersigned was the holder of a Class 2 Frontier Secured Claim in the aggregate outstanding amount of $_____.[2]

**CHECK ONE BOX**

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE: You must vote <u>all</u> of your Class 2 Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2. Certification**

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)      such person or entity is the holder of the aggregate amount of the Class 2 Claim set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)     such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only. Subject to tabulation rules.

DOCS_SF:103751.2 36027/002                            2

005682

(iii)    such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of the Class 2 Claim;

(iv)    no other Ballots with respect to the Class 2 Claim identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 2 Claim, such earlier Ballots are hereby revoked;

(v)    all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
                              (If appropriate)

TITLE: _____
                              (If appropriate)

ADDRESS: _____

_____

TEL. NO. (      ) _____ - _____        DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

005683

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique Electronic Ballot ID #:_____

Unique Electronic Ballot PIN #: _____

Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.

005684

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1.  Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2.  Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3.  Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4.  Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5.  Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6.  Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7.  The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8.  Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9.  Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

005685

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

005686

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

005687

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

### CLASS 7 BALLOT – Convenience Claims

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

005688

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

### BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "Voting Deadline"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended.  Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1.  Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "Record Date"), the undersigned was the holder of a Class 7 Convenience Claim in the aggregate outstanding amount of $_____.[2]

### CHECK ONE BOX

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE:  You must vote <u>all</u> of your Class 7 Convenience Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2.  GUC Election – Optional and Voluntary Election to Receive the Treatment Provided to Class 8 General Unsecured Claims.**

If you check the box below, your Claim will receive the treatment provided to Class 8 General Unsecured Claims and you will receive (i) your Pro Rata share of the Claimant Trust Interests or (ii) such other less favorable treatment as to which you and the Claimant Trustee shall have agreed upon in writing.

If you check the box below and elect to have your Class 7 Convenience Claim treated as a Class 8 General Unsecured Claim; (i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 7 with respect to the Plan, but your Claim will receive the treatment afforded to Class 8 General Unsecured Claims; and (ii) you will be giving up all distributions to Class 7 Convenience Class Claims in exchange for the treatment provided to Class 8 General Unsecured Claims.

I hereby elect to have my Class 7 Convenience Claim identified in Item 1 treated

---

[2]  For voting purposes only.  Subject to tabulation rules.

as a Class 8 General Unsecured Claim for all purposes.

## Item 3.  Certification

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)       such person or entity is the holder of the aggregate amount of the Class 7 Convenience Claim(s) set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)      such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

(iii)     such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 7 Convenience Claims;

(iv)     no other Ballots with respect to the Class 7 Convenience Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 7 Convenience Claims, such earlier Ballots are hereby revoked;

(v)      all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

ADDRESS: _____

_____

TEL. NO. (    ) _____ - _____        DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a

claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE
VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL
COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER
ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT,
KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE
"HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR
BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL:
(310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE
THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING
AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED
BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245**

---

Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit
http://www.kccllc.net/hmlp and click on the "Submit Electronic Ballot" section of the website
and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your
customized electronic Ballot:

Unique Electronic Ballot ID #:_____

Unique Electronic Ballot PIN #: _____

Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of
your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot
ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online
portal should NOT also submit a paper Ballot.

---

005691

# VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1. Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8. Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9. Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

005692

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

005693

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

005694

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
|  | ) |
| Debtor. | ) |
|  | ) |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 8 BALLOT – General Unsecured Claims**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

## BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "<u>Voting Deadline</u>"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "<u>Record Date</u>"), the undersigned was the holder of a Class 8 General Unsecured Claim in the aggregate outstanding amount of $_____.[2]

## <u>CHECK ONE BOX</u>

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE: You must vote <u>all</u> of your Class 8 General Unsecured Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Convenience Class Election – Optional and Voluntary Election to Receive the Treatment Provided Class 7 Convenience Claims.**

If your Claim is liquidated on or before the Confirmation Date, you are eligible to make the Convenience Class Election. If you are eligible and you check the box below, your Claim will be reduced to $1,000,000 (to the extent your claim is in excess of that amount), and you will receive the treatment provided to Class 7 Convenience Claim, which is the lesser of (a) 85% of the Allowed amount of your Claim (as reduced) or (b) your pro rata share of the Convenience Claims Cash Pool ($13,150,000).

If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; (i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims; and (ii) you will be giving up all distributions to Class 8 General Unsecured Claims in exchange for the treatment provided to Class 7 Convenience Claims

---

[2] For voting purposes only. Subject to tabulation rules.

005696

I hereby elect to reduce my Claim and to receive the treatment provide to a Class 7 Convenience Claim.

## Item 2.  Certification

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)        such person or entity is the holder of the aggregate amount of the Class 8 General Unsecured Claim(s) set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)       such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

(iii)      such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 8 General Unsecured Claims;

(iv)       no other Ballots with respect to the Class 8 General Unsecured Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 8 General Unsecured Claims, such earlier Ballots are hereby revoked;

(v)        all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER:  _____

SIGNATURE:  _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

005697

ADDRESS: _____

_____

TEL. NO. (    ) \_\_\_\_\_ - _____      DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique Electronic Ballot ID #:_____
Unique Electronic Ballot PIN #: _____

Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.

005698

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1. Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8. Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9. Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

005699

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12.    If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13.    If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14.    The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15.    Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16.    If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17.    Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18.    Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19.    Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20.    No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21.    The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

005700

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

005701

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 9 BALLOT – Subordinated Claims**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended) (the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

005702

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "<u>Voting Deadline</u>"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "<u>Record Date</u>"), the undersigned was the holder of a Class 9 Subordinated Claim in the aggregate outstanding amount of $_____.[2]

**<u>CHECK ONE BOX</u>**

I hereby vote the above Claim to ACCEPT the Plan

I hereby vote the above Claim to REJECT the Plan

**NOTE: You must vote <u>all</u> of your Class 9 Subordinated Claim <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2. Certification**

By signing this Ballot, the undersigned certifies with respect to the claim(s) identified in Item 1, above, that:

(i)        such person or entity is the holder of the aggregate amount of the Class 9 Subordinated Claim(s) set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)       such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only. Subject to tabulation rules.

005703

(iii)    such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 9 Subordinated Claims;

(iv)    no other Ballots with respect to the Class 9 Subordinated Claims identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 9 Subordinated Claims, such earlier Ballots are hereby revoked;

(v)    all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

ADDRESS: _____

_____

TEL. NO. ( ) _____ - _____    DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

005704

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

**Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique Electronic Ballot ID #:_____**
**Unique Electronic Ballot PIN #: _____**

**Each Electronic Ballot ID# is to be used solely for voting on those Claims in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

---

005705

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1. Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2. Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6. Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8. Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9. Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12.      If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13.      If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14.      The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15.      Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16.      If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17.      Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18.      Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19.      Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20.      No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21.      The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

005708

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 10 BALLOT – Class B/C Limited Partnership Interests**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended)(the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL NOT BE COUNTED.**

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "Voting Deadline"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1. Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "Record Date"), the undersigned was the holder of a Class 10 Class B/C Limited Partnership Interests in the aggregate outstanding amount of $_____.[2]

**CHECK ONE BOX**

I hereby vote the above Interest to ACCEPT the Plan

I hereby vote the above Interest to REJECT the Plan

**NOTE: You must vote all of your Class 10 Class B/C Limited Partnership Interests either to accept or reject the Plan, and may not split such vote.**

**Item 2. Certification**

By signing this Ballot, the undersigned certifies with respect to the Class 10 Class B/C Limited Partnership Interests identified in Item 1, above, that:

(i)     such person or entity is the holder of the aggregate amount of the Class 10 Class B/C Limited Partnership Interests set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan; or

(ii)     such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2] For voting purposes only. Subject to tabulation rules.

005710

(iii)    such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 10 Class B/C Limited Partnership Interests;

(iv)    no other Ballots with respect to the Class 10 Class B/C Limited Partnership Interests identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 10 Class B/C Limited Partnership Interests, such earlier Ballots are hereby revoked;

(v)    all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____
(If appropriate)

TITLE: _____
(If appropriate)

ADDRESS: _____

_____

TEL. NO. ( ___ ) _____ - _____    DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING**

005711

**AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

**Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique Electronic Ballot ID #:_____**
**Unique Electronic Ballot PIN #: _____**

**Each Electronic Ballot ID# is to be used solely for voting on those Interests in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

---

005712

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1.  Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2.  Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3.  Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4.  Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5.  Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6.  Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7.  The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8.  Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery. Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9.  Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

005714

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

005715

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT**

**BALLOT FOR ACCEPTING OR REJECTING THE *FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.***

**CLASS 11 BALLOT – Class A Limited Partnership Interests**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE BALLOT.**

This Ballot may not be used for any purpose other than for submitting a vote to accept or reject the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended or modified, the "Plan"). All capitalized terms used in this ballot (the "Ballot"), including in the voting instructions attached to this Ballot (the "Voting Instructions"), but not otherwise defined therein shall have the meaning ascribed to them in the Plan.

On _____, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an Order [Docket No. ___] approving the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as may be modified or amended)(the "Disclosure Statement") as containing adequate information and authorized the above-captioned debtor (the "Debtor") to transmit the Disclosure Statement, Plan and this Ballot to holders of claims and equity security interests entitled to vote on the Plan.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on an impaired class if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims that actually vote in the class of claims voting on the Plan and more than half of the equity security interests that actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

005716

Bankruptcy Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**BALLOTS CAST BY FACSIMILE OR E-MAIL WILL <u>NOT</u> BE COUNTED.**

---

**This Ballot must be received by Kurtzman Carson Consultants LLC (the "Balloting Agent") by 5:00 p.m. prevailing Central Time, on or before January 5, 2021 (the "Voting Deadline"), unless the Debtor or the Bankruptcy Court extends the period during which votes will be accepted by the Debtor, in which case the term "Voting Deadline" shall mean the last time and date to which such date is extended. Please review the enclosed voting instructions in connection with casting your ballot or accept or reject the Plan.**

---

**Item 1.  Acceptance or Rejection of the Plan**

The undersigned certifies that as of November 23, 2020 (the "Record Date"), the undersigned was the holder of a Class 11 A Limited Partnership Interests in the aggregate outstanding amount of $_____.[2]

**<u>CHECK ONE BOX</u>**

I hereby vote the above Interest to ACCEPT the Plan

I hereby vote the above Interest to REJECT the Plan

**NOTE:  You must vote <u>all</u> of your Class 11 Class A Limited Partnership Interests <u>either</u> to accept or reject the Plan, and may <u>not</u> split such vote.**

**Item 2.  Certification**

By signing this Ballot, the undersigned certifies with respect to the Class 11 Class A Limited Partnership Interests identified in Item 1, above, that:

(i)      such person or entity is the holder of the aggregate amount of the Class 11 Class A Limited Partnership Interests set forth in Item 1 herein or is an authorized signatory, and has full power and authority to vote to accept or reject the Plan;

(ii)      such person or entity has received and reviewed a copy of the Disclosure Statement and the Plan, the Ballot and other solicitation materials and documents related thereto, and acknowledges that the solicitation of votes to accept or reject the Plan is being made solely pursuant to the statements and conditions set forth therein;

---

[2]  For voting purposes only.  Subject to tabulation rules.

