**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | |
|---|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. | **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | | |
| Appellant | § | | |
| vs. | § | | |
| **Highland Capital Management, L.P, et al** | § | | **3:23-CV-2071-E** |
| Appellee | § | | |

**[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 24

# APPELLANT RECORD

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
## STATEMENT OF THE ISSUES

A. Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1. the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2. the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3. the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

       4.   "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.     Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.     Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1.   Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2.   Appellant's claims or allegations are not "plausible";

    3.   Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4.   Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5.   Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT and the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6.   Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7.   The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8.   Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9.   Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

   10.   Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

---

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.   Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.   Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.   Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.   Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.   Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

  1.   declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

  2.   concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*VOl. 1*

1.   **Notice of Appeal**

*000001*        a.   Notice of Appeal **[Dkt. 3906]**;

*000276*        b.   Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*        c.   Second Amended Notice of Appeal **[Dkt. 3945]**

2.   **The judgment, order, or decree appealed from:**

  a.   Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

001049

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

Vol. 2

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594
001660
001821
001830
Vol. 3
001849
Thru Vol. 4
Vol 4
002236
002243
002248

Vol. 5
002251

002254

002262

002340

002355

002358

002391

002398

002400

Vol. 8
002826

Vol. 9
003257

003260

003270

003278

Thru Vol. 7

Thru Vol. 9

| Date | Doc No. | Description |
|---|---|---|
| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

*(handwritten annotations in left margin: Vol. 10, 003281, 003286, 003291, 003294, 003296, 003299, 003302, 003311, 003314, 003323, 003368, 003430)*

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| *Vol. 10* | | | Holdings LLC, Stonehill Capital Management LLC |
| *003458* | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *003463* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *Vol. 11*  *003537* | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Thru Vol. 16*  *Vol. 17*  *004465* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *004712* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004714* | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *004808* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *004813* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004836* | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18*  *004930* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *004931* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 18*
*004939.*

| | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| *004959* | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *004961* | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *004984* | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *005049* | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *005114* | 06/05/2023 | 3817 (3817-1 — 3817-5) *Thru Vol. 25* | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| *Vol. 26* *006608* | 06/05/2023 | 3818 (3818-1 — 3818-9) *Thru Vol. 39* | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| *Vol. 39* *009273* | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009290* | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009416* | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| *009424* | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

| | Date | Doc | Description |
|---|---|---|---|
| **Vol. 40** 009426 | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| 009436 | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 009444 | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 009445 | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 009446 | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009456 | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 009458 **Vol. 42** Thru Vol. 41 009841 | 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 009901 | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 009905 | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 009908 | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 009912 | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43

010135

010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

B.    **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5, 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
    Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 2-60   Filed 06/06/23   Page 15 of 214   PageID 5687

55

1      So, with regard to the evidentiary issue, obviously, if

2  the Court determines that it's going to be an evidentiary

3  hearing, which we object to and oppose, I would reserve the

4  opportunity to revisit the issue of withdrawing Mr. Dondero's

5  declarations.

6      I will tell the Court, we're prepared to do so if this is

7  not an evidentiary hearing, and we do not believe it should be

8  an evidentiary hearing.

9           THE COURT:  All right.

10          MR. MCENTIRE:  I believe -- I think my position --

11          THE COURT:  Wait.  I'm hearing argument again.  Right

12  now, I'm just talking about dates.

13          MR. MCENTIRE:  Understood.

14          THE COURT:  And May 25th or as soon thereafter as you

15  can be heard.  Any opposition to that?  I mean, basically, I'm

16  just asking you to speak up, Mr. Morris's suggestion of these

17  new dates:  Anything you want to say about that?

18          MR. MCENTIRE:  I do believe that my corporate

19  representative is going to be unavailable on May 25th, and so

20  we would ask that we keep the original schedule.

21          MR. MORRIS:  Your Honor, I would propose, as an

22  alternative to the 25th, since the 26th is the Friday before

23  Memorial Day weekend, either the 30th, the 31st, or June 1st,

24  with the 31st and the 1st being ideal, so we don't have to

25  travel on the holiday weekend.  I don't know what other folks'

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 2-60 Exhibit 2-60Filed 07/28/23   Page 16 of 214   PageID 5688

56

1   schedules look like, but --

2              THE COURT:  Okay.

3              MR. MORRIS:  -- that seems to make sense to me.

4              THE COURT:  What about May 31st or June 1st?  And

5   Traci, please let me know if I'm offering something I can't.

6              THE CLERK:  Judge Jernigan, will you be giving a full

7   day for the hearing?  If so, neither one of those dates work.

8   You could do the day after Memorial Day, May 30th.  Or Friday

9   of that week, May 2nd.  I'm sorry, June 2nd.

10             MR. MORRIS:  I'd prefer May 30th.

11             THE COURT:  All right.

12             MR. MCENTIRE:  My corporate representative -- my

13  corporate representative is not available on May 30th.  He's

14  returning on the 31st from a vacation.  And so, under the

15  circumstances, we would request June 2nd.

16             THE COURT:  Anyone have a problem with June 2nd?

17             MR. MORRIS:  Can we go -- can we go with May 24th?

18             MR. MCENTIRE:  My corporate representative is out the

19  week from May 21st to May 31st.

20             THE COURT:  Okay.  Say again.

21             MR. MCENTIRE:  I just received an --

22             MR. MORRIS:  June 2nd.

23             THE COURT:  Wait.  Wait, wait, wait, wait.  May 21st

24  through May 31st?

25             MR. MCENTIRE:  Yes, ma'am.

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 34-60   Filed 02/08/2045   Page 17 of 214   PageID 5689

57

1          THE COURT:  Okay.  I'm just --

2          MR. MCENTIRE:  So, under the circumstances, we would

3    request --

4          THE COURT:  I'm just letting you know, I am going to

5    set aside a whole day.  Okay?  I don't know positively is it

6    going to be evidentiary.  What I'll do is, after the reply

7    briefs, shortly after May 18th, I'll notify people you're

8    going to be allowed to put on evidence or not.

9       But for your planning purposes, based on what I've looked

10   at right now, again, the *Barton Doctrine* cases by analogy, it

11   looks like the Court has discretion to hear evidence.  Okay?

12   So if people want to put on evidence, they're entitled to put

13   on evidence.  Okay?  You don't have to.  Nobody has to.  But I

14   think the Court in its discretion is going to hear it.

15      So I may read the briefs and do research, and if I change

16   my mind, I'll let you all know May 19th or 20th.

17      All right.  So, that being the case, it's difficult,

18   because we're trying to find a whole day just in case we need

19   the whole day.  You just said your client representative,

20   which is -- who is your client representative?

21         MR. MCENTIRE:  Mr. Patrick.

22         THE COURT:  He's gone May 21st through 31st?

23         MR. MCENTIRE:  Yes, Your Honor.

24         THE COURT:  All right.  Did I hear June 2nd did not

25   work for somebody else?

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Filed 09/08/23   Page 18 of 214   PageID 5690

58

1          MR. MORRIS:  Correct.  Yeah, Your Honor.  I'll be --

2     I'll be out of the country beginning the evening of the 2nd,

3     returning the following Tuesday, so whatever date that is.  I

4     think the 6th.  So I'd be prepared to go on the 8th or the 9th

5     of June.

6          THE COURT:  Okay.  So, I'm sorry, you're out the 2nd

7     through 9th?  Is that what I heard?

8          MR. MORRIS:  The 2nd -- the 2nd through the 6th, but

9     I wouldn't want to do it on the 7th.

10         THE COURT:  Okay.  Well, --

11         MR. MORRIS:  Or Thursday or Friday, June 8 or 9.

12         THE COURT:  Okay.  Anyone have a problem with June 8

13    or 9?

14         MR. MCENTIRE:  Your Honor, the 8th is vastly

15    superior, but I will confess the 9th is a college friend who

16    will be staying at my house with my wife and kids, and my wife

17    shouldn't be subjected to having to host him, but -- so if the

18    8th is available, I will beg for the Court's indulgence.  But

19    I'll be here on the 9th if that's requested.

20         THE COURT:  Okay.  Everyone good, --

21         MR. MCENTIRE:  I might need a note.

22         THE COURT:  -- June 8th?  Everybody good with that?

23    Okay.  I'm hearing no objection.  Traci, am I available?

24         THE CLERK:  Yes.  You have a Chapter 13 docket that

25    afternoon, but I am sure we can work something out with Mr.

006211

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23460 Filed 02/00/2845 Page 19 of 214    PageID 5691

59

1    Powers.

2              THE COURT:  Okay.  So --

3              MR. MCENTIRE:  Your Honor?  Your Honor, this is

4    Sawnie McEntire.  For the record, I do need to lodge my

5    objection, but I understand the conflicts.  And so, subject to

6    my objection, we agree to that date.

7              THE COURT:  All right.  So we'll start 9:30 in the

8    morning, June 8th.  And so I'm going to look for a scheduling

9    order that uses these revised dates that I think I've heard

10   you all will live with.  May 11th for objections to the motion

11   for leave, and that will include any briefs in support of the

12   objections.  And then May 18th for Hunter Mountain's reply and

13   any briefing in the reply that responds to the objections.

14   And shortly after that my courtroom deputy will let lawyers

15   know, yes, she's going to hear evidence, or no, she's not

16   going to have evidence.  And the hearing will be June 8th at

17   9:30 in the morning.

18        Any other housekeeping matters while we are here?  I mean,

19   these are the only pleadings that are going to be allowed.

20   How about that, among other things, as a housekeeping matter?

21   Just these pleadings, except, obviously, if we have live

22   witnesses and evidence on the 8th, you'll be bound by the

23   Local Rule that says witness and exhibit lists are due three

24   days before.  Anything else that you all can think of?

25             MR. MORRIS:  Your Honor, if I may, I greatly

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Filed 07/28/45   Page 20 of 214   PageID 5692

60

1    appreciate your patience today.  But I did want to just

2    inquire as to the status of the decisions on the SE

3    Multifamily HCRE matter as well as the motion to dismiss that

4    was argued back in January.  Not because I intentionally or

5    unintentionally seek to pressure the Court, but I do think

6    that those decisions will be helpful one way or the other

7    resolving, you know, or getting some clarity in this case.

8           THE COURT:  All right.  Well, the next of those two

9    items that comes out will be the SE Multihousing matter.  My

10   law clerk that's working on that is right over here to my

11   right.  And we think before the end of the week, but we are

12   juggling lots of things, as you might imagine.  So that one is

13   next, and I'm hesitating to give you a time estimate on the

14   other one, but it'll be next in the queue.  We've had lots of

15   different adversary proceedings in other cases that we've had

16   to --

17          MR. MORRIS:  Yeah.

18          THE COURT:  -- work on.  But I think, again, SE is

19   probably towards the end of this week.

20          MR. MORRIS:  All right.  We appreciate the guidance,

21   Your Honor.

22          THE COURT:  Okay.  She's giving me a thumbs up like

23   I'm not overpromising.  You can't see her from the video.

24      All right.  So, everyone clear?  I want to say in the

25   strongest terms that I don't want an avalanche of pleadings.

61

1   Is everyone a hundred percent clear that we get the objections

2   with supportive briefing May 11th, reply with supportive

3   briefing on the 18th, and that's it?  That's it.  Other than

4   witness and exhibit lists, --

5            MR. MORRIS:  Yes, Your Honor.

6            THE COURT:  -- if we have evidence.  Everybody clear?

7   Any questions?

8            MR. MCENTIRE:  No, ma'am.  Thank you.  Thank you for

9   your time.

10           THE COURT:  Okay.  Thank you.  We are adjourned.

11           THE CLERK:  All rise.

12       (Proceedings concluded at 3:12 p.m.)

13                            --oOo--

14

15

16

17

18

19

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                              **04/25/2023**

24   _____     _____

25   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

62

INDEX

PROCEEDINGS                                                                   3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Dugaboy Investment Trust and Hunter Mountain Investment        7
Trust's Motion for Leave to File Proceeding (3662)

Status Conference re: Motion for Leave to File Verified       49
Adversary Proceeding filed by Creditor Hunter Mountain
Investment Trust (3699)

END OF PROCEEDINGS                                                           61

INDEX                                                                        62

006215

# EXHIBIT 44

**EXECUTION VERSION**

## LITIGATION SUB-TRUST AGREEMENT

       This Litigation Sub-Trust Agreement, effective as of August 16, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among James P. Seery, Jr., as trustee of the Highland Claimant Trust (the "Claimant Trustee"), Wilmington Trust, National Association, a national banking association ("WTNA"), as Delaware Trustee (in such capacity hereunder, and not in its individual capacity, the "Delaware Trustee"), and Marc S. Kirschner as trustee (the "Litigation Trustee," and together with the Claimant Trustee and Delaware Trustee, the "Parties") of the Litigation Sub-Trust for the benefit of the Claimant Trust as sole Litigation Sub-Trust Beneficiary.

## RECITALS

       WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

       WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943] (the "Confirmation Order");

       WHEREAS, this Agreement, including all exhibits hereto, is the "Litigation Sub-Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

       WHEREAS, pursuant to the Plan and Confirmation Order, the Litigation Sub-Trust Assets are hereby to be transferred by the Claimant Trust to the Litigation Sub-Trust (each as defined herein) created and evidenced by this Agreement so that (i) Estate Claims can be investigated, prosecuted, settled, abandoned, resolved, and otherwise monetized as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; (ii) proceeds of Estate Claims can be remitted to the Claimant Trust as Claimant Trust Assets for distribution to the Claimant Trust Beneficiaries (as defined in the Claimant Trust Agreement) in accordance with the Plan and Claimant Trust Agreement; (iii) the Litigation Trustee can investigate, litigate, settle, or otherwise resolve any Filed Claims relating to the Estate Claims, including the Employee Claims; and (iv) administrative services relating to the activities of the Litigation Sub-Trust can be performed by the Litigation Trustee.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Docket No. 1875, Exh. B.

006217

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Litigation Trustee and the Claimant Trustee have executed this Agreement for the benefit of the Claimant Trust as provided for in the Plan.

TO HAVE AND TO HOLD unto the Litigation Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Litigation Sub-Trust in accordance with Article IX hereof, this Litigation Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Litigation Sub-Trust Assets are to be strictly held and applied by the Litigation Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1    Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan. For all purposes of this Agreement, the following terms shall have the following meanings:

(a)    "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(b)    "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(c)    "Claimant Trust Agreement" means the Claimant Trust Agreement dated August 11, 2021, by and between the Debtor, Claimant Trustee, and Wilmington Trust, National Association, as Delaware trustee thereunder.

(d)    "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" under the Claimant Trust Agreement and as defined in the Plan, and any successor Claimant Trustee who may be appointed pursuant to the terms of the Claimant Trust Agreement.

(e)    "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to the Claimant Trust Agreement.

(f)    "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(g)    "Delaware Trustee" has the meaning set forth in the introduction hereof.

(h)    "Disability" means as a result of the Litigation Trustee's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Litigation Trustee, the Litigation Trustee has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(i)    "Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(j)    "Employee" means the employees of the Debtor set forth in the Plan Supplement.

(k)    "Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(l)    "Litigation Sub-Trust" means the sub-trust created pursuant to this Agreement, and in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d).

(m)    "Litigation Sub-Trust Agreement" means this Agreement.

(n)    "Litigation Sub-Trust Assets" means the Estate Claims and the Litigation Sub-Trust Expense Cash Reserve.

(o)    "Litigation Sub-Trust Beneficiary" means the Claimant Trust.

(p)    "Litigation Sub-Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Litigation Sub-Trust and/or the Litigation Trustee in administering and conducting the affairs of the Litigation Sub-Trust, and otherwise carrying out the terms of the Litigation Sub-Trust and the Plan on behalf of the Litigation Sub-Trust, including without limitation, any taxes owed by the Litigation Sub-Trust, and the fees and expenses of the Litigation Trustee and professional persons retained by the Litigation Sub-Trust or Litigation Trustee in accordance with Article 3.12(b) of this Agreement.

(q)    "Litigation Sub-Trust Expense Cash Reserve" means $1.5 million in Cash to be funded by the Debtor or Reorganized Debtor, as applicable, pursuant to the Plan into a bank account of the Litigation Sub-Trust (or of the Claimant Trust for the benefit of the Litigation Sub-

Trust) on or before the Effective Date for the purpose of paying Litigation Sub-Trust Expenses in accordance herewith.

(r)      "Litigation Trustee" means Marc S. Kirschner as the initial "Litigation Trustee" hereunder and under the Plan, and any successor Litigation Trustee who may be appointed pursuant to the terms of this Agreement.

(s)      "Oversight Board" has the meaning set forth in the Claimant Trust Agreement.

(t)      "Plan" has the meaning set forth in the Recitals hereof.

(u)      "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(v)      "Securities Act" means the Securities Act of 1933, as amended.

(w)      "TIA" means the Trust Indenture Act of 1939, as amended.

(x)      "Trust Interests" means the trust interest(s) to be distributed to the Claimant Trust as the sole Litigation Sub-Trust Beneficiary.

(y)      "Trust Register" has the meaning given to it in Section 5.3(b) hereof.

1.2    General Construction. As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3    Incorporation of the Plan. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE II.
## ESTABLISHMENT OF THE LITIGATION SUB-TRUST

2.1    Establishment of Sub-Trust.

(a)    The Parties, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish a statutory trust under the Delaware Statutory Trust Act on behalf of the Claimant Trust as the sole Litigation Sub-Trust Beneficiary, which shall be known as the "Highland Litigation Sub-Trust," on the terms set forth herein. The Litigation Trustee may use this name in accordance with the terms and conditions set forth herein as the Litigation Trustee sees fit.

(b)    The Litigation Trustee shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in his capacity as Litigation Trustee, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

2.2    Nature and Purposes of the Litigation Sub-Trust.  The Litigation Sub-Trust is organized and established as a trust for the purpose of monetizing the Estate Claims and making distributions to Litigation Sub-Trust Beneficiary in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d).  The Litigation Sub-Trust shall serve as a mechanism for investigating, prosecuting, settling, resolving, and otherwise monetizing all Estate Claims and distributing the proceeds of such Estate Claims to the Claimant Trust in a timely fashion in accordance with the Plan, the Confirmation Order, and this Agreement.  The Litigation Sub-Trust and Litigation Trustee shall have and retain any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Estate Claim as of the Petition Date. Except as otherwise provided herein, the Litigation Sub-Trust shall have the sole responsibility for the pursuit and settlement of the Estate Claims, and, subject to the terms of the Claimant Trustee Agreement, the sole power and authority to allow or settle and compromise any Claims related to the Estate Claims, including, without limitation, Employee Claims.  For the avoidance of doubt, the Litigation Sub-Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).

2.3    Transfer of Assets and Rights to the Litigation Sub-Trust.

(a)    On or as soon as practicable after the Effective Date, the Claimant Trust shall automatically an irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims, Employee Claims, and Privileges.  For purposes of the transfer of documents, the Litigation Sub-Trust is an assignee and successor to the Debtor in respect of the Estate Claims and Employee Claims and shall be treated as such in any review of confidentiality restrictions in requested documents.  For the avoidance of doubt, following the Effective Date, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

DOCS_NY:43848.5 36027/002

006221

(b)      Until the Litigation Sub-Trust terminates pursuant to the terms hereof, legal title to the Estate Claims shall be vested at all times in the Litigation Sub-Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Estate Claims to be vested in the Litigation Trustee, in which case title shall be deemed to be vested in the Litigation Trustee, solely in his capacity as Litigation Trustee.  For purposes of such jurisdictions, the term Litigation Sub-Trust, as used herein, shall be read to mean the Litigation Trustee.

