**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

|  |  |  |
|---|---|---|
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.

# Volume 25

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.   Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.   the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.   the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3.   the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

     4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

---

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

---

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.  Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.  Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.  Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.  Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.  Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

   1.  declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

   2.  concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1.  **Notice of Appeal**

*000001*      a.  Notice of Appeal **[Dkt. 3906]**;

*000276*      b.  Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*      c.  Second Amended Notice of Appeal **[Dkt. 3945]**

2.  **The judgment, order, or decree appealed from:**

      a.  Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

**a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru  Vol. 4*
*Vol 4*
*0022 36*
*00 22 43*
*0022 48*

Vol. 5
002251

002254

002262

002340

002355

002358

002391

002398

002400

Vol. 8
002826

Vol. 9
003257

003260

003270

003278

Thru Vol. 7

Thru Vol. 9

| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

*Handwritten annotations in left margin:*
Vol. 10
003281
003286
003291
003294
003296
003299
003302
003311
003314
003323
003368
003430

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| *Vol. 10* | | | Holdings LLC, Stonehill Capital Management LLC |
| *003458* | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *003463* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *Vol. 11* *003537* *Thru Vol. 16* | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Vol. 17* *004465* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *004712* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004714* | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *004808* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *004813* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004836* | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18* *004930* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *004931* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18
004939.

| | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| 004959 | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004961 | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004984 | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005049 | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005114  Thru Vol. 25 | 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| Vol. 26  006608  Thru Vol. 39 | 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| Vol. 39  009273 | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009290 | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009416 | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 009424 | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*
*Vol. 42*   *Thru Vol. 41*
*009847*

*009901*

*009905*

*009908*

*009912*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

Vol. 42

| | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|---|
| 009928 | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 009944 | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 010013 | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 010023 | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 010025 | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 010029 | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 010035 | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 010047 | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 010059 | | | |

Vol. 43

| | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |
|---|---|---|---|
| 010062 | | | |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

*Vol. 43*
*010135*
*010136*

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.     Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                    Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
      Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

## SECURED PROMISSORY NOTE

$0,000,000.00                                                               December __, 2015

FOR VALUE RECEIVED, the undersigned, Hunter Mountain Investment Trust, a Delaware statutory trust ("Maker"), hereby promises to pay to the order of [__] ("Payee"), at its office at [__], in lawful money of the United States of America, the principal sum of [__] DOLLARS AND [__] CENTS ($0,000,000.00), together with interest on the outstanding principal balance thereof at the rate of two and sixty-one one-hundredths percent (2.61%) per annum, as provided herein and compounded as shown in the amortization table in EXHIBIT A.

### Payments

ALL UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, IN ACCORDANCE WITH THE AMORTIZATION SCHEDULE ATTACHED HERETO AS EXHIBIT A. NOTWITHSTANDING THE FOREGOING SENTENCE, SO LONG AS THIS NOTE IS OUTSTANDING, MAKER COVENANTS NOT TO MAKE ANY DISTRIBUTIONS TO ITS BENEFICIAL OWNER WITHOUT THE PRIOR WRITTEN CONSENT OF PAYEE. MAKER AGREES TO PAY TO PAYEE, UNTIL THIS NOTE IS SATISFIED, ANY AMOUNTS THAT WOULD OTHERWISE BE AVAILABLE FOR DISTRIBUTIONS TO MAKER'S BENEFICIAL OWNER ("EXCESS CASH"), AND FURTHER CONSENTS TO HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCM") PAYING DISTRIBUTIONS OTHERWISE PAYABLE TO MAKER, TO THE EXTENT SUCH DISTRIBUTION REPRESENTS EXCESS CASH, DIRECTLY TO PAYEE.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be.  If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date.  "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)        this Note executed by Maker;

SECURED PROMISSORY NOTE, Page 1

006408

(b)     the Partnership Interest Purchase Agreement, of even date herewith (the "Purchase Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Purchase Agreement have been fulfilled;

(c)     evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker;

(d)     true and correct copies of the organizational documents of Maker; and

(g)     such other agreements, documents, information, and other assurances as Payee may reasonably request.

## Security

As security for the prompt payment and performance in full when due of its indebtedness and obligations under this Note, Maker hereby pledges and assigns to Payee, and grants to Payee a continuing security interest in, all of Maker's right, title and interest (whether now existing or hereafter arising and wherever located) in and to: (a) the Purchase Agreement and all documents related thereto including, without limitation, all rights to receive distributions with respect to the Subject Interests (as defined in the Purchase Agreement) and other payments thereunder; (b) the Subject Interests received by Maker under the Purchase Agreement; (c) all accounts and general intangibles arising from, or related to, the Purchase Agreement; and (d) all proceeds and products of the foregoing clauses (a), (b) and (c) (collectively, the "Collateral"). In addition to all other rights and remedies granted to Payee in this Note or by applicable law, Payee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Texas with respect to the Collateral. Maker shall keep the Collateral free and clear of all liens, security interests and encumbrances other than those in favor of Payee. Maker hereby authorizes Payee to file any financing statement naming Maker as debtor, Payee as secured party and describing the Collateral which Payee deems necessary. Maker will take all actions and execute all documents reasonably requested by Payee to create, perfect, protect and enforce Payee's interest in the Collateral.

## Events of Default

Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

(a)     the failure of Maker to make any payment required to be made under this Note when such payment becomes due; provided, however, that Maker's failure to make a payment when due shall not be considered an Event of Default if HCM has failed to timely make Priority Distributions, as described in the Fourth Amended and Restated Agreement of Limited Partnership of HCM (or a successor document) (the "Partnership Agreement"); provided further that such a failure by HCM to timely make Priority Distributions when permitted because of a Honis Trigger Event, as defined in the Partnership Agreement, shall not be an excuse for an Event of Default.

(b)     Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document when made that is not cured within thirty days of Maker's receipt of written notice thereof to Maker (other than Events of Default set forth in clauses (a), (d), (e) and (f) hereof for which notice of default shall not be required);

(c)     any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is incorrect in any material respect;

SECURED PROMISSORY NOTE, Page 2

(d)      Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

(e)      any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property; provided, however that an involuntary proceeding shall only be an Event of Default if such proceeding remains unstayed or undismissed for a period of sixty days;

(f)      any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee, HCM or other Class A limited partners of HCM;

(g)      Maker creates, incurs or otherwise permits to exist any indebtedness for borrowed money other than the indebtedness evidenced by (i) this Note, (ii) and any note issued by Maker in favor of Payee, HCM or other Class A limited partners of HCM;

(h)      any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity if the holder of such indebtedness causes any of such indebtedness to become due, or requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(i)      the validity or enforceability of this Note shall be contested or challenged by Maker; or

(j)      any lien purported to be created to secure the amounts owing under this Note shall cease to be, or shall be asserted by Maker not to be, a valid and perfected lien on any collateral, with the priority required hereby, provided, however, that if the security interest is not perfected due to an act or omission of Payee, the lack of perfection shall not be an event of default.

### Remedies

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the principal and interest contemplated hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (d) of the definition of "Event of Default", such indebtedness shall become immediately due and payable in full without demand or acceleration); (b) reduce any claim to judgment; (c) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (d) may unilaterally cause HCM to transfer from Maker to Payee the portion of the Collateral having a fair market value equal to the remaining indebtedness due hereunder together with interest thereon at the time of Default; (e) may cure any Event of Default, or event of nonperformance under this Note; and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or

SECURED PROMISSORY NOTE, Page 3

006410

otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

Except as otherwise specifically provided in the immediately preceding paragraph, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

All proceeds of the Collateral received by Payee shall be applied by Payee to repay the fees and expenses of Payee incurred in connection with this Note and the other indebtedness owing under this Note.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

## Miscellaneous

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full,

006411

refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder to or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, with confirmation, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. SUBJECT TO THE REQUIREMENTS HEREIN TO ARBITRATE, AS APPLICABLE, MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION PROPERLY BEFORE A COURT OF LAW SHALL BE TRIED BY SUCH COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

[Remainder of Page Intentionally Left Blank]

SECURED PROMISSORY NOTE, Page 5

006412

Signed effective as of the date of this Note.

HUNTER MOUNTAIN INVESTMENT TRUST

By:  Beacon Mountain LLC, its Administrator

By:  _____
Name: John Honis
Title:  President

<u>Maker's address for notice:</u>

Hunter Mountain Investment Trust
c/o Beacon Mountain, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis

with a copy (which shall not constitute notice) to

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attention: Steven Huttler, Esq.
Fax:  212-573-8151

SECURED PROMISSORY NOTE, Signature Page

006413

Exhibit 23-50   Filed 12/26/23   Page

Exhibit A

Amortization Schedule

EXHIBIT C

FORM OF ASSIGNMENT OF PARTNERSHIP INTERESTS

[See attached]

006415

## ASSIGNMENT OF PARTNERSHIP INTEREST

THIS ASSIGNMENT, dated as of September ___, 2015 is made by and between [●], a [●] ( the "<u>Assignee</u>") and [●], a [●] (the "<u>Assignor</u>") as follows:

WHEREAS, Assignor and Assignee desire that Assignor assign to Assignee certain of Assignor's limited partnership interest (the "<u>Partnership Interest</u>") in Highland Capital Management, L.P. a Delaware limited partnership (the "<u>Partnership</u>"), which consists of a [●]% limited partnership interest in the Partnership;

NOW, THEREFORE, in consideration of the undertakings of Assignee herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby grant, sell, assign, transfer and convey to Assignee the Partnership Interest.

TO HAVE AND TO HOLD the Partnership Interest unto Assignee, its successors and assigns, forever, and Assignor does hereby bind himself, his successors and assigns to forever warrant and defend title (free and clear of all liens or other encumbrances of any kind) to the Partnership Interest unto Assignee, its successors and assigns, against every person whomsoever claiming or to claim the same or any part thereof.

Assignor and Assignee hereby agree to execute any documents required to evidence further or to confirm the assignment effected hereby.  This instrument may be executed in separate original counterparts, each of which shall be deemed to be an original but both of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have executed this instrument effective as of the date first written above.

[●]

By: _____
Name: _____
Title: _____


[●]

By: _____
Name: _____
Title: _____

006416

EXHIBIT D

<u>FORM OF FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP</u>

[See attached]

.

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

ARTICLE 1   GENERAL ......................................................................................................... 1
   1.1.   Continuation ................................................................................................ 1
   1.2.   Name ........................................................................................................... 1
   1.3.   Purpose ....................................................................................................... 1
   1.4.   Term. ........................................................................................................... 1
   1.5.   Partnership Offices; Addresses of Partners. ............................................... 1

ARTICLE 2   DEFINITIONS ................................................................................................... 2
   2.1.   Definitions ................................................................................................... 2
   2.2.   Other Definitions ........................................................................................ 6

ARTICLE 3   FINANCIAL MATTERS ..................................................................................... 6
   3.1.   Capital Contributions .................................................................................. 6
   3.2.   Allocations of Profits and Losses ............................................................... 8
   3.3.   Allocations on Transfers ............................................................................ 9
   3.4.   Special Allocations. .................................................................................... 9
   3.5.   Curative Allocations. ................................................................................. 10
   3.6.   Code Section 704(c) Allocations ............................................................... 10
   3.7.   Capital Accounts ........................................................................................ 11
   3.8.   Distributive Share for Tax Purpose ............................................................ 12
   3.9.   Distributions. .............................................................................................. 12
   3.10.  Compensation and Reimbursement of General Partner ............................. 14
   3.11.  Books, Records, Accounting, and Reports ................................................. 14
   3.12.  Tax Matters ................................................................................................. 14

ARTICLE 4   RIGHTS AND OBLIGATIONS OF PARTNERS ............................................. 15
   4.1.   Rights and Obligations of the General Partner ........................................... 15
   4.2.   Rights and Obligations of Limited Partners ............................................... 19
   4.3.   Transfer of Partnership Interests ................................................................ 19
   4.4.   Issuances of Partnership Interests to New and Existing Partners ............... 21
   4.5.   Withdrawal of General Partner .................................................................. 21
   4.6.   Admission of Substitute Limited Partners and Successor General Partner .... 21

ARTICLE 5   DISSOLUTION AND WINDING UP .............................................................. 22
   5.1.   Dissolution .................................................................................................. 22
   5.2.   Continuation of the Partnership .................................................................. 23
   5.3.   Liquidation .................................................................................................. 23
   5.4.   Distribution in Kind .................................................................................... 24
   5.5.   Cancellation of Certificate of Limited Partnership ..................................... 24
   5.6.   Return of Capital ........................................................................................ 24
   5.7.   Waiver of Partition. .................................................................................... 24

ARTICLE 6   GENERAL PROVISIONS ................................................................................ 24
   6.1.   Amendments to Agreement ........................................................................ 24

i

| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

006420

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and
among Strand Advisors, Inc., a Delaware corporation *("Strand"),* as General Partner, the Limited Partners
party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in <u>Article 2</u>.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**. Subject to the provisions of this Agreement, the Partners hereby continue
the Partnership as a limited partnership pursuant to the provisions of the Delaware Act. Except as
expressly provided herein, the rights and obligations of the Partners and the administration and
termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.** The name of the Partnership shall be, and the business of the Partnership shall be
conducted under the name of Highland Capital Management, L.P. The General Partner, in its sole and
unfettered discretion, may change the name of the Partnership at any time and from time to time and shall
provide Limited Partners with written notice of such name change within twenty (20) days after such
name change.

**1.3.    Purpose.** The purpose and business of the Partnership shall be the conduct of any
business or activity that may lawfully be conducted by a limited partnership organized pursuant to the
Delaware Act. Any or all of the foregoing activities may be conducted directly by the Partnership or
indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.** The Partnership was formed as a limited partnership on July 7, 1997, and shall
continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    <u>Partnership Offices.</u> The registered office of the Partnership in the State of
Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for
service of process on the Partnership at that registered office shall be Corporation Service Company, or
such other registered office or registered agent as the General Partner may from time to time designate.
The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or
such other place as the General Partner may from time to time designate. The Partnership may maintain
offices at such other place or places as the General Partner deems advisable.

(b)    <u>Addresses of Partners.</u> The address of the General Partner is 300 Crescent Court,
Suite 700, Dallas, Texas 75201. The address of each Limited Partner shall be the address of that Limited
Partner appearing on the books and records of the Partnership. Each Limited Partner agrees to provide
the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect to any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

*"Class B Limited Partner"* means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

*"Class B Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

*"Class B NAV Ratio Trigger Period"* means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

*"Class C Limited Partner"* means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

*"Class C Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

*"Class C NAV Ratio Trigger Period"* means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

*"Code"* means the Internal Revenue Code of 1986, as amended and in effect from time to time.

*"Contribution Note"* means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

*"Default Loan"* has the meaning set forth in Section 3.1(c)(i).

*"Defaulting Partner"* has the meaning set forth in Section 3.1(c).

*"Delaware Act"* means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

*"Effective Date"* means the date first recited above.

*"Fiscal Year"* has the meaning set forth in Section 3.11(b).

006423

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

006424

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

006425

"***Record Date***" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"***Second Amended Buy-Sell and Redemption Agreement***" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"***Securities***" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"***Securities Act***" means the Securities Act of 1933, as amended, and any successor to such statute.

"***Substitute Limited Partner***" has the meaning set forth in Section 4.6(a).

"***Transfer***" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"***Treasury Regulations***" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

006426

    (i) The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

    (ii) Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

    (c) Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

    (i) Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loan and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

006427

(ii)     Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

### 3.2.    Allocations of Profits and Losses.

(a)     Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

(b)     Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)     First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

8

006428

(c)    Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.    Allocations on Transfers.**  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.    Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)    Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

     (e)     Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

     (f)     Partner Nonrecourse Deductions. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

     (g)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

     (h)     Section 481 Adjustments. Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

     **3.5.**     **Curative Allocations.** The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4. Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

     **3.6.**     **Code Section 704(c) Allocations.** In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property. Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

006430

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7.    Capital Accounts.**

(a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

**3.8.   Distributive Share for Tax Purpose.**   All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion. Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.   Distributions.**

(a)   <u>General</u>.   The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f). The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners. Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)   <u>Priority Distributions</u>.   Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)   No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

(iii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)   No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)   Tax Distributions.   The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "*Tax Distribution*").   The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.   Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)   Payments Not Deemed Distributions.   Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)   Withheld Amounts.   Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.   If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.   To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.   Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.   Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)   Special Tax Distributions.   The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)   Tolling of Priority Distributions.   In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

3.10.    **Compensation and Reimbursement of General Partner**.

(a)    Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)    Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

3.11.    **Books, Records, Accounting, and Reports**.

(a)    Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law.  Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)    Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)    Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)    Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

3.12.    **Tax Matters**.

(a)    Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)     Tax Elections. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)     Tax Controversies. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)     Taxation as a Partnership. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

4.1.    **Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)     Management. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

006435

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

        (e)      Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

        (i)      The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

        (ii)      The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

        (iii)      The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

        (f)      Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

        (g)      Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

        (h)      Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

006437

the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

(i)    Liability of General Partner.

(i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

(ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(j)    Reliance by General Partner.

(i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

(k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

006438

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

4.2.    **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)    <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)    <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)    <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)    <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided, however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

4.3.    **Transfer of Partnership Interests**.

(a)    <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

(b)    <u>Transfers by General Partner</u>. The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner. Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement. If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

(c)    <u>Transfers by Limited Partners</u>. The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>. If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under <u>Section 3.4</u>. All distributions declared on or before the date of that Transfer shall be made to the transferor. Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest. Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>. In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners. The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in <u>Section 3.9(b)</u> shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

4.4.    **Issuances of Partnership Interests to New and Existing Partners**.

(a)    <u>Issuance of Partnership Interests to New Limited Partners</u>. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    <u>Issuance of an Additional Partnership Interest to an Existing Partner</u>. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

4.5.    **Withdrawal of General Partner**

(a)    <u>Option</u>. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**Departing Partner**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    <u>Conversion</u>. If the successor to a Departing Partner does not exercise the option described in <u>Section 4.5(a)</u>, the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

4.6.    **Admission of Substitute Limited Partners and Successor General Partner**.

(a)    <u>Admission of Substitute Limited Partners</u>. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "**Substitute Limited Partner**"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)      Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)      Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

### DISSOLUTION AND WINDING UP

**5.1.    Dissolution.**  The Partnership shall be dissolved upon:

(a)      The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b)):

(b)      An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)      Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

006442

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

006443

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**    Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**    Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**    The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**    Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1.    Amendments to Agreement.**    The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.    Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.    Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.    Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.    Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.    Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.    Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.    Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.    Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.    Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.    Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.   General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.   Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.   The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.   Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.   The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

006446

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

006447

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____

    James D. Dondero,
    President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership*

006448

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator


By:      _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

006449

## EXHIBIT A

| | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

# EXHIBIT B

## ADDENDUM
## TO THE
## FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
## OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20__, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

### RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

### AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

006451

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

006452

FORM OF GUARANTY AGREEMENT

[See attached]

# GUARANTY AGREEMENT

WHEREAS, the execution of this Guaranty Agreement is a condition to Hunter Mountain Investment Trust, a Delaware statutory trust ("Borrower"), borrowing from [●] ("Lender"), pursuant to that certain Secured Promissory Note dated as of [●], 2015 executed by Borrower and payable to Lender (such Secured Promissory Note, as it may hereafter be amended or modified from time to time, being hereinafter referred to as the "Secured Promissory Note", and capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Secured Promissory Note);

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned, [●] (the "Guarantor"), hereby irrevocably and unconditionally guarantees to Lender the full and prompt payment and performance of the Guaranteed Indebtedness (hereinafter defined), this Guaranty Agreement being upon the following terms:

1.    Guaranteed Indebtedness.  The term "Guaranteed Indebtedness", as used herein means all of the indebtedness, liabilities and obligations of Borrower arising under or in connection with the Secured Promissory Note and the other documents executed in connection therewith.  The term "Guaranteed Indebtedness" shall include, without limitation, any and all (a) extensions of credit made under the Secured Promissory Note and all accrued and unpaid interest thereon and (b) post-petition interest and expenses (including attorneys' fees) whether or not allowed under any bankruptcy, insolvency, or other similar law.

2.    Absolute and Irrevocable Guaranty.  This instrument shall be an absolute, continuing, irrevocable, and unconditional guaranty of payment and performance, and not a guaranty of collection, and Guarantor shall remain liable on its obligations hereunder until the payment and performance in full of the Guaranteed Indebtedness.  No set-off, counterclaim, recoupment, reduction, or diminution of any obligation, or any defense of any kind or nature which Borrower may have against Lender or any other party, or which Guarantor may have against Borrower, Lender, or any other party, shall be available to, or shall be asserted by, Guarantor against Lender or any subsequent holder of the Guaranteed Indebtedness or any part thereof or against payment of the Guaranteed Indebtedness or any part thereof.

3.    Rights Cumulative.  If Guarantor becomes liable for any indebtedness owing by Borrower to Lender by endorsement or otherwise, other than under this Guaranty Agreement, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

4.    Agreement to Pay Guaranteed Indebtedness.  In the case of default by Borrower in payment or performance of the Guaranteed Indebtedness, or any part thereof, when such Guaranteed Indebtedness becomes due, whether by its terms, by acceleration, or otherwise, Guarantor shall promptly pay the amount due thereon to Lender without notice or demand in lawful money of the United States of America and it shall not be necessary for Lender, in order to enforce such payment by Guarantor, first to institute suit or exhaust its remedies against Borrower or others liable on such Guaranteed Indebtedness, or to enforce any rights against any collateral which shall ever have been given to secure such Guaranteed Indebtedness.  In the event such payment is made by Guarantor, then Guarantor shall be subrogated to the rights then held by Lender with respect to the Guaranteed Indebtedness to the extent to which the Guaranteed Indebtedness was discharged by Guarantor and, in addition, upon payment by Guarantor of any sums to Lender hereunder, all rights of Guarantor against Borrower or any collateral arising as a result therefrom by way of right of subrogation, reimbursement, or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full of the Guaranteed

006454

Indebtedness. All payments received by Lender hereunder shall be applied by the Lender to the payment of the Guaranteed Indebtedness in such order and manner as the Lender may determine in its sole discretion.

5.  <u>Stay of Acceleration</u>. If acceleration of the time for payment of any amount payable by Borrower under the Guaranteed Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower, all such amounts otherwise subject to acceleration under the terms of the Guaranteed Indebtedness shall nonetheless be payable by Guarantor hereunder forthwith on demand by Lender.

6.  <u>Liabilities Not Impaired</u>.   Guarantor hereby agrees that its obligations under this Guaranty Agreement shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor: (a) the taking or accepting of collateral as security for any or all of the Guaranteed Indebtedness or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Indebtedness; (b) any partial release of the liability of Guarantor hereunder, or the release of any other guarantor from liability for any or all of the Guaranteed Indebtedness; (c) any disability of Borrower, or the dissolution, insolvency, or bankruptcy of Borrower, Guarantor, or any other Person at any time liable for the payment of any or all of the Guaranteed Indebtedness; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Indebtedness or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Indebtedness; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to Borrower, Guarantor, or any other party ever liable for any or all of the Guaranteed Indebtedness; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Indebtedness; (g) the unenforceability or invalidity of any or all of the Guaranteed Indebtedness or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Indebtedness; (h) any payment by Borrower or any other party to Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Indebtedness; (j) the non-perfection of any security interest or lien securing any or all of the Guaranteed Indebtedness; (k) any impairment of any collateral securing any or all of the Guaranteed Indebtedness; (l) the failure of Lender to sell any collateral securing any or all of the Guaranteed Indebtedness in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate existence, structure, or ownership of Borrower; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, Borrower or Guarantor (other than the indefeasible payment in full).

7.  <u>Representations and Warranties</u>. Guarantor represents and warrants to Lender as follows:

(a)   Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite authority and power to carry on its business as now conducted, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

(b)   Guarantor has the power and authority and legal right to execute, deliver, and perform its obligations under this Guaranty Agreement and this Guaranty Agreement constitutes the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditor's rights.

GUARANTY AGREEMENT, Page 2

(c)      The execution, delivery, and performance by Guarantor of this Guaranty Agreement do not and will not violate or conflict with any law, rule, or regulation or any order, writ, injunction, or decree of any court, governmental authority or agency, or arbitrator and do not and will not conflict with, result in a breach of, or constitute a default under, or result in the imposition of any lien upon any assets of Guarantor pursuant to the provisions of any indenture, mortgage, deed of trust, security agreement, franchise, permit, license, or other instrument or agreement to which Guarantor or its properties is bound.

(d)      No authorization, approval, or consent of, and no filing or registration with, any court, governmental authority, or third party is necessary for the execution, delivery, or performance by Guarantor of this Guaranty Agreement or the validity or enforceability thereof.

(e)      The value of the consideration received and to be received by Guarantor as a result of Lender accepting the Secured Promissory Note and Guarantor executing and delivering this Guaranty Agreement is reasonably worth at least as much as the liability and obligation of Guarantor hereunder, and such liability and obligation and the Secured Promissory Note have benefited and may reasonably be expected to benefit Guarantor directly and indirectly.

(f)      Guarantor has, independently and without reliance upon Lender and based upon such documents and information as Guarantor has deemed appropriate, made its own analysis and decision to enter into this Guaranty Agreement.

(g)      Guarantor has adequate means to obtain from Borrower on a continuing basis information concerning the financial condition and assets of Borrower and Guarantor is not relying upon Lender to provide (and Lender shall have no duty to provide) any such information to Guarantor either now or in the future.

8.      <u>Covenants</u>.  Guarantor covenants and agrees that, as long as the Guaranteed Indebtedness or any part thereof is outstanding or Lender has any commitment under the Secured Promissory Note:

(a)      Guarantor will furnish to Lender, upon request, a copy of the financial statements of Guarantor for such fiscal year.

(b)      Guarantor will furnish promptly to Lender written notice of the occurrence of any default under this Guaranty Agreement or an Event of Default under the Secured Promissory Note of which Guarantor has knowledge.

(c)      Guarantor will furnish promptly to Lender such additional information concerning Guarantor as Lender may request.

(d)      Guarantor will obtain at any time and from time to time all authorizations, licenses, consents or approvals as shall now or hereafter be necessary or desirable under all applicable laws or regulations or otherwise in connection with the execution, delivery and performance of this Guaranty Agreement and will promptly furnish copies thereof to Lender.

9.      <u>Right of Setoff</u>.  Lender shall have the right to set off and apply against this Guaranty Agreement or the Guaranteed Indebtedness or both, at any time and without notice to Guarantor, any and all deposits or other sums at any time credited by or owing from Lender to Guarantor whether or not the Guaranteed Indebtedness is then due and irrespective of whether or not Lender shall have made any demand under this Guaranty Agreement.

GUARANTY AGREEMENT, Page 3

006456

10.   Subordination.

(a)   Guarantor hereby agrees that the Subordinated Indebtedness (as hereinafter defined) shall be subordinate and junior in right of payment to the prior payment in full of all Guaranteed Indebtedness, and Guarantor hereby assigns the Subordinated Indebtedness to Lender as security for the Guaranteed Indebtedness.  If any sums shall be paid to Guarantor by Borrower or any other person or entity on account of the Subordinated Indebtedness, such sums shall be held in trust by Guarantor for the benefit of Lender and shall forthwith be paid to Lender without affecting the liability of Guarantor under this Guaranty Agreement and may be applied by Lender against the Guaranteed Indebtedness in such order and manner as Lender may determine in its sole discretion.  Upon the request of Lender, Guarantor shall execute, deliver, and endorse to Lender such documents and instruments as Lender may request to perfect, preserve, and enforce its rights hereunder.  For purposes of this Guaranty Agreement, the term "Subordinated Indebtedness" means all indebtedness, liabilities, and obligations of Borrower to Guarantor, whether such indebtedness, liabilities, and obligations now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon are direct, indirect, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such indebtedness, liabilities, or obligations are evidenced by a note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such indebtedness, obligations, or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.

(b)   Guarantor agrees that any and all liens, security interests, judgment liens, charges, or other encumbrances upon Borrower's assets securing payment of any Subordinated Indebtedness shall be and remain inferior and subordinate to any and all liens, security interests, judgment liens, charges, or other encumbrances upon Borrower's assets securing payment of the Guaranteed Indebtedness or any part thereof, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attached.  Without the prior written consent of Lender, Guarantor shall not (i) file suit against Borrower or exercise or enforce any other creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester, or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, security interests, collateral rights, judgments or other encumbrances held by Guarantor on assets of Borrower.

(c)   In the event of any receivership, bankruptcy, reorganization, rearrangement, debtor's relief, or other insolvency proceeding involving Borrower as debtor, Lender shall have the right to prove and vote any claim under the Subordinated Indebtedness and to receive directly from the receiver, trustee or other court custodian all dividends, distributions, and payments made in respect of the Subordinated Indebtedness.  Lender may apply any such dividends, distributions, and payments against the Guaranteed Indebtedness in such order and manner as Lender may determine in its sole discretion.

(d)   Guarantor agrees that all promissory notes, accounts receivable, ledgers, records, or any other evidence of Subordinated Indebtedness shall contain a specific written notice thereon that the indebtedness evidenced thereby is subordinated under the terms of this Guaranty Agreement.

