**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 28

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
## STATEMENT OF THE ISSUES

A.   Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.   the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.   the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3.   the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

    4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.  Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.  Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.  ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.  determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.  Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.  Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.  Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.  Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.  Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.  Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.  there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.  there is no evidence to support the alleged quid pro quo;

3.  the material shared was *public* information; and/or

4.  the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

---

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave?  [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.    **Notice of Appeal**

*000001*    a.    Notice of Appeal **[Dkt. 3906]**;

*000276*    b.    Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*    c.    Second Amended Notice of Appeal **[Dkt. 3945]**

2.    **The judgment, order, or decree appealed from:**

a.    Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940        Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045        **b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

001049        a.  Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

       **a.**  HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

Vol. 2

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594
001660
001821
001830
Vol. 3
001849
Thru  Vol. 4
Vol 4
002236
002243
002248

*Vol. 5*
*002251*
*002254*
*002262*
*002341*
*002355*
*002358*
*002391*
*002398*
*002400*
*Vol. 8*
*002826*
*Thru Vol. 7*
*Thru Vol. 9*
*Vol. 9*
*003257*
*003260*
*003270*
*003278*

| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| *Vol. 10* *003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

[3] A duplicate of Doc 3758.

| | | | Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Handwritten annotations in left margin:
Vol. 10
003458
003463
Vol. 11
003537
Thru Vol. 16
Vol. 17
004665
004712
004714
004808
004813
004836
Vol. 18
004930
004931

*Vol. 18*

*0049 39.*

| | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| *0049 59* | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *0049 61* | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *0049 84* | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *0050 49* | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *0051 14* | 06/05/2023 | 3817 (3817-1 — 3817-5) *Thru Vol. 25* | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| *Vol. 26* *006608* | 06/05/2023 | 3818 (3818-1 — 3818-9) *Thru Vol. 39* | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| *Vol. 39* *0092 73* | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *0092 90* | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *0094 16* | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| *0094 24* | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*009436*

*009444*

*009445*

*009446*

*009456*

*009458* *Vol. 41*
*Thru Vol. 41*
*Vol. 42*
*009847*

*009901*

*009905*

*009908*

*009912*

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869.  Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

*Vol. 43*

*010135*

*010136*

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.    Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                    Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
        Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire

```
 1        A.   Not that I recall, no.

 2        Q.   So your company that you were recently involved

 3   in, Guggenheim Securities LLC, has never been involved

 4   in investing in or purchasing claims in bankruptcy

 5   proceedings?

 6        A.   I never said such a thing.

 7        Q.   That's my question, though.

 8        A.   No.  You said "so."  And so the answer is, in

 9   the things that I worked on at Guggenheim, no.  I don't

10   know what else they've done in the securities business.

11        Q.   You were co-head of credit at Guggenheim

12   Securities LLC; is that correct?

13        A.   That's correct.

14        Q.   And what was your responsibility as the co-head

15   of credit at Guggenheim Securities?

16        A.   We were trying to build a new-issue credit

17   business as part of the Guggenheim Securities investment

18   bank.

19        Q.   Guggenheim Securities, you left -- you left

20   that position in 2019?

21        A.   I left that position in 2019, yes.  That's

22   correct.

23        Q.   And where are you now?

24        A.   At Highland Capital.

25        Q.   Is that your only official company affiliation?
```

 1      A.   That's correct.

 2      Q.   And you left Guggenheim Securities, then, in

 3  connection with becoming the CEO of Highland Capital?

 4      A.   No.

 5      Q.   Why did you leave Guggenheim Securities?

 6      A.   The credit business opportunity and strategy

 7  wasn't really working, wasn't a good fit for me or for

 8  Guggenheim.  And they ultimately decided not to pursue

 9  that business.

10      Q.   You've served as a trustee or as -- let me back

11  that up.

12           You served as a chief restructuring officer

13  in bankruptcies other than the Highland Capital

14  bankruptcy proceeding, correct?

15      A.   That's incorrect.

16      Q.   Is the only time you've ever served as chief

17  restructuring officer in connection with the Highland

18  Capital bankruptcy proceeding?

19      A.   Yes.

20      Q.   Have you ever served as a CEO of a debtor in

21  possession in bankruptcy other than Highland Capital?

22      A.   No.

23      Q.   That was --

24           MR. STANCIL:  Mr. Seery -- excuse me.

25           Mr. Seery, you have to give me a second

```
 1  to --
 2              THE WITNESS:  I'm sorry.
 3              MR. STANCIL:  -- get on the Zoom.
 4              So just objection to form.
 5      Q.  (By Mr. McEntire) All right.  So the first time
 6  you ever served as a CEO in connection with a debtor in
 7  possession was the -- was the Highland Capital
 8  proceeding, correct?
 9              MR. STANCIL:  Objection to form.
10      A.  (No audible response.)
11      Q.  (By Mr. McEntire) Sir?
12      A.  Can I answer?
13      Q.  Yes, you may.  Unless he -- unless he instructs
14  you not to answer, I would ask that you answer.
15      A.  Can -- can you repeat the question, please?
16      Q.  Yes.
17              The first time you've ever served as a --
18  as a chief executive officer of a debtor in possession
19  was in connection with the Highland Capital proceeding?
20      A.  Yes.
21              MR. STANCIL:  Same objection.
22      Q.  (By Mr. McEntire) I --
23              MR. MORRIS:  Go ahead and answer.
24      Q.  (By Mr. McEntire) I couldn't hear your answer
25  because he talked over you.  I'm sorry.  Go ahead.
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-11   Filed 12/22/23   Page 18 of 214   PageID 6546

Exhibit Exhibit 11 - Dep. of Seery   Page 17                                    Pages 16

```
 1          A.  Yes, I believe so.

 2          Q.  And for the record, for the clarity, the

 3   only -- the first time you ever served as a chief

 4   restructuring officer in connection with a -- a

 5   bankruptcy proceeding was in connection with Highland

 6   Capital; is that correct?

 7          A.  Yes.

 8          Q.  Have you ever served in a -- as a trustee in

 9   connection with a bankruptcy proceeding other than

10   Highland Capital?

11               MR. STANCIL:  Objection to form.

12          A.  No.

13          Q.  (By Mr. McEntire) So the only time, a figure of

14   time you've ever served as a trustee is in connection

15   with the Highland Capital Management proceeding,

16   correct?

17               MR. STANCIL:  Objection to form.

18          A.  Yes.

19          Q.  (By Mr. McEntire) Did you personally undertake

20   any market studies to determine what a chief executive

21   officer is entitled to receive in terms of compensation

22   in a -- for a debtor in possession?

23          A.  No, not market studies.

24          Q.  Did you undertake any type of market study to

25   determine what a chief restructuring officer is entitled
```

1   to receive in compensation serving as a -- as a chief

2   restructuring officer for a debtor in possession?

3       A.  I did not, no.

4       Q.  Have you ever -- you currently serve as a

5   trustee under the terms of the claimant trust agreement

6   or the Highland Claimant Trust Agreement, do you not?

7       A.  Yes.

8       Q.  Have you ever undertaken a market study to

9   determine the -- the spectrum of compensation for a

10  trustee serving as a trustee similar to the duties that

11  you were discharging as the trustee under the claimant

12  trust agreement?

13      A.  I'm sorry.  Could -- could you repeat that

14  question?

15      Q.  I would like to know whether you personally

16  undertook any type of market study to determine the

17  spectrum of compensation that is typically awarded to a

18  trustee similar to the duties that you undertook and are

19  undertaking in connection with the Highland bankruptcy

20  reorganized debtor proceedings?

21              MR. STANCIL:  Objection to form.

22      A.  No.

23      Q.  (By Mr. McEntire) Are you involved in any

24  bankruptcy proceedings currently, other than the

25  Highland Capital proceedings?

```
 1        A.  No.

 2        Q.  Do you have any business dealings with Farallon

 3   Capital Management or Stonehill Capital Management,

 4   other than in connection with the Highland Capital

 5   Management proceedings?

 6             MR. STANCIL:  Objection to form.

 7        A.  No.

 8        Q.  (By Mr. McEntire) Do you consider yourself to

 9   be knowledgeable about claims trading generally?

10        A.  I think I have a fair knowledge of claims

11   trading, yes.

12        Q.  Fair enough.  Thank you.

13             Can you tell me from what is the basis of

14   your familiarity and -- and understanding of that

15   process?

16        A.  I've been a restructuring attorney for

17   30 years.  I've been in and around the restructuring

18   community and businesses for that amount of time.  I've

19   worked in businesses with distressed investors and have

20   been involved in numerous bankruptcy cases.

21        Q.  Have you ever represented a company or -- or an

22   individual in connection with investigating and

23   acquiring a claim in a bankruptcy proceeding?

24             MR. STANCIL:  Objection to form.

25        A.  I -- I don't -- I don't recall if I -- if I
```

1    ever had that role specifically, no.

2        Q.  (By Mr. McEntire) As it relates to claims

3    trading, have you had any role in either selling or

4    acquiring?

5            And I'm setting aside Highland Capital

6    Management for -- in the interest of fairness to you.

7    I'm asking -- I'm just trying to ascertain your

8    background.

9        A.  I'm taking it as a background question.

10           I've certainly been in and around trading

11   of investments and interests in bankruptcy -- bankrupt

12   companies and bankers in cases.  And I'm just not

13   recalling off the top of my head trading of claims.

14       Q.  Fair enough.

15           In what capacities, then, have you become

16   specifically familiar with the process of claims

17   trading?

18           MR. STANCIL:  Objection to form.

19       A.  Again, it's part of the general knowledge of

20   being in and around this business, certainly in

21   connection with trading of loans in bankruptcy cases or

22   trading bonds in bankruptcy cases.  I'm just not

23   recalling ever trading specifically claims.

24       Q.  (By Mr. McEntire) Were you involved as a --

25   a -- a -- have you ever represented a -- a purchaser of

```
 1   a loan or a distressed asset in bankruptcy?

 2             MR. MORRIS:  I'm sorry.  Could I have that

 3   question again?

 4             MR. MCENTIRE:  Certainly.

 5        Q.  (By Mr. McEntire) Have you ever represented a

 6   purchaser in connection with the acquisition of a

 7   distressed asset in bankruptcy?

 8             MR. MORRIS:  Thank you.

 9             MR. STANCIL:  Objection to form.

10        A.  Yeah, that was a different question.

11        Q.  (By Mr. McEntire) I apologize if it is.  That

12   is my question, though.

13        A.  So distressed asset, yes.

14        Q.  Okay.  And did you perform due diligence or

15   otherwise oversee due diligence in connection with that

16   acquisition?

17        A.  Probably not.

18        Q.  Okay.  Did you delegate that to someone else or

19   was due diligence undertaken by someone else?

20        A.  The client would have done the due diligence.

21        Q.  What type of due diligence would the client

22   have -- generally have undertaken?

23             MR. MORRIS:  Objection.

24             MR. STANCIL:  Objection to form.

25        A.  It depends on the asset.
```

1     Q.  (By Mr. McEntire) Well, I'm talking about a

2     distressed asset.  What type of due diligence, generally

3     speaking, would you expect a client to undertake?

4              MR. MORRIS:  Objection.

5              MR. STANCIL:  Objection to form.

6     A.  To make sure that they know what the asset is,

7     how they view the value of the asset, the ownership

8     history of the asset, liabilities in connection with the

9     asset, regulatory issues in connection with purchasing

10    the asset, licensing issues in connection with

11    purchasing the asset.  There's a myriad of things that

12    the investor would think about when they're buying an

13    asset out of a distressed company.

14    Q.  (By Mr. McEntire) And you would classify a

15    company that's in bankruptcy to be a distressed company;

16    is that fair?

17             MR. STANCIL:  Objection to form.

18    A.  Yes.

19    Q.  (By Mr. McEntire) In connection with the trades

20    involving Muck, Jessup, Farallon, and Stonehill, they

21    refer to themselves as the claim purchasers.  Are you

22    familiar with that?

23    A.  If I'm familiar with how they refer to

24    themselves?

25    Q.  Yes, through the various pleadings and motions.

 1  I'm just trying to get a -- a -- a defined term so we

 2  don't have to waste a lot of time talking about each

 3  individual entity.

 4            So if I refer to Muck, Jessup, Stonehill,

 5  and Farallon as the claims purchasers, will you

 6  understand what I'm referring to?

 7       A.  Yes.

 8       Q.  Fair.  Thank you.

 9            Did you provide any type of data room to

10  the claims purchasers in connection with their

11  investigation or due diligence relating to the claim

12  purchases at issue?

13            MR. STANCIL:  Objection to form.

14       A.  Not related to the -- to the claim purchases,

15  no.

16       Q.  (By Mr. McEntire) Did you provide any documents

17  to the claim purchasers to review or consider in

18  connection with any due diligence they may have

19  conducted related to the claim purchasers -- the claim

20  purchases?

21       A.  Not related to the claim purchases, no.

22       Q.  Did you provide any documents at all to -- to

23  the claim purchasers in connection with their

24  involvement in this matter?

25       A.  To Farallon and to Stonehill, yes.

1     Q.   What did you provide and when?

2     A.   The -- the "you," "what did you," I want to

3   make sure we're clear about "you."  It was not me.  It

4   was Highland Capital that provided data to Farallon and

5   to Stonehill.

6     Q.   Fair enough.  Let's make sure the record is

7   clear.  Did Highland Capital make available a data room

8   to the claims purchasers in connection with these claim

9   purchases?

10     A.   The answer is no.

11     Q.   To your knowledge, did Highland Capital provide

12   any documents to the claims purchasers in connection

13   with any due diligence they may have conducted in

14   connection with the claim purchases?

15     A.   The answer is no.

16     Q.   What information did Highland Capital provide,

17   if you know, to the claim purchasers in connection with

18   their involvement in this matter?

19     A.   Highland provided information to Farallon and

20   to Stonehill subject to nondisclosure agreements in

21   connection with exit financing that Highland was

22   investigating to exit bankruptcy.

23     Q.   When did they sign the -- we'll refer to those

24   as "NDAs."  When did they sign the NDAs?

25     A.   They signed NDAs in the beginning of April,

1   April --

2       Q.  20 --

3       A.  The end of the first week, beginning of the

4   second week of April 2021.

5       Q.  2021.  And the purpose of those NDAs, what were

6   they reviewing that you required the NDA specifically?

7       A.  We conducted a process by which we sought exit

8   financing for Highland.  We went to multiple potential

9   financiers to get letters of interests in order to see

10  data that would help them develop a letter of interest.

11  If they were so interested, they signed NDAs.  Each of

12  the potential financiers signed an NDA, including

13  Farallon, including Stonehill.  And then they did work

14  in a data room.  And they received information.  And

15  they either determined to make a -- present a letter of

16  interest or not.

17      Q.  Did both Farallon and Stonehill have access to

18  a data room in connection with this NDA?

19      A.  Yes.

20      Q.  Did they send representatives to the data room

21  in connection with this NDA?

22      A.  I don't know who they -- they sent.  I didn't

23  run the data room.  So I don't know which -- which

24  entity sent which people.  But the way you phrased it,

25  did they send representatives to a data room?  It's --

```
 1   it's -- it's virtual.

 2        Q.  Fair enough.

 3        A.  No one goes to a room.

 4        Q.  Sure.  I understand.  So we'll talk about the

 5   virtual data room then.

 6             You indicated that this -- did Highland

 7   Capital solicit Farallon and Stonehill to determine

 8   whether they'd be interested in providing the exit

 9   financing in whole or in part?

10        A.  Yes.

11        Q.  Did Farallon or Stonehill provide exit -- exit

12   financing in whole or in part?

13        A.  Neither of them provided exit financing.  They

14   did provide indications of interest and -- but they

15   didn't provide the financing.

16        Q.  Did -- did you -- you say they did provide

17   indications of interest.  Did they explain to you why

18   they ultimately decided not to provide the exit

19   financing?

20             MR. MORRIS:  Objection to the form of the

21   question.

22        A.  They -- they -- they each explained their own

23   reasons for what they did.  They each did different

24   things.

25        Q.  (By Mr. McEntire) Fair enough.
```

1          Did Farallon provide as explanation in

2  writing either in whole or in part?

3      A.  Not in writing, no.

4      Q.  Did Stonehill provide its explanation in

5  writing either in whole or in part?

6      A.  Stonehill -- you're presuming Stonehill was not

7  interested.  Stonehill was interested.

8      Q.  I understand.  But they ultimately did not

9  participate.  So at some point in time, they would have

10  indicated that they did not want to go forward, correct?

11          MR. MORRIS:  Objection to the form of the

12  question.

13          MR. STANCIL:  Objection to form.

14      A.  That's just completely incorrect.

15      Q.  (By Mr. McEntire) So did Stonehill actually

16  provide exit financing?

17      A.  No.  Stonehill did not provide exit financing.

18      Q.  Was that your decision or was that Stonehill's

19  decision not to do so?

20      A.  That was my decision.

21      Q.  Okay.  And why did you not want Stonehill to be

22  involved in your exit financing?

23      A.  They got beaten out of the process.

24      Q.  All right.  Did they actually submit a bid to

25  participate?

 1        A.   It's not a bid.  It's a letter of interest.

 2        Q.   Okay.  Did Farallon ever provide a letter of

 3   interest?

 4        A.   They did not.

 5        Q.   Did Farallon ever explain to you verbally --

 6   you indicated there was no writing.  Did they -- did

 7   Farallon ever express to you verbally why they did not

 8   want to pursue the exit financing role?

 9        A.   Yes.

10        Q.   And what was -- what was their explanation?

11        A.   It's not really what they do.  While they

12   already own claims in the case and were interested in

13   the case, it wasn't really something that they were set

14   up to do.  They didn't think the return was attractive

15   enough since other people were more competitive.

16        Q.   So in listening to your answer, to be clear,

17   Farallon had already made its investment in the claims

18   before they had access to your data room; is that

19   correct?

20        A.   That's correct.

21        Q.   And Stonehill had already had -- been involved

22   in investing in claims before they signed the NDA as

23   well; is that correct?

24        A.   I don't know.

25        Q.   You just don't recall?

 1          MR. MORRIS:  Objection to the form of the

 2   question.

 3       A.  I don't -- I don't think I know.

 4       Q.  (By Mr. McEntire) Fair enough.

 5            You indicated earlier that the NDAs were

 6   signed in the first or second week of April of 2021.  Do

 7   you recall that generally?

 8            MR. MORRIS:  Objection to the form of the

 9   question.

10       A.  Generally, yes.

11       Q.  (By Mr. McEntire) When -- do you know when

12   Farallon reached an agreement with the sellers of the

13   claims in which it invested, the date, generally?

14       A.  I know when they told me they did.

15       Q.  And what did they tell you?

16       A.  March 15th, 2021.  That's when they told me.  I

17   don't know what date that they actually did it.  That's

18   when they told me they owned interest in claims.

19       Q.  Is there a document that would -- that you've

20   looked at that would refresh your memory in that regard?

21       A.  I would have to look at my -- they told me in

22   writing in an e-mail.  I'd have to check it.

23       Q.  All right.  Did Stonehill ever advise you when

24   it reached an agreement in connection with its

25   investments in the claims at issue?

```
 1         A.   No.

 2         Q.   Do you have anything in writing or otherwise to

 3    indicate when that date may have been, generally falling

 4    within the month of February or March of 2021?

 5         A.   I --

 6              MR. STANCIL:  Objection to form.

 7         A.   I don't recall ever knowing when Stonehill

 8    acquired their claims with any precision.

 9         Q.   (By Mr. McEntire) Fair enough.

10              Do you know whether it was in March or

11    April of 2021?

12         A.   I don't know.

13         Q.   You certainly were aware that the investments

14    had been consummated before the notice of assignments

15    and transfers that were filed in bankruptcy court,

16    correct?

17              MR. STANCIL:  Objection to form.

18              MR. MORRIS:  Form of the question.

19         A.   I knew -- I knew that Farallon had acquired

20    claims before that.  I don't believe I knew that

21    Stonehill knew that.  And I don't know when I learned

22    that they filed notices of transfer.

23         Q.   (By Mr. McEntire) I will present to you that

24    Far- --

25              THE WITNESS:  I'm not done yet.
```

```
 1       Q.   (By Mr. McEntire) -- Farallon filed --

 2              MR. MORRIS:  Let him finish --

 3              THE WITNESS:  I'm not done yet.

 4              MR. MCENTIRE:  I'm sorry.  I thought you

 5   were.  I certainly did not mean to interrupt you.  Go

 6   ahead.

 7       A.   I don't recall ever talking to them about

 8   acquiring their claims or when they did it.  At some

 9   point, it was clear that they had acquired a claim.  But

10   I don't have any recollection of when that was.

11       Q.   (By Mr. McEntire) Okay.  Who -- who -- who do

12   you deal with historically -- let me rephrase that

13   question.  That's poor.

14              Who do you know at Farallon in terms of

15   principals or your contact individuals at Farallon?  Who

16   do you deal with?

17              MR. STANCIL:  Objection to the form.

18       A.   The -- the person responsible for this

19   investment at Farallon, to my understanding -- and he

20   sits on the claimant trust board -- is Mike Linn.

21       Q.   (By Mr. McEntire) Do you know Raj Patel?

22       A.   I do know who he is, yes.

23       Q.   Have you ever met Raj Patel?

24       A.   I believe I've met Raj Patel twice.

25       Q.   Have you ever met Mike Linn?
```

```
 1        A.  He's on the oversight board.  I talk to him

 2   every week.  And I've met him personally during this

 3   case since he became part of the oversight board.

 4        Q.  Have you ever met with Mike Linn before he

 5   became a part of the oversight board?

 6        A.  I believe I met him once.

 7        Q.  Did you represent Farallon in connection with

 8   any bankruptcy proceedings in the past unrelated to

 9   Highland Capital?

10        A.  I have never represented Farallon in any

11   capacity whatsoever.

12        Q.  Have you ever assisted Farallon in connection

13   with any prior bankruptcy, assisting them in connection

14   with the bankruptcy or the reorganization of Lehman

15   Brothers?

16             MR. STANCIL:  Objection to form.

17        A.  Never whatsoever.

18        Q.  (By Mr. McEntire) Toys"R"Us?

19        A.  Never whatsoever.

20        Q.  Blockbuster?

21        A.  Never whatsoever.

22        Q.  Were you involved in the Toys"R"Us bankruptcy

23   proceedings?

24        A.  Never whatsoever.

25        Q.  Were you involved in the Blockbuster bankruptcy
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3811 Page 31 of 207   Page 34 of 214   PageID 6562

James B. Seery, Jr.                                                              Pages 32

```
 1   proceedings?

 2        A.  Yes.

 3        Q.  What was your role and capacity?

 4        A.  I was counsel for a lender group.

 5        Q.  Was Farallon a member of that lender group?

 6        A.  No.

 7        Q.  Was Stonehill a member of that lender group?

 8        A.  Apparently, according to your pleading, they

 9   were.

10        Q.  Did Lehman Brothers actually go into

11   bankruptcy?

12        A.  It depends on which entity you're talking

13   about.

14        Q.  Well, did you play any role in connection with

15   the Lehman Brothers bankruptcy?

16             MR. STANCIL:  Objection to form.

17        A.  The answer is I was responsible for helping

18   sell Lehman Brothers Inc. to Barclays for efforts to try

19   to keep Lehman Brothers Holdings out of bankruptcy.

20   When Lehman Brothers Holdings filed, I no longer had any

21   involvement with Lehman Brothers Holdings.

22        Q.  (By Mr. McEntire) Did you provide any

23   assistance to Farallon in any way, directly or

24   indirectly, in connection with the Lehman Brothers

25   reorganization or sale?
```

```
 1        A.  No.

 2                  MR. STANCIL:  Objection to form.

 3        Q.  (By Mr. McEntire) Did you provide any

 4   assistance to Stonehill in any capacity in connection

 5   with the Lehman Brothers reorganization or sale?

 6        A.  No.

 7                  MR. STANCIL:  Objection to form.

 8        Q.  (By Mr. McEntire) You said you had met Michael

 9   Linn before his involvement in this -- this proceeding.

10   How did you come to know Mr. Linn?

11                  MR. MORRIS:  Objection to the form.

12        A.  I didn't come to know Mr. Linn.  I met him at a

13   meeting at Farallon after I left Guggenheim.

14        Q.  (By Mr. McEntire) What was the purpose of that

15   meeting?

16        A.  Meet and greet.

17        Q.  All right.  So after 2019, you met Mr. Linn at

18   Farallon at a meet and greet.  What was the purpose of

19   the meet and greet and who were you representing?

20                  MR. MORRIS:  Objection to the form of the

21   question.

22        A.  The purpose was to meet and to greet.  I wasn't

23   representing anybody.  I was on my own.

24        Q.  (By Mr. McEntire) Were you soliciting business?

25        A.  No.  I was meeting and greeting and hoping
```

 1  there would be business down the line.  I didn't have a

 2  particular role.  And I was looking to get back to the

 3  investing side.

 4       Q.  Were you -- were you seeking a position with

 5  Farallon?

 6       A.  No.

 7       Q.  Were you affiliated with any type of business

 8  entity at the time of this meet and greet?

 9       A.  No.

10       Q.  Were you simply a solo practitioner at that

11  point?

12       A.  No, I was not a solo practitioner.

13       Q.  What company were you affiliated with?

14            MR. MORRIS:  Objection to the form of the

15  question.

16       A.  I wasn't affiliated with any company.

17       Q.  (By Mr. McEntire) Okay.  You were hoping to get

18  back into the investment side of the business.  So did

19  you solicit an opportunity to meet Mr. Linn and other

20  executives at Farallon?

21       A.  No.

22            MR. STANCIL:  Objection to form.

23       Q.  (By Mr. McEntire) I'm sorry?

24       A.  No.  I don't think that's a fair

25  characterization.

1      Q.  How did the meet and greet come to -- come to

2   pass?  Who organized it and who reached out to whom?

3      A.  I organized it.  I was going to be in San

4   Francisco.  And I asked Raj if he had time.  I had met

5   him once before while I was at Guggenheim.  And he

6   indicated he did.  And he wanted Mike to go to the

7   meeting, to my recollection.

8      Q.  All right.  And how did you know Raj Patel from

9   Guggenheim -- when you were at Guggenheim?

10     A.  I was at a meeting at -- with Raj Patel with a

11  group from Guggenheim at a similar type of meet and

12  greet.  And I -- I didn't organize that meeting.  But I

13  believe I had heard of Raj.  We may have talked at some

14  point over the past 30 years.

15     Q.  Who do you deal with principally at Stonehill?

16             MR. STANCIL:  Objection to form.

17     A.  I -- I don't deal with anybody principally at

18  Stonehill.

19     Q.  (By Mr. McEntire) Do you know anyone at

20  Stonehill?

21     A.  I know Michael Stern.  He is now responsible

22  for the Stonehill investment in -- in Highland.  And I

23  got to know him in this matter only.

24     Q.  Did you not know anyone from Stonehill prior to

25  their involvement in -- in this -- in the Highland

 1  Capital bankruptcy?

 2              MR. STANCIL:  Objection to form.

 3      Q.  (By Mr. McEntire) I'm sorry?

 4      A.  No.  I -- I -- I did know at least one other

 5  person there.

 6      Q.  Who was that?

 7      A.  Jonathan Sacks.

 8      Q.  How did you know Jonathan Sacks?

 9      A.  I had gotten to know Jonathan a little bit over

10  the years.  I had not, to my recollection, done any

11  business with him.  But you seem to indicate that they

12  were involved in Blockbuster.  But their interest must

13  have been really small because I have no recollection of

14  it.  And while at Guggenheim, I solicited -- solicited a

15  financing proposal from Jonathan for a company that --

16  it didn't come -- he gave a proposal.  But the financing

17  didn't come to fruition.

18      Q.  The meet and greet at Farallon, at Farallon's

19  offices in -- you said in San Francisco?

20      A.  Yes.

21      Q.  You left Guggenheim in 2019.  When did you have

22  this meet and greet?

23      A.  In 2019.

24      Q.  And when did you become involved in the

25  Highland Capital bankruptcy?

 1      A.   In January of 2020.

 2      Q.   Is that the only time you had met Michael Linn

 3  before their involvement in the bankruptcy proceedings

 4  at issue?

 5      A.   Yes.

 6      Q.   Did -- when is the first time -- after you

 7  became the CEO of Highland Capital and the chief

 8  restructuring officer, what is the first contact that

 9  you remember having with Farallon?

10      A.   After I became the CEO and chief restructuring

11  officer, the first contact I recall was in January of

12  2021.

13      Q.   Can you still hear me, Mr. Seery?

14      A.   Yes.

15           MR. MCENTIRE:   Something has happened to

16  my -- there we go.   I apologize.

17           By the way, Tim, you can take down the --

18  the exhibit.

19           That's better.

20      Q.   (By Mr. McEntire) You said January of 2021.

21  When is the first time that you recall communicating

22  with a representative of Stonehill after you became the

23  CEO, CRO of Highland?

24      A.   It was the end of February or the beginning of

25  March 2021.

```
 1        Q.  Who contacted you in January of 2021 on behalf
 2   of Farallon?
 3              MR. STANCIL:  Objection to form.
 4        Q.  (By Mr. McEntire) I'm sorry?
 5              MR. STANCIL:  Objection to form.
 6        A.  Michael Linn.
 7        Q.  (By Mr. McEntire) Did you call Michael Linn, or
 8   did Michael Linn call you?
 9              MR. MORRIS:  Objection --
10              MR. STANCIL:  Objection to form.
11        A.  Neither.
12        Q.  (By Mr. McEntire) What happened?  How did the
13   communication occur?
14        A.  Mr. Linn sent me an e-mail.
15        Q.  All right.  And does that e-mail still exist?
16        A.  Of course.
17        Q.  You said "of course"?
18        A.  I said "of course."
19        Q.  Is that because, as the CEO of Highland
20   Capital, you have an obligation to preserve documents?
21              MR. MORRIS:  Objection.
22              MR. STANCIL:  Objection to form.
23              MR. MORRIS:  Answer.
24        A.  It's because --
25              MR. STANCIL:  It calls for a legal
```

  1   conclusion.

