**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

**[3904]** Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.

# Volume 29

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
## STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.  the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

2. Appellant's claims or allegations are not "plausible";

3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

---

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L. Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M. Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N. Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O. Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P. Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

    1. declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

    2. concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1. **Notice of Appeal**

    *000001*    a. Notice of Appeal **[Dkt. 3906]**;

    *000276*    b. Amended Notice of Appeal **[Dkt. 3908]**; and

    *000551*    c. Second Amended Notice of Appeal **[Dkt. 3945]**

2. **The judgment, order, or decree appealed from:**

    a. Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

    **b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

    a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

    **a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru  Vol 4*
*Vol 4*
*002236*
*002243*
*002248*

---

*Vol. 5*
*002251*

*002254*

*002262*

*002346*

*002355*

*002358*

*002391*

*002398*

*002400*

*Vol. 6*
*002826*   *Thru Vol. 7*

*Vol. 9*
*003257*   *Thru Vol. 9*

*003260*

*003270*

*003278*

| | | | |
|---|---|---|---|
| 03/30/2023 | 3706 | | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

*Handwritten annotations in left margin:* Vol. 10, 003281, 003286, 003291, 003294, 003296, 003299, 003302, 003311, 003314, 003323, 003368, 003430

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| Vol. 10 | | | Holdings LLC, Stonehill Capital Management LLC |
| 003458 | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| 003463 | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| Vol. 11 003537 Thru Vol. 16 | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| Vol. 17 004466 | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| 004712 | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 004714 | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 004808 | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| 004813 | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 004836 | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| Vol. 18 004930 | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| 004931 | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

| | | | |
|---|---|---|---|
| | 05/25/2023 | 3798<br>(3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| | 06/05/2023 | 3815<br>(3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 06/05/2023 | 3816<br>(3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 06/05/2023 | 3817<br>(3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| | 06/05/2023 | 3818<br>(3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| | 06/07/2023 | 3821<br>(3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| | 06/07/2023 | 3822<br>(3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Handwritten annotations in left margin:
Vol. 18
0004939.
0004959
0004961
0004984
0005049
0005114
Vol. 26
0006608
Thru Vol. 25
Thru Vol. 39
Vol. 39
0009273
0009290
0009416
0009424

*Vol. 40*

*009426*

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*
*Vol. 42*
*009847*    *Thru Vol. 41*

*009901*

*009905*

*009908*

*009912*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

Vol. 42

009928

009944

010013

010023

010025

010029

010035

010047

010059

Vol. 43

010062

| | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|---|
| | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.      Exhibits.**

        Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                Respectfully Submitted,

                                        **PARSONS MCENTIRE MCCLEARY PLLC**

                                        By: */s/ Sawnie. A. McEntire*
                                            Sawnie A. McEntire
                                        Texas State Bar No. 13590100
                                        smcentire@pmmlaw.com
                                        1700 Pacific Avenue, Suite 4400
                                        Dallas, Texas 75201
                                        Telephone: (214) 237-4300
                                        Facsimile: (214) 237-4340

                                        Roger L. McCleary
                                        Texas State Bar No. 13393700
                                        rmccleary@pmmlaw.com
                                        One Riverway, Suite 1800
                                        Houston, Texas 77056
                                        Telephone: (713) 960-7315
                                        Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

**complicated** 113:18

**comprised** 108:1

**concepts** 82:6

**concern** 87:5,14 88:12,14

**conclusion** 39:1 56:20 123:22 145:25 146:8 153:2,24

**conditioned** 79:7

**conducted** 22:19 23:13 24:7 89:14 109:8 150:13 182:20

**conducting** 182:9

**conference** 183:1

**confidence** 125:6,8

**confidential** 125:12 128:19,23 129:19,22,23 163:20

**confirm** 78:23 119:22 136:19 137:11,12

**confirmation** 49:12 51:17 139:13,19 142:1 153:18

**confirmed** 50:2 51:16 81:3 132:25 138:19 152:3

**confirming** 137:19

**confused** 175:8

**congratulated** 65:7

**congratulating** 64:10,18

**connected** 69:9,10,14 169:8

**connection** 7:20 8:2 9:16 14:3,17 15:6,19 16:4,5,9, 14 17:19 18:4,22 19:21 20:6,15 21:8,9,10,19 22:10,18,23 23:8,12,14, 17,21 24:18,21 28:24 31:7,12,13 32:14,24 33:4 43:8,13 44:3,9 45:2,9,12, 22 46:20 47:23 48:20 49:3,13 53:4,11 54:1,4

56:16 60:2 64:4 65:14,22 67:3 69:19 71:16 86:18 89:1 100:8 101:14 102:12,14 104:1 109:8, 10,11,15 169:7,11 186:8 188:8,15 192:1,2 196:14 198:10

**conscious** 85:13

**consideration** 197:8

**considered** 12:10 194:22 196:16

**consignee** 42:1

**conspiracy** 113:14

**constitutes** 164:10

**constructive** 53:22 134:3

**consultant** 188:12

**consulted** 127:23

**consulting** 117:24 118:1

**consummated** 29:14

**contact** 30:15 37:8,11 51:7 183:5,6,7 192:2 198:3,13 199:3

**contacted** 38:1 51:4 192:5,6 198:9

**contained** 78:14

**contenders** 126:10

**content** 66:14

**contents** 66:17 120:24

**contested** 129:7

**context** 54:8,11 79:9 115:19 144:21 181:1

**contingent** 86:25

**continue** 61:22 71:3 94:5 122:9

**continued** 93:19 94:8 142:17

**continuing** 93:16 202:20

**contracts** 132:25

**contractual** 118:3

**contribute** 69:21

**contributing** 71:5

**contribution** 69:17,18,25 70:3,19

**contributions** 70:6

**contributor** 70:24

**contributors** 70:12

**control** 79:20 84:14,20 113:3

**controlled** 67:23 68:5 174:11

**conversation** 99:11,14 128:3 133:21 134:1,11 149:22 197:22

**conversations** 44:8 46:6 53:10 62:9 78:19 86:20 133:17 134:17,21 135:5 198:24

**COO** 198:23

**copy** 11:1

**Cornerstone** 111:5

**corporate** 6:5 67:21

**correct** 6:22,23 13:12,13, 22 14:1,14 15:8 16:6,16 26:10 27:19,20,23 29:16 41:22,24 43:9 45:16 47:5 51:2,18,19 55:19 58:2,20 59:9 61:19 62:11,15 68:14 73:10,11 77:8 79:25 80:4,16 81:1,9,12 82:8,10,13 88:25 90:13, 14 91:5,10,11 92:2,9 93:21,22 94:12,16 95:8, 24 96:15 101:24,25 104:13,14 108:2 109:18 110:2 120:14 121:7,8 122:15 123:13 125:12 135:12 136:2,3 139:25 141:5,25 142:5 151:13,17

153:11 156:12 157:16
158:2 159:6,19,20,21
162:22 164:25 165:19
167:11 170:18,20 171:19
172:3,7,24 173:11 174:9
178:25 179:18 191:10
192:22 193:1,2,25 194:24
197:2,4 198:5,8

**correctly** 61:15,17 73:7
81:7 102:20 122:11 130:2
135:9 159:15 193:4

**correspondence** 50:25
65:17

**cost** 124:17 155:4

**counsel** 7:19 32:4 164:10
192:7 198:4,21

**counsel's** 47:2

**counter** 105:3,9

**countered** 105:5

**counterparties** 113:5

**counterparty** 58:15

**counterproposal** 84:5

**country** 68:22

**couple** 172:2 197:12

**Cournoyer** 130:2 131:6

**court** 5:6,7,11 9:21 12:21
29:15 54:15,18,22,23
102:4 111:23 150:4,9
167:18,20,22 168:3,16
201:23

**cover** 160:7

**covered** 95:4

**covey** 63:16

**COVID** 154:25 188:19
189:3,5

**created** 112:21

**credit** 13:11,15,16 14:6

**creditors** 58:19 79:4
113:5 142:4,9,19 153:22

162:9,13,16

**CRO** 37:23

**Crusader** 179:23 180:11,
12

**cumulative** 166:3

**current** 107:25 158:6
160:10 166:12 182:14

**cut** 39:20 112:16

**CV** 11:2,14

**D**

**Dallas** 5:8

**damages** 83:21

**data** 22:9 23:4,7 24:10,14,
18,20,23,25 25:5 27:18
45:7 121:23,24 122:2,4,5
155:24 190:7,9,13 191:3,
14

**date** 5:2 28:13,17 29:3
44:25 54:14 55:2,5,6,7,9
66:7,18 78:20 81:1 86:6
93:19,20 96:11 99:10
134:3,9,22 139:3,13
141:11,13,14 149:24
151:22 154:5 155:23
158:3,4,5 159:3,7,9,10,
12,16 163:9 189:8 203:1

**dated** 159:8

**dates** 141:3,6 158:8

**David** 154:10

**day** 39:17

**days** 50:23 172:2 194:21
202:22

**deadline** 167:11,17

**deal** 30:12,16 35:15,17
73:12 90:12 193:20
195:12

**dealing** 88:23 188:10

**dealings** 18:2 179:19
202:12,25

**deals** 112:16 118:4

**debating** 70:8

**debt** 80:22

**debtor** 5:22 6:7 14:20
15:6,18 16:22 17:2,20
55:17 56:17 57:11,25
58:18 89:9 110:1 112:5
117:17 138:21 155:2
174:10

**debtor's** 136:14 138:10

**December** 111:24 119:6
132:24 135:9,20,21,23
154:20 155:11 174:1
189:9 199:1 200:2

**deceptive** 149:19

**decided** 14:8 25:18

**decision** 26:18,19,20
42:13 85:13 153:14,20

**decisions** 153:21

**declaration** 201:10

**declination** 155:7

**decline** 154:21,22 189:8,
12

**declined** 103:4

**deeper** 154:24

**defense** 46:22

**define** 43:19 48:11

**defined** 22:1 81:17

**definition** 12:5 116:21
124:15

**degradation** 154:23

**degree** 74:19 180:13

**Delaware** 60:5,17 61:7
62:2,3,10,19 63:17

**delegate** 20:18

**delegated** 200:19

**delete** 202:14

**deleted** 202:1

**delineated** 59:23

**delineation** 161:15,17

**deny** 134:10,21 135:2
    143:18 185:19,24 186:9

**department** 113:12

**depend** 94:22 149:16

**depended** 105:15

**depending** 42:10 105:21
    106:2,22 107:24 147:13
    161:14

**depends** 12:7 20:25 32:12
    160:23 163:13 166:19
    189:2

**deploys** 68:21

**deposed** 40:3

**deposition** 5:4 7:14 8:3,5,
    7,8,17,18,22,25 9:2,3,12,
    13,15,20 10:4,10 40:1,6
    46:2,8 47:5,13 48:8,16,
    21,25 49:4 98:20 128:23,
    25 170:16

**describe** 177:12,23,25

**description** 66:5 108:21
    177:16

**designed** 154:1

**desire** 173:11

**despicable** 71:12

**detailed** 161:24 191:16

**determination** 161:2

**determinations** 164:11

**determine** 16:20,25 17:9,
    16 25:7 61:6 89:7 94:25
    119:22 120:6,9

**determined** 24:15 79:21
    84:19 161:4 163:24

**develop** 24:10 79:2

**difference** 116:1

**differences** 116:7

**difficult** 77:23

**digits** 104:21,23 105:21

**diligence** 20:14,15,19,20,
    21 21:2 22:11,18 23:13
    64:4 65:14,22,25 89:15
    102:24 109:8 121:23
    191:1 196:14

**diligencing** 121:23

**direct** 47:6 60:9 111:10,12
    130:14 144:20 145:2
    158:24 163:3 164:12
    188:21 189:18 199:5,8
    200:24

**directed** 199:16 200:18

**directing** 60:25 163:21
    201:19

**directly** 32:23 113:24
    179:20

**director** 64:12 65:8

**directors** 120:13 123:18
    124:1,24 127:7 174:9

**disagree** 112:13

**disappointed** 53:21

**disasters** 68:22,24

**discharge** 165:12 167:6

**discharging** 17:11

**disclose** 46:10 47:3 86:5,
    6 184:18

**disclosed** 116:17

**disclosing** 63:23

**disclosure** 114:14

**discount** 105:19 106:19
    107:2

**discovered** 83:21

**discovery** 39:9 112:7
    130:20 202:22

**discretionary** 115:17

**discuss** 8:6 76:20

**discussed** 8:5 46:11
    47:15 61:4 144:1,4
    150:19 188:20

**discussing** 45:10 170:16

**discussion** 52:22 53:16
    54:19 87:23 196:23

**discussions** 44:25 46:6,
    16 47:23 61:23 62:17
    66:6 78:8,15 85:14 86:1,
    5,6,10 87:18 99:9,22
    100:6,9

**disgusts** 149:20

**displayed** 129:21

**displaying** 129:22

**dissuade** 71:5

**distinction** 83:8 116:1
    177:17

**distress** 12:10

**distressed** 11:24,25 12:2,
    4,5,14,16 18:19 20:1,7,13
    21:2,13,15 144:10 145:20
    146:3,5,14 148:25 181:11
    184:14,19,21

**distributed** 139:8 151:20
    162:6,9,11 165:7

**distribution** 95:19 141:20
    142:8,18 151:7,12,16,18,
    23 152:3

**distributions** 84:14

**District** 5:6,8

**diversity** 112:21

**Division** 5:8

**Docket** 137:1

**document** 9:18 11:4,5
    28:19 39:14 47:14 71:17,

documentary 111:21

documents 7:9,10 22:16,
22 23:12 38:20 42:15
46:1,7 47:11,19,20 58:17
143:24 189:7,17

dollar 12:9,13

dollars 83:24 106:12
141:20

domination 113:3

Donder- 132:18

Dondero 39:17 44:8 83:22
112:15 113:14 120:12,13,
17,23,25 121:5 124:24
132:14,18 133:3 135:10,
11,14,16,24 153:23
160:12 174:11 180:10
199:1 201:4,8

Dondero's 111:16 112:2
117:12 198:10

Dondero-related 160:8

double 105:21

double-digit 103:17
107:10

downright 71:11

downward 93:23 94:1

dozens 126:24,25

drafted 58:15

drafting 58:10

draws 116:2

drivers 155:6

dropping 188:20

drum 199:22

DSI 140:8,10,16 152:15,18

Dubavoy 202:22

due 20:14,15,19,20,21
21:2 22:11,18 23:13 64:4
65:13,22 89:15 109:7
191:1 196:14

duly 6:11

duration 106:5

duties 17:10,18 56:18
57:1,12,17,20,25 58:1,6
59:11,12,16,19,23 60:1,
17 61:6,21 62:10,18
63:17 152:25

duty 56:24 125:5,7


E


e-mail 28:22 38:14,15
40:8,10,25 41:14,19
48:13 49:9,11,12,15 50:1,
12,17,21 51:4,5,11,12
53:9 64:8,13,17 65:5,18
74:17,24 75:3,5,19 76:9
77:5 99:3,5 117:12 119:4,
6,15,18,21 120:5,16,19,
24 121:6,7 124:12 125:19
128:12,13,14 134:18
135:10,15,25 185:10
198:25 201:4

e-mails 47:21 48:1,2,7,10
49:1,6 75:4 76:16 78:15

earlier 28:5 104:19 122:13
149:21 157:11 188:21
193:12

early 51:25 87:2 135:21

earned 82:17,18

easier 78:13

easily 113:19

easy 112:17

educate 200:11

effect 134:11 154:25
169:25

effective 44:25 54:10
55:5,6,7,9 78:20 81:1
86:6 93:19 99:10 134:3
149:24 151:22 163:9

effectively 161:1

efficient 168:22

effort 60:4,13,16 61:5,21
83:9,10 94:3,4,7

efforts 32:18 61:25
166:24

elected 174:8

else's 10:19

Embassy 179:17

emotional 53:23

employed 124:14

employees 140:14 180:14
197:1

end 24:3 37:24 41:18
49:11,25 50:14 51:19
52:25 93:11 94:23 104:25
105:1 203:16

endeavor 134:6

ended 103:16

ending 152:12 158:21
159:12

enemy 145:5

engage 185:5

engaged 56:8 73:5

entail 170:5

entire 79:15

entirety 95:25

entities 43:25 68:7,8
83:22 108:24 113:6,8
115:4 118:8 160:8 190:8,
18,25

entitled 16:21,25 42:3

entity 22:3 24:24 32:12
34:8 42:11 45:6 67:16

68:2 114:19,20,22 118:16
153:7

**environment** 184:14,15

**equity** 57:13,21 58:2,8
107:15,25 130:11 140:2
151:15

**Eric** 53:15

**escrow** 108:7

**established** 167:5 188:9,
10 201:15

**estate** 56:18,24 57:10
58:7 83:23 113:15
153:13,15

**estimate** 8:13,15 150:13

**estimated** 139:1,19
141:19 142:18

**estimates** 142:7

**estimating** 163:16

**estimation** 160:11

**evaluate** 42:5 60:4 61:21

**evaluation** 140:11 196:14

**evenly** 79:18

**event** 85:9 94:10 123:3,13

**events** 69:12 183:11
184:1

**everybody's** 98:3

**evidence** 47:19 100:21,25
101:2 111:21 128:2

**evidentiary** 10:5

**exact** 114:15 141:11
198:7

**exactitude** 108:12

**EXAMINATION** 6:12

**exceed** 87:15

**exceeded** 81:15 82:16,17

**exceeding** 81:19

**exceedingly** 112:25

**Excel** 78:13

**exchange** 40:9 52:1
115:12 116:2

**excited** 133:16

**excluding** 80:21 166:3

**excuse** 5:7 14:24 51:3
66:11 72:9 90:3 101:13
151:21 155:10 164:8,9
202:8,13

**executive** 15:18 16:20
73:5,10 89:8 198:4

**executives** 34:20

**exemplary** 95:4

**exhibit** 9:12,14 10:23,24
11:1 37:18 71:14 98:14,
15,19,21 117:12 119:2
120:20,21,22 128:10
136:5,7,14 137:20 138:7,
13 141:17,18 151:6
152:7,8,9 154:4 158:10,
18,20 199:2

**exist** 38:15

**existing** 57:21

**exists** 39:2

**exit** 23:21,22 24:7 25:8,
11,13,18 26:16,17,22
27:8 99:20 102:16
103:12,24 105:20 106:20
169:23 190:9,21 191:17,
24

**expect** 21:3 86:21 157:19
159:24

**expectation** 79:17 83:13
157:22,23 158:1,6

**expectations** 81:8,15,19

**expected** 112:18 145:19
146:16 148:3 149:2 157:8
160:10 163:12

**expeditions** 202:6

**experience** 11:7

**experienced** 146:10
148:25

**expert** 146:3,9,14,21

**expertise** 94:7

**explain** 25:17 27:5 79:12
103:19 188:23 189:3,5
194:2

**explained** 25:22 106:15

**explains** 165:20

**explanation** 26:1,4 27:10

**express** 27:7 55:1 87:5,14
122:9

**expressed** 53:19 102:17

**expressing** 51:20 87:8

**expressions** 88:12

**extensively** 7:16

**extent** 45:14 60:10 66:4
79:21 85:25

**extremely** 42:23 191:18
193:23

---

**F**

**face** 166:1,2

**facilitating** 12:24

**fact** 191:13,15 194:13,22

**factors** 84:20

**facts** 123:4 124:19 128:2

**fair** 9:1,9 10:9 11:21
18:10,12 19:14 21:16
22:8 23:6 25:2,25 28:4
29:9 34:24 43:1 44:1
46:25 65:11,20 67:25
74:7,13 76:3 82:2 88:8
89:7 91:25 96:18 97:7
98:17 103:6 108:5 110:25
116:24 117:3 141:1 147:4

Case 19-34054-sgj11 Doc 3818-2 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 28-1 Filed 12/28/23 Page 20 of 214 PageID 6762
Exhibit Exhibit 26 - 891 Page 287 of 458 fairly..form

154:15 157:13 162:19
171:21,24 173:2 177:14,
16 179:13 180:6 184:9
194:11 196:18

**fairly** 57:6,9

**fairness** 19:6

**faith** 73:6,13 89:5 94:6

**falling** 29:3

**falls** 124:14

**familiar** 11:4 19:16 21:22,
23 68:15 71:16,20 116:8,
10 117:14,18 144:9
169:17 179:2

**familiarity** 18:14

**fantastic** 71:5

**Far-** 29:24 104:15

**Farallon** 18:2 21:20 22:5,
25 23:4,19 24:13,17 25:7,
11 26:1 27:2,5,7,17 28:12
29:19 30:1,14,15,19 31:7,
10,12 32:5,23 33:13,18
34:5,20 36:18 37:9 38:2
43:16 45:19 49:13 58:22
64:4 65:14 68:5,10,13
69:25 70:1,9,11,18,21
72:15 80:13 89:23,24
97:4 98:10 99:1,11 100:7,
15,20,22 101:2,6,14,18,
22 102:17 104:12 108:9,
24 109:8 110:4,10,19,21
134:9,23 142:22 143:16
144:4,5 150:13 156:12,
18,23 168:23 169:10,13
170:17 172:1,6,9,16,18
174:14 176:15 177:12,23
178:19 180:16 184:20
185:5 186:7 200:13,23
201:8 202:12 203:1

**Farallon's** 36:18 44:8
72:20 180:22

**Farr** 5:19

**favor** 114:16

**Feb-** 51:3

**February** 29:4 37:24
49:11,25 50:14 51:4,8,9,
17,19 75:18 80:25 82:7
83:5 140:24 141:24 148:1
150:3 169:25

**fee** 81:16 82:12,15 85:8
94:21 105:20

**fees** 105:19 106:19,20,21
107:1,2,6,12

**Felton** 53:15

**fiduciary** 56:18,23 57:12,
17 59:12

**figure** 16:13 48:5 106:25

**figured** 52:3

**file** 81:4

**filed** 7:21 12:20 29:15,22
30:1 32:20 39:16 47:16
71:15 112:2 136:12
141:13,25 152:10 153:25
154:12 158:4,22 202:22

**filing** 135:6 136:14
138:10,24 159:9,12,16

**final** 58:11 152:18

**finance** 152:20

**financial** 140:8

**financier** 105:7 106:12

**financiers** 24:9,12

**financing** 23:21 24:8 25:9,
12,13,15,19 26:16,17,22
27:8 36:15,16 52:23 53:2
99:20 100:8,10 102:16
103:12,24 106:22 190:9,
21 191:17,24

**financings** 104:2 106:24
190:17

**find** 40:14 60:16 105:3
115:24 184:16 195:17

**finding** 113:11

**fine** 47:9 130:19

**finish** 30:2 87:21 90:9
92:15 145:14

**finished** 73:24 105:24
143:7,12 165:17 176:11

**firm** 5:16 7:7 46:19 47:4
56:14 169:7,11,13,14,15

**fishing** 189:23 195:17,18
199:21 202:5

**fit** 14:7 79:7

**flew** 172:11,19 175:23

**flow** 104:4 105:16

**fly** 170:24 172:5,9

**focus** 84:22 94:3

**focused** 68:24 87:22,24
88:3 99:23

**focusing** 173:10

**folks** 113:16 171:4 180:12

**follow** 39:23 47:2,8 63:25
130:23

**footnote** 10:1 157:6,10
165:16,18,19 166:1

**footnotes** 157:6

**forced** 155:5

**forget** 55:22 171:17
198:22

**forgetting** 115:6

**form** 15:4,9 16:11,17
17:21 18:6,24 19:18 20:9,
24 21:5,17 22:13 25:20
26:11,13 28:1,8 29:6,17,
18 30:17 31:16 32:16
33:2,7,11,20 34:14,12
35:16 36:2 38:3,5,10,22
40:19 41:1,6,12,23 42:7,
17,21 43:3,10 44:5,12
46:3 47:22 50:16 53:8
56:6 57:3,14,15,22 58:4,

Case 19-34054-sgj11 Doc 3818-2 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Exhibit Exhibit 391 PDF Page 22 of 289 Page 21 of 214 PageID 8703
Index for mat..grab

5,24 59:4,14,20,21 60:6,8
62:13,14,22 64:19 74:3,
17 75:1,3 76:10 77:7
78:14 80:17 81:2,11 82:4,
9,23 83:6 86:2 87:16
96:20 97:1 100:4,18
101:1,11,16 102:2,8
104:6 105:4 108:18 109:2
110:7 111:9 112:12,23
115:22 116:4,13,20,25
117:1,6,7 118:24 119:24
120:3,8 121:9,13,25
122:16,18,19,23 123:8,
14,21 124:4,5 125:1,2,9,
13,20 126:3,16,20,23
127:8,13,18,25 128:1
131:8,15,23 132:5
133:13,18,19,20,25
134:13 135:1,3,13 136:1
138:18,22 140:4,23 141:9
142:13,14 143:14,20
144:11,12 145:20,23
146:19 147:20,21 148:5,
6,18,20 149:3,4,6 151:24,
25 153:1,8,16,17 156:7,
13,14,20,21 159:25
160:18,22 161:5,9,22
162:1,2,10,14,15,21
163:2,7,18 164:2,3 165:8,
23 166:8 167:7,12,13
170:1,6,12,21 171:1
172:23 173:12 174:16,18
175:25 176:16,17 178:23
180:1,17,19 181:20,24
182:16 183:8,23 184:10
185:8,21,22 186:1,2,10,
11 187:11,17 188:14,24
189:13,17 190:11,22
192:4,9,24,25 193:15
194:5 195:1,14,15,23,24
196:6 198:6 199:6

**format** 10:5

**forum** 129:21

**forward** 26:10

**found** 105:5

**founder** 181:21

**four-hour** 200:10

**fourth** 173:23,25

**frame** 98:24

**Francisco** 35:4 36:19
72:21 170:18,25 171:25
172:18,21 173:18,19
174:24 177:4,5 184:7

**fraud** 83:21 113:11

**frauds** 83:23

**free** 112:7

**front** 127:9,14,17 128:25
137:5 152:12

**front-end** 107:12

**Frontier** 114:16

**froze** 11:19

**frozen** 199:9

**fruition** 36:17

**FTC** 134:4

**full** 6:16 95:2 155:24
162:8

**full-time** 94:4 109:18,20
110:2

**fully** 58:21 59:2 67:23
165:12 167:5

**functions** 181:3,12,13
182:23

**fund** 118:12 132:16
177:13,15,19 178:1,16
179:15,24

**fundraising** 69:5

**funds** 69:11 122:5 132:15
142:4 150:25 151:3
177:9,10,20 184:17
194:10

**funny** 113:23

**future** 189:23

## G

**G-I-A** 72:18

**gain** 42:4

**gala** 69:5,20

**Gallagher** 5:19

**gave** 36:16 50:17 51:11
102:10 107:8 126:25

**GC** 198:17

**gears** 55:11 201:20

**general** 19:19 52:18,20
142:8,18 151:7 155:9,12
192:7 198:4,21

**generally** 18:9 20:22 21:2
28:7,10,13 29:3 49:12
116:10 117:20 154:6
169:20 178:15 184:12
190:12

**generate** 174:14,19

**generic** 177:21

**generically** 178:10

**gentleman** 67:13 128:16

**Gia** 72:18

**give** 8:13 14:25 102:4
103:10 112:7 131:5
149:12 200:9

**globally** 68:25

**Gmail** 75:8,9

**goal** 167:4,8,9

**goals** 95:12

**good** 14:7 73:6,13 89:5
94:6 116:21 193:20
196:18,19 203:8

**governing** 129:6

**governs** 129:4

**grab** 129:25 148:13

**graduated** 79:17 84:9

**granted** 39:23

**greater** 81:25 82:1

**greet** 33:16,18,19,22 34:8
35:1,12 36:18,22 170:15,
17 171:7 172:1 174:14,24
176:3,20 178:25 184:6

**greeting** 33:25

**greets** 171:9 176:25
178:17

**Gro-** 179:9

**Grosvenor** 179:3,5,7,11,
19,20,22 180:8,9,13,14,
15,20,21

**grounds** 163:22

**group** 32:4,5,7 35:11
130:4 140:2 173:10 175:1
187:9,25

**guess** 128:20 130:23
193:12

**Guggenheim** 13:3,9,11,
15,17,19 14:2,5,8 33:13
35:5,9,11 36:14,21 115:9
171:2,6,11,15 173:15,16
175:2,11 176:14,22
178:18

**guidance** 100:14 101:6,
14,22 149:12 185:18
186:8

**guy** 110:13

**guys** 137:22 142:24
143:11

---

**H**

**half** 80:11 93:7 102:4
155:5 173:4,14 175:15
182:6

**hall** 97:9 168:7

**handle** 53:14 74:10

**happen** 99:17 112:18
124:18 126:6 133:24
134:5 173:22

**happened** 37:15 38:12
133:22 185:20 186:9

**happening** 188:23 194:20

**happy** 40:13,14 41:19,20
200:25 201:12

**Harbourvest** 44:22 53:4
114:25 115:1

**hard** 55:7 84:1,2

**Hayley** 7:6

**HCLOF** 114:19,21,24
115:2 118:19,22

**HCMLP** 73:5 190:15

**he'll** 47:8

**head** 19:13 47:20 49:17
99:15 104:20 115:7
160:19 162:4 165:4

**hear** 11:19 15:24 37:13
57:7 64:21 167:21 199:11

**heard** 35:13 44:24 169:6,9
179:4,7,21 180:5 185:2
199:15

**hearing** 10:6 49:9 153:18

**hearings** 6:20

**hedge** 147:10 177:9,13,
15,19,20 178:1 179:14
194:10

**held** 193:24 194:3,7,9

**helping** 32:17

**hiatus** 55:23

**hide** 113:14

**high** 11:23 103:16 104:21,
23 105:23 107:9 143:1

**higher** 82:13 83:10 85:7

**Highland** 5:5,23 13:24
14:3,13,17,21 15:7,19

16:5,10,15 17:6,19,25
18:4 19:5 23:4,7,11,16,
19,21 24:8 25:6 31:9
35:22,25 36:25 37:7,23
38:19 39:4 40:15 43:12
44:10 45:8,16,17 46:19
56:24 65:8 73:2,4 75:5
80:15 101:13,21 103:15
104:2 107:14 108:3,16,22
109:22 112:10,21 114:4,
7,10,11,12,18,20,23
115:3 118:7,8,10,11
129:11,14,18 130:3,5,6,7,
13,25 131:22,24 132:12
133:2,5,7,11 135:6 140:7,
9,14 148:1 151:20,21
152:17 154:17 157:24,25
166:13 169:18,21 174:3,
11 179:8 180:2,3,7
185:17 188:15,19 193:9,
10,17,21 197:1,3,6 198:9
199:3 200:1,20

**Highland's** 117:18 130:20
132:16

**highlight** 77:25

**highly** 145:8

**hindsight** 132:21

**hire** 188:11

**hiring** 197:5

**historically** 30:12

**history** 21:8

**hit** 90:15 92:22 188:19

**hold** 54:18,23 68:8 146:21
148:17 150:9 200:9

**Holdings** 32:19,20,21
72:2,6,8

**holds** 67:17,18 146:14

**holiday** 181:12

**Holland** 128:17,21

**home** 90:15 182:25

**honestly** 57:6,9

**hope** 167:5 203:7

**hoped** 86:24 166:17

**hoping** 33:25 34:17 103:8

**host** 69:6

**hour** 97:8 173:4 175:15
188:7

**hours** 8:15 90:9 196:21

**hundreds** 47:17

**Hunter** 5:14 57:13,18 58:1
101:13 111:24 112:2,3
151:14

**hypothetical** 149:9,11

**I**

**ICP** 95:11

**idea** 54:10 79:2 81:16,24
149:25 150:1,18 151:2
178:3,11 182:18 195:7

**identified** 48:14 84:25
118:16 127:3 142:3
161:23 202:11

**identify** 45:6 46:5,7 49:6,8
77:3,5 97:22 98:18 112:4
125:25 126:13 136:8

**ii** 93:25 96:3

**iii** 96:3

**immediately** 106:6

**important** 116:23

**improper** 148:7

**inability** 112:15

**inaccurate** 141:7

**inaudible** 40:20 80:22
103:5 131:16 147:9

**incentive** 95:11

**incentivize** 81:20

**incentivizing** 82:21,24

**inclined** 92:25

**include** 12:16 140:10
157:7 165:25 166:5
184:23

**included** 85:15 94:5
107:11 190:9

**includes** 165:9

**including** 24:12,13 113:15

**inclusion** 132:20

**incorrect** 14:15 26:14
55:20 56:5,11 77:10
118:21 142:6 172:8

**increase** 81:15

**increased** 82:22 83:2

**increment** 91:20,21

**incremental** 90:17,19
92:1

**indemnification** 162:7
163:13

**indemnifications** 160:11

**indemnities** 162:25 178:9

**indemnity** 113:15 161:16,
19 162:5,6 163:6,11,16,
21

**independent** 62:1 63:2,12
64:11 65:8 73:15 132:23
188:12

**indicating** 124:2

**indication** 52:21 64:6,7
65:12

**indications** 25:14,17

**indirectly** 32:24

**individual** 6:4 18:22 22:3
45:15 58:7 113:4 130:18

**individuals** 30:15 73:14
198:15

**industry** 173:17 174:20
181:3,9 182:23 183:10

**inform** 184:8

**information** 23:16,19
24:14 40:23 41:21,25
42:2,4,12 45:8 63:24
80:14,18 102:12 111:19,
22,25 116:3,9,14,24
117:9 118:6 122:6 123:17
124:1 125:23,24 126:1,
13,18,25 127:6,10 132:8
140:8 143:18 148:13
151:20 152:19 164:11
189:23 194:24 195:13
196:5,12

**initial** 51:3,4 79:5,7,14
163:8

**initially** 163:8 183:4

**inning** 168:20,21

**inquired** 41:25

**inquiring** 53:17

**inquiry** 71:4

**inside** 182:25

**instance** 78:4 91:1

**institution** 112:24

**instruct** 39:11,14 46:4
48:5 62:24,25 63:1,21
66:6 163:19 199:2,23
202:4,20

**instructed** 199:25

**instructing** 66:13

**instructions** 39:24 47:2
61:17 131:5 190:6

**instructs** 15:13 39:22

**intent** 189:6

**intention** 47:10

**interconnected** 113:7

**interest** 19:6 24:10,16
25:14,17 27:1,3 28:18

36:12 43:17 44:9 46:15,
19,22 51:21 52:21 53:1,
11 58:22 59:3 66:5,14
67:19 68:9 103:2,4,11,23
104:18 105:9 106:10,11
107:1,11 114:5,7,11,19,
23,24,25 115:3 118:9,10,
12 122:10,21,22 126:7
134:10,23 151:4 153:13,
15 166:3,5,10 179:23

**interested** 24:11 25:8
26:7 27:12 51:13 102:18
122:7 124:7

**interesting** 184:17

**interests** 19:11 24:9
100:13 113:8 114:6 115:5

**interrupt** 30:5

**interrupting** 143:13

**interruption** 10:14 55:12

**introduce** 173:11

**introduces** 49:24

**invest** 146:15 148:2 149:1

**invested** 12:3 28:13 80:13
99:13 100:15 107:18
108:10 110:19 142:22
143:17 180:21 184:20

**investigate** 99:20

**investigated** 89:6

**investigating** 18:22 23:22

**investigation** 22:11 43:9
44:3 150:13

**investing** 11:24,25 12:20
13:4 27:22 34:3 44:9,10
144:3 185:6

**investment** 5:14 13:17
27:17 30:19 34:18 35:22
44:3 57:13,18 58:1 64:5
65:15,23,25 101:7,23
108:17 109:10,11,16
146:23 147:15 150:14
151:15 180:10 184:17

**investments** 19:11 28:25
29:13 108:23 112:20,21
115:6 146:12 147:11
178:4,6

**investor** 21:12 116:16
147:13 178:13 180:16

**investors** 18:19 144:10
174:21 178:2,7,10,12,13,
14 180:22,23 184:13,19

**invests** 12:2

**invited** 103:1

**involved** 6:20 12:19,24
13:2,3 17:23 18:20 19:24
26:22 27:21 31:22,25
36:12,24 51:16,24 53:15
58:9,16 69:1,11 70:10,14,
16 72:10 75:13,15,17
96:19 102:23 107:20
108:25 109:5 110:5,10
115:10,14,18 144:3
160:13 162:24 171:11,22
174:3,8 176:4 180:3,7
185:17 186:3,12,21,23
187:1,22 188:21 198:23

**involvement** 22:24 23:18
32:21 33:9 35:25 37:3
60:3 69:15 102:16 160:25
184:19,24 187:6

**involves** 60:10

**involving** 21:20 48:2,20
83:24

**irrelevant** 190:1

**irrespective** 125:22

**issue** 22:12 28:25 37:4
48:11 64:5 134:10 147:18
150:15 196:2 200:14

**issued** 9:16

**issues** 21:9,10 74:12
112:7 195:20

**Item** 164:18 165:5

**items** 127:3

**iterations** 74:23 78:12

---

**J**

**J-I-A** 72:19,20

**James** 5:4 6:10,18 11:23
148:17

**January** 37:1,11,20 38:1
40:8,12 41:18,19 49:10
51:3,7 65:19 99:3 152:12
155:10,18,20 156:4,9
174:5

**January/february** 98:24

**Jessup** 21:20 22:4 67:13,
15 68:12 72:1 85:21,23
87:12,24 88:2,15 89:11,
19,21 90:2 96:24 144:2
151:3

**Jia** 72:17

**Jim** 44:8 131:2 183:22

**job** 109:18

**John** 5:20,21 62:24 86:1
128:14 144:18 180:24,25
181:18,23 182:1,5,12,21,
24,25 183:2,25

**John's** 181:7

**joined** 5:19 67:14 97:21

**joint** 46:15,21 66:14 71:14
126:22

**Jonathan** 36:7,8,9,15

**Jones** 5:22

**Josh** 5:20

**Jr** 5:5 6:10,18

**July** 54:7 131:12,18

**June** 5:3 64:8,13,14,15,
16,17 65:5,18 140:19
203:6

**junior** 173:8

## K

**Katz** 73:16

**kind** 40:13 50:10 107:6 149:20 163:4 168:19 188:5,6

**kinds** 181:17

**Klos** 154:10

**knew** 10:3 29:19,20,21 55:4,6 120:12 173:13,17 184:20 195:5,6

**Knight** 128:17,21

**knowing** 29:7

**knowledge** 6:6 9:6 18:10 19:19 23:11 43:8 44:13, 16,17 45:3,20,21,23 65:21,24 69:13,16 74:11 96:23 119:12 143:5,23 168:24 170:13 180:18,20, 21,22,23 185:11

**knowledgeable** 18:9

## L

**L.A.** 171:4 172:14,15 173:20

**lack** 11:2 104:4

**lacking** 146:22

**laid** 59:15

**landscape** 184:13

**large** 107:22 109:22 110:5 114:12 118:14,17

**late** 40:11,12,13 198:12

**law** 5:15 6:24 7:7 56:8 59:19 60:5,17 61:7 62:2, 11,19 63:17 169:7,11,13, 14

**lawsuit** 200:14

**lawyer** 39:21 54:9 55:17,

18 56:3 60:14 61:1 71:15 111:17 112:2 130:24,25 169:15

**lawyer's** 64:1

**lawyers** 48:1 61:4,10,24 62:1,17 63:16,20 124:22 195:17

**lead** 114:16

**learned** 29:21

**leave** 14:5 98:13

**left** 13:19,21 14:2 33:13 36:21 56:14 108:6 138:11 168:18 171:6,15 182:13 201:22

**legal** 38:25 48:3 56:19 60:10,21 63:9,10,22 86:7, 9 113:12,16 123:22 145:25 146:8 153:2 163:20

**legitimate** 121:16

**Lehman** 31:14 32:10,15, 18,19,20,21,24 33:5

**lender** 32:4,5,7 106:4,18 187:9,10,25

**lenders** 104:8

**length** 8:4

**Leslie** 198:18,21

**letter** 24:10,15 27:1,2

**letters** 24:9

**level** 107:9 112:22

**levels** 126:7

**Levy** 5:20

**liabilities** 21:8 155:8

**license** 55:21

**licensing** 21:10

**life** 169:8

**limitations** 118:3

**limited** 59:24 80:2

**Limousine** 111:4

**lined** 173:18

**lines** 71:24

**Linn** 30:20,25 31:4 33:9, 10,12,17 34:19 37:2 38:6, 7,8,14 40:9,11 41:4,11 42:20 43:8 49:10 64:9,13, 17 65:5,9 66:3,18,20 70:1,18,21 72:9,16 73:16 74:8 133:15,22 134:2,11, 17 170:25 171:12 172:21, 25 173:1,6 175:4 177:2 184:6

**Linn's** 72:5

**liquidate** 153:7

**liquidation** 141:21 142:20 153:11,12 154:2

**list** 43:5 117:19,21,22 119:7,13,16,19,23 120:7, 10 127:24 128:4,5 131:6, 11,12,20,21 132:8 201:18

**listed** 90:14

**Listen** 144:17

**listening** 27:16 64:24

**litigated** 113:4

**litigation** 46:20 53:23 80:22 83:19 86:25 87:10 189:24

**litigations** 160:12

**LLC** 13:3,12

**LLP** 5:6

**loan** 12:3 20:1 99:24 102:13 104:5,11 105:15, 16,17

**loans** 19:21 113:7

**located** 74:16 179:17

**log** 117:14 128:7 132:3 170:10

**logs** 130:13

**London** 179:12

**long** 7:25 8:10 10:14 56:7
   70:14 173:3 175:14

**longer** 32:20 106:3,9
   130:6 175:16

**looked** 28:20 47:16 48:19,
   24,25 62:3 127:2 149:17

**Los** 172:16 176:5 177:11

**losses** 147:3

**lost** 54:15 150:6

**lot** 22:2 84:13 87:24
   107:19 115:24 155:4
   160:14 185:19

**low** 105:20 107:9

**lower** 81:9,25 84:8 106:3,
   10

---

**M**

**made** 27:17 61:2 63:5
   69:17,19 70:1,2,18,19
   85:13 102:13 138:16
   153:20,21 175:20 185:19
   186:7 190:7,20,25

**mail** 121:6

**main** 126:10

**maintained** 132:9 170:10

**maintaining** 130:13

**majority** 156:18

**make** 6:3,8 10:15 21:6
   23:3,6,7 24:15 39:5 42:13
   46:9 69:25 70:6 77:25
   80:5 86:15 91:25 92:12
   98:14 119:10 134:7,14
   137:1,6 145:10 148:22
   153:14 168:21 176:5,9
   193:8,19 198:2

**makes** 83:9 84:9 94:6

**making** 103:23 148:11
   176:2

**man** 103:15,19,21,24
   104:7,18 124:25

**manage** 107:18

**managed** 108:15

**management** 5:6 16:15
   18:3,5 19:6 73:3 108:21
   131:1 151:21 189:11

**manager** 132:20 155:3

**managing** 84:15 108:4,5
   109:25

**manner** 53:8 162:11

**March** 28:16 29:4,10
   37:25 41:14 52:9 110:23,
   25 134:19 139:10 152:11
   156:24 157:23 158:21
   159:3,8 185:11

**margined** 155:1

**mark** 5:16,18 98:13
   120:20 136:14 152:6
   158:10,11 197:5

**marked** 9:14 10:24 98:21
   119:2 128:8,19 129:19,23
   136:7 152:8 158:18,19
   199:1

**market** 16:20,23,24 17:8,
   16 89:7,15,17,20,24
   96:17,21,24 104:3,10
   126:8 166:19,22 196:17

**marks** 140:9

**massive** 87:10

**material** 116:2,9,16,19,22
   118:5 122:10,14,21
   123:1,17,23 124:3,8,9
   194:24 195:12 196:5,12

**materials** 126:21 127:5
   128:8

**math** 146:22

**matter** 5:5 7:20,21 22:24
   23:18 35:23 39:9 94:23
   147:18 174:7 190:2 202:8

**matters** 7:22 117:19

**maximize** 79:10 81:21

**maximizing** 88:4

**Mccleary** 5:15

**Mcentire** 5:13,14,24 6:1,
   13 7:23 8:16 9:11,15,22,
   24,25 10:2,13,18,21,22,
   25 11:12,14,18 15:5,11,
   22,24 16:13,19 17:23
   18:8 19:2,24 20:4,5,11
   21:1,14,19 22:16 25:25
   26:15 28:4,11 29:9,23
   30:1,4,11,21 31:18 32:22
   33:3,8,14,24 34:17,23
   35:19 36:3 37:15,20 38:4,
   7,12 39:3,8,10,13,20
   40:24 41:3,10,17 42:3,13,
   19,24 43:7,14 44:7,13
   46:4,9,21,25 47:1,11,25
   48:4,9,18 49:5 50:20
   54:15,21 55:1,13,14,16
   56:7,21,25 57:7,19,24
   58:9 59:1,7,18 60:2,11,
   15,20,23 61:2,8,11,13,16,
   20 62:16 63:5,7,8,14,25
   64:21 65:1,4 66:7,10,12,
   16 67:2 71:9,13,21,25
   72:23,25 74:7 75:4 76:12
   77:9,14,16,18,19,25 78:2
   80:7,23 81:6,14 82:7,11
   83:1,11 84:2,4 86:8,12,18
   87:19 88:1,18,22 89:2,4
   90:6,11,22,24,25 91:1,7,9
   93:13,15 94:17,19 96:23
   97:3,7,13,23 98:5,8,12,
   17,23 100:14,21 101:5,
   12,20 102:6,15 105:8
   108:22 109:7 110:12
   111:11,14 112:9,19
   113:21,22 115:25 116:8,
   18,23 117:4,11,13 119:3
   120:1,4,12 121:10,15,17

122:3,17,21,25 123:11,
16,25 124:23 125:7,11,
18,25 126:12,19,21
127:2,11,16,22 128:6,13,
19 129:5,9,13,24 130:10,
22 131:3,10,18,21 132:1,
14 133:3,10,15,23 134:7,
20 135:8,18,22 136:2,4,8,
10,12,18,23,25 137:3,8,
12,14,17,24 138:6,9,12,
15,19,25 140:16,24
141:16,19 142:21 143:7,
11,15 144:1,17,25 145:4,
7,9,14,18 146:2,13 147:4,
25 148:14,22,24 150:4,
11,20,24 152:5,9 153:5,
10 154:3 156:5,9,17
157:5,6 158:9,12,13,16,
19 159:11,15 160:15,20
161:3,7,12,23 162:9,13,
19,22 163:5,15,23 164:5,
7,9,12,14,21,24 165:2
166:4,9,16,24 167:4,10,
18,21 168:6,16,23 170:4,
9,14,24 171:5 173:2,21
174:23 176:6,19 178:22,
24 180:24 181:22 182:4,
19 183:12,17,19 184:5,18
185:14,24 186:5,15,18,
20,23 187:5,15,18 188:1,
18 189:4,16,19,25 190:3,
7,19 191:4 192:6,12
193:2,18 194:8 195:11,18
196:3,13,20,22,24,25
197:10,14,21 198:14
199:11,18,24 200:6,15
201:1,11,14,16,20,25
202:4,9,11,24 203:4

**meaning** 103:15 157:2

**means** 9:3 74:20 116:12,
14 122:22

**meant** 43:14 197:4

**measured** 81:18

**mediation** 111:20 153:23

**meet** 7:13,16,25 8:1,10
33:16,18,19,22 34:8,19
35:1,11 36:18,22 79:16
81:20 155:2,3 170:15,17,
25 171:6 172:1,5,9,10
174:14,23 175:6 176:3,
20,25 177:6 178:17,25
184:6 203:5

**meet all** 160:5

**meeting** 33:13,15,25 35:7,
10,12 78:24 81:18 121:11
125:17,22 173:3,5 174:20
175:14,24 176:15 181:1,4
182:7,10,11,20 184:7

**meetings** 53:10 76:8,11,
12,15,17,19,21,22,24,25
78:23 173:18 181:9
182:24

**meets** 171:9

**member** 32:5,7 65:8 69:4
123:18 124:1,24 125:10
127:7

**members** 67:21 73:15
76:20 79:22,23 80:2
88:23 94:21 95:6,8
188:17

**memorandum** 71:10

**memory** 28:20 47:12

**mention** 51:24

**mentioned** 51:23 114:9

**merger** 194:19

**message** 49:24 50:13,21
75:18,21 202:12,14

**messages** 49:18,19,20,22
50:3 53:9 75:12,15 202:2,
25

**met** 6:21 7:18 8:5,16
30:23,24,25 31:2,4,6
33:8,12,17 35:4 37:2 81:7
171:3,13 172:20,25
173:1,14 175:4 180:25

182:21

**method** 71:4

**metrics** 78:13 84:23
95:15,24 96:3

**MG** 201:17

**MGM** 114:11,12 115:2,8
118:7,9,11,13,14,19,22
119:7,19,22 120:6,10,13
123:18 124:25 125:6,8
126:5 127:7,23 128:3
131:6,11 133:16 134:3,
12,22 135:10 192:1,2,5,7,
11,13,21 193:4,9,14,18
194:9,12 196:4 197:22
198:4,10,11 199:2,3
200:2,18,21 201:17,18

**Michael** 33:8 35:21 37:2
38:6,7,8 40:9 66:3 72:5

**mid** 40:11,12 41:18
104:23

**mid-january** 65:19

**mid-march** 41:14

**Mike** 30:20,25 31:4 35:6

**Miller** 5:15 10:25 136:6,22
137:16,19 138:8

**million** 83:24 92:10,11,18,
20 93:3,4,7,9,10 94:9,11
112:5 139:7,11,20,23
140:20 141:1,15 142:10
143:2,17 146:15 148:2,4
149:1,2 150:2 154:18,21
155:12 156:10 159:4,5,
17,18 160:8 161:8 165:10
166:4 178:14 198:11

**mine** 84:19 95:6

**minute** 197:11 200:10

**minutes** 50:10 97:9
168:18 173:4 175:19
196:21 201:22,24

**mischaracterize** 183:16

**mispronounce** 179:10

**misspoke** 51:8

**misstated** 121:16

**model** 141:4

**monetization** 51:15 79:9
153:24 166:17 167:11

**monetize** 154:1 166:12,25
167:6

**monetized** 139:3

**money** 100:10 144:2
147:12 155:4 161:12
185:19 186:7

**month** 29:4 66:19 93:16,
20 139:11,18 152:12

**monthly** 96:14 152:15

**months** 124:3 140:20,25
174:7

**morning** 8:6

**Morris** 5:21 7:3,13,18 8:1,
7,10 15:23 20:2,8,23 21:4
25:20 26:11 28:1,8 29:18
30:2 33:11,20 34:14 38:9,
21,23 40:20 41:6 42:6,21
43:2 46:15 47:4,6,15,24
48:25 49:2 57:2,4,15,23
58:3,5 59:13,21 60:8,18
62:12,14,20,22 63:1,12,
19 64:19,24 65:2 71:15
74:3 80:5 82:3 86:2 87:21
97:12,20,24,25 101:1
108:18 109:2 110:7
111:9,12,15 117:1,7
118:24 121:13,25 123:20
124:5 125:2 128:1,15
129:8,11 130:14,24,25
131:8,14,16 133:8,19
135:20 140:4 142:12,14
143:4,9,19 144:12,15,20
145:1,5,6,12,14,16,23,25
146:6,8,18 147:19,21
149:4,9,14 151:24 152:1
153:17 156:7,14,21 160:1

161:21 162:2,15 163:2,
17,19 164:3,19 165:23
166:14,18 167:2,12,14
170:21 175:25 181:24
182:16 185:22 187:4,11,
24 188:25 189:14,18,21
190:1,4 192:25 193:15
194:5,25 195:15,22,24
199:5,7,16,19 200:5,8,22
201:6,12,19 203:11,13

**Morris's** 6:24 7:7 46:19

**motion** 39:16 200:16
202:22

**motions** 21:25

**Motulsky** 180:24,25
181:13,18,23 182:1,5,12,
22,24 183:2,5,6 184:1

**Motulsky's** 182:25

**Mountain** 5:14 57:13,18
58:1 111:24 112:2,3
151:15

**move** 10:17 63:19

**moved** 113:9 173:15

**Muck** 21:20 22:4 67:12
68:1,13 72:6,8 85:20,22
86:20 87:14,23 88:2,12
89:5,10,14,22 96:23
144:2 150:25

**Multi** 118:12,14

**multi-strategy** 177:15,19,
21 178:1,16 184:22

**multiple** 7:20 24:8

**multiyear** 53:23

**mute** 55:15

**mutual** 177:10

**myriad** 7:21 21:11 118:2
126:17

**N**

**named** 67:13 72:17
113:13

**names** 73:14 98:6 110:20
111:1

**nature** 56:25 78:8 94:4
112:20 115:21 170:4

**NDA** 24:6,12,18,21 27:22
42:4,9,10,15 43:8,12 44:2
45:7,11,16,19,22 99:19
100:2,7 102:14,15 190:8
191:9 192:11,12,22
193:19 194:13 195:3,4,21
198:16 200:3 201:16

**NDAS** 23:24,25 24:5,11
28:5 49:13

**necessarily** 140:13

**needed** 52:3 189:2 194:13
195:9

**nefarious** 111:22

**negotiate** 89:16 94:5

**negotiated** 58:13,18,22
59:2 83:11 96:17,25

**negotiating** 78:6 89:16

**negotiation** 76:9 86:19
188:15

**negotiations** 73:6,13
86:10,11 89:5,6 188:8

**neighborhood** 74:1 161:7

**nev-** 183:1

**new-issue** 13:16

**Nexpoint** 129:15 131:22,
25 132:8,10 133:4,7,11
169:18,22

**Nexpoint's** 132:11

**nice** 71:3 157:11

**Nizer** 56:14

**non-privileged** 48:13,19

**nondisclosure** 23:20

**nonpublic** 116:3,9 118:5
123:17,23 124:9 125:11
194:24 195:12 196:5,12

**nonresponsive** 84:3
113:21

**normal** 113:19

**north** 83:24 104:25 105:1
113:5

**Northern** 5:8

**note** 9:20 52:14

**noted** 98:4

**notes** 160:9

**notice** 9:13,16 29:14
136:14 138:10

**notices** 29:22

**November** 173:25

**number** 75:23,24 84:20
85:7 91:16 98:15 107:8
136:5 142:25 143:25
155:14 157:2,3,12 165:9
172:13,14 193:24

**numbers** 91:18 92:8,18
93:3,5 95:17 140:16
149:25

**numerous** 18:20 61:25

---

**O**

**object** 10:16,19 84:3
86:14 100:4 101:11,16
102:1,8 112:12,23 113:21
115:22 116:4,13,20,25
117:1,6,7 120:3 122:16,
18,23 128:1 129:17
140:23 141:9 148:19,20
149:6 151:24,25 170:1
172:23 174:16 176:16
180:17 181:20 183:8,23
184:10 186:1 187:17

**object-** 189:19

**objecting** 86:2

**objection** 7:17 8:14 15:4,
9,21 16:11,17 17:21 18:6,
24 19:18 20:9,23,24 21:4,
5,17 22:13 25:20 26:11,
13 28:1,8 29:6,17 30:17
31:16 32:16 33:2,7,11,20
34:14,22 35:16 36:2 38:3,
5,9,10,21,22 39:7 40:19
41:1,6,12,23 42:6,7,17,21
43:2,3,10 44:5,12 46:3
47:22 49:9 50:16 56:6,19
57:2,3,14,15,22 58:3,4,24
59:4,13,14,20,21 60:6,8,
19 62:12,13,20,21 64:19
66:4 74:3 75:1,7 76:10
77:7 80:17 81:2,11 82:3,
4,9,23 83:6,16 85:25
87:16 96:20 97:1,5
100:18 101:1 105:4
108:18 109:2 110:7
111:9,21 118:24 119:24
120:8 121:9,13,16,25
122:19 123:8,14,20,21
124:4,5 125:1,2,9,13,20
126:3,16,20,23 127:8,13,
18,25 131:8,14,15,16,19,
23 132:5 133:8,13,18,19,
20,25 134:13 135:1,3,13
136:1 138:18,22 140:4,5
142:12,13 143:3,4,14,19,
20,21 144:12,14 145:23,
24 146:6,7,18,19 147:19,
20 148:5,6,18 149:3,4
150:16,22 153:1,8,16,17
156:7,13,14,20,21 159:25
160:1,18,22 161:5,9,22
162:1,2,10,14,21 163:2,7,
17,18 164:2,3 165:23
166:8 167:7,12,13 170:6,
12,21 171:1 173:12
174:18 175:25 176:17

**object-** 189:19

188:14,24 189:13 190:22
192:4,9 195:1,14,23
196:6 198:6 199:6

**object-** 189:19

**objecting** 86:2

**objection** 7:17 8:14 15:4,

178:23 180:1,19 181:24
182:16 185:8,21,22
186:2,10,11,17,19 187:4,
11,24 189:1,20 190:11
192:24,25 193:15 194:5,
25 195:22 202:3,16 203:2

**objections** 10:5,11,19

**obligation** 38:20 160:5
163:13

**obligations** 160:6 162:7
163:16,21 167:6

**observe** 6:19

**observing** 5:16

**occasion** 70:19,25

**occur** 38:13 55:25 68:24
194:23

**occurred** 50:14 78:23

**October** 132:22 154:4,17
173:25

**odd** 74:5

**office** 135:6 170:20
182:25 184:3

**officer** 14:12,17 15:18
16:4,21,25 17:2 37:8,11
73:5,10 89:8 152:22,25
153:6 188:19

**offices** 6:24 11:1 36:19
72:21,22 170:18 181:5
182:8,9

**official** 13:25

**offsetting** 147:11

**ongoing** 7:22

**opinion** 55:1 87:5

**opportunity** 14:6 34:19
184:16 200:9

**opposition** 71:14 126:22
127:4

**optimistic** 134:12

**oral** 5:4

**order** 9:21 24:9 42:1,4
120:25 124:13 128:22
129:3,4,6 199:21

**ordered** 8:9

**organization** 68:21 71:6
110:1

**organize** 35:12

**organized** 35:2,3 44:21,23

**original** 95:1 167:8

**originally** 114:24

**outdated** 11:3

**outlined** 91:23 92:8

**outperformed** 91:3

**overlevered** 155:1

**oversee** 20:15

**oversight** 31:1,3,5 66:21
67:5,8 72:10 73:3 84:6
85:1,14 95:14 99:8
160:24 162:25 163:24
181:4 182:11

**owe** 57:20,25 58:1 59:12,
16,19 60:1,17

**owned** 28:18 67:23 68:5,
10,11,12,13 112:4 114:11
118:8,10 193:10,17

**ownership** 21:7 118:7

**P**

**p.m.** 97:15,17,18 138:1,3,
4 168:11,13,14 197:16,
18,19 203:14

**Pachulski** 5:21 7:19

**package** 104:8 107:6

**pages** 47:17 136:22,23,24

**paid** 105:15,17 106:2,23,
25 139:20 141:1 143:22
144:6,7 159:4,17,24

**oral** 160:6 172:12,19 194:17

**Paragraph** 96:3 112:3

**pardon** 10:13,14

**part** 13:17 19:19 25:9,12
26:2,5 31:3,5 76:8 78:12
103:12 104:7 107:5
113:13 115:1 128:8
130:3,4,11 132:21 142:1
146:9 150:5 153:21 159:2
163:8,10 169:22 170:11
176:3 184:21 197:22
198:16

**participate** 26:9,25 69:5
72:15 129:22

**participates** 72:13

**participation** 79:3 81:8,25
82:1,12,15

**parties** 46:19 48:2 74:18
122:7

**partner** 53:22

**Partners** 155:8

**party** 58:14

**pass** 35:2

**past** 31:8 35:14 168:20
169:8 182:2

**Patel** 30:21,23,24 35:8,10
66:3,18,23 72:9 134:20,
22 135:5 170:25 171:11,
14 172:25 173:6,13
175:7,9 177:1 184:6
185:14,16 186:4,6

**path** 40:23

**Patrick** 5:16 197:5

**pay** 80:20 100:10 142:4
165:12 172:6

**payment** 95:9,11 96:2

**payments** 96:9,10,14

**payout** 88:13 139:1,2,3
149:2 159:21

**PE** 130:4 140:11

**pending** 111:17 118:4
166:2

**people** 24:24 27:15 70:6
71:5 97:21 107:23 108:1
109:25 115:20 124:7
128:25 171:3 172:13,14
173:5,9,16,19 174:20
175:10,16,23 177:20
190:8

**perceive** 152:24

**percent** 12:9 80:8,16
90:16 91:3,10,19 92:6,11,
19 93:4 95:10,13 96:1
104:24 105:14 106:1
151:8,9,10,23 159:21

**percentage** 90:20 92:23
106:12 151:6 193:14,17

**percentages** 78:6 84:25
85:4

**perceptions** 144:22

**perfectly** 61:18

**perform** 20:14

**performance** 79:21 82:25
83:3,9 84:21 94:24 95:4,
15,18 96:10

**period** 50:25 80:21 141:14
151:16 166:23 192:16

**permitted** 42:10 95:5

**person** 12:2 30:18 36:5
107:24 146:2,13 148:24
173:8 198:15

**personal** 6:6 9:6 45:3
75:10,14,22 76:21,24
111:16 113:7

**personally** 8:17 12:19
16:19 17:15 31:2 60:12
61:6,20,25 62:5 115:11

**personnel** 118:4 190:15

**pertinent** 59:19 62:3

**petition** 154:5 189:8

**Phillips** 56:14

**phone** 41:4,8 50:23 52:4,
5,10,13,19 75:14,22,23
76:3 77:1 121:6 198:20
202:1

**phrase** 61:18 103:24

**phrased** 7:24 24:24

**pick** 41:4

**picked** 41:8

**piece** 126:1

**pierce** 121:4

**pitch** 175:22

**place** 52:5 55:8 78:19
129:4 166:12 170:17
184:3,16 190:17

**places** 147:12,14

**plan** 51:15 58:17 73:3
78:11 79:6,9,16,18,19
80:8,19,20,24 81:3,8,17,
19,21 83:4 87:9,11,15
88:13 132:25 136:15
138:10 139:3,19 141:20
142:1,19 152:3 153:25
166:12 190:14

**planned** 91:3

**play** 32:14

**pleading** 32:8

**pleadings** 21:25 47:16
143:1,16

**point** 12:12 26:9 30:9
34:11 35:14 51:25 53:18
63:6 115:7 140:13 144:4
189:5 192:5,11

**policies** 117:18

**pool** 79:15,20 84:11,16
85:6 95:2

**poor** 30:13

**populated** 180:13

**portfolio** 108:3,10,14
109:9 110:14,18 111:1,2,
3,7 113:23 114:3 115:3
132:20 155:3 188:22
189:11

**portion** 54:25 79:23 88:22
94:20 95:5,6,20,22
150:10

**position** 13:20,21 34:4
48:9 57:20,21,24 59:18
72:1,4,5,8 96:19 101:9
130:10 151:15 182:14

**positions** 94:11

**possession** 14:21 15:7,18
16:22 17:2 55:17 56:17
57:12,25 117:18 138:21

**possibility** 123:5

**possibly** 93:12

**post** 44:24 51:17 86:6
93:19 134:2

**posted** 11:1

**potential** 24:8,12 40:21
45:9 83:19 86:25 87:9
102:16 134:12 149:18
150:14 163:16 190:20
192:2 202:25

**potentially** 44:9 88:7 96:6

**practice** 56:8

**practices** 39:15

**practicing** 56:3

**practitioner** 34:10,12

**pre-board** 121:17,19

**pre-effective** 203:1

**precision** 29:8 112:4

**Predom-** 154:23

**predominantly** 84:22

**predominately** 154:23

**premise** 77:8,9 142:16
149:18,24 172:8

**preparation** 46:8 48:16
49:3

**prepare** 46:2 152:15

**prepared** 152:16 155:18
156:4

**preparing** 8:2 47:5,13
48:21

**prepping** 48:24

**present** 24:15 29:23

**presentation** 175:20,21

**presented** 78:17 83:12

**preservation** 39:15 202:5

**preserve** 38:20

**preserved** 39:6 74:24

**president** 132:15 133:4

**press** 144:8

**presuming** 26:6

**pretty** 81:13 196:18

**previous** 90:23 93:1
169:11

**previously** 59:5 65:18
130:4

**price** 104:6 117:10 126:7
195:7 196:17

**principally** 35:15,17

**principals** 30:15

**prior** 10:11 31:13 35:24
47:17 99:10 101:7,18,23
108:7 134:9,17,22 135:6
160:12 182:19 185:10,17
186:7 198:13

**priorities** 43:5

**private** 107:15,25 130:11
140:2

**privilege** 46:15 163:22

Case 19-34054-sgj11 Doc 3818-2 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Exhibit Exhibit 2 - 11 Filed 12/07/23 Page 32 of 214 PageID 6974
Index - Page 299 through 4 Index - privileged to question

**privileged** 49:7 63:24
164:10

**pro** 189:22

**probable** 123:13,19
124:2,6 126:2,14 127:5

**problem** 98:5 176:3

**procedure** 9:4

**procedures** 161:24

**proceed** 6:14 114:2

**proceeding** 9:17 10:11
14:14,18 15:8,19 16:5,9,
15 18:23 33:9 111:18
129:7 144:11 145:21

**proceedings** 13:5 17:20,
24,25 18:5 31:8,23 32:1
37:3 71:16 115:20 136:13
148:1 184:25 187:23
203:16

**process** 9:1,3,4 18:15
19:16 24:7 26:23 44:21,
23 45:2,4,12,15 89:15
104:1

**product** 46:5

**professional** 11:24 12:1
181:2 183:5,6,20 184:1

**profile** 149:17 184:22

**projected** 80:15,19 141:1,
2 151:22 166:23

**projecting** 82:8 83:4
155:11 157:15

**projection** 79:18,19 80:8,
10,24,25 82:16 155:15,
16,21,22 157:20

**projections** 80:20 81:4
87:11,15 88:13 91:4
139:24 140:1 141:24
157:17

**pronounce** 179:9,11

**pronounced** 179:4

**pronouncing** 130:2

**proposal** 36:15,16 76:15
77:23 78:5,16 79:5,12,14,
19 83:12 84:24 102:13
104:13 105:6,9 106:7
107:5 191:17

**proposals** 73:17,20
74:15,20 77:4,6 104:9
105:18

**proposed** 103:14,15
200:14

**prospective** 106:3

**protected** 46:13

**protecting** 131:2

**protection** 106:24 107:3

**protective** 128:22 129:3,6
190:2

**provide** 9:5 22:9,16,22
23:1,11,16 25:11,14,15,
16,18 26:1,4,16,17 27:2
32:22 33:3 87:11 98:25
100:14 101:22 127:10
191:17,23

**provided** 23:4,19 25:13
58:12 80:14,19 101:5,14
127:6

**providing** 25:8

**provision** 94:5

**provisions** 73:1

**Provost** 67:13 73:16 74:8

**Provost's** 72:1

**prudent** 146:15

**public** 125:15 126:1
129:21 136:12 141:25
152:9,10 154:12 157:24
158:20

**publications** 126:18

**publicly** 116:17 129:21
138:16 194:3,13

**pull** 136:4 158:9

**pulling** 92:18 93:5

**purchase** 42:5 45:9 99:19
101:15,24 115:11 126:11
150:19

**purchased** 41:15 134:9
143:23 146:24 156:12

**purchaser** 19:25 20:6

**purchasers** 21:21 22:5,
10,17,19,23 23:8,12,17

**purchases** 22:12,14,20,21
23:9,14 43:13,15 45:12

**purchasing** 13:4 21:9,11
184:24 185:2,17 186:3,6,
13,21

**purpose** 24:5 33:14,18,22

**purposes** 47:12 67:6
89:23 111:23 161:20

**pursuant** 9:21

**pursue** 14:8 27:8

**put** 9:12 10:22 44:15
46:12 55:15,22 71:9 76:1
95:1 98:2 104:6,9,12
105:18 106:7 111:21
117:11,19 120:10 122:6
128:6,25 137:5,17,18
138:6 140:14,16 148:9
152:6 191:16 201:17

**putting** 140:2

**Q**

**quarter** 123:3,13,19
126:2,14 127:6 158:21
159:12 173:23,25 195:8

**question** 7:23 9:9 11:19
13:7 15:15 17:14 19:9
20:3,10,12 25:21 26:12
28:2,9 29:18 30:13 33:21
34:15 40:5,20 41:7 42:22
47:7 54:11 55:3 57:4,16,

23 58:5 59:22 60:9,12,15,
21,22 61:9,18 62:14,23
63:4,22 64:20 67:7 70:23
74:4 76:23 86:3,17 87:12,
19,20 88:8,11,15 89:11,
19,22,23 90:2,3 97:3
99:21 108:19 109:3,13
110:8 111:10 113:24
117:2,8 118:25 120:1,2
121:4,14 122:1,20 125:3
127:11,17 128:2,21
129:24 130:22 134:20
142:14 143:8,12,15
144:13,15 145:7,10
146:1,20 147:7,22 148:9,
10,15,20,21,23 149:5,7,
19 150:20 152:1 153:18
156:8,15,22 158:7 161:22
162:3,15 163:3 164:4
165:24 167:14,15 169:4,
10 170:22 176:1 181:25
182:17 183:3,9,23 184:11
185:23 186:15 187:12
191:23 193:16 194:6
195:15,25 199:12,15
200:1,6 202:9

**questioning** 90:9

**questions** 9:5 46:16 70:8
86:15 99:1,25 102:6,9
144:18,19 192:7 202:19
203:5,9

**quick** 39:21 154:2 168:5

**quickly** 126:6

**quid** 189:22

**quo** 189:22

---

**R**

---

**raising** 69:11

**Raj** 30:21,23,24 35:4,8,10,
13 66:3

**ran** 12:3 58:6

**range** 12:10 104:25 106:6

107:10 109:6 174:2
192:16 197:25

**rate** 80:9 102:19 103:7,10,
11,23 104:18 105:10
106:10,11 107:1,11
146:4,11

**rates** 12:11 144:9 145:19

**RCP** 118:10 198:11

**reach** 85:24 93:12

**reached** 28:12,24 35:2
54:9 86:22 87:6,8 153:24
164:11 192:10,21 193:5,
18,22

**reaching** 193:21

**read** 54:16,25 58:11 65:2
72:25 73:7 77:24 122:11
127:21 139:5 142:7
143:24 150:5,7,10 165:4
200:15,16

**reading** 141:22 164:16

**ready** 6:14

**real** 39:21 148:9

**realized** 113:12

**reason** 42:19,25 103:1
132:7 160:5

**reasonable** 116:16

**reasonableness** 188:13

**reasons** 25:23 118:2
195:21

**recall** 9:18 13:1 18:25
27:25 28:7 29:7 30:7
37:11,21 40:12 45:24
47:14,19 49:16 50:3
51:12 52:7 53:12,13,18
56:1 66:24,25 69:22,23,
24 70:1,4,20,21,24 71:1,2
83:20 86:23 87:1,7,17
88:1,2,3,11,17 89:10,13
90:1,5 98:16 99:7,14,16,
18,22 100:1,6 103:13
104:17,18 105:11 106:8

107:8 114:15 115:23
118:15,18 119:3,20
120:11 131:9 132:6
133:21 134:1,2 140:12
141:11 143:24 160:19
161:6 170:7,10 171:13
173:7,23 174:6 175:12
176:18,24 177:8,10
182:24 189:10 198:12,17,
18

**recalled** 200:18

**recalling** 19:13,23

**recalls** 201:5

**recedes** 155:4

**receive** 16:21 17:1 50:11
93:16,19 96:2 128:18
146:11,16

**received** 24:14 49:1 50:12
60:14 63:4,10 96:10,13
119:6,14,18,21 120:4,16,
19,22 123:12 150:25
151:3 198:25 200:2

**receiving** 119:4 123:25
135:24 158:1

**recently** 13:2 158:22

**recognize** 56:17 154:11,
14

**recollection** 30:10 35:7
36:10,13 46:8 48:8,12
50:22 52:18 54:11 73:21
76:14 85:4 100:11 103:14
104:20 183:25

**recommendation** 100:16
197:14

**recommendations** 101:6,
22 102:11

**reconsider** 190:5

**record** 5:4,11 6:16 10:3,
10,15 16:2 23:6 52:13
54:20 97:16,19,22,24
98:1,9 114:1 136:13

137:21 138:2,5 141:25
145:10 152:10 154:12
158:20 168:1,8,12,15
183:13 193:3 196:23
197:10,17,20 198:2
203:15

**records** 152:11

**recover** 83:14 160:7

**recovered** 88:5

**recoveries** 79:8,16 82:12,
22 83:2,3 84:21,22 85:24
86:16 90:13 102:11
157:8,16

**recovery** 79:3 80:9,16,19
81:25 82:8 83:14,18 84:1
85:9 91:2 92:6 96:1
106:11,14,18 157:20
158:2

**recycle** 106:5

**redacted** 79:24 88:22

**redactions** 80:2

**redeemed** 180:12

**Redeemer** 40:22 44:20
53:8,10,13 179:23,24
180:11

**redo** 152:4

**refer** 21:21,23 22:4 23:23
95:13 114:21 120:20

**reference** 63:19 189:5

**referred** 73:10 104:7
116:6

**referring** 22:6 43:23 44:15
47:25 53:9 77:19 98:14
123:5,12 181:10

**reflect** 114:1

**reflected** 159:12

**reflecting** 157:4 189:7
202:25

**refresh** 28:20 46:7 47:12

48:8

**refreshing** 48:11

**refused** 155:3

**regard** 28:20 70:23 88:15
89:11,19 90:2,4 97:3
102:6,15 109:13 135:12
150:20 169:10 186:15

**registration** 56:1,2

**regulated** 115:12

**regulatory** 21:9

**rehired** 197:1

**rejected** 74:22 77:4,6
133:1 169:22

**relate** 200:23

**related** 22:14,19,21 46:16
84:21,22 104:10 124:10
201:2

**relates** 19:2 116:15

**relating** 22:11 45:8 47:4
101:7

**relationship** 131:24
132:13 133:1,6

**relative** 129:3

**relevance** 144:15 145:13
149:7 163:4 200:17
201:15

**relevant** 39:15 111:16
145:8 148:10 190:5

**relied** 116:24

**remain** 111:7

**remained** 80:25

**remaining** 142:8,18 160:9
165:11,12 166:13,25

**remember** 37:9 142:25

**remembering** 102:20

**remind** 86:5

**renegotiated** 94:8

**reorganization** 31:14
32:25 33:5 73:3 115:20
136:16 154:1

**reorganize** 153:6

**reorganized** 5:22 6:7
17:20 89:9 110:1 117:17

**repayment** 99:24

**repeat** 15:15 17:13 54:21
57:23

**rephrase** 7:10 30:12 48:6
185:15

**replied** 52:16

**reporter** 5:11 54:15,18,22,
23 102:4 150:4,9 167:18,
20,22 168:3,16 201:23

**reports** 152:15 154:21

**represent** 31:7 74:2
169:16

**representation** 11:7 74:9
80:5 108:6

**representative** 5:17 37:22
53:16 67:3,7,12 72:3,7

**representatives** 24:20,25
85:20 176:14

**represented** 18:21 19:25
20:5 31:10 169:1,14
187:9,22,25

**representing** 33:19,23
74:5 115:20 187:21

**represents** 165:22

**request** 200:3

**requested** 54:25 103:13
150:10

**require** 109:20

**required** 24:6

**requirement** 139:3

**research** 62:1,6 63:13
89:15,18,20,25

**reservation** 10:15,16

**reserve** 160:10 161:1 203:5

**reserved** 161:10

**reserves** 160:14,15,20,23 161:2

**resign** 94:10

**resigned** 132:19,22

**resolve** 112:17

**resolved** 113:19

**respect** 53:13 57:10 60:20 62:4 65:25 76:15 84:18

**respected** 104:8

**respond** 40:24,25 41:2 42:2,14 43:1 50:20 66:12 99:6

**responded** 84:4

**responding** 42:20

**response** 15:10 41:5,9 84:7 85:1 121:7 199:13

**responsibilities** 62:4 130:12

**responsibility** 13:14 152:19

**responsible** 30:18 32:17 35:21 153:3

**responsive** 113:24

**rest** 144:22 203:5

**restate** 121:15

**restrained** 124:12

**restraining** 120:25 124:13

**restricted** 117:19,21,22 119:7,13,16,19,23 120:6, 10 127:24 128:4 131:6, 11,12,20 201:18

**restructuring** 14:12,17 16:4,25 17:2 18:16,17 37:8,10 152:22,25 153:4,
6,9 188:18

**result** 176:20 178:17

**retain** 188:11

**retained** 131:12 196:25 197:2,3

**retirement** 55:24

**return** 27:14 102:19 103:3,7,8,10,16,17 104:21 106:3 107:4 144:9 145:19 146:4,11,16 148:3 149:17

**returned** 85:9

**returns** 99:24 147:1,14

**review** 22:17 46:1 47:12, 14,21 48:2 49:2,19 95:21, 23

**reviewed** 7:9 46:7 48:7, 10,12,15 49:20 138:15,23 140:7,9

**reviewing** 24:6 50:4

**rewarded** 83:10

**ridiculous** 202:18

**rights** 10:16 60:4

**risk** 147:14

**risks** 104:10 147:1

**risky** 134:5 147:18,24

**robust** 73:6,13 76:8 86:10 89:4

**Roger** 5:15

**role** 19:1,3 27:8 32:3,14 34:2 56:16 69:3 190:14

**romanette** 93:25 96:3

**room** 7:2,5,11 22:9 23:7 24:14,18,20,23,25 25:3,5 27:18 45:8 121:23,24 122:2,4,5 137:23 138:11 183:1 190:7,9,13 191:3, 14 197:15

**roughly** 74:14 108:11 140:24,25

**round** 93:3

**rounds** 73:22 76:18

**Rubicon** 68:16,18,19 70:6,15

**rude** 43:5

**rule** 200:10

**ruled** 111:23

**rumor** 116:2

**run** 24:23 90:15 97:9,11 104:1 168:6

**résumé** 11:2,15 76:1

**S**

**Sacks** 36:7,8

**safely** 80:1

**Salary** 93:15

**sale** 12:25 32:25 33:5 40:22 53:4,11 54:1,5,12 108:8 115:11 123:6,12, 15,19 124:2,6 126:2,5,14 127:5 134:12,22 192:2,8 195:5,20 198:11 199:4

**sales** 53:14

**sample** 126:24

**San** 35:3 36:19 72:21 170:18,24 171:25 172:18, 21 173:18 174:24 177:4,5 184:6

**sat** 184:2

**satisfied** 102:18 162:8

**saved** 202:24

**Sawnie** 5:13 6:2 144:16 148:8 168:5 183:10,15 199:9 202:18 203:11

**schedule** 42:25 139:2

**scheme** 132:22 188:13

**SCHULTE** 133:20 135:3
143:14,20 148:5,18 149:3
174:18 176:17 178:23
180:19 185:8 186:2,11,17

**scope** 39:8,18

**screen** 86:19

**scroll** 9:22,25 11:9 71:23
77:18 88:18 93:14
136:18,20 138:14 157:5
164:19,21

**sec** 137:16

**seconds** 137:22

**Section** 88:23 139:1

**secu-** 187:13

**secure** 149:17

**secured** 187:13,15,25

**securities** 13:3,10,12,15,
17,19 14:2,5 115:11,12
116:1 117:23 155:1,5

**security** 116:15 117:10
124:11

**seek** 144:10

**seeking** 34:4 48:3 111:18

**Seery** 5:5,19 6:4,10,14,18,
19 10:12,21,25 11:19,23
14:24,25 37:13 39:21
40:2 46:5,17 47:1 48:23
55:13,16 60:16 61:20
63:21 64:23 71:14 78:2,
16 79:12 83:12 84:24
86:5,18 90:8 96:16 98:8,
23 102:3 112:9 113:22
114:3 129:25 130:1,17
131:2 136:19 138:16
145:9,18 148:14,24
150:12,24 152:10 158:20
164:1,6,7 168:19 176:11
183:3,9 189:6 190:3
196:25 197:21 199:11,25
201:7,21,25 202:17,24

203:3,7

**Seery's** 144:22 149:8

**select** 191:19,20

**selected** 105:12 174:10

**sell** 32:18 160:9 196:8

**sellers** 28:12 45:19,22

**selling** 19:3 53:17 155:5

**semi-suspension** 55:23

**send** 24:20,25 98:6
124:21

**sends** 41:19 124:12

**senior** 160:6

**sense** 83:9 94:6 174:20

**Sentinel** 83:21 113:15

**separate** 43:20,22 63:11
68:7 108:20,23 140:6
161:17

**September** 139:7,16

**Seri** 111:4

**series** 50:5

**serve** 17:4 69:6

**served** 14:10,12,16,20
15:6,17 16:3,8,14

**service** 68:23

**services** 133:11

**serving** 17:1,10

**set** 27:13 43:22 51:13
82:15 84:10 160:24
162:7,11 163:6,8,9
167:11

**sets** 43:20 160:20

**setting** 19:5 48:10 61:23
62:8,16 63:15 162:24

**settlement** 115:1

**setup** 85:6

**seventh** 168:20

**severance** 94:9,11

**severed** 94:10

**share** 42:12

**shared** 129:14 131:21
132:1,2,3,8 133:10

**shareholders** 193:23

**shares** 114:15 193:11
194:7,9

**sharing** 125:21

**sheet** 104:6 142:7 155:19,
20

**shift** 55:11 94:20 201:20

**shortly** 135:16

**show** 77:13 128:22
157:11 164:22

**showing** 111:21

**shows** 77:12,13

**side** 34:3,18 46:12

**Sidley** 56:10,15 168:24,25
169:2,5 179:22 188:3

**sign** 23:23,24 42:4,9 44:2
99:18 100:7 140:3
192:12,17,22 193:19,24
195:3,4,21 198:16 200:3

**sign-off** 140:7,12

**signature** 71:24 152:21
154:10

**signatures** 154:8

**signed** 23:25 24:11,12
27:22 28:6 42:16 43:8,12
45:7,11 100:2 102:14
128:21 154:8 190:8
191:10 192:10 201:16

**significant** 117:9 122:14,
22 123:2 180:15 189:8
193:23

**significantly** 82:13

**signing** 45:16,19,21 49:13

**similar** 7:22 17:10,18
35:11 69:25 96:18 122:17

**similarly** 58:17

**simple** 112:11

**simpler** 112:14

**simply** 9:20 10:2 34:10
39:18 42:24 66:7 70:8
78:6 81:7

**simultaneous** 11:17
130:9 132:17 148:16
183:21 202:7

**single** 84:11 104:21,23
126:1,13

**single-digit** 103:16 107:9

**sir** 11:6 15:11 92:12
138:23 187:8

**sit** 101:20 166:25 185:9

**sits** 30:20

**sitting** 45:13 62:8 64:3
95:7 159:23 185:4,7,9

**situation** 58:7

**size** 110:11

**skim** 77:14

**slower** 77:18 136:20

**small** 36:13 81:13,14
126:24 173:10

**social** 181:2,3 183:4,19

**socially** 181:8 183:10

**Sofia** 72:17

**softer** 95:15

**sold** 111:8

**solicit** 25:7 34:19

**solicited** 36:14

**soliciting** 33:24 60:11

**solo** 34:10,12

**somebody's** 40:5

**sort** 44:20,21 52:14
106:23 123:15 176:2

**sotto** 54:19 196:23

**sought** 24:7 79:10 111:22

**sound** 148:13

**source** 126:13 129:10

**SPE** 67:17

**speak** 65:16 66:20,25

**speaking** 6:7 11:17 21:3
130:9 132:17 148:16
183:21 202:7

**speaks** 142:15 161:21

**speci-** 52:7

**special** 162:18

**special-purpose** 67:16
68:2,8

**specialist** 146:3

**specific** 47:20 48:7 77:6
89:13 104:20 119:12
124:10 140:12 161:15,17
166:20 167:9 175:18,21
201:2

**specifically** 8:2 19:1,16,
23 24:6 48:18 53:12
70:20 73:12 88:11,17
103:14 105:11 115:10
116:5 117:15 158:25
169:19 187:5 190:13
191:7

**specificity** 177:22

**specifics** 170:7

**spectrum** 17:9,17 145:19

**speculation** 149:11

**speed** 116:5

**spent** 47:17 150:2

**spoke** 51:13 66:23 100:19

**spoken** 135:16

**spring** 80:13 98:10
110:15,17 114:5,6

**square** 179:14,16

**staff** 109:22 110:6 152:16

**stake** 114:12 118:7,9,11,
14,17,19,22

**Stancil** 5:18 6:2 7:17,18
8:8,14,17 10:13,20 14:24
15:3,9,21 16:11,17 17:21
18:6,24 19:18 20:9,24
21:5,17 22:13 26:13 29:6,
17 30:17 31:16 32:16
33:2,7 34:22 35:16 36:2
38:3,5,10,22,25 39:7,13,
22 40:19 41:1,12,23 42:7,
17 43:3,10 44:5,12 46:3,
11,14,18,24 47:15,22,24
48:4,10,15,22,25 49:2
50:16 56:6,19,22 57:3,14,
22 58:4,24 59:4,14,20
60:6,19,25 61:3,8,12,14,
16 62:13,21,24 63:8,21
66:4,9,11 75:1,7,9 76:10
77:7 80:17 81:2,11 82:4,
9,23 83:6,16 85:25 86:4,
12 87:16 96:20 97:1,5
98:12,22 100:4,18
101:11,16 102:1,8 105:4
112:12,23 115:22 116:4,
13,20,25 117:6 119:24
120:3,8 121:9 122:16,18,
23 123:8,14,21 124:4
125:1,9,13,20 126:3,16,
20,23 127:8,13,18,25
128:11,14,16,20 129:20
131:15,19,23 132:5
133:13,18,25 134:13
135:1,13 136:1,25 137:4,
10,13 138:18,22 140:5,23
141:9 142:13 143:3,21
144:14 145:24 146:7,19
147:20 148:6,17,19
149:6,10,15 150:7,16,22
151:25 153:1,8,16
156:13,20 158:11,14,17
159:9,14,25 160:18,22

161:5,9 162:1,10,14,21
163:7,18 164:2,6,8,23
165:1 166:8 167:7,13
168:2,4,9 170:1,6,12
171:1 172:23 173:12
174:16 176:16 180:1,17
181:20 183:8,15,18,22
184:10 185:21 186:1,10,
19 187:17 188:14,24
189:13 190:11,22 192:4,
9,24 195:1,14,23 196:6
198:6 199:6 202:3,8,16
203:2,12

**Stancil's** 47:8

**stand** 190:6

**stands** 60:15

**Stang** 5:21

**start** 76:2 97:25 141:11,13

**started** 56:13 142:16
170:15

**state** 5:10 6:16 10:2 65:6
127:5

**stated** 131:10 133:16
143:16 185:15,16 186:6
191:4

**statement** 89:13 100:23
101:3 114:14 185:25

**statements** 89:10

**states** 5:6,7 68:24 154:4

**stating** 10:10,14

**status** 129:2 199:4

**stave** 46:16

**stay** 197:6,15

**stayed** 169:25

**step** 137:22 184:9

**steps** 39:4 119:22 120:5,9

**Stern** 35:21 49:12,24
50:13 51:1,4,7 52:19
67:14 72:12 75:18

**Stinson** 111:17

**stock** 114:11,13 115:12,
24 118:19 119:7 193:9,14
201:17,18

**Stonehill** 18:3 21:20 22:4,
25 23:5,20 24:13,17 25:7,
11 26:4,6,7,15,17,21
27:21 28:23 29:7,21 32:7
33:4 35:15,18,20,22,24
37:22 44:2 45:21 49:13
51:1,20 59:2,6 65:22
67:3,7,23 68:7,11,12
69:9,15 70:9,11,23,24
72:12 75:14,16 90:4 97:4
98:10 102:7 104:15
105:2,5 108:9,24 109:4,
13 110:4,9 142:22 143:16
150:21 156:12,18,25
169:4,12 178:24,25
180:16 181:19 182:15
186:16,22 191:5,9,13,20
200:13,23 201:9 202:13
203:1

**Stonehill's** 26:18 105:8
180:23 181:5 182:7,9
183:1

**stop** 9:8 11:10 89:3 90:25

**stopped** 182:13

**stranger** 8:25 9:3

**Strat** 118:12,14

**strategy** 14:6

**straw** 103:15,19,21,24
104:7,17

**straw-man** 107:5

**stretch** 168:20

**strictly** 95:17

**strike** 63:19

**strings** 74:24 75:5 77:5

**structure** 67:21 78:11,14
79:5 81:16 82:15 84:11
95:2 153:25 190:15

194:18

**structured** 81:22 84:9
178:3,12,20 196:11

**studies** 16:20,23

**study** 16:24 17:8,16

**stuff** 50:10 176:2,5

**subject** 10:4,11 23:20
95:20,22 114:16 139:2
189:1

**submit** 26:24

**submitted** 47:18

**subordinated** 151:12

**Subsection** 94:19 95:10

**subsequent** 99:7,19
113:10 135:11

**subsidiaries** 114:10

**substance** 40:9 50:9 51:5
66:8

**substantive** 88:20 90:7

**subtle** 88:9

**success** 79:7,9 81:16,18,
23 85:8 94:21

**successful** 83:10 95:12

**successfully** 92:6

**suggest** 61:9 119:19
143:1 148:10 168:5

**suggesting** 77:17 85:23
103:12 107:7 129:16
133:6,9 141:6,10 168:10
186:5

**suggests** 93:25

**summaries** 164:15

**summarized** 74:18

**summary** 77:11,22,23
159:2 165:2

**supercede** 93:1

**Supplement** 136:15

**support** 194:19 195:10 196:15

**supported** 193:8

**suppose** 74:17

**supposed** 124:21 125:15, 21

**supposedly** 133:22

**surreptitious** 198:11

**survey** 184:13

**suspended** 55:21

**swear** 5:11

**sworn** 5:25 6:11

**synonym** 122:24

**system** 132:9,10

**systems** 132:10

### T

**tab** 71:10 136:5 152:5 158:10

**taking** 9:17 19:9 67:7 68:6

**talk** 25:4 31:1 41:4 50:1 55:15 66:17 108:14 115:8 124:20 167:22 170:14 171:16 175:17

**talked** 15:25 35:13 51:12 66:2 67:3 167:23 198:15

**talking** 21:1 22:2 30:7 32:12 43:11,15 55:14 64:22 86:9 179:14

**team** 68:16,17,19 70:6,14 79:22,23 81:20,23 84:13, 14,15 88:24 94:21 95:5,6, 8 107:14,15,17,22,25 130:3,11 140:9,11,14 152:20 171:2

**teams** 80:3

**teeny** 193:17

**telephone** 75:23,24 202:15

**telling** 41:17 63:9 123:18 125:14,16 164:1 194:16, 23

**tells** 157:12

**temporary** 124:13

**ten** 50:23 56:9 104:22 105:22 113:5 168:18 178:13 194:20

**ten-minute** 97:10

**tend** 191:11

**tens** 70:5

**term** 11:2 22:1 80:8 104:6 106:9 107:9 116:9,10 124:10 177:21

**terminated** 94:11,13 169:22

**terms** 16:21 17:5 30:14 59:8 67:21 74:21 85:18 87:3 105:6 106:12 167:5

**testi-** 149:10

**testified** 6:11 59:5 135:4 149:11,21 156:25 183:9 184:2 193:12

**testifying** 148:8

**testimony** 48:16 101:21 127:4 135:9 183:16 198:5

**Texas** 5:8

**text** 49:18,19,20,22,24 50:3,13,20 51:10,12 52:15 53:9 75:12,15,18, 21 135:17 202:1,12,14,25

**that'd** 182:2

**thing** 13:6 53:12 71:18 173:20 174:22

**things** 13:9 21:11 25:24 115:21 181:17 197:12

201:13

**thinking** 12:22 106:19 147:9 174:21 175:17 184:8,13

**third-party** 188:11

**thou-** 193:10

**thought** 30:4 53:21 75:17 83:17 86:8 95:16 99:11 104:3 147:23 171:5 193:25 194:12

**thousands** 70:5

**threat** 121:3

**threatening** 135:17

**threw** 142:24

**ticket** 172:6,7,12

**tied** 52:1

**tier** 90:11,12,20,21 91:2, 14 92:4,5,7,9,10,17 93:1, 3,6,8

**tiers** 78:6 85:5

**tight** 192:16 194:21

**tightly** 193:23 194:2,7

**Tim** 5:15 9:11,23 10:22 11:13 37:17 71:9,22 72:24 77:14 88:18 93:14 94:17 117:11 128:6 130:2 131:5 136:4,5,11 137:12, 18 138:6,12 141:16 152:6 158:9 164:13

**time** 5:3 7:11 8:4,8 12:8, 13 14:16 15:5,17 16:3,13, 14 18:18 22:2 26:9 34:8 35:4 37:2,6,21 39:12 42:14 43:5 47:18 48:17 50:25 61:19 66:2,8,18,23 67:2 80:14,24 83:13,20 87:1 94:7 97:15,18,24 98:24 100:2 101:6 108:9, 24 110:1,4,18 111:3 124:21 133:12 138:1,4 140:15 141:14 145:15,17

149:2 151:16 154:2 157:4
158:6 166:23 167:19,24
168:7,11,14 173:1 181:12
182:4,20 190:10,24
192:16 197:13,16,19
198:3,13 202:20 203:7,
10,14

**times** 7:20 8:7,23 49:21
74:22 92:10 93:3,9
134:15 146:25 181:22
182:1 183:18 184:21

**timetable** 166:16,20

**timing** 105:21 134:8 188:9
195:7,11,20

**today** 8:9 45:13 62:8 64:3
74:16 76:4 95:7 101:20
111:7 112:5 130:17
159:23 167:1 185:4,7,9
199:2

**Today's** 5:2

**told** 28:14,16,18,21 41:13
50:23 52:1,23 53:14
102:17 110:10,22 134:18
156:23 158:5 164:9 195:9
196:4,8,9,10 202:4

**top** 19:13 47:20 49:16
72:24 76:1 98:19 99:15
104:20 115:7 136:11
141:22 159:8,13 160:19
162:4 165:4 198:19

**topics** 124:22

**Torch** 191:25

**total** 79:20 85:6 93:11
141:19 142:3 154:17
156:10 159:4,21,22

**totally** 149:16

**touch** 50:23

**touching** 173:16

**tourist** 172:2

**Toys"r"us** 31:18,22
186:24

**track** 54:16

**trade** 118:1 147:24 149:23

**traded** 43:24 55:5 117:23,
24

**trades** 12:13 21:19 55:8

**trading** 12:8 18:9,11 19:3,
10,13,17,21,22,23 76:16

**transaction** 122:7 153:23
193:8,25 194:16,18,20,23
196:19

**transactions** 124:11

**transfer** 29:22

**transferred** 114:25

**transfers** 29:15

**transportation** 172:20

**trick** 134:16

**trip** 172:12

**TRO** 125:5 132:24 135:15

**true** 133:17

**trust** 5:14,23 6:8 17:5,6,12
30:20 57:13,18 58:1,10,
14,21 59:1,9,15,16,24,25
60:5,17 61:7 62:4,11,19
63:17 67:19 68:9 73:2,4
79:6 95:11 100:13 151:15
161:1,14,16,17 162:5,6,
12,17,23 163:10,11
190:16

**trustee** 14:10 16:8,14
17:5,10,11,18 59:7,8,10,
12 60:3,17 61:22 64:11
73:9 89:8 96:18 128:17
159:23 165:8 167:6

**trustee/chief** 73:5

**Trustwave** 111:3,4

**truth** 112:15

**turn** 138:13

**two-year** 80:21

**type** 16:24 17:16 20:21
21:2 22:9 34:7 35:11
45:7,14 68:20 74:9 85:8
89:14 104:5 147:13
174:13 181:9 185:5

**types** 106:24 107:20

**typical** 104:1 112:11
146:4

**typically** 12:8 17:17 52:14
75:8 95:18 117:22 144:10
145:21 152:18

---

## U

**U.S.** 128:17 165:8 179:16

**UBS** 40:22 44:19,20 54:3
149:22 157:3

**ultimate** 99:12

**ultimately** 14:8 25:18 26:8
43:16 100:13 162:17

**un-** 155:9

**unable** 153:22

**uncertainty** 82:1

**underneath** 151:11

**understand** 9:4,9 10:6,7,8
22:6 25:4 26:8 43:18 55:3
68:12 72:20 76:23 82:14
90:11,18 92:1,12 103:18,
22,25 106:17 114:18
115:25 124:10 135:8
145:2,13 146:1 154:5
156:1,3 159:2,15 165:21
184:23 190:4 200:16
201:25

**understanding** 18:14
30:19 62:18 63:22 67:15,
18 68:4 84:15 116:14
120:5 121:24 122:3 154:6
180:8,9 183:14 184:22
185:1 194:1

**understandings** 63:15

**understood** 43:17,18 81:7
123:11

**undertake** 16:19,24 21:3
61:21

**undertaken** 17:8 20:19,22
60:3,13,16 61:5 96:17

**undertaking** 17:19

**undertook** 17:16,18

**underwriting** 69:12

**unilaterally** 48:11

**unique** 113:2

**United** 5:6,7 68:24

**unrelated** 31:8

**unrisky** 147:24

**unsecured** 58:19 142:4,9,
19 151:7 155:9,13
156:10,19

**untrue** 100:24 101:3,4

**upcoming** 10:6

**update** 121:22 123:3
124:19

**updated** 11:14

**upfront** 105:19 106:19
107:1,6

**upside** 87:9 149:18
150:14

**upward** 147:2

---

**V**

**valuations** 190:20,24

**valued** 12:12

**values** 79:10 87:9 99:23
102:11,12 188:20

**variation** 193:13

**varies** 12:7 146:12

**vast** 156:18

**verbal** 53:9 78:14,15

**verbally** 27:5,7 85:2

**versed** 70:3

**version** 137:5,20

**Versus** 159:22

**veteran-led** 68:21

**veterans** 68:22

**vexatiousness** 112:14

**video** 5:4 97:16,19 138:2,
5 168:12,15 197:17,20
203:15

**videoconference** 77:2

**view** 21:7 53:19,20 104:10
196:18

**viewed** 79:9 123:1

**violation** 135:15

**virtual** 25:1,5 76:21,24

**virtually** 66:20 191:14

**voce** 54:19 196:23

---

**W**

**Wait** 183:22

**walk** 79:11

**wanted** 35:6 40:14,23
41:20 50:1 51:15,24
52:25 54:9 84:12,16,19
86:14 95:2,14,16,20,22
98:13 192:17,22 193:7
195:20

**waste** 22:2 39:12 202:19

**wasting** 145:15,16

**ways** 183:2

**week** 24:3,4 28:6 31:2
49:14 66:20,22 67:8,9,10
194:20 197:24

**weekend** 203:8

**weeks** 6:21 52:21,24

**well-founded** 87:10

**well-known** 194:14

**whatsoever** 31:11,17,19,
21,24 45:5

**wholly** 68:5

**widely** 126:4,6,7,9 146:12

**wife** 171:20,25 177:5

**wife's** 172:7

**Willkie** 5:19 7:19

**Winograd** 7:6

**wishing** 41:19

**witching** 188:7

**woman** 72:17 198:17

**wondering** 74:23

**woodshed** 183:13

**word** 60:20 68:6 74:5
122:13,24 123:6 139:22

**words** 123:9 150:11

**work** 24:13 46:5 79:13
102:25 191:2

**worked** 13:9 18:19 169:15
184:4

**working** 14:7 52:22 53:1
55:7 113:13 147:7 153:22

**workings** 130:21

**works** 72:22 122:25

**world** 68:22

**worst** 145:5

**worth** 83:24 100:17
156:10

**worthless** 71:4

**would've** 132:12

**wrapping** 188:6 197:11

**write** 171:17

LEXITAS

**writing** 26:2,3,5 27:6
  28:22 29:2

**written** 41:5,9 46:21 54:19
  189:17

**wrong** 125:19 142:16,17
  158:8

**wrote** 98:15

---

## Y

**year** 40:13,14 41:20 69:5
  70:22 139:10,18 140:19
  155:5 173:14 181:12,22

**year's** 69:20

**years** 18:17 35:14 36:10
  56:4,9,15 70:17 113:6
  176:23 181:16 182:2

**yesterday** 8:5,11,20
  39:17,18

**yield** 11:23 12:9

**yields** 12:7

**York** 6:25 8:20 55:23
  170:20 181:11

**you-all** 78:6

---

## Z

**Ziehl** 5:22

**zoom** 15:3 78:1 102:3

# HMIT Exhibit No. 17

007236

# HMIT Exhibit No. 18

007237

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE NORTHERN DISTRICT OF TEXAS

3    DALLAS DIVISION

4    ------------------------------)

5    In Re:                    Chapter 11

6    HIGHLAND CAPITAL          Case No.

7    MANAGEMENT, LP,           19-34054-SGJ 11

8

9         Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23

24   Reported by:
     Debra Stevens, RPR-CRR
     JOB NO. 189212
25

Page 2

```
1              January 29, 2021
2              9:00 a.m. EST
3
4       Remote Deposition of JAMES P.
5  SEERY, JR., held via Zoom
6  conference, before Debra Stevens,
7  RPR/CRR and a Notary Public of the
8  State of New York.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  REMOTE APPEARANCES:
2
3  Heller, Draper, Hayden, Patrick, & Horn
4  Attorneys for The Dugaboy Investment
5  Trust and The Get Good Trust
6       650 Poydras Street
7       New Orleans, Louisiana 70130
8
9
10 BY:   DOUGLAS DRAPER, ESQ
11
12
13 PACHULSKI STANG ZIEHL & JONES
14 For the Debtor and the Witness Herein
15      780 Third Avenue
16      New York, New York 10017
17 BY:   JOHN MORRIS, ESQ.
18      JEFFREY POMERANTZ, ESQ.
19      GREGORY DEMO, ESQ.
20      IRA KHARASCH, ESQ.
21
22
23
24           (Continued)
25
```

Page 4

```
1  REMOTE APPEARANCES:  (Continued)
2
3  LATHAM & WATKINS
4  Attorneys for UBS
5       885 Third Avenue
6       New York, New York 10022
7  BY:   SHANNON McLAUGHLIN, ESQ.
8
9  JENNER & BLOCK
10 Attorneys for Redeemer Committee of
11 Highland Crusader Fund
12      919 Third Avenue
13      New York, New York 10022
14 BY:   MARC B. HANKIN, ESQ.
15
16 SIDLEY AUSTIN
17 Attorneys for Creditors' Committee
18      2021 McKinney Avenue
19      Dallas, Texas 75201
20 BY:   PENNY REID, ESQ.
21      MATTHEW CLEMENTE, ESQ.
22      PAIGE MONTGOMERY, ESQ.
23
24           (Continued)
25
```

Page 5

```
1  REMOTE APPEARANCES:  (Continued)
2  KING & SPALDING
3  Attorneys for Highland CLO Funding, Ltd.
4       500 West 2nd Street
5       Austin, Texas 78701
6  BY:   REBECCA MATSUMURA, ESQ.
7
8  K&L GATES
9  Attorneys for Highland Capital Management
10 Fund Advisors, L.P., et al.:
11      4350 Lassiter at North Hills
12      Avenue
13      Raleigh, North Carolina 27609
14 BY:   EMILY MATHER, ESQ.
15
16 MUNSCH HARDT KOPF & HARR
17 Attorneys for Defendants Highland Capital
18 Management Fund Advisors, LP; Highland
19 Advisors, LP; Highland Income Fund;
20 NexPoint Strategic Opportunities Fund and
21 NexPoint Capital, Inc.:
22      500 N. Akard Street
23      Dallas, Texas 75201-6659
24    BY:  DAVOR RUKAVINA, ESQ.
25              (Continued)
```

Page 6

```
1   REMOTE APPEARANCES (Continued)
2
3   BONDS ELLIS EPPICH SCHAFER JONES
4   Attorneys for James Dondero,
5   Party-in-Interest
6       420 Throckmorton Street
7
8          Fort Worth, Texas 76102
9   BY:    CLAY TAYLOR, ESQ.
10          JOHN BONDS, ESQ.
11          BRYAN ASSINK, ESQ.
12
13
14  BAKER McKENZIE
15  Attorneys for Senior Employees
16       1900 North Pearl Street
17
18          Dallas, Texas 75201
19  BY:    MICHELLE HARTMANN, ESQ.
20          DEBRA DANDEREAU, ESQ.
21
22
23
24              (Continued)
25
```

Page 7

```
1   REMOTE APPEARANCES: (Continued)
2
3   WICK PHILLIPS
4   Attorneys for NexPoint Real Estate
5   Partners, NexPoint Real Estate Entities
6   and NexBank
7          100 Throckmorton Street
8             Fort Worth, Texas 76102
9   BY:    LAUREN DRAWHORN, ESQ.
10
11  ROSS & SMITH
12  Attorneys for Senior Employees, Scott
13  Ellington, Isaac Leventon, Thomas Surgent,
14  Frank Waterhouse
15       700 N. Pearl Street
16       Dallas, Texas 75201
17  BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
1
2       E X A M I N A T I O N S
3   WITNESS                     PAGE
4   JAMES SEERY
5     By Mr. Draper                 9
6     By Mr. Taylor                75
7     By Mr. Rukavina             165
8     By Mr. Draper               217
9
            E X H I B I T S
10  SEERY DYD
    EXHIBIT      DESCRIPTION      PAGE
11
    Exhibit 1   January 2021 Material    11
12
    Exhibit 2   Disclosure Statement     14
13
    Exhibit 3   Notice of Deposition     74
14
15
    INFORMATION/PRODUCTION REQUESTS
16  DESCRIPTION                    PAGE
17  Subsidiary ledger showing note    22
    component versus hard asset
18  component
19  Amount of D&O coverage for        131
    trustees
20
    Line item for D&O insurance       133
21
22          MARKED FOR RULING
            PAGE     LINE
23          85      20
24
25
```

Page 9

```
1
2          COURT REPORTER:  My name is
3   Debra Stevens, court reporter for TSG
4   Reporting and notary public of the
5   State of New York.  Due to the
6   severity of the COVID-19 pandemic and
7   following the practice of social
8   distancing, I will not be in the same
9   room with the witness but will report
10  this deposition remotely and will
11  swear the witness in remotely.  If any
12  party has any objection, please so
13  state before we proceed.
14          Whereupon,
15          J A M E S   S E E R Y,
16    having been first duly sworn/affirmed,
17    was examined and testified as follows:
18  EXAMINATION BY
19  MR. DRAPER:
20     Q.   Mr. Seery, my name is Douglas
21  Draper, representing the Dugaboy Trust.  I
22  have series of questions today in
23  connection with the 30(b) Notice that we
24  filed.  The first question I have for you,
25  have you seen the Notice of Deposition
```

Page 10

```
1              J. SEERY
2   that we sent out?
3       A.    Yes.
4       Q.    You are the person most
5   qualified to answer the areas of inquiry
6   identified in the 30(b) Deposition Notice?
7       A.    Yes.
8       Q.    And if in fact when we go
9   through this, if you are not the most
10  qualified person, I'd ask you to identify
11  who would be most qualified to provide the
12  answers.  Is that okay?
13      A.    I think I am the most qualified.
14  But if there is something I can't answer I
15  will endeavor to figure out who could.
16      Q.    Great.  Thank you very much.
17  Yesterday we were furnished by
18  Mr. Morris a new set of what I will call
19  plan analysis versus liquidation analysis.
20          MR. DRAPER:  Bryan, can you put
21      that document up?
22      Q.    Mr. Seery, can you get your
23  hands on that document?
24          THE WITNESS:  Is that in the
25      pieces you sent to me, John?
```

Page 11

```
1              J. SEERY
2          MR. MORRIS:  Yes.
3          THE WITNESS:  Do you recall
4      which one?  I will open them all.
5      It's not a big deal.
6      Q.    Bryan has put the document up
7   for you.
8          THE WITNESS:  John, I don't see
9      it in the ones you sent to me.  I can
10     see it on the screen.  I have the plan
11     of reorg, I have got the disclosure
12     statement, schedules.  I have
13     bankruptcy schedules from the filing.
14         MR. MORRIS:  Hold on one second.
15     See if it is among what I just sent
16     you.
17         (Reporter interruption.)
18         (So marked for identification as
19     Seery Exhibit 1.)
20         THE WITNESS:  Okay.  I am
21     looking at it.  It is easier to see on
22     my screen than yours.  We can do it
23     either way.
24  BY MR. DRAPER:
25      Q.    Did you prepare this document?
```

Page 12

```
1              J. SEERY
2       A.    It was prepared for me.
3       Q.    It was prepared under your
4   supervision.  Correct?
5       A.    Correct.
6       Q.    Who worked on the team?
7       A.    The team from DSI.
8       Q.    Who at DSI?
9       A.    The team working on the case.
10  It is Fred Caruso, Jack Donohue, James
11  Romey as well as counsel and myself.
12      Q.    If in fact there is a question
13  that I ask you about this document that
14  you don't know the answer, can you
15  identify for me the person --
16         (Reporter interruption.)
17      Q.    Mr. Seery, if in fact you don't
18  know an answer to a question about the
19  document, I would ask you to identify the
20  person at DSI who is most responsible for
21  the piece of information on the document.
22         MR. MORRIS:  Objection to the
23     form of the question.  He is here as
24     the 30(b)(6) witness.  We have offered
25     him as the person who is prepared to
```

Page 13

```
1              J. SEERY
2   answer the questions.  Just ask the
3   questions.  If he doesn't know
4   something, we'll decide whether or not
5   it warrants going elsewhere.  But
6   let's just move on.  It is like the
7   third time you asked him if he can
8   identify -- we don't even have
9   something that he doesn't know yet.
10      Q.    Mr. Seery, is the team that
11  prepared this document the same team that
12  prepared the November similar document
13  that is attached to the disclosure
14  statement in November?
15      A.    Largely.
16      Q.    This new document was prepared
17  to reflect information I gather that was
18  changed from November 20th of 2020 to
19  today's date?
20      A.    Yes.
21      Q.    In looking at the two
22  documents -- and I would ask you to go to
23  the disclosure statement of November 2020.
24  I think it is page 174.
25         MR. MORRIS:  Can you move it on
```

Page 14

```
1              J. SEERY
2     the screen, please?
3     A.    Page what?
4     Q.    I think it is page 174.
5     A.    Of the PDF or of the document?
6     Q.    Of the disclosure statement that
7  was filed.  It is up on the screen right
8  now.
9              COURT REPORTER:  Do you intend
10        this as another exhibit for today's
11        deposition?
12             MR. DRAPER:  We'll mark this
13        Exhibit 2.
14             (So marked for identification as
15        Seery Exhibit 2.)
16    Q.    If you look to the recovery to
17 Class 8 creditors in the November 2020
18 disclosure statement was a recovery of
19 87.44 percent?
20    A.    That actually says the percent
21 distribution to general unsecured
22 creditors was 87.44 percent.  Yes.
23    Q.    And in the new document that was
24 filed, given to us yesterday, the recovery
25 is 62.5 percent?
```

Page 15

```
1              J. SEERY
2     A.    It says the percent distribution
3  to general unsecured creditors is
4  62.14 percent.
5     Q.    Have you communicated the
6  reduced recovery to anybody prior to the
7  date -- to yesterday?
8              MR. MORRIS:  Objection to the
9        form of the question.
10    A.    I believe generally, yes.  I
11 don't know if we have a specific number,
12 but generally yes.
13    Q.    And would that be members of the
14 Creditors' Committee who you gave that
15 information to?
16    A.    Yes.
17    Q.    Did you give it to anybody other
18 than members of the Creditors' Committee?
19    A.    Yes.
20    Q.    Who?
21    A.    HarbourVest.
22    Q.    And when was that?
23    A.    Within the last two months.
24    Q.    You did not feel the need to
25 communicate the change in recovery to
```

Page 16

```
1              J. SEERY
2  anybody else?
3     A.    I said Mr. Doherty.
4     Q.    In looking at the two elements,
5  and what I have asked you to look at is
6  the claims pool.  If you look at the
7  November disclosure statement, if you look
8  down Class 8, unsecured claims?
9     A.    Yes.
10    Q.    You have 176,000 roughly?
11    A.    Million.
12    Q.    176 million.  I am sorry.  And
13 the number in the new document is 313
14 million?
15    A.    Correct.
16    Q.    What accounts for the
17 difference?
18    A.    An increase in claims.
19    Q.    When did those increases occur?
20 Were they yesterday?  A month ago?  Two
21 months ago?
22    A.    Over the last couple months.
23    Q.    So in fact over the last couple
24 months you knew in fact that the recovery
25 in the November disclosure statement was
```

Page 17

```
1              J. SEERY
2  not accurate?
3     A.    Yes.  We secretly disclosed it
4  to the Bankruptcy Court in open court
5  hearings.
6     Q.    But you never did bother to
7  calculate the reduced recovery; you just
8  increased --
9              (Reporter interruption.)
10    Q.    You just advised as to the
11 increased claims pool.  Correct?
12             MR. MORRIS:  Objection to the
13        form of the question.
14    A.    I don't understand your
15 question.
16    Q.    What I am trying to get at is,
17 as you increase the claims pool, the
18 recovery reduces.  Correct?
19    A.    No.  That is not how a fraction
20 works.
21    Q.    Well, if the denominator
22 increases, doesn't the recovery ultimately
23 decrease if --
24    A.    No.
25    Q.    -- if the numerator stays the
```

Page 18

J. SEERY

1  same?
2     A.    Now your question is correctly
3  stated.
4     Q.    Thank you.
5           Now, in connection with the
6  proceeds from the liquidation of the
7  assets in both the plan recovery and the
8  liquidation model -- and I will go back to
9  the January document that we just got.
10 Did you personally determine the estimated
11 proceeds, or that was done by the DSI
12 people?
13    A.    Can you ask your question again?
14 I am looking at two different documents so
15 I don't know what you are asking me.
16    Q.    Let's go to the January
17 document.  If you will see, in line 2,
18 where you have plan versus liquidation?
19    A.    Yes.
20    Q.    You will see in line 2 it says
21 estimated proceeds 257, and then there is
22 191?
23    A.    Yes.
24    Q.    Do you see those numbers?

Page 19

J. SEERY

1     A.    Yes.
2     Q.    Is that your number?  That is
3  the number you came up with?
4     A.    Correct.
5           MR. MORRIS:  Objection to the
6           form of the question.  It is the
7           Debtor's number.
8     Q.    Mr. Seery, what I have asked you
9  to look at is the statement of assumptions
10 in the January document, and look at
11 assumption P.  Just so I can read it, it
12 says, "See below the Class 8 estimated
13 payout schedule" and then it lists a
14 September 30, 2021 date, a March 31, 2022
15 date, and a June 30, 2022 date.  Do you
16 see that?
17    A.    I do.
18    Q.    Is that your assumption, or an
19 assumption made by DSI?
20    A.    That is my assumption.
21    Q.    That footnote P is the same note
22 that was in the November 2020 disclosure
23 statement.  Correct?
24    A.    I'd have to look.

Page 20

J. SEERY

1     Q.    Do you want to take a look?  Let
2  me tell you it is, but you can confirm
3  that.
4     A.    It appears to be, yes.
5     Q.    Now, going back to the 257,941
6  that is in the January statement?
7     A.    The second line?
8     Q.    Yes.  What percentage of that
9  are notes -- collection from notes versus
10 collection from liquidation of assets?
11    A.    The total percentage, I don't
12 recall the exact percentage off the top of
13 my head.  It includes all the demand notes
14 and the demanded note from NexPoint
15 Advisors.  So, it should be around
16 $40 million worth of value would come from
17 the notes.  Somewhere in that
18 neighborhood.
19    Q.    So roughly what we are talking
20 about when we break up the 257 is, doing
21 rough math, 210 being assets, 40 million
22 being note collection?
23    A.    Roughly, I believe.  I don't
24 have it off the top of my head but that is

Page 21

J. SEERY

1  rough numbers.  We have made demand, I
2  think it is about 40 million, 24 million
3  on NexPoint and then 8 million on HCFMA,
4  roughly.  And then somewhere around 8
5  million on Dondero, all for notes that
6  were either demanded because they were
7  able to be demanded or accelerated because
8  they were defaulted.
9     Q.    And then in the liquidation
10 analysis you have $191 million.  What
11 percentage of that is note collection
12 versus what percentage of that is
13 liquidation of assets?
14    A.    The same amount for the demanded
15 notes, and the non-demand notes are a
16 reduced amount because they are assumed to
17 be sold.
18    Q.    So that doesn't answer my
19 question.  In the 257, you had a
20 $40 million figure.  Correct?
21    A.    Approximately.
22    Q.    Do you have a $40 million figure
23 in the 191?
24    A.    I believe it does.

J. SEERY

1
2    Q.    Excuse me?
3    A.    I believe it does.
4    Q.    Is there a subsidiary ledger
5  that would tell me what is the note
6  component versus what is the hard asset
7  component?
8    A.    Yes.
9    Q.    Who has that?
10   A.    I do.
11         MR. DRAPER:  Mr. Morris, can I
12   get that document?
13         MR. MORRIS:  I will take it
14   under advisement.
15   Q.    There is also a Dugaboy note in
16  your notes that is to be sold.  Is that
17  Dugaboy note in the $40 million, or is it
18  in the hard asset monetization?
19   A.    I believe it is in the -- it is
20  to be sold, so it is not collected in
21  full.  If they default, then we would
22  accelerate that and collect that in full
23  as well.
24   Q.    That doesn't answer my question
25  unfortunately.  What I am asking you, is

J. SEERY

1
2  it in the $40 million calculation, or in
3  the $200 million number?
4    A.    It doesn't answer your question
5  because you didn't listen to my prior
6  answer.  I said that the 40 million
7  calculation was for stuff that had been
8  demanded.  I think you represent -- do you
9  represent Dugaboy?  I don't think we
10  demanded --
11   Q.    I do.  Excuse me?
12   A.    So if it wasn't demanded, it is
13  not in the hard asset calculation; it's in
14  the discounted amount.
15   Q.    Let me try to understand your
16  answer.  What you are telling me, just so
17  we are both clear, is that that Dugaboy
18  note is not in the $40 million; it is in
19  the balance of the 257?  That is a yes or
20  no answer.
21   A.    I didn't take it as a question.
22  It sounded like a statement.  I agree with
23  your statement.
24   Q.    Thank you.  So the answer is
25  yes?

J. SEERY

1
2    A.    It wasn't a question.  I agree
3  with your statement; yes.
4    Q.    Thank you.
5         Now, let's go to the
6  November 2020 schedule that we had.  If
7  you see in the line "Estimated proceeds
8  from monetization of assets," you had
9  $190 million under the plan analysis?
10   A.    Yes.
11   Q.    What percentage of that are
12  notes versus hard assets?
13   A.    The demand notes only were
14  included in the proceeds in terms of
15  recovery in full.  I don't quite
16  understand your distinction between hard
17  assets.  There is a lot of intangibles as
18  well as tangibles in the total.
19         But if we are distinguishing
20  between notes and other assets, the demand
21  notes are included in the 190.  The longer
22  dated notes are assumed to be sold.  So,
23  they are included but they are included at
24  a much lower amount.
25   Q.    Okay.  Now how much of the

J. SEERY

1
2  demand notes in the 190, Mr. Seery?
3    A.    Off the top of my head I don't
4  recall.  It is the Dondero demand notes as
5  well as the HCFMA demand notes, so it
6  should be about 15 to $20 million.
7  Somewhere in that realm.  The same as the
8  other demand notes.
9    Q.    Were the other notes, the
10  $40 million of notes that you referenced
11  in the January document, were they carried
12  at face or at discounted amount in the
13  190?
14   A.    In the 190, the ones that were
15  demand were carried at face.  The ones
16  that were long dated, which really at that
17  point I believe -- the only difference is
18  the $24-and-change-million NexPoint
19  Advisors note was at a discounted amount.
20  The others were at face.
21   Q.    What was the discount that was
22  applied to that note?
23   A.    I don't recall off the top of my
24  head.  It is pretty significant because of
25  the long dated nature of the notes.  They

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-1   Filed 12/07/23   Page 52 of 214   PageID 6794
Exhibit Exh-B-1 Part 2 of 5   Page 339 of 507

Page 26

```
 1                J. SEERY
 2    were amended without consideration a few
 3    years ago.  So, for our purposes we didn't
 4    make the assumption, which I am sure will
 5    happen, a fraudulent conveyance claim on
 6    those notes, that a fraudulent conveyance
 7    action would be brought.  We just assumed
 8    that we'd have to discount the notes
 9    heavily to sell them because nobody would
10    respect the ability of the counterparties
11    to fairly pay.
12         Q.    And the same discount was
13    applied in the liquidation analysis to
14    those notes?
15         A.    Yes.
16         Q.    Now --
17         A.    The difference -- there would be
18    a difference, though, because they would
19    pay for a while because they wouldn't want
20    to accelerate them.  So there would be
21    some collections on the notes for P and I.
22         Q.    But in fact as of January you
23    have accelerated those notes?
24         A.    Just one of them, I believe.
25         Q.    Which note was that?
```

Page 27

```
 1                J. SEERY
 2         A.    NexPoint, I said.  They
 3    defaulted on the note and we accelerated
 4    it.
 5         Q.    So there is no need to file a
 6    fraudulent conveyance suit with respect to
 7    that note.  Correct, Mr. Seery?
 8              MR. MORRIS:  Objection to the
 9         form of the question.
10         A.    Disagree.  Since it was likely
11    intentional fraud, there may be other
12    recoveries on it.  But to collect on the
13    note, no.
14         Q.    My question was with respect to
15    that note.  Since you have accelerated it,
16    you don't need to deal with the issue of
17    when it's due?
18              MR. MORRIS:  Objection to the
19         form of the question.
20         A.    That wasn't your question.  But
21    to that question, yes, I don't need to
22    deal with when it's due.
23         Q.    Let me go over certain assets.
24    I am not going to ask you for the
25    valuation of them but I am going to ask
```

Page 28

```
 1                J. SEERY
 2    you whether they are included in the asset
 3    portion of your $257 million number, all
 4    right?  Mr. Morris didn't want me to go
 5    into specific asset value, and I don't
 6    intend to do that.
 7              The first question I have for
 8    you is, the equity in Trustway Highland
 9    Holdings, is that included in the
10    $257 million number?
11         A.    There is no such entity.
12         Q.    Then I will do it in a different
13    way.  In connection with the sale of the
14    hard assets, what assets are included in
15    there specifically?
16         A.    Off the top of my head -- it is
17    all of the assets, but it includes
18    Trustway Holdings and all the value that
19    flows up from Trustway Holdings.  It
20    includes Targa and all the value that
21    flows up from Targa.  It includes CCS
22    Medical and all the value that would flow
23    to the Debtor from CCS Medical.  It
24    includes Cornerstone and all the value
25    that would flow from Cornerstone.  It
```

Page 29

```
 1                J. SEERY
 2    includes any other securities and all the
 3    value that would flow from Cornerstone.
 4    It includes HCLOF and all the value that
 5    would flow up from HCLOF.  It includes
 6    Korea and all the value that would flow up
 7    from Korea.
 8              There may be others off the top
 9    of my head.  I don't recall them.  I don't
10    have a list in front of me.
11         Q.    Now, with respect to those
12    assets, have you started the sale process
13    of those assets?
14         A.    No.  Well, each asset is
15    different.  So, the answer is, with
16    respect to any securities, we do seek to
17    sell those regularly and we do seek to
18    monetize those assets where we can
19    depending on whether there is a
20    restriction or not and whether there is
21    liquidity in the market.
22              With respect to the PE assets or
23    the companies I described -- Targa, CCS,
24    Cornerstone, JHT -- we have not --
25    Trustway.  We have not sought to sell
```

Page 30

J. SEERY

1  those assets yet.
2      Q.    In connection -- you have sold
3  one business, which Mr. Dondero and
4  Mr. Lynne raised an issue about and that
5  is the SSP sale?
6      A.    Yes.
7      Q.    How was that sale effectuated?
8      A.    What do you mean?  Cash versus
9  securities or do you want description of
10 the process?
11     Q.    The process.
12     A.    How far back would you like me
13 to start?
14     Q.    Let's start from the time -- how
15 did you obtain an offer for that asset?
16     A.    Then I can start from the
17 beginning if you like.
18     Q.    That's fine.
19     A.    When the board was installed we
20 took a review of all of the assets of the
21 company.  We met with the various teams at
22 Highland who were managing those assets,
23 including the PE team that was managing
24 SSP.  We examined the performance of SSP

Page 31

J. SEERY

1  and its conditions.  We looked at the
2  opportunity to invest in the company,
3  which we determined we didn't have the
4  ability to do, or to monetize it another
5  way or just to hold it for a better
6  market.
7      We determined with the team,
8  after advice from the PE team, that
9  investments had to be made in the company
10 in order to make it competitive and that
11 those capital investments would need to be
12 made relatively quickly.  We determined
13 with the team that the asset had a value
14 that we would like to try to receive, and
15 if we could receive that we should do so
16 because we weren't going to be able to
17 make the investments.
18     Primarily the biggest issues
19 were their ability to compete with much,
20 much larger competitors and the need to
21 deal with those competitors who were also
22 customers.  Without the investments we
23 thought that the company could be at
24 substantial risk.  Our PE team also talked

Page 32

J. SEERY

1  to the management team, who concurred with
2  that assessment.
3      We went about trying to raise
4  capital internally to try to do some of
5  the work for CapEx at the company to put
6  it in the best position to seek to
7  monetize the value over some period of
8  time -- we didn't have a fixed period.  We
9  looked at opportunities where investors
10 came and proposed bids for the company.
11 We considered them, talked to external
12 bankers, talked to the internal team and
13 determined that if we could get
14 $50 million we believed that would have
15 been fair value for the company.
16     We received numerous bids,
17 competed off a couple bids against each
18 other and ended up going with a company
19 called Race Rock.  Race Rock ultimately
20 closed the transaction with us.
21 Management concurred, management went
22 along with that transaction and we closed
23 it.
24     Q.    Will the same process in essence

Page 33

J. SEERY

1  be employed for the sale of the other
2  businesses?
3      A.    Not necessarily, no.
4      Q.    Who ran the SSP sale process?
5      A.    No one person.  We had a team of
6  people at Highland that were the PE team
7  sitting on top of it.  They worked with me
8  to drive the process.
9      Q.    Would the same PE team be
10 employed or used to sell the other
11 businesses?
12     A.    Not necessarily.
13     (Proceedings interrupted;
14 technical interruption.)
15     Q.    Mr. Seery, the only --
16     MR. MORRIS:  I am having a
17 difficult time hearing you, Douglas.
18     Q.    Mr. Seery, you only external
19 people to Highland in that process, if I
20 understand, are you, the internal board
21 and DSI.  Is that correct?
22     A.    No.
23     Q.    Am I correct in that?
24     A.    No.

Page 34

J. SEERY

1  Q.    Who else is external?
2  A.    External counsel, both
3  bankruptcy and corporate.
4  Q.    Now, the corporate counsel, were
5  they previously counsel for the business,
6  or they are new counsel that you have
7  brought in?
8        MR. MORRIS:  Objection.
9  A.    They are new counsel to the
10 business.
11 Q.    Let me ask a question.  In the
12 liquidation analysis, if a trustee was
13 appointed, couldn't the trustee use
14 Pachulski or corporate counsel to
15 facilitate a sale?
16 A.    Couldn't they?  I suppose they
17 could.  My experience is that they don't.
18 I am not sure, if they got permission from
19 the court, that they couldn't.  But
20 typically trustee counsel, in my
21 experience, gets its own counsel separate
22 from the Debtor's prior counsel.  But I
23 suppose they --
24 Q.    But what about transactional

Page 35

J. SEERY

1  counsel that had a knowledge of the
2  business?  Couldn't they use them to help
3  facilitate the sale?
4  A.    Again, I suppose they could.
5  They might need permission from the court.
6  I have not seen that done that way before,
7  but I suppose they could.
8  Q.    And in fact, in a liquidation,
9  which you are doing for these businesses,
10 a trustee could hire a third party who is
11 as capable as you and others to facilitate
12 the sale or arrange for the sale.
13 Correct?
14 A.    Well, I take issue with your
15 proposition that we are liquidating these
16 assets and it is a liquidation.  We are
17 not -- plan analysis is not a liquidation
18 analysis.  The liquidation analysis is a
19 liquidation analysis.
20 Q.    Let's not parse words.  Your
21 intention is to sell these assets on or
22 before December 2022.  Correct?
23 A.    Let's parse words.  This is a
24 deposition and you are specifically trying

Page 36

J. SEERY

1  to put certain things into a framework
2  that you would like to use later.  So, it
3  is about parsing words.
4        We have a plan that is a
5  monetization plan.  Your supposition is
6  incorrect.  We are going to manage these
7  businesses and look for opportunities to
8  monetize them when it is appropriate based
9  upon how we look at the market, what the
10 conditions are for each of the individual
11 assets and the best way to do that within
12 what we think is a reasonable time frame.
13 That is very different than a liquidation.
14 Q.    Let me ask you a question.  The
15 assumption that is made in the plan
16 analysis that you have here is that
17 everything is sold by December of 2022.
18 Correct?
19 A.    For the purposes of this
20 projection and assumptions, yes.
21 Q.    Which one of the operating
22 businesses that are here go into the trust
23 versus those retained by the reorganized
24 debtor?

Page 37

J. SEERY

1  A.    I think any of the businesses
2  that we can transfer into the trust, we
3  will do so for ease of operation.  There
4  is no requirement that we have to transfer
5  any particular ones into the trust.
6  Q.    So, which ones cannot be
7  transferred into the trust?
8  A.    None of the businesses cannot be
9  transferred into the trust.  The question
10 is with respect to underlying obligations
11 at the business, if that transfer would
12 trigger a change of control or some other
13 change in the business either with respect
14 to important contracts or financings, we
15 wouldn't make the transfer without
16 amending the agreements or putting new
17 agreements in place.
18 Q.    So, is it your testimony that
19 potentially these businesses could be
20 owned and operated for 10 years?
21 A.    Potentially, yes.
22 Q.    Isn't there a limitation on the
23 liquidation trust that you have in place
24 as to its life?

Page 38

J. SEERY

1   A.   I don't recall the specific
2   limitation on the trust.  But if there was
3   a reason to hold on to the asset, if there
4   is a limitation, we can seek an extension.
5   Q.   Let me ask a question.  With
6   respect to these businesses, the Debtor
7   merely owns an equity interest in them.
8   Correct?
9   A.   Which business?
10  Q.   The ones you have identified as
11  operating businesses earlier?
12  A.   It depends on the business.
13  Q.   Well, let me -- again, let's try
14  to be specific.  With respect to SSP, it
15  was your position that you did not need to
16  get court approval for the sale.  Correct?
17  A.   That's correct.
18  Q.   Which one of the operating
19  businesses that are here, that you have
20  identified, do you need court authority
21  for a sale?
22  MR. MORRIS:  Objection to the
23  form of the question.
24  A.   Each of the businesses will be a

Page 39

J. SEERY

1   different analysis that we'll undertake
2   with bankruptcy counsel to determine what
3   we would need depending on when it is
4   going to happen and what the restrictions
5   either under the code are or under the
6   plan.
7   Q.   Is there anything that would
8   stop you from selling these businesses if
9   the Chapter 11 went on for a year or two
10  years?
11  MR. MORRIS:  Objection to form
12  of the question.
13  A.   Is there anything that would
14  stop me?  We'd have to follow the
15  strictures of the code and the protocols,
16  but there would be no prohibition -- let
17  me finish, please.
18  There would be no prohibition
19  that I am aware of.
20  Q.   Now, in connection with your
21  differential between the liquidation of
22  what I will call the operating businesses
23  under the liquidation analysis and the
24  plan analysis, who arrived at the discount

Page 40

J. SEERY

1   or determined the discount that has been
2   placed between the two, plan analysis
3   versus liquidation analysis?
4   MR. MORRIS:  Objection to form
5   of the question.
6   A.   To which document are you
7   referring?
8   Q.   Both the June -- the January and
9   the November analysis has a different
10  estimated proceeds for monetization for
11  the plan analysis versus the liquidation
12  analysis.  Do you see that?
13  A.   Yes.
14  Q.   And there is a note under there.
15  "Assumes Chapter 7 trustee will not be
16  able to achieve the same sales proceeds as
17  Claimant trustee."
18  A.   I see that, yes.
19  Q.   Do you see that note?
20  A.   Yes.
21  Q.   Who arrived at that discount?
22  A.   I did.
23  Q.   What percentage did you use?
24  A.   Depended on the asset.  Each one

Page 41

J. SEERY

1   is different.
2   Q.   Is the discount a function of
3   capability of a trustee versus your
4   capability, or is the discount a function
5   of timing?
6   MR. MORRIS:  Objection to form.
7   A.   It could be a combination.
8   Q.   So, let's -- let me walk through
9   this.  Your plan analysis has an
10  assumption that everything is sold by
11  December 2022.  Correct?
12  A.   Correct.
13  Q.   And the valuations that you have
14  used here for the monetization assume a
15  sale between -- a sale prior to December
16  of 2022.  Correct?
17  A.   Sorry.  I don't quite understand
18  your question.
19  Q.   The 257 number, and then let's
20  take out the notes.  Let's use the 210
21  number.
22  MR. MORRIS:  Can we put the
23  document back on the screen, please?
24  Sorry, Douglas, to interrupt, but it

---

Page 42

J. SEERY

1
2    would be helpful.
3            MR. DRAPER:  That is fine, John.
4        (Pause.)
5            MR. MORRIS:  Thank you very
6    much.
7        Q.    Mr. Seery, do you see the 257?
8        A.    In the one from yesterday?
9        Q.    Yes.
10       A.    Second line, 257,941.  Yes.
11       Q.    That assumes a monetization of
12   all assets by December of 2022?
13       A.    Correct.
14       Q.    And so everything has been sold
15   by that time; correct?
16       A.    Yes.
17       Q.    So, what I am trying to get at
18   is, there is both the capability between
19   you and a trustee, and then the second
20   issue is timing.  So, what discount was
21   put on for timing, Mr. Seery, between when
22   a trustee would sell it versus when you
23   would sell it?
24           MR. MORRIS:  Objection.
25       Q.    What is the percentage you

---

Page 43

J. SEERY

1
2    applied?
3        A.    Each of the assets is different.
4        Q.    Is there a general discount that
5    you used?
6        A.    Not a general discount, no.  We
7    looked at each individual asset and went
8    through and made an assessment.
9        Q.    Did you apply a discount for
10   your capability versus the capability of a
11   trustee?
12       A.    No.
13       Q.    So a trustee would be as capable
14   as you are in monetizing these assets?
15           MR. MORRIS:  Objection to the
16       form of the question.
17       Q.    Excuse me?  The answer is?
18       A.    The answer is maybe.
19       Q.    Couldn't a trustee hire somebody
20   as capable as you are?
21           MR. MORRIS:  Objection to the
22       form of the question.
23       A.    Perhaps.
24       Q.    Sir, that is a yes or no
25   question.  Could the trustee hire somebody

---

Page 44

J. SEERY

1
2    as capable as you are?
3            MR. MORRIS:  Objection to the
4        form of the question.
5        A.    I don't know.
6        Q.    Is there anybody as capable as
7    you are?
8            MR. MORRIS:  Objection to the
9        form of the question.
10       A.    Certainly.
11       Q.    And they could be hired.
12   Correct?
13       A.    Perhaps.  I don't know.
14       Q.    And if you go back to the
15   November 2020 liquidation analysis versus
16   plan analysis, it is also the same note
17   about that a trustee would bring less, and
18   there is the same sort of discount between
19   the estimated proceeds under the plan and
20   under the liquidation analysis.
21           MR. MORRIS:  If that is a
22       question, I object.
23       Q.    Is that correct, Mr. Seery,
24   looking at the document?
25       A.    There are discounts, yes.

---

Page 45

J. SEERY

1
2        Q.    Again, the discounts are applied
3    for timing and capability?
4        A.    Yes.
5        Q.    Now, in looking at the November
6    plan analysis number of $190 million and
7    the January number of $257 million, what
8    accounts for the increase between the two
9    dates?  What assets specifically?
10       A.    There are a number of assets.
11   Firstly, the HCLOF assets are added.
12       Q.    How much are those?
13       A.    Approximately 22 and a half
14   million dollars.
15       Q.    Okay.
16       A.    Secondly, there is a significant
17   increase in the value of certain of the
18   assets over this time period.
19       Q.    Which assets, Mr. Seery?
20       A.    There are a number.  They
21   include MGM stock, they include Trustway,
22   they include Targa.
23       Q.    And what is the percentage
24   increase from November to January,
25   November of 2020 to January of 2021?

---

Page 46

J. SEERY

2    A.    Do you mean what is the

3 percentage increase from 190 to 257?

4    Q.    No.  You just identified three

5 assets.  MGM stock, we can go look at the

6 exchange and figure out what the price

7 increase is; correct?

8    A.    No.

9    Q.    Why not?  Is the MGM stock

10 publicly traded?

11    A.    Yes.  It doesn't trade on --

12    Q.    Excuse me?

13    A.    It doesn't trade on an exchange.

14    Q.    Is there a public market for the

15 MGM stock that we could calculate the

16 increase?

17    A.    There is a semipublic market;

18 yes.

19    Q.    So it is a number that is

20 readily available between the two dates?

21    A.    It's available.

22    Q.    Now, you identified Targa and

23 Trustway.  Correct?

24    A.    Yes.

25    Q.    Those are not readily available

Page 47

J. SEERY

2 markets; correct?

3    A.    No.

4    Q.    Those are operating businesses?

5    A.    Correct.

6    Q.    Who provided the valuation for

7 the November 2020 liquidation analysis?

8    A.    We use a combination of the

9 value that we get from Houlihan Lokey for

10 mark purposes and then we adjust it for

11 plan purposes.

12    Q.    And the adjustment was up or

13 down?

14    A.    When?

15    Q.    For both November and January.

16 You got a number from Houlihan Lokey.  You

17 adjusted it.  Did you adjust it up or did

18 you adjust it down?

19          MR. MORRIS:  Objection to form

20     of the question.

21    A.    I believe that for November we

22 adjusted it down, and for January we

23 adjusted it down.  I don't recall off the

24 top of my head but I believe both of them

25 were adjusted down.

Page 48

J. SEERY

2    Q.    And if I understand what you

3 just said, it is that the Houlihan Lokey

4 valuation for those two businesses showed

5 a significant increase between November of

6 2020 and January of 2021?

7          MR. MORRIS:  Objection to form

8     of the question.

9    A.    I didn't say that.

10    Q.    I am trying to account for the

11 increase between the two dates, and you

12 identified three assets.  You identified

13 MGM stock, which has, I can guess, as you

14 have said, a readily ascertainable value.

15 Then you identified two others that the

16 valuation is based upon something Houlihan

17 Lokey provided you.  Correct?

18    A.    I gave you three examples.  I

19 never said "readily."  That is your word,

20 not mine.  And I didn't say that Houlihan

21 had a significant change in their

22 valuation.

23    Q.    So let's now go back to the

24 question.  There is an increase in value

25 from November 24th of 2020 to January 28th

Page 49

J. SEERY

2 of 2021, the magnitude being roughly 60

3 some odd million dollars.  Correct?

4    A.    Correct.

5    Q.    We can account for $22 million

6 of it easily, right?

7          MR. MORRIS:  Objection to form.

8    A.    Correct.

9    Q.    That is the HarbourVest

10 settlement, so that leaves roughly

11 $40 million unaccounted for?

12          MR. MORRIS:  Objection to the

13     form of the question if that is a

14     question.  It is accounted for.

15    Q.    What makes up that difference,

16 Mr. Seery?

17    A.    A change in the plan value of

18 the assets.

19    Q.    Okay.  Which assets?  Let's sort

20 of go back to where we were.

21    A.    There are numerous assets in the

22 plan formulation.  I gave you three

23 examples of the operating businesses.  The

24 securities, I believe, have increased in

25 value since the plan, so those would go up

Page 50

J. SEERY

1  for one.  On the operating businesses, we
2  looked at each of them and made an
3  assessment based upon where the market is
4  and what we believe the values are, and we
5  have moved those valuations.
6      Q.    Let me look at some numbers
7  again.  In the liquidation analysis in
8  November of 2020, the liquidation value is
9  $149 million.  Correct?
10     A.    Yes.
11     Q.    And in the liquidation analysis
12 in January of 2021, you have $191 million?
13     A.    Yes.
14     Q.    You see that number.  So there
15 is $51 million there, right?
16     A.    No.
17     Q.    What is the difference between
18 191 and -- sorry.  My math may be a little
19 off.  What is the difference between the
20 two numbers, Mr. Seery?
21     A.    Your math is off.
22     Q.    Sorry.  It is 41 million?
23     A.    Correct.
24     Q.    $22 million of that is the

Page 51

J. SEERY

1  HarbourVest settlement, right?
2      A.    I believe that's correct.
3      Q.    Is that fair, Mr. Seery?
4      A.    I believe that is correct, yes.
5      Q.    And part of that differential
6  are publicly traded or ascertainable
7  securities.  Correct?
8      A.    Yes.
9      Q.    And basically you can get, or
10 under the plan analysis or trustee
11 analysis, if it is a marketable security
12 or where there is a market, the
13 liquidation number should be the same for
14 both.  Is that fair?
15     A.    No.
16     Q.    And why not?
17     A.    We might have a different price
18 target for a particular security than the
19 current trading value.
20     Q.    I understand that, but I mean
21 that is based upon the capability of the
22 person making the decision as to when to
23 sell.  Correct?
24         MR. MORRIS:  Objection to form

Page 52

J. SEERY

1  of the question.
2      Q.    Mr. Seery, yes or no?
3      A.    I said no.
4      Q.    What is that based on, then?
5      A.    The person's ability to assess
6  the market and timing.
7      Q.    Okay.  And again, couldn't a
8  trustee hire somebody as capable as you to
9  both, A, assess the market and, B, make a
10 determination as to when to sell?
11         MR. MORRIS:  Objection to form
12 of the question.
13     A.    I suppose a trustee could.
14     Q.    And there are better people or
15 people equally or better than you at
16 assessing a market.  Correct?
17     A.    Yes.
18         MR. MORRIS:  Objection to form
19 of the question.
20     Q.    So, again, let's go back to
21 that.  We have accounted for, out of
22 $41 million where the liquidation analysis
23 increases between the two dates,
24 $22 million of it.  That leaves

Page 53

J. SEERY

1  $18 million.  How much of that is publicly
2  traded or ascertainable assets versus
3  operating businesses?
4      A.    I don't know off the top of my
5  head the percentages.
6      Q.    All right.  The same question
7  for the plan analysis where you have the
8  differential between the November number
9  and the January number.  How much of it is
10 marketable securities versus an operating
11 business?
12     A.    I don't recall off the top of my
13 head.
14         MR. DRAPER:  Let me take a
15 few-minute break.  Can we take a
16 ten-minute break here?
17         THE WITNESS:  Sure.
18         (Recess.)
19 BY MR. DRAPER:
20     Q.    Mr. Seery, what I am going to
21 show you and what I would ask you to look
22 at is in the note E, in the statement of
23 assumptions for the November 2020
24 disclosure statement.  It discusses fixed

Page 54

J. SEERY

1   assets.  Do you see that note?
2        A.    Yes.
3        Q.    It says, "Fixed assets used in
4   the daily business operations are sold in
5   February of 2021."
6             In your November monetization,
7   did the fixed assets account for any funds
8   if you know?
9        A.    It was a minimal amount.  I
10  don't recall the specific amount.  It was
11  either 100,000 or a million or some
12  nominal amount of money.
13       Q.    Well, there is a big difference
14  between a hundred thousand and a million
15  dollars.  Do you recall what it is?
16       A.    Yes.  It is a million.  The
17  difference between zero and a million.
18  Yes.
19       Q.    And now in the January 2021
20  analysis you have them sold in June of
21  2021 for zero dollars?
22       A.    Correct.
23       Q.    See note E for the January 2021
24  document, the statement of assumptions?

Page 55

J. SEERY

1        A.    I see it, yes.
2        Q.    What accounts for both the
3   timing difference and the determination
4   that they will generate no money?
5        A.    The determination was that -- in
6   November, was that it would generate a
7   nominal amount of money.  I don't recall,
8   as I said, if it was $100,000 or a million
9   dollars.  We assumed they will be
10  transferred for zero dollars.  These are
11  the fixed assets used in the business.
12       Q.    What about the timing issue, the
13  difference between February...
14       A.    The difference between February
15  and June?
16       Q.    Yes.
17       A.    The four months.
18       Q.    No, I understand that.  What
19  accounts for the timing difference?
20       A.    The plan has been pushed back,
21  the start date.
22       Q.    And what is the new start date?
23       A.    March 1st.
24       Q.    You have made a decision that

Page 56

J. SEERY

1   there has been a change in the Debtor's
2   business ongoing and it is reflected in
3   the number of people you are going to keep
4   and how long you are going to provide
5   management services and advisory services
6   for certain CLOs.  Correct?
7             MR. MORRIS:  Objection to form
8        of the question.
9        A.    That is partially correct.
10       Q.    To address that -- and I think
11  you were asked this the other day.  In
12  your November 2020 cash flow your
13  management fees shut off after March of
14  2021.  Correct?
15       A.    I don't recall the specific
16  date, but they did shut off, yes.
17       Q.    Now, in the new report, those
18  fees don't shut off.  Correct?
19       A.    That's correct.
20       Q.    What I would ask you to do --
21  you will have to educate me now -- is look
22  at the January 2021 cash flow that you
23  have.  I think it starts on -- I don't
24  know what page.  It looks like page 3 of

Page 57

J. SEERY

1   4, a profit and loss statement for
2   Highland Capital Management LP?
3             MR. MORRIS:  Can we get that on
4        the screen?
5        Q.    The page starts "Actual
6   January 2020" and then goes on.
7             Mr. Seery, can you explain to
8   me, in looking at this document, what
9   revenue you will generate by the change in
10  your determination to keep a business or
11  things going?
12            MR. MORRIS:  Objection to the
13       form of the question?  Is this the
14       right page, Douglas?
15            MR. DRAPER:  It is the start of
16       it, yes.  I have asked him to look at
17       the document.  I need him to explain
18       to me.  I am trying to understand it.
19            MR. MORRIS:  It is fine.  I want
20       to make sure we are all on the same
21       page, literally.
22       A.    I am not sure what you are
23  asking, but the management fee line at the
24  top is the revenue line.  That shows

Page 58

**J. SEERY**

1    revenue for management fees, shared
2    service fees and other income.  Different
3    from that is the management fee line.
4        Q.    So my question is, what is the
5    new revenue that is generated between now
6    and December of 2022?
7        A.    Between now and December 2021 is
8    3.897 million.  Between now and
9    December 22nd, if you go to the next page,
10   is 6.215 million.
11       Q.    And what is the cost that you
12   are showing to generate that revenue?
13   What is the incremental cost?
14       A.    Incremental to what?
15       Q.    Well, you are going to generate
16   $6.2 million.  Correct?
17       A.    Correct.
18       Q.    That doesn't come in without
19   some cost attributable to it, true?
20       A.    The management fee line will
21   generate $6.2 million in revenue.  The
22   total --
23       Q.    I understand that.  I understand
24   the revenue side.  That is the --

Page 59

**J. SEERY**

1        A.    Hold on.  Mr. Draper, let's be
2    precise about things.  You just said the
3    revenue will be 6.2.  That is not true.
4    The revenue is 8.269.  The management fee
5    revenue is 6.2.
6        Q.    All right.  So the total revenue
7    from your change is $8.2 million.
8    Correct?
9        A.    No.
10       MR. MORRIS:  Objection to form
11   of the question.
12       Q.    That is why I am asking you to
13   explain the document to me, Mr. Seery.
14   How much additional revenue will you
15   generate from your change in plans from
16   November of 2020 to January of 2021?  I am
17   not asking for the revenue you generate
18   during that period.  But you have made a
19   change in what the business -- what you
20   are going to do going forward to generate
21   this $8.269 million.  Correct?
22       A.    Correct.
23       Q.    Now, tell me what the cost of
24   generating the $8.269 million is.

Page 60

**J. SEERY**

1        A.    The total costs are the
2    operating expenses.  Those are
3    $38 million.
4        Q.    Okay.  But in that $38 million
5    there is professional fees for Pachulski.
6    There are other costs, correct?  What of
7    the $38 million in costs are attributable
8    to the change in business going forward?
9        MR. MORRIS:  Objection to the
10   form of the question.
11       A.    I don't understand what you are
12   asking.  Maybe I could explain the model
13   to you just generally, or you could ask me
14   a question that makes sense.
15       Q.    I am sorry for asking you
16   questions that don't make sense for two
17   hours.  I apologize for that.
18       A.    You are putting in "change" and
19   then you have only one thing up on the
20   screen.  Are you trying to trick me, or
21   are you trying to learn what is in the
22   model?
23       Q.    I am trying to learn what is on
24   the model.

Page 61

**J. SEERY**

1        A.    Then let's put the two pieces up
2    next to each other and then we can do a
3    comparison.
4        Q.    Let's do a comparison.
5        Mr. Seery, take your
6    January 2021 document and tell me where
7    the costs are on that document associated
8    with generating the $8.269 million other
9    than professional fees that were
10   previously in your November model.  What
11   are the new costs that are attributable to
12   generating the $8.269 million?
13       A.    Now, the previous total
14   revenue -- I think we have only one piece
15   of that up from the last one through '21.
16   I don't see the '22 piece from your prior
17   document.  So if you are looking at just
18   the management fee line, the management
19   fee line is increased by the revenues from
20   the CLOs, and that basically all of that
21   difference is from the CLOs.
22       Q.    I got that part.  I am looking
23   at the expense side of the ledger.  What
24   is it going to cost you to generate solely

Page 62

J. SEERY

1  the $8.269 million?  What on this sheet
2  tells me what those costs are?
3       MR. MORRIS:  Objection to form.
4       Q.    Or on some other page on this
5  sheet, so that I am not tricking you.
6  Look at the whole document and tell me
7  where those costs are.
8       A.    They are in the total expense
9  line.
10      Q.    All right.  Let's sort of parse
11  our way through this a little, so possibly
12  again this may give you some assistance.
13           If you look at the assumptions
14  that you made, and let me get this in
15  front of you.
16      A.    I am working off the document.
17  I can see the whole document because
18  Mr. Morris forwarded it to me.  I am
19  working off that document because the Zoom
20  document is too blurry.
21      Q.    If I remember correctly, there
22  is a note, and I am trying to find it, in
23  the January 2021 document that says you
24  are going to keep ten people.  Do you

Page 63

J. SEERY

1  recall that?
2       A.    That's about the right number.
3  If you can point me to the note that would
4  be helpful.
5       Q.    I am trying to find it.  And in
6  the prior document in November you said
7  you were going to keep three people.
8       A.    I don't see it in front of me,
9  but if that is what you represent, I think
10  that that was a base assumption, yes.
11      Q.    So what I am trying to get at
12  is, to generate the $8.6 million that you
13  were previously not going to get in
14  November of 2020, what is the cost to
15  generate the $8.6 million?  What on this
16  sheet in January 2021 tells me that cost?
17      A.    Again, it is --
18      Q.    And I am only focusing on --
19      A.    It is the $6.2 million.
20      Q.    No, I am focusing on what you
21  pointed out is 8 point something million
22  dollars?
23      A.    That is the total amount.
24  Before you were asking me for the

Page 64

J. SEERY

1  difference.
2       Q.    No, I am not, Mr. Seery.  I am
3  asking you for the cost side of the
4  ledger.  What on this document tells me
5  the costs to generate that additional
6  income?
7       A.    The operating expenses.
8       Q.    So you are telling me that it is
9  beneficial to spend $30 million to
10  generate an additional $8 million of
11  revenue?
12      A.    That is not what you are asking
13  me.
14           MR. MORRIS:  Objection to form.
15      Q.    Let's start all over again.  We
16  now know that your item in January of 2021
17  shows $8.2 million of additional revenue
18  that was not reflected on the November
19  document.  Correct?
20      A.    Incorrect.
21      Q.    All that revenue is reflected in
22  the November document?
23      A.    No, it is not.
24      Q.    What additional revenue is

Page 65

J. SEERY

1  reflected in January that was not
2  reflected in November for this change of
3  managing the CLOs and for the shared
4  services or whatever?  The revenue items
5  that are now in January that were not in
6  November.
7           I realize you are exasperated
8  and so am I, so let's sort of try to work
9  our way through this.
10      A.    I will object to the form.
11  There is about eleven questions there.
12           MR. MORRIS:  Thank you.
13      Q.    No, there are comments.  Let's
14  sort of get to where we get to so I
15  understand this.
16           Please explain to me what the
17  cost is for generating the $8.2 million.
18  If your answer is it is going to cost you
19  $30 million to do it, fine; that's your
20  answer.
21      A.    The total expenses to generate
22  the total 8.2 are $38,849,000.
23      Q.    Okay.
24      A.    Those are the operating

Page 66

J. SEERY

1
2  expenses.
3      Q.    That would not be incurred but
4  for keeping these services available and
5  managing the CLOs?
6      A.    That is not what I said.  Is
7  that a question?
8      Q.    I am trying to understand what
9  you said.  I am trying to get to -- just
10 understand.  If you focus on that revenue
11 generation, the $8.2 million, what are
12 your costs associated with that?
13         MR. MORRIS:  Objection.  Asked
14     and answered.
15     Q.    Just that piece.
16         MR. MORRIS:  Objection.
17     A.    $38,249,000.
18         MR. MORRIS:  Which he said now
19     about three, four or five times.  It
20     has been answered.  You actually said,
21     "If that's your answer, it's okay."
22     He actually said that answer and yet
23     you persist.
24         MR. DRAPER:  That is fine.  I
25     will let him stand with that answer.

Page 67

J. SEERY

1
2      Q.    Let me walk you to page 28 of
3  your disclosure statement and try to
4  understand what you are saying here and
5  try to parse some numbers into that.  This
6  is the November disclosure statement.
7         MR. DRAPER:  Page 28.
8      Q.    Let me read you the statement
9  while it is coming up on the screen.  What
10 you are trying to address here is the drop
11 in value of the assets of the Debtor from
12 when it started to this date, and you say,
13 "The drop in value of the Debtor's assets
14 and assets under management was caused in
15 part by COVID-19 global pandemic.
16 Specifically the decline was the result
17 of, among other things, the drop in value
18 of the Debtor's assets generally, the loss
19 in value in the prime accounts discussed
20 below, the professional and other costs
21 associated with Chapter 11 case and the
22 reserve of approximately $59 million
23 against a loan receivable listed as an
24 asset."
25         So, what I can glean from this

Page 68

J. SEERY

1
2  is the $59 million reserve is the Hunter
3  Mountain receivable.  Correct?
4      A.    Yes.
5      Q.    And a portion of it, I gather
6  $30 million, is the Jefferies margin call.
7  Is that also correct?
8      A.    Well, a portion of it would be
9  the paydown of the Jefferies margin loan
10 in the internal account, which was about
11 $30 million.
12     Q.    Right.  So, that both reduced
13 the assets and reduced the liabilities;
14 correct?
15     A.    It would reduce both -- I don't
16 know if the liabilities are listed there.
17 I am only seeing assets.
18     Q.    I understand that.  But when you
19 make a paydown it reduces both sides of
20 the ledger?
21     A.    It would if they were
22 incorporated, yes.  I am only -- you are
23 only showing me assets.
24     Q.    I understand that.  Now, I
25 gather the rest of the loss of value is a

Page 69

J. SEERY

1
2  function of COVID-19?
3      A.    COVID-19 is an overall overlay,
4  but there is very specific reasons that
5  value was lost.
6      Q.    Can you identify them for me and
7  in which businesses?
8      A.    Sure.  Approximately 58 million,
9  as we talked about, was related to the
10 Hunter Mountain note.  This is a tax
11 scheme note that we don't know if it is
12 collectible and we don't know if it might
13 lead to some kind of tax fraud liability.
14         Fifty-four million was the
15 equity lost by Mr. Dondero's trading in
16 the select equity account.  He lost
17 $54 million in that account.
18         Thirty-six, roughly -- maybe
19 that is through December, but 35 or
20 $36 million were the costs through this
21 period, right in that neighborhood to my
22 recollection.
23         About 30 million was the
24 aforementioned Jefferies loan in the
25 internal account, which was the margin

Page 70

J. SEERY

1  loan that had to be paid down due to
2  margin calls.  Again, disastrous trading
3  by Mr. Dondero.  In addition, he lost
4  $25 million in equity in that account.
5  For those playing at home, that is close
6  to $100 million.
7        Ten million --
8     Q.    So --
9     A.    I am not done.  $10 million
10  approximately lost in the Carey Limousine
11  loan.  That was primarily just COVID
12  driven.  And about $7 million lost in a
13  position called NexPoint Hospitality
14  Trust.  This is a -- it's -- it's even
15  hard to explain it out loud and not sound
16  humorous.
17        It's a highly levered U.S.
18  hospitality REIT that Mr. Dondero put
19  together that was listed on the TSX, has
20  no liquidity and may be worth zero.  I
21  think that's about 225 million, roughly,
22  which I think equals the delta between the
23  two columns.
24     Q.    The trades you talked about

Page 71

J. SEERY

1  where a loss took place, what is the date
2  for those trades?
3     A.    They are from the petition date
4  to approximately mid-March when Jefferies
5  seized the select account and I took over
6  the internal account.
7     Q.    No, I am not talking about the
8  Jefferies issue.  I am talking about the
9  Dondero trades that you referenced before.
10  Those were made between the petition date
11  and March?
12     A.    The losses in the account were
13  generated between the petition date and
14  March, yes.
15     Q.    You were talking about some
16  trades Mr. Dondero made.  What I am trying
17  to ascertain --
18     A.    The trading in the account.
19     Q.    Okay.  He had sole control over
20  those accounts for that period?
21     A.    Yes.  Well, he had sole -- sole
22  control is different.  He had portfolio
23  management responsibility.
24     Q.    And you have seen direct

Page 72

J. SEERY

1  instruction from him to make those trades
2  that were detrimental?
3     A.    He didn't meet the margin calls.
4  He laid out a completely margined account.
5  He refused to meet it.  He had personal
6  discussions with Steve Handler, the
7  president of Jefferies, begging him to
8  extend additional margin.  He thought he
9  had the ability to keep doing that.
10  Unfortunately, Jefferies did not think the
11  same thing.
12     Q.    But the --
13     A.    He --
14        (Inaudible cross-talk.)
15     Q.    Let me go back.  The Jefferies
16  issue both reduced the assets of the
17  Debtor but also reduced the liabilities of
18  the Debtor to Jefferies.  Correct?
19     A.    It would, yes.
20     Q.    Has any D&O claim been made by
21  the Debtor with respect to officers and
22  directors of the Debtor?
23        MR. MORRIS:  Objection to the
24     form of the question.

Page 73

J. SEERY

1     A.    Not yet, no.
2        (Reporter interruption.)
3     Q.    There has been?
4     A.    Not yet, no.
5        MR. DRAPER:  I think Mr. Morris
6     said yes.
7        MR. MORRIS:  Yes, in response to
8     the court reporter's question as to
9     whether or not there was an objection.
10     Q.    Mr. Seery, have you looked to
11  see whether the policies that are in place
12  are claims-made policies?
13        MR. MORRIS:  Objection to the
14     form of the question.
15     A.    In connection with?
16     Q.    Directors and officers claims.
17     A.    We have looked at the policy,
18  yes.
19     Q.    Do you know if they are claims
20  made or some other type of policy?
21        MR. MORRIS:  Objection to the
22     form of the question.
23     A.    Which policy?
24     Q.    The directors and officers

Page 74

J. SEERY

1  policies.  Are there one or more?
2      A.    There is more.
3      Q.    Are they all claims made, or are
4  they all different types of policies?
5      A.    I believe they are different
6  types.  Each one is slightly different.
7          MR. DRAPER:  I think I have
8      nothing further.  Let me, for purposes
9      of the record, be clear on the
10     documents that are introduced and the
11     document numbers.
12         Document 1 is the January 2021
13     material that we received.  I think it
14     is ten pages in length.
15         I think Document 2 is the
16     disclosure statement.  I believe that
17     is Exhibit 2.  I don't think I used
18     anything else looking at my notes.
19         Let me introduce as Document 3
20     my Notice of Deposition, which I have
21     not introduced but Mr. Seery
22     identified, and I will pass the
23     witness.
24         (So marked for identification as

Page 75

J. SEERY

1      Seery DYD Exhibit 3.)
2  EXAMINATION BY
3  MR. TAYLOR:
4      Q.    Mr. Seery, my name is Clay
5  Taylor.  I represent Mr. Dondero in this
6  matter.  I appreciate your time this
7  morning.  I will attempt to be brief. And
8  I will also attempt to not cover ground
9  that has already been covered but, of
10 course, I do indeed have an outline and
11 Mr. Draper kind of cut and pasted a lot of
12 mine so it is a little cut up.  I will
13 attempt to keep a flow of questioning so
14 we can make this brief.
15         If you don't understand
16 anything, of course, ask me to repeat it
17 and I will do my best to do so.
18         Let's, first of all, just talk
19 about when I say liquidation analysis, we
20 are going to be talking about both of
21 them, just like you did with Mr. Draper.
22 I will use the nomenclature the
23 "disclosure statement analysis" and then
24 the "updated liquidation analysis" to

Page 76

J. SEERY

1  differentiate between the November and the
2  recently produced, last night, updated
3  financials or liquidation analysis.  Is
4  that clear to you?
5      A.    It would be easier if we just
6  used "November" and "January."
7      Q.    Okay.  I will attempt to use
8  that.
9      A.    Thank you.
10     Q.    I believe you testified that
11 both the November and January liquidation
12 analysis was prepared for you by DSI, and
13 you and the legal team reviewed it before
14 it was published.  Is that correct?
15     A.    At my direction.  I think that's
16 close to correct.  But, yes, we did review
17 it before it was published and I was
18 involved in the actual production of it.
19     Q.    I believe you have testified
20 that there are indeed roll-ups behind
21 these documents.  Is that correct?
22     A.    That's correct, yes.
23     Q.    Who provided the assumptions
24 that were used in both analyses?

Page 77

J. SEERY

1      A.    I did.
2          MR. MORRIS:  Objection to form
3      of the question.
4      Q.    What is an assumption for
5  purposes of an expert report or analysis?
6          MR. MORRIS:  Objection to the
7      form of the question.
8      A.    For purposes of this disclosure
9  statement, these are certain of the bases
10 that we assume in order to put forth our
11 projections.  They are just that.  They
12 set a base --
13     Q.    Sorry.
14         MR. TAYLOR:  Mr. Draper, I
15     believe you were trying to say
16     something?  Were you trying to make an
17     objection?
18         MR. DRAPER:  Sorry.  I thought I
19     had it on mute.  I apologize.
20         MR. MORRIS:  We have interrupted
21     the witness now.
22         (Record read.)
23         THE WITNESS:  They set a base
24     that we rely on in order to project

Page 78

```
 1                J. SEERY
 2    the performance of the company for the
 3    two years following exit.
 4        Q.    And the financial projections
 5    that are used in both the November and
 6    January liquidation analysis are
 7    projections that are made jointly by you
 8    and the DSI team.  Correct?
 9        MR. MORRIS:  Objection to the
10        form of the question.  It is presented
11        by the Debtor.
12        A.    In the liquidation analysis we
13    don't -- we use a model up to a particular
14    point and then we liquidate it.  So the
15    projections which go forward for the
16    period really apply more to the plan
17    analysis.  There are certain assumptions
18    that are different for the liquidation
19    than they are for the plan.  Among the
20    most obvious is that the plan goes out
21    while the liquidation does not.
22        MR. TAYLOR:  Bryan, could you go
23        ahead and pull up the November
24        liquidation analysis, the very first
25        page, the disclaimers.
```

Page 79

```
 1                J. SEERY
 2        THE WITNESS:  Is this the same
 3        document Mr. Draper used?
 4        MR. TAYLOR:  That is correct.
 5        THE WITNESS:  It is a little
 6        hard to see on the screen.
 7        MR. TAYLOR:  Bryan, can you blow
 8        that up so Mr. Seery can see it a
 9        little better?
10        Q.    Is that better, Mr. Seery?
11        A.    Yes.
12        Q.    Correct me if I am reading this
13    incorrectly but it says, "These
14    projections have been prepared by DSI with
15    input from management at the company."
16    Correct?
17        A.    Correct.
18        Q.    This statement also says that it
19    includes "statements, estimates and
20    forecasts provided by the company with
21    respect to the company's anticipated
22    future performance."  Is that correct?
23        A.    That is what it says, yes.
24        Q.    You agree with me, would you
25    not, that these estimates contain a lot of
```

Page 80

```
 1                J. SEERY
 2    subjective judgment and analysis.
 3    Correct?
 4        MR. MORRIS:  Objection to form.
 5        A.    That is what it says, yes.
 6        Q.    Well, would you agree with what
 7    it says?
 8        A.    Yes, I do.
 9        Q.    Would you agree that they may or
10    may not prove to be accurate or correct?
11        A.    That is correct, yes.
12        Q.    And it not only states that, but
13    you believe that to be true.  Correct?
14        A.    Yes.
15        Q.    You also agree with the next
16    statement that "there can be no assurance
17    that these statements, estimates and
18    forecasts will be attained."  Correct?
19        A.    A weird statement there.  You
20    fell apart at the end of your question.
21        Q.    Sorry about that.
22            Would you agree with the
23    statement that "there can be no assurance
24    that these statements, estimates and
25    forecasts will be attained"?
```

Page 81

```
 1                J. SEERY
 2        A.    It is slightly inartfully
 3    worded, but past performance is not a
 4    predictor or assurance of future
 5    performance.
 6        Q.    You would agree, would you not,
 7    that actual outcomes and results may
 8    differ materially from what is estimated
 9    in this document.  Correct?
10        A.    Correct.
11        Q.    I believe in this document it
12    says management may update but DSI has no
13    duty to do so.  Correct?
14        A.    Yes.
15        Q.    But DSI did indeed participate
16    in updating the January liquidation
17    analysis.  Is that correct?
18        A.    That's correct, yes.
19        Q.    And just to be clear, it was not
20    prepared in accordance with SEC
21    regulations or GAAP.  Correct?
22        A.    That's correct.
23        Q.    I believe you testified that you
24    made the assumptions that were
25    incorporated within these analyses?
```

Page 82

J. SEERY

1  A.    Yes.

2  Q.    Why did you change track on
3  selling the fixed assets for some amount
4  of money versus now zero from the November
5  to the January?

6  A.    I wouldn't describe that as a
7  change of track.  There is a change in
8  timing.  We didn't think they were -- I
9  don't think and I don't think anyone else
10 on the team thinks that they are worth a
11 ton other than to the users.  In place for
12 use, they are worth quite a bit.  Our
13 assumption is that they are not going to
14 have material value to the estate other
15 than to help facilitate a deal if we can
16 get one.  If we can't, then we don't think
17 they are worth very much.

18 Q.    Just so I understand what you
19 mean by fixed assets, I am assuming that
20 means the desks, the chairs, the
21 computers, the shelving and items such as
22 that.  Is that a correct assumption?

23 A.    Yes.

24 Q.    Is there anything else in that

Page 83

J. SEERY

1  asset category that I am missing?  Any
2  material items?

3  A.    Not that we considered.  The
4  only thing that may have value beyond that
5  that we haven't considered, at least off
6  the top of my head, would be art.  There
7  is not a lot of great art in the office
8  but we have not made an assessment of that
9  value.

10 Q.    I believe, in the November
11 assumptions, there was an assumption made
12 that all management, advisory or shared
13 service contracts are terminated by their
14 effective date and all accruals or bonuses
15 would be reversed and not paid.  Is that
16 correct?

17 A.    Correct.

18 Q.    Later in the January analysis, I
19 believe that wording was changed just a
20 little bit and it says, "Highland bonus
21 plan has been terminated in accordance
22 with its terms" --

23 (Reporter interruption.)

24 Q.    The wording changed slightly.

Page 84

J. SEERY

1  It says, "All management advisory or
2  shared service contracts are terminated on
3  their terms" -- sorry.  I misspoke to the
4  reporter and to you.  It's assumption F.

5  "Highland bonus plan has been
6  terminated in accordance with its terms."
7  That is slightly different wording.  Why
8  did that wording change?

9  A.    The facts changed.

10 Q.    Could you explain to me in a
11 little more detail of what facts changed?

12 A.    The Highland bonus plan has been
13 terminated in accordance with its terms.

14 Q.    And previously that was
15 incorrect?

16 A.    That's correct.

17 MR. MORRIS:  Objection to the
18 form of the question.

19 Q.    When did that fact come into
20 being that you were able to make that
21 change?

22 A.    Within the last month.  In fact,
23 we had a retention bankruptcy curb plan
24 approved by the court which we substituted

Page 85

J. SEERY

1  for part of that plan, and we explained it
2  in detail in that motion in the court.

3  Q.    Are you aware that there is a
4  disagreement between Highland and
5  Mr. Dondero as to the amount of employee
6  claims that are due and payable?

7  MR. MORRIS:  Objection to form
8  of the question.

9  A.    Not a good faith disagreement,
10 no.

11 Q.    Thank you for that answer, and I
12 appreciate that.  I believe the question
13 was, is there a disagreement between
14 Mr. Dondero and Highland as to the amount
15 payable to employees?

16 A.    I don't know.

17 Q.    Did counsel not inform you of
18 that disagreement?

19 MR. MORRIS:  Objection to form
20 of the question.  Don't answer.

21 Q.    Are you aware that Mr. Dondero
22 believes that Highland owes employees
23 approximately $35 million?

24 A.    I don't believe that to be true

Page 86

J. SEERY

1  for an instant.
2  Q.   You don't believe that
3  Mr. Dondero contends that?
4  A.   No; I don't believe he believes
5  that.  You didn't ask me if he contends
6  it.  You asked me if he believes it.  I
7  don't believe he believes that for a
8  second.
9  Q.   So you are testifying that you
10 are able to ascertain what Mr. Dondero
11 believes?
12 MR. MORRIS:  Objection.
13 A.   You asked me if I believe it.  I
14 said I don't believe he believes it.  I
15 don't believe he believes it for a second.
16 Q.   You understand that Mr. Dondero
17 contends that the employees are owed
18 $35 million?
19 A.   I don't know the amount he now
20 contends to try to fabricate.  I do not
21 know that amount.
22 Q.   The litigation cost budget is
23 $6.5 million.  Can you give me an
24 approximate breakdown of where that number

Page 87

J. SEERY

1  comes from?
2  MR. MORRIS:  Objection to form
3  of the question.
4  A.   The number comes from a
5  negotiation with the committee.
6  Q.   And is that largely for
7  professional fees?
8  A.   I believe so, yes.
9  Q.   In your November liquidation
10 analysis I believe that you estimated that
11 HarbourVest and UBS would have zero
12 dollars' worth of claims to pay those
13 creditors.  Is that correct?
14 A.   That's correct, yes.
15 Q.   Is that true in your January
16 projections?
17 A.   "True" is not an appropriate
18 word.  But it is not contained in our
19 January projections.
20 Q.   What is contained for those two
21 creditors in the January projections?
22 A.   The actual settled amount with
23 HarbourVest and $94.8 million for UBS,
24 which is the estimated amount.

Page 88

J. SEERY

1  Q.   Sorry.  You said $94 million for
2  HarbourVest?
3  A.   No.  I said the actual settled
4  amount for HarbourVest.
5  Q.   And did you state an amount for
6  UBS?
7  A.   I said 94.8 million.
8  Q.   I am sorry.  So HarbourVest is
9  how much?
10 A.   It is in the assumption,
11 counselor.  Line M, $45 million is the
12 actual settled amount.
13 Q.   And what about UBS?
14 A.   It is in the assumption,
15 counselor.  $94.8 million for UBS.
16 Q.   So the previous amounts of zero
17 from November to January turned out to be
18 materially incorrect?
19 MR. MORRIS:  Objection to the
20 form of the question.  The judge made
21 a ruling.
22 A.   The projections changed based
23 upon the change in the facts.
24 Q.   Would you agree that

Page 89

J. SEERY

1  $140 million worth of change is a material
2  difference?
3  A.   Versus what?
4  MR. MORRIS:  Objection to form
5  of the question.
6  Q.   Do you believe that an
7  additional $140 million worth of claims,
8  approximately, is a material change?
9  A.   From what?
10 Q.   From November to January in
11 performing a liquidation analysis, do you
12 believe that an increased pool of at least
13 $140 million is a material change?
14 A.   Yes.  I think $140 million
15 changing the claims pool number is a
16 material change in the claims pool number.
17 Yes.
18 Q.   Has Highland resolicited votes
19 due to that material change?
20 A.   I don't believe we resolicited
21 votes at all, no.
22 Q.   Did you estimate in your
23 November liquidation analysis what Acis's
24 claim was going to be?

Page 90

J. SEERY

```
1                 J. SEERY
2       A.    I believe it is included, the
3  claim amount, yes.
4       Q.    Do you remember what that number
5  was?
6       A.    I don't recall the exact number.
7  It is approximately $24 million.
8       Q.    And did that number change from
9  November to January?
10      A.    I don't believe it did.
11      Q.    And the only way to be able to
12  tell that from one version to the other
13  would be to view the roll-ups.  Is that
14  correct?
15      A.    That is incorrect.
16            MR. MORRIS:  Objection to form
17  of the question.
18      Q.    How would one ascertain that?
19      A.    It would be in the assumptions.
20      Q.    There is no assumption here
21  either as to Acis.  Is that correct or did
22  I miss something?
23      A.    There is no change in the
24  assumptions.  I think you missed
25  something.
```

Page 91

J. SEERY

```
1                 J. SEERY
2       Q.    Is Acis mentioned in the
3  assumption?
4       A.    I don't believe it is mentioned
5  in the assumption.
6       Q.    Let's talk about the prior
7  sales.  Most recently I believe you
8  testified briefly about the sale of SSP,
9  subsidiary of Trustway.  Correct?
10      A.    Indirect subsidiary of Trustway
11  Holdings.  Yes.
12      Q.    What do they do?
13      A.    Make structural steel products
14  for highway construction.
15      Q.    Are you familiar with who the
16  major suppliers, competitors, vendors and
17  creditors are of that company?
18      A.    Some of them, yes.
19      Q.    And you previously testified --
20  we don't have to go through it -- how that
21  sale came about.  I believe you did not
22  employ a broker to do that sale.  Is that
23  correct?
24      A.    That's correct.
25      Q.    Did you ever prepare any teasers
```

Page 92

J. SEERY

```
1                 J. SEERY
2  for this sale?
3       A.    No.
4       Q.    Did you ever do any mailouts to
5  try to solicit interest regarding that
6  sale?
7       A.    No.
8       Q.    Any email blasts?
9       A.    No.
10      Q.    Did you prepare any marketing
11  materials for the sale?
12      A.    Prepared a data room; yes.
13      Q.    And how did you solicit people
14  to come look at this data room?
15      A.    We talked to those who had prior
16  interest and we received inquiry from a
17  number who had interest.
18      Q.    If I am understanding you
19  correctly, other than those expressions or
20  prior expressions of interest, you did not
21  attempt to create an additional market.
22  Is that correct?
23      A.    In addition to the prior --
24  those who had prior interest and the ones
25  who inquired, we did not attempt to create
```

Page 93

J. SEERY

```
1                 J. SEERY
2  a new market; no.
3       Q.    Did you notify the major
4  suppliers, competitors, vendors and
5  creditors of SSP of this potential offer?
6       A.    The question is extremely
7  compound.
8       Q.    Do you not understand it?
9       A.    It's not answerable in one word.
10  The answer is sometimes; yes.
11      Q.    The answer is sometimes you
12  contacted major suppliers, competitors,
13  vendors and creditors of SSP?
14      A.    Some of those, yes.
15      Q.    How did you determine which ones
16  to contact?
17      A.    The ones who had prior interest.
18      Q.    Do you not think it would have
19  been a good idea to contact those that
20  might not have expressed an interest or
21  reached out to Trustway or SSP about it
22  but might have an interest if contacted?
23      A.    No, I do not think it would have
24  been a good idea.
25      Q.    And why is that?
```

Page 94

J. SEERY

2    A.    Because contacting your
3  suppliers or your competitors that you are
4  for sale is not always a good idea when
5  you are bidding for contracts using those
6  suppliers or competing against those
7  competitors.
8    Q.    Did you obtain non-disclosure
9  agreements or confidentiality agreements
10  from parties that were conducting due
11  diligence?
12    A.    Yes.
13    Q.    How many prior expressions of
14  interest had you had before deciding to
15  conduct the sale?
16        MR. MORRIS:  Objection to form
17    of the question.
18    A.    I believe it was four or five.
19    Q.    Ultimately how many NDAs did you
20  receive?
21    A.    I don't recall.
22    Q.    Less than five?
23    A.    I think it would be less than
24  five.
25    Q.    But more than one?

Page 95

J. SEERY

2    A.    Yes.
3    Q.    So somewhere between -- it is
4  either two, three or four then.  Is that
5  correct?
6    A.    Five or less; more than one.
7    Q.    Who came up with the valuation
8  target price for SSP?
9        MR. MORRIS:  Objection to form
10    of the question.
11    A.    There wasn't necessarily a
12  target price.  There was an argue around
13  value, which was determined with the PE
14  team and myself.
15    Q.    Did you employ any outside party
16  to vet that valuation?
17    A.    No.
18    Q.    Did you obtain a fairness
19  opinion?
20    A.    No.
21    Q.    Did you notify Mr. Dondero that
22  SSP was going to be put on the market?
23    A.    Not that I recall, no.
24    Q.    Did you notify all creditors of
25  this Debtor that SSP was going to be put

Page 96

J. SEERY

2  on the market?
3    A.    No.
4    Q.    Are you aware that a Chapter 7
5  trustee would typically and is in fact
6  required to notice those parties?
7        MR. MORRIS:  Objection to the
8    form of the question.
9    A.    I don't know that he would be or
10  wouldn't be for this asset.  Chapter 7
11  trustee for whom?
12    Q.    For Highland Capital.
13    A.    I don't know that he would be or
14  wouldn't be.
15    Q.    Let's move on to the OmniMax
16  sale.
17    A.    Pardon me?
18    Q.    Let's move on to the OmniMax
19  sale.
20    A.    Yes.
21    Q.    You are familiar with that
22  business?
23    A.    I am.
24    Q.    What do they do?
25    A.    They make aluminum products that

Page 97

J. SEERY

2  are sold in either the DIY business or
3  they have an RV business as well, mostly
4  for home improvements.
5    Q.    Are you generally familiar with
6  their major suppliers, competitors,
7  vendors and creditors?
8    A.    No.
9    Q.    Could you tell me how the
10  OmniMax sale came about?
11    A.    OmniMax was a loan that certain
12  Highland entities had into a company
13  called OmniMax.  This company sat around
14  in the Highland portfolio for years and
15  years and years doing extremely poorly and
16  being undermanaged.
17        Coming into 2019, OmniMax
18  suffered some significant losses early on
19  in the year and was looking to head
20  towards a potential default.  It went out
21  and sought refinancing opportunities,
22  including hybrid capital financiers.  It
23  obtained some bankers to get those and it
24  went out looking for them.  When that was
25  proposed, Mr. Dondero objected to it and

Page 98

```
 1                J. SEERY
 2   began causing difficulty with getting
 3   anything done.  It looked like OmniMax
 4   might have to file.
 5                He specifically threatened to
 6   blow up the transaction involving Pimco.
 7   It was a very expensive transaction and
 8   would have required OmniMax to perform
 9   exceptionally well over the projected
10   period.  But when it went away, there was
11   another opportunity.  That opportunity was
12   with a company called SVP, an experienced
13   distressed investor.  They own senior
14   secured debt as well as some of the debt
15   that our entities, the Highland-managed
16   entities controlled.
17                SVP took the position that they
18   wanted to purchase the debt and try to do
19   a restructuring out of court, with the
20   expenses being exceptionally high if they
21   took it through court.  SVP bought
22   similarly situated debt from the ones that
23   we managed for approximately 15 percent
24   and then was moving forward with that
25   transaction.
```

Page 99

```
 1                J. SEERY
 2                While that was going on, there
 3   was a senior secured piece that was
 4   extremely large and held by a number of
 5   distressed investors.  They wanted the
 6   keys and wanted to wipe out the debt that
 7   we owned.  We negotiated -- that was
 8   coming up for maturity in July.
 9                We negotiated a transaction with
10   SVP and sold our piece to SVP but we did
11   it on an option where they could buy our
12   piece, and they had to buy our piece if
13   they closed on a transaction where they
14   were buying all or any substantial part of
15   the company.
16                After close negotiations, the
17   board telling us they would turn the keys
18   over to the secured creditors, extremely
19   late, difficult negotiations, we finally
20   got a deal done with SVP and the senior
21   secured and the company.  SVP signed our
22   deal, and then Mr. Dondero turned around,
23   while still being the portfolio manager
24   for the CLOs at that time, basically held
25   them up after telling me that I had
```

Page 100

```
 1                J. SEERY
 2   authority to sell the piece at a
 3   particular level.  He retraded that very
 4   specifically.  But that was, I guess, his
 5   custom, and then tried to hold us up.
 6                We had a choice to either put
 7   the public entities that he was the
 8   portfolio manager to zero by running the
 9   company through bankruptcy.  If we had
10   done that, it would have cost us more with
11   our sharing arrangement with SVP than to
12   pay them off.  SVP negotiated a deal and
13   his entities got paid off at a sum higher
14   than the 30? roughly that we received.
15       Q.   Did you employ a broker in that
16   sales process?
17       A.   No.
18       Q.   Did you create any marketing
19   materials for that company?
20       A.   There were a myriad of marketing
21   materials prepared for the company.  The
22   company had its own broker.  The company
23   had -- there were various investment
24   bankers.  Each of the secured creditors,
25   our group had advisors and the company had
```

Page 101

```
 1                J. SEERY
 2   multiple advisors.
 3       Q.   Thank you.
 4       A.   The company was going to go into
 5   bankruptcy.
 6       Q.   I believe you testified earlier,
 7   and I will just restate a little bit of
 8   your testimony just so we can save some
 9   time -- that a representative sample, and
10   I believe these are probably the largest
11   assets that are going to be sold in this
12   wind-down plan or liquidation plan;
13   whatever you'd like to call it -- are
14   Trustway, Targa, CCS Medical, Cornerstone,
15   other securities, HCLF, Korea, and then --
16   my words not yours, Mr. Seery -- a
17   miscellaneous category of perhaps others I
18   believe is what you said.
19                Is that the bulk of the assets
20   that are going to be sold via this
21   wind-down plan?
22       A.   I don't agree with virtually
23   anything you said in your categorization
24   of it.
25       Q.   Then we'll start from the top.
```

Page 102

J. SEERY

1  What are the assets that are going to be
2  sold during this wind-down plan?
3       A.    Take it all the way to the top.
4  This is a monetization reorganization.  So
5  you can try to claim that I have said it
6  is a liquidation or something else but
7  that will be hard to do since I didn't.
8  So, please don't do that again.
9            We looked at a number of
10 different assets.  They run through
11 various entities, like RCP, like the
12 directly owned assets, like Longhorn.
13 We'll manage a bunch of different assets
14 including CLOs.  Those assets, directly or
15 indirectly, include on the PE side
16 Trustway, Cornerstone, CCS, JHT and Targa.
17           In addition, there are
18 securities, significant holdings in MGM
19 Studios, other securities including
20 positions in real property loans, and the
21 aforementioned Korea Fund.
22           I should also mention that I had
23 mentioned before we also own an interest
24 in funds called PetroCap, which are energy

Page 103

J. SEERY

1  funds primarily focused on oil.
2       Q.    Let's see if we have the list
3  together.  I am not trying to place words
4  in your mouth.  I am just trying to get an
5  accurate list together.  Trustway, JHT,
6  Targa, securities which include MGM
7  Studios; real property loans, Korea Fund,
8  Petro funds.  I wasn't sure if you said
9  CCS Medical?
10      A.    I did.
11      Q.    Am I missing anything from my
12 list that I just read?
13           MR. MORRIS:  Objection to the
14      form of the question.
15      A.    I don't know what your list is
16 but I assume if that is your list you
17 wouldn't be missing anything on it.  My
18 list would be extensively longer because
19 there is lots of assets in the total
20 amount of assets that we will be managing
21 in the vehicles.
22      Q.    Let's just take Trustway first.
23 That is an easy example.  Have you engaged
24 any brokers to sell this business?

Page 104

J. SEERY

1       A.    Yes.
2       Q.    Who is that?
3       A.    Rothschild.
4       Q.    Sorry?  Who?
5       A.    Rothschild.
6       Q.    Forgive me.  I am familiar with
7  a Rothschild law firm.  Is there a
8  separate brokerage house also named that?
9       A.    Yes.
10      Q.    Have they prepared marketing
11 materials?
12      A.    Yes.  I should say, when you
13 said have you prepared, I assume you meant
14 Highland.  I didn't think you meant me as
15 myself.  Pre-petition, Rothschild was
16 retained by the company, not by HCMLP.
17      Q.    Have they begun a marketing
18 process for Trustway?  Has Highland -- it
19 was inartfully asked.  Has Highland begun
20 a marketing process?
21      A.    Separate from the Rothschild,
22 no.
23      Q.    Is that marketing process
24 ongoing?

Page 105

J. SEERY

1       A.    It's -- that is not a fair word.
2       Q.    Okay.
3       A.    They are still engaged.
4       Q.    Does Highland intend to assume
5  that brokerage contract with Rothschild?
6            MR. MORRIS:  Objection to the
7       form of the question.
8       A.    It is not our contract.
9       Q.    Is it Trustway's contract?
10      A.    Yes.
11      Q.    Has that contract terminated or
12 is it terminable or is there still a term
13 to run on it?
14      A.    I believe that that contract is
15 in its tail but we'll likely continue it,
16 meaning Trustway will likely continue it.
17      Q.    You ultimately will direct
18 whether Trustway continues it or not.
19 Correct?
20      A.    With management.  I would do
21 that with management.
22      Q.    You said the marketing process
23 is ongoing wouldn't be a fair
24 characterization.  Why do you say that?

Page 106

J. SEERY

1    A.    We are not out shopping it right
2  now.
3    Q.    And why is that?
4    A.    We took a break.
5    Q.    And why is that?
6    A.    Didn't like the market
7  conditions.
8    Q.    And what do you believe are
9  unfavorable about the market conditions?
10   A.    The market has evolved.  There
11 was a major -- it is really way too
12 complicated for this discussion.  But we
13 don't like the market conditions.  We
14 think the company has got opportunities to
15 continue to prove its business plan.  When
16 the market conditions are better we'll
17 determine whether to access or not.
18   Q.    Is it cash flow positive?
19   A.    Yes.
20   Q.    How about JHT?  Have they or
21 Highland employed a broker?
22   A.    No.
23   Q.    Do you intend to hire a broker?
24   A.    Not necessarily.

Page 107

J. SEERY

1    Q.    Have you prepared any marketing
2  materials for JHT?
3    A.    No.
4    Q.    How about Targa?  Have you
5  employed a broker?
6    A.    No.
7    Q.    Any --
8    A.    Brokers have been talked to but
9  we haven't employed one, no.
10   Q.    How many brokers have you
11 interviewed or interfaced with?
12   A.    I haven't talked to any.
13   Q.    How many has Targa been talking
14 to?
15   A.    It talked to at least two
16 potential counterparties for
17 monetizations.
18   Q.    So when you say
19 "counterparties," you are talking not
20 brokers; they have actually talked with
21 potential buyers?
22   A.    Potential buyers and brokers.
23 Brokers could also participate in a buy.
24   Q.    Have any marketing materials

Page 108

J. SEERY

1  been prepared?
2    A.    I don't believe so.
3    Q.    Any teasers been prepared?
4    A.    I'd consider that a marketing
5  material.
6    Q.    Fair enough.
7    I believe you previously
8  testified that the MGM stock is
9  semi-liquid.  Where are they actually
10 traded?
11       MR. MORRIS:  Objection to form
12   of the question.
13   A.    It is an over-the-counter
14 market.
15       MR. TAYLOR:  We were talking
16   over each other.  For the court
17   reporter's purposes, Mr. Morris made
18   an objection.  I believe it was as to
19   form.
20       MR. MORRIS:  Correct.
21   Q.    The question is still
22 outstanding if you understand.  Otherwise
23 I will restate.
24   A.    It's traded in the gray market.

Page 109

J. SEERY

1  It's OTC.
2    Q.    What percentage of the
3  securities that Highland holds is MGM
4  securities approximately?
5        MR. MORRIS:  Objection to form
6    of the question.
7    A.    You have to break it down
8  significantly.  Highland owns its own
9  holdings directly in MGM securities.  Then
10 Highland manages different funds that own
11 MGM securities, and those funds are owned
12 by different investors.  Or if they are
13 not owned by those investors they have
14 different interests in those funds.
15   Q.    Sometimes Highland owns a
16 portion of those funds that own the MGM
17 securities.  Is that correct?
18   A.    That's correct.
19   Q.    Out of the actual equities that
20 Highland owns or owns a percentage of
21 funds that owns them, what percentage of
22 the securities in which Highland has an
23 interest is MGM Studios?  Is it
24 50 percent?  Is it 20 percent?

Page 110

J. SEERY

1        MR. MORRIS:  Objection to form.
2    A.    I don't understand your
3 question.  But maybe I can get there more
4 easily.  Are you asking if the direct or
5 indirect ownership of MGM constitutes a
6 substantial portion of the securities with
7 which Highland is involved?
8    Q.    That was much more artfully
9 asked.  Thank you very much.  Yes, that
10 was precisely what I was trying to get to.
11    A.    The vast majority.
12    Q.    I truly don't know the answer to
13 this so I am just asking.  When you say
14 "vast majority," are we talking around
15 90 percent?
16    A.    It has to be at least that
17 amount.
18    Q.    Am I correct in presuming that
19 any kind of sell-down of MGM securities
20 will probably have to be in a step-down
21 basis such that you don't flood the
22 market?
23    A.    A what basis?
24    Q.    On a step-down basis or gradual
25

Page 111

J. SEERY

1 basis such you don't flood the market and
2 significantly impact the price?
3        MR. MORRIS:  Objection to the
4    form of the question.
5    A.    That is incorrect.
6    Q.    You might be looking for a bulk
7 buyer?
8    A.    It could be.
9    Q.    Do you feel any more qualified
10 to sell those than a hypothetical Chapter
11 7 trustee?
12        MR. MORRIS:  Objection to form
13    of the question.
14    A.    It would depend on the trustee.
15    Q.    The real property loans that
16 Highland owns or owns indirectly, those
17 are all secured presumably by real estate.
18 Correct?
19        MR. MORRIS:  Objection to form
20    of the question.
21    A.    It's well more complicated than
22 that because Highland set up a bit of a
23 tax scheme around these assets.  So, we
24 are working our way through it.
25

Page 112

J. SEERY

1    Q.    When you say "we are working our
2 way through it," who are you working with
3 on that?
4    A.    Myself, my team at DSI,
5 Pachulski, other outside counsel.
6    Q.    Any appointed Chapter 7 trustee
7 could potentially hire DSI to perform the
8 same work.  Correct?
9    A.    I suppose potentially, if the
10 court approved it, yes.
11    Q.    The Korea Fund, has Highland or
12 its appropriate subsidiary hired a broker
13 on that?
14    A.    No.
15    Q.    Prepared any marketing
16 materials?
17    A.    No.
18    Q.    How about CCS Medical?  Have
19 they or Highland hired any brokers?
20    A.    Yes.
21    Q.    Who have they hired?
22    A.    Cantor Fitzgerald.
23    Q.    And is that Highland employing
24 them, or is that CCS Medical?
25

Page 113

J. SEERY

1    A.    That was CCS Medical.
2    Q.    Is that on track still in its
3 beginning term or is it now terminable?
4        MR. MORRIS:  Objection to form
5    of the question.
6    A.    I believe the contract is
7 actually terminated, and I believe it is
8 out of its tail but it may not be
9 completely.
10    Q.    Terminated and may or may not be
11 out of the tail?
12    A.    Correct.
13    Q.    Thank you.
14        How about Petro funds -- oh,
15 sorry.  Backing up, I will ask the same
16 question.  I presume since you have hired
17 a broker that marketing materials have
18 been prepared for CCS Medical?
19    A.    I didn't hire a broker.
20    Q.    I thought Cantor Fitzgerald had
21 been hired for CCS Medical?
22    A.    You asked me -- you said "I
23 believe you have hired a broker."  I have
24 not hired a broker.  You can read the
25

Page 114

1                    J. SEERY
2    question back if you like.
3         Q.    Thank you for keeping me very
4    precise.  I appreciate that, Mr. Seery.
5              Have the brokers for CCS Medical
6    prepared marketing materials?
7         A.    Yes.
8         Q.    Have they done any mailouts?
9         MR. MORRIS:  Objection to form
10        of the question.
11        A.    I doubt it.  That is not how
12   this business works.
13        Q.    Well, how have they gone about
14   creating a market?
15             MR. MORRIS:  Objection to the
16        form of the question.
17        A.    They don't need to create a
18   market.  They market the company to
19   potential buyers who are either strategic
20   or private equity who are looking for
21   these types of assets.  So, the markets
22   exist, and then they go out and they
23   present to the players in the market,
24   generally with whom they are most familiar
25   because they are typically regular

Page 115

1                    J. SEERY
2    players.  And the banker, if they know and
3    are experienced, will know the players in
4    the market.  That's how investment bankers
5    generally approach these types of
6    assignments.
7         Q.    Okay.
8         A.    There are myriad, you know, more
9    transactions that are done without brokers
10   than there are with brokers.
11        Q.    So Cantor Fitzgerald has
12   approached players that they know might be
13   interested in acquiring a company similar
14   to CCS Medical.  Is that correct?
15        A.    I didn't review exactly how they
16   did it.  They certainly went out and
17   marketed the company and received bids for
18   the company.
19        Q.    Does CCS Medical intend to renew
20   with Cantor Fitzgerald or hire a new
21   broker?
22        A.    I don't know the answer to that.
23        Q.    Who is going to make that
24   decision for CCS Medical?
25        A.    The CCS board.

Page 116

1                    J. SEERY
2         Q.    Highland Capital controls CCS
3    Medical's board?
4         A.    No.
5         Q.    How many seats do they hold on
6    that board?
7         A.    Currently, I believe two.
8         Q.    And the board is how large?
9         A.    I believe it's seven.
10        Q.    So they are a minority owner of
11   CCS Medical?
12        MR. MORRIS:  Objection to form
13        of the question.
14        A.    CCS is way more complicated than
15   this.
16        Q.    Can you give me the 10,000-foot
17   overview for dummies?
18        A.    Highland -- different Highland
19   funds own loans.  There is first-lien
20   loans.  There is a revolver owned by two
21   other hedge funds that also own interests.
22   There are first-lien loans, there are
23   second-lien loans, and there is equity.
24   Each are owned by slightly different
25   slices of a group of different investors.

Page 117

1                    J. SEERY
2         Q.    Fair enough.
3              Is Highland at each level of
4    that capital structure or --
5         A.    Not in the revolver.  You say
6    "Highland."  Different funds are in
7    different places and then there is
8    different weighting in each of the
9    tranches.
10        Q.    Thank you for that preciseness
11   and I do appreciate your ability to see
12   where I am going with these questions and
13   just get to meat of the matter.  That is
14   very much appreciated.
15             Petro funds, have they or
16   Highland hired a broker?
17        A.    It is PetroCap.  I don't know if
18   they have hired a broker.  I have not
19   hired a broker or Highland has not hired a
20   broker.
21        Q.    Does Highland intend upon hiring
22   a broker?
23        A.    Not necessarily.
24        Q.    To be clear, just so I believe
25   we are on the same page, when I say

007267

Page 118

J. SEERY

1  broker, that could mean broker or
2  investment banker.  Is that fair?
3       A.    That is fair.
4       Q.    And that is how you have been
5  answering these questions.  Correct?
6       A.    Yes.
7       Q.    Do you know if PetroCap
8  independently is going to hire a broker or
9  investment banker?
10      A.    I don't know.
11      Q.    Do you know if any marketing
12 materials have been prepared?
13      A.    I don't know.
14      Q.    For each of the entities that we
15 just went through, has Highland performed
16 an analysis of total value of each
17 company?
18      A.    Which entities?
19      Q.    The one we just went through.  I
20 will list them for you.  Trustway, JHT,
21 Targa, the real property loans as an asset
22 category.  Korea Fund, CCS Medical and
23 PetroCap.
24      A.    We have values for each of those

Page 119

J. SEERY

1  properties; yes.
2       Q.    And I presume that means both a
3  gross value and then a net value to
4  Highland.  Correct?
5       A.    Yes.
6       Q.    And DSI helped you prepare
7  those?
8       A.    The answer is no.  Each of these
9  are kept in -- Highland has a valuation
10 procedure and methodology and we stay
11 consistent with that valuation procedure
12 and methodology.
13      Q.    And those are all records of
14 Highland.  Correct?
15      A.    Yes.
16      Q.    And those have all been written
17 down somewhere.  Correct?
18      A.    I believe they have all been
19 written down somewhere.
20      Q.    And those could be made
21 available to any Chapter 7 trustee that
22 could be appointed?
23      A.    Yes.
24      Q.    Let's turn our attention here

Page 120

J. SEERY

1  for a second.  You have certain cost
2  that --
3            MR. MORRIS:  Objection to form
4       of the question.
5            (Reporter interruption.)
6       Q.    Highland will incur certain
7  costs to wind down, through 2022, under
8  its proposed plan of liquidation.  Is that
9  correct?
10           MR. MORRIS:  Objection to form
11      of the question.
12      A.    No.  We project certain costs to
13 operate the business through 2022.  Yes.
14      Q.    And you made a distinction
15 between my question and the answer you
16 gave.  Could you explain to me what that
17 distinction is?  I am not picking up on
18 why you made the distinction.
19      A.    Because you said "wind down the
20 business."  We intend to operate the
21 business.
22           MR. MORRIS:  Objection to use of
23      the phrase "plan of liquidation."
24      Q.    Is it your position or is it

Page 121

J. SEERY

1  Highland's position, Mr. Seery, that this
2  is a reorganization?
3       A.    Yes.
4       Q.    Maybe we have a fundamental
5  misunderstanding.  My understanding is
6  that your plan and your analyses says that
7  all assets, substantially all assets will
8  be sold by the end of December 2022.  Is
9  that correct?
10      A.    That is our assumption.  Yes.
11      Q.    So how is that not a wind-down?
12      A.    Because we intend to operate the
13 business and continue to operate to seek
14 value.  I consider a wind-down to be a
15 liquidation where I immediately start
16 looking for a sale every day and try to
17 hit the fastest bid that I can get.  That
18 is not what we are trying to do.  We are
19 trying to maximize value based on how we
20 look at market conditions using
21 professionals to manage the assets.
22      Q.    So your distinction, so I have
23 this correct, is that because you are
24 going to operate in the interim period

Page 122

J. SEERY

1  while you gradually sell these assets off
2  over a two-year period, it is not a
3  wind-down or liquidation?
4      A.   That's correct.
5      MR. TAYLOR:   Now that we have
6  established that that is what
7  Highland's position is, obviously
8  Mr. Dondero takes a different
9  position.  Can we just have a running
10 objection from Mr. Morris to the
11 extent that I use the phrase "wind
12 down" or "liquidation plan," that he
13 has a running objection as to the form
14 of that question?
15     THE WITNESS:   We could stipulate
16 that Mr. Dondero is incapable of
17 selling assets.  That has been proved
18 over the last 15 years, and he takes
19 other people's money in forms that are
20 not permanent capital because he is
21 not able to access public markets and
22 just uses it for his own purposes.
23 That's a good stipulation.
24     MR. MORRIS:   Clay, to answer

Page 123

J. SEERY

1  your question, as you saw through
2  Mr. Draper's testimony, as you see in
3  the disclosure statement, as you saw
4  in the documents we provided last
5  night, we have projections for the
6  reorganization and we have projections
7  for the liquidation.  They are
8  different because they are not the
9  same thing.
10     Liquidation would require the
11 immediate sale of assets at a fire
12 sale.  That is not what the Debtor is
13 doing.  If you want to stipulate to
14 that distinction or if you want to
15 stipulate that that is what we contend
16 the distinction is, I am happy to do
17 it.  I don't understand why this is so
18 difficult for folks to understand.
19     There is a liquidation analysis,
20 which is a fire sale -- let's shut it
21 down, let's get rid of everything.
22 And there is what we are doing, which
23 is going to operate the business in
24 order to maximize value over an

Page 124

J. SEERY

1  extended period of time.  That is the
2  distinction and that is what I am
3  willing to stipulate is the
4  distinction.
5      MR. TAYLOR:   I appreciate the
6  explanation.  Obviously, I believe
7  this is better left for argument in
8  front of the court.  If you want to
9  make either a running objection or,
10 alternatively, if you want to state it
11 every time, that is fine, too.
12     I would note for the record that
13 I move to strike Mr. Seery's response
14 or, I would say, non-response to a
15 question that was not asked, as
16 non-responsive.
17     THE WITNESS:   What was the
18 question?  I thought you were looking
19 for me to form a stipulation we could
20 agree on.  If there is a different
21 stipulation, go ahead.  I gave you
22 what I would stipulate to.
23     MR. TAYLOR:   Thank you for that.
24     Q.   You would agree, would you not,

Page 125

J. SEERY

1  Mr. Seery, that under Highland's plan,
2  that they are going to incur some costs
3  for the Claimant trust?  Correct?
4      A.   Yes.
5      Q.   One of those costs is going to
6  be to pay the trustees.  Correct?
7      A.   Yes.
8      Q.   How many trustees are there
9  going to be?
10     A.   I will be the Claimant trustee
11 unless the Oversight Committee decides
12 they want to have somebody else.
13     Q.   And if the Oversight Committee
14 decides they want somebody else, how much
15 is that person going to be paid, or
16 persons?
17     A.   I have no idea.
18     Q.   How much are you going to be
19 paid?
20     A.   Base compensation is $150,000 a
21 month.
22     Q.   What other types of compensation
23 other than base compensation?
24     A.   Bonus compensation.

J. SEERY

1         Q.    You said your base compensation
2  was how much per month?
3         A.    $150,000 per month.
4         Q.    Is that just for you?
5         A.    That's correct.
6         Q.    Do you have to bear any costs
7  out of that 150,000 per month?
8         A.    A man's got to eat.
9         Q.    Is that the answer?  No?
10        A.    No; I don't bear any other than
11 my own costs.
12        Q.    Other than your personal
13 costs --
14        A.    They are business costs.  They
15 are business costs.  This all doesn't
16 happen for free.
17        Q.    So you are going to bear your
18 own overhead, for instance your office
19 space?
20        A.    Yes.
21        Q.    But to be fair, travel and, for
22 instance, if you had to hire an expert,
23 those would not be costs that you would
24 bear.  Correct?

J. SEERY

1         A.    That's correct.
2               MR. TAYLOR:  I have had a
3  request for a bathroom break by one of
4  the other counsel on the phone.  If
5  it's okay, could we take -- I am fine
6  with a ten-minute break.  Mr. Seery,
7  if you would like longer that is fine.
8               THE WITNESS:  However short you
9  want.
10              MR. TAYLOR:  John, do you have a
11 preference?
12              MR. MORRIS:  I don't.  I
13 appreciate the inquiry.  Whatever you
14 want.
15              MR. TAYLOR:  Let's take a
16 15-minute break.  I have about 11:40
17 Central Time.  Let's reconvene at
18 11:58.
19              (Recess.)
20 BY MR. TAYLOR:
21        Q.    Mr. Seery, this is Clay Taylor
22 again.  Thank you for allowing us to take
23 a break.
24              I believe you were testifying or

J. SEERY

1  we were talking about how much your fees
2  as the Claimant trustee was going to be
3  and we had left off where you had said
4  there was also some bonus compensation
5  available to you.  Could you briefly
6  explain to the court what that bonus
7  structure is?
8         A.    It's to be negotiated within
9  45 days of the confirmation.
10        Q.    Have you begun those
11 negotiations?
12        A.    No.
13        Q.    I presume those negotiations
14 will be conducted between yourself and the
15 Unsecured Creditors' Committee?
16        A.    I think it will actually be
17 myself and the Oversight Committee, which
18 will consist of the Claimant -- the
19 Creditors' Committee members, at least
20 three of them, as well as one or two
21 independents, depending on certain timing.
22        Q.    Have you been provided an ask as
23 of this time?
24        A.    I have not, no.

J. SEERY

1         Q.    There is also going to be a
2  litigation trust established under the
3  proposed plan.  Correct?
4         A.    That's correct.
5         Q.    How many trustees will there be?
6         A.    I believe, just one.
7         Q.    What is the proposed
8  compensation for that trustee?
9         A.    I don't know yet.
10        Q.    Would they be paid on a monthly
11 basis?
12        A.    I don't know.  I assume he will
13 have some contingency arrangement.  He is
14 an experienced litigation trustee, and I
15 assume he will be paid a combination of
16 base plus some upside depending on
17 recoveries.
18        Q.    So that would be presumably a
19 monthly fee plus a step contingency
20 arrangement?  Is that your experience?
21        A.    I am not familiar with the term
22 "step contingency arrangement," but there
23 are innumerable ways to structure
24 contingency fee arrangements in my

J. SEERY

1  experience.
2      Q.    That compensation has yet to be
3  discussed?
4      A.    It hasn't been discussed with
5  me.  No.  I won't have any oversight over
6  it or responsibility for it.
7      Q.    Ultimately that will come out
8  of -- any fees that are paid under that
9  arrangement will come out of the ultimate
10 recovery made available to the unsecured
11 creditors and any subordinate classes to
12 the unsecured creditors.  Correct?
13     A.    As a general statement, I think
14 that's correct, yes.
15     Q.    I believe there has been some
16 discussion in the pleadings in this case
17 that D&O coverage would be afforded to the
18 trustees.  Is that correct?
19     A.    That's correct.
20     Q.    Have you priced that?
21     A.    We have.
22     Q.    How much is that anticipated to
23 run per annum?
24     A.    I haven't -- I don't have that

J. SEERY

1  specifically at my fingertips.  I just
2  don't recall the specific amount.  We went
3  through it in the last few days and I just
4  don't have the amount.
5      Q.    Would you mind providing that
6  figure to your counsel to be distributed
7  to the objecting creditors?
8      A.    I don't know --
9          MR. MORRIS:  We will take it
10 under advisement.  Douglas had also
11 made a request earlier during the
12 deposition where I provided the same
13 response.  Respectfully, I'd ask each
14 of you to just send me an email at the
15 conclusion of the deposition because I
16 am not going to be able to -- I don't
17 think I should have the burden of
18 keeping track of this.  But it's a
19 fair request.  Send it to us in
20 writing and we'll respond promptly.
21         MR. TAYLOR:  We certainly will
22 make a note to send that to you.
23     Q.    Mr. Seery, if a Chapter 7
24 trustee were appointed, they wouldn't

J. SEERY

1  require D&O coverage.  Is that correct?
2          MR. MORRIS:  Objection to the
3  form of the question.
4      A.    I don't know if a Chapter 7
5  trustee would require any D&O or not.
6      Q.    You are an experienced
7  insolvency professional.  Correct?
8      A.    Yes.
9          MR. MORRIS:  Objection to form
10 of the question.
11     Q.    You do have experience with
12 Chapter 7 trustees also.  Correct?
13     A.    Dated, but I have some.
14     Q.    In your experience, have they
15 typically gone out and obtained D&O
16 coverage?
17         MR. MORRIS:  Objection to form
18 of the question.
19     A.    My experience is it depends on
20 the Chapter 7 trustee, where they are
21 coming from, whether they are in an
22 institution that has coverage, whether
23 they are going to be using other people.
24 They have qualified immunity, but I am not

J. SEERY

1  an expert in how they deal with their own
2  coverages.
3      Q.    For purposes of the liquidation
4  analysis versus the plan analysis that is
5  presented in the November and January plan
6  analysis versus liquidation analysis, did
7  you make some assumptions regarding how
8  much D&O coverage would cost under the
9  plan?
10     A.    Under the plan analysis for
11 certain, yes.
12     Q.    And what did you estimate that
13 D&O coverage to cost?
14     A.    I don't recall off the top of my
15 head the exact amount.  I don't know if we
16 have a line item for it, but I just don't
17 recall specifically that line item.
18     Q.    Are those line items contained
19 in what I will refer to as the roll-ups
20 for the plan versus liquidation analysis?
21     A.    The full model does contain a
22 specific line item for D&O.  Yes.
23         MR. TAYLOR:  Bryan, I will ask
24 you to include that on our list of

Page 134

J. SEERY

1  items we are going to request from
2  Mr. Morris in addition to what was
3  previously discussed.
4      Q.   I presume the United States
5  Trustee fees are included in the costs
6  included within the plan analysis?
7      A.   Yes.
8      Q.   Were any U.S. Trustee fees
9  included in the liquidation analysis?
10     A.   I believe that they were.  I am
11 not sure of that, though.  I don't recall
12 specifically if they were just subsumed in
13 the trustee fees or if there is a separate
14 U.S. Trustee fee.  I just don't know the
15 answer to that.
16     Q.   Has Highland conducted an
17 analysis of what a Chapter 7 trustee's
18 fees would be calculated at?
19     A.   For the plan assumption
20 purposes, I believe we do, yes.
21     Q.   And that is contained as a
22 roll-up and specific line items, too.
23 Correct?
24     A.   Yes.

Page 135

J. SEERY

1      Q.   Are certain brokers' fees
2  included within both the plan analysis and
3  the liquidation analysis?
4      A.   I am not quite sure what you
5  are -- I don't understand the question.
6      Q.   Do you anticipate incurring any
7  broker or investment banker fees under the
8  plan analysis?
9      A.   When you say me --
10     Q.   Does Highland.
11     A.   Highland, I don't believe so,
12 no.
13     Q.   Are those brokers' fees or
14 investment banker fees included when you
15 get to a net figure that would flow to
16 Highland's creditors?
17     A.   Depending on the asset, yes.
18     Q.   So certain investment banking or
19 brokerage fees are included at the
20 subsidiary level?
21     A.   Yes.
22     Q.   And that is only -- to be fair,
23 that is only as to some assets.  Correct?
24     A.   It is subsumed within the asset

Page 136

J. SEERY

1  amount.  Correct.  It is in that amount.
2      Q.   And the detail for that is
3  included within, again, those roll-ups?
4      A.   I don't believe that we broke
5  out brokers' fees or investment banker
6  fees for any individual assets.  We
7  assumed a net recovery from those assets.
8  Whether we use a broker or not will depend
9  on the circumstances and situation we
10 encounter in the market at the time.
11     Q.   So it would be impossible for
12 myself, the court or any reviewing court
13 to understand which ones have an assumed
14 broker or investment banker fees at each
15 asset?  Is that correct?
16     A.   No, that is not correct.
17     Q.   How would one determine whether
18 an investment banker or brokerage fee was
19 included within each asset sale?
20     A.   We could consider each asset
21 individually and I could walk through what
22 those are.  But it could change.
23     Q.   But within the roll-ups, when
24 examining those papers how would one

Page 137

J. SEERY

1  determine that?
2      A.   There wouldn't be a net amount.
3  There is only a net amount in the
4  roll-ups.  It doesn't show whether there
5  is a broker used or not.
6      Q.   So the only way to determine
7  that would be to walk through each
8  individual potential asset sale and ask
9  you that question whether an investment
10 banking fee was included in that?
11     A.   Yeah.  We put a net amount.  We
12 don't believe it will be reduced by some
13 fee.  If we hired a separate broker we
14 would expect to be able to get a higher
15 amount to cover the brokerage fee.
16     Q.   Are the legal fees that would be
17 incurred in connection with each asset
18 sale broken out by line item?
19     A.   No.
20     Q.   Are they included within the net
21 sales figure?
22     A.   Yes.
23     Q.   How about accountant fees?  Are
24 those covered for under the plan analysis?

Page 138

J. SEERY

1    A.    Accountant fees are certainly
2  covered under the plan analysis, yes.
3    Q.    Are they accounted for under the
4  liquidation analysis?
5    A.    I believe so, yes.
6    Q.    Are those numbers the same under
7  the plan analysis and the liquidation
8  analysis?
9    A.    I don't recall off the top of my
10 head.
11   Q.    How about legal fees?  Are those
12 the same under the plan analysis as
13 compared to liquidation analysis?
14   A.    I believe they are different.
15   Q.    And are they higher under the
16 plan analysis or liquidation analysis?
17   A.    I think they are higher under
18 the plan analysis.
19   Q.    Why is that?
20   A.    The period runs longer and there
21 is more issues to be dealt with as opposed
22 to a trustee just selling assets and then
23 distributing later.
24   Q.    With what has been provided, can

Page 139

J. SEERY

1  one ascertain what that delta is?
2    A.    Of the legal fees?
3    Q.    Correct.
4    A.    I think -- I'd have to look at
5  each line.  I don't think we have broken
6  it out in this particular presentation.  A
7  lot of that will just depend on how
8  frivolously litigious you are.
9         MR. TAYLOR:  Move to strike the
10   characterization as non-responsive but
11   thank you for your answer.
12        MR. MORRIS:  Motion granted.
13   Q.    Now, I could be wrong on this,
14 and you may know or may not.  If you don't
15 know, that is fine.
16        I would presume that both the
17 Claimant trust and the litigation trust
18 are going to be required to file separate
19 tax returns each year.  Is that your
20 understanding?
21   A.    I don't think that's the case,
22 no.
23   Q.    And why is that?
24   A.    I think they roll up into the

Page 140

J. SEERY

1  one trust.
2    Q.    Have you examined that issue?
3    A.    I believe we have, yes.
4    Q.    And did you obtain either an
5  opinion of an accountant or a legal
6  conclusion to that effect?
7    A.    You know better, but the answer
8  is we got guidance; yes.
9    Q.    Now, you estimate that you are
10 going to collect about $60 million more in
11 asset sales in the plan analysis rather
12 than the liquidation analysis.  Is that a
13 fair characterization of what the January
14 plan analysis versus liquidation analysis
15 shows?
16   A.    I think the two, in terms of the
17 total amounts, are on the sheet.  So if
18 you look at it, it is 174 versus 222 in
19 estimated available for distribution.  The
20 cash number is the same.  Then you will go
21 through each part.  So, you have got
22 expenses, et cetera.
23        If you are looking at just the
24 proceeds, then you'd look at the 257

Page 141

J. SEERY

1  versus the 191.
2    Q.    Okay.  So approximately
3  $67 million difference.  Correct?
4    A.    Yes.
5    Q.    But then the expenses are going
6  to be approximately 2 -- sorry.  I am
7  terrible at math.  $18 million less under
8  the liquidation analysis.  Is that right?
9    A.    That's correct.
10   Q.    So explain to me why you believe
11 it's going to be 257 million, actually
12 almost 258 million under the plan analysis
13 as compared to the 192 under the
14 liquidation analysis.
15        MR. MORRIS:  This is -- Clay,
16   this is for the proceeds from the
17   monetization of the asset sales?
18        MR. TAYLOR:  Correct.  Kind of
19   what I will call line 2.
20   A.    The difference between those is
21 what we think we can do managing the
22 assets and being able to put them through
23 a longer period, being able to access the
24 market at more appropriate times as

Page 142

```
           J. SEERY
 1                J. SEERY
 2  opposed to simply running a quick fire
 3  sale.  So we think we will be able to
 4  generate more proceeds through taking our
 5  time with those assets, looking for right
 6  opportunities in the market as opposed to
 7  hitting whatever the market brings.
 8            MR. MORRIS:  I renew my request
 9       to stipulate now, Clay.
10       Q.    Is the assumption made that a
11  Chapter 7 trustee could not conduct an
12  orderly wind-down?
13       A.    The assumption is made that the
14  Chapter 7 trustee will not conduct an
15  orderly wind-down.  It will conduct a
16  Chapter 7 liquidation swiftly.
17       Q.    And is it Highland's position
18  that a Chapter 7 trustee could not take on
19  the same roles and conduct an orderly
20  wind-down?
21       A.    We don't think --
22            MR. MORRIS:  Objection to form
23       of the question.
24            MR. TAYLOR:  Hold on one second,
25       Mr. Seery.  Mr. Morris, I couldn't
```

Page 143

```
 1                J. SEERY
 2  hear your objection.
 3            MR. MORRIS:  Just objection to
 4       the form of the question.
 5       Q.    Mr. Seery, can you answer the
 6  question if you can?
 7       A.    We assume that a Chapter 7
 8  trustee would not do that.  They would not
 9  try to operate the business as we do in
10  our reorganization plan.
11       Q.    Have you conducted any due
12  diligence as to whether a Chapter 7
13  trustee could, under the code, conduct an
14  orderly wind-down?
15       A.    Due diligence?  No.
16            MR. MORRIS:  Object to form of
17       the question.
18       Q.    Is it fair to say that is a
19  naked assumption?
20            MR. MORRIS:  Objection to form
21       of the question.
22       A.    Not fair.
23       Q.    What is not fair about that?
24       A.    The way you phrased your
25  assumption.
```

Page 144

```
 1                J. SEERY
 2       Q.    It's Highland's position that a
 3  Chapter 7 trustee would not conduct an
 4  orderly wind-down I believe you stated.
 5  Is that correct?
 6       A.    Correct.
 7       Q.    Do you have any opinion as to
 8  whether a Chapter 7 trustee could conduct
 9  an orderly wind-down?
10       A.    Yes.
11       Q.    What is that opinion?
12       A.    I don't think he could.
13       Q.    And why not?
14       A.    I think the business is too
15  complicated, there is too many moving
16  parts, there is too much risk of
17  litigation from your client and others who
18  are controlled by your client, and the
19  Chapter 7 trustee would have difficulty
20  coming into this situation and trying to
21  manage these assets in an orderly way and
22  would opt instead to liquidate them in the
23  way most chap -- trustees in most Chapter
24  7 proceedings are conducted.
25       Q.    Have you conducted any
```

Page 145

```
 1                J. SEERY
 2  interviews with potential Chapter 7
 3  trustees to come to that conclusion?
 4       A.    No.
 5       Q.    What is the factual basis by
 6  which you came to that conclusion?
 7       A.    My experience and the experience
 8  of the professionals in the case, both in
 9  term of this case and our experience
10  outside of the case.
11       Q.    I am going to direct your
12  attention to --
13            MR. TAYLOR:  Bryan, if you would
14       pull it up.
15       Q.    You probably have it there in
16  front of you, Mr. Seery.  Footnote 1,
17  where it says "assumes a Chapter 7 trustee
18  will not be able to achieve the same sale
19  proceeds as Claimant trustee."
20            You would agree with me, would
21  you not, that it uses the word "assumes."
22  Correct?
23       A.    Correct.
24       Q.    The word "assumes" generally
25  means that there has not been an analysis
```

Page 146

J. SEERY

1  conducted regarding that. Would you agree
2  with me?
3     MR. MORRIS: Objection to form
4     of the question.
5     A.  I would not agree with you.
6     Q.  Then why did you use the word
7  "assume"?
8     MR. MORRIS: Objection to form
9     of the question.
10    A.  Because it is an assumption.
11    Q.  Why don't you explain to the
12 court and me what you mean by the word
13 "assumes" then?
14    MR. MORRIS: Objection to the
15    form of the question.
16    A.  What I believe the word
17 "assumes" means? I believe it is a thing
18 or fact that one puts into an analysis
19 based upon experience and it is presumed
20 to carry through the analysis irrespective
21 of what actually happens. Typically with
22 projections, because they are a prediction
23 of what may happen in the future, you may
24 not have hard facts as to what will happen

Page 147

J. SEERY

1  because predicting the future is actually
2  difficult.
3     So, we use assumptions, and they
4  are not based on nothing. They are
5  usually based on facts. We do it in
6  mathematics as well.
7     Q.  Mr. Seery, do you have both the
8  November and the January plan analysis
9  versus liquidation analysis in front of
10 you?
11    A.  No.
12    Q.  I believe you have one of those
13 in hard copy in front of you. Is that
14 correct?
15    A.  I don't have any hard copy in
16 front of me. I have it on the screen.
17    Q.  In the November analysis, the
18 liquidation analysis shows that the
19 estimated expenses through final
20 distribution would be approximately 36
21 million. Do you see that?
22    A.  I don't see that because that is
23 the one I don't have on the screen.
24    Q.  We are getting that up for you

Page 148

J. SEERY

1  really quick. Page 174.
2     Do you see that, Mr. Seery, the
3  third line?
4     A.  Tell me what you want to look
5  at.
6     Q.  Estimated expenses through final
7  distribution in liquidation analysis.
8     A.  Yes, I see that.
9     Q.  I am going to represent to
10 you -- but we can pull it up on the screen
11 if you would like -- that the January
12 liquidation analysis shows approximately
13 $41.5 million in estimated expenses to a
14 Chapter 7 trustee, so approximately
15 $5.2 million more.
16    A.  Yes.
17    Q.  Do you know why that number
18 changed? What were the inputs?
19    A.  Off the top of my head, I don't
20 recall the specific inputs that would have
21 that cost. I'd have to go back and check
22 in the underlying models.
23    Q.  And that would be available to
24 anybody who was curious about that through

Page 149

J. SEERY

1  the roll-ups? You could ascertain why it
2  is $5.2 million more?
3     A.  I don't think we are going to
4  make the backup available to anybody who
5  is curious, no.
6     Q.  Well, to any reviewing party who
7  is allowed to review it, would viewing
8  those roll-ups make it clear?
9     A.  I think you'd be able to figure
10 it out. I don't know whether it would be
11 made clear. Depends on the skill set of
12 the reviewing party.
13    Q.  Fair enough.
14    You testified earlier regarding
15 your experience with Chapter 7 trustees.
16 When was the last time you had an
17 experience with a Chapter 7 trustee?
18    A.  2009.
19    Q.  So 13 years ago? 12? Is that
20 correct?
21    A.  Let me make sure. One came to
22 mind. I want to make sure there are no
23 others.
24    There may be some others in

Page 150

J. SEERY

1 there. That one jumped out because it was
2 big.
3    Q.    What case was that in?
4    A.    Lehman brokerage.
5    Q.    What was your role in that case?
6    A.    I was one of four or five people
7 responsible for selling, chiefly
8 responsible for selling Lehman to
9 Barclays.
10    Q.    There was a Chapter 7 trustee in
11 the Lehman case?
12    A.    There was a SIPC trustee, which
13 I think is very similar rules with respect
14 to the assets that weren't sold from the
15 broker-dealer. And then there was a
16 Creditors' Committee and reorg of the
17 holding company.
18    Q.    How long did that SIPC trustee
19 take to wind down the affairs and assets
20 he or she was responsible for?
21    A.    The assets were distributed and
22 liquidated really quickly. Distribution
23 might have taken some time. Litigation
24 took, I think, about seven years for the

Page 151

J. SEERY

1 SIPC trustee.
2    Q.    The SIPC trustee was in place
3 for seven years?
4    A.    Around that amount of time.
5 Again, most of the assets from the
6 broker-dealer were sold to Barclays, and
7 the SIPC trustee then monetized the
8 remaining assets very quickly and then
9 engaged in litigation.
10    Q.    That sale to Barclays was a bulk
11 sale of basically all the non-litigation
12 assets that Lehman held?
13    A.    No.
14    Q.    What did they not sell to
15 Barclays then?
16    A.    It's way more complicated than
17 that.
18    Q.    So it's even more complicated
19 than this case?
20    A.    Exceedingly.
21    Q.    That was the last time you dealt
22 with a Chapter 7 trustee or one
23 substantially similar to this?
24    A.    I think so. I had dealings in

Page 152

J. SEERY

1 MF Global, in that litigation, which was a
2 similar trustee. That was probably a
3 little bit later than the Lehman case in
4 terms of my investments and involvement.
5 And I don't recall any others post that
6 amount of time.
7    Q.    I am going to compare and
8 contrast the November liquidation and plan
9 analysis to January's. Specifically
10 focusing on Class 8.
11        MR. TAYLOR: Bryan, if you can
12    pull up November.
13    A.    I think you have November up.
14    Q.    Sorry. I wasn't looking at the
15 screen. I was looking at my notes. I was
16 unaware it was still up.
17        The plan analysis says there is
18 $176 million worth of claims for Class 8,
19 general unsecured claims. Correct?
20    A.    That is what it says, yes.
21    Q.    And in January that number was
22 changed to 313.5 million. Correct?
23    A.    For Class 8 unsecureds, I have
24 it in front of me. Yes.

Page 153

J. SEERY

1    Q.    You would agree with me, would
2 you not, that that is the single largest
3 change in this liquidation analysis from
4 November to January. Correct?
5    A.    I will accept your
6 representation.
7    Q.    In November, under the
8 liquidation analysis, you believe that
9 unsecured creditors received 62.6 cents on
10 the dollar. Correct?
11    A.    That is in the January one.
12    Q.    No. Actually, let's go ahead
13 and --
14    A.    I am sorry. The liquidation
15 analysis?
16    Q.    Yes. Sorry. I thought I said
17 that. If I did not, I apologize.
18    A.    Yes, 62.6.
19    Q.    And as we sit here today, under
20 Highland's revised numbers, what does
21 Highland project unsecured creditors are
22 going to receive?
23    A.    48.16.
24    Q.    And under the plan analysis what

J. SEERY

1  are they going to receive?
2      A.    On the one we just filed?
3  62.14.
4      Q.    So, you are now projecting that
5  unsecured creditors are going to receive
6  less than what you were predicting under
7  the liquidation plan analysis performed in
8  November.  Correct?
9      A.    A little bit, yes.
10     Q.    Again, you haven't resolicited
11  this plan; correct?
12     A.    No.
13     Q.    I am curious.  A few months ago
14  you thought the spread between what the
15  plan could achieve as far as gross
16  proceeds was approximately 190,000 --
17  sorry.  $190 million.  Is that correct?
18     A.    If you could pull up the
19  November to determine what you are asking
20  me?
21     Q.    I am looking at line 2,
22  estimated proceeds from monetization.
23  Under the plan analysis it shows 190
24  million.  Right?

J. SEERY

1      A.    Correct.
2      Q.    And under liquidation analysis,
3  it shows 150 million.  Right?
4      A.    Correct.
5      Q.    So the spread was 40 million
6  bucks.  Right?
7      A.    That is the difference between
8  those numbers, yes.
9      Q.    I call it the spread, right, the
10  difference between how much better you
11  think the plan would do rather than a
12  liquidation?
13     A.    In estimated proceeds from
14  monetization of assets, yes.
15     Q.    In January, if we pull that up,
16  the same line, now under a plan you could
17  achieve 258 million but that a Chapter 7
18  trustee could only recover 191 million.
19  Now the spread is $65 million, so that
20  spread increased from 40 million to 65
21  million.  You would agree that the
22  documents show that.  Correct?
23     A.    Yes.  The difference in those
24  numbers is different and it's greater.

J. SEERY

1      Q.    It is approximately $25 million
2  greater.  Correct?
3      A.    Yes.
4      Q.    What changed in two months to
5  make those recoveries $25 million greater
6  under a plan rather than liquidation?
7      A.    Both the assets in terms of
8  their values and the view of the markets.
9      Q.    I would ask you to dig a little
10  deeper than that and provide a little more
11  color.
12     A.    Okay.
13     Q.    So what accounts for the
14  $25 million worth of difference in the
15  spread?
16     A.    Certain of the assets jumped up
17  in value.  Other assets, we have a more
18  robust view of value because of the
19  conditions that we see in the market going
20  forward.
21     Q.    So the total asset value
22  increased in your opinion.  Correct?
23     A.    The total asset value increased
24  as well as the projection for how the

J. SEERY

1  markets look on a forward basis.
2      Q.    And why is it that you believe
3  it is now $25 million more of what you
4  could receive under a plan rather than a
5  liquidation?
6         MR. MORRIS:  Objection to the
7      form of the question.
8      A.    I think I just answered that.
9  That asset values went up higher and the
10  projection for the future looks better.
11     Q.    And why is it that a Chapter 7
12  trustee could not capture that increased
13  value?
14     A.    Because a Chapter 7 trustee, in
15  our opinion and our assumption, moves to
16  liquidate the assets quickly and does not
17  have the ability, therefore, to capture
18  that forward projection of market value
19  that we think is more robust.
20     Q.    We covered this a little bit
21  before.  Other than your prior experience
22  with Chapter 7 trustees, did you conduct
23  any empirical data or go through any
24  empirical data to justify the difference

Page 158

J. SEERY

1  between liquidation versus the plan
2  analysis?
3       A.    In respect of doing the work for
4  this?
5       Q.    Sorry.  That was a terrible
6  question.  I will rephrase.
7            Did you conduct any interviews
8  with Chapter 7 trustees or otherwise
9  conduct due diligence to justify the
10 spread between 257 and the 191 in your
11 most recent projections?
12      A.    I object to the use of "due
13 diligence."  That is not the right use of
14 that term.
15           Did I interview trustees?  No.
16      Q.    What analysis did you perform to
17 get to the spread?
18           MR. MORRIS:  Objection to the
19      form of the question.
20      A.    I think I said it, but we looked
21 at each of the assets.  We considered it
22 in the context of its now current value as
23 well as our projections with respect to
24 the prospects in the market over the

Page 159

J. SEERY

1  foreseeable time period, which we used as
2  an assumption here over the next two
3  years.
4       Q.    You testified regarding your
5  involvement with MF Global and the Chapter
6  7 trustee.  Can you give me a little
7  background on that case?
8       A.    It was liquidation of a
9  commodity broker-dealer.  We invested, we
10 bought securities in the case and traded
11 them.
12      Q.    Were these broker-dealers that
13 held regularly marketable securities?
14      A.    It was a broker-dealer that was
15 a commodity broker-dealer.  So, they had
16 debt and we traded in its debt.
17      Q.    How long was the Chapter 7
18 trustee in place in the MF Global case?
19      A.    I don't recall.  The assets were
20 very swiftly litigated and it was a
21 litigation case.  In both of those cases
22 the assets were blown out.  They got blown
23 out quickly, and then it's a litigation
24 case.  So, you are betting on timing,

Page 160

J. SEERY

1  distributions and recoveries in
2  litigations.
3       Q.    Mr. Seery, let's just go back
4  briefly.  I wanted to pick up on a line of
5  questioning where you were asked about, by
6  Mr. Draper, about the total operational
7  expenses versus what you would receive in
8  income.  I am going to try to get to where
9  I think you guys were talking over each
10 other a little bit.
11           MR. TAYLOR:  If you could pull
12      up, Bryan, the November profit and
13      loss that shows all the way to
14      November 2022?  The total of 2022
15      where it rolls everything up, the next
16      page down.
17      Q.    Mr. Seery, just to I make sure I
18 understand this document correctly, this
19 is the November projections and the total
20 operating expenses there are going to be
21 $18 million.  Correct?
22      A.    18.468.  Yes.
23      Q.    In the January report or
24 analysis the total operating expenses are

Page 161

J. SEERY

1  going to be approximately $20.5 million
2  higher at $38.8 million.  Correct?
3       A.    38.8.  Yes.
4       Q.    So an increase of $20.5 million.
5  Correct?
6       A.    I will take your math.
7       Q.    That is a dangerous way to do it
8  but I think it's right.
9       A.    That is what I have been seeing.
10      Q.    So the total revenue in November
11 the Debtor is going to be able to realize
12 is $2 million.  Correct?  For management
13 fees, shared services fees and other
14 income?
15      A.    Which plan are you looking at?
16      Q.    I am looking at the November.
17      A.    Total revenue, 2.154.
18      Q.    Now going to the January one, we
19 made a change in assumptions here, right?
20      A.    Yes.
21      Q.    With that change in assumption
22 you are going to be able to realize
23 approximately 6.1 million more dollars,
24 correct, in gross revenue?

Page 162

J. SEERY

1   A.   If that is the delta.  I didn't
2   pay attention to the list.
3   Q.   2.1 versus 8.2.
4   A.   That is fine.
5   Q.   So $6.1 million increased gross
6   revenue.  Right?
7   A.   Correct.
8   Q.   But you are going to have to
9   spend 20.5 million more dollars because of
10  those changes in assumptions.  Correct?
11  A.   Not to do with the revenue but
12  because of the other changes in
13  assumptions; correct.
14  Q.   What are those other changes in
15  assumptions?
16  A.   They are built in throughout the
17  model.  I think -- I think we have given
18  you a summary of it.  If you want to walk
19  through line by line, we can do that.  You
20  guys seem to keep driving at the CLOs or
21  management fees.  They are profitable.
22  Very.  You just have trouble getting there
23  on the question.
24  Q.   So how much of that

Page 163

J. SEERY

1   $20.5 million of increased costs are
2   attributable to the cost that it takes --
3   or for the income stream generated by
4   these management and shared service fees
5   and other income, the increase of
6   6.1 million?
7   A.   I don't understand your
8   question.
9   Q.   Let me try it another way.
10  Of that increased cost of
11  $20.5 million, how much of that expense is
12  driven by the costs -- how much of the
13  $20.5 million of cost is needed to
14  generate that extra 6.1 million in
15  revenue?
16  A.   Over that period, probably about
17  4 million.  Somewhere in the 3 to 4
18  million range.
19  Q.   So you believe it is positive
20  cash flow 2 to $3 million in making those
21  changes of assumptions?
22  A.   Very conservatively, yes.
23  Q.   And what are those other
24  $15 million worth of increased costs

Page 164

J. SEERY

1   generated from?
2   A.   We'd have to go through line by
3   line.  But there is a significant amount
4   of more cost that we put into the
5   management of the assets that have both
6   more of a robust ability to manage the
7   assets as well as to litigate with the
8   parties we expect to be fighting with.
9       MR. TAYLOR:  So, Mr. Seery, I am
10  going to take a very, very brief break
11  just to confer with my colleagues,
12  probably five minutes.  And I think I
13  probably lied to you in that I think I
14  am at the end of my questioning.  I
15  want to confer with them and make sure
16  I have covered everything we want to
17  cover.
18      I currently have the time at
19  12:44.  If we can reconvene, if
20  everybody would stay by their computer
21  for three minutes and just let me
22  confer with them really quick, I
23  believe I will conclude my questioning
24  subject to reexamining based upon

Page 165

J. SEERY

1   whatever Mr. Rukavina may ask or your
2   own counsel may ask.
3       MR. RUKAVINA:  Wait for me to
4   come back.  It will be less than five
5   minutes.  I will have less than 30.  I
6   am prepared.
7       MR. TAYLOR:  We'll reconvene in
8   10 to 15.
9       (Recess.)
10      MR. TAYLOR:  Mr. Seery, thank
11  you for allowing me that brief break.
12  I have no further questions pending
13  asking some follow-up questions
14  depending on what further testimony
15  you may have in this deposition.  I
16  might have to jump back in at the end
17  but I will wait until the end.  With
18  that, I have no further questions
19  pending that reservation.
20      MR. RUKAVINA:  Mr. Seery, this
21  is Davor Rukavina.
22  EXAMINATION BY
23  MR. RUKAVINA:
24  Q.   A few questions about those

Page 166

```
 1              J. SEERY
 2   updated projections from yesterday if you
 3   have them in front of you.  Assumption C
 4   is that all demand notes are collected in
 5   the year 2021, three term notes defaulted
 6   and have been demanded, et cetera.
 7          Can you identify the three term
 8   notes that are discussed in that?
 9       A.    Let me just see.  Assumption --
10   I believe it is the $24 million NexPoint
11   note, and I forget if it is two HCFMA
12   notes.  I thought they were demand.  Off
13   the top of my head, those are the three I
14   recall.  Certainly the largest was
15   NexPoint.
16       Q.    Are you meaning HCMFA?
17       A.    Did I get it wrong?  Highland
18   Capital Management Financial Advisors.
19   Whatever they call themselves.
20       Q.    That is what I understood.
21          You anticipate that all three of
22   those notes will be collected in the year
23   2021?
24       A.    Yes.
25       Q.    Are these the three notes that
```

Page 167

```
 1              J. SEERY
 2   the Debtor has recently filed adversary
 3   proceedings regarding?
 4       A.    I think those are three of the
 5   notes.  I think we filed for demand notes
 6   as well.
 7       Q.    Do these projections include any
 8   discount for those three notes based on
 9   potential uncollectability?
10       A.    No.  I don't believe -- there is
11   no uncollectability discount for the
12   demanded notes.
13       Q.    Has the Debtor undertaken an
14   analysis of the collectability of those
15   three notes?
16       A.    Only from a top-level view; yes.
17       Q.    Do you have an opinion on that?
18       A.    Yes.  They are going to be
19   collectible.
20       Q.    Including the Highland Capital
21   Management Fund Advisors one?
22       A.    Oh, yes.
23       Q.    Has the Debtor considered what
24   would happen if the collection of those
25   notes drove those Defendants into
```

Page 168

```
 1              J. SEERY
 2   insolvency or bankruptcy procedures?
 3       A.    Yes.
 4       Q.    And you are still not prepared
 5   to discount them, or you have already
 6   taken that into account when you did not
 7   discount them?
 8       A.    There is a ton of assets hidden
 9   behind them that have been siphoned off
10   that we are highly confident we would get
11   to rather quickly.
12       Q.    Are you talking about potential
13   fraudulent transfers?
14       A.    Yes.
15       Q.    Assumption F, as in Frank,
16   discusses the Highland bonus plan.  It
17   says "accrual for employee bonuses as of
18   January 2021 are reversed and not paid."
19   Do you see that?
20       A.    Yes.
21       Q.    Do you recall the approximate
22   amount of that accrual?
23       A.    I don't recall, no.
24       Q.    Is it more than $20 million?
25       A.    I don't believe it was.  From
```

Page 169

```
 1              J. SEERY
 2   the prior question, I was thrown some
 3   numbers that Dondero claimed is some
 4   large amount.  I don't think that's good
 5   faith.  Obviously, or maybe not so
 6   obviously, if he ran his company and
 7   siphoned off that much money, what 20
 8   million -- it would be kind of weird to
 9   stiff your employees for that amount.  I
10   don't recall the exact amount.
11       Q.    Why would Mr. Dondero siphoning
12   off money have anything to do with
13   accruals for employee bonuses?
14       A.    Typically when you have the
15   cash, you pay the employees.
16       Q.    Are you aware of how this
17   alleged bonus plan was intended to
18   function?
19       A.    Yes.
20       Q.    What is your understanding of
21   it?
22       A.    My understanding is that they
23   deferred significant amounts of cash that
24   they otherwise would have potentially paid
25   employees and they had the ability to
```

Page 170

J. SEERY

1 terminate the payment of that amount at
2 any time except for debt of the employee.
3     Q.    Is it your understanding that
4 those bonus payments were always intended
5 to be paid out over time or were they
6 supposed to be paid in lump sums whenever
7 they might otherwise be payable?
8         MR. MORRIS:  Objection to form
9     of the question.
10     A.    My understanding of the plan is
11 it gave the company complete flexibility
12 to pay them or not pay them.  I think by
13 virtue of what is done in this case, there
14 was never an intention to pay them.
15     Q.    That accrual that we mentioned,
16 was that an accrual on the books and
17 records of the Debtor?
18     A.    I don't believe so, no.
19     Q.    Do you know where, if anywhere,
20 that was accrued?
21     A.    Certainly in the individual
22 employee's account line item that
23 personnel kept.  But it wasn't something
24 that I would find on the balance sheet.

Page 171

J. SEERY

1     Q.    So the individual employee would
2 keep that, but the Debtor's books and
3 records would not also reflect some
4 written accrual?
5         MR. MORRIS:  Object to form of
6     the question.
7     Q.    Let me ask again.  You mentioned
8 that you wouldn't find it on the balance
9 sheet.  Correct?
10     A.    Correct.
11     Q.    But I also asked whether to your
12 knowledge an accrual is kept anywhere on
13 the Debtor's books and records.  Do you
14 remember me asking that?
15     A.    Yes.
16     Q.    I believe you said no.  Do you
17 stand by that answer?
18     A.    I did not say that.
19     Q.    Then let me ask it again.  I
20 apologize for misunderstanding.
21         Would, to your knowledge, an
22 accrual for these bonus payments have been
23 kept anywhere by the Debtor on its books
24 and records?

Page 172

J. SEERY

1     A.    Yes.
2     Q.    Do you remember approximately
3 where?
4     A.    In the personnel files.
5     Q.    Okay.  Is it your opinion that
6 that accrual and claims related to it are
7 worth zero?
8     A.    Yes.
9     Q.    And I take it that, therefore,
10 when you are estimating distributions to
11 Class 8 general unsecured claims, you are
12 assuming again zero for those accruals and
13 claims?
14     A.    Yes.
15     Q.    Using round numbers, the
16 projections estimate 194 million-plus
17 available to Class 8.  If those employee
18 claims based on that accrual were allowed
19 in any amount, then whatever that amount
20 would be would come off of that 194
21 million.  Is that accurate?
22     A.    It would come off?  No.  The
23 amount available for distribution would be
24 the same, but the amount to be distributed

Page 173

J. SEERY

1 to would go up.
2     Q.    I apologize.  You are correct.
3 If those employee accrual claims were
4 allowed in any amount, then the estimated
5 distribution to Class 8 creditors would go
6 down from 62.14 percent.  Is that correct?
7     A.    That's correct.
8     Q.    Assumption I, as in India, is
9 that the litigation trustee budgeted
10 6.5 million.  Does that include your
11 estimated compensation?
12     A.    I am not the litigation trustee,
13 so no, it does not.
14     Q.    I apologize.  That's just for
15 the litigation subtrust?
16     A.    Correct.
17     Q.    Do you know whether that
18 includes potential fees and expenses of
19 counsel that would be prosecuting the
20 litigation?
21     A.    This amount is the amount that
22 we expect from our projections to
23 distribute to the litigation trustee.  I
24 assume that the litigation trustee will

J. SEERY

1  spend infinitely more than that.
2      Q.    I understand.  Do you agree
3  that, therefore, the litigation trustee
4  will have to retain counsel on a
5  contingency basis if he will have to spend
6  infinitely more than that?
7      A.    Not necessarily, no.
8      Q.    Why not?
9      A.    The Claimant trust could make
10  additional distributions if the Oversight
11  Committee permitted it.
12      Q.    Got it.
13          Help me, please, if I am dense,
14  but where on these projections, if
15  anywhere, are the estimated net proceeds
16  of the litigation trust included in a
17  distribution to general unsecured
18  creditors?
19      A.    They are not.
20      Q.    So is it fair to say that any
21  net distributions from that litigation
22  trust would increase the 62.14 percent
23  estimated distribution?
24      A.    Yes.

J. SEERY

1      Q.    Do you have an estimate of how
2  much that could be increased by or what
3  the net value of those litigation causes
4  of action might be?
5      A.    I do not.
6      Q.    Assumption "O" and other matters
7  in here discuss the 85-cent payout to
8  Class 7.  You are familiar with that
9  85-cent payout.  Correct?
10      A.    Yes.
11      Q.    Why is there a difference in the
12  proposed 85 percent to Class 7 and
13  62 percent to Class 8?
14      A.    The structure of the plan.
15      Q.    I understand correctly that
16  Class 7 consists of convenience class
17  claims?
18      A.    Generally claims that were
19  liquidated claims as of the time that we
20  put the plan together.
21      Q.    But they are in an amount of
22  $1 million or less?  Am I right about
23  that?
24      A.    That's correct.

J. SEERY

1      Q.    So then tell me, to your
2  understanding, how the $1 million number
3  was determined and why Class 7 is a
4  separate class?
5      A.    It was negotiated with the
6  Creditors' Committee.
7      Q.    Is it inconvenient to the
8  Claimant trust to have to deal with those
9  claims post-confirmation?
10      MR. MORRIS:  Objection to form
11      of the question.
12      A.    Did you say is it inconvenient?
13      Q.    Yes, sir.
14      A.    No.  It is very convenient.
15      Q.    Well, maybe I am wrong, but
16  isn't Class 7 called convenience class
17  claims?
18      A.    That's its name.
19      Q.    Okay.  But it is not really done
20  for convenience purposes; it is done as a
21  negotiation with the Creditors' Committee?
22  Is that your answer?
23      MR. MORRIS:  Objection to form
24      of the question.

J. SEERY

1      A.    I think it is very convenient,
2  using the conventional definition of the
3  word, to deal with Class 7 the way it is
4  structured.
5      Q.    And why is it convenient, sir?
6      A.    Because they will be paid off
7  early on in the case, once it's exited.
8      Q.    And that was one of the
9  negotiated points of the committee?
10      A.    Yes.
11      Q.    Would it be administratively
12  inconvenient for the post-confirmation
13  Claimant trust to have to deal with those
14  claims?
15      A.    It would be more difficult.  So,
16  yes, I think it is fair to say it would be
17  inconvenient.
18      Q.    Why would it be more difficult?
19      A.    There would be more to do.
20      Q.    Do you have a ballpark of how
21  many claims are in Class 7, by number that
22  is?  In other words, I know it is 10
23  million or so in amount, but do you have a
24  ballpark estimate of the number?

---

Page 178

```
 1                J. SEERY
 2       A.    I don't recall right now.
 3       Q.    Is it fair to say that it is
 4  less than a hundred?
 5       A.    I believe that is fair to say.
 6       Q.    And you are saying that it would
 7  be inconvenient for the Claimant trust to
 8  have to deal with carrying these claims on
 9  its books and making distributions to
10  these creditors in the future?
11       A.    Yes.
12       Q.    And how was the $1 million
13  amount fixed at?
14       A.    It was negotiated.
15            MR. MORRIS:  Objection.  Asked
16       and answered.
17       Q.    Negotiated with the Creditors'
18  Committee?
19       A.    Yes.
20       Q.    Is that the extent of the reason
21  for the $1 million?
22       A.    I don't understand your
23  question.
24       Q.    Do you recall who proposed the
25  million dollar number, the Creditors'
```

---

Page 179

```
 1                J. SEERY
 2  Committee or the Debtor?
 3       A.    I think initially -- not the
 4  million dollar number.  I think the Debtor
 5  initially proposed the structure, to
 6  bifurcate liquidated and unliquidated
 7  claims, and we negotiated the amount.  So
 8  I don't recall the specific -- whether it
 9  was a number we came up with or the
10  committee came up with.
11       Q.    Was that number, was the basis
12  for that number administrative
13  convenience, or was it a negotiation with
14  the committee?
15       A.    I don't recall the exact basis,
16  but it was all a negotiation.
17       Q.    Can you tell the court what the
18  inconvenience, the administrative
19  inconvenience to the post-confirmation
20  Claimant trust would be if it had to
21  administer these Class 7 claims in
22  addition to Class 8 claims?
23       A.    I will tell you; I don't know if
24  the court is on, but we can tell the court
25  next week.  It will just be more work that
```

---

Page 180

```
 1                J. SEERY
 2  we'd have to deal with to administer the
 3  estate.
 4       Q.    Have you undertaken or anyone
 5  for you undertaken an analysis of how much
 6  more work would be involved?
 7       A.    No.
 8       Q.    Have you undertaken or has
 9  anyone for you undertaken an analysis of
10  the cost of that additional work?
11       A.    No.
12       Q.    Was there any particular
13  creditor on the Creditors' Committee that
14  you can think of that was really pushing
15  for this Class 7 $1 million treatment, or
16  was that the committee as a whole?
17       A.    It was the committee as a whole.
18       Q.    I am still looking at these
19  projections, if that's a fair
20  characterization.  I am now on the page
21  where it is plan analysis versus
22  liquidation analysis.
23       A.    Which is the part where you are
24  having a problem with whether it is a fair
25  characterization?
```

---

Page 181

```
 1                J. SEERY
 2       Q.    Sorry?
 3       A.    You said something about a fair
 4  characterization.  Was that just being
 5  snide, or did you have something specific
 6  you wanted to talk about?
 7       Q.    I am calling what was sent last
 8  night the updated plan projections.  Can I
 9  call them that?  Do you know what I am
10  talking about?
11       A.    Yes.  I think you used some
12  different phrase there, but that is okay.
13       Q.    Forgive me not only for my
14  accent but for the electronic nature of
15  this.  I am just trying to tell you where
16  I am looking.
17            I am looking at what is called
18  plan analysis versus liquidation analysis,
19  which you were asked about quite a bit
20  earlier today.
21       A.    Yes.
22       Q.    One of the line items under the
23  plan analysis is "estimated expenses
24  through final distribution" and it is
25  $59 million and change.  Do you see that?
```

---

Page 182

1              J. SEERY
2       A.    Yes.
3       Q.    Can you point me to somewhere in
4  these documents that that ties into?
5       A.    I am sorry.  I don't understand
6  what you mean, "ties into."
7       Q.    I apologize.  What does the
8  $59 million consist of as far as other
9  line items in these projections?
10      A.    That is the estimated expenses
11 through the final distribution.
12      Q.    Is there, to your knowledge, a
13 portion of these projections that
14 separates that $59 million discretely into
15 its constituent parts?
16            MR. MORRIS:  Objection to the
17      form of the question.
18      A.    In the P&L statement we break
19 out the operating expenses versus the
20 professional fees.
21      Q.    This projection estimates some
22 $10.5 million in administrative claims.
23 Are you familiar with that?
24      A.    Yes.
25      Q.    I take it part of that is unpaid

Page 183

1              J. SEERY
2  professional fees?
3       A.    That's correct.
4       Q.    Is any part of that cure claims
5  for the assumption of contracts?
6       A.    There may be a small amount in
7  there that we have to cure but not
8  significant.
9       Q.    Are you familiar with the
10 administrative claim that my two advisor
11 clients filed last week?
12      A.    Yeah.  That's kind of funny.
13 Yes.
14      Q.    I take it, because you think it
15 is kind of funny and because you are
16 smirking, you think those are bogus
17 claims?
18      A.    I know they are bogus claims.
19      Q.    Are those claims valued at zero
20 in this 10.5 million estimate?
21      A.    Zero -- I don't know if we have
22 taken any positive for the fees we will
23 probably see but we value them at zero.
24      Q.    Why are those bogus claims?
25      A.    Because they have no basis in

Page 184

1              J. SEERY
2  fact.
3       Q.    So the allegation at least is
4  that my clients made post-petition
5  payments for employees that no longer
6  existed?  Are you aware of that
7  allegation?
8       A.    I am very aware of the
9  allegation and numerous other allegations
10 that your clients have propounded that
11 have no basis in fact and that you
12 propound without having any basis in law.
13 So yes, I have seen this a lot and will
14 continue to see it.  They only seemed to
15 have to come up when there is a dispute
16 around the plan.  Kind of odd.  Nobody
17 complained earlier, but we'll continue.
18      Q.    To your opinion, what baseless
19 allegations in law have I personally made?
20      A.    You accused me of breaching the
21 Advisers Act.
22      Q.    Anything else?
23      A.    That seems pretty good.  We can
24 start there.
25      Q.    What allegations of fact that

Page 185

1              J. SEERY
2  are baseless have my clients made?
3       A.    I just named one.
4       Q.    Any more?
5       A.    There is lots more.
6       Q.    Can you name a couple?
7       A.    We'll get to it next week.
8       Q.    You are not prepared today to
9  tell me what allegations the funds and
10 advisors have had that are baseless in
11 fact?
12      A.    Everything related to last
13 week's testimony in front of the judge, as
14 well as these bogus claims.
15      Q.    Okay.
16      A.    The claim that they are
17 independent from Dondero, the claim that
18 you are acting independent from Dondero.
19 This is all bogus.
20      Q.    So to your understanding,
21 anything that touches Dondero is bogus and
22 done for litigation leverage.  Is that
23 accurate?
24      A.    That is what I have seen, as
25 well as you.

Page 186

J. SEERY

1    Q.    Is that why you sent an email to
2  the independent board member Ethan on
3  Wednesday accusing the CCO of perjury?
4    A.    No, that is not why I sent that.
5    Q.    Why did you send that?
6    A.    Because they had stuck their
7  head in the sand from a termination notice
8  that was sent on the service agreements
9  more than 60 days ago.  They also knew
10 that their funds -- the advisor to their
11 funds were in default to HCFMA, yet this
12 board of directors never did anything to
13 plan for the future of this business.
14         They also knew that Dondero
15 resisted any transition, that they had
16 done nothing.  They didn't file an 8-K,
17 they didn't post anything to their
18 website.  The stocks trade retail with the
19 most illiquid assets.
20         That's why I sent it.
21    Q.    I understand why you sent it but
22 you didn't answer my question.  Why did
23 you feel the need to tell the board that
24 my CCO answers to that he committed

Page 187

J. SEERY

1  multiple acts of perjury?
2    A.    In my opinion he did, and I
3  think that the board of directors should
4  know that because, obviously, to me,
5  either they are complicit in it or they
6  haven't been advised of anything.  And the
7  fact that they haven't notified investors
8  of the current condition of their funds is
9  quite scary.
10    Q.    Did you intend that that board
11 do something with respect to your
12 statement that my client CCO committed
13 multiple acts of perjury?
14    A.    I believe that they should.
15    Q.    Did you know that he was still
16 in the middle of his testimony before
17 Judge Jernigan when you sent that email?
18    A.    That is not correct.
19    Q.    Do you not understand that I was
20 not done examining him when Tuesday's
21 hearing adjourned?
22    A.    I did not understand that, no.
23    Q.    You thought that he was done
24 with his testimony?

Page 188

J. SEERY

1    A.    I thought he was.  Yes.
2    Q.    Did you expect that that email
3  would eventually get to him and that
4  allegation that he committed perjury?
5    A.    No.
6         MR. MORRIS:  Davor, I am going
7    to shut this down now.  I appreciate
8    your interest in these questions.
9    There is nobody on the phone who
10   otherwise has an interest in these
11   questions.  It has absolutely nothing
12   to do with confirmation, so I would
13   respectfully request that you move on.
14        MR. RUKAVINA:  One more question
15   on that and then I will -- well, two
16   more questions.
17    Q.    Prior to sending that email did
18 you have a telephone conference with
19 Ethan?
20    A.    I did.
21    Q.    My last question on this topic:
22 In that telephone conference, did you call
23 the K&L lawyers criminal lawyers?
24    A.    I don't believe I said that, no.

Page 189

J. SEERY

1    Q.    Did you say anything similar to
2  that?
3    A.    No --
4         MR. MORRIS:  That is your second
5    question.  You got it.  Let's move on.
6    A.    No, I don't believe so.
7    Q.    Have you discussed with
8  Mr. Waterhouse whether my administrative
9  claim that I filed has any factual merit?
10    A.    Only last --
11        MR. MORRIS:  Objection to the
12   form of the question.
13    A.    Only last night because we got a
14 subpoena -- or he got a subpoena.
15    Q.    Prior to that, you did not
16 discuss with him whether my administrative
17 claim had any factual merit?
18    A.    I don't believe so.  Not the
19 administrative claim, no.
20    Q.    Other than communications that
21 you have had with counsel, have you
22 discussed that administrative claim with
23 anyone else that might be able to tell you
24 whether it has or does not have any

Page 190

J. SEERY

1  factual merit?
2      A.    I believe I have, but I am not
3  certain of it.
4      Q.    Is it fair to conclude that you
5  believe that that claim is bogus because
6  Mr. Dondero is somehow involved with it?
7          MR. MORRIS:  Objection to form
8      of the question.
9      A.    I think I already answered it.
10  That is part of it, that he is directing
11  it and it is just made up out of thin air.
12  But these services have gone on.  I talked
13  to the retail boards.  I've had
14  negotiations and dealings with some of
15  these entities for a long time during the
16  case.  It was never raised before.
17          These claims that something
18  happened now in the case that is different
19  than happened before and that they weren't
20  getting services are just solely
21  fabricated for the case.  I suspect that
22  it's been done in a coordinated effort.
23      Q.    Coordinated between whom?
24      A.    Mr. Dondero and the operators at

Page 191

J. SEERY

1  the funds, who work for Mr. Dondero.
2      Q.    I apologize.  You have seen my
3  administrative claim, right?
4      A.    No.
5          MR. MORRIS:  Davor, I am really
6      going to direct the witness not to
7      answer.  We are done with your
8      administrative claim and his knowledge
9      of the administrative claim.  He
10      answered the question as it relates to
11      the projections.  There is no money in
12      the forecast for the payment of the
13      administrative claim.  So, let's move
14      on.
15          MR. RUKAVINA:  Ms. Court
16      Reporter, did you hear the answer
17      "no"?
18          COURT REPORTER:  I do have the
19      answer "no" on the record.
20      Q.    The liquidation analysis from
21  yesterday estimates expenses through final
22  distribution in a liquidation at
23  $41,488,000.  Are you familiar with that?
24      A.    Yes.

Page 192

J. SEERY

1      Q.    Do you know how that $41 million
2  number was estimated?
3      A.    We built it up on our assumption
4  of the expenses that would be required to
5  conduct a liquidation.
6      Q.    That liquidation, does it assume
7  a Chapter 7?
8      A.    It does.
9      Q.    Do you know what the constituent
10  parts of that 41-and-a-half-million-dollar
11  estimate are?
12      A.    I don't recall off the top of my
13  head, but I do know them, yes.
14      Q.    So there is an analysis, do you
15  think it would include the Chapter 7
16  trustee's commission?
17      A.    Yes.
18      Q.    Do you think it would include
19  the Chapter 7 trustee's attorneys?
20      A.    Yes.
21      Q.    Do you think it would include
22  Chapter 7 trustee, other professionals
23  like accountants and tax advisors?
24      A.    I believe it does, yes.

Page 193

J. SEERY

1      Q.    And do you know the factual
2  basis from which those constituent numbers
3  were estimated?
4          MR. MORRIS:  Objection to the
5      form of the question.
6      A.    Sorry.  Can you give me the
7  question again?
8      Q.    Yes.  Do you know the factual
9  basis from which those constituent
10  components were estimated?  I followed up
11  with, was it just experience of
12  professionals, or something else?
13      A.    To the first question, it was
14  our experience looking at the assets and
15  looking at how a trustee would approach
16  them and what the costs would be.  What is
17  the second question?
18      Q.    I will withdraw the second
19  question.
20          I am going to move now to the
21  P&L.  It is the first page of the P&L
22  where it talks about revenue.  I am going
23  to look at shared services fees.  It says
24  "total 2020, 15 million and change."  Do

J. SEERY

1  you see that?
2      A.   Yes.
3      Q.   Some of that hasn't been paid.
4  Correct?
5      A.   I assume that this part is a
6  P&L, I believe that have not been paid, as
7  opposed to a cash draw.
8      Q.   Well, it looks --
9      A.   Certainly it is not up to date
10 and your clients are in arrears.
11     Q.   I understand that.  That is my
12 question.  They are in arrears for
13 something like 5 or more million dollars.
14 Is that correct?
15     A.   The total amount, I think -- I
16 am not sure which are your clients and
17 which are others -- is between 5 and
18 $7 million of unpaid post-petition.
19     Q.   And then it continues to have
20 shared service fees of 1.4 and change
21 million in 2021 and it looks like that's
22 it.  Correct?
23     A.   No.
24     Q.   What are -- forget about what is

J. SEERY

1  in default right now.  But going forward,
2  what are the estimated -- what is the
3  estimated revenue from shared service fees
4  going forward post-confirmation?
5      A.   In 2021 -- post-confirmation?
6      Q.   Yes, sir.
7      A.   It will be probably about
8  90,000, $100,000 post-confirmation,
9  assuming that everything is paid through
10 the first three months.
11     Q.   And you were asked about this
12 before, the $6 million-plus in management
13 fees under the plan.  You are not prepared
14 to give an estimate of the actual expenses
15 that would have to be incurred in
16 collecting those management fees, are you?
17     A.   I think I gave one.
18     Q.   What was it, sir?
19     A.   It's about 3 to $4 million.
20     Q.   Thank you.  Then I apologize.  I
21 had missed it.
22          Is there a cure claim, to your
23 understanding, associated with assuming
24 those management contracts?

J. SEERY

1      A.   I believe there is.
2      Q.   And is it -- do you know what
3  the estimated or potential amount of that
4  is?
5      A.   About half a million dollars.
6      Q.   Have you included that in the
7  expenses you just mentioned of realizing
8  those $6.215 million?
9      A.   I believe it is actually
10 included in the administrative costs.
11     Q.   The second PDF that counsel sent
12 last night, I just have a question about
13 this.  It shows independent director fees
14 going into 2021 and 2022.  I had
15 understood that under the plan the
16 independent directors would no longer be
17 there.  Am I wrong on that assumption?
18     A.   You are conflating two different
19 types of independent directors.
20     Q.   Then I apologize.  The current
21 independent board, that is going to be
22 disbanded or whatever the correct word is
23 at confirmation.  Correct?
24     A.   That's correct.

J. SEERY

1      Q.   So what independent directors
2  are there going to be post-confirmation?
3      A.   There will be --
4          MR. MORRIS:  Objection to form.
5      A.   There will be independent
6  persons on the Claimant Oversight
7  Committee.
8      Q.   So the $210,000 or so monthly in
9  that document, that refers to that
10 Oversight Committee?
11     A.   Can you show me the document?
12     Q.   Yes.  It is the second PDF that
13 Mr. Morris showed today and yesterday, the
14 smaller one.  Plan disclosure statement
15 forecast profit/loss.
16     A.   Is this in the projections, or
17 something else?
18     Q.   Sir, I was actually going to ask
19 you how these tie in together.  Mr. Morris
20 yesterday sent two PDF's.  One are the
21 projections that we have been talking
22 about all day.  Then he sent a separate
23 PDF that is only three pages that is
24 called "Profit and Loss."  I was going to

J. SEERY

1  see how these two tie in if at all.
2        Do you not have the second PDF
3  on your computer?
4        A.    I don't have it in front of me.
5  If you are asking me questions about it, I
6  would like to have it in front of me.
7  This is a three-page profit and loss?
8        Q.    Yes.
9        A.    I think I have it.
10             MR. MORRIS:  I am sending it
11  now.
12             THE WITNESS:  You sent it to
13  me --
14             MR. TAYLOR:  Bryan is attempting
15  to pull that up for everybody.
16             (Reporter interruption.)
17             MR. TAYLOR:  This is something
18  separate sent with Exhibit 1 but not
19  attached thereto.
20        Do you want the total shown for
21  the two-year total or the first page
22  of it?  Bryan, you can maneuver the
23  document.
24             MR. RUKAVINA:  Bryan, the next

J. SEERY

1        page, please.
2        Q.    Are you able to see that,
3  Mr. Seery?
4        A.    I can, yes.
5        Q.    You see it is 220, 210, 210 and
6  so on for independent director fees.  Do
7  you see that, Mr. Seery?
8        A.    I do, yes.
9        Q.    What are those independent
10  directors related in that line item?
11        A.    I am sorry.  I don't understand
12  your question.
13        Q.    Who are the independent
14  directors being paid these monthly
15  projected amounts?
16        A.    They are going to be independent
17  directors on the Claimant Oversight Board,
18  and they will also oversee the litigation
19  trustee.
20        Q.    Do you see the entry for
21  June 2021 of $1,710,000?
22        A.    Yes.
23        Q.    Do you have an understanding of
24  why that number is so much higher than the

J. SEERY

1  other monthly amounts?
2        A.    That may include -- I don't know
3  if that includes my bonus from the case
4  that we would have built into the
5  projections, not for the post that we
6  haven't negotiated, but for the case.
7        Q.    Can you think of anything else
8  that that might be other than what you
9  just mentioned?
10        A.    No.  I can't think of anything
11  specific, no.
12        Q.    The row beneath that, "Other
13  bankruptcy fees," do you know what those
14  fees are that is being referenced there?
15        A.    I do on the build-up of this,
16  but I don't know the specific items in
17  there.  Those would have been the deferred
18  bankruptcy fees for the end of June we
19  expect to be cleaned up by the end of six
20  months, halfway into the year.
21        Q.    What do you mean by deferred
22  fees, sir?  Just unpaid professional fees?
23        A.    Yes.
24        Q.    What about the fees after that?

J. SEERY

1  You will see they continue into 2021,
2  other bankruptcy fees.  Do you know what
3  that is referring to?
4        A.    There will be trustee fees in
5  there.  There shouldn't be much left for
6  any committee or anything like that.  We
7  should be exited and not have additional
8  cost.
9        Q.    Do you understand whether all
10  these costs and expenses are part of the
11  $59 million estimated expenses through
12  final distribution that we looked at
13  before?
14        A.    Yes.
15             MR. RUKAVINA:  You can take that
16  down, Bryan.
17             COURT REPORTER:  Is that a
18  document you want marked as an
19  exhibit?
20             MR. RUKAVINA:  No, thank you.
21        Q.    One of the topics that I asked
22  you to be prepared for today was the
23  ownership, if any, of voting preference
24  shares of my fund clients in these CLOs.

Page 202

J. SEERY

1    Are you prepared to discuss that today,
2    Mr. Seery?
3       A.    I know what they are; yes.
4       Q.    It is not a setup.  I just want
5    to get through it quickly.  Do you have
6    some kind of sheet handy or something in
7    front of you where you can give me those?
8    If not, I can ask differently.
9       A.    I don't have a sheet in front of
10   me, no.
11      Q.    Are you familiar with who the
12   funds, the names of the funds are that I
13   represent?
14      A.    Yes.
15      Q.    Will you agree with me that each
16   of those funds owns some number of voting
17   preference shares in some of the CLOs at
18   issue under the plan?
19      A.    I would agree with you that they
20   claim to own them.  I don't know that for
21   a fact.
22      Q.    Do you have any basis to
23   disagree that they own them?
24      A.    No.  I have no basis to agree,

Page 203

J. SEERY

1    other than their claims.
2       Q.    Does the Debtor maintain books
3    and records that show the ownership
4    interest in the CLOs of various funds?
5       A.    Does the Debtor maintain?  I
6    don't quite understand.  Does the Debtor
7    maintain the interests of who owns the
8    shares in the funds?
9       Q.    No.  The Debtor, pursuant to the
10   CLO portfolio management agreements,
11   manages the CLOs.  Correct?
12      A.    Correct.
13      Q.    As part of doing that, does the
14   Debtor keep books and records of which
15   actual entities own the voting preference
16   shares in those CLOs?
17      A.    Not always, no.
18      Q.    Do you know where such
19   information would be stored?  And if you
20   don't, you don't.
21      A.    The trustee.
22      Q.    So you are prepared only to
23   agree that these funds claim some
24   percentage of ownership of voting

Page 204

J. SEERY

1    preference shares in the CLOs?
2       A.    Correct.
3       Q.    So I take it you are not
4    prepared to agree that with respect to
5    three of the CLOs these funds hold the
6    majority of voting preference shares?
7       A.    That's correct.
8       Q.    Please tell me what steps you
9    undertook prior to today's deposition to
10   find out the amount of outstanding voting
11   preference shares held by all of these
12   funds.
13      A.    I don't think that was the
14   question in your 30(b)(6).  It was the
15   Debtor's knowledge about its own business.
16   So, we didn't investigate whether -- we
17   didn't go to the trustee to see whether
18   any of your clients actually own anything.
19   We didn't check to see whether they traded
20   any yesterday or the day before or the day
21   before that.  We have no idea.  From the
22   Debtor's perspective, I know what we have.
23      Q.    You just mean your own ownership
24   interest, the Debtor's?

Page 205

J. SEERY

1       A.    Correct.
2       Q.    Sir, I asked, with respect to
3    each CLO, the present amount of
4    outstanding voting preference shares held
5    by -- and I listed my funds.  What steps,
6    if any, did you take to review the
7    Debtor's books and records to see if you
8    could answer that question?
9       A.    We don't have that as a regular
10   book that we keep and I did not do any
11   additional steps to check.
12      Q.    Did you ask any Debtor employees
13   whether they would have the answer to that
14   question?
15      A.    No.
16      Q.    Without going into any legal
17   arguments or contract provisions, would
18   you agree with me that those management
19   agreements give the majority of voting
20   equity shareholders some rights to remove
21   the Debtor or terminate the agreements?
22         MR. MORRIS:  Objection to the
23   form of the question.
24      A.    I would agree that those rights

Page 206

J. SEERY

1  are cabined by, in almost all the
2  instances, maybe not every one, cause and
3  a specific delineation of what cause would
4  be.  In some it is not the majority, it is
5  the super majority.
6  
7      Q.    I agree with you, but I just
8  wanted you to agree that there are some
9  rights.  I think you agree that there are
10  some rights.  We don't have to go down
11  exactly what those rights are.
12         What I would like to know is, is
13  it the Debtor's intent that those rights
14  of removal or termination for cause be
15  affected by the confirmation of this plan?
16      A.    I believe there will be an
17  injunction that would go in place.  Yes.
18      Q.    So under the plan, to your
19  understanding, there is an injunction that
20  would affect whoever owns these rights
21  post-confirmation from exercising those
22  rights?
23      A.    I don't believe that is the way
24  the injunction will work, no.
25      Q.    What is your understanding of

Page 207

J. SEERY

1  how the injunction would work?
2      A.    I would expect it to be limited
3  to your clients so long as they are in
4  control and working in concert with
5  Mr. Dondero.  Certainly that is what I
6  would ask for.
7      Q.    So --
8      A.    I am not worried about Fidelity
9  owning them.
10      Q.    So if my clients owned voting
11  preference shares and if they were under
12  the control of or working in concert with
13  Mr. Dondero, you would expect the plan to
14  affect their exercise of those rights?
15      A.    I hope so.
16      Q.    To summarize, they would be
17  enjoined from exercising those rights
18  post-confirmation.  Correct?
19      A.    There would be a limitation on
20  their exercise of those rights is what I
21  believe we are hoping for.  Yes.
22      Q.    Do you have an understanding of
23  what that limitation will be?
24      A.    Yes.
25  

Page 208

J. SEERY

1      Q.    What is your understanding?
2      A.    We are looking to have them
3  enjoined from taking action to compel the
4  dissolution or the transfer of the
5  management of those agreements until we
6  are able to monetize the assets in the
7  vehicles.
8      Q.    And I asked you before as to how
9  long you estimate it will take to monetize
10  those assets, and I believe you told me
11  maybe two to three years.  Would that
12  still be an accurate statement, or do you
13  have a different time frame?
14      A.    That is still accurate.  The
15  assumption is two years.
16      Q.    I asked you before and you
17  didn't have anything in writing by then so
18  let me ask now.  As of today, do you have
19  anything in writing from the CLOs
20  consenting to the assumption of those
21  management contracts?
22      A.    I don't believe that I do.  It
23  could be on my email unopened.  I don't
24  recall.
25  

Page 209

J. SEERY

1      Q.    Do you have an understanding of
2  whether those CLOs have consented in
3  writing to the assumption of the
4  management agreements?
5      A.    I believe they have.  The actual
6  final docs haven't been completed, but I
7  believe they have agreed in writing, yes.
8      Q.    Do you expect the final docs to
9  be completed before Tuesday's confirmation
10  hearing?
11      A.    I don't know whether they will
12  be done by Tuesday.
13      Q.    I think you gave your
14  qualifications on Tuesday to manage those
15  contracts, so I won't go through that.
16  But is the current plan to retain any
17  outside servicer or subservicer to assist
18  you with managing the portfolio management
19  agreements post-confirmation?
20      A.    I am sorry.  I didn't understand
21  the question.
22      Q.    Let me ask it differently.
23         As the Debtor, post
24  confirmation, manages those portfolio

Page 210

J. SEERY

1  management agreements, you will be in
2  charge.  Correct?
3      A.   Yes.
4      Q.   Will there be anyone assisting
5  you with managing those agreements?
6      A.   Yes.
7      Q.   Who will those people be?  You
8  don't have to name names.  Just who will
9  be helping you?
10     A.   I will have a team of probably
11 ten employees that will work with me to
12 help manage those assets.  And I will have
13 outside professionals as well as
14 accountants, accountants and lawyers.
15     Q.   Those outside professionals you
16 mentioned, I get it, accountants and
17 lawyers.  Anyone else?
18     A.   No.
19     Q.   So you and internal --
20 post-confirmation Debtor employees will be
21 managing those agreements with the
22 assistance of outside counsel and legal --
23 accountants?
24     A.   Yes, and third-party

Page 211

J. SEERY

1  professional advisors.  Yes.
2      Q.   Who will those third-party
3  professional advisors be?
4      A.   I haven't identified all of them
5  yet.
6      Q.   Is any of the duties or
7  obligations under those management
8  agreements, are they going to be delegated
9  to these third-party professionals?
10     A.   I don't expect that to be the
11 case at this time, no.
12     Q.   So they might give you advice
13 but ultimately it will be you and your
14 employees that will continue to manage
15 those agreements?
16     A.   That is the current plan.  Yes.
17     Q.   Have you considered -- I am not
18 sure what the correct word is, but have
19 you considered subbing out or
20 sub-agencying out those services to some
21 other party?
22     A.   We have considered that, yes.
23     Q.   Have you made a determination on
24 that?

Page 212

J. SEERY

1      A.   Our initial determination is
2  that we prefer to keep them in-house.
3      Q.   Have you analyzed the cost of
4  what sourcing that out might be to the
5  post-confirmation Debtor?
6      A.   We did, but that was a while
7  back as we started to develop the plan and
8  we determined we preferred to keep it
9  in-house.
10     Q.   Why would you prefer to keep it
11 in-house?
12     A.   We think it is a better way to
13 control the assets, better way to be able
14 to access the market more efficiently.
15 There are costs that would be able to be
16 kept in line and that we would be able to
17 maximize value in that way better than
18 farming it out to a third party.
19     Q.   Under the plan, the holders of
20 limited partnership interests in the
21 Debtor are being given, I think it is
22 called unvested contingent interests in
23 the Claimant trust.  Is that generally
24 correct?

Page 213

J. SEERY

1      A.   Generally, yes.
2      Q.   Why are they being given those
3  unvested contingent interests?
4      A.   Potentially, if litigations
5  against Mr. Dondero are very successful
6  and the amount of the claims are exceeded
7  by the recovery on the assets, then those
8  entities might be able to recover from the
9  recoveries from him.
10     Q.   And those would become only
11 vested and contingent if all Class 8 and
12 subordinated creditors and claims were
13 paid full with interest.  Correct?
14     A.   I believe that is the case, yes.
15     Q.   Do you consider those unvested
16 contingent interest in the trusts to be
17 property interests?
18         MR. MORRIS:  Objection to form
19     of the question.
20     A.   I don't really have a view on
21 that.  I think at best they would be
22 inchoate.
23     Q.   Suffice it to say from the
24 projection that you don't believe that

Page 214

J. SEERY

1    J. SEERY
2  those non-vested contingent interests have
3  any value.  Do you?
4      A.    Well, remember, the projections
5  don't contain any recoveries from the
6  litigation trust.  So, I think that it
7  would likely be that they don't.  But, you
8  know, there are some pretty significant
9  causes of action.
10     Q.    And those causes of action, can
11  you run me through some of the more
12  significant ones?
13          MR. MORRIS:  Objection to the
14     form.
15     A.    The causes of action include
16  fraudulent conveyances, both constructive
17  and actual; diversion of assets.  They are
18  still being investigated.  The committee
19  has really got the laboring oar on that.
20  But there are significant amounts of
21  transfers that we have seen that are
22  problematic.
23     Q.    And you believe that those
24  causes of action have value?
25     A.    I believe they do, yes.

Page 215

J. SEERY

1    J. SEERY
2      Q.    Material, large value?
3      A.    I don't know.
4      Q.    You have been a professional
5  for, I guess, your whole adult life.  Do
6  you believe that these non-vested
7  contingent interests -- strike all that.
8          Have you tried to see whether
9  any third party would be willing to make
10  an offer to get these unvested contingent
11  interests?
12     A.    No.
13     Q.    Any reason why not?
14     A.    No reason to do so.  No reason
15  why not.
16     Q.    So those unvested contingent
17  interests may have a value, but that value
18  would be in the future and subject to a
19  pretty serious contingency.  Correct?
20     A.    Yes.
21     Q.    They may be a property interest,
22  but inchoate only.  Correct?
23     A.    That is my belief.  I don't
24  claim to be an expert on the different
25  types of property interests, whether they

Page 216

J. SEERY

1    J. SEERY
2  be inchoate, reversionary, ethereal.  I
3  don't claim to be an expert on the
4  different types of property interests.
5      Q.    Let me ask it this way.  If you
6  have an understanding, you do; and if you
7  don't, you don't.
8          If the Debtor owned those
9  unvested contingent interests, would you
10  consider that to be property of your
11  estate?
12          MR. MORRIS:  Objection to form
13     of the question.
14     A.    I probably would consider it to
15  be property of the estate because the
16  definition of property of the estate is so
17  broad and intended to encompass all manner
18  of interests.  I think outside of the
19  world of bankruptcy in normal parlance
20  they would be a pretty thin interest.
21     Q.    The last time that we were
22  provided a ballot summary -- I'm going off
23  memory here, but I believe 31 Class 8
24  creditors rejected the plan.  Does that
25  sound about correct?

Page 217

J. SEERY

1    J. SEERY
2      A.    I don't know.
3      Q.    My question is, to your
4  knowledge have any Class 8 creditors
5  switched their vote from reject to accept
6  since the ballot summary was filed?
7      A.    Class 8?  I don't know the
8  answer to that.
9          MR. RUKAVINA:  I will pass the
10     witness.  Thank you.
11          MR. MORRIS:  Anybody else have
12     any questions?
13          MR. DRAPER:  A few follow-up
14     questions.
15          Bryan, can you put up the second
16     email we got, the last page?
17  FURTHER EXAMINATION BY
18  MR. DRAPER:
19     Q.    Can you see, Mr. Seery, there is
20  a list of operating expenses on that page?
21     A.    Can you just let me know which
22  doc this is?  It would be easier if I
23  could actually see the whole page.
24          MR. MORRIS:  The last one I sent
25     you a few minutes ago.

J. SEERY

1    THE WITNESS:  Okay.  I think I
2  have it.
3    Q.    You just identified, with the
4  question -- that you would be hiring
5  accountants, outside professionals,
6  third-party professionals, advisors and
7  retain ten people.  Where in those line
8  items for expenses are those costs?
9    MR. MORRIS:  Can we go to the
10  left, please?  Thank you.
11    A.    Professional services.
12    Q.    And compensation and benefits,
13  those would be the ten individuals?
14    A.    Yes.
15    Q.    So the combination of the two
16  would be the total cost of the retention
17  of the management services agreements that
18  Davor asked you about?
19    A.    No.
20    MR. MORRIS:  Objection to form
21  of the question.
22    Q.    No?
23    A.    No.
24    Q.    Let me try to get at it one last

J. SEERY

1  way.  You testified you are going to make
2  3 or 4 -- costs of 3 to $4 million from
3  the generation of revenue with respect to
4  the change of what you are doing.  Where
5  in these line items are the costs
6  associated with the 3 or $4 million?
7    A.    Three to $4 million are
8  contained in multiple places.  So, that
9  contains employee comp as well as
10  additional costs specifically related to
11  contracts that need to be maintained in
12  order to run the CLO business.
13    Q.    Is that in any of these line
14  items?
15    A.    Yes.
16    Q.    Where?
17    A.    It is in compensation, it is in
18  professional services and it is in
19  operating expenses.
20    Q.    Do you know what elements make
21  up that within those three line items?
22    A.    I don't understand the question.
23    Q.    Within the detail that you have
24  that rolls numbers up into this summary,

J. SEERY

1  do you know, if I had the summary I could
2  identify what the components are and what
3  the cost of each component is?
4    A.    I apologize.  I still don't
5  understand the question.  I think I gave
6  you the combination of employees and
7  additional contracts is in that 2 to
8  $3 million range is my recollection.
9    Q.    Now, the compensation is not
10  solely for the generation of the
11  additional revenue.  Correct?
12    A.    Correct.
13    Q.    How much of the $7 million is?
14  If you don't know, you don't know.
15    A.    It is somewhere in the million
16  to million and a half range.
17    Q.    Will the details of that line
18  item tell me how much is in there?
19    A.    Not necessarily because
20  employees do multiple functions.  So, we
21  haven't done a cost basis for each part of
22  the business that we are maintaining.
23    Q.    What about professional
24  services?  Will that detail tell me?

J. SEERY

1    A.    Again, we have estimated overall
2  services.  We don't look at a specific
3  line item and say this accountant is going
4  to just work on this one item and this
5  consultant will just work on this other
6  item.  We have not broken it out -- we
7  have broken it out as a company, not as a
8  function.
9    Q.    Now, the Debtor has filed suit
10  on demand notes.  Correct?
11    A.    Yes.
12    Q.    Do those notes -- (inaudible)
13    MR. TAYLOR:  Mr. Draper, if I
14  can suggest, you are so much
15  clearer -- I know you can't hear
16  yourself -- when you pick up the
17  phone.
18    MR. DRAPER:  Let me re-call in
19  then.  Well, I will just pass the
20  witness.  That is fine.
21    MR. MORRIS:  Does anybody have
22  any more questions?  We are not just
23  going to continue to beat the pinata.
24    THE WITNESS:  I resent that.

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-29   Filed 12/07/23   Page 101 of 214   PageID 6843
Exhibit Exhibit 2 Page 228 of 368   Page 101 of 214



Page 222

```
 1                    J. SEERY
 2          MR. MORRIS:  I apologize.  We
 3    are not just going to continue to take
 4    turns here.
 5          MR. TAYLOR:  We do not have
 6    further questions.
 7          MR. MORRIS:  Thank you very
 8    much.
 9          MR. RUKAVINA:  I am done.
10          [TIME NOTED:  2:53 p.m. EST]
11
12
13    _____
14          JAMES P. SEERY, JR.
15
16
17
18    SUBSCRIBED AND SWORN TO
19    BEFORE ME THIS_____DAY
20    OF_____, 2021.
21
22    _____
23       NOTARY PUBLIC
24
25
```

Page 223

```
 1
 2                 CERTIFICATION
 3
 4
 5       I, DEBRA STEVENS, a Notary Public for
 6    and within the State of New York, do
 7    hereby certify:
 8       That the witness whose testimony as
 9    herein set forth, was duly sworn by me;
10    and that the within transcript is a true
11    record of the remote testimony given by
12    said witness.
13       I further certify that I am not
14    related to any of the parties to this
15    action by blood or marriage, and that I am
16    in no way interested in the outcome of
17    this matter.
18       IN WITNESS WHEREOF, I have hereunto
19    set my hand this 29th day of January,
20    2021.
21
22    _____
23          DEBRA STEVENS, RPR-CRR
24
25          *     *     *
```

Page 224

```
 1
 2              WITNESS ERRATA SHEET
 3
     CASE NAME: Highland Capital
 4   DATE OF DEPOSITION:  January 29, 2021
     WITNESS NAME:  JAMES P. SEERY, JR.
 5
     PAGE/LINE(S)/    CHANGE        REASON
 6   _____/_____/_____/_____
 7   _____/_____/_____/_____
 8   _____/_____/_____/_____
 9   _____/_____/_____/_____
10   _____/_____/_____/_____
11   _____/_____/_____/_____
12   _____/_____/_____/_____
13   _____/_____/_____/_____
14   _____/_____/_____/_____
15   _____/_____/_____/_____
16   _____/_____/_____/_____
17   _____/_____/_____/_____
18   _____/_____/_____/_____
19   _____/_____/_____/_____
20
21          _____
                JAMES P. SEERY, JR.
22   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS____ DAY
23   OF_____, 2021.
24   _____
            NOTARY PUBLIC
25
     MY COMMISSION EXPIRES_____
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 22-11   Filed 12/07/23   Page 102 of 214   PageID 6844

Index: $1..6.215

**$**

**$1** 175:23 176:3 178:12,21 180:15

**$1,710,000** 199:22

**$10** 70:10

**$10.5** 182:22

**$100** 70:7

**$100,000** 55:9 195:9

**$140** 89:2,8,14,15

**$149** 50:10

**$15** 163:25

**$150,000** 125:21 126:4

**$176** 152:19

**$18** 53:2 141:8 160:22

**$190** 24:9 45:6 154:18

**$191** 21:11 50:13

**$2** 161:13

**$20** 25:6 168:24

**$20.5** 161:2,5 163:2, 12,14

**$200** 23:3

**$210,000** 197:9

**$22** 49:5 50:25 52:25

**$24** 90:7 166:10

**$24-and-change-million** 25:18

**$25** 70:5 156:2,6,15 157:4

**$257** 28:3,10 45:7

**$3** 163:21 220:9

**$30** 64:10 65:20 68:6, 11

**$35** 85:24 86:19

**$36** 69:20

**$38** 60:4,5,8

**$38,249,000** 66:17

**$38,849,000** 65:23

**$38.8** 161:3

**$4** 195:20 219:3,7,8

**$40** 20:17 21:21,23 22:17 23:2,18 25:10 49:11

**$41** 52:23 192:2

**$41,488,000** 191:24

**$41.5** 148:14

**$45** 88:12

**$5.2** 148:16 149:3

**$50** 32:15

**$51** 50:16

**$54** 69:17

**$59** 67:22 68:2 181:25 182:8,14 201:12

**$6** 195:13

**$6.1** 162:6

**$6.2** 58:17,22 63:20

**$6.215** 196:9

**$6.5** 86:24

**$60** 140:11

**$65** 155:20

**$67** 141:4

**$7** 70:13 194:19 220:14

**$8** 64:11

**$8.2** 59:8 64:18 65:18 66:11

**$8.269** 59:22,25 61:9, 13 62:2

**$8.6** 63:13,16

**$94** 88:2

**$94.8** 87:24 88:16

**1**

**1** 11:19 74:13 145:16 198:19

**1.4** 194:21

**10** 37:21 165:9 177:23

**10,000-foot** 116:16

**10.5** 183:20

**100,000** 54:12

**11** 39:10 67:21

**11:40** 127:17

**11:58** 127:19

**12** 149:20

**12:44** 164:20

**13** 149:20

**15** 25:6 98:23 122:19 165:9 193:25

**15-minute** 127:17

**150** 155:4

**150,000** 126:8

**174** 13:24 14:4 140:19 148:2

**176** 16:12

**176,000** 16:10

**18.468** 160:23

**190** 24:21 25:2,13,14 46:3 154:24

**190,000** 154:17

**191** 18:23 21:24 50:19 141:2 155:19 158:11

**192** 141:14

**194** 172:17,21

**1st** 55:24

**2**

**2** 14:13,15 18:18,21 74:16,18 141:7,20 154:22 163:21 220:8

**2.1** 162:4

**2.154** 161:18

**20** 109:25 169:7

**20.5** 162:10

**2009** 149:19

**2019** 97:17

**2020** 13:18,23 14:17 19:23 24:6 44:15 45:25 47:7 48:6,25 50:9 53:24 56:13 57:7 59:17 63:15 193:25

**2021** 19:15 45:25 48:6 49:2 50:13 54:6, 20,22,24 56:15,23 58:8 59:17 61:7 62:24 63:17 64:17 74:13 166:5,23 168:18 194:22 195:6 196:15 199:22 201:2 222:20 223:20

**2022** 19:15,16 35:23 36:18 41:12,17 42:12 58:7 120:8,14 121:9 160:15 196:15

**20th** 13:18

**21** 61:16

**210** 20:22 41:21 199:6

**22** 45:13 61:17

**220** 199:6

**222** 140:19

**225** 70:22

**22nd** 58:10

**24** 21:3

**24th** 48:25

**257** 18:22 20:21 21:20 23:19 41:20 42:7 46:3 140:25 141:12 158:11

**257,941** 20:6 42:10

**258** 141:13 155:18

**28** 67:2,7

**28th** 48:25

**29th** 223:19

**2:53** 222:10

**3**

**3** 56:25 74:20 75:2 163:18 195:20 219:3, 7

**3.897** 58:9

**30** 19:15,16 69:23 100:14 165:6

**30(b)** 10:6

**30(b)(6)** 12:24 204:15

**31** 19:15 216:23

**313** 16:13

**313.5** 152:23

**35** 69:19

**36** 147:21

**38.8** 161:4

**4**

**4** 57:2 163:18 219:3

**40** 20:22 21:3 23:6 155:6,21

**41** 50:23

**41-and-a-half-million-dollar** 192:11

**45** 128:10

**48.16** 153:24

**5**

**5** 194:14,18

**50** 109:25

**58** 69:8

**6**

**6.1** 161:24 163:7,15

**6.2** 59:4,6

**6.215** 58:11

**6.5** 173:11

**60** 49:2 186:10

**62** 175:14

**62.14** 15:4 154:4 173:7 174:23

**62.5** 14:25

**62.6** 153:10,19

**65** 155:21

---

**7**

**7** 40:16 96:4,10 111:12 112:7 119:22 131:24 132:5,13,21 134:18 142:11,14,16, 18 143:7,12 144:3,8, 19,24 145:2,17 148:15 149:16,18 150:11 151:23 155:18 157:12,15,23 158:9 159:7,18 175:9,13,17 176:4,17 177:4,22 179:21 180:15 192:8,16,20, 23

---

**8**

**8** 14:17 16:8 19:13 21:4,5 63:22 152:11, 19,24 172:12,18 173:6 175:14 179:22 213:12 216:23 217:4, 7

**8-K** 186:17

**8.2** 65:23 162:4

**8.269** 59:5

**85** 175:13

**85-cent** 175:8,10

**87.44** 14:19,22

---

**9**

**90** 110:16

**90,000** 195:9

**94.8** 88:8

---

**A**

**ability** 26:10 31:5,20 52:6 72:10 117:11 157:18 164:7 169:25

**absolutely** 188:12

**accelerate** 22:22 26:20

**accelerated** 21:8 26:23 27:3,15

**accent** 181:14

**accept** 153:6 217:5

**access** 106:18 122:22 141:24 212:15

**accordance** 81:20 83:22 84:7,14

**account** 48:10 49:5 54:8 68:10 69:16,17, 25 70:5 71:6,7,13,19 72:5 168:6 170:23

**accountant** 137:24 138:2 140:6 221:4

**accountants** 192:24 210:15,17,24 218:6

**accounted** 49:14 52:22 138:4

**accounts** 16:16 45:8 55:3,20 67:19 71:21 156:14

**accrual** 168:17,22 170:16,17 171:5,13, 23 172:7,19 173:4

**accruals** 83:15 169:13 172:13

**accrued** 170:21

**accurate** 17:2 80:10 103:6 172:22 185:23 208:13,15

**accused** 184:20

**accusing** 186:4

**achieve** 40:17 145:18 154:16 155:18

**Acis** 90:21 91:2

**Acis's** 89:24

**acquiring** 115:13

**Act** 184:21

**acting** 185:18

**action** 26:7 175:5 208:4 214:9,10,15,24 223:15

**acts** 187:2,14

**actual** 57:6 76:19 81:7 87:23 88:4,13 109:20 195:15 203:16 209:6 214:17

**added** 45:11

**addition** 70:4 92:23 102:18 134:3 179:22

**additional** 59:15 64:6,11,18,25 72:9 89:8 92:21 174:11 180:10 201:8 205:12 219:11 220:8,12

**address** 56:11 67:10

**adjourned** 187:22

**adjust** 47:10,17,18

**adjusted** 47:17,22, 23,25

**adjustment** 47:12

**administer** 179:21 180:2

**administrative** 179:12,18 182:22 183:10 189:9,17,20, 23 191:4,9,10,14 196:11

**administratively** 177:12

**adult** 215:5

**adversary** 167:2

**advice** 31:9 211:13

**advised** 17:10 187:7

**advisement** 22:14 131:11

**Advisers** 184:21

**advisor** 183:10 186:11

**advisors** 20:16 25:19 100:25 101:2 166:18 167:21 185:10 192:24 211:2, 4 218:7

**advisory** 56:6 83:13 84:2

**affairs** 150:20

**affect** 206:20 207:15

**affected** 206:15

**afforded** 130:18

**aforementioned** 69:24 102:22

**agree** 23:22 24:2 79:24 80:6,9,15,22 81:6 88:25 101:22 124:21,25 145:20 146:2,6 153:2 155:22 174:3 202:16,20,25 203:24 204:5 205:19, 25 206:7,8,9

**agreed** 209:8

**agreements** 37:17, 18 94:9 186:9 203:11 205:20,22 208:6 209:5,20 210:2,6,22 211:9,16 218:18

**ahead** 78:23 124:22 153:13

**air** 190:12

**allegation** 184:3,7,9 188:5

**allegations** 184:9, 19,25 185:9

**alleged** 169:17

**allowed** 149:8 172:19 173:5

**allowing** 127:23 165:12

**alternatively** 124:11

**aluminum** 96:25

**amended** 26:2

**amending** 37:17

**amount** 21:15,17 23:14 24:24 25:12,19 54:10,11,13 55:8 63:24 82:4 85:6,15 86:20,22 87:23,25 88:5,6,13 90:3 103:21 110:18 131:3, 5 133:16 136:2 137:3,4,12,16 151:5 152:7 164:4 168:22 169:4,9,10 170:2 172:20,24,25 173:5, 22 175:22 177:24 178:13 179:7 183:6 194:16 196:4 204:11 205:4 213:7

**amounts** 88:17 140:18 169:23 199:16 200:2 214:20

**analyses** 76:25 81:25 121:7

**analysis** 10:19 21:11 24:9 26:13 34:13 35:18,19,20 36:17 39:2,24,25 40:3,4,10, 12,13 41:10 44:15, 16,20 45:6 47:7 50:8, 12 51:11,12 52:23 53:8 54:21 75:20,24, 25 76:4,13 77:6 78:6, 12,17,24 80:2 81:17 83:19 87:11 89:12,24 118:17 123:20 133:5, 7,11,21 134:7,10,18 135:3,4,9 137:25 138:3,5,8,9,13,14,17, 19 140:12,13,15 141:9,13,15 145:25 146:19,21 147:9,10, 18,19 148:8,13 152:10,18 153:4,9, 16,25 154:8,24 155:3 158:3,17 160:25 167:14 180:5,9,21,22 181:18,23 191:21 192:15

**analyzed** 212:4

**annum** 130:24

**answerable** 93:9

**answering** 118:6

**answers** 10:12 186:25

---

Case 19-34054-sgj11    Doc 3818-2    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-1 Filed 12/06/23 Page 104 of 214    PageID 6846
Exhibit Exhibit B-60 Page 37

Index: anticipate..board

**anticipate** 135:7 166:21

**anticipated** 79:21 130:23

**apologize** 60:18 77:20 153:18 171:21 173:3,15 182:7 191:3 195:21 196:21 220:5 222:2

**appears** 20:5

**applied** 25:22 26:13 43:2 45:2

**apply** 43:9 78:16

**appointed** 34:14 112:7 119:23 131:25

**appreciated** 117:14

**approach** 115:5 193:16

**approached** 115:12

**approval** 38:17

**approved** 84:25 112:11

**approximate** 86:25 168:21

**approximately** 21:22 45:13 67:22 69:8 70:11 71:5 85:24 89:9 90:7 98:23 109:5 141:3,7 147:21 148:13,15 154:17 156:2 161:2, 24 172:3

**areas** 10:5

**argue** 95:12

**argument** 124:8

**arguments** 205:18

**arrange** 35:13

**arrangement** 100:11 129:14,21,23 130:10

**arrangements** 129:25

**arrears** 194:11,13

**arrived** 39:25 40:22

**art** 83:7,8

**artfully** 110:9

**ascertain** 71:18 86:11 90:18 139:2 149:2

**ascertainable** 48:14 51:7 53:3

**assess** 52:6,10

**assessing** 52:17

**assessment** 32:3 43:8 50:4 83:9

**asset** 22:6,18 23:13 28:2,5 29:14 30:16 31:14 38:4 40:25 43:7 67:24 83:2 96:10 118:22 135:18, 25 136:16,20,21 137:9,18 140:12 141:18 156:22,24 157:10

**assets** 18:8 20:11,22 21:14 24:8,12,17,20 27:23 28:14,17 29:12,13,18,22 30:2, 21,23 35:17,22 36:12 42:12 43:3,14 45:9, 10,11,18,19 46:5 48:12 49:18,19,21 53:3 54:2,4,8 55:12 67:11,13,14,18 68:13,17,23 72:17 82:4,20 101:11,19 102:2,11,13,14,15 103:20,21 111:24 114:21 121:8,22 122:2,18 123:12 135:24 136:7,8 138:23 141:23 142:5 144:21 150:15,20,22 151:6,9,13 155:15 156:8,17,18 157:17 158:22 159:20,23 164:6,8 168:8 186:20 193:15 208:7,11 210:13 212:14 213:8 214:17

**assignments** 115:6

**assist** 209:18

**assistance** 62:13 210:23

**assisting** 210:5

**assume** 41:15 77:11 103:17 104:14 105:5 129:13,16 143:7 146:8 173:25 192:7 194:6

**assumed** 21:17 24:22 26:7 55:10 136:8,14

**assumes** 40:16 42:11 145:17,21,24 146:14,18

**assuming** 82:20 172:13 195:10,24

**assumption** 19:12, 19,20,21 26:4 36:16 41:11 63:11 77:5 82:14,23 83:12 84:5 88:11,15 90:20 91:3, 5 121:11 134:20 142:10,13 143:19,25 146:11 157:16 159:3 161:22 166:3,9 168:15 173:9 175:7 183:5 192:4 196:18 208:16,21 209:4

**assumptions** 19:10 36:21 53:24 54:25 62:14 76:24 78:17 81:24 83:12 90:19,24 133:8 147:4 161:20 162:11,14,16 163:22

**assurance** 80:16,23 81:4

**attached** 13:13 198:20

**attained** 80:18,25

**attempt** 75:8,9,14 76:8 92:21,25

**attempting** 198:15

**attention** 119:25 145:12 162:3

**attorneys** 192:20

**attributable** 58:20 60:8 61:12 163:3

**authority** 38:21 100:2

**aware** 39:20 85:4,22 96:4 169:16 184:6,8

---

**B**

**back** 18:9 20:6 30:13 41:24 44:14 48:23 49:20 52:21 55:21 72:16 114:2 148:22 160:4 165:5,17 212:8

**background** 159:8

**Backing** 113:16

**backup** 149:5

**balance** 23:19 170:25 171:9

**ballot** 216:22 217:6

**ballpark** 177:21,25

**banker** 115:2 118:3, 10 135:8,15 136:6, 15,19

**bankers** 32:13 97:23 100:24 115:4

**banking** 135:19 137:11

**bankruptcy** 11:13 17:4 34:4 39:3 84:24 100:9 101:5 168:2 200:14,19 201:3 216:19

**Barclays** 150:10 151:7,11,16

**base** 63:11 77:13,24 125:21,24 126:2 129:17

**based** 36:9 48:16 50:4 51:22 52:5 88:23 121:20 146:20 147:5,6 164:25 167:8 172:19

**baseless** 184:18 185:2,10

**bases** 77:10

**basically** 51:10 61:21 99:24 151:12

**basis** 110:22,24,25 111:2 129:12 145:5

157:2 174:6 179:11, 15 183:25 184:11,12 193:3,10 202:23,25 220:22

**bathroom** 127:4

**bear** 126:7,11,18,25

**beat** 221:24

**began** 98:2

**begging** 72:8

**beginning** 30:18 113:4

**begun** 104:18,20 128:11

**belief** 215:23

**believed** 32:15

**believes** 85:23 86:5, 7,8,12,15,16

**beneath** 200:13

**beneficial** 64:10

**benefits** 218:13

**betting** 159:25

**bid** 121:18

**bidding** 94:5

**bids** 32:11,17,18 115:17

**bifurcate** 179:6

**big** 11:5 54:14 150:3

**biggest** 31:19

**bit** 82:13 83:21 101:7 111:23 152:4 154:10 157:21 160:11 181:19

**blasts** 92:8

**blood** 223:15

**blow** 79:7 98:6

**blown** 159:23

**blurry** 62:21

**board** 30:20 33:21 99:17 115:25 116:3, 6,8 186:3,13,24 187:4,11 196:22 199:18

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-1 Filed 12/07/23 Page 105 of 214   PageID 6847
Exhibit Exhibit B Page 537

Index: boards..class

**boards** 190:14

**bogus** 183:16,18,24 185:14,19,21 190:6

**bonus** 83:21 84:6,13 125:25 128:5,7 168:16 169:17 170:5 171:23 200:4

**bonuses** 83:15 168:17 169:13

**book** 205:11

**books** 170:17 171:3, 14,24 178:9 203:3,15 205:8

**bother** 17:6

**bought** 98:21 159:11

**breaching** 184:20

**break** 20:21 53:16,17 106:5 109:8 127:4,7, 17,24 164:11 165:12 182:18

**breakdown** 86:25

**briefly** 91:8 128:6 160:5

**bring** 44:17

**brings** 142:7

**broad** 216:17

**broke** 136:5

**broken** 137:19 139:6 221:7,8

**broker** 91:22 100:15, 22 106:22,24 107:6 112:13 113:18,20,24, 25 115:21 117:16,18, 19,20,22 118:2,9 135:8 136:9,15 137:6,14

**broker-dealer** 150:16 151:7 159:10, 15,16

**broker-dealers** 159:13

**brokerage** 104:9 105:6 135:20 136:19 137:16 150:5

**brokers** 103:25

107:9,11,21,23,24 112:20 114:5 115:9, 10

**brokers'** 135:2,14 136:6

**brought** 26:7 34:8

**Bryan** 10:20 11:6 78:22 79:7 133:24 145:13 152:12 160:13 198:15,23,25 201:17 217:15

**bucks** 155:7

**budget** 86:23

**budgeted** 173:10

**build-up** 200:16

**built** 162:17 192:4 200:5

**bulk** 101:19 111:7 151:11

**bunch** 102:14

**burden** 131:18

**business** 30:4 34:6, 11 35:3 37:12,14 38:10,13 53:12 54:5 55:12 56:3 57:11 59:20 60:9 96:22 97:2,3 103:25 106:16 114:12 120:14,21,22 121:14 123:24 126:15,16 143:9 144:14 186:14 204:16 219:13 220:23

**businesses** 33:3,12 35:10 36:8,23 37:2,9, 20 38:7,12,20,25 39:9,23 47:4 48:4 49:23 50:2 53:4 69:7

**buy** 99:11,12 107:24

**buyer** 111:8

**buyers** 107:22,23 114:19

**buying** 99:14

**C**

**cabined** 206:2

**calculate** 17:7 46:15

**calculated** 134:19

**calculation** 23:2,7, 13

**call** 10:18 39:23 68:6 101:13 141:20 155:10 166:19 181:9 188:23

**called** 32:20 70:14 97:13 98:12 102:25 176:17 181:17 197:25 212:23

**calling** 181:7

**calls** 70:3 72:4

**Cantor** 112:23 113:21 115:11,20

**capability** 41:4,5 42:18 43:10 45:3 51:22

**capable** 35:12 43:13, 20 44:2,6 52:9

**Capex** 32:6

**capital** 31:12 32:5 57:3 96:12 97:22 116:2 117:4 122:21 166:18 167:20

**capture** 157:13,18

**Carey** 70:11

**carried** 25:11,15

**carry** 146:21

**carrying** 178:8

**Caruso** 12:10

**case** 12:9 67:21 130:17 139:22 145:8, 9,10 150:4,6,12 151:20 152:4 159:8, 11,19,22,25 170:14 177:8 190:17,19,22 200:4,7 211:12 213:15

**cases** 159:22

**cash** 30:9 56:13,23 106:19 140:21 163:21 169:15,23 194:8

**categorization** 101:23

**category** 83:2 101:17 118:23

**caused** 67:14

**causing** 98:2

**CCO** 186:4,25 187:13

**CCS** 28:21,23 29:23 101:14 102:17 103:10 112:19,25 113:2,19,22 114:5 115:14,19,24,25 116:2,11,14 118:23

**Central** 127:18

**cents** 153:10

**CERTIFICATION** 223:2

**certify** 223:7,13

**cetera** 140:23 166:6

**chairs** 82:21

**change** 15:25 37:13, 14 48:21 49:17 56:2 57:10 59:8,16,20 60:9,19 65:3 82:3,8 84:9,22 88:24 89:2,9, 14,17,20 90:8,23 136:23 153:4 161:20, 22 181:25 193:25 194:21 219:5

**changed** 13:18 83:20,25 84:10,12 88:23 148:19 152:23 156:5

**changing** 89:16

**chap** 144:23

**Chapter** 39:10 40:16 67:21 96:4,10 111:11 112:7 119:22 131:24 132:5,13,21 134:18 142:11,14,16,18 143:7,12 144:3,8,19, 23 145:2,17 148:15 149:16,18 150:11

**cash**

151:23 155:18 157:12,15,23 158:9 159:6,18 192:8,16, 20,23

**characterization** 105:25 139:11 140:14 180:20,25 181:4

**charge** 210:3

**check** 148:22 204:20 205:12

**chiefly** 150:8

**choice** 100:6

**circumstances** 136:10

**claim** 26:5 72:21 89:25 90:3 102:6 183:10 185:16,17 189:10,18,20,23 190:6 191:4,9,10,14 195:23 202:21 203:24 215:24 216:3

**Claimant** 40:18 125:4,11 128:3,19 139:18 145:19 174:10 176:9 177:14 178:7 179:20 197:7 199:18 212:24

**claimed** 169:3

**claims** 16:6,8,18 17:11,17 73:17,20 74:4 85:7 87:13 89:8, 16,17 152:19,20 172:7,12,14,19 173:4 175:18,19,20 176:10, 18 177:15,22 178:8 179:7,21,22 182:22 183:4,17,18,19,24 185:14 190:18 203:2 213:7,13

**claims-made** 73:13

**class** 14:17 16:8 19:13 152:11,19,24 172:12,18 173:6 175:9,13,14,17 176:4,5,17 177:4,22 179:21,22 180:15 213:12 216:23 217:4, 7

**classes** 130:12

**Clay** 75:5 122:25 127:22 141:16 142:9

**cleaned** 200:20

**clear** 23:17 74:10 76:5 81:19 117:24 149:9,12

**clearer** 221:16

**client** 144:17,18 187:13

**clients** 183:11 184:4,10 185:2 194:11,17 201:25 204:19 207:4,11

**CLO** 203:11 205:4 219:13

**CLOS** 56:7 61:21,22 65:4 66:5 99:24 102:15 162:21 201:25 202:18 203:5,12,17 204:2,6 208:20 209:3

**close** 70:6 76:17 99:16

**closed** 32:21,23 99:13

**code** 39:6,16 143:13

**colleagues** 164:12

**collect** 22:22 27:12 140:11

**collectability** 167:14

**collected** 22:20 166:4,22

**collectible** 69:12 167:19

**collecting** 195:17

**collection** 20:10,11,23 21:12 167:24

**collections** 26:21

**color** 156:12

**columns** 70:24

**combination** 41:8 47:8 129:16 218:16 220:7

**comments** 65:14

**commission** 192:17

**committed** 186:25 187:13 188:5

**committee** 15:14,18 87:6 125:12,14 128:16,18,20 150:17 174:12 176:7,22 177:10 178:18 179:2,10,14 180:13,16,17 197:8,11 201:7 214:18

**commodity** 159:10,16

**communicate** 15:25

**communicated** 15:5

**communications** 189:21

**comp** 219:10

**companies** 29:23

**company** 30:22 31:3,10,24 32:6,11,16,19 78:2 79:15,20 91:17 97:12,13 98:12 99:15,21 100:9,19,21,22,25 101:4 104:17 106:15 114:18 115:13,17,18 118:18 150:18 169:6 170:12 221:8

**company's** 79:21

**compare** 152:8

**compared** 138:14 141:14

**comparison** 61:4,5

**compel** 208:4

**compensation** 125:21,23,24,25 126:2 128:5 129:9 130:3 173:12 218:13 219:18 220:10

**compete** 31:20

**competed** 32:18

**competing** 94:6

**competitive** 31:11

**competitors** 31:21, 22 91:16 93:4,12 94:3,7 97:6

**confidentiality** 94:9

**confirm** 20:3

**confirmation** 128:10 188:13 196:24 206:15 209:10,25

**conflating** 196:19

**connection** 18:6 28:13 30:3 39:21 73:16 137:18

**consented** 209:3

**consenting** 208:21

**conservatively** 163:23

**consideration** 26:2

**considered** 32:12 83:4,6 158:22 167:23 211:18,20,23

**consist** 128:19 182:8

**consistent** 119:12

**consists** 175:17

**constituent** 182:15 192:10 193:3,10

**constitutes** 110:6

**construction** 91:14

**constructive** 214:16

**consultant** 221:6

**contact** 93:16,19

**contacted** 93:12,22

**contacting** 94:2

**contained** 87:19,21 133:19 134:22 219:9

**contend** 123:16

**contends** 86:4,6,18,21

**context** 158:23

**contingency** 129:14,20,23,25 174:6 215:19

**contingent** 212:23 213:4,12,17 214:2 215:7,10,16 216:9

**comments** 65:14

**complained** 184:17

**complete** 170:12

**completed** 209:7,10

**completely** 72:5 113:10

**complicated** 106:13 111:22 116:14 144:15 151:17,19

**complicit** 187:6

**component** 22:6,7 220:4

**components** 193:11 220:3

**compound** 93:7

**computer** 164:21 198:4

**computers** 82:22

**concert** 207:5,13

**conclude** 164:24 190:5

**conclusion** 131:16 140:7 145:3,6

**concurred** 32:2,22

**condition** 187:9

**conditions** 31:2 36:11 106:8,10,14,17 121:21 156:20

**conduct** 94:15 142:11,14,15,19 143:13 144:3,8 157:23 158:8,10 192:6

**conducted** 128:15 134:17 143:11 144:24,25 146:2

**conducting** 94:10

**confer** 164:12,16,23

**conference** 188:19,23

**confident** 168:10

**continue** 105:16,17 106:16 121:14 184:14,17 201:2 211:15 221:24 222:3

**continues** 105:19 194:20

**contract** 105:6,9,10,12,15 113:7 205:18

**contracts** 37:15 83:14 84:3 94:5 183:5 195:25 208:22 209:16 219:12 220:8

**contrast** 152:9

**control** 37:13 71:20,23 207:5,13 212:14

**controlled** 98:16 144:18

**controls** 116:2

**convenience** 175:17 176:17,21 179:13

**convenient** 176:15 177:2,6

**conventional** 177:3

**conveyance** 26:5,6 27:6

**conveyances** 214:16

**coordinated** 190:23,24

**copy** 147:14,16

**Cornerstone** 28:24,25 29:3,24 101:14 102:17

**corporate** 34:4,5,15

**correct** 12:4,5 16:15 17:11,18 19:5,24 21:21 27:7 33:22,24 35:14,23 36:19 38:9,17,18 41:12,13,17 42:13,15 44:12,23 46:7,23 47:2,5 48:17 49:3,4,8 50:10,24 51:3,5,8,24 52:17 54:23 56:7,10,15,19,20 58:17,18 59:9,22,23 60:7 64:20 68:3,7,14 72:19 76:15,17,

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-1   Filed 12/07/23   Page 107 of 214   PageID 6849

Index: correctly..differentiate

22,23 78:8 79:4,12,
16,17,22 80:3,10,11,
13,18 81:9,10,13,17,
18,21,22 82:23
83:17,18 84:17
87:14,15 90:14,21
91:9,23,24 92:22
95:5 105:20 108:21
109:18,19 110:19
111:19 112:9 113:13
115:14 118:6 119:5,
15,18 120:10 121:10,
24 122:5 125:4,7
126:6,25 127:2
129:4,5 130:13,15,
19,20 132:2,8,13
134:24 135:24 136:2,
16,17 139:4 141:4,
10,19 144:5,6
145:22,23 147:15
149:21 152:20,23
153:5,11 154:9,12,18
155:2,5,23 156:3,23
160:22 161:3,6,13,25
162:8,11,14 171:10,
11 173:3,7,8,17
175:10,25 183:3
187:19 194:5,15,23
196:23,24,25 203:12,
13 204:3,8 205:2
207:19 210:3 211:19
212:25 213:14
215:19,22 216:25
220:12,13 221:11

**correctly** 18:3 62:22
92:19 160:19 175:16

**cost** 58:12,14,20
59:24 61:25 63:15,17
64:4 65:18,19 86:23
100:10 120:2 133:9,
14 148:22 163:3,11,
14 164:5 180:10
201:9 212:4 218:17
220:4,22

**costs** 60:2,7,8 61:8,
12 62:3,8 64:6 66:12
67:20 69:20 120:8,13
125:3,6 126:7,12,14,
15,16,24 134:6
163:2,13,25 193:17
196:11 201:11
212:16 218:9 219:3,
6,11

**counsel** 12:11 34:3,
5,6,7,10,15,21,22,23
35:2 39:3 85:18
112:6 127:5 131:7
165:3 173:20 174:5
189:22 196:12
210:23

**counselor** 88:12,16

**counterparties**
26:10 107:17,20

**couple** 16:22,23
32:18 185:6

**court** 14:9 17:4 34:20
35:6 38:17,21 73:9
84:25 85:3 98:19,21
108:17 112:11 124:9
128:7 136:13 146:13
179:17,24 191:16,19
201:18

**cover** 75:9 137:16
164:18

**coverage** 130:18
132:2,17,23 133:9,14

**coverages** 133:3

**covered** 75:10
137:25 138:3 157:21
164:17

**COVID** 70:12

**COVID-19** 67:15
69:2,3

**create** 92:21,25
100:18 114:17

**creating** 114:14

**creditor** 180:13

**creditors** 14:17,22
15:3 87:14,22 91:17
93:5,13 95:24 97:7
99:18 100:24 130:12,
13 131:8 135:17
153:10,22 154:6
173:6 174:19 178:10
213:13 216:24 217:4

**Creditors'** 15:14,18
128:16,20 150:17
176:7,22 178:17,25
180:13

**criminal** 188:24

**cross-talk** 72:15

**curb** 84:24

**cure** 183:4,7 195:23

**curious** 148:25
149:6 154:14

**current** 51:20 158:23
187:9 196:21 209:17
211:17

**custom** 100:5

**customers** 31:23

**cut** 75:12,13

---

**D**

**D&o** 72:21 130:18
132:2,6,16 133:9,14,
23

**daily** 54:5

**dangerous** 161:8

**data** 92:12,14 157:24,
25

**date** 13:19 15:7
19:15,16 55:22,23
56:17 67:12 71:2,4,
11,14 83:15 194:10

**dated** 24:22 25:16,25
132:14

**dates** 45:9 46:20
48:11 52:24

**Davor** 165:22 188:7
191:6 218:19

**day** 56:12 121:17
197:23 204:21
223:19

**days** 128:10 131:4
186:10

**deal** 11:5 27:16,22
31:22 82:16 99:20,22
100:12 133:2 176:9
177:4,14 178:8 180:2

**dealings** 151:25
190:15

**dealt** 138:22 151:22

**DEBRA** 223:5,23

**debt** 98:14,18,22
99:6 159:17 170:3

**debtor** 28:23 36:25
38:7 67:11 72:18,19,
22,23 78:11 95:25
123:13 161:12 167:2,
13,23 170:18 171:24
179:2,4 203:3,6,7,10,
15 205:13,22 209:24
210:21 212:6,22
216:8 221:10

**Debtor's** 19:8 34:23
56:2 67:13,18 171:3,
14 204:16,23,25
205:8 206:13

**December** 35:23
36:18 41:12,16 42:12
58:7,8,10 69:19
121:9

**decide** 13:4

**decides** 125:12,15

**deciding** 94:14

**decision** 51:23 55:25
115:24

**decline** 67:16

**decrease** 17:23

**deeper** 156:11

**default** 22:21 97:20
186:12 195:2

**defaulted** 21:9 27:3
166:5

**Defendants** 167:25

**deferred** 169:23
200:18,22

**definition** 177:3
216:16

**delegated** 211:9

**delineation** 206:4

**delta** 70:23 139:2
162:2

**demand** 20:14 21:2
24:13,20 25:2,4,5,8,
15 166:4,12 167:5
221:11

**demanded** 20:15
21:7,8,15 23:8,10,12

**debt** 98:14,18,22

**denominator** 17:21

**dense** 174:14

**depend** 111:15 136:9
139:8

**Depended** 40:25

**depending** 29:19
39:4 128:22 129:17
135:18 165:15

**depends** 38:13
132:20 149:12

**deposition** 10:6
14:11 35:25 74:21
131:13,16 165:16
204:10

**describe** 82:7

**description** 30:10

**desks** 82:21

**detail** 84:12 85:3
136:3 219:24 220:25

**details** 220:18

**determination**
52:11 55:4,6 57:11
211:24 212:2

**determine** 18:11
39:3 93:15 106:18
136:18 137:2,7
154:20

**determined** 31:4,8,
13 32:14 40:2 95:13
176:4 212:9

**detrimental** 72:3

**develop** 212:8

**differ** 81:8

**difference** 16:17
25:17 26:17,18 49:15
50:18,20 54:14,18
55:4,14,15,20 61:22
64:2 89:3 141:4,21
155:8,11,24 156:15
157:25 175:12

**differential** 39:22
51:6 53:9

**differentiate** 76:2

**differently** 202:9
209:23

**difficult** 33:18 99:19
123:19 147:3 177:16,
19

**difficulty** 98:2
144:19

**dig** 156:10

**diligence** 94:11
143:12,15 158:10,14

**direct** 71:25 105:18
110:5 145:11 191:7

**directing** 190:11

**direction** 76:16

**directly** 102:13,15
109:10

**director** 196:14
199:7

**directors** 72:23
73:17,25 186:13
187:4 196:17,20
197:2 199:11,15,18

**disagree** 27:10
202:24

**disagreement** 85:5,
10,14,19

**disastrous** 70:3

**disbanded** 196:23

**disclaimers** 78:25

**disclosed** 17:3

**disclosure** 11:11
13:13,23 14:6,18
16:7,25 19:23 53:25
67:3,6 74:17 75:24
77:9 123:4 197:15

**discount** 25:21 26:8,
12 39:25 40:2,22
41:3,5 42:20 43:4,6,9
44:18 167:8,11
168:5,7

**discounted** 23:14
25:12,19

**discounts** 44:25
45:2

**discretely** 182:14

**discuss** 175:8
189:17 202:2

**discussed** 67:19
130:4,5 134:4 166:8
189:8,23

**discusses** 53:25
168:16

**discussion** 106:13
130:17

**discussions** 72:7

**dispute** 184:15

**dissolution** 208:5

**distinction** 24:16
120:15,18,19 121:23
123:15,17 124:3,5

**distinguishing**
24:19

**distressed** 98:13
99:5

**distribute** 173:24

**distributed** 131:7
150:22 172:25

**distributing** 138:24

**distribution** 14:21
15:2 140:20 147:21
148:8 150:23 172:24
173:6 174:18,24
181:24 182:11
191:23 201:13

**distributions** 160:2
172:11 174:11,22
178:9

**diversion** 214:17

**DIY** 97:2

**doc** 217:22

**docs** 209:7,9

**document** 10:21,23
11:6,25 12:13,19,21
13:11,12,16 14:5,23
16:13 18:10,18 19:11
22:12 25:11 40:7
41:24 44:24 54:25
57:9,18 59:14 61:7,8,
18 62:7,17,18,20,21,
24 63:7 64:5,20,23
74:12,13,16,20 79:3

**documents** 13:22
18:15 74:11 76:22
123:5 155:23 182:4

**Doherty** 16:3

**dollar** 153:11 178:25
179:4

**dollars** 45:14 49:3
54:16,22 55:10,11
63:23 161:24 162:10
194:14 196:6

**dollars'** 87:13

**Dondero** 21:6 25:4
30:4 70:4,19 71:10,
17 75:6 85:6,15,22
86:4,11,17 95:21
97:25 99:22 122:9,17
169:3,11 185:17,18,
21 186:15 190:7,25
191:2 207:6,14 213:6

**Dondero's** 69:15

**Donohue** 12:10

**doubt** 114:11

**Douglas** 33:18 41:25
57:15 131:11

**Draper** 10:20 11:24
14:12 22:11 42:3
53:15,20 57:16 59:2
66:24 67:7 73:6 74:8
75:12,22 77:15,19
79:3 160:7 217:13,18
221:14,19

**Draper's** 123:3

**draw** 194:8

**drive** 33:9

**driven** 70:13 163:13

**driving** 162:21

**drop** 67:10,13,17

**drove** 167:25

**DSI** 12:7,8,20 18:12
19:20 33:22 76:13
78:8 79:14 81:12,15
112:5,8 119:7

**due** 27:17,22 70:2
85:7 89:20 94:10
143:11,15 158:10,13

**Dugaboy** 22:15,17
23:9,17

**duly** 223:9

**dummies** 116:17

**duties** 211:7

**duty** 81:13

**DYD** 75:2

---

**E**

**earlier** 38:12 101:6
131:12 149:15
181:20 184:17

**early** 97:18 177:8

**ease** 37:4

**easier** 11:21 76:6
217:22

**easily** 49:6 110:5

**easy** 103:24

**eat** 126:9

**educate** 56:22

**effect** 140:7

**effective** 83:15

**effectuated** 30:8

**efficiently** 212:15

**effort** 190:23

**electronic** 181:14

**elements** 16:4
219:21

**eleven** 65:12

**email** 92:8 131:15
186:2 187:18 188:3,
18 208:24 217:16

**empirical** 157:24,25

**employ** 91:22 95:15
100:15

**employed** 33:2,11
106:22 107:6,10

**employee** 85:6
168:17 169:13 170:3
171:2 172:18 173:4
219:10

**employee's** 170:23

**employees** 85:16,23
86:18 169:9,15,25
184:5 205:13 210:12,
21 211:15 220:7,21

**employing** 112:24

**encompass** 216:17

**encounter** 136:11

**end** 80:20 121:9
164:15 165:17,18
200:19,20

**endeavor** 10:15

**ended** 32:19

**energy** 102:25

**engaged** 103:24
105:4 151:10

**enjoined** 207:18
208:4

**entities** 97:12 98:15,
16 100:7,13 102:12
118:15,19 190:16
203:16 213:9

**entity** 28:11

**entry** 199:21

**equally** 52:16

**equals** 70:23

**equities** 109:20

**equity** 28:8 38:8
69:15,16 70:5 114:20
116:23 205:21

**essence** 32:25

**EST** 222:10

**established** 122:7
129:3

**estate** 82:15 111:18
180:3 216:11,15,16

**estimate** 89:23
133:13 140:10
172:17 175:2 177:25
183:20 192:12

Case 19-34054-sgj11 Doc 3818-2 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-1 Filed 12/07/23 Page 109 of 214 PageID 6851
Exhibit Exhibit B - 11-09 12 of 376 Page 109 of 214

Index: estimated..form

195:15 208:10

**estimated** 18:11,22
19:13 24:7 40:11
44:19 81:8 87:11,25
140:20 147:20 148:7,
14 154:23 155:14
173:5,12 174:16,24
181:23 182:10 192:3
193:4,11 195:3,4
196:4 201:12 221:2

**estimates** 79:19,25
80:17,24 182:21
191:22

**estimating** 172:11

**Ethan** 186:3 188:20

**ethereal** 216:2

**eventually** 188:4

**evolved** 106:11

**exact** 20:13 90:6
133:16 169:10
179:15

**EXAMINATION** 75:3
165:23 217:17

**examined** 30:25
140:3

**examining** 136:25
187:21

**examples** 48:18
49:23

**exasperated** 65:8

**exceeded** 213:7

**Exceedingly** 151:21

**exceptionally** 98:9,
20

**exchange** 46:6,13

**Excuse** 22:2 23:11
43:17 46:12

**exercise** 207:15,21

**exercising** 206:21
207:18

**exhibit** 11:19 14:10,
13,15 74:18 75:2
198:19 201:20

**exist** 114:22

**existed** 184:6

**exit** 78:3

**exited** 177:8 201:8

**expect** 137:15 164:9
173:23 188:3 200:20
207:3,14 209:9
211:11

**expense** 61:24 62:9
163:12

**expenses** 60:3 64:8
65:22 66:2 98:20
140:23 141:6 147:20
148:7,14 160:8,21,25
173:19 181:23
182:10,19 191:22
192:5 195:15 196:8
201:11,12 217:20
218:9 219:20

**expensive** 98:7

**experience** 34:18,22
129:21 130:2 132:12,
15,20 145:7,9 146:20
149:16,18 157:22
193:12,15

**experienced** 98:12
115:3 129:15 132:7

**expert** 77:6 126:23
133:2 215:24 216:3

**explain** 57:8,18
59:14 60:13 65:17
70:16 84:11 120:17
128:7 141:11 146:12

**explained** 85:2

**explanation** 124:7

**expressed** 93:20

**expressions** 92:19,
20 94:13

**extend** 72:9

**extended** 124:2

**extension** 38:5

**extensively** 103:19

**extent** 122:12 178:20

**external** 32:12 33:19
34:2,3

**extra** 163:15

**extremely** 93:6
97:15 99:4,18

_____

**F**
_____

**fabricate** 86:21

**fabricated** 190:22

**face** 25:12,15,20

**facilitate** 34:16 35:4,
12 82:16

**fact** 10:8 12:12,17
16:23,24 26:22 35:9
84:20,23 96:5 146:19
184:2,11,25 185:11
187:8 202:22

**facts** 84:10,12 88:24
146:25 147:6

**factual** 145:5 189:10,
18 190:2 193:2,9

**fair** 32:16 51:4,15
105:2,24 108:7 117:2
118:3,4 126:22
131:20 135:23
140:14 143:18,22,23
149:14 174:21
177:17 178:3,5
180:19,24 181:3
190:5

**fairly** 26:11

**fairness** 95:18

**faith** 85:10 169:5

**familiar** 91:15 96:21
97:5 104:7 114:24
129:22 175:9 182:23
183:9 191:24 202:12

**farming** 212:19

**fastest** 121:18

**February** 54:6 55:14,
15

**fee** 57:24 58:4,21
59:5 61:19,20
129:20,25 134:15
136:19 137:11,14,16

**feel** 15:24 111:10
186:24

**fees** 56:14,19 58:2,3

60:6 61:10 87:8
128:2 130:9 134:6,9,
14,19 135:2,8,14,15,
20 136:6,7,15
137:17,24 138:2,12
139:3 161:14 162:22
163:5 173:19 182:20
183:2,22 193:24
194:21 195:4,14,17
196:14 199:7 200:14,
15,19,23,25 201:3,5

**fell** 80:20

**few-minute** 53:16

**Fidelity** 207:9

**Fifty-four** 69:14

**fighting** 164:9

**figure** 10:15 21:21,23
46:6 131:7 135:16
137:22 149:10

**file** 27:5 98:4 139:19
186:17

**filed** 14:7,24 154:3
167:2,5 183:11
189:10 217:6 221:10

**files** 172:5

**filing** 11:13

**final** 147:20 148:7
181:24 182:11
191:22 201:13 209:7,
9

**finally** 99:19

**financial** 78:4 166:18

**financials** 76:4

**financiers** 97:22

**financings** 37:15

**find** 62:23 63:6
170:25 171:9 204:11

**fine** 30:19 42:3 57:20
65:20 66:24 124:12
127:6,8 139:16 162:5
221:21

**fingertips** 131:2

**finish** 39:18

**fire** 123:12,21 142:2

**firm** 104:8

**first-lien** 116:19,22

**Firstly** 45:11

**Fitzgerald** 112:23
113:21 115:11,20

**fixed** 32:9 53:25
54:4,8 55:12 82:4,20
178:13

**flexibility** 170:12

**flood** 110:22 111:2

**flow** 28:22,25 29:3,5,
6 56:13,23 75:14
106:19 135:16
163:21

**flows** 28:19,21

**focus** 66:10

**focused** 103:2

**focusing** 63:19,21
152:11

**folks** 123:19

**follow** 39:15

**follow-up** 165:14
217:13

**footnote** 19:22
145:16

**forecast** 191:13
197:16

**forecasts** 79:20
80:18,25

**foreseeable** 159:2

**forget** 166:11 194:25

**Forgive** 104:7
181:13

**form** 12:23 15:9
17:13 19:7 27:9,19
38:24 39:12 40:5
41:7 43:16,22 44:4,9
47:19 48:7 49:7,13
51:25 52:12,19 56:8
57:14 59:11 60:11
62:4 64:15 65:11
72:25 73:15,23 77:3,
8 78:10 80:4 84:19
85:8,20 87:3 88:21
89:5 90:16 94:16

95:9 96:8 103:15
105:8 108:12,20
109:6 110:2 111:5,
13,20 113:5 114:9,16
116:12 120:4,11
122:14 124:20 132:4,
10,18 142:22 143:4,
16,20 146:4,9,16
157:8 158:20 170:9
171:6 176:11,24
182:17 189:13 190:8
193:6 197:5 205:24
213:19 214:14
216:12 218:21

**forms** 122:20

**formulation** 49:22

**forward** 59:21 60:9
78:15 98:24 156:21
157:2,19 195:2,5

**forwarded** 62:19

**fraction** 17:19

**frame** 36:13 208:14

**framework** 36:2

**Frank** 168:15

**fraud** 27:11 69:13

**fraudulent** 26:5,6
27:6 168:13 214:16

**Fred** 12:10

**free** 126:17

**frivolously** 139:9

**front** 29:10 62:16
63:9 124:9 145:16
147:10,14,17 152:25
166:3 185:13 198:5,7
202:8,10

**full** 22:21,22 24:15
133:22 213:14

**function** 41:3,5 69:2
169:18 221:9

**functions** 220:21

**fund** 102:22 103:8
112:12 118:23
167:21 201:25

**fundamental** 121:5

**funds** 54:8 102:25
103:2,9 109:11,12,

15,17,22 113:15
116:19,21 117:6,15
185:9 186:11,12
187:9 191:2 202:13,
17 203:5,9,24 204:6,
13 205:6

**funny** 183:12,15

**furnished** 10:17

**future** 79:22 81:4
146:24 147:2 157:11
178:10 186:14
215:18

---

## G

**GAAP** 81:21

**gather** 13:17 68:5,25

**gave** 15:14 48:18
49:22 120:17 124:22
170:12 195:18
209:14 220:6

**general** 14:21 15:3
43:4,6 130:14 152:20
172:12 174:18

**generally** 15:10,12
60:14 67:18 97:5
114:24 115:5 145:24
175:19 212:24 213:2

**generate** 55:5,7
57:10 58:13,16,22
59:16,18,21 61:25
63:13,16 64:6,11
65:22 142:4 163:15

**generated** 58:6
71:14 163:4 164:2

**generating** 59:25
61:9,13 65:18

**generation** 66:11
219:4 220:11

**give** 15:17 62:13
86:24 116:16 159:7
193:7 195:15 202:8
205:20 211:13

**glean** 67:25

**global** 67:15 152:2
159:6,19

**good** 85:10 93:19,24

94:4 122:24 169:4
184:23

**gradual** 110:25

**gradually** 122:2

**granted** 139:13

**gray** 108:25

**great** 10:16 83:8

**greater** 155:25
156:3,6

**gross** 119:4 154:16
161:25 162:6

**ground** 75:9

**group** 100:25 116:25

**guess** 48:13 100:4
215:5

**guidance** 140:9

**guys** 160:10 162:21

---

## H

**half** 45:13 196:6
220:17

**halfway** 200:21

**hand** 223:19

**Handler** 72:7

**hands** 10:23

**handy** 202:7

**happen** 26:5 39:5
126:17 146:24,25
167:24

**happened** 190:19,20

**happy** 123:17

**Harbourvest** 15:21
49:9 51:2 87:12,24
88:3,5,9

**hard** 22:6,18 23:13
24:12,16 28:14 70:16
79:6 102:8 146:25
147:14,16

**HCFMA** 21:4 25:5
166:11 186:12

**HCLF** 101:15

**HCLOF** 29:4,5 45:11

**HCMFA** 166:16

**HCMLP** 104:17

**head** 20:14,25 25:3,
24 28:16 29:9 47:24
53:6,14 83:7 97:19
133:16 138:11
148:20 166:13 186:8
192:14

**hear** 143:2 191:17
221:16

**hearing** 33:18
187:22 209:11

**hearings** 17:5

**heavily** 26:9

**hedge** 116:21

**held** 99:4,24 151:13
159:14 204:12 205:5

**helped** 119:7

**helpful** 42:2 63:5

**helping** 210:10

**hereunto** 223:18

**hidden** 168:8

**high** 98:20

**higher** 100:13 137:15
138:16,18 157:10
161:3 199:25

**Highland** 28:8 30:23
33:7,20 57:3 83:21
84:6,13 85:5,15,23
89:19 96:12 97:12,14
104:15,19,20 105:5
106:22 109:4,9,11,
16,21,23 110:8
111:17,23 112:12,20,
24 116:2,18 117:3,6,
16,19,21 118:16
119:5,10,15 120:7
134:17 135:11,12
153:22 166:17
167:20 168:16

**Highland's** 121:2
122:8 125:2 135:17
142:17 144:2 153:21

**Highland-managed**
98:15

**HCLOF** 29:4,5 45:11

**highly** 70:18 168:10

**highway** 91:14

**hire** 35:11 43:19,25
52:9 106:24 112:8
113:20 115:20 118:9
126:23

**hired** 44:11 112:13,
20,22 113:17,22,24,
25 117:16,18,19
137:14

**hiring** 117:21 218:5

**hit** 121:18

**hitting** 142:7

**hold** 11:14 31:6 38:4
59:2 100:5 116:5
142:24 204:6

**holders** 212:20

**holding** 150:18

**holdings** 28:9,18,19
91:11 102:19 109:10

**holds** 109:4

**home** 70:6 97:4

**hope** 207:16

**hoping** 207:22

**hospitality** 70:14,19

**Houlihan** 47:9,16
48:3,16,20

**hours** 60:18

**house** 104:9

**humorous** 70:17

**hundred** 54:15 178:4

**Hunter** 68:2 69:10

**hybrid** 97:22

**hypothetical** 111:11

---

## I

**idea** 93:19,24 94:4
125:18 204:22

**identification** 11:18
14:14 74:25

**identified** 10:6

38:11,21 46:4,22
48:12,15 74:23 211:5
218:4

**identify** 10:10 12:15,
19 13:8 69:6 166:7
220:3

**illiquid** 186:20

**immediately** 121:16

**immunity** 132:25

**impact** 111:3

**important** 37:15

**impossible** 136:12

**improvements** 97:4

**in-house** 212:3,10,
12

**inartfully** 81:2
104:20

**inaudible** 72:15
221:13

**incapable** 122:17

**inchoate** 213:23
215:22 216:2

**include** 45:21,22
102:16 103:7 133:25
167:7 173:11 192:16,
19,22 200:3 214:15

**included** 24:14,21,
23 28:2,9,14 90:2
134:6,7,10 135:3,15,
20 136:4,20 137:11,
21 174:17 196:7,11

**includes** 20:14
28:17,20,21,24 29:2,
4,5 79:19 173:19
200:4

**including** 30:24
97:22 102:15,20
167:20

**income** 58:3 64:7
160:9 161:15 163:4,6

**inconvenience**
179:18,19

**inconvenient** 176:8,
13 177:13,18 178:7

**incorporated** 68:22

81:25

**incorrect** 36:7 64:21
84:16 88:19 90:15
111:6

**incorrectly** 79:13

**increase** 16:18 17:17
45:8,17,24 46:3,7,16
48:5,11,24 161:5
163:6 174:23

**increased** 17:8,11
49:24 61:20 89:13
155:21 156:23,24
157:13 162:6 163:2,
11,25 175:3

**increases** 16:19
17:22 52:24

**incremental** 58:14,
15

**incur** 120:7 125:3

**incurred** 66:3 137:18
195:16

**incurring** 135:7

**independent**
185:17,18 186:3
196:14,17,20,22
197:2,6 199:7,10,14,
17

**independently**
118:9

**independents**
128:22

**India** 173:9

**indirect** 91:10 110:6

**indirectly** 102:16
111:17

**individual** 36:11
43:7 136:7 137:9
170:22 171:2

**individually** 136:22

**individuals** 218:14

**infinitely** 174:2,7

**inform** 85:18

**information** 12:21
13:17 15:15 203:20

**initial** 212:2

**initially** 179:3,5

**injunction** 206:17,
19,24 207:2

**innumerable** 129:24

**input** 79:15

**inputs** 148:19,21

**inquired** 92:25

**inquiry** 10:5 92:16
127:14

**insolvency** 132:8
168:2

**installed** 30:20

**instance** 126:19,23

**instances** 206:3

**instant** 86:2

**institution** 132:23

**instruction** 72:2

**intangibles** 24:17

**intend** 14:9 28:6
105:5 106:24 115:19
117:21 120:21
121:13 187:11

**intended** 169:17
170:5 216:17

**intent** 206:13

**intention** 35:22
170:15

**intentional** 27:11

**interest** 38:8 92:5,
16,17,20,24 93:17,
20,22 94:14 102:24
109:24 188:9,11
203:5 204:25 213:14,
17 215:21 216:20

**interested** 115:13
223:16

**interests** 109:15
116:21 203:8 212:21,
23 213:4,18 214:2
215:7,11,17,25
216:4,9,18

**interfaced** 107:12

**interim** 121:25

**internal** 32:13 33:21
68:10 69:25 71:7
210:20

**internally** 32:5

**interrupt** 41:25

**interrupted** 33:14
77:21

**interruption** 11:17
12:16 17:9 33:15
73:3 83:24 120:6
198:17

**interview** 158:16

**interviewed** 107:12

**interviews** 145:2
158:8

**introduce** 74:20

**introduced** 74:11,22

**invest** 31:3

**invested** 159:10

**investigate** 204:17

**investigated** 214:18

**investment** 100:23
115:4 118:3,10
135:8,15,19 136:6,
15,19 137:10

**investments** 31:10,
12,18,23 152:5

**investor** 98:13

**investors** 32:10 99:5
109:13,14 116:25
187:8

**involved** 76:19 110:8
180:6 190:7

**involvement** 152:5
159:6

**involving** 98:6

**irrespective** 146:21

**issue** 27:16 30:5
35:15 42:20 55:13
71:9 72:17 140:3
202:19

**issues** 31:19 138:22

**item** 64:17 133:17,18,
23 137:19 170:23
199:11 220:19 221:4,
5,7

**items** 65:5 82:22
83:3 133:19 134:2,23
181:22 182:9 200:17
218:9 219:6,15,22

---

**J**

**Jack** 12:10

**James** 12:10 222:14

**January** 18:10,17
19:11 20:7 25:11
26:22 40:9 45:7,24,
25 47:15,22 48:6,25
50:13 53:10 54:20,24
56:23 57:7 59:17
61:7 62:24 63:17
64:17 65:2,6 74:13
76:7,12 78:6 81:16
82:6 83:19 87:16,20,
22 88:18 89:11 90:9
133:6 140:14 147:9
148:12 152:22 153:5,
12 155:16 160:24
161:19 168:18
223:19

**January's** 152:10

**Jefferies** 68:6,9
69:24 71:5,9 72:8,11,
16,19

**Jernigan** 187:18

**JHT** 29:24 102:17
103:6 106:21 107:3
118:21

**John** 10:25 11:8 42:3
127:11

**jointly** 78:7

**JR** 222:14

**judge** 88:21 185:13
187:18

**judgment** 80:2

**July** 99:8

**jump** 165:17

**jumped** 150:2 156:17

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-9   Filed 12/07/23   Page 112 of 214   PageID 6854

Index: June..market

**June** 19:16 40:9
54:21 55:16 199:22
200:19

**justify** 157:25 158:10

---

### K

**K&l** 188:24

**keeping** 66:4 114:3
131:19

**keys** 99:6,17

**kind** 69:13 75:12
110:20 141:19 169:8
183:12,15 184:16
202:7

**knew** 16:24 186:10,
15

**knowledge** 35:2
171:13,22 182:12
191:9 204:16 217:4

**Korea** 29:6,7 101:15
102:22 103:8 112:12
118:23

---

### L

**laboring** 214:19

**laid** 72:5

**large** 99:4 116:8
169:4 215:2

**largely** 13:15 87:7

**larger** 31:21

**largest** 101:10 153:3
166:14

**late** 99:19

**law** 104:8 184:12,19

**lawyers** 188:24
210:15,18

**lead** 69:13

**learn** 60:22,24

**leaves** 49:10 52:25

**ledger** 22:4 61:24
64:5 68:20

**left** 124:8 128:4 201:6

**218:11**

**legal** 76:14 137:17
138:12 139:3 140:6
205:17 210:23

**Lehman** 150:5,9,12
151:13 152:4

**length** 74:15

**level** 100:3 117:3
135:21

**leverage** 185:22

**levered** 70:18

**liabilities** 68:13,16
72:18

**liability** 69:13

**lied** 164:14

**life** 37:25 215:5

**limitation** 37:23
38:3,5 207:20,24

**limited** 207:3 212:21

**Limousine** 70:11

**liquidate** 78:14
144:22 157:17

**liquidated** 150:23
175:20 179:6

**liquidating** 35:16

**liquidation** 10:19
18:7,9,19 20:11
21:10,14 26:13 34:13
35:9,17,18,19,20
36:14 37:24 39:22,24
40:4,12 44:15,20
47:7 50:8,9,12 51:14
52:23 75:20,25 76:4,
12 78:6,12,18,21,24
81:16 87:10 89:12,24
101:12 102:7 120:9,
24 121:16 122:4,13
123:8,11,20 133:4,7,
21 134:10 135:4
138:5,8,14,17
140:13,15 141:9,15
148:8,13 152:9
153:4,9,15 154:8
155:3,13 156:7 157:6
158:2 159:9 180:22
181:18 191:21,23

**192:6,7**

**liquidity** 29:21 70:21

**list** 29:10 103:3,6,13,
16,17,19 118:21
133:25 162:3 217:20

**listed** 67:23 68:16
70:20 205:6

**listen** 23:5

**lists** 19:14

**literally** 57:22

**litigate** 164:8

**litigated** 159:21

**litigation** 86:23
129:3,15 139:18
144:17 150:24
151:10 152:2 159:22,
24 173:10,13,16,21,
24,25 174:4,17,22
175:4 185:22 199:19
214:6

**litigations** 160:3
213:5

**litigious** 139:9

**loan** 67:23 68:9 69:24
70:2,12 97:11

**loans** 102:21 103:8
111:16 116:19,20,22,
23 118:22

**Lokey** 47:9,16 48:3,
17

**long** 25:16,25 56:5
150:19 159:18
190:16 207:4 208:10

**longer** 24:21 103:19
127:8 138:21 141:24
184:5 196:17

**Longhorn** 102:13

**looked** 31:2 32:10
43:7 50:3 73:11,18
98:3 102:10 158:21
201:13

**loss** 57:2 67:18 68:25
71:2 160:14 197:25
198:8

**losses** 71:13 97:18

**lost** 69:5,15,16 70:4,
11,13

**lot** 24:17 75:12 79:25
83:8 139:8 184:13

**lots** 103:20 185:5

**loud** 70:16

**lower** 24:24

**LP** 57:3

**lump** 170:7

**Lynne** 30:5

---

### M

**made** 19:20 21:2
31:10,13 36:16 43:8
50:3 55:25 59:19
62:15 71:11,17 72:21
73:21 74:4 78:7
81:24 83:9,12 88:21
108:18 119:21
120:15,19 130:11
131:12 142:10,13
149:12 161:20 184:4,
19 185:2 190:12
211:24

**magnitude** 49:2

**mailouts** 92:4 114:8

**maintain** 203:3,6,8

**maintained** 219:12

**maintaining** 220:23

**major** 91:16 93:3,12
97:6 106:12

**majority** 110:12,15
204:7 205:20 206:5,6

**make** 26:4 31:11,18
37:16 52:10 57:21
60:17 68:19 72:2
75:15 77:17 84:21
91:13 96:25 115:23
124:10 131:23 138:3
149:5,9,22,23 156:6
160:18 164:16
174:10 215:9 219:2,
21

**makes** 49:15 60:15

**making** 51:23 163:21

**178:9**

**man's** 126:9

**manage** 36:7 102:14
121:22 144:21 164:7
209:15 210:13
211:15

**managed** 98:23

**management** 32:2,
22 56:6,14 57:3,24
58:2,4,21 59:5 61:19
67:14 71:24 79:15
81:12 83:13 84:2
105:21,22 161:13
162:22 163:5 164:6
166:18 167:21
195:13,17,25 203:11
205:19 208:6,22
209:5,19 210:2 211:8
218:18

**manager** 99:23
100:8

**manages** 109:11
203:12 209:25

**managing** 30:23,24
65:4 66:5 103:21
141:22 209:19 210:6,
22

**maneuver** 198:23

**manner** 216:17

**March** 19:15 55:24
56:14 71:12,15

**margin** 68:6,9 69:25
70:3 72:4,9

**margined** 72:5

**mark** 14:12 47:10

**marked** 11:18 14:14
74:25 201:19

**market** 29:21 31:7
36:10 46:14,17 50:4
51:13 52:7,10,17
92:21 93:2 95:22
96:2 106:7,10,11,14,
17 108:15,25 110:23
111:2 114:14,18,23
115:4 121:21 136:11
141:25 142:6,7
156:20 157:19
158:25 212:15

Case 19-34054-sgj11    Doc 3818-2    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-11    Filed 12/07/23    Page 113 of 214    PageID 6855

Index: marketable..non-response

**marketable** 51:12
53:11 159:14

**marketed** 115:17

**marketing** 92:10
100:18,20 104:11,18,
21,24 105:23 107:2,
25 108:5 112:16
113:18 114:6 118:12

**markets** 47:2 114:21
122:22 156:9 157:2

**marriage** 223:15

**material** 74:14 82:15
83:3 89:2,9,14,17,20
108:6 215:2

**materially** 81:8
88:19

**materials** 92:11
100:19,21 104:12
107:3,25 112:17
113:18 114:6 118:13

**math** 20:22 50:19,22
141:8 161:7

**mathematics** 147:7

**matter** 75:7 117:13
223:17

**matters** 175:7

**maturity** 99:8

**maximize** 121:20
123:25 212:18

**meaning** 105:17
166:16

**means** 82:21 119:3
145:25 146:18

**meant** 104:14,15

**meat** 117:13

**Medical** 28:22,23
101:14 103:10
112:19,25 113:2,19,
22 114:5 115:14,19,
24 116:11 118:23

**Medical's** 116:3

**meet** 72:4,6

**member** 186:3

**members** 15:13,18

128:20

**memory** 216:23

**mention** 102:23

**mentioned** 91:2,4
102:24 170:16 171:8
196:8 200:10 210:17

**merit** 189:10,18
190:2

**met** 30:22

**methodology**
119:11,13

**MF** 152:2 159:6,19

**MGM** 45:21 46:5,9,15
48:13 102:19 103:7
108:9 109:4,10,12,
17,24 110:6,20

**mid-march** 71:5

**middle** 187:17

**million** 16:11,12,14
20:17,22 21:3,4,6,11,
21,23 22:17 23:2,3,6,
18 24:9 25:6,10 28:3,
10 32:15 45:6,7,14
49:3,5,11 50:10,13,
16,23,25 52:23,25
53:2 54:12,15,17,18
55:9 58:9,11,17,22
59:8,22,25 60:4,5,8
61:9,13 62:2 63:13,
16,20,22 64:10,11,18
65:18,20 66:11 67:22
68:2,6,11 69:8,14,17,
20,23 70:5,7,8,10,13,
22 85:24 86:19,24
87:24 88:2,8,12,16
89:2,8,14,15 90:7
140:11 141:4,8,12,13
147:22 148:14,16
149:3 152:19,23
154:18,25 155:4,6,
18,19,20,21,22
156:2,6,15 157:4
160:22 161:2,3,5,13,
24 162:6,10 163:2,7,
12,14,15,18,19,21,25
166:10 168:24 169:8
172:22 173:11
175:23 176:3 177:24
178:12,21,25 179:4
180:15 181:25 182:8,

14,22 183:20 192:2
193:25 194:14,19,22
195:20 196:6,9
201:12 219:3,7,8
220:9,14,16,17

**million-plus** 172:17
195:13

**mind** 131:6 149:23

**mine** 48:20 75:13

**minimal** 54:10

**minority** 116:10

**minutes** 164:13,22
165:6 217:25

**miscellaneous**
101:17

**missed** 90:24 195:22

**missing** 83:2 103:12,
18

**misspoke** 84:4

**misunderstanding**
121:6 171:21

**model** 18:9 60:13,23,
25 61:11 78:13
133:22 162:18

**models** 148:23

**monetization** 22:18
24:8 36:6 40:11
41:15 42:11 54:7
102:5 141:18 154:23
155:15

**monetizations**
107:18

**monetize** 29:18 31:5
32:8 36:9 208:7,10

**monetized** 151:8

**monetizing** 43:14

**money** 54:13 55:5,8
82:5 122:20 169:7,12
191:12

**month** 16:20 84:23
125:22 126:3,4,8

**monthly** 129:11,20
197:9 199:15 200:2

**months** 15:23 16:21,

22,24 55:18 154:14
156:5 195:11 200:21

**morning** 75:8

**Morris** 10:18 11:2,14
12:22 13:25 15:8
17:12 19:6 22:11,13
27:8,18 28:4 33:17
34:9 38:23 39:12
40:5 41:7,23 42:5,24
43:15,21 44:3,8,21
47:19 48:7 49:7,12
51:25 52:12,19 56:8
57:4,13,20 59:11
60:10 62:4,19 64:15
65:13 66:13,16,18
72:24 73:6,8,14,22
77:3,7,21 78:9 80:4
84:18 85:8,20 86:13
87:3 88:20 89:5
90:16 94:16 95:9
96:7 103:14 105:7
108:12,18,21 109:6
110:2 111:4,13,20
113:5 114:9,15
116:12 120:4,11,23
122:11,25 127:13
131:10 132:3,10,18
134:3 139:13 141:16
142:8,22,25 143:3,
16,20 146:4,9,15
157:7 158:19 170:9
171:6 176:11,24
178:15 182:16 188:7
189:5,12 190:8 191:6
193:5 197:5,14,20
198:11 205:23
213:19 214:13
216:12 217:11,24
218:10,21 221:22
222:2,7

**motion** 85:3 139:13

**Mountain** 68:3 69:10

**mouth** 103:5

**move** 13:6,25 96:15,
18 124:14 139:10
188:14 189:6 191:14
193:21

**moved** 50:6

**moves** 157:16

**moving** 98:24 144:15

**multiple** 101:2
187:2,14 219:9
220:21

**mute** 77:20

**myriad** 100:20 115:8

**N**

**naked** 143:19

**named** 104:9 185:3

**names** 202:13 210:9

**nature** 25:25 181:14

**NDAS** 94:19

**necessarily** 33:4,13
95:11 106:25 117:23
174:8 220:20

**needed** 163:14

**negotiated** 99:7,9
100:12 128:9 176:6
177:10 178:14,17
179:7 200:7

**negotiation** 87:6
176:22 179:13,16

**negotiations** 99:16,
19 128:12,14 190:15

**neighborhood**
20:19 69:21

**net** 119:4 135:16
136:8 137:3,4,12,21
174:16,22 175:4

**Nexpoint** 20:15 21:4
25:18 27:2 70:14
166:10,15

**night** 76:3 123:6
181:8 189:14 196:13

**nomenclature** 75:23

**nominal** 54:13 55:8

**non-demand** 21:16

**non-disclosure**
94:8

**non-litigation**
151:12

**non-response**
124:15

Case 19-34054-sgj11    Doc 3818-2    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 22-11 Filed 12/07/23    Page 114 of 214    PageID 6856

Index: non-responsive..pay

**non-responsive** 124:17 139:11

**non-vested** 214:2 215:6

**normal** 216:19

**Notary** 222:23 223:5

**note** 19:22 20:15,23 21:12 22:5,15,17 23:18 25:19,22 26:25 27:3,7,13,15 40:15, 20 44:16 53:23 54:2, 24 62:23 63:4 69:10, 11 124:13 131:23 166:11

**NOTED** 222:10

**notes** 20:10,14,18 21:6,16 22:16 24:12, 13,20,21,22 25:2,4,5, 8,9,10,25 26:6,8,14, 21,23 41:21 74:19 152:16 166:4,5,8,12, 22,25 167:5,8,12,15, 25 221:11,13

**notice** 10:6 74:21 96:6 186:8

**notified** 187:8

**notify** 93:3 95:21,24

**November** 13:12,14, 18,23 14:17 16:7,25 19:23 24:6 40:10 44:15 45:5,24,25 47:7,15,21 48:5,25 50:9 53:9,24 54:7 55:7 56:13 59:17 61:11 63:7,15 64:19, 23 65:3,7 67:6 76:2, 7,12 78:5,23 82:5 83:11 87:10 88:18 89:11,24 90:9 133:6 147:9,18 152:9,13,14 153:5,8 154:9,20 160:13,15,20 161:11, 17

**number** 15:11 16:13 19:3,4,8 23:3 28:3,10 41:20,22 45:6,7,10, 20 46:19 47:16 50:15 51:14 53:9,10 56:4 63:3 86:25 87:5 89:16,17 90:4,6,8

92:17 99:4 102:10 140:21 148:18 152:22 176:3 177:22, 25 178:25 179:4,9, 11,12 192:3 199:25 202:17

**numbers** 18:25 21:2 50:7,21 67:5 74:12 138:7 153:21 155:9, 25 169:3 172:16 193:3 219:25

**numerator** 17:25

**numerous** 32:17 49:21 184:9

---

**O**

**oar** 214:19

**object** 44:22 65:11 143:16 158:13 171:6

**objected** 97:25

**objecting** 131:8

**objection** 12:22 15:8 17:12 19:6 27:8,18 34:9 38:23 39:12 40:5 41:7 42:24 43:15,21 44:3,8 47:19 48:7 49:7,12 51:25 52:12,19 56:8 57:13 59:11 60:10 62:4 64:15 66:13,16 72:24 73:10,14,22 77:3,7,18 78:9 80:4 84:18 85:8,20 86:13 87:3 88:20 89:5 90:16 94:16 95:9 96:7 103:14 105:7 108:12,19 109:6 110:2 111:4,13,20 113:5 114:9,15 116:12 120:4,11,23 122:11,14 124:10 132:3,10,18 142:22 143:2,3,20 146:4,9, 15 157:7 158:19 170:9 176:11,24 178:15 182:16 189:12 190:8 193:5 197:5 205:23 213:19 214:13 216:12 218:21

**obligations** 37:11 211:8

**obtain** 30:16 94:8 95:18 140:5

**obtained** 97:23 132:16

**obvious** 78:20

**occur** 16:19

**odd** 49:3 184:16

**offer** 30:16 93:5 215:10

**offered** 12:24

**office** 83:8 126:19

**officers** 72:22 73:17, 25

**oil** 103:2

**Omnimax** 96:15,18 97:10,11,13,17 98:3, 8

**ongoing** 56:3 104:25 105:24

**open** 11:4 17:4

**operate** 120:14,21 121:13,14,25 123:24 143:9

**operated** 37:21

**operating** 36:22 38:12,19 39:23 47:4 49:23 50:2 53:4,11 60:3 64:8 65:25 160:21,25 182:19 217:20 219:20

**operation** 37:4

**operational** 160:7

**operations** 54:5

**operators** 190:25

**opinion** 95:19 140:6 144:7,11 156:23 157:16 167:17 172:6 184:18 187:3

**opportunities** 32:10 36:8 97:21 106:15 142:6

**opportunity** 31:3 98:11

**opposed** 138:22 142:2,6 194:8

**opt** 144:22

**option** 99:11

**order** 31:11 77:11,25 123:25 219:13

**orderly** 142:12,15,19 143:14 144:4,9,21

**OTC** 109:2

**outcome** 223:16

**outcomes** 81:7

**outline** 75:11

**outstanding** 108:23 204:11 205:5

**over-the-counter** 108:14

**overhead** 126:19

**overlay** 69:3

**oversee** 199:19

**oversight** 125:12,14 128:18 130:6 174:11 197:7,11 199:18

**overview** 116:17

**owed** 86:18

**owes** 85:23

**owned** 37:21 99:7 102:13 109:12,14 116:20,24 207:11 216:8

**owner** 116:10

**ownership** 110:6 201:24 203:4,25 204:24

**owning** 207:10

**owns** 38:8 109:9,16, 21,22 111:17 202:17 203:8 206:20

---

**P**

**P&I** 182:18 193:22

194:7

**p.m.** 222:10

**Pachulski** 34:15 60:6 112:6

**pages** 74:15 197:24

**paid** 70:2 83:16 100:13 125:16,20 129:11,16 130:9 168:18 169:24 170:6, 7 177:7 194:4,7 195:10 199:15 213:14

**pandemic** 67:15

**papers** 136:25

**Pardon** 96:17

**parlance** 216:19

**parse** 35:21,24 62:11 67:5

**parsing** 36:4

**part** 51:6 61:23 67:15 85:2 99:14 140:22 180:23 182:25 183:4 190:11 194:6 201:11 203:14 220:22

**partially** 56:10

**participate** 81:15 107:24

**parties** 94:10 96:6 164:9 223:14

**partnership** 212:21

**parts** 144:16 182:15 192:11

**party** 35:11 95:15 149:7,13 211:22 212:19 215:9

**pass** 74:23 217:9 221:20

**past** 81:3

**pasted** 75:12

**Pause** 42:4

**pay** 26:11,19 87:13 100:12 125:7 162:3 169:15 170:13,15

**payable** 85:7,16 170:8

**paydown** 68:9,19

**payment** 170:2 191:13

**payments** 170:5 171:23 184:5

**payout** 19:14 175:8, 10

**PDF** 14:5 196:12 197:13,24 198:3

**PDF's** 197:21

**PE** 29:22 30:24 31:9, 25 33:7,10 95:13 102:16

**pending** 165:13,20

**people** 18:13 33:7,20 52:15,16 56:4 62:25 63:8 92:13 132:24 150:7 210:8 218:8

**people's** 122:20

**percent** 14:19,20,22, 25 15:2,4 98:23 109:25 110:16 173:7 174:23 175:13,14

**percentage** 20:9,12, 13 21:12,13 24:11 40:24 42:25 45:23 46:3 109:3,21,22 203:25

**percentages** 53:6

**perform** 98:8 112:8 158:17

**performance** 30:25 78:2 79:22 81:3,5

**performed** 118:16 154:8

**performing** 89:12

**period** 32:8,9 45:18 59:19 69:21 71:21 78:16 98:10 121:25 122:3 124:2 138:21 141:24 159:2 163:17

**perjury** 186:4 187:2, 14 188:5

**permanent** 122:21

**permission** 34:19 35:6

**permitted** 174:12

**persist** 66:23

**person** 10:4,10 12:15,20,25 33:6 51:23 125:16

**person's** 52:6

**personal** 72:6 126:13

**personally** 18:11 184:19

**personnel** 170:24 172:5

**persons** 125:17 197:7

**perspective** 204:23

**petition** 71:4,11,14

**Petro** 103:9 113:15 117:15

**Petrocap** 102:25 117:17 118:8,24

**phone** 127:5 188:10 221:18

**phrase** 120:24 122:12 181:12

**phrased** 143:24

**pick** 160:5 221:17

**picking** 120:18

**piece** 12:21 61:15,17 66:15 99:3,10,12 100:2

**pieces** 10:25 61:2

**Pimco** 98:6

**pinata** 221:24

**place** 37:18,24 71:2 73:12 82:12 103:4 151:3 159:19 206:17

**places** 117:7 219:9

**plan** 10:19 11:10 18:8,19 24:9 35:18 36:5,6,16 39:7,25

40:3,12 41:10 44:16, 19 45:6 47:11 49:17, 22,25 51:11 53:8 55:21 78:16,19,20 83:22 84:6,13,24 85:2 101:12,21 102:3 106:16 120:9,24 121:7 122:13 125:2 129:4 133:5,6,10,11, 21 134:7,20 135:3,9 137:25 138:3,8,13, 17,19 140:12,15 141:13 143:10 147:9 152:9,18 153:25 154:8,12,16,24 155:12,17 156:7 157:5 158:2 161:16 168:16 169:17 170:11 175:15,21 180:21 181:8,18,23 184:16 186:14 195:14 196:16 197:15 202:19 206:15,18 207:14 209:17 211:17 212:8, 20 216:24

**plans** 59:16

**players** 114:23 115:2,3,12

**playing** 70:6

**pleadings** 130:17

**point** 25:17 63:4,22 78:14 182:3

**pointed** 63:22

**points** 177:10

**policies** 73:12,13 74:2,5

**policy** 73:18,21,24

**pool** 16:6 17:11,17 89:13,16,17

**poorly** 97:15

**portfolio** 71:23 97:14 99:23 100:8 203:11 209:19,25

**portion** 28:3 68:5,8 109:17 110:7 182:13

**position** 32:7 38:16 70:14 98:17 120:25 121:2 122:8,10

142:17 144:2

**positions** 102:21

**positive** 106:19 163:20 183:22

**possibly** 62:12

**post** 152:6 186:18 200:6 209:24

**post-confirmation** 176:10 177:13 179:19 195:5,6,9 197:3 206:21 207:19 209:20 210:21 212:6

**post-petition** 184:4 194:19

**potential** 93:5 97:20 107:17,22,23 114:19 137:9 145:2 167:9 168:12 173:19 196:4

**potentially** 37:20,22 112:8,10 169:24 213:5

**Pre-petition** 104:16

**precise** 59:3 114:4

**precisely** 110:11

**preciseness** 117:10

**predicting** 147:2 154:7

**prediction** 146:23

**predictor** 81:4

**prefer** 212:3,11

**preference** 127:12 201:24 202:18 203:16 204:2,7,12 205:5 207:12

**preferred** 212:9

**prepare** 11:25 91:25 92:10 119:7

**prepared** 12:2,3,25 13:11,12,16 76:13 79:14 81:20 92:12 100:21 104:11,14 107:2 108:2,4 112:16 113:19 114:6 118:13 165:7 168:4 185:8 195:14 201:23 202:2 203:23 204:5

**present** 114:23 205:4

**presentation** 139:7

**presented** 78:10 133:6

**president** 72:8

**presume** 113:17 119:3 128:14 134:5 139:17

**presumed** 146:20

**presuming** 110:19

**pretty** 25:24 184:23 214:8 215:19 216:20

**previous** 61:14 88:17

**previously** 34:6 61:11 63:14 84:15 91:19 108:8 134:4

**price** 46:6 51:18 95:8,12 111:3

**priced** 130:21

**primarily** 31:19 70:12 103:2

**prime** 67:19

**prior** 15:6 23:5 34:23 41:16 61:17 63:7 91:6 92:15,20,23,24 93:17 94:13 157:22 169:2 188:18 189:16 204:10

**private** 114:20

**problem** 180:24

**problematic** 214:22

**procedure** 119:11, 12

**procedures** 168:2

**proceedings** 33:14 144:24 167:3

**proceeds** 18:7,12,22 24:7,14 40:11,17 44:19 140:25 141:17 142:4 145:19 154:17, 23 155:14 174:16

**process** 29:12

Case 19-34054-sgj11    Doc 3818-2    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-1 Filed 12/07/23 Page 116 of 214    PageID 6858

Index: produced..refinancing

30:11,12 32:25 33:5,
9,20 100:16 104:19,
21,24 105:23

**produced** 76:3

**production** 76:19

**products** 91:13
96:25

**professional** 60:6
61:10 67:20 87:8
132:8 182:20 183:2
200:23 211:2,4 215:4
218:12 219:19
220:24

**professionals**
121:22 145:8 192:23
193:13 210:14,16
211:10 218:6,7

**profit** 57:2 160:13
197:25 198:8

**profit/loss** 197:16

**profitable** 162:22

**prohibition** 39:17,19

**project** 77:25 120:13
153:22

**projected** 98:9
199:16

**projecting** 154:5

**projection** 36:21
156:25 157:11,19
182:21 213:25

**projections** 77:12
78:4,7,15 79:14
87:17,20,22 88:23
123:6,7 146:23
158:12,24 160:20
166:2 167:7 172:17
173:23 174:15
180:19 181:8 182:9,
13 191:12 197:17,22
200:6 214:4

**promptly** 131:21

**properties** 119:2

**property** 102:21
103:8 111:16 118:22
213:18 215:21,25
216:4,10,15,16

**proposed** 32:11
97:25 120:9 129:4,8
175:13 178:24 179:5

**proposition** 35:16

**propound** 184:12

**propounded** 184:10

**prosecuting** 173:20

**prospects** 158:25

**protocols** 39:16

**prove** 80:10 106:16

**proved** 122:18

**provide** 10:11 56:5
156:11

**provided** 47:6 48:17
76:24 79:20 123:5
128:23 131:13
138:25 216:22

**providing** 131:6

**provisions** 205:18

**public** 46:14 100:7
122:22 222:23 223:5

**publicly** 46:10 51:7
53:2

**published** 76:15,18

**pull** 78:23 145:14
148:11 152:13
154:19 155:16
160:12 198:16

**purchase** 98:18

**purposes** 26:3 36:20
47:10,11 74:9 77:6,9
108:18 122:23 133:4
134:21 176:21

**pursuant** 203:10

**pushed** 55:21

**pushing** 180:14

**put** 10:20 11:6 32:6
36:2 41:23 42:21
61:2 70:19 77:11
95:22,25 100:6
137:12 141:23 164:5
175:21 217:15

**puts** 146:19

**putting** 37:17 60:19

**Q**

**qualifications**
209:15

**qualified** 10:5,10,11,
13 111:10 132:25

**question** 12:12,18,
23 15:9 17:13,15
18:3,14 19:7 21:20
22:24 23:4,21 24:2
27:9,14,19,20,21
28:7 34:12 36:15
37:10 38:6,24 39:13
40:6 41:19 43:16,22,
25 44:4,9,22 47:20
48:8,24 49:13,14
52:2,13,20 53:7 56:9
57:14 58:5 59:12
60:11,15 66:7 72:25
73:9,15,23 77:4,8
78:10 80:20 84:19
85:9,13,21 87:4
88:21 89:6 90:17
93:6 94:17 95:10
96:8 103:15 105:8
108:13,22 109:7
110:4 111:5,14,21
113:6,17 114:2,10,16
116:13 120:5,12,16
122:15 123:2 124:16,
19 132:4,11,19 135:6
137:10 142:23 143:4,
6,17,21 146:5,10,16
157:8 158:7,20
162:24 163:9 169:2
170:10 171:7 176:12,
25 178:23 182:17
186:23 188:15,22
189:6,13 190:9
191:11 193:6,8,14,
18,20 194:13 196:13
199:13 204:15 205:9,
15,24 209:22 213:20
216:13 217:3 218:5,
22 219:23 220:6

**questioning** 75:14
160:6 164:15,24

**questions** 13:2,3
60:17 65:12 117:12
118:6 165:13,14,19,
25 188:9,12,17 198:6

217:12,14 221:23
222:6

**quick** 142:2 148:2
164:23

**quickly** 31:13 150:23
151:9 157:17 159:24
168:11 202:6

**R**

**Race** 32:20

**raise** 32:4

**raised** 30:5 190:17

**ran** 33:5 169:6

**range** 163:19 220:9,
17

**RCP** 102:12

**re-call** 221:19

**reached** 93:21

**read** 19:12 67:8
77:23 103:13 113:25

**readily** 46:20,25
48:14,19

**reading** 79:12

**real** 102:21 103:8
111:16,18 118:22

**realize** 65:8 161:12,
23

**realizing** 196:8

**realm** 25:7

**reason** 38:4 178:20
215:13,14

**reasonable** 36:13

**reasons** 69:4

**recall** 11:3 20:13
25:4,23 29:9 38:2
47:23 53:13 54:11,16
55:8 56:16 63:2 90:6
94:21 95:23 131:3
133:15,18 134:12
138:10 148:21 152:6
159:20 166:14
168:21,23 169:10
178:2,24 179:8,15
192:13 208:25

**receivable** 67:23
68:3

**receive** 31:15,16
94:20 153:23 154:2,6
157:5 160:8

**received** 32:17 74:14
92:16 100:14 115:17
153:10

**recent** 158:12

**recently** 76:3 91:7
167:2

**Recess** 53:19 127:20
165:10

**recollection** 69:22
220:9

**reconvene** 127:18
164:20 165:8

**record** 74:10 77:23
124:13 191:20
223:11

**records** 119:14
170:18 171:4,14,25
203:4,15 205:8

**recover** 155:19
213:9

**recoveries** 27:12
129:18 156:6 160:2
213:10 214:5

**recovery** 14:16,18,
24 15:6,25 16:24
17:7,18,22 18:8
24:15 130:11 136:8
213:8

**reduce** 68:15

**reduced** 15:6 17:7
21:17 68:12,13
72:17,18 137:13

**reduces** 17:18 68:19

**reexamining** 164:25

**refer** 133:20

**referenced** 25:10
71:10 200:15

**referring** 40:8 201:4

**refers** 197:10

**refinancing** 97:21

**reflect** 13:17 171:4

**reflected** 56:3 64:19, 22 65:2,3

**refused** 72:6

**regular** 114:25 205:10

**regularly** 29:17 159:14

**regulations** 81:21

**REIT** 70:19

**reject** 217:5

**rejected** 216:24

**related** 69:9 172:7 185:12 199:11 219:11 223:14

**relates** 191:11

**rely** 77:25

**remaining** 151:9

**remember** 62:22 90:4 171:15 172:3 214:4

**remote** 223:11

**removal** 206:14

**remove** 205:21

**renew** 115:19 142:8

**reorg** 11:11 150:17

**reorganization** 102:5 121:3 123:7 143:10

**reorganized** 36:24

**repeat** 75:17

**rephrase** 158:7

**report** 56:18 77:6 160:24

**reporter** 11:17 12:16 14:9 17:9 73:3 83:24 84:5 120:6 191:17,19 198:17 201:18

**reporter's** 73:9 108:18

**represent** 23:8,9 63:10 75:6 148:10

202:14

**representation** 153:7

**representative** 101:9

**request** 127:4 131:12,20 134:2 142:8 188:14

**require** 123:11 132:2,6

**required** 96:6 98:8 139:19 192:5

**requirement** 37:5

**resent** 221:25

**reservation** 165:20

**reserve** 67:22 68:2

**resisted** 186:16

**resolicited** 89:19,21 154:11

**respect** 26:10 27:6, 14 29:11,16,22 37:11,14 38:7,15 72:22 79:21 150:14 158:4,24 187:12 204:5 205:3 219:4

**respectfully** 131:14 188:14

**respond** 131:21

**response** 73:8 124:14 131:14

**responsibility** 71:24 130:7

**responsible** 12:20 150:8,9,21

**rest** 68:25

**restate** 101:7 108:24

**restriction** 29:20

**restrictions** 39:5

**restructuring** 98:19

**result** 67:16

**results** 81:7

**retail** 186:19 190:14

**retain** 174:5 209:17 218:8

**retained** 36:24 104:17

**retention** 84:24 218:17

**retraded** 100:3

**returns** 139:20

**revenue** 57:10,25 58:2,6,13,22,25 59:4, 5,6,7,15,18 61:15 64:12,18,22,25 65:5 66:10 161:11,18,25 162:7,12 163:16 193:23 195:4 219:4 220:12

**revenues** 61:20

**reversed** 83:16 168:18

**reversionary** 216:2

**review** 30:21 76:17 115:15 149:8 205:7

**reviewed** 76:14

**reviewing** 136:13 149:7,13

**revised** 153:21

**revolver** 116:20 117:5

**rid** 123:22

**rights** 205:21,25 206:9,10,11,13,20,22 207:15,18,21

**risk** 31:25 144:16

**robust** 156:19 157:20 164:7

**Rock** 32:20

**role** 150:6

**roles** 142:19

**roll** 139:25

**roll-up** 134:23

**roll-ups** 76:21 90:13 133:20 136:4,24 137:5 149:2,9

**rolls** 160:16 219:25

**Romey** 12:11

**room** 92:12,14

**Rothschild** 104:4,6, 8,16,22 105:6

**rough** 20:22 21:2

**roughly** 16:10 20:20, 24 21:5 49:2,10 69:18 70:22 100:14

**round** 172:16

**row** 200:13

**RPR-CRR** 223:23

**Rukavina** 165:2,4, 21,22,24 188:15 191:16 198:25 201:16,21 217:9 222:9

**rules** 150:14

**ruling** 88:22

**run** 102:11 105:14 130:24 214:11 219:13

**running** 100:8 122:10,14 124:10 142:2

**runs** 138:21

**RV** 97:3

---

**S**

**sale** 28:13 29:12 30:6,8 33:2,5 34:16 35:4,13 38:17,22 41:16 91:8,21,22 92:2,6,11 94:4,15 96:16,19 97:10 121:17 123:12,13,21 136:20 137:9,19 142:3 145:18 151:11, 12

**sales** 40:17 91:7 100:16 137:22 140:12 141:18

**sample** 101:9

**sand** 186:8

**sat** 97:13

**save** 101:8

**scary** 187:10

**schedule** 19:14 24:6

**schedules** 11:12,13

**scheme** 69:11 111:24

**screen** 11:10,22 14:2,7 41:24 57:5 60:21 67:9 79:6 147:17,24 148:11 152:16

**seats** 116:5

**SEC** 81:20

**second-lien** 116:23

**secretly** 17:3

**secured** 98:14 99:3, 18,21 100:24 111:18

**securities** 29:2,16 30:10 49:24 51:8 53:11 101:15 102:19, 20 103:7 109:4,5,10, 12,18,23 110:7,20 159:11,14

**security** 51:12,19

**seek** 29:16,17 32:7 38:5 121:14

**Seery** 10:1,22 11:1, 19 12:1,17 13:1,10 14:1,15 15:1 16:1 17:1 18:1 19:1,9 20:1 21:1 22:1 23:1 24:1 25:1,2 26:1 27:1,7 28:1 29:1 30:1 31:1 32:1 33:1,16,19 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1, 7,21 43:1 44:1,23 45:1,19 46:1 47:1 48:1 49:1,16 50:1,21 51:1,4 52:1,3 53:1,21 54:1 55:1 56:1 57:1,8 58:1 59:1,14 60:1 61:1,6 62:1 63:1 64:1,3 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,11 74:1,22 75:1,2,5 76:1 77:1

78:1 79:1,8,10 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1,16 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1,4 115:1
116:1 117:1 118:1
119:1 120:1 121:1,2
122:1 123:1 124:1
125:1,2 126:1 127:1,
7,22 128:1 129:1
130:1 131:1,24 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1,25 143:1,5
144:1 145:1,16 146:1
147:1,8 148:1,3
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1,4,
18 161:1 162:1 163:1
164:1,10 165:1,11,21
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1,4,8 200:1
201:1 202:1,3 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1,19 218:1
219:1 220:1 221:1
222:1,14

**Seery's** 124:14

**seized** 71:6

**select** 69:16 71:6

**sell** 26:9 29:17,25
33:11 35:22 42:22,23

51:24 52:11 100:2
103:25 111:11 122:2
151:15

**sell-down** 110:20

**selling** 39:9 82:4
122:18 138:23 150:8,
9

**semi-liquid** 108:10

**semipublic** 46:17

**send** 131:15,20,23
186:6

**sending** 188:18
198:11

**senior** 98:13 99:3,20

**sense** 60:15,17

**separate** 34:22
104:9,22 134:14
137:14 139:19 176:5
197:23 198:19

**separates** 182:14

**September** 19:15

**service** 58:3 83:14
84:3 163:5 186:9
194:21 195:4

**servicer** 209:18

**services** 56:6 65:5
66:4 161:14 190:13,
21 193:24 211:21
218:12,18 219:19
220:25 221:3

**set** 10:18 77:13,24
111:23 149:12 223:9,
19

**settled** 87:23 88:4,13

**settlement** 49:10
51:2

**setup** 202:5

**shared** 58:2 65:4
83:13 84:3 161:14
163:5 193:24 194:21
195:4

**shareholders**
205:21

**shares** 201:25
202:18 203:9,17

204:2,7,12 205:5
207:12

**sharing** 100:11

**sheet** 62:2,6 63:17
140:18 170:25
171:10 202:7,10

**shelving** 82:22

**shopping** 106:2

**short** 127:9

**show** 53:22 137:5
155:23 197:12 203:4

**showed** 48:4 197:14

**showing** 58:13 68:23

**shown** 198:21

**shows** 57:25 64:18
140:16 147:19
148:13 154:24 155:4
160:14 196:14

**shut** 56:14,17,19
123:21 188:8

**side** 58:25 61:24 64:4
102:16

**sides** 68:19

**signed** 99:21

**significant** 25:24
45:16 48:5,21 97:18
102:19 164:4 169:23
183:8 214:8,12,20

**significantly** 109:9
111:3

**similar** 13:12 115:13
150:14 151:24 152:3
189:2

**similarly** 98:22

**simply** 142:2

**single** 153:3

**SIPC** 150:13,19
151:2,3,8

**siphoned** 168:9
169:7

**siphoning** 169:11

**sir** 43:24 176:14
177:6 195:7,19

197:19 200:23 205:3

**sit** 153:20

**sitting** 33:8

**situated** 98:22

**situation** 136:10
144:20

**skill** 149:12

**slices** 116:25

**slightly** 74:7 81:2
83:25 84:8 116:24

**small** 183:6

**smaller** 197:15

**smirking** 183:16

**snide** 181:5

**sold** 21:18 22:16,20
24:22 30:3 36:18
41:11 42:14 54:5,21
97:2 99:10 101:11,20
102:3 121:9 150:15
151:7

**sole** 71:20,22

**solely** 61:25 190:21
220:11

**solicit** 92:5,13

**sort** 44:18 49:19
62:11 65:9,15

**sought** 29:25 97:21

**sound** 70:16 216:25

**sounded** 23:22

**sourcing** 212:5

**space** 126:20

**specific** 15:11 28:5
38:2,15 54:11 56:16
69:4 131:3 133:23
134:23 148:21 179:8
181:5 200:12,17
206:4 221:3

**specifically** 28:15
35:25 45:9 67:16
98:5 100:4 131:2
133:18 134:13
152:10 219:11

**spend** 64:10 162:10

174:2,6

**spread** 154:15 155:6,
10,20,21 156:16
158:11,18

**SSP** 30:6,25 33:5
38:15 91:8 93:5,13,
21 95:8,22,25

**stand** 66:25 171:18

**start** 30:14,15,17
55:22,23 57:16 64:16
101:25 121:16
184:24

**started** 29:12 67:12
212:8

**starts** 56:24 57:6

**state** 88:6 124:11
223:6

**stated** 18:4 144:4

**statement** 11:12
13:14,23 14:6,18
16:7,25 19:10,24
20:7 23:22,23 24:3
53:23,25 54:25 57:2
67:3,6,8 74:17 75:24
77:10 79:18 80:16,
19,23 123:4 130:14
182:18 187:13
197:15 208:13

**statements** 79:19
80:17,24

**states** 80:12 134:5

**stay** 119:11 164:21

**stays** 17:25

**steel** 91:13

**step** 129:20,23

**step-down** 110:21,
25

**steps** 204:9 205:6,12

**Steve** 72:7

**STEVENS** 223:5,23

**stiff** 169:9

**stipulate** 122:16
123:14,16 124:4,23
142:9

Case 19-34054-sgj11    Doc 3818-2    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc

Case 3:23-cv-02071-E    Document 20-11 Filed 12/07/23 Page 119 of 214    PageID 6861
Exhibit Exhibit BB-29 1-00 12/07/23 86 Page

Index: stipulation..traded

**stipulation** 122:24 124:20,22

**stock** 45:21 46:5,9, 15 48:13 108:9

**stocks** 186:19

**stop** 39:9,15

**stored** 203:20

**strategic** 114:19

**stream** 163:4

**strictures** 39:16

**strike** 124:14 139:10 215:7

**structural** 91:13

**structure** 117:4 128:8 129:24 175:15 179:5

**structured** 177:5

**stuck** 186:7

**Studios** 102:20 103:8 109:24

**stuff** 23:7

**sub-agencying** 211:21

**subbing** 211:20

**subject** 164:25 215:18

**subjective** 80:2

**subordinate** 130:12

**subordinated** 213:13

**subpoena** 189:15

**SUBSCRIBED** 222:18

**subservicer** 209:18

**subsidiary** 22:4 91:9,10 112:13 135:21

**substantial** 31:25 99:14 110:7

**substantially** 121:8 151:24

**substituted** 84:25

**subsumed** 134:13 135:25

**subtrust** 173:16

**successful** 213:6

**suffered** 97:18

**Suffice** 213:24

**suggest** 221:15

**suit** 27:6 221:10

**sum** 100:13

**summarize** 207:17

**summary** 162:19 216:22 217:6 219:25 220:2

**sums** 170:7

**super** 206:6

**supervision** 12:4

**suppliers** 91:16 93:4,12 94:3,6 97:6

**suppose** 34:17,24 35:5,8 52:14 112:10

**supposed** 170:7

**supposition** 36:6

**suspect** 190:22

**SVP** 98:12,17,21 99:10,20,21 100:11, 12

**swiftly** 142:16 159:21

**switched** 217:5

**sworn** 222:18 223:9

---

**T**

**tail** 105:16 113:9,12

**takes** 122:9,19 163:3

**taking** 142:4 208:4

**talk** 75:19 91:6 181:6

**talked** 31:25 32:12, 13 69:9 70:25 92:15 107:9,13,16,21 190:13

**talking** 20:20 71:8,9, 16 75:21 107:14,20 108:16 110:15 128:2 160:10 168:12 181:10 197:22

**talks** 193:23

**tangibles** 24:18

**Targa** 28:20,21 29:23 45:22 46:22 101:14 102:17 103:7 107:5, 14 118:22

**target** 51:19 95:8,12

**tax** 69:10,13 111:24 139:20 192:24

**Taylor** 75:4,6 77:15 78:22 79:4,7 108:16 122:6 124:6,24 127:3,11,16,21,22 131:22 133:24 139:10 141:19 142:24 145:13 152:12 160:12 164:10 165:8,11 198:15,18 221:14 222:5

**team** 12:6,7,9 13:10, 11 30:24 31:8,9,14, 25 32:2,13 33:6,7,10 76:14 78:8 82:11 95:14 112:5 210:11

**teams** 30:22

**teasers** 91:25 108:4

**technical** 33:15

**telephone** 188:19,23

**telling** 23:16 64:9 99:17,25

**tells** 62:3 63:17 64:5

**ten** 62:25 70:8 74:15 210:12 218:8,14

**ten-minute** 53:17 127:7

**term** 105:13 113:4 129:22 145:9 158:15 166:5,7

**terminable** 105:13 113:4

**terminate** 170:2 205:22

**terminated** 83:14,22 84:3,7,14 105:12 113:8,11

**termination** 186:8 206:14

**terms** 24:14 83:23 84:4,7,14 140:17 152:5 156:8

**terrible** 141:8 158:6

**testified** 76:11,20 81:23 91:8,19 101:6 108:9 149:15 159:5 219:2

**testifying** 86:10 127:25

**testimony** 37:19 101:8 123:3 165:15 185:13 187:17,25 223:8,11

**thereto** 198:20

**thin** 190:12 216:20

**thing** 60:20 72:12 83:5 123:10 146:18

**things** 36:2 57:12 59:3 67:17

**thinks** 82:11

**third-party** 210:25 211:3,10 218:7

**Thirty-six** 69:18

**THIS_____DAY** 222:19

**thought** 31:24 72:9 77:19 113:21 124:19 153:17 154:15 166:12 187:24 188:2

**thousand** 54:15

**threatened** 98:5

**three-page** 198:8

**thrown** 169:2

**tie** 197:20 198:2

**ties** 182:4,6

**time** 13:7 30:15 32:9 33:18 36:13 42:15 45:18 75:7 99:24 101:9 124:2,12 127:18 128:24 136:11 142:5 149:17 150:24 151:5,22 152:7 159:2 164:19 170:3,6 175:20 190:16 208:14 211:12 216:21 222:10

**times** 66:19 141:25

**timing** 41:6 42:20,21 45:3 52:7 55:4,13,20 82:9 128:22 159:25

**today** 153:20 181:20 185:8 197:14 201:23 202:2 208:19

**today's** 13:19 14:10 204:10

**told** 208:11

**ton** 82:12 168:8

**top** 20:13,25 25:3,23 28:16 29:8 33:8 47:24 53:5,13 57:25 83:7 101:25 102:4 133:15 138:10 148:20 166:13 192:13

**top-level** 167:16

**topic** 188:22

**topics** 201:22

**total** 20:12 24:18 58:23 59:7 60:2 61:14 62:9 63:24 65:22,23 103:20 118:17 140:18 156:22,24 160:7,15, 20,25 161:11,18 193:25 194:16 198:21,22 218:17

**touches** 185:21

**track** 82:3,8 113:3 131:19

**trade** 46:11,13 186:19

**traded** 46:10 51:7

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-11 Exhibit BB 29 1-60 12 of 237 Page 120 of 214   PageID 6862

Index: trades..words

53:3 108:11,25
159:11,17 204:20

**trades** 70:25 71:3,10,
17 72:2

**trading** 51:20 69:15
70:3 71:19

**tranches** 117:9

**transaction** 32:21,
23 98:6,7,25 99:9,13

**transactional** 34:25

**transactions** 115:9

**transcript** 223:10

**transfer** 37:3,5,12,16
208:5

**transferred** 37:8,10
55:11

**transfers** 168:13
214:21

**transition** 186:16

**travel** 126:22

**treatment** 180:15

**trick** 60:21

**tricking** 62:6

**trigger** 37:13

**trouble** 162:23

**true** 58:20 59:4 80:13
85:25 87:16,18
223:10

**trust** 36:23 37:3,6,8,
10,24 38:3 70:15
125:4 129:3 139:18
140:2 174:10,17,23
176:9 177:14 178:7
179:20 212:24 214:6

**trustee** 34:13,14,21
35:11 40:16,18 41:4
42:19,22 43:11,13,
19,25 44:17 51:11
52:9,14 96:5,11
111:12,15 112:7
119:22 125:11 128:3
129:9,15 131:25
132:6,21 134:6,9,14,
15 138:23 142:11,14,
18 143:8,13 144:3,8,
19 145:17,19 148:15

149:18 150:11,13,19
151:2,3,8,23 152:3
155:19 157:13,15
159:7,19 173:10,13,
24,25 174:4 192:23
193:16 199:20 201:5
203:22 204:18

**trustee's** 134:18
192:17,20

**trustees** 125:7,9
129:6 130:19 132:13
144:23 145:3 149:16
157:23 158:9,16

**trusts** 213:17

**Trustway** 28:8,18,19
29:25 45:21 46:23
91:9,10 93:21 101:14
102:17 103:6,23
104:19 105:17,19
118:21

**Trustway's** 105:10

**TSX** 70:20

**Tuesday** 209:13,15

**Tuesday's** 187:21
209:10

**turn** 99:17 119:25

**turned** 88:18 99:22

**turns** 222:4

**two-year** 122:3
198:22

**type** 73:21

**types** 74:5,7 114:21
115:5 125:23 196:20
215:25 216:4

**typically** 34:21 96:5
114:25 132:16
146:22 169:14

**U**

**U.S.** 70:18 134:9,15

**UBS** 87:12,24 88:7,
14,16

**ultimate** 130:10

**ultimately** 17:22
32:20 94:19 105:18

130:8 211:14

**unaccounted** 49:11

**unaware** 152:17

**uncollectability**
167:9,11

**underlying** 37:11
148:23

**undermanaged**
97:16

**understand** 17:14
23:15 24:16 33:21
41:18 48:2 51:21
55:19 57:19 58:24
60:12 65:16 66:8,10
67:4 68:18,24 75:16
82:19 86:17 93:8
108:23 110:3 123:18,
19 135:6 136:14
160:19 163:8 174:3
175:16 178:22 182:5
186:22 187:20,23
194:12 199:12
201:10 203:7 209:21
219:23 220:6

**understanding**
92:18 121:6 139:21
169:20,22 170:4,11
176:3 185:20 195:24
199:24 206:19,25
207:23 208:2 209:2
216:6

**understood** 166:20
196:16

**undertake** 39:2

**undertaken** 167:13
180:4,5,8,9

**undertook** 204:10

**unfavorable** 106:10

**United** 134:5

**unliquidated** 179:6

**unopened** 208:24

**unpaid** 182:25
194:19 200:23

**unsecured** 14:21
15:3 16:8 128:16
130:11,13 152:20
153:10,22 154:6

172:12 174:18

**unsecureds** 152:24

**unvested** 212:23
213:4,16 215:10,16
216:9

**update** 81:12

**updated** 75:25 76:3
166:2 181:8

**updating** 81:16

**upside** 129:17

**users** 82:12

**V**

**valuation** 27:25 47:6
48:4,16,22 95:7,16
119:10,12

**valuations** 41:14
50:6

**valued** 183:19

**values** 50:5 118:25
156:9 157:10

**vast** 110:12,15

**vehicles** 103:22
208:8

**vendors** 91:16 93:4,
13 97:7

**version** 90:12

**versus** 10:19 18:19
20:10 21:13 22:6
24:12 30:9 36:24
40:4,12 41:4 42:22
43:10 44:15 53:3,11
82:5 89:4 133:5,7,21
140:15,19 141:2
147:10 158:2 160:8
162:4 180:21 181:18
182:19

**vested** 213:12

**vet** 95:16

**view** 90:13 156:9,19
167:16 213:21

**viewing** 149:8

**virtually** 101:22

**virtue** 170:14

**vote** 217:5

**votes** 89:19,22

**voting** 201:24 202:17
203:16,25 204:7,11
205:5,20 207:11

**W**

**wait** 165:4,18

**walk** 41:9 67:2
136:22 137:8 162:19

**wanted** 98:18 99:5,6
160:5 181:6 206:8

**warrants** 13:5

**Waterhouse** 189:9

**ways** 129:24

**website** 186:19

**Wednesday** 186:4

**week** 179:25 183:11
185:7

**week's** 185:13

**weighting** 117:8

**weird** 80:19 169:8

**WHEREOF** 223:18

**wind** 120:8,20 122:12
150:20

**wind-down** 101:12,
21 102:3 121:12,15
122:4 142:12,15,20
143:14 144:4,9

**wipe** 99:6

**withdraw** 193:19

**word** 48:19 87:19
93:9 105:2 145:21,24
146:7,13,17 177:4
196:23 211:19

**worded** 81:3

**wording** 83:20,25
84:8,9

**words** 35:21,24 36:4
101:16 103:4 177:23

**work** 32:6 65:9 112:9
158:4 179:25 180:6,
10 191:2 206:24
207:2 210:12 221:5,6

**worked** 12:6 33:8

**working** 12:9 62:17,
20 111:25 112:2,3
207:5,13

**works** 17:20 114:12

**world** 216:19

**worried** 207:9

**worth** 20:17 70:21
82:11,13,18 87:13
89:2,8 152:19 156:15
163:25 172:8

**writing** 131:21
208:18,20 209:4,8

**written** 119:17,20
171:5

**wrong** 139:14 166:17
176:16 196:18

_____

Y

_____

**year** 39:10 97:19
139:20 166:5,22
200:21

**years** 26:3 37:21
39:11 78:3 97:14,15
122:19 149:20
150:25 151:4 159:4
208:12,16

**yesterday** 10:17
14:24 15:7 16:20
42:8 166:2 191:22
197:14,21 204:21

**York** 223:6

_____

Z

_____

**Zoom** 62:20

007314

# HMIT Exhibit No. 19

007315

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE NORTHERN DISTRICT OF TEXAS

3    DALLAS DIVISION

4    ------------------------------)

5    In Re:                   Chapter 11

6    HIGHLAND CAPITAL          Case No.

7    MANAGEMENT, LP,           19-34054-SGJ 11

8

9          Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14             January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25

Page 14

```
          J. SEERY
1
2     the screen, please?
3     A.    Page what?
4     Q.    I think it is page 174.
5     A.    Of the PDF or of the document?
6     Q.    Of the disclosure statement that
7  was filed.  It is up on the screen right
8  now.
9          COURT REPORTER:  Do you intend
10    this as another exhibit for today's
11    deposition?
12         MR. DRAPER:  We'll mark this
13    Exhibit 2.
14         (So marked for identification as
15    Seery Exhibit 2.)
16    Q.    If you look to the recovery to
17 Class 8 creditors in the November 2020
18 disclosure statement was a recovery of
19 87.44 percent?
20    A.    That actually says the percent
21 distribution to general unsecured
22 creditors was 87.44 percent.  Yes.
23    Q.    And in the new document that was
24 filed, given to us yesterday, the recovery
25 is 62.5 percent?
```

Page 15

```
          J. SEERY
2     A.    It says the percent distribution
3  to general unsecured creditors is
4  62.14 percent.
5     Q.    Have you communicated the
6  reduced recovery to anybody prior to the
7  date -- to yesterday?
8          MR. MORRIS:  Objection to the
9     form of the question.
10    A.    I believe generally, yes.  I
11 don't know if we have a specific number,
12 but generally yes.
13    Q.    And would that be members of the
14 Creditors' Committee who you gave that
15 information to?
16    A.    Yes.
17    Q.    Did you give it to anybody other
18 than members of the Creditors' Committee?
19    A.    Yes.
20    Q.    Who?
21    A.    HarbourVest.
22    Q.    And when was that?
23    A.    Within the last two months.
24    Q.    You did not feel the need to
25 communicate the change in recovery to
```

Page 16

```
          J. SEERY
2  anybody else?
3     A.    I said Mr. Doherty.
4     Q.    In looking at the two elements,
5  and what I have asked you to look at is
6  the claims pool.  If you look at the
7  November disclosure statement, if you look
8  down Class 8, unsecured claims?
9     A.    Yes.
10    Q.    You have 176,000 roughly?
11    A.    Million.
12    Q.    176 million.  I am sorry.  And
13 the number in the new document is 313
14 million?
15    A.    Correct.
16    Q.    What accounts for the
17 difference?
18    A.    An increase in claims.
19    Q.    When did those increases occur?
20 Were they yesterday?  A month ago?  Two
21 months ago?
22    A.    Over the last couple months.
23    Q.    So in fact over the last couple
24 months you knew in fact that the recovery
25 in the November disclosure statement was
```

Page 17

```
          J. SEERY
2  not accurate?
3     A.    Yes.  We secretly disclosed it
4  to the Bankruptcy Court in open court
5  hearings.
6     Q.    But you never did bother to
7  calculate the reduced recovery; you just
8  increased --
9          (Reporter interruption.)
10    Q.    You just advised as to the
11 increased claims pool.  Correct?
12         MR. MORRIS:  Objection to the
13    form of the question.
14    A.    I don't understand your
15 question.
16    Q.    What I am trying to get at is,
17 as you increase the claims pool, the
18 recovery reduces.  Correct?
19    A.    No.  That is not how a fraction
20 works.
21    Q.    Well, if the denominator
22 increases, doesn't the recovery ultimately
23 decrease if --
24    A.    No.
25    Q.    -- if the numerator stays the
```

Page 26

J. SEERY

1  were amended without consideration a few
2  years ago. So, for our purposes we didn't
3  make the assumption, which I am sure will
4  happen, a fraudulent conveyance claim on
5  those notes, that a fraudulent conveyance
6  action would be brought. We just assumed
7  that we'd have to discount the notes
8  heavily to sell them because nobody would
9  respect the ability of the counterparties
10 to fairly pay.
11      Q.   And the same discount was
12 applied in the liquidation analysis to
13 those notes?
14      A.   Yes.
15      Q.   Now --
16      A.   The difference -- there would be
17 a difference, though, because they would
18 pay for a while because they wouldn't want
19 to accelerate them. So there would be
20 some collections on the notes for P and I.
21      Q.   But in fact as of January you
22 have accelerated those notes?
23      A.   Just one of them, I believe.
24      Q.   Which note was that?

Page 27

J. SEERY

1      A.   NexPoint, I said. They
2  defaulted on the note and we accelerated
3  it.
4      Q.   So there is no need to file a
5  fraudulent conveyance suit with respect to
6  that note. Correct, Mr. Seery?
7          MR. MORRIS:  Objection to the
8      form of the question.
9      A.   Disagree. Since it was likely
10 intentional fraud, there may be other
11 recoveries on it. But to collect on the
12 note, no.
13      Q.   My question was with respect to
14 that note. Since you have accelerated it,
15 you don't need to deal with the issue of
16 when it's due?
17          MR. MORRIS:  Objection to the
18     form of the question.
19     A.   That wasn't your question. But
20 to that question, yes, I don't need to
21 deal with when it's due.
22     Q.   Let me go over certain assets.
23 I am not going to ask you for the
24 valuation of them but I am going to ask

Page 28

J. SEERY

1  you whether they are included in the asset
2  portion of your $257 million number, all
3  right? Mr. Morris didn't want me to go
4  into specific asset value, and I don't
5  intend to do that.
6          The first question I have for
7  you is, the equity in Trustway Highland
8  Holdings, is that included in the
9  $257 million number?
10     A.   There is no such entity.
11     Q.   Then I will do it in a different
12 way. In connection with the sale of the
13 hard assets, what assets are included in
14 there specifically?
15     A.   Off the top of my head -- it is
16 all of the assets, but it includes
17 Trustway Holdings and all the value that
18 flows up from Trustway Holdings. It
19 includes Targa and all the value that
20 flows up from Targa. It includes CCS
21 Medical and all the value that would flow
22 to the Debtor from CCS Medical. It
23 includes Cornerstone and all the value
24 that would flow from Cornerstone. It

Page 29

J. SEERY

1  includes any other securities and all the
2  value that would flow from Cornerstone.
3  It includes HCLOF and all the value that
4  would flow up from HCLOF. It includes
5  Korea and all the value that would flow up
6  from Korea.
7          There may be others off the top
8  of my head. I don't recall them. I don't
9  have a list in front of me.
10     Q.   Now, with respect to those
11 assets, have you started the sale process
12 of those assets?
13     A.   No. Well, each asset is
14 different. So, the answer is, with
15 respect to any securities, we do seek to
16 sell those regularly and we do seek to
17 monetize those assets where we can
18 depending on whether there is a
19 restriction or not and whether there is
20 liquidity in the market.
21          With respect to the PE assets or
22 the companies I described -- Targa, CCS,
23 Cornerstone, JHT -- we have not --
24 Trustway. We have not sought to sell

| Page 30 | Page 31 |
|---|---|
| J. SEERY | J. SEERY |

**Page 30**

J. SEERY

2  those assets yet.

3     Q.   In connection -- you have sold
4  one business, which Mr. Dondero and
5  Mr. Lynne raised an issue about and that
6  is the SSP sale?

7     A.   Yes.

8     Q.   How was that sale effectuated?

9     A.   What do you mean?  Cash versus

10  securities or do you want description of

11  the process?

12     Q.   The process.

13     A.   How far back would you like me

14  to start?

15     Q.   Let's start from the time -- how

16  did you obtain an offer for that asset?

17     A.   Then I can start from the

18  beginning if you like.

19     Q.   That's fine.

20     A.   When the board was installed we

21  took a review of all of the assets of the

22  company.  We met with the various teams at

23  Highland who were managing those assets,

24  including the PE team that was managing

25  SSP.  We examined the performance of SSP

**Page 31**

J. SEERY

1  and its conditions.  We looked at the

2  opportunity to invest in the company,

3  which we determined we didn't have the

4  ability to do, or to monetize it another

5  way or just to hold it for a better

6  market.

7     We determined with the team,

8  after advice from the PE team, that

9  investments had to be made in the company

10  in order to make it competitive and that

11  those capital investments would need to be

12  made relatively quickly.  We determined

13  with the team that the asset had a value

14  that we would like to try to receive, and

15  if we could receive that we should do so

16  because we weren't going to be able to

17  make the investments.

18     Primarily the biggest issues

19  were their ability to compete with much,

20  much larger competitors and the need to

21  deal with those competitors who were also

22  customers.  Without the investments we

23  thought that the company could be at

24  substantial risk.  Our PE team also talked

**Page 32**

J. SEERY

2  to the management team, who concurred with

3  that assessment.

4     We went about trying to raise

5  capital internally to try to do some of

6  the work for CapEx at the company to put

7  it in the best position to seek to

8  monetize the value over some period of

9  time -- we didn't have a fixed period.  We

10  looked at opportunities where investors

11  came and proposed bids for the company.

12  We considered them, talked to external

13  bankers, talked to the internal team and

14  determined that if we could get

15  $50 million we believed that would have

16  been fair value for the company.

17     We received numerous bids,

18  competed off a couple bids against each

19  other and ended up going with a company

20  called Race Rock.  Race Rock ultimately

21  closed the transaction with us.

22  Management concurred, management went

23  along with that transaction and we closed

24  it.

25     Q.   Will the same process in essence

**Page 33**

J. SEERY

1  be employed for the sale of the other

2  businesses?

3     A.   Not necessarily, no.

4     Q.   Who ran the SSP sale process?

5     A.   No one person.  We had a team of

6  people at Highland that were the PE team

7  sitting on top of it.  They worked with me

8  to drive the process.

9     Q.   Would the same PE team be

10  employed or used to sell the other

11  businesses?

12     A.   Not necessarily.

13     (Proceedings interrupted;

14  technical interruption.)

15     Q.   Mr. Seery, the only --

16     MR. MORRIS:  I am having a

17  difficult time hearing you, Douglas.

18     Q.   Mr. Seery, the only external

19  people to Highland in that process, if I

20  understand, are you, the internal board

21  and DSI.  Is that correct?

22     A.   No.

23     Q.   Am I correct in that?

24     A.   No.

Page 34

```
           J. SEERY
 1
 2       Q.    Who else is external?
 3       A.    External counsel, both
 4   bankruptcy and corporate.
 5       Q.    Now, the corporate counsel, were
 6   they previously counsel for the business,
 7   or they are new counsel that you have
 8   brought in?
 9           MR. MORRIS:  Objection.
10       A.    They are new counsel to the
11   business.
12       Q.    Let me ask a question.  In the
13   liquidation analysis, if a trustee was
14   appointed, couldn't the trustee use
15   Pachulski or corporate counsel to
16   facilitate a sale?
17       A.    Couldn't they?  I suppose they
18   could.  My experience is that they don't.
19   I am not sure, if they got permission from
20   the court, that they couldn't.  But
21   typically trustee counsel, in my
22   experience, gets its own counsel separate
23   from the Debtor's prior counsel.  But I
24   suppose they --
25       Q.    But what about transactional
```

Page 35

```
           J. SEERY
 1
 2   counsel that had a knowledge of the
 3   business?  Couldn't they use them to help
 4   facilitate the sale?
 5       A.    Again, I suppose they could.
 6   They might need permission from the court.
 7   I have not seen that done that way before,
 8   but I suppose they could.
 9       Q.    And in fact, in a liquidation,
10   which you are doing for these businesses,
11   a trustee could hire a third party who is
12   as capable as you and others to facilitate
13   the sale or arrange for the sale.
14   Correct?
15       A.    Well, I take issue with your
16   proposition that we are liquidating these
17   assets and it is a liquidation.  We are
18   not -- plan analysis is not a liquidation
19   analysis.  The liquidation analysis is a
20   liquidation analysis.
21       Q.    Let's not parse words.  Your
22   intention is to sell these assets on or
23   before December 2022.  Correct?
24       A.    Let's parse words.  This is a
25   deposition and you are specifically trying
```

Page 36

```
           J. SEERY
 1
 2   to put certain things into a framework
 3   that you would like to use later.  So, it
 4   is about parsing words.
 5           We have a plan that is a
 6   monetization plan.  Your supposition is
 7   incorrect.  We are going to manage these
 8   businesses and look for opportunities to
 9   monetize them when it is appropriate based
10   upon how we look at the market, what the
11   conditions are for each of the individual
12   assets and the best way to do that within
13   what we think is a reasonable time frame.
14   That is very different than a liquidation.
15       Q.    Let me ask you a question.  The
16   assumption that is made in the plan
17   analysis that you have here is that
18   everything is sold by December of 2022.
19   Correct?
20       A.    For the purposes of this
21   projection and assumptions, yes.
22       Q.    Which one of the operating
23   businesses that are here go into the trust
24   versus those retained by the reorganized
25   debtor?
```

Page 37

```
           J. SEERY
 1
 2       A.    I think any of the businesses
 3   that we can transfer into the trust, we
 4   will do so for ease of operation.  There
 5   is no requirement that we have to transfer
 6   any particular ones into the trust.
 7       Q.    So, which ones cannot be
 8   transferred into the trust?
 9       A.    None of the businesses cannot be
10   transferred into the trust.  The question
11   is with respect to underlying obligations
12   at the business, if that transfer would
13   trigger a change of control or some other
14   change in the business either with respect
15   to important contracts or financings, we
16   wouldn't make the transfer without
17   amending the agreements or putting new
18   agreements in place.
19       Q.    So, is it your testimony that
20   potentially these businesses could be
21   owned and operated for 10 years?
22       A.    Potentially, yes.
23       Q.    Isn't there a limitation on the
24   liquidation trust that you have in place
25   as to its life?
```

Page 38

J. SEERY

1  A.    I don't recall the specific
2  limitation on the trust.  But if there was
3  a reason to hold on to the asset, if there
4  is a limitation, we can seek an extension.
5  Q.    Let me ask a question.  With
6  respect to these businesses, the Debtor
7  merely owns an equity interest in them.
8  Correct?
9  A.    Which business?
10  Q.    The ones you have identified as
11  operating businesses earlier?
12  A.    It depends on the business.
13  Q.    Well, let me -- again, let's try
14  to be specific.  With respect to SSP, it
15  was your position that you did not need to
16  get court approval for the sale.  Correct?
17  A.    That's correct.
18  Q.    Which one of the operating
19  businesses that are here, that you have
20  identified, do you need court authority
21  for a sale?
22  MR. MORRIS:  Objection to the
23  form of the question.
24  A.    Each of the businesses will be a

Page 39

J. SEERY

1  different analysis that we'll undertake
2  with bankruptcy counsel to determine what
3  we would need depending on when it is
4  going to happen and what the restrictions
5  either under the code are or under the
6  plan.
7  Q.    Is there anything that would
8  stop you from selling these businesses if
9  the Chapter 11 went on for a year or two
10  years?
11  MR. MORRIS:  Objection to form
12  of the question.
13  A.    Is there anything that would
14  stop me?  We'd have to follow the
15  strictures of the code and the protocols,
16  but there would be no prohibition -- let
17  me finish, please.
18  There would be no prohibition
19  that I am aware of.
20  Q.    Now, in connection with your
21  differential between the liquidation of
22  what I will call the operating businesses
23  under the liquidation analysis and the
24  plan analysis, who arrived at the discount

Page 40

J. SEERY

1  or determined the discount that has been
2  placed between the two, plan analysis
3  versus liquidation analysis?
4  MR. MORRIS:  Objection to form
5  of the question.
6  A.    To which document are you
7  referring?
8  Q.    Both the June -- the January and
9  the November analysis has a different
10  estimated proceeds for monetization for
11  the plan analysis versus the liquidation
12  analysis.  Do you see that?
13  A.    Yes.
14  Q.    And there is a note under there.
15  "Assumes Chapter 7 trustee will not be
16  able to achieve the same sales proceeds as
17  Claimant trustee."
18  A.    I see that, yes.
19  Q.    Do you see that note?
20  A.    Yes.
21  Q.    Who arrived at that discount?
22  A.    I did.
23  Q.    What percentage did you use?
24  A.    Depended on the asset.  Each one

Page 41

J. SEERY

1  is different.
2  Q.    Is the discount a function of
3  capability of a trustee versus your
4  capability, or is the discount a function
5  of timing?
6  MR. MORRIS:  Objection to form.
7  A.    It could be a combination.
8  Q.    So, let's -- let me walk through
9  this.  Your plan analysis has an
10  assumption that everything is sold by
11  December 2022.  Correct?
12  A.    Correct.
13  Q.    And the valuations that you have
14  used here for the monetization assume a
15  sale between -- a sale prior to December
16  of 2022.  Correct?
17  A.    Sorry.  I don't quite understand
18  your question.
19  Q.    The 257 number, and then let's
20  take out the notes.  Let's use the 210
21  number.
22  MR. MORRIS:  Can we put the
23  document back on the screen, please?
24  Sorry, Douglas, to interrupt, but it

Page 42

```
 1                J. SEERY
 2      would be helpful.
 3            MR. DRAPER:  That is fine, John.
 4      (Pause.)
 5            MR. MORRIS:  Thank you very
 6      much.
 7      Q.     Mr. Seery, do you see the 257?
 8      A.     In the one from yesterday?
 9      Q.     Yes.
10      A.     Second line, 257,941.  Yes.
11      Q.     That assumes a monetization of
12      all assets by December of 2022?
13      A.     Correct.
14      Q.     And so everything has been sold
15      by that time; correct?
16      A.     Yes.
17      Q.     So, what I am trying to get at
18      is, there is both the capability between
19      you and a trustee, and then the second
20      issue is timing.  So, what discount was
21      put on for timing, Mr. Seery, between when
22      a trustee would sell it versus when you
23      would sell it?
24            MR. MORRIS:  Objection.
25      Q.     What is the percentage you
```

Page 43

```
 1                J. SEERY
 2      applied?
 3      A.     Each of the assets is different.
 4      Q.     Is there a general discount that
 5      you used?
 6      A.     Not a general discount, no.  We
 7      looked at each individual asset and went
 8      through and made an assessment.
 9      Q.     Did you apply a discount for
10      your capability versus the capability of a
11      trustee?
12      A.     No.
13      Q.     So a trustee would be as capable
14      as you are in monetizing these assets?
15            MR. MORRIS:  Objection to the
16      form of the question.
17      Q.     Excuse me?  The answer is?
18      A.     The answer is maybe.
19      Q.     Couldn't a trustee hire somebody
20      as capable as you are?
21            MR. MORRIS:  Objection to the
22      form of the question.
23      A.     Perhaps.
24      Q.     Sir, that is a yes or no
25      question.  Could the trustee hire somebody
```

Page 44

```
 1                J. SEERY
 2      as capable as you are?
 3            MR. MORRIS:  Objection to the
 4      form of the question.
 5      A.     I don't know.
 6      Q.     Is there anybody as capable as
 7      you are?
 8            MR. MORRIS:  Objection to the
 9      form of the question.
10      A.     Certainly.
11      Q.     And they could be hired.
12      Correct?
13      A.     Perhaps.  I don't know.
14      Q.     And if you go back to the
15      November 2020 liquidation analysis versus
16      plan analysis, it is also the same note
17      about that a trustee would bring less, and
18      there is the same sort of discount between
19      the estimated proceeds under the plan and
20      under the liquidation analysis.
21            MR. MORRIS:  If that is a
22      question, I object.
23      Q.     Is that correct, Mr. Seery,
24      looking at the document?
25      A.     There are discounts, yes.
```

Page 45

```
 1                J. SEERY
 2      Q.     Again, the discounts are applied
 3      for timing and capability?
 4      A.     Yes.
 5      Q.     Now, in looking at the November
 6      plan analysis number of $190 million and
 7      the January number of $257 million, what
 8      accounts for the increase between the two
 9      dates?  What assets specifically?
10      A.     There are a number of assets.
11      Firstly, the HCLOF assets are added.
12      Q.     How much are those?
13      A.     Approximately 22 and a half
14      million dollars.
15      Q.     Okay.
16      A.     Secondly, there is a significant
17      increase in the value of certain of the
18      assets over this time period.
19      Q.     Which assets, Mr. Seery?
20      A.     There are a number.  They
21      include MGM stock, they include Trustway,
22      they include Targa.
23      Q.     And what is the percentage
24      increase from November to January,
25      November of 2020 to January of 2021?
```

Page 46

J. SEERY

2   A.   Do you mean what is the
3 percentage increase from 190 to 257?
4   Q.   No.  You just identified three
5 assets.  MGM stock, we can go look at the
6 exchange and figure out what the price
7 increase is; correct?
8   A.   No.
9   Q.   Why not?  Is the MGM stock
10 publicly traded?
11   A.   Yes.  It doesn't trade on --
12   Q.   Excuse me?
13   A.   It doesn't trade on an exchange.
14   Q.   Is there a public market for the
15 MGM stock that we could calculate the
16 increase?
17   A.   There is a semipublic market;
18 yes.
19   Q.   So it is a number that is
20 readily available between the two dates?
21   A.   It's available.
22   Q.   Now, you identified Targa and
23 Trustway.  Correct?
24   A.   Yes.
25   Q.   Those are not readily available

Page 47

J. SEERY

1 markets; correct?
2   A.   No.
3   Q.   Those are operating businesses?
4   A.   Correct.
5   Q.   Who provided the valuation for
6 the November 2020 liquidation analysis?
7   A.   We use a combination of the
8 value that we get from Houlihan Lokey for
9 mark purposes and then we adjust it for
10 plan purposes.
11   Q.   And the adjustment was up or
12 down?
13   A.   When?
14   Q.   For both November and January.
15 You got a number from Houlihan Lokey.  You
16 adjusted it.  Did you adjust it up or did
17 you adjust it down?
18     MR. MORRIS:  Objection to form
19     of the question.
20   A.   I believe that for November we
21 adjusted it down, and for January we
22 adjusted it down.  I don't recall off the
23 top of my head but I believe both of them
24 were adjusted down.

Page 48

J. SEERY

1   Q.   And if I understand what you
2 just said, it is that the Houlihan Lokey
3 valuation for those two businesses showed
4 a significant increase between November of
5 2020 and January of 2021?
6     MR. MORRIS:  Objection to form
7     of the question.
8   A.   I didn't say that.
9   Q.   I am trying to account for the
10 increase between the two dates, and you
11 identified three assets.  You identified
12 MGM stock, which has, I can guess, as you
13 have said, a readily ascertainable value.
14 Then you identified two others that the
15 valuation is based upon something Houlihan
16 Lokey provided you.  Correct?
17   A.   I gave you three examples.  I
18 never said "readily."  That is your word,
19 not mine.  And I didn't say that Houlihan
20 had a significant change in their
21 valuation.
22   Q.   So let's now go back to the
23 question.  There is an increase in value
24 from November 24th of 2020 to January 28th

Page 49

J. SEERY

1 of 2021, the magnitude being roughly 60
2 some odd million dollars.  Correct?
3   A.   Correct.
4   Q.   We can account for $22 million
5 of it easily, right?
6     MR. MORRIS:  Objection to form.
7   A.   Correct.
8   Q.   That is the HarbourVest
9 settlement, so that leaves roughly
10 $40 million unaccounted for?
11     MR. MORRIS:  Objection to the
12     form of the question if that is a
13     question.  It is accounted for.
14   Q.   What makes up that difference,
15 Mr. Seery?
16   A.   A change in the plan value of
17 the assets.
18   Q.   Okay.  Which assets?  Let's sort
19 of go back to where we were.
20   A.   There are numerous assets in the
21 plan formulation.  I gave you three
22 examples of the operating businesses.  The
23 securities, I believe, have increased in
24 value since the plan, so those would go up

Page 106

J. SEERY

```
 1            J. SEERY
 2       A.   We are not out shopping it right
 3   now.
 4       Q.   And why is that?
 5       A.   We took a break.
 6       Q.   And why is that?
 7       A.   Didn't like the market
 8   conditions.
 9       Q.   And what do you believe are
10   unfavorable about the market conditions?
11       A.   The market has evolved.  There
12   was a major -- it is really way too
13   complicated for this discussion.  But we
14   don't like the market conditions.  We
15   think the company has got opportunities to
16   continue to prove its business plan.  When
17   the market conditions are better we'll
18   determine whether to access or not.
19       Q.   Is it cash flow positive?
20       A.   Yes.
21       Q.   How about JHT?  Have they or
22   Highland employed a broker?
23       A.   No.
24       Q.   Do you intend to hire a broker?
25       A.   Not necessarily.
```

Page 107

J. SEERY

```
 1            J. SEERY
 2       Q.   Have you prepared any marketing
 3   materials for JHT?
 4       A.   No.
 5       Q.   How about Targa?  Have you
 6   employed a broker?
 7       A.   No.
 8       Q.   Any --
 9       A.   Brokers have been talked to but
10   we haven't employed one, no.
11       Q.   How many brokers have you
12   interviewed or interfaced with?
13       A.   I haven't talked to any.
14       Q.   How many has Targa been talking
15   to?
16       A.   It talked to at least two
17   potential counterparties for
18   monetizations.
19       Q.   So when you say
20   "counterparties," you are talking not
21   brokers; they have actually talked with
22   potential buyers?
23       A.   Potential buyers and brokers.
24   Brokers could also participate in a buy.
25       Q.   Have any marketing materials
```

Page 108

J. SEERY

```
 1            J. SEERY
 2   been prepared?
 3       A.   I don't believe so.
 4       Q.   Any teasers been prepared?
 5       A.   I'd consider that a marketing
 6   material.
 7       Q.   Fair enough.
 8            I believe you previously
 9   testified that the MGM stock is
10   semi-liquid.  Where are they actually
11   traded?
12            MR. MORRIS:  Objection to form
13       of the question.
14       A.   It is an over-the-counter
15   market.
16            MR. TAYLOR:  We were talking
17       over each other.  For the court
18       reporter's purposes, Mr. Morris made
19       an objection.  I believe it was as to
20       form.
21            MR. MORRIS:  Correct.
22       Q.   The question is still
23   outstanding if you understand.  Otherwise
24   I will restate.
25       A.   It's traded in the gray market.
```

Page 109

J. SEERY

```
 1            J. SEERY
 2   It's OTC.
 3       Q.   What percentage of the
 4   securities that Highland holds is MGM
 5   securities approximately?
 6            MR. MORRIS:  Objection to form
 7       of the question.
 8       A.   You have to break it down
 9   significantly.  Highland owns its own
10   holdings directly in MGM securities.  Then
11   Highland manages different funds that own
12   MGM securities, and those funds are owned
13   by different investors.  Or if they are
14   not owned by those investors they have
15   different interests in those funds.
16       Q.   Sometimes Highland owns a
17   portion of those funds that own the MGM
18   securities.  Is that correct?
19       A.   That's correct.
20       Q.   Out of the actual equities that
21   Highland owns or owns a percentage of
22   funds that owns them, what percentage of
23   the securities in which Highland has an
24   interest is MGM Studios?  Is it
25   50 percent?  Is it 20 percent?
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-9   Filed 12/07/23   Page 132 of 214   PageID 6874
Exhibit Exhibit B-29 Part 1 of 1   Page 7 of 16

Page 110

J. SEERY

1   MR. MORRIS:  Objection to form.
2       A.    I don't understand your
3   question.  But maybe I can get there more
4   question.  But maybe I can get there more
5   easily.  Are you asking if the direct or
6   indirect ownership of MGM constitutes a
7   substantial portion of the securities with
8   which Highland is involved?
9       Q.    That was much more artfully
10  asked.  Thank you very much.  Yes, that
11  was precisely what I was trying to get to.
12      A.    The vast majority.
13      Q.    I truly don't know the answer to
14  this so I am just asking.  When you say
15  "vast majority," are we talking around
16  90 percent?
17      A.    It has to be at least that
18  amount.
19      Q.    Am I correct in presuming that
20  any kind of sell-down of MGM securities
21  will probably have to be in a step-down
22  basis such that you don't flood the
23  market?
24      A.    A what basis?
25      Q.    On a step-down basis or gradual

Page 111

J. SEERY

1   basis such you don't flood the market and
2   significantly impact the price?
3       MR. MORRIS:  Objection to the
4   form of the question.
5       A.    That is incorrect.
6       Q.    You might be looking for a bulk
7   buyer?
8       A.    It could be.
9       Q.    Do you feel any more qualified
10  to sell those than a hypothetical Chapter
11  7 trustee?
12      MR. MORRIS:  Objection to form
13  of the question.
14      A.    It would depend on the trustee.
15      Q.    The real property loans that
16  Highland owns or owns indirectly, those
17  are all secured presumably by real estate.
18  Correct?
19      MR. MORRIS:  Objection to form
20  of the question.
21      A.    It's well more complicated than
22  that because Highland set up a bit of a
23  tax scheme around these assets.  So, we
24  are working our way through it.

Page 112

J. SEERY

1       Q.    When you say "we are working our
2   way through it," who are you working with
3   on that?
4       A.    Myself, my team at DSI,
5   Pachulski, other outside counsel.
6       Q.    Any appointed Chapter 7 trustee
7   could potentially hire DSI to perform the
8   same work.  Correct?
9       A.    I suppose potentially, if the
10  court approved it, yes.
11      Q.    The Korea Fund, has Highland or
12  its appropriate subsidiary hired a broker
13  on that?
14      A.    No.
15      Q.    Prepared any marketing
16  materials?
17      A.    No.
18      Q.    How about CCS Medical?  Have
19  they or Highland hired any brokers?
20      A.    Yes.
21      Q.    Who have they hired?
22      A.    Cantor Fitzgerald.
23      Q.    And is that Highland employing
24  them, or is that CCS Medical?

Page 113

J. SEERY

1       A.    That was CCS Medical.
2       Q.    Is that on track still in its
3   beginning term or is it now terminable?
4       MR. MORRIS:  Objection to form
5   of the question.
6       A.    I believe the contract is
7   actually terminated, and I believe it is
8   out of its tail but it may not be
9   completely.
10      Q.    Terminated and may or may not be
11  out of the tail?
12      A.    Correct.
13      Q.    Thank you.
14          How about Petro funds -- oh,
15  sorry.  Backing up, I will ask the same
16  question.  I presume since you have hired
17  a broker that marketing materials have
18  been prepared for CCS Medical?
19      A.    I didn't hire a broker.
20      Q.    I thought Cantor Fitzgerald had
21  been hired for CCS Medical?
22      A.    You asked me -- you said "I
23  believe you have hired a broker."  I have
24  not hired a broker.  You can read the

Page 118

```
1                    J. SEERY
2   broker, that could mean broker or
3   investment banker.  Is that fair?
4        A.    That is fair.
5        Q.    And that is how you have been
6   answering these questions.  Correct?
7        A.    Yes.
8        Q.    Do you know if PetroCap
9   independently is going to hire a broker or
10  investment banker?
11       A.    I don't know.
12       Q.    Do you know if any marketing
13  materials have been prepared?
14       A.    I don't know.
15       Q.    For each of the entities that we
16  just went through, has Highland performed
17  an analysis of total value of each
18  company?
19       A.    Which entities?
20       Q.    The one we just went through.  I
21  will list them for you.  Trustway, JHT,
22  Targa, the real property loans as an asset
23  category.  Korea Fund, CCS Medical and
24  PetroCap.
25       A.    We have values for each of those
```

Page 119

```
1                    J. SEERY
2   properties; yes.
3        Q.    And I presume that means both a
4   gross value and then a net value to
5   Highland.  Correct?
6        A.    Yes.
7        Q.    And DSI helped you prepare
8   those?
9        A.    The answer is no.  Each of these
10  are kept in -- Highland has a valuation
11  procedure and methodology and we stay
12  consistent with that valuation procedure
13  and methodology.
14       Q.    And those are all records of
15  Highland.  Correct?
16       A.    Yes.
17       Q.    And those have all been written
18  down somewhere.  Correct?
19       A.    I believe they have all been
20  written down somewhere.
21       Q.    And those could be made
22  available to any Chapter 7 trustee that
23  could be appointed?
24       A.    Yes.
25       Q.    Let's turn our attention here
```

Page 120

```
1                    J. SEERY
2   for a second.  You have certain cost
3   that --
4             MR. MORRIS:  Objection to form
5        of the question.
6             (Reporter interruption.)
7        Q.    Highland will incur certain
8   costs to wind down, through 2022, under
9   its proposed plan of liquidation.  Is that
10  correct?
11            MR. MORRIS:  Objection to form
12       of the question.
13       A.    No.  We project certain costs to
14  operate the business through 2022.  Yes.
15       Q.    And you made a distinction
16  between my question and the answer you
17  gave.  Could you explain to me what that
18  distinction is?  I am not picking up on
19  why you made the distinction.
20       A.    Because you said "wind down the
21  business."  We intend to operate the
22  business.
23            MR. MORRIS:  Objection to use of
24       the phrase "plan of liquidation."
25       Q.    Is it your position or is it
```

Page 121

```
1                    J. SEERY
2   Highland's position, Mr. Seery, that this
3   is a reorganization?
4        A.    Yes.
5        Q.    Maybe we have a fundamental
6   misunderstanding.  My understanding is
7   that your plan and your analyses says that
8   all assets, substantially all assets will
9   be sold by the end of December 2022.  Is
10  that correct?
11       A.    That is our assumption.  Yes.
12       Q.    So how is that not a wind-down?
13       A.    Because we intend to operate the
14  business and continue to operate to seek
15  value.  I consider a wind-down to be a
16  liquidation where I immediately start
17  looking for a sale every day and try to
18  hit the fastest bid that I can get.  That
19  is not what we are trying to do.  We are
20  trying to maximize value based on how we
21  look at market conditions using
22  professionals to manage the assets.
23       Q.    So your distinction, so I have
24  this correct, is that because you are
25  going to operate in the interim period
```

Page 126

1          J. SEERY
2      Q.    You said your base compensation
3  was how much per month?
4      A.    $150,000 per month.
5      Q.    Is that just for you?
6      A.    That's correct.
7      Q.    Do you have to bear any costs
8  out of that 150,000 per month?
9      A.    A man's got to eat.
10     Q.    Is that the answer?  No?
11     A.    No; I don't bear any other than
12  my own costs.
13     Q.    Other than your personal
14  costs --
15     A.    They are business costs.  They
16  are business costs.  This all doesn't
17  happen for free.
18     Q.    So you are going to bear your
19  own overhead, for instance your office
20  space?
21     A.    Yes.
22     Q.    But to be fair, travel and, for
23  instance, if you had to hire an expert,
24  those would not be costs that you would
25  bear.  Correct?

Page 127

1          J. SEERY
2      A.    That's correct.
3          MR. TAYLOR:  I have had a
4  request for a bathroom break by one of
5  the other counsel on the phone.  If
6  it's okay, could we take -- I am fine
7  with a ten-minute break.  Mr. Seery,
8  if you would like longer that is fine.
9          THE WITNESS:  However short you
10  want.
11         MR. TAYLOR:  John, do you have a
12  preference?
13         MR. MORRIS:  I don't.  I
14  appreciate the inquiry.  Whatever you
15  want.
16         MR. TAYLOR:  Let's take a
17  15-minute break.  I have about 11:40
18  Central Time.  Let's reconvene at
19  11:58.
20         (Recess.)
21  BY MR. TAYLOR:
22     Q.    Mr. Seery, this is Clay Taylor
23  again.  Thank you for allowing us to take
24  a break.
25         I believe you were testifying or

Page 128

1          J. SEERY
2  we were talking about how much your fees
3  as the Claimant trustee was going to be
4  and we had left off where you had said
5  there was also some bonus compensation
6  available to you.  Could you briefly
7  explain to the court what that bonus
8  structure is?
9      A.    It's to be negotiated within
10  45 days of the confirmation.
11     Q.    Have you begun those
12  negotiations?
13     A.    No.
14     Q.    I presume those negotiations
15  will be conducted between yourself and the
16  Unsecured Creditors' Committee?
17     A.    I think it will actually be
18  myself and the Oversight Committee, which
19  will consist of the Claimant -- the
20  Creditors' Committee members, at least
21  three of them, as well as one or two
22  independents, depending on certain timing.
23     Q.    Have you been provided an ask as
24  of this time?
25     A.    I have not, no.

Page 129

1          J. SEERY
2      Q.    There is also going to be a
3  litigation trust established under the
4  proposed plan.  Correct?
5      A.    That's correct.
6      Q.    How many trustees will there be?
7      A.    I believe, just one.
8      Q.    What is the proposed
9  compensation for that trustee?
10     A.    I don't know yet.
11     Q.    Would they be paid on a monthly
12  basis?
13     A.    I don't know.  I assume he will
14  have some contingency arrangement.  He is
15  an experienced litigation trustee, and I
16  assume he will be paid a combination of
17  base plus some upside depending on
18  recoveries.
19     Q.    So that would be presumably a
20  monthly fee plus a step contingency
21  arrangement?  Is that your experience?
22     A.    I am not familiar with the term
23  "step contingency arrangement," but there
24  are innumerable ways to structure
25  contingency fee arrangements in my

J. SEERY

2  experience.

3       Q.    That compensation has yet to be
4  discussed?

5       A.    It hasn't been discussed with
6  me.  No.  I won't have any oversight over
7  it or responsibility for it.

8       Q.    Ultimately that will come out
9  of -- any fees that are paid under that
10 arrangement will come out of the ultimate
11 recovery made available to the unsecured
12 creditors and any subordinate classes to
13 the unsecured creditors.  Correct?

14      A.    As a general statement, I think
15 that's correct, yes.

16      Q.    I believe there has been some
17 discussion in the pleadings in this case
18 that D&O coverage would be afforded to the
19 trustees.  Is that correct?

20      A.    That's correct.

21      Q.    Have you priced that?

22      A.    We have.

23      Q.    How much is that anticipated to
24 run per annum?

25      A.    I haven't -- I don't have that

J. SEERY

2  specifically at my fingertips.  I just
3  don't recall the specific amount.  We went
4  through it in the last few days and I just
5  don't have the amount.

6       Q.    Would you mind providing that
7  figure to your counsel to be distributed
8  to the objecting creditors?

9       A.    I don't know --

10           MR. MORRIS:  We will take it
11 under advisement.  Douglas had also
12 made a request earlier during the
13 deposition where I provided the same
14 response.  Respectfully, I'd ask each
15 of you to just send me an email at the
16 conclusion of the deposition because I
17 am not going to be able to -- I don't
18 think I should have the burden of
19 keeping track of this.  But it's a
20 fair request.  Send it to us in
21 writing and we'll respond promptly.

22           MR. TAYLOR:  We certainly will
23 make a note to send that to you.

24      Q.    Mr. Seery, if a Chapter 7
25 trustee were appointed, they wouldn't

J. SEERY

2  require D&O coverage.  Is that correct?

3           MR. MORRIS:  Objection to the
4  form of the question.

5       A.    I don't know if a Chapter 7
6  trustee would require any D&O or not.

7       Q.    You are an experienced
8  insolvency professional.  Correct?

9       A.    Yes.

10           MR. MORRIS:  Objection to form
11 of the question.

12      Q.    You do have experience with
13 Chapter 7 trustees also.  Correct?

14      A.    Dated, but I have some.

15      Q.    In your experience, have they
16 typically gone out and obtained D&O
17 coverage?

18           MR. MORRIS:  Objection to form
19 of the question.

20      A.    My experience is it depends on
21 the Chapter 7 trustee, where they are
22 coming from, whether they are in an
23 institution that has coverage, whether
24 they are going to be using other people.
25 They have qualified immunity, but I am not

J. SEERY

2  an expert in how they deal with their own
3  coverages.

4       Q.    For purposes of the liquidation
5  analysis versus the plan analysis that is
6  presented in the November and January plan
7  analysis versus liquidation analysis, did
8  you make some assumptions regarding how
9  much D&O coverage would cost under the
10 plan?

11      A.    Under the plan analysis for
12 certain, yes.

13      Q.    And what did you estimate that
14 D&O coverage to cost?

15      A.    I don't recall off the top of my
16 head the exact amount.  I don't know if we
17 have a line item for it, but I just don't
18 recall specifically that line item.

19      Q.    Are those line items contained
20 in what I will refer to as the roll-ups
21 for the plan versus liquidation analysis?

22      A.    The full model does contain a
23 specific line item for D&O.  Yes.

24           MR. TAYLOR:  Bryan, I will ask
25 you to include that on our list of

Page 150

J. SEERY

1  there.  That one jumped out because it was
2  big.
3      Q.    What case was that in?
4      A.    Lehman brokerage.
5      Q.    What was your role in that case?
6      A.    I was one of four or five people
7  responsible for selling, chiefly
8  responsible for selling Lehman to
9  Barclays.
10     Q.    There was a Chapter 7 trustee in
11  the Lehman case?
12     A.    There was a SIPC trustee, which
13  I think is very similar rules with respect
14  to the assets that weren't sold from the
15  broker-dealer.  And then there was a
16  Creditors' Committee and reorg of the
17  holding company.
18     Q.    How long did that SIPC trustee
19  take to wind down the affairs and assets
20  he or she was responsible for?
21     A.    The assets were distributed and
22  liquidated really quickly.  Distribution
23  might have taken some time.  Litigation
24  took, I think, about seven years for the
25

Page 151

J. SEERY

1  SIPC trustee.
2      Q.    The SIPC trustee was in place
3  for seven years?
4      A.    Around that amount of time.
5  Again, most of the assets from the
6  broker-dealer were sold to Barclays, and
7  the SIPC trustee then monetized the
8  remaining assets very quickly and then
9  engaged in litigation.
10     Q.    That sale to Barclays was a bulk
11  sale of basically all the non-litigation
12  assets that Lehman held?
13     A.    No.
14     Q.    What did they not sell to
15  Barclays then?
16     A.    It's way more complicated than
17  that.
18     Q.    So it's even more complicated
19  than this case?
20     A.    Exceedingly.
21     Q.    That was the last time you dealt
22  with a Chapter 7 trustee or one
23  substantially similar to this?
24     A.    I think so.  I had dealings in
25

Page 152

J. SEERY

1  MF Global, in that litigation, which was a
2  similar trustee.  That was probably a
3  little bit later than the Lehman case in
4  terms of my investments and involvement.
5  And I don't recall any others post that
6  amount of time.
7      Q.    I am going to compare and
8  contrast the November liquidation and plan
9  analysis to January's.  Specifically
10  focusing on Class 8.
11         MR. TAYLOR:  Bryan, if you can
12     pull up November.
13     A.    I think you have November up.
14     Q.    Sorry.  I wasn't looking at the
15  screen.  I was looking at my notes.  I was
16  unaware it was still up.
17         The plan analysis says there is
18  $176 million worth of claims for Class 8,
19  general unsecured claims.  Correct?
20     A.    That is what it says, yes.
21     Q.    And in January that number was
22  changed to 313.5 million.  Correct?
23     A.    For Class 8 unsecureds, I have
24  it in front of me.  Yes.
25

Page 153

J. SEERY

1      Q.    You would agree with me, would
2  you not, that that is the single largest
3  change in this liquidation analysis from
4  November to January.  Correct?
5      A.    I will accept your
6  representation.
7      Q.    In November, under the
8  liquidation analysis, you believe that
9  unsecured creditors received 62.6 cents on
10  the dollar.  Correct?
11     A.    That is in the January one.
12     Q.    No.  Actually, let's go ahead
13  and --
14     A.    I am sorry.  The liquidation
15  analysis?
16     Q.    Yes.  Sorry.  I thought I said
17  that.  If I did not, I apologize.
18     A.    Yes, 62.6.
19     Q.    And as we sit here today, under
20  Highland's revised numbers, what does
21  Highland project unsecured creditors are
22  going to receive?
23     A.    48.16.
24     Q.    And under the plan analysis what
25

Page 154

J. SEERY

2  are they going to receive?
3      A.     On the one we just filed?
4  62.14.
5      Q.     So, you are now projecting that
6  unsecured creditors are going to receive
7  less than what you were predicting under
8  the liquidation plan analysis performed in
9  November.  Correct?
10     A.    A little bit, yes.
11     Q.    Again, you haven't resolicited
12 this plan; correct?
13     A.    No.
14     Q.    I am curious.  A few months ago
15 you thought the spread between what the
16 plan could achieve as far as gross
17 proceeds was approximately 190,000 --
18 sorry.  $190 million.  Is that correct?
19     A.    If you could pull up the
20 November to determine what you are asking
21 me?
22     Q.    I am looking at line 2,
23 estimated proceeds from monetization.
24 Under the plan analysis it shows 190
25 million.  Right?

Page 155

J. SEERY

2      A.     Correct.
3      Q.     And under liquidation analysis,
4  it shows 150 million.  Right?
5      A.     Correct.
6      Q.     So the spread was 40 million
7  bucks.  Right?
8      A.     That is the difference between
9  those numbers, yes.
10     Q.     I call it the spread, right, the
11 difference between how much better you
12 think the plan would do rather than a
13 liquidation?
14     A.     In estimated proceeds from
15 monetization of assets, yes.
16     Q.     In January, if we pull that up,
17 the same line, now under a plan you could
18 achieve 258 million but that a Chapter 7
19 trustee could only recover 191 million.
20 Now the spread is $65 million, so that
21 spread increased from 40 million to 65
22 million.  You would agree that the
23 documents show that.  Correct?
24     A.     Yes.  The difference in those
25 numbers is different and it's greater.

Page 156

J. SEERY

2      Q.     It is approximately $25 million
3  greater.  Correct?
4      A.     Yes.
5      Q.     What changed in two months to
6  make those recoveries $25 million greater
7  under a plan rather than liquidation?
8      A.     Both the assets in terms of
9  their values and the view of the markets.
10     Q.     I would ask you to dig a little
11 deeper than that and provide a little more
12 color.
13     A.     Okay.
14     Q.     So what accounts for the
15 $25 million worth of difference in the
16 spread?
17     A.     Certain of the assets jumped up
18 in value.  Other assets, we have a more
19 robust view of value because of the
20 conditions that we see in the market going
21 forward.
22     Q.     So the total asset value
23 increased in your opinion.  Correct?
24     A.     The total asset value increased
25 as well as the projection for how the

Page 157

J. SEERY

2  markets look on a forward basis.
3      Q.     And why is it that you believe
4  it is now $25 million more of what you
5  could receive under a plan rather than a
6  liquidation?
7          MR. MORRIS:  Objection to the
8  form of the question.
9      A.     I think I just answered that.
10 That asset values went up higher and the
11 projection for the future looks better.
12     Q.     And why is it that a Chapter 7
13 trustee could not capture that increased
14 value?
15     A.     Because a Chapter 7 trustee, in
16 our opinion and our assumption, moves to
17 liquidate the assets quickly and does not
18 have the ability, therefore, to capture
19 that forward projection of market value
20 that we think is more robust.
21     Q.     We covered this a little bit
22 before.  Other than your prior experience
23 with Chapter 7 trustees, did you conduct
24 any empirical data or go through any
25 empirical data to justify the difference

007330

Page 214

```
          J. SEERY
 1
 2   those non-vested contingent interests have
 3   any value.  Do you?
 4        A.    Well, remember, the projections
 5   don't contain any recoveries from the
 6   litigation trust.  So, I think that it
 7   would likely be that they don't.  But, you
 8   know, there are some pretty significant
 9   causes of action.
10        Q.    And those causes of action, can
11   you run me through some of the more
12   significant ones?
13        MR. MORRIS:  Objection to the
14   form.
15        A.    The causes of action include
16   fraudulent conveyances, both constructive
17   and actual; diversion of assets.  They are
18   still being investigated.  The committee
19   has really got the laboring oar on that.
20   But there are significant amounts of
21   transfers that we have seen that are
22   problematic.
23        Q.    And you believe that those
24   causes of action have value?
25        A.    I believe they do, yes.
```

Page 215

```
          J. SEERY
 1
 2        Q.    Material, large value?
 3        A.    I don't know.
 4        Q.    You have been a professional
 5   for, I guess, your whole adult life.  Do
 6   you believe that these non-vested
 7   contingent interests -- strike all that.
 8        Have you tried to see whether
 9   any third party would be willing to make
10   an offer to get these unvested contingent
11   interests?
12        A.    No.
13        Q.    Any reason why not?
14        A.    No reason to do so.  No reason
15   why not.
16        Q.    So those unvested contingent
17   interests may have a value, but that value
18   would be in the future and subject to a
19   pretty serious contingency.  Correct?
20        A.    Yes.
21        Q.    They may be a property interest,
22   but inchoate only.  Correct?
23        A.    That is my belief.  I don't
24   claim to be an expert on the different
25   types of property interests, whether they
```

Page 216

```
          J. SEERY
 1
 2   be inchoate, reversionary, ethereal.  I
 3   don't claim to be an expert on the
 4   different types of property interests.
 5        Q.    Let me ask it this way.  If you
 6   have an understanding, you do; and if you
 7   don't, you don't.
 8        If the Debtor owned those
 9   unvested contingent interests, would you
10   consider that to be property of your
11   estate?
12        MR. MORRIS:  Objection to form
13   of the question.
14        A.    I probably would consider it to
15   be property of the estate because the
16   definition of property of the estate is so
17   broad and intended to encompass all manner
18   of interests.  I think outside of the
19   world of bankruptcy in normal parlance
20   they would be a pretty thin interest.
21        Q.    The last time that we were
22   provided a ballot summary -- I'm going off
23   memory here, but I believe 31 Class 8
24   creditors rejected the plan.  Does that
25   sound about correct?
```

Page 217

```
          J. SEERY
 1
 2        A.    I don't know.
 3        Q.    My question is, to your
 4   knowledge have any Class 8 creditors
 5   switched their vote from reject to accept
 6   since the ballot summary was filed?
 7        A.    Class 8?  I don't know the
 8   answer to that.
 9        MR. RUKAVINA:  I will pass the
10   witness.  Thank you.
11        MR. MORRIS:  Anybody else have
12   any questions?
13        MR. DRAPER:  A few follow-up
14   questions.
15        Bryan, can you put up the second
16   email we got, the last page?
17   FURTHER EXAMINATION BY
18   MR. DRAPER:
19        Q.    Can you see, Mr. Seery, there is
20   a list of operating expenses on that page?
21        A.    Can you just let me know which
22   doc this is?  It would be easier if I
23   could actually see the whole page.
24        MR. MORRIS:  The last one I sent
25   you a few minutes ago.
```

# HMIT Exhibit No. 20

007332

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Wednesday, February 3, 2021 |
|  | ) | 9:30 a.m. Docket |
| Debtor. | ) |  |
|  | ) | CONFIRMATION HEARING [1808] |
|  | ) | AGREED MOTION TO ASSUME [1624] |
|  | ) |  |
|  | ) | *Continued from 02/02/2021* |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:          Jeffrey Nathan Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                          13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Debtor:          John A. Morris
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

For the Debtors:         Ira D. Kharasch
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                          13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                            One South Dearborn Street
                            Chicago, IL  60603
                            (312) 853-7539

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-1   Filed 12/07/23   Page 141 of 214   PageID 6883

2

```
 1    APPEARANCES, cont'd.:

 2    For James Dondero:            Clay M. Taylor
                                    BONDS ELLIS EPPICH SCHAFER
 3                                    JONES, LLP
                                    420 Throckmorton Street,
 4                                    Suite 1000
                                    Fort Worth, TX  76102
 5                                  (817) 405-6900

 6    For Get Good Trust and       Douglas S. Draper
      Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
 7                                  650 Poydras Street, Suite 2500
                                    New Orleans, LA  70130
 8                                  (504) 299-3300

 9    For Certain Funds and        Davor Rukavina
      Advisors:                    Julian Vasek
10                                  MUNSCH, HARDT, KOPF & HARR
                                    500 N. Akard Street, Suite 3800
11                                  Dallas, TX  75201-6659
                                    (214) 855-7587
12
      For the NexPoint             Lauren K. Drawhorn
13    Parties:                     WICK PHILLIPS
                                    3131 McKinney Avenue, Suite 100
14                                  Dallas, TX  75204
                                    (214) 692-6200
15
      For the U.S. Trustee:        Lisa L. Lambert
16                                  OFFICE OF THE UNITED STATES
                                      TRUSTEE
17                                  1100 Commerce Street, Room 976
                                    Dallas, TX  75242
18                                  (214) 767-8967

19    For Scott Ellington,         Debra A. Dandeneau
      Isaac Leventon, Thomas       BAKER & MCKENZIE, LLP
20    Surgent, and Frank           452 Fifth Avenue
      Waterhouse:                  New York, NY 10018
21                                  (212) 626-4875

22    For Certain Funds and        A. Lee Hogewood, III
      Advisors:                    K&L GATES, LLP
23                                  4350 Lassiter at North Hills
                                      Avenue, Suite 300
24                                  Raleigh, NC  27609
                                    (919) 743-7306
25
```

007334

Case 19-34054-sgj11 Doc 3818-2 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-11 Filed 12/07/23 Page 142 of 214 PageID 6884

3

1    Recorded by:             Michael F. Edmond, Sr.

2                             UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
                                Dallas, TX  75242

3                                (214) 753-2062

4    Transcribed by:          Kathy Rehling

5                                311 Paradise Cove
                                Shady Shores, TX  76208

6                                (972) 786-3063

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

25

007335

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 11-90   Filed 12/07/23   Page 143 of 214   PageID 6885

Seery - Direct                                        48

1    Singaporean.

2    Q    Okay.  But did the Debtor own more than 20 percent of that

3    entity?

4    A    I don't know the specific allocations of equity ownership.

5    Q    Okay.  What about Pennant (phonetic) Management, LP?  Do

6    you know whether the Debtor owns or owned more than 20 percent

7    of that entity?

8    A    I don't recall, no.

9           MR. RUKAVINA:  You can take that exhibit down, Mr.

10   Vasek.

11   BY MR. RUKAVINA:

12   Q    Mr. Seery, very quick, are you familiar with Bankruptcy

13   Rule 2015.3?

14   A    I am, yes.

15   Q    Okay.  Has the Debtor filed any Rule 2015.3 statements in

16   this case?

17   A    I don't believe we have.

18   Q    Okay.

19          MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20   witness.

21          THE COURT:  All right.  Any other Objector

22   questioning?  None from Mr. Taylor, none from Mr. Draper, none

23   from Ms. Drawhorn?

24      All right.  Any cross -- any examination from you, Mr.

25   Morris?

Seery - Cross                                    49

1              MR. MORRIS:  Just one question.

2              THE COURT:  Go ahead.

3                        CROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Mr. Seery, do you know why the Debtor has not yet filed

6    the 2015.3 statement?

7    A    I have a recollection of it, yes.

8    Q    Can you just describe that for the Court?

9    A    When we -- when we initially filed, when the Debtor filed

10   and it was transferred over, we started trying to get all the

11   various rules completed.  There are, as the Court is aware, at

12   least a thousand and maybe more, more like three thousand,

13   entities in the total corporate structure.

14        We pushed our internal counsel to try to get that done,

15   and were never able to really get it completed.  We did not

16   have -- we were told we didn't have separate consolidating

17   statements for every entity, and it would be difficult.  And

18   just in the rush of things that happened from the first

19   quarter into the COVID into the year, we just didn't complete

20   that filing.  There was no reason for it other than we didn't

21   get it done initially and I think it fell through the cracks.

22            MR. MORRIS:  Nothing further, Your Honor.

23            THE COURT:  All right.  Anything further, Mr.

24   Rukavina?

25                      REDIRECT EXAMINATION

007337

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-1   Filed 12/07/23   Page 145 of 214   PageID 6887
Exhibit Exhibit B-1 Page 50 of 212

Seery - Redirect                          50

1    BY MR. RUKAVINA:

2    Q    Mr. Seery, I appreciate that answer.  But you never sought

3    leave from the Bankruptcy Court to postpone the deadlines for

4    filing 2015.3, did you?

5    A    No.  If it hadn't fallen through the cracks, it would have

6    been something we recalled and we would have done something

7    with it.  But, frankly, it just fell off the -- through the

8    cracks.  We didn't deal with it.

9    Q    Okay.

10              MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11   Seery.

12              THE COURT:  All right.  Any other Objector

13   examination?

14         Mr. Morris, anything further on that point?

15              MR. MORRIS:  No, thank you, Your Honor.  No further

16   questions.

17              THE COURT:  All right.  Mr. Seery, thank you.  You're

18   excused once again from the witness stand.

19         (The witness is excused.)

20              THE COURT:  Your next witness?

21              MR. SEERY:  Thank you, Your Honor.

22              THE COURT:  Uh-huh.

23              MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24   Post, if you're listening, which I believe you are, if you'll

25   please activate your camera.

255

1              THE CLERK:  All rise.

2              MR. MORRIS:  Thank you, Your Honor.

3          (Proceedings concluded at 4:34 p.m.)

4                         --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                      **02/05/2021**

24  _____        _____
   Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber


007339

Case 3:23-cv-02071-E Document 29-11 Filed 12/07/24 Page 147 of 214 PageID 6889

256

INDEX

PROCEEDINGS                                                         4

WITNESSES

<u>Debtor's Witnesses</u>

Marc Tauber
- Direct Examination by Mr. Morris                                25
- Cross-Examination by Mr. Rukavina                               34
- Cross-Examination by Mr. Taylor                                 36
- Redirect Examination by Mr. Morris                              41

<u>Certain Funds and Advisors' Witnesses</u>

James P. Seery
- Direct Examination by Mr. Rukavina                              45
- Cross-Examination by Mr. Morris                                 49
- Redirect Examination by Mr. Rukavina                           50

Robert Jason Post
- Direct Examination by Mr. Rukavina                              51
- Cross-Examination by Mr. Morris                                 56
- Redirect Examination by Mr. Rukavina                           62
- Recross-Examination by Mr. Morris                              63

EXHIBITS

Debtor's Docket 1887 - Leatham Declaration      Received     6
Debtor's Exhibit B, Docket 1822                 Received     8
Debtor's Exhibit 6R, Docket Entry 1822          Received     9
Debtor's Exhibits 6S and 6T, Docket Entry 1822  Received    12
Debtor's Exhibit 6U, Docket Entry 1822          Received    13
Debtor's Exhibits D and E, Docket Entry 1822    Received    15
Debtor's Exhibits 4D, 4E, and 4G, Docket 1822   Received    17
Debtor's Exhibit 5T, Docket 1822                Withdrawn   17
Debtor's Exhibit 10A                            Received    22
Debtor's Omnibus Reply to Plan Objections,      Received    23
  Docket 1807
Debtor's Exhibit 7O (Abridged)                  Received    44

Certain Funds and Advisors' Exhibit 2,          Received    53
  Docket Entry 1863

Dondero's Exhibits 6 through 12 and             Received    66
  15 through 17

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-1   Filed 12/07/23   Page 148 of 214   PageID 6890

257

INDEX
Page 2

EXHIBITS, cont'd.

Judicial Notice to be Taken of Docket 1887,                    6
   Patrick Leatham Declaration

Judicial Notice to be Taken of Docket 247,                   45
   Schedules

CLOSING ARGUMENTS

- By Mr. Pomerantz                                           73
- By Mr. Kharasch                                           151
- By Mr. Clemente                                           154
- By Mr. Draper                                             159
- By Mr. Rukavina                                           184
- By Mr. Taylor                                             208
- By Mr. Pomerantz                                          227
- By Mr. Clemente                                           246

RULINGS

Confirmation Hearing [1808] - *Taken Under Advisement*       248

Agreed Motion to (1) Assume Non-Residential Real Property    248
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624] - *Taken
Under Advisement*

END OF PROCEEDINGS                                          255

INDEX                                                   256-257

# HMIT Exhibit No. 21

007342

```
 1   IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
 2   DALLAS DIVISION
     -------------------------------)
 3   In Re:                 Chapter 11

 4   HIGHLAND CAPITAL        Case No.
     MANAGEMENT, LP,         19-34054-SGJ 11
 5
         Debtor
 6
     ------------------------------------
 7   HIGHLAND CAPITAL MANAGEMENT, LP,

 8          Plaintiff,
                         Adversary Proceeding
 9    vs.               No. 21-03000-SGJ

10   HIGHLAND CAPITAL MANAGEMENT
     FUND ADVISORS, LP, NEXPOINT
11   ADVISORS, LP,

12          Defendants.
     ------------------------------------
13

14

15    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

16               January 20, 2021

17               9:00 a.m. EST

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 188908
25
```

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-29   Filed 12/07/23   Page 151 of 214   PageID 6893

Page 35

1                    J. SEERY

2    owned and controlled the management

3    entities, then we wouldn't really need an

4    injunction because they wouldn't engage in

5    this type of activity.

6         Q.    I want to just round off the

7    discussion on the two or three-year

8    estimate of the post-confirmation Debtor

9    managing these agreements.  You mentioned

10   the monetizing of assets.  Again, I am

11   asking you to tell the court why you think

12   it will take two to three years -- in

13   other words, is that the length of time it

14   will take to sell all the assets of the

15   CLO's or sell the management rights?  In

16   other words, why two or three years?

17        A.    Two or three years, we believe,

18   is a conservative amount of time to

19   monetize these assets depending on market

20   conditions.  So, it gives us comfort that

21   we would be able to do this quite easily.

22   There is a very limited amount of assets.

23   It is likely or possible that some of

24   these assets could be sold in the next six

25   months.  The vast majority of the value

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-29   Filed 12/07/23   Page 152 of 214   PageID 6894

Page 36

1                    J. SEERY

2    could go in the next six months if we

3    think that the opportunity is correct.

4         Q.    Is it fair to say, then, that

5    within two or three years or perhaps

6    whatever the actual time is, the assets of

7    the CLO's will be sold to where all those

8    assets are monetized?

9         A.    Yes.

10        Q.    Today, what is an estimate of

11   the value of the assets of the CLO's being

12   managed?

13             MR. MORRIS:  Objection to the

14        form of the question.

15        A.    I don't have the exact amount.

16   It is somewhere in the $1.4 billion total

17   amount I believe, and nearly 4 to 5 -- 400

18   to 500 or 450, roughly, is MGM stock.

19        Q.    Why does the Debtor believe that

20   those assets should be sold within the

21   next two or three years as opposed to held

22   for a much longer period of time?

23        A.    Because that's the best way to

24   monetize the assets.  These are not

25   permanent investment vehicles.  The

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-11   Filed 12/07/23   Page 153 of 214   PageID 6895

Page 37

                          J. SEERY

1

2      investors that we have talked to and our

3      own view of the investments are that they

4      are supposed to be monetized.

5          Q.     That is the best way to monetize

6      the assets for whose benefit?

7          A.     The CLO's benefit as well as the

8      investors.

9          Q.     Have you talked to the investors

10     about their goals?

11         A.     Some of them, yes.

12         Q.     Can you remember anyone in

13     particular?

14         A.     HCLOF.

15         Q.     What was their view, HCLOF's

16     view?

17         A.     Monetize the assets as

18     sufficiently as possible based on market

19     conditions with due regard to value.

20         Q.     What about the investors that

21     are dominated or controlled by

22     Mr. Dondero?

23         A.     I haven't spoken to those

24     investors.

25         Q.     You are aware they want a

# HMIT Exhibit No. 22

007347

1

2            IN THE UNITED STATES BANKRUPTCY COURT

3            FOR THE NORTHERN DISTRICT OF TEXAS

4                     DALLAS DIVISION

5    -------------------------------------------)

6    IN RE:                              Chapter 11

7                          Case No. 19-34054-sgj11

8    HIGHLAND CAPITAL

9    MANAGEMENTS, L.P.,

10                        Debtor,
                                       )
11   ----------------------------------)

12

13

14        * * * C O N F I D E N T I A L * * *

15        REMOTE VIDEOTAPED DEPOSITION OF

16            JAMES P. SEERY, JR.,

17            New York, New York

18            October 17, 2020

19

20

21

22

23

24   JOB NO. 185291

25   Reported by:  BONNIE PRUSZYNSKI, RMR, RPR, CLR

Page 14

J. Seery

1
2  that give the committee a lot of control over
3  how the debtor operates day to day, and as
4  part of that process, Highland was required
5  to appoint an independent board.  I and a
6  gentleman named John Dubel were agreed upon
7  by the debtor, as well as the official
8  committee, and then Dubel and I selected Russ
9  Nelms as the third director.
10     Q.    Okay.  And were you subsequently
11 appointed as the chief executive and chief
12 restructuring officer?
13     A.    I think you said was I subsequently
14 appointed?
15     Q.    That's right.
16     A.    Yes.
17     Q.    And was that by order of July 16th
18 of 2020?
19     A.    I believe so.
20     Q.    What in particular led to your
21 appointment to the chief executive and chief
22 restructuring officer?
23     A.    I think it's largely on the record,
24 but in particular, it was a much more
25 streamlined way to operate the business, as

Page 15

J. Seery

1
2  opposed to by committee, and because of my
3  experience, the board wanted me to do it.  We
4  negotiated with the official committee, and
5  they agreed.
6     Q.    So how -- when you were
7  subsequently appointed to the CEO and
8  restructuring officer, how did that -- how
9  did your role change in this process?
10     MR. MORRIS:  Objection.
11     A.    Many of the day-to-day functions I
12 was already effectively doing anyway since
13 March, and so that part of it didn't change
14 that much, but it more formally cemented me
15 as the lead on the director group and the
16 CEO/CRO of the firm, and then had me directly
17 working with -- obviously, subject to the
18 board, but me directly working with the
19 Highland management team, as well as the
20 committee, to try to push the case towards
21 conclusion.
22     Q.    Well, how are decisions made on the
23 board of directors?
24     A.    I'm sorry.  Can you repeat that?
25 You're muddled.

Page 16

J. Seery

1
2     Q.    How are decisions made on the board
3  of directors, after the July 16th order?
4     MR. MORRIS:  Objection to the form
5     of the question.
6     A.    I am not -- I'm not trying -- I
7  don't really understand your question.  Are
8  you asking me how a corporate board of
9  directors works?
10     Q.    Well, how does in particular this
11 corporate board of directors work?
12     A.    My experience is that this one
13 works very similar to other boards of
14 directors.  So I -- if -- I don't think it's
15 particularly useful for me to go into a
16 dissertation of corporate governance, but we
17 could do that at a different time.
18     Q.    Well, maybe what I can more simply
19 ask is, if there was a disagreement between
20 the board members, how would that
21 disagreement be resolved?  Would it be a
22 majority vote?
23     A.    Yes.
24     Q.    So, you don't have any
25 supermajority powers to vote?

Page 17

J. Seery

1
2     A.    No, I do not.
3     Q.    Okay.  I'm going to send out the
4  first exhibit for this deposition.
5     A.    Counsel, if I can make a
6  suggestion.  When you are speaking, can you
7  get closer to your microphone, because when
8  you step back, it's very difficult -- or lean
9  back, it's very difficult to hear you.
10     Q.    All right.  I apologize.  I will
11 try to do better.
12     A.    No worries.
13     Q.    So, I have just sent out the first
14 deposition exhibit, which is going to be
15 labeled Dondero Exhibit A.
16     (Seery Exhibit 1, Proof of Claim
17     Number 23 marked for identification, as
18     of this date.)
19     Q.    Can you let me know when you have
20 received it.
21     MR. MORRIS:  I don't have it yet,
22 John.
23     I got it now.
24     MR. WILSON:  Okay.  It was about a
25 one-megabyte file, so it might take a

Page 22

J. Seery

1    it.  I don't know if I have reviewed this
2    specific document.
3        Q.    Okay.  And when did you become
4    aware of the proof of claim that Acis filed?
5        A.    Early in the case.
6        Q.    And when you say "early in the
7    case," what does that mean?
8        A.    Sometime in January.
9        Q.    So, shortly after you were
10   appointed to the board of directors, you
11   became familiar with Acis's proof of claim?
12            MR. MORRIS:  Objection.
13       A.    If proof of claim means the claim
14   that they filed in the case and the general
15   terms of it, yes.  They are a member of the
16   official committee.  The first hearing that
17   we showed up at, we met with them for lunch
18   after the hearing, and with respect to the
19   proof of claim, before I was even appointed,
20   one should assume and I will say that I
21   checked out who was on the committee and what
22   their purported claims were.
23       Q.    Okay.  Fair enough.
24            Now, let's go back to the second

Page 23

J. Seery

1    part of the earlier question, but did you
2    attempt to make any type of independent
3    analysis of Acis's proof of claim?
4            MR. MORRIS:  Objection to the form
5        of the question.
6        A.    I'm not sure what you're asking,
7    Counsel.
8        Q.    I'm asking if you --
9        A.    By "independent," when you say
10   "independent," the word typically means on my
11   own.  A separate independent assessment
12   without the assistance of counsel?
13       Q.    I think that's what I am asking
14   you, because you referred to your counsel
15   earlier.  Did you, without the assistance of
16   your counsel, attempt to undertake an
17   analysis of this claim?
18       A.    No.
19       Q.    So, all the legal arguments that
20   were ultimately advanced by Highland were the
21   product of your counsel and not you
22   individually?
23            MR. MORRIS:  Objection --
24       A.    That's correct.

Page 24

J. Seery

1            MR. MORRIS:  -- to the form of the
2        question.
3        Q.    So, would it be fair to say that
4    you have not made any analysis with respect
5    to the Acis proof of claim independent of
6    what your attorneys have done?
7            MR. MORRIS:  Objection to the form
8        of --
9        A.    That would not be fair, no.
10           MR. MORRIS:  -- the question.
11       Q.    I'm sorry.  I didn't catch the
12   answer.
13       A.    That would not be fair, no.
14       Q.    Well, so, I guess can you describe
15   for me the level of analysis that you
16   conducted on your own?
17       A.    With or without the assistance of
18   my counsel?
19       Q.    Well, I guess both.  Maybe you're
20   working hand in hand with your counsel, but
21   I'm just trying to understand to what extent
22   you analyzed this yourself, and you
23   understand the arguments that were made in
24   the -- in the -- I guess the Highland

Page 25

J. Seery

1    objection to proof of claim.
2        A.    Oh, I understand the arguments in
3    the Highland objection to proof of claim,
4    yes.
5        Q.    But your testimony is that those
6    arguments were developed by your counsel and
7    not you?
8        A.    That is not my testimony.
9            MR. MORRIS:  Objection to the form
10       of the question.
11       Q.    So -- well, help me understand how
12   those arguments came about.
13           MR. MORRIS:  Without disclosing
14       attorney-client privileged
15       communications.
16       A.    I believe before I -- I believe I
17   testified just currently here, a couple
18   minutes ago, that before I was even
19   appointed, I determined who the players were
20   on the committee and generally tried to get
21   an assessment or understanding of what their
22   claims were.  In fact, they were the parties
23   that interviewed prospective candidates for
24   the board along with the debtor.

J. Seery

1  committee members.
2
3      Q.    You said with the exception of one
4  of the committee members, of the convenience
5  class?
6      A.    Yes.  Yep.
7      Q.    So, you don't have a belief as you
8  sit there today whether they will accept the
9  plan?
10     A.    I think I hope that they will.  I
11  don't know if I, I have a belief that they
12  will.  It will be up to everybody.  I think
13  that the issues that we have with respect to
14  monetization in terms of timing, and the
15  issues we have with respect to larger
16  litigation claims and the timing and
17  litigating those, that it makes econom<mark>ic</mark>
18  <mark>sense</mark> for those smaller claims to take a
19  discounted payout and -- and end their
20  involvement in the case.
21         So, I would think economically that
22  they should, if people are economically
23  rational actors, which typically they tend to
24  be.  So, my hope is that they will.  I'm not
25  quibbling with your term "belief."  I just

J. Seery

1  don't know what you mean.  I hope they will,
2  and I anticipate they will.
3      Q.    Okay.  Fair enough.
4         In your understanding, is the plan
5  confirmable under the bankruptcy code if the
6  convenience class accepts and the unsecured
7  class does not?
8         MR. MORRIS:  Objection to the form
9      of the question, to the extent it calls
10     for a legal conclusion.
11     A.    My understanding is that it is.
12     Q.    Now, what do you foresee as the
13  allowable amount of the UBS claim?
14         MR. MORRIS:  Objection to the form
15     of the question.  How is this related to
16     the Acis settlement?
17         MR. WILSON:  I don't think I have
18     to answer that.  I asked a question.
19         MR. MORRIS:  I am going to put you
20     on notice that if we go too far afield
21     from the deposition topic, I will direct
22     the witness not to answer, but he can
23     answer this one.
24     A.    What was the question?

J. Seery

1      Q.    What do you perceive as the
2  allowable amount of the UBS claim?
3      A.    I -- "perceive" is a weird word.  I
4  think the allowed amount in my estimation
5  should be zero.
6      Q.    Okay.  Why do you believe that?
7      A.    Because I don't believe that UBS
8  has a legitimate claim against the debtor.
9      Q.    Can you explain the basis for that
10  belief?
11         MR. MORRIS:  Last question.
12     A.    It's in -- it's in substantial
13  papers that have been filed to date.  It's in
14  summary judgment papers that were filed.
15         But very quickly, their judgment is
16  against two subsidiaries, foreign
17  subsidiaries.  The 20th largest bank in the
18  world made a very sophisticated investment in
19  a CDO product.  Its documents expressly
20  provide that 100 percent of the risk will be
21  borne by those foreign subs.  It expressly,
22  expressly excludes HCMLP as a defendant.
23         It initially brought a claim
24  against HCMLP and it lost.  It then tried to

J. Seery

1  cobble together other claims, and it was
2  denied on res judicata grounds by the
3  Appellate Division in New York.
4  Subsequently, it's tried to pursue an alter
5  ego and then a fraudulent conveyance claim.
6  Both of those claims require significant
7  facts that aren't going to be available to
8  UBS because of the original terms of the deal
9  and because of the facts related to the
10  purported fraudulent conveyances, including
11  significant releases, as well as value
12  exchanged.
13         This could be hours.  I'm not sure
14  where it gets you.
15     Q.    That's fair.  I understand.  I just
16  wanted to hear your position.
17         How likely is it in your estimation
18  that there will be room for equity to
19  participate under the currently filed plan?
20         MR. MORRIS:  Objection to the form
21     of the question.
23     A.    <mark>I think under the filed plan,</mark>
24  <mark>ultimately equity will get a return, but it's</mark>
25  <mark>dependent on a number of things,</mark> first and

Case 19-34054-sgj11   Doc 3818-2   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-9   Filed 12/22/23   Page 159 of 214   PageID 6901
Exhibit Exhibit B-29 to the Declaration Page 159 of 214
Confidential

**Page 118**

J. Seery

2  A.    Yeah.  It's New York Supreme, so I
3  think it was a New York firm.  I just -- the
4  name is just at the tip of my tongue.  I
5  cannot recall it.
6  Q.    And I just have a couple more
7  questions based on Mr. Wilson's questions.
8         I believe you testified that you
9  had spoken to somebody on the committee that
10  was going to be placed in the convenience
11  class.  Do you recall that?
12  A.    Yes.
13  Q.    Okay.  Was that person Meta?  Is
14  that the person that is being put in the
15  convenience class?
16  A.    I think Meta is the name of the
17  company, not the guy.  The only Metta I
18  recall as a person was a player for the
19  Pacers, but that is the name of the company.
20  Q.    That is the name of the creditor
21  that would be placed in that class?
22  A.    That's correct.
23  Q.    And have they indicated that they
24  are going to vote for the plan or not?
25  Because I think you had said that they had

**Page 119**

J. Seery

1  indicated they're going --
3  A.    Not to my knowledge, but they have
4  been an active participant in the -- in the
5  case as a committee member, and so I believe
6  they will vote for it, because the committee
7  has helped craft that, or at least been in
8  negotiations around the class.  I am assuming
9  that if they didn't like it, I would have
10  heard, but I don't really know.
11  Q.    Okay.  You testified that -- when
12  we talked about that the debtor is
13  potentially solvent, that ultimately equity
14  will get a return, and I guess my question
15  is:  How is that possible under the debtor's
16  plan, because the debtor's plan cancels
17  equity; correct?
18  A.    The debtor's plan cancels equity
19  but reissues limited partnership interests
20  to -- or trust interests, I'm sorry, to the
21  creditors, which are, for lack of a better
22  term, senior interests, and to the equity,
23  for lack of a better term, as contingent
24  interests, so that if the senior interests
25  are all paid off and the claims are all

**Page 120**

J. Seery

2  satisfied, then the contingent interests come
3  into play and can receive a recovery.
4  Q.    And I want to be very precise here,
5  and if we need to look at the plan, we will.
6  The plan provides that the existing equity in
7  the debtor is going to be canceled; correct?
8  A.    Yes.
9  Q.    And new equity under the plan is
10  actually going to be issued to the claimant
11  trust; correct?
12  A.    Correct.
13  Q.    Okay.  And then the creditors in
14  class seven, I believe it is, they get
15  interest in the trust; correct?
16  A.    Correct.
17  Q.    And then the plan also provides,
18  though, that equity existing -- and I will be
19  more specific.  The class A, B and C limited
20  partnership interests receive, quote/unquote,
21  contingent interests in the claimant trust;
22  is that correct?
23  A.    That's right.
24  Q.    So, my question is very direct.
25  Are the class A and the class B-C limited

**Page 121**

J. Seery

2  partnership interests, the ones classified in
3  classes nine and class ten, are they
4  receiving the, quote/unquote, contingent
5  interest on account of their existing equity
6  they own in the debtor?
7  A.    I am not sure if technically that
8  is correct, or if it's because once the other
9  interests are satisfied, they come into
10  place, because they are contingent, but
11  for -- without being specific or bankruptcy
12  specific, on account of, they're not getting
13  it for a charitable purpose.  They are
14  getting it because they are equity holders,
15  and to the extent that value exceeds the
16  claims, because the denominator is not set,
17  nor is the numerator, as we talked about,
18  then those interests would come into -- would
19  ripen, if you will, and be entitled to
20  recovery.
21  Q.    I'm going to ask this question a
22  different way, and your answer may be the
23  same.  What is the basis for class A, B and C
24  limited partnership interest holders
25  receiving the contingent interests in the

Page 122

J. Seery

2  claimant trust?
3     A.   I'm not sure if it's what you're
4  asking, but it's because the enterprise may
5  be solvent.
6     Q.   That will -- that will complete
7  kind of what my follow-up is, and so I will
8  kind of get into kind of my more specific
9  questions, or I guess my questions now.
10         I think I asked you, you have some
11 experience -- you are a lawyer.  You have
12 some experience in restructuring bankruptcy;
13 correct?
14    A.   Yes.
15    Q.   You generally understand the
16 bankruptcy code, understand what it can and
17 can't provide; correct?
18    A.   Yes.
19    Q.   Included in that, you are -- you
20 have a, what I will call baseline, and
21 Mr. Morris will object, understanding of the
22 requirements for confirmation under
23 Section 1129?
24         MR. MORRIS:  Objection to the form
25    of the question.

Page 123

J. Seery

2     A.   Yes.
3     Q.   And I am not asking specific, but
4  you do have a general understanding of what
5  is necessary in order to get a settlement
6  approved under Bankruptcy Rule 9019; correct?
7         MR. MORRIS:  Objection.
8     A.   Yes.
9     Q.   Okay.  I will ask this question a
10 little bit different than Mr. Wilson did.
11 What's your understanding of what must be
12 shown, and again, I'm not asking for a legal
13 conclusion, the standards are set out in the
14 motion, but from a layperson, what is your
15 general understanding of what must be shown
16 in order to get a settlement approved under
17 Rule 9019?
18    A.   I believe that the settlement must
19 be reasonable, considering the time, the
20 cost, the risk, the benefit to creditors, the
21 benefit to the estate, that overall it should
22 be viewed as fair and equitable, and that,
23 you know, in sum, it should be viewed as
24 beneficial to the estate.
25    Q.   And as the CEO of the debtor, you

Page 124

J. Seery

2  believe the court should approve the
3  settlement that is proposed in Docket Number
4  1087 and in 1088 and what's been marked in
5  this deposition as Seery Exhibit Number 4,
6  Exhibit 5, and Exhibit 6?
7     A.   Without looking at the exhibits, I
8  believe the court should approve the
9  settlement struck with Acis and Terry.
10    Q.   And implicit in that is that you
11 believe that the settlement meets the
12 requirements under Rule 9019; is that
13 correct?
14    A.   That's correct.
15    Q.   Are you the sole person that makes
16 that decision on behalf of the debtor, or did
17 you have to get approval from the indirect --
18 from the independent directors to approve
19 this settlement?
20    A.   The board approved the settlement.
21    Q.   So, implicit in that is that you
22 discussed the settlement with the independent
23 directors?
24    A.   That's correct.
25    Q.   Did you ever discuss that

Page 125

J. Seery

2  settlement with independent directors outside
3  of the presence of counsel?
4     A.   I'm pausing because I don't know.
5  I doubt it, because this settlement, you
6  know, we spent a lot of time with counsel,
7  and we are -- we are very careful about
8  making sure that we get proper advice in
9  terms of being exhaustive on going through
10 each of the items, and this was a settlement
11 that was part of a mediation that, you know,
12 the directors participated in, and we had our
13 own breakout rooms with counsel.
14         So, I -- my guess is that we
15 didn't.  My belief is that we didn't.  I just
16 don't recall any specific.  Is it possible
17 that we had a passing conversation without
18 counsel?  It's possible.
19    Q.   You're a smart guy.  You are a
20 lawyer.  You know where I am getting at here.
21 If you always discussed it with the
22 directors, I'm not going to get into that,
23 that's privileged communications.  But if you
24 talked with the other directors outside the
25 presence of counsel, I want to know what the

# HMIT Exhibit No. 23

007354

# EXHIBIT 42

007355

## ASSIGNMENT AGREEMENT

This Assignment Agreement, effective as of August 11, 2021 (this "Agreement"), is being entered by and among the Highland Claimant Trust (the "Claimant Trust") and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust") for the transfer and assignment of certain claims and causes of action.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943] (the "Confirmation Order");

WHEREAS, on August 11, 2021, the Effective Date of the Plan occurred [Docket No. 2700] and, pursuant to the Plan, the Claimant Trust and the Litigation Sub-Trust subsequently came into existence;

WHEREAS, pursuant to the Plan, the Causes of Action were vested in the Claimant Trust and the Estate Claims that were Causes of Action were transferred from the Claimant Trust to the Litigation Sub-Trust;

WHEREAS, the purpose of the Litigation Sub-Trust is to investigate, prosecute, settle, or otherwise resolve claims and causes of action for the benefit of the Claimant Trust Beneficiaries;

WHEREAS, pursuant to Section 2.6 of the Litigation Sub-Trust Agreement, the Claimant Trustee shall, upon reasonable request of the Litigation Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Litigation Trustee any portion of the Claimant Trust Assets intended to be conveyed by the Litigation Sub-Trust Agreement and in the Plan;

WHEREAS, the Litigation Trustee, at the direction of the Claimant Trust Oversight Committee, has requested that the Claimant Trustee assign to the Litigation Sub-Trust all Causes of Action not otherwise held by the Litigation Sub-Trust to the Litigation Sub-Trust, other than those Causes of Action that (1) the Claimant Trustee is currently pursuing, and (2) the Claimant Trustee intends to pursue on behalf of entities managed by the Reorganized Debtor (together, the "

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

007356

Claimant Trust Causes of Action").

## AGREEMENT

In furtherance of the Plan and for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Claimant Trust hereby irrevocably transfers and assigns to the Litigation Sub-Trust any and all Causes of Action not previously transferred or assigned by operation of the Plan, the Litigation Sub-Trust Agreement, or otherwise, except for the Claimant Trust Causes of Action, effective as of the date below. For the avoidance of doubt, to the extent not already held by the Litigation Sub-Trust, all Causes of Action that will be included in the Litigation Trustee's complaint filed on or before October 15, 2021 are assigned to the Litigation Sub-Trust.

Executed as of _October 8, 2021_

**Claimant Trust**

By: _____

James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

**Litigation Sub-Trust**

By: _____

Marc Kirschner, not individually but solely in his capacity as the Litigation Trustee

DOCS_NY:44237.1 36027/003

178

007357

# HMIT Exhibit No. 24

007358

| From: | Michele Naudin |
| To: | |
| Cc: | |
| Subject: | FW: Follow up from Friday's call |
| Date: | Thursday, February 16, 2023 1:57:42 PM |
| Attachments: | image001.jpg |

**MICHELE NAUDIN | Attorney**
Lynn**Pinker**Hurst**Schwegmann**
Direct     214 292 3648
Mobile    469 705 2825
mnaudin@lynnllp.com

2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
lynnllp.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Lynn Pinker Hurst & Schwegmann, LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail, and destroy this communication and all copies thereof, including all attachments.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, February 16, 2023 1:54 PM
**To:** Michele Naudin <mnaudin@lynnllp.com>
**Cc:** Hayley R. Winograd <hwinograd@pszjlaw.com>; Michael K. Hurst <MHurst@lynnllp.com>; Laura M. Garcia <lgarcia@weinsteinklein.com>
**Subject:** RE: Follow up from Friday's call

Michele:

The answers to your questions as follows:

1. Mr. Seery's iPhone is personal in nature. While it is backed up to iCloud, that back-up does not contain deleted items, whether deleted manually or as part of an automatic setting.
2. The automatic text deletion setting is currently set at one year; texts that are manually or automatically deleted are not retrievable; and
3. We have provided all texts and screenshots that we could locate based on a reasonable search. As I mentioned, we're glad that you had the screenshot of Goldsmith bringing documents to a storage facility because we both recalled that Jim sent that to me and I could

007359

not locate it (and you can see from Jim's response that he told Daugherty to "knock it off").
As you know, our ability to locate documents is based on search terms.  If Jim forwarded a
screen shot (or anything else) without comment (which is possible), I would only be able to
find it by reviewing every email received from Jim – which, after three years of daily
communications, we don't believe we are required to do.  To be as helpful as we can, I recall
Jim sending several screenshots to me over the years including:  (a) the one of Goldsmith, (b)
one of Scott speaking with someone in front of a house (which I think you sent), (c) one of
Thomas Surgent's car (obviously sent in 2020). Jim does currently not have any of those
pictures on his iPhone.   And obviously, as verified by the information produced, Jim never
requested these unsolicited pictures or did anything with them (other than forward them to
me).

To summarize what we also discussed:

1.  Jim and I accepted service of the subpoenas despite the fact that service was improper;
2.  We produced all responsive emails, pictures, and texts we located after conducting a
    reasonable search;
3.  We immediately withdrew the objection that you challenged to make clear we were not
    hiding anything;
4.  We've acknowledged receiving (or sharing) certain texts that you obtained elsewhere;
5.  One of those texts clearly shows Jim's discomfort with the photo of Ms. Goldsmith;
6.  My text with Dandeneau (Scott's lawyer for that purpose) during the remand hearing shows I
    was ready to "pounce" on Daugherty if he even suggested that he was working on behalf or at
    that direction of Jim or the Trust.

Please confirm that Jim and I have done all we need to do to comply the subpoena.  Otherwise,
please let me know what questions remain.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Michele Naudin [mailto:mnaudin@lynnllp.com]
**Sent:** Monday, February 13, 2023 11:07 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Hayley R. Winograd <hwinograd@pszjlaw.com>; Michael K. Hurst <MHurst@lynnllp.com>; Laura M. Garcia <lgarcia@weinsteinklein.com>
**Subject:** Follow up from Friday's call

Mr. Morris,

As a follow up from Friday's call, we look forward to hearing from you this week as to (1) whether Seery's data backed up to the Cloud, (2) Seery's automatic deletion settings, if any and what the setting is, and (3) confirm that you could not locate another email for any other contemporaneous screenshots of Daugherty's texts sent to Seery, which you stated that Seery screenshotted and sent to you from time to time.

Thank you,


**MICHELE NAUDIN  |  Attorney**
**Lynn**Pinker**Hurst**Schwegmann
Direct      214 292 3648
Mobile     469 705 2825
mnaudin@lynnllp.com

2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
**lynnllp.com**

# HMIT Exhibit No. 25

007362

| | |
|---|---|
| **From:** | Giles, Courtney |
| **Cc:** | Hartmann, Michelle; Cahn, Blaire; Zimmerman, Laura |
| **Subject:** | FW: Kirschner v. Dondero et al.: Letter re text messages |
| **Date:** | Friday, March 10, 2023 3:26:41 PM |
| **Attachments:** | image001.png |



Thanks,

**Courtney Giles**
Associate, Litigation
Baker & McKenzie LLP
700 Louisiana, Suite 3000
Houston, TX 77002
United States
Tel: +1 713 427 5000
Direct: +1 713 427 5086
Fax: +1 713 427 5099
courtney.giles@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | Twitter

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, March 10, 2023 3:20 PM
**To:** Hartmann, Michelle <Michelle.Hartmann@bakermckenzie.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley
R. Winograd <hwinograd@pszjlaw.com>; 'Robert Loigman' <robertloigman@quinnemanuel.com>;
'Aaron Lawrence' <aaronlawrence@quinnemanuel.com>; Giles, Courtney
<Courtney.Giles@bakermckenzie.com>
**Subject:** [EXTERNAL] Kirschner v. Dondero et al.: Letter re text messages

Michelle:

As you know, Mr. Seery is (among other things) the CEO of our client, Highland Capital Management,
L.P., and we represent him in that capacity, not in his personal, individual capacity.

In response to the communication, please be advised that Mr. Seery recently suspended his deletion
setting; separately, all potentially relevant documents in his possession, custody, and control have
been preserved.

Regards,

John

**John A. Morris**

Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Giles, Courtney [mailto:Courtney.Giles@bakermckenzie.com]
**Sent:** Tuesday, March 7, 2023 10:05 PM
**To:** robertloigman@quinnemanuel.com; Aaron Lawrence <aaronlawrence@quinnemanuel.com>;
Hartmann, Michelle <Michelle.Hartmann@bakermckenzie.com>
**Cc:** Dandeneau, Debra A. <Debra.Dandeneau@bakermckenzie.com>; qe-highland <qe-
highland@quinnemanuel.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris
<jmorris@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd
<hwinograd@pszjlaw.com>
**Subject:** RE: Kirschner v. Dondero et al.: Letter re text messages

Counsel,

Please see the attached correspondence.

Best regards,

**Courtney Giles**
Associate, Litigation
Baker & McKenzie LLP
700 Louisiana, Suite 3000
Houston, TX 77002
United States
Tel: +1 713 427 5000
Direct: +1 713 427 5086
Fax: +1 713 427 5099
courtney.giles@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | Twitter

This message may contain confidential and privileged information. If it has been sent to you in error,
please reply to advise the sender of the error and then immediately delete this message. Please visit
www.bakermckenzie.com/disclaimers for other important information concerning this message.

**From:** Aaron Lawrence <aaronlawrence@quinnemanuel.com>

**Sent:** Tuesday, March 7, 2023 2:08 PM
**To:** Hartmann, Michelle <Michelle.Hartmann@bakermckenzie.com>
**Cc:** Giles, Courtney <Courtney.Giles@bakermckenzie.com>; Dandeneau, Debra A.
<Debra.Dandeneau@bakermckenzie.com>; qe-highland <qe-highland@quinnemanuel.com>;
'jpomerantz@pszjlaw.com' <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>;
Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** [EXTERNAL] Kirschner v. Dondero et al.: Letter re text messages

Michelle,

Please see the attached correspondence.

Best,

**Aaron Lawrence**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
Direct
212-849-7000 Main Office Number
212-849-7100 FAX
aaronlawrence@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s)
named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If
the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby
notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is
strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original
message.

# HMIT Exhibit No. 26

007366

EXECUTION VERSION

## CLAIMANT TRUST AGREEMENT

      This Claimant Trust Agreement, effective as of August 11, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee") and Wilmington Trust, National Association, a national banking association ("WTNA"), as Delaware trustee (in such capacity hereunder, and not in its individual capacity, the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

      WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

      WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943] (the "Confirmation Order");

      WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

      WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Docket No. 1875, Exh. B.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

Disputed Claims as set forth herein and in the Plan; and (vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1  Certain Definitions.  Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan. For all purposes of this Agreement, the following terms shall have the following meanings:

(a)  "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)  "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)  "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(d)  "Claimant Trust Agreement" means this Agreement.

2

007368

(e)    "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)    "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)    "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)    "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)    "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)    "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)    "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)    "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)    "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

(n)    "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

(o)     "<u>Delaware Statutory Trust Act</u>" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p)     "<u>Delaware Trustee</u>" has the meaning set forth in the introduction hereof.

(q)     "<u>Disability</u>" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r)     "<u>Disinterested Members</u>" has the meaning set forth in Section 4.1 hereof.

(s)     "<u>Disputed Claims Reserve</u>" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [[(in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board)] to be sufficient to pay Disputed Claims under the Plan.

(t)     "<u>Employees</u>" means the employees of the Debtor set forth in the Plan Supplement.

(u)     "<u>Employee Claims</u>" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v)     "<u>Estate Claims</u>" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [Docket No. 354].

(w)     "<u>Equity Trust Interests</u>" has the meaning given to it in Section 5.1(c) hereof.

(x)     "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended.

(y)     "<u>General Unsecured Claim Trust Interests</u>" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z)     "<u>GUC Beneficiaries</u>" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa)     "<u>GUC Payment Certification</u>" has the meaning given to it in Section 5.1(c) hereof.

(bb)     "<u>HarbourVest</u>" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

DOCS_NY:43843.3 36027/002

(cc)   "Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

(dd)   "Investment Company Act" means the Investment Company Act of 1940, as amended.

(ee)   "Litigation Sub-Trust" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff)   "Litigation Sub-Trust Agreement" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg)   "Litigation Trustee" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh)   "Managed Funds" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii)   "Material Claims" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj)   "Member" means a Person that is member of the Oversight Board.

(kk)   "New GP LLC" means the general partner of the Reorganized Debtor.

(ll)   "Oversight Board" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan.  Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

(mm)   "Plan" has the meaning set forth in the Recitals hereof.

(nn)   "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to,

DOCS_NY:43843.3 36027/002

007371

attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo)    "PSZJ" means Pachulski Stang Ziehl & Jones LLP.

(pp)    "Redeemer Committee" means the Redeemer Committee of the Highland Crusader Fund.

(qq)    "Registrar" has the meaning given to it in Section 5.3(a) hereof.

(rr)    "Reorganized Debtor Assets" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss)    "Securities Act" means the Securities Act of 1933, as amended.

(tt)    "Subordinated Beneficiaries" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu)    "Subordinated Claim Trust Interests" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv)    "TIA" means the Trust Indenture Act of 1939, as amended.

(ww)    "Trust Interests" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx)    "Trust Register" has the meaning given to it in Section 5.4(b) hereof.

(yy)    "Trustees" means collectively the Claimant Trustee and Delaware Trustee, however, it is expressly understood and agreed that the Delaware Trustee shall have none of the duties or liabilities of the Claimant Trustee.

(zz)    "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa)    "WilmerHale" Wilmer Cutler Pickering Hale & Dorr LLP.

1.2    General Construction.  As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all

007372

cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3    Incorporation of the Plan. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE II.
## ESTABLISHMENT OF THE CLAIMANT TRUST

2.1    Creation of Name of Trust.

(a)    The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust." The Claimant Trustee shall be empowered to conduct all business and hold all property constituting the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

(b)    The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

2.2    Objectives.

(a)    The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b)    It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment,

make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

     2.3   <u>Nature and Purposes of the Claimant Trust</u>.

     (a)   The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

     (b)   The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

     (i)   to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

     (ii)   to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); <u>provided</u>, <u>however,</u> that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

<div align="center">8</div>

007374

<div style="margin-left:3em">

(iii)    to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

(iv)    to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

(v)    to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

(vi)    to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

(vii)    to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

(viii)    to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

(ix)    to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

</div>

2.4    <u>Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust</u>.

(a)    On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement.  To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b)    On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement. Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

(c)     On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved.  For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d)     Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trustee, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee.  For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

2.5     Principal Office.  The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:  100 Crescent Court, Suite 1850, Dallas, Texas 75201.

2.6     Acceptance.  The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7     Further Assurances.  The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8     Incidents of Ownership.  The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

007376

**ARTICLE III.**
**THE TRUSTEES**

3.1     Role.  In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2     Authority.

(a)     In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.  The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.  The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)     The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; provided, however, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate.  To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)     solely as required by Section 2.4(d), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

DOCS_NY:43843.3 36027/002

007377

(ii)     open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)     as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)     settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)     sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)     upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)     exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)     protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)     obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise.  The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x)     without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi)     retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay,

DOCS_NY:43843.3 36027/002

007378

such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii)    prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii)   prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv)    to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv)     subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

(xvi)    request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii)   take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii)  take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix)    exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx)     evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi)    with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from

DOCS_NY:43843.3 36027/002

the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the "Authorized Acts").

(d)     The Claimant Trustee and the Oversight Committee will enter into an agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's authority with respect to certain other assets, including certain portfolio company assets (the "Other Assets").

(e)     The Claimant Trustee has the power and authority to act as trustee of the Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns, is removed, or is otherwise unable to serve for any reason.

3.3     Limitation of Authority.

(a)     Notwithstanding anything herein to the contrary, the Claimant Trust and the Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Claimant Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents or the Confirmation Order.

(b)     Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein, in order to:

(i)     terminate or extend the term of the Claimant Trust;

(ii)     prosecute, litigate, settle or otherwise resolve any of the Material Claims;

(iii)     except otherwise set forth herein, sell or otherwise monetize any assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

(iv)     except for cash distributions made in accordance with the terms of this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with Article IV of the Plan;

(v)     except for any distributions made in accordance with the terms of this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

DOCS_NY:43843.3 36027/002

(vi)     reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

(vii)    borrow as may be necessary to fund activities of the Claimant Trust;

(viii)   determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

(ix)     invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

(x)      change the compensation of the Claimant Trustee;

(xi)     subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

(xii)    retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and (ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

(c)      [Reserved.]

3.4     <u>Investment of Cash</u>.  The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; <u>provided</u>, <u>however</u> that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("<u>IRS</u>") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement).

DOCS_NY:43843.3 36027/002

3.5     Binding Nature of Actions.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall be final and binding upon any and all Beneficiaries.

3.6     Term of Service.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

3.7     Resignation.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

3.8     Removal.

        (a)     The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

        (b)     To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9     Appointment of Successor.

        (a)     Appointment of Successor.  In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust.  The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the

007382

vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

(b)    <u>Vesting or Rights in Successor Claimant Trustee</u>.  Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee.  In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

(c)    <u>Interim Claimant Trustee</u>.  During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "<u>Interim Trustee</u>") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

3.10    <u>Continuance of Claimant Trust</u>.  The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee.  In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, <u>provided</u> the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust.  The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

3.11    <u>Claimant Trustee as "Estate Representative"</u>.  The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Claimant

007383

Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; provided that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims. The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12    Books and Records.

(a)    The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)    The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)    The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

007384

3.13    Compensation and Reimbursement; Engagement of Professionals.

    (a)    Compensation and Expenses.

    (i)    Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

    (ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

    (b)    Professionals.

    (i)    Engagement of Professionals.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

    (ii)    Fees and Expenses of Professionals.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

3.14    Reliance by Claimant Trustee.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

3.15    Commingling of Claimant Trust Assets.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

DOCS_NY:43843.3 36027/002

3.16    Delaware Trustee.

(a)    The Delaware Trustee shall have the limited power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement, in either case as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee and upon which the Delaware Trustee shall be entitled to conclusively and exclusively rely; provided, however, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.  The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Claimant Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the Claimant Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Statutory Trust Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to those expressly set forth in this Section 3.16 and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Claimant Trust, the other parties hereto or any beneficiary of the Claimant Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement.

(b)    The Delaware Trustee shall serve until such time as the Claimant Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Claimant Trustee in accordance with the terms hereof.  The Delaware Trustee may resign at any time upon the giving of at least thirty (30) days' advance written notice to the Claimant Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Claimant Trustee in accordance with the terms hereof. If the Claimant Trustee does not act within such thirty (30) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(c)    Upon the resignation or removal of the Delaware Trustee, the Claimant Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the

DOCS_NY:43843.3 36027/002

007386

outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Delaware Statutory Trust Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Claimant Trustee and any undisputed fees, expenses and indemnity due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Agreement.

(d)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement. The Claimant Trust shall promptly advance and reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(e)     WTNA shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(f)     Any corporation or association into which WTNA may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Delaware Trustee is a party, will be and become the successor Delaware Trustee under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## ARTICLE IV.
## THE OVERSIGHT BOARD

4.1     <u>Oversight Board Members</u>.  The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "<u>Disinterested Members</u>").  The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker. David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members; <u>provided</u>, <u>however</u>, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-

007387

E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

    4.2   <u>Authority and Responsibilities</u>.

    (a)   The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein. As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.8 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; <u>provided</u>, <u>however</u>, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

    (b)   The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

    (c)   The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

    (d)   Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

    (e)   Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate

DOCS_NY:43843.3 36027/002

in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds. It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

4.3     <u>Fiduciary Duties</u>.  The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; <u>provided</u>, <u>however</u>, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; <u>provided</u>, <u>further</u>, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action.  In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust.  Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

4.4     <u>Meetings of the Oversight Board</u>.  Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly. Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; <u>provided</u>, <u>however</u>, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board).  Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

4.5     <u>Unanimous Written Consent</u>.  Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded.  If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone.  Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

DOCS_NY:43843.3 36027/002

4.6    Manner of Acting.

(a)    A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); provided that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum.  Except as set otherwise forth herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement.  Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof.  Any Member participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

(b)    Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

(c)    Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Trust Interests).  A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "Conflicted Member" who shall not be entitled to vote or take part in any action with respect to such matter or issue.  In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d)    Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "Committee Member Claim Matter").  A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any

DOCS_NY:43843.3 36027/002

007390

Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

4.7 <u>Tenure of the Members of the Oversight Board</u>. The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article IX hereof. The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.8 below, or removal pursuant to Section 4.9 below.

4.8 <u>Resignation</u>. A Member of the Oversight Board may resign by giving prior written notice thereof to the Claimant Trustee and other Members. Such resignation shall become effective on the earlier to occur of (i) the day that is 90 days following the delivery of such notice, (ii) the appointment of a successor in accordance with Section 4.10 below, and (iii) such other date as may be agreed to by the Claimant Trustee and the non-resigning Members of the Oversight Board.

4.9 <u>Removal</u>. A majority of the Oversight Board may remove any Member for Cause or Disability. If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein. Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

4.10 <u>Appointment of a Successor Member</u>.

(a) In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; <u>provided</u>, <u>however,</u> that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; <u>provided</u>, <u>further,</u> that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board. The appointment of a successor Member will be further evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

(b) Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act. A successor Member will not be liable personally for any act or omission of a predecessor Member.

(c) Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment

DOCS_NY:43843.3 36027/002

under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

4.11    Compensation and Reimbursement of Expenses.    Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; provided, however, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member. Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

4.12    Confidentiality.  Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("Confidential Trust Information"), except as otherwise required by law.  For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "Member Affiliates") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.12.

## ARTICLE V.
## TRUST INTERESTS

5.1    Claimant Trust Interests.

(a)    General Unsecured Claim Trust Interests. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "GUC Beneficiaries").  The Claimant Trustee shall allocate to each Holder of an Allowed Class 8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims. The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

(b)    Subordinated Claim Trust Interests.  On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "Subordinated Beneficiaries").  The

007392

Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9. The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests. The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

(c)     Contingent Trust Interests. On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

5.2     Interests Beneficial Only. The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

5.3     Transferability of Trust Interests. No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or

007393

reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause the Claimant Trust to become a public reporting company and/or make periodic reports under the Exchange Act (provided that it is not required to register under the Investment Company Act or register its securities under the Securities Act) to enable such disposition to be made. In the event that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such restrictions upon such disposition and other terms of this Agreement as are deemed necessary or appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

5.4     Registry of Trust Interests.

(a)     Registrar.  The Claimant Trustee shall appoint a registrar, which may be the Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests as provided herein.  The Registrar, if other than the Claimant Trustee, shall be an institution or person acceptable to the Oversight Board.  For its services hereunder, the Registrar, unless it is the Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as a Claimant Trust Expense.

(b)     Trust Register.  The Claimant Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the Registrar may prescribe.

(c)     Access to Register by Beneficiaries.  The Claimant Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's Trust Interest.

5.5     Exemption from Registration.  The Parties hereto intend that the rights of the Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Claimant Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act.  The Trust Interests shall not have consent or voting rights or otherwise confer on the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Claimant Trustee under this Agreement.

DOCS_NY:43843.3 36027/002

007394

5.6 <u>Absolute Owners</u>.  The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7 <u>Effect of Death, Incapacity, or Bankruptcy</u>.  The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8 <u>Change of Address</u>.  Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Claimant Trustee.  Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9 <u>Standing</u>.  No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets.  No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10 <u>Limitations on Rights of Claimant Trust Beneficiaries</u>.

(a) The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

(b) In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; <u>provided</u>, <u>however</u>, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

(c) A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed.  A request for such bond can be made by the Claimant Trust or by Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

(d) Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas.  Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

(e) The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

DOCS_NY:43843.3 36027/002

007395

## ARTICLE VI.
## DISTRIBUTIONS

6.1    Distributions.

(a)    Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7.  Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board.  The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

(b)    At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

(c)    All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

6.2    Manner of Payment or Distribution.  All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3    Delivery of Distributions.  All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records

of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

6.4     Disputed Claims Reserves.  There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.  The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

6.5     Undeliverable Distributions and Unclaimed Property.  All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

6.6     De Minimis Distributions.  Distributions with a value of less than $100 will be treated in accordance with the Plan.

6.7     United States Claimant Trustee Fees and Reports.  **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.  After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

# ARTICLE VII.
# TAX MATTERS

7.1     Tax Treatment and Tax Returns.

(a)     It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.  Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable).  The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b)     The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c)     The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the

Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2     Withholding.  The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof.  Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary.  As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws.  If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

## ARTICLE VIII.
## STANDARD OF CARE AND INDEMNIFICATION

8.1     Standard of Care.  None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence.  The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee, Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence.  None of the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2     Indemnification.  The Claimant Trustee (including each former Claimant Trustee), WTNA in its individual capacity and as Delaware Trustee, the Oversight Board, and all past and present Members (collectively, in their capacities as such, the "Indemnified Parties") shall be

DOCS_NY:43843.3 36027/002

indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence. If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; provided, however, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm. The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; provided that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, willful misconduct, or gross negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; provided, further, that any such repayment obligation shall be unsecured and interest free. The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties. For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, WTNA in its individual capacity and as Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such. The indemnification provided hereby shall be a Claimant Trust Expense and shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein. The terms of this Section 8.2 shall survive the termination of this Agreement and the resignation or removal of any Indemnified Party.

8.3     No Personal Liability. Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or

007399

otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4 <u>Other Protections</u>. To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

<div align="center">

**ARTICLE IX.**
**TERMINATION**

</div>

9.1 <u>Duration</u>. The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2 <u>Distributions in Kind</u>. Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

9.3 <u>Continuance of the Claimant Trustee for Winding Up</u>. After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall prepare, execute and file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "<u>Termination Date</u>"). If the Delaware Trustee's signature is required for purposes of filing such certificate of cancellation, the Claimant Trustee shall provide the Delaware

Trustee with written direction to execute such certificate of cancellation, and the Delaware Trustee shall be entitled to conclusively and exclusively rely upon such written direction without further inquiry. Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4     Termination of Duties. Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5     No Survival. The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, provided that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

## ARTICLE X.
## AMENDMENTS AND WAIVER

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; provided that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement. No amendment or waiver of this Agreement that adversely affects the Delaware Trustee shall be effective unless the Delaware Trustee has consented thereto in writing in its sole and absolute discretion.

## ARTICLE XI.
## MISCELLANEOUS

11.1     Trust Irrevocable. Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2     Bankruptcy of Claimant Trust Beneficiaries. The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

11.3     Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets. No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4     Agreement for Benefit of Parties Only. Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in

007401

respect of this Agreement.  The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

11.5   <u>Notices</u>.  All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a)   If to the Claimant Trustee:

> Claimant Trustee
> c/o Highland Capital Management, L.P.
> 100 Crescent Court, Suite 1850
> Dallas, Texas 75201

With a copy to:

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd, 13th Floor
> Los Angeles, CA 90067
> Attn:   Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
>           Ira Kharasch (ikharasch@pszjlaw.com)
>           Gregory Demo (gdemo@pszjlaw.com)

(b)   If to the Delaware Trustee:

> Wilmington Trust, National Association
> 1100 North Market Street
> Wilmington, DE 19890
> Attn:  Corporate Trust Administration/David Young
> Email:  nmarlett@wilmingtontrust.com
> Phone:  (302) 636-6728
> Fax:  (302) 636-4145

Notice mailed shall be effective on the date mailed or sent.  Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

11.6   <u>Severability</u>.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.7   <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

DOCS_NY:43843.3 36027/002

11.8    Binding Effect, etc.   All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the Claimant Trust Beneficiaries, and their respective successors and assigns.  Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

11.9    Headings; References.   The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10    Governing Law.   This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11    Consent to Jurisdiction.   Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12    Transferee Liabilities.   The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.  In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims.  If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

DOCS_NY:43843.3 36027/002

007403

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By: _____

James P. Seery, Jr.
Chief Executive Officer and
Chief Restructuring Officer

Claimant Trustee

By: _____

James P. Seery, Jr., not individually but
solely in his capacity as the Claimant Trustee

DOCS_NY:43843.3 36027/002

007404

Wilmington Trust, National Association,
as Delaware Trustee


By: _____
Name:  Neumann Marlett
Title:  Bank Officer

007405

# HMIT Exhibit No. 26a

007406

# EXHIBIT S

007407