**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 30

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

2.  the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

      4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

      1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

      2.  Appellant's claims or allegations are not "plausible";

      3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

      4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

      5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

      6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

      7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

      8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

      9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

      10.  Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

---

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.   Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.   Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.   Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.   Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.   Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

    1.   declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

    2.   concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.  **Notice of Appeal**

*000001*

    a.   Notice of Appeal **[Dkt. 3906]**;

*000276*

    b.   Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*

    c.   Second Amended Notice of Appeal **[Dkt. 3945]**

2.  **The judgment, order, or decree appealed from:**

    a.   Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

001049

a.  Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a.  HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

Vol. 2

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594
001660
001821
001830
Vol. 3
001849
Thru  Vol. 4
Vol 4
002236
002243
002248

| | | | |
|---|---|---|---|
| *Vol. 5* *002251* | 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
| *002254* | 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| *002262* | 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| *002340* | 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| *002355* | 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| *002358* | 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| *002391* | 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| *002398* | 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| *002400* | 04/05/2023 | 3721 (3721-1 — 3721-2) *Thru Vol. 7* | HMIT Notice of Appeal |
| *Vol. 8* *002826* | 04/06/2023 | 3726 (3726-1) *Thru Vol. 9* | Certificate of Mailing regarding HMIT Notice of Appeal |
| *Vol. 9* *003257* | 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| *003260* | 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| *003270* | 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| *003278* | 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10* *003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| | | | Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10* *0034 58* | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *0034 63* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *Vol. 11* *0035 37* | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Thru Vol. 16* *Vol. 17* *0041 66* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *0047 12* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *0047 14* | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *0048 08* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *0048 13* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *0048 36* | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18* *0049 30* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *0049 31* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 18*
*004939.*

*004959*

*004961*

*004984*

*005049*

*005114*

*Thru Vol. 25*

*Vol. 26*
*006608*

*Thru Vol. 39*

*Vol. 39*
*009273*

*009290*

*009416*

*009424*

| Date | Document No. | Description |
|---|---|---|
| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 40
009426
009436
009444
009445
009446
009456
009458
Vol. 42
009841 Thru Vol. 41
009901
009905
009908
009912

| Date | Doc | Description |
|---|---|---|
| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|---|
| | 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| | 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| | 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| | 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| | 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| | 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| | 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| | 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.     Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
      Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

Case 19-34054-sgj11 Doc 1811 Filed 01/22/21 Entered 01/22/21 22:10:41 Page 2 of 39
Case 3:23-cv-02071-E   Document 30-11   Filed 12/07/23   Page 15 of 214   PageID 6971

*DRAFT*

# CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [_____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and (vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.
[2]   For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1     Certain Definitions.  Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.  For all purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)     "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)     "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(d)     "Claimant Trust Agreement" means this Agreement.

2

007409

(e)     "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)     "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)     "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)     "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)     "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)     "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)     "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)     "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)     "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

007410

(n)    "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

(o)    "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p)    "Delaware Trustee" has the meaning set forth in the introduction hereof.

(q)    "Disability" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r)    "Disinterested Members" has the meaning set forth in Section 4.1 hereof.

(s)    "Disputed Claims Reserve" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [(in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board)] to be sufficient to pay Disputed Claims under the Plan.

(t)    "Employees" means the employees of the Debtor set forth in the Plan Supplement.

(u)    "Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v)    "Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(w)    "Equity Trust Interests" has the meaning given to it in Section 5.1(c) hereof.

(x)    "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(y)    "General Unsecured Claim Trust Interests" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z)    "GUC Beneficiaries" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa)    "GUC Payment Certification" has the meaning given to it in Section 5.1(c) hereof.

4

(bb) "<u>HarbourVest</u>" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

(cc) "<u>Investment Advisers Act</u>" means the Investment Advisers Act of 1940, as amended.

(dd) "<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended.

(ee) "<u>Litigation Sub-Trust</u>" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff) "<u>Litigation Sub-Trust Agreement</u>" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg) "<u>Litigation Trustee</u>" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh) "<u>Managed Funds</u>" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii) "<u>Material Claims</u>" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj) "<u>Member</u>" means a Person that is member of the Oversight Board.

(kk) "<u>New GP LLC</u>" means the general partner of the Reorganized Debtor.

(ll) "<u>Oversight Board</u>" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan. Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

007412

(mm)    "Plan" has the meaning set forth in the Recitals hereof.

(nn)    "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo)    "PSZJ" means Pachulski Stang Ziehl & Jones LLP.

(pp)    "Redeemer Committee" means the Redeemer Committee of the Highland Crusader Fund.

(qq)    "Registrar" has the meaning given to it in Section 5.3(a) hereof.

(rr)    "Reorganized Debtor Assets" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss)    "Securities Act" means the Securities Act of 1933, as amended.

(tt)    "Subordinated Beneficiaries" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu)    "Subordinated Claim Trust Interests" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv)    "TIA" means the Trust Indenture Act of 1939, as amended.

(ww)    "Trust Interests" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx)    "Trust Register" has the meaning given to it in Section 5.3(b) hereof.

(yy)    "Trustees" means collectively the Claimant Trustee and Delaware Trustee.

(zz)    "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa)    "WilmerHale" Wilmer Cutler Pickering Hale & Dorr LLP.

6

1.2 <u>General Construction</u>. As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3 <u>Incorporation of the Plan</u>. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE II.
## ESTABLISHMENT OF THE CLAIMANT TRUST

2.1 <u>Creation of Name of Trust</u>.

(a) The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust." The Claimant Trustee shall be empowered to conduct all business and hold all property constituting the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

(b) The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

7

2.2 <u>Objectives</u>.

(a) The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b) It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3 <u>Nature and Purposes of the Claimant Trust</u>.

(a) The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust, pursuant to section

8

007415

1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

(b)     The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

(i)     to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

(ii)     to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

(iii)     to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

(iv)     to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

(v)     to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

(vi)     to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

(vii)     to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

(viii)     to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

(ix)     to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

9

2.4     Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust.

(a)     On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement. To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b)     On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement. Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

(c)     On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved. For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d)     Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trustee, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee. For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

10

007417

2.5    Principal Office.  The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6    Acceptance.  The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7    Further Assurances.  The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8    Incidents of Ownership.  The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

## ARTICLE III.
## THE TRUSTEES

3.1    Role.  In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2    Authority.

(a)    In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.  The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.  The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)    The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; provided, however, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate.  To the extent that

11

any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)      Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)      solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)      open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)      as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)      settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)      sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)      upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)      exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)      protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)      obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board

12

007419

solely in their capacities as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x)     without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi)     retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay, such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii)     prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii)     prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv)     to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv)     subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

13

007420

(xvi)   request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii)   take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii)   take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix)   exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx)   evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi)   with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the "Authorized Acts").

(d)   The Claimant Trustee and the Oversight Committee will enter into an agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's authority with respect to certain other assets, including certain portfolio company assets (the "Other Assets").

(e)   The Claimant Trustee has the power and authority to act as trustee of the Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns, is removed, or is otherwise unable to serve for any reason.

3.3   Limitation of Authority.

(a)   Notwithstanding anything herein to the contrary, the Claimant Trust and the Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Claimant Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents or the Confirmation Order.

(b)   Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority

of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein, in order to:

(i)     terminate or extend the term of the Claimant Trust;

(ii)    prosecute, litigate, settle or otherwise resolve any of the Material Claims;

(iii)   except otherwise set forth herein, sell or otherwise monetize any assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

(iv)    except for cash distributions made in accordance with the terms of this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with Article IV of the Plan;

(v)     except for any distributions made in accordance with the terms of this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

(vi)    reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

(vii)   borrow as may be necessary to fund activities of the Claimant Trust;

(viii)  determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

(ix)    invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

(x)     change the compensation of the Claimant Trustee;

(xi)    subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

(xii)   retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and

15

(ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

        (c)     [Reserved.]

        3.4    <u>Investment of Cash</u>.  The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; <u>provided</u>, <u>however</u> that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("<u>IRS</u>") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement).

        3.5    <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall be final and binding upon any and all Beneficiaries.

        3.6    <u>Term of Service</u>.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

        3.7    <u>Resignation</u>.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

        3.8    <u>Removal</u>.

        (a)    The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she

16

may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

(b)    To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9    Appointment of Successor.

(a)    Appointment of Successor.  In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust.  The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

(b)    Vesting or Rights in Successor Claimant Trustee.  Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee.  In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

(c)    Interim Claimant Trustee.  During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "Interim Trustee") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

17

007424

3.10 <u>Continuance of Claimant Trust</u>.  The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee.  In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, <u>provided</u> the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust. The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

3.11 <u>Claimant Trustee as "Estate Representative"</u>.  The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "<u>Estate Representative</u>") with respect to the Claimant Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; <u>provided</u> that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims.  The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order.  All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12 <u>Books and Records</u>.

(a)     The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein.  Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any

007425

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)     The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)     The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13     Compensation and Reimbursement; Engagement of Professionals.

(a)     Compensation and Expenses.

(i)     Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, including any severance, as agreed to by the Claimant Trustee, on the one hand, and the Committee, if agreed upon prior to the Effective Date, or the Oversight Board, if agreed upon on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

(ii)     Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

    (b)    <u>Professionals</u>.

        (i)    <u>Engagement of Professionals</u>.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

        (ii)    <u>Fees and Expenses of Professionals</u>.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

    3.14    <u>Reliance by Claimant Trustee</u>.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

    3.15    <u>Commingling of Claimant Trust Assets</u>.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

    3.16    <u>Delaware Trustee</u>.  The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee; <u>provided, however</u>, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as

20

007427

expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust.

**ARTICLE IV.**
**THE OVERSIGHT BOARD**

4.1    Oversight Board Members.  The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "Disinterested Members").  The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker. David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members; provided, however, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

4.2    Authority and Responsibilities.

(a)    The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein.  As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.7 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; provided, however, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

(b)    The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

(c)    The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

21

(d)     Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action  by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

(e)     Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds.  It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

4.3     _Fiduciary Duties_.  The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; provided, however, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; provided, further, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action.  In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust.  Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

4.4     _Meetings of the Oversight Board_.  Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly.  Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; provided, however, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board).  Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

22

007429

4.5    <u>Unanimous Written Consent</u>.  Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded.  If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone.  Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

4.6    <u>Manner of Acting</u>.

(a)    A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); <u>provided</u> that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum.  Except as set forth in Sections 3.3(c), 4.9(a), 5.2, 5.4, 6.1, 9.1, and 10, herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement.  Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof.  Any Member participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

(b)    Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

(c)    Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Trust Interests).  A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "<u>Conflicted Member</u>" who shall not be entitled to vote or take part in any action with respect to

23

such matter or issue.  In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d)     Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "Committee Member Claim Matter").  A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

4.7     Tenure of the Members of the Oversight Board.  The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article X hereof. The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.7 below, or removal pursuant to Section 4.8 below.

4.8     Resignation.  A Member of the Oversight Board may resign by giving not less than 90 days prior written notice thereof to the Claimant Trustee and other Members.  Such resignation shall become effective on the earlier to occur of (i) the day specified in such notice and (ii) the appointment of a successor in accordance with Section 4.9 below.

4.9     Removal.  A majority of the Oversight Board may remove any Member for Cause or Disability.  If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein.  Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

4.10    Appointment of a Successor Member.

(a)     In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; provided, however, that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; provided, further, that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board.  The appointment of a successor Member will be further evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

24

(b)    Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act.  A successor Member will not be liable personally for any act or omission of a predecessor Member.

(c)    Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

4.11    Compensation and Reimbursement of Expenses.    Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; provided, however, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member.  Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

4.12    Confidentiality.  Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("Confidential Trust Information"), except as otherwise required by law.   For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "Member Affiliates") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.11.

### ARTICLE V.
### TRUST INTERESTS

5.1    Claimant Trust Interests.

(a)    General Unsecured Claim Trust Interests. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "GUC Beneficiaries").  The Claimant Trustee shall allocate to each Holder of an Allowed Class

25

8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims. The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

(b)  Subordinated Claim Trust Interests.  On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "Subordinated Beneficiaries"). The Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9. The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests. The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

(c)  Contingent Trust Interests.  On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

5.2  Interests Beneficial Only.  The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

007433

5.3     Transferability of Trust Interests.  No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause the Claimant Trust to become a public reporting company and/or make periodic reports under the Exchange Act (provided that it is not required to register under the Investment Company Act or register its securities under the Securities Act) to enable such disposition to be made.  In the event that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such restrictions upon such disposition and other terms of this Agreement as are deemed necessary or appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

5.4     Registry of Trust Interests.

(a)     Registrar.  The Claimant Trustee shall appoint a registrar, which may be the Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests as provided herein.  The Registrar, if other than the Claimant Trustee, shall be an institution or person acceptable to the Oversight Board.  For its services hereunder, the Registrar, unless it is the Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as a Claimant Trust Expense.

(b)     Trust Register.  The Claimant Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the Registrar may prescribe.

(c)     Access to Register by Beneficiaries.  The Claimant Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's Trust Interest.

5.5     Exemption from Registration.  The Parties hereto intend that the rights of the Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Claimant Trustee may amend this

007434

Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act. The Trust Interests shall not have consent or voting rights or otherwise confer on the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Claimant Trustee under this Agreement.

5.6     Absolute Owners.  The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7     Effect of Death, Incapacity, or Bankruptcy.  The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8     Change of Address.  Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Claimant Trustee.  Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9     Standing.  No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets.  No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10     Limitations on Rights of Claimant Trust Beneficiaries.

(a)     The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

(b)     In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; provided, however, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

(c)     A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed.  A request for such bond can be made by the Claimant Trust or by

28

Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

(d)    Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas.  Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

(e)    The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

**ARTICLE VI.**
**DISTRIBUTIONS**

6.1    Distributions.

(a)    Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7.  Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board.  The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

(b)    At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

(c)    All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

007436

6.2     Manner of Payment or Distribution.   All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3     Delivery of Distributions.   All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

6.4     Disputed Claims Reserves.   There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.   The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

6.5     Undeliverable Distributions and Unclaimed Property.   All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

6.6     De Minimis Distributions.   Distributions with a value of less than $100 will be treated in accordance with the Plan.

6.7     United States Claimant Trustee Fees and Reports.   **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.   After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

## ARTICLE VII.
## TAX MATTERS

7.1     Tax Treatment and Tax Returns.

(a)     It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.   Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets

30

for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c) The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2 <u>Withholding</u>. The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary. As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

**ARTICLE VIII.
STANDARD OF CARE AND INDEMNIFICATION**

8.1 <u>Standard of Care</u>. None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee, Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence. None of

31

the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2  <u>Indemnification</u>.  The Claimant Trustee (including each former Claimant Trustee), Delaware Trustee, Oversight Board, and all past and present Members (collectively, in their capacities as such, the "<u>Indemnified Parties</u>") shall be indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence.  If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; <u>provided</u>, <u>however</u>, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm.  The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; <u>provided</u> that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, misconduct, or negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; <u>provided</u>, <u>further</u>, that any such repayment obligation shall be unsecured and interest free.  The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties.  For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such.  The indemnification provided hereby shall be a Claimant Trust Expense and

32

shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein.

8.3     No Personal Liability. Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4     Other Protections. To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

## ARTICLE IX.
## TERMINATION

9.1     Duration. The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2     Distributions in Kind. Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

9.3     Continuance of the Claimant Trustee for Winding Up. After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been

007440

fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "Termination Date"). Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4     Termination of Duties. Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5     No Survival. The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, provided that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

## ARTICLE X.
## AMENDMENTS AND WAIVER

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; provided that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement.

## ARTICLE XI.
## MISCELLANEOUS

11.1     Trust Irrevocable. Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2     Bankruptcy of Claimant Trust Beneficiaries. The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

007441

11.3    <u>Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets</u>.  No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4    <u>Agreement for Benefit of Parties Only</u>.  Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in respect of this Agreement.  The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

11.5    <u>Notices</u>.  All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a)    If to the Claimant Trustee:

Claimant Trustee
c/o **[insert contact info for Claimant Trustee]**

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn:  Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
       Ira Kharasch (ikharasch@pszjlaw.com)
       Gregory Demo (gdemo@pszjlaw.com)

Notice mailed shall be effective on the date mailed or sent.  Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

11.6    <u>Severability</u>.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.7    <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.8    <u>Binding Effect, etc.</u>  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the Claimant Trust Beneficiaries, and their respective successors and assigns.  Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

35

007442

11.9   Headings; References.   The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10   Governing Law.   This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11   Consent to Jurisdiction.   Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement or the Plan, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board, or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12   Transferee Liabilities.   The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.   In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims.   If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

36

007443

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By: _____

James P. Seery, Jr.
Chief Executive Officer and
Chief Restructuring Officer

Claimant Trustee

By: _____

James P. Seery, Jr., not individually but
solely in his capacity as the Claimant Trustee

37

007444

Document comparison by Workshare 9.5 on Friday, January 22, 2021 4:38:30 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/41280/9 |
| Description | DOCS_NY-#41280-v9-Highland_-_Claimant_Trust_Agreement |
| Document 2 ID | PowerDocs://DOCS_NY/41280/10 |
| Description | DOCS_NY-#41280-v10-Highland_-_Claimant_Trust_Agreement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 11 |
| Deletions | 5 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 16 |

# HMIT Exhibit No. 27

007446

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Reorganized Debtor*

IN THE UNITED STATED BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., [1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |

**NOTICE OF APPOINTMENT OF MEMBERS OF THE OVERSIGHT BOARD OF THE
<u>HIGHLAND CLAIMANT TRUST</u>**

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

007447

Pursuant to the *Fifth Amended Plan of Reorganization of Highland Capital* Management, *L.P. (As Modified)* [<mark>Docket No. 1808</mark>] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[2] and the Claimant Trust Agreement, the initial Members of the Oversight Board were (i) the Redeemer Committee; (ii) Acis; (iii) UBS; (iv) Meta-e Discovery; and (v) David Pauker (collectively, the "Initial Members"). The Initial Members resigned from the Oversight Board on the Effective Date.

Pursuant to the procedures set forth in the Claimant Trust Agreement, the following Members were appointed to the Oversight Board, effective as of the Effective Date, to replace the Initial Members (after giving effect to the resignations of the Initial Members, the following Members comprise the entire Oversight Board):

| | |
|---|---|
| Disinterested Member: | Richard Katz<br>c/o Highland Capital Management, L.P.<br>100 Crescent Court, Suite 1850,<br>Dallas, Texas 75201<br>Phone: (972) 628-4100 |
| Member: | Muck Holdings LLC<br>c/o Crowell & Moring LLP<br>Attn: Paul B. Haskel<br>590 Madison Avenue<br>New York, New York 10022<br>Phone: (212) 530-1823 |
| Member: | Jessup Holdings LLC<br>c/o Mandel, Katz and Brosnan LLP<br>Attn: John J. Mandler<br>100 Dutch Hill Road, Suite 390<br>Orangeburg, NY 10962<br>Phone: (845) 639-7800 |

---

[2] The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [<mark>Docket No. 1875</mark>]. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

007448

Dated: September 2, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Reorganized Debtor*

007449

# HMIT Exhibit No. 28

007450

# EXHIBIT 41

**EXHIBIT**

**3**

# MEMORANDUM OF AGREEMENT

In accordance with the provisions of the Highland Claimant Trust Agreement and the Highland Capital Management, L.P. ("HCMLP") Plan of Reorganization, the Oversight Board of the Highland Claimant Trust and the Claimant Trustee/Chief Executive Officer of HCMLP engaged in robust, arm's-length and good faith negotiations regarding the incentive compensation program for the Claimant Trustee/CEO and the HCMLP post-effective date operating team ("HCMLP Team"). After considering various structures and incentives to motivate performance on behalf of the Claimant Trust, the parties reached the binding agreement reflected in the attached HCMLP and Claimant Trust Management Incentive Compensation Program (the "ICP") pdf document. A model entitled "ICP Nov 17 2021 Adjusted Dec 2 2021" summarizing potential ICP payments is also attached hereto.

The ICP is a detailed outline of the agreed program with Claimant Trust Expense compensation payments designed to assure the efficient and successful operation of the Claimant Trust and HCMLP for the benefit of the Claimant Trust and the Claimant Trust Beneficiaries. To the extent that there remain additional details regarding allocations (or other issues) to be determined in the future, the Oversight Board and the Claimant Trustee/CEO will negotiate in good faith the resolve those issues.

This Memorandum of Agreement is executed in accordance with the Claimant Trust Agreement (i) by Claimant Trustee executes this agreement on behalf of himself, the Claimant Trust and HCMLP and (ii) by the Oversight Board Members in their respective capacities as members of the Oversight Board

**ACCEPTED AND AGREED** this 6th day of December 2021.

_____
James P. Seery, Jr., Claimant Trustee and HCMLP CEO

**Oversight Board Members**

_____
Richard Katz. Independent Member

**Jessup Holdings LLC**

_____
By:     Christopher Provost
          Authorized Signatory

**Muck Holdings LLC**

_____
By:     Michael Linn
          Authorized Signatory

007452

FINAL

# MANAGEMENT INCENTIVE COMPENSATION AGREED TERMS
## REORGANIZED HIGHLAND CAPITAL MANAGEMENT, L.P. and
## HIGHLAND CLAIMANT TRUST, (the "<u>Trust</u>")
## DECEMBER 2, 2021

In accordance with the terms of the Claimant Trust Agreement in respect of compensation and severance for the Claimant Trustee, and consistent with the Claimant Trustee's management of the Reorganized Highland Capital Management, L.P. ("<u>HCMLP</u>") and its employees, the following term sheet contains the terms of the Incentive Compensation Program ("<u>ICP</u>") agreed to by the Oversight Board, the Claimant Trustee and HCMLP.  Payments made under this ICP are Claimant Trust Expenses and compensation and reasonable expenses of administering the confirmed HCMLP Plan of Reorganization ("<u>Plan</u>").

1.  <u>Structure</u>
    a.  The ICP will have 5 Tiers based upon distribution to allowed Class 8 and Class 9 Claims. Incentive Payments will be based on actual cash reserved or distributed to holders of Allowed Class 8 and Class 9 Claims.
    b.  The (i) Claimant Trustee/CEO and (ii) the HCMLP Team will each be indefeasibly allocated a percentage of the distributions reserved or made to Allowed Class 8 (principal and interest) and Class 9 Claims effective as of the date hereof.



    c.  Timing of payments to the Claimant Trustee/CEO and the HCMLP Team TBD.  However, the purpose of the program is to incentivize performance and promote retention. Accordingly, allocations and distributions are not expected to occur until significant progress is made on the monetizations contemplated by the Plan.
    d.  Assumed Allowed Claim Amounts
        1.  Class 8 Principal                                    $295,326,201
        2.  Class 8 Interest (thru 12/22)                        $9,676,000
        3.  Class 9 (assumes Daugherty settlement)               $98,750,000
    e.  Incentive Payment Tiers
        i.   Tier 1  $200,000,000 to $210,000,000 (approx. 68% to 71% Class 8)
        ii.  Tier 2  $210,000,001 to $266,000,000 (approx. 71.1% to 90% Class 8)
        iii. Tier 3  $266,000,001 to $305,000,000 (approx. 90.1% to 103% Class 8)
        iv.  Tier 4  $305,000,001 to $354,000,000 (approx. 50% Class 9)
        v.   Tier 5  $354,000,001 to 100% Class 9 Payout (> 50% Class 9)

007453

FINAL

f. Tier Payment Percentages

|  | Claimant Trustee/CEO | |
|---|---|---|
| Tier 1 | .72% | |
| Tier 2 | 1.17% | |
| Tier 3 | 2.75% | |
| Tier 4 | 4.25% | |
| Tier 5 | 6.000% | |

g. 

h. Base Salary
   i. As set for the in the Claimant Trust Agreement, Claimant Trustee/CEO will continue to receive his current base salary of $150,000 per month (the "Base Salary"), less the actual cost of health insurance benefits provided to the Claimant Trustee/CEO.
   ii. Claimant Trustee/CEO and Oversight Board agree that the Base Salary will reset to $75,000.00 per month starting 12/31/22, it being understood that Claimant Trustee/CEO and Oversight Board will negotiate in good faith to the extent a different Base Salary makes sense based on the scope of remaining assets and ongoing litigation for the Trust as needed for the periods from 12/31/22 to the end of the Trust. To that end, Claimant Trustee/CEO and Oversight Board agree to re-evaluate the Base Salary at least every 6m starting 12/31/22.
   iii. Claimant Trustee/CEO to receive a cash payment of $1,000,000.00 and the Claimant Trustee/CEO ICP in the event of severance without cause, it being understood that if severance occurs during the period of 7/1/22 to 12/31/22, the cash payment portion will be the continuation of Base Salary until 12/31/22.
   iv.

