**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

Appellant § §

vs. §

**Highland Capital Management, L.P, et al** §    **3:23-CV-2071-E**

Appellee §

[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.

# Volume 31

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2.  the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

       4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2.  Appellant's claims or allegations are not "plausible";

    3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10.  Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.  Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.  Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

  1.  ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

  2.  determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.  Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.  Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.  Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.  Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.  Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.  Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

  1.  there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

  2.  there is no evidence to support the alleged quid pro quo;

  3.  the material shared was *public* information; and/or

  4.  the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

    1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

    2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1.    **Notice of Appeal**

*000001*        a.    Notice of Appeal **[Dkt. 3906]**;

*000276*        b.    Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*        c.    Second Amended Notice of Appeal **[Dkt. 3945]**

2.    **The judgment, order, or decree appealed from:**

        a.    Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

   **b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

   a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

   **a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru   Vol. 4*
*Vol 4*
*002236*
*002243*
*002248*

---

*Vol. 5*
*002251*

*002254*

*002262*

*002340*

*002355*

*002358*

*002391*

*002398*

*002400*

*Vol. 6*
*002826*

*Vol. 9*
*003257*

*003260*

*003270*

*003278*

| | | | |
|---|---|---|---|
| 03/30/2023 | 3706 | | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) *Thru Vol. 7* | | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) *Thru Vol. 9* | | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

_Handwritten annotations in left margin:_ Vol. 10 / 003281 / 003286 / 003291 / 003294 / 003296 / 003299 / 003302 / 003311 / 003314 / 003323 / 003368 / 003430

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| | | | Holdings LLC, Stonehill Capital Management LLC |
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Handwritten annotations in left margin:* Vol. 10 / 003458 / 003463 / Vol. 11 / 003537 / Thru Vol. 16 / Vol. 17 / 004465 / 004712 / 004714 / 004808 / 004813 / 004836 / Vol. 18 / 004930 / 004931

*Vol. 18*
*004939.*

| | 05/25/2023 | 3798<br>(3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| *004959* | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *004961* | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| *004984* | 06/05/2023 | 3815<br>(3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *005049* | 06/05/2023 | 3816<br>(3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| *005114* | 06/05/2023 | 3817<br>(3817-1 — 3817-5)<br>*Thru Vol. 25* | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| *Vol. 26*<br>*006608* | 06/05/2023 | 3818<br>(3818-1 — 3818-9)<br>*Thru Vol. 39* | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| *Vol. 39*<br>*009273* | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009290* | 06/07/2023 | 3821<br>(3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009416* | 06/07/2023 | 3822<br>(3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| *009424* | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*  *Thru  Vol. 41*
*Vol. 42*
*009841*

*009901*

*009905*

*009908*

*009912*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.**    **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023          Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
    Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ Sawnie A. McEntire
Sawnie A. McEntire

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53   Filed 12/07/23   Page 15 of 214   PageID 7185
Exhibit Exhibits 53-58   Page 15 of 202

Seery - Direct                              68

1   Q    And do you remember one of them was an order that the

2   Court entered on January 9th?

3   A    Yes.

4        MR. MORRIS:  All right.  Your Honor, just for the

5   record, and we'll be looking at this, but that would be

6   document Exhibit 5Q as in queen, and that's at ==Docket No.==

7   ==1822==.

8   BY MR. MORRIS:

9   Q    Do you remember there was a separate term sheet, Mr.

10  Seery, that was also part of the agreement among the

11  constituents?

12  A    Yes.  There were -- I think there were a couple of term

13  sheets and stipulations, but I do recall that there was some

14  very specific term sheets with the terms.

15       MR. MORRIS:  All right.  And we'll look at that one

16  as well, Your Honor, but that can be found at Exhibit 5O as in

17  Oscar.

18  BY MR. MORRIS:

19  Q    And then, finally, do you recall that Mr. Dondero signed a

20  stipulation that was also part of the agreement?

21  A    Yes.  That was absolutely key to the agreement for the

22  creditors and perhaps the Court.  But it was really -- it

23  needed to be clear that he was signed on to this transaction.

24       MR. MORRIS:  Okay.  And we'll look at that as well.

25  That's Exhibit 7Q.  And remind me, we'll move that one into

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-58   Exhibit Exhibits 53-58 Filed 12/07/23   Page 16 of 214   PageID 7186

Seery - Direct                          69

1    evidence.

2    BY MR. MORRIS:

3    Q    Did you and the other prospective independent directors

4    actually participate in the negotiation of any aspect of this

5    agreement that you've generally described?

6    A    Absolutely.  Although we hadn't been appointed yet, these

7    agreements were going to be the structure with which -- or

8    under which we would come in as independent fiduciaries.  They

9    would govern a lot of our relationships.  They would provide

10   for the protections that we required and that I required.  So

11   they were exceedingly important to me.

12   Q    Can you describe for the Court at a general level your

13   understanding of the overall structure of the corporate

14   governance settlement?

15   A    From a very high level, the settlement was -- Highland

16   Capital Partners is a limited partnership.  It's managed by

17   its general partner, Strand Advisors.  Although Strand is the

18   GP, its effective interest in Highland is minimal, about .25

19   percent of the effective partnership interest.  But it is the

20   general partner.  So it does govern the -- the partnership.

21       We came in as an independent board that would oversee and

22   control Strand Advisors and thereby, through the general

23   partner position, oversee and control HCMLP, the Debtor.

24       In addition, the Committee then overlaid what we could do

25   with respect to how we operated the business in the ordinary

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-53   Filed 12/07/23   Page 17 of 214   PageID 7187

Seery - Direct                                70

1   course in Chapter 11 with a specific set of protocols that

2   governed certain transactions that we would have to get

3   permission from either the Committee or the Court to engage

4   in.

5       And in addition, Mr. Dondero, notwithstanding the

6   insertion of the independent board at Strand, also had a set

7   of restrictions around him, because, of course, not only was

8   he the former control entity at Highland and Strand, he also

9   had a hundred percent of the ownership -- indirectly, of

10  course -- of Strand and could have removed the board.  So

11  there were restrictions around what he could do with respect

12  to the board.  There were also restrictions around what he

13  could do through various entities to terminate contracts and

14  --

15  Q   All right.  We'll look at some of those in detail.  Did,

16  to the best of your recollection, did Mr. Dondero give up his

17  position as president or CEO of the Debtor?

18  A   He did, yes.

19  Q   And did he nevertheless stay on as an employee of the

20  Debtor and retain a position as portfolio manager?

21  A   He did.  At the last second, I believe it was the night

22  before, when we were actually in Dallas preparing for the

23  hearing, but Mr. Ellington raised the concern that if Dondero

24  was removed from not only the presidency but also the

25  portfolio management position, potentially there would be some

007610

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53 Filed 12/07/23   Page 18 of 214   PageID 7188

Seery - Direct                                        71

1    agreements that might or might not be subject to Court

2    approval that could be terminated and value would be lost.  So

3    this was a very last-second provision.  Obviously, the -- as

4    new estate fiduciaries, we didn't want value to be lost

5    instantly for key man or some other reason.  And the Committee

6    ultimately, or I guess you'd say reluctantly, agreed to that

7    because we just didn't have time to look at any of -- any such

8    agreements.

9            MR. MORRIS:  All right.  Let's -- can we put up on

10   the screen, Ms. Canty, Debtor's Exhibit 5Q?

11       And this is in evidence, Your Honor.  This is the January

12   9th order.

13       And can we please go to Paragraph 8?

14   BY MR. MORRIS:

15   Q    Mr. Seery, you had mentioned just a few minutes ago that

16   there were certain restrictions that were placed on Mr.

17   Dondero.  Does Paragraph 8, to the best of your recollection,

18   provide for the substance of at least some of those

19   restrictions?

20   A    It does, yes.

21   Q    And can you just describe for the Court your understanding

22   of the restrictions that were imposed on Mr. Dondero pursuant

23   to Paragraph 8?

24   A    Well, as I recall, when Mr. Ellington came in with the

25   last-minute request, the Committee was extremely upset about

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 18-53   Filed 12/07/23   Page 19 of 214   PageID 7189
Exhibit Exhibit 53   Page 23 of 292

Seery - Direct                              72

1    it.  We talked about it.  Obviously, we, as an independent

2    board that was going to come in, didn't know the underlying

3    contracts and couldn't really render any judgment as to

4    whether there would be value lost.  So, the Committee agreed,

5    but they wanted to make sure that Mr. Dondero still reported

6    to -- directly to the board, and if the board asked Mr.

7    Dondero to leave, he would do so.

8    Q    Okay.  Just looking at this paragraph, is it your

9    understanding that the scope and responsibilities of Mr.

10   Dondero would be determined by the board?

11   A    Yes.

12   Q    And was it your understanding that Mr. Dondero would serve

13   without compensation?

14   A    Yes.

15          MR. DRAPER:  Objection.  Leading, Your Honor.

16          THE COURT:  Overruled.

17   BY MR. MORRIS:

18   Q    Was it your understanding that Mr. Dondero's role would be

19   subject to the direct supervision, direction, and authority of

20   the board?

21   A    That's, you know, that's what the order says and that's

22   what the agreement was.  In practice, that was really going to

23   have to evolve because we were coming in very cold and

24   obviously he'd been there for --

25          (Interruption.)

007612

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-53    Exhibit Exhibits 53-58 Page 20 of 214    PageID 7190    Page 20 of 214

Seery - Direct                          73

1          THE COURT:  All right.  Someone needs to put their

2     phone on mute.  I don't know who it is.

3     BY MR. MORRIS:

4     Q   Was it also part of the agreement that Mr. Dondero would

5     (garbled) upon the board's request?

6     A   I think I got you, but yes, that's contained in this

7     paragraph, and Mr. Dondero agreed to that.

8          THE COURT:  All right.  Whoever LC is, your phone

9     needs to be put on mute.  Okay.  Please be sensitive to

10    keeping your device on mute except for Mr. Morris and Mr.

11    Seery.

12         All right.  Go ahead.

13    BY MR. MORRIS:

14    Q   Do you recall, Mr. Seery, whether there were any

15    restrictions placed on Mr. Dondero's ability to terminate

16    agreements with the Debtor?

17    A   Yes.  That was a very specific provision as well.

18    Q   Can we take a look at Paragraph 9 below?  Is that the

19    provision that you're referring to?

20    A   That's the provision in the order.  I believe there were

21    other agreements -- certainly, discussion around it -- because

22    it was an important provision because it had been borne out of

23    some experience that Acis and Mr. Terry had had in particular.

24    So it was supposed to be broad and prevent both direct and

25    indirect termination of agreements.

007613

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53   Filed 12/07/23   Page 21 of 214   PageID 7191

Seery - Direct                          74

1  Q   Okay.  And do you know, do you recall that the definition

2  of related entity is contained within the term sheet that you

3  referred to earlier?

4  A   It's a pretty extensive -- I recall the definition not

5  specifically, but it's a pretty extensive definition.  It

6  includes any of the entities that he owns, that Mr. Dondero

7  owns, that Mr. Dondero controls, that Mr. Dondero manages,

8  that Mr. Dondero owns indirectly, that Mr. Dondero manages

9  indirectly, and it really covers a wide swath of those

10 entities in which he has interests and control.

11        MR. MORRIS:  All right.  Let's see if we could just

12 look at the definition specifically at Exhibit 5O as in Oscar.

13 And if we could just scroll down to the next page.

14    Now, this was -- this is part of the term sheet that was

15 filed at Docket 354.

16 BY MR. MORRIS:

17 Q   At Definition I(d), is that the definition of related

18 entity that you were referring to?

19 A   That's correct.

20 Q   Okay.  In addition to what you've described, I think you

21 also mentioned that there was a separate stipulation that Mr.

22 Dondero entered into as part of the corporate governance

23 settlement.  Do I have that right?

24 A   That's my recollection, yes.  And I believe he signed it,

25 and that was a key gating issue to the hearing that we had on

 1  January 9th.

 2  Q   And what do you recall about that document as being a key

 3  gating issue?

 4  A   The key gating issue that I recall is that it had to be

 5  signed.  And I don't believe it was signed until that very

 6  morning.

 7          MR. MORRIS:  All right.  Can we call up Exhibit 7Q as

 8  in queen?

 9  BY MR. MORRIS:

10  Q   All right.  Is this the stipulation that you were

11  referring to?  We can scroll down to any portion you want.

12  A   I believe that is, yes.

13          MR. MORRIS:  Okay.  Can we just scroll down to see

14  Mr. Dondero's signature?  Yeah.  That's -- okay.

15      So, that's dated January 9th.  This was filed at Docket

16  338.  It's on the Debtor's exhibit list as Exhibit 7Q.  And

17  the Debtor would respectfully move Exhibit 7Q into evidence.

18          THE COURT:  Any objection?  All right.  7Q is

19  admitted.

20      (Debtor's Exhibit 7Q is received into evidence.)

21          MR. MORRIS:  Okay.  And if we could just scroll up a

22  page or two to the four bullet points.  Yeah, right there.  A

23  little more.

24  BY MR. MORRIS:

25  Q   Okay.  So, do you see Paragraph 10 contains the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 13-53    Filed 12/07/23    Page 23 of 214    PageID 7193

Seery - Direct                                76

1    stipulation?

2    A    Yes.

3    Q    And as you recall, Mr. Seery, in the events leading up to

4    the entry of the order approving the settlement, was this one

5    of the documents that was being negotiated among -- among the

6    parties?

7    A    Yes, it was.

8    Q    Okay.  You mentioned that there were certain provisions of

9    the January 9th order that were important to you and the other

10   independent directors.  Do I have that right?

11   A    Yes.

12        MR. MORRIS:  Let's see if we can back to Exhibit 5Q,

13   please, Paragraph 4.

14   BY MR. MORRIS:

15   Q    Okay.  Paragraph 4, can you tell me what Paragraph -- what

16   Paragraph 4 is and why it was important to you?

17   A    Well, there really were four key, I guess I'll use the

18   term gating items again, for my involvement, and ultimately in

19   discussions with Mr. Nelms and Mr. Dondero -- Mr. Dubel, their

20   involvement in the matter.

21        Because of the litigious nature of the Highland operations

22   and the expectations we had for more litigation after taking a

23   look at the Acis case, we wanted to make sure that, as

24   independents coming into a situation with really no stake in

25   the particular outcome, other than trying to achieve a

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53   Filed 12/07/23   Page 24 of 214   PageID 7194
Exhibit Exhibit 53   Page 23 of 202

Seery - Direct                                77

 1   successful reorganization, that we were protected.  So, number

 2   one, I looked at the limited partnership agreement.  I wanted

 3   to make sure that the LPA contained broad and at least

 4   standard indemnification provisions and that they would apply

 5   to the board.

 6        Number two, because -- that then requires you to look at

 7   the indemnification provisions at Strand, because you're a

 8   director of Strand, the GP.  So then we looked at those.  I

 9   took a close examination of those.  They looked okay, except

10   Strand didn't have any assets other than its equity interest

11   in Highland, and if that equity interest turned out to be

12   zero, that indemnity wouldn't be very valuable.

13        So I wanted to make sure that Highland, the Debtor,

14   guaranteed the indemnity (garbled) on a postpetition basis, so

15   that if there were a failure of D&O, which I'll get to in a

16   second, or it wasn't enough, that we would have a senior claim

17   in the case, an admin claim in the case.

18        I then, of course, wanted to make sure that we had D&O

19   insurance.  This was very difficult to get, because, frankly,

20   there's a Dondero exclusion in some of the markets, we've been

21   told by our insurance brokers, and so getting the right policy

22   that would cover the independent board was difficult.  We did

23   get that.

24        And then ultimately there'll be another provision in the

25   agreement here -- I don't see it off the top of my head -- but

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 35-53    Filed 12/07/23    Page 25 of 214    PageID 7195
Exhibit Exhibit 53    Page 29 of 302

Seery - Direct                                78

1    a gatekeeper provision.  And that provision --

2    Q    Hold on one second, Mr. Seery, because we'd want to

3    scroll.  So Paragraph 4 and Paragraph 5, were those, were

4    those provisions put in there at the insistence of the

5    prospective independent directors?

6    A    Yes.  And remember, so the Paragraph 4, as I said, is the

7    guarantee of Strand's obligations for its indemnity.  Again,

8    Strand didn't have any money, so the Debtor had to be the one

9    purchasing the D&O for the directors and for Strand.  So those

10   are the two provisions that really worked to address my

11   concerns about the indemnities and then the D&O.

12            MR. MORRIS:  Okay.  Can we go to Paragraph 10,

13   please?  There you go.

14   BY MR. MORRIS:

15   Q    Is this the other provision that you were referring to?

16   A    This is.  It's come to be known as the gatekeeper

17   provision, but it's a provision that I actually got from other

18   cases.  Again, another very litigious case that I thought it

19   was appropriate to bring in to this case.

20        And the concept here is that when you're dealing with

21   parties that seem to be willing to engage in decade-long

22   litigation in multiple forums, not only domestically but even

23   throughout the world, it seemed important and prudent for me

24   and a requirement that I set out that somebody would have to

25   come to this Court, the court with jurisdiction over these

1    matters, to determine whether there was a colorable claim.

2    And that colorable claim would have to show gross negligence

3    and willful misconduct, *i.e.*, something that would not

4    otherwise be indemnified.

5        So it basically sets an exculpation standard for

6    negligence.  It exculpates the directors from negligence.  And

7    if somebody wants to bring a cause against the directors, they

8    have to come to this Court first and get a finding that

9    there's a colorable claim for gross negligence or willful

10   misconduct.

11   Q    Would you have accepted the engagement as an independent

12   director without the Paragraphs 4, 5, and 10 that we just

13   looked at?

14   A    No.  These were very specific requests.  The language here

15   has been 'smithed, to be sure, but I provided the original

16   language for 10 and insisted on the guaranty provision above

17   to assure that the indemnity would have some support.

18   Q    And ultimately, did the Committee and the Debtor agree to

19   provide all of the protection afforded by Paragraphs 4, 5, and

20   10?

21   A    Yes.

22   Q    Okay.

23        MR. MORRIS:  Your Honor, we're going to move on now

24   to good faith, Section 1129(e)(3), just to give you a little

25   bit of a roadmap of where we're going.

007619

1  BY MR. MORRIS:

2  Q    Let's talk about the process that led to the plan that the

3  Debtor is asking the Court to confirm today.  Real basic stuff

4  at the beginning.  Can you tell me your understanding of the

5  makeup of the UCC, of the Creditors' Committee?

6  A    The Creditors' Committee in this case has four members.

7  It's UBS, the Redeemer Committee, which are former holders of

8  interests in a fund called the Crusader Fund, which was a

9  Highland fund, who had redeemed and then had a dispute with

10  Highland.

11      And the next creditor is Mr. Terry and Acis.  We generally

12  group them as one, but the creditor is Acis.

13      And the fourth creditor is an entity called Meta-e, and

14  they provide litigation support and technical support and

15  discovery support in litigations for the Debtor, including in

16  this case now.

17  Q    All right.  Just focusing really on the early period, the

18  first few months, can you describe the early stages of the

19  negotiations with the UCC as best as you can recall?

20  A    Well, I think the early stage of the case wasn't directly

21  a negotiation; it was really trying to understand as best we

22  could the myriad of assets that we had here, the various

23  businesses that the Debtor either owned, controlled, or

24  managed, as well as the claims.

25      We went through a process of trying to understand each of

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-53    Filed 12/07/23    Page 28 of 214    PageID 7198
Exhibit Exhibit 53    Page 28 of 232

Seery - Direct                         81

1   the claims that the Debtor -- or against the Debtor that were

2   represented by the Committee, as well as some other claims

3   that were not on the Committee.

4   Q    Was the Debtor -- I mean, was the Committee initially

5   pushing the independent board to go to a monetization plan, an

6   asset monetization plan?

7   A    Very quickly and early on, the Debtor -- the Committee

8   took a pretty aggressive approach with the Debtor and the

9   independent board.  I think the Committee's perspective, as

10  articulated to me, and where -- at least how we took it, was

11  that they'd been litigating for years and they sort of knew

12  the situation and the value of their claims, that the Debtor

13  was insolvent, in their view, and that we should be operating

14  the estate in essence for the benefit of the creditors.

15  Q    And what was the board's view in reaction to that?

16  A    We disputed it.  And the reason we disputed it was very

17  straightforward.  Save for the Redeemer claim, which at least

18  had an arbitration award, Acis and Mr. Terry didn't have any

19  specific awards, notwithstanding the results of the Acis

20  bankruptcy, and UBS, while it had a judgment, that judgment

21  was not against the Debtor.

22       So our view was, until we have our hands around these

23  claims and we determine what the validity is in our estate,

24  that we would treat the Debtor as if it were solvent.  We also

25  wanted to assess the value of the assets.  So, looking at the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-5   Filed 12/07/23   Page 29 of 214   PageID 7199

Seery - Direct                                    82

1  assets not just from a book value but what they might be

2  really worth in the market.

3  Q    And did the board in the early portion of the case

4  consider all strategic alternatives?

5  A    I don't know if we considered every strategic alternative,

6  but we certainly considered a lot of alternatives.

7  Q    Can you describe for the Court the alternatives that were

8  considered by the board before settling on the asset

9  monetization plan?

10 A    Well, early on, you know, we looked at each of the -- what

11 we would think of the large category types of ways to resolve

12 a case.  Number one, could we go through a very traditional

13 reorganization with either stretching out claims to creditors

14 after settlement or converting some of those to equity,

15 getting new equity infusions?  We considered those

16 alternatives.

17      Number two, we considered whether we should simply sell

18 the assets.  That's one of the things that the Committee was

19 pushing for.  They could be sold to third parties.  They could

20 be sold individually.  Mr. Dondero potentially could buy some

21 of the assets.  That'd be a reasonable reorganization in this

22 case.

23      We also considered whether that, you know, we would just

24 do a straight liquidation.  Is there some value to doing --

25 converting the case to a 7 and doing a straight liquidation?

007622

1      We also considered a grand bargain plan, and this was

2  something that I worked on quite a bit.  The phrase is mine,

3  although no pride of authorship, certainly, since it didn't

4  work out.  But that perhaps we could come to an agreement with

5  the major creditors and with Mr. Dondero and then shift some

6  of the expenses in the case out further to litigate some of

7  the other claims while reorganizing around the base business.

8      And then, finally, we considered the asset monetization

9  plan, and ultimately that evolved into what we have today.

10  Q    Were there guiding principles or factors that the board

11  was focused on as it assessed these different options?

12  A    Well, the number one guiding principle was overall

13  fairness and equitable treatment of the various stakeholders.

14  So, again, at that point, we didn't know exactly what, if

15  anything, we would owe to claimants like UBS or HarbourVest or

16  even Mr. Terry and Acis.  We had a good sense of where we

17  would end up with Redeemer, I think, but we still had some

18  options and wanted to negotiate the issues related to

19  potential appeal rights that we had.  So I think that was the

20  number one overall concern.

21      But that did evolve over time.  Costs of the case were

22  exceptionally high.  And the reason they're so high is that

23  Highland was run for a long time, at least from what we can

24  tell, at an operating deficit.  Typically, what it would do is

25  run at a deficit and then sell assets to cover the shortfall,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-53   Filed 12/07/23   Page 31 of 214   PageID 7201

Seery - Direct                                  84

1   and it would defer a whole bunch of employee -- potential

2   employee compensation.  And because of the way the environment

3   was going, particularly in the first half of the year, it

4   didn't look to us like there was going to be any great asset

5   increase that would somehow save us from the hole that was

6   being dug, the considerable amount of expenses to run the

7   case.

8   Q    Did changing the culture of litigation factor into the

9   path that the board considered?

10  A    Well, we certainly looked at the way the company had run

11  and why it got to where it is in terms of litigating.  And not

12  just litigating valid claims, but litigating any claim to the

13  *nth* degree.  And stories are legion, I won't talk about them,

14  but of Highland taking outrageous positions and then pursuing

15  them, hoping that the other side caves.

16       We determined that this estate couldn't bear that kind of

17  expense, and it wasn't fair and equitable to do that anyway.

18  So we wanted to attack the claims that we could -- and I say

19  attack; try to resolve them as swiftly as we could --

20  protecting the Debtor's interests but trying to find an

21  equitable resolution.

22       I'm not averse to litigating.  And I think when there are

23  claims that are legitimate, the Debtor should pursue them.

24  There's always -- a good settlement is always better than a

25  bad litigation.  But if there (indecipherable) to resolve

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-53    Filed 12/07/23    Page 32 of 214    PageID 7202

Seery - Direct                                      85

 1  them, we should -- we should pursue those.  And if we have

 2  defenses, we should pursue those, and not just be held up

 3  because someone else is willing to, you know, take a more

 4  difficult position than we are.

 5      But in this case, it really did cry out for some sort of

 6  resolution on many of these cases because they were far beyond

 7  -- far beyond the facts and far beyond the dollars.  There was

 8  personal antipathy involved in virtually every one of the

 9  unlitigated or unliquidated Committee cases.

10  Q    Did the board, as it was assessing the various strategic

11  alternatives, consider maximization of the value?

12  A    Always number one was, can we maximize value?  But that

13  has to be done within the context of the risk you're taking

14  and the time it takes.  So, not all wine ages well in a cave

15  and not all investments get to be more valuable over time.  We

16  wanted to look at each individual asset that the Debtor had,

17  each claim that the Debtor had, each defense that the Debtor

18  had, and consider the time and the costs and then try to find

19  the best way to maximize value with those multiple

20  considerations.

21  Q    How about the role and support of the UCC, how did that

22  factor into the decision-making, the Debtor's decision-making

23  as to what plan to pursue?

24  A    Well, you know, the decision-making with the UCC was

25  cumbersome and oftentimes difficult.  Sometimes our relations

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53   Filed 12/07/23   Page 33 of 214   PageID 7203
Exhibit Exhibits 3-50   Page 33 of 202

Seery - Direct                           86

1   were very contentious, and sometimes they continue to be.  But

2   the Committee had significant oversight because of the

3   protocols that had been agreed to.  Some of the disputes we

4   had with the Committee found their way into the court.  Those

5   time and that cost, some of which we won, some of which we

6   lost, but those factored into our analysis.

7        But eventually we knew that we were going to need to get,

8   you know, some significant portion of the Committee to agree,

9   because, at minimum, Meta-e had a liquidated claim, and

10  Redeemer was very close to fully liquidated, so we were going

11  to need support from the Committee with whatever we tried to

12  push through.  And so that's how we negotiated with the

13  Committee from that perspective.

14  Q   Is it fair to say that the Debtor and the Committee's

15  interests because aligned upon approval of the disclosure

16  statement back at the end of November?

17  A   I don't think they became perfectly aligned, because we

18  still have, you know, some disputes around, you know,

19  implementation and things like the employee releases, which

20  were very important to me.  But I think we're largely aligned

21  and that the Committee is supportive, as Mr. Clemente said at

22  the start of this hearing, of the plan.  We negotiated at

23  arm's length with them about most of the provisions.  I would

24  say virtually everything was a relatively significant

25  negotiation, or at least there was a good faith exchange of

Seery - Direct                                87

1    views on each side and assessment of legal and financial

2    risks.  And I think at this point they're largely in support

3    of the plan.

4    Q   All right.  Let's -- you mentioned the grand bargain, and

5    I just want to spend a few minutes talking about that, how

6    that evolved.  Focusing your attention in the kind of late

7    spring/early summer, can you tell me what efforts you and the

8    board made in trying to achieve a grand bargain in that early

9    part of the case?

10   A   Well, we had -- at that point, we had reached agreement,

11   at least in principle, with Redeemer.  And the thought was --

12   my thought was that we could construct a plan, understanding

13   what the cash flows looked like and what we thought the base

14   value of the asset looked like -- and those are not just the

15   assets that are tangible assets, but the notes that are

16   collectible by the Debtor as well -- and then engage with UBS

17   in particular.  Redeemer.  To some degree, Mr. Terry.  We had

18   not yet reached any agreement with him.  But UBS, we thought

19   of as a slightly -- I don't mean this to be disparaging -- but

20   a slightly more commercial player than Acis because of the

21   history that Acis had to deal with and endure.

22       And we were hoping that we could get some sort of

23   coalescence around an agreed distribution that would require

24   those creditors to take a lot less than they might have

25   otherwise agreed, Mr. Dondero to put in more than he otherwise

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-53 Filed 12/07/23   Page 35 of 214   PageID 7205

Seery - Direct                              88

1    thought he could put in or would be willing to put in, and

2    then we would get out to Acis and the other creditors with a

3    plan.

4         And so I built, with the team at DSI, a detailed model on

5    how the distributions could work and what the potential timing

6    could be, trying to, each time, move in a multidimensional way

7    with UBS, Redeemer, Mr. Dondero, and to some degree Acis,

8    around the respective issues for their claims.

9         Again, UBS and Acis had not been resolved and weren't

10   close, but the thought was if we could get dollar agreements

11   for distribution, perhaps we could then figure out how to

12   construct settlements of their claims.

13   Q    During this time period, did you work directly with Mr.

14   Dondero in the formulation of a potential grand bargain?

15   A    I did, yes.

16   Q    And the model that you described, did that go through a

17   number of iterations?

18   A    It went through multiple iterations.  I don't believe I

19   ever shared the model with anybody.  One of the reasons for

20   that is I didn't want -- I felt I had -- if I was going to

21   share it with Mr. Dondero, for example, I'd have to share it

22   with UBS and I'd have to share it with Redeemer.  And I wanted

23   it to be -- I wanted it to be a working model with the team at

24   DSI.  In particular, we would make, you know, adjustments on

25   an almost-daily basis.

1      Mr. Dondero had -- remember, he was still portfolio

2  manager at that time.  He also had a related-party interest,

3  as people have seen from some of the litigation around the

4  sales of securities.  He had access and was receiving emails

5  from the team as well as from the finance team.  So he had

6  access to the information at that point and had a view around

7  the value.  And this was more trying to adjust what those

8  distributions would look like depending on the amounts that he

9  would be willing to contribute.

10 Q    Moving on in time, did there come a time when the Debtor

11 participated in a mediation with certain of the major

12 constituents in the case?

13 A    Yes.  That was towards the end of the summer.

14 Q    And during that mediation, did the concept of a grand

15 bargain, was that put on the table?  Without discussing any

16 particulars about it, just as a matter of process, was the

17 grand bargain subject to the mediation discussions?

18 A    Well, the mediation had multiple components, so the answer

19 to the question in short is yes, but I'll go longer because I

20 tend to.  The grand bargain plan stayed in place, and that was

21 going to be an overall settlement.  The mediation was

22 initially, I think, as a main course, focused on Acis, UBS,

23 and then the third piece being the grand bargain.  And if you

24 could settle one of those claims, perhaps -- obviously, if you

25 could settle both of them, you could get to then focusing on

Seery - Direct                                    90

1    the grand bargain.

2         But even before we got to mediation, the idea of the

3    monetization plan had also been put forth.  Notwithstanding

4    that it wasn't my idea, I actually thought that it was a good

5    idea, ultimately.  Didn't initially.  And the reason for that

6    is that it set a marker for what a base expectation could be

7    for the creditors and just for Mr. Dondero.  And knowing that

8    that was out there, at least with them, that could hopefully

9    be a catalyst in the mediation for folks to say, let's see if

10   we can get our claims done and get a grand bargain done,

11   because if we don't we have this Debtor monetization plan.

12   And by that -- at that point, I don't think we had much

13   agreement with the Committee on anything, and certainly with

14   Mr. Dondero, on -- on a monetization plan.

15   Q    All right.  And let's just bring it forward from the fall,

16   post-mediation, to the present.  Has -- has -- have you and

17   the board continued discussing with Mr. Dondero the

18   possibility of a grand bargain?

19   A    Well, it's shifted.  So, the grand bargain discussions

20   really -- you had multiple phases.  So, you had pre-mediation.

21   There was the grand bargain discussions that I just described

22   previously that also involved UBS and Redeemer, and to some

23   degree Acis and Mr. Terry.  Then you have the mediation, which

24   is much more focused on the claims and whether they can fit

25   into the grand bargain with Mr. Dondero.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-5 Filed 12/06/23   Page 38 of 214   PageID 7208

Seery - Direct                              91

1      And the way that was conducted was a little bit more

2   separated, meaning the parties would talk to the mediator, the

3   mediator would then go and talk to other parties and try to

4   work a settlement on each of those components.

5      Subsequent to the mediation where we reached the agreement

6   with Acis and Mr. Terry, and we ultimately in that timeframe

7   banged out the final terms of our agreement with Redeemer, we

8   engaged with Mr. Dondero around -- I wouldn't call it the

9   grand bargain, but a different plan.  By that point, the

10   monetization plan had started to gain some traction with the

11   creditor group, and Mr. Dondero and his counsel, I believe,

12   focused on the potential of what was referred to as a pot

13   plan.  And while it has the -- it could have the ability of

14   being a resolution plan, it wasn't the grand bargain plan that

15   I had initially envisioned.  And pot plan was really a

16   misnomer, because it didn't have a whole pot, so -- so it's a

17   little bit of a hybrid.

18   Q    Did the board spend time during its meetings discussing

19   various pot plan proposals that had been put forth by Mr.

20   Dondero?

21   A    Oh, absolutely.  And not only the board.  I mean, we did

22   our own work as an independent board and then brought in our

23   professional advisors, both your firm and the DSI folks, to go

24   through analytics around the pot plan, and even before that,

25   the other plan alternatives, but we had direct discussions

007631

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 33-53 Filed 12/07/23    Page 39 of 214    PageID 7209
Exhibit Exhibit 53    Page 38 of 202

Seery - Direct                              92

1  with Mr. Dondero and his counsel.

2  Q    And in the last couple of months, has the board listened

3  to presentations that were made by Mr. Dondero and his counsel

4  concerning various forms of the pot plan?

5  A    Yes.  At least two or three.

6  Q    And during this time, has the board and the Debtor

7  communicated with the Committee concerning different

8  iterations of the proposed pot plan?

9  A    Yes.  We've had continual discussions with the Committee

10 regarding the various iterations of the potential grand

11 bargain all the way through the pot plan.

12 Q    And during this process, did the Debtor provide Mr.

13 Dondero and his counsel with certain financial information

14 that had been requested?

15 A    Yes.  As I said, up 'til the point where he resigned and

16 was then ultimately, at the end of the year, removed from the

17 office, he had access to financial information related to the

18 Debtor and even got the information from the financial group.

19 Subsequent to that, we've provided him with requests -- with

20 financial information that was requested by his counsel.

21 Q    Okay.  Were your efforts at the grand bargain or the

22 pursuit of the pot plan successful?

23 A    No, they were not.

24 Q    Do you have an understanding as to -- just, again, without

25 going into -- into details about any particular proposal, do

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53   Filed 12/07/23   Page 40 of 214   PageID 7210
Exhibit Exhibits 53-58   Page 234 of 332

Seery - Direct                                    93

1  you have an understanding as to what the barrier was to

2  success?

3  A    The grand bargain, we just never got the traction that we

4  needed to get that going and the sides were just far -- too

5  far apart.  And the pot plan, similarly.  Our discussions with

6  Mr. Dondero and the Committee, they're -- they're very far

7  apart.

8  Q    And is it fair to say that the Committee's lack of support

9  in either the grand bargain or the pot plan is the principal

10  cause as to why we're not talking about that today?

11  A    Well, it's -- it -- right now, we've got the plan that's

12  on file, the monetization plan.  The monetization plan has

13  gone out for creditor vote and has received support.  It

14  distributes, we think, equitably, as well as a significant

15  amount of distributions to unsecured creditors.  And there

16  really isn't an alternative that we see, based upon the

17  numbers I've seen, that competes with it or has any traction

18  with the largest creditors.

19  Q    All right.  So, now we've talked about various proposals

20  or alternatives that were considered by the board, including

21  the grand bargain and the pot plan.  Let's spend some time

22  talking about the plan that is before the Court today and how

23  we got here.  And I'd like to take you really back to the

24  beginning, if I may.

25        Tell us, tell the Court just what the board was doing in

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 33-53    Filed 12/07/23    Page 41 of 214    PageID 7211
Exhibit Exhibits 53-58    Page 295 of 902

Seery - Direct                              94

1   the early months after getting appointed, because I think

2   context is important here.  What were you all doing the first

3   few months of the case?

4   A    Well, the first few months, we really were drinking from

5   the proverbial fire hose, trying to get an understanding of

6   the business, how it had been managed previously, what the

7   issues related to the different parts of the business were.

8   And then an understanding of each of the employees that were

9   working under us, what their roles were, how they performed

10  them, who sat where with respect to each of the assets, what

11  the contracts looked like, whether they be shared service or

12  management agreements.  And then we started looking at the

13  individual assets in terms of value.

14      At the same time, we were trying to get up to speed on the

15  complex nature of the claims that were in the case.  The

16  liquidated claims were relatively easy, but there had been a

17  significant amount of transfers in and out of the Debtor, and

18  then there's a myriad of relationships involving related

19  entities that we had to understand, both with respect to the

20  claims as well as with respect to the assets.

21      And so that -- those were the main things we were doing

22  for those first few months in the case.

23  Q    Just a couple months into the case, the COVID pandemic

24  reared its head.  Do you recall that?

25  A    Yes.  We had been in Dallas every day working up 'til the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53   Filed 12/07/23   Page 42 of 214   PageID 7212
Exhibit Exhibit 53   Page 36 of 302

Seery - Direct                                    95

1   time of the COVID and some of the shutdown orders,

2   particularly in the Northeast, and so that changed the dynamic

3   of how we could function every day.

4       Notwithstanding that, we -- we were able to manage from

5   afar, and ultimately, when there were some cases in the office

6   of COVID, we -- on the Highland side, not the related entity

7   side, but on the Highland side -- we determined that the staff

8   and the team should work from home, which they were able to do

9   quite well.

10  Q   Okay.  In those early months, do you recall that there was

11  a substantial erosion of value, at least as of the time you

12  were appointed in those first three or four months?

13  A   There was.  And I think we've heard some -- some noise

14  about what that value was and the drop in the asset value as

15  opposed to net value.  But the asset value did, did drop

16  significantly.

17  Q   Can you describe for the Court your recollection as to the

18  causes of the drop in the value that you just descried?

19  A   Yes.  The number one drop was a reservation that the board

20  took for a receivable from an entity called Hunter Mountain.

21  The quick version of this is that Hunter Mountain owns

22  Highland.  As I mentioned, while Strand is the GP, it only has

23  a quarter-percent interest in Highland.  The vast majority of

24  the interests are owned by an entity called the Hunter

25  Mountain Investment Trust in a very complicated, tax-driven

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 11-53   Filed 12/06/23   Page 43 of 214   PageID 7213

Seery - Direct                          96

1    structure.

2           Dondero and Okada transferred their interests in Highland

3    at a high valuation to Hunter Mountain.  Hunter Mountain then

4    didn't have the money, so it, in essence, borrowed the money

5    from the Debtor in a note to pay for those interests.  There's

6    a circular running of the cash, but we were not sure where, if

7    any, where any assets are, if they would be sufficient.  So we

8    took a reservation of $58 million for that note.

9           The second biggest piece of the reduction in value was the

10   equity that was lost in the Select Equity account.  This is a

11   Debtor trading account that was managed by Mr. Dondero.  $54

12   million was lost in that account.  Basically, it was really

13   highly margined, very high leverage in that account when the

14   market volatility came in.  As it grew through January,

15   February, March, more and more margin calls.  Ultimately,

16   Jefferies, which had Safe Harbor protections -- technically,

17   the account was not a Debtor account, but they would have had

18   it anyway -- they seized that account.  $54 million in equity

19   was lost in that account.

20          The next highest amount is about $35 million, but it's

21   higher now.  That's just the bankruptcy costs, where we have

22   spent cash and Debtor assets in the case.  It was about $36 to

23   $40 million through the end of the year.  That's now higher.

24          About $30 million was lost in paying back Jefferies on the

25   asset side of the ledger in the Highland internal equity

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 35-53   Filed 12/06/23   Page 44 of 214   PageID 7214

Seery - Direct                              97

account.  This was similar to the equity -- the Select Equity

account, also managed by Mr. Dondero.  Extremely highly-

levered coming into the market volatility of the first

quarter, which was exacerbated, obviously, by the COVID.  That

was about $30 million that was repaid in margin loan in that

account.

    In addition, $25 million of equity was lost in that

account while Mr. Dondero was managing it.  I took over

effectively managing it in mid-March and worked with Jefferies

to keep them from seizing the account.  We've since gotten a

bunch of value coming back from that account, but that was the

amount that was lost.

    About $10 million was lost in the Carey Limousine loan

transaction.  That is a -- an interesting little company.  Has

done a nice job -- management did a very good job coming into

the year, and it actually had real value, notwithstanding the

changeover to Uber in people's preferences.  But with the

COVID, it really relied on events, airport travel, executive

travel, and that really took a bite out of it, although, you

know, we're hoping to be able to restructure, we have

restructured it to some degree, and we're hoping that there

could be value there.

    And then about $7 million was lost in equity in an entity

called NexPoint Hospitality Trust.  This is another extremely

highly-levered hospitality REIT that NexPoint manages.  It

1    trades on the Toronto Stock Exchange.  And I think likely that

2    -- it's got a lot of issues with respect to its mortgage debt.

3    And because it was hospitality, it was really hurt by the

4    COVID.

5        And I think that's probably -- those numbers add up to

6    north of $200 million of the loss.

7    Q    All right.  Thank you for that recitation, Mr. Seery.  So,

8    turning to the spring, after all of those issues were

9    addressed, at the same time you were working on the grand

10   bargain, did the Debtor and its professionals begin

11   formulating the monetization plan that we have today?

12   A    I'm sorry, in the spring?  I lost that question.  I

13   apologize.

14   Q    That's okay.  After you dealt with everything that you

15   just described, were you doing two things at once?  Were you

16   working on the grand bargain and the asset monetization plan

17   at the same time?

18   A    Yes, that's correct.

19   Q    All right.  Can you just describe for the Court kind of,

20   you know, how the asset monetization plan evolved up until the

21   point of the mediation?

22   A    Yes.  I alluded to it earlier, but because the Debtor was

23   running an operating deficit, we were very concerned about

24   liquidity.  Highland typically runs, from a liquidity

25   perspective and a cash perspective, very close to the edge.  I

007638

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153-5   Filed 12/07/20   Page 46 of 214   PageID 7216

Seery - Direct                                      99

1    don't feel particularly comfortable helping lead an

2    organization that's running that close to the edge.  And I was

3    very focused on the burn that we had on an operating basis, as

4    well as the professional cost burn, because for a case this

5    size it was significant.

6         The rest of the board felt similarly, and one of the

7    directors, and I'm not sure if it was Mr. Nelms or Mr. Dubel,

8    came up with the idea that we needed an alternative to

9    continuing to just burn assets while we were in this case.

10   There had to be some sort of catalyst to get the parties, both

11   Mr. Dondero as well as the creditors -- at that point, as I

12   said, we weren't settled with Acis or UBS, and we weren't,

13   frankly, close with either of them.  And so we needed what --

14   what I think the -- the idea was that we needed a catalyst to

15   have people focus on what the alternative was.  Because

16   continuing to run the case until we ran out of money was not

17   an acceptable alternative.

18        What I didn't like about the plan was it didn't have

19   anybody's support, and so I wasn't sure how we made progress

20   with it without having some Committee member or Mr. Dondero in

21   support of it.  I was outvoted, although maybe I came around

22   in the actual vote.  But ultimately, I think it was actually a

23   quite smart idea, because it did set the basis for what the

24   case would be.  Either there would be some resolution or it

25   would push towards the monetization plan, and parties could

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153-5   Filed 12/07/01   Page 47 of 214   PageID 7217

Seery - Direct                              100

1    then assess whether they liked the monetization plan or not.

2    That if I was going to be the Claimant Trustee or the --

3    defending the, you know, against the claims, they would have

4    the pleasure of litigating with me for some period of time.

5    Or they could come to some either grand bargain or ultimately

6    some other resolution.

7        And as we started to develop a plan and put more of a

8    framework -- more flesh around the framework, it actually

9    started to look more and more like a real viable alternative

10   to either long-term litigation or some other grand bargain if

11   we couldn't get there.

12   Q   And ultimately, did the board authorize the Debtor to file

13   its initial version of the asset monetization plan at around

14   the time of the mediation?

15   A   Yeah.  We developed it over the summer and really fleshed

16   it out in terms of how the structure would work, what the tax

17   issues were, what the governance issues were.  We did that

18   largely negotiating with ourselves, so we -- we were extremely

19   successful.  And then we filed, we filed that plan right

20   before the mediation.

21       And my recollection is that there was some concern from

22   the mediators that they thought that putting that plan out in

23   the public could upset the possibility of a grand bargain, so

24   we ended up filing that under seal.

25   Q   Do you recall what the Committee's initial reaction was to

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 53153 Filed 12/07/20 Page 48 of 214   PageID 7218

Seery - Direct                                        101

1   the asset monetization plan that you filed under seal?

2   A   Well, initially, they -- the Committee didn't like it.

3   They didn't like the governance.  They didn't like the fact

4   that it set up for those creditors who didn't litigate the

5   prospect of litigations to try to resolve their claims.  It

6   effectively cut out some of the advisory that the Committee

7   currently had.  The -- one of the driving forces behind the

8   asset monetization plan and how we initially started it is we

9   can't continue these costs, as I said.  Well, an easy way to

10  get rid of -- to reduce the costs is to get rid of half of

11  them.

12      So if you could get rid of the Committee, effectively, and

13  coalesce around an asset monetization vehicle, then if folks

14  wanted to resolve their claim, you could.  If you had to

15  litigate it, you could, but you'd have one set of lawyers that

16  the estate was paying for, one set of financial advisors the

17  estate was paying for, as opposed to multiple sets.

18  Q   In addition to the corporate governance issues that you

19  just described, did the Committee and the Debtor quickly reach

20  an agreement on the terms of the treatment of employee claims

21  and the scope of the releases for the employees?

22  A   No.  Not very quickly at all.

23  Q   Yeah.

24  A   You know, again, one of the issues in this case that

25  drives perspectives is the history that creditors have in

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 49 of 214   PageID 7219
Exhibit Exhibit 153 Page 1207-203 of 692

Seery - Direct                                                    102

1    dealing with Highland and in dealing with many of the

2    employees at Highland, you know, who had worked for Mr.

3    Dondero and served at his pleasure for a long time, and how

4    they had been treated in various of their attempts to collect

5    their claims.  So the idea of giving any sort of releases to

6    the employees was anathema to -- to many of the Committee

7    members.

8         From my perspective, you know, releases are particularly

9    important because there's a *quid pro quo* leading up to the

10   confirmation of a plan, particularly with a monetization plan

11   where it's clear that the employees are all going to be or

12   largely going to be either transitioned or terminated.  If

13   they're going to keep working towards that, we either have to

14   have some sort of financial incentive or some sort of

15   assurance that their actions which are done in good faith to

16   try to pursue this give them the benefit of more than just

17   their paycheck.

18        And so we thought we were setting up the *quid pro quo* in

19   terms of work towards the monetization, bring the case home,

20   and you're entitled to a release, so long as you haven't done

21   something that was grossly negligent or willful misconduct.

22   And the Committee, I think, wanted to have a more aggressive

23   posture.

24   Q    And did those disagreements over corporate governance and

25   the employee releases kind of spill out into the public at

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-3 Filed 12/07/04   Page 50 of 214   PageID 7220

Seery - Direct                                        103

1   that disclosure statement hearing in October?

2   A    I think they spilled out at that hearing as well as in the

3   hearing either the next day or two days later around Mr.

4   Daugherty's claim.  And again, it was -- it was contentious.

5   I tend to try to reach resolution, but I tend to hold firm

6   when I think that there's a good reason, an equitable reason

7   to do so, and compromising that issue was very difficult for

8   me.

9   Q    But in the weeks that followed, did the Committee and the

10  Debtor indeed negotiate to resolve to their mutual

11  satisfaction the issues surrounding corporate governance and

12  employee releases?

13  A    We did, yes.

14  Q    And were -- was the Debtor able to get its disclosure

15  statement approved with Committee support in late November?

16  A    We did, yes.

17  Q    Can you describe for the Court generally kind of the

18  process by which the Debtor negotiated with the Committee?

19  I'll ask it as broadly as I can, and I'll focus if I need to.

20  A    Yeah.  The process was usually in group settings with the

21  independent directors, professionals, and the Committee

22  members and their professionals.  Oftentimes, then, there

23  would be certain one-off conversations if there was a

24  particular issue that was more important to one Committee

25  member or another, or if they were designated by the Committee

```
 1   to be the point on that.  And so I negotiated on behalf of the

 2   Debtor, both collectively and individually, around these

 3   points.

 4         The biggest issues related to governance of the Claimant

 5   Trust, the separation of the Claimant Trust and the Litigation

 6   Trust, which was important to me, the treatment of employees

 7   between the filing -- the time we came up with the case and

 8   when we were going to exit, and then how that release

 9   provision would work.

10   Q    Is it fair to say that numerous iterations of the various

11   documents that embodied the plan were exchanged between the

12   Debtor and the Committee?

13   A    Yes.  There were -- there were dozens.

14   Q    Fair to say that the negotiations were arm's length?

15   A    Absolutely.  Often contentious, always professional, but I

16   do think that there were, you know, well -- good-faith views

17   held by folks on both sides.  And I think we were fortunate to

18   be able to get resolution of those, because they were

19   strongly-held views.

20   Q    Okay.  And ultimately, I think you've already testified,

21   and Mr. Clemente certainly made it clear:  Is the Debtor --

22   does the Debtor have the Committee on board for their plan

23   today?

24   A    My understanding is again -- and you heard Mr. Clemente --

25   both the Committee and each of the individual members are
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3 53 Filed 12/07/206 of 692 52 of 214   PageID 7222

Seery - Direct                              105

1  supportive of the plan.

2  Q    All right.  Let's switch to Mr. Dondero and his reaction

3  to the asset monetization plan.  Can you describe for the

4  Court based on your experience and your interaction with him

5  what you interpreted Mr. Dondero's position to be?

6            A VOICE:  Objection, hearsay, or --

7            MR. DRAPER:  Objection, hearsay.  Calls for

8  speculation, Your Honor.

9            THE COURT:  Overruled.

10            THE WITNESS:  Yeah.  I had direct discussions with

11  Mr. Dondero regarding the plan, the asset monetization plan,

12  as I mentioned, direct discussions regarding a potential grand

13  bargain.  The initial view from Mr. Dondero was, and he told

14  me, that if he didn't get a plan that he agreed to, if he

15  didn't have a specific control or agreement around what got

16  paid to Acis and Mr. Terry and what got paid to Redeemer

17  specifically, that he would, quote, burn the place down.  I

18  know that because it is, excuse the pun, seared into my mind,

19  but I also wrote it down.  And that was, you know, in the

20  early summer.

21      We had subsequent discussions around the plan, and as we

22  were talking about the -- about the grand bargain or -- the

23  pot plan hadn't come out at that point -- even on a large call

24  -- the plan initially called for a transition, and still does,

25  of employees of the Debtor to a related entity to continue

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/207 of 92 Page 53 of 214   PageID 7223

Seery - Direct                          106

1    performing services that were under the prior shared service

2    agreements that we were going to terminate.

3        But that transition is wholly dependent on Mr. Dondero.

4    And we had a call with at least five to seven people on it

5    where I said to Mr. Dondero, look, this is going to be in your

6    financial interest to agree to a smooth transition.  These

7    people have worked for you for a long time.  It's for their

8    benefit.  You portfolio-manage these funds.  It's to the

9    benefit of those funds to do this smoothly.  And if there's

10   litigation between you and the estate later, then those chips

11   will fall where they may.

12       And he told me to be prepared for a much more difficult

13   transition than I envisioned.

14       And I specifically said to him, and this one sticks in my

15   mind because I recall it, I said, don't worry, Mr. Dondero --

16   I think I used Jim -- I will be prepared.  I was a Boy Scout

17   and we spend time preparing for these kinds of things.  So

18   we're -- we would love to get done the best transition we can,

19   but we will be prepared for a difficult one.

20       So, from the start, the idea of the monetization plan was

21   not something that obviously he supported.  We did agree with

22   -- after his inquiry or request with the mediators, to file it

23   under seal while we went into the mediation.

24   BY MR. MORRIS:

25   Q    And after, after that was filed in September, early

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3    Filed 12/07/23    Page 54 of 214    PageID 7224
Exhibit Exhibit 153-Page 207-208 of 692

Seery - Direct                                         107

1    October, did Mr. Dondero start to act in a way that the board

2    perceived to be against the Debtor's interests?

3    A    Certainly.  I mean, he previously had shown inclinations

4    of that, but that -- it got very aggressive as he interfered

5    with the trades we were trying to do in terms of managing the

6    CLO assets.  He took a position that postpetition, which was

7    really one of his entities taking a position, that

8    postposition a sale of life policy assets was somehow not in

9    the best interests of the funds and that we had abused our

10   position, notwithstanding that he turned it over to us with no

11   liquidity to maintain those life policies.  There were several

12   other instances.  And those led to the decision to, one, have

13   him resign, and then ultimately, after the text to me that I

14   perceived as threatening, and we've had subsequent hearings on

15   it, we asked him to leave the office.

16   Q    Okay.  Let's move back to the plan here.  Can you

17   describe, you know, generally, if you can, the purpose and

18   intent of the asset monetization plan?

19   A    Well, very simply, the main purpose is to maximize value.

20   This is not a competition between Mr. Dondero and myself.  I

21   have no stake in getting more money out of the maximization

22   other than my duty to do the job that I was hired to do.

23        So our goal is to manage the assets in what we think is

24   the best way to do that over time, and find opportunities

25   where the market is right to monetize the assets, primarily

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153-5   Page 107 of 209   Page 55 of 214   PageID 7225

Seery - Direct                                         108

1   through sales.  There may be other instances, depending on the

2   type of asset, whether a sale makes sense, if we can structure

3   it through some kind of distribution that's more structured.

4   Q    We've used the phrase a bunch of times already.  Can you

5   describe in your own words what an asset monetization plan is

6   in the context of the Debtor's proposal?

7   A    Well, it may be slightly an awkward moniker, but I think

8   it's not completely different than what you'd see, in some

9   respects, to a regular plan, where you equitize debt and you

10  operate the business for the benefit of the equitized debt.

11  Here, it's a little different in that we know exactly how

12  we're going to move forward.  We've effectively -- we'll

13  effectively turn the debt obligations into trust interests and

14  we will pay those as we sell down assets.  So we've got it

15  structured in a way where we can pivot depending on market

16  conditions and we'll be managing certain funds that the assets

17  sit in.

18       So there's really four assets where the assets sit, and

19  we'll manage those.  First are the ones that the Debtor owns

20  directly.  Second will be the ones that are in Restoration

21  Capital -- Restoration Capital Partners.  Third are the assets

22  in a fund called Multi-Strat.  Fourth is the direct ownership

23  interest in Cornerstone, and technically (garbled) would be

24  the -- would be the next one.

25       So we have the ability to manage these individual assets

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23 Page 56 of 214   PageID 7226

Seery - Direct                                             109

```
 1   and then be able to sell them in what we determine to be the
 2   best way to maximize value, depending on the timing.
 3   Q    And when you say that you're going to continue to operate
 4   the business, do you mean that the Debtor will continue to
 5   manage the assets you've just described in the same way that
 6   it had prior to the petition date?
 7   A    It'll be a smaller team, but that's the Debtor's business.
 8   So what we won't be doing are the shared services anymore.
 9   That was part of the Debtor's business.  But we will be
10   managing the assets.  So the 1.0 CLOs, we'll manage those
11   assets.  The RCP assets, we'll manage those assets.  The
12   Trussway Holdings assets, we'll managing those assets.  Each
13   of them is a little bit different.  There's things as diverse
14   as operating companies to real estate.  We'll operate, subject
15   to final agreement, but the Longhorn A and B, which are
16   separate accounts that are -- were funded and are controlled
17   by the largest -- one of the largest investors in the world.
18   And so they have agreed that we should manage those assets for
19   them.
20        So we're -- that's the business that the Debtor is in.  It
21   won't be doing all of the businesses that the Debtor was in
22   before, like the shared services, but the management of the
23   assets will be very similar.
24   Q    And why do these funds and these assets need continued
25   management?  Why aren't you just selling them?
```

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 153-54    Filed 12/07/23    Page 57 of 214    PageID 7227

Seery - Direct                                              110

1    A    Well, in some respects, they could just be sold, but the

2    -- we believe that the value would be a lot lower.  So, a lot

3    of them are complex.  The time to sell them may not be now.

4    Some will require restructuring in some way, whether -- not

5    through a reorganization process, but some sort of structural

6    treatment to how the obligations at the individual asset are

7    treated, or the equity at the individual asset.  So we're

8    going to manage each of them and look for market opportunities

9    where we think the value can be maximized.

10        MR. MORRIS:  Your Honor, I'm about to switch to

11    another topic.  We have been going for a little bit more than

12    two and a half hours.  I'm happy to just continue if you and

13    the witness are, but I just wanted to give you a head's up

14    that I'm about to switch topics.  If you wanted to take a

15    short break, we could.  If you want me to continue, I'm happy

16    to do that, too.

17        THE COURT:  Well, let me ask you, how much longer do

18    you think you're going to take overall with Mr. Seery?

19        MR. MORRIS:  I think I'll probably have another hour

20    to an hour and a half, Your Honor.  We want to make a complete

21    factual record here.

22        THE COURT:  All right.  Well, it's 12:07 Central

23    time.  Why don't we take a 30-minute lunch break, okay?  Can

24    everybody do their lunch snack that fast?

25        MR. MORRIS:  Sure.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-153 Filed 12/07/23   Page 58 of 214   PageID 7228
Document Page 207 of 212

Seery - Direct                          111

 1           THE COURT:  I think that would probably be the way to

 2    go.  So we'll come back -- it's now 12:08.  We'll come back at

 3    12:38 Central time and resume --

 4           MR. MORRIS:  Okay.

 5           THE COURT:  -- resume this direct testimony, okay?

 6    So, see you in 30 minutes.

 7           MR. MORRIS:  Thank you very much.

 8           THE COURT:  Okay.

 9           THE CLERK:  All rise.

10      (A recess ensued from 12:08 p.m. to 12:44 p.m.)

11           THE COURT:  We are going back on the record in the

12    Highland confirmation hearing.  It's 12:44 Central time.  I

13    took a little bit longer break than I said we would.

14        Mr. Morris and Mr. Seery, are you ready to resume?

15           MR. MORRIS:  I am, Your Honor.

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  Okay, good.  A couple of things.  I'm

18    required to remind you you're still under oath, Mr. Seery.

19    And also, just for people's planning purposes, what I intend

20    to do is, when the direct examination of Mr. Seery is

21    finished, I'm going to allow cross-examination of the

22    Objectors in the same amount of time in the aggregate that the

23    Debtor got, okay?  So, Objectors, in the aggregate, you can

24    spend as long cross-examining as the Debtor spent examining.

25    I can figure out this is the most significant witness, so I'm

Seery - Direct                          112

1    assuming that Debtor's other witnesses are going to be a lot

2    shorter than this, but --

3            MR. MORRIS:  Yes, I promise.

4            THE COURT:  -- that's how we'll proceed.  And I

5    expect to finish Mr. Seery today.

6        So, all right.  With that, you may proceed, Mr. Morris.

7            MR. MORRIS:  Okay.

8                    DIRECT EXAMINATION, RESUMED

9    BY MR. MORRIS:

10   Q    Can you hear me okay, Mr. Seery?

11   A    Yes, sir.

12   Q    Okay.  Before we move on to the next topic, you spent some

13   time describing the asset monetization plan.  Would it be fair

14   to describe that as a long-term going-concern liquidation?

15   A    Long-term is subjective.  We anticipate that we'll be able

16   to monetize the assets in two years.  We could go out longer

17   to three.  There's no absolute restriction that we couldn't

18   take longer, depending on what we see in the market, but the

19   objective would be to find maximization opportunities within

20   that time period.

21   Q    Okay.  So let's turn now to the post-confirmation

22   corporate governance structure.

23       (Interruption.)

24           THE WITNESS:  Mr. Golub (phonetic), you should mute.

25           THE COURT:  Yes.  I don't know -- I didn't catch who

007652

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23   Page 60 of 214   PageID 7230

Seery - Direct                          113

 1   that was.  But anyway, anyone other than --

 2            A VOICE:  It's someone named Garrett Golub.

 3            THE COURT:  -- Morris and Seery, please mute.  All

 4   right.  Go ahead.

 5            MR. MORRIS:  Okay.

 6   BY MR. MORRIS:

 7   Q    At a high level, Mr. Seery, can you please describe for

 8   the Court the post-confirmation structure that's envisioned

 9   under the proposed plan?

10   A    At a high level, we anticipate reorganizing HCMLP such

11   that the current parties of interest will be extinguished and,

12   in exchange, creditors will get trust interests.  There'll be

13   a trust that will sit on top of HCMLP and it will have an

14   overall responsibility for the Claimant Trust, which will be

15   the HCMLP assets plus the assets that we move into the

16   Claimant Trust, depending on structural considerations.  And

17   then a Litigation Trust, which will be a separate trust, and

18   that will roll up into the main trust.  And the main trust

19   will be where the creditors hold their interests.  And those

20   interests take the form of senior interests or junior

21   interests.

22   Q    All right.  You mentioned a Claimant Trust.  Who is

23   proposed to serve as the Claimant Trustee?

24   A    I am.

25   Q    And you mentioned a Litigation Trust.  Is there someone

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Ex 13153 Filed 12/07/23    Page 61 of 214    PageID 7231

Seery - Direct                                    114

1    proposed to serve as the Litigation Trustee?

2    A    A gentleman named Marc Kirschner.  He's been doing these

3    kinds of things for a long time.

4    Q    Is there going to be any kind of oversight group or

5    committee?

6    A    There is an oversight committee that sits at the main

7    trust.  Into it will report Mr. Kirschner and myself.  It has

8    oversight responsibilities similar to a board of directors in

9    terms of the operations of the Claimant Trust and the

10   Litigation Trust.

11   Q    Do you have an understanding as to who the initial members

12   of the Claimant Oversight Committee?

13   A    The initial members will be each of the members of the

14   Creditors' Committee.  So, UBS, Acis, Redeemer, a

15   representative from Redeemer, and Meta-e, as well as an

16   independent named David Pauker.  So that's the initial

17   structure.

18   Q    And can you describe for the Court, how did Mr. Pauker get

19   involved in this?

20   A    He was selected by the Committee.

21   Q    Okay.  Is there -- Meta-e is a convenience class claim

22   holder.  Do I have that right?

23   A    Yeah.  They're -- they -- as I went through earlier, they

24   had a liquidated claim for litigation services.  So we

25   expected that they'll be paid off rather early in the process.

Seery - Direct                                    115

```
 1   At that point, we suspect they wouldn't -- they would no

 2   longer be an Oversight Committee member and they would be

 3   replaced by an independent.

 4   Q    And do you have any understanding as to how that

 5   independent will be chosen?

 6   A    I believe it's chosen by the other members.

 7   Q    Okay.  Can you describe your proposed compensation

 8   structure as the proposed Claimant Trustee?

 9   A    My compensation will be $150,000 a month, which is the

10   same compensation I have now.  In addition, we'll negotiate a

11   bonus structure with the Oversight Committee.  And that will

12   likely be a bonus not just for myself but for the entire team,

13   depending on performance.

14   Q    Okay.  And that -- and who is that negotiation going to be

15   had with?

16   A    The Oversight Committee.

17   Q    Okay.  Are you familiar with Mr. Pauker's compensation

18   structure?

19   A    I -- I've seen it.  I don't recall specifically.  I think

20   his -- from the models, I think he's about 40 or 50 grand a

21   month, something along those lines.

22   Q    Okay.  How about Mr. Kirschner?  Do you recall -- let me

23   just ask you this.  Does it refresh your recollection at all

24   if I said that 250 in year one for Mr. Pauker?

25   A    Yeah.  So maybe closer to $20,000 to $25,000 a month.  And
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-3 Filed 12/07/23   Page 63 of 214   PageID 7233

Seery - Direct                          116

1   then Mr. Kirschner is a lower amount, but he would get a

2   contingency fee arrangement somewhere dependent on the

3   recoveries from his litigations.

4   Q    Okay.  You mentioned earlier that the Debtor intends to

5   continue operations at least for some period of time post-

6   effective date.  Do you have a view as to whether the post-

7   confirmation entity will have sufficient personnel to manage

8   the business?

9   A    I do, yes.

10  Q    And why is that?  What makes you believe that the Debtor

11  will have -- the post-confirmation Debtor will have sufficient

12  personnel to manage the business?

13  A    Well, we've gone through and looked at each of the assets

14  and what is required to manage those assets.  We have a lot of

15  experience doing it during the case.  The bulk of the

16  employees, who do a fine job, are really doing shared service

17  arrangements.  The direct asset management group is a smaller

18  group, and we'll be able to manage those with the team we're

19  putting together.

20  Q    Okay.  How does the ten employees compare to the original

21  plan that was set forth in the disclosure statement, if you

22  recall?

23  A    Well, we had less, and I believe the number was either two

24  or three, along with me, and then using a lot of outside

25  professional help.  But we determined that we wanted to have a

```
 1   much more robust team, based on the litigation that we're

 2   seeing around the case and we expect to continue post-exit, so

 3   that the team can manage those assets unfettered.

 4        In addition, we were taking on the CLO management, the 1.0

 5   CLO contracts.  These one -- as I've mentioned before, they're

 6   not traditional CLOs in the sense that they require the same

 7   hands-on management, but they do require an experienced team

 8   to help manage the exposures, most of which are cross-holdings

 9   in different -- in different entities or different investments

10   that Highland also has exposure to.

11   Q   In addition to the assumption of the CLO management

12   agreements, has the Debtor made any decisions regarding the

13   possibility of hiring a sub-servicer?

14   A   We have, yes.

15   Q   And did that factor into the Debtor's decision to increase

16   the number of personnel it was going to retain?

17   A   Well, we determined we weren't going to hire a sub-

18   servicer.  And I'm not sure exactly when we made that

19   determination.  We do have a TPA, which is SEI, and that's a

20   third-party administrator, to sift through the funds and

21   provide accounting supporting to those, to those funds.  So

22   that -- they will help.  We also have an outside consultant

23   that we're using, Experienced Advisory Consultants, who are

24   financial consultants who've worked in the business.  So we do

25   have those.
```

```
 1        But we didn't think that we would get a third-party sub-
 2   servicer, as was the case in Acis, and determined that wasn't
 3   in the best interest of the estate.
 4   Q   Can you just shed a little light on what factors the
 5   Debtor took into account in deciding not to hire a sub-
 6   servicer?
 7   A    Well, we primarily looked at cost, as well as control of
 8   the assets, and determined that that was -- those were in the
 9   best interests of the estate, to keep them managed internally.
10   We reviewed that with the Committee, and they agreed.
11   Q    Okay.
12            MR. MORRIS:  Let's turn now to the best interests of
13   creditors' test, Your Honor, 1129(a)(7), and let's talk about
14   whether the plan is in the best interests of creditors.
15   BY MR. MORRIS:
16   Q   Has the Debtor done any analysis to determine the likely
17   value to be realized in a Chapter 7 liquidation?
18   A   We have, yes.
19   Q   And has the Debtor done any analysis to determine the
20   likely recoveries under the plan?
21   A    Yes.
22   Q   Okay.  Do you recall when these projections were first
23   prepared?
24   A   We started working on projections in the fall, as we were
25   developing the monetization plan.  We filed projections, I
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23   Page 66 of 214   PageID 7236

Seery - Direct                                            119

 1  believe, in November.  We've subsequently updated those

 2  projections based on the claims, market condition, and value

 3  of the assets.

 4  Q    And were those updates provided to plan objectors last

 5  week?

 6  A    Yes, they were.

 7  Q    Okay.  Can we refer to the projections that were in the

 8  disclosure statement as the November projections?

 9  A    That'd be fine.

10  Q    And can we refer to the projections that were provided to

11  the objectors last week as the January projections?

12  A    Yes.

13  Q    And as --

14  A    I think they're actually -- I think they're actually dated

15  February 1, is the most recent update.

16  Q    Okay.  And then was a further update provided yesterday

17  and filed on the docket, to the best of your knowledge?

18  A    Yes.

19  Q    All right.  We'll talk about some of the changes in those

20  projections.

21         MR. MORRIS:  Can we call up on the screen Debtor's

22  Exhibit 7D as in dog?  And this document is in evidence.  Um,

23  --

24         THE COURT:  No, this is -- oh, wait.  How many Ds is

25  it?  Seven?

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 153-5    Filed 12/07/21    Page 67 of 214    PageID 7237

Seery - Direct                                                    120

1          MR. MORRIS:  It's 7D, so that would be on Docket

2   1866, all of which has been admitted.

3          THE COURT:  Okay.  You're right.

4          MR. MORRIS:  Okay.

5      And if we could just, I'm sorry, go to Page 3.

6   BY MR. MORRIS:

7   Q    Is there any way to look at this, Mr. Seery?  Is this the

8   January projections that were provided last week?

9   A    Yes.

10  Q    Okay.  Can you describe for the Court the process by which

11  this set of projections and the November projections were

12  prepared?  How did the Debtor go about preparing these

13  projections?

14  A    Yeah.  These are prepared what I would call bottoms-up.

15  So what we did was we looked at each of the assets that the

16  Debtor owns or manages or has a direct or indirect interest

17  in, used the values that we have for those assets, because we

18  do keep valuations for each of the assets that the Debtor owns

19  or manages in the ordinary course of business.  We then

20  adjusted those depending on what we saw as the outcomes for

21  the case, either a plan outcome or a liquidation outcome, and

22  then rolled those into the -- into the numbers that you see

23  here.

24      So the 257 and change.  And please excuse my eyesight.

25  I'm going to make this bigger.  The 257 is the estimated

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 153-5    Filed 12/07/22    Page 68 of 214    PageID 7238

Seery - Direct                                121

1  proceeds from monetization.  Above that, you see cash.  That's

2  our estimated cash at 131.  And we monitor those, those values

3  daily.

4  Q    And were these projections prepared under your

5  supervision?

6  A    They were, yes.

7  Q    Okay.  And who was involved in the preparation of this

8  document and other iterations of the projections?

9  A    The team at DSI.  Obviously, myself; the team at DSI; as

10  well as the, at least from a review perspective, counsel.

11  Q    All of these contain various assumptions.  Do I have that

12  right?

13  A    Yes.

14        MR. MORRIS:  Can we go to the prior page, please, I

15  think is where the assumptions are?  And let's just look at a

16  few of them.  Okay.  Can we make that a little bigger, La

17  Asia?  Okay.  Good.

18  BY MR. MORRIS:

19  Q    Why does the Debtor's projections and liquidation analysis

20  contain any assumptions?  Why, why include assumptions?

21  A    Well, all projections contain assumptions.  So an

22  assumption -- I was strangely asked the question at

23  deposition, what does that mean?  It's a thing or fact that

24  one accepts as true for the purposes of analysis.  And so in

25  terms of looking out into the future as to what the potential

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23 Page 69 of 214   PageID 7239

Seery - Direct                                                122

 1   operation expenses will be and what the potential recoveries

 2   will be, one has to make assumptions in order to be able to

 3   compare apples to apples.

 4   Q    And do you believe that these assumptions are reasonable?

 5   A    Yes.  It would make no sense to have assumptions that

 6   aren't reasonable.  I mean, and we've all seen that with

 7   analysis through our respective careers.  It really should be

 8   grounded in some fact and a reasonable projection on what can

 9   happen in the future, based upon experience.

10   Q    Okay.  And have you personally vetted each of the

11   assumptions on this page?

12   A    Yes.

13   Q    Okay.  Let's just look at a few of them.  Let's start with

14   B.  It says, All investment assets are sold by December 31,

15   2022.  Do you see that?

16   A    Yes.

17   Q    Why did the Debtor make that assumption?

18   A    We looked at a two-year projection horizon.  We thought

19   that that was a reasonable amount of time, looking at these

20   assets, to monetize the assets.  Remember that we did go

21   through a process of the case over the last year, and we did

22   consider monetization asset events for certain of the assets

23   throughout the case, some of which we were successful on, some

24   of which we weren't, some we just determined to pull back.

25   But we do believe that, based upon our view of the market and

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/24   Page 70 of 214   PageID 7240

Seery - Direct                                    123

1   where we think these assets will be positioned, that

2   monetizing them over a two-year period makes sense.

3   Q    And is it possible that it takes longer than that?

4   A    It's possible.  The -- you know, we would be wrong about

5   the market.  The -- we could go into a full-blown recession.

6   Capital could dry up.  The financing markets could turn

7   negative.  But they're extremely positive right now.  Those

8   things could happen.  But we're assuming that they won't.

9   Q    And is it possible that you complete the process on a more

10  accelerated timeframe?

11  A    That's always possible.  It's not, in my experience, a

12  good way to plan.  Luck really isn't a business strategy.  But

13  if good opportunity shows up and folks want to pay full value

14  for an asset, we certainly wouldn't turn them away just so we

15  could stretch out the time period.

16  Q    Is it fair to say that this projected time period is your

17  best estimate on the most likely timeframe needed?

18  A    It's -- I think it's the best estimate that we have based

19  upon our experience with the assets, again, and our projection

20  of the marketplace that we see now.  If things change, we'll

21  adjust it, but this is a fair estimate of when we can get the

22  monetization accomplished.

23  Q    Okay.  The next assumption relates to certain demand

24  notes.  Do you see that?

25  A    Yes.

007663

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 153    Filed 12/07/23    Page 71 of 214    PageID 7241

Seery - Direct                                    124

1  Q    Can you explain to the Court what that assumption is and

2  why the Debtor believed that it was reasonable?

3  A    Well, the Debtor has certain notes that are demand notes.

4  These are all from related entities.  Most of the notes, the

5  demand notes, we have demanded, and we've commenced litigation

6  to collect.  And we assume that we're going to be able to

7  collect those.

8       Three notes that were long-term notes -- these were notes

9  with maturities in 2047 that had been stretched out a couple

10 years ago -- were defaulted recently.  And we have accelerated

11 those notes and we've asserted demands and we have commenced

12 litigation, I believe, on each of those last week to collect.

13 So we do estimate that we will collect on all of the notes

14 that we've demanded and that we've commenced action on.  So

15 the demand notes as well as the accelerated notes.

16      The next, the next bullet shows there's one Dugaboy note

17 that has not defaulted.  That also has a 2047 maturity.  I

18 believe it's about $18 million.  And we expect that one to

19 stay current, because now I think the relater parties learned

20 that when you don't pay a long-dated note, it accelerates,

21 provided the holder, which is us, wishes to accelerate it,

22 which we did.  And so that note we do not expect to be

23 collected in the time period.

24 Q    Okay.

25           MR. MORRIS:  Let's go down to M.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 72 of 214   PageID 7242
Exhibit Exhibits 153-188   Page 72 of 692

Seery - Direct                                     125

1    BY MR. MORRIS:

2    Q    M relates to certain claims.  Do you see that?

3    A    Yes.

4    Q    Can you just describe at a high level what assumption was

5    made with which -- with respect to which particular claims?

6    A    Well, we've summarized them there.  And what we've assumed

7    is that, with respect to Class 8, IFA, which is a derivative

8    litigation claim that seeks to hold, loosely, HCMLP liable for

9    obligations of NexBank, is worth zero.  I think that's pretty

10   close to settling.  We assumed here $94.8 million for UBS,

11   which was the estimated amount, and $45 million for

12   HarbourVest.

13   Q    And when you say the estimated amount, are you referring

14   to the 3018 order on voting?

15   A    Yes.  We just use the estimated amount in this projection

16   based upon the 3018 order.

17   Q    Okay.  And finally, let's look at P.  P has a payout

18   schedule.  Do I have that right?

19   A    That's an estimated payout schedule, yes.

20   Q    And what do you mean by that, that it's estimated?

21   A    Based upon our projections and how we perceive being able

22   to monetize the assets and reach the valuations that we want

23   to reach, we believe we could make these distributions.

24   However, there's no requirement to make them.

25        So the first and foremost objective we have, as I said

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Ext 15 153 Filed 12/07/227 of 692 73 of 214   PageID 7243

Seery - Direct                                      126

1   earlier, is to maximize value, and not -- it's not based on a

2   payment schedule, it's based upon the market opportunity.  And

3   we've estimated for our purposes here that we'll be able to

4   meet these distribution amounts, but there's no requirement to

5   do so.

6   Q    Okay.

7            MR. MORRIS:  Let's go to Page 3 of the document,

8   please.

9   BY MR. MORRIS:

10  Q    Can you just describe generally what this page reflects?

11  A    This is a comparison of the plan analysis and what we

12  expect to achieve under the plan and the liquidation analysis

13  if a trustee, a Chapter 7 trustee, were to take over.  And it

14  compares those two distribution amounts based upon the

15  assumptions on the prior page.

16  Q    All right.  Let's just look at some of the -- some of the

17  data points on here.  If we look at the plan analysis, what is

18  -- what is projected to be available for distribution, the

19  value that's available for distribution?

20  A    $222.6 million.

21  Q    Okay.  So, 222?  And on a claims pool that's estimated to

22  be, for this purpose, how much?

23  A    $313 million.

24  Q    And what is the distribution, the projected distribution

25  to general unsecured creditors on a percentage basis?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 74 of 214   PageID 7244
Exhibit Exhibit 153   Page 128 of 692

Seery - Direct                                    127

1   A    On this analysis, to general unsecured creditors, it's

2   62.14 percent.  But remember, that backs out the payment to

3   the Class 7 creditors of 85 cents above.

4   Q    Okay.  And does this plan analysis include any value for

5   litigation claims?

6   A    No, it does not.

7   Q    And is that true for all forms of the Debtor's

8   projections?

9   A    That's correct, yes.

10  Q    Okay.  And let's look at the right-hand column for a

11  moment.  It says, Liquidation Analysis.  What does that column

12  represent?

13  A    That represents our estimate of what a Chapter 7 trustee

14  could achieve if it were to take over the assets, sell them,

15  and make distributions.

16  Q    Okay.  And let's just look at the comparable data points

17  there.  Under the liquidation analysis, as of -- the January

18  liquidation analysis as of last week, what was projected to be

19  available for distribution?

20  A    A hundred and -- approximately $175 million.

21  Q    Okay.  And what was the claims pool?

22  A    The claims pool was $326 million.  Recall that that's a

23  slightly larger claims pool because it doesn't back out the

24  Class 7 claims.

25  Q    Okay.  The convenience class claims?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 75 of 214   PageID 7245
Exhibit Exhibit 53 Page 1207/229 Page

Seery - Direct                                    128

1    A    Correct.

2    Q    Okay.  And what's the projected recovery for general

3    unsecured claims under the liquidation analysis?

4    A    Based on this analysis and the assumptions, 48 (audio

5    gap).

6    Q    Okay.  Based on the Debtor's analysis, are creditors

7    expected to do better under this analysis in the -- under the

8    Debtor's plan versus the hypothetical Chapter 7 liquidation?

9    A    Yes.  Both -- both Class 7 and Class 8.

10   Q    Okay.  Now, this set of projections differs from the

11   projections that were included in the disclosure statement; is

12   that right?

13   A    That's correct.

14   Q    Okay.  Can we just talk about what the differences are

15   between the November projections that were in the disclosure

16   statement and the January projections that are up on the

17   screen?  Let's start with the monetization of assets, the

18   second line.  Do you recall if there was an increase, a

19   decrease, or did the value from the monetization of assets

20   stay the same between the November projections and the January

21   projections?

22   A    They increased from November 'til -- 'til now.

23   Q    Okay.  Can you explain to the judge why the value from the

24   monetization of assets increased from November to January?

25   A    Well, really, it's the composition of the assets and their

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 76 of 214   PageID 7246
Exhibit Exhibit 153 Page 207 of 692

Seery - Direct                                    129

1    value.  So there's four main drivers.

2         The first is HarbourVest.  We had a settlement with

3    HarbourVest, which include HarbourVest transferring to the

4    Debtor $22-1/2 million of HCLOF interests.  Those have a real

5    value, and we've now included them in the -- in the asset

6    pool.  We've also included HarbourVest in the claims pool.

7         The second was we talked a little bit earlier on the

8    assumptions on the notes.  We previously had anticipated that,

9    on the long-dated notes, a collection, we -- we'd receive

10   principal and interest currently, but we wouldn't receive the

11   full amount of the principal that was due well off in the

12   future, and we would sell it a discount.

13        So the amount of the asset pool has been increased by $24

14   million, and that reflects the delta between or the change

15   between what was in the prior plan, the notes paying and then

16   being sold at a discount, and what's in the current plan,

17   which include the accelerated notes, which is a $24 million

18   note that Advisors defaulted on that we have accelerated and

19   brought action on, as well as two six -- roughly $6 million

20   notes, one from Highland Capital Real Estate and the other

21   from HCM Services.  So that's, that's additional 24.

22        In addition, Trussway, we've reexamined where Trussway is

23   in the market, both its marketplace and its performance, and

24   reassessed where the value is.  So that has increased by about

25   $10.6 million.

007669

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-153 Filed Page 77 of 231   Page 77 of 214   PageID 7247

Seery - Direct                               130

1      That doesn't mean that we would sell it today.  It means

2  that, when you look at the performance of the company, what we

3  think are the best opportunities in the market.  As we see the

4  marketplace with managing the company over time, we think that

5  that asset has appreciated considerably since November.

6      And then, finally, there were additional revenues that

7  flow into the model from the November analysis which would be

8  distributable, and those include revenues from the 1.0 CLOs.

9  Q    Okay.  So that accounts for the difference and the

10 increase in value from the monetization of assets.  Is there

11 also an increase in expenses from the November projections to

12 the January projections?

13 A    Yeah.  It's -- it's about -- it's around $25 million

14 additional increase.

15 Q    And can you explain to the Court what is the driver behind

16 that increase in expenses?

17 A    Yeah.  There's several drivers to that.  The first one is

18 head count.  So our head count, we've increased.  As I

19 mentioned earlier, we determined that we wanted to have a much

20 more robust management presence.  So we've increased the head

21 count, so we have a base comp, compensation, about $5 million

22 more than we initially thought.

23     Secondly, we have bonus comp.  So we've back-ended --

24 structured a backend bonus performance bonus for the team, and

25 that will run another $5 million, roughly.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153-Filed 12/07/23   Page 78 of 214   PageID 7248

Seery - Direct                                      131

1      Previously, we had thought about, as you mentioned

2  earlier, the sub-servicing, but we've now talked about and we

3  have engaged a TPA, SEI, as well as experienced advisors.

4  That's another $1 to $2 million.

5      Operating expenses have increased by about $8 million,

6  based upon our assessment.  The biggest driver there is D&O,

7  which is up about $3 million.  In addition, we've gotten -- we

8  determined to keep a bunch of agreements related to data

9  collection and operations.  Those were requested by the

10  Committee, but they also serve us in performing our functions.

11  That's another couple million dollars.

12      My comp, my bonus comp was not in the prior model.  So I

13  have a bonus that has not been agreed to by the Court for the

14  bankruptcy performance.  This is not a future bonus.  And we

15  built that into the model.  Obviously, it's subject to Court

16  approval and Committee objection, and I suppose anybody else's

17  objection, but we'll -- we'll be before the Court for that.

18  But we wanted to build that into the model so that we had it

19  covered in the event that it was approved.

20  Q   Was there also a change in the assumption from November to

21  January with respect to the size of the general unsecured

22  claim pool?

23  A   Yes.  There have been -- there have been several changes

24  that have happened, and we've added those and refined the

25  claim pool numbers.

007671

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-153 Filed 12/07/23   Page 79 of 214   PageID 7249

Seery - Direct                                                 132

 1   Q   And are those changes reflected in the assumption we

 2   looked at earlier, Exhibit -- Assumption M, which went through

 3   certain claims that have been liquidated?

 4   A   Some, some are.  That assumption, I don't believe, was --

 5   it's not in front of me, but wasn't up to date.  So, that one,

 6   for example, assumed UBS at the 3018 estimated amount.  We've

 7   since refined that number to reflect the agreed-upon

 8   transaction with UBS, which is subject to Court approval.

 9   Q   Right.  But before we get to that, for purposes of the

10   January model, the one that's up on the page -- and if we need

11   to look at the prior page --

12          MR. MORRIS:  Let's go to the prior page, the

13   assumption.  Assumption M.

14   BY MR. MORRIS:

15   Q   Assume the UBS, the UBS claim at the $94.8 million, the

16   3018 number.  Do you remember that?

17   A   Yeah.  That's, that -- that's the assumption in this

18   model.  I think back in November we assumed HarbourVest at

19   zero and UBS at zero.  So we've since -- we've since refined

20   those numbers, obviously, through both the 3018 process as

21   well as the settlement with HarbourVest.

22   Q   And did the -- did the inclusion -- withdrawn.  At the

23   time that you prepared the November model -- withdrawn.  At

24   the time the Debtor prepared the November model, did it know

25   what the UBS or the HarbourVest claims would be valued at?

007672

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Exhibit Ex 3-153 Filed 12/07/234 of 692 80 of 214 PageID 7250

Seery - Direct                                      133

1    A    No.  We just had our assumption back then, which was zero.

2    And now, obviously, we know.

3    Q    And so the January model took into account the settlement

4    with HarbourVest and the 3018 motion; do I have that right?

5    A    That's correct.  That's in the assumptions.

6    Q    And what was the impact on the projected recoveries to

7    general unsecured creditors from the changes that you've just

8    described, including the increase in the claims amount?

9    A    Well, when -- like any fraction, the distribution will go

10   down if the claimant pool goes up.  So, with the denominator

11   going up by the UBS and the UBS amount -- the UBS and the

12   HarbourVest amounts, the distribution percentage went down.

13   Q    Okay.  I want to focus your attention on the second line

14   where we've got the monetization of assets under the plan at

15   $258 million but under the liquidation analysis it's $192

16   million.  Do you see that?

17   A    Yes.

18   Q    Can you tell Judge Jernigan why the Debtor believes that

19   under the plan the Debtor or the post-confirmation Debtor is

20   likely to receive or recover more for the --

21       (Interruption.)

22           THE COURT:  All right.  Hang on a minute.  Where is

23   that coming from, Mike?

24           THE CLERK:  Someone is calling in.

25           THE COURT:  Okay.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-53 Filed 12/07/23    Page 81 of 214    PageID 7251
Exhibit Exhibit 3-53    Page 207 of 235

Seery - Direct                              134

1        MR. MORRIS:  Thank you.

2        THE COURT:  Mr. --

3        MR. MORRIS:  Let me restate the question.

4        THE COURT:  Yes.  Restate.

5   BY MR. MORRIS:

6   Q    Can you explain to Judge Jernigan why the Debtor believes

7   that the -- under the plan corporate structure, the Debtor is

8   likely to recover more from the monetization of assets than a

9   Chapter 7 liquidation trustee would?

10  A    Sure.  My experience is that Chapter 7 trustees will

11  generally try to move quickly to monetize assets.  They will

12  retain their own professionals, they will examine the assets,

13  and they will look to sell those assets swiftly.

14       The monetization plan does not plan to do that.  I've got

15  a year's of experience -- a year now of experience with these

16  assets, as well as we'll have a team with several years at

17  least each of experience with the assets.  We intend to look

18  for market opportunities, and think we'll be able to do it in

19  a much better fashion than a liquidating Chapter 7 trustee.

20       The nature of these assets is complex.  Many of them are

21  private equity investments in operating businesses.  Certain

22  of them are complicated real estate structures that need to be

23  dealt with.  Some of them are securities that, depending on

24  when you want to sell them, we believe there'll be better

25  times than moving quickly forward to sell them now.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3153 Filed 12/07/236 Page 82 of 214    PageID 7252

Seery - Direct                          135

1      So, with each of them, we think that we'll be able to do

2   better than a Chapter 7 trustee based upon our experience.

3   The only thing that we're level-set with a Chapter 7 trustee

4   on is that cash is cash.

5   Q    Do you have any concerns that a Chapter 7 trustee might

6   not be able to retain the same personnel that the Debtor is

7   projected to retain?

8   A    Well, again, in my experience, it would be very difficult

9   for a Chapter 7 trustee to retain the same professionals, and

10  typically they don't.

11      Secondly, retaining the individuals, I think, would be

12  very difficult for a Chapter 7 trustee, would not have a

13  relationship with them, and that gap of time and the risks

14  that they would have to take to join a Chapter 7 trustee I

15  think would lead most of them to look for different

16  opportunities.

17  Q    Okay.  One of the other things, one of the other changes I

18  think you mentioned between the November and the January

19  projections was the decision to assume the CLO management

20  contracts.  Do I have that right?

21  A    That's correct.

22  Q    And why has the Debtor decided to assume the CLO

23  management contracts?  How does that impact the analysis on

24  the screen?

25  A    Well, it does add to the expense, but it also adds to the

007675

1    proceeds.

2         When we did the HarbourVest settlement, we ended up with

3    the first significant interest in HCLOF.  HCLOF owns the vast

4    majority of the equity in Acis 7, and also owns significant

5    preferred share interests in the 1.0 CLOs.  And we think it's

6    in the best interest of the estate to keep the management of

7    those assets where we have an interest in the outcome of

8    maximizing value with the estate.

9         In addition, we're going to have employees who are going

10   to work with us to manage those specific assets, so we feel

11   like that will be something where we can control the

12   disposition much better.

13        There's also cross-interests that these CLOs have in --

14   the 1.0 CLOs have in a number of other investments that

15   Highland has.  As in all things Highland, it's interrelated,

16   and so many of the companies have direct loans from the CLOs.

17   We intend to refinance that, but we feel much more comfortable

18   and feel that there would be value maximization if we're able

19   to work directly with the Issuers as a manager while we seek

20   in those underlying investments to refinance the CLO debt.

21   Q    Has the Debtor -- has the Debtor reached an agreement with

22   the Issuers on the assumption of the CLO management

23   agreements?

24   A    Yes, we have.

25   Q    Can you describe for the Court the terms of the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3    Exhibit Exhibit 3-53 Filed 12/07/23    Page 84 of 214    PageID 7254

Seery - Direct                                    137

1    assumption?

2            MR. RUKAVINA:  Your Honor, this --

3            THE WITNESS:  Yes.

4            MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

5    would object to this as hearsay.

6            THE COURT:  Well, he has not --

7            MR. MORRIS:  It's --

8            THE COURT:  He's not said an out-of-court statement

9    yet, so I overrule.

10        Go ahead.

11            THE WITNESS:  Yeah, we -- we are going to assume the

12    CLO contracts.  We have had direct discussions with the

13    Issuers.  They have agreed.

14        The basic terms are that we're going to cure them by

15    satisfying about $500,000 of cure costs related to costs that

16    the CLO Issuers have incurred in respect of the case, and

17    we'll be able to pay that over time.

18            MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

19    would renew my objection and move to strike his answer that

20    they've agreed.  That is hearsay, an out-of-court statement

21    offered to prove the truth of the matter asserted.

22            THE COURT:  Okay.  Mr. Morris, what is your response?

23            MR. MORRIS:  He's describing an agreement.  I

24    actually think it's in the Debtor's plan that's on file

25    already.  But he's describing the terms of an agreement.  He's

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 153-5    Filed 12/07/23    Page 85 of 214    PageID 7255
Page 207 of 392

Seery - Direct                                    138

 1   not saying what anybody said.  There's no out-of-court

 2   statement.  It's an agreement that's being described.

 3            THE COURT:  All right.  Thank you.  I overrule the

 4   objection.

 5            MR. MORRIS:  Okay.

 6   BY MR. MORRIS:

 7   Q    Does the Debtor believe that the CLO agreements will be

 8   profitable?

 9   A    Yes.

10   Q    And why does the Debtor believe that the CLO agreements

11   will be profitable to the post-confirmation estate?

12   A    Well, we don't -- we don't break out profitability on a

13   line-by-line basis.  But the simple math is that the revenues

14   from the CLO contracts which will roll in to the Debtor from

15   the management fees are more than what we anticipate the

16   actual direct costs of monitoring and managing those assets

17   would be.

18   Q    Okay.  Are you aware that yesterday the Debtor filed a

19   further revised set of projections?

20   A    I am, yes.

21   Q    All right.  Let's call those the February projections.

22            MR. MORRIS:  Can we put those on the screen?

23       It's Exhibit 7P, Your Honor.

24            THE COURT:  Okay.

25            MR. MORRIS:  All right.  I think that for some reason

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23   Page 86 of 214   PageID 7256

Seery - Direct                          139

1    -- yeah, okay.  There we go.  Perfect.  Right there.

2         Your Honor, these are the projections that were filed

3    yesterday.  I'm going to move for the admission into evidence

4    of these projections.

5              THE COURT:  All right.

6              MR. TAYLOR:  Your Honor, this is Clay Taylor.

7              THE COURT:  Go ahead.

8              MR. TAYLOR:  We object.  These were -- these were not

9    previously provided.  They were provided on the eve of the

10   confirmation hearing, after the Debtors had already revised

11   them once and provided those on -- after close of business on

12   a Friday before Mr. Seery's deposition.  And these were

13   provided even later, certainly not within the three days

14   required by the Rule.  And therefore we move to -- that these

15   should not be allowed into evidence.

16             THE COURT:  Mr. Morris, what is your response to

17   that?

18             MR. MORRIS:  Your Honor, first of all, the January

19   projections were provided in advance of Mr. Seery's deposition

20   and he was questioned extensively on it.  These projections

21   have been updated since then, I think for the singular purpose

22   of reflecting the UBS settlement.

23        As Your Honor just saw, the prior projections included an

24   assumption based on the 3018 motion.  Since Mr. Seery's

25   deposition, UBS and the Debtor have agreed to publicly

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Exhibit Exhibit 3 153 Filed 12/07/231 Page 87 of 214 PageID 7257

Seery - Direct 140

1  disclose the terms of the settlement, and that's reflected in

2  these revised numbers. I think there was one other change

3  that Mr. Seery can testify to, but those are the only changes

4  that were made.

5  THE COURT: All right. Mr. Seery, what besides the

6  UBS settlement do you think was put in these overnight ones?

7  THE WITNESS: I believe the only other change, Your

8  Honor, was correcting a mistake. In Assumption M, the second

9  line is assumes RCP claims will offset against HCMLP's

10  interest in the fund and will not be paid from the Debtor's

11  assets. That hasn't changed.

12  Basically, the Debtor got an advance from RCP that was to

13  -- for tax distributions, and did not repay it. The RCP

14  investors are entitled to recovery of that. So we had

15  previously backed that out. It's about four million bucks.

16  What happened was it was just double-counted.

17  THE COURT: Okay.

18  THE WITNESS: So, as an additional claim, it was

19  counted as $8 million. I think that's the only other change.

20  THE COURT: All right. I overrule the objection.

21  You may go forward. I admit 7P.

22  MR. MORRIS: Thank you, Your Honor.

23  (Debtor's Exhibit 7P is received into evidence.)

24  MR. MORRIS: Can you just -- if we can go to the next

25  page, please.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23 Page 88 of 214   PageID 7258

Seery - Direct                                      141

1  BY MR. MORRIS:

2  Q    So, with -- seeing that the claims pool under the plan

3  previously was $313 million, and what's the claims pool under

4  the projections up on the screen under the plan?

5  A    Two -- well, remember, there's 273 for Class 8, and then

6  you'd add in the Class 7 as well, which is the $10.2 million.

7  So the 273 went from 313 to 273 with that settlement.

8  Q    And is there any -- is there any reason for the decrease

9  other than the change from the 3018 settlement -- order figure

10  to the actual settlement amount?

11  A    For the UBS piece, no.  And then, as I mentioned, I

12  believe the other piece would have been that four million --

13  that additional $4 million that was taken out.

14  Q    And did those two changes have a -- did those two changes

15  have an impact on the projected recoveries under the plan?

16  A    Sure, particularly with respect to -- to the Class 8.

17  Those recoveries went up significantly because the denominator

18  went up.

19  Q    Okay.  Does the Debtor believe that its plan is feasible?

20  A    Yes, absolutely.

21  Q    And do you know whether the administrative priority and

22  convenience class claims will be paid in full under the

23  Debtor's plan?

24  A    Yes.  We monitor the cash very closely, so we do have

25  additional cash to raise, but we're set to reach or exceed

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-153 Filed 12/07/23   Page 89 of 214   PageID 7259

Seery - Direct                    142

1   that target, so we do believe we'll be able to pay all the

2   administrative claims when they come in.  Obviously, we have

3   to see what they are.  We will be able to pay Class 7 on the

4   effective date.  Any other distributions, we expect to be able

5   to make as well.

6        So, and then it's -- then it's a question of going forward

7   with a few other claims that we have to pay over time.  We

8   have the cash flow to pay those.  Frontier, for example, we'll

9   be able to pay that claim over time in accordance with the

10  restructured terms.  If the assets that secure that claim are

11  sold, they would be paid when those assets are sold.

12  Q    Frontier, will the plan enable the Debtor to pay off the

13  Frontier secured claim?

14  A    Yes.  That's what I was explaining.  The cash flow is

15  sufficient to support the current P&I on that claim.  We will

16  be able to satisfy it from other assets if we determine not to

17  sell the asset securing the Frontier claim, or if we sell the

18  asset securing the Frontier claim we could satisfy that claim.

19  The asset far exceeds the value of the claim.

20  Q    Has the plan been proposed for the purpose of avoiding the

21  payment of any taxes?

22  A    No.  We expect all tax claims to be paid in accordance

23  with the Code, and to the extent that there are additional

24  taxes generated, we would pay them.

25  Q    Okay.  Let's just talk about Mr. Dondero for a moment

Case 19-34054-sgj11  Doc 3818-4  Filed 06/05/23  Entered 06/05/23 22:10:41  Desc
Case 3:23-cv-02071-E  Exhibit Exhibit 153 Filed 12/07/24 Page 90 of 214  PageID 7260

Seery - Direct                                      143

    1  before we move on.  Are you aware that Mr. Dondero's counsel

    2  has requested the backup to, you know, these numbers,

    3  including the asset values?

    4  A    It -- I'm not sure if it was his counsel or one of the

    5  other related-entity counsels.

    6  Q    Okay.  But you're aware that a request was made for the

    7  details regarding the asset values and the other aspects of

    8  this?

    9  A    Yes.

   10  Q    Those were -- were those formal requests or informal

   11  requests?

   12  A    They were certainly at my deposition.

   13  Q    Right.  But you haven't seen a document request or

   14  anything like that, have you?

   15  A    No.

   16  Q    Did the Debtor make a decision as to whether or not to

   17  provide the rollup, the backup information to Mr. Dondero or

   18  the entities acting on his behalf?

   19  A    Yes.

   20  Q    And what did the Debtor decide?

   21  A    We would not do that.

   22  Q    And why did the Debtor decide that?

   23  A    Well, I think that's pretty standard.  The underlying

   24  documentation and the specific terms of the model are very

   25  specific, and they are -- they are confidential business

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23 Page 91 of 214   PageID 7261

Seery - Direct                                    144

 1   information that runs through what we expect to spend and what

 2   we expect to receive and when we expect to sell assets and

 3   then receive proceeds, and the prices at which we expect to

 4   sell them.

 5       To the extent that any entity wants to have that

 6   information as a potential bidder, that would be very

 7   detrimental to our ability to maximize value.  So, typically,

 8   I wouldn't expect that to be given out, and I would not

 9   approve it to be given out here.

10   Q    Did the Debtor disclose to Mr. Dondero's counsel or

11   counsel for one of his entities the agreement in principle

12   with UBS before the updated plan analysis was filed last

13   night?

14   A    I believe that disclosure was done a while ago, to Mr.

15   Lynn.

16   Q    So, to the best of your -- so, to the best of your

17   knowledge, the Debtor actually shared the specifics of the

18   agreement with UBS with Mr. Dondero and his counsel before

19   last night?

20   A    Yes.  I have specific personal knowledge of it because we

21   had to ask UBS for their permission, and they agreed.

22   Q    Okay.

23           MR. MORRIS:  All right.  Let's move on to 1129(b),

24   Your Honor, the cram-down portion.

25   BY MR. MORRIS:

007684

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53   Filed 12/07/26   Page 92 of 214   PageID 7262

Seery - Direct                            145

 1   Q    Are you aware, Mr. Seery, how various classes have voted

 2   under the plan?

 3   A    I am generally, yes.

 4   Q    Okay.  Did any class vote to reject the plan, to the best

 5   of your knowledge?

 6   A    I don't -- I guess it depends on how you define the class.

 7   I think the answer is that I don't believe that, when you

 8   count the full votes of the -- the allowed claims and the

 9   votes in any class, I don't believe any of the classes voted

10   to reject the plan.

11   Q    What type of claims are in Class 8?

12   A    General unsecured claims.

13   Q    And what percentage of the dollar amount of Class 8 voted

14   to accept?

15   A    It's -- I think it's near -- now with the Daugherty

16   agreements, it's near a hundred percent of the third-party

17   dollars.  I don't know the individual employees' claims off

18   the top of my head.

19   Q    All right.  And what about the number in Class 8?  Have a

20   majority voted to accept or reject in Class 8?

21   A    If you include the employee claims -- which, again, we

22   think have no dollar amounts -- then I think it's a majority

23   would have rejected.  The vast dollar amounts did accept.

24   Q    Okay.  Let's talk about those employees claims for a

25   moment.  Do you have an understanding as to the basis of the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23   Page 93 of 214   PageID 7263

Seery - Direct                                   146

1  claims?

2  A    Yes.

3  Q    What's your understanding of the basis of the claims?

4  A    Most of the claims are based on deferred compensation, and

5  that's the 2005 Highland Capital Management bonus plan.  And

6  that bonus plan provides certain deferred payment amounts to

7  the employees to be paid over multiple-year periods, provided

8  that they are in the seat when the payment is due.  That's the

9  vesting date.

10  Q    Okay.

11       MR. MORRIS:  Your Honor, just as a note-keeping

12  matter, the deferred compensation plan and the annual bonus

13  plan are Exhibits 6F and 6G, respectively, and they're on

14  Docket 1822.

15       THE COURT:  All right.

16  BY MR. MORRIS:

17  Q    And Mr. Seery, are you generally familiar with those

18  plans?

19  A    I am, yes.

20  Q    In order to receive benefits under the plans, are the

21  employees required to be employed at the time of vesting?

22  A    Yeah.  Our counsel refers to them, various terms, but

23  generally -- our outside labor counsel.  They're referred to

24  as seat-in-the-seat plans, meaning that your seat has to be in

25  a seat at the office at the day that the payment is due.  If

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 153 Filed 12/07/23   Page 94 of 214   PageID 7264
Exhibit 26-153   Page 94 of 214

Seery - Direct                                    147

 1   you're terminated for cause or if you resign, you're not

 2   entitled to any payment.

 3       So either you're there and you receive it or you're not

 4   and you don't.  The only exception to that, I believe, is

 5   death and disability.  Or disability.

 6   Q   All right.  Did the Debtor terminate the annual bonus

 7   plan?

 8   A   Yes, we did.

 9   Q   And in what context did the Debtor terminate the annual

10   bonus plan?

11   A   Well, we had discussion on it last week.  As Mr. Dondero

12   had also testified, the plan was to terminate all the

13   employees prior to the transition.  That's well known among

14   the employees.  The board terminated the 2005 bonus plan and

15   instead replaced it with a KERP plan that was approved by this

16   Court.

17   Q   And what was your understanding of the consequences of the

18   termination of the bonus plan for -- for purposes of the

19   claims that have been asserted by the employees who rejected

20   in Class 8?

21   A   It's clear that, under the 2005 HCMLP bonus plan, no

22   amounts are due because the plan has been terminated.

23   Q   All right.  Do you have an understanding as to when

24   payments become due under the deferred compensation -- under

25   the compensation plan?

007687

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 95 of 214   PageID 7265
Exhibit Exhibit 3-53   Page 249 of 692

Seery - Direct                          148

1    A    I do, yes.

2    Q    And when are they due?

3    A    The next payments are due in May.

4    Q    And what is the Debtor intending to do with respect to the

5    objecting employees?

6    A    The Debtor will have terminated all those employees before

7    that date.

8    Q    All right.  So, what's -- what are the consequences of

9    their termination vis-à-vis their claims under the deferred

10   compensation plan?

11   A    They won't have any claims.

12   Q    Okay.  So is it the Debtor's view that the employees who

13   voted to reject in Class 8 have no valid claims under the

14   annual comp -- annual bonus plan or the deferred compensation

15   plan?

16          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

17   With due respect, Your Honor, these employees have voted.  The

18   voting is on file.  There has been no claim objections to

19   their claims filed.  There's been no motion to designate their

20   votes filed.  So Mr. Seery's answer to this is irrelevant.

21   They have votes -- pursuant to this Court's disclosure

22   statement order, they have votes and they have counted, and

23   now Mr. Seery is attempting to basically impeach his own

24   balloting summary.

25          THE COURT:  Mr. Morris, what is your response?

1          MR. MORRIS:  The point of cram-down, Your Honor, is

2     it fair and equitable.  Does -- does -- is it really fair and

3     equitable to the 99 percent of the economic interests to allow

4     24 employees who have no valid claims to carry the day here?

5     And this is -- that's what cram-down is about, Your Honor.

6          THE COURT:  All right.  I overrule the objection.

7     BY MR. MORRIS:

8     Q    Let's talk about Class 7 for a moment, Mr. Seery.  That's

9     the convenience class; is that right?

10    A    That's correct.

11    Q    How and why was that created?

12    A    Well, initially, that was created because we had two types

13    of creditors in the case, broadly speaking.  We had liquidated

14    claims, which were primarily trade-type creditors, and we had

15    unliquidated claims, which were the litigation-type creditors.

16    And so that class was created to deal with the liquidated

17    claims, and the Class 8 would deal with the unliquidated

18    claims, which were expected to, as we talked about earlier

19    with respect to the monetization plan, take some time to

20    resolve.

21    Q    Was the creation of the convenience class a product of

22    negotiations with the Committee?

23    A    The initial discussion on how we set it up I believe was

24    generated by the Debtor's side, but how it evolved and who

25    would be in it and how it was treated in terms of

007689

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-153 Filed 12/07/251 of 692 97 of 214    PageID 7267

Seery - Direct                                    150

1    distributions was a product of negotiation with the Committee.

2    Q    Okay.  So how was the dollar threshold figure arrived at?

3    How did you actually determine to create a convenience class

4    at a million dollars?

5    A    It was through negotiation with the Committee.  So this

6    was one of those items that moved a fair bit, in my

7    recollection, through the many negotiations we had, heated

8    negotiations on some of these items, with the Committee.

9    Q    And are all convenience class -- all holders of

10   convenience class claims holders of claims that were

11   liquidated at the time the decision was made to create the

12   class?

13   A    I believe so.  I don't think there's been -- other than --

14   well, there -- we just had some settlements today, and I think

15   that relates to the employees, but those would be the only

16   ones that there would be disputes about, and that would roll

17   into the liquidat... the convenience class.

18   Q    Okay.  Finally, is there any circumstance under which

19   holders of Class 10 or 11, Class 10 or Class 11 claims will be

20   able to obtain a recovery under the plan?

21   A    Theoretically, there's a circumstance, and that is if

22   every other creditor in the case were to be paid in full, with

23   interest at the federal judgment rate, including Class 9,

24   which are the subordinated claims.  If those all got paid in

25   full, then theoretically the junior interest holders could

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Exhibit Exhibit 153 Filed 12/07/25   Page 98 of 214   PageID 7268   Page 98 of 214   PageID 7268

Seery - Direct                    151

1    receive distributions.

2         However, based upon our projections, that would be wholly

3    dependent on a significant recovery in the Litigation -- by

4    the Litigation Trustee.

5    Q    Okay.  Let's move now to questions of the Debtor release

6    and the plan injunction.  Is the Debtor providing a release

7    under the plan?

8    A    Yes.

9    Q    Is anyone other than the Debtor providing a release under

10   the plan?

11   A    No.

12   Q    Who is the Debtor proposing to release under the plan?

13   A    The release parties are pretty similar to what you

14   typically would see, in my experience, in most plans.  You

15   have the independent board, myself as CEO and CRO, the

16   professional -- the Committee members, the professionals in

17   the case, and the employees that we reached agreement with

18   respect to certain of them who have signed on to a

19   stipulation, and others, get a broader release for negligence.

20   Q    Okay.  Is the Debtor aware of any facts that might give

21   rise to a colorable claim against any of the proposed release

22   parties?

23   A    Not with respect to any of the release parties.  So the --

24   obviously, I don't think there's any claims against me.  But

25   the same is true with respect to the oversight board, the

007691

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Exhibit Exhibit 3-153 Filed 12/07/23 Page 99 of 214 PageID 7269

Seery - Direct                    152

1  independent board.

2      The Committee has been, you know, working with us hand-in-

3  glove, and I think if they thought we -- there was something

4  there, we would have heard it.

5      With respect to the professionals, we haven't seen

6  anything as an independent board.

7      And with respect to the employees' that -- general

8  negligence release, these are current employees and we have

9  been monitoring them for a year and we don't have any evidence

10 or anything to suggest that there would be a claim against

11 them.

12 Q   Are there conditions to the employees' release?

13 A   There are.  So, the employee release, as we talked about

14 earlier, was highly negotiated with the Committee.  It

15 requires that employees assist in the monetization efforts,

16 which is really on the transition and the monetization.  They

17 don't have to assist in bringing litigations against anybody,

18 so that's not part of what the provision requires.  But it

19 does require that they assist generally in our efforts to

20 monetize assets.

21     We don't think that's going to be significant, but if

22 there are individual questions or help we need, we certainly

23 would reach out to them.  If it's significant time, that will

24 be a different discussion.

25     And then with respect to the two senior employees who

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 53-Filed 12/07/23 54 Page 100 of 214    PageID 7270

Seery - Direct                                    153

1   signed the stipulation, they have to give up a part of their

2   distribution for their release.

3   Q    All right.  I think you just alluded to this, but has the

4   release been the subject of negotiation with the Creditors'

5   Committee?

6   A    Yeah.  We've touched on it a bunch of times, and we

7   certainly, unfortunately, let it spill over into the court a

8   couple times.  It was a hotly-negotiated piece of the plan.

9   Q    Okay.  Has the Committee indicated to the Debtor in any

10  way that anybody subject to the release is the subject of a

11  colorable claim?

12  A    Anyone subject to the release?  No.

13  Q    Yeah.  All right.  Let's talk about the plan injunction

14  for a moment.  Are you familiar with the plan injunction?

15  A    Broadly, yes.

16  Q    And what is your broad understanding of the plan

17  injunction?

18  A    Anybody who has a claim or thinks they have a claim will

19  broadly be enjoined from bringing that, other than as it's

20  satisfied under the plan or else ultimately bringing it before

21  this Court.  And that's the gatekeeper part, which is a little

22  bit of combining the two pieces.

23  Q    And what's your understanding of the purpose of the

24  injunction?

25  A    It's really to prevent vexatious litigation.  We, as

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 23-153    Filed 12/07/23    Page 101 of 214    PageID 7271

Seery - Direct                          154

 1  independent directors, stepped into what I think most people

 2  would fairly say is one of the more litigious businesses and

 3  enterprises that they've seen.  And we have a plan that will

 4  allow us to monetize assets for the benefit of the creditor

 5  body, provided we're able to do that and not have to put out

 6  fires every day on different fronts.  So what we're hoping to

 7  do with the injunction is ensure that we can actually fulfill

 8  the purposes of the plan.

 9  Q   All right.  Let's talk about some of the litigation that

10  you're referring to.

11        MR. MORRIS:  Can we put up on the screen the

12  demonstrative for the Crusader litigation?

13  BY MR. MORRIS:

14  Q   And Mr. Seery, I would just ask you to kind of describe

15  your understanding in a general way about the history of the

16  Crusader litigation.

17        MR. MORRIS:  And, Your Honor, just to be clear here,

18  this is a demonstrative exhibit.  As you can see in the

19  footnotes, it's heavily footnoted to the documents and to --

20  and, really, to the court cases themselves.  The documents on

21  the exhibit list include the dockets from each of the

22  underlying litigations.  And I just want to just have Mr.

23  Seery describe at an extremely high level some of the

24  litigation that the Debtor has confronted over the years, you

25  know, as the driver, as he just testified to, for the decision

Seery - Direct                                    155

1   to seek this gatekeeper injunction.

2                THE COURT:  All right.

3   BY MR. MORRIS:

4   Q    So, Mr. Seery, can you just describe kind of in general

5   terms the Crusader litigation?

6   A    Yeah.  I apologize to the Redeemer team for maybe not

7   doing this justice.  But this is litigation that came out of a

8   financial crisis upheaval related to this fund.  Disputes

9   arose with respect to the holders of the interests, which were

10  the -- ultimately became the Redeemers, and Highland as the

11  manager.

12        That went through initial litigation, and then into the

13  Bermuda courts, where it was subject to a scheme.  The scheme

14  required or allowed for the liquidation of the fund and then

15  distributions to the -- to the holders, and then deferred many

16  of the payments to Highland.

17        At some point, Highland, frustrated that it wasn't able to

18  get the payments, decided to just take them, and I think, you

19  know, fairly -- can be fairly described, at least by the

20  arbitration panel, as coming up with reasons that may not have

21  been wholly anchored in reality as to what its reasons were

22  for taking that money.

23        That led to further disputes with the Redeemers, who then

24  terminated Highland and brought an arbitration action against

25  Highland.  They were successful in that arbitration and

007695

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-153 Filed 12/07/23   Page 103 of 214   PageID 7273
Exhibit Exhibits 53-80 Page 2557 of 602

Seery - Direct                          156

1    received a $137 arbitration award.  And right up to the

2    petition date, that arbitration pursued.  When they finally

3    got their -- the arbitration award, they were going to

4    Delaware Chancery Court to file it and perfect it, and the

5    Debtor filed.

6    Q    Okay.

7         MR. MORRIS:  Let's go to the next slide, the Terry/

8    Acis slide.  If we could just open that up a little bit.  It's

9    -- as you can imagine, Your Honor, it's a little difficult to

10   kind of summarize the Acis/Terry saga in one slide, but we've

11   done the best we can.

12   BY MR. MORRIS:

13   Q    Mr. Seery, can you describe generally for Judge Jernigan,

14   who is well-versed in the matter, the broad overview of this

15   litigation?

16   A    There's clearly nothing I can tell the Court about the

17   bankruptcy that it doesn't already know.  But very quickly,

18   for the record, Mr. Terry was an employee at Highland.  He

19   also has a partnership interest in Acis, which was, in

20   essence, the Highland CLO business.  He -- and he got into a

21   dispute with Mr. Dondero regarding certain transactions that

22   Mr. Dondero wanted to enter into and Mr. Terry didn't believe

23   were appropriate for the investors.

24        Strangely, the assets that underlie that dispute are still

25   in the Highland portfolio, both Targa (phonetic) and Trussway.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 53-5    Filed 12/07/23    Page 104 of 214    PageID 7274
Exhibit Exhibit 25 Page 102 of 158

Seery - Direct                                       157

1    Mr. Terry was terminated, or quit, depending on whose side of

2    the argument you take.  Mr. Terry then sought compensation in

3    the arbitration pursuant to the partnership agreement.

4    Ultimately, he was awarded an arbitration award of roughly $8

5    million.

6         When he went to enforce that -- that was against Acis.

7    When he went to enforce that against Acis, which had all the

8    contracts, Highland went about, I think, terribly denuding

9    Acis and moving value.  Mr. Terry ultimately was able to file

10   an involuntary against Acis, and after a tremendous amount of

11   litigation had a plan confirmed that gave him certain rights

12   in Acis and any ability to challenge certain transactions with

13   respect to Highland that formed the basis of his claims in the

14   Highland bankruptcy.

15        That wasn't the end of the saga, because Highland

16   commenced a litigation -- well, not Highland, but HCLOF and

17   others, directed by others -- commenced litigation against Mr.

18   Terry in Guernsey, an island in the English Channel.  That

19   litigation wound its way for a couple -- probably close to two

20   years, at least a year and a half, and ultimately was -- it

21   was dismissed in Mr. Terry's favor.

22        While that was pending, litigation was commenced in New

23   York Supreme Court against Mr. Terry and virtually anybody who

24   had ever associated with him in the business, including --

25   including some of the rating agencies.  That was withdrawn as

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 33-5 Filed 12/07/23 Page 105 of 214    PageID 7275

Seery - Direct                              158

1    part of our efforts working with DAF to try to bring a little

2    bit of sanity to the case.  But it was withdrawn without

3    prejudice.

4         But ultimately, you know, we've agreed to a claims

5    settlement, which was approved by this Court, with Acis and

6    Mr. Terry.

7    Q    All right.

8              MR. MORRIS:  How about UBS?  Can we get the UBS

9    slide?

10             THE WITNESS:  I should mention that there's other

11   litigations involving Mr. Terry and Highland individuals that

12   are outstanding, I believe, in Texas court.  We have not yet

13   had to deal with those.

14   BY MR. MORRIS:

15   Q    Okay.  Can you describe for the Court your general

16   understanding of the UBS litigation?

17   A    Again, UBS comes out of the financial crisis.  It was a

18   warehouse facility that UBS had established for Highland.  It

19   actually was a pre-crisis facility that was restructured in

20   early '08, while the markets were starting to slide but before

21   they really collapsed.  That litigation started after Highland

22   failed to make a margin call.  UBS foreclosed out -- or it

23   wasn't really a foreclosure, because it's a warehouse

24   facility, but basically closed out all the interest and sought

25   recovery from Highland for the shortfall.

Seery - Direct                                    159

1          Highland was one of the defendants, but there are numerous

2     defendants, including some foreign subsidiaries of Highland.

3          That case wend its way through the New York Supreme Court,

4     up and down between the Supreme and the Appellate Division,

5     which is the intermediate appellate court in New York.

6     Incredibly litigious effort over virtually every single item

7     you could possibly think of.

8          Ultimately, UBS got a judgment for $500-plus million and

9     -- plus prejudgment interest against two of the Highland

10    subsidiaries.  It then sought to commence action up -- enforce

11    its judgment through various theories against Highland.  That

12    is part of the settlement that we have -- it's been part of

13    the lift stay motion here, the 3019, as well as the 3018, and

14    as well as the ultimate settlement we've discussed today.

15    Q    Okay.  Moving on to Mr. Daugherty, can you describe for

16    the Court your understanding of the Daugherty litigation?

17    A    The Daugherty litigation goes back even further.  It did

18    -- I think the original disputes were -- or, again, started to

19    happen between Mr. Daugherty and Mr. Dondero even prior to the

20    crisis, but Mr. Dondero -- Daugherty certainly stayed with

21    Highland post-crisis.  And then when Mr. Daugherty was severed

22    or either resigned or terminated from his position, there was

23    various litigations that began between the parties very

24    intensely in state court, one of the more nasty litigations

25    that you can imagine, replete with salacious allegations and

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit D-8153-5   Filed 12/08/2361 Page 2107 of 214   PageID 7277

Seery - Direct                          160

 1   press releases.

 2        That litigation then led to an award originally for Mr.

 3   Daugherty from HERA, which was an entity that had assets that

 4   Mr. Daugherty alleges were stripped.  Mr. Daugherty had to pay

 5   a judgment against Highland.  Ultimately, litigations were

 6   commenced in both the state court and the Delaware Chancery

 7   Court.  Those litigations, many of those continue, because

 8   they're not just against the entities but specific

 9   individuals.  Mr. Daugherty got a voting -- a claim allowed

10   for voting purposes in our case of $9.1 million, and we've

11   since reached an agreement with Mr. Daugherty on his claim,

12   save for a tax case which we announced earlier that relates to

13   compensation, claimed compensation with respect to a tax

14   distribution, which we have defenses for and he has claims

15   for.

16             MR. MORRIS:  All right.  We can take that down,

17   please.

18   BY MR. MORRIS:

19   Q   And let's just talk for a few minutes about some of the

20   things that have happened in this case.  Did Mr. Dondero

21   engage in conduct that caused the Debtor to seek and obtain a

22   temporary restraining order?

23   A   Yes, he did.

24   Q   And did the Debtor -- did Mr. Dondero engage in conduct

25   that caused the Debtor to seek and obtain a preliminary

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53 Filed 12/07/23   Page 108 of 214   PageID 7278

Seery - Direct                                161

 1  injunction against him?

 2  A    Yes.

 3  Q    And has the Debtor filed a motion to hold Mr. Dondero in

 4  contempt for violation of the TRO?

 5  A    Yes.

 6  Q    Are you aware that -- of the CLO-related motion that was

 7  filed in mid-December?

 8  A    It's similar in that these are controlled entities that

 9  brought similar types of claims against the Debtor and

10  interfered in similar ways, albeit not as directly threatening

11  with respect to the personnel of the Debtor.

12  Q    Okay.  And you're aware of how that -- that motion was

13  resolved?

14  A    I know we resolved it, and I'm drawing a blank on that.

15  But --

16  Q    All right.  Are you aware, did Mr. Daugherty also object

17  to the Acis and HarbourVest settlements, or at least either

18  him or entities acting on his behalf?

19  A    I think you meant Mr. Dondero.  I don't believe Mr.

20  Daugherty did.

21  Q    You're right.  Thank you.  Let me ask the question again.

22  Thank you for the clarification.  We're almost done.  To the

23  best of your knowledge, did Mr. Dondero or entities that he

24  controls file objections to the Acis and HarbourVest

25  settlements?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 15-53   Filed 12/07/23   Page 109 of 214   PageID 7279
Exhibit Exhibit 53-Part 202 of 3 Page 109 of 214

Seery - Direct                                          162

1    A    Yes, they did.

2    Q    And we're here today with this long recitation because the

3    remaining objectors are all Mr. Dondero or entities owned or

4    controlled by him; is that right?

5    A    That's correct.

6    Q    All right.

7            MR. RUKAVINA:  Your Honor, I didn't have a chance to

8    object in time.  Entities owned or controlled by Mr. Dondero.

9    There's no evidence of that with respect to at least three of

10   my clients, and this witness has not been asked predicate

11   questions to lay a foundation.  Mr. Dondero does not own or

12   control the three retail (inaudible).  So I move to strike

13   that answer.

14           MR. MORRIS:  Your Honor, I withdraw with respect to

15   the three funds.  It's fine.

16           THE COURT:  All right.  With that withdrawal, then I

17   think that resolves the objection.

18           MR. MORRIS:  Uh, --

19           THE COURT:  Or I overrule the remaining portion.

20      Okay.  Go ahead.

21           MR. RUKAVINA:  That does, Your Honor.  Thank you.

22   BY MR. MORRIS:

23   Q    Are -- are -- is everything that you just described, Mr.

24   Seery, the basis for the Debtor's request for the gatekeeper

25   and injunction features of the plan?

1    A    Well, everything I described are a part of the basis for

2    that.  I didn't describe every single basis with respect to

3    why those --

4    Q    So what are -- what are the other reasons that the Debtor

5    is seeking the gatekeeper and injunction provisions in the

6    plan?

7    A    We really do need to be able to operate the business and

8    monetize the assets without direct interference and litigation

9    threats.  We didn't go through some of the specifics, and I

10   hesitate to burden the Court again, but the email to me, the

11   email to Mr. Surgent, the testimony threatening -- effectively

12   threatening Mr. Surgent, in my opinion, by Mr. Dondero, in the

13   court in previous weeks, statements by his counsel indicating

14   that Mr. Dondero is going to sue me for hundreds of millions

15   of dollars down the road.

16       I mean, this is nonstop.  I'm an independent fiduciary.

17   I'm trying to maximize value for the estate.  I've got some

18   guy who's threatening to sue me?  It's absurd.

19           MR. MORRIS:  Your Honor, I have no further questions,

20   but what I would respectfully request is that we take just a

21   short five-minute break.  I'd like to just confer with my

22   colleagues before I pass the witness.

23           THE COURT:  All right.  Five-minute break.

24           MR. MORRIS:  Thank you, Your Honor.

25           THE CLERK:  All rise.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-5 Filed 12/07/23 Page 111 of 214   PageID 7281

Seery - Direct                               164

```
 1        (A recess ensued from 1:58 p.m. to 2:06 p.m.)

 2             THE CLERK:  All rise.

 3             THE COURT:  All right.  Please be seated.  We're back

 4   on the record in Highland.  Mr. Morris, anything else?

 5             MR. MORRIS:  All right, Your Honor.  Can you hear me?

 6             THE COURT:  I can, uh-huh.

 7             MR. MORRIS:  Okay.  Mr. Seery, are you there?

 8             THE WITNESS:  I am, yes.

 9             MR. MORRIS:  I just have a few follow-up questions,

10   Your Honor, if I may.

11             THE COURT:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q    Okay.  Mr. Seery, we talked for a bit about the difference

15   between the convenience class and the general unsecured

16   claims.  Do you recall that?

17   A    Yes.

18   Q    And that's the difference between Class 7 and 8; do I have

19   that right?

20   A    Yes.

21   Q    And what is the recovery for claimants in Class 7, to the

22   best of your recollection, the convenience class?

23   A    It's 85 cents.

24   Q    And under --

25   A    On the dollar.
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 3-53 Filed 12/07/23   Page 112 of 214   PageID 7282

Seery - Direct                          165

1    Q    And under the projections that were filed last night, and

2    we can call them up on the screen if you don't have total

3    recall, do you recall what Class 8 is projected to recover now

4    that we've taken into account the UBS settlement?

5    A    Approximately 71.

6    Q    Okay.

7    A    Percent.  71 cents on the dollar.

8         THE COURT:  Okay.  The answer --

9    BY MR. MORRIS:

10   Q    Okay.  Do I this right --

11        THE COURT:  The answer was a little garbled.  Can you

12   repeat the answer, Mr. Seery?

13        THE WITNESS:  Approximately 71 cents on the dollar,

14   Your Honor.

15        THE COURT:  Okay.  Thank you.

16   BY MR. MORRIS:

17   Q    Okay.  And do I have that right, that that 71 cents

18   includes no value for potential litigation claims?

19   A    That's correct.  We didn't even put that in our

20   projections at all.

21   Q    So is it possible, depending on Mr. Kirschner's work, that

22   holders of Class 8 claims could recover an amount in excess of

23   85 percent?

24   A    It's possible, yes.

25   Q    Okay.  Are you aware that Dugaboy has suggested that the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 153-5   Filed 12/07/23   Page 113 of 214   PageID 7283

Seery - Direct                                    166

```
 1   Debtor should resolicit because their -- their -- the

 2   projections in the November disclosure statement were

 3   misleading?

 4   A    I'm aware that they've made allegations along those lines,

 5   yes.

 6   Q    Okay.  Do you think the November projections were

 7   misleading in any way?

 8   A    No, not at all.

 9   Q    And why not?

10   A    Well, the plan was -- the projections are for the plan,

11   and they contain assumptions.  And it was clear in the plan

12   that those assumptions could change.  So the value of the

13   assets, which aren't static, does change.  The costs aren't

14   static.  They do change.  The amount of the claims, the

15   denominator, was not static and would change.

16   Q    Okay.  And were the -- were the changes in the claims, for

17   example, changes that were all subject to public viewing, as

18   the Court ruled on 3018, as the settlement with HarbourVest

19   was announced?

20   A    Well, the plan -- the terms of the plan made clear that

21   the Class 8 claims would -- would be whatever the final

22   amounts of those claims were going to be.  We did resolve the

23   claims of HarbourVest and then ultimately the settlement

24   announced today, but in front of -- in front of the world, in

25   front of the Court, with a 9019 motion.
```

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 13-53 Exhibit Ex. B-13    Filed 12/07/23    Page 114 of 214    Page 2114 of 214    PageID 7284

Seery - Direct                                    167

1   Q    Okay.  We had finished up with some questioning about the

2   gatekeeper and the injunction provision.  Do you recall that?

3   A    Yes, I do.

4   Q    And you had testified as to the reasons why the Debtor was

5   seeking that particular protection.  Do you recall that?

6   A    Yes.

7   Q    In the absence of that protection, does the Debtor have

8   any concerns that interference by Mr. Dondero could adversely

9   impact the timing of the Debtor's plan?

10  A    Well, that's my opinion and what I testified to before.  I

11  think the -- the injunction -- the exculpation, the

12  injunction, and the gatekeeper are really critical and

13  essential elements of this plan, because we have to have the

14  ability, unfettered by litigation, particularly vexatious

15  litigation in multiple jurisdictions, we have to be able to

16  avoid that and be able to focus on monetizing the assets and

17  try to maximize value.

18  Q    Is there a concern that that value would erode if

19  resources and time and attention are diverted to the

20  litigation you've just described?

21  A    Absolutely.  The focus of the team has to be on the

22  assets' monetization, creative ways to get the most value out

23  of those assets, and not on defending itself, trying to paper

24  up some sort of litigation defense against vexatious

25  litigation, and also spending time actually defending

1   ourselves in various courts.

2   Q    Okay.  Last couple of questions.  If there was no

3   gatekeeper provision in the plan, would you accept appointment

4   as the Claimant Trustee?

5   A    You broke up.  No which provision?

6   Q    If there was no gatekeeper provision in the -- in the

7   confirmation order, would you accept the position as Claimant

8   Trustee?

9   A    No, I wouldn't.  Just -- just like when I came on, there

10  were -- there are some pretty essential elements that I

11  mentioned before.  One is indemnification.  Two is directors

12  and officers insurance.  And three was a gatekeeper function.

13  I want to make sure that we're not at risk, that I'm not at

14  risk, for doing my job.

15  Q    And I think you just said it, but if you were unable to

16  obtain D&O insurance, would you accept the position as

17  Claimant Trustee?

18  A    No, I would not.

19          MR. MORRIS:  I have no further questions, Your Honor.

20          THE COURT:  All right.  So, you went two hours and 34

21  minutes in total with your direct.  So we'll now pass the

22  witness for cross.  And the Objectors get an aggregate of two

23  hours and 34 minutes.

24       Who's going to go first?

25          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I will.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53   Filed 12/07/23   Page 116 of 214   PageID 7286
Exhibit Exhibits 53-59 Page 370 of 602

Seery - Direct                                169

1          THE COURT:  Okay.  Go ahead.

2          MR. RUKAVINA:  Mr. Vasek, if you can pull up Exhibit

3   6N, the ballot summary, Page 7 of 15 on the top.

4          MR. POMERANTZ:  Mr. Morris, you're not on mute.

5          MR. MORRIS:  Thank you, sir.

6          MR. RUKAVINA:  Mr. Vasek, did you hear me?  There it

7   is.

8                        CROSS-EXAMINATION

9   BY MR. RUKAVINA:

10  Q   Mr. Seery, are you familiar with this ballot tabulation

11  that was filed with the Court and that has been admitted into

12  evidence?

13  A   Yes, I believe I've seen this.

14  Q   Okay.  And this says that 31 Class 8 creditors rejected

15  and 12 Class 8 creditors accepted the plan, correct?

16  A   That's correct.

17  Q   And since then, I think we've heard that Mr. Daugherty and

18  maybe two other employees have changed their vote to an

19  accept; is that correct?

20  A   That's correct, yes.

21  Q   Okay.  Other than three, those three employees that are

22  changing, do you know of any other Class 8 creditors that are

23  changing their votes?

24  A   Mr. Daugherty is not an employee.

25  Q   I apologize.  Other than those three Class 8 creditors

 1   that are changing their votes, do you know of any other ones

 2   that are changing their votes?

 3   A    No.

 4   Q    Okay.  You didn't tabulate the ballots, did you?

 5   A    No, I did not.

 6   Q    Do you have any reason to question the accuracy of this

 7   ballot summary that's been filed with the Court?

 8   A    No, I do not.

 9   Q    Okay.  You mentioned that many of the people that rejected

10   the plan are former employees who you don't think will

11   ultimately have allowed claims, correct?

12   A    Not ultimately.  I said they don't have them now.

13   Q    Okay.  Are you aware that the Court ordered that

14   contingent unliquidated claims be allowed to vote in an

15   estimated amount of one dollar?

16   A    I'm aware of that, yes.

17   Q    Okay.  All right.  Now, no motion to reconsider that order

18   has been filed, correct?

19   A    Not to my knowledge.

20   Q    Okay.  No objection to these rejecting employees' claims

21   have been filed yet, correct?

22   A    Correct.

23   Q    Okay.  And no motion to strike or designate their vote has

24   been filed as of now, correct?

25   A    Correct.

Seery - Cross                                    171

1              MR. RUKAVINA:  You can take down that exhibit, Mr.

2    Vasek.

3    BY MR. RUKAVINA:

4    Q    Mr. Seery, the Debtor itself is a limited partnership; I

5    think you confirmed that earlier, correct?

6    A    Correct.

7    Q    And its sole general partner is Strand Advisors, Inc.,

8    correct?

9    A    Correct.

10   Q    And to your understanding, the Debtor, as a limited

11   partnership, is managed by its general partner, correct?

12   A    Correct.

13   Q    Okay.  And Strand, that's where the independent board of

14   you, Mr. Nelms, and Mr. Dubel -- or I apologize if I'm

15   misspelling, misstating his name -- that's where the board

16   sits, at Strand, correct?

17   A    Yes.

18   Q    Okay.  And that board has been in place since about

19   January 9, 2020?

20   A    Yes.

21   Q    Okay.  Strand is not a debtor in bankruptcy, correct?

22   A    No.

23   Q    Okay.  Do you have any understanding as to whether, under

24   non-bankruptcy law, a general partner is liable for the debts

25   of the limited partnership that it manages?

007711

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53   Filed 12/07/23   Page 119 of 214   PageID 7289
Exhibit Exhibit 53 Page 373 of 692

Seery - Cross                                    172

1    A    I do.

2    Q    Okay.  What's your understanding?

3    A    Typically, a general partner is liable for the debts of

4    the partnership.

5    Q    Okay.  And under the plan, Strand itself is an exculpated

6    party and a protected party and a released party for matters

7    arising after January 9, 2020, correct?

8    A    Yes.

9    Q    Okay.  You mentioned that you're the chief executive

10   officer and chief restructuring officer in this case for the

11   Debtor, correct?

12   A    For the Debtor, yes.

13   Q    Yeah.  You are not a Chapter 11 trustee, right?

14   A    No.

15   Q    Okay.  You are one of the principal authors of this plan,

16   correct?

17   A    Consultant.

18            MR. MORRIS:  Objection to the form of the question.

19            THE COURT:  Sustained.

20   BY MR. RUKAVINA:

21   Q    You are --

22            THE COURT:  Sustained.

23   BY MR. RUKAVINA:

24   Q    You are --

25            THE COURT:  Rephrase.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 153-5ed 12/07/23 4 Page 120 of 214    PageID 7290

Seery - Cross                                        173

 1   BY MR. RUKAVINA:

 2   Q    -- one of the principal --

 3           MR. RUKAVINA:  I apologize.

 4   BY MR. RUKAVINA:

 5   Q    You had input in creating this plan, didn't you?

 6   A    I did, yes.

 7   Q    Okay.  And you're familiar with the plan's provisions,

 8   aren't you?

 9   A    Yes.

10   Q    Okay.  And you, of course, approve of the plan, correct?

11   A    Yes.

12   Q    Okay.  And you are, of course, familiar generally with

13   what the property of the estate currently is, correct?

14   A    Yes.

15   Q    Okay.  And part of the purpose of the plan, I take it, is

16   to vest that property in the Claimant Trust in some respects

17   and the Reorganized Debtor in some respects, correct?

18   A    I don't -- I don't know if that's a fair characterization.

19   Some property -- maybe some property will stay with the

20   Debtor, some will be transferred directly to the Trust.

21   Q    Okay.  All property of the estate as it currently exists

22   will stay with the Debtor or go to the Trust, correct?

23   A    Yes.

24   Q    Okay.  And under the plan, the Creditor Trust will be

25   responsible for payment of prepetition claims, correct?

1   A    Yes.

2   Q    And under the plan, the Creditor Trust will be responsible

3   for the payment of postpetition pre-confirmation claims,

4   correct?

5   A    Do you mean admin claims?  I don't --

6   Q    Sure.

7   A    I don't understand your question.  I'm sorry.

8   Q    Yes.  We can call them admin claims.

9   A    Yeah.  Those -- they'll be -- they will be paid on the

10  effective date or in and around that time.  So I'm not sure if

11  that's actually going to be from the Trust, but I think it's

12  actually from the Debtor, as opposed to from the Trust.

13  Q    Okay.  But after the creation of the Claimant Trust, --

14  A    Uh-huh.

15  Q    -- whatever administrative claims are not paid by that

16  time will be assumed by and paid from the Claimant Trust,

17  correct?

18  A    I don't recall that specifically.

19  Q    Is it your testimony that the Reorganized Debtor will be

20  obligated post-effective date of the plan to pay any admin

21  claims that are then unpaid?

22          MR. MORRIS:  Objection to the form of the question.

23          THE COURT:  Sustained.  Rephrase.

24  BY MR. RUKAVINA:

25  Q    Who pays unpaid admin claims under the plan once the plan

Seery - Cross                          175

1   goes effective?

2   A    I believe the Debtor does.  The Reorganized Debtor.

3   Q    Okay.  The Reorganized Debtor also gets a discharge,

4   correct?

5   A    Yes.

6   Q    Okay.  And there is no bankruptcy estate left after the

7   plan goes effective, correct?

8            MR. MORRIS:  Objection to the form of the question.

9            THE COURT:  Overruled.

10            MR. RUKAVINA:  Your Honor, I have the right to know

11   what the objection to my question is.

12            THE COURT:  I overruled.

13            MR. MORRIS:  Okay.

14            THE COURT:  I overruled the objection.

15            MR. RUKAVINA:  Thank you.

16   BY MR. RUKAVINA:

17   Q    Mr. Seery, do you remember my question?

18   A    That whether there was a bankruptcy estate after the

19   effective date?

20   Q    Yes.

21   A    There wouldn't be a bankruptcy estate anymore, no.

22   Q    Okay.  Under the plan, the creditors, to the extent that

23   they have their claims allowed, the prepetition creditors,

24   they're the beneficiaries of the Claimant Trust, correct?

25   A    They are some of the beneficiaries, yes.

Seery - Cross                                    176

1   Q    Okay.  And you would be the Trustee, I think you said, of

2   the Claimant Trust?

3   A    Of the Claimant Trust, yes.

4   Q    Okay.  And you will have fiduciary duties to the

5   beneficiaries of the Claimant Trust, correct?

6   A    I believe I have some, yes.

7   Q    Okay.  Well, as the Trustee, you will have some fiduciary

8   duties; you do agree with that?

9   A    That's what I said, yes.

10  Q    Okay.  What's your understanding of what those fiduciary

11  duties to the beneficiaries of the Claimant Trust will be?

12  A    I think they'll be -- they are cabined to some degree by

13  the provisions of the agreement, but generally there will be a

14  duty of care and a duty of loyalty.

15  Q    Do you feel like you'll have a duty to try to maximize

16  their recoveries?

17  A    That depends.

18  Q    On what?

19  A    My judgment on what's the -- if I'm exercising my duty of

20  care and my duty of loyalty.

21  Q    Okay.  But surely you'd like to, whether you have a duty

22  or not, you'd like to maximize their recoveries as Trustee,

23  wouldn't you?

24  A    Yes.

25  Q    Okay.  Now, in addition to the beneficiaries, which I

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53 Filed 12/07/23 Page 124 of 214   PageID 7294
Exhibit Exhibits 53   Page 2078 of 2178 Page 124 of 214

Seery - Cross                              177

1  believe are the Class 8 and Class 9 creditors, the plan

2  proposes to give non-vested contingent interests in the Trust

3  to certain holders of limited partnership interests, correct?

4  A    Yes.

5  Q    Okay.  And those non-vested contingent interests would

6  only be paid and would only vest if and when all unsecured

7  creditors and subordinated creditors are paid in full, with

8  interest, correct?

9  A    Yes.

10  Q    Okay.  And those non-vested contingent interests are a

11  property interest, although they're an inchoate property

12  interest, correct?

13  A    I don't know.  I think I testified in my deposition that I

14  -- I reached for inchoate, but I'm not an expert in the

15  definitions of property interests.  I don't know if they're

16  too ethereal to be considered a property interest.

17  Q    Okay.

18        MR. RUKAVINA:  Mr. Vasek, will you please pull up Mr.

19  Seery's deposition at Page 215?  And if you'll go to Page 200

20  -- can you zoom -- can you zoom that in a little bit?  Mr.

21  Vasek, can you zoom on that?

22        MR. VASEK:  Just a moment.  There's some sort of

23  issue here.

24        MR. RUKAVINA:  Okay.  And then go to Page 216.

25  Scroll down to 216, please.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53   Filed 12/07/23   Page 125 of 214   PageID 7295

Seery - Cross                                          178

1              MR. VASEK:  Okay.  I can't see it, so --

2              MR. RUKAVINA:  Okay.  Stay, stay where you are.  Go

3    down one more row.

4    BY MR. RUKAVINA:

5    Q    Okay.  Mr. Seery, can you see this?

6    A    Yes.

7    Q    Okay.  So, I ask you on Line 21, "They may be a property

8    interest, but inchoate only, correct?"  And you answer, "That

9    is my belief.  I don't claim to be an expert on the different

10   types of property interests," --

11             MR. RUKAVINA:  Mr. Vasek, can you go to the next

12   page?

13   BY MR. RUKAVINA:

14   Q    (continues) "-- whether they be inchoate, reversionary,

15   ethereal.  I don't claim to be an expert on the different

16   types of property interests."

17        Do you see that answer, sir?

18   A    Yes.

19   Q    And do you stand by your answer given on Lines 23 through

20   Line 4 of the next page?

21   A    Yes.

22   Q    Okay.  And these non-vested contingency -- contingent

23   interests in the Claimant Trust, they may have some value in

24   the future, correct?

25   A    Yes.

Seery - Cross                                179

1              MR. RUKAVINA:  Okay.  You can take that down, Mr.

2     Vasek.

3     BY MR. RUKAVINA:

4     Q    Have you tried to see whether anyone outside this case, or

5     anyone at all, would pay anything for those unvested

6     contingent interests to the Claimant Trust?

7     A    No.

8     Q    Okay.  Now, the Debtor is a registered investment advisor

9     under the Investment Advisers Act of 1940; is that correct?

10    A    That's correct.

11    Q    And under that Act, the Debtor owes a fiduciary duty to

12    the funds that it manages and to the investors of those funds,

13    correct?

14    A    Clearly to the funds, and generally to the investors more

15    broadly, yes.

16    Q    Okay.  And would you agree that that duty compels the

17    Debtor to look for the interests of the funds and the

18    investors of those funds ahead of its own interests?

19    A    Generally, but it's a much more fine line than what you're

20    describing.  It means you can't -- the manager can't put its

21    own interests in front of the investors and the funds.  It

22    doesn't mean that the manager subordinates its interest in the

23    -- to the investors and the funds.

24             MR. RUKAVINA:  Well, Mr. Vasek, please pull up the

25    October 20th transcript at Page 233.

007719

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-3 Filed 12/07/23   Page 127 of 214   PageID 7297
Exhibit Exhibit 53 Filed 12/07/23   Page 127 of 214   PageID 7297

Seery - Cross                                    180

1          MR. MORRIS:  What transcript is this?

2          MR. RUKAVINA:  October 20, 2019.  Mr. Vasek has the

3    docket entry.

4          MR. MORRIS:  Oh, so it's the -- Your Honor, I just do

5    want to point out that Mr. Rukavina objected, in fact, to the

6    use of trial transcripts, but we'll get to that when we put on

7    our evidence, when we finish up.

8          MR. RUKAVINA:  Well, Your Honor, I believe that

9    you're allowed to use a trial transcript to impeach testimony,

10   which is what I'm going to do now.

11        So, for that purpose, Mr. Vasek, if you could -- are you

12   on Page 233?

13         THE COURT:  And just so the record is clear, this is

14   from October 2020, not October 2019, which is, I think, what I

15   heard.  Continue.

16         MR. MORRIS:  Your --

17         MR. RUKAVINA:  Your Honor, I apologize, you did hear

18   that and I did make a mistake.  Yes, this is at <mark>Docket 1271</mark>.

19        Mr. Vasek, if you'll scroll down, please.  Okay.  No, stop

20   there.

21   BY MR. RUKAVINA:

22   Q    And you see on Line 16, sir, you're asked your

23   understanding, and then you answer, "Okay."  "And in

24   exercising those duties, the manager, under the Advisers Act,

25   has a duty to subordinate its interests to the interests of

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 113-53   Filed 12/07/23   Page 128 of 214   PageID 7298

Seery - Cross                    181

1    those investors in the CLOs, correct?"  And you answer --

2              MR. RUKAVINA:  Go down, Mr. Vasek.

3    BY MR. RUKAVINA:

4    Q   -- "I think -- I think, generally, when you think about

5    the fiduciary duty, and I think that we -- I want to make sure

6    I'm very specific about this, is that the manager has a duty,

7    fiduciary duties -- there's a whole bunch of legal analysis of

8    what they are, but they are significant -- that the manager

9    owes to the investors.  And to the extent" --

10             MR. RUKAVINA:  Scroll down, please.

11   BY MR. RUKAVINA:

12   Q   "And to the extent that the manager's interests would

13   somehow be -- somehow interfere with the investors' in the

14   CLO, he is supposed to -- he or she is supposed to subordinate

15   those to the benefit of the investors."

16        Did I read that accurately, Mr. Seery?

17   A   You did.

18   Q   Was that your testimony on October 20th last?

19   A   Yes.

20   Q   Okay.  Are you willing to revise your testimony from a few

21   minutes ago that the manager does not have to subordinate its

22   interests to the interests of the investors?

23   A   No.  I think that's very similar.

24   Q   Okay.

25   A   You left out the part about garbled up top where I said it

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E   Document Exhibit 03-15 Filed 12/07/23 Page 2129 of 214   PageID 7299

Seery - Cross                          182

1  was nuanced, almost exactly what I just said.  On Line 9, I

2  believe, on the prior page.

3  Q    Well, I heard you say a couple of minutes ago, and maybe I

4  misunderstood because of the WebEx nature, that the manager

5  does not have to subordinate its interests to the interests of

6  the investors.  Did I misheard you say that a few minutes ago?

7  A    I think you misheard it.  I said it's a nuanced analysis,

8  and it's -- it's pretty significant.  But the manager does

9  subordinate his general interest and assures that the CLO or

10  any of the investors' interests are paramount, but he doesn't

11  subordinate every single interest.

12       For example, and I think it's in this testimony, the

13  manager, if the fund isn't doing well, doesn't just have to

14  take his fee and not get paid.  He's allowed -- entitled to

15  take his fee.  He doesn't subordinate every single interest of

16  his.  He doesn't give up his home and his family.  So it's --

17  it's a nuanced analysis.  The interests of the manager are

18  subordinated to the interests of the investors and the fund.

19  I don't -- I don't disagree with anything I said there.  I

20  think I'm consistent.

21  Q    Okay.

22       MR. RUKAVINA:  You can take that down, Mr. Vasek.

23  BY MR. RUKAVINA:

24  Q    So, how do you describe, sir, the fiduciary duty that the

25  Debtor owes to the funds that it manages and to the investors

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 53-5 Filed 12/07/23    Page 130 of 214    PageID 7300

Seery - Cross                                      183

 1   in those funds?

 2              MR. MORRIS:  Objection to the -- to the extent it

 3   calls for a legal conclusion, Your Honor.  I just want to make

 4   sure we're -- we're asking a witness for his lay views.

 5              THE COURT:  Okay.  I overrule the objection.  He can

 6   answer.

 7              THE WITNESS:  Yes.  As a manager of a fund, the

 8   manager is a fiduciary to the fund, and sometimes to the

 9   investors, depending on the structure of the fund.  Some funds

10   are purposely set up where the investors are actually debt-

11   holders, and their interests are much more cabined by the

12   terms of the contract, as opposed to straight equity holders.

13   But the manager has a duty to seek to maximize value of the

14   assets in the best interests of the underlying -- of the fund

15   and the underlying investors, to the extent that it can,

16   within the confines and structure of the fund.

17   BY MR. RUKAVINA:

18   Q   Okay.  And these duties as you just described them, they

19   would apply to the Reorganized Debtor, correct?

20   A   They would apply to the Reorganized Debtor to the extent

21   that it's a manager for a fund, not, for example, with respect

22   to necessarily interests -- the inchoate interests that we

23   talked about earlier.

24   Q   Sure.  And I apologize, I meant just for the fund.  And if

25   the manager, the Reorganized Debtor, breaches those duties,

007723

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-1    Filed 12/07/23    Page 131 of 214    PageID 7301
Exhibit Exhibit 53 Page 131

Seery - Cross                                184

1    then it's possible that there's going to be liability,

2    correct?

3    A    It's possible.

4    Q    Okay.  Now, under the plan, the limited partnership

5    interests in the Reorganized Debtor will be owned by the

6    Claimant Trust, correct?

7    A    Yes.

8    Q    Okay.  And there's a new entity called New GP, LLC that

9    will be created or already has been created, correct?

10   A    Yes.

11   Q    Okay.  And that entity will hold the general partnership

12   interest in the Reorganized Debtor, correct?

13   A    I believe that's correct.

14   Q    Okay.  And that entity -- that being New GP, LLC -- will

15   also be owned by the Claimant Trust, correct?

16   A    Yes.

17   Q    Okay.  Who will manage the Reorganized Debtor?

18   A    The G -- the GP will manage the Reorganized Debtor.

19   Q    Okay.  And will there be an officer or officers of the

20   Reorganized Debtor, or will it all be managed through the GP?

21   A    It'll be managed through the GP.

22   Q    Okay.  And who will manage the GP?

23   A    Likely, I will.

24   Q    Okay.  That's the current plan, that you will?

25   A    I'll be the Claimant Trustee, and I believe that I'll be

Seery - Cross                                    185

1   responsible for any assets that remain in the Reorganized

2   Debtor, yes.

3   Q   Okay.  Right now, the Debtor is managing its own assets as

4   the Debtor-in-Possession, right?

5   A   Yes.

6   Q   And it is managing various funds and CLOs, right?

7   A   Yes.

8   Q   Okay.  And right now, the Debtor is attempting to reduce

9   some of its assets to money, like the promissory notes that

10  you mentioned earlier that the Debtor filed suit on, correct?

11  A   Yes.

12  Q   And the Debtor is trying to reduce some of its assets to

13  money, like the promissory notes, to benefit its creditors,

14  correct?

15  A   Yes.

16  Q   Okay.  And correct me if I'm wrong, but the Committee has

17  filed various claims and causes of action against Mr. Dondero,

18  correct?

19  A   They -- they've filed some.  I haven't -- I haven't looked

20  at their (indecipherable) closely, but --

21  Q   Okay.

22  A   -- some are preserved in the case.

23  Q   You understand --

24  A   In the plan.  I'm sorry.

25  Q   You understand that the Committee is doing that for the

Case 3:23-cv-02071-E   Document 18-15  Filed 12/07/23  Page 133 of 214   PageID 7303

1  benefit of the estate, correct?

2  A    Yes.

3  Q    And you understand that they're also doing that for the

4  benefit of creditors, correct?

5  A    Yes.

6  Q    Okay.  And under the plan, just so that I'm clear, those

7  claims that the Committee has asserted will be preserved and

8  will vest in either the Claimant Trust or the Litigation Sub-

9  Trust, correct?

10 A    Yes.

11 Q    Okay.  And under the plan, the Reorganized Debtor would

12 continue to manage its assets, correct?

13 A    Yes.

14 Q    And it would continue to manage the Funds and the CLOs,

15 correct?

16 A    Yes.

17 Q    And the Claimant Trust would attempt to liquidate and

18 distribute to its beneficiaries the assets that are

19 transferred to it, correct?

20 A    Yes.

21 Q    Okay.  And you mentioned that the Claimant Trust will have

22 an Oversight Board comprised of five members, right?

23 A    Yes.

24 Q    And four of them will be the people that are currently on

25 the Committee, right?

```
 1    A    Yes.

 2    Q    And the fifth is David Pauker, and I think you mentioned

 3    that he's independent.  David Pauker is the fifth member,

 4    right?

 5    A    Yes.

 6    Q    Who -- who is he?

 7    A    David Pauker is a very well-known professional in the

 8    restructuring world.  He's a long-time financial advisor in --

 9    in reorganizations.  He's served on numerous boards in

10    restructuring -- restructurings.

11    Q    Okay.  So, other than a different corporate structure and

12    the Claimant Trust, the monetization of assets for the benefit

13    of creditors would continue post-confirmation as now, correct?

14    A    I -- I believe so.  I'm not exactly sure what you asked

15    there.

16    Q    No one is putting in any new money under the plan, are

17    they?

18    A    No.  No.

19    Q    Okay.  There's no exit financing contingent on the plan

20    being confirmed, right?

21    A    You mean no exit -- the plan is not contingent on exit

22    financing.  I think you just mixed up your -- your financing

23    and your plan.

24    Q    I apologize.  There's no exit financing in place today,

25    correct?
```

1    A    No.

2    Q    Okay.  So, post-confirmation, you are basically going to

3    continue managing the CLOs and funds and trying to monetize

4    assets for creditors the same as you are today, correct?

5    A    Similar, yes.

6    Q    Okay.  And just like the Committee has some oversight role

7    in the case, the members of the Oversight Board will have some

8    oversight role post-confirmation, correct?

9    A    Yes.

10    Q    Okay.  You don't need anything in the plan itself to

11    enable you to continue managing the Debtor and its assets,

12    correct?

13    A    I don't need anything in the plan?

14    Q    Correct.

15    A    I don't -- I don't understand the question.  Can you

16    rephrase it?

17    Q    Well, you are managing the Debtor and its assets today,

18    correct?

19    A    Yes.

20    Q    Okay.  Nothing in the plan is going to change that,

21    correct?

22    A    Well, it's going to change it a lot.

23    Q    Okay.  Well, with respect to you managing the Funds and

24    the CLOs, you don't need anything in the plan that you don't

25    have today to keep managing them, do you?

1   A    No.  The Debtor manages them, and I will -- I'm the CEO

2   and I'll be in a similar position with a different team.

3   Q    Okay.  And I believe you told me that you expect the

4   Debtor to administer the CLOs for two or three years, maybe?

5   A    However long it takes, but we expect -- our projections

6   are that we'd be able to monetize most of the assets within

7   two years.

8   Q    Does that include the CLOs?

9   A    It does, yes.

10  Q    Okay.  Now, you're going to be the person for the

11  Reorganized Debtor in charge of managing the CLOs, correct?

12  A    I'll be the person responsible for managing the

13  Reorganized Debtor.  The Reorganized Debtor will be the

14  manager of the CLOs.

15  Q    Okay.  But the buck will stop with you at the Reorganized

16  Debtor, right?

17  A    Yes.

18  Q    Okay.  You're going to have a team of employees and

19  outside professionals helping you, but ultimately, on behalf

20  of the Reorganized Debtor, you're going to be the one in

21  charge of managing the CLOs, correct?

22  A    Yes.

23  Q    Okay.  That means that you'll also be making decisions as

24  to when to sell assets of the CLOs, correct?

25  A    Yes.

Seery - Cross                              190

1   Q   Okay.  And to be clear, the CLOs, they own their own

2   assets, whatever they are, and the Debtor just manages those

3   assets, right?

4   A   Correct.

5   Q   The Debtor doesn't directly own those assets, right?

6   A   No.

7   Q   And currently there's more than one billion dollars in CLO

8   assets that the Debtor manages?

9   A   Approximately.

10  Q   Yeah.  And the Debtor receives fees for its services,

11  correct?

12  A   Yes.

13  Q   Can you generally describe how the amount of those fees is

14  calculated and paid, if you have an understanding?

15  A   How the fees are calculated and paid?

16  Q   Yes, sir.

17  A   It's a percentage of the assets.

18  Q   Assets administered or assets sold in any given time

19  period?

20  A   Administered.

21  Q   Okay.  So the sale of CLO assets does not affect the fees

22  that the Reorganized Debtor would receive under these

23  agreements?

24          MR. MORRIS:  Objection to the form of the question.

25          THE COURT:  Over --

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-15   Filed 12/07/23   Page 138 of 214   PageID 7308
Exhibit Exhibits 53-56   Page 192 of 202

Seery - Cross                           191

1          THE WITNESS:  That's not correct.

2          THE COURT:  Overruled.

3    BY MR. RUKAVINA:

4    Q   Okay.  What is not correct about that?

5    A   When you sell the assets, the amount administered shrinks,

6    so you have less fees.

7          MR. RUKAVINA:  Your Honor, the answer cut out at the

8    very end.  You have less--?

9          THE WITNESS:  Fees.

10   BY MR. RUKAVINA:

11   Q   Fees?  I understand.  Okay.  So are you saying that there

12   is a disincentive to the Reorganized Debtor to sell assets in

13   the CLOs?

14   A   No.

15   Q   Okay.  Is there an incentive to the Reorganized Debtor to

16   sell assets in the CLOs?

17   A   To do their job correctly, yes.

18   Q   Okay.  And the Debtor wishes to assume those contracts

19   because the Debtor will get those fees going forward and

20   there'll be a profit, even after the expenses of servicing

21   those contracts are taken out, correct?

22   A   They are profitable.  That's one of the reasons that we're

23   assuming, yes.

24   Q   Okay.  Now, over my objection, you testified that the CLOs

25   have agreed to the assumption of these contracts, right?

1  A    Yes.

2  Q    Okay.  Is there anything in the record other than your

3  testimony here today demonstrating that?

4  A    I believe there is, yes.

5  Q    What do you believe there is in the record other than your

6  testimony?

7  A    I believe we filed a notice of assumption.

8  Q    Okay.  My question is a little bit different.  You

9  testified that the CLOs, over my objection, have agreed to the

10  assumption.  You did testify so, right?

11  A    Yes.

12  Q    Okay.  What is there in the record, sir, from the CLOs

13  confirming that?

14  A    You mean today's record?

15  Q    Yes, sir.

16  A    I'm the only one who's testified so far.

17  Q    Okay.  Are you aware of anything in the exhibits that

18  would confirm your testimony?

19  A    Not that I know of.

20  Q    Has there been an agreement with the CLOs that's been

21  reduced to writing?

22  A    Yes.

23  Q    So there is a written agreement with the CLOs providing

24  for assumption?

25  A    Yes.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit D Filed 12/07/23   Page 140 of 214   PageID 7310

Seery - Cross                                      193

1   Q    A signed, written agreement?

2   A    No, it's -- it's email.

3   Q    Okay.  When was this email agreement reached?

4   A    Within the last couple weeks.  There's a number of back

5   and forths where that was agreed to, and I believe we filed a

6   notice of assumption.

7        MR. RUKAVINA:  Mr. Vasek, if you will please pull up

8   Mr. Seery's January 29th deposition.

9   BY MR. RUKAVINA:

10   Q    Mr. Seery, you remember me deposing you last Friday,

11   correct?

12   A    Yes.

13   Q    And you remember me asking you if there was a written

14   agreement in place with the CLOs?

15   A    I don't recall specifically.

16        MR. RUKAVINA:  Okay.  Mr. Vasek, if you would please

17   scroll to that.  Okay.  Stop there.

18   BY MR. RUKAVINA:

19   Q    Sir, you'll recall I also deposed you January 20th, right?

20   A    Yes.

21   Q    Okay.  And do you remember that we had some discussion

22   regarding whether the CLOs would consent or not?

23   A    Yes.

24   Q    Okay.  And do you remember telling me something like that

25   like you think that they will and that's still in the works on

Seery - Cross                                194

1    January 20th?

2    A    I don't recall specifically, but if you say that's what it

3    says.

4    Q    Okay.  Well, here I'm asking you on January 29th, Line 17,

5    "I asked you before and you didn't have anything in writing by

6    then, so let me ask now.  As of today, do you have anything in

7    writing from the CLOs consenting to the assumption of those

8    management agreements?"  I'm sorry.  Contracts.  Answer, "I

9    don't believe that I do.  It could be on my email I opened.  I

10   don't recall."

11           MR. RUKAVINA:  Scroll down, Mr. Vasek.

12   BY MR. RUKAVINA:

13   Q    Okay.  Then I ask, "Do you have an understanding of

14   whether those CLOs have consented in writing to the assumption

15   of the management agreements?"  And you answer, "I believe

16   they have.  The actual final docs haven't been completed, but

17   I believe they have agreed in writing, yes."

18           Then I ask --

19           MR. RUKAVINA:  Scroll down a little bit more.

20   BY MR. RUKAVINA:

21   Q    I ask, "Do you expect the final docs to be completed

22   before Tuesday's confirmation hearing?"  Answer, "I don't know

23   whether they will be done by Tuesday."

24           Did I read all of that correctly, sir?

25   A    Other than your misstatement.  The word was "unopened."

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 153-5 Filed 12/07/23 Page 142 of 214    PageID 7312

Seery - Cross                            195

1  Q    Thank you.  So, let me ask you again today.  As of today,

2  is there a written agreement that has been signed by the

3  parties providing for the assumption of the CLO agreements?

4  A    When phrased the way you did, is it signed by the parties,

5  no.

6  Q    Okay.

7          MR. RUKAVINA:  You can take that down, Mr. Vasek.

8  BY MR. RUKAVINA:

9  Q    I think -- I'm not sure if you quantified this earlier,

10  but it might help.  I believe that the Reorganized Debtor

11  projects that it will generate revenue of $8.269 million post-

12  reorganization from managing the CLO contracts, correct?

13  A    It's in that neighborhood.  I did not testify to that

14  earlier.

15  Q    That's what I meant.  And when I asked you at deposition,

16  you were able to give me an estimate of how much it would cost

17  to generate that revenue, correct?

18  A    I was not?

19  Q    You were?  I'm sorry.  Let me --

20  A    Did you say I wasn't or I was?

21  Q    Let me -- I apologize.  Let me ask again.  I talk too fast

22  and I have an accent.  You have been able to give an estimate

23  of how much the Reorganized Debtor will expend to generate

24  that revenue, correct?

25  A    Yes.

1    Q    Okay.  Do you remember what your estimate is?

2    A    I -- I think it was around $2 million a year.  It was a

3    portion of our employees plus the contracts.

4    Q    Okay.  So, over the life of the projection at $8.2

5    million, do you remember that you projected costs of about

6    $3.5 to $4 million to generate that revenue?

7    A    If -- if you are representing that to me, I'd accept it.

8    Yes, that sounds about right.

9    Q    Well, suffice it to say you're projecting at least $4

10   million in net profit over the next two years for the

11   Reorganized Debtor from managing the CLO agreements, correct?

12   A    Net profit is not a fair, fair way to analyze it, no.

13   Q    Okay.  Are you projecting any profit for the Reorganized

14   Debtor from managing the CLO agreements post-confirmation?

15   A    Yes.

16   Q    Okay.  Do you have an estimate of what that profit is?

17   A    General overview are the contracts are profitable to about

18   the tune of $4 million over that period.

19   Q    Okay.  Thank you.  If the Reorganized Debtor makes a

20   profit post-confirmation, is it fair to say that that would

21   then be dividended up or distributed up to the partners,

22   ultimately to the Claimant Trust?

23   A    I don't think that's fair to say, no.

24   Q    Okay.  So, if the Reorganized Debtor makes a profit post-

25   confirmation, where does that profit go?

007736

Exhibit Exhibits 53-56   12/07/23 Page 2

Seery - Cross                    197

1   A    The Reorganized Debtor -- what kind of profit?  I don't

2   understand your question.

3   Q    Okay.  I apologize if I'm being too simplistic about it.

4   If a business, after it takes account of its expenses to

5   generate revenue, has any money left over, would that be

6   profit to you?

7   A    Yes.

8   Q    Okay.  Do you think that the Reorganized Debtor, post-

9   confirmation, will make a profit?

10   A    I don't know.

11   Q    Okay.  Do you think that the Reorganized Debtor, post-

12   confirmation, will lose money?

13   A    I think there will be costs, and the costs will exceed the

14   -- the amount that it generates on an income basis, yes.

15   Q    Okay.  Thank you.

16          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

17   the plan, the injunctions, and releases.  9F.

18      (Pause.)

19   BY MR. RUKAVINA:

20   Q    I apologize, Mr. Seery.

21          MR. RUKAVINA:  So, Mr. Vasek, if you'll go to the

22   bottom of the Page 51.  Stop there.

23   BY MR. RUKAVINA:

24   Q    So, I'm going to read just the first couple sentences

25   here, Mr. Seery, if you'll read it along with me.  Subject --

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-153   Filed 12/07/23   Page 145 of 214   PageID 7315

Seery - Cross                                  198

 1   this is the bottom paragraph:  Subject in all respects to

 2   Article 12(b), no enjoined party may commence or pursue a

 3   claim or cause of action of any kind against any protected

 4   party that arose or arises from or is related to the Chapter

 5   11 case, the negotiation of the plan, the administration of

 6   the plan, or property to be distributed under the plan, the

 7   wind-down of the business of the Debtor or Reorganized Debtor.

 8        I'd like to stop there.  Do you see that clause there, Mr.

 9   Seery, talking about the wind-down of the business of the

10   Debtor or Reorganized Debtor?  Do you see that, sir?

11   A    Yes.

12   Q    Okay.  Do I understand correctly that this provision we've

13   just read means that, upon the assumption of these CLO

14   management agreements, if the counterparties to those

15   agreements want to take any action against the Reorganized

16   Debtor, they first have to go through this channeling

17   injunction?

18   A    I believe that's what it says, yes.

19   Q    Okay.  Because the wind-down of the business of the

20   Reorganized Debtor will include the management of these CLO

21   portfolio management agreements, correct?

22   A    Yes.

23   Q    Okay.  As well as the management of various funds that the

24   Debtor owns, correct?

25   A    Yes.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 53-5ed 12/20/2300 Page 146 of 214   PageID 7316

Seery - Cross                            199

1   Q    Okay.  And would you agree with me that the new general

2   partner, New GP, LLC, is also a protected party under the

3   plan?

4   A    I assume it is.  I don't recall specifically.

5   Q    I believe you discussed to some degree postpetition

6   losses.  I'd like to visit a little bit about those.  Since

7   January 9th, 2020, Mr. Dondero was not an officer of the

8   Debtor, correct?

9   A    Correct.

10  Q    And since January 9th, 2020, he was no longer a director

11  of Strand, correct?

12  A    That's correct.

13  Q    Since January 9th, 2020, until he was asked to resign, he

14  was an employee, correct?

15  A    Yes.

16  Q    And about -- I'm trying to remember.  About when did he

17  resign?  October something of 2020?  Do you remember?

18  A    I don't recall.

19  Q    Okay.  Do you recall if it was in October 2020?

20  A    It was in the fall.

21  Q    Okay.  And he resigned because the independent board asked

22  him to resign, correct?

23  A    Yes.

24  Q    Okay.  And you mentioned that the estate has had a

25  postpetition drop in the value of its assets and the assets

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-5   Filed 12/07/23   Page 147 of 214   PageID 7317
Exhibit Exhibits 53-88 12/07/201 Page 2

Seery - Cross                                    200

1  that it manages.  Right?

2  A   I believe I went through the estate's assets.  The only

3  asset that wasn't a direct estate asset was the hundred

4  percent control of Select Equity Fund.  I didn't talk about

5  the Fund assets.

6  Q   Okay.  Do you recall that the disclosure statement that

7  the Court approved states that, postpetition, there was a drop

8  from approximately $566 million to $328 million in the value

9  of Debtor assets and assets under Debtor management?

10  A   Yes.  That's the $200 million I walked through earlier.

11  Q   Okay.  And I believe you mentioned some of it was due to

12  the pandemic, right?

13  A   It certainly impacted the markets.  The pandemic didn't

14  cause a specific loss.  It impacted the markets and the

15  ability to work within those markets.

16  Q   But you also believe that Mr. Dondero was responsible for

17  something like a hundred million dollars of these losses,

18  right?

19  A   Probably more.

20  Q   Okay.  Mr. Dondero is not being released or exculpated for

21  that, is he?

22  A   No.

23  Q   And while Mr. Dondero was an employee during the period of

24  these losses, he answered to you as CEO and CRO, correct?

25  A   Not during that period.  I wasn't (audio gap) until later.

Seery - Cross                                201

1  Q    I'm sorry.  As of January 9th, 2020, were you the CEO of

2  the Debtor?

3  A    No.

4  Q    When did you become the CEO of the Debtor?

5  A    I believe the order was July 9th, retroactive to a date in

6  March.

7  Q    July 9th, 2020?

8  A    Correct.

9  Q    Okay.  And when did you become the CRO of the Debtor?

10  A    At the same time.

11  Q    Okay.  So, between January and July 2020, you were one of

12  the independent directors, correct?

13  A    Yes.

14  Q    Okay.  So, during that period of time, would Mr. Dondero

15  have answered to that independent board?

16  A    Yes.

17  Q    Okay.  Now, if someone alleges that that independent board

18  has any liability on account of Mr. Dondero's losses, that's

19  released under this plan, isn't it?

20  A    Yes.

21  Q    Okay.  And if someone alleges that Strand has any

22  liability on account of Mr. Dondero's losses, that's released

23  under this plan, correct?

24  A    Yes.

25  Q    Okay.  And if someone believes that the Debtor -- that the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 15-53 Filed 12/07/23    Page 149 of 214    PageID 7319
Exhibit Exhibit 53 Filed 12/07/23    Page

Seery - Cross                                    202

1  way that the Debtor has managed the CLOs or its funds

2  postpetition gives rise to a cause of action in negligence,

3  that's also released and exculpated in the plan, correct?

4  A    I believe it would be.  I'm not positive, but I believe it

5  would be.

6  Q    Well, let's be clear.  The plan does not release or

7  exculpate you or Strand or the board for willful misconduct,

8  gross negligence, fraud, or criminal conduct, correct?

9  A    No, it does not.

10  Q    Okay.  And I'm not, just so we're clear, I'm not alleging

11  that, okay?  So I want the judge to understand I'm not

12  alleging that.  But the plan does release and exculpate for

13  negligence, right?

14  A    Yes.

15  Q    Okay.  Where do you have an understanding a cause of

16  action for breach of fiduciary duty lies on the spectrum of

17  negligence all the way to criminal conduct?

18  A    It's -- it's not -- generally not criminal, although I

19  suppose that breach of fiduciary duty could be criminal.

20  Typically, it's negligence, and that you would breach a duty

21  for either duty of care, duty of loyalty.  But it could slide

22  to willful.  And probably most of the instances where they

23  come up are where someone has done something willfully or

24  grossly negligent.

25  Q    Okay.  But -- and I would agree with you.  But there are

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 11-53   Filed 12/07/23   Page 150 of 214   PageID 7320
Exhibit Exhibit B-3 Page 2 of 69

Seery - Cross                                           203

1   certain breaches of fiduciary duty that are possible based on

2   simple negligence, correct?

3   A    They are, and in these instances, they don't -- they don't

4   rise to actionable claims because they're indemnified by the

5   funds.

6   Q    Okay.  You have to explain that to me.  So, the negligence

7   claim is not actionable because someone is indemnifying it?

8   A    Typically, there's no way to recover because it's

9   indemnified by the fund that the investor might be in.  If it

10  goes beyond that, then it wouldn't be.

11  Q    Okay.  So there are potential negligence breach of

12  fiduciary duty claims that might be subject to these

13  exculpations and releases that would not be indemnified?

14  A    Gross negligence and willful misconduct, certainly.

15  Q    Okay.  Now, post-confirmation, post-confirmation, if the

16  Debtor, or the Reorganized Debtor, rather, engages in

17  negligence or any actionable conduct, that's when the

18  channeling injunction comes into play, right?

19  A    I don't quite understand your question.

20  Q    Okay.

21  A    Can you repeat that?

22  Q    Sure.  To your understanding, does the channeling

23  injunction we're looking at right now -- and you can read it

24  if you need to -- does it apply to purely post-confirmation

25  alleged causes of action?

007743

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 153-5    Filed 12/07/23    Page 151 of 214    PageID 7321

Seery - Cross                                   204

1   A    It does apply to those, yes.

2   Q    Okay.  And it says that the Bankruptcy Court will have

3   sole and exclusive jurisdiction to determine whether a claim

4   or cause of action is colorable, and, only to the extent

5   legally permissible and as provided for in Article 11, shall

6   have jurisdiction to adjudicate the underlying colorable claim

7   or cause of action.

8        Do you see that, sir?

9   A    I do.

10  Q    Okay.  And this -- the Bankruptcy Court's exclusive

11  jurisdiction here, that would continue after confirmation?  Is

12  that the intent behind the plan?

13  A    It has -- it says what it says.  Will have the sole and

14  exclusive jurisdiction to determine whether a claim is

15  colorable, and then, to the extent permissible, it'll have

16  jurisdiction to adjudicate.

17  Q    Okay.  Nothing in this plan limits the period of the

18  Bankruptcy Court's inquiry to the pre-confirmation time frame,

19  correct?

20  A    I don't believe it does, no.

21  Q    Okay.  Have you taken into account the potential that this

22  bankruptcy case will eventually be closed with a final decree?

23  A    Have I taken that into account?

24  Q    Well, do you know what a final decree in Chapter 11 is?

25  A    I do.

007744

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 53-Filed 12/06/206 Page 152 of 214    PageID 7322

Seery - Cross                                        205

1  Q   Okay.  So, help me understand.  If there's a final decree

2  and the bankruptcy case is closed, then who do I go to,

3  because the Bankruptcy Court has exclusive jurisdiction, to

4  get this clearing injunction cleared?

5          MR. MORRIS:  Objection to the form of the question,

6  Your Honor.

7          THE COURT:  Sustained.  Rephrase.

8          MR. RUKAVINA:  Okay.

9  BY MR. RUKAVINA:

10 Q   Is it the plan's intent, Mr. Seery, that this channeling

11 injunction that we just looked at would continue to apply even

12 after a point in time in which the bankruptcy case is closed?

13 A   I don't believe so.

14         MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15 someone's phone right when he answered, and I didn't hear his

16 answer, if he could please re-answer.

17         THE WITNESS:  I don't -- I don't think if the case is

18 closed that's the intention.

19 BY MR. RUKAVINA:

20 Q   Okay.  What about if there's a final decree entered?

21         MR. MORRIS:  Objection, Your Honor.  You know, the

22 document kind of speaks for itself.

23         THE COURT:  Overruled.  He can answer if he knows.

24         THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25 making a distinction between the case being closed and the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-5   Filed 12/07/23   Page 153 of 214   PageID 7323
Exhibit Exhibits 3-5   Page 207 of 602

Seery - Cross                                    206

1   final decree.  I believe in both instances they'll be pretty

2   close to the same time and we'll make a judgment then as to

3   how to close the case in accordance --

4   Q   Okay.

5   A   -- with the rules.

6          MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

7   to the beginning of this injunction.  A little bit higher.

8   Right there.  Right there.

9   BY MR. RUKAVINA:

10  Q   The very first clause, Mr. Seery, if you'll read with me,

11  says, Upon entry of the confirmation order -- pardon me --

12  all enjoined parties are and shall be permanently enjoined on

13  and after the effective date from taking any actions to

14  interfere with the implementation or consummation of the

15  plan.

16      Do you see that, sir?

17  A   I do, yes.

18  Q   What does interfering with the implementation or

19  consummation of the plan mean?

20  A   It means in some way taking actions to upset, distract,

21  stop, or otherwise prohibit or hurt the estate from

22  implementing or consummating the plan.

23  Q   Okay.  And is that intended -- is that clause we just

24  read and you described intended to be very broad?

25  A   I -- I think it's -- if the words have meaning, yes, that

1   it should -- it's pretty broad.

2   Q   Okay.  Is the Debtor not able to state with more

3   specificity what it would believe interference with the

4   implementation or consummation of the plan would mean?

5           MR. MORRIS:  Objection to the form of the question.

6           THE COURT:  Sustained.

7           THE WITNESS:  I think it's -- I think it's --

8           THE COURT:  Sustained.

9           MR. RUKAVINA:  Okay.

10          THE WITNESS:  I'm sorry.

11  BY MR. RUKAVINA:

12  Q   Well, you just gave us four or five examples of what

13  interfering with the implementation or consummation of the

14  plan might be.  Why isn't that, those four or five examples,

15  why aren't they listed here?

16          MR. MORRIS:  Object to the form of the question.

17          MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18  and I'll argue this at closing argument.

19          THE COURT:  Okay.

20  BY MR. RUKAVINA:

21  Q   When did the Committee agree to you serving as the

22  Claimant Trustee?

23  A   In the late -- in the late fall.  I've been contemplated

24  to be the Claimant Trustee.  I'm willing to take -- if we can

25  come to an agreement.  They have their options open if we

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-15    Filed 12/07/23    Page 155 of 214    PageID 7325
Exhibit Exhibit 15 - Part 2 of 2    Page 155 of 214

Seery - Cross                                                        208

1   can't come to an agreement on compensation.

2   Q   Okay.  And since the Committee agreed to you being the

3   Claimant Trustee, you have reached a resolution with UBS,

4   correct?

5   A   I don't think so.  I think that that was before UBS, the

6   UBS resolution was reached.

7   Q   I'm sorry.  When did you reach the UBS resolution in

8   principle with UBS?

9   A   I don't recall the exact date, but I do recall specific

10  conversations where some of the Committee members were

11  supportive.  I didn't know that UBS wasn't, but I assumed

12  that some meant not all.  And that was UBS, because I don't

13  think we had a deal yet.

14  Q   Well, let me ask the question in a little bit of a

15  different way.  Whenever the Debtor reached the agreement in

16  principle with UBS that your counsel described this morning,

17  whenever that point in time was, the Committee had already

18  agreed before that point in time to you serving as Claimant

19  Trustee, correct?

20  A   I believe so, yes.

21  Q   And is the answer the same with respect to the

22  HarbourVest settlement?

23  A   I believe so.  With HarbourVest, I believe so as well,

24  yes.

25  Q   What about the Acis settlement?

Seery - Cross                                209

1    A    I don't believe so.  I think Acis came first.  I don't

2    think we settled on an agreement on Claimant Trustee until

3    after the Acis -- certainly after the Acis agreement, maybe

4    not after the Acis 9019.  I just don't recall.

5    Q    Okay.  And the million-dollar cutoff for convenience

6    class creditors, that number was a negotiated amount with the

7    Committee, correct?

8    A    Yes.

9    Q    Okay.  Thank you, Mr. Seery.

10           MR. RUKAVINA:  Your Honor, I'll pass the witness.

11           THE COURT:  All right.  Just for purposes of time,

12   it's 3:00 o'clock, so you went 48 minutes.

13       Who's next?

14           MR. DRAPER:  Mr. Taylor is.

15           THE COURT:  All right.  Mr. Taylor, go ahead.

16           MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17   would like the Court to do, we are asking for a brief

18   continuance and to go into tomorrow, and there is a reason

19   for that and I would like to explain it.

20       Mr. Dondero has communicated an offer which we believe to

21   be a higher and better offer than what the plan analysis,

22   even in its most recent iteration that was just changed last

23   night, will yield significantly higher recoveries.  Those are

24   guaranteed recoveries.  There is a cash component to that

25   offer.  There are some debt components, but they would be

1   secured by substantially all of the assets of Highland.

2       We believe it's a higher and better offer, that the

3   creditors and the Creditors' Committee, Mr. Seery, who

4   obviously has been testifying all day on the stand, may have

5   heard some -- some inkling of it via a text or an email he

6   might have been able to glance at, or maybe not, because he's

7   been too busy, and that's understandable.

8       But we do believe it is a material offer.  It is a real

9   offer.  And for that reason, we would like to request the

10  Court's indulgence.  This has gone rather fast.  We believe

11  that in the event that it does not gain any traction, then we

12  could complete this confirmation hearing tomorrow, or it's

13  more than likely that we could.  And therefore we would

14  request a continuance until tomorrow morning beginning at

15  9:30 so all the parties can confer, consider that offer, and

16  see if it gains any traction.

17              THE COURT:  All right.

18              MR. POMERANTZ:  Your -- Your --

19              THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20  to respond --

21              MR. POMERANTZ:  Your --

22              THE COURT:  -- to that?

23              MR. POMERANTZ:  Your Honor, this is Jeff --

24              THE COURT:  Mr. Pomerantz?

25              MR. POMERANTZ:  This is Jeff Pomerantz. I will

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-1 Filed 12/07/23   Page 158 of 214   PageID 7328
Exhibit Exhibits 53-58   Page 22 of 69

Seery - Cross                                  211

 1    respond.

 2         I think right at the beginning of the hearing, or

 3    slightly after, I did receive an email from Michael Lynn

 4    extending this offer.  The email was also addressed to Mr.

 5    Clemente.  As we have told Your Honor before, if the Committee

 6    is interested in continuing negotiations with Mr. Dondero, far

 7    be it from us to stand in the way.

 8         So what I would really ask is for Mr. Clemente to respond

 9    to think if -- to see if he thinks that this offer is worthy.

10    If it's worthy and the Committee wants to consider it, we

11    would by all means support a continuance.  If it is not, I

12    think this is just a last-minute delay without a reason.  And

13    if there is no likelihood of that being acceptable or the

14    Committee wanting to engage, we would want to continue on.

15              THE COURT:  All right.  Mr. Clemente, what say you?

16              MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17    on behalf of the Committee.

18         Obviously, I haven't had a chance to confer with my

19    Committee members, but there's no reason to not continue the

20    confirmation hearing today.  I will be able to confer with

21    them over email, et cetera, this evening.  There's simply no

22    reason to not continue going forward at this particular point

23    in time, Your Honor.

24         So, although I haven't conferred with the Committee

25    members, that would be what I would recommend to them.  And so

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-5 Filed 12/04/23   Page 159 of 214   PageID 7329
Exhibit Exhibits 153-Bed 1240/23   Page

Seery - Cross                              212

1    my view, the Committee's view, I believe, would be let's

2    continue forward and we'll discuss Mr. Dondero's proposal that

3    I know came across after opening statements this morning, you

4    know, in due course.  But I do not believe that a continuance

5    here is necessary or appropriate.

6              THE COURT:  All right.  Mr. Taylor, that request is

7    denied, so you may cross-examine.

8              MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.

9    I have a couple people that are in my ear.  But yes, I'm ready

10   to proceed.

11             THE COURT:  Okay.

12                         CROSS-EXAMINATION

13   BY MR. TAYLOR:

14   Q   Mr. Seery, I believe you can probably largely testify from

15   your memory of the various iterations of the plan analysis

16   versus the liquidation analysis.  But to the extent that

17   you're unable to, we can certainly pull those up.

18       Mr. Seery, you put forth or Highland put forth on November

19   24th of 2020 a plan analysis versus a liquidation analysis,

20   correct?

21   A   I think that's the approximate date, yes.

22   Q   Okay.  And do you recall what the plan analysis predicted

23   the recovery to general unsecured creditors in Class 8 would

24   be at that time?

25   A   I believe it was in the 80s.

1  Q    And approximately 87.44 percent?

2  A    That sounds close, yes.

3  Q    Okay.  And then just right before -- the evening before

4  your deposition that took place on January 29th, I believe a

5  revised plan analysis versus a liquidation analysis was

6  provided.  Do you remember that?

7  A    Yes.

8  Q    Okay.  And what was the predicted recovery to general

9  unsecured creditors under that analysis?

10  A    I believe that was --

11          MR. MORRIS:  Object to the form of the question.  I

12  just want to make sure that we're talking about the -- and

13  maybe I misunderstood the question -- plan versus liquidation.

14          THE COURT:  Okay.  Could you restate --

15          MR. TAYLOR:  I said plan analysis.

16          THE COURT:  Plan.

17          THE WITNESS:  I believe that that initially was in

18  the -- in the high 60s.

19  BY MR. TAYLOR:

20  Q    It was --

21  A    Might have been --

22  Q    -- 62.14 percent; is that correct?

23  A    Okay.  Yeah.  That sounds -- I'll take your

24  representation.  That's fine.

25  Q    Okay.  And going back to the November 28th liquidation

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 153-5ed 12/04/23 5 Page 161 of 214   PageID 7331

Seery - Cross                          214

 1   analysis, what did Highland believe that creditors in Class 8

 2   would get under a liquidation analysis?

 3   A    I don't recall the -- if you just tell me, I'll -- I'll --

 4   if you're reading it, I'll agree with -- because I -- from my

 5   memory.

 6   Q    62.6 percent?  Is that correct?

 7   A    That sounds about right.

 8   Q    You would agree with me, would you not, that 62.6 cents on

 9   the dollar is higher than 62.14 cents, correct?

10   A    Yes.

11   Q    And so at least comparing the January 28th versus -- of

12   2021 versus the November 24th of 2020, the liquidation

13   analysis actually ended up being higher than the plan

14   analysis, correct?

15   A    Yes.

16   Q    But there was -- there was some changes also in the plan

17   analysis.  I'm sorry.  There were some subsequent changes that

18   were done over the weekend that were provided on February 1st.

19   Is that correct?

20   A    Yes.

21   Q    Okay.  And what were -- give us an overview of what those

22   changes were.

23   A    What are -- what are you comparing?  What would you like

24   me to compare?

25   Q    Okay.  The January to February plan analysis, what were

1  the changes?  Why did it go up from 62.6 to 71.3?

2  A    The main changes, as we discussed earlier, and maybe the

3  only major change, was the UBS claim amount, which went down

4  significantly from the earlier iteration.  And then there was

5  the small change related to the RCP recovery, which was a

6  double-count.

7  Q    Okay.  And you talked about earlier about what assumptions

8  went into these analyses, correct?

9  A    Yes.

10  Q    And you said these assumptions were always done after

11  careful consideration.  Is that a correct summation of what

12  you said?

13  A    I think that's fair.

14  Q    Okay.

15         MR. TAYLOR:  Mr. Assink, could you pull up the

16  November assumptions?

17  BY MR. TAYLOR:

18  Q    I believe that's coming up, Mr. Seery.  The Court.

19         (Pause.)

20         MR. TAYLOR:  And go down one page, please, Mr.

21  Assink.  Roll up.  The Assumption L.

22  BY MR. TAYLOR:

23  Q    So, these are the November assumptions, correct, Mr.

24  Seery?

25  A    I believe so, yes.

1  Q   Okay.  And what was the assumption that you made after

2  careful consideration regarding the claims for UBS and

3  HarbourVest?

4  A   The plan assumes zero, that was L, for those claims.

5  Q   Okay.  And ultimately what did -- and I believe you just

6  announced this today and made this public today -- what is

7  UBS's claim?  What are you proposing that it be allowed at?

8  A   $50 million in Class 8, and then they have a junior claim

9  as well.

10  Q   Okay.  And what about HarbourVest?  What kind of allowed

11  claim did they end up with?

12  A   $45 million in Class 8 and a $35 million junior claim.

13  Q   So your well-reasoned assumption, carefully considered,

14  was off by $95 million; is that correct?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  The difference between zero and those

18  numbers is $95 million, yes.

19  BY MR. TAYLOR:

20  Q   You solicited creditors of the Highland estate based upon

21  the November plan analysis and liquidation analysis that was

22  provided and that we're looking at right now, correct?

23  A   It was one of the bases, yes.  It's the plan is what --

24  what we solicited votes for, not the projections.

25  Q   But this was included within the disclosure statement; is

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-31 Filed 12/07/23 Page 164 of 214    PageID 7334
Exhibit Exhibit 53-Bed 12/07/23 Page

Seery - Cross                                            217

1    that correct?

2    A    It's one of the bases.  It was included, yes.

3    Q    And this is the bases by which you believe that the best

4    interests of the creditors have been met better than a Chapter

5    7 liquidation, correct?

6    A    I believe this evidences that the best interest test would

7    be satisfied, yes.

8    Q    And so the record is very clear, for this Court and

9    anybody looking at the record, no solicitation was done of the

10   creditor body after the disclosure statement was sent out?  No

11   updates were sent, correct?

12   A    Updated projections were filed, but no solicitation was --

13   was -- there was only one solicitation.  We did not resolicit.

14   That's correct.

15   Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16   if this plan is confirmed, how much are you going to be paid

17   per month to be the Trustee?

18   A    For the Trustee role, $150,000 per month is the base.

19   Q    It's a base amount?  On top of that, you're going to

20   receive some sort of bonus amount, correct?

21   A    There's two bonuses.  There's a bonus for the bankruptcy

22   case, which I'd need Court approval for, and then I'm going to

23   seek a bonus for the Trustee work, which would be a

24   combination of myself and the team for a performance bonus.

25   That's to be negotiated.

Seery - Cross                                  218

1       To be fair, the Committee or the Oversight Group may not

2   agree to any change, in which case we would not have an

3   agreement.

4   Q    And what would happen if you don't come to an agreement,

5   Mr. Seery?

6   A    They would have to get a different Plan Trustee.

7   Q    Okay.  So it's certainly going to have to be greater than

8   zero, correct?

9   A    Typically.

10  Q    Is it going to be in the nature of three or four percent

11  of the sales proceeds, or have you considered that?

12  A    Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13  thinking -- my apologies.  I misunderstood.  I thought you

14  meant any number.  I haven't -- I haven't had negotiation with

15  them.  I'm thinking about looking at the full recovery of the

16  team -- for the team, looking at expected performance numbers,

17  and then trying to negotiate a structure of bonus compensation

18  that would be payable to the whole team, and then allocated by

19  the CEO (garbled) which would be made.

20  Q    When predicting the expenses of the Trust going forward in

21  your projections, did you build in an amount for a bonus fee?

22  A    No.  It wouldn't be part of the expenses.  It would come

23  out at the end.

24  Q    Okay.  So those additional expenses are not shown in the

25  plan analysis, correct?

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 53-5 Filed 12/07/23    Page 166 of 214    PageID 7336

Seery - Cross                              219

1  A    No, they're not.  It's just not going to be an expense.

2  It'll be a -- as an operating expense.  It'll be an

3  expenditure at the end out of distributions.

4  Q    Okay.  And did you subtract those from the distributions?

5  A    No.

6  Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7  or more to monetize these assets, is he?

8  A    No.

9  Q    Have you priced how much D&O insurance is going to be on a

10  go-forward basis post-confirmation?

11  A    I'm sorry.  I couldn't -- couldn't hear you.

12  Q    Sorry.  Let me get closer to my mic.  Have you priced what

13  D&O insurance is going to run the Trust on a go-forward basis

14  post-confirmation?

15  A    Yes.

16  Q    Okay.  And what are you projecting that to run?

17  A    About $3-1/2 million.

18  Q    And is that per annum for over the two-year life of this

19  plan?

20  A    Well, it's the two-year projection period, not life.  But

21  I expect that that's for the two-year projection period.

22  Q    Okay.  So approximately one point -- I'm sorry, you said

23  $3.5 million, correct?

24  A    Yes.

25  Q    Okay.  So, $1.75 million per year?

Seery - Cross                                    220

1   A    Yes.

2   Q    On top of the minimum $1.8 million per year that you're

3   going to be paid, correct?

4   A    Well, that's -- that's the base compensation.  But, again,

5   to be fair to the Oversight Committee, they haven't approved

6   it yet.  So the Committee, the Committee reserves their rights

7   to negotiate a total package.

8   Q    And there's going to be a Litigation Trustee, correct?

9   A    Yes.

10   Q    And that Litigation Trustee is going to be paid some

11   amount of compensation, correct?

12   A    Yes.

13   Q    That has not been negotiated yet, correct?

14   A    No, I believe -- I believe the base piece has.  But his --

15   I don't know what the contingency fee or if that's been

16   negotiated yet.  I don't know.

17   Q    And what is the base fee for the Litigation Trustee?

18   A    My recollection is it was about $250,000 a year, some

19   number in that area.

20   Q    Thank you.  So, at this point, over the two-year period,

21   we're looking at approximately $3.6 million to you, $3.5

22   million to the D&O insurance, and approximately $500,000 base

23   fee to the Litigation Trustee, plus a contingency.  Is that

24   correct?

25   A    That's probably real close, yes.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 33-18    Filed 12/07/23    Page 168 of 214    PageID 7338
Exhibit Exhibit 18    Page 92

Seery - Cross                                221

1    Q    Okay.  And how about U.S. Trustee fees?  You've estimated

2    of how much those are going to be during the two-year period,

3    correct?

4    A    They're built into the plan up 'til -- I think it's only

5    up until the actual effective date, but I don't recall the

6    specifics.

7    Q    Okay.  And U.S. Trustee fees, the case is going to stay

8    open and those are going to continue to have to be paid, even

9    after confirmation, correct?

10   A    Yes.

11   Q    Okay.  And do you have an estimate of how much those are

12   going to run per annum or over that two-year period?

13   A    I don't recall, no.

14   Q    Okay.  Well, they're provided within your projections,

15   correct?

16   A    Yes.

17   Q    Okay.  A Chapter 7 trustee would not have to incur any of

18   these costs, would they?

19   A    I don't think they'll have to incur Chapter -- U.S.

20   Trustee fees.  I don't know whether they would bring on a

21   litigation trustee or not.  I would assume, since there's --

22   appear to be valuable claims, they probably would, but perhaps

23   they would do it themselves.  So I don't know the specifics of

24   what they would do.

25   Q    In preparing your liquidation analysis, did you ask

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 53-5    Filed 12/07/23    Page 169 of 214    PageID 7339
Exhibit Exhibit 153 Page 2223 of 692

Seery - Cross                                      222

1    Pachulski if they would be willing to work for a Chapter 7

2    trustee if one was appointed?

3    A    I didn't specifically ask, no.

4    Q    Did you ask DIS, your, for lack of a better word,

5    financial advisors in this case, if they would be willing to

6    work with a Chapter 7 trustee?

7    A    DSI.  No, I did not specifically ask them.

8    Q    Okay.  All right.  Any of the accountants that you're

9    working with, did you ask them if they would be willing to

10    work with a Chapter 7 trustee?

11    A    I didn't specifically ask them, no.

12    Q    Okay.  The proposed plan has no requirements that you

13    notice any potential sale of either Highland assets or

14    Highland subsidiary assets; is that correct?

15    A    Do you mean after the effective date?

16    Q    Yes.

17    A    No, it does not.

18    Q    In the SSP sale, which is a subsidiary of Trussway, which

19    is a subsidiary of Highland, or actually it's a sub of a sub

20    of Highland, you conducted the sale of SSP, correct?

21    A    The team did, yes.  I was part.

22    Q    All right.  That was not noticed to the creditor body; is

23    that correct?

24    A    That's correct.

25    Q    And it is the Debtor's and your position that no notice

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 53-Filed 12/07/224 Page 170 of 214    PageID 7340

Seery - Cross                                    223

1  was required because this was a sub of a sub and therefore

2  this was in the ordinary course?

3  A    Not exactly, no.

4  Q    Okay.  Then what is your position?

5  A    It was in the ordinary course.  It was -- I believe it's a

6  sub of a sub of a sub, and a significant portion of the

7  interests are owned by third parties.

8  Q    It is possible, is it not, that had you noticed this to

9  the larger creditor body, that you might have engendered a

10 competitive bidding situation that might have reached a higher

11 return for investors, correct?

12 A    The same possibility is it could have gone lower.

13 Q    But it is possible, correct?

14 A    Certainly possible.

15 Q    In fact, there is normally requirements under the

16 Bankruptcy Code and the Rules that asset sales are noticed out

17 to the creditor body, correct?

18 A    Asset sales that -- property of the estate, yes.  Other

19 than in the ordinary course, of course.

20 Q    I believe you have described Mr. Dondero as being very

21 litigious within this case; is that correct?

22 A    I believe so, yes.

23 Q    Okay.  Did Mr. Dondero initiate any litigation in this

24 case prior to September 2020?

25 A    Prior to September?  I don't believe so.  I don't know

007763

Seery - Cross                    224

1  when he filed the claim from NexPoint.  It certainly indicated

2  that -- I believe it was from NexPoint.  My memory is slightly

3  off here.  He filed a claim in -- administrative claim, which

4  effectively is like you're bringing a complaint, against HCMLP

5  for the management of Multi-Strat and the sale of the life

6  settlement policies out of Multi-Strat, which was conducted in

7  the spring.

8  Q    And wasn't Mr. Dondero seeking document production related

9  to that sale?

10  A    No.

11  Q    Okay.  I believe that the preliminary injunction that you

12  talked about and were questioned earlier, the plan asks to

13  enjoin (garbled) party from allowing the plan to go effective.

14  Is that correct?

15  A    I'm sorry.  I didn't understand you question.  There was a

16  -- there was a bunch of interference.

17  Q    Okay.  Sure.  I'm sorry about that.  I don't know if

18  that's -- I don't think that's me, but --

19  A    It may not be.  It sounded like someone else.

20  Q    The injunction prohibits anybody from interfering with the

21  plan going effective, correct?

22  A    The plan injunction?

23  Q    Yes.

24  A    Yes.

25  Q    Okay.  Just so I'm clear, is the plan injunction

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 18-153   Filed 12/07/23   Page 172 of 214   PageID 7342

Seery - Cross                                225

 1  attempting to strip appellate rights of Mr. Dondero?

 2  A    No.

 3  Q    Okay.  So, if, for instance, if he were to file any appeal

 4  of an order confirming this plan, he wouldn't be in violation

 5  of that plan injunction?

 6  A    I don't think so, because the order wouldn't be final.

 7  Q    Okay.  But it -- it says upon entry of a confirmation

 8  order, you're enjoined from doing so.  So that's not the

 9  intent?

10  A    It certainly would not be my intent.  I don't think that

11  anybody had that in mind.

12  Q    Okay.  And if Mr. Dondero were to seek a stay pending

13  appeal either during that 14-day period or afterwards, is that

14  plan injunction attempting to stop that -- that sort of

15  action?

16  A    I apologize.  You're breaking up.  But I think I

17  understood your question.  No, it was -- it was your screen as

18  well.  No.  If either this Court stays its own order or a

19  higher court says that the order is stayed, then there would

20  be no way there could be any allegation that it's interfering

21  with an order if it's not effective.

22  Q    Mr. Dondero opposed the Acis sale, correct?

23  A    The Acis settlement?

24  Q    Correct.

25  A    Yes.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-15   Filed 12/07/23   Page 173 of 214   PageID 7343

Seery - Cross                                    226

1  Q   After he opposed the Acis settlement, the next filing Mr.

2  Dondero made was requesting that the Debtor notice the sale of

3  any assets or any major subsidiary assets.  Is that correct?

4  A   I don't recall the sequence of his filings.  I think that

5  Judge Lynn at least sent a letter to that effect.  I don't

6  recall if there is a filing to that effect.

7  Q   Did Mr. Dondero, through his counsel, attempt to resolve

8  that motion without filing anything further?

9  A   I don't recall the specifics of the motion.  I know they

10  asked for some sort of relief that -- that we thought was

11  inappropriate.

12  Q   When the Court postponed any hearing on Mr. Dondero's

13  request for relief until the eve of the confirmation hearing,

14  and Mr. Pomerantz announced that no sales were expected before

15  confirmation, did Mr. Dondero withdraw his motion?

16  A   Again, I don't recall the specifics of the motion.  I only

17  recall the letter from Judge Lynn.

18  Q   Did Mr. Dondero do anything more than object to the

19  HarbourVest deal?

20  A   Not that I know of.

21  Q   Did Mr. Dondero do anything more than respond to the

22  Defendants' injunction suit?

23         MR. MORRIS:  Objection to the form of the question.

24  I mean, -- objection to the form.

25         THE COURT:  Overruled.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 1-53 Filed 12/07/28 Page 174 of 214   PageID 7344
Exhibit Exhibit 53   Page 2

Seery - Cross                                   227

 1          MR. TAYLOR:  I apologize.  I should have said the

 2     Debtor's injunction suit.

 3          THE WITNESS:  Yeah, the -- I'm not sure of the

 4     specific order, but certainly the communications with me,

 5     which I think are prior to the order.  The communications with

 6     Mr. Surgent, which I believe are after the order.  Certain

 7     communications with Mr. Waterhouse, which were oral.  Those

 8     were all similarly difficult and obstreperous actions.

 9     BY MR. TAYLOR:

10     Q    Has Mr. Dondero commenced any adversary proceeding or

11     litigation in this case other than filing a competing plan?

12          MR. MORRIS:  Objection to the form of the question.

13          THE COURT:  Over --

14          THE WITNESS:  Yeah, I don't --

15          THE COURT:  -- ruled.

16          THE WITNESS:  I don't believe he's commenced an

17     adversary.  I'm sorry, Judge.  I don't believe he's commenced

18     an adversary proceeding, no.

19     BY MR. TAYLOR:

20     Q    Mr. Dondero didn't file any opposition to the life

21     settlement sale, did he?

22     A    We didn't do the life settlement (garbled) Court.

23     Q    Right.  Again, that wasn't noticed through the -- this

24     Court, was it?

25     A    It was an -- the reason was it was an asset of Multi-Strat

Seery - Cross                                              228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q    Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A    Yes.

5   Q    In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A    He may have.

9   Q    And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A    I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q    So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A    Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

1    If we have a -- if we have a transaction that's pending

2    that wouldn't be hurt by a notice and that we'd be able to get

3    the Court's imprimatur to maybe more better insulate, if you

4    will, against Mr. Dondero's attacks, then we may well come to

5    the Court to seek that.

6        The problem with noticing sales is that -- that it often

7    depresses value.  That's just not the way folks outside of the

8    bankruptcy world (audio gap) sales.

9    Q    So there's no requirement that either public or private

10   notice be provided, correct?

11   A    No.  Meaning it is correct.

12   Q    Okay.  And if Mr. Dondero had objections either to the

13   pricing of the sale or the manner and means by which the sale

14   was being conducted, he would be prohibited by the plan

15   injunction from bringing any objection to such sale, correct?

16   A    I believe so, yes.

17   Q    Mr. Dondero also had concerns regarding the OmniMax sale,

18   correct?

19   A    Mr. Dondero did not go along with the OmniMax sale with

20   the assets that he managed.  I don't know if he had concerns

21   with -- with our sale or OmniMax's interests.

22   Q    Did Mr. Dondero ever express to you any concern that the

23   value wasn't being maximized regarding the sale of those

24   assets?

25   A    He thought he could get more.  I don't know that he

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53 Filed 12/04/23   Page 177 of 214   PageID 7347

Seery - Cross                                    230

1    thought that he could get more for his assets that he was

2    managing or whether he thought he could get more for all of

3    the assets.

4    Q    Other than voicing those concerns, did Mr. Dondero file

5    any pleading with this Court attempting to block that sale?

6    A    Pleading with the Court?  No.

7            MR. TAYLOR:  Your Honor, I would like to confer with

8    my colleagues just very briefly and see if they have anything

9    further.  And even if they don't, Mr. Lynn of my firm would

10   like a very brief moment to address the Court prior to me

11   passing the witness.

12        So, if I may have a literally hopefully one-minute break

13   where I can turn my camera off and my microphone off to confer

14   with my colleagues, and then move forward?

15           THE COURT:  Okay.  Well, you can have a one-minute

16   break, but we're going to continue on with cross-examination

17   at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18   wants to raise an issue at this point.  Could you elaborate?

19           MR. TAYLOR:  I will get some elaboration during our

20   30-second to one-minute break, Your Honor.  I was just passed

21   a note.

22           THE COURT:  All right.  So, but I'll just you know,

23   --

24           A VOICE:  Your Honor?

25           THE COURT:  -- I'm inclined to continue with the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 53-5    Filed 12/08/23    Page 178 of 214    PageID 7348
Exhibit Exhibits 3-5    Page 2232 of 2392

Seery - Cross                                            231

 1   cross-examination.  You know, this isn't a time for, you know,

 2   arguments or anything like that.  All right?

 3        So, we'll take a one-minute break.  You can turn off your

 4   audio and video for one minute, and come back.

 5        (Off the record, 3:33 p.m. to 3:34 p.m.)

 6             THE WITNESS:  Your Honor?

 7             THE COURT:  Yes?

 8             THE WITNESS:  It's Jim Seery.  Can I turn it into

 9   just a two-minute break, since I've sat in my seat, and it

10   would be better for him to just continue straight through.  I

11   could use one or two minutes.

12             THE COURT:  Okay.

13             THE WITNESS:  I apologize.

14             THE COURT:  All right.  Well, it's been more than

15   minute.  Let's just say a five-minute break for everyone, and

16   we'll come back at 3:39 Central time.  Okay.

17             THE WITNESS:  Okay.  Thank you, Your Honor.  I

18   appreciate that.

19        (A recess ensued from 3:35 p.m. until 3:40 p.m.)

20             THE CLERK:  All rise.

21             THE COURT:  Please be seated.  All right.  We are

22   back on the record.  Mr. Taylor, are you there?

23             MR. TAYLOR:  I am, Your Honor.  My video is not

24   wanting to start, but my -- I believe my audio is on.

25             THE COURT:  Okay.  After you went offline for your

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit Exhibit 53-Filed 12/07/23   Page 179 of 214   PageID 7349

Seery - Cross                    232

| | |
|---|---|
| 1 | one-minute break, Mr. Seery asked for a five-minute bathroom |
| 2 | break, or a couple-minute.  Anyway, we've been gone on a |
| 3 | bathroom break.  We're back now. |
| 4 |      MR. TAYLOR:  Thank you.  I was actually -- I was |
| 5 | still listening with one ear, -- |
| 6 |      THE COURT:  Okay. |
| 7 |      MR. TAYLOR:  -- Your Honor, so I understand. |
| 8 |      THE COURT:  All right. |
| 9 |      MR. TAYLOR:  So, thank you. |
| 10 |      THE COURT:  Are you finished with cross, or no? |
| 11 |      MR. TAYLOR:  Just a little bit of a follow-up. |
| 12 |      CROSS-EXAMINATION, RESUMED |
| 13 | BY MR. TAYLOR: |
| 14 | Q   Mr. Seery, you had previously testified that Mr. Dondero's |
| 15 | counsel had threatened you and/or the independent board, I was |
| 16 | not exactly sure who you were referring to, with suits, and I |
| 17 | believe you said a hundred million dollars' worth of suits and |
| 18 | getting dragged into litigation. |
| 19 |     Is that still your testimony today, that you were -- you |
| 20 | were threatened with suit by this firm of a suit of over a |
| 21 | hundred million dollars? |
| 22 | A   I believe what I was told by my counsel was that, not Mr. |
| 23 | Dondero's, but one of the other counsel, who I can name, said |
| 24 | specifically that Dondero will sue Seery for hundreds of |
| 25 | millions of dollars.  We're going to take it up to the Fifth |

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 31-53 Filed 12/06/23 Page 2180 of 214   PageID 7350

Seery - Cross                        233

 1  Circuit, get it reversed, and he'll go after him.

 2  Q   Okay.  So it was not Mr. Dondero's counsel, and you were

 3  not -- is that correct?

 4  A   No.  It was one of the other counsel on the phone today.

 5  Q   Okay.  And you base that not upon your own personal

 6  knowledge but based on some -- something else that you were

 7  told, correct?

 8  A   Yes.  By my counsel.

 9  Q   Thank you.

10         MR. TAYLOR:  Yes, Your Honor.  We can pass the

11  witness.

12         THE COURT:  Okay.  So, you've gone, or you and Mr.

13  Rukavina collectively have gone one hour and 17 minutes.  Mr.

14  Draper, you're next.

15         MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16  basically have no more than ten questions, so I gather the

17  Court will welcome that.

18         THE COURT:  Okay.

19                    CROSS-EXAMINATION

20  BY MR. DRAPER:

21  Q   Mr. Seery, has the new general partner been formed yet?

22  A   I don't know if they've been -- we've actually done the

23  formation, but it -- it would be in process.

24  Q   So it either has been formed or has not been formed?

25  A   I don't -- I don't know the answer.

007773

Seery - Cross                          234

1  Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

2  have nothing to do with the Reorganized Debtor, correct?

3  A    Not necessarily, but they don't have a specific role at

4  this time.

5  Q    They won't be officers or directors of the new general

6  partner or the Reorganized Debtor, correct?

7  A    I don't -- I don't believe so, but it's not set in stone.

8  Q    All right.  Has any finance -- has any party who is the

9  beneficiary of an exculpation, a release, or the channeling

10  injunction contributed anything to this plan of reorganization

11  in terms of money?

12  A    No.

13  Q    Have you ever interviewed a trustee as to how they would

14  liquidate the assets or monetize the assets in this case?

15  A    No.

16  Q    And last question is, is there any bankruptcy prohibition

17  that you're aware of that a Chapter 7 trustee could not do

18  what you're doing?

19  A    Which -- which -- what do you mean, under the plan?

20  Q    No.  Could not monetize the assets of the estate in the

21  manner that you're attempting to monetize them.

22  A    I don't think there's a specific rule, but I just haven't

23  -- I haven't seen that before, no.  So I don't think there's a

24  specific rule that I know of.

25  Q    Okay.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-5 Filed 12/07/23   Page 182 of 214   PageID 7352
Exhibit Exhibit 3-5 Page 236

Seery - Cross                    235

1           MR. DRAPER:  I have nothing further for this witness.

2           THE COURT:  All right.  I should have asked, we had a

3   couple of other objectors.  Ms. Drawhorn, did you have any

4   questions?

5           MS. DRAWHORN:  I have no questions, Your Honor.

6           THE COURT:  All right.  Were there any other

7   objectors out there that I missed that might have questions?

8       All right.  Any redirect?

9           MR. MORRIS:  Your Honor, if I may, can I -- can I

10  just take a short minute to confer with my colleagues?

11          THE COURT:  Sure.  You can --

12          MR. MORRIS:  Thank you.

13          THE COURT:  -- put you --

14          MR. MORRIS:  Two -- two minutes, Your Honor.

15          THE COURT:  Okay.

16      (Pause, 3:45 p.m. until 3:48 p.m.)

17          THE COURT:  All right.  We've been a couple of

18  minutes.  Mr. Morris?

19          MR. MORRIS:  Yes, Your Honor.

20          THE COURT:  What are --

21          MR. MORRIS:  Just, just a few points, Your Honor.

22          THE COURT:  Okay.

23          MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24          THE WITNESS:  I am, yes.

25                      REDIRECT EXAMINATION

Seery - Redirect                          236

1  BY MR. MORRIS:

2  Q    You were asked a number of questions about your

3  compensation.  Do you recall all that?

4  A    Yes, I do.

5  Q    And you testified to the $150,000 a month.  Do you recall

6  that?

7  A    Yes.

8  Q    Under the -- under the documentation right now, your

9  compensation is still subject to negotiation with the

10  Committee; is that right?

11  A    Yes, it is.

12  Q    Okay.  You were asked a couple of questions about the

13  conduct of Mr. Dondero.  Earlier, you testified that the

14  monetization plan was filed under seal at around the time of

15  the mediation.  Do I have that right?

16  A    Yes.  Right at the start of the mediation.

17  Q    Okay.  And is that the first time that the Debtor made the

18  constituents aware, including Mr. Dondero, that it intended to

19  use that as a catalyst towards getting to a plan?

20  A    That's the first time that we filed it, but that plan had

21  been discussed prior to that.

22  Q    And do you recall that there came a point in time where

23  you -- when the Debtor gave notice that it intended to

24  terminate the shared services agreements with the Dondero-

25  related entities?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-31 Filed 12/07/23   Page 184 of 214   PageID 7354
Exhibit Exhibits 53-89   Page 2 of 92

Seery - Redirect                                237

1    A    Yes.

2    Q    And when did that happen?

3    A    That was about 60 -- now it's like 62 days ago.

4    Q    Uh-huh.  And you know, from your perspective, from the

5    filing of the monetization plan in August through the notice

6    of shared services, is that what you believe has contributed

7    to the resistance by Mr. Dondero to the Debtor's pursuit of

8    this plan?

9    A    Well, I think there's a number of factors that

10   contributed, but the evidence that I've seen is that when we

11   started talking about a transition, if there wasn't going to

12   be a deal, if Mr. Dondero couldn't reach a deal with the

13   creditors, we were going to push forward with the monetization

14   plan.  And the monetization plan required the transition of

15   the employees.  And indeed, it called specifically, and we had

16   testimony regarding it all through the case, about the

17   employees being terminated or transferred.

18        In order to transfer them over to an entity that's

19   related, Mr. Dondero pulls all of those strings.  And he

20   refused to engage on that.  We started in the fall.  We

21   specifically told employees of the Debtor not to engage.  They

22   couldn't spend his money, which made sense --

23              MR. TAYLOR:  Objection, Your Honor.

24              THE WITNESS:  So, very -- that --

25              THE COURT:  Just -- there's an objection.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-153   Filed 12/07/23   Page 185 of 214   PageID 7355

Seery - Redirect                              238

1            MR. MORRIS:  There's an objection.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  There was an objection.

4            MR. TAYLOR:  Yes, Your Honor.  Object --

5            THE COURT:  Go ahead.

6            MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

7    Taylor.  Objection.  He's directly said Mr. Dondero told other

8    employees *x*, and that is purely hearsay, not based upon his

9    personal opinion, or his personal knowledge, and therefore

10   that part of the answer should be struck.

11           MR. MORRIS:  Your Honor, it's a statement against

12   interest.

13           THE COURT:  Overrule the objection.  Go ahead.

14           THE WITNESS:  Yeah.  The difficulty of transitioning

15   this business, I've equated it to doing a corporate carve-out

16   transaction on an M&A side.  It's hard, and you need

17   counterparties on the other side willing to engage.  And what

18   we went through over the weekend, on Friday, was seemingly

19   that the Funds, you know, directed by Mr. Dondero, just

20   haven't engaged.

21       We actually gave them an extra two weeks to engage,

22   because it's -- they've really been unable to do anything.  I

23   mean, hopefully, we've got the employees working in a way that

24   can -- that can foster and get around some of this

25   obstreperousness, and I've used that word before, but that's

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 53-Filed 12/04/23 Page 186 of 214    PageID 7356

Seery - Redirect                              239

1    what it is.  It's really an attempt to just prevent the plan

2    from going forward.

3         And at some point, the plan will go forward.  And if we

4    are unable to transition people, we will simply have to

5    terminate them.  And that is not a good outcome for those

6    employees, but it's not a good outcome for the Funds, either.

7    And the Funds, Mr. Dondero, the Advisors, the boards, nobody

8    wants to do anything except come in this court.

9    BY MR. MORRIS:

10   Q    Do you recall being asked about Mr. Dondero and certain

11   things that he didn't do and certain actions that he hadn't

12   taken?

13   A    Yes.

14   Q    By Mr. Taylor?  To the best of your recollection, did Mr.

15   Dondero personally object to the HarbourVest settlement?

16   A    I -- I don't recall if he did or if it was one of the

17   entities.

18   Q    It was Dugaboy.  Does that refresh your recollection?

19   A    Dugaboy certainly objected, yes.

20   Q    And do you understand that Dugaboy has appealed the

21   granting of the 9019 order in the HarbourVest settlement?

22   A    Yes.

23   Q    And Mr. Taylor asked you to confirm that Mr. Dondero

24   hadn't taken any action with respect to the life settlement

25   deal.  Do you remember that?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-Exhibit PDFs Page 187 of 214   Page 2187 of 214   PageID 7357

Seery - Redirect                                          240

1    A    I do.

2    Q    But are you aware that Dugaboy actually filed an

3    administrative claim relating to the alleged mismanagement of

4    the life settlement sale?

5    A    Yes, I did, I did allude to that.  I wasn't sure it was

6    Dugaboy, but -- but that was very --

7    Q    Uh-huh.

8    A    -- very early on, an objection filed in the form of an

9    administrative claim or complaint against, if you will,

10   against Highland for the management of Multi-Strat.

11   Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12   seeking to inhibit the Debtor from managing the CLO assets; is

13   that right?

14   A    No, not the CLO assets, no.

15   Q    Yeah.  But the Funds and the Advisors did.  That was the

16   hearing on December 16th.  Do you recall that?

17   A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18   and the various Advisors.

19   Q    All right.  Do you recall Mr. Rukavina asking you whether

20   there was any evidence in the record to support your testimony

21   that there was an agreement in place to assume the CLO

22   management agreements?

23   A    I recall the question, yes.

24   Q    Okay.

25            MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-53   Filed 12/07/23   Page 188 of 214   PageID 7358

Seery - Redirect                          241

```
1    to put up on the screen the Debtor's omnibus reply to the plan

2    objections.

3              THE COURT:  Okay.

4              MR. MORRIS:  It was filed -- it was filed on January

5    22nd.  And if we can go, I think, to -- I think it's Paragraph

6    -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

7    BY MR. MORRIS:

8    Q    Take a look at that, Mr. Seery.  Does that -- does that

9    statement in Paragraph 135 accurately reflect the

10   understanding that's been reached between the Debtor and the

11   CLO Issuers with respect to the Debtor's assumption of the CLO

12   management agreements?

13   A    Yes.  I think that's consistent with what I testified to

14   earlier, the substance of the agreement.

15             MR. MORRIS:  And if we can just scroll to the top,

16   just to see the date.  Or the bottom.  I guess the top.

17             THE WITNESS:  Do you mean the date of this pleading?

18   BY MR. MORRIS:

19   Q    Yeah.  So, it was filed on January 22nd, right, ten days

20   ago?  Okay.

21   A    That's correct.

22             MR. MORRIS:  I'd like to put up on the screen an

23   email, Your Honor, that I'd like to mark as Debtor's Exhibit

24   10A.  And this is --

25   BY MR. MORRIS:
```

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 13-5 Filed 12/07/23 Page 189 of 214    PageID 7359

Seery - Redirect                                    242

1   Q    Do you recall, Mr. Seery, you testified that the agreement

2   was reflected in an email?

3   A    Yes.

4   Q    Is this the email that you're referring to?

5           MR. MORRIS:  If we could scroll down.  Right there.

6           THE WITNESS:  Yes.

7           MR. MORRIS:  Okay.  One -- the email below.  Okay.

8   Right there.

9   BY MR. MORRIS:

10  Q    Is that the -- is that the email you had in mind?

11  A    It was the series of emails.  We -- we had a -- I think I

12  testified in the prior testimony, or my -- one of my

13  depositions, that we had had a number of conversations with

14  the Issuers and their counsel, and this was the summary of the

15  agreement that was contained in these emails.

16  Q    Okay.  And this is, this is the same date as the omnibus

17  reply that we just looked at, right, January 22nd?

18  A    That's correct.

19  Q    Okay.  You were asked a question, I think, late in your

20  cross-examination about a Chapter 7 trustee's ability to sell

21  the assets in the same way as you are proposing to do.  Do you

22  recall that testimony?

23  A    Yes.

24  Q    And I think, if I understood correctly, the question was

25  narrowly tailored to whether there was any legal impediment to

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 31-53 Filed 12/07/23   Page 190 of 214   PageID 7360

Seery - Redirect                                    243

1   a trustee doing -- performing the same functions as you.  Do I

2   have that right?

3   A    That's the question I was asked, whether the Bankruptcy

4   Code had a specific prohibition.

5   Q    Okay.  And I think, I think you testified that you weren't

6   aware of anything.  Is that right?

7   A    That's correct.

8   Q    All right.  But let's talk about practice.  Do you think a

9   Chapter 7 trustee will realize the same value as you and the

10  team that you're assembling will, in terms of maximizing value

11  and getting the maximum recovery for the assets?

12  A    No.  As I testified earlier, you know, I've been working

13  with these assets now for a year.  It's a complicated

14  structure.  The assets are all slightly different.  And

15  sometimes much more than slightly.  And the team that we're

16  going to have helping managing is familiar with the assets as

17  well.  We believe we'll be able to execute very well in the

18  markets that we (garbled).

19  Q    Do you think a Chapter 7 trustee will have a steep

20  learning curve in trying to even begin to understand the

21  nature of the assets and how to market and sell them?

22  A    I think anybody coming into this, the way this company is

23  set up, as an asset manager, and the diversity of the assets,

24  would have a steep learning curve, yes.

25  Q    Do you have any view as to whether the perception in the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-31   Filed 12/07/23   Page 191 of 214   PageID 7361
Exhibit Exhibit 53-8 Page 245 Page

Seery - Redirect                                   244

1    marketplace of a Chapter 7 trustee taking over to sell the

2    assets will have an impact on value as compared to a post-

3    confirmation estate of the type that's being proposed under

4    the plan?

5    A    Yes, I do, and it certainly would be negative, in my

6    experience.  Typically, assets are not conducted -- asset

7    sales are not conducted through a bankruptcy court, and

8    certainly not with a Chapter 7 trustee that has to sell them,

9    and generally is viewed as having to sell them quickly.  So we

10   -- we approach each asset differently, but certainly in a way

11   that would be much more conducive to maximizing value than a

12   Chapter 7 trustee could, just by the nature of their role.

13   Q    Is it -- is it your understanding that, under the proposed

14   plan and under the proposed corporate governance structure,

15   that the Claims Oversight Committee will -- will manage you?

16   That you'll report to that Committee and that they'll have the

17   opportunity to make their assessment as to the quality of your

18   work?

19   A    Yeah, absolutely.  And that's consistent with what we've

20   done before in this case.  Even where it wasn't an asset of

21   the estate or was being sold in the ordinary course, we spent

22   time with the Committee and the Committee professionals before

23   selling assets.

24   Q    And you've worked with the Committee for over -- for a

25   year now, right?

007784

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-13   Filed 12/07/23   Page 192 of 214   PageID 7362

Seery - Redirect                                    245

1    A    It's over a year.

2    Q    And the Committee is comfortable with you taking this

3    role; is that right?

4    A    I think they're supportive of it.  Comfortable might be

5    not the right word choice.

6    Q    Okay.  I appreciate the clarification.  And do you have

7    any reason to believe that the -- that the Oversight Committee

8    is going to allow you the unfettered discretion to do whatever

9    you want with the assets of the Trust?

10   A    Not a chance.  Not with this group.  Nor would I want to.

11   There's no right or wrong answer for most of these things, and

12   the collaborative views from professionals and people who have

13   an economic stake in the outcome will be helpful.

14   Q    Okay.  You were asked some questions about the November

15   projections and the -- and the assumption that was made that

16   valued the HarbourVest and the UBS claims at zero.  Do you

17   recall that?

18   A    Yes.

19   Q    As of that time, was the Debtor still in active litigation

20   with both of those claim holders?

21   A    Very much so.

22   Q    And after the disclosure statement was issued, do you

23   recall that the Court entered its order on UBS's Rule 3018

24   motion?

25   A    Yes.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-5 Filed 12/07/23   Page 193 of 214   PageID 7363
Exhibit Exhibit 153 Page 2347 of 492

Seery - Redirect                          246

 1  Q   And do you recall what the -- what the claims estimate was

 2  for voting purposes under that order?

 3  A   It was about $95 million.  That was -- it was together

 4  with the summary judgment orders of that date.  They were

 5  separate orders, but that was the lone hearing.

 6  Q   And was that public information, that order was publicly

 7  filed on the docket; isn't that right?

 8  A   Yes, it was.

 9  Q   Is there anything in the world that you can think of that

10  would have prevented any claim holder from doing the math to

11  try to figure out the impact on the estimated recoveries from

12  the -- by using that 3018 claims estimate?

13  A   No.  It would have -- it would have been quite easy to do.

14  Q   And, in fact, that's what you wound up doing with respect

15  to the January projections, right?

16  A   That's correct.

17  Q   And do you recall when the HarbourVest settlement, when

18  the 9019 motion was filed?

19  A   I don't recall the actual filing.  It was subsequent to

20  the UBS, though.

21       MR. MORRIS:  Ms. Canty, if you have it, can we just

22  put it on the screen, to see if we can refresh Mr. Seery's

23  recollection?  If we could just look at the very top.

24  BY MR. MORRIS:

25  Q   Does that refresh your recollection that the 9019 motion

007786

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 53-53    Filed 12/07/23    Page 194 of 214    PageID 7364

Seery - Redirect                                        247

1   was filed on December 23rd?

2   A    Yes, it does.  The agreement was reached before that, but

3   it took a little bit of time to document the particulars and

4   then to -- to get it filed.

5   Q    And this wasn't filed under seal, to the best of your

6   recollection, was it?

7   A    No, no.  This was -- this was open, and we had a very open

8   hearing about it, because it was a related-party objection.

9   Q    And to the best of your recollection, did this 9019 motion

10  publicly disclose all of the material terms of the proposed

11  settlement?

12  A    Yes, it did.

13  Q    Can you think of anything in the world that would have

14  prevented any interested party from doing the math to figure

15  out how this particular settlement would impact the claim

16  recoveries set forth in the Debtor's disclosure statement?

17  A    No.  And just again, to be clear, the plan and the

18  projections had assumptions, but the plan was very clear that

19  the denominator was going to be determined by the total amount

20  of allowed claims.

21  Q    And, again, at the time that that was filed, you hadn't

22  reached a settlement with HarbourVest, had you?

23  A    No.

24  Q    And the order on the 3018 motion hadn't yet been filed; is

25  that right?

007787

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document Exhibit 153 Filed 12/07/23 Page 195 of 214 PageID 7365

Seery - Redirect                                          248

1    A   That's correct.

2    Q   Okay.  Has -- are you aware of any creditor expressing any

3    interest in trying to change their vote as a result of the

4    updates of the forecasts?

5    A   Only Mr. Daugherty.  And actually, they have a stipulation

6    with the two -- the two former employees.

7    Q   All right.  But to be fair, that wasn't -- had nothing to

8    do with the revisions to the projections?  That was just in

9    connection with their settlement; is that right?

10   A   That's correct.  As was, I suspect, Mr. Daugherty's, but

11   he'd been aware of the settlements, just like everyone else.

12   Q   Okay.  You were asked a couple of questions, I think, by

13   Mr. Rukavina about whether there is anything that you need to

14   do your job on a go-forward basis.  And I think you said no.

15   Do I -- do I have that right?  Nothing further that you need?

16   A    I -- I'm not really sure what your question means, to be

17   honest.

18   Q   Okay.  Fair enough.  To be clear, is there any chance that

19   you would accept the position as the Claimant Trustee if the

20   gatekeeper and injunction provisions of the proposed plan were

21   extracted from those documents?

22   A   No.  As I said earlier, they're integral in my view to the

23   entire plan, but they're absolutely essential to my bottom.

24   Q   Okay.  And through -- through the date of the effective

25   date, are you relying on the exculpation clause of the -- have

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-5   Filed 12/04/23   Page 196 of 214   PageID 7366
Exhibit Exhibits 157-167 Page 250 of 502

Seery - Redirect                                      249

1    you been relying on the exculpation clause in the January 9th

2    order that you testified to at the beginning of this hearing?

3    A    Yeah.  Both the January 9th order as well as the July

4    order with respect to my CEO/CRO positions.

5    Q    Okay.

6              MR. MORRIS:  I've got nothing further, Your Honor.

7              THE COURT:  All right.  Any recross on that redirect?

8              A VOICE:  I believe Mr. Rukavina is speaking but is

9    muted, Your Honor.

10             THE COURT:  Mr. Rukavina, do you have any recross?

11             MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12   apologize.

13             THE COURT:  Okay.

14             MR. RUKAVINA:  Can you hear me now?

15             THE COURT:  Yes.

16             THE WITNESS:  Yes.

17             MR. RUKAVINA:  Thank you.

18        Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19   Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20   search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21   down.  Stop there.

22                      RECROSS-EXAMINATION

23   BY MR. RUKAVINA:

24   Q    Mr. Seery, do you see what's attached as Exhibit C to the

25   Omnibus Reply, which is proposed language in the confirmation

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 13-53 Filed 12/07/23 Page 197 of 214 PageID 7367
Exhibit Exhibit 53 Page 251 Page

Seery - Recross                                          250

 1  order?

 2  A    I see the exhibit.  I didn't know if this was -- I don't

 3  know exactly what it's for.  If it's proposed language, I'll

 4  accept your representation.

 5          MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

 6  Vasek.  I want to make sure that I understand what you're

 7  saying.  Scroll back up.  Do the word search for where Exhibit

 8  C appears first.  Start again.  Okay.  So scroll up.

 9  BY MR. RUKAVINA:

10  Q    So, you'll recall Mr. Morris was asking you about the

11  paragraph in here where you outlined the terms of the

12  agreement with the CLOs.  Do you recall that testimony?

13  A    Yes.

14  Q    Okay.  And then you see it says, The Debtor and the CLOs

15  agreed to seek approval of this compromise by adding language

16  to the confirmation order.  A copy of that language is

17  attached hereto as Exhibit C and will be included in the

18  confirmation order.

19          Do you see that, sir?

20  A    I do.

21  Q    Okay.

22          MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23  BY MR. RUKAVINA:

24  Q    So it's correct that this Exhibit C is the referenced

25  agreement that the Debtor and the CLOs will seek approval of,

Seery - Recross                          251

 1  correct?

 2  A    The -- the -- it may be word-splitting, but I believe it

 3  says that they've reached agreement and this is the language

 4  that will evidence that agreement or embody that agreement.

 5  Q    Okay.

 6          MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

 7  page, please.

 8  BY MR. RUKAVINA:

 9  Q    Real quick, do the CLOs owe the Debtor any money for the

10  management fees?

11  A    I don't -- well, the answer is there are accrued fees that

12  haven't been paid, but when they have cash they run through

13  the waterfall and pay them.

14  Q    And I believe you mentioned to me those accrued fees

15  before.  They're several million dollars, correct?

16  A    It -- I don't know right off the top of my head.  They can

17  aggregate and then they get paid down in the quarter depending

18  on the waterfall.  And it's -- it's not a fair statement by

19  either of us to say the CLOs, as if they're all the same.

20  Each one is different.

21  Q    I understand.  But as of today, you agree that the CLOs

22  collectively owe some amount of money to the Debtor in accrued

23  and unpaid management fees?

24  A    I believe that's the case.

25  Q    Okay.  And do you believe it's north of a million dollars?

1   A   I don't recall.

2   Q   Okay.

3          MR. RUKAVINA:  Well, scroll down a couple of more

4   lines, Mr. Vasek.  Stay there.

5   BY MR. RUKAVINA:

6   Q   Sir, if you'll read with me, isn't the Debtor releasing

7   each Issuer, which is the CLOs, for and from any and all

8   claims, debts, et cetera, by this provision?

9   A   Claims.  Not -- not fees, but claims.  I don't believe

10  there's any release of fees that the CLOs might owe and would

11  run through the waterfall here.

12  Q   Okay.  For and from any and all claims, debts,

13  liabilities, demands, obligations, promises, acts, agreements,

14  liens, losses, costs, and expenses, including without

15  limitation attorneys' fees and related costs, damages,

16  injuries, suits, actions, and causes of action, of whatever

17  kind or nature, whether known or unknown, suspected or

18  unsuspected, matured or unmatured, liquidated or unliquidated,

19  contingent or fixed.

20       Are you saying that that does not release whatever fees

21  have accrued and the CLOs owe?

22  A   I don't believe it would.  If it did, your client should

23  be ecstatic.  But I don't believe it does that.

24  Q   And you don't believe that it releases the CLOs of any and

25  all other obligations that they may have to the Debtor and the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-1   Filed 12/07/23   Page 200 of 214   PageID 7370
Exhibit Exhibit 153-53   Page 202

Seery - Recross                                        253

 1  estate?

 2  A    I -- again, I don't believe there are any, but I think

 3  it's a broad release of claims away from the actual fees that

 4  are generated by the Debtor.  I don't believe there's an

 5  intention to release fees that have accrued.

 6  Q    Have you seen this language before I showed it to you

 7  right now?

 8  A    I believe I have, yes.

 9  Q    Okay.  Take a minute.  Can you point the Court to anywhere

10  where present or future fees under the CLO agreements are

11  excepted from the release?

12  A    I could go through, I'll take your representation, but I

13  don't believe that that's what it -- it's supposed to release

14  fees.  Again, if the fees are owed, they get paid, if there

15  are assets there to pay them.

16  Q    Okay.  This release and this settlement was never noticed

17  out as part of a 9019, was it?

18  A    I don't believe so, no.

19  Q    Okay.  So, other than bringing it up here today, this is

20  the first that the Court, at least, has heard of this,

21  correct?

22  A    Yeah, again, I don't --

23          MR. MORRIS:  Objection to the form of the question.

24          THE WITNESS:  Yeah.  I just stated before that I

25  don't think this is a -- that there claims.

Seery - Recross                                    254

1            THE COURT:  Wait.  Slow down.  I think --

2            MR. SEERY:  Oh, I'm sorry, Your Honor.

3            THE COURT:  -- there was an objection.  Go ahead, Mr.

4    Morris.

5            MR. MORRIS:  The notion that this is the first time

6    the Court has heard of this is just factually incorrect.

7    First of all, it's in the document from January 22nd.  Second

8    of all, Mr. Seery testified to it last week at the preliminary

9    injunction hearing.  I mean, --

10           THE COURT:  I -- I --

11           MR. MORRIS:  -- I don't know what the point of the

12   inquiry is, but there's -- this is not new news.

13           THE COURT:  Okay.  I sustain the objection.

14   BY MR. RUKAVINA:

15   Q   And Mr. Seery, can you point me to any document where

16   counsel for the CLOs has signed this particular confirmation

17   order or any other document agreeing to this language in the

18   confirmation order?

19   A   I don't think there's any document that's signed.  I think

20   we already went over that.  I think the email is evidence

21   their agreement to the general terms.  I don't see any

22   agreement with respect to this particular language.

23   Q   Well, you have no personal information?  You're going on

24   what your lawyers told you that the CLOs agreed to, correct?

25   A   That's correct.

Seery - Recross                             255

1   Q   Okay.  You didn't personally --

2   A   Excuse me.  That's correct with respect to this language,

3   not with respect to the agreement.  I was on the phone when

4   they agreed.

5   Q   Okay.  And they agreed orally, you're saying, to basically

6   the assumption of the CLO management agreements?

7   A   Correct.

8   Q   Okay.

9           MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

10  witness.

11          THE COURT:  All right.  Other recross?

12          MR. TAYLOR:  Yes, Your Honor, I do.

13          THE COURT:  Go ahead.

14                          RECROSS-EXAMINATION

15  BY MR. TAYLOR:

16  Q   Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,

17  let me restart.  I believe you testified earlier, in response

18  to questions by Mr. Morris, that you didn't believe a Chapter

19  7 trustee would be very effective in monetizing these assets,

20  correct?

21  A   I think I said I didn't believe that the Chapter 7 trustee

22  would be as effective at monetizing the assets as the

23  Reorganized Debtor would be, and me in the role as Claimant

24  Trustee.

25  Q   And one of the reasons that you gave is you believe that

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit D-8 53    Filed 12/07/23    Page 203 of 214    PageID 7373

Seery - Recross                              256

 1   the Chapter 7 trustee had to liquidate assets so quickly that

 2   it could not be effective; is that correct?

 3   A    Typically, that's the case, yes.

 4   Q    You worked for the Lehman trustee, correct?

 5   A    That's incorrect.

 6   Q    Okay.  Did you work on the Lehman case?

 7   A    Did I work in the case?  No.

 8   Q    Okay.  Did you -- how were you involved within -- within

 9   the Lehman case?

10   A    It's a long history, but I was a relatively senior person,

11   not senior level, not senior management level person at

12   Lehman.  I ran the loan businesses and I helped a number of

13   other places and I -- in the organization.  I helped construct

14   the sale of Lehman to Barclays out of the broker-dealer and

15   then helped consummate that sale.

16   Q    Okay.  I believe, in that case, it was a SIPC -- the

17   trustee was a SIPC trustee, correct?

18   A    With respect to the broker-dealer.

19   Q    Okay.  And you believe that a SIPC trustee is very -- has

20   very similar rules with respect to asset sales; is that

21   correct?

22   A    There are some similarities, absolutely.

23   Q    Okay.  And so in that case, the trustee was in place for

24   seven years, yet you believe -- you want this Court to believe

25   that a Chapter 7 trustee has to liquidate assets in a very

007796

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 31-53   Filed 12/07/23   Page 204 of 214   PageID 7374
                        Exhibit Exhibit 53 Part 2 of 2   Page 204 of 214
                         Seery - Recross                    257

1    short time frame, is that correct?

2              MR. MORRIS:  Objection to the form of the question.

3              THE WITNESS:  Yeah, in the Lehman case, --

4              THE COURT:  Overruled.

5              THE WITNESS:  I'm sorry, Judge.

6              THE COURT:  Go ahead.

7              THE WITNESS:  In the Lehman case, the SIPC trustee

8    spent years litigating, not liquidating.  The broker-dealer

9    was sold in our structured deal to Barclays, and then the SIPC

10   trustee liquidated the remainder of the estate, which was the

11   broker-dealer, but most of it had been sold to Barclays.  It

12   was really a litigation case.

13   BY MR. TAYLOR:

14   Q   But it did -- that trustee did sell off subsequent assets

15   after the initial sale, correct?

16   A   That trustee, I don't think, managed -- I don't know about

17   that.  The trustee didn't really manage any assets.  Other

18   than litigations.

19   Q   You've also testified that you didn't believe or that you

20   would not take on this role without the gatekeeper and

21   injunction -- gatekeeper role and injunction being in place;

22   is that correct?

23   A   Yes.

24   Q   And you're also familiar with the Barton Doctrine,

25   correct?

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 53-Filed 12/07/23 Page 205 of 214    PageID 7375

Seery - Recross                                        258

 1   A    I'm not.

 2   Q    Okay.  Do you believe that a Chapter 7 trustee could be

 3   sued by third parties without obtaining either relief from

 4   this Court -- let me just stop there.  Do you believe that a

 5   Chapter 7 trustee could be sued without seeking leave of this

 6   Court?

 7   A    I think it would be difficult.  I know that Chapter 7

 8   trustees have qualified immunity, so I think, whether it would

 9   be leave of this Court or it's just that there's a very high

10   bar to suing them, I'm not exactly sure.  It's not something

11   I've spent time on.

12   Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13   need of the gatekeeper role or injunction if this case were

14   converted to one under Chapter 7, correct?

15   A    That's probably true.

16   Q    Thank you.

17           MR. TAYLOR:  No further questions.

18           THE COURT:  All right.  Any other recross?

19           MR. DRAPER:  Your Honor, I have nothing --

20           THE COURT:  All right.

21           MR. DRAPER:  -- further.

22           THE COURT:  All right.  I think we're done, but

23   anyone I've missed?

24       All right.  Mr. Seery, it's been a long day.  You are

25   excused from the virtual witness stand.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-31 Filed 12/07/23   Page 206 of 214   PageID 7376
Exhibit Exhibits 153-162   Page 2 of 60

Seery - Recross                                259

```
 1          THE WITNESS:  Thank you, Your Honor.

 2          THE COURT:  All right.  Mr. Morris, let's see if

 3   there's anything else we can accomplish today.  It's 4:18

 4   Central time.  Who would be your next witness?

 5          MR. MORRIS:  My next witness would be John Dubel,

 6   Your Honor.

 7          THE COURT:  All right.  Can you give us a time

 8   estimate for direct?

 9          MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10   than 20 minutes or so, but I would offer the Court, if you

11   think it would be helpful, counsel for the CLO Issuers is on

12   the call, and I believe that they would be prepared to just

13   confirm for Your Honor that there is an agreement in

14   principle, just as Mr. Seery has testified to, and maybe you

15   want to hear from her.  I know she's not really a witness, but

16   she might be able to make some representations to give the

17   Court some comfort that everything Mr. Seery has said is true.

18          THE COURT:  I think that would be useful.  Is it Ms.

19   Anderson or who is it?

20          MS. ANDERSON:  That is -- it is, Your Honor.  And you

21   know, I appreciate the testimony given.  I certainly do not

22   want to testify, but thought it might be useful for the Court

23   to hear from us.

24       Amy Anderson on behalf of the Issuers from Jones Walker.

25   Schulte Roth also represents the Issuers.  And I can represent
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-53 Filed 12/07/23   Page 207 of 214   PageID 7377

260

1  to the Court that the agreement as it's represented on ==Docket==

2  ==1807==, as more particularly described in Exhibit C, which Your

3  Honor has seen, is the agreement reached between the Issuers

4  and the Debtor.

5      There was some testimony about fees owed, accrued fees

6  owed to the Debtor.  I certainly cannot speak to the substance

7  of each particular management agreement with each CLO.  They

8  are all distinct and unique and very lengthy documents.  I

9  will -- I can represent to the Court that any accrued fees

10  that are owed were not intended to be included in the release.

11  It is -- it is not meant to release fees owed to Highland

12  under the particular management agreements.

13      Of course, if the Court has any questions or if I can

14  provide anything further, I'm happy to.  And I will be on the

15  hearing today and tomorrow, but I thought it might be useful,

16  given the topic of the testimony this afternoon.

17          THE COURT:  All right.  That was useful.  Thank you,

18  Ms. Anderson.

19      All right.  Well, Mr. Morris, shall we go ahead and hear

20  from Mr. Dubel today, perhaps finish up a second witness?

21          MR. MORRIS:  Yeah.  I think we have the time.  I

22  think Mr. Dubel is here.  Are you here, Mr. Dubel?

23          MR. DUBEL:  I am.  Can you hear me, Your Honor?

24          THE COURT:  I can hear you, but I cannot see you.

25  Oh, now I can see you.  Please raise your right hand.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 53-55   Filed 12/07/23   Page 208 of 214   PageID 7378
Exhibit Exhibits 53-55   Page 2262 of 2269

Dubel - Direct                                    261

1              JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

2              THE COURT:  All right.  Thank you.  Mr. Morris, go

3    ahead.

4              MR. MORRIS:  Thank you very much, Your Honor.

5                        DIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Dubel, can you hear me?

8    A    I can, Mr. Morris.

9    Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13             MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   *C.V.* can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18             THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of

Dubel - Direct                                    262

1    management teams, and as a director, both an independent

2    director and a non-independent director.

3        My executive roles have included the -- both an executive

4    director, chief executive officer, president, chief

5    restructuring officer, chief financial officer.  And I have

6    been involved in some of the largest Chapter 11 cases over the

7    last several decades, including cases like *WorldCom* and

8    *SunEdison*.

9    Q    Let's focus your attention for a moment just on the

10   position of independent director.  Have you served in that

11   capacity before this case?

12   A    I have.

13   Q    Can you describe for the Court some of the cases in which

14   you've served as an independent director?

15   A    Sure.  I've served as an independent director in several

16   cases that were I'll call post-reorg cases.  *Werner Company*,

17   which was the largest climbing equipment manufacturer in the

18   world, manufacturer of ladders, Werner Ladders.  You'll see

19   them on every pickup truck running around the countryside.

20       *FXI Corporation*, which is a -- one of the largest foam

21   manufacturers.  Everybody's probably slept or sat on one of

22   their products.

23       *Barneys New York*, back in 2012, when they did an out-of-

24   court restructuring.  I had previously been involved with

25   Barneys 15 years before that, and so I was called upon because

007802

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit D Pg 153-5 Filed 12/04/23 Page 210 of 214    PageID 7380

Dubel - Direct                    263

1    of my knowledge to be an independent director in that

2    situation.  Have had no relationship with Barneys since it

3    emerged from Chapter 11 back in 1998.

4        I have been the independent director in *WMC Mortgage*,

5    which was a mortgage company owned by General Electric.

6        And I am currently serving as an independent director in a

7    company -- in two companies.  One, *Alpha Media*, which is a

8    large radio station chain that recently filed Chapter 11, I

9    believe it was late Sunday night, and I am also an independent

10   director in the *Purdue Pharma* bankruptcy, and have served

11   prior to the bankruptcy and am the chair of the special

12   independent committee of directors -- special committee of

13   independent directors in that particular situation.

14   Q    That sounds like a lot.  In terms of other fiduciary

15   capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16   involved in that case, and if so, how?

17   A    I was.  That was -- for those people who may remember it,

18   that goes back into the 1993 era.  *Leslie Fay* was a large

19   apparel manufacturer, and at the time was one of the largest

20   companies that had gone through an extensive fraud.  I say at

21   the time because it was about a $180 million fraud, which

22   pales by some of the ones that have followed it.

23       I was brought in as the executive vice president in charge

24   of restructuring, chief financial officer, and was also added

25   to the board of directors.  Even though I wasn't independent,

1    I was added to the board of directors to have the fresh face

2    on the board in that particular situation because of the fraud

3    that had taken place.

4    Q    And --

5    A    *Sun* --

6    Q    Go ahead.

7    A    *SunEdison*, I was brought in as the CEO.  Actually,

8    initially, as the chief restructuring officer, with a mandate

9    to replace the CEO, which took place shortly after I was

10   brought on board and -- because of various issues surrounding

11   investigations by the SEC, DOJ, and allegations by the

12   creditors of fraud.  And so I was brought in to run the

13   company through its Chapter 11 process.

14        As I'd mentioned earlier, *WorldCom*, I was brought in at

15   the beginning of the case as the fresh chief financial

16   officer.  And I think everybody is familiar with what happened

17   in the *WorldCom* situation.

18   Q    All right.  Based on that experience, do you have a view

19   as to whether the appointment of independent directors is

20   unusual?

21   A    It is not.  More recently, it has -- it had been in the

22   past.  Usually, you know, they would try and take the existing

23   directors and form a special committee of the existing

24   directors.  But I think the state of the art has become more

25   where independent directors are brought in, mainly because the

007804

Dubel - Direct                            265

1   cases have become a lot more complex in nature, and larger,

2   and the transactions themselves are much more sophisticated.

3   And so having somebody independent has been important for

4   analyzing the various transactions.  And also, quite often,

5   it's just bringing a fresh, independent voice to the company

6   on the board.

7   Q    Do you have an understanding as to the purpose and the

8   role of independent directors generally in restructuring and

9   bankruptcy cases?

10  A    Sure.  As I kind of alluded to a little bit earlier, the

11  -- probably the most critical thing is for restoring

12  confidence in the company and in the management in terms of

13  corporate governance, especially when there have been troubled

14  situations, where -- whether it's been fraud or allegations

15  made against the company and its prior management or when

16  management has left under difficult situations.

17       Also, you know, independent thought process being brought

18  to the board is very important for helping guide companies.

19  It's quite often the existing management team or the existing

20  board may get stuck in a rut, as you can say, you know, in

21  terms of their thinking on how to manage it, and having

22  somebody with restructuring experience who provides that

23  independent voice is very important to the operations.

24       In addition, having someone who can look at conflicts that

25  might arise between shareholders or shareholders and the board

Dubel - Direct                                        266

1   members is important.  As I mentioned earlier, the *WMC*

2   *Mortgage* situation was one where I was brought on to -- as an

3   independent member of the board to effectively negotiate an

4   agreement or a settlement between WMC and its parent, General

5   Electric.  That entity was being -- WMC was being sued for

6   billions of dollars, and there were issues as to whether or

7   not General Electric should fund those obligations.  And so

8   that was a role that is quite often occurring in today's day

9   and age.

10       In addition, evaluating transactions for companies is

11   important, whereby either the shareholders who sit on the

12   board or board members may be involved in those transactions,

13   needing an independent voice to review it.  And, you know, I

14   have served in situations.  Again, *Barneys New York* and *Alpha*

15   *Media* is another example where, as an independent director, I

16   am one of the parties responsible for evaluating those

17   transactions and making recommendations to the entire board.

18       And then, again, you know, situations where it's just

19   highly-contentious and having, as I said, having that

20   independent view brought to the table is something that is

21   very helpful in these cases.

22   Q   I appreciate the fulsomeness of the answer.  During the

23   time that you served in these various fiduciary capacities, is

24   it fair to say you spent a lot of time considering and

25   addressing issues relating to D&O and other executive

007806

Dubel - Direct                                    267

1  liability issues?

2  A    It's usually one of the things that you get involved with

3  thinking about prior to taking on the role because you want to

4  make sure that there are the appropriate protections for the

5  director.

6  Q    Can you describe for the Court some of the protections

7  that you've sought or that you've seen employed in some of the

8  cases you've worked on, including this one, by the way?

9  A    Sure.  I mean, one of the first things you look to is does

10 the company -- will the company indemnify the director for

11 serving in that capacity?  And if the company will not

12 indemnify, then there's always a question as to why not, and

13 it's probably something you don't want to get involved with.

14      Generally, that is something that I don't think I've ever

15 seen a case where there has not been indemnification.

16 Obviously, it would, you know, cause great pause or concern if

17 they weren't willing to indemnify.  But that is important.

18      Providing D&O insurance is very important.  And in most

19 situations, you know, over the last 10-15 years, if there's

20 not adequate D&O insurance -- quite often, the D&O insurance

21 has been tapped out because of claims that will -- have been

22 brought or are anticipated to be brought -- new D&O insurance

23 is something that's front and center for the minds of

24 independent directors such as myself.

25      As you -- that gets you into the case and gets you moving.

007807