**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

Appellant § 

vs. §

**Highland Capital Management, L.P, et al** § **3:23-CV-2071-E**

Appellee §

[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.

# Volume 32

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its
individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital
Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and
files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in
the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the
court to consider evidence and other non-pleading materials including, but not limited to,
the court's reasoning that:

1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type
analysis;

2.  the colorability analysis is "akin to the standards applied under the ... *Barton*
doctrine";

3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts
have applied when considering motions to file suit when a vexatious litigant bar
order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File
Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the
Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on
10/23/2023.

      4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

      1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

      2. Appellant's claims or allegations are not "plausible";

      3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

      4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

      5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

      6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

      7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

      8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

      9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

     10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

    1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

    2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*VOL. 1*

1.    **Notice of Appeal**

*000001*     a.    Notice of Appeal [**Dkt. 3906**];

*000276*     b.    Amended Notice of Appeal [**Dkt. 3908**]; and

*000551*     c.    Second Amended Notice of Appeal [**Dkt. 3945**]

2.    **The judgment, order, or decree appealed from:**

    a.    Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

*001049*

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru   Vol. 4*
*Vol 4*
*002236*
*002243*
*002248*

*Vol. 5*
*002251*
*002254*
*002262*
*002346*
*002355*
*002358*
*002391*
*002398*
*002400*
*Vol. 8*
*002826*
*Vol. 9*
*003257*
*003260*
*003270*
*003278*

| | | | |
|---|---|---|---|
| 03/30/2023 | 3706 | | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) *Thru Vol. 7* | | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) *Thru Vol. 9* | | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | |
|---|---|---|---|
| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *Vol. 10*<br>*003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760<br>(3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

---

| | | | Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Handwritten annotations in left margin:* Vol. 10 / 003458 / 003463 / Vol. 11 / 003537 / Thru Vol. 16 / Vol. 17 / 004465 / 004712 / 004714 / 004808 / 004813 / 004836 / Vol. 18 / 004930 / 004931

*Vol. 18*

*004939.*

*004959*

*004961*

*004984*

*005049*

*005114*

*Vol. 26*

*006608*

*Vol. 39*

*009273*

*009290*

*009416*

*009424*

| | | | |
|---|---|---|---|
| 05/25/2023 | 3798 (3798-1) | | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| 05/26/2023 | 3800 | | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) *Thru Vol. 25* | | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) *Thru Vol. 39* | | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|
| *009436* | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| *009444* | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| *009445* | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| *009446* | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009456* | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *009458 Vol. 42 Thru Vol. 41* | 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| *009841* | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| *009901* | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| *009905* | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| *009908* | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| *009912* | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

*Vol. 43*
*010135*
*010136*

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.    Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
       Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-53 Filed 12/07/23 Page 15 of 214    PageID 7399

Dubel - Direct                    268

```
 1   As you start to look towards the confirmation and exit from

 2   the case, things that would be appropriate, that, you know,

 3   would always be something you would want to look at would be

 4   exculpation language, releases.  And in this particular case,

 5   the injunction, or what Mr. Seery earlier referred to as the

 6   gatekeeper clause, is something that is very important for

 7   directors, both, you know, as they're thinking through it and

 8   as they emerge.

 9   Q    All right.  Let's shift now to this case, with that

10   background.  How did you learn about this case?

11   A    I had a party who was involved in the case reach out to me

12   in early part of December of 2019 to see if I would be

13   interested in getting involved.  I think that was about the

14   time -- it was after -- as I recall, it was after the case had

15   been moved to Dallas and when there was a -- consideration of

16   either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17   exactly which it was.  But there was talk about a motion to

18   bring on a trustee and get rid of all the management and the

19   like and such.

20   Q    Can you describe in as much detail as you can recall the

21   facts and circumstances that led to your appointment as an

22   independent director?

23   A    Sure.  I, as I said, I had -- early December, I had an --

24   one of the parties involved -- had, probably within the next

25   week, probably two or three others -- that reached out to see
```

007808

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 16 of 214   PageID 7400
Exhibit Exhibit 253 Page 207 of 692

Dubel - Direct                                         269

1    if I would be interested in participating.  I met with the

2    Creditors' Committee or -- I'm not sure if it was all the

3    members, but representatives of the Creditors' Committee,

4    along with counsel, and I believe financial advisors were

5    involved.  They walked me through the issues.  They wanted to

6    hear about my *C.V.*  Quite a few of them knew me, knew me well,

7    but others wanted to hear about my background and how I would

8    look at things as an independent director.

9         That went through into the latter part of December.  I

10   knew that they were talking to other parties.  I think it was

11   probably right around the first of the year or so that I was

12   informed, maybe a little bit earlier than that, that I was

13   informed that Mr. Seery was one of the other parties that they

14   were talking to, and Mr. Seery and I were put in touch with

15   each other.  I had worked with Mr. Seery back probably nine

16   years earlier when I was the CEO of FGIC.  He was involved in

17   a matter that we were restructuring, and so knew him a little

18   bit and was comfortable working with him as a, you know,

19   another independent director.

20        Then we took the time that we had to to -- or, I took the

21   time to -- from the beginning, you know, the early part of

22   December, look at the docket, understand what was taking

23   place.  I -- in addition, I met with the company and its

24   advisors, in-house counsel, the folks at DSI who were at the

25   time the CRO and the company's counsel to better understand

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-3 Filed 12/07/23  Page 17 of 214    PageID 7401

Dubel - Direct                                    270

1    some of the issues.

2        Mr. Seery and I, as I said, were both selected, and we

3    went through the process of, I guess, breaking the tie, I

4    think, if I could say it that way, amongst the creditors and

5    the Debtor as to who would be the third member of the board.

6    And we were given the opportunity to go out, interview, and

7    select the third member, which resulted in Russell Nelms'

8    appointment to the board.  And also during that time, we were

9    given the opportunity to have some input -- not a hundred

10   percent input, but some input -- on the January 9th order that

11   -- the January 9, 2020 order that was put in place appointing

12   us and giving us some of the protections that we felt were

13   appropriate and necessary in this case.

14   Q    All right.  We'll get to that in a moment, but during this

15   diligence period, did you form an understanding as to why an

16   independent board was being formed, why it was being sought?

17   A    Yes.  There was, my words, there was a lot of distrust

18   between the creditors and the management -- not the CRO, but

19   the prior management of the company -- and there had been a

20   motion brought both to obviously bring the case back to Dallas

21   from I think it was originally in Delaware and then there was

22   a motion to seek, you know, to remove management and put in a

23   trustee.

24       There had been a dozen years of litigation with one party,

25   about eight or nine years with another major party, and

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 263-3 Filed 12/07/23   Page 18 of 214   PageID 7402

Dubel - Direct                                    271

1    several other of the major creditors were litigants.  The

2    other, as I understood, the other creditors, main creditors in

3    the case were all lawyers who had not yet gotten paid for the

4    litigation work that they had done.  And so it was obvious

5    that this was a very -- a highly-litigious situation.

6    Q    In addition to speaking with the various constituents, did

7    you do any diligence on your own to try to understand the case

8    before you accepted the appointment?

9    A    Yes.  I went to the docket to look at all the -- not every

10   single thing that had been filed, but to try and look at all

11   the key, relevant items that had been filed, get a better

12   understanding of what was out there.  Looked at some of the

13   initial filings of the company in terms of the, you know, the

14   creditors, to understand who the creditor base was per the

15   schedules that had been filed.  Looked at the -- some of the

16   various pleadings that had been put in place.

17   Q    Did you form a view as to the causes of the bankruptcy

18   filing?

19   A    Litigation.  That was my clear view.  This company had

20   been in litigation with multiple parties, various different

21   parties, since around 2008.  Generally, you would see

22   litigation like the types that were, you know, that were here,

23   you know, you'd litigate for a while, then you'd try and

24   settle it.

25        It did not appear to me that there was any intention on

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Page 19 of 214   PageID 7403

Dubel - Direct                                    272

```
 1   the -- the Debtor to settle these litigations, but would

 2   rather just continue the process and proceed forward on the

 3   litigation until the very last minute.  And so it was obvious

 4   that this was going to -- that the Debtor was a, as I said, a

 5   highly-litigious shop, and that was one of the causes,

 6   obviously, the cause of the filing, along with the fact that

 7   judgments were about to be entered against the Debtor.

 8   Q    All right.  And in January 2020, do you recall that's when

 9   the agreement was reached between the Debtor, the Committee,

10   and Mr. Dondero?

11   A    Yeah, it was the first week or so, which resulted in a

12   hearing on I believe it was January 9th in front of Judge

13   Jernigan.

14   Q    And as a part of that -- I think you testified at that

15   hearing.  Do I have that right?

16   A    I don't recall if I did.  I might have.  I might have

17   testified at a subsequent hearing.  But --

18   Q    But was --

19   A    -- I was in the courtroom for that hearing, yes.

20   Q    Was it part of that process by which you accepted the

21   appointment as independent director?

22   A    I accepted it based upon the order that had been

23   negotiated amongst the parties, the creditors, the Debtor, Mr.

24   Dondero, and others.  And that was the key thing that was --

25   and approved by the Court on that date.  And that was key for
```

1    my acceptance of the role as an independent director.

2    Q    And did you and the other prospective independent

3    directors participate in the negotiation of the substance of

4    the agreement?

5    A    We did.  We didn't have a hundred percent say over it, but

6    we were able to get our voices heard.  As Mr. Seery testified

7    earlier, he was instrumental in coming up with an idea about

8    how to put in place the injunction, you know, the -- I think

9    he referred to it as the gatekeeper injunction, which was

10   obviously in this case very critical to all three of us:  Mr.

11   Seery, Mr. Nelms, and myself.

12   Q    Can you describe for the Court kind of the issues of

13   concern to you and the other prospective board members?  What

14   was it that you were focused on in terms of the negotiations?

15   A    Well, obviously, indemnification was important, but that

16   was something that was going to be granted.  Having the right

17   to obtain separate D&O insurance just for the three directors

18   was important.  We were concerned that Strand Advisors, Inc.

19   really had no assets, and so we wanted to make sure that the

20   Debtor was going to get -- was going to basically guarantee

21   the indemnification.

22        The -- because of the litigious nature and what we had

23   heard from all of the various parties involved, including

24   people inside the Debtor who we had talked with, that it would

25   be something that was important for us to make sure that the

007813

1    injunction, the gatekeeper injunction was put in place.

2    Q    And can you elaborate a little bit on I think you said you

3    had done some diligence and you had formed a view as to the

4    causes of the bankruptcy filing, but did this case present any

5    specific concerns or issues that you and the board members had

6    to address perhaps above and beyond what you experienced in

7    some of the other cases you described?

8    A    Well, as I said earlier, the fact that the litigation --

9    the various litigations with the creditors have been going on

10   for what I viewed as an inordinate amount of years, and that

11   it was clear from my diligence that I had done that this had

12   been directed by Mr. Dondero, to keep this moving forward in

13   the litigation, and to, in essence, just, you know, never give

14   up on the litigation.

15       It was important that the types of protections that we

16   were afforded in the January 9th order were put in place,

17   because we -- none of us -- none of the three of us, and

18   myself in particular, did not want to be in a position where

19   we would be sued and harassed through lawsuits for the next,

20   you know, ten years or so.  That's not something anybody would

21   want to sign up for.

22   Q    All right.  Let's look at the January 9th order and the

23   specific provisions I think that you're alluding to.

24             MR. MORRIS:  Can we call up Exhibit 5Q, please?

25             THE WITNESS:  Pardon me while I put my glasses on to

1   read this.

2            MR. MORRIS:   All right.  And if we can go to

3   Paragraph 4.

4   BY MR. MORRIS:

5   Q    Is that the paragraph, sir, that was intended to address

6   the concern that you just articulated about Strand not having

7   any assets of its own?

8   A    Yes, it is.

9   Q    And can you just describe for the Court how that

10  particular provision addressed that concern?

11  A    Sure.  Since we were directors of Strand, which is the

12  general partner of the Debtor, we felt it was important that

13  the general -- that Highland, the Debtor, would provide the

14  guaranty on indemnification, because Highland had the assets

15  to back up the indemnification.

16       It was also pretty clear, from my experience in having

17  placed D&O insurance, you know, over the last 25-30 years,

18  that if there was no, you know, opportunity for

19  indemnification, putting in place insurance would be very

20  difficult or exorbitantly expensive.  So having this

21  indemnification by Highland was a very important piece of the

22  order that we were seeking.

23  Q    And the next piece is the insurance piece in Paragraph 5.

24  Do you see that?

25  A    I do.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-35 Filed 12/07/23   Page 23 of 214   PageID 7407

Dubel - Direct                                        276

 1   Q    Did you have any involvement in the Debtor's efforts to

 2   obtain D&O insurance for the independent board?

 3   A    I did.

 4   Q    Can you just describe for the Court what role you played

 5   and what issues came up as the Debtor sought to obtain that

 6   insurance?

 7   A    Sure.  The Debtors had been looking to get an insurance

 8   policy in place.  They were not able to do that.  I happen to

 9   have worked with an insurance broker on D&O situations in some

10   very difficult situations over the years and brought them into

11   the mix.  They were able to go out to the market and find a

12   policy that would cover us, the -- kind of the key components

13   of that policy, though, were, number one, the guaranty that

14   HCMLP would give -- I'm sorry, the guaranty that HCMLP would

15   give to Strand's obligations, and also the -- I'll call it the

16   gatekeeper provision was very important because these parties

17   did not want to have -- they wanted to have what was referred

18   to, commonly referred to as the Dondero Exclusion.

19        So while we were -- we purchased a policy that covered us,

20   it did have an exclusion, unless there were no assets left,

21   and then the what I'll call -- we refer to as kind of a Side A

22   policy would kick in.

23   Q    Okay.  What do you mean by the Dondero Exclusion?

24   A    The insurers did not want to cover the -- any litigation

25   that Mr. Dondero would bring against directors.  It was pretty

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-53 Filed 12/07/23  Page 24 of 214    PageID 7408
Page 24 of 214

Dubel - Direct                                    277

1    commonly known in the marketplace that Mr. Dondero was very

2    litigious, and insurers were not willing to write the

3    insurance without the protections that this order afforded

4    because they did not want to be hit with frivolous -- hit with

5    claims on the policy for frivolous litigation that might be

6    brought.

7            MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8    got to object to the last answer.  He testified as to what the

9    insurers' belief was and what they would or would not do based

10   upon their own knowledge.  It's not within his personal

11   knowledge.  And therefore we'd move to strike.

12           THE COURT:  I overrule that objection.

13           MR. MORRIS:  Your Honor?

14           THE COURT:  I overrule the objection.

15           MR. MORRIS:  Thank you.  Thank you, Your Honor.

16   BY MR. MORRIS:

17   Q   Mr. Dubel, can you explain to the Court, in your work in

18   trying to secure the D&O insurance, what rule the gatekeeper

19   provision played in the Debtor's ability to get that?

20   A   Based upon my discussions with the insurance broker, who I

21   have worked with for 25-plus years, had that gatekeeper

22   provision not been put in place, we would not have been able

23   to get insurance.

24   Q   All right.  Let's look at the gatekeeper provision.

25           MR. MORRIS:  Can we go down to Paragraph 10, please?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/23   Page 25 of 214   PageID 7409

Dubel - Direct                                        278

1    Perfect.  Right there.

2    BY MR. MORRIS:

3    Q    Is this gatekeeper provision, is this also the source of

4    the exculpation that you referred to?

5    A    Yes.

6    Q    And what's your understanding of how the exculpation and

7    gatekeeper functions together?

8    A    Well, my apologies, I'm not an attorney, so just from a

9    business point of view, the way I look at this is that, you

10   know, obviously, we're -- you know, the directors are not

11   protected from willful misconduct or gross negligence, but any

12   negligence -- you know, claims brought under negligence and

13   the likes of such, and things that might be considered

14   frivolous, would have to first go to Your Honor in the

15   Bankruptcy Court for a review to determine if they were claims

16   that should be entitled to be brought.

17   Q    If you take a look at the provision, right, do you

18   understand that nobody can bring a claim without -- in little

19   i, it says, first determining -- without the Court first

20   determining, after notice, that such claim or cause of action

21   represents a colorable claim of willful misconduct or gross

22   negligence against an indirect -- independent director.  Do

23   you see that?

24   A    I do.

25   Q    Is it your understanding that parties can only bring

```
 1   claims for gross negligence or willful misconduct if the Court

 2   makes a determination that there is a colorable claim?

 3   A    That's my understanding.

 4   Q    And the second --

 5   A    I think they have the right -- I think they have the right

 6   to go to the Court to ask if they can bring the claim, but the

 7   Court has to make the determination that it's a colorable

 8   claim for willful misconduct or gross negligence.

 9   Q    And if the Court -- is it your understanding that if the

10   Court doesn't find that there is a colorable claim of willful

11   misconduct or gross negligence, then the claim can't be

12   brought against the independent directors?

13   A    That is my understanding, yes.

14   Q    And was -- taken together, Paragraphs 4, 5, and 10, were

15   they of importance to you and the other independent directors

16   before accepting the position?

17   A    They were absolutely critical to me and definitely

18   critical to the other directors, because we all negotiated

19   that together, and it would -- I don't -- I don't think any of

20   the three of us would have taken on this role if those

21   paragraphs had not been included in the order.

22   Q    Okay.  Just speaking for yourself personally, is there any

23   chance you would have accepted the appointment without all

24   three of those provisions?

25   A    I would not have.
```

```
 1   Q    And why is that?  In this particular case, why did you

 2   personally believe that you needed all three of those

 3   provisions?

 4   A    Well, you know, people like myself, you know, someone

 5   who's coming in as an independent director, come in in a

 6   fiduciary capacity.  And, you know, we take on risks.  Now,

 7   granted, in a Chapter 11 case, as the saying goes, you know,

 8   it's a lot safer because everything has to be approved by the

 9   Court, but there are still opportunities for parties to, in

10   essence, have mischief going on and bring nuisance lawsuits

11   that would take a lot of time and effort away from either the

12   role of our job of restructuring the entity or post-

13   restructuring, would just be nuisance things that would cost

14   us money.  And we, you know, I did not want to be involved in

15   that situation, knowing the litigious nature of Mr. Dondero

16   from the research that I had done, you know, the diligence

17   that I had done.  I did not want to subject myself to that.

18   And it has proven an appropriate and very solid order because

19   of the conduct of Mr. Dondero, as Mr. Seery has testified to

20   earlier.

21   Q    Do you have a view as to what the likely effect would be

22   on future corporate restructurings if you and your fellow

23   directors weren't able to obtain the type of protection

24   afforded in the January 9th order?

25   A    I think it would be very difficult to find qualified
```

007820

1   people who would be willing to serve in these types of

2   positions if they knew they had a target on their backs.  You

3   know, it was something that was clear to us, to Mr. Seery, Mr.

4   Nelms, myself at the time, that if we had a target -- we felt

5   like we would have a target on our back if we didn't have

6   these protections.

7        It just wasn't worth the risk, the stress, the

8   uncertainty, the potential cost to us.  And so I don't think

9   anybody else would be, you know, willing to take on the roles

10  as an independent director with the facts and circumstances

11  and the players involved in this particular case.

12          MR. MORRIS:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Pass the witness.  Let's see.

14  You went -- I'm going to give a time.  You went 32 minutes.

15  So, for cross of this witness, I'm going to limit it to an

16  aggregate of 32 minutes.  Who wants to go first?

17          MR. DRAPER:  Your Honor, this is Douglas Draper.

18  I'll be happy to go first.

19          THE COURT:  All right.

20                      CROSS-EXAMINATION

21  BY MR. DRAPER:

22  Q   Mr. Dubel, prior to your engagement, did you happen to

23  read the case of *Pacific Lumber*?

24  A   I did not.

25  Q   And were you advised about *Pacific Lumber* by somebody

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53 Filed 12/07/283 Page 29 of 214   PageID 7413

Dubel - Cross                                              282

```
 1  other than a -- your lawyer?

 2  A    I'm not familiar with the case at all, Mr. Draper.

 3  Q    Are you aware, and you've been around a long time, that

 4  different circuits have different rules for liabilities of

 5  officers, directors, and people like that?

 6  A    I am aware that there are different, I don't know what the

 7  right term is, but precedents, I guess, in different circuits

 8  for any number of things, whether it's a sale motion or

 9  protections of officers and directors or anything.  So each

10  circuit has its own unique situations.

11  Q    And one last question.  On a go-forward, after -- if this

12  plan is confirmed and on the effective date, you will not have

13  any role whatsoever as an officer or director of the new

14  general partner, correct?

15  A    I have not been asked to.  As Mr. Seery testified, he may

16  ask for assistance or just -- in most situations that I'm

17  involved with, I may have a continuing role just as a -- I'll

18  call it an advisor or somebody to provide a history.  But at

19  this point in time, I have not been asked to have any

20  involvement.

21  Q    And based on your experience, you know that there's a

22  different liability for a director and an officer versus

23  somebody who is an advisor?

24          MR. MORRIS:  Objection to the form of the question.

25  No foundation.
```

1            THE COURT:  Overruled.

2            MR. DRAPER:  Mr. Dubel has shown --

3            THE COURT:  Mr. Dubel, you can answer if you know.

4            MR. DRAPER:  Mr. Dubel, you can answer.

5            THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6    you say overruled.  Thank you.

7        Mr. Draper, I apologize, could you repeat the question?

8    BY MR. DRAPER:

9    Q    The question is you know from your experience that there's

10   a different liability for somebody who is an officer or

11   director versus somebody who's an advisor?

12   A    Yes, that's my experience, which is why in several

13   situations post-reorganization, while I have not been involved

14   *per se*, and I use the term involved meaning, you know, on a

15   day-to-day basis, if someone asks me to assist, I'll usually

16   ask them to bring me in as a non -- an unpaid employee or a,

17   you know, a nominally-amount-paid employee, so that I would be

18   protected by whatever protections the company might provide.

19            MR. DRAPER:  I have nothing further for this witness,

20   Your Honor.

21            THE COURT:  All right.  Other cross?

22            MR. TAYLOR:  Yes, Your Honor.

23            MR. RUKAVINA:  Yes, Your Honor.

24            MR. TAYLOR:  Oh, go ahead, Davor.

25            MR. RUKAVINA:  No, Clay, go ahead.

Dubel - Cross                          284

                         CROSS-EXAMINATION

1

2    BY MR. TAYLOR:

3    Q   Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4    Dondero.  I believe you had previously testified in response

5    to questions from Mr. Morris that Mr. Dondero had engaged in a

6    pattern of litigious behavior; is that correct?

7    A   I believe that's the testimony I gave, yes.

8    Q   Okay.  And please give me the specific examples of which

9    cases you believe he has engaged in overly-litigious behavior.

10   A   Well, all of the cases that resulted in creditors, large

11   creditors in our bankruptcy.  That would be the UBS situation,

12   the Crusader situation which became the Redeemer Committee,

13   litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14   as I mentioned earlier, I'd, you know, been informed by

15   members of the management team that it was Mr. Dondero's style

16   to just litigate until the very end to try and grind people

17   down.

18   Q   Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19   in the UBS case?

20   A   No, but what was referred -- what I was referring to was

21   the nature in which he defended it and went overboard and

22   refused to ever, you know, try and settle things in a manner

23   that would have gotten things done.  And just looking at,

24   having been involved in the restructuring industry for the

25   last 40 years, as I said, almost 40 years, and been involved

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-3 Filed 12/07/286 Page 32 of 214    PageID 7416

Dubel - Cross                                    285

1    in many, many litigious situations, it's obvious when someone

2    is litigious, whether they're the plaintiff or the defendant.

3    Q    So are you personally familiar with the settlement

4    negotiations in the UBS case that happened pre-bankruptcy,

5    then?

6    A    I have been informed that there were settlement

7    negotiations, and subsequently determined, through discussions

8    with the parties, that they weren't really close to -- to a

9    settlement.

10    Q    But are you aware of --

11    A    Mr. Dondero might have thought they were, but they were

12    not.

13    Q    Okay.  Would you be surprised to learn if UBS had offered

14    to settle pre-bankruptcy for $7 million?

15    A    As I understand, settlements -- settlement offers pre-

16    bankruptcy had a tremendous number of -- I don't know what the

17    right term is -- things tied to it and that clearly were never

18    going to get done.

19    Q    Okay.  When you say things were tied to it, what things

20    were tied to it?

21    A    I don't know all of the settlement discussions that took

22    place, but what I was informed was that there were a lot of

23    conditions that were included in that.  And it's -- if it had

24    been an offer of $7 million and Mr. Dondero didn't settle for

25    that, there must have been a reason why.  So, you know, since

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 33 of 214   PageID 7417
Exhibit Exhibit 253-58   Page 7 of 69

Dubel - Cross                                                    286

1    the entities -- all of the entities within the Highland

2    Capital empire, if you'd call it that, were being sued for

3    almost a billion dollars.

4    Q   Okay.  And you say there was lots of conditions that were

5    tied to that.  What were the conditions?

6    A   As I said earlier, I wasn't informed of them on all the

7    prepetition settlements.  That's just what I was told, there

8    was conditions.

9    Q   Okay.  And who were you told these things by?

10   A   Both external counsel and internal counsel.  Mr.

11   Ellington, Scott Ellington, and Isaac -- the litigation

12   counsel.

13   Q   Okay.  So --

14   A   That's -- sorry.

15   Q   Okay.  In each of these cases, you were informed by your

16   views by statements that were made to you by other people?

17   A   Yes.

18   Q   Okay.

19   A   Made -- and particularly made by members of management of

20   the Debtor, which is pretty informed.

21   Q   Okay.  Which members of management were those?

22   A   As I just testified, it was Mr. Ellington, who was the

23   general -- the Debtor's general counsel, and Mr. Leventon,

24   Isaac Leventon, who was the -- I believe his title was

25   associate general counsel in charge of litigation.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-23 Filed 12/07/23    Page 34 of 214    PageID 7418

Dubel - Cross                              287

1   Q    Okay.  Thank you.

2            MR. TAYLOR:  No further questions.

3            THE COURT:  All right.  Mr. Rukavina?

4                    CROSS-EXAMINATION

5   BY MR. RUKAVINA:

6   Q    Mr. Dubel, we've never met, although I think we were on

7   the phone once together.  I know you're a director, so you're

8   at the top, but having been in this case for more than a year,

9   you probably have some understanding of the assets that the

10  Debtor has, don't you?

11  A    I do, but I'm not as facile with it as Mr. Seery,

12  obviously.

13  Q    Sure.  Is it true, to your understanding, that the Debtor

14  owns various equity interests in third-party companies?

15  A    Either directly or indirectly.  That's my understanding,

16  yes.

17  Q    Okay.  Have you heard of an entity called Highland Select

18  Equity Fund, LP?

19  A    I have.

20  Q    And is that a publicly-traded company?

21  A    I'm not familiar with its nature there, no.

22  Q    Do you know how much of the equity of that entity the

23  Debtor owns?

24  A    I don't know off the top of my head, no.

25  Q    And again, these may be unfair questions because you're at

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 253-5   Filed 12/07/23   Page 35 of 214   PageID 7419

Dubel - Cross                                                      288

<pre>
 1    the top, so I'm not trying to make you look foolish.  I'm just

 2    trying to see.  Let me ask one more.  Have you heard of

 3    Wright, W-R-I-G-H-T, Limited?

 4            MR. MORRIS:  Objection, Your Honor.  Beyond the

 5    scope.

 6            MR. RUKAVINA:  Your Honor, I can recall him on my

 7    direct, then.

 8            THE COURT:  Yeah.  I'll --

 9            MR. RUKAVINA:  But I'd just rather get it over with.

10            THE COURT:  I'll allow it.

11            MR. MORRIS:  All right.  If we're going to get rid of

12    --

13            THE COURT:  Overruled.

14            MR. MORRIS:  No, that's fine.

15    BY MR. RUKAVINA:

16    Q   Have you heard of Wright, W-R-I-G-H-T, Limited?

17    A   I think I have, but I just don't recall it, Mr. Rukavina.

18    I'm sorry, Rukavina.  Sorry.

19    Q   It's okay.  It's a --

20    A   I'm looking at your chart here, at your name here, and it

21    looks like Drukavina, so I really apologize.

22    Q   Believe it or not, it's actually a very famous name in

23    Croatia, although it means nothing here.

24        So, all of the entities that the Debtor owns equity in, I

25    guess you probably, just because, again, you're not in the
</pre>

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 36 of 214   PageID 7420

Dubel - Cross                                289

 1   weeds, you can't tell us how much of that equity the Debtor

 2   owns, can you?

 3   A   I can't individually, no.  You know, Mr. Seery is our CEO

 4   and he's responsible for the day-to-day, you know, issues.  So

 5   usually we look at it more on a consolidated basis and not in

 6   the, you know, down in the weeds, as you refer to it, unless

 7   something specific came up.

 8   Q   Well, would you remember whether, when Mr. Seery or the

 9   prior CRO would provide you, as the board member, financial

10   reports, whether that included P&Ls and balance sheets and

11   financial reports for the entities that the Debtor owned

12   interests in?

13   A   We might -- we would have seen certain consolidating

14   reports that might -- that would be, you know, consolidating

15   financial statements that would be P&Ls.  Where we didn't

16   consolidate them, I'm not sure we saw the actual individual-

17   entity P&Ls on a regular basis.  We might have seen them if

18   there was a transaction taking place.  But again, you know, I

19   don't have -- I don't remember every single one of them, no.

20   Q   And you would agree with me, sir, that the Pachulski law

21   firm is an excellent restructuring, reorganization, insolvency

22   law firm, wouldn't you?

23   A   Yes, I would agree with you there.

24   Q   Okay.  And you would expect them to ensure that anything

25   that has to be filed with Her Honor is timely filed, wouldn't

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/291 of 692 37 of 214   PageID 7421

Dubel - Cross                                    290

 1  you?

 2  A    I would expect that they would follow the rules.

 3  Q    Okay.  And you have the utmost of confidence, I take it,

 4  in your CRO, don't you?

 5  A    I have a tremendous amount of confidence in our CEO, who

 6  also happens to hold the title of CRO, yes, if that's what

 7  you're referring to as, Mr. Seery.

 8       (Interruption.)

 9            MR. RUKAVINA:  John.

10  BY MR. RUKAVINA:

11  Q    Okay, I think -- yeah, I think I heard that you have

12  tremendous confidence in the CEO, who happens to be the CRO,

13  right?

14  A    Yes, that's the case.

15            MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16  witness.

17            THE COURT:  All right.  Any other cross of Mr. Dubel?

18       All right.  Mr. Morris, redirect?

19            MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                        REDIRECT EXAMINATION

21  BY MR. MORRIS:

22  Q    You were asked about that *Pacific Lumber* case, Mr. Dubel;

23  do you remember that?

24  A    I do remember being asked about it.

25  Q    And you weren't familiar with that case, right?

1  A    I'm not familiar with the name of the case, no.

2  Q    But you did know that the exculpation and gatekeeping

3  provisions were going to be included in the order; is that

4  fair?

5  A    I did.

6  Q    And did you testify that you wouldn't have accepted the

7  position without it?

8  A    I did testify that way.

9  Q    And if you knew that you couldn't get those provisions in

10  the Fifth Circuit, would you ever accept a position as an

11  independent director in the Fifth Circuit on a go-forward

12  basis?

13  A    Not in a situation such as this, no.

14  Q    Okay.  Okay.

15         MR. MORRIS:  No further questions, Your Honor.

16         THE COURT:  All right.  Any recross on that narrow

17  redirect?

18     All right.  Well, Mr. Dubel, you are excused from the

19  virtual witness stand.

20         THE WITNESS:  Thank you, Your Honor.

21         THE COURT:  All right.  I want to go ahead and --

22         MR. DUBEL:  Do you mind if I turn my video off?

23         THE COURT:  I'm sorry, what?

24         MR. DUBEL:  I said, do you mind if I turn my video

25  off?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 39 of 214   PageID 7423

292

1            THE COURT:  No, you may.  That's fine.

2            MR. DUBEL:  Thank you, Your Honor.

3            THE COURT:  All right.  I want to break now, unless

4    there's any quick housekeeping matter.  Anything?

5            MR. MORRIS:  No, Your Honor, but I would just ask

6    all parties to let me know by email if they have any

7    objections to any of the exhibits on the witness list that was

8    filed at ==Docket No. 1877==, because I want to begin tomorrow by

9    putting into evidence the balance of our exhibits.

10            MR. RUKAVINA:  And Your Honor, I was responsible for

11    this due to an internal mistake.  The only ones I have an

12    objection to are -- is that 7?  John, is that 7, right, 7OO --

13            MR. MORRIS:  Yes.

14            MR. RUKAVINA:  Your Honor, I only have an objection

15    to 7O and 7P, although I think -- think the Court has already

16    admitted 7P, so my objection is moot.

17            THE COURT:  I have.

18            MR. RUKAVINA:  Okay.

19            THE COURT:  So, what --

20            MR. RUKAVINA:  Then it would just be --

21            THE COURT:  Go ahead.

22            MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23    Septuple O or whatever the word is.

24            THE COURT:  All right.  So I will go ahead and admit

25    7F through 7Q, with the exception of 7O.  Again, these appear

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 11/07/23   Page 40 of 214   PageID 7424

293

1    at Docket Entry 1877.  And Mr. Morris, you can try to get in

2    7O the old-fashioned way if you want to.

3             MR. MORRIS:  Yeah, I'll deal with 7O and the very

4    limited number of other objections at the beginning of

5    tomorrow's hearing.

6             THE COURT:  All right.

7         (Debtor's Exhibits 7F through 7Q, with the exception of

8    7O, are received into evidence.)

9             THE COURT:  So we will reconvene at 9:30 Central time

10   tomorrow.  I think we're going to hear from the Aon, the D&O

11   broker, Mr. Tauber; is that correct?

12            MR. MORRIS:  That's right.  And that should be

13   shorter than even Mr. Dubel.

14            THE COURT:  All right.  Well, we will see you at 9:30

15   in the morning.  We are in recess.

16            MR. MORRIS:  Thank you so much.

17            THE CLERK:  All rise.

18        (Proceedings concluded at 5:09 p.m.)

19                          --oOo--

20                         CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                           **02/04/2021**

24   _____     _____
     Kathy Rehling, CETD-444                           Date
25   Certified Electronic Court Transcriber

007833

294

INDEX

PROCEEDINGS                                                       5

OPENING STATEMENTS

- By Mr. Pomerantz                                              12
- By Mr. Kathman                                               29
- By Mr. Clemente                                              33
- By Mr. Draper                                                40
- By Mr. Rukavina                                              42
- By Mr. Taylor                                                44
- By Mr. Kathman                                               49
- By Ms. Drawhorn                                              50

WITNESSES

Debtor's Witnesses

James P. Seery
- Direct Examination by Mr. Morris                             58
- Cross-Examination by Mr. Rukavina                           169
- Cross-Examination by Mr. Taylor                             212
- Cross-Examination by Mr. Draper                             233
- Redirect Examination by Mr. Morris                          236
- Recross-Examination by Mr. Rukavina                         249
- Recross-Examination by Mr. Taylor                           255

John S. Dubel
- Direct Examination by Mr. Morris                            261
- Cross-Examination by Mr. Draper                             281
- Cross-Examination by Mr. Taylor                             284
- Cross-Examination by Mr. Rukavina                           287
- Redirect Examination by Mr. Morris                          290

EXHIBITS

Debtor's Docket 1822 Exhibits                        Received  55
   (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
    5T, 6R, 6S, 6T, and 6U)
Debtor's Docket 1866 Exhibits                        Received  56
Debtors' Exhibits 7F through 7Q (exclusive of        Received 293
    Exhibit 7O)
Debtor's Exhibit 7P                                  Received 140
Debtor's Exhibit 7Q                                  Received  75

295

 1                              INDEX
 2                             Page 2

 3    RULINGS

 4    Confirmation Hearing [1808] - *Continued to 2/3/2021*      293

 5    Agreed Motion to (1) Assume Non-Residential Real Property   293
      Lease with Crescent TC Investors, LP upon Confirmation of
 6    Plan and (II) Extend Assumption Deadline [1624] -
      *Continued to 2/3/2021*
 7
      END OF PROCEEDINGS                                          293
 8
      INDEX                                                    294-295
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

007835

# HMIT Exhibit No. 54

007836

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                    )    Case No. 19-34054-sgj-11
3   In Re:                          )    Chapter 11
                                    )
4   HIGHLAND CAPITAL                )    Dallas, Texas
    MANAGEMENT, L.P.,               )    Wednesday, February 3, 2021
5                                   )    9:30 a.m. Docket
            Debtor.                 )
6                                   )    CONFIRMATION HEARING [1808]
                                    )    AGREED MOTION TO ASSUME [1624]
7                                   )
                                    )    Continued from 02/02/2021
8   _____)

9                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                UNITED STATES BANKRUPTCY JUDGE.

11  WEBEX APPEARANCES:

12  For the Debtor:             Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
13                              10100 Santa Monica Blvd.,
                                 13th Floor
14                              Los Angeles, CA  90067-4003
                                (310) 277-6910
15
    For the Debtor:             John A. Morris
16                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
17                              New York, NY  10017-2024
                                (212) 561-7700
18
    For the Debtors:            Ira D. Kharasch
19                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
20                               13th Floor
                                Los Angeles, CA  90067-4003
21                              (310) 277-6910

22  For the Official Committee  Matthew A. Clemente
    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
23                              One South Dearborn Street
                                Chicago, IL  60603
24                              (312) 853-7539

25
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/299   Page 45 of 214   PageID 7429

2

```
 1    APPEARANCES, cont'd.:

 2    For James Dondero:          Clay M. Taylor
                                  BONDS ELLIS EPPICH SCHAFER
 3                                  JONES, LLP
                                  420 Throckmorton Street,
 4                                  Suite 1000
                                  Fort Worth, TX  76102
 5                                (817) 405-6900

 6    For Get Good Trust and      Douglas S. Draper
      Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
 7                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
 8                                (504) 299-3300

 9    For Certain Funds and       Davor Rukavina
      Advisors:                   Julian Vasek
10                                MUNSCH, HARDT, KOPF & HARR
                                  500 N. Akard Street, Suite 3800
11                                Dallas, TX  75201-6659
                                  (214) 855-7587
12
      For the NexPoint            Lauren K. Drawhorn
13    Parties:                    WICK PHILLIPS
                                  3131 McKinney Avenue, Suite 100
14                                Dallas, TX  75204
                                  (214) 692-6200
15
      For the U.S. Trustee:       Lisa L. Lambert
16                                OFFICE OF THE UNITED STATES
                                    TRUSTEE
17                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
18                                (214) 767-8967

19    For Scott Ellington,        Debra A. Dandeneau
      Isaac Leventon, Thomas      BAKER & MCKENZIE, LLP
20    Surgent, and Frank          452 Fifth Avenue
      Waterhouse:                 New York, NY 10018
21                                (212) 626-4875

22    For Certain Funds and       A. Lee Hogewood, III
      Advisors:                   K&L GATES, LLP
23                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
24                                Raleigh, NC  27609
                                  (919) 743-7306
25
```

007838

3

```
 1   Recorded by:              Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
 2                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
 3                             (214) 753-2062

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.
25
```

007839

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23 Page 47 of 214   PageID 7431

4

1      DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.

2           THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5           THE COURT:  Good morning.  Please be seated.  All

6    right.  We are ready for Day Two of the confirmation hearing

7    in Highland Capital Management, LP, Case No. 19-34054.  I'll

8    just make sure we've got the key parties at the moment.  Do we

9    have Mr. Pomerantz, Mr. Morris, for the Debtor team?

10          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

11   Pomerantz for the Debtors.

12          MR. MORRIS:  And I'm here as well, Your Honor.

13          THE COURT:  All right.  Good.

14       All right.  For our objecting parties, do we have Mr.

15   Taylor and your crew for Mr. Dondero?

16          MR. TAYLOR:  Yes, Your Honor.

17          THE COURT:  Good morning.

18       All right.  For Dugaboy Trust and Get Good Trust, do we

19   have Mr. Draper?  (No response.)  All right.  I do see Mr.

20   Draper.  I didn't hear an appearance.  You must be on mute.

21          MR. DRAPER:  I'm present, --

22          THE COURT:  Okay.

23          MR. DRAPER:  -- Your Honor.

24          THE COURT:  Okay.  Good morning.

25          MR. DRAPER:  I'm present, Your Honor.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23 Page 48 of 214   PageID 7432
Page 202 of 692

5

1          THE COURT:  Good morning.  I heard you that time.

2  Thank you.

3     All right.  And now for what I'll call the Funds and

4  Advisors Objectors, do we have Ms. Rukavina present?

5          MR. RUKAVINA:  Yes, Your Honor.  Good morning.

6          THE COURT:  Good morning.  All right.  And I will

7  check.  Do we have Mr. Clemente or your team there?

8          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

9  Clemente from Sidley Austin on behalf of the Committee.

10         THE COURT:  All right.  Ms. Drawhorn, do we have you

11 there for the NexPoint Real Estate Partners and related funds?

12         MS. DRAWHORN:  Yes, Your Honor.  Good morning.

13         THE COURT:  Good morning.  All right.  Did I miss --

14 I think that captured all of our Objectors.  Anyone who I've

15 missed?

16    All right.  Well, when we recessed yesterday, Mr. Morris,

17 I think you were about to call your third witness; is that

18 correct?

19         MR. MORRIS:  It is, Your Honor.  But if I may, I'd

20 like to just address the objections to the remaining exhibits,

21 since I hope that won't take too long.

22         THE COURT:  All right.  You may.

23         MR. POMERANTZ:  Actually, Your Honor, before we go

24 there, we filed the supplemental declaration of Patrick

25 Leatham, as we indicated we would do yesterday.  We just

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-3 Filed 12/07/23   Page 49 of 214   PageID 7433

6

```
1    wanted to get confirmation again that nobody intends to cross-
2    examine him, so that he doesn't have to sit through the
3    festivities today.
4              THE COURT:  All right.  Well, I did see that you
5    filed that.
6         Does anyone anticipate wanting to cross-examine Mr.
7    Leatham, the balloting agent?
8              MR. RUKAVINA:  Your Honor, I take it that that
9    declaration is part of the record.  As long as the Court
10   confirms that, I do not intend to call the gentlemen.
11             THE COURT:  All right.  Well, I will take judicial
12   notice of it and make it part of the record.  It appears at
13   Docket Entry No. 1887.  Again, it was filed -- well, it was
14   actually filed early this morning, I think.  So, all right.
15   So, with --
16             MR. MORRIS:  And to avoid --
17             THE COURT:  Go ahead.
18             MR. MORRIS:  To -- I was just going to say, to avoid
19   any ambiguity, Your Honor, the Debtor respectfully moves that
20   document into the evidentiary record.
21             THE COURT:  All right.  The Court will --
22        (Interruption.)
23             THE COURT:  Someone needs to put their phone on mute,
24   perhaps.  Unless someone was intentionally speaking.
25        All right.  So, I will grant that request.  Docket Entry
```

007842

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3    Filed 12/07/23    Page 50 of 214    PageID 7434
Exhibit Exhibits 3-5    Page 204 of 692

7

1  No. 1887 will be part of the confirmation evidence of this

2  hearing.

3      (Debtor's Patrick Leatham Declaration at Docket 1887 is

4  received into evidence.)

5          THE COURT:  All right.  Anything else?  There were

6  other exhibits I think you were going to talk about?

7          MR. MORRIS:  Yeah.  Let me just go through them one

8  at a time, if I may, Your Honor.

9          THE COURT:  Okay.

10         MR. MORRIS:  All right.  So, I'm going to deal with

11 the transcripts that have been objected to one at a time.  And

12 I'll just take them in order.  The first one can be found at

13 Exhibit B.  It is on Docket No. 1822.

14         THE COURT:  Okay.

15         MR. MORRIS:  Exhibit B is the deposition transcript

16 from the December 16, 2020 hearing on the Advisor and the

17 Funds' motion for an order restricting the Debtor from

18 engaging in certain CLO-related transactions.

19     During that hearing, the Court heard the testimony of

20 Dustin Norris.  Mr. Norris is an executive vice president for

21 each of the Funds and each of the Advisors.

22     We would be offering the transcript for the limited

23 purposes of establishing Mr. Dondero's ownership and control

24 over the Advisors.

25     Mr. Norris also gave some pretty substantial testimony

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-253 Filed 12/07/23   Page 51 of 214   PageID 7435

8

1    concerning the so-called independent board of the Funds.

2       And as a general matter, Your Honor, to the extent that

3    the objection is on hearsay grounds, the transcript -- at

4    least the portions relating to Mr. Norris's testimony --

5    simply are not hearsay under Evidentiary Rule 801(d)(2).

6    These are statements of an opposing party, and I think we fall

7    well within that.

8      So, we would respectfully request that the Court admit

9    into the record the transcript from December 16th, at least

10    the portions of which are Mr. Norris's testimony.

11       THE COURT:  All right.  And, again, these appear at

12    -- I think I heard you say B and then E.  Is that correct?

13       MR. MORRIS:  Just B.  Just B at the moment.  B as in

14    boy.

15       THE COURT:  Okay.  Just B at the moment?

16     All right.  Any objections to that?

17       MR. RUKAVINA:  Your Honor, I had objected, but now

18    that it's offered for that limited purpose, I withdraw my

19    objection.

20       THE COURT:  All right.  Then B -- I'm sorry.  Was

21    there anyone else speaking?

22     B will be admitted.  And, again, it appears at Docket

23    Entry 1822.

24     (Debtor's Exhibit B, Docket Entry 1822, is received into

25    evidence.)

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/23   Page 52 of 214   PageID 7436

9

1          MR. MORRIS:  Okay.  Next, the next transcript can be

2     found at Exhibit 6R, and that's ==Docket 1866==.  Exhibit 6R is

3     the transcript of the January 9, 2020 hearing where the Court

4     approved the corporate governance settlement.  We think that

5     that transcript is highly relevant, Your Honor, because it

6     reflects not only Mr. Dondero's notice and active

7     participation in the consummation of the corporate governance

8     agreement, but it also reflects the Court and the parties'

9     views and expectations that were established at that time,

10    such that if anybody contends that there's any ambiguity about

11    any aspect of the order, I believe that that would be the best

12    evidence to resolve any such disputes.

13         So, for the purpose of establishing Mr. Dondero's notice,

14    Mr. Dondero's participation, and the parties' discussions and

15    expectations with regard to every aspect of the corporate

16    governance settlement, including Mr. Dondero's stipulation,

17    the order that emerged from it, and the term sheet, we think

18    that that's properly into evidence.

19         THE COURT:  Any objection?

20         All right.  6R will be admitted.  Again, at Docket Entry

21    1822.

22         (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23    evidence.)

24         MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25    as in Sam and 6T as in Thomas.  They're companions.  And they

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/307 of 692 53 of 214   PageID 7437

10

1   can be found at Docket 1866.  And those are the transcripts.

2   The first one is from the October 27th disclosure statement

3   hearing, and the second one actually is from the Patrick

4   Daugherty, I believe, lift stay motion.

5       I'll deal with the first one first, Your Honor.  We

6   believe that the transcript of the October 27th hearing goes

7   to the good faith nature of the Debtor's proposed plan.  It

8   shows that the Debtor and the Committee were not always

9   aligned on every interest.  It shows that the Committee, in

10  fact, strenuously objected to certain aspects of the then-

11  proposed plan by the Debtors.  And we just think it goes to

12  the heart of the good faith argument.

13      The transcript for the 28th, we would propose to offer for

14  the limited purpose of the commentary that you offered at the

15  end of that hearing, where Your Honor made it clear that

16  employee releases would not be -- would not likely be

17  acceptable to the Court unless there was some consideration

18  paid.

19      And it was really, frankly, Your Honor's comments that

20  helped spur the Committee and the Debtor to discuss over the

21  next few weeks the resolution of the issues concerning the

22  employee releases.

23      So we're not offering Exhibit 6T for anything having to do

24  with Mr. Daugherty or his claim, but just the latter portion

25  relating to the discussion about the employee releases.  And,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 54 of 214   PageID 7438

11

1   with that, we'd move those transcripts into evidence.

2         THE COURT:  Any objection?

3         MR. RUKAVINA:  Your Honor, yes, I do object.  6S is

4   hearsay, and under Rule 804(b)(1) it's admissible only if the

5   witnesses are unavailable to be called.  There's been no

6   suggestion that they're not.

7      As far as 6T, what Your Honor says is not hearsay, so as

8   long as it's just what Your Honor was saying, I do not object

9   to 6T.  I object to the balance of it.

10        THE COURT:  Okay.  What about that objection on 6S?

11        MR. MORRIS:  Yeah.  One second, Your Honor.  I would

12  go to the residual exception to the hearsay rule under 807.

13  807 specifically applies if the statement being offered is

14  supported by sufficient guarantees of trustworthiness and it's

15  more probative on the point -- and the point here is simply to

16  help buttress the Debtor's good faith argument -- and it's

17  more probative on the point than any other evidence.  And I'm

18  not sure what better evidence there would be than an on-the-

19  record discussion between the Debtor and the Committee as to

20  the disputes they were having on the disclosure statement.

21        THE COURT:  All right.  I'm going to overrule the

22  objection and accept that 807 exception as being valid here.

23  So, I am admitting both 6S and 6T.  And for the record, I

24  think you said they appeared at 1866.  They actually appear at

25  1822.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/23   Page 55 of 214   PageID 7439

12

```
 1              MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

 2    is 6S and 6T, and they are indeed at 1822.  Forgive me.

 3              THE COURT:  Okay.

 4         (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

 5    received into evidence.)

 6              MR. MORRIS:  The next transcript and the last one is

 7    6U, which is also at 1822.  6U is the transcript from the

 8    December 10th hearing on the Debtor's motion for a TRO against

 9    Mr. Dondero.  We believe the entirety of that transcript is

10    highly relevant, and it relates specifically to the Debtor's

11    request for the exculpation, gatekeeper, and injunction

12    provisions of their plan.  And on that basis, we would offer

13    that into evidence.

14              THE COURT:  Any objection?

15              MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16    behalf of Mr. Dondero.

17         We do object, on the same basis that it is hearsay.  There

18    has certainly been plenty of testimony before this Court and

19    on the record as to why the Debtor believes that its plan

20    provisions are appropriate and allowable, and there's no need

21    to allow hearsay in for that.  All of the witnesses were

22    available to be called by the Debtor.  The Debtor is in the

23    midst of its case and can call whoever else it needs to call

24    to get these into evidence or to get those docs into evidence.

25    And therefore, we don't believe that any residual exception
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Exhibit Exhibit 23-5   Filed 12/07/23   Page 56 of 214   PageID 7440

13

1    should apply.

2              THE COURT:  Mr. Morris, your response?

3              MR. MORRIS:  First, Your Honor, any statements made

4    by or on behalf of Mr. Dondero would not be hearsay under

5    801(d)(2).

6        And secondly, there is no other evidence of the Debtor's

7    motion of the -- of the argument that was had.  There is no

8    other evidence, let alone better evidence, than the transcript

9    itself.  And I believe 807 is certainly the best rule to

10   capture that.

11       It is a statement that's supported by sufficient

12   guarantees of trustworthiness.  Again, these are the litigants

13   appearing before Your Honor.  It may not be sworn testimony,

14   but I would hope that everybody is doing their best to comply

15   with the guarantee of trustworthiness in that regard, putting

16   aside advocacy.

17       And it is more probative on the point for which we're

18   offering -- and that is on the very issues of exculpation,

19   gatekeeper, and injunction -- than anything else we can offer

20   in that regard.

21             THE COURT:  All right.  I overrule the objection and

22   I will admit 6U.  Okay.

23       (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24   evidence.)

25             MR. MORRIS:  All right.  Going back to the top, Your

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 26-3 3 Filed 12/07/21   Page 57 of 214   PageID 7441

14

1  Honor, Companions Exhibit D as in David and E as in Edward,

2  which are at Docket 1822.

3      Exhibit D is an email string that relates to the Debtor's

4  communications with the Creditors' Committee concerning a

5  transaction known as SSP, which stands for Steel Products --

6  Structural and Steel Products.  So that was an asset that the

7  Debtor was selling, trying to sell at a particular point in

8  time.  And Exhibit E is a deck that the Debtor had prepared

9  for the benefit of the UCC.

10     And if we looked that those documents, Your Honor, you'd

11 see that the Debtor was properly following the protocols that

12 were put in place in connection with the January 9th corporate

13 governance settlement.  And the Committee is being informed by

14 the Debtor of what the Debtor intends to do with that

15 particular asset.

16     And the reason that it's particularly relevant here, Your

17 Honor, is Dustin Norris had submitted a declaration in support

18 of their motion that was heard on September -- on December

19 16th.  That declaration is an exhibit to what is Exhibit A on

20 Docket 1822.  Exhibit A on the docket is the Advisor and the

21 Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22 to that Exhibit A is an exhibit, which is Mr. Norris's

23 declaration.

24     At Paragraph 9 of Mr. Norris's declaration, he takes issue

25 with the Debtor's process for the sale of that particular

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Exhibit Exhibit 253 Filed 12/07/23 Page 58 of 214 PageID 7442

15

1   asset.

2       And so, having admitted already into the record Mr.

3   Norris's declaration, we believe that these documents rebut

4   the statements made in Mr. Norris's declaration, and indeed,

5   were part of the transcript that has now already been admitted

6   into evidence.  So we think the documents are needed because

7   they were exhibits during that hearing.

8           THE COURT:  All right.  Any objection?

9           MR. RUKAVINA:  Your Honor, yes, I object based on

10  authenticity.  This document has not been authenticated, nor

11  has the attachment.  And on hearsay.  And I don't think that

12  the Debtor can introduce one exhibit just to introduce another

13  to rebut the first.

14          THE COURT:  Your response?

15          MR. MORRIS:  You know, in all honesty, I wish that

16  the authenticity objection had been made yesterday and I might

17  have been able to deal with that.

18      These documents have already been admitted by the Court

19  against these very same parties.  I think it would be a little

20  unfair for them now to exclude the document that they had no

21  objection to the first time around.  They clearly relate to

22  Paragraph 9 of Mr. Norris's declaration, which was admitted

23  into evidence in this case without objection.

24          THE COURT:  All right.  I overrule the objection.  D

25  and E are admitted.

007851

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 253 Filed 12/07/23   Page 59 of 214   PageID 7443
Document Page 233 of 692

16

1          (Debtor's Exhibits D and E, Docket Entry 1822, is received

2    into evidence.)

3          MR. MORRIS:  Next, Your Honor, we have Exhibits 4D as

4    in David, 4E as in Edward, and 4G as in Gregory.  And those

5    can all be found on Docket 1822.  And to just cut to the

6    chase, Your Honor, these are the K&L Gates letter that were

7    sent in late December and my firm's responses to those

8    letters.

9          Those letters are being offered, again, to support --

10   well, the Debtor contends that, in the context of this case,

11   and at the time and under the circumstances, the letters

12   constituted interference and evinces a disregard for the

13   January 9th order, for Mr. Dondero's TRO, and for the Court's

14   comments at the December 16th hearing.  And they go

15   specifically to the Debtor's request for the gatekeeper,

16   exculpation, and injunction provisions.

17         To the extent that those exhibits contain the letters that

18   were sent on behalf of the Funds and on behalf of the

19   Advisors, they would simply not be hearsay under 801(d)(2).

20   And to the extent the objection goes to my firm's response, I

21   think just as a matter of completeness the Court -- I won't

22   offer them for the truth of the matter asserted.  I'll simply

23   offer the Pachulski responses at those exhibits for the

24   purpose of stating the Debtor's position, without regard to

25   the truth of the matter asserted.

007852

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-53 Filed 12/07/23 4 of 692 60 of 214    PageID 7444

17

 1          THE COURT:  All right.  Any objection?

 2          MR. RUKAVINA:  Your Honor, with that understanding,

 3    I'll withdraw my objection to these exhibits.

 4          THE COURT:  All right.  So, 4D, 4E, and 4G are

 5    admitted.

 6       (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

 7    received into evidence.)

 8          MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

 9    as in Thomas.  That document can be found at Docket No. 1822.

10    Your Honor, that document is a schedule of a long list of

11    promissory notes that are owed to the Debtor by the Advisors,

12    Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13    I'll withdraw that exhibit.

14          THE COURT:  All right.

15       (Debtor's Exhibit 5T is withdrawn.)

16          MR. MORRIS:  And then, finally, just one last one.  I

17    think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18    can be found at Docket No. 1877.  Exhibit 7O are the documents

19    that were admitted in the January 21st hearing, and I believe

20    that they all go -- they're being offered to support the

21    Debtor's application for the gatekeeper, exculpation, and

22    injunction provisions.

23          THE COURT:  All right.  7O is being offered.  Any

24    objection?

25          MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53 Filed 12/07/23   Page 61 of 214   PageID 7445

18

1  are exhibits from a separate adversary proceeding that has not

2  been concluded.  In fact, my witness is still on the stand in

3  that.

4      And I'll note that that's another 20,000 pages that's very

5  duplicative of the current record, and we already are going to

6  have an unwieldy record.  So I question why Mr. Norris -- why

7  Mr. Morris would even need this.

8      So that's my objection, Your Honor.

9          MR. MORRIS:  You know what?  That's a fair point,

10  Your Honor.  And -- that is a fair point, and I guess what I'd

11  like to do is at some point this morning see if I can single

12  out documents that are not duplicative and come back to you

13  with very specific documents.  I think that's a very fair

14  point.

15          THE COURT:  All right.

16          MR. MORRIS:  And with that, Your Honor, I think we've

17  now addressed every single document that the Debtor has

18  offered into evidence, and I believe, other than the

19  withdrawal of --

20          THE COURT:  5T.

21          MR. MORRIS:  -- 5T --

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  -- and the open question on 7O, I

24  believe every single document at ==Docket 1822, 1866==, and 1877

25  has been admitted.  Do I have that right?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/23   Page 62 of 214   PageID 7446

19

1          THE COURT:  All right.  Yes, because I did admit

2     yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3     with what you just said.

4          MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5     Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6     Entities List, have not been admitted.  But if I'm wrong on

7     that, then I apologize.

8          THE COURT:  Okay.  5S was part of 1866, which I

9     admitted entirely.

10        And what was the other thing?

11         MR. RUKAVINA:  I'm counting letters, Your Honor.

12    One, two, three, four.  6D, Legal Entities List, Redacted.

13         THE COURT:  Okay.  6B would have been --

14         MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15    6-dog.

16         THE COURT:  Okay.  6D, yeah, that was part of 1822

17    that I admitted *en masse* yesterday.

18         MR. MORRIS:  Yeah, I didn't hear an objection to that

19    one yesterday, and I agree, Your Honor.  My records show that

20    it was already admitted.

21         MR. RUKAVINA:  Then I apologize to the Court.

22         THE COURT:  All right.  Any --

23         MR. MORRIS:  No worries.  Let's get --

24         THE COURT:  Any other housekeeping matters before we

25    go to the next witness?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 63 of 214   PageID 7447
Exhibit Exhibit 23-58   Page 217 of 692

20

1           MR. MORRIS:  No, Your Honor.  Not from the Debtor.

2           THE COURT:  Anyone else?

3       All right.  Well, let's hear from the next witness.

4           MR. MORRIS:  All right, Your Honor.  The Debtor calls

5   as its next and last witness Marc Tauber.

6           THE COURT:  All right.  Mr. --

7           MR. MORRIS:  Mr. Tauber, if you're on the phone,

8   please identify yourself.

9       (No response.)

10          THE COURT:  Mr. Tauber, we're not hearing you.

11  Perhaps you are on mute.  Could you unmute your device?

12      (No response.)

13          THE COURT:  All right.  If it's a phone, you need to

14  hit *6.

15      Hmm.  Any -- do you know which caller he is?

16          THE CLERK:  I'm trying to find out.

17          THE COURT:  All right.  We've got well over a hundred

18  people, so we can't easily identify where he is at the moment.

19      All right.  Mr. Tauber, Marc Tauber?  This is Judge

20  Jernigan.  We cannot hear you, so -- all right.  Well, maybe

21  we can --

22          MR. MORRIS:  Can we just take a three-minute break

23  and let me see if I can track him down?

24          THE COURT:  Yes.  Why don't you do that?  So let's

25  take a three-minute break.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3253Filed 12/07/23 Page 64 of 214    PageID 7448

21

1          MR. MORRIS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3     (A recess ensued from 10:02 a.m. until 10:04 a.m.)

4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

5     in in a moment.  But I've been reminded that there is one more

6     exhibit.  It's the exhibit I used on rebuttal yesterday with

7     Mr. Seery.  There was the one document that was on the docket,

8     and that was the Debtor's omnibus reply to the plan

9     objections, where we looked at Paragraph 135, I believe.  And

10    we would offer that into evidence for the purpose of just

11    establishing that the Debtor had given notice no later than

12    January 22nd of its agreement in principle to assume the CLO

13    management contracts.

14         And then the second exhibit that we had offered that I

15    think I suggested could be marked as Exhibit 10A was the email

16    string between my firm and counsel for the CLO Issuers where

17    they agreed to the agreement in principle for the Debtor's

18    assumption of the CLO management contracts.

19         And we would offer both of those documents into evidence

20    as well.

21         THE COURT:  All right.  Any objections?

22         All right.  Well, I will admit them.

23         As far as this email string with the CLO Issuers that you

24    called 10A, does that appear on the docket?  I remember you

25    putting it on the screen, but, if not, you'll need to file a

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 65 of 214   PageID 7449
Exhibit Exhibit 3-53 Page 207 of 692

22

1   supplement to the record, a supplemental exhibit.

2          MR. MORRIS:  We will, Your Honor.  We'll do that for

3   both of those exhibits.

4          THE COURT:  And then as -- okay, for both?  Because I

5   -- I've read that reply, and I could reference the docket

6   number if we need to.

7          MR. MORRIS:  We'll clean that up, Your Honor.

8          THE COURT:  Okay.

9      (Debtor's Exhibit 10A is received into evidence.)

10     (Clerk advises Court re new caller.)

11         THE COURT:  Oh, okay.  Just a minute.  I was looking

12  up something.

13     (Pause.)

14         THE COURT:  All right.  Well, you're going to file --

15  hmm, I really wanted to just reference where that reply brief

16  appears on the record.  There were a heck of a lot of things

17  filed on January 22nd.

18     (Interruption.)

19         THE COURT:  Okay.  We'll --

20         MR. MORRIS:  All right.  We're just going to need one

21  more minute with Mr. Tauber.  It's my fault, Your Honor.

22         THE COURT:  Okay.

23         MR. MORRIS:  I didn't send him easily-digestible

24  dial-in instructions.  He'll be just a moment.

25         THE COURT:  Okay.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 53-58   Page 66 of 214   PageID 7450

23

```
 1        (Court confers with Clerk regarding exhibit.)

 2              THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

 3   brief that we talked about Paragraph 35, that is at ==Docket No.==

 4   ==1807==.  Okay?  All right.

 5        (Debtor's Omnibus Reply to Plan Objections, ==Docket 1807==,

 6   is received into evidence.)

 7        (Pause.)

 8              MR. TAUBER:  Hi.  It's Marc Tauber.

 9              THE COURT:  All right.

10              MR. MORRIS:  Excellent.

11              THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12   can hear you, but I can't see you.  Do you have a video --

13              MR. TAUBER:  Yeah, I don't know why it's not working.

14              THE COURT:  Hmm.

15              MR. TAUBER:  I'm on WebEx all day.  Usually it works

16   no problem.

17              THE COURT:  Okay.  Well, do you want to give it

18   another try or two?

19              MR. TAUBER:  Yeah.  It looks like it's starting to

20   come up.  It's all -- pictures, so --

21              THE COURT:  Okay.

22              MR. TAUBER:  -- hopefully you'll be able to see me in

23   a second.

24              THE COURT:  Okay.  The first thing I'm going to need

25   to do is swear you in, so we'll see if the video comes up here
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23   Page 67 of 214   PageID 7451

24

1  in a minute.

2          MR. TAUBER:  Okay.

3          THE COURT:  Can you see us, Mr. Tauber?

4          MR. TAUBER:  I can see four people.  The rest are

5  just names still.

6          THE COURT:  Okay.

7          MR. TAUBER:  I can go out and try to come back in, if

8  you think that's --

9          THE COURT:  I'm afraid of losing you.  So, your

10  audio, is it on your phone or is it on --

11          MR. TAUBER:  No.

12          THE COURT:  -- a computer?

13          MR. TAUBER:  On the computer.  Yeah.

14          THE COURT:  Okay.  So you're coming through loud and

15  clear on your computer.

16          MR. TAUBER:  Yeah.  Like I said, we use WebEx for

17  work, so I have them on all day long without any issues,

18  typically.

19          THE COURT:  Okay.

20      (Court confers with Clerk.)

21          THE COURT:  Okay.  Our court reporter thinks it's a

22  bandwidth issue on your end, so I don't --

23          MR. TAUBER:  There's only two of us here at home on

24  the line right now, so I don't know why.  It looks like it's

25  trying to come in, and then just keeps --

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 68 of 214   PageID 7452
Exhibit Exhibit 23-3 Filed 12/07/232 of 692

Tauber - Direct                          25

 1            THE COURT:  I at least see your name on the screen
 2    now, which I did not before.
 3            MR. TAUBER:  Yeah.
 4            THE COURT:  So hopefully we're going to -- ah.  We
 5    got you.
 6            MR. TAUBER:  There it is.
 7            THE COURT:  All right.
 8            MR. TAUBER:  Yeah.
 9            MR. MORRIS:  There we go.
10            MR. TAUBER:  I might lose you, though.  Give me one
11    second, because I have a thing saying the WebEx meeting has
12    stopped working.  Let me close that.
13            THE COURT:  Okay.  We've still got you.  Please raise
14    your right hand.
15            MR. TAUBER:  Okay.
16               MARC TAUBER, DEBTOR'S WITNESS, SWORN
17            THE COURT:  All right.  Thank you.  Mr. Morris?
18            MR. MORRIS:  Thank you, Your Honor.
19                         DIRECT EXAMINATION
20    BY MR. MORRIS:
21    Q   Good morning, Mr. Tauber.
22    A   Good morning.
23    Q   I apologize for the delay in getting you the information.
24    Are you currently employed, sir?
25    A   Yes, sir.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23 Filed 12/07/23 Page 69 of 214   PageID 7453

Tauber - Direct                          26

1   Q   By whom?

2   A   Aon Financial Services.

3   Q   And does Aon Financial Services provide insurance

4   brokerage services among its services?

5   A   Yes.

6   Q   And what position do you currently hold?

7   A   Vice president.

8   Q   How long have you been a vice president at Aon?

9   A   Since October of 2019.

10   Q   Can you just describe for the Court generally your

11   professional background?

12   A   Sure.  I spent about 20 years on Wall Street, working in a

13   variety of jobs, in research, trading, and as the COO of a

14   hedge fund.  And then in 2010 I switched to the insurance

15   world.  I was an underwriter for ten-plus years for Zurich and

16   QBE.  And then in 2019 switched to the brokering side for Aon.

17   Q   And what are your duties and responsibilities as a vice

18   president at Aon?

19   A   Well, we're responsible or my team and I are responsible

20   for creating bespoke insurance programs, focusing on D&O and

21   E&O insurance for our insureds.

22   Q   And what is, for the benefit of the record, what do you

23   mean by bespoke insurance program?

24   A   Well, each client is different, so the programs and the

25   policies that we put in place might be off-the-shelf policies,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 70 of 214   PageID 7454
Exhibit Exhibit 253 Page 1207 of 692

Tauber - Direct                              27

1  but we endorse and amend them as needed to meet the needs of

2  the individual client.

3  Q    And during your work, both as an underwriter and now as a

4  broker, have you familiarized yourself with the market for D&O

5  and E&O insurance policies?

6  A    Yes.

7  Q    All right.  Let's talk about the early part of this case.

8  Did there come a time in early 2020 when Aon was asked to

9  place insurance on behalf of the board of Strand Advisors?

10  A    Yes.

11  Q    Can you describe for the Court how that came about?

12  A    Sure.  One of our account executives, a man by the name of

13  Jim O'Neill, had a relationship with a man named John Dubel,

14  who was one of the appointees to serve on -- as a member of

15  Strand, which was being appointed, as we understood it, to be

16  the general partner of Highland Capital Management by the

17  Bankruptcy Court.  And they -- we had done -- or, Jim and John

18  had a longstanding relationship.  I had actually underwritten

19  an account for a previous appointment of John's when I was an

20  underwriter, so I had some familiarity with John as well, and

21  actually brokered a subsequent deal for John at Aon.

22       So I had, again, some familiarity with John, and we were,

23  you know, tasked with going out and finding a program for

24  Strand.

25  Q    Can you describe what happened next?  How did you go about

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-5 23-3 Filed Page 207 of 225 07/25 Page 71 of 214    PageID 7455

Tauber - Direct                                28

1   accomplishing that task?

2   A    So, there are a number of markets or insurance companies

3   that provide management liability insurance, which this was a

4   management liability-type policy.  D&O is a synonym for

5   management liability, I guess you'd say.  And we approached

6   the, I think, 14 or 15 markets that we knew to provide

7   insurance in this space and that would be willing to buy the

8   type of policy we were seeking and have interest in a risk

9   like this, which had a little hair on it.  Obviously, there

10  was the Dondero involvement, as well as the bankruptcy.

11  Q    As part of that process, did you and your firm put

12  together a package of information for prospective interested

13  parties?

14  A    Yes.

15  Q    Can you describe for the Court what was contained in the

16  package?

17  A    Had the *C.V.s*, some relevant pleadings from the case,

18  court order.  I'd have to go back and look exactly.  But sort

19  of just general, you know, general information that was

20  available about the situation at hand and Strand's

21  appointment.

22  Q    And the court order that you just mentioned, is that the

23  one that had that gatekeeper provision in it?

24  A    Correct.

25  Q    And can you explain to the Court why you and your team

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-3 Filed 12/07/23    Page 72 of 214    PageID 7456

Tauber - Direct                                 29

1    decided to include the order with the gatekeeper provision in

2    the package that you were delivering to prospective carriers?

3    A    Sure.  In our initial conversations to discuss our

4    engagement, the gatekeeper function was explained to us by

5    John.  And I'm not sure who else was on the initial call.

6    And, but it was explained to us that I guess Judge Jernigan

7    would sit as the gatekeeper between any potential claimant

8    against the insureds and, you know, would basically have to

9    approve any claim that would be made against (indecipherable),

10   which would thereby prevent any frivolous claims from

11   happening.

12   Q    All right.  Let's just talk for a moment.  How did you and

13   your firm decide which underwriters to present the package to?

14   A    Again, you know, I -- my background, or my Wall Street

15   background, obviously, sort of made me have a -- it was very

16   unique for the insurance world when I switched over, so I had

17   sort of risen to a certain level of expertise within the

18   space.  And, you know, our team also is very experienced, and

19   decades of experience in the insurance world.  So we're very

20   familiar with the markets that are willing to provide these

21   types of policies and the markets that would be likely to take

22   a look at a risk such as this.

23   Q    Okay.  You mentioned that there was -- I think your words

24   were a little hair on this, and one of the things you

25   mentioned was bankruptcy.  How did the fact that Strand was

```
 1    the general partner of a debtor in bankruptcy impact your

 2    ability to solicit D&O insurance?

 3  A    Well, it's just not a plain vanilla situation, so people

 4    are somewhat, you know, are -- I think -- so, the type of

 5    insurance, D&O insurance, that we write is very different from

 6    auto insurance, as an example.  Auto insurance, people expect

 7    there to be a certain amount of claims, and they expect the

 8    premiums to cover the claims plus the expenses and then

 9    provide them a reasonable profit on top of that.

10        Our insurance is really much more by binary.  The

11    expectation for underwriters is that they will be completing

12    ignoring -- or, avoiding risk at all costs, wherever possible.

13    So anytime there is a situation that looks a little risky, so

14    the premium might be a little higher, the deductible might be

15    a little higher, but, again, the underwriters are really

16    making a bet that they will not have a claim.  Because the

17    premiums pale in comparison to the limits that are available

18    to the policyholder.

19  Q    And so --

20  A    So, -- I'm sorry.  What were you going to say?

21  Q    I didn't mean to interrupt.

22  A    Yeah.

23  Q    Have you finished your answer?

24  A    Sure.

25  Q    Okay.  So, were some of the 14 or 15 markets that you
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53 Filed 12/07/23   Page 74 of 214   PageID 7458

Tauber - Direct                                31

1  contacted reluctant to underwrite because there was a

2  bankruptcy ongoing?

3  A    Well, I think that probably -- I mean, there are certain

4  markets that we didn't go to in the beginning because they

5  would be very reluctant to write a risk that had that kind of

6  hair on it, based on our experience from dealing with them.

7  And, you know, I think the bankruptcy was certainly a little

8  bit of an issue.  And then, obviously, as people did their

9  research and -- or if they weren't already familiar with

10 Highland and got to know, you know, got -- I will just say for

11 a simple Google search and learned a little bit about Mr.

12 Dondero, I think there was definitely some significant

13 reluctance to write this program.

14 Q    Was the fact that the Debtor -- was the fact that the

15 Debtor is a partnership an issue that came up, in your -- in

16 your process?

17 A    There are certainly some carriers who won't write what's

18 known as general partnership liability insurance.  So, yes,

19 that is part of that.  It was part of the limiting factor in

20 terms of who we went to.

21 Q    Okay.  And, finally, you mentioned Mr. Dondero.  What role

22 did he play in your ability to obtain insurance for the Strand

23 board?

24 A    Well, that's a very significant role.  As, you know, as

25 mentioned, the underwriters are very risk-averse, so the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 75 of 214   PageID 7459
Exhibit Exhibit 3-53 Page 209 of 692

Tauber - Direct                          32

1    litigiousness of Mr. Dondero is a very strong red flag

2    prohibiting a number of people from writing the insurance at

3    all.  And the ones that were writing, that were willing to

4    provide options, were looking for protections from Mr.

5    Dondero.

6    Q    And what kind of protections were they looking for?

7    A    Well, the gatekeeper function was a key factor.  That was

8    really the only way we could even start a conversation with

9    any of the people that we were able to engage.  And in

10   addition, they wanted a, you know, sort of a belts and

11   suspenders additional protection of having an exclusion

12   preventing any litigation brought by or on behalf of Mr.

13   Dondero.

14   Q    Were you able to identify any carrier who was prepared to

15   underwrite D&O insurance for Strand without the gatekeeper

16   provision or without a Dondero exclusion?

17   A    We were not.

18   Q    Okay.  Let's fast-forward now.  Has your firm been

19   requested to obtain professional management insurance for the

20   contemplated post-confirmation debtor entities and individuals

21   associated with those entities?

22   A    Yes.

23   Q    Okay.  So let's just talk about the entities first, the

24   Claimant Trust and the Litigation Trust.  In response to that

25   request, have you and your team gone out into the marketplace

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-3 Filed 12/07/23    Page 76 of 214    PageID 7460

Tauber - Direct                              33

```
 1   to try to find an underwriter willing to underwrite a policy

 2   for those entities?

 3   A    Yes.

 4   Q    And have you been able to find any carrier who's willing

 5   to provide coverage for the Claimant Trust and the Litigation

 6   Trust?

 7   A    Yes.

 8   Q    And how many -- how many have expressed a willingness to

 9   do that?

10   A    Two.

11   Q    And have those two carriers indicated that there would be

12   conditions to coverage for the entities?

13   A    Both will require a -- the continuation of the gatekeeper

14   function, as well as a Dondero exclusion.

15   Q    Okay.  Have you also been tasked with the responsibility

16   of trying to find coverage for the individuals associated with

17   the Claimant Trust and the Litigation Trust, meaning the

18   Claimant Trustee, the Litigation Trustee, and the Oversight

19   Board?

20   A    Yes.  So we did it concurrently.

21   Q    Okay.  So, are the two firms that you just mentioned

22   willing to provide insurance for the individuals as well as

23   the entities?

24   A    Correct.  With the same stipulations.

25   Q    They require -- they both require the gatekeeper and the
```

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3 23 Filed 12/07/23    Page 77 of 214    PageID 7461
Exhibit Exhibit 3-53 Page 207 of 331    Page 77 of 214

Tauber - Direct                           34

1    Dondero exclusion?

2    A    That's correct.

3    Q    Is there any other firm who has indicated a willingness to

4    consider providing D&O insurance for the individuals?

5    A    There is one that is willing to do so, as long as the

6    gatekeeper function remains in place.  They have indicated

7    that if the gatekeeper function was to be removed, that they

8    would then add a Dondero exclusion to their coverage.

9    Q    So is there any insurance carrier that you're aware of who

10   is prepared to insure either the individuals or the entities

11   without a gatekeeper provision?

12   A    No.

13   Q    And that last company, I just want to make sure the record

14   is clear:  If the gatekeeper provision is overturned on appeal

15   or is otherwise not effective, do you have an understanding as

16   to what happens to the insurance coverage?

17   A    They will either add an exclusion for any claims brought

18   by or on behalf of Mr. Dondero or cancel the coverage

19   altogether.

20            MR. MORRIS:  I have no further questions, Your Honor.

21            THE COURT:  All right.  Cross of this witness?

22                     CROSS-EXAMINATION

23   BY MR. RUKAVINA:

24   Q    Mr. Tauber, I'm a little confused.  So, the insurance

25   that's being written now for the post-bankruptcy entities, did

007870

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-53 Filed 12/07/23    Page 78 of 214    PageID 7462

Tauber - Cross                         35

1   I hear you say that there is one carrier that would give that

2   insurance subject to having a Dondero exclusion?

3   A   So, first of all, there's nothing currently being written.

4   We have solicited quotes.  So, just to make sure that that --

5   I want to make sure that's clear.

6        We have three carriers that are willing to provide varying

7   levels of coverage.  All three will only do so with the

8   existence of the gatekeeper function continuing to be in

9   place.  One of the three has -- two of those three will also

10  provide the coverage with -- even with the gatekeeper function

11  and the Dondero exclusion.  The third one was not requiring a

12  Dondero exclusion unless the gatekeeper function goes away.

13  Q   Okay.  So the third one, you believe, will, whatever the

14  term is, write the insurance or provide the coverage without a

15  gatekeeper, as long as there is a strong Dondero exclusion?

16  A   No.  Their initial requirement is that the gatekeeper

17  function remains in place.  That is their preferred option.

18  If the gatekeeper function is removed, then they will add a

19  Dondero exclusion in place of the gatekeeper exclusion.  In

20  addition, that carrier is only willing to provide coverage for

21  the individuals, not for the entities.

22  Q   Okay.  Thank you.

23           MR. RUKAVINA:  I'll pass the witness, Your Honor.

24           THE COURT:  All right.  Other cross?

25           MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-53 Filed 12/07/33 of 692 79 of 214    PageID 7463

Tauber - Cross                                      36

```
 1              THE COURT:  Okay.
 2                         CROSS-EXAMINATION
 3   BY MR. TAYLOR:
 4   Q    Good morning, Mr. Tauber.
 5   A    Good morning.
 6   Q    Are you generally familiar with placing D&O insurance at
 7   distressed debt level private equity firms?
 8   A    I am familiar with it probably more from the underwriting
 9   side, and I also worked at a fund that was distressed and had
10   to be liquidated, so I -- as the COO, so I have a fair amount
11   of familiarity, yes.
12   Q    Okay.  Before taking this to market for the first time for
13   the pre-confirmation policies that you have in place, did your
14   firm conduct any due diligence or analysis of comparing the
15   amount of litigation the Highland entities and Mr. Dondero
16   were involved in as compared to other comparable firms in the
17   marketplace?  Say, you know, Apollo, Fortress, Cerberus, other
18   similar market participants?
19   A    Well, it wouldn't really be our role as the broker.
20   That's the role of the underwriter.
21   Q    Are you familiar if any of the underwriters undertook any
22   such analysis?
23   A    I would assume that they did, since they all had concerns
24   about Mr. Dondero almost immediately.
25   Q    Do you have any -- you didn't conduct any personal due
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53   Filed 12/07/23   Page 80 of 214   PageID 7464

Tauber - Cross                                      37

1   diligence on comparing the amount of litigation that the

2   Highland entities were involved in as compared to, say,

3   Fortress, do you?

4   A    Well, again, that wouldn't really be my role as the

5   broker.  But I will say that I used to write the primary

6   insurance for Fortress Investment Group when I was at Zurich.

7   So I'm extremely familiar with Fortress, to use your example,

8   and I would say that the level of litigation at Fortress was

9   much, just out of personal knowledge, was significantly less

10  than I had encountered or than I had read about at Highland.

11  Q    That you have read about?  Is that based upon a number of

12  cases where Fortress was a plaintiff as compared to Highland

13  was a plaintiff?  Over what time period?

14  A    Again, not my role.  Not something that I've done.  I'm

15  just generally familiar with Fortress and I'm generally

16  familiar with Highland.

17  Q    All right.  So you're generally familiar and you say that

18  -- you're telling me and this Court that Fortress is involved

19  in less litigation.  Could you quantify that for me, please?

20  A    No, but it's really irrelevant to the situation at hand.

21  The issue is not my feelings whatsoever.  The issue is the

22  underwriters' feelings and their concern with Mr. Dondero, not

23  mine or anybody else's.

24  Q    So, I appreciate your answer and thank you for that, but I

25  believe the question that was before you is, have you

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53 Filed 12/07/23   Page 81 of 214   PageID 7465
Page 207 of 235   Page

Tauber - Cross                              38

1    quantitatively -- do you have any quantitative analysis by

2    which you can back up the statement that Fortress is less

3    litigious than Highland?

4    A    I wouldn't even try, no.

5    Q    Okay.  Do you have any quantitative analysis for -- that

6    Cerberus is any less litigious than Highland?

7    A    I don't have any real knowledge of Cerberus's

8    litigiousness.

9    Q    Same question as to Apollo.

10   A    Again, the Fortress, you just happened to mention

11   Fortress, which was a special case because I used to be their

12   primary underwriter.  I don't have any specific -- I'm not a

13   claims attorney.  I don't have any specific knowledge of the

14   level of litigiousness.

15       And, again, it's not up to me, my decision.  It's the

16   underwriters' decision of whether or not they're willing to

17   write the coverage, not mine.

18   Q    You mentioned that the -- when you took this out to

19   market, it had a little hair on it.  Correct?

20   A    Correct.

21   Q    And you put together a package of materials that you sent

22   out to 14 or 15 market participants; is -- did I get that

23   correct?

24   A    Yes.

25   Q    And in that package, you had certain pleadings, including

1   the court order, correct?

2   A    Yes.  I believe that's correct.

3   Q    And that was after your initial conversation with John and

4   -- where he pointed out the gatekeeper role.  Correct?

5   A    Correct.

6   Q    And so when you went out to market, presumably you

7   highlighted the gatekeeper role to all the people you

8   solicited offers from because you thought it included less

9   risk, correct?

10  A    It offered a level of protection that was not -- that's

11  not common.  So it's, yes, it's a huge selling point for the

12  risk.

13  Q    Okay.  So, to be clear, you never went out to the market

14  to even see if you could get underwriting the first time

15  without the gatekeeper function; is that correct?

16  A    Well, it's my job as a broker to present the risk in the

17  best possible light.  So if we have a fact that makes the risk

18  a better write for the underwriters, we, of course, will

19  highlight it.  So, no, I did not do that.

20  Q    Okay.  So, the quick answer to the question is no, you did

21  not go out and solicit any bids without the gatekeeper

22  function?

23  A    Correct.

24  Q    When you have approached the market for the post-

25  confirmation potential coverage, did you approach the same 14

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 23-5    Filed 12/07/23    Page 83 of 214    PageID 7467

Tauber - Cross                          40

 1  or 15 parties that you did before?

 2  A    I don't have the two lists in front of me.  They would

 3  have been vastly similar, yes.

 4  Q    Okay.  And so, again, all of the 14 or 15 parties or the

 5  lists that you solicited were already familiar with the

 6  gatekeeper function, correct?

 7  A    Yes.

 8  Q    And so therefore they already had that right; they're not

 9  going to trade against themselves and therefore say that,

10  without it, we'll go ahead and write coverage.  Correct?

11  A    I -- I -- it'd be hard to answer that question.  I don't

12  know.

13  Q    Okay.  Because you didn't try that, did you?

14  A    I would have had no reason to, no.

15  Q    Okay.  So you don't know if a market exists without the

16  gatekeeper function because you haven't asked, have you?

17  A    I guess that's fair, yeah.

18          MR. TAYLOR:  I have no further questions.

19          THE COURT:  All right.  Any other Objectors with

20  cross-examination?

21          MR. DRAPER:  I have no questions for the witness,

22  Your Honor.

23          THE COURT:  All right.  Anyone else?  Mr. Morris,

24  redirect?

25          MR. MORRIS:  Just one.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23   Page 84 of 214   PageID 7468
Page 207 of 238

Tauber - Redirect                           41

```
 1                      REDIRECT EXAMINATION

 2    BY MR. MORRIS:

 3    Q    One question, Mr. Tauber.  Is there any -- do all

 4    underwriters -- any underwriters for Fortress require, as a

 5    condition to underwriting the D&O insurance, require a

 6    gatekeeping provision?

 7    A    In my, you know, 11, 12 years of experience in this

 8    industry, in this space, I have never seen that gatekeeper

 9    function be available, as an underwriter or as a broker.  So,

10    no.

11            MR. MORRIS:  No further questions, Your Honor.

12            THE COURT:  Any recross on that redirect?

13        All right.  Well, Mr. Tauber, you are excused.  We thank

14    you for your testimony today.  So you can log off.

15            THE WITNESS:  Thank you.

16            THE COURT:  Okay.

17        (The witness is excused.)

18            THE COURT:  Mr. Morris, does the Debtor rest?

19            MR. MORRIS:  The Debtor does rest, Your Honor.

20            THE COURT:  All right.  Well, what are we going to

21    have from the Objectors as far as evidence?

22            MR. RUKAVINA:  Your Honor, I will be very short.  I

23    will call Mr. Seery for less than ten minutes.  I will call

24    Mr. Post for less than ten minutes.  I will have one exhibit.

25    And I think that that's it for all the Objectors, unless I'm
```

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 85 of 214   PageID 7469
Exhibit Exhibit 23-5   Page 339 of 692

42

 1  mistaken, gentlemen.

 2           MR. TAYLOR:  Your Honor, I had one witness, Mr.

 3  Sevilla, under subpoena to testify, and needed a brief moment

 4  to discuss with my colleagues whether we're going to call him,

 5  and if so, put him on notice that he would be coming up

 6  probably about -- I don't know your schedule, Your Honor, but

 7  probably, I'm guessing, either before lunch or after, and I

 8  need to let him know that also.

 9     So I do need a brief three to five minutes to confer with

10  my colleagues and some direction from the Court to, if we

11  decide to call him, as to when we would tell him to be

12  available.

13           THE COURT:  All right.  Well, before I get to that,

14  Mr. Draper, do you have any witnesses?

15           MR. DRAPER:  I do not.

16           THE COURT:  All right.  Well, let's see.  It's 10:34.

17  We're making good time this morning.  If Seery is truly ten

18  minutes of direct, and Post is truly ten minutes of direct,

19  and I don't know how long the documentary exhibits are going

20  to take, it sounds to me like we are very likely to get to Mr.

21  Sevilla before a lunch break.

22     So if you want to -- you know, I don't know what that

23  involves, you sending text messages or making a quick phone

24  call.  Do you need a five-minute break for that?

25           MR. TAYLOR:  Yes, Your Honor.  It involves a phone

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 3-53 Filed 12/07/23    Page 86 of 214    PageID 7470

43

1    call and an email.  Just a confirmatory phone call just to

2    make sure that the guy -- just so you know who he is, he is

3    actually a Highland employee, but he's represented by separate

4    counsel, and so we do need to go through him just because

5    that's the right thing to do.

6            THE COURT:  All right.  Well, again, I mean, I never

7    know how long cross is going to take, but I'm guessing, you

8    know, we're going to get to him in an hour or so, if not

9    sooner, it sounds like.  So, all right.  So, do we need a

10   five-minute break?

11           MR. RUKAVINA:  And Your Honor, it might make more

12   sense to make it a ten-minute break.  I suspect that Mr.

13   Taylor will be able to release his witness if he and I will

14   just be able to talk.  So I would ask the Court's indulgence

15   for a ten-minuter.

16           THE COURT:  Okay.  We'll take a ten-minute break.

17   We'll come back at 10:46 Central time.

18           THE CLERK:  All rise.

19       (A recess ensued from 10:36 a.m. until 10:46 a.m.)

20           THE CLERK:  All rise.

21           THE COURT:  Please be seated.  We're going back on

22   the record in the Highland confirmation hearing.  Are the

23   Objectors ready to proceed?

24           MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25           THE COURT:  All right.  Well, Mr. Rukavina, are you

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit D-3 Filed 12/07/23   Page 87 of 214   PageID 7471
Document Page 87 of 692

44

 1  going to call your witnesses first?

 2          MR. RUKAVINA:  Yes, I will.  Before that, if it might

 3  help the Court and Mr. Morris:  Mr. Morris, with respect to

 4  that last exhibit, I do not object to the admission of any of

 5  the exhibits that were admitted at that PI hearing.

 6      But I do think, Your Honor, for the record, that -- and I

 7  would ask Mr. Morris that he should refile those exhibits here

 8  in this case, except for those that are duplicative.  Because,

 9  again, there's 10,000 pages of indentures, et cetera.

10          MR. MORRIS:  Thank you very much, sir.

11      Your Honor, if that's acceptable to you, we'll do that as

12  soon as possible.

13          THE COURT:  All right.  And let me make sure the

14  record is clear.  Are we talking about what you've described

15  as 7O?  I'm getting mixed up now.  Am I --

16          MR. MORRIS:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. MORRIS:  It's 7O, which is the documents that

19  were introduced into evidence in the prior hearing.  And Mr.

20  Rukavina is exactly right, that there is substantial overlap

21  between that and other documents that have already been

22  admitted in the record in this case.  So we'll just file an

23  abridged version of Exhibit O that only includes non-

24  duplicative documents.

25          THE COURT:  All right.  So that will be admitted, and

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23 Page 88 of 214   PageID 7472

Seery - Direct                          45

 1   we'll look for your filed abridged version to show up on the

 2   docket.  7O.

 3        (Debtor's Exhibit 7O is received into evidence as

 4   specified.)

 5             THE COURT:  All right.  What's next?

 6             MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

 7   James Seery.

 8             THE COURT:  All right.  Mr. Seery, welcome back.

 9   Please raise your right hand.

10             MR. SEERY:  Can you -- can you hear me, Your Honor?

11             THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13             THE COURT:  All right.  Thank you.

14        Mr. Rukavina, go ahead.

15                       DIRECT EXAMINATION

16   BY MR. RUKAVINA:

17   Q   Mr. Seery, --

18             MR. RUKAVINA:  Thank you.

19   BY MR. RUKAVINA:

20   Q   Mr. Seery, good morning.

21             MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22   the schedules.

23        What we have here, Your Honor, is Docket 247, the Debtor's

24   schedules.  I'd ask the Court to take judicial notice of it.

25             THE COURT:  All right.  The Court will do so.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-3 Filed 12/07/23 Page 89 of 214   PageID 7473

Seery - Direct                          46

1   BY MR. RUKAVINA:

2   Q    Mr. Seery, are you familiar with these entities listed

3   here on the Debtor's schedules?

4   A    Generally.  Each one a little bit different.

5   Q    Okay.  Do you agree that the Debtor still owns equity

6   interests in these entities?

7   A    I believe it does, yes.

8   Q    Okay.  Is it true that none of these entities are publicly

9   traded?

10  A    I don't believe any of these are publicly-traded entities,

11  no.

12  Q    Okay.  And none of these, to your knowledge, are debtors

13  in this bankruptcy case, right?

14  A     No.  We only have one debtor in the case.

15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor

16  owns more than 20 percent of the equity in that entity, right?

17  A    I believe the Debtor owns the majority of that entity.

18  That is a fund with an on- and offshore feeder.  And I, off

19  the top of my head, don't recall exactly how the allocations

20  of equity work.  But I believe we do.

21  Q    Does 67 percent refresh your memory?  Are you prepared to

22  say that the Debtor owns 67 percent of that equity?

23  A    I'm not prepared to say that, no.

24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20

25  percent of that equity?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 23-53 Filed 11/07/24   Page 90 of 214   PageID 7474

Seery - Direct                            47

1    A    There's about -- I don't recall.  There's about at least

2    25 artist, designers, or designs.  Wright, AMES, Hockney,

3    Rothco, all own in different places, and they all own in turn

4    some other thing.  So I don't know what each of them, off the

5    top of my head, own.  There's -- they're part of a myriad of

6    corporate structures here.

7    Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8    20 percent of the equity of that entity?

9    A    Stark?  I don't know.

10   Q    Okay.  I don't know how to pronounce the next one.  Eamis

11   (phonetic) Ltd.  Do you know whether the Debtor owns more than

12   20 percent of that equity?

13   A    Off the top of my head, I don't recall.

14   Q    What about Maple Avenue Holdings, LLC?

15   A    I believe, I don't know if it's directly or indirectly,

16   that we own a hundred percent of that entity.  But I'm not

17   sure.

18   Q    What about Highland Capital Management Korea, Ltd.?

19   A    Effectively, Highland Capital Management is owned a

20   hundred percent.

21   Q    What about Highland Capital Management Singapore Pte.

22   Ltd.?

23   A    We are in the process of shutting it down, so I don't know

24   that -- what the equity percentages are.  It's really just a

25   question -- it's -- it's dissolved save for a signature from a

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 26-3 Filed 12/07/23   Page 91 of 214   PageID 7475

Seery - Direct                                    48

1   Singaporean.

2   Q   Okay.  But did the Debtor own more than 20 percent of that

3   entity?

4   A   I don't know the specific allocations of equity ownership.

5   Q   Okay.  What about Pennant (phonetic) Management, LP?  Do

6   you know whether the Debtor owns or owned more than 20 percent

7   of that entity?

8   A   I don't recall, no.

9        MR. RUKAVINA:  You can take that exhibit down, Mr.

10  Vasek.

11  BY MR. RUKAVINA:

12  Q   Mr. Seery, very quick, are you familiar with Bankruptcy

13  Rule 2015.3?

14  A   I am, yes.

15  Q   Okay.  Has the Debtor filed any Rule 2015.3 statements in

16  this case?

17  A   I don't believe we have.

18  Q   Okay.

19       MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20  witness.

21       THE COURT:  All right.  Any other Objector

22  questioning?  None from Mr. Taylor, none from Mr. Draper, none

23  from Ms. Drawhorn?

24       All right.  Any cross -- any examination from you, Mr.

25  Morris?

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 253 Filed 12/07/23   Page 92 of 214   PageID 7476

Seery - Cross                          49

| 1 | MR. MORRIS:  Just one question. |
| 2 | THE COURT:  Go ahead. |
| 3 | CROSS-EXAMINATION |
| 4 | BY MR. MORRIS: |
| 5 | Q    Mr. Seery, do you know why the Debtor has not yet filed |
| 6 | the 2015.3 statement? |
| 7 | A    I have a recollection of it, yes. |
| 8 | Q    Can you just describe that for the Court? |
| 9 | A    When we -- when we initially filed, when the Debtor filed |
| 10 | and it was transferred over, we started trying to get all the |
| 11 | various rules completed.  There are, as the Court is aware, at |
| 12 | least a thousand and maybe more, more like three thousand, |
| 13 | entities in the total corporate structure. |
| 14 | We pushed our internal counsel to try to get that done, |
| 15 | and were never able to really get it completed.  We did not |
| 16 | have -- we were told we didn't have separate consolidating |
| 17 | statements for every entity, and it would be difficult.  And |
| 18 | just in the rush of things that happened from the first |
| 19 | quarter into the COVID into the year, we just didn't complete |
| 20 | that filing.  There was no reason for it other than we didn't |
| 21 | get it done initially and I think it fell through the cracks. |
| 22 | MR. MORRIS:  Nothing further, Your Honor. |
| 23 | THE COURT:  All right.  Anything further, Mr. |
| 24 | Rukavina? |
| 25 | REDIRECT EXAMINATION |

 1   BY MR. RUKAVINA:

 2   Q    Mr. Seery, I appreciate that answer.  But you never sought

 3   leave from the Bankruptcy Court to postpone the deadlines for

 4   filing 2015.3, did you?

 5   A    No.  If it hadn't fallen through the cracks, it would have

 6   been something we recalled and we would have done something

 7   with it.  But, frankly, it just fell off the -- through the

 8   cracks.  We didn't deal with it.

 9   Q    Okay.

10        MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11   Seery.

12        THE COURT:  All right.  Any other Objector

13   examination?

14     Mr. Morris, anything further on that point?

15        MR. MORRIS:  No, thank you, Your Honor.  No further

16   questions.

17        THE COURT:  All right.  Mr. Seery, thank you.  You're

18   excused once again from the witness stand.

19     (The witness is excused.)

20        THE COURT:  Your next witness?

21        MR. SEERY:  Thank you, Your Honor.

22        THE COURT:  Uh-huh.

23        MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24   Post, if you're listening, which I believe you are, if you'll

25   please activate your camera.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 25-3   Filed 12/07/23   Page 94 of 214   PageID 7478
Exhibit Exhibit 23-3   Page 238 of 392

Post - Direct                                           51

1            THE COURT:  Mr. Post, we do not see or hear you yet.

2            MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

3    focus on you.

4            MR. POST:  Yes.  Can you hear me now?

5            THE COURT:  We can hear you.  We cannot see you yet.

6    Could you say, "Testing, one, two; testing, one, two"?

7            MR. POST:  Testing, one, two.  Testing, one, two.

8            THE COURT:  There you are.  Okay.  Please raise your

9    right hand.

10        JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

11           THE COURT:  All right.  Thank you.  You may proceed.

12                         DIRECT EXAMINATION

13   BY MR. RUKAVINA:

14   Q   Mr. Post, good morning.  State your name for the record,

15   please.

16   A   Robert Jason Post.

17   Q   How are you employed?

18   A   I'm employed by NexPoint Advisors, LP.

19   Q   What is your title?

20   A   Chief compliance officer.

21   Q   Were you ever employed by the Debtor here?

22   A   Yes.

23   Q   Between when and when?  Approximately?

24   A   I believe it was July of '08 through October of 2020.

25   Q   What was your last title while you were employed at the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23   Page 95 of 214   PageID 7479

Post - Direct                                          52

 1   Debtor?

 2   A    Still chief compliance officer.  For the retail funds.

 3   Q    Okay.  Very, very quickly, what does a chief compliance

 4   officer do?  Or what do you do?

 5   A    It's multiple things.  Interaction with the regulators.

 6   Adherence to prospectus and SAI limitations for the funds.

 7   And then establishment of written policies and procedures to

 8   prevent and detect violations of the federal securities laws

 9   and then testing those on a frequent basis.

10   Q    And I believe you mentioned you're the CCO for NexPoint

11   Advisors and Highland Capital Management Fund Advisors.  Are

12   you also the CCO for any funds that they advise?

13   A    Yes.  For all the funds that they advise.

14   Q    Okay.  Does that include so-called retail funds?

15   A    Yes.  They're all retail funds.

16   Q    What is a retail fund?

17   A    It typically constitutes funds that are subject to the

18   Investment Company Act of 1940, such as open-end mutual funds,

19   closed-end funds, ETFs.

20   Q    Obviously, you know who my clients are.  Are any of my

21   clients so-called retail funds that you just described?

22   A    Yes.

23   Q    Name them, please.

24   A    You've got NexPoint Capital, Inc., Highland Income Fund,

25   and NexPoint Strategic Opportunities Fund.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3   Filed 12/07/23   Page 96 of 214   PageID 7480
Exhibit Exhibits 53-58   Page 250 of 692

Post - Direct                                    53

 1  Q   Do those three retails funds hold any voting preference

 2  shares in the CLOs that the Debtor manages?

 3  A   Yes.

 4          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

 5  Exhibit 2.

 6      Your Honor, I believe I have a stipulation with Mr. Morris

 7  that this exhibit can be admitted, so I'll move for its

 8  admission.

 9          MR. MORRIS:  No objection, Your Honor.

10          THE COURT:  All right.  Exhibit 2 will be admitted.

11  And let's be clear.  That appears at -- is it Docket No. --

12  let's see.  Is it 1673 that you have your -- no, no, no, no.

13  1670?  Is that where your exhibits are?

14          MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think

15  we did an amended one because we numbered our exhibits instead

16  of having seventeen Os and Ps.  So it's 1863.

17          THE COURT:  1863?  Okay.  All right.  There it is.

18  Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What

19  exhibit?  It's Exhibit 2, is admitted.  Okay.

20          MR. RUKAVINA:  Thank you, Your Honor.

21      (Certain Funds and Advisors' Exhibit 2 is received into

22  evidence.)

23  BY MR. RUKAVINA:

24  Q   Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what

25  do they stand for?  Do they stand for the retail funds you

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Exhibit Exhibit 3-53 Filed 12/07/23   Page 97 of 214   PageID 7481

Post - Direct                                    54

```
 1   just named?
 2             MR. SEERY:  I don't think he meant me.
 3             THE WITNESS:  Yeah.
 4   BY MR. RUKAVINA:
 5   Q   I'm sorry, Mr. Post.  I didn't hear you.
 6   A   You addressed me as Mr. Seery.
 7   Q   Oh.  I apologize.  What do those initials stand for?
 8   A   The names of the funds that I mentioned.
 9   Q   Okay.  And what do these percentages show?
10   A   The percentages show the amount of shares outstanding and
11   the preference shares that each of the respective funds hold
12   of the named CLOs.
13   Q   And those CLOs on the left there, those are the CLOs that
14   the Debtor manages pursuant to agreements, correct?
15   A   Yes.  Those are some of them, correct.
16   Q   Yes.  The ones that the retail funds you mentioned have
17   interests in, correct?
18   A   Correct.
19   Q   And what does the far-right column summarize or show?
20   A   That would be the aggregate across the three retail funds.
21   Q   In each of those CLOs?
22   A   Correct.
23   Q   Thank you.
24             MR. RUKAVINA:  Mr. Vasek, you may pull this down.
25   BY MR. RUKAVINA:
```

Post - Direct                              55

1    Q    Mr. Post, in the aggregate, how much do those three retail

2    funds have invested in those CLOs, ballpark?

3    A    I believe it's approximately $130 million, give or take.

4    Q    Is it closer to 140 or 130?

5    A    A hundred -- I think it's 140, actually.

6    Q    Okay.  Thank you.  Who controls those three retail funds?

7    A    Ultimately, the board --

8    Q    And what --

9    A    -- of the funds.

10   Q    What is -- what do you mean by the board?  Do they have

11   independent boards?

12   A    Yes.  They have a majority independent board, the funds

13   do.

14   Q    Do you report to that board?

15   A    Yes.

16   Q    Does Mr. Dondero sit on those boards?

17   A    He does not.

18   Q    Okay.

19         MR. RUKAVINA:  I'll pass the witness, Your Honor.

20   Thank you, Mr. Post.

21         THE COURT:  All right.  Any other Objector

22   examination of Mr. Post?

23      All right.  Mr. Morris, do you have cross?

24         MR. MORRIS:  Yes, Your Honor, I do.

25         THE COURT:  Okay.

1              CROSS-EXAMINATION

2    BY MR. MORRIS:

3    Q    Mr. Post, can you hear me okay, sir?

4    A    Yes, I can hear you.

5    Q    Okay.  Nice to see you again.  When did you first join

6    Highland?

7    A    I believe it was July of '08.

8    Q    So you've worked with the Highland family of companies for

9    about a dozen years now; is that right?

10   A    Yes.

11   Q    And you were actually employed by the Debtor from 2008

12   until October 2020; is that right?

13   A    Correct.

14   Q    And you left at that time and went to join Mr. Dondero as

15   the chief compliance office of the Advisors; do I have that

16   right?

17   A    Yes.  I transitioned to NexPoint Advisors shortly, I

18   believe, after Mr. Dondero left, but I was already the named

19   CCO for that entity.

20   Q    Right, but your employment status changed from being an

21   employee of the Debtor to being an employee of NexPoint; is

22   that right?

23   A    Correct.

24   Q    And that happened shortly after Mr. Dondero resigned from

25   the Debtor and went to NexPoint Advisors, correct?

1    A    Correct.

2    Q    Okay.  You mentioned that the funds are controlled by

3    independent boards; do I have that right?

4    A    It's a majority independent board, correct.

5    Q    Okay.  There's no independent board member testifying in

6    this hearing, is there?

7    A    I --

8            MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9    that, but I'll stipulate to that as a fact.

10           THE COURT:  All right.

11           MR. MORRIS:  Okay.

12   BY MR. MORRIS:

13   Q    Did you -- do you speak with the board members from time

14   to time?

15   A    Yes.

16   Q    Did you tell them that it might be best if they came and

17   identified themselves and helped persuade the Court that they

18   were, in fact, independent?

19   A    They have counsel to assist them with that determination.

20   I never mentioned anything along those line to them.

21   Q    Okay.  Can you tell me who the board members are?

22   A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23   Honis, and then Ed Constantino.  He is only a board member,

24   though, for NSOF.  NexPoint Strategic Opportunities Fund.

25   Q    All right.  Mr. Honis, is he -- has he been determined to

 1  be an interested director, for purposes of the securities

 2  laws?

 3  A    Yes.

 4  Q    Okay.  Mr. Froeh..., do you know much about his

 5  background?

 6  A    I believe he worked at Deutsche Bank and a couple of the

 7  other -- or maybe a couple of other investment firms in the

 8  past.  And he also owns a minor league baseball team.

 9  Q    Do you know how long he served as a director of the funds?

10  A    I don't know, approximately.  I think maybe seven -- six,

11  seven years.

12  Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work

13  for Highland?

14  A    Not that I can recall.

15  Q    Did Mr. Ward ever work for Highland?

16  A    Not that I can recall.

17  Q    Do you recall how long he's been serving as a director of

18  the funds?

19  A    Mr. Ward?

20  Q    Yes.

21  A    I believe -- I'd be -- I don't recall specifically.  I

22  think it's been, you know, 10 to 12 years, give or take.

23  Q    He was a director when you got to Highland; isn't that

24  right?

25  A    He was on the board of directors.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3-57-5ed 12/07/23356 Page 102 of 214    PageID 7486

Post - Cross                                    59

1    Q    Yeah.  So fair to say that Mr. Ward has been a director

2    since at least the mid to late oughts?  2005 to 2008?

3    A    I'm sorry, you cut out.  Late what?

4    Q    The late oughts.  Withdrawn.  Is it fair to say that Mr.

5    Ward's been a director of the funds since somewhere between

6    2005 and 2008?

7    A    Again, I don't recall specifically.  You know, I joined

8    the complex, the retail complex as the named CCO in 2015, and

9    he had been serving in that role prior to that, and I believe

10   it was for probably a period of five to seven years, so that

11   sounds in line.

12   Q    Did you have a chance to review Dustin Norris's testimony

13   from the December 16th hearing?

14   A    I did not.

15   Q    Do you know -- are you aware that he testified at some

16   length regarding the relationship of each of these directors

17   to Mr. Dondero and Highland?

18   A    I didn't review anything, so I don't know what he said or

19   how long it took.

20   Q    Do you know if Mr. Powell's ever worked for Highland?

21   A    He has.

22   Q    Do you know in what capacity and during what time periods?

23   A    He was -- I think his last title was -- I believe was

24   chief product strategist, I believe.  And he was also the

25   named PM for one of -- or, a suite of ETF funds.  I think he

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 10-8   Filed 12/08/23   Page 103 of 214   PageID 7487
Exhibit Ex. B 253   Page 357 of 602

Post - Cross                                  60

1   was last employed maybe --from my recollection, 2014,

2   possibly.  Or 2015.  Somewhere around in there.

3   Q    Okay.  And to the best of your knowledge, did Mr. Dondero

4   appoint Mr. Powell to be the chief product strategist?

5   A    I don't -- I don't know.  I wasn't involved in the

6   decision for his appointment.  I don't know how he attained

7   that role.

8   Q    To the best of your knowledge, did Mr. Dondero appoint Mr.

9   Powell as the PM of the ETF funds?

10  A    Again, I wasn't involved in that determination, but he

11  probably would have had a role in making the determination on

12  who was the PM, along with probably some other investment

13  professionals.

14  Q    Okay.  And did Mr. Powell join the board of the funds

15  before or after he left Highland around 2015?

16  A    I can't recall specifically if he was already on the board

17  or was an interested member, but I believe he, you know, I

18  believe he joined shortly after he left.

19  Q    Okay.  So he went from being an employee and being a

20  portfolio manager at Highland to being on the board of these

21  funds.  Do I have that right?

22  A    Again, I can't recall specifically.  He may have already

23  been on the board as an interested board member.  But, you

24  know, I believe, you know, if that wasn't the case, he would

25  have joined the board shortly after leaving.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 3 Filed 12/07/23 Page 104 of 214   PageID 7488

Post - Cross                                      61

1   Q   And Mr. Ward, I think you said, has been on the funds'

2   board since somewhere between 2005 and 2008.  Does that sound

3   right?

4   A   I think that was a time frame you referenced, and I think

5   that was kind of in line, walking it back.  But I don't recall

6   specifically when he joined.

7   Q   And to the best of your knowledge, have the Advisors for

8   which you serve as the chief compliance officer managed the

9   Funds for which Mr. Ward has served as a director since the

10  time he became a director?

11  A   I'm sorry.  Can you repeat the question?

12  Q   Yeah.  I'm just trying to understand if the advisors --

13  withdrawn.  The Advisors manage the Funds; do I have that

14  right?

15  A   They provide investment advice on behalf of the Funds.

16  Q   And they do that pursuant to written agreements; do I have

17  that right?

18  A   Correct.

19  Q   And is it your understanding that, for the entire time

20  that Mr. Ward has served as a member of the board of the

21  Funds, the Advisors have provided the investment advice to

22  each of those Funds?

23  A   Yes, in one form or fashion.  I believe at one period in

24  time, historically, the Advisor may have changed its name, but

25  it would have been, you know, at the end of the day, one or

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 253-5 Filed 12/06/23   Page 105 of 214   PageID 7489
Exhibit Exhibit 4 Page 359 of 402

Post - Cross                                                    62

 1  more -- one of either NexPoint Advisors or Highland Capital

 2  Management Fund Advisors would have advised those Funds.

 3  Q    Is it fair to say that each of the Advisors for which you

 4  serve as the chief compliance officer has always been managed

 5  by an Advisor owned and controlled by Mr. Dondero?

 6  A    I believe so, yes.

 7              MR. MORRIS:  I have no further questions, Your Honor.

 8              THE COURT:  All right.  Any redirect?

 9              MR. RUKAVINA:  Yes.

10              THE COURT:  Okay.  Mr. Rukavina?

11              MR. RUKAVINA:  Your Honor, was I on mute?  I

12  apologize.

13              THE COURT:  Yes.

14                      REDIRECT EXAMINATION

15  BY MR. RUKAVINA:

16  Q    Mr. Post, why did you leave Highland?

17  A    It -- because I was a HCMLP employee and it was --

18  basically, there was conflicts that were created by being an

19  employee of the Debtor and by also serving as the CCO to the

20  named Funds and the Advisors, and it coincided with Jim

21  toggling over from HCMLP to NexPoint.  It just made sense more

22  functionally and from a silo perspective for me to be the

23  named CCO for that entity since he was no longer an employee

24  of HCMLP.

25  Q    And by Jim, you mean Jim Dondero?

007898

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-5 Filed 12/07/23   Page 106 of 214   PageID 7490

Post - Redirect/Recross                                63

1   A   Yes, sorry.  Jim Dondero.

2   Q   You're not some kind of lackey for Mr. Dondero, where you

3   go wherever he goes, are you?

4            MR. MORRIS:  Objection to the question.

5            THE WITNESS:  No.

6            THE COURT:  Overruled.  He can answer.

7            MR. RUKAVINA:  Okay.

8            THE WITNESS:  No.

9            MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10  pass the witness.

11           THE COURT:  Any other Objector examination?

12        All right.  Any recross, Mr. Morris?

13                    RECROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q   Just one question, sir.  The conflicts that you just

16  mentioned, they were in existence for the one-year period

17  between the petition date and the date you left; isn't that

18  right?

19  A   I think -- I believe so, and I think they became more

20  evident as, you know, time progressed.

21  Q   Okay.  But they existed on day one of the bankruptcy

22  proceeding; isn't that right?

23  A   Yes, I believe so.

24  Q   All right.

25           MR. MORRIS:  No further questions, Your Honor.

007899

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 27-5 Filed 12/07/23   Page 107 of 214   PageID 7491
Exhibit Exhibit 253-B Page 361 Page

Post - Recross                         64

 1          THE COURT:  All right.  Thank you, Mr. Post.  You're

 2    excused from the virtual witness stand.

 3       (The witness is excused.)

 4          THE COURT:  All right.  Your next witness?

 5          MR. RUKAVINA:  Your Honor, my exhibit has been

 6    admitted, I promised I'd be short, and my evidentiary

 7    presentation is done.  Thank you.

 8          THE COURT:  All right.  Well, Mr. Taylor, your

 9    evidence?

10          MR. TAYLOR:  First of all, given the testimony that

11    we have received just recently, we have released Mr. Sevilla

12    from his subpoena and are not going to call him.

13       With that being said, we do have some documents that we

14    would like to get into evidence.  We filed our witness and

15    exhibit list at Docket No. 1874.  I don't believe any of these

16    are controversial.  I'm trying to keep from duplicating those

17    that are already into evidence by the Debtor.  And therefore I

18    would like to offer into evidence Exhibits No. 6 through 12

19    and 17.  And that is it, Your Honor.

20          THE COURT:  Okay.  Is there any objection to Dondero

21    Exhibits 6 through 12 and 17, appearing at Docket 1874?

22          MR. MORRIS:  I just want to be clear that Exhibits 6

23    and 7, which are letters, I believe, from Mr. Lee (phonetic)

24    are not being offered for the truth of the matter asserted in

25    either letter.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3 Filed 12/07/23    Page 108 of 214    PageID 7492
Exhibit Exhibit 3 Page 1208 of 362

65

1          MR. TAYLOR:  That is correct, Your Honor.  Just

2    merely that those requests and the words that were stated in

3    there were indeed sent on those dates.

4          MR. MORRIS:  And the same comment, Your Honor, with

5    respect to Exhibits 9 through 12, that those documents are not

6    being offered for the truth of the matter asserted.

7          MR. TAYLOR:  Again, just that those requests were

8    sent and those responses as stated were sent.

9       And I apologize.  I missed one, Your Honor.  Also No. 15.

10   6 through 12, 15, and 17.

11         MR. MORRIS:  Your Honor, the Debtor has no objection

12   to Exhibits 15, 16, and 17.

13         THE COURT:  All right.  So, so they are all admitted

14   with the representation that 6 and 9 through 12 are not being

15   offered for the truth of the matter asserted.  With that

16   representation, you have no objection, Mr. Morris?

17         MR. MORRIS:  That's right.  I do just want to get

18   confirmation that Exhibits 1 through 5 and 13 through 16 -- 13

19   and 14 are not being offered at all.

20         THE COURT:  Mr. Taylor?

21         MR. TAYLOR:  So, that -- that is correct.  1 through

22   5 would be duplicative of what has already been introduced

23   into the record by Mr. Morris, so I am not offering those.

24   And do not believe that 13 and 14 are relevant anymore, and so

25   therefore did not offer those.

007901

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 25-3    Filed 12/07/23    Page 109 of 214    PageID 7493
Exhibit Exhibit 53-53 Page 363 Page

66

1          THE COURT:  Okay.  So, with that, I have admitted 6

2    through 12, 15, 16, and 17 at Docket Entry 1874.

3        (Dondero Exhibits 6 through 12 and 15 through 17 are

4    received into evidence.)

5          THE COURT:  All right.  Anything else, Mr. Taylor?

6          MR. TAYLOR:  No, Your Honor.  We are not calling any

7    witnesses.

8          THE COURT:  All right.  Mr. Draper, what about you?

9    Any evidence?

10          MR. DRAPER:  No evidence or witnesses.  The evidence

11    that's been introduced by Mr. Taylor and Mr. Rukavina are

12    sufficient for me.

13          THE COURT:  All right.  Ms. Drawhorn, anything from

14    you?

15          MS. DRAWHORN:  No additional evidence, Your Honor.

16          THE COURT:  All right.  Well, then, Mr. Morris, did

17    you have anything in rebuttal?

18          MR. MORRIS:  No, Your Honor.  I think we can proceed

19    to closing statements.  I would just appreciate confirmation

20    by the Objecting Parties that they rest.

21          THE COURT:  All right.  Well, I guess we'll get that

22    clear if it is isn't clear.  All of the Objectors rest.

23    Confirm, yes, Mr. Rukavina?

24          MR. RUKAVINA:  Confirm.

25          THE COURT:  And Mr. Taylor?

007902

1              MR. TAYLOR:  Confirmed, Your Honor.

2              THE COURT:  Okay.  And Draper and Drawhorn?

3              MR. DRAPER:  Yes, Your Honor.

4              MS. DRAWHORN:  Confirmed, Your Honor.

5              THE COURT:  All right.  By the way, I assume Mr.

6    Dondero has been participating this morning.  I didn't

7    actually get that clarification before we started.  Mr.

8    Taylor, is he there with you this morning?

9              MR. TAYLOR:  Your Honor, he is.  He has been

10   participating.  He is sitting directly to my left about

11   slightly more than six feet apart.

12             THE COURT:  Okay.  All right.  Good.

13      All right.  Well, let's talk about our closing arguments

14   and let me figure out, do we have -- should we break a bit

15   before starting?  I have an idea in my brain about a time

16   limitation, but before I do that, let me ask.  Mr. Morris,

17   first I'll ask you.  How much time do you think you need for a

18   closing argument?

19             MR. MORRIS:  Your Honor, --

20             MR. POMERANTZ:  Your Honor?

21             MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22   going to deliver that portion of our presentation today.

23             THE COURT:  All right.  Mr. Pomerantz?

24             MR. POMERANTZ:  Your Honor, I will be making -- yes,

25   Your Honor.  I will be making the majority portion of the

68

1    argument.  Mr. Kharasch will be making the portion of the

2    argument dealing with the Advisor and Funds' objection.  But I

3    expect my closing to be quite lengthy, given the 1129

4    requirements, all the legal issues, which I plan to spend a

5    fair amount of time.  So I would anticipate a range of an hour

6    and 45 minutes.

7          THE COURT:  An hour and 45 minutes?  All right.

8    Well, --

9          MR. POMERANTZ:  Correct.

10         THE COURT:  I'm getting an echo.

11         MR. CLEMENTE:  Your Honor, it's Matt Clemente on

12    behalf on the Committee.  I'll have 15 minutes or less, Your

13    Honor.  Just some things I would like to touch on.

14         THE COURT:  All right.  So, two hours.  If I were to

15    --

16         MR. POMERANTZ:  And then you need, Your Honor, to add

17    Mr. Kharasch.  I think he's on.  He can indicate how long his

18    part of the closing will be.

19         THE COURT:  Mr. Kharasch?

20         MR. KHARASCH:  Yes.  I would figure my argument would

21    probably be about 20 minutes to 30 minutes.

22         THE COURT:  Okay.

23         MR. RUKAVINA:  Your Honor, let me interject something

24    that I think will help everyone out.  With the CLOs having

25    consented through their counsel to the assumption, the bulk of

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 25-3 Filed 12/07/23    Page 112 of 214    PageID 7496

69

1    my objection is now moot.  We no longer can and will argue

2    that the contracts are unassignable under 365(b) or (c)

3    because we do have now their consent.  So that will hopefully

4    help the Debtor on that issue.

5        MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

6    not anticipating that.  I believe that that will take away the

7    bulk of my argument.  I'm still going to be dealing with some

8    of the other non-assumption-type arguments raised by the CLO

9    Objectors, kind of dovetailing with Mr. Pomerantz's arguments

10   on the injunction.  But that will greatly reduce, Your Honor,

11   my argument.

12       THE COURT:  All right.  So if I say two hours of

13   argument for the Debtor and Creditors' Committee, Rukavina,

14   Taylor and Draper and Drawhorn, can you collectively manage to

15   share that two hours?  Have a two-hour argument in the

16   aggregate?  That seems fair to me.

17       MR. RUKAVINA:  Your Honor, I think -- I think that's

18   fine, Your Honor.

19       THE COURT:  All right.  And I guess I'll --

20       MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

21       THE COURT:  Okay.  And Mr. Draper?

22       MR. DRAPER:  This is Douglas Draper.  I agree.  I

23   agree also, Your Honor.

24       THE COURT:  All right.  And I'm going to ask --

25       MR. POMERANTZ:  Your Honor, I --

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8   Filed 12/07/23   Page 113 of 214   PageID 7497

70

1          THE COURT:  Go ahead.

2          MR. POMERANTZ:  Your Honor, we -- I think we may need

3    like two hours and ten minutes, because mine was 1:45, Mr.

4    Clemente was 15, and then Mr. Kharasch.  But we'll be around

5    that.  And I tend to speak fast, so I might even shorten mine.

6          THE COURT:  Okay.  You negotiated me up to two hours

7    and ten minutes, Debtors/Objectors, each.

8       I'm going to ask one more time.  The U.S. Trustee lobbed a

9    written objection, but we've not heard anything from the U.S.

10   Trustee.  Are you out there wanting to make an oral argument?

11         MS. LAMBERT:  Yes, Your Honor.  The United States

12   Trustee is on the line.  And we've been listening to the

13   hearing.  I can turn my video on.  I think you're --

14         THE COURT:  Yes.  I can hear you.  I can't see you.

15         MS. LAMBERT:  Okay.  All right.  And so the U.S.

16   Trustee feels that the issues about the releases have been

17   adequately joined and raised by the other parties and that

18   it's an issue of law.  The U.S. Trustee does not feel that we

19   can add to that dialogue by, you know, wasting more of the

20   Court's time.  I think it's been adequately briefed and it's

21   been adequately argued here today.

22         THE COURT:  Okay.

23         MS. LAMBERT:  And we do have an agreement to include

24   governmental release language in the order.  I understand that

25   agreement is still being honored.  That's a separate agreement

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-32    Filed 12/07/23    Page 114 of 214    PageID 7498
Exhibit Exhibits 53-56    Page 368 of 692

71

1    than the issue of whether the releases are precluded.  But

2    we're going to let the other people carry the water on that.

3            THE COURT:  Okay.

4            MR. POMERANTZ:  Yeah.  And that is correct.  That is

5    correct, Your Honor.  They asked for some information -- a

6    provision on government releases.  They also asked for a

7    provision regarding joint and several liability for Trustee

8    fees.

9        As I mentioned previously, the IRS has asked for a

10    provision in the confirmation order, as have the Texas Taxing

11    Authorities.

12        We have not uploaded a proposed confirmation order, but I

13    will state right now on the record that, before we do so, we

14    will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15    Taxing Authorities the opportunity to review.  We expect there

16    won't be any issue because the language has already been

17    agreed to.

18            THE COURT:  All right.  Well, how about this.  It's

19    11:23 Central time.  Let's break until 12:00 noon Central

20    time, okay, so that gives everyone a little over 30 minutes to

21    have a snack and get their notes together, and we'll start

22    with closing arguments at 12:00 noon.  All right?  So we're in

23    recess until then.

24            THE CLERK:  All rise.

25        (A recess ensued from 11:24 a.m. until 12:05 p.m.)

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3 Filed 12/04/23   Page 115 of 214   PageID 7499
Exhibit Exhibit 253   Page 369 of 602

72

```
 1              THE COURT:  All right.  Please be seated.  All right.

 2     This is Judge Jernigan.  We are back on the record in

 3     Highland.  Let me make sure we have the people we need.  Do we

 4     have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?

 5              MR. POMERANTZ:  Yes, you do, Your Honor.

 6              THE COURT:  All right.  For our Objectors, Mr.

 7     Taylor, are you there?

 8              MR. TAYLOR:  Yes, Your Honor, I am.

 9              THE COURT:  All right.  I see Mr. Draper there on the

10     video.  You're there.

11              MR. DRAPER:  I'm here.  Can you hear me?

12              THE COURT:  I can hear you loud and clear, yes.

13              MR. DRAPER:  Great, because I didn't -- I'm not

14     hearing, something so I apologize.

15              THE COURT:  All right.  So we have Mr. Rukavina, and

16     I think I see Mr. Hogewood there as well.  Is that correct?

17     You're ready to go forward?

18              MR. RUKAVINA:  Yes, Your Honor.

19              THE COURT:  All right.

20              MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.

21              THE COURT:  All right.  And Ms. Drawhorn, you're

22     there?

23              MS. DRAWHORN:  Yes, Your Honor.

24              THE COURT:  Okay.  Committee.  Mr. Clemente, are you

25     there?
```

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 25-3 Filed 12/07/23    Page 116 of 214    PageID 7500
Exhibit Exhibits 3-53 Page 370 of 602

73

1          MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your

2    Honor.

3          THE COURT:  Okay.  Very good.  All right.  So, let me

4    reiterate.  We've given two-hour and 10-minute time

5    limitations for the Debtor, and that'll be both any time you

6    reserve for rebuttal and your closing, initial closing

7    argument.  Mr. Clemente, you're going to be in that time frame

8    as well.  Okay?

9          MR. CLEMENTE:  Yes, Your Honor.

10         THE COURT:  And so, as supporters of the plan.

11      And then, of course, the Objectors, they have collectively

12   two hours and ten minutes.

13      A couple of things.  I'm going to have my law clerk, Nate,

14   who you can't see but he's to my right, he's going to keep

15   time.  I promise I won't be a jerk and cut anyone off

16   midsentence, but please don't push the limit if I say, you

17   know, "Time."

18      The other thing I will tell you is I'll probably have some

19   questions here or there.  And I've told Nate, cut off the

20   timer if we're in a question-answer session.  I won't count

21   that as part of the two hours and ten minutes.

22      All right.  So, with that, Mr. Pomerantz, you may begin.

23               CLOSING STATEMENT ON BEHALF OF THE DEBTOR

24         MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor

25   is aware, the Debtor has been able to resolve all objections

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-53 Filed 12/07/23   Page 117 of 214   PageID 7501
Exhibit Exhibit 53 Page 371 Page

74

1   to confirmation other than the objection by Mr. Dondero or his

2   entities and the United States Trustee.

3        Your Honor, I have a very lengthy closing argument, given

4   the number of issues that are raised in the objections, and I

5   want to make a complete record, since I understand that

6   there's a good likelihood that (garbled) appeal.

7        With that in mind, Your Honor, I'm prepared to go through

8   each and every confirmation requirement in Section 1129.

9   However, as an alternative, I might propose that I can go

10  through each of the Section 1129 requirements that are the

11  subject of pending objections or otherwise depend upon

12  evidence that Your Honor has heard.

13            THE COURT:  Okay.

14            MR. POMERANTZ:  And of course, I'll be happy to

15  answer any questions that you have in the process.

16            THE COURT:  Okay.

17            MR. POMERANTZ:  And after my closing argument, I will

18  turn it over to Mr. Kharasch to address the Advisor and Funds'

19  objections.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  Before I walk the Court through the

22  confirmation requirements, I did want to note for the Court,

23  as I did previously, that we filed an updated ballot summary

24  at Docket No. 1887.  And as reflected in the summary, Classes

25  2 and 7 have voted to accept the plan with the respective

1   numerosity and amounts required.  In fact, the votes are a

2   hundred percent.

3       Class 8, however, has voted to reject the plan.  Seventeen

4   creditors in Class 8 voted yes and 24 objectors, which are, I

5   think, all but one the employees with one-dollar claims for

6   voting purposes, voted against.

7       In dollar amount, Class 8 has accepted the plan by 99.8

8   percent of the claims.  And I will address the issues of the

9   cram-down over that class a little bit later on.

10      Lastly, during the course of my presentation, I will

11  identify for the Court certain modifications we have made to

12  address the objections that were filed on January 22nd and

13  then also on February 1st.  And at the end of my presentation,

14  I will raise a couple of other modifications that I won't get

15  to during my presentation and will explain to the Court why

16  all the modifications do not require resolicitation and are

17  otherwise appropriate under Section 1127.

18      Your Honor, as Your Honor is aware, Section 1129 requires

19  the Debtors to demonstrate to the court that the plan

20  satisfies a number of statutory requirements.  1129(a)(1)

21  provides that the plan requires -- complies with all statutory

22  provisions of Title 11, and courts interpreted this provision

23  as requiring the debtor to demonstrate it complies with

24  Section 1122 and 1123.

25      With respect to classification, Your Honor, there has been

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 25-3   Filed 12/04/23   Page 119 of 214   PageID 7503

76

1   one objection that was raised to essentially a classification,

2   and that was raised by Mr. Dondero to Article 3C of the plan

3   on the grounds that it purports to eliminate a class that did

4   not have any claims in it as of the effective date but which

5   may later have a claim in that class.

6       I think he was primarily concerned about Class 9

7   subordinated claims.  But Mr. Dondero misunderstands the

8   provision.  It only eliminates a claim for voting purposes,

9   and if there's later a claim in that class, it will be treated

10  as the plan provides the treatment.

11      In any event, Class 9, as we know now, will be populated

12  by the HarbourVest claims, as well as the UBS claims and the

13  Patrick Daugherty claims, if the Court approves the settlement

14  approving those claims.

15      Next, Your Honor, Section 1123(a) contains seven mandatory

16  requirements that a plan must include.  Sections 1, 2, and 3

17  of 1123(a) apply to the classification of claims and where

18  they're impaired and treatment.  The plan does that.

19      There has been an objection to 1123(a)(3) raised by

20  several parties with respect to the classification and

21  treatment of subordinated claims.  The concerns stem from the

22  mistaken belief that the Debtor reserved the right to

23  subordinate claims without providing parties with notice and

24  without obtaining a court order.

25      The Debtor never intended to have unilateral ability to

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 18-25 Filed 12/07/23  Page 120 of 214    PageID 7504

77

1   subordinate claims without affording parties due process

2   rights, and we've added some clarificatory language to so

3   provide.

4        We made changes to the plan on January 22nd, and then on

5   February 1st, and the plan addresses all those issues in

6   Article 3(j) and it talks about when a claim is going to be

7   subordinated as a non-creditor.  We've also redefined the

8   definition of subordinated claims to make clear that a claim

9   is only subordinated upon entry of an order subordinating that

10  claim.

11       Mr. Dondero also objected on the grounds that the plan did

12  not contain a deadline pursuant to which the Debtor would be

13  required to seek any subordination, and we have revised

14  Article 7(b) of the plan to provide that any request to

15  subordinate a claim would have to be made on or before the

16  claim objection deadline, which is 180 days after the

17  effective date.

18       Lastly, certain former employees, Mr. Yang and Borud,

19  objection also joined by Mr. Deadman, Travers, and Kauffman,

20  objected to the inclusion of language in the definition of

21  "Subordinated Claims" that a claims arising from a Class A, B,

22  or C limited partnership is deemed automatically subordinated.

23  The concerns were that the language could broadly apply to any

24  potential claims by a former partner, and could be also read

25  to encompass claims outside the statutory scope of 510(b) or

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8   Filed 12/07/23   Page 121 of 214   PageID 7505

78

1    otherwise relating to limited partnership interests.

2        While the Debtor does reserve the right to seek to

3    subordinate the claims on any basis, we have modified the plan

4    to address that concern and to address the concern that we're

5    not attempting to create any new causes of action for

6    subordination that don't otherwise exist under applicable law,

7    but it just preserves the parties' rights with respect to

8    subordination and deals with that at a later date.

9        Next, Your Honor, Section 1123(a)(5).  I skipped over

10   1123(a)(4) because there are no objections to that provision.

11            THE COURT:  Okay.

12            MR. POMERANTZ:  Section 1123(a)(5), a plan must

13   provide for adequate means of implementation.  And the plan

14   provides a detailed structure and blueprint how the Debtor's

15   operations will continue, how the assets will be monetized,

16   including the establishment of the Claimant Trust,

17   establishment of the Litigation Sub-Trust, the Reorganized

18   Debtor, the Claimant Trust Oversight Board.  And the documents

19   precisely describing how this will occur were filed as part of

20   the various plan supplements.

21       1123(a)(7), Your Honor, requires that the plan only

22   contain provisions that are consistent with the interest of

23   equity holders and creditors with respect to the manner,

24   selection, and -- of any director, officer, or trustee under

25   the plan.  And as discussed in the plan, at the disclosure

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 25-53    Filed 12/07/23    Page 122 of 214    PageID 7506

79

1    statement, and as testified to by Mr. Seery, the Committee and

2    the Debtor had arm's-length negotiations regarding the post-

3    effective date corporate governance and believe that the

4    selection of the claimant Trustee, the Litigation Sub-Trustee,

5    and the Claimant Trust Oversight Board are in the best

6    interest of stakeholders.

7        HCMFA has raised a particular objection, I think, to these

8    issues, but I will address it in the context of the

9    requirement under Section 1129(a)(5).

10        Your Honor, Section 1129(a)(2) requires that the plan

11    comply with the disclosure and solicitation requirements under

12    the plan.  Section 1125 requires that the Debtor only solicit

13    with a court-approved disclosure statement.  The Court

14    approved the disclosure statement on November 23rd, and

15    pursuant to the proofs of service on file, the plan and

16    disclosure statement were mailed, along with solicitation

17    materials that the court approved.

18        Now, there has been an objection raised by Dugaboy, and

19    also alluded to by Mr. Taylor in some of his comments before,

20    that the plan does violate 1129(a)(2) because the Debtor's

21    disclosure statement was deficient.

22        In support of that argument, Dugaboy points to the

23    reduction in the anticipated distribution to creditors from

24    the November plan analysis to the January plan analysis, and

25    argues that that reduction requires resolicitation.  However,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-5 Filed 12/04/23   Page 123 of 214   PageID 7507
Exhibit Exhibit 253 Page 2 of 92

80

1    those arguments are not well-taken.

2        First, none of the people making these objections were

3    solicited for their vote on the plan, or if they had been,

4    they didn't vote or decided to reject the plan.  And to the

5    extent that Class 8 creditors, the distribution has gone down

6    -- that's the class that Mr. Taylor and Mr. Draper are

7    concerned about -- you don't hear the Committee, Acis,

8    Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9    making their argument, this argument, and they represent over

10    99 percent of the claims in that class.  And in fact, of the

11    17 Class 8 creditors that have accepted the plan, 15 are

12    represented by the parties I just mentioned.

13        So who are the two creditors that they're so concerned

14    about?  One is Contrarian, which is a claims trader that

15    actually elected to be treated in Class 7, and one is one of

16    the employees who voted to accept the plan.

17        Second, Your Honor, the argument conflates the difference

18    between adverse change to the treatment of a claim or interest

19    that would require a resolicitation under Section 1127 and a

20    change to the distribution that would not.

21        More importantly, Your Honor, the argument is specious.

22    As Mr. Seery testified yesterday, the material differences

23    between the analysis contained on November and late January

24    and the one we filed on February 1st were based on three types

25    of changes:  an update regarding the increased value of assets

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-53   Filed 12/07/23   Page 124 of 214   PageID 7508

81

1   based upon events that had transpired during this period,

2   which included an increase in asset value, no recoveries, and

3   revenues expected to be generated by the CLO management

4   agreements; an update to the expected costs of the Reorganized

5   Debtor and the Claimant Trust as a result of the continued

6   evaluation of staffing needs, operational expenses, and

7   professional fees; and an update to reflect resolution of the

8   HarbourVest and UBS claims.

9       In the filing Monday, Your Honor, we updated the plan

10  projection, a liquidation analysis which revised the unsecured

11  claims based upon the UBS settlement that I was able to

12  disclose to Your Honor.  And in the filing, the distribution

13  now revised to Class 8 creditors is now 71 percent, compared

14  to the 87 percent that was in the disclosure statement that

15  went out for solicitation.

16      Your Honor, there can be no serious argument that the

17  creditors in this case were not fully aware of the potential

18  for the UBS and HarbourVest creditors receiving claims.  Your

19  Honor's UBS 3018 order granting its claim for voting purposes

20  was entered right around the time that the disclosure

21  statement was approved.  And, in fact, a last-minute addition

22  to the disclosure statement disclosed the 3018 amount,

23  although the amount did not make it to the attachment to the

24  disclosure statement.  And that reference, Your Honor, to the

25  UBS claim being allowed for voting purposes can be found at

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-53   Filed 12/07/23   Page 125 of 214   PageID 7509

82

1    Page 41 of Docket No. 1473.

2        And the HarbourVest settlement was filed on about December

3    23, two weeks before the voting deadline, sufficient time for

4    people to take that into consideration.

5        And as Your Honor surely knows, the hearings in this case

6    have been very well-attended by the major parties, and I

7    believe that if we went back and looked at the records of who

8    was on the WebEx system during the HarbourVest and UBS

9    hearings, you would find that representatives of basically

10   every creditor, every major creditor in this case in Class 8

11   participated.

12       Moreover, Your Honor, creditors were not guaranteed any

13   percentage recovery under the plan and disclosure statement,

14   which clearly identified the size of the claims pool as a

15   material risk.

16       Article 4(a)(7) of the disclosure statement, which is at

17   Docket 1473, is entitled "Claims Estimation" and warns

18   creditors that there can be no assurances that the Debtor's

19   claims estimates will prove correct, and that the actual

20   amount of the allowed claims may vary materially.

21       And if Dugaboy is arguing it was misled as the holder of a

22   disputed administrative claim and general unsecured claim,

23   that argument is simply preposterous.

24       Dugaboy cites several cases for the proposition that

25   deficient disclosure may warrant resolicitation, and the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-2   Filed 12/07/23   Page 126 of 214   PageID 7510

83

1   Debtor agrees with the proposition as a general matter.  But

2   if one looks at the cases that were filed -- that Dugaboy

3   cited to, it will see that they are clearly inapposite and

4   distinguishable.

5       *In re Michaelson*, the Bankruptcy Court for the Eastern

6   District of California, revoked confirmation because the

7   debtor failed to disclose in the disclosure statement a mail

8   fraud indictment of the turnaround specialist who was to lead

9   the reorganization effort and a prior Chapter 7 company he

10   drove into the ground.

11       In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12   of the Bankruptcy Court that the individual debtor's decision

13   to modify its financial projections on the eve of confirmation

14   did not require a resolicitation.  And there, the financial

15   projections were off by 75 percent.

16       And in *Renegade Holdings*, the Bankruptcy Court granted a

17   motion by a group of states to revoke confirmation by the

18   debtors, who manufactured and distributed tobacco products,

19   because the debtors failed to disclose in its disclosure

20   statement that the debtor and its principals were under

21   criminal investigation for unlawful trafficking in cigarettes,

22   which was not disclosed to creditors.

23       Your Honor, none of these cases are remotely analogous to

24   this case, and they certainly do not stand for the proposition

25   that the Debtor was required to resolicit.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-53   Filed 12/07/23   Page 127 of 214   PageID 7511

84

1          Next, Your Honor, the next requirement is 1129(a)(3),

2     which requires that any plan be proposed in good faith.  As

3     Mr. Seery testified at length, and the Court has personal

4     knowledge of, having presided over this case for a year, the

5     plan is the result of substantial arm's-length negotiations

6     with the Committee over a period of several months.

7          Mr. Seery testified yesterday that, soon after the board

8     was appointed, the Committee wanted to immediately pursue down

9     the path of an asset monetization plan.  However, as Mr. Seery

10    testified, the board decided that it was inappropriate to rush

11    to judgment and that it should consider all potential

12    restructuring alternatives for the Debtor.  And Mr. Seery

13    testified what those alternatives were:  a traditional

14    restructuring and continuation of the Debtor's business; a

15    potential sale of the Debtor's assets in one or more

16    transactions; an asset monetization plan like the one before

17    the Court today; and, last but not least, a grand bargain plan

18    that would involve Mr. Dondero sponsoring the plan with a

19    substantial equity infusion.

20         As Mr. Seery testified, by the early summer of 2020, the

21    Debtor decided that it was appropriate to start moving down

22    the path of an asset monetization plan while it continued to

23    work on the grand bargain plan.  Accordingly, Mr. Seery

24    testified that the Debtor commenced good-faith negotiations

25    with the Committee regarding the asset monetization plan, and

007920

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-3 Filed 12/04/23 Page 128 of 214 PageID 7512

85

1   that those negotiations took several months, were hard-fought

2   and at arm's-length, and involved substantial analysis of the

3   appropriate post-confirmation corporate structure, governance,

4   operational, regulatory, and tax issues.  And on August 12th,

5   Your Honor, the plan was filed with the Court.

6       And although the Debtor at that time had not reached an

7   agreement with the Committee on some of the most significant

8   issues, Mr. Seery testified that the independent board

9   believed that it was important to file that plan at that time,

10  a proverbial stake in the ground to act as a catalyst for

11  reaching a consensual plan with the Committee or others, which

12  it has done.

13      As Mr. Seery testified, he continued to work with Mr.

14  Dondero to try to achieve a grand bargain plan, while at the

15  same time proceeding down the path of the filed plan.

16      He testified that the parties participated in mediation at

17  the end of August and early September to try to reach an

18  agreement on a grand bargain plan, but were unsuccessful.  And

19  the Debtor proceeded on the path of the August 12th plan and

20  sought approval of its disclosure statement on August 27th,

21  2020.

22      Mr. Seery testified that, at that time, the Debtor still

23  had not reached an agreement with the Committee on certain

24  significant issues involving post-confirmation governance and

25  the scope of releases.  And as a result, after a contested

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 28-53 Filed 12/07/23    Page 129 of 214    PageID 7513

86

1    hearing, Your Honor, Your Honor did not approve the disclosure

2    statement on October 27th, but asked us to go back again to

3    try to work out the issues, and we came back on November 23rd.

4         Mr. Seery testified that the Debtor continued to negotiate

5    with the Committee to resolve the material disputes leading --

6    which led up to the November 23rd hearing, where we came in

7    with the support of the Committee.  But as Mr. Seery has also

8    testified, he has continued to try to reach a consensus on a

9    global plan, notwithstanding the approval of the disclosure

10   statement.  And he spent personally several hundred hours

11   since his appointment trying to build consensus.

12        As part of this process, Mr. Seery testified that Mr.

13   Dondero received access to substantial information regarding

14   the Debtor's assets and liabilities, most recently in

15   connection with a series of informal document requests which

16   were made at the end of December.

17        And after the Court asked the parties to again reengage in

18   efforts to try to reach a global hearing after the Debtor's

19   preliminary injunction motion, Mr. Seery testified that he and

20   the board participated in calls with Mr. Dondero and his

21   advisors and the Committee to see if common ground could be

22   attained.

23        Unfortunately, as Mr. Seery testified, the Committee and

24   Mr. Dondero were not able to reach an agreement.

25        Accordingly, Your Honor, the testimony unequivocally and

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-53   Filed 12/07/23   Page 130 of 214   PageID 7514

87

1   overwhelmingly demonstrates that the plan was proposed in good

2   faith.

3       I expect the Objectors may argue in closing that they have

4   filed a plan under seal that is a better alternative than that

5   being proposed by the plan that the Debtor seeks to confirm.

6   Your Honor, as a threshold matter, yesterday I said any

7   mention of the specifics of the recent plan would be

8   inappropriate.  We are not here today to debate the merits of

9   Mr. Dondero's plan, which the Court permitted him to file

10  under seal.  He had ample opportunity to file this plan after

11  exclusivity was terminated, seek approval of a disclosure

12  statement, and, if approved, solicit votes in connection with

13  a confirmation hearing, but he failed to do so.

14      What matters today, Your Honor, is whether the Debtor's

15  plan, the plan that has been accepted by 99.8 percent of the

16  amount of creditors, and opposed only by Mr. Dondero, his

17  related entities, and certain employees, meets the

18  confirmation requirements of Section 1129, which we most

19  certainly argue it does.

20      And perhaps most importantly, Your Honor, the Court

21  remarked at the last hearing that, without the Committee's

22  support for a competing plan, Mr. Dondero's plan would be dead

23  on arrival.  And as you have heard from Mr. Clemente, Mr.

24  Dondero does not yet have the Committee's support.

25      Next, Your Honor, is Section 1129(a)(5).  That requires

007923

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 2131 of 214   PageID 7515

88

1    that the plan disclose the identity of any director,

2    affiliate, officer, or insider of the debtor, and such

3    appointment be consistent with the best interest of creditors

4    and equity holders.  Courts have held that this section

5    requires the disclosure of the post-confirmation governance of

6    the reorganized entity.

7        HCMFA objects to the plan, arguing that it did not comply

8    with Section 1129(a)(5) because it didn't disclose the people

9    who would control and manage the Reorganized Debtor and who

10   might be a sub-servicer.  HCMFA's objection is off-base.

11   Under the plan, Mr. Seery will be the claimant Trustee and

12   Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13   testified extensively about his background, and he has

14   appeared before the Court many times and the Court is familiar

15   with him.  We have also introduced his *C.V.* into evidence.

16       As he testified, he will be paid $150,000 per month,

17   subject to further negotiations with the Claimant Trust

18   Oversight Committee regarding the monthly amount and any

19   success fee and severance fee, which negotiation is expected

20   to be completed within the 45 days following the effective

21   date.

22       Mr. Seery also testified regarding the names of the

23   members of the Claimant Trust Oversight Committee, which

24   information was also contained in the plan supplement and it

25   generally includes the four members of the Committee and David

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8 Filed 12/07/23   Page 132 of 214   PageID 7516

89

1   Pauker, a restructuring professional with decades of

2   restructuring experience.

3       The members of the Oversight Committee will serve without

4   compensation, except for Mr. Pauker, who Mr. Seery testified

5   will receive $250,000 in the first year and $150,000 for

6   subsequent years.

7       As set forth in the Claimant Trust agreement, if at any

8   time there is a vacant seat to be filled by another

9   independent member, their compensation will be negotiated by

10  and between the Claimant Trust Oversight Board and them.

11      Mr. Seery has also testified that he believed the Claimant

12  Trust will have sufficient personnel to manage its business.

13  Specifically, he has testified that he intends to employ

14  approximately ten of the Debtor's employees, who will be

15  sufficient to enable him to continue to operate the Debtor's

16  business, including as an advisor to the managed funds and the

17  CLOs, until the Claimant Trust is able to effectively and

18  efficiently monetize its assets for fair value, whether that

19  takes two years or whether that takes 18 months or whether

20  that takes longer.

21      Mr. Seery further testified that he believes that the

22  operations can be best conducted by the Debtor's employees.

23  And while he did consider the retention of a sub-servicer, he

24  ultimately decided, in consultation with the Committee, that

25  the monetization would be a lot more effective if done with a

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3    Filed 12/04/23    Page 133 of 214    PageID 7517

90

1   subset of the Debtor's current employees.

2        The proposed corporate governance is also consistent with

3   the interests of the Debtor and its stakeholders.  The Court

4   is very familiar with Mr. Seery and the Debtor, and I believe

5   that Mr. Clemente, when he comments, will say the Committee

6   can think of no better person to continue managing the

7   Claimant Trust than Mr. Seery.

8        Mr. Kirschner is also well qualified to be the Litigation

9   Trustee.  His *C.V.* is part of the evidence that's been

10  admitted and contains additional information regarding his

11  background.  And he will receive $40,000 a month for the first

12  three months and $20,000 a month thereafter, plus a to-be-

13  negotiated success fee.

14       There just simply can be no challenge to Mr. Seery's or

15  Mr. Kirschner's qualifications or abilities to act in a manner

16  contemplated by the plan or that their involvement is not in

17  the best interest of the estate and its creditors.

18       Your Honor, the next requirement that is objected to is

19  Section 1129(a)(7).  That, of course, requires the Debtor to

20  demonstrate that creditors will receive not less under the

21  plan than they would receive if the Debtor was to be

22  liquidated in Chapter 7.  And on February 1st, Your Honor, we

23  filed our updated liquidation analysis, which contains the

24  latest-and-greatest evidence to support that.

25       These documents, the updated documents, in connection with

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 134 of 214   PageID 7518
Exhibit Exhibit 53-Bso 12 407 388 Page

91

1   the prior analysis, was provided to objecting parties in

2   advance of the January 29th deposition, and Your Honor has

3   heard the differences between the January 29th and the

4   February 1st documents being very minimal.

5       The Court heard extensive evidence and testimony from Mr.

6   Seery regarding the assumptions that went into the preparation

7   of the liquidation analysis and the differences of what

8   creditors are projected to receive under the plan as compared

9   to what they are projected to receive in a Chapter 7.

10      Such testimony also included a comparison between the

11  liquidation analysis that was filed with the plan in November,

12  the updated liquidation analysis filed on the -- or, provided

13  to parties on January 28th, and the last version, filed on

14  February 1st.

15      Mr. Seery testified that, on the revenue side, the

16  liquidation analysis was updated to include the HCLOF

17  interest, which was required as part of the settlement with

18  HarbourVest; the increase in value of certain assets,

19  including Trussway; revenue expected to be generated from

20  continued management of the CLOs; and increased recovery on

21  notes as a result of the acceleration of certain related

22  notes.

23      On the expense side, Mr. Seery testified regarding his

24  best estimate of the likely expenses to be incurred by a

25  Chapter 7 trustee -- by the Claimant Trust, including

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3 Filed 12/07/23   Page 135 of 214   PageID 7519

92

1    personnel costs; professional costs, which increase because of

2    the litigious nature this case has become; and operating

3    expenses.

4         And lastly, on the claim side, Your Honor, Mr. Seery

5    testified that the claims numbers have been updated to include

6    the settlement from HarbourVest and initially the amount

7    approved to UBS pursuant to the 3018 order and then the

8    reduction at $50 million based upon the settlement announced.

9    And like the prior liquidation analysis, the current analysis

10   demonstrates that creditors will fare substantially better

11   under in Chapter -- under the plan than in Chapter 7.   In

12   fact, the projected recovery under the plan is 85 percent for

13   Class 7 creditors and 71.32 percent for Class 8 creditors, as

14   compared to 54.96 percent for all unsecured creditors in a

15   Chapter 7.

16        Mr. Seery also testified that expenses are expected to be

17   more under Chapter 11 than under Chapter 7, but he also

18   testified that the tens of millions of dollars in greater

19   revenue and asset recoveries under the plan will more than

20   offset the additional expenses.

21        As a result, the Court has more than sufficient

22   evidentiary basis to conclude that the Debtor has carried its

23   burden to prove that it meets the best interest of creditors

24   best.

25        But Mr. Dondero's counsel spent a lot of time crossing --

1    cross-examining Mr. Seery, in a vain attempt to demonstrate to

2    the Court that a Chapter 7 actually would be much better for

3    creditors.  And this argument has also been made by Dugaboy

4    and the Advisors and the Funds.

5        Before I address these arguments on its merits, Your

6    Honor, I just wanted to remind the Court of the Objectors --

7    these Objectors' interest in this case.  Mr. Dondero owns no

8    equity in the Debtor.  He owns a general partner.  Strand, in

9    turn, owns a quarter-percent -- a quarter of one percent of

10   the total equity in the Debtor.  And Mr. Dondero's claim, it's

11   only a claim for indemnification.  Dugaboy asserts two claims:

12   a frivolous administrative claim relating to the postpetition

13   management of a Multi-Strat, which, as an administrative

14   claim, if it's valid, would not even be affected by the best

15   interest of creditors test, because it would have to be paid

16   in full.  And he also asserts a claim that the Debtor's

17   subsidiary -- against the Debtor's subsidiary for which it

18   tries to pierce the corporate veil.

19       Just think about it.  Dugaboy, Mr. Dondero's entity, is

20   arguing that he should be able to pierce the corporate veil to

21   get at the entity that was his before the bankruptcy.

22       Dugaboy's only other interest in this case relates to a --

23   a one -- point eighteen and several-hundredths percent of the

24   equity interest of the Debtor, and that is out of the money.

25       And as I mentioned previously, Your Honor, Mr. Rukavina's

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3    Filed 12/07/23    Page 137 of 214    PageID 7521

94

1   clients either didn't file any general unsecured claims or

2   filed them and withdrew them.  Their only claim is a disputed

3   administrative claim against the Debtor that was filed a week

4   ago and which, at the appropriate time, the Debtor will

5   demonstrate is without merit.

6       And I understand that, just today, NexPoint Advisors also

7   filed administrative claim.

8       So I'm not going to argue to Your Honor that these parties

9   do not have standing, although their standing is tenuous, at

10  best, to assert this argument.  The Court should keep their

11  relative interests in mind when evaluating the merits and the

12  good faith of this objection.

13      The principal objection, as I said, is that creditors will

14  do better in a Chapter 7.  Essentially, they argue that a

15  Chapter 7 trustee can liquidate the assets just as well as Mr.

16  Seery can and not require the cost structure that is included

17  in the Debtor's plan projections.  Yes, they argue that a

18  Chapter 7 will be more efficient.

19      Mr. Seery's testimony, the only testimony on the topic,

20  however, establishes that this preposterous proposition has no

21  basis in reality.  Mr. Seery testified that a Chapter 7

22  trustee's mandate would be to reduce Debtor's assets as fast

23  as possible, while he will monetize assets as and when

24  appropriate to maximize the value.

25      But even if you can assume that the Chapter 7 trustee

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-8 Filed 12/06/23 Page 138 of 214 PageID 7522

95

1    could get court authority in a Chapter 7 to operate, there are

2    several reasons Mr. Seery testified why a liquidation by a

3    Chapter 7 trustee would be far worse than the plan.

4        First, Your Honor, no matter how competent the Chapter 7

5    trustee is -- and Mr. Seery did not say he is more competent

6    than anyone else out there -- the lack of a learning curve

7    that Mr. Seery established through the 13 months in this case

8    puts Mr. Seery at such a major advantage compared to a Chapter

9    7 trustee.

10        Second, Mr. Seery questioned whether the Chapter 7 trustee

11    would be able to retain the Debtor's existing professionals,

12    even assuming they were willing to be retained.  I'm not sure

13    what's the Court's practice or the practice in the Northern

14    District, but in many districts around the country debtor's

15    counsel and professionals cannot be retained by Chapter 7

16    trustee, as general counsel, at least.

17        And I could just imagine, Your Honor, Mr. Dondero's

18    position if the Chapter 7 trustee actually sought to hire

19    Pachulski Stang and DSI.

20        Third, Your Honor, regardless of whether the Chapter 7

21    trustee obtained some operating authority, the market

22    perception will be that a Chapter 7 trustee will sell assets

23    for less value than would Mr. Seery as claimant Trustee.  Mr.

24    Seery testified to that.

25        The argument that the Objectors make that a Chapter 7

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3 Filed 12/07/23   Page 139 of 214   PageID 7523

96

1    process, whereby the trustee would seek court approval of

2    assets, is better for value than a process overseen by the

3    Claimant Trust Board lacks any evidentiary basis and also is

4    contradicted by Mr. Seery's testimony.

5        In fact, Mr. Seery testified that the Chapter 7 process,

6    the public process of it, would very likely result in less

7    recovery than a sale conducted in the Claimant Trust.

8        And lastly, Mr. Seery testified that it's unlikely that

9    the ten or so valuable employees who Mr. Seery is planning to

10   heavily rely on to assist him with post-confirmation would

11   agree to a work for Chapter 7 trustee.  Your Honor is all too

12   familiar with the fights in the *Acis* case and Chapter 7

13   trustee, and it's just hard to believe that any of the

14   Highland employees would go work for the Chapter 7 trustee.

15       So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16   actually making this objection and advocating for a Chapter 7?

17   It's because they would expect to buy the Debtor's assets on

18   the cheap from a Chapter 7 trustee, exactly what they've been

19   trying to do in this case.

20       Your Honor, moving right now to Section 1129(a)(11), that

21   requires the debtor to demonstrate that the plan is feasible.

22   In other words, it's not likely to be followed by a further

23   liquidation or restructuring.  Under the Fifth Circuit law,

24   the debtor need only demonstrate that the plan will have a

25   reasonable probability of success to satisfy the feasibility

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-2 Filed 12/07/23   Page 140 of 214   PageID 7524

97

1    requirement, and the Debtor has easily met this standard.

2        As Mr. Seery testified, the Debtor's plan contemplates

3    continued operations through which time the assets will be

4    monetized for the benefit of creditors.  The plan contemplates

5    that Class 7 creditors will be paid off shortly after the

6    effective date.  Class 8 creditors are not guaranteed any

7    recovery but will receive pro rata distributions over a period

8    of time.  Class 2, Frontier secured claim, will be paid off

9    over time, and the projections demonstrate that it will -- the

10   Debtor will have money to do so.

11       Mr. Seery testified at length regarding the assumptions

12   that went into the preparation of the projections most

13   recently filed on February 1, and based on that testimony, the

14   Debtor has clearly demonstrated that the plan is feasible.

15       Your Honor, I think that brings us to Section 1129(b).  Of

16   course, again, Your Honor, if Your Honor has any other

17   questions with the sections I'm skipping over.  I believe

18   we've adequately covered them in the briefs and I don't think

19   there's any objection.

20       But as I mentioned before, we have three classes that have

21   voted to reject the plan.  Class 8 is the general unsecured

22   claims.  They voted to reject the plan.  Yes.  Even though,

23   based upon the ballot summary, 99 percent of the amount of

24   claims in that class voted to accept the plan, approximately

25   24 employees voted to reject the plan.  And accordingly, the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 141 of 214   PageID 7525

98

1    Debtor cannot satisfy the numerosity requirement of Section

2    1126(c).

3        I do want to briefly recount for Your Honor Mr. Seery's

4    testimony regarding the nature of the claims of the 24

5    employees who voted to reject the plan.  And I'm not doing

6    this to argue that the votes from these contingent creditors

7    are not valid or that the Debtor doesn't need to satisfy the

8    cram-down requirements.  The Debtor understands it needs to

9    demonstrate to the Court that Section 1129(b) is satisfied for

10   the Court to confirm the plan.

11       Rather, why I do this, Your Honor, is to provide the Court

12   with context about the nature and extent of the creditors in

13   this class as the Court determines whether the plan is, in

14   fact, fair and equitable and can be crammed down to a

15   dissenting vote.

16       Mr. Seery testified that these employees originally had

17   claims under the annual bonus plan and the deferred

18   compensation plan.  And as he testified, in order for claims

19   under each of those plans to vest -- I think he referred to

20   them as be-in-the-seat plans -- the employee was required to

21   remain employed as of that date.

22       Mr. Seery testified that the Debtor terminated the annual

23   bonus plan in the middle of January and replaced it with the

24   key employee retention plan that the Court previously

25   approved.

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-3 Filed 12/07/23 Page 142 of 214 PageID 7526
Exhibit Exhibit 3-53 Page 396 of 409

99

1      Accordingly, Mr. Seery testified that no employee who

2  voted to reject the plan anymore has a claim on the annual

3  bonus plan.  He also testified that, with respect to the

4  deferred compensation plan, people have contingent claims

5  under that plan and that no payments are due until May 20 --

6  2021.

7      As Mr. Seery testified, if the employees who would be

8  entitled to receive payments under the deferred compensation

9  plan do not agree to enter into a separation agreement that

10  was approved by the Court, they will be terminated before May

11  and there will no -- not longer be any deferred compensation

12  due.

13      Accordingly, while the 24 employees who voted to reject

14  the plan do technically have claims at this time they have

15  voted, Mr. Seery testified the claims will go away soon.

16      I do want to point out something that's obviously

17  painfully obvious at this point, that while Class 8 voted to

18  reject the plan, the Committee, the statutory fiduciary for

19  all unsecured creditors, supports the plan enthusiastically

20  and I believe it does so unanimously.

21      The other classes to reject the plan, Your Honor, are

22  Class 11, the A limited partnerships, and none of the holders

23  in Class B and C limited partnerships voted on the plan, so

24  cram-down is required over those classes as well.  So Your

25  Honor is able to confirm the plan pursuant to the cram-down

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 143 of 214   PageID 7527

100

1  procedures under 1129(b) if the Court determines that the plan

2  is fair and equitable and does not discriminate unfairly

3  against the rejecting classes.

4      Let's first turn to the fair and equitable requirement.  A

5  plan is fair and equitable if it follows the absolute priority

6  rule, meaning that if a class does not receive payment in

7  full, no junior class will receive anything under the plan.

8  With respect to Class 8, no junior class -- junior class to

9  Class 8 will receive payment, and here is the key point,

10  unless Class 8 is paid in full, with appropriate interest.

11  NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12  that the plan does not satisfy the absolute priority rule

13  because Class 10 and Class Equity Interests have a contingent

14  right to receive property under the plan.

15      Your Honor, this argument misunderstands the absolute

16  priority rule.  Class 10 and Class Creditors will only receive

17  payment after distribution to 8 and 9, the unsecured claims

18  and the subordinated claims, are all paid in full, plus

19  interest.

20      And, in fact, Dugaboy, in its brief, to its credit, admits

21  that the argument is contrary to the Bankruptcy Court's

22  decision of Judge Gargotta in the Western District case of *In

23  re Introgen Therapeutics*.  There, the Court was faced with a

24  similar argument by a group of unsecured creditors who argued

25  that the debtor's plan violated the absolute priority rule

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document Exhibit 2b-2 53-5 Filed 12/07/23 Page 144 of 214    PageID 7528

101

1    because equity was retaining a contingent interest that would

2    only be payable if general unsecured claims were paid in full.

3         In rejecting the argument, the Court reasoned, and I

4    quote, "The only way Class 4 will receive anything is if Class

5    3, in fact, gets paid in full, in satisfaction of

6    1129(b)(2)(B)(i)," meaning that the absolute priority rule

7    would not be an issue.  If Class 3 is not paid in full, Class

8    4's property interest is not -- is just -- is not just

9    valueless, it just doesn't exist.

10        Your Honor, this is precisely the situation in this case.

11   Equity interests will only receive a recovery if Class 8 and 9

12   are paid in full.

13        But Dugaboy attempts to escape the logical reading of the

14   absolute priority rule by claiming that *Introgen* was wrongly

15   decided and goes against the Supreme Court's decision in

16   *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17   Court decided that property given to a junior class without

18   paying a senior class in full is property, even if it's

19   worthless.

20        But Dugaboy misses the point.  Like the debtor in the

21   *Introgen*, the Debtor here is not arguing that the property  --

22   the absolute priority rule is not violated because the

23   contingent trust is worthless.  Rather, the argument is that

24   the absolute priority rule is not violated; it's, in order to

25   receive anything on account of the junior -- of the equity,

007937

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3 Filed 12/07/23    Page 145 of 214    PageID 7529
Exhibit Exhibit 253-Bates 1203-399 Page

102

1   the senior creditors have to be paid a hundred percent plus

2   interest.

3       In fact, Your Honor, if the plan just didn't give any

4   recovery to the equity Class 10 and 11, I bet you Dugaboy and

5   Mr. Dondero would be arguing that it violated the absolute

6   priority rule because senior classes, unsecured creditors,

7   could potentially receive more than a hundred percent of their

8   interest.  And there's a case in the Southern District of

9   Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10  plan to be confirmed, its stockholders eliminated, creditors

11  must not receive more than payment in full.

12      Excess proceeds, Your Honor, if any, have to go somewhere.

13  They can't go to creditors, so they have to go to equity.  And

14  the absolute priority rule is not violated.

15      And how is Dugaboy harmed?  They say they may want to buy

16  the contingent interests, and the lack of a marketing effort

17  violates the *LaSalle* opinion as well.  And who holds the Class

18  B and Class C partnership interests that come before Dugaboy

19  that Dugaboy is concerned may have this opportunity rather

20  than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21  like Dugaboy, that's owned and controlled by Mr. Dondero.

22      Accordingly, the argument that the plan violates the

23  absolute priority rule is actually a frivolous argument.

24      Turning now to unfair discrimination, Your Honor, Dugaboy

25  argued in its brief Monday that because the projected

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-5 Filed 12/07/23   Page 146 of 214   PageID 7530

103

1   distribution to unsecured creditors has gone down in the

2   recent plan projections, the discrepancy between Class 7 and

3   Class 8 is so large that that amounts to unfair

4   discrimination.

5        Again, the Court should first ask why is Dugaboy even the

6   right party to be making the objection.  Its claim against the

7   Debtor to pierce the corporate veil, as I mentioned, is

8   frivolous.  It's subject to objection.  It didn't even bother

9   to have the claim temporarily allowed for voting purposes, as

10  did other creditors who thought they had a valid claim.  Yet

11  this is another example of Mr. Dondero, through Dugaboy,

12  trying to throw as many roadblocks in front of confirmation as

13  he can.

14       But this argument, like the other ones, fails as well.

15  Class 8 contains the general unsecured creditor claims,

16  predominately litigation claims that have been pending against

17  the Debtor for years.  The Debtor was justified in treating

18  the other unsecured creditors differently.

19       Class 6 consists of the PTO claims in excess of the cap,

20  which are of different quality and nature than the other

21  claims.

22       Class 7 consists of the convenience class.  And it's

23  appropriate to bribe convenience class creditors with a

24  discount option for smaller claims to be cashed out for

25  administrative convenience.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 3-8253-1 Filed 12/07/23    Page 147 of 214    PageID 7531

104

1        Mr. Seery testified that when the plan was formulated, the

2   concept was to separately classify liquidated claims in small

3   amounts in Class 7 and unliquidated claims in Class 8.  Mr.

4   Seery also testified that there's a valid business

5   justification to treat the -- hold business 7 -- Class 7

6   claims differently.  These creditors had a reasonable

7   expectation of getting paid promptly, as compared to

8   litigation creditors, who would expect to be paid over time.

9        As the Court is aware, the litigation claims in Class 8

10  involve litigation that has been pending for several years in

11  the case of Acis, Daugherty, Redeemer, and more than a decade

12  in UBS.

13       And most importantly, as Mr. Seery testified, the

14  Committee and the Debtor had significant negotiation regarding

15  the classification and treatment provisions of the plan for

16  Class 7.

17       The Committee does have one constituent who is a Class 7

18  creditor.  However, the other three creditors are all in Class

19  8 and hold claims in excess of $200 million and supported the

20  separate classification and the different treatment.

21       So, Your Honor, discrimination, different treatment among

22  Class 7 and 8 is appropriate, and the different treatment is

23  not unfair.  In the February 1 projections, the Class 8

24  creditors are estimated to receive 71.32 percent of their

25  claims, but that's just an estimate.  As Mr. Seery testified,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 148 of 214   PageID 7532

105

1   the number can go up based upon the value he can generate from

2   the assets and, importantly, from litigation claims.  Class 8

3   creditors could up end up receiving a hundred percent on

4   account of their claims.  Class 7 creditors are fixed at 85

5   percent.

6        Giving Class 8 creditors the opportunity to roll the dice

7   and potentially get more or less than the 85 percent offered

8   to Class 7 is not at all unfair.

9        For these reasons, Your Honor, the Court has the ability

10  and should confirm the plan pursuant to the cram-down

11  provisions of 1129(b).

12       Your Honor, I'm now going to switch from the statutory

13  requirements to all the issues raised by the release,

14  injunction, and exculpation provisions.

15       I'd just like to take a brief sip of water.

16       Dugaboy -- I will first deal with the Debtor release

17  provided in Article 9(f) of the plan, which we claim is

18  appropriate.  Dugaboy and the U.S. Trustee have objected to

19  the release contained in Article 9(f).  Dugaboy objects

20  because it believes that the Debtor release releases claims

21  that the Claimant Trust or Litigation Trust have that have not

22  yet arisen, and the U.S. Trustee objects because it believes

23  that the release is a third-party release.

24       These objections have no merit, and they should be

25  overruled.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23 Page 149 of 214   PageID 7533
Exhibit Exhibit B-53 Page 2 of 60

106

1        I would like to ask Ms. Canty to put up a demonstrative

2   which contains the provision Article 9(f) of the plan.

3        Your Honor, as set forth in this Article 9(f), only the

4   Debtor is granting any release.  While that --

5             THE COURT:  And for the record, it's 9(d)?  9(d),

6   right?

7             MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8             THE COURT:  Yes.  Okay.

9             MR. POMERANTZ:  Sorry about that.

10            THE COURT:  Uh-huh.

11            MR. POMERANTZ:  While the release is broad, it does

12   not purport to release the claims of any third party.  The

13   Claimant Trust and the Litigation Trust are only included in

14   the release as successors of the Debtor.  The release is

15   specifically only for claims that the Debtor or the estate

16   would have been legally entitled to assert in their own right.

17        Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18   a plan may provide for the settlement or adjustment of any

19   claims or interests belonging to the debtor or the estate, and

20   that's exactly what the Debtor release provides.

21        Accordingly, Dugaboy is wrong that the release effects a

22   release of claims that the Claimant Trust or the Litigation

23   Sub-Trust have that won't arise until after the effective

24   date.  And the U.S. Trustee is simply wrong; there's no third-

25   party release aspect under the release.

007942

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-53   Filed 12/07/23   Page 150 of 214   PageID 7534

107

1          The last point I will address on the release, Your Honor,

2     is who is being released and why and what does the evidence

3     show.  The Debtor release extends to release parties which

4     include the independent directors, Strand, for actions after

5     January 9th, Jim Seery as the CEO and CRO, the Committee,

6     members of the Committee, professionals, and employees.

7          You have heard Mr. Seery's testimony that the Debtor does

8     not believe that any claims against the parties that are

9     proposed to be released actually exist.  You have heard Mr.

10    Seery's testimony that he worked closely with the employees

11    and believes that not only have they all been instrumental in

12    getting the Debtor to the -- be on the cusp of plan

13    confirmation, but that also Mr. Seery is not aware of any

14    claims against them.

15         Moreover, as Mr. Seery testified, the release for the

16    employees is only conditional.  He testified that the

17    employees are required to assist in the monetization of assets

18    and the resolution of claims, and if they do not like -- if

19    they do not lose their release, then any Debtor claims are

20    tolled, such that could be pursued by the Litigation Trustee

21    at a future time.

22         Lastly, I'm sure that the Dondero entities will argue that

23    someone needs to investigate claims against Mr. Seery for

24    mismanagement or for, God forbid, having failed to file the

25    2015.3 statements.  Such claims are part of the continuing

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 151 of 214   PageID 7535

108

1    harassment of Mr. Seery that the Dondero entities have

2    embarked on after it was apparent that nobody would support

3    their plan.

4        There is no evidence of any claims that exist, Your Honor.

5    In fact, the Committee and its professionals have watched the

6    Debtor through this case like a hawk.  They have not been

7    afraid to challenge the Debtor's actions in general and Mr.

8    Seery's in particular.  FTI has worked on a daily basis with

9    DSI and the company, had access to information.  When COVID

10   was happening, they were looking at trades going on on a daily

11   basis.

12       So if the Committee, whose members hold approximately $200

13   million of claims against the estate, are okay with the

14   release against the independent directors and Mr. Seery, that

15   should provide the Court with comfort to approve the releases

16   as part of the plan.

17       In summary, Your Honor, the Debtor release is entirely

18   appropriate and does not affect the release of third-party

19   claims that have not yet arisen.

20       Next, Your Honor, I want to go to the discharge.  There's

21   been objections to the discharge.  Dugaboy and NexPoint have

22   objected that the Debtor receiving a discharge under the plan

23   -- argue a debtor is liquidating.  The objection is not well

24   taken based upon Mr. Seery's testimony regarding what it is

25   the Claimant Trust and the Reorganized Debtor plan to do after

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 152 of 214   PageID 7536
Exhibit Exhibit 253 Page 206 of 60

109

1  the effective date, as compared to what the limitations of a

2  discharge are under 1141(d)(3).

3      Your Honor, Article 9 of the -- 9(b) of the plan provides

4  that as -- except as otherwise expressly provided in the plan

5  or the confirmation order, upon the effective date, the Debtor

6  and its estate will be discharged or released under and to the

7  fullest extent provided under 1141(d)(A) [sic] and other

8  applicable provisions of the Bankruptcy Court.  Bankruptcy

9  Code.

10      Section 1141(d)(3) provides an exception to the discharge,

11  and I'd like to have that section put up for Your Honor at

12  this point.  Ms. Canty?

13      As this -- as the section reflects, and as the Fifth

14  Circuit has ruled in the *TH-New Orleans Limited Partnership*

15  case cited in our materials, in order to deny the debtor a

16  discharge under 1141(d)(3), three things must be true:  (1)

17  the plan provides for the liquidation of all or substantially

18  all of the property in the estate; (2) the debtor does not

19  engage in business after consummation of the plan; and (3) the

20  debtor would be denied a discharge under 727(a) of this title

21  if the case was converted to Chapter 7.  Here, only C applies.

22      With respect to A, Your Honor, while the plan does project

23  that it will take approximately two years to monetize the

24  Debtor's assets for fair value, the Debtor is just not

25  liquidating within the meaning of Section A.

1          As Mr. Seery testified, during the post-confirmation

2     period, post-effective date period, the Debtor will continue

3     to manage its funds and conduct the same type of business it

4     conducted prior to the effective date.  It'll manage the CLOs.

5     It'll manage Multi-Strat.  It'll manage Restoration Capital.

6     It'll manage the Select Fund, and it'll manage the Korea Fund.

7          The Bankruptcy Court for the Southern District of New

8     York's 2000 opinion in *Enron*, cited in our materials, is on

9     point.  There, the Court found that a debtor liquidating its

10    assets over an indefinite period of time that is likely to

11    take years is not liquidating within the meaning of Section

12    1141(b)(3)(A), justifying a denial of discharge.

13         But even if we failed A, based upon Mr. Seery's testimony,

14    we would not fail B.  The Debtor will be continuing to do what

15    it has done during the case, as it did before, as I said,

16    managing its business.  B says the debtor does not engage in

17    the business after management.  So while Mr. Seery testified

18    that it would take approximately two years, it could take

19    more, it could take less, and there is no requirement to

20    liquidate assets over a period of time.

21         Accordingly, Your Honor, the Debtor is conducting the type

22    of business contemplated by Section B so as not to just deny a

23    discharge.

24         As the Fifth Circuit said in the *TH-New Orleans* case, the

25    court granted a discharge there because it was likely that the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-5 Filed 12/07/23   Page 154 of 214   PageID 7538

111

1    debtor would be liquidating its assets and conducting business

2    (indecipherable) years following a confirmation date.  And

3    this result makes sense, Your Honor, because the Debtor will

4    need the discharge and the tenant injunctions, which I'll get

5    to in a moment, in order to prevent interference with the

6    Debtor's ability to implement the terms of the plan and make

7    distributions to creditors.

8        I would now like, Your Honor, to turn to the exculpation

9    provisions, which there's been -- there's been a lot of

10   briefing on it, and I know Your Honor is very aware of the

11   exculpation provisions and the *Pacific Lumber* case.  And

12   several parties have objected to the exculpation contained in

13   the plan, based primarily on the Fifth Circuit ruling in

14   *Pacific Lumber*.

15       The exculpation provision, which is not dissimilar to what

16   is found in many plans around the country, including in plans

17   confirmed in bankruptcy courts in the Fifth Circuit, acts to

18   exculpate the exculpated parties for negligent-only acts as it

19   contains the standard carve-outs for gross negligence,

20   intentional conduct, and willful misconduct.

21       I do want to bring to the Court's attention a deletion we

22   made to the parties protected by the exculpation in the plan

23   and now -- were filed on February 1st.  The definition of

24   exculpated parties included, before February 1, not only the

25   Debtor but its direct and indirect majority-owned subsidiaries

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-13 Filed 12/07/23 Page 155 of 214 PageID 7539

112

1   and the managed funds.  In the plan amendment, we have deleted

2   the Debtor's direct and indirect majority-owned subsidiaries

3   and managed funds from the definition and are not seeking

4   exculpation for those entities.

5        But before, Your Honor, I address *Pacific Lumber* and why

6   the Debtor believes it does not preclude the Court from

7   approving the exculpation in this case, I do want to focus on

8   something that the Objectors conveniently ignore from their

9   argument.

10       As I mentioned in my opening argument, Your Honor, the

11  independent directors were appointed pursuant to the Court's

12  order on January 9, 2020.  They have resolved many issues

13  between the Debtor and the Committee, and avoided the

14  appointment of a Chapter 11 trustee.

15       The January 9th order was specifically approved by Mr.

16  Dondero, who was in control of the Debtor at the time, and I

17  believe the transcripts that are admitted into evidence will

18  demonstrate that he was fully behind the approval of the

19  January 9th order.

20       In addition to appointing the independent directors into

21  what was sure to be a contentiously litigious case, the

22  January 9th order set the standard of care for the independent

23  directors, and specifically exculpated them from negligence.

24       You have heard Mr. Seery and Mr. Dubel testify that they

25  had input into what the order said and would have not agreed

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3    Filed 12/07/23    Page 156 of 214    PageID 7540

113

1    to be appointed as independent directors if it did not include

2    Paragraph 10, as well as the provisions regarding

3    indemnification and D&O insurance.

4        I would like to put a demonstrative on the screen, which

5    is actually Paragraph 10 of that order.  Your Honor, Paragraph

6    10, there's two concepts embedded here.  First, it requires

7    any parties wishing to sue the independent directors or their

8    agents to first seek such approval from the Bankruptcy Court.

9    Secondly, and importantly for purposes of the independent

10   directors and their agents, who would include the employees,

11   it set the standard of care for them during the Chapter 11 and

12   entitled them to exculpation for negligence.  Paragraph 10

13   says the Court will only permit a suit to go forward if such

14   claim represents a colorable claim for willful misconduct or

15   gross negligence.

16       And Your Honor, Paragraph 10 does not expire by its terms.

17       By not including negligence in the definition of what a

18   colorable claim might be, the Court has already exculpated the

19   independent directors and their agents, which include the

20   employees acting at their direction.

21       And because the independent directors and their agents are

22   exculpated under Paragraph 10, Strand needs to be exculpated

23   as well for actions occurring after January 9th.  This is

24   because a suit against Strand for conduct after the

25   independent board was appointed is effectively a suit against

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8   Filed 12/07/23   Page 157 of 214   PageID 7541

114

1   the independent directors, who were the only people in control

2   of Strand at that time.

3        After the effective date, Mr. Dondero will regain control

4   of Strand, as the independent directors will be discharged.

5   And for parties able to sue Strand essentially for negligence

6   for conduct conducted by the independent directors after

7   January 9th, Strand will then be able to seek indemnification

8   from the Debtor under the Debtor's partnership agreement

9   because the partnership agreement does provide the general

10  partner is entitled to indemnification.

11       Accordingly, an exculpation for Strand is really the

12  functional equivalent of an exculpation for the independent

13  directors and the Debtor.

14       The January 9th order was not appealed, and an objection

15  to exculpation at this point as it relates to the independent

16  directors, their agents, and Strand is a collateral attack on

17  this order.  So, Your Honor, Your Honor does not even need to

18  get to the thorny issues addressed by *Pacific Lumber*.

19       However, even in the absence of the January 9th order,

20  exculpation of the independent directors and their employees,

21  as well as the other exculpated parties, is not prohibited by

22  *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23  a bankruptcy court order confirming a plan because the

24  exculpation provision was too broad and included parties that

25  the Fifth Circuit thought could not be exculpated under

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 158 of 214   PageID 7542
Exhibit Exhibit 253 Filed 12/07/23   Page

115

1   Section 524(e) of the Code.

2       A close look at the issue before the Court, Your Honor,

3   the reasoning for the Court's ruling and why certain parties

4   like Committee and its members were entitled to exculpation,

5   reflects that this case does not prevent the Court from

6   approving exculpation of this case.

7       A careful read of the underlying briefs and opinions in

8   *Pacific Lumber* reveals that the concern that the Appellants

9   had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17      After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23      However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3 Filed 12/07/23    Page 159 of 214    PageID 7543

116

1    and its members.  And why did the Court do that?  Because it

2    looked at the Committee's qualified immunity under 1103 and

3    also reasoned that Committee members are essentially

4    disinterested volunteers that should be entitled to

5    exculpation on negligence.

6        The Court also cited approvingly *Colliers* for the

7    proposition that if Committee members were not exculpated for

8    negligence and subject to suit by people who are unhappy with

9    them, they just would not serve.

10       Accordingly, the Fifth Circuit based its willingness to

11   exculpate Committee members on the strong public policy that

12   supports exculpation for those parties under those

13   circumstances.  And against this backdrop, Your Honor, there

14   are several reasons why the Court should authorize exculpation

15   in this case, notwithstanding *Pacific Lumber*.

16       First, Your Honor, the independent directors in this case

17   are analogous -- much more analogous to the Committee members

18   that the Fifth Circuit ruled were entitled to than the

19   incumbent officer and directors.

20       Your Honor has the following facts before the Court, based

21   upon the testimony of Mr. Seery and Mr. Dubel and other

22   evidence in the record.  The independent board members were

23   not part of the Highland enterprise before the Court appointed

24   them on January 9th.  The Court appointed the independent

25   directors in lieu of a Chapter 11 trustee to address what the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8   Filed 12/07/23   Page 160 of 214   PageID 7544

117

1    Court perceived as the serious conflicts of interest and

2    fiduciary duty concerns with current management, as identified

3    by the Committee.

4        The independent directors would not have agreed to accept

5    their role without indemnification, insurance, exculpation,

6    and the gatekeeper function provided by the January 9th order.

7        And Mr. Dubel testified regarding the significant

8    experience he has as an independent director during his 30-

9    plus years in the restructuring community, including several

10   engagements as an independent director in Chapter 11 cases.

11   And he testified that independent directors have become

12   commonplace in complex restructurings over the last several

13   years and have been appointed in many cases, including high-

14   profile cases.  We've cited to just a few of those cases in

15   our brief, but we could go on and on.

16       Mr. Dubel testified that the independent directors are a

17   critical tool in proper corporate governance and restoring

18   creditor confidence in management in modern-day

19   restructurings, and he testified that, based upon his

20   experience, independent directors expect to be indemnified by

21   the company, expect to obtain directors and officers

22   insurance, and expect to be exculpated from claims of

23   negligence when they agree to be appointed.

24       He further testified that if independent directors cannot

25   be assured that they will be exculpated for simple negligence,

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-5   Filed 12/07/23   Page 161 of 214   PageID 7545

118

1    he believes they will be unwilling to serve in contentious

2    cases like the one we have here, which will have a material

3    adverse effect on the Chapter 11 restructuring process as we

4    know it.

5        Based upon the foregoing testimony, Your Honor, which is

6    uncontroverted, the Court should have no problem finding that

7    the independent directors are much more analogous to the

8    Committee members in *Pacific Lumber* who the Fifth Circuit said

9    could be exculpated.

10       The facts, these facts also distinguish this case from the

11   *Dropbox v. Thru* case which Your Honor decided and which was

12   reversed on this issue by the District Court.  In neither

13   *Pacific Lumber* or *Thru* was there an argument that the policy

14   reasons that supported exculpation of Committee members also

15   supported the exculpation of the parties sought to be

16   exculpated.

17       Moreover, Your Honor, the independent directors in this

18   case were pointed as essentially as substitute for a Chapter

19   11 trustee.  There was a Chapter 11 trustee motion filed a few

20   days before, I believe, and the Court, in approving this, said

21   that you -- better than a Chapter 11 trustee.  And Chapter 11

22   Trustees are entitled to qualified immunity.  So, while, yes,

23   the independent directors aren't truly Chapter 11 trustees,

24   they are analogous.

25       Second, Your Honor, while there is language in *Pacific*

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-53 Filed 12/07/23    Page 162 of 214    PageID 7546

119

1    *Lumber* that says that the directors and officers of the debtor

2    are not entitled to exculpation, the issue before the Court

3    really on appeal was the plan sponsors and whether they were.

4    So I would argue that any discussion of the exculpation not

5    being available for directors and officers in the Fifth

6    Circuit opinion in *Palco* is actually dicta.

7        Third, Your Honor, as I discussed before, the *Pacific*

8    *Lumber* decision was based solely on 524(e) of the Bankruptcy

9    Code, which only says that the discharge of a claim against

10   the debtor does not affect the discharge of a third party.

11   However, the Debtor is not relying on 524(e) as the basis of

12   their exculpation.  As we outline in our brief, Your Honor, we

13   believe that the exculpation is appropriate under Section 105

14   and 1123(b)(6) as a means -- part of an implementation of the

15   plan.

16       Importantly, Your Honor, as other courts hostile to third-

17   party releases have determined, exculpation only sets a

18   standard of care for parties and is not an effort to relieve

19   fiduciaries of liability.

20       Other courts that have aligned with the Fifth Circuit and

21   rejected third-party releases, like the Ninth Circuit, have

22   recently determined exculpation has nothing to do with 524(e).

23   In *In re Blixseth*, a Ninth Circuit case decided at the end of

24   2020 cited in our materials, they examined several of their

25   circuit cases that had strongly prohibited non-consensual

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8 Filed 12/07/23   Page 163 of 214   PageID 7547

120

1    third-party releases under 524(e).  But again, the Court

2    concluded that 524(e) only prohibits third parties from being

3    released from liability of a prepetition claim for which the

4    debtor receives a discharge.  The Court reasoned that the

5    exculpation clause, however, protects parties from negligence

6    claims relating to matters that occurred during the Chapter 11

7    case and has nothing to do with 524(e).

8         The Ninth Circuit, which along with the Fifth Circuit has

9    been notorious for prohibiting third-party releases, issued

10   its ruling against this backdrop and said that exculpations

11   are appropriate.

12        Your Honor, the Objectors made a point yesterday of

13   pointing out that Strand, as the Debtor's general partner, is

14   liable for the debts under applicable law.  To the extent they

15   intend to argue that the exculpation is seeking to discharge

16   any such prepetition liability, they would be wrong.  The

17   exculpation only applies to postpetition matters.  And to the

18   extent they argue that the exculpation seeks to discharge

19   Strand's potential postpetition liability, for the reasons I

20   discussed, a claim against Strand will essentially be a claim

21   against the Debtor because the Debtor will be obligated to

22   indemnify them.

23        Accordingly, Your Honor, we submit that if this matter

24   goes up to appeal to the Fifth Circuit, which it may very well

25   do, that the Fifth Circuit may very well come out the same way

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 18-5 Filed 12/07/23 Page 164 of 214   PageID 7548

121

1   as the Ninth Circuit and start relaxing the standard or

2   otherwise provide that the independent directors are much more

3   like Committee members.

4        Lastly, Your Honor, if the Court does confirm the plan,

5   which we certainly hope it will do, it will have made a

6   finding that the plan has been proposed in good faith, and in

7   doing so, the Court essentially finds that the independent

8   directors and their agents have acted appropriately and

9   consistent with their fiduciary duties, and it makes --

10  exculpation for negligence naturally flows from that finding.

11       Your Honor, I would now like to go to the injunction

12  provisions, and my argument is that the injunction provisions

13  as amended are appropriate.

14            THE COURT:  Can I stop you?

15            MR. POMERANTZ:  We received several of -- yes.

16            THE COURT:  I want to just recap a couple of things I

17  think I heard you say.  You're not asking this Court, you say,

18  to go contrary to *Pacific Lumber* per se.  You have thrown out

19  there the possibility that *Pacific Lumber* mistakenly relied on

20  524(e) in rejecting exculpations of plan sponsors.  You're

21  saying, eh, as a technical matter, I think they were wrong in

22  focusing on that statute because that statute seems to deal

23  with prepetition liability.  Okay?  Its actual wording, 524(e)

24  states, discharge of a debt of a debtor does not affect the

25  liability of any other entity on such debts.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 253-5   Filed 12/07/23   Page 165 of 214   PageID 7549

122

1     And reading between the lines, I think you're saying --

2     well, maybe this isn't what you're saying, but here's what I

3     inferred -- "debt" is defined in 101(12) to mean liability on

4     a claim, and then "claim" is defined in 101(5) of the

5     Bankruptcy Code as meaning right to payment.  It doesn't say

6     as of the petition date, but I think if you look at, then,

7     Section 502 of the Bankruptcy Code that addresses claims and

8     interests, clearly, it seems to be referring to the

9     prepetition time period, you know, claims and interest as of

10    the petition date.  And then -- that's 502.  And then 503

11    speaks of, for the most part, postpetition administrative

12    expenses.

13         So that was my rambling way of saying I'm understanding

14    you to say, eh, as a technical matter, we think the Fifth

15    Circuit was wrong to focus on 524(e) because when you're

16    talking about exculpation you're talking about postpetition

17    liability, not prepetition liability.  And 524(e) is talking

18    more about prepetition liability.

19         But I think what I also hear you saying is, at bottom,

20    *Pacific Lumber* was sort of a policy-driven holding where, you

21    know, we're worried about no one would ever sign up for being

22    on an unsecured creditors' committee if they could be exposed

23    to lawsuits.  They're fiduciaries, we think, for policy

24    reasons.  Exculpation is appropriate for this one group.  And

25    you're saying, well, they didn't have an independent board

1    that they were considering.  They were just considering non-

2    fiduciary plan sponsors.  And so the rationale presented by

3    *Pacific Lumber* applies equally here, and just they didn't make

4    a holding in this factual context.

5          Have I recapped what you're saying?

6                MR. POMERANTZ:  Your Honor, that's generally --

7    generally correct, with a couple of nuances.  So, yes, first,

8    I think, on a policy basis, Your Honor -- again, putting aside

9    the January 9th order, because we don't see --

10               THE COURT:  Right.  Right.

11               MR. POMERANTZ:  -- Your Honor even needs to get to

12   this issue.

13               THE COURT:  I understand.

14               MR. POMERANTZ:  But if Your Honor does get to this

15   issue, we think, as a first point, Your Honor could be totally

16   consistent with *Pacific Lumber* because there's policy reasons

17   and there was not a categorical rejection of exculpation.

18   Okay.  So if there was a categorical rejection, then it

19   wouldn't have been okay for committee members.  Okay.

20         Second argument, yes, we don't think -- we think it's part

21   of dicta.  It's not part of the holding.  We understand that

22   other courts may have not agreed, maybe your *Thru* case, which

23   Your Honor was appealed on.

24         But the third issue, our argument is all they looked at

25   was 524(e).  They said 523 -- 4(e) does not authorize it.

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3    Filed 12/06/21    Page 167 of 214    PageID 7551

124

1    They did not say 524(e) prohibits it.

2        We think there's other provisions in the Code.  And then

3    when you basically add in the analysis that Your Honor

4    provided, which we agree with, and what 524 was -- to do,

5    524(e) just says that discharge doesn't affect.  It doesn't

6    say that under another provision of the Code or for another

7    reason you are authorized to give an exculpation.  I think

8    it's a nuance and it's a difference there.

9        And my point of bringing up the *Blixseth* case -- which, of

10   course, is Ninth Circuit and it's not binding on Your Honor,

11   it's not binding on the Fifth Circuit -- is to say, when that

12   was presented to them, they saw the distinction that 524(e)

13   has nothing to do with an exculpation.  And while, yes, the

14   Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15   that argument is made to the Fifth Circuit, we don't know how

16   they would rule, I think that, based upon their analysis --

17   which, again, Your Honor, is no more than a page and a half of

18   their opinion, right, of a long, lengthy opinion on the

19   confirmation issues.  So I think, Your Honor, with the Fifth

20   Circuit, there is a good chance that based upon the developing

21   case law of exculpation, based upon the sister circuit in

22   *Blixseth* making that distinction, that there is a very good

23   chance that the Fifth Circuit would change.

24       But look, I recognize that argument requires Your Honor to

25   say, okay, this is outside and -- and what *Pacific Lumber* did

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-53 Filed 12/04/22 Page 168 of 214    PageID 7552

125

1    or didn't do.  But I think, Your Honor, there's several

2    potential reasons, there's several potential arguments that

3    you can get to the same place.

4              THE COURT:  Okay.  Thank you.

5              MR. POMERANTZ:  Okay.  If I may just get another

6    glass of -- sip of water before my time starts?

7              THE COURT:  Okay.

8              MR. POMERANTZ:  Okay, Your Honor.  We're now turning

9    to the injunction provision.  The Debtor received several

10   objections to the injunction provisions in -- I think I have

11   it right now -- Article 9(f) to the plan.  And we've modified

12   Article 9(f) to address certain of those concerns, and we

13   believe that, as modified, that the injunction provision

14   implements and enforces the plan's discharge, release, and

15   exculpation provisions to prevent parties from pursuing claims

16   in interest that are addressed by the plan and otherwise

17   interfering with consummation and implementation of the plan.

18        I'd like to put up the first paragraph of the injunction

19   on the screen now.

20        Okay, Your Honor.  The first paragraph, all it does is

21   prohibits the enjoined parties from taking action to interfere

22   with consummation or implementation of the plan.  I suspect a

23   sentence like that is probably in hundreds of plans in the

24   Fifth Circuit and elsewhere.

25        Initially, to address a concern that it applied to too

007961

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/04/23   Page 169 of 214   PageID 7553

126

1    many parties, the Debtor added a definition in the revised

2    plan that defines "enjoined parties," which I'd like to now

3    put that definition up on the screen.

4         The changes -- it's a little hard to read there, but you

5    have it in the -- oh, there you go.  The changes made clear

6    that only parties who have a relationship to this case, either

7    holding a claim or interest, having appeared in the case, be a

8    -- or be a party in interest, Jim Dondero, or related entity,

9    or related person of the foregoing are covered.  The claim

10   objectors argue that the word "implementation and

11   consummation" is vague, or vague and unclear.  Your Honor,

12   these terms are both defined in the Bankruptcy Code and under

13   the case law, and they're, as I said, common features of many

14   plans.

15        Section 1123(a)(5) of the Code provides that a plan shall

16   provide for its implementation, and identifies a list of items

17   that the plan can include.  Article 4 of our plan is defined

18   as "Means of Implementation of This Plan," and describes the

19   various corporate steps required to implement the provisions

20   of the plan, including canceling equity interests, creation of

21   new general partners and a limited part of the Reorganized

22   Debtor, the restatement of the limited partnership agreement,

23   and the establishment of the various trusts.

24        Paragraph 1 rightly and appropriately enjoins efforts to

25   interfere with these steps.

1      Nor is the term "consummation of the plan" vague.

2   "Consummation" also is a commonly-used term and has been

3   defined by the Fifth Circuit and the Code.  1102 -- 1101(2)

4   defines "Substantial Consummation" to be the transfer of

5   assets to be transferred under the plan, the assumption by the

6   debtor of the management of all the property dealt with by the

7   plan, and the commencement of distributions under the plan.

8      Section 1142 gives the Court authority to direct a party

9   to perform any act necessary for consummation of a plan.  And

10   as the Fifth Circuit, in *United States Brass Corp.*, which is

11   said in our material, states, said the Bankruptcy Court had

12   post-confirmation jurisdiction to enforce the unperformed

13   terms of a plan with respect to a matter that could affect the

14   parties' post-confirmation rights because the plan had not

15   been fully consummated.

16      And Your Honor just wrote on this issue last year in the

17   *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18   case, and you cited to *U.S. Brass* to find that, in that case,

19   post-confirmation jurisdiction existed to resolve a dispute

20   relating to an assumed contract because the matter related to

21   interpretation, implementation, and execution of the plan.

22      Accordingly, Your Honor, neither implementation or

23   consummation are vague, and the first paragraph of the

24   injunction is necessary and appropriate to enforce the

25   Debtor's discharge.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 253-Filed 12/07/23   Page 171 of 214   PageID 7555

128

1      As I said before, I will leave it to Mr. Kharasch to

2    address specifically the concerns that the Advisor and the

3    Funds have with the injunction.

4      The second and third paragraphs of the injunction, Your

5    Honor, certain parties have objected to them on the ground

6    that they constitute an improper release of the independent

7    directors as well as the release of claims against the

8    Reorganized Debtor, the Claimant Trust, and the Litigation

9    Sub-Trust, entities that will not have come into existence

10   until after the effective date.

11     We believe we have addressed these concerns by

12   modifications to the second and third paragraphs of the

13   injunction, which I would now like to put the second and third

14   paragraphs on the screen.

15     (Pause.)

16        MR. POMERANTZ:  As that is happening, Your Honor, I

17   will -- there we go.

18     We believe that the changes that were made to these

19   paragraphs should address the Objectors' concerns.

20     First, as with the first paragraph, we have created a

21   defined term of "Enjoined Parties" who are subject to the

22   injunction which is narrower than all persons, I believe, or

23   all entities that was included in the prior plan.  So we've

24   narrowed that.

25     "Enjoined Parties" are generally defined, as I mentioned

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-2 Filed 12/07/23   Page 172 of 214   PageID 7556

129

1  before, as entities involved in this case or related to Jim

2  Dondero, or have appeared in this case.

3      Second, we have removed independent directors from these

4  paragraphs to address the concern that the injunction was a

5  disguised third-party release.

6      Third, we have removed the Reorganized Debtor and the

7  Claimant Trust from the second paragraph and moved them to the

8  third paragraph.  We did this to make clear that the

9  Reorganized Debtor and Claimant Trust were only getting the

10  benefit of the injunction as the successors to the Debtor.  As

11  the Reorganized Debtor and the Claimant Trust receives the

12  property from the Debtor free and clear of all claims and

13  interests and equity holders under 1141(c), they are entitled

14  to the benefit of the injunction.

15      Fourth, we have addressed the concern that the injunction

16  improperly affected set-off rights.  We added language to make

17  clear that the injunction would only affect the parties' set-

18  off of an obligation owed to the Debtor to the extent that

19  that was permissible under 553 and 1141 of the Bankruptcy

20  Code.

21      In other words, we are punting the issue for another day,

22  and there's nothing in the plan that gives the Debtor any more

23  set-off rights than it otherwise has under the Bankruptcy

24  Code.

25      Lastly, Your Honor, certain Objectors have argued that the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 25-3 Filed 12/07/23   Page 173 of 214   PageID 7557
Exhibit Exhibits 53 Pg 207 of 409

130

1 injunction somehow prevents them from enforcing the rights

2 they have under the plan or the confirmation order.  We don't

3 really understand this concern, as the language leading into

4 the second paragraph of the injunction says, except as

5 expressly provided in the plan, the confirmation order, or a

6 separate order of the Bankruptcy Court.

7     With these modifications, Your Honor, the provisions do

8 nothing more than implement 1123(b)(6) and 1141 by preventing

9 parties from taking actions to interfere with the Debtor's

10 plan.

11     The Court has also heard testimony from Mr. Seery

12 regarding the importance of the injunction to implementation

13 of the plan.  He testified that he intends to monetize assets

14 in a way that will maximize value.  And to effectively do

15 that, he has testified that the Claimant Trust needs to be

16 able to pursue its objectives without interference and

17 continued harassment from Mr. Dondero and his related

18 entities.

19     In fact, Mr. Seery testified that if the Claimant Trust

20 were subject to interference by Mr. Dondero, it would take him

21 more time to monetize assets, they would be monetized for less

22 money, and creditors would be harmed.

23     If Your Honor doesn't have any questions for me on the

24 injunction provisions, I'd like to turn to the last part of

25 the injunction, which is really the gatekeeper provision.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3 Filed 12/06/23 Page 174 of 214   PageID 7558
Exhibit Exhibit 23-53 Page 209 of 228

131

1          THE COURT:  All right.  You may.

2          MR. POMERANTZ:  Your Honor, the last paragraph in

3    Article 9(f) is really not an injunction but is rather a

4    gatekeeper provision.  And as originally drafted, it'd do two

5    things:  first, it'd require that before any entity, which is

6    defined very broadly, could file an action against a protected

7    party relating to certain specified matters, the entity would

8    have to seek a determination from this Court that the claim

9    represented are colorable claim of bad faith, criminal

10   conduct, willful misconduct, fraud, or gross negligence.  The

11   specified matters to which the gatekeeper provision would

12   apply included the Chapter 11 case, negotiations regarding the

13   plan, the administration of the plan, the property to be

14   distributed under the plan, the wind-down of the Debtor's

15   business, the administration of the Claimant Trust, or

16   transactions related to the foregoing.

17          Subject to certain exceptions for Dondero-related parties,

18   protected parties were defined to include the Debtor, its

19   successors and assigns, indirect and direct, majority-owned

20   subsidiaries and managed funds, employees, Strand, Reorganized

21   Debtor, the independent directors, the Committee and its

22   members, the Claimant Trust, the Claimant Trustee, the

23   Litigation Trust, the Litigation Sub-Trustee, the members of

24   the Oversight Committee, retained professionals, the CEO and

25   CRO, and persons related to the foregoing.  Essentially,

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-8 Filed 12/07/23    Page 175 of 214    PageID 7559

132

1    parties related to the pre-effective-date administration of

2    the estate or the post-confirmation implementation of the

3    plan.

4        Second, the gatekeeper provision as originally presented

5    gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6    any cause of action that it determined would pass through the

7    gate.  The gatekeeper provision, Your Honor, is not a release

8    in any way.  Rather, it permits enjoined parties who believe

9    they have a claim against the protected parties to pursue such

10   a claim, provided they first make a showing that the claim is

11   colorable to the Bankruptcy Court.

12       Several parties, Your Honor, objected to the Bankruptcy

13   Court having exclusive jurisdiction to adjudicate the claims

14   that pass through the gate.  The Debtor believes that the

15   Bankruptcy Court would ultimately have jurisdiction of any of

16   those claims that pass through the gate.  However, the Debtor

17   did, upon reflection, appreciate the concern that if the Court

18   agreed to that now, it would essentially be determining its

19   jurisdiction before a claim was filed.

20       Accordingly, in the January 22nd plan, Your Honor, we

21   amended the provision to provide that the Bankruptcy Court

22   will only have jurisdiction over such claims to the extent it

23   was legally permissible to do so, essentially deferring the

24   issue to a later time.

25       And as Your Honor, I believe, in one of cases called the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-5   Filed 12/07/23   Page 176 of 214   PageID 7560

133

1   *Icing on the Cake*, the retention and jurisdiction provisions

2   in the plan only are to the extent under applicable law and

3   are quite broad and include the things that we would have the

4   Court -- have jurisdiction for the Court, otherwise

5   determined.

6        The Court made some other changes to the gatekeeper

7   provision, and I would like to place the amended gatekeeper

8   provision on the screen right now.  In addition to the change

9   I mentioned, the Debtor made the following changes:  the

10  provision is limited now to apply only to enjoined parties,

11  rather than any entity.  Than any entity.  Much narrower.  The

12  provision added the administration of the Litigation Sub-Trust

13  to the matters to which the provision would apply.  The

14  provision makes clear now that any claim, including

15  negligence, is a claim that could be sought and pursued

16  through the gatekeeper function.  And the provision made some

17  other syntax changes.

18       We believe, Your Honor, with these changes, we believe

19  that the gatekeeper provision is within the Court's

20  jurisdiction and it's appropriate to include under the plan.

21       But certain parties have argued that the Court does not

22  have the authority, the jurisdictional authority to perform

23  the gatekeeper function, separate and apart from whether it

24  has jurisdiction to adjudicate the claims that pass through

25  the gate.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 10-3  Filed 12/07/23   Page 177 of 214   PageID 7561

134

1          Your Honor, we submit that these arguments represent a

2     fundamental misunderstanding of Bankruptcy Court jurisdiction

3     and the Court's authority to make sure the Debtor is free of

4     interference in carrying out the plan which I'll get to in a

5     couple moments.

6          As a preliminary matter, Your Honor, it is important for

7     the Court to remember that Paragraph 10 of the January 9 order

8     already contains a gatekeeper provision as it relates to the

9     independent directors and their agents.  And as I mentioned on

10    a couple of occasions, that order is not going away, it

11    doesn't expire by its terms, and it cannot be collaterally

12    attacked in this forum.

13         The Debtor does acknowledge, though, that the gatekeeper

14    provision in the plan is broader in terms of the people it

15    protects and it applies to post-confirmation matters.

16         Before I address the Court's authority to approve the

17    gatekeeper provision, I want to summarize the evidence that it

18    has heard from Mr. Seery and Mr. Tauber regarding why the

19    gatekeeper is so important a provision to the success of the

20    plan.

21         Although the Court is all too familiar with the history of

22    litigation initiated by and filed against Mr. Dondero and his

23    related affiliates, Mr. Seery spent some time on the stand

24    testifying about the litigation so the Court would have a

25    complete record for this hearing.  He testified that prior to

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-3 Filed 12/07/23 Page 178 of 214 PageID 7562

135

1   the petition date, the Debtor faced years of litigation from

2   Mr. Terry and Acis that led to the *Acis* bankruptcy case, which

3   Your Honor has said many times it's still in your mind. Years

4   of litigation with the Redeemer Committee which precipitated

5   the filing of a bankruptcy case and resulted in an award very

6   critical of the Debtor's conduct. Years of litigation with

7   UBS. Years of litigation with Patrick Daugherty. And we

8   placed all the dockets for all these matters before the Court.

9       Also, during the bankruptcy and after the Committee

10  essentially rejected the Debtor's pot plan proposal and

11  indicated -- and the Debtor indicated it would be terminating

12  the shared service agreements with Mr. Dondero and his related

13  entities, the Debtor was the subject of harassment from Mr.

14  Dondero and related entities which resulted in the temporary

15  restraining order against him, a preliminary injunction

16  against him, a contempt motion, which Your Honor is scheduled

17  to hear Friday, a motion by the Debtor's controlled -- by the

18  Dondero-controlled investors and funds in CLO managed --

19  managed by the Debtor, which the Court referred to that motion

20  as being frivolous and a waste of the Court's time. Multiple

21  plan objections, most of which are focused on allowing the

22  Debtors to continue their litigation crusade against the

23  Debtor and its successors post-confirmation. An objection to

24  the Debtor approval of the Acis order and a subsequent appeal.

25  An objection to the HarbourVest settlement and subsequent

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 28-53 Filed 12/07/23 Page 179 of 214 PageID 7563

136

1    appeal.  A complaint and injunction against the Advisors and

2    the Funds to prevent them from violating Paragraph 9 of the

3    January 9th order.  And a temporary restraining order against

4    those parties, which was by consent.

5        Mr. Dondero's counsel tends to argue that he is the victim

6    here and that the litigation is being commenced against him

7    and -- instead of by him.  That response does not even deserve

8    a response, Your Honor.  It is disingenuous.

9        Mr. Tauber testified that he was part of the team at Aon

10   that sourced coverage for the independent directors after

11   their appointment in January 2020 and that he has over 20

12   years of underwriting experience.  He testified that at Aon he

13   builds bespoke insurance programs which are not cookie-cutter

14   programs for his clients, with an emphasis on D&O and E&O.

15   And he was asked by the independent board to obtain D&O and

16   E&O insurance after the board's appointment on January 9th.

17       Based upon the process Aon conducted in reaching out to

18   insurance carriers, Mr. Tauber testified that Aon was only

19   able to obtain D&O insurance based upon the inclusion of

20   Paragraph 10 of the January 9 order, the gatekeeper provision.

21   I know Mr. Taylor said that that was spoon-fed to the

22   insurers, but Mr. Tauber's testimony is they knew about Mr.

23   Dondero and they knew about his litigation tactics, so it is

24   not a good inference to be made from the testimony that they

25   would not have required something.  They probably would have

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 25-3 Filed 12/07/23    Page 180 of 214    PageID 7564

137

1     just said no.

2         Aon has now been -- Mr. Tauber testified that Aon has now

3     been asked to obtain D&O coverage for the Claimant Trustee,

4     the Litigation Trustee, the Oversight Committee, the members,

5     the Claimant Trust, and the Litigation Sub-Trust.  He

6     testified that he and Aon have approached the insurance

7     carriers that they believe might be interested in underwriting

8     coverage.

9         And no, he hasn't approached every D&O and E&O carrier out

10    there, and there may be, just like an investment banker

11    doesn't have to approach everyone.  They are experts in the

12    field, and he testified they approached the people they

13    thought would likely be willing or interested and potentially

14    be willing to extend coverage.  And as a result of Aon's

15    efforts, Mr. Tauber has determined that there's a continued

16    resistance to provide any coverage that does not contain an

17    exclusion for actions relating to Mr. Dondero or his related

18    entities.  And he further believes that all carriers that will

19    -- that have discussed a willingness to provide coverage will

20    only do so if there is a gatekeeper provision, and only one

21    carrier will agree to provide coverage without a Dondero

22    exclusion.

23        Mr. Tauber testified that he believes that any ultimate

24    policy will provide that if at any time the gatekeeper

25    provision is not in place, either the carrier will not cover

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-8    Filed 12/08/23    Page 181 of 214    PageID 7565

138

1    any actions related to Mr. Dondero or his affiliates or that

2    the coverage will be vacated or voided.

3        Based upon the foregoing record, Your Honor, which is

4    uncontroverted, there's ample justification on a factual basis

5    for approval of the gatekeeper provision.

6        I will now turn to the Court's authority to approve the

7    gatekeeper provision.

8        There are three alternative bases upon which the Court can

9    approve the gatekeeper provision.  First, several provisions

10   of the Bankruptcy Code give broad authority to approve a

11   provision like the gatekeeper provision.

12       Second, the Court can analogize to the Barton Doctrine the

13   facts and circumstances in this case and authorize the Court

14   to act as a gatekeeper to prevent frivolous litigation from

15   being filed against court-appointed officers and directors and

16   those that will lead the post-confirmation monetization of the

17   estate's assets.

18       And third, Your Honor, the Court can find that Mr. Dondero

19   and his entities are vexatious litigants, and use the

20   gatekeeper provision as a sanction to prevent the filing of

21   baseless litigation designed merely to harass those in charge

22   of the estate post-confirmation.

23       So, Bankruptcy Court authority.  Your Honor, there are

24   several provisions in the Bankruptcy Code which we rely on to

25   support the Court's authority.  First, Section 1123(a)(5)

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 25-3   Filed 12/07/23   Page 182 of 214   PageID 7566

139

1     permits the plan to approve adequate means of implementation,

2     and contains a long, non-exclusive list.  Mr. Seery's

3     testimony is uncontroverted that a gatekeeper provision is

4     necessary for the adequate implementation of the plan.

5         Second, Your Honor, 1123(b)(6) authorizes a plan to

6     include any appropriate provision in a plan not inconsistent

7     with any other provision in this Code.  There are not any

8     provisions and none have been cited by the Objectors that

9     would prohibit a gatekeeper provision.  Section 1141

10    effectively holds that the terms of a plan bind the debtor and

11    its creditors and vest property in a reorganized debtor, free

12    and clear of the interests of third parties.

13        If nothing else, Your Honor, the spirit of 1141 allows the

14    Court to prevent, in appropriate cases, vexatious litigation

15    by unhappy creditors and parties in interest from torpedoing

16    the plan.

17        1142(b), Your Honor, provides that the confirmation --

18    that, after confirmation, the Court may direct any parties to

19    perform any act necessary for the consummation of the plan,

20    and requiring the party to seek court-approval before filing

21    an action is certainly an act.

22        And lastly, Your Honor, Section 105 allows the Court to

23    enter orders necessary to order other things, enforce orders

24    of the Court like the confirmation order, and prevent an abuse

25    of process which would certainly occur if baseless litigation

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 25-3 Filed 12/07/23   Page 183 of 214   PageID 7567
Exhibit Exhibits 3-5 Page 2437

140

1   were filed against the parties in charge of the Reorganized

2   Debtor and the trust vehicles entrusted with carrying out the

3   plan.

4         Your Honor, gatekeepers are not a novel concept and have

5   been approved by courts in appropriate circumstances.  In the

6   *Madoff* cases, the Court has been the gatekeeper post-

7   confirmation to determine whether investor claims are

8   derivative or direct claims.

9         In *General Motors*, the Court has been the gatekeeper post-

10  confirmation to determine whether product liability claims are

11  proper claims against the reorganized debtor.

12        Closer to home, Judge Lynn, Mr. Dondero's counsel,

13  approved a gatekeeper provision, arguably even more far-

14  reaching than the provision here, in the *Pilgrim's Pride* case.

15  In that case, Judge Lynn held that *Pacific Lumber* prevented

16  him -- prevented the Court from approving the exculpation

17  provision in the plan.  However, he did hold that it was

18  appropriate for the Court to ensure that debtor

19  representatives are not improperly pursued for their good-

20  faith actions by requiring that any actions against the debtor

21  or its representatives, and further, on the performance of

22  their obligations as debtor-in-possession, be heard

23  exclusively before the Bankruptcy Court.

24        And *Pilgrim's Pride* is not the only case in this district

25  to include a gatekeeper provision, as Judge Houser approved

007976

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-5    Filed 12/07/23    Page 2184 of 214    PageID 7568

141

1    one in the *CHC Group* in 2016, which is cited in our materials.

2        The theme in all these cases, Your Honor, is that there

3    are circumstances where it is necessary and appropriate for

4    the Bankruptcy Court to act as a gatekeeper as a means of

5    reducing litigation that could interfere with a confirmed plan

6    and that a Court has the authority to approve such provisions.

7        The Objectors argue that the Bankruptcy Court does not

8    have jurisdiction to approve that provision.  The Debtor

9    understands the argument as it related to the prior provision,

10   which gave the Court exclusive jurisdiction over any claim it

11   found colorable, and we've amended the plan to address that

12   issue.  The jurisdiction to deal with those claims could be

13   left to a later day.

14       But to the extent the Objectors still pursue the

15   jurisdiction argument in light of the current provision,

16   they're really conflating two very different things:  the

17   ability to determine whether a claim is colorable and the

18   ability to adjudicate that claim if the Court determines it's

19   colorable.

20       None of the authorities cited by the Objectors hold that

21   the Court is without jurisdiction to approve a gatekeeper

22   provision like the one here.  So, rather, what they do is they

23   try to -- they argue, based upon the *Craig's Stores* case,

24   which is narrower than other circuits of post-confirmation

25   jurisdiction in the Bankruptcy Court, and argue that the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3 Filed 12/07/23    Page 185 of 214    PageID 7569

142

1   gatekeeper provision doesn't fall within that.  But that --

2   such reliance is misplaced, Your Honor.

3       *Craig* held that the Bankruptcy Court did not have

4   jurisdiction to adjudicate a post-confirmation dispute over a

5   private-label credit card agreement between the debtor and the

6   bank.  In declining to find jurisdiction, the Fifth Circuit

7   remarked that there was no antagonism or claim pending between

8   the parties as of the reorganization and no facts or law

9   deriving from the reorganization or the plan was necessary to

10  the claim asserted by the debtor.

11      However, in so ruling, Your Honor, the Fifth Circuit did

12  reason that post-confirmation jurisdiction in the Bankruptcy

13  Court continues to exist for matters pertaining to

14  implementation and execution of the plan.  Requiring parties

15  to seek Bankruptcy Court determination the claim is colorable

16  before embarking on litigation that will impact

17  indemnification rights and affect distributions to creditors

18  is not an expansion of jurisdiction and fits well within the

19  *Craig* reasoning.

20      Unlike the credit card agreement dispute in *Craig*, Mr.

21  Dondero and his entities have demonstrated tremendous

22  antagonism towards the Debtor.  And while the Debtor's plan

23  may be confirmed, further litigation has been threatened by

24  Mr. Dondero.  It's in the pleadings.  That's one of the

25  reasons Mr. Dondero says his plan is better.  It'll avoid

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-53 Filed 12/07/23   Page 186 of 214   PageID 7570

143

1 │ tremendous amount of litigation.

2 │      After *Craig*, the Fifth Circuit again examined the

3 │ bankruptcy court's post-confirmation jurisdiction in the

4 │ *Stoneridge* case in 2005.  In that case, the Fifth Circuit

5 │ ruled that a bankruptcy court has post-confirmation

6 │ jurisdiction to resolve a dispute between two nondebtors that

7 │ could trigger indemnification claims against a liquidating

8 │ trust formed as a result of a confirmed plan.

9 │      And lastly, as I mentioned Your Honor's decision before,

10 │ the *TXMS Real Estate* case, I think just a couple of months

11 │ ago, it stands for the proposition that post-confirmation

12 │ jurisdiction exists for matters bearing on the implementation,

13 │ interpretation, and execution of a plan.  In that case, Your

14 │ Honor ruled that Your Honor had jurisdiction to resolve a

15 │ post-confirmation dispute between a liquidating trust formed

16 │ under a plan and a landlord, the result of which could

17 │ significantly and adversely affect the value of the

18 │ liquidating trust and monies available for unsecured

19 │ creditors.

20 │      And you have heard Mr. Seery testify that litigation will

21 │ have an adverse effect on the ability to make distributions to

22 │ creditors.

23 │      So, Your Honor, under these authorities, the Court

24 │ undoubtedly would have jurisdiction to act as the gatekeeper

25 │ for the litigation.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-53 Filed 12/07/23   Page 187 of 214   PageID 7571
Exhibit Exhibit 53   Page 241 of 692

144

1          There's also an independent basis for the gatekeeper

2     provision, Your Honor, the Barton Doctrine, which the Court is

3     very familiar from your opinion in the *In re Ondova* case in

4     2017 and which provides that before a suit may be brought

5     against a trustee, leave of Court is required.  In *Ondova*, the

6     Court reviewed the history of the doctrine in connection with

7     litigation brought by a highly-litigious debtor against a

8     trustee and his professionals.  This Court noted that there

9     are several important policies followed by the doctrine,

10    including a concern for the overall integrity of the

11    bankruptcy process and the threat of trustees being distracted

12    from or intimidated from doing their jobs.  And Your Honor's

13    language still:  For example, losers in the bankruptcy process

14    might turn to other courts to try to become winners there by

15    alleging the trustee did a negligent job.

16         Your Honor, this is precisely what the Debtor is trying to

17    prevent here, Mr. Dondero and his entities from putting the

18    bad experience before Your Honor in this case behind it and

19    going to try to find better luck in a more hospitable court.

20         Your Honor, the Barton Doctrine originally only applied to

21    receivers, and over the course of time has been extended to

22    apply to various court-appointed fiduciaries, as we have cited

23    in our materials:  trustees, debtors-in-possession, officers

24    and directors, employees, and attorneys representing the

25    debtor.

007980

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 25-53 Filed 12/07/23 Page 188 of 214   PageID 7572

145

1        And I expect the Objectors to argue that there is a

2   statutory exception to the Barton Doctrine under 28 U.S.C. 959

3   and it does not apply to acts or transactions in carrying out

4   business conducted with a property.  The exception, Your

5   Honor, is very narrow and was meant to apply for things like

6   slip-and-fall cases.  In fact, the Eleventh Circuit in the

7   *Carter v. Rodgers* case, <mark>220 F.3d 1249</mark> in 2000, held that

8   Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9   trustees for administering or liquidating the bankruptcy

10  estate.

11       The Objectors also argue that the gatekeeper provision

12  violates *Stern v. Marshal*.  However, as the Court acknowledged

13  in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14  recognized that the Barton Doctrine remains viable post-*Stern*

15  *v. Marshal*.  The Fifth Circuit reasoned that while Barton

16  Doctrine is jurisdictional in that a court does not have

17  jurisdiction of an action if preapproval has not been

18  obtained, it does not implicate the extent of a bankruptcy

19  court's jurisdiction to adjudicate the underlying claim,

20  precisely the distinction we're making here.  The bankruptcy

21  court would be the gatekeeper for deciding whether the claim

22  passes through the gate, and then after will decide if it has

23  jurisdiction to rule on the underlying claim.

24       And this is important especially in a case like this, Your

25  Honor, where Your Honor has had extensive experience with the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-5 Filed 12/08/23 Page 189 of 214   PageID 7573

146

1   parties and is in the best position to determine whether the

2   claims are valid or attempted to be used as harassment.

3       The Objectors will complain about the open-ended nature of

4   the gatekeeper provision, whether it will or won't apply after

5   the case is closed or a final decree is issued, and the unfair

6   burden of their rights.

7       Your Honor has a previous reported opinion where basically

8   jurisdiction does extend after a case is closed or a final

9   decree is entered, so that issue is a red herring.

10      As Your Honor is well aware, it's a decade-long -- a

11  decade of litigation against the Dondero-controlled entities

12  that caused the Highland bankruptcy.  And the Court is very

13  well aware of the litigation that occurred in *Acis*, very well

14  aware of the litigation that's occurred here that I mentioned

15  a few minutes ago.  Your Honor, it is not over, you'll be

16  presiding over the contempt hearing.

17      And if the Court needs yet another ground to approve the

18  gatekeeper provision, the Debtor submits that the procedure is

19  an appropriate sanction for Dondero's vexatious litigation

20  activities.  We cited the *In re Carroll* case in the Fifth

21  Circuit of 2017 that held that a bankruptcy court has the

22  authority to enjoin a litigant from filing any pleading in any

23  action without the prior authority from the bankruptcy court.

24      And in affirming the decision of the bankruptcy court, the

25  Fifth Circuit commented on the reasons the bankruptcy court

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 13-53   Filed 12/07/23   Page 190 of 214   PageID 7574

147

1  gave for its ruling.  After recounting the bad faith of

2  appellants, the bankruptcy court determined that the Carrolls'

3  true motives were to harass the trustee and thereby delay the

4  proper administration of the estate, in the hope that they

5  would be able to retain their assets or make pursuit of the

6  assets so unappealing that the trustee would be compelled to

7  settle on terms favorable to appellants.

8       Sounds familiar, Your Honor.  The same can certainly be

9  said about what Mr. Dondero is doing in this case.

10      And to make a showing that a party is vexatious litigant,

11 the Court must find that the party has a history of vexatious

12 and harassing litigation, whether the party has a good faith

13 -- the litigation or has filed it as a means to harass, the

14 burden to the Court and other parties, and the adequacy of

15 alternative sanctions.

16      And as Your Honor is well aware from all the litigation,

17 Your Honor is well, well able to make the finding required for

18 the vexatious litigation finding.

19      But here, we don't ask for the drastic sanction of

20 enjoining from any further filings.  Rather, we just ask for a

21 less-severe sanction, requiring Mr. Dondero and his entities

22 to first make a showing that he has a colorable claim.

23      The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24 that.  In *Baum*, the district court barred a vexatious litigant

25 from initiating litigation without first obtaining the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 10-8 53-5 Filed 12/07/23 Page 191 of 214   PageID 7575

148

1   approval of the district court.  Ultimately, the matter

2   reached the Fifth Circuit after the district court had

3   modified the pre-filing injunction to limit it to a certain

4   case, and then broadened it again based upon continued bad

5   faith conduct.

6       On appeal, the Fifth Circuit, citing several prior cases,

7   noted that a district court has the authority to impose a pre-

8   filing injunction to defer vexatious, abusive, and harassing

9   litigation.

10      And for those reasons, Your Honor, the Debtor asks the

11  Court to overrule any objections to the gatekeeper provision.

12      Your Honor, I was just going to then go to the plan

13  modification provisions, but I wanted to stop and see if you

14  had any questions at this point.

15          THE COURT:  I do not.  Let's give him a time

16  estimate, Nate.  About how --

17          THE CLERK:  Twenty.

18          MR. POMERANTZ:  I have another five or six minutes, I

19  think, based upon --

20          THE COURT:  Okay.

21          MR. POMERANTZ:  And then I'll be ready to turn it

22  over to --

23          THE COURT:  Okay.

24          MR. POMERANTZ:  -- to Mr. Kharasch.

25          THE COURT:  All right.  Yes.  You've got -- you've

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 253-5Bd   12/07/2916 Page 192 of 214   PageID 7576

149

1    done an hour and 33 minutes.  So you have about, I guess, 37

2    minutes left.  Okay.  Go ahead.

3            MR. POMERANTZ:  Thank you, Your Honor.

4        I would like to address the modifications of the plan that

5    were contained in our January 22nd plan and the additional

6    changes filed on February 1, several of which I have referred.

7        As a preliminary matter, Your Honor, under 1127(b), the

8    Debtor can modify a plan at any time prior to confirmation if

9    -- and not require resolicitation if there's no adverse change

10   in the treatment of claim or interest of any equity holder.

11       With that background, I won't go through the changes we

12   made that I've already discussed, but I will point out a

13   couple, Your Honor, that I would like to point out now.  We

14   have modified the plan with respect to conditions of the

15   effective date in Article 8.  First, a condition to the

16   effective date will now be entry of a final order confirming a

17   plan, as opposed just to entry of order.  And final order is

18   defined as the exhaustion of all appeals.

19       In addition, the ability to obtain directors and officers

20   insurance coverage on terms acceptable to the Debtor, the

21   Committee, the Claimant Trustee, the Claimant Trustee

22   Oversight Board, and the Litigation Trustee is now a condition

23   to the effective date.

24       The Court heard testimony today and has experienced

25   firsthand the litigiousness of Mr. Dondero and his related

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 28-53 Filed 12/07/23    Page 193 of 214    PageID 7577

150

1    entities.  And the Court heard testimony from Mr. Tauber and

2    Aon that the D&O insurance will not be available post-

3    effective date without assurances that the gatekeeper

4    provision will be in effect for the duration of the policy and

5    any run-off period.

6        Mr. Tauber further testified that he expected the final

7    terms from the insurance carrier to provide that if the

8    confirmation order was reversed on appeal and the gatekeeper

9    was removed, it would void -- it would either void the

10    directors and officers coverage or it'd result in a Dondero

11    exclusion.

12        Mr. Dondero and his entities are no strangers to the

13    appellate process, as Your Honor knows.  They appealed several

14    of your orders, and continue the tack in this case, having

15    appealed the Acis and the HarbourVest orders and the

16    preliminary injunction.  It would not surprise the Debtor if

17    Mr. Dondero and his entities appealed your confirmation order,

18    if Your Honor decides to confirm the plan.

19        The Debtor is confident that it will prevail on any appeal

20    in the confirmation order, as we believe the Debtor has made a

21    compelling case for confirmation.

22        The Debtor also believes a compelling case exists that if

23    the plan went effective without a stay pending appeal, that

24    the appeal would be equitably moot, but we understand we are

25    facing headwinds from the courts, bankruptcy court have

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-3 Filed 12/07/23    Page 194 of 214    PageID 7578

151

1    addressed that issue before.

2      However, given the effect a reversal would have on the

3    availability of insurance coverage, the Claimant Trustee, the

4    Claimant Oversight Committee, and the Litigation Trustee are

5    just not willing to take that risk.

6      We are hopeful that Mr. Dondero and his entities will

7    recognize that any appeal is futile and step aside and let the

8    plan proceed and become effective.

9      If Mr. Dondero and his related entities do appeal the

10    confirmation order, preventing it from becoming final and

11    preventing the effective date from the occurring, the Debtor

12    intends to work closely with the Committee to ratchet down

13    costs substantially and proceed to operate and monetize assets

14    as appropriate until an order becomes final.

15      None of these modifications adversely affect the treatment

16    of claims or interests under the plan, Your Honor, and for

17    those reasons, Your Honor, we request that the Court approve

18    those modifications.

19      And with that, I would like to turn the podium over to Mr.

20    Kharasch to briefly address the remaining CLO objections.

21         THE COURT:  All right.  Mr. Kharasch?

22          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23        MR. KHARASCH:  Good afternoon, Your Honor.  I'll be

24    as brief as possible.  I know we're under a deadline.

25      As you've heard yesterday, you've heard before in other

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 10-53-53   Filed 12/07/23   Page 195 of 214   PageID 7579

152

1   proceedings, Your Honor, the CLO Objecting Parties, the so-

2   called investors, do have rights under the CLO management

3   agreements and indentures, including contractual rights to

4   terminate the management agreements under certain

5   circumstances.

6       What they complain about today, Your Honor, is that the

7   injunction language in the plan, including the language

8   preventing actions to interfere with the implementation and

9   consummation of the plan, is so broad and ambiguous that their

10  rights are or may be improperly impacted, especially any

11  rights to remove the manager for acts of malfeasance.

12      But the Debtor is primarily relying, Your Honor, not so

13  much on the plan injunctions but on the clear provisions of

14  the January 9 order, to which Mr. Dondero consented and which

15  provides that Mr. Dondero shall not cause any of his related

16  entities to terminate any agreements with the Debtor.

17      Yes, that is a broad provision, but it is very clear, and

18  it does not even allow the CLO Objecting Parties to come to

19  court under a gatekeeper-type provision.  But that is what Mr.

20  Dondero consented to on behalf of himself and his related

21  entities.

22      Important to note, Your Honor, we are not here today to

23  litigate who is and who is not a related entity.  That will be

24  left for another day.  However, Your Honor, we have considered

25  these issues, including last night and this morning, and we

007988

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 20-53 Filed 12/07/50 Page 196 of 214 PageID 7580

153

1    are going to propose -- well, we will modify our plan through

2    a provision in the confirmation order to provide the

3    following:  Notwithstanding anything in the plan or the

4    January 9 order, the CLO Objecting Parties will not be

5    precluded from exercising their contractual or statutory

6    rights in the CLOs based on negligence, malfeasance, or any

7    wrongdoing, but before exercising such rights shall come to

8    this Court to determine whether those rights are colorable and

9    to also determine whether they are a related entity.  If the

10   Court has jurisdiction, the Court can determine the underlying

11   colorable rights or claims.

12       This does not impact the separate settlement we have with

13   CLO Holdco, Your Honor.

14       We think that such modification addresses some of the

15   concerns raised yesterday by the objecting parties by

16   providing more clarity as to what the plan is doing and not

17   doing with respect to the plan and the January 9 order, and we

18   think it is also a fair resolution of some legitimate

19   concerns.

20       So, with that, Your Honor, we think that, with that

21   clarification that we did not have to make but are willing to

22   make, that this should fully satisfy the CLO Objecting Parties

23   with regard to their objections to the injunction and the

24   gatekeeper.

25       Thank you, Your Honor.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3 Filed 12/07/23   Page 197 of 214   PageID 7581

154

1         THE COURT:  All right.  Mr. Clemente?

2     CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

3         MR. CLEMENTE:  Yes, Your Honor.  And I actually am

4    going to be brief.  Mr. Pomerantz's discussion, obviously, was

5    very, very thorough, so I'm able to cut out a lot of stuff.

6      Thank you, Your Honor.  Matt Clemente, Sidley Austin, on

7    behalf of the Committee.

8      The plan, Your Honor, meets the confirmation standards and

9    should be confirmed.  Mr. Pomerantz covered a lot of ground,

10   and I will endeavor not to repeat that, but there are a few

11   points that I think the Committee wishes to emphasize.

12      Your Honor, since I first appeared in front of you, I have

13   maintained consistently that no plan can or should be

14   confirmed without the consent of the Committee.  Your Honor,

15   in her wisdom, understood this immediately, as it was obvious

16   -- it was the obvious conclusion, given the makeup of the

17   creditor body, the asset pool, and the impetus for the filing

18   of the case.

19      Unfortunately, not everyone came to this conclusion so

20   easily, and it took much hard-fought negotiations as well as a

21   defeated disclosure statement, among other things, and

22   tireless dedication and commitment by each individual

23   Committee member to drive for a value-maximizing plan that is

24   in the best interests of its constituencies and for us to get

25   to where we are today.

007990

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 12-53   Filed 12/07/23   Page 198 of 214   PageID 7582
Exhibit Exhibit 53-53 Page 252 Page

155

1      And where we are today, Your Honor, is at confirmation for

2   a plan that the Committee unanimously supports, which was the

3   inevitable outcome for this case from the very beginning.

4      I've also said, Your Honor, that context is critical in

5   this case.  It has been from the beginning, and it remains so

6   now.  Mr. Draper, interestingly, began his comments yesterday

7   by saying that even a serial killer is entitled to *Miranda*

8   rights.  While I will admit that at times the rhetoric in this

9   case has been heated, I have never certainly likened Mr.

10  Dondero to a serial killer.  But the record shows, and Mr.

11  Dondero's own words and actions show, that he is, in fact, a

12  serial litigator who has no hesitation at all to take any

13  position in an attempt to leverage an outcome that suits his

14  self-interest.  And he has no hesitation at all to use his

15  many tentacles in a similar fashion.

16     That is a very important context in which the Court should

17  view the remaining objections of the Dondero tentacles and

18  weigh confirmation of the Debtor's plan.

19     Against this context of a serial litigator, Your Honor, we

20  have a plan supported by each member of the Official Committee

21  of Unsecured Creditors, accepted by two classes of claims,

22  Class 2 and Class 7, and holders of almost one hundred percent

23  in amount of non-insider claims in Class 8.

24     The parties that have voted against the plan are either

25  employees who are not receiving distributions under the plan

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8   Filed 12/07/23   Page 199 of 214   PageID 7583

156

1   or are insiders or parties related to Mr. Dondero.

2        The overwhelming number and amount of creditors who are

3   receiving distributions under this plan, therefore, have

4   accepted the plan.  The true creditors and economic parties in

5   interest have spoken, they have spoken loudly, and they have

6   spoken in favor of confirming the plan.

7        Your Honor, I'm not going to address the technical

8   requirements, as Mr. Pomerantz did that.  So I'm going to skip

9   over my remarks in that regard, except I do want to emphasize

10   the remarks regarding the gatekeeper, exculpation, and

11   injunction provisions as they're of critical importance to the

12   plan.

13        The testimony has shown and the proceedings of this case

14   has shown, again, Mr. Dondero is a serial litigator with a

15   stated goal of causing destruction and delay through

16   litigation.

17        The testimony has further shown that none of the

18   independent board members would have signed onto the role

19   without the gatekeeper and injunction provisions and the

20   indemnity from the Debtor.

21        Therefore, it follows that such provisions are necessary

22   to entice parties to serve in the Claimant Trustee and other

23   roles under the plan, which, as I remarked in my opening

24   comments, are integral to providing the structure that the

25   creditors believe is necessary to unlocking the value and

007992

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/24   Page 200 of 214   PageID 7584

157

1    unlocking themselves from the Dondero web.

2        Regarding the exculpation and injunction provisions

3    specifically, Your Honor, the Court will recall that the

4    Committee raised objections to them in connection with the

5    first disclosure statement hearing.  In response, the Debtor

6    narrowed the provisions, and the Committee believes they

7    comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8    walked Your Honor through.

9        And to be clear, Your Honor, not only does the Committee

10   believe the exculpation and injunction provisions comply with

11   Fifth Circuit law, the Committee does not believe the estate

12   is harmed by such provisions, as the Committee does not

13   believe there are any cognizable claims that could or should

14   be raised that would otherwise be affected by the exculpation

15   or injunction, and, frankly, with respect to the release that

16   Mr. Pomerantz walked Your Honor through with respect to the

17   directors and the officers.

18       Regarding the gatekeeper, Your Honor, Your Honor

19   presciently approved it in her January 9th order, and the

20   developments since then only serve as further justification

21   for including it in the plan and confirmation order.  Mr.

22   Dondero is a serial and vexatious litigator, and the

23   instruments put in place under the plan to maximize value for

24   the creditors and to oversee that value-maximizing process

25   must be protected, and the gatekeeper function serves that

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 201 of 214   PageID 7585

158

1   protection while also, importantly, as Mr. Pomerantz pointed

2   out, providing Mr. Dondero with a forum to advance any

3   legitimate claims he and his tentacles may have.

4       In short, Your Honor, the gatekeeper provision is

5   necessary to the implementation to the plan, is fair under the

6   circumstances of the case, and is therefore within this

7   Court's authority, and it is appropriate to approve.

8       Your Honor, in sum, it has been a long road to get here

9   today, but we are finally here.  And we are here, Your Honor,

10  I believe in large part as a result of the tireless efforts of

11  the individual members of my Committee, and for that I thank

12  them.

13      The Committee fully supports and unanimously supports

14  confirmation of the plan.  As demonstrated by the evidence,

15  the plan meets all the requirements of the Bankruptcy Code.

16  The Committee believes the plan is in the best interests of

17  its constituencies.  And therefore the Committee, along with

18  two classes of creditors and the overwhelming amount of

19  creditors in terms of dollars, urge you to confirm the plan.

20      That's all I have, Your Honor, but I'm happy to answer any

21  questions you may have for me.

22          THE COURT:  Okay.  Not at this time.

23      Nate, how much time --

24      (Clerk advises.)

25          THE COURT:  Twenty-five minutes remaining?  All

007994

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-8   Filed 12/07/23   Page 202 of 214   PageID 7586

159

1  right.  Just so you know, you've got a collective Debtor's

2  counsel/Committee's counsel 25 minutes remaining for any

3  rebuttal, if you choose to make it.

4      Let's take a five-minute break, and then we'll hear the

5  Objectors' closing arguments.  Okay.

6          THE CLERK:  All rise.

7      (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8          THE COURT:  All right.  Please be seated.  We're

9  going back on the record in Highland.  We're ready to hear the

10  Objectors' closing arguments.  Who wants to go first?

11          MR. DRAPER:  Your Honor, this -- this is Douglas

12  Draper.  I get the joy of going first.

13          THE COURT:  Okay.

14   CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15          MR. DRAPER:  We've heard a great deal of testimony

16  about the Debtor's belief that the circumstances in this case

17  warrant an exception to existing Fifth Circuit case law, the

18  Bankruptcy Code, and Court's post-confirmation jurisdiction.

19      I would not be standing here today objecting to the plan

20  if the Debtor didn't attempt to extend, move past and beyond

21  the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22  *Lumber*.  In fact, I think I heard an argument that *Pacific*

23  *Lumber* is not applicable and this Court should disregard Fifth

24  Circuit case law.

25      Let's start with the exculpation provision.  And the focus

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 28-53 Filed 12/07/25   Page 203 of 214   PageID 7587

160

1   of this case has been, and what we've heard over the last few

2   days, is about the independent directors.  I understand there

3   was an order entered earlier, the order stands, and the order

4   is applicable in this case.  It cuts off, however, when we

5   have a Reorganized Debtor, because these independent directors

6   are no longer independent directors.  It cuts off when we have

7   a new general partner.

8        And so the protections that were afforded by that order do

9   not need to be afforded to the new officers and new directors

10  of the new general partner.  And in fact, the protections that

11  they're entitled to are completely different than the

12  protections that were entitled -- that are covered by the

13  order that the Court has looked at.

14       Let's first focus on, however, the exculpation provision.

15  And I wanted to ask the Court to look at the exculpated

16  parties.  Have to be very careful and very interest -- and

17  focus solely on the independent directors.  But if you look at

18  the parties covered by exculpation provision, it includes the

19  professionals retained by the Debtor.  My reading of *Pacific*

20  *Lumber* is that neither the Creditors' Committee counsel nor

21  the Debtor can be covered by an exculpation provision.  This

22  in and of itself makes the plan non-confirmable.  This

23  exculpation provision is unwarranted and unnecessary.

24       Two, --

25            THE COURT:  Well, let's drill down on that.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 26-3 Filed 12/07/23 Page 204 of 214   PageID 7588

161

1          MR. DRAPER:  -- we have --

2          THE COURT:  Let's drill down on that.  Mr. Pomerantz

3     says that this wasn't what they considered one way or another

4     by *Pacific Lumber*.  Debtor, debtor professionals.  Okay?  Do

5     you disagree with that?

6          MR. DRAPER:  I disagree with that.  *Pacific Lumber*

7     said you could only have releases and exculpations for the

8     Creditors' Committee members.  And the rationale behind that

9     was that those people volunteered to be part and parcel of the

10    bankruptcy process, that those parties did not get paid.

11    Here, we have two professionals who both volunteered and are

12    being paid, and are not entitled to an exculpation under

13    *Pacific Lumber*.  They're not entitled to a --

14         THE COURT:  Okay.  So you say *Pacific* --

15         MR. DRAPER:  -- release.  Now, ultimately, they --

16         THE COURT:  -- *Pacific Lumber* categorically rejected

17    all exculpations except to Creditors' Committee and its

18    members.  That's your --

19         MR. DRAPER:  I agree.  That's --

20         THE COURT:  -- interpretation of *Pacific Lumber*?

21         MR. DRAPER:  Yes.

22         THE COURT:  Okay.  All right.  So you just absolutely

23    disagree, one by one, with every one of the arguments, that it

24    was really -- the only thing before the Fifth Circuit was plan

25    sponsors, okay?  A plan proponent that I think was like a

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 205 of 214   PageID 7589

162

1    competitor previously of the debtor, and I think a large

2    creditor or secured creditor.  I think those were the two plan

3    proponents.

4        So you disagree -- I'm going to, obviously, go back and

5    line-by-line pour through *Pacific Lumber*, but you disagree

6    with Mr. Pomerantz's notion that, look, it was really a page

7    and a half or two of a multipage opinion where the Fifth

8    Circuit said, no, I don't think 524(e) is authority to give

9    exculpation from postpetition liability for negligence as to

10   these two plan sponsors.  And I guess it was also -- I don't

11   know.  They say, Pachulski's briefing says it was really only

12   looking at these two plan sponsors and the Committee and its

13   members on appeal, you know, going through the briefing, and

14   in such, you can see that these were all that was presented

15   and addressed by the Fifth Circuit.  You disagree with that?

16        MR. DRAPER:  Look, I know the facts of *Pacific Lumber*

17   and they -- I know what the posture of the case was.  However,

18   the literal language by the opinion in it, it transcends just

19   a dispute in the case.  And I think the U.S. Trustee's

20   position that this exculpation provision is correct as a

21   matter of law support -- is further evidence of the fact that

22   the U.S. Trustee, as watchdog of this process, and *Pacific*

23   *Lumber* say this cannot be done, period, end of story.

24        THE COURT:  Okay.  So you, at bottom, just totally

25   disagree with Mr. Pomerantz?  You say *Pacific Lumber* is

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-2   Filed 12/04/23    Page 206 of 214   PageID 7590

163

1  actually a very broad holding, and I guess, if such, there's a

2  conflict among the Circuits, right?

3          MR. DRAPER:  Well, that's okay.

4          THE COURT:  So, --

5          MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

6  binding on you.

7          THE COURT:  Understood.

8          MR. DRAPER:  There may be a conflict in the Circuits,

9  and ultimately the Supreme Court may make a decision and

10 decide who's right and who's wrong.

11     But for purposes of today and for purposes of this

12 exculpation provision and for purposes of this confirmation,

13 *Pacific Lumber* is the applicable law.

14         THE COURT:  Okay.  Well, again, this is a hugely

15 important issue, although in many ways I don't understand why

16 it is, because we're just talking about postpetition acts and

17 negligence, okay?  You know, many might say it's much ado

18 about nothing, but it's front and center of your objection.

19 So I guess I'm just thinking through, if the Fifth Circuit was

20 presented these exact facts and was presented with the

21 argument, you know, the *Blixseth* case says 524(e) has nothing

22 to do with exculpation because exculpation is a postpetition

23 concept, and it's just talking about standard liability --

24 these people aren't going to be liable for negligence; they

25 can be liable for anything and everything else -- if presented

| | |
|---|---|
| 1 | with that *Blixseth* case, you know, there are several arguments |
| 2 | that Mr. Pomerantz has made why, if you accept that 524(e) |
| 3 | might not apply here, let's look at the reasoning, the little |
| 4 | bit of reasoning we had of *Pacific Lumber*, that it was really |
| 5 | a policy rationale, right?  These independent fiduciaries, |
| 6 | strangers to the company and case, they'd never want to do |
| 7 | this if they knew they were vulnerable for getting sued for |
| 8 | negligence.  Mr. Pomerantz's argument is that these |
| 9 | independent board members are exactly analogous to a |
| 10 | Committee, more than prepetition officers and directors.  What |
| 11 | do you have to say about that policy argument? |
| 12 | MR. DRAPER:  Well, I think there's a huge distinction |
| 13 | between the members of a Creditors' Committee who are |
| 14 | volunteers and are not paid versus a paid independent |
| 15 | director.  And more importantly, I think there's a huge |
| 16 | difference between a member of a Creditors' Committee who's |
| 17 | not paid and counsel for a Debtor and counsel for a Creditors' |
| 18 | Committee. |
| 19 | THE COURT:  Okay. |
| 20 | MR. DRAPER:  Look, you have -- you've -- |
| 21 | THE COURT:  So, at bottom, it was all about |
| 22 | compensation to the Fifth Circuit? |
| 23 | MR. DRAPER:  Well, no.  The Fifth Circuit policy |
| 24 | decision was we want to protect a party who wants to serve and |
| 25 | do their civic duty to serve on a Creditors' Committee for no |

008000

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-3   Filed 12/07/23   Page 208 of 214   PageID 7592

165

1  compensation.  I agree with that.  I think it's a laudable

2  policy decision.  I think it makes sense.

3       However, the Fifth Circuit in its language basically said,

4  nobody else gets it.  It didn't say, look, you know, if there

5  are circumstances that are different, we may look at it

6  differently.  The language is absolute in the opinion.  And

7  that's what I think is binding and I think that's what the

8  case stands for.

9       And look, just so the Court is very clear, when Pachulski

10 files its fee application and the Court grants the fee

11 application, any claim against them is res judicata.  So, in

12 fact, they do have -- they do have protection.  They do have

13 the ability to get out from under.  The Court -- they're just

14 not -- they just can't get out from under through an

15 exculpation provision.  And the same goes for Mr. Clemente and

16 his firm.

17            THE COURT:  Which, --

18            MR. DRAPER:  And the same goes for DSI.

19            THE COURT:  Which, by the way, that's one reason I

20 think sometimes this is much ado about nothing.  It goes both

21 ways.  The Debtor professionals, the Committee professionals,

22 estate professionals, they're going to get cleared on the day

23 any fee app is approved, right?  I mean, there's Fifth Circuit

24 law that says --

25            MR. DRAPER:  I -- I --

1          THE COURT:  -- says that's res judicata as to any

2    future claims.

3        But I guess I'm really trying to understand, you know, at

4    bottom, I feel like the Fifth Circuit was making a holding

5    based on policy more than any directly applicable Code

6    provision.

7        I mean, it's been said, for example, that Committee

8    members, they're entitled to exculpation because of, what,

9    1103, some people argue, 1103, which subsection, (c)?  That's

10   been quoted as giving, quote, qualified immunity to

11   Committees.  But it doesn't really say that, right?  It's just

12   something you infer.

13          MR. DRAPER:  No.  Look, what I think, if you really

14   want to put the two concepts together, I think what the Fifth

15   Circuit, when they told lawyers and professionals that you

16   can't get an exculpation, was very mindful of the fact that

17   you can get released once your fee app is approved.  So, as a

18   policy, they didn't need to do it in a exculpation provision.

19   There was another methodology in which it could be done.

20          THE COURT:  Uh-huh.

21          MR. DRAPER:  And so that's -- you have to look at it

22   as holistic and not just focus on the exculpation provision.

23   Because, in fact, they recognize and they -- I'm sure they

24   knew their existing case law on res judicata, and that's why

25   they read it out.

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 33-53   Filed 12/07/23   Page 210 of 214   PageID 7594

167

1    So, honestly, there's no reason for Pachulski to be in

2    here.  There's no reason for Mr. Clemente to be in here.

3    There's no reason for the professionals employed by the Debtor

4    to be in here.  They have an exit not by virtue of the plan.

5         THE COURT:  But so then it boils down to the

6    independent directors and Strand post January 9th?

7         MR. DRAPER:  It boils down somewhat to them, but

8    quite frankly, there are two parts to this.  One is you have

9    an order that's in place.  I am not asking the Court to

10   overturn the order.  And quite frankly, this provision could

11   have been written to the effect that the order that was in

12   place on -- that's been presented to the Court is applicable

13   and applied.

14       However, let's parse that down.  Let's look at Mr. Seery.

15   The order that's in place solely protects the independent

16   directors acting in their capacities as independent directors.

17   If somebody's acting as -- and if you want to liken it to a

18   trustee, their protection is afforded by the Barton Doctrine,

19   and that's how the protection arises.

20       What's going on here is they're extending the provisions,

21   first of all, of the Court's order, and number two, of the

22   Barton Doctrine, which are -- which cannot be -- which should

23   not be extended.  The law limits what protections you have and

24   what protections you don't have.  And we, as lawyers -- look,

25   I'll give you the best example.  Think of all the times you

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-53 Filed 12/07/23   Page 211 of 214   PageID 7595

168

1   had somebody write in the concept of superpriority in a cash

2   collateral order.  And how many times have you had a lawyer

3   rewrite the concept of the issue as to diminution in value?

4   The Code says diminution in value, and quite frankly, a cash

5   collateral order should just say if, to the extent there's

6   diminution in value, just apply the Code section.  It's

7   written there.  Smart people put it in, and Congress approved

8   it.  And once you start getting beyond that, those things

9   should be limited.

10      And what we have are lawyers trying to extend out by

11  definitions things that the Code limits by its reach.  That

12  goes for post-confirmation jurisdiction.  That goes for the

13  injunction.  That goes for the so-called gatekeeper provision.

14      And so, again, I would not be here if, in fact, they had

15  said, we have an injunction to the full extent allowed by the

16  Bankruptcy Code and *Pacific Lumber*.  We have an exculpation

17  provision that's allowed by virtue of the Court's order.  We

18  have the full extent and full reach of the Barton Doctrine.

19  Those are legitimate.  Once you start expanding upon that,

20  you're reaching into matters that are not authorized and not

21  allowed.

22      And then you get into 105 territory, which is always very

23  dangerous.  And that's really what's going on here.  And

24  that's the tenor of my argument and what I'm trying to say.

25  The Code gives protections.  It is not for us to extend the

Case 19-34054-sgj11    Doc 3818-4    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-8    Filed 12/07/23    Page 212 of 214    PageID 7596

169

1   protections.  It's not for us to enlarge them, even under a,

2   gee, the other party's litigious.

3       And so that's -- let's take *Craig's Store*.  Attempted to

4   limit its reach.  *Craig's Store* says once you have a confirmed

5   plan, any dispute between the parties, for -- let's take an

6   executory contract.  If there's a breach of the executory

7   contract, that's a matter to be handled aft... by another

8   court.  It's not a matter to be handled by this Court.  This

9   Court lets the parties out.

10      And in this case, it's even worse, because you basically

11  have a new general partner coming in, you have an assumption

12  of various executory contracts, and you have a -- Strand is no

13  longer present.

14      If you adopted Mr. Seery's argument, anybody who appeals a

15  decision, questions what he does or how he does it, is a

16  vexatious litigator.  That's not the case.  And the fact that

17  we are appealing a decision is a right that we have.  It

18  shouldn't be limited, and it shouldn't be held against us.

19  Courts can rule against us.  That's fine.

20      And so that's really what the focus is here and that's why

21  I gave the opening that I had.  We are willing to be bound by

22  applicable law.  And quite frankly, the concept that the

23  exigencies of a case allow a court to change what applicable

24  law is is problematic.  I gave the criminal example as a

25  reason.  And the reason was that, in certain instances, the

Case 19-34054-sgj11   Doc 3818-4   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 30-53   Filed 12/07/23   Page 213 of 214   PageID 7597

170

1    application of law may allow a criminal to go free.  It's a

2    problem with our system and how we work, but that's what the

3    law does, and it is absolute in its application.

4         Let me address the so-called gatekeeper provision.  The

5    gatekeeper provision, in a certain sense, is recognized in the

6    Barton Doctrine.  It's jurisdictional, and it says, to the

7    extent you're going to litigate with somebody who served

8    during the bankruptcy, who was a trustee, then you have to

9    come to the bankruptcy court and pass through a gate.  It

10   doesn't say you have to pass through a gate for a reorganized

11   debtor who does something after a plan is confirmed and going

12   forward.  And so that's -- there's a distinction.

13        And if you look at Judge Summerhays' decision, which I

14   will be happy to send to the Court, in *WRT* involving -- it's

15   kind of (indecipherable) and Mr. Pauker, where, in that case,

16   the trustee, the litigation trustee, spent more litigating

17   than it had in recoveries, and Baker Hughes filed suit.  Judge

18   Summerhays said, look, the Barton Doctrine only applies to a

19   certain extent.  It is limited once you get into post-

20   confirmation matters and related-to jurisdiction.

21        And so, again, the Barton Doctrine is what it stands for.

22   We agree with it, we recognize it, and it should be applied.

23   The Barton Doctrine, however, should not be extended, should

24   not go past its reach, and should not go past the grant of

25   jurisdiction for this Court.

Case 19-34054-sgj11 Doc 3818-4 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 10-8 Exhibit Exhibit 53 Filed 12/07/23 Page 214 of 214 PageID 7598

171

1      And so you have in here, though they have -- they have

2  tried to hide it in a limited fashion, this gatekeeper

3  provision.  The gatekeeper provision, as currently written,

4  covers post-confirmation claims that somebody has to come

5  before this Court to the extent there's a breach of a

6  contract.  That's not proper, and it's not covered by your

7  post-confirmation jurisdiction.  To the extent there's an

8  interpretation of an existing contract and an interpretation

9  of the order, you do have authority, and I don't question

10  that.

11      THE COURT:  But address Mr. Pomerantz's statement

12  that there's a difference between saying you have to go to the

13  bankruptcy court and make an argument, we have a colorable

14  claim that we would like to pursue, and having that

15  jurisdictional step required.  There's a difference between

16  that and the bankruptcy court adjudicating the claim.

17      MR. DRAPER:  Well, there are two parts to that.

18  Number one is there's an injunction in place from an action

19  taken post-confirmation against property of the estate.  We

20  all agree at that, correct?  And we believe that the

21  injunction applies to post-confirmation action against

22  property of the pre-confirmation estate.  We all agree to

23  that.

24      However, if in fact there's a breach of a contract

25  postpetition that the parties have a dispute about, that

008007