**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In Re: **Highland Capital Management, L.P.** § Case No. **19-34054-SGJ-11**

**Hunter Mountain Investment Trust**

|                                             |   |                    |
|---------------------------------------------|---|--------------------|
| Appellant                                   | § |                    |
| vs.                                         | § |                    |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee                                    | § |                    |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

## Volume 35

## APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its

individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital

Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and

files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in

the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.   Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the
court to consider evidence and other non-pleading materials including, but not limited to,
the court's reasoning that:

1.   the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type
analysis;

2.   the colorability analysis is "akin to the standards applied under the … *Barton*
doctrine";

3.   the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts
have applied when considering motions to file suit when a vexatious litigant bar
order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File
Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the
Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on
10/23/2023.

    4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

---

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

    1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

    2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

    1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

    2.   there is no evidence to support the alleged quid pro quo;

    3.   the material shared was *public* information; and/or

    4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.  Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.  Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.  Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.  Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.  Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

   1.  declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

   2.  concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1.  **Notice of Appeal**

*000001*       a.  Notice of Appeal **[Dkt. 3906]**;

*000276*       b.  Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*       c.  Second Amended Notice of Appeal **[Dkt. 3945]**

2.  **The judgment, order, or decree appealed from:**

   a.  Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

001049

a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594
001660
001821
001830

*Vol. 3*
001849
*Thru  Vol. 4*

*Vol 4*
002236
002243
002248

*Vol. 5*
*002251*
*002254*
*002262*
*002341*
*002355*
*002358*
*002391*
*002398*
*002400*
*Vol. 6*
*002826*
*Thru Vol. 7*
*Vol. 9*
*003257*
*Thru Vol. 9*
*003260*
*003270*
*003278*

| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| *Vol. 10*<br>*003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760<br>(3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

---

| | | | |
|---|---|---|---|
| *Vol. 10* | | | Holdings LLC, Stonehill Capital Management LLC |
| *003458* | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *003463* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *Vol. 11* *003537* | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Thru Vol. 16* *Vol. 17* *004465* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *004712* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004714* | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *004808* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *004813* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004836* | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18* *004930* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *004931* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 18*
*004939.*

*004959*

*004961*

*004984*

*005049*

*005114*
*Vol. 26*  *Thru Vol. 25*
*006608*

*Vol. 39*  *Thru Vol. 39*
*009273*

*009290*

*009416*

*009424*

| Date | Docket No. | Description |
|---|---|---|
| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*00 9426*

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|

*00 9436*

| | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
|---|---|---|---|

*00 9444*

| | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
|---|---|---|---|

*00 9445*

| | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
|---|---|---|---|

*00 9446*

| | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
|---|---|---|---|

*00 9456*

| | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|

*00 9458  Thru  Vol. 41*

*Vol. 42*

| | 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
|---|---|---|---|

*00 9841*

| | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
|---|---|---|---|

*00 9901*

| | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
|---|---|---|---|

*00 9905*

| | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
|---|---|---|---|

*00 9908*

| | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
|---|---|---|---|

*00 9912*

| | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
|---|---|---|---|

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | | | |
|---|---|---|---|
| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

*Vol. 43*

*010135*

*010136*

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.    Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023            Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
        Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

# HMIT Exhibit No. 61

008408

**MUNSCH /**
**HARDT /**
DALLAS / HOUSTON / AUSTIN

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com
Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

May 11, 2022

Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC  20530

Dear Ms. Eitel:

By way of follow-up to the letter Douglas Draper sent to your offices on October 4, 2021 and my letter dated November 3, 2021, I write to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor"). Those abuses, as detailed in our prior letters, include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to line the pockets of Debtor management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of stakeholders and third-party investors in Debtor-managed funds and in violation of investors' due process rights and various fiduciary duties and duties of candor to the Bankruptcy Court and all constituents.  In particular, I write this letter to further detail:

1.    Actions and omissions by the Debtor that have but a single apparent purpose: to spend the assets of the Highland estate to enrich those currently managing the estate at the expense of the business owners (the equity).  Currently, the Highland estate has more than enough assets to pay 100% of the allowed creditors' claims. But doing so would deprive the current steward, Jim Seery, as well as his professional cohorts, the opportunity to reap tens, if not hundreds of millions of dollars, in fees. This motivation explains the acts and omissions described below—all designed to prop up a façade that the post-confirmation bankruptcy machinations are necessary, and to avoid any scrutiny of that façade, and to foreclose any investigation into a contrary thesis.

2.    The Debtor's intentional understatement of the value of the estate for personal gain, the gain of professionals, and the gain of affiliated or related secondary claims-buyers.

3.    The failure to adhere to fiduciary duties to maximize the value of estate assets and failure to contest baseless proofs of claim to enable Highland to emerge from bankruptcy as a going concern and to preserve value for all stakeholders.

4.    The gross misuse of estate assets by the Debtor and Debtor professionals in pursuing baseless and stale claims against former insiders of the Debtor when the current value of the estate (over

008409

Ms. Nan R. Eitel
May 11, 2022
Page 2

$650 million with the recent completion of the MGM sale, which includes over $200 million in cash)
greatly exceeds the estate's general unsecured claims ($410 million).

    5.    The failure of the Debtor's CRO and CEO, Jim Seery, to adhere to his fiduciary duty to
maximize the value of the estate. As evidenced by the chart below, all general unsecured claims could
have been resolved using $163 million of debtor cash and other liquidity. Instead, proofs of claim were
inflated and sold to Stonehill Capital Management ("Stonehill") and Farallon Capital Management
("Farallon"), which are both affiliates of Grosvenor (the largest investor in the Crusader Funds, which
became the largest creditor in the bankruptcy). Mr. Seery has a long-standing relationship with
Grosvenor and was appointed to the Independent Board (the board charged with managing the Debtor's
estate) by the Redeemer Committee of the Crusader Funds, on which Grosvenor held five of nine seats.

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0 ($65.0 net of other assets) |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 to $163.0** |

    As highlighted in the prior letters to your office and as further detailed herein, this is the type of
systemic abuse of process that is something lawmakers and the Executive Office of the U.S. Trustee (the
"EOUST") should be concerned about. Accordingly, we urge the EOUST to exercise its "broad
administrative, regulatory, and litigation/enforcement authorities . . . to promote the integrity and
efficiency of the bankruptcy system for the benefit of all stakeholders–debtors, creditors, and the public."[1]
Specifically, we believe it would be appropriate for the EOUST to undertake an investigation to confirm
the current value of the estate and to ensure that the claims currently being pursued by the Debtor are
intended to benefit creditors of the estate, and not just to further enrich Debtor professionals and Debtor
management.

## BACKGROUND

**The Players**

James Dondero – co-founder of Highland in 1993. Mr. Dondero is chiefly responsible for ensuring that
Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other
areas, including real estate, private equity, and alternative investments. Mr. Dondero is a dedicated
philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy.
He currently serves as a member of the Executive Board of the Southern Methodist University Cox
School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential
Center.

---

[1] https://www.justice.gov/ust.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 3

Highland – Highland Capital Management, L.P., the Debtor.  Highland is an SEC-registered investment advisor co-founded by James Dondero in 1993.  Prior to its bankruptcy, Highland served as adviser to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

Strand – Strand Advisors, Inc., a Delaware corporation.  The general partner of Highland.

The Independent Board – the managing board installed after Highland's bankruptcy filing.  To avoid a protracted dispute, and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by three independent directors of Strand, who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern.  Pursuant to an agreement with the Creditors' Committee that was approved by the Bankruptcy Court, Mr. Dondero, UBS, and the Redeemer Committee each were permitted to choose one director.  Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James P. Seery, Jr.[2]

Creditors' Committee – On October 29, 2019, the bankruptcy court appointed the Official Committee of Unsecured Creditors, which consisted of: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).

James P. Seery, Jr. – a member of the Independent Board, and the Chief Executive Officer, and Chief Restructuring Officer of the Debtor.  Beginning in March 2020, Mr. Seery ran day-to-day operations and negotiations with the Creditors' Committee, investors, and employees in return for compensation of $150,000 per month and generous incentives and stands to earn millions more for administering the Debtor's post-confirmation liquidation.  Judge Nelms and John Dubel remained on the Independent Board, receiving weekly updates and modest compensation.

Acis – Acis Capital Management, L.P., a former affiliate of Highland.  Acis is currently owned and controlled by Josh Terry, a former employee of Highland.  Acis (Joshua Terry) was a member of Highland's Creditors' Committee.

UBS – UBS Securities LLC and UBS AG London Branch, collectively.  UBS asserted claims against Highland arising out of a default on a 2008 warehouse lending facility (to which Highland was neither a party nor a guarantor).  Highland had paid UBS twice for full releases of claims UBS asserted against Highland – approximately $110 million in 2008 and an additional $70.5 million via settlement with Barclays, the Crusader Funds, and Credit Strategies in June 2015.  UBS was a member of the Creditors' Committee and appointed John Dubel to the Independent Board.

---

[2] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 4

<u>HarbourVest</u> – HarbourVest Partners, LLC.  HarbourVest is a private equity fund of funds and one of the largest private equity investment managers globally.  HarbourVest has approximately $75 billion in assets under management.  HabourVest has deep ties with Grosvenor and has jointly with Grosvenor sponsored 59 LBO transactions in the last two years.

<u>The Crusader Funds</u> – a group of Highland-managed funds formed between 2000 and 2002.  During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue.  That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their full investment plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been paid when made.  Subsequently, when disputes regarding management of the Crusader Funds' liquidation arose, the Redeemer Committee instituted an arbitration against Highland, resulting in an arbitration award against Highland of approximately $190 million.  Nonetheless, due to offsets and double-counting, the Debtor initially estimated the value of the Redeemer arbitration award at $105 million to $110 million.  In a 9019 settlement with the Debtor, the Crusader Funds ultimately received allowed claims of $137 million, plus $17 million of sundry claims and retention of an interest in Cornerstone Healthcare Group, Inc., an acute-health-care company, valued at over $50 million.  Notably, UBS objected to the Crusader Funds' 9019 settlement, arguing that the Redeemer arbitration award was actually worth much less— between $74 and $128 million.  The Crusader Funds sold their allowed claims to Stonehill, in which Grosvenor is the largest investor.  This sale to an affiliated fund without approval of other investors in the fund is a violation of the Investment Advisers Act of 1940.

<u>The Redeemer Committee</u> – The Redeemer Committee of the Highland Crusader Funds was a group of investors in the Crusader Funds that oversaw the liquidation of the funds.  The Redeemer Committee was comprised of nine members.  Grosvenor held five seats.  Concord held one seat.

<u>Grosvenor</u> – GCM Grosvenor is a global alternative asset management firm with over $59 billion in assets under management.  Grosvenor has one of the largest operations in the Cayman Islands, with more than half of their assets under management originating through its Cayman operations.  Unlike most firms operating in the Cayman Islands, Grosvenor has its own corporate and fiduciary services firm.  This structure provides an additional layer of opacity to anonymous corporations from the British Virgin Islands (which includes significant Russian assets), Hong Kong (which includes significant Chinese assets), and Panama (which includes significant South American assets).  As a registered investment adviser, Grosvenor must adhere to know-your-customer regulations, must report suspicious activities, and must not facilitate non-compliance or opacity.  In 2020, Michael Saks and other insiders distributed all of Grosvenor's assets to shareholders and sold the firm to a SPAC originated by Cantor Fitzgerald.[3] In 2020, the equity market valued asset managers and financial-services firms at decade-high valuations.  It makes little sense that Grosvenor would use the highly dilutive SPAC process (as opposed to engaging

---

[3]  *See* https://www.wsj.com/articles/gcm-grosvenor-to-merge-with-cantor-fitzgerald-spac-11596456900.  The Securities and Exchange Commission recently released a rule proposal that is focused on enhancing disclosure requirements around special purpose acquisition companies, including additional disclosures about SPAC sponsors, conflicts of interest and sources of dilution, business combination transactions between SPACs and private operating companies, and fairness of these transactions.  *See* https://www.pionline.com/regulation/sec-proposes-enhanced-spac-disclosure-rule.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 5

in a traditional IPO or other strategic-sale alternatives) unless such a structure was employed to avoid the diligence and management-liability tail inherent in more traditional processes.

Farallon – Farallon Capital Management, L.L.C. Farallon is a hedge fund that manages capital on behalf of institutions and individuals and was previously the largest hedge fund in the world. Farallon has approximately $27 billion in assets under management. Grosvenor is a significant investor in Farallon. Grosvenor and Farallon are further linked by Hellman & Friedman, LLC, an American private equity firm. Hellman & Friedman owned a stake in Grosvenor from 2007 until it went public in 2020 and seeded Farallon's initial capital.

Muck – Muck Holdings, LLC. Muck is owned and controlled by Farallon. Together with Jessup Holdings, LLC (described below)), Muck acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Stonehill – Stonehill Capital Management, LLC. Stonehill provides portfolio management for pooled investment vehicles. It has approximately $3 billion in assets under management, which we have reason to believe includes approximately $1 billion from Grosvenor.

Jessup – Jessup Holdings, LLC. Jessup is owned and controlled by Stonehill. Together with Muck (Farallon), Stonehill acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Marc Kirschner/Teneo - The Debtor retained Marc Kirschner to pursue over $1 billion in claims against former insiders and affiliates of the Debtor despite the significant solvency of the estate ($650 million in assets versus $410 million in claims). Kirschner's bankruptcy restructuring firm was purchased by Teneo (which also purchased the restructuring practice of KPMG). Teneo is sponsored by LetterOne, a London-based private equity firm owned by Mikhail Fridman, a Russian oligarch. Fridman is also the primary investor in Concord Management, LLC ("Concord"), which held a position on the Redeemer Committee. During the resolution of a 2018 arbitration involving a Debtor-managed fund, the Highland Credit Strategies Fund, evidence emerged demonstrating that Concord was operating as an unregistered investment adviser of Russian money from Alfa-Bank, Russia's largest privately held bank and a key part of Fridman's Alfa Group Consortium. —That money that was funneled into BVI-domiciled shell companies into the Cayman Islands, then into various hedge funds and private equity funds in the U.S. Evidence of these activities was presented by the Debtor to Grosvenor, and the Debtor asked to have Concord removed from the Redeemer Committee. Concord was never removed. Concord is a large investor in Grosvenor. Grosvenor, in turn, is a large investor in Stonehill and Farallon.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved investors in the Crusader Funds. As explained above, a group of Crusader Funds investors sued after the funds' manager temporarily suspended redemptions during the financial crisis. That dispute resolved with the formation of the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors'

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 6

receiving a return of their investments plus a profit, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite the successful liquidation of the Crusader Funds, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

In view of the expected arbitration award and believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[4]

On October 29, 2019, the Bankruptcy Court appointed the Creditors' Committee. At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[5]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

**Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate**

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of Strand. To avoid a protracted dispute and to

---

[4] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.
[5] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 7

facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by the Independent Board.[6]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the independent directors, Mr. Seery. Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[7] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[8]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[9] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." See http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of

---

[6] Frank Waterhouse and Scott Ellington, Highland employees, remained as officers of Strand, Chief Financial Officer and General Counsel, respectively.

[7] See Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[8] See Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[9] See Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

Ms. Nan R. Eitel
May 11, 2022
Page 8

creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[10] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate. This becomes all the more important when a debtor or an estate holds substantial assets through non-debtor subsidiaries or vehicles, as is the case here; hence, the purpose of Rule 2015.3.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored, and neither the Bankruptcy Court nor the U.S. Trustee's Office did anything to ensure compliance. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below. Additionally, the lack of proper and accurate information and intentional hiding of material information led creditors to vote for the Debtor's plan and the Bankruptcy Court to confirm that plan which, we believe, would not have happened had the Debtor complied with its fiduciary and reporting duties.

As Mr. Draper and I have already highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[11] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-

---

[10] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).
[11] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

APP 3021

Ms. Nan R. Eitel
May 11, 2022
Page 9

value determinations.[12] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

Despite these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements adopted by the EOUST and historical rules mandating transparency.[13]

Because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**The Lack of Transparency Permitted the Debtor to Quietly Sell Assets Without Observing Best Practices**

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of Portola Pharma shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year).

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to the debtor (20% less than Mr. Dondero received in funds he managed).

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or

---

[12] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[13] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

0008417
APP 3022

Ms. Nan R. Eitel
May 11, 2022
Page 10

outside stakeholders, resulting in a loss to the estate of over $10 million versus cost and $20 million versus fair market value.

- The Debtor "sold" interests in certain investments commonly referred to as PetroCap without engaging in a public sale process and without exploring any other method of liquidating the asset.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors. Equally as troubling, for certain similar sale transactions the Debtor *did* seek Bankruptcy Court approval, thus acknowledging that such approval was necessary or, at a minimum, that disclosures regarding non-estate asset sales are required.

**The Lack of Transparency Permitted the "Inner Circle" to Manipulate the Estate for Personal Gain**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic because the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months in the wake of the global pandemic. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 million impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). A Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity— information that was critical in evaluating the worth of claims against the estate or future investments into it.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time financial information with respect to the affairs of non-Debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. The Debtor's "inner circle" -- the Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) – had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

### *Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate*

Mr. Seery's compensation package encouraged, and the lack of transparency permitted, manipulation of the estate and settlement of creditors' claims at inflated amounts.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 11

Upon his initial appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[14]

When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he his compensation package was handsomely improved. His base salary, which was on the verge of dropping to $30,000 per month, was increased *retroactively* back to March 15, 2020, to $150,000 per month. Additionally, his employment agreement contemplated a discretionary "Restructuring Fee"[15] that would be calculated in one of two ways:

(1)   If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)   If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and was intended to provide a powerful economic incentive for Mr. Seery to steer Highland through the Chapter 11 case and emerge from bankruptcy as a going concern.

Despite the structure of his compensation package, Mr. Seery saw greater value in aligning himself with creditors and the Creditors' Committee. To that end, he publicly alienated and maligned Mr. Dondero, and he found willing allies in the Creditors' Committee. The posturing also paved the way for Mr. Seery to bestow upon the hold-out creditors exorbitant settlements at the expense of equity and earn his Restructuring Fee. In fact, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee (both members of the Creditors' Committee),[16] leaving only the HarbourVest and UBS (also a member of the Creditors' Committee) claims to resolve. In other words, Mr. Seery had curried favor with two of the four members of the Creditors' Committee who would ultimately approve his Restructuring Fee and future compensation following plan consummation.

Ultimately, the confirmed Plan appointed Mr. Seery as the Claimant Trustee, which continued his compensation of $150,000 per month (termed his "Base Salary") and provided that the Oversight Board and Mr. Seery would negotiate additional "go-forward" compensation, including a "success fee" and severance pay.[17] Mr. Seery's success fee presumably is (or will be) based on whether his liquidation of

---

[14] *See* Dkt. 339, ¶ 3.
[15] *See* Dkt. 854, Ex. 1.
[16] *See* Dkt. 864, p. 8, l. 24 – p. 9, l. 8.
[17] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 12

the estate outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy but also to ensure that he eventually receives a large "success fee" and severance payment. In fact, during a deposition taken on October 21, 2021, Mr. Seery testified that he expected to make "a few million dollars a year" for each year during the years that he will take to liquidate the Debtor, although we estimate that, based on the estate's nearly $650 million value today, Mr. Seery's success fee could approximate $50 million.

### *Mr. Seery Enters into Inflated Settlements*

Even before his appointment as CEO and CRO of the Debtor, Mr. Seery had effectively seized control of the Debtor as its *de facto* chief executive officer.[18] Thus, while he was in the process of negotiating his compensation agreement, he was simultaneously negotiating settlements with the remaining creditors to ensure he earned his Restructuring Fee, even if he did so at inflated amounts. One transaction that highlights this is the settlement with the Crusader Funds and the Redeemer Committee.

In connection with Mr. Seery's appointment as CEO and CRO, the Debtor announced that it had reached an agreement in principle with the Crusader Funds and the Redeemer Committee. Even **UBS**, one of the members of the Creditors' Committee, thought the settlement was inflated. In its objection to the Debtor's 9019 motion, UBS stated:[19]

The Redeemer Claim is based on an Arbitration Award that required the Debtor, inter alia, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) in exchange for all of Crusader's shares in Cornerstone. Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation. As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer. The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement. Depending on the valuation of the Cornerstone shares, the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

---

[18] *See* Dkt. 864, p. 6, l. 18 – 22.

[19] *See* Dkt. 1190, p. 6 – 7.

Ms. Nan R. Eitel
May 11, 2022
Page 13

      In the meantime, other general unsecured creditors of the Debtor will receive a much lower percentage recovery than they would if those assets were instead transferred to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among the Debtor's creditors.  The Proposed Settlement is only in the best interests of Redeemer and, as such, it should be rejected.

******

[3] The potential range of value attributable to the Cornerstone shares is significant because, according to the Debtor's liquidation analysis, the Debtor expects to have only $195 million total in value to distribute, and only $161 million to distribute to general unsecured creditors under its proposed plan.  See Liquidation Analysis [Dkt. No. 1173-1]; First Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1079].

      UBS was right.  Mr. Seery agreed to a settlement that substantially overpaid the Redeemer Committee, and UBS only agreed to withdraw its objection and appeal of the Redeemer Committee's settlement when the Debtor bestowed upon UBS its own lavish settlement.[20]

      It is worth noting that the Redeemer Committee ultimately sold its bankruptcy claim for $78 million in cash, but the sale excluded, and the Crusader Funds retained, its investment in Cornerstone Healthcare Group Holding Inc. and certain non-cash consideration.[21]  At the end of the day, the Crusader Funds and the Redeemer Committee cashed out of their bankruptcy claims for total consideration at the very least of $135 million, meaning they received 105% of the highest estimate (according to UBS) of the net amount of their arbitration award.[22]

### The Inner Circle Doesn't Object to Inflated Settlements

      Following the Bankruptcy Court's approval of settlements with Acis/Josh Terry and the Crusader Funds/the Redeemer Committee, Mr. Seery turned his attention to the two remaining critical holdouts: HarbourVest and UBS.  HarbourVest, a private equity fund-of-funds with approximately $75 billion under management, had invested pre-bankruptcy $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO

---

[20] See Dkt 2199.  Under the terms of the UBS Settlement, UBS received a Class 8 claim in the amount of $65 million, a Class 9 claim in the amount of $60 million, a payment in cash of $18.5 million from a non-Debtor fund managed by the Debtor, and the Debtor's agreement to assist UBS in pursuing other claims against former Debtor affiliates related to a default on a credit facility during the Global Financial Crisis.  Importantly, over the course of the preceding 11 years, UBS had already received payments totaling $180 million in connection with this dispute, and just prior to bankruptcy, UBS and the Debtor had reached a settlement in principle in which the Debtor would pay UBS just $7 million and $10 million in future business.
[21] See Exh. B.
[22] The estimation of a total recovery of $135 million includes attributing $48 million to the retained Cornerstone investment.  The $48 million valuation equated to a ~45% interest in Cornerstone, which was valued pre-pandemic at approximately $107 million.  Following COVID, Cornerstone's long-term acute care facilities flourished.  Additionally, Cornerstone held a direct investment of over 800,000 shares in MGM, which was held on its books at approximately $72 per share.  The per-share closing price on the sale of MGM to Amazon exceeded $164, which would have increased the company's valuation (irrespective of the post-COVID growth) by more than $70 million, bring Crusader Funds' windfall to more than $205 million.

APP. 3926

Ms. Nan R. Eitel
May 11, 2022
Page 14

Funding, Ltd. ("HCLOF"). A charitable fund called the Charitable DAF Fund, L.P. ("DAF") held
49.02% member interests in HCLOF, and the remaining ~2.00% was held by Highland and certain of its
employees.

Before Highland filed bankruptcy, a dispute arose between HarbourVest and Highland in which
HarbourVest claimed it was duped into making the investment into HCLOF because Highland allegedly
failed to disclose facts relating to the investment (namely, that Highland was engaged in ongoing
litigation with former employee, Josh Terry, which would result in HCLOF's incurring legal fees and
costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15
million in legal fees and costs. In Highland's bankruptcy, however, HarbourVest filed a proof of claim
alleging that it was due over $300 million in damages in the dispute, a claim that the Debtor and Debtor's
counsel initially argued was absurd. Indeed, Debtor management valued HarbourVest's claims at $0,
which was consistently reflected in the Debtor's publicly-filed financial statements up through and
including its December 2020 Monthly Operating Report.[23] Nevertheless, as one of the final creditor
claims to be resolved, Mr. Seery ultimately agreed to give HabourVest a $45 million Class 8 claim and a
$35 million Class 9 claim.[24] At that time, the Debtor's public disclosures reflected that Class 8 creditors
could expect to receive 71.32% payout on their claims, and Class 9 creditors could expect 0.00%. Thus,
HarbourVest's total $80 million in allowed claims would result in HarbourVest receiving $32 million in
cash.[25] The cash consideration was offset by HarbourVest's agreement to convey its interest in HCLOF
to the Debtor (or its designee) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in
support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was
$22.5 million. In other words, from the outside looking in, the Debtor agreed to pay $9.5 million for a
spurious claim.

Oddly enough, no creditors (other than former insiders) objected. What the inner circle
presumably knew was that the settlement was actually a windfall for the Debtor. As we have previously
detailed, the $22.5 million valuation of HCLOF that the Debtor utilized in seeking approval of the
settlement was based upon September 2020 figures when the economy was still reeling from the
pandemic. The value of that investment rebounded rapidly, particularly because of the pending MGM
sale to Amazon that was disclosed to the Debtor but not the public (i.e., material non-public information).
We have subsequently learned that the actual value of the HCLOF at the time the Bankruptcy Court
approved the HarbourVest settlement was at least $44 million—a value that Mr. Seery would have known
but that was not disclosed to the Court or the public.

Likewise, there were no objections to the UBS settlement, which is puzzling. As detailed in the
Debtor's 64-page objection to the UBS proof of claim and the Redeemer Committee's 431-page objection
to the UBS proof of claim, UBS's claims against the Debtor were razor thin and largely foreclosed by res
judicata and a settlement and release executed in connection with the June 2015 settlement. Moreover,
the publicly available information indicated that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16,

---

[23] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[24] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[25] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital
Management—an SEC-registered investment advisor—for approximately $27 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 15

> 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021);[26]

- Allowed claims against the estate increased by $236 million from December 2020 to January 2021, with Class 8 claims ballooning $74 million in December to $267 million in January;

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for Class 8 Claims decreased from 87.44% to 71.32% in just a matter of months.

The Liquidation Analysis estimated total assets remaining for distribution to general unsecured claims to be $195 million, with general unsecured claims totaling $273 million. By the time the UBS settlement was presented to the court for approval, the allowed Class 8 Claims had increased to $309,345,000, reducing the distribution to Class 8 creditors to 62.99%. Surely significant creditors like the Redeemer Committee—whose projected distribution dropped from $119,527,515 when it voted for the Plan to $86,105,194 with the HarbourVest and UBS claims included—should have taken notice.

**Mr. Seery Stacks the Oversight Board**

As previously disclosed, we believe Mr. Seery facilitated the sale of the four largest claims in the estate to Farallon and Stonehill. Based upon conversations with representatives of Farallon, Mr. Seery contacted them directly to encourage their acquisition of claims in the bankruptcy estate.[27] We believe Mr. Seery did so by disclosing the true value of the estate versus what was publicly disclosed in court filings, demonstrating that there was substantial upside to the claims as compared to what was included in the Plan Analysis. For example, publicly available information at the time Farallon and Stonehill acquired the UBS claim indicated the purchase would have made no economic sense: the publicly disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Farallon and Stonehill would have lost money on the claim acquisition. We can only conclude Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), which based upon accurately disclosed financial statements would indicate they were likely to recover close to 100% on both Class 8 and Class 9 claims.

As set forth in the previous letters, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers Farallon, through Muck, and Stonehill, through Jessup. The four claims purchased by Farallon and Stonehill comprise the largest four claims in the Highland bankruptcy by a substantial margin, collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[26] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473].

[27] We believe Mr. Seery made similar calls to representatives of Stonehill. We are informed and believe that Mr. Seery has long-standing relationships with both Farallon and Stonehill.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 16

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,696,610** | **$95,000,000** | |

From the information we have been able to gather, it appears that Stonehill and Farallon purchased these claims for the following amounts:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[28] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 - $165.0** |

As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) are overseeing the liquidation of the reorganized Debtor. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth below, we estimate that the estate today is worth nearly $650 million and has approximately $200 million in cash, which could result in Mr. Seery's receipt of a performance bonus approximating $50 million. Thus, it is a warranted and logical deduction that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. As set forth in previous letters, there are three primary reasons to believe this:

- The scant publicly available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that was actually publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims; and

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

For example, consider the sale of the Crusader Funds' claims, which we *know* was sold for $78 million. Based upon the publicly available information at the time of the acquisition, the expected distribution would have been $86 million. Surely a sophisticated hedge fund would not invest $78 million in a particularly contentious bankruptcy if it believed its maximum return was $86 million years later.

---

[28] Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

008424
APP. 3920

Ms. Nan R. Eitel
May 11, 2022
Page 17

Ultimately, the Plan, Mr. Seery's compensation package, and the lack of transparency to everyone other than the Debtor, its management, and the Creditors' Committee permitted Debtor management and the Creditors' Committee to support grossly inflated claims (at the expense of residual stakeholders) in a grossly understated estate, which facilitated the sales of those claims to a small group of investors with significant ties to Debtor management. In doing so, Mr. Seery installed on the Reorganized Debtor's Oversight Board friendly faces who stand to make $370 million on ~$150 million investment. And Mr. Seery's plan has already worked. Notably, while the confirmed Plan was characterized by the Debtor as a monetization plan,[29] the newly installed Oversight Board supported, and the Court approved, paying Mr. Seery the much more lucrative Case Resolution Fee, netting Mr. Seery $1.5 million more than he was entitled to receive under his employment agreement.

In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

|  | Value as of Aug. 2021 | | March 2022 High Estimate updated for MGM closing |
|---|---|---|---|
| **Asset** | **Low** | **High** | |
| Cash as of 4/25/22 | $17.9 | $17.9 | |
| Targa Sale | $37.0 | $37.0 | |
| 8/1 CLO Flows | $10.0 | $10.0 | |
| Uchi Bldg. Sale | $9.0 | $9.0 | |
| Siepe Sale | $3.5 | $3.5 | |
| PetroCap Sale | $3.2 | $3.2 | |
| Park West Sale | $3.5 | $3.5 | |
| HCLOF trapped cash | $25.0 | $25.0 | |
| **Total Cash** | **$105.6** | **$105.6** | **$200** |
| Trussway | $180.0 | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 | $25.0 |
| HCLOF | $40.0 | $40.0 | $20.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 | $30.0 |
| MGM (direct ownership) | $32.0 | $32.0 | $0.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 | $30.0 |
| Korea Fund | $18.0 | $18.0 | $20.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 | $70.0 |
| Other | $2.0 | $10.0 | $10.0 |

---

[29] See Dkt. 194., p.5.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 18

| Highland Restoration Capital Partners | | | |
|---|---|---|---|
| **TOTAL** | $472.6 | $598.6 | $645.0 |

### The Bankruptcy Professionals are Draining the Estate

Yet another troubling aspect of the Highland bankruptcy has been the rate at which Debtor professionals have drained the Estate, largely through invented, unnecessary, and greatly overstaffed and overworked offensive litigation. The sums expended between case filing and the effective date of the Plan (the "Effective Date") are staggering:

| Professional | Fees | Expenses |
|---|---|---|
| Hunton Andrews Kurth | $1,147,059.42 | $2,747.84 |
| FTI Consulting, Inc. | $6,176,551.20 | $39,122.91 |
| Teneo Capital, LLC | $1,221,468.75 | $6,257.07 |
| Marc Kirschner | $137,096.77 | |
| Sidley Austin LLP | $13,134,805.20 | $211,841.25 |
| Pachulski Stang Ziehl & Jones | $23,978,627.25 | $334,232.95 |
| Mercer (US) Inc. | $202,317.65 | $2,449.37 |
| Deloitte Tax LLP | $553,412.60 | |
| Development Specialists, Inc. | $5,562,531.12 | $206,609.54 |
| James Seery[30] | $5,100,000.00 | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| Wilmer Cutler Pickering Hale & Dorr LLP | $2,645,729.72 | $5,207.53 |
| Kurtzman Carson Consultants LLC | $2,054,716.00 | |
| Foley & Lardner LLP | $629,088.00 | |
| Casey Olsen Cayman Limited | $280,264.00 | |
| ASW Law Limited | $4,976.00 | |
| Houlihan Lokey Financial Advisors, Inc. | $766,397.00 | |
| Berger Harris, LLP | | |
| Hayward PLLC | $825,629.50 | $46,482.92 |
| | **$64,420,670.18** | **$854,951.38** |
| | | |
| **Total Fees and Expenses** | | **$65,275,621.56** |

"The [bankruptcy] estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 872 (Bankr. N.D. Ill. 1989).

---

[30] This amount includes Mr. Seery's success fee, which was paid a month following the Effective Date.

008426
APP 3931

Ms. Nan R. Eitel
May 11, 2022
Page 19

The rate at which Debtor professionals have drained the estate is in stark contrast to the treatment of the employees who stayed with the Debtor (without a key employee retention plan or key employee incentive program) on the promise they would be made whole for prepetition deferred compensation that had not yet vested, only to be stiffed and summarily terminated. Even worse, some of these employees have been targeted by the litigation sub-trust for acts they took in the course and scope of their employment.

Following the Effective Date, siphoning of estate assets continues. Mr. Seery still receives base compensation of $150,000 per month, and he expects to receive compensation of at least "a few million dollars a year" according to his own deposition testimony. In addition, his retention was conditioned upon receiving a to-be-negotiated success fee and severance payment (notably, none of which is disclosed publicly).

Likewise, Teneo Capital, LLC was retained as the litigation adviser. For its services post-Effective Date, it is compensated $20,000 per month for Mr. Kirschner as trustee for the Litigation Subtrust, plus the regularly hourly fees of any additional Teneo personnel, plus a "Litigation Recovery Fee." The Litigation Recovery Fee is equal to 1.5% of Net Litigation Proceeds up to $100 million and 2.0% of Net Litigation Proceeds above. Interestingly, although "Net Litigation Proceeds" is defined as gross litigation proceeds less certain fees incurred in pursing the litigation, net proceeds are not reduced by Mr. Kirschner's monthly fee, contingency fees charged by any other professionals, or litigation funding financing. Moreover, Teneo is given credit for any litigation recoveries regardless of whether those recoveries stem from actions commenced by the litigation trustee. The Debtor has not disclosed, and is not required to disclose, the terms upon which any professionals have been engaged following the Effective Date, including Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Litigation Subtrust. Based upon pre-Effective Date monthly expenses, the number of lawyers that attend various matters on behalf of the Debtor,[31] and the addition of Quinn Emanuel Urquhart & Sullivan, LLP and Teneo, we believe the Debtor could be spending as much as $5-$7 million per month.

The Reorganized Debtor and the Highland Claimant Trust recently filed heavily redacted, quarterly post-confirmation reports.[32] Of note, the Reorganized Debtor disclosed that it has disbursed $81,983,611 since the Effective Date but disclosed that it has only paid $47,793 in priority claims and $6,918,473 in general unsecured claims, while still estimating a total recovery to general unsecured claims of $205,144,544. The Highland Claimant Trust disclosed that it has disbursed an additional $7,152,331 since the Effective Date.

## CONCLUSION

The Highland bankruptcy is an extreme example of the abuses that can occur if the federal bench, federal government appointees, and federal lawmakers do not police federal bankruptcy proceedings by

---

[31] In connection with a recent two-day trial on an administrative claim, the Debtor was represented by John Morris ($1,245.00 per hour), Greg Demo ($950 per hour), and Hayley Winograd ($695 per hour), and was assisted by paralegal La Asia Canty ($460 per hour). The Debtor's local counsel, Zachery Annable ($300 per hour), was also present, and Jeffrey Pomerantz ($1,295 per hour) observed the trial via WebEx. Despite the army of lawyers, Mr. Morris handled virtually the entire proceeding, with Ms. Winograd examining only two small witnesses. Messrs. Pomerantz, Demo, and Annable played no active role in the proceedings.
[32] Dkt 3325 and 3326.

4862-7970-5887v.1 019717.00004

Case 19-34054-sgj11   Doc 3808-7   Filed 06/06/23   Entered 06/06/23 20:06:24   Desc
Case 3:23-cv-02071-E   Document 40-5 Filed 12/06/23   Page 35 of 214   PageID 8061
Appendix Part 5 of 7   Page 321 of 502

Ms. Nan R. Eitel
May 11, 2022
Page 20

permitting debtors-in-possession to hide material information, violate duties of transparency and candor, and manipulate information and transactions to benefit disclosed and undisclosed insiders or "friends" of insiders. Bankruptcy should not be an avenue for opportunistic venturers to prey upon companies to the detriment of third-party stakeholders and the bankruptcy estate. We therefore encourage your office to investigate the problems inherent in the Highland bankruptcy. At a minimum, we ask that the EOUST seek orders from the Bankruptcy Court compelling the Debtor to undertake the following actions:

1. turn over all financial reports that should have been disclosed during the pendency of the bankruptcy, including 2015.3 reports;

2. provide a detailed disclosure of the assets Reorganized Debtor;

3. provide a copy of the executed Claimant Trust Agreement, which should already have been disclosed;

4. disclose all solvency analyses prepared by the Debtor; and

5. provide copies of all agreements for the engagement of Debtor professionals post-confirmation, including the terms of Mr. Seery's success fee and severance agreement, compensation agreements for personnel of the Reorganized Debtor, and the fee arrangement with Quinn Emanuel Urquhart & Sullivan, LLP.

Sincerely,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____

Davor Rukavina, Esq.

DR:

008428

APP 1933

```
 1    IN THE UNITED STATES BANKRUPTCY COURT

 2    FOR THE NORTHERN DISTRICT OF TEXAS

 3    DALLAS DIVISION

 4    -----------------------------)

 5    In Re:                 Chapter 11

 6    HIGHLAND CAPITAL        Case No.

 7    MANAGEMENT, LP,         19-34054-SGJ 11

 8

 9         Debtor

10    ------------------------------------

11

12

13     REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23
      Reported by:
24    Debra Stevens, RPR-CRR
      JOB NO. 189212
25
```

008429
APP 3924

Page 2

```
 1            January 29, 2021
 2            9:00 a.m. EST
 3
 4      Remote Deposition of JAMES P.
 5  SEERY, JR., held via Zoom
 6  conference, before Debra Stevens,
 7  RPR/CRR and a Notary Public of the
 8  State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  REMOTE APPEARANCES:
 2
 3  Heller, Draper, Hayden, Patrick, & Horn
 4  Attorneys for The Dugaboy Investment
 5  Trust and The Get Good Trust
 6        650 Poydras Street
 7        New Orleans, Louisiana 70130
 8
 9
10  BY:    DOUGLAS DRAPER, ESQ
11
12
13  PACHULSKI STANG ZIEHL & JONES
14  For the Debtor and the Witness Herein
15        780 Third Avenue
16        New York, New York 10017
17  BY:    JOHN MORRIS, ESQ.
18        JEFFREY POMERANTZ, ESQ.
19        GREGORY DEMO, ESQ.
20        IRA KHARASCH, ESQ.
21
22
23
24            (Continued)
25
```

Page 4

```
 1  REMOTE APPEARANCES:  (Continued)
 2
 3  LATHAM & WATKINS
 4  Attorneys for UBS
 5        885 Third Avenue
 6        New York, New York 10022
 7  BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9  JENNER & BLOCK
10  Attorneys for Redeemer Committee of
11  Highland Crusader Fund
12        919 Third Avenue
13        New York, New York 10022
14  BY:    MARC B. HANKIN, ESQ.
15
16  SIDLEY AUSTIN
17  Attorneys for Creditors' Committee
18        2021 McKinney Avenue
19        Dallas, Texas 75201
20  BY:    PENNY REID, ESQ.
21        MATTHEW CLEMENTE, ESQ.
22        PAIGE MONTGOMERY, ESQ.
23
24            (Continued)
25
```

Page 5

```
 1  REMOTE APPEARANCES:  (Continued)
 2  KING & SPALDING
 3  Attorneys for Highland CLO Funding, Ltd.
 4        500 West 2nd Street
 5        Austin, Texas 78701
 6  BY:    REBECCA MATSUMURA, ESQ.
 7
 8  K&L GATES
 9  Attorneys for Highland Capital Management
10  Fund Advisors, L.P., et al.:
11        4350 Lassiter at North Hills
12        Avenue
13        Raleigh, North Carolina 27609
14  BY:    EMILY MATHER, ESQ.
15
16  MUNSCH HARDT KOPF & HARR
17  Attorneys for Defendants Highland Capital
18  Management Fund Advisors, LP; NexPoint
19  Advisors, LP; Highland Income Fund;
20  NexPoint Strategic Opportunities Fund and
21  NexPoint Capital, Inc.:
22        500 N. Akard Street
23        Dallas, Texas 75201-6659
24  BY:    DAVOR RUKAVINA, ESQ.
25            (Continued)
```

APP 2925
008430

Page 6

```
 1   REMOTE APPEARANCES (Continued)
 2
 3   BONDS ELLIS EPPICH SCHAFER JONES
 4   Attorneys for James Dondero,
 5   Party-in-Interest
 6          420 Throckmorton Street
 7
 8          Fort Worth, Texas 76102
 9   BY:    CLAY TAYLOR, ESQ.
10          JOHN BONDS, ESQ.
11          BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16          1900 North Pearl Street
17
18          Dallas, Texas 75201
19   BY:    MICHELLE HARTMANN, ESQ.
20          DEBRA DANDEREAU, ESQ.
21
22
23
24              (Continued)
25
```

Page 7

```
 1   REMOTE APPEARANCES: (Continued)
 2
 3   WICK PHILLIPS
 4   Attorneys for NexPoint Real Estate
 5   Partners, NexPoint Real Estate Entities
 6   and NexBank
 7          100 Throckmorton Street
 8            Fort Worth, Texas 76102
 9   BY:    LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15          700 N. Pearl Street
16          Dallas, Texas 75201
17   BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
 1             E X A M I N A T I O N S
 2
 3   WITNESS                              PAGE
 4   JAMES SEERY
 5     By Mr. Draper                         9
 6     By Mr. Taylor                        75
 7     By Mr. Rukavina                     165
 8     By Mr. Draper                       217
 9
               E X H I B I T S
10   SEERY DYD
     EXHIBIT      DESCRIPTION             PAGE
11
     Exhibit 1    January 2021 Material     11
12
     Exhibit 2    Disclosure Statement      14
13
     Exhibit 3    Notice of Deposition      74
14
15
       INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                          PAGE
17   Subsidiary ledger showing note        22
     component versus hard asset
18   component
19   Amount of D&O coverage for           131
     trustees
20
     Line item for D&O insurance          133
21
22           MARKED FOR RULING
                PAGE    LINE
23               85      20
24
25
```

Page 9

```
 1
 2             COURT REPORTER:  My name is
 3     Debra Stevens, court reporter for TSG
 4     Reporting and notary public of the
 5     State of New York.  Due to the
 6     severity of the COVID-19 pandemic and
 7     following the practice of social
 8     distancing, I will not be in the same
 9     room with the witness but will report
10     this deposition remotely and will
11     swear the witness in remotely.  If any
12     party has any objection, please so
13     state before we proceed.
14             Whereupon,
15           J A M E S   S E E R Y,
16     having been first duly sworn/affirmed,
17     was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20     Q.    Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

Page 10

```
 1                J. SEERY
 2    that we sent out?
 3        A.    Yes.
 4        Q.    You are the person most
 5    qualified to answer the areas of inquiry
 6    identified in the 30(b) Deposition Notice?
 7        A.    Yes.
 8        Q.    And if in fact when we go
 9    through this, if you are not the most
10    qualified person, I'd ask you to identify
11    who would be most qualified to provide the
12    answers.  Is that okay?
13        A.    I think I am the most qualified.
14    But if there is something I can't answer I
15    will endeavor to figure out who could.
16        Q.    Great.  Thank you very much.
17              Yesterday we were furnished by
18    Mr. Morris a new set of what I will call
19    plan analysis versus liquidation analysis.
20             MR. DRAPER:  Bryan, can you put
21        that document up?
22        Q.    Mr. Seery, can you get your
23    hands on that document?
24             THE WITNESS:  Is that in the
25        pieces you sent to me, John?
```

Page 11

```
 1                J. SEERY
 2             MR. MORRIS:  Yes.
 3             THE WITNESS:  Do you recall
 4        which one?  I will open them all.
 5        It's not a big deal.
 6        Q.    Bryan has put the document up
 7    for you.
 8             THE WITNESS:  John, I don't see
 9        it in the ones you sent to me.  I can
10        see it on the screen.  I have the plan
11        of reorg, I have got the disclosure
12        statement, schedules.  I have
13        bankruptcy schedules from the filing.
14             MR. MORRIS:  Hold on one second.
15        See if it is among what I just sent
16        you.
17             (Reporter interruption.)
18             (So marked for identification as
19        Seery Exhibit 1.)
20             THE WITNESS:  Okay.  I am
21        looking at it.  It is easier to see on
22        my screen than yours.  We can do it
23        either way.
24    BY MR. DRAPER:
25        Q.    Did you prepare this document?
```

Page 12

```
 1                J. SEERY
 2        A.    It was prepared for me.
 3        Q.    It was prepared under your
 4    supervision.  Correct?
 5        A.    Correct.
 6        Q.    Who worked on the team?
 7        A.    The team from DSI.
 8        Q.    Who at DSI?
 9        A.    The team working on the case.
10    It is Fred Caruso, Jack Donohue, James
11    Romey as well as counsel and myself.
12        Q.    If in fact there is a question
13    that I ask you about this document that
14    you don't know the answer, can you
15    identify for me the person --
16             (Reporter interruption.)
17        Q.    Mr. Seery, if in fact you don't
18    know an answer to a question about the
19    document, I would ask you to identify the
20    person at DSI who is most responsible for
21    the piece of information on the document.
22             MR. MORRIS:  Objection to the
23        form of the question.  He is here as
24        the 30(b)(6) witness.  We have offered
25        him as the person who is prepared to
```

Page 13

```
 1                J. SEERY
 2    answer the questions.  Just ask the
 3    questions.  If he doesn't know
 4    something, we'll decide whether or not
 5    it warrants going elsewhere.  But
 6    let's just move on.  It is like the
 7    third time you asked him if he can
 8    identify -- we don't even have
 9    something that he doesn't know yet.
10        Q.    Mr. Seery, is the team that
11    prepared this document the same team that
12    prepared the November similar document
13    that is attached to the disclosure
14    statement in November?
15        A.    Largely.
16        Q.    This new document was prepared
17    to reflect information I gather that was
18    changed from November 20th of 2020 to
19    today's date?
20        A.    Yes.
21        Q.    In looking at the two
22    documents -- and I would ask you to go to
23    the disclosure statement of November 2020.
24    I think it is page 174.
25             MR. MORRIS:  Can you move it on
```

008432
APP 3937

Page 14

J. SEERY

1  the screen, please?
2      A.    Page what?
3      Q.    I think it is page 174.
4      A.    Of the PDF or of the document?
5      Q.    Of the disclosure statement that
6  was filed.  It is up on the screen right
7  now.
8          COURT REPORTER:  Do you intend
9      this as another exhibit for today's
10     deposition?
11         MR. DRAPER:  We'll mark this
12     Exhibit 2.
13         (So marked for identification as
14     Seery Exhibit 2.)
15     Q.    If you look to the recovery to
16  Class 8 creditors in the November 2020
17  disclosure statement was a recovery of
18  87.44 percent?
19     A.    That actually says the percent
20  distribution to general unsecured
21  creditors was 87.44 percent.  Yes.
22     Q.    And in the new document that was
23  filed, given to us yesterday, the recovery
24  is 62.5 percent?

Page 15

J. SEERY

1      A.    It says the percent distribution
2  to general unsecured creditors is
3  62.14 percent.
4      Q.    Have you communicated the
5  reduced recovery to anybody prior to the
6  date -- to yesterday?
7          MR. MORRIS:  Objection to the
8      form of the question.
9      A.    I believe generally, yes.  I
10  don't know if we have a specific number,
11  but generally yes.
12     Q.    And would that be members of the
13  Creditors' Committee who you gave that
14  information to?
15     A.    Yes.
16     Q.    Did you give it to anybody other
17  than members of the Creditors' Committee?
18     A.    Yes.
19     Q.    Who?
20     A.    HarbourVest.
21     Q.    And when was that?
22     A.    Within the last two months.
23     Q.    You did not feel the need to
24  communicate the change in recovery to

Page 16

J. SEERY

1  anybody else?
2      A.    I said Mr. Doherty.
3      Q.    In looking at the two elements,
4  and what I have asked you to look at is
5  the claims pool.  If you look at the
6  November disclosure statement, if you look
7  down Class 8, unsecured claims?
8      A.    Yes.
9      Q.    You have 176,000 roughly?
10     A.    Million.
11     Q.    176 million.  I am sorry.  And
12  the number in the new document is 313
13  million?
14     A.    Correct.
15     Q.    What accounts for the
16  difference?
17     A.    An increase in claims.
18     Q.    When did those increases occur?
19  Were they yesterday?  A month ago?  Two
20  months ago?
21     A.    Over the last couple months.
22     Q.    So in fact over the last couple
23  months you knew in fact that the recovery
24  in the November disclosure statement was

Page 17

J. SEERY

1  not accurate?
2      A.    Yes.  We secretly disclosed it
3  to the Bankruptcy Court in open court
4  hearings.
5      Q.    But you never did bother to
6  calculate the reduced recovery; you just
7  increased --
8          (Reporter interruption.)
9      Q.    You just advised as to the
10  increased claims pool.  Correct?
11         MR. MORRIS:  Objection to the
12     form of the question.
13     A.    I don't understand your
14  question.
15     Q.    What I am trying to get at is,
16  as you increase the claims pool, the
17  recovery reduces.  Correct?
18     A.    No.  That is not how a fraction
19  works.
20     Q.    Well, if the denominator
21  increases, doesn't the recovery ultimately
22  decrease if --
23     A.    No.
24     Q.    -- if the numerator stays the

Page 18

J. SEERY

1  same?
2      A.      Now your question is correctly
3  stated.
4      Q.      Thank you.
5              Now, in connection with the
6  proceeds from the liquidation of the
7  assets in both the plan recovery and the
8  liquidation model -- and I will go back to
9  the January document that we just got.
10  Did you personally determine the estimated
11  proceeds, or that was done by the DSI
12  people?
13      A.      Can you ask your question again?
14  I am looking at two different documents so
15  I don't know what you are asking me.
16      Q.      Let's go to the January
17  document.  If you will see, in line 2,
18  where you have plan versus liquidation?
19      A.      Yes.
20      Q.      You will see in line 2 it says
21  estimated proceeds 257, and then there is
22  191?
23      A.      Yes.
24      Q.      Do you see those numbers?

Page 19

J. SEERY

1      A.      Yes.
2      Q.      Is that your number?  That is
3  the number you came up with?
4      A.      Correct.
5              MR. MORRIS:  Objection to the
6  form of the question.  It is the
7  Debtor's number.
8      Q.      Mr. Seery, what I have asked you
9  to look at is the statement of assumptions
10  in the January document, and look at
11  assumption P.  Just so I can read it, it
12  says, "See below the Class 8 estimated
13  payout schedule" and then it lists a
14  September 30, 2021 date, a March 31, 2022
15  date, and a June 30, 2022 date.  Do you
16  see that?
17      A.      I do.
18      Q.      Is that your assumption, or an
19  assumption made by DSI?
20      A.      That is my assumption.
21      Q.      That footnote P is the same note
22  that was in the November 2020 disclosure
23  statement.  Correct?
24      A.      I'd have to look.

Page 20

J. SEERY

1      Q.      Do you want to take a look?  Let
2  me tell you it is, but you can confirm
3  that.
4      A.      It appears to be, yes.
5      Q.      Now, going back to the 257,941
6  that is in the January statement?
7      A.      The second line?
8      Q.      Yes.  What percentage of that
9  are notes -- collection from notes versus
10  collection from liquidation of assets?
11      A.      The total percentage, I don't
12  recall the exact percentage off the top of
13  my head.  It includes all the demand notes
14  and the demanded note from NexPoint
15  Advisors.  So, it should be around
16  $40 million worth of value would come from
17  the notes.  Somewhere in that
18  neighborhood.
19      Q.      So roughly what we are talking
20  about when we break up the 257 is, doing
21  rough math, 210 being assets, 40 million
22  being note collection?
23      A.      Roughly, I believe.  I don't
24  have it off the top of my head but that is

Page 21

J. SEERY

1  rough numbers.  We have made demand, I
2  think it is about 40 million, 24 million
3  on NexPoint and then 8 million on HCFMA,
4  roughly.  And then somewhere around 8
5  million on Dondero, all for notes that
6  were either demanded because they were
7  able to be demanded or accelerated because
8  they were defaulted.
9      Q.      And then in the liquidation
10  analysis you have $191 million.  What
11  percentage of that is note collection
12  versus what percentage of that is
13  liquidation of assets?
14      A.      The same amount for the demanded
15  notes, and the non-demand notes are a
16  reduced amount because they are assumed to
17  be sold.
18      Q.      So that doesn't answer my
19  question.  In the 257, you had a
20  $40 million figure.  Correct?
21      A.      Approximately.
22      Q.      Do you have a $40 million figure
23  in the 191?
24      A.      I believe it does.

008434

Page 22

```
              J. SEERY
1
2      Q.    Excuse me?
3      A.    I believe it does.
4      Q.    Is there a subsidiary ledger
5  that would tell me what is the note
6  component versus what is the hard asset
7  component?
8      A.    Yes.
9      Q.    Who has that?
10     A.    I do.
11         MR. DRAPER: Mr. Morris, can I
12  get that document?
13         MR. MORRIS: I will take it
14  under advisement.
15     Q.    There is also a Dugaboy note in
16  your notes that is to be sold. Is that
17  Dugaboy note in the $40 million, or is it
18  in the hard asset monetization?
19     A.    I believe it is in the -- it is
20  to be sold, so it is not collected in
21  full. If they default, then we would
22  accelerate that and collect that in full
23  as well.
24     Q.    That doesn't answer my question
25  unfortunately. What I am asking you, is
```

Page 23

```
              J. SEERY
1
2  it in the $40 million calculation, or in
3  the $200 million number?
4      A.    It doesn't answer your question
5  because you didn't listen to my prior
6  answer. I said that the 40 million
7  calculation was for stuff that had been
8  demanded. I think you represent -- do you
9  represent Dugaboy? I don't think we
10  demanded --
11     Q.    I do. Excuse me?
12     A.    So if it wasn't demanded, it is
13  not in the hard asset calculation; it's in
14  the discounted amount.
15     Q.    Let me try to understand your
16  answer. What you are telling me, just so
17  we are both clear, is that that Dugaboy
18  note is not in the $40 million; it is in
19  the balance of the 257? That is a yes or
20  no answer.
21     A.    I didn't take it as a question.
22  It sounded like a statement. I agree with
23  your statement.
24     Q.    Thank you. So the answer is
25  yes?
```

Page 24

```
              J. SEERY
1
2      A.    It wasn't a question. I agree
3  with your statement; yes.
4      Q.    Thank you.
5            Now, let's go to the
6  November 2020 schedule that we had. If
7  you see in the line "Estimated proceeds
8  from monetization of assets," you had
9  $190 million under the plan analysis?
10     A.    Yes.
11     Q.    What percentage of that are
12  notes versus hard assets?
13     A.    The demand notes only were
14  included in the proceeds in terms of
15  recovery in full. I don't quite
16  understand your distinction between hard
17  assets. There is a lot of intangibles as
18  well as tangibles in the total.
19            But if we are distinguishing
20  between notes and other assets, the demand
21  notes are included in the 190. The longer
22  dated notes are assumed to be sold. So,
23  they are included but they are included at
24  a much lower amount.
25     Q.    Okay. Now how much of the
```

Page 25

```
              J. SEERY
1
2  demand notes in the 190, Mr. Seery?
3      A.    Off the top of my head I don't
4  recall. It is the Dondero demand notes as
5  well as the HCFMA demand notes, so it
6  should be about 15 to $20 million.
7  Somewhere in that realm. The same as the
8  other demand notes.
9      Q.    Were the other notes, the
10  $40 million of notes that you referenced
11  in the January document, were they carried
12  at face or at discounted amount in the
13  190?
14     A.    In the 190, the ones that were
15  demand were carried at face. The ones
16  that were long dated, which really at that
17  point I believe -- the only difference is
18  the $24-and-change-million NexPoint
19  Advisors note was at a discounted amount.
20  The others were at face.
21     Q.    What was the discount that was
22  applied to that note?
23     A.    I don't recall off the top of my
24  head. It is pretty significant because of
25  the long dated nature of the notes. They
```

008435
APP 3940

Page 26

```
                J. SEERY
 1
 2   were amended without consideration a few
 3   years ago.  So, for our purposes we didn't
 4   make the assumption, which I am sure will
 5   happen, a fraudulent conveyance claim on
 6   those notes, that a fraudulent conveyance
 7   action be brought.  We just assumed
 8   that we'd have to discount the notes
 9   heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12      Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15      A.    Yes.
16      Q.    Now --
17      A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for P and I.
22      Q.    But in fact as of January you
23   have accelerated those notes?
24      A.    Just one of them, I believe.
25      Q.    Which note was that?
```

Page 27

```
                J. SEERY
 1
 2      A.    NexPoint, I said.  They
 3   defaulted on the note and we accelerated
 4   it.
 5      Q.    So there is no need to file a
 6   fraudulent conveyance suit with respect to
 7   that note.  Correct, Mr. Seery?
 8           MR. MORRIS:  Objection to the
 9      form of the question.
10      A.    Disagree.  Since it was likely
11   intentional fraud, there may be other
12   recoveries on it.  But to collect on the
13   note, no.
14      Q.    My question was with respect to
15   that note.  Since you have accelerated it,
16   you don't need to deal with the issue of
17   when it's due?
18           MR. MORRIS:  Objection to the
19      form of the question.
20      A.    That wasn't your question.  But
21   to that question, yes, I don't need to
22   deal with when it's due.
23      Q.    Let me go over certain assets.
24   I am not going to ask you for the
25   valuation of them but I am going to ask
```

Page 28

```
                J. SEERY
 1
 2   you whether they are included in the asset
 3   portion of your $257 million number, all
 4   right?  Mr. Morris didn't want me to go
 5   into specific asset value, and I don't
 6   intend to do that.
 7           The first question I have for
 8   you is, the equity in Trustway Highland
 9   Holdings, is that included in the
10   $257 million number?
11      A.    There is no such entity.
12      Q.    Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16      A.    Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20   includes Targa and all the value that
21   flows up from Targa.  It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

Page 29

```
                J. SEERY
 1
 2   includes any other securities and all the
 3   value that would flow from Cornerstone.
 4   It includes HCLOF and all the value that
 5   would flow up from HCLOF.  It includes
 6   Korea and all the value that would flow up
 7   from Korea.
 8           There may be others off the top
 9   of my head.  I don't recall them.  I don't
10   have a list in front of me.
11      Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14      A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22           With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

**Alvarez & Marsal CRF
Management, LLC** 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million.  Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021.  Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director

**On investor letterhead, please use the template below to provide Alvarez & Marsal CRF Management, LLC and SEI your updated wire information.**

| Information Needed | Wire Information Input |
|---|---|
| Investor name (as it reads on monthly statements)<br><br>Fund(s) Invested<br><br>Contact Information (Phone No. and Email)<br><br>Updated Wire Information<br>• Beneficiary Bank<br>• Bank Address<br>• Beneficiary (Account) Name<br>• ABA/Routing #<br>• Account #<br>• SWIFT Code<br><br>International Wires<br>• Correspondent Bank<br>• ABA/Routing #<br>• SWIFT Code | |

Signed By: _____      Date: _____

# HMIT Exhibit No. 62

008440

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## DECLARATION OF SAWNIE A. MCENTIRE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to 28 U.S.C. 1746 and declares

as follows:

1. My name is Sawnie A. McEntire. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I am a licensed attorney in good standing with the State Bar of Texas. I am a Director and Shareholder at the firm Parsons McEntire McCleary PLLC. I serve as lead counsel for Hunter Mountain Investment Trust ("HMIT") in these proceedings in regard to the motion described in Paragraph 3 below. I also served as lead counsel for HMIT in Rule 202 Proceedings filed in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004 ("Rule 202 Proceedings").

3. I submit this declaration in support of HMIT's Emergency Motion for Leave to File Adversary Proceeding ("Emergency Motion") to which this Declaration is attached.

1

008441

4. On January 20, 2023, HMIT filed its Verified Rule 202 Petition in the 191st District Court of Dallas County, Texas, Cause No. DC-23-01004. **A true and correct copy of HMIT's Verified Rule 202 Petition, with accompanying exhibits, is attached to this declaration as Exhibit 4-A.**

5. HMIT served notice of the Rule 202 Petition and hearing on Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), Muck Holdings LLC ("Muck"), and Jessup Holdings LLC ("Jessup") in February 2023. Farallon and Stonehill entered an appearance, responded to the proceedings, and were represented by David Shulte of the law firm of Holland & Knight. Among other things, the Rule 202 Petition sought discovery related to Farallon and Stonehill's due diligence, if any, concerning the sale and transfer of four allowed bankruptcy claims in the above-referenced bankruptcy proceedings from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "Claims") in April and August of 2021.[1]

6. On February 22, 2023, HMIT's Verified Rule 202 Petition was heard by the Honorable Gena Slaughter of the 191st District Court of Dallas County, Texas. **A true and correct copy of the Hearing Transcript of the Rule 202 Proceedings on February 22, 2023, is attached to this declaration as Exhibit 4-B** ("Transcript'). At this hearing, I argued on behalf of HMIT and Mr. Shulte argued on behalf of Farallon and Stonehill. During this hearing, Farallon and Stonehill admitted they acquired the Claims through their respective "special purpose entities," as reflected in the Transcript. Farallon resisted the requested discovery in the state district court.

7. A true and correct copy of a certified copy of Muck's formation papers in the State of Delaware, showing Muck was created on March 9, 2021, is attached to this Declaration as **Exhibit 4-D**. A true and correct copy of a certified copy of Jessup's formation papers in Delaware, showing Jessup was created on April 8, 2021, is attached to this Declaration as **Exhibit 4-E**. Muck and Jessup's corporate formation documents do not identify their respective members or managing members. *See* Exhibit 4-D and 4-E.

8. On March 8, 2023, the state district court denied and dismissed HMIT's Verified Rule 202 Petition. This ruling was necessarily without prejudice. A true and correct copy of the related Order, dated March 8, 2023, is attached to this declaration as **Exhibit 4-C**.

---

[1] *See* Notices of Transfers [Docs. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

2

008442

9. On March 9, 2023, my law partner, Roger McCleary sent correspondence to Mr. Schulte, as Farallon and Stonehill's counsel, requesting disclosure of the details of their respective legal relationships to Muck and Jessup. Farallon and Stonehill never responded to this inquiry. A true and correct copy of this email correspondence, dated March 9, 2023, is attached to this declaration as **Exhibit 4-F.**

10. I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 27, 2023.

FURTHER DECLARANT SAYETH NOT.

Executed in Dallas County, State of Texas, on the _27th_ day of March 2023.

Sawnie A. McEntire

008443

Case 19-34054-sgj11   Doc 3899-4   Filed 06/08/23   Entered 06/08/23 20:00:43   Desc
Case 3:23-cv-02071-E   Document 36-11   Filed 11/05/24   Page 51 of 214   PageID 8077
Exhibit Exhibit B 05-14 to Page 287 of 302

# Exhibit 4-A

FILED
1/20/2023 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Stephanie Clark DEPUTY

DC-23-01004

## CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | 191st |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner*, | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S
## VERIFIED RULE 202 PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner, Hunter Mountain Investment Trust ("HMIT"), files this Verified Petition ("Petition") pursuant to Rule 202 of the Texas Rules of Civil Procedure, seeking pre-suit discovery from Respondent Farallon Capital Management, LLC ("Farallon") and Respondent Stonehill Capital Management, LLC ("Stonehill") (collectively "Respondents"), to allow HMIT to investigate potential claims against Respondents and other potentially adverse entities, and would respectfully show:

### PARTIES

1.     HMIT is a Delaware statutory trust that was the largest equity holder in Highland Capital Management, L.P. ("HCM"), holding a 99.5% limited partnership interest. HCM filed chapter 11 bankruptcy proceedings in 2019 and, as a result of these

008445

proceedings,[1] HMIT held a Class 10 claim which, post-confirmation, was converted to a

Contingent Trust Interest in HCM's post-reorganization sole limited partner.

2.      Farallon is a Delaware limited liability company with its principal office in

California, which is located at One Maritime Plaza, Suite 2100, San Francisco, CA 94111.

3.      Stonehill is a Delaware limited liability company with its principal office in

New York, which is located at 320 Park Avenue, 26th Floor, New York, NY 10022.

## VENUE AND JURISDICTION

4.      Venue is proper in Dallas County, Texas, because all or substantially all of

the events or omissions giving rise to HMIT's potential common law claims occurred in

Dallas County, Texas. In the event HMIT elects to proceed with a lawsuit against Farallon

and Stonehill, venue of such proceedings will be proper in Dallas County, Texas.

5.      This Court has jurisdiction over the subject matter of this Petition pursuant

to Texas Rule of Civil Procedure 202.[2] The amount in controversy of any potential claims

against Farallon or Stonehill far exceeds this Court's minimum jurisdictional

requirements. Without limitation, HMIT specifically seeks to investigate potentially

actionable claims for unjust enrichment, imposition of a constructive trust with

---

[1] These proceedings were initially filed in Delaware but were ultimately transferred to and with venue in the U.S. Bankruptcy Court for the Northern District of Texas.

[2] The discovery relief requested in this Petition does not implicate the HCM bankruptcy court's jurisdiction. Furthermore, this Rule 202 Petition is not subject to removal because there is no amount in actual controversy and there is no cause of action currently asserted.

008446

disgorgement, knowing participation in breaches of fiduciary duty, and tortious interference with business expectancies.

6.      This Court has personal jurisdiction over the Respondents from which discovery is sought because both Farallon and Stonehill are doing business in Texas under Texas law including, without limitation, Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ §17.042. Consistent with due process, Respondents have established minimum contacts with Texas, and the assertion of personal jurisdiction over Respondents complies with traditional notions of fair play and substantial justice. HMIT's potential claims against Respondents arise from and/or relate to Farallon's and Stonehill's contacts in Texas. Respondents also purposefully availed themselves of the privilege of conducting business activities within Texas, thus invoking the benefits and protections of Texas law.

## SUMMARY

7.      HMIT seeks to investigate potential claims relating to the sale and transfer of large, unsecured creditors' claims in HCM's bankruptcy to special purpose entities affiliated with and/or controlled by Farallon and Stonehill (the "Claims"). Upon information and belief, Farallon and Stonehill historically had and benefited from close relationships with James Seery ("Seery"), who was serving as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO") at the time of the Claims purchases. Furthermore, still upon information and belief, because Farallon and Stonehill acquired or controlled the acquisition of the Claims under highly questionable

3

circumstances. HMIT seeks to investigate whether Respondents received material non-public information and were involved in insider trading in connection with the acquisition of the Claims.

8.      The pre-suit discovery which HMIT seeks is directly relevant to potential claims, and it is clearly appropriate under Rule 202.1(b). HMIT anticipates the institution of a future lawsuit in which it may be a party due to its status as a stakeholder as former equity in HCM or in its current capacity as a Contingent Trust Interest holder, as well as under applicable statutory and common law principles relating to the rights of trust beneficiaries. In this context, HMIT may seek damages on behalf of itself or, alternatively, in a derivative capacity and without limitation, for damages or disgorgement of monies for the benefit of the bankruptcy estate.

9.      HMIT currently anticipates a potential lawsuit against Farallon and Stonehill as defendants and, as such, Farallon and Stonehill have adverse interests to HMIT in connection with the anticipated lawsuit. The addresses and telephone numbers are as follows: **Farallon Capital Management LLC**, One Maritime Plaza, Suite 2100, San Francisco, CA 94111, Telephone: 415-421-2132; **Stonehill Capital Management**, LLC, 320 Park Avenue, 26th Floor, New York, NY 10022, 212-739-7474 . Additionally, the following parties also may be parties with adverse interests in any potential lawsuit: **Muck Holdings LLC**, c/o Crowell & Moring LLP, Attn: Paul B. Haskel, 590 Madison Avenue, New York, NY 10022, 212-530-1823; **Jessup Holdings LLC**, c/o Mandel, Katz and Brosnan

008448

LLP, Attn: John J. Mandler, 100 Dutch Hill Road, Suite 390, Orangeburg, NY 10962, 845-

6339-7800.

## BACKGROUND[3]

A.  *Procedural Background*

10.     On or about October 16, 2019, HCM filed a voluntary petition for relief

under chapter 11 of the Bankruptcy Code in Delaware Bankruptcy Court, which was later

transferred to the Northern District of Texas Bankruptcy Court, Dallas Division, on

December 4, 2019.

11.     On October 29, 2019, the U.S. Trustee's office appointed a four-member

Unsecured Creditors Committee ("UCC") consisting of three judgment creditors—the

Redeemer Committee, which is a committee of investors in an HCM-affiliated fund

known as the Crusader Fund that obtained an arbitration award against HCM in the

hundreds of millions of dollars; Acis Capital Management, L.P. and Acis Capital

Management GP LLC (collectively "Acis"); and UBS Securities LLC and UBS AG London

Branch (collectively "UBS") - and an unpaid vendor, Meta-E Discovery.

12.     Following the venue transfer to Texas on December 27, 2019, HCM filed its

*Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured*

*Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary*

---

[3] All footnote references to evidence involve documents filed in the HCM bankruptcy proceedings and are cited by "Dkt." reference. HMIT asks the Court to take judicial notice of the documents identified by these docket entries.

008449

*Course* ("HCM's Governance Motion").[4] On January 9, 2020, the Court signed an order

approving HCM's Settlement Motion (the "Governance Order").[5]

13.     As part of the Governance Order, an independent board of directors—

which included Seery as one of the UCC's selections—was appointed to the Board of

Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors") HCM's general

partner. Following the approval of the Governance Order, the Board then appointed

Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer

("CRO") in place of the previous CEO.[6] Seery currently serves as Trustee of the Claimant

Trust (HCM's sole post-reorganization limited partner) and, upon information and belief,

continues to serve as CEO of HCM following the effective date of the HCM bankruptcy

reorganization plan ("Plan").[7]

**B.    *Seery's Relationships with Stonehill and Farallon***

14.     Farallon and Stonehill are two capital management firms (similar to HCM)

that, upon information belief, have long-standing relationships with Seery. Upon

information and belief, they eventually participated in, directed and/or controlled the

acquisition of hundreds of millions of dollars of unsecured Claims in HCM's bankruptcy

on behalf of funds which they manage. It appears they did so without any meaningful

---

[4] Dkt. 281.
[5] Dkt. 339.
[6] Dkt. 854, Order Approving Retention of Seery as CEO/CRO.
[7] *See* Dkt. 1943, Order Approving Plan, p. 34.

6

008450

due diligence, much less reasonable due diligence, and *ostensibly* based their investment decisions only on Seery's input.

15.     Upon information and belief, Seery historically has had a substantial business relationship with Farallon and he previously served as legal counsel to Farallon in other matters. Upon information and belief, Seery also has had a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee[8] (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

## C.     *Claims Trading*

16.     Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of settlements with Redeemer, Acis, UBS, and another major creditor, HarbourVest[9] (the "Settlements") (Redeemer, Acis, UBS, and HarbourVest are collectively the "Settling Parties"), resulting in the following allowed claims:[10]

---

[8] Declaration of John A. Morris [Dkt. 1090], Ex. 1, pp. 15.

[9] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

[10] Orders Approving Settlements [Dkt. 1273, Dkt. 1302, Dkt. 1788, Dkt. 2389].

008451

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |

17.     Although these Settlements were achieved after years of hard-fought litigation,[11] each of the Settling Parties *curiously* sold their claims to Farallon or Stonehill (or affiliated special purpose entities) shortly after they obtained court approval of their Settlements. One of these "trades" occurred within just a few weeks before the Plan's Effective Date.[12] Upon information and belief, Farallon and Stonehill coordinated and controlled the purchase of these Claims through special purpose entities, Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup") (collectively "SPEs").[13] Upon information and belief, both of these SPEs were created on the eve of the Claims purchases for the ostensible purpose of taking and holding title to the Claims.

18.     Upon information and belief, Farallon and Stonehill directed and controlled the investment of over $160 million dollars to acquire the Claims in the absence of any publicly available information that could rationally justify this substantial investment. These "trades" are even more surprising because, at the time of the confirmation of HCM's Plan, the Plan provided only pessimistic estimates that these Claims would ever receive full satisfaction:

---

[11] Order Confirming Plan, pp. 9-11.
[12] Dkt. 2697, 2698.
[13] *See* Notice of Removal [Dkt 2696], ¶ 4.

008452

a. HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[14]

   i. This meant that Farallon and Stonehill invested more than $163 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

b. In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%* (down approximately $328.3 million);[15]

c. From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million;[16]

d. Despite the stark decline in the valuation of the HCM bankruptcy estate and reduction in percentage of Class 8 Claims expected to be satisfied, Stonehill, through Jessup, and Farallon, through Muck, nevertheless purchased the four largest bankruptcy claims from the Redeemer Committee/Crusader Fund, Acis, HarbourVest, and UBS (collectively the "<u>Claims</u>") in April and August of 2021[17] in the combined amount of approximately $163 million; and

e. Upon information and belief:

   i. Stonehill, through an SPE, Jessup, acquired the Redeemer Committee's claim for approximately $78 million;[18]

---

[14] Dkt. 1875-1, Plan Supplement, Exh. A, p. 4.

[15] Dkt. 2949.

[16] Dkt 1473, Disclosure Statement, p. 18.

[17] Notices of Transfers [Dkt. 2211, 2212, 2261, 2262, 2263, 2215, 2697, 2698].

[18] July 6, 2021 Letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds Stakeholders.

008453

  ii. The $23 million Acis claim[19] was sold to Farallon/Muck for approximately $8 million;

  iii. HarbourVest sold its combined approximately $80 million in claims to Farallon/Muck for approximately $27 million; and

  iv. UBS sold its combined approximately $125 million in claims for approximately $50 million to both Stonehill/Jessup and Farallon/Muck *at a time when the total projected payout was only approximately $35 million*.

19. In Q3 2021, just over $6 million of the projected $205 million available to satisfy general unsecured claims was disbursed.[20] No additional distributions were made to general unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—$45 million more than was *ever* projected.[21] According to HCM's Motion for Exit Financing,[22] and a recent motion filed by Dugaboy Investment Trust,[23] there remain **substantial** assets to be monetized for the benefit of HCM's creditors. Thus, upon information and belief, the funds managed by Stonehill and Farallon stand to realize significant profits on their Claims purchases. In turn, upon information and belief, Stonehill and Farallon will garner (or already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the purchase of the Claims.

---

[19] Seery/HCM have argued that $10 million of the Acis claim is self-funding. Dkt. 1271, Transcript of Hearing on Motions to Compromise Controversy with Acis Capital Management [1087] and the Redeemer Committee of the Highland Crusader Fund [1089], p. 197.

[20] Dkt. 3200.

[21] Dkt. 3582.

[22] Dkt. 2229.

[23] Dkt. 3382.

008454

### D.    *Material Information is Not Disclosed*

20.    Bankruptcy Rule 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." No public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks."[24]

21.    As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction.[25] Approximately 19.1% of HCLOF's assets were comprised of debt and equity in Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). The HCLOF interest was not to be transferred to HCM for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements.[26]

22.    Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, upon information and belief, it appears that Seery may have acquired material non-public information regarding Amazon's now-consummated interest in acquiring MGM,[27] yet there is no record of Seery's disclosure of such

---

[24] Dkt. 1905, February 3, 2021 Hearing Transcript, 49:5-21.
[25] Dkt. 1625, p. 9, n. 5.
[26] Dkt. 1625.
[27] Dkt. 150-1.

008455

information to the Court, HCM's creditors, or otherwise. Upon the receipt of this material non-public information, HMIT understands, upon information and belief, that MGM was supposed to be placed on HCM's "restricted list," but Seery nonetheless continued to move forward with deals that involved MGM assets.[28]

23.     As HCM additionally held its own direct interest in MGM,[29] the value of MGM was of paramount importance to the value of HCM's bankruptcy estate. HMIT believes, upon information and belief, that Seery conveyed material non-public information regarding MGM to Stonehill and Farallon as inducement to purchase the Claims.

**E.**     *Seery's Compensation*

24.     Upon information and belief, a component of Seery's compensation is a "success fee" that depends on the actual liquidation of HCM's bankruptcy estate assets versus the Plan projections. As current holders of the largest claims against the HCM estate, Muck and Jessup, the SPEs apparently created and controlled by Stonehill and Farallon, were installed as two of the three members of an Oversight Board in charge of monitoring the activities of HCM, as the Reorganized Debtor, and the Claimant Trust.[30] Thus, along with a single independent restructuring professional, Farallon and

---

[28] *See* Dkt. 1625, Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, filed December 23, 2020
[29] Motion for Exit Financing.[Dkt.2229]
[30] Dkt. 2801.

008456

Stonehill's affiliates oversee Seery's go-forward compensation, including any "success" fee.[31]

## DISCOVERY REQUESTED

25.    HMIT seeks to investigate whether Farallon and Stonehill received material non-public information in connection with, and as inducement for, the negotiation and sale of the claims to Farallon and Stonehill or its affiliated SPEs. Discovery is necessary to confirm or deny these allegations and expose potential abuses and unjust enrichment.

26.    The requested discovery from Farallon is attached as Exhibit "A", and includes the deposition of one or more of its corporate representatives and the production of documents. The requested discovery from Stonehill is attached as Exhibit "B", and includes the deposition of Stonehill's corporate representative(s) and the production of documents.

27.    Pursuant to Rule 202.2(g), the requested discovery will include matters that will allow HMIT to evaluate and determine, among other things:

    a.    The substance and types of information upon which Stonehill and Farallon relied in making their respective decisions to invest in or acquire the Claims;

    b.    Whether Farallon and Stonehill conducted due diligence, and the substance of any due diligence when evaluating the Claims;

---

[31] Claimant Trust Agreement [Dkt. 1656-2].

008457

c.  The extent to which Farallon and Stonehill controlled the SPEs, Muck and Jessup, in connection with the acquisition of the Claims;

d.  The creation and organizational structure of Farallon, Stonehill, Muck, and Jessup, as well as the purpose of creating Muck and Jessup as SPEs to hold the Claims;

e.  Any internal valuations of Muck or Jessup's net asset value (NAV);

f.  Any external valuation or audits of the NAV attributable to the Claims;

g.  Any documents reflecting expected profits from the purchase of the Claims;

h.  All communications between Farallon and Seery concerning the value and purchase of the Claims;

i.  All communications between Stonehill and Seery concerning the value and purchase of the Claims;

j.  All documents reflecting the expected payout on the Claims;

k.  All communications between Farallon or Stonehill and HarbourVest concerning the purchase of the Claims;

l.  All communications between Farallon or Stonehill and Acis regarding the purchase of the Claims;

m.  All communications between Farallon or Stonehill and UBS regarding the purchase of the Claims;

n.  All communications between Farallon or Stonehill and The Redeemer Committee regarding the purchase of the Claims;

o.  All communications between Farallon and Stonehill regarding the purchase of the Claims;

008458

p.  All communications between Farallon and Stonehill and
investors in their respective funds regarding purchase of the
Claims or valuation of the Claims;

q.  All communications between Seery and Stonehill or Farallon
regarding Seery's compensation as the Trustee of the
Claimant Trust;

r.  All documents relating to, regarding, or reflecting any
agreements between Seery and the Oversight Committee
regarding compensation;

s.  All documents reflecting the base fees and performance fees
which Stonehill has received or may receive in connection
with management of the Claims;

t.  All documents reflecting the base fees and performance fees
which Farallon has received or may receive in connection
with management of the Claims;

u.  All monies received by and distributed by Muck in
connection with the Claims;

v.  All monies received by and distributed by Jessup in
connection with the Claims;

w.  All documents reflecting whether Farallon is a co-investor in
any fund which holds an interest in Muck; and

x.  All documents reflecting whether Stonehill is a co-investor in
any fund which holds an interest in Jessup.

## BENEFIT OUTWEIGHS THE BURDEN

28.    The beneficial value of the requested discovery greatly outweighs any

conceivable burden that could be placed on the Respondents. The requested information

008459

also should be readily available because the Respondents have been engaged in the bankruptcy proceedings relating to the matters at issue for several years.

29.     The important benefit associated with this requested discovery is also clear – it is reasonably calculated to determine whether the Respondents have unjustly garnered tens of millions of dollars of benefit based upon insider information. If this occurred, the monies received as a result of such conduct are properly subject to a constructive trust and disgorged. This would result in substantial funds available for other creditors, including those creditors in Class 10, which includes HMIT as a beneficiary. This significant benefit, in addition to the value of bringing proper light to the activities of Farallon and Stonehill as discussed in this petition, far outweighs any purported burden associated with requiring Respondents to sit for focused depositions concerning the topics and documents identified in Exhibits A and B.

## REQUEST FOR HEARING AND ORDER

30.     After service of this Petition and notice, Rule 202.3(a) requires the Court to hold a hearing on this Petition.

## PRAYER FOR RELIEF

31.     Petitioner Hunter Mountain Investment Trust respectfully requests that the Court issue an order pursuant to Texas Rule of Civil Procedure 202 authorizing HMIT to take a deposition of designated representatives of Farallon Capital Management, LLC and Stonehill Capital Management, LLC. HMIT additionally requests authorization to

008460

issue subpoenas duces tecum compelling the production of documents in connection

with the depositions in compliance with Tex. R. Civ. P. 205, and asks that the Court grant

HMIT all such other and further relief to which it may be justly entitled.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie A. McEntire*
Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

008461

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Before me, the undersigned notary, on this day personally appeared Mark Patrick, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

> "My name is Mark Patrick. I am the Administrator of Hunter Mountain Investment Trust, and I am authorized and capable of making this verification. I have read Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition ("Petition"). The facts as stated in the Petition are true and correct based on my personal knowledge and review of relevant documents in the proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054, in the United States Bankruptcy Court in the Northern District of Texas, Dallas Division ."

_____
Mark Patrick

Sworn to and subscribed before me by Mark Patrick on January 20, 2023.

_____
Notary Public in and for
the State of Texas



DEBORAH COLE
Notary ID #134079165
My Commission Expires
November 23, 2026

3116424.1

008462

EXHIBIT "A"

CAUSE NO. _____

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| HUNTER MOUNTAIN | § | |
| INVESTMENT TRUST | § | _____th JUDICIAL DISTRICT |
| | § | |
| *Petitioner*, | § | |
| | § | DALLAS COUNTY, TEXAS |

## NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC

TO:    Farallon Capital Management, LLC, by and through its attorney of record _____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205, Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral examination under oath of Farallon Capital Management, LLC ("Farallon") on _____, 2023 at _____ _.m. before a notary public or other person authorized to administer a proper oath and will be recorded by stenographic means. The deposition will take place at _____ before a court reporter and videographer and will continue from day to day until completed. The deposition may also be recorded by non-stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Farallon is requested to designate one or more person(s) most knowledgeable and prepared to testify on behalf of Farallon concerning the topics identified on Exhibit "1", and to produce the documents described in Exhibit "2", attached hereto.

008463

Respectfully submitted,

_____

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain*
*Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on January ___, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____

Sawnie A. McEntire

2

008464

EXHIBIT "A"

**TO NOTICE OF DEPOSITION OF FARALLON CAPITAL MANAGEMENT, LLC**

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

## RULES OF CONSTRUCTION

1. The terms "all" and "each" shall be construed as all and each.

2. The terms "all" and "any" shall be construed as all and any.

3. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4. The use of the singular form of any word includes the plural and vice versa.

## DEFINITIONS

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

008465

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning.* The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents.* The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI.* The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate.* The term "Estate" means HCM's bankruptcy estate.

*Farallon*, *you*, and *your*. The terms "Farallon," "you," and "your" shall mean Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

008466

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill*. The term "Stonehill" refers to Stonehill Capital Management, LLC.

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

008467

*UBS.* The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

008468

### EXHIBIT "1"

### TOPIC CATEGORIES

The witness(es) designated by Farallon to testify on its behalf  is (are) requested to testify concerning the following Topic Categories:

a.  The substance, types, and sources of information Farallon considered in making any decision to invest in any of the Claims on behalf of itself, Muck, and/or any fund with which Farallon is connected;

b.  Whether Farallon conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c.  Any and all communications with James Dondero;

d.  The extent to which Farallon was involved in creating and organizing Muck in connection with the acquisition of any of the Claims;

e.  The organizational structure of Muck (including identification of all members, managing members), as well as the purpose for creating Muck, including, but not limited to, regarding holding title to any of the Claims;

f.  Any internal valuations of Muck's Net Asset Value (NAV), as well as all assets owned by Muck;

g.  Any external valuation or audits of the NAV attributable to any of the Claims;

h.  Any documents reflecting profit forecasts relating to any of the Claims;

i.  All communications between Farallon and Seery relating to  any of the Claims;

008469

j.  All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k.  All communications between Farallon and any of the Settling Parties concerning any of the Claims;

l.  Any negotiations between Farallon and any of the Settling Parties concerning any of the Claims;

m.  All communications between Farallon and Stonehill regarding any of the Claims;

n.  All communications between Farallon and any investors in any fund managed by Farallon regarding any of the Claims or valuation of the Claims;

o.  All communications between Seery and Farallon regarding Seery's compensation as Trustee of the Claimant Trust;

p.  All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q.  All base fees and performance fees which Farallon has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r.  All monies received by Muck in connection with any of the Claims and any distributions made by Muck to any members of Muck relating to such Claims;

s.  Whether Farallon is a co-investor in any fund which holds an interest in Muck or otherwise holds a direct interest in Muck and all documents reflecting the same;

t.  All communications between Farallon and any of the following entities concerning any of the Claims:

      i.  UCC;

008470

  ii. Highland;

  iii. Grosvenor;

  iv. Muck;

  v. the Oversight Board.

u. The sources of funds used by Muck for the acquisition of any of the Claims;

v. The terms and conditions of any agreements governing the transfers of any of the Claims to Muck;

w. Representations made by Farallon, Muck, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x. Farallon's valuation or evaluation of HCM's Estate;

y. Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z. The appointment of Muck to the Oversight Board;

aa. Farallon's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Muck.

008471

**EXHIBIT "2"**

**DOCUMENT REQUESTS**

1. Any and all documents created by, prepared for, or received by Farallon concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

   d. promises and representations made in connection with the transfer of the Claims;

   e. any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

   f. consideration for the transfer of the Claims;

   g. the value of HCM's Estate;

   h. the projected future value of HCM's Estate;

   i. past distributions and projected distributions from HCM's Estate;

   j. compensation earned by or paid to Seery in connection with or relating to the Claims;

   k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

   l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Farallon, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Stonehill, (vi) Grosvenor or, (vii) the Oversight Board, concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

10

008472

    d.  promises and representations made in connection with the transfer of the Claims;

    e.  any due diligence undertaken by Farallon or Muck prior to acquiring the Claims;

    f.  consideration for the transfer of the Claims;

    g.  the value of HCM's Estate;

    h.  the projected future value of HCM's Estate;

    i.  past distributions and projected distributions from HCM's Estate;

    j.  compensation earned by or paid to Seery in connection with or relating to the Claims;

    k.  compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l.  any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3. All correspondence and/or other documents by or between Farallon and/or Muck and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4. Any and all documents reflecting the sources of funding used by Muck to acquire any of the Claims.

5. Organizational and formation documents relating to Muck including, but not limited to, Muck's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6. Company resolutions prepared by or on behalf of Muck approving the acquisition of any of the Claims.

7. Any and all documents reflecting any internal or external audits regarding Muck's NAV.

8. Agreements between Farallon and Muck regarding management, advisory, or other services provided to Muck by Farallon.

9. Any and all documents reviewed by Farallon as part of its evaluation and due diligence regarding any of the Claims.

10. Any documents reflecting any communications with James Dondero;

11. Annual fund audits relating to Muck.

008473

12. Muck's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Farallon in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

008474

EXHIBIT "B"

CAUSE NO. _____

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **HUNTER MOUNTAIN** | § | |
| **INVESTMENT TRUST** | § | **_____th JUDICIAL DISTRICT** |
| | § | |
| *Petitioner,* | § | |
| | § | **DALLAS COUNTY, TEXAS** |

## NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC

TO:   Stonehill Capital Management, LLC, by and through its attorney of record
_____.

PLEASE TAKE NOTICE that, pursuant to Tex. R. Civ. P. 199, 202, and 205,

Petitioner Hunter Mountain Investment Trust ("HMIT") will take the deposition on oral

examination under oath of Stonehill Capital Management, LLC ("Stonehill") on

_____, **2023 at _____ _.m.** before a notary public or other person authorized to

administer a proper oath and will be recorded by stenographic means. The deposition

will take place at _____ before a court reporter and videographer and will

continue from day to day until completed. The deposition may also be recorded by non-

stenographic (videotape) means.

Please take further notice that, pursuant to Tex. R. Civ. P. 199.2(b), Stonehill is

requested to designate one or more person(s) most knowledgeable and prepared to testify

on behalf of Stonehill concerning the topics identified on Exhibit "1", and to produce the

documents described in Exhibit "2", attached hereto.

Respectfully submitted,

_____
Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
State Bar No. 24110325
isalzer@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Petitioner Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that, on January ___, 2023, a true and correct copy of the foregoing document was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

_____
Sawnie A. McEntire

2

008476

**EXHIBIT "A"**
**TO NOTICE OF DEPOSITION OF STONEHILL CAPITAL MANAGEMENT, LLC**

For purposes of the attached Exhibits "1" and "2", the following rules and definitions shall apply.

**RULES OF CONSTRUCTION**

1.     The terms "all" and "each" shall be construed as all and each.

2.     The terms "all" and "any" shall be construed as all and any.

3.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.     The use of the singular form of any word includes the plural and vice versa.

**DEFINITIONS**

The terms used herein shall have the following meanings unless the context requires otherwise:

*Acis*. The term "Acis" refers to Acis Capital Management, L.P. and Acis Capital Management GP LLC, collectively.

*Any* and *all*. The terms "any" and "all" should be understood in either the most or the least inclusive sense as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope. "Any" includes the word "all," and "all" includes the term "any."

*Bankruptcy Case*. The term "Bankruptcy Case" shall mean the Chapter 11 Bankruptcy of Debtor Highland Capital Management, L.P., Case No. 19-34054 in the United States Bankruptcy Court for the Northern District of Texas.

*Claims*. The term "Claims" shall mean the claims against Highland's Estate transferred to/acquired by Muck and/or Jessup as evidenced by Bankruptcy Case Dkt. Nos. 2215, 2261, 2262, 2263, 2697, 2698.

*Communication*. The term "communication" means any manner in which the mental processes of one individual are related to another, including without limitation, any verbal utterance, correspondence, **email, text message**, statement, transmission of information by computer or other device, letters, telegrams, telexes, cables, telephone

3

008477

conversations, and records or notations made in connection therewith, notes, memoranda, sound recordings, electronic data storage devices, and any other reported, recorded or graphic matter or document relating to any exchange of information.

*Concerning*. The term "concerning" means reflecting, regarding, relating to, referring to, describing, evidencing, or constituting.

*Document or documents*. The terms "document" or "documents" shall mean anything that may be considered to be a document or tangible thing within the meaning of the TEXAS RULES OF CIVIL PROCEDURE, including (without limitation) Electronically Stored Information and the originals and all copies of any correspondence, memoranda, handwritten or other notes, letters, files, records, papers, drafts and prior versions, diaries, calendars, telephone or other message slips, invoices, files, statements, books, ledgers, journals, work sheets, inventories, accounts, calculations, computations, studies, reports, indices, summaries, facsimiles, telegrams, telecopied matter, publications, pamphlets, brochures, periodicals, sound recordings, surveys, statistical compilations, work papers, photographs, videos, videotapes, drawings, charts, graphs, models, contracts, illustrations, tabulations, records (including tape recordings and transcriptions thereof) of meetings, conferences and telephone or other conversations or communications, financial statements, photostats, e-mails, microfilm, microfiche, data sheets, data processing cards, computer tapes or printouts, disks, word processing or computer diskettes, computer software, source and object codes, computer programs and other writings, or recorded, transcribed, punched, taped and other written, printed, recorded, digital, or graphic matters and/or electronic data of any kind however produced or reproduced and maintained, prepared, received, or transmitted, including any reproductions or copies of documents which are not identical duplicates of the original and any reproduction or copies of documents of which the originals are not in your possession, custody or control.

*Electronically Stored Information or ESI*. The terms *"Electronically Stored Information" or "ESI" shall mean and include all documents, notes, photographs, images, digital, analog or other information stored in an electronic medium. Please produce all Documents/ESI in .TIF format (OCR text, single page). Please also provide a Summation Pro Load File (.dii) respect to all such Documents/ESI*

*Estate*. The term "Estate" means HCM's bankruptcy estate.

*Farallon*. The term "Farallon," refers to Farallon Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to, Muck Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees, representatives, attorneys, predecessors, successors,

4

assigns, related entities, parent companies, subsidiaries, and/or entities in which Farallon is a general partner or owns an entities' general partner, or anyone else acting on Farallon's behalf, now or at any time relevant to the response.

*Grosvenor*. The term "Grosvenor" refers to Grosvenor Capital Management, L.P.

*HarbourVest*. The term "HarbourVest" refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., collectively.

*HCM*. The term "HCM" refers to debtor Highland Capital Management, L.P.

*Jessup*. The term "Jessup" refers to Jessup Holdings, LLC.

*MGM*. The term "MGM" refers to Metro-Goldwyn-Mayer Studios, Inc.

*Muck*. The term "Muck" shall refer to Muck Holdings, LLC.

*NAV*. The term "NAV" means net asset value.

*Oversight Board*. The term "Oversight Board" refers to the Claimant Trust Oversight Committee (a/k/a the Oversight Board of the Highland Claimant Trust) as identified in Bankruptcy Case Dkt. No. 2801.

*Person*. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

*Plan*. The term "Plan" refers to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified).

*Redeemer*. The term "Redeemer" means the Redeemer Committee of the Highland Crusader Funds.

*Seery*. The term "Seery" refers to James P. ("Jim") Seery.

*Settling Parties*. The term "Settling Parties" refers to Redeemer, Acis, HarbourVest, and UBS, collectively.

*Stonehill," "you," and "your."* The terms "Stonehill", "you," and "your" shall mean Stonehill Capital Management, LLC and its corporate parent, subsidiaries, or affiliates and entities it manages or operates, including, but not limited to Jessup Holdings, LLC. These terms also include any owners, partners, shareholders, agents, employees,

representatives, attorneys, predecessors, successors, assigns, related entities, parent companies, subsidiaries, and/or entities in which Stonehill is a general partner or owns an entities' general partner, or anyone else acting on Stonehill's behalf, now or at any time relevant to the response .

*Strand*. The term "Strand" refers to Strand Advisors, Inc.

*UBS*. The term "UBS" refers to UBS Securities LLC and UBS AG London Branch, collectively.

008480

## EXHIBIT "1"

## TOPIC CATEGORIES

The witness(es) designated by Stonehill to testify on its behalf is (are) requested to testify concerning the following Topic Categories:

a.  The substance, types, and sources of information Stonehill considered in making any decision to invest in any of the Claims on behalf of itself, Jessup, and/or any fund with which Stonehill is connected;

b.  Whether Stonehill conducted due diligence, and the substance and identification of any due diligence (including associated documents), when evaluating any of the Claims;

c.  Any and all communications with James Dondero;

d.  The extent to which Stonehill was involved in creating and organizing Jessup in connection with the acquisition of any of the Claims;

e.  The organizational structure of Jessup (including identification of all members, managing members), as well as the purpose for creating Jessup, including, but not limited to, regarding holding title to any of the Claims;

f.  Any internal valuations of Jessup's Net Asset Value (NAV), as well as all assets owned by Jessup;

g.  Any external valuation or audits of the NAV attributable to any of the Claims;

h.  Any documents reflecting profit forecasts relating to any of the Claims;

i.  All communications between Stonehill and Seery relating to any of the Claims;

008481

j. All forecasted payout(s) on any of the Claims and all documents including or reflecting the same;

k. All communications between Stonehill and any of the Settling Parties concerning any of the Claims;

l. Any negotiations between Stonehill and any of the Settling Parties concerning any of the Claims;

m. All communications between Stonehill and Farallon regarding any of the Claims;

n. All communications between Stonehill and any investors in any fund managed by Stonehill regarding any of the Claims or valuation of the Claims;

o. All communications between Seery and Stonehill regarding Seery's compensation as Trustee of the Claimant Trust;

p. All agreements and other communications between Seery and the Oversight Committee regarding Seery's compensation and all documents relating to, regarding, or reflecting such agreements and other communications;

q. All base fees and performance fees which Stonehill has received or may receive in connection with the Claims and all documents relating to, regarding, or reflecting the same;

r. All monies received by Jessup in connection with any of the Claims and any distributions made by Jessup to any members of Jessup relating to such Claims;

s. Whether Stonehill is a co-investor in any fund which holds an interest in Jessup or otherwise holds a direct interest in Jessup and all documents reflecting the same;

t. All communications between Stonehill and any of the following entities concerning any of the Claims:

      i. UCC;

008482

  ii. Highland;

  iii. Grosvenor;

  iv. Jessup;

  v. the Oversight Board.

u. The sources of funds used by Jessup for the acquisition of any of the Claims;

v. The terms and conditions of any agreements governing the transfers of any of the Claims to Jessup;

w. Representations made by Stonehill, Jessup, Seery, and/or the Settling Parties in connection with the transfer of any of the Claims;

x. Stonehill's valuation or evaluation of HCM's Estate;

y. Information learned regarding MGM during the pendency of the negotiations relating to the Claims;

z. The appointment of Jessup to the Oversight Board;

aa. Stonehill's historical relationships and business dealings with Seery and Grovesnor;

bb. Representations made to the bankruptcy court in connection with the transfer of any of the Claims to Jessup.

008483

## EXHIBIT "2"

## <u>DOCUMENT REQUESTS</u>

1. Any and all documents created by, prepared for, or received by Stonehill concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

   d. promises and representations made in connection with the transfer of the Claims;

   e. any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

   f. consideration for the transfer of the Claims;

   g. the value of HCM's Estate;

   h. the projected future value of HCM's Estate;

   i. past distributions and projected distributions from HCM's Estate;

   j. compensation earned by or paid to Seery in connection with or relating to the Claims;

   k. compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

   l. any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

2. Any and all communications between Stonehill, on the one hand, and any of the following individuals or entities: (i) Seery, (ii) the UCC, (iii) the Settling Parties, (iv) Farallon, (vi) Grosvenor, or, (vii) the Oversight Board, concerning any of the following topics:

   a. the transfer of the Claims;

   b. negotiation and/or consummation of any agreement regarding the transfer of the Claims;

   c. valuation of the Claims or the assets underlying the Claims;

008484

    d.   promises and representations made in connection with the transfer of the Claims;

    e.   any due diligence undertaken by Stonehill or Jessup prior to acquiring the Claims;

    f.   consideration for the transfer of the Claims;

    g.   the value of HCM's Estate;

    h.   the projected future value of HCM's Estate;

    i.   past distributions and projected distributions from HCM's Estate;

    j.   compensation earned by or paid to Seery in connection with or relating to the Claims;

    k.   compensation earned by or paid to Seery for his roles as CEO, CRO, and Foreign Representative of HCM, Trustee of the Highland Claimant Trust, and/or Independent Director of Strand; and

    l.   any future compensation to be paid to Seery as Trustee of the Highland Claimant Trust.

3. All correspondence and/or other documents by or between Stonehill and/or Jessup and any investors in any fund regarding the Claims and/or the acquisition or transfer of the Claims.

4. Any and all documents reflecting the sources of funding used by Jessup to acquire any of the Claims.

5. Organizational and formation documents relating to Jessup including, but not limited to, Jessup's certificate of formation, company agreement, bylaws, and the identification of all members and managing members.

6. Company resolutions prepared by or on behalf of Jessup approving the acquisition of any of the Claims.

7. Any and all documents reflecting any internal or external audits regarding Jessup's NAV.

8. Agreements between Stonehill and Jessup regarding management, advisory, or other services provided to Jessup by Stonehill.

9. Any and all documents reviewed by Stonehill as part of its evaluation and due diligence regarding any of the Claims.

10. Any documents reflecting any communications with James Dondero;

11. Annual fund audits relating to Jessup.

008485

12. Jessup's NAV Statements.

13. Documents reflecting the fees or other compensation earned by Stonehill in connection with the investment in, acquisition of, transfer of, and/or management of any of the Claims.

3116467

008486

# Exhibit 4-B

1                        **REPORTER'S RECORD**

2                          VOLUME 1 OF 1

3

4          COURT OF APPEALS CAUSE NO. 00-00-00000-CV

5            TRIAL COURT CAUSE NO. DC-23-01004-J

6
   IN RE:                          )  IN   THE   DISTRICT COURT
7                                  )
                                   )
8  HUNTER MOUNTAIN                 )
   INVESTMENT TRUST,               )  OF DALLAS COUNTY, TEXAS
9                                  )
                                   )
10       Petitioner.              )  191ST JUDICIAL DISTRICT

11

12

13      **PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S**

14                      **RULE 202 PETITION**

15                    **which was heard on**

16              **Wednesday, February 22, 2023**

17

18

19        On the 22nd day of February 2023, the following

20  proceedings came on to be heard in the above-entitled

21  and numbered cause before the Honorable Gena Slaughter,

22  Judge Presiding, held in Dallas, Dallas County, Texas,

23  and the following proceedings were had, to wit:

24          Proceedings reported by machine shorthand

25  utilizing computer-assisted realtime transcription.

 1  <u>APPEARANCES</u>:

 2

 3  MR. SAWNIE A. McENTIRE          ATTORNEYS FOR PETITIONER
    State Bar No. 13590100          Hunter Mountain
 4  PARSONS McENTIRE               Investment Trust
         McCLEARY, PLLC
 5  1700 Pacific Avenue
    Suite 4400
 6  Dallas, Texas  75201
    Telephone:  (214) 237-4300
 7  Facsimile:  (214) 237-4340
    Email:  smcentire@pmmlaw.com
 8
    and
 9
    MR. ROGER L. McCLEARY
10  State Bar No. 13393700
    PARSONS McENTIRE
11       McCLEARY, PLLC
    One Riverway
12  Suite 1800
    Houston, Texas  77056
13  Telephone:  (713) 960-7315
    Facsimile:  (713) 960-7347
14  Email:  rmccleary@pmmlaw.com

15

16

17  MR. DAVID C. SCHULTE           ATTORNEY FOR RESPONDENTS
    State Bar No. 24037456         Farallon Capital
18  HOLLAND & KNIGHT, LLP          Management, LLC, and
    1722 Routh Street              Stonehill Capital
19  Suite 1500                     Management LLC
    Dallas, Texas  75201
20  Telephone:  (214) 964-9500
    Facsimile:  (214) 964-9501
21  Email:  david.schulte@hklaw.com

22

23

24            *        *        *

25

```
 1

 2

 3                        VOLUME 1 INDEX

 4

 5        PETITIONER HUNTER MOUNTAIN INVESTMENT TRUST'S

 6                     RULE 202 PETITION

 7                     which was heard on

 8                Wednesday, February 22, 2023

 9
```

```
10   PROCEEDINGS:                                    Page   Vol

11   Proceedings on the record...................... 8     1

12   Argument by Mr. Sawnie A. McEntire............ 9      1

13   Response by Mr. David C. Schulte............... 37    1

14   Response by Mr. Sawnie A. McEntire............ 65    1

15   Response by Mr. David C. Schulte............... 73    1

16   Response by Mr. Sawnie A. McEntire............ 76    1

17   The court takes the matter under consideration. 77   1

18   Adjournment................................... 78    1

19   Reporter's Certificate........................ 79    1
```

```
20

21

22

23

24

25
```

```
1              PETITIONER'S EXHIBITS INDEX

2
                                              (Excluded)
3      Number    Description           Offered Admitted  Vol

4

5       P-1      Declaration of             36     42      1
                 Mark Patrick
6

7      P1-A      Claimant                   36     42      1
                 Trust Agreement
8

9      P1-B      Division of                36     42      1
                 Corporations - Filing
10

11     P1-C      Division of                36     42      1
                 Corporations - Filing
12

13     P1-D      Order Approving            36     42      1
                 Debtor's Settlement
14

15     P1-E      Order Approving            36     42      1
                 Debtor's Settlement
16

17     P1-F      Order Approving            36     42      1
                 Debtor's Settlement
18

19     P1-G      Order Approving            36     42      1
                 Debtor's Settlement
20

21     P1-H      July 6, 2021, Alvarez      36     41      1
                 & Marsal letter to         --     42      1
22               Highland Crusader
                 Funds Stakeholder
23

24     P1-I      United States Bankruptcy   36     42      1
                 Court Case No. 19-34054
25
```

```
 1              PETITIONER'S EXHIBITS INDEX  continued

 2
                                            (Excluded)
 3    Number    Description            Offered Admitted Vol

 4

 5   PI-J      Exhibit A                  36      42      1
               Highland Capital
 6             Management, L.P.
               Disclaimer for
 7             Financial Projections

 8
     PI-K      United States Bankruptcy   36      42      1
 9             Court Case No. 19-34054

10
      P-2      Declaration of             36      42      1
11             James Dondero

12
     P2-1      Jim Dondero email          36    (41)      1
13             dated Thursday,
               December 2020
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    RESPONDENT'S EXHIBITS INDEX

2
                                              (Excluded)
3    Number    Description              Offered  Admitted  Vol

4

5    R-1       Cause No. DC-21-09543        41      44      1
               Verified Amended Petition
6

7    R-2       Cause No. DC-21-09543        41      44      1
               Order
8

9    R-3       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
10

11   R-4       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
12

13   R-5       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
14

15   R-6       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
16

17   R-7       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
18

19   R-8       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
20

21   R-9       United States Bankruptcy     41      44      1
               Court Case No. 19-34054
22

23   R-10      United States Bankruptcy     41      44      1
               Court Case No. 19-34054
24

25

```
 1              RESPONDENT'S EXHIBITS INDEX continued

 2
                                            (Excluded)
 3     Number    Description              Offered  Admitted  Vol

 4

 5    R-11      United States Bankruptcy      41      44       1
                Court Case No. 19-34054
 6

 7    R-12      United State Bankruptcy       41      44       1
                Court Case No. 19-12239
 8

 9    R-13      United States Bankruptcy      41      44       1
                Court Case No. 19-34054
10

11    R-14      United States Bankruptcy      41      44       1
                Court Case No. 19-34054
12

13    R-15      United States Bankruptcy      41      44       1
                Court Case No. 19-34054
14

15    R-16      United States Bankruptcy      41      44       1
                Court Case No. 19-34054
16

17    R-17      United States Bankruptcy      41      44       1
                Court Case No. 19-34054
18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              THE COURT:  Okay.  Good morning, Counsel.

 4              We are here in DC-23-01004, In re:

 5    Hunter Mountain Investment Trust.

 6              And who is here for the plaintiff?

 7              MR. McENTIRE:  For the petitioner,

 8    Your Honor, Sawnie McEntire and my partner

 9    Roger McCleary.

10              THE COURT:  Okay.  And then for Farallon?

11              MR. SCHULTE:  My name is David Schulte and

12    I represent both of the respondents.  It's Farallon

13    Capital Management, LLC, and Stonehill Capital

14    Management, LLC.

15              THE COURT:  We are here today on a request

16    for a 202 petition.  I know one of the issues is the

17    related suit, but let's just plow into it and we'll

18    go from there.

19              Okay.  Counsel?

20              MR. McENTIRE:  May I approach the bench?

21              THE COURT:  Yes, you may.

22              MR. McENTIRE:  And I've given Mr. Schulte

23    copies of all these materials.

24              In the interest of time, I have all the

25    key pleadings here, which I will give you a copy of.
```

1             THE COURT:  Thank you.

2             MR. McENTIRE:  And this is the evidentiary

3    submission that we submitted about a week ago.

4             THE COURT:  Right.

5             MR. McENTIRE:  To the extent you are

6    interested, it is cross-referenced by exhibit number

7    to the references in our petition to the docket in the

8    bankruptcy court.

9             THE COURT:  I appreciate that.  Otherwise,

10   I go hunting for stuff.

11            MR. McENTIRE:  This is a PowerPoint.

12            THE COURT:  Okay.

13            MR. McENTIRE:  And, lastly, a proposed

14   order.

15            THE COURT:  Wonderful.

16            MR. McENTIRE:  And Mr. Schulte has copies

17   of it all.

18            THE COURT:  Okay.

19            MR. McENTIRE:  May I proceed, Your Honor?

20            THE COURT:  You may.

21            MR. McENTIRE:  All right.  Your Honor,

22   we are here for leave of court to conduct discovery

23   under Rule 202 to investigate potential claims.

24            The issue before the court is not whether

25   we have an actual claim.

 1                    THE COURT:  Right.

 2                    MR. McENTIRE:  We do not even need to

 3   state a cause of action.  It is simply the investigation

 4   of potential claims.

 5                    Mr. Mark Patrick is here with us today.

 6   He's behind me.  Mr. Patrick is the administrator of

 7   Hunter Mountain, which is a Delaware trust.

 8                    THE COURT:  Okay.

 9                    MR. McENTIRE:  He is the manager of

10   Rand Advisors, which is also an investment manager

11   of the trust.  And, in effect, for all intents and

12   purposes, Mr. Patrick manages the assets of the trust on

13   a daily basis.

14                    THE COURT:  Okay.

15                    MR. McENTIRE:  There are potential claims

16   that we're investigating.  And I'll go through some

17   of these because I know opposing counsel has raised

18   standing issues.

19                    THE COURT:  Right.

20                    MR. McENTIRE:  And I think we can address

21   all those standing issues.

22                    Insider trading is in itself a wrong

23   as recognized by courts.  And I'll refer you to the

24   opinions.  We believe there's a breach of fiduciary

25   duties, and that may take a little explanation.

 1                    At the time that Farallon and Stonehill

 2   acquired these claims, through their special purpose

 3   entities Muck and Jessup, they were outsiders.

 4                    THE COURT:  Right.

 5                    MR. McENTIRE:  But by acquiring the

 6   information in the manner in which we believe they did,

 7   they became insiders.  And when they became insiders,

 8   under relevant authorities they owe fiduciary duties.

 9                    And at the time they acquired the claims,

10   my client Hunter Mountain Investment Trust was the

11   99.5 percent interest holder or stakeholder in

12   Highland Capital.

13                    THE COURT:  Right.

14                    MR. McENTIRE:  We also believe a knowing

15   participation of breach of fiduciary duties under

16   another name, aiding and abetting.  But Texas recognizes

17   it as knowing participation.  Unjust enrichment,

18   constructive trust, and tortious interference.

19                    THE COURT:  Okay.

20                    MR. McENTIRE:  Farallon and Stonehill are

21   effectively hedge funds.  And so is Highland Capital.

22                    They were created.  They actually did

23   create Muck and Jessup.  Those are the two entities

24   that actually are titled with the claims.  They

25   acquired it literally days before the transfers.

 1              So the reason we're focusing our discovery

 2    effort on Farallon and Stonehill, we are confident

 3    that any meaningful discovery -- emails, letters,

 4    correspondence, document drafts, things of that

 5    nature -- probably predated the existence of

 6    Muck and Jessup.

 7              THE COURT:  Right.

 8              MR. McENTIRE:  That's why we're focusing

 9    our discovery effort on Farallon and on Stonehill.

10              But, needless to say, Farallon, Stonehill,

11    Muck and Jessup, having all participated in this

12    acquisition, they're all insiders for purposes

13    of assuming fiduciary duties.

14              And as I said, outsiders become insiders

15    under the relevant authority.  And one key case is the

16    Washington Mutual case --

17              THE COURT:  Right.

18              MR. McENTIRE:  -- which we cited in our

19    materials.

20              I would also just let you know, this is

21    not something in total isolation.  We understand we're

22    not privy to the details.  But we understand the Texas

23    State Security Board also has an open investigation that

24    has not been closed.

25              THE COURT:  Okay.

1              MR. McENTIRE:  And that's by way of

2    background.

3              202 allows presuit discovery for a couple

4    of reasons.  And I won't belabor the point.  One is to

5    investigate potential claims.

6              There is no issue of notice or service

7    here.  There's no issue of personal jurisdiction.

8    Farallon and Stonehill made a general appearance.

9              THE COURT:  Right.

10             MR. McENTIRE:  There's no issue concerning

11   subject-matter jurisdiction.  They actually concede that

12   the court has jurisdiction on page 8 of their response.

13             The court's inquiry today is a limited

14   judicial inquiry.  There are really two avenues which

15   I'll explain, but, first, I think the salient avenue

16   is does the benefit of the discovery outweigh the

17   burden.

18             And I think as I will hopefully

19   demonstrate, I think that we clearly do.

20             THE COURT:  Okay.

21             MR. McENTIRE:  The merits of a potential

22   claim, the case law is clear, is not before the court.

23             Much of their brief and their response

24   is devoted to trying to attack the fact that there

25   is no duty or things such as standing.

1              But the reality of it is we are not

2    required to actually prove up a cause of action to

3    this court although I think I can.  In this process,

4    I probably certainly can identify a potential cause of

5    action.  That's not our obligation to carry our burden.

6              There was an issue about timely submission

7    of evidence they raised in a footnote, but I think that

8    was resolved before the court took the bench.

9              THE COURT:  Okay.

10             MR. McENTIRE:  I've handed you a binder

11   with Mr. Mark Patrick's affidavit and Jim Dondero's

12   affidavit.

13             As I understand it, correct me if I'm

14   wrong, you're not objecting to the submission of that

15   evidence.  Is that correct?

16             MR. SCHULTE:  Almost.

17             THE COURT:  Okay.

18             MR. SCHULTE:  Your Honor, I do object

19   to the two declarations that were submitted I believe

20   five days before the hearing.

21             THE COURT:  Okay.

22             MR. SCHULTE:  As Your Honor is aware,

23   Rule 202 contemplates 15 days' notice.  The petition

24   itself was required to be verified.  It was verified

25   and then new substance was added by way of these

 1   declarations five days before the hearing.

 2                  And so we would argue that that has the

 3   effect of amending or supplementing the petition within

 4   that 15-day notice period.

 5                  All that said, I don't have any issue with

 6   the majority of the documents attached to Mr. Patrick's

 7   declaration.

 8                  THE COURT:  Okay.

 9                  MR. SCHULTE:  So I do object on the

10   grounds of hearsay and timeliness to the declarations.

11                  On Exhibit H to Mr. Patrick's declaration,

12   I object to that document on the grounds of hearsay.

13                  THE COURT:  Okay.  Which one?

14                  MR. SCHULTE:  Exhibit H to Mr. Patrick's

15   declaration on the basis of hearsay.

16                  All the other documents are I believe

17   file-stamped copies of the pleadings filed in the

18   bankruptcy, which I don't have any issue with that.

19                  And then the exhibit to Mr. Dondero's

20   declaration is an email that's objected to on the basis

21   of hearsay.  And it hasn't been proven up as a business

22   record or any other way that will get past hearsay.

23                  THE COURT:  Okay.

24                  MR. SCHULTE:  So those are the limited

25   objections I have to what's in that filing, Your Honor.

1              MR. McENTIRE:  And I will address those

2    objections.  And we're prepared to put Mr. Patrick on

3    the stand, if necessary.

4              I would point out that the case law is

5    very clear that there's no 15-day rule here.

6              THE COURT:  Okay.

7              MR. McENTIRE:  We have asked the court

8    to take judicial notice of all of our evidence in our

9    petition itself.

10              The 15 days is the amount of time you have

11   to give notice before the hearing --

12              THE COURT:  Right.

13              MR. McENTIRE:  -- but the case law

14   is clear that I can put live testimony on, I can

15   put affidavit testimony on.

16              THE COURT:  This is an evidentiary

17   hearing.

18              MR. McENTIRE:  That's correct.

19              And that includes affidavits.  And

20   affidavits are routinely accepted in these types of

21   proceedings and I have the case law I can cite to the

22   court.

23              MR. SCHULTE:  Your Honor, in contrast,

24   I think if this were, for example, an injunction

25   hearing, I don't believe that an affidavit would be

 1   the substitute in an injunction hearing for live

 2   testimony.

 3            And so if this is an evidentiary standard,

 4   I don't think that these affidavits should come in for

 5   the truth of the matter asserted.  The witnesses should

 6   testify to the facts that they want to prove up.

 7            MR. McENTIRE:  I could give the court a

 8   cite.

 9            THE COURT:  Okay.

10            MR. McENTIRE:  It's Glassdoor, Inc. versus

11   Andra Group.

12            THE COURT:  What was the name of it?

13            MR. McENTIRE:  Glassdoor, Inc. versus

14   Andra Group.  It is 560 S.W.3d 281.  It specifically

15   addresses the use and relies upon affidavits in the

16   record for purposes of a Rule 202.

17            So, with that said, I will address it in

18   more detail in a moment.  The evidentiary rule, to be

19   clear, is it has to be supported by evidence.  Seven

20   days was the date that I picked because it was well

21   in advance.  It's the standard rule that's used for

22   discovery issues.  It's seven days before a hearing.

23            So I picked it.  He's had it for seven

24   days.  He's never filed any written objections to my

25   evidence.  None.

1            And under the Local Rules I would think

2    he would have objected within three business days.

3    He did not do that, and so I'm a little surprised

4    by the objection.

5            THE COURT:  Okay.

6            MR. McENTIRE:  All right.  We do have

7    copies of all the certified records, but I gave you

8    the agenda on that.  And we talked about the two

9    declarations.

10           So the limited judicial inquiry is the

11   only issue before the district court.  It's whether

12   or not to allow the discovery, not the merits of any

13   claim yea or nay.

14           THE COURT:  Right.

15           MR. McENTIRE:  There's no need for us to

16   even plead a cause of action, although we did.

17           Mr. Schulte goes to great length in

18   his response to take issue with our cause of action,

19   suggesting we had none.  We do.  But we're not even

20   under an obligation to plead it; nevertheless, we did.

21           This is actually a two-part test.  The

22   first part was allowing the petitioner -- in this case,

23   Hunter Mountain -- to take the requested deposition may

24   prevent a failure or delay of justice, or the likely

25   benefit outweighs the burden.  Both apply here.

 1              These trades took place in April of 2021,

 2   three of the four.  The fourth I think took place in the

 3   summer.

 4              And our goal is to obtain the discovery

 5   in a timely manner so we do not have any argument, valid

 6   or invalid, that there's a limitations issue.

 7              THE COURT:  Okay.

 8              MR. McENTIRE:  And so any further delay,

 9   such as transferring this to another court or back to

10   the bankruptcy court, which it does not have

11   jurisdiction, would cause tremendous delay.

12              THE COURT:  Okay.

13              MR. McENTIRE:  Hunter Mountain, a little

14   bit of background.  It is an investment trust.  When

15   it has money, it participates directly in funding the

16   Dallas Foundation --

17              THE COURT:  Okay.

18              MR. McENTIRE:  -- which is a very I think

19   well-respected and recognized charitable foundation.

20              Certain individuals and pastors from

21   various churches are actually here because Hunter

22   Mountain indirectly, but ultimately, provides a

23   significant source of funding for their outreach

24   programs and their charitable functions and programs.

25              THE COURT:  Okay.

008506

1            MR. McENTIRE:  The empirical evidence in

2    the documents that are before the court, regardless of

3    what's in the affidavits, just screams that there was

4    no due diligence here.

5            Now, we know in Mr. Dondero's affidavit

6    he had a conversation with representatives of Farallon,

7    which would be admissions against interest.  They're

8    admissions basically against interest that they

9    effectively did no due diligence.

10           Yet we believe, upon information and

11   belief, that they invested over $167 million.  There

12   are two sets of claims.  There's a Class 8 claim and

13   a Class 9 creditor claim.

14           THE COURT:  Right.

15           MR. McENTIRE:  Their expectations at the

16   time that they acquired these claims was that Class 9

17   would get zero recovery.

18           So who spends $167 million when their

19   expectation on return of investment is zero?  Who spends

20   $167 million even in Class 8 when the expected return is

21   just 71 percent and is actually declining?  And I think

22   it's actually admitted in the affidavit that Mr. Dondero

23   provided.

24           So without being hyperbolic or

25   exaggerating, the data that was available publicly

1    was extremely pessimistic and doubtful that there would

2    be any recovery.

3              We have direct information -- admissions,

4    frankly -- that Farallon had access to non-public

5    material, non-public information.  And that was

6    the fact that MGM Studios was up for sale.

7              Mr. Dondero was on the board of directors.

8              THE COURT:  Okay.

9              MR. McENTIRE:  He communicated, because

10   of his responsibilities, this information to Mr. Seery.

11             And Mr. Seery, apparently, would have been

12   restricted.  He couldn't use it or distribute it.

13             THE COURT:  Right.

14             And I don't know a lot about securities

15   law but, yeah, that would be insider information.

16   Right?

17             MR. McENTIRE:  Yes.

18             And it appears from the affidavit that

19   Mr. Dondero submitted that Farallon was aware of the

20   information before the sale closed, before they closed

21   their acquisitions.

22             And Mr. Dondero asked the question are

23   you willing to even sell your claims and they said no.

24   Or even 30 percent more and they said no.  We're told

25   that they're going to be very valuable.

1         Well, no one else had this information, so
2    we have a problem here that we have two outsiders who
3    are now insiders.  They've acquired potentially very
4    valuable claims with the sale of MGM.
5         They also acquired information concerning
6    the portfolios of these companies over which Highland
7    Capital managed and had ownership interests, so we're
8    talking about having access to information that any
9    other bidder or suitor would not have.
10        So this is how they were divided up.
11   $270 million in Class 8.  Each of the creditors
12   right here are the unsecured creditors who sold.
13   They were the sellers.
14             THE COURT:  Right.
15             MR. McENTIRE:  And these are the claims in
16   the Class 9.
17        So you have $95 million in Class 9 claims
18   that are being acquired when the expectation is that
19   there will be zero return on investment.  You have
20   $270 million where the expectation was extremely
21   low and pessimistic.
22             And here are the documents.  And
23   Mr. Schulte has not objected to these.  This particular
24   document is Exhibit 1-J to Mr. Patrick's affidavit.
25             THE COURT:  Okay.

 1                    MR. McENTIRE:  This came out of the plan.

 2   So when the bankruptcy plan was confirmed in February

 3   2021, Farallon, Stonehill, Muck and Jessup, the latter

 4   two weren't even in existence.

 5                    THE COURT:  Right.

 6                    MR. McENTIRE:  Farallon and Stonehill were

 7   complete strangers to the bankruptcy proceedings, yet

 8   they come in in the wake of this information and

 9   they invest tens if not hundreds of millions of

10   dollars with no apparent due diligence.

11                    The situation gets even worse.  And this

12   is Exhibit 1-I to Mr. Patrick's affidavit.  And as

13   I understand, Mr. Schulte does not object to these

14   documents.  It's declining.  And then, suddenly,

15   they're in the money.

16                    And at the end of the third quarter last

17   year, they're already making 255 million bucks.  And

18   that's a far cry from the original investment.  This

19   is for both Class 8 and Class 9.

20                    So Mr. Patrick states the purpose of

21   this is to seek cancellation.  Another word for it

22   in bankruptcy-ese would be disallowance.  But the

23   cancellation of these claims and disgorgement.

24                    If these are ill-gotten gains, regardless

25   of the rubric or the monicker that you place on it --

```
 1  breach of fiduciary duty as insiders, aiding and

 2  abetting or knowing participation in fiduciary duties,

 3  because a lot of people have fiduciary duties on this

 4  stuff.  No matter what you call it, disgorgement is a

 5  remedy.

 6              Wrongdoers should not be entitled to

 7  profit from their wrongdoing.

 8              Mr. Schulte makes a big point that we

 9  can't prove damages.  Well, first of all, I don't agree

10  with the conclusion.

11              THE COURT:  Right.

12              MR. McENTIRE:  But even if he was right,

13  disgorgement is a proxy for damages.  And we have an

14  entitlement and a right to explore how much they have

15  actually received, when did they receive it.

16              The weathervane is tilting in one

17  direction here, Judge.

18              Clearly, there is a creditor trust

19  agreement.  That's a very important document.  It spells

20  out rights and obligations.  It's part of the plan.

21              There's a waterfall.  And on page 27 of

22  the creditor trust agreement a waterfall is exactly

23  what it suggests.  You have one bucket gets full,

24  you go to the next bucket all the way down.

25              THE COURT:  Class 1 or tier 1.
```

1           I can't remember the category.  I don't

2    do bankruptcy.  But, yeah, those get paid, then the

3    next level, then the next level.

4           So by the time you get down to

5    level 10, which I think is what Hunter Mountain was,

6    theoretically, there wouldn't have been anything left.

7           MR. McENTIRE:  That's correct.

8           But here, if Class 8 and Class 9 -- and

9    I will say the big elephant in those two classes are

10   Farallon and Stonehill or their special purpose entity

11   bucket Jessup -- they have 95 percent of that category.

12          And suddenly they're not entitled to keep

13   what they've got, and suddenly there's a disallowance,

14   or suddenly a cancellation regardless of the theory

15   or the cause of action -- and we have several avenues

16   here -- a lot of money is going to flow into the

17   coffers of Hunter Mountain, and a lot of money will flow

18   into the Dallas Foundation, and a lot of money will flow

19   into the coffers of charities.

20          So there is standing here.  Standing

21   requires the existence of a duty.  We think we have

22   duties.

23          And a concrete injury.  And if these

24   claims were manipulated, we have a concrete injury

25   and our proxy is disgorgement.

1          We've been deprived of an opportunity to
2  share in category 10 or as we just described it in the
3  waterfall under the creditor trust agreement.
4          THE COURT:  Right.
5          MR. McENTIRE:  Their burden is to show
6  that this discovery has no benefit.  No.  That's my
7  burden to show benefit.  But their burden would be
8  to show that it's overly burdensome to them.
9          And I find that difficult to understand
10  since part of their response is devoted to the fact
11  that, hey, judge in Dallas County, you should turn
12  this over to Judge Jernigan in the bankruptcy court.
13          THE COURT:  Because it's bankruptcy,
14  you know.
15          MR. McENTIRE:  In bankruptcy, that's their
16  invitation.
17          THE COURT:  Right.
18          MR. McENTIRE:  Well, if they're inviting
19  us to go do the discovery in bankruptcy court, it
20  doesn't seem to be that burdensome because it's
21  going to be the same discovery.
22          And, by the way, Judge Jernigan actually
23  does not have jurisdiction over these proceedings.
24  The other earlier proceeding, as you know, they
25  attempted to remove it to her court and it was remanded.

1   Clearly, she does not have jurisdiction.

2              The problem with bankruptcy involved,

3   in addition, if I wanted to do Rule 2004 discovery like

4   they're suggesting, that's their invitation.  They would

5   like you to push us down the road.

6              Well, we can't afford to push it down the

7   road.  Because if they push it down the road, I've got

8   to go file a motion with Judge Jernigan, get leave to

9   issue subpoenas.

10             THE COURT:  Right.

11             MR. McENTIRE:  They have 14 days to file

12  a motion to quash, then I have to file another motion.

13  And it's 21 days before their response is even filed.

14  And there's another 14 or 15 days before the reply is

15  filed.  We're looking at 60, 70 days.  And that's one

16  of the reasons we selected this procedure.

17             And, by the way, you hear the phrase forum

18  shopping a lot.  Well, without engaging in the negative

19  inference that that term suggests, a plaintiff, a

20  petitioner, has the right to select its venue for a

21  variety of reasons.

22             Our venue is the state district courts

23  of Texas because it has an accelerated procedure.  And

24  that's why we're here.

25             THE COURT:  Right.

1              MR. McENTIRE:  I've identified the

2    potential causes of action.  Entities or people that

3    breach fiduciary duties and receive ill-gotten gains

4    a constructive trust may be imposed, disgorgement.

5    Then we do run into bankruptcy concepts.

6              But it's important to know that some of

7    these are not bankruptcy.  Some of these are common law.

8              I suggest to the court, I don't have to

9    go get Judge Jernigan's permission to sue Farallon or

10   Stonehill for breach of fiduciary duties.  I don't have

11   to get her permission to sue for knowing participation.

12             If I'm actually looking for equitable

13   disallowance, probably, maybe.  But I can do the

14   discovery here and then make that decision whether

15   I need to go back to bankruptcy court.

16             I'm not foolish.  I'm not going to run

17   afoul of Judge Jernigan's orders.  If I have to go back

18   to Judge Jernigan to get permission, I will do it.

19             THE COURT:  Right.  Because only an

20   idiot runs afoul of the bankruptcy court.

21             MR. McENTIRE:  Hopefully, I'm not that.

22             So I clearly understand what both my

23   ethical and lawyer obligations are.  And I'm not

24   going to run afoul of any court orders.

25             But some of these remedies don't require

 1   an overview by Judge Jernigan or the bankruptcy court.

 2                THE COURT:  Okay.

 3                MR. McENTIRE:  They have a duty not to

 4   commit fraud, whether it's commit fraud against us or

 5   commit fraud against the estate.

 6                They have a duty not to interfere with

 7   the expectancies that we have as a B/C beneficiary.

 8   That's a code name for a former Class 10 creditor.

 9                They have a duty not to trade on inside

10   information, and that's the Washington Mutual case.

11                And I've just already mentioned that

12   because they were outsiders, they're insiders now.

13                These are their arguments.  Our evidence

14   is timely.  It's not untimely.  It's not speculative.

15   It's not speculative because the events have already

16   taken place.  I'm not talking about something

17   hypothetical.

18                THE COURT:  Right.

19                MR. McENTIRE:  My remedy flows from that.

20                So we're not projecting that I might have

21   a claim later on.  I have a claim today.  If I have a

22   claim today, I have it today.  I have it and I want to

23   confirm it by this discovery.  Because their wrongdoing

24   has already taken place, it's not hypothetical, it's not

25   futuristic, it's already occurred.

 1                When they say they have no duty to us,

 2   they're just wrong.  They have duties not to breach

 3   fiduciary duties.  We have direct standing I believe to

 4   bring a claim in that regard.

 5                We have a right to bring direct standing

 6   under the Washington Mutual case, which I'll discuss.

 7                And we also have a right to bring a

 8   derivative action.

 9                THE COURT:  Right.

10                MR. McENTIRE:  And I notice that

11   they made a comment about that in their response.

12   But I can sue individually.

13                And I can also bring an action in the

14   alternative as a derivative action for the estate.

15   And these are all valid claims for the estate.

16                THE COURT:  Okay.

17                MR. McENTIRE:  Transfer.  This is not a

18   related case because it's not the litigation.

19                So if you just go to the very first

20   instance and you look at the Local Rule, it talks

21   about litigation and causes of action.

22                THE COURT:  Right.

23                MR. McENTIRE:  We don't have a cause

24   of action.  We're not asserting one in this petition.

25   So this is not a related case that falls within the

1    four corners of the Local Rule.

2                    THE COURT:  Well, I guess the thing

3    is it's still a related case.  Like if you file a 202

4    and then you file a lawsuit, that would be considered

5    related.

6                    I looked at it and you're right.

7    Technically, it's different parties.  I'll just say it's

8    a grey zone at best.

9                    MR. McENTIRE:  That's correct.

10                   This is not a lawsuit in terms of causes

11   of action.  It might be a related case if Mr. Dondero

12   had come in and filed a lawsuit.  That would be a

13   related case.  Mr. Dondero is not involved in this

14   process, other than as a fact witness.

15                   These are all the evidentiary issues

16   that perhaps he's raised.  Live testimony, affidavit

17   testimony is admissible.

18                   The court considered numerous affidavits

19   filed with the court.  And that's as recently as 2017.

20   These are all good cases, good law.

21                   Equitable disallowance.  It's kind of a

22   fuzzy image.  This is a bankruptcy court case, but this

23   is simply to underscore the fact that in addition to

24   my common law remedies there is a very substantial

25   remedy in bankruptcy court.

 1                    It's not one I necessarily have to pursue,

 2      but if I wanted to I could.  But what it does do is it

 3      helps to find some duties.

 4                    And here, the court has the right

 5      to disallow a claim on equitable grounds in extreme

 6      instances, perhaps very rare, where it is necessary

 7      as a remedy.  And they did it in this case.

 8                    THE COURT:  Okay.

 9                    MR. McENTIRE:  This is simply an analogy

10      to securities fraud and the 10b-5 statute.

11                    Insiders of a corporation are not limited

12      to officers and directors, but may include temporary

13      insiders who have entered into a special confidential

14      relationship in the conduct of the business of the

15      enterprise and are given access to information solely

16      for corporate purposes.

17                    Well, what about the MGM stock?  The court

18      finds that the Equity Committee -- so here's the

19      equity -- has stated a colorable claim.  We were

20      99.5 percent equity.

21                    The Equity Committee has stated a

22      colorable claim that the settlement noteholders became

23      temporary insiders because they acquired information

24      that was not of public knowledge in connection with

25      their acquisition.

 1              And allowed them to participate in

 2   negotiations with JPMC -- JPMorgan Chase -- for the

 3   shared goal of reaching a settlement.

 4              So these were outsiders that suddenly

 5   became temporary insiders because of access to inside

 6   information.

 7              This is not a new concept.  It comes

 8   from the United States Supreme Court.  Fiduciaries

 9   cannot utilize inside information.

10              THE COURT:  Right.

11              MR. McENTIRE:  And we believe we

12   have enough before the court to support and justify

13   a further investigation that this may have occurred.

14              THE COURT:  Okay.

15              MR. McENTIRE:  Now, not a related case.

16   The Jim Dondero case is actually closed.

17              THE COURT:  Right.

18              MR. McENTIRE:  And I'll be frank with you.

19   In all candor, I never thought this was a possible

20   related case.

21              THE COURT:  I mean, we're talking about

22   the same events, but there are differences, I agree.

23              MR. McENTIRE:  We're talking about one

24   similar event dealing with Farallon.  Other events

25   are different.

1              THE COURT:  Okay.

2              MR. McENTIRE:  So we have different dates.

3              THE COURT:  Right.

4              MR. McENTIRE:  Different parties on the

5    petitioner's side, different law firms.

6              The only common party is Farallon.

7    Alvarez & Marsal are not parties to this but Stonehill

8    is.  Stonehill was not a party to the prior proceedings.

9              And the standing is manifest.  With no

10   criticism of Mr. Dondero's lawyer, I searched in his

11   argument where he was articulating standing.

12             And without going further, I will tell

13   you I think our standing is clear.  We're in the money.

14             THE COURT:  Okay.

15             MR. McENTIRE:  We are in the money if

16   there's a disgorgement or a disallowance.

17             THE COURT:  Okay.

18             MR. McENTIRE:  We have all types of

19   claims, including insider trading and a creation of

20   fiduciary duties.

21             Our remedies, as far as I can tell, he

22   didn't identify any.  We have several.  Disgorgement,

23   disallowance, subordination, a variety.  And damages.

24             So we suggest strongly that it is not a

25   related case.

 1                    And I must tell you, the reference

 2    to say send this to bankruptcy court or defer to the

 3    bankruptcy court or send us over to Judge Purdy, with

 4    all due respect to opposing counsel, it's really just

 5    a delay mechanism.

 6                    And what they're seeking to do through

 7    their invective, their criticisms, the references to

 8    these other courts, is seeking an opportunity to push us

 9    down the road and put us in a bad position potentially

10    and a not enviable position in connection with statute

11    of limitations.

12                    Your Honor, we would offer the binder

13    of exhibits that we submitted on February 15, 2022,

14    including the affidavits and all the attached exhibits.

15                    I would ask the court to take judicial

16    notice of all the exhibits that we referred to in our

17    petition, which I think is appropriate since we were

18    specifying with particularity what we were requesting

19    the court to take judicial notice of.  And that's the

20    large index, that's the list.

21                    THE COURT:  Obviously, I can take

22    judicial notice of any kind of court pleadings,

23    whether they're state or federal.

24                    MR. McENTIRE:  That's correct.

25                    THE COURT:  That's clear.

```
 1                    MR. McENTIRE:  We would offer both

 2   affidavits and all the attachments into evidence

 3   at this time.

 4                    THE COURT:  Okay.  Do you have exhibit

 5   numbers for them?

 6                    MR. McENTIRE:  Yes.  It's Exhibit 1 with

 7   attachments.  1-A, 1-B, 1-C, 1-D, 1-E, 1-F and then

 8   Exhibit 1-G, Exhibit 1-H, Exhibit 1-J, Exhibit 1-K.

 9                    Everything in the binder, Your Honor.

10   It's Exhibit 1 and Exhibit 2 with the attachments.

11                    THE COURT:  Okay.

12                    MR. McENTIRE:  I believe they're all

13   identified.  I can put a sticker on them, if you'd like.

14                    THE COURT:  Yeah.  To admit them, it will

15   need a sticker.

16                    So I'm going to hold off on admitting

17   them for just a minute because I do want to hear his

18   objections and then we can go back to it.  So just make

19   sure we do that.

20                    I'm not trying to not admit them, but I do

21   want to let him have his objections.

22                    Okay.  Anything else, Counsel?

23                    MR. McENTIRE:  That's all I have right

24   now, Judge.

25                    THE COURT:  Okay.  Counsel?
```

 1                    MR. SCHULTE:  Should I start with those

 2    exhibits, Your Honor?

 3                    THE COURT:  Why don't you do that.  That's

 4    probably the easiest way.

 5                    MR. SCHULTE:  In light of the authorities

 6    that Mr. McEntire shared about the affidavits, I'll

 7    withdraw the objections to the affidavits or the

 8    declarations.

 9                    THE COURT:  Okay.

10                    MR. SCHULTE:  I'm taking Mr. McEntire's

11    word that those cases say what he says they say.

12                    THE COURT:  I'll tell you because 202

13    is not a lawsuit, you don't necessarily have a right

14    to cross-examine, et cetera.  So, yeah, affidavits are

15    frequently used on 202s.

16                    MR. SCHULTE:  And that's fine, Your Honor.

17    I'll take Mr. McEntire's word what those cases say.

18                    But I will maintain the objection to

19    Exhibit H -- it's the declaration of Mr. Patrick --

20    on the grounds of hearsay.  That is not a court record

21    or a file-stamped pleading from federal or state court.

22    It's just a letter.  So that's hearsay.  And it hasn't

23    been properly authenticated.

24                    The other issue is the exhibit to

25    Mr. Dondero's declaration.  That's just an email

1    from Mr. Dondero, so I object on the grounds of hearsay.

2                    THE COURT:  Mr. McEntire, what's your

3    response specifically to Exhibit H as attached to

4    the Patrick declaration and then the attachment

5    to the Dondero declaration?

6                    MR. McENTIRE:  Exhibit H to Mr. Patrick's

7    affidavit would be hearsay, but there's an exception

8    that it's not controversial.

9                    THE COURT:  Okay.

10                   MR. McENTIRE:  And there's no indication

11   that there's any challenge of the reliability of the

12   document.

13                   THE COURT:  What is the exhibit?

14   I'm trying to pull it up.  Sorry.

15                   MR. McENTIRE:  It's Exhibit 1-H.  It is

16   a letter from Alvarez & Marsal simply indicating what

17   they paid for the claim.

18                   THE COURT:  Is it the July 6th, 2021,

19   letter?

20                   MR. McENTIRE:  Yes, Your Honor.

21                   THE COURT:  I've got it.

22                   MR. McENTIRE:  And the exhibit to

23   Mr. Dondero's is not being offered for the truth of

24   the matter asserted, just the state of mind of Farallon.

25                   THE COURT:  Okay.

```
 1                    MR. McENTIRE:  He has proved it up
 2   that it's authentic.  It's a true and accurate copy.
 3                    And it goes to the state of mind of
 4   Farallon and it goes to the state of mind of Mr. Seery
 5   as well who are basically individuals who are trading on
 6   inside information.
 7                    And Mr. Seery would not have known about
 8   the MGM sale but for that email.  And Farallon and
 9   Stonehill would not know about MGM but for Mr. Seery.
10                    THE COURT:  Okay.  So the response to
11   hearsay is that it goes to state of mind.
12                    MR. McENTIRE:  It goes to state of mind.
13                    THE COURT:  Okay, Counsel.  How do you
14   respond to that?
15                    MR. SCHULTE:  I'll start with the last
16   one, Your Honor.  I think that's the definition of
17   hearsay, is that you're purporting to establish the
18   state of mind of the parties who are not before the
19   court.
20                    It's been emphasized that Mr. Dondero has
21   no relation to HMIT.  And none of the recipients of the
22   email are parties to this proceeding.
23                    This purports to establish the state of
24   mind of Mr. Seery, who is not before the court, and the
25   state of mind of Farallon, just based on the say so of
```

 1  Mr. Dondero in this email.  That's hearsay.

 2              And as for the first letter, this is a

 3  letter on the letterhead of A&M which, by the way, is

 4  one of the parties in the Dondero Rule 202 petition.

 5              And it's not on the letterhead of any of

 6  the parties to this case so the letter isn't properly

 7  authenticated.

 8              And I'm not aware of the not controversial

 9  exception to hearsay.

10              THE COURT:  Well, there is a thing that

11  talks about if you're admitting something that's just

12  not controverted.  Right?  It's everybody agrees "X"

13  happened.  We're just admitting evidence to have that.

14  So what this basically is is just showing the claim of

15  the funds.

16              And I guess my question is what's the

17  objection.  Is there an objection to the substance of

18  it?

19              MR. SCHULTE:  I don't think there's any

20  dispute that Farallon and Stonehill, through their

21  respective special purpose entities, purchased the

22  claims that are at issue here.

23              And if that's the sole purpose

24  of admitting this letter into evidence, I don't

25  think that's a matter that's genuinely in dispute.

```
 1                    THE COURT:  Okay.

 2                    MR. SCHULTE:  So if that's the only issue

 3    as raised by this letter, I don't know that there's a

 4    dispute there.

 5                    THE COURT:  Right.  Well, that's the whole

 6    thing.

 7                    MR. McENTIRE:  I think we're almost

 8    solving the issue on the fact of how much they paid,

 9    $75 million.

10                    THE COURT:  Okay.  So I will sustain the

11    objection to the email to Mr. Dondero's declaration,

12    Exhibit P 2-1.

13                    I am going to overrule the objection

14    to -- I don't know what the letter is of the attachment.

15                    MR. McENTIRE:  It's Exhibit P 1-H to

16    Mr. Patrick's affidavit.

17                    THE COURT:  Correct.  Sorry.

18                    Okay, Counsel.  If you'll proceed.

19                    MR. SCHULTE:  May I approach the bench,

20    Your Honor?  I have a binder of exhibits also.

21                    THE COURT:  Yes, you may.

22                    MR. SCHULTE:  These have all been

23    marked with exhibit stickers already.  There are tabs

24    for each of the exhibits.  They're marked R1 through 17,

25    I believe.  And "R," of course, stands for Respondents.
```

 1                    THE COURT:  I take the shortcut of calling

 2     everybody "Plaintiff" and "Defendant" just because

 3     I'm so used to using that language in court.

 4                    But I do agree.  It's Petitioner

 5     and Respondent.  You're not technically a defendant.

 6                    Okay.  So, first of all, I'm going to

 7     admit Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2,

 8     with the sole exception of the email to Mr. Dondero's

 9     declaration that I sustained.

10                    And then are there objections to the

11     respondent's exhibits?

12                    MR. McENTIRE:  Very few.

13                    I object to Exhibit No. 1 and

14     Exhibit No. 2 as irrelevant.

15                    THE COURT:  What's the objection to 1?

16                    MR. McENTIRE:  They're offering the order

17     from Judge Purdy.

18                    THE COURT:  Okay.  I can take judicial

19     notice of that.  I mean, it's a court record from

20     Dallas County.  So I don't think that that's

21     particularly relevant.

22                    To be bluntly honest, I looked at it last

23     night.  Right?  Because of the issue that there's

24     a related case, I pulled that file too and looked

25     at everything.

 1                    So I can take judicial notice of that.

 2       Whether it's relevant or not, I can look at it.  And,

 3       obviously, if it's not relevant, I'll disregard it.

 4                    MR. McENTIRE:  Fair enough.

 5                    THE COURT:  I'll overrule that objection.

 6                    What's next?

 7                    MR. McENTIRE:  The only other objections

 8       are Exhibit 12 and 13.  I just don't know what they

 9       are or for what purpose they would be offered.

10                    THE COURT:  Okay.  So 12 is a notice of

11       appearance and request for service in the bankruptcy

12       court on behalf of Hunter Mountain Trust.

13                    So what's the issue, Counsel?

14                    MR. SCHULTE:  Your Honor, these are

15       notices of appearance filed by Hunter Mountain in the

16       bankruptcy court.

17                    And the purpose of these notices is simply

18       to show -- and maybe this is not genuinely in dispute --

19       that Hunter Mountain, through its counsel, would have

20       received notice of all the activity that was going on

21       in the bankruptcy court.

22                    THE COURT:  It's the same issue I've

23       got with everything that Plaintiff submitted.  It's a

24       bankruptcy pleading.  I can take notice of it.  If it's

25       irrelevant, I'll disregard it.

 1                    So I'll overrule that objection.

 2                    And then what's 13?

 3                    MR. McENTIRE:  The same objection.

 4                    THE COURT:  I'll overrule it because

 5    again, I can take judicial notice of those.

 6                    MR. McENTIRE:  No other objections,

 7    Your Honor.

 8                    THE COURT:  So Respondent's Exhibits

 9    1 through 17 are so admitted.

10                    MR. SCHULTE:  May I proceed, Your Honor?

11                    THE COURT:  Yes, you may.

12                    MR. SCHULTE:  HMIT -- Hunter Mountain --

13    races into this court seeking extensive and burdensome

14    presuit discovery about claims trading that took place

15    in the Highland bankruptcy two years ago.

16                    Mr. McEntire has talked about the harm

17    that would result from delay if a different court were

18    to consider this request for presuit discovery.  That is

19    a function of waiting two years after the subject claims

20    transfers to seek relief in this court.

21                    The exact same allegations of claims

22    trading and misconduct by Jim Seery -- those allegations

23    are not on the slides that you looked at.  But those

24    allegations are common in Mr. Dondero's Rule 202

25    petition and this petition.

```
1              THE COURT:  Right.  They're common.
2              I know you make the allegation that
3   Dondero is related to Hunter Mountain, but I guess
4   I don't have any evidence of that.
5              Or do you have evidence of that?  Because
6   otherwise, while it involves some of the same issues in
7   the sense of the underlying facts, technically Farallon
8   is the common respondent.
9              But there's a different respondent and
10  there's a different petitioner in that case.
11             MR. SCHULTE:  Yes.  That's true,
12  Your Honor.  And we've said that on information and
13  belief.
14             THE COURT:  Okay.
15             MR. SCHULTE:  That's our suspicion.
16             We believe that to be the case, but
17  I don't have evidence of it.  I didn't hear a denial
18  of it, but, nevertheless, that is where things stand.
19             But what's important about the case is
20  even if this court and Judge Purdy determined that the
21  cases are not related, what is important is that the
22  same allegations related to this claims trading and the
23  same allegations of inside information being shared by
24  Mr. Seery, those were front and center in the July 2021
25  petition filed by Mr. Dondero.
```

 1              Even if there are other dissimilarities

 2   between the cases, those are issues that are common.

 3              THE COURT:  Okay.

 4              MR. SCHULTE:  And it's important to note

 5   that as HMIT has filed this petition, it has glossed

 6   over issues of its own standing and the assertion of

 7   viable claims that will justify this discovery.

 8              Now, I know that HMIT has cited these

 9   cases that say, Your Honor, I don't have to state a

10   really specific claim right now.

11              But you do have to articulate some ground

12   for relief, some theory, that would justify the expense

13   and the burden that you're trying to put the respondents

14   to in responding to all this discovery.

15              And this isn't simple discovery.

16   We're talking about deposition topics with I believe

17   29 topics each and 13 sets of really broad discovery

18   requests with a bunch of subcategories.

19              THE COURT:  Right.

20              MR. SCHULTE:  We're not talking about some

21   minimal burden here.  This is an intrusion into entities

22   that are not parties to a lawsuit, but rather this

23   investigation.

24              And HMIT has ignored that there is

25   a specific mechanism in the bankruptcy court that's

 1    available to it under federal bankruptcy Rule 2004 and

 2    that the substance of HMIT's petition, which is claims

 3    trading and bankruptcy, falls squarely within the

 4    expertise of Judge Jernigan, the presiding bankruptcy

 5    judge.

 6                    THE COURT:  And I agree.  You could do

 7    this in federal court.  But there's a lot of things

 8    that can be done in state court or done in federal

 9    court.

10                    They get to choose the method of getting

11    the information, so why should I say, theoretically,

12    yes, this is a good thing, I should do it, but, hey,

13    send it to bankruptcy.  Why?

14                    MR. SCHULTE:  The bankruptcy judge has

15    actually answered that question directly.

16                    THE COURT:  Okay.

17                    MR. SCHULTE:  It is true, as HMIT

18    has said, the federal bankruptcy court doesn't have

19    jurisdiction over a Rule 202 proceeding.  That's not in

20    dispute.

21                    THE COURT:  Right.

22                    MR. SCHULTE:  We tried to remove the

23    last case to federal bankruptcy court and it was a state

24    claim.

25                    But what the bankruptcy judge pointed out

 1  when she remanded the case back to Judge Purdy, who

 2  ended up dismissing Dondero's petition, is it pointed

 3  out, one, there's this mechanism in bankruptcy where

 4  they can do the exact same thing, Rule 2004.

 5          And the bankruptcy judge pointed out that

 6  it is in the best position to consider Hunter Mountain's

 7  request.

 8          It pointed out when it remanded the

 9  case that it had grave misgivings about doing so.

10  It confirmed that it is in the best position to

11  consider this presuit discovery.

12          THE COURT:  Okay.  This is part of one of

13  the exhibits?

14          MR. SCHULTE:  Yes, Your Honor.  This is

15  in one of the opinions that I included in the binder,

16  a courtesy copy of one of those opinions.

17          THE COURT:  Oh, at the back?

18          MR. SCHULTE:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. SCHULTE:  It's 2022 Bankruptcy

21  Lexis 5.

22          THE COURT:  Okay.  I got it.

23          And real quick, for the record,

24  it's <u>Dondero versus Alvarez & Marsal</u>.  It's

25  2022 Bankruptcy Lexis 5.

```
 1                    MR. SCHULTE:  Right.

 2                    And in particular, Your Honor, I'm looking

 3    at pages 31 to 32 of that order.

 4                    THE COURT:  Okay.

 5                    MR. SCHULTE:  What the judge is pointing

 6    out here is it has grave misgivings about remanding the

 7    case because it knows a thing or two about the Highland

 8    bankruptcy, having presided over the case and all the

 9    related litigation for over what's now three years.

10                    And it's familiar with the legal

11    and factual issues.  It's familiar with the parties.

12    It's familiar with claims trading in a bankruptcy case,

13    which was the very crux of the Dondero petition.  It's

14    also the crux of this petition by Hunter Mountain.

15                    And it observed, the bankruptcy court

16    did, that any case that could be fashioned from the

17    investigation would end up in bankruptcy court anyway

18    because it would be related to the Highland bankruptcy.

19                    So you ask a really good question,

20    Your Honor.  Why should I ship it off to the bankruptcy

21    court.  The answer is Judge Jernigan is in a position

22    to efficiently and practically deal with this request

23    because she deals with it all the time and she is

24    intimately familiar with the legal and factual

25    issues and with claims trading.
```

Case 19-34054-sgj11   Doc 3898-7   Filed 08/08/23   Entered 08/08/23 20:00:23   Desc
Case 3:23-cv-02071-E   Document 30-6   Filed 08/26/24   Page 144 of 214   PageID 8170
Exhibit Exhibit 6 to 7 Page 3050856   Page 2144 of 214
Response by Mr. Schulte                    50

1              It's not like Hunter Mountain gets poured

2    out if it goes to bankruptcy court.  It has a mechanism

3    to seek the exact same discovery from Judge Jernigan who

4    is very familiar with these very particular issues.

5              Now, Hunter Mountain says, well,

6    bankruptcy court is too time-consuming and cumbersome.

7    It's going to take 60 days to even get this before the

8    bankruptcy court.

9              Well, we're talking about the fact that

10   they've waited two years to file this proceeding related

11   to these claims transfers that took place in 2021.

12             So, again, what HMIT is asking this court

13   to do is inefficient and is impractical.  This court

14   would need to devote a lot of resources to understand

15   what the proper scope of any discovery should be,

16   whether the claims are cognizable.

17             And that's just a tall order, Your Honor.

18   The request is more appropriately dealt with by the

19   bankruptcy judge, according to a proper bankruptcy

20   filing.

21             It's undisputed that while the bankruptcy

22   court doesn't have jurisdiction over a 202 petition,

23   there's no question that it has jurisdiction over a Rule

24   2004 request for discovery, which is the counterpart

25   for this type of discovery in bankruptcy court.

```
 1                    THE COURT:  Right.

 2                    MR. SCHULTE:  The real issue, Your Honor,

 3   and this is the part that Hunter Mountain is dancing

 4   around, is that Hunter Mountain doesn't want to be

 5   in front of Judge Jernigan.

 6                    Judge Jernigan held Mark Patrick --

 7   that is HMIT's principal who verified this petition.

 8   She held him along with Dondero and Dondero's counsel

 9   and others in civil contempt and sanctioned them nearly

10   $240,000 for trying to join Seery to a lawsuit in

11   violation of Judge Jernigan's gatekeeping orders.

12                    HMIT is trying to dodge the bankruptcy

13   court and its scrutiny of what HMIT is doing as this

14   petition also targets Seery and the inside information

15   that he purportedly gave to Farallon and Stonehill.

16                    This is forum shopping, plain and simple.

17   And the court should dismiss the petition so that HMIT

18   can seek this discovery in bankruptcy court.

19                    Now, I don't want to spend a lot of time

20   on the related case, but I will emphasize just what I've

21   mentioned, which is while some of the parties may be

22   different, we're still talking about the same claims

23   trading activity that took place in 2021 and the same

24   allegations of insider dealing by Seery.

25                    And Judge Purdy, on remand, dismissed
```

```
 1   that petition where some of the same arguments were made

 2   about judicial efficiency and that the case should be

 3   filed in bankruptcy court.

 4              And it bears noting, by the way, that

 5   after Judge Purdy dismissed Dondero's Rule 202 petition,

 6   where we had argued that this ought to be in the

 7   bankruptcy court, Dondero didn't file in the bankruptcy

 8   court, which sort of makes the point that they didn't

 9   want to be in front of Judge Jernigan on this either.

10              Okay.  Now let's turn to the merits,

11   Your Honor.  While Mr. McEntire has gone to great

12   lengths to say we don't have to state claims, he stated

13   five or six on that PowerPoint presentation of claims

14   that he envisions.

15              But what made it all really crystal clear

16   is in that notice of supplemental evidence, and that

17   includes the declaration of Mr. Patrick, there in

18   paragraphs 15 and 16 it's made clear what Hunter

19   Mountain really wants.

20              THE COURT:  Okay.

21              MR. SCHULTE:  What the goal of this

22   discovery is is to invalidate the claims that Farallon

23   and Stonehill's entities purchased.

24              So let's unpack what it is they purchased.

25              THE COURT:  Okay.
```

1          MR. SCHULTE:  These are claims that were

2  not ever held by Hunter Mountain.  These are claims

3  that were held by Redeemer, Acis, UBS, and HarbourVest.

4          THE COURT:  Right.  They were the Class 8

5  and 9.  Right?

6          MR. SCHULTE:  I believe that's correct.

7          THE COURT:  Okay.

8          MR. SCHULTE:  Those claims were always

9  superior to whatever it was that Hunter Mountain held.

10         So Redeemer, Acis, UBS, and HarbourVest

11 held those claims.  The parties in the bankruptcy had

12 the opportunity to file objections to those claims.

13 And they did.

14         And Seery, on behalf of the debtor,

15 negotiated with Redeemer, Acis, UBS, and HarbourVest

16 and reached settlements that resolved the priority and

17 amounts of those claims.

18         THE COURT:  Right.

19         MR. SCHULTE:  And then filed what's

20 referred to -- and I'm sure Your Honor knows this --

21 as a Rule 9019 motion to approve those settlements in

22 the bankruptcy court.

23         THE COURT:  Actually, I don't.  I've never

24 done bankruptcy but I read it.  I know the general

25 process and I did read it.

008540

 1                      MR. SCHULTE:  All right.

 2                      THE COURT:  Just FYI, I've never done

 3    bankruptcy law.  They've got their own rules.

 4                      MR. SCHULTE:  Well, the parties in

 5    the bankruptcy had the opportunity to object to those

 6    settlements and some did so.

 7                      And after evidentiary hearings, the

 8    bankruptcy court granted those motions and allowed

 9    and approved those claims.

10                      That is really important, Your Honor.

11                      THE COURT:  Okay.

12                      MR. SCHULTE:  That's Exhibits 14 through

13    17 in the binder that I handed you.

14                      And these are the same exhibits that are

15    referenced in Hunter Mountain's petition.  And it bears

16    noting that the U.S. District Court affirmed those

17    orders after appeals were taken.

18                      But the bankruptcy court's approval of

19    the very same claims that Hunter Mountain now seeks to

20    investigate and invalidate is entitled to res judicata.

21                      HMIT can't now second-guess the bankruptcy

22    court's orders approving those very same claims.  That's

23    the effect of the investigation that Hunter Mountain

24    seeks, the invalidation of claims that are already

25    bankruptcy court approved.

 1                And it bears noting that each of those

 2    four orders, Exhibits 14 through 17, provides the

 3    following:  quote, "The court" -- the bankruptcy

 4    court -- "shall retain exclusive jurisdiction to

 5    hear and determine all matters arising from the

 6    implementation of this order."

 7                This would include HMIT's stated goal

 8    of conducting discovery to try to invalidate these

 9    very claims.

10                This is yet another reason, Your Honor, to

11    answer your question earlier of why this request for

12    discovery should be posed to the bankruptcy court.

13                Judge Jernigan, I suspect, would have

14    views on whether her own orders authorizing these claims

15    should be overturned.

16                Okay.  So HMIT -- Hunter Mountain --

17    alleges that after the bankruptcy court approved these

18    claims, Seery disclosed inside information to Farallon

19    and to Stonehill to encourage them to buy these claims

20    from the original claimants.  Again, UBS, Redeemer,

21    Acis, and HarbourVest.

22                Farallon, through Muck, which is its

23    special purpose entity, and Stonehill through Jessup,

24    which is Stonehill's special purpose entity, acquired

25    those transferred claims in 2021.

 1            And there's no magic in bankruptcy court

 2   to claims transfers.  It's a contractual matter between

 3   the transferors and the transferees.  It's strictly

 4   between them.

 5            THE COURT:  Okay.

 6            MR. SCHULTE:  And there's no bankruptcy

 7   court approval that's even required.

 8            The transferee, so in this case Muck and

 9   Jessup, had simply to file under federal bankruptcy

10   Rule 3001(e) a notice saying these claims were

11   transferred to us.  And they did so.

12            Your Honor, that's Exhibit 6 through 11 in

13   the binder that I handed to you.

14            THE COURT:  Okay.

15            MR. SCHULTE:  The filings evidencing those

16   claims transfers were public.  And Hunter Mountain

17   received the claims transfer notices.

18            And that's the exhibits that we were

19   talking about, Exhibits 12 through 13, where Hunter

20   Mountain's lawyers had appeared in the case before those

21   claims transfer notices were filed.

22            So not surprisingly, Hunter Mountain did

23   not file any objections to those claims transfers.  And

24   that's not surprising because under Rule 3001, the only

25   party that could object to the claims transfers were

1    the transferors themselves.

2                    THE COURT:  Right.

3                    MR. SCHULTE:  Essentially saying, hold on.

4    We didn't transfer these claims.  But of course there's

5    no dispute that the transfers were made.

6                    Here, HMIT was neither the transferor nor

7    the transferee of the claims.  It had no interest in

8    these claims.  It never did.  It didn't before the

9    claims transfers and it didn't after the claims

10   transfers.

11                   The claims originally belonged to

12   Redeemer, Acis, UBS, and HarbourVest, and they were then

13   transferred to Muck and Jessup, which are Farallon's and

14   Stonehill's entities.

15                   THE COURT:  Right.

16                   MR. SCHULTE:  So why does that matter?

17   That matters because these claims were approved by the

18   bankruptcy court.  The claims didn't change or become

19   more valuable after they were transferred.  The only

20   difference is who is holding the claims.

21                   So Hunter Mountain says, hold on.  What

22   we're alleging here is that the claims that Farallon and

23   Stonehill purchased with the benefit of this purported

24   inside information from Mr. Seery, they're secretly

25   worth more than expected.

 1            Those allegations, they're disputed, to be

 2   sure.  But let's assume they're true.  That situation

 3   has zero impact on Hunter Mountain.

 4            THE COURT:  Okay.

 5            MR. SCHULTE:  And that's because this is a

 6   matter that's strictly between the parties to the claims

 7   transfers.  Again, Redeemer, Acis, UBS, and HarbourVest

 8   on the one hand and Farallon and Stonehill on the other.

 9            And the way we know this is let's

10   pretend that Muck and Jessup didn't buy these claims,

11   Your Honor, and that the claims instead have remained

12   with UBS, HarbourVest, Acis, and whatever the other

13   one I'm forgetting.  The claims wouldn't have been

14   transferred, and they would have remained with those

15   entities.

16            In that case, the original claimants would

17   have held those claims for longer than they wanted.  And

18   if HMIT is right, then the claims would have ended up

19   being worth more than even they expected.

20            So why does that matter?  Well, that

21   matters because if that is all true, Hunter Mountain

22   would be in the exact same place today.  Neither better

23   nor worse off, it would be in the exact same place.

24            Either Farallon and Stonehill's entities

25   are gaining more on these claims than they expected

```
 1   or UBS, HarbourVest, Acis, and Redeemer, they are

 2   realizing more on these claims than they expected.

 3            But Hunter Mountain never stood to be paid

 4   on these claims to which it was a stranger.  These are

 5   claims in which Hunter Mountain never had any interest.

 6            THE COURT:  So presuming that Hunter

 7   Mountain had expressed interest in buying these claims

 8   and there was insider trading, you don't think that

 9   would be a tortious interference in a potential

10   contract?

11            MR. SCHULTE:  If there was insider trading

12   of the type that Hunter Mountain alleges in this case,

13   it would have no impact on the rights of Hunter

14   Mountain.

15            If that's true, maybe there was a fraud on

16   the bankruptcy court.  The bankruptcy court would surely

17   be interested in that.  Maybe there was a fraud on the

18   transferors.  I mean, maybe UBS, Redeemer, Acis -- why

19   do I always forget the third one? -- and HarbourVest.

20            THE COURT:  Like I said, I had a chart

21   last night of all the names.  Obviously, I haven't been

22   involved in this case up until now, and there's a lot of

23   names.

24            MR. SCHULTE:  Yes.

25            The transferors of the claims might say,
```

1   well, wait a minute.  I wish I would have known this

2   inside information.  I'm the one that was really injured

3   here.

4              Because if there was really meat on this

5   bone, Your Honor, then the injured parties would be

6   the transferors of the claims:  Redeemer, Acis, UBS,

7   and HarbourVest.

8              Because the crux of HMIT's petition is

9   that those entities, the transferors, were duped into

10  selling their claims for too little when the claims were

11  secretly worth more.

12             Well, if that's true, you would expect

13  that the transferors would be screaming up and down

14  the hallway, saying we didn't get paid enough.

15             THE COURT:  Right.

16             MR. SCHULTE:  We are the injured parties

17  here, we are the ones with damages, we want to unwind

18  these claims transfers, or we want to be paid more on

19  these claims transfers.

20             But the rights of those entities,

21  the transferors, to complain about these allegations

22  doesn't mean that Hunter Mountain can also stand up and

23  say, well, I want to complain too.  Because Hunter

24  Mountain never stood to be paid on these claims.

25             The question is if somebody was duped,

 1   if somebody was injured, if anybody it was the

 2   transferors, not Hunter Mountain.  The transferors would

 3   be the only real parties in interest that would have

 4   been injured by what Hunter Mountain alleges.

 5              But it's notable that none of those

 6   transferors has filed an objection to these transfers.

 7              THE COURT:  Right.

 8              MR. SCHULTE:  None of them has filed a

 9   Rule 202 proceeding.  None of them has filed a Rule 2004

10   proceeding seeking discovery about inside information

11   that Farallon and Stonehill allegedly had.  It is

12   Hunter Mountain who is an absolute stranger to

13   these claims trading transactions.

14              And so HMIT is trying to inject itself

15   into a transaction to which it was never a party and

16   which it never had any interest.

17              The sellers were entitled to sell those

18   claims to any buyer they wanted to on whatever terms

19   they agreed to.

20              And if there was some information that

21   they didn't have the benefit of that the buyers did,

22   you would expect the transferors, if anyone at all,

23   to be the ones complaining about it.  But that's not

24   what we have here.

25              THE COURT:  Okay.

1              MR. SCHULTE:  All right.  Another note

2    that Hunter Mountain glosses over is duty.

3              So all the claims that were listed on

4    the PowerPoint all require that there must have been

5    some kind of a duty owed by Farallon and Stonehill to

6    Hunter Mountain.  But there's no duty owed to a stranger

7    to a claims trading transaction.

8              Yet again, if anybody were to have a

9    duty owed to it, I guess it would be the transferors

10   of the claims even though that was an arm's length

11   transaction.

12             But it's not a stranger to the transaction

13   and a stranger that has no interest in the claims that

14   we're talking about here.

15             THE COURT:  Okay.

16             MR. SCHULTE:  Nor has Hunter Mountain

17   identified any authority for a private cause of action

18   belonging to Hunter Mountain related to these claims

19   transfers.

20             Hunter Mountain doesn't have the right to

21   assert claims on behalf of other parties.  It only has

22   the right to assert claims on behalf of itself when it

23   has been personally aggrieved.

24             I heard Mr. McEntire say several times

25   during his presentation that Hunter Mountain had a

```
 1   99.5 percent equity interest in Highland Capital.

 2                   THE COURT:  Right.

 3                   MR. SCHULTE:  I think it's important to

 4   point out that that equity interest was completely

 5   extinguished by the confirmed plan in the bankruptcy

 6   case.

 7                   As Your Honor pointed out, we have the

 8   waterfall, and Classes 1 through 9 have to be paid in

 9   full.  And you know what Classes 8 and 9 are?  General

10   unsecured claims and subordinated claims.

11                   And the only way that Hunter Mountain

12   is ever in the money, as Mr. McEntire was saying, with

13   its Class 10 claim is if Seery, the claimant trustee,

14   certifies that all claims in 1 through 9 are paid in

15   full 100 percent with interest and all indemnity claims

16   are satisfied.

17                   There has been no such certification by

18   Mr. Seery, and there may never be such a certification

19   by Mr. Seery.

20                   THE COURT:  Okay.

21                   MR. SCHULTE:  So that is real important

22   because the idea that Hunter Mountain stands to somehow

23   gain from this transaction is flawed for the reasons

24   we've already talked about.

25                   But it's also flawed because they have
```

1    what is, at best, a contingent interest.  It's

2    contingent on things that have not yet occurred.  And

3    under the case law, they don't have standing conferred

4    on them in that interest.

5              THE COURT:  Okay.

6              MR. SCHULTE:  So for all those reasons why

7    there is no interest in the claims, no legal damages, no

8    duty owed to it, no private cause of action belonging

9    to it and a hypothetical and contingent interest, HMIT

10   lacks standing to investigate or challenge these claims

11   and claims transfers to which it was not a party and in

12   which it had zero interest.

13             And for any or all of the reasons

14   we've talked about, Your Honor, their petition should be

15   dismissed.  I welcome any questions the court may have.

16             THE COURT:  No.  My head is kind of

17   spinning.  Like I said, I spent all day yesterday

18   reading stuff.  As I said, I will admit I've never

19   practiced bankruptcy law.

20             I mean, my joking statement is I pretty

21   much know enough to not be in contempt of bankruptcy

22   court.  Because I have cases where one of the defendants

23   or one of the parties ends up in bankruptcy court and

24   whether or not I can proceed with my case, et cetera.

25   That's my whole goal is not to be in contempt of court.

```
1              MR. SCHULTE:  That should be the goal, is

2    to not be in contempt of the bankruptcy court.

3              MR. McENTIRE:  May I have just five or ten

4    minutes?

5              THE COURT:  I don't have another hearing,

6    so we're fine on time.

7              MR. McENTIRE:  All right.  In all due

8    deference to Mr. Schulte, the last 15 minutes of his

9    argument misstates the law.

10             THE COURT:  Okay.

11             MR. McENTIRE:  The Washington Mutual case

12   addresses almost 90 percent of what he just talked

13   about.  Their equity was entitled to bring an action

14   to basically disallow an interest that was acquired by

15   inside information.

16             Okay.  And so he has not addressed the

17   Washington Mutual case at all.

18             THE COURT:  Well, okay.  So my question

19   is let's say that the insider trading didn't happen.

20             I mean, when I was playing with the

21   numbers last night, it doesn't appear that Hunter

22   Mountain, being Class 10, would have gotten anything

23   anyways even if.  Right?

24             Like I said, I did a lot of reading last

25   night, so I want to make sure I understand.
```

 1                     MR. McENTIRE:  Fair enough.  I think I can
 2      address that.
 3                     The bottom line is a wrongdoer should
 4      not be entitled to profit from his wrong.  That's
 5      the fundamental premise behind the restatement on
 6      restitution.  That's the fundamental purpose of
 7      the <u>Washington Mutual</u> case.
 8                     You have remedies, including disgorgement,
 9      disallowance or subordination.
10                     THE COURT:  I'm just trying to be devil's
11      advocate because I'm trying to work through this.
12                     So let's say it did happen and the court
13      ordered disgorgement and invalidated these transfers,
14      then the money would just go to the Class 8 and
15      Class 9.  Right?  To Acis, UBS, HarbourVest, etc.
16                     MR. McENTIRE:  No, they would not.
17      Because those claims have already been traded.
18                     THE COURT:  Okay.  Well, that's
19      what I'm saying.
20                     If the court said there was insider
21      trading and to disallow the transfer and ordered
22      disgorgement, theoretically, back to Highland Capital,
23      then the money is there.
24                     Okay.  So then it would just go to Acis
25      and UBS.  Right?

1              MR. McENTIRE:  The remedy here is to

2      subordinate their claims.  HarbourVest, UBS, Acis, and

3      the Redeemer committee have sold their claims.  They can

4      intervene if they want and that's up to them.  If they

5      want to take the position that they were defrauded,

6      that's up to them.

7              THE COURT:  Okay.

8              MR. McENTIRE:  Otherwise, the remedy is to

9      disgorge the proceeds and put them back into the coffers

10     of the bankruptcy court in which case Category 8 and 9

11     would be brimful, overflowing, and flow directly into

12     the coffers in Class 10.

13             And that's the purpose of 15 and 16 in

14     Mr. Patrick's affidavit.

15             THE COURT:  Okay.

16             MR. McENTIRE:  I find it amazing that he

17     refers to Judge Jernigan's orders where he said anything

18     dealing with these claims must come back to me.  I have

19     exclusive jurisdiction.  I recall that argument.

20             THE COURT:  Right.

21             MR. McENTIRE:  Well, she could have

22     accepted the removal of Mr. Dondero in that other

23     proceeding.  She didn't.  She said I don't have

24     jurisdiction over this.  I'm sending it back to

25     the state court.

 1                    THE COURT:  Okay.  Because it was filed

 2    as a 202.  If it had been filed as a Rule 404, then she

 3    would have had jurisdiction because you're specifically

 4    invoking a state court process.  Right?

 5                    MR. McENTIRE:  I'm invoking exclusively

 6    a state court process because of the benefit it

 7    provides.  That is a strategic choice that this

 8    petitioner has elected.  It has nothing to do with

 9    bankruptcy court, other than bankruptcy court is too

10    slow.

11                    All the invective about the prior contempt

12    order has nothing to do with these proceedings.

13    Mr. Dondero is not involved in these proceedings.

14                    If HarbourVest and UBS want to intervene

15    in some subsequent lawsuit, they have a right to do so.

16    I can't stop them.

17                    But until then, we have stated a cause

18    of action or at least a potential cause of action which

19    is insider trading.  That from an outsider makes them an

20    insider that owes fiduciary duties to the equity.

21                    Washington Mutual allowed equity to come

22    in and disallow those claims.  And if those claims are

23    disallowed, the Class 10 is going to be overflowing on

24    the waterfall.  And that's my client.

25                    A couple of other things.  Hunter Mountain

1  is not a stranger.  Hunter Mountain was the big elephant

2  in the room until the effective date of the plan.

3           We held 99.5 percent of the equity stake

4  and when all of these wrongdoings occurred, Hunter

5  Mountain was still the 99.5 percent equity stakeholder.

6           It's only after the bankruptcy plan had

7  gone effective, after these claims had already been --

8           THE COURT:  Wait.  The insider trading

9  happened after the bankruptcy had been filed but before

10  the bankruptcy was resolved.

11           So it's during that process.  Right?

12           MR. McENTIRE:  You have filing a

13  bankruptcy.  You have a bankruptcy plan.  You have

14  confirmation of the plan, but it doesn't go effective

15  until six months later.

16           THE COURT:  Right.

17           MR. McENTIRE:  After the bankruptcy

18  plan was confirmed and they had dismal estimates of

19  recovery -- 71 percent on Class 8, zero percent on

20  Class 9 -- that's when Farallon and Stonehill purchased

21  the claims.

22           But they purchased the claims at a time

23  before the bankruptcy wasn't effective.  And so the

24  so-called claimant trust agreement had not gone into

25  effect until several months later.

```
1                    THE COURT:  Okay.

2                    MR. McENTIRE:  And during this period of

3    time Hunter Mountain was the very, very largest

4    stakeholder.

5                    THE COURT:  Okay.

6                    MR. McENTIRE:  And so to call it a

7    stranger is just not right and it's not fair because

8    we're anything but a stranger.

9                    They make an argument that Hunter Mountain

10   didn't object to the settlements.  Well, so what?

11   I'm not attacking the underlying settlements.

12   I'm attacking the claims transfers.

13                   And then he says, well, why didn't they

14   object to the claims transfers.  Well, he finally

15   conceded that the claims transfers are not actually

16   subject to a judicial scrutiny by the bankruptcy court.

17                   This court is uniquely qualified to

18   review these claims transfers as is Judge Jernigan.

19   Insider information is insider information as a rose

20   is a rose is a rose.  And any court of law is qualified

21   to determine whether insider information was used.

22                   Judge Jernigan did not say, okay,

23   Farallon, you can buy this claim.  There was no

24   judicial process here.

25                   THE COURT:  Right.  I mean, it's a motion.
```

1    We want to do this, just get approval.

2                 MR. McENTIRE:  They don't even have to get

3    approval.

4                 THE COURT:  Okay.

5                 MR. McENTIRE:  All they have to do is file

6    notice.

7                 THE COURT:  Okay.  File the notice.

8                 MR. McENTIRE:  Judge Jernigan was not

9    involved at all.

10                We had no reason to object.  All we know

11   there's a claims transfer.  It's not until later that

12   we discover that inside information was used and that's

13   why we're here.

14                So we didn't object to the original

15   claims.  There was no need to.  The original settlements

16   rather.  There was no need to.  There was no objection

17   to the claims transfers.

18                There was no mechanism to object, other

19   than what we're doing here today.  This is our

20   objection.  This is our attempt to object.

21                Because we believe that they have acquired

22   hundreds of millions of dollars of ill-gotten gain and

23   if that is true, not only will Hunter Mountain be

24   benefited tremendously, but other unsecured creditors.

25   They are very few but they will be also benefited.

```
 1                      Frankly, Judge Jernigan may want that to
 2   happen.
 3                      THE COURT:  Okay.
 4                      MR. McENTIRE:  But we're here to get the
 5   discovery so I can pull it all together within the next
 6   30 days or 40 days.  So I can make decisions before
 7   somebody might suggest, hey, well, you should have
 8   filed this a little bit earlier.
 9                      And so, Judge, that's why we're here,
10   in the interest of time.  And that was my decision.
11   That was my strategic decision to bring it here.
12                      THE COURT:  Right.
13                      MR. McENTIRE:  He says that Rule 3001 is
14   the exclusive remedy.  Only transferors can complain
15   about transferees or vice versa.
16                      THE COURT:  You're not necessarily
17   complaining about the actual transfer.  It's how
18   the transfer came about.
19                      MR. McENTIRE:  That's right.
20                      And to suggest that that is the governing
21   principle that this court should consider is an absolute
22   contradiction to the Washington Mutual case.
23                      Because if fraud is in play, if inside
24   information is in play, then it impacts everyone who
25   is a stakeholder.  Everyone.
```

1           THE COURT:  Okay.

2           MR. McENTIRE:  And we are one of the

3  largest stakeholders in the bankruptcy proceedings,

4  even today.  So that's all I have.

5           I thank you for your attention,

6  Your Honor.  Clearly, the benefit here is we get to

7  uncover some things that need to be uncovered.  And

8  we'd like to do it so in a timely fashion.

9           And if we don't have a claim, we don't

10  have a claim.  If we have a claim, then we may file it

11  in a state district court.

12           And if Judge Jernigan and her gate-keeping

13  orders require us to go there, we'll go there.  I'm not

14  going to run afoul of any rule she has, but we need to

15  get this underway.

16           THE COURT:  Okay.

17           MR. SCHULTE:  Your Honor, may I make some

18  rifle-shot responses?

19           THE COURT:  Yeah.  That's fine.

20           MR. SCHULTE:  Okay.  Mr. McEntire has said

21  that they are one of the largest stakeholders in the

22  Highland bankruptcy based on this 99.5 percent equity.

23  That equity was extinguished in the fifth amended plan.

24           That's Exhibit 3 that I handed you,

25  Your Honor.  That plan was filed in January of 2021

 1  before any of these claims transfers took place.

 2  The equity was extinguished by virtue of the plan.

 3            THE COURT:  Okay.

 4            MR. SCHULTE:  Mr. McEntire was talking

 5  about this Washington Mutual case.  I read the case.

 6            But what he said repeatedly, and I think

 7  it's really important to listen to what Mr. McEntire

 8  said about this case, is that that court allowed the

 9  equity to come in and talk about these transfers.

10            Hunter Mountain doesn't have any equity.

11  That equity was extinguished in the plan for reasons

12  I just discussed.  So for being the largest stakeholder,

13  according to Mr. McEntire, in the bankruptcy what does

14  Hunter Mountain have to show for that?  A Class 10.

15            As Your Honor pointed out, a Class 10

16  interest, that is below everybody else.  And that's

17  where they've been relegated.

18            And to answer your question, Your Honor,

19  that you posed to Mr. McEntire that I'm not sure was

20  ever answered, HMIT -- Hunter Mountain -- at Class 10

21  stood to gain nothing when the plan was put together.

22  So the largest stakeholder stood to gain nothing.

23            I've pointed to the language in the

24  court's order about how the court has exclusive

25  jurisdiction.

```
 1                    And Your Honor nailed the answer to the
 2   concern raised by Mr. McEntire, which is the bankruptcy
 3   court didn't have jurisdiction over a 202 proceeding.
 4   But it unquestionably has authority over the
 5   counterpart, 2004 in bankruptcy court.
 6                    THE COURT:  Right.
 7                    MR. SCHULTE:  Finally, I have never argued
 8   and if I did say this, I apologize.  I have never argued
 9   that Hunter Mountain is somehow a stranger to the
10   bankruptcy.
11                    THE COURT:  Right.  They were obviously
12   involved in the bankruptcy, but they're a stranger to
13   these transfers.
14                    MR. SCHULTE:  Exactly.  They were a
15   stranger to these transactions.  They didn't have any
16   interest in these claims.
17                    They don't stand to gain anything if
18   the claims are either rescinded or if the claims are
19   invalidated or the transfers are invalidated.  They
20   don't stand to get anything because they never had
21   any interest in these claims.
22                    The claims are the claims and either UBS,
23   Redeemer, Acis, and HarbourVest stood to gain more than
24   expected or Farallon and Stonehill stand to gain more
25   than expected.
```

```
 1                    And if anybody is really injured here,
 2   it's not Hunter Mountain.  It's the transferors who
 3   were duped into these transfers, according to Hunter
 4   Mountain.  And they would be the ones that would have
 5   damage and have a claim along the lines of what
 6   Hunter Mountain is trying to assert on behalf
 7   of all stakeholders.
 8                    Your Honor, I have a proposed order, as
 9   Mr. McEntire does.
10                    May I bring it up?
11                    THE COURT:  Yes, you may.
12                    Okay, Mr. McEntire.  Anything else?
13                    MR. McENTIRE:  His last few statements are
14   inconsistent with the law, Your Honor.
15                    THE COURT:  Okay.
16                    MR. McENTIRE:  Because the law clearly,
17   clearly indicates that we are a beneficiary.  And
18   that's what the Washington Mutual case stands for.
19                    THE COURT:  Okay.  Wait.  Let me make sure
20   I know which one.
21                    Do you have a cite for that case?
22                    MR. McENTIRE:  Yes, ma'am.  It's in the
23   PowerPoint.
24                    THE COURT:  That's fine.  I just wanted
25   to make sure I could find it.
```

1          MR. McENTIRE:  There's also a Fifth

2   Circuit case that talks about subordination where

3   a Class 8 and Class 9 would actually be subordinated,

4   Your Honor, to our claim.

5          So that's another approach to this, is

6   subordination.

7          THE COURT:  Okay.

8          MR. McENTIRE:  And that's the In re Mobile

9   Steel case out of the Fifth Circuit.  I think there's a

10  cite in our brief.

11          THE COURT:  Okay.

12          MR. McENTIRE:  I acknowledge that

13  we're now classified with a different name.  We're

14  a B/C limited partner.  And we're, in effect, a Class 10

15  beneficial interest.

16          But we're there having been a 99.5.  And

17  the lion share of any money, 99.5 percent of any money

18  that overflows into bucket No. 10 is ours.

19          THE COURT:  Right.

20          Okay.  I am processing.  Obviously, I need

21  to take this into consideration.  I haven't had a chance

22  to go through Respondent's exhibits.

23          I've looked through the plaintiff's

24  exhibits, but now I have much more of a focus of what

25  I'm doing.

1              So I will try to get you all a ruling

2    by the end of next week.  I apologize.  I've got a

3    special setting next week that's going to be kind

4    of crazy, but I will do everything I can.

5              If you all haven't heard from me by next

6    Friday afternoon, call my coordinator Texxa and tell

7    her to bug me.

8              MR. McENTIRE:  Thank you for your time.

9              THE COURT:  You all are excused.  Have

10   a great day.

11

12

13              (This completes the Reporter's Record,

14              Petitioner Hunter Mountain Investment

15              Trust's Rule 202 Petition, which was

16              heard on Wednesday, February 22, 2023.)

17

18

19

20

21

22

23

24

25

```
 1   STATE   OF   TEXAS   )

 2   COUNTY OF DALLAS   )

 3           I, Gina M. Udall, Official Court Reporter

 4   in and for the 191st District Court of Dallas County,

 5   State of Texas, do hereby certify that the above and

 6   foregoing contains a true and correct transcription of

 7   all portions of evidence and other proceedings requested

 8   in writing by counsel for the parties to be included in

 9   this volume of the Reporter's Record in the above-styled

10   and numbered cause, all of which occurred in open court

11   and were reported by me.

12           I further certify that this Reporter's Record

13   of the proceedings truly and correctly reflects the

14   exhibits, if any, offered by the respective parties.

15           I further certify that the total cost for the

16   preparation of this Reporter's Record is $750.00 and was

17   paid by the attorney for Respondents.

18           WITNESS MY OFFICIAL HAND on this the 1st day of

19   March 2023.

20

21                   /S/    Gina M. Udall
                     Gina M. Udall, Texas CSR  #6807
22                   Certificate Expires: 10-31-2024
                     Official Reporter, 191st District
23                   Court of Dallas County, Texas
                     George Allen Sr. Courts Building
24                   600 Commerce St., 7th Floor
                     Dallas, Texas  75202
25                   Telephone:  (214) 653-7146
```

# Exhibit 4-C

008567

CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | DALLAS COUNTY, TEXAS |
| Petitioner. | § | 191ST JUDICIAL DISTRICT |
| | § | |

## ORDER

Came on for consideration *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* ("Petition") filed by petitioner Hunter Mountain Investment Trust ("HMIT"). The Court, having considered the Petition, the joint verified response in opposition filed by respondents Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"), HMIT's reply, the evidence admitted during the hearing conducted on February 22, 2023, the argument of counsel during that hearing, Farallon's and Stonehill's post-hearing brief, the record, and applicable authorities, concludes that HMIT's Petition should be denied and that this case should be dismissed. Therefore,

The Court ORDERS that HMIT's Petition be, and is hereby, DENIED, and that this case be, and is hereby, DISMISSED.

THE COURT SO ORDERS.

Signed this _____ day of March, 2023.

_____
HONORABLE GENA SLAUGHTER

008568

# Exhibit 4-D

008569

State of Delaware
Secretary of State
Division of Corporations
Delivered  09:24 AM 03/09/2021
FILED  09:24 AM 03/09/2021
SR  20210838989 - File Number  5421257

CERTIFICATE OF FORMATION

OF

Muck Holdings, LLC

FIRST:  The name of the limited liability company is:

Muck Holdings, LLC

SECOND:  Its registered office in the State of Delaware is to be located at 251 Little Falls Drive, in the City of Wilmington, Delaware, 19808, and its registered agent at such address is CORPORATION SERVICE COMPANY.


IN WITNESS WHEREOF, the undersigned, being the individual forming the Company, has executed, signed and acknowledged this Certificate of Formation this 9th day of March, 2021.




By: /s/ Hanchang Sohn
    Name: Hanchang Sohn
    Title:  Authorized Person

008570

# Exhibit 4-E

# CERTIFICATE OF FORMATION

## OF

## Jessup Holdings LLC

**FIRST:**   The name of the limited liability company is Jessup Holdings LLC.

**SECOND:**   The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:**   Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

   **IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation on April 08, 2021.


   */s/Taylor Lolya*
   Taylor Lolya, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered  01:10 PM 04/08/2021
FILED  01:10 PM 04/08/2021
SR 20211222936 - File Number  5822640

008572

# Exhibit 4-F

| From: | Roger L. McCleary |
|---|---|
| To: | Schulte, David C (DAL - X59419) |
| Cc: | Sawnie A. McEntire |
| Subject: | HMIT — court's order/HMIT's request for information |
| Date: | Thursday, March 9, 2023 3:46:00 PM |

David,

     Thank you. This ruling denies Hunter Mountain Investment Trust ("HMIT") the investigatory discovery sought from Farallon Capital Management, LLC ("Farallon") and Stonehill Capital Management, LLC ("Stonehill") under Tex. R. Civ. P. 202. Accordingly, HMIT requests that Farallon and Stonehill advise whether they will *voluntarily* provide some or all of the information and documents requested in HMIT's Rule 202 Petition and, if so, under what terms. Please let us know by Tuesday, March 14th, whether Farallon and Stonehill will consider doing so. If so, we are available to discuss this at your earliest convenience.

     In any event, HMIT also requests that Farallon and Stonehill *voluntarily* respond to the following two specific requests, which they can answer in a matter of minutes:

1. A simple description of the legal relationship: a) between Farallon and Muck Holdings, LLC ("Muck"), and b) between Stonehill and Jessup Holdings, LLC ("Jessup").
2. Whether: a) Farallon is a co-investor in any fund in which Muck holds an interest related to the Claims at issue in the Rule 202 Petition; b) Stonehill is a co-investor in any fund which Jessup holds an interest related to the Claims at issue in the Rule 202 Petition.

We would also appreciate prompt written responses to these two specific requests. To the extent we do not receive written responses to these two requests by close of business on Tuesday, March 14th, this will be taken as Farallon and Stonehill's refusal to provide the requested responses. Similarly, to the extent we do not receive a written confirmation of Farallon and Stonehill's willingness to discuss voluntary production of more of the information and documents requested in HMIT's Rule 202 Petition by then, this will be taken as their refusal to consider doing so.

     Please let us know if you or your clients have any questions about this request. Thank you.

Regards, Roger.

Roger L. McCleary
**Parsons McEntire McCleary PLLC**
One Riverway, Suite 1800
Houston, TX 77056
Tel: (713) 960-7305
Fax: (832) 742-7387
www.pmmlaw.com

This e-mail message is for the sole use of the intended  recipient(s) and may contain confidential and privileged  information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you

008574

are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of
the original message.

---

**From:** Schulte, David C (DAL - X59419) <David.Schulte@hklaw.com>
**Sent:** Wednesday, March 8, 2023 9:08 PM
**To:** Sawnie A. McEntire <smcentire@pmmlaw.com>; Roger L. McCleary <rmccleary@pmmlaw.com>
**Cc:** Timothy J. Miller <tmiller@pmmlaw.com>
**Subject:** [EXTERNAL] HMIT — court's order

Counsel--attached is a copy of the court's order in this case.


Dave


**David C. Schulte** | **Holland & Knight**
Partner
Holland & Knight LLP
1722 Routh St., Suite 1500 | Dallas, TX 75201
Cell 214-274-4141
Phone 214-964-9419
Fax 214-964-9501
david.schulte@hklaw.com | www.hklaw.com

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the
individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender
immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an
existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific
statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you
properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in
confidence in order to preserve the attorney-client or work product privilege that may be available to protect
confidentiality.

# HMIT Exhibit No. 63

008576

| Assets | | Amount | Backup |
|---|---|---|---|
| **HCMLP Assets to be Monetized**[1] | | | |
| **As of 3/31/23 (Est.)** | | | |
| | | | |
| Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF") | | $   25,000,000 | Debtor Pleading(re ACIS)  Dkt 1235 Filed 08/18/21 p.3n.10 ($25 m); 3/31/23 DAF Multi-strat Statement ($19.5 m est); there should be more value in the 1.0 CLOS (Brentwood – 17%;Gleneagles – 1%;Grayson – 5%;Greenbriar–23%;Liberty-18%;Rockwall-15%) |
| Highland Multi Strategy Credit Fund, L.P. ("MS") | | 30,817,992 | ADV 3/31/23 (rev 4/24/2023) |
| Highland Restoration Capital Partners Master LP & Highland Restoration Capital Partners, L.P. ("RCP") | | 24,192,773 | ADV 3/31/23 (rev 4/24/2023) |
| Stonebridge-Highland Healthcare Private Equity Fund ( "Korea Fund") | | 5,701,330 | ADV 3/31/23 (rev 4/24/2023) |
| SE Multifamily Holdings LLC ("SE Multifamily") | | 12,400,000 | Communications with Debtor which apparantly values it even higher |
| Other | | 5,000,000 | Other investments on the post-confirmation report |
| Assets as of 3/31/21 (Est.)[1] | | $   103,112,095 | |

| **HCMLP Monetizations & Management Fees (est.)** | Sale date if known | | |
|---|---|---|---|
| **10/31/19 - 3/31/23 (Est.)** | | | |
| | | | |
| Targa | October ?, 2021 | $   37,500,000 | Uptick from COVID; market communications 90% of sales price 200MM, net of debt; need confirmation |
| Trussway | Sept. 1, 2022 | 180,000,000 | |
| | | | **Assume 53% of sales price obtained because: HCM owns about 50% of RCP and  60% of Chrusader (and assume increase in value of MGM within Cornerstone should should have been enough to offset its debt) Sale** |
| Cornerstone | Jan. 23, 2023 | 132,500,000 | **announced May 12, 2022** |
| SSP | Month/date/2020 | 18,000,000 | Market communications |
| MGM Direct | Mar. 17, 2022 | 25,000,000 | @ $145, **sale announced May 2021** |
| Petrocap | Aug. 10, 2021 | 2,684,886 | Dkt, 2537, sale motion |
| Uchi | Aug. 6, 2021 | 9,750,000 | Dkt 2687, sale order |
| | | | FV form 206, net of debt, but NXRT moved from $40 to $80 plus and we don't know |
| Jefferies Account & DRIP | | 60,000,000 | when monitized, so number could be low |
| Terrell (raw land) | | 500,000 | FV Form 206 |
| | | | 3 years mgmt fees, misc distrbutions in |
| Mgmt Fees/Dist/Fund loan repayments (est.) | | 30,000,000 | MS/RCP/Korea, loan paybacks |
| Siepe | | 3,500,000 | Market communications |
| HCLOF | | 35,000,000 | Calculated based on DAF distributions |
| Total Monetizations & Cash Flows (Est.) | | $   534,434,886 | |
| | | | |
| **Total Assets as of 3/31/23 & Prior Monetizations & Management Fees** | | | |
| | | $   637,546,981 | |

| **Cash Roll** | | | |
|---|---|---|---|
| **10/31/19 - 3/31/23 (Est.)** | | | |
| | | | |
| Cash as of 10/31/2019 | | $   2,286,000 | |
| Monetizations & Cash Flows (10/31/19 - 3/31/23) | | 534,434,886 | Dkt. 3756, 3757 (not clear if additional $11.6 million disputed claim reserve is included in or in excess of the cash on hand so cash |
| Less: Cash on Hand as of 3/31/23 | | (57,000,000) | could be $68.6 million) |
| | | | |
| Fees, Distributions & Other Payments (10/31/19 - 3/31/23)[2] | | $   479,720,886 | |
| | | | Dkt 3756 filed on 4/21/23 ($33,005,136 for Professional fees (bk); $7,604,472 for Professional fees (nonbk); $60,171,929 for all prof fees and exp (Debtor & UCC)  Note: this appears to be for "Preconfirmation" so what |
| Administrative Fees Paid | | $   100,781,537 | are the post confirmation amounts?) |
| | | | Dkt 3756 - Unsecured, priority, secured and |
| Cumulative Payments to Creditors | | 276,709,651 | admin |
| | | | **The $102 million is a plug - based on subtracting cumulative payments to creditors and known pre conf prof fees and costs from the  $479 million determined above. Where are these** |
| Other Unknown Payments or ? | | 102,229,698 | **funds?** |
| Fees & Distributions Paid (10/31/19 - 3/31/23) | | $   479,720,886 | |

[1] Does not include approximately $70M in affiliate notes
[2] Includes $101M of fees paid during bankruptcy

# HMIT Exhibit No. 64

008578

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:24 AM 03/09/2021
FILED 09:24 AM 03/09/2021
SR 20210838989 - File Number 5421257

CERTIFICATE OF FORMATION

OF

Muck Holdings, LLC

FIRST:  The name of the limited liability company is:

Muck Holdings, LLC

SECOND:  Its registered office in the State of Delaware is to be located at 251 Little Falls Drive, in the City of Wilmington, Delaware, 19808, and its registered agent at such address is CORPORATION SERVICE COMPANY.


IN WITNESS WHEREOF, the undersigned, being the individual forming the Company, has executed, signed and acknowledged this Certificate of Formation this 9th day of March, 2021.




By: /s/ Hanchang Sohn
          Name: Hanchang Sohn
          Title:  Authorized Person

6109645v.1 344/05975

008579

# HMIT Exhibit No. 65

008580

# CERTIFICATE OF FORMATION

## OF

## Jessup Holdings LLC

**FIRST:**  The name of the limited liability company is Jessup Holdings LLC.

**SECOND:**  The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:**  Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation on April 08, 2021.

 */s/Taylor Lolya*
Taylor Lolya, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:10 PM 04/08/2021
FILED 01:10 PM 04/08/2021
SR 20211222936 - File Number 5822640

008581

# HMIT Exhibit No. 66

008582

CAUSE NO. DC-23-01004

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT |
| | § | |
| HUNTER MOUNTAIN | § | |
| INVESTMENT TRUST | § | 191st JUDICIAL DISTRICT |
| | § | |
| *Petitioner,* | § | |
| | § | DALLAS COUNTY, TEXAS |

## DECLARATION OF MARK PATRICK

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

The undersigned provides this Declaration pursuant to Texas Civil Practice and Remedies Code Section 132.001 and declares as follows:

1. My name is Mark Patrick. I am over 21 years of age. I am of sound mind and body and I am competent to make this declaration. Unless otherwise, indicated, the facts stated within this declaration are based upon my personal knowledge and are true and correct.

2. I submit this declaration in support of Petitioner Hunter Mountain Investment Trust's ("HMIT") Verified Rule 202 Petition ("Petition"). I previously reviewed and verified the Petition. I am personally familiar with the numerous documents identified in the Petition which are part of the public record in the bankruptcy proceedings styled *In re Highland Capital Management, L.P.*, Case No. 19-34054 ("HCM Bankruptcy Proceedings").

3. I serve as the Administrator of HMIT. In this capacity, I am the duly authorized person to act on behalf of HMIT. As such, I am familiar with the organizational structure of HMIT and its status both before and during the HCM Bankruptcy Proceedings. Due to my other affiliations with other interested parties in the HCM Bankruptcy Proceedings, I am generally familiar with the docket in the HCM

1

Bankruptcy Proceedings and have attended multiple hearings in the HCM Bankruptcy Proceedings.

4.  HMIT is a Delaware statutory trust. It was the largest equity holder in Highland Capital Management, L.P. ("HCM") until the Effective Date of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) (the "Plan"). The Effective Date of the Plan occurred on August 11, 2021. Prior to the Effective Date, HMIT was classified as a Class 10 unsecured creditor. Upon the Effective Date, and pursuant to the Plan, HMIT's Class 10 claim was converted to a "Contingent Trust Interest," as defined in the Claimant Trust Agreement, which was approved by the Bankruptcy Court as part of the Plan. HMIT was the only stakeholder in Class 10. A true and correct copy of the Claimant Trust Agreement is attached as Exhibit A.

5.  Following various orders in the HCM Bankruptcy Proceedings, Jim Seery was appointed as a member of the Board of Directors ("Board") of Strand Advisors, Inc., HCM's general partner. Subsequently, the Board appointed Jim Seery as HCM's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"). Following the Effective Date of the Plan, Jim Seery continues to serve as the CEO of HCM, but also serves as the Trustee of the Claimant Trust under the terms of a Claimant Trust Agreement which, along with the Plan, identifies the various classes of unsecured creditors, including allowed claims for Class 8, allowed claims for Class 9 and Class 10, as well as the waterfall for potential distributions from the Bankruptcy Estate. Under the Claimant Trust Agreement and the Plan, Unsecured Creditors in Class 8 participate in distributions before Unsecured Creditors in Class 9; Unsecured Creditors in Class 9 participate in distributions before HMIT. The Plan also established an Oversight Committee, which now includes Muck Holdings, LLC ("Muck") and Jessup Holdings, LLC ("Jessup"), over the Claimant Trust.

6.  Neither Muck nor Jessup were original creditors in the HCM Bankruptcy Proceedings. Rather, as reflected in public filings, Muck was created on March 9, 2021, and Jessup was created on April 8, 2021, well after the HCM Bankruptcy Proceedings were under way. The HCM Bankruptcy Proceedings began in 2019. True and correct copies of publicly available information with the Delaware Division of Corporations reflecting Muck and Jessup's dates of formation are attached as Exhibits B and C, respectively.

7.  Upon information and belief, Muck is a special purpose entity created by Farallon Capital Management LLC ("Farallon"). Upon information and belief, Jessup is a special purpose entity created by Stonehill Capital Management LLC ("Stonehill").

008584

Both Farallon and Stonehill are capital management companies or "hedge funds" operating across the United States and throughout the world.

8.  As HCM's CEO and CRO, Jim Seery negotiated and obtained bankruptcy court approval for the settlement of claims with four (4) large unsecured creditors of HCM, three of which served on the Unsecured Creditors Committee in the HCM Bankruptcy Proceedings. These unsecured creditors included: (i) the Redeemer Committee, which is a committee of investors in an HCM-affiliated fund known as the Crusader Fund that obtained an arbitration award against HCM; (ii) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively "Acis"); (iii) HarbourVest[1] and (iv) UBS Securities LLC and UBS AG London Branch (collectively "UBS") (collectively, "Settling Parties"). These settlements are documented in the docket of the HCM Bankruptcy Proceedings at Document Nos. 1273, 1302, 1788, and 2389, respectively, and true and correct copies are attached hereto, respectively, as Exhibits D, E, F, and G (collectively, the "Settlements").

9.  As reflected in these Settlements, Exhibits D, E, F, and G, each of the Settling Parties received Class 8 and Class 9 claims, as provided below:

| Exhibit | Creditor | Class 8 | Class 9 | Total |
|---|---|---|---|---|
| **D** | **Redeemer** | $136.7 mm | $0 mm | $136.7 mm |
| **E** | **Acis** | $23 mm | $0 mm | $23 mm |
| **F** | **HarbourVest** | $45 mm | $35 mm | $80 mm |
| **G** | **UBS** | $65 mm | $60 mm | $125 mm |
| | **Total** | $269.7 mm | $95 mm | $364.7 mm |

10. Following the Settlements in the HCM Bankruptcy Proceedings, the Settling Parties sold their claims to Muck and Jessup, which, upon information and belief, are the special purpose entities created by Farallon and Stonehill. HMIT was not given an opportunity to bid for these claims. The stated face value or par value of these claims was $364.7 million. To date, these claims represent the vast majority

---

[1] "HarbourVest" collectively refers to HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

008585

(over 90%) of all unsecured creditor claims in Class 8 and Class 9 which, according to the Q3 2022 Report, total $397,485,568.00.[2]

11. Stonehill or Jessup acquired the Redeemer claim for $78 million on or about April 30, 2021. A true and correct copy of a letter from Alvarez & Marsal CRF Management, LLC to Highland Crusader Funds reflecting this purchase price is attached as Exhibit H.

12. In addition to the purchase of the claim from the Redeemer Committee as described above, and continuing upon information and belief, Muck and Jessup paid additional tens of millions of dollars to acquire the Class 8 and Class 9 claims held by UBS, HarbourVest and Acis. Upon information and belief, the magnitude of these investments contrasts sharply with the available public information concerning the expected value of Class 8 and Class 9 claims.

13. Attached as Exhibit I is a true and correct copy of HCM's Q3 2021 Post-Confirmation Report ("Q3 Report"). According to this Q3 Report, HCM reported that the Class 8 claims were expected to be paid at 54%. This reflects a drop from approximately 71.32% reflected in Exhibit J, which is a public filing available to Farallon and Stonehill in the HCM Bankruptcy Proceedings. Thus, at the time of the purchases, the publicly available information indicated that the return on investment was substantially less than 100% for Class 8 creditors and 0% for the Class 9 creditors.

14. Despite earlier, much lower financial disclosures provided by the debtor, HCM, concerning expected distributions, almost $250 million was paid in Q3 2022 to Class 8 general unsecured creditors—$45 million *more* than was *ever* projected. A true and accurate copy of the public filing which reflects these distributions is attached as Exhibit K.

15. The discovery which HMIT seeks is reasonably calculated to confirm whether Farallon or Stonehill (via Muck or Jessup) traded and acquired their claims at issue based upon non-public information. If so, HMIT intends to seek cancellation of these claims in their entirety and disgorgement of all distributions which Farallon or Stonehill (via Muck or Jessup) may have received to date. These distributions are estimated to be at least $173 million. This estimate is based upon the relative proportions of: (1) the Class 8 claims owned by Farallon and Stonehill (via Muck and Jessup) to the total amount of general unsecured claims, (2) and the amount

---

[2] This number, $397,485,568 assumes the public disclosure of "allowed" general unsecured claims, includes all Class 8 and Class 9 claims. *See infra,* Exhibit K.

008586

previously distributed to general unsecured claimholders to the total amount of general unsecured claims.

16. Under the terms of the Claimant Trust Agreement, a cancellation of the claims at issue, together with disgorgement, will free more than $222,480,270 of the over $255 million that has been disbursed to date. This approximate sum, after appropriate offsets, will be available to pay HMIT after taking into account any other residual creditors in Class 8 or Class 9. Under this scenario, as the former holder of 99.5% equity in HCM, HMIT stands to receive substantial financial benefit. Based upon my experience in managing litigation, and in reviewing and approving the payment of outside counsel legal services for many years, the benefit to HMIT clearly outweighs any expense burden that may be imposed on Farallon or Stonehill to comply with basic and simple discovery requests.

17. My name is Mark Patrick my date of birth is April 23, 1972, and my address is 6716 Glenhurst Drive, Dallas, Texas 75254, United States of America. I declare under penalty of perjury that the foregoing is true and correct.

008587

FURTHER DECLARANT SAYETH NOT.


Executed in Dallas County, State of Texas, on the <u>14th</u> day of February 2023.


_____

Mark Patrick

008588

# EXHIBIT A

008589

*EXECUTION VERSION*

## <u>CLAIMANT TRUST AGREEMENT</u>

This Claimant Trust Agreement, effective as of August 11, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "<u>Agreement</u>"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "<u>Debtor</u>"), as settlor, and James P. Seery, Jr., as trustee (the "<u>Claimant Trustee</u>"), and Wilmington Trust, National Association, a national banking association ("<u>WTNA</u>"), as Delaware trustee (in such capacity hereunder, and not in its individual capacity, the "<u>Delaware Trustee</u>," and together with the Debtor and the Claimant Trustee, the "<u>Parties</u>") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## <u>RECITALS</u>

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "<u>Chapter 11 Case</u>");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[1] which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943] (the "<u>Confirmation Order</u>");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Docket No. 1875, Exh. B.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

Disputed Claims as set forth herein and in the Plan; and (vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

**DECLARATION OF TRUST**

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

**ARTICLE I.**
**DEFINITION AND TERMS**

1.1    Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan. For all purposes of this Agreement, the following terms shall have the following meanings:

(a)    "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)    "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)    "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

(d)    "Claimant Trust Agreement" means this Agreement.

008591

(e)  "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)  "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)  "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)  "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)  "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)  "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)  "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)  "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)  "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

(n)  "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

3

008592

(o)    "<u>Delaware Statutory Trust Act</u>" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p)    "<u>Delaware Trustee</u>" has the meaning set forth in the introduction hereof.

(q)    "<u>Disability</u>" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r)    "<u>Disinterested Members</u>" has the meaning set forth in Section 4.1 hereof.

(s)    "<u>Disputed Claims Reserve</u>" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [[(in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board)] to be sufficient to pay Disputed Claims under the Plan.

(t)    "<u>Employees</u>" means the employees of the Debtor set forth in the Plan Supplement.

(u)    "<u>Employee Claims</u>" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v)    "<u>Estate Claims</u>" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [Docket No. 354].

(w)    "<u>Equity Trust Interests</u>" has the meaning given to it in Section 5.1(c) hereof.

(x)    "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended.

(y)    "<u>General Unsecured Claim Trust Interests</u>" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z)    "<u>GUC Beneficiaries</u>" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa)    "<u>GUC Payment Certification</u>" has the meaning given to it in Section 5.1(c) hereof.

(bb)    "<u>HarbourVest</u>" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

4

(cc) "Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

(dd) "Investment Company Act" means the Investment Company Act of 1940, as amended.

(ee) "Litigation Sub-Trust" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff) "Litigation Sub-Trust Agreement" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg) "Litigation Trustee" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh) "Managed Funds" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii) "Material Claims" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj) "Member" means a Person that is member of the Oversight Board.

(kk) "New GP LLC" means the general partner of the Reorganized Debtor.

(ll) "Oversight Board" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan. Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

(mm) "Plan" has the meaning set forth in the Recitals hereof.

(nn) "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to,

DOCS_NY:43843.3 36027/002

008594

attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo)    "PSZJ" means Pachulski Stang Ziehl & Jones LLP.

(pp)    "Redeemer Committee" means the Redeemer Committee of the Highland Crusader Fund.

(qq)    "Registrar" has the meaning given to it in Section 5.3(a) hereof.

(rr)    "Reorganized Debtor Assets" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss)    "Securities Act" means the Securities Act of 1933, as amended.

(tt)    "Subordinated Beneficiaries" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu)    "Subordinated Claim Trust Interests" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv)    "TIA" means the Trust Indenture Act of 1939, as amended.

(ww)    "Trust Interests" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx)    "Trust Register" has the meaning given to it in Section 5.4(b) hereof.

(yy)    "Trustees" means collectively the Claimant Trustee and Delaware Trustee, however, it is expressly understood and agreed that the Delaware Trustee shall have none of the duties or liabilities of the Claimant Trustee.

(zz)    "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa)    "WilmerHale" Wilmer Cutler Pickering Hale & Dorr LLP.

1.2    General Construction. As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all

DOCS_NY:43843.3 36027/002

008595

cases where they would apply. "Includes" and "including" are not limiting and "or" is not exclusive. References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars. References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

      1.3    <u>Incorporation of the Plan</u>. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE II.
## ESTABLISHMENT OF THE CLAIMANT TRUST

      2.1    <u>Creation of Name of Trust</u>.

      (a)    The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust." The Claimant Trustee shall be empowered to conduct all business and hold all property constituting the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

      (b)    The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

      2.2    <u>Objectives</u>.

      (a)    The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries. The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC. The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan. In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

      (b)    It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations. In furtherance of this objective, the Claimant Trustee shall, in his business judgment,

7

008596

make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

      2.3   <u>Nature and Purposes of the Claimant Trust</u>.

      (a)    The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement. The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date. On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement. For the avoidance of doubt, the Claimant Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

      (b)    The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

        (i)    to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

        (ii)    to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); <u>provided</u>, <u>however,</u> that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

008597

(iii) to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

(iv) to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

(v) to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

(vi) to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

(vii) to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

(viii) to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

(ix) to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

2.4    Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust.

(a) On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement. To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b) On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement. Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

9

008598

(c)     On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved. For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d)     Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trustee, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee. For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

2.5     Principal Office. The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address: 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

2.6     Acceptance. The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7     Further Assurances. The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8     Incidents of Ownership. The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

DOCS_NY:43843.3 36027/002

008599

## ARTICLE III.
## THE TRUSTEES

3.1 <u>Role</u>. In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2 <u>Authority</u>.

(a) In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust. The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law. The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b) The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; <u>provided</u>, <u>however</u>, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate. To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c) Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i) solely as required by Section 2.4(d), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

DOCS_NY:43843.3 36027/002

008600

(ii)    open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)    as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)    settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)    sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)    upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)    exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)    protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x)    without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi)    retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay,

DOCS_NY:43843.3 36027/002

008601

such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii)     prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii)    prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv)     to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv)      subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

(xvi)     request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii)    take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii)   take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix)     exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx)      evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi)     with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from

008602

the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that
were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such
that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect
to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the
"Authorized Acts").

(d)     The Claimant Trustee and the Oversight Committee will enter into an
agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's
authority with respect to certain other assets, including certain portfolio company assets (the
"Other Assets").

(e)     The Claimant Trustee has the power and authority to act as trustee of the
Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns,
is removed, or is otherwise unable to serve for any reason.

3.3     Limitation of Authority.

(a)     Notwithstanding anything herein to the contrary, the Claimant Trust and the
Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions
inconsistent with the management of the Claimant Trust Assets as are required or contemplated by
applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in
contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC
to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents
or the Confirmation Order.

(b)     Notwithstanding anything herein to the contrary, and in no way limiting the
terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority of
the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein,
in order to:

(i)     terminate or extend the term of the Claimant Trust;

(ii)     prosecute, litigate, settle or otherwise resolve any of the Material
Claims;

(iii)     except otherwise set forth herein, sell or otherwise monetize any
assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to
the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

(iv)     except for cash distributions made in accordance with the terms of
this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with
Article IV of the Plan;

(v)     except for any distributions made in accordance with the terms of
this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed
Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

DOCS_NY:43843.3 36027/002

008603

(vi)  reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

(vii)  borrow as may be necessary to fund activities of the Claimant Trust;

(viii)  determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

(ix)  invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

(x)  change the compensation of the Claimant Trustee;

(xi)  subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

(xii)  retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and (ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

(c)  [Reserved.]

3.4  _Investment of Cash_.  The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; provided, however that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("IRS") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement).

DOCS_NY:43843.3 36027/002

008604

3.5    Binding Nature of Actions.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall be final and binding upon any and all Beneficiaries.

3.6    Term of Service.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

3.7    Resignation.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

3.8    Removal.

(a)    The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

(b)    To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9    Appointment of Successor.

(a)    Appointment of Successor.  In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust.  The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the

DOCS_NY:43843.3 36027/002

008605

vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

(b)     Vesting or Rights in Successor Claimant Trustee.    Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee.  In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

(c)     Interim Claimant Trustee.  During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "Interim Trustee") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

3.10    Continuance of Claimant Trust.  The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee.  In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, provided the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust.  The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

3.11    Claimant Trustee as "Estate Representative".  The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "Estate Representative") with respect to the Claimant

008606

Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; provided that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims. The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12    Books and Records.

(a)     The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein. Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)     The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)     The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

DOCS_NY:43843.3 36027/002

008607