**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| In Re: **Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 36

# APPELLANT RECORD

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its
individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital
Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and
files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in
the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
## STATEMENT OF THE ISSUES

A.  Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the
court to consider evidence and other non-pleading materials including, but not limited to,
the court's reasoning that:

1.  the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type
analysis;

2.  the colorability analysis is "akin to the standards applied under the … *Barton*
doctrine";

3.  the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts
have applied when considering motions to file suit when a vexatious litigant bar
order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File
Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the
Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].
[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on
10/23/2023.

    4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.     Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.     Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1. Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2. Appellant's claims or allegations are not "plausible";

    3. Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4. Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5. Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT and the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6. Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7. The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8. Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9. Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

     [*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

     1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

     2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

     [*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

     [*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

     [*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

     1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

     2.   there is no evidence to support the alleged quid pro quo;

     3.   the material shared was *public* information; and/or

     4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L. Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M. Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N. Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O. Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P. Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

1. declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

2. concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1. **Notice of Appeal**

*000001*   a. Notice of Appeal **[Dkt. 3906]**;

*000276*   b. Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*   c. Second Amended Notice of Appeal **[Dkt. 3945]**

2. **The judgment, order, or decree appealed from:**

a. Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045

**b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3.** Docket sheet.

001049

a. Bankruptcy Case No. 19-34054

**4.** Other Items to be included:

a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

Vol. 2

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594
001660
001821
001830

Vol. 3
001849 Thru Vol. 4

Vol 4
002236
002243
002248

Vol. 5
002251
002254
002262

| | 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|---|
| | 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| | 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| | 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| | 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| | 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| | 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| | 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| | 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| | 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| | 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| | 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| | 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

002346
002355
002358
002391
002398
002400
Vol. 6
002826   Thru Vol. 7
Vol. 9   Thru Vol. 9
003257
003260
003270
003278

|  | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| --- | --- | --- | --- |
| *Vol. 10*<br>*003281* | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003286* | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| *003291* | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| *003294* | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| *003296* | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| *003299* | 04/19/2023 | 3751 | Notice of Status Conference |
| *003302* | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| *003311* | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| *003314* | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| *003323* | 04/23/2023 | 3760<br>(3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| *003368* | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| *003430* | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| *Vol. 10* | | | Holdings LLC, Stonehill Capital Management LLC |
| *003458* | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| *003463* | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| *Vol. 11* *003537* | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| *Thru Vol. 16* *Vol. 17* *004665* | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| *004712* | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004714* | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *004808* | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| *004813* | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| *004836* | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| *Vol. 18* *004930* | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| *004931* | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 18*
*004939.*

*004959*

*004961*

*004984*

*005049*

*005114*
*Vol. 26*
*006608*
*Vol. 39*
*009273*

*009290*

*009416*

*009424*

| | | | |
|---|---|---|---|
| 05/25/2023 | 3798 (3798-1) | | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| 05/26/2023 | 3800 | | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) *Thru Vol. 25* | | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) *Thru Vol. 39* | | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|
| | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| | 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

Handwritten: Vol. 40 / 009426 / 009436 / 009444 / 009445 / 009446 / 009456 / 009458 Thru Vol. 41 / Vol. 42 009841 / 009901 / 009905 / 009908 / 009912

*Vol. 42*

*009928*

*009944*

*010013*

*010023*

*010025*

*010029*

*010035*

*010047*

*010059*

*Vol. 43*

*010062*

| | | | |
|---|---|---|---|
| 06/16/2023 | 3854 | | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

B.    **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits** |
| **(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits** |
| **(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                          Respectfully Submitted,

                                                  **PARSONS MCENTIRE MCCLEARY PLLC**

                                                  By: */s/ Sawnie. A. McEntire*
                                                      Sawnie A. McEntire
                                                  Texas State Bar No. 13590100
                                                  smcentire@pmmlaw.com
                                                  1700 Pacific Avenue, Suite 4400
                                                  Dallas, Texas 75201
                                                  Telephone: (214) 237-4300
                                                  Facsimile: (214) 237-4340

                                                  Roger L. McCleary
                                                  Texas State Bar No. 13393700
                                                  rmccleary@pmmlaw.com
                                                  One Riverway, Suite 1800
                                                  Houston, Texas 77056
                                                  Telephone: (713) 960-7315
                                                  Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

3.13   Compensation and Reimbursement; Engagement of Professionals.

(a)   Compensation and Expenses.

(i)   Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

(ii)   Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

(b)   Professionals.

(i)   Engagement of Professionals.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

(ii)   Fees and Expenses of Professionals.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

3.14   Reliance by Claimant Trustee.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

3.15   Commingling of Claimant Trust Assets.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

008608

### 3.16  Delaware Trustee.

(a)  The Delaware Trustee shall have the limited power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Delaware Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement, in either case as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee and upon which the Delaware Trustee shall be entitled to conclusively and exclusively rely; provided, however, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.  The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Claimant Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the Claimant Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Statutory Trust Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to those expressly set forth in this Section 3.16 and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Claimant Trust, the other parties hereto or any beneficiary of the Claimant Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement.

(b)  The Delaware Trustee shall serve until such time as the Claimant Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Claimant Trustee in accordance with the terms hereof.  The Delaware Trustee may resign at any time upon the giving of at least thirty (30) days' advance written notice to the Claimant Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Claimant Trustee in accordance with the terms hereof. If the Claimant Trustee does not act within such thirty (30) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(c)  Upon the resignation or removal of the Delaware Trustee, the Claimant Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the

DOCS_NY:43843.3 36027/002

008609

outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Delaware Statutory Trust Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Claimant Trustee and any undisputed fees, expenses and indemnity due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Agreement.

(d)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement. The Claimant Trust shall promptly advance and reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(e)     WTNA shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(f)     Any corporation or association into which WTNA may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Delaware Trustee is a party, will be and become the successor Delaware Trustee under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## ARTICLE IV.
## THE OVERSIGHT BOARD

4.1     Oversight Board Members. The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "Disinterested Members"). The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker. David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members; provided, however, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-

DOCS_NY:43843.3 36027/002

E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

    4.2    <u>Authority and Responsibilities</u>.

    (a)    The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein.  As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.8 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; <u>provided</u>, <u>however</u>, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

    (b)    The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

    (c)    The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

    (d)    Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action  by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

    (e)    Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate

DOCS_NY:43843.3 36027/002

008611

in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds. It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

4.3     <u>Fiduciary Duties</u>.  The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; <u>provided</u>, <u>however</u>, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; <u>provided</u>, <u>further</u>, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action.  In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust.  Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

4.4     <u>Meetings of the Oversight Board</u>.  Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly.  Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; <u>provided</u>, <u>however</u>, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board).  Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

4.5     <u>Unanimous Written Consent</u>.  Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded.  If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone.  Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

DOCS_NY:43843.3 36027/002

008612

4.6   Manner of Acting.

(a)   A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); provided that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum.  Except as set otherwise forth herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement.  Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof.  Any Member participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

(b)   Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

(c)   Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Trust Interests).  A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "Conflicted Member" who shall not be entitled to vote or take part in any action with respect to such matter or issue.  In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d)   Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "Committee Member Claim Matter").  A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any

DOCS_NY:43843.3 36027/002

008613

Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

4.7  <u>Tenure of the Members of the Oversight Board</u>.  The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article IX hereof.  The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.8 below, or removal pursuant to Section 4.9 below.

4.8  <u>Resignation</u>.  A Member of the Oversight Board may resign by giving prior written notice thereof to the Claimant Trustee and other Members.  Such resignation shall become effective on the earlier to occur of (i) the day that is 90 days following the delivery of such notice, (ii) the appointment of a successor in accordance with Section 4.10 below, and (iii) such other date as may be agreed to by the Claimant Trustee and the non-resigning Members of the Oversight Board.

4.9  <u>Removal</u>.  A majority of the Oversight Board may remove any Member for Cause or Disability.  If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein.  Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

4.10  <u>Appointment of a Successor Member</u>.

(a)  In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; <u>provided</u>, <u>however,</u> that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; <u>provided</u>, <u>further,</u> that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board.  The appointment of a successor Member will be further evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

(b)  Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act.  A successor Member will not be liable personally for any act or omission of a predecessor Member.

(c)  Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment

DOCS_NY:43843.3 36027/002

008614

under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

     4.11  <u>Compensation and Reimbursement of Expenses</u>.  Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; <u>provided</u>, <u>however</u>, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member. Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

     4.12  <u>Confidentiality</u>. Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("<u>Confidential Trust Information</u>"), except as otherwise required by law.  For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "<u>Member Affiliates</u>") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.12.

<div align="center">

**ARTICLE V.**
**TRUST INTERESTS**

</div>

     5.1  <u>Claimant Trust Interests</u>.

     (a)  <u>General Unsecured Claim Trust Interests</u>. On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "<u>GUC Beneficiaries</u>").  The Claimant Trustee shall allocate to each Holder of an Allowed Class 8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims. The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

     (b)  <u>Subordinated Claim Trust Interests</u>.  On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "<u>Subordinated Beneficiaries</u>").  The

DOCS_NY:43843.3 36027/002

008615

Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9. The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests. The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

(c)    Contingent Trust Interests.  On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

5.2    Interests Beneficial Only.  The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

5.3    Transferability of Trust Interests.  No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or

008616

reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment
Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the
Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause
the Claimant Trust to become a public reporting company and/or make periodic reports under the
Exchange Act (provided that it is not required to register under the Investment Company Act or
register its securities under the Securities Act) to enable such disposition to be made. In the event
that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such
restrictions upon such disposition and other terms of this Agreement as are deemed necessary or
appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such
disposition under applicable securities and other laws.

    5.4    Registry of Trust Interests.

    (a)    Registrar. The Claimant Trustee shall appoint a registrar, which may be the
Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests
as provided herein. The Registrar, if other than the Claimant Trustee, shall be an institution or
person acceptable to the Oversight Board. For its services hereunder, the Registrar, unless it is the
Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as
a Claimant Trust Expense.

    (b)    Trust Register. The Claimant Trustee shall cause to be kept at the office of
the Registrar, or at such other place or places as shall be designated by the Registrar from time to
time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"),
which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the
Registrar may prescribe.

    (c)    Access to Register by Beneficiaries. The Claimant Trust Beneficiaries and
their duly authorized representatives shall have the right, upon reasonable prior written notice to
the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant
Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust
Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's
Trust Interest.

    5.5    Exemption from Registration. The Parties hereto intend that the rights of the
Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under
applicable laws, but none of the Parties represent or warrant that such rights shall not be securities
or shall not be entitled to exemption from registration under the applicable securities laws. The
Oversight Board, acting unanimously, and Claimant Trustee may amend this Agreement in
accordance with Article IX hereof to make such changes as are deemed necessary or appropriate
with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or
reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment
Company Act. The Trust Interests shall not have consent or voting rights or otherwise confer on
the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation
in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight
Board and/or the Claimant Trustee under this Agreement.

5.6 <u>Absolute Owners</u>. The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7 <u>Effect of Death, Incapacity, or Bankruptcy</u>. The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8 <u>Change of Address</u>. Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address. Such notification shall be effective only upon receipt by the Claimant Trustee. Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9 <u>Standing</u>. No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets. No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10 <u>Limitations on Rights of Claimant Trust Beneficiaries</u>.

(a) The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

(b) In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; <u>provided</u>, <u>however</u>, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

(c) A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed. A request for such bond can be made by the Claimant Trust or by Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

(d) Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas. Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

(e) The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

DOCS_NY:43843.3 36027/002

008618

## ARTICLE VI.
## DISTRIBUTIONS

6.1    Distributions.

      (a)    Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7.  Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board.  The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

      (b)    At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

      (c)    All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

6.2    Manner of Payment or Distribution.  All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

6.3    Delivery of Distributions.  All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records

DOCS_NY:43843.3 36027/002

008619

of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

6.4     Disputed Claims Reserves.  There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.  The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

6.5     Undeliverable Distributions and Unclaimed Property.     All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

6.6     De Minimis Distributions.  Distributions with a value of less than $100 will be treated in accordance with the Plan.

6.7     United States Claimant Trustee Fees and Reports.  **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.  After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

## ARTICLE VII.
## TAX MATTERS

7.1     Tax Treatment and Tax Returns.

(a)     It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.  Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable).  The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b)     The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c)     The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the

008620

Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2 <u>Withholding</u>. The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary. As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

<div align="center">

**ARTICLE VIII.**
**STANDARD OF CARE AND INDEMNIFICATION**

</div>

8.1 <u>Standard of Care</u>. None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee, Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence. None of the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2 <u>Indemnification</u>. The Claimant Trustee (including each former Claimant Trustee), WTNA in its individual capacity and as Delaware Trustee, the Oversight Board, and all past and present Members (collectively, in their capacities as such, the "<u>Indemnified Parties</u>") shall be

<div align="center">32</div>

008621

indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence. If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; provided, however, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm. The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; provided that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, willful misconduct, or gross negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; provided, further, that any such repayment obligation shall be unsecured and interest free. The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties. For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, WTNA in its individual capacity and as Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such. The indemnification provided hereby shall be a Claimant Trust Expense and shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein. The terms of this Section 8.2 shall survive the termination of this Agreement and the resignation or removal of any Indemnified Party.

8.3    No Personal Liability. Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or

008622

otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4 <u>Other Protections</u>. To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

# <u>ARTICLE IX.</u>
# <u>TERMINATION</u>

9.1 <u>Duration</u>. The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2 <u>Distributions in Kind</u>. Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

9.3 <u>Continuance of the Claimant Trustee for Winding Up</u>. After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall prepare, execute and file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "<u>Termination Date</u>"). If the Delaware Trustee's signature is required for purposes of filing such certificate of cancellation, the Claimant Trustee shall provide the Delaware

008623

Trustee with written direction to execute such certificate of cancellation, and the Delaware Trustee shall be entitled to conclusively and exclusively rely upon such written direction without further inquiry. Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4 <u>Termination of Duties</u>. Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5 <u>No Survival</u>. The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, <u>provided</u> that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

<div align="center">

**ARTICLE X.**
**AMENDMENTS AND WAIVER**

</div>

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; <u>provided</u> that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement. No amendment or waiver of this Agreement that adversely affects the Delaware Trustee shall be effective unless the Delaware Trustee has consented thereto in writing in its sole and absolute discretion.

<div align="center">

**ARTICLE XI.**
**MISCELLANEOUS**

</div>

11.1 <u>Trust Irrevocable</u>. Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2 <u>Bankruptcy of Claimant Trust Beneficiaries</u>. The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

11.3 <u>Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets</u>. No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4 <u>Agreement for Benefit of Parties Only</u>. Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in

DOCS_NY:43843.3 36027/002

008624

respect of this Agreement. The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

    11.5   <u>Notices</u>. All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

        (a)     If to the Claimant Trustee:

                Claimant Trustee
                c/o Highland Capital Management, L.P.
                100 Crescent Court, Suite 1850
                Dallas, Texas 75201

      With a copy to:

                Pachulski Stang Ziehl & Jones LLP
                10100 Santa Monica Blvd, 13th Floor
                Los Angeles, CA 90067
                Attn:   Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
                          Ira Kharasch (ikharasch@pszjlaw.com)
                          Gregory Demo (gdemo@pszjlaw.com)

        (b)     If to the Delaware Trustee:

                Wilmington Trust, National Association
                1100 North Market Street
                Wilmington, DE 19890
                Attn: Corporate Trust Administration/David Young
                Email: nmarlett@wilmingtontrust.com
                Phone: (302) 636-6728
                Fax: (302) 636-4145

Notice mailed shall be effective on the date mailed or sent. Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

    11.6   <u>Severability</u>. Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

    11.7   <u>Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

DOCS_NY:43843.3 36027/002

008625

11.8  Binding Effect, etc.  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the Claimant Trust Beneficiaries, and their respective successors and assigns.  Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

11.9  Headings; References.  The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10  Governing Law.  This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11  Consent to Jurisdiction.  Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12  Transferee Liabilities.  The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement.  In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims.  If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

DOCS_NY:43843.3 36027/002

008626

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By: _____

James P. Seery, Jr.
Chief Executive Officer and
Chief Restructuring Officer

Claimant Trustee

By: _____

James P. Seery, Jr., not individually but
solely in his capacity as the Claimant Trustee

DOCS_NY:43843.3 36027/002

008627

Wilmington Trust, National Association,
as Delaware Trustee

By: _____
Name:  Neumann Marlett
Title:  Bank Officer

008628

# EXHIBIT B

Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

| | |
|---|---|
| **HOME** | |

| Entity Details |
|---|

<div align="center">

**THIS IS NOT A STATEMENT OF GOOD STANDING**

</div>

| | | | |
|---|---|---|---|
| File Number: | **5421257** | Incorporation Date / Formation Date: | **3/9/2021** (mm/dd/yyyy) |
| Entity Name: | **MUCK HOLDINGS, LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **CORPORATION SERVICE COMPANY** | | |
| Address: | **251 LITTLE FALLS DRIVE** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **302-636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# EXHIBIT C

008631

Delaware.gov                                                    Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

| | |
|---|---|
| **HOME** | Entity Details |

<div align="center"><strong style="color:red">THIS IS NOT A STATEMENT OF GOOD STANDING</strong></div>

| | | | |
|---|---|---|---|
| File Number: | **5822640** | Incorporation Date / Formation Date: | **4/8/2021** (mm/dd/yyyy) |
| Entity Name: | **JESSUP HOLDINGS LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **VCORP SERVICES, LLC** | | |
| Address: | **108 W. 13TH STREET SUITE 100** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

<span style="color:red">Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.</span>

Would you like ○ Status  ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]                    [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT D

008633



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed October 22, 2020**

**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket No. 1089 |

**ORDER APPROVING DEBTOR'S SETTLEMENT WITH (A) THE REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND (CLAIM NO. 72), AND (B) THE HIGHLAND CRUSADER FUNDS (CLAIM NO. 81), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

Upon the *Motion for Entry of an Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1089] (the "Motion")[2] filed by the above-captioned debtor and debtor-in-possession (the "Debtor"); and this

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, any and all other documents filed in support of the Motion, and the UBS Objection; and this Court having held an evidentiary hearing October 20, 2020, where it assessed the credibility of the witnesses, considered the evidence admitted into the record, and determined that the legal and factual bases set forth in the Motion and at the hearing on the Motion establish good cause for the relief granted herein; and upon overruling any objections to the Motion; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Settlement, attached as **Exhibit 1** to the Morris Declaration, is approved in all respects pursuant to Bankruptcy Rule 9019.

3.      The UBS Objection is overruled in its entirety.

4.      The Debtor and its agents are authorized to take any and all actions necessary or desirable to implement the Settlement without need of further Court approval or notice.

5.      The Court shall retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order

### END OF ORDER ###

DOCS_NY:41107.8 36027/002

008635

# EXHIBIT E

008636

Case 19-34054-sgj11 Doc 1303 Filed 10/28/20 Entered 10/28/20 10:14:16 Desc Main Document Page 1 of 2
Docket #1302 Date Filed: 10/28/2020
Case 3:23-cv-02071-E Exhibit Exhibit 36 Filed 12/07/23 Page 44 of 214 PageID 8284



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed October 27, 2020

United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 1087 & 1088 |

### ORDER APPROVING DEBTOR'S SETTLEMENT WITH (A) ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP LLC (CLAIM NO. 23), (B) JOSHUA N. TERRY AND JENNIFER G. TERRY (CLAIM NO. 156), AND (C) ACIS CAPITAL MANAGEMENT, L.P. (CLAIM NO. 159) AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

Having considered the *Debtor's Motion for Entry of an Order Approving Settlement with*

*(a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b)*

*Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P.*

*(Claim No. 159) and Authorizing Actions Consistent Therewith* [Docket No. 1087] (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



"Motion"),[2] the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement") to

*Declaration of Gregory V. Demo in Support of the Debtor's Motion for Entry of an Order*

*Approving Settlement with (A) Acis Capital Management, L.P. and Acis Capital Management*

*GP, LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and Acis*

*Capital Management, L.P. (Claim No. 159), and Authorizing Actions Consistent Therewith*

[Docket No. 1088] (the "Demo Declaration"), and the General Release attached as **Exhibit "2"**

(the "Release") to the Demo Declaration filed by the above-captioned debtor and debtor-in-

possession (the "Debtor"); and this Court having jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to

28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion

in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found

that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors,

and other parties-in-interest; and this Court having found the Settlement Agreement and the

Release are fair and equitable; and this Court having, analyzed, for the reasons stated on the

record, (1) the probability of success in litigating the claims subject to Settlement Agreement and

Release, with due consideration for the uncertainty in fact and law; (2) the complexity and likely

duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other

factors bearing on the wisdom of the compromise, including: (i) the best interests of the

creditors, with proper deference to their reasonable views; and (ii) the extent to which the

settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this

Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the

Motion were appropriate under the circumstances and that no other notice need be provided; and

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

008638

this Court having reviewed the Motion, any and all other documents filed in support of the Motion, including the Debtor's Omnibus Reply filed by the Debtor at Docket No. 1211, and all objections thereto, including the objection filed by James Dondero at Docket No. 1121 (the "Dondero 9019 Objection");[3] and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.       The Motion is **GRANTED** as set forth herein.

2.       The Settlement and the Release, attached hereto as **Exhibit 1** and **Exhibit 2** are approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.       The Dondero 9019 Objection and all other objections to the Motion are overruled in their entirety.

4.       All objections to the proofs of claim subject to the Motion[4] are overruled as moot in light of the Court's approval of the Settlement Agreement and Release.

5.       The Debtor, the Debtor's agents, the Acis Parties (as defined by the Release), and all other parties are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement and the Release without need of further Court approval or notice.

---

[3] The objection to the Motion filed by Patrick Hagaman Daugherty at Docket No. 1201 was withdrawn on the record during the hearing on the Motion. The reservations of rights filed by Highland CLO Funding, Ltd., CLO Holdco, Ltd., HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P. and HarbourVest Partners L.P. filed at Docket Nos. 1177, 1191, and 1195 (collectively, the "Reservations") are resolved based on the Debtor's representations on the record, made without objection, that (a) the conditions precedent in Section 1(c) of the Settlement Agreement will not occur and therefore, the Debtor will not, pursuant to the Settlement Agreement, transfer all of its direct and indirect right, title and interest in Highland HCF Advisor, Ltd. to Acis or its nominee, and that (b) none of the parties asserting any of the Reservations are bound by the Release.

[4] The objections include (a) the Debtor's *Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 771]; (b) *James Dondero's Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC; and (II) Joinder in Support of Highland Capital Management, L.P.'s Objection to Proof of Claim of Acis Capital Management L.P. and Acis Capital Management GP, LLC* [Docket No. 827]; and (c) *UBS (I) Objection to Proof of Claim of Acis Capital Management, L.P. and Acis Capital Management GP, LLC and (II) Joinder in the Debtor's Objection* [Docket No. 891].

008639

6.      The Court shall retain exclusive jurisdiction with respect to all matters arising

from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

008640

# EXHIBIT 1

008641

# SETTLEMENT AGREEMENT

This Settlement Agreement, including all attachments, (the "<u>Agreement</u>") is entered into as of September 9, 2020, by and among (i) Highland Capital Management, L.P. ("<u>HCMLP</u>"); (ii) Acis Capital Management, L.P. ("<u>Acis LP</u>"); (iii) Acis Capital Management GP LLC ("<u>Acis GP</u>" and together with Acis LP, "<u>Acis</u>"); (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and (v) Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan

Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS**, on August 3, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>") entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, Acis Capital Management L.P., and Acis Capital Management GP, LLC (together, the "<u>Mediation Parties</u>"), among others, were directed to mediate their disputes before Retired Judge Allan Gropper and Sylvia Mayer (together, the "<u>Mediators</u>"); and

**WHEREAS**, during the mediation, the Mediators made an economic proposal to resolve the Claims (the "<u>Mediators' Economic Proposal</u>"), and each of the Mediation Parties accepted the Mediators' Economic Proposal; and

**WHEREAS**, the Parties have negotiated and executed that certain General Release, dated as of even date herewith (the "<u>Release</u>"),[1] which, among other things, releases the Acis Released Claims and the HCMLP Released Claims; and

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the Mediators' Economic Proposal and which, when combined with the Release, will fully and finally resolve the Claims; and

**WHEREAS**, this Agreement and the Release attached hereto will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("<u>Rule 9019</u>");

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.     **Settlement of Claims.**  In full and complete satisfaction of the Claims:

(a)     The proof of claim filed by Acis in the HCMLP Bankruptcy Case on December 31, 2019 [Claim No. 23] will be allowed in the amount of $23,000,000 as a general unsecured claim;

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Release.

1

008642

(b)  On the effective date of a plan of reorganization and confirmed by the Bankruptcy Court, HCMLP will pay in cash to:

(i)  Joshua N. Terry and Jennifer G. Terry $425,000, plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed in the HCMLP Bankruptcy Case by Joshua N. Terry and Jennifer G. Terry on April 8, 2020 [Claim No. 156];

(ii)  Acis LP $97,000, which amount represents the legal fees incurred by Acis LP with respect to *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195-2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP in the HCMLP Bankruptcy Case on April 8, 2020 [Claim No. 159];

(iii)  Joshua N. Terry $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

(c)  On the effective date of a plan of reorganization proposed by HCMLP and confirmed by the Bankruptcy Court, if HMCLP receives written advice of nationally recognized external counsel that it is legally permissible consistent with HCMLP's contractual and legal duties to transfer all of its direct and indirect right, title and interest in Highland HCF Advisor, Ltd. to Acis or its nominee and that doing so would not reasonably subject HCMLP to liability, HCMLP shall transfer all of its right, title and interest in Highland HCF Advisor, Ltd., whether its ownership is direct or indirect, to Acis or its nominee, subject at all times to Acis's right to unilaterally reject the transfer in its sole and absolute discretion;

(d)  Within five (5) days of the Agreement Effective Date, HCMLP shall:

(i)  Move to withdraw, with prejudice, its proof of claim [Claim No. 27] filed in *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018), and its proof of claim [Claim No. 13] filed in *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018);

(ii)  Move to withdraw, with prejudice, Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b) filed in the Acis Bankruptcy Case [Docket No. 772];

(e)  At all times after the execution of this Agreement:

(i)  Only to the extent reasonably necessary to maintain the status quo in the Acis Appeals, the Parties shall cooperate in seeking to abate or otherwise stay the Acis Appeals vis-à-vis the Parties pending the occurrence of the Agreement Effective Date; and

(ii)  HCMLP shall cooperate in good faith to promptly return to Acis all property of Acis that is in HCMLP's possession, custody, or control, including but not limited to e-mail communications.

2

2.  **Releases.**  The Release is (a) attached to this Agreement as **Appendix A**; (b) an integral component of the Mediator's Economic Proposal and (c) incorporated by reference into this Agreement as if fully set forth herein.

3.  **Agreement Subject to Bankruptcy Court Approval.**

(a)  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the Release by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement and the Release expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order.  The "Agreement Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

(b)  The Parties acknowledge and agree that the terms and conditions of this Agreement are conditioned, in all respects, on the execution of the Release by the Parties and the approval of the Release and this Agreement by the Bankruptcy Court.  If either the Release or this Settlement Agreement are not approved by the Bankruptcy Court for any reason, this Agreement and the Release will be immediately null and void and of no further force and effect.

4.  **Representations and Warranties.**  Subject in all respects to Section 3, each Party represents and warrants to the other Party that such Party is fully authorized to enter into and perform the terms of this Agreement and that, as of the Agreement Effective Date, this Agreement and the Release will be fully binding upon each Party in accordance with their terms.

5.  **No Admission of Liability.**  The Parties acknowledge that there is a bona fide dispute with respect to the Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by HCMLP, the Acis Parties, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the Acis Parties, or any other person.

6.  **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns, including but not limited to any Chapter 7 trustee appointed for HCMLP.

7.  **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**Acis**

Acis Capital Management, LP
4514 Cole Avenue
Suite 600
Dallas, Texas 75205

3

US-DOCS\115534291.12

008644

Attention:  Joshua N. Terry
Email: josh@aciscm.com

with a copy (which shall not constitute notice) to:


ROGGE DUNN GROUP, P.C.
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Attention:  Brian P. Shaw
Telephone No.:  214.239.2707
E-mail:  shaw@roggedunngroup.com

**Joshua N. Terry and Jennifer G. Terry**

25 Highland Park Village, Suite 100-848
Dallas TX 75205
Attention:  Joshua N. Terry
Email:  joshuanterry@gmail.com

with a copy (which shall not constitute notice) to:


ROGGE DUNN GROUP, P.C.
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Attention:  Brian P. Shaw
Telephone No.:  214.239.2707
E-mail:  shaw@roggedunngroup.com

**HCMLP**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910

4

008645

Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

8.     **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

9.     **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

10.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

11.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

12.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

13.     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the HCMLP Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this

008646

Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

6

008647

**IT IS HEREBY AGREED.**

**ACIS CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____Joshua N. Terry_____
Its: _____President_____

**ACIS CAPITAL MANAGEMENT GP LLC**

By: _____
Name: _____Joshua N. Terry_____
Its: _____President_____

**JOSHUA N. TERRY**

By: _____
Name: _____Joshua N. Terry_____
Its: _____Self_____

**JENNIFER G. TERRY**

By: _____
Name: _____Jennifer G. Terry_____
Its: _____Self_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

008648

**IT IS HEREBY AGREED.**

ACIS CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

ACIS CAPITAL MANAGEMENT GP LLC

By: _____
Name: _____
Its: _____

JOSHUA N. TERRY

By: _____
Name: _____
Its: _____

JENNIFER G. TERRY

By: _____
Name: _____
Its: _____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _James P. Seery, Jr._____
Its: _CEO/CRO_____

7

# EXHIBIT 2

008650

# GENERAL RELEASE

This GENERAL RELEASE (this "Release"), effective on the Effective Date (as defined below), is entered into by and among (i) Highland Capital Management, L.P. ("HCMLP"), (ii) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (collectively, the "Terry Parties"), (iii) Acis Capital Management L.P., and Acis Capital Management GP, LLC (collectively, "Acis") (the Terry Parties and Acis, collectively, the "Acis Parties"), and (iii) those HCMLP Specified Parties (as defined below) who execute this Release (together, the "Parties").

# RECITALS

WHEREAS, the Parties have asserted or may assert claims that are defined in Section 1 below as the "Acis Released Claims" and the "HCMLP Released Claims" (collectively, the "Claims"); and

WHEREAS, on August 3, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Court") entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, Acis Capital Management L.P., and Acis Capital Management GP, LLC (together, the "Mediation Parties"), among others, were directed to mediate their disputes before Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"); and

WHEREAS, during the mediation, the Mediators made an economic proposal to resolve the Claims (the "Mediators' Economic Proposal"), and each of the Mediation Parties accepted the Mediators' Economic Proposal; and

WHEREAS, the Parties desire to enter into a general release of all Claims which, when combined with the Mediators' Economic Proposal, will fully and finally resolve the Claims; and

WHEREAS, except in Section 1.c below, this is a general release, meaning the Parties intend hereby to release any and all Claims which the Parties can release, and the Parties are unaware of any Claims between them which are not being released herein; and

WHEREAS, this Release will be appended or otherwise incorporated into a written settlement agreement (the "Settlement Agreement") that will include the terms of the Mediators' Economic Proposal and will be presented to the Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"), and is only effective upon the Effective Date.

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the promises made herein and in the Mediators' Economic Proposal, the Parties agree to release each other pursuant to and in accordance with the terms and conditions set forth below.

008651

## AGREEMENT

1.  <u>Releases</u>.

      a.    Upon the Effective Date, and to the maximum extent permitted by law, and except as set forth in Section 1d below, each of the Acis Parties on behalf of himself, herself, or itself and each of their respective current or former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (A)(i) HCMLP; (ii) Strand; (iii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP and any entity otherwise controlled by HCMLP; and (iv) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP (the foregoing (A)(i) through (A)(iv) the "<u>HCMLP Entities</u>") and (B) with respect to each such HCMLP Entity, such HCMLP Entity's respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the HCMLP Entities, the "<u>HCMLP Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Filed Cases, including the proofs of claim [Claim No. 23; 156; 159] filed by the Acis Parties in the HCMLP Bankruptcy Case and any objections or potential objections to the Plan or the confirmation thereof (collectively, the "<u>Acis Released Claims</u>"). This release is intended to be general. Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties **shall not** include NexPoint Advisors (and any of its subsidiaries), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd.), Highland CLO Funding, Ltd. (and any of its subsidiaries), NexBank, SSB (and any of its subsidiaries), James Dondero, Hunter Mountain Investment Trust (or any trustee acting for the trust), Dugaboy Investment Trust (or any trustee acting for the trust), Grant Scott, David Simek, William Scott, Heather Bestwick, Mark Okada and his family trusts (and the trustees for such trusts in their representative capacities), McKool Smith, PC, Gary Cruciani, Lackey Hershman, LLP, Jamie Welton, or Paul Lackey.

      b.    Upon the Effective Date, and to the maximum extent permitted by law, each HCMLP Released Party hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue the (A) Acis Parties, (B) Acis CLO 2013-1Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., Acis CLO 2015-6 Ltd. (collectively, the "<u>Acis CLOs</u>"), and (C) with respect to each such Acis Party and Acis CLO, to the extent applicable, such Acis Party and Acis CLO, their respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents,

008652

affiliates, successors, designees, and assigns (the foregoing (A), (B), and (C), the "Acis Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Filed Cases (collectively, the "HCMLP Released Claims"). This release is intended to be general. Notwithstanding anything contained herein to the contrary, this Section 1.b will not affect any right to payment under any notes, debt, equity, or other security issued by any Acis CLO and held by any HCMLP Released Party.

c.      The HCMLP Released Parties shall also hereby forever, finally, fully, unconditionally, and completely release, relieve, acquit, remise, and exonerate, and covenant never to sue (A) U.S. Bank National Association, Moody's Investor Services, Inc., and Brigade Capital Management, Inc. and (B) with respect to each such DAF Suit Defendant, to the extent applicable, such DAF Suit Defendant, their respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the foregoing (A) and (B), the "DAF Suit Defendants"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, which were or could have been asserted in, in connection with, or with respect to the DAF Lawsuits.  This release is not intended to be general.

d.      Notwithstanding anything herein to the contrary, if (A) any HCMLP Specified Party has not executed this Release on or before the Effective Date or (B) any HCMLP Released Party, including any HCMLP Specified Party, (i) sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten any Acis Released Party on or in connection with any HCMLP Released Claim or any other claim or cause of action arising prior to the date of this Release, (ii) takes any action that, in HCMLP's reasonable judgment, impairs or harms the value of HCMLP, its estate, and its assets; or (iii) in HCMLP's reasonable judgment fails to use commercially reasonable efforts to support confirmation of the Plan and/or the monetization of HCMLP's assets at their maximum value, then (a) such HCMLP Released Party (and only such HCMLP Released Party) will be deemed to have waived (x) the release and all other protections set forth in Section 1a hereof and will have no further rights, duties, or protections under this Release and (y) any releases set forth in the Plan, (b) the Acis Released Parties, as applicable, may, in their discretion, assert any and all Acis Released Claims against such HCMLP Released Party (and only such HCMLP Released Party), and (c) any statutes of limitation or other similar defenses are tolled against such HCMLP Released Party (and only such HCMLP Released Party) from the execution of this Release until ninety (90) days after the Acis Released Parties receive actual written notice of any violation of this Section 1d. For the avoidance of doubt, by signing this Release each of the HCMLP Specified Parties is

008653

acknowledging and agreeing, without limitation, to the terms of this Section 1.d and the tolling agreement set forth herein.

        2.    <u>Withdrawal/Dismissal of Filed Cases</u>.  Within five days of the Effective Date, each Acis Released Party and HCMLP Released Party, to the extent applicable, will coordinate to cause the Filed Cases, including any appeals of any Filed Cases, to be dismissed with prejudice as to any Acis Released Party or HCMLP Released Party; *provided, however,* that there is no obligation to dismiss or withdraw the HCMLP Bankruptcy Case.  For the avoidance of doubt, and consistent with this Section, (a) if HMCLP receives written advice of nationally recognized external counsel that it is legally permissible consistent with HCMLP's contractual and legal duties to direct Neutra, Ltd. to move to dismiss all of their appeals arising from the Acis Bankruptcy and that doing so would not reasonably subject HCMLP to liability, HCMLP shall direct Neutra, Ltd. to move to dismiss all of their appeals arising from the Acis Bankruptcy and (b) Acis shall move to dismiss with prejudice its claims against HCMLP asserted in any adversary proceeding in the Acis Bankruptcy Case.  To the extent reasonably necessary to maintain the status quo in the Filed Cases, including any appeals thereof, prior to the Effective Date, each Acis Released Party and HCMLP Released Party shall reasonably cooperate in seeking to abate or otherwise stay the Filed Cases vis-à-vis the Parties.

        3.    <u>Representations and Warranties</u>.

        a.    Each of the Acis Parties represents and warrants to each of the HCMLP Released Parties and each of the HCMLP Specified Parties who have signed this Release that (a) he, she or it has full authority to release the Acis Released Claims and has not sold, transferred, or assigned any Acis Released Claim to any other person or entity, and that (b) to the best of his, her or its current knowledge, no person or entity other than the Acis Parties has been, is, or will be authorized to bring, pursue, or enforce any Acis Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) any of the Acis Parties.

        b.    Each of HCMLP and each HCMLP Specified Party who has signed this Release represents and warrants to each of the Acis Parties that he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity.

        c.    Each HCMLP Specified Party and each of HCMLP and Strand represents and warrants to each of the Acis Parties that he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Specified Party, HCMLP, or Strand personally has against any Acis Party.

        d.    HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support the Acis Parties' position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will have no obligations to assist the Acis Parties under this Section if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such

assistance would require HCMLP to expend material amounts of time or money. HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Release shall in any way affect the enforceability of this Release vis-à-vis any of the HCMLP Entities. The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

Notwithstanding anything herein to the contrary, the Acis Parties acknowledge and agree that their sole and exclusive remedy for the breach of the foregoing Sections 3b, 3c, and 3d will be that set forth in Section 1.d hereof.

4.    Additional Definitions.

a.    "Acis Bankruptcy Case" means, collectively, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018)

b.    "DAF Lawsuits" means (a) Case No. 1:19-cv-09857-NRB; *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al*, formerly pending in the United States District Court for the Southern District of New York; and (b) Case No. 1:20-cv-01036-LGS; *The Charitable Donor Advised Fund, L.P. and CLO Holdco, Ltd. v. U.S. Bank National Association, et al*, formerly pending in the United States District Court for the Southern District of New York.

c.    "Effective Date" means the date of an order of the Court approving the Settlement Agreement pursuant to a motion filed under Rule 9019.

d.    "Filed Cases" means (a) the HCMLP Bankruptcy Case, (b) *Acis Capital Management, L.P., et al. v. Highland Capital Management, L.P., et al*, Case No. 18-03078 (Bankr. N.D. Tex. 2018); (c) *Motion for Relief from the Automatic Stay to Allow Pursuit of Motion for Order to Show Cause for Violations of the Acis Plan Injunction*, Case No. 19-34054-sgj-11 [Docket No. 593] (Bankr. N.D. Tex. 2020); (d) *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent*, Case No. DC-16-11396, pending in the 162nd District Court of Dallas County Texas; (e) *Acis Capital Management, L.P., et al v. James Dondero, et al.*, Case No. 20-0360 (Bankruptcy N.D. Tex. 2020); (f) *Acis Capital Management, L.P., et al v. Gary Cruciani, et al.*, Case No. DC-20-05534, pending in the 162nd District Court of Dallas County Texas; (g) *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey; and (h) the Acis Bankruptcy Case.

e.    "HCMLP Bankruptcy Case" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex. 2019).

f.    "HCMLP Specified Party" means Scott Ellington, Isaac Leventon, Thomas Surgent, Frank Waterhouse, Jean Paul Sevilla, David Klos, Kristin Hendrix, Timothy Cournoyer, Stephanie Vitiello, Katie Irving, Jon Poglitsch, or Hunter Covitz. For the avoidance of doubt, each HCMLP Specified Party is a HCMLP Released Party.

008655

g.    "Plan" means the *Plan of Reorganization of Highland Capital Management, L.P.*, filed in the HCMLP Bankruptcy Case [Docket No. 956] as may be amended or restated.

h.    "Strand" means Strand Advisors, Inc.

5.    Miscellaneous.

a.    For the avoidance of doubt, all rights, duties, and obligations of any HCMLP Released Party or Acis Released Party created by this Release or the Settlement Agreement shall survive its execution.

b.    This Release, together with the Settlement Agreement and any exhibits thereto, contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

c.    This Release may not be modified other than by a signed writing executed by the Parties.

d.    The effectiveness of this Release is subject in all respects to entry of an order of the Court approving this Release and the Settlement Agreement and authorizing HCMLP's execution thereof.

e.    This Release may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument, and shall be effective against a Party upon the Effective Date.

f.    This Release will be exclusively governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to its conflicts of law principles, and all claims relating to or arising out of this Release, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Texas, excluding Texas's conflicts of law principles. The Court will retain exclusive jurisdiction over all disputes relating to this Release.  In any action to enforce this Release, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[SIGNATURE PAGE FOLLOWS]*

**IT IS HEREBY AGREED.**

**ACIS CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____Joshua N. Terry_____
Its: _____President_____

**ACIS CAPITAL MANAGEMENT GP LLC**

By: _____
Name: _____Joshua N. Terry_____
Its: _____President_____

**JOSHUA N. TERRY**

By: _____
Name: _____Joshua N. Terry_____
Its: _____Self_____

**JENNIFER G. TERRY**

By: _____
Name: _____Jennifer G. Terry_____
Its: _____Self_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

008657

**IT IS HEREBY AGREED.**

           **ACIS CAPITAL MANAGEMENT, L.P.**

           By: _____
           Name: _____
           Its: _____

           **ACIS CAPITAL MANAGEMENT GP LLC**

           By: _____
           Name: _____
           Its: _____

           **JOSHUA N. TERRY**

           By: _____
           Name: _____
           Its: _____

           **JENNIFER G. TERRY**

           By: _____
           Name: _____
           Its: _____

           **HIGHLAND CAPITAL MANAGEMENT, L.P.**

           By: _____
           Name: _JAMES P. SEERY, JR._____
           Its: _CEO/CRO_____

008658

**HCMLP SPECIFIED PARTIES**

SCOTT ELLINGTON

_____

ISAAC LEVENTON

_____

THOMAS SURGENT

_____

FRANK WATERHOUSE

_____

JEAN PAUL SEVILLA

_____

DAVID KLOS

_____

KRISTIN HENDRIX

_____

TIMOTHY COURNOYER

_____

STEPHANIE VITIELLO

_____

KATIE IRVING

_____

JON POGLITSCH

_____

008659

**HUNTER COVITZ**

_____

008660

# EXHIBIT F

008661

Case 19-34054-sgj11 Doc 1788 Filed 01/21/25 Entered 01/21/25 07:55:10 Page 1 of 3
Case 3:23-cv-02071-E Exhibit Exhibit 36 Filed 12/07/23 Page 69 of 214 PageID 8309
Docket #1788 Date Filed: 01/21/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

## ORDER APPROVING DEBTOR'S SETTLEMENT
## WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
## AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order*

*Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and*

*Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland

Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-

captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant

to ==28 U.S.C. §§ 157== and ==1334==; and this Court having found that this is a core proceeding

pursuant to ==28 U.S.C. § 157(b)(2)==; and this Court having found that venue of this proceeding and

the Motion in this District is proper pursuant to ==28 U.S.C. §§ 1408== and ==1409==; and this Court

having found that the relief requested in the Motion is in the best interests of the Debtor's estate,

its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement

fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the

probability of success in litigating the claims subject to the Settlement Agreement, with due

consideration for the uncertainty in fact and law, (2) the complexity and likely duration of

litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing

on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper

deference to their reasonable views, and (ii) the extent to which the settlement is truly the

product of arms-length bargaining, and not of fraud or collusion; and this Court having found

that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were

appropriate under the circumstances and that no other notice need be provided; and this Court

having determined that the legal and factual bases set forth in the Motion establish good cause

for the relief granted herein; and upon all of the proceedings had before this Court; and after due

deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** as set forth herein.

2. All objections to the Motion are overruled.

3. The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all

respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

008664

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

<p align="center">###End of Order###</p>

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

DOCS_NY:41987.4 36027/002

008665

# EXHIBIT 1

008666

**EXECUTION VERSION**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

# R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

008667

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

    (a)      In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)      an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)      an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)      On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

    (a)      Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

EXECUTION VERSION

4. **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support.**

(a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

008670

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and
the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

      6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide
dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an
admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and
the execution of this Agreement does not constitute an admission of liability, fault, or
wrongdoing on the part of the Debtor, HarbourVest, or any other person.

      7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to
the benefit of each of the Parties and their successors, and assigns.

      8.    **Notice**.  Each notice and other communication hereunder will be in writing and
will be sent by email and delivered or mailed by registered mail, receipt requested, and will be
deemed to have been given on the date of its delivery, if delivered, and on the fifth full business
day following the date of the mailing, if mailed to each of the Parties thereto at the following
respective addresses or such other address as may be specified in any notice delivered or mailed
as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

US-DOCS\115534291.12

EXECUTION VERSION

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

008672

**EXECUTION VERSION**

        14.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<p style="text-align:center"><em>[Remainder of Page Intentionally Blank]</em></p>

EXECUTION VERSION

IT IS HEREBY AGREED.

### HIGHLAND CAPITAL MANAGEMENT, L.P.

By: /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its: CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

US-DOCS\115534291.12

008674

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:   /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:   /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

US-DOCS\115534291.12

008675

# Exhibit A

# TRANSFER AGREEMENT
## FOR ORDINARY SHARES OF
## HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

008677

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

008678

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 184668980v.2

008679

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

008680

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member


By: _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer



**PORTFOLIO MANAGER:**


**Highland HCF Advisor, Ltd.**


By: _____

Name:  James P. Seery, Jr.

Title:  President



**FUND:**
**Highland CLO Funding, Ltd.**


By: _____

Name:

Title:


*[Additional Signatures on Following Page]*

008681

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
       Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
       Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
       Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

6

008682

**HarbourVest 2017 Global Fund L.P.**

By: HarbourVest 2017 Global Associates L.P.
Its General Partner

By: HarbourVest GP LLC
Its General Partner

By: HarbourVest Partners, LLC
Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

008683

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

008684

# EXHIBIT G

008685

Docket #2389 Date Filed: 05/27/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

Signed May 27, 2021

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH UBS SECURITIES LLC AND UBS AG LONDON BRANCH
### AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the Motion; (b) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



1934054210527000000000012

*Declaration of Robert J Feinstein in Support of the Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2200] (the "Feinstein Declaration"), and the exhibits annexed thereto including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) the *Limited Preliminary Objection to Debtor's Motion for Entry of an Order Approving Settlement with UBS and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Trusts' Preliminary Objection"), filed by The Dugaboy Investment Trust and the Get Good Trust (collectively the "Trusts"); (e) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Trusts' Supplemental Opposition"), filed by the Trusts; (f) *James Dondero's Objection Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection" and collectively, with the Trusts' Preliminary Objection and the Trusts' Supplemental Opposition, the "Objections"), filed James Dondero; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2308] (the "Debtor's Reply"), filed by the Debtor; (h) UBS's *Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2310]; (i) the testimonial and documentary evidence admitted into evidence during the hearing held on May 21, 2021 (the "Hearing"), including assessing the credibility of the witness; and (j) the arguments made during the Hearing; and this Court having jurisdiction over

DOCS_NY:43249.2 36027/002

008687

this matter pursuant to <mark>28 U.S.C. §§ 157</mark> and <mark>1334</mark>; and this Court having found that this is a core proceeding pursuant to <mark>28 U.S.C. § 157(b)(2)</mark>; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to <mark>28 U.S.C. §§ 1408</mark> and <mark>1409</mark>; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) that the  settlement is the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

008688

4.  The Debtor, UBS, and all other parties are authorized to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

5.  The Court finds that the Debtor, in its capacity as investment manager of Multi-Strat, exercised sound business judgment in causing Multi-Strat to enter into the Settlement Agreement. Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor, in its capacity as investment manager of Multi-Strat, is authorized to cause Multi-Strat to settle the claims UBS has asserted against Multi-Strat in the State Court and otherwise to cause Multi-Strat to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

6.  The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

<div align="center">###End of Order###</div>

DOCS_NY:43249.2 36027/002

008689

# EXHIBIT 1

EXECUTION VERSION

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

Case 19-34054-sgj11 Doc 3838 Filed 05/27/26 Entered 05/27/26 05:33:22 Page 7 of 21
Case 3:23-cv-02071-E Document 25-17 Filed 12/07/285 Page 99 of 214 PageID 8339
EXECUTION VERSION

WHEREAS, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

WHEREAS, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

WHEREAS, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

WHEREAS, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

WHEREAS, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

WHEREAS, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

WHEREAS, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

WHEREAS, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

WHEREAS, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

WHEREAS, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

WHEREAS, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

WHEREAS, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

WHEREAS, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

008692

**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

WHEREAS, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

WHEREAS, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

WHEREAS, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

WHEREAS, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

WHEREAS, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

WHEREAS, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

WHEREAS, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

WHEREAS, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

008693

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.     **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)     The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

008694

EXECUTION VERSION

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows:  (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

008695

Case 19-34054-sgj11 Doc 2838 Filed 05/27/21 Entered 05/27/21 13:22:12 Page 1 of 21
Case 3:23-cv-02071-E Document 18-61 Filed 12/07/23 Page 103 of 214 PageID 8343
EXECUTION VERSION

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

(d)     Redeemer Appeal.

(i)     On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

008696

Case 19-34054-sgj11 Doc 2683-1 Filed 05/26/06/28 Entered 05/27/06/05/23 22:1 Page 12 of 21
Case 3:23-cv-02071-E Document 26-1 Filed 12/20/290 Page 104 of 214 PageID 8344
EXECUTION VERSION

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor.  For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

**2.     Definitions.**

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

**3.     Releases.**

(a)     **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

008697

EXECUTION VERSION

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) shall be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

       (b)    **HCMLP Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

008698

Case 19-34054-sgj11 Doc 2683-8 Filed 05/27/20 Entered 05/27/20 15:33:12 Page 14 of 21
Case 3:23-cv-02071-E   Document 20-16 Filed 12/04/23   Page 106 of 214   PageID 8346
EXECUTION VERSION

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4.     **No Third Party Beneficiaries**.  Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5.     **UBS Covenant Not to Sue**.  Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

008699

Case 19-34054-sgj11 Doc 2838-8 Filed 05/27/06/15/23 Entered 05/27/06/15/23 23:22:10 Page 15 of 21
Case 3:23-cv-02071-E Document 86-1 Filed 12/07/23 Page 107 of 214 PageID 8347
EXECUTION VERSION

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6.  **Agreement Subject to Bankruptcy Court Approval.**

(a)     The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7.  **Representations and Warranties**.

(a)     Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)     Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)     Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

008700

**EXECUTION VERSION**

**8.** **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim.  Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice**.  Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Telephone No.:  972-628-4100
E-mail:  notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention:  Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.:  310-277-6910
E-mail:  jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention:  Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-9007
E-mail:  elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention:  John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

008701

**EXECUTION VERSION**

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
           Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
       sarah.tomkowiak@lw.com

      **11.**   **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

      **12.**   **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

      **13.**   **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

      **14.**   **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

      **15.**   **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

008702

EXECUTION VERSION

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

  **16. Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

<p style="text-align:center">*[Remainder of Page Intentionally Blank]*</p>

008703

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: James P. Seery, Jr.
Its: Authorized Signatory

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____
Name: James P. Seery, Jr
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____
Name: James P. Seery, Jr
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____
Name: James P. Seery, Jr
Its: Authorized Signatory

**STRAND ADVISORS, INC.**

By: _____
Name: James P. Seery, Jr.
Its: Authorized Signatory

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____
Name: John Lantz
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____
Name: William Chandler
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

15

008705

EXECUTION VERSION

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

008706

# EXHIBIT H

008707



**Alvarez & Marsal CRF
Management, LLC** 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million.  Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021.  Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____
      Steven Varner
      Managing Director

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT

_____ Northern __ DISTRICT OF __ Texas _____

Case number 19-34054-sgj11

In re: Highland Capital Management, LP    §     Case No. __19-34054_____
   §
   §
_____    §
Debtor(s)    §     ☐ Jointly Administered

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 09/30/2021 _____     Petition Date: 10/16/2019 _____

Plan Confirmed Date: 02/22/2021 _____     Plan Effective Date: 08/11/2021 _____

This Post-confirmation Report relates to: ⦿ Reorganized Debtor

○ Other Authorized Party or Entity: _____

Name of Authorized Party or Entity

/s/ Zachery Z. Annable _____     Zachery Z. Annable, Hayward PLLC _____
Signature of Responsible Party     Printed Name of Responsible Party

10/21/2021 _____
Date

    10501 N. Central Expressway, Suite 106
    Dallas TX 75231 _____
    Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

008711

Debtor's Name Highland Capital Management, LP        Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $33,868,509 | $28,496,358 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $0 |
| d. Total transferred (a+b+c) | $33,868,509 | $28,496,358 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor    *Aggregate Total* | | $2,632,365 | $31,771,605 | $6,150,655 | $30,888,237 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Pachulski Stang Ziehl & Jones L | Lead Counsel | $2,519,827 | $23,611,818 | $4,843,118 | $22,789,658 |
| ii | Development Specialists, Inc. | Financial Professional | $0 | $5,658,299 | $813,227 | $5,658,299 |
| iii | Kurtzman Carson Consultants | Other | $0 | $1,857,660 | $330,712 | $1,857,660 |
| iv | Hayward & Associates PLLC | Local Counsel | $112,538 | $643,827 | $163,599 | $582,621 |

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor    *Aggregate Total* | | $536,506 | $6,183,667 | $1,032,709 | $5,073,192 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Hunton Andrews Kurth LLP | Other | $520,023 | $1,149,807 | $416,394 | $1,009,864 |
| ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| iii | Deloitte | Financial Professional | $16,482 | $428,361 | $0 | $206,336 |
| iv | Mercer (US) Inc. | Other | $0 | $170,284 | $0 | $170,284 |
| v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $616,315 | $616,315 |
| vi | Wilmer Cutler Pickering Hale a | Other | $0 | $1,389,667 | $0 | $1,389,667 |
| vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| c. | All professional fees and expenses (debtor & committees) | | $4,408,326 | $56,849,059 | $8,572,805 | $54,651,118 |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $15,750 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $691,367 | $691,367 | $5,886,018 | 12% |
| c. Priority claims | $16,498 | $19,683 | $19,683 | $19,683 | 100% |
| d. General unsecured claims | $205,144,544 | $6,168,473 | $6,168,473 | $376,622,019 | 2% |
| e. Equity interests | $0 | $0 | $0 | | |

008712

Debtor's Name Highland Capital Management, LP                    Case No. 19-34054

| Part 4: Questionnaire | | |
|---|---|---|

a. Is this a final report?                                      Yes ○    No ◉

    If yes, give date Final Decree was entered:                    _____

    If no, give date when the application for Final Decree is anticipated:    _____

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?    Yes ◉    No ○

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**<u>I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.</u>**

/s/ James Seery                                      James Seery
_____                      _____
Signature of Responsible Party                       Printed Name of Responsible Party

Chief Operating Officer                              10/21/2021
_____                      _____
Title                                                Date

008713

# EXHIBIT J

# EXHIBIT A

008715

2/1/2021

008716

**Highland Capital Management, L.P.**
*Disclaimer For Financial Projections*

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

2/1/2021

008717

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A.  Plan effective date is March 1, 2021

B.  All investment assets are sold by December 31, 2022.

C.  All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021

D.  Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the interim interest income and principal payments are not collected due to prepayment on note

E.  Fixed assets currently used in daily operations are sold in June 2021 for $0

F.  Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G.  All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H.  Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.

I.  Litigation Trustee budget is $6,500,000.

J.  Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K.  Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L.  Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HMI").

M.  Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HMI, $50.0 million for UBS and $45 million HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N.  With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O.  Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.

P.  See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):

    o  By September 30, 2021 - $50,000,000
    o  By March 31, 2022 – additional $50,000,000
    o  By June 30, 2022 – additional $25,000,000
    o  All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Q.  Assumptions subject to revision based on business decision and performance of the business

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 - Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | - |
| Subtotal | (27,793) | (17,514) |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

*Footnotes:*
[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs
[3] Estimated expenses through final distribution exclude non-cash expenses:
   Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO
[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages
[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund
   UBS claim included at $50.0 million.

*Notes:*
All claim amounts are estimated as of February 1, 2020 and subject to change

008718

2/1/2021

2/1/2021

008719

**Highland Capital Management, L.P.**
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast --> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| **Claims** | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 – Frontier Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 3 – Other Secured Claims | - | - | - | 5,528 | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 273,219 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Class 9 – Subordinated Claims [1] | - | - | - | - | 4,500 | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 278,747 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | 141,230 | 291,639 | 283,468 | 233,723 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Partners' Capital | 199,551 | 182,842 | 190,005 | 16,154 | 4,500 | (5,495) | (30,636) | (36,715) | (41,677) | (44,396) | (78,354) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

[1] Class 9 has $60 million of subordinated claims; Debtor anticipates no distributions to Class 9

2/1/2021

008720

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

|  | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast --> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 590 |
| **Total revenue** | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| **Income/(loss) From Operations** | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,139 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (156,042) | 326 | (93) | 29 | (155,780) |
| **Operating Gain/(Loss)** | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (172,669) | $ (9,978) | $ (5,433) | $ (4,259) | $ (192,339) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | | | | | | | | | |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | - | (8,850) | (35,719) | (1,013) | 522 | - | - | (491) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | 1,549 | 4,523 | (32,857) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Realized Gain /(Loss) from Equity Method Investees | - | (7,450) | (364) | (364) | - | - | - | - | - |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | (13,301) | (13,301) |
| **Total Realized and Unrealized Gain/(Loss)** | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| **Net Income** | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (220,641) |

*Footnotes:*
[1] Operating expenses include an adjustment in January 2021 to account for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $197.3 million in Q1 2021 includes:
[a] $209.7 million was expensed to record for the increase of allowed claims.
[b] Income of $11.7 million for the accrued, but unpaid payroll liability related to the Debtor's deferred bonus programs amount written-off.

2/1/2021

008721

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Forecast --> | | | | | |
| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (156,434) |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (214,470) |
| Realized and Unrealized Gain/(Loss) | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (268,359) |

**Highland Capital Management, L.P.**
*Cash Flow Indirect*
*(US $000's)*

| | Forecast ---> | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
| Net (Loss) Income | $ (16,708) | $ (14,453) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,138) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,587 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | - |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (217,998) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,703) |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | 21,616 | - | 7,960 |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | - | - | - |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 278,747 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | - |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | (69,881) |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 194,580 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,881) |
| Net Change in Cash | $ (9,107) | $ 25,159 | $ (20,719) | $ 29,735 | $ 2,770 | $ 92,303 | $ (54,404) | $ (8,495) | $ (2,870) | $ (69,928) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ 69,418 |

# EXHIBIT K

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

In re: Highland Capital Management, LP      §      Case No.   19-34054

§

§

_____ § 

Debtor(s)      §     ☐ Jointly Administered

# Post-confirmation Report         Chapter 11

Quarter Ending Date: 09/30/2022         Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021         Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ⦿ Reorganized Debtor

                                    ◯ Other Authorized Party or Entity: _____

                                                         Name of Authorized Party or Entity

/s/ Zachery Z. Annable              Zachery Z. Annable, Hayward PLLC
_____         _____
Signature of Responsible Party         Printed Name of Responsible Party

10/21/2022
_____
Date

             10501 N. Central Expressway, Suite 106
             Dallas TX 75231
             Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

008724

Debtor's Name Highland Capital Management, LP     Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $10,725,675 | $94,905,199 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $5,194,652 |
| d. Total transferred (a+b+c) | $10,725,675 | $100,099,851 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | $0 | $33,005,136 | $0 | $33,005,136 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Pachulski Stang Ziehl & Jones | Lead Counsel | $0 | $24,312,860 | $0 | $24,312,860 |
| ii | Development Specialists, Inc. | Financial Professional | $0 | $5,765,448 | $0 | $5,765,448 |
| iii | Kurtzman Carson Consultants | Other | $0 | $2,054,716 | $0 | $2,054,716 |
| iv | Hayward & Associates PLLC | Local Counsel | $0 | $872,112 | $0 | $872,112 |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |

008725

Debtor's Name Highland Capital Management, LP                                      Case No.  19-34054

| | | | | | |
|---|---|---|---|---|---|
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |

008726

Debtor's Name Highland Capital Management, LP                                    Case No.  19-34054

| | | | | | |
|---|---|---|---|---|---|
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxviii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxiii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |
| xcix | | | | | |
| c | | | | | |
| ci | | | | | |

| | | | Approved Current Quarter | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor       *Aggregate Total* | | $0 | $7,604,472 | $0 | $7,604,472 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Hunton Andrews Kurth LLP | Other | $0 | $1,149,807 | $0 | $1,149,807 |
| ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| iii | Deloitte | Financial Professional | $0 | $553,413 | $0 | $553,413 |
| iv | Mercer (US) Inc. | Other | $0 | $204,767 | $0 | $204,767 |
| v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $0 | $1,364,823 |
| vi | Wilmer Cutler Pickering Hale | Other | $0 | $2,650,937 | $0 | $2,650,937 |

008727

Debtor's Name Highland Capital Management, LP                                    Case No.  19-34054

| | | | | | | |
|---|---|---|---|---|---|---|
| vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |
| xxxvii | | | | | | |
| xxxvii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |

008728

Debtor's Name Highland Capital Management, LP                                Case No.  19-34054

| | | | | | |
|---|---|---|---|---|---|
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxviii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxiii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |

008729

Debtor's Name Highland Capital Management, LP                                                Case No.  19-34054

| | | | | | | |
|---|---|---|---|---|---|---|
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | $0 | $60,171,929 | $0 | $60,171,929 |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $1,108,943 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $248,999,332 | $255,201,228 | $397,485,568 | 64% |
| e. Equity interests | $0 | $0 | $0 | | |

## Part 4: Questionnaire

a. Is this a final report?                                                Yes ○   No ●

    If yes, give date Final Decree was entered:                      _____

    If no, give date when the application for Final Decree is anticipated:   _____

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?   Yes ●   No ○

008730

Debtor's Name Highland Capital Management, LP Case No. 19-34054

## Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory.  The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes.  For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records."  *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/ rules_regulations/index.htm.  Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee.  11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

/s/ James Seery
Signature of Responsible Party

James Seery
Printed Name of Responsible Party

CEO
Title

10/21/2022
Date

UST Form 11-PCR (12/01/2021)          8

008731

Debtor's Name Highland Capital Management, LP                                    Case No.  19-34054



Page 1



Other Page 1



Page 2 Minus Tables



Bankruptcy Table 1-50

008732

Debtor's Name Highland Capital Management, LP                                    Case No.   19-34054



Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

008733

# HMIT Exhibit No. 67

008734



**Alvarez & Marsal CRF
Management, LLC** 2029 Century
Park East Suite 2060 Los
Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds  to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing.  The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee.  Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims.  In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million.  Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021.  Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____
     Steven Varner
     Managing Director

008736

**On investor letterhead, please use the template below to provide Alvarez & Marsal CRF Management, LLC and SEI your updated wire information.**

| Information Needed | Wire Information Input |
|---|---|
| Investor name (as it reads on monthly statements)<br><br>Fund(s) Invested<br><br>Contact Information (Phone No. and Email)<br><br>Updated Wire Information<br>&bull; Beneficiary Bank<br>&bull; Bank Address<br>&bull; Beneficiary (Account) Name<br>&bull; ABA/Routing #<br>&bull; Account #<br>&bull; SWIFT Code<br><br>International Wires<br>&bull; Correspondent Bank<br>&bull; ABA/Routing #<br>&bull; SWIFT Code | |

Signed By: _____          Date: _____

008737

# HMIT Exhibit No. 68

008738



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order*

*Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and*

*Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland

Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-

captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

DOCS_NY:41987.4 36027/002

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3

008741

4. All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5. The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6. Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7. The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

<p align="center">###End of Order###</p>

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

DOCS_NY:41987.4 36027/002

008742

# EXHIBIT 1

008743

EXECUTION VERSION

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

WHEREAS, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

WHEREAS, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

WHEREAS, on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

WHEREAS, on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

WHEREAS, on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

WHEREAS, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

EXECUTION VERSION

WHEREAS, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

WHEREAS, the Debtor disputes the HarbourVest Claims;

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

WHEREAS, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

WHEREAS, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

NOW THEREFORE, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

   (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

      (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

      (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

   (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

   (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

008745

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

EXECUTION VERSION

4. <u>**Representations and Warranties**</u>.  Subject in all respects to Section 3 hereof:

      (a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

      (b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. <u>**Plan Support**</u>.

      **(a)**    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

      (b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

      (c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

US-DOCS\115534291.12

008747

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7. **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

008748

**EXECUTION VERSION**

<div style="margin-left:2em">

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

</div>

9. **Advice of Counsel**. Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10. **Entire Agreement**. This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11. **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12. **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

<div style="text-align:center">6</div>

<div style="text-align:right">008749</div>

**EXECUTION VERSION**

       14.     **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

EXECUTION VERSION

IT IS HEREBY AGREED.

<div align="center">

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

</div>

By:    /s/ James P. Seery, Jr.
Name:   James P. Seery, Jr.
Its:      CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:   Michael Pugatch
Its:      Managing Director

US-DOCS\115534291.12

**008751**

Case 1:23-cv-04545-gjl Doc 7888 Filed 01/24/06/05/23 Entered 01/24/06/05/23 12:1 Page 14 of 23
Case 3:23-cv-02071-E Document Exhibit 386-17 Filed 12/07/2345 Page 159 of 214 PageID 8399
EXECUTION VERSION

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

9

008752

# Exhibit A

**TRANSFER AGREEMENT**
**FOR ORDINARY SHARES OF**
**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January \_\_\_\_, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on <u>Exhibit A</u> hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Transfer of Shares and Advisory Board</u>

    a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

    b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

008754

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2.  <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

008755

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

008756

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement. In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto. No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

008757

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

*[Additional Signatures on Following Page]*

008758

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:   HarbourVest Partners (Ireland) Limited
      Its Alternative Investment Fund Manager

By:   HarbourVest Partners L.P.
      Its Duly Appointed Investment Manager

By:   HarbourVest Partners, LLC
      Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

008759

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director


*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

ActiveUS 184668980v.2

008760

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

008761

# HMIT Exhibit No. 69

008762



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 27, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH UBS SECURITIES LLC AND UBS AG LONDON BRANCH
### AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the Motion; (b) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

*Declaration of Robert J Feinstein in Support of the Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2200] (the "Feinstein Declaration"), and the exhibits annexed thereto including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) the *Limited Preliminary Objection to Debtor's Motion for Entry of an Order Approving Settlement with UBS and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Trusts' Preliminary Objection"), filed by The Dugaboy Investment Trust and the Get Good Trust (collectively the "Trusts"); (e) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Trusts' Supplemental Opposition"), filed by the Trusts; (f) *James Dondero's Objection Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection" and collectively, with the Trusts' Preliminary Objection and the Trusts' Supplemental Opposition, the "Objections"), filed James Dondero; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2308] (the "Debtor's Reply"), filed by the Debtor; (h) UBS's *Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2310]; (i) the testimonial and documentary evidence admitted into evidence during the hearing held on May 21, 2021 (the "Hearing"), including assessing the credibility of the witness; and (j) the arguments made during the Hearing; and this Court having jurisdiction over

DOCS_NY:43249.2 36027/002

008764

this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) that the settlement is the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** as set forth herein.

2. All objections to the Motion are overruled.

3. The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

008765

4.      The Debtor, UBS, and all other parties are authorized to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

5.      The Court finds that the Debtor, in its capacity as investment manager of Multi-Strat, exercised sound business judgment in causing Multi-Strat to enter into the Settlement Agreement. Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor, in its capacity as investment manager of Multi-Strat, is authorized to cause Multi-Strat to settle the claims UBS has asserted against Multi-Strat in the State Court and otherwise to cause Multi-Strat to take any and all actions necessary and desirable to implement the terms of the Settlement Agreement without need of further approval or notice.

6.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

DOCS_NY:43249.2 36027/002

008766

# EXHIBIT 1

008767

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**EXECUTION VERSION**

WHEREAS, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

WHEREAS, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

WHEREAS, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

WHEREAS, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

WHEREAS, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

WHEREAS, Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

WHEREAS, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

WHEREAS, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

WHEREAS, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

WHEREAS, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

WHEREAS, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

WHEREAS, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

WHEREAS, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

008769

Case 19-34054-sgj11 Doc 3838 Filed 05/27/16/05/20 Entered 05/27/16/05/30 22:10 Page 8 of 21
Case 3:23-cv-02071-E   Document 86-1   Filed 12/07/23   Page 2177 of 214   PageID 8417
**EXECUTION VERSION**

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

008770

Case 19-34054-sgj11 Doc 2838 Filed 05/27/16 Entered 05/27/16 15:30:22 Page 9 of 21
Case 3:23-cv-02071-E Document 26-61 Filed 12/07/23 Page 178 of 214 PageID 8418
EXECUTION VERSION

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.     **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)     The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

008771

Case 19-34054-sgj11 Doc 2638-7 Filed 05/27/20 Entered 05/27/20 05:03:22 Page 10 of 21
Case 3:23-cv-02071-E Document 38-61 Filed 12/07/23 Page 179 of 214 PageID 8419
EXECUTION VERSION

(b)      Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows:  (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)      Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

008772

Case 19-34054-sgj11 Doc 2683-8 Filed 05/27/26/05/23 Entered 05/27/206/05/23 22:11:42 Page 1 of 21
Case 3:23-cv-02071-E   Document Exhibit B3 61-7ed 12/07/236 Page 2180 of 214   PageID 8420
EXECUTION VERSION

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

(d)    Redeemer Appeal.

(i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

008773

Case 19-34054-sgj11 Doc 2838-8 Filed 05/27/16/05/23 Entered 05/27/20/05/23/22 Page 12 of 21
Case 3:23-cv-02071-E   Document 26-61 Filed 12/07/23   Page 181 of 214   PageID 8421
EXECUTION VERSION

(ii)    The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)    As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)    On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)    On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor.  For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

2.    **Definitions.**

(a)    "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)    "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)    "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)    "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

3.    **Releases.**

(a)    **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

008774

EXECUTION VERSION

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) shall be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

008775

EXECUTION VERSION

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)    **Multi-Strat Release.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

4.    **No Third Party Beneficiaries**.  Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

5.    **UBS Covenant Not to Sue**.  Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

008776

EXECUTION VERSION

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

### 6.    Agreement Subject to Bankruptcy Court Approval.

(a)    The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

### 7.    Representations and Warranties.

(a)    Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b)    Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c)    Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

008777

EXECUTION VERSION

**8.** **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice**. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

008778

<div align="right"><b>EXECUTION VERSION</b></div>

Telephone No.:  212-713-1371
E-mail:  john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention:  Andrew Clubok
               Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.:  202-637-3323
Email: andrew.clubok@lw.com
         sarah.tomkowiak@lw.com

**11.**    <u>**Advice of Counsel**</u>.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.**    <u>**Entire Agreement**</u>.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.**    <u>**No Party Deemed Drafter**</u>.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel.  Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.**    <u>**Future Cooperation**</u>.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.**    <u>**Counterparts**</u>.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document.  Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

<div align="center">12</div>

<div align="right">008779</div>

EXECUTION VERSION

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

16. **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

008780

**IT IS HEREBY AGREED.**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:

Name: James P. Seery, Jr.

Its: Authorized Signatory

HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.

By:

Name: James P. Seery, Jr

Its: Authorized Signatory

STRAND ADVISORS, INC.

By:

Name: James P. Seery, Jr.

Its: Authorized Signatory

008781

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its: Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its: Authorized Signatory

15

008782

EXECUTION VERSION

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

008783

# HMIT Exhibit No. 70

008784

## SUB-ADVISORY AGREEMENT

This Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts (any such fund or account, an "Account", and the assets comprising the portfolio of such Account, a "Portfolio"); and

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows.

1.    Appointment; Limited Scope of Services.

(a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes,

008785

including recommendations as to the specific assets to be purchased, retained or sold by any such Account;

(ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)    identify, evaluate and recommend to the Management Company, in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)    assist the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account in performing due diligence on prospective Portfolio investments by such Account;

(v)    provide information to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account;

(vi)    assist and advise the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager, investment manager or any similar capacity for any applicable Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company. Furthermore, the parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company, including, but not limited to, administrative, management or similar services.

(c)    The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements.

008786

In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.      Compensation.

(a)      As compensation for its performance of its obligations as Sub-Advisor under this Agreement, the Sub-Advisor will be entitled to receive a monthly fee in the amount of Two Hundred Fifty-Two Thousand and 00/100 Dollars ($252,000.00) (the "Sub-Advisory Fee"). The Sub-Advisory Fee shall be payable monthly in advance.

(b)      Each party shall bear its own expenses.

(c)      Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

3.      Representations and Warranties.

(a)      Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)      it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(ii)      this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)      no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)      neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract,

3

lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of the Sub-Advisor's Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care.  Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)     Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or

4

008788

any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegate of the Management Company or any other person or entity, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement. The exculpations set forth in this Section 4(b) shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

(c)     Indemnification.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated, whether currently existing or accruing in the future ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"),

5

008789

whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 4(c) regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 4(c) shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 4(c) to the fullest extent permitted by law

(d)     Other Sources of Recovery etc. The indemnification rights set forth in Section 4(c) are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any Account has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

6

008790

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 36-7   Filed 12/07/23   Page 198 of 214   PageID 8438
Exhibit Exhibit 6-7   Page 82 of 384 Page 2198 of 214

(f)   <u>Reliance</u>.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)   <u>Rights Under Management Agreements and Related Agreements</u>.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

5.   <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

(a)   The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)   So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees, partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)   The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

7

6.      Termination; Survival.

(a)      This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)      This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)      All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.      Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.      Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount or priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

8

008792

9.     <u>Amendments; Assignments</u>.

(a)     Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)     Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)     The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.     <u>Advisory Restrictions</u>.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>").   If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

11.     <u>Records; Confidentiality</u>.

(a)     The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon

9

008793

not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)     The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by an Account or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure.  This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

12.     <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

008794

(a)     If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

(b)     If to the Sub-Advisor:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

13.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.     <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.     <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.     <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

17.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

008795

18.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    <u>No Partnership or Joint Venture</u>.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    <u>Entire Agreement</u>.    This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

008796

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse
Title:   Treasurer


**NEXPOINT ADVISORS, L.P.,**
as the Management Company

By: NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

008797

## Appendix A

| Fund or Account | Management Agreement | Related Agreements | Date of Management Agreement |
|---|---|---|---|
| [_] | [_] | [_] | [_] |
| [_] | [_] | [_] | [_] |

008798

# APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its clients, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio asset or any affiliate thereof;

(e)     sell any Portfolio asset to, or purchase or acquire any Portfolio asset from, any Account while acting in the capacity of principal or agent; *provided, however,* that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio asset;

008799

(g)      serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio asset; or

(h)      act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio assets and performing the Services under this Agreement.  Each of such ownership and other relationships may result in securities laws restrictions on Transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account.  The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions.  The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement.  As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a Transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect Transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that a Portfolio investment complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, the Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio assets or other securities or obligations of the obligors or issuers of the Portfolio assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

008800

make recommendations to others, or effect Transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction, whether or not for the benefit of the related secured parties, securing the obligations of such Account.

008801

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio asset or other assets received in respect thereof in the open market or otherwise by the Account.

008802

# HMIT Exhibit No. 71

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>Client or Account</u>" shall mean any fund, client or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"<u>Indebtedness</u>" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

2

008805

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

# ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

008806

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)      *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)      *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)      *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)      *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)      *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)      *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)      *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

008807