**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

   **[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 37

# APPELLANT RECORD

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
## STATEMENT OF THE ISSUES

A. Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

    1. the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

    2. the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

    3. the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

4. "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.  Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.  Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

2.  Appellant's claims or allegations are not "plausible";

3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1. ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2. determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1. there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2. there is no evidence to support the alleged quid pro quo;

3. the material shared was *public* information; and/or

4. the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.   Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.   Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.   Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.   Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.   Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

   1.   declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

   2.   concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*vol. 1*

1.   **Notice of Appeal**

*000001*   a.   Notice of Appeal **[Dkt. 3906]**;

*000276*   b.   Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*   c.   Second Amended Notice of Appeal **[Dkt. 3945]**

2.   **The judgment, order, or decree appealed from:**

   a.   Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

    **b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

    **3. Docket sheet.**

*001049*

    a. Bankruptcy Case No. 19-34054

    **4. Other Items to be included:**

    **a.** HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru Vol. 4*
*Vol 4*
*002236*
*002243*
*002248*

*Vol. 5*
*002251*

*002254*

*002262*

*002346*

*002355*

*002358*

*002391*

*002398*

*002400*

*Vol. 6*
*002826*   *Thru  Vol. 7*

*Vol. 9*   *Thru  Vol. 9*
*003257*

*003260*

*003270*

*003278*

| Date | Docket | Description |
|---|---|---|
| 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| | 04/19/2023 | 3751 | Notice of Status Conference |
| | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

Handwritten annotations in left margin:
Vol. 10
003281
003286
003291
003294
003296
003299
003302
003311
003314
003323
003368
003430

[3] A duplicate of Doc 3758.

| | | | |
|---|---|---|---|
| Vol. 10 | | | Holdings LLC, Stonehill Capital Management LLC |
| 003458 | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| 003463 | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| Vol. 11 003537 Thru Vol. 16 | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| Vol. 17 004465 | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| 004712 | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 004714 | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 004808 | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| 004813 | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 004836 | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| Vol. 18 004930 | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| 004931 | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18
004939.

| | 05/25/2023 | 3798<br>(3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| 004959 | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004961 | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004984 | 06/05/2023 | 3815<br>(3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005049 | 06/05/2023 | 3816<br>(3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005114<br>*Thru Vol. 25* | 06/05/2023 | 3817<br>(3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| Vol. 26<br>006608<br>*Thru Vol. 39* | 06/05/2023 | 3818<br>(3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| Vol. 39<br>009273 | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009290 | 06/07/2023 | 3821<br>(3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009416 | 06/07/2023 | 3822<br>(3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 009424 | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*

*009426*

*009436*

*009444*

*009445*

*009446*

*009456*

*009458*

*Vol. 42*  *Thru Vol. 41*

*009847*

*009901*

*009905*

*009908*

*009912*

| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| --- | --- | --- |
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

Vol. 42
009928

009944

010013

010023

010025

010029

010035

010047

010059

Vol. 43

010062

| Date | Docket No. | Description |
|---|---|---|
| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

*Vol. 43*

*010135*

*010136*

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.**   **Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits** **(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits** **(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                        Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  */s/ Sawnie. A. McEntire*
       Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

       (i)    *Administrative Services*.   The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

       (j)    *Shared Employees*.   To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

       (k)    *Ancillary Services*.   Assistance and advice on all things ancillary or incidental to the foregoing; and

       (l)    *Other*.   Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

    Section 2.03   Shared Employees.

       (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

008808

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" or, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

008809

     (i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

     (j)    The Staff and Services Provider shall require that each Shared Employee:

       (i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

       (ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

       (iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

       (iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

       (v)    to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

       (vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

     (k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

    Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

    Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

008810

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

008811

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).    Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

008813

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

008814

Section 6.02 <u>Exculpation</u>. To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement. The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03 <u>Indemnification by the Management Company</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; provided that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

008816

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

008817

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

15

008818

Section 8.04   <u>Governing Law</u>.

(a)   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)   The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

008819

Section 8.09   <u>Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

    (a)    If to the Management Company:

        NexPoint Advisors, L.P.
        200 Crescent Court
        Suite 700
        Dallas, TX 75201

008820

(b)      If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

008821

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

008822

# HMIT Exhibit No. 72

## More speculation over MGM sale

hollywoodreporter.com

August 24, 2008 Sunday

Copyright 2008 VNU Business Media, Inc. All Rights Reserved



**Section:** BUSINESS INDEX; NEWS

**Length:** 357 words

**Byline:** Carl DiOrio

## Body

Speculation circulates anew over a possible turnover in ownership at MGM.

Two things are stressed by those in the know: The current owners won't sell for substantially less than the $5 billion they paid for the studio just a few years ago, and few suitors will be interested in bidding anywhere near that for the Lion.

Business Week reported online Friday that the investment consortium currently controlling MGM had retained Goldman Sachs to solicit **purchase** offers for the **studio**. **MGM** declined comment on the report, and other parties were unavailable.

But though the magazine put the asking price at $5.2 billion, many doubt the studio could fetch even $5 billion, let alone a premium on the consortium's 2004 investment.

Sony has a 20% stake in MGM -- investment banks and Comcast hold the balance of equity -- and is considered a prime candidate to bid on the remaining interest in the Lion should a formal auction be launched. Lionsgate is considered among other prospective suitors, as the mini-major has consistently sought to bulk up its holdings over recent years.

The Hollywood Reporter reported last week that Reliance Big Entertainment -- which is poised to ink a $550 equity investment in a Steven Spielberg-resurrected DreamWorks -- considered taking an MGM stake and ultimately passed,

Serial Lion-tamer Kirk Kerkorian is also said to have floated a low-ball bid of $3 billion for the studio, though such a low offer would be risible to an ownership group determined to avoid taking a bath on their pricey foray into Hollywood. Sources in the banking community said execs at Providence Equity Partners and the other private equity firms in the MGM consortium, for now, appear dead set against taking any loss on their investment whatever.

Indeed, a key MGM insider predicted privately on Friday that the studio would be controlled by essentially the same ownership one year from now.

More speculation over MGM sale

Details were unavailable regarding any formal search process at Goldman Sachs, which advised MGM prior to its last turnover in owners. But a financial-community insider said no further offers are expected to gel until after Labor Day at the earliest.

**Load-Date:** August 30, 2008

---

**End of Document**

# MGM's not on the block

The Hollywood Reporter

August 26, 2008 Tuesday

Copyright 2008 VNU Business Media, Inc. All Rights Reserved



**Length:** 438 words

**Byline:** Carl DiOrio

## Body

MGM said Monday that it's not for **sale** but acknowledged retaining Goldman Sachs to pursue capital "enhancements."

Those include a new production fund that's expected to be announced "soon," MGM spokesman Jeff Pryor said.

Pryor declined to specify lenders on the financing or a deal amount. But sources familiar with the pending transaction said that the Royal Bank of Scotland will lead a more than $500 million financing that features a $340 million revolving credit facility and which should be buttoned up in three to six weeks.

Longer term, Goldman Sachs' strategic search could yield a new private-equity investment in the studio, a debt restructuring or even an initial pubic offering, Pryor said.

"Contrary to recent media reports, (MGM) is not for **sale**," the Lion said in a statement cleared by all current owners of the studio.

"There is no 'asking price' for the company," the **studio** said. "**MGM**'s existing financing arrangements are sufficient to meet its needs. Goldman Sachs has been retained to explore enhancements to MGM's long-term capital structure."

Business Week reported Friday that the Wall Street firm had approached prospective MGM **buyers** with an asking price of $5.2 billion. The Hollywood Reporter reported Wednesday that Mumbai-based Reliance Big Entertainment had considered taking an equity stake in the studio but decided against such a move.

As for MGM's current financing arrangements, the studio has a pair of revolving credit facilities through JPMorgan totaling $450 million and a $500 million production fund for its United Artists division through Merrill Lynch.

MGM recently greenlighted its first production under recently appointed film czar Mary Parent, the horror film "Cabin in the Woods." No production start date has been set, largely because of uncertainty over the prospect of a SAG strike.

MGM has been on the hunt for additional funding for newly commenced production operations at the parent studio, and executives also have been seeking means of reducing an enormous $3.7 billion debt load at the company.

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Exhibit Exhibit 6-1 Filed 11/07/20   Page 34 of 214   PageID 8488
Case 3:23-cv-02071-E   Document 35-1   Filed 12/04/23   Page 230 of 562   Page 2 of 2
MGM's not on the block

"All of the MGM shareholders -- including Providence Equity Partners, TPG, Sony Corp. of America and Comcast Corp. -- are pleased with the company's momentum and are committed to the future growth of the **studio**," **MGM** said.

The ownership consortium paid $5 billion to acquire MGM in 2004. A consortium desire to alleviate MGM's debt structure prompted the consortium to retain Goldman Sachs, Pryor said.

Middle East financiers and additional Wall Street investors are among those likely to be approached by Goldman Sachs about a possible investment, a studio insider said. (partialdiff)

**Load-Date:** August 31, 2008

---

**End of Document**

# MGM Studios 'not for sale' despite high debt

Los Angeles Times

August 26, 2008 Tuesday

Home Edition

Copyright 2008 Los Angeles Times All Rights Reserved

**Section:** BUSINESS; Business Desk; Part C; Pg. 3

**Length:** 268 words

**Byline:** From the Associated Press

## Body

Metro-Goldwyn-Mayer Studios Inc. said Monday it was "not for **sale**" after BusinessWeek magazine said MGM's owners wanted to sell the movie company for $5.2 billion.

The studio was taken private for nearly $5 billion in 2005 by Providence Equity Partners, TPG, Sony Corp. of America and Comcast Corp.

The company said its owners were committed to growing the studio and denied there was an asking price.

MGM spokesman Jeff Pryor did say, however, that the studio had retained Goldman Sachs & Co. to enhance its long-term capital structure, primarily because $3.7 billion in debt must be repaid in 2012.

That debt begins amortizing in 2011, which means the amount owed will begin to increase, he said.

"Goldman was brought in to look at strategic alternatives at how we're going to deal with the debt," Pryor said. "It's all about deleveraging."

The studio has been paying interest on the debt but has not paid down the principal.

Last year, it made $558 million from its 4,000-title film library, but has yet to deliver a big hit.

The studio's United Artists subsidiary, run by Tom Cruise and Paula Wagner, flopped on its first effort with last year's political thriller "Lions for Lambs," which is estimated to have lost about $30 million.

UA's second release, "Valkyrie," starring Cruise as a Nazi army officer executed after a failed attempt to assassinate Adolf Hitler, has been delayed several times and is now scheduled for Dec. 26.

Billionaire Kirk Kerkorian, who **bought** and sold the studio several times over the years, reportedly offered $3 billion for it through his Tracinda Corp. but the offer was dismissed.

**Load-Date:** August 26, 2008

---

**End of Document**

008828

## MGM denies it's for sale

Daily Deal/The Deal

August 27, 2008 Wednesday

Copyright 2008 The Deal, L.L.C.

**Section:** PRIVATE EQUITY; Corporate Restructuring

**Length:** 370 words

**Byline:** by Carolyn Murphy
**Highlight:** The private equity backed Hollywood studio said it has hired Goldman Sachs to help it examine new capital structures.

# Body

**Metro-Goldwyn-Mayer Studios Inc.**moved Monday, Aug. 25, to diffuse media reports it is on the block, saying it had retained **Goldman Sachs & Co.**but only to explore "enhancements to its long-term capital structure."

The private equity-backed Los Angeles studio said in a statement, "There is no 'asking price' for the company" and maintained its current financing arrangements are adequate to meet its needs.

Furthermore, MGM said: "All of the MGM shareholders, including **Providence Equity Partners, TPG, Sony Corp. Of America**and **Comcast Corp**., are pleased with the company's current momentum and are committed to the future growth of the studio."

The studio, however, could stage an initial public offering or seek to refinance its debt as it feels downward pressure from the credit crunch to fund its movies, a spokesman told Reuters.

MGM's United Artists studio last August secured $500 million in financing from **Merrill Lynch & Co.** to fund the production of 15 to 18 movies over five years.

And in hopes of negotiating more favorable terms, the bank is said to be examining its contract to see if MGM violated any terms over the departure of Paula Wagner, the New York Post reported Monday, citing sources close to the situation. Wagner is the former chief executive of **United Artists Entertainment LLC**, which was formed in 2006 through a partnership between MGM, Wagner and Tom Cruise. She left earlier in August to return to producing films. The Post story pegged MGM's turning to Goldman as a response measure, while a BusinessWeek report Friday suggested Goldman had been retained to shop the company.

The asking price, BusinessWeek said, was a rich $5.2 billion, and the company was being shopped to potential strategic **buyers** like India's **Reliance ADA Group**, which is meanwhile said to be near a deal with Steven Spielberg's **Dreamworks SKG.**

Mumbai-based Reliance looked at MGM and passed, according to BusinessWeek.

The Sony-led consortium agreed in September 2004 to **buy** MGM for nearly $5 billion, months after MGM brought in Goldman to advise on its auction. Kirk Kerkorian had been the company's controlling shareholder.

The billionaire investor reportedly offered $3 billion for the company recently, BusinessWeek said.

http://www.TheDeal.com

008829

MGM denies it's for sale

**Load-Date:** August 27, 2008

---

End of Document

## MGM: not for sale . . .but $4.3b in debt

Townsville Bulletin (Australia)

August 27, 2008 Wednesday

1 - Edition

Copyright 2008 Nationwide News Pty Limited All Rights Reserved

**Section:** FEATURES; Pg. 20

**Length:** 261 words

## Body

THE **Metro-Goldwyn-Mayer Studios** are `not for **sale'** following a report in BusinessWeek that MGM's owners were looking to sell the movie company for $US5.2 billion ($A6.0 billion). The studio was taken private for nearly $US5 billion ($A5.77 billion) in 2005 by Providence Equity Partners, TPG, Sony Corp of America and Comcast Corp.

The company said its owners were committed to growing the studio and denied there was an asking price.

MGM spokesman Jeff Pryor did say, however, that the studio has retained Goldman Sachs to enhance its long-term capital structure, primarily because $US3.7 billion ($A4.27 billion) in debt needs to be repaid in 2012.

``Goldman was brought in to look at strategic alternatives at how we're going to deal with the debt,'' Pryor said.

Last year, it made $US558 million ($A644.27 million) from its 4000 title film library, but has yet to deliver a big hit.

The studio's subsidiary run by Tom Cruise and Paula Wagner, United Artists, flopped on its first production attempt with last year's political thriller Lions for Lambs, which is estimated to have lost about $US30 million ($A34.64 million). UA's second effort, Valkyrie, starring Cruise as a Nazi army officer executed after a failed attempt to assassinate Adolf Hitler, has been delayed a few times and will now be released on Boxing Day, December 26.

Billionaire Kirk Kerkorian, who **bought** and sold the studio several times over the years, reportedly offered $US3 billion ($A3.46 billion) for it through Tracinda Corp. but the offer was dismissed.

A Tracinda spokeswoman had no comment.

**Load-Date:** August 26, 2008

End of Document

## Burdened by Billions in Debt, MGM Puts Itself Up for Sale

The New York Times

November 14, 2009 Saturday

Late Edition - Final

Copyright 2009 The New York Times Company

**Section:** Section B; Column 0; Business/Financial Desk; Pg. 2

**Length:** 349 words

**Byline:** By BROOKS BARNES

**Dateline:** LOS ANGELES

## Body

Metro-Goldwyn-Mayer is back on the block.

The film studio, crumbling under the weight of almost $4 billion in debt, said late Friday that it would seek a **buyer**. MGM could also try to merge with another media company or remain independent with new equity investors, an option that is regarded by analysts as unlikely.

The announcement, which was expected, is a fishing expedition to see how much the studio can fetch in its diminished state, analysts said. Estimates for the studio, which owns a 4,000-title film library and holds the rights to the James Bond franchise, range from a bargain-basement price of $1.5 billion to almost $3 billion.

A consortium that includes Sony, Comcast, Providence Equity Partners and the Quadrangle Group took MGM private in 2004 for $5 billion.

Although MGM has not yet opened its books to potential **buyers** -- that process starts now -- interested parties have been evaluating the company. Time Warner, sitting on a deep cash reserve, is considered a candidate; Warner already plans to co-produce two "Hobbit" movies with MGM.

Other potential bidders include Qualia Capital, a private equity fund run by the Hollywood veteran Amir Malin; 20th Century Fox, which distributes MGM's home entertainment products; and Lionsgate.

MGM also said that it had gained additional concessions from lenders to allow it to pursue a merger or acquisition, a process that is expected to take a couple of months or more. MGM can now skip interest payments until Jan. 31. Previously, lenders had agreed to allow MGM to skip payments for September, October and November.

Once the most powerful **studio** in Hollywood, **MGM** has only released one movie in the last year, a remake of "Fame" that sputtered at the box office. A **studio** spokeswoman said **MGM** had enough cash on hand to market and complete a handful of films planned for next year, including a ribald comedy called "Hot Tub Time Machine."

The company is currently under the leadership of the turnaround expert Stephen F. Cooper, who took over in August after the company fired Harry E. Sloan as chief executive.

http://www.nytimes.com

008832

Burdened by Billions in Debt, MGM Puts Itself Up for Sale

## Graphic

PHOTO: Daniel Craig stars in the studio's James Bond franchise. (PHOTOGRAPH BY KAREN BALLARD/COLUMBIA PICTURES)

**Load-Date:** November 14, 2009

**End of Document**

# Movie Studio MGM Up For Sale As Debt Woes Mount

Dow Jones News Service

November 16, 2009 Monday 5:11 PM GMT

Copyright 2009 Factiva ®, from Dow Jones
All Rights Reserved



© 2009 Dow Jones & Company, Inc.

DOW JONES NEWSWIRES

**Length:** 209 words

**Byline:** By Shasha Dai

## Body

Of DOW JONES LBO WIRE

Hollywood movie studio Metro-Goldwyn-Mayer Inc., owner of such titles as the James Bond movie franchise, said it is evaluating options including a **sale** of the company.

In an emailed statement, the company said it is "beginning a process to explore various strategic alternatives including operating as a standalone entity, forming strategic partnerships and evaluating a potential **sale** of the Company."

MGM also said its lenders have agreed to extend forbearance on its debt until Jan. 31, 2010, in support of its evaluation of alternatives.

MGM was acquired for about $5 billion in 2004 by a consortium that includes buyout firms TPG Capital and Providence Equity Partners; and media companies Sony Corp. (SNE) and Comcast Corp. (CMCSA,CMCSK). Minority owners include buyout firms DLJ Merchant Banking Partners and Quadrangle Group LLC. It has been operating under a debt load of some $3.7 billion, and hired Moelis & Co. in May to help it look at refinancing options.

A spokesman for TPG declined to comment. Spokespersons for other parties in the consortium weren't available for comment.

(Dow Jones LBO Wire covers news about private equity buyouts.)

-By Shasha Dai, Dow Jones LBO Wire; shasha.dai@dowjones.com

-0-

[ 11-16-09 1211ET ]

Movie Studio MGM Up For Sale As Debt Woes Mount

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** November 21, 2010

---

**End of Document**

008835

## Place your bids on Leo the Lion

The Irish Times

November 27, 2009 Friday

Copyright 2009 The Irish Times All Rights Reserved

**Section:** THE TICKET; Film News; Pg. 3

**Length:** 237 words

# Body

Want to own a vital slab of movie history? Well, you could try tracking down the sledge from *Citizen Kane* or the ruby slippers from *The Wizard of Oz.* Alternately, you could put in a tender for one of the most historic of Hollywood s **studios**.

**Metro Goldwyn Mayer**, currently in debt to the tune of $3.7 billion, has been put up for **sale** and bids are expected to start coming in within the next week.

Despite that heavy financial liability and the sobering fact that the studio only released one film this year (the iffy remake of *Fame*) MGM does have a great many assets worth coveting. Secure the company and you get hold of the James Bond series, the *Pink Panther* franchise, half-ownership of the upcoming *Hobbit* films, a back-catalogue of 4,000 titles and, of course, the rights to that famous logo featuring Leo the Lion.

This being the digital age, the bidding will take place in a  virtual room , a secure website that allows potential **purchasers** access to the company s internal financial data. Rupert Murdoch s News Corp is, inevitably, circling the property, and Lionsgate Pictures  smallish, but mobile  also is believed to be interested. The most likely **purchaser** is, however, the already enormous Time Warner. Analysts reckon the conglomerate would need to fork out somewhere between $1.5 billion and $2.5 billion.

So, if you have that sort of change down the back of the sofa, you ll want to get your offer in pronto.

**Load-Date:** November 27, 2009

End of Document

## Lion braces for bidding process.

Daily Variety

December 29, 2009

Copyright 2009 Gale Group, Inc.
All Rights Reserved
Business and Industry
Copyright 2009 Reed Business Information

**Section:** Pg. 2; Vol. 305; No. 58; ISSN: 0011-5509

**Length:** 489 words

## Body

The possible **sale** of MGM--one of Hollywood's longest-running dramas--will come into focus in the next few weeks when the first bids are expected to be submitted.

The Lion, which put itself up for **sale** Nov. 13, has received several non-disclosure agreements back from potential bidders, a source close to the process indicated. It sent out more than 20 NDAs last month as a prelude to bidders seeing MGM's internal books.

It's not a given that MGM will be sold. The beleaguered studio has left open the door to continue operating as a standalone entity or forming some kind of strategic partnership if MGM's 140 debtholders agree to do so, possibly through a prepackaged bankruptcy. The bondholders have agreed to hold off receiving interest payments until Jan. 31 in order to enable management to find out the actual value of the assets and whether it should proceed with a formal auction.

And in a sign underlining the uncertainty facing **MGM**, **studio** chief Mary Parent has retained powerful attorney David Boies, according to a rep for his firm Boies Schiller & Flexner. The rep refused to elaborate Monday and Parent--hired in March 2008 as chairman of the worldwide motion picture group--declined to comment.

MGM has released only one movie this year--a revamp of "Fame" that cumed just $22 million domestically--and has slotted "Hot Tub Time Machine," "The Zookeeper" and "Red Dawn" next year and "Cabin in the Woods" in 2011. It's a co-financer with Warner Bros. on the two "Hobbit" films, expected to begin production this summer in New Zealand with Guillermo del Toro directing.

MGM's assets--a 4,000-title library, the logo, the United Artists operations, rights to the James Bond and Pink Panther franchises and half-ownership in the upcoming "Hobbit" films--are expected to fetch somewhere between $1.5 billion and $2 billion. Speculation has focused mostly on Time Warner Inc. as a likely bidder, since it has more than $9 billion in cash from the recent spinoff of its cable systems and would gain full control over "The Hobbit." Time Warner also owns the pre-1985 MGM library through its 1996 buyout of Turner Broadcasting and made an eleventh-hour bid in 2004 for MGM but was topped by an investor group led by Sony.

News Corp., Lionsgate and Liberty Media are also possible bidders but reports say News Corp. may not bid due to concerns over restrictions in the non-disclosure agreement. Reps for Time Warner, News Corp. and Lionsgate have refused to comment.

[ILLUSTRATION OMITTED]

Lion braces for bidding process.

MGM carries a debt load of $3.7 billion from the Sony buyout along with payments due next April on its $250 million revolving credit facility. Harry Sloan was replaced as MGM's CEO in August summer by turnaround specialist Stephen Cooper.

MGM was taken private in 2005 by a consortium led by Sony, Providence Equity Partners, Texas Pacific Group and Comcast Corp. The group paid $2.85 billion and assumed $2 billion in debt as part of the **purchase**.

**Load-Date:** January 19, 2010

---

**End of Document**

## MGM interest payment deadline extended

hollywoodreporter.com

January 29, 2010 Friday

Copyright 2010 VNU Business Media, Inc. All Rights Reserved



**Section:** HOMEPAGE; NEWS

**Length:** 291 words

**Byline:** Carl DiOrio

## Body

The Lion has another two months of breathing room.

A group of nearly 150 MGM lenders had a Jan. 31 deadline on a big interest payment related to $3.7 billion in **studio** debt. But **MGM** said Friday that the lenders had extended the deadline for a third time -- to March 31, in the latest move -- to accommodate a continued solicitation of offers to **buy** the studio.

It a statement, MGM continued to cling to the notion that a simpler restructuring of finances might be possible. But the lenders are pressing strongly for a **sale** of the studio.

"The lenders took this action in support of the company's efforts to strengthen its financial position and to facilitate the company's ongoing process of exploring strategic alternatives, which include continuing to operate as a standalone entity and evaluating a potential **sale** of the company," the **studio** said. "**MGM** appreciates the continued support of its lender group."

The studio said it had begun a second phase of the solicitation process. The first round brought roughly 10 non-binding offers to **buy** the studio, all below $2 billion.

About half the first-round bidders will be invited to a second round of due diligence.

"This phase of the process is expected to run for the next several weeks," MGM said.

Moelis & Co. launched the solicitation process in December. Representatives of Warner Bros., Lionsgate, Liberty Media, AT&T, Summit Entertainment, Reliance Big Entertainment, and Elliott Management, a stakeholder in Relativity Media. Fox is still reviewing financial data while mulling a possible offer.

MGM's current ownership group includes Providence Equity, TPG Capital, Sony, Comcast, DLJ Merchant and Quadrangle.

JPMorgan Chase is leading a steering committee representing the studio's lenders group.

**Load-Date:** October 20, 2011

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 35-1 Filed 12/07/23   Page 47 of 214   PageID 8501
Exhibit Exhibit 36-3 F-72   Page 233 of 562
MGM interest payment deadline extended
Page 2 of 2

**End of Document**

008840

# MGM lenders linger longer: interest deadline extended again, to March 31, as potential buyers circle; INSIDE TRACK; Metro-Goldwyn-Mayer Inc.; Brief article

Hollywood Reporter

February 1, 2010

Copyright 2010 Gale Group, Inc.
All Rights Reserved
ASAP
Copyright 2010 Nielsen Business Media, Inc.

**Section:** Pg. 3(1); Vol. 413; No. 10; ISSN: 0018-3660

**Length:** 290 words

**Byline:** DiOrio, Carl

## Body

LOS ANGELES -- The Lion has another two months of breathing room.

A group of nearly 150 MGM lenders had a Sunday deadline on a big interest payment related to $3.7 billion in **studio** debt. But **MGM** said Friday that the lenders have extended the deadline a third time--to March 31--to accommodate an ongoing solicitation of offers to **buy** the studio.

In a statement, MGM continued to cling to the notion that a simpler restructuring of finances might be possible. But lenders are pressing strongly for a **sale** of the studio.

"The lenders took this action in support of the company's efforts to strengthen its financial position and to facilitate the company's ongoing process of exploring strategic alternatives, which include continuing to operate as a stand-alone entity and evaluating a potential **sale** of the company," the **studio** said. "**MGM** appreciates the continued support of its lender group."

The studio said it has begun a second phase of the solicitation process. The first round brought about 10 nonbinding offers to **buy** the studio, all for less than $2 billion.

About half the first--round bidders will be invited to a second round of due diligence.

"This phase of the process is expected to run for the next severalweeks," MGM said.

Moelis & Co. launched the solicitation process in December. Included were representatives of Warner Bros., Lionsgate, Liberty Media, AT&T, Summit Entertainment, Reliance Big Entertainment and Elliott Management, a stakeholder in Relativity Media. Fox is reviewing financialdata while mulling a possible offer.

MGM's current ownership group includes Providence Equity, TPG Capital, Sony, Comcast, DLJ Merchant and Quadrangle.

JPMorgan Chase is leading a steering committee representing the studio's lenders group.

**Load-Date:** March 6, 2010

MGM lenders linger longer: interest deadline extended again, to March 31, as potential buyers circle; INSIDE
TRACK; Metro-Goldwyn-Mayer Inc.; Brief article

---

**End of Document**

## LIONSGATE THROWS IN TOWEL OVER MGM BID WAR

The New York Post

March 26, 2010 Friday

Copyright 2010 N.Y.P. Holdings, Inc. All Rights Reserved

**Section:** All Editions; Pg. 27

**Length:** 290 words

## Body

And then there were two.

Lionsgate, the film studio behind the "Saw" and Tyler Perry franchises, won't take another run at debt-laden **studio Metro-Goldwyn-Mayer**, leaving the auction for the venerable studio down to just two suitors as it tries to restructure its $4 billion debt load.

Lionsgate had offered to **buy** MGM for as much as $1.4 billion, well short of the $2 billion price-tag MGM's debtholders were expecting to get for the 86-year-old studio whose 4,000-title library includes the James Bond and Pink Panther franchises.

The decision by Lionsgate to pull out of the hunt for MGM came a day after the studio asked creditors for more time to make a debt payment that was due at month's end. MGM during a conference call Wednesday asked lenders to give it until mid-May to make the payment as it simultaneously tries to hammer out a restructuring plan.

It also comes as Lionsgate spars with billionaire activist investor Carl Icahn, who spent part of this week trading barbs with Lionsgate executives after the studio's board rejected his buyout offer. Icahn was offering $6 a share for Lionsgate, a price the company rejected as too low. Lionsgate shares closed up a nickel yesterday to $6.30.

Left in the derby for MGM are Time Warner, which reportedly has offered $1.5 billion, and Russian billionaire Len Blavatnik, whose bid has been described as slightly less.

The Wall Street Journal's Web site first reported on Lionsgate's withdrawal from the MGM bidding.

With just two bidders left, and little chance that either will sweeten its offer, it looks increasingly likely that MGM will fall into the hands of its creditors, many of whom have been frustrated by the pace of a **sale** process that began in November. Post Staff

**Load-Date:** March 26, 2010

End of Document

008843

## MGM's uncertain future stops work on new 007 film

Agence France Presse -- English

April 20, 2010 Tuesday 11:33 AM GMT

Copyright 2010 Agence France Presse All Rights Reserved



**Length:** 257 words

**Dateline:** LONDON, April 20 2010

## Body

Work on the latest James Bond movie has been suspended indefinitely because of debt-ridden **MGM studio**'s uncertain future, the British production company behind the project said Tuesday.

Producers Barbara Broccoli and Michael Wilson of London-based EON Productions said work on the movie -- working title "Bond 23" -- could not continue amid doubts over the future of the Metro Goldwyn Mayer (**MGM**) **studio**.

"Due to the continuing uncertainty surrounding the future of MGM and the failure to close a **sale** of the studio, we have suspended development on 'Bond 23' indefinitely," they said in a company statement.

"We do not know when development will resume and do not have a date for the release of Bond 23," they added.

Bond star Daniel Craig, on location in Canada on another movie, was quoted by British media as saying: "I have every confidence in Barbara and Michael's decision and look forward to production resuming as quickly as possible."

The **MGM studio** is home to famous franchises including James Bond and the Pink Panther, but has been struggling under huge debts.

At the end of last month MGM was given a new extension until May 14 to repay some 3.7 billion dollars in debt. The studio had said earlier in March that it had received several offers to **buy** the company.

Craig has starred in two Bond movies so far: "Casino Royale" and "Quantum of Solace." He follows actors including Sean Connery, Roger Moore and Pierce Brosnan in the longest-running movie franchise in film history.

The new 007 movie had been set for release in 2011 or 2012.

**Load-Date:** April 21, 2010

End of Document

# Corporate News: Indian company in talks to buy film studio MGM

The Wall Street Journal Asia

September 20, 2010 Monday

Copyright 2010 Factiva ®, from Dow Jones
All Rights Reserved



© 2010 Dow Jones & Company, Inc. To see the edition in which this article appeared, click here http://awsj.com.hk/factiva-ns

**THE WALL STREET JOURNAL.**

ASIA EDITION

**Section:** Pg. 20

**Length:** 329 words

**Byline:** By Mike Spector

# Body

Indian conglomerate Sahara India Pariwar is in talks to acquire beleaguered movie studio Metro-Goldwyn-Mayer Inc. for more than $2 billion, said a person familiar with the matter.

The discussions come as creditors prepare to take over MGM in a streamlined bankruptcy next month and turn management over to Gary Barber and Roger Birnbaum, co-heads of Spyglass Entertainment, a film company that co-financed such recent releases as "Dinner for Schmucks" and "Invictus."

MGM owes creditors about $4 billion and recently won a seventh reprieve on debt payments until Oct. 29.

MGM declined to comment. A Sahara representative said: "On mutual interest discussions are on but it's too early to comment on the issue."

The person familiar with the matter cautioned that the talks were at an early stage, and that MGM and its stakeholders haven't yet shown substantial interest in doing a deal with Sahara, a Lucknow-based company whose businesses include TV and film.

MGM's debt is largely held by hedge funds that **purchased** pieces of the studio's bank obligations at around 60 cents on the dollar, implying a valuation of around $2.4 billion.

Sahara would likely have to top that number to garner substantial interest from creditors, who have a big say in how MGM is restructured.

MGM's creditors have spent the past several months ironing out a deal with Spyglass.

Messrs. Barber and Birnbaum of Spyglass have signed a letter of intent to manage MGM once it emerges from bankruptcy, and would be entitled to break-up fees should the studio pursue a different deal, other people familiar with the matter said.

008845

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3    Filed 12/07/23    Page 53 of 214    PageID 8507
Exhibit Exhibit 3-61-72    Page 2 of 239    Page 2 of 2
Corporate News: Indian company in talks to buy film studio MGM

MGM owns the rights to the James Bond franchise and half the rights to a pair of coming "Hobbit" movies that would be prequels to the "Lord of the Rings" trilogy.

The studio put itself up for **sale** last year but garnered little interest from suitors.

---

Lauren A.E. Schuker, Amol Sharma and Eric Bellman contributed to this article.

 License this article from Dow Jones Reprint Service

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** September 19, 2010

**End of Document**

## Spyglass deal set to ensure MGM survival

The Times (London)

October 30, 2010 Saturday

Edition 3, National Edition

Copyright 2010 Times Newspapers Limited All Rights Reserved



**Section:** BUSINESS; Pg. 71

**Length:** 510 words

**Byline:** Alexandra Frean

## Body

The battle for control of the Hollywood film studio Metro-Goldwyn-Mayer (MGM) was expected to reach a climax last night when the company agreed a rescue package that would see its management taken over by the smaller rival Spyglass Entertainment.

The deal will ensure the survival of MGM, home to the James Bond and Pink Panther franchises. Last year the company, which is burdened with nearly $4 billion (£2.5 billion) of debt, put itself up for **sale** only to find that most potential bidders were not interested in the $2 billion price tag that its creditors were seeking.

The deal, which was approved last night by a vote by MGM creditors, would see the studio go into a pre-packaged bankruptcy. Its creditors would exchange debt for about 95 per cent of the equity. The owners of Los Angelesbased Spyglass Entertainment, a relatively small studio whose movie titles include The Sixth Sense, would get the remaining 5 per cent and take over the management of **MGM**.

The **studio** would raise new financing to produce several movies a year, including new Bond and Hobbit films. About 15 movie titles owned by Gary Barber and Roger Birnbaum, who own half of Spyglass along with Cerberus Capital Management, would be folded into MGM''s catalogue of 4,000 movies.

MGM has $3.7 billion of debt from a $5 billion buyout in 2005 by a consortium of private equity and media groups. Its film library is one of its most attractive assets, generating $450 million in 2008, but it has struggled to create new hits and is trying to cope with plunging DVD **sales** caused by consumers moving online.

The agreement with Spyglass spells disappointment for Lions Gate Entertainment, home of the Emmy awardwinning television series Mad Men as well as a string of hit movies. It had proposed a merger that has the support of the activist investor Carl Icahn, who has stakes in both companies.

Lions Gate sued Mr Icahn this week, accusing him of misleading shareholders by initially opposing its proposed merger with MGM.

Mr Icahn's initial - and very vocal - opposition to the merger was merely an attempt to depress both MGM and Lions Gate shares, the lawsuit alleges.It claims that Mr Icahn was "secretly plotting to merge the two studios - but only after he had acquired a sufficiently large position in both companies at depressed prices to ensure that he maximised his own profits." Only later did he say that he supported the merger, Lions Gate claims.

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Page 2 of 2
Case 3:23-cv-02071-E    Document 26-3    Filed 12/07/23    Page 55 of 214    PageID 8509
Exhibit Exhibit 61-72
Spyglass deal set to ensure MGM survival

The case follows a disclosure by Mr Icahn on Wednesday that he had **bought** more of MGM's debt as he unsuccessfully stepped up his effort to thwart the deal between MGM and Spyglass Entertainment.

The Icahn Group said in a statement that the lawsuit was "completely without merit". Mr Icahn, who launched a hostile bid for Lions Gate in March, extended his offer to **buy** its shares for $7.50 each until midnight on November 12. He owns more than 30 per cent of Lions Gate.

Even if the Spyglass deal goes through, that might not be end of the turmoil for MGM as there is some speculation that Spyglass might eventually link up with Lions Gate.

# Graphic

MGM, home to the James Bond franchise, is burdened by nearly $4 billion of debt and has been on **sale** for a year

SUSIE ALLNUTT /SONY PICTURES

**Load-Date:** October 30, 2010

---

**End of Document**

## Fabled movie studio MGM files for protection; Carl Icahn leveraged $400 million investment to cut a deal; BANKRUPTCY

Broward Daily Business Review

November 5, 2010 Friday

Copyright 2010 ALM Media Properties, LLC All Rights Reserved Further duplication without permission is prohibited



**Section:** Pg. A6; Vol. 51; No. 230

**Length:** 534 words

**Byline:** Brian Baxter , bbaxter@alm.com

## Body

Metro-Goldwyn-Mayer filed for Chapter 11 protection in New York as part of a prearranged reorganization plan with creditors.

MGM is being advised in Chapter 11 proceedings by Skadden Arps Slate Meagher & Flom and Los Angeles bankruptcy boutique Klee Tuchin Bogdanoff & Stern.

Skadden's connection to MGM runs deep, with legendary litigator Frank Rothman having once served as chairman and chief executive of the studio as a result of his relationship with its former owner, billionaire Kirk Kerkorian, who has **bought** and sold MGM several times.

MGM's current owners  a consortium of Sony, Comcast and private equity firms TPG Capital, Providence Equity Partners, Quadrangle Group and DLJ Merchant Banking Partners  will see their stakes in the studio wiped out in the prepackaged plan filed Wednesday. Debt from the $4.8 billion leveraged buyout in 2004 has crippled MGM's balance sheet.

More than 100 MGM lenders and bondholders approved a reorganization plan submitted by the company late last week. They will exchange nearly $4 billion in debt for a 95 percent stake in the studio once it emerges from bankruptcy. Organizational control of MGM will be transferred to a management team led by executives from Spyglass Entertainment. The company is half-owned by private equity firm Cerberus Capital Management and is being represented by O'Melveny & Myers.

Spyglass originally was set to take a 5 percent stake in the reorganized MGM. That now has been cut to 1 percent, according to the Hollywood Reporter. Activist investor Carl Icahn, who had been **buying** up MGM debt in a bid to merge the studio with another studio in which he's a major shareholder, Lions Gate Entertainment, apparently leveraged his $400 million in MGM debt to reach a last-minute settlement after opposing the company's reorganization plan.

Icahns lawyer, White & Case global financial restructuring chair Thomas Lauria, who splits his time between New York and Miami, did not respond to a request for comment by deadline. But the Hollywood Reporter said Icahn has won a seat on MGM's board and an agreement to limit the role of Spyglass executives running the reorganized company.

008849

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 26-3761 Filed 12/07/23    Page 57 of 214    PageID 8511

Page 2 of 2

Exhibit Exhibit 72    Page 233 of 562

Fabled movie studio MGM files for protection; Carl Icahn leveraged $400 million investment to cut a deal;
BANKRUPTCY

O'Melveny entertainment and media practice partner Christopher Brearton, who is representing Spyglass, did not respond to a request for comment.

In an MGM news release, the company said it intends to raise $500 million to continue funding its operations, including the production of new films and television series. The debtor anticipates a bankruptcy judge will approve its reorganization plan within 30 days.

According to the studio's 14-page bankruptcy filing, Skadden and Klee Tuchin are serving as co-counsel to the debtor. MGM lists assets and liabilities in excess of $1 billion in the filing, which was signed by general counsel Scott Packman, an O'Melveny alum.

Jay Goffman, global restructuring cochair at Skadden, is leading a team from the firm that includes private equity cochair Nick Saggese, M&A/restructuring partner Rick Madden and restructuring counsel Glenn Walter. Kenneth Klee and Michael Tuchin, partners at Klee Tuchin, are also advising MGM.

Brian Baxter reports for The American Lawyer, an ALM affiliate of the Daily Business Review.

**Load-Date:** April 17, 2011

---

**End of Document**

008850

## LIONS GATE: Sues Icahn for Plotting Merger with MGM

Troubled Company Reporter

December 3, 2010

Troubled Company Reporter Copyright  1994 - 2010  Bankruptcy Creditors' Service, Inc. & Beard Group, Inc. All Rights Reserved

**Section:** Vol. 14; ISSN: 1520-9474

**Length:** 1770 words

## Body

Patricia Hurtado at Bloomberg News reports that Lions Gate Entertainment Corp. sued billionaire Carl Icahn in federal court in New York, alleging the financier was "secretly plotting" to

merge the **studio** with **Metro-Goldwyn-Mayer** Inc.

In the lawsuit, Vancouver-based Lions Gate alleges that Mr. Icahn realized by June that Lions Gate was in advanced negotiations with two unidentified studios.  Aware that the deals might dilute his stake in Lions Gate, Mr. Icahn "took drastic and improper action," the studio said.

According to the report, Lions Gate said Mr. Icahn, 74, the studio's largest shareholder, undermined any proposed transactions by making false and misleading statements.  He told the investing public that such a deal would be a "financial debacle" and issued press releases vowing to challenge any transaction and sue any entity that interfered with his tender offer, the studio said.

"Icahn opposed a merger with MGM not because it was bad for Lions Gate shareholders, but because it was good -- so good, in fact,

that he wanted to postpone it until he could **buy** as much of both companies as he could and thus extract for himself as much of the value stemming from the merger as possible," Lions Gate said in the complaint, filed October 28 in U.S. District Court in New York, according to the Bloomberg report.

The case is Lions Gate Entertainment Corp., v. Carl Icahn, 10-CV-8169 (S.D.N.Y.).

### MGM's Prepackaged Plan

MGM creditors are scheduled to vote October 29 on a plan to turn

008851

Case 19-34054-sgj11  Doc 3818-7  Filed 06/05/23  Entered 06/05/23 22:10:41  Desc
Case 3:23-cv-02071-E  Exhibit Exhibit 3761 Filed 12/07/23  Page 59 of 214  PageID 8513
Page 2 of 5
LIONS GATE: Sues Icahn for Plotting Merger with MGM

management of the Los Angeles-based studio over to Spyglass
Entertainment founders, a plan Mr. Icahn opposes.

Mike Spector and Lauren A.E. Schuker, writing for The Wall Street
Journal, report that if the plan wins enough support -- odds
appear to favor it -- MGM will file for a Chapter 11 bankruptcy as
soon as Sunday.

As reported by the TCR on October 8, 2010, the plan provides for
MGM's secured lenders to exchange more than $4 billion in
outstanding debt for approximately 95.3% of equity in MGM upon its
emergence from Chapter 11.  Spyglass Entertainment would
contribute certain assets to the reorganized company in exchange
for approximately 0.52% of the reorganized company.  In addition,
two entities owned by Spyglass affiliates -- Cypress Entertainment
Group, Inc. and Garoge, Inc. -- will merge with and into a
subsidiary of MGM, with the MGM subsidiary as the surviving
entity.  The stockholders of Cypress and Garoge will receive
approximately 4.17% of the reorganized company in exchange.

Gary Barber and Roger Birnbaum, currently Co-Chairman and Chief
Executive Officer of Spyglass Entertainment, would serve as the
Co-Chairman and Chief Executive Officer of MGM following the
company's emergence from Chapter 11.

The Journal's Mr. Spector and Ms. Schuker earlier reported that if
MGM gets enough creditor support, it hopes to spend roughly two
months under Chapter 11 bankruptcy protection.  When it exits
bankruptcy, MGM's ambitions will be scaled back to making only a
handful of new movies each year.  The studio plans to tap a new
$500 million credit line to finance new film production, people
familiar with the matter said, far less than the company had
originally envisioned.

MGM has received a series of forbearance agreements from its
bondholders and lenders, wherein the lenders extended the period
during which MGM won't have to pay principal and interest on its
bank debt, including a revolving credit facility.  The latest
forbearance agreement expires October 29.

MGM tried to sell itself in March 2010 but received low bids.
According to The Wall Street Journal, Sahara India Pariwar offered
a bit more than $2 billion for MGM in September, but the studio's
creditors rejected the overture.

MGM has hired investment bank Moelis & Company and Skadden, Arps,
Slate, Meagher & Flom.  According to the Wall Street Journal,
Moelis media banker Navid Mahmoodzedegan prepared a confidential

book for MGM's prospective **buyers** and advised on its subsequent
restructuring.  The Journal says Skadden's Jay Goffman, Esq.,
prepared bankruptcy papers and helped draw up a "prepackaged"
bankruptcy.

LIONS GATE: Sues Icahn for Plotting Merger with MGM

In August 2009, MGM hired the restructuring expert Stephen F.
Cooper to help lead the company.

The Journal also relates Irwin Gold, head of restructuring at Los
Angeles investment bank Houlihan Lokey, advises MGM's creditors.

### Icahn Opposes MGM Plan

Carl Icahn has launched a three-headed attack to win over MGM
creditors' support and scuttle the studio's prepackaged bankruptcy
plan:

(A) On Tuesday, Mr. Icahn said his affiliated entities are
commencing a tender offer for Metro-Goldwyn-Mayer Inc.
senior secured loans.  Tuesday's Tender Offer is at a

**purchase** price of $0.53 per $1.00 in principal amount and
is conditioned on at least $1.6 billion in principal
amount of Senior Loans being tendered in the Tender
Offer.  If Tender Offer condition is satisfied and the
Spyglass Prepackaged Plan is rejected, then the Icahn

affiliates will **purchase** $1.6 billion in principal amount
of Senior Loans, less those accepted pursuant to the Put
Offer now in progress.  This amount plus the amount of
Debt currently owned by the Icahn parties will
approximate 51% of the outstanding Senior Loans.  Payment
for tendered Senior Loans accepted in the Tender Offer
will be made immediately following acceptance.  Mr.
Icahn, in its sole discretion, may accept tenders as they
are made, whether or not any conditions are satisfied,
and may accept any amount tendered, but in no event will
Mr. Icahn accept more than the $1.6 billion stated.

(B) On Wednesday, Mr. Icahn said his affiliated entities have

been **buying** MGM senior secured loans outside of the

tender and put offers at a **purchase** price of $0.50 per
$1.00 in principal amount.  Mr. Icahn indicated that his

affiliates had already **purchased** a substantial amount of
Senior Loans and are seeking to acquire an aggregate of
$500 million in principal amount of Senior Loans.  UNLIKE

THE TENDER AND PUT OFFERS, **PURCHASES** ARE NOT CONDITIONED
ON ANY MINIMUM AMOUNT BEING ACQUIRED AND PAYMENT WILL BE
MADE IMMEDIATELY.  Sellers must be record holders of
Senior Loans and must vote against the Spyglass Plan.
Those interested in selling their Senior Loans should
call Vincent Intrieri at 212-702-4328.

(C) As reported by the Troubled Company Reporter on

LIONS GATE: Sues Icahn for Plotting Merger with MGM

October 22, 2010, Mr. Icahn offered **holders** of **MGM** senior
secured loans the right to put loans to Icahn Affiliates

at a **purchase** price of $0.45 per $1.00 in principal
amount on a first-come, first-served basis.  The offer
would give participating holders of Senior Loans the
right to keep the upside on their MGM position, if there
is one, without taking risk on the downside.  The Put
offer is conditioned on a minimum of $963,000,000 in
principal amount in Senior Loans participating in the
offer.

Lions Gate Proposal to MGM

Lions Gate on October 25, 2010, sent a letter to MGM in connection
with its proposal for the potential combination of the business of
the Company and MGM.  Jon Feltheimer, Co-Chairman and CEO of Lions
Gate, told MGM in the letter that Lions Gate continues to believe
that a merger with MGM represents a unique, value creating
opportunity for the stakeholders of Lions Gate and MGM.

Lions Gate made a presentation on July 13, 2010, to the steering
sub-committee of the MGM lender group.  In Monday's letter, Mr.
Feltheimer said Lions Gate believes that recent positive
developments at Lions Gate and MGM, as well as further specific
and actionable opportunities, have the potential to increase cash
flow from Lions Gate's July projections by over $40 million in
fiscal year 2011 and over $120 million over the subsequent five
years.

Specifically:

1) an incremental $10 million to $15 million of annual
   overhead savings for a total potential annual overhead
   savings of over $100 million per year. This results in
   approximately $68 million of savings over five years vs.
   the July Projections;

2) Positive developments in Lions Gate's Channel Ventures,
   including the recently announced EPIX deal with Netflix,
   resulting in significant cash flow improvements;

3) The exercise of MGM's right to `opt-out' of certain
   elective distribution right `buyouts'.

About Metro-Goldwyn-Mayer

Metro-Goldwyn-Mayer, Inc., is an independent, privately held
motion picture, television, home video, and theatrical production
and Distribution Company.  The Company owns the world's largest
library of modern films, comprising approximately 4,000 titles,
and over 10,400 episodes of television programming.  An investor
consortium, comprised of Providence Equity Partners, TPG Capital,

008854

LIONS GATE: Sues Icahn for Plotting Merger with MGM

Sony Corporation of America, Comcast Corporation, DLJ Merchant
Banking Partners and Quadrangle Group, acquired MGM from Kirk
Kerkorian for $5 billion in 2005.  The studio is now valued at
around $1.9 billion, according to The Wall Street Journal.

### About Lions Gate

British Columbia-domiciled and Santa Monica, California-
headquartered Lions Gate is an independent producer and
distributor of motion pictures, home entertainment, television
programming and animation worldwide and holds a majority interest
in the pioneering CinemaNow VOD business.

Lions Gate Entertainment Corp. reported total assets of
$1,592,874,000 against total liabilities of $1,594,454,000,
resulting in total deficiency of $1,580,000 as of June 30, 2010.

As reported by the Troubled Company Reporter on March 10, 2010,
Standard & Poor's Ratings Services revised its rating outlook on
Lions Gate to negative from stable.  At the same time, S&P
affirmed ratings on Lions Gate, including the 'B-' corporate
credit rating.

Lions Gate carries Moody's "B2" corporate family rating and
probability of default rating.

Standard & Poor's Ratings Services revised the CreditWatch
implications on its 'B-' corporate credit rating for British
Columbia, Canada-domiciled and Santa Monica, Calif.-headquartered
Lions Gate Entertainment Corp. and its subsidiary, Lions Gate
Entertainment Inc., to developing from negative.  S&P initially
placed the rating on CreditWatch with negative implications on
March 24, 2010, in response to investor Carl Icahn's unsolicited
tender offer to acquire all outstanding shares of the
entertainment company's common stock.

**Load Date:** December 3, 2010

---

**End of Document**

## Lionsgate Accuses Icahn Of Double-Crossing

December 06, 2010



Copyright © 2023 Portfolio Media, Inc. All rights reserved.

**Author:** Bibeka Shrestha

## Summary

Lions Gate Entertainment Corp. has renewed its charge against billionaire investor Carl Icahn, Brett Icahn and other members of the Icahn group, accusing them of double-crossing Lionsgate and Metro-Goldwyn-Mayer Inc. in a secret plot to profit handsomely from a merger between the two.

## Body

Lions Gate Entertainment Corp. has renewed its charge against billionaire investor Carl Icahn, Brett Icahn and other members of the Icahn group, accusing them of double-crossing Lionsgate and Metro-Goldwyn-Mayer Inc. in a secret plot to profit handsomely from a merger between the two.

Lionsgate, a leading independent film and television studio that produces the television show "Mad Men" and produced the Oscar-winning film "Precious," filed an amended complaint Friday in the U.S. District Court for the Southern District of New York, days before Lionsgate shareholders decide whether to install Carl Icahn's slate of five dissident members on Lionsgate's board of directors at the annual shareholders meeting Dec. 14.

The initial complaint was filed in October but is now being amended after Carl Icahn abandoned his original plans to install his son Brett to the Lionsgate board.

Lionsgate alleges that Icahn publicly blasted its management for pursuing a merger with MGM as a transaction that would end in bankruptcy and "oblivion." In the meantime, the complaint alleges, Icahn acquired substantial **holdings** in both **MGM** debt and Lionsgate shares, after which Icahn began aggressively promoting a merger of the two studios.

"At the same time Icahn was telling the investing public that a Lionsgate-MGM transaction would be a financial debacle, he was secretly plotting to merge the two," the complaint said. "Icahn was playing a double game."

Members of the Icahn group issued a statement claiming that Lionsgate's lawsuit and its claims are "completely without merit."

Directly refuting allegations that Icahn tried to keep his MGM dealings under wraps, the statement claimed that in a Nov. 2, 2010, court filing, Carl Icahn disclosed that he **purchased** about $145 million of MGM debt in November and December 2008, about $51 million in July and November 2009, and an additional $400 million between August and October 2010.

Icahn called Lionsgate's amended complaint a sham in a letter hand-delivered to the judge Monday, claiming the changes made were trivial.

"Lionsgate's purported amendment is a transparent and ultimately hopeless attempt to stave off dismissal," Icahn's letter said. According to the letter, Icahn made a motion to dismiss two weeks ago and is asking the court to grant the motion to dismiss for default.

Representatives for Lionsgate could not be reached for further comment Monday.

Lionsgate had originally pursued a merger with MGM for access to its vast film collection, but Icahn denounced the proposed transaction, referring to MGM as a "dinosaur" with a decaying library.

Icahn threatened to sue any company, including MGM, that entered into a transaction with Lionsgate, a deal that would allegedly endanger his quest for control of Lionsgate, according to the complaint.

Meanwhile, Icahn had amassed more than 10 percent of MGM's approximately $4 billion in debt and increased his stake in Lionsgate to approximately 33 percent by late September, the complaint said.

Lionsgate accuses Icahn of keeping its shareholders in the dark by failing to disclose his **purchases** of privately traded MGM debt and filing materially false and misleading statements with the U.S. Securities and Exchange Commission.

On Friday, Lionsgate also filed a motion for preliminary injunction enjoining the Icahn group from **purchasing** any Lionsgate securities until the group discloses the extent and value of its **holdings** of **MGM** debt, including the entire history of its trading activity in MGM debt.

Moreover, Lionsgate is demanding full disclosure about the Icahn group's agreement with Mark Cuban, a business associate of Icahn's who agreed to hand over his 5.4 percent stake in Lionsgate despite Lionsgate informing Cuban of another **buyer** willing to pay more, according to the complaint.

Lionsgate alleges that the Icahn group provided special considerations to Cuban to seal the deal that it did not offer to other Lionsgate shareholders, violating the so-called Best-Price Rule.

Lionsgate claims that shareholders are entitled to know all these details before voting for Icahn's proxy slate of directors. According to the complaint, Lionsgate is also seeking damages for the Icahn group's tortious interference in advanced negotiations with two other studios it cannot name.

Lionsgate is represented by Wachtell Lipton Rosen & Katz. Icahn is represented by Winston & Strawn LLP.

The case is Lions Gate Entertainment Corp. v. Icahn et al., case number 10-CV-8169, in the U.S. District Court for the Southern District of New York.

---

**End of Document**

# METRO-GOLDWYN-MAYER: Chinese Company Interested in Buying Stake

Troubled Company Reporter

December 17, 2010

Troubled Company Reporter Copyright  1994 - 2010  Bankruptcy Creditors' Service, Inc. & Beard Group, Inc. All Rights Reserved

**Section:** Vol. 14; ISSN: 1520-9474

**Length:** 439 words

## Body

A top official of China Film Group Corp. disclosed that a Chinese

company is interested in **buying** a stake in **Metro-Goldwyn-Mayer**

**Studios** Inc., according to a November 6, 2010 report by Bloomberg

News.


Zhou Tiedong, general manager of China Film's marketing division,
did not identify the Chinese company but said that a U.S. law
firm is handling the transaction, the report said.


About **Metro-Goldwyn-Mayer Studios**


**Metro-Goldwyn-Mayer Studios** Inc. -- http://www.mgm.com/ --
-- is actively engaged in the worldwide production and
distribution of motion pictures, television programming, home
video, interactive media, music, and licensed merchandise. The
company owns the world's largest library of modern films,

comprising around 4,100 titles. Operating units include **Metro-**

**Goldwyn-Mayer Studios** Inc., **Metro-Goldwyn-Mayer** Pictures Inc.,
United Artists Films Inc., MGM Television Entertainment Inc., MGM
Networks Inc., MGM Distribution Co., MGM International Television
Distribution Inc., Metro-Goldwyn-Mayer Home Entertainment LLC, MGM
ON STAGE, MGM Music, MGM Consumer Products and MGM Interactive. In
addition, MGM has ownership interests in domestic and
international TV channels reaching over 130 countries.

As of September 30, 2010, the Debtors' unaudited consolidated
financial statements, as prepared in accordance with accounting
principles generally accepted in the United States for interim
financial statements, included $2,673,772,000 in total assets and
$3,451,493,000 in total liabilities

Excluding certain adjustments made by the Company in accordance
with GAAP, the Debtors' total outstanding liabilities would be
$5,766,721,000, which includes the total face value of outstanding
principal and accrued, but unpaid, interest under the Credit
Agreement and interest rate swap agreements.

Metro-Goldwyn-Mayer Inc. and 160 of its affiliates on November 3
filed Chapter 11 cases (Bankr. S.D.N.Y. Lead Case No. 10-15774),
to seek confirmation of their "pre-packaged" plan of
reorganization.

Jay M. Goffman, Esq., at Skadden, Arps, Slate, Meagher & Flom LLP,
in New York, serves as bankruptcy counsel to the Debtors. Klee,
Tuchin, Bogdanoff & Stern LLP is the legal counsel. Moelis &
Company is the financial advisor. Donlin Recano & Company, Inc.,
is the claims and notice agent. CAIR Management, LLC, Stephen F.
Cooper, and Zolfo Cooper Management LLC, is the Debtors'
management service providers.

Bankruptcy Creditors' Service, Inc., publishes METRO-GOLDWYN-MAYER
BANKRUPTCY NEWS. The newsletter tracks the Chapter 11 proceeding
undertaken by Metro-Goldwyn-Mayer Inc. and its affiliates.

(http://bankrupt.com/newsstand/ or 215/945-7000)

**Load Date:** December 17, 2010

---

**End of Document**

008859

## METRO-GOLDWYN-MAYER: Bankr. Court Won't Hear United Artists Deal

Troubled Company Reporter

December 14, 2011

Troubled Company Reporter Copyright  1994 - 2011  Bankruptcy Creditors' Service, Inc. & Beard Group, Inc. All Rights Reserved

**Section:** Vol. 15; ISSN: 1520-9474

**Length:** 471 words

## Body

U.S. Bankruptcy Judge Stuart M. Bernstein on Monday refused to

approve an agreement between **Metro-Goldwyn-Mayer Studios** Inc. and

United Artists Production Finance LLC to **buy** about $11 million in
UAPF debt relating to credit agreements with an MGM subsidiary,
saying his court lacked jurisdiction.

Keith Goldberg at Bankruptcy Law360 reports that Judge Bernstein

said the **purchase** agreement came after he approved MGM's Chapter
11 restructuring plan in December, which meant that MGM was no
longer under the protection of the bankruptcy court.

Prior to the petition date, MGM owned a 62.5% stake in United
Artists Entertainment LLC.  New United Artists was formed "to
develop and produce new theatrically released films under the New
United Artists banner."  It did not file for bankruptcy.

A copy of Judge Bernstein's ruling is available at

http://is.gd/61NMb1 from Leagle.com.

About **Metro-Goldwyn-Mayer Studios**

**Metro-Goldwyn-Mayer Studios** Inc. -- http://www.mgm.com/ -- is
actively engaged in the worldwide production and distribution of
motion pictures, television programming, home video, interactive
media, music, and licensed merchandise.  The company owns the
world's largest library of modern films, comprising around 4,100

titles.  Operating units include **Metro-Goldwyn-Mayer Studios** Inc.,

**Metro-Goldwyn-Mayer** Pictures Inc., United Artists Films Inc., MGM
Television Entertainment Inc., MGM Networks Inc., MGM Distribution
Co., MGM International Television Distribution Inc., Metro-
Goldwyn-Mayer Home Entertainment LLC, MGM ON STAGE, MGM Music, MGM
Consumer Products and MGM Interactive.  In addition, MGM has
ownership interests in domestic and international TV channels
reaching over 130 countries.

As of September 30, 2010, the Debtors' unaudited consolidated
financial statements, as prepared in accordance with accounting
principles generally accepted in the United States for interim
financial statements, included $2,673,772,000 in total assets and
$3,451,493,000 in total liabilities

Metro-Goldwyn-Mayer Inc. and 160 of its affiliates on November 3
filed Chapter 11 cases (Bankr. S.D.N.Y. Lead Case No. 10-15774),
to seek confirmation of their "pre-packaged" plan of
reorganization.

Jay M. Goffman, Esq., at Skadden, Arps, Slate, Meagher & Flom LLP,
in New York, served as bankruptcy counsel to the Debtors.  Klee,
Tuchin, Bogdanoff & Stern LLP was the legal counsel.  Moelis &
Company was the financial advisor.  Donlin Recano & Company, Inc.,
is the claims and notice agent.  CAIR Management, LLC, Stephen F.
Cooper, and Zolfo Cooper Management LLC, was the Debtors'
management service providers.

In mid-December 2011, Metro-Goldwyn-Mayer Inc. restructuring
became effective, with exit financing of $500 million in place.
The Company's "pre-packaged" plan of reorganization was confirmed
on December 2, 2010, by the Bankruptcy Court.

**Load Date:** December 14, 2011

---

**End of Document**

# MGM Will Buy Out Icahn;  Studio Eyes $3 Billion IPO

The Wall Street Journal Online

July 31, 2012

Copyright 2012 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

**Section:** MARKETS

**Length:** 639 words

**Byline:** By Mike Spector and Michelle Kung

## Body

The parent of Metro-Goldwyn-Mayer reached a deal to pay investor Carl Icahn more than $590 million for all his shares in the film studio, as the company makes preparations to go public, said people familiar with the matter.

MGM Holdings Inc. agreed on July 29 to repurchase Mr. Icahn's roughly 17.6 million shares for $33.50 apiece, according to a letter to investors reviewed by The Wall Street Journal. The deal is expected to close within the next two weeks or so, one of the people said.

Under the plan, the activist investor's representative will leave MGM's board, according to one of the people close to the situation. MGM will now go on with one less director or perhaps replace the vacant spot with someone else, the person said.

Mr. Icahn's shares trace to **purchases** of private bank debt that was later converted to equity. It isn't clear how much Mr. Icahn paid for the debt he later converted, making it difficult to determine how much, if any, money he made selling his shares. But the $33.50 **purchase** price is a premium to the about $27 level where the stock was trading in private markets Tuesday morning.

Mr. Icahn didn't immediately respond to a request for comment. An MGM spokeswoman couldn't be reached immediately for comment.

Meanwhile, MGM's shareholders are targeting a roughly $3 billion valuation for the studio when it goes public, perhaps as soon as the fourth quarter of this year, said the person close to the situation. MGM's next James Bond installment, "Skyfall," hits theaters in November, while the first of three films adapted from J.R.R. Tolkien's "The Hobbit" arrives on screens in December. Both have potential to bring in big box-office numbers.

The timing of any public stock offering remains in flux, the person cautioned. In addition, MGM hasn't arrived yet at a target price for shares or the number of shares it will sell, this person said. A separate person familiar with **MGM** said the **studio** could seek $40 a share.

MGM Will Buy Out Icahn;  Studio Eyes $3 Billion IPO

MGM hired J.P. Morgan Chase & Co. and Goldman Sachs Group Inc. to manage a potential public stock offering, the person said. J.P. Morgan would lead the IPO, this person said. Other banks are expected to join the fray before MGM goes public, the person said.

MGM disclosed last week it was exploring a public stock offering after making a confidential filing with the Securities and Exchange Commissions. The company didn't reveal a timeline or terms for the possible IPO. Under the JOBS Act signed into law earlier this year companies that have less than $1 billion in annual revenue can submit their preliminary prospectuses confidentially to the SEC.

Mr. Icahn **bought** up MGM debt in late 2010 and tried to upend the studio's bankruptcy plans, urging the company merge with rival Lions Gate Entertainment Corp., in which he was an investor. In the end, MGM revised certain terms of its restructuring and gave Mr. Icahn a board seat.

MGM emerged from bankruptcy proceedings at the end of 2010, installed Spyglass Entertainment founders Gary Barber and Roger Birnbaum as co-chief executives and pivoted to focusing on television distribution and co-financing films with other studios. Mr. Icahn's exit, meanwhile, caps a tumultuous foray into Hollywood in which he feuded with Lions Gate and MGM creditors.

MGM's other big shareholders include hedge funds Anchorage Advisors, Highland Capital Management, Davidson Kempner Capital Management and Solus Alternative Asset Management. They became the studio's owners after leading other creditors in converting more than $4 billion of debt to equity during MGM's bankruptcy reorganization.

The hedge funds are hesitant for MGM to go public without a valuation in the neighborhood of $3 billion, said one of the people familiar with the studio's plans.

Write to Mike Spector at  mike.spector@wsj.com  and Michelle Kung at  michelle.kung@wsj.com

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** August 1, 2012

**End of Document**

## MGM Sells Channels, Buys Out Icahn Ahead Of IPO

August 01, 2012



Copyright © 2023 Portfolio Media, Inc. All rights reserved.

**Author:** Karlee Weinmann

## Summary

**MGM Holdings** Inc. said Wednesday that it sold most of its international television channels to Liberty Global Inc. subsidiary Chellomedia as reports swirled that the studio needed $590 million to **buy** back activist investor Carl Icahn's stake ahead of an initial public offering.

## Body

**MGM Holdings** Inc. said Wednesday that it sold most of its international television channels to Liberty Global Inc. subsidiary Chellomedia as reports swirled that the studio needed $590 million to **buy** back activist investor Carl Icahn's stake ahead of an initial public offering.

The **studio**'s subsidiary, **Metro-Goldwyn-Mayer Studios** Inc., and Chellomedia did not disclose the deal's financial terms. An MGM spokesperson said the media Goliath was "not commenting on any financial aspects of the deal," including the prospective **purchase** of Icahn's 25 percent MGM interest or its **rumored** IPO.

But MGM and Icahn have reportedly already agreed to the terms and expect to button up the share **sale** within two weeks, according to several outlets including the Wall Street Journal, which broke the story citing unnamed sources familiar with the matter.

The $590 million price, which boils down to a $33.50 per share payout, would represent a roughly 20 percent premium over Tuesday private market trading for Icahn, known for wedging himself into board rooms to shake up and redirect companies. He had been a vocal opponent of MGM management's strategy as the studio navigated its way through a 2010 bankruptcy.

Icahn was not immediately available for comment Wednesday.

So far, MGM has stayed mum about the details of its potential IPO, only issuing a brief statement last week that said it had made a confidential U.S. Securities and Exchange Commission filing as it prepared for a possible IPO.

The company did not reveal a timeline, the number of shares that would hit the market or a targeted valuation. Media reports have suggested the offering could come as soon as November, and could yield as much as $3 billion.

In unveiling the Chellomedia **sale**, MGM indicated plans to redouble its focus on its media assets in North America, Australia, Brazil, Germany and the U.K., all of which are set to stick with the company through the deal. In waving off the international channels, MGM will center its business on core movie and television show offerings.

MGM Sells Channels, Buys Out Icahn Ahead Of IPO

Under the terms reached with Chellomedia, MGM will unload channels in Israel, Poland, Spain, Turkey, India and other Southeast Asian countries. The **sale** will also break up the 50-50 MGM Latin America joint venture between MGM and Liberty Global, split between the companies since 1998. Chellomedia is Liberty Global's international content arm.

"MGM is not exiting the channel business completely," Roma Khanna, president of MGM's television group and digital, said in a statement, adding that the company is merely shifting its geographic focus to "unlock shareholder value."

MGM owns the world's largest library of modern films, which includes more than 4,000 titles. Its slew of divisions include United Artists Films Inc., MGM Television Entertainment Inc. and Metro-Goldwyn-Mayer Home Entertainment LLC, in addition to **Metro-Goldwyn-Mayer Studios**.

Barclays PLC served as financial adviser to Chellomedia.

Counsel information for the parties was not immediately available.

--Editing by Andrew Park.

---

**End of Document**

008865

## METRO-GOLDWYN-MAYER: Mulls Public Stock Offering

Troubled Company Reporter

August 30, 2012

Troubled Company Reporter Copyright  1994 - 2012  Bankruptcy Creditors' Service, Inc. & Beard Group, Inc. All Rights Reserved

**Section:** Vol. 16; ISSN: 1520-9474

**Length:** 468 words

## Body

Michelle Kung and Mike Spector, writing for The Wall Street

Journal, report **MGM Holdings**, Inc., the parent of Metro-Goldwyn-
Mayer, is planning a possible public stock offering.  MGM has
filed documents with the Securities and Exchange Commission late
Tuesday.  MGM gave neither a timeline nor any terms for the
potential IPO.  An MGM spokeswoman declined to comment further.
MGM has hired Goldman Sachs Group Inc. as a lead manager.

According to WSJ, depending on how a public offering is received,
it could be a boon for Anchorage Advisors and other hedge funds
that own MGM, including Highland Capital Management, Davidson
Kempner Capital Management and Solus Alternative Asset Management.

The funds **purchased** MGM debt at discounts as the studio foundered
in 2009 and 2010, then converted those holdings to ownership
stakes when the company emerged from bankruptcy proceedings.

About **Metro-Goldwyn-Mayer Studios**

**Metro-Goldwyn-Mayer Studios** Inc. -- http://www.mgm.com/ -- is
actively engaged in the worldwide production and distribution of
motion pictures, television programming, home video, interactive
media, music, and licensed merchandise.  The company owns the
world's largest library of modern films, comprising around 4,100

titles.  Operating units include **Metro-Goldwyn-Mayer Studios** Inc.,

**Metro-Goldwyn-Mayer** Pictures Inc., United Artists Films Inc., MGM
Television Entertainment Inc., MGM Networks Inc., MGM Distribution
Co., MGM International Television Distribution Inc., Metro-

Goldwyn-Mayer Home Entertainment LLC, MGM ON STAGE, MGM Music, MGM
Consumer Products and MGM Interactive.  In addition, MGM has
ownership interests in domestic and international TV channels
reaching over 130 countries.

Metro-Goldwyn-Mayer Inc. and 160 of its affiliates on Nov. 3,
2010, filed Chapter 11 cases (Bankr. S.D.N.Y. Lead Case No.
10-15774), to seek confirmation of their "pre-packaged" plan of
reorganization.  As of Sept. 30, 2010, the Debtors' unaudited
consolidated financial statements included $2,673,772,000 in total
assets and $3,451,493,000 in total liabilities.

Jay M. Goffman, Esq., at Skadden, Arps, Slate, Meagher & Flom LLP,
in New York, served as bankruptcy counsel to the Debtors.  Moelis
& Company is the financial advisor.  Donlin Recano & Company,
Inc., is the claims and notice agent.  CAIR Management, LLC,
Stephen F. Cooper, and Zolfo Cooper Management LLC, provided
management services.

MGM's restructuring became effective in December 2010, with exit
financing of $500 million in place.  The "pre-packaged" plan of
reorganization was confirmed Dec. 2, 2010.  As part of the
bankruptcy, MGM eliminated $5 billion in debt and converted other
debt into stock.  In February 2012, MGM said its lenders helped
retire the old debt that was left and loaned the studio $500
million in a revolving credit facility.

**Load Date:** August 30, 2012

---

**End of Document**

## ... 'Bond' studio said to eye sale [Exclusive]

The New York Post

February 24, 2017 Friday

Copyright 2017 N.Y.P. Holdings, Inc. All Rights Reserved

**Section:** Sports+Late City Final; Pg. 28

**Length:** 241 words

**Byline:** Claire Atkinson

## Body

LOS ANGELES - First Rambo and now 007?

**MGM**, the independent **studio** behind the James Bond franchise, is in "advanced talks" to sell the company to a Chinese **buyer**, a senior source said.

MGM, which also houses President Trump's "The Apprentice" archive, has been looking for a **buyer**, or an IPO.

The firm is also a third owner - with Lionsgate and Paramount - in premium movie and TV service Epix.

It's unclear which China-based **buyer** is set to acquire the firm, but it is just the latest to look East for a **buy**-out.

The film studio (and home to the driver of the world's most famous Aston Martin DB5, inset) is owned by a slew of hedge funds including Kevin Ulrich's Anchorage Capital Group and Highland Capital. Other investors include Daniel Loeb's Third Point.

MGM emerged from a complex bankruptcy in 2010 whereby debtholders were able to convert their holdings into equity. The firm was loaded with $3.7 billion of debt at the time of its bankruptcy.

Sources say a deal with the Chinese could become complicated. Chinese nationals are having a hard time getting visas to enter the States, sources told The Post. The Beijing government is also cracking down on how much cash can leave the country.

Such rapid global changes are weighing on Dick Clark Productions, which made a $1 billion deal to sell itself to Wanda.

Industry sources insist that deal is now all but dead.

A spokesman for MGM was not immediately available.

## Graphic

"JB 007" license plate.

**Load-Date:** February 24, 2017

008868

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Exhibit Exhibit 6-1 Filed 12/07/23    Page 76 of 214    PageID 8530
... 'Bond' studio said to eye sale [Exclusive]

**End of Document**

008869

## Chinese $$ retreat KO's Dick Clark deal

The New York Post

March 11, 2017 Saturday

Copyright 2017 N.Y.P. Holdings, Inc. All Rights Reserved

**Section:** All Editions; Pg. 22

**Length:** 333 words

**Byline:** Richard Morgan

## Body

A Chinese conglomerate's decision to kill its $1 billion deal to **buy** Dick Clark Productions left many in Hollywood wondering if an era of what a studio veteran called "dumb money" had ended.

Eldridge Industries acknowledged the derailing of its deal to sell DCP to China's Dalian Wanda Group by filing for a termination fee on Friday.

The fee was part of the agreement between Eldridge and Wanda announced with much fanfare in November.

China's enthusiasm for Hollywood properties spilled into January, when Wanda Chairman Wang Jianlin announced his company would spend up to $10 billion on overseas entertainment assets this year.

Given Wanda's **purchase** of "Batman" co-producer Legendary Entertainment for $3.5 billion and Carmike Cinemas for $1.1 billion in 2016, few expected the spending spree to stop

But a move by Beijing to limit outflows of capital is killing or jeopardizing some recently announced deals.

For example, **MGM**, the **studio** behind James Bond flicks, was in talks to be sold to Chinese investors, sources said. Those talks ended last week.

A $1 billion slate deal that calls for two Chinese companies to finance at least 25 percent of every film by Paramount Pictures over the next three years is said to be in trouble, Variety reported on Friday.

China's tightening the spigot already has some Hollywood veterans worried about obtaining outlandish premiums on asset **sales**.

"The Chinese strategy is to invest and then learn," a source said.

The move by Beijing to limit capital flight caused another deal to collapse on Friday, when the $1 billion **sale** of Dick Clark Productions, which owns the rights to televise the Golden Globes, was canceled.

Other beset Hollywood deals with Chinese companies:

n The $350 million **sale** of Voltage Pictures, maker of "The Hurt Locker," to Anhui Xinke New Materials collapsed

n A $1 billion financing deal between Paramount Pictures (inset) and Shanghai Film Group and Huahua Media is in trouble

rmorgan@nypost.com

008870

Chinese $$ retreat KO's Dick Clark deal

## Graphic

-Actress Tracee Ellis Ross at the 2017 Golden Globe Awards. [WireImage]-Paramount Pictures Studios.

**Load-Date:** March 13, 2017

---

End of Document

008871

## Which Studio Would Apple Want to Buy?

hollywoodreporter.com

April 2, 2018 Monday

Copyright 2018 Prometheus Global Media, LLC All Rights Reserved



**Section:** NEWS; TAG

**Length:** 536 words

**Byline:** Paul Bond

## Body

The latest **rumor** that Apple had kicked the tires on an acquisition of A24 has reignited speculation that the tech giant wants to **buy** a studio so it can better compete with Netflix, Amazon and Hulu in the lucrative streaming media market.

Apple has $285 billion in cash, so it can afford to **buy** practically anything it wants, though it remains to be seen how serious the company is about getting into the content business, even though investors are clamoring for the next big thing to come from the pioneering company behind iTunes, iPhones and iPad.

While A24 looks like a nice, relatively cheap fit, reports of serious discussions between the two may be more about partnerships than of an outright acquisition of the company behind Oscar-nominated films like Lady Bird and Moonlight.

Apple has said that it would spend $1 billion making original content this year, like another season of Amazing Stories, a reboot of Steven Spielberg & amp;#39;s 1980s anthology series, and an upcoming drama from Reese Witherspoon and Jennifer Aniston, but that & amp;#39;s a pittance compared to the $8 billion Netflix is expected to spend this year.

If Apple is to get more seriously in the game, it should **buy** an established studio, observers say. But the company doesn & amp;#39;t like to spend money on acquisitions - its largest in recent memory being the $3 billion **purchase** of Beats Music four years ago.

"Apple may want to acquire a studio in order to deepen its relationships in Hollywood, access a deep library and secure a quality development pipeline," says Ben Weiss, chief investment officer of 8th & Jackson Capital Management.

Some have opined Apple might just bite the bullet and try to **buy** Netflix, though when The Hollywood Reporter speculated on such an acquisition in 2016, Netflix was valued at $40 billion. Since then, its market capitalization has swelled to $128 billion.

"Apple has a history of making smaller acquisitions, such as Beats, to acquire talent and intellectual property that it can leverage across its product and services platform," says Weiss.

008872

Which Studio Would Apple Want to Buy?

Another name bandied about is **MGM**, the **studio** behind the James Bond film franchise and Mark Burnett reality TV shows. But MGM, valued somewhere north of $4 billion, recently parted ways with its CEO, Gary Barber, and one of the reasons was that Barber wanted to sell while the investment groups that own MGM do not.

Lionsgate, valued at more than $5 billion, is another possibility. John Feltheimer, the CEO of the studio behind the Hunger Games and John Wick movie franchises, not to mention TV shows like Orange Is the New Black and Nashville, has often considered a **sale**. Billionaire mogul John Malone has a big stake in Lionsgate, and he & amp;#39;s constantly looking for media assets to **buy**, sell and spin off.

Still, there are many who view Apple as being quite content to slowly build out its own studio, seeing as the world & amp;#39;s most valuable company has had massive success doing its thing on its timeline.

"It is unlikely Apple **buys** a studio," says Steven Birenberg, founder of Northlake Capital Management. "They seem to be just getting started in producing their own shows and seems like they would give it some time to see how they do."

**Load-Date:** May 3, 2018

---

008873

# FALL OF BUSINESS BARON'S EMPIRE

The Gold Coast Bulletin (Australia)

March 2, 2019 Saturday

GoldCoast Edition

Copyright 2019 Nationwide News Pty Limited All Rights Reserved

**Section:** LIFESTYLE; Pg. 41

**Length:** 553 words

**Byline:** FLASHBACK WITH ANDREW POTTS Email: , andrew.potts@news.com.au

## Body

Developer Christopher Skase was a major player on the Coast in the '80s before it all came crashing down

THE Gold Coast's development industry has seen some big names come and go over the decades.

Some have come and proposed big flashing projects but departed before putting a shovel in the ground.

But others have arrived, built something impressive and then crashed out spectacularly.

Among the most famous was Christopher Skase, whose reputation and crimes remain well-known three decades later.

The Melbourne-born Skase became one of the Gold Coast's best-known figures in the 1980s, and came to symbolise that decade's excess.

A developer and business baron, Skase through his company Qintex Group became a major player during the 1980s as he **bought** into everything from football teams to real estate.

During this time he built Marina Mirage and the Sheraton Mirage on The Spit, co-founded the Carrara-based Brisbane Bears Australian Rules team and built its stadium and the Seven network.

Skase even began operating a hovercraft on the Broadwater while spending more than $450,000 on the company's 1988 Christmas party.

With spending like that, Skase appeared to be confident of his own success. But this week marks 30 years since the beginning of the end of Qintex and Skase's empire.

In the first week of March 1989 the corporation announced the $433 million **sale** of nearly half of its Mirage resort wing, which included hotels on the Gold Coast, Port Douglas and Hawaii.

The Mirage **buyers**, Japanese companies Mitsui Co Ltd and Nippon Shinpan Co Ltd, also gained the first right of refusal to invest in resorts Qintex planned in the US.

The **sale** became necessary after a sharp rise in interest rates and the company's failed attempt to **buy** US **studio MGM**.

Skase admitted the companies' debts had reached $650 million but insisted the money would be used to pay off the resort division's debt and continue the **buy**-up of US land.

"The linking of California, Hawaii, Queensland and Japan will form a quadrant of strength in the burgeoning tourist market in the Pacific, the fastest-growing tourist market in the world," he said.

"For Qintex Australia, the association with Mitsui and Nippon Shinpan reflects the conclusion of the Qintex group's first phase of development and the beginning of the second phase with a focus on the Pacific Rim and the USA." The company also sold off several of its Queensland television network assets. But it was all for nothing and creditors moved in after revelations of financial impropriety, including Skase demanding millions be paid by the company's board into a private company of his.

Skase himself had debts of more than $700 million.

Qintex collapsed in January 1991, just months before Skase escaped from Australia despite facing charges.

Setting himself up in Majorca in Spain, Skase was chased by the Australian government for a decade but would ultimately never answer for his crimes - he died from stomach cancer in August 2001.

Despite this infamy, Skase left behind a physical legacy on the Gold Coast - both Marina Mirage and the Sheraton continue to operate today and are some of the city's most famous landmarks. While the Brisbane Bears and Carrara Stadium are long gone, the old lights which overlooked it were retained after the demolition and watch over Metricon Stadium today.

**Load-Date:** March 3, 2019

---

**End of Document**

 CNBC

MARKETS   BUSINESS   INVESTING   TECH   POLITICS   CNBC TV   INVESTING CLUB 🔒   PRO 🔒

WATCHLIST | SIGN IN | CREATE FREE ACCOUNT

MAKE IT ↗   SELECT ↗   USA • INTL   ● WATCH LIVE

TECH

# MGM leads 2020 media acquisition targets as the entertainment world splits into haves and have-nots

PUBLISHED SUN, JAN 26 2020•9:01 AM EST

 **Alex Sherman**
@SHERMAN4949

SHARE    

**KEY POINTS**

- Apple, Amazon, AT&T, Comcast, Disney and Netflix may be a new "Big 6" among global media companies.

- MGM has held preliminary talks with Apple, Netflix and other larger media companies about an acquisition as the biggest streaming companies consider strengthening their content libraries.

- ViacomCBS and Discovery are in limbo: They are potentially big enough to hang with the Big 6, but too small in their current form to compete effectively.


📺 TV
**Fast Money Halftime Report**   WATCH LIVE ⊳
UP NEXT | **The Exchange** 01:00 pm ET   Listen



Sean Connery, as James Bond.
*Bettmann | Getty Images*

**TRENDING NOW**

 1  Stocks making the biggest moves midday: First Republic, Snap, Amazon, Intel and more

 2  First Republic most likely headed for FDIC receivership, sources say; shares drop 40%

 3  I answered a Craigslist ad offering $25/hr to help a woman find 'intelligent, well-educated men'

 4  43-year-old's bar only plays women's sports on the TVs—it brought in almost $1 million in 8 months

 5  Here's the No. 1 thing successful couples never do, say psychologists: It can 'destroy a relationship'

Sponsored Links by Taboola

**FROM THE WEB**

There is now significant and potentially irreversible inequality in the world of media. If you're looking for an equalizing force, don't bet on it happening in 2020.

Two major shifts in the past year have made scale — the concept of being as big as possible — more important than ever for media companies. The first is the transition from linear cable TV to streaming services, which are expensive to build out and run and require premium content to stand out.

008876





Finally, House Passes Billions for
Camp Lejeune Families

Trulaw Attorneys

Amazon Hates When You Do This,
But They Can't Stop You

Online Shopping Tools

## RELATED INVESTING NEWS

**PRO**  Barclays says there's a big buying opportunity in
Activision Blizzard after blocked Microsoft deal,
sees shares rallying 30%

**Brian Evans**    A DAY AGO

---

The second is major consolidation — Disney buying Fox, Comcast acquiring
Sky, AT&T purchasing Time Warner and Viacom merging with CBS — that has
put media companies with enterprise valuations under $50 billion at a severe
disadvantage to their peers.

The result leaves a handful of companies, including AMC Networks
(enterprise value: $5.2 billion), Discovery (~$40 billion), Lions Gate (~$6
billion), MGM (private), Sony Pictures (part of larger company, Sony), and
even the merged ViacomCBS (~$25 billion), in positions of relative
weakness.

On the other side, Netflix (~$160 billion), Amazon (~$965 billion),
Comcast (~$320 billion), AT&T (~$487 billion), Disney (~$315 billion)
and Apple (~$1.4 trilion) have all put their flags in the ground in what the
media calls The Streaming Wars, an evolution from bundled cable TV to a
world of a la carte services that can be watched anywhere on any device. If
Comcast, Charter/Time Warner Cable, Dish and DirecTV were the Big 4 of
the media distribution world for the past decade, Amazon, Apple, AT&T,
Comcast, Disney and Netflix look like the Big 6 of the streaming era.

MGM, in particular, seems like a logical candidate to sell this year. Its owners
include Anchorage Capital, Highland Capital and Solus Alternative Asset
Management, hedge funds that acquired the company out of bankruptcy in
2010. The funds have made a brilliant decision to sit on their asset for nearly a
decade, turning a bankrupt content library into an asset likely worth more than
$10 billion, according to people familiar with the matter. And unlike family-
owned media companies like AMC (the Dolan family) or ViacomCBS (the
Redstone family), the company's owners are probably less likely to be deterred
from selling.

MGM has held preliminary talks with a number of companies, including Apple
and Netflix, to gauge their interest in an acquisition, two of the people said.
MGM owns the James Bond catalog and its studio has made several current hit
shows including "The Handmaid's Tale," which streams on Hulu, and "Live
PD," a reality police show that has frequently been the most watched show on
cable TV and airs on A&E. It also owns premium cable network Epix. MGM
had revenue of more than $1 billion for the first nine months of the year
consisting primarily of about $600 million in TV and film licensing revenue
and $300 million from Epix subscriptions. For the nine months ended
September 30, 2019, MGM reported adjusted earnings before interest, taxes,
depreciation and amortization of $123 million.

Representatives for MGM, Apple and Netflix declined to comment.

## The 'arms dealer' could soon be extinct

The bifurcation of media into haves and have-nots could lead to several outcomes.

The default is smaller companies will simply license their content to the bigger companies' streaming services. This is the foundation of what built Netflix and Amazon Prime Video.

But the shift to streaming could make the so-called "arms dealer" extinct over time. Disney will want Disney content for its streaming services, AT&T will want WarnerMedia content, NBCUniversal will use NBCUniversal content, and so on.

If that's where the world is headed, the big streaming services will continue to look for an edge over each other. That's good news for the little guys, which may see their values spike if they turn into juicy acquisition targets.

Apple, for example, is brand new to media production and distribution and has started Apple TV+ without an existing library of series and movies to entice consumers. Buying an existing studio with experienced media executives may make sense, especially if the company, such as MGM, is heavy on intellectual property and light on people. (Apple is historically averse to corporate integrations that may result in culture clashes.) Apple, of course, also has a balance sheet that dwarfs virtually every other media company and could make a sizable acquisition without betting the company.

Netflix is the only pure play entertainment streaming video company, meaning it will have to churn out content at rates far faster than its competition, which still gets billions of dollars from a declining yet formidable traditional cable TV model with 80 million U.S. households. Buying a studio could help jump start Netflix's original productions, particularly for time-consuming movies. Netflix has an internal goal to make 95 movies in a year, according to people familiar with the matter. That's nearly four times what a studio like Universal Pictures makes in a year.

MGM's studio and library of content, which also includes movies such as "Rocky," "Mad Max," and "Hot Tub Time Machine," would be an appealing add to any company looking to bolster its streaming offerings, including traditional companies like Disney, WarnerMedia and NBCUniversal. But each of those companies is still digesting enormous acquisitions from last year, potentially opening the door for a large, unchallenged bid by one of the big technology companies. If it happens, it would be the first time a big tech company makes a sizable legacy media acquisition.

The catch is that Apple and Netflix have always been averse to big acquisitions. Netflix has never done a material acquisition in the history of the company. Apple's largest deal ever was a $3 billion purchase of Beats in 2014, an almost laughably small "record deal" given Apple's size and cash hoard.

Still, things stay the same until they change. Until 2017, Amazon's biggest deal was online shoe-seller Zappos, which it bought for $1.2 billion in 2009. Then it dropped $13.4 billion on Whole Foods. Just because a company hasn't made a large acquisition doesn't mean it won't.

## A third option: bundling

## A third option: bundling

There's one other option to arms dealer and mass consolidation: bundling.

Smaller players like Starz, Discovery and ViacomCBS could partner with members of the Big 6 to bundle their streaming services together for a discount. WarnerMedia CEO John Stankey said he was open to this idea in a CNBC interview last year, with HBO Max serving as the centralized hub to access not only WarnerMedia content, but also programming from other services.

In this scenario, instead of distributors such as Comcast, Charter, Dish and DirecTV all offering basically the same bundled service, consumers could have choices of bundles among different streaming services. It's conceivable the Big 6 could each market a different bundle centered around the user experience of their technology. Comcast could have an Xfinity streaming bundle, Apple could have an iOS bundle with Apple Music and Games, Amazon could sell a Prime-based bundle and so on.

Lions Gate CEO Jon Feltheimer alluded to this in his company's second-quarter earnings call in November.

"Rather than watching our traditional business ratchet down with each new unwinding of the television bundle, we're embracing the realities of the evolving marketplace, collaborating with our linear partners to grow our respective businesses and transitioning our customers on an innovative and orderly path to an a la carte environment together," Feltheimer said.

## ViacomCBS and Discovery in limbo

It's possible the Big 6 could turn into a Big 7 if ViacomCBS and Discovery merged their assets. They're currently too small to effectively compete toe-to-toe against the Big 6, but big enough where both companies feel they can survive in a streaming world.

Viacom, under current ViacomCBS CEO Bob Bakish, was interested in buying Scripps in 2017, but it was ultimately outbid by Discovery. Bringing the companies together would add strength to a global company that has a movie studio (Paramount), live sports (NFL, Premiere League), and non-fiction programming (HGTV, Discovery, Food Network).

Still, the structure of a deal could be challenging, with potential ownership challenges between the Redstones and billionaire John Malone (the largest individual Discovery shareholder) and Discovery dwarfing ViacomCBS in enterprise value but likely acting as the seller. Moreover, Viacom and CBS just merged and are still integrating the companies, which could make a second large deal untenable for a while.

That could lead ViacomCBS and Discovery to either sell or look for smaller acquisitions to build scale, such as Lions Gate's Starz.

It's highly unlikely we'll see the same type of mega-media merger action of 2019 in 2020. Companies will instead focus on marketing their streaming services and bidding on professional sports rights, including the NFL, in the second half of the year.

But the stratification of media has already taken place, and the lines have been drawn. If you're a media have-not, chances are organic growth, efficient operations and shrewd strategy won't get you very far. Fortunately for them, there are some very big fish that may finally be hungry enough to bite.

*Disclosure: CNBC and NBC are owned by Comcast's NBCUniversal unit.*

**WATCH:** Liberty Media's John Malone: Streaming content will eventually thin out



**VIDEO** 10:09
MALONE ON CONTENT SPENDING
Liberty Media's John Malone: Streaming content will eventually thin out
CNBC

*Follow @CNBCtech on Twitter for the latest tech and media industry news.*

**The Exchange**
UP NEXT | Power Lunch 02:00 pm ET

WATCH LIVE ⊙

Tabⓠola Feed

**MORE FROM CNBC**

Beer boycott hitting Bud Light: Report says Bud Light pours down after conservative boycott

I don't totally buy existing explanations for Tucker Carlson's ouster, says Semafor's Ben Smith

Florida Gov. Ron DeSantis responds to Disney lawsuit

Banks propose plan to save First Republic Bank as stock hits all-time low

McDonald's CEO: We'll be looking at high single-digit inflation by the end of year

We're close to a bottom in oil prices, says Citi's Ed Morse

**FROM THE WEB**



Finally, House Passes Billions for Camp Lejeune Families

Trulaw Attorneys



Amazon Hates When You Do This, But They Can't Stop You

Online Shopping Tools



Look For Any High School Yearbook, It's Free

Classmates

by Taboola

# MORE IN TECHNOLOGY



**MGM Held Talks With Apple and Netflix to Gauge Interest in Acquisition**

Monday January 27, 2020 5:30 pm PST by Juli Clover

MGM held preliminary talks with Apple, Netflix, and other large media companies to gauge their interest in a possible acquisition, reports *CNBC*.

The report confirms another report from *The Wall Street Journal* last month that suggested Apple was exploring deals for MGM Holdings content, though the talks had "yet to reach an advanced stage."



A deal with MGM would potentially offer Apple a huge catalog of content to add to Apple TV Plus. MGM owns the James Bond franchise and is responsible for multiple hit TV shows like "The Handmaid's Tale," which currently airs on Hulu. It also owns Epix and the rights to movies like "Rocky" and "Mad Max."

There's no word on when and if MGM and Apple might reach some kind of deal, and all companies declined to comment on the ongoing talks.

Right now, Apple is behind other streaming media services. Apple TV+ features a handful of original Apple shows, like "The Morning Show," "For All Mankind," "Servant," and "See." Some of the shows have been nominated for awards and have proven popular, but Apple has a long way to go to be able to compete with the larger catalogs available from Netflix, Hulu, and Disney+.

*Tags:  Apple TV Shows, Apple TV Plus Guide*

[ 131 comments ]

# Related Stories

search text 🔍      ⬆ SHOW ALL

Apple Held Acquisition Talks With Podcast Network...

Apple Reportedly Talked With Electronic Arts About Potenti...

Apple in Talks With MGM and Pac-12 Over Content Deals fo...

Apple, Square Acquisition Talks Went South Over $3B Offer...

Amazon to Acquire MGM for $8.45 Billion Amid Competiti...

Huawei Hasn't Held Talks With Apple About Supplying 5G...

MORE •••

Get weekly top MacRumors stories in your inbox.

Email Address          Subscribe

## Top Rated Comments



**Gsmaniac**
*43 months ago*

I hope who ever buys it relaunches the Stargate franchise.

**Score:** 14 Votes (Like | Disagree)



**cmaier**
*43 months ago*

*You think Apple can afford Disney? Doubtful. It'd be nice to see Apple get some back catalog. That's what they are missing. Nothing to do after originals are done.*

Disney market cap is only 245 billion? Apple would only need half. They could theoretically do it with cash, no?

**Score:** 12 Votes (Like | Disagree)

**69Mustang**
*43 months ago*

> *Just buy disney already and call it a day..all this ***** footing around is getting old.*

This is getting old. By this I mean that old "Apple should just buy..." adage. Some think of Apple's shrunken and steadily shrinking cash hoard as if it's disposable income like an individual would have. It is not. Using @cmaier estimation of Disney's market cap at $245B and his *guestimate* of half of that would get the job done, his question was Apple could do it with cash. That answer is no. Apple has been spending that money on stock repurchases (smarter use of funds than buying Disney imo). As of late summer 2019 Alphabet had more cash than Apple.

Continuing to play with the cash idea, a hypothetical Disney acquisition would be more than 40X larger than the largest acquisition Apple has ever done (Beats at $3B). Bad idea imo. Disney comes with astronomical annual overhead. Most of their revenue comes from their media networks, not studio entertainment. Disney is a hydra that Apple should avoid imo. Apple's better play is to buy what they consider to be wheat (content) and stay away from the chaff that is business interests that don't align with theirs. A lot of Disney does not align with Apple.

**Score:** 10 Votes (Like | Disagree)

---

**JosephAW**
*43 months ago*

If this happens we could see Brad Wright revive Stargate.

**Score:** 9 Votes (Like | Disagree)

**I7guy**
*43 months ago*

Seems like that would be a big win for Apple, if this comes to pass, given the rich heritage of MGM movies.

**Score:** 8 Votes (Like | Disagree)

**DEXTERITY**
*43 months ago*

Just buy disney already and call it a day..all this ***** footing around is getting old.

**Score:** 8 Votes (Like | Disagree)

Read All Comments

## Popular Stories

### iOS 17 Rumored to Add New Lock Screen, Apple Music, and App Library Features

Tuesday April 25, 2023 9:35 am PDT by Joe Rossignol

### Microsoft Now Rolling Out iMessage Support on Windows With Several Limitations

Wednesday April 26, 2023 8:00 am PDT by Joe Rossignol

### Beats Studio Buds+ Launching in May With New Transparent Design Option, Improved Noise Cancellation, and More

Tuesday April 25, 2023 5:46 pm PDT by Joe Rossignol

### Apple's Mixed-Reality Headset Now Said to Be in 'Final Sprint' and 'Delivery Stage' Ahead of WWDC

Wednesday April 26, 2023 4:54 am PDT by Hartley Charlton

### Emergency SOS via Satellite Saves Students Trapped in Utah Canyon

Monday April 24, 2023 2:24 pm PDT by Juli Clover

### iPhone 15 Pro Still Expected to Feature 'Action' Button Instead of Mute Switch

Wednesday April 26, 2023 9:29 am PDT by Joe Rossignol

### iPadOS 17 Again Rumored to Drop Support for These iPads
Monday April 24, 2023 4:05 am PDT by Tim Hardwick

### Video: How to Get Widgets on Your Mac's Desktop
Tuesday April 25, 2023 12:07 pm PDT by Juli Clover



MacRumors attracts a broad audience of both consumers and professionals interested in the latest technologies and products. We also boast an active community focused on purchasing decisions and technical aspects of the iPhone, iPod, iPad, and Mac platforms.

**About MacRumors.com**

**Advertise on MacRumors**

## Our Staff

**Arnold Kim**
Editorial Director
Email • Twitter

**Eric Slivka**
Editor in Chief
Email • Twitter

**Juli Clover**
Managing Editor
Email • Twitter

**Joe Rossignol**
Senior Reporter
Email • Twitter

**Mitchel Broussard**
Deals Editor
Email • Twitter

**Tim Hardwick**
Senior Editor
Email • Twitter

**Hartley Charlton**
Senior Editor

**Marianne Schultz**
Project Manager

008886

Email • Twitter

**Dan Barbera**
Video Content Producer
Email • Twitter

**Ryan Barrieau**
Graphic Designer
Email •Twitter

**Steve Moser**
Contributing Writer
Email • Twitter

## Related Links

### Touch Arcade

**Dead Cells 'Clean Cut' Update Out Now on PC Bringing In Two New Weapons, Speedrun Mode, and More**

---

**'Grand Mountain Adventure+' Out Now on Apple Arcade**

---

**SwitchArcade Round-Up: 'Mugen Souls', 'Ninja Smasher', 'Omega Strikers', Plus Today's Other Releases and Sales**

---

**Devolver Digital Mobile Games Interview – Mark Hickey on Premium Ports, Subscription Services, the Importance of Exclusives, and More**

---

**All Danganronpa Games Discounted for a Limited Time on iOS and Android**

---

**'LEGO Bricktales' Is Out Now on iOS and Android as a Premium Release**

---

**'Gunship Battle: Total Warfare' Adds Themed Rewards and a Thrilling Narrative Among Other Goodies in Epic G.I. JOE Crossover Event**

---

**Out Now: 'Peglin', 'Omega Strikers', 'Super Meat Boy Forever', 'Honkai: Star Rail', 'Roundguard', 'TRUDOGRAD', 'Black Book', 'The Centennial Case', 'War Mongrels', 'Subway Surfers Blast', and More**

---

### YouTube

tvOS 17, HomePod, and HomeKit Wishlist - What We Want to See!

---

Apple to Release New Beats Studio Buds+ on May 18th!

---

Get These Widgets on Your Mac's Desktop!

---

008887

Apple's 15-Inch MacBook Air Coming at WWDC: Are You Buying?

---

Mark Gurman Talks WWDC 2023, Apple AR/VR Headset, and New Macs

**Copyright © 2000-2023 MacRumors.com, LLC.**

Privacy / DMCA contact / Affiliate and FTC Disclosure

Accessibility Statement

[ Featured On/Off ] [ Full Articles On/Off ] [ Fluid | Fluid HD ] [ Auto | Light | Dark ]

Information from your device can be used to personalize your ad experience.

Do not sell or share my personal information.

## MGM Holdings, Studio Behind 'James Bond,' Explores a Sale -- Update

Dow Jones Institutional News

December 21, 2020 Monday 11:38 PM GMT

Copyright 2020 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2020, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Length:** 875 words

## Body

By Benjamin Mullin, Cara Lombardo and Juliet Chung

MGM Holdings Inc., the movie studio behind the "James Bond" franchise, is exploring a sale, according to people familiar with the matter, betting that its library of content will prove attractive to companies pursuing growth in streaming video.

Closely held MGM has tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process, the people said. The company has a market value of around $5.5 billion, based on privately traded shares and including debt, some of the people said.

The studio has contemplated a sale at various points over the past few years, but potential suitors have previously balked at the price MGM was seeking. MGM is hopeful the current process will generate interest beyond Hollywood's traditional players, from international media companies, private-equity investors and blank-check companies, one of the people familiar with the matter said.

MGM's biggest shareholder, New York hedge fund Anchorage Capital Group, has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks.

MGM's exploration of a possible sale comes amid a bidding war for content to fill a new wave of streaming-video services. MGM's library of titles could make it an attractive target, its investors say.

The film studio has produced or distributed movies and TV shows including the "Rocky" franchise, "The Handmaid's Tale" and "Vikings." It has struck deals to license movies from its library, including "Silence of the Lambs," "Dances with Wolves," "Rain Man" and "The Terminator."

MGM's biggest asset is the "James Bond" franchise, which it shares with Danjaq LLC, a holding company owned by the Wilson/Broccoli family, that co-owns the copyright to existing "Bond" movies and controls the future of the franchise.

MGM Holdings, Studio Behind 'James Bond,' Explores a Sale -- Update

MGM also owns Epix, a premium TV channel and video-streaming service, and purchased an ownership stake in "Survivor" producer Mark Burnett's production ventures.

In 2018, MGM fired its then-chief executive, Hollywood veteran Gary Barber, for having early, unsanctioned conversations with Apple Inc. to sell the studio for more than $6 billion. The preliminary talks fell apart when he was ousted. MGM board chairman Kevin Ulrich, co-founder of Anchorage, told studio investors at the time he could sell MGM for more than $8 billion in two to three years, The Wall Street Journal previously reported.

But the price of the company's shares, which are privately traded, has dropped steeply since then. It trades around $80, well above the $17 a share it commanded coming out of bankruptcy in 2010 but below the about $120 it traded around in 2018 in hopes of the Apple deal.

Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers, investors have said.

Anchorage and several other hedge funds bought MGM's debt before it filed for bankruptcy in 2010 and then became shareholders of the restructured studio. They and other hedge funds that later got involved made a canny bet that distributors would make a land-grab for content.

Their plan was to boost the value of MGM's library with new hits and then exit through an initial public offering or the sale of the studio. Few expected to remain in MGM a decade on.

Mr. Ulrich and other investors had been hoping for a deal around the release of "No Time to Die," expecting the film's release would increase the library's value while creating publicity that could spark interest from a buyer. MGM's postponing the premiere of "No Time to Die" from November to April 2021 so it could be seen in theaters is expected to deliver a blow to MGM's 2020 earnings before interest, taxes, depreciation and amortization, a measure of cash flows.

While movie theaters have remained dark for most of the year as a result of capacity restrictions, the pandemic has proved a boon in some ways for MGM. Its production business suffered earlier in the year, but its library has benefited from strong demand because of the broad dearth of new content, MGM said earlier this year.

In a third-quarter earnings call, Chief Operating Officer Christopher Brearton said production had picked back up and that MGM was possibly on track to have its biggest year for new content in 2021.

In the first three quarters of 2020, MGM reported $181 million in adjusted Ebitda, compared with $123 million over the same period last year. It attributed the growth to the studio's stronger television-licensing revenue and lower marketing expenses, though MGM noted it was partially offset by film releases delayed by the pandemic.

Possible suitors expressed interest in MGM this spring as people stayed home and demand for streaming picked up, a person familiar with the process said. Interest has picked up recently as companies look ahead to a long winter and an uncertain time frame for reopening, this person said.

--Joe Flint contributed to this article.

Write to Benjamin Mullin at Benjamin.Mullin@wsj.com, Cara Lombardo at cara.lombardo@wsj.com and Juliet Chung at juliet.chung@wsj.com

(END) Dow Jones Newswires

December 21, 2020 18:38 ET (23:38 GMT)

## Notes

MGM Holdings, Studio Behind 'James Bond,' Explores a Sale -- Update

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** December 21, 2020

---

**End of Document**

### MGM Holdings, Studio Behind 'James Bond,' Explores a Sale;  Movie studio has tapped bankers to find a buyer, as media companies look to stock up on content

The Wall Street Journal Online

December 21, 2020

Copyright 2020 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2020 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.

**Section:** BUSINESS; Media & Marketing

**Length:** 856 words

**Byline:** By Benjamin Mullin, Cara Lombardo and Juliet Chung

## Body

MGM Holdings Inc., the movie studio behind the "James Bond" franchise, is exploring a sale, according to people familiar with the matter, betting that its library of content will prove attractive to companies pursuing growth in streaming video.

Closely held MGM has tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process, the people said. The company has a market value of around $5.5 billion, based on privately traded shares and including debt, some of the people said.

The studio has contemplated a sale at various points over the past few years, but potential suitors have previously balked at the price MGM was seeking. MGM is hopeful the current process will generate interest beyond Hollywood's traditional players, from international media companies, private-equity investors and blank-check companies, one of the people familiar with the matter said.

MGM's biggest shareholder, New York hedge fund Anchorage Capital Group, has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks.

MGM's exploration of a possible sale comes amid a bidding war for content to fill a new wave of streaming-video services. MGM's library of titles could make it an attractive target, its investors say.

The film studio has produced or distributed movies and TV shows including the "Rocky" franchise, "The Handmaid's Tale" and "Vikings." It has struck deals to license movies from its library, including "Silence of the Lambs," "Dances with Wolves," "Rain Man" and "The Terminator."

MGM Holdings, Studio Behind 'James Bond,' Explores a Sale;  Movie studio has tapped bankers to find a buyer, as media companies look to stock up on content

MGM's biggest asset is the "James Bond" franchise, which it shares with Danjaq LLC, a holding company owned by the Wilson/Broccoli family, that co-owns the copyright to existing "Bond" movies and controls the future of the franchise.

MGM also owns Epix, a premium TV channel and video-streaming service, and purchased an ownership stake in "Survivor" producer Mark Burnett's production ventures.

In 2018, MGM fired its then-chief executive, Hollywood veteran Gary Barber, for having early, unsanctioned conversations with Apple Inc. to sell the studio for more than $6 billion. The preliminary talks fell apart when he was ousted. MGM board chairman Kevin Ulrich, co-founder of Anchorage, told studio investors at the time he could sell MGM for more than $8 billion in two to three years, The Wall Street Journal previously reported.

But the price of the company's shares, which are privately traded, has dropped steeply since then. It trades around $80, well above the $17 a share it commanded coming out of bankruptcy in 2010 but below the about $120 it traded around in 2018 in hopes of the Apple deal.

Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers, investors have said.

Anchorage and several other hedge funds bought MGM's debt before it filed for bankruptcy in 2010 and then became shareholders of the restructured studio. They and other hedge funds that later got involved made a canny bet that distributors would make a land-grab for content.

Their plan was to boost the value of MGM's library with new hits and then exit through an initial public offering or the sale of the studio. Few expected to remain in MGM a decade on.

Mr. Ulrich and other investors had been hoping for a deal around the release of "No Time to Die," expecting the film's release would increase the library's value while creating publicity that could spark interest from a buyer. MGM's postponing the premiere of "No Time to Die" from November to April 2021 so it could be seen in theaters is expected to deliver a blow to MGM's 2020 earnings before interest, taxes, depreciation and amortization, a measure of cash flows.

While movie theaters have remained dark for most of the year as a result of capacity restrictions, the pandemic has proved a boon in some ways for MGM. Its production business suffered earlier in the year, but its library has benefited from strong demand because of the broad dearth of new content, MGM said earlier this year.

In a third-quarter earnings call, Chief Operating Officer Christopher Brearton said production had picked back up and that MGM was possibly on track to have its biggest year for new content in 2021.

In the first three quarters of 2020, MGM reported $181 million in adjusted Ebitda, compared with $123 million over the same period last year. It attributed the growth to the studio's stronger television-licensing revenue and lower marketing expenses, though MGM noted it was partially offset by film releases delayed by the pandemic.

Possible suitors expressed interest in MGM this spring as people stayed home and demand for streaming picked up, a person familiar with the process said. Interest has picked up recently as companies look ahead to a long winter and an uncertain time frame for reopening, this person said.

Joe Flint contributed to this article.

Write to Benjamin Mullin at Benjamin.Mullin@wsj.com, Cara Lombardo at cara.lombardo@wsj.com and Juliet Chung at juliet.chung@wsj.com

MGM Holdings, Studio Behind 'James Bond,' Explores a Sale;  Movie studio has tapped bankers to find a
buyer, as media companies look to stock up on content

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** December 22, 2020

**End of Document**

### Film Studio MGM Puts Itself on The Block -- WSJ

Dow Jones Institutional News

December 22, 2020 Tuesday 7:32 AM GMT

Copyright 2020 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2020, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Section:** Pg. A1

**Length:** 905 words

## Body

By Benjamin Mullin, Cara Lombardo and Juliet Chung

This article is being republished as part of our daily reproduction of WSJ.com articles that also appeared in the U.S. print edition of The Wall Street Journal (December 22, 2020).

MGM Holdings Inc., the movie studio behind the "James Bond" franchise, is exploring a sale, according to people familiar with the matter, betting that its library of content will prove attractive to companies pursuing growth in streaming video.

Closely held MGM has tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process, the people said. The company has a market value of around $5.5 billion, based on privately traded shares and including debt, some of the people said.

The studio has contemplated a sale at various points over the past few years, but potential suitors have previously balked at the price MGM was seeking. MGM is hopeful the current process will generate interest beyond Hollywood's traditional players, from international media companies, private-equity investors and blank-check companies, one of the people familiar with the matter said.

MGM's biggest shareholder, New York hedge fund Anchorage Capital Group, has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks.

MGM's exploration of a possible sale comes amid a bidding war for content to fill a new wave of streaming-video services. MGM's library of titles could make it an attractive target, its investors say.

The film studio has produced or distributed movies and TV shows including the "Rocky" franchise, "The Handmaid's Tale" and "Vikings." It has struck deals to license movies from its library, including "Silence of the Lambs," "Dances with Wolves," "Rain Man" and "The Terminator."

MGM's biggest asset is the "James Bond" franchise, which it shares with Danjaq LLC, a holding company owned by the Wilson/Broccoli family, that co-owns the copyright to existing "Bond" movies and controls the future of the franchise.

MGM also owns Epix, a premium TV channel and video-streaming service, and purchased an ownership stake in "Survivor" producer Mark Burnett's production ventures.

In 2018, MGM fired its then-chief executive, Hollywood veteran Gary Barber, for having early, unsanctioned conversations with Apple Inc. to sell the studio for more than $6 billion. The preliminary talks fell apart when he was ousted. MGM board chairman Kevin Ulrich, co-founder of Anchorage, told studio investors at the time he could sell MGM for more than $8 billion in two to three years, The Wall Street Journal previously reported.

But the price of the company's shares, which are privately traded, has dropped steeply since then. It trades around $80, well above the $17 a share it commanded coming out of bankruptcy in 2010 but below the about $120 it traded around in 2018 in hopes of the Apple deal.

Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers, investors have said.

Anchorage and several other hedge funds bought MGM's debt before it filed for bankruptcy in 2010 and then became shareholders of the restructured studio. They and other hedge funds that later got involved made a canny bet that distributors would make a land-grab for content.

Their plan was to boost the value of MGM's library with new hits and then exit through an initial public offering or the sale of the studio. Few expected to remain in MGM a decade on.

Mr. Ulrich and other investors had been hoping for a deal around the release of "No Time to Die," expecting the film's release would increase the library's value while creating publicity that could spark interest from a buyer. MGM's postponing the premiere of "No Time to Die" from November to April 2021 so it could be seen in theaters is expected to deliver a blow to MGM's 2020 earnings before interest, taxes, depreciation and amortization, a measure of cash flows.

While movie theaters have remained dark for most of the year as a result of capacity restrictions, the pandemic has proved a boon in some ways for MGM. Its production business suffered earlier in the year, but its library has benefited from strong demand because of the broad dearth of new content, MGM said earlier this year.

In a third-quarter earnings call, Chief Operating Officer Christopher Brearton said production had picked back up and that MGM was possibly on track to have its biggest year for new content in 2021.

In the first three quarters of 2020, MGM reported $181 million in adjusted Ebitda, compared with $123 million over the same period last year. It attributed the growth to the studio's stronger television-licensing revenue and lower marketing expenses, though MGM noted it was partially offset by film releases delayed by the pandemic.

Possible suitors expressed interest in MGM this spring as people stayed home and demand for streaming picked up, a person familiar with the process said. Interest has picked up recently as companies look ahead to a long winter and an uncertain time frame for reopening, this person said.

--Joe Flint contributed to this article.

Write to Benjamin Mullin at Benjamin.Mullin@wsj.com, Cara Lombardo at cara.lombardo@wsj.com and Juliet Chung at juliet.chung@wsj.com

(END) Dow Jones Newswires

December 22, 2020 02:32 ET (07:32 GMT)

Film Studio MGM Puts Itself on The Block -- WSJ

## Notes

PUBLISHER: Dow Jones & Company, Inc.


**Load-Date:** December 22, 2020

---

**End of Document**

## Film Studio MGM Puts Itself on The Block

The Wall Street Journal

December 22, 2020 Tuesday

Copyright 2020 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2020 Dow Jones & Company, Inc. All Rights Reserved.

**THE WALL STREET JOURNAL.**

U.S. EDITION

**Section:** Pg. A1

**Length:** 714 words

**Byline:** By Benjamin Mullin, Cara Lombardo and Juliet Chung

## Body

MGM Holdings Inc., the movie studio behind the James Bond franchise, is exploring a sale, according to people familiar with the matter, betting that its library of content will prove attractive to companies pursuing growth in streaming video.

Closely held MGM has tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process, the people said. The company has a market value of around $5.5 billion, based on privately traded shares and including debt, some of the people said.

The studio has contemplated a sale at various points over the past few years, but potential suitors have previously balked at the price MGM was seeking. MGM is hopeful the current process will generate interest beyond Hollywood's traditional players, from international media companies, private-equity investors and blank-check companies, one of the people familiar with the matter said.

MGM's biggest shareholder, New York hedge fund Anchorage Capital Group, has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks.

MGM's exploration of a possible sale comes amid a bidding war for content to fill a new wave of streaming-video services. MGM's library of titles could make it an attractive target, its investors say.

The film studio has produced or distributed movies and TV shows including the "Rocky" franchise, "The Handmaid's Tale" and "Vikings." It has struck deals to license movies from its library, including "Silence of the Lambs," "Dances with Wolves," "Rain Man" and "The Terminator."

MGM's biggest asset is the James Bond franchise, which it shares with Danjaq LLC, a holding company owned by the Wilson/Broccoli family, that co-owns the copyright to existing Bond movies and controls the future of the franchise.

008898

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 33-7    Filed 12/07/23    Page 106 of 214    PageID 8560
Exhibit Exhibit 87 to 1207/292    Page 2 of 2
Page 2 of 2
Film Studio MGM Puts Itself on The Block

MGM also owns Epix, a premium TV channel and video-streaming service, and purchased an ownership stake in "Survivor" producer Mark Burnett's production ventures.

In 2018, MGM fired its then chief executive, Hollywood veteran Gary Barber, for having early, unsanctioned conversations with Apple Inc. to sell the studio for more than $6 billion. The preliminary talks fell apart when he was ousted.

MGM board chairman Kevin Ulrich, co-founder of Anchorage, told studio investors at the time he could sell MGM for more than $8 billion in two to three years, The Wall Street Journal previously reported.

But the price of the company's shares, which are privately traded, has dropped steeply since then. It trades around $80, well above the $17 a share it commanded coming out of bankruptcy in 2010 but below the about $120 it traded around in 2018 in hopes of the Apple deal.

Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers, investors have said.

Anchorage and several other hedge funds bought MGM's debt before it filed for bankruptcy in 2010 and then became shareholders of the restructured studio. They and other hedge funds that later got involved made a canny bet that distributors would make a land-grab for content. Their plan was to boost the value of MGM's library with new hits and then exit through an initial public offering or the sale of the studio. Few expected to remain in MGM a decade on.

Mr. Ulrich and other investors had been hoping for a deal around the release of "No Time to Die," expecting the Bond film would increase the library's value while creating publicity that could spark interest from a buyer. The coronavirus shutdowns clobbered theaters, though, and the movie's release was pushed back.

The movie studio's postponement of the premiere of "No Time to Die" from November to April 2021 so it could be seen in theaters is expected to deliver a blow to MGM's 2020 earnings before interest, taxes, depreciation and amortization, a measure of cash flows.

While movie theaters have remained dark for most of the year as a result of capacity restrictions, the pandemic has proved a boon in some ways for MGM. Its production business suffered earlier in the year, but its library has benefited from strong demand because of the dearth of new content, MGM said earlier this year.

---

Joe Flintcontributed to this article.

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** October 1, 2022

**End of Document**

## Hollywood studio MGM puts itself up for sale at $5bn

The Guardian (London)

December 22, 2020 Tuesday 8:27 PM GMT

Copyright 2020 The Guardian, a division of Transcontinental Media Group Inc. All Rights Reserved

**theguardian**

**Section:** BUSINESS; Version:2

**Length:** 307 words

**Byline:** Mark Sweney

**Highlight:** Studio behind James Bond franchise looks to cash in on rocketing prices for content amid TV streaming boom

## Body

MGM, the Hollywood studio behind the James Bond and Rocky franchises, is up for sale with a price-tag of more than $5bn (£3.75bn).

The studio has explored selling several times over the last few years, most recently in January  when preliminary talks were held with Netflix and Apple among others, but price proved to be a stumbling block.

However, the streaming wars continue to fuel huge inflation in the prices willing to be paid for must-have content, and proven global franchises are becoming increasingly scarce and as a result rocketing in value.

MGM owns a library of 4,000 film titles and 17,000 hours of TV programming, from Gone with the Wind and The Hobbit to TV hits such as The Handmaid's Tale. It made $1.5bn in revenues last year. While the studio, which was forced into bankruptcy a decade ago  after running up a $4bn (£2.5bn) in debt, has developed new franchises such as Rocky spin-off Creed, starring Michael B Jordan, its crown jewel remains the 58-year-old evergreen James Bond franchise.

Bond is the fifth-most valuable movie franchise of all-time, with its 24 films to date grossing more than $7bn, behind only the Marvel, Star Wars, Harry Potter and Spider-Man films. And with a loyal, global fanbase the films can be relied on to bring in about $1bn at the global box office. The next Bond film, No Time To Die, Daniel Craig's last outing as 007, has been moved twice with its premiere now scheduled for April  in the hope that movie fans will be able to return to theatres en masse.

Founded in 1924, MGM (AKA Metro-Goldwyn-Mayer), which has recorded huge success over the years with films such as The Wizard of Oz, Ben Hur and Singin' in the Rain, has frequently changed hands over the years. Owners have included drinks magnate Edgar Bronfman, the Las Vegas casino billionaire Kirk Kerkorian and CNN's founder Ted Turner.

**Load-Date:** December 23, 2020

008900

## Reports say US film studio MGM exploring selloff

Asia Times-English

December 22, 2020 Tuesday 4:19 PM GMT

Copyright 2020 Asia Times (Hong Kong) Limited All Rights Reserved



**Length:** 513 words

**Byline:** Dave Makichuk

**Highlight:** It could very well be the first major movie studio to be crushed by the pandemic, and even the likes of James Bond may not be able to save it. Reports say that MGM, one of the oldest movie studios in operation, is currently exploring a sale of all its assets, including its vast film […]

## Body

It could very well be the first major movie studio to be crushed by the pandemic, and even the likes of James Bond may not be able to save it.

Reports say that MGM, one of the oldest movie studios in operation, is currently exploring a sale of all its assets, including its vast film library, which includes the 007 franchise, ScreenRant reported.

Started in 1924, MGM was named after the three studios, which were consolidated by movie legend Marcus Loew — Metro Pictures, Goldwyn Pictures, and Louis B. Mayer Pictures.

Loew also founded the popular cinema chain that bore his name, which was bought out by AMC in 2006, itself now facing financial troubles, ScreenRant reported.

The studio is best known for producing the James Bond movies, along with EON Productions, since the beginning of the franchise.

The series is currently up to the 25th film, *No Time To Die*, which has been repeatedly delayed by the coronavirus, ScreenRant reported.

Sources say MGM has a film library of over 4,000 titles and 17,000 hours of television programming.

It has also produced a number of other big movies, including the *Pink Panther* series, Sylvester Stallone's *Rocky* pictures, as well as *The Hobbit* trilogy, *The Terminator*, *Rain Man* and *Silence of the Lambs*.

It's also responsible for a number of TV series, from *Stargate SG-1* to *The Handmaid's Tale*. In the past decade, the studio's movies were distributed by a number of companies, following its near bankruptcy in 2009, ScreenRant reported.

According to Variety, MGM's current top shareholder is the hedge fund Anchorage Capital, which is led by former Goldman Sachs executive Kevin Ulrich. Ulrich is also at the head of MGM's board of directors.

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 18-7    Filed 12/04/23    Page 109 of 214    PageID 8563
Exhibit Exhibit 761-7    Page 2 of 2
Reports say US film studio MGM exploring selloff

Link to Image

Despite surviving that crisis, it seems like MGM won't outlast the pandemic.

The *Wall Street Journal* is reporting that MGM is actively trying to sell off the studio through investment banks Morgan Stanley and LionTree LLC.

The report mentions MGM is valuing itself at US$5.5 billion, a number that includes not only all of its current titles but its entire historic film library.

The company is reportedly confident a streaming service, or a company wanting to expand its reach in streaming, will be willing to pay that price for its content.

The studio has been struggling with no major theater releases in 2020 and was at one point rumored to be looking for a streaming buyer for *No Time To Die*, ScreenRant reported.

None were willing to pay the $600 million price tag for Daniel Craig's final outing as the spy, though, and further delays to the movie reportedly cost the studio $1 million in interest a month.

At the time, many wondered how MGM would be able to carry that kind of debt, given its previous financial struggles.

The answer is now clear that it can't. Without any income and without a streaming option to turn to like Disney and Warner Bros., MGM seems to have run out of money and, with that, options.

The sale will also have repercussions for *No Time To Die*. If MGM is sold soon, the Bond film could find itself getting released on a streaming service after all.

## Graphic

No buyers were willing to pay the US$600 million price tag for Daniel Craig's final outing as the spy, and further delays to the movie reportedly cost the studio $1 million in interest a month. Credit: MGM/Universal/EON.

**Load-Date:** December 22, 2020

**End of Document**

# MGM up for sale for $5B after 'preliminary talks' with Apple failed

Newstex Blogs

9to5Mac

December 23, 2020 Wednesday 7:20 PM EST

Copyright 2020 Newstex LLC All Rights Reserved

**Length:** 405 words

**Byline:** Parker Ortolani

# Body

Dec 23, 2020( 9to5Mac: http://9to5mac.com Delivered by Newstex)  The Wall Street Journal reports[1] that film studio MGM Holdings Inc. is putting itself up for sale after years of difficulty.

MGM has had trouble selling itself in the past, reportedly because its asking price was just too high. The new pricing was selected in an effort to gather more interest from studios that may make a nice home for MGM's franchises.Apple has previously held talks with MGM[2] about acquiring the company to expand their television and film portfolios. Although those talks didn't go anywhere, this new reasonable price tag might make the company more appealing. Apple seems to be quite happy with the first full year of Apple TV+ original programming, but they have shown a willingness to add existing IP to the service.Lots of companies are in the process of rapidly building out new streaming services, so there is sure to be a great deal of interest in MGM. Any studio or service that chooses to acquire the company will gain a massive selection of popular franchises. Some of their biggest names include: James Bond, The Handmaid's Tale, Terminator, Stargate, The Pink Panther, and The Hobbit. The company also owns the rights to iconic characters like the Addams Family, Bill and Ted, Rocky, and Elle Woods from the Legally Blonde series. Apple acquired Beats in 2014 for $3 billion[3], and that acquisition has proven to be a major success for the company. $5 billion for MGM's massive portfolio actually seems quite reasonable. It would make a lot of sense for Apple to acquire MGM. With one sale they'd instantly gain tons of classic and new beloved franchises for Apple TV+. Featured photo credit: BEVERLY HILLS, CA - OCTOBER 28: General view of MGM Studios on October 28, 2020 in Beverly Hills, California. (Photo by AaronP/Bauer-Griffin/GC Images) FTC: We use income earning auto affiliate links. More.[4] http://bit.ly/38q80UaCheck out 9to5Mac on YouTube for more Apple news:[5] [embedded content] [ 1]: https://www.wsj.com/articles/mgm-holdings-studio-behind-james-bond-explores-a-sale-11608588732 [ 2]: https://9to5mac.com/2019/12/19/report-apple-exploring-deals-with-mgm-and-pac-12-for-potential-apple-tv-library-expansion-including-live-sports/ [ 3]: https://9to5mac.com/2014/05/28/apple-confirms-beats-purchase-for-3-billion/ [ 4]: https://9to5mac.com/about/#affiliate [ 5]: https://www.youtube.com/c/9to5mac?sub_confirmation=1

**Load-Date:** December 23, 2020

---

End of Document

## MGM studios is exploring a sale. So who's buying?; Company is exploring options a decade after exiting bankruptcy filing

The San Diego Union-Tribune

December 25, 2020 Friday

Final Edition

Copyright 2020 The San Diego Union-Tribune All Rights Reserved

**Section:** BUSINESS; Part C; Pg. 1

**Length:** 535 words

**Byline:** LOS ANGELES TIMES

## Body

Metro-Goldwyn-Mayer Studios, the film and TV company behind the James Bond movies, is exploring a sale a decade after the company exited Chapter 11 bankruptcy protection.

The Beverly Hills-based studio, which also controls franchises such as Rocky and TV shows including "The Voice," is working with advisers to find a buyer hungry for its robust film and television library, according to a person familiar with the matter who was not authorized to comment.

The search for a deal begins as demand for content surges among streaming services battling for subscribers and advertising dollars. The Wall Street Journal first reported that the company has engaged Morgan Stanley and LionTree Advisors to begin the formal sale process.

MGM has been a perennial subject of deal speculation as the entertainment industry consolidates into a handful of dominant players.

The biggest film and TV studios are either owned by telecom or technology giants, such as AT&T (which owns WarnerMedia) and Comcast (parent of NBCUniversal), or they're transforming themselves into streaming businesses, as Walt Disney Co. has done. Apple and Amazon are moving further into the movie and TV business, and Netflix continues to grow its Hollywood clout amid the pandemic.

Smaller players such as MGM and Santa Monica-based Lionsgate are struggling to compete as COVID-19 prevents them from releasing their big movies in theaters. MGM, for example, decided to push the next James Bond movie, "No Time to Die," from November to April.

New York hedge fund Anchorage Capital Group, MGM's largest shareholder, has come under pressure to pursue an exit through a sale. MGM has operated without a chief executive for two years since the ouster of CEO Gary Barber, who was previously agitating for a deal.

Apple and Amazon have previously been pegged as potential buyers, but MGM's valuation has long been seen as a sticking point. Anchorage CEO Kevin Ulrich, as chairman of MGM's board, had wanted a price of at least $7.5 billion, according to industry insiders. The studio's market value is about $5.5 billion including debt, said one person familiar with the company's finances who was not authorized to comment.

The storied company filed for bankruptcy in 2010 and emerged with a reorganization plan to wipe out $4 billion in debt. Anchorage, Highland Capital Partners, Davidson Kempner Capital Management and Owl Creek Investments each owned more than 10 percent of outstanding shares of common stock in MGM as of Sept. 30.

008904

MGM studios is exploring a sale. So who's buying?; Company is exploring options a decade after exiting
bankruptcy filing

MGM's library includes 4,000 movies such as "Robocop," "The Pink Panther" and "The Silence of the Lambs." Its scripted TV division is responsible for "Fargo," "The Handmaid's Tale" and "Vikings."

But it's unclear how interested a global media company or tech titan like Apple is in paying for a movie and TV library when most companies are focused on building their Hollywood businesses through original productions.

Moving "No Time to Die" denied MGM potential revenue this year from a franchise that does most of its business outside the U.S., which has been harder hit by the pandemic. But analysts say having a Bond movie in the can could help draw more interest from buyers than if the movie had already been released.

## Graphic

PHOTO: Daniel Craig's next James Bond film will be released in April. PHOTOGRAPHER: Michael Sohn AP file

**Load-Date:** December 30, 2020

**End of Document**

008905

## James Bond studio MGM is exploring a sale. So who's buying?

The Daily World (Aberdeen, Washington)

December 26, 2020

Copyright 2020 Black Press Inc. All Rights Reserved

**Section:** BUSINESS

**Length:** 324 words

## Body

Los Angeles Times

Metro-Goldwyn-Mayer Studios, the film and TV company behind the James Bond movies, is exploring a sale a decade after the company exited Chapter 11 bankruptcy protection.

The Beverly Hills-based studio, which also controls franchises such as "Rocky" and TV shows including "The Voice," is working with advisers to find a buyer hungry for its robust film and television library, according to a person familiar with the matter who was not authorized to comment.

The search for a deal begins as demand for content surges among streaming services battling for subscribers and advertising dollars. The Wall Street Journal first reported that the company has engaged Morgan Stanley and LionTree Advisors to begin the formal sale process. MGM declined to comment.

MGM has been a perennial subject of deal speculation as the entertainment industry consolidates into a handful of dominant players.

The biggest film and TV studios are either owned by telecom or technology giants, such as AT&T Inc. (which owns WarnerMedia) and Comcast Corp. (parent of NBCUniversal), or they're transforming themselves into streaming businesses, as Walt Disney Co. has done. Apple and Amazon are moving further into the movie and TV business, and Netflix continues to grow its Hollywood clout amid the pandemic.

Smaller players such as MGM and Santa Monica-based Lionsgate are struggling to compete as COVID-19 prevents them from releasing their big movies in theaters.

New York hedge fund Anchorage Capital Group, MGM's largest shareholder, has come under pressure to pursue an exit through a sale. MGM has operated without a chief executive for two years since the ouster of CEO Gary Barber, who was previously agitating for a deal.

MGM's library includes 4,000 movies such as "Robocop," "The Pink Panther" and "The Silence of the Lambs." Its scripted TV division is responsible for "Fargo," "The Handmaid's Tale" and "Vikings."

Copyright 2020 Aberdeen Daily World

**Load-Date:** April 1, 2021

---

End of Document

008906

# MGM Looks to Amazon as the Hollywood Studio Tries to Find a Buyer

The New York Times

May 17, 2021 Monday 11:49 EST

Copyright 2021 The New York Times Company All Rights Reserved

**Section:** BUSINESS

**Length:** 1064 words

**Byline:** Brooks Barnes
**Highlight:** A deal would add Metro-Goldwyn-Mayer's 4,000 films to Amazon's streaming library, including the James Bond, Rocky and "Legally Blonde" franchises.

# Body

A deal would add Metro-Goldwyn-Mayer's 4,000 films to Amazon's streaming library, including the James Bond, Rocky and "Legally Blonde" franchises.

LOS ANGELES — Metro-Goldwyn-Mayer has been in talks to sell itself to Amazon, according to three people briefed on the matter. If completed, a deal would turbocharge Amazon's streaming ambitions by bringing James Bond, Rocky, RoboCop and other film and television properties into the e-commerce giant's fold.

MGM has been for looking for a buyer for months, with $9 billion floated as an asking price. Apple and Comcast had previously kicked MGM's tires and decided it was worth roughly $6 billion.

It was unclear how much Amazon might be willing to spend, according to the people briefed on the talks who spoke on the condition of anonymity because the sale process is private. The purchase of Whole Foods for $13.4 billion in 2017 was the biggest acquisition in Amazon's history. Even $6 billion would make MGM the second-largest.

Representatives for Amazon and MGM declined to comment.

A timeline for a potential deal was unclear, the people said. Michael De Luca, MGM's chairman, presented the studio's coming slate to Amazon's team on Friday, one of the people said. News of the possible deal was earlier reported by The Information.

On Thursday, Amazon announced that Jeff Blackburn, a former Amazon executive who helped build the company's Prime streaming service, would return as senior vice president of global media and entertainment, overseeing Amazon Studios, Audible, Twitch and related endeavors. The move was seen as underscoring Amazon's growing ambition in Hollywood.

In total, MGM has about 4,000 films in its library, but many of its characters (the Pink Panther, Chucky the doll) and franchises ("Legally Blonde," "Tomb Raider") need reinvention. The studio has a compelling array of new films on its assembly line, however. They include "Respect," an Aretha Franklin biopic starring Jennifer Hudson that already has awards buzz; Ridley Scott's "House of Gucci," starring Lady Gaga and Adam Driver; an animated "Addams Family" sequel; and an untitled 1970s-era film directed by Paul Thomas Anderson ("Boogie Nights") and starring Bradley Cooper.

MGM, once home to "more stars than the heavens" as its co-founder Louis B. Mayer liked to brag, has been majority owned by Anchorage Capital, a New York investment firm, for more than a decade. Kevin Ulrich, Anchorage's chief executive and MGM's chairman, formally put the studio on the block late last year, hiring Aryeh

008907

MGM Looks to Amazon as the Hollywood Studio Tries to Find a Buyer

B. Bourkoff, a deal maker and chief executive of LionTree, to orchestrate a sale. Anchorage has been under pressure from various stakeholders to exit the investment, with some agitators complaining that Mr. Ulrich was overly enamored with Hollywood and should have sold years ago.

The end of MGM as a stand-alone company would add to a vast reshaping of the media business as the big seek to compete by getting even bigger. On Monday, AT&amp;T announced a deal to spin off its WarnerMedia group and combine it with Discovery Inc., a move designed to strengthen WarnerMedia's struggling HBO Max streaming service and a nascent streaming platform owned by Discovery. In a counterattack against the tech companies that have aggressively moved into Hollywood over the last decade, Disney paid $71.3 billion for the bulk of Rupert Murdoch's entertainment assets in 2019.

Such megadeals have left smaller studios like MGM, Lionsgate and STX Entertainment looking for lifelines. (STX, known for "Hustlers" and "Bad Moms," merged with the Bollywood studio Eros International last summer.)

Streaming has become fiercely competitive, with Disney+ coming on strong and HBO Max, Apple TV+ and Paramount+ determined to make inroads. That has pushed the original streaming disrupters — Netflix and Amazon Prime Video — to lean harder on broad-appeal movies to keep growing, particularly overseas.

The 58-year-old James Bond franchise is a Hollywood crown jewel that has generated tens of billions of dollars in ticket sales, home entertainment revenue, video games and marketing partnerships. But 007 has been both an enticement and a deterrent to prospective MGM bidders.

That is because MGM owns only 50 percent of the spy franchise. The balance is held by Barbara Broccoli and her brother, Michael G. Wilson. Through their company, Eon, which stands for Everything or Nothing, the siblings also have ironclad creative control, approving every line of dialogue, casting decision, stunt sequence, TV ad, poster and billboard. Bond has enormous untapped value, with television offshoots as one potential bonanza. But Ms. Broccoli and Mr. Wilson, worried about adulterating the brand, have blocked spinoff efforts in the past: Bond belongs on big screens, not small ones.

"If we get the wrong partners, there are liable to be conflicts," Mr. Wilson said in a 2015 interview.

"No Time to Die," the 25th installment in the Bond series, cost about $250 million to make and is scheduled for pandemic-delayed release in theaters on Oct. 8. (The previous film, "Spectre," took in about $900 million worldwide in 2015.) The role of James Bond is expected to be recast after "No Time to Die," as Daniel Craig leaves the role after 15 years.

Amazon's entertainment strategy has evolved as streaming services have proliferated. Indie films like "Manchester by the Sea" and unconventional shows like "The Marvelous Mrs. Maisel" and "Transparent" gave Amazon a foothold in Hollywood; domination will require a steady supply of mainstream hits.

The problem: Amazon Studios has limited bandwidth, most of which is tied up with television series — including a coming "Lord of the Rings" adaptation that is believed to be the most expensive show ever made, with a one-season budget of $465 million. To stock its shelves with big movies, Amazon has been turning to outside suppliers. It paid $125 million for the rights to "Coming 2 America" and $80 million for "Borat Subsequent Moviefilm." In July, Amazon will release "The Tomorrow War," a science-fiction spectacle it bought for $200 million.

Nicole Sperling contributed reporting.

Nicole Sperling contributed reporting.

PHOTO: The 58-year-old James Bond franchise, which MGM owns 50 percent of, is a Hollywood crown jewel that has generated tens of billions of dollars in ticket sales. (PHOTOGRAPH BY Mark Makela/Reuters FOR THE NEW YORK TIMES)

MGM Looks to Amazon as the Hollywood Studio Tries to Find a Buyer

**Load-Date:** November 13, 2021

---

**End of Document**

# Amazon At Altar With MGM?

Deadline

May 17, 2021

Copyright 2021 Penske Media Corporation All Rights Reserved

# DEADLINE

**Length:** 793 words

## Body

In the wake of the surprise $43 billion merger between Discovery and AT&T's WarnerMedia, rumors are racing that Amazon is poised to scoop up MGM in a deal that is reportedly worth under $10 billion.

Much of this coming from a speculative report Monday in The Information. Deadline separately hears from sources that there's been a weeks of talks between the tech giant and the Hollywood studio that included sales presentations. MGM declined to comment on rumors, and Amazon did not respond. We're awaiting more intel at the time of this report.

Rumors have been afloat for years that the 007 studio has been up for sale. Days before Christmas last year, a WSJ report surfaced that MGM had tapped Morgan Stanley and LionTree to explore a sale. At the time, rumors were swirling that another tech giant, Apple, was interested in acquiring the studio. MGM had been seeking $10 billion-plus, a price tag considered too high by a number of potential suitors who have been going off a $6 billion valuation for the company.

According to sources, speculation intensified late last week that an Amazon-MGM deal was imminent. The announcement of the AT&T-Discovery pact appeared to have slowed the momentum of the talks since, so it is unclear whether they will lead to an agreement.

What would Amazon be getting? One of the deepest film libraries, which boasts over 5,200 titles, 17,000 hours of TV, 177 Oscar wins, 12 Best Picture winners, the James Bond franchise that has grossed over $7 billion in its global B.O. lifetime, and the Rocky and Creed movies which have together earned more than a $1 billion. There's also the Epix pay TV network, of which MGM took full ownership in 2017, buying out the stakes of Paramount and Lionsgate. There's also Emmy-winning series such as The Handmaid's Tale, Fargo and Survivor among its big TV assets. The rights to the James Bond franchise are owned by EON Prods.

MGM has been a big believer in theatrical, postponing its 007 title No Time to Die, Daniel Craig's final pic as James Bond, from Easter 2020 all the way to October 8 of this year due to the pandemic. The studio is waiting for all global markets to be fully back online for the film, which many believe could be a $1 billion box office-grossing success. That said, MGM did entertain offers from streamers for the pic that they ultimately declined.

Meanwhile, Amazon in the wake of its double-digit million Sundance 2019 acquisitions like Mindy Kaling's Late Night and Brittany Runs a Marathon has switched over to a truncated theatrical window (of one to three weeks) for its movies before they hit Amazon Prime. The streamer's Oscars contenders One Night in Miami had a three-week theatrical window while Sound of Metal was two weeks. The streamer's big pic acquisitions Coming 2

America and Without Remorse were respectively released in a handful of theaters during their first weekend on the service.

While Amazon has its own distribution and marketing arm, MGM promotes and releases its movies through United Artists Releasing. which is a joint venture with Annapurna boss Megan Ellison. She has been contributing heavily to that j.v. and the question becomes whether her portion gets bought out by Amazon or whether she takes back the reins on the distribution/marketing ops.

MGM's financial statements reportedly show $1.496 billion in revenue last year, up from $1.18 billion in 2016. MGM's biggest shareholder is hedge fund Anchorage Capital, whose founder, Kevin Ulrich, is chairman, and has been leading the sales effort. Amazon recently hit 200 million Prime members, 175 million of which streamed content in the last year.

Former New Line-DreamWorks-Sony executive and Fifty Shades of Grey producer Michael De Luca joined MGM in January last year to turn the studio around, and active it certainly was during the pandemic when several other studios pulled back their activity. MGM acquired such packages as the Ridley Scott-directed Gucci movie that has Lady Gaga playing convicted murderer Patrizia Reggiano, in a film that also has Adam Driver, Jared Leto, Al Pacino, Jack Huston and Reeve Carney. MGM also picked up from Focus in turnaround Paul Thomas Anderson's next film, as well as the Ron Howard-directed Thai Cave rescue pic Thirteen Lives. They also optioned the Ta-Nehisi Coates novel The Water Dancer with Oprah Winfrey and are working on a Pink Panther reboot and another Creed sequel.

More from Deadline

AT&T's WarnerMedia And Discovery To Merge, Create New Company Led By David Zaslav Sigourney Weaver To Star In & EP 'The Lost Flowers of Alice Hart' Series Adaptation For Amazon; Made Up Stories, Amazon Studios & Endeavor Content To Produce 'Nine Perfect Strangers': Amazon Swoops For Global Rights To Nicole Kidman, Melissa McCarthy Series

**Load-Date:** May 17, 2021

---

End of Document

008911

# Amazon 'in talks' to buy James Bond and Handmaid's Tale movie studio MGM for $9billion

MailOnline

May 18, 2021 Tuesday 8:15 AM GMT

Copyright 2021 Associated Newspapers Ltd. All Rights Reserved



**Section:** NEWS; Version:2

**Length:** 785 words

**Byline:** Dailymail.com Reporter Lauren Lewis For Mailonline

## Body

- Amazon has reportedly offered $9 billion for movie studio Metro Goldwyn Mayer

- Studio is behind James Bond, The Handmaid's Tale, Fargo, Vikings, Shark Tank

- Latest in Amazon's efforts to widen its offering to keep up with Netflix, Disney+

Amazon is in talks to buy Hollywood studio MGM in what could be a huge salvo in the ongoing streaming wars.

Metro-Goldwyn-Mayer, the last standalone American studio, which owns storied franchises such as the James Bond and Rocky stable of films, would significantly bulk up Amazon's catalog, giving it a huge boost for its Prime Video service to compete against the likes of Netflix, Hulu and Disney+

Amazon could pay between $7 billion and $10 billion for the studio, the Information reported, citing sources close to the matter.

The Jeff Bezos-founded company brought in nearly $390 billion in revenue last year. The company also has its own Amazon Studios division that produces original entertainment.

MGM has about 4,000 films in its catalog, according to the New York Times. Now-classics such as Dances With Wolves, the Rain Man and the Terminators movies are housed at the studio. And newer productions made-for-TV, such as the Handmaid's Tale, also are part of the studio's portfolio.

The news of a possible MGM purchase comes after AT&T announced it would hive off its WarnerMedia entertainment and news assets and merge them with Discovery's - creating a $150 billion behemoth that would better compete with the likes of Netflix and Hulu.

The combined AT&T-Discovery company, which doesn't yet have a name, would likely spend around $20 billion a year on original content. Last year, Amazon spent around $11 billion on its own content.

Amazon declined to comment on the report. MGM also declined to comment, according to the New York times.

The purchase would bring one of Hollywood's most storied names into the Big Tech fold. MGM was once home to 'more stars than the heavens,' co-founder Louis B. Mayer would brag, according the times. They included Judy Garland, Clark Gable, James Stewart and Mickey Rooney at at one time or another.

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-7    Filed 12/04/2306 Page 2120 of 214    PageID 8574
Amazon 'in talks' to buy James Bond and Handsmaid's Tale movie studio MGM for $9billion

Meanwhile, Amazon is looking to consolidate its film and television offering as it seeks to keep Prime Video competitive with streaming sites Netflix and Disney+, The Information reported.

The ecommerce giant fared well at the recent 93rd Academy Awards, scooping up 12 nominations for films including 'Sound of Metal', 'Time', and 'One Night in Miami'. But Amazon is said to want to vastly expand its production capabilities to keep up with rival studios and streamers.

In March, the tech company signed a ten-year agreement with the National Football League - becoming the first streaming service to secure an exclusive broadcast deal.

Prime Video will feature one pre-season game per year as well as 15 regular season football games starting in 2023.

In another sign Amazon will increasingly focus on entertainment, the company announced last week former high-ranking executive Jeff Blackburn would return to oversee a consolidating global media and entertainment group.

The ecommerce company said recently it has reached 200 million subscribers on Prime Video.

In December, MGM said it was exploring a sale. It said it had tapped investment banks Morgan Stanley and LionTree LLC, and started a formal sale process.

At the time, the company had a market value of around $5.5 billion, based on privately traded shares and including debt, Reuters reported.

MGM would be the latest in a line of Hollywood studios to get taken over by a massive corporation.

Universal now operates within Comcast; Paramount through ViacomCBS; and Fox under Disney.

On Monday, rival AT&T announced it was merging WarnerMedia and Discovery to create a new streaming service and the second largest media company in the world in terms of revenue, after Disney.

Many studios have been hard hit by the coronavirus pandemic as cinemas across the world were forced to close for more than 12 months.

MGM postponed the release of the latest Bond film - No Time to Die - four times. It is now set for release on October 8 in the US and September 30 in the UK.

Netflix had engaged in talks with MGM to release the film on its streaming platform in fall last year but said the cost was prohibitive after discussions broke down.

Netflix was one of the big winners of the pandemic, seeing a surge in subscribers as people the world over were confined to their homes.

Traditional US media companies are now trying to re-invent themselves as streaming services to keep up with the streaming giant.

Disney, Apple, and Comcast have all recently launched streaming platforms with global ambitions. Hulu, Starz, and Paramount+ have also joined the highly-competitive market.

**Load-Date:** May 18, 2021

---

End of Document

## In buyer search, MGM cozies up to Amazon

The Houston Chronicle

May 19, 2021 Wednesday

Houston Edition

Copyright 2021 Hearst Newspapers, a division of Hearst Communications, Inc. All Rights Reserved

**Section:** BUSINESS; Pg. B002

**Length:** 399 words

## Body

LOS ANGELES - Metro-Goldwyn-Mayer has been in talks to sell itself to Amazon, according to three people briefed on the matter. If completed, a deal would turbocharge Amazon's streaming ambitions by bringing James Bond, Rocky, RoboCop and other film and television properties into the e-commerce giant's fold.

MGM has been looking for a buyer for months, with $9 billion floated as an asking price. Apple and Comcast had previously kicked MGM's tires and decided it was worth roughly $6 billion.

It was unclear how much Amazon might be willing to spend, according to the people briefed on the talks who spoke on the condition of anonymity because the sale process is private. The purchase of Whole Foods for $13.4 billion in 2017 was the biggest acquisition in Amazon's history. Even $6 billion would make MGM the second-largest.

Representatives for Amazon and MGM declined to comment.

A timeline for a potential deal was unclear, the people said. Michael De Luca, MGM's chairman, presented the studio's coming slate to Amazon's team on Friday, one of the people said.

In total, MGM has about 4,000 films in its library, but many of its characters (the Pink Panther, Chucky the doll) and franchises ("Legally Blonde," "Tomb Raider") need reinvention.

MGM, once home to "more stars than the heavens" as its co-founder Louis B. Mayer liked to brag, has been majority owned by Anchorage Capital, a New York investment firm, for more than a decade. Kevin Ulrich, Anchorage's chief executive and MGM's chairman, formally put the studio on the block late last year, hiring Aryeh B. Bourkoff, a deal maker and chief executive of LionTree, to orchestrate a sale.

The end of MGM as a stand-alone company would add to a vast reshaping of the media business as the big seek to compete by getting even bigger. On Monday, AT&T announced a deal to spin off its WarnerMedia group and combine it with Discovery Inc., a move designed to strengthen WarnerMedia's struggling HBO Max streaming service.

Such megadeals have left smaller studios like MGM, Lionsgate and STX Entertainment looking for lifelines. (STX, known for "Hustlers" and "Bad Moms," merged with the Bollywood studio Eros International last summer.)

**Load-Date:** May 20, 2021

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Exhibit Exhibit 61-72 Page 2308 of 502   Page 2 of 2

Case 3:23-cv-02071-E   Document 25-87   Filed 12/04/23   Page 122 of 214   PageID 8576

In buyer search, MGM cozies up to Amazon

---

**End of Document**

008915

# Amazon Nears Deal to Buy Hollywood Studio MGM;  Deal for the 'Rocky' and 'James Bond' studio would mark tech company's second largest-ever acquisition

The Wall Street Journal Online

May 24, 2021

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

**Section:** BUSINESS; Business

**Length:** 1166 words

**Byline:** By Juliet Chung, Joe Flint and Erich Schwartzel

## Body

Amazon.com Inc. is nearing a deal to buy the Hollywood **studio MGM** Holdings for almost $9 billion including debt, said people familiar with the matter, a pact that would turn a film operation founded in the silent era into a streaming asset for the e-commerce giant.

An agreement could be announced as early as this week, people close to the situation said, assuming the talks don't fall apart at the last minute.

The deal would mark Amazon's second-largest acquisition in history, behind its $13.7 billion **purchase of** Whole Foods in 2017, and highlight the premium that content is commanding as streaming wars force consolidation and drive bigger players to bulk up with assets that help them compete.

The privately traded MGM was valued around $5.5 billion, including debt, last December. Its stock price has soared in recent days, from about $105 a share in mid-May, before talks were reported, to roughly $140 a share Monday morning. The share price reached $150 Monday afternoon, after The Wall Street Journal reported news of the expected deal.

The fabled movie and TV studio had around $2 billion of long-term debt at the end of March. It has long been considered in play, but hired investment banks LionTree LLC and Morgan Stanley late last year to begin a formal process.

News of the deal talks first emerged as AT&T Inc. agreed to combine its media assets with Discovery Inc. and form a new company, a pact that is expected to spark even further media consolidation.

The talks between Amazon and MGM have been on-again, off-again since the start of this year, people close to both companies said. Amazon and MGM have been in exclusive talks in recent weeks, the people said. The MGM

Amazon Nears Deal to Buy Hollywood Studio MGM;  Deal for the 'Rocky' and 'James Bond' studio would mark
tech company's second largest-ever acquisition

board was briefed on the matter Sunday night, a person close to the situation said. There are no guarantees they
will ultimately reach an agreement.

An acquisition of one the most iconic entertainment brands in the world would be the most aggressive foray yet by a
tech giant into Hollywood.

The studio is best known for classics such as "Singin' in the Rain," as well as "Rocky" and "The Pink Panther."
MGM has a library of titles, including the James Bond franchise, that, in contemporary Hollywood, is most valuable
as an asset that can be used to drive subscriber sign-ups to Amazon's Prime Video streaming service.

MGM also has a TV studio whose shows include the Hulu hit "The Handmaid's Tale" and FX's "Fargo." It also owns
the premium pay-TV channel Epix.

MGM shares the James Bond franchise with a holding company owned by the Wilson/Broccoli family, who co-own
the copyright to existing Bond movies and control the future of the franchise. The next James Bond movie, "No
Time to Die," was repeatedly delayed due to the Covid-19 pandemic and is now scheduled for release in October.

While Amazon is getting a big library, the MGM classics such as "The Wizard of Oz" and "Gone with the Wind"
were sold long ago along with the rest of the pre-1948 catalog and now belong to AT&T's Warner Bros.

Forbes and The Information previously reported on Amazon's interest in MGM.

Amazon has continued to invest billions of dollars in its film and TV operations as well as live sports to support its
Prime membership offering. The company is currently in production on a TV series based on "Lord of the Rings,"
which has a first-season budget of $465 million.

Amazon has spent hundreds of millions of dollars acquiring would-be theatrical releases from major studios, like
Paramount Pictures' forthcoming "The Tomorrow War" starring Chris Pratt. It also aggressively pursued a deal to
stream movies from Sony Pictures Entertainment on its service, a person familiar with that situation said. Sony
Pictures ultimately ended up reaching a multiyear agreement with Netflix Inc.

It is also investing heavily in live sports. In March, Amazon struck a long-term deal to stream the NFL's Thursday
night franchise at an average annual fee of $1.2 billion.

The MGM deal would mark the latest twist in what has been a rocky journey for the studio. In 2018, it fired then-
chief executive Gary Barber for having preliminary conversations with Apple Inc. for a **sale** that valued the studio at
more than $6 billion. Since then, MGM has had no chief executive officer, instead having an "office of the CEO"
comprising executives across the company. Its board is chaired by Kevin Ulrich, co-founder of New York hedge
fund Anchorage Capital Group, MGM's largest shareholder.

MGM has weighed on its long-term hedge-fund shareholders in recent years, several of whom got involved around
2010 with the idea that MGM's value could be boosted through a refresh of its film and television library and that
they could then exit through an initial public offering or the **sale** of the studio. A deal would mark a long-awaited win
for Anchorage and firms including Highland Capital Management LP and Davidson Kempner Capital Management
LP, all of which converted their debt to equity when MGM emerged from bankruptcy in late 2010.

Should a deal be finalized between MGM and Amazon, it could heighten antitrust concerns for the technology giant,
which is already at the center of multiple probes because of its size and power.

Congress, the Federal Trade Commission and the European Union, among others, have been looking into the way
Amazon competes. A report last year from Congress determined that Amazon had monopoly power over its sellers.
At the time, Amazon addressed the findings in a blog post. "All large organizations attract the attention of
regulators, and we welcome that scrutiny. But large companies are not dominant by definition, and the presumption
that success can only be the result of anti-competitive behavior is simply wrong," it said.

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 20-7    Filed 12/07/23    Page 125 of 214    PageID 8579
Exhibit Exhibit 6 Filed 12/07/23    Page 2 of 3    Page 2 of 3

Amazon Nears Deal to Buy Hollywood Studio MGM;  Deal for the 'Rocky' and 'James Bond' studio would mark tech company's second largest-ever acquisition

Colorado Rep. Ken Buck, the ranking Republican member of the House Antitrust Subcommittee that prepared the report, expressed concern over a potential deal between Amazon and MGM.

"This proposed merger is yet another example of Big Tech's commitment to total dominance in every sector of our economy. If Congress does not act soon, there won't be a market Big Tech doesn't control," Mr. Buck said in a statement. Amazon didn't immediately respond to a request for comment and an MGM spokeswoman declined to comment on Mr. Buck's statement.

Members of Congress have also publicly criticized former Amazon deals, such as its acquisition of Whole Foods, which they say should have had tougher scrutiny.

The Journal chronicled how entrepreneurs who have held talks with Amazon's deal-making arm felt exploited by the Seattle company. Amazon has said legitimate disputes about intellectual property are resolved in courts. Congress is expected to introduce new legislation, that if passed, would hamper the ability of technology giants to strike some large deals.

Benjamin Mullin, Cara Lombardo and Dana Mattioli contributed to this article.

Write to Juliet Chung at juliet.chung@wsj.com, Joe Flint at joe.flint@wsj.com and Erich Schwartzel at erich.schwartzel@wsj.com

Amazon Nears Deal to Buy Hollywood **Studio MGM**

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 25, 2021

**End of Document**

## Amazon Closes In On Deal For MGM --- With price of almost $9 billion, film studio would build streaming assets for tech giant

The Wall Street Journal

May 25, 2021 Tuesday

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

### THE WALL STREET JOURNAL.

**U.S. EDITION**

**Section:** Pg. A1

**Length:** 918 words

**Byline:** By Juliet Chung, Joe Flint and Erich Schwartzel

## Body

Amazon.com Inc. is nearing a deal to buy the Hollywood studio MGM Holdings for almost $9 billion including debt, said people familiar with the matter, a pact that would turn a film operation founded in the silent era into a streaming asset for the e-commerce giant.

An agreement could be made public as early as this week, people close to the situation said, assuming the talks don't fall apart at the last minute.

The deal would mark Amazon's second-largest acquisition in history, behind its $13.7 billion purchase of Whole Foods in 2017, and highlight the premium that content is commanding as streaming wars force consolidation and drive bigger players to bulk up with assets.

The privately traded MGM was valued around $5.5 billion, including debt, last December. Its stock price has soared in recent days, from about $105 a share in mid-May, before talks were reported. The share price reached $150 Monday afternoon, after The Wall Street Journal reported news of the expected deal.

The fabled movie and TV studio had around $2 billion of long-term debt at the end of March. It has long been considered in play, but hired investment banks LionTree LLC and Morgan Stanley late last year to begin a formal process.

News of deal talks first emerged as AT&T Inc. agreed to combine its media assets with Discovery Inc. to form a new company, a deal that is expected to spark even further media consolidation.

The talks between Amazon and MGM have been on-again, off-again since the start of this year, people close to both companies said. Amazon and MGM have been in exclusive talks in recent weeks, the people said.

An acquisition of one the most iconic entertainment brands in the world would be the most aggressive foray yet by a tech giant into Hollywood.

Amazon Closes In On Deal For MGM --- With price of almost $9 billion, film studio would build streaming assets for tech giant

The studio is best known for classics such as "Singin' in the Rain," as well as "Rocky" and "The Pink Panther." MGM has a library of titles, including the James Bond franchise that, in contemporary Hollywood, is most valuable as an asset that can be used to drive subscriber sign-ups to Amazon's Prime Video streaming service.

MGM also has a TV studio whose shows include the Hulu hit "The Handmaid's Tale" and FX's "Fargo." It also owns the premium pay-TV channel Epix.

MGM shares the James Bond franchise with a holding company owned by the Wilson/Broccoli family, who co-own the copyright to existing Bond movies and control the future of the franchise. The next Bond movie, "No Time to Die," was delayed by the pandemic and is now scheduled for release in October.

While Amazon is getting a big library, the MGM classics such as "The Wizard of Oz" and "Gone with the Wind" were sold long ago along with the rest of the pre-1948 catalog and now belong to AT&T's Warner Bros.

Forbes and The Information previously reported on Amazon's interest in MGM.

Amazon has continued to invest billions of dollars in its film and TV operations as well as live sports to support its Prime membership offering. The company is currently in production on a TV series based on "Lord of the Rings," which has a first-season budget of $465 million.

Amazon has spent hundreds of millions of dollars acquiring would-be theatrical releases from major studios, like Paramount Pictures' forthcoming "The Tomorrow War" starring Chris Pratt. It also aggressively pursued a deal to stream movies from Sony Pictures Entertainment on its service, a person familiar with that situation said. Sony Pictures ultimately ended up reaching a multiyear agreement with Netflix Inc.

It is also investing heavily in live sports. In March, Amazon struck a long-term deal to stream the NFL's Thursday night franchise at an average annual fee of $1.2 billion.

The MGM deal would mark the latest twist in what has been a rocky journey for the studio. In 2018, it fired then-chief executive Gary Barber for having preliminary conversations with Apple Inc. for a sale that valued the studio at more than $6 billion. Since then, MGM has had no chief executive officer, instead having an "office of the CEO" comprising executives across the company. Its board is headed by Kevin Ulrich, co-founder of New York hedge fund Anchorage Capital Group, MGM's largest shareholder.

MGM has weighed on its long-term hedge-fund shareholders in recent years. A deal would mark a long-awaited win for Anchorage and other longtime hedge-fund holders, including Highland Capital Management LP and Davidson Kempner Capital Management LP, all of which converted their debt to equity when MGM emerged from bankruptcy in late 2010.

Should a deal be finalized between MGM and Amazon, it could heighten antitrust concerns for the technology giant, which is already at the center of multiple probes because of its size and power.

Congress, the Federal Trade Commission and the European Union, among others, have been looking into the way Amazon competes. A report last year from Congress said Amazon had monopoly power over its sellers. At the time, Amazon said: "The presumption that success can only be the result of anti-competitive behavior is simply wrong."

Rep. Ken Buck of Colorado, the ranking Republican member of the House Antitrust Subcommittee that prepared the report, expressed concern over a potential deal between Amazon and MGM

"This proposed merger is yet another example of Big Tech's commitment to total dominance in every sector of our economy," Mr. Buck said. Amazon didn't respond to a request for comment; MGM declined to comment.

---

Benjamin Mullin, Cara Lombardo and Dana Mattioli contributed to this article.

Amazon Closes In On Deal For MGM --- With price of almost $9 billion, film studio would build streaming assets for tech giant

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** October 1, 2022

---

**End of Document**

008921

### Amazon's $8.5 billion purchase of MGM will give it rights to James Bond, 'Legally Blonde,' 'Robocop,' 'The Handmaid's Tale,' and much more. Here's what the tech giant could own under the deal.

Business Insider US

May 26, 2021 Wednesday 01:46 PM GMT

Copyright 2021 Insider Inc. All Rights Reserved

# BUSINESS
# INSIDER

**Length:** 416 words

## Body

- Amazon is buying MGM for $8.45 billion, the companies announced on Wednesday.
- From James Bond to "The Handmaid's Tale," MGM is getting a massive trove of movies and TV.
- These are the highlights of the blockbuster acquisition.
- Visit the Business section of Insider for more stories.

Amazon just dropped $8.45 billion to buy MGM Studios, the decades-old film studio that owns rights to some of the biggest movies and TV shows in the world.

In the press release announcing the deal, Amazon pointed to the "vast catalog" of "more than 4,000 films" and "17,000 TV shows" as the reason for the purchase - assuredly intended to bolster Amazon's Prime video streaming service.

So, what's Amazon getting for nearly $8.5 billion?

The decades-long catalog of James Bond films is among the "more than 4,000" films Amazon is buying, in addition to classic movies like "12 Angry Men," "Silence of the Lambs," "Thelma & Louise," "Midnight Cowboy," "Fiddler on the Roof," "Dances with Wolves," and "Raging Bull."

Another major franchise Amazon gets in the deal: "Rocky," as well as the more recent "Creed" films.

And that's just movies.

In terms of television, Amazon's getting more recent classics, like "Fargo," "The Handmaid's Tale," and "Vikings."

Beyond the titles specifically noted by Amazon, there are countless others that belong to the MGM Holdings catalog - though it's not completely clear which movies and TV shows have rights split up between several companies.

MGM Holdings includes MGM Television, for instance, which counts "The Real Housewives" franchise among its titles. An MGM rep confirmed that "The Real Housewives" franchise is part of the deal, as well as "The Voice," "Shark Tank," and "Survivor."

What we know for sure *isn't* included in the deal is the vast library of MGM films from prior to 1986, which controlled by Turner Entertainment Company.

008922

Amazon's $8.5 billion purchase of MGM will give it rights to James Bond, 'Legally Blonde,' 'Robocop,' 'The Handmaid's Tale,' and much more. Here's what the tech....

Beyond what's listed above, Amazon's press release included "Basic Instinct," "Legally Blonde," "Moonstruck," "Poltergeist," "Stargate," "Tomb Raider," The Magnificent Seven," The Pink Panther," and "The Thomas Crown Affair" among the movie rights it acquired in the deal.

Amazon and MGM representatives were unable to clarify the full list of acquired movie and TV rights in the deal.

*Got a tip? Contact Insider senior correspondent Ben Gilbert via email (*bgilbert@insider.com*), or Twitter DM (@realbengilbert). We can keep sources anonymous. Use a non-work device to reach out. PR pitches by email only, please.*

Read the original article on

**Load-Date:** May 26, 2021

---

# Amazon to Buy Film Studio MGM for $8.45 Billion

Barron's Online

May 26, 2021

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

**BARRON'S**

**Section:** DAILY

**Length:** 470 words

**Byline:** By Eric J. Savitz

## Body

Amazon.com has agreed to acquire privately owned MGM Holdings for about $8.45 billion. It's the latest development in a steady stream of consolidation in the movie and television content business. The announcement confirms months of speculation about a potential deal.

Amazon (ticker: AMZN) Senior VP of Prime Video and Amazon Studios Mike Hopkins said in a statement Wednesday that "the real financial value behind this deal is the treasure trove of IP in the deep catalog that we plan to reimagine and develop together with MGM's talented team. It's very exciting and provides so many opportunities for high-quality storytelling."

Amazon shares are up 0.4% in premarket trading Wednesday. The company said the deal is subject to regulatory approvals and other customary closing conditions.

MGM is owned by a group of private-equity firms, including Anchorage Capital Partners, Highland Capital Partners, Davidson Kempner Capital Management, and Owl Creek Investments. The Wall Street Journal had reported in December that the investment group had hired the investment banks Morgan Stanley and LionTree to explore a sale.

According to financial filings on the company's website, MGM had 2021 revenue of $1.5 billion, down about 3% from the previous year. Revenue was roughly evenly split among the company's film, television, and media network businesses. The company had net income for the year of $33.9 million, while generating adjusted Ebitda (earnings before interest, taxed, depreciation, and amortization) of $307 million.

Also read

* Why Amazon Is Buying MGM and Why It Won't Change Much in the Streaming Wars

* 'It's Time to Unleash the Media Assets,' AT&T CEO John Stankey Says

Amazon to Buy Film Studio MGM for $8.45 Billion

* Netflix Stock Has Been Stuck in a Rut. Why One Analyst Offers Rave Reviews.

The transaction includes a library of more than 4,000 films and 17,000 TV episodes. The most valuable piece of the MGM portfolio is the company's 25 James Bond films-and the right to make more Bond films. MGM also controls the Pink Panther, Rocky, RoboCop, Legally Blonde, Tomb Raider, and Adams Family franchises. MGM also produces scripted series such as The Handmaid's Tale and Fargo, and unscripted series like Shark Tank and The Voice. The company's revenues are split roughly into thirds among films, TV shows, and its Epix subscription movie service.

MGM's future has been a topic of speculation for several months. The Wall Street Journal reported last year that Apple(APPL) held talks about acquiring MGM. Forbes reported in January that MGM was for sale, with a potential $9 billion price tag, specifically calling out Amazon as a potential buyer. On Monday, the Journal reported that an Amazon deal for MGM was close, confirming previous reporting by Variety and The Information.

Write to editors@barrons.com

Amazon to Buy Film Studio MGM for $8.45 Billion

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 26, 2021

**End of Document**

## Amazon to Buy MGM, Bagging a Lion to Help Wage Streaming Battle; Purchase of movie studio in deal valued at $6.5 billion, excluding debt, aims to bulk up Prime Video in race against Netflix and Disney

The Wall Street Journal Online

May 26, 2021

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

### THE WALL STREET JOURNAL.

**Section:** BUSINESS; Business

**Length:** 1020 words

**Byline:** By Joe Flint

## Body

Amazon.com Inc. said it has agreed to acquire the Hollywood studio MGM in a deal that the e-commerce company is betting can jump-start its Prime Video streaming platform and position it to compete with industry heavyweights including Netflix Inc. and Walt Disney Co.

The purchase, which was unveiled Wednesday morning, has an equity value of $6.5 billion, people familiar with the matter said. Including debt, the value of the deal is $8.45 billion, Amazon said. It would be the second-largest acquisition in the company's history behind its $13.7 billion purchase of Whole Foods in 2017.

In MGM, Amazon will get a library of more than 4,000 films, including franchises such as James Bond and Rocky, and classics such as "The Silence of the Lambs," "Raging Bull" and "12 Angry Men." The TV catalog includes critically acclaimed shows such as "The Handmaid's Tale," "Fargo" and "Vikings."

"The acquisition's thesis here is really very simple," Amazon Chief Executive Officer Jeff Bezos said on a call with shareholders later Wednesday. "MGM has a vast, deep catalog of much-beloved intellectual property, and with the talented people at MGM and the talented people at Amazon Studios, we can reimagine and develop that IP for the 21st century."

Amazon said in February that Mr. Bezos would be stepping down as CEO in a leadership change that leaves top lieutenant Andy Jassy to oversee MGM's integration into the company when he takes the reins as CEO on July 5.

MGM Chairman Kevin Ulrich had sought $10 billion for the company, scaring off some potential suitors, such as Apple Inc. and Sony Group Corp.'s Sony Pictures Entertainment, a person close to him said. Amazon, hungry for more content for Prime Video, had a greater appetite than others.

The tech company had approached MGM multiple times over the past 18 months, according to people familiar with the talks. At one point in their discussions, MGM and Amazon executives weighed a possible deal to bring the latest

008926

Amazon to Buy MGM, Bagging a Lion to Help Wage Streaming Battle;  Purchase of movie studio in deal valued at $6.5 billion, excluding debt, aims to bulk up Prime....

James Bond film to the Amazon's streaming service while movie theaters remained closed during the pandemic, according to a person familiar with the matter.

Late last year, Mike Hopkins, senior vice president of Prime Video and Amazon Studios, contacted Mr. Ulrich and subsequently took the lead on merger talks, which for months didn't move past the exploratory stage, according to people familiar with the matter. That changed about five weeks ago, when the tech company made its more than $8 billion offer.

The board quickly signed off, and the two reached an agreement Monday, according to people close to the deal. The companies decided to hold the announcement for Wednesday out of sensitivity that Tuesday was the first anniversary of George Floyd's murder by a police officer in Minneapolis, the people said.

Besides MGM, Amazon also approached Sony Pictures Entertainment about an acquisition but was rebuffed, a person familiar with the matter said.

Amazon is facing antitrust scrutiny from U.S. and foreign regulators over a range of its business practices. Sen. Amy Klobuchar (D., Minn.) said Wednesday that the MGM deal should be subject to a federal probe.

"This is a major acquisition that has the potential to impact millions of consumers," she said in a statement. "The Department of Justice must conduct a thorough investigation to ensure that this deal won't risk harming competition."

The acquisition is the latest in a series of mergers that are shaking the entertainment industry as media and tech companies fight for supremacy in the streaming age.

Earlier this month, AT&T Inc. said it would spin off its WarnerMedia assets and merge them with Discovery Inc. In recent years, Disney bought most of the entertainment assets of 21st Century Fox, and Viacom Inc. recombined with CBS Corp., all part of efforts to amass content and build direct-to-consumer streaming services.

Media executives have buzzed for years about the possibility of mergers with companies such as Amazon and Apple, but the tech companies avoided big-ticket deals as they built out their streaming platforms.

Now the landscape is shifting. Traditional studios are keeping more content for their homegrown streaming services, such as NBCUniversal's Peacock and WarnerMedia's HBO Max, instead of licensing it to the likes of Amazon and Netflix. Owning MGM would help Amazon better control its destiny in the streaming wars.

The James Bond franchise is among the most important content Amazon is taking hold of and comes with added complexity. The producers Barbara Broccoli and Michael Wilson essentially control the property's creative and business operations.

Mr. Hopkins called the producers before the deal closed to reassure them that the franchise would be in good hands at Amazon, people familiar with the call said. In addition, Ms. Broccoli has a long friendship with Jen Salke, who heads Amazon's TV and movie operations.

Amazon agreed that all James Bond movies currently in the pipeline would continue to have a theatrical release. "Barbara and Michael still have control and are protected," one of the people close to the deal said.

Although Amazon has deeper pockets than any other players in the streaming business, its Prime Video service hasn't had the massive creative successes that Netflix and newcomer Disney+ have enjoyed. It made several critically acclaimed movies and TV shows including "Transparent," "Manchester by the Sea" and, more recently, "One Night in Miami."

Entertainment isn't the only content on which Amazon is spending heavily. In March it struck a deal with the National Football League for exclusive rights to Thursday Night Football at a price of $1.2 billion a season over 11 years, people with knowledge of that transaction said.

Amazon to Buy MGM, Bagging a Lion to Help Wage Streaming Battle;  Purchase of movie studio in deal valued at $6.5 billion, excluding debt, aims to bulk up Prime....

Cara Lombardo, Benjamin Mullin and Erich Schwartzel contributed to this article.

The Amazon-MGM Deal

More coverage of the transaction, selected by the editors

* [Deal Marks Win for Some Hedge Funds](#)

* [Heard on the Street: Amazon Green-Lights Antitrust Thriller](#)

* [Amazon Would Add James Bond, Content Depth in Deal](#)

Write to Joe Flint at [joe.flint@wsj.com](mailto:joe.flint@wsj.com)

[Amazon to Buy MGM, Bagging a Lion to Help Wage Streaming Battle](#)

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 27, 2021

End of Document

## [Amazon to Buy MGM for $8.45 Billion With Debt -- 2nd Update](#)

Dow Jones Institutional News

May 26, 2021 Wednesday 2:47 PM GMT

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2021, Dow Jones & Company, Inc.

**DOW JONES** NEWSWIRES

**Length:** 609 words

**Byline:** By Joe Flint and Dave Sebastian

## Body

Amazon.com Inc. said it has agreed to acquire Hollywood studio MGM Holdings, a deal the e-commerce giant is betting can jump-start its Prime Video streaming platform and position it to compete with industry heavyweights including Netflix Inc. and Walt Disney Co.

The purchase, which was unveiled Wednesday morning, has an equity value of $6.5 billion, people familiar with the matter said. Including debt, the value of the deal is $8.45 billion, Amazon said. It is the second-largest acquisition in the company's history behind its $13.7 billion purchase of Whole Foods in 2017.

In MGM, Amazon will get a library of over 4,000 films, including iconic franchises such as "James Bond" and "Rocky," and classics such as "The Silence of the Lambs," "Raging Bull" and "12 Angry Men." The TV catalog includes critically acclaimed shows such as "The Handmaid's Tale," "Fargo" and "Vikings."

Amazon's deal for MGM is the latest in a series of mergers that are shaking the entertainment industry as media and tech companies fight for supremacy in the streaming age.

Earlier this month, AT&T Inc. said it would spin off its WarnerMedia assets and merge them with Discovery Inc. In recent years, Walt Disney bought most of the entertainment assets of 21st Century Fox, and Viacom Inc. recombined with CBS Corp., all part of efforts to amass content and build direct-to-consumer streaming services.

Media executives have buzzed for years about the possibility of mergers with companies such as Amazon and Apple Inc., but the tech giants avoided big-ticket deals as they built out their streaming platforms.

Now, the landscape is shifting. Traditional studios are keeping more content for their homegrown streaming services, such as NBCUniversal's Peacock and WarnerMedia's HBO Max, instead of licensing it to the likes of Amazon and Netflix. Owning MGM would help Amazon better control its destiny in the streaming wars.

Amazon is banking on not only having old movies and TV shows to offer its customers but also using that content to create new franchises.

008929

Amazon to Buy MGM for $8.45 Billion With Debt -- 2nd Update

"The real financial value behind this deal is the treasure trove of [intellectual property] in the deep catalog that we plan to reimagine and develop together with MGM's talented team," said Mike Hopkins, senior vice president of Prime Video and Amazon Studios.

Although Amazon has deeper pockets than any other players in the streaming game, its Prime Video service hasn't had the creative successes that Netflix and newcomer Disney+ have enjoyed. It made several critically acclaimed movies and TV shows including "Transparent, " "Manchester by the Sea" and, more recently, "One Night in Miami."

Prime Video is offered as a bonus for Amazon's more than 150 million subscribers to its Amazon Prime shopping service.

Amazon and MGM held on-again-off-again talks for much of this year. The two companies first discussed a sale in January, but then discussions cooled, a person familiar with the matter said. In recent weeks, Amazon and MGM began meeting again and negotiations advanced rapidly.

Besides MGM, Amazon also approached Sony Group Corp.'s Sony Pictures Entertainment about an acquisition but was rebuffed, a person familiar with the matter said.

Entertainment isn't the only content on which Amazon is spending heavily. In March it struck a deal with the National Football League for exclusive rights to Thursday Night Football at a price of $1.2 billion a season over 11 years, people with knowledge of that transaction said.

--Cara Lombardo contributed to this article.

Write to Joe Flint at joe.flint@wsj.com and Dave Sebastian at dave.sebastian@wsj.com

(END) Dow Jones Newswires

May 26, 2021 10:47 ET (14:47 GMT)

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 26, 2021

**End of Document**

## Amazon to Buy MGM for $8.45 Billion With Debt -- 3rd Update

Dow Jones Institutional News

May 26, 2021 Wednesday 7:56 PM GMT

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright © 2021, Dow Jones & Company, Inc.

DOW JONES NEWSWIRES

**Length:** 669 words

**Byline:** By Joe Flint and Dave Sebastian

## Body

Amazon.com Inc. said it has agreed to acquire Hollywood studio MGM Holdings, a deal the e-commerce giant is betting can jump-start its Prime Video streaming platform and position it to compete with industry heavyweights including Netflix Inc. and Walt Disney Co.

The purchase, which was unveiled Wednesday morning, has an equity value of $6.5 billion, people familiar with the matter said. Including debt, the value of the deal is $8.45 billion, Amazon said. It is the second-largest acquisition in the company's history behind its $13.7 billion purchase of Whole Foods in 2017.

In MGM, Amazon will get a library of over 4,000 films, including iconic franchises such as "James Bond" and "Rocky," and classics such as "The Silence of the Lambs," "Raging Bull" and "12 Angry Men." The TV catalog includes critically acclaimed shows such as "The Handmaid's Tale," "Fargo" and "Vikings."

"The acquisition's thesis here is really very simple," Amazon Chief Executive Jeff Bezos said during a call with shareholders later Wednesday. "MGM has a vast, deep catalog of much-beloved intellectual property, and with the talented people at MGM and the talented people at Amazon Studios, we can reimagine and develop that IP for the 21st century."

Amazon said in February that Mr. Bezos would be stepping down as CEO, a leadership change that leaves top lieutenant Andy Jassy to oversee MGM's integration into the company when he takes the reins as CEO on July 5. Mr. Bezos, who will become executive chairman, said Wednesday that Mr. Jassy's first day in the top role carries symbolic weight, coinciding with the date of Amazon's incorporation 27 years ago.

Amazon's deal for MGM is the latest in a series of mergers that are shaking the entertainment industry as media and tech companies fight for supremacy in the streaming age.

Earlier this month, AT&T Inc. said it would spin off its WarnerMedia assets and merge them with Discovery Inc. In recent years, Walt Disney bought most of the entertainment assets of 21st Century Fox, and Viacom Inc. recombined with CBS Corp., all part of efforts to amass content and build direct-to-consumer streaming services.

008931

Amazon to Buy MGM for $8.45 Billion With Debt -- 3rd Update

Media executives have buzzed for years about the possibility of mergers with companies such as Amazon and Apple Inc., but the tech giants avoided big-ticket deals as they built out their streaming platforms.

Now, the landscape is shifting. Traditional studios are keeping more content for their homegrown streaming services, such as NBCUniversal's Peacock and WarnerMedia's HBO Max, instead of licensing it to the likes of Amazon and Netflix. Owning MGM would help Amazon better control its destiny in the streaming wars.

Although Amazon has deeper pockets than any other players in the streaming game, its Prime Video service hasn't had the creative successes that Netflix and newcomer Disney+ have enjoyed. It made several critically acclaimed movies and TV shows including "Transparent, " "Manchester by the Sea" and, more recently, "One Night in Miami."

Prime Video is offered as a bonus for Amazon's more than 150 million subscribers to its Amazon Prime shopping service.

Amazon and MGM held on-again-off-again talks for much of this year. The two companies first discussed a sale in January, but then discussions cooled, a person familiar with the matter said. In recent weeks, Amazon and MGM began meeting again and negotiations advanced rapidly.

Besides MGM, Amazon also approached Sony Group Corp.'s Sony Pictures Entertainment about an acquisition but was rebuffed, a person familiar with the matter said.

Entertainment isn't the only content on which Amazon is spending heavily. In March it struck a deal with the National Football League for exclusive rights to Thursday Night Football at a price of $1.2 billion a season over 11 years, people with knowledge of that transaction said.

--Cara Lombardo contributed to this article.

Write to Joe Flint at joe.flint@wsj.com and Dave Sebastian at dave.sebastian@wsj.com

(END) Dow Jones Newswires

May 26, 2021 15:56 ET (19:56 GMT)

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 26, 2021

End of Document

008932

## Amazon's Top Deals Show Urge For Multi-Industry Domination

May 26, 2021



Copyright © 2023 Portfolio Media, Inc. All rights reserved.

**Author:** Benjamin Horney

## Summary

Amazon has been more than an online retail platform for a long time now, and the largest mergers and acquisitions in company history illustrate its aspirations of being a dominant player in multiple sectors and industries, including technology, media and entertainment, and food and beverage.

## Body

Amazon has been more than an online retail platform for a long time now, and the largest mergers and acquisitions in company history illustrate its aspirations of being a dominant player in multiple sectors and industries, including technology, media and entertainment, and food and beverage.

When Jeff Bezos founded Amazon.com Inc. back in 1994, it was primarily an online bookstore. In the years since, the company has expanded to become a one-stop shop for almost any product imaginable. But Amazon clearly has ambitions to be more than just one of the world's foremost online retailers, as evidenced by its $8.45 billion **purchase** Wednesday of movie and television giant **MGM Studios**.

Amazon's ongoing attempts to grow ever bigger have drawn ire from authorities and policymakers alike. The District of Columbia attorney general sued Amazon on Tuesday over allegations that the company stifles competition through contracts with sellers on its platform, resulting in higher prices for consumers and reducing innovation for online retail marketplaces. Following the MGM announcement, U.S. Sen. Josh Hawley, R-Mo., issued a statement Wednesday saying the deal should not go through and calling Amazon a "monopoly."

Whether Amazon will eventually face some kind of strict regulation remains to be seen, but there's no question that the company's acquisition history shows an entity hungry to continue growing, no matter how many industries it has to wrap its tentacles around.

Here, Law360 counts down the five largest acquisitions in Amazon history.

5. Amazon Opens Door to Home Security With $1B Ring Buy

In February 2019, Amazon agreed to buy Santa Monica, California-headquartered Ring Inc., which provides a smart home security system that allows users to see who's at the door on their devices. Founded in 2012, the video doorbell company has a stated mission of making communities safer, according to its website.

Amazon's Top Deals Show Urge For Multi-Industry Domination

In an April 2018 press release announcing the deal had closed, Jamie Siminoff, CEO and chief inventor of Ring, said that "together with Amazon, we will accelerate our mission dramatically by connecting more neighbors globally and making our security devices and systems more affordable and accessible."

Before **purchasing** Ring, Amazon actually offered its own version of Ring's video doorbell system, the Amazon Cloud Cam. That product has since been discontinued, however, and is no longer available for **purchase**.

Counsel information for the deal was not immediately available.

4. Amazon Tries Zappos on for Size in $1.2B Deal

Nearly a decade before the Ring deal, in July 2009, Gibson Dunn-advised Amazon agreed to buy Fenwick & West-counseled Zappos.com Inc. for $850 million in cash and stock. Including debt, the value of the transaction reached $1.2 billion, according to Dealogic.

The companies said in a press release at the time that Zappos would stay an independent unit within Amazon. In a letter to Zappos employees released in conjunction with the deal announcement, then-CEO Tony Hsieh said that Amazon was "not looking to have their folks come in and run Zappos unless we ask them to."

"That being said, they have a lot of experience and expertise in a lot of areas, so we're very excited about the opportunities to tap into their knowledge, expertise and resources, especially on the technology side," he added.

Hsieh died in 2020, according to an obituary in The New York Times. Zappos has been led by CEO Kedar Deshpande since August, according to Deshpande's LinkedIn profile.

Founded in 1999, Zappos originally sold only footwear, although the company has since branched out to also offer a variety of clothing and other items. To this day, Zappos.com continues to operate as an independent website.

Amazon was represented in the transaction by Gibson Dunn & Crutcher LLP, and Zappos was advised by Fenwick & West LLP.

3. Amazon Takes a Big Swing With $3.5B Deal for YES Network

In August 2019, Amazon was part of a consortium that agreed to take over the YES Network in a $3.47 billion transaction that featured assistance from five law firms.

The agreement saw a consortium composed of Yankee Global Enterprises with strategic partners Amazon and Sinclair Broadcast Group **purchase** from Walt Disney Co. the roughly 80% interest in YES Network that they did not already own. As part of the deal, equity investments were provided by RedBird Capital, plus funds managed by Blackstone Group's Tactical Opportunities division and Mubadala Capital.

The YES Network, launched in 2002, broadcasts Yankee games as well as other content, including games for the NBA's Brooklyn Nets, Major League Soccer's New York City FC and the WNBA's New York Liberty.

At the time, Yankee Global Enterprises, Sinclair and Amazon said they would "work together to enhance the network and position it strategically to continue its leadership in sports broadcasting across all forms of distribution."

Debevoise & Plimpton LLP advised Amazon. Latham & Watkins LLP represented Sinclair. Cravath Swaine & Moore LLP advised Disney. Gibson Dunn & Crutcher LLP represented RedBird Capital. Boies Schiller Flexner LLP advised the Yankees in connection with U.S. Department of Justice approval of the deal.

2. Amazon Lands Movie, TV Giant **MGM Studios** in $8.45B Deal

Amazon on Wednesday morning unveiled its $8.45 billion play for **MGM Studios** in a deal that adds more than 4,000 films and 17,000 TV shows to the streaming giant's catalog.

Under the terms of the transaction, Metro-Goldwyn-Mayer **Studios** Inc., or **MGM**, will be integrated into Amazon Studios, which has historically focused on making television shows. The acquisition serves to significantly expand the Amazon Studios portfolio through the addition of everything from the James Bond and "Rocky" movies to "The Silence of the Lambs" and "Legally Blonde," as well as TV shows like "Fargo" and "The Handmaid's Tale."

Amazon's Top Deals Show Urge For Multi-Industry Domination

Amazon was advised by Cravath Swaine & Moore LLP, and MGM was represented by Paul Weiss Rifkind Wharton & Garrison LLP and Latham & Watkins LLP.

Cleary Gottlieb Steen & Hamilton LLP is representing Anchorage Capital Group, a principal stockholder of **MGM Studios**. Paul Hastings LLP is advising Morgan Stanley and Lion Tree LLC as financial advisers to MGM.

1. Amazon Enters Grocery Realm With $13.7B Whole Foods Buy

Amazon made a massive push to broaden its offerings with the $13.7 billion **purchase** of grocery retailer Whole Foods Market Inc., a deal that was announced in June 2017 and built by six law firms, counting those that counseled the lenders and financial advisers involved.

Perhaps it's fitting that a grocery store chain is the largest acquisition in Amazon history. At the time of the merger, the companies said Whole Foods would continue to operate its stores under the same brands and continue to source from its "trusted vendors and partners."

The $42 per share transaction faced pushback, including from politicians and While Foods investors. By August 2017, however, the Federal Trade Commission had signaled support for the **sale**, and the companies were able to close the deal that month.

Amazon was advised in the deal by Sullivan & Cromwell LLP, with Covington & Burling LLP advising on antitrust matters. Weil Gotshal & Manges LLP advised Goldman Sachs and Bank of America Merrill Lynch, which provided bridge financing for the deal. Paul Hastings LLP advised Goldman Sachs as financial adviser to Amazon. Wachtell Lipton Rosen & Katz represented Whole Foods, and Latham & Watkins LLP advised Evercore as financial adviser to Whole Foods.

--Additional reporting by Matthew Perlman. Editing by Breda Lund and Jill Coffey.

---

**End of Document**

## Is MGM Film Chief Mike De Luca Primed for Big Amazon Gig?

Variety

May 26, 2021

Copyright 2021 Penske Media Corporation All Rights Reserved



**Length:** 1169 words

## Body

Michael De Luca may be the big winner from Wednesday's blockbuster news that Amazon will purchase Metro-Goldwyn-Mayer for $8.45 billion.

Though insiders caution that no decisions have been made, there is speculation around Hollywood that De Luca will play a major role in helping the e-commerce giant monetize its new library of 4,000 MGM film titles. It's an arsenal of intellectual property that includes "Robocop," "The Silence of the Lambs," "Rocky," and, of course, James Bond. That list of heavy-hitting films and franchises is one that De Luca, who has held top jobs at New Line and Sony, may be best positioned to exploit.

As a producer, De Luca has shown a deft hand at juggling prestige fare such as "The Social Network" and "Captain Phillips" along with more broadly commercial offerings such as the "Fifty Shades of Grey" films - a sweet spot Amazon has been trying to reach in recent years.

Under Amazon Studios chief Jennifer Salke, the unit has moved away from indie features like "Manchester by the Sea" and "Weiner-Dog" to more populist movies such as the recently released "Borat 2," the Michael B. Jordan thriller "Without Remorse" and "Coming 2 America." Although it has had some success with these movies, they are primarily acquisitions, which landed at Amazon in the height of the pandemic when companies like Paramount and Universal couldn't secure wide theatrical releases for their films. What Amazon has been less successful at doing is producing its own movies in-house, though the studio does have a handful of promising projects such as Aaron Sorkin's "Being the Ricardos" and George Clooney's "The Tender Bar" in the works.

MGM is expected to operate as a standalone brand within the Amazon portfolio, similar to how the company has handled previous acquisitions such as Wondery or Twitch. Some insiders believe that MGM will become the primary funnel for film content, leaving Amazon Studios's film division, which is run by Julie Rapaport and Matt Newman, to handle smaller-scale, straight-to-streaming content. Neither Rapaport nor Newman have De Luca's deep relationships with the creative community or track record of producing hits.

De Luca is 16 months into a three-year contract, sources said. It's possible that he will take a payout and move on, but he was involved in negotiations to sell the company, which could indicate he'd like to play a larger role. If he does, he will probably bring along Pamela Abdy, the former Makeready and New Regency executive, that he hired in 2020 to run MGM's motion picture division.

Insiders familiar with both MGM and Amazon speculated that De Luca could foreseeably be named head of original films across both Amazon Studios and MGM - though they struggled to imagine De Luca reporting to Salke or

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 20-17 Filed 12/04/23   Page 144 of 214   PageID 8598
Exhibit Exhibit 7   Page 50 of 52   Page 2 of 3

Is MGM Film Chief Mike De Luca Primed for Big Amazon Gig?

sharing a title. Salke was said to be involved in the deal from the beginning, according to two sources, who added she enjoys a close relationship with Bond rights holder Barbara Broccoli. She is also seen as close counsel to Jeff Blackburn, Amazon's senior vice president of global media and entertainment, and outgoing CEO Jeff Bezos.

Amazon Studios and MGM declined to comment on this story. Insiders at both companies said discussions around structure have not yet begun, and the deal will take months to pass regulators.

"Mike could easily go back to producing, make more money, and wait for something big to open up," said one top media executive. "But he's a 'get,' and this could be a big opportunity for him."

So far, most Amazon employees are left with more questions than answers about the deal. At a town hall on Wednesday with all of Amazon Studios' employees, staffers were informed that they should operate as if it were "business as usual." The 20-minute presentation was led by Amazon Studios Chief Operating Officer Albert Cheng, Salke, and Mike Hopkins, the senior vice president of Prime Video and Amazon Studios who negotiated much of the deal. After showing a sizzle reel full of MGM hits like "Rocky" and "The Silence of the Lambs," Salke and Hopkins talked up the pact, saying it represented "another big step [by Amazon] into the content space." They added that roles for the MGM executives have not been decided. Sentiments were the same at an MGM town hall the same day.

Both De Luca and Abdy are credited with nailing down deals for some high-profile upcoming films, including Paul Thomas Anderson's next project, a Thomas Kail-directed remake of "Fiddler on the Roof," and "Project Hail Mary," an adaptation of "Martian" author Andy Weir's novel of the same name that's set to star Ryan Gosling and be directed by Phil Lord and Chris Miller.

Those upcoming titles also raise important questions about theatrical distribution. MGM's films are put out through United Artists Releasing, a joint venture formed in 2019 with Megan Ellison's Annapurna Pictures.

While the JV was set to expire in 2021, Variety reported last month that MGM extended their participation for a full year in the interest of simplicity as it sought this exact billion-dollar sale. Though insiders at the company, led by CEO Pam Kunath, are said to be fearful for their jobs, many in the industry expect UAR to ride out 2021 and release films like 'House of Gucci" and "No Time to Die" theatrically. It is Amazon's interest in owning a distribution engine going forward that will determine their fate. At least some MGM films will bow in cinemas even after the deal closes. Broccoli and her half-brother Michael G. Wilson released a statement saying that they "...are committed to continuing to make James Bond films for the worldwide theatrical audience," a sign that 007 won't be premiering on Amazon Prime anytime soon.

As it stands, MGM owns a 2/3 stake in United Artists Releasing, sources said, a position previously held by Annapurna (which has not released a movie in nearly two years). The company was structured as a profit driver, as overhead costs for staff and P&A are covered by distribution fees and the profits are circulated back into UAR.

"UAR could easily be dissolved in 2022," said one well-placed individual, "but look at the staff over there and MGM. Apples to apples, they're better marketers."

The source cast doubts on the effectiveness of Amazon's theatrical marketing team, who recently launched expensive campaigns for "Borat 2" and "Coming 2 America." Executives like MGM's Stephen Bruno (a Netflix alum) and UAR's Gerry Rich are seen as savvier than the streaming giant's existing team. Erik Lomis, UAR's head of distribution and an industry veteran with stints at the Weinstein Company, could prove to be of great use to Amazon should they invest in wide global releases.

United Artists Releasing declined to comment on the matter.

More from Variety

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 23-7   Filed 12/04/23   Page 145 of 214   PageID 8599
Exhibit Exhibit 6 Pg 2 of 3   Page 2 of 3

Is MGM Film Chief Mike De Luca Primed for Big Amazon Gig?

Jeff Bezos on MGM Acquisition: Amazon Will 'Reimagine' Studio Franchises 'for the 21st Century' James Bond Franchise Will Get 'Worldwide Theatrical Release,' Say Barbara Broccoli and Michael G. Wilson (EXCLUSIVE) Amazon Buys MGM, Studio Behind James Bond, for $8.45 Billion

**Load-Date:** May 26, 2021

---

End of Document

# James Bond, Meet Jeff Bezos: Amazon Makes $8.45 Billion Deal for MGM

The New York Times

May 26, 2021 Wednesday 18:05 EST

Copyright 2021 The New York Times Company All Rights Reserved

**Section:** BUSINESS

**Length:** 1934 words

**Byline:** Brooks Barnes, Nicole Sperling and Karen Weise
**Highlight:** Metro-Goldwyn-Mayer, while diminished, commanded a premium price, with Amazon seeking to bolster its crucial Prime membership offering.

## Body

Metro-Goldwyn-Mayer, while diminished, commanded a premium price, with Amazon seeking to bolster its crucial Prime membership offering.

LOS ANGELES — In the ultimate symbol of one Hollywood era ending and another beginning, Metro-Goldwyn-Mayer, home to James Bond, "Thelma &amp; Louise" and Rocky, finally found a buyer willing to pay retail: Amazon.

The e-commerce giant said on Wednesday that it would acquire the 97-year-old film and television studio for $8.45 billion — or about 40 percent more than other prospective buyers, including Apple and Comcast, thought MGM was worth. The studio, which had been shopped around for months, was once home to "more stars than the heavens," as Louis B. Mayer liked to brag. But its vast production lot and pre-1986 film library were sold off decades ago. (Sony Pictures now occupies the lot, and Warner Bros. owns classic MGM films like "Singin' in the Rain," "The Wizard of Oz" and "Gone With the Wind.")

MGM does come with one Hollywood crown jewel: James Bond. The spy franchise, which started in 1962 with "Dr. No," will help Amazon compete in the white-hot streaming wars. With Disney+ coming on strong and HBO Max, Apple TV+ and Paramount+ determined to make inroads, the original streaming disrupters — Netflix and Amazon Prime Video — are leaning harder on movies with broad appeal to keep growing, particularly overseas.

But even 007 has an asterisk. Amazon will own only 50 percent of Bond. The balance is held by Barbara Broccoli and her brother, Michael G. Wilson. The siblings also have ironclad creative control, deciding when to make a new Bond film, who should play the title role and whether remakes and television spinoffs get made. (They have blocked such efforts in the past.)

The 25th installment in the Bond series, "No Time to Die," is scheduled for pandemic-delayed release in theaters on Oct. 8, with Universal Pictures handling overseas distribution. Beyond that, the franchise's theatrical future is unclear. Amazon has released movies in theaters in the past, but lately has preferred to put them directly on its Prime Video service. The title role is also expected to be recast; Daniel Craig has played Bond for 15 years.

"We are committed to continuing to make James Bond films for the worldwide theatrical audience," Ms. Broccoli and Mr. Wilson said in a statement.

So why did Amazon pay such a startling premium?

For starters, it can. The company has $71 billion in cash and a market capitalization of $1.64 trillion.

But Jeff Bezos, Amazon's founder and chief executive, is known as a conservative buyer. The **purchase** of Whole Foods for $13.4 billion in 2017 was the biggest acquisition in Amazon's history. Its next-largest deals — until MGM — were for Zappos ($1.2 billion, 2009) and the smart-doorbell company Ring ($1.2 billion, 2018).

The Whole Foods deal was a major strategic change for the company, pushing it into new markets of groceries and physical stores, which it had largely avoided. MGM is more about augmenting a current strategy: Amazon most likely paid more than others thought MGM was worth because of its all-important Prime membership program.

"If you're Amazon, the perspective is what's the potential for Prime membership, what is the potential for advertising," said Brian Yarbrough, a senior analyst at Edward Jones.

In addition to paying Amazon $119 a year or $13 a month for free shipping and other perks — notably access to the Prime Video streaming service — households with Prime memberships typically spend $3,000 a year on Amazon. That is more than twice what households without the membership spend, according to Morgan Stanley. About 200 million people pay for Prime memberships.

"As Prime Video turns 10, over 175 million Prime members have streamed shows and movies in the past year, and streaming hours are up more than 70 percent year over year," Mr. Bezos said last month when Amazon reported quarterly earnings.

In buying MGM, Amazon is bolstering Prime Video at a time when the biggest old-line studios are becoming less willing to license their libraries to outside streaming services; Warner Bros., Walt Disney Studios and Paramount Pictures must now supply corporate siblings like HBO Max, Disney+ and Paramount+.

That shift has made independent film libraries more valuable. In recent weeks, Sony Pictures licensed its old films and TV shows to Netflix and Disney in deals valued at more than $3 billion, a sharp increase from the expiring licensing agreements. Sony does not have a streaming service, unless you count the game-oriented PlayStation Network.

The Amazon deal could emerge as a pivotal moment in the convergence of Big Tech and the entertainment industry. Instead of acquiring old-line studios, internet companies have grown under their own steam in Hollywood — until now. Apple has flirted with such **purchases** in the past.

Sony has repeatedly insisted that its movie and television studio, valued at roughly $30 billion, is not for **sale**. Other big film libraries are owned by NBCUniversal, which is part of Comcast, and ViacomCBS.

"The acquisition thesis here is very simple," Mr. Bezos said during Amazon's annual shareholder meeting on Wednesday. He said MGM had a "vast, deep catalog of much beloved" movies and shows. "We can reimagine and redevelop that I.P. for the 21st century." He said that work would be fun and "people who love stories will be the big beneficiaries."

Although its library is diminished, MGM still owns 4,000 older movies, including pre-1986 films that come from two MGM divisions, United Artists and Orion. Those movies include "Rocky," "RoboCop," "The Pink Panther," "The Silence of the Lambs" and the James Bond catalog. Other titles include "Legally Blonde," "Moonstruck," "Basic Instinct," "The Thomas Crown Affair" and "Tomb Raider." (Fun fact: In true Hollywood fashion, MGM's roaring lion mascot is lip-syncing; a cranky tiger sounded more ferocious.)

"MGM didn't have the resources to build and create off the catalog," said Rich Greenfield, a founder of the Lightshed Partners media research firm. "Amazon does, and the opportunity to exploit the MGM catalog is incredible."

In addition, MGM has several movies in its pipeline that could be Oscar contenders, including "Respect," an Aretha Franklin biopic starring Jennifer Hudson; Ridley Scott's "House of Gucci," starring Lady Gaga and Adam Driver; and Paul Thomas Anderson's latest project, which stars Bradley Cooper in his first film since "A Star Is Born."

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 11-17   Filed 12/07/23   Page 148 of 214   PageID 8602
Exhibit Exhibit 76-7   Page 1149 of 214   Page 31 of 4
James Bond, Meet Jeff Bezos: Amazon Makes $8.45 Billion Deal for MGM

Completion of the deal is subject to regulatory approval. On Wednesday, Representative Ken Buck, Republican of Colorado and a senior member of the House antitrust subcommittee, said in a statement that he was "deeply concerned" by the acquisition and noted Amazon's pandemic-fueled growth spurt.

"It's critical that mergers and acquisitions involving monopoly companies experiencing tremendous and exponential growth are met with a greater level of scrutiny," Mr. Buck said. Amazon's revenue for the first quarter of 2021 increased 44 percent to $108.5 billion, the company's fastest rise in almost 10 years.

Amazon's entertainment strategy has evolved as streaming services have proliferated. Indie films like "Manchester by the Sea" and unconventional series like "The Marvelous Mrs. Maisel" and "Transparent" gave Amazon a foothold in Hollywood; domination will require a steady supply of hits that appeal to wide audiences.

Amazon's appetite for movies became ravenous during the pandemic. It paid $125 million for the rights to "Coming 2 America," $80 million for "Borat Subsequent Moviefilm" and $200 million for "The Tomorrow War," a Chris Pratt adventure that will arrive on Prime on July 2. Amazon also has Oscar ambitions, buying the rights to "Sound of Metal," which was nominated for best picture and other top awards at this year's ceremony and won the Oscars for sound and editing.

The problem: Amazon Studios has had limited bandwidth, most of which is tied up with television series — including a coming "Lord of the Rings" adaptation that is believed to be the most expensive show ever made, with a one-season budget of $465 million.

MGM managers could help. Michael De Luca, MGM's movie chairman, has a track record that includes, at various companies, the "Rush Hour," "Austin Powers" and "Fifty Shades of Grey" franchises. When it comes to making its own hit films, Amazon has long struggled. In one debacle from 2015, Amazon spent lavishly to bring Woody Allen into its fold and later terminated the contract, prompting lawsuits.

MGM also has a 17,000-episode television library and a TV studio that makes "Vikings," "The Handmaid's Tale," "Fargo" and various "Real Housewives" shows. In 2014, MGM acquired Mark Burnett's production company, One Three Media, which holds rights to competition series like "The Voice." Mr. Burnett, a contentious figure in Hollywood because he helped shape Donald J. Trump's image with "The Apprentice" and remained close to him during his divisive presidential term, serves as MGM's television chairman.

MGM, which bought out Mr. Burnett's company in 2015, owns the entirety of "The Apprentice," both the aired shows and unaired footage, which some have claimed contains unflattering footage of Mr. Trump.

Anchorage Capital, a New York investment firm, has been the majority owner of MGM for more than a decade. Before that, MGM was tossed between owners. Bitten by falling DVD revenue, the studio eventually filed for bankruptcy to eliminate about $4 billion in debt. It was worth about $2 billion in 2010, according to analysts.

Kevin Ulrich, Anchorage's chief executive and MGM's chairman, formally put the studio on the block late last year. Anchorage has been under pressure from various stakeholders to exit the investment, with some agitators complaining that Mr. Ulrich was overly enamored with Hollywood and should have sold years ago.

The end of MGM as a stand-alone company adds to a vast reshaping of the media business as the big seek to compete by getting even bigger. Last week, AT&amp;T announced a deal to spin off its WarnerMedia group and combine it with Discovery Inc., a move meant to strengthen WarnerMedia's struggling HBO Max streaming service and a nascent streaming platform owned by Discovery. In a counterattack against the tech companies that have aggressively moved into Hollywood over the last decade, Disney paid $71.3 billion for the bulk of Rupert Murdoch's entertainment assets in 2019.

Such megadeals have left smaller **studios** like **MGM**, Lionsgate and STX Entertainment looking for lifelines. (STX, known for comedies like "Hustlers" and "Bad Moms," merged with the Bollywood studio Eros International last summer.)

Some of the first conversations between Amazon and MGM began in March 2020, when Mike Hopkins, Amazon's newly installed head of video, had a series of talks with Mr. Ulrich. But Amazon did not formally begin acquisition talks — largely negotiated remotely, as so many deals have been during the pandemic — until about two months ago.

"The opportunity to align MGM's storied history with Amazon is an inspiring combination," Mr. Ulrich said in a statement. "I'm very proud that MGM's lion, which has long evoked the Golden Age of Hollywood, will continue its storied history."

Michael J. de la Merced contributed reporting.

PHOTOS: The 25th James Bond film, "No Time to Die," is set for release in theaters on Oct. 8. Amazon would own 50 percent of the Bond franchise. Left, Jennifer Hudson plays Aretha Franklin in "Respect," an MGM film generating buzz. (PHOTOGRAPHS BY MLADEN ANTONOV/AGENCE FRANCE-PRESSE — GETTY IMAGES; QUANTRELL D. COLBERT/MGM) (B6)

**Load-Date:** November 13, 2021

---

End of Document

# Why Amazon just spent more than $8 billion on MGM

CNN Wire

May 26, 2021 Wednesday 4:53 PM GMT

Copyright 2021 Cable News Network All Rights Reserved

**Length:** 965 words

**Byline:** By Frank Pallotta, CNN Business

**Dateline:** (CNN)

## Body

MGM, a classic Hollywood brand synonymous with "The Wizard of Oz" and Leo the roaring lion, was purchased for $8.45 billion on Wednesday by Amazon, a company currently valued at nearly $1.7 trillion. Being gobbled up by a tech behemoth is a fitting finale for a studio that has been whittled down over the last century by one technology disruption after another.

"MGM is really the story of Hollywood," Jonathan Kuntz, a film professor at UCLA School of Theater, Film and TV, told CNN Business. "The studio has gone through all of the cycles of the film business over the last 100 years."

"In many ways, MGM is the idea of the classic Hollywood studio," he said. "And it tried to preserve that idea long after it was no longer a viable business strategy."

Here's a brief history of MGM, and why Amazon was likely so interested in buying it:

"More stars than in the heavens"

As Hollywood changes, much of it stays the same. Case in point: MGM started nearly a century ago with a merger.

In 1924, Marcus Loew, a theater mogul, brought together Metro Pictures and Goldwyn Pictures, as well as Louis B. Mayer Productions, to form Metro-Goldwyn-Mayer.

Hollywood, as they say, would never be the same.

The studio exemplified Hollywood's golden age. This period planted the seeds of what would become modern-day Hollywood and produced many films that would help define cinema: "The Wizard of Oz," "Singin' In The Rain" and "Ben Hur," which won 11 Academy Awards. It was far and away one of the most successful studios of Hollywood's early days.

"At one time, MGM was the most prestigious studio in Hollywood," Leonard Maltin, a film critic and historian, told CNN Business. "It had a glory period that ran for decades."

Since MGM was a big part of the studio system, which held actors under contract at different studios, it also helped to create some of Hollywood's most glamorous stars, such as Greta Garbo, Clark Gable and Joan Crawford.

"It was said of MGM that they had more stars than in the heavens," Maltin added.

But as Hollywood changed with the advent of TV, MGM was "one of the most reluctant to change," Kuntz pointed out.

008943

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 28-67 ed 12/04/23 37 Page 151 of 214    Page 9 8605
Why Amazon just spent more than $8 billion on MGM

"MGM tried to preserve the old ways of Hollywood," he said. "You might say it was in first place during the classic era of Hollywood and has been arguably in last place during the modern era of Hollywood."

Kerkorian, Turner and UA

Much like the present moment, the late 1960s were a turbulent time for Hollywood. The rise of television and the changing tastes of audiences disrupted the business of Hollywood, undercutting the bottom line at the box office.

MGM, like other studios, was not immune to the changing times and struggled to adapt.

In 1969, Kirk Kerkorian, a business magnate, took control of MGM and used the brand's prestige to build hotels like the MGM Grand hotel rather than focusing on the studio itself. The studio, in the meantime, faded from what it once was.

This was the "beginning of a 35-year period when Kerkorian would buy and sell MGM three times," according to Tino Balio, professor emeritus of communication arts at UW-Madison, who also authored a book about MGM.

At the studio, Kerkorian put James Aubrey Jr. in charge of MGM, who used "draconian methods" to cut costs, Balio said.

Ultimately, MGM became a shell of its former self in the 1970s, but was somewhat bolstered by acquiring United Artists in 1981. UA was known for hit brands like James Bond. However, it wasn't long before MGM was a part of yet another deal.

Ted Turner, the businessman who founded CNN, bought the newly formed MGM/UA Entertainment Co. in 1986. Turner wanted to use the the studio's extensive library to show its films on his cable networks. Amazon bought MGM for its library, too, but instead of cable it's for streaming via Amazon Prime Video.

The new merged studio produced some hits over the years, but was bought and sold repeatedly as the years went on. Turner eventually returned portions of MGM to Kerkorian but kept MGM's film catalog prior to 1986. That included some of MGM's most classic films like "The Wizard of Oz."

"MGM was very much left behind in the 1990s when other studios were bulking up and becoming global companies," Kuntz noted.

MGM eventually was repurchased by Kerkorian in 1996. It bought up film libraries from different studios like Orion Pictures, which led to "the world's largest film vault," according to Balio.

Amazon

Kerkorian sold MGM for the final time in 2005 to a group of investors led by Sony. Balio said Sony wanted "MGM's library of 4,000 films to help its Blu-ray technology win the DVD high definition format war."

The studio eventually filed for bankruptcy in 2010 and focused more on its home entertainment and its TV offerings than its film slate.

However, MGM's movies still mattered because of James Bond - one of the most successful and popular franchises in movie history.

"James Bond is really the one film franchise left out there," Kuntz said. "Everything else has been bought up."

And that leads to Amazon.

Amazon is investing even more heavily in growing its position in the entertainment world and MGM helps facilitate that thanks to its library.

Why Amazon just spent more than $8 billion on MGM

Beyond Bond, MGM also houses franchises including "The Handmaid's Tale," "RoboCop," "Legally Blonde" and the Epix TV network, which MGM took sole ownership of in 2017.

Amazon's purchase of MGM also marks the latest salvo in the streaming wars, amid other deals - from Disney's acquisition of Fox's entertainment assets to the pending deal to combine CNN parent WarnerMedia and Discovery - as companies bulk up.

Yet, for MGM, Amazon is just the latest example of the studio being tossed around in another Hollywood sea change.

By Frank Pallotta, CNN Business

TM & © 2021 Cable News Network, Inc., a Time Warner Company. All rights reserved.

**Load-Date:** May 30, 2021

---

**End of Document**

# Amazon and MGM form $9B 'Bond'

Daily News (New York)

May 27, 2021 Thursday

1STAR Edition

Copyright 2021 Daily News, L.P. All Rights Reserved

**Section:** NEWS; CS; Pg. 3

**Length:** 331 words

**Byline:** Kate Feldman New York Daily News

## Body

The name's Bezos ... Jeff Bezos.

The magnate just ponied up almost $9 billion for a full film library that includes the James Bond (inset) franchise, "Rocky," "RoboCop" and a lot more.

Amazon, founded by Bezos, will acquire MGM Studios for $8.45 billion, the company announced Wednesday, in a move that Amazon says will "preserve MGM's heritage and catalog of films" and allow the studio to "continue to do what they do best: great storytelling."

Metro-Goldwyn-Mayer's expansive library also includes "The Pink Panther," "Singin' in the Rain," "The Wizard of Oz," "West Side Story," "The Silence of the Lambs" and "Legally Blonde," as well as TV shows such as "Stargate SG-1," "Vikings," "Fargo," "The Handmaid's Tale," "The Voice," "Survivor" and "Shark Tank."

"The real financial value behind this deal is the treasure trove of [intellectual property] in the deep catalog that we plan to reimagine and develop together with MGM's talented team," Mike Hopkins, senior vice president of Prime Video and Amazon Studios, said.

"It's very exciting and provides so many opportunities for high-quality storytelling."

The sale comes amid a reshuffling of the streaming service marketplace, as AT&T announced this month it will spin off WarnerMedia and combine it with Discovery, creating a joint company with a catalog of more than 200,000 hours of programming including HBO, Warner Bros. Studios, CNN, HGTV, Oprah Winfrey's OWN, the Food Network, Animal Planet, TBS and TNT.

This marks Amazon's second-biggest purchase, behind the $13.7 billion price tag of Whole Foods in 2017.

In the race to keep up with Netflix, Amazon boasts perennial Emmy favorite "The Marvelous Mrs. Maisel" and 2021 hopeful "The Underground Railroad" from director Barry Jenkins, as well as the upcoming "Lord of the Rings" series, which is expected to cost $465 million for its first season alone. On the movie side, "Sound of Metal," "One Night in Miami" and "Borat Subsequent Moviefilm" all earned Oscar nominations this year.

**Load-Date:** May 27, 2021

# Amazon Roars With MGM Deal

The New York Times

May 27, 2021 Thursday

Late Edition - Final

Copyright 2021 The New York Times Company

**Section:** Section B; Column 0; Business/Financial Desk; Pg. 1

**Length:** 1909 words

**Byline:** By Brooks Barnes, Nicole Sperling and Karen Weise

## Body

Metro-Goldwyn-Mayer, while diminished, commanded a premium price, with Amazon seeking to bolster its crucial Prime membership offering.

LOS ANGELES -- In the ultimate symbol of one Hollywood era ending and another beginning, Metro-Goldwyn-Mayer, home to James Bond, ''Thelma & Louise'' and Rocky, finally found a buyer willing to pay retail: Amazon.

The e-commerce giant said on Wednesday that it would acquire the 97-year-old film and television studio for $8.45 billion -- or about 40 percent more than other prospective buyers, including Apple and Comcast, thought MGM was worth. The studio, which had been shopped around for months, was once home to ''more stars than the heavens,'' as Louis B. Mayer liked to brag. But its vast production lot and pre-1986 film library were sold off decades ago. (Sony Pictures now occupies the lot, and Warner Bros. owns classic MGM films like ''Singin' in the Rain,'' ''The Wizard of Oz'' and ''Gone With the Wind.'')

MGM does come with one Hollywood crown jewel: James Bond. The spy franchise, which started in 1962 with ''Dr. No,'' will help Amazon compete in the white-hot streaming wars. With Disney+ coming on strong and HBO Max, Apple TV+ and Paramount+ determined to make inroads, the original streaming disrupters -- Netflix and Amazon Prime Video -- are leaning harder on movies with broad appeal to keep growing, particularly overseas.

But even 007 has an asterisk. Amazon will own only 50 percent of Bond. The balance is held by Barbara Broccoli and her brother, Michael G. Wilson. The siblings also have ironclad creative control, deciding when to make a new Bond film, who should play the title role and whether remakes and television spinoffs get made. (They have blocked such efforts in the past.)

The 25th installment in the Bond series, ''No Time to Die,'' is scheduled for pandemic-delayed release in theaters on Oct. 8, with Universal Pictures handling overseas distribution. Beyond that, the franchise's theatrical future is unclear. Amazon has released movies in theaters in the past, but lately has preferred to put them directly on its Prime Video service. The title role is also expected to be recast; Daniel Craig has played Bond for 15 years.

''We are committed to continuing to make James Bond films for the worldwide theatrical audience,'' Ms. Broccoli and Mr. Wilson said in a statement.

So why did Amazon pay such a startling premium?

For starters, it can. The company has $71 billion in cash and a market capitalization of $1.64 trillion.

008947

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Exhibit Exhibit 61-73 Page 155 of 214   Page 96 of 4
Case 3:23-cv-02071-E   Document 21-1   Filed 12/05/23   Page 155 of 214   PageID 8609

Amazon Roars With MGM Deal

But Jeff Bezos, Amazon's founder and chief executive, is known as a conservative buyer. The purchase of Whole Foods for $13.4 billion in 2017 was the biggest acquisition in Amazon's history. Its next-largest deals -- until MGM -- were for Zappos ($1.2 billion, 2009) and the smart-doorbell company Ring ($1.2 billion, 2018).

The Whole Foods deal was a major strategic change for the company, pushing it into new markets of groceries and physical stores, which it had largely avoided. MGM is more about augmenting a current strategy: Amazon most likely paid more than others thought MGM was worth because of its all-important Prime membership program.

"If you're Amazon, the perspective is what's the potential for Prime membership, what is the potential for advertising," said Brian Yarbrough, a senior analyst at Edward Jones.

In addition to paying Amazon $119 a year or $13 a month for free shipping and other perks -- notably access to the Prime Video streaming service -- households with Prime memberships typically spend $3,000 a year on Amazon. That is more than twice what households without the membership spend, according to Morgan Stanley. About 200 million people pay for Prime memberships.

"As Prime Video turns 10, over 175 million Prime members have streamed shows and movies in the past year, and streaming hours are up more than 70 percent year over year," Mr. Bezos said last month when Amazon reported quarterly earnings.

In buying MGM, Amazon is bolstering Prime Video at a time when the biggest old-line studios are becoming less willing to license their libraries to outside streaming services; Warner Bros., Walt Disney Studios and Paramount Pictures must now supply corporate siblings like HBO Max, Disney+ and Paramount+.

That shift has made independent film libraries more valuable. In recent weeks, Sony Pictures licensed its old films and TV shows to Netflix and Disney in deals valued at more than $3 billion, a sharp increase from the expiring licensing agreements. Sony does not have a streaming service, unless you count the game-oriented PlayStation Network.

The Amazon deal could emerge as a pivotal moment in the convergence of Big Tech and the entertainment industry. Instead of acquiring old-line studios, internet companies have grown under their own steam in Hollywood -- until now. Apple has flirted with such purchases in the past.

Sony has repeatedly insisted that its movie and television studio, valued at roughly $30 billion, is not for sale. Other big film libraries are owned by NBCUniversal, which is part of Comcast, and ViacomCBS.

"The acquisition thesis here is very simple," Mr. Bezos said during Amazon's annual shareholder meeting on Wednesday. He said MGM had a "vast, deep catalog of much beloved" movies and shows. "We can reimagine and redevelop that I.P. for the 21st century." He said that work would be fun and "people who love stories will be the big beneficiaries."

Although its library is diminished, MGM still owns 4,000 older movies, including pre-1986 films that come from two MGM divisions, United Artists and Orion. Those movies include "Rocky," "RoboCop," "The Pink Panther," "The Silence of the Lambs" and the James Bond catalog. Other titles include "Legally Blonde," "Moonstruck," "Basic Instinct," "The Thomas Crown Affair" and "Tomb Raider." (Fun fact: In true Hollywood fashion, MGM's roaring lion mascot is lip-syncing; a cranky tiger sounded more ferocious.)

"MGM didn't have the resources to build and create off the catalog," said Rich Greenfield, a founder of the Lightshed Partners media research firm. "Amazon does, and the opportunity to exploit the MGM catalog is incredible."

In addition, MGM has several movies in its pipeline that could be Oscar contenders, including "Respect," an Aretha Franklin biopic starring Jennifer Hudson; Ridley Scott's "House of Gucci," starring Lady Gaga and Adam Driver; and Paul Thomas Anderson's latest project, which stars Bradley Cooper in his first film since "A Star Is Born."

Amazon Roars With MGM Deal

Completion of the deal is subject to regulatory approval. On Wednesday, Representative Ken Buck, Republican of Colorado and a senior member of the House antitrust subcommittee, said in a statement that he was "deeply concerned'' by the acquisition and noted Amazon's pandemic-fueled growth spurt.

"It's critical that mergers and acquisitions involving monopoly companies experiencing tremendous and exponential growth are met with a greater level of scrutiny,'' Mr. Buck said. Amazon's revenue for the first quarter of 2021 increased 44 percent to $108.5 billion, the company's fastest rise in almost 10 years.

Amazon's entertainment strategy has evolved as streaming services have proliferated. Indie films like "Manchester by the Sea'' and unconventional series like "The Marvelous Mrs. Maisel" and "Transparent'' gave Amazon a foothold in Hollywood; domination will require a steady supply of hits that appeal to wide audiences.

Amazon's appetite for movies became ravenous during the pandemic. It paid $125 million for the rights to "Coming 2 America,'' $80 million for "Borat Subsequent Moviefilm'' and $200 million for "The Tomorrow War,'' a Chris Pratt adventure that will arrive on Prime on July 2. Amazon also has Oscar ambitions, buying the rights to "Sound of Metal,'' which was nominated for best picture and other top awards at this year's ceremony and won the Oscars for sound and editing.

The problem: Amazon Studios has had limited bandwidth, most of which is tied up with television series -- including a coming "Lord of the Rings'' adaptation that is believed to be the most expensive show ever made, with a one-season budget of $465 million.

MGM managers could help. Michael De Luca, MGM's movie chairman, has a track record that includes, at various companies, the "Rush Hour,'' "Austin Powers'' and "Fifty Shades of Grey'' franchises. When it comes to making its own hit films, Amazon has long struggled. In one debacle from 2015, Amazon spent lavishly to bring Woody Allen into its fold and later terminated the contract, prompting lawsuits.

MGM also has a 17,000-episode television library and a TV studio that makes "Vikings,'' "The Handmaid's Tale,'' "Fargo'' and various "Real Housewives'' shows. In 2014, MGM acquired Mark Burnett's production company, One Three Media, which holds rights to competition series like "The Voice.'' Mr. Burnett, a contentious figure in Hollywood because he helped shape Donald J. Trump's image with "The Apprentice'' and remained close to him during his divisive presidential term, serves as MGM's television chairman.

MGM, which bought out Mr. Burnett's company in 2015, owns the entirety of "The Apprentice,'' both the aired shows and unaired footage, which some have claimed contains unflattering footage of Mr. Trump.

Anchorage Capital, a New York investment firm, has been the majority owner of MGM for more than a decade. Before that, MGM was tossed between owners. Bitten by falling DVD revenue, the studio eventually filed for bankruptcy to eliminate about $4 billion in debt. It was worth about $2 billion in 2010, according to analysts.

Kevin Ulrich, Anchorage's chief executive and MGM's chairman, formally put the studio on the block late last year. Anchorage has been under pressure from various stakeholders to exit the investment, with some agitators complaining that Mr. Ulrich was overly enamored with Hollywood and should have sold years ago.

The end of MGM as a stand-alone company adds to a vast reshaping of the media business as the big seek to compete by getting even bigger. Last week, AT&T announced a deal to spin off its WarnerMedia group and combine it with Discovery Inc., a move meant to strengthen WarnerMedia's struggling HBO Max streaming service and a nascent streaming platform owned by Discovery. In a counterattack against the tech companies that have aggressively moved into Hollywood over the last decade, Disney paid $71.3 billion for the bulk of Rupert Murdoch's entertainment assets in 2019.

Such megadeals have left smaller studios like MGM, Lionsgate and STX Entertainment looking for lifelines. (STX, known for comedies like "Hustlers'' and "Bad Moms,'' merged with the Bollywood studio Eros International last summer.)

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document 61-72   Filed 12/04/23   Page 157 of 214   PageID 8611
Page 4 of 4

Amazon Roars With MGM Deal

Some of the first conversations between Amazon and MGM began in March 2020, when Mike Hopkins, Amazon's newly installed head of video, had a series of talks with Mr. Ulrich. But Amazon did not formally begin acquisition talks -- largely negotiated remotely, as so many deals have been during the pandemic -- until about two months ago.

"The opportunity to align MGM's storied history with Amazon is an inspiring combination," Mr. Ulrich said in a statement. "I'm very proud that MGM's lion, which has long evoked the Golden Age of Hollywood, will continue its storied history."

Michael J. de la Merced contributed reporting.


https://www.nytimes.com/2021/05/26/business/amazon-MGM.html


## Graphic


PHOTOS: The 25th James Bond film, "No Time to Die," is set for release in theaters on Oct. 8. Amazon would own 50 percent of the Bond franchise. Left, Jennifer Hudson plays Aretha Franklin in "Respect," an MGM film generating buzz. (PHOTOGRAPHS BY MLADEN ANTONOV/AGENCE FRANCE-PRESSE -- GETTY IMAGES

 QUANTRELL D. COLBERT/MGM) (B6)


**Load-Date:** May 27, 2021

---

**End of Document**

# Sen. Klobuchar wants the Justice Department to investigate Amazon's $8.45 billion MGM purchase over antitrust concerns

Business Insider US

May 27, 2021 Thursday 04:14 PM GMT

Copyright 2021 Insider Inc. All Rights Reserved

## BUSINESS INSIDER

**Length:** 487 words

## Body

- Sen. Klobuchar said the Justice Department "must conduct a thorough investigation" of Amazon's $8.45 billion MGM deal.
- MGM's extensive film library gives Amazon an edge in the crowded streaming market.
- Republicans are also concerned about the deal. Sen. Hawley said the "**sale** should not go through."
- See more stories on Insider's business page.

Democratic Sen. Amy Klobuchar of Minnesota says the US Department of Justice should investigate Amazon's $8.45 billion **purchase** of MGM over antitrust concerns.

"This is a major acquisition that has the potential to impact millions of consumers," she said Thursday. "The Department of Justice must conduct a thorough investigation to ensure that this deal won't risk harming competition."

Spokespersons for both Amazon and the Department of Justice declined to comment.

Klobuchar's call for an investigation comes the day after Amazon announced plans to buy the parent company of MGM Studios, a decades-old studio that is home to some of the world's most popular and beloved films and shows. MGM's extensive library of more than 4,000 films and 17,000 TV shows could give Amazon an edge in its fight to compete with other streaming competitors like Netflix and Disney+.

Concern over Amazon's deal with MGM appears to be a bipartisan issue, with several Republicans also voicing disapproval of the **sale** due to anticompetitive business concerns.

Republican Sen. Josh Hawley of Missouri tweeted on Wednesday that the "**sale** should not go through. @amazon is already a monopoly platform that owns e-commerce, shipping, grocers & the cloud. They shouldn't be permitted to buy anything else. Period."

Republican Congressman Ken Buck of Colorado shared Sen. Hawley's tweet and added the caption, "Agreed."

-Rep. Ken Buck  (@RepKenBuck) May 26, 2021

US lawmakers have focused more intently on Amazon and its big tech peers over antitrust concerns in recent years. Congress questioned Bezos in a July 2020 hearing alongside other tech executives about alleged

Case 19-34054-sgj11   Doc 3818-7   Filed 06/05/23   Entered 06/05/23 22:10:41   Desc
Case 3:23-cv-02071-E   Document Exhibit 61-7ed 12/07/23   Page 2159 of 214   PageID 8613
Sen. Klobuchar wants the Justice Department to investigate Amazon's $8.45 billion MGM purchase over
antitrust concerns

anticompetitive business practices. Officials were particularly focused on Amazon's treatment of its third-party sellers.

*Read more: Amazon takes considerably more money from sellers in fees than Walmart. Third-party users say it's better anyway.*

Scrutiny has only mounted on the company since. Washington DC Attorney General Karl Racine said Tuesday that he is suing Amazon, accusing the firm of abusing its monopoly power to control prices of goods online.

Racine said Amazon creates "an artificially high price floor across the online retail marketplace" by requiring its third-party sellers to agree not to offer their products for a lower price on other websites.

Amazon did not respond to Insider's request for comment in light of Racine's lawsuit, but the company told The Verge that "the DC Attorney General has it exactly backwards - sellers set their own prices for the products they offer in our store."

Read the original article on

**Load-Date:** May 27, 2021

---

End of Document

# MGM Purchase May Just Be the Start of Amazon Gobbling Up Movie Studios

Globest.com (Online)

May 28, 2021 Friday

Copyright 2021 ALM Media Properties, LLC All Rights Reserved Further duplication without permission is prohibited

**Length:** 438 words

# Body

Amazon's $8.45 billion **purchase** of MGM Holdings may only be the beginning, according

to S&P Global Market Intelligence's Katie Arcieri.

Arcieri writes that retail analysts say Amazon could be eyeing other movie studios to further bolster its streaming library. If approved, the deal for MGM Holdings, which operates the studio Metro-Goldwyn-Mayer Inc, would add thousands of TV episodes and movies to Amazon's Prime Video library.

Two other deals

-

the move to combine AT&T Inc.'s Warner Media operations with Discovery and The Walt Disney Co.'s 2019 **purchase** of 21st Century Fox

-

puts pressure on Amazon to aggressively find studios, according to Dan Romanoff, an analyst with Morningstar.

"It wouldn't surprise me at all if they were looking at other properties, other studios as well," Romanoff told Arcieri. "If Amazon wants to remain a relevant player in live streaming video, they have to expand their content library."

Tuna Amobi, media and entertainment analyst with CFRA Research, told Arcieri that Amazon has the financial power to **purchase** other studios, such as Lions Gate Entertainment Corp.

The deal is Amazon's second-largest acquisition behind its 2017 **purchase** of Whole Foods Market for $14.62 billion. Usually, the company looks for smaller deals to bolster its current offerings, according to Romanoff.

Romanoff says content from MGM and future acquisitions would be used to keep its Prime members engaged. Eventually, this content could help the company justify price increases.

If movies are regularly released on streaming services, that could make platforms like Amazon Prime even more attractive to consumers. As movie theaters closed during the pandemic, streaming has gained even more momentum.

Case 19-34054-sgj11    Doc 3818-7    Filed 06/05/23    Entered 06/05/23 22:10:41    Desc
Case 3:23-cv-02071-E    Document 30-37 Filed 12/07/23    Page 161 of 214    PageID 8615
Exhibit Exhibit 7 Page 2 of 2
MGM Purchase May Just Be the Start of Amazon Gobbling Up Movie Studios

Indeed the pandemic clearly changed how we consume content, especially amid the widespread movie theater closures. Whether this will be a permanent trend and how that would affect movie studio real estate was a topic of a CBRE podcast last October.

Victor Coleman, CEO of Hudson Pacific Properties, one of the largest owners of studio and tech space, said last October that there was an open question around how motion picture companies will release content. In the future, Coleman wondered if studios might direct dollars into streaming videos or pay for play.

Hudson Pacific Properties owns an extensive media portfolio in Hollywood, which attracted the attention of Blackstone

during the height of the pandemic last year. The private equity giant agreed to **purchase** a 49% stake in three Hudson studios and five Class A office buildings. Altogether the 2.2 million square feet of real estate was valued at $1.65 billion.

**Load-Date:** May 29, 2021

---

**End of Document**

## Hedge Fund Behind Amazon-MGM Deal Amasses Big Bet on Uranium; Anchorage, best known for selling Hollywood studio MGM to Amazon.com , bought uranium in a bet on higher prices for the nuclear fuel

The Wall Street Journal Online

June 10, 2021

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

**Section:** MARKETS; Commodities

**Length:** 846 words

**Byline:** By Joe Wallace

## Body

The hedge fund behind the Amazon.com Inc .-MGM Holdings Inc. deal has another trade up its sleeve: going big on uranium.

New York hedge fund Anchorage Capital Group LLC has amassed a holding of a few million pounds of uranium, people familiar with the matter say, in a bet that prices of the nuclear fuel will recover after a decade in the doldrums. It is buying and selling uranium alongside mining companies, specialist traders and utility firms with nuclear-power plants, turning the fund into a significant player in the market.

Venturing into the uranium market, which is much smaller than oil or gold markets, is unusual for a firm that typically invests in corporate debt. It is another example of money managers straying into esoteric markets in search of returns after a yearslong run-up in stocks and slide in a bond yields.

Anchorage was recently in the spotlight after scoring about $2 billion in paper profits from Amazon's deal to buy MGM  in May. The hedge fund became MGM's biggest shareholder  after the Hollywood studio emerged from bankruptcy in 2010.

Anchorage's physical uranium holdings are also a rarity because Wall Street firms don't typically own physical uranium. Most investors bet on uranium prices by buying shares of mining firms , or through companies like Yellow Cake PLC ., which acts as an exchange-traded fund.

In the 2000s, investors piled into uranium trades, helping to power a run-up in prices that peaked in 2007 . Most funds exited either during the 2008-09 financial crisis or after Japan's 2011 Fukushima nuclear disaster sapped demand.

Goldman Sachs Group has pared back its uranium trading book and Deutsche Bank AG has quit the market, leaving Macquarie Group Ltd . as the financial institution with the biggest presence.

Hedge Fund Behind Amazon-MGM Deal Amasses Big Bet on Uranium;  Anchorage, best known for selling
Hollywood studio MGM to Amazon.com , bought uranium in a bet on....

The uranium that is usually traded takes the form of U3O8, a lightly processed ore. Prices for U3O8 have sagged since Fukushima knocked demand, leading to a glut that traders say has yet to be whittled down.

The material this week traded at $32.05 a pound, according to UxC LLC, a nuclear-fuel data and research company. Prices reached an all-time high  of $136 a pound in 2007, according to records going back to 1987.

Anchorage is wagering on a reversal. Spearheaded by trader Jason Siegel, the fund began acquiring uranium a few years ago, because its analysis showed most miners were booking losses at prevailing prices, a person familiar with the fund's thinking said. The fund bet that uranium prices would rise to encourage miners to produce enough material.

Mr. Siegel didn't respond to requests seeking comment.

The entry of a financial firm has caused a stir in the uranium market. Anchorage buys and sells infrequently, but in large quantities that put it in the same league as big uranium merchants such as Traxys Group, participants say.

Anchorage hasn't publicly disclosed its interest in the uranium market, the size of its holdings or the terms of any specific transactions. The exact size of Anchorage's position-a topic of speculation in the market-couldn't be learned. The person familiar with the fund's thinking said it owned fewer than five million pounds of uranium. The overall spot market for the nuclear fuel turns over 60 million to 80 million pounds each year, according to UxC.

Due to strict rules about where uranium can be held, trading typically doesn't involve moving the fuel around the world. Firms instead take ownership of U3O8 stored in drums at three processing facilities in France, Canada and the U.S. When they sell, buyers take ownership on the spot. The transactions aren't reported publicly.

Anchorage's wager relies on buying uranium and selling it to utility companies and others at a higher price for delivery several years in the future, in what is known as a carry trade. Doing so could generate annualized returns of roughly 5% for Anchorage, according to people familiar with the matter.

SHARE YOUR THOUGHTS

How do you see the uranium market developing? Join the conversation below.

The hedge fund embeds options into **sale** agreements with utilities and other firms, people familiar with the matter say. This can involve selling fuel to a utility company at a discount in return for the right to deliver more uranium at a set price at a later date.

Anchorage isn't alone in betting that prices are primed to rebound.

Investment firms including Segra Capital Management LLC, Sachem Cove Partners LLC and Azarias Capital Management LP expect that efforts to wean the world off fossil fuels will require new nuclear-power stations, according to executives at the funds. They are seeking to profit by buying shares of uranium miners or firms like Yellow Cake, which is up 31% in London trading over the past year.

Some investors hesitate to own uranium outright because of the perception that it can cause dangerous accidents, according to Joe Kelly, chief executive of brokerage Uranium Markets LLC.

"There's a deterrent that does not exist in other commodities," said Mr. Kelly.

Write to Joe Wallace at Joe.Wallace@wsj.com

Hedge Fund Behind Amazon-MGM Deal Amasses Big Bet on Uranium

008956

Hedge Fund Behind Amazon-MGM Deal Amasses Big Bet on Uranium;  Anchorage, best known for selling
Hollywood studio MGM to Amazon.com , bought uranium in a bet on....

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** September 3, 2021

**End of Document**

## Amazon's Planned Purchase of MGM Faces FTC Scrutiny;  Commission secures antitrust review after talks with Justice Department, and as Amazon critic Lina Khan takes the FTC's helm

The Wall Street Journal Online

June 22, 2021

Copyright 2021 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2021 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

**Section:** TECH; Technology

**Length:** 661 words

**Byline:** By Brent Kendall

## Body

WASHINGTON-The Federal Trade Commission will be the agency to review Amazon.com Inc.'s proposed acquisition of Hollywood **studio MGM**, according to people familiar with the matter, just as the commission gets a new chairwoman who has been critical of the online giant's expansion.

Amazon last month announced its deal for MGM, which would boost its Prime Video streaming platform in a market that includes rivals such as Netflix Inc. and Walt Disney Co. MGM has a library of more than 4,000 films, including the James Bond franchise, and a television catalog that includes "The Handmaid's Tale" and "Vikings."

Companies doing sizable mergers have to submit their deals for government antitrust review. The FTC shares antitrust authority with the Justice Department, and the two agencies split up the work of reviewing proposed deals. The department has recently reviewed transactions involving video content, including Disney's acquisition of 21st Century Fox and AT&T Inc.'s acquisition of Time Warner, a deal the department unsuccessfully attempted to block in court.

During recent interagency negotiations, the FTC secured the right to review the Amazon-MGM deal, the people familiar with the matter said. The FTC pushed for jurisdiction over the merger review because it already has an open, wide-ranging antitrust investigation into Amazon's business practices, the people said.

The FTC and the Justice Department previously agreed to divide up investigations of four leading tech giants' conduct, with the department taking Apple Inc. and Alphabet Inc.'s Google, while the FTC took Facebook Inc. and Amazon.

An Amazon spokesman had no immediate comment. An FTC spokeswoman declined to comment.

Amazon's Planned Purchase of MGM Faces FTC Scrutiny;  Commission secures antitrust review after talks
with Justice Department, and as Amazon critic Lina Khan ta....

The MGM review could present an early test for new FTC Chairwoman Lina Khan, who made her name in antitrust circles in large part by criticizing Amazon. She wrote a widely read law-review article while at Yale Law School that argued U.S. antitrust law has failed to restrain the online retailer.

Ms. Khan more broadly has argued that antitrust enforcement needs far-reaching changes to better restrain dominant companies. She won Senate confirmation last week to be an FTC commissioner, and President Biden then immediately designated her as chairwoman.

Amazon is a growing producer of its own video content and has become an aggressive buyer of sports rights, including those for the National Football League. But it still has a relatively modest library compared with traditional media giants.

MGM is now one of the smaller studios in Hollywood, meaning the tie-up isn't necessarily the kind of transaction that in the past would have raised immediate red flags about anticompetitive concentration. But in light of Amazon's broader marketplace footprint, the addition of MGM could raise concerns about the expansion of the online giant's platform, which critics in Washington already believe is too powerful.

Though the FTC and Justice Department have similar antitrust authority, their procedures are different, and companies generally prefer to have their matters before the department because its process is more straightforward.

If the Justice Department wants to block a merger, it must go to court and win a case. The FTC, by contrast, has the option to challenge a transaction in its own administrative-court proceedings, and can go to federal court concurrently to seek a preliminary injunction blocking a merger while its in-house legal proceedings take place. That two-track process can be more complicated, and companies face high hurdles to winning a case run through the FTC's administrative system.

The FTC in 2017 cleared Amazon's acquisition of Whole Foods Market without giving the deal a lengthy, detailed review. Ms. Khan was among a group of progressives who criticized the transaction and argued that the FTC should block it.

Joe Flint contributed to this article.

Write to Brent Kendall at brent.kendall@wsj.com

Amazon's Planned **Purchase** of MGM Faces FTC Scrutiny

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** June 30, 2021

**End of Document**

008959

# Old Hollywood Collides With Streaming

The New York Times

July 6, 2021 Tuesday

Late Edition - Final

Copyright 2021 The New York Times Company

**Section:** Section B; Column 0; Business/Financial Desk; Pg. 1

**Length:** 1498 words

**Byline:** By Nicole Sperling

## Body

Paul Thomas Anderson and Michael De Luca are film geeks with a shared history. As a studio executive, Mr. De Luca championed Mr. Anderson's "Boogie Nights" and "Magnolia," films that established the director's reputation as a creative force. So when Focus Features said it would postpone the production of Mr. Anderson's new film because of the pandemic, it was Mr. De Luca, in his new role as chairman of MGM's Motion Picture Group, who swooped in and pledged to get the movie into production in Los Angeles when Mr. Anderson wanted to shoot.

And being that the two men can't resist the pull of old Hollywood, Mr. De Luca made sure to amp up the nostalgia associated with his efforts to reinvigorate MGM, the once mighty studio that in recent decades has been reduced to a financial Ping-Pong ball, volleyed back and forth by various investors eager to turn the company's 4,000-film library into a cash cow.

"I said, 'This will be fun. Come make your movie at Metro,'" Mr. De Luca recalled with a laugh, referring to the studio's former moniker of Metro-Goldwyn-Mayer.

Mr. Anderson was game.

"If Mike says something will happen, it happens," he said. "It's hard not to stress how rare of a quality that is."

The question now is, in light of Amazon's decision last month to acquire MGM in an $8.45 billion deal, will Mr. De Luca still be able to keep his promises? Or will he simply be part of a corporate hierarchy less prone to taking chances on films and filmmakers?

In the past 15 months, MGM has experienced a resurgence, led by Mr. De Luca, a one-time brash and reckless young executive who introduced filmmakers like Mr. Anderson and David Fincher to the culture when he was president of production at New Line Cinema, and now, after 36 years in the business, is seen as one of its most reliable statesmen. His deputy, Pamela Abdy, produced "Garden State" when she was at Jersey Films and amplified the career of Alejandro González Iñárritu, among others, during her time as a Paramount executive and later at New Regency.

At MGM, the two have compiled a heady mix of A-list directors and compelling material they hope hearkens back to the days when Fred Astaire and Judy Garland roamed the once-hallowed studio's hallways. The next six months will show if their strategy pays off. Mr. Anderson's movie will debut on Nov. 26. It will follow Ridley Scott's pulpy drama "House of Gucci," starring Lady Gaga and Adam Driver. In December, Joe Wright's musical adaptation of "Cyrano," with Peter Dinklage and featuring music from The National, will be released.

And then there is "No Time to Die," the long-awaited 25th installment of the James Bond franchise and Daniel Craig's swan song in the role, which is scheduled for theatrical release on Oct. 8.

"Mike and Pam understand that we are at a critical juncture and that the continuing success of the James Bond series is dependent on us getting the next iteration right and will give us the support we need to do this," Michael Wilson and Barbara Broccoli, the sibling producing team who have long overseen the Bond franchise, said in a statement.

They added that "Amazon has assured us that Bond will continue to debut" in movie theaters. "Our hope is that they will empower Mike and Pam to continue to run MGM unencumbered," they said.

Still, Amazon's priorities are inherently different from a traditional studio's.

In 2019, Amazon Studios, under the leadership of Jennifer Salke, shifted away from exclusive theatrical windows, opting instead to make movies available in theaters and on Amazon Prime the same day, the strategy preferred by the prominent streaming platforms. The pandemic turbocharged that approach. Ms. Salke was able to buy films like "Coming 2 America" and the recently released "The Tomorrow War" from studios looking to offload their movies because theaters were largely closed. Viewership on Amazon Prime skyrocketed and movies, which had previously taken a back seat to television shows, suddenly became a much more attractive opportunity. Anemic overall film output would no longer do.

Mr. De Luca and Ms. Abdy stress that even in light of the pending acquisition, which still needs government approval, their philosophy of movie theaters first will remain.

"There is theatrical in our near future, there will be theatrical after the deal closes," Mr. De Luca said. "There will always be theatrical at MGM."

It's not clear how the management of MGM will be handled once the acquisition is complete. Amazon declined to comment on the record for this article. There are some in Hollywood's film community who are hopeful that Mr. De Luca and Ms. Abdy will oversee Amazon's movie business once the merger is complete.

Ms. Salke has led both divisions for the past three years, managing an $8 billion annual content budget, and Amazon has made no indication that will change. Before joining Amazon, Ms. Salke spent seven years as president of entertainment at NBC. (In an interesting twist, Ms. Salke's biggest bet is a $450 million television adaptation of J.R.R. Tolkien's "Lord of the Rings," which Peter Jackson previously adapted into a series of blockbuster films at New Line when Mr. De Luca was an executive there.) Her upcoming films include the Cannes Film Festival opener "Annette"; Aaron Sorkin's "Being the Ricardos," about Lucy and Desi Arnaz; and George Clooney's "The Tender Bar," starring Ben Affleck.

The producer Matt Tolmach, who has two projects in the works at MGM, including the horror film "Dark Harvest," set for release on Sept. 23, said Mr. De Luca's passion for good stories is infectious. "He read the script and he called me, and we had an hourlong conversation just about the possibilities and how amazing it would be and how we can push the boundaries," he said of "Dark Harvest." "That's what he does. He makes your movie better."

As Mr. De Luca sees it, the new MGM is about "treating the filmmakers like the franchise," he said. When he and Ms. Abdy first joined forces, the duo compiled a list of 36 directors they were hoping to lure to the studio. In 15 months, they've nabbed 20 percent of them, including Darren Aronofsky, Sarah Polley, Melina Matsoukas and George Miller.

"We don't mind taking big swings and gambling because I think it's either go big or go home," he added. "I think the audience rewards you if you are really original, innovative, bold and creative."

In a shareholder meeting last month Jeff Bezos, Amazon's founder and executive chairman, called the reason behind the acquisition "very simple." He said MGM had a "vast, deep catalog of much beloved" movies and shows. "We can reimagine and redevelop that I.P. for the 21st century."

That runs counter to the approach Mr. De Luca and Ms. Abdy have primarily taken.

"Mike and I did not sit down and say let's raid the library and remake everything," Ms. Abdy said. "Our focus is original ideas with original authorship and real filmmakers, but you know every once in a while something will come up that's fun and we'll pursue it if we think it makes sense."

Those ideas include a hybrid live action/animated remake of "Pink Panther"; Michael B. Jordan directing the third installment of the "Rocky" spinoff "Creed"; and "Legally Blonde 3" with Reese Witherspoon and a script co-written by Mindy Kaling.

Of course, all of MGM's success is hypothetical, as none of the projects initiated by Mr. De Luca and Ms. Abdy have been seen yet. The company's recent acquisition of Sean Penn's directorial effort "Flag Day," which is set to debut at the Cannes Film Festival before opening on Aug. 20, will mark the regime's first release. The studio also has high hopes for "Respect," an Aretha Franklin biopic starring Jennifer Hudson, which comes out in August (and was in motion when Mr. De Luca and Ms. Abdy came to MGM).

But they said their efforts to reinvigorate the studio were more than just an attempt to make the company attractive to buyers. Anchorage Capital, the majority owners of **MGM**, put the **studio** up for **sale** in December and the speed with which a deal was made surprised Mr. De Luca and Ms. Abdy.

Both said they were in for the long haul. "If it works, I feel like it could go on forever," Mr. De Luca said. Ms. Abdy added, "Until they carry us out."

As part of their efforts, Mr. De Luca and Mrs. Abdy even had MGM's logo reworked: Leo the lion is now digital and the gold film ribbons that encircle him have been sharpened "to own gold the way Netflix owns red," Mr. De Luca said. The three Latin words encircling the lion -- "Ars Gratia Artis" -- are first spelled out in English: "Art for Art's Sake."

That's music to Mr. Anderson's ears.

"Long live the lion!" he said. "Whether it's 'The Wizard of Oz' or 'Tom & Jerry' cartoons, the lion is a symbol of our business. The healthier, the better."

And how does he feel about MGM being sold to Amazon?

"Who?" he responded.

https://www.nytimes.com/2021/07/06/business/media/mgm-amazon-michael-deluca-pamela-abdy.html

## Graphic

PHOTOS: Pamela Abdy and Michael De Luca helm MGM, which Amazon will acquire. (B1)

"Our focus is original ideas," Pamela Abdy said of the approach she and Michael De Luca take in leading MGM. (PHOTOGRAPHS BY MAGGIE SHANNON FOR THE NEW YORK TIMES) (B2)

**Load-Date:** July 6, 2021

# They Resurrected MGM. Amazon Bought the Studio. Now What?

The New York Times

July 6, 2021 Tuesday 11:49 EST

Copyright 2021 The New York Times Company All Rights Reserved

**Section:** BUSINESS; media

**Length:** 1532 words

**Byline:** Nicole Sperling
**Highlight:** Michael De Luca and Pamela Abdy have reinvigorated a once-storied Hollywood institution. Now it needs to figure out its place in a streaming company.

## Body

Paul Thomas Anderson and Michael De Luca are film geeks with a shared history. As a studio executive, Mr. De Luca championed Mr. Anderson's "Boogie Nights" and "Magnolia," films that established the director's reputation as a creative force. So when Focus Features said it would postpone the production of Mr. Anderson's new film because of the pandemic, it was Mr. De Luca, in his new role as chairman of MGM's Motion Picture Group, who swooped in and pledged to get the movie into production in Los Angeles when Mr. Anderson wanted to shoot.

And being that the two men can't resist the pull of old Hollywood, Mr. De Luca made sure to amp up the nostalgia associated with his efforts to reinvigorate MGM, the once mighty studio that in recent decades has been reduced to a financial Ping-Pong ball, volleyed back and forth by various investors eager to turn the company's 4,000-film library into a cash cow.

"I said, 'This will be fun. Come make your movie at Metro,'" Mr. De Luca recalled with a laugh, referring to the studio's former moniker of Metro-Goldwyn-Mayer.

Mr. Anderson was game.

"If Mike says something will happen, it happens," he said. "It's hard not to stress how rare of a quality that is."

The question now is, in light of Amazon's decision last month to acquire MGM in an $8.45 billion deal, will Mr. De Luca still be able to keep his promises? Or will he simply be part of a corporate hierarchy less prone to taking chances on films and filmmakers?

In the past 15 months, MGM has experienced a resurgence, led by Mr. De Luca, a one-time brash and reckless young executive who introduced filmmakers like Mr. Anderson and David Fincher to the culture when he was president of production at New Line Cinema, and now, after 36 years in the business, is seen as one of its most reliable statesmen. His deputy, Pamela Abdy, produced "Garden State" when she was at Jersey Films and amplified the career of Alejandro González Iñárritu, among others, during her time as a Paramount executive and later at New Regency.

At MGM, the two have compiled a heady mix of A-list directors and compelling material they hope hearkens back to the days when Fred Astaire and Judy Garland roamed the once-hallowed studio's hallways. The next six months will show if their strategy pays off. Mr. Anderson's movie will debut on Nov. 26. It will follow Ridley Scott's pulpy drama "House of Gucci," starring Lady Gaga and Adam Driver. In December, Joe Wright's musical adaptation of "Cyrano," with Peter Dinklage and featuring music from The National, will be released.

And then there is "No Time to Die," the long-awaited 25th installment of the James Bond franchise and Daniel Craig's swan song in the role, which is scheduled for theatrical release on Oct. 8. (The film was completed before Mr. De Luca and Ms. Abdy's arrival and was delayed by the pandemic.)

"Mike and Pam understand that we are at a critical juncture and that the continuing success of the James Bond series is dependent on us getting the next iteration right and will give us the support we need to do this," Michael Wilson and Barbara Broccoli, the sibling producing team who have long overseen the Bond franchise, said in a statement.

They added that "Amazon has assured us that Bond will continue to debut" in movie theaters. "Our hope is that they will empower Mike and Pam to continue to run MGM unencumbered," they said.

Still, Amazon's priorities are inherently different from a traditional studio's.

In 2019, Amazon Studios, under the leadership of Jennifer Salke, shifted away from exclusive theatrical windows, opting instead to make movies available in theaters and on Amazon Prime the same day, the strategy preferred by the prominent streaming platforms. The pandemic turbocharged that approach. Ms. Salke was able to buy films like "Coming 2 America" and the recently released "The Tomorrow War" from studios looking to offload their movies because theaters were largely closed. Viewership on Amazon Prime skyrocketed and movies, which had previously taken a back seat to television shows, suddenly became a much more attractive opportunity. Anemic overall film output would no longer do.

Mr. De Luca and Ms. Abdy stress that even in light of the pending acquisition, which still needs government approval, their philosophy of movie theaters first will remain.

"There is theatrical in our near future, there will be theatrical after the deal closes," Mr. De Luca said. "There will always be theatrical at MGM."

It's not clear how the management of MGM will be handled once the acquisition is complete. Amazon declined to comment on the record for this article. There are some in Hollywood's film community who are hopeful that Mr. De Luca and Ms. Abdy will oversee Amazon's movie business once the merger is complete.

Ms. Salke has led both divisions for the past three years, managing an $8 billion annual content budget, and Amazon has made no indication that will change. Before joining Amazon, Ms. Salke spent seven years as president of entertainment at NBC. (In an interesting twist, Ms. Salke's biggest bet is a $450 million television adaptation of J.R.R. Tolkien's "Lord of the Rings," which Peter Jackson previously adapted into a series of blockbuster films at New Line when Mr. De Luca was an executive there.) Her upcoming films include the Cannes Film Festival opener "Annette"; Aaron Sorkin's "Being the Ricardos," about Lucy and Desi Arnaz; and George Clooney's "The Tender Bar," starring Ben Affleck.

The producer Matt Tolmach, who has two projects in the works at MGM, including the horror film "Dark Harvest," set for release on Sept. 23, said Mr. De Luca's passion for good stories is infectious. "He read the script and he called me, and we had an hourlong conversation just about the possibilities and how amazing it would be and how we can push the boundaries," he said of "Dark Harvest." "That's what he does. He makes your movie better."

As Mr. De Luca sees it, the new MGM is about "treating the filmmakers like the franchise," he said. When he and Ms. Abdy first joined forces, the duo compiled a list of 36 directors they were hoping to lure to the studio. In 15 months, they've nabbed 20 percent of them, including Darren Aronofsky, Sarah Polley, Melina Matsoukas and George Miller.

"We don't mind taking big swings and gambling because I think it's either go big or go home," he added. "I think the audience rewards you if you are really original, innovative, bold and creative."

Case 19-34054-sgj11 Doc 3818-7 Filed 06/05/23 Entered 06/05/23 22:10:41 Desc
Case 3:23-cv-02071-E Document 1-172 Filed 12/04/23 Page 172 of 214 PageID 8626
Exhibit Exhibit 61-72 Page 558 of 500 Page 2 of 3

They Resurrected MGM. Amazon Bought the Studio. Now What?

In a shareholder meeting last month, Jeff Bezos, Amazon's founder and executive chairman, called the reason behind the acquisition "very simple." He said MGM had a "vast, deep catalog of much beloved" movies and shows. "We can reimagine and redevelop that I.P. for the 21st century."

That runs counter to the approach Mr. De Luca and Ms. Abdy have primarily taken.

"Mike and I did not sit down and say let's raid the library and remake everything," Ms. Abdy said. "Our focus is original ideas with original authorship and real filmmakers, but you know every once in a while something will come up that's fun and we'll pursue it if we think it makes sense."

Those ideas include a hybrid live action/animated remake of "Pink Panther"; Michael B. Jordan directing the third installment of the "Rocky" spinoff "Creed"; and "Legally Blonde 3" with Reese Witherspoon and a script co-written by Mindy Kaling.

Of course, all of MGM's success is hypothetical, as none of the projects initiated by Mr. De Luca and Ms. Abdy have been seen yet. The company's recent acquisition of Sean Penn's directorial effort "Flag Day," which is set to debut at the Cannes Film Festival before opening on Aug. 20, will mark the regime's first release. The studio also has high hopes for "Respect," an Aretha Franklin biopic starring Jennifer Hudson, which comes out in August (and was in motion when Mr. De Luca and Ms. Abdy came to MGM).

But they said their efforts to reinvigorate the studio were more than just an attempt to make the company attractive to buyers. Anchorage Capital, the majority owners of **MGM**, put the **studio** up for **sale** in December and the speed with which a deal was made surprised Mr. De Luca and Ms. Abdy.

Both said they were in for the long haul. "If it works, I feel like it could go on forever," Mr. De Luca said. Ms. Abdy added, "Until they carry us out."

As part of their efforts, Mr. De Luca and Mrs. Abdy even had MGM's logo reworked: Leo the lion is now digital and the gold film ribbons that encircle him have been sharpened "to own gold the way Netflix owns red," Mr. De Luca said. The three Latin words encircling the lion — "Ars Gratia Artis" — are first spelled out in English: "Art for Art's Sake."

That's music to Mr. Anderson's ears.

"Long live the lion!" he said. "Whether it's 'The Wizard of Oz' or 'Tom &amp; Jerry' cartoons, the lion is a symbol of our business. The healthier, the better."

And how does he feel about MGM being sold to Amazon?

"Who?" he responded.

PHOTOS: Pamela Abdy and Michael De Luca helm MGM, which Amazon will acquire. (B1); "Our focus is original ideas," Pamela Abdy said of the approach she and Michael De Luca take in leading MGM. (PHOTOGRAPHS BY MAGGIE SHANNON FOR THE NEW YORK TIMES) (B2)

**Load-Date:** November 13, 2021

---

End of Document

## Progressive Groups Press FTC To Block Amazon's MGM Deal

September 01, 2021



Copyright © 2023 Portfolio Media, Inc. All rights reserved.

**Author:** J. Edward Moreno

## Summary

A coalition of 35 progressive organizations including the Working Families Party and Justice Democrats are asking the Federal Trade Commission to block Amazon's proposed $8.45 billion **purchase** of **MGM Studios**.

## Body

A coalition of 35 progressive organizations including the Working Families Party and Justice Democrats are asking the Federal Trade Commission to block Amazon's proposed $8.45 billion **purchase** of **MGM Studios**.

In a letter addressed to FTC Chair Lina Khan on Tuesday, the organizations said the acquisition "is not simply a one-off deal for streaming content" and would give Amazon "numerous interconnected points of dominance over businesses and consumers."

The MGM merger is currently under review by the FTC. The organizations applauded that investigation, and pointed out what they consider a pattern of Amazon using smaller businesses that use its platforms to launch itself into other markets. They say the acquisition will allow Amazon to do this in the streaming market.

"Amazon demonstrates the dangers of modern tech platform monopolies," the organizations said. "It has a long history of combining and utilizing its many businesses together as an integrated whole to weaponize them against workers, businesses and ultimately consumers."

Under the proposed merger, MGM will be integrated into Amazon Studios, which has historically focused on making television shows. The acquisition serves to significantly grow the Amazon Studios catalog through the addition of everything from the James Bond and "Rocky" movies to "Silence of the Lambs" and "Legally Blonde," as well as TV shows such as "Fargo" and "The Handmaid's Tale."

The organizations said if the merger goes through, Amazon could hypothetically drive out competitors to its Fire TV products by denying other streaming platforms access to MGM content, which includes a catalog of more than 4,000 films and 17,000 TV shows. It could also leverage the intellectual property rights of that content to gain further leverage on its e-commerce platforms

"All of this means Amazon can exert greater control even outside of the portions of commerce it directly owns," they said. "And ultimately it means consumers, businesses and the workers that depend on them are subject entirely to Amazon's whims."

Progressive Groups Press FTC To Block Amazon's MGM Deal

Shortly after Khan was sworn in to the FTC in June, Amazon called for her to be recused from any matter involving it because before joining the agency she made a name for herself in antitrust circles by calling for enforcement actions against Amazon and other Big Tech companies.

Khan dismissed the notion that her work could create the appearance of a conflict, saying any instance of recusal from her would be looked at on a case-by-case basis.

Amazon's MGM merger has also turned heads on Capitol Hill.

The organizations noted that the acquisition has also garnered scrutiny from legislators, with Sens. Elizabeth Warren, D-Mass., and Amy Klobuchar, D-Minn., calling for a broad review of the deal.

"The proposed acquisition of MGM would give an already abusive monopoly even more weapons to use against consumers, businesses and workers," the organizations said. "We urge the FTC to halt this deal and to continue to investigate Amazon's broad abuse of its ecosystem."

A representative for Amazon did not immediately respond to a request for comment Wednesday.

--Additional reporting by Benjamin Horney and Bryan Koenig. Editing by Stephen Berg.

---

End of Document

## Amazon Closes $8.5B MGM Deal With FTC Warning On Heels

March 17, 2022



Copyright © 2023 Portfolio Media, Inc. All rights reserved.

**Author:** Matthew Perlman

## Summary

Amazon.com Inc. completed its $8.45 billion **purchase** of **MGM Studios** on Thursday, days after European enforcers cleared the deal without conditions, but the Federal Trade Commission warned it can always challenge deals after they close.

## Body

Amazon.com Inc. completed its $8.45 billion **purchase** of **MGM Studios** on Thursday, days after European enforcers cleared the deal without conditions, but the Federal Trade Commission warned it can always challenge deals after they close.

Any challenge from the FTC, however, may have to wait until the confirmation of Democratic nominee for commissioner Alvaro Bedoya, because the commission currently appears to be split 2-2 between Republicans and Democrats, the latter of whom have taken a newly aggressive stand against mergers.

Amazon.com Inc. has completed its **purchase** of **MGM Studios**, granting the retail giant a catalog of more than 4,000 film titles and 17,000 television episodes. (AP Photo/Craig Ruttle)Amazon said in a statement Thursday that MGM is now part of its Prime Video and Amazon Studios offerings, adding a catalog of more than 4,000 film titles and 17,000 television episodes to its stable of streaming content. Amazon announced the deal in May last year and the European Commission signed off on the transaction on Tuesday after finding it did not raise any competition concerns in the bloc.

But Lindsay M. Kryzak, director of the FTC's Office of Public Affairs, responded to an inquiry about the deal's closing with a reminder that U.S. enforcers have the authority to challenge mergers after they close.

"The FTC does not comment on any particular matters," Kryzak said in a statement Thursday. "However, we reiterate that the commission does not approve transactions and may challenge a deal at any time if it determines that it violates the law."

The statement also noted that the FTC started sending letters last summer warning some merging parties that investigations of their transactions will extend beyond the agency's statutory deadlines. Companies are generally free under U.S. law to close deals once the deadlines expire, but the letters raise the prospect of a post-closing challenge.

"These letters alert merging parties that their transactions remain under investigation, and warn that consummation occurs at their own risk," Kryzak said Thursday.

It's not clear if the commission issued one of these letters to Amazon or if an investigation of the transaction is continuing. The FTC review has been closely watched because of Chair Lina Khan's past work in academia and as a congressional staffer that was highly critical of Amazon and its expansion across various industries.

An article Khan wrote in 2017 for the Yale Law Journal, "Amazon's Antitrust Paradox," helped make her a well-known figure in antitrust circles. She also worked as a House antitrust subcommittee staffer, where she was a key author of a landmark report from the panels' Democratic members examining the dominance of Amazon, Apple, Google and Facebook.

Since joining the commission in June, Khan has taken a progressive tack with a number of changes to agency process and policies geared towards stepping up enforcement against anti-competitive conduct and mergers, some of which have received blowback from the commission's Republicans.

Her past work has prompted both Amazon and Facebook to call on Khan to be recused from matters involving them, but the commission has so far refused the requests.

The commission is also currently down a member following the departure of Rohit Chopra, who is now serving as head of the Consumer Financial Protection Bureau. Bedoya, a privacy advocate and Georgetown University Law Center scholar, is President Joe Biden's pick to replace Chopra. His confirmation hit speed bumps in the Senate, leaving a current 2-2 split among Democrat and Republican commissioners.

It takes a majority vote among the commissioners to bring a merger challenge, but it's unclear if the commission has yet held a vote on a potential challenge to Amazon's MGM deal. Reporting by Politico on Thursday suggested Khan declined to hold a vote, knowing it wouldn't succeed.

The European Commission approved the transaction Tuesday after looking at its potential impact across a number of video and content distribution channels and finding there's strong competition from other players in the industry.

In Thursday's statement, Mike Hopkins, senior vice president of Prime Video and Amazon Studios, said the companies share a commitment to bringing a broad slate of original programming to a global audience, and lauded MGM for its "nearly century-long legacy of producing exceptional entertainment."

"We welcome MGM employees, creators, and talent to Prime Video and Amazon Studios, and we look forward to working together to create even more opportunities to deliver quality storytelling to our customers," Hopkins said.

Representatives for the FTC and Amazon declined to comment further on the merger review Thursday.

--Additional reporting by Benjamin Horney, Dave Simpson, Bryan Koenig and Christopher Cole. Editing by Marygrace Anderson.

**End of Document**

# HMIT Exhibit No. 73

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust
and the Hunter Mountain Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## MOTION FOR LEAVE TO FILE PROCEEDING

008971

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

MOTION FOR LEAVE TO FILE PROCEEDING.........................................................1

SUMMARY AND STATEMENT OF FACTS ...............................................................1

ARGUMENT .................................................................................................................8

    A.   The Gatekeeper Provision...............................................................................8

    B.   The Gatekeeper Provision Is Satisfied Because Movants Were Directed to Raise Valuation Issues through an Adversary Proceeding....................................8

    C.   The Valuation Proceeding Sets Forth a Colorable Claim. ............................9

CORE/3522697.0002/179160551.9

008972

## MOTION FOR LEAVE TO FILE PROCEEDING

Movants The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment

Trust ("Hunter Mountain" and collectively with Dugaboy, "Movants") file this Motion for Leave

to File Proceeding.

## SUMMARY AND STATEMENT OF FACTS[1]

1.      Movants file this Motion for Leave to File Proceeding (the "Motion for Leave") out

of an abundance of caution in light of the gatekeeper injunction (the "Gatekeeper Provision")

contained in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as

Modified) ("Plan") confirmed by order of this Court on February 22, 2021, § AA & Ex. A, Article

IX.F [Dkt. No.1950].   Specifically, Movants seek an order from the Court finding that the

Gatekeeper Provision is inapplicable to the proposed proceeding (the "Valuation Proceeding") to

be commenced by Movants in this Court, or that the requisite standard is met.

2.      The Valuation Proceeding largely seeks the same relief previously sought by

Movants through motion practice.   In particular, the Valuation Proceeding seeks information

regarding the value of the estate, including the assets and liabilities of the Highland Claimant Trust

(the "Claimant Trust") and related determinations by the Court.   On December 6, 2022, the Court

ordered Movants to seek the relief previously sought by motion practice through an adversary

proceeding [Dkt. No. 3645].   As a result, Movants are required to name Highland Capital

Management, L.P. ("HCMLP" or "Debtor") and the Highland Claimant Trust (the "Claimant

Trust") as defendants in the Valuation Proceeding, notwithstanding that what Movants are really

---

[1] Movants incorporate the facts alleged in their proposed Complaint To (I) Compel Disclosures About The Assets Of The Highland Claimant Trust And (II) Determine (A) Relative Value Of Those Assets, And (B) Nature Of Plaintiffs' Interests In The Claimant Tru[st ("Proposed Complaint" or "Valuation Complaint"), annexed hereto as Exhibit A.

seeking is information from HCMLP and the Claimant Trust.   Under the circumstances, Movants believe their Valuation Proceeding should fall outside of the Gatekeeper Provision.

3.     However, if the Court determines that the Gatekeeper Provision applies to the Valuation Proceeding, Movants seek an order determining that the Valuation Proceeding presents a "colorable claim" within the meaning of the Gatekeeper Provision and should be allowed.

4.     As holders of Contingent Claimant Trust Interests[2] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Movants need to file the Valuation Proceeding in an effort to obtain information about the assets and liabilities of the Claimant Trust established to liquidate the assets of the HCMLP bankruptcy estate.

5.     HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that, even with inflated claims and below market sales of assets, cash available is likely more than enough to pay class 8 and class 9 creditors 100 cents on the dollar.   Accordingly, Movants and the entire estate would benefit from a close evaluation of current assets and liabilities.   Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation.   That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or nothing for the owners that built the company.

6.     While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity.   As this

---

[2] Capitalized terms not defined have the meanings set forth herein.  If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Dkt. No. 1808].

008974

Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity. In some cases, the protection is in the form of an equity committee; here, a prompt valuation of the estate would serve the same purpose and is needed.

7.      As set forth in greater detail in the annexed complaint ("Valuation Complaint"), upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Movants. Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery who would then be inclined to approve inflated compensation when the hidden but true value of the estate's assets was realized. Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

8.      Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full. Because of the lack of transparency to date, unless Movants are allowed to proceed, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

008975

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

9. On the petition date, the estate had over $550 million in assets, with far less in non-disputed non-contingent liabilities.

10. By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[3]

11. On information and belief, the value of the assets in the estate as of June 1, 2022, was as follows:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | Low | High |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |
| Affiliate Notes[4] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[3] Additional detail in the Valuation Complaint and its exhibits.

[4] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

CORE/3522697.0002/179160551.9

008976

12.     By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

13.     On information and belied, Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded with a reorganization plan to the many settlement offers from Mr. Dondero, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

14.     Instead, it appears that Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court." Making the transactions particularly suspect is the fact that the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years' hence.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

15.     On information and belief, Mr. Seery provided such information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

008977

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating business in the hands of its equity owners.

16.    Specifically, Mr. Seery could and should have investigated seeking sufficient funds from equity to pay all claims and return the estate to the equity holders.  This was an obvious path because the estate had assets sufficient to support a line of credit for $59 million, as Mr. Seery eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were sold, much of the massive administrative costs run up by the estate would never have been incurred.  One such avoided cost would be the post effective date litigation now pursued by Marc S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the cost of the Kirschner litigation).  But buying in the claims to resolve the bankruptcy and enabling equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the hands of grateful business colleagues who received outsized rewards for the claims they were steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is transparency.

17.    But worse still, even with all of the manipulation that appears to have occurred, Movants believe that the combination of cash and other assets held by the Claimant Trust in its own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

unnecessary litigation would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest, now.

18.     In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Movants and others, even though the only beneficiaries of any recovery from such litigation would be Movants in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity of any meaningful recovery.

19.     Based upon the restrictions imposed on Movants including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Movants have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Movants become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Movants are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

20.     Movants are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

CORE/3522697.0002/179160551.9

008979

## ARGUMENT

### A.     The Gatekeeper Provision.

21.     The Debtor's Plan includes a Gatekeeper Provision, limiting how claims can be asserted against Protected Parties (Plan, § AA & Ex. A, Article IX.F), such as the reorganized Debtor and the Claimant Trust.  Plan Ex. A, Article I.B, ¶ 105.

22.     Under the Debtor's Plan confirmed by this Court, an "Enjoined Party" may not:

[C]ommence or pursue a claim or cause of action of any kind against any Protected Party that arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind . . . against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party.

Plan, § AA & Ex. A, Article IX.F.

23.     The Plan defines the term "Enjoined Party" to include "all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor", "any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared", and any "Related Entity." Plan Ex. A, Article I.B, ¶ 56. The Plan expressly defines "Related Entity" to include Dugaboy and Hunter Mountain. *Id.*, § B, ¶ 110. Accordingly, each of Movants is an "Enjoined Party."  The question thus arises whether Movants must seek Court permission prior to instituting the annexed Valuation Proceeding.

### B.     The Gatekeeper Provision Is Satisfied Because Movants Were Directed to Raise Valuation Issues through an Adversary Proceeding

24.     Movants previously sought by way of contested matter to obtain the relief sought in the Valuation Proceeding [Dkt. Nos. 3382, 3467, and 3533]. Debtor objected, asserting both that that the relief asserted was unwarranted and that it could only be obtained in an adversary proceeding [Dkt No. 3465]. The Court ruled that Movants must pursue an adversary proceeding.

CORE/3522697.0002/179160551.9

008980

Given that the Court has already ordered Movants to proceed in this fashion, the Court has already served its gatekeeper function and this motion is unnecessary [Dkt. No. 3645].

25.      However, Movants conferenced the issue with Debtor, and Debtor was only willing to stipulate that no gatekeeper motion was needed if Movants sought exactly the same relief as had been sought in the motion.  Because the relief sought is better defined now, and to avoid further delay, in an excess of caution, Movants bring this motion. After filing, Movants will attempt to negotiate a resolution of this motion so that the Court can proceed directly to the merits.

**C.      The Valuation Proceeding Sets Forth a Colorable Claim.**

26.      Movants present colorable claims that should be authorized to proceed.

27.      The Plan does not define what constitutes a "colorable claim of any kind."  Nor does the Bankruptcy Code define the term.   The case law construing the requirement for "colorable" claims clearly provides that the requisite showing is a relatively low threshold to satisfy, requiring Movants to prove "there is a possibility of success."  *See Spring Svc. Tex., Inc. v. McConnell (In re McConnell)*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989).

28.      The Fifth Circuit has stated that "the colorable claim standard is met if the [movant] has asserted claims for relief that on appropriate proof would allow a recovery.  Courts have determined that a court need not conduct an evidentiary hearing, but must ensure that the claims do not lack any merit whatsoever."  *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 248 (5th Cir. 1988).  The Court therefore need not be satisfied that there is an evidentiary basis for the claims to be asserted but instead should allow the claims if they appear to have some merit.

29.      Other federal circuit courts have reached similar conclusions regarding the standard to be applied.  For example, the Eighth Circuit held that "creditors' claims are colorable if they would survive a motion to dismiss."  *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008); *accord In Re Foster*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), *aff'd* 602 Fed. Appx. 356 (8th Cir.

2015) (per curiam). The Sixth Circuit has adopted a similar test requiring that the court look only to the face of the complaint to determine if claims are colorable. *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995).

30. Other federal courts have adopted roughly the same standard—*i.e.*, a claim is colorable if it is merely "plausible" and thus could survive a motion to dismiss. *See In re America's Hobby Center, Inc.*, 223 B.R. 275, 282 (S.D.N.Y 1998); *see also, e.g., In re GI Holdings*, 313 B.R. at 631 (court must decide whether the committee has asserted "claims for relief that on appropriate proof would support a recovery"); *Official Comm. v. Austin Fin. Serv. (In re KDI Holdings)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999) (observing that the inquiry into whether a claim is colorable is similar to that undertaken on a motion to dismiss for failure to state a claim); *In re iPCS, Inc.*, 297 B.R. 283, 291-92 (Bankr. N.D. Ga. 2003) (same).

31. In addition, in the non-bankruptcy context, the District Court for this district has explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff must have an 'arguable claim' and not that the plaintiff must be able to succeed on that claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002).

32. This Court's analysis of whether the Valuation Proceeding sets forth a colorable claim is not a determination of whether the Court finds there is enough evidence presented. Rather, if on the face of the Valuation Complaint, there appears a plausible claim, then the Valuation Proceeding presents a colorable claim, and this Motion must be granted to allow Movants to file their Valuation Complaint.

33. In the First Claim for Relief of the Valuation Complaint, Movants seek disclosures of Claimant Trust Assets and request an accounting. An equitable accounting is proper "when the facts and accounts presented are so complex that adequate relief may not be obtained at law."

008982

*Gooden v. Mackie*, No. 4:19-CV-02948, 2020 WL 714291 (S.D. Tex. Jan. 23 2020) (quoting

*McLaughlin v. Wells Fargo Bank, N.A.*, No. 4:12-CV-02658, 2013 WL 5231486, at *6 (S.D. Tex.

Sep. 13, 2013); *Bates Energy Oil & Gas v. Complete Oilfeld Servs.*, 361 F. Supp. 3d 633, 663

(W.D. Tex. 2019) (finding an equitable accounting claim was sufficiently stated when was a party

was less than forthcoming in providing information and the available information was insufficient

to determine what was done with a party's money); *Phillips v. Estate of Poulin*, No. 03-05-00099-

CV, 2007 WL 2980179, at *3 (Tex. App.-Austin, Oct. 12, 2007, no pet.) (finding that an

accounting order was appropriate where the facts are complex and when the plaintiff could not

obtain adequate relief through standard discovery); *Southwest Livestock & Trucking Co. v. Dooley*,

884 S.W.2d 805, 809 (Tex. App.-San Antonio 1994, writ denied) (finding that an accounting was

necessary in order to determine the identity of the property or the amount of money owed to a

party).

34.     The requested disclosures and accounting are necessary due to the lack of

transparency surrounding the assets and liabilities of the Claimant Trust.  The Court has retained

jurisdiction to ensure that distributions to Holders of Allowed Equity Interests are accomplished

pursuant to the provisions of the Plan.  *See* Plan, Article XI.  As set forth above and in the Valuation

Complaint, Movants have concerns that those provisions are not being appropriately followed, and

efforts to obtain the information necessary to confirm otherwise has been unavailable through

discovery. As a result of the restrictions imposed on Movants, including Movants' inability, as

holders of Contingent Claimant Trust Interests, to access virtually any financial information related

to the Claimant Trust, Movants have little to no insight into the value of the Claimant Trust assets

versus the Claimant Trust's obligations and no method to independently ascertain those amounts

until Movants become Claimant Trust Beneficiaries.  Because Movants are in the dark regarding

the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought. Movants are unable to protect their own interests without an equitable accounting. Therefore, the First Claim for Relief sets forth a colorable claim.

35. The Second Claim for Relief of the Valuation Complaint sets forth Movants' request for a declaratory judgment regarding the value of Claimant Trust Assets compared to the bankruptcy estate obligations. When considering whether a valid declaratory judgment claim exists, a court must engage in a three-step inquiry. *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). The court must ask (1) whether an actual controversy exists between the parties, (2) whether the court has the authority to grant such declaratory relief; and (3) whether the court should exercise its "discretion to decide or dismiss a declaratory judgment action." *Id*; *see also In re Fieldwood Energy LLC,* No. 20-33948, 2021 WL 4839321, at *4 (Bankr. S.D. Tex. Oct. 15 2021) (seeking declaratory judgment regarding interpretation of a Plan and whether certain claims were discharged); *In re Think3, Inc.,* 529 B.R. 147, 206-07 (Bankr. W.D. Tex. 2015) (sufficient actual controversy to bring a declaratory judgment action to assist with an early and prompt adjudication of claims and to promote judicial and party economy).

36. In this case, there can be no serious doubt that an actual controversy exists between the parties with respect to the relief sought, as the Debtor has already opposed the relief sought in the Valuation Complaint. Additionally, there is no dispute that the Court has the inherent power to grant the relief sought in the Proposed Complaint. Further, the third element is satisfied because this determination is important to the implementation of the Plan and distributions to Holders of Allowed Claims and Allowed Equity Interests. If the value of the Claimant Trust assets exceeds the obligations of the estate, then several currently pending adversary proceedings aimed at

recovering value for HCMLP's estate are not necessary to pay creditors in full. As such, the pending adversary proceedings could be brought to a swift close, allowing creditors to be paid and the Bankruptcy Case to be brought to a close. In addition, such a determination by the Court could allow for a settlement that would cover the spread between current assets and obligations before that gap is further widened by the professional fees incurred by the Claimant Trust. Therefore, the Second Claim for Relief pleads a colorable claim.

37.     Finally, in the Third Claim for Relief of the Valuation Complaint, Movants request a declaratory judgment and determination regarding the nature of their interests. As with the Second Claim for Relief, there is no serious dispute that an actual controversy exists between the parties and that the Court has the power to grant the relief requested. Additionally, the third element is satisfied because, in particular, in the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient to pay all Allowable Claims indefeasibly, Movants seek a declaration and a determination that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries. To be clear, Plaintiffs do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests. All of that must be done according to the terms of the Plan and the Claimant Trust Agreement. However, the requested determination would further assist parties in interest, such as Movants, to ascertain whether the estate is capable of paying all creditors in full and also paying some amount to residual interest holders, as contemplated by the Plan and the Claimant Trust Agreement. Therefore, the Third Claim for Relief pleads a colorable claim.

38.     The equitable relief sought in the Valuation Proceeding certainly meets any iteration of the standard for what constitutes "a colorable claim of any kind." Instead of using the

008985

information governing provisions of the Claimant Trust as a shield, HCMLP and the Claimant Trust are using them as a sword to enable continued litigation that ultimately provides no benefit to Claimant Trust Beneficiaries or Movants as holders of Contingent Claimant Trust Interests.

39.    As set forth above, the Valuation Complaint seeks disclosure of information and an accounting that are related to the administration of the Plan and property to be distributed under the Plan, but not otherwise available to Movants.  The Valuation Complaint also requests declaratory judgments within the Court's jurisdiction and relevant to the furtherance of the Bankruptcy Case.  These claims are colorable, and this Motion for Leave should be granted.

WHEREFORE, Movants request the entry of an order i) granting this Motion for Leave; ii) determining that the Gatekeeping Provision is satisfied as applied to the Valuation Proceeding; and iii) authorizing Movants to file the Valuation Complaint.

Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust and the Hunter Mountain Investment Trust*

CORE/3522697.0002/179160551.9

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on February 5, 2023, Louis M. Phillips conferenced with counsel for Defendants, John Morris, regarding this motion. Counsel for Defendants was willing to stipulate that no gatekeeper motion was needed if Movants sought exactly the same relief as had been sought in their prior motion addressing these issues. Because the relief sought is better defined now, and to avoid further delay, in an excess of caution, Movants bring this motion. After filing, Movants will attempt to negotiate a resolution of this motion so that the Court can proceed directly to the merits.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

008987

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 6, 2023, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*

Deborah Deitsch-Perez

CORE/3522697.0002/179160551.9

008988

# EXHIBIT A

008989

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Plaintiffs the Dugaboy Investment Trust and the*
*Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| DUGABOY INVESTMENT TRUST and | § | |
| HUNTER MOUNTAIN INVESTMENT TRUST, | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | _____ |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. and | § | |
| HIGHLAND CLAIMANT TRUST, | § | |
| | § | |
| Defendants. | § | |

**COMPLAINT TO (I) COMPEL DISCLOSURES**
**ABOUT THE ASSETS OF THE HIGHLAND CLAIMANT TRUST AND**
**(II) DETERMINE (A) RELATIVE VALUE OF THOSE ASSETS, AND**
**(B) NATURE OF PLAINTIFFS' INTERESTS IN THE CLAIMANT TRUST**

Plaintiffs The Dugaboy Investment Trust ("Dugaboy") and Hunter Mountain Investment Trust ("Hunter Mountain" and collectively with Dugaboy, the "Plaintiffs") file this adversary complaint (the "Complaint") against defendants Highland Capital Management, L.P. ("HCMLP" or the "Debtor") and the Highland Claimant Trust (the "Claimant Trust," and collectively with HCMLP, the "Defendants"), seeking: (1) disclosures about and an accounting of the assets and liabilities currently held in the Claimant Trust; (2) a determination of the value of those assets; and (3) declaratory relief setting forth the nature of Plaintiffs' interests in the Claimant Trust.

## PRELIMINARY STATEMENT

1.      As holders of Contingent Claimant Trust Interests[1] that vest into Claimant Trust Interests once all creditors are paid in full, and as defendants in litigation pursued by Marc S. Kirschner ("Kirschner") as Trustee of the Litigation Sub-Trust (which seeks to recover damages on behalf of the Claimant Trust), Plaintiffs file this Complaint to obtain information about the assets and liabilities of the Claimant Trust, which was established to monetize and liquidate the assets of the HCMLP bankruptcy estate.

2.      HCMLP's October 21, 2022 and January 24, 2023 post-confirmation reports show that even with inflated claims and below market sales of assets, cash available is more than enough to pay class 8 and class 9 creditors in full. Accordingly, Plaintiffs and the entire estate would benefit from a close evaluation of current assets and liabilities. Such evaluation will also show whether assets were marked below appraised value during the pandemic and unreasonably held on the books *at those values*, along with overstated liabilities, to justify continued litigation. That litigation serves to enable James P. Seery ("Mr. Seery") and other estate professionals to carefully extract nearly every last dollar out of the estate with (along with incentive fees), leaving little or

---

[1] Capitalized terms not defined have the meanings set forth herein. If no meaning is set forth herein, the terms have the meaning set forth in the Fifth Amended Plan of Reorganization (as Modified) [Docket No. 1808].

008991

nothing for the owners that built the company. While grave harm has already been done, valuation now would at least enable the Court to put an end to this already long-running case and salvage some value for equity. As this Court observed in the *In re ADPT DFW Holdings* case, where there is significant uncertainty about insolvency, protections must be put in place so that the conduct of the case itself does not deplete the equity. In some cases, the protection is in the form of an equity committee; here a prompt valuation of the estate is needed.

3.     Upon information and belief, during the pendency of HCMLP's bankruptcy proceedings, creditor claims and estate assets have been sold in a manner that fails to maximize the potential return to the estate, including Plaintiffs. Rather, Mr. Seery, first acting as Chief Executive Officer and Chief Restructuring Officer of the Debtor and then as the Claimant Trustee, facilitated the sale of creditor claims to entities with undisclosed business relationships with Mr. Seery, who he knew would approve his inflated compensation when the hidden but true value of the estate's assets were realized. Because Mr. Seery and the Debtor have failed to operate the estate in the required transparent manner, they have been able to justify pursuit of unnecessary avoidance actions (for the benefit of the professionals involved), even though the assets of the estate, if managed in good faith, should be sufficient to pay all creditors.

4.     Further, by understating the value of the estate and preventing open and robust scrutiny of sales of the estate's assets, Mr. Seery and the Debtor have been able to justify actions to further marginalize equity holders that otherwise would be in the money, such as including plan and trust provisions that disenfranchise equity holders by preventing them from having any input or information unless the Claimant Trustee certifies that all other interest holders have been paid in full. Because of the lack of transparency to date, unless the relief sought herein is granted, there will be no checks and balances to prevent a wrongful failure to certify, much less any process to

008992

ensure that the estate has been managed in good faith so as to enable all interest holders, including the much-maligned equity holders, to receive their due.

5.      By demonizing the estate equity holders, withholding information, and manipulating the sales of claims and assets, Mr. Seery and the Claimant Trust have maximized the potential for a grave miscarriage of justice.  The estate had over $550 million in assets on the petition date, with far less in non-disputed non-contingent liabilities.

6.      By June 30, 2022, the estate had $550 million in cash and approximately $120 million of other assets despite paying what appears in reports to be over $60 million in professional fees and selling assets non-competitively, on information and belief, at least $75 million below market price.[2]

7.      On information and belief, the value of the assets in the estate as of 6/1/22 was:

| Highland Capital Assets | | Value in Millions | |
|---|---|---|---|
| | | Low | High |
| Cash as of Feb 1. 2022 | | $125.00 | $125.00 |
| Recently Liquidated | $246.30 | | |
| Highland Select Equity | $55.00 | | |
| Highland MultiStrat Credit Fund | $51.44 | | |
| MGM Shares | $26.00 | | |
| Portion of HCLOF | $37.50 | | |
| Total of Recent Liquidations | $416.24 | $416.24 | $416.24 |
| **Current Cash Balance** | | **$541.24** | **$541.24** |
| | | | |
| Remaining Assets | | | |
| Highland CLO Funding, LTD | | $37.50 | $37.50 |
| Korea Fund | | $18.00 | $18.00 |
| SE Multifamily | | $11.98 | $12.10 |
| Affiliate Notes[3] | | $50.00 | $60.00 |
| Other (Misc. and legal) | | $5.00 | $20.00 |
| **Total (Current Cash + Remaining Assets)** | | **$663.72** | **$688.84** |

---

[2] Examples of non-competitive sales are set forth in letters to the United States Trustee dated October 5, 2021, November 3, 2021 and May 11, 2022, annexed hereto as Exhibits 1, 2, and 3, as is further detail about claims buyers.
[3] Some of the Affiliate Notes should have been forgiven as of the MGM sale, but litigation continues over that also.

4

008993

8.      By June 2022, Mr. Seery had also engineered settlements making the inflated face amount of the major claims against the estate $365 million, but which traded for significantly less.

| Creditor | Class 8 | Class 9 | Beneficiary | Purchase Price |
|----------|---------|---------|-------------|----------------|
| Redeemer | $137.0 | $0.0 | Claim buyer 1 | $65 million |
| ACIS | $23.0 | $0.0 | Claim buyer 2 | $8.0 |
| HarbourVest | $45.0 | $35.0 | Claim buyer 2 | $27.0 |
| UBS | $65.0 | $60.0 | Claim buyers 1 & 2 | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 million** |

9.      Mr. Seery made no efforts to buy the claims into the estate or resolve the estate efficiently.  Mr. Seery never made a proposal to the residual holders or Mr. Dondero and never responded to the over the many settlement offers from Mr. Dondero with a reorganization (as opposed to liquidation) plan, even though many of Mr. Dondero's offers were in excess of the amounts paid by the claims buyers.

10.      Instead, Mr. Seery brokered transactions enabling colleagues with long-standing but undisclosed business relationships to buy the claims without the knowledge or approval of the Court.  Because the claims sellers were on the creditors committee, Mr. Seery and those creditors had been notified that "Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court."   These transactions are particularly suspect because the claims buyers paid amounts equivalent to the value the Plan estimated would be paid three years later.  Sophisticated buyers would not pay what appeared to be full price unless they had material non-public information that the claims could and would be monetized for much more than the public estimates made at the time of Plan confirmation – as indeed they have been.

11.      On information and belief, Mr. Seery provided that information to claims buyers rather than buying the claims in to the estate for the roughly $150 million for which they were sold.

By May 2021, when the claims transfers were announced to the Court, the estate had over 100 million

in cash and access to additional liquidity to retire the claims for the sale amounts, leaving an operating

business in the hands of its equity owners.

12.     Specifically, Mr. Seery could and should have investigated seeking sufficient funds

from equity to pay all claims and return the estate to the equity holders.  This was an obvious path

because the estate had assets sufficient to support a $59 million line of credit, as Mr. Seery

eventually obtained. If funds had been raised to pay creditors in the amounts for which claims were

sold, much of the massive administrative costs run up by the estate would never have been

incurred.  One such avoided cost would be the post-effective date litigation now pursued by Mr.

Kirschner, as Litigation Trustee for the Litigation Sub-Trust, whose professionals likely charge

over $2000 an hour for senior lawyers and over $800 an hour for first year associates (data obtained

from other cases because, of course, there has been no disclosure in the HCMLP bankruptcy of the

cost of the Kirschner litigation).    But buying the claims to resolve the bankruptcy and enabling

equity to resume operations would not have had the critical benefit to Mr. Seery that his scheme

contained: placing the decision on his incentive bonus, perhaps as much as $30 million, in the

hands of grateful business colleagues who received outsized rewards for the claims they were

steered into buying.  The parameters of Mr. Seery's incentive compensation is yet another item

cloaked in secrecy, contrary to the general rule that the hallmark of the bankruptcy process is

transparency.

13.     But worse still, even with all of the manipulation that appears to have occurred,

Plaintiffs believe that the combination of cash and other assets held by the Claimant Trust in its

own name and held in various funds, reserve accounts, and subsidiaries, if not depleted by

CORE/3522697.0002/178862860.17

unnecessary litigation, would be sufficient to pay all Claimant Trust Beneficiaries in full, with interest now.

14.     In short, it appears that the professionals representing HCMLP, the Claimant Trust, and the Litigation Sub-Trust are litigating claims against Plaintiffs and others, even though the only beneficiaries of any recovery from such litigation would be Plaintiffs in this adversary proceeding (and of course the professionals pressing the claims). It is only the cost of the pursuit of those claims that threatens to depress the value of the Claimant Trust sufficiently to justify continued pursuit of the claims, creating a vicious cycle geared only to enrich the professionals, including Mr. Seery, and to strip equity holders of any meaningful recovery.

15.     Based upon the restrictions imposed on Plaintiffs, including the unprecedented inability for Plaintiffs, as holders of Contingent Claimant Trust Interests, to access virtually any financial information related to the Claimant Trust, Plaintiffs have little to no insight into the value of the Claimant Trust assets versus the Claimant Trust's obligations and no method to independently ascertain those amounts until Plaintiffs become Claimant Trust Beneficiaries. Because Mr. Seery and the professionals benefiting from Mr. Seery's actions have ensured that Plaintiffs are in the dark regarding the estate's assets and liabilities, as well as the estate's professional and incentive fees that are rapidly depleting the estate, there is a compelling need for the relief sought herein.

16.     In bringing this Complaint, Plaintiffs are seeking transparency about the assets currently held in the Claimant Trust and their value—information that would ultimately benefit all creditors and parties-in-interest by moving forward the administration of the Bankruptcy Case.

CORE/3522697.0002/178862860.17

## JURISDICTION AND VENUE

17.     This adversary proceeding arises under and relates to the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Texas (the "Court").

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

19.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (O).

20.     In the event that it is determined that the Court, absent consent of the parties, cannot enter final order or judgments over this matter, Plaintiffs do not consent to the entry of a final order by the Court.

## THE PARTIES

21.     Dugaboy is a trust formed under the laws of Delaware.

22.     Hunter Mountain is a trust formed under the laws of Delaware.

23.     HCMLP is a limited partnership formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

24.     The Claimant Trust is a statutory trust formed under the laws of Delaware with a business address of 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

## CASE BACKGROUND

25.     On October 16, 2019 (the "Petition Date"), HCMLP, a 25-year Delaware limited partnership in good standing, filed for Chapter 11 restructuring in the United States Bankruptcy Court for the District of Delaware.

26.     At the time of its chapter 11 filing, HCMLP had approximately $550 million in assets and had only insignificant debt owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  [Dkt. No. 1943, ¶ 8].  HCMLP's reason for seeking

CORE/3522697.0002/178862860.17

bankruptcy protection was to restructure judgment debt stemming from an adverse arbitration award of approximately $190 million issued in favor of the Redeemer Committee of the Crusader Funds, which, after offsets and adjustments, would have been resolved for about $110 million. Indeed, the Redeemer Committee sold its claim for about $65 million, well below the expected $110 million,[4] and indeed, even below amounts for which Dondero offered to buy the claim.

27.      At the urging of the newly-appointed Unsecured Creditors Committee (the "Committee"), and over the objection of HCMLP and its management, the Delaware Bankruptcy Court transferred the bankruptcy case to this Court on December 4, 2019.  It seems likely that the creditors sought this transfer to take advantage of antipathy the Court had exhibited to HCMLP and its management in the ACIS bankruptcy.[5]  Shortly after the transfer, and likewise influenced by the adverse characterizations of HCMLP management in the ACIS bankruptcy, the U.S. Trustee, notwithstanding the Debtor's apparent solvency, sought appointment of a chapter 11 trustee.

28.      To avoid the appointment of a chapter 11 trustee and the potential liquidation of a potentially solvent estate, the Committee and the Debtor agreed that Strand Advisors, Inc., HCMLP's general partner, would appoint a three-member independent board (the "Independent Board") to manage HCMLP during its bankruptcy.  The three board members were:

---

[4] Reports that Redeemer Committee was paid $78 million note that in addition to the claim, the Committee sold other assets as well, which on information and belief, amounted to about $13 million.

[5] For example, at a hearing in Delaware Bankruptcy Court on the Motion to Transfer Venue to this Court, Mr. Pomerantz, counsel for Debtor stated, "The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, without the baggage of what happened in a previous case, which contrary to what Acis and the committee says, has very little do with this debtor." [December 2, 2019 Hearing Transcript at 79, Case No. 19012239 (CSS), Docket No. 181]. The taint of the ACIS case can be seen in that, without having read or even seen the supposedly offending complaint, during the ACIS case Judge Jernigan called Mr. Dondero not just vexatious, but "transparently vexatious," for allegedly having sued Moody's for failing to downgrade certain CLOs that ACIS had been manipulating in violation of its indentures and even though the Plaintiff in the supposedly offending case was not Mr. Dondero or any company he controlled [September 23, 2020 Hearing Transcript at 51-52, In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC, Case No. 18-30264-SGJ-11, Docket No. 1186].

CORE/3522697.0002/178862860.17

008998

    a. James P. Seery, Jr. – (who was selected by arbitration awardee and Committee member, the Redeemer Committee);

    b. John Dubel – (who was selected by Committee member UBS); and

    c. Former Judge Russell Nelms – (who was selected by the Debtor).

29.    The Bankruptcy Court almost immediately let the Debtor's professionals know that its feelings about Mr. Dondero and other equity holders had not changed – a disclosure that led inexorably to the many acts that now threaten to wipe out entirely the value of the equity.  For example, at one of the earliest hearings, the Court rejected recommendations by Judge Nelms, suggesting he was bamboozled because he was under management's spell.  Specifically, Judge Jernigan admitted that normally "Bankruptcy Courts should defer heavily to the reasonable exercise of business judgment by a board… But I'm concerned that Dondero or certain in-house counsel has -- you know, they're smart, they're persuasive… they have exercised their powers of persuasion or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these [actions], when it's really all about  . . . Mr. Dondero." [February 19, 2020 Hearing Transcript at 177.]

30.    At around the same time that the Court telegraphed animus towards Mr. Dondero, it also squelched oversight by responsible professionals who could and would have ensured transparency. When the Committee and the Debtor reported to the Court that they had agreed to use Judge Jones and Judge Isgur in Houston as mediators to potentially resolve the bankruptcy case, Judge Jernigan stated that she was "surprised that Judge Jones' or Judge Isgur's staff expressed that they had availability."  Debtor's counsel then asked if he could independently follow up with staff for Judges Jones and Isgur regarding their availabilities, and Judge Jernigan said, "I'll take it from here."  Six days later, Judge Jernigan simply said, "my continued thought on that [mediation by Judges Jones and Isgur] is that they just don't have meaningful time." [July 14, 2020 Hearing Transcript at 121] In retrospect, this avoided scrutiny of the case by professionals

who would recognize and potentially curtail the Court's unprecedented, immediately biased conduct of the case. This sent a powerful message to Mr. Seery and the other professionals who developed strategies to enrich themselves to the detriment of any possibility of a quick reorganization with equity regaining control.

31.     Meanwhile, not realizing the turn the bankruptcy was about to take, Mr. Dondero had agreed to step down as CEO of the Debtor and to the appointment of an Independent Board only because he was assured that new, independent management would expedite an exit from bankruptcy, preserve the Debtor's business as a going concern, and retain and compensate key employees whose work was critical to ensuring a successful reorganization.

32.     None of that happened. Almost immediately, Mr. Seery emerged as the de facto leader of the Independent Board. On July 14, 2020, the Court retroactively appointed Mr. Seery Chief Executive Officer and Chief Restructuring Officer, vesting him with the fiduciary responsibilities of a registered advisor to investors and fiduciary responsibilities to the estate. [Dkt. No. 854]. And although Mr. Seery publicly represented that he intended to restructure and preserve HCMLP's business, privately he was engineering a much different plan.

33.     Indeed, Mr. Seery's public-facing statements stand in stark contrast to what actually happened under his direction and control. For example, initially Mr. Seery reported consistently positive reviews of the Debtor's employees, describing the Debtor's staff as a "lean" and "really good team." He also testified: "My experience with our employees has been excellent. The response when we want to get something done, when I want to get something done, has been first-rate. The skill level is extremely high."

34.     Yet despite these glowing reviews, Mr. Seery failed to put a key employee retention program into place, and although key employees supported Mr. Seery and the Debtor through the

plan process, ultimately Mr. Seery fired most of those employees.  It was clear that Mr. Seery was firing anyone with perceived loyalty to Mr. Dondero, no doubt leaving remaining staff fearful of challenging Mr. Seery, lest they too be fired.

35.     From the start, and before there was much litigation to speak of, the Court regularly referred to Mr. Dondero and related parties as "vexatious litigants," emboldening the Debtor to do the same, even while admitting it had not presented evidence that Mr. Dondero was a vexatious litigant.  This was plainly a carryover from the ACIS case where the Court labelled Mr. Dondero a "transparently" vexatious litigant based pleadings she had only heard about from parties opposing Dondero and admittedly had not read herself.   Ironically, the first time Mr. Dondero was labeled "vexatious" by the Court in the HCM case, he was defending himself from three lawsuits initiated by the Debtor and had commented in proposed settlements in the case, but had not himself initiated any actions in the case.  Thereafter, though, the Debtor and its professionals repeated the mantra that Dondero and his companies were vexatious litigants to successfully oppose sharing information about the estate with them.

36.     In addition to the Debtor's mistreatment of employees, under the control of the Independent Board, most of the ordinary checks and balances that the hallmark of bankruptcy were ignored.  Despite providing regular and robust financial information to the Committee, the Debtor inexplicably failed and refused to file quarterly 2015.3 reports, leaving stakeholders, including Plaintiffs, in the dark about the value of the estate and the mix of assets it held.    Amplifying the lack of transparency, Mr. Seery further engineered transactions to hide the real value of the estate.

37.     For example, he authorized the Debtor to settle the claims of HabourVest (which claims had initially been valued at $0) for $80 million, in order to acquire HarborVest's interest in Highland CLO Funding, Ltd. ("HCLOF"), gain HarborVest's vote in favor of its Plan, and hide

CORE/3522697.0002/178862860.17

the value of Debtor's interest in HCLOF by placing it into a non-reporting subsidiary. This created another pocket of non-public information because the pleadings supporting the 9019 settlement valued the HCLOF interest at $22 million, when, on information and belief, it was worth $40 million at the time and over $60 million 90 days later when the MGM sale was announced.

38.     At the same time, Mr. Seery and the Independent Board deliberately shut out equity holders from any discussion surrounding the plan of reorganization or HCMLP's efforts to emerge from bankruptcy as a going concern. Indeed, as noted above, Mr. Seery failed to meaningfully respond to the many proposals made by residual equity holders to resolve the estate and never encouraged any dialogue between creditors and equity holders. These failures only contributed to the difficulty of getting stakeholders' buy-in for a reorganization plan and significantly undermined an efficient exit from bankruptcy.

39.     Worse still, while knowing that HCMLP had sufficient resources to emerge from bankruptcy as a going concern (and, on information and belief, while knowing that the estate was solvent), Mr. Seery and the Independent Board failed to propose any plan of reorganization that contemplated HCMLP's continued post-confirmation existence. Instead, and inexplicably, the very first plan proposed contemplated liquidation of the company, as did all subsequent plans.

40.     While secretly engineering the total destruction of HCMLP, Mr. Seery also privately settled multiple proofs of claim against the estate at inflated levels that were unreasonable multiples of the Debtor's original estimates. He did this notwithstanding the Debtor's early and vehement objection to many of the claims as baseless. But instead of litigating those objections in a manner that would have exposed the true value of the claims, on information and belief, Mr. Seery settled the claims as a means of brokering sales of the claims at 50-60% of their face values. That is, the inflated values softened up claims sellers to be willing to sell. Had the Debtor instead

fought the inflated proofs of claim in open court, it could have settled the claims for closer to true value and ensured that the estate had sufficient resources to pay them.

41.     It is also no coincidence that virtually all original proofs of claim were sold to buyers that had prior business relationships with Mr. Seery and/or affiliates of Grosvenor (company with which Mr. Seery has a long personal history)—buyers that ultimately would be positioned to approve a favorable compensation and bonus structure for Mr. Seery.

42.     That the claims sales happened at all is curious in light of the scant publicly-available information about the value of the estate.  It would have been impossible, for example, for any of the claims buyers to conduct even modest due diligence to ascertain whether the purchases made economic sense.  In fact, the publicly-available information purported to show a net decrease in the estate's asset value by approximately $200 million in a matter of months during the global pandemic.  Given the sophistication of the claims-buyers, their purchases of claims at prices that exceeded published expected recoveries (according to the schedules then available to the public) would only make sense if they obtained inside information regarding the transactions undertaken by Debtor management that would justify the transfer pricing.

43.     And indeed, the claims could and would be monetized for much more than the publicly-available information suggested (as only one with inside information would know).  In October 2022, $250 million was paid to Class 8 holders.  That is about 85% of the inflated proofs of claim and $90 million more than plan projections.  On information and belief, claims buyers have thus had an over 170% annualized return thus far, with more to come.  On information and belief, Mr. Seery will use this "success" to justify an incentive bonus estimated in the range of $30 million.

009003

44.    At the same time, the Claimant Trust has made no distributions to Contingent
Claimant Trust Interest holders and has argued in various proceedings that no such distributions
are likely.  No wonder. The cost of holding open the estate, including unnecessary litigation costs,
appears to have exceeded $140 million post-confirmation, and seems geared to ensure that no such
distributions can occur, even though it can now be projected that the litigation is not needed to pay
creditors.  *See* Docket No. 3410-1.

45.    It is worth noting that it appears that virtually all of the claims trades brokered on
behalf of Committee members seem to have occurred while those entities remained on the
Committee.  Yet at the outset of their service, Committee members were instructed by the United
States Trustee that "Creditors wishing to serve as fiduciaries on any official committee are advised
that they may *not* purchase, sell or otherwise trade in or transfer claims against the Debtor while
they are committee members absent an order of the Court."  Thus, the claims trades violated
Committee members' fiduciary duty to the estate while lining the pockets of Mr. Seery and other
Debtor professionals, to the detriment of creditors and residual equity holders.

46.    The sales of claims were not the only transactions shrouded in secrecy.  As further
detailed in other litigation, assets were sold with insufficient disclosures, no competitive bidding,
no data room, and without inviting equity (which may have at one time had the knowledge to make
the highest bid) to participate in the sales process.  Indeed, on occasion assets were sold for
amounts less that Mr. Dondero's written offers. This exacerbated the harms caused by the lack of
transparency characterized by the Court's indifference to the Debtor's complete failure to abide its
Rule 2015 disclosure obligations.

47.    In short, the lack of transparency combined with at least the appearance of bias, if
not actual bias of the Bankruptcy Court, emboldened and enabled an opportunistic CRO to

manipulate the bankruptcy to enrich himself, his long-time business associates, and the professionals continuing to litigate to collect fees to pay claims that could have been resolved with money left over for equity but for that manipulation.

## STATEMENT OF FACTS

### A.   Plaintiffs Hold Contingent Claimant Trust Interests

48.   As of the Petition Date, HCMLP had three classes of limited partnership interests (Class A, Class B, and Class C).  *See* Disclosure Statement [Docket No. 1473], ¶ F(4).

49.   The Class A interests were held by Dugaboy, Mark Okada ("Okada"), personally and through family trusts, and Strand Advisors, Inc. ("Strand"), HCMLP's general partner.  The Class B and C interests were held by Hunter Mountain.  *Id.*

50.   In the aggregate, HCMLP's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by Dugaboy, (c) 0.0627% by Okada, and (d) 0.25% by Strand.

51.   On February 22, 2021, the Court entered the Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief [Docket No. 1943] (the "Confirmation Order") [Docket No. 1808] (the "Plan").

52.   In the Plan, General Unsecured Claims are Class 8 and Subordinated Claims are Class 9.  *See* Plan, Article III, ¶ H(8) and (9).

53.   In the Plan, HCMLP classified Hunter Mountain's Class B Limited Partnership Interest and Class C Limited Partnership Interest (together, Class B/C Limited Partnership Interests) as Class 10, separately from that of the holders of Class A Limited Partnership Interests, which are Class 11 and include Dugaboy's Limited Partnership Interest.  *See* Plan, Article III, ¶ H(10) and (11).

16

54. According to the Plan, Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests are subordinate to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests. *See* Plan, Article I, ¶44.

55. In the Confirmation Order, the Court found that the Plan properly separately classified those equity interests because they represent different types of equity security interests in HCMLP and different payment priorities pursuant to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended (the "Limited Partnership Agreement"). Confirmation Order, ¶36; Limited Partnership Agreement, §3.9 (Liquidation Preference).

56. The Court overruled objections to the Plan lodged by entities it deemed related to Mr. Dondero, including Dugaboy. In doing so, the Court acknowledged that Dugaboy has a residual ownership interest in HCMLP and therefore "technically" had standing to object to the Plan. *See* Confirmation Order, ¶¶ 17-18.

57. Based on the Debtor's financial projections at the time of confirmation, however, the Court found that the plan objectors' "economic interests in the Debtor appear to be extremely remote." *Id.*, ¶ 19; *see also id.*, ¶ 17 ("the remoteness of their economic interests is noteworthy").

58. The Plan went Effective (as defined in the Plan) on August 11, 2021, and HCMLP became the Reorganized Debtor (as defined in the Plan) on the Effective Date. *See* Notice of Occurrence of the Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 2700].

59. The Plan created the Claimant Trust, which was established for the benefit of Claimant Trust Beneficiaries, which is defined to mean:

> the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed

CORE/3522697.0002/178862860.17

Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests

*See* Plan, Article I, ¶27; *see also* Claimant Trust Agreement, Article I, 1.1(h).

60.     Plaintiffs hold Contingent Claimant Trust Interests, which will vest into Claimant Trust Interests upon indefeasible payment of Allowed Claims.

61.     Depending on the realization of asset value less debts, Plaintiffs may become Claimant Trust Beneficiaries.

62.     In its Post Confirmation Quarterly Report for the Third Quarter of 2022 [Docket No. 3582], Debtor stated that it distributed $255,201,228 to holders of general unsecured claims, which is 64% of the total allowed general unsecured claims of $387,485,568.  This amount is far greater than was anticipated at the time of confirmation of the Plan.

**B.      Debtor Has Failed To Disclose Claimant Trust Asse**ts

63.     Upon information and belief, the value of the estate as held in the Claimant Trust has changed markedly since Plan confirmation.  Not only have many of the assets held by the estate fluctuated in value based on market conditions, with some increasingly in value dramatically, but Plaintiffs are aware that many of the major assets of the estate have been liquidated or sold since Plan confirmation, locking in increased value to the estate.

64.     The estate is solvent and has always been solvent.  Nonetheless, Mr. Seery has remained committed to maximizing professional fees and incentive fees by increasing the total claims amount to justify litigation to satisfy those inflated claims.