(iii)     such person or entity has cast the same vote on every Ballot completed by such person or Entity with respect to holdings of Class 11 Class A Limited Partnership Interests;

(iv)     no other Ballots with respect to the Class 11 Class A Limited Partnership Interests identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 11 Class A Limited Partnership Interests such earlier Ballots are hereby revoked;

(v)     all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the undersigned shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

If the holder entitled to vote is a corporation, please sign in corporate name by authorized officer, or if a partnership, please sign in partnership name by authorized person.

NAME OF VOTER: _____

SIGNATURE: _____

BY: _____

(If appropriate)

TITLE: _____

(If appropriate)

ADDRESS: _____

_____

TEL. NO. (     ) _____ - _____     DATE: _____

This Ballot shall not constitute or be deemed a proof of claim or equity interest, an assertion of a claim or equity interest, or the allowance of a claim or equity interest.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE PLAN, DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT, KCC, VIA EMAIL AT HIGHLANDINFO@KCCLLC.COM AND REFERENCE "HIGHLAND CAPITAL MANAGEMENT, L.P." IN THE SUBJECT LINE OR BY TELEPHONE AT TOLL FREE: (877) 573-3984, OR INTERNATIONAL: (310) 751-1829.

**IN ORDER FOR YOUR VOTE TO COUNT, PLEASE COMPLETE, SIGN AND DATE THE BALLOT AND RETURN IT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE TO THE ADDRESS PROVIDED BELOW.**

005718

**If by first class mail, personal delivery or overnight mail, to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

---

**Alternatively, you may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique Electronic Ballot ID #:_____**
**Unique Electronic Ballot PIN #: _____**

**Each Electronic Ballot ID# is to be used solely for voting on those Interests in Item 1 Below of your electronic ballot. Please complete and submit an electronic ballot for each Electronic Ballot ID# you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

---

005719

## VOTING INSTRUCTIONS

The following general voting procedures and standard assumptions be used in tabulating Ballots:

1.  Except to the extent the Debtor otherwise determines, or as permitted by the Court and Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

2.  Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

3.  Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

4.  Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

5.  Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

6.  Parties holding claims or equity security interests in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

7.  The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each holder of a claim or equity security interest, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Balloting Agent or, if submitted online in accordance with the electronic voting instructions, received by the Balloting Agent through the online portal;

8.  Delivery of the original, executed Ballot to the Balloting Agent on or before the Voting Deadline is required, except where the Ballot is submitted through a customized online balloting portal The Balloting Agent is authorized to accept Ballots either by (a) regular mail facilitated by a return envelope that the Debtor will provide with each Ballot; overnight courier to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (c) personal delivery.  Additionally, the Balloting Agent is authorized to accept Ballots via electronic, online transmissions through a customized online balloting portal on the Debtor's case website maintained by the Balloting Agent. Ballots submitted via online transmission through the customized online balloting portal shall be deemed to contain an original signature;

9.  Ballots submitted by facsimile, email or other means of electronic transmission other than the online balloting portal, will not be counted.

10. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

11. The Debtor expressly reserves the right to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification).  If the Debtor makes material changes in the terms

005720

of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

12. If multiple Ballots are received from or on behalf of an individual holder of a claim or equity security interest with respect to the same claims or interests prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

13. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence satisfactory to the Debtor to so act in such capacity;

14. The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein or otherwise ordered by the Court, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

15. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

16. If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such claim or equity security interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

17. Any holder of a claim or equity security interest who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

18. Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

19. Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

20. No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

21. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

005721

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or proof of interest or an assertion or admission of a claim or equity security interest.

005722

**EXHIBIT B**

**Confirmation Hearing Notice**

005723

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### NOTICE OF: (I) ENTRY OF ORDER APPROVING DISCLOSURE STATEMENT; (II) HEARING TO CONFIRM PLAN; AND (III ) RELATED IMPORTANT DATES[2]

On [•], 2020, the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") entered its *Order (a) Approving the Adequacy of the Disclosure Statement; (b) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization; (c) Establishing Deadline for Filing Objections to Confirmation of Plan; (d) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; and (e) Approving Form and Manner of Notice* (the "<u>Disclosure Statement Order</u>"). The Disclosure Statement Order approved the *Disclosure Statement for the Ffith Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "<u>Disclosure Statement</u>"), as containing adequate information required

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms have the meanings given to them in the Plan.

005724

under section 1125(a) of the Bankruptcy Code, and authorized the Debtor to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").

**HEARING TO CONFIRM PLAN**.  A hearing to confirm the Plan (the "Confirmation Hearing") will commence on **January 13, 2021, at 9:30 a.m., prevailing Central Time**, before the Bankruptcy Court. The Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.

**PLAN OBJECTION DEADLINE**.  The Bankruptcy Court has established **January 5, 2021, at 5:00 p.m., prevailing Central Time**, as the last date and time for filing and serving objections to the confirmation of the Plan (the "Plan Objection Deadline").  All objections must state with particularity the legal and factual grounds for such objection.

In order to be considered by the Bankruptcy Court, objections, if any, must:  (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of Texas; (iii) be filed with the United States Bankruptcy Court for the Northern District of Texas; and (iv) be served upon by the following parties: (a) counsel for the Debtor, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA  90067, Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo, Emails: jpomerantz@pszjlaw.com, ikharasch@pszjlaw.com, gdemo@pszjlaw.com; (b) counsel for the Debtor, Hayward & Associates PLLC, 10501 N. Central Expy, Ste. 106, Dallas, Texas 75231, Attn: Melissa S. Hayward and Zachery Z. Annable, Emails: ZAnnable@HaywardFirm.com, MHayward@HaywardFirm.com; (c) counsel to the official committee of unsecured creditors, Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603, Attn: Matthew A. Clemente and Alyssa Russell, Emails: mclemente@sidley.com, Alyssa.russell@sidley.com; and (d) counsel for the Office of the United States Trustee, U.S. Department of Justice, Region 6: Northern District of Texas, Office of The United States Trustee, Earle Cabell Federal Building, 1100 Commerce Street, Room 976, Dallas, TX  75242, Attn: Lisa L. Lambert, Emails: Email: Lisa.L.Lambert@usdoj.gov (collectively, the "Notice Parties").

**VOTING RECORD DATE**.  **November 23, 2020**, is the record date for purposes of determining which parties are entitled to vote on the Plan.

**VOTING DEADLINE**.  **January 5, 2021** (the "Voting Deadline"), is the deadline for casting a ballot ("Ballot") to accept or reject the Plan.  All Ballots accepting or rejecting the Plan must be received by the Notice and Balloting Agent by 5:00 p.m., prevailing Central Time, on the Voting Deadline at the following address, whether by First Class Mail, hand delivery, or overnight courier: HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  If you require a Ballot, or if your Ballot is lost, damaged or destroyed, contact the Notice and Balloting Agent to obtain a replacement Ballot.

**RULE 3018 MOTION DEADLINE AND HEARING**.  It shall be the responsibility of each party who files a motion for an order pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of a claim for voting purposes to (a) file such motion with evidence in support thereof by no later than **January 5, 2021**, (b) schedule a hearing on such motion, and (c) schedule the hearing on or prior to the Confirmation Hearing.

005725

Dated: _____, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:       jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

---

**If you require additional information, you may contact the Debtor's Solicitation Agent, KCC, by calling 877-573-3984 (U.S. and Canada) or 310-751-1829 (International), by email at HighlandInfo@kccllc.com, or through the case website: http://www.kccllc.net/HCMLP.**

---

005726

**EXHIBIT C**

**Notice of Non-Voting Status**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) ) | Case No. 19-34054-sgj11 |
| Debtor. | ) ) ) | |

### NOTICE OF NON-VOTING STATUS WITH RESPECT TO
### UNIMPAIRED CLASSES DEEMED TO ACCEPT THE PLAN [2]

TO: ALL HOLDERS OF CLAIMS IN CLASS 1 (JEFFERIES SECURED CLAIM), CLASS 3 (OTHER SECURED CLAIMS); CLASS 4 (PRIORITY NON-TAX CLAIMS); CLASS 5 (RETAINED EMPLOYEE CLAIMS); AND CLASS 6 (PTO CLAIMS)

On [•], 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered its *Order (A) Approving the Adequacy of the Disclosure Statement; (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

005728

*Ballots, Voting Deadline and Solicitation Procedures; and (E) Approving Form and Manner of Notice* (the "<u>Disclosure Statement Order</u>"). The Disclosure Statement Order approved the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "<u>Disclosure Statement</u>"), as containing adequate information required under section 1125(a) of the Bankruptcy Code, and authorized the Debtor to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "<u>Plan</u>").

In accordance with the terms of the Plan and the Bankruptcy Code, holders of claims in Classes 1, 3, 4, 5 and 6 are unimpaired under § 1124 of the Bankruptcy Code and, therefore, pursuant to § 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. You have been sent this notice because you have been identified as a holder of a claim in Class 1, 3, 4, 5 or 6. This notice and the Confirmation Hearing Notice are provided to you for informational purposes only.

If you have any questions regarding the status of your claim or wish to obtain additional information, including a copy of the Plan and Disclosure Statement free of charge, you may contact KCC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to receive copies of these documents by (i) **email transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

005729

Dated: _____, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

005730

**EXHIBIT D**

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### NOTICE OF (I) EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED BY THE
### DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (III) CURE AMOUNTS,
### IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH

        **PLEASE TAKE NOTICE THAT** on _____, 2020, the United States Bankruptcy
Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No.
__] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure
Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*
(the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[2]

    **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on January 13, 2021 at 9:30 a.m. prevailing Central Time, before the Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496.

    **PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract that will be assumed by the Debtor or, alternatively, assumed by the Debtor and assigned to and assignee. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

    **PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume, or alternatively assume and assign, your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto to which you are a party.[3]

    **PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption/assignment. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

    **PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption. If an objection to the proposed assumption or related cure amount is

---

[2] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[3] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, or assumption and assignment, that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption or assumption and assignment by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

005733

sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption and/or assignment of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is January 5, 2021, at 5:00 p.m., prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the **Confirmation Objection Deadline**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption and/or assignment of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION AND/OR ASSIGNMENT OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND/OR ASSIGNMENT AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION AND/OR ASSIGNMENT OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTOR OR REORGANIZED DEBTOR ASSUMES OR ASSIGNS SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also

005734

obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to receive copies of these documents by (i) **email transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: _____, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

/s/ Zachery Z. Annable
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**Schedule A**

**Schedule of Assumed Contracts and Leases and Proposed Cure Cost**

005736

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost | Proposed Assignee of Contract or Lease |
|--------|--------------|--------------------------------------------|-----------|----------------------------------------|
|        |              |                                            |           |                                        |

005737

# EXHIBIT 17

005738

November 30, 2020

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel

> **RE:**   **Termination of Second Amended and Restated Shared Services Agreement, effective as of February 8, 2013, by and among Highland Capital Management, L.P. ("<u>HCMLP</u>"), and Highland Capital Management Fund Advisors, L.P. (the "<u>Agreement</u>").**

To Whom It May Concern:

As set forth in Section 7.02 of the Agreement, the Agreement is terminable at will upon at least 60 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

  **RE:** **Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT 18

005741

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

   Re: Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

005742

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        D. Michael Lynn

005743

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 19

005745

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

       Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

005746

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

005747

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:       Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 20

005749

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
c/o NexPoint Advisors, LP
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Demand on Promissory Notes:

Dear Mr. Dondero,

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 11/27/13 | $100,000 | $171,542.00 | $526.10 | $172,068.10 |
| 10/12/17 | $2,500,000 | $3,149,919.12 | $41,423.60 | $3,191,342.72 |
| 10/15/18 | $750,000 | $874,977.53 | $10,931.23 | $885,908.76 |
| 9/25/19 | $900,000 | $750,279.14 | $12,662.24 | $762,941.38 |
| **TOTALS** | **$4,250,000** | **$4,946,717.79** | **$65,543.17** | **$5,012,260.96** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

005750

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

005751

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 21

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| **TOTALS** | **$900,000** | **$934,330.79** | **$13,188.64** | **$947,519.43** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

005754

cc:   Fred Caruso
      James Romey
      Jeffrey Pomerantz
      Ira Kharasch
      Gregory Demo

005755

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:   Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 22



JD

Jim ›

office until Monday and
will speak with me then.

From Lynn

Tue, Nov 24, 10:39 AM

Update on UBS please

Tue, Nov 24, 1:01 PM

No update. Will let you
know if something
changes. Assume that you
and Lynn are pushing on
the Pot plan. Thanks

Tied up this afternoon

Delivered

Today 5:26 PM

Be careful what you do –
last warning.

  iMessage 

# EXHIBIT 23

Case 19-34054-sgj11 Doc 103 Filed 12/10/20 Entered 12/10/20 13:31:54 Page 1 of 4
Case 3:23-cv-02071-E Document 23-42 Filed 12/07/23 Page 167 of 214 PageID 5197
Docket #0010 Date Filed: 12/10/2020



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed December 10, 2020

United States Bankruptcy Judge

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding |
| | § | |
| vs. | § | |
| | § | No. 20-03190-sgj |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION
### FOR A TEMPORARY RESTRAINING ORDER AGAINST JAMES DONDERO

Having considered the *Debtor's Motion for a Temporary Restraining Order and*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41695.4 36027/002



1934054201210000000000006

*Preliminary Injunction against James Dondero* [Docket No. 6] (the "Motion"), the *Memorandum of Law* (the "Memorandum of Law")[2] in support of the Motion, and the *Declaration of James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order against James Dondero* [Docket No. 4] (the "Seery Declaration"), including the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and the Memorandum of Law establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is temporarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.

005761

employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "<u>Prohibited Conduct</u>").[3]

3.      James Dondero is further temporarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

4.      All objections to the Motion are overruled in their entirety.

5.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

---

[3] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in the above-referenced bankruptcy case.

005762

# EXHIBIT 24

005763

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
      In Re:                        )    Chapter 11
                                    )
      HIGHLAND CAPITAL              )    Dallas, Texas
      MANAGEMENT, L.P.,             )    Wednesday, December 16, 2020
                                    )    1:30 p.m. Docket
              Debtor.               )
                                    )    - MOTION FOR ORDER IMPOSING
                                    )    TEMPORARY RESTRICTIONS [1528]
                                    )    - DEBTOR'S EMERGENCY MOTION TO
                                    )    QUASH SUBPOENA AND FOR ENTRY
                                    )    OF PROTECTIVE ORDER [1564,
                                    )    1565]
                                    )    - JAMES DONDERO'S MOTION FOR
                                    )    ENTRY OF ORDER REQUIRING
                                    )    NOTICE AND HEARING [1439]
      _____)

                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

      WEBEX APPEARANCES:

      For the Debtor:              Jeffrey N. Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
                                    13th Floor
                                   Los Angeles, CA  90067-4003
                                   (310) 277-6910

      For the Debtor:              John A. Morris
                                   Gregory V. Demo
                                   PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
                                   (212) 561-7700

      For the Official Committee   Matthew A. Clemente
      of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
                                   Chicago, IL  60603
                                   (312) 853-7539
```

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/27/23   Page 172 of 214   PageID 5202
Exhibit B-42   Page 207 of 603

2

```
1    APPEARANCES, cont'd.:

2    For James Dondero:          D. Michael Lynn
                                 Bryan C. Assink
3                                BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
4                                420 Throckmorton Street,
                                   Suite 1000
5                                Fort Worth, TX  76102
                                 (817) 405-6900
6
     For the Issuer Group:       James E. Bain
7                                JONES WALKER, LLP
                                 811 Main Street, Suite 2900
8                                Houston, TX  77002
                                 (713) 437-1820
9
     For the NexPoint Parties:   James A. Wright, III
10                               K&L GATES
                                 State Street Financial Center
11                               One Lincoln Street
                                 Boston, MA  02111
12                               (617) 261-3193

13   For Highland CLO Funding,   Rebecca Matsumura
     Ltd.:                       KING & SPALDING, LLP
14                               500 West 2nd Street, Suite 1800
                                 Austin, TX  78701
15                               (512) 457-2024

16   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
17                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
18                               (214) 753-2062

19   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
20                               Shady Shores, TX  76208
                                 (972) 786-3063
21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/07/23   Page 173 of 214   PageID 5203
Exhibit 23-42   Page 207 of 603

3

Case 3:23-cv-02071-E   Document 23-42   Filed 12/07/23   Page 173 of 214   PageID 5203

| | |
|---|---|
| 1 | <u>DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.</u> |
| 2 | THE COURT:  All right.  This is Judge Jernigan.  We |
| 3 | have settings in Highland.  We have -- I guess the very first |
| 4 | thing that we had set today was a motion of Dondero, Mr. |
| 5 | Dondero wanting some sort of revised procedures for "future |
| 6 | estate transactions occurring outside the ordinary course of |
| 7 | business."  Then, related to that, we received the other day |
| 8 | -- I'm not showing it on the calendar, I'm not sure if that |
| 9 | means it's moot now or not, but we had a motion for protective |
| 10 | order and a motion to quash with regard to certain depositions |
| 11 | that Mr. Dondero wanted in connection with his motion.  The |
| 12 | Debtor filed that motion to quash.  It was to quash a |
| 13 | deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr. |
| 14 | Caruso.  And then we have the CLO Motion, what I'm calling the |
| 15 | CLO Motion, of -- |
| 16 | (Interruption.) |
| 17 | THE COURT:  Okay.  Let's -- |
| 18 | MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz. |
| 19 | The first two motions have been resolved.  And after Your |
| 20 | Honor takes appearances, I'm happy to inform the Court of the |
| 21 | proposed resolution, and there's an agreed order that we would |
| 22 | upload after the hearing. |
| 23 | THE COURT:  Okay.  Well, that is certainly music to |
| 24 | my ears.  All right.  So I was just trying to lay out the |
| 25 | program for what I thought was set, potentially three motions, |

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 28-242    Filed 12/07/23    Page 174 of 214    PageID 5204
Exhibit B-242    Page 20 of 60

4

1 | one of which was a deposition dispute.

2 |     All right.  So let's go ahead and get appearances.  Mr.

3 | Pomerantz, you're obviously appearing for the Debtor team.

4 |     MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5 | good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6 | Ziehl & Jones.  Also on the video with me today are John

7 | Morris and Greg Demo.  They will be handling the CLO Motion,

8 | and I will be reporting to the Court on the resolution of Mr.

9 | Dondero's motion and our corollary discovery motions.

10 |     THE COURT:  Okay.  All right.  Well, why don't I take

11 | an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12 | there.

13 |     MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14 | Assink, who will replace me after the preliminaries when our

15 | business is done.  Other than concurring with Mr. Pomerantz, I

16 | wanted to advise Your Honor that in the last 30 minutes we

17 | filed an additional motion where we're seeking a clarification

18 | with respect to the temporary restraining order that the Court

19 | entered last week.

20 |     THE COURT:  All right.  Well, I did see an email from

21 | my courtroom deputy right before walking in about that motion,

22 | and so that's why I was a little surprised and said "Music to

23 | my ears" that there was an agreed order on the Dondero

24 | motions.  But I'll get the details --

25 |     MR. LYNN:  Well, we're --

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-6   Exhibit 23-6-42   Filed 12/27/23   Page 175 of 214   PageID 5205

5

1          THE COURT:  I'll get the details about that in a

2     minute.  Let me go ahead and get the other appearances.

3        For the Movants on what I've called the CLO Motion, who do

4     we have appearing?

5          MR. WRIGHT:  Good afternoon, Your Honor.  It's James

6     Wright of K&L Gates for the -- I guess I'll call them the

7     Movant for this motion.

8          THE COURT:  Yes.  Sometimes you're referred to as the

9     Advisors and the Funds and -- but Movants on Docket Entry

10    1528.

11       All right.  For the Committee, I know you have weighed in

12    on a couple of these motions.  Who do we have?

13         MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14    Clemente with Sidley Austin on behalf of the Committee.

15         THE COURT:  All right.  Well, we have a lot of folks

16    on the phone.  I think I've covered everybody who filed a

17    pleading for today.  Is there anyone else who would like to

18    appear?  I'd really like to restrict it only to those who have

19    filed pleadings today.

20         MS. MATSUMURA:  This is Rebecca Matsumura from King &

21    Spalding representing Highland CLO Funding, Ltd.  I don't

22    expect I'll be weighing in today, but there are a couple

23    issues that I may say a sentence on, so I want to go ahead and

24    make my appearance now.

25         THE COURT:  All right.  Thank you.  Anyone else?

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-42    Filed 12/22/23    Page 176 of 214    PageID 5206
Exhibit 23-42    Page 22 of 60

6

1          MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2     Walker; on behalf of the CLO Issuers.

3          THE COURT:  All right.

4          MR. BAIN:  And Your Honor, if we may make certain

5     comments at the requisite time, we'd appreciate it.

6          THE COURT:  All right.  Thank you.  Anyone else?

7       All right.  Well, Mr. Pomerantz, let's hear about the

8     agreements you have on the Dondero-related motions.

9          MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10    Lynn is correct, we saw also an emergency motion that came

11    through that I'll have a couple of comments at the end of my

12    presentation.

13      So, as I mentioned before, Your Honor, I'm pleased to

14    report that with respect to the two motions that Your Honor

15    scheduled for today's hearing, we have an agreement with Mr.

16    Dondero.  One was the motion of Mr. Dondero requiring

17    transactions out of the ordinary course to be brought before

18    this Court.  The second was the Debtor's motion to quash a

19    series of subpoenas that had been issued in the last two days,

20    requiring board members and others to testify.

21      As part of the agreement, we have agreed with Mr. Dondero

22    that his motion, which is presently set for today, shall be

23    continued to January 4th, which is the same date set as the

24    continued hearing on the preliminary injunction relating to

25    the TRO that Your Honor had entered last week.

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-242   Filed 02/27/23   Page 177 of 214   PageID 5207
Exhibit 23-242   Page 227 of 603

7

1     As part of that agreement, the Debtor has agreed that it

2     will provide Mr. Dondero with three business days' notice

3     before selling any non-security assets from any managed funds

4     accounts through and including January 13th, which is the date

5     set for confirmation.

6     While, as the Court is aware, the Debtor doesn't believe

7     that any notice, opportunity for hearing, or an order from the

8     Court is required in connection with such transactions, as the

9     Debtor does not have any current plans to sell non-security

10    assets from managed funds before confirmation, it was willing

11    to agree to the notice requirement as essentially a way of

12    resolving the motion before Your Honor today and continuing

13    until the 4th.

14    As part of the agreement as well, Your Honor, the parties

15    have agreed that there will be no further discovery in

16    connection with the motion that is set.  That'll be no

17    additional discovery by Mr. Dondero, so he is withdrawing the

18    subpoenas as it relates to this motion, and there will be no

19    further discovery as -- by the Debtor.  As Your Honor, I

20    think, is aware, there were depositions conducted of both Mr.

21    Seery and Mr. Dondero on Monday in connection with this

22    motion, but the discovery will not happen over the next couple

23    of weeks.

24    Mr. Dondero wanted to make sure, and the Debtor didn't

25    have any opposition, that that agreement with respect to no

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/22/23   Page 178 of 214   PageID 5208
Exhibit 23-42   Page 207 of 603

8

1    discovery only relates to the pending motion before the Court.

2    And in connection with any other matters relating to this

3    bankruptcy case, Mr. Dondero would reserve the right to pursue

4    discovery, and of course the Debtors would reserve the right

5    to challenge discovery if we believed it was inappropriate or

6    unduly burdensome.

7         With respect to the motion that was just filed, Your

8    Honor, we had a chance to briefly review it.  We haven't had a

9    chance to discuss it with the board.  In any event, we don't

10   think there's an emergency.  Mr. Dondero wants the opportunity

11   to approach and communicate with the board.  I've told Mr.

12   Lynn that communications regarding the plan are to go through

13   Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14   He's the chief restructuring officer.  And at this point, the

15   board doesn't see a reason or have a desire to meet with Mr.

16   Dondero to talk about his plan, but, again, would be happy to

17   receive any written communications that Mr. Dondero has.

18        Mr. Dondero has sought to modify the TRO to allow him to

19   speak to the board.  Again, if the board agreed to speak with

20   Mr. Dondero, that wouldn't violate the TRO, provided that

21   counsel would be present.  But at this point, the board has

22   decided that it would be inappropriate and not a good use of

23   anyone's time to have that communication and that Mr. Dondero

24   should continue to communicate through Mr. Seery, the Debtor's

25   chief executive officer.

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-242   Filed 22/27/23   Page 179 of 214   PageID 5209
Exhibit 23-242   Page 273 of 603

9

1       If Your Honor, after reading the motion and hearing my

2   comments, and I'm sure Judge Lynn's comments that he will make

3   to Your Honor, Your Honor wants to set it for hearing, we

4   would submit, Your Honor, there's no emergency and that a

5   hearing could be set next week, but we would think Your Honor

6   might be able to dispose of the motion just on the papers and

7   the limited argument that would go on today.

8           THE COURT:  All right.

9           MR. POMERANTZ:  Thank you, Your Honor.

10           THE COURT:  All right.  Mr. Lynn, first, could you

11   confirm the terms of the agreed order that Mr. Pomerantz just

12   announced are consistent with what you and your client

13   believed was negotiated?

14           THE CLERK:  He's on mute.

15           THE COURT:  You're on mute, sir.

16           MR. LYNN:  Mr. Pomerantz has correctly stated the

17   agreement of the parties.  I am pleased to advise Your Honor

18   that I expect that we will withdraw the motion that is

19   presently pending to be heard on January 4th, since all we

20   were asking for was notice until confirmation date.  If those

21   sales are going to take place before then, we don't have a

22   problem any longer with the pre-confirmation activity of Mr.

23   Seery.

24       With regard to the motion that we filed requesting that

25   the temporary restraining order be modified, we would point

005772

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/07/23   Page 180 of 214   PageID 5210
Exhibit 23-42   Page 22423 of 603

10

1    out, respectfully, that the independent board is the board of

2    directors of Strand Advisors.  Strand Advisors belongs to Mr.

3    Dondero.  It is not unreasonable for the sole stockholder of

4    Strand Advisors to ask the board questions or present thoughts

5    to the board or ask its advice.  Mr. Seery, on the other hand,

6    while being a member of the board of Strand, is the chief

7    executive officer and the chief restructuring officer of

8    Highland, which is not the same as Strand.

9         Furthermore, Your Honor, Mr. Dondero has been attempting

10   for several months to negotiate an arrangement by which the

11   Debtor can continue as a going concern.  It is his desire to

12   discuss further with the board as a whole what he can do in

13   that regard.  I think the Court, by directing him originally

14   to participate in the mediation that took place in September,

15   expected him to do so.  He has attempted to do so.  And while

16   he has not gotten a response from the Creditors' Committee

17   that is definitive, he has at least caught the interest of Mr.

18   Seery, though that interest may have died for a variety of

19   reasons in recent weeks.

20        And by the way, next week is fine with us.  We're not in a

21   hurry beyond that if the Court feels further discussion would

22   be useful.

23           MR. POMERANTZ:  Your Honor, just a couple of points

24   in response.

25        Mr. Dondero has the right to request an audience with the

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 28-42   Filed 12/27/23   Page 181 of 214   PageID 5211
Exhibit 23-42   Filed 12/27/23   Page 181 of 214

11

 1   board.  He has requested the audience with the board.  The

 2   board has considered it and decided not to communicate in that

 3   fashion with Mr. Dondero at this time.  There is nothing that

 4   Your Honor can do in the TRO that would change that, other

 5   than ordering the board to speak with Mr. Dondero, which I

 6   highly doubt Your Honor would do.

 7        Having said that, this board in general and Mr. Seery in

 8   particular have been very supportive of an overall resolution

 9   to this case, not only with the creditors, but with Mr.

10   Dondero.  Mr. Seery has spent tens if not hundreds of hours

11   over the last several months working with Mr. Dondero to try

12   to get him in a position to present something that would have

13   traction with the Unsecured Creditors.  Unfortunately, that

14   hasn't occurred.  We understand there have been communications

15   between Mr. Lynn and Mr. Clemente.  And if there is any hope

16   of a plan and any traction with the creditors, this Debtor in

17   general and Mr. Seery in particular stands ready, willing, and

18   able to do anything within the Debtor's power to help that

19   out.

20        So, it's not really the Debtor standing in the way.  It's

21   an economic agreement ultimately that needs to be reached with

22   Mr. Clemente and his constituents and Mr. Lynn.  And if that

23   can be reached, we will be the first to jump on that bandwagon

24   and do everything humanly possible to have that occur.

25        Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3817-4 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 3:23-cv-02071-E Document 23-42 Filed 12/27/23 Page 182 of 214 PageID 5212
Exhibit B-2 Page 207 of 603

12

1              THE COURT:  All right.  Well, again, I've not read

2     the motion.  I've just seen an email that I have this motion.

3     I'm a little bit confused.  I don't want to spend too long on

4     this because we have another motion to get to.  But I'm a

5     little bit confused on how Dondero wants the TRO to be

6     modified.  If he has the right already to request an audience

7     of the board, what is it that is problematic about the TRO

8     that he wants modified?

9              THE CLERK:  He's on mute.

10             THE COURT:  You're on mute.

11             MR. LYNN:  Sorry, Your Honor.  As I told you before,

12    you must forgive me, my command of technology is not great.

13        In response, I would say that I question whether it is

14    appropriate, in advance of a meeting with the board of his

15    company, that what he wants to talk about should be screened.

16    And that is what has occurred in our effort to meet by

17    telephone with the board.

18        Any such meeting would, of course, be subject to the

19    restraints that are included in the temporary restraining

20    order, in that both Mr. Pomerantz or his designee and I would

21    participate in any such discussion.  I respectfully submit

22    Strand is his.  Nobody may like that, but it is his, and he

23    ought to be able to talk to his own board.

24             THE COURT:  Is this about having a conversation

25    without the Committee's involvement?  I just don't -- hmm.  I

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/27/23   Page 183 of 214   PageID 5213
Exhibit 23-42   Page 22723 of 603

13

just need to see the motion.

Mr. Clemente, anything you want to add at this juncture? Have you even reviewed the motion yet?

MR. CLEMENTE:  Your Honor, I apologize.  I haven't actually even seen the motion.  And so I have no comment on it, Your Honor.  I apologize for not having been able to look at it.

THE COURT:  Okay.  Well, what about the agreed order that's been announced?  Any comment on that?

MR. CLEMENTE:  Your Honor, we support the resolution that Mr. Pomerantz announced on the record.

THE COURT:  Okay.  All right.  Well, I assume there's nothing further, then, on the Dondero motions that were scheduled today?

All right.  So I will happily accept the agreed order that has been announced.  For now, we will continue the Dondero motion that was Docket Entry No. 1439 to January 4th, when the preliminary injunction hearing is set.  And we -- I understand there are going to be no more discovery requests in connection with these matters that were set today.

And I will review the motion that Mr. Dondero has filed shortly before today's hearing in chambers later, and I will have my courtroom deputy communicate to the lawyers whether I see fit to set it for an emergency hearing next week or rule on the pleadings or set it for January 4th.  Those are, I

Case 19-34054-sgj11 Doc 3817-4 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 3:23-cv-02071-E Document 23-4 Filed 11/27/23 Page 184 of 214 PageID 5214

14

1    guess, the three possibilities I can think of that I might

2    decide upon.

3        So, again, I'm not making any ruling at all on a motion I

4    haven't read yet. So I'll -- the courtroom deputy will let

5    you all know, if not later today, tomorrow. Probably

6    tomorrow, because I have a confirmation hearing set later

7    today in another case.

8        All right. So, thank you all for working these issues

9    out. And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10   Lynn, anything further on the Dondero disputes?

11           MR. POMERANTZ: Nothing from the Debtor, Your Honor.

12           MR. LYNN: Your Honor, nothing from Mr. Dondero. May

13   I be excused?

14           THE COURT: Is anyone anticipating needing Mr.

15   Dondero's counsel for the other matter? All right. If not,

16   then I certainly have no problem with you dropping off the

17   line, Mr. Lynn. Thank you.

18           MR. LYNN: Thank you, Your Honor.

19           THE COURT: Okay. All right. So let's turn next to

20   the CLO Motion. I take it there are no agreements on this

21   one?

22           MR. POMERANTZ: There are not, Your Honor.

23           MR. WRIGHT: There are not, Your Honor. I can

24   confirm that.

25           THE COURT: All right. Mr. Wright, do you have

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/27/23   Page 185 of 214   PageID 5215
Exhibit B-42   Page 229 of 603

15

1   anything you want to say as far as an opening statement before

2   we go to the evidence?

3         MR. WRIGHT:  I don't, Your Honor.  My intention, if

4   it's okay with you, you asked me to bring a witness, so I do

5   have Mr. Norris from my client, and I was going to just remind

6   the Court who I am and state the name of all of my Movants,

7   and then I was going to move directly to put him on the stand

8   and go through a brief direct.

9         THE COURT:  All right.  I think I heard Mr. Morris is

10   going to handle this phase of the hearing.

11         MR. DEMO:  And Your Honor, this is Greg Demo from

12   Pachulski on behalf of the Debtor.

13         THE COURT:  Oh, okay.

14         MR. DEMO:  We would like to make a brief opening

15   statement before we have witnesses, if that's all right with

16   Your Honor.

17         THE COURT:  All right.  I'm fine with that.  So, --

18         MR. DEMO:  All right.

19         THE COURT:  -- go ahead.

20         MR. DEMO:  All right.  Well, thank you, Your Honor.

21   Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22     We are here today on what really amounts to the third of

23   three motions that deal with Mr. Dondero's attempts, either

24   directly or through a proxy, to transfer control away from the

25   Debtor and back to Mr. Dondero.

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/28/23   Page 186 of 214   PageID 5216
Exhibit B-42   Page 208 of 603

16

1    The current motion is filed by NexPoint Capital and

2    Highland Capital Management Fund Advisors and three of their

3    managed funds:  Highland Income Fund, NexPoint Capital, and

4    NexPoint Strategic Opportunities Funds.

5    Mr. Dondero owns and controls NexPoint Capital and

6    Highland Capital Management Fund Advisors.  While both

7    NexPoint Capital and Highland Capital Management Fund Advisors

8    are governed by boards, the boards have no investment

9    authority with respect to the funds they manage, nor was the

10   boards' approval necessary to file the motion, or obtained.

11   Mr. Dondero is the sole portfolio manager for NexPoint

12   Strategic Opportunities Fund and Highland Income Fund.  Mr.

13   Dondero is one of three portfolio managers for NexPoint

14   Capital.  Mr. Dondero's decisions are not subject to

15   oversight.

16   The Movants disclosed these facts in their recent SEC

17   filings, and there can be no dispute that Mr. Dondero is the

18   controlling figure behind the Movants in the relief being

19   sought in the motion which seeks to impede the Debtor's

20   efforts to exercise its rights as a CLO manager.

21   The fact that this motion was even filed is quite

22   surprising, since on December 7th the Debtor filed a complaint

23   and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24   the Debtor's efforts to sell assets from the very CLOs that

25   are the subject of this motion.

005779

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/27/23   Page 187 of 214   PageID 5217
Exhibit 23-42   Page 207 of 603

17

1        The Court granted the TRO on December 10th.  Mr. Dondero

2   also filed a motion seeking similar relief in November, which

3   has now been adjourned to January 4th.

4        The Movants are essentially now seeking an order from this

5   Court enjoining the Debtor from exercising its rights as a CLO

6   manager and requiring the Debtor to seek the Movants' and Mr.

7   Dondero's permission to fulfill its obligations as a manager

8   for the CLOs.

9        The Movants, however, do not come right out and say this,

10  and instead couch the motion as seeking to simply pause the

11  CLOs' asset sales while the Movants and the Debtor engage in

12  discussions regarding the future of the CLOs' management.

13       In the motion, the Movants also argue the Debtor has made

14  decisions detrimental to the interests of the preference

15  shareholders because the Debtor is trying to monetize its

16  assets in a manner inconsistent with the preference shares'

17  objectives.

18       The Movants simply mischaracterize the facts, the parties'

19  respective rights under contracts, and the law.

20       First, to the extent the Movants hold interests, they hold

21  only preference shares in the CLOs and are minority investors

22  in the preference shares of 12 of the 15 CLOs at issue.  In

23  one third of the CLOs, the Movants' interests sit behind

24  senior debt which must be paid first.

25       Notably, Your Honor, no other investors in the CLOs are

005780

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 28-42    Filed 09/27/23    Page 188 of 214    PageID 5218

18

1    here or have expressed support for the Movants' position.

2          Second, the Movants simply have no right under the

3    contracts governing the CLOs to the relief they are

4    requesting.  The CLOs are governed by a series of agreements

5    which were agreed to long ago and dictate the rights of all

6    investors of the CLOs.  The enforceability of those agreements

7    is relied on by all investors, not just the Movants.

8          Under these agreements, investment discretion is given to

9    the CLOs' manager -- in this case, the Debtor -- and no

10    investor has the right to direct the CLO manager.  The manager

11    was chosen to manage the CLOs' assets.  No individual investor

12    was chosen to manage the CLOs' assets.

13          Simply said, there will be no evidence that the Movants

14    have the right to do what they're trying to do, and there will

15    be no evidence that the Movants' preferences with respect to

16    the CLOs' assets is in line with that of the other investors

17    in the CLOs.

18          Under the relevant agreements, if an investor is not happy

19    with a manager's performance, the investor's rights are

20    generally limited to replacing the manager.  The investors

21    here -- excuse me, the Movants here -- have not done that and

22    cannot do that.  Under the agreements, replacement requires at

23    least the majority of the preference shares that are not

24    affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25    hold a substantial minority interest position.  They are not

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-42    Filed 08/07/23    Page 189 of 214    PageID 5219
Exhibit 2-42    Page 203 of 603

19

1    the majority.  In the three CLOs in which they are the

2    majority, the Movants still cannot replace the Debtor as the

3    investment manager because they are the Debtor's affiliates.

4        It is indisputable that, prior to January 9th, when Mr.

5    Dondero was removed from control of the Debtor, that the

6    Debtor, NexPoint Advisors, Highland Capital Management Fund

7    Advisors, and the three funds were the Debtor's affiliates

8    because of Mr. Dondero's common control.

9        After January 9th, where the Court removed Mr. Dondero

10   from control of the Debtor, the Debtor is arguably, under the

11   documents, not an affiliate.  However, Your Honor, the Movants

12   have disclosed in their recent proxy statements filed in 2020

13   that they still consider themselves the Debtor's affiliate,

14   and they should be bound by that statement.  The Movants, by

15   virtue of Mr. Dondero's being removed from control of the

16   Debtor, should not be able to use that removal to reassert

17   control over the CLOs that were taken away from Mr. Dondero

18   when he was removed in January 2020.

19       The Debtor believes that additional briefing may be needed

20   on this issue, and that a ruling specifically on this issue

21   and the parties' relative rights under the CLO management

22   agreements may be needed.  The Debtor reserves its right to

23   brief this issue and to bring it before this Court, either as

24   a declaratory judgment or any other procedurally-appropriate

25   motion.

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/28/23   Page 190 of 214   PageID 5220

20

1    Because the Debtor -- excuse me.  The Movants have no

2    right to the relief requested.  They argue that the relief is

3    justified because of the mismatch between the investors'

4    timelines and the Movants'.  This is not true.  The Movants

5    cite to three transactions to justify their statement in the

6    motion:  SSP, OmniMax, and certain recent transactions.

7        The recent transactions were the attempted sales of two

8    public equities immediately before Thanksgiving that Mr.

9    Dondero interfered with.  You'll hear testimony from Mr. Seery

10   about each of these transactions and how each was in the best

11   interest of the CLOs.

12       First, SSP.  SSP is a steel business that was suffering

13   for a number of reasons.  The Debtor's investment team

14   believed SSP should be sold since 2019.  The Debtor received

15   multiple offers for SSP, the Debtor evaluated these offers,

16   and the Debtor choose the one that was the best.  The SSP sale

17   closed in early November.

18       Notably, Your Honor, none of the CLOs held an equity

19   interest in SSP, its parent, or in Trussway.  Instead, they

20   held debt, and they got exactly what they bargained for,

21   repayment of their debt obligations in full.

22       OmniMax, Your Honor, is the second one.  It is a

23   fabricator of building materials.  The CLOs and the Movants

24   held an interest in OmniMax debt which they have been trying

25   to refinance or equitize since 2019.  That deal was intended

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 28-42   Filed 12/28/23   Page 191 of 214   PageID 5221
Exhibit 23-42   Page 228 of 603

21

1  to include the Movants, but instead of working with the

2  Debtor, Mr. Dondero held out and used the threat of litigation

3  against OmniMax to secure a higher price for the Movants, to

4  the detriment of the CLOs.

5       As Mr. Seery will testify, these two transactions were all

6  about maximizing value and have nothing to do with investment

7  timelines.

8       Finally, Your Honor, the Movants reference the

9  Thanksgiving transactions.  These transactions were discussed

10 in the context of Mr. Dondero's TRO.  Mr. Seery directed

11 Debtor personnel, on the advice of his investment team, to

12 sell these securities.  Mr. Dondero blocked those trades.  Now

13 the Movants argue that the reason those trades were blocked

14 was because of a mismatch between the Movants' and the

15 Debtor's investment timelines.  That is not the case.  Mr.

16 Seery will testify as to these trades.  The Debtor is an

17 investment manager and appreciates that its decisions with

18 respect to how it manages its assets are -- is a judgment

19 call.  The evidence, however, will show that the Debtor at all

20 times exercised that judgment in good faith based on all

21 available information.

22      The Movants may disagree with the Debtor's judgment, Your

23 Honor, but that is irrelevant.  The Movants have no right to

24 interfere with the Debtor's management of the CLOs.  There is

25 simply no statutory or contractual basis for this, not under

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/28/23   Page 192 of 214   PageID 5222
Exhibit 23-42   Page 227 of 603

22

1   Section 363 and not under the CLO agreements.

2          Finally, Your Honor, -- I guess not finally.  There's one

3   more point I want to make.  But Your Honor, this -- what we're

4   here on today is notably similar to the Acis bankruptcy that

5   Your Honor noted last time we were here last week.  In that

6   bankruptcy, HCLOF tried to direct the collateral manager to

7   take certain actions that HCLOF thought were in the best

8   interest of the CLOs.  In this case, the Movants, through Mr.

9   Dondero, are trying to file an action that functionally seeks

10  to direct the Debtor to take interests that the Movants

11  believe are in their best interest.  There is substantial

12  overlap between the litigation in Acis and the litigation

13  here.

14         Finally, Your Honor, the Debtor has been in discussions

15  with the CLOs' counsel on this issue.  And the Debtor has been

16  informed that the CLOs' position is that the Debtor's ability

17  to operate under the management agreements should not be

18  interfered with, not by the Movants or not by any other party.

19         Thank you, Your Honor.  With that, I will turn it over to

20  Mr. Norris.  Or, I'm sorry, Mr. Wright.

21             THE COURT:  All right.  Mr. Wright, you may call your

22  witness.

23             MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24  should be -- should be dialed in and should be available on

25  screens.

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/27/23   Page 193 of 214   PageID 5223
Exhibit B-42   Page 208 of 603

Norris - Direct                          23

```
 1              THE COURT:  Okay.  I'm going to --

 2              MR. WRIGHT:  I'll pause and have him confirm that.

 3              THE COURT:  I'm going to ask you, Mr. Wright, to

 4   speak up or closer to your device.  I didn't hear the name of

 5   your witness.

 6              MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

 7   last time, you were having trouble hearing me, and so I'm

 8   trying a different device this time.  I actually followed the

 9   instructions that I found very helpful, so I'm trying my phone

10   in hopes that it will work better.

11              THE COURT:  All right.

12              MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13   I-N, N-O-R-R -- N-O-R-R-I-S.

14              THE COURT:  All right.  Mr. Norris, can you say

15   "Testing one two" so we pick up your video?

16              MR. NORRIS:  Testing one two.

17              THE COURT:  All right.

18              MR. NORRIS:  Testing one two.

19              THE COURT:  All right.  Please raise your right hand.

20           DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21              THE COURT:  All right.  Mr. Wright, you may proceed.

22              MR. WRIGHT:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24   BY MR. WRIGHT:

25   Q    Mr. Norris, you're employed by NexPoint Advisors?
```

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 13-242    Filed 12/28/23    Page 194 of 214    PageID 5224
Exhibit 23-242    Page 208 of 603

Norris - Direct                            24

1    A    I am.  That's correct.

2    Q    And what is your title and role there?

3    A    Yeah.  I am the executive vice president of NexPoint

4    Advisors.  In that role, I oversee business development,

5    marketing, sales, investor relations.  And as far as the funds

6    advised by the advisor, I'm the liaison with the independent

7    board on the business side.

8    Q    Thank you.  Do you also have a role for Highland Capital

9    Management Fund Advisors?

10    A    I do.  I'm also the same executive vice president and

11    fulfill that same role as it pertains to business development,

12    sales, investor relations.  And in both, I'm also working on

13    product development.  So, launching, developing new products

14    and investment funds.

15    Q    Do you also have a role for Highland Income Fund, NexPoint

16    Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17    A    I do.  I'm also executive vice president for each of those

18    funds.

19    Q    Thank you.  Have you ever served on the boards of these

20    three funds?

21    A    I have.  I've served as the interested trustee, sole

22    interested trustee for each of these funds.  I'm no longer the

23    board member or interested trustee, but still serve as an

24    officer, executive vice president, for each fund.

25    Q    At times, I'm going to refer to NexPoint Advisors, LP and

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/29/23   Page 195 of 214   PageID 5225
Exhibit 28 Page 238 of 603

Norris - Direct                          25

1    Highland Capital Management Fund Advisors, LP simply as the

2    Advisors, to avoid having to keep saying their long names.

3    And similarly with the three funds that are part of the

4    motion, I may just call them the Funds.

5        Can you explain the relationship between the Advisors and

6    the Funds, briefly?

7    A    Yeah.  So, each of these are investment companies that are

8    registered under the Investment Company Act of 1940.  So, with

9    that comes a unique relationship between an investment advisor

10   and the funds themselves.  The Funds don't have employees.

11   They rely on the investment advisor and investment advisor

12   employees.  And between the Funds and the Advisors is an

13   investment advisory agreement.  And the Funds themselves are

14   also overseen by an independent board, and that's by statute

15   by the 1940 Act.

16   Q    Okay.  And just to be clear, when you said that these are

17   -- entities are investment companies, you meant that the three

18   Funds are investment companies?

19   A    Correct.  Correct.  The three Funds are investment

20   companies.  The investment advisors are not investment

21   companies.

22   Q    Thank you.  Can you explain the role of the board for the

23   Funds?

24   A    Yeah.  So, as prescribed by the Investment Company Act of

25   1940, there are certain obligations related to an investment

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/04/23   Page 196 of 214   PageID 5226

Norris - Direct                              26

1  company, and one of those is they must be overseen by an

2  independent board.  And the independent board has a

3  responsibility to oversee the -- certain material agreements,

4  including the advisory agreement.  And we meet regularly with

5  the boards.  They overseas certain processes and, again, all

6  material contracts.  And the board is, by Section 15(c) of the

7  1940 Act, required by law to annually review the capabilities

8  of the Advisor and to either approve or reject the advisory

9  contracts.  So, each year, those contracts are renewed by the

10 independent board.

11     There are certain obligations of the Fund and operations

12 that are delegated responsibility to the investment advisors.

13 That includes portfolio management and investment decisions.

14 But all those are overseen by the board.

15 Q   Okay.  And are the boards involved in the day-to-day

16 operations of the Funds?

17 A   They're not.

18 Q   Okay.  And do you know who the members of the boards of

19 these three Funds are?

20 A   I do.

21 Q   Could you share that with us?

22 A   Yeah.  So, the -- there is one interested trustee of each

23 board, and that's John Honis.  And then for the Highland

24 Income Fund and the NexPoint Strategic Opportunities Fund --

25 sorry, for NexPoint -- for Highland Income Fund and NexPoint

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-242   Filed 204/23 6 Page 197 of 214   PageID 5227

Norris - Direct                        27

 1   Capital, we have the same three disinterested or independent

 2   trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

 3   Powell.  And for NexPoint Strategic Opportunities Fund, we

 4   have the same four trustees, one interested, three

 5   independent, but there's another fourth independent trustee,

 6   Ed Constantino.

 7   Q    And when you refer to independent trustees, do you mean

 8   independent for purposes of the Investment Company Act of

 9   1940, as amended?

10   A    That's correct.  They, by statute, they are independent

11   trustees.  They also have an independent legal counsel.  Stacy

12   Louizos represents them from Blank Rome.  And also two of

13   these Funds are listed on the New York Stock Exchange, and the

14   New York Stock Exchange has various independence requirements

15   that each independent director has met.

16   Q    Thank you.  And which are the two Funds that are listed on

17   NYSE?

18   A    The Highland Income Fund and the NexPoint Strategic

19   Opportunities Fund are both NYSE-listed.

20   Q    And I know you probably haven't memorized everybody who

21   invests in the Funds, but can you give us a general idea of

22   who invests in these Funds?

23   A    Certainly.  I definitely have not memorized them.  There

24   are thousands of individual investors in each of these Funds.

25   Part of my role overseeing investor relations and sales, I do

 1   talk to a lot of those investors.  But the majority of the

 2   investors in each of these Funds are individual investors.

 3       As '40 Act Funds, almost anybody with a brokerage account

 4   can buy them.  They have tickers, particularly the Funds that

 5   are listed.  Closed-end funds.  And so, with that, it is mom-

 6   and-pop investors.  It's retail investors,  including myself.

 7   I've allocated my 401(k) to these funds, the majority of my

 8   401(k) to these funds.  But there are also institutional

 9   investors.  There's hedge funds.  There's ETFs.  There are

10   large high-net-worth individuals.  But the majority of it is

11   individual investors that have invested through their

12   brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13   These are -- these are -- these are the individual investors.

14   Q    Thank you.  Does Mr. Dondero have investments in the

15   Funds?  Do you know?

16   A    He does.  He's invested in each of the Funds.

17   Q    Does he have a majority investment in any of the Funds?

18   A    He does not have a majority investment in any of the

19   Funds.

20   Q    Thank you.  Does Mr. Dondero have a control relationship

21   with the two Advisors?

22   A    Yes.  He does.  With the Advisors.

23   Q    And does he have a control relationship with the Funds?

24   A    As it pertains to portfolio management, he is a portfolio

25   manager of each Fund.  But as discussed, as I mentioned, the

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/04/23   Page 199 of 214   PageID 5229
Exhibit 23-42   Page 204 of 603

Norris - Direct                    29

1   independent board on an annual basis has the ability to

2   terminate or renew our advisory contracts, and that -- that

3   dynamic removes the control, overall control, of the Funds in

4   that regard.

5   Q   Are you familiar with the motion that the Court I think

6   has accurately referred to as the CLO Motion that was filed by

7   the two Advisors and the three Funds?

8   A   Yes.  I am familiar with it.

9   Q   And I'm going to ask you a question now that I think is of

10  interest to the Court, based on the last time I was in front

11  of Judge Jernigan.  Were any employees of the Debtor involved

12  in deciding to bring this motion or in preparing the motion?

13  A   No.  None of the HCMLP employees, to my knowledge, were

14  involved in preparing or deciding to bring the motion.

15  Q   Okay.  And you investigated who was involved in preparing

16  the motion, so your knowledge is pretty good on this point?

17  A   Correct.  I have.  And none were involved, based on that

18  investigation.

19  Q   (garbled) involved in deciding to bring a motion,

20  preparing it, other than outside counsel and my firm?

21  A   Yeah.  So, the initial cause for concern was raised by Mr.

22  Dondero himself to our legal -- internal legal team and

23  compliance team.  And working together with them, myself, and

24  outside counsel, and senior management of Highland Capital

25  Management Fund Advisors, including Joe Sowin, we prepared the

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/04/23   Page 200 of 214   PageID 5230
Exhibit B-42   Page 204 of 603

Norris - Direct                              30

 1 | order.  Or, sorry, not the order, the motion.

 2 | Q   All right.  Thank you.  Were the boards of the three Funds

 3 | involved at all with bringing the motion?

 4 | A   They were not involved in the preparation of the motion

 5 | itself.  They were aware and supportive, but they did not

 6 | prepare the motion.

 7 | Q   You provided a (audio gap), correct?

 8 | A   Sorry.  You did cut out there.  I didn't hear the

 9 | question.

10 | Q   I'll try again.  You provided a declaration (garbled)

11 | motion, correct?

12 | A   I did, yes.

13 | Q   And there are two exhibits to your declaration.  There's

14 | an Exhibit A and an Exhibit B.

15 | A   Correct.

16 | Q   Exhibit A, does this reflect the current repayment status

17 | of the various CLOs as we -- as you understand it to be as of

18 | December 1st?

19 | A   Yes, it does.

20 | Q   And does Exhibit (garbled) of the three Funds --

21 |         THE COURT:  Okay.  Mr. --

22 | BY MR. WRIGHT:

23 | Q   -- and the various CLOs, --

24 |         THE COURT:  Mr. Wright?

25 | BY MR. WRIGHT:

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/07/23   Page 201 of 214   PageID 5231
Exhibit 23-42   Page 20520 of 603

Norris - Direct                          31

1    Q    -- as you understand it?

2              THE COURT:  Mr. Wright, time out.  Two things.

3    First, I don't know what you can do to improve --

4              MR. WRIGHT:  Sure.

5              THE COURT:  -- your connection, but you're

6    occasionally breaking up a little.

7         But second, can we be clear for myself, the record,

8    everyone else, what you're referring to right now?  We have an

9    Advis... your witness and exhibit list is at Docket 1573.  Is

10   that what I should be looking at first?

11             MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12   Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13   It may be the only exhibit on our exhibit list, frankly.

14             THE COURT:  Okay.  So you're talking about his

15   declaration now, not the witness and exhibit list with the

16   attachments to it?  Actually, it is attached here.  Exhibit A.

17   Okay.  I'm there.  I went to Exhibit A in your attachments to

18   your exhibit list at 1573.

19        All right.  Let's try again with your question you just

20   asked.

21             MR. WRIGHT:  Sure.

22   BY MR. WRIGHT:

23   Q   So, Mr. Norris, Exhibit A, this reflects the current

24   repayment status of the CLOs that are the subject of the

25   motion as of December 1.  Correct?

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/07/23   Page 202 of 214   PageID 5232
Exhibit 23-42   Page 203 of 603

Norris - Direct                              32

1  A    Correct.

2  Q    And then --

3            MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4  which is just a couple pages forward.

5            MR. MORRIS:  Your Honor, I would ask that this be put

6  up on the screen, if possible.

7            THE COURT:  Yes.  Can you do that, please?

8            MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9            THE COURT:  He asked if you could --

10            MR. MORRIS:  I would --

11            THE COURT:  -- share your screen.  Can you share your

12  screen as to what you're looking at?

13            MR. WRIGHT:  Can I share my screen?  Last time I was

14  using a computer and you were having trouble hearing me, so

15  this time I'm doing it on my phone.  So my phone, no, I don't

16  have this on my phone to share my screen that way.  It's

17  Docket 1522-1, and it's the only exhibit that was on our

18  exhibit list.

19            MR. MORRIS:  No objection, Your Honor.

20            MR. WRIGHT:  All it shows is the holdings in Funds in

21  the CLOs.  That's all it is.

22            MR. MORRIS:  No objection, Your Honor.

23            THE COURT:  Okay.

24            MR. NORRIS:  I'm sorry, John.  I didn't hear.

25            THE COURT:  Give me a minute, because I was at 1573,

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-642   Filed 12/07/23   Page 203 of 214   PageID 5233
Exhibit 23-642   Page 2047 of 603

Norris - Direct                          33

 1 │ your witness and exhibit list.

 2 │     (Pause.)

 3 │         THE COURT:  Okay.  That's not the correct docket

 4 │ number.

 5 │         MR. MORRIS:  Your Honor?

 6 │         THE COURT:  Yes?

 7 │         MR. MORRIS:  If I may, it's John -- it's John Morris.

 8 │ It's Docket No. 1528.  And the declaration can be found at

 9 │ Page 12 of 26.

10 │         MR. WRIGHT:  Thank you.

11 │         THE COURT:  1528?

12 │         MR. WRIGHT:  That's bizarre, because I have a

13 │ printout of it and it says Docket 1522-1.

14 │         THE COURT:  Okay.  1528 is the -- the actual motion

15 │ we've set for hearing.

16 │         MR. MORRIS:  And it's attached to that, yes.  If you

17 │ -- if you go to PDF Page 12, it's the first page of the

18 │ declaration.

19 │         THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20 │ that declaration.  And then you were having the witness look

21 │ first at Exhibit A to that declaration.  And then where are

22 │ you having him look next?  Exhibit B, which is entitled

23 │ "Holdings of Preferred Shares in CLOs"?

24 │         MR. WRIGHT:  Exhibit B, Your Honor.

25 │         THE COURT:  Okay.  Continue.

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-42    Filed 12/07/23    Page 204 of 214    PageID 5234
Exhibit B-42    Page 204 of 213

Norris - Direct                        34

1           MR. WRIGHT:  (garbled) I think some of the exhibits

2    that I have had the wrong docket number printed on the top,

3    and I --

4    BY MR. WRIGHT:

5    Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6    shows the holdings of the preference shares of the Funds in

7    the various CLOs that are the subject of the motion, correct?

8    A    That's correct.  One clarification.  It shows the

9    percentage ownership of each of those preference share

10   tranches that each Fund owns.

11   Q    Thank you.  Mr. Norris, do the three Funds have a date by

12   which they have to liquidate their investments?

13   A    Sorry, you did skip out there.  If you could you repeat

14   the question.  I apologize.

15   Q    It's frustrating.  Do the three Funds have a date by which

16   they must liquidate their investments?

17   A    No.  They do not.

18   Q    Okay.  Can you briefly explain why the Advisors and the

19   Funds brought this motion?

20   A    Yeah.  The Advisors and the Funds were concerned with

21   certain transactions, as described in the motion.  As

22   preference share owners, we own the majority or a substantial

23   portion of the economics of most of these CLOs, and in three

24   instances the majority of the economic benefit.  And there was

25   concern with the way that the sales were executed.  And so,

Norris - Cross                              35

1   with that, we're simply asking for a temporary relief in order

2   to benefit and to maximize the recovery for our preference

3   shares that we own.

4   Q    Thank you.

5          MR. WRIGHT:  All right, Your Honor.  I have no

6   further questions for Mr. Norris, although I guess I reserve

7   the right to redirect.

8          THE COURT:  All right.  Cross-examination?

9          MR. MORRIS:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q    Good afternoon, Mr. Norris.  Can you hear me?

13  A    I can.  Thank you, Mr. Morris.

14  Q    All right.  I'm going to go into a little bit more detail

15  about some of the topics that you discussed.  To be clear

16  here, there are five moving parties; is that right?

17  A    That's correct.  The two Advisors and the three Funds.

18  Q    And one of the advisory firms is Highland Capital

19  Management Fund Advisors, LP; is that right?

20  A    That's correct.

21  Q    And I'll refer to that as Fund Advisors; is that okay?

22  A    That's great.

23  Q    James Dondero and Mark Okada are the beneficial owners of

24  Fund Advisors, correct?

25  A    That is my understanding, yes.

005798

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-242   Filed 12/05/23   Page 206 of 214   PageID 5236
Exhibit 23-242   Page 206 of 603

Norris - Cross                                     36

1   Q   And your understanding is that Mr. Dondero controls Fund

2   Advisors, correct?

3   A   That's correct.

4   Q   And the other advisory firm that brought the motion is

5   NexPoint Advisors, LP; is that right?

6   A   That is correct.

7   Q   And Mr. Dondero is the beneficial owner of NexPoint; is

8   that right?

9   A   A family trust where Jim is the sole beneficiary, I

10  believe, controls or owns NexPoint Advisors.

11  Q   Okay.  And Mr. Dondero --

12  A   Or 99.9 percent of NexPoint Advisors.

13  Q   Thank you for the clarification.  Mr. Dondero controls

14  NexPoint; is that right?

15  A   Correct.

16  Q   All right.  And I'm going to refer to Fund Advisors and

17  NexPoint as the Advisors going forward; is that fair?

18  A   That's fair.

19  Q   Each of the Advisors manages certain funds; is that right?

20  A   That is correct.

21  Q   And three of those funds that are managed by the Advisors

22  are the Movants on this motion, correct?

23  A   Correct.

24  Q   All right.  The Advisors caused these three Funds to

25  invest in CLOs that are managed by the Debtor; is that right?

005799

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 02/07/25   Page 207 of 214   PageID 5237
Exhibit 23-42   Page 207 of 603

Norris - Cross                                37

1    A    The portfolio managers working for the Advisors did.

2    That's correct.

3    Q    And Mr. Dondero is the portfolio manager of the Highland

4    Income Fund; is that right?

5    A    He is one of the portfolio managers for that Fund.

6    Q    And he's also --

7    A    I believe there are two.

8    Q    And he's also a portfolio manager of NexPoint Capital,

9    Inc., one of the Movants here, right?

10   A    That is correct.

11   Q    And he's also the portfolio manager of NexPoint Strategic

12   Opportunities Fund, another Movant; is that right?

13   A    Yes.  That is correct.

14   Q    Okay.  And I think you testified earlier that each of

15   these Funds has a board.  Is that right?

16   A    That is correct.

17   Q    But the boards don't make investment decisions for the

18   Funds, do they?

19   A    They do not.  They have delegated that authority.

20   Q    And that authority to make investment decisions is

21   delegated to the Advisors; is that right?

22   A    Yes.

23   Q    Okay.  And none of the boards of the Funds who are Movants

24   here adopted any resolution authorizing the Funds to file this

25   motion; is that right?

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/27/23   Page 208 of 214   PageID 5238
Exhibit 42   Page 207 of 603

Norris - Cross                                    38

 1   A    To my knowledge, that is correct.

 2   Q    And in fact, the boards were not required to approve the

 3   filing of this motion, correct?

 4   A    I'm not -- I believe that's a legal question, but to my

 5   knowledge, there was not a requirement of the board to -- or,

 6   to adopt a resolution for that.

 7   Q    Okay.  Let's talk a little bit about your background.  I

 8   think you testified that you're the executive vice president

 9   at NexPoint Advisors, one of the Movants.  Is that right?

10   A    That's right.

11   Q    Who's the president of NexPoint Advisors, LP?

12   A    Mr. Dondero.

13   Q    And you report directly to him; is that right?

14   A    I do.

15   Q    You're also the executive vice president of Fund Advisors,

16   another Movant; is that right?

17   A    Correct.

18   Q    And Mr. Dondero is the president of Fund Advisors; is that

19   right?

20   A    He is not.  There is no president of Fund Advisors.  But

21   he -- yeah.

22   Q    You're the president of another entity called NexPoint

23   Securities; is that right?

24   A    That's correct.

25   Q    And you're also the executive vice president of the 11 or

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-42   Filed 12/05/23   Page 209 of 214   PageID 5239
Exhibit 6-42   Page 205 of 603

Norris - Cross                           39

1   12 funds that are managed by the Advisors here, right?

2   A    Yes.  That is correct.

3   Q    Okay.  You've been working for Highland Capital Management

4   or other Highland-related entities for a little more than a

5   decade; is that right?

6   A    That's correct.  Since June 2010.

7   Q    Okay.  Now, you don't personally make any investment

8   decisions for -- for the Funds.  Is that right?

9   A    That's correct.

10  Q    And you don't hold yourself out as an investment manager,

11  do you?

12  A    I do not.

13  Q    And you've never worked for a CLO, have you?

14  A    Never worked for a -- for a C -- employed by a CLO.

15  Worked on accounting, various other aspects, but never worked

16  for a CLO.

17  Q    Okay.  You referred earlier to the declaration that you've

18  submitted in support of the motion.  Do you remember that?

19  A    I do.

20  Q    I've got an assistant on the line here.

21       MR. MORRIS:  Ms. Cantey, can we put up onto the

22  screen Debtor's Exhibit C, which I believe was Mr. Norris's

23  declaration?  And if we could go to Page 12 of 26.  Oh, all

24  right.

25  BY MR. MORRIS:

Norris - Cross                            40

 1  Q    And, again, Mr. Norris, as we did in the deposition

 2  yesterday, I'll remind you of the difficulty of doing a

 3  virtual examination.  And if at any time I ask you a question

 4  about your declaration that prompts you to think you need to

 5  see another portion of the declaration, will you let me know

 6  that?

 7  A    Yes, I will.

 8  Q    Okay.  Because I'm not here to test your memory.  I'm just

 9  here to ask you certain questions.  So please let me know if

10  you need to see something that's not on the screen itself.

11       You didn't write any portion of this declaration; is that

12  right?

13  A    I did not.

14  Q    And you didn't provide any substantive comments to the

15  declaration as drafted because you agreed with -- with the

16  declaration as written by others; is that fair?

17  A    Correct.

18  Q    And all of the key information in your declaration was

19  supplied by NexPoint's management; isn't that right?

20  A    Correct.

21  Q    The individuals who provided the information that's in

22  your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23  and outside counsel at K&L Gates; is that right?

24  A    Correct.

25  Q    And Mr. Sauter is in-house counsel at the Advisors; is

Case 19-34054-sgj11    Doc 3817-4    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-42    Filed 12/05/23    Page 211 of 214    PageID 5241
Exhibit B-42    Page 205 of 603

Norris - Cross                                        41

1    that right?

2    A    That is right.

3    Q    And Mr. Post is the chief compliance officer at NexPoint;

4    is that right?

5    A    That's correct.

6    Q    The whole idea for this motion initiated with Mr. Dondero;

7    isn't that right?

8    A    The concern, yes, the concern originated, and his concern

9    was voiced to our legal and compliance team.

10   Q    Okay.

11          MR. MORRIS:  Can we take the declaration down for --

12   oh, actually, no, I'm sorry, leave it there, and let's talk

13   about Exhibit B.  Now we can all see it.  If you can scroll

14   down to Exhibit B, please.  Okay.

15   BY MR. MORRIS:

16   Q    This page is attached to your declaration, right?

17   A    That's correct.

18   Q    And this page is intended to show the percentage of

19   preferred shares owned by each of the Movant Funds and the 15

20   different CLOs, right?

21   A    That's right.

22   Q    And the Debtor is the portfolio manager for each of these

23   CLOs; is that right?

24   A    Yes.

25   Q    And it's your understanding that the Debtor's management

1  of the CLOs on this page is governed by written agreements

2  between the Debtor and each of the CLOs, right?

3  A    Yes.

4  Q    None of the Movants are parties to the agreements between

5  the Debtor and each of the CLOs pursuant to which the Debtor

6  serves as portfolio manager; is that correct?

7  A    I believe that is correct.  One, I think, important --

8  even though they're not subject to the agreement, they are the

9  -- they have the economic ownership of each of these CLOs.

10  Q    But they're not party to the agreement; is that right?

11  A    Not that I'm aware of.

12  Q    Okay.  And in preparing for this motion and preparing for

13  your testimony, you didn't personally review any of the

14  agreements between the Debtor and any of the CLOs listed on

15  this page, right?

16  A    No.  I relied on legal counsel for that review.

17  Q    Okay.  And, but even though you didn't review the

18  agreements, it's your understanding that among the

19  responsibilities that the Debtor has as the portfolio manager

20  is buying and selling assets on behalf of the CLOs; is that

21  right?

22  A    Yes.  And I believe I specifically stated in my statement,

23  if you want to turn to it, what I (audio gap) to regarding the

24  CLOs' duties under the agreements.

25  Q    Okay.  It's your understanding, in fact, that nobody other

005805

Case 19-34054-sgj11   Doc 3817-4   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 28-42   Filed 12/05/23   Page 213 of 214   PageID 5243
Exhibit B-42   Page 257 of 608

Norris - Cross                                    43

1    than the Debtor has the right or the authority to buy and sell

2    assets on behalf of the CLOs listed on Exhibit B, correct?

3    A    That's my understanding.

4    Q    Okay.  And it's also your understanding, your specific

5    understanding, that holders of preferred shares do not make

6    investment decisions on behalf of the CLO; is that right?

7    A    Correct.

8    Q    And that's something that the Advisors knew when they

9    decided to invest in the CLOs on behalf of the Movant Funds;

10   is that fair?

11   A    That's right.  And at that time, the knowledge in the

12   purchase was with Highland Capital Management, LP and the

13   portfolio management team at that time.

14   Q    And it's still with Highland Capital Management, LP; isn't

15   that right?

16   A    That's correct.  I'm not sure that the portfolio

17   management team looks the same, but it was HCMLP.

18   Q    Okay.  Let's just look at this document for a second.  The

19   first column has the list of the CLOs in which the Movant

20   Funds have invested; is that right?

21   A    Correct.

22   Q    And the second column, HIF, that stands for Highland

23   Income Fund; is that right?

24   A    Yes, sir.

25   Q    And Highland Income Fund is one of the Funds who are the

Norris - Cross                          44

1   Movants here, right?

2   A    That is correct.

3   Q    And the percentages below that show the percentage of the

4   preference shares of each of the CLOs that that particular

5   fund holds; is that right?

6   A    That's right.

7   Q    And then the third column relates to NexPoint Strategic

8   Opportunities Fund, one of the Movants here; is that right?

9   A    That's correct.

10  Q    And the next column, the fourth column, relates to

11  NexPoint Capital, Inc.'s holding of preference shares in the

12  15 CLOs, right?

13  A    That's right.

14  Q    So, NexPoint Capital doesn't hold any preference shares in

15  any of the CLOs except for a less-than-one-percent interest in

16  Grayson; am I reading that correctly?

17  A    Yes, that's correct.

18  Q    Okay.  And then the last column is intended to show the

19  aggregate portion or percentage of preference shares that the

20  three moving Funds have in each of the 15 CLOs; is that right?

21  A    Yes, that's right.

22  Q    Okay.  Am I reading this correctly that, for 12 of the 15

23  Funds, the moving Funds own less than a majority of the

24  outstanding preferred shares?

25  A    Yes, that's correct.

005807