(c)      In accordance with section 1123(d) of the Bankruptcy Code, the Litigation Trustee may enforce all rights to commence and pursue, as appropriate, any and all Estate Claims after the Effective Date.  No Person or entity may rely on the absence of a specific reference in the Plan to any Estate Claim against them as any indication that the Litigation Trustee will not pursue any and all available Estate Claims or objections against them.  Unless any Estate Claim against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trustee expressly reserves all Estate Claims for later adjudication, and, therefore, no preclusion doctrine including the doctrine of res judicata, collateral, estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Claims upon, after, or as a consequence of the Confirmation Order.

2.4      <u>Principal Office</u>.  The principal office of the Litigation Sub-Trust shall be maintained by the Litigation Trustee at the following address: Goldin Associates, a Teneo Company, 350 Fifth Avenue, New York, New York 10118.

2.5      <u>Acceptance</u>.  The Litigation Trustee accepts the Litigation Sub-Trust imposed by this Agreement and agrees to observe and perform that Litigation Sub-Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.6      <u>Further Assurances</u>.  The Claimant Trustee and any successors thereof will, upon reasonable request of the Litigation Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Litigation Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Litigation Trustee the powers, instruments or funds in trust hereunder.

2.7      <u>Incidents of Ownership</u>.  The Claimant Trust shall be the sole beneficiary of the Litigation Sub-Trust and the Litigation Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

## <u>ARTICLE III.</u>
## <u>THE LITIGATION TRUSTEE AND THE DELAWARE TRUSTEE</u>

3.1      <u>Role</u>.  In furtherance of and consistent with the purpose of the Litigation Sub-Trust, the Plan, and this Agreement, the Litigation Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Litigation Trustee with respect to the Litigation Sub-Trust Assets for the benefit of the Litigation Sub-Trust Beneficiary and maintain, manage, and take action on behalf of the Litigation Sub-Trust.

DOCS_NY:43848.5 36027/002

3.2    Authority.

(a)    In connection with the administration of the Litigation Sub-Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee shall, in an expeditious but orderly manner, investigate, prosecute, settle, and otherwise resolve the Estate Claims.  The Litigation Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Litigation Sub-Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.

(b)    The Litigation Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).  To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Estate Claims or Employee Claims prior to the Effective Date, on the Effective Date the Litigation Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "Marc Kirschner, not individually but solely as Litigation Trustee for the Highland Litigation Sub-Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Litigation Trustee shall have the power and authority to:

(i)    hold legal title to any and all rights in or arising from the Litigation Sub-Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Sub-Trust (including any proceeds of the Litigation Sub-Trust Assets);

(ii)    perform the duties, exercise the powers, and asserts the rights of a trustee under sections 1123(b)(3)(B) of the Bankruptcy Code with respect to the Litigation Sub-Trust Assets, including the right to assert claims, defenses, offsets, and privileges;

(iii)    subject to any approval of the Oversight Board that may be required under Section 3.3(b), protect and enforce the rights of the Litigation Sub-Trust with respect to any Litigation Sub-Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceeds, or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(iv)    determine and satisfy any and all liabilities created, incurred, or assumed by the Litigation Sub-Trust;

(v)    subject to any approval of the Oversight Board that may be required under Section 3.3(b), investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, all Estate

DOCS_NY:43848.5 36027/002

Claims, Employee Claims, or any other Causes of Action in favor of or against the Litigation Sub-Trust;

(vi)     with respect to any Estate Claim, avoid and recover transfers of the Debtor's property as may be permitted by the Bankruptcy Code or applicable state law;

(vii)    subject to applicable law, seek the examination of any Entity or Person with respect to the Estate Claims;

(viii)   make all payments relating to the Litigation Sub-Trust Assets;

(ix)     assess, enforce, release, or waive any privilege or defense on behalf of the Litigation Sub-Trust, the Litigation Sub-Trust Assets, or the Litigation Sub-Trust Beneficiary, if applicable;

(x)      prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax returns, information returns, and other required documents with respect to the Litigation Sub-Trust, and pay taxes properly payable by the Litigation Sub-Trust;

(xi)     if not otherwise covered by insurance coverage obtained by the Claimant Trust, obtain reasonable insurance coverage with respect to any liabilities and obligations of the Litigation Trustee, solely in his capacity as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise.  The cost of any such insurance shall be a Litigation Sub-Trust Expense and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Reserve;

(xii)    without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Litigation Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Litigation Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Litigation Trustee shall be Litigation Sub-Trust Expenses and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Cash Reserve;

(xiii)   to the extent applicable, assert, enforce, release, or waive any Privilege or defense on behalf of the Litigation Sub-Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Litigation Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xiv)    take all steps and execute all instruments and documents necessary to effectuate the purpose of the Litigation Sub-Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder; and

DOCS_NY:43848.5 36027/002

006224

(xv)    exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order (the foregoing subparagraphs (i)-(xv) being collectively, the "<u>Authorized Acts</u>").

(d)    The Litigation Trustee has the power and authority to act as trustee of the Litigation Sub-Trust and perform the Authorized Acts through the date such Litigation Trustee resigns, is removed, or is otherwise unable to serve for any reason.

(e)    Any determinations by the Liquidation Trustee, under the direction of the Oversight Board, with respect to the amount or timing of settlement or other disposition of any Estate Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Litigation Sub-Trust Beneficiary and all other parties of interest following the entry of an order of a court of competent jurisdiction approving such settlement or other disposition to the extent required or obtained.

3.3    <u>Limitation of Authority</u>.

(a)    Notwithstanding anything herein to the contrary, the Litigation Sub-Trust and the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Estate Claims as required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, or (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement.

(b)    Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Litigation Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.6 of the Claimant Trust Agreement, in order to:

(i)    terminate or extend the term of the Litigation Sub-Trust;

(ii)    commence litigation with respect to any Estate Claims and, if applicable under the terms of the Claimant Trust Agreement, the Employee Claims, including, without limitation, to (x) litigate, resolve, or settle coverage and/or the liability of any insurer under any insurance policy or legal action related thereto, or (y) pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law;

(iii)    settle, dispose of, or abandon any Estate Claims (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Estate Claim);

(iv)    borrow funds as may be necessary to fund litigation or other costs of the Litigation Sub-Trust;

(v)    reserve or retain any cash or cash equivalents in the Litigation Sub-Trust Cash Reserve in an amount reasonably necessary to meet claims and contingent liabilities;

(vi)    change the compensation of the Litigation Trustee; and

DOCS_NY:43848.5 36027/002

006225

(vii)    retain counsel, experts, advisors, or any other professionals.

(c)    [Reserved]

3.4    <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Litigation Trustee in accordance with the provisions of this Agreement shall be final and binding upon the Litigation Sub-Trust Beneficiary.

3.5    <u>Term of Service</u>.  The Litigation Trustee shall serve as the Litigation Trustee for the duration of the Litigation Sub-Trust, subject to death, resignation or removal.

3.6    <u>Resignation</u>.  The Litigation Trustee may resign as trustee of the Litigation Sub-Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Litigation Trustee shall continue to serve as Litigation Trustee after delivery of the Litigation Trustee's resignation until the proposed effective date of such resignation, unless the Litigation Trustee and a [simple majority] of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Litigation Trustee in accordance with Section 3.8 hereof becomes effective.

3.7    <u>Removal</u>.

(a)    The Litigation Trustee may be removed by a simple majority vote of the Oversight Board for Cause, immediately upon notice thereof, or without Cause, upon 60 days' prior written notice.

(b)    To the extent there is any dispute regarding the removal of a Litigation Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Litigation Trustee will continue to serve as the Litigation Trustee after his removal until the earlier of (i) the time when a successor Litigation Trustee will become effective in accordance with Section 3.8 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.8    <u>Appointment of Successor</u>.

(a)    <u>Appointment of Successor</u>.  In the event of a vacancy by reason of the death, Disability, or removal of the Litigation Trustee, or prospective vacancy by reason of resignation, a successor Litigation Trustee shall be selected by a [simple majority] vote of the Oversight Board. If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Litigation Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Litigation Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Litigation Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Litigation Sub-Trust, or the Claimant Trust on behalf of the Litigation Sub-Trust.  The successor Litigation Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Litigation Trustee.

(b)      Vesting or Rights in Successor Litigation Trustee.  Every successor Litigation Trustee appointed hereunder shall execute, acknowledge, and deliver to the Litigation Sub-Trust, the Claimant Trustee, the exiting Litigation Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Litigation Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Litigation Trustee except that the successor Litigation Trustee shall not be liable for the acts or omissions of the retiring Litigation Trustee.  In no event shall the retiring Litigation Trustee be liable for the acts or omissions of the successor Litigation Trustee.

(c)      Interim Litigation Trustee.  During any period in which there is a vacancy in the position of Litigation Trustee, the Oversight Board shall appoint one of its Members or the Claimant Trustee to serve as the interim Litigation Trustee (the "Interim Trustee") until a successor Litigation Trustee is appointed pursuant to Section 3.8(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board or Claimant Trustee, as applicable, merely by such Person's appointment as Interim Trustee.

3.9      Continuance of Litigation Sub-Trust.  The death, resignation, or removal of the Litigation Trustee shall not operate to terminate the Litigation Sub-Trust created by this Agreement or to revoke any existing agency (other than any agency of the Litigation Trustee as the Litigation Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Litigation Trustee.  In the event of the resignation or removal of the Litigation Trustee, the Litigation Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Litigation Trustee's capacity under this Agreement and the conveyance of the Estate Claims then held by the exiting Litigation Trustee to the successor Litigation Trustee; (ii) deliver to the successor Litigation Trustee all non-privileged documents, instruments, records, and other writings relating to the Litigation Sub-Trust as may be in the possession or under the control of the exiting Litigation Trustee, provided, the exiting Litigation Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Litigation Trustee and the cost of making such copies shall be a Litigation Sub-Trust Expense to be paid by the Litigation Sub-Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Litigation Trustee's obligations and functions by his successor, provided the fees and expenses of such assistance and cooperation shall be paid to the exiting Litigation Trustee by the Litigation Sub-Trust.  The exiting Litigation Trustee shall irrevocably appoint the successor Litigation Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Litigation Trustee is obligated to perform under this Section 3.9.

3.10     Litigation Trustee as "Estate Representative".  The Litigation Trustee will be the exclusive trustee of the Litigation Sub-Trust Assets, for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "Estate Representative") with respect to the Estate Claims, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement.  The Litigation Trustee will be the successor-in-interest to the

DOCS_NY:43848.5 36027/002

006227

Debtor with respect to any action pertaining to the Estate Claims, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interests constituting or relating to Estate Claims are preserved and retained and may be enforced by the Litigation Trustee as an Estate Representative.

3.11    Books and Records.

(a)    The Litigation Trustee shall maintain, in respect of the Litigation Sub-Trust and the Claimant Trust, books and records pertinent to Estate Claims in its possession and the income of the Litigation Sub-Trust and payment of expenses, liabilities, and claims against or assumed by the Litigation Sub-Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Sub-Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Sub-Trust, or as a condition for managing any payment or distribution out of the Litigation Sub-Trust. Notwithstanding the foregoing, the Litigation Trustee shall to retain such books and records, and for such periods, with respect to any Reorganized Debtor Assets as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

(b)    The Litigation Trustee may dispose some or all of the books and records maintained by the Litigation Trustee at the later of (i) such time as the Litigation Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Litigation Sub-Trust, including with respect to the Estate Claims, or (ii) upon the termination and winding up of the Litigation Sub-Trust under Article IX of this Agreement.

3.12    Reports.

(a)    Financial and Status Reports. The fiscal year of the Litigation Sub-Trust shall be the calendar year. Within 90 days after the end of each calendar year during the term of the Litigation Sub-Trust, and within 45 days after the end of each calendar quarter during (other than the fourth quarter) the term of the Litigation Sub-Trust and as soon as practicable upon termination of the Litigation Sub-Trust, the Litigation Trustee shall make available upon request to the Oversight Board or Litigation Sub-Trust Beneficiary appearing on its records as of the end of such period or such date of termination, a written report including: (i) unaudited financial statements of the Litigation Sub-Trust for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Trustee) reflecting the result of such agreed-upon procedures relating to the financial accounting administration of the Litigation Sub-Trust as proposed by the Litigation Trustee; (ii) a summary description of any action taken by the Litigation Sub-Trust that, in the judgment of the Litigation Trustee, materially affects the Litigation Sub-Trust and of which notice has not previously been given to the Oversight Board or Litigation Sub-Trust Beneficiary, provided, that any such description shall not include any privileged or confidential information of

DOCS_NY:43848.5 36027/002

006228

the Litigation Trustee; and (iii) a description of the progress of liquidating the Litigation Sub-Trust Assets and making distributions to the Litigation Sub-Trust Beneficiary and any other material information relating to the Litigation Sub-Trust Assets and the administration of the Litigation Sub-Trust deemed appropriate to be disclosed by the Litigation Trustee, which description shall include a written report detailing, among other things, the litigation status of the Estate Claims transferred to the Litigation Sub-Trust, any settlements entered into by the Litigation Sub-Trust with respect to the Estate Claims, the proceeds recovered to date from Estate Claims, and the distributions made by the Litigation Sub-Trust.

(b)      Annual Plan and Budget.   If instructed by the Oversight Board, the Litigation Trustee shall prepare and submit to the Oversight Board for approval an annual plan and budget in such detail as reasonably requested.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)      Compensation and Expenses.

(i)      Compensation.   As compensation for any services rendered by the Litigation Trustee in connection with this Agreement, the Litigation Trustee shall receive initial compensation in a manner and amount as agreed upon by the Committee. Any additional compensation or compensation of a Successor Litigation Trustee shall be determined by the Oversight Board.

(ii)      Expense Reimbursements.   All reasonable out-of-pocket expenses of the Litigation Trustee in the performance of his or her duties hereunder, shall be reimbursed as Litigation Sub-Trust Expenses paid by the Litigation Sub-Trust.

(b)      Professionals.

(i)      Engagement of Professionals.   The Litigation Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.   The Litigation Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

(ii)      Fees and Expenses of Professionals.   The Litigation Trustee shall pay the reasonable fees and expenses of any retained professionals as Litigation Sub-Trust Expenses.

3.14    Reliance by Litigation Trustee.   Except as otherwise provided herein, the Litigation Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Litigation Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Litigation Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.   The Litigation Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Litigation Trustee in accordance therewith.   The

Litigation Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning Estate Claims, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Litigation Trustee in accordance therewith.  The Litigation Sub-Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

3.15    <u>Commingling of Litigation Sub-Trust Assets</u>.  The Litigation Trustee shall not commingle any of the Litigation Sub-Trust Assets with his or her own property or the property of any other Person.

3.16    <u>Delaware Trustee</u>.

(a)    The Delaware Trustee shall have the limited power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Litigation Sub-Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement, in either case as may be directed in a writing delivered to the Delaware Trustee by the Litigation Trustee and upon which the Delaware Trustee shall be entitled to conclusively and exclusively rely; <u>provided</u>, <u>however</u>, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Litigation Sub-Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Litigation Sub-Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Litigation Sub-Trust. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.  The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Claimant Trustee or the Litigation Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the Litigation Sub-Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Statutory Trust Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to those expressly set forth in this Section 3.16 and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Litigation Sub-Trust, the other parties hereto or any beneficiary of the Litigation Sub-Trust, it is hereby understood and agreed by the other parties hereto that such duties and

liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement.

(b)     The Delaware Trustee shall serve until such time as the Litigation Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Litigation Trustee in accordance with the terms hereof.  The Delaware Trustee may resign at any time upon the giving of at least thirty (30) days' advance written notice to the Litigation Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Litigation Trustee in accordance with the terms hereof. If the Litigation Trustee does not act within such thirty (30) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(c)     Upon the resignation or removal of the Delaware Trustee, the Litigation Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Delaware Statutory Trust Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Litigation Trustee and any undisputed fees, expenses and indemnity due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Agreement.

(d)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.  The Litigation Sub-Trust shall promptly advance and reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(e)     WTNA shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(f)     Any corporation or association into which WTNA may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Delaware Trustee is a party, will be and become the successor Delaware Trustee under this Agreement and will have and succeed to the rights, powers, duties, immunities

DOCS_NY:43848.5 36027/002

006231

and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## ARTICLE IV.
## THE OVERSIGHT BOARD

The Oversight Board shall be governed by Article IV of the Claimant Trust Agreement.

## ARTICLE V.
## TRUST INTERESTS

5.1    Litigation Sub-Trust Interests.  On the date hereof, the Litigation Sub-Trust shall issue Trust Interests to the Claimant Trust as the sole Litigation Sub-Trust Beneficiary.  The Litigation Sub-Trust Beneficiary shall be entitled to distributions from the Litigation Sub-Trust Assets in accordance with the terms of the Plan and this Agreement.

5.2    Transferability of Trust Interests.  No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected.

5.3    Exemption from Registration.  The Parties hereto intend that the rights of the Litigation Sub-Trust Beneficiary arising under this Litigation Sub-Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Litigation Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Litigation Sub-Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act.  The Trust Interests shall not have consent or voting rights or otherwise confer on the Litigation Sub-Trust Beneficiary any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Litigation Trustee under this Agreement.

## ARTICLE VI.
## DISTRIBUTIONS

6.1    Distributions.  The Litigation Trustee shall distribute Cash proceeds of the Estate Claims to the Claimant Trust within 30 days of receipt of such Cash proceeds, net of any amounts that (a) are reasonably necessary to maintain the value of the Litigation Sub-Trust Assets pending their monetization or other disposition during the term of the Litigation Sub-Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Litigation Sub-Trust Expenses and any other expenses incurred by the Litigation Sub-Trust (including, but not limited to, any taxes imposed on or payable by the Litigation Trustee with respect to the Litigation Sub-Trust Assets), and (c) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Litigation Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses).

6.2    Manner of Payment or Distribution.  All distributions made by the Litigation Trustee on behalf of the Litigation Sub-Trust to the Litigation Sub-Trust Beneficiary shall be

payable by the Litigation Trustee directly to the Claimant Trust, as sole Litigation Sub-Trust Beneficiary, on the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3    Delivery of Distributions.  All distributions under this Agreement to the Claimant Trust shall be made pursuant to wire instructions provided by the Claimant Trustee to the Litigation Trustee.

## ARTICLE VII.
## TAX MATTERS

7.1    Tax Treatment and Tax Returns.  It is intended that the Litigation Sub-Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) the sole beneficiary of which is the Claimant Trust.  Consistent with such treatment, it is intended that the transfer of the Litigation Sub Trust Assets from the Claimant Trust to the Litigation Sub Trust will be treated as a non-event for federal income tax purposes (and foreign, state, and local income tax purposes where applicable).  Further, because the Claimant Trust is itself intended to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable),it is intended that the beneficiaries of the Claimant Trust will be treated as the grantor of the Litigation Sub-Trust and owner of the Litigation Sub-Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable).  The Litigation Trustee shall cooperate with the Claimant Trustee in connection with the preparation and filing of any federal income tax returns (and foreign, state, and local income tax returns where applicable) or information statements relating to the Litigation Sub Trust Assets.

7.2    Withholding.  The Litigation Trustee may withhold from any amount distributed from the Litigation Sub-Trust to the Litigation Sub-Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof.  Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the Litigation Sub-Trust Beneficiary.  As a condition to receiving any distribution from the Litigation Sub-Trust, the Litigation Trustee may require that the Litigation Sub-Trust Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Litigation Trustee to comply with applicable tax reporting and withholding laws.

## ARTICLE VIII.
## STANDARD OF CARE AND INDEMNIFICATION

8.1    Standard of Care.  None of the Litigation Trustee, acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Litigation Sub-Trust or to any Person (including the Litigation Sub-Trust Beneficiary and Claimant Trust Beneficiaries) in connection with the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either

declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Litigation Trustee, the Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence.  The employees, agents and professionals retained by the Litigation Sub-Trust, the Litigation Trustee, the Delaware Trustee or Oversight Board shall not be personally liable to the Litigation Sub-Trust or any other Person in connection with the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence.  None of the Litigation Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Litigation Sub-Trust or to any Person for the acts or omissions of any employee, agent or professional of the Litigation Sub-Trust or Litigation Trustee, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Litigation Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Litigation Sub-Trust.

8.2    <u>Indemnification</u>.    The Litigation Trustee (including each former Litigation Trustee), WTNA in its individual capacity and as Delaware Trustee, the Oversight Board, and all past and present Members (collectively, the "<u>Indemnified Parties</u>") shall be indemnified by the Litigation Sub-Trust against and held harmless by the Litigation Sub-Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Litigation Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Litigation Sub-Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence.  If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Litigation Sub-Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Litigation Trustee and/or Oversight Board, as applicable; <u>provided</u>, <u>however</u>, that the failure of an Indemnified Party to promptly notify the Litigation Trustee and/or Oversight Board of an indemnification obligation will not excuse the Litigation Sub-Trust from indemnifying the Indemnified Party unless such delay has caused the Litigation Sub-Trust material harm.  The Litigation Sub-Trust shall periodically advance or otherwise reimburse on demand the Indemnified Party's reasonable legal and other expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and related expenses) incurred in connection therewith as a Litigation Sub-Trust Expense, but the Indemnified Party shall be required to repay promptly to the Litigation Sub-Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, willful misconduct, or gross negligence in connection with the affairs of the Litigation Sub-Trust with respect to which such expenses were paid.  The Litigation Sub-Trust shall indemnify and hold harmless the

employees, agents and professionals of the Litigation Sub-Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties. For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Litigation Trustee, WTNA in its individual capacity and as Delaware Trustee, or Member or the estate of any decedent Litigation Trustee or Member. The indemnification provided hereby shall be a Litigation Sub-Trust Expense. The terms of this Section 8.2 shall survive the termination of this Agreement and the resignation or removal of any Indemnified Party.

8.3     To the extent applicable, the provisions and protections set forth in Article IX of the Plan will apply to the Litigation Sub-Trust, the Litigation Trustee, Oversight Board, and the Members.

## ARTICLE IX.
## TERMINATION

9.1     Duration. The Litigation Trustee, the Litigation Sub-Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as the Litigation Trustee determines that the Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate, and all Distributions required to be made by the Litigation Trustee to the Litigation Sub-Trust Beneficiary under the Plan and this Agreement have been made, but in no event shall the Litigation Sub-Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Sub-Trust Assets.

9.2     Continuance of the Litigation Trustee for Winding Up. After dissolution of the Litigation Sub-Trust and for purpose of liquidating and winding up the affairs of the Litigation Sub-Trust, the Litigation Trustee shall continue to act as such until the Litigation Trustee's duties have been fully performed. Prior to the final distribution of all remaining Litigation Sub-Trust Assets, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Litigation Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Litigation Sub-Trust, until such time as the winding up of the Litigation Sub-Trust is completed. Upon the dissolution of the Litigation Sub-Trust and completion of the winding up of the assets, liabilities and affairs of the Litigation Sub-Trust pursuant to the Delaware Statutory Trust Act, the Litigation Trustee shall prepare, execute and file a certificate of cancellation with the State of Delaware to terminate the Litigation Sub-Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "Termination Date"). If the Delaware Trustee's and the Claimant Trustee's signature is required for purposes of filing such certificate of cancellation, the Litigation Trustee shall provide the Delaware Trustee and the Claimant Trustee with written direction to execute such certificate of cancellation, and the Delaware Trustee and the Claimant Trustee shall be entitled to conclusively and exclusively rely upon such written direction without further inquiry. Subject in all respects to Section 3.11, upon the Termination date, the Litigation Trustee shall retain for a period of two (2) years, as a Litigation Sub-Trust Expense, the books, records, and certificated and other documents and files that have

been delivered to or created by the Litigation Trustee. Subject in all respects to Section 3.11, at the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.3    <u>Termination of Duties</u>. Except as otherwise specifically provided herein, upon the Termination Date of the Litigation Sub-Trust, the Litigation Trustee, the Oversight Board, and its Members shall have no further duties or obligations hereunder.

### ARTICLE X.
### AMENDMENTS AND WAIVER

The Litigation Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Litigation Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; <u>provided</u> that the Litigation Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement. No amendment or waiver of this Agreement that adversely affects the Delaware Trustee shall be effective unless the Delaware Trustee has consented thereto in writing in its sole and absolute discretion.

### ARTICLE XI.
### MISCELLANEOUS

11.1    <u>Trust Irrevocable</u>. Except as set forth in this Agreement, establishment of the Litigation Sub-Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Litigation Sub-Trust Beneficiary.

11.2    <u>Litigation Sub-Trust Beneficiary has No Legal Title to Litigation Sub-Trust Assets</u>. The Litigation Sub-Trust Beneficiary shall have no legal title to any part of the Litigation Sub-Trust Assets.

11.3    <u>Agreement for Benefit of Parties Only</u>. Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Litigation Trustee, Oversight Board, and the Litigation Sub-Trust Beneficiary any legal or equitable right, remedy or claim under or in respect of this Agreement. The Litigation Sub-Trust Assets shall be held for the sole and exclusive benefit of the Litigation Sub-Trust Beneficiary.

11.4    <u>Notices</u>. All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a)    If to the Litigation Trustee:

Marc S. Kirschner
c/o Goldin Associates LLC, a Teneo Company

20

350 Fifth Avenue
New York, New York 10118

With a copy to:

Quinn Emanuel LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Attn:   Deborah J. Newman
(deborahnewman@quinnemanuel.com)

(b)      If to the Claimant Trustee:

Claimant Trustee
c/o Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas  75201
Attention:  James P. Seery, Jr.

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
          Ira Kharasch (ikharasch@pszjlaw.com)
          Gregory Demo (gdemo@pszjlaw.com)

(c)      If to the Delaware Trustee:

Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE 19890
Attn:  Corporate Trust Administration/David Young
Email:  nmarlett@wilmingtontrust.com
Phone:  (302) 636-6728
Fax:  (302) 636-4145

Notice mailed shall be effective on the date mailed or sent.  Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.4 to the entity to be charged with knowledge of such change.

11.5    Severability.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

DOCS_NY:43848.5 36027/002

006237

11.6     Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.7     Binding Effect, etc.  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Litigation Sub-Trust, the Litigation Trustee, and the Litigation Sub-Trust Beneficiary, and their respective successors and assigns.  Any notice, direction, consent, waiver or other instrument or action by any Litigation Sub-Trust Beneficiary shall bind its successors and assigns.

11.8     Headings; References.  The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.9     Governing Law.  This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.10   Consent to Jurisdiction.  Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.11   Transferee Liabilities.  The Litigation Sub-Trust shall have no liability for, and the Litigation Sub-Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.  In no event shall the Litigation Trustee or the Litigation Sub-Trust Beneficiary have any personal liability for such claims.  If any liability shall be asserted against the Litigation Sub-Trust or the Litigation Trustee as the transferee of the Litigation Sub-Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Litigation Trustee may use such part of the Litigation Sub-Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Litigation Trustee as a Litigation Sub-Trust Expense.

[Remainder of Page Intentionally Blank]

DOCS_NY:43848.5 36027/002

006238

IN WITNESS HEREOF, the parties hereto have caused this Litigation Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

**CLAIMANT TRUSTEE**

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

**LITIGATION TRUSTEE**

By: _____

Marc S. Kirschner, not individually but solely in his capacity as the Litigation Trustee

**DELAWARE TRUSTEE**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
Name:
Title:

DOCS_NY:43848.3 36027/002

006239

IN WITNESS HEREOF, the parties hereto have caused this Litigation Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

**CLAIMANT TRUSTEE**

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

**LITIGATION TRUSTEE**

By: _____

Marc S. Kirschner, not individually but solely in his capacity as the Litigation Trustee

**DELAWARE TRUSTEE**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
Name:
Title:

23

006240

IN WITNESS HEREOF, the parties hereto have caused this Litigation Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

**CLAIMANT TRUSTEE**

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

**LITIGATION TRUSTEE**

By: _____

Marc S. Kirschner, not individually but solely in his capacity as the Litigation Trustee

**DELAWARE TRUSTEE**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: _____

Name: Neumann Marlett
Title: Bank Officer

DOCS_NY:43848.3 36027/002

006241

# EXHIBIT 45

006242

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| ***Defendants.*** | § | |

## ORIGINAL COMPLAINT

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital
Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd.
("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of
1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF")
(HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which
have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the
Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement,
among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126



At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

## III.

## JURISDICTION AND VENUE

**7.**     This Court has subject matter jurisdiction over this dispute under <mark>28 U.S.C. § 1331</mark> as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under <mark>28 U.S.C. § 1367</mark>.

**8.**     Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under <mark>18 U.S.C. § 1965(d)</mark>.

**9.**     Venue is proper in this Court under <mark>28 U.S.C. § 1391(b)</mark> and <mark>(c)</mark> because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under <mark>18 U.S.C. § 1965(d)</mark>.

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.**     Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**     Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

---

Original Complaint                                                                                    Page 7

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

---

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

---

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current*
valuation when communicating with an investor, such as what may or may not be taken into
account, and what cannot pass muster as a current valuation. Upon information and belief, these
regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the
RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating
the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance
both with the Adviser Act regulations and its Form ADV representations, and/or simply
misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because
Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have
breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary
relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and
the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the
Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value
as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to
purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment
Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary
relationship by defrauding his client in any investment transaction connected to the Advisory
relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla.
Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206
of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection
with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equitization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.    As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.    Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.    Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.    Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.    In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**SECOND CAUSE OF ACTION**
***Breach of HCLOF Company Agreement***
**(By Holdco against HCLOF, HCM and HCFA)**

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

Original Complaint                                                                                    Page 18

100.    Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101.    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102.    Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

103.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104.    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105.    Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107.    It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.**    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.**    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.**    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.**    Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.**    Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

**113.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.**    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.**    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071 Document 1-4 Filed 04/07/23   Page 72 of 214   PageID 5744
Case 3:21-cv-00742-B Document 33-60 Filed 02/07/22   Page 73 of 214   PageID 3744

126.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest
Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount,
which would violate the letter and spirit of the Adviser's Act.

127.    Seery was informed in late December 2020 at an in-person meeting in Dallas to
which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities
because Seery had learned from James Dondero, who was on the Board of MGM, of a potential
purchase of the company.  The news of the MGM purchase should have caused Seery to revalue
the HCLOF investment in MGM.

128.    In or around October 2020, Seery (who controls the Board of CSS Medical) was
pursuing "equalization" of CSS Medical's debt, which would have increased the value of certain
securities by 25%. In several communications through the U.S. interstate wires and/or mails, and
with Plaintiffs, and the several communications with Harbourvest during the negotiations of the
settlement, Seery failed to disclose these changes which were responsible in part for the ever-
growing value of the HCLOF CLO portfolio.

129.    Seery was at all relevant times operating as an agent of HCM.

130.    This series of related violations of the wire fraud, mail fraud, and securities fraud
laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of
racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000
payday under the confirmation agreement.

131.    The federal RICO statute makes it actionable for one's conduct of an enterprise to
include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions
require full transparency and accountability to an advisers' investors and clients and does not
require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071 Document 3460 Filed 04/07/23 Page 73 of 214 PageID 5745

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.    Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

FIFTH CAUSE OF ACTION
*Tortious Interference*
**(CLO Holdco against HCM)**

134.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## **JURY DEMAND**

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## **PRAYER FOR RELIEF**

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

a.   Actual damages;

b.   Disgorgement;

c.   Treble damages;

d.   Exemplary and punitive damages;

e.   Attorneys' fees and costs as allowed by common law, statute or contract;

f.   A constructive trust to avoid dissipation of assets;

g.   All such other relief to which Plaintiff is justly entitled.

006267

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
      jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# EXHIBIT 46

006269

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

## DEBTOR'S NOTICE OF FILING OF PLAN SUPPLEMENT TO THE FIFTH
## AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
## MANAGEMENT, L.P. (AS MODIFIED)

**PLEASE TAKE NOTICE** that on January 22, 2021, the Debtor filed the *Fifth Amended*

*Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



(as subsequently amended and/or modified, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor"), filed the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* on November 24, 2020 [Docket No. 1473] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit C to the Disclosure Statement was the Debtor's Liquidation Analysis/Financial Projections.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** are the Debtor's amended Liquidation Analysis/Financial Projections (the "Amended Liquidation Analysis/Financial Projections"), which supersede the Liquidation Analysis/Financial Projections filed on November 24, 2020, with the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that a prior version of the Amended Liquidation Analysis/Financial Projections was provided to parties in interests on January 28, 2021, in advance of the deposition of James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer, and that the Amended Liquidation Analysis/Financial Projections differ from such version in two respects:

- The Amended Liquidation Analysis/Financial Projections include the settlement in principle between UBS and the Debtor, which provides for UBS receiving a Class 8 (General Unsecured Claim) of $50,000,000 and a Class 9 (Subordinated Claim) of $25,000,000. The prior Liquidation Analysis/Financial Projections included a Class 8 (General Unsecured Claim) in the amount of $94,761,076 pursuant to the Court's order temporarily allowing the UBS claim in that amount for voting purposes; and

- The Debtor inadvertently understated the aggregate amount of Class 8 (General Unsecured Claims) by $4,392,937, which error is corrected in the Amended Liquidation Analysis/Financial Projections.

**PLEASE TAKE NOTICE** that the Debtor hereby files the documents included herewith

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

DOCS_NY:42174.4 36027/002

as **Exhibits DD-FF** (collectively, the "Fifth Plan Supplement") as Exhibits DD-FF to the Plan:

**Exhibit DD**: Schedule of Retained Causes of Action (supersedes Exhibits E, L, and Q);

**Exhibit EE**: Revisions to Form of Claimant Trust Agreement (amends Exhibit R); and

**Exhibit FF**: Schedule of Contracts and Leases to Be Assumed (supersedes Exhibit H, I, and X).[3]

**PLEASE TAKE NOTICE** that the Debtor hereby gives notice of supplemental amendments (the "Plan Amendments") to the Plan, which are set forth in the redlined excerpts of the Plan attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Blank]*

---

[3] The Schedule of Contracts and Leases includes an agreement with Bloomberg Finance, L.P. ("Bloomberg"). The Debtor is currently in discussions with Bloomberg regarding the assumption of such agreement.

006272

Dated: February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:42174.4 36027/002

006273

# EXHIBIT A

**Highland Capital Management, L.P.**
*Disclaimer For Financial Projections*

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

006276

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is March 1, 2021

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021

D. Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the interim interest income and principal payments are not collected due to prepayment on note

E. Fixed assets currently used in daily operations are sold in June 2021 for $0

F. Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L. Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HMI").

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):

   o By September 30, 2021 - $50,000,000
   o By March 31, 2022 – additional $50,000,000
   o By June 30, 2022 – additional $25,000,000
   o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Q. Assumptions subject to revision based on business decision and performance of the business

006277

2/1/2021

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | | |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 - Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | |
| Subtotal | (27,793) | (17,514) |
| | | |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| | | |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

*Footnotes:*

[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs
[3] Estimated expenses through final distribution exclude non-cash expenses:
Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO
[6] Debtor will pay off unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages
[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund
UBS claim included at $50.0 million.

*Notes:*
All claim amounts are estimated as of February 1, 2020 and subject to change

2/1/2021

006278

**Highland Capital Management, L.P.**
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast --> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | - | - | - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 – Frontier Secured Claim | - | - | - | 5,528 | - | - | - | - | - | - | - |
| Class 3 – Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 273,219 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Class 9 – Subordinated Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 278,747 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | $ 141,230 | 291,639 | 283,468 | 233,723 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Partners' Capital | 199,551 | 182,842 | 190,005 | 16,154 | 4,500 | (5,495) | (30,636) | (36,715) | (41,677) | (44,396) | (78,354) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

[1] Class 9 has $60 million of subordinated claims; Debtor anticipates no distributions to Class 9

**Highland Capital Management, L.P.**
**Profit/Loss**
*(US $000's)*

| | Actual<br>Jan 2020 to June 2020 Total | Actual<br>3 month ended Sept 2020 | Forecast --><br>3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 590 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,139 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (156,042) | 326 | (93) | 29 | (155,780) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (172,669) | $ (9,978) | $ (5,433) | $ (4,259) | $ (192,339) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (1,013) | 522 | - | - | (491) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | 4,523 | (32,857) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | - | - |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | (13,301) | (13,301) |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| Net Income | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (220,641) |

*Footnotes:*
[1] Operating expenses include an adjustment in January 2021 to account for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $197.3 million in Q1 2021 includes:
   [a] $209.7 million was expensed to record for the increase of allowed claims.
   [b] Income of $11.7 million for the accrued, but unpaid payroll liability related to the Debtor's deferred bonus programs amount written-off.

2/1/2021

006280

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| | Forecast --> | | | | | |
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (156,434) |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (214,470) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (268,359) |

**Highland Capital Management, L.P.**
*Cash Flow Indirect*
*(US $000's)*

|  | Forecast ---> | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
| Net (Loss) Income | $ (16,708) | $ (14,453) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,758) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,387 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | - |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (217,998) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,983) |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 278,747 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,300) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 194,580 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,300) |
| Net Change in Cash | $ (9,107) | $ 25,159 | $ (20,719) | $ 29,735 | $ 2,770 | $ 92,303 | $ (54,404) | $ (8,495) | $ (2,870) | $ (69,323) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ 69,368 |

006281

# EXHIBIT B

006282

61.     "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, ~~direct and indirect majority owned subsidiaries, and the Managed Funds~~, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

~~9~~

006283

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to ~~11 U.S.C. § 510 or~~ an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

~~16~~

Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.      Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed Priority Tax Claim, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however,* that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.      Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within

18

**I.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.      Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. ~~Under section 510 of the Bankruptcy Code, upon~~Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.      Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

~~25~~

006286

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the ~~Effective~~Confirmation Date.  Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts

~~39~~

006287

forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.      Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or

47

47

# EXHIBIT DD

006289

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

## Annex 1

11 Estates Lane, LLC
1110 Waters, LLC
140 Albany, LLC
1525 Dragon, LLC
17720 Dickerson, LLC
1905 Wylie LLC
2006 Milam East Partners GP, LLC
2006 Milam East Partners, L.P.
201 Tarrant Partners, LLC
2014 Corpus Weber Road LLC
2325 Stemmons HoldCo, LLC
2325 Stemmons Hotel Partners, LLC
2325 Stemmons TRS, Inc.
300 Lamar, LLC
3409 Rosedale, LLC
3801 Maplewood, LLC
3801 Shenandoah, L.P.
3820 Goar Park LLC
400 Seaman, LLC
401 Ame, L.P.
4201 Locust, L.P.
4312 Belclaire, LLC
5833 Woodland, L.P.
5906 DeLoache, LLC
5950 DeLoache, LLC
7758 Ronnie, LLC
7759 Ronnie, LLC
AA Shotguns, LLC
Aberdeen Loan Funding, Ltd.
Acis CLO 2017-7 Ltd
Acis CLO Management GP, LLC
Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*
Acis CLO Management Holdings, L.P.
Acis CLO Management Intermediate Holdings I, LLC
Acis CLO Management Intermediate Holdings II, LLC
Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*
Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.
Acis CMOA Trust
Advisors Equity Group LLC
Alamo Manhattan Hotel I, LLC (Third Party)
Allenby, LLC
Allisonville RE Holdings, LLC
AM Uptown Hotel, LLC
Apex Care, L.P
Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*
Ascendant Advisors
Atlas IDF GP, LLC
Atlas IDF, LP
BB Votorantim Highland Infrastructure, LLC
BDC Toys Holdco, LLC
Beacon Mountain, LLC
Bedell Trust Ireland Limited (Charitable trust account)
Ben Roby (third party)
BH Equities, LLC
BH Heron Pointe, LLC
BH Hollister, LLC
BH Willowdale Manager, LLC
Big Spring Partners, LLC
Blair Investment Partners, LLC
Bloomdale, LLC
Brave Holdings III Inc.
Brentwood CLO, Ltd.
Brentwood Investors Corp.
Brian Mitts
Bristol Bay Funding Ltd.
Bristol Bay Funding, Ltd.
BVP Property, LLC
C-1 Arbors, Inc.
C-1 Cutter's Point, Inc.
C-1 Eaglecrest, Inc.
C-1 Silverbrook, Inc.
Cabi Holdco GP, LLC
Cabi Holdco I, Ltd
Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

Cayco Admin Ltd.

Cayco Insolvency Ltd.

CG Works, Inc.

CG Works, Inc.
(fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault
James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Four Rivers Co-Invest GP, LLC
Four Rivers Co-Invest, L.P.
FRBH Abbington SM, Inc.
FRBH Abbington, LLC
FRBH Arbors, LLC
FRBH Beechwood SM, Inc.
FRBH Beechwood, LLC
FRBH C1 Residential, LLC
FRBH Courtney Cove SM, Inc.
FRBH Courtney Cove, LLC
FRBH CP, LLC
FRBH Duck Creek, LLC
FRBH Eaglecrest, LLC
FRBH Edgewater JV, LLC
FRBH Edgewater Owner, LLC
FRBH Edgewater SM, Inc.
FRBH JAX-TPA, LLC
FRBH Nashville Residential, LLC
FRBH Regatta Bay, LLC
FRBH Sabal Park SM, Inc.
FRBH Sabal Park, LLC
FRBH Silverbrook, LLC
FRBH Timberglen, LLC
FRBH Willow Grove SM, Inc.
FRBH Willow Grove, LLC
FRBH Woodbridge SM, Inc.
FRBH Woodbridge, LLC
Freedom C1 Residential, LLC
Freedom Duck Creek, LLC
Freedom Edgewater, LLC
Freedom JAX-TPA Residential, LLC
Freedom La Mirage, LLC
Freedom LHV LLC
Freedom Lubbock LLC
Freedom Miramar Apartments, LLC
Freedom Sandstone, LLC
Freedom Willowdale, LLC
Fundo de Investimento em Direitos Creditorios
BB Votorantim Highland Infraestrutura
G&E Apartment REIT The Heights at Olde
Towne, LLC
G&E Apartment REIT The Myrtles at Olde
Towne, LLC

GAF REIT, LLC
GAF Toys Holdco, LLC
Gardens of Denton II, L.P.
Gardens of Denton III, L.P.
Gleneagles CLO, Ltd.
Goverannce RE, Ltd.
Governance Re, Ltd.
Governance, Ltd.
Grant Scott
Grant Scott, Trustee of The SLHC Trust
Grayson CLO, Ltd.
Grayson Investors Corp.
Greater Kansas City Community Foundation
(third party)
Greenbriar CLO, Ltd.
Greg Busseyt
Gunwale LLC
Gunwale, LLC
Hakusan, LLC
Hammark Holdings LLC
Hampton Ridge Partners, LLC
Harko, LLC
Harry Bookey/Pam Bookey (third party)
Haverhill Acquisition Co., LLC
Haygood, LLC
HB 2015 Family LP (third party)
HCBH 11611 Ferguson, LLC
HCBH Buffalo Pointe II, LLC
HCBH Buffalo Pointe III, LLC
HCBH Buffalo Pointe, LLC
HCBH Hampton Woods SM, Inc.
HCBH Hampton Woods, LLC
HCBH Overlook SM, Inc.
HCBH Overlook, LLC
HCBH Rent Investors, LLC
HCMS Falcon GP, LLC
HCMS Falcon, L.P.
HCO Holdings, LLC
HCOF Preferred Holdings, L.P.
HCOF Preferred Holdings, LP
HCOF Preferred Holdings, Ltd.
HCRE 1775 James Ave, LLC
HCRE Addison TRS, LLC

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highlandi HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company, LLC

Hinduja Bank (Switzerland) Ltd

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov 25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt Descendants' Trust

Mark and Pam Okada Family Trust - Exempt Trust #2

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust - Exempt Trust #2

Mark K. Okada

Mark Okada
Mark Okada and Pam Okada
Mark Okada and Pam Okada, as joint owners
Mark Okada/Pamela Okada
Markham Fine Jewelers, L.P.
Markham Fine Jewelers, LP
Matt McGraner
Meritage Residential Partners, LLC
MGM Studios HoldCo, Ltd.
Michael Rossi
ML CLO XIX Sterling (Cayman), Ltd.
N/A
Nancy Dondero
NCI Apache Trail LLC
NCI Assets Holding Company LLC
NCI Country Club LLC
NCI Fort Worth Land LLC
NCI Front Beach Road LLC
NCI Minerals LLC
NCI Royse City Land LLC
NCI Stewart Creek LLC
NCI Storage, LLC
Neil Labatte
Neutra, Ltd.
New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company,
LLC)*

NexAnnuity Holdings, Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities Inc.
NexBank Securities, Inc.

NexBank SSB
NexBank Title, Inc.
(dba NexVantage Title Services)

NexBank, SSB
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc.

NexPoint Capital, Inc. *(fka NexPoint Capital,
LLC)*
NexPoint CR F/H DST, LLC
NexPoint Credit Strategies Fund
NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*
NexPoint DRIP
NexPoint Energy and Materials Opportunities
Fund *(fka NexPoint Energy Opportunities
Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Flamingo Property Manager, LlC
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP,
LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions,
L.P.)*

NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*
NexPoint Multifamily Capital Trust, Inc.
NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc.,
fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership,
L.P.

NexPoint Peoria, LLC
NexPoint Polo Glen DST

NexPoint Polo Glen Holdings, LLC

NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities,  LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc.
*(fka Highland Capital Funds Distributor, Inc.)*
*(fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund
*(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund
*(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST
*(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, LLC

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC
*(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

NHT Operating Partnership II, LLC

NHT Operating Partnership, LLC

NHT Salem, LLC

NHT SP Parent, LLC

NHT SP TRS, LLC

NHT SP, LLC

NHT Tigard TRS, LLC

NHT Tigard, LLC

NHT TRS, Inc.

NHT Uptown, LLC

NHT Vancouver TRS, LLC

NHT Vancouver, LLC

NLA Assets LLC

NMRT TRS, Inc.

NREA Adair DST Manager, LLC

NREA Adair Investment Co, LLC

NREA Adair Joint Venture, LLC

NREA Adair Leaseco Manager, LLC

NREA Adair Leaseco, LLC

NREA Adair Property Manager LLC

NREA Adair, DST

NREA Ashley Village Investors, LLC

NREA Cameron Creek Investors, LLC

NREA Cityplace Hue Investors, LLC

NREA Crossing Investors LLC

NREA Crossings Investors, LLC

NREA Crossings Ridgewood Coinvestment, LLC *(fka NREA Crossings Ridgewood Investors, LLC)*

NREA DST Holdings, LLC

NREA El Camino Investors, LLC

NREA Estates Inc.

NREA Estates Investment Co, LLC

NREA Estates Leaseco, LLC

NREA Estates Manager, LLC

NREA Estates Property Manager, LLC

NREA Estates, DST

NREA Gardens DST Manager LLC

NREA Gardens DST Manager, LLC

NREA Gardens Investment Co, LLC

NREA Gardens Leaseco Manager, LLC

NREA Gardens Leaseco, LLC

NREA Gardens Property Manager, LLC

NREA Gardens Springing LLC

NREA Gardens Springing Manager, LLC

NREA Gardens, DST

NREA Hidden Lake Investment Co, LLC

NREA Hue Investors, LLC

NREA Keystone Investors, LLC

NREA Meritage Inc.

NREA Meritage Investment Co, LLC

NREA Meritage Leaseco, LLC

NREA Meritage Manager, LLC

NREA Meritage Property Manager, LLC

NREA Meritage, DST

NREA Oaks Investors, LLC

NREA Retreat Investment Co, LLC

NREA Retreat Leaseco, LLC

NREA Retreat Manager, LLC

NREA Retreat Property Manager, LLC

NREA Retreat, DST

NREA SE MF Holdings LLC

NREA SE MF Holdings, LLC

NREA SE MF Investment Co, LLC

NREA SE MF Investment Co, LLC

NREA SE Multifamily LLC

NREA SE Multifamily, LLC

NREA SE One Property Manager, LLC

NREA SE Three Property Manager, LLC

NREA SE Two  Property Manager, LLC

NREA SE1 Andros Isles Leaseco, LLC

NREA SE1 Andros Isles Manager, LLC

NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)

NREA SE1 Arborwalk Leaseco, LLC

NREA SE1 Arborwalk Manager, LLC

NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)

NREA SE1 Towne Crossing Leaseco, LLC

NREA SE1 Towne Crossing Manager, LLC

NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne Crossing, LP)

NREA SE1 Walker Ranch Leaseco, LLC

NREA SE1 Walker Ranch Manager, LLC

NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner, L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC

NREA SE2 Hidden Lake, DST

NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC

NREA SE2 Vista Ridge Manager, LLC

NREA SE2 Vista Ridge, DST

NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC

NREA SE2 West Place Manager, LLC

NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC

NREA SE3 Arboleda Manager, LLC

NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC

NREA SE3 Fairways Manager, LLC

NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC

NREA SE3 Grand Oasis Manager, LLC

NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio Three Manager, LLC

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Two Manager, LLC

NREA Southeast Portfolio Two, DST

NREA Southeast Portfolio Two, LLC

NREA SOV Investors, LLC

NREA Uptown TRS, LLC

NREA VB I LLC

NREA VB II LLC

NREA VB III LLC

NREA VB IV LLC

NREA VB Pledgor I LLC

NREA VB Pledgor I, LLC

NREA VB Pledgor II LLC

NREA VB Pledgor II, LLC

NREA VB Pledgor III LLC

NREA VB Pledgor III, LLC

NREA VB Pledgor IV LLC

NREA VB Pledgor IV, LLC

NREA VB Pledgor V LLC

NREA VB Pledgor V, LLC

NREA VB Pledgor VI LLC

NREA VB Pledgor VI, LLC

NREA VB Pledgor VII LLC

NREA VB Pledgor VII, LLC

NREA VB SM, Inc.

NREA VB V LLC

NREA VB VI LLC

NREA VB VII LLC

NREA Vista Ridge Investment Co, LLC

NREC AR Investors, LLC

NREC BM Investors, LLC

NREC BP Investors, LLC

NREC Latitude Investors, LLC

NREC REIT Sub, Inc.

NREC TRS, Inc.

NREC WW Investors, LLC

NREF OP I Holdco, LLC

NREF OP I SubHoldco, LLC

NREF OP I, L.P.

NREF OP II Holdco, LLC

NREF OP II SubHoldco, LLC

NREF OP II, L.P.

NREF OP IV REIT Sub TRS, LLC

NREF OP IV REIT Sub, LLC

NREF OP IV, L.P.

NREO NW Hospitality Mezz, LLC

NREO NW Hospitality, LLC

NREO Perilune, LLC

NREO SAFStor Investors, LLC

NREO TRS, Inc.

NRESF REIT Sub, LLC

NXRT Abbington, LLC

NXRT Atera II, LLC

NXRT Atera, LLC

NXRT AZ2, LLC

NXRT Barrington Mill, LLC

NXRT Bayberry, LLC

NXRT Bella Solara, LLC

NXRT Bella Vista, LLC

NXRT Bloom, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine LP, LLC

NXRT Brandywine LP, LLC

NXRT Brentwood Owner, LLC

NXRT Brentwood, LLC

NXRT Cedar Pointe Tenant, LLC

NXRT Cedar Pointe, LLC

NXRT Cityview, LLC

NXRT Cornerstone, LLC

NXRT Crestmont, LLC

NXRT Crestmont, LLC

NXRT Enclave, LLC

NXRT Glenview, LLC

NXRT H2 TRS, LLC

NXRT Heritage, LLC

NXRT Hollister TRS LLC

NXRT Hollister, LLC

NXRT LAS 3, LLC

NXRT Master Tenant, LLC

NXRT Nashville Residential, LLC

NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*

NXRT North Dallas 3, LLC

NXRT Old Farm, LLC

NXRT Pembroke Owner, LLC

NXRT Pembroke, LLC

NXRT PHX 3, LLC

NXRT Radbourne Lake, LLC

NXRT Rockledge, LLC

NXRT Sabal Palms, LLC

NXRT SM, Inc.

NXRT Steeplechase, LLC

NXRT Stone Creek, LLC

NXRT Summers Landing GP, LLC

NXRT Summers Landing LP, LLC

NXRT Torreyana, LLC

NXRT Vanderbilt, LLC

NXRT West Place, LLC

NXRTBH AZ2, LLC

NXRTBH Barrington Mill Owner, LLC

NXRTBH Barrington Mill SM, Inc.

NXRTBH Barrington Mill, LLC

NXRTBH Bayberry, LLC

NXRTBH Cityview, LLC

NXRTBH Colonnade, LLC

NXRTBH Cornerstone Owner, LLC

NXRTBH Cornerstone SM, Inc.

NXRTBH Cornerstone, LLC

NXRTBH Dana Point SM, Inc.

NXRTBH Dana Point, LLC

NXRTBH Foothill SM, Inc.

NXRTBH Foothill, LLC

NXRTBH Heatherstone SM, Inc.

NXRTBH Heatherstone, LLC

NXRTBH Hollister Tenant, LLC

NXRTBH Hollister, LLC

NXRTBH Madera SM, Inc.

NXRTBH Madera, LLC

NXRTBH McMillan, LLC

NXRTBH North Dallas 3, LLC

NXRTBH Old Farm II, LLC

NXRTBH Old Farm Tenant, LLC

NXRTBH Old Farm, LLC

NXRTBH Radbourne Lake, LLC

NXRTBH Rockledge, LLC

NXRTBH Sabal Palms, LLC

NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA

NXRTBH Stone Creek, LLC

NXRTBH Vanderbilt, LLC

NXRTBH Versailles SM, Inc.

NXRTBH Versailles, LLC

Oak Holdco, LLC

Oaks CGC, LLC

Okada Family Revocable Trust

Oldenburg, Ltd.

Pam Capital Funding GP Co. Ltd.

Pam Capital Funding, L.P.

PamCo Cayman Ltd.

Park West 1700 Valley View Holdco, LLC

Park West 2021 Valley View Holdco, LLC

Park West Holdco, LLC

Park West Portfolio Holdco, LLC

Participants of Highland 401K Plan

Patrick Willoughby-McCabe

PCMG Trading Partners XXIII, L.P.

PCMG Trading Partners XXIII, LP

PDK Toys Holdco, LLC

Pear Ridge Partners, LLC

Penant Management GP, LLC

Penant Management LP

PensionDanmark Holding A/S

PensionDanmark
Pensionsforsikringsaktieselskab

Peoria Place Development, LLC
(30% cash contributions - profit participation
only)

Perilune Aero Equity Holdings One, LLC

Perilune Aviation LLC

PetroCap Incentive Holdings III. L.P.

PetroCap Incentive Partners II GP, LLC

PetroCap Incentive Partners II, L.P.

PetroCap Incentive Partners III GP, LLC

PetroCap Incentive Partners III, LP

PetroCap Management Company LLC

PetroCap Partners II GP, LLC

PetroCap Partners II, L.P.

PetroCap Partners III GP, LLC

PetroCap Partners III, L.P.

Pharmacy Ventures I, LLC

Pharmacy Ventures II, LLC

Pollack, Ltd.

Powderhorn, LLC

PWM1 Holdings, LLC

PWM1, LLC

RADCO - Bay Meadows, LLLP

RADCO - Bay Park, LLLP

RADCO NREC Bay Meadows Holdings, LLC

RADCO NREC Bay Park Holdings, LLC

Ramarim, LLC

Rand Advisors Series I Insurance Fund

Rand Advisors Series II Insurance Fund

Rand Advisors, LLC

Rand PE Fund I, L.P.

Rand PE Fund I, L.P. - Series 1

Rand PE Fund Management, LLC

Rand PE Holdco, LLC

Realdania

Red River CLO, Ltd.

Red River Investors Corp.

Riverview Partners SC, LLC

Rockwall CDO II Ltd.

Rockwall CDO II, LLC

Rockwall CDO, Ltd.

Rockwall Investors Corp.

Rothko, Ltd.

RTT Bella Solara, LLC

RTT Bloom, LLC

RTT Financial, Inc.

RTT Hollister, LLC

RTT Rockledge, LLC

RTT Torreyana, LLC

SALI Fund Partners, LLC

SAS Management

SAS Asset Recovery Ltd.

San Diego County Employees Retirement
Association

Sandstone Pasadena Apartments, LLC

Sandstone Pasadena, LLC

Santa Barbara Foundation (third party)

Saturn Oil & Gas LLC

SBC Master Pension Trust

Scott Matthew Siekielski

SE Battleground Park, LLC

SE Battleground Park, LLC

SE Glenview, LLC

SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C. *(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C. *(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC *(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

Sentinel Reinsurance Limited

SFH1, LLC

SFR WLIF I, LLC *(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC *(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC *(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC *(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC *(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

006304

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

Specialty Financial Products Designated
Activity Company (fka Specialty Financial
Products Limited)

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private
Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation
only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated
Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust -
Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the
City of New York

The Twentysix Investment Trust
(Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium
Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.

Wake LV Holdings, Ltd.

Walter Holdco GP, LLC

Walter Holdco I, Ltd.

Walter Holdco, L.P.

Warhol, Ltd.

Warren Chang

Westchester CLO, Ltd.

William L. Britain

Wright Ltd.

Wright, Ltd.

Yellow Metal Merchants, Inc.

# EXHIBIT EE

006307

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)     The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)     The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)     Compensation and Expenses.

(i)     Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary a base salary, (b) a success fee, and (c) severance.

(ii)     Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

19

006308

# EXHIBIT FF

006309

## Schedule of Contracts and Leases to Be Assumed

1.      Advisory Services Agreement, dated November 21, 2011, effective June 20, 2011, by and between Carey International, Inc., and Highland Capital Management, L.P.

2.      Amended and Restated Advisory Services Agreement, dated March 4, 2013, by and between Trussway Holdings, Inc., and Highland Capital Management, L.P.

3.      Reference Portfolio Management Agreement, dated March 4, 2004, by and between Highland Capital Management, L.P., and Citibank N.A.

4.      Advisory Services Agreement, dated May 25, 2011, by and between CCS Medical, Inc., and Highland Capital Management, L.P.

5.      Amended and Restated Advisory Services Agreement, dated February 28, 2013, by and between Cornerstone Healthcare Group Holding, Inc., and Highland Capital Management, L.P.

6.      Prime Brokerage Agreement by and between Jefferies LLC and Highland Capital Management, L.P., dated May 24, 2013.

7.      Amended and Restated Shared Services Agreement, dated August 21, 2015, by and between Highland Capital Management, L.P., and Falcon E&P Opportunities GP, LLC.

8.      Amended and Restated Administrative Services Agreement, effective as of August 21, 2015, by and between Highland Capital Management, L.P., and Petrocap Partners II GP, LLC.

9.      Office Lease, between Crescent Investors, L.P., and Highland Capital Management, L.P.

10.     Paylocity Corporation Services Agreement, between Highland Capital Management, L.P., and Paylocity Corporation, dated November 19, 2012.

11.     Electronic Trading Services Agreement, between SunTrust Robinson Humphrey Inc., and Highland Capital Management, L.P., dated February 6, 2019.

12.     Letter Agreement, between FTI Consulting, Inc., and Highland Capital Management, L.P., dated November 19, 2018.

13.     Administrative Services Agreement, dated January 1, 2018, between Highland Capital Management, L.P., and Liberty Life Assurance Company of Boston.

14.     Electronic Communications:  Customer Authorization & Indemnification, between Highland Capital Management, L.P., and The Bank of New York Mellon Corporation, dated August 9, 2016.

15.     Letter Agreement, dated August 9, 2016, Electronic Access Terms and Conditions, by and between The Bank of New York Mellon Trust Company, N.A., and Highland Capital Management, L.P.

16.     Shared Services Agreement by and between Highland HCF Advisor, Ltd., and Highland Capital Management, L.P., dated effective October 27, 2017.

17. Sub-Advisory Agreement, by and between Highland HCF Advisors, Ltd., and Highland Capital Management, dated effective October 27, 2017.

18. Collateral Management Agreement, dated November 2, 2006, by and between Highland Credit Opportunities CDO Ltd. and Highland Capital Management, L.P.

19. Management Agreement, dated November 15, 2007, between Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master L.P., Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P.

20. Investment Management Agreement, between Highland Capital Multi-Strategy Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

21. Investment Management Agreement, between Highland Capital Multi-Strategy Master Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

22. Management Agreement, dated August 22, 2007, between and among Highland Capital Management, L.P., and Walkers Fund Services Limited, as trustee of Highland Credit Opportunities Japanese Unit Trust.

23. Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P., dated November 1, 2013.

24. Investment Management Agreement, dated March 31, 2015, by and among Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., and Highland Capital Management, L.P.

25. Amended and Restated Investment Management Agreement, dated February 27, 2017, by and among Highland Prometheus Master Fund L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland SunBridge GP, LLC, and Highland Capital Management, L.P.

26. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

27. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

28. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

29. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

30. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

31. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

32. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

006311

33. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

34. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

35. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

36. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

37. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

38. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

39. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

40. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

41. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

42. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

43. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

44. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

45. AT&T Managed Internet Service, between Highland Capital Management, L.P. and AT&T Corp., dated February 24, 2015.

46. ViaWest, Master Service Agreement, dated October 3, 2011, between Highland Capital Management, L.P. and ViaWest

47. Stockholders' Agreement, dated April 15, 2005, by and between American Banknote Corporation and Highland Capital Management, L.P.

48. Stockholders' Agreement and Amendment No. 1, dated January 25, 2011, by and between Carey Holdings, Inc. and Highland Capital Management, L.P.

49. Stockholders' Agreement and Amendment, dated March 24, 2010, by and between Cornerstone Healthcare Group Holding, Inc. and Highland Capital Management, L.P.

50. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

51. Stock Purchase and Sale Agreement and Amendment, dated January 16, 2013, by and between Progenics Pharmaceuticals, Inc. and Highland Capital Management, L.P.

52.    Stockholders' Agreement and Amendments, dated October 24, 2008, by and between JHT Holdings, Inc. and Highland Capital Management, L.P.

53.    Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated February 25, 2013, by and between Highland Dynamic Income Fund GP, LLC and Highland Capital Management, L.P.

54.    Highland Multi-Strategy Fund, L.P. Limited Partnership Agreement, dated July 6, 2006, by and between Highland Multi-Strategy Fund GP, L.P. and Highland Capital Management, L.P.

55.    Operating Agreement of HE Capital, LLC (as amended), dated September 27, 2007, by and between ENA Capital, LLC Ellman Management Group, Inc. and Highland Capital Management, L.P.

56.    Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund II, LLC, dated February 27, 2007, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

57.    Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund, LLC, dated July 19, 2006, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

58.    Highland Capital Management, L.P., Limited Liability Company Agreement of Highland Receivables Finance 1, LLC, by and between Highland Capital Management, L.P. and Highland Capital Management, L.P.

59.    Agreement of Limited Partnership of Highland Restoration Capital Partners, L.P. and Amendments, dated November 6, 2007, by and between Highland Restoration Capital Partners GP, LLC and Highland Capital Management, L.P.

60.    Agreement of Limited Partnership of Highland Select Equity Fund GP, L.P., dated October 2005, by and between Highland Select Equity Fund GP, LLC and Highland Capital Management, L.P.

61.    Agreement of Limited Partnership of Penant Management LP, dated December 12, 2012, by and between Penant Management GP, LLC and Highland Capital Management, L.P.

62.    Agreement of Limited Partnership of Petrocap Incentive Partners III, LP, dated April 12, 2018, by and between Petrocap Incentive Partners III GP, LLC, Petrocap Incentive Holdings III, LP and Highland Capital Management, L.P.

63.    Amended and Restated Agreement of Limited Partnership of Petrocap Partners II, LP, dated October 30, 2014, by and between Petrocap Partners II GP, LLC, Petrocap Incentive Partners II, LP and Highland Capital Management, L.P.

64.    Agreement of Limited Partnership of Highland Credit Opportunities CDO GP, L.P., dated December 29, 2005, by and between Highland Credit Opportunities CDO GP, LLC and Highland Capital Management, L.P.

65.    Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P., dated November 1, 2014, by and between Highland Multi Strategy Credit Fund GP, L.P. and Highland Capital Management, L.P.

66.    DUO Security, 2 factor authentication, by and between DUO Security and Highland Capital Management, L.P.

67.    GoDaddy Domain Registrations, by and between GoDaddy and Highland Capital Management, L.P.

68.    Highland Loan Fund, Ltd. et al, Investment Management Agreement, dated July 31, 2001, by and between Highland Loan Fund, Ltd. et al and Highland Capital Management, L.P.

69.    E Mailflow Monitoring, by and between Mxtoolbox and Highland Capital Management, L.P.

70.    Cloud single sign on for HR related employee login, by and between Onelogin and Highland Capital Management, L.P.

71.    Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

72.    Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

73.    Order Addenda, dated January 28, 2020, by and between CenturyLink Communications, LLC and Highland Capital Management, L.P.

74.    Service Agreement (as amended), dated April 1, 2005, by and between Intex Solutions, Inc. and Highland Capital Management, L.P.

75.    Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

76.    Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

77.    Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

78.    Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

79.    Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

80.    Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

81.    Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

82.    Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

83. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

84. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

85. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

86. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

87. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

88. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

89. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

90. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

91. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

92. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

93. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

94. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

95. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

96. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

97. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

006315

98.     A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

99.     A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

100.     Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

101.     Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

102.     Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

103.     Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

104.     Securities Account Control Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Highland CDO Opportunity Fund, Ltd.; JPMorgan Chase Bank, National Association

105.     Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

106.     Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

107.     Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

108.     Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

109.     Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

110.     Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

111.     Extension/Buy-Out Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Citigroup Financial Products Inc.; Citigroup Global Markets Inc.

112.     Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

113.     Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

114.     Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

115. Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery

116. Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel

117. Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms

118. Colocation Service Order dated October 14, 2019 between Highland Capital Management and Dawn US Holdings, LLC d/b/a Evoque Date Center Solutions

119. Tradesuite Web Module Services/Agreement between Highland Capital Management and DTCC ITP LLC

120. Bloomberg (Terminal) Agreement No. 306371 between Highland Capital Management and Bloomberg Finance, L.P.[1]

121. Master Service Agreement between Highland Capital Management and Via West

122. Amendment to Bloomberg Order Management System Addendum and Bloomberg Order Management System Schedule of Services Account No. 167969 between Highland Capital Management and Bloomberg Finance, L.P.

123. Fourth Amendment to Software License and Services Agreement between Highland Capital Management and Markit WSO Corporation

124. Master Services Agreement, First Amendment to Master Services Agreement, Second Amendment and Restatement of Master Services Agreement between Highland Capital Management and Siepe Services, LLC

125. Internet Agreement Account No. 831-000-7888-651 between Highland Capital Management and AT&T

126. Landline Fax Agreement Account No. 831-000-2532-176 between Highland Capital Management and AT&T

127. Amazon Web Services Account No. 353534426569 between Highland Capital Management and Amazon Web Service, Inc.

128. Website Hosting Agreement  Account No. 325667 between Highland Capital Management and WP Engine

---

[1] The Debtor is currently in discussions with Bloomberg regarding the assumption of this agreement.

006317

# EXHIBIT 47



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed January 9, 2020

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

## ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

DOCS_NY:39973.13 36027/002

1934054200109000000000008

000319

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.      The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

4.     The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.     The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.     All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.     Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.     Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.     Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

DOCS_NY:39973.13 36027/002

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

       11.     Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

       12.     Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

DOCS_NY:39973.13 36027/002

006322

13.    The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

DOCS_NY:39973.13 36027/002

006323

# EXHIBIT 48

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| ------------------------------------------------- | § | |
| In re: | § | Chapter 11 |
|  | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § | |
| Debtor. | § | Related to Docket No. 281 |
| ------------------------------------------------- | § | |

## NOTICE OF DEBTOR'S AMENDED OPERATING PROTOCOLS

TO:    (a) the Office of the United States Trustee; (b) the Office of the United States Attorney
for the Northern District of Texas; (c) counsel to the Committee; (d) the Debtor's
principal secured parties; and (e) parties requesting notice pursuant to Bankruptcy Rule
2002.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054200221000000000000001

000325

PLEASE TAKE NOTICE that on February 19, 2020, the Court held a hearing (the "Hearing") on (i) that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 281] (the "Motion") filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (collectively, the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case"), and (ii) that certain *Limited Objection of the Issuers to Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 324] (the "Limited Objection") filed by the Issuers[2] in response to the Debtor's Motion.

PLEASE TAKE FURTHER NOTICE that at the Hearing, the Debtor announced to the Court that the Issuers' Limited Objection had been resolved and that, as part of the resolution of the Limited Objection, the Debtor would present to the Court an amended and modified version of the protocols governing the Debtor's continued operations in the ordinary course of its business (the "Amended Operating Protocols").

PLEASE TAKE FURTHER NOTICE that the Amended Operating Protocols are attached hereto as **Exhibit A**. A redline copy identifying the specific amendments and modifications appearing in the Amended Operating Protocols is attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Left Blank]*

---

[2] The "Issuers" are a group of 25 separate Cayman issuers of collateralized loan and debt obligations are specifically identified in the Limited Objection.

---

NOTICE OF DEBTOR'S AMENDED OPERATING PROTOCOLS

Dated:  February 21, 2020.

PACHULSKI STANG ZIEHL & JONES LLP


Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pcszjlaw.com
           mlitvak@pszjlaw.com
           gdemo@pszjlaw.com


-and-

HAYWARD & ASSOCIATES PLLC

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**Counsel for the Debtor and
Debtor-in-Possession**

# EXHIBIT "A"

006328

# I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

1

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.  "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

    a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

    b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

    a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)  Stage 3:

        (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

2

006330

       (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

    b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006331

a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) <u>Stage 3</u>:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

006332

IV. **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

            a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

            b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

            a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            b)    <u>Stage 3</u>:

                (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

                (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.    Third Party Transactions (All Stages):

            a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006333

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)     The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.     **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

**V.**     **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.     Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.     Ordinary Course Transactions (All Stages): N/A

C.     Operating Requirements: N/A

D.     Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

VI. **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VII. **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VIII. **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

IX. **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006335

## X.    Representations and Warranties

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

006336

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 19-34054-sgj11 Doc 466-3 Filed 02/29/20 Entered 02/29/20 23:08:26 Page 11 of 13
Case 3:23-cv-02071-E Document 234-60 Filed 02/08/23 Page 145 of 214 PageID 5817
Exhibit C-3 Page 145 of 455

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

006338

**Schedule B**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

006339

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

006340

Exhibit 5 Page 1 of 14

# EXHIBIT "B"

## I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a Transaction; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

006342

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Exhibit 2343460 Filed 02/09/28 of 455 Page 150 of 214 PageID 5822
Case 3:23-cv-02071-E Document 466-2 Filed 02/21/20 Page 3 of 14

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.  "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

## II.  Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

  1.  Ordinary Course Transactions do not require Court approval (All Stages).

    a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

    b)  Stage 3: ordinary course determined by the Debtor.

  2.  Related Entity Transactions

    a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)  Stage 3:

      (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

-2-

006343

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Exhibit 342460 Filed 02/21/20 Page 2 of 455 Page 4 of 14
Case 3:23-cv-02071-E Document 34 Filed 09/22/23 Page 151 of 214 PageID 5823

(2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006344

Case 3:23-cv-02071-E Document 23460 Filed 02/09/23 Page 5 of 14

a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) <u>Stage 3</u>:

    (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

## IV. Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

006345

A.   **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.   **Operating Requirements**

   1.   Ordinary Course Transactions do not require Court approval (All Stages).

      a)   Stage 1 and Stage 2: ordinary course determined by the CRO.

      b)   Stage 3: ordinary course determined by the Debtor.

   2.   Related Entity Transactions

      a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)   Stage 3:

         (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

         (2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

   3.   Third Party Transactions (All Stages):

      a)   Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006346

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)   The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.  Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.   **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.   Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

VI.   **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006347

A.  Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B.  Ordinary Course Transactions (All Stages): N/A

C.  Operating Requirements: N/A

D.  Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

## VII.  Transactions involving Non-Discretionary Accounts

A.  Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

B.  Ordinary Course Transactions (All Stages): N/A

C.  Operating Requirements: N/A

D.  Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

## VIII.  Additional Reporting Requirements – All Stages (to the extent applicable)

A.  DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.  The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

## IX.  Shared Services

A.  The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.  The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

006348

## X.   Representations and Warranties

A.   The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.   The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.   The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

006349

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 19-34054-sgj11 Doc 466-32 Filed 02/29/20 Entered 02/29/20 13:08:29 Page 10 of 14
Case 3:23-cv-02071-E Document 34-60 Filed 09/26/23 Page 157 of 214 PageID 5829
Exhibit 343 Page 60 of 455

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

9

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 19-34054-sgj11 Doc 406-3 Filed 02/20/20 Entered 02/20/20 13:08:23 Page 11 of 14
Case 3:23-cv-02071-E Document 34-60 Filed 02/09/23 Page 158 of 214 PageID 5830
Exhibit 34360 Filed 02/09/23 Page 158 of 214

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

006351

## Schedule B

### Related Entities Listing (other than natural persons)

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

006353

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Exhibit 343460 Filed 02/09/23 of 455 Page 14 of 14
Case 3:23-cv-02071-E Document 83-1 Filed 02/09/23 Page 161 of 214 PageID 5833

| Summary report: | |
|---|---|
| **Litéra® Change-Pro TDC 10.1.0.300 Document comparison done on 2/3/2020 1:05:23 PM** | |
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** DOCS_NY-#39943-v15-Highland_-_Discussion_Outline_for_Protocols.docx | |
| **Modified filename:** DOCS_NY-#39943-v15-Highland_-_Discussion_Outline_for_Protocols_2.docx | |
| **Changes:** | |
| Add | 5 |
| Delete | 0 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 5 |

# EXHIBIT 49

006355

PARTNERSHIP INTEREST PURCHASE AGREEMENT

among

THE DUGABOY INVESTMENT TRUST,

THE MARK AND PAMELA OKADA FAMILY TRUST-EXEMPT TRUST #1,

THE MARK AND PAMELA OKADA FAMILY TRUST-EXEMPT TRUST #2,

MARK K. OKADA

and

HUNTER MOUNTAIN INVESTMENT TRUST

DATED AS OF December 24, 2015

TABLE OF CONTENTS

Page

ARTICLE I    Definitions..................................................................................................1

ARTICLE II    Purchase and sale .......................................................................................5

Section 2.01.    Purchase and Sale .....................................................................5
Section 2.02.    Purchase Price ..........................................................................5
Section 2.03.    Closing Deliveries ....................................................................5
Section 2.04.    Closing .....................................................................................6

ARTICLE III    Representations and Warranties of Sellers ...............................................6

Section 3.01.    Organization; Authorization; Enforceability ..........................6
Section 3.02.    Organization and Qualification of the Partnership .................7
Section 3.03.    Capital Structure ......................................................................7
Section 3.04.    Title to Subject Interests .........................................................7
Section 3.05.    No Conflict; Consents ..............................................................7
Section 3.06.    Financial Statements; Absence of Undisclosed Liabilities......8
Section 3.07.    Litigation .................................................................................8
Section 3.08.    Compliance with Laws .............................................................8
Section 3.09.    Tax Matters ..............................................................................8
Section 3.10.    Books and Records ...................................................................9
Section 3.11.    Solvency; No Fraudulent Conveyance.......................................9
Section 3.12.    Brokers .....................................................................................9
Section 3.13.    No Other Representations and Warranties.................................9
Section 3.14.    Clients, Etc .............................................................................10
Section 3.15.    Insurance .................................................................................10
Section 3.16.    Employee Benefit Plans; Employee Matters ..........................10
Section 3.17.    Material Contracts ..................................................................10
Section 3.18.    CLO Activities ........................................................................11
Section 3.19.    Real Property ..........................................................................11
Section 3.20.    Tangible Personal Property .....................................................12
Section 3.21.    Intellectual Property ...............................................................12
Section 3.22.    Absence of Certain Developments...........................................12

ARTICLE IV    Representations and Warranties of Buyer...............................................12

Section 4.01.    Organization; Authorization; Enforceability .........................12
Section 4.02.    No Conflict; Consents ............................................................13
Section 4.03.    Investment Purpose ................................................................13
Section 4.04.    Brokers ....................................................................................13
Section 4.05.    Sufficiency of Funds ...............................................................13
Section 4.06.    Litigation ................................................................................13
Section 4.07.    Compliance with Laws ...........................................................13
Section 4.08.    No Disqualification Events .....................................................13

i

006357

Section 4.09.   Independent Investigation ...................................................................14

ARTICLE V   Covenants....................................................................................................14

Section 5.01.   Confidentiality .........................................................................................14
Section 5.02.   Public Announcements .............................................................................14
Section 5.03.   Further Assurances....................................................................................14
Section 5.04.   Stand Alone Indemnity ............................................................................15

ARTICLE VI  Indemnification ..........................................................................................15

Section 6.01.   Survival .....................................................................................................15
Section 6.02.   Indemnification By Sellers ......................................................................15
Section 6.03.   Indemnification By Buyer........................................................................15
Section 6.04.   Defense of Third Party Claims ................................................................16
Section 6.05.   Certain Limitations ...................................................................................17
Section 6.06.   Tax Treatment of Indemnification Payments ..........................................18
Section 6.07.   Exclusive Remedies..................................................................................18

ARTICLE VII Miscellaneous ............................................................................................19

Section 7.01.   Expenses ...................................................................................................19
Section 7.02.   Notices.......................................................................................................19
Section 7.03.   Interpretation.............................................................................................20
Section 7.04.   Headings....................................................................................................21
Section 7.05.   Severability................................................................................................21
Section 7.06.   Entire Agreement ......................................................................................21
Section 7.07.   Successors and Assigns.............................................................................21
Section 7.08.   No Third-party Beneficiaries ....................................................................21
Section 7.09.   Amendment and Modification; Waiver .....................................................22
Section 7.10.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.................22
Section 7.11.   Specific Performance .................................................................................23
Section 7.12.   Counterparts...............................................................................................23

Exhibits:

| Exhibit A | - | Subject Interests and Purchase Price |
|-----------|---|--------------------------------------|
| Exhibit B | - | Form of Promissory Note |
| Exhibit C | - | Form of Assignment of Partnership Interests |
| Exhibit D | - | Form of Fourth Amended and Restated Agreement of Limited Partnership |
| Exhibit E | - | Form of Guaranty Agreement |

006358

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23460 Filed 12/20/23   Page 166 of 214   PageID 5838
Exhibit 23460   Page 2 of 455   Page 166 of 214

PARTNERSHIP INTEREST PURCHASE AGREEMENT

THIS PARTNERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of December 24, 2015, is entered into among THE DUGABOY INVESTMENT TRUST, THE MARK AND PAMELA OKADA FAMILY TRUST-EXEMPT TRUST #1, THE MARK AND PAMELA OKADA FAMILY TRUST-EXEMPT TRUST #2, MARK K. OKADA (each, individually, a "Seller" and, collectively, the "Sellers") and HUNTER MOUNTAIN INVESTMENT TRUST ("Buyer").

RECITALS

WHEREAS, Sellers wish to sell and transfer to Buyer, and Buyer wishes to purchase from Sellers, certain of their limited partnership interests in the Partnership, which collectively constitute a forty-four and one-half percent (44.5%) interest in the capital currently held by the Class A Limited Partners and forty-four and one-half percent (44.5%) of the total profits of the Partnership as set forth on Exhibit A attached hereto (the "Subject Interests"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the respective representations, warranties, covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Amended Partnership Agreement" has the meaning set forth in Section 2.03(a)(ii).

"Ancillary Agreements" means, collectively, the agreements, documents and instruments to be executed pursuant to this Agreement.

"Assignment of Partnership Interests" has the meaning set forth in Section 2.03(a)(i).

"Balance Sheet Date" has the meaning set forth in Section 3.06(a).

"Benefit Plan" has the meaning set forth in Section 3.16(a).

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Dallas, Texas are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Buyer Covered Person" has the meaning set forth in Section 4.08.

"Buyer Indemnified Parties" has the meaning set forth in Section 6.02.

"Cash Purchase Price" has the meaning set forth in Section 2.02.

"CLO Agreement" has the meaning set forth in Section 3.18(b).

"CLO Issuer" means any entity managed by the Partnership pursuant to a Collateral Management Agreement that issues collateralized loan obligations.

"Closing" has the meaning set forth in Section 2.04.

"Closing Date" has the meaning set forth in Section 2.04.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Management Agreement" has the meaning set forth in Section 3.18(b).

"Contract" means any written or oral leases, agreements, instruments or other contractually binding commitments.

"Deductible" has the meaning set forth in Section 6.05(a).

"Disqualification Event" has the meaning set forth in Section 4.08.

"Effective Time" has the meaning set forth in Section 2.04.

"Encumbrances" means any encumbrances, mortgages, pledges, security interests, deeds of trust, other deeds to secure debt, security agreements, financing statements, liens (including, without limitation, tax liens), judgments, impositions, charges, options, conditional sales or title retention contracts, claims, levies, attachments, licenses, easements, rights of way, any other interest in property or assets (or the income or profit therefrom), title defects or other encumbrances or restrictions of any nature whatsoever.

"ERISA" means the Employee Retirement Income Security Act, as amended, and any regulations thereunder.

"Fee-Sharing Arrangements" has the meaning set forth in Section 3.18(d).

"Financial Statements" has the meaning set forth in Section 3.06.

2

"Fundamental Representations" means, collectively, the representations and warranties set forth in Section 3.01 (Organization; Authorization; Enforceability), Section 3.02 (Organization and Qualification of the Partnership) and Section 3.04 (Title to Subject Interests).

"GAAP" means United States generally accepted accounting principles, consistently applied and as in effect at the time to which the related reference to such principles pertains.

"General Partner" means Strand Advisors, Inc.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Authorization" means any consent, license, registration, certification, certificate, approval, concession, franchise, grant, easement, authorization, order, clearance or permit issued by, granted by, given by, required by, required to be submitted to, or otherwise made available by any Governmental Authority or pursuant to any Law.

"Indebtedness" means any existing or contingent (i) indebtedness or liability for borrowed money, (ii) indebtedness or liability evidenced by any note, bond, debenture or other debt security or negotiable instrument, (iii) liability or obligation for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables not more than sixty (60) days past due), (iv) commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (v) indebtedness or liability guaranteed in any manner by a Person (including guarantees in the form of an agreement to repurchase or reimburse), (vi) liability or obligation under capitalized leases with respect to which a Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligation a Person assures a creditor against loss, (vii) indebtedness or liability that is secured by an Encumbrance on such Person's assets or the assets of such Person's Affiliates and (viii) any amounts of finders' fees or any similar fees owed by a Person to any Person in connection with the transactions contemplated hereby.

"Indemnified Party" has the meaning set forth in Section 6.04(a).

"Indemnified Party Claim" has the meaning set forth in Section 6.04(a).

"Indemnified Party Claim Notice" has the meaning set forth in Section 6.04(a).

"Indemnifying Party" has the meaning set forth in Section 6.04(a).

"Indemnifying Party Defense Notice" has the meaning set forth in Section 6.04(a).

"Knowledge of Sellers" or "Sellers' Knowledge" or any other similar knowledge qualification, means the actual knowledge of Sellers, after due inquiry.

3

006361

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, injunction, writ or other requirement or rule of law of any Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, mediation, investigation, inquiry, proceedings or claims (including counterclaims) by or before a Governmental Authority.

"Losses" means all losses, damages, liabilities, claims, judgments, fines, penalties, costs or expenses, including reasonable attorneys', accountants', investigators' and experts' fees and expenses in investigating or defending any of the foregoing or in the enforcement of this Agreement.

"Material Adverse Effect" means any effect, event, condition, occurrence, fact, variation, development, circumstance or change that has resulted in, or that may reasonably be expected to result in, a material adverse effect on the business, operations, assets or financial or other condition of the Partnership, or the Subject Interests; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been, or could reasonably be expected to be, a Material Adverse Effect: (a) changes in general economic conditions; (b) changes that are generally applicable to the industry in which the Partnership operates (which changes do not affect the Partnership in a materially disproportionate manner), including any regulatory changes; or (c) changes in GAAP or any interpretation thereof.

"Material Contracts" has the meaning set forth in Section 3.17(a).

"Note" has the meaning set forth in Section 2.02.

"Owned Property" and "Owned Properties" have the meanings set forth in Section 3.19.

"Partnership" has the meaning set forth in the recitals.

"Partnership Advisory Contract" has the meaning set forth in Section 3.14(a).

"Partnership Property" and "Partnership Properties" have the meanings set forth in Section 3.19.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Purchase Price" has the meaning set forth in Section 2.02.

"Real Property Lease" and "Real Property Leases" have the meanings set forth in Section 3.19.

"Securities Act" has the meaning set forth in Section 4.03.

4

006362

"Seller(s)" has the meaning set forth in the preamble.

"Seller Indemnified Parties" has the meaning set forth in Section 6.03.

"Subject Interests" has the meaning set forth in the recitals.

"Tax" or "Taxes" means (i) any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, estimated, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any governmental body or payable under any tax-sharing agreement or any other Contract; (ii) liability of a Person for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto); and (iii) liability of a Person for the payment of any amounts of the type described in clause (i) as a result of any express or implied obligation to indemnify or otherwise assume or succeed to the liability of any other Person or by operation of Law.

"Tax Return" means returns, declarations, reports, claims for refund, information returns or other documents (including any related or supporting schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of Taxes of any party or the administration of any Laws, regulations, or administrative requirements relating to Taxes.

"Treasury Regulations" means the regulations promulgated under the Code, as such regulations are in effect on the date hereof.

ARTICLE II
PURCHASE AND SALE

Section 2.01.  Purchase and Sale.  Upon and subject to the terms and conditions set forth herein, at the Closing, each Seller shall sell, transfer, assign, convey and deliver to Buyer, free and clear of all Encumbrances, and Buyer shall purchase and accept from each Seller, the Subject Interests for the consideration specified in Section 2.02.

Section 2.02.  Purchase Price.  The aggregate purchase price for the Subject Interests (the "Purchase Price") shall be $93,000,000.  Buyer shall (a) pay to each Seller the amount in cash (the "Cash Purchase Price"), by wire transfer of immediately available funds, indicated on Exhibit A attached hereto and (b) issue to each Seller a promissory note (the "Note") in the initial principal amount indicated on Exhibit A attached hereto substantially in the form of Exhibit B attached hereto.

Section 2.03.  Closing Deliveries.

(a)    At the Closing, each Seller shall execute, as applicable, and deliver, or cause to be delivered, to Buyer and the General Partner, as applicable:

(i)    an Assignment of Partnership Interests substantially in the form of Exhibit C attached hereto (the "Assignment of Partnership Interests"); and

(ii)    the Fourth Amended and Restated Agreement of Limited Partnership (the "Amended Partnership Agreement") substantially in the form of Exhibit D attached hereto.

(b)    At the Closing, Buyer shall execute, as applicable, and deliver, or cause to be delivered, to each Seller and the General Partner, as applicable:

(i)    such Seller's portion of the Cash Purchase Price;

(ii)    the applicable Note;

(iii)    a Guaranty Agreement substantially in the form of Exhibit E attached hereto;

(iv)    the Assignment of Partnership Interests; and

(v)    the Amended Partnership Agreement.

(c)    At the Closing, the General Partner shall execute, as applicable, and deliver, or cause to be delivered, to each Seller and Buyer the Amended Partnership Agreement.

Section 2.04.    Closing.    The closing of the transactions provided for in this Agreement (the "Closing") will take place at the offices of Hunton & Williams LLP in Dallas, Texas on the date hereof (the "Closing Date"), unless the parties agree in writing otherwise.  The Closing shall be effective as of 12:01 a.m. United States Central Time on the Closing Date (the "Effective Time").

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, Sellers, on a several, and not joint and several, basis represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the Closing.

Section 3.01.    Organization; Authorization; Enforceability.    If such Seller is an individual, such Seller has full power, legal right and capacity to execute and deliver this Agreement and the other agreements contemplated hereby to which such Seller is a party, to perform his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; this Agreement and the other agreements contemplated hereby to which such Seller is a party have been duly executed and delivered by such Seller and constitute his legal, valid, and binding obligations, enforceable against him in accordance with their respective terms, in each case subject to bankruptcy, insolvency, reorganization,

006364

moratorium and similar laws of general application relating to or affecting creditors' rights and
to general equity principles. If such Seller is a trust, such Seller is duly organized, validly
existing and in good standing under the laws of the jurisdiction of its organization; such Seller
has full trust power and authority to execute and deliver this Agreement and the other
agreements contemplated hereby to which such Seller is a party, to perform its obligations
hereunder and thereunder and to consummate the transactions contemplated hereby and thereby;
the execution, delivery and performance of this Agreement and the other agreements
contemplated hereby to which such Seller is a party have been duly authorized and do not require
any further authorization; this Agreement and the other agreements contemplated hereby to
which such Seller is a party have been duly authorized, executed and delivered by such Seller
and constitute the legal, valid and binding obligation of such Seller enforceable against such
Seller in accordance with their respective terms, in each case subject to bankruptcy, insolvency,
reorganization, moratorium and similar laws of general application relating to or affecting
creditors' rights and to general equity principles.

Section 3.02.   <u>Organization and Qualification of the Partnership</u>.  The Partnership (a) is a
limited partnership, duly organized, validly existing and in good standing under the Laws of the
State of Delaware; (b) has the requisite power to carry on its business as now being conducted
and to own or lease the properties it now owns or leases; and (c) is duly qualified or licensed to
transact business as a foreign limited partnership and is in good standing in each jurisdiction in
which the conduct of its business requires such qualification.

Section 3.03.   <u>Capital Structure</u>.  The Subject Interests have been validly issued and were
not issued in violation of any preemptive or other similar right and were offered and sold in
compliance with all federal and state securities Laws.  Except for this Agreement, there are no
outstanding options, warrants, contracts, commitments or other rights of any kind to acquire any
interests in the Partnership or other securities convertible into or exchangeable for, or that
otherwise confer on the holder thereof any right to acquire or receive a benefit or payment
measured, in whole or in part, by the value of the partnership interests of the Partnership, nor is
the Partnership committed to issue any such option, warrant, contract, commitment, right or
security.

Section 3.04.   <u>Title to Subject Interests</u>.  Each Seller is the record and beneficial owner
of and has good and marketable title to the Subject Interests free and clear of any Encumbrances.
Upon consummation of the Closing, and upon Buyer's payment of the Purchase Price therefor,
good and marketable title to the Subject Interests, free and clear of any Encumbrances, will pass
to the Buyer.

Section 3.05.   <u>No Conflict; Consents</u>.  Except for the filing of an updated Form ADV
with the Securities and Exchange Commission on behalf of the Partnership or as otherwise
disclosed on <u>Schedule 3.05</u>, the execution, delivery and performance by Sellers of this
Agreement and the other agreements contemplated hereby to which each Seller is a party, and
the consummation of the transactions contemplated hereby and thereby require no action on any
of the Sellers' part, and will require no action on any of the Sellers' or the Partnership's part, by
or in respect of, or any filing with, consent from or notice to, any Governmental Authority or any
other Person.  Neither the execution, delivery and performance by Sellers of this Agreement or
the other agreements contemplated hereby to which any Seller is a party, will violate, conflict

7

with, or result in a breach of, any provision of the organizational documents of any Seller or any applicable Law or Governmental Authorization, and will not result in a change of "control," as defined in Section 202(a)(12) of the Investment Advisors Act of 1940, as amended.

Section 3.06.   <u>Financial Statements; Absence of Undisclosed Liabilities</u>.

(a)   Buyer has previously been provided a copy of (i) the audited balance sheet of the Partnership as of December 31, 2014 (the "<u>Balance Sheet Date</u>") and the related statements of operations and cash flows of the Partnership for the year then ended and (ii) the unaudited balance sheet of the Partnership as of November 30, 2015 and the related statement of operations for the eleven (11) months then ended (collectively, the "<u>Financial Statements</u>").

(b)   The Financial Statements (i) have been prepared based upon the information contained in the books and records of the Partnership, (ii) have been prepared in accordance with GAAP applied on a consistent basis as at the dates and for the periods presented (except, in the case of unaudited Financial Statements, the absence of footnote disclosures and normal year-end adjustments), and (iii) present fairly, in all material respects, the financial position and results of operations and cash flows of the Partnership as at the dates and for the periods presented (except, in the case of unaudited Financial Statements, the absence of cash flows).

(c)   Except as set forth on <u>Schedule 3.06(c)</u> attached hereto, the Partnership did not have at the Balance Sheet Date, nor has the Partnership incurred since that date, any liabilities of any nature other than liabilities (i) which were accrued or reserved against and were adequately reflected in the Financial Statements, (ii) which were incurred after the Balance Sheet Date in the ordinary course of business consistent with past practices or (iii) that have been discharged or paid in full prior to the date hereof.

Section 3.07.   <u>Litigation</u>.   All material Legal Proceedings to which the Partnership is a party is listed on <u>Schedule 3.07</u>.

Section 3.08.   <u>Compliance with Laws</u>.   To the Sellers' Knowledge, the Partnership has complied, and currently is in compliance, in all material respects with all Laws applicable to the Partnership, except to the extent non-compliance is not expected to have a Material Adverse Effect on the Partnership.

Section 3.09.   <u>Tax Matters</u>.

(a)   The Partnership has filed all required Tax Returns relating to its business, properties and assets and has paid all Taxes shown thereon as due and owing.

(b)   The Partnership is in compliance with the requirements of ASC 740-10, and its Tax accrual work papers explain and support all amounts provided and positions taken by the Partnership with respect to ASC 740-10.

8

(c)     The Partnership has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party, and all information returns (including Forms W-2 and 1099 and corresponding state and local forms) required with respect thereto have been properly completed and timely filed.

(d)     The Partnership is not party to and does not have obligations under any Tax-sharing, Tax indemnity or Tax allocation agreement or similar arrangement, nor does the Partnership have any liability or potential liability to another party under any such agreement or arrangement.  The Partnership has never filed a consolidated Federal Income Tax Return or a consolidated, unitary or combined state income tax return, or been included in any such Tax Return filed by another entity.

(e)     Except as set forth on Schedule 3.09(e), the Partnership has not engaged in any "reportable transaction" as defined in Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).  Further, the reportable transactions listed on Schedule 3.09(e) are not "listed transactions" and consist only of "loss transactions," each as described in Treas. Reg. § 1.6011-4(b)(5).

(f)     Except as set forth on Schedule 3.09(f), the Partnership has not been notified in writing of any audits or Legal Proceedings relating to a Tax that have been commenced with respect to the Partnership and that are pending as of the date hereof.

Section 3.10.  Books and Records.  The books and records of the Partnership: (a) reflect actual, bona fide transactions and have been maintained in accordance with sound business practices; (b) are stated in reasonable detail and accurately and fairly reflect the transactions and dispositions of the assets of the Partnership; and (c) accurately and fairly reflect the basis for the Financial Statements.  The Partnership has devised and maintains a system of internal accounting controls sufficient to provide reasonable assurances that:  (i) transactions are executed in accordance with management's general or specific authorization and (ii) transactions are recorded as necessary:  (A) to permit preparation of financial statements in conformity with the GAAP applied on a consistent basis and (B) to maintain accountability for assets.

Section 3.11.  Solvency; No Fraudulent Conveyance.  Immediately following the Closing, each Seller will be solvent for all purposes under Federal bankruptcy and applicable State fraudulent transfer and fraudulent conveyance Laws, and the transactions contemplated hereby do not constitute fraudulent transfers or fraudulent conveyances under such Laws.

Section 3.12.  Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Partnership.

Section 3.13.  No Other Representations and Warranties.  Except for the representations and warranties contained in this Article III, none of the Sellers, the Partnership or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Sellers or the Partnership, including any representation or warranty as to

9

the future revenue, profitability or success of the Partnership, or any representation or warranty arising from statute or otherwise in law.

Section 3.14.    Clients, Etc.

(a)    Schedule 3.14 sets forth a correct and complete listing of all advisory Contracts that the Partnership is party to as of the date hereof (each, a "Partnership Advisory Contract") and sets forth with respect to each such Partnership Advisory Contract the name of the Partnership's advisory client that is party thereto.

(b)    Except as set forth on Schedule 3.14, the Partnership is not currently in material default under any of the terms of any Partnership Advisory Contract.

Section 3.15.    Insurance.  Schedule 3.15 sets forth a correct and complete listing of all material insurance policies in force and effect with respect to the Partnership.

Section 3.16.    Employee Benefit Plans; Employee Matters.

(a)    Schedule 3.16 lists each material "Benefit Plan" which shall mean each deferred compensation, retiree medical or life insurance plan, program or arrangement, and each bonus or other incentive compensation, equity compensation plan, employee welfare benefit plan, fund or program (within the meaning of Section 3(1) of ERISA); employee pension benefit plan, fund or program (within the meaning of Section 3(2) of ERISA) and each supplemental retirement, severance or other benefit plan, program or arrangement; each employment, termination, severance agreement or other Contract or agreement; and each other employee benefit plan (within the meaning of Section 3(3) of ERISA).

(b)    The consummation of the transactions contemplated by this Agreement will not, except as expressly provided in this Agreement, (i) entitle any employee to separation, termination or severance pay, unemployment compensation or any other similar-type benefit payment, (ii) result in the payment to any present or former employee of any money or other property, or (iii) accelerate the time of payment or vesting, or increase the amount of compensation due any present or former employee.

Section 3.17.    Material Contracts.

(a)    As of the date hereof, Schedule 3.17(a) sets forth a list of each material Contract to which the Partnership is a party (the "Material Contracts") including, without limitation, the following types of Contracts:

(i)    any Partnership Advisory Contract;

(ii)    any strategic partnership or similar agreements; and

(iii)    any Contract involving the acquisition or disposition (by merger, consolidation, acquisition or sale of stock or assets or otherwise) of any material interest in, or any material amount of property or assets of, any Person or business after January 1, 2015 that is part of the business of the Partnership.

10

(b)     Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of the Partnership and, to the Knowledge of the Sellers, of each other party thereto, enforceable against each of them in accordance with its terms.  No party to any Material Contract has any contractual right of termination with respect to such Material Contract in connection with the consummation of the transaction contemplated hereby.  Except as set forth on Schedule 3.17(b), neither the Partnership nor, to the Knowledge of the Sellers, any other party to any Material Contract is in breach or default of any material term of any such Material Contract and no event has occurred that, with the lapse of time or giving the effect of notice, or both, would constitute a breach or default of any material term of any such Material Contract on the part of the Partnership, except, in each case, to the extent such breach or default is not expected to have a Material Adverse Effect on the Partnership.  No party to any of the Material Contracts has exercised any termination rights with respect thereto.  The Sellers have delivered to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

Section 3.18.  CLO Activities.

(a)     The Sellers have delivered or made available to Buyer true and correct copies of all reports that have been distributed by the Partnership to its general and limited partners since December 31, 2014.

(b)     Schedule 3.18(b) lists each collateral management Contract to which the Partnership is a party or pursuant to which it acts as collateral manager (or in any similar capacity) or performs other services on behalf of the applicable CLO Issuer (each, a "Collateral Management Agreement").  The Partnership is in compliance in all material respects with the terms of each Collateral Management Agreement and each other related indenture as supplemented or amended through the date hereof (each, a "CLO Agreement").  No breach by the Partnership of any Collateral Management Agreement or other CLO Agreement exists or has occurred since December 31, 2014, nor has the Partnership received any written notice since December 31, 2014 that any such breach has occurred or is imminent, except to the extent such breach is not expected to have a Material Adverse Effect on the Partnership.

(c)     No exemptive orders, "no-action" letters or similar exemptions or regulatory relief have been obtained by (or on behalf of) the Partnership, nor are there any requests by (or on behalf of) the Partnership, pending therefor, by or with respect to any CLO Issuer or otherwise in connection with the operation of any CLO Issuer, or with respect to any officer or employee of the Partnership in connection with the operation of any CLO Issuer.

(d)     Schedule 3.18(d) sets forth all fee-sharing or other similar arrangements with respect to any management fees (the "Fee-Sharing Arrangements") payable by any CLO Issuer to the Partnership.  The Partnership is not subject to any other priority or other undertakings with respect to the distribution of any management fees of any CLO Issuer other than as set forth in the applicable Collateral Management Agreement or CLO Agreement.

Section 3.19.  Real Property.  Schedule 3.19 sets forth a complete list of (i) all real property and interests in real property, including improvements thereon and easements appurtenant thereto owned in fee by the Partnership (individually, an "Owned Property" and collectively, the "Owned Properties"), (ii) all real property and interests in real property leased

11

by the Partnership (individually, a "Real Property Lease" and collectively, the "Real Property Leases" and, together with the Owned Properties, being referred to herein individually as "Partnership Property" and collectively as "Partnership Properties") as lessee or lessor, including a description of each such Real Property Lease (including the name of the third party lessor or lessee and the date of the lease or sublease and all amendments thereto). The Partnership has good and marketable fee title to all Owned Property, free and clear of all Liens of any nature whatsoever, except as set forth on Schedule 3.19.

Section 3.20.  Tangible Personal Property.  The Partnership has good and marketable title to all of the items of tangible personal property used in the business of the Partnership free and clear of all Encumbrances.  All such items of tangible personal property which, individually or in the aggregate, are material to the operation of the business of the Partnership are in good condition and in a state of good maintenance and repair (ordinary wear and tear excepted) and are suitable for the purposes used.

Section 3.21.  Intellectual Property.  The Partnership has not impermissibly infringed on the intellectual property of any other person, and to the Sellers' Knowledge, no other party has impermissibly infringed on the Partnership's intellectual property; provided, however, that the Sellers make no representation with respect to the impermissible infringement, by the Partnership or others, on trademarks relating to, or including, the word "Highland."

Section 3.22.  Absence of Certain Developments.  Except as expressly contemplated by this Agreement or as set forth on Schedule 3.22, since the Balance Sheet Date (i) the Partnership has conducted its business in the ordinary course and (ii) there has not been any event, change, occurrence or circumstance that, individually or in the aggregate with any such events, changes occurrences or circumstances has had or could reasonably be expected to have a Material Adverse Effect.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article IV are true and correct as of the Closing.

Section 4.01.  Organization; Authorization; Enforceability.  Buyer is a statutory trust, duly organized, validly existing and in good standing under the Laws of the State of Delaware. Buyer has full trust power and authority to execute and deliver this Agreement and the other agreements contemplated hereby to which Buyer is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; the execution, delivery and performance of this Agreement and the other agreements contemplated hereby to which Buyer is a party have been duly authorized and do not require any further authorization; this Agreement and the other agreements contemplated hereby to which Buyer is a party have been duly authorized, executed and delivered by Buyer and constitute the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with their respective terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

12

Section 4.02.  <u>No Conflict; Consents</u>.  Neither the execution, delivery and performance by Buyer of this Agreement or the other agreements contemplated hereby to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby require any action on the part of Buyer by or in respect of, or any filing with or notice to, any Governmental Authority.  Neither the execution, delivery and performance by Buyer of this Agreement or the other agreements contemplated hereby to which Buyer is a party, will violate, conflict with, or result in a breach of, any provision of the trust documents of Buyer or any applicable Law or Governmental Authorization.

Section 4.03.  <u>Investment Purpose</u>.  Buyer is acquiring the Subject Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.  Buyer acknowledges that the Subject Interests are not registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any state securities laws, and that the Subject Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.  Buyer is able to bear the economic risk of holding the Subject Interests for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

Section 4.04.  <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.05.  <u>Sufficiency of Funds</u>.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Cash Purchase Price and consummate the transactions contemplated by this Agreement.

Section 4.06.  <u>Litigation</u>.  All material Legal Proceedings to which Buyer or any of its Affiliates is a party is listed on <u>Schedule 4.06</u>.  There is no pending or, to the knowledge of Buyer, threatened Action against Buyer or any of its Affiliates, directors, officers or employees that involves any challenge to, or seeks damages or other relief in connection with, this Agreement or any transactions contemplated under this Agreement or under any of the agreements contemplated hereby.

Section 4.07.  <u>Compliance with Laws</u>.  To the Buyer's knowledge, the Buyer and each of its Affiliates has complied, and currently is in compliance, in all material respects with all Laws applicable to the Buyer or any of its Affiliates, as the case may be, except to the extent non-compliance is not expected to have a material adverse effect on the Buyer or its Affiliates.  Neither the Buyer nor any of its Affiliates has received any written notice from any Governmental Authority asserting that it is not in compliance in any material respect with any Laws applicable to the Buyer or any of its Affiliates, as the case may be.

Section 4.08.  <u>No Disqualification Events</u>.  None of the Buyer nor any of its Affiliates, nor any of their respective predecessors, directors, officers or employees (each, a "<u>Buyer Covered Person</u>"), is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (a "<u>Disqualification Event</u>"), except for a

13

Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act. The Buyer has exercised reasonable care to determine (i) the identity of each person that is a Buyer Covered Person; and (ii) whether any Buyer Covered Person is subject to a Disqualification Event.

Section 4.09.  Independent Investigation.  Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) and assets of the Partnership, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Partnership for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in Article III of this Agreement (including the related portions of the Disclosure Schedules); and (b) none of the Sellers, the Partnership or any other Person has made any representation or warranty as to Sellers, the Partnership or this Agreement, except as expressly set forth in Article III of this Agreement.

ARTICLE V
COVENANTS

Section 5.01.  Confidentiality.  Each of the parties hereto shall, and shall cause its Affiliates and its and their employees, agents, accountants, legal counsel and other representatives and advisers to, hold in strict confidence all, and not divulge or disclose any, confidential and proprietary information of any kind concerning the other party and its respective business; provided, however, that the foregoing obligation of confidence shall not apply to (i) information that is or becomes generally available to the public other than as a result of a disclosure by such party, any of its Affiliates or any of their employees, agents, accountants, legal counsel or other representatives or advisers, (ii) information that is or becomes available to such party, or any of its Affiliates or employees, agents, accountants, legal counsel or other representatives or advisers on a non-confidential basis, and (iii) information that is required to be disclosed by such party or any of its Affiliates or employees, agents, accountants, legal counsel or other representatives or advisers as a result of any applicable Law, rule or regulation of any Governmental Authority.  For the purpose of this Section 5.01, the term "confidential and proprietary information" shall include information relating to matters such as trade secrets, books and records, client lists, suppliers, distribution channels, pricing information, private processes, formulae, functional specifications,  know-how, data, improvements, discoveries, designs, inventions, techniques, marketing plans, strategies, forecasts, new products and financial statements.

Section 5.02.  Public Announcements.  Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

Section 5.03.  Further Assurances.  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional

14

documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

Section 5.04. <u>Stand Alone Indemnity</u>. The General Partner covenants to use good faith reasonable best efforts to cause the Partnership to negotiate and enter into an indemnity agreement with Buyer as soon as practicable relating to liability arising out of Buyer's ownership of the Class C Limited Partnership Interest.

ARTICLE VI
INDEMNIFICATION

Section 6.01. <u>Survival</u>.    Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months from the Closing Date; provided that the representations and warranties set forth in <u>Section 3.09</u> (Tax Matters) and <u>Section 3.16</u> (Employee Benefit Plans; Employee Matters) shall remain in full force and effect until the expiration of the applicable statute of limitations and the Fundamental Representations shall remain in force indefinitely. Notwithstanding the foregoing, any claims which are timely asserted prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

Section 6.02. <u>Indemnification By Sellers</u>. Subject to the other terms and conditions of this <u>Article VI</u>, Sellers shall on a several, and not a joint and several, basis indemnify Buyer and its trustees, sponsors, administrators, grantors, officers, directors, managers, Affiliates, beneficiaries, shareholders, members, partners, successors and assigns (collectively, the "<u>Buyer Indemnified Parties</u>") against, and shall hold the Buyer Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, any Buyer Indemnified Parties based upon, arising out of, with respect to or by reason of:

(a)    any inaccuracy in or breach of any of the representations or warranties of any of the Sellers contained in this Agreement or any of the other agreements contemplated hereby to which any Seller is a party;

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by any of the Sellers pursuant to this Agreement or any of the other agreements contemplated hereby to which any Seller is a party; and

(c)    any and all actions, suits, proceedings, claims, demands and Losses incident to any of the foregoing or incurred in attempting to oppose the imposition thereof, or in enforcing this indemnity.

Section 6.03. <u>Indemnification By Buyer</u>. Subject to the other terms and conditions of this <u>Article VI</u>, Buyer shall indemnify Sellers and each of their officers, directors, managers, Affiliates, beneficiaries, shareholders, members, partners, successors and assigns (collectively, the "<u>Seller Indemnified Parties</u>") against, and shall hold the Seller Indemnified Parties harmless

15

006373

from and against, any and all Losses incurred or sustained by, or imposed upon, any Seller Indemnified Parties based upon, arising out of, with respect to or by reason of:

      (a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement;

      (b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any of the other agreements contemplated hereby to which Buyer is a party; and

      (c)     any and all actions, suits, proceedings, claims, demands and Losses incident to any of the foregoing or incurred in attempting to oppose the imposition thereof, or in enforcing this indemnity.

      Section 6.04.   <u>Defense of Third Party Claims</u>.

      (a)     Any party making a claim for indemnification under this <u>Article VI</u> (an "<u>Indemnified Party</u>") shall notify the party against whom such claims are asserted (an "<u>Indemnifying Party</u>") of the claim (the "<u>Indemnified Party Claim</u>") in writing promptly after receiving notice of any third party claim, liability, demand, assessment, action, suit or proceeding, describing the Indemnified Party Claim, the amounts thereof (if known and quantifiable) and the basis therefor, provided such notification would not violate any applicable privilege (the "<u>Indemnified Party Claim Notice</u>"), <u>provided</u>, <u>further</u>, <u>however</u>, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually and materially prejudiced as a result of such failure. In the event the Indemnified Party Claim arises out of a claim asserted by a third party, the Indemnifying Party shall have the right and shall notify the Indemnified Party in writing, within 10 Business Days of receipt of the Indemnified Party Claim Notice, of its intent to assume the control of the defense of any such third party claims, including, at its own expense, employment of counsel reasonably satisfactory to the Indemnified Party (the "<u>Indemnifying Party Defense Notice</u>"); <u>provided</u>, <u>however</u>, that prior to assuming the defense of any such claim, the Indemnifying Party must acknowledge in writing and without qualification (or reservation of rights) its indemnification obligations under this Agreement (which such acknowledgment shall include the Indemnifying Party's agreement to be fully responsible for all Losses relating to such Indemnified Party Claim and that it shall provide full indemnification to the Indemnified Party with respect to such third party claim giving rise to such claim for indemnification). If the Indemnifying Party shall have exercised its right to assume such control, the Indemnified Party may, in its sole discretion and at its expense, employ counsel to represent it (in addition to counsel employed by the Indemnifying Party) in any such matter, and in such event counsel selected by the Indemnifying Party shall be required to cooperate with such counsel of the Indemnified Party in such defense, compromise or settlement; provided that the fees and expenses of such separate counsel that are incurred for any period during which the Indemnifying Party has not assumed control of the defense shall be borne by Indemnifying Party.

      (b)     In the event that the Indemnifying Party shall fail to give the Indemnifying Party Defense Notice, the Indemnifying Party shall be deemed to have elected not to conduct the defense of the subject third party claim, and in such event the Indemnified Party shall have the

right to conduct such defense and to compromise and settle such claim with the consent of the Indemnifying Party, which shall not be unreasonably withheld, conditioned or delayed.

(c)     In the event that the Indemnifying Party does deliver an Indemnifying Party Defense Notice and thereby elects to conduct the defense of the third party claim, the Indemnifying Party shall have the right to conduct such defense and, except as provided below, to settle the claim without the prior consent of the Indemnified Party.  The Indemnified Party will cooperate with and make available to the Indemnifying Party such assistance and materials as the Indemnifying Party may reasonably request, all at the expense of the Indemnifying Party, and the Indemnified Party shall have the right at its expense to participate in the defense assisted by counsel of its own choosing; provided that in such cases the Indemnified Party shall have the right to compromise and settle the third party claim only with the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed; further provided that the Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement without the prior written consent of the Indemnified Party, if (A) such judgment or settlement does not include as an unconditional term thereof the giving by each claimant or plaintiff to each Indemnified Party of a release from all liability in respect to such claim, (B) such judgment or settlement would result in the finding or admission of any violation of Law, or (C) as a result of such consent or settlement, injunctive or other equitable relief would be imposed against the Indemnified Party or such judgment or settlement would interfere with or materially and adversely affect the business, operations or assets of the Indemnified Party.

(d)     Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume control of the defense or settlement of any third party claim and shall, subject to the Indemnifying Party being obligated to indemnify the Indemnified Party under this Article VI, pay the fees and expenses of counsel retained by the Indemnified Party if (A) the claim for indemnification is with respect to a criminal proceeding, action, indictment, allegation or investigation, (B) the Indemnified Party has been advised by counsel that a reasonable likelihood exists of a conflict of interest between the Indemnifying Party and the Indemnified Party, (C) the Indemnifying Party has failed or is failing to reasonably prosecute or defend such claim, or (D) the claim seeks an injunction or other equitable relief against any Indemnified Party.

(e)     Notwithstanding who is controlling the defense or settlement of any third party claim (the "Defending Party"), and without regard to who might be ultimately responsible for the liability related thereto, the Defending Party shall diligently and vigorously defend such claim (subject to the Defending Party's right to settle such Indemnified Party Claim in accordance with the terms of this Section 6.04).

(f)     Limitations on Seller Indemnity.  Notwithstanding anything else herein, the Sellers' (and any Seller's) liability shall be limited to the amount of cash such Sellers (or Seller) have received from Buyer as a Cash Purchase Price or as a payment of principal or interest on the Note.

Section 6.05.  Certain Limitations.  The indemnification provided for in Section 6.02 and Section 6.03, except with respect to Fundamental Representations, shall be subject to the following limitations:

17

(a)     The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 6.02(a) or Section 6.03(a), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 6.02(a) or Section 6.03(a), as the case may be, exceeds one percent (1.0%) of the Purchase Price (the "Deductible"), in which event the Indemnifying Party shall be required to pay or be liable for all such Losses in excess of the Deductible; provided, however, that for purposes of this Section 6.05(a) only, the term "Purchase Price" shall be limited to the sum of (i) the Cash Purchase Price and (ii) the amount of principal actually paid by Buyer on the applicable Note, or Notes, as the case may be, at the time of a claim for indemnity..

(b)     The aggregate amount of all Losses for which Sellers shall be liable shall not exceed ten percent (10%) of the Purchase Price; provided, however, that for purposes of this Section 6.05(b) only, the term "Purchase Price" shall be limited to the sum of (i) the Cash Purchase Price and (ii) the amount of principal actually paid by Buyer on the applicable Note, or Notes, as the case may be, at the time of a claim for indemnity.

(c)     Payments by an Indemnifying Party pursuant to Section 6.02 or Section 6.03 in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds actually received by an Indemnified Party and any indemnity, contribution or other similar payment actually received by an Indemnified Party in respect of any such claim.

(d)     Notwithstanding any provision contained in this Agreement to the contrary, the limitations set forth in this Section 6.04 shall not apply to Losses for any claims that resulted from or are based upon willful misconduct and/or fraud.

(e)     Subject to the limitations in this Section 6.05, any indemnification obligation of the Sellers under Section 6.02 shall not be payable to the Indemnified Party in cash, but shall instead be satisfied by a reduction in the principal balance of the applicable Note, or Notes, as the case may be, for the amount of such indemnification obligation.

Section 6.06.   Tax Treatment of Indemnification Payments.   All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

Section 6.07.   Exclusive Remedies.   Subject to Section 7.11, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article VI. Nothing in this Section 6.07 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section 7.11 or to seek any remedy on account of fraud by any party hereto.

18

006376

ARTICLE VII
MISCELLANEOUS

Section 7.01.  Expenses.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; provided, however, that such costs and expenses of Buyer relating to the negotiation and execution of this Agreement shall be paid by the Partnership.

Section 7.02.  Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) one Business Day after dispatch if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

| If to The Dugaboy Investment Trust: | The Dugaboy Investment Trust<br>1010 Crescent Beach<br>Vero Beach, FL 32963<br>Attn: Nancy M. Dondero, Trustee<br>Facsimile: _____<br>E-mail: _____ |
|---|---|
| If to The Mark and Pamela Okada Family Trust-Exempt Trust #1: | The Mark and Pamela Okada Family Trust-Exempt Trust #1<br>2164 Fernwood Drive<br>Moraga, CA 94556<br>Attn: Lawrence Tonomura, Trustee<br>Facsimile: _____<br>E-mail: mapfamilytrust@gmail.com |
| If to The Mark and Pamela Okada Family Trust-Exempt Trust #2: | The Mark and Pamela Okada Family Trust-Exempt Trust #2<br>2164 Fernwood Drive<br>Moraga, CA 94556<br>Attn: Lawrence Tonomura, Trustee<br>Facsimile: _____ |

19

006377

E-mail: mapfamilytrust@gmail.com

| | |
|---|---|
| If to Mark Okada: | Mark K. Okada<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201<br>Facsimile: 972-628-4147<br>E-mail: MOkada@HighlandCapital.com |
| If to the Partnership: | Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201<br>Attn: Frank Waterhouse<br>Facsimile: 972-628-4147<br>E-mail: corporateaccounting@hcmlp.com |
| With a copy for notices sent to any of the above *(which shall not constitute notice)*: | Hunton & Williams LLP<br>1445 Ross Ave., Suite 3700<br>Dallas, TX 75202<br>Attn: Alexander McGeoch, Esq.<br>Facsimile: 214-979-3938<br>E-mail: AMcGeoch@hunton.com |
| If to Buyer: | Hunter Mountain Investment Trust<br>c/o Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, NY 12866<br>Attn: John Honis<br>E-mail: JHonis@randadvisors.com |
| With a copy *(which shall not constitute notice)* to: | Sadis & Goldberg LLP<br>551 Fifth Avenue, 21st Floor<br>New York, NY 10176<br>Attn: Steven Huttler, Esq.<br>Facsimile: 212-573-8151<br>E-mail: SHuttler@sglawyers.com |

Section 7.03.  Interpretation.  For purposes of this Agreement:  (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires,

20

references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be deemed to be jointly drafted by the parties and shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 7.04.  <u>Headings</u>.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 7.05.  <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 7.06.  <u>Entire Agreement</u>.  This Agreement, together with the Disclosure Schedules and the Exhibits, and the Ancillary Agreements constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 7.07.  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs and personal representatives.  No party may assign its rights or obligations hereunder without the prior written consent of all of the other parties, which consent shall not be unreasonably withheld or delayed; <u>provided</u>, <u>however</u>, that Buyer may collaterally assign its rights (but not its obligations and such assignment will not relieve it of its obligations under) this Agreement and the other documents entered into in connection herewith to any lender providing financing to Buyer or its Affiliates.  No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 7.08.  <u>No Third-party Beneficiaries</u>.  Except as provided in <u>Article VI</u>, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any

21

006379

other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 7.09.  <u>Amendment and Modification; Waiver</u>.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 7.10.  <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)     In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that Sellers or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award.  The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted

in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.10(c).

Section 7.11. Specific Performance. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 7.12. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, portable document format (.pdf), e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

23

006381

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS:                          THE DUGABOY INVESTMENT TRUST

                                  By: _Nancy M. Dondero_____
                                  Name: Nancy M. Dondero
                                  Title: Trustee


                                  THE MARK AND PAMELA OKADA FAMILY
                                  TRUST-EXEMPT TRUST #1


                                  By: _____
                                  Name: Lawrence Tonomura
                                  Title: Trustee


                                  THE MARK AND PAMELA OKADA FAMILY
                                  TRUST-EXEMPT TRUST #2


                                  By: _____
                                  Name: Lawrence Tonomura
                                  Title: Trustee


                                  MARK K. OKADA _____


BUYER:                            HUNTER MOUNTAIN INVESTMENT TRUST
                                  By: Beacon Mountain LLC, its Administrator


                                  By: _____
                                  Name: John Honis
                                  Title: President


*SIGNATURE PAGE TO PARTNERSHIP
INTEREST PURCHASE AGREEMENT*

                        24

006382

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS:                    THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy M. Dondero
Title:  Trustee

THE MARK AND PAMELA OKADA FAMILY
TRUST-EXEMPT TRUST #1

By: _____
Name: Lawrence Tonomura
Title:  Trustee

THE MARK AND PAMELA OKADA FAMILY
TRUST-EXEMPT TRUST #2

By: _____
Name: Lawrence Tonomura
Title:  Trustee

MARK K. OKADA

_____

BUYER:                      HUNTER MOUNTAIN INVESTMENT TRUST
By: Beacon Mountain LLC, its Administrator

By: _____
Name: John Honis
Title: President

*SIGNATURE PAGE TO PARTNERSHIP
INTEREST PURCHASE AGREEMENT*

24

006383

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS:                        THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy M. Dondero
Title: Trustee

THE MARK AND PAMELA OKADA FAMILY
TRUST-EXEMPT TRUST #1

By: _____
Name: Lawrence Tonomura
Title: Trustee

THE MARK AND PAMELA OKADA FAMILY
TRUST-EXEMPT TRUST #2

By: _____
Name: Lawrence Tonomura
Title: Trustee

MARK K. OKADA

_____

BUYER:                        HUNTER MOUNTAIN INVESTMENT TRUST
By: Beacon Mountain LLC, its Administrator

By: _____
Name: John Honis
Title: President

*SIGNATURE PAGE TO PARTNERSHIP*
*INTEREST PURCHASE AGREEMENT*

24

006384

IN WITNESS WHEREOF, the undersigned General Partner has executed this Agreement as of the date first above written to evidence its agreement to be bound by the provisions of Section 2.03, Section 5.04 and Section 7.01 hereof.

GENERAL PARTNER:

STRAND ADVISORS, INC.

By: _____
Name: James D. Dondero
Title: President

*SIGNATURE PAGE TO PARTNERSHIP*
*INTEREST PURCHASE AGREEMENT*

25

## Schedule 3.05 – Government Filings

The Sellers and Partnership will determine what Section 16 and/or Schedule 13 reports may need to be filed with the SEC, if any.

**Schedule 3.06(c) – Liabilities**

$5,000,000 loan from Acis Capital Management, LP dated December 8, 2015

## Schedule 3.07 – Legal Proceedings

Boston Generating

    Side:  Defendant

    Case Style: Craig R. Jalbert, the Liquidating Trustee of the BosGen Liquidating Trust v. K Road Power Management, LLC, et al. (In re Boston Generating, LLC et al.); Adv. Pro. No. 12-01879 in the United States Bankruptcy Court for the Southern District of New York

    Legal Counsel:  Akin Gump

    Date Filed: 12/10/2012

    Summary: Plaintiff seeks to clawback alleged fraudulent transfers to first lien holders (HCMLP and Highland Crusader are defendants)

Citi

    Side: Plaintiff

    Case Style: Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A., Cause No. 12-civ-02827 in the United States District Court for the Southern District of New York

    Legal Counsel: Lackey Hershman

    Date Filed: 4/05/2012

    Summary: Citi charged undue fees in winding down a financing facility.  Citi has counterclaimed for amounts allegedly due.

Clean Harbors (FINRA)

    Side:  Respondent

    Case Style: Review of Trading in Clean Harbors, Inc., FINRA Matter No. 20120346107

    Legal Counsel:  N/A

    Date Filed: 03/11/2013

    Summary: FINRA investigation as to potential trading violations

Clean Harbors (SEC)

    Side:  Respondent

    Case Style: In the Matter of Clean Harbors, Inc., HO-12313

    Legal Counsel:  WilmerHale

    Date Filed: 04/22/2014

    Summary: SEC investigation as to potential trading violations

Cornerstone – Reliant

> Side: Plaintiff
>
> Case Style: Cornerstone Healthcare Group Holding, Inc. v. Reliant Hospital Partners, LLC, Nautic Partners, LLC, Michael Brohm, Patrick Ryan, Kenneth McGee, Jerry Huggler, Chad Deardorff v. Highland Capital Management, LP; Cause No. 11-04339 in the 68th Judicial District of Dallas County, Texas
>
> Legal Counsel: Andrews Kurth
>
> Date Filed: 04/06/2011
>
> Summary: Cornerstone alleges that Defendants utilized proprietary and confidential info to usurp the Reliant acquisition opportunity and are continuing to wrongfully utilize and disclose Cornerstone's proprietary and confidential info in furtherance of their own benefit. Former Cornerstone executives allege Highland Capital Management interfered with the payment of their severance after they left the company.

Credit Strategies

> Side: Defendant
>
> Case Style: Redeemer Committee of Highland Credit Strategies Fund v. Highland Capital Management, L.P.; AAA Case No. 13 512 0180813
>
> Legal Counsel: McKool Smith
>
> Date Filed: 07/30/2013
>
> Summary: Allegations relating to the management of a private investment fund in wind-down.

Daugherty

> Side: Both
>
> Case Style: Highland Capital Management, L.P. v. Patrick Daugherty v. Sierra Verde, LLC, Highland Employee Retention Assets, LLC, James Dondero, Patrick Boyce, and William L. Britain
>
> Legal Counsel: Andrews Kurth
>
> Date Filed: 04/11/2012
>
> Summary: Highland obtained a verdict for $2.8 million against Daugherty. Daugherty obtained a judgment for $2.6 million against HERA. Both sides are appealing.

Hamilton

> Side: Defendant
>
> Case Style: Hamilton Partners, L.P. v. Highland Capital Management, L.P. and Joseph Furlong; Cause No. 6547 in the Court of Chancery of the State of Delaware
>
> Legal Counsel: Cole Schotz/ Wachtell

Date Filed: 06/06/2011

Summary: Allegedly improper restructuring of American Home Patient

UBS – Main

Side:  Defendant

Case Style: UBS Securities LLC and UBS AG, London Branch v. Highland Capital Management, L.P., Highland Special Opportunities Holding Company, Highland CDO Opportunity Master Fund, L.P. Highland Financial Partners, L.P., Highland Credit Strategies Fund, Highland Crusader Offshore Partners, L.P., Highland Credit Opportunities CDO, L.P. and Strand Advisors, Inc.; Supreme Court of the State of New York, County of New York; Case No. 650097/2009

Legal Counsel:  Lackey Hershman

Date Filed: 02/24/2009 Amended 06/28/2010

Summary: Plaintiff alleges that HCMLP engaged in fraudulent transfers and breached its duty of good faith in fair dealing in managing the obligations of its funds.  Plaintiff's first set of claims against HCMLP were dismissed on appeal and Plaintiff's second set of claims against HCMLP was severely curtailed on appeal.

006390

## <u>Schedule 3.09(e) – Reportable Transactions</u>

The Partnership has engaged in certain reportable transactions considered "loss transactions" as defined in Treasury Regulation section 1.6011-4(b)(5). Details on such "loss transactions" are available upon request.

**Schedule 3.09(f) – Pending Audits**

- Form 1065 for tax year ended December 31, 2008 is under review by the Internal Revenue Service.

- Form 1065 for tax year ended December 31, 2009 has been selected for audit by the Internal Revenue Service.

006392

## Schedule 3.14 – Advisory Contracts

See Schedule 3.17(a)

The Crusader Fund is behind the stated realization schedule set forth in the Plan and Scheme of Distribution for the Fund

*See also Schedule 3.07*

006393

## Schedule 3.15 – Insurance

Governance Re, Ltd.

>   Management, Employers & Professional Liability Indemnity Insurance

Liberty Mutual Insurance Company

>   Fidelity, Premises, Transit, Forgery or Alteration, Securities Forgery, Worldwide Counterfeit Currency, Computer Systems Fraud, Coverage on Partners, Voice Initiated Transfer Fraud, Telefacsimile Transfer Fraud, Claims Expense

Illinois National Insurance Company

>   Employment practices liability

*See also the list of routine employees benefits on Schedule 3.16*

## Schedule 3.16 – Benefit Plans

**Highland 401(k) Plan** (defined contribution plan)

**Highland Capital Management, L.P. Retirement Plan and Trust** (defined benefit plan; no longer open, but has several legacy participants)

**HCMLP Bonus Plan**

**Highland Capital Management, L.P. Deferred Incentive Plan**

**2008 HCMLP Long-Term Incentive Plan**

In addition to the plans listed above, Highland Capital Management, L.P. generally offers the following paid employee benefits.

- Comprehensive medical & dental insurance
- Life, AD&D and disability insurance
- Executive long-term disability
- Daily catered lunches
- Parking
- Cell phone reimbursement
- Health club membership
- Paid time off
- Paid holidays

## Schedule 3.17(a) – Material Contracts

### Advisory Agreements

Bandera Strategic Credit Partners I, LP

BB Highland Floating Rate Fund

Charitable DAF Fund, LP

Governance Re, Ltd

Highland Loan Master Fund, LP

Highland Capital Loan Fund, LP

Highland Loan Fund, Ltd.

Highland CDO Opportunity Master Fund, LP

Highland CDO Opportunity Fund, LP

Highland CDO Opportunity Fund, Ltd

Highland Credit Strategies Master Fund, LP

Highland Credit Strategies Fund, LP

Highland Credit Strategies Fund, Ltd

Highland Crusader Offshore Partners, LP

Highland Crusader Fund, LP

Highland Crusader Fund, Ltd

Highland Crusader Fund II, Ltd

Highland Life Settlement Program, LP

Highland Merger Arbitrage Fund, LP

Highland Multi Strategy Credit Fund, LP

Highland Multi Strategy Credit Fund, Ltd

Highland Multi-Strategy Master Fund, LP

Highland Capital Multi-Strategy Fund, LP

Highland Restoration Capital Partners, LP

Highland Restoration Capital Partners Offshore, LP

Highland Restoration Capital Partners Master, LP

Longhorn Credit Funding, LLC

NexBank SSB

PCMG Trading Partners XXIII, LP

Pension Denmark

## Distributions Plans

Highland Crusader Fund Plan of Distribution and Scheme of Arrangement

Highland Credit Strategy Fund Plan of Distribution and Scheme of Arrangement

## Servicing/Collateral Management Agreements

Aberdeen Funding, Ltd

Brentwood CLO, Ltd

Bristol Bay Funding, Ltd

Eastland CLO, Ltd

Gleneagles CLO, Ltd

Grayson CLO, Ltd

Greenbriar CLO, Ltd

Highland Legacy Limited

Highland Loan Funding V, Ltd

Highland Park CDO 1, Ltd

Jasper CLO, Ltd

Liberty CLO, Ltd

Loan Funding IV LLC

Loan Funding VII LLC

ML CBO IV (Cayman) Ltd

ML CBO XIX Sterling (Cayman), Ltd

Pam Capital Funding, LP

PamCo Cayman, Ltd

Red River CLO, Ltd

Restoration Funding CLO, Ltd

Rockwall CDO, Ltd

Rockwall CDO II, Ltd

Southfork CLO, Ltd

Stratford CLO, Ltd

Valhalla CLO, Ltd

Westchester CLO, Ltd

### <u>Portfolio Companies Advisory Services Agreements</u>

3P Holdings, Inc.

American Homepatient, Inc.

Carey International, Inc.

CCS Medical, Inc.

Cornerstone Healthcare Group Holding, Inc.

Romacorp, Inc.

Trussway Holdings, Inc.

### <u>Other Material Agreements (other than advisory)</u>

**Principal Counterparty – Acis Capital Management, LP**

    Second Amended and Restated Shared Services Agreement

    Sub-Advisory Agreement (Bandera Strategic Credit Partners I, LP)

    Sub-Advisory Agreement (Highland Multi Strategy Credit Fund, Ltd.)

**Principal Counterparty – Highland Capital Management Fund Advisors, LP**

    Second Amended and Restated Shared Services Agreement

**Principal Counterparty – NexPoint Advisors, LP**

    Shared Services Agreement

**Principal Counterparty – NexPoint Real Estate Advisors, LP**

    Shared Services Agreement

**Principal Counterparty – Petrocap, LLC**

Exchange Agreement

Subsequent Funds Capital Commitment Agreement

Shared Services Agreement


**Principal Counterparty – Crescent TC Investors, LP**

Office Lease


### **Partnership Borrowings**


**Lender – Principal outstanding December 11, 2015**

Dallas Police and Fire Pension System ($18,647,806)
(Outstanding balance of note for purchase of fund interest)

Highland Select Equity Fund ($11,000,000)

KeyBank ($10,000,000)

Frontier State Bank ($9,368,479)

The Get Good Non-Exempt Trust #2 ($6,713,323)

Acis Capital Management, LP ($5,000,000)


### **Partnership Lending**


*The Partnership routinely makes loans to affiliates. A detailed schedule of such loans including the underlying loan documents has been uploaded to the data room hosted by Hunton & Williams.*

**<u>Schedule 3.17(b) – Material Contracts Events</u>**

See Schedule 3.14

## <u>Schedule 3.18(b) – CLO Agreements</u>

See Schedule 3.17(a)

## Schedule 3.18(d) – CLO Fee Agreements

See Schedule 3.17(a)

006402

## **Schedule 3.19 – Real Property**

(i)      Real property and interests in real property of the Partnership
     a.  Estates on Maryland Owners, LLC
         i.  Subject to lien from KeyBank (see schedule 3.14(a)
     b.  Little Terrell land
     c.  Dallas Office Property (2817 Maple Avenue)

(ii)     Leased property of the Partnership
     a.  Crescent building (300 Crescent Court)
         i.  Primary office space in Dallas (43,515 square feet)
        ii.  Landlord: Crescent TC Investors, LP
       iii.  Date: April 20, 2011
     b.  Chase building (2200 Ross Avenue)
         i.  Additional office space in Dallas primarily for disaster recovery and storage (8,313 square feet)
        ii.  Landlord: 2200 Ross, LP
       iii.  Date: August 30, 2006

006403

### Schedule 3.22 - Developments

*Provided and uploaded to the data room hosted by Hunton & Williams in the file titled "Pro forma Balance Sheet 12.11.15.xlsx".*

**Schedule 4.06 – Litigation**

None

EXHIBIT A

<u>SUBJECT INTERESTS AND PURCHASE PRICE</u>

Hunter Mountain Investment Trust will be acquiring forty-four and one-half percent (44.5%) of
the existing capital accounts of the Class A Limited Partners and the Percentage Interest of each
Class A Limited Partner shown as sold in the table below.

| | Pre Transaction Percentage Interest | Percentage Interest Sold | Post Transaction Percentage Interest | Total Purchase Price | Cash Purchase Price | Note |
|---|---|---|---|---|---|---|
| The Dugaboy Investment Trust | 33.49917% | 33.3130% | 0.18656% | $69,619,608.08 | $6,961,960.81 | $62,657,647.27 |
| Mark K. Okada | 8.74206% | 8.6930% | 0.04869% | $18,168,175.24 | $1,816,817.52 | $16,351,357.72 |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 1.75559% | 1.7460% | 0.00978% | $3,648,542.33 | $364,854.23 | $3,283,688.09 |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 0.75240% | 0.7480% | 0.00419% | $1,563,674.36 | $156,367.44 | $1,407,306.92 |
| Total | 44.74922% | 44.50000% | 0.24922% | $93,000,000.00 | $9,300,000.00 | $83,700,000.00 |

006406

FORM OF PROMISSORY NOTE

[See attached]

006407