11.   Amendment and Waiver.  No amendment or waiver of any provision of this Guaranty Agreement nor consent to any departure by the Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by Lender.  No failure on the part of Lender to exercise, and no delay in exercising, any right, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further

GUARANTY AGREEMENT, Page 4

exercise thereof or the exercise of any other right, power, or privilege. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

12. <u>Tolling of Statue of Limitations</u>. Any acknowledgment or new promise, whether by payment of principal or interest or otherwise and whether by Borrower or others (including Guarantor), with respect to any of the Guaranteed Indebtedness shall, if the statute of limitations in favor of Guarantor against Lender shall have commenced to run, toll the running of such statute of limitations and, if the period of such statute of limitations shall have expired, prevent the operation of such statute of limitations.

13. <u>Successors and Assigns</u>. This Guaranty Agreement is for the benefit of Lender and its successors and assigns, and in the event of an assignment of the Guaranteed Indebtedness, or any part thereof, the rights and benefits hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. This Guaranty Agreement is binding not only on Guarantor, but on Guarantor's heirs and personal representatives. Guarantor may not assign any of its obligations hereunder without the consent of the Lender. Any assignment by Guarantor in violation of this paragraph shall be void.

14. <u>Reliance and Inducement</u>. Guarantor recognizes that Lender is relying upon this Guaranty Agreement and the undertakings of Guarantor hereunder in extending of credit to Borrower under the Secured Promissory Note and further recognizes that the execution and delivery of this Guaranty Agreement is a material inducement to Lender in entering into the Secured Promissory Note. Guarantor hereby acknowledges that there are no conditions to the full effectiveness of this Guaranty Agreement.

15. <u>Governing Law</u>. This Guaranty Agreement shall be governed by and construed in accordance with the applicable law pertaining in the State of Texas, other than those conflict of law provisions that would defer to the substantive laws of another jurisdiction.

16. <u>Jurisdiction; Venue; Mandatory Arbitration</u>.

(a) This Guaranty Agreement is executed and delivered as an incident to a lending transaction negotiated, consummated, and performable in Dallas County, Texas. Any action or proceeding against Guarantor under or in connection with this Guaranty Agreement may be brought in any state or federal court in Dallas County, Texas. Guarantor hereby irrevocably (a) submits to the nonexclusive jurisdiction of such courts, and (b) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any such court or that any such court is an inconvenient forum. Guarantor agrees that service of process upon him may be made by certified or registered mail, return receipt requested, at its address specified below. Nothing herein shall affect the right of Lender to serve process in any other matter permitted by law or shall limit the right of Lender to bring any action or proceeding against Guarantor or with respect to any of Guarantor's property in courts in other jurisdictions.

(b) Except as otherwise specifically provided in paragraph 16(a), in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be

GUARANTY AGREEMENT, Page 5

006458

conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear the costs and fees. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

17.   <u>Expenses</u>.  Guarantor shall pay on demand all attorneys' fees and all other costs and expenses incurred by Lender in connection with the preparation, administration, enforcement, or collection of this Guaranty Agreement.

18.   <u>Waiver of Promptness, Diligence, etc</u>.  Guarantor hereby waives promptness, diligence, notice of any default under the Guaranteed Indebtedness, demand for payment, notice of acceptance of this Guaranty Agreement, presentment, notice of protest, notice of dishonor, notice of the incurring by Borrower of additional indebtedness, and all other notices and demands with respect to the Guaranteed Indebtedness and this Guaranty Agreement.

19.   <u>Incorporation of Secured Promissory Note</u>.  The Secured Promissory Note, and all of the terms thereof, are incorporated herein by reference, the same as if stated verbatim herein, and Guarantor agrees that Lender may exercise any and all of the rights and remedies granted to it under the Secured Promissory Note without affecting the validity or enforceability of this Guaranty Agreement.

20.   <u>Headings</u>.  All paragraph headings used herein are for convenience of reference only, are not part of this Guaranty Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Guaranty Agreement.

21.   <u>Survival</u>.  All covenants, agreements, representations and warranties made by the Guarantor in this Guaranty Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Guaranty Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Secured Promissory Note and this Guaranty Agreement and the making of any advances, loans, or other extensions of credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may

have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Guaranteed Indebtedness has been indefeasibly paid in full and the Lender has no further commitments or obligations under the Secured Promissory Note.

22.   <u>Counterparts</u>.  This Guaranty Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Guaranty Agreement by telecopy or other electronic communication shall be effective as delivery of a manually executed counterpart of this Guaranty Agreement.

23.   <u>Entire Agreement</u>.   THIS GUARANTY AGREEMENT EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED INDEBTEDNESS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.  THIS GUARANTY AGREEMENT IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY AGREEMENT, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.  THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

21.   <u>Waiver of Jury Trial</u>.   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS GUARANTY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF LENDER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

[Remainder of Page Intentionally Left Blank]

EXECUTED as of the _____ day of _____, 2015.

GUARANTOR:

_____

Name: _____
Title: _____

Address: _____
_____
_____

006461

# EXHIBIT 50

006462

## SECURED PROMISSORY NOTE

$63,000,000.00                                                    December 21, 2015

FOR VALUE RECEIVED, the undersigned, Hunter Mountain Investment Trust, a Delaware statutory trust ("Maker"), hereby promises to pay to the order of Highland Capital Management, L.P., a Delaware limited partnership ("Payee"), at its office at 300 Crescent Court, Suite 700, Dallas, Texas 75201, in lawful money of the United States of America, the principal sum of SIXTY THREE MILLION DOLLARS ($63,000,000.00), together with interest on the outstanding principal balance thereof at the rate of two and sixty-one one hundredths percent (2.61%) per annum, as provided herein and compounded as shown in the amortization table in EXHIBIT A.

### Payments

ALL UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, IN ACCORDANCE WITH THE AMORTIZATION SCHEDULE ATTACHED HERETO AS EXHIBIT A.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be. If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date. "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)     this Note executed by Maker;

(b)     the Contribution Agreement, of even date herewith (the "Contribution Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Contribution Agreement have been fulfilled;

(c)     evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker;

(d)     true and correct copies of the organizational documents of Maker; and

(g)     such other agreements, documents, information, and other assurances as Payee may reasonably request.

SECURED PROMISSORY NOTE          Page 1

006463

## Security

     As security for the prompt payment and performance in full when due of its indebtedness and obligations under this Note, Maker hereby pledges and assigns to Payee, and grants to Payee a continuing security interest in, all of Maker's right, title and interest (whether now existing or hereafter arising and wherever located) in and to: (a) the Contribution Agreement and all documents related thereto including, without limitation, all rights to receive distributions with respect to the Subject Interests (as defined in the Contribution Agreement) and other payments thereunder; (b) the Subject Interests received by Maker under the Contribution Agreement; (c) all accounts and general intangibles arising from, or related to, the Contribution Agreement; and (d) all proceeds and products of the foregoing clauses (a), (b) and (c) (collectively, the "Collateral").  In addition to all other rights and remedies granted to Payee in this Note or by applicable law, Payee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Texas with respect to the Collateral.  Maker shall keep the Collateral free and clear of all liens, security interests and encumbrances other than those in favor of Payee.  Maker hereby authorizes Payee to file any financing statement naming Maker as debtor, Payee as secured party and describing the Collateral which Payee deems necessary.  Maker will take all actions and execute all documents reasonably requested by Payee to create, perfect, protect and enforce Payee's interest in the Collateral.

## Events of Default

     Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

     (a)     the failure of Maker to make any payment required to be made under this Note when such payment becomes due;

     (b)     Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document when made that is not cured within thirty days of Maker's receipt of written notice thereof to Maker (other than Events of Default set forth in clauses (a), (d), (e) and (f) hereof for which notice of default shall not be required);

     (c)     any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is incorrect in any material respect;

     (d)     Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

     (e)     any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property; provided, however that an involuntary proceeding shall only be an Event of Default if such proceeding remains unstayed or undismissed for a period of sixty days;

     (f)     any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee, its affiliates or its partners;

SECURED PROMISSORY NOTE     Page 2

(g)     Maker creates, incurs or otherwise permits to exist any indebtedness for borrowed money other than the indebtedness evidenced by (i) this Note, (ii) and any note issued by Maker in favor of Payee, its affiliates or partners;

(h)     any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity if the holder of such indebtedness causes any of such indebtedness to become due, or requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(i)     the validity or enforceability of this Note shall be contested or challenged by Maker; or

(j)     any lien purported to be created to secure the amounts owing under this Note shall cease to be, or shall be asserted by Maker not to be, a valid and perfected lien on any collateral, with the priority required hereby, provided, however, that if the security interest is not perfected due to an act or omission of Payee, the lack of perfection shall not be an event of default.

## Remedies

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the principal and interest contemplated hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (d) of the definition of "Event of Default", such indebtedness shall become immediately due and payable in full without demand or acceleration); (b) reduce any claim to judgment; (c) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (d) may unilaterally cause Maker to forfeit the portion of the Collateral having a fair market value equal to the remaining indebtedness  due hereunder together with interest thereon at the time of Default; (e) may cure any Event of Default, or event of nonperformance under this Note; and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

Except as otherwise specifically provided in the immediately preceding paragraph, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award.  The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not

SECURED PROMISSORY NOTE        Page 3

specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

All proceeds of the Collateral received by Payee shall be applied by Payee to repay the fees and expenses of Payee incurred in connection with this Note and the other indebtedness owing under this Note.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

## Miscellaneous

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full, refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder to or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL

SECURED PROMISSORY NOTE        Page 4

WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, with confirmation, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. SUBJECT TO THE REQUIREMENTS HEREIN TO ARBITRATE, AS APPLICABLE, MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION PROPERLY BEFORE A COURT OF LAW SHALL BE TRIED BY SUCH COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

[Remainder of Page Intentionally Left Blank]

006467

Signed effective as of the date of this Note.

HUNTER MOUNTAIN INVESTMENT TRUST
By: Beacon Mountain LLC, its Administrator

By: _____
Name:  John Honis
Title:   President

Maker's address for notice:

Hunter Mountain Investment Trust
c/o Rand Advisors, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention:  John Honis

with a copy (which shall not constitute notice) to:

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attention: Steven Huttler, Esq.
Fax: 212-573-8151

SECURED PROMISSORY NOTE, Signature Page
SWDocIDLocation

006468

Exhibit A

## Amortization Schedule

Beginning Principal       63,000,000
Interest Rate       2.61% December 2015 Long-term AFR
Effective Date       12/21/2015 To be updated based on closing date of the transaction

| Year | Due Date (On or Before) | Beginning Balance | Interest Accrued | Interest Paid | Principal Paid | Total Payment | Ending Principal Balance | Ending P+I |
|---|---|---|---|---|---|---|---|---|
| 1 | 12/21/2016 | $63,000,000.00 | $ 1,644,300.00 | $ - | $ - | $ - | $64,644,300.00 | $64,644,300.00 |
| 2 | 12/21/2017 | 64,644,300.00 | 1,687,216.23 | - | - | - | 66,331,516.23 | 66,331,516.23 |
| 3 | 12/21/2018 | 66,331,516.23 | 1,731,252.57 | - | - | - | 68,062,768.80 | 68,062,768.80 |
| 4 | 12/21/2019 | 68,062,768.80 | 1,776,438.27 | - | 2,500,000.00 | 2,500,000.00 | 67,339,207.07 | 67,339,207.07 |
| 5 | 12/21/2020 | 67,339,207.07 | 1,757,553.30 | - | 2,500,000.00 | 2,500,000.00 | 66,596,760.37 | 66,596,760.37 |
| 6 | 12/21/2021 | 66,596,760.37 | 1,738,175.45 | - | 5,000,000.00 | 5,000,000.00 | 63,334,935.82 | 63,334,935.82 |
| 7 | 12/21/2022 | 63,334,935.82 | 1,653,041.82 | - | 5,000,000.00 | 5,000,000.00 | 59,987,977.64 | 59,987,977.64 |
| 8 | 12/21/2023 | 59,987,977.64 | 1,565,686.22 | - | 5,000,000.00 | 5,000,000.00 | 56,553,663.86 | 56,553,663.86 |
| 9 | 12/21/2024 | 56,553,663.86 | 1,476,050.63 | - | 7,500,000.00 | 7,500,000.00 | 50,529,714.49 | 50,529,714.49 |
| 10 | 12/21/2025 | 50,529,714.49 | 1,318,825.55 | - | 7,500,000.00 | 7,500,000.00 | 44,348,540.04 | 44,348,540.04 |
| 11 | 12/21/2026 | 44,348,540.04 | 1,157,496.90 | - | 7,500,000.00 | 7,500,000.00 | 38,006,036.94 | 38,006,036.94 |
| 12 | 12/21/2027 | 38,006,036.94 | 991,957.56 | - | 7,500,000.00 | 7,500,000.00 | 31,497,994.50 | 31,497,994.50 |
| 13 | 12/21/2028 | 31,497,994.50 | 822,097.66 | - | 10,000,000.00 | 10,000,000.00 | 22,320,092.16 | 22,320,092.16 |
| 14 | 12/21/2029 | 22,320,092.16 | 582,554.41 | - | 10,000,000.00 | 10,000,000.00 | 12,902,646.57 | 12,902,646.57 |
| 15 | 12/21/2030 | 12,902,646.57 | 336,759.08 | 336,759.08 | 12,902,646.57 | 13,239,405.65 | - | - |
| | Totals | | $20,239,405.65 | $ 336,759.08 | $82,902,646.57 | $83,239,405.65 | | |

SECURED PROMISSORY NOTE, Exhibit A

006469

# EXHIBIT 51

## SECURED PROMISSORY NOTE

$62,657,647.27                                                                December 24, 2015

FOR VALUE RECEIVED, the undersigned, Hunter Mountain Investment Trust, a Delaware statutory trust ("Maker"), hereby promises to pay to the order of The Dugaboy Investment Trust ("Payee"), at its office at 300 Crescent Court, Suite 700, Dallas, Texas 75201, in lawful money of the United States of America, the principal sum of SIXTY-TWO MILLION SIX HUNDRED FIFTY-SEVEN THOUSAND SIX HUNDRED FORTY-SEVEN DOLLARS AND TWENTY-SEVEN CENTS ($62,657,647.27), together with interest on the outstanding principal balance thereof at the rate of two and sixty-one one-hundredths percent (2.61%) per annum, as provided herein and compounded as shown in the amortization table in EXHIBIT A.

### Payments

ALL UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, IN ACCORDANCE WITH THE AMORTIZATION SCHEDULE ATTACHED HERETO AS EXHIBIT A. NOTWITHSTANDING THE FOREGOING SENTENCE, SO LONG AS THIS NOTE IS OUTSTANDING, MAKER COVENANTS NOT TO MAKE ANY DISTRIBUTIONS TO ITS BENEFICIAL OWNER WITHOUT THE PRIOR WRITTEN CONSENT OF PAYEE. MAKER AGREES TO PAY TO PAYEE, UNTIL THIS NOTE IS SATISFIED, ANY AMOUNTS THAT WOULD OTHERWISE BE AVAILABLE FOR DISTRIBUTIONS TO MAKER'S BENEFICIAL OWNER ("EXCESS CASH"), AND FURTHER CONSENTS TO HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCM") PAYING DISTRIBUTIONS OTHERWISE PAYABLE TO MAKER, TO THE EXTENT SUCH DISTRIBUTION REPRESENTS EXCESS CASH, DIRECTLY TO PAYEE.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be. If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date. "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)        this Note executed by Maker;

SECURED PROMISSORY NOTE, Page 1

006471

(b)      the Partnership Interest Purchase Agreement, of even date herewith (the "Purchase Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Purchase Agreement have been fulfilled;

(c)      evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker;

(d)      true and correct copies of the organizational documents of Maker; and

(g)      such other agreements, documents, information, and other assurances as Payee may reasonably request.

## Security

As security for the prompt payment and performance in full when due of its indebtedness and obligations under this Note, Maker hereby pledges and assigns to Payee, and grants to Payee a continuing security interest in, all of Maker's right, title and interest (whether now existing or hereafter arising and wherever located) in and to: (a) the Purchase Agreement and all documents related thereto including, without limitation, all rights to receive distributions with respect to the Subject Interests (as defined in the Purchase Agreement) and other payments thereunder; (b) the Subject Interests received by Maker under the Purchase Agreement; (c) all accounts and general intangibles arising from, or related to, the Purchase Agreement; and (d) all proceeds and products of the foregoing clauses (a), (b) and (c) (collectively, the "Collateral"). In addition to all other rights and remedies granted to Payee in this Note or by applicable law, Payee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Texas with respect to the Collateral. Maker shall keep the Collateral free and clear of all liens, security interests and encumbrances other than those in favor of Payee. Maker hereby authorizes Payee to file any financing statement naming Maker as debtor, Payee as secured party and describing the Collateral which Payee deems necessary. Maker will take all actions and execute all documents reasonably requested by Payee to create, perfect, protect and enforce Payee's interest in the Collateral.

## Events of Default

Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

(a)      the failure of Maker to make any payment required to be made under this Note when such payment becomes due; provided, however, that Maker's failure to make a payment when due shall not be considered an Event of Default if HCM has failed to timely make Priority Distributions, as described in the Fourth Amended and Restated Agreement of Limited Partnership of HCM (or a successor document) (the "Partnership Agreement"); provided further that such a failure by HCM to timely make Priority Distributions when permitted because of a Honis Trigger Event, as defined in the Partnership Agreement, shall not be an excuse for an Event of Default.

(b)      Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document when made that is not cured within thirty days of Maker's receipt of written notice thereof to Maker (other than Events of Default set forth in clauses (a), (d), (e) and (f) hereof for which notice of default shall not be required);

(c)      any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is incorrect in any material respect;

SECURED PROMISSORY NOTE, Page 2

006472

(d)     Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

(e)     any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property; provided, however that an involuntary proceeding shall only be an Event of Default if such proceeding remains unstayed or undismissed for a period of sixty days;

(f)     any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee, HCM or other Class A limited partners of HCM;

(g)     Maker creates, incurs or otherwise permits to exist any indebtedness for borrowed money other than the indebtedness evidenced by (i) this Note, (ii) and any note issued by Maker in favor of Payee, HCM or other Class A limited partners of HCM;

(h)     any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity if the holder of such indebtedness causes any of such indebtedness to become due, or requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(i)     the validity or enforceability of this Note shall be contested or challenged by Maker; or

(j)     any lien purported to be created to secure the amounts owing under this Note shall cease to be, or shall be asserted by Maker not to be, a valid and perfected lien on any collateral, with the priority required hereby, provided, however, that if the security interest is not perfected due to an  act or omission of Payee, the lack of perfection shall not be an event of default.

### Remedies

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the principal and interest contemplated hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (d) of the definition of "Event of Default", such indebtedness shall become immediately due and payable in full without demand or acceleration); (b) reduce any claim to judgment; (c) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (d) may unilaterally cause HCM to transfer from Maker to Payee the portion of the Collateral having a fair market value equal to the remaining indebtedness due hereunder together with interest thereon at the time of Default; (e) may cure any Event of Default, or event of nonperformance under this Note; and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or

SECURED PROMISSORY NOTE, Page 3

006473

otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

Except as otherwise specifically provided in the immediately preceding paragraph, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.   A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award.  The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.   All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

All proceeds of the Collateral received by Payee shall be applied by Payee to repay the fees and expenses of Payee incurred in connection with this Note and the other indebtedness owing under this Note.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

<u>Miscellaneous</u>

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law).  If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full,

SECURED PROMISSORY NOTE, Page 4

refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder to or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, with confirmation, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. SUBJECT TO THE REQUIREMENTS HEREIN TO ARBITRATE, AS APPLICABLE, MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION PROPERLY BEFORE A COURT OF LAW SHALL BE TRIED BY SUCH COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

[Remainder of Page Intentionally Left Blank]

SECURED PROMISSORY NOTE, Page 5

006475

Signed effective as of the date of this Note.

HUNTER MOUNTAIN INVESTMENT TRUST

By:  Beacon Mountain LLC, its Administrator

By: _____
Name: John Honis
Title:  President

Maker's address for notice:

Hunter Mountain Investment Trust
c/o Beacon Mountain, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis

with a copy (which shall not constitute notice) to

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attention: Steven Huttler, Esq.
Fax:  212-573-8151

SECURED PROMISSORY NOTE, Signature Page

Exhibit A

### Amortization Schedule

| Year | Due Date (On or Before) | Beginning Balance | Interest Accrued | Interest Paid | Principal Paid | Total Payment | Ending Principal Balance | Ending P+I |
|------|------|------|------|------|------|------|------|------|
| 1 | 12/24/2016 | $ 62,657,647.27 | $ 1,635,364.59 | $ 1,635,364.59 | $ 3,132,882.36 | $ 4,768,246.95 | $ 59,524,764.91 | $ 59,524,764.91 |
| 2 | 12/24/2017 | 59,524,764.91 | 1,553,596.36 | 1,553,596.36 | 3,132,882.36 | 4,686,478.72 | 56,391,882.54 | 56,391,882.54 |
| 3 | 12/24/2018 | 56,391,882.54 | 1,471,828.13 | 1,471,828.13 | 3,132,882.36 | 4,604,710.49 | 53,259,000.18 | 53,259,000.18 |
| 4 | 12/24/2019 | 53,259,000.18 | 1,390,059.90 | 1,390,059.90 | 3,132,882.36 | 4,522,942.26 | 50,126,117.82 | 50,126,117.82 |
| 5 | 12/24/2020 | 50,126,117.82 | 1,308,291.67 | 1,308,291.67 | 3,132,882.36 | 4,441,174.03 | 46,993,235.45 | 46,993,235.45 |
| 6 | 12/24/2021 | 46,993,235.45 | 1,226,523.45 | 1,226,523.45 | 3,132,882.36 | 4,359,405.81 | 43,860,353.09 | 43,860,353.09 |
| 7 | 12/24/2022 | 43,860,353.09 | 1,144,755.22 | 1,144,755.22 | 3,132,882.36 | 4,277,637.58 | 40,727,470.73 | 40,727,470.73 |
| 8 | 12/24/2023 | 40,727,470.73 | 1,062,986.99 | 1,062,986.99 | 3,132,882.36 | 4,195,869.35 | 37,594,588.36 | 37,594,588.36 |
| 9 | 12/24/2024 | 37,594,588.36 | 981,218.76 | 981,218.76 | 3,132,882.36 | 4,114,101.12 | 34,461,706.00 | 34,461,706.00 |
| 10 | 12/24/2025 | 34,461,706.00 | 899,450.53 | 899,450.53 | 3,132,882.36 | 4,032,332.89 | 31,328,823.64 | 31,328,823.64 |
| 11 | 12/24/2026 | 31,328,823.64 | 817,682.30 | 817,682.30 | 3,132,882.36 | 3,950,564.66 | 28,195,941.27 | 28,195,941.27 |
| 12 | 12/24/2027 | 28,195,941.27 | 735,914.07 | 735,914.07 | 3,132,882.36 | 3,868,796.43 | 25,063,058.91 | 25,063,058.91 |
| 13 | 12/24/2028 | 25,063,058.91 | 654,145.84 | 654,145.84 | 3,132,882.36 | 3,787,028.20 | 21,930,176.54 | 21,930,176.54 |
| 14 | 12/24/2029 | 21,930,176.54 | 572,377.61 | 572,377.61 | 3,132,882.36 | 3,705,259.97 | 18,797,294.18 | 18,797,294.18 |
| 15 | 12/24/2030 | 18,797,294.18 | 490,609.38 | 490,609.38 | 3,132,882.36 | 3,623,491.74 | 15,664,411.82 | 15,664,411.82 |
| 16 | 12/24/2031 | 15,664,411.82 | 408,841.15 | 408,841.15 | 3,132,882.36 | 3,541,723.51 | 12,531,529.45 | 12,531,529.45 |
| 17 | 12/24/2032 | 12,531,529.45 | 327,072.92 | 327,072.92 | 3,132,882.36 | 3,459,955.28 | 9,398,647.09 | 9,398,647.09 |
| 18 | 12/24/2033 | 9,398,647.09 | 245,304.69 | 245,304.69 | 3,132,882.36 | 3,378,187.05 | 6,265,764.73 | 6,265,764.73 |
| 19 | 12/24/2034 | 6,265,764.73 | 163,536.46 | 163,536.46 | 3,132,882.36 | 3,296,418.82 | 3,132,882.36 | 3,132,882.36 |
| 20 | 12/24/2035 | 3,132,882.36 | 81,768.23 | 81,768.23 | 3,132,882.36 | 3,214,650.59 | 0.00 | 0.00 |
| Totals | | | $ 17,171,328.25 | $ 17,171,328.25 | $ 62,657,647.27 | $ 79,828,975.52 | | |

SECURED PROMISSORY NOTE, Exhibit A

006477

# EXHIBIT 52

## SECURED PROMISSORY NOTE

$16,351,357.72                                                                    December 24, 2015

FOR VALUE RECEIVED, the undersigned, Hunter Mountain Investment Trust, a Delaware statutory trust ("Maker"), hereby promises to pay to the order of Mark K. Okada ("Payee"), at his office at 300 Crescent Court, Suite 700, Dallas, Texas 75201, in lawful money of the United States of America, the principal sum of SIXTEEN MILLION THREE HUNDRED FIFTY-ONE THOUSAND THREE HUNDRED FIFTY-SEVEN DOLLARS AND SEVENTY-TWO CENTS ($16,351,357.72), together with interest on the outstanding principal balance thereof at the rate of two and sixty-one one-hundredths percent (2.61%) per annum, as provided herein and compounded as shown in the amortization table in EXHIBIT A.

### Payments

ALL UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, IN ACCORDANCE WITH THE AMORTIZATION SCHEDULE ATTACHED HERETO AS EXHIBIT A. NOTWITHSTANDING THE FOREGOING SENTENCE, SO LONG AS THIS NOTE IS OUTSTANDING, MAKER COVENANTS NOT TO MAKE ANY DISTRIBUTIONS TO ITS BENEFICIAL OWNER WITHOUT THE PRIOR WRITTEN CONSENT OF PAYEE. MAKER AGREES TO PAY TO PAYEE, UNTIL THIS NOTE IS SATISFIED, ANY AMOUNTS THAT WOULD OTHERWISE BE AVAILABLE FOR DISTRIBUTIONS TO MAKER'S BENEFICIAL OWNER ("EXCESS CASH"), AND FURTHER CONSENTS TO HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCM") PAYING DISTRIBUTIONS OTHERWISE PAYABLE TO MAKER, TO THE EXTENT SUCH DISTRIBUTION REPRESENTS EXCESS CASH, DIRECTLY TO PAYEE.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be. If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date. "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)      this Note executed by Maker;

SECURED PROMISSORY NOTE, Page 1

006479

(b)     the Partnership Interest Purchase Agreement, of even date herewith (the "Purchase Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Purchase Agreement have been fulfilled;

(c)     evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker;

(d)     true and correct copies of the organizational documents of Maker; and

(g)     such other agreements, documents, information, and other assurances as Payee may reasonably request.

### Security

As security for the prompt payment and performance in full when due of its indebtedness and obligations under this Note, Maker hereby pledges and assigns to Payee, and grants to Payee a continuing security interest in, all of Maker's right, title and interest (whether now existing or hereafter arising and wherever located) in and to: (a) the Purchase Agreement and all documents related thereto including, without limitation, all rights to receive distributions with respect to the Subject Interests (as defined in the Purchase Agreement) and other payments thereunder; (b) the Subject Interests received by Maker under the Purchase Agreement; (c) all accounts and general intangibles arising from, or related to, the Purchase Agreement; and (d) all proceeds and products of the foregoing clauses (a), (b) and (c) (collectively, the "Collateral"). In addition to all other rights and remedies granted to Payee in this Note or by applicable law, Payee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Texas with respect to the Collateral. Maker shall keep the Collateral free and clear of all liens, security interests and encumbrances other than those in favor of Payee. Maker hereby authorizes Payee to file any financing statement naming Maker as debtor, Payee as secured party and describing the Collateral which Payee deems necessary. Maker will take all actions and execute all documents reasonably requested by Payee to create, perfect, protect and enforce Payee's interest in the Collateral.

### Events of Default

Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

(a)     the failure of Maker to make any payment required to be made under this Note when such payment becomes due; provided, however, that Maker's failure to make a payment when due shall not be considered an Event of Default if HCM has failed to timely make Priority Distributions, as described in the Fourth Amended and Restated Agreement of Limited Partnership of HCM (or a successor document) (the "Partnership Agreement"); provided further that such a failure by HCM to timely make Priority Distributions when permitted because of a Honis Trigger Event, as defined in the Partnership Agreement, shall not be an excuse for an Event of Default.

(b)     Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document when made that is not cured within thirty days of Maker's receipt of written notice thereof to Maker (other than Events of Default set forth in clauses (a), (d), (e) and (f) hereof for which notice of default shall not be required);

(c)     any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is incorrect in any material respect;

SECURED PROMISSORY NOTE, Page 2

006480

(d)     Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

(e)     any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property; provided, however that an involuntary proceeding shall only be an Event of Default if such proceeding remains unstayed or undismissed for a period of sixty days;

(f)     any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee, HCM or other Class A limited partners of HCM;

(g)     Maker creates, incurs or otherwise permits to exist any indebtedness for borrowed money other than the indebtedness evidenced by (i) this Note, (ii) and any note issued by Maker in favor of Payee, HCM or other Class A limited partners of HCM;

(h)     any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity if the holder of such indebtedness causes any of such indebtedness to become due, or requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(i)     the validity or enforceability of this Note shall be contested or challenged by Maker; or

(j)     any lien purported to be created to secure the amounts owing under this Note shall cease to be, or shall be asserted by Maker not to be, a valid and perfected lien on any collateral, with the priority required hereby, provided, however, that if the security interest is not perfected due to an act or omission of Payee, the lack of perfection shall not be an event of default.

<u>Remedies</u>

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the principal and interest contemplated hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (d) of the definition of "<u>Event of Default</u>", such indebtedness shall become immediately due and payable in full without demand or acceleration); (b) reduce any claim to judgment; (c) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (d) may unilaterally cause HCM to transfer from Maker to Payee the portion of the Collateral having a fair market value equal to the remaining indebtedness due hereunder together with interest thereon at the time of Default; (e) may cure any Event of Default, or event of nonperformance under this Note; and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or

SECURED PROMISSORY NOTE, Page 3

006481

otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

Except as otherwise specifically provided in the immediately preceding paragraph, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

All proceeds of the Collateral received by Payee shall be applied by Payee to repay the fees and expenses of Payee incurred in connection with this Note and the other indebtedness owing under this Note.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

## Miscellaneous

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full,

SECURED PROMISSORY NOTE, Page 4

refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder to or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, with confirmation, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. SUBJECT TO THE REQUIREMENTS HEREIN TO ARBITRATE, AS APPLICABLE, MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION PROPERLY BEFORE A COURT OF LAW SHALL BE TRIED BY SUCH COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

[Remainder of Page Intentionally Left Blank]

SECURED PROMISSORY NOTE, Page 5

Signed effective as of the date of this Note.

HUNTER MOUNTAIN INVESTMENT TRUST

By:  Beacon Mountain LLC, its Administrator

By: _____
Name: John Honis
Title:  President

Maker's address for notice:

Hunter Mountain Investment Trust
c/o Beacon Mountain, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis

with a copy (which shall not constitute notice) to

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attention: Steven Huttler, Esq.
Fax: 212-573-8151

SECURED PROMISSORY NOTE, Signature Page

006484

Exhibit A

Amortization Schedule

| Year | Due Date (On or Before) | Beginning Balance | Interest Accrued | Interest Paid | Principal Paid | Total Payment | Ending Principal Balance | Ending P+I |
|---|---|---|---|---|---|---|---|---|
| 1 | 12/24/2016 | $ 16,351,357.72 | $ 426,770.44 | $ 426,770.44 | $ 817,567.89 | $ 1,244,338.33 | $ 15,533,789.83 | $ 15,533,789.83 |
| 2 | 12/24/2017 | 15,533,789.83 | 405,431.91 | 405,431.91 | 817,567.89 | 1,222,999.80 | 14,716,221.95 | 14,716,221.95 |
| 3 | 12/24/2018 | 14,716,221.95 | 384,093.39 | 384,093.39 | 817,567.89 | 1,201,661.28 | 13,898,654.06 | 13,898,654.06 |
| 4 | 12/24/2019 | 13,898,654.06 | 362,754.87 | 362,754.87 | 817,567.89 | 1,180,322.76 | 13,081,086.18 | 13,081,086.18 |
| 5 | 12/24/2020 | 13,081,086.18 | 341,416.35 | 341,416.35 | 817,567.89 | 1,158,984.24 | 12,263,518.29 | 12,263,518.29 |
| 6 | 12/24/2021 | 12,263,518.29 | 320,077.83 | 320,077.83 | 817,567.89 | 1,137,645.72 | 11,445,950.40 | 11,445,950.40 |
| 7 | 12/24/2022 | 11,445,950.40 | 298,739.31 | 298,739.31 | 817,567.89 | 1,116,307.20 | 10,628,382.52 | 10,628,382.52 |
| 8 | 12/24/2023 | 10,628,382.52 | 277,400.78 | 277,400.78 | 817,567.89 | 1,094,968.67 | 9,810,814.63 | 9,810,814.63 |
| 9 | 12/24/2024 | 9,810,814.63 | 256,062.26 | 256,062.26 | 817,567.89 | 1,073,630.15 | 8,993,246.75 | 8,993,246.75 |
| 10 | 12/24/2025 | 8,993,246.75 | 234,723.74 | 234,723.74 | 817,567.89 | 1,052,291.63 | 8,175,678.86 | 8,175,678.86 |
| 11 | 12/24/2026 | 8,175,678.86 | 213,385.22 | 213,385.22 | 817,567.89 | 1,030,953.11 | 7,358,110.97 | 7,358,110.97 |
| 12 | 12/24/2027 | 7,358,110.97 | 192,046.70 | 192,046.70 | 817,567.89 | 1,009,614.59 | 6,540,543.09 | 6,540,543.09 |
| 13 | 12/24/2028 | 6,540,543.09 | 170,708.17 | 170,708.17 | 817,567.89 | 988,276.06 | 5,722,975.20 | 5,722,975.20 |
| 14 | 12/24/2029 | 5,722,975.20 | 149,369.65 | 149,369.65 | 817,567.89 | 966,937.54 | 4,905,407.32 | 4,905,407.32 |
| 15 | 12/24/2030 | 4,905,407.32 | 128,031.13 | 128,031.13 | 817,567.89 | 945,599.02 | 4,087,839.43 | 4,087,839.43 |
| 16 | 12/24/2031 | 4,087,839.43 | 106,692.61 | 106,692.61 | 817,567.89 | 924,260.50 | 3,270,271.54 | 3,270,271.54 |
| 17 | 12/24/2032 | 3,270,271.54 | 85,354.09 | 85,354.09 | 817,567.89 | 902,921.98 | 2,452,703.66 | 2,452,703.66 |
| 18 | 12/24/2033 | 2,452,703.66 | 64,015.57 | 64,015.57 | 817,567.89 | 881,583.46 | 1,635,135.77 | 1,635,135.77 |
| 19 | 12/24/2034 | 1,635,135.77 | 42,677.04 | 42,677.04 | 817,567.89 | 860,244.93 | 817,567.89 | 817,567.89 |
| 20 | 12/24/2035 | 817,567.89 | 21,338.52 | 21,338.52 | 817,567.89 | 838,906.41 | 0.00 | 0.00 |
| | Totals | | $ 4,481,089.58 | $ 4,481,089.58 | $ 16,351,357.72 | $ 20,832,447.30 | | |

SECURED PROMISSORY NOTE, Exhibit A

006485

# EXHIBIT 53

006486

## SECURED PROMISSORY NOTE

$3,283,688.09                                                    December 24, 2015

FOR VALUE RECEIVED, the undersigned, Hunter Mountain Investment Trust, a Delaware statutory trust ("Maker"), hereby promises to pay to the order of The Mark and Pamela Okada Family Trust – Exempt Trust #1 ("Payee"), at its office at 300 Crescent Court, Suite 700, Dallas, Texas 75201, in lawful money of the United States of America, the principal sum of THREE MILLION TWO HUNDRED EIGHTY-THREE THOUSAND FOUR HUNDRED EIGHTY-EIGHT DOLLARS AND NINE CENTS ($3,283,688.09), together with interest on the outstanding principal balance thereof at the rate of two and sixty-one one-hundredths percent (2.61%) per annum, as provided herein and compounded as shown in the amortization table in EXHIBIT A.

### Payments

ALL UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, IN ACCORDANCE WITH THE AMORTIZATION SCHEDULE ATTACHED HERETO AS EXHIBIT A. NOTWITHSTANDING THE FOREGOING SENTENCE, SO LONG AS THIS NOTE IS OUTSTANDING, MAKER COVENANTS NOT TO MAKE ANY DISTRIBUTIONS TO ITS BENEFICIAL OWNER WITHOUT THE PRIOR WRITTEN CONSENT OF PAYEE. MAKER AGREES TO PAY TO PAYEE, UNTIL THIS NOTE IS SATISFIED, ANY AMOUNTS THAT WOULD OTHERWISE BE AVAILABLE FOR DISTRIBUTIONS TO MAKER'S BENEFICIAL OWNER ("EXCESS CASH"), AND FURTHER CONSENTS TO HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCM") PAYING DISTRIBUTIONS OTHERWISE PAYABLE TO MAKER, TO THE EXTENT SUCH DISTRIBUTION REPRESENTS EXCESS CASH, DIRECTLY TO PAYEE.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be. If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date. "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)      this Note executed by Maker;

SECURED PROMISSORY NOTE, Page 1

(b)     the Partnership Interest Purchase Agreement, of even date herewith (the "Purchase Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Purchase Agreement have been fulfilled;

(c)     evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker;

(d)     true and correct copies of the organizational documents of Maker; and

(g)     such other agreements, documents, information, and other assurances as Payee may reasonably request.

## Security

As security for the prompt payment and performance in full when due of its indebtedness and obligations under this Note, Maker hereby pledges and assigns to Payee, and grants to Payee a continuing security interest in, all of Maker's right, title and interest (whether now existing or hereafter arising and wherever located) in and to: (a) the Purchase Agreement and all documents related thereto including, without limitation, all rights to receive distributions with respect to the Subject Interests (as defined in the Purchase Agreement) and other payments thereunder; (b) the Subject Interests received by Maker under the Purchase Agreement; (c) all accounts and general intangibles arising from, or related to, the Purchase Agreement; and (d) all proceeds and products of the foregoing clauses (a), (b) and (c) (collectively, the "Collateral"). In addition to all other rights and remedies granted to Payee in this Note or by applicable law, Payee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Texas with respect to the Collateral. Maker shall keep the Collateral free and clear of all liens, security interests and encumbrances other than those in favor of Payee. Maker hereby authorizes Payee to file any financing statement naming Maker as debtor, Payee as secured party and describing the Collateral which Payee deems necessary. Maker will take all actions and execute all documents reasonably requested by Payee to create, perfect, protect and enforce Payee's interest in the Collateral.

## Events of Default

Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

(a)     the failure of Maker to make any payment required to be made under this Note when such payment becomes due; provided, however, that Maker's failure to make a payment when due shall not be considered an Event of Default if HCM has failed to timely make Priority Distributions, as described in the Fourth Amended and Restated Agreement of Limited Partnership of HCM (or a successor document) (the "Partnership Agreement"); provided further that such a failure by HCM to timely make Priority Distributions when permitted because of a Honis Trigger Event, as defined in the Partnership Agreement, shall not be an excuse for an Event of Default.

(b)     Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document when made that is not cured within thirty days of Maker's receipt of written notice thereof to Maker (other than Events of Default set forth in clauses (a), (d), (e) and (f) hereof for which notice of default shall not be required);

(c)     any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is incorrect in any material respect;

SECURED PROMISSORY NOTE, Page 2

006488

(d)    Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

(e)    any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property; provided, however that an involuntary proceeding shall only be an Event of Default if such proceeding remains unstayed or undismissed for a period of sixty days;

(f)    any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee, HCM or other Class A limited partners of HCM;

(g)    Maker creates, incurs or otherwise permits to exist any indebtedness for borrowed money other than the indebtedness evidenced by (i) this Note, (ii) and any note issued by Maker in favor of Payee, HCM or other Class A limited partners of HCM;

(h)    any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity if the holder of such indebtedness causes any of such indebtedness to become due, or requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(i)    the validity or enforceability of this Note shall be contested or challenged by Maker; or

(j)    any lien purported to be created to secure the amounts owing under this Note shall cease to be, or shall be asserted by Maker not to be, a valid and perfected lien on any collateral, with the priority required hereby, provided, however, that if the security interest is not perfected due to an act or omission of Payee, the lack of perfection shall not be an event of default.

<u>Remedies</u>

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the principal and interest contemplated hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (d) of the definition of "<u>Event of Default</u>", such indebtedness shall become immediately due and payable in full without demand or acceleration); (b) reduce any claim to judgment; (c) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (d) may unilaterally cause HCM to transfer from Maker to Payee the portion of the Collateral having a fair market value equal to the remaining indebtedness due hereunder together with interest thereon at the time of Default; (e) may cure any Event of Default, or event of nonperformance under this Note; and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or

SECURED PROMISSORY NOTE, Page 3

006489

otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

Except as otherwise specifically provided in the immediately preceding paragraph, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

All proceeds of the Collateral received by Payee shall be applied by Payee to repay the fees and expenses of Payee incurred in connection with this Note and the other indebtedness owing under this Note.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

### Miscellaneous

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full,

SECURED PROMISSORY NOTE, Page 4

refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder to or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, with confirmation, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. SUBJECT TO THE REQUIREMENTS HEREIN TO ARBITRATE, AS APPLICABLE, MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION PROPERLY BEFORE A COURT OF LAW SHALL BE TRIED BY SUCH COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

[Remainder of Page Intentionally Left Blank]

SECURED PROMISSORY NOTE, Page 5

006491

Signed effective as of the date of this Note.

HUNTER MOUNTAIN INVESTMENT TRUST

By:  Beacon Mountain LLC, its Administrator

By: _____
Name: John Honis
Title:  President

Maker's address for notice:

Hunter Mountain Investment Trust
c/o Beacon Mountain, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis

with a copy (which shall not constitute notice) to

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attention: Steven Huttler, Esq.
Fax: 212-573-8151

SECURED PROMISSORY NOTE, Signature Page

Exhibit A

## Amortization Schedule

| Year | Due Date (On or Before) | Beginning Balance | Interest Accrued | Interest Paid | Principal Paid | Total Payment | Ending Principal Balance | Ending P+I |
|---|---|---|---|---|---|---|---|---|
| 1 | 12/24/2016 | $ 3,283,688.09 | $ 85,704.26 | $ 85,704.26 | $ 164,184.40 | $ 249,888.66 | $ 3,119,503.69 | $ 3,119,503.69 |
| 2 | 12/24/2017 | 3,119,503.69 | 81,419.05 | 81,419.05 | 164,184.40 | 245,603.45 | 2,955,319.28 | 2,955,319.28 |
| 3 | 12/24/2018 | 2,955,319.28 | 77,133.83 | 77,133.83 | 164,184.40 | 241,318.23 | 2,791,134.88 | 2,791,134.88 |
| 4 | 12/24/2019 | 2,791,134.88 | 72,848.62 | 72,848.62 | 164,184.40 | 237,033.02 | 2,626,950.47 | 2,626,950.47 |
| 5 | 12/24/2020 | 2,626,950.47 | 68,563.41 | 68,563.41 | 164,184.40 | 232,747.81 | 2,462,766.07 | 2,462,766.07 |
| 6 | 12/24/2021 | 2,462,766.07 | 64,278.19 | 64,278.19 | 164,184.40 | 228,462.59 | 2,298,581.66 | 2,298,581.66 |
| 7 | 12/24/2022 | 2,298,581.66 | 59,992.98 | 59,992.98 | 164,184.40 | 224,177.38 | 2,134,397.26 | 2,134,397.26 |
| 8 | 12/24/2023 | 2,134,397.26 | 55,707.77 | 55,707.77 | 164,184.40 | 219,892.17 | 1,970,212.85 | 1,970,212.85 |
| 9 | 12/24/2024 | 1,970,212.85 | 51,422.56 | 51,422.56 | 164,184.40 | 215,606.96 | 1,806,028.45 | 1,806,028.45 |
| 10 | 12/24/2025 | 1,806,028.45 | 47,137.34 | 47,137.34 | 164,184.40 | 211,321.74 | 1,641,844.05 | 1,641,844.05 |
| 11 | 12/24/2026 | 1,641,844.05 | 42,852.13 | 42,852.13 | 164,184.40 | 207,036.53 | 1,477,659.64 | 1,477,659.64 |
| 12 | 12/24/2027 | 1,477,659.64 | 38,566.92 | 38,566.92 | 164,184.40 | 202,751.32 | 1,313,475.24 | 1,313,475.24 |
| 13 | 12/24/2028 | 1,313,475.24 | 34,281.70 | 34,281.70 | 164,184.40 | 198,466.10 | 1,149,290.83 | 1,149,290.83 |
| 14 | 12/24/2029 | 1,149,290.83 | 29,996.49 | 29,996.49 | 164,184.40 | 194,180.89 | 985,106.43 | 985,106.43 |
| 15 | 12/24/2030 | 985,106.43 | 25,711.28 | 25,711.28 | 164,184.40 | 189,895.68 | 820,922.02 | 820,922.02 |
| 16 | 12/24/2031 | 820,922.02 | 21,426.06 | 21,426.06 | 164,184.40 | 185,610.46 | 656,737.62 | 656,737.62 |
| 17 | 12/24/2032 | 656,737.62 | 17,140.85 | 17,140.85 | 164,184.40 | 181,325.25 | 492,553.21 | 492,553.21 |
| 18 | 12/24/2033 | 492,553.21 | 12,855.64 | 12,855.64 | 164,184.40 | 177,040.04 | 328,368.81 | 328,368.81 |
| 19 | 12/24/2034 | 328,368.81 | 8,570.43 | 8,570.43 | 164,184.40 | 172,754.83 | 164,184.40 | 164,184.40 |
| 20 | 12/24/2035 | 164,184.40 | 4,285.21 | 4,285.21 | 164,184.40 | 168,469.61 | (0.00) | (0.00) |
| Totals | | | $ 899,894.72 | $ 899,894.72 | $ 3,283,688.09 | $ 4,183,582.81 | | |

SECURED PROMISSORY NOTE, Exhibit A

006493

# EXHIBIT 54

006494

## SECURED PROMISSORY NOTE

$1,407,306.92                                                December 24, 2015

FOR VALUE RECEIVED, the undersigned, Hunter Mountain Investment Trust, a Delaware statutory trust ("Maker"), hereby promises to pay to the order of The Mark and Pamela Okada Family Trust – Exempt Trust #2 ("Payee"), at its office at 300 Crescent Court, Suite 700, Dallas, Texas 75201, in lawful money of the United States of America, the principal sum of ONE MILLION FOUR HUNDRED SEVEN THOUSAND THREE HUNDRED SIX DOLLARS AND NINETY-TWO CENTS ($1,407,306.92), together with interest on the outstanding principal balance thereof at the rate of two and sixty-one one-hundredths percent (2.61%) per annum, as provided herein and compounded as shown in the amortization table in EXHIBIT A.

### Payments

ALL UNPAID PRINCIPAL HEREOF, TOGETHER WITH ALL ACCRUED AND UNPAID INTEREST THEREON, SHALL AUTOMATICALLY BE DUE AND PAYABLE IN FULL, WITHOUT NECESSITY OF DEMAND OR NOTICE, IN ACCORDANCE WITH THE AMORTIZATION SCHEDULE ATTACHED HERETO AS EXHIBIT A. NOTWITHSTANDING THE FOREGOING SENTENCE, SO LONG AS THIS NOTE IS OUTSTANDING, MAKER COVENANTS NOT TO MAKE ANY DISTRIBUTIONS TO ITS BENEFICIAL OWNER WITHOUT THE PRIOR WRITTEN CONSENT OF PAYEE. MAKER AGREES TO PAY TO PAYEE, UNTIL THIS NOTE IS SATISFIED, ANY AMOUNTS THAT WOULD OTHERWISE BE AVAILABLE FOR DISTRIBUTIONS TO MAKER'S BENEFICIAL OWNER ("EXCESS CASH"), AND FURTHER CONSENTS TO HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCM") PAYING DISTRIBUTIONS OTHERWISE PAYABLE TO MAKER, TO THE EXTENT SUCH DISTRIBUTION REPRESENTS EXCESS CASH, DIRECTLY TO PAYEE.

All past due principal and interest shall bear interest from and after the date when due at a rate equal to the lesser of (a) eighteen percent (18.0%) per annum or (b) the Maximum Rate (as defined herein).

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a rate that exceeds the maximum rate allowed by applicable law (such rate, the "Maximum Rate") in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be. If the regularly scheduled due date for any payment under this Note is not a Business Day, the due date for such payment shall be the next succeeding Business Day, and payment made on such succeeding Business Day shall have the same force and effect as if made on the regularly scheduled due date. "Business Day" means a day, other than a Saturday, Sunday or legal holiday, on which a bank in Dallas, Texas is open for business.

Maker shall have the right to prepay this Note, in whole or in part, at any time and from time to time without premium or penalty. Amounts borrowed and repaid hereunder may not be reborrowed.

### Conditions Precedent

This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until Payee has received each of the following in form and substance acceptable to Payee:

(a)      this Note executed by Maker;

SECURED PROMISSORY NOTE, Page 1

006495

(b)      the Partnership Interest Purchase Agreement, of even date herewith (the "Purchase Agreement"), by and between Maker and Payee, and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that all conditions to the effectiveness of the Purchase Agreement have been fulfilled;

(c)      evidence that the execution, delivery and performance by Maker of this Note and all other documents and instruments related to this Note have been duly authorized by, or on behalf of, Maker;

(d)      true and correct copies of the organizational documents of Maker; and

(g)      such other agreements, documents, information, and other assurances as Payee may reasonably request.

## Security

As security for the prompt payment and performance in full when due of its indebtedness and obligations under this Note, Maker hereby pledges and assigns to Payee, and grants to Payee a continuing security interest in, all of Maker's right, title and interest (whether now existing or hereafter arising and wherever located) in and to: (a) the Purchase Agreement and all documents related thereto including, without limitation, all rights to receive distributions with respect to the Subject Interests (as defined in the Purchase Agreement) and other payments thereunder; (b) the Subject Interests received by Maker under the Purchase Agreement; (c) all accounts and general intangibles arising from, or related to, the Purchase Agreement; and (d) all proceeds and products of the foregoing clauses (a), (b) and (c) (collectively, the "Collateral"). In addition to all other rights and remedies granted to Payee in this Note or by applicable law, Payee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Texas with respect to the Collateral. Maker shall keep the Collateral free and clear of all liens, security interests and encumbrances other than those in favor of Payee. Maker hereby authorizes Payee to file any financing statement naming Maker as debtor, Payee as secured party and describing the Collateral which Payee deems necessary. Maker will take all actions and execute all documents reasonably requested by Payee to create, perfect, protect and enforce Payee's interest in the Collateral.

## Events of Default

Maker shall be in default under this Note upon the occurrence of any of the following events or conditions (each, an "Event of Default"):

(a)      the failure of Maker to make any payment required to be made under this Note when such payment becomes due; provided, however, that Maker's failure to make a payment when due shall not be considered an Event of Default if HCM has failed to timely make Priority Distributions, as described in the Fourth Amended and Restated Agreement of Limited Partnership of HCM (or a successor document) (the "Partnership Agreement"); provided further that such a failure by HCM to timely make Priority Distributions when permitted because of a Honis Trigger Event, as defined in the Partnership Agreement, shall not be an excuse for an Event of Default.

(b)      Maker defaults in the performance of any obligation, covenant, or agreement now or hereafter made or owed by Maker to Payee, whether under this Note or any related document when made that is not cured within thirty days of Maker's receipt of written notice thereof to Maker (other than Events of Default set forth in clauses (a), (d), (e) and (f) hereof for which notice of default shall not be required);

(c)      any representation or warranty made by Maker to Payee in connection with this Note or any document executed or delivered in connection therewith, is incorrect in any material respect;

SECURED PROMISSORY NOTE, Page 2

006496

(d)    Maker shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any corporate action to authorize any of the foregoing;

(e)    any involuntary proceeding shall be commenced against Maker seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property; provided, however that an involuntary proceeding shall only be an Event of Default if such proceeding remains unstayed or undismissed for a period of sixty days;

(f)    any lien, attachment, sequestration or similar proceeding against any of Maker's assets or properties other than liens in favor of Payee, HCM or other Class A limited partners of HCM;

(g)    Maker creates, incurs or otherwise permits to exist any indebtedness for borrowed money other than the indebtedness evidenced by (i) this Note, (ii) and any note issued by Maker in favor of Payee, HCM or other Class A limited partners of HCM;

(h)    any event or condition occurs that results in any indebtedness of Maker becoming due prior to its scheduled maturity if the holder of such indebtedness causes any of such indebtedness to become due, or requires the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(i)    the validity or enforceability of this Note shall be contested or challenged by Maker; or

(j)    any lien purported to be created to secure the amounts owing under this Note shall cease to be, or shall be asserted by Maker not to be, a valid and perfected lien on any collateral, with the priority required hereby, provided, however, that if the security interest is not perfected due to an act or omission of Payee, the lack of perfection shall not be an event of default.

<u>Remedies</u>

Should an Event of Default exist, Payee may but without any obligation to do so, at its option and at any time, and without presentment, demand, or protest, notice of default, dishonor, demand, non-payment, or protest, notice of intent to accelerate all or any part of the principal and interest contemplated hereunder, notice of acceleration of all or any part of the indebtedness evidenced by this Note, or notice of any other kind, all of which Maker hereby expressly waives, except for any notice required by applicable statute which cannot be waived: (a) declare the indebtedness evidenced by this Note, or any part thereof, immediately due and payable, whereupon the same shall be due and payable (provided, however, that upon the occurrence of any event described in clause (d) of the definition of "<u>Event of Default</u>", such indebtedness shall become immediately due and payable in full without demand or acceleration); (b) reduce any claim to judgment; (c) to the maximum extent permitted under applicable laws, set-off and apply any and all deposits, funds, or assets at any time held and any and all other indebtedness at any time owing by Payee to or for the credit or the account of Maker against any and all obligations, whether or not Payee exercises any other right or remedy hereunder and whether or not such obligations are then matured; (d) may unilaterally cause HCM to transfer from Maker to Payee the portion of the Collateral having a fair market value equal to the remaining indebtedness due hereunder together with interest thereon at the time of Default; (e) may cure any Event of Default, or event of nonperformance under this Note; and/or (f) exercise any and all rights and remedies afforded by this Note, or by law or equity or

SECURED PROMISSORY NOTE, Page 3

006497

otherwise, as Payee deems appropriate. No failure or delay of the holder hereof to exercise any of its rights or remedies shall not constitute a waiver thereof.

Except as otherwise specifically provided in the immediately preceding paragraph, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Payee or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

All proceeds of the Collateral received by Payee shall be applied by Payee to repay the fees and expenses of Payee incurred in connection with this Note and the other indebtedness owing under this Note.

If the holder hereof incurs any costs or expenses in any attempt to enforce payment of all or any part of this Note, or if this Note is placed in the hands of an attorney for collection, Maker agrees to pay all such costs fees and expenses incurred, including without limitation, reasonable attorneys' fees.

<u>**Miscellaneous**</u>

It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable law of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness under this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If such law is ever judicially interpreted so as to render usurious any amount contracted for, charged, taken, reserved or received with respect to this Note, or if any payment by Maker results in Maker having paid any interest in excess of the amount that is permitted by such law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance hereof (or, if the principal balance has been or would thereby be paid in full,

SECURED PROMISSORY NOTE, Page 4

refunded to Maker), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new documents, so as to comply with all such applicable laws, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance or detention of money and other indebtedness evidenced by this Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the rate or amount of interest on account of such indebtedness does not exceed the applicable usury ceiling provided by such applicable law. Notwithstanding any provision contained herein to the contrary, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the maximum rate allowed by applicable law on principal amounts actually advanced hereunder or for the account of Maker.

MAKER AND EACH SURETY, GUARANTOR, ENDORSER, AND OTHER PARTY EVER LIABLE FOR PAYMENT OF ANY SUMS OF MONEY PAYABLE ON THIS NOTE JOINTLY AND SEVERALLY WAIVE NOTICE, PRESENTMENT, DEMAND FOR PAYMENT, PROTEST, NOTICE OF PROTEST AND NON-PAYMENT OR DISHONOR, NOTICE OF ACCELERATION, NOTICE OF INTENT TO ACCELERATE, NOTICE OF INTENT TO DEMAND, DILIGENCE IN COLLECTING, GRACE, AND ALL OTHER FORMALITIES OF ANY KIND, AND CONSENT TO ALL EXTENSIONS WITHOUT NOTICE FOR ANY PERIOD OR PERIODS OF TIME AND PARTIAL PAYMENTS, BEFORE OR AFTER MATURITY, AND ANY IMPAIRMENT OF ANY COLLATERAL SECURING THIS NOTE, ALL WITHOUT PREJUDICE TO THE HOLDER. Without limiting the foregoing, any notice or demand upon Maker in connection with this Note shall be in writing and shall become effective (a) upon personal delivery, (b) three (3) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid or (c) when properly transmitted by telecopy, with confirmation, in each case addressed to Maker's address for notice specified in connection with its signature below.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. THIS NOTE IS PERFORMABLE IN DALLAS COUNTY, TEXAS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF PAYEE TO BRING ANY ACTION OR PROCEEDING AGAINST MAKER OR ANY OTHER PARTY LIABLE HEREUNDER OR WITH RESPECT TO ANY COLLATERAL IN ANY STATE OR FEDERAL COURT IN ANY OTHER JURISDICTION.

MAKER AND PAYEE EACH IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. SUBJECT TO THE REQUIREMENTS HEREIN TO ARBITRATE, AS APPLICABLE, MAKER AND PAYEE EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION PROPERLY BEFORE A COURT OF LAW SHALL BE TRIED BY SUCH COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT ITS RIGHT TO A TRIAL BY JURY IS WAIVED AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS NOTE OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS NOTE, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

This Note embodies the final, entire agreement of Maker and Payee with respect to the indebtedness evidenced hereby and supersedes any and all prior commitments, agreements, representations and understandings, whether written or oral, relating thereto and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of Maker and Payee. There are no oral agreements between Maker and Payee.

[Remainder of Page Intentionally Left Blank]

SECURED PROMISSORY NOTE, Page 5

Signed effective as of the date of this Note.

> HUNTER MOUNTAIN INVESTMENT TRUST
>
> By: Beacon Mountain LLC, its Administrator
>
> By: _____
> Name: John Honis
> Title: President

<u>Maker's address for notice:</u>

Hunter Mountain Investment Trust
c/o Beacon Mountain, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis

with a copy (which shall not constitute notice) to

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attention: Steven Huttler, Esq.
Fax: 212-573-8151

SECURED PROMISSORY NOTE, Signature Page

006500

Exhibit A

## Amortization Schedule

| Year | Due Date (On or Before) | Beginning Balance | Interest Accrued | Interest Paid | Principal Paid | Total Payment | Ending Principal Balance | Ending P+I |
|---|---|---|---|---|---|---|---|---|
| 1 | 12/24/2016 | $ 1,407,306.92 | $ 36,730.71 | $ 36,730.71 | $ 70,365.35 | $ 107,096.06 | $ 1,336,941.57 | $ 1,336,941.57 |
| 2 | 12/24/2017 | 1,336,941.57 | 34,894.18 | 34,894.18 | 70,365.35 | 105,259.53 | 1,266,576.23 | 1,266,576.23 |
| 3 | 12/24/2018 | 1,266,576.23 | 33,057.64 | 33,057.64 | 70,365.35 | 103,422.99 | 1,196,210.88 | 1,196,210.88 |
| 4 | 12/24/2019 | 1,196,210.88 | 31,221.10 | 31,221.10 | 70,365.35 | 101,586.45 | 1,125,845.54 | 1,125,845.54 |
| 5 | 12/24/2020 | 1,125,845.54 | 29,384.57 | 29,384.57 | 70,365.35 | 99,749.92 | 1,055,480.19 | 1,055,480.19 |
| 6 | 12/24/2021 | 1,055,480.19 | 27,548.03 | 27,548.03 | 70,365.35 | 97,913.38 | 985,114.84 | 985,114.84 |
| 7 | 12/24/2022 | 985,114.84 | 25,711.50 | 25,711.50 | 70,365.35 | 96,076.85 | 914,749.50 | 914,749.50 |
| 8 | 12/24/2023 | 914,749.50 | 23,874.96 | 23,874.96 | 70,365.35 | 94,240.31 | 844,384.15 | 844,384.15 |
| 9 | 12/24/2024 | 844,384.15 | 22,038.43 | 22,038.43 | 70,365.35 | 92,403.78 | 774,018.81 | 774,018.81 |
| 10 | 12/24/2025 | 774,018.81 | 20,201.89 | 20,201.89 | 70,365.35 | 90,567.24 | 703,653.46 | 703,653.46 |
| 11 | 12/24/2026 | 703,653.46 | 18,365.36 | 18,365.36 | 70,365.35 | 88,730.71 | 633,288.11 | 633,288.11 |
| 12 | 12/24/2027 | 633,288.11 | 16,528.82 | 16,528.82 | 70,365.35 | 86,894.17 | 562,922.77 | 562,922.77 |
| 13 | 12/24/2028 | 562,922.77 | 14,692.28 | 14,692.28 | 70,365.35 | 85,057.63 | 492,557.42 | 492,557.42 |
| 14 | 12/24/2029 | 492,557.42 | 12,855.75 | 12,855.75 | 70,365.35 | 83,221.10 | 422,192.08 | 422,192.08 |
| 15 | 12/24/2030 | 422,192.08 | 11,019.21 | 11,019.21 | 70,365.35 | 81,384.56 | 351,826.73 | 351,826.73 |
| 16 | 12/24/2031 | 351,826.73 | 9,182.68 | 9,182.68 | 70,365.35 | 79,548.03 | 281,461.38 | 281,461.38 |
| 17 | 12/24/2032 | 281,461.38 | 7,346.14 | 7,346.14 | 70,365.35 | 77,711.49 | 211,096.04 | 211,096.04 |
| 18 | 12/24/2033 | 211,096.04 | 5,509.61 | 5,509.61 | 70,365.35 | 75,874.96 | 140,730.69 | 140,730.69 |
| 19 | 12/24/2034 | 140,730.69 | 3,673.07 | 3,673.07 | 70,365.35 | 74,038.42 | 70,365.35 | 70,365.35 |
| 20 | 12/24/2035 | 70,365.35 | 1,836.54 | 1,836.54 | 70,365.35 | 72,201.89 | 0.00 | 0.00 |
| Totals | | | $ 385,672.47 | $ 385,672.47 | $ 1,407,306.92 | $ 1,792,979.39 | | |

SECURED PROMISSORY NOTE, Exhibit A

# EXHIBIT 55

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

May 3, 2021

Hunter Mountain Investment Trust
c/o Rand Advisors, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention:  John Honis

       Re:  Demand on Secured Promissory Note

Dear Mr. Honis,

On December 21, 2015, Hunter Mountain Investment Trust ("Maker") entered into that certain secured promissory note in the original principal amount of $63,000,000 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in the "Payments" section of the Note, accrued interest and principal on the Note is due and payable in accordance with the amortization schedule attached to the Note as "Exhibit A."  Maker failed to make the payments due on December 21, 2019, and December 21, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to the "Remedies" section of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of May 5, 2021 is $72,226,809.30; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

006503

cc:    Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       E.P. Keiffer
       Steven Huttler       Sadis & Goldberg LLP,
                            551 Fifth Avenue, 21st Floor,
                            New York, NY 10176

006504

# Appendix A

**Appendix A**

ABA #:           322070381
Bank Name:       East West Bank
Account Name:    Highland Capital Management, LP
Account #:       5500014686

# EXHIBIT 56

006507

```
                        IN THE UNITED STATES BANKRUPTCY COURT
 1                      FOR THE NORTHERN DISTRICT OF TEXAS
                                  DALLAS DIVISION
 2
                                        )   Case No. 19-34054-sgj-11
 3    In Re:                            )   Chapter 11
                                        )
 4    HIGHLAND CAPITAL                  )   Dallas, Texas
      MANAGEMENT, L.P.,                 )   May 26, 2023
 5                                      )   9:30 a.m. Docket
           Reorganized Debtor.         )
 6                                      )   - MOTION FOR EXPEDITED HEARING
                                        )     FILED BY HUNTER MOUNTAIN
 7                                      )     TRUST [3789]
                                        )   - MOTION TO CONTINUE HEARING
 8                                      )     FILED BY HUNTER MOUNTAIN
                                        )     TRUST [3791]
 9                                      )   - MOTION FOR EXPEDITED
                                        )     DISCOVERY FILED BY HUNTER
10                                      )     MOUNTAIN TRUST [3788]
      _____)
11
                             TRANSCRIPT OF PROCEEDINGS
12               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                      UNITED STATES BANKRUPTCY JUDGE.
13
      APPEARANCES:
14
      For the Reorganized         John A. Morris
15    Debtor:                     PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
16                                New York, NY  10017-2024
                                  (212) 561-7700
17
      For Hunter Mountain         Sawnie A. McEntire
18    Investment Trust:           Timothy J. Miller
                                  PARSONS MCENTIRE MCCLEARY, PLLC
19                                1700 Pacific Avenue, Suite 4400
                                  Dallas, TX  75201
20                                (214) 237-4303
21    For Hunter Mountain         Roger L. McCleary
      Investment Trust:           PARSONS MCENTIRE MCCLEARY, PLLC
22                                One Riverway, Suite 1800
                                  Houston, TX  77056
23                                (713) 960-7305
24
25
```

006508

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Exhibit 23-60   Filed 07/28/23   Page 116 of 214   PageID 6002

2

```
1   APPEARANCES, cont'd.:

2   For Muck Holdings, et al.:  Brent Ryan McIlwain
                                Chris Bailey
3                               David C. Schulte
                                HOLLAND & KNIGHT, LLP
4                               300 Crescent Court, Suite 1100
                                Dallas, TX  75201
5                               (214) 964-9481

6   For James P. Seery, Jr.:   Joshua Seth Levy
                                Mark Stancil
7                               WILLKIE FARR & GALLAGHER, LLP
                                1875 K Street, NW
8                               Washington, DC  20006
                                (202) 303-1133
9
    For James P. Seery, Jr.:   John L. Brennan
10                              WILLKIE FARR & GALLAGHER, LLP
                                787 Seventh Avenue
11                              New York, NY  10019-6099
                                (212) 728-8187
12
    Recorded by:               Michael F. Edmond, Sr.
13                              UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
14                              Dallas, TX  75242
                                (214) 753-2062
15
    Transcribed by:            Kathy Rehling
16                              311 Paradise Cove
                                Shady Shores, TX  76208
17                              (972) 786-3063

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
```

006509

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 03/28/24   Page 117 of 214   PageID 6003
Exhibit 23-5   Page 2 of 455

3

<table>
<tr><td>1</td><td style="text-align:center">DALLAS, TEXAS - MAY 26, 2023 - 9:37 A.M.</td></tr>
</table>

1          DALLAS, TEXAS - MAY 26, 2023 - 9:37 A.M.

2          THE COURT:  All right.  We're here for an emergency

3  hearing in Highland, Case No. 19-34054.  We have motions to

4  take expedited discovery, and alternatively, a motion to

5  continue the June 8th hearing, filed by Hunter Mountain Trust.

6  So I will start by getting lawyer appearances.  Who do we have

7  appearing for Hunter Mountain?

8          MR. MCENTIRE:  Good morning, Your Honor.  This is

9  Sawnie McEntire on behalf of Hunter Mountain Investment Trust,

10  along with my partner, Roger McCleary, and an associate in our

11  firm, Tim Miller.

12      And Your Honor, the audio is very low.  I have mine

13  cranked all the way up.  I could barely hear you, with all due

14  deference to the Court.

15          THE COURT:  All right.  Well, I'll try to talk

16  louder.  I don't know if it's a problem everyone's having, or

17  just on your end.

18      All right.  Who do we have appearing for Highland?

19          MR. MORRIS:  Good morning, Your Honor.  It's John

20  Morris from Pachulski Stang Ziehl & Jones for the Reorganized

21  Debtor and the Claimant Trust.  And I do apologize for not

22  having a necktie this morning, Your Honor.  I'm out of town in

23  the middle of nowhere and just don't have one with me.  I do

24  apologize.

25          THE COURT:  Okay.  Understood.  This was an emergency

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 03/28/23   Page 118 of 214   PageID 6004
Exhibit 234560   Page 119 of 455

4

1  setting right before a holiday.

2      All right.  Who do we have appearing for Mr. Seery today?

3          MR. LEVY:  This is Josh Levy from Willkie Farr &

4  Gallagher on behalf of Mr. Seery.  I'm joined today by my

5  colleagues, Mark Stancil and John Brennan.

6          THE COURT:  Okay.  Thank you.

7      Who do we have appearing for what I'll call the Claims

8  Purchasers?

9          MR. MCILWAIN:  Good morning, Your Honor.  Brent

10 McIlwain from Holland & Knight here for Farallon Capital,

11 Stonehill Capital, Muck, and Jessup.  David Schulte and Chris

12 Bailey are also on, but I anticipate handling the hearing.

13         THE COURT:  Okay.  Thank you.

14     I presume that's all of our appearances.  Is there anyone

15 I have missed?

16     All right.  Well, Mr. McEntire, this is all about you.

17 This is all about your motion.  Tell me what you'd like to

18 present today.

19         MR. MCENTIRE:  Thank you, Your Honor.  Your Honor,

20 it's difficult for me to see right here.  Do we have a court

21 reporter?

22         THE COURT:  Of course we do.

23         MR. MCENTIRE:  Thank you.  Just the visual on my

24 computer is not very good.  Thank you.

25     Your Honor, we're before the Court today on a motion for

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Filed 09/20/23   Page 119 of 214   PageID 6005
Exhibit 34   Page 3 of 45

5

1  expedited discovery.  Our motion, as well as the discovery we

2  have propounded, it's certainly subject to and without waiving

3  our prior objections to the evidentiary format that the Court

4  has indicated it intends to conduct in connection with the

5  June -- upcoming June 8 hearing.

6      As the Court knows, we have objected to the evidentiary

7  format of that hearing.  But in light of the Court's recent

8  ruling on --

9          THE COURT:  Okay.  Can I just stop you there, because

10  --

11          MR. MCENTIRE:  Sure.

12          THE COURT:  -- your motion, it made me think that you

13  think I've ordered evidence.  Okay?  I thought I made clear in

14  my order, you can use your time however you want on June 8th,

15  argument, evidence, but the issue here is that you chose to

16  put on evidence, the Dondero affidavit, and as we discussed at

17  the hearing on what kind of hearing we're going to have, if

18  you put on a declaration or an affidavit, every court in the

19  country is going to say that witness has to be made available

20  for cross-examination.

21      So you decided to start this with putting on evidence, so

22  I was simply saying, okay, well, if you're going to put on

23  evidence, then other people are entitled to cross-examine your

24  witness.  And I went further to say I think this is maybe a

25  mixed question of fact and law, so therefore people are

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 06/28/23   Page 120 of 214   PageID 6006
Exhibit 234560   Filed 06/28/23   Page 120 of 455

6

1    entitled to put on evidence in that regard.  Okay?

2        So I feel like we went through this all at the last

3    hearing on what kind of hearing we're going to have.  So, I

4    mean, you may continue, but I just, I took issue just now with

5    you saying basically I ordered there was going to be evidence,

6    okay?  I would have been perfectly --

7            MR. MCENTIRE:  Okay, Your Honor.

8            THE COURT:  -- fine if you wanted to just put on

9    argument, but I feel like you kind of started the ball rolling

10   by putting in evidence.

11           MR. MCENTIRE:  Well, Your Honor, to respond to your

12   comments at the beginning of this hearing, as I indicated

13   during the course of the status conference, we have withdrawn

14   Mr. Dondero's affidavits and all the supporting evidence in

15   connection with our motion and provided --

16           THE COURT:  Well, I mean, you haven't actually

17   withdrawn it.  You said you might want to withdraw it.

18           MR. MCENTIRE:  Well, we're -- well, actually, Your

19   Honor, my recollection is that we are -- we're not only

20   prepared but we have withdrawn it, subject only to our

21   reservation of rights to use that evidence should the Court

22   allow Mr. Seery, the Highland parties, or any other party to

23   offer evidence.

24       We strenuously objected to the evidentiary format, and our

25   offer and tender in that regard was made in the context of our

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5    Filed 06/02/23    Page 121 of 214    PageID 6007
Exhibit 34560    Page 122 of 455

7

1    position that the Court can make a ruling on the pleadings,

2    which I understand now the Claims Purchasers actually agree

3    with us.

4        So it's Mr. Seery and the Highland parties who have

5    provided substantial briefing to the Court on why they are

6    entitled to an evidentiary hearing.  And we responded with

7    substantial briefing to the Court on why we did not think

8    evidentiary hearing was appropriate under the various legal

9    standards.

10       And then we received the Court's order, which perhaps --

11   certainly allows the Highland parties and certainly allows Mr.

12   Seery to put on evidence.  It doesn't prevent them from

13   putting on evidence.  If they're entitled to put on evidence,

14   then we should be entitled to conduct discovery.  And if

15   they're entitled to put on evidence, then we should be

16   entitled to offer the material that was attached to our

17   original motion.  That is our position.  And that is what

18   prompted our initiation of the discovery requests that are now

19   before the Court.

20       I'll make a further point that we do believe that the

21   Court can conduct this hearing on colorability based upon the

22   four corners of the document and the document references that

23   are in the four corners of that document because that is a --

24   that is an appropriate inquiry.  That is an appropriate

25   judicial inquiry in connection with the type of proceeding

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5   Filed 06/28/23   Page 122 of 214   PageID 6008
Exhibit 234560 Filed 06/28 of 455

8

1  that's currently before the Court on June 8th.

2      Mr. Morris's attempt and Mr. Seery's lawyers' attempt to

3  inject evidence into the proceeding we think is improper.

4  However, if the Court is going to allow them to do so, then

5  we're entitled to conduct discovery to protect our due process

6  rights, which are very substantial.

7      What we have now is a very schizophrenic situation,

8  because the Claims Purchasers are objecting to participate in

9  any discovery.  They're taking the position that they are not

10  going to offer any evidence.  But nevertheless, they're going

11  to seek to benefit, undoubtedly, from any evidence that Mr.

12  Morris develops or that Mr. Seery's counsel develops.  So it's

13  a bit of a whipsaw situation.

14      They opened the Pandora's box here, Judge.  We tried to

15  keep it closed.  We said that in our briefing when we filed

16  our last brief on May 18.  They have opened a Pandora's box.

17  And if they want to put on any evidence at all, then we're

18  entitled to do discovery.

19      That's my response to your initial comments.  I'm prepared

20  to discuss more detailed arguments that have been presented in

21  the responses, if the Court wishes, and I'd like to proceed on

22  -- as well.

23          THE COURT:  Okay.  Let me stop.  Can I --

24          MR. MCENTIRE:  Your Honor, --

25          THE COURT:  Let me stop.  You said you would address

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Filed 06/28/23   Page 123 of 214   PageID 6009
Exhibit 34-5   Page 123 of 455

9

1   the responses.  Have responses to your emergency motions that

2   were filed Wednesday night and Thursday morning been filed and

3   I just haven't seen them?

4        MR. MCENTIRE:  Yes.  There are two responses.  They

5   were both filed yesterday.  The Claims Purchasers filed a

6   response, I believe, midafternoon, and then I believe Mr.

7   Morris and Mr. Seery's counsel filed a response yesterday

8   evening.  And I am prepared to respond to those, because I

9   think we have some very serious issues that need to be

10  presented to the Court for the Court to fully assess the

11  situation.

12      Your Honor, --

13        THE COURT:  Just a moment while --

14        MR. MCENTIRE:  -- the joint opposition --

15        THE COURT:  Just a moment.  I'm pulling up the

16  responses.  Okay.

17        MR. MCENTIRE:  Yes, ma'am.

18        THE COURT:  They were filed at 7:25 p.m. last night.

19  Okay.  Or a response.

20      Let me stop you right now.  Tell me what is your first

21  choice of what you want here, okay?  I'm just trying to

22  understand.  As you said, we have a lot going on here.  You

23  filed the motion.  You filed an affidavit of Dondero

24  supporting many of your factual allegations in your motion.

25  What do you want?  If we could go backwards in time, what

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-560 Filed 02/06/23f 455age 124 of 214   PageID 6010
Exhibit 23-5

10

1   would you want the Court to do here?

2          MR. MCENTIRE:  I think it's proper for the Court to

3   conduct its inquiry based upon the four corners of the Exhibit

4   1-A which is attached to our supplemental motion.  We believe

5   the Court can make its decision on colorability based on the

6   four corners of that document.  We do believe that the Court,

7   if it wishes to do so -- it does not need to do so -- but if

8   it's going to consider anything extraneous to the four corners

9   of that document, it would be limited to the documents that

10  are referred to in that petition -- in the complaint, rather

11  -- Exhibit 1-A to our supplemental motion.

12     We do not believe any additional discovery would take

13  place, and we believe Mr. --

14          THE COURT:  Okay.  Remind me, because there were 300

15  pages plus of material, remind me of what Document 1-A was.

16          MR. MCENTIRE:  Exhibit 1-A is the complaint that is

17  attached to our supplemental motion.

18          THE COURT:  Okay.  Right.  Okay.  So that's what you

19  were referring to.  I thought you were referring to --

20          MR. MCENTIRE:  Yes, ma'am.

21          THE COURT:  -- an Exhibit A perhaps to that exhibit.

22  All right.

23          MR. MCENTIRE:  Exhibit 1 --

24          THE COURT:  So you want me to scrap --

25          MR. MCENTIRE:  Exhibit 1-A.

006517

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-560   Filed 06/06/23   Page 125 of 214   PageID 6011
Exhibit 2-4560   Page 1062 of 455

11

1          THE COURT:  I mean, here's the problem.  You've got a

2     motion for leave that gives factual reasons why, in exercising

3     the gatekeeper provision, I should allow that complaint to be

4     filed, and it has an affidavit of Dondero.  I don't know how

5     to put that genie back in the bottle here.  Tell me what you

6     --

7          MR. MCENTIRE:  I think it's very easy.

8          THE COURT:  -- would have me to do, now that that's

9     on the record and I've seen it.

10          MR. MCENTIRE:  The Court can conduct a hearing on the

11     four corners of the pleading, just like the Claims Purchasers

12     also agree.  So you have five parties in this case right now

13     --

14          THE COURT:  Okay.

15          MR. MCENTIRE:  -- who all agree --

16          THE COURT:  But what do I do about that motion that's

17     on file and that affidavit?

18          MR. MCENTIRE:  You could ignore the exhibits that are

19     attached to it.

20          THE COURT:  Except the complaint.

21          MR. MCENTIRE:  Except the complaint.  Exhibit 1-A

22     attached to the supplemental motion.  Yes, Your Honor.

23          THE COURT:  So if you got what you want here, what

24     are you saying, that you would, I don't know, agree to

25     redaction of every sentence in your motion that refers to the

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-560   Filed 09/07/23   Page 126 of 214   PageID 6012
Exhibit 23-560   Page 12 of 455

12

1    Dondero affidavit and also striking the Dondero affidavit?  Is

2    that what -- I'm just, I'm trying to give meaning to this.

3              MR. MCENTIRE:  If that would help the Court, we can

4    redact any reference to Mr. Dondero's affidavit.

5              THE COURT:  I'm not saying --

6              MR. MCENTIRE:  Now, we have allegations --

7              THE COURT:  I'm trying to get at how we do what you

8    want the Court to do -- that is, not consider evidence.  And

9    I'm trying to think of procedurally how we put the genie back

10   in the bottle.  So is that your answer, there would be

11   redaction of every sentence in the motion for leave that is

12   supported by the Dondero affidavit and then a striking of the

13   Dondero affidavit?

14             MR. MCENTIRE:  I would withdraw the Dondero affidavit

15   and I would be prepared to redact those portions of our motion

16   that refer to the Dondero affidavit.  Yes, Your Honor.

17             THE COURT:  All right.  And so that would be your

18   desired way to go forward on your motion, and then you just

19   show up on the 8th and each make legal arguments?

20             MR. MCENTIRE:  We would show up on the 8th and make

21   legal arguments, assuming that Mr. Morris and Mr. Seery's

22   counsel do not attempt to put on evidence.  If they attempt to

23   put on evidence, pursuant to the Court's most recent order,

24   then we should be entitled to put on evidence as well, as well

25   as the Dondero affidavit.

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 06/28/23   Page 127 of 214   PageID 6013
Exhibit 3-5   Page 662 of 455

13

1           THE COURT:  With Mr. Dondero in court subject to

2     cross-examination?

3           MR. MCENTIRE:  If that's -- if the Court allows Mr.

4     Morris to examine Mr. Dondero in court, then he'll be subject

5     to --

6           THE COURT:  I'm asking what --

7           MR. MCENTIRE:  -- cross-examination on the affidavit

8     as well.

9           THE COURT:  -- you want, okay?  Quit saying if that's

10    what the Court wants.  I wish I wasn't here on Friday morning

11    before a three-day weekend, okay?  Tell me what you want,

12    okay?  Do you --

13          MR. MCENTIRE:  Yes, ma'am.

14          THE COURT:  You've just said --

15          MR. MCENTIRE:  I believe --

16          THE COURT:  -- you want only oral argument.  That's

17    what you want?

18          MR. MCENTIRE:  Hunter Mountain Investment Trust

19    believes that the hearing on June 8th should be conducted on

20    the pleading only and no extraneous evidence offered,

21    including Mr. Dondero's affidavit.  That is what we want.

22          THE COURT:  So you would say, Here is our proposed

23    complaint and here's why we think it presents colorable

24    claims?  And you would make --

25          MR. MCENTIRE:  Yes.

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 09/22/23   Page 128 of 214   PageID 6014
Exhibit 234560 Filed Page 2 of 455 Page 128 of 214

14

1          THE COURT:  -- legal arguments of why colorable

2     claims are articulated?

3          MR. MCENTIRE:  Yes, Your Honor.  And the Court may

4     consider the documents that are referred to in the complaint,

5     but Mr. Dondero's affidavit is not referred to in the

6     complaint.

7          THE COURT:  Okay.  And remind me of what documents

8     are referred to in the complaint.

9          MR. MCENTIRE:  All of the documents are of public

10    record, I believe.  Various documents from the Court's docket,

11    disclosure statements, the plan, the Claimant Trust Agreement,

12    the notices of claims trading that occurred in the spring of

13    2021.  I believe they're all traceable back to the Court's

14    docket or otherwise accessible in your records.

15         THE COURT:  And why would I need to look at those?

16         MR. MCENTIRE:  That's a traditional -- if the Court

17    wishes to do so, that's a traditional process of a 12(b)(6)

18    motion, that courts may make an inquiry into documents that

19    are referred to and incorporated into a complaint or a

20    petition.

21         THE COURT:  Well, I know Fifth Circuit authority

22    permits the Court to do that, but I'm just wondering how

23    looking at these items support the argument that your

24    complaint presents colorable claims.

25         MR. MCENTIRE:  Well, I think there -- it does so in a

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 07/28/23   Page 129 of 214   PageID 6015
Exhibit 23-5   Page 128 of 455

15

1   variety of ways.  The disclosure statements that are referred

2   to, the projections on distributions that are referred to, are

3   very supportive of the notion that the Claims Purchasers had

4   access to information that no one else had access to.  They

5   invested $163 million or more in claims involving -- where

6   they conducted no due diligence.  And that's an allegation in

7   the complaint.

8        They've invested over $163 million in purchasing these

9   claims, when the disclosures were -- suggested that they would

10  only get 71 percent on Plan -- on Tier 8 and zero percent on

11  Tier 9.  They invested a substantial sum of money in Tier --

12  related to Tier 9 when they were projected to get zero value.

13       I think that all supports the notion that sophisticated

14  buyers who have their own fiduciary duties to their own

15  investors would actually invest $163 million in purchasing

16  claims in the absence of due diligence when the disclosure

17  suggested a very pessimistic return.  Those are the types of

18  inferences that are properly and reasonably drawn, and

19  accepting all of the allegations in my complaint as true and

20  plausible.

21       Now, the Court certainly can determine if it wishes that

22  my clients are not plausible, but we think that that's -- what

23  I've just described is -- creates a robust circumstantial

24  plausibility.

25            THE COURT:  Okay.  Well, I'm going to ask you one

006522

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 07/28/23   Page 130 of 214   PageID 6016
Exhibit 234560   Page 2 of 455

16

1    more question, and then of course I'm going to let the others

2    weigh in.  And you used the term plausible, and we've talked

3    about is plausible the same thing as colorable, and you think

4    it is and others think it's not.  But here is my last question

5    for you.  And I want to phrase this in as helpful a way as

6    possible as I can.  If all I hear is legal argument, and if

7    the standard is plausibility, or if plausibility is the same

8    thing as colorability, to me, the legal question that I have

9    to decide, okay -- again, and I'm viewing the world through

10   the lens you're viewing it, okay, that colorability is

11   plausibility, and really all you need to do is look at the

12   complaint and consider legal argument -- if that is the

13   correct lens the Court is supposed to look through here, I'm

14   telling you I think it will boil down to this question:  When

15   or under what circumstances can claims trading during a

16   Chapter 11 case -- and it's a stretch here to say during a

17   Chapter 11 case, right?  It was post-confirmation, pre-

18   effective date.  But when can claims trading in connection

19   with a Chapter 11 case give rise to a cause of action that

20   either the bankruptcy estate or a shareholder of the debtor

21   have standing to bring?  Is that not the legal question that

22   the Court would have to consider on June 8th if it's a

23   plausibility standard and if it's just a legal argument, not

24   evidence type of hearing?

25        Because I am, I'm just going to tell you right now, I'm

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 34-5   Filed 07/28/23   Page 131 of 214   PageID 6017
Exhibit 23-5   Page 2 of 45

17

1   trying to be helpful in telling you what I think, I really

2   struggle with how in the heck does the bankruptcy estate or a

3   shareholder of the bankruptcy estate have a cause of action

4   relating to claims trading.  Okay?  Claims trading is a robust

5   industry in the world of Chapter 11, and it has been for

6   decades.  People who are as old as me remember when the

7   bankruptcy rules changed in 1991, Rule 3001(e), to make claims

8   trading simply a matter between buyer and seller, where the

9   court doesn't even have to issue any order.

10      So I am trying to understand the theory of the proposed

11   adversary proceeding.  And because I cannot figure out a legal

12   theory, that's why, in my view, I have gone overboard to be

13   generous here and said, I'll consider evidence, maybe somebody

14   is going to say something in evidence that helps me understand

15   the legal theory.  And, in fact, you put in an affidavit.

16      So, again, I'm being what I think is super-generous by

17   saying, okay, you put on evidence, you want to put on

18   evidence, fine, you put on evidence, but other people can put

19   on evidence.  And now you're saying, oh, never mind, I don't

20   want to put on evidence.  Okay.  But tell me -- I guess, not

21   to get ahead of things, but I'm trying to understand what the

22   theory is here if all I'm supposed to do is look at the four

23   corners of the complaint and view it under a 12(b)(6)

24   plausibility standard.  How is there a cause of action here?

25          MR. MCENTIRE:  Okay.  Your Honor, responding

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Filed 02/07/23   Page 132 of 214   PageID 6018
Exhibit 23-60   Page 132 of 455

18

1    specifically to your question, this has been thoroughly

2    briefed in our reply brief that we submitted on May 18.  It

3    addresses your question on all corners.

4         This is more than just a claims-trading case.  The estate

5    was actually impacted.  The estate is impacted because of what

6    we are alleging to be a quid pro quo.  Mr. Seery is placing

7    individuals or companies or entities into positions to approve

8    his compensation scheme, which we believe to be excessive.

9    Even the compensation agreement that was recently produced by

10   the Highland parties and Mr. Morris we believe reflects, in

11   essence, an excessive agreement.

12        And the situation here is that the estate has been

13   directly impacted, as well as innocent creditors and

14   stakeholders, because money has been drained away from the

15   estate.  This is not a simple, pure claims-trading issue.

16   It's not a situation between seller and buyer.  This impacts

17   the estate.

18        From all we know, because we've never seen the discovery,

19   the sellers have already released all their claims.  The

20   estate would be the only one in the "Big Boy" agreements that

21   are typical of these claims-trading arrangements.  So the

22   estate is the only truly aggrieved party, as well as Hunter

23   Mountain, who would have standing to bring these claims.  And

24   these claims would not be released under the gatekeeping

25   provisions because they would involve willful conduct.

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5    Filed 07/28/23    Page 133 of 214    PageID 6019
Exhibit 23560    Page 12 of 455

19

1    Our allegation is a conspiracy to breach Mr. Seery's

2    fiduciary duties, to line his pockets with extra money in a

3    quid pro quo exchange for providing people he knows or

4    companies he knows into positions where they can greatly

5    profit from inside information.

6         THE COURT:  Okay.  So, --

7         MR. MCENTIRE:  It's not limited to MGM.

8         THE COURT:  So the whole --

9         MR. MCENTIRE:  Yes?

10        THE COURT:  -- theory of your case is Seery is being

11   paid too much money for his role as Liquidating Trustee or

12   Claims Trustee?  That's what it's all going to boil down to?

13        MR. MCENTIRE:  No, ma'am.  That's just one aspect of

14   our claim.  I was responding to your question of why this

15   isn't just a pure claims-trading case.  We derive our standing

16   to sue from other areas as well.  As aiders and abettors in a

17   breach of these fiduciary duties, --

18        THE COURT:  What are the different --

19        MR. MCENTIRE:  -- the Claims Purchasers are subject

20   --

21        THE COURT:  -- breaches of fiduciary duties?  The

22   claims that were sold were already allowed claims, which,

23   while there was massive litigation involving these claimants,

24   there was mediation during the case and there was a settlement

25   of these claims and there were 9019 motions approved by orders

006526

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 02/07/25   Page 134 of 214   PageID 6020
Exhibit 23-560   Page 75 of 455

20

1   of the Court.

2        So, again, I'm trying to understand the theory of your

3   case.  The claims amounts were set.  Whoever held them, the

4   sellers, the purchasers, or someone else out there -- Carl

5   Icahn, pick your Claims Purchaser -- the claims amounts were

6   set.

7        So I'm trying to understand how you think the estate and

8   the shareholder have a cause of action for the estate being

9   harmed, when the claims amounts were going to be the same,

10  okay, because they had already been mediated and settled and

11  approved by final order, and the only thing I'm hearing is,

12  because the Claims Purchasers are purportedly friendly with

13  Mr. Seery, they approved exorbitant compensation for him that

14  maybe some other claims purchaser would have resisted, and

15  therefore the claim, the estate, and the shareholder have been

16  harmed by whatever extra compensation is allowed.  Is that

17  what it all boils down to?

18            MR. MCENTIRE:  I think, again, Your Honor, that's --

19  it's much more than that.

20            THE COURT:  What is the much more?

21            MR. MCENTIRE:  Your first question is --

22            THE COURT:  What is the much more?  And this isn't

23  the hearing, this isn't the June 8th hearing, but I'm trying

24  to understand, should I order people to sit for depositions

25  over a holiday weekend, okay?  That's what this is about.  Or

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-60   Filed 07/28/23   Page 135 of 214   PageID 6021
Exhibit 23456   Page 2 of 455

21

1    should I continue the June 8th hearing because you think you

2    need depositions, okay?  I'm trying to understand the theory

3    of the case before we can figure out, do we go down that

4    trail?

5            MR. MCENTIRE:  I'll try to be succinct, Your Honor,

6    in responding to your last question.

7        Your first question was -- well, actually, there's

8    several.  Your first question was what fiduciary duties were

9    breached?  There is a fiduciary duty not to engage in self-

10   dealing, not to engage in conflicts of interest, and duties of

11   disclosure.  We believe that Mr. Seery engaged with the Claims

12   Purchasers to participate in a *quid pro quo* where he could be

13   assured of significant compensation post-effective-date by

14   placing two companies with whom he is very close and familiar

15   on the Oversight Board, controlling the decisions of the

16   Oversight Board.  We believe that actual compensation

17   agreement that has now been produced reflects excessive

18   compensation.  That hurts the estate.  If it hurts the estate,

19   it hurts the innocent stakeholders, including other innocent

20   creditors and my client as former equity.  That's number one.

21       Number two.  What other evidence do we have within the

22   four corners?  First, they're allegations, but we believe that

23   they're well-pled allegations under a 12(b)(6) standard.

24       If the only publicly-available disclosure that is

25   available in February of 2021 is that Tier 9 will get zero

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 07/28/23   Page 136 of 214   PageID 6022
Exhibit 23-5   Page 12 of 455

22

1    return, yet the Claims Purchasers spent $45 million or more on

2    Tier 9 claims, and that Tier 8 is only going to get 71 percent

3    return, and they nevertheless spent a total of $163 million,

4    we believe those are clear, colorable, plausible allegations

5    supporting a participation and receiving inside information.

6        Now, it is clear that Mr. Seery was aware of MGM.  He

7    disclosed it.  We know he disclosed it because we have the

8    allegations in the pleading.  Not referring to Mr. Dondero.

9    We also know that the Claims Purchasers rejected any

10   suggestion that they would sell their participation in those

11   claims for even a 40 percent premium.

12       Well, when they're projected to get zero return or 71

13   percent return, it's difficult to understand -- in fact, I

14   don't think it's possible to understand -- why they would be

15   unwilling to sell even at a 40 percent premium.  That is the

16   allegation.

17       This is not a summary judgment proceeding.  This is an

18   initial threshold pleading stage.  And the Court is asking

19   good questions.  Hopefully I'm providing some good answers

20   that can put our claim into context.  This is not just a pure

21   claims-trading issue.

22       Now, the claim sellers, when they -- the Claims

23   Purchasers, when they participate in this agreement, this

24   collusion, as we allege, or this conspiracy, as we clearly

25   allege, they become aiders and abettors under relevant law.

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-50    Filed 07/28/23    Page 137 of 214    PageID 6023
Exhibit 2435    Page 12 of 45

23

1    And as aiders and abettors, they're subject to disgorgement.

2    That would be a claim that the estate would have for aiding

3    and abetting the breach of fiduciary duties of a CEO and a

4    Trustee.

5              THE COURT:  All right.  Well, I'm going to hear from

6    others, but --

7              MR. MCENTIRE:  Your Honor, I will tell you that I do

8    have -- if the Court does want us to address the discovery

9    issues before the Court, I have a lot to talk about, but I

10   understand you may want to first hear from other counsel on

11   this issue.

12             THE COURT:  Okay.  I do.  But I want you to know I'm

13   struggling mightily with your legal theories, okay?  And I'm

14   letting you know, if all I do is consider legal argument, I

15   don't know how in the world you're going to get there.  You

16   are complaining in essence about claims purchasing.  Okay?

17   You say you're not, but it all is at the heart of your

18   theories, that these claims which were sold, which were

19   mediated -- which were litigated heavily, were mediated, were

20   the subject of settlement agreements and 9019 motions, and

21   then the original claims holders, like many people in every

22   bankruptcy -- not every; in lots of bankruptcies around the

23   country -- choose to monetize their claims.  And it happens

24   all the time.  It happens all the time.

25             And in 1991, the rules-making committee decided, you know

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 07/28/23   Page 138 of 214   PageID 6024
Exhibit 234560   Page 079 of 455

24

1   what, the bankruptcy judges don't even need to be in the

2   middle of this.  You just file a notice in the docket, and if

3   the original seller, holder of the claim, wants to file an

4   objection and say, I didn't sell my claim, they can file an

5   objection and the court will hold a hearing.  But absent that

6   dispute between seller and purchaser, the bankruptcy judge,

7   frankly, shouldn't care.

8       Now, we've had some extreme situations in certain cases.

9   The old *Japonica* case from I think the 1990s where someone

10  said the claims purchaser, their votes on the plan shouldn't

11  count because they purchased their claims and were acting in

12  bad faith.  I mean, that is the only thing I can think of here

13  where you say a person who purchases a claim during the case,

14  then acts in bad faith, don't allow their claim for voting

15  purposes.  Or we've had a few weird cases out there where the

16  claim is only allowed at the purchase amount for voting and

17  distribution purposes.

18      But I have never, in 34 years, seen anything like this.

19  And claims trading is a robust industry.  People have made

20  their livelihoods -- I mentioned Carl Icahn.  I'm getting very

21  philosophical.  But this happens all the time.  And you have

22  set forth a proposed lawsuit that is arguing there was a

23  breach of fiduciary duty by Mr. Seery by encouraging people

24  friendly to him to purchase claims that had already been

25  allowed.  And, by the way, it happened post-confirmation, pre-

006531

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 3:23-cv-02071-E Document 23-5 Exhibit 2345-60 Filed 02/08/20 Page 2 of 455 Page 139 of 214 PageID 6025

25

```
 1   effective date.  And there was a conspiracy here that the

 2   Claims Purchasers participated in.

 3       If all we have is legal argument on this, I think you're

 4   going to lose.  Okay?  So, again, in my view, I am keeping an

 5   open mind and letting you put on evidence if there's some sort

 6   of evidence that you think is going to get me over the legal

 7   hump here, okay?  So that's why we're here.  Okay?

 8            MR. MCENTIRE:  Okay.

 9            THE COURT:  Okay.  So, Mr. Morris, I'll let you go

10   next.

11            MR. MORRIS:  Thank you, Your Honor.  I'd like to just

12   defer, if I may, to Mr. Stancil first, Mr. Seery's counsel,

13   and then I'll follow him.

14            THE COURT:  Okay.  Mr. Stancil?

15            MR. STANCIL:  Good morning, Your Honor.  This is Mark

16   Stancil from -- thank you -- from Willkie Farr for Mr. Seery.

17       I think I just want to make three brief points, and Mr.

18   Morris may wish to add before -- and I do want to invite my

19   colleague, Mr. Levy, to address discovery issues if we turn to

20   the scope of discovery.

21       First and foremost, and I think consistent with what I

22   heard Your Honor say, I did not hear Mr. McEntire identify a

23   single injury, hypothetical or otherwise, to the estate that

24   does not derive exclusively from purportedly excessive

25   compensation to Mr. Seery.  So, every aiding and abetting or
```

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 34-5   Filed 08/28/23   Page 140 of 214   PageID 6026
Exhibit 23456   Page 128 of 455

26

1    breach theory that he articulated, the only way any of those

2    could conceivably have harmed the estate under their theory is

3    that Mr. Seery was somehow able to obtain outside

4    compensation.  And that is what this case boils down to.  So

5    none of the other -- whether -- how many causes of action he

6    splits it into makes no difference.

7         I would add, moreover, that we completely dispute his

8    characterization of Mr. Seery's compensation as excessive, and

9    as I'd like to explain in just a moment, we believe we're

10   entitled to show that.

11        But I would be remiss not to add that they filed this

12   complaint alleging that Mr. Seery's compensation was excessive

13   without knowing what Mr. Seery's compensation even was.  So

14   were he to rely truly on the four corners of his complaint, he

15   has nothing, literally nothing to base this theory of

16   excessive compensation on, besides absolute supposition.

17        Second, and I realize, Your Honor, this was supposed to be

18   the topic for June 8th, as to what the proper standard is, and

19   we've -- both sides have briefed that.  Mr. McEntire has

20   veered pretty heavily into that argument, so I just wanted to

21   respond very briefly to a couple of his points.

22        It would make a mockery of the gatekeeping order were a

23   party bound by it or subject to it entitled to simply make up

24   assertions and say, well, I'll rely on these assertions, and

25   the more false they are, the better, because that'll get me

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 03/22/24   Page 141 of 214   PageID 6027
Exhibit 23456   Page 37 of 455

27

1    past the gatekeeping and I can then file it.

2         So, for that reason, we believe it is clear under *Barton*

3    and vexatious litigant doctrines, upon which this Court's

4    gatekeeping order was expressly based when it was ordered,

5    that we believe that even if they choose to rely solely on the

6    four corners of their complaint, we are entitled to submit, if

7    we so choose, evidence that directly rebuts and renders any

8    allegation facially implausible.  And we think that that's

9    exactly what Your Honor will see here.  The documents -- and

10   perhaps Mr. Morris would care to address these in more detail;

11   I'll defer to him -- but the documents and evidence we would

12   present and will present at the hearing, most of which is

13   already just attached to our motion, will blow this out of the

14   water.  It's an absurd allegation.  And the idea that we have

15   to allow this to be filed because they choose to make what

16   are, candidly, bald-faced lies in a complaint and just say,

17   well, we're now going to ignore our attempt to support it with

18   any evidence, but you can't contradict any of our assertions

19   in our complaint, we think that would be completely --

20   completely improper.

21        And we think, to the extent the complaint on its four

22   corners would rely on the say-so of a party in interest such

23   as Mr. Dondero, we would be entitled to cross-examine him.

24        You know, there are complaints that have objective,

25   verifiable, or at least testable evidence that is independent

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 32-5    Filed 02/03/25    Page 142 of 214    PageID 6028
Exhibit 34560    Page 57 of 455

28

1    of someone's personal recollection, that he must have had some

2    phone call or claims, as is the case here, that essentially

3    third parties confessed in an unrelated phone call to some

4    criminal scheme to him.

5          The last point I'll make before I turn it over to Mr.

6    Morris is we think it's very important, whatever the Court's

7    decision today with respect to discovery, that we keep the

8    June 8 date.  This is hanging over the estate.  As all of us

9    know, the longer something runs, the more expensive it is, no

10   matter what.  We believe every lick of discovery that's

11   appropriate, if that's what the Court orders, can be done.

12   Everybody can be deposed.  It'll all get done by June 8th.

13   And those of us who are in the bankruptcy trenches know that

14   people have moved far greater mountains than these in shorter

15   periods of time.

16         So, with that, we think it's really important to hold that

17   hearing date and get past this.

18              THE COURT:  Okay.  Thank you.

19         Let me ask you what you think of the idea I put out there

20   of, assuming we can kind of put the genie back in the bottle

21   here, if Mr. McEntire withdrew the Dondero affidavit and we

22   had redaction of every sentence in the motion for leave that

23   mentioned the Dondero affidavit, is your client opposed to

24   that and then just going forward with legal argument on June

25   8th?  I'm not clear on that.

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 3:23-cv-02071-E Document 34-5 Filed 03/28/24 Page 143 of 214 PageID 6029

29

1          MR. STANCIL: Yes, Your Honor. Yes, Your Honor. On

2     behalf of Mr. Seery, he is opposed to that for two reasons.

3          Your Honor will recall that the complaint basically

4     alleges that Mr. Seery took what they call nonpublic

5     information and gave it to somebody, in violation of his

6     obligations. That is just an absolute fabrication that we're

7     entitled, on a gatekeeping standard, to rebut. If they choose

8     to limit themselves to the four corners, that's fine. But

9     it's a contested matter. It's not an adversary proceeding

10    yet. They're trying to get there. It's a contested matter,

11    and we're entitled to put on evidence to show that they cannot

12    meet the colorability gatekeeping standard as expressed in

13    this Court's order.

14         So if they choose to limit themselves to their say-so even

15    in a complaint, I do believe, Your Honor, that we would be

16    entitled to show contrary evidence. And whether it persuades

17    Your Honor that it's not colorable after we've shown it to

18    you, that's up to Your Honor.

19         For example, if the complaint were to allege that the sun

20    sets in the east and rises in the west, well, we should be

21    able to put on a photograph that says no, here it is in the

22    west, here it is in the east. And it would be perverse to say

23    that they can file a complaint that's subject to a gatekeeping

24    order just based on their say-so. I mean, ironically, the

25    more absurd and disprovable the allegation, the easier it is

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 03/08/25   Page 144 of 214   PageID 6030
Exhibit 234560   Page 2 of 455

30

1   to get past, in theory, get past some sort of gatekeeping

2   order, and it should be just the opposite.  We believe we're

3   entitled to that under the Rules, Your Honor.

4           THE COURT:  All right.  So you want to put on Seery,

5   Mr. Seery, at the June 8th hearing?

6           MR. MCENTIRE:  Let me just check, Your Honor, one

7   phone.  Yes.

8           THE COURT:  Okay.  All right.

9       Well, I guess I'll go to -- well, Mr. Morris, did you want

10  to speak next?

11          MR. MORRIS:  I do, Your Honor.

12          THE COURT:  Okay.  Go ahead.

13          MR. MORRIS:  I do.  And I'll join in Mr. Stancil's

14  presentation, with one modification.  I think he may have

15  misspoke in suggesting that Hunter Mountain alleged that Mr.

16  Seery's compensation was, quote, excessive.  They did not make

17  that allegation.  They're making that allegation now because

18  they've actually seen Mr. Seery's compensation package.  They

19  had no knowledge of Mr. Seery's compensation package until we

20  voluntarily disclosed it as one of our exhibits in opposition

21  to the motion.

22      The allegation in the complaint is not that Mr. Seery's

23  compensation is excessive, it's that it was rubberstamped by

24  his age-old friends at Farallon and Stonehill in exchange for

25  the delivery of this so-called material nonpublic information.

006537

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 02/08/24   Page 145 of 214   PageID 6031
Exhibit 234560   Page 32 of 45

31

1      So I otherwise agree with Mr. Stancil.  But let's -- it's

2   very important for the Court to hold Hunter Mountain to the

3   allegations in their complaint, because this is what we have

4   seen for three years, the shifting tides of allegations.  It's

5   the same game of Whack-a-Mole that we did for two years in

6   connection with the notes litigation.

7      I am very sensitive to these things, Your Honor.  The

8   allegation in the complaint is *quid pro quo*.  It's not, oh,

9   I've now seen Mr. Seery's compensation package and it's

10  excessive.  For somebody who is asking the Court and swore to

11  the Court that $70 million of notes would be forgiven because

12  Jim Seery as the Highland representative sold MGM assets, for

13  him to suggest that this is excessive is unbelievable.

14     Let me take a step back, Your Honor.  The Court can

15  certainly take judicial notice of the fact that it is the

16  sixth body to consider these insider trading allegations.  Mr.

17  Dondero filed a 202 seeking discovery based on it.  And yet

18  how can he have a colorable claim today when he couldn't state

19  a colorable basis simply to get discovery?  Boom.  They shut

20  the door on him in Texas state court.

21     Doug Draper wrote an enormous letter to the United States

22  Trustee's Office, put forth an enormous amount of paper, made

23  the allegations of insider trading.  They can't state a

24  colorable claim today because they couldn't state a colorable

25  basis to get the United States Trustee to commence an

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5    Filed 09/07/23    Page 146 of 214    PageID 6032
Exhibit 23-560    Page 2 of 21

32

1   investigation.

2        Mr. Rukavina did the same thing.  No investigation.

3        Hunter Mountain.  They filed a 202 petition.  They

4   couldn't state a colorable basis to get discovery.

5        And then my favorite is the Texas State Securities Board.

6   I've now learned that indeed they did commence an

7   investigation on the basis of Mr. Dondero's complaint.  It

8   wasn't just a review.  It was actually a heightened inquiry.

9   And after considering everything, the Texas State Securities

10  Board said, we are taking no action.

11       You are the sixth body to consider.  I think, when

12  deciding whether or not there is a colorable claim, we're

13  done, frankly.  0-for-6.

14       Next, I think the Court can certainly take judicial notice

15  of newspaper articles.  And the fact that Mr. Dondero had

16  absolutely no duty whatsoever to send that email on December

17  17th.  Look at the context in which it was sent.  It's laid

18  out very clearly in our opposition.  And four days later, the

19  *Wall Street Journal* -- not, you know, an obscure publication

20  -- publishes an article that says MGM has retained investment

21  bankers.  They identify the investment bankers.  They say

22  there is a formal process going on to sell the company.  They

23  quote the chairman of the board that says we're actively

24  selling the company.  We have four interested parties, and two

25  of them are Apple and Amazon, the very two people that four

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5    Filed 03/28/24    Page 147 of 214    PageID 6033
Exhibit 234560   Page 33 of 455

33

1    days earlier Jim Dondero, for no reason at all other than to

2    gum up the wheels, tells Jim Seery about.  The Court can

3    certainly take judicial notice of these things.

4         And then, finally, I don't know how Hunter Mountain can

5    tell the Court that they should accept the allegations in the

6    complaint as true when we got four months of negotiations over

7    Mr. Seery's compensation.  The allegation in the complaint is

8    that it was rubberstamped.  We will put in documentary

9    evidence -- you don't have to accept that if there's no

10   credibility determination on this point, but this is really --

11   this is yet another reason why there's no -- there can never

12   be, as a matter of fact, a colorable claim here.  I appreciate

13   the legal points that Your Honor made earlier, but as a matter

14   of fact, there is -- it is inconceivable that there could be a

15   colorable claim, because the claim is *quid pro quo*.

16   Rubberstamped.  That's their word.  The Court already has in

17   the record evidence showing that that is a lie.  They had no

18   basis.  They have no knowledge.  They had no inquiry as to how

19   his compensation, but they said it was rubberstamped as part

20   of a *quid pro quo*.  Just look at the exhibits that Your Honor

21   has already.

22        The Court is supposed to say, "I accept the allegations as

23   true," when it has documentary evidence that shows the

24   allegations are false?  In what world would that be just?

25        I don't want to get directly involved in the discovery

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 3:23-cv-02071-E Document 23-5 Filed 09/28/23 Page 148 of 214 PageID 6034

34

1    disputes.  I'll leave that to Mr. Seery's counsel.  But

2    whether it's on a legal basis or a factual basis, the fact of

3    the matter is that they sought discovery not once but twice.

4    They got nothing.  And yet here they are, pressing the same

5    allegations.

6        I only ask the Court to hold them to their allegations.

7    Do not let them use what they get in discovery to say, Aha, we

8    have a new claim.  That's not the way this process works.  The

9    question is whether they have stated a colorable claim.  And

10   we have already proven, frankly, as a matter of fact and as a

11   matter of law, that there is not only no basis to these

12   claims, these claims are not made in good faith.

13       Thank you, Your Honor.

14           THE COURT:  All right.  You said you'd defer to Mr.

15   Seery's counsel on the discovery questions.  I just want to --

16   I'll ask you the same question.

17           MR. MORRIS:  Yeah.

18           THE COURT:  If you had your way, what would the

19   hearing on June 8th look like?  And I guess you're on the same

20   page as Mr. Stancil, that Mr. Seery should be allowed to

21   testify?

22           MR. MORRIS:  I believe that's right, Your Honor.

23   Only Mr. Seery can say what Mr. Seery did, instead of drawing

24   just absurd inferences based on absolutely nothing.  And I

25   think, I think the record will be clear.  I think he should

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-560   Filed 09/20/23   Page 149 of 214   PageID 6035
Exhibit 234-5   Page 149 of 455

35

1    authenticate, for example, the documents relating to the

2    negotiation of his compensation package.  I think he should be

3    able to tell the Court that he never disclosed anything about

4    MGM or this other -- there's no *quid pro quo*.  He barely knew

5    these people, if he knew them at all.  This is just, you know,

6    this is just more of the same, Your Honor.  It's more of what

7    we've been doing for three years.

8         And I'll just repeat, you are the sixth body to pass on

9    these so-called insider trading allegations.  And you're

10   actually being asked to do substantially more than the five

11   prior bodies declined to do.

12             THE COURT:  Okay.  Two --

13             MR. MORRIS:  Right.  They declined to get discovery.

14   They declined -- yeah.

15             THE COURT:  Two Texas state court judges in a Rule

16   202, --

17             MR. MORRIS:  Right.

18             THE COURT:  -- we want pre-lawsuit discovery; the

19   Texas Securities Board; and the U.S. Trustee?  Now, who's the

20   other one?

21             MR. MORRIS:  The U.S. Trustee twice.

22             THE COURT:  Oh, twice?

23             MR. MORRIS:  The U.S. Trustee twice, because there

24   were two different letters, --

25             THE COURT:  Okay.

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5    Filed 09/28/23    Page 150 of 214    PageID 6036

36

1          MR. MORRIS:  -- each of which addressed the so-called

2     insider trading allegations.  And that's how I get to five.

3          THE COURT:  Okay.

4          MR. MORRIS:  And I just think that that just is

5     really illustrative of, you know, the lack of credibility, the

6     lack of bona fides, the lack of truthfulness in the

7     allegations that are being pressed here.

8          THE COURT:  All right.  Mr. McIlwain, anything you

9     want to add to this discussion?

10         MR. MCILWAIN:  Yes, Your Honor.  And I'll be brief.

11    And if I may, because I suspect you're going to ask me the

12    same question, I might start with my answer regarding the

13    hearing.

14         From our perspective, from the Claims Purchasers

15    respective, and I think we're uniquely situated, we're

16    different in most regards, if not all regards, than Mr. Seery

17    in that we are just Claims Purchasers.  Now, my clients are on

18    the Oversight Committee, and I think we're protected by the

19    gatekeeper as a result of that.

20         But based on the allegations set forth in the four corners

21    of the complaint, and our response was narrowly tailored,

22    directed to issues that did not have anything to do with the

23    facts, they were legal bases for denial of the motion for

24    leave.  And in that regard, Your Honor, I would be fine and my

25    clients would be fine if this hearing were conducted on a

Case 19-34054-sgj11 Doc 3817-5 Filed 06/05/23 Entered 06/05/23 19:54:44 Desc
Case 3:23-cv-02071-E Document 23-5 Filed 09/22/23 Page 151 of 214 PageID 6037

37

```
 1   purely -- purely based on the pleadings, on legal arguments

 2   and with no evidence.

 3        That being said, I understand Mr. Stancil's position and

 4   Mr. Seery's position that there is some need, from their

 5   perspective, to clean up the record, when, you know, frankly,

 6   the bona fides and reputation is being attacked.  I understand

 7   that.  But from my perspective and from my client's

 8   perspective, I think we're prepared to move forward on the 8th

 9   purely on a legal basis.

10        In all of our response -- in each one of our responses,

11   the items that we responded to, Your Honor, we did so very

12   carefully not to raise evidentiary issues, affirmative

13   evidentiary issues from our perspective.  They either referred

14   to purely legal questions, and in which case we think we win,

15   or refer to, you know, documents that were on file with the

16   Court.

17        Moreover, Your Honor, we do not -- you know, I understand

18   the Court may not have had an opportunity to review our

19   response that we filed late yesterday, but the Claims

20   Purchasers have no intention of presenting any evidence at the

21   June 8th hearing.  We don't intend to put on any witnesses.

22   We don't intend to submit any exhibits.

23        And frankly, Your Honor, and I know we've covered a lot of

24   ground today, but as it relates to the motion that's on file

25   today, Hunter Mountain Investment Trust's request to take
```

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 34-5    Filed 09/28/23    Page 152 of 214    PageID 6038
Exhibit 34-5    Page 92 of 455

38

1    expedited discovery, which is being heard, as the Court noted,

2    the Friday before Memorial Day, right, we would submit that

3    that's completely inappropriate for our clients to be

4    subjected to any discovery at this point.  As Mr. Morris

5    pointed out, two state courts have already denied these

6    requests.

7        And if the Court were to allow Hunter Mountain to take

8    discovery in the face of us stating on the record and in

9    pleadings that we have no intention of putting on any

10   witnesses or submitting any evidence at the hearing, I mean,

11   it essentially turns the gatekeeper order on its head, or

12   provision on its head.  Because what that would mean is that

13   they can file a complaint, or a motion for leave to file a

14   complaint, they can make any allegations they want, and if you

15   respond to that motion to leave, you're now subjected to

16   discovery, and so they can go out and search and try to find

17   some other claim.

18       Ordinarily, Your Honor, it wouldn't -- discovery, from my

19   perspective, doing this for 25 years, I wouldn't have an issue

20   with discovery.  This is different.  This is different because

21   Hunter Mountain and Mr. Dondero have taken every opportunity

22   to harass various parties in the case.  And, you know, someone

23   would ask, why would -- why do claims sellers sell their

24   claims?  My Lord, why wouldn't you want to get out of this

25   case?  I mean, I can't imagine being subjected to this

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 34-5   Filed 09/28/23   Page 153 of 214   PageID 6039

39

1    litigation, as Mr. Seery has been subjected, year after year

2    after year.  And successfully.  Mr. Seery has been successful

3    in every regard.

4        So, Your Honor, we -- in summary, I think the Court hit it

5    right on the head.  This is -- these are -- at the heart, this

6    complaint is about claims trading.  We complied with Rule

7    3001.  The Court has no role in respect to the claims trading.

8    The fantastical allegations that they've made as it relates to

9    these claims trade don't -- have no impact, frankly, on the

10   fact that the claims were allowed, they were litigated, they

11   were mediated, and they're only entitled -- the Claims

12   Purchasers are only entitled to get whatever the claims are,

13   right?  These claims don't get enlarged.  They're not equity.

14   They're claims.  They're claims that were converted, by the

15   way, into trust interests.  So, you know, as we point out in

16   our response, we think many of the points and relief that

17   Hunter Mountain is requesting just can't even be granted by

18   the Court.  In fact, we can address those on June 8th.

19       At the end of the day, we're here on a discovery motion

20   that has been filed on an emergency basis to seek discovery.

21   And from my clients they're seeking four depositions.  Four --

22   so 16 hours of depositions.  Over 30 topics, with 19 different

23   document requests.  Your Honor, if we're not going to present

24   any evidence and we're not going to put any witnesses on, I

25   would submit that that's totally inappropriate and it flies in

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-560    Filed 09/28/23    Page 154 of 214    PageID 6040

Exhibit 234560    Page 095 of 455

40

1  the face of the whole point of the gatekeeper.  And that's why

2  we would ask that, at least as it relates to the Claims

3  Purchasers, that Hunter Mountain's motion for expedited

4  discovery be denied.

5           THE COURT:  All right.  Mr. McEntire, I'm going to

6  give you the last word.  And let me tell you what I'm inclined

7  to do based on everything I've heard.

8       If someone wants to put on Mr. Seery -- Highland or Mr.

9  Seery's counsel -- I'm going to hear evidence from Mr. Seery

10 on June 8th.  And if you want to withdraw the Dondero

11 affidavit and the Court will redact or have you file a

12 redacted version of your motion for leave that strikes every

13 sentence that refers to the Dondero affidavit, no other

14 changes, just that, you can do that.  Or if you don't do that,

15 then Mr. Dondero, you can put him on if you want, or he has to

16 be available for cross-examination.  Okay?

17      But that would be it.  No Claims Purchaser witnesses.  And

18 I'm not continuing the hearing beyond June 8th.  You can get

19 depos done, if you both want to do depos or one of you wants

20 to do depos, between now and June 8th.  Not on the holidays,

21 by the way.  I'm not going to order anyone to appear sooner

22 than, say, Wednesday of next week.

23      But that's what I'm inclined to do.  And one thing that's

24 rolling around in my brain is I do remember the 202 suits in

25 Texas state court as, starting two years ago, opportunities to

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-60 Exhibit 234560 Filed 09/28/23 Page 2 of 45 Page 155 of 214    PageID 6041

41

1    take discovery.  So I don't know why at this late stage I

2    would allow discovery of the Claims Purchasers, especially

3    when this really looks like it's more about Mr. Seery and Mr.

4    Dondero than them.  And again, the whole policy that the Court

5    really isn't supposed to get in the middle of claims trading.

6        So that is what I'm inclined to do.  Tell me what

7    different view of the world you want me to consider.

8            MR. MCENTIRE:  Well, with all due respect, Your

9    Honor, my view of the world is substantially different.  We

10   would, of course, object if that's your ultimate ruling, for

11   the following reasons.

12       The 202 petitions having nothing to do with colorability.

13   The court, to address the Hunter Mountain 202 pleading or

14   petition, did not specify a reason.  But I would advise the

15   Court, and we -- actually, you could take notice of the record

16   of the proceedings.  They earnestly argued that you, Your

17   Honor, were in the best position to address these issues.  So

18   I think it's highly likely that the judge who addressed the

19   202 petition that Hunter Mountain had filed did so in

20   deference to you.  Not to suggest --

21           THE COURT:  Did it --

22           MR. MCENTIRE:  -- to you how to rule.

23           THE COURT:  Did it happen twice?  Same judge twice,

24   or two different judges?

25           MR. MCENTIRE:  Oh, I'm sorry.  There were two

Case 19-34054-sgj11    Doc 3817-5    Filed 06/05/23    Entered 06/05/23 19:54:44    Desc
Case 3:23-cv-02071-E    Document 23-5  Filed 09/28/23  Page 156 of 214   PageID 6042
Exhibit 2342560  Page 9728 of 455

42

1    different judges, but Hunter Mountain was not involved in the

2    first inquiry at all.  And they argued standing in that issue.

3    And that's a totally different proceeding, totally different

4    issues, totally different evidence got put on before the

5    Court.  And totally -- and Farallon's counsel, who's actually

6    on this website today, earnestly argued that you were in the

7    best position to address these discovery issues.  That's in

8    his briefing and his oral argument.  That's number one.

9        Number two, the Texas State --

10           THE COURT:  Did you ever bring --

11           MR. MCENTIRE:   -- Securities Board --

12           THE COURT:   -- a 2004 exam asking me to?  Because

13   the reason I remember this is because the Claims Purchasers

14   actually removed from state court to this Court the first 202

15   state court action, if that's what you call it, an action,

16   pre-action discovery.  And I remanded it --

17           MR. MCENTIRE:  Pre-suit discovery.  Yes, Your Honor.

18           THE COURT:   I remanded it back, with some angst,

19   because I'm like, okay, well, there's a tool, 2004, and I

20   don't know why we're doing this in state court, but if that's

21   what whoever it was at the time, Hunter Mountain Trust or

22   whoever it was, if that's what they want to do, they can do

23   it.  Okay?

24           MR. MCENTIRE:  Sure.

25           THE COURT:  So when they were unsuccessful --

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 34-5   Filed 09/20/23   Page 157 of 214   PageID 6043
Exhibit 23-560   Page 2 of 455

43

1          MR. MCENTIRE:  So, Hunter Mountain --

2          THE COURT:   -- I don't know why they didn't -- well,

3    anyway, I'm just baffled.

4          MR. MCENTIRE:  Hunter Mountain Investment -- yes, if

5    I could finish my comments, Your Honor.  Hunter Mountain

6    Investment Trust was not involved in that.  Hunter Mountain

7    Investment Trust filed its 202 petition because of timing

8    issues because we were concerned we were going to meet with

9    the same obstructive tactics that we're seeing today in this

10   court, --

11         THE COURT:  Who was involved?

12         MR. MCENTIRE:   -- trying to oppose this.

13         THE COURT:  If it wasn't Hunter Mountain, who was it?

14         MR. MCENTIRE:  It was Jim Dondero.

15         THE COURT:  Okay.

16         MR. MCENTIRE:  Hunter Mountain was only involved in

17   one proceeding, and it was in February and March of this year.

18   And immediately after that resolved, we proceeded to move in

19   this court.  We were concerned about limitations issues with

20   regard to one of the individual claims and one of the causes

21   of action, so we proceeded to file our motion for leave of the

22   gatekeeping order.

23       Our history is very simple.  It's very clear.  It has not

24   been harassing.  And it's very clearly identified as we've

25   only been in two courts on this issue, the 202 petition and

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 234-560   Filed 02/09/23   Page 158 of 214   PageID 6044
Exhibit 34-5   Page 92 of 455

44

1    your court, and that's it.  To suggest that we're harassing is

2    just a distortion.

3        There are some other distortions.  Mr. Morris is

4    absolutely wrong.  We have specific allegations as to

5    excessive compensation in the complaint.  And it's interesting

6    how counsel can make a characterization but omit facts or

7    allegations that are inconsistent with the truth.

8        And so I find it amazing that Paragraph 71 stands out like

9    a sore thumb, where we specifically allege excessive

10   compensation that Mr. Seery garnered from his deal.  That's

11   the second thing.

12       We have a situation where the Claims Purchasers have never

13   clearly denied access to material nonpublic information.  They

14   have never clearly denied that they did no due diligence, yet

15   they obstructed discovery in the 202 petition and now they

16   obstruct discovery here.

17       A Pandora's box has been opened.  To allow Mr. Seery to

18   take the stand and to explain that he didn't do this or didn't

19   do that and allow the other part of the conspirator group, Mr.

20   McIlwain's clients, escape and avoid being tested and

21   challenged in cross-examination is the epitome of a

22   deprivation of due process.  We will be deprived of our due

23   process rights if you singularly let Mr. Seery take the stand

24   and prevent our right to take discovery from the Claims

25   Purchasers.

006551

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 34-5   Filed 12/00/23   Page 159 of 214   PageID 6045
Exhibit 342560   Page 002 of 45

45

1    They do not want to be challenged.  They do not want to

2    open the door as to what happened here.  And they've been

3    trying to prevent that from day one.

4        We don't think that evidence of any type is appropriate.

5    But if you're going to let any evidence in, you cannot let --

6    you can't let part of the toothpaste out without letting it

7    all out.  And so we're entitled to a full-blown discovery and

8    a full-blown evidentiary hearing if in fact you allow any

9    evidence in.

10       We agree with the Claims Purchasers' lawyer that it

11   shouldn't come in generally, and that includes Mr. Seery, and

12   that includes Mr. Dondero, and that includes everything else,

13   except the four corners of our pleading.  And we're prepared

14   to stand on that, subject to the pertinent rules that deal

15   with 12(b)(6) inquiries.

16       Your Honor, what we've done today is we've talked about

17   the merits of our claim before the June 8th hearing.  The only

18   issue before the Court today was a discovery issue, which

19   we've never really addressed, because Mr. Morris and Mr.

20   Seery's counsel are trying to slide over the fact that they

21   have objected to some of our discovery, refusing to produce

22   documents that go to the very core of our claim.  They are

23   seeking to prevent access and Mr. Seery's deposition on

24   communications with the Claims Purchasers dealing with the

25   asset values and projections, distributions from the estate.

006552

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 09/20/23   Page 160 of 214   PageID 6046
Exhibit 2-5   Page 002 of 455

46

1    Well, that's the guts of material nonpublic information.

2        And we -- this case is not limited to MGM as much as Mr.

3    Morris would like to do so.  A fair reading of our complaint

4    in Paragraphs 3, 13, 17, 47, 50, and 51 make it very clear

5    that this is a lot larger than just MGM.

6        And Your Honor, to allow them to put Mr. Seery on the

7    stand without our right to depose him and have documents

8    relating to his communications --

9            THE COURT:  Wait, wait, wait.

10           MR. MCENTIRE:   -- with the Claims Purchasers --

11           THE COURT:  Wait, wait, wait.  Maybe I was not clear.

12   You all can depose -- if Seery is going to testify, you can

13   depose him before June 8th, just not over the holiday weekend.

14   Okay?  And --

15           MR. MCENTIRE:  Yes, I understood that.

16           THE COURT:  And -- and -- and --

17           MR. MCENTIRE:  But they're trying to prevent --

18           THE COURT:  And -- and -- and -- and if you're not

19   going to withdraw the Dondero affidavit and redact the

20   sentences in the motion for leave that mention the Dondero

21   affidavit, okay, so if you're going to rely on Dondero's

22   affidavit or call him at the June 8th hearing, they can depose

23   him.  Again, not over the holiday weekend.

24       But I'm just saying that's as far as I'm going to let the

25   evidence go.  I'm not going to allow depositions of Claims

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 09/29/23   Page 161 of 214   PageID 6047
Exhibit 234-5   Page 22 of 45

47

1  Purchasers unless you somehow show me you've got a colorable

2  claim or claims in your proposed complaint.  Then, if I say

3  yes, then normal discovery rules will apply.  We have very

4  much a cart-before-the-horse situation here.

5           MR. MCENTIRE:  We do.  I agree with that.

6  Completely.  And in fact, what was happening here, Your Honor,

7  with all due respect, is you're just addressing the

8  colorability of my client's claims to determine whether I can

9  conduct discovery, but they want to put discovery on to

10  challenge the colorability of my claims.  Somewhat circular,

11  Your Honor, with all due respect.  And so we're truly being

12  deprived --

13           THE COURT:  Well, again, --

14           MR. MCENTIRE:  -- of our rights.

15           THE COURT:  -- again, I go back to where it all

16  starts, and it starts with your motion attaching a Dondero

17  affidavit.  That's where it all starts.  You could have just

18  filed a motion making legal argument.  And if you just wanted

19  to make your legal argument at the hearing on this, then that

20  would have been fine to the Court.  But once you filed that

21  affidavit, all I can say is everything changed.  I used the

22  genie-in-the-bottle analogy.

23      So I'm giving you every opportunity here to present your

24  colorable claim.  And I have told you that, if it all comes

25  down to legal argument, I'm not sure how you're ever going to

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 02/00/28 of 455   Page 162 of 214   PageID 6048

48

1    convince me.  I'm saying you can --

2              MR. MCENTIRE:  Well, I --

3              THE COURT:  I'm saying you can take back the Dondero

4    affidavit if you want.  I'm saying you can go forward with it

5    if you want, but they can cross-examine him if you do.  But

6    now that the genie is out of the bottle, I can understand the

7    Defendants wanting to put on their own countervailing

8    evidence, because the genie is out of the bottle.  I've

9    already read your motion and I've read the Dondero affidavit.

10   I can't unsee it.  So if --

11             MR. MCENTIRE:  The genie is not out of the -- with

12   all due respect, Your Honor, the genie is not out of the

13   bottle because we have a right to amend or supplement, and

14   that's effectively what we've done here.  And so you do not --

15             THE COURT:  And I want you --

16             MR. MCENTIRE:  -- need to consider the Dondero --

17             THE COURT:  -- to be clear about what I am saying.

18   If you want to take it back, you can.  If you want to refile

19   the motion, merely redacting those sentences that refer to the

20   Dondero affidavit and not filing the Dondero affidavit, I'll

21   let you.  But I'm not going to stop the other side from

22   putting on Mr. Seery out of concern --

23             MR. MCENTIRE:  Right.

24             THE COURT:   -- that I've already read that stuff.

25   Okay?

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 02/00/28   Page 163 of 214   PageID 6049
Exhibit 234560   Filed 02/00/28   Page 163 of 214

49

```
1              MR. MCENTIRE:  All right.

2              THE COURT:  And I don't think they like that, --

3              MR. MCENTIRE:  I understand your ruling.

4              THE COURT:  -- especially.  I don't think they like

5    it, especially.  I think they'd now like probably to cross-

6    examine Mr. Dondero.  But I'm giving --

7              MR. MORRIS:  If I may, Your Honor, just really --

8              THE COURT:  Go ahead.

9              MR. MORRIS:  I'm sorry.  I was just --

10             MR. MCENTIRE:  Your Honor, if I can finish --

11             MR. MORRIS:  (overspoken)

12             MR. MCENTIRE:   -- my presentation.

13             MR. MORRIS:   We have relied --

14             MR. MCENTIRE:  I understand your ruling.

15             MR. MORRIS:  We have relied on the Dondero

16   affidavits.  They were analyzed and reviewed extensively in

17   the opposition.  I think it would be very prejudicial if they

18   were allowed to withdraw them.  But, you know, the Court has

19   to do what the Court thinks is right.

20      But I do want to point out that Mr. McEntire made the

21   point at the status conference that he was considering

22   withdrawing the affidavits.  He didn't do so.  We did an

23   extensive analysis of those affidavits.  We relied on them.

24   And only in reply did they say, oh, we're withdrawing them.  I

25   just don't think that's proper.
```

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-560 Filed 02/00/528 f 455age 164 of 214   PageID 6050

50

```
1                THE COURT:  Okay.

2                MR. MCENTIRE:  Your Honor, I have a few more comments

3    to clarify your ruling, please.

4                THE COURT:  Okay.  Go ahead.

5                MR. MCENTIRE:  Number one, we have withdrawn the

6    affidavit, number one.

7                THE COURT:  You -- it is still --

8                MR. MCENTIRE:  We reserve the right, if you --

9                THE COURT:  When did you withdraw it?  Because I just

10   looked at the docket.  It's not withdrawn.

11               MR. MCENTIRE:  I did it at the status conference.

12   And if there's any ambiguity or concern or confusion about

13   that, --

14               THE COURT:  It is on the docket.

15               MR. MCENTIRE:  -- I clearly did it --

16               THE COURT:  It has been publicly available for weeks

17   now.

18               MR. MCENTIRE:  It was formally done in our reply on

19   May 18, and so there can be no ambiguity.  If you'd like for

20   me to withdraw it from the public record, I'll be glad to do

21   so.

22               THE COURT:  Okay.

23               MR. MCENTIRE:  I didn't know that was an additional

24   issue.

25               THE COURT:  I mean, here -- I gave you this emergency
```

006557

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-50   Exhibit 234560 Filed 02/00/28 of 455ge 165 of 214   PageID 6051

51

1   hearing.  You asked for 45 minutes.  I actually have a

2   conference call at 11:00 o'clock.

3       Here's what I'm going to do.  We'll have yet another order

4   regarding what kind of hearing we're going to have on June

5   8th, and it will clarify that Mr. Seery can testify and Mr.

6   Dondero can testify, and both of them shall be made available

7   for depositions before June 8th but not sooner than next

8   Wednesday.  And that is the evidence that the Court will

9   consider.  No other deposi...

10         MR. MCENTIRE:  Your Honor, we --

11         THE COURT:  No other -- I'm still talking.  No other

12   depositions will happen between now and June 8th.  You can

13   make your legal arguments, you can put on your witnesses, and

14   the Court is going to rule.  Okay?

15         MR. MCENTIRE:  I understand your ruling.  There's one

16   additional clarification, Your Honor.

17         THE COURT:  Okay.

18         MR. MCENTIRE:  We would like for the documents to be

19   produced that we've requested from Mr. Seery.  They're

20   important to allow us to conduct his deposition.  And we

21   specifically would like the objections to the production of

22   documents to be overruled.

23       If the Court wants to take that under advisement because

24   of the shortness of this hearing today, that's fine, but it's

25   very important that we have access to information relating to

Case 19-34054-sgj11   Doc 3817-5   Filed 06/05/23   Entered 06/05/23 19:54:44   Desc
Case 3:23-cv-02071-E   Document 23-560   Filed 02/00/28 of 455   Page 166 of 214   PageID 6052

52

1  the value of the estate, communications with the Claims

2  Purchasers about the value of the estate, projected

3  distributions.  And specifically, I'll provide the reference,

4  we have allegations in Paragraphs 24, 59, and 99 that relate

5  to this, as well as all the communications regarding insider

6  trading that would be -- that would support the relevance.

7  It's Request for Production Number 1-H through J.

8           THE COURT:  Okay.  Let me stop you.

9           MR. MCENTIRE:  And it's Request for Production --

10          THE COURT:  I'm denying that request.  Okay.  And I'm

11  going to go back to the cart-before-the-horse analogy.  You

12  know something, you have something that makes you think you

13  have colorable claims.  Okay?  You can put on your witness and

14  try to convince me.  You can cross-examine Mr. Seery and try

15  to convince me.  Okay?  But if you convince me, then there'll

16  be a normal lawsuit and discovery.  But at this point, I think

17  it's a very improper request.  Okay?  So that's the --

18          MR. MCENTIRE:  Please note for the record, Your

19  Honor, that we're being denied the opportunity to depose Mr.

20  Seery fully and completely without the production of these

21  documents.  We understand your ruling, however.  Please note

22  our objection.

23          THE COURT:  All right.  I will see you on June 8th.

24  We're adjourned.

25          MR. MCENTIRE:  Thank you, Your Honor.

53

1              THE CLERK:  All rise.

2         (Proceedings concluded at 10:55 a.m.)

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23    **/s/ Kathy Rehling**                           **05/27/2023**

24 _____    _____
   Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

006560

54

                                  INDEX

PROCEEDINGS                                                      3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                         50

     Motion for Expedited Hearing filed by Interested Party
     Hunter Mountain Trust (3789)

     Motion to Continue Hearing filed by Interested Party
     Hunter Mountain Trust (3791)

     Motion to Shorten Time - Expedited Discovery filed by
     Interested Party Hunter Mountain Trust (3788)

END OF PROCEEDINGS                                              53

INDEX                                                           54

# EXHIBIT 57

006562



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 22, 2023**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------

In re:                                          §
                                                §   Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P.,              §
                                                §   Case No. 19-34054-sgj11
                        Reorganized Debtor.      §
                                                §
                                                §

------------------------------------------------

### ORDER PERTAINING TO THE HEARING ON HUNTER MOUNTAIN INVESTMENT
### TRUST'S MOTION FOR LEAVE TO FILE ADVERSARY PROCEEDING

### [DE ## 3699 & 3760]

Based on the court's review of all of the parties' pleadings and briefing relating to the

above-referenced motion and supplemental motion ("Motion for Leave"), the court has determined

that there may be mixed questions of fact and law implicated by the Motion for Leave—and, in

particular, pertaining to the court's required inquiry into whether "colorable" claims may exist, as

described in the Motion for Leave.  Therefore, the parties will be permitted to present evidence

(including witness testimony) at the June 8, 2023 hearing if they so choose.  This may include

1

006563

examining any witness for whom a Declaration or Affidavit has already been filed.  The parties

will be allowed no more than three hours of presentation time each (allocated three hours to the

movant and three hours to the aggregate respondents).  This allocated presentation time may be

spent in whatever manner the parties believe will be useful to the court (argument/evidence).

### # # # END OF ORDER # # #

006564

# EXHIBIT 58



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 26, 2023**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §   Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §   Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## ORDER REGARDING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY OR, ALTERNATIVELY, FOR CONTINUANCE OF THE JUNE 8, 2023 HEARING

### [Dkt. Nos. 3788 and 3791]

Having considered the *Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing* of Hunter Mountain Investment Trust ("HMIT") filed on May 24, 2023, at Dkt. No. 3788 ("Motion for Expedited Discovery"), and, separately, on May 25, 2023, at Dkt. No. 3791 ("Motion for Continuance," and, together with the Motion for Expedited Discovery, the "Motions"), and the arguments of counsel at the emergency hearing on the Motions held on Friday May 26, 2023, at 9:30 a.m.,

1

006566

IT IS ORDERED that the Motion for Continuance be, and hereby is, **DENIED**;

IT IS FURTHER ORDERED that the Motion for Expedited Discovery be, and hereby is, **GRANTED**, in part and only to the extent as set forth below:

(1) To the extent any party would like to depose either James P. Seery, Jr. or James Dondero in advance of the June 8 hearing ("June 8 Hearing") on HMIT's *Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. No. 3699] and *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* [Dkt. 3760] (together, the "Motion for Leave"), Mr. Seery and Mr. Dondero shall be made available for depositions ("Depositions") on a date and at a time agreeable to the parties that is no earlier than May 31, 2023, and no later than June 7, 2023, and no discovery or depositions of any other party or witness will be permitted prior to the June 8 hearing; and

(2) None of the parties shall be entitled to any other discovery, including the production of documents from Mr. Seery or Mr. Dondero, or any other party or witness pursuant to a subpoena *duces tecum*, or otherwise, prior to the conduct of the Depositions or to the court's ruling on the Motion for Leave following the June 8, 2023 hearing;

IT IS FURTHER ORDERED that, except as specifically set forth in this Order, HMIT's Motion for Expedited Discovery be, and hereby is, **DENIED**.

# # # END OF ORDER # # #

006567

# EXHIBIT 59

006568

**From:** James Seery <jpseeryjr@gmail.com>
**Date:** November 3, 2021 at 11:15:09 PM EDT
**To:** Rich Katz <rich.katz@torquepointllc.com>, Michael Linn <MLinn@faralloncapital.com>, Chris Provost <cprovost@galvancap.com>
**Cc:** Sophia Jia <SJia@faralloncapital.com>, Michael Stern <MStern@stonehillcap.com>
**Subject: Re: As Previously Discussed**

Oversight Board;

I reduced my response to actual members of the board or those who appointed members.

My responses to Rich's framework queries are highlighted below. I would like to find a time on Friday or Monday or Tuesday to have a call with whomever will lead the negotiations to finalize the ICP. My suggestion is that we get the smaller group together to hash out the terms of the ICP and then bring it to the full board.

I am wide open on Friday and in Dallas on M-T-W of next week.

Please let me know who (or all) is on point and what times Friday or M-T-W work.

Thanks.

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com


**From:** Rich Katz <rich.katz@torquepointllc.com>
**Date:** Tuesday, October 26, 2021 at 3:54 PM
**To:** James Seery <jpseeryjr@gmail.com>, Michael Linn <MLinn@FarallonCapital.com>, Chris Provost <cprovost@galvancap.com>
**Cc:** Sophia Jia <SJia@faralloncapital.com>, Michael Stern <mstern@stonehillcap.com>, Lantz, John <john.lantz@ubs.com>, elizabeth.kozlowski@ubs.com <elizabeth.kozlowski@ubs.com>
**Subject:** RE: As Previously Discussed

Hi Jim,

The board discussed your counterproposal and is looking forward to working through the various open items so we can finalize an ICP for you and the troops. Can we put a call on the calendar in the next few days to do that?

We propose doing this in two stages. First, we'd like to come to agreement on <u>structural</u> elements of the ICP. Only after we'd done that – when the board had greater understanding of what plan they were

006569

pricing – would we together haggle out the specific <u>numbers</u> (tier attachment points and % participation in each tier).

So, the first call would only be about structure, not the actual numbers. Does that make sense to you?

Here are some topics we'd like to talk thru in that first stage:

1.  <u>Salary (JS only)</u>. Our proposal contemplated salary reductions for you as the workload of the case diminishes. Your counterproposal seemed to rule that out. We'll need to come to a landing spot on that. We aren't proposing to define a specific schedule of salary reductions (as that would depend on facts on the ground none of us can predict now) but rather having a common perspective on what might happen in the future. These liquidations can go on for an extremely long time, though with declining time commitments, and it would not make sense for the company to be committed to a constant salary level in light of meaningful reductions in the work the job requires of you. This relates, in a way, to your request for severance.

    ==Based on the required expertise, volume and personal risk of the work today, I do not think that any formulaic reduction in base comp is appropriate. With the complexity and amount of issues that I have to manage on a daily basis, I currently do not have capacity to take on significant outside work. Of course, things can change. If they do, I am open to discussing a reduction in the base. I have no interest in sitting around, doing nothing, having no risk and collecting the full base compensation. We can include precatory language and an agreement to revisit our terms, but I do not see an avenue to set parameters to lock in an agreement for the future at this time.==

    ==As to severance, I propose and expect that the ICP will be locked in at agreement. If I am severed without cause, I should receive a cash payment of $1 million. (2/3 of 1 year base) and keep my ICP.==

2.  <u>Time value (JS & staff)</u>. The board's proposal applied an 8% discount rate to creditor distributions, anchoring to 12/31/22 payouts, such that distributions before (after) that date would earn greater (lesser) ICP credit. We didn't see anything of this nature in your counterproposal. There are different ways to formulaically deal with this, but we think the ICP should in some way give effect to the creditors' own return criteria, recognizing the impact if it took a couple extra years to get the distributions out.

    ==I believe the base return in the model is a fair hurdle. Return hurdles hit after 12/31/22 should increase by 8% per annum.==

3.  <u>Discretionary component (JS)</u>. Our proposal had contemplated that one-third of what would otherwise be payable to you be subject to the overlay of other criteria that the board and you would discuss from time to time (cost control, etc.). This doesn't seem to have been part of your counter. Particularly given the extreme deference that the Plan & CTA give you in terms of managing the estate, the board would like the ability to relate at least some part of your compensation to factors that aren't exactly distribution-related.

    ==I disagree. This work is based on returns. There are no soft standards to judge performance.==

4.  <u>Discretionary component (staff)</u>



5. <u>Timing of ICP payouts (JS & staff)</u>.  We would like to make sure we're all thinking the same way about how the ICP is paid out – we may already be, but just to confirm.  Our thought is that, as a general matter, nobody's ICP is paid to them until "the lights are turned off".  This means that as distributions are made, the corresponding ICP entitlements get paid into an account for the benefit of you and the staff, with no part of this sum being distributed until all aspects of HCM's wind-down are complete.

We see two potential exceptions to this general rule: first, we could disburse _____ early, and second, _____ . As you can appreciate, there are many variables that we will all need to incorporate and react to as time evolves and our sense is that together we can modify as needed in the future when complexities arise on an individual basis.

6. <u>Allocation of pool (staff only)</u>.



Anyway, that is all just for your consideration before a group call – let us know what might work for you?  Thanks in advance for spending so much time on this with us, getting the right structure agreed to upfront will make for a better functioning situation going forward so we can purely focus on maximizing the value.

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Wednesday, October 13, 2021 12:49 PM
**To:** Michael Linn <MLinn@FarallonCapital.com>; Chris Provost <cprovost@galvancap.com>; Rich Katz <rich.katz@torquepointllc.com>

**Cc:** Sophia Jia <SJia@faralloncapital.com>; Michael Stern <mstern@stonehillcap.com>
**Subject:** Re: As Previously Discussed

As requested.  I noticed an error in H, I, J and K24 which has been fixed.  Thanks

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** Michael Linn <MLinn@FarallonCapital.com>
**Date:** Tuesday, October 12, 2021 at 12:56 PM
**To:** 'James Seery' <jpseeryjr@gmail.com>, Chris Provost <cprovost@galvancap.com>, Richard Katz <rich.katz@torquepointllc.com>
**Cc:** Sophia Jia <SJia@faralloncapital.com>, Michael Stern <mstern@stonehillcap.com>
**Subject:** RE: As Previously Discussed

Hi Jim
Thanks for sending this over.  Would you mind sharing the excel for the ICP Application pdf just so we can make sure we are doing the math right and speaking the same language?
Michael

**Michael Linn**
Farallon Capital Management, L.L.C.
One Maritime Plaza, Suite 2100
San Francisco, CA 94111
Tel: +1 415 421 2132
mlinn@faralloncapital.com
www.faralloncapital.com



**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Saturday, October 09, 2021 1:49 PM
**To:** Michael Linn <MLinn@FarallonCapital.com>; Chris Provost <cprovost@galvancap.com>; Richard Katz <rich.katz@torquepointllc.com>
**Cc:** Sophia Jia <SJia@faralloncapital.com>; Michael Stern <mstern@stonehillcap.com>
**Subject:** As Previously Discussed

**EXTERNAL EMAIL**

Oversight Board:

As previously discussed, attached is a revised ICP proposal responding to your counter last month.  I will walk you through this proposal at your earliest.  I've included a summary memo, a PDF of a comparison model, and the Oversight Board proposal.  Thanks

006572

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

006573

# EXHIBIT 60

006574

# Highland CLO Funding, Ltd.

## ANNUAL REPORT AND AUDITED FINANCIAL STATEMENTS

FOR THE FINANCIAL YEAR ENDED 31 December 2020

Registration No. 60120

006575

**Highland CLO Funding, Ltd.**

**Contents**                                              **Page**

Management and Administration                              2
Directors' Report                                         3
Independent Auditor's Report                              7
Statement of Assets and Liabilities                       10
Condensed Schedule of Investments                         11
Statement of Operations                                   12
Statement of Changes in Net Assets                        13
Statement of Cash Flows                                    14
Financial Highlights                                      15
Notes to the Financial Statements                         16
Notice of Annual General Meeting                          30
Form of Proxy                                             31

006576

Highland CLO Funding, Ltd.

## Management and Administration

**Directors**
Richard Boleat (Chairman) – *appointed 7 July 2020*
Richard Burwood – *appointed 7 July 2020*

*Both Directors are independent non-executive directors.*

*William Scott and Heather Bestwick served as Directors during the year ended 31 December 2020 and resigned as Directors on 7 July 2020.*

**Registered Office**
1st Floor
Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JV
Channel Islands

**Portfolio Manager**
Highland HCF Advisor Ltd.
300 Crescent Court
Suite 700
Dallas
Texas 75201
United States

*Portfolio Manager' registered office*:
PO Box 10008, Willow House, Cricket Square,
Grand Cayman KY1-1001, Cayman Islands

**Auditor**
Grant Thornton Limited
PO Box 313
Lefebvre House
Lefebvre Street
St Peter Port
Guernsey
GY1 3TF

**Sub-Adviser**
Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas
Texas 75201
United States

**Administrator & Company Secretary**
Elysium Fund Management Limited
PO Box 650, 1st Floor
Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

**Legal Advisers to the Company**
*(as to US Law)*
King & Spalding LLP
PO Box 116133
Atlanta
GA, 30368-6133
United States

*(as to Guernsey Law)*
Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
Guernsey, GY1 4BZ
Channel Islands

**Custodian**
Liberum Wealth Limited
PO Box 650, 1st Floor
Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

006577

**Highland CLO Funding, Ltd.**
**Directors' Report**

The Directors present their Annual Report and the audited financial statements of Highland CLO Funding, Ltd. (the "Company") for the financial year ended 31 December 2020.

**General information**
The Company was incorporated in Guernsey on 30 March 2015 under The Companies (Guernsey) Law, 2008 (the "Companies Law") with registration number 60120, and is registered as a closed-ended investment scheme, regulated under The Protection of Investors (Bailiwick of Guernsey) Law, 1987 (the "POI Law"). The Company commenced operations on 10 August 2015.

**Principal activities**
The Company's investment objective is to provide shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and CLO notes, on both a direct and indirect basis.

**Results and dividends**
The results for the financial year are set out in the Statement of Operations. The Company declared and paid no dividends during 2020 (2019: nil).

**Significant events during the financial year**
See Note 9 of the audited financial statements for details of significant events affecting the Company's financial statements during the year.

**Significant events since the financial year end**
See Note 11 of the audited financial statements for details of significant events affecting the Company since the year end.

**Going Concern**
The Directors believe it is appropriate to adopt the going concern basis in preparing the financial statements as, after due consideration, the Directors consider that the Company has adequate resources to continue in operational existence for the foreseeable future (see Note 12).

**Directors and Directors' Interests**
The Directors of the Company, who held office during the financial year, were:
- Richard Boleat *(appointed 7 July 2020)*
- Richard Burwood *(appointed 7 July 2020)*
- Heather Bestwick *(resigned 7 July 2020)*
- William Scott *(resigned 7 July 2020)*

The Directors and their families had no beneficial interests in the share capital of the Company at 31 December 2020. The Company has no employees and its Directors have been appointed on a non-executive basis.

**Issued Share Capital**
See Note 5 for details of the issued Ordinary Shares.

As at 31 December 2020, the Company had one class of share in issue.

**Directors' and Officers' Liability Insurance**
The Company maintains insurance in respect of Directors' and officers' liability in relation to their acts on behalf of the Company.

006578

Highland CLO Funding, Ltd.

**Directors' Report** *(continued)*

### Directors' responsibilities

As there are no employees of the Company, the Board performs certain management functions, which include the overseeing of the Company's investment policy and investment strategy, the supervision of any delegated responsibilities to third-party service providers and any necessary investment management functions, and will have the ultimate responsibility for the management and operations of the Company.

The Directors are responsible for preparing the Annual Report and the financial statements for each financial year which give a true and fair view, in accordance with Guernsey Law and Accounting Principles Generally Accepted in the United States of America ("U.S. GAAP"), of the state of affairs of the Company and of the profit or loss of the Company for that year. In preparing those financial statements the Directors are required to:

- Select suitable accounting policies and then apply them consistently;
- Make judgments and estimates that are reasonable and prudent;
- State whether applicable accounting standards have been followed; and
- Prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Company will continue in business.

The Directors confirm that they have complied with the above requirements in preparing the financial statements.

The Directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the Company and which enable them to ensure that the financial statements comply with the Companies Law. They are also responsible for safeguarding the assets of the Company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

### Disclosure of information to Auditor

So far as each of the Directors is aware, there is no relevant audit information of which the Company's Auditor is unaware, and each Director has taken all the steps they ought to have taken as a Director to make themselves aware of any relevant audit information and to establish that the Company's Auditor is aware of that information.

### Corporate Governance

The Directors are committed to maintaining high standards of corporate governance. Insofar as the Directors believe it to be appropriate and relevant to the Company, it is their intention that the Company should comply with best practice standards for the business carried on by the Company.

The GFSC Finance Sector Code of Corporate Governance (the "Code") provides a framework that applies to all entities licensed by the GFSC or which are registered or authorised as a collective investment scheme. The Code was issued on 30 September 2011 and came into effect on 1 January 2012. The Company currently complies with, and will continue to comply with, the GFSC Code.

As an investment company, all the Directors are non-executive and the Company has no employees.

### Audit Committee

The Company has established an Audit Committee, which comprises both Directors. The Company's Audit Committee meets formally at least once a year for the purpose, amongst other things, of considering the appointment, independence and remuneration of the Auditor and to review the Company's annual financial reports. Where audit-related and/or non-audit services are to be provided by the Auditor, full consideration of the financial and other implications on the independence of the Auditor arising from any such engagement will be considered before proceeding. Richard Burwood acts as chairman of the Audit Committee. Prior to Richard Burwood's and Richard Boleat's appointments on 7 July 2020, William Scott and Heather Bestwick were members of the Audit Committee, and Heather Bestwick was chairman of the Audit Committee.

006579

**Highland CLO Funding, Ltd.**

**Directors' Report** *(continued)*

### Audit Committee *(continued)*

The responsibilities of the Audit Committee include monitoring the integrity of the Company's results and financial statements, reviewing reports received from the Administrator on the adequacy and the effectiveness of the Company's internal controls and risk management systems and assessing the ongoing suitability of the Auditor and ensuring their coordination with any internal audit function.

The chairmanship of the Audit Committee and each Director's performance is reviewed annually by the Chairman and the performance of the Chairman is assessed by the other Director.

### Remuneration and Nomination Committee

Given the size of the Board, the Directors have deemed that such a committee is unnecessary and the full Board will fulfil this role.

### Directors' Remuneration

Each of the Directors has signed a letter of appointment with the Company setting out the terms of their appointment, which are available for inspection at the Company's registered office. The level of Directors' fees payable in respect of 2020 is set out in Note 8 to these financial statements.

### Portfolio Manager

Highland HCF Advisor Ltd. ("HCF") acts as Portfolio Manager to the Company (pursuant to the Portfolio Management Agreement) and may act (either itself or through an affiliate) as the CLO Manager to HCF CLOs. Pursuant to the Portfolio Management Agreement, the Portfolio Manager is responsible for rendering discretionary investment advice to the Company and for ensuring the Company has the required personnel and credit research available to it to make necessary business decisions and carry on the day-to-day management of the Company's business and to implement its investment objective and policy.

In addition, HCF (or one of its affiliates) may also manage HCF CLOs pursuant to management agreements to be entered into from time to time.

### Administrator

Elysium Fund Management Limited has been appointed as Administrator of the Company with effect from 8 November 2019 pursuant to the Administration Agreement. In such capacity, the Administrator is responsible for the day-to-day administration of the Company (including but not limited to the calculation and publication of the estimated monthly Net Asset Value ("NAV")) and general secretarial functions required by the Companies Law (including but not limited to the maintenance of the Company's accounting and statutory records).

The Administrator is licensed under the POI Law with the GFSC to carry out controlled investment business.

Elysium Fund Management Limited, as Administrator, is responsible for maintaining the Company's share register.

### Custodian

Liberum Wealth Limited has been appointed as Custodian to the Company pursuant to the Custody Agreement with effect from 31 December 2019. In acting as Custodian of the Company's investments, the Custodian provides for the safekeeping of certificates of deposits, shares, notes and in general any instruments evidencing the ownership of securities and may take custody of cash and other assets. Assets are held in a custody account and registered in the name of the Company or the Custodian, its delegate or a nominee.

### Litigation

During the course of 2020, the Company continued to be involved in substantial litigation in the United States of America arising out of an employment dispute between the former Portfolio Manager and a former employee/partner thereof, further detail is provided in Note 9.

006580

**Highland CLO Funding, Ltd.**
**Directors' Report** *(continued)*

**Annual General Meeting**
Details of the resolutions to be proposed at the Annual General Meeting ("AGM"), together with explanations, will appear in the Notice of Meeting to be distributed to shareholders together with a copy of this Annual Report.

Members of the Board will be in attendance at the AGM and will be available to answer shareholder questions.

**Independent Auditor**
During the year, as a result of the Board's decision, Grant Thornton Limited was appointed as the Company's auditor and has indicated its willingness to act from 16 December 2020.

On behalf of the Board:

Richard Boleat
Director
21 April 2021

Richard Burwood
Director
21 April 2021

006581

**Independent Auditor's Report**

**To the shareholders of Highland CLO Funding, Ltd.**

**Opinion**

We have audited the financial statements of Highland CLO Funding, Ltd. (the 'Company') for the year ended 31 December 2020 which comprise the Statement of Assets and Liabilities, the Condensed Schedule of Investments, the Statement of Operations, the Statement of Changes in Net Assets, the Statement of Cash Flows and notes to the financial statements, including a summary of significant accounting policies. The financial reporting framework that has been applied in their preparation is applicable law and accounting principles generally accepted in the United States of America ("US GAAP").

In our opinion, the financial statements:

- give a true and fair view of the state of the Company's affairs as at 31 December 2020 and of its loss for the year then ended;
- have been properly prepared in accordance with US GAAP; and
- comply with the requirements of The Companies (Guernsey) Law, 2008.

**Basis for opinion**

We conducted our audit in accordance with International Standards on Auditing (ISAs) and applicable law. Our responsibilities under those standards are further described in the 'Auditor's responsibilities for the audit of the financial statements' section of our report. We are independent of the Company in accordance with the ethical requirements that are relevant to our audit of the financial statements in Guernsey, including the International Code of Ethics for Professional Accountants (including International Independence Standards) issued by the International Ethics Standards Board for Accountants, and we have fulfilled our other ethical responsibilities in accordance with these requirements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

**Other matter**

The financial statements of the Company for the year ended 31 December 2019 were audited by another auditor who expressed an unmodified opinion with emphasis of matter on going concern on those statements on 30 June 2020.

*Emphasis of matter*

We draw attention to Note 9 to the financial statements which describes the status and uncertainty related to the outcome of the litigation matters involving the Company and its related parties. Our opinion is not qualified in respect of this matter.

**Other information**

The Directors are responsible for the other information. The other information comprises the information included in the annual report, other than the financial statements and our auditor's report thereon. Our opinion on the financial statements does not cover the other information and, except to the extent otherwise explicitly stated in our report, we do not express any form of assurance conclusion thereon.

In connection with our audit of the financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. If we identify such material inconsistencies or apparent material misstatements, we are required to determine whether there is a material misstatement in the financial statements or a material misstatement of the other information. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact.

We have nothing to report in this regard.

006582

**Independent Auditor's Report**
**To the Shareholders of Highland CLO Funding, Ltd.** *(continued)*

**Matters on which we are required to report by exception**

We have nothing to report in respect of the following matters in relation to which The Companies (Guernsey) Law, 2008, requires us to report to you if, in our opinion:

- proper accounting records have not been kept by the Company; or
- the financial statements are not in agreement with the accounting records; or
- any report of the directors is inconsistent with the financial statements; or
- we have not obtained all the information and explanations, which to the best of our knowledge and belief, are necessary for the purposes of our audit.

**Responsibilities of the directors for the financial statements**

As explained more fully in the Directors' responsibilities set out on page 4, the Directors are responsible for the preparation of the financial statements which give a true and fair view in accordance with US GAAP, and for such internal control as the Directors determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the Directors are responsible for assessing the Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Directors either intend to liquidate the Company or to cease operations, or has no realistic alternative but to do so.

**Auditor's responsibilities for the audit of the financial statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control.
- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.
- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Company's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Company to cease to continue as a going concern.
- Evaluate the overall presentation, structure and content of the financial statements, including the disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

006583

**Independent Auditor's Report**
**To the Shareholders of Highland CLO Funding, Ltd.** *(continued)*

**Auditor's responsibilities for the audit of the financial statements** *(continued)*
We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

**Use of our report**
This report is made solely to the Company's shareholders, as a body, in accordance with Section 262 of The Companies (Guernsey) Law, 2008. Our audit work has been undertaken so that we might state to the Company's shareholders those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's shareholders as a body, for our audit work, for this report, or for the opinions we have formed.

Grant Thornton Limited
Chartered Accountants
St Peter Port, Guernsey
21 April 2021

006584

Highland CLO Funding, Ltd.
**Statement of Assets and Liabilities**
**as at 31 December 2020**

| | Notes | As at 31 December 2020 US$ |
|---|---|---|
| **Assets** | | |
| Investments in securities at fair value (cost $191,865,611) | 4 | 55,346,738 |
| Cash and cash equivalents | 2k | 5,249,171 |
| Cash collateral deposit | 2h | 1,453,115 |
| Other assets | | 1,179,441 |
| | | ------------------ |
| **Total assets** | | **63,228,465** |
| | | ------------------ |
| **Liabilities** | | |
| Loans and credit facilities | 2h | (11,449,923) |
| Other payables and accrued expenses | | (1,323,287) |
| | | ------------------ |
| **Total liabilities** | | **(12,773,210)** |
| | | ------------------ |
| **Net assets** | | **50,455,255** |
| | | ------------------ |
| **Net assets** | | |
| Share capital | 5 | 146,609,566 |
| Retained earnings | | (96,154,311) |
| | | ------------------ |
| **Total net assets** | | **50,455,255** |
| | | ------------------ |

The notes on pages 16 to 29 form an integral part of these financial statements.

The financial statements on pages 10 to 29 were approved by the Board of Directors on 21 April 2021 and signed by

Richard Boleat
Director
21 April 2021

Richard Burwood
Director
21 April 2021

**Highland CLO Funding, Ltd.**
**Condensed Schedule of Investments**
**as at 31 December 2020**

| Description | Nominal holdings | Cost US$ | Fair value US$ | % of net assets |
|---|---|---|---|---|
| **Investments in CLOs** | | | | |
| **Cayman Islands** | | | | |
| **Industry: Financial** | | | | |
| ACIS CLO 2014-5 Ltd | 53,000,000 | 42,400,000 | 9,805,000 | 19.43 |
| ACIS CLO 2015-6 Ltd | 51,850,000 | 33,261,875 | 8,468,661 | 16.78 |
| Greenbriar CLO Ltd | 18,000 | 8,100,000 | 7,349,940 | 14.57 |
| Brentwood CLO Ltd | 12,000 | 4,500,000 | 6,000,000 | 11.89 |
| ACIS CLO 2014-4 Ltd | 50,750,000 | 39,585,000 | 5,159,600 | 10.23 |
| Grayson CLO Ltd | 5,900 | 1,958,250 | 2,109,250 | 4.18 |
| Rockwall CDO Ltd | 14,000,000 | 830,486 | 1,607,900 | 3.19 |
| Liberty CLO Ltd | 17,000 | 3,405,832 | 3,922,750 | 7.77 |
| ACIS CLO 2014-3 Ltd | 39,750,000 | 28,620,000 | 861,263 | 1.71 |
| Gleneagles CLO Ltd | 1,250 | 293,767 | 348,625 | 0.69 |
| ACIS CLO 2013-1 Ltd | 18,558,000 | 10,916,137 | - | - |
| Other | 1,096,200 | 26,999 | 122,336 | 0.24 |
| **Total Cayman Islands (cost: $173,898,346)** | | 173,898,346 | 45,755,325 | 90.68 |
| **Total investments in CLOs (cost: $173,898,346)** | | 173,898,346 | 45,755,325 | 90.68 |
| **Investments in LLC interests** | | | | |
| **United States** | | | | |
| **Industry: Energy – Oil and Gas** | | | | |
| Fieldwood Energy LLC | 118,614 | 2,767,265 | - | - |
| **Total United States (cost: $2,767,265)** | | 2,767,265 | - | - |
| **Total investments in LLC Interests (cost: $2,767,265)** | | 2,767,265 | - | - |
| **Investments in Limited Partnerships** | | | | |
| **Cayman Islands** | | | | |
| **Industry: Financial** | | | | |
| ACIS CLO Management Holdings, LP | 15,200,000 | 15,200,000 | 9,591,413 | 19.01 |
| **Total Cayman Islands (cost: $15,200,000)** | | 15,200,000 | 9,591,413 | 19.01 |
| **Total investments in Limited Partnerships (cost: $15,200,000)** | | 15,200,000 | 9,591,413 | 19.01 |
| **Total investments in securities (cost: $191,865,611)** | | 191,865,611 | 55,346,738 | 109.69 |

The notes on pages 16 to 29 for an integral part of these financial statements.

Highland CLO Funding, Ltd.
**Statement of Operations**
for the financial year ended 31 December 2020

| | Notes | For the year ended 31 December 2020 US$ |
|---|---|---|
| **Investment income and expenses** | | |
| **Income** | | |
| Dividends | | 2,877,999 |
| Bank interest | | 55 |
| | | ------------------ |
| **Total investment income** | | **2,878,054** |
| | | ------------------ |
| | | |
| **Expenses** | | |
| Legal and professional fees | | (2,136,315) |
| Interest expense | 2h | (666,573) |
| Directors' fees | 8 | (372,309) |
| Administration fees | 6 | (252,994) |
| Audit fees | | (108,027) |
| Other | | (33,812) |
| | | ------------------ |
| **Total expenses** | | **(3,570,030)** |
| | | ------------------ |
| | | |
| **Net investment loss** | | **(691,976)** |
| | | ------------------ |
| | | |
| **Net realised and unrealised gain/(loss) on investments** | | |
| Net realised gain on investments | 4 | 45,593 |
| Net change in unrealised loss on investments | 4 | (34,634,800) |
| | | ------------------ |
| **Net realised and unrealised loss on investments** | | **(34,589,207)** |
| | | ------------------ |
| | | |
| **Net foreign exchange gain** | | **282** |
| | | ------------------ |
| | | |
| **Net decrease in net assets resulting from operations** | | **(35,280,901)** |
| | | ------------------ |

The above results are derived from continuing operations.

The notes on pages 16 to 29 form an integral part of these financial statements.

006587

**Highland CLO Funding, Ltd.**
**Statement of Changes in Net Assets**
**for the financial year ended 31 December 2020**

| | Share capital US$ | Retained earnings US$ | Total net assets US$ |
|---|---|---|---|
| Net assets at 31 December 2019 | 146,609,566 | (60,873,410) | 85,736,156 |
| **Operating transactions** | | | |
| Net decrease in net assets resulting from operations | - | (35,280,901) | (35,280,901) |
| Net assets at 31 December 2020 | 146,609,566 | (96,154,311) | 50,455,255 |

The notes on pages 16 to 29 form an integral part of these financial statements.

006588

**Highland CLO Funding, Ltd.**
**Statement of Cash Flows**
**for the financial year ended 31 December 2020**

| | Notes | For the year ended 31 December 2020 US$ |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net decrease in net assets resulting from operations | | (35,280,901) |
| | | |
| *Adjustments to reconcile net decrease in net assets from operations to net cash used in operating activities* | | |
| Proceeds from disposal of securities | 4 | 303,951 |
| Net realised gain on investments | 4 | (45,593) |
| Net change in unrealised loss on investments | 4 | 34,634,800 |
| | | |
| *Net changes in operating assets and liabilities* | | |
| Change in other assets | | (799,223) |
| Change in accrued expenses | | (20,503) |
| | | ------------------ |
| **Net cash used in operating activities** | | **(1,207,469)** |
| | | ------------------ |
| | | |
| **Cash flows from financing activities** | | |
| Loan payments | 2h | (3,967,380) |
| | | ------------------ |
| **Net cash used in financing activities** | | **(3,967,380)** |
| | | ------------------ |
| | | |
| **Net change in cash and cash equivalents** | | |
| | | |
| Cash and cash equivalents at beginning of year | | 11,877,135 |
| | | ------------------ |
| **Cash and cash equivalents at end of year** | 2k | **6,702,286** |
| | | ------------------ |
| | | |
| **Supplemental disclosure of cash flow information** | | |
| Interest paid | | 683,612 |

The notes on pages 16 to 29 form an integral part of these financial statements.

006589

**Highland CLO Funding, Ltd.**
**Financial highlights**

Financial highlights for the financial year ended 31 December 2020 for Highland CLO Funding, Ltd. are as follows:

|  | Ordinary shares 31 December 2020 | Ordinary shares 31 December 2019 |
|---|---|---|
| Internal rate of return (cumulative) [1] | (15.5)% | (8.3)% |
|  |  |  |
| **Ratio to average shareholder capital** [2] |  |  |
| Investment income | 4.2% | 4.3% |
| Operating expenses | (5.2)% | (3.9)% |
|  | ------------------ | ------------------ |
| **Net investment loss** | (1.0)% | 0.4% |
|  | ------------------ | ------------------ |
| Ratio of contributed capital to committed capital [3] | 6.5% | 6.5% |

[1] The Internal Rate of Return ("IRR") is based on the date on which actual cash inflows (capital contributions) and outflows (cash distributions) occur, and the residual net assets of the Company as of the applicable measurement date. The IRR is reflected after all investment related and operating expenses, including Carried Interest when applicable. As discussed in Note 2, current accounting guidance requires, for purposes of financial statement presentation, a reallocation of shareholders' Carried Interest which is calculated as the amount that would be distributed in accordance with the Offering Memorandum to the Portfolio Manager calculated as if the assets of the Company were liquidated at fair value and distributed as of 31 December 2020. As of 31 December 2020, no allocations of Carried Interest have been made to the Portfolio Manager, based on this hypothetical liquidation. No Carried Interest has been paid as of 31 December 2020.

[2] The ratios of expenses and net investment income to average net assets reflect the expenses and net investment income, as reported in the Statement of Operations, as a percentage of the Company's weighted average net assets for the financial year ended 31 December 2020. The net investment income ratio does not include the effect of Carried Interest. The computation of such ratios based on the amount of expenses and Carried Interest assessed to an individual shareholder may vary from these ratios based on different Carried Interest arrangements.

[3] The ratio of contributed capital to committed capital relates to the US$10,000,000 contribution of the total US$153,000,000 committed by shareholders under the 15 November 2017 subscription and transfer agreement (see Note 5). The original share capital issued prior to 15 November 2017 has not been included in the contributed capital in this calculation.

006590

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements**
**for the year ended 31 December 2020**

## 1. Organisation

Highland CLO Funding, Ltd. (the "Company"), formerly Acis Loan Funding, Ltd., was incorporated in Guernsey on 30 March 2015 under The Companies (Guernsey) Law, 2008, as amended (the "Companies Law") with registration number 60120, and is registered as a closed-ended investment scheme, regulated under the Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended (the "POI Law").

The Company's investment objective is to provide Participating Shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and CLO Notes, on both a direct and indirect basis.

Any terms not defined in these notes shall have the meaning used in the Offering Memorandum of the Company.

**Investment Period**
The Investment Period ended in the period under review, on 30 April 2020.

**Term**
The term of the Company will end (and the Company thereafter will be wound up and dissolved) on 15 November, 2027 (the ten-year anniversary of the closing date).

## 2. Significant Accounting Policies

The following is a summary of the significant accounting policies followed by the Company in the preparation of these financial statements.

**a) Basis of Accounting**
The Company's financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and are stated in United States dollars, which is the functional and presentation currency. Assets and liabilities denominated in foreign currencies are translated into the functional currency using closing rates of exchange at the reporting date while revenues and expenses are translated at the daily spot rates of exchange.

The accounting policies applied in preparing these financial statements are consistent with those applied in the annual audited financial statements for the year ended 31 December 2019. The Company is an investment company in conformity with U.S. GAAP and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 946. Therefore, the Company follows the accounting and reporting guidelines for investment companies.

**b) New standards, amendments and interpretations issued and effective for annual reporting periods beginning 1 January 2020 and not early adopted**
ASU 2016-13, Measurement of Credit Losses on Financial Instruments, introduces a new model for recognising credit losses on financial instruments based on an estimate of current expected credit losses. The new guidance is effective for public business entities that are SEC filers for fiscal years beginning after 15 December 2019 (including interim periods). For all other public business entities, ASU 2016-13 is effective for fiscal years beginning after 15 December 2020, including interim periods. For all other reporting entities, ASU 2016-13 is effective for fiscal years beginning after 15 December 2020, and interim periods within fiscal years beginning after 15 December 2021.

The effective dates and transition requirements of ASU 2018-19 - Codification Improvements to Topic 326, Financial Instruments—Credit Losses, and ASU 2019-04 - Codification Improvements to Topic 326, Financial Instruments—Credit Losses, are the same as for ASU 2016-13 above.

006591

Highland CLO Funding, Ltd.
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**2.  Significant Accounting Policies** *(continued)*
**b) New standards, amendments and interpretations issued and effective for annual reporting periods
beginning 1 January 2020 and not early adopted** *(continued)*
In August 2018, the FASB issued Accounting Standards Update (ASU) 2018-13, Disclosure Framework— Changes
to the Disclosure Requirements for Fair Value Measurement, which modifies the disclosure requirements for
fair value measurements. The new guidance is effective for all entities for fiscal years beginning after 15
December 2019.

The new standards have not had any impact on the Company's Statement of Assets and Liabilities, Statement of
Operations or disclosures in its financial statements as there are no current expected credit losses the Company
must recognise.

**c) Use of Estimates**
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates
and assumptions that affect the amounts reported in the financial statements and accompanying notes. The
Company's significant estimates include the fair value of its investments. Actual results could differ from those
estimates.

**d) Investment Transactions and Related Investment Income**
Investment transactions are recorded on a trade-date basis. Realised gains and losses on the investment
transactions are determined based on the first-in, first-out method. The Company uses prices and inputs that
are current as of the measurement dates. The Company also considers the counterparty's non-performance risk
when measuring the fair value of its investments. Investments are valued at market or fair value at the date of
the financial statements with the resulting net unrealised gain or loss reflected in the Statement of Operations.
See Note 4 for a presentation of fair value hierarchy disclosures.

Investments in limited partnerships ("L.P.s") are valued using the net asset values provided by the underlying L.P.s
as a practical expedient. The Company applies the practical expedient to its investments in private investment
companies on an investment-by-investment basis, and consistently with the Company's entire position in a
particular investment, unless it is probable that the Company will sell a portion of an investment at an amount
different from the net asset value of the investment. The Company is precluded from consolidating entities that
are not investment companies when it is required to measure those entities at fair value in accordance with
Topic 946.

**e) Cayman Limited Partnerships**
The Portfolio Manager provides to the Administrator full supporting documentation to support the value of the
100% interest the Company has in a Cayman registered L.P., ACIS CLO Management Holdings L.P.

**f) Investment Valuation - Collateralised Loan Obligations ("CLOs")**
CLOs are valued according to a number of key data points including, but not limited to, market trading levels,
bid auctions, financial institution data, offering levels from counterparties/dealers and other sources, such as
an independent pricing service.

In cases where no third party price is available, or where the Company determines that the provided price is
not an accurate representation of the fair value of the investment, the Company will determine the valuation
based on the Company's fair valuation policy. The overall criterion for fair value is a price at which a CLO would
change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to
buy or sell and both having the same knowledge of the relevant facts.

006592

Highland CLO Funding, Ltd.
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**2.  Significant Accounting Policies** *(continued)*
**f) Investment Valuation - Collateralised Loan Obligations ("CLOs")** *(continued)*
Consistent with the above criterion, the following criteria will be considered when applicable:

- valuation of other securities by a similar CLO for which market quotations are available;
- reasons for the absence of market quotations;
- recent sales prices and/or bid and ask quotations for a similar CLO;
- the soundness of the CLO's loan portfolio, its weighted average spread, weighted average life, the portfolio legal maturity profile, the credit standing and market prices of the loans and the structure of the CLO; and
- the CLO cash flows generated using Intex CLO modelling based on prevailing market assumptions including, inter alia, defaults, recoveries, prepayment rates, loan reinvestment prices and spreads, forward interest rates and loan prepayment rates.

**g) Equity Investments**
Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity securities that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. The Company holds a limited number of private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets. In the event both a reliable market quote and third-party pricing service data are not available for such assets or such quotes are determined to be unreliable, the Company fair values the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilising comparable trading multiples, the Portfolio determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publicly available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortisation (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Portfolio Manager to be within a reasonable range, as calculated amongst its peers, is then applied to the underlying company's price to book ratio or EBITDA (which may be normalised to adjust for certain non-recurring events) to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

**h) Credit Facilities**
With effect from 23 November 2015, the Company is a party to a committed loan agreement with a Texas savings bank, NexBank SSB (the "Lender"), an affiliate of the Portfolio Manager, a majority of the equity of which is owned directly or indirectly by principals of the Portfolio Manager or its affiliates. As security for its obligations under the loan agreement, the Company has provided collateral in the form of certain shares of the ACIS CLOs as detailed in the Investment Portfolio.

During the year, as a result of the impact of the COVID-19 pandemic on the Company's investment values, the Company breached its loan to value covenant with the Lender. The Company cured this breach by renegotiating the credit facility on 26 June 2020. Following the renegotiation of the credit facility:

- The maturity of the credit facility was extended by three years and the loan from NexBank SSB is now due to be repaid on 23 November 2024;
- A principal repayment of US$3 million was made to the Lender on 26 June 2020;
- Additional investments were pledged as collateral; and
- The quarterly repayments were reduced from US$547,034 to US$278,462 per quarter.

006593

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

### 2. Significant Accounting Policies *(continued)*
#### h) Credit Facilities *(continued)*

During the year, repayments totalled US$3,967,380, and at 31 December 2020 there was an outstanding balance of US$11,449,923 on the facility. As at 31 December 2020, the investments pledged as collateral to the Lender had a market value of US$37,644,464. Accrued but unpaid interest totalled US$48,490 at the financial year end. Per the terms of the amended loan agreement dated 26 June 2020, interest accrues at a rate of 5.0% annually, payments of US$278,462 are due quarterly, and the remaining outstanding principal is due on 23 November 2024. The quarterly payments are inclusive of the total interest accrued as of the payment dates and the difference is a reduction to loan principal.

Collateral is held by counterparties in respect of cash and loans to the Company as per the following table. Non-cash collateral is included in Investments in securities and cash collateral is included in cash and cash equivalents.

**31 December 2020**

| Counterparty | Collateral Type | Collateral Par Value US$ | Collateral Market Value US$ |
|---|---|---|---|
| NexBank SSB | Non-cash | 167,383,012 | 37,644,464 |
| NexBank SSB | Other [1] | 367,249 | 367,249 |
| NexBank SSB | Cash | 1,453,115 | 1,453,115 |
| | | 169,203,376 | 39,464,828 |

[1]    In September 2019, the Company paid NexBank SSB US$367,249 more than the regular quarterly repayment amount. The additional US$367,249, which is being held by NexBank SSB and classified as cash collateral by the Lender, is included in other assets in the Statement of Assets and Liabilities.

#### i) Dividend Income

Dividend income is recognised in the Statement of Operations within dividend income when the Company's right to receive payments is established. This will generally be the ex-dividend date or, for certain securities, when notified. Dividend income is recognised gross of withholding tax, if any.

#### j) Income and Expense Recognition

Interest on currently paying debt instruments is accrued as earned. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognised when received. Such accretion/amortisation is calculated on an effective-yield basis. Amendment fees are recognised when received. Dividend income is recorded on the ex-dividend date. Interest income on cash and cash equivalent balances and securities held is accrued when earned. Operating expenses are recorded on the accrual basis as incurred.

#### k) Cash and Cash Equivalents

Cash and cash equivalents consist of cash held at the Principal Bankers and deposits with original maturities of less than 90 days.

The total cash and cash equivalents of US$6,702,286 in the Statement of Cash Flows comprises the cash and cash equivalents of US$5,249,171 and the cash collateral deposit of US$1,453,115.

#### l) Foreign Currency

Investment securities and other assets and liabilities denominated in foreign currencies are translated into U.S. dollar amounts at the date of valuation. Purchases and sales of investment securities and income and expense items denominated in foreign currencies are translated into U.S. dollar amounts on the respective dates of such transactions in the Statement of Operations.

006594

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

### 2.  Significant Accounting Policies *(continued)*
**l) Foreign Currency** *(continued)*
The Company does not isolate that portion of the results of operations resulting from changes in foreign exchange rates on investments from the fluctuations arising from changes in market prices of securities held.

**m) Distributions**
During the previous year, the Company suspended the payment of dividends for an indefinite period. The Directors monitor the Company's profitability and cash flow regularly with a view to re-instating the payment of dividends, if and when the Board consider it appropriate.

**n) Management Fees**
No management fees will be payable by the Company pursuant to any Services Agreement.

The Company shall pay or reimburse the Portfolio Manager and its affiliates all expenses related to the services as set out in the Portfolio Management Agreement.  Highland HCF Advisor receives, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable Valued Added Tax ("VAT") arising on such costs and expenses.

### 3.  Financial Instruments with Concentration of Credit Risk and Other Risks
**Limited Diversification**
Highland HCF Advisor Ltd., as the Portfolio Manager, has attempted to diversify the Company's investments. However, the Company's portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of risk may increase the losses suffered by the Company. This limited diversity could expose the Company to losses that are disproportionate to market movements as a whole.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Company due to a change in the market value of its investments. The Company's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of security prices and the liquidity of the Company's investments. Volatility or illiquidity could impair the Company's performance or result in losses. The Company may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.

**Custody Risk**
The clearing operations for the Company investments are provided by brokerage firms. The Company is subject to credit risk to the extent that a broker is unable to deliver cash balances or securities, or clear securities transactions on the Company's behalf. In addition, all of the Company's cash and investments are held with banks or brokerage firms. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Company may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations.

**Liquidity Risk**
The Company's ordinary shares outstanding owned by its investors have not been registered under the Securities Act or any other applicable securities laws. There is no public market for such interests and the Portfolio Manager and the Company do not expect such a market to develop. In addition, the Company's shares are not transferable except with the consent of the Portfolio Manager, which it generally may withhold in its sole discretion in accordance with the terms and conditions of the articles of incorporation.

006595

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**3.  Financial Instruments with Concentration of Credit Risk and Other Risks** *(continued)*
**Concentration of Credit Risk and Other Risks**
At 31 December 2020, the Company's investments were predominantly concentrated in the Cayman Islands. Industry concentrations are provided in the Condensed Schedule of Investments. Five of the CLO investments held by the Company, representing 48.15% of the Company's net asset value as at 31 December 2020, were in CLOs managed by Acis Capital Management LP ("Acis"), the Company's former Portfolio Manager and the subject of the litigation process described more fully in Note 9. As a result of and for the duration of the Plan Injunction, the Company cannot require a redemption of those CLOs.

**Reverse Repurchase Agreements**
Securities purchased under agreements to resell (Reverse Repurchase Agreements) are reported as reverse repurchase agreements and carried in the Statement of Assets and Liabilities as a financial liability at amortised cost. Interest incurred on reverse repurchase agreements is recognised as interest expense over the life of the agreement. As at 31 December 2020, no assets were subject to reverse repurchase agreements.

**Debt Obligations**
The Company's investment portfolio consists of CLOs that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of the marketability of these investments, the Portfolio Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

**4.  Fair Value Hierarchy of Financial Instruments**
In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Company discloses the fair value of its investments in a hierarchy that prioritises the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to valuations based upon unobservable inputs that are significant to the valuation (Level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

Level 1 – Valuations based on quoted prices in active markets for identical assets and liabilities that the Company has the ability to access as of the measurement date. Valuations utilising Level 1 inputs do not require any degree of judgment.

Level 2 – Valuations based on: (a) quoted prices for similar instruments in active markets; (b) quoted prices for which identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorised for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

006596

Highland CLO Funding, Ltd.
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

### 4. Fair Value Hierarchy of Financial Instruments *(continued)*

The Company uses prices and inputs that are current as of the measurement dates. The Company also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Company uses actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Company develops methodologies that provide appropriate fair value estimates. Management reviews these methodologies on a continuous basis to account for changing market conditions.

The Portfolio Manager has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorised within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, comprising various personnel from the Portfolio Manager.

The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of 31 December 2020, the Company's investments consisted primarily of CLOs, LLC Interests and Limited Partnership Interests.

Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

The Company categorised investments recorded at fair value in accordance with the hierarchy established.

The following table provides a summary of the investments recorded at fair value on a recurring basis by level within the hierarchy as of 31 December 2020:

| Assets | Level 1 US$ | Level 2 US$ | Level 3 US$ | Total US$ |
|---|---|---|---|---|
| Investments in CLOs | - | - | 45,755,325 | 45,755,325 |
| Limited Partnership Interests | - | - | 9,591,413 | 9,591,413 |
| Investments in LLC Interests | - | - | - | - |
| **Total** | - | - | 55,346,738 | 55,346,738 |

006597

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**4.  Fair Value Hierarchy of Financial Instruments** *(continued)*

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorised within Level 3 of the fair value hierarchy:

| Category | Fair value at 31/12/20 US$ | Valuation technique | Unobservable inputs | Input value(s) |
|---|---|---|---|---|
| Investments in CLOs | 45,755,325 | Indicative broker quotes | n/a | n/a |
| Limited Partnership Interest | 9,591,413 | Net asset value | n/a | n/a |
| Total | 55,346,738 | | | |

The following table provides a summary of changes in the amounts for the financial year ended 31 December 2020 for financial instruments classified within Level 3. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.

| | Fair value at 31/12/19 US$ | Transfers in/(out) of level 3 US$ | Purchases US$ | Sales and maturities US$ | Net realised gain/(loss) US$ | Net change in unrealised gain/(loss) US$ | Fair value at 31/12/20 US$ |
|---|---|---|---|---|---|---|---|
| Investments in CLOs | - | 77,537,647 | - | (303,951) | 45,593 | (31,523,964) | 45,755,325 |
| Investments in LLC Interests | - | 2,392,089 | - | - | - | (2,392,089) | - |
| Limited Partnership Interest | 10,310,160 | - | - | - | - | (718,747) | 9,591,413 |
| | 10,310,160 | 79,929,736 | - | (303,951) | 45,593 | (34,634,800) | 55,346,738 |

Transfers into and out of Level 3 are recognised at the beginning of the financial year. All of the net changes in unrealised, which are presented in the table above, are related to investments held as at 31 December 2020.

Except for the transfers from Level 2 into Level 3 in the table above, there were no other transfers between levels during the year.

**5.  Share Capital**

The shares of the Company are classified as equity based on the substance of the contractual arrangements and in accordance with the definition of equity instruments under ASC 480 "Distinguishing from Equities".

**Ordinary Shares**

The rights attaching to the Ordinary Shares shall be as follows:

a)  As to income - subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and within each such class, income shall be divided pari passu amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

006598

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**5.  Share Capital** *(continued)*

b)  As to capital - on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles of Incorporation and the Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of the Ordinary Shares and, within each such class, such assets shall be divided pari passu amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of that class held by them.

c)  As to voting - the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak and vote (in accordance with Article 22 of the Articles of Incorporation) at general meetings of the Company.

Throughout the year, there was only one class of Ordinary Shares in issue.

The following table represents the movement in ordinary shares issued by the Company for the financial year ended 31 December 2020:

|  | 31 December 2020 Quantity |
| --- | --- |
| Opening balance | 153,139,231 |
| Issued/(repurchased) | - |
| | ------------------ |
| **Closing balance** | **153,139,231** |
| | ------------------ |

During the financial year, no shares were issued or repurchased.

**Net Asset Value**
The net asset value per share at 31 December 2020 is determined by dividing the value of the net assets by the total number of ordinary shares in issue at the financial year end.

|  | 31 December 2020 |
| --- | --- |
| Total net assets | US$50,455,255 |
| Number of ordinary shares in issue | 153,139,231 |
| Net asset value per ordinary share | US$0.33 |

**Capital Management**
The Company is closed-ended and has no externally imposed capital requirements although, as noted in Note 2, there are certain covenants and collateral held in respect of the loan with the Lender.

**Committed Capital**
On 15 November 2017, the existing shareholders entered into a subscription and transfer agreement (the "Subscription Agreement") with the Company. Collectively, the shareholders committed to purchase $153,000,000 of ordinary shares from the Company, pro rata, at a price per ordinary share determined in reference to the most recent quarterly determined net asset value of the Company.

The Portfolio Manager may call capital from the shareholders to purchase additional shares from time to time, on a pro rata basis, upon 10 business days' written notice to the shareholders. Upon the expiration of the Investment Period, all shareholders will be released from any further obligation to purchase shares under the Subscription Agreement, except to the extent necessary to:

(i)  Complete, no later than 180 days after the expiration of the Investment Period, the purchase of shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

006599

Highland CLO Funding, Ltd.
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**5. Share Capital** *(continued)*
**Committed Capital** *(continued)*
(ii) Fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any warehouse loan facilities).

At the date of signing these financial statements, the Portfolio Manager is still able to call capital from shareholders to repay outstanding indebtedness.

As at 31 December 2020, unfunded commitments totalled US$143,000,000.

**6. Administration**
Elysium Fund Management Limited (the "Administrator" or "Elysium") is the Company's administrator, effective from 8 November 2019, and receives a fee of US$155,000 per annum. During the year, administration fees totalled US$252,994, which includes US$97,994 of fees payable to Elysium for additional work undertaken in the year.

**7. Income Taxes**
The Company is an exempted company organised in Guernsey. Under the current laws of Guernsey, there are no income, estate, transfer, sale or other taxes payable by the Company.

For U.S. income tax purposes, the Company is treated as a pass-through entity, which means it is not subject to federal taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the Company's net taxable income.

The Company invests in CLOs for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Portfolio Manager intends to conduct the Company's business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Portfolio Manager has offices.

Dividends as well as certain interest and other income received by the Company from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realised by the Company from non-U.S. sources and capital gains realised on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The Company applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions which requires management to determine whether a tax position of the Company is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognised in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realised upon ultimate settlement with the relevant taxing authority. Management have determined that there was no effect on the financial statements from the Company's adoption of this authoritative guidance, and they do not expect a significant change in uncertain tax positions during the twelve months subsequent to 31 December 2020.

The Company files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Company is subject to examination by federal and foreign jurisdictions, where applicable. As of 31 December 2020, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the commencement of operations forward.

006600

Highland CLO Funding, Ltd.
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**8.  Related Party Transactions**
**Directors' Fees**
The Directors' fees incurred during the year amounted to US$372,309 and are presented in the Statement of Operations. As at 31 December 2020, US$36,612 was still outstanding and is included within accrued expenses presented in the Statement of Assets and Liabilities. The total fees incurred consisted of base fees of US$151,543 (GBP116,453 equivalent) and US$220,766 related to additional duties arising out of the litigation process referred to in the Directors' Report on page 6 and further described in Note 9 below.

**Affiliates of the Portfolio Manager**
The Company committed US$18,487,500 to purchase limited partnership interests in ACIS CLO Management Holdings, L.P., an affiliated entity controlled by the Portfolio Manager. Of the US$18,487,500 committed, US$17,850,000 was contributed to ACIS CLO Management Holdings, L.P. on 18 September 2017, US$2,650,000 was redeemed on 26 November 2019 and US$3,287,500 remains unfunded as at 31 December 2020.

Certain investments are issued and managed by affiliates of the Portfolio Manager. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of 31 December 2020, the Company held the following investments that were issued and managed by affiliates of the Portfolio Manager:

|  |  | 31 December 2020 Fair Value |
|---|---|---|
| **Issuer** | **Type of Security** | **US$** |
| ACIS CLO Management Holdings, LP | Limited Partnership | 9,591,413 |
| Greenbriar CLO Ltd | Asset-backed equity tranche | 7,349,940 |
| Brentwood CLO Ltd | Asset-backed equity tranche | 6,000,000 |
| Liberty CLO Ltd | Asset-backed equity tranche | 3,922,750 |
| Grayson CLO Ltd | Asset-backed equity tranche | 2,109,250 |
| Rockwall CDO Ltd | Asset-backed equity tranche | 1,607,900 |
| Gleneagles CLO Ltd | Asset-backed equity tranche | 348,625 |
|  |  | ------------------ |
|  |  | 30,929,878 |
|  |  | ------------------ |

All related party transactions were made at arm's length on normal commercial terms and conditions. There have been no other transactions between the Company and its related parties during the reporting period.

006601

Highland CLO Funding, Ltd.
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**9.  Litigation and other significant events during the financial year**
The portfolio manager of certain of the CLOs in which the Company has an investment is Acis Capital Management L.P. ("Acis" and such CLOs, the "Acis CLOs"). In 2017, a former Highland employee obtained an arbitration award against Acis and in an effort to collect thereon, in January 2018 he petitioned for Acis's involuntary bankruptcy under the US bankruptcy code. This petition was granted in April 2018, and in May 2018 the bankruptcy court appointed a Trustee to oversee Acis's operations pursuant to Chapter 11 of the US Bankruptcy Code. In August 2018, the Trustee replaced Highland as sub-manager and subadviser to Acis with respect to the Acis CLOs. In July 2018, the Trustee on behalf of Acis asserted claims against the Company in the bankruptcy court alleging that certain transactions involving Acis in 2017, including the Company's management contract with HCF Advisor, Ltd., constituted transfers of assets by Acis without reasonably equivalent value (the "Fraudulent Transfer Allegations"), and further that the Company's previous efforts in early- to mid-2018 to redeem the CLO notes constitute a violation of the automatic stay applicable under the US bankruptcy code. These allegations have subsequently been amended to include claims that, inter alia, the Company is the alter ego of Highland and Acis and should be liable for all liabilities alleged against Highland and Acis (collectively with the foregoing claims, the "Acis Litigation"). The Company retained counsel to assert its rights in the bankruptcy court and defend the Acis Litigation.  In October 2018, the Trustee proposed a fourth plan of reorganization premised on an injunction on the Company that prohibits redemption of the Acis CLOs until the Fraudulent Transfer Allegations are resolved or the creditors of Acis have been paid in full ("Plan D"). The bankruptcy court approved such plan of reorganization in January 2019. The Company appealed the approval of Plan D to the United States District Court for the Northern District of Texas.

The Northern District of Texas affirmed the approval of Plan D in July 2019. The Company appealed the affirmation of Plan D in the United States Court of Appeals for the Fifth Circuit with an oral argument to be scheduled in 2020.  The Acis Litigation remains pending and subject to a motion to "withdraw the reference" (which would cause the litigation to be transferred to the United States District Court for the Northern District of Texas), as well as motion to dismiss all claims asserted against the Company.  As a result of a chapter 11 bankruptcy filing by Highland in October 2019, the Acis Litigation has been effectively stayed at the present time. No discovery schedule or trial has been set. The oral argument in respect of the Company's appeal to United States Court of Appeals for the Fifth Circuit is now scheduled to take place on 8 June 2021.

On 11 April 2020, Acis filed a separate complaint advancing substantially similar allegations as set forth in the above referenced Acis Litigation against multiple individuals employed by Highland as well as the two then independent directors of the Company.  The claims against the Company's then directors asserted claims of aiding and abetting alleged breaches of fiduciary duties of individuals alleged to owe duties to Acis, as well as claims for violation of the automatic stay (based on the same allegations set forth above).  The Company's then directors filed their first response to this complaint on 22 June 2020.

On 17 April 2020, Acis filed a motion seeking relief from the automatic stay in the Highland bankruptcy case to file and pursue, in the Acis bankruptcy case, a motion to show cause seeking to impose sanctions (the "Sanctions Motion") on the Company, Highland, several employees of Highland, and the two then independent directors of the Company for an alleged violation of the plan injunction contained in the Acis's confirmed plan of reorganization.  The Sanctions Motion asserts that the continued prosecution of a lawsuit pending in Guernsey against the former employee of Highland and former partner in Acis referred to above, Josh Terry, constitutes a violation of the plan injunction because such claim allegedly belongs to the Acis bankruptcy estate.  The Sanctions Motion seeks to enjoin the further prosecution of the Guernsey lawsuit against Josh Terry and also seeks sanctions in the amount of $800,000.  The sanctions motion has not yet been formally filed (as Acis is first seeking relief from the automatic stay).  If filed, the Company will contest this motion.

The Guernsey lawsuit against Josh Terry was found in favour of Mr Terry on 5 August 2020. The Company determined not to appeal this judgment and the time period for such an appeal has expired.

The Company is actively engaged in settlement discussions with Acis in respect of all matters of contention between the parties. There can be no certainty as to the outcome of such negotiations.

006602

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

**9.   Litigation and other significant events during the financial year** *(continued)*
There were no other significant events affecting the Company during the financial year that require amendment to or disclosure in the Financial Statements.

**10.   Commitments and Contingencies**
In the normal course of business, the Company may enter into contracts that provide general indemnifications and contain a variety of representations and warranties that may expose the Company to some risk of loss. The amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant with the possible exception of indemnities to employees of the Portfolio Manager under the terms of the Portfolio Management Agreement ("PMA") arising out of the litigation more fully described in Note 9 above. The Company is unable to determine and reliably estimate the future costs associated with these indemnity claims and therefore no contingent liabilities have been raised at the year end.

**11.   Subsequent Events**
On 14 January 2021, HCMLP Investments, LLC purchased 49.99% of the Company's ordinary shares.

On 1 February 2021, the Company received a notification from Highland of an intention to redeem Acis 2017-7 CLO, an asset held via ACIS CLO Management Holdings, LP, in which the Company held an 85% effective economic interest. As a result of this redemption, on 17 March 2021 the Company received partial cash proceeds of US$8,717,198.

On 15 April 2021, the directors notified NexBank SSB of their intention to fully repay the facility disclosed in note 2(h) above, with an effective repayment date of 29 April 2021.

There were no other significant events affecting the Company since the year end date that require amendment to or disclosure in the Financial Statements.

**12.   Going concern**
The COVID-19 pandemic is a risk to the global economy, and, like the majority of companies, has had an impact on the Company's operations. The Portfolio Manager and Administrator invoked their business continuity plans to help ensure the safety and well-being of their staff, thereby retaining the ability to maintain business operations. These actions help to ensure business resilience. The COVID-19 pandemic could have a negative impact on investment valuations and on the volatility of investment valuations, but it does not impact the ability of the Company to continue as a going concern. The impact of the COVID-19 pandemic is changing but the Directors will continue to monitor the situation closely, and they consider that the Company is well placed to deal with challenges arising from the COVID-19 pandemic.

In determining that it is appropriate to adopt the going concern basis in preparing these financial statements, the Directors have taken into consideration:

- The litigation in the United States of America arising out of an employment dispute between the former Portfolio Manager and a former employee/partner thereof (see Note 9).

- The breach of the Nexbank SSB loan to value covenant due to a fall in the fair value of the Company's investments arising from the impact of the COVID-19 pandemic on security prices, and the resolution of the breach by renegotiating the credit facility, as described in Note 2h.

006603

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2020**

12. **Going concern** *(continued)*
- The possible quantum and timing of cashflows to 31 December 2022, including legal costs based on a number of different scenarios, the increased uncertainty of the income from and valuation of the Company's investments as a result of the COVID-19 pandemic's impact on financial markets, and the recovery via insurance of certain of those legal costs.

- The decision to fully repay the NexBank SSB facility as disclosed in note 11 above.

After careful consideration of the above, the Board is satisfied that the Company will have adequate liquidity to continue to operate for at least the next 12 months from the date of signing these financial statements and that the going concern basis of preparation of the financial statements for the year ended 31 December 2020 is appropriate.

006604

**Highland CLO Funding, Ltd.**
**Incorporated in Guernsey**
**Registered Number: 60120**
**(the "Company")**

### Notice of Annual General Meeting

Notice is hereby given that the Annual General Meeting of the Members of the Company will be held at 1st Floor, Royal Chambers, St. Julian's Avenue, St Peter Port, Guernsey, GY1 3JX on 10 May 2021 at 11am (BST) for the purpose of considering the following:

The Board anticipates that at the time of the Annual General Meeting Shareholders will be able to attend the meeting in person, subject to any COVID-19 restrictions that might be imposed by the States of Guernsey. However, the Board recommends that, due to continuing uncertainty, Shareholders appoint the Chairman as proxy and provide voting instructions in advance of the AGM. Should it be required, arrangements will be made by the Company to ensure that the minimum number of Shareholders required to form a quorum will attend the AGM so that it may proceed. The completion of the form of proxy will not preclude a member from attending and voting in person at the meeting if it is so allowed.

#### AGENDA

1. To receive and consider the Annual Report and Audited Financial Statements of the Company for the year ended 31 December 2020.

2. To approve the re-appointment of Grant Thornton Limited as Auditor to the Company until the conclusion of the next annual general meeting.

3. To authorise the Directors to determine the Auditor's remuneration for the ensuing year.

21 April 2021

**By Order of the Board**
Elysium Fund Management Limited
Company Secretary

**Registered Office:**
1st Floor
Royal Chambers
St. Julian's Avenue
St Peter Port
Guernsey
GY1 3JX

**Highland CLO Funding, Ltd.**
**Incorporated in Guernsey**
**Registered Number: 60120**
**(the "Company")**

**FORM OF PROXY**

We/I,

........................................................................................................................................................,

being a Member of the above named Company hereby appoint

.......................................................................................................................................... (full name)

of

......................................................................................................................... (address) or

failing him/her the Chairman or the Company Secretary as my/our Proxy to vote for me/us on my/our behalf at the General Meeting of the Company to be held on 10 May 2021 at 11am, and at any adjournment thereof. My/Our Proxy is to vote as indicated by an "X" in the appropriate column. Unless otherwise indicated, my/our Proxy will vote or abstain as he/she thinks fit.

| *Ordinary Resolutions* | *For* | *Against* | *Abstain* |
|---|---|---|---|
| 1. *To receive and adopt the Annual Report and Audited Financial Statements of the Company for the year ended 31 December 2020.* | | | |
| 2. *To approve the re-appointment of Grant Thornton Limited as Auditor to the Company until the conclusion of the next annual general meeting.* | | | |
| 3. *To authorise the Directors to determine the Auditor's remuneration.* | | | |

.................................................................................
Authorised Signatory or Print name if an individual

Date: ........................................

**The proxy must be lodged with the Company Secretary, Elysium Fund Management Limited, 1st Floor, Royal Chambers, St. Julian's Avenue, St Peter Port, Guernsey, GY1 3JX, or be returned by email to elysium@elysiumfundman.com, as soon as possible but to arrive no later than 11am on 6 May 2021.**

006606

**Highland CLO Funding, Ltd.**
**Incorporated in Guernsey**
**Registered Number: 60120**
**(the "Company")**

**Notes:**

(i)   In accordance with Section 252 of the Companies (Guernsey), Law, 2008 (the **"Law"**) the Company is required to lay copies of its most recent Accounts, Directors' Report and Auditor's Report before the Annual General Meeting.

(ii)   In accordance with section 222 of the Law, each shareholder is entitled to appoint another person as his proxy to exercise all or any of his rights to attend and to speak and vote at a meeting of the Company.  A proxy need not be a member of the Company.

(iii)   This instrument, if given by a company, should be executed under the common seal of that company or under the hand of an officer or attorney duly authorised to do so.

(iv)   This instrument and the power of attorney or other authority (if any) under which it is signed, or a notarised certified copy of that power or authority, must be delivered to the Registered Office of the Company so as to arrive no later than 11am on 6 May 2021.

(v)   In the case of joint holders of a Share, the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the voted of the other joint holders, and for this purpose seniority shall be determined by the order in which the names stand in the Register in respect of the relevant Share.

(vi)   Only shareholders registered in the register of members of the Company at the close of business on 7 May 2021  shall be entitled to vote at the aforesaid meeting in respect of the number of shares registered in their name at the time, or in the event that the meeting is adjourned in accordance with the provisions before the time of any adjourned meeting. Changes to entries in the Register of members after such time or, in the event that the meeting is adjourned, to entries in the register of members after close of business before the time of the adjourned meeting, shall be disregarded in determining the rights of any person to attend or vote at the meeting.

(vii)   To change your proxy instructions, simply submit a new proxy appointment using the method set out above.  If you submit more than one valid proxy appointment, the appointment received before the latest time for the receipt of proxies will take precedence. Please note that the cut-off time for receipt of proxy appointments also applies in relation to amended instructions; any amended proxy appointment received after the relevant cut-off time will be disregarded.

(viii)   To appoint more than one proxy you may photocopy the form of proxy.  Please indicate the proxy holder's name and the number of shares in relation to which they are authorised to act as your proxy (which, in aggregate should not exceed the number of shares held by you).  Please also indicate if the proxy instruction is one of multiple instructions being given.  All forms must be signed and should be returned together in the same envelope.

006607