  2        A.  Because it still exists.

  3        Q.  (By Mr. McEntire) Well, have you -- have you

  4   taken any steps, in your capacity as the CEO of Highland

  5   Capital, to make sure that your communications are

  6   preserved?

  7                MR. STANCIL:  Objection.

  8                Mr. McEntire, this is beyond the scope of

  9   the discovery you're authorized to take in this matter.

 10                MR. MCENTIRE:  No, it's not.  If you want

 11   to instruct him not to answer, you should do so.  But I

 12   don't want to waste my time arguing with you.

 13                MR. STANCIL:  Well, Mr. McEntire, I will

 14   instruct the witness not to answer.  The document and

 15   communication preservation practices are not relevant.

 16   And I think we're both aware of a motion filed by

 17   another Dondero affiliate yesterday or day before

 18   yesterday.  And it's simply beyond -- beyond the scope

 19   of this.  And we're not going to let him answer it.

 20        Q.  (By Mr. McEntire) So I'm going to just cut to

 21   the quick real quick, Mr. Seery.  If your lawyer,

 22   Mr. Stancil, instructs you not to answer, I'll just take

 23   it for granted that you're going to follow his

 24   instructions, agreed?

 25        A.  Yes.

1      Q.  Have you ever taken a deposition yourself

2   before, Mr. Seery?

3      A.  Have I ever been deposed?

4      Q.  No.  I've already asked -- asked -- asked you

5   that question.  Have you ever taken somebody's

6   deposition?

7      A.  I believe I have, yes.

8      Q.  Okay.  January 2021, you have an e-mail

9   exchange with Michael Linn.  What was the substance of

10  that e-mail?

11     A.  Mr. Linn was saying hello mid to late -- I

12  recall it because it was mid to late January.  And he

13  still said, "Kind of late to do a Happy New Year, but

14  Happy New Year."  Wanted to find out basically if there

15  was something for him to do in the Highland case.

16     Q.  What do you mean something for him to do?  What

17  do you mean by that?

18     A.  He --

19               MR. STANCIL:  Objection to form.

20               MR. MORRIS:  (Inaudible) of the question.

21     A.  He indicated that there were potential claims

22  for sale that -- with Redeemer and UBS, I believe.  And

23  wanted to know if there was a path to get information.

24     Q.  (By Mr. McEntire) And what did you respond?

25  Did you respond by e-mail?

```
 1              MR. STANCIL:  Objection to form.

 2       A.  I didn't respond at all.

 3       Q.  (By Mr. McEntire) All right.  So you didn't

 4  pick up the phone, didn't talk to Mr. Linn?  There was

 5  no written response at all?

 6              MR. MORRIS:  Objection to the form of the

 7  question.

 8       A.  I neither picked up the phone nor sent any

 9  written response.

10       Q.  (By Mr. McEntire) All right.  Have you had any

11  further communications with Mr. Linn about the claims?

12              MR. STANCIL:  Objection to form.

13       A.  When he told me he bought the claims, he sent

14  me an e-mail in March of 2021, mid-March, and said that

15  he had purchased claims.  That was the next

16  communication I had with him.

17       Q.  (By Mr. McEntire) So what you're telling us is

18  that between the end of January of 20 -- mid to end of

19  January 2021, he sends you an e-mail wishing you a Happy

20  New Year, a belated Happy New Year, and wanted to

21  know -- get some information about the claims; is that

22  correct?

23              MR. STANCIL:  Objection to form.

24       A.  No, that's not correct.  I think I said he --

25  he inquired if there was a way to get information and to
```

 1   assign a consignee in order to be able to get

 2   information.  And I didn't respond to it.

 3        Q.  (By Mr. McEntire) Okay.  Was he entitled to

 4   sign a -- an NDA and gain access to information in order

 5   to -- for him to evaluate a claims purchase?

 6                MR. MORRIS:  Objection.

 7                MR. STANCIL:  Objection to form.

 8        A.  If -- if somebody would have allowed him to

 9   sign an NDA, then he may have been able to do whatever

10   the NDA permitted, depending on whether -- what the

11   entity would be and who they would be and whether they

12   had information that they were allowed to share.

13        Q.  (By Mr. McEntire) Did you make a decision at

14   that time that you were not going to respond because you

15   would not allow any access to documents even if an NDA

16   had been signed?

17                MR. STANCIL:  Objection to form.

18        A.  No, I did not.

19        Q.  (By Mr. McEntire) What was your reason for not

20   responding to Mr. Linn?

21                MR. MORRIS:  Objection to the form of the

22   question.

23        A.  I was extremely busy.

24        Q.  (By Mr. McEntire) So it simply had to do with

25   your schedule, and that was the reason why you did not

```
 1   respond; is that fair?
 2              MR. MORRIS:  Objection.
 3              MR. STANCIL:  Objection to form.
 4       A.  Yes.  It just was something that was way down
 5   the list of priorities at that time.  And I wasn't rude.
 6   But we were very busy.
 7       Q.  (By Mr. McEntire) All right.  To your
 8   knowledge, Mr. Linn never signed an NDA in connection
 9   with the investigation of the claims, correct?
10              MR. STANCIL:  Objection to form.
11       A.  I don't know what claims you're talking about.
12   But he never -- he never signed an NDA with Highland
13   Capital in connection with these claims purchases, no.
14       Q.  (By Mr. McEntire) That's what I meant, the
15   claims purchases.  When I say "the claims," I'm talking
16   about the claims in which Farallon ultimately acquired
17   an interest, all right?  You understood -- you
18   understood -- you understand my -- my -- the way I'm
19   trying to define this?
20       A.  There's separate sets of claims.  But I think I
21   answered it.
22       Q.  When you say "there's a separate set of
23   claims," what are you referring to?
24       A.  There's different claims that traded to
25   different entities.
```

```
 1       Q.  Fair enough.  Okay.

 2            Did -- did Stonehill ever sign an NDA in

 3  connection with this investigation of its investment to

 4  acquire these claims?

 5            MR. STANCIL:  Objection to form.

 6       A.  I don't believe so, no.

 7       Q.  (By Mr. McEntire) Did you have any

 8  conversations with Jim Dondero concerning Farallon's

 9  interest in connection with potentially investing --

10  investing in claims in the Highland Capital bankruptcy?

11       A.  No.

12            MR. STANCIL:  Objection to form.

13       Q.  (By Mr. McEntire) Do you have any knowledge as

14  to whether these -- these claims, the claims that we're

15  referring to, were ever put out for bid?

16       A.  I -- I have some knowledge, yes.

17       Q.  Tell me what your knowledge is.

18       A.  I believe that the claims for -- the claims of

19  UBS -- well, maybe not UBS.  The -- I think the claim of

20  UBS and the claim of Redeemer may have been in some sort

21  of broker process or some sort of organized process.

22  And I believe the claim of HarbourVest may have been in

23  some organized process.  I don't know about the Aces'

24  claim.  And what I've heard on this is really post

25  effective date discussions of how they came to own their
```

1   claims.

2       Q.  In connection with any brokerage process that

3   may have been affiliated, you had no personal knowledge

4   of any brokerage process, did you?

5       A.  None whatsoever, no.

6       Q.  Can you -- can you identify whether any entity

7   ever signed an NDA to have access to any type of data

8   room or information relating to Highland Capital in

9   connection with the potential purchase of the claims

10   that we're discussing?

11       A.  I -- I don't think anybody signed an NDA in

12   connection with any claims purchases or any process.

13       Q.  So you -- so sitting here today, to the -- to

14   the extent there was any type of bidding or brokerage

15   process, you're not aware of any company or individual

16   signing any NDA with Highland Capital; is that correct?

17       A.  With Highland Capital, no.

18       Q.  Are you aware of any -- any -- are you aware of

19   Farallon signing any NDA with any of the claims sellers?

20       A.  I am not so -- I have no knowledge of that.

21       Q.  Do you have any knowledge of Stonehill signing

22   any NDA in connection with any claims sellers?

23       A.  I -- I have no knowledge of whether they --

24   they did or didn't.  Not -- not that I recall with

25   either of them.

```
 1        Q.  What documents did you actually review to

 2   prepare for this deposition?

 3               MR. STANCIL:  Objection to form.

 4               So, Mr. McEntire, I would instruct

 5   Mr. Seery not to identify attorney work product or any

 6   conversations or discussions that he had with us.  He

 7   could identify documents he reviewed to refresh his

 8   recollection in preparation for this deposition.

 9               MR. MCENTIRE:  Well, I certainly -- to make

10   it very clear, I would never ask you to disclose what --

11   what Mr. Stancil has advised you or discussed with you.

12   We'll put that to the side.  That's in a -- that's in a

13   protected box.

14               Are you -- Mr. Stancil, are you claiming a

15   joint interest privilege with Mr. Morris that would also

16   stave off any questions related to his discussions with

17   Mr. Seery?

18               MR. STANCIL:  Yes.  We have a common

19   interest with Mr. Morris's firm and the Highland parties

20   in connection with this litigation, yes.

21               MR. MCENTIRE:  And is there a written joint

22   defense agreement or a common interest agreement, just

23   so I know?

24               MR. STANCIL:  I'm not going to answer that.

25               MR. MCENTIRE:  All right.  Fair enough.
```

```
 1        Q.  (By Mr. McEntire) Mr. Seery, I take it that,

 2   then, that you will follow your counsel's instructions,

 3   that you will not disclose any communications that

 4   you've had with Mr. Morris or his firm relating to

 5   preparing for this deposition; is that correct?

 6               MR. MORRIS:  And I'll direct him not to

 7   answer that question.  Well, he can answer -- he can

 8   answer whether he'll follow Mr. Stancil's advice.

 9   That's fine.

10        A.  That's my intention to do so, yes.

11        Q.  (By Mr. McEntire) All right.  What documents

12   did you review to refresh your memory for purposes of

13   preparing for this deposition?

14        A.  I don't recall any document review outside of

15   what I discussed with Mr. Stancil and Mr. Morris.  I

16   certainly looked at the pleadings that you filed and the

17   prior hundreds of pages of attachments, spent various

18   amounts of time on each of them that you submitted as

19   your evidence.  But I don't recall any other documents

20   that would be specific documents off the top of my head.

21        Q.  Did you review any e-mails?

22               MR. STANCIL:  Objection to form.

23        A.  Not other than in connection with discussions

24   with Mr. Morris and Mr. Stancil.

25        Q.  (By Mr. McEntire) Well, I'm not referring to
```

e-mails between you and the lawyers. But did you review -- review any e-mails involving third parties from whom you're not seeking legal advice?

MR. STANCIL: Mr. McEntire, I need to figure out how to instruct him to answer or not answer. Do you mean -- or would you please rephrase to be specific as to whether he reviewed any e-mails to refresh his recollection for this deposition?

MR. MCENTIRE: Well, it's my position, Mr. Stancil, if he reviewed any e-mails, setting aside the issue of what you define unilaterally as refreshing his -- his recollection, if he's reviewed any non-privileged e-mail, that's -- that's -- that should be identified.

MR. STANCIL: But -- but reviewed in preparation for his testimony in this deposition, not just at any time.

MR. MCENTIRE: I'm asking specifically for if he -- if he has looked at any non-privileged communications not involving attorneys in connection with him preparing for this deposition.

MR. STANCIL: Okay. You may answer, Mr. Seery.

A. Certainly I've looked at -- in prepping for the deposition with Mr. Stancil and Mr. Morris, I looked at

 1   some e-mails that I received that didn't have

 2   Mr. Stancil or Mr. Morris on them.  But my review of

 3   them was in connection with my preparation for the

 4   deposition with them.

 5       Q.  (By Mr. McEntire) Well, I'd like you to

 6   identify those e-mails then for me because I don't

 7   consider those to be privileged.  So I would like you to

 8   identify those communications.

 9       A.  Not hearing any objection, I believe the e-mail

10   that I got from Mr. Linn in January of 2021.  I believe

11   there's an e-mail in -- at the end of February after

12   confirmation from Mr. Stern.  And generally e-mail in

13   connection with Farallon and Stonehill signing NDAs in

14   that first or second week of April.

15       Q.  All right.  Any other e-mail communications?

16       A.  Not -- not that I recall off the top of my

17   head.  Something ---

18       Q.  How about -- how about text messages?  Did you

19   review any text messages?

20       A.  Yes.  I would have reviewed text messages

21   around the same times.

22       Q.  What text messages were those?

23       A.  I believe the first communication from

24   Mr. Stern is a text message that introduces himself

25   and -- at the end of February 2021 and gives me his

1  e-mail and indicates that he wanted to talk about the

2  case which you just then confirmed.

3      Q.  Any other text messages that you recall

4  reviewing?

5      A.  If there were any along those series, it would

6  have been -- I would have -- I would have checked them

7  just to see if there were any communications.  So there

8  would be some in there.  But not -- not with any

9  substance.  They would always say, "I'll call you back

10  in five minutes," that kind of stuff.

11      Q.  Did you receive any -- you also indicated you

12  may have received an e-mail associated with that -- that

13  text message from Mr. Stern, and that would have

14  occurred at the end of February 2021?

15      A.  He --

16          MR. STANCIL:  Objection to form.

17      A.  Yeah.  I indicated he gave me his e-mail

18  address because he -- since I didn't know him, I didn't

19  have it.

20      Q.  (By Mr. McEntire) Did you respond to his text

21  message or his e-mail?

22      A.  I think over the -- my recollection is over the

23  next ten days or so, we did touch base by phone.  I told

24  him there was nothing to do.  And we then had some

25  correspondence back and forth over a period of time.

```
 1        Q.  Mr. Stern is with Stonehill?

 2        A.  That's correct.

 3        Q.  The initial January, Feb- -- excuse me.  The

 4   initial February 2021 e-mail where Mr. Stern contacted

 5   you, what was -- what was the substance of that e-mail?

 6   What did it say?

 7        A.  Mr. Stern didn't contact me in January of 2021.

 8        Q.  No.  I said February.  I'm sorry.  I misspoke.

 9   February.

10        A.  He sent -- I believe it was a text.  And he

11   gave me his address, his e-mail address.  And then we --

12   we talked.  I don't recall if it was text or e-mail and

13   how it got set up.  But we spoke.  And he was interested

14   in acquiring assets because he had seen that there was a

15   monetization plan and wanted to know how to get

16   involved.  It had already been confirmed.

17        Q.  So this is post confirmation in February of

18   2021, correct?

19        A.  The end of February, correct.

20        Q.  And he -- on behalf of Stonehill expressing an

21   interest in acquiring assets?

22        A.  I believe assets.  I don't know that he -- he

23   didn't -- I don't know if he mentioned claims or didn't

24   mention claims.  He wanted to get involved in the -- in

25   the case in some way.  At some point in that early
```

1  exchange told him we were very tied up, but we would try

2  to get back to him if there's something to do.  We

3  hadn't figured out what we needed to do yet.

4      Q.  All right.  And so you had this one phone call.

5  When did the phone call take place?  Or maybe it was

6  more than one?

7      A.  I don't -- I don't recall speci- -- it would

8  have been after -- it would have been in the beginning

9  of March.

10     Q.  All right.  Did you have more than one phone

11  call?

12     A.  I'm sure I did.

13     Q.  Do you have a record of those phone calls?

14     A.  Typically I would have some sort of either note

15  or there would be a text where he called me and I

16  replied "Five," which will mean I'll call you back

17  because I use --

18     Q.  So your general recollection is that you had

19  more than one phone call with Mr. -- Mr. Stern?

20     A.  One -- one or two.  First was just a general

21  indication of interest.  And then several weeks later,

22  there was some further discussion where we were working

23  on financing.  And I told him that I'd get back to him.

24  And then several weeks later, which I think is towards

25  the end of -- beginning of April, wanted to know if he

1    still had any interest because we were working on

2    financing.

3         Q.  Did you have any communications with

4    HarbourVest in connection with the sale of their --

5    their claim?

6         A.  No.

7         Q.  Did you have any communications with the

8    Redeemer Committee in any manner or form, and I'm

9    referring to both text messages, e-mail, or verbal

10   conversations or meetings with Redeemer Committee in

11   connection with the sale of their interest?

12        A.  Not that I recall specifically.  The only thing

13   I can recall with respect to Redeemer is that Redeemer

14   didn't actually handle the sales.  But I was told by

15   Eric Felton.  And he just said he wasn't involved.  He

16   was the committee representative.  So I had a discussion

17   with him inquiring as to whether they were selling their

18   claim at some point.  I don't recall when it was.  And

19   expressed my -- my view around it.  And --

20        Q.  What was your -- what was your view?

21        A.  I was disappointed because I thought they were

22   a constructive partner in the case and that they were a

23   little less emotional around the multiyear litigation

24   than -- than others in the case might have been.

25        Q.  Did you have any communications with Aces in

```
 1   connection with the sale of its claim?

 2        A.  No.

 3        Q.  Did you have any communications with UBS -- and

 4   I mean this broadly -- communication in connection with

 5   the sale of its claim?

 6        A.  I -- I think I did.  I think I did in August,

 7   July or August of 2021.

 8        Q.  What was the context of that communication?

 9        A.  They -- their lawyer reached out and wanted to

10   know if we had an idea when we were going effective.

11   And the context of that question, my recollection is,

12   was that if they were going to do any sale of any or all

13   of their claim, they would have to do it before that

14   date.

15              MR. MCENTIRE:  Ms. Court Reporter, I lost

16   track of his answer.  Can you read back his answer,

17   please?

18              THE COURT REPORTER:  Yes.  Hold on.  Okay.

19              (Sotto voce discussion off the written

20               record.)

21              MR. MCENTIRE:  Can you repeat the answer

22   please, Ms. Court Reporter?

23              THE COURT REPORTER:  I'm trying to.  Hold

24   on.

25              (Requested portion read back.)
```

```
 1        Q.  (By Mr. McEntire) Did you express an opinion

 2   whether it should be done before that date, or was that

 3   their question to you?  That's what I didn't understand.

 4        A.  They knew the answer, which was claims couldn't

 5   be traded after the effective date.  They were calling

 6   to see if I knew when the effective date would be.  And

 7   we were working hard to try to get to an effective date.

 8        Q.  So all of the trades had to take place before

 9   the effective date?

10        A.  Yes.

11        Q.  I want to shift gears for a second, Mr. --

12             (Interruption.)

13        Q.  (By Mr. McEntire) -- Mr. Seery.

14             MR. MCENTIRE:  Somebody is talking.  If

15   you're going to talk, please put it on mute.

16        Q.  (By Mr. McEntire) Mr. Seery, as the CEO of the

17   debtor in possession and as a lawyer -- you're

18   currently -- you're currently actively a lawyer; is that

19   correct?

20        A.  That's incorrect.

21        Q.  Have you suspended your license?

22        A.  I have put it into -- I forget what they call

23   it in New York -- a hiatus, a semi-suspension, or

24   retirement.  I'm not sure.

25        Q.  When did that occur?
```

1        A.  I don't recall if it was '21 registration or

2   '22 registration.  I think it was '21.  It's biannual.

3        Q.  But you have been practicing as a lawyer for,

4   what, 30-plus years?

5        A.  That's incorrect.

6             MR. STANCIL:  Objection to form.

7        Q.  (By Mr. McEntire) How long have you actually

8   engaged in the practice of law?

9        A.  About ten years.

10       Q.  That's when you were with Sidley Austin?

11       A.  No.  That's incorrect.

12       Q.  Who were you with?

13       A.  I started my career with Cadwalader.  I went to

14  a firm called Phillips Nizer.  Then I -- I left.  And

15  then I had two years at Sidley Austin.

16       Q.  Okay.  In connection with your role as a CEO of

17  a debtor in possession, do you recognize that you have

18  fiduciary duties to the bankruptcy estate?

19             MR. STANCIL:  Objection, calls for a legal

20  conclusion.

21             MR. MCENTIRE:  You can answer.

22             MR. STANCIL:  If you know.

23       A.  I -- I believe -- I believe I have a fiduciary

24  duty to the estate or to -- to Highland, yes.

25       Q.  (By Mr. McEntire) And what is the nature of

 1  those duties?

 2              MR. MORRIS:  Objection --

 3              MR. STANCIL:  Objection to form.

 4              MR. MORRIS:  -- to the question.

 5      A.  I -- I don't know.  I think it's just to act

 6  honestly and fairly.

 7      Q.  (By Mr. McEntire) I'm sorry?  I couldn't hear

 8  you.

 9      A.  I think it's to act honestly and fairly with

10  respect to the -- to the estate.

11      Q.  All right.  And as the CEO of a debtor in

12  possession, did you have any fiduciary duties to the

13  equity, Hunter Mountain Investment Trust?

14              MR. STANCIL:  Objection to form.

15              MR. MORRIS:  Objection to the form of the

16  question.

17      A.  I don't believe I had any fiduciary duties to

18  Hunter Mountain Investment Trust.

19      Q.  (By Mr. McEntire) So you -- it's your -- it's

20  your position that you owe no duties at all to the

21  existing equity; is that -- is that your position?

22              MR. STANCIL:  Objection to form.

23              MR. MORRIS:  Could you repeat the question?

24      Q.  (By Mr. McEntire) It's your position that you

25  owe no duties as the CEO of the debtor in possession,

 1  you owe no duties to Hunter Mountain Investment Trust as

 2  the equity; is that correct?

 3              MR. MORRIS:  Objection --

 4              MR. STANCIL:  Objection to form.

 5              MR. MORRIS:  -- form of the question.

 6      A.  Yeah.  I think my -- my duties ran to the

 7  estate in a bankruptcy situation, not to the individual

 8  equity.

 9      Q.  (By Mr. McEntire) Were you involved in the

10  drafting of the claimant trust agreement?

11      A.  I believe I read it before it was final.  And

12  I'm sure I provided comments.

13      Q.  Did you -- okay.  Who was -- who negotiated the

14  claimant trust agreement, if there were a party and

15  counterparty?  Was there a counterparty who drafted that

16  or involved?

17      A.  All of the plan documents were similarly

18  negotiated between the debtor and the committee.

19      Q.  That's the unsecured creditors committee?

20      A.  That's correct.

21      Q.  Was the claimant trust agreement fully

22  negotiated before Farallon acquired its interest in the

23  claims?

24              MR. STANCIL:  Objection to form.

25      A.  Yes.

```
 1        Q.   (By Mr. McEntire) Was the claimant trust

 2   agreement fully negotiated before Stonehill acquired its

 3   interest in the claims?

 4             MR. STANCIL:  Objection to form.

 5        A.   I previously testified I don't really know

 6   exactly when Stonehill acquired their claims.

 7        Q.   (By Mr. McEntire) All right.  As the trustee,

 8   you are the -- you are a trustee in terms of the

 9   claimant trust agreement.  That's correct, is it not?

10        A.   I'm the claimant trustee, yes.

11        Q.   And what -- what are your duties as the

12   claimant trustee?  To whom do you owe fiduciary duties?

13             MR. MORRIS:  Objection.

14             MR. STANCIL:  Objection to form.

15        A.   They're laid out in the claimant trust

16   agreement.  I owe duties to the claimant trust in the

17   Class 8 and Class 9 beneficiaries.

18        Q.   (By Mr. McEntire) Is it your position under

19   pertinent law that you owe no duties at all to Class 10?

20             MR. STANCIL:  Objection to form.

21             MR. MORRIS:  Objection to the form of the

22   question.

23        A.   I think my duties are delineated -- delineated

24   by the -- and limited by the claimant trust agreement.

25   And if you're not a claimant trust beneficiary
```

1   currently, I don't owe any duties to you.

2        Q.   (By Mr. McEntire) In connection with your

3   involvement as the trustee, have you undertaken any

4   effort to evaluate what Class 10's rights are under

5   Delaware trust law?

6              MR. STANCIL:  Objection to form and calls

7   for --

8              MR. MORRIS:  Objection to the form of the

9   question.  And I'm going to direct him not to answer to

10  the extent that it involves legal advice.

11             MR. MCENTIRE:  I'm not soliciting or asking

12  a question.  I'm asking whether he personally has

13  undertaken the effort.  I'm not asking for any advice

14  received from any lawyer.

15       Q.   (By Mr. McEntire) My question stands,

16  Mr. Seery.  Have you undertaken any effort to -- to find

17  what duties a trustee may owe under Delaware trust law?

18             MR. MORRIS:  You can answer yes or no.

19             MR. STANCIL:  Same objection.  With

20  respect -- you used the word "any," Mr. McEntire.  And

21  it's a legal question.  So I don't think he can answer

22  your question.

23             MR. MCENTIRE:  Well, let's see if he can.

24  Let's see if he can.

25             MR. STANCIL:  Well, I'm directing him not

1  to answer what he may or may not have asked a lawyer.

2          MR. MCENTIRE:  I -- but I've made it very

3  clear, Mr. Stancil, that I'm not asking him what he has

4  discussed with other lawyers, okay, or his lawyers.  I'm

5  asking him whether you have undertaken any effort

6  personally to determine what your duties are under

7  Delaware trust law.

8          MR. STANCIL:  All right.  Mr. McEntire, may

9  I suggest you clarify your question to say other than

10  communications with lawyers.  And then --

11          MR. MCENTIRE:  I just did.

12          MR. STANCIL:  And then --

13          MR. MCENTIRE:  Well, you're --

14          MR. STANCIL:  Okay.  Then say it -- then

15  say it correctly.  And maybe we can let him answer it.

16          MR. MCENTIRE:  You know, Mr. Stancil, I'm

17  not going to take instructions on how to correctly

18  phrase a question because my question was perfectly

19  correct.  I'm going to try it one more time.

20      Q.  (By Mr. McEntire) Mr. Seery, did you personally

21  undertake any effort to evaluate what your duties were

22  as a trustee and continue to be as a trustee to

23  Class 10, setting aside any discussions you've had with

24  your lawyers?

25      A.  I personally have taken numerous efforts with

 1  my lawyers.  I have not done any independent research on

 2  my own, gone to Delaware case law or gone to the

 3  Delaware codes and looked up what might be pertinent

 4  with respect to this trust and its responsibilities.

 5      Q.  You have -- you have personally done that

 6  research?

 7      A.  I said I did not.

 8      Q.  Okay.  So sitting here today and setting aside

 9  any conversations you may have had with your attorneys,

10  you do not know what the duties may be under Delaware

11  trust law; is that correct?

12              MR. MORRIS:  Objection to the --

13              MR. STANCIL:  Objection to form.

14              MR. MORRIS:  -- form of the question.

15      A.  It's not correct.

16      Q.  (By Mr. McEntire) All right.  Setting aside any

17  discussions you've had with your lawyers, what is your

18  understanding of what duties you may have to Class 10

19  under Delaware trust law?

20              MR. MORRIS:  Objection --

21              MR. STANCIL:  Objection.

22              MR. MORRIS:  -- to the form of the

23  question.

24              MR. STANCIL:  Instruct -- go ahead, John.

25              Well, I instruct the witness not to answer.

1          MR. MORRIS:  Instruct him not to answer

2   unless he has an independent basis to answer.  Unless he

3   has a basis for answering other than the advice he's

4   received, he's welcome to answer the question.

5          MR. MCENTIRE:  I think I made that clear.

6   We were already at that point.

7      Q.  (By Mr. McEntire) Do you have --

8          MR. STANCIL:  Mr. McEntire, you're asking

9   him for legal answers on which he is telling you he's

10  received legal advice.  So I don't know how he can

11  separate --

12         MR. MORRIS:  And has done no independent

13  research.

14     Q.  (By Mr. McEntire) Let's try it this way.

15  Setting aside any understandings you've acquired from

16  your lawyers, your bevy and covey of lawyers, do you

17  know what your duties are under Delaware trust law to

18  Class 10?

19         MR. MORRIS:  I move to strike the reference

20  to "bevy of lawyers."

21         MR. STANCIL:  Mr. Seery, I instruct you not

22  to answer what your understanding is of a legal question

23  because I don't believe you can do it without disclosing

24  privileged information.

25     Q.  (By Mr. McEntire) You're going to follow your

 1 | lawyer's advice, right?

 2 |     A.  Yes.

 3 |     Q.  Sitting here today, can you tell me whether or

 4 | not Farallon did any due diligence at all in connection

 5 | with this investment in the claims at issue?

 6 |     A.  I have an indication they did, yes.

 7 |     Q.  What is your indication and how did you get it?

 8 |     A.  In -- in June of 2020, I got an e-mail from

 9 | Mr. Linn that said that he and his associate had been

10 | following the case and just congratulating me on getting

11 | appointed as the independent trustee -- or independent

12 | director.  I'm sorry.

13 |     Q.  So you got an e-mail from Mr. Linn in June of

14 | 2020 after you had been appointed?  Is it June 2020 or

15 | June '21?

16 |     A.  June 2020.

17 |     Q.  You got an e-mail from Mr. Linn in June of 2020

18 | congratulating you on your appointment as the CEO?

19 |         MR. MORRIS:  Objection to the form of the

20 | question.

21 |     Q.  (By Mr. McEntire) I couldn't hear your answer

22 | because they're -- they're talking so much.  What did

23 | you say, Mr. Seery?

24 |         MR. MORRIS:  You're not listening very

25 | much.

1          MR. MCENTIRE:  I'm trying to.

2          MR. MORRIS:  Then have the answer read

3    back.

4        Q.  (By Mr. McEntire) Let's try it this way.  You

5    got an e-mail in June of 2020 from Mr. Linn.  What did

6    it state?

7        A.  It congratulated me on my appointment as an

8    independent board member or director at Highland and

9    indicated that Mr. Linn had been following -- Mr. Linn

10   and his associate had been following the case.

11       Q.  Fair enough.

12            Other than an indication that they had been

13   following the case, are you aware of any other due

14   diligence that Farallon did in connection with this

15   investment and these claims?

16       A.  No, I'm not.  I didn't speak with them

17   between -- or have any correspondence with them between

18   June of 2020 and the previously described e-mail in

19   January, mid-January of 2021.

20       Q.  Fair enough.

21            Do you have any knowledge as to whether or

22   not Stonehill did any due diligence in connection with

23   this investment and these claims?

24       A.  I have no knowledge about their -- what

25   diligence they did with respect to their investment and

 1   the claims, no.

 2       Q.  When is the last time you -- you have talked

 3   with either Michael Linn or Raj Patel?

 4              MR. STANCIL:  Objection.  To the extent

 5   this calls for a description of common interest

 6   discussions, I would instruct the witness not to answer.

 7              MR. MCENTIRE:  I simply asked him a date,

 8   when is the last time.  I didn't ask him the substance,

 9   Mr. Stancil.

10       Q.  (By Mr. McEntire) When is the last --

11              MR. STANCIL:  Excuse me.  Excuse me,

12   Mr. McEntire.  I'll respond.

13              I'm instructing the witness not to -- not

14   to answer with the content of any joint interest

15   communications.

16              MR. MCENTIRE:  I'm not asking him for the

17   contents.  I'm asking him when did he last talk with

18   either Mr. Linn or Mr. Patel, the date or the time or

19   month.

20       A.  I speak to Mr. Linn virtually every week on a

21   board call.  We have an oversight board call, if not

22   every week, every other week now.

23              And the last time I spoke to Mr. Patel,

24   that I recall, would probably have been in 2019.  I

25   don't -- I don't recall.  I don't speak to him very

 1  often.

 2       Q.  (By Mr. McEntire) When is the last time you

 3  talked to a representative of Stonehill in connection

 4  with this bankruptcy?

 5       A.  If we consider this bankruptcy the oversight

 6  board, which, for your purposes, I'll -- that's the way

 7  I'm taking the question, a representative of Stonehill

 8  is also on the oversight board calls every week or every

 9  other week.  We -- we have done them every week.  And

10  now we're more like every other week.

11       Q.  And who is that?

12       A.  The representative on the -- for Muck -- for

13  Jessup is a gentleman named Chris Provost.  But we're

14  usually joined by Mr. Stern as well.

15       Q.  What is your understanding of Jessup, the

16  entity?  Is that a special-purpose entity?

17       A.  Just a -- just an SPE that holds -- my -- my --

18  I don't really know.  My only understanding is it holds

19  the interest in the claimant trust.

20       Q.  All right.  Do you know anything about its

21  corporate structure in terms of who the members are?

22       A.  Nothing other than I believe it to be

23  controlled and owned fully by Stonehill.  That's my

24  belief.  I don't --

25       Q.  Fair enough.

1          And is it your belief that Muck is also a

2    special-purpose entity?

3          A.  Yes.

4          Q.  And that, to your understanding or belief, it's

5    also wholly owned or controlled by Farallon?

6          A.  Taking the word "also" out, I believe it --

7    Stonehill -- I think they have two separate entities.

8    My belief is they are special-purpose entities that hold

9    the claims that then became the interest in the trust.

10   And that each -- or one is owned by Farallon, and one is

11   owned by Stonehill.

12         Q.  Jessup, you understand, is owned by Stonehill,

13   and Muck is owned by Farallon?

14         A.  That's correct.

15         Q.  Are you familiar with a -- a charity known as

16   Rubicon Team?

17         A.  That's not the name of it.  It's called Team

18   Rubicon.  Yes.

19         Q.  I apologize.  Team Rubicon.  What is -- what

20   type of charity is that?

21         A.  It's a veteran-led organization that deploys

22   veterans to disasters around the country and the world

23   to help service the communities that those -- those

24   disasters occur in, focused mainly in the United States

25   but does it globally as well.

 1       Q.  Are you involved in that charity?

 2       A.  I am, yes.

 3       Q.  What is your role?

 4       A.  I -- I'm just an active member.  And I -- I

 5  participate in the fundraising gala every year.

 6       Q.  All right.  And you serve on the host

 7  committee?

 8       A.  Yes.

 9       Q.  Is Stonehill connected with that charity?

10       A.  I don't know what you mean "connected with" by.

11       Q.  Has it been involved in raising funds or

12  underwriting various events for that charity?

13       A.  Not to my knowledge.

14       Q.  You said you don't know what I mean "connected

15  with."  Does Stonehill have any involvement at all, to

16  your knowledge, with that charity?

17       A.  I believe they made a contribution.

18       Q.  And when was that contribution?

19       A.  I believe they made it in connection with last

20  year's gala.

21       Q.  How much did they contribute?

22       A.  I don't recall.  I think it may have -- I don't

23  recall.  I think it may have been $10,000, but I don't

24  recall.

25       Q.  Did Farallon make a similar contribution?

```
 1      A.  I don't recall if Farallon made it or Mr. Linn

 2  made it on his own.  But I believe they made a

 3  contribution as well.  I -- I should be better versed in

 4  that.  I just don't recall.

 5              I should add that there's tens of thousands

 6  of people who make contributions to Team Rubicon.

 7      Q.  I'm sure there are.  I'm not -- I'm not

 8  debating that.  I simply was asking questions about

 9  Farallon and Stonehill, though.

10              Are you involved in any other charities in

11  which either Farallon or Stonehill have also been

12  contributors?

13      A.  No, I'm not.

14      Q.  And how long have you been involved with Team

15  Rubicon?

16      A.  I think I've been involved at least five,

17  seven years.

18      Q.  And has Farallon made -- or Mr. Linn, rather,

19  has he made a contribution on more than one occasion?

20      A.  I don't recall specifically whether they --

21  whether it's Farallon or Mr. Linn.  And I don't recall

22  whether it's one year or more than one year.

23      Q.  Same question with regard to Stonehill.  Do you

24  recall whether Stonehill has been a contributor for --

25  on more than one occasion?
```

1          A.  I -- I -- I don't recall.  I -- if -- I wish

2     they had.  I wish I could recall.  But it would be

3     really nice if they have and they continue to do so.

4     Hopefully your worthless inquiry in this method won't

5     dissuade people from contributing to a fantastic

6     charitable organization.

7          Q.  I'm sure it is.

8          A.  No, you're not.

9               MR. MCENTIRE:  Tim, would you put up the

10    memorandum of agreement.  In our tab, it's Tab 10.

11              THE WITNESS:  That's just downright

12    despicable.  It's the best.  It's the best.

13         Q.  (By Mr. McEntire) All right.  This was attached

14    as Exhibit 41, Mr. Seery, to the joint opposition that

15    was filed by, I believe, your lawyer and Mr. Morris in

16    connection with these proceedings.  You're familiar with

17    this document, are you not?

18         A.  Can I see the whole thing, please?

19         Q.  Sure.

20         A.  Yes, I'm familiar with the document.

21              MR. MCENTIRE:  All right.  Let's go back to

22    the first page -- or the second page, Tim, please.

23              Scroll down a little bit.  I want to look

24    at the signature lines, please.

25         Q.  (By Mr. McEntire) Do you know what

 1   Mr. Christopher Provost's actual position is with Jessup

 2   Holdings?

 3        A.  He's the representative on the board.  I don't

 4   know that he has a position or not.

 5        Q.  Do you know what Michael Linn's position is

 6   with Muck Holdings?

 7        A.  He's the representative on the board.  I don't

 8   know if he has a position at Muck Holdings or not.

 9        Q.  Is Mr. Linn also -- excuse me.  Is Mr. Patel

10   ever involved in the oversight board?

11        A.  No.

12        Q.  Mr. Stern from Stonehill?

13        A.  He participates in the -- in the -- in the

14   calls, yes.

15        Q.  Okay.  Anybody else from Farallon participate

16   in the calls, other than Mr. Linn?

17        A.  A woman named Sofia Jia.

18        Q.  Gia, G-I-A?

19        A.  J-I-A.

20        Q.  J-I-A.  You understand she's from Farallon's

21   offices in San Francisco?

22        A.  She works out of those offices, yes.

23             MR. MCENTIRE:  All right.  Go back to the

24   top of the page, please, Tim.

25        Q.  (By Mr. McEntire) I want to read the first

1  line.  "In accordance with the provisions of the

2  Highland Claimant Trust Agreement and the Highland

3  Capital Management Plan of Reorganization, the oversight

4  board of the Highland Claimant Trust and the claimant

5  trustee/chief executive officer of HCMLP engaged in

6  robust, arm's-length and good faith negotiations ..."

7         Have I read that correctly?

8     A.  I believe so, yes.

9     Q.  You are the claimant trustee and chief

10 executive officer referred to here, correct?

11    A.  That is correct.

12    Q.  Who did you specifically deal with in these

13 robust, arm's-length and good faith negotiations?  What

14 are the names of the individuals?

15    A.  The -- each of the members of the independent

16 board.  So it would be Mr. Katz, Mr. Linn, Mr. Provost.

17    Q.  And were there proposals that went back and

18 forth?

19    A.  Yes.

20    Q.  How many proposals went back and forth?

21    A.  My recollection is approximately four or five

22 rounds of back-and-forths.

23    Q.  Did you have any -- I'm sorry.  Were you

24 finished?

25    A.  Probably somewhere in that -- in that

1   neighborhood.  Probably four to five.

2       Q.  Did you represent yourself?

3           MR. MORRIS:  Objection to the form of the

4   question.

5       A.  I -- representing is -- is an odd word.  I

6   acted for myself, yes.

7       Q.  (By Mr. McEntire) Fair enough.

8           And did -- did Mr. Linn or Mr. Provost, did

9   they have any type of attorney representation or did

10  they handle it themselves?

11      A.  To my knowledge, they -- they addressed the

12  issues themselves.

13      Q.  Fair enough.

14          Where are these four -- roughly four

15  proposals that went back and forth?  Where are they

16  located today?

17      A.  I suppose they would be in e-mail form between

18  various parties.  I believe they're summarized in this

19  agreement, to some degree, at the bottom.

20      Q.  Well, if there are proposals, that means that

21  not all the terms were accepted and some of the terms

22  may have been rejected if they went back four times.  So

23  I'm wondering where are the various iterations

24  preserved?  Are they on e-mail strings?

25      A.  They would be --

```
 1                   MR. STANCIL:  Objection to form.
 2        A.  They would -- they would be on -- they would be
 3   in e-mail form, yes.
 4        Q.  (By Mr. McEntire) And are those e-mails
 5   strings -- were you using your Highland Capital e-mail
 6   address?
 7                   MR. STANCIL:  Objection.
 8        A.  Typically I would have used my Gmail address.
 9        Q.  (By Mr. Stancil) Your Gmail address, that's
10   your personal address?
11        A.  Yes.
12        Q.  Okay.  By the way, the text messages that you
13   may have been involved in back in 2021 with -- with
14   Stonehill, was that on your personal phone?
15        A.  I wasn't involved in any text messages in 2021
16   with Stonehill.
17        Q.  I thought you said you were involved in a
18   February 2021 text message with Mr. Stern that followed
19   up with an e-mail?
20        A.  Oh, I'm sorry.  And in 2021, yes, there was a
21   text message.  And, yes, that would have been on my
22   phone, my personal phone.
23        Q.  What was the telephone number of that phone?
24        A.  My telephone number?
25        Q.  Yes.
```

```
 1        A.  It's at the top of the résumé you put at the
 2   start.
 3        Q.  Fair enough.  And is that the same phone you
 4   have today?
 5        A.  It is.
 6             You're not authorized to call me.
 7        Q.  Looking back at the -- the agreement, did you
 8   have any meetings as part of this robust, arm's-length
 9   negotiation or was it all via e-mail?
10             MR. STANCIL:  Objection to form.
11        A.  We had meetings, yes.
12        Q.  (By Mr. McEntire) How many meetings did you
13   have?
14        A.  It would have been -- my recollection is -- is
15   meetings with respect to each proposal back and forth.
16   It wasn't just trading e-mails.
17        Q.  How many meetings did you have?
18        A.  There were, I think, four or five rounds.  So
19   there would have been at least four or five meetings to
20   discuss, with various members, the back-and-forth.
21        Q.  Were these personal meetings or virtual
22   meetings?
23        A.  I'm sorry.  I didn't understand your question.
24        Q.  Were these personal meetings or virtual
25   meetings?
```

 1      A.   These -- these probably were all by phone or on

 2   videoconference.

 3      Q.   Okay.  This document doesn't identify any of

 4   the proposals that were rejected.  Other than these

 5   e-mail strings, is there any way else to identify

 6   specific proposals that were rejected?

 7            MR. STANCIL:  Objection to form.

 8      A.   I don't think your premise is correct.

 9      Q.   (By Mr. McEntire) Then tell me why my premise

10   is incorrect.

11      A.   I believe there's a summary at the bottom that

12   shows at least some of the back-and-forth.  It does not

13   show all of it, but it shows some of it.

14            MR. MCENTIRE:  Tim, why don't you skim

15   down.

16      Q.   (By Mr. McEntire) Tell me where -- what you're

17   suggesting is the -- the --

18            MR. MCENTIRE:  Scroll slower.

19      Q.   (By Mr. McEntire) Is this what you're referring

20   to?

21      A.   Yes.

22      Q.   Okay.  So we -- we have the summary of

23   Proposal 1, summary of Proposal -- it's difficult for me

24   to read.

25            MR. MCENTIRE:  Can you highlight that, make

1  it zoom in?

2     Q.  (By Mr. McEntire) Can you see it, Mr. Seery?

3     A.  Yes.

4     Q.  Okay.  So for instance, that would be your

5  first proposal, their -- their proposal back.  Are

6  you-all simply negotiating percentages and tiers?

7     A.  No.

8     Q.  Well, what were the nature of the discussions

9  then?

10     A.  They were about the -- both the amount and the

11  structure of the compensation plan, so each of the

12  iterations amount was part of it.  That's part of the

13  metrics.  That's easier to capture in Excel.  And then

14  the form and structure were -- were verbal and contained

15  in either e-mails or verbal discussions.

16     Q.  Seery Proposal No. 1, when was it -- when would

17  it have been presented?

18     A.  I believe it was August of 2021.

19     Q.  Did any of these conversations take place

20  before the effective date?

21     A.  No.

22     Q.  Do you have a calendar or some way that you

23  could confirm when the meetings occurred?

24     A.  If it was a meeting that was calendared, I

25  could.  If it was a call, then it wouldn't be on the

1  calendar.

2     Q.  Whose idea was it to develop a bonus

3  participation based upon the recovery for the various

4  classes of creditors?

5     A.  The initial proposal came from the structure of

6  the claimant trust agreement and the plan which

7  conditioned a success fit.  My -- my initial ask was

8  that it be based on recoveries because that's how I

9  viewed success in the context of a monetization plan

10  that sought to maximize values.

11     Q.  So can you just walk -- walk us through your

12  proposal on how -- your Seery Proposal No. 1 and explain

13  to me how it would work?

14     A.  My proposal -- my initial proposal was that

15  there would be a entire bonus pool, that it would be

16  based upon recoveries, very little just to meet the plan

17  expectation of 71-and-change cents and then graduated

18  but more evenly between the plan projection and amounts

19  above the plan projection.  My proposal was to basically

20  have a total pool that I would control.  And then to the

21  extent that I determined performance, I would allocate

22  it to myself and to various members of the team.

23     Q.  The various members of the team are the portion

24  on the right that's redacted?

25     A.  That's correct.

1    Q.  Okay.  So we can -- can I safely assume that

2   all the redactions are limited just to members of your

3   teams?

4    A.  That's correct.

5             MR. MORRIS:  I'll make that representation

6   to you so that it's really clear.  Yes.

7    Q.  (By Mr. McEntire) Going back to -- you used the

8   term "the plan projection."  That's the 71 percent

9   recovery rate for Class 8 claims?

10    A.  The -- the actual projection was 71 -- near 71

11   and a half, 71.32.

12    Q.  So when -- just to be clear, when -- when

13   Farallon invested in the claims in the -- in the spring

14   of 2021, the only information provided at that time by

15   Highland Capital was that there was a projected

16   71 percent recovery for Class 8, correct?

17             MR. STANCIL:  Objection to form.

18    A.  That's far from the only information that was

19   provided.  That was the projected recovery in the plan.

20   And the projections are next to the plan that would pay

21   that 71-and-change over a two-year period, excluding

22   litigation against the debt (inaudible).

23    Q.  (By Mr. McEntire) Okay.  And -- and from the

24   time of that projection, at the time of the plan in

25   February 2021, that remained the same projection up and

 1    through the effective date, correct?

 2                    MR. STANCIL:  Objection to form.

 3        A.  Once the plan was confirmed, we didn't amend

 4    our -- our projections that were on file.  That --

 5    that -- we did not.

 6        Q.  (By Mr. McEntire) All right.  So, basically, if

 7    I understood you correctly, if you simply met the

 8    expectations of the plan, your participation would be

 9    lower; is that correct?

10        A.  It was --

11                    MR. STANCIL:  Objection to form.

12        A.  Yeah.  I think that's correct.  It would be --

13    it would be -- it would be pretty small at best.

14        Q.  (By Mr. McEntire) You said small.  Okay.  Why

15    would it increase if you exceeded those expectations?

16        A.  The idea was to structure a success fee, which

17    was, I believe, how it was defined in the plan.  And

18    success was going to be measured on not just meeting

19    plan expectations but exceeding plan expectations.  And

20    so to incentivize myself and the team to not just meet

21    the plan but really try to maximize value, the plan

22    would be structured with additional compensation the

23    more success I and the team had.

24        Q.  So the idea here is the more certain the

25    recovery, the lower the participation was; the greater

 1   the uncertainty, the greater the participation bonus; is

 2   that fair?

 3              MR. MORRIS:  Objection.

 4              MR. STANCIL:  Objection to form.

 5       A.  I don't think certainty is the way to think

 6   about these concepts.

 7       Q.  (By Mr. McEntire) Well, in February of 2021,

 8   you were projecting zero recovery for Class 9, correct?

 9              MR. STANCIL:  Objection to form.

10       A.  That -- that's correct.

11       Q.  (By Mr. McEntire) And if you achieved Class 9

12   recoveries, your -- your participation fee would be

13   significantly higher, correct?

14       A.  I don't -- I don't understand what you mean by

15   participation fee.  But the bonus structure was set up

16   that if you exceeded Class 8 projection, then more bonus

17   would be earned.  If you -- the more you exceeded it,

18   the more bonus would be earned.  And if you got into

19   Class 9, there would be even more bonus sent.

20       Q.  Why -- why would you -- other than

21   incentivizing, why would you get more and more as -- as

22   the recoveries increased?

23              MR. STANCIL:  Objection to form.

24       A.  It indicates -- other than -- incentivizing is

25   one.  But it indicates better performance.

```
 1        Q.   (By Mr. McEntire)  Why?

 2        A.   Because the recoveries are increased.

 3        Q.   And better performance because those recoveries

 4   are less certain than what the plan was projecting in

 5   February of 2021?

 6                   MR. STANCIL:  Objection to form.

 7        A.   Again, I don't -- I don't accept your

 8   certain/not certain distinction.  I just don't think it

 9   makes any sense.  The better the performance, the effort

10   and the successful effort gets rewarded higher.

11        Q.   (By Mr. McEntire)  Well, when you negotiated

12   and -- and presented Seery Proposal No. 1, did you have

13   an expectation at that time in August of 2021 that you

14   would recover Class 9 -- you would have recovery in

15   Class 9?

16                   MR. STANCIL:  Objection.

17        A.   I don't believe we did.  We really thought we

18   wouldn't have any recovery into Class 9 except for the

19   potential of litigation.

20                   And you'll recall, by that time, we had

21   discovered the Sentinel fraud and the damages that --

22   that Dondero and other entities had caused to -- to the

23   estate through that and other frauds, you know,

24   involving north of 100 to 300 million dollars worth of

25   assets.  And that indicated that there may be some
```

```
 1   recovery, but it was going to be hard to achieve.

 2             MR. MCENTIRE:  Hard to achieve.

 3             Object as nonresponsive, by the way.

 4        Q.  (By Mr. McEntire) So they responded back to

 5   you.  And what was their counterproposal?  "They" being

 6   the oversight board.

 7        A.  They -- their response back was, one, we think

 8   the amount has to be much lower.  Two, it has to be

 9   structured in a way that it makes it even more graduated

10   than -- than I had set it up.  And, three, they didn't

11   like the structure that it's a single bonus pool and I

12   get to allocate it.  They wanted to have it broken

13   between me and the team, and that they had a lot more

14   control over both the distributions and the team.

15   Understanding that I will be managing the team.  But

16   that they wanted a say into who -- how any bonus pool

17   was allocated.

18             And also with respect to me, that it was

19   clear that mine was determined by them.  And they wanted

20   to add a number of other control factors to assure

21   performance not just related to recoveries, which was my

22   focus, but predominantly related to recoveries but also

23   other metrics.

24        Q.  Mr. Seery, looking at your Seery Proposal

25   No. 1, I don't see any percentages identified.  I do see
```

 1   them in the oversight board response to you.  Is this

 2   something that you had communicated to them verbally?

 3        A.  No, no.  We had -- we had -- we had

 4   percentages.  And my recollection is I had percentages

 5   and tiers, not -- I don't know why it's not in this

 6   setup.  I think it's a -- it was a total pool, and it

 7   was a much higher number.

 8        Q.  Did you ever consider any type of success fee

 9   in the event that you actually returned a recovery for

10   Class 10, an amount?

11        A.  I don't believe that we did.  I don't believe

12   so.

13        Q.  Was there a conscious decision that was made in

14   your discussions with the oversight board that that

15   would not be included?

16        A.  I don't believe so.  I think it was that we

17   didn't think that we were going to get into Class 10.

18   And so there was no need to go there in terms of

19   allocating, you know, any bonus for that amount.  And

20   the representatives on the board, at least the Muck and

21   the Jessup, were Class 8 and 9.

22        Q.  Do you have any communications from either Muck

23   or Jessup suggesting that they were aware you would

24   never reach recoveries for Class 9?

25                  MR. STANCIL:  Objection to the extent it

1  calls for discussions -- I'm sorry, John.  Go ahead.

2              MR. MORRIS:  I'm just objecting to the form

3  of the question.

4              MR. STANCIL:  I would -- I would just

5  remind Mr. Seery to not disclose any discussions, not

6  disclose discussions post effective date that may

7  contain legal advice.

8              MR. MCENTIRE:  Well, I thought -- I'm not

9  asking about legal advice.  I'm talking about

10 discussions about the negotiations, the robust

11 negotiations of this agreement as --

12             MR. STANCIL:  Mr. -- Mr. McEntire, if

13 you're -- if you're asking about the compensation

14 agreement, I'm not going to object.  I just wanted to

15 make sure.  I think you had said any questions regarding

16 Class 10 recoveries.  And that's a -- that's a broader

17 question.

18     Q.  (By Mr. McEntire) Mr. Seery, in connection with

19 your negotiation of the agreement that's on the screen,

20 did you have any conversations with Muck that they

21 didn't -- did not expect that Class 9 would ever be

22 reached?

23     A.  Class 9, I don't recall.  I think we certainly

24 hoped that we would be able to get into Class 9.  And we

25 had -- we had litigation and potential contingent

1  benefits.  But I don't -- I don't recall at this time --

2  this was -- at the beginning, this was very early.  So I

3  don't know what -- what's out there in terms of Class 9.

4      Q.  Well, I'm not asking what you -- I'm asking

5  whether -- did they ever express an opinion or concern

6  that Class 9 would never be reached?

7      A.  Not -- not that I -- I recall them ever

8  expressing that it wouldn't be reached.  Again, there

9  was always potential upside to plan values.  And there

10  was a massive and well-founded litigation that could

11  provide benefits above the plan projections.

12      Q.  Same question for Jessup.  Same answer?

13      A.  Yes.

14      Q.  Did -- did Muck ever express a concern that

15  they would never exceed plan projections on Class 8?

16              MR. STANCIL:  Objection to the form.

17      A.  That they would never -- I -- I don't recall

18  any discussions about whether --

19      Q.  (By Mr. McEntire) Same question -- same

20  question --

21              MR. MORRIS:  Let him finish.

22      A.  They were certainly focused on -- no, I

23  don't -- they didn't have a discussion with Muck about

24  that.  I think Jessup was focused a lot on 8.  But they

25  both were.

1    Q.  (By Mr. McEntire) So nothing that you recall

2  with Muck, but you do recall something with Jessup?

3    A.  No.  I recall them both being focused on

4  maximizing value and trying to get not only just to

5  71 cents but anything that could be recovered above that

6  to get as far into the 8 as we could and then

7  potentially into the 9.

8    Q.  Fair enough.  My question is a little bit

9  different.  Maybe -- maybe it's subtle, but it's a

10  little bit different.

11           My question is do you specifically recall

12  any expressions of concern by Muck that you would never

13  get a payout on Class 8 over and above plan projections?

14    A.  Not of concern, no.

15    Q.  Same question with regard to Jessup.  Same

16  answer?

17    A.  Not -- nothing I can recall specifically, no.

18           MR. MCENTIRE:  Tim, can you go -- scroll

19  back up to Page 2 or Page 3 of the -- of the document.

20           Page 2, substantive page.  Right there.  Go

21  back.

22    Q.  (By Mr. McEntire) The redacted portion under

23  Section 1(b), that's all dealing with members of your

24  team?

25    A.  That's correct.

1    Q.   In connection with this agreement --

2              MR. MCENTIRE:   Go back to Page 1, please.

3   Go back.   Yeah, keep going.   Stop.

4    Q.   (By Mr. McEntire) The robust, arm's-length and

5   good faith negotiations, did Muck ever tell you during

6   these negotiations that it -- it had investigated the

7   market to determine what would be fair compensation for

8   you as a trustee and chief executive officer of the

9   reorganized debtor?

10    A.   I don't recall any such statements from Muck.

11    Q.   Same question with regard to Jessup.   Same

12   answer?

13    A.   Yeah.   I don't recall any specific statement.

14    Q.   Are you aware that Muck conducted any type of

15   market research or due diligence before, in the process

16   of negotiate -- negotiating this agreement?

17    A.   I'm not aware that they did any market

18   research, no.

19    Q.   Same question with regard to Jessup.

20    A.   I'm not aware of any market research that

21   Jessup did, no.

22    Q.   Now, the same question, when I use "Muck," I

23   also want to -- for purposes of my question, Farallon.

24   Did Farallon ever advise you that they had done market

25   research?

```
 1        A.  Not that I recall, no.

 2        Q.  Same question with regard to Jessup.  Same

 3   answer?  I mean -- excuse me -- same -- same question

 4   with regard to Stonehill.  Same answer?

 5        A.  Not that I recall, no.

 6             MR. MCENTIRE:  All right.  If you can go

 7   back to -- to Page 3, substantive Page 3.

 8             Mr. Seery, we've been going almost two

 9   hours.  I'm going to finish this line of questioning.

10   And we'll take a little bit of a break.

11        Q.  (By Mr. McEntire) Just so I understand, Tier 1,

12   2 -- Tier 2, Tier 3, Tier 4, Tier 5, they all deal with

13   recoveries for Class 8 and Class 9, correct?

14        A.  That's correct.  They're listed above.

15        Q.  So if you -- if you hit a home run on Class 9,

16   you're going to get 6 percent?

17        A.  It's incremental.

18        Q.  I understand.  Well, maybe I don't.  When you

19   say "it's incremental," what do you mean by that?

20        A.  Each tier, the percentage applies to the -- to

21   the amounts in the tier.

22             MR. MCENTIRE:  I see.

23             So go back to the previous page.

24        Q.  (By Mr. McEntire) So --

25             MR. MCENTIRE:  Stop.
```

1    Q.   (By Mr. McEntire) So here, for instance, if you

2   get Tier 3, if you get a recovery for Class 8 between 90

3   and 103 percent, you've outperformed planned

4   projections, agree?

5    A.   Correct.

6    Q.   You're going to get --

7            MR. MCENTIRE:   Let's go back to the next

8   page.

9    Q.   (By Mr. McEntire) You're going to get

10   2.75 percent, correct?

11    A.   That's not correct.

12    Q.   What do you get?

13    A.   Well, the first -- there's nothing below, I

14   believe, the -- anything below Tier 1.  So there

15   wouldn't be any compensation, any bonus compensation.  I

16   think there was -- whatever the number was.  So then

17   there's .72 of that amount.

18            And then between whatever those numbers

19   are, 210 and 250, there would be 1.17 percent of that

20   increment.  Then between 250 and 300, it would be 1. --

21   or 2.75 up that increment amount.

22    Q.   All right.

23    A.   They add up.  And if -- and that's outlined in

24   the --

25    Q.   All right.  Fair enough.  Make sure I

 1   understand.  You would add these up on an incremental

 2   basis, correct?

 3       A.  They -- yes.  So the first --

 4       Q.  You would take .72 of Tier 1.  You would add

 5   that to 1.17 if you completed Tier 2.  And you would add

 6   to that 2.75 percent recovery if you also successfully

 7   achieved the completed Tier 3?

 8       A.  The numbers are outlined on the attachment.  So

 9   I don't think you have it correct.  Each tier is its own

10   tier.  So if you get 200 million, it's .72 times the

11   200 million, percent.

12       Q.  Yeah.  I understand, sir.  I want to make sure

13   that --

14       A.  I'm still -- I'm still trying to help you out

15   here, so let me finish.

16       Q.  I need -- I need all the help I can get.

17       A.  Then between -- in the next tier, it will be

18   50 million, approximately.  Just pulling numbers out of

19   the air.  It would be 1.17 percent of that.  So that

20   would be, in my example, 1.3 million in the first.  And

21   it would be approximately $500- or $600,000 in the

22   second.  And if you hit the third, it's 2.75 of that

23   percentage.  And those are what you're aggregating.

24       Q.  So I apologize.  But I'm not -- I'm not

25   arithmetically inclined.  Do we add them up, or does one

 1   supercede the previous tier?

 2        A.   They get added up.  So it's -- in the first

 3   tier -- let's just use round numbers.  200 million times

 4   .72 percent, $1.4 million approximately.  I'm just

 5   pulling numbers up.  That's not the actual numbers.

 6              And then in the next tier, if it were

 7   50 million, it would be half a million.  So that would

 8   be 1.9 in the aggregate.  And in the third tier, it's

 9   another, just say, 50 million times 2.75.  That would be

10   another million that would get added.

11              And at the end total, I think it could

12   possibly reach 8.3.

13              MR. MCENTIRE:  Let me -- go to the --

14   scroll down there, Tim, please.

15        Q.   (By Mr. McEntire) Under "Base Salary," are you

16   continuing to receive $150,000 a month?

17        A.   I am, yes.

18        Q.   So since August of -- since August of 2021,

19   post effective date, you have continued to receive

20   $150,000 a month for each -- each month since that date;

21   is that correct?

22        A.   That's correct.

23        Q.   There's been no downward adjustment?

24        A.   There has not, no.

25        Q.   Romanette ii suggests that there would be a

 1   downward adjustment.  Why was there not a downward

 2   adjustment?

 3       A.  The amount of effort was the -- the focus of

 4   the effort, the full-time nature of it, because it

 5   included a provision that we would continue to negotiate

 6   in good faith to see what makes sense, the amount of

 7   time, effort, expertise to accomplish it, we

 8   renegotiated.  And the board continued the 150.

 9       Q.  The -- then you have a $1 million severance.

10   In the event that you are severed or resign your

11   positions or terminated, you get a $1 million severance?

12       A.  That's correct.

13       Q.  With or without cause if you're terminated?

14       A.  I believe it's without cause.  That's what it

15   says.

16       Q.  It does.  You are correct.

17           MR. MCENTIRE:  Tim, if you could go to the

18   next page, please.

19       Q.  (By Mr. McEntire) Subsection 2(d) says that you

20   have the right to shift any portion of your bonus

21   success fee to your team members.  Have you done that?

22       A.  No.  It would -- it would really depend on

23   where we are at the end of the matter or where -- where

24   we think performance has been and whether -- whether we

25   determine that -- that it's -- it's enough.  It was

1  really something that I put in from the original

2  structure where I wanted the full pool to me and then I

3  would get to allocate it.  If there was, you know,

4  exemplary performance that I didn't think was covered by

5  the team portion, I would be permitted to allocate a

6  portion of mine to members of the team.

7      Q.  But sitting here today, there's been no -- no

8  allocation back to the team members, correct?

9      A.  Neither allocation nor payment.

10     Q.  Subsection 2(g), the 20 percent of the claimant

11 trust ICP, incentive compensation payment, will be based

12 on the successful achievement of the following goals.

13 What does that 20 percent refer to?

14     A.  The oversight board wanted a -- they wanted

15 more say over what I'll call softer performance metrics

16 than I wanted.  So I thought and still think the better

17 way to do this is strictly by the numbers.  That's

18 typically how -- if you think about performance in this

19 business and distribution to the beneficiaries.  They

20 wanted a portion of the compensation to be subject to

21 review.

22     Q.  They wanted a portion of it to be subject to

23 review?

24     A.  Correct, with these metrics.

25     Q.  So assuming that you had achieved the entirety

1   of Class 9 recovery, 20 percent of that -- of that bonus

2   payment that you would receive would be based upon the

3   metrics romanette i, ii, and iii under Paragraph 2(g)?

4          A.   Could be, yes.

5          Q.   Could they take it away from you?

6          A.   I think the answer is potentially yes.  But

7   I --

8          Q.   Have they take -- have they taken any

9   payments -- by the way, let's back up.  Have you

10  received any bonus payments or performance payments to

11  date?

12         A.   No.

13         Q.   All right.  So all you've received are the

14  monthly payments?

15         A.   That's correct.

16         Q.   Since -- Mr. Seery, since this agreement was

17  negotiated, have you undertaken any market analysis of

18  what fair compensation would be for a trustee similar to

19  the position you're involved in?

20              MR. STANCIL:  Objection to form.

21         A.   I haven't done any market analysis of my own,

22  no.

23         Q.   (By Mr. McEntire) To your knowledge, has Muck

24  or Jessup done any market analysis since this agreement

25  was negotiated?

 1                  MR. STANCIL:  Objection to form.

 2       A.   I don't know if they have or they haven't.

 3       Q.   (By Mr. McEntire) Same question with regard to

 4  Farallon and Stonehill.

 5                  MR. STANCIL:  Same objection.

 6       A.   I don't know if either of them have.

 7                  MR. MCENTIRE:  Fair enough.

 8                  We've been going about an hour and

 9  55 minutes.  I need to run down the hall.  Would you

10  like to take about a ten-minute break?  We'll come back

11  and -- and go one more -- one more run on this.

12                  MR. MORRIS:  Thank you very much.

13                  MR. MCENTIRE:  All right.  Take a little

14  break.

15                  THE VIDEOGRAPHER:  The time is 12:29 p.m.

16  We're going off the video record.

17                  (Break taken from 12:29 p.m. to 12:43 p.m.)

18                  THE VIDEOGRAPHER:  The time is 12:43 p.m.

19  We're back on the video record.

20                  MR. MORRIS:  Before we begin, I think there

21  are other people who have joined.  Can -- can everybody

22  identify themselves for the record, please?

23                  MR. MCENTIRE:  Can we do that off the

24  record?  You're using my time right now, Mr. Morris.

25                  MR. MORRIS:  We -- we won't start the

1   clock.  But I -- I -- I just want the record to be

2   clear.  Put it in the chat.  I don't care.  But I want

3   everybody's appear- -- anybody who is on this call

4   should be noted.

5            MR. MCENTIRE:  I have no problem with that

6   at all.  I would ask everybody to send their names to

7   the chat.

8      Q.  (By Mr. McEntire) All right.  Mr. Seery, we're

9   back on the record.  I want to go back to your -- your

10   communications with Farallon and Stonehill in the spring

11   of 2021.

12            MR. STANCIL:  Mr. McEntire, before --

13   before you leave, I just wanted to ask, did you mark

14   that exhibit that you were referring to?  I want to make

15   sure that we know what number.  I wrote Exhibit 3.  But

16   my colleague does not recall.

17            MR. MCENTIRE:  Fair enough.  We're going

18   to -- we're going to identify the compensation

19   agreement, Exhibit 41 at the top, as Exhibit No. 3 to

20   this deposition.

21            (Exhibit 3 marked.)

22            MR. STANCIL:  Thank you.

23      Q.  (By Mr. McEntire) All right.  Mr. Seery, going

24   back to -- to the January/February time frame in 2021,

25   did you ever provide -- let me back up.

```
 1              Did Farallon ever ask you any questions
 2   concerning the value of the claims?
 3        A.   In the e-mail of January 2021?
 4        Q.   Or in any other communication with you.
 5        A.   Certainly not in the e-mail of 2021 because
 6   they didn't ask and I didn't respond to it.  I don't
 7   recall any other value of the claims.  Subsequent to
 8   them being on the claimant oversight board, we would
 9   have had discussions around the value of the assets.
10        Q.   Prior to the effective date, did you ever have
11   a conversation with Farallon concerning what you thought
12   would be the ultimate value of those claims that it
13   invested in?
14        A.   Not in no conversation that I recall off the
15   top of my head, nothing.
16        Q.   Well, you say that you recall.  Are you saying
17   it didn't happen?
18        A.   No.  I said I don't recall one.  They did sign
19   an NDA subsequent to their purchase of the claims.  And
20   they did investigate the exit financing.
21        Q.   Let me ask you a question about that.
22        A.   I don't recall if there were discussions around
23   the claim values then because it would have been focused
24   around the returns to assure repayment of the loan.
25        Q.   Did they ask you any questions -- you say you
```

1    don't recall.  Again, are you saying that they never

2    asked you after the time they signed the NDA about the

3    value of the claims?

4              MR. STANCIL:  Object to the form.

5        A.  I think it's exactly what I just answered.  I

6    don't recall any value of the claims discussions with

7    Farallon.  I do know that they did sign an NDA after

8    they bought the claims in connection with the financing.

9    So there would have been discussions about assuring that

10   there was enough money to pay back the financing.  I

11   don't believe -- I don't have any recollection that they

12   would have gone to what would be available for the

13   claims or ultimately the trust interests.

14       Q.  (By Mr. McEntire) Did you provide any guidance

15   to Farallon before they bought the claims, invested in

16   the claims, concerning a recommendation of what the

17   claims may be worth?

18             MR. STANCIL:  Objection to form.

19       A.  No.  I never spoke to, communicated with

20   Farallon before they bought their claims.

21       Q.  (By Mr. McEntire) So if there's evidence in

22   this case that Farallon says they did have those

23   communications with you, their statement would be

24   untrue?

25       A.  If there's evidence that --

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-11   James Dondero, Volume 2 Page 103 of 214   PageID 6631

Pages 101

 1              MR. MORRIS:  Objection, form.

 2       A.  If there's evidence that Farallon says that,

 3  that would be untrue.  If there's a statement from

 4  anyone else that says that, that would also be untrue.

 5       Q.  (By Mr. McEntire) So -- so you provided no

 6  recommendations or guidance to Farallon at any time

 7  prior to their investment of the claims relating to

 8  those claims; is that -- is that your -- is that your

 9  position?

10       A.  Yes.

11              MR. STANCIL:  Object to the form.

12       Q.  (By Mr. McEntire) Do you know whether anyone

13  else at Hunter -- excuse me -- at Highland Capital

14  provided any guidance to -- to Farallon in connection

15  with those purchase of those claims?

16              MR. STANCIL:  Object to the form.

17       A.  I'm sure that they didn't, as there were no

18  communications with Farallon prior to them acquiring

19  their claims.

20       Q.  (By Mr. McEntire) So as you sit here today,

21  it's your testimony that no one at Highland Capital were

22  to provide any guidance or recommendations to Farallon

23  regarding those claims prior to the investment and

24  purchase of those claims; is that correct?

25       A.  That's correct.

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-1   Filed 12/08/23   Page 104 of 214   PageID 6632

Exhibit Exhibit 11 - James Seery - Jun 5       Pages 102

```
 1                MR. STANCIL:  Object to -- object to the

 2    form.

 3                Mr. Seery, please, given the Zoom, just

 4    give me just half a beat, please, so the court reporter

 5    can get us --

 6       Q.  (By Mr. McEntire) Same questions with regard to

 7    Stonehill.  Same answers?

 8                MR. STANCIL:  Object to the form.

 9       A.  There -- there were so many questions.  But

10    I -- the answers are the same.  I never gave them

11    recommendations or values or claim recoveries.  If they

12    got information about asset values in connection with

13    the loan proposal that they made, it would have been

14    connection after they signed an NDA.

15       Q.  (By Mr. McEntire) With regard to the -- the NDA

16    and the potential involvement in exit financing, you

17    told us that Farallon expressed -- basically said they

18    were not interested because they were not satisfied with

19    the rate of return.  Is that -- was that -- am I

20    remembering correctly?

21       A.  You are not.

22       Q.  Tell me then what was basis of why they did not

23    want to be involved.

24       A.  They -- they did their diligence.  They did the

25    work.  And they said to us, or said to me, that it's not
```

 1  really what we do.  The reason they were invited was

 2  because they had an interest in claims.  And because

 3  it's not really what they do and their return did not

 4  look attractive enough to them, they declined interest

 5  unless they were going to be really (inaudible).

 6      Q.  Fair enough.

 7          What was the -- the return -- the rate of

 8  return that they were -- were hoping to get that they --

 9  that they would not get?  Do you know?

10      A.  They didn't give me their rate of return.

11      Q.  What was the interest rate that you were

12  suggesting as part of your exit financing?

13      A.  I don't recall.  We had requested

14  specifically -- my recollection is that we proposed in a

15  straw man, meaning Highland proposed in a straw man a

16  high single-digit return.  And we ended up in below

17  double-digit return area.

18      Q.  What -- I'm not sure I understand what you mean

19  by "straw man."  Can you -- can you explain what you

20  just said?

21      A.  What a straw man is?

22      Q.  I'm not -- I don't understand your answer.  You

23  said the interest rate that you were making available

24  for exit financing, you used the phrase "straw man."  I

25  don't understand the -- the answer.

 1          A.   Very typical process that is run in connection

 2   with financings.  We analyzed, Highland, what we

 3   thought, based on our analysis of the market, with the

 4   assets we had and the lack of cash flow that we had,

 5   what a loan of that type would look like and how it

 6   would price.  We put together a form term sheet often

 7   referred to as a straw man.  And that was part of the

 8   package that respected lenders got.  And they got to

 9   take a look at that and then put in proposals based upon

10   their view of the market and the risks related to the

11   loan.

12          Q.   And did -- and Farallon never put in a

13   proposal, correct?

14          A.   That's correct.

15          Q.   But Far- -- but Stonehill did?

16          A.   Yes.

17          Q.   And do you recall the -- what the -- the straw

18   man interest rate, do you recall what that was?

19          A.   That's what I said earlier.  I don't have a

20   specific recollection off the top of my head.  I believe

21   it was high single digits all in return, maybe --

22   maybe -- maybe up to ten.  But it was -- I think it was

23   high single digits, mid to high single digits.

24          Q.   7, 8 -- 7, 8, 9, 10 percent, in that area?

25          A.   More of the north end of that -- that range.

1    Q.  Okay.  The north end.

2         All right.  And did -- did -- did Stonehill

3    find that to be acceptable or did they counter?

4         MR. STANCIL:  Objection to form.

5    A.  Stonehill found it -- they countered the

6    proposal, did not just accept our terms, nor did any

7    other financier.

8    Q.  (By Mr. McEntire) What -- what was Stonehill's

9    counter proposal on the -- on the -- on the interest

10   rate?  What did they want?

11   A.  I don't recall specifically.  But they were

12   very close to the bid that was selected.  They were just

13   a little behind.

14   Q.  So maybe 11, 12 percent?

15   A.  It depended on -- on when the loan was paid

16   back because the loan doesn't -- wouldn't cash flow.  It

17   would be an asset loan that got paid down in chunks.

18   And each of the bidders put forth proposals that had

19   upfront fees, either upfront fees and a discount or an

20   exit fee.  And so the all-in would have been in that low

21   double digits somewhere, depending on the timing,

22   between ten and --

23   Q.  How high would it go up?

24   A.  I wasn't -- I wasn't finished.

25   Q.  I apologize.  Go ahead.

1    A.   Somewhere between 10, 11 percent and -- and

2   maybe up to 13 depending on when you paid it back.  The

3   longer it went, the lower the return to the prospective

4   lender would be because they'd get the benefit of the

5   duration.  And they wouldn't have to just recycle their

6   capital immediately.  So it was somewhere in that range.

7   And they put forth a very competitive proposal.  I just

8   don't recall what it was.

9    Q.   And how -- you said the longer the term, the

10   lower the interest rate?

11    A.   Not the interest rate.  The all-in recovery to

12   the financier in terms of a percentage.  The dollars

13   would go up.  But the --

14    Q.   Tell me what you mean by "all-in recovery."

15    A.   I think I just explained that.

16    Q.   Well, I'm asking for clarification.  Maybe I

17   don't understand.

18    A.   The lender analyzes their all-in recovery by

19   thinking about the fees they get upfront, any discount

20   that it's -- it's advanced at, any exit fees, and any

21   other fees that they might have built into the

22   financing.  And then they'd look at it depending upon

23   when it's paid back.  So there would be some sort of

24   call protection in these types of financings.  And when

25   you get paid back, when you figure out what your

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 22-11   Filed 12/02/24   Page 109 of 214   PageID 6637

James Dondero, Jr. 5-2          Pages 107

 1  interest rate is, what your upfront fees were, what your

 2  discount might have been, what your ancillary fees are,

 3  and what your call protection is, that's how you analyze

 4  your return.

 5       Q.  The straw-man proposal that you had part of the

 6  package, what kind of upfront fees were you -- you

 7  suggesting would be available?

 8       A.  I don't recall.  The number I gave before was

 9  an all-in term level in that high single-digit, low

10  double-digit range.

11       Q.  That would have included both the interest rate

12  and the front-end fees?

13       A.  Yes.

14       Q.  Is there a team at Highland called the

15  private -- private equity team?

16       A.  There is, yeah.

17       Q.  What does that team do?

18       A.  They help manage the assets that are invested

19  assets in -- in companies.  But they -- they do a lot

20  more than that because they get involved in other types

21  of assets that we're analyzing as well.

22       Q.  How large is the team?

23       A.  It's -- it's really two to three people,

24  depending on how you categorize each person.

25       Q.  So your current private equity team is

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 123-1   Filed 12/04/23   Page 110 of 214   PageID 6638

Exhibit Exhibit 2 - James P. Seery, Jr.   Page 110 of 214   Pages 108

 1   comprised of two to three people?

 2       A.  Correct.

 3       Q.  And how many portfolio companies is Highland

 4   currently managing?

 5       A.  Currently -- managing is not -- not fair.  We

 6   have board representation on two companies that are left

 7   and -- and one other asset that is escrow from a prior

 8   sale.

 9       Q.  At the time that -- that Farallon and Stonehill

10   invested in the claims, how many portfolio companies

11   were there?  Roughly?  I'm not -- I'm not asking for an

12   exactitude.

13       A.  Four -- four or five.

14       Q.  Okay.  And when we talk about a portfolio

15   company, are those companies that are being managed by

16   Highland Capital in which Highland Capital also has an

17   investment?

18              MR. MORRIS:  Objection to the form of the

19   question.

20       A.  The companies all have their own separate

21   management.  And so your description is not accurate.

22       Q.  (By Mr. McEntire) Okay.  But Highland Capital

23   would have had investments in four or five separate

24   entities at the time that Farallon and Stonehill became

25   involved in these claims?

```
 1        A.  Again, I'm not exactly --

 2             MR. MORRIS:  Objection to the form of the

 3    question.

 4        A.  I'm not exactly sure when Stonehill got

 5    involved.  But they -- I think that that's -- that's

 6    close.  Somewhere in that -- in that range.

 7        Q.  (By Mr. McEntire) Are you aware of any due

 8    diligence that Farallon conducted in connection with the

 9    asset value of any of these portfolio companies in

10    connection with their investment of these claims?

11        A.  Not in connection with their investment in

12    claims, no.

13        Q.  Same question with regard to Stonehill.  Same

14    answer?

15        A.  I'm not aware of what they did in connection

16    with their investment in the claims.

17        Q.  Okay.  Would you agree that -- this is your

18    full-time job, correct?

19        A.  Yeah.  Unfortunately, yes.

20        Q.  Does it require your full-time attention?

21        A.  Yes, it does.

22        Q.  And how large is your staff at Highland Capital

23    currently?

24        A.  There's 11 of us.

25        Q.  So you have 11 people managing the -- the
```

```
 1    organization, the reorganized debtor at this time

 2    basically on a full-time basis, correct?

 3         A.  Yes.

 4         Q.  And at the time that Farallon and Stonehill

 5    become involved in these claims, how large was the

 6    staff?

 7                   MR. MORRIS:  Objection to the form of the

 8    question.

 9         A.  I don't know what -- you know, when Stonehill

10    got involved.  When Farallon told me they had bought

11    their claims, it was the same size.

12         Q.  (By Mr. McEntire) Okay.

13         A.  There might have -- there was one other guy.

14         Q.  Can you name the portfolio companies for me at

15    the -- back in the spring of 2021?

16         A.  At the -- I don't -- I don't -- when?

17         Q.  In -- in the spring of 2021.  You just said

18    there were four or five portfolio companies at the time

19    that Farallon became invested in the claims.  I would

20    like to know what the names of those companies are.

21         A.  I'm not sure I said that.  I -- Farallon had

22    their -- when they told me they bought their claims in

23    March, nothing would have changed.  We didn't add any

24    assets.

25         Q.  Fair enough.  As of March of 2021, what were
```

1   the names of the portfolio companies?

2       A.   The portfolio companies that we had were, at

3   that time, Trustwave -- we would consider portfolio

4   companies -- Trustwave, CCS, Seri Limousine,

5   Cornerstone.  And I think that's -- I think that's it.

6       Q.   And has -- which of those companies still

7   remain portfolio companies today and which ones have

8   been sold?

9            MR. MORRIS:  Objection to the form of the

10  question.  Direct the witness not to answer.

11           MR. MCENTIRE:  I'm sorry?

12           MR. MORRIS:  I direct the witness not to

13  answer.

14           MR. MCENTIRE:  On what basis?

15           MR. MORRIS:  On the basis that it's not

16  relevant.  On the basis that Mr. Dondero's personal

17  lawyer at Stinson has pending right now a -- an

18  adversary proceeding where they're seeking this

19  information.

20           On the basis that in our mediation

21  objection, we've put forth documentary evidence showing

22  that this information is being sought for nefarious

23  purposes.  On the basis that the court ruled last

24  December that Hunter Mountain has no right to get this

25  information.

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-1   Filed 12/06/23   Page 114 of 214   PageID 6642

Exhibit Exhibits James P. Seery, Jr.   Page 112

 1                On the basis that in the complaint that

 2   Hunter Mountain filed, that Mr. Dondero's lawyer filed

 3   on behalf of Hunter Mountain, in Paragraph 10, they

 4   identify with precision the value of each asset owned by

 5   the debtor today within $15 million.

 6                So I'm not going to let him -- I'm not

 7   going to give free discovery on issues under these

 8   circumstances.

 9        Q.   (By Mr. McEntire) Mr. Seery, would you agree

10   that when you became the CEO of Highland Capital, that

11   this was not your typical simple bankruptcy?

12                MR. STANCIL:  Object to the form.

13        A.   I actually disagree with that.  I think it's

14   actually much, much simpler but for the vexatiousness

15   of -- of Mr. Dondero and his inability to tell the truth

16   and to actually cut any deals.  So I think this would

17   have been a very easy case to resolve.  And that's what

18   I expected to happen when I became the CEO.

19        Q.   (By Mr. McEntire) I see.  So you don't think

20   that the -- the nature of the investments and the

21   diversity of the investments of Highland Capital created

22   any level of complexity?

23                MR. STANCIL:  Object to the form.

24        A.   Every -- every -- every institution is complex.

25   Every -- many businesses have exceedingly much more

1  complexity than -- than this business.

2            What's -- what's -- what's unique about

3  this business was the complete domination and control of

4  one -- one individual who had litigated with the

5  counterparties and became the creditors for north of ten

6  years.  That within each of the various entities, he had

7  his own personal interconnected loans and loans from his

8  entities and -- and different interests that have been

9  moved around.

10           And then subsequent to that, the complexity

11  is really finding the -- the bankruptcy fraud where, you

12  know, we realized that the legal department was not

13  accurately named.  That it was actually working in part

14  of a conspiracy with Mr. Dondero to hide assets in the

15  estate, including the Sentinel assets and the indemnity

16  that were given to the -- to legal folks.

17           So, yeah, I mean, I don't think this was a

18  complicated case at all.  I think this could have been

19  easily resolved.  And with normal commercial actors, it

20  would have been.

21           MR. MCENTIRE:  Object as nonresponsive.

22     Q.  (By Mr. McEntire) Mr. Seery, other than the

23  portfolio companies -- what's so funny about that?

24     A.  It was directly responsive to your question.

25  But you can --

1    Q.  Well, the record will reflect that it wasn't.

2  But let's proceed.

3             Mr. Seery, other than the portfolio

4  companies, what other companies does -- did Highland

5  Capital have interest in back in the spring of 2021?

6    A.  In the spring of 2021, what other interests did

7  Highland Capital have interest in?

8    Q.  Yes.

9    A.  The ones I mentioned.  There were different

10 subsidiaries as well.  And they also had -- Highland had

11 an interest in MGM stock that -- that Highland owned.

12   Q.  How large a stake did Highland have in the MGM

13 stock?

14   A.  It was in the disclosure statement.  I think it

15 was about 170,000 shares.  I don't recall the exact

16 value.  It was subject to a lead in favor of Frontier

17 Bank.

18   Q.  And I understand that Highland also had an

19 interest in an entity called HCLOF?

20   A.  Highland -- there's no entity called H Cloth.

21 But we do refer to it as HCLOF.

22   Q.  Yes.  That's the entity.

23   A.  And Highland -- Highland had an interest in

24 HCLOF.  Well, originally its own interest, plus an

25 interest that was transferred to it by HarbourVest.

 1   It's part of the HarbourVest claim settlement.

 2       Q.  So other than HCLOF, MGM, and the four

 3   portfolio companies, did Highland have interest in any

 4   other entities?

 5       A.  There were certainly interests in different

 6   investments, I mean, if I'm forgetting anything, at that

 7   point, off the top of my head.

 8       Q.  I'd like to talk about MGM a little bit.  When

 9   you were with Guggenheim -- let me back up.

10            Have you ever been involved, specifically

11   you personally, in the sale or purchase of securities

12   stock that's regulated by the Securities and Exchange

13   Commission?

14       A.  Have -- have I been involved --

15       Q.  Yes.

16       A.  I -- I have a brokerage account.  But it's

17   discretionary with my broker, always has been.

18            Have I been involved in --

19       Q.  In a business context where you were

20   representing people or the reorganization proceedings or

21   things of that nature.

22            MR. STANCIL:  Object to the form.

23       A.  Not that -- not that I recall.  I didn't --

24   didn't do a lot to find stock.

25       Q.  (By Mr. McEntire) Do you understand the

 1  difference and the distinction that the Securities and

 2  Exchange Commission draws between rumor and material

 3  nonpublic information?

 4              MR. STANCIL:  Object to the form.

 5      A.  I don't know that I am up to speed specifically

 6  on -- on what -- whatever you just referred, the

 7  differences between.

 8      Q.  (By Mr. McEntire) Are you familiar with the

 9  term of "material nonpublic information"?

10      A.  I'm generally familiar with the term, yes.

11      Q.  What does it mean to you?

12      A.  It means --

13              MR. STANCIL:  Object to the form.

14      A.  My understanding is it means information about

15  a company or a security that relates to the security

16  that a reasonable investor would think was material that

17  is not otherwise publicly disclosed or available.

18      Q.  (By Mr. McEntire) What do you mean by

19  "material"?

20              MR. STANCIL:  Object to the form.

21      A.  I don't know that there's a good definition of

22  "material" that I know.

23      Q.  (By Mr. McEntire) Important -- important

24  information that might be relied upon; is that fair?

25              MR. STANCIL:  Object to the form.

```
 1              MR. MORRIS:  Object to the form of the

 2   question.

 3       A.  No, I don't think that's fair at all.

 4       Q.  (By Mr. McEntire) Then how would you -- how

 5   would you change it?

 6              MR. STANCIL:  Object to the form.

 7              MR. MORRIS:  Object to the form of the

 8   question.

 9       A.  I think it's -- it's significant information

10   that would somehow affect the price of the security.

11              MR. MCENTIRE:  Okay.  Tim, would you put up

12   the exhibit, Mr. Dondero's e-mail, please.

13       Q.  (By Mr. McEntire) While he's doing that, are

14   you familiar with what's called a compliance log?

15       A.  Not specifically, no.

16       Q.  Are you -- does -- as the CEO of the

17   reorganized debtor and the CEO of the former debtor in

18   possession, are you familiar with Highland's policies

19   regarding matters that are put on a restricted list?

20       A.  Generally, yes.

21       Q.  What is a restricted list?

22       A.  Typically a restricted list is a list of

23   securities that either shouldn't be traded or shouldn't

24   be traded without consulting compliance.

25       Q.  And why would it not be -- why would you not
```

1    want to trade it without consulting compliance?

2        A.   It could be a myriad of reasons.  It could have

3    to do with contractual limitations.  It could have to do

4    with pending deals.  It could have to do with personnel.

5    And it could have to do with material nonpublic

6    information.

7        Q.   The MGM ownership that Highland had at stake,

8    did any other entities in which Highland owned an

9    interest also have a stake in MGM?

10        A.   I think that Highland owned an interest in RCP

11    that had a stake in -- in MGM.  And Highland had an

12    interest in Multi Strat Fund which had an interest in

13    MGM.

14        Q.   How large a stake did Multi Strat have in MGM?

15        A.   I don't recall.

16        Q.   The other entity that you just identified, how

17    large a stake was it?

18        A.   I don't recall.

19        Q.   And, also, HCLOF had a stake in MGM stock as

20    well, did it not?

21        A.   That's incorrect.

22        Q.   HCLOF has never had a stake in MGM?

23        A.   No.

24            MR. MORRIS:  Objection to the form of the

25    question.

```
 1        A.  No, it has not.

 2                (Exhibit 4 marked.)

 3        Q.  (By Mr. McEntire) Okay.  Do you recall

 4   receiving this e-mail?

 5        A.  Yes.

 6        Q.  When you received this e-mail in December of

 7   2020, MGM stock was already on the restricted list, was

 8   it not?

 9        A.  I -- I don't know.  It -- it may have been on

10   certainly a check -- checklist to make sure that we

11   checked before we did anything to it.  But I -- I

12   don't -- I don't have any specific knowledge that it was

13   on the restricted list.

14        Q.  Well, after -- did you -- you received this

15   e-mail, did you check to see whether it was on the

16   restricted list?

17        A.  I did not check, no.

18        Q.  After you received this e-mail, did you ask,

19   suggest that MGM be placed on a restricted list?

20        A.  Not that I recall.

21        Q.  So after you received this e-mail, you took no

22   steps to determine or to confirm whether or not MGM

23   should be placed on the restricted list?

24                MR. STANCIL:  Objection to form.

25        A.  That's not what I said.
```

1    Q.  (By Mr. McEntire) Well, that's my question now.

2    A.  What -- what's your question?

3            MR. STANCIL:  Object to the form.

4    Q.  (By Mr. McEntire) After you received this

5  e-mail, is it my understanding that you took no steps to

6  determine whether MGM should be placed on the restricted

7  list?

8            MR. STANCIL:  Objection to form.

9    A.  I don't think I took steps to determine whether

10  MGM should be put on the restricted list, no.  Not that

11  I recall.

12    Q.  (By Mr. McEntire) Mr. Dondero, you knew

13  Mr. Dondero was on the board of directors of MGM,

14  correct?

15    A.  Yes.

16    Q.  After you received this e-mail, did you call

17  Mr. Dondero?

18    A.  No.

19    Q.  After you received this e-mail -- we're going

20  to mark this as Exhibit 4, by the way.  I'll refer to it

21  as Exhibit 4.

22            After you received Exhibit 4, did you have

23  any communications with Mr. Dondero concerning the

24  contents of this e-mail?

25    A.  No.  Mr. Dondero has a restraining order

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-11   Filed 12/05/23   Page 123 of 214   PageID 6651

Exhibit B-18 - James Dondero Page 123 of 214   Pages 121

1   against him from communicating with me.  And I wasn't

2   going to communicate with him.  His last communication

3   to me was a threat.

4        Q.  If you can answer my question, then, to pierce

5   through it.  You had no communications with Mr. Dondero,

6   whether by phone, mail, e-mail, or otherwise, in

7   response to or regarding this e-mail; is that correct?

8        A.  That's correct.

9             MR. STANCIL:  Objection to form.

10        Q.  (By Mr. McEntire) It says that he had just

11   gotten off a -- a board meeting at 3 o'clock that

12   afternoon.  Do you see that?

13             MR. MORRIS:  Objection to the form of the

14   question.

15             MR. MCENTIRE:  Yeah.  I'll restate it.  I

16   think that's a legitimate objection.  I misstated.

17        Q.  (By Mr. McEntire) "Just got off a pre-board

18   call.  The board call is at 3 o'clock."  So this was

19   sent sometime between the pre-board call and the actual

20   call.  Do you see that?

21        A.  That's what it says.

22        Q.  "Update is as follows: Amazon and Apple

23   actively diligence -- diligencing in data room."

24             What is your understanding of a data room?

25             MR. MORRIS:  Objection to the form of the

 1   question.

 2       A.  I'm sorry.  The data room?

 3       Q.  (By Mr. McEntire) What is your understanding of

 4   a data room?

 5       A.  A data room is a room that companies or funds

 6   put together to put information in for whatever the

 7   transaction might be for interested parties to take a

 8   look at.

 9       Q.  It says here, "Both continue to express

10   material interest."  That's Amazon and Apple.

11               Have I read that correctly?

12       A.  That's what it says, yes.

13       Q.  And I think you used the word earlier, at least

14   an adjective.  "Material" could be "significant,"

15   correct?  Not an adjective --

16               MR STANCIL:  Object to the form.

17       Q.  (By Mr. McEntire) -- an analog, similar?

18               MR. STANCIL:  Object to the form.

19   Objection to the form.

20       A.  What's the question?

21       Q.  (By Mr. McEntire) Material interest basically

22   also means significant interest, right?

23               MR. STANCIL:  Object to the form.

24       A.  Are you looking for the word "synonym"?

25       Q.  (By Mr. McEntire) Yeah.  That works.

 1      A.  It could -- I think "material" could be viewed

 2   as "significant," yes.

 3      Q.  "Probably first quarter event.  Will update as

 4   facts change."

 5              He's referring to the possibility of a

 6   sale.  And he actually uses the word "probably," does he

 7   not?

 8              MR. STANCIL:  Objection to form.

 9      A.  That's not what it says.  But the words are

10   what they say.

11      Q.  (By Mr. McEntire) And you understood this, when

12   you received it, that he's referring to a sale as being

13   a probable first quarter event, correct?

14              MR. STANCIL:  Objection to form.

15      A.  Some sort of sale, yes.

16      Q.  (By Mr. McEntire) Do you not agree that this is

17   material nonpublic information coming from a board

18   member of the board of directors of MGM telling you that

19   there's a probable first quarter sale?

20              MR. MORRIS:  Objection to the --

21              MR. STANCIL:  Objection to form.  Calls for

22   a legal conclusion.

23      A.  I don't think this is material nonpublic at

24   all, no.

25      Q.  (By Mr. McEntire) You don't think receiving

1   information from a member of the board of directors

2   indicating that there's a probable sale within the next

3   three months is a -- is -- is material?

4            MR. STANCIL:  Objection to form.

5            MR. MORRIS:  Objection to the form.

6       A.   It doesn't say there's probable sale.  It says

7   two people are interested.  So I don't think it's --

8   it's material.

9            In addition, material nonpublic, as I

10  understand it, is a specific term of art related to

11  security transactions.  When somebody out of the blue

12  sends you an e-mail, someone who's already restrained by

13  a temporary restraining order, someone who's not

14  employed by your company, I don't think that that falls

15  in the definition.

16           Moreover, it doesn't tell me who's going to

17  buy it.  It doesn't tell me how much it's going to cost.

18  It doesn't tell me when it's going to happen.  And then

19  it says he's going to update facts.  He's not allowed to

20  talk to me.  He's not allowed to communicate with me.

21  At this time, he was supposed to send, in advance,

22  topics for communication to my lawyers.

23      Q.   (By Mr. McEntire) So you're saying that

24  Mr. Dondero is, as a member of the board of directors of

25  MGM, is just a man out of the blue?

```
 1                    MR. STANCIL:  Objection to form.

 2                    MR. MORRIS:  Objection to the form of the

 3  question.

 4       A.  No.  I'm saying -- I'm saying he's -- he's

 5  breaching both the TRO and he's breaching his duty of

 6  confidence to MGM.

 7       Q.  (By Mr. McEntire) So he had a duty of

 8  confidence to MGM when he sent this to you?

 9                    MR. STANCIL:  Objection to form.

10       A.  I would think every board member would.

11       Q.  (By Mr. McEntire) So this would be nonpublic,

12  then, because it should be confidential, correct?

13                    MR. STANCIL:  Objection to form.

14       A.  No.  I think he's telling me something that the

15  public already knows.  But he's not supposed to be

16  telling me anything about what's going on in the board

17  meeting.

18       Q.  (By Mr. McEntire) Well, so you think he did

19  something wrong when he sent this e-mail to you.  Why?

20                    MR. STANCIL:  Objection to form.

21       A.  Because he's not supposed to be sharing what

22  went on in a board meeting irrespective of whether

23  it's -- it's some new information or any additional

24  information.

25       Q.  (By Mr. McEntire) Well, can you identify a
```

1   single piece of public information that said there was a

2   probable sale in the first quarter of 2021?

3           MR. STANCIL:  Objection to form.

4       A.  Yes.  I think it was widely known that -- that

5   Amazon was for -- MGM was for sale.  I think it was

6   widely known that it had to happen quickly.  I think it

7   was widely known what the price levels of interest were

8   based upon both market and what the chairman had

9   indicated he was looking for.  And it was widely known

10  that both Amazon and Apple were the main contenders to

11  purchase it.

12      Q.  (By Mr. McEntire) So you can -- can you

13  identify a single source of information that says that a

14  sale is probable during the first quarter to either

15  Amazon or Apple?

16          MR. STANCIL:  Objection to form.

17      A.  I believe there's -- there's myriad of

18  publications that indicated the same information.

19      Q.  (By Mr. McEntire) Name me one.

20          MR. STANCIL:  Objection to form.

21      Q.  (By Mr. McEntire) Are these the materials that

22  are attached to your joint opposition?

23          MR. STANCIL:  Objection to form.

24      A.  Those are a small sample of the dozens and

25  dozens of articles that gave both that information and

```
 1   more.

 2       Q.  (By Mr. McEntire) Well, I've looked at all the

 3   items that you've identified and attached to your

 4   opposition.  So is it your testimony that those

 5   materials state that there's a probable sale in the

 6   first quarter of 2021 based upon information provided by

 7   a member of the board of directors of MGM?

 8               MR. STANCIL:  Objection to form.

 9       A.  I don't have those in front of me.  But they

10   provide quite a bit of information.

11       Q.  (By Mr. McEntire) Can you answer my question,

12   please?

13               MR. STANCIL:  Objection to form.

14       A.  I think I just did.  I don't have them in front

15   of me.

16       Q.  (By Mr. McEntire) So your best answer to my

17   question is you don't have them in front of you?

18               MR. STANCIL:  Objection to form.

19       A.  Yes.  That's my -- my answer is I don't know

20   exactly what each of those articles say.  But if you

21   read them all, this doesn't add anything to it.

22       Q.  (By Mr. McEntire) All right.  So did you --

23   were you consulted at all about MGM coming off the

24   restricted list?

25               MR. STANCIL:  Objection to form.
```

```
 1                    MR. MORRIS:  Object to the form of the

 2   question.  Assumes facts not in evidence.

 3        A.  I -- I didn't have any conversation about MGM

 4   coming off the restricted list or going on a restricted

 5   list.

 6                    MR. MCENTIRE:  Tim, would you put up the

 7   compliance log, please?

 8                    That's not marked part of the materials.  I

 9   didn't know I was going to have to use it.  But I'm --

10   I'm going to be using a new exhibit.

11                    MR. STANCIL:  Could you please ask your

12   colleague to e-mail it to me and Mr. --

13                    MR. MCENTIRE:  Yeah.  Please e-mail it

14   to -- please e-mail it to both Mr. Stancil and John

15   Morris.

16                    MR. STANCIL:  And I think the gentleman

17   from Holland & Knight and the U.S. Trustee should

18   receive it as well.

19                    MR. MCENTIRE:  It's marked as confidential.

20                    MR. STANCIL:  Well, I guess that's a

21   question -- I don't know if Holland & Knight have signed

22   a protective order or not.  But if you're about to show

23   a confidential document in a deposition --

24                    Can I ask you to take that down before we

25   put that up in front of people in the deposition?  Thank
```

1   you.

2            So what's the status of this document

3   relative to the protective order?  Is there a protective

4   order in place that governs this?

5            MR. MCENTIRE:  I don't know that there's a

6   protective order governing this particular use in

7   this -- in this contested proceeding.

8            MR. MORRIS:  Where did you get it?

9            MR. MCENTIRE:  Well, first of all, we get

10  it from a source that -- that we got it from.  It's --

11           MR. MORRIS:  It's a Highland document,

12  isn't it?

13           MR. MCENTIRE:  No, it's not.  It's not a

14  Highland document.  This is a shared document with

15  NexPoint.  So this comes from NexPoint.

16           And so if you -- are you suggesting that

17  you do not -- you're going to object to my use of this

18  document even though it's not a Highland document?  It

19  is marked as confidential as well.

20           MR. STANCIL:  Well, before we allow it to

21  be publicly displayed in a public forum, I'm not going

22  to participate in displaying a confidential document if

23  you can't tell me why it's marked confidential.

24       Q.  (By Mr. McEntire) Let me ask you this question,

25  Mr. Seery.  Let me grab my document.  One second.

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-11 Filed 12/22/23   Page 132 of 214   PageID 6660

Exhibit Ex. B 2:31-bk-35524-James P. Seery Jr. Vol 5a 5:327

Pages 130

1          Mr. Seery, who is -- and I may not be

2     pronouncing this name correctly.  Who is Tim Cournoyer?

3        A.   He is part of the Highland team right now.

4     He's part of the PE group, as well as he was previously

5     at Highland.

6        Q.   Is he no longer with Highland?

7        A.   He's -- he's currently with Highland, yes.

8        Q.   What is his --

9             (Simultaneous speaking.)

10        Q.   (By Mr. McEntire) What is his position?

11        A.   He's part of the private equity team.

12        Q.   Does he have any responsibilities over

13     maintaining compliance logs at Highland?

14             MR. MORRIS:  I'm going to direct the

15     witness not to answer.  Again, I don't know what this

16     has to do with the colorability of your claims.  If you

17     want to ask Mr. -- Mr. Seery is here today in his

18     individual capacity.  If you want to ask him what he

19     did, what he said, what he didn't do, that's fine.  But

20     we're not going to take discovery into Highland's inner

21     workings.

22        Q.   (By Mr. McEntire) I need to ask this question.

23     First of all, are you going to follow your -- I guess is

24     Mr. Morris your lawyer?

25             MR. MORRIS:  I'm the lawyer for Highland

1    Capital Management.  And that's -- that's what I'm

2    protecting here, not Jim Seery.

3        Q.   (By Mr. McEntire) So can you tell me why -- let

4    me back up.

5             Did you give any instructions to Tim

6    Cournoyer to take MGM off the restricted list in April

7    of 2021?

8             MR. MORRIS:  Objection as to form.

9        A.   Not -- not that I recall, no.

10       Q.   (By Mr. McEntire) And you stated that -- did

11   you know that MGM was on the restricted list and was --

12   and was to be retained on the restricted list until July

13   of 2021?

14            MR. MORRIS:  Objection, asked and answered.

15            MR. STANCIL:  Objection to form.

16            MR. MORRIS:  (Inaudible) objection.

17       A.   2021?

18       Q.   (By Mr. McEntire) July of 2021.

19            MR. STANCIL:  Same objection.

20       A.   Whose restricted list?

21       Q.   (By Mr. McEntire) It's a shared list between

22   NexPoint and Highland.

23            MR. STANCIL:  Objection to form.

24       A.   Highland didn't have any relationship with

25   NexPoint in 2021.

1    Q.  (By Mr. McEntire) It was not a shared

2  agreement -- was it not a shared agreement where this

3  compliance log would be shared between the two

4  companies?

5          MR. STANCIL:  Objection to form.

6    A.  Not -- not that I recall.  We certainly didn't

7  have any communication.  So there's no reason that any

8  information at NexPoint would be on a shared list.

9          If -- if our system maintained it because

10  NexPoint didn't have systems and were using our system,

11  that's NexPoint's.  It shouldn't have been anything that

12  would've had to do with Highland.  We didn't have any

13  relationship with them.

14    Q.  (By Mr. McEntire) Well, wasn't Mr. Dondero the

15  president of -- of one of the funds?

16    A.  No.  Of Highland's fund?

17          (Simultaneous speaking.)

18    A.  No.  Mr. Donder- -- after -- after Mr. Dondero

19  resigned, first he resigned from all capacity except a

20  last second inclusion as a portfolio manager, which, in

21  hindsight, we -- we can now tell was -- was part of a

22  scheme.  And then he resigned in October of 2020 when he

23  was -- was asked to do so by the independent board.  And

24  then he had a TRO against him in December of 2020.  And

25  then the plan got confirmed.  And all the contracts had

1  been rejected.  He had no relationship with -- with

2  Highland.

3      Q.  (By Mr. McEntire) Wasn't Mr. Dondero the

4  president of NexPoint Advisors?

5      A.  That's not Highland.

6      Q.  Are you suggesting there's no relationship at

7  all between NexPoint Advisors and Highland?

8          MR. MORRIS:  Objection, asked and answered.

9      A.  I am so suggesting, yes.

10     Q.  (By Mr. McEntire) Wasn't there a shared

11  services agreement between NexPoint and Highland at this

12  time?

13          MR. STANCIL:  Objection to form.

14     A.  I don't think so, no.

15     Q.  (By Mr. McEntire) If Mr. -- if Mr. Linn had

16  stated that he was particularly excited about MGM based

17  upon his conversations with you, is that not true?

18          MR. STANCIL:  Objection to form.

19          MR. MORRIS:  Objection to the form.

20          MR. SCHULTE:  Objection to form.

21     A.  I don't recall any such conversation with

22  Mr. Linn.  Do you know when that supposedly happened?

23     Q.  (By Mr. McEntire) And if -- so are you saying

24  it didn't happen?

25          MR. STANCIL:  Objection to form.

1    A.  I don't recall any such conversation with

2  Mr. Linn.  I do recall that throughout 2021, post

3  effective date, I was constructive about MGM being able

4  to get through the FTC when others were less certain

5  that that could happen.  And it was a very risky

6  endeavor.

7    Q.  (By Mr. McEntire) Well, let's make sure our

8  timing is -- is clear.

9          Prior to the date that Farallon purchased

10  its interest in the claims at issue, do you deny having

11  a conversation with Mr. Linn to the effect that he

12  became optimistic about the potential of an MGM sale?

13          MR. STANCIL:  Objection to form.

14    A.  Yes.  Let me make really clear because I've

15  said this to you a bunch of times.  And you keep trying

16  to come up with some new way to trick me.  I had no

17  conversations, none, with Mr. Linn prior to his

18  acquisition of the claims when he told me that by e-mail

19  on March 15, 2021.  None.  Zero.

20    Q.  (By Mr. McEntire) Same question with Mr. Patel.

21  Do you deny that you had any conversations with

22  Mr. Patel concerning the MGM sale prior to the date that

23  they acquired their -- Farallon acquired its interest in

24  these claims?

25    A.  Yes.

```
 1              MR. STANCIL:  Objection to form.

 2        A.  Yes, categorically deny it.

 3              MR. SCHULTE:  Objection, form.

 4        A.  I testified that I didn't have any

 5   conversations with Mr. Patel, I don't think since I was

 6   in their office prior to Highland even filing

 7   bankruptcy.

 8        Q.  (By Mr. McEntire) So if I understand your

 9   testimony correctly, after December of 2020, when

10   Mr. Dondero sent his e-mail to you about MGM, you have

11   had no subsequent communications with Mr. Dondero at all

12   in any regard; is that correct?

13              MR. STANCIL:  Objection to form.

14        A.  I didn't have a communication with Mr. Dondero

15   with his e-mail sent in violation of a TRO.  I have not

16   spoken to Mr. Dondero since shortly after he sent me a

17   threatening text.

18        Q.  (By Mr. McEntire) And when was that?

19        A.  I believe that was in --

20              MR. MORRIS:  December 3rd.

21        A.  There we go.  Early December.

22        Q.  (By Mr. McEntire) All right.  So since

23   December -- since December 3 of 2020, you've had no

24   communications with Mr. Dondero, other than receiving

25   that one e-mail?
```

```
 1              MR. STANCIL:  Objection to form.

 2      Q.  (By Mr. McEntire) Is that correct?

 3      A.  That -- I believe that's correct.

 4              MR. MCENTIRE:  Tim, would you pull up

 5  the -- Tab 5?  What exhibit number will this be, Tim?

 6              MR. MILLER:  5.  Or -- yes.  It's 5.

 7              (Exhibit 5 marked.)

 8      Q.  (By Mr. McEntire) Can you identify this

 9  document?

10              MR. MCENTIRE:  First, if we could go to the

11  top, please, Tim, so he can see the top of the document.

12      Q.  (By Mr. McEntire) This is filed of public

13  record in the bankruptcy proceedings.  We're going to

14  mark this as Exhibit 5.  It's Debtor's Notice of Filing

15  of Plan Supplement to the Fifth Amended Plan of

16  Reorganization.  Do you see that?

17      A.  Yes.

18              MR. MCENTIRE:  Would you scroll through it

19  so Mr. Seery can confirm that -- that this is an

20  attached document.  Scroll a little bit slower, please,

21  so he can see it.

22              MR. MILLER:  It's 48 pages.

23              MR. MCENTIRE:  48 pages.  I'm only going to

24  be addressing the first few pages.

25              MR. STANCIL:  Mr. McEntire, I just want to
```

1   make sure I have the right one.  This is <mark>Docket</mark>

2   <mark>No. 1875</mark>?

3                    MR. MCENTIRE:  Yes.

4                    MR. STANCIL:  So I think I saw a barcode on

5   the front of the version you put up.  But it's not on

6   what I have.  Is that -- I just want to make sure I'm

7   not looking at --

8                    MR. MCENTIRE:  I -- I think you're looking

9   at the same document.

10                   MR. STANCIL:  Well, how do I -- I want

11  to -- can we just confirm that?  Can you --

12                   MR. MCENTIRE:  Tim, please confirm it.

13                   MR. STANCIL:  Well...

14                   MR. MCENTIRE:  Can we go back to the

15  beginning, please?

16                   MR. MILLER:  Yeah.  One sec.

17                   MR. MCENTIRE:  Put the document back up,

18  please.  Tim, please put the document back up.

19                   MR. MILLER:  Yeah.  I'm confirming the same

20  version is what we sent.  This is Exhibit 5.

21                   THE WITNESS:  Can we go off the record for

22  two seconds while you guys do this so I can step out of

23  the room?

24                   MR. MCENTIRE:  Sure.

25                   THE WITNESS:  Thanks.

```
 1                THE VIDEOGRAPHER:  The time is 1:31 p.m.
 2   We're going off the video record.
 3                (Break taken from 1:31 p.m. to 1:34 p.m.)
 4                THE VIDEOGRAPHER:  The time is 1:34 p.m.
 5   We're back on the video record.
 6                MR. MCENTIRE:  Tim, would you please put up
 7   Exhibit 5, please.
 8                MR. MILLER:  Yeah.
 9       Q.  (By Mr. McEntire) So this is the -- again, the
10   debtor's notice of filing of plan.  This is the document
11   we were looking at while you left the room.
12                MR. MCENTIRE:  And, Tim, I would like -- I
13   would like you to turn to Page 3 of Exhibit A, please.
14   If you can scroll down to the bottom.
15       Q.  (By Mr. McEntire) Would you have reviewed this
16   before it was made publicly available, Mr. Seery?
17       A.  Yes.
18                MR. STANCIL:  Objection to form.
19       Q.  (By Mr. McEntire) And you would have confirmed
20   and authorized the -- the use of this as the CEO of
21   the -- of the debtor in possession?
22                MR. STANCIL:  Objection to form.
23       A.  Yes, sir.  I certainly reviewed it and approved
24   its -- its filing, yes.
25       Q.  (By Mr. McEntire) All right.  It says under
```

```
 1    Section P, the "See below for Class 8 estimated payout

 2    schedule.  Payout is subject to certain assets being

 3    monetized by payout date.  No plan requirement to do

 4    so."

 5              Do you see where I've read?

 6        A.  Yes.

 7        Q.  It says by September 30 of 2021, $50 million

 8    would be distributed.  Do you see that?

 9        A.  Yes.

10        Q.  By March 31st of 2022, almost a year and one

11    month later, another $50 million.  Do you see that?

12        A.  I see that.  But you're --

13        Q.  I'm asking from the date of the confirmation

14    of --

15        A.  Oh, okay.  All right.  But not from

16    September '21?

17        Q.  No, of course not.

18              So as of almost a year and one month after

19    the confirmation of the plan, it was estimated that only

20    $100 million would be paid out to Class 8.  Do you see

21    that?

22        A.  I -- I challenge your use of the word "only."

23    But it says 100 million, yes.

24        Q.  And these are the projections, agree?

25        A.  That's correct.
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 22-11   Filed 12/02/24   Page 142 of 214   PageID 6670

James Dondero - Pages 140

1    Q.  And the projections are based upon presumably

2 your private equity group putting it together?  Did they

3 sign off on this, by the way?

4             MR. MORRIS:  Objection to the form.

5             MR. STANCIL:  Objection.

6    A.  I -- I don't believe that we had separate

7 sign-off from anybody at Highland.  We reviewed the

8 information with our financial advisor, DSI.  And we

9 used the Highland marks.  And the Highland team reviewed

10 those with DSI, which would include both accounting and

11 the PE team and the evaluation committees.  But I don't

12 recall having a specific sign-off because I don't

13 believe, at this point yet, we had necessarily had the

14 team put together.  We used the Highland employees who

15 were there at the time.

16    Q.  (By Mr. McEntire) DSI put these numbers

17 together?

18    A.  Yes.

19    Q.  By June 30, 2022 -- so this will be a year and

20 four months later -- another additional $25 million.  Do

21 you see that?

22    A.  Yes.

23             MR. STANCIL:  Object to form.

24    Q.  (By Mr. McEntire) So roughly from February of

25 2021 through roughly 16 months, 15 months later, a

1  projected $125 million would be paid; is that fair?

2  Projected?

3      A.  Yeah, using those dates.  But there is a --

4  there is a model on the back of this.  So that -- that's

5  correct.

6      Q.  Well, are you suggesting that these dates were

7  inaccurate?

8      A.  No.

9           MR. STANCIL:  Object to the form.

10     A.  No.  I'm suggesting you're using the -- I don't

11  recall the exact date that the start date on this goes

12  from, which would be attached to it.  But rather than

13  using the -- the date this was filed, whenever the start

14  date would be, over that period of time, it would be

15  $125 million.

16          MR. MCENTIRE:  Go to the next page, Tim,

17  Page 4 of this exhibit, Page 4 of Exhibit A of

18  Exhibit 5.

19     Q.  (By Mr. McEntire) It says, "Total estimated

20  available dollars for distribution."  You have your plan

21  analysis, and you have your liquidation analysis.  Do

22  you see where I'm reading at the top?

23     A.  Yes.

24     Q.  So the projections on February 1st of 2021,

25  this would have been filed of public record, correct, as

 1  part of the -- the plan confirmation?

 2      A.  Yes.

 3      Q.  In this, it identified the total available

 4  funds available to pay the unsecured creditors.  It

 5  would be $222,658,000.  Am I correct?

 6      A.  That's incorrect.

 7      Q.  If you read down on the sheet, it estimates the

 8  amount remaining for distribution to the general

 9  unsecured creditors is actually less than that.  It's

10  actually about 194 million because you have taken out

11  Class 1 through 7?

12              MR. MORRIS:  Objection --

13              MR. STANCIL:  Objection to form.

14              MR. MORRIS:  -- form of the question.  The

15  document speaks for itself.

16      A.  Yeah.  Your premise started wrong.  And so you

17  just continued to go wrong.  But that's why, yes,

18  estimated amount remaining for distribution to general

19  unsecured creditors is 194 in the plan analysis and 157

20  in the liquidation analysis.

21      Q.  (By Mr. McEntire) Okay.  So do you know how

22  much Farallon and Stonehill invested in this -- in the

23  acquisition of these claims?

24      A.  I don't.  The only -- you guys threw out a

25  number.  But I don't remember what it was.

```
 1        Q.  I believe our pleadings suggest as high as

 2   163 million combined in acquiring these claims.

 3                  MR. STANCIL:  Objection.

 4                  MR. MORRIS:  Objection.  He's got no

 5   knowledge.

 6        A.  I don't --

 7                  MR. MCENTIRE:  I haven't finished my

 8   question.

 9                  MR. MORRIS:  Yeah.  I think -- I think

10   you're -- I think you're --

11                  MR. MCENTIRE:  Guys, please.  Please.  I

12   wasn't even finished with my question.  You're

13   interrupting me, all right?

14                  MR. SCHULTE:  Objection, form.

15        Q.  (By Mr. McEntire) My question is this:  We have

16   stated in our pleadings that Farallon and Stonehill

17   invested as much as $163 million.  Do you have any

18   information, that you're aware of, to deny that?

19                  MR. MORRIS:  Objection.

20                  MR. SCHULTE:  Objection, form.

21                  MR. STANCIL:  Objection.

22        A.  I don't know what they paid for their -- their

23   claims that they purchased.  The only knowledge I have

24   is what I've read in your documents.  And I don't recall

25   the number you used.
```

1    Q.  (By Mr. McEntire) Have you ever discussed with

2   Muck or Jessup how much was -- how much money was

3   involved in investing in these claims?

4    A.  At one point, I discussed it with Farallon.

5    Q.  And what did Farallon tell you?

6    A.  They wouldn't tell me what they paid.  They --

7   I -- they just wouldn't tell me what they paid.  And I

8   didn't press it.

9    Q.  Are you familiar with rates of return that

10   investors typically seek when they buy a distressed

11   asset in the form of a claim in a bankruptcy proceeding?

12            MR. MORRIS:  Objection to the form of the

13   question.

14            MR. STANCIL:  Objection.

15            MR. MORRIS:  I question the relevance.

16   Like, what are we doing here, Sawnie?

17            MR. MCENTIRE:  Listen, I'm not here to

18   answer your questions, John.  I'm asking the witness

19   questions.

20            MR. MORRIS:  Well, I'm going to direct him

21   not to answer unless I have some context for this.  What

22   Mr. Seery's perceptions of value or the rest of it, I

23   don't see how it goes to the colorability of your

24   claims.

25            MR. MCENTIRE:  Well --

```
 1                   MR. MORRIS:  Unless you can help me to

 2   understand that, I'm going to begin to direct him not to

 3   answer.

 4                   MR. MCENTIRE:  Then you're going to be your

 5   own worst enemy, Mr. Morris --

 6                   MR. MORRIS:  Okay.

 7                   MR. MCENTIRE:  -- because my question is

 8   highly relevant.

 9       Q.   (By Mr. McEntire) Mr. Seery, I'm going to ask

10   the question to make sure it's on the record and it's

11   clear.

12                   MR. MORRIS:  Do you want to help me to

13   understand the relevance because I don't --

14                   MR. MCENTIRE:  Mr. Morris, let me finish,

15   please.  You're wasting my time.

16                   MR. MORRIS:  Yeah.  Well, you're wasting my

17   time.  But go ahead.

18       Q.   (By Mr. McEntire) Mr. Seery, do you know what

19   the spectrum of expected rates of return are for a

20   company buying a distressed asset in the form of a claim

21   in a bankruptcy proceeding, what they typically look

22   for?

23                   MR. MORRIS:  Objection to the form.

24                   MR. STANCIL:  Objection.

25                   MR. MORRIS:  Calls for a legal conclusion.
```

```
 1        A.   I don't understand your question.

 2        Q.   (By Mr. McEntire) So as a person who is a

 3   specialist and an expert in distressed assets, do you

 4   know what your typical rate of return is before you buy

 5   a distressed asset?

 6                  MR. MORRIS:  Objection.

 7                  MR. STANCIL:  Objection.

 8                  MR. MORRIS:  Calls for a legal conclusion.

 9        A.   I don't know what the expert part is, where you

10   got that one.  But I am -- I am experienced.  And -- and

11   the rate of return that you would receive on

12   investments, it varies widely.

13        Q.   (By Mr. McEntire) All right.  As a person

14   who's -- holds himself out as an expert in distressed

15   assets, do you think it's prudent to invest $163 million

16   if you're not expected to receive any return on Class 9

17   claims?

18                  MR. MORRIS:  Objection --

19                  MR. STANCIL:  Objection to the form of the

20   question.

21        A.   I don't hold myself out as an expert.  Your

22   math is really lacking.  That's -- that's not how you'd

23   analyze your investment.  And each investment is

24   different.  So each claim would be purchased at

25   different times for different amounts, analyzing what
```

1   you think the risks are, what the returns are, and what

2   the upward -- the upward possible benefits are and what

3   you think your possible losses could be.

4       Q.  (By Mr. McEntire) Well, what would -- fair

5   enough.

6       A.  I'm not done yet.  I'm not done.  I'm still

7   working on your question.

8       Q.  All right.

9       A.  (Inaudible) thinking about whether you need to

10  hedge it, whether you -- whether there are other

11  offsetting investments you have.  And then also what

12  you -- what other places you can use your money.

13  Because depending on the type of investor you are, there

14  may -- may be better places the way the risk returns

15  that are more appropriate than one -- one investment or

16  another.

17      Q.  Did you consider the acquisition of the claims

18  at issue in this -- this matter to be risky?

19              MR. MORRIS:  Objection --

20              MR. STANCIL:  Objection to form.

21              MR. MORRIS:  -- to the form of the

22  question.

23      A.  I've never -- I've never thought about whether

24  it was a risky trade or a -- or a unrisky trade.

25      Q.  (By Mr. McEntire) Based upon what you know of

1   the Highland bankruptcy proceedings in February of 2021,

2   would you have advised a client to invest $163 million

3   in these claims when the expected return was only

4   194 million?

5             MR. SCHULTE:  Objection, form.

6             MR. STANCIL:  Objection, form.  This is

7   improper.

8             Sawnie, you're testifying and trying to --

9   to put it into a question.  So if you have a real

10  question that's relevant to this, I'd suggest you ask

11  it.  But making your characterizations and saying "isn't

12  that right," this is -- you're not trying to collect

13  information.  You're trying to grab a sound bite.

14      Q.  (By Mr. McEntire) Mr. Seery, please answer my

15  question.

16             (Simultaneous speaking.)

17             MR. STANCIL:  Hold on, James.

18             MR. SCHULTE:  Objection, form.

19             MR. STANCIL:  I object to the -- object to

20  the form of the question.  I object to whether it's a

21  question at all.

22             MR. MCENTIRE:  Well, let me make sure it

23  comes across as a question.

24      Q.  (By Mr. McEntire) Mr. Seery, as a person who is

25  experienced in distressed assets, would you have advised

1  a client to invest $163 million to acquire a claim where

2  the only expected payout was 194 million over time?

3              MR. SCHULTE:  Objection, form.

4              MR. MORRIS:  Objection to the form of the

5  question.

6              MR. STANCIL:  I object both to the form of

7  the question and to the relevance of the question,

8  Mr. Seery's advice to clients.

9              MR. MORRIS:  It's hypothetical.

10             MR. STANCIL:  He's already testi- -- it's

11 hypothetical; it's speculation.  He's testified he

12 didn't give any guidance to anybody on these claims.

13 So --

14             MR. MORRIS:  But you can answer.

15             MR. STANCIL:  -- this is -- go ahead.

16    A.  It would totally depend on -- on what the

17 return profile looked like, how secure it looked, what

18 the potential upside beyond that would be.  The premise

19 of your question, though, is -- is -- is deceptive.  And

20 that's what kind of disgusts me about it.  And you know

21 this because we testified -- I testified earlier that I

22 had a conversation with UBS.  They didn't actually do

23 anything to trade their claim because they asked about

24 the effective date in August of 2021.  So your premise

25 of 163 was -- I have no idea whether your numbers are

1    right.  I have no idea what -- what you're claiming.

2    But was 163 -- nobody spent 163 million, that I know of

3    and you know of, in February of -- of 2021.

4                    MR. MCENTIRE:  Ms. Court Reporter, would

5    you read back the first part of his answer, please.  I

6    got -- I lost it.

7                    MR. STANCIL:  Please read the whole answer

8    back.

9                    THE COURT REPORTER:  Okay.  Please hold.

10                   (Requested portion read back.)

11        Q.  (By Mr. McEntire) Okay.  So using your words,

12   Mr. Seery, can you tell me, if you know, what

13   investigation Farallon conducted to try to estimate the

14   potential upside of this investment and the claims at

15   issue?

16                   MR. STANCIL:  Objection, asked and

17   answered.

18        A.  I have no idea what they did.  I never

19   discussed the claims purchase with them.

20        Q.  (By Mr. McEntire) Same question with regard

21   to -- to Stonehill.  Same answer?

22                   MR. STANCIL:  Same objection.

23        A.  Same answer.

24        Q.  (By Mr. McEntire) Mr. Seery, do you know where

25   Muck received the funds to -- to actually acquire the

```
 1   claims?
 2        A.  I have no idea.
 3        Q.  Do you know where Jessup received the funds to
 4   actually acquire its interest in the claims?
 5        A.  No.
 6        Q.  Looking at Exhibit 5, the percentage
 7   distribution to general unsecured claims, do you see
 8   that, 71 percent?
 9        A.  Yes.  71.32 percent.
10        Q.  71.32 percent, yes.
11             And then it has, underneath that, "Class 9
12   subordinated claims, no distribution."  Do you see that?
13        A.  Correct.
14        Q.  And then Class 10, that would be the Hunter
15   Mountain Investment Trust equity position.  No
16   distribution anticipated as of this time period,
17   correct?
18        A.  Class 10 says no distribution.
19        Q.  So can you tell me whether or not you're aware
20   of any other information distributed by Highland
21   management -- excuse me -- Highland Capital between this
22   date and the effective date that changed the projected
23   percent of distribution of 71.32 percent?
24             MR. MORRIS:  Object to the form --
25             MR. STANCIL:  Object to the form.
```

```
 1                MR. MORRIS:  -- of the question.

 2        A.  I think I already said we never changed the

 3   71.32 distribution because once the plan was confirmed,

 4   we don't go back and redo these analyses.

 5                MR. MCENTIRE:  Could you go to Tab 6,

 6   please, Tim.  And put up what we're going to now mark as

 7   Exhibit 6.

 8                (Exhibit 6 marked.)

 9        Q.  (By Mr. McEntire) Exhibit 6 is another public

10   record, Mr. Seery.  It's -- it was filed in the public

11   records in March of 2021.  But I believe, if you look at

12   the front page, it's the month ending January of 2021.

13   Do you see that?

14        A.  Yes.

15        Q.  Did DSI prepare these monthly reports, or was

16   this something that was prepared by the staff at

17   Highland Capital?

18        A.  Typically a combination.  DSI would be final

19   responsibility, I believe.  But they got the information

20   from the finance team.

21        Q.  This is your signature here that we see, chief

22   restructuring officer?

23        A.  Yes.

24        Q.  By the way, what did you perceive to be your

25   duties as the chief restructuring officer?
```

Case 19-34054-sgj11  Doc 3818-2  Filed 06/05/23  Entered 06/05/23 22:10:41  Desc
Case 3:23-cv-02071-E  Document 23-11 filed 12/05/23  Page 155 of 214  PageID 6683

Pages 153

 1                      MR. STANCIL:  Objection to the form, asked

 2   and answered, calls for a legal conclusion.

 3        A.   My -- my belief is that I was responsible for

 4   trying to get a restructuring done.

 5        Q.   (By Mr. McEntire) So was the chief

 6   restructuring officer going to actually reorganize the

 7   entity or was it trying to liquidate the entity?

 8                      MR. STANCIL:  Objection to the form.

 9        A.   Trying to -- trying to achieve a restructuring.

10        Q.   (By Mr. McEntire) Which would be something

11   other than liquidation, correct?

12        A.   It could be liquidation if that -- if that's in

13   the best interest of the estate, yes.

14        Q.   When did you make the decision that that was in

15   the best interest of the estate?

16                      MR. STANCIL:  Objection to form.

17                      MR. MORRIS:  Objection to the form of the

18   question.  I mean, we had a confirmation hearing.  I

19   know you weren't around, but...

20        A.   I never made any such decision.  There was a

21   board that I was part of that made the decisions.  And

22   working with the creditors committee, unable to get a

23   transaction done with Mr. Dondero even after mediation,

24   the board reached a conclusion that the monetization

25   plan that we filed was the most appropriate structure.

1    It was a reorganization designed to monetize the assets

2    over time and not to do a quick liquidation.

3        Q.   (By Mr. McEntire) If you look at the second

4    page of this Exhibit 6, it states that October 15th of

5    2019, I understand that to be the petition date.  Is

6    that generally your understanding?

7        A.   Can you go back up a little bit?  I just didn't

8    see the signatures.  I don't know who else signed this

9    with me.

10       Q.   Your signature and David Klos or Klos?

11       A.   Yeah.  I just don't recognize his.

12       Q.   Okay.  Well, it was filed of public record.

13   This comes right from --

14       A.   I just didn't recognize it.

15       Q.   Fair enough.

16            If we go to the next page, if you look,

17   under "Total Assets," on October 15 of 2019, Highland

18   Capital had assets of $566 million.  Do you see that?

19       A.   Yes, I see it.

20       Q.   And then on 12 -- December 31st, 2020, it

21   reports a decline -- well, it's more than a $200 million

22   decline.  What do you associate that decline with?

23       A.   Predom- -- predominately it was a degradation

24   in value that was even deeper than that, I believe.  And

25   it went through COVID effect on assets.  And then being

1    entirely overlevered and margined in some securities

2    accounts, which the debtor couldn't meet and that the

3    portfolio manager refused to meet.  And then those

4    recedes.  So that -- that cost a lot of money.  And that

5    forced securities selling in the first half of the year.

6    So those were the biggest drivers, I believe, of -- of

7    the declination in value.

8         Q.  If you go down to the "Liabilities and Partners

9    Capital," it has Class 8 general un- -- unsecured

10   claims.  So, basically, as of January 31st of -- excuse

11   me -- December 31st of 2020, it was projecting

12   $73 million in general -- general -- Class 8 general

13   unsecured claims.  Do you see that?

14        A.  I see -- I see the number.  I don't think

15   that's a projection.

16        Q.  No, that's not a projection.  That would have

17   been something a little bit different because this was

18   actually prepared in January, right?

19        A.  No.  It's a balance sheet.

20        Q.  Balance sheet.  What is the January 31st, 2021?

21   Is that a projection?

22        A.  It's not a projection.  I believe that would

23   have been the claims that were allowed as of that date.

24   I don't -- I don't have the full data.  But that's what

25   I think.

```
 1        Q.  Okay.  Now I understand.

 2              So -- but let's go back to the first page.

 3   This is what I'm trying to understand.  This was

 4   prepared in January of 2021.

 5              MR. MCENTIRE:  Okay.  Go back to the page

 6   we were on.

 7              MR. MORRIS:  Objection to the form of the

 8   question.

 9        Q.  (By Mr. McEntire) And so on January 31, 2021,

10   there's a total of $267 million worth of unsecured

11   claims.  These are the claims that some of which were

12   purchased by Farallon and Stonehill, correct?

13              MR. STANCIL:  Objection to form.

14              MR. MORRIS:  Objection to the form of the

15   question.

16        A.  I -- I don't know.

17        Q.  (By Mr. McEntire) Well, other than -- you agree

18   that Farallon and Stonehill bought the vast majority of

19   unsecured claims, do you not?

20              MR. STANCIL:  Objection to form.

21              MR. MORRIS:  Objection to the form of the

22   question.

23        A.  I don't know.  I know when Farallon told me

24   they bought their claims in March of 2021 that I've

25   already testified to.  I don't know when Stonehill
```

```
 1    bought its claim.  And I don't know what's in the

 2    1-31-21 number, meaning I don't know, for example, if

 3    UBS is in that number.  I just -- I just don't know what

 4    that's reflecting at this time.

 5              MR. MCENTIRE:  Okay.  Scroll down.

 6         Q.  (By Mr. McEntire) In the footnotes, Footnote

 7    No. 7, it says, "Does not include Class 9 claims for

 8    which recoveries are not currently expected."  Do you

 9    see that?

10         A.  Yeah.  I'm looking at Footnote 2, though, which

11    it would have been nice to show me that earlier.  But

12    that tells you what's in that number.

13         Q.  Okay.  Fair enough.

14         A.  I do see -- I do -- I do see the No. 7, yes.

15         Q.  And No. 7 says you're still projecting no

16    recoveries for Class 9 claims, correct?

17         A.  It doesn't say anything about projections.  It

18    says what it says.

19         Q.  Well, when you say you don't expect to have any

20    recovery for Class 9 claims, if that's not a projection,

21    what is it?

22         A.  It's an expectation.

23         Q.  Okay.  An expectation.  So as of March 15,

24    2021, Highland Capital is advising the public who are

25    following the -- the Highland Capital bankruptcy that
```

1   there is no expectation of Class 9 claims receiving

2   recovery, correct?

3        A.   That's when the date of this document was

4   filed.  I think the date of the -- up above is a

5   different date than that.  But that's what's being told

6   the current expectation at that time is, yes.

7        Q.   That was my question.  Thank you.

8        A.   Yeah.  Your dates were wrong, though.

9             MR. MCENTIRE:  Tim, would you pull up

10  Tab 8.  We'll mark it as Exhibit 7.

11            MR. STANCIL:  Did you mark this one,

12  Mr. McEntire?

13            MR. MCENTIRE:  6.

14            MR. STANCIL:  This is 6.  Okay.  So now

15  we're on to 7?

16            MR. MCENTIRE:  Yes.

17            MR. STANCIL:  Okay.

18            (Exhibit 7 marked.)

19        Q.   (By Mr. McEntire) So what is marked as

20  Exhibit 7, Mr. Seery, is also another public record.

21  It's for the quarter ending March 31st, 2023.  This was

22  recently filed.  Have you seen this document before?

23        A.   I believe so, yes.

24        Q.   All right.  And I'd like to direct your

25  attention specifically to Page -- one second, please.

```
  1    To Page 7.

  2                    So if I understand this summary in Part 3,

  3    as of this date, which is March 31, 2023, you had a

  4    total allowed claims of $397 million, and you had paid

  5    on those claims $270 million and some change; is that

  6    correct?

  7       A.   I apologize.  What's the date of this document?

  8       Q.   It's dated at the top.  It's March 31st, 2023.

  9                    MR. STANCIL:  Is that the filing date or

 10    the as-of date?

 11                    MR. MCENTIRE:  That's the -- that's the

 12    quarter ending date.  The filing date is reflected at

 13    the top of the document.  It's April 21.

 14                    MR. STANCIL:  Thank you.

 15       Q.   (By Mr. McEntire) So if I understand correctly,

 16    as of the filing date then, you had allowed claims of

 17    $397 million and some change, and you had paid towards

 18    those claims $270 million and some change; is that

 19    correct?

 20       A.   I believe that's correct, yes.

 21       Q.   For a total of 68 percent payout, correct?

 22       A.   Versus the total amount of allowed claims, yes.

 23       Q.   And sitting here today, does -- as the trustee,

 24    do you expect that all of Class 8 will be paid?

 25                    MR. STANCIL:  Objection to form.
```

```
 1                    MR. MORRIS:  Objection.

 2                    Actually, you know what?  Go ahead.  You

 3  can answer.

 4       A.  I don't, actually, right now.  And -- and the

 5  reason is that we have an obligation to meet all of our

 6  senior obligations before any claims get paid out.

 7                    So, first, we've got to cover -- recover

 8  about 100 million from Dondero-related entities and

 9  notes.  Got to sell off the remaining assets.  And then

10  we have to reserve for current and expected

11  indemnifications.  And I think those, my own estimation,

12  looking at the prior litigations that Dondero has been

13  involved in, they're going to be -- that's going to be a

14  lot of reserves.

15       Q.  (By Mr. McEntire) What are the reserves

16  currently?

17       A.  I don't --

18                    MR. STANCIL:  Objection to form.

19       A.  I don't recall off the top of my head.

20       Q.  (By Mr. McEntire) Who sets those reserves?

21  You?

22                    MR. STANCIL:  Objection to form.

23       A.  It depends on where the reserves are.  And so

24  each -- each has been set by the oversight board with my

25  involvement.  I do have the ability, under the claimant
```

1    trust agreement, to reserve effectively what my

2    determination is of the appropriate reserves.

3        Q.  (By Mr. McEntire) Well, how much have you

4    determined is appropriate?

5              MR. STANCIL:  Objection to form.

6        A.  I don't -- I don't recall right now.

7        Q.  (By Mr. McEntire) Is it in the neighborhood of

8    $30 million?

9              MR. STANCIL:  Objection to form.

10       A.  I think we reserved a little bit more than

11   that.

12       Q.  (By Mr. McEntire) What happens to that money if

13   it's not used?

14       A.  Depending on where it is, so the claimant trust

15   agreement has a very specific delineation of what

16   happens.  And then the indemnity trust agreement, which

17   is a separate trust, has a very specific delineation of

18   how it's to be used.

19       Q.  What happens if it's not used, for indemnity

20   purposes?

21             MR. MORRIS:  The document speaks for

22   itself.  Objection to the form of the question.

23       Q.  (By Mr. McEntire) You've identified that it has

24   very detailed procedures.  I'm asking you what that is.

25   How much --

```
 1                  MR. STANCIL:  Objection to the form.

 2                  MR. MORRIS:  Objection to the form of the

 3   question.

 4       A.  I don't know off the top of my head.  But,

 5   basically, the -- the indemnity trust agreement provides

 6   that it would be distributed the way the indemnity trust

 7   is set up once all of the indemnification obligations

 8   are satisfied in full.

 9       Q.  (By Mr. McEntire) Distributed to creditors?

10                  MR. STANCIL:  Objection to form.

11       A.  It would be distributed in the manner set forth

12   in the claimant trust agreement.

13       Q.  (By Mr. McEntire) Is that to creditors?

14                  MR. STANCIL:  Objection to form.

15                  MR. MORRIS:  Form of the question.  There

16   are no creditors.

17       A.  Ultimately it would be to the -- to the trust

18   special beneficiaries.

19       Q.  (By Mr. McEntire) Fair -- fair enough.  The

20   claimant beneficiaries?

21                  MR. STANCIL:  Objection to form.

22       Q.  (By Mr. McEntire) Is that correct?

23       A.  Claimant trust beneficiaries, yes.

24       Q.  Who was involved in setting the amount of the

25   indemnities?  Is that you and the oversight board
```

```
 1   together?

 2              MR. MORRIS:  Objection to the form of the

 3   question.  I'm going to direct the witness not to

 4   answer.  This has no relevance of any kind.

 5        Q.  (By Mr. McEntire) When was -- when -- when was

 6   the indemnity amount set?

 7              MR. STANCIL:  Objection to form.

 8        A.  Initially, the -- the initial part is set --

 9   was set at the effective date, or actually before then,

10   as part of the claimant trust agreement and the

11   indemnity trust agreement.  And it has the ability to

12   get adjusted based upon the expected anticipated

13   indemnification obligation.  So it depends on what they

14   are.

15        Q.  (By Mr. McEntire) How did you go about

16   estimating the -- the potential indemnity obligations?

17              MR. MORRIS:  Objection.

18              MR. STANCIL:  Objection to form.

19              MR. MORRIS:  Instruct the witness not to

20   answer.  This is confidential legal advice, assessment

21   of indemnity obligations.  I'm directing the witness not

22   to answer on grounds of attorney-client privilege.

23        Q.  (By Mr. McEntire) So this was -- this was not

24   determined by the oversight board.  This was on the

25   basis of advice from attorneys.  Is that -- is that what
```

 1  you're telling me, Mr. Seery?

 2              MR. STANCIL:  Objection to form.

 3              MR. MORRIS:  Objection to the form of the

 4  question.

 5              MR. MCENTIRE:  You can answer.

 6              MR. STANCIL:  No, you cannot, Mr. Seery.

 7      Q.  (By Mr. McEntire) Mr. Seery --

 8              MR. STANCIL:  Excuse me one second,

 9  Mr. McEntire.  Excuse me.  You've been told by company

10  counsel that that constitutes the company's privileged

11  information, how those determinations were reached.

12              MR. MCENTIRE:  Can you direct -- can you go

13  to Page 13, Tim, please?

14      Q.  (By Mr. McEntire) Class 8 -- at the bottom of

15  the page, Class 8, 9 summaries, do you see where I'm

16  reading?

17      A.  No.

18      Q.  No?  It's Item No. 2.

19              MR. MORRIS:  Can you scroll up a bit,

20  please?

21              MR. MCENTIRE:  Scroll down.  Yeah, scroll

22  up.  Show him the --

23              MR. STANCIL:  Bottom of the page.

24              MR. MCENTIRE:  So we can see the bottom of

25  the page.  Correct.  There you go.

```
 1              MR. STANCIL:  There you go.

 2       Q.  (By Mr. McEntire) Class 8, Class 9 summary, can

 3  you tell me what we're looking at here?

 4       A.  Not off the top of my head.  I have to read it.

 5       Q.  I'm asking you to look at Item No. 2.

 6       A.  Yeah.  Yeah.  This is a breakdown of Class 8

 7  and 9 alone as to what's been distributed on those

 8  classes.  Whereas up above, the U.S. trustee form has

 9  aggregate number which includes Class 7, 8, and 9.

10       Q.  If we look at Class 8, it says 28.7 million

11  remaining.  Is that the amount that's -- that's still

12  remaining before you fully discharge and pay off

13  Class 8?

14       A.  I don't think so.  I believe that -- that

15  doesn't seem like the right amount.  I think that

16  that -- let me see what the footnote says.

17       Q.  Were you finished with your answer?

18       A.  I'm just -- I'm looking at the footnote.  I

19  don't think that's the correct amount.  But the footnote

20  explains why.

21       Q.  So I'm just trying to understand what the 28.7

22  represents.

23              MR. MORRIS:  Objection to the form of the

24  question.

25       A.  I believe that that does not include -- it's in
```

 1   Footnote 3.  But I think it's the face amount of the --

 2   plus the face amount of the pending claims, less the

 3   cumulative amount, and excluding interest on the claims.

 4       Q.  (By Mr. McEntire) So 28.7 million does not

 5   include the accrued interest, so you're going to have to

 6   add that in, right?

 7       A.  Yes.

 8               MR. STANCIL:  Objection to form.

 9       Q.  (By Mr. McEntire) All right.  And do you know

10   what the accrued interest is?

11       A.  I don't know.

12       Q.  Is there a current plan in place to monetize

13   the remaining assets of Highland Capital?

14               MR. MORRIS:  I'll let him answer yes or no.

15       A.  Yes.

16       Q.  (By Mr. McEntire) Is there a timetable within

17   which that monetization is -- is hoped to be achieved?

18               MR. MORRIS:  I'll let him answer yes or no.

19       A.  It depends on -- on the market and the activity

20   we have going on.  So there's no specific timetable.

21   We're -- we're doing our best in the case of each of the

22   assets and the market they're in.  So there's no --

23   there's no projected time period.

24       Q.  (By Mr. McEntire) Are there active efforts to

25   monetize all of the remaining assets, as we sit here

 1  today?

 2              MR. MORRIS:  I'll let him answer yes or no.

 3       A.  Yes.

 4       Q.  (By Mr. McEntire) Is there some goal that has

 5  been established in terms of when you hope to fully

 6  monetize and discharge your obligations as the trustee?

 7              MR. STANCIL:  Objection to form.

 8       A.  There's not a goal.  The original goal was

 9  12-31-22.  So we don't have a specific goal.

10       Q.  (By Mr. McEntire) So right now there is no

11  deadline at all set for monetization; is that correct?

12              MR. MORRIS:  Objection to the form --

13              MR. STANCIL:  Objection to form.

14              MR. MORRIS:  -- of the question.  That's a

15  different question.

16       A.  Yeah.  There's -- there's no -- there's no --

17  there's no deadline.

18              MR. MCENTIRE:  Ms. Court Reporter, how much

19  time have I used, please?

20              THE COURT REPORTER:  Christina, do you --

21              MR. MCENTIRE:  I couldn't hear you.

22              THE COURT REPORTER:  I was trying to talk.

23  But someone talked over me.

24              Christina, do you have the time?

25              THE VIDEOGRAPHER:  I'd need to go off the

```
 1   record and add it.

 2                    MR. STANCIL:  Yeah.

 3                    THE COURT REPORTER:  Yeah, me too.

 4                    MR. STANCIL:  That's what I was going to

 5   suggest, Sawnie, we take a quick break for about --

 6                    MR. MCENTIRE:  Yeah.  I need to run down

 7   the hall anyway.  But I would like to know the time

 8   before we take the break.  Let's go off the record now.

 9                    MR. STANCIL:  Yeah.  That's what I was

10   suggesting.

11                    THE VIDEOGRAPHER:  The time is 2:11 p.m.

12   We're going off the video record.

13                    (Break taken from 2:11 p.m. to 2:25 p.m.)

14                    THE VIDEOGRAPHER:  The time is 2:25 p.m.

15   We're back on the video record.

16                    MR. MCENTIRE:  Ms. Court Reporter, or

17   somebody, Videographer, would you let me know when I've

18   got about five to ten minutes left, please.

19                    Mr. Seery, we're kind of in the last --

20   we're past the seventh inning stretch.  We're going --

21   in the last inning now.  So we'll try to make this as

22   efficient as possible.

23       Q.   (By Mr. McEntire) Was Farallon, to your

24   knowledge, ever a client of Sidley & Austin while you

25   were an attorney at Sidley & Austin?
```

1      A.   No.   I never -- I never represented them.   And

2    I don't know that they were ever a client of Sidley

3    Austin ever.

4      Q.   Same question about Stonehill.   Was Stonehill

5    ever a client of Sidley & Austin while you were there?

6      A.   No, not that I -- not that I ever heard.

7      Q.   How about in connection with any other law firm

8    that you, in your past life, were connected with?

9      A.   No, not that I've ever heard.

10      Q.   Same question with regard to Farallon in

11    connection with any previous law firm you were with.

12      A.   Yeah, assuming the first one was Stonehill,

13    never any law firm.   The second one, Farallon, never any

14    law firm.   I'd never represented them.   I've never known

15    any firm that I ever worked for to, as a lawyer, to

16    represent them.

17      Q.   Are you familiar with a self advisory agreement

18    between Highland and NexPoint?

19      A.   Not -- not specifically.

20      Q.   How about generally?

21      A.   There -- there were agreements between Highland

22    and NexPoint that were terminated or rejected as part of

23    the exit from bankruptcy, yes.

24      Q.   You weren't aware, though, a self advisory

25    agreement stayed in effect through February of 2021?

1              MR. STANCIL:  Object to form.

2         A.  Yeah, I don't -- I don't believe that to be the

3    case.

4         Q.  (By Mr. McEntire) What was the nature of the

5    self advisory agreement?  What did it entail?

6              MR. STANCIL:  Objection to form.

7         A.  Yeah.  I don't -- I don't recall the specifics

8    of -- of that arrangement.

9         Q.  (By Mr. McEntire) Do you believe -- do you

10   recall that a compliance log was maintained by both

11   companies as part of that self advisory agreement?

12             MR. STANCIL:  Objection to form.

13        A.  No.  I have no -- I have no knowledge of that.

14        Q.  (By Mr. McEntire) I'd like to talk a little bit

15   about the meet and greet that we started off this

16   deposition about or discussing.

17             The meet and greet with Farallon took place

18   at their offices in San Francisco, correct?

19        A.  Yes.

20        Q.  Your office is in New York, correct?

21             MR. MORRIS:  Objection to the form of the

22   question.

23        A.  Yes.

24        Q.  (By Mr. McEntire) Did you fly out there to San

25   Francisco to meet with Mr. Patel and Mr. Linn?

1             MR. STANCIL:  Objection to form.

2        A.  No.  So -- so Guggenheim had a team.  And we

3   went out and met with people in both the Bay Area and

4   with folks in -- in L.A.

5        Q.  (By Mr. McEntire) I thought this was after you

6   had left Guggenheim that you went out for this meet and

7   greet?

8        A.  There were two.

9        Q.  There were two meets and greets?

10       A.  Yeah.  There was -- there was one at

11   Guggenheim, which involved Mr. Patel.  I don't believe

12   Mr. Linn was there.  And that was in 2017 or '18.  I

13   don't recall.  Because you asked me when I met

14   Mr. Patel.  And then -- then there was the one after I

15   left Guggenheim.

16       Q.  Okay.  Let's -- let's talk about each of them.

17   Let me write that down so I don't forget.

18             The -- the 20 -- the 2019, you went out

19   there by yourself, correct?

20       A.  I went there with my wife.

21       Q.  Okay.  Fair enough.

22       A.  She had her own business.  She wasn't involved

23   in any of my business.

24       Q.  Fair enough.

25             So you and your wife go to San Francisco, a

1    meet and greet with Farallon, and then presumably you're

2    a tourist for a couple of days?

3         A.   That's not correct, no.

4         Q.   Okay.   I was just trying.

5              All right.   So you fly out to meet

6    Farallon.   And you -- you pay for your own ticket,

7    correct, and your wife's ticket?

8         A.   Your -- your premise is incorrect.   I did not

9    fly out to meet Farallon.

10        Q.   How did you meet them?

11        A.   I -- I flew out with her when she was going on

12   a trip.   And I paid for my own ticket to go out.   And

13   then I saw a number of people in the Bay Area.   And then

14   I went down to L.A.   And I saw a number of people in

15   L.A.

16        Q.   Okay.   Where was Farallon based?   In Los

17   Angeles?

18        A.   No.   Farallon is based in San Francisco.

19        Q.   Oh, okay.   So you flew out there.   You paid for

20   your own -- own transportation.   And you met with

21   Mr. Linn in San Francisco?

22        A.   I believe that --

23              MR. STANCIL:   Object to the form.

24        A.   Yeah.   No, I don't think that's correct.   I

25   believe I met with Mr. Linn and Mr. Patel.   And that

```
 1    was, I believe, the first time I ever met Mr. Linn.

 2         Q.  (By Mr. McEntire) Fair enough.

 3              And how long did the meeting last?

 4         A.  Maybe 20 minutes, a half hour.

 5         Q.  Okay.  Were other people at the meeting other

 6    than you, Mr. Linn, and Mr. Patel?

 7         A.  I -- I don't recall.  If there was, it would

 8    have been a junior person.

 9         Q.  But there was not a bunch of people there.  It

10    was just -- it was a small group there focusing on your

11    desire to introduce yourself, correct?

12              MR. STANCIL:  Objection to form.

13         A.  I -- I -- I knew of -- of Mr. Patel.  And I had

14    met him the year before or year and a half before,

15    whenever that was with Guggenheim.  And I had moved on

16    from Guggenheim and was touching base with people that I

17    knew in the industry.  And because I was going to be in

18    San Francisco, I lined up a bunch of meetings in San

19    Francisco with various people.  And then I did the same

20    thing in L.A.

21         Q.  (By Mr. McEntire) When in -- when in 2020 --

22    when in 2019 did this actually happen?

23         A.  I don't recall.  It was in the fourth quarter

24    sometime.

25         Q.  In the fourth quarter.  So October, November,
```

```
 1   or December, right?

 2       A.   Somewhere in that range, yeah.

 3       Q.   And you became involved in the Highland

 4   bankruptcy when?

 5       A.   January 7th, 2020.  7th or the 9th.  I don't

 6   recall.

 7       Q.   So it was just a matter of a few months you --

 8   you got involved and were elected to the board of

 9   directors, correct?

10       A.   I was selected to the board by the debtor,

11   which was Highland controlled by Dondero, and the

12   committee.

13       Q.   Okay.  What type of business were you actually

14   trying to generate with Farallon at this meet and greet

15   in 2019?

16            MR. STANCIL:  Object to the form.

17       A.   I wasn't trying to --

18            MR. SCHULTE:  Objection, form.

19       A.   I wasn't trying to generate any business.  I

20   was meeting people in the industry to get a better sense

21   for myself as to what different investors were thinking

22   and how I might do the next thing for myself.

23       Q.   (By Mr. McEntire) Okay.  The 2017 meet and

24   greet, was that also in San Francisco?

25       A.   That was, yes.
```

```
 1        Q.  And you went out there with a group from

 2   Guggenheim?

 3        A.  Yes.

 4        Q.  And you met Mr. Linn?

 5        A.  No.

 6        Q.  Who did you meet with?

 7        A.  Mr. Patel.

 8        Q.  I'm sorry.  I'm sorry.  I get them confused.

 9   Mr. Patel.

10             And how many people went with you from

11   Guggenheim?

12        A.  I don't recall.  At least -- at least three in

13   addition to me.  It may have been four.

14        Q.  Okay.  And how long was that meeting?

15        A.  Probably the same, half hour.  That would be --

16   that would be longer because there were more people

17   there to talk about what -- what they were thinking

18   about their specific area.  So that would probably be

19   somewhere in the 30 minutes to 45 or 60 minutes.

20        Q.  Was there a presentation made?

21        A.  Not a -- not a specific presentation.  There

22   was no particular pitch.

23        Q.  So you flew four people out for a 30- to

24   40-minute meeting; is that what you said?

25             MR. MORRIS:  Objection to the form of the
```

1    question.

2         A.   You keep making stuff up.  It's sort of a

3    problem.  I said that it was part of a meet and greet

4    that involved several businesses in the Bay Area and

5    then down to Los Angeles.  Why do you make stuff up?

6         Q.   (By Mr. McEntire) I'm sorry.  I wasn't

7    attempting to do that.  I apologize if you believe that

8    way.

9              So -- but I want to make sure --

10        A.   Because you didn't.

11        Q.   Mr. Seery, are you finished now?

12        A.   I am.

13        Q.   Okay.  Other than your company and the

14   representatives from Guggenheim, was anyone else in

15   attendance at this meeting from outside of Farallon?

16             MR. STANCIL:  Object to the form.

17             MR. SCHULTE:  Objection, form.

18        A.   I don't -- I don't recall.

19        Q.   (By Mr. McEntire) All right.  Did any business

20   result from that meet and greet?

21        A.   Not that I'm aware of, no.

22        Q.   And that was in 2017.  You were with Guggenheim

23   for another two years?

24        A.   I don't recall whether it was '17 or '18.

25        Q.   Okay.  And between the two meet and greets, did

1    you have any other communications with Mr. Patel or

2    Mr. Linn?

3         A.   Not that I know of, no.

4         Q.   When you went out to San Francisco in 2019 with

5    your wife, how many other companies in San Francisco did

6    you meet with?

7         A.   At least three or four.

8         Q.   Do you recall who they were?

9         A.   Different hedge funds.  Also some of the CLO

10    funds, mutual funds.  I don't recall who else I saw

11    then.  And then I had others in Los Angeles as well.

12         Q.   How would you describe Farallon?  Is that a

13    hedge fund?

14         A.   I think it's fair to say they're -- they're a

15    hedge fund.  I think they're multi-strategy fund.  I

16    think it's probably a fair description.

17         Q.   What's the distinction?

18         A.   Between what and what?

19         Q.   A multi-strategy fund and a hedge fund.

20         A.   I think people think about hedge funds as in --

21    often in a generic term.  And then multi-strategy

22    provides more specificity to what they do.

23         Q.   And how would you describe Farallon?

24         A.   I said I think they're -- I don't know how they

25    describe themselves.  I would describe them as a

1    multi-strategy hedge fund.

2         Q.   Okay.  Do they have their own investors?

3         A.   I have no idea how they're structured or what

4    their investments are or who they're --

5         Q.   I'm not asking what -- I'm not asking what your

6    investments are.  I'm asking --

7         A.   I said who their investors are.

8         Q.   I'm not asking for -- sorry.  Go ahead.  I'm

9    not asking -- I'm not asking for indemnities.  I'm just

10   asking do they generically have their own investors?

11        A.   And I said I have no idea how they're

12   structured or who their investors are, whether they have

13   one investor, whether they have ten investors, whether

14   they have a million investors.  I don't know.  I don't

15   know anything about their business, other than generally

16   they're a multi-strategy fund.

17        Q.   So as -- as a result of two meet and greets,

18   one on behalf of Guggenheim and one on behalf of

19   yourself, you don't know anything about how Farallon is

20   structured?

21        A.   No.

22             MR. MCENTIRE:  Okay.

23             MR. SCHULTE:  Objection, form.

24        Q.   (By Mr. McEntire) Now, Stonehill, you've never

25   done a meet and greet with Stonehill, correct?

1      A.  No.

2      Q.  All right.  Are you familiar with a company

3  known as Grosvenor?

4      A.  I never heard of -- I believe it's pronounced

5  Grosvenor.

6      Q.  Maybe.  I apologize.

7      A.  And I never heard of Grosvenor until this

8  Highland case.

9      Q.  Gro- -- how do you pronounce it?  I don't want

10  to mispronounce it.

11      A.  I don't -- I pronounce it Grosvenor.  That's

12  how they do it in London.

13      Q.  Fair enough.

14      A.  You're talking about a square, not a hedge

15  fund, or whatever they are.

16      Q.  I know.  I've been to the square.  The U.S.

17  Embassy used to be located there.

18      A.  That's correct.

19      Q.  So Grosvenor, you've never had any dealings

20  directly with Grosvenor?

21      A.  No.  Never heard of them.

22      Q.  Sidley & Austin, were you aware Grosvenor had

23  an interest in the -- in -- in the Redeemer Crusader

24  fund with the Redeemer Committee?  Were you aware of

25  that?

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-11   Filed 12/02/24   Page 182 of 214   PageID 6715

Pages 180

1          MR. STANCIL:  Objection to form.

2      A.  Before I became in Highland, I'd never --

3  involved in Highland --

4      Q.  After -- after --

5      A.  -- I never heard of them.

6      Q.  Fair enough.

7              After you became involved at Highland, had

8  you -- what was your understanding of Grosvenor?

9      A.  My -- my understanding of Grosvenor, much of

10 which came from Dondero, was that they had an investment

11 in a Crusader, and that the Redeemer Committee, which

12 was the -- the folks who redeemed from Crusader, was

13 populated, to some degree, by Grosvenor or former

14 Grosvenor employees.

15     Q.  Do you know that Grosvenor is a significant

16 investor in Farallon and Stonehill?

17          MR. STANCIL:  Object to the form.

18     A.  I have no knowledge --

19          MR. SCHULTE:  Objection, form.

20     A.  I have no knowledge of Grosvenor.  I have no

21 knowledge of who Grosvenor is invested in.  I have no

22 knowledge of Farallon's investors, nor do I have any

23 knowledge of Stonehill's investors.

24     Q.  (By Mr. McEntire) Do you know John Motulsky?

25     A.  I've met John Motulsky, yes.

1      Q.  And what was the context of that meeting?  Was

2   that social or professional?

3      A.  First social at -- at industry functions.  And

4   I have seen him since meeting on the oversight board at

5   Stonehill's offices.

6      Q.  Is he an attorney?

7      A.  I don't know John's background.

8      Q.  You say you've seen him socially at various

9   industry meetings.  What type of industry meetings are

10   those that you're referring to?

11      A.  The distressed community in New York has a few

12   functions every year around the holiday time.  And I

13   have seen Motulsky at those functions.

14      Q.  Okay.

15      A.  And I can't tell you the last one.  It's been,

16   you know, 20-plus years of doing this in those -- going

17   to those kinds of things.

18      Q.  John Motulsky, do you know what -- what his

19   affiliation is with Stonehill?

20              MR. STANCIL:  Object to the form.

21      A.  I believe he's the founder.

22      Q.  (By Mr. McEntire) So how many times a year do

23   you actually see John Motulsky?

24              MR. MORRIS:  Objection to the form of the

25   question.

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-11   Filed 12/02/23   Page 184 of 214   PageID 6712

Pages 182

1      A.  If I've seen John Motulsky five times in the

2   past 25 years, that'd probably be too many.  That's -- I

3   don't think it's been more than that.

4      Q.  (By Mr. McEntire) When is the last time you saw

5   John Motulsky?

6      A.  Probably in -- sometime in the second half of

7   2022 when I did a board meeting from Stonehill's

8   offices.

9      Q.  You were at Stonehill's offices conducting a

10  board meeting?

11     A.  A -- yeah, an oversight board meeting.

12     Q.  And John Motulsky was still there?

13     A.  He stopped in and said hello and then left.

14     Q.  Okay.  What is his current position at

15  Stonehill?

16          MR. MORRIS:  Objection to the form of the

17  question.

18     A.  I have no idea.

19     Q.  (By Mr. McEntire) And prior to 2022 when you

20  conducted the board meeting, when was the one time

21  before that that you had met with or -- met with John

22  Motulsky?

23     A.  I said it was at industry functions.  I don't

24  recall any -- any other meetings with John Motulsky.

25  I've never been inside John Motulsky's home office.

```
 1   I've been in Stonehill's conference room.  I've nev- --
 2   I don't know John Motulsky other than in those ways.
 3       Q.  Well, let me ask this question, Mr. Seery.
 4   Initially you said that you initially had some social
 5   contact with Mr. Motulsky.  Then you said professional
 6   contact with Mr. Motulsky.  What was the professional
 7   contact?
 8               MR. STANCIL:  Object to the form of the
 9   question.  Mr. Seery testified exactly -- I'm sorry,
10   Sawnie.  But he said he saw him socially at industry
11   events.
12               MR. MCENTIRE:  You don't need -- you don't
13   need to woodshed the witness on the record.  My
14   understanding --
15               MR. STANCIL:  No.  Sawnie, you don't
16   need -- you don't need to mischaracterize his testimony.
17               MR. MCENTIRE:  I'm not.
18               MR. STANCIL:  Five times.  You are.
19       Q.  (By Mr. McEntire) You indicated both social and
20   professional.  What was the professional?
21               (Simultaneous speaking.)
22               MR. STANCIL:  Wait.  Wait, Jim.
23               I object to the form of this question.
24               You may go ahead and answer again.
25       A.  My recollection is that I've seen John at
```

1  the -- Motulsky at the professional events.  And that --

2  and I think I testified there was no -- I never sat in

3  his office.  He's never been in my office at any place

4  that I've ever worked.

5      Q.  (By Mr. McEntire) All right.  Going back to

6  your meet and greet with Patel and Linn in San

7  Francisco, you said you were meeting with them to see

8  what they were thinking so you could better inform

9  yourself on what your next step might be; is that fair?

10          MR. STANCIL:  Object to the form of the

11  question.

12      A.  I think, generally, yes.  I was trying to

13  survey the landscape of what investors were thinking

14  about the -- the environment and what the distressed

15  environment, in particular, could look like and whether

16  I'd have an opportunity to find a place at different

17  investment funds that could be interesting for me.

18      Q.  (By Mr. McEntire) And did they disclose their

19  involvement at all as investors in distressed assets?

20      A.  No.  I already knew that Farallon invested in

21  distressed assets at times.  That's part of their -- it

22  was my understanding was their multi-strategy profile.

23      Q.  Did you also understand that that would include

24  involvement in purchasing claims in bankruptcy

25  proceedings?

1      A.   I didn't have an understanding either way.

2  I've never known or heard of them purchasing claims.

3  They may well have done it.

4      Q.   As you -- sitting here today, are you aware

5  that -- that Farallon does engage in this -- this type

6  of investing in claims?

7      A.   Sitting here today --

8           MR. SCHULTE:   Objection, form.

9      A.   Sit -- sitting here today, I know that they

10  bought claims in this case prior to the -- that e-mail

11  that I got on March 15th, 2021.  I had no knowledge of

12  other claims that they bought because I haven't been

13  around --

14     Q.   (By Mr. McEntire) So if -- if Mr. Patel has

15  stated -- let me rephrase this.

16          If Mr. Patel has stated that he's been

17  involved in purchasing claims prior to the Highland

18  Capital bankruptcy based upon your guidance and advice

19  and made a lot of money, do you deny that that ever

20  happened?

21          MR. STANCIL:   Objection to form.

22          MR. MORRIS:   Objection to the form of the

23  question.

24     Q.   (By Mr. McEntire) Do you deny -- do you deny

25  that statement?

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-11   Filed 12/02/25   Page 188 of 214   PageID 6716

Exhibit Exhibits 1 thru 50   James Dondero   June 22, 2022   Pages 186

1            MR. STANCIL:  Object to the form.

2            MR. SCHULTE:  Objection, form.

3       A.  I've never been involved in purchasing claims

4  with Mr. Patel.

5       Q.  (By Mr. McEntire) I'm not suggesting that you

6  were actually purchasing yourself.  If Mr. Patel stated

7  that Farallon had made money based upon your prior

8  guidance in connection with other claims in other

9  bankruptcies, do you deny that that ever happened?

10            MR. STANCIL:  Objection to form.

11            MR. SCHULTE:  Objection, form.

12       A.  I never was involved or advised -- advised them

13  about purchasing claims.  That's just not something I

14  would have done.

15       Q.  (By Mr. McEntire) Same question with regard to

16  Stonehill.

17            MR. SCHULTE:  Same objection.

18       Q.  (By Mr. McEntire) Same answer?

19            MR. STANCIL:  Same objection.

20       Q.  (By Mr. McEntire) Same answer?

21       A.  I've never been involved in purchasing claims

22  in a bankruptcy with Stonehill.

23       Q.  (By Mr. McEntire) Were you involved in the

24  Toys"R"Us bankruptcy?

25       A.  No, I was not.

Case 19-34054-sgj11  Doc 3818-2  Filed 06/05/23  Entered 06/05/23 22:10:41  Desc
Case 3:23-cv-02071-E  Document 22-1  Filed 12/02/23  Page 189 of 214  PageID 6717

Exhibit B3  James Dondero Jr  Pages 187

1    Q.  Were you involved in the Blockbuster

2    bankruptcy?

3    A.  Yes.

4              MR. MORRIS:  Objection, asked and answered.

5    Q.  (By Mr. McEntire) What specifically was your

6    involvement?

7    A.  In the Blockbuster bankruptcy?

8    Q.  Yes, sir.

9    A.  Yeah, I represented a lender group.

10   Q.  Which lender?

11             MR. MORRIS:  Objection to the form of the

12   question.

13   A.  They were secu- -- I believe they were secured

14   bonds.

15   Q.  (By Mr. McEntire) They were -- had secured

16   bonds.  What was the name of the company?

17             MR. STANCIL:  Object to the form.

18   Q.  (By Mr. McEntire) Sorry?

19   A.  Blockbuster.

20   Q.  Oh, you were -- that was actually -- you --

21   were you actually representing Blockbuster, or you

22   represented someone who was involved in the bankruptcy

23   proceedings?

24             MR. MORRIS:  Objection, asked and answered.

25   A.  I represented the secured lender group.

1    Q.  (By Mr. McEntire) Okay.  As an attorney?

2    A.  Yes.

3    Q.  That's when you were with Sidley & Austin?

4    A.  Yes.

5    Q.  I'm doing kind of a little bit of cleanup here

6  because we're kind of wrapping up the -- the big

7  witching hour.

8         In connection with the negotiations of the

9  compensation agreement, we established the timing.  We

10  established who you were dealing with.

11         Did anyone hire or retain a third-party

12  independent consultant to come in and assess the

13  reasonableness of your compensation scheme?

14         MR. STANCIL:  Object to the form.

15    A.  In connection with that negotiation, Highland

16  did not.  And I'm not -- I would know that.  And I'm not

17  aware that any of the board members did either.

18    Q.  (By Mr. McEntire) As the chief restructuring

19  officer and the CEO of Highland, when COVID hit and

20  values -- asset values were dropping as we discussed

21  earlier, were you involved in the direct communications

22  with any of the boards of any of the portfolio companies

23  to explain what was happening?

24         MR. STANCIL:  Object to the form.

25         MR. MORRIS:  You can answer yes or no.

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-11   Filed 12/04/23   Page 191 of 214   PageID 6719

Exhibit B-2 James Seery June 5, 2021                          Pages 189

```
 1   Subject to the objection.  But don't --

 2       A.  It depends on when.  And I don't think I needed

 3   to explain COVID to anybody.

 4       Q.  (By Mr. McEntire) I only said -- used that as a

 5   reference point.  I'm not asking you to explain COVID,

 6   Mr. Seery.  My -- my intent was different.

 7            We've seen documents here reflecting a

 8   significant decline in value from the petition date to

 9   December 31st, 2020.  And I'm asking you whether you

10   recall having communications with the boards or the

11   management of any of the portfolio companies concerning

12   the causes of that decline.

13            MR. STANCIL:  Object to the form.

14            MR. MORRIS:  Answer yes or no.

15       A.  Yes.

16       Q.  (By Mr. McEntire) Would that have been in the

17   form of -- of written documents?

18            MR. MORRIS:  I direct him not to answer.

19            MR. MCENTIRE:  What's your object- --

20   what's the objection there?

21            MR. MORRIS:  It has nothing to do with the

22   quid pro quo and the colorability of the claims here.

23   It's fishing to get information to use for future

24   litigation.

25            MR. MCENTIRE:  I see.
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-11 Filed 12/08/23   Page 192 of 214   PageID 6720

James P. Seery, Jr.                                                    Pages 190

 1            MR. MORRIS:  It's both irrelevant.  And I'm

 2  doing it as a protective matter.

 3       Q.  (By Mr. McEntire) So, Mr. Seery --

 4            MR. MORRIS:  If you help me to understand

 5  why it's relevant, I might reconsider.  But otherwise,

 6  I'm going to stand by my instructions.

 7       Q.  (By Mr. McEntire) When you made the data room

 8  available for people or entities who signed the NDA for

 9  exit financing, what was included in the data room at

10  that time?

11            MR. STANCIL:  Objection to form.

12       A.  I only know generally.  I didn't look

13  specifically at the data room.  But it would have been

14  the plan, the -- who was going to be in each role, so

15  the personnel, the -- the structure between the HCMLP

16  and the trust, and then the -- the assets below and what

17  the financings were that were in place at various

18  entities.

19       Q.  (By Mr. McEntire) Would there be asset

20  valuations made available to the potential bidders for

21  exit financing?

22            MR. STANCIL:  Object to the form.

23       A.  I don't think so.  We would have had whatever

24  our valuations were at the time.  I don't know that we

25  made those available to entities.  They would have made

1    their own -- anybody doing due diligence would have done

2    their own work.  I don't know what was in -- exactly in

3    the data room.

4        Q.  (By Mr. McEntire) You stated that you don't

5    know when Stonehill closed its agreements to acquire the

6    claims?

7        A.  Yeah.  I don't -- I don't know specifically.

8        Q.  So you -- so you don't -- you don't know

9    whether it was before or after the NDA that Stonehill

10   signed; is that correct?

11       A.  I -- I don't know.  I tend to think it was

12   after.  But I don't -- I don't know.

13       Q.  Okay.  Do you know for a fact that Stonehill

14   actually accessed the data room virtually?

15       A.  I -- I -- I don't know for a fact.  I -- I

16   assume they did because they put forth a very detailed

17   proposal to provide exit financing.  And it was

18   extremely competitive.

19       Q.  Why did you select the -- why did you not

20   select Stonehill?

21       A.  It wasn't the best one.

22       Q.  Who -- who -- I don't know the answer to this

23   question.  Perhaps I should.  Who actually did provide

24   the exit financing?

25       A.  Blue Torch Capital.

1    Q.  In connection with MGM, did you -- did you ever

2   contact the MGM in connection with the potential sale to

3   Amazon or Apple?

4              MR. STANCIL:  Object to the form.

5    A.  At some point, MGM contacted me.

6    Q.  (By Mr. McEntire) You never contacted the

7   general counsel of MGM to ask him questions about the

8   sale to Amazon or Apple?

9              MR. STANCIL:  Object to the form.

10   A.  They reached out to me.  And we actually signed

11  a -- an NDA with MGM at some point.

12   Q.  (By Mr. McEntire) When did you sign an NDA with

13  MGM?

14   A.  It would have been the beginning of May.  I

15  think it was the beginning of May 2021, that -- that

16  range.  It was a very tight period of time.  And -- and

17  the buyer wanted us to sign off on the -- on the

18  agreement.

19   Q.  What buyer?

20   A.  Amazon.

21   Q.  Amazon.  Amazon reached out to you through MGM

22  and wanted you to sign an NDA; is that correct?

23   A.  No.

24              MR. STANCIL:  Objection to the form.

25              MR. MORRIS:  Objection to form.

```
 1        A.   That's not correct.

 2        Q.   (By Mr. McEntire) Then correct -- then correct

 3   the record for me.

 4        A.   I think I said it correctly before.  MGM

 5   reached out.

 6        Q.   Yes.

 7        A.   And wanted to have us take a look at the

 8   transaction and make sure that we were supported.

 9        Q.   How much MGM stock did Highland actually own?

10        A.   Highland owned about 150 thou- -- 170,000

11   shares, I think.

12        Q.   You testified to that earlier.  But I guess I

13   was looking for a little bit -- a different variation of

14   that.  What percentage of MGM stock did you own?

15             MR. MORRIS:  Objection to the form of the

16   question.

17        A.   Highland owned a teeny percentage.

18        Q.   (By Mr. McEntire) Okay.  So MGM reached out to

19   you and asked you to sign an NDA to make sure that you

20   were good with the deal?

21        A.   Yeah.  I think it was Highland, not reaching

22   out to me.  And they reached out to, I think, all of the

23   significant shareholders.  It was extremely tightly

24   held.  And a number of them had to sign off if they

25   thought the transaction was correct.  That's my
```

```
 1   understanding.
 2       Q.  Did they explain to you why it was so tightly
 3   held if, according to you, it was already publicly
 4   known?
 5            MR. MORRIS:  Objection to the form of the
 6   question.  That's not what --
 7       A.  The shares were tightly held.
 8       Q.  (By Mr. McEntire) I see.
 9       A.  The shares -- the shares of MGM were held
10   basically by six hedge funds.
11       Q.  Okay.  Fair enough.
12            Did MGM tell you why they thought they
13   needed an NDA from you if, in fact, it was publicly
14   well-known that Amazon or Apple was going to buy them?
15       A.  That's -- that's not what they were asking me.
16   They were coming and telling us, "We have a transaction.
17   Here's what it -- here's what is going to be paid.
18   Here's the structure of the transaction.  Here's the
19   merger agreement.  We want your support on this
20   transaction.  It's happening in about a week or ten
21   days."  It was very tight.
22       Q.  And you -- you considered the fact that they
23   were telling you that a transaction would occur was
24   material nonpublic information, correct?
25            MR. MORRIS:  Objection.
```

 1                  MR. STANCIL:  Object to the form.

 2        A.  No, I don't.  I think it's -- when the -- they

 3   call you and ask you to sign a NDA.  They didn't tell me

 4   anything until after you sign that NDA.  They -- they

 5   just said, "We need you to."  I knew they were for sale,

 6   of course.  I knew who the likely buyers was.  I had no

 7   idea what the price was.  I had no idea what the timing

 8   was.  This was after the first quarter of 2021.  And

 9   they actually needed -- told us we -- they need our

10   support.

11        Q.  (By Mr. McEntire) So you agree that the timing

12   of the deal could actually be material nonpublic

13   information?

14                  MR. STANCIL:  Object to the form.

15                  MR. MORRIS:  Form of the question.

16        A.  I don't -- I don't -- I don't think what you're

17   fishing for you're going to find in these lawyers.

18        Q.  (By Mr. McEntire) I'm not fishing for anything.

19   I'm just asking you will you agree that one of the

20   issues was the timing of the sale, and they wanted you

21   to sign an NDA?  That was one of the reasons?

22                  MR. MORRIS:  Objection --

23                  MR. STANCIL:  Object to the form.

24                  MR. MORRIS:  -- to the form of the

25   question.

 1     A.  And that's not what I said.  And that was not

 2  an issue.

 3     Q.  (By Mr. McEntire) Okay.  So you don't

 4  consider -- do you consider anything that MGM told you

 5  to be material nonpublic information?

 6          MR. STANCIL:  Object to the form.

 7     A.  Yeah.  I -- I -- I think they did.  I think

 8  they told us they had an agreement to sell it.  They

 9  told us how much it was going to be.  They told us how

10  the buyer -- who the buyer was.  They told us exactly

11  how it was going to be structured.  That's -- that's

12  material nonpublic information.

13     Q.  (By Mr. McEntire) Did you -- did you do some

14  due diligence in connection with your evaluation,

15  whether you were going to support it?

16     A.  We analyzed the agreement.  And we considered

17  the price, obviously.  We'd already -- the market price

18  was pretty fair.  And we had a good view of what that

19  was.  And this was a good transaction.

20          THE VIDEOGRAPHER:  Mr. McEntire, you're at

21  3 hours and 53 minutes.

22          MR. MCENTIRE:  All right.  One second.

23          (Sotto voce discussion off the record.)

24          MR. MCENTIRE:  One second, please.

25     Q.  (By Mr. McEntire) Mr. Seery, you retained or

 1  rehired several of the Highland Capital employees after

 2  you became the CEO.  You retained some of them, correct?

 3       A.  Yes.  Well, Highland retained them.

 4       Q.  Correct.  That's -- that was what I meant.

 5            Did you ever consider hiring Mark Patrick

 6  to stay at Highland?

 7       A.  No.

 8       Q.  That was never a consideration?

 9       A.  Not -- no.

10            MR. MCENTIRE:  Can we go off the record for

11  about one minute?  I may be wrapping up.  I just want to

12  check a couple things.

13            THE VIDEOGRAPHER:  The time is 2:59.

14            MR. MCENTIRE:  But my recommendation, just

15  please stay in the room, if you would.

16            THE VIDEOGRAPHER:  The time is 2:59 p.m.

17  We're going off the video record.

18            (Break taken from 2:59 p.m. to 3:01 p.m.)

19            THE VIDEOGRAPHER:  The time is 3:01 p.m.

20  We're back on the video record.

21       Q.  (By Mr. McEntire) Mr. Seery, after you had your

22  conversation and -- with MGM, you said in the first part

23  of May?

24       A.  Yes.  First or second week of May.  It was

25  somewhere in that -- in that range because they

1 | announced on May 26th.

2 |     Q.  Okay.  So I want to make sure the record is

3 | clear.  At no time before then did you contact any

4 | executive or the general counsel of MGM on your own; is

5 | that correct?  Is that what your testimony is?

6 |             MR. STANCIL:  Object to the form.

7 |     A.  I don't think that's exact -- I don't think I

8 | said that.  I don't think that's exactly correct.  And

9 | I -- I don't know if, for example, Highland contacted

10 | MGM.  And I think we did in connection with Dondero's

11 | surreptitious sale of 125 million of MGM out of RCP in

12 | late '19, 2019.  I don't -- I don't recall any other

13 | contact prior to that time.  I just -- I can't --

14 |     Q.  (By Mr. McEntire) What -- what's the name of

15 | the person or individuals you talked with in the first

16 | part of May of 2021 when they asked you to sign the NDA?

17 |     A.  I don't recall.  The -- the GC is a woman,

18 | Leslie.  And I just -- I don't recall her -- her last

19 | name off of the top --

20 |     Q.  Any -- anyone else on the phone other than

21 | Leslie, the general counsel?

22 |     A.  There definitely would have been.  And I forget

23 | if he's the COO or the CFO, involved in -- in some of

24 | those conversations.

25 |     Q.  After you received the -- the e-mail from

```
 1   Mr. Dondero in December 2020 that we've marked as an

 2   exhibit here today about MGM, did you instruct anyone

 3   else from Highland Capital to contact MGM about the

 4   status of their -- the sale to either Amazon or Apple?

 5              MR. MORRIS:  I'm going to direct you --

 6              MR. STANCIL:  Object to the form.

 7              MR. MORRIS:  -- not to answer.  I'm going

 8   to direct you not to answer.

 9              I think you're frozen, Sawnie.  Oh, no.

10   There --

11      Q.  (By Mr. McEntire) Mr. Seery, did you hear my

12   question?

13      A.  (No audible response.)

14      Q.  Hello?

15      A.  Yes, I heard your question.

16              MR. MORRIS:  And I directed him not to

17   answer.

18              MR. MCENTIRE:  On what basis?

19              MR. MORRIS:  Same basis.  This has

20   absolutely nothing to do with the colorability of your

21   claims.  And I know that you're fishing in order to try

22   to drum up a new cause of action.  So I'm going to

23   instruct --

24              MR. MCENTIRE:  Just to be clear, you've

25   instructed -- you've instructed Mr. Seery to not answer
```

1   a question about a communication from Highland Capital

2   to MGM between December 20th and when he received the

3   request to sign the NDA?  Is that you're -- is that what

4   you're -- you're not --

5               MR. MORRIS:  Yes.

6               MR. MCENTIRE:  -- allowing me to question

7   him on this?

8               MR. MORRIS:  I'll answer you again.  And

9   I'll -- I'll give you the opportunity.  And I won't hold

10  to the four-hour rule if you need another minute or

11  three.  I'll ask you again to educate me on how, whether

12  he did or did not do that, that has anything to do with

13  his communications with Farallon and Stonehill and the

14  claims that are at issue in the proposed lawsuit.

15              MR. MCENTIRE:  Well, if you've read our

16  motion and you read our complaint, you'll understand the

17  relevance.  He's indicated that he did not have any

18  directed communications with MGM that he recalled.  I'm

19  now asking him whether he delegated that or asked

20  someone else at Highland to have that communication with

21  MGM.

22              MR. MORRIS:  And how does that -- how does

23  that relate to Farallon and Stonehill?  If it doesn't,

24  then I'm going to direct him not to answer.  If it does,

25  I'll be happy to let him answer.

1    MR. MCENTIRE:  I think you know how it's

2    related because we have a specific affidavit that -- or

3    you know about an affidavit.  And you also know about an

4    e-mail communication.  And you know what Mr. Dondero

5    recalls.

6    MR. MORRIS:  That's right.  So ask him --

7    ask Mr. Seery anything you want about his communications

8    with Mr. Dondero, with his communications with Farallon,

9    with his communications with Stonehill.  That's what

10   that declaration is about.

11   MR. MCENTIRE:  Yeah.

12   MR. MORRIS:  And I'll be happy to let him

13   answer any of those things.

14   MR. MCENTIRE:  Okay.  Well, I think I've

15   established the relevance.

16   Q.   (By Mr. McEntire) So after you signed the NDA

17   with MGM, did you tell someone to put the MG stock --

18   MGM stock on a restricted list?

19   MR. MORRIS:  Directing him not to answer.

20   MR. MCENTIRE:  Okay.  I want to shift gears

21   then a little bit, Mr. Seery.  And I've got a few

22   minutes left.

23   Ms. Court Reporter, tell me when I've got

24   about one or two minutes.  I may already be there.

25   Q.   (By Mr. McEntire) Mr. Seery, I understand that

1   your -- your cell phone automatically deleted text

2   messages.

3              MR. STANCIL:  Objection.  We're not doing

4   this, Mr. McEntire.  I've already told you I instruct

5   him not to answer document preservation fishing

6   expeditions because --

7              (Simultaneous speaking.)

8              MR. STANCIL:  Excuse me -- another matter.

9              MR. MCENTIRE:  My question is a little bit

10  different.

11     Q.   (By Mr. McEntire) You identified that you have

12  a text message from your dealings with Farallon --

13  excuse me -- from Stonehill.  And I'd like to know how

14  you have that text message if you have automatic delete

15  on your telephone.

16             MR. STANCIL:  Objection.

17             Do not answer, Mr. Seery.

18             Sawnie, this is ridiculous.  You can either

19  ask these questions, and we'll -- and we'll waste your

20  time continuing to instruct him not to answer.  But the

21  answer is no.  We're not going to let you use this for

22  discovery of some motion that Dubavoy filed two days

23  ago.

24     Q.   (By Mr. McEntire) Mr. Seery, have you saved all

25  of your text messages reflecting your potential dealings

```
 1   with Farallon and Stonehill pre-effective date?

 2                  MR. STANCIL:  Same objection.

 3                  Do not answer, Mr. Seery.

 4                  MR. MCENTIRE:  All right.  I think I'll

 5   reserve the rest of my questions until we meet on

 6   June 8th.

 7                  Thank you for your time, Mr. Seery.  I hope

 8   you have a good weekend.

 9                  That's all the questions I have at this

10   time.

11                  MR. MORRIS:  Thank you, Sawnie.

12                  MR. STANCIL:  Thank you.

13                  MR. MORRIS:  Take care.

14                  THE VIDEOGRAPHER:  The time is 3:08 p.m.

15   We're going off the video record.

16                  (End of proceedings.)

17

18

19

20

21

22

23

24

25
```

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3   IN RE:                         )
                                    ) CHAPTER 11
 4   HIGHLAND CAPITAL               )
     MANAGEMENT, L.P.               )
 5                                  ) CASE NO. 19-34054-SGJ11
                 Debtor.            )
 6

 7

 8                    REPORTER'S CERTIFICATION
          ORAL AND VIDEOTAPED DEPOSITION OF JAMES P. SEERY, JR.
 9                         JUNE 2, 2023
                        (Reported Remotely)
10

11        I, Crystal Greer, Certified Shorthand Reporter in

12   and for the State of Texas, hereby certify to the

13   following:

14        That the witness, JAMES P. SEERY, JR., was duly

15   sworn by the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by

17   the witness;

18        I further certify that pursuant to FRCP Rule

19   30(f)(1) that the signature of the deponent:

20        ____ was requested by the deponent or a party

21   before the completion of the deposition and returned

22   within 30 days from date of receipt of the transcript.

23   If returned, the attached Changes and Signature page

24   contains any changes and the reasons therefor;

25        _X__ was not requested by the deponent or a party
```

1  before the completion of the deposition.

2      I further certify that I am neither counsel for,

3  related to, nor employed by any of the parties or

4  attorneys in the action in which this proceeding was

5  taken, and further that I am not financially or

6  otherwise interested in the outcome of the action.

7      Subscribed and sworn to on this the 4th day of

8  June, 2023.

9

10  *Crystal Greer*

11  _____

12  CRYSTAL GREER, TEXAS CSR 8575
    Expiration Date:  11/30/2023

13  Firm Registration No. 459
    Lexitas Legal

14  325 North St. Paul Street
    Suite 1900

15  Dallas, Texas 75201
    (214) 373-4977

16

17

18

19

20

21

22

23

24

25

## Exhibits

**Seery 001** 4:11 9:12,14

**Seery 002** 4:12 10:23,24 11:1

**Seery 003** 4:13 98:15,19, 21

**Seery 004** 4:14 119:2 120:20,21,22

**Seery 005** 4:15 136:7,14 137:20 138:7 141:18 151:6

**Seery 006** 4:17 152:7,8,9 154:4

**Seery 007** 4:18 158:10,18, 20

---

## $

**$1** 94:9,11

**$1.4** 93:4

**$10,000** 69:23

**$100** 139:20

**$125** 141:1,15

**$15** 112:5

**$150,000** 93:16,20

**$163** 143:17 146:15 148:2 149:1

**$200** 154:21

**$222,658,000** 142:5

**$25** 140:20

**$267** 156:10

**$270** 159:5,18

**$30** 161:8

**$397** 159:4,17

**$50** 139:7,11

**$500-** 92:21

**$566** 154:18

**$600,000** 92:21

**$73** 155:12

---

## 1

**1** 9:12,14 77:23 78:16 79:12 83:12 84:25 89:2 90:11 91:14,20 92:4 142:11

**1(b)** 88:23

**1-31-21** 157:2

**1.17** 91:19 92:5,19

**1.3** 92:20

**1.9** 93:8

**10** 12:9,13 59:19 61:23 62:18 63:18 71:10 85:10, 17 86:16 104:24 106:1 112:3 151:14,18

**10's** 60:4

**100** 83:24 139:23 160:8

**103** 91:3

**10:34** 5:3

**11** 105:14 106:1 109:24,25

**12** 105:14 154:20

**12-31-22** 167:9

**125** 198:11

**12:29** 97:15,17

**12:43** 97:17,18

**13** 106:2 164:13

**15** 134:19 140:25 154:17 157:23

**150** 94:8 193:10

**157** 142:19

**15th** 28:16 154:4 185:11

**16** 140:25

**163** 143:2 149:25 150:2

**17** 176:24

**170,000** 114:15 193:10

**18** 171:12 176:24

**1875** 137:2

**19** 198:12

**19-34054-SGJ11** 5:9

**194** 142:10,19 148:4 149:2

**1:31** 138:1,3

**1:34** 138:3,4

**1st** 141:24

---

## 2

**2** 10:23,24 11:1 88:19,20 90:12 92:5 157:10 164:18 165:5

**2(d)** 94:19

**2(g)** 95:10 96:3

**2.75** 91:10,21 92:6,22 93:9

**20** 24:2 41:18 95:10,13 96:1 171:18 173:4

**20-plus** 181:16

**200** 92:10,11 93:3

**2017** 171:12 174:23 176:22

**2019** 13:20,21 33:17 36:21,23 66:24 154:5,17 171:18 173:22 174:15 177:4 198:12

**2020** 37:1 64:8,14,16,17 65:5,18 119:7 132:22,24 135:9,23 154:20 155:11 173:21 174:5 189:9 199:1

**2021** 24:4,5 28:6,16 29:4, 11 37:12,20,25 38:1 40:8 41:14,19 49:10,25 50:14

51:4,7,18 54:7 65:19
75:13,15,18,20 78:18
80:14,25 82:7 83:5,13
93:18 98:11,24 99:3,5
110:15,17,25 114:5,6
126:2 127:6 131:7,13,17,
18,25 134:2,19 139:7
140:25 141:24 148:1
149:24 150:3 152:11,12
155:20 156:4,9,24 157:24
169:25 185:11 192:15
195:8 198:16

**2022**  139:10 140:19 182:7,
19

**2023**  5:3 158:21 159:3,8

**20th**  200:2

**21**  56:1,2 64:15 139:16
159:13

**210**  91:19

**22**  56:2

**25**  182:2

**250**  91:19,20

**26th**  198:1

**28.7**  165:10,21 166:4

**2:11**  168:11,13

**2:25**  168:13,14

**2:59**  197:13,16,18

**2nd**  5:3

---

### 3

**3**  88:19 90:7,12 91:2 92:7
98:15,19,21 121:11,18
135:23 138:13 159:2
166:1 196:21

**30**  18:17 35:14 139:7
140:19 175:19

**30-**  175:23

**30-plus**  56:4

**300**  83:24 91:20

**31**  156:9 159:3

**31st**  139:10 154:20
155:10,11,20 158:21
159:8 189:9

**3:01**  197:18,19

**3:08**  203:14

**3rd**  135:20

---

### 4

**4**  90:12 119:2 120:20,21,
22 141:17

**40-minute**  175:24

**41**  71:14 98:19

**45**  175:19

**48**  136:22,23

---

### 5

**5**  90:12 136:5,6,7,14
137:20 138:7 141:18
151:6

**50**  92:18 93:7,9

**53**  196:21

**55**  97:9

---

### 6

**6**  90:16 152:5,7,8,9 154:4
158:13,14

**60**  175:19

**68**  159:21

---

### 7

**7**  104:24 142:11 157:7,14,
15 158:10,15,18,20 159:1
165:9

**71**  80:8,10,16 88:5 151:8

**71-and-change**  79:17
80:21

**71.32**  80:11 151:9,10,23
152:3

**72**  91:17 92:4,10 93:4

**7th**  174:5

---

### 8

**8**  59:17 80:9,16 82:16
85:21 87:15,24 88:6,13
90:13 91:2 104:24 139:1,
20 155:9,12 158:10
159:24 164:14,15 165:2,
6,9,10,13

**8.3**  93:12

**80**  12:8

**8th**  203:6

---

### 9

**9**  59:17 82:8,11,19 83:14,
15,18 85:21,24 86:21,23,
24 87:3,6 88:7 90:13,15
96:1 104:24 146:16
151:11 157:7,16,20 158:1
164:15 165:2,7,9

**90**  91:2

**9th**  174:5

---

### A

**a.m.**  5:3

**ability**  160:25 163:11

**absolutely**  199:20

**accept**  83:7 105:6

**acceptable**  105:3

**accepted**  74:21

**access**  24:17 27:18 42:4,

15 45:7

**accessed** 191:14

**accomplish** 94:7

**accordance** 73:1

**account** 115:16

**accounting** 140:10

**accounts** 155:2

**accrued** 166:5,10

**accurate** 108:21

**accurately** 113:13

**Aces** 53:25

**Aces'** 44:23

**achieve** 84:1,2 153:9

**achieved** 82:11 92:7
95:25 166:17

**achievement** 95:12

**acquire** 44:4 149:1 150:25
151:4 191:5

**acquired** 29:8,19 30:9
43:16 58:22 59:2,6 63:15
134:23

**acquiring** 18:23 19:4 30:8
51:14,21 101:18 143:2

**acquisition** 20:6,16
134:18 142:23 147:17

**act** 57:5,9

**acted** 74:6

**action** 199:22

**active** 69:4 166:24

**actively** 55:18 121:23

**activity** 166:19

**actors** 113:19

**actual** 72:1 80:10 93:5
121:19

**add** 70:5 84:20 91:23
92:1,4,5,25 110:23

**added** 93:2,10

**addition** 124:9 175:13

**additional** 81:22 125:23
140:20

**address** 50:18 51:11 75:6,
8,9,10

**addressed** 74:11

**addressing** 136:24

**adjective** 122:14,15

**adjusted** 163:12

**adjustment** 93:23 94:1,2

**advance** 124:21

**advanced** 106:20

**adversary** 111:18

**advice** 47:8 48:3 60:10,13
63:3,10 64:1 86:7,9 149:8
163:20,25 185:18

**advise** 28:23 89:24

**advised** 46:11 148:2,25
186:12

**advising** 157:24

**advisor** 140:8

**Advisors** 133:4,7

**advisory** 169:17,24 170:5,
11

**affect** 117:10

**affidavit** 201:2,3

**affiliate** 39:17

**affiliated** 34:7,13,16 45:3

**affiliation** 13:25 181:19

**afternoon** 121:12

**aggregate** 93:8 165:9

**aggregating** 92:23

**agree** 91:4 109:17 112:9
123:16 139:24 156:17

**agreed** 39:24

**agreement** 17:5,6,12
28:12,24 46:22 58:10,14,
21 59:2,9,16,24 71:10
73:2 74:19 76:7 79:6
86:11,14,19 89:1,16
96:16,24 98:19 132:2
133:11 161:1,15,16
162:5,12 163:10,11
169:17,25 170:5,11 188:9
192:18 194:19 196:8,16

**agreements** 23:20 169:21
191:5

**ahead** 15:23,25 30:6
62:24 86:1 105:25 145:17
149:15 160:2 178:8
183:24

**air** 92:19

**all-in** 105:20 106:11,14,18
107:9

**allocate** 79:21 84:12 95:3,
5

**allocated** 84:17

**allocating** 85:19

**allocation** 95:8,9

**allowed** 42:8,12 124:19,
20 155:23 159:4,16,22

**allowing** 200:6

**Amazon** 121:22 122:10
126:5,10,15 192:3,8,20,
21 194:14 199:4

**amend** 81:3

**Amended** 136:15

**amount** 18:18 78:10,12
84:8 85:10,19 91:17,21
94:3,6 142:8,18 159:22
162:24 163:6 165:11,15,
19 166:1,2,3

**amounts** 47:18 79:18

**analog** 122:17

**analyses** 152:4

**analysis** 96:17,21,24
  104:3 141:21 142:19,20

**analyze** 107:3 146:23

**analyzed** 104:2 196:16

**analyzes** 106:18

**analyzing** 107:21 146:25

**ancillary** 107:2

**Angeles** 172:17 176:5
  177:11

**announced** 198:1

**answering** 63:3

**answers** 6:6 9:5 63:9
  102:7,10

**anticipated** 151:16 163:12

**anticipation** 8:18

**apologize** 20:11 37:16
  68:19 92:24 105:25 159:7
  176:7 179:6

**Apparently** 32:8

**appear-** 98:3

**appearances** 5:10

**Apple** 121:22 122:10
  126:10,15 192:3,8 194:14
  199:4

**applies** 90:20

**appointed** 64:11,14

**appointment** 64:18 65:7

**approved** 12:20 138:23

**approximately** 73:21
  92:18,21 93:4

**April** 23:25 24:1,4 28:6
  29:11 49:14 52:25 131:6
  159:13

**area** 103:17 104:24 171:3
  172:13 175:18 176:4

**arguing** 39:12

**arithmetically** 92:25

**arm's-length** 73:6,13 76:8
  89:4

**arrangement** 170:8

**art** 124:10

**articles** 126:25 127:20

**as-of** 159:10

**ascertain** 19:7

**assess** 188:12

**assessment** 163:20

**asset** 12:5,12,14,16 20:1,
  7,13,25 21:2,6,7,8,9,10,
  11,13 102:12 105:17
  108:7 109:9 112:4 144:11
  145:20 146:5 188:20
  190:19

**assets** 12:2,4,8 51:14,21,
  22 83:25 99:9 104:4
  107:18,19,21 110:24
  113:14,15 139:2 146:3,15
  148:25 154:1,17,18,25
  160:9 166:13,22,25
  184:19,21 190:16

**assign** 42:1

**assignments** 29:14

**assistance** 32:23 33:4

**assisted** 31:12

**assisting** 31:13

**associate** 64:9 65:10
  154:22

**assume** 80:1 191:16

**Assumes** 128:2

**assuming** 95:25 169:12

**assure** 84:20 99:24

**assuring** 100:9

**attached** 71:13 126:22
  127:3 136:20 141:12

**attachment** 92:8

**attachments** 47:17

**attempting** 176:7

**attendance** 176:15

**attention** 109:20 158:25

**attorney** 7:7 18:16 46:5
  74:9 168:25 181:6 188:1

**attorney-client** 163:22

**attorneys** 5:10 48:20 62:9
  163:25

**attractive** 27:14 103:4

**audible** 15:10 199:13

**August** 54:6,7 78:18
  83:13 93:18 149:24

**Austin** 56:10,15 168:24,
  25 169:3,5 179:22 188:3

**authorized** 39:9 76:6
  138:20

**automatic** 202:14

**automatically** 202:1

**awarded** 17:17

**aware** 29:13 39:16 45:15,
  18 65:13 85:23 89:14,17,
  20 109:7,15 143:18
  151:19 169:24 176:21
  179:22,24 185:4 188:17

**B**

**back** 9:22,25 11:9 14:10
  34:2,18 50:9,25 52:2,16,
  23 54:16,25 65:3 71:21
  72:23 73:17,20 74:15,22
  75:13 76:7,15 78:5 80:7
  84:4,7 88:19,21 89:2,3
  90:7,23 91:7 95:8 96:9

97:10,19 98:9,24,25
100:10 105:16 106:2,23,
25 110:15 114:5 115:9
131:4 137:14,17,18 138:5
141:4 150:5,8,10 152:4
154:7 156:2,5 168:15
184:5 197:20

**back-and-forth** 76:20
77:12

**back-and-forths** 73:22

**background** 11:7 19:8,9
181:7

**balance** 155:19,20

**bank** 13:18 114:17

**bankers** 19:12

**bankrupt** 19:11

**bankruptcies** 14:13 186:9

**bankruptcy** 5:7 12:17,21
13:4 14:14,18,21 16:5,9
17:19,24 18:20,23 19:11,
21,22 20:1,7 21:15 23:22
29:15 31:8,13,14,22,25
32:11,15,19 36:1,25 37:3
44:10 56:18 58:7 67:4,5
112:11 113:11 135:7
136:13 144:11 145:21
148:1 157:25 169:23
174:4 184:24 185:18
186:22,24 187:2,7,22

**Barclays** 32:18

**barcode** 137:4

**base** 50:23 93:15 173:16

**based** 6:6 9:5 79:3,8,16
95:11 96:2 104:3,9 126:8
127:6 133:16 140:1
147:25 163:12 172:16,18
185:18 186:7

**basically** 40:14 79:19
81:6 102:17 110:2 122:21
155:10 162:5 194:10

**basis** 18:13 63:2,3 92:2

102:22 110:2 111:14,15,
16,20,23 112:1 163:25
199:18,19

**Bay** 171:3 172:13 176:4

**beat** 102:4

**beaten** 26:23

**begin** 97:20 145:2

**beginning** 23:25 24:3
37:24 52:8,25 87:2
137:15 192:14,15

**behalf** 5:19 38:1 51:20
112:3 178:18

**belated** 41:20

**belief** 67:24 68:1,4,8
153:3

**beneficiaries** 59:17 95:19
162:18,20,23

**beneficiary** 59:25

**benefit** 106:4

**benefits** 87:1,11 147:2

**bevy** 63:16,20

**biannual** 56:2

**bid** 26:24 27:1 44:15
105:12

**bidders** 105:18 190:20

**bidding** 45:14

**big** 188:6

**biggest** 155:6

**bit** 36:9 71:23 88:8,10
90:10 115:8 127:10
136:20 154:7 155:17
161:10 164:19 170:14
188:5 193:13 201:21
202:9

**bite** 148:13

**Blockbuster** 31:20,25
36:12 187:1,7,19,21

**blue** 124:11,25 191:25

**board** 30:20 31:1,3,5 65:8
66:21 67:6,8 72:3,7,10
73:4,16 84:6 85:1,14,20
94:8 95:14 99:8 108:6
120:13 121:11,18 123:17,
18 124:1,24 125:10,16,22
127:7 132:23 153:21,24
160:24 162:25 163:24
174:8,10 181:4 182:7,10,
11,20 188:17

**boards** 188:22 189:10

**bonds** 19:22 187:14,16

**bonus** 79:2,15 82:1,15,16,
18,19 84:11,16 85:19
91:15 94:20 96:1,10

**bottom** 74:19 77:11
138:14 164:14,23,24

**bought** 12:23 41:13
100:8,15,20 110:10,22
156:18,24 157:1 185:10,
12

**box** 46:13

**breaching** 125:5

**break** 90:10 97:10,14,17
138:3 168:5,8,13 197:18

**breakdown** 165:6

**Brennan** 5:20

**broader** 86:16

**broadly** 54:4

**broken** 84:12

**broker** 44:21 115:17

**brokerage** 12:25 45:2,4,
14 115:16

**Brothers** 31:15 32:10,15,
18,19,20,21,24 33:5

**build** 13:16

**built** 106:21

Index: bunch..claims

**bunch** 134:15 173:9,18

**business** 12:3 13:10,17
14:6,9 18:2 19:20 33:24
34:1,7,18 36:11 95:19
113:1,3 115:19 171:22,23
174:13,19 176:19 178:15

**businesses** 18:18,19
112:25 176:4

**busy** 42:23 43:6

**buy** 124:17 144:10 146:4
194:14

**buyer** 192:17,19 196:10

**buyers** 195:6

**buying** 21:12 145:20

---

### C

**Cadwalader** 56:13

**calendar** 78:22 79:1

**calendared** 78:24

**call** 38:7,8 50:9 52:4,5,11,
16,19 55:22 66:21 76:6
78:25 95:15 98:3 106:24
107:3 120:16 121:18,19,
20 195:3

**called** 52:15 56:14 68:17
107:14 114:19,20 117:14

**calling** 55:5

**calls** 38:25 52:13 56:19
60:6 66:5 67:8 72:14,16
86:1 123:21 145:25 146:8
153:2

**capacities** 19:15

**capacity** 6:4,5 31:11 32:3
33:4 39:4 130:18 132:19

**capital** 5:5 13:24 14:3,13,
18,21 15:7,19 16:6,10,15
17:25 18:3,4 19:5 23:4,7,
11,16 25:7 31:9 36:1,25
37:7 38:20 39:5 43:13

44:10 45:8,16,17 73:3
75:5 80:15 101:13,21
106:6 108:16,22 109:22
112:10,21 114:5,7 131:1
151:21 152:17 154:18
155:9 157:24,25 166:13
185:18 191:25 197:1
199:3 200:1

**capture** 78:13

**care** 98:2 203:13

**career** 56:13

**case** 5:8 27:12,13 31:3
40:15 50:2 51:25 53:22,
24 62:2 64:10 65:10,13
100:22 112:17 113:18
166:21 170:3 179:8
185:10

**cases** 18:20 19:12,21,22

**cash** 104:4 105:16

**categorically** 135:2

**categorize** 107:24

**caused** 83:22

**CCS** 111:4

**cell** 202:1

**cents** 12:8,13 79:17 88:5

**CEO** 14:3,20 15:6 37:7,10,
23 38:19 39:4 55:16
56:16 57:11,25 64:18
112:10,18 117:16,17
138:20 188:19 197:2

**certain/not** 83:8

**certainty** 82:5

**CFO** 198:23

**chairman** 126:8

**challenge** 139:22

**change** 117:5 123:4
159:5,17,18

**changed** 110:23 151:22
152:2

**changing** 12:11

**characterization** 34:25

**characterizations** 148:11

**charitable** 71:6

**charities** 70:10

**charity** 68:15,20 69:1,9,
12,16

**chat** 98:2,7

**check** 28:22 119:10,15,17
197:12

**checked** 50:6 119:11

**checklist** 119:10

**chief** 14:12,16 15:18 16:3,
20,25 17:1 37:7,10 73:9
89:8 152:21,25 153:5
188:18

**Chris** 67:13

**Christina** 167:20,24

**Christopher** 72:1

**chunks** 105:17

**circumstances** 112:8

**City** 6:25

**claim** 12:20,25 18:23
21:21 22:11,14,17,19,21,
23 23:8,14,17 30:9 44:19,
20,22,24 53:5,18 54:1,5,
13 99:23 102:11 115:1
144:11 145:20 146:24
149:1,23 157:1

**claimant** 5:23 6:8 17:5,6,
11 30:20 58:10,14,21
59:1,9,10,12,15,16,24,25
67:19 73:2,4,9 79:6 95:10
99:8 160:25 161:14
162:12,20,23 163:10

**claiming** 46:14 150:1

**claims** 12:16,23 13:4
18:9,10 19:2,13,16,23
22:5,10 23:8,12 27:12,17,

22 28:13,18,25 29:8,20
30:8 40:21 41:11,13,15,
21 42:5 43:9,11,13,15,16,
20,23,24 44:4,10,14,18
45:1,9,12,19,22 51:23,24
55:4 58:23 59:3,6 64:5
65:15,23 66:1 68:9 80:9,
13 99:2,7,12,19 100:3,6,
8,13,15,16,17,20 101:7,8,
15,19,23,24 103:2
108:10,25 109:10,12,16
110:5,11,19,22 130:16
134:10,18,24 142:23
143:2,23 144:3,24 146:17
147:17 148:3 149:12
150:14,19 151:1,4,7,12
155:10,13,23 156:11,19,
24 157:7,16,20 158:1
159:4,5,16,18,22 160:6
166:2,3 184:24 185:2,6,
10,12,17 186:3,8,13,21
189:22 191:6 199:21
200:14

**clarification** 106:16

**clarify** 61:9

**clarity** 16:2

**Class** 59:17,19 60:4 61:23
62:18 63:18 80:9,16 82:8,
11,16,19 83:14,15,18
85:10,17,21,24 86:16,21,
23,24 87:3,6,15 88:13
90:13,15 91:2 96:1 139:1,
20 142:11 146:16 151:11,
14,18 155:9,12 157:7,16,
20 158:1 159:24 164:14,
15 165:2,6,9,10,13

**classes** 79:4 165:8

**classified** 12:14

**classify** 21:14

**cleanup** 188:5

**clear** 6:3 10:15 23:3,7
27:16 30:9 46:10 61:3
63:5 80:6,12 84:19 98:2

**client** 5:17 20:20,21 21:3
148:2 149:1 168:24
169:2,5

**clients** 149:8

**CLO** 177:9

**clock** 98:1

**close** 105:12 109:6

**closed** 191:5

**Cloth** 114:20

**co-head** 13:11,14

**codes** 62:3

**colleague** 98:16 128:12

**colleagues** 5:20

**collect** 148:12

**colorability** 130:16
144:23 189:22 199:20

**combination** 152:18

**combined** 143:2

**comments** 58:12

**commercial** 113:19

**Commission** 115:13
116:2

**committee** 53:8,10,16
58:18,19 69:7 153:22
174:12 179:24 180:11

**committees** 140:11

**common** 46:18,22 66:5

**communicate** 121:2
124:20

**communicated** 85:2
100:19

**communicating** 37:21
121:1

**communication** 38:13
39:15 41:16 49:23 54:4,8

99:4 121:2 124:22 132:7
135:14 200:1,20 201:4

**communications** 39:5
41:11 47:3 48:20 49:8,15
50:7 53:3,7,25 54:3 61:10
66:15 85:22 98:10 100:23
101:18 120:23 121:5
135:11,24 177:1 188:21
189:10 200:13,18 201:7,
8,9

**communities** 68:23

**community** 18:18 181:11

**companies** 19:12 107:19
108:3,6,10,15,20 109:9
110:14,18,20 111:1,2,4,6,
7 113:23 114:4 115:3
122:5 132:4 170:11 177:5
188:22 189:11

**company** 13:2,25 18:21
21:13,15 34:13,16 36:15
45:15 108:15 116:15
124:14 145:20 164:9
176:13 179:2 187:16

**company's** 164:10

**compensation** 16:21
17:1,9,17 78:11 81:22
86:13 89:7 91:15 95:11,
20 96:18 98:18 188:9,13

**competitive** 27:15 106:7
191:18

**complaint** 112:1 200:16

**complete** 113:3

**completed** 92:5,7

**completely** 26:14

**complex** 112:24

**complexity** 112:22 113:1,
10

**compliance** 117:14,24
118:1 128:7 130:13 132:3
170:10