007454

FINAL



2. <u>General Terms</u>

    a.

    b.

    c.

    d. Claimant Trustee/CEO is permitted to shift a portion of his ICP payments to HCMLP Team members at his sole discretion.

    e. It is the intent of the parties to make distributions from the Claimant Trust on a net basis, including the calculation of ICP so that payments under the ICP are treated as Claimant Trust Expenses and other reasonable costs of compensation and expenses. The ICP payments are not Claimant Trust distributions. For example, if a 1% share is owed on a $100mm distribution, the Trust would need have $101mm of cash for distribution so that $1mm would go to the ICP and the balance to the Claimant Trust beneficiaries (holders of Class 8 and Class 9 Claims).

    f. The amounts of ICP entitlement, based on the tiers above in 1e and 1f, are anchored to 12/31/22 claim distributions; an 8% discount rate (annual rate, quarterly compounding) will apply to any distribution based on deviation from 12/31/22. For example, if a $1mm distribution is made on 12/31/23, such distribution will be treated for ICP calculation purposes as the equivalent of $924k on 12/31/22; analogously, if a $1mm distribution is made 6/30/22, such amount will be treated as the equivalent of $1.04mm on 12/31/22. Such time value adjustments will be done on a distribution-by-distribution basis.

    g. 20% of the Claimant Trustee/CEO ICP will be based on the successful achievement of the following goals, as determined by the Oversight Board :

        i. Claimant Trustee/CEO to monitor and manage costs appropriately

        ii. Claimant Trustee/CEO to manage and retain HCMLP Team appropriately

        iii. Claimant Trustee/CEO to report to the Oversight Board on a timely basis all relevant information regarding the Claimant Trust.

-END-



# HMIT Exhibit No. 29

007457

# EXHIBIT 39

007458

**Minutes of the Meeting of the**
**Claimant Trust Oversight Board of the Highland Claimant Trust**

**August 26, 2021**



    Mr. Seery also presented the Board with an overview of his Incentive Compensation Program proposal which would include not only Mr. Seery but the current HCMLP team. (The

terms and structure of the proposal had been previewed with the Board in prior operating models presented by Mr. Seery.) Mr. Serry reviewed the proposal and stated his view that the proposal was market based and was designed to align incentives between himself and the HCMLP team on the one hand and the Claimant Trust beneficiaries on the other. The Board asked questions regarding proposal and determined that is would consider the proposal and revert to Mr. Seery with a counter proposal.

Richard Katz

Michael Linn

Christopher Provost

007460

# HMIT Exhibit No. 30

007461

# EXHIBIT 40

007462

**Minutes of the Meeting of the**
**Claimant Trust Oversight Board of the Highland Claimant Trust**

**August 30, 2021**



In the notice of the meeting, HCMLP provided the Oversight Board with notice that the meeting would address (i) incentive based compensation for the Claimant Trustee and the HCMLP Team and

Mr. Katz began the meeting by walking the Oversight Board and Mr. Seery through the Oversight Board's counter-proposal to the HCMLP incentive compensation proposal, including the review of a spreadsheet and summary of the counter-proposal. Discussion was joined by Mr. Linn and Mr. Stern. Mr. Seery asked numerous questions and received detailed responses from the Oversight Board. Mr. Seery and the Oversight Board agreed to continue the discussion and negotiations regarding the proposed incentive compensation plan for the Claimant Trustee and the HCMLP.



_____
Richard Katz

_____
Michael Linn

_____
Christopher Provost

# HMIT Exhibit No. 31

007464

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 23 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**ACMLP Claim, LLC**

**Name of Transferors:**

**Acis Capital Management L.P. and
Acis Capital Management GP, LLC**

Name and Address where notices to
Transferee should be sent:

**ACMLP Claim, LLC
4514 Cole Ave., Suite 600
Dallas, TX 75205**

Phone: (214) 556-3405

Name and Address where transferee
payments should be sent:

**Same as above**

| | |
|---|---|
| Claim No.: | 23 |
| Amount of Claim: | $23,000,000.00 |
| Date Claim Filed: | December 31, 2019 |

Phone: (214) 556-3405

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____       Date: 4/16/21
    Transferee's Agent

007465

## EVIDENCE OF TRANSFER OF CLAIM

**TO:   THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, Acis Capital Management GP, LLC ("**Assignor**") has unconditionally and irrevocably transferred and assigned to ACMLP Claim, LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 23 ("**Claim No. 23**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 23 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law.  Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 23 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 23.  Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 23, and all payments or distributions of money or property in respect of Claim No. 23, shall be delivered or made to Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 15th day of April, 2021.

ACIS CAPITAL MANAGEMENT GP, LLC

By: _____

Name: _Joshua N. Terry_

Title: _President_

007466

# HMIT Exhibit No. 32

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| IN RE: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § |  |
|  | § |  |
| Debtor. | § |  |

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 23 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

ACMLP Claim, LLC

**Name of Transferors:**

Acis Capital Management L.P. and
Acis Capital Management GP, LLC

Name and Address where notices to
Transferee should be sent:

**ACMLP Claim, LLC**
**4514 Cole Ave., Suite 600**
**Dallas, TX 75205**

Phone: (214) 556-3405

Name and Address where transferee
payments should be sent:

**Same as above**

Claim No.: ___23___
Amount of Claim: ___$23,000,000.00___
Date Claim Filed: ___December 31, 2019___

Phone: (214) 556-3405

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____     Date: __4/15/21__
      Transferee's Agent

007468

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, Acis Capital Management, L.P. ("**Assignor**") has unconditionally and irrevocably transferred and assigned to ACMLP Claim, LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 23 ("**Claim No. 23**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 23 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law.  Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 23 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 23.  Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 23, and all payments or distributions of money or property in respect of Claim No. 23, shall be delivered or made to Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 15th day of April, 2021.

ACIS CAPITAL MANAGEMENT, L.P.

By: Shorewood GP, LLC, its general partner

By: _____
Joshua N. Terry, President

007469

# HMIT Exhibit No. 33

007470

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |
| | § | |

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 23 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Muck Holdings LLC**

**Name of Transferor:**

**ACMLP Claim, LLC**

Name and Address where notices to Transferee should be sent:

**Muck Holdings LLC**
c/o Crowell & Moring LLP
Attn: Paul Haskel
590 Madison Avenue
New York, NY 10022

Phone: (212) 530-1823

Name and Address where transferee payments should be sent:

**Same as above**

Claim No.:    23
Amount of Claim:    $23,000,000.00
Date Claim Filed:    December 31, 2019

Phone: (212) 530-1823

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____
        Transferee's Agent

Date: April 16, 2021

007471

# EVIDENCE OF TRANSFER OF CLAIM

**TO:** **THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, ACMLP Claim, LLC ("**Assignor**") has unconditionally and irrevocably transferred and assigned to Muck Holdings LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 23 ("**Claim No. 23**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 23 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 23 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 23. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 23, and all payments or distributions of money or property in respect of Claim No. 23, shall be delivered or made to Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 16th day of April, 2021.

ACMLP Claim, LLC
By: Shorewood GP, LLC, its Manager

By: _____
Name: Joshua N. Terry
Title: President

# HMIT Exhibit No. 34

007473

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 72 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Jessup Holdings LLC**

**Name of Transferors:**

**Redeemer Committee of the Highland Crusader Fund**

Name and Address where notices to Transferee should be sent:

**Jessup Holdings LLC**
c/o Mandel, Katz and Brosnan LLP
Attn: John Mandler
100 Dutch Hill Road, Suite 390
Orangeburg, NY 10962

Phone: (845) 639-7800

Name and Address where transferee payments should be sent:

**Same as above**

| | |
|---|---|
| Claim no.: | **72** |
| Amount of Claim: | **$137,696,610.00** |
| Date Claim Filed: | **April 3, 2020** |

Phone: (845) 639-7800

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____
　　Transferee's Agent

Date: April _30_, 2021

007474

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, the Redeemer Committee of the Highland Crusader Fund ("**Assignor**") has unconditionally and irrevocably transferred and assigned to Jessup Holdings LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 72 ("**Claim No. 72**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 72 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 72 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 72. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 72, and all payments or distributions of money or property in respect of Claim No. 72, will be delivered or made to Assignee.

[Signature Pages Follow]

007475

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 30th day of April, 2021.

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Grosvenor Capital Management, L.P.

By: _____

Name:  Burke Montgomery, designated representative of Grosvenor Capital Management, L.P.

007476

Case 19-34054-sgj11 Doc 2263 Filed 04/30/20 Entered 04/30/20 15:23:10 Page 4 of 10
Case 3:23-cv-02071-E   Document 23-30   Filed 12/07/23   Page 84 of 214   PageID 7040
Exhibit Exhibits 31-52   Page 14 of 46

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Grosvenor Capital Management, L.P.

By: _____

Name:  Brian Zambie, designated representative of
Grosvenor Capital Management, L.P.

007477

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Grosvenor Capital Management, L.P.

By: _____

Name:  Tom Rowland, designated representative of
Grosvenor Capital Management, L.P.

007478

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Concord Management, LLC

By: _____

Name:  Brant Behr, designated representative of
Concord Management, LLC

007479

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Baylor University

By: _____

Name:  David Morehead, designated representative
of Baylor University

ATTEST:

007480

Case 19-34054-sgj11 Doc 2268 Filed 04/30/20 Entered 04/30/20 13:52:10 Page 8 of 10
Case 3:23-cv-02071-E   Document 23-80   Filed 12/09/23   Page 88 of 214   PageID 7044
Exhibit Exhibits 31-52   Page 28 of 76

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND

Man Solutions Limited

By: _____
Name:  Michael Buerer, designated representative
of Man Solutions Limited

[Signature Page to Evidence of Transfer of Claim]

**REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND**

Belleville Road Pty Limited

By: _____

Name:  Stuart Robertson, designated representative
of Seattle Fund SPC

007482

# HMIT Exhibit No. 35

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NO. 81 was filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

Jessup Holdings LLC

**Name of Transferors:**

Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd.

Name and Address where notices to Transferee should be sent:

Jessup Holdings LLC
c/o Mandel, Katz and Brosnan LLP
Attn: John Mandler
100 Dutch Hill Road, Suite 390
Orangeburg, NY 10962

Phone: (845) 639-7800

Name and Address where transferee payments should be sent:

**Same as above**

| | |
|---|---|
| Claim no.: | __81__ |
| Amount of Claim: | __$50,000.00__ |
| Date Claim Filed: | __April 6, 2020__ |

Phone: (845) 639-7800

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____
    Transferee's Agent

Date: April 3⁰, 2021

007484

# EVIDENCE OF TRANSFER OF CLAIM

**TO:** **THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd. (collectively, the "**Assignor**") has unconditionally and irrevocably transferred and assigned to Jessup Holdings LLC ("**Assignee**") all of Assignor's rights, title and interest in, to and under those claims asserted by Assignor in the proof of claim that was assigned claim number 81 ("**Claim No. 81**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**").

Assignor waives any objection to the transfer of Claim No. 81 on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring Claim No. 81 to Assignee and recognizing Assignee as the sole owner and holder of Claim No. 81. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim No. 81, and all payments or distributions of money or property in respect of Claim No. 81, will be delivered or made to Assignee.

*(remainder of page blank)*

007485

# HMIT Exhibit No. 36

007486

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NOS. 143, 147, 149, 150, 153, and 154 were filed in this case or deemed filed under 11 U.S.C. § 1111(a).  Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**                              **Name of Transferors:**

**Muck Holdings LLC**                                **HarbourVest 2017 Global Fund L.P.**
                                                     **HarbourVest 2017 Global AIF L.P.**
                                                     **HarbourVest Dover Street IX Investment L.P.**
                                                     **HV International VIII Secondary L.P.**
                                                     **HarbourVest Skew Base AIF L.P.**
                                                     **HarbourVest Partners L.P.**

| | | |
|---|---|---|
| Name and Address where notices to Transferee should be sent: | **Claim Nos.:** | 143, 147, 149, 150, 153, and 154 and all associated claims and rights pursuant to the Court's Order at Doc. No. 1788 (Entered 1/21/21) |
| **Muck Holdings LLC**<br>c/o Crowell & Moring LLP<br>Attn: Paul Haskel<br>590 Madison Avenue<br>New York, NY 10022 | | |
| | **Amount of Claims:** | **$45,000,000.00 (GUC)**<br>**$35,000,000.00 (Subor.)** |
| Phone: (212) 530-1823 | **Date POCs Filed:** | **April 8, 2020** |
| | Phone: (617) 348-3773 | |

Name and Address where transferee payments should be sent:
***Same as above***

*[Signature page follows]*

14

007487

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____    Date: April 2_, 2021
       Transferee's Agent

15

007488

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "**Assignors**") have unconditionally and irrevocably transferred and assigned to Muck Holdings LLC ("**Assignee**") all of Assignors' rights, title and interest in, to and under those claims asserted by Assignors in the proofs of claims that were assigned claim numbers 143, 147, 149, 150, 153, and 154 ("**Claim Nos. 143, 147, 149, 150, 153, and 154**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and all associated claims and rights under that certain *Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* dated January 20, 2021 [Doc No. 1788] (the "**Order**").

Assignors waive any objection to the transfer of Claim Nos. 143, 147, 149, 150, 153, and 154 as well as the claims and rights under the Order - on the books and records of the Debtor and the Bankruptcy Court, and hereby waive to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law.  Assignors acknowledge and understand, and hereby stipulate, that an order of the Bankruptcy Court may be entered without further notice to Assignors transferring Claim Nos. 143, 147, 149, 150, 153, and 154 as well as all associated claims and rights under the Order to Assignee and recognizing Assignee as the sole owner and holder of Claim Nos. 143, 147, 149, 150, 153, and 154 as well as all associated claims and rights under the Order. Assignors further direct the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court- appointed claims and noticing agent, and all other interested parties that all further notices relating to Claim Nos. 143, 147, 149, 150, 153, and 154, and all payments or distributions of money or property in respect of Claim Nos. 143, 147, 149, 150, 153, and 154 as well as associated claims and rights under the Order, shall be delivered or made to Assignee.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 28 day of April, 2021.

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: _____

Name:  Michael Pugatch

Its:    Managing Director

007489

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: _____

Name: <u>Michael Pugatch</u>

Its: <u>Managing Director</u>

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: _____

Name: <u>Michael Pugatch</u>

Its: <u>Managing Director</u>

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: _____

Name: <u>Michael Pugatch</u>

Its: <u>Managing Director</u>

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: _____

Name: <u>Michael Pugatch</u>

Its: <u>Managing Director</u>

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: _____

Name: <u>Michael Pugatch</u>

Its: <u>Managing Director</u>

007490

# HMIT Exhibit No. 37

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |

## NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NOS. 190 and 191 were filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Jessup Holdings LLC**

Name and Address where notices to
Transferee should be sent:

**Jessup Holdings LLC**
c/o Mandel, Katz and Brosnan LLP
Attn: John J. Mandler
100 Dutch Hill Road, Suite 390
Orangeburg, NY 10962
Phone: (845) 639-7800

Name and Address where transferee
payments should be sent:

**Same as above**

**Name of Transferors:**

**UBS Securities LLC and UBS AG London Branch**

| | |
|---|---|
| Claim no.: | __190__ |
| Amount of Claim: | __$32,175,000.00__ |
| Date Claim Filed: | __June 26, 2020__ |

and

| | |
|---|---|
| Claim No. | __191__ |
| Amount of Claim: | __$18,000,000.00__ |
| Date Claim Filed: | __June 26, 2020__ |

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____
        Transferee's Agent

Date: August 9, 2021

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, UBS Securities LLC ("**UBS Securities**") and UBS AG London Branch ("**UBS AG**" and, together with UBS Securities, "**Assignor**") have unconditionally and irrevocably transferred and assigned to Jessup Holdings LLC ("**Assignee**"), a portion of Assignor's rights, title and interest in, to and under the claims asserted by Assignor contained in the proofs of claim that was assigned claim numbers 190 and 191 (the "**Transferred Claim**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and allowed pursuant to the Bankruptcy Court's Order dated May 27, 2021 at Docket No. 2389 in the amounts consisting of:  (a) a 49.5% portion of the Class 8 Claim in the amount of $32,175,000.00 (which, with respect to claim number 190, is comprised of the sum of the claim amount of $21,450,000.00 asserted and held by UBS AG and the claim amount of $10,725,000.00 asserted and held by UBS Securities) and (b) a 30% portion of the Class 9 Claim in the amount of $18,000,000.00 (which, with respect to claim number 191, is comprised of the sum of the claim amount of $12,000,000.00 asserted and held by UBS AG and the claim amount of $6,000,000.00 asserted and held by UBS Securities).

Assignor waives any objection to the transfer of the Transferred Claim on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring the Transferred Claim to Assignee and recognizing Assignee as the sole owner and holder of the Transferred Claim. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Transferred Claim, and all payments or distributions of money or property in respect of the Transferred Claim, will be delivered or made to Assignee.

*(remainder of page blank)*

159-990/6476978.1

007493

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name: William W. Chandler
Title: Managing Director

By: _____
Name: John Lantz
Title: Executive Director

**UBS AG LONDON BRANCH**

By: _____
Name: Jignesh Doshi
Title: Mananging Director

By: _____
Name: William W. Chandler
Title: Managing Director

**ASSIGNEE:**

**JESSUP HOLDINGS LLC**

By: _____
Name: John J. Mandler
Title: Authorized Signatory

159-990/6476978.1

007494

# HMIT Exhibit No. 38

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054-sgj11 |
| L.P., | § | |
| | § | |
| Debtor. | § | |

### NOTICE OF TRANSFER OF CLAIM OTHER THAN FOR SECURITY

CLAIM NOS. 190 and 191 were filed in this case or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

**Name of Transferee:**

**Muck Holdings LLC**

Name and Address where notices to Transferee should be sent:

**Muck Holdings LLC**
c/o Crowell & Moring LLP
Attn: Paul B. Haskel
590 Madison Avenue
New York, New York 10022
Phone: (212) 530- 1823

Name and Address where transferee payments should be sent:

**Same as above**

**Name of Transferors:**

**UBS Securities LLC and UBS AG London Branch**

| | |
|---|---|
| Claim no.: | **190** |
| Amount of Claim: | **$32,175,000.00** |
| Date Claim Filed: | **June 26, 2020** |

and

| | |
|---|---|
| Claim No. | **191** |
| Amount of Claim: | **$18,000,000.00** |
| Date Claim Filed: | **June 26, 2020** |

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____     Date: August 9, 2021
    Transferee's Agent

007496

## EVIDENCE OF TRANSFER OF CLAIM

**TO:    THE DEBTOR AND THE BANKRUPTCY COURT**

For value received, the adequacy and sufficiency of which are hereby acknowledged, UBS Securities LLC ("**UBS Securities**") and UBS AG London Branch ("**UBS AG**" and, together with UBS Securities,  "**Assignor**") have unconditionally and irrevocably transferred and assigned to Muck Holdings LLC ("**Assignee**"), a portion of Assignor's rights, title and interest in, to and under the claims asserted by Assignor contained in the proofs of claim that was assigned claim numbers 190 and 191 (the "**Transferred Claim**") filed against Highland Capital Management, L.P. (the "**Debtor**") in Case No. 19-34054 pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") and allowed pursuant to the Bankruptcy Court's Order dated May 27, 2021 at Docket No. 2389 in the amounts consisting of:  (a) a 49.5% portion of the Class 8 Claim in the amount of $32,175,000.00 (which, with respect to claim number 190, is comprised of the sum of the claim amount of $21,450,000.00 asserted and held by UBS AG and the claim amount of $10,725,000.00 asserted and held by UBS Securities) and (b) a 30% portion of the Class 9 Claim in the amount of $18,000,000.00 (which, with respect to claim number 191, is comprised of the sum of the claim amount of $12,000,000.00 asserted and held by UBS AG and the claim amount of $6,000,000.00 asserted and held by UBS Securities).

Assignor waives any objection to the transfer of the Transferred Claim on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to Assignor transferring the Transferred Claim to Assignee and recognizing Assignee as the sole owner and holder of the Transferred Claim. Assignor further directs the Debtor, the Bankruptcy Court, Kurtzman Carson Consultants, LLC, as court-appointed claims and noticing agent, and all other interested parties that all further notices relating to Transferred Claim, and all payments or distributions of money or property in respect of the Transferred Claim, will be delivered or made to Assignee.

*(remainder of page blank)*

159-990/6476979.1

007497

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name: William W. Chandler
Title: Managing Director

By: _____
Name: John Lantz
Title: Executive Director

**UBS AG LONDON BRANCH**

By: _____
Name: Jignesh Doshi
Title: Mananging Director

By: _____
Name: William W. Chandler
Title: Managing Director

**ASSIGNEE:**

**MUCK HOLDINGS LLC**

By: _____
Name: Michael Linn
Title: Authorized Signatory

159-990/6476979.1

007498

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM is executed this 9th day of August, 2021.

**ASSIGNOR:**

**UBS SECURITIES LLC**

By: _____
Name:
Title:

By: _____
Name:
Title:

**UBS AG LONDON BRANCH**

By: _____
Name:
Title:

By: _____
Name:
Title:

**ASSIGNEE:**

**MUCK HOLDINGS LLC**

By: _____
Name: Michael Linn
Title: Authorized Signatory

159-990/6476979.1

007499

# HMIT Exhibit No. 39

007500

CURRICULUM VITAE
K. SCOTT VAN METER

**K. Scott Van Meter**
**Managing Director**
**B. Riley Advisory Services**
**4400 Post Oak Parkway, Suite 1400**
**Houston, Texas 77027**
**(713) 858-3225**
**svanmeter@brileyfin.com**

K. Scott Van Meter has over 30 years of diverse professional experience in bankruptcy and restructuring, litigation consulting, valuation, forensic and investigative accounting, law and management. He joined B. Riley Advisory Services in 2019 after over 20 years working with other global consulting firms

Mr. Van Meter  has provided financial advisory and litigation support services to a wide variety of clients including plaintiffs, defendants, corporations and individuals, as well as debtors, creditors, shareholders, committees, and trustees in bankruptcy matters. He has testified on dozens of occasions as an expert witness in complex commercial disputes involving intellectual property, accounting/auditing malpractice, valuation and economic damages and in bankruptcy related disputes, including avoidance matters, solvency, and claims litigation. In addition, he has managed investigations in "who killed the company" matters, where issues of corporate governance, breach of fiduciary duty and malfeasance were prevalent, and has served as the post- confirmation trustee responsible for administering the plan of reorganization and pursuing recovery actions. He has also been retained as a consulting expert on matters involving competition/antitrust, accounting/auditing malpractice and officer and director malfeasance issues.

Mr. Van Meter has been designated as an expert witness in more than 100 disputes throughout North America and Europe. He has testified in Federal and State Courts throughout the United States as well as in arbitrations (under ICC, AAA and JAMS rules) as an independent expert  on matters of economic damages/quantum, accounting and auditing standards, corporate governance and forensic accounting. His testimonial experience spans a broad spectrum of industries including mining and extraction (including upstream and mid-stream oil & gas and coal), manufacturing, healthcare, construction, telecommunications, transportation and professional services. He has also served as the sole arbitrator in a post-acquisition dispute.

Prior to his career in consulting, he was an attorney with Bracewell in Houston and at Stearns Weaver Miller Weissler Alhadeff & Sitterson in Tampa and Miami. His legal experience includes corporate restructuring, bankruptcy and commercial litigation, and he has served as General Counsel to several companies. His management experience includes senior leadership positions (Director, President, Executive Vice-President, Secretary and Treasurer) in several for- profit and not-for-

profit companies. He began his professional career at Arthur Andersen where he provided auditing and accounting services.

Mr. Van Meter has been a member of multiple professional organizations throughout his career including the American Bar Association, the American Bankruptcy Institute, the American Institute of Certified Public Accountants (AICPA), the Association of Insolvency and Restructuring Advisors (AIRA), the Texas Society of CPA's and the Turnaround Management Association. He has served on committees and held leadership positions in many of these organizations. He is an attorney and CPA (licensed in Texas and Florida), Certified in Financial Forensics by the AICPA and a Certified Insolvency and Restructuring Advisor, a designation by the AIRA.

Mr. Van Meter has published articles and given presentations on multiple topics throughout his career, including ethics, lost profits, statistical analysis and bankruptcy-related issues.

Selected examples from his body of work include the following:

**Forensic Accounting and Investigations:**

**Accounting malpractice litigation** – Mr. Van Meter led a team of consultants analyzing the alleged accounting and audit malpractice involving a failed distributor of products and replacement parts related to computer printers and other peripherals. The analysis supported the work and opinions of the ultimate testifying expert.

**Accounting malpractice litigation** – Mr. Van Meter was retained as the accounting and audit expert in this matter involving a bankrupt distributor of a business forms and transportation company. Mr. Van Meter analyzed the audit and non-audit work conducted by the company's accounting firm. Mr. Van Meter prepared multiple reports and testified at deposition and in a jury trial in federal district court.

**Accounting malpractice and fraud litigation related to failed consolidation company**
– Mr. Van Meter was retained as a consultant to assist counsel develop claims against the accountants, officers and directors and assess damages suffered by the plaintiffs as a result of the bankruptcy of the company. Mr. Van Meter conducted a forensic analysis related to the work of outside auditors and the actions of the officers and directors of the company in light of subsequently discovered accounting irregularities. In addition, Mr. Van Meter prepared an estimate of damages to plaintiffs and assisted counsel in settlement negotiations with the defendants.

**Life insurance company on behalf of the state insurance commissioner** – Mr. Van Meter conducted an investigation into the marketing practices and analyzed the company's stated marketing practices and policies as compared to deposition testimony of key executives in class

action litigation over alleged marketing misconduct. The investigation identified numerous violations of state regulations resulting in the imposition of record fines against the company.

**Economic Damages and Antitrust:**

**Damages in Securities Fraud matter** – Mr. Van Meter was retained to analyze the damages resulting from the failure of auditor to uncover various accounting frauds. The analysis involved the valuation of the underlying company securities at various points related to the alleged failures. Mr. Van Meter provided an expert report and testified at deposition. The case settled on the eve of trial.

**Damages for theft of trade secrets** – control and trip throttle valves – Mr. Van Meter is currently engaged to analyze economic damages in a matter involving the alleged theft of trade secrets related to the design and manufacture of control and trip throttle valves used in steam turbine applications. He has estimated plaintiff's damages, issued an expert report and testified in deposition. The case is pending.

**Failed telecommunications company acquisition** – Mr. Van Meter led the analysis of damages for alleged securities fraud and other causes of action related to alleged misrepresentations by the seller in the sale of one of its subsidiaries to another telecommunications provider for nearly $300 million.

**Arbitration of disputes related to acquisition of a telecommunications company** – Mr. Van Meter was retained by a large privately held telecommunications company to assist in the resolution of disputes related to their acquisition of another telecommunications company. Mr. Van Meter directed the company's activities related to the arbitration of a $27 million dispute over the net working capital of the acquired company at closing. In addition, Mr. Van Meter testified at deposition and in a separate arbitration proceeding regarding the amount of net working capital and other accounting related matters.

**Alleged legal malpractice in failed acquisition** – Mr. Van Meter was retained as the damage expert in this legal malpractice action related a failed acquisition of a startup company in the early stages of commercializing a patented fiber. Mr. Van Meter prepared damage analyses and testified at deposition.

**Damages for alleged legal malpractice related to tax shelters** – Mr. Van Meter was retained as the testifying expert in this series of cases by several clients of a law firm that provided opinion letters related to tax shelter transactions later challenged by the Internal Revenue Service. Mr. Van Meter prepared expert reports and testified at deposition with regard to damages and causation.

**Alleged discrimination in the wireless communications industry** – Mr. Van Meter directed an analysis, on behalf of a large, facilities based wireless communications company, of the claims by a small cellular reseller that it was damaged by alleged discriminatory pricing by the defendant. The analysis included the review and critique of the opposing experts' damage models, identifying critical flaws in their model, and providing a comprehensive alternative model resulting in significantly reduced damage estimates.

**Antitrust class action litigation** – Mr. Van Meter directed the analysis of price fixing allegations against a multinational corporation. Mr. Van Meter prepared a financial assessment of defendant's historical financial performance and directed the creation of databases containing more than 14 years of detailed sales transactions. In addition, Mr. Van Meter created financial models to evaluate settlement proposals and analyzed effects of class opt-outs on ultimate settlement agreement that exceeded $1 billion.

**Alleged anticompetitive conduct in the steel industry** – Mr. Van Meter directed a detailed analysis of the steel plate industry in response to a claim that the defendant had engaged in anticompetitive conduct. The analysis supported the testifying expert in the preparation of a report analyzing and refuting the existence of anticompetitive conduct and in responding to alleged damages.

**Restructuring Advisor to Genomic Laboratory** – Mr. Van Meter was retained to assist the client company in accessing new capital. The company had achieved rapid success until changes in Medicare reimbursement caused a catastrophic reduction in revenue. He worked with company management, vendors and investors to reduce costs, work-out extended payment terms and prepare robust financial projections to support a substantial new capital raise.

**Price fixing litigation in synthetic vitamins market** – Mr. Van Meter led a team studying the effects of an admitted cartel on the prices of products over several decades in this nationwide multi-district litigation. Mr. Van Meter's investigation and analyses over a four-year period supported the work of the testifying expert retained in the case to opine on alleged damages. Mr. Van Meter also assisted counsel in analyzing and responding to the reports of opposing experts, in planning and taking depositions of opposing experts, and evaluating settlement options with individual plaintiffs. In addition, Mr. Van Meter created financial models to evaluate settlement proposals and analyzed effects of class opt-outs on ultimate settlement agreement that exceeded $1 billion.

**Price fixing litigation in US animal feed supplement market** – Mr. Van Meter directed the investigation into an alleged cartel and the potential effects on prices over a decade in a segment of the animal feed supplement market. Over a three-year period, Mr. Van Meter analyzed alleged antitrust liability and damages, provided supporting analysis for responding to the reports of opposing experts, and assisted the testifying experts in the preparation of reports and for deposition.

Case 19-34054-sgj11    Doc 3818-3    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 28-30    Exhibit E 30 - 6    Filed 12/08/23    Page 112 of 214    PageID 7068

CURRICULUM VITAE
K. SCOTT VAN METER

**Canadian price fixing litigation** – Mr. Van Meter provided detailed financial analysis and investigation to assist Canadian counsel respond to allegations of cartel behavior in the animal feed supplement market. Mr. Van Meter directed the creation of detailed sales transaction databases and provided extensive analyses used by counsel to evaluate and ultimately settle the claims by plaintiffs.

**Forensic examination of alleged fraud by medical provider** – Mr. Van Meter was retained by the examiner appointed in the bankruptcy case of a medical services provider to investigate allegedly fraudulent conduct by the debtor related to the factoring of the debtor's receivables. Mr. Van Meter analyzed the debtor's factoring transactions over several years and advised the examiner with regard to his findings. Assisted the examiner in preparing her report to the bankruptcy court.

**Physician practice management companies** – Mr. Van Meter developed damage models for lost profits on behalf of multiple medical practices related to the failure of the physician practice management companies. Mr. Van Meter also evaluated the companies' failures and/ or inability to provide contracted services with subsequent isolation of the effects of the breaches of contract on the profits of the medical practices.

**Insolvent life and health insurance company** – Mr. Van Meter directed the investigation of the extent of unprocessed claims in order to evaluate the loss exposure of state guaranty associations. Mr. Van Meter also designed and implemented a system to expedite the claims resolution process, effectively eliminating a one-year backlog of claims in six weeks.

**Bankruptcy and Insolvency:**

**Solvency and damages expert** – Mr. Van Meter prepared a solvency analysis over multiple years for the debtor coal company including a valuation of the debtors' assets and liabilities, a cash flow analysis and an analysis of the debtors' capital structure. He also prepared an analysis of damages resulting from multiple alleged fraudulent conveyances during the same period and provided deposition testimony. Trial is anticipated in September 2017.

**Financial Advisor to Pension Plan of Patriot Coal** – The UMWA 1974 Pension Plan and Trust was one of the largest creditors of Patriot Coal and its subsidiaries and secured a seat on the Unsecured Creditors' Committee. As one of the Pension Plan's financial advisors, Mr. Van Meter provided analysis and advice on multiple fronts in Patriot's bankruptcy case. This included multiple restructuring scenarios, a solvency analysis, the analysis of intercompany accounts, a waterfall analysis under numerous conditions and the assessment of multiple valuation models proposed by the Debtors, the Unsecured Creditors Committee and others. Using the financial analyses provided,

the Pension Plan was able to negotiate a continuation of the multi-employer pension and benefit plans, allowing Patriot to avoid a staggering billion dollar plus withdrawal liability.

**Financial Advisor to creditors' committee of KLN Steel Products Company** – Mr. Van Meter was the financial advisor to the Committee assisting in evaluating the issues of the case, including monitoring the monthly operating reports filed by the debtor, evaluation of business plans submitted by the debtor, development of the plan of reorganization, and analyses and valuations in support of confirmation. He also was appointed and served as the Chair of the Board of the post-confirmation trust created pursuant to the plan of reorganization, with overseeing the work of the Trustee and counsel related to administration of the plan and recovery litigation pursued by the trust.

**Counsel to Recreational Watercraft Manufacturer** – Mr. Van Meter was part of the legal team assisting this manufacturer of recreational watercraft throughout its bankruptcy and ultimate reorganization. The debtors manufactured boats under Chris*Craft and other brand names and included small boats to large yachts. The debtors' assets (including dies, molds and a license to the Chris*Craft brand) were ultimately sold through an auction that resulted in substantial recoveries for creditors. Mr. Van Meter was also part of the team litigating claim objections and pursuing recoveries against the officers and directors, professionals and others.

**Counsel to Frozen Seafood Packing Company** – Mr. Van Meter represented this Tampa, Florida based processor of frozen seafood in its out of court liquidation. The company decided against using bankruptcy to liquidate, so Mr. Van Meter worked with company management to negotiate consensual reductions in creditor claims and the sale of all of the company's assets. All creditor claims were resolved without litigation and without resort to bankruptcy.

**Financial Advisor to creditors' committee** – Mr. Van Meter was the financial advisor to the Committee in evaluating the issues of the case, including monitoring the monthly operating reports filed by the debtor, an analysis of the debtor in possession's financing proposals, evaluation of business plans submitted by the debtor, valuation of a closely held subsidiary and the negotiation of the sale of that subsidiary, development of the plan of reorganization, and analyses and valuations in support of confirmation.

**Financial advisor to creditors' committee of a bankrupt telecommunications company** – Mr. Van Meter analyzed and monitored the debtors' financial condition throughout the case and advised the committee with regard to the debtors' likelihood of continued existence. Mr. Van Meter evaluated the debtors' proposed DIP financing and proposed plans of reorganization. In addition, Mr. Van Meter conducted a valuation of the debtors' assets in response to a proposed sale of substantially all the assets of the debtors' estates and assisted counsel in evaluating the possibility of a fraudulent conveyance related to the debtors' initial acquisition of the assets.

CURRICULUM VITAE
K. SCOTT VAN METER

**Creditors' committee of a telecommunications tower manufacturer** – Mr. Van Meter assisted the committee to negotiate a consensual plan of reorganization by evaluating the debtor's proposed plan of reorganization and pre-bankruptcy leveraged buyout transaction in excess of $100 million as a potential fraudulent conveyance.

**Financial Advisor and Accountant to Chapter 7 Trustee** – Mr. Van Meter advised the Chapter 7 Trustee of a bankrupt web-hosting provider. Mr. Van Meter led the team investigating the alleged theft of millions of dollars from the company by one of the owners and founder of the company. The engagement involved tracing international transfers through multiple money center banks and elsewhere.

**Manager of post-confirmation litigation trust** - The trust was formed as an integral part of the Plan of Reorganization. Mr. Van Meter was responsible for administration of the plan, including the analysis, investigation and litigation of multiple claims for recovery of accounting and legal malpractice, director and officer liability, and preferences and fraudulent conveyances, as well as claim resolution and distributions.

**Oil and Gas Industry:**

**Chief Restructuring Financial Officer of crude oil refinery** – Mr. Van Meter was appointed the CRFO of this troubled refinery to direct the debtors' reorganization efforts. Mr. Van Meter analyzed business plan alternatives, developed detailed cash flow budgets and projections, and assisted in the development of the plan of reorganization. He also conducted a valuation of the debtor, analyzed appropriate claim reserves and testified on matters affecting confirmation of the debtor's plan of reorganization.

**Damages for breach of refining joint venture** – Mr. Van Meter was retained to provide opinions on damages related to the alleged breach of crude oil supply and refined product marketing contracts involved in the operations of a light crude refinery in Texas. His analysis required the valuation of crude oil and refined products at various points in time, as well as accounting for cash collections on product sales. Mr. Van Meter authored expert reports and testified in deposition and at the arbitration hearing.

**Valuation expert** – The debtor was an oil and gas exploration company the filed a pre-packaged plan of reorganization that sought to eliminate pre-existing equity interests. Mr. Van Meter was retained by one of the company's shareholders to analyze the value of the restructured company in support of the shareholder's objection to confirmation of the plan. Mr. Van Meter gave a deposition and testified at the contested confirmation hearing.

**Solvency expert** – The debtor oil and gas exploration company sued its lender for alleged fraudulent conveyances related to interests conveyed to the lender in exchange for forbearing and

007507

modifying the terms of the debt. Mr. Van Meter was retained to rebut the debtor's solvency expert, opining that the debtor was solvent at all relevant times.

**Forensic Accountant to Bankruptcy Examiner** – Mr. Van Meter led the forensic accounting investigation of the financial affairs of a bankrupt Oil & Gas company. Mr. Van Meter's team documented millions of dollars or potential fraudulent conveyances and preferences and assisted the Examiner in the preparation and presentation of his report to the Bankruptcy Court.

**Damages for tortious interference in the sale of company and business defamation** – In this matter, Mr. Van Meter was asked to analyze damages suffered by the client as a result of allegedly false allegations involving the purchase and sale of allegedly stolen natural gas condensate. The client, an independent midstream oil and natural gas service provider, was sued for participating in various transaction involving the purchase and resale of allegedly stolen natural gas condensate. The client counterclaimed for business defamation and tortious interference related to the failed sale of the company and inability to obtain capital as a result of the negative publicity surrounding the lawsuit. Mr. Van Meter authored an expert report and provided deposition testimony.

**Damages for theft of trade secrets – coated fracking sands** – This matter involved the alleged theft of trade secrets related to technology used to manufacture coated fracking sands used in oil and gas drilling applications. Mr. Van Meter was retained to estimate the economic damages incurred by the plaintiffs. He prepared expert reports and testified in deposition. The matter settled before trial.

**Complex Business Interruption Claims:**

**Crude oil refinery, flood loss** – Mr. Van Meter led the analysis of the business interruption claim for this mid-west refinery shut down for an extended period of time as a result of extensive flooding.

**Processor of snack foods, fire loss** – Mr. Van Meter led the team analyzing the recoverable losses sustained by this global snack foods manufacturer as a result of a fire that destroyed the entire production capacity of one of its key South American processing plants.

**Global diesel engine and components manufacturer, flood loss** – Mr. Van Meter led the analysis of the business interruption losses sustained as a result of the flooding of the company's research and development facilities as well as certain specialty manufacturing facilities.

**IT infrastructure hosting provider, electrical interconnect explosion** – Mr. Van Meter led a team assisting this provider of IT hosting solutions determine the business interruption and property losses associated with the catastrophic failure of and related explosion in its electrical interconnect.

CURRICULUM VITAE
K. SCOTT VAN METER

**Arbitration:**

**Arbitration of purchase price dispute** – Mr. Van Meter was appointed as the sole arbitrator of a dispute over purchase price adjustments related to an acquisition in the construction services industry.

**Publications:**

"Lessons Learned from the GM & Chrysler Bankruptcies," Andrews Publications (Division of West), 2009

"The Impact of Evolving Bankruptcy Law on Strategy and Practice" (with D. Brickley), chapter in Adapting to Changes in Bankruptcy Law, Thomson Reuters/Aspatore, 2009

**Recent Presentations:**

"How Experts Lie with Statistics", American Bankruptcy Institute Winter Leadership Conference, December 2017

**Testimony:**

In re: United States of America ex rel Kipp Fesenmaier v. The Cameron-Ehlen Group, Inc., dba Precision Lens and Paul Ehlen
Expert Report, trial, and deposition testimony regarding damages, 2020-2023

In re: GEL Tex Marketing, LLC v. Shell Trading (US) Company)
Expert report, trial, and deposition testimony regarding damages, 2021-2022

In re: Ascend Performance Materials Texas Inc., Ascend Performance Materials Operations LLC, And Ascend Performance Materials Holdings Inc. v. Ineos Olefins & Polymers USA, Ineos USA LLC and Team Industrial Services, Inc.
Expert report and deposition testimony regarding damages, 2021

In re: OSG 243 LLC and Overseas Shipholding Group, Inc. v. M/V Yochow, Her Engines Tackle, Apparel, Etc. in Rem; Grand Famous Shipping LTD; and China Navigation CO PTE Ltd, in Personam v. Grand Famous Shipping, LTD., et al., v. Unknown Claimants v. Wilbert Cormier, v. TPC Group, Inc.
Expert report and deposition testimony regarding damages, 2021

In re: Freeport Expansion, L.P. v. FLNG Liquefaction 2, LLC
Expert report, deposition, and arbitration hearing testimony regarding a contract dispute, 2021

CURRICULUM VITAE
K. SCOTT VAN METER

In re: State of South Carolina County of Horry Myrtle Beach SkyWheel, LLC v. LandShark of
Myrtle Beach, LLC IMCMV MB Landshark, LLC; and Margaritaville Enterprises, LLC
Expert report and trial testimony regarding damages, 2020

In re: Urban Oaks Builders, Inc.
Expert testimony at deposition and trial on lost profits and lost value damages, 2019-2020

In re: Gastar Exploration, Inc. et al.
Expert testimony at deposition and contested confirmation hearing on valuation, 2018

Trans-Global Solutions, Inc. v. Jefferson Gulf Coast Energy Partners, LLC
Expert report, deposition and arbitration hearing testimony regarding damages, 2018

Choice! Natural Gas v. John Cartwright, et al.
Expert report and deposition testimony regarding damages, 2017

Dresser-Rand v. Schutte & Koerting Acquisition Company, et al. Expert report and deposition
testimony regarding damages, 2017

Lazarus Energy, LLC v. Gel Tex Marketing, LLC.
Expert report, deposition, and hearing testimony regarding damages, 2017

# HMIT Exhibit No. 40

## Highland Capital Management

**Case No. 19-34054-sgj11**

*Documents Considered*

| # | Docket Number, File Name, Description |
|---|---|
| **Received from Counsel:** | |
| 1 | 1 - Ex. 41 - 2021.12.06 - Memorandum of Agreement  re CTA Compensation.pdf |
| 2 | 10 - 2021 0526 Amazon-MGM Merger Announcement.pdf |
| 3 | 2 - Dkt 1811-3 - Redlined Claimant Trust Agreement.pdf |
| 4 | 2021.10.05 Doug Draper Letter to US Trustee's Office.pdf |
| 5 | 2021.11.03 Davor Rukavina Letter to US Trustee's Office.pdf |
| 6 | 2023 0331 HCM Form ADV.pdf |
| 7 | 2023 0425 HCM Form ADV.pdf |
| 8 | 2023-02-14 Declaration of Mark Patrick.PDF |
| 9 | 2023.04.23 [Doc 3760] HMIT Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding.pdf |
| 10 | 2023.05.10 Dugaboy HMIT Valuation Complaint.pdf |
| 11 | 3 - Dkt 2472 - Minutes of Strand Board re Seery Compensation.pdf |
| 12 | 4 - Dkt 1875-1 - Liquidation Analysis.pdf |
| 13 | 4 - Highland Bankruptcy Timeline.DOCX |
| 14 | 5 - Dkt 3200 - Amended Q3 2021 Post-Confirmation Report.pdf |
| 15 | 6 - Dondero Handwritten Notes_2021-10-05 18-27.pdf |
| 16 | 7 - Dkt 150-1 - 2020 1217 email re MGM MNPI.pdf |
| 17 | Declaration of Mark Patrick w_ Exhibits -- Dallas County.PDF |
| 18 | Dkt 3756 - Q1 2023 Post Confirmation Report.pdf |
| 19 | Dkt 3757 - Q1 2023 Post Confirmation Report (Claimant Trust).pdf |
| **Bankruptcy Docket - Case 19-34054-sgj11:** | |
| 20 | [1165] - Notice of Transfer of Stanton Claim |
| 21 | [1166] - Notice of Transfer of Lynn Pinker Cox & Hurst Claim |
| 22 | [1377] - Notice of Transfer of Debevoise & Plimpton LLP Claim |
| 23 | [1378] - Notice of Transfer of Debevoise & Plimpton LLP Claim |
| 24 | [1379] - Notice of Transfer of Debevoise & Plimpton LLP Claim |
| 25 | [1401] - Notice of Transfer of DLA Piper LLP Claim |
| 26 | [1473] Disclosure Statement and 5th Amended Plan |
| 27 | [1500] - Notice of Transfer of Katten Muchin Rosenman LLP Claim |
| 28 | [1508] - Notice of Transfer of Daniel Sheehan & Associates Claim |
| 29 | [1509] - Notice of Transfer of Vengroff Williams inc of AAA Claim |
| 30 | [1512] - Notice of Transfer of Foley Gardere (lardner) Claim |
| 31 | [1582] - Notice of Transfer of CVE Technologies Group Inc. Claim |
| 32 | [1591] - Notice of Transfer of Bates White Claim |
| 33 | [1658] - Notice of Transfer of ACA Compliance Group Claim |
| 34 | [1875] Plan Supplement 020121 |
| 35 | [1875-1] Liquidation Analysis |
| 36 | [1930] - Notice of Transfer of Stanton Law Firm of AAA Claim |
| 37 | [1959] - Notice of Transfer of Action Shred of Texas Claim |
| 38 | [2044] - Evidence of Partial Transfer of Claim B. Jain to NPA |
| 39 | [2045] - Evidence of Partial Transfer of Claim - M. Beispiel to NPA |
| 40 | [2046] - Evidence of Partial Transfer of Claim S. Kook to NextPoint Advisors, LP |
| 41 | [2047] - Evidence of Partial Transfer of Claim P. Stewart to NPA |
| 42 | [2092] - Notice of Transfer of Scott Ellington Claim |
| 43 | [2093] - Notice of Transfer of Frank Waterhouse Claim |
| 44 | [2094] - Notice of Transfer of John Paul Sevilla Claim |
| 45 | [2096] - Notice of Transfer of Issac Leventon Claim |
| 46 | [2097] - Notice of Transfer of Lucy Bannon Claim |
| 47 | [2098] - Notice of Transfer of Jerome Carter Claim |
| 48 | [2099] - Notice of Transfer of Brian Collins Claim |
| 49 | [2100] - Notice of Transfer of Matthew Diorio Claim |
| 50 | [2101] - Notice of Transfer of Hayley Eliason Claim |
| 51 | [2102] - Notice of Transfer of William Gosserand Claim |
| 52 | [2103] - Notice of Transfer of Steven Haltom Claim. |
| 53 | [2104] - Notice of Transfer of Charles Hoedebeck Claim |
| 54 | [2105] - Notice of Transfer of Mary Irving Claim |
| 55 | [2106] - Notice of Transfer of Helen Kim Claim |
| 56 | [2107] - Notice of Transfer of Kari Kovelan Claim |
| 57 | [2108] - Notice of Transfer of William Mabry Claim |
| 58 | [2109] - Notice of Transfer of Mark Patrick Claim |
| 59 | [2110] - Notice of Transfer of Christopher Rice Claim |
| 60 | [2111] - Notice of Transfer of Jason Rothstein Claim |
| 61 | [2112] - Notice of Transfer of Kellie Stevens Claim |
| 62 | [2113] - Notice of Transfer of Ricky Swadley Claim |
| 63 | [2114] - Notice of Transfer of Lauren Thedford Claim |
| 64 | [2115] - Notice of Transfer of Stephanie Vitiello Claim |
| 65 | [2211] - Notice of Acis Transfer (ACMLP) |
| 66 | [2212] - Notice of Transfer of Acis Claim (ACMLP) |
| 67 | [2215] - Notice of Transfer of Acis Claim (Muck) |
| 68 | [2261] - Notice of Transfer of Redeemer Claim |
| 69 | [2262] - Notice of Transfer of Crusader Claim |

**Highland Capital Management**

Case No. 19-34054-sgj11

*Documents Considered*

| # | Docket Number, File Name, Description |
|---|---|
| 70 | [2263] - Notice of Transfer of HarbourVest Claim |
| 71 | [2266] - Notice of Transfer of Sahan Abayarathna Claim |
| 72 | [2273] PCR Q1 2021 |
| 73 | [2629] PCR Q2 2021 |
| 74 | [2697] - Notice of Transfer of UBS Claim to Jessup |
| 75 | [2698] - Notice of Transfer of UBS Claim to Muck |
| 76 | [3146] - Notice of Transfers of NextPoint Advisors, LP |
| 77 | [3200] PCR Q3 2021 |
| 78 | [3201] PCR Q4 2021 |
| 79 | [3325] PCR Q1 2022 |
| 80 | [3409] PCR Q2 2022 |
| 81 | [3582] PCR Q3 2022 |
| 82 | [3652] PCR Q4 2022 |
| 83 | [3699] Motion for Leave to File Adversary - Highland_Capital_Management__L_P_-3699-0 |
| 84 | [3699-1] Highland_Capital_Management__L_P_-3699-1 |
| 85 | [3699-2] Highland_Capital_Management__L_P_-3699-2 |
| 86 | [3699-3] Highland_Capital_Management__L_P_-3699-3 |
| 87 | [3699-4] Highland_Capital_Management__L_P_-3699-4 |
| 88 | [3756] March 2023 MOR Highland Capital Managementt - Highland_Capital_Management__L_P_-3756-0 |
| 89 | [3756] PCR Q1 2023 |
| 90 | [3757] March 2023 MOR Highland Claimant Trust - Highland_Capital_Management__L_P_-3757-0 |
| 91 | [3758] Brief in Support by HMIT Highland_Capital_Management__L_P_-3758-0 |
| 92 | [3780] Objection to Motion for Leave by Farallon Highland_Capital_Management__L_P_-3780-0 |
| 93 | [3781-1] Exh A to 3781 - Highland_Capital_Management__L_P_-3788-1 |
| 94 | [3783] Response to Motion for Leave by Highland Capital Mgt and Claimant Trust - Highland_Capital_Management__L_P_-3783-0 |
| 95 | [3784] Declaration of Morris ISO 3783 Response Highland_Capital_Management__L_P_-3784-0 |
| 96 | [3785] HMIT Reply to Objection and Response - Highland_Capital_Management__L_P_-3785-0 |
| 97 | [3786] Cert of Service - Highland_Capital_Management__L_P_-3786-0 |
| 98 | [3787] Order on 3699 Highland_Capital_Management__L_P_-3787-0 |
| 99 | [3788] Motion to Shorten Time - Highland_Capital_Management__L_P_-3788-0 |
| 100 | [3795] Objection to Motion for Expedited Discovery - Highland_Capital_Management__L_P_-3795-0 |
| 101 | [3798] Response to Motion for Expedited Discovery - Highland_Capital_Management__L_P_-3798-0 |
| 102 | [3800] Order Granting in Part HMIT Mtn for Exp Discovery - Highland_Capital_Management__L_P_-3800-0 |
| **Proof of Claims:** | |
| 103 | POC 186 |
| 104 | POC 216 |
| 105 | POC 217 |
| 106 | POC 219 |
| 107 | POC 220 |
| 108 | POC 221 |
| 109 | POC 222 |
| 110 | POC 223 |
| 111 | POC 224 |
| 112 | POC 225 |
| 113 | POC 226 |
| 114 | POC 227 |
| 115 | POC 228 |
| 116 | POC 229 |
| 117 | POC 230 |
| 118 | POC 231 |
| 119 | POC 232 |
| 120 | POC 233 |
| 121 | POC 234 |
| 122 | POC 235 |
| 123 | POC 236 |
| 124 | POC 237 |
| 125 | POC 241 |
| 126 | POC 244 |

# HMIT Exhibit No. 41

007514

**Highland Capital Management**

Case No. 19-34054-sgj11

*Notice of Transfers*

| Claim Number | Plan Class | Name of Transferee | Name of Transferors | Transfer Date | Amount of Claim | Source Docket Number | Amt. Transferred % of Original Total Claims |
|---|---|---|---|---|---|---|---|
| Schedule F | 8 | Argo Partners | Stanton Advisors LLC | October 1, 2020 | $ 10,000 | 1165 | 100.0% |
| 148 | 8 | MCS Capital, LLC | Lynn Pinker Cox & Hurst, LLP | October 10, 2020 | $ 507,430 | 1166 | 100.0% |
| 94 | 8 | Contrarian Funds, LLC | Debevoise & Plimpton LLP | October 19, 2020 | $ 268,095 | 1377 | 100.0% |
| 97 | 8 | Contrarian Funds, LLC | Debevoise & Plimpton LLP | October 19, 2020 | $ 268,095 | 1378 | 100.0% |
| Schedule F | 8 | Contrarian Funds, LLC | Debevoise & Plimpton LLP | October 19, 2020 | $ 20,659 | 1379 | 100.0% |
| Schedule F | 8 | Contrarian Funds, LLC | DLA Piper LLP | November 4, 2020 | $ 1,318,730 | 1401 | 100.0% |
| 26 | 8 | Cedar Glade LP | Katten Muchin Rosenman LLP | November 30, 2020 | $ 16,695 | 1500 | 100.0% |
| 47 | 8 | Fair Harbor Capital, LLC | Daniel Sheehan & Associates, PLLC | December 4, 2020 | $ 32,434 | 1508 | 100.0% |
| 33 | 8 | Fair Harbor Capital, LLC | Vengroff Williams Inc agent of American Arbitration Association | December 4, 2020 | $ 12,912 | 1509 | 100.0% |
| 57 | 8 | Hain Capital Investors Master Fund, Ltd | Foley Gardere nka Foley & Lardner LLP | December 7, 2020 | $ 1,446,137 | 1512 | 100.0% |
| N/A | 8 | Fair Harbor Capital, LLC | CVE Technologies Group Inc. | December 16, 2020 | $ 1,500 | 1582 | 100.0% |
| Schedule F | 8 | Argo Partners | Bates White LLC | December 17, 2020 | $ 90,856 | 1591 | 100.0% |
| Schedule F | 8 | Argo Partners | ACA Compliance Group | January 5, 2021 | $ 26,324 | 1658 | 100.0% |
| 163 | 8 | Cedar Glade LP | Stanton Law Firm PC | February 10, 2021 | $ 88,134 | 1930 | 100.0% |
| N/A | 8 | Fair Harbor Capital, LLC | Action Shred of Texas | March 1, 2021 | $ 3,825 | 1959 | 100.0% |
| 223 | 8 | CPCM, LLC | Jerome Carter | March 10, 2021 | $ 27,500 | 2098 | 100.0% |
| 232 | 8 | CPCM, LLC | William Gosserand | March 10, 2021 | $ 87,830 | 2102 | 100.0% |
| 231 | 8 | CPCM, LLC | Mary Irving | March 10, 2021 | $ 273,970 | 2105 | 100.0% |
| 219 | 8 | CPCM, LLC | Mark Patrick | March 10, 2021 | $ 424,510 | 2109 | 100.0% |
| 229 | 8 | CPCM, LLC | Jason Rothstein | March 10, 2021 | $ 229,333 | 2111 | 100.0% |
| 222 | 8 | CPCM, LLC | Lauren Thedford | March 10, 2021 | $ 161,882 | 2114 | 100.0% |
| 217 | 8 | CPCM, LLC | Frank Waterhouse | March 11, 2021 | $ 1,514,106 | 2093 | 100.0% |
| 216 | 8 | CPCM, LLC | Issac Leventon | March 11, 2021 | $ 687,595 | 2096 | 100.0% |
| 230 | 8 | CPCM, LLC | Matthew Diorio | March 11, 2021 | $ 171,962 | 2100 | 100.0% |
| 226 | 8 | CPCM, LLC | Helen Kim | March 11, 2021 | $ 59,371 | 2106 | 100.0% |
| 234 | 8 | CPCM, LLC | William Mabry | March 11, 2021 | $ 87,005 | 2108 | 100.0% |
| 220 | 8 | CPCM, LLC | Christopher Rice | March 11, 2021 | $ 8,333 | 2110 | 100.0% |
| 235 | 8 | CPCM, LLC | Lucy Bannon | March 12, 2021 | $ 53,867 | 2097 | 100.0% |
| 233 | 8 | CPCM, LLC | Brian Collins | March 12, 2021 | $ 248,850 | 2099 | 100.0% |
| 224 | 8 | CPCM, LLC | Steven Haltom | March 12, 2021 | $ 6,667 | 2103 | 100.0% |
| 228 | 8 | CPCM, LLC | Charles Hoedebeck | March 12, 2021 | $ 13,333 | 2104 | 100.0% |
| 227 | 8 | CPCM, LLC | Kari Kovelan | March 12, 2021 | $ 33,466 | 2107 | 100.0% |
| 221 | 8 | CPCM, LLC | Kellie Stevens | March 12, 2021 | $ 52,502 | 2112 | 100.0% |
| 237 | 8 | CPCM, LLC | Ricky Swadley | March 12, 2021 | $ 262,510 | 2113 | 100.0% |
| 225 | 8 | CPCM, LLC | Stephanie Vitiello | March 12, 2021 | $ 59,371 | 2115 | 100.0% |
| 236 | 8 | CPCM, LLC | Hayley Eliason | March 16, 2021 | $ 6,667 | 2101 | 100.0% |
| 241 | 8 | CPCM, LLC | Jean Paul Sevilla | March 22, 2021 | $ 659,925 | 2094 | 100.0% |
| 244 | 8 | CPCM, LLC | Scott Ellington | March 24, 2021 | $ 3,074,408 | 2092 | 100.0% |
| 23 | 8 | ACMLP Claim, LLC | Acis Capital Management L.P and Acis Capital Management GP, LLC | April 15, 2021 | $ 23,000,000 | 2211 | Duplicate |
| 23 | 8 | ACMLP Claim, LLC | Acis Capital Management L.P and Acis Capital Management GP, LLC | April 15, 2021 | $ 23,000,000 | 2212 | 100.0% |
| 23 | 8 | Muck Holdings LLC | ACMLP Claim, LLC | April 16, 2021 | $ 23,000,000 | 2215 | 100.0% |
| 143, 147,149, 150, 153, 154 | 8 | Muck Holdings LLC | HarbourVest 2017 Global Fund, HarbourVest 2017 Glocal AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., HarbourVest Partners L.P. | April 29, 2021 | $ 45,000,000 | 2263 | 100.0% |
| 143, 147,149, 150, 153, 154 | 9 | Muck Holdings LLC | HarbourVest 2017 Global Fund, HarbourVest 2017 Glocal AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., HarbourVest Partners L.P. | April 29, 2021 | $ 35,000,000 | 2263 | 100.0% |
| 72 | 8 | Jessup Holdings LLC | Redeemer Committee of the Highland Crusader Fund | April 30, 2021 | $ 137,696,610 | 2261 | 100.0% |
| 81 | 8 | Jessup Holdings LLC | Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd. And Highland Crusader Fund II, Ltd. | April 30, 2021 | $ 50,000 | 2262 | 100.0% |
| Schedule F | 8 | NextPoint Advisors, LP | Sahan Abayarathna | April 30, 2021 | $ * | 2266 | 100.0% |
| 186 | 8 | NextPoint Advisors, LP | Hunter Cortez | May 26, 2021 | $ 250,000 | 3146 | 100.0% |
| 190 | 8 | Jessup Holding LLC | UBS Securities LLC and UBS AG London Branch | August 9, 2021 | $ 32,175,000 | 2697 | 49.5% |
| 191 | 9 | Jessup Holding LLC | UBS Securities LLC and UBS AG London Branch | August 9, 2021 | $ 18,000,000 | 2697 | 30.0% |
| 190 | 8 | Muck Holdings LLC | UBS Securities LLC and UBS AG London Branch | August 9, 2021 | $ 32,175,000 | 2698 | 49.5% |
| 191 | 9 | Muck Holdings LLC | UBS Securities LLC and UBS AG London Branch | August 9, 2021 | $ 18,000,000 | 2698 | 30.0% |
| Schedule F | 8 | NextPoint Advisors, LP | Bhawika Jain | March 17, 2021 | $ * | 2044 | 100.0% |
| Schedule F | 8 | NextPoint Advisors, LP | Michael Beispiel | March 17, 2021 | $ * | 2045 | 100.0% |
| Schedule F | 8 | NextPoint Advisors, LP | Sang Kook (Michael) Jeong | March 17, 2021 | $ * | 2046 | 100.0% |
| Schedule F | 8 | NextPoint Advisors, LP | Phoebe Stewart | March 17, 2021 | $ * | 2047 | 100.0% |

Note: * - Could not identify claim amount from Schedules

# HMIT Exhibit No. 42

## Highland Capital Management

### Case No. 19-34054-sgj11

*Analysis of Claim Amount Transferred By Month*

| Period | % of total | Amount Transferred | Num. of Transfers | Cumulative |
|--------|-----------|-------------------|-------------------|------------|
| Oct-20 | 0.29% | $   1,074,279 | 5 | $  1,074,279 |
| Nov-20 | 0.35% | 1,335,425 | 2 | 2,409,705 |
| Dec-20 | 0.42% | 1,583,838 | 5 | 3,993,543 |
| Jan-21 | 0.01% | 26,324 | 1 | 4,019,867 |
| Feb-21 | 0.02% | 88,134 | 1 | 4,108,001 |
| Mar-21 | 2.18% | 8,208,787 | 24 | 12,316,788 |
| Apr-21 | 70.02% | 263,746,610 | 8 | 276,063,398 |
| May-21 | 0.07% | 275,000 | 1 | 276,338,398 |
| Jun-21 | 0.00% | - | - | 276,338,398 |
| Jul-21 | 0.00% | - | - | 276,338,398 |
| Aug-21 | 26.64% | 100,350,000 | 8 | 376,688,398 |
| **Total** | 100.0% | $  376,688,398 | 43 | |

# HMIT Exhibit No. 43

007518

Case 19-34054-sgj11   Doc 3818-3   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Exhibit Exhibits 31-52   Page 56 of 76

# Highland Capital Management

Case No. 19-34054-sgj11
*Analysis of Expected Returns*

| Date | Original Held | Claim Category | Face Value | Purchased By | Amount Paid by Purchaser | Amount Paid as % of Face | Expected Payout % | Expected Payout $ [1] | Amount Paid as % of Expected Return |
|------|---------------|----------------|-----------|--------------|--------------------------|--------------------------|-------------------|-----------------------|-------------------------------------|
| 4/30/2021 | Redeemer | Claim Num. 8 | $ 137,000,000 | Jessup Holdings | $ 78,000,000 | 56.93% | 71.23% | $ 97,585,100 | 79.93% |
| 4/16/2021 | Acis Capital | Claim Num. 8 | 23,000,000 | Muck Holdings | 8,000,000 | 34.78% | 71.23% | 16,382,900 | 48.83% |
| 4/30/2021 | HarbourVest | Claim Num. 8 | 45,000,000 | Muck Holdings | | | 71.23% | 32,053,500 | |
| 4/30/2021 | HarbourVest | Claim Num. 9 | 35,000,000 | Muck Holdings | | | 0.00% | - | |
| **HarbourVest** | | **Subtotal** | **80,000,000** | **Muck Holdings** | **27,000,000** | **33.75%** | | **32,053,500** | **84.23%** |
| 8/9/2021 | UBS | Claim Num. 8 | 32,500,000 | Muck Holdings | | | 71.23% | 23,149,750 | |
| 8/9/2021 | UBS | Claim Num. 9 | 18,000,000 | Muck Holdings | | | 0.00% | - | |
| 8/9/2021 | UBS | Claim Num. 8 | 32,500,000 | Jessup Holdings | | | 71.23% | 23,149,750 | |
| 8/9/2021 | UBS | Claim Num. 9 | 18,000,000 | Jessup Holdings | | | 0.00% | - | |
| **UBS** | | **Subtotal** | **101,000,000** | **Combined** | **50,000,000** | **49.50%** | | **46,299,500** | **107.99%** |
| | | **Total** | **$ 341,000,000** | | **$ 163,000,000** | **47.80%** | | **$ 192,321,000** | **84.75%** |

[1] Based on February 1, 2021 Plan Supplement, Docket # 1875

007519 Page 1 of 1

B. Riley Advisory Services

# HMIT Exhibit No. 44

**Highland Capital Management**

### Case No. 19-34054-sgj11

*Analysis of Cumulative Distributions*

| Date | Total Unsecured Allowed Amount | | Total Distribution | | Cumulative Distribution | | Docket # |
|---|---|---|---|---|---|---|---|
| 2021 Q1 | | | $ | - | $ | - | 2273 |
| 2021 Q2 | | | $ | - | $ | - | 2629 |
| 2021 Q3 | $ | 376,622,019 | $ | 6,168,473 | $ | 6,168,473 | 3200 |
| 2021 Q4 | $ | 376,622,019 | $ | - | $ | 6,168,473 | 3201 |
| 2022 Q1 | $ | 388,622,019 | $ | 750,000 | $ | 6,918,473 | 3325 |
| 2022 Q2 | $ | 390,624,608 | $ | 9,318 | $ | 6,201,896 | 3409 |
| 2022 Q3 | $ | 397,485,568 | $ | 248,999,332 | $ | 255,201,228 | 3582 |
| 2022 Q4 | $ | 397,485,568 | $ | - | $ | 255,201,228 | 3652 |
| 2023 Q1 | $ | 397,485,568 | $ | 15,044,364 | $ | 270,205,592 | 3756 |

Note: Cumulative balances as reported on the PCR. Does not equal the sum of the reported distributions.

# HMIT Exhibit No. 45

**Highland Capital Management**

**Case No. 19-34054-sgj11**

*Analysis of Estimated Trustee Compensation*

| Date | Base Compensation [1] | Total Distribution [2] | Cumulative Distributions | Est. ICP Compensation | Total Compensation | Est. Cumulative Compensation |
|---|---|---|---|---|---|---|
| 2021 Q3 | $ 450,000 | $ 6,168,473 | $ 6,168,473 | $ - | $ 450,000 | $ 450,000 |
| 2021 Q4 | $ 450,000 | $ - | $ 6,168,473 | $ - | $ 450,000 | $ 900,000 |
| 2022 Q1 | $ 450,000 | $ 750,000 | $ 6,918,473 | $ - | $ 450,000 | $ 1,350,000 |
| 2022 Q2 | $ 450,000 | $ 9,318 | $ 6,927,791 | $ - | $ 450,000 | $ 1,800,000 |
| 2022 Q3 | $ 450,000 | $ 248,999,332 | $ 255,927,123 | $ 2,049,347 | $ 2,499,347 | $ 4,299,347 |
| 2022 Q4 | $ 450,000 | $ - | $ 255,927,123 | $ - | $ 450,000 | $ 4,749,347 |
| 2023 Q1 | $ 450,000 | $ 15,044,364 | $ 270,971,487 | $ 254,569 | $ 704,569 | $ 5,453,916 |

| Incentive Compensation Factors [1] | | | |
|---|---|---|---|
| ICP Tier | Range Low | Range High | ICP % |
| Tier 1 | $ 200,000,000 | $ 210,000,000 | 0.72% |
| Tier 2 | $ 210,000,001 | $ 266,000,000 | 1.17% |
| Tier 3 | $ 266,000,001 | $ 305,000,000 | 2.75% |
| Tier 4 | $ 305,000,001 | $ 354,000,000 | 4.25% |
| Tier 5 | $ 354,000,001 | 100% Class 9 | 6.00% |

**Source:**
[1] Dkt # 3784-43
[2] Exhibit 4

# HMIT Exhibit No. 46

007524

**STEVEN J. PULLY**

**4564 Meadowood Road, Dallas, Texas**

**(214) 587-6133**

**sjpully@yahoo.com**

---

### *Employment History*

---

| | |
|---|---|
| October 2014 – Present | **SPEYSIDE PARTNERS/INVESTMENT BANKER/CONSULTANT/BOARD DIRECTOR/CORPORATE EXECUTIVE**<br>• *Investment banker/consultant to companies, investors and creditors on matters including capital raising, distressed debt restructurings, asset dispositions, activist investing defense, strategic opportunities, and expert witness matters* |
| January 2008 – Sept. 2014 | **CARLSON CAPITAL, L.P.,** General Counsel and Partner, Dallas, Texas<br>• *Responsible for legal affairs of hedge fund with over $9.0 B of AUM; worked closely with affiliated oil and gas private equity fund with $700 of AUM beginning in 2010*<br>• *Member of Management, Operating and Valuation Committees (Chair)* |
| Dec. 2001 – October 2007 | **NEWCASTLE CAPITAL MANAGEMENT, L.P.,** President, Dallas, Texas<br>• *Activist fund with $650 MM of assets under management*<br>• *Operating positions for portfolio companies: CEO of Pinnacle Frames, Jan. 2003 – June 2004 (largest domestic picture frame manufacturer with 600 employees; involved in multiple visits to Wal-Mart, visited China and identified new CEO for company); CEO of New Century Equity Holdings, June 2003 – Oct. 2007 (cash shell seeking to acquire business)* |
| May 2000 – Dec. 2001 | **BANC OF AMERICA SECURITIES**, Managing Director, Investment Banking  - M&A/ Energy & Power Groups; Houston and Dallas, Texas |
| January 1997  – May 2000 | **BEAR STEARNS & CO. INC.,** Senior Managing Director  -  Investment Banking Department; Dallas, Texas |
| April 1996  – Dec. 1996 | **CONVERGENT ASSOCIATES, INC.,** President, Dallas, Texas.<br>• *Private equity firm that controlled three technology-oriented companies involved in travel, media and software; affiliated with EDS* |
| January 1996 - April 1996 | **WASSERSTEIN PERELLA & CO., INC.,** Vice President  -  Investment Banking Department; Dallas, Texas<br>• *Left after brief association because supervisor announced departure plans* |
| July 1989 - Dec. 1995 | **PAINEWEBBER INCORPORATED/ KIDDER, PEABODY & CO.,**  First Vice President  - Investment Banking Department; New York City and Houston, Texas |

October 1985 -    **BAKER & BOTTS, Attorneys,** Associate  –  Corporate Department; Houston, Texas
July 1989

---

### *Board Experience*

---

**Board Leadership**  -  Experience as Lead Director, Chairman of the Board, Executive Committee
    member and Chairman of Audit, Compensation, Governance and Strategic Committees
**Accounting/Finance**  -  CPA and CFA certifications, significant experience with financial statements
    and analysis, member of several audit committees including chair role
**Strategic Transactions/Capital Raising**  -  Substantial history with successful strategic transactions
    and efficient capital raising, including debt restructurings
**Governance/Activist Investing Expertise**  -  Extensive experience with shareholder governance and
    activist investing/defense; positive reputation with shareholders as a value creator
**Legal/Regulatory**  -  Licensed attorney, extensive experience managing legal/compliance activitises

### Public Company Directorships

**Previous:** Bellatrix Exploration, Energy XXI (Chair – Comp and Strategic), EPL Oil & Gas Inc. (Lead
Director, Chair - Comp), Ember Resources, Cano Petroleum, Goodrich Petroleum, Harvest Oil and
Gas (Chairman of the Board, Chair – Audit), Peerless Systems (Chair – Audit), New Century Equity
Holdings, MaxWorldwide, Geoworks Corporation, Pizza Inn (Chair – Governance), Titan Energy,
VAALCO Energy (Chair – Governance, Comp), Whitehall Jewelers (Chairman)

### Private Company Directorships

**Current:** Harvest Oil & Gas (Chairman of the Board and Chief Executive Officer, formerly public
company), Heritage Power, Wild Rivers (Chairman, Chair – Audit), Constellation Services (Chair –
Audit), OSG/Everview (Chairman)
**Previous:**  Fox & Hound, GenCanna Global, Pinnacle Frames & Accents, Aspire Holdings (Chair –
Comp), PermianLide, Tribune Resources (Chair – Audit), PGi, Southland Royalty, Greylock Energy,
Karya Prop., PRIMEXX Energy, Titan Energy, ExpressJet, Limetree Bay Refinery, JetHoldings, Salem
Harbor Power (Chairman)

---

### *Professional Certifications, Education and Other Interests*

---

**CHARTERED FINANCIAL ANALYST,** 2004 (Active member), **CERTIFIED PUBLIC ACCOUNTANT,**
Texas, 1985 (Active member), **STATE BAR OF TEXAS,** 1985 (Active member), **FINRA** Series 7, 63
and 79 (Current)

**The University of Texas School of Law, 1985,** Int'l Law Journal, Moot Court, Board of Advocates

**Georgetown University, BSBA with honors, 1982, Major in accounting with 3.90 GPA in major**
President of Student Government Senate, National Model U.N. Team

**Centre for Management Studies, Oxford University, England**, **Summer 1981**

# HMIT Exhibit No. 47

**Documents and Materials Reviewed by Steve Pully**

1. 2023 0425 HCM Form ADV Part 1
2. 2023 0331 HCM Form ADV Part 1
3. 2021 1206 - Memorandum of Agreement re CTA Compensation
4. 2021 0526 Amazon-MGM Merger Announcement
5. 2023 0214 Declaration of Mark Patrick with Exhibits
6. 2022 0531 Dondero Declaration
7. 2023 0215 Dondero Declaration
8. Dondero Handwritten Notes_2021-10-05 18-27
9. Dkt 150-1 - 2020 1217 email re MGM MNPI
10. Dkt 1493 - Oct 2020 Operating Report
11. Dkt 1710 - Nov 2020 Operating Report
12. Dkt 1811-3 - Redlined Claimant Trust Agreement
13. Dkt 1875-1 - Liquidation Analysis
14. Dkt 1943 - Order Confirming Plan
15. Dkt 1949 - Dec 2020 Operating Report
16. Dkt 2030 - January 2021 Monthly Operating Report
17. Dkt 2229 - Mtn for Exit Financing
18. Dkt 2273 - Q1 2021 Operating Report
19. Dkt 2472 - Minutes of Strand Board re Seery Compensation
20. Dkt 2629 - Q2 2021 Post-Confirmation Report
21. Dkt 2949 - Q3 2021 Post-Confirmation Report
22. Dkt 3200 - Amended Q3 2021 Post-Confirmation Report
23. Dkt 3201 - Q4 2021 Post-Confirmation Report
24. Dkt 3325 - Q1 2022 Post-Confirmation Report
25. Dkt 3409 - Q2 2022 Post-Confirmation Report
26. Dkt 3582 - Q3 2022 Post-Confirmation Report
27. Dkt 3652 - Q4 2022 Post-Confirmation Report
28. Dkt 3699 – HMIT's Motion for Leave to File Verified Adversary Proceeding
29. Dkt 3756 - Q1 2023 Post Confirmation Report
30. Dkt 3757 - Q1 2023 Post Confirmation Report (Claimant Trust)
31. Dkt 3760 – HMIT's Supplement to its Motion for Leave to File Verified Adversary Proceeding with Exhibit
32. Dkt 3778 - 2023.05.10 Dugaboy HMIT Valuation Complaint
33. Transcript and Exhibits from June 2, 2023 Deposition of James P. Seery, Jr.

34.  Dkt 3780 - 2023 0511 Claim Purchasers' Objection to HMIT's Emergency Motion for Leave

35.  Dkt 3783 - 2023 0511 HCML/HCT/Seery's Joint Opposition to HMIT's Motion for Leave to File Verified Adversary Proceeding

36.  Dkt 3785 - 2023 0518 HMIT's Reply Brief in Support of Emergency Motion for Leave to File Adversary Pleading

37.  LinkedIn Profile for James P. Seery, Jr.

# HMIT Exhibit No. 48

Case 19-34054-sgj11  Doc 3818-3  Filed 06/05/23  Entered 06/05/23 22:10:41  Desc
Exhibit Exhibits 31-52  Page 68 of 76

**Analysis of Farallon and Stonehill Claims Purchase**
**Prepared by Steven J. Pully, CFA, CPA, ESQ.**
**5-Jun-23**

Estimated Recovery of Class 8 and Class 9 Claims Based On Public Information

| | Face Amount of Claims | Reference | Percentage Estimated To Be Recovered Per Public Documents Dated February 1, 2021 | Reference | Amount Estimated To Be Recovered Per Public Documents | Reference |
|---|---|---|---|---|---|---|
| Class 8 | $270.1 | Notices of Transfers [Docs. 2212, 2215, 2261, 2262, 2263, 2215, 2697, 2698], Doc. 2389, Order Approving UBS settlement. | 71.3% | 1875-1, Exhibit A | $194.8 | 1875-1, Exhibit A |
| Class 9 | $36.0 | Orders Approving Settlements [Doc. 1788, Doc. 2389]; Notices of Transfers [Docs. 2697, 2698] | 0.0% | 1875-1, Exhibit A | $0.0 | 1875-1, Exhibit A |
| | $306.1 | | | | $194.8 | |

007531

# HMIT Exhibit No. 49

Case 19-34054-sgj11   Doc 3818-3   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Exhibit Exhibits 31-52   Page 70 of 76

Analysis of Farallon and Stonehill Claims Purchase
Prepared by Steven J. Pully, CFA, CPA, ESQ.
5-Jun-23

**Amount Paid By Farallon and Stonehill for Class 8 and Class 9 Claims**

| | What Farallon and Stonehill Paid | Reference | Date Acquired by Farallon and Stonehill | Reference | Percentage of Total Claims Owned By Farallon and Stonehill | Reference | Amount Recovered Thus Far By Farallon and Stonehill | Reference |
|---|---|---|---|---|---|---|---|---|
| Class 8 | Respondents refused to provide detailed information but do not deny the allegations in the Complaint | See Respondents' responses | Except for the UBS claim, before April 30, 2021 | Notices of Transfers [Docs. 2212, 2215, 2261, 2262, 2263, 2697, 2698]. The Acis claim was transferred on April 16, 2021; the Redeemer, Crusader, and HarbourVest claims were transferred on April 30, 2021; and the UBS claims were transferred on August 9, 2021 | 94.9% | See Doc. 3409; Respondents owned $270.1 million of $284.6 million of total allowed Class 8 claims | | |
| Class 9 | Respondents refused to provide detailed information but do not deny the allegations in the Complaint | See Respondents' responses | Except for the UBS claim, before April 30, 2021 | Notices of Transfers [Docs. 2263, 2697, 2698]. The HarbourVest claims were transferred on April 30, 2021 and the UBS claims were transferred on August 9, 2021 | 36.5% | See Doc. 3409; Respondents owned $36.0 million of $98.7 million of total allowed Class 8 claims | | |
| Total | $163.0 | Exhibit 1-A to Emergency Motion filed on 4/23/23 | | | | | $250.0 | Amount calculated by taking total amount on Doc. 3757, page 13 of 15, of $263.4 and multiplying that by 94.9% |

007533

# HMIT Exhibit No. 50

007534

007535

**Analysis of Farallon and Stonehill Claims Purchase**
Prepared by Steven J. Pully, CFA, CPA, ESQ.
5-Jun-23

Recoveries On Class 8 and 9 Claims

| | What Farallon and Stonehill Paid | Reference | Projected Total Amount to Be Received Based on Public Information | Reference | Projected Annualized Return Based on Public Information | | Reference | Actual Total Profit to Farallon and Stonehill To Date | Reference | Actual Annualized Return to Farallon and Stonehill | Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Positive | Negative | | | | | |
| Class 8 | | | | | | | | | | | |
| Class 9 | | | | | | | | | | | |
| Total | $163.0 | Exhibit 1-A to Emergency Motion filed on 4/23/23 | $184.9 | Multiplied public estimate of recovery of $194.8 MM by 94.9%, which reflects approximate percentage of amount owned by Farallon and Stonehill | 8.4% | | IRR calculation based on time of investment and time of distribution with distributions limited to publicly projected total amount | $87.0 MM | Difference between $250.0 MM and $163.0 MM | 40.3% | IRR calculation based on time of investment and time of distribution |

# HMIT Exhibit No. 51

007536

Case 19-34054-sgj11    Doc 3818-3    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Exhibit Exhibits 31-52    Page 74 of 76

**Analysis of Farallon and Stonehill Claims Purchase**
**Prepared by Steven J. Pully, CFA, CPA, ESQ.**
**5-Jun-23**

**Calculation of Returns to Farallon and Stonehill**

| | Timeline of Investments | | | Timeline of Distributions | | |
|---|---|---|---|---|---|---|
| Seller of Claims | No Later Than | Payment Amounts by Farallon and Stonehill for Class 8 and 9 | | Total Unsecured Distributions to Classes 6, 7 and 8 | Total Unsecured Distributions to Class 8 | Reference |
| | | | | | | *Adjusted per Docs. 3757 and 3409 to remove Class 6 and 7 distributions* |
| Redeemer | 4/30/2021 | $78.0 | Third Quarter, 2021 | $6.0 | $0.0 amount | |
| Acis | 4/16/2021 | $8.0 | Fourth Quarter, 2021 | $0.0 | $0.0 | |
| HarbourVest | 4/30/2021 | $27.0 | First Quarter, 2022 | $0.8 | $0.0 | |
| UBS | 8/9/2021 | $50.0 | Second Quarter, 2022 | $0.1 | $0.0 | |
| | | **$163.0** | Third Quarter, 2022 | $249.0 | $248.4 | |
| | | | Fourth Quarter, 2022 | $0.0 | $0.0 | |
| | | | First Quarter, 2023 | $15.0 | $15.0 | |
| | | | | **$270.8** | **$263.4** | |

007537

# HMIT Exhibit No. 52

007538

**Analysis of Farallon and Stonehill Claims Purchase**
**Prepared by Steven J. Pully, CFA, CPA, ESQ.**
**5-Jun-23**

**IRR Calculations**

| Month | Actual Amount Distributed | Hypothetial Amount Distributed Based on Public Information |
|---|---|---|
| Apr-21 | -$113.00 | -$113.00 |
| May-21 | $0.00 | $0.00 |
| Jun-21 | $0.00 | $0.00 |
| Jul-21 | $0.00 | $0.00 |
| Aug-21 | -$50.00 | -$50.00 |
| Sep-21 | $0.00 | $0.00 |
| Oct-21 | $0.00 | $0.00 |
| Nov-21 | $0.00 | $0.00 |
| Dec-21 | $0.00 | $0.00 |
| Jan-22 | $0.00 | $0.00 |
| Feb-22 | $0.00 | $0.00 |
| Mar-22 | $0.00 | $0.00 |
| Apr-22 | $0.00 | $0.00 |
| May-22 | $0.00 | $0.00 |
| Jun-22 | $0.00 | $0.00 |
| Jul-22 | $0.00 | $0.00 |
| Aug-22 | $235.73 | $0.00 |
| Sep-22 | $0.00 | $0.00 |
| Oct-22 | $0.00 | $0.00 |
| Nov-22 | $0.00 | $0.00 |
| Dec-22 | $0.00 | $184.90 |
| Jan-23 | $0.00 | $0.00 |
| Feb-23 | $14.24 | $0.00 |
| Mar-23 | $0.00 | $0.00 |
| **Total Net Distributions** | $86.97 | $21.90 |
| **IRR** | 40.32% | 8.38% |

# HMIT Exhibit No. 53

007540

```
                      IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
 2
                                      )    Case No. 19-34054-sgj-11
 3    In Re:                          )    Chapter 11
                                      )
 4    HIGHLAND CAPITAL                )    Dallas, Texas
      MANAGEMENT, L.P.,               )    Tuesday, February 2, 2021
 5                                    )    9:30 a.m. Docket
               Debtor.                )
 6                                    )    CONFIRMATION HEARING [1808]
                                      )    AGREED MOTION TO ASSUME [1624]
 7    _____)

 8                         TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 9                     UNITED STATES BANKRUPTCY JUDGE.

10    WEBEX APPEARANCES:

11    For the Debtor:             Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
12                                10100 Santa Monica Blvd.,
                                    13th Floor
13                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
14
      For the Debtor:             John A. Morris
15                                Gregory V. Demo
                                  PACHULSKI STANG ZIEHL & JONES, LLP
16                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
17                                (212) 561-7700

18    For the Debtor:             Ira D. Kharasch
                                  PACHULSKI STANG ZIEHL & JONES, LLP
19                                10100 Santa Monica Blvd.,
                                    13th Floor
20                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
21
      For the Official Committee  Matthew A. Clemente
22    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
23                                Chicago, IL  60603
                                  (312) 853-7539
24

25
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-30   Filed 12/07/23   Page 23 of 892   Page 149 of 214   PageID 7105

2

```
 1   APPEARANCES, cont'd.:

 2   For Redeemer Committee of     Terri L. Mascherin
     the Highland Crusader          JENNER & BLOCK, LLP
 3   Fund:                          353 N. Clark Street
                                    Chicago, IL  60654-3456
 4                                  (312) 923-2799

 5   For Acis Capital              Rakhee V. Patel
     Management GP, LLC:            WINSTEAD, P.C.
 6                                  2728 N. Harwood Street, Suite 500
                                    Dallas, TX  75201
 7                                  (214) 745-5250

 8   For UBS Securities, LLC:      Andrew Clubok
                                    LATHAM & WATKINS, LLP
 9                                  555 Eleventh Street, NW,
                                      Suite 1000
10                                  Washington, DC  20004
                                    (202) 637-2200
11
     For Patrick Daugherty:        Jason Patrick Kathman
12                                  PRONSKE & KATHMAN, P.C.
                                    2701 Dallas Parkway, Suite 590
13                                  Plano, TX  75093
                                    (214) 658-6500
14
     For HarbourVest, et al.:      Erica S. Weisgerber
15                                  DEBEVOISE & PLIMPTON, LLP
                                    919 Third Avenue
16                                  New York, NY  10022
                                    (212) 909-6000
17
     For James Dondero:            Clay M. Taylor
18                                  John Y. Bonds, III
                                    D. Michael Lynn
19                                  Bryan C. Assink
                                    BONDS ELLIS EPPICH SCHAFER
20                                    JONES, LLP
                                    420 Throckmorton Street,
21                                    Suite 1000
                                    Fort Worth, TX  76102
22                                  (817) 405-6900

23   For Get Good Trust and        Douglas S. Draper
     Dugaboy Investment Trust:      HELLER, DRAPER & HORN, LLC
24                                  650 Poydras Street, Suite 2500
                                    New Orleans, LA  70130
25                                  (504) 299-3300
```

007542

3

```
 1     APPEARANCES, cont'd.:

 2     For Certain Funds and        Davor Rukavina
       Advisors:                    Julian Vasek
 3                                   MUNSCH, HARDT, KOPF & HARR
                                     500 N. Akard Street, Suite 3800
                                     Dallas, TX  75201-6659
 4                                   (214) 855-7587

 5     For Certain Funds and        A. Lee Hogewood, III
       Advisors:                    K&L GATES, LLP
 6                                   4350 Lassiter at North Hills
                                       Avenue, Suite 300
 7                                   Raleigh, NC  27609
                                     (919) 743-7306
 8
       For the NexPoint             Lauren K. Drawhorn
 9     Parties:                     WICK PHILLIPS
                                     3131 McKinney Avenue, Suite 100
10                                   Dallas, TX  75204
                                     (214) 692-6200
11
       For Scott Ellington,         Frances A. Smith
12     Isaac Leventon, Thomas       ROSS & SMITH, P.C.
       Surgent, and Frank           Plaza of the Americas
13     Waterhouse:                  700 N. Pearl Street, Suite 1610
                                     Dallas, TX  75201
14                                   (214) 593-4976

15     For Scott Ellington,         Debra A. Dandeneau
       Isaac Leventon, Thomas       BAKER & MCKENZIE, LLP
16     Surgent, and Frank           452 Fifth Avenue
       Waterhouse:                  New York, NY  10018
17                                   (212) 626-4875

18     For CLO Holdco, Ltd.:        John J. Kane
                                     KANE RUSSELL COLEMAN LOGAN, P.C.
19                                   901 Main Street, Suite 5200
                                     Dallas, TX  75202
20                                   (214) 777-4261

21     For Davis Deadman, Todd      Jason Patrick Kathman
       Travers, and Paul Kauffman:  PRONSKE & KATHMAN, P.C.
22                                   2701 Dallas Parkway, Suite 590
                                     Plano, TX  75093
23                                   (214) 658-6500

24

25
```

007543

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-30   Filed 12/07/23   Page 151 of 214   PageID 7107

4

```
1    APPEARANCES, cont'd.:

2    For the United States        David G. Adams
     of America (IRS):            U.S. STATES DEPARTMENT OF JUSTICE,
3                                   TAX DIVISION
                                  717 N. Harwood Street, Suite 400
4                                 Dallas, TX  75201
                                  (214) 880-2432
5
     For Highland CLO Funding,    Rebecca Matsumura
6    Ltd.:                        KING & SPALDING, LLP
                                  500 West 2nd Street, Suite 1800
7                                 Austin, TX  78701
                                  (512) 457-2024
8
     For Crescent TC              Michael S. Held
9    Investors:                   JACKSON WALKER, LLP
                                  2323 Ross Avenue, Suite 600
10                                Dallas, TX  75201
                                  (214) 953-5859
11
     For the Issuer Group:        Amy K. Anderson
12                                JONES WALKER, LLP
                                  811 Main Street, Suite 2900
13                                Houston, TX  77002
                                  (713) 437-1866
14
     Recorded by:                 Michael F. Edmond, Sr.
15                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
16                                Dallas, TX  75242
                                  (214) 753-2062
17
     Transcribed by:              Kathy Rehling
18                                311 Paradise Cove
                                  Shady Shores, TX  76208
19                                (972) 786-3063

20

21

22

23

24           Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
25
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-30   Exhibit Exhibit 30 Page 153 of 202   Filed 12/02/23   Page 152 of 214   PageID 7108

5

| | |
|---|---|
| 1 | DALLAS, TEXAS - FEBRUARY 2, 2021 - 9:38 A.M. |
| 2 | THE COURT:  Good morning.  Please be seated.  All |
| 3 | right.  We are ready to get started now in Highland Capital. |
| 4 | We have a confirmation hearing as well as a motion to assume |
| 5 | the non-residential real property lease at the headquarters. |
| 6 | All right.  This is Case No. 19-34054.  I know we're going to |
| 7 | have a lot of appearances today.  I think we're just down to a |
| 8 | handful of objections, but I'm nevertheless going to go ahead |
| 9 | and get formal appearances from our key parties that we've had |
| 10 | historically in this case. |
| 11 | First, for the Debtor team, do we have Mr. Pomerantz and |
| 12 | your crew? |
| 13 | MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff |
| 14 | Pomerantz, along with John Morris, Ira Kharasch, and Greg |
| 15 | Demo, on behalf of the Debtor-in-Possession, Highland Capital. |
| 16 | THE COURT:  All right.  Good morning.  All right. |
| 17 | For the Unsecured Creditors' Committee team, do we have Mr. |
| 18 | Clemente and others? |
| 19 | MR. CLEMENTE:  Yes.  Good morning, Your Honor. |
| 20 | Matthew Clements; Sidley Austin; on behalf of the Official |
| 21 | Committee of Unsecured Creditors. |
| 22 | THE COURT:  All right.  I'm actually going to call a |
| 23 | roll call for the Committee members who have obviously been |
| 24 | very active during this case.  For the Redeemer Committee and |
| 25 | Crusader Fund, do we have Ms. Mascherin and her team? |

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-30   Filed 12/20/23   Page 153 of 214   PageID 7109
Exhibit 28-30   53-58   Page 27 of 992

6

```
 1    (Pause.)  Okay.  We're -- if -- you must be on mute.

 2              MS. MASCHERIN:  Your Honor, I apologize.

 3              THE COURT:  Okay.  Go ahead.

 4              MS. MASCHERIN:  I apologize, Your Honor.  I was on

 5    mute and could not figure out how to unmute myself quickly.

 6    Terri Mascherin; Jenner & Block; on behalf of the Redeemer

 7    Committee.

 8              THE COURT:  All right.  Good morning.

 9         All right.  What about Acis?  Do we have Ms. Patel and

10    others for the Acis team?

11              MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

12    on behalf of Acis Capital Management.

13              THE COURT:  Good morning.

14         All right.  Mr. Clubok, I see you there for the UBS team,

15    correct?

16              MR. CLUBOK:  Yes.  Good morning, Your Honor.

17              THE COURT:  Good morning.

18         All right.  For Patrick Daugherty, I think I see Mr.

19    Kathman out there, correct?

20              MR. KATHMAN:  Good morning, Your Honor.  Jason

21    Kathman on behalf of Patrick Daugherty.

22              THE COURT:  All right.  Good morning.

23         All right.  What about HarbourVest?  Anyone on the line

24    for HarbourVest?

25              MS. WEISGERBER:  Good morning, Your Honor.  Erica
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-30   Filed 12/07/23   Page 154 of 214   PageID 7110
Exhibit Exhibit 53-58   Page 23 of 202

7

1 Weisgerber for HarbourVest.

2          THE COURT:  All right.  Very good.

3     All right.  Well, I'll now, I guess, turn to some of the

4 Objectors that I haven't hit yet.  Who do we have appearing

5 for Mr. Dondero this morning?

6          MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

7 of the law firm of Bonds Ellis Eppich Schaefer & Jones

8 appearing on behalf of Mr. Dondero.  I have with me, of

9 course, Mr. Dondero, who is in the room with me.  Dennis

10 Michael Lynn, John Bonds, and Bryan Assink are also appearing

11 on behalf of Mr. Dondero.

12          THE COURT:  All right.  Thank you, Mr. Taylor.

13     All right.  For the Dugaboy Trust and Get Good Trust, do

14 we have Mr. Draper and others?

15          MR. DRAPER:  Yes, Your Honor.  This is Douglas Draper

16 on the line.

17          THE COURT:  All right.  Good morning.

18          MR. DRAPER:  Good morning, Your Honor.

19          THE COURT:  All right.  What about what I'll call

20 Highland Fund, the Highland Funds and Advisors?  Do we have

21 Mr. Rukavina this morning, or who do we have?

22          MR. RUKAVINA:  Your Honor, good morning.  Davor

23 Rukavina and Julian Vasek for the Funds and Advisors.  I can

24 make a full appearance, but it's the parties listed on Docket

25 1670.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-30   Exhibit Exhibit 53-58   Page 29 of 692   Page 155 of 214   PageID 7111

8

1          THE COURT:  All right.  Thank you, Mr. Rukavina.

2      All right.  What about --

3          MR. HOGEWOOD:  Your Honor?

4          THE COURT:  Go ahead.

5          MR. HOGEWOOD:  Your Honor, Lee Hogewood.  I'm sorry,

6   Your Honor.  Lee Hogewood is also here on behalf of the same

7   parties.

8          THE COURT:  All right.  Thank you, sir.

9      All right.  What about NexPoint Real Estate Partners, HCRE

10  Partners?

11         MS. DRAWHORN:  Good morning, Your Honor.  Lauren

12  Drawhorn with Wick Phillips on behalf of NexPoint Real Estate

13  Partners, LLC.  I'm also here on behalf of the NexPoint Real

14  Estate entities which are listed on ==Docket 1677==, and NexBank,

15  which is -- their objection is 1676.

16         THE COURT:  All right.  Thank you.

17     All right.  Let's cover some of the employees.  I think I

18  see Ms. Smith out there.  Are you appearing for Mr. Ellington

19  and Mr. Leventon?

20         MS. SMITH:  Yes, Your Honor.  Frances Smith with Ross

21  & Smith, along with Debra Dandeneau of Baker McKenzie, on

22  behalf of Scott Ellington, Isaac Leventon, Thomas Surgent, and

23  Frank Waterhouse.

24         THE COURT:  All right.  Could you spell the last name

25  of your co-counsel from Baker McKenzie?  I didn't clearly get

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Exhibit Exhibit 33-58   Page 156 of 214   PageID 7112
Filed 12/07/23   Page 156 of 214

9

```
 1    that.

 2              MS. SMITH:  Yes, Your Honor.  It's Debra Dandeneau,

 3    D-A-N-D-E-N-N-A-U [sic].

 4              THE COURT:  Okay.  Thank you.

 5        All right.  CLO Holdco, do we have you appearing this

 6    morning?

 7              MR. KANE:  Your Honor, John Kane on behalf of CLO

 8    Holdco.

 9              THE COURT:  Thank you, Mr. Kane.

10        All right.  I know we had a different group of current or

11    former employees -- Brad Borud, Jack Yang -- and some joining

12    parties:  Kauffman, Travers, Deadman.  Who do we have

13    appearing for those?  (Pause.)  Anyone?  If you're appearing,

14    we're not hearing you.  Go ahead.

15              MR. KATHMAN:  Good morning, Your Honor.  Jason

16    Kathman.  I represent Mr. Deadman, Mr. Travers, and Mr.

17    Kauffman as well.

18              THE COURT:  Okay.  Thank you.  And I can't remember

19    who represents Mr. Borud and Yang.  Someone separately.

20              MR. KATHMAN:  It's Mr. Winikka, Your Honor.

21              THE COURT:  Oh, Mr. Winikka.

22              MR. KATHMAN:  And I haven't scrolled through to see

23    whether he's with -- in the 120 people signed in this morning.

24    But I believe that objection has been resolved.  I think Mr.

25    Pomerantz will probably address that later.  So Mr. Winikka
```

1    may not be appearing.

2         THE COURT:  Okay.  All right.  Well, anyone for the

3    IRS?

4         MR. ADAMS:  Good morning, Your Honor.  David Adams,

5    Department of Justice, on behalf of the United States and its

6    agency, the Internal Revenue Service.

7         THE COURT:  Thank you, Mr. Adams.

8     For the U.S. Trustee, who do we have appearing this

9    morning?  (No response.)  I'm not hearing you.  If you're

10    trying to appear, you must be on mute.  (No response.)  All

11    right.  Well, I suspect at some point we'll hear from the U.S.

12    Trustee, even though I don't hear anyone now.

13     At this point, I will open it up to anyone else who wishes

14    to appear who I failed to call.

15         MS. MATSUMURA:  Your Honor, this is Rebecca Matsumura

16    from King & Spalding representing Highland CLO Funding, Ltd.

17    Thank you.

18         THE COURT:  All right.  Thank you, Ms. Matsumura.

19    HCLOF.

20     Anyone else?

21         MR. HELD:  Your Honor, this is Michael Held with the

22    law firm of Jackson Walker, LLP on behalf of the office

23    landlord, Crescent TC Investors, LP.

24         THE COURT:  All right.  Thank you, Mr. Held.

25         MR. HELD:  Thank you, Your Honor.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-38 Exhibit 3 Filed 12/07/23   Page 158 of 214   PageID 7114

11

1           THE COURT:  Okay.  Any other lawyer appearances?

2       All right.  Well, again, if there's anyone out there who

3   did not get to appear, maybe we'll hear from you at some point

4   as the day goes on.

5       All right.  Mr. Pomerantz, this is an important day,

6   obviously.  How did you want to begin things?

7           MR. POMERANTZ:  So, Your Honor, I have a brief

8   opening to talk about what I plan to do, and a little more

9   lengthy opening, and it'll be come clear.  So if I may

10  proceed, Your Honor?

11          THE COURT:  You may.

12          MR. POMERANTZ:  Your Honor, we're here to request

13  that the Court confirm the Debtor's Fifth Amended Plan of

14  Reorganization, as modified.  The operative documents before

15  Your Honor are the Fifth Amended Plan, as modified, that was

16  filed along with our pleadings in support of confirmation on

17  January 22nd and the minor amendments that we filed on

18  February 1st.

19      Here is my proposal on how we can proceed this morning.  I

20  would intend to provide the Court with an opening statement

21  that would last approximately 20 minutes.  And then after any

22  other party who desires to make an opening statement, I would

23  propose that the Debtor put on its evidence that it intends to

24  rely on in support of confirmation.  The evidence consists of

25  the exhibits that the Debtor filed with its witness and

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-8   Filed 12/07/23   Page 159 of 214   PageID 7115

12

1   exhibit list on January 22nd and certain amendments that we

2   filed yesterday.

3       We would also put on the testimony of the following

4   witnesses:  Jim Seery, the Debtor's chief executive officer,

5   who Your Honor is very familiar with, and also a member of

6   Strand's board of directors; John Dubel, a member of Strand's

7   board of directors; and Mark Tauber, a vice president with Aon

8   Financial Services, the Debtor's D&O broker.

9       We have also submitted the declaration of Patrick Leatham,

10  who is with KCC, the Debtor's balloting agent.  And we don't

11  intend to put Mr. Leatham on the stand, but he is available on

12  the WebEx for cross-examination, to the extent necessary.

13      I propose that I would leave the bulk of my argument,

14  which includes going through the Section 1129 requirements for

15  plan confirmation, as well as responding to the remaining

16  outstanding objections, until my closing argument.

17      With that, Your Honor, I will pause and ask the Court if

18  Your Honor has any questions before I proceed.

19          THE COURT:  I do not have questions, so your method

20  of going forward sounds appropriate.  You may go ahead.

21          MR. POMERANTZ:  Thank you, Your Honor.

22           OPENING STATEMENT ON BEHALF OF THE DEBTOR

23          MR. POMERANTZ:  As I indicated, Your Honor, we stand

24  here side by side with the Creditors' Committee asking that

25  the Court confirm the Debtor's plan of reorganization.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-36  Exhibit Exhibit 58-68  Filed 12/07/23  Page 160 of 214    PageID 7116

13

1          As Your Honor is well aware, this case started in December

2     in -- October 2019, was transferred to Your Honor's court in

3     December 2019, and has been pending for approximately 15

4     months.

5          On January 9, 2020, I stood before Your Honor seeking the

6     approval of the independent board of directors of Strand, the

7     general partner of the Debtor, pursuant to a heavily-

8     negotiated agreement with the Committee.  And as the Court has

9     remarked on occasions throughout the case, the economic

10    stakeholders in this case believed that the installation of a

11    new board consisting of highly-qualified restructuring

12    professionals and a bankruptcy judge, a former bankruptcy

13    judge, was far more attractive than the alternative, which was

14    appointment of a trustee.  And upon approval of the

15    settlement, members of the board -- principally, Mr. Seery --

16    testified that one of the board's goals was to change the

17    culture of litigation that plagued Highland in the decade

18    before filing and threatened to embroil the Debtor in

19    continued litigation if changes were not made.

20         And as Your Honor is well aware, the last 14 months have

21    not been easy.  The board took its role as an independent

22    fiduciary extremely seriously, much to the consternation of

23    the Committee at times, and more recently, to the

24    consternation of Mr. Dondero and his affiliated entities.

25         And what has the Debtor, under the leadership of the

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 23-3 Filed 12/07/23 Page 161 of 214 PageID 7117

14

1    board, been able to accomplish during this case?  The answer

2    is a lot more than many parties believed when the board was

3    installed.

4         The Debtor reached a settlement with the Redeemer

5    Committee, resolving disputes that had been litigated for many

6    years, in many forums, and that resulted in an arbitration

7    award that was the catalyst for the bankruptcy filing.

8         Participating in a court-ordered mediation at the end of

9    August 2020 and September, the Debtor reached agreement with

10   Acis and Josh Terry.  The Court is all too familiar with the

11   years of disputes between the Debtor and Acis and Josh Terry,

12   which spanned arbitration proceedings and an extremely

13   combative Chapter 11 that Your Honor presided over.

14        The Debtor next reached an agreement with HarbourVest

15   regarding their assertion of over $300 million of claims

16   against the estate.  The HarbourVest litigation stemmed from

17   its investment in the Acis CLOs and would have resulted in

18   complex, fact-intensive litigation which would have forced the

19   Court to revisit many of the issues addressed in the Acis

20   case.

21        And perhaps most significantly, Your Honor, the Debtor was

22   able to resolve disputes with UBS, disputes which took the

23   most time of any claim in this case, through a contested stay

24   relief motion, a hotly-contested summary judgment motion, and

25   a Rule 3018 motion.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-8   Exhibit Exhibit 58-58   Page 162 of 214   PageID 7118

15

 1          While the Debtor and UBS hoped to file a 9019 motion prior

 2     to the commencement of the hearing, they were not able to do

 3     so.  However, I am now in a position to disclose to the Court

 4     the terms of the settlement, which is the subject of

 5     documentation acceptable to the Debtor and UBS.  The

 6     settlement provides for, among other things, the following

 7     terms:

 8          UBS will receive a $50 million Class 8 general unsecured

 9     claim against the Debtor.

10          UBS will receive a $25 million Class 9 subordinated

11     general unsecured claim against the Debtor.

12          UBS will receive a cash payment of $18.5 million from

13     Multi-Strat, which was a defendant and the subject of

14     fraudulent transfer claims.

15          The Debtor will use reasonable efforts to assist UBS to

16     collect its Phase I judgment against CDL Fund and assets CDL

17     Fund may have.

18          The parties will also agree to mutual and general

19     releases, subject to agreed carve-outs.

20          And, of course, the parties will not be bound until the

21     Court approves the settlement pursuant to a 9019 motion we

22     would hope to get on file shortly.

23          I am also pleased to let the Court know -- breaking news

24     -- that this morning we reached an agreement to settle Patrick

25     Daugherty's claims.  I would now like to, at the request of

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33 5 Filed 12/07/23   Page 163 of 214   PageID 7119
Exhibit Exhibit 58-56 12/07/23   Page

16

1   Mr. Kathman, read into the record the Patrick Daugherty

2   settlement.

3        Under the Patrick Daugherty settlement, Mr. Daugherty will

4   receive a $750,000 cash payment on the effective date.  He

5   will receive an $8.25 million general unsecured claim, and he

6   will receive a $2.75 million Class 9 subordinated claim.

7        The settlement of all claims against the Debtor and its

8   affiliates -- and affiliates will be defined in the documents

9   -- with the exception of the tax claim against the Debtor, Mr.

10   Dondero, and Mr. Okada -- and for the avoidance of doubt,

11   except as I describe below, nothing in the settlement is

12   intended to affect any pending litigation Mr. Daugherty has

13   against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14   Katz, Michael Hurst, and Hunton Andrew Kurth.

15        Mr. Daugherty will release the Debtor and its affiliates

16   and current employees for all claims and causes of action,

17   except for the agreements I identify below, and dismiss all

18   current employees as to pending actions.  We believe this only

19   applies to Thomas Surgent and no other employee is implicated.

20        Mr. Surgent and other employees, including but not limited

21   to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22   and Matt Diorio, will receive releases similar to the covenant

23   in Paragraph 1D of the Acis settlement agreement, which

24   essentially provided the release would go away if they

25   assisted anyone in pursuing claims against Mr. Daugherty.

17

1    Highland and the above-mentioned parties will accept

2    service of any subpoenas and acknowledge the jurisdiction of

3    the Delaware Chancery Court for the purposes of accepting any

4    subpoenas.  And for the avoidance of doubt, Highland will

5    accept service on behalf of the employees only in their

6    capacity as such.

7    Highland will also use material -- will use reasonable

8    efforts at no material cost to assist Daugherty in vacating a

9    Texas judgment that was issued against him.  We've also looked

10    at a form of the motion and believe we have agreed on the form

11    of the motion.

12    Highland, its affiliates, and current employees will

13    covenant and agree they will not pursue or seek to enforce the

14    injunction and the Texas judgment against Daugherty.

15    And lastly, Daugherty will not be able to settle any

16    claims for negligence or other claims that might be subject to

17    indemnification by the Debtor or any successor.

18    Accordingly, Your Honor, other than the claims of Mr.

19    Dondero and his related entities, and the unliquidated claims

20    of certain employees, substantially all claims have been

21    resolved in this case, a truly remarkable achievement.

22    Separate and apart, Your Honor, from the work done

23    resolving the claims, the Debtor, under the direction of the

24    independent board, has worked extremely hard to develop a plan

25    of reorganization.

007557

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Filed 12/07/23   Page 165 of 214   PageID 7121

18

1      After the independent board got its bearings, it started

2  to work on various plan alternatives.  And the board received

3  a lot of pressure from the Committee to go straight to a plan

4  seeking to monetize assets like the one before Your Honor

5  today.  However, the board believed that before proceeding to

6  do so and go down an asset monetization path, it should

7  adequately diligence all alternatives, including a

8  continuation of the current business model, a reorganization

9  sponsored by Mr. Dondero and his affiliates, a sale of the

10 Debtor's assets, including a sale to Mr. Dondero.

11     In June 2020, plan negotiations proceeded in earnest, and

12 the Debtor started to negotiate an asset monetization plan

13 with the Committee, while still pursuing other alternatives.

14     Preparation of an asset monetization plan is not typically

15 a complicated process.  However, creating the appropriate

16 structure for a business like the Debtor's was extremely

17 complicated, because of the contractual, regulatory, tax, and

18 governance issues that had to be carefully considered.

19     At the same time the Committee negotiations were

20 proceeding down that path, Mr. Seery continued to spend

21 substantial time trying to negotiate a grand bargain plan with

22 Mr. Dondero.  It is not an exaggeration to say that over the

23 last several months Mr. Seery has dedicated hundreds of hours

24 towards a potential grand bargain plan.

25     And why did he do it?  Because he has always believed that

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 23-03 Exhibit 23-03 5 Filed 12/07/23 Page 166 of 214 PageID 7122

19

1   a global restructuring among all parties was the best

2   opportunity to fully and finally resolve the acrimony that

3   continued to plague the Debtor.

4        Notwithstanding Mr. Seery's and the independent board's

5   best efforts, they were not able to reach consensus on a grand

6   bargain plan, and the Debtor filed the plan, the initial plan,

7   on August 12th, which ultimately evolved into the plan before

8   the Court today.

9        The Court conducted an initial hearing on the disclosure

10  statement on October 27th, and then ultimately approved -- the

11  Court approved the disclosure statement at a hearing on

12  November 23rd.

13       While the Debtor continued to work towards resolving

14  issues with the Committee with the filed plan, Mr. Dondero,

15  beginning to finally see that the train was leaving the

16  station, started to do whatever he could to get in the way of

17  plan confirmation.

18       He objected to the Acis settlement.  When his objection

19  was overruled, he filed an appeal.

20       He objected to the HarbourVest settlement.  When his

21  objection was overruled, he had Dugaboy file an appeal.

22       He started to interfere with the Debtor's management of

23  its CLOs, stopping trades, refusing to provide support, and

24  threatening Mr. Seery and the Debtor's employees.

25       He had his Advisors and Funds that he owned and controlled

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-38   Exhibit Exhibit 58-58 1707231   Page 167 of 214   PageID 7123

20

1    file motions that Your Honor said was a waste of time.

2        He had those same Funds and Advisors threaten to terminate

3    the Debtor as a manager, in blatant violation of the Court's

4    January 9, 2020 order.

5        His conduct was so egregious that it warranted entry of a

6    temporary restraining order and preliminary injunction against

7    him.  And of course, he has appealed that ruling as well.

8        But that was not all.  He brazenly threw out his phone, in

9    what the Court has remarked was spoliation of evidence, and he

10   violated the TRO in other ways, actions for which he will

11   answer for at the contempt hearing scheduled later this week.

12        And, of course, he and his pack of related entities have

13   filed a series of objections.  We have received 12 objections

14   to the plan, Your Honor, excluding three joinders.  And as I

15   mentioned, we have been pleased to report that we've been able

16   to resolve six of them:  those of the Senior Employees, those

17   of Patrick Daugherty, those of CLO Holdco, those of the IRS,

18   those of Texas Taxing Authorities, and those of Jack Young and

19   Brad Borud.

20        The CLO Holdco objection was withdrawn in connection with

21   the settlement reached with them in connection with the

22   preliminary injunction hearing that the Court heard -- started

23   to hear last week.

24        The Taxing Authorities' objections have been resolved by

25   the Debtor agreeing to make certain modifications to the plan

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-58  Exhibit Exhibit 58   Filed 12/07/23   Page 168 of 214   PageID 7124   Page 692 of 692

21

1  that were included in our filing yesterday and to include

2  certain provisions in the confirmation order to address other

3  concerns.

4      The group of employees who are referred to as the Senior

5  Employee are comprised of four individuals -- Frank

6  Waterhouse, Thomas Surgent, Scott Ellington, and Isaac

7  Leventon -- although Mr. Ellington and Mr. Leventon are no

8  longer employed by the Debtor.

9      On January 22nd, Your Honor, we filed executed

10  stipulations with Frank Waterhouse and Thomas Surgent.  These

11  stipulations were essentially the Senior Employee stipulations

12  that were referred to in the plan and the disclosure

13  statement.

14      And as part of those stipulations, the Debtor, in

15  consultation with and agreement from the Committee, agreed to

16  certain modifications of the prior version of the Senior

17  Employee stipulation with both Mr. Waterhouse and Mr. Surgent

18  that effectively reduced the compensation they needed to

19  provide for the release from 40 percent to five percent of

20  their claims.

21      The Debtor and the Committee believed the resolution with

22  Mr. Surgent and with Mr. Waterhouse was fair, given the

23  importance of these two people to the transition effort and

24  the increased reliance upon them that the Debtor would have

25  with the departure of Mr. Ellington and Mr. Leventon.  And as

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-8   Exhibit Exhibit 58 Filed 12/07/23   Page 169 of 214   PageID 7125

22

1   a result of that agreement, Your Honor, on January 27th, Mr.

2   Waterhouse and Mr. Surgent withdrew from the Senior Employee

3   objection.

4        Subsequently, we reached agreement with Mr. Ellington and

5   Mr. Leventon to resolve the objections they raised with

6   confirmation.  And at Ms. Dandeneau's request, I would like to

7   read into the record the agreement reached with both of them,

8   and I know she will correct me if I get anything wrong.

9            THE COURT:  Okay.

10           MR. POMERANTZ:  Among other things, Mr. Ellington and

11  Mr. Leventon asserted in their objection that they were

12  entitled to have their liquidated bonus claims treated as

13  Class 7 convenience claims under the plan, under their reading

14  of the plan, and their understanding of communications with

15  Mr. Seery.  The Debtor disputed the entitlement to elect Class

16  7 based upon the terms of the plan, the disclosure statement,

17  and applicable law.  But as I said, the parties have resolved

18  this dispute.

19       Mr. Ellington asserts liquidated bonus claims in the

20  aggregate amount of $1,367,197, which, to receive convenience

21  class treatment under anybody's analysis, would have had to be

22  reduced to a million dollars.

23       Mr. Leventon asserts a liquidated bonus claim in the

24  amount of $598,198.

25       If Mr. Ellington and Mr. Leventon were entitled to be

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Filed 12/07/23   Page 170 of 214   PageID 7126

23

1   included in the convenience class, as they claimed, they would

2   be entitled to receive 85 percent of their claim as and when

3   the claims were allowed under the plan.

4       To settle the dispute regarding whether, in fact, they

5   would be entitled to the convenience class treatment, they

6   have agreed to reduce the percentage they would otherwise be

7   entitled to receive from 85 percent to 70.125 percent.  And as

8   a result, Mr. Ellington's Class 7 convenience claim would be

9   entitled to receive $701,250 if allowed, and Mr. Leventon's

10  Class 7 convenience claim would be entitled to receive

11  $413,175.10 if allowed.

12      Mr. Ellington and Mr. Leventon would reserve the right to

13  assert that a hundred percent of their liquidated bonus claims

14  are entitled to administrative priority, and the Debtor, the

15  Committee, the estate and their successors, would reserve all

16  rights to object.

17      If anyone did object to the allowance of the liquidated

18  bonus claims and Mr. Ellington and/or Mr. Leventon prevailed

19  in such disputes, then the discount that was previously agreed

20  to -- 85 percent to 70.125 percent -- would go away and they

21  would be entitled to receive the full 85 percent payout as

22  essentially a penalty for litigating against them on their

23  allowed claims and losing.

24      As an alternative to the estate preserving the right to

25  object to the allowance of Mr. Ellington and Mr. Leventon's

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-33    Filed 12/07/23    Page 171 of 214    PageID 7127
Exhibit Exhibit 33 Page 1270 of 692

24

1    liquidated bonus claims, the Debtor and the Committee have an

2    option to be exercised before the effective date to just agree

3    that both their claims will be allowed, and allowed as Class 7

4    convenience claims.  And if that agreement was reached, then

5    the amount of such liquidated bonus claims, they would receive

6    a payment equal to 60 percent of their allowed convenience

7    class claim.

8        In exchange, Mr. Ellington and Mr. Leventon would waive

9    their right to assert payment of a hundred percent of their

10   liquidated bonus claims as an administrative expense.

11       So, under this circumstance, Mr. Ellington would receive

12   an allowed claim of $600,000, which is 60 percent of a million

13   dollars, and Mr. Leventon will receive a payment on account of

14   his Class 7 claim of $358,918.80.

15       Under both scenarios, Mr. Ellington and Mr. Leventon would

16   preserve their paid time off claims that are treated in Class

17   6, and they would preserve their other claims in Class 8,

18   largely unliquidated indemnification claims, subject to the

19   rights of any party in interest to object to those claims.

20       Mr. Ellington will change his vote in Class 8 from

21   rejecting the plan to accepting the plan, and Mr. Leventon

22   would change his votes in Class 8 and Class 7 from rejecting

23   the plan to accepting the plan.  And Mr. Ellington and Mr.

24   Leventon would withdraw any remaining objections to

25   confirmation of the plan, and we intend to put this settlement

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33 53-58 12/07/26 Page 172 of 214   PageID 7128

25

1   in the confirmation order.

2   Your Honor, six objections to the plan remain outstanding.

3   One objection was filed by the Office of the United States

4   Trustee, and the remaining five objections are from Mr.

5   Dondero and his related entities.  And I would like to put up

6   a demonstrative on the screen which shows how all of these

7   objections lead back to Jim Dondero.

8            THE COURT:  All right.

9            MR. POMERANTZ:  You see on the top left, Your Honor,

10  there's a box in white that says A through E, which are the

11  five remaining objections.  And you can see how they relate.

12  But all of it goes back to that orange box in the middle, Jim

13  Dondero.

14  These objections, which I will address in my closing

15  argument in detail, are not really focused on concerns that

16  creditors are being treated unfairly, and that's because Mr.

17  Dondero and his entities don't really have any valid claims.

18  Mr. Dondero owns no equity in the Debtor.  He owns the

19  Debtor's general partner, Strand, which in turn owns a quarter

20  percent of the total equity in the Debtor.  Mr. Dondero's only

21  other claim is a claim for indemnification.  And as Your Honor

22  would expect, the Debtor intends to fight that claim

23  vigorously.

24  Dugaboy and Get Good have asserted frivolous

25  administrative and unsecured claims, which I will discuss in

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-03   Exhibit Exhibit 3B Filed 12/06/23   Page 173 of 214   PageID 7129

26

1    more detail later.

2         Dugaboy does have an equity interest in the Debtor, but it

3    represents eighteen-hundredths of a percent of the Debtor's

4    total equity.

5         And Mr. Rukavina's clients similarly have no general

6    unsecured claims against the Debtor.  Either his clients did

7    not file proofs of claim or filed claims and then agreed to

8    have them expunged.  The only claims that his clients assert

9    is a disputed administrative claim filed by NexPoint Advisors.

10        And the objections aren't legitimately concerned about the

11   post-confirmation operations of the estate, to preserve equity

12   value, how much people are getting, whether Mr. Seery is

13   really the right person to run these estates.  That's because

14   Mr. Dondero has repeatedly told the Court that he believes his

15   offer, which doesn't come close to satisfying claims in full

16   in this case, is for fair value and that creditors, who are

17   owed more than $280 million, will not receive anywhere close

18   to the amount of their claims.

19        Rather, Mr. Dondero and his entities are concerned with

20   one thing and one thing only:  how to preserve their rights to

21   continue their frivolous litigation after confirmation against

22   the independent directors, the Claimant Trustee, the

23   Litigation Trustee, the employees, the Claimant Trust

24   Oversight Board, and anyone who will stand in their way.  For

25   Mr. Dondero, the decision is binary:  Either give him what he

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Filed 12/07/23   Page 174 of 214   PageID 7130
Exhibit Exhibits B-58 1707/228 Page

27

1   wants, or as he has told Mr. Seery, he will burn down the

2   place.

3       Your Honor will hear a lot of argument today about how the

4   -- and tomorrow, in closing -- about how the injunction, the

5   gatekeeper, and the exculpation provisions of the plan are not

6   appropriate under applicable law.  The Debtor, of course,

7   disagrees with these arguments, and I will address them in

8   detail in my closing argument.

9       But I do think it's important to focus the Court at the

10  outset on the January 9, 2020 order that the Court entered

11  which addressed some of these issues.  This order, which has

12  not been appealed, which was actually agreed to by Mr.

13  Dondero, has no expiration by its terms and will continue

14  post-confirmation, did some things that the Objectors just

15  refuse to recognize and accept.

16      It approved an exculpation for negligence for the

17  independent directors and their agents.  It provided that the

18  Court would be the gatekeeper to determine whether any claims

19  asserted for them -- against them for gross negligence and

20  willful misconduct could be pursued, and if so, provided that

21  this Court would have exclusive jurisdiction to adjudicate

22  those claims.  And it prevented Mr. Dondero and his related

23  entities from causing any related entity to terminate any

24  agreements with the Debtor.

25      I also note, Your Honor, that the Court's July 16, 2020

007567

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-18   Filed 12/07/23   Page 175 of 214   PageID 7131
Exhibit 23-18    5B-58   1707-239   692

28

1   order approving Mr. Seery as chief executive officer and chief

2   restructuring officer included the same exculpation and

3   gatekeeping provision as contained in the January 29th --

4   January 9th order.

5       Your Honor, we have all come too far to allow Mr. Dondero

6   to make good on his promise to Mr. Seery to burn down the

7   place if he didn't get what he wanted.  The Debtor deserves

8   better, the creditors deserve better, and this Court deserves

9   better.

10      That concludes my opening argument, Your Honor.

11          THE COURT:  All right.  Thank you.  I had one follow-

12  up question about the Daugherty settlement.  You did not

13  mention, is it going to be reflected in the confirmation

14  order, is it going to be the subject of a 9019 motion, or

15  something else?

16          MR. POMERANTZ:  It'll be subject to a -- it'll be

17  subject to a 9019 motion, Your Honor.

18          THE COURT:  All right.

19          MR. POMERANTZ:  I apologize for leaving that out.

20          THE COURT:  All right.  Thank you.  Well, --

21          MR. KATHMAN:  Your --

22          THE COURT:  -- I appreciate that you stuck closely to

23  your 20-minute time estimate.

24      As far as other opening statements today, I'm going to

25  start with the objections that were resolved.  Mr. Kathman, I

 1    see you there.  Who will speak on behalf of Patrick Daugherty

 2    and the announced settlement?

 3            OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

 4            MR. KATHMAN:  Good morning, Your Honor.  Jason

 5    Kathman on behalf of Mr. Daugherty.

 6        Mr. Pomerantz correctly recited the bullet points of the

 7    settlement that we agreed to in principle this morning.  There

 8    was one that he did leave off that I do want to make sure that

 9    I mention and that it's read into the record.  And he read at

10    the top end that Mr. Daugherty does maintain his ability to

11    pursue his 2008 tax refund bonus claim, or tax refund

12    compensation claim.  If the Court will recall, there's a

13    contingent liability out there based on how compensation was

14    paid back in 2008 that's the subject of an IRS audit.  And so

15    the settlement expressly contemplates that those -- that that

16    claim will be preserved and Mr. Daugherty may pursue that

17    claim.  Should the IRS have an adverse ruling and we have to

18    pay money back, we get to preserve that claim.

19        And so the one thing that is preserved, Your Honor -- and

20    the same way that Mr. Pomerantz read verbatim the words, I'm

21    going to read verbatim the words that we've agreed to:

22    Daugherty maintains and may pursue the 2008 tax refund

23    compensation portion of his claim that is currently a disputed

24    contingent liability.  The Debtor and all successors reserve

25    the right to assert any and all defenses to this portion of

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-33   Filed 12/07/23   Page 177 of 214   PageID 7133

30

1    the Daugherty claim.  The litigation of this claim shall be

2    stayed until the IRS makes a final determination, provided,

3    however, Daugherty may file a motion with the Bankruptcy Court

4    seeking to have the amount of his tax claim determined for

5    reservation purposes as a "disputed claim" under the Debtor's

6    plan.  The Debtor and all successors reserve the right to

7    assert any and all defenses to any such motion.

8         So the Debtor's plan says that they can make estimations

9    for disputed claims.  There is not currently something

10   reserving this particular claim, so we wanted to make sure we

11   reserve our rights to be able to have that amount reserved

12   under the Debtor's plan.  And the Debtor obviously preserves

13   their ability to object to that.

14        With that, Your Honor, it is going to be papered up in a

15   9019, and we'll have some further things to say at the 9019

16   hearing, but didn't want to derail the Debtor's confirmation

17   hearing this morning.

18             THE COURT:  All right.  And --

19             MR. POMERANTZ:  And Mr. Kathman is -- Mr. Kathman is

20   correct.  I neglected to mention that provision, but he is --

21   he read it, and that's agreed to.

22             THE COURT:  All right.  And I did not hear anything

23   about Mr. Daugherty's vote on the plan.  Is there an agreement

24   to change or a motion to change the vote from no to yes?

25             MR. KATHMAN:  Your Honor, that wasn't, I think,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-03  Exhibit Exhibit 5B-58 1-7 of 232 of 692  Page 178 of 214   PageID 7134

31

1  directly -- and Mr. Pomerantz can correct me if I'm wrong, or

2  Mr. Morris, actually, probably more could -- that wasn't

3  directly addressed, but I think the answer to that is probably

4  they don't need our vote.

5       THE COURT:  Okay.

6       MR. KATHMAN:  I think they have enough votes in that

7  class to carry.

8       THE COURT:  Okay.

9       MR. KATHMAN:  But the answer directly is that that

10  wasn't specifically addressed one way or the other.

11       THE COURT:  All right.

12       MR. POMERANTZ:  That is correct, Your Honor.  We

13  would, of course, not oppose Mr. Daugherty changing his vote,

14  but as Your Honor saw in the ballot summary, we are way over

15  the amount in dollar amounts of claims.  But if they wanted to

16  change their vote, we wouldn't oppose.

17       THE COURT:  All right.  Well, --

18       MR. KATHMAN:  Your Honor, I have -- I have the

19  benefit of Mr. Daugherty.  He is on -- I should note, Mr.

20  Daugherty is on the hearing this morning.  He just let me know

21  that he is willing to change his vote.  If the Debtor were to

22  so make a motion, we're fine changing our vote to in favor of

23  the plan.

24       THE COURT:  All right.  All right.  Well, we'll get

25  the ballot agent declaration or testimony later.  At one time

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-18   Exhibit Exhibit 5B-58 12 Page 2179 of 214   PageID 7135   Filed 12/07/23   Page 179 of 214

32

1    when I had checked, there was a numerosity problem but not a

2    dollar amount problem.  And it sounds like that is no longer

3    an issue, perhaps because of the employee votes, or I don't

4    know.

5        But, all right.  Well, thank you.

6            MR. POMERANTZ:  Your Honor, there is still a

7    numerosity problem.

8            THE COURT:  Okay.

9            MR. POMERANTZ:  There's not a dollar amount problem.

10           THE COURT:  Okay.

11           MR. POMERANTZ:  But we'll address that and cram-down

12   in closing.

13           THE COURT:  All right.  Very good.

14       All right.  Well, I want to hear from the -- what we've

15   called the Senior Employee group.  Is Ms. Dandeneau going to

16   confirm the announcement of Mr. Pomerantz?

17           MS. DANDENEAU:  Yes, Your Honor.  I confirm that Mr.

18   Pomerantz's recitation of the terms to which we've agreed is

19   accurate.

20           THE COURT:  All right.  Very good.

21       All right.  I suppose I should circle back to UBS.  We've,

22   of course, heard in prior hearings the past few weeks that

23   there was a settlement with UBS, but Mr. Clubok, could I get

24   you to confirm what Mr. Pomerantz announced earlier about the

25   UBS settlement?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-38   Exhibit 23-38   Filed 12/07/23   Page 180 of 214   PageID 7136

33

1          MR. CLUBOK:  Yes.  Good morning again, Your Honor.

2      Yes, we have reached a settlement, and it's just -- and

3  it's been approved internally at UBS and obviously by the

4  Debtor.  It's just subject to the final documentation.  And we

5  are working very closely with the Debtor to try to do that as

6  quickly as possible.

7          THE COURT:  All right.  Thank you.

8      All right.  Well, let me go, then, to other opening

9  statements.  Is there anyone else who at this time wishes to

10  make an opening statement?  And, you know, for the pending

11  objectors, please, no more than 20 minutes.

12          MR. CLEMENTE:  Your Honor?  Your Honor, if I may,

13  it's Matt Clemente on behalf of the Committee.

14          THE COURT:  Okay.

15          MR. CLEMENTE:  I'd be very brief, but I would like to

16  make some remarks to Your Honor.  It'll be less than five

17  minutes.

18          THE COURT:  All right.  Go ahead.

19          MR. CLEMENTE:  Thank you, Your Honor.

20  OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

21          MR. CLEMENTE:  Again, for the record, Matt Clemente;

22  Sidley Austin; on behalf of the Official Committee of

23  Unsecured Creditors.

24      Your Honor, to be clear, the Committee fully supports

25  confirmation of the Debtor's plan and believes the plan is

007573

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-08   Exhibit Exhibit 5B-58 17 of 235   Page 181 of 214   PageID 7137

34

1   confirmable and should be confirmed.

2       Although it has taken us quite some time to get to this

3   point, Your Honor, and as Mr. Pomerantz referred, the Debtor's

4   business is somewhat complex, the plan is remarkably

5   straightforward, Your Honor, and has only been made

6   complicated by the various objections filed by Mr. Dondero's

7   tentacles.

8       At bottom, Your Honor, the plan is designed to recognize

9   the reality of the situation that the Committee has

10  continually been expressing to Your Honor, and that is the

11  overwhelming amount of creditors in terms of dollars are

12  litigation creditors, creditors who are here entirely because

13  of the fraudulent and other conduct of Mr. Dondero and his

14  tentacles.

15      The other third-party creditors, Your Honor, by and large

16  are those collateral to these litigation claims in terms of

17  true trade creditors and service providers.

18      Recognizing this fact, Your Honor, the plan contains an

19  appropriate convenience class, which, in the Committee's view,

20  provides a fair way to capture a large number of claims and

21  appropriately recognizes the distinction between those claims

22  and the large litigation claims.  And the holders of these

23  large litigation claims, including now Mr. Daugherty, have

24  voted in favor of allowing this convenience class treatment.

25      Your Honor, after distributions are made to the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-33    Exhibit 23-33    Filed 12/02/36    Page 182 of 214    PageID 7138

35

1  administrative creditors, the priority creditors, the secured

2  creditors, and the convenience creditors, the remainder goes

3  to general unsecured creditors who will control how this value

4  is realized.  These are the large litigation creditors.

5      Additionally, Your Honor, recognizing the possibility of

6  recovery in excess of general unsecured claims plus interest,

7  and to thwart, from the Committee's perspective, what would

8  have undoubtedly been an argument by one of the Dondero

9  tentacles that the general unsecured creditors could be paid

10  more than they are owed, the plan provides for a contingent

11  interest to kick in after payment in full for interests of all

12  prior claims.

13      Your Honor, this is the sum and substance of the plan.  At

14  bottom, fairly straightforward.  And the true creditors, Your

15  Honor, have voted overwhelmingly in favor of the plan.  Class

16  8 has voted to support the plan.  Class 7 has voted to accept

17  the plan.  And now I believe, with Mr. Daugherty's settlement,

18  one hundred percent in amount of Class 8, non-insider, non-

19  Dondero-controlled or (audio gap) have voted in favor of the

20  plan.

21      To be clear, as Your Honor pointed out and as Mr.

22  Pomerantz referenced, there is not numerosity in Class 8, Your

23  Honor, but that is driven, as Your Honor will see, from

24  approximately 30 no-votes of current employees who the

25  Committee believes are not owed any amounts and therefore they

 1   will not be receiving payments under the plan, yet they voted

 2   against the plan.  So although we have a technical cram-down

 3   plan from the Class 8 perspective, Your Honor, the plan voting

 4   reflects the reality that the economic parties in interest

 5   overwhelmingly support the plan.

 6        So, Your Honor, cutting through the machinations of the

 7   Dondero tentacles, we do have a fairly straightforward plan

 8   and a plan that the Committee believes is confirmable and

 9   should be confirmed.

10        Your Honor, since I've been in front of you for over a

11   year now, I've referred to the goals of the Committee in this

12   case, and the goals are straightforward in terms of expressing

13   them but can be difficult in reality to implement them.  The

14   Committee's goals have been two-fold:  to maximize the value

15   of the estate and therefore the recoveries for its

16   constituency, and to disentangle from the Dondero (audio gap).

17        As with all things Highland, although these goals are

18   straightforward, they're remarkably difficult to achieve,

19   given the Dondero tentacles.  However, the Committee strongly

20   believes the plan achieves these two goals.

21        First, the plan provides a credible path to maximize

22   recovery with Mr. Seery, who has gotten to know the assets and

23   who has performed skillfully and credibly throughout this very

24   difficult process.  It is a difficult set of assets and

25   complex set of assets, as Your Honor knows very well.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-8   Filed 12/07/23   Page 184 of 214   PageID 7140

37

1      To be sure, there is uncertainty associated with the

2   Debtor's projections, but that is inherent in the nature of

3   the assets of the Debtor, and frankly, is inherent in the

4   nature of projections themselves.  And Mr. Dondero and his

5   tentacles will point to the downside, potentially, in those

6   projections, but the Court will be reminded that there is also

7   potential upside in those projections, an upside that would

8   inure to the benefit of the general unsecured claims.

9      Second, Your Honor, although it is seemingly impossible to

10  free yourself from the Dondero web until every single one of

11  the 2,000 barbed tentacles is painfully removed, if that's

12  even possible, Your Honor, the Reorganized Debtor, the

13  Claimant Trust, the Claimant Trustee, the Litigation Sub-

14  Trust, the Litigation Trustee, and the Oversight Board

15  construct and mechanisms is a structure that the Committee

16  believes provides the creditors with the best possibility to

17  do so, and that is to deal with what will undoubtedly be a

18  flurry of attacks from Mr. Dondero and his tentacles.

19     This is a virtual certainty, Your Honor.  The creditors

20  have seen this movie before and Your Honor has seen this movie

21  before.  They have seen Mr. Dondero make and break promises.

22  They have seen Mr. Dondero attempt to bludgeon adversaries

23  into submission in order to accept his offerings, and they

24  have heard Mr. Dondero say that which he has said in this

25  court during the preliminary injunction hearing --

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Exhibit 23-33   Filed 12/07/23   Page 185 of 214   PageID 7141

38

1   specifically, that the Debtor's plan "is going to end up in a

2   myriad of litigation."

3       The creditors are steeled in their will to be rid of Mr.

4   Dondero, and they're confident in this structure to do so.

5       To be clear, Your Honor, what is before the Court today

6   for confirmation is the Debtor's plan, not some other plan

7   that no one supports other than Mr. Dondero and his tentacles.

8   The question isn't whether Mr. Dondero has a better proposal

9   -- and footnote, Your Honor, the answer is he does not, both

10  from a qualitative and quantitative perspective -- but whether

11  the plan before the Court is in the best interest of creditors

12  and should be confirmed.  The Committee strongly believes it

13  is, and should, and all the Committee members support

14  confirmation of the Debtor's plan.

15      Recognizing Mr. Dondero's behavior, Your Honor, and

16  threats regarding how he will behave in the future, there are

17  certain provisions in the plan that are of critical importance

18  to the creditors.  Of course, all provisions in the plan are

19  extremely important, Your Honor, but as Mr. Pomerantz

20  referenced, the creditors need the gatekeeper, exculpation,

21  and injunction provisions.

22      The reason is obvious, and is emphasized by the

23  supplemental objection filed just yesterday by some of Mr.

24  Dondero's tentacles -- namely, the Dugaboy and the Get Good

25  Trusts.  And I quote, Your Honor:  "It is virtually certain

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-8    Filed 12/07/23    Page 186 of 214    PageID 7142
Exhibit Exhibit 5B-58 1707-230 of 692

39

1    that, under the Debtor's plan, there will be years of

2    litigation in multiple adversary proceedings, appeals, and

3    collection activities, all adding substantial uncertainty and

4    delay."

5        Additionally, Your Honor has seen from the proceedings in

6    this case and has expressed frustration at numerous times at

7    the myriad and at times baseless and borderline frivolous and

8    out of touch with reality suits and objections and proceedings

9    that the Dondero tentacles bring.  The creditors need the

10   gatekeeper, exculpation, and injunction provisions to preserve

11   and protect value.  And the record, I think, to this point is

12   clear, and will be further made clear through the confirmation

13   proceedings, that the protections are appropriate and entirely

14   within this Court's authority to grant.

15       In sum, Your Honor, the Committee fully supports

16   confirmation of the plan.  The Committee believes it is

17   confirmable and should be confirmed, and two classes of

18   creditors and the overwhelming amount of creditors in terms of

19   dollars agree.

20       That's it, Your Honor.  Unless you have questions for me,

21   I have nothing further at this time.

22              THE COURT:  All right.  Thank you, Mr. Clemente.

23              MR. CLEMENTE:  Thank you, Your Honor.

24              THE COURT:  All right.  Who else wishes to be heard?

25              MR. DRAPER:  Your Honor, this is Douglas Draper.  I'd

1  like to be heard.  I have a few -- I'll take five minutes, at

2  most --

3        THE COURT:  All right.  Go ahead.

4        MR. DRAPER:  -- and just focus on a few things.

5  OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

6                    INVESTMENT TRUST

7        MR. DRAPER:  I'm going to focus my opening remarks on

8  the releases, the exculpations, and channeling injunctions in

9  the plan.  I'm not waiving my other objections, but, rather,

10 trying not to subject the Court to hearing the same argument

11 from multiple lawyers.

12      The good thing about the law is that it's absolute in

13 certain respects.  It does not matter who is asserting a legal

14 protection, the law applies it.  For example, a serial killer

15 is entitled to a *Miranda* warning and a protection against

16 unlawful search and seizure.  The law does not allow tainted

17 evidence or an unlawful admission into evidence,

18 notwithstanding the fact that the lack of admission of that

19 evidence may lead to the freeing of that serial killer.

20      Today, you must make an independent evaluation as to

21 whether the plan complies with 1129 and applicable law.  The

22 decision must be made notwithstanding the fact that it is

23 being made by a Dondero entity.  It's not being -- it must be

24 applied notwithstanding the fact that it's being made by me.

25      We contend that the plan does not meet the hurdle and

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-3    Filed 12/07/23    Page 188 of 214    PageID 7144
Exhibit Exhibit 58 Filed 12/07/23    Page

41

1    confirmation should be denied, notwithstanding the fact that

2    the infirmity with the plan is asserted by me and

3    notwithstanding the fact that Mr. Pomerantz and the unsecured

4    creditors have overwhelming support.

5        We all know 1141, the Barton Doctrine, and 544 -- 524

6    provide injunctions and protections for certain parties

7    associated with the Debtor.  Had the plan merely referenced

8    these sections and stated that the injunction, et cetera,

9    shall not exceed those allowed pursuant to *Pacific Lumber*, I

10   would not be making this argument.

11       Instead, we see a plan that has a definition of Exculpated

12   Parties, Released Parties, Related Parties, that exceed the

13   protections afforded by the Bankruptcy Code, the Barton

14   Doctrine, and 524.

15       We have a grant of jurisdiction and oversight that exceeds

16   that allowed under *Craig's Store*, the *Craig's Store* line of

17   cases.

18       We have releases of claims against non-debtor parties,

19   such as Strand, who is, under the Bankruptcy Code, under 723,

20   liable for the debts of the Debtor.

21       The plan, with its expansive releases, released parties,

22   grant of injunctions, exculpations and channeling injunctions,

23   are impermissible under Fifth Circuit case law.  And I would

24   ask the Court to look closely at those definitions, who is --

25   who the law allows to be exculpated and released and who the

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 23-13 Filed 12/07/23 Page 189 of 214 PageID 7145

42

1   law specifically prohibits being exculpated and released, and,

2   in fact, apply the *Pacific Lumber* line of -- case, as well as

3   524 and the Bankruptcy Code when you look at these issues.

4        Notwithstanding the overwhelming so-called support by the

5   creditors at issue, the law must be applied, and it must be

6   applied pursuant to what the Fifth Circuit requires.

7             THE COURT:  All right.  Thank you, Mr. Draper.

8        Other Objectors with opening statements?

9             MR. RUKAVINA:  Your Honor, Davor Rukavina.  Briefly?

10             THE COURT:  Okay.

11   OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12             MR. RUKAVINA:  Your Honor, I represent various funds,

13   including three of which have independent boards.  The Debtor

14   manages more than $140 million of those funds, and the Debtor

15   manages around a billion dollars in CLOs.

16        Whether I am a tentacle of Mr. Dondero or not -- I'm not,

17   since there's an independent board -- the fact remains that

18   the Debtor wants to manage these assets and my clients' money

19   post-assumption and post-confirmation with effective judicial

20   immunity.  So our fundamental problem with this plan is the

21   assumption of those contracts under 365(c) and (b).  I think

22   we'll have to wait for the evidence to see what the Debtor

23   proposes and has, and I will reserve, I guess, the balance of

24   my arguments on that to closing, depending on what the

25   evidence is.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 28-33    Filed 12/07/24    Page 190 of 214    PageID 7146
Exhibit Exhibit 58-68   Page 192

43

1          But I don't want the Court to lose sight of the fact that

2     what the Debtor wants to do is, in contravention of our

3     desires, continue managing our assets post-confirmation, even

4     as it liquidates, just to make a buck.  It's our money, Your

5     Honor, and whether we're Dondero or not, we're a couple

6     hundred million, probably, or more, of third-party investment

7     professionals, pension funds, et cetera, and we should not be

8     all tainted without evidence as a tentacle of someone whom,

9     I'll remind everyone here, built a multi-billion dollar

10    company and made a lot of money for people.

11         The second objection, Your Honor, goes to the Class 8

12    rejection.  It sounds like there's still a problem with the

13    number of creditors, even though certain creditors have

14    switched their votes.  That raises now the fair and equitable

15    standard, together with the undue discrimination and the

16    absolute priority rule.  I think we'll have to let the

17    evidence play out, and I'll reserve the balance of my closing

18    or the balance of my remarks to closing on that issue.

19         The third issue, Your Honor, is the same exculpation and

20    release and injunction provisions that Mr. Draper raised.

21    Those are legal matters that I'll discuss at closing, but I do

22    note that the Debtor purports to prevent my clients from

23    exercising post-assumption post-confirmation rights, period.

24    And that's just inappropriate, because if the Debtor wants the

25    benefits of these agreements, well, then of course it has to

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-68   Exhibit 23-68   Filed 12/07/23   Page 191 of 214   PageID 7147

44

1    comply with the burdens.  And to say *a priori* that anything

2    that my clients might do post-confirmation would be the result

3    of a bad-faith Mr. Dondero strategy, there's no basis for that

4    and that's not the basis on which my clients' rights in the

5    future, when there is no bankruptcy estate and there is no

6    bankruptcy jurisdiction, can be enjoined.

7         And the final point, Your Honor, entails this channeling

8    injunction.  I'll talk about it during closing.  It is

9    inappropriate under 28 U.S.C. 959.  This is not a Barton

10   Doctrine trustee issue, this is a debtor-in-possession, and a

11   channeling injunction, the Court will have no jurisdiction

12   post-confirmation.

13        Thank you, Your Honor.

14             THE COURT:  All right.  Thank you.

15        Does Mr. Dondero's counsel have an opening statement?

16             MR. TAYLOR:  I do, Your Honor.  I'll keep it brief.

17   This is Clay Taylor on behalf of Mr. Dondero.

18             THE COURT:  Okay.

19           OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

20             MR. TAYLOR:  Your Honor, the plan is clear in some

21   respects, and I'm not going to belabor these points, as other

22   objecting counsel have already addressed this.  But the plan

23   does provide for non-debtor releases, and it provides for non-

24   debtor releases for parties beyond that which is allowed by

25   *Pacific Lumber* and under the Code.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Filed 12/07/23   Page 192 of 214   PageID 7148
Exhibit Exhibit 33   Page 206 of 692

45

1     It also provides for exculpations of non-debtor parties in

2     excess of that which is allowed under the Code and applicable

3     case law.

4          Finally -- or, not finally, but third, it requires this

5     Court to keep a broad retention of post-confirmation

6     jurisdiction that could go on for years, and that is improper.

7          Finally, it requires the parties to submit to the

8     jurisdiction of this Court via a channeling injunction, which

9     we believe is beyond that which is allowed under applicable

10    Fifth Circuit precedent.

11         What is clear, what the evidence will show -- and I

12    thought it was interesting that none of the proponents of plan

13    confirmation ever talk about what the evidence is going to

14    show.  They testified a lot before Your Honor, but they didn't

15    ever talk about what the evidence would show.  What the

16    evidence will show is this plan was solicited via a disclosure

17    statement that told all the unsecured creditors, we project

18    that you're going to receive 87 cents on the dollar on your

19    claim.

20         About two months later, and this was Friday of this past

21    week, they changed those projections, and those projections

22    then showed unsecured creditors, under a plan analysis, that

23    they were going to receive 62 cents on the dollar.  That is in

24    contrast to the liquidation analysis that had been prepared

25    just two months prior showing that, under a hypothetical

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-36   Exhibit 23-36   Filed 1/07/24   Page 193 of 214   PageID 7149

46

1    Chapter 7 liquidation analysis, that the unsecured creditors

2    would receive 65 cents on the dollar.  Obviously, 62 cents is

3    less than 65 percent.

4        Realizing they had a problem, I guess, over the weekend,

5    they changed last night, the night before confirmation, and

6    sent us some new projections that now show that the unsecured

7    creditors under a plan would receive 71 cents on the dollar.

8        Your Honor, what the evidence will show, and it is

9    Highland's burden to show this, is that -- that they meet the

10   best interests of the creditors.  And part of that is that

11   they will do better under a plan rather than under a

12   hypothetical Chapter 7.

13       Quite simply, they don't have the evidence, nor have they

14   done the analysis to be able to prove that to this Court.

15       What the evidence will also show is clear is that Mr.

16   Seery, under the plan analysis, is scheduled to receive at

17   least $3.6 million over just the first two years of this plan

18   if it doesn't go any further.  And that's just for monthly

19   payouts of $150,000 per month.  That's not including a to-be-

20   agreed-upon success fee structure, which hasn't been

21   negotiated yet.  And if it hasn't been negotiated yet, it

22   can't be analyzed yet to see if those costs would exceed their

23   benefits and therefore drive the return down such that a

24   hypothetical Chapter 7 trustee could do better.

25       There is also going to be additional costs for the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33 5 Filed 12/07/23   Page 194 of 214   PageID 7150

47

1   Litigation Trustee and the fees that they are going to charge.

2   There's going to be an Oversight Committee, and those fees are

3   also to be negotiated.  There's also U.S. Trustee fees, which

4   Mr. Seery tells us that he has calculated within the

5   liquidation and plan analysis numbers, albeit both myself and

6   Mr. Draper, as the evidence will show, have asked for the

7   rollups that come behind the liquidation and plan analysis in

8   each instance of the three iterations that have been done in

9   two months, and we have been denied that information.  That

10  evidence is not going to come in before this Court, and

11  without that rollup information, this Court can't make an

12  independent verification that this meets the best interests of

13  the creditor and better than a hypothetical Chapter 7 trustee.

14      What the evidence will also show, make an assumption that,

15  under a plan analysis, that Mr. Seery will be able to generate

16  higher returns on the sale of the assets of the Highland

17  debtor and its subsidiaries, to the neighborhood of $60

18  million higher.  There is no independent verification of this.

19  There has been no due diligence done.  It was merely an

20  assumption done by Mr. Seery and his advisors, and we submit

21  that they will not have the evidence to show that they can

22  beat a Chapter 7 trustee.

23      This Court does have an alternative before it.  There is

24  an alternative plan that has been filed under seal.  The Court

25  is aware of it.  And it guarantees that creditors will receive

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33  Exhibit 23-33 Filed 12/07/23   Page 195 of 214   PageID 7151

48

```
1   at least 65 cents on the dollar.  Moreover, those claims are

2   guaranteed -- and they're going to be secured that they will

3   be paid that money.

4         MR. POMERANTZ:  Your Honor, this is under -- this is

5   under seal.  And I never interrupt somebody's argument, but

6   this plan is under seal for a reason, Your Honor, and I object

7   to any description of the terms of a plan that's not before

8   Your Honor and is under seal.

9         THE COURT:  Okay.  I sustain that objection.

10        MR. TAYLOR:  Your Honor has a means to cut the

11  Gordian knot of the litigation and appeals before it and to

12  ensure that there is certainty for creditors.  It would

13  massively reduce the administrative fee burn that is

14  contemplated under the proposed plan before the Court.  As

15  I've mentioned, it's at least $3.6 million just in monthly

16  fees for Mr. Seery alone.  All of the rest of the fees are yet

17  to be determined and to be negotiated.  I don't see how any

18  analysis could have been done regarding the administrative fee

19  burn that is going to happen over the two years and

20  potentially much further as this case draws on.

21        For those reasons alone, Your Honor, we believe that the

22  plan confirmation should be denied and this Court should look

23  at the alternatives before it.

24        MR. KATHMAN:  Can I say something before --

25        MR. TAYLOR:  Thank you, Your Honor.
```

007588

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-36   Exhibit Exhibit 5B-56 1-170 Page 50 of 69 196 of 214   PageID 7152

49

```
1               THE COURT:  All right.  Thank you.

2          All right.  Have I missed any Objectors?

3               MR. KATHMAN:  Your Honor?

4               MS. DRAWHORN:  Yes, Your Honor.

5               THE COURT:  Okay.  Ms. --

6               MR. KATHMAN:  Your Honor, if I could spend just one

7     minute, and I -- we -- I -- we filed a joinder on behalf of

8     Mr. -- or, Jason Kathman on behalf of Davis Deadman, Todd

9     Travers, and Paul Kauffman.

10              THE COURT:  Uh-huh.

11       OPENING STATEMENT ON BEHALF OF DAVIS DEADMAN, TODD TRAVERS,

12                      AND PAUL KAUFFMAN

13              MR. KATHMAN:  Mr. Pomerantz had noted, I think, at

14    the front end that the Debtor amended their plan that resolved

15    those objections.  I just want to say for the record that

16    those had been resolved.

17         And with that, Your Honor, may I be dismissed?

18              THE COURT:  Yes, you may.  Thank you.

19              MR. KATHMAN:  Thank you, Your Honor.

20              THE COURT:  All right.  Was Ms. Drawhorn speaking up

21    to make an opening statement?

22              MS. DRAWHORN:  Yes.

23              THE COURT:  Go ahead.

24              MS. DRAWHORN:  Yes, Your Honor.

25              THE COURT:  Go ahead.
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-18   Filed 12/07/23   Page 197 of 214   PageID 7153

50

OPENING STATEMENT ON BEHALF OF THE NEXPOINT PARTIES

1

2          MS. DRAWHORN:  Just very briefly, Lauren Drawhorn on

3  behalf of NexPoint Real Estate Partners, the NexPoint Real

4  Estate entities, and NexBank.

5      Just a very brief opening.  Just wanted to note that it

6  seems that the Debtor's and the Committee's position seems to

7  be if there's some way, any way, to connect an entity to Mr.

8  Dondero, then they don't need to perform any true evaluation

9  of potential claims or that party's rights or their concerns,

10  and that results in ignoring not only the merits of many

11  claims but also the basic requirements of due process and the

12  statutes, the Bankruptcy Code, and the case law.

13      We filed objections that were focused largely on the

14  injunctions and the releases, and then also the proposed

15  subordination provisions.

16      Two of my clients, one of them has a proof of claim, and

17  while it is being disputed, that claim is out there and should

18  get -- be entitled to be pursued and defended, and many of the

19  injunctions appear to prevent my client from doing so.

20      Similarly, it was mentioned that NexBank, in the

21  demonstrative, had a terminated service agreement, but there's

22  periods of time for which no services were provided but

23  payment was made, and that's a potential admin claim that has

24  been raised.  And the injunction, again, appears to prevent my

25  clients from pursuing these claims.

007590

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-3   Filed 12/07/23   Page 198 of 214   PageID 7154
Exhibit Exhibit 58-58 1207252 Page

51

```
1        So I think, despite the general response to any connection

2    to Dondero means there's no merit, that's not what we're here

3    for today.  We need to really look at the merits of all

4    potential claims and all -- the rights of all parties and the

5    -- how the injunction and release provisions prevent that and

6    how they don't comply with the required law.

7        And, of course, we join in with many of the other

8    objections, but that's my main point for the opening today.

9            THE COURT:  All right.  Thank you.

10       All right.  I think I have covered all of the at least

11   pending objections except the U.S. Trustee.  I'll check again

12   to see if someone is out there for the U.S. Trustee.  (No

13   response.)  All right.  If you're there, we're not hearing

14   you.  You're on mute.

15       Okay.  Any other attorneys out there who wish to make an

16   opening statement?

17       All right.  Well, I'll turn back to Mr. Pomerantz.  You

18   may call your first witness.

19           MR. POMERANTZ:  Okay.  I will turn the virtual podium

20   over to my partner, John Morris, who will be putting on our

21   witnesses.

22           THE COURT:  All right.  Mr. Morris, you may call your

23   first witness.

24           MR. MORRIS:  Good morning, Your Honor.  John Morris

25   from Pachulski Stang Ziehl & Jones on behalf of the Debtor.
```

1  Can you hear me okay?

2  THE COURT:  I can.

3  MR. MORRIS:  Okay.  Thank you very much.

4  The Debtor calls James Seery as its first witness.

5  THE COURT:  All right.  Mr. Seery, if you could say,

6  "Testing, one, two," please.

7  MR. SEERY:  Testing, one, two.

8  THE COURT:  All right.  Hmm, I've not picked up your

9  video yet.  Let's try it again.

10  MR. SEERY:  Testing, one, two.  Testing.

11  MR. MORRIS:  We have the audio.

12  THE COURT:  We have the audio.

13  MR. SEERY:  Oh.

14  MR. MORRIS:  There we go.

15  THE COURT:  There you are.

16  MR. SEERY:  The video should be working.

17  THE COURT:  All right.

18  MR. POMERANTZ:  Yeah.  Actually, one -- Your Honor,

19  one thing before we start.  We have Patrick Leatham from KCC.

20  He is prepared to sit on the line for the whole day until his

21  time comes.  I would just like to know if anyone intends to

22  cross-examine him or object to his declaration.  Because if

23  they don't, we could excuse Mr. Leatham.

24  THE COURT:  All right.  What about that?  Anyone

25  want to cross-examine the balloting agent?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-8   Exhibit Exhibit 58 Filed 12/07/24   Page 200 of 214   PageID 7156

53

1          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I do not.

2     If the Debtor would just state, with the change of votes in

3     Class 8, what the final tally is, I see no reason to dispute

4     that, and then we can dismiss this gentleman.  But I do think

5     that we should all know, with the change of votes, what it now

6     is.

7          THE COURT:  All right.

8          MR. POMERANTZ:  We will -- we will work on that, Your

9     Honor, with the changes as a result of the settlements today,

10    and including Mr. Daugherty's client.  We can get that

11    information sometime today.

12         THE COURT:  All right.  So, Mr. Rukavina, do you

13    agree that he can be excused with that representation, or do

14    you want --

15         MR. RUKAVINA:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  So, it's Mr. Leatham?

17    You are excused if you want to drop off this video.

18        All right.  Mr. Seery, please raise your right hand.

19             JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

20         THE COURT:  All right.  Thank you.  Mr. Morris, go

21    ahead.

22         MR. MORRIS:  Thank you, Your Honor.

23        If I may, I'd like to just begin by moving my exhibits

24    into evidence so that it'll make this all go a little bit

25    smoother.

54

 1              THE COURT:  All right.

 2              MR. MORRIS:  And if you'll indulge me just a little

 3    patience, please, because the Debtor's exhibits are found in

 4    three separate places.

 5              THE COURT:  Uh-huh.

 6              MR. MORRIS:  And I would just take them one at a

 7    time.

 8         First, at Docket No. 1822, the Court will find Debtor's

 9    Exhibits A through what I'm referring to as 6Z.  Six Zs.  So

10    the Debtor respectfully moves into evidence Exhibits A through

11    6Z on Docket No. 1822.

12              THE COURT:  All right.  Are there any objections?

13              MR. RUKAVINA:  Your Honor, I have a number of

14    targeted objections to all of the exhibits.  Did I hear Mr.

15    Morris say 6Z?

16              THE COURT:  Yes.

17              MR. MORRIS:  Yes.

18              MR. RUKAVINA:  Or six -- then, Your Honor, I can go

19    through my limited objections, if that pleases the Court.

20              THE COURT:  All right.  Go ahead.

21              MR. RUKAVINA:  Your Honor, Exhibit B, a transcript, B

22    as in boy.  Exhibit D, an email, D as in dog.  Exhibit E as in

23    Edward.  Moving on, Your Honor, 4D as in dog.  4E as in

24    Edward.

25              MR. MORRIS:  Slow down, please.

55

1       THE COURT:  Okay.

2       MR. RUKAVINA:  I'm sorry.

3       THE COURT:  You said 4D as in dog, correct?

4       MR. RUKAVINA:  Then -- yes, Your Honor.  Then 4E as

5   in Edward.

6       THE COURT:  Okay.

7       MR. RUKAVINA:  4G as in George.  Your Honor, one,

8   two, three, four, five T.  5T as in Tom.  And then, Your

9   Honor, one, two -- 6R.  6S.  6T as in Tom.  And 6U as in

10  under.  That's it.

11      THE COURT:  All right.  Well, Mr. Morris, do you want

12  to carve those out for now and just offer them the old-

13  fashioned way and I can rule on the objections then?

14      MR. MORRIS:  Why don't we do that?  I may just deal

15  with it at the end of the case.  But subject to those

16  objections, the Debtor then moves into evidence the balance of

17  the exhibits on Docket 1822.

18      THE COURT:  All right.  So, for the record, the Court

19  will admit all exhibits at Docket No. 1822 at this time except

20  B, D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U.

21      (Debtor's Docket 1822 exhibits, exclusive of Exhibits B,

22  D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U, are received into

23  evidence.)

24      THE COURT:  All right.  Mr. Morris, continue.

25      MR. MORRIS:  Thank you, Your Honor.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-23    Exhibit Exhibit 53-58 1707257 of 692    Page 203 of 214    PageID 7159

56

1     Next, at Docket 1866, you'll find Debtor's Exhibits 7A

2  through 7E, and the Debtor respectfully moves those dockets --

3  documents into evidence.

4         THE COURT:  All right.  Any objection?  (No

5  response.)  Are there any objections?

6         MR. RUKAVINA:  Your Honor, not from -- not from me.

7         THE COURT:  All right.  Hearing no objections, the

8  Court will admit all Debtor exhibits appearing at Docket Entry

9  No. 1866.

10         MR. MORRIS:  Thank you, Your Honor.

11     (Debtor's Docket 1866 exhibits are received into

12  evidence.)

13         MR. MORRIS:  And finally, at Docket 1877, the Court

14  will find Debtor's Exhibits 7F through 7Q, and the Debtor

15  respectfully moves for the admission of those documents into

16  evidence.

17         THE COURT:  All right.  Any objection?

18         MR. RUKAVINA:  Your Honor, I might have to talk about

19  this with Mr. Morris, but I have 7F as any document entered in

20  the case, 7G as any document to be filed, et cetera.  Mr.

21  Morris, am I wrong about that?

22         MR. MORRIS:  I don't have that list in front of me.

23  So I'll reserve on those documents and we can talk about them

24  at a break, Your Honor.

25         THE COURT:  All right.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-38   Filed 12/06/23   Page 204 of 214   PageID 7160
Exhibit Exhibit 58-58 17 of 22

57

1          MR. DRAPER:  Your Honor, this is Douglas Draper.  I

2    object, and I don't have the number in front of me, it's the

3    liquidation analysis and the plan summary.  It's a summary

4    exhibit, and we've not been given the underlying documentation

5    with respect to them.  I'd ask Mr. Morris to deal with that

6    separately also.

7          MR. MORRIS:  All right.  Well, we're certainly going

8    to be moving that into evidence, so we can deal with that at

9    the time, Your Honor.

10          THE COURT:  Okay.  Which documents are they?  Which

11   exhibits are those?

12          MR. DRAPER:  I don't have the number in front -- Mr.

13   Morris, do you have the number for that exhibit?

14          MR. MORRIS:  I do, but why don't we just deal with it

15   when I -- when I get into --

16          THE COURT:  Okay.

17          MR. MORRIS:  -- into the testimony?

18          THE COURT:  I just wanted the record clear what I am

19   admitting at this time at Docket Entry No. 1877.  Or do you

20   want to just --

21          MR. MORRIS:  Okay.

22          THE COURT:  -- hold all those --

23          MR. MORRIS:  Mr. Rukavina, other than F and G, which

24   you noted, is there any objection to any of the other

25   documents on that witness and exhibit list?

```
 1          MR. RUKAVINA:  Well, I also have H as impeachment/
 2   rebuttal, I as any document offered by any other party.  So I
 3   would suggest, Mr. Morris, that I have my associate confirm
 4   that I have the right -- the right stuff here, and we can take
 5   it up maybe during a break.  But I have F, G, H, I as so-
 6   called catchalls, not any discrete exhibits.
 7          MR. MORRIS:  All right.  All right, Your Honor.
 8   Let's, let's just proceed.  We've got -- we took care of
 9   Docket No. 1822 and 1866, and the balance we'll deal with at a
10   break, --
11          THE COURT:  All right.
12          MR. MORRIS:  -- unless they come up through
13   testimony.
14          THE COURT:  All right.  That sounds good.
15          MR. MORRIS:  Okay.  Thank you very much.  May I
16   proceed?
17          THE COURT:  You may.
18          MR. MORRIS:  Okay.
19                        DIRECT EXAMINATION
20   BY MR. MORRIS:
21   Q   Good morning, Mr. Seery.
22   A    (no response)
23   Q   Can you hear me?
24   A   Apologies.  I went on mute.  Can you hear me now?  I
25   apologize.
```

007598

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Filed 12/07/23   Page 206 of 214   PageID 7162
Exhibit 23-33   Page 1707 of 1692

Seery - Direct                        59

1    Q   Yes.  Good morning.

2            MR. MORRIS:  So, let's begin, Your Honor, with just a

3    little bit of background of Mr. Seery and how he got involved

4    in the case.

5    BY MR. MORRIS:

6    Q   Mr. Seery, what's your current position with the Debtor?

7    A    I am the CEO, the CRO -- the chief restructuring officer

8    -- as well as an independent director on the Strand Advisors

9    board of directors.

10   Q   Okay.

11           MR. MORRIS:  Your Honor, I'm going to ask Mr. Seery

12   to describe a bit for his background.  For the record, you'll

13   find that Exhibits 6X, 6Y, and 6Z, on the Debtor's exhibit

14   list at Docket 1822, the resumes and *C.V.s* of the three

15   independent members of the board.  If Your Honor has any

16   question about their qualifications and their experience, that

17   evidence is already in the record.

18           THE COURT:  Okay.

19   BY MR. MORRIS:

20   Q   But Mr. Seery, without going into the detail of everything

21   that's on your *C.V.*, can you just describe for the Court

22   generally your professional background, starting, well, with

23   your time as a lawyer?

24   A    I've been involved in the restructuring, finance,

25   investing and managing of assets and banking-type assets for

 1   over 30 years.

 2       I began in restructuring in real estate.  Became a lawyer,

 3   and was a lawyer in private practice dealing with

 4   restructuring and finance for approximately ten years, in

 5   addition to time before that on the real estate side.

 6       I joined Lehman Brothers on the business side in 1999,

 7   where I immediately began working on the -- with a distress

 8   team as a team member investing off the balance sheet, Lehman

 9   Brothers assets in various types of distressed financing

10   investments.  Bonds, loans, equities.  In addition, then I

11   became the head of Lehman's loan business globally.  I ran

12   that business for the number of years.  Was one of the key

13   players in selling Lehman Brothers to Barclays in a very

14   difficult situation and structure.

15       After that, joined some of my partners, we formed a hedge

16   fund called RiverBirch Capital, about a billion and a half

17   dollar hedge fund in -- operating in -- globally, but mostly

18   U.S. stressed/distressed assets that we invested in.

19   Oftentimes, though, we would run from high-grade assets all

20   the way down to equities, different types of investors,

21   different types of investments.

22       Thereafter, I left -- was -- joined Guggenheim.  I left

23   Guggenheim, and shortly thereafter became a director at

24   Strand.

25   Q   Prior to acceptance of the positions that you described

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-83   Exhibit 23-83 5 Filed 12/07/22   Page 208 of 214   PageID 7164

Seery - Direct                          61

1   earlier, were you at all familiar with Highland or Mr.

2   Dondero?

3   A    Yeah.  I was, yes.

4   Q    Can you just describe for the Court how you became

5   familiar with Highland and Mr. Dondero?

6   A    Highland was a customer of Lehman Brothers, and it was --

7   particularly in the loan business.  And the CLO businesses.

8   Highland was run by Mr. Dondero, and I knew of that business

9   through that --

10       (Interruption.)

11            MR. MORRIS:  Can somebody please put their device on

12   mute?

13            A VOICE:  That's Mr. Taylor.

14            THE COURT:  Mr. Taylor, you were off mute,

15   apparently, for a moment.  Make sure you're staying on mute.

16   Thank you.

17            MR. TAYLOR:  Yes.  Sorry, Your Honor.  I thought we

18   might have a hearsay objection.  I wasn't sure what the answer

19   was going to be, so I wanted to be prepared to object.

20            THE COURT:  All right.  Thank you.

21   BY MR. MORRIS:

22   Q    Did you know or meet Mr. Dondero in the course of what you

23   just described?

24   A    Yes, I did.  I believe we met once or twice over the

25   years.  There was a senior team member who handled the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33 Exhibit Exhibit 58 Filed 12/07/23   Page 209 of 214   PageID 7165

Seery - Direct                          62

1    Highland relationship.  He was quite good, quite experienced,

2    and he handled most of the Highland relationship issues.  But

3    Highland, we came across a number of times, whether it be in

4    -- I came across a number of times, whether it be in specific

5    investments we had where they would be either a competing

6    party or holding a similar interest, whether they were a

7    customer purchasing loans or securities, whether they were a

8    potential CLO customer where we were structuring some assets

9    for them.

10   Q   Okay.  And who are the two other members of the

11   independent board at Strand?

12   A   John Dubel and Russel Nelms.

13   Q   And had you had any personal experience with either of

14   those gentleman prior to this case?

15   A   I knew of Mr. Nelms and his experience as a bankruptcy

16   judge in the Northern District of Texas, and I had worked on

17   one matter with Mr. Dubel, but very, very briefly, while he

18   was the CEO of FGIC, which is a large insurer in the financial

19   insurance space that he was responsible for reorganizing and

20   ultimately winding down.

21   Q   Okay.  How did you learn about this particular case?  How

22   did you learn about the opportunity or the possibility of

23   becoming an independent director?

24   A   Initially, I was contacted by some of the creditors and

25   asked whether I was interested, and I indicated that I was.

1    Subsequently, I received a call from the Debtor's

2    representatives as well meeting the counsel as well as the

3    financial advisor as well as specific members of the Debtor's

4    senior management.

5    Q    Do you know how long in advance of the January 9th

6    settlement you were first contacted?

7    A    Probably four, four or five days at the most, but started

8    working immediately at that time because it was a pretty

9    complicated matter and the interview process would be quick

10   because of the hearing date that was coming up.

11   Q    Do you recall the names of any of the creditors who

12   reached out to you?

13   A    I spoke to counsel for UBS.  Certainly, Committee counsel.

14   I don't recall if I spoke to anybody from Jenner Block in the

15   initial interview.  And then I spoke to representatives from

16   your firm as well as Mr. Leventon and ultimately Mr.

17   Ellington.

18   Q    Did you do any due diligence before accepting the

19   appointment?

20   A    I did, yes.

21   Q    Can you describe for the Court the due diligence you did

22   before accepting your appointment as independent director?

23   A    Well, I got the petition, I read the petition, as well as

24   the first day, as well as the venue-changing motion.  In

25   addition, I went through the schedules.  Ultimately, I took a

Case 3:23-cv-02071-E   Document 23-33   Exhibit Exhibit 33   Filed 12/07/23   Page 211 of 214   PageID 7167

Seery - Direct                            64

1   look at and examined the limited partnership agreement of the

2   Debtor, with particular focus on the indemnity provisions.  I

3   then sat down with the Committee to get their views as part of

4   the interview process, as well as the Debtor's counsel and

5   Debtor's representatives.

6   Q    Did you -- in the course of your diligence, did you come

7   to an understanding or did you form a view as to why an

8   independent board was being sought at that time?

9   A    Yes, I did.

10  Q    And what view or understanding did you come to?

11  A    There was extreme antipathy from the creditors, as

12  evidenced by the venue motion and the documents around that

13  venue motion.

14       In addition, in the first day order, or affidavit, you

15  could see the issues related to Redeemer and the length of

16  time that litigation has been gone on, going on.

17       The creditors became extremely concern with Mr. Dondero

18  having any control over the operations of the Debtor and

19  wanted to make sure that either he was removed from that or

20  that -- and someone else was brought in, or that the case was

21  somehow taken over by a trustee.

22  Q    Did you form any views as to the causes of the Debtor's

23  bankruptcy filing?

24  A    The initial cause was the entry or the soon-to-be-entered

25  order related to the arbitration with Redeemer, but it was

Seery - Direct                          65

1    pretty clear from looking at the first day that there was a

2    number of litigations.  The bulk of the creditor body was made

3    up of -- on the liquidated side was made up of litigation

4    creditors.  And then the other creditors, the Committee

5    members, other than Meta-e, were significant litigation

6    creditors.

7            MR. MORRIS:  Your Honor, I think Mr. Seery was sworn

8    in, but unless -- unless you -- if you think there's a need,

9    I'm happy to have you swear Mr. Seery in again just to make

10   sure his testimony is under oath.

11           THE WITNESS:  I was sworn in.

12           THE COURT:  Yes, I swore him in.

13           MR. MORRIS:  That's what I thought.  That's what I

14   thought.  Somebody had made the suggestion to me, so I was

15   just trying to make sure, because I didn't want any unsworn

16   testimony here today.

17           THE COURT:  We did.

18           MR. MORRIS:  Okay.

19           THE COURT:  We did.

20           MR. MORRIS:  Thank you.  Thank you.

21   BY MR. MORRIS:

22   Q    Ultimately, sir, just to move this along a little bit, do

23   you recall that an agreement was reached with the UCC and Mr.

24   Dondero and the Debtor concerning governance issues?

25   A    Yes, I do.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-8   Filed 12/07/23   Page 213 of 214   PageID 7169
Exhibit Exhibit 58 Page 213 of 214

Seery - Direct                              66

1   Q    And did you accept your position as an independent

2   director at Strand as part of that corporate governance

3   settlement?

4   A    That, that was part of the appointment.  We -- the

5   independent directors were brought in to take -- really, to

6   take control of the company as independent fiduciaries.  And

7   the idea, I think, was that there was a Chapter 7 motion that

8   was about to be filed by the Committee, or at least that was

9   the representation, and the Debtor had a choice, they could

10  either accept the independent directors or they could face the

11  motion.

12       What actually happened was a little bit more complicated.

13  The creditors and the Debtor agreed on the selection of Mr.

14  Dubel and myself.  And then because they couldn't agree on the

15  third member of the independent board, they left it to Mr.

16  Dubel and myself to actually come up with a process, interview

17  candidates, and make that selection, which we did, which

18  ultimately became Mr. Nelms.

19  Q    And did all of this take place during that four- or five-

20  day period prior to January 9th?

21  A    It did, yes.

22  Q    Okay.  And let's talk about the makeup of the board.

23  You've identified the other individuals.  How would you

24  characterize the skillset and the capability of the

25  individual?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-33   Exhibit 33 5-58 1270 268 Page 214 of 214   PageID 7170

Seery - Direct                           67

1  A    Well, on paper, I think it's a pretty uniquely-constructed

2  board for this type of asset management business with the

3  diversity of these types of assets and the diversity of issues

4  that we had.

5      So, former Judge Nelms, obviously skilled in bankruptcy

6  and the law around bankruptcy, but also very skilled in

7  mediation, conflict resolution, and in particular his

8  prepetition or maybe pre-judicial experience in litigation and

9  litigation involving fiduciary duties we thought could be

10  very, very important because of the myriad of interrelated

11  issues that we could see that might arise.

12      John Dubel is an extremely well-known and respected

13  restructuring professional.  He has been dealing these kinds

14  of assignments as an independent fiduciary for, gosh, as long

15  as I can recall, but at least going back 15 to 20 years.  He

16  had experience in accounting, but he's also been the leader of

17  these kinds of organizations going through restructuring in

18  many operational type roles, and so he was a perfect fit.

19      And my experience in both restructuring as well as asset

20  management and investment I think dovetailed nicely with the

21  experience that Mr. Nelms and Mr. Dubel have.

22  Q    Okay.  Let's talk for just a moment at a high level of the

23  agreement that was reached.  Do you remember that there were

24  several documents that embodied the terms of the agreement?

25  A    Yes, I do.