**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

**[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 40

# APPELLANT RECORD

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | |

*INDEX*

### APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
### SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
### DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its

individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital

Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and

files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in

the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

### I.
### STATEMENT OF THE ISSUES

A.     Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the
court to consider evidence and other non-pleading materials including, but not limited to,
the court's reasoning that:

1. the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type
analysis;

2. the colorability analysis is "akin to the standards applied under the ... *Barton*
doctrine";

3. the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts
have applied when considering motions to file suit when a vexatious litigant bar
order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File
Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the
Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on
10/23/2023.

     4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.    Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.    Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

    1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

    2.  Appellant's claims or allegations are not "plausible";

    3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

    4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

    5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

    6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

    7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

    8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

    9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

    10.  Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.    Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.    Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.    Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave? [*See* Dkt. 3713].

O.    Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.    Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

    1.    declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

    2.    concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*Vol. 1*

1.    **Notice of Appeal**

*000001*       a.    Notice of Appeal **[Dkt. 3906]**;

*000276*       b.    Amended Notice of Appeal **[Dkt. 3908]**; and

*000551*       c.    Second Amended Notice of Appeal **[Dkt. 3945]**

2.    **The judgment, order, or decree appealed from:**

    a.    Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

000835
000940

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

001045

    **b.** Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3. Docket sheet.**

001049

    a. Bankruptcy Case No. 19-34054

**4. Other Items to be included:**

    a. HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

Vol. 2

| FILE DATE | DOCKET No. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

001594

001660

001821

001830

Vol. 3
001849
Thru  Vol. 4

Vol 4
002236

002243

002248

| | 03/30/2023 | 3706 | HMIT Amended Certificate of Conference |
|---|---|---|---|
| | 03/30/2023 | 3707 | Highland's Response in Opposition to Emergency Motion for Leave |
| | 03/30/2023 | 3708 (3708-1 — 3708-8) | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| | 03/31/2023 | 3712 | HMIT Reply in Support of Application for Expedited Hearing |
| | 03/31/2023 | 3713 | Order Denying Motion for Expedited Hearing |
| | 04/04/2023 | 3718 (3718-1 — 3718-4) | HMIT Motion for Leave to File Appeal |
| | 04/04/2023 | 3719 (3719-1) | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| | 04/05/2023 | 3720 | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| | 04/05/2023 | 3721 (3721-1 — 3721-2) | HMIT Notice of Appeal |
| | 04/06/2023 | 3726 (3726-1) | Certificate of Mailing regarding HMIT Notice of Appeal |
| | 04/07/2023 | 3731 | Notice of Docketing Transmittal of Notice of Appeal |
| | 04/13/2023 | 3738 (3738-1) | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| | 04/13/2023 | 3739 | Highland's Motion for Expedited Hearing |
| | 04/13/2023 | 3740 | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

Vol. 5
002251
002254
002262
002340
002355
002358
002391
002398
002400
Vol. 8
002826
Thru Vol. 7
Thru Vol. 9
Vol. 9
003257
003260
003270
003278

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| *Vol. 10* 003281 | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| 003286 | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| 003291 | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| 003294 | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| 003296 | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| 003299 | 04/19/2023 | 3751 | Notice of Status Conference |
| 003302 | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| 003311 | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| 003314 | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| 003323 | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 003368 | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| 003430 | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

[3] A duplicate of Doc 3758.

*Vol. 10*

*003458*

*003463*

*Vol. 11*

*003537*

*Thru Vol. 16*

*Vol. 17*

*004665*

*004712*

*004714*

*004808*

*004813*

*004836*

*Vol. 18*
*004930*

*004931*

| | | | |
|---|---|---|---|
| | | | Holdings LLC, Stonehill Capital Management LLC |
| 05/11/2023 | 3781 | | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| 05/11/2023 | 3783 | | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| 05/11/2023 | 3784 (3784-1 — 3784-46) | | Declaration of John Morris in Support of Highland Parties' Joint Response |
| 05/18/2023 | 3785 | | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| 05/22/2023 | 3787 | | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 05/24/2023 | 3788 (3788-1 — 3788-5) | | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 05/24/2023 | 3789 | | HMIT's Application for Expedited Hearing |
| 05/24/2023 | 3790 | | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| 05/25/2023 | 3791 (3791-1 — 3791-5) | | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| 05/25/2023 | 3792 | | Order Setting Expedited Hearing |
| 05/25/2023 | 3795 | | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18

004939.

004959

004961

004984

005049

005114

Vol. 26

006608

Vol. 39

009273

009290

009416

009424

| | | | |
|---|---|---|---|
| 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
| 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Thru Vol. 25

Thru Vol. 39

*Vol. 40*
*009426*

| | 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
|---|---|---|---|
| *009436* | 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| *009444* | 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| *009445* | 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| *009446* | 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| *009456* | 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| *009458* *Vol. 42* *009841* | 06/13/2023 *Thru Vol. 41* | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| | 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| *009901* | 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| *009905* | 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| *009908* | 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| *009912* | 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

Vol. 42
009928
009944
010013
010023
010025
010029
010035
010047
010059
Vol. 43
010062

| Date | Doc | Description |
|---|---|---|
| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.    Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits**<br>**(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits**<br>**(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023                Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
    Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S OBJECTIONS TO THE HIGHLAND
PARTIES' EXHIBIT AND WITNESS LIST**

Movant Hunter Mountain Investment Trust ("HMIT") files these written objections

("Objections") to The Highland Parties' Witness and Exhibit List with Respect to

Evidentiary Hearing to be Held on June 8, 2023 [Doc. 3817] ("Highland Parties' Witness

and Exhibit List") regarding HMIT's Emergency Motion for Leave to File Verified

Adversary Proceeding [Doc. 3699] and Supplement to Emergency Motion for Leave to File

Verified Adversary Proceeding [Doc. 3760] (together the "Motion for Leave").[1]

**HMIT's Objections to the Highland Parties' Witnesses and Exhibit List in its Entirety**

HMIT has objected and continues to object to the evidentiary nature of the June 8,

2023, hearing ("June 8, Hearing") on HMIT's Motion for Leave, and HMIT does not waive

its substantive and procedural rights or objections, including, but not limited to, HMIT's

objections to the evidentiary format of the Motion for Leave Hearing, including as ordered

by the Court's May 22, 2023, Order. HMIT's has previously objected to an evidentiary

hearing on "colorability," and to applying an evidentiary burden of proof to HMIT's

Motion for Leave.[2]   Further, HMIT objects that all of the Highland Parties' proposed

---

[1] This instrument and HMIT's Objections are filed subject to and without waiving any of HMIT's substantive and procedural rights including, but not limited to, HMIT's objections to the evidentiary format of the Motion for Leave Hearing, including as ordered by the Court's May 22, 2023, Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE ## 3699 & 3760] [Doc. 3787] ("May 22 Order"). HMIT's prior objections to an evidentiary hearing on "colorability," and applying an evidentiary burden of proof to HMIT's Motion for Leave, were asserted by HMIT during the April 24, 2023, Status Conference, and were further set forth in HMIT'S Reply Brief in Support of its Motion for Leave [Doc. 3785] and during the May 26, 2023, hearing regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing [Doc 3788], all of which objections are incorporated herein for all purposes ("HMIT's Evidentiary Hearing Objections").

Subject to and without waiving HMIT's Evidentiary Hearing Objections, and based on the Court's rulings relating to the evidentiary format for the Motion for Leave Hearing, HMIT also files this instrument and these Objections subject to and without waiving HMIT's procedural and substantive rights relating to HMIT's efforts to take discovery in advance of the Motion for Leave Hearing including, but not limited to, the discovery HMIT requested in Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing [Doc. 3791] to the extent it was denied in the Court's May 26, 2023, Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing [Dkt. Nos. 3788 and 3791] [Doc. 3800].

[2] *See* HMIT's Evidentiary Hearing Objections, which are incorporated herein in their entirety by reference.

witnesses and exhibits identified in the Highland Parties' Witness and Exhibit List are

irrelevant because the "colorability" issue as to HMIT's proposed complaint should be

decided based on a pleadings standard, rather than an evidentiary standard, that is less

stringent than that applied under a Rule 12(b)(6) motion. *See In re Deepwater Horizon*, 732

F.3d 326, 340 (5th Cir. 2013) (quoting *Richardson v. United States,* 468 U.S. 317, 326 n. 6 (1984));

*Louisiana World Exposition v. Fed. Ins. Co.,* 858 F.2d 233, 252-53 and n. 15 (5th Cir. 1988).

### HMIT's Additional Objections to Specific Exhibits in the Highland Parties' Witness and Exhibit List

Subject to and without waiving the foregoing, HMIT asserts the following additional

objections to specific exhibits listed in the Highland Parties' Witness and Exhibit List:

| NO. | EXHIBIT | HMIT ADDITIONAL OBJECTION TO SPECIFIC EXHIBITS |
|---|---|---|
| 1. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] | • FRE 401, 402 – Relevance |
| 2. | *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief* [Docket No. 1943] | • FRE 401, 402 – Relevance |
| 3. | *Verified Petition to Take Deposition Before Suit and Seek Documents* filed on July 22, 2021 (Cause No. DC-21-09534) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 4. | *Verified Amended Petition to Take Deposition Before Suit and Seek Documents* filed on May 2, 2022 (Cause No. DC-21-09534) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 5. | *Declaration of James Dondero* dated May 31, 2022 (Cause No. DC-21-09534) | • FRE 401, 402 – Relevance |
| 6. | *Memorandum Opinion and Order Granting* | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |

| | | |
|---|---|---|
| | *James Dondero's Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request, and Related Rulings* [Adv. Pro. No. 21-03051, Docket No. 23] | |
| 7. | *Order* dated June 1, 2022, denying First Rule 202 Petition and dismissing case (Cause No. DC-21-09534) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 8. | *Petitioner Hunter Mountain Investment Trust's Verified Rule 202 Petition* filed on January 20, 2023 (Cause No. DC-23-01004) | • FRE 401, 402 – Relevance |
| 9. | *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023 (Cause No. DC-23-01004) | • FRE 401, 402 – Relevance |
| 10. | *Order* dated March 8, 2023, denying Second Rule 202 Petition and dismissing case (Cause No. DC-23-01004) | • FRE 401, 402 – Relevance |
| 11. | Email sent by James Dondero to James Seery on December 17, 2020 | |
| 12. | James Dondero's resignation letters dated January 9, 2020 | • FRE 401, 402 – Relevance |
| 13. | James Dondero's October 9, 2020 resignation e-mail | • FRE 401, 402 – Relevance |
| 14. | Advisors' October 16, 2020 letter to James P. Seery | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 15. | *Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO* entered on June 7, 2021 [Adv. Pro. No. 20-03190, Docket No. 190] | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 16. | *Order (A) Approving the Adequacy of the Disclosure Statement; (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; and (E) Approving Form* | • FRE 401, 402 – Relevance |

| | | |
|---|---|---|
| | *and Manner of Notice* entered November 24, 2020 [<mark>Docket No. 1476</mark>] | |
| 17. | Written notices of termination of shared services agreements with NexPoint Advisors, L.P. and Highland Capital Management Advisors, L.P., dated November 30, 2020 | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 18. | Demand Letter sent to James Dondero on December 3, 2020 | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 19. | Demand Letter sent to HCMFA on December 3, 2020 | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 20. | Demand Letter sent to HCRE on December 3, 2020 | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 21. | Demand Letter sent to HCMS on December 3, 2020 | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 22. | James Dondero's text message to James Seery sent on December 3, 2020 | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 23. | *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-03190, <mark>Docket No. 10</mark>] | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 24. | Transcript of the hearing held on December 16, 2020 | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 25. | Article: *MGM Leads 2020 Media Acquisition Targets as the Entertainment World Splits Into Haves and Have-Nots* (January 26, 2020) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 26. | Article: *It's 'No Time to Die' for Hedge-Fund* | • FRE 401, 402 – Relevance |

| | | |
|---|---|---|
| | *Manager Ulrich's Big James Bond Bet* (Oct. 11, 2020) | • FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 27. | Article: *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale* (Dec. 21, 2020) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 28. | Article: *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue* (Dec. 23, 2020) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 29. | Article: *Could Apple Be Ready to Gobble Up MGM Studios Entirely* (Dec. 24, 2020) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 30. | Article: MGM Is For Sale (Again) (January 15, 2021) | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 31. | Email from James Seery to the other Independent Directors on December 8, 2020 | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 31-a. | Highland CLO Funding Ltd.'s Statement of Financial Position as of November 30, 2020 **[REDACTED]** | • FRE 401, 402 – Relevance<br>• FRE 106 – Incomplete<br>• Improper Redaction |
| 32. | *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 33. | Letter from the Texas State Securities Board to Highland Capital Management, L.P., dated May 9, 2023 | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 34. | Article: *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (May 26, 2021) | • FRE 401, 402 – Relevance |

| 35. | Letter from Davor Rukavina, to counsel to NexPoint, to Stonehill Capital Partners, dated October 14, 2022 | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
|---|---|---|
| 36. | *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* entered on July 16, 2020 [Docket No. 854] | • FRE 401, 402 – Relevance |
| 37. | *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] | • FRE 401, 402 – Relevance |
| 38. | *Claimant Trust Agreement*, effective as of August 11, 2021 | • FRE 401, 402 – Relevance |
| 39. | August 26, 2021 *Minutes of the Meeting of the Claimant Trust Oversight Board of the Highland Claimant Trust* [**REDACTED**] | • FRE 401, 402 – Relevance<br>• FRE 106 – Incomplete<br>• Improper Redaction<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 40. | August 30, 2021 *Minutes of the Meeting of the Claimant Trust Oversight Board of the Highland Claimant Trust* [**REDACTED**] | • FRE 401, 402 – Relevance<br>• FRE 106 – Incomplete<br>• Improper Redaction<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 41. | *Memorandum of Agreement* executed December 6, 2021 [**REDACTED**] | • FRE 401, 402 – Relevance<br>• FRE 106 – Incomplete<br>• Improper Redaction |
| 42. | *Assignment Agreement*, effective as of October 8, 2021 | • FRE 401, 402 – Relevance |
| 43. | Transcript of the status conference held on April 24, 2023 | • FRE 401, 402 – Relevance |
| 44. | *Litigation Sub-Trust Agreement*, effective as of | • FRE 401, 402 – Relevance |

|  | August 16, 2021 |  |
|---|---|---|
| 45. | *Original Complaint*, Case No. 3:21-cv-00842-B, Docket No. 1 (N.D. Tex. April 12, 2021) | • FRE 401, 402 – Relevance<br>• FRE 403<br>• FRE 803 - Hearsay |
| 46. | *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* [Docket No. 1875] | • FRE 401, 402 – Relevance |
| 47. | *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339] | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 48. | *Notice of Debtor's Amended Operating Protocols* [Docket No. 466] | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |
| 49. | *Partnership Interest Purchase Agreement Among The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust /42, Mark K. Okada, and Hunter Mountain Investment Trust Dated as of December 24, 2015* | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 50. | Hunter Mountain Investment Trust's *Secured Promissory Note* to Highland Capital Management, LP ($63 Million) | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 51. | Hunter Mountain Investment Trust's *Secured Promissory Note* to Dugaboy ($62.6 Million) | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 52. | Hunter Mountain Investment Trust's *Secured Promissory Note* to Mark Okada ($16.3 Million) | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 53. | Hunter Mountain Investment Trust's *Secured Promissory Note* to The Mark and Pamela Okada Family Trust-Exempt Trust #1 ($3.2 Million) | • FRE 401, 402 – Relevance<br>• FRE 403 |

| 54. | Hunter Mountain Investment Trust's *Secured Promissory Note* to The Mark and Pamela Okada Family Trust-Exempt Trust #2 ($1.4 Million) | • FRE 401, 402 – Relevance<br>• FRE 403 |
|-----|---|---|
| 55. | Hunter Mountain Investment Trust Demand Letter, dated May 3, 2021 | • FRE 401, 402 – Relevance<br>• FRE 403 |
| 56. | Transcript of the hearing held on May 26, 2023 | • FRE 401, 402 – Relevance |
| 57. | *Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE ## 3699 & 3760]* (Docket No. 3787) | • FRE 401, 402 – Relevance |
| 58. | *Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing* (Docket No. 3800) | • FRE 401, 402 – Relevance |
| 59. | Email chain dated October 9, 2021 – November 5, 2021 re Incentive Compensation Proposal | • FRE 401, 402 – Relevance<br>• FRE 106 – Incomplete<br>• Improper Redaction<br>• FRE 803 - Hearsay<br>• FRE 901 - Authenticity |
| 60. | Highland CLO Funding, Ltd. *Annual Report and Audited Financial Statements for the Financial Year Ended 31 December 2020* | • FRE 401, 402 – Relevance<br>• FRE 803 - Hearsay |

HMIT reserves the right to amend and/or supplement this instrument and HMIT's objections to the Highland Parties' Witness and Exhibit.

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By:  /s/ Sawnie A. McEntire

Sawnie A. McEntire

009434

Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

**Attorneys for Hunter Mountain**
**Investment Trust**

## CERTIFICATE OF SERVICE

I certify that on the 7th day of June 2023, a true and correct copy of the foregoing
Motion was served on counsel of record for all of the Respondents.

_/s/ Sawnie A. McEntire_
Sawnie A. McEntire

009435

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | Chapter 11 |
| **MANAGEMENT, L.P.** | § | |
| | § | Case No. 19-34054-sgj11 |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S RESPONSE
TO HIGHLAND CLAIMANT TRUST AND JAMES P. SEERY, JR.'S JOIINT
MOTION TO EXCLUDE TESTIMONY AND DOCUMENTS OF EXPERTS SCOTT
VAN METER AND SETVE PULLY**

009436

Hunter Mountain Investment Trust ("HMIT") submits this Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully ("Joint Motion").[1]

## A.    HMIT's Expert Disclosures are Timely and Exceed Procedural Requirements.

1.      Bankruptcy Rule of Procedure 9014 governs this contested matter, and 9014 specifically excludes Rule 26(a)(2)(b) requirements regarding expert witness disclosures and reports. *See* Bank. R. Proc. 9014 ("The following subdivisions of Fed. R. Civ. P. 26, as incorporated by Rule 7026, shall not apply in a contested matter unless the court directs otherwise: 26(a)(1) (mandatory disclosure), 26(a)(2) (***disclosures regarding expert testimony***) and 26(a)(3) (additional pre-trial disclosure), and 26(f) (mandatory meeting

---

[1] HMIT files this Response subject to and without waiving its prior objections concerning the evidentiary format of the June 8 hearing, including, , but not limited to, HMIT's objections to the evidentiary format of the Motion for Leave Hearing, including as ordered by the Court's May 22, 2023, Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE ## 3699 & 3760] (Doc. 3787) ("May 22 Order"). HMIT's prior objections to an evidentiary hearing on "colorability," and applying an evidentiary burden of proof to HMIT's Motion for Leave, were asserted by HMIT during the April 24, 2023, Status Conference, and were further set forth in HMIT'S Reply Brief in Support of its Motion for Leave (Doc. 3785) and during the May 26, 2023, hearing regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing (Doc 3788), all of which objections are incorporated herein by reference for all purposes ("HMIT's Evidentiary Hearing Objections"). HMIT objects that all of the Highland Parties' proposed exhibits are irrelevant because the "colorability" issue should be decided per a standard no more stringent than that applied under a Rule 12(b)(6) motion. *See In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) (quoting *Richardson v. United States*, 468 U.S. 317, 326 n. 6 (1984)); *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 252-53 and n. 15 (5th Cir. 1988).

009437

before scheduling conference/discovery plan) (emphasis added)). Moreover, this Court's

local rules do not require expert disclosures.

     2.     Here, the Court specifically explained the limited pre-hearing discovery

which would be allowed during the May 26, 2023 on HMIT's Motion for Expedited

Discovery (Doc. 3788). The Court stated:

> "Here's what I'm going to do. We'll have yet another order regarding what
> kind of hearing we're going to have on June 8th, and it will clarify that Mr.
> Seery can testify and Mr. Dondero can testify, and both of them shall be
> made available for depositions before June 8th but not sooner than next
> Wednesday. And that is the evidence that the Court will consider. No other
> deposi... No other -- I'm still talking. No other depositions will happen
> between now and June 8th. You can make your legal arguments, ***you can
> put on your witnesses***, and the Court is going to rule." May 26, 2023 Hr. Tr.
> at 51:3-14 (emphasis added).

Nothing in the Court's statements limited any parties' rights to call other witnesses. The

only limitation concerned discovery. As such, the Highland Parties' and Seery's

statements to the contrary should be recognized for what it is: the paradigm of

doublespeak. Indeed, they also designated Mark Patrick as a witness.

     3.     The Court further explained that there would be no pre-hearing document

production among the parties. *See id*. at 52:10-17 ("I'm denying that request [to compel

document productions]. Okay. And I'm going to go back to the cart-before-the-horse

analogy. You know something, you have something that makes you think you have

colorable claims. Okay? ***You can put on your witness and try to convince me***. You can

cross-examine Mr. Seery and try to convince me. Okay? But if you convince me, then

there'll be a normal lawsuit and discovery. But at this point, I think it's a very improper

request." (emphasis added)).

4.      Finally, the Court made clear that other than pursuant to Local Rule 9014-

1(c) (providing for witness and exhibit lists to be exchanged three days before the

hearing) and the depositions of Mr. Dondero and/or Mr. Seery, there would be no other

required pre-hearing disclosures. *See* May 26, 2023 Order on HMIT's Emergency Motion

for Expedited Discovery (Doc. 3800) ("None of the parties shall be entitled to any other

discovery [other than the depositions of Mr. Dondero and/or Mr. Seery], including the

production of documents from Mr. Seery or Mr. Dondero, ***or any other party or witness***

***pursuant to a subpoena duces tecum, or otherwise***, prior to the conduct of the Depositions

or to the court's ruling on the Motion for Leave following the June 8, 2023 hearing."

(emphasis added)). Again, this makes clear that other witnesses were contemplated.

5.      Again, contrary to the position taken in the Joint Motion, the Highland

Parties identified Mark Patrick as a witness—though he was not specifically discussed as

a witness at the May 26, 2023 hearing.

6.      HMIT's expert witness disclosures were timely and provided more detail

than required. While HMIT has consistently taken the position (and still does) that the

Court should only consider the four corners of its proposed Adversary Proceeding

pursuant to the governing Supreme Court and Fifth Circuit standard for "colorability" of

a claim, this Court clearly and unequivocally has rejected that standard in favor of an

evidentiary hearing with expressly limited pre-hearing discovery. To the extent a representative of Stonehill Capital Management, LLC or Farallon Capital Management, LLC could offer expert testimony regarding their claims trading, so should HMIT have the same opportunity. The fact that they chose not to do so does not create a "trial by ambush" situation.

7.      None of the cases cited in the Joint Motion involves a pre-hearing disclosures prior to a contested bankruptcy proceeding—and certainly none is analogous to the facts of the Court's order in this case (which involve a gatekeeping colorability determination). *In re Dernick*, 2019 WL 5078632 (Bankr. S.D. Tex. September 10, 2019) (relating to discovery served in an adversary proceeding after the discovery deadline expired and discovery served while trial was ongoing); *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354 (5th Cir. 2018) (failure to disclose updated medical records in Uniformed Services Employment and Reemployment Rights Act matter); *In re Cathey*, 2021 WL 2492851 at *2 (Bankr. N.D. Miss. June 17, 2021) (involving improper, late, and jurisdictionally prohibited form of request for relief) ("Rather than appearing for the state court proceeding at the time or pursuing the state court appeals process, the debtor asks this Court to essentially overturn a judgment of the state court that is now final and non-appealable. This position is expressly prohibited by the *Rooker-Feldman* doctrine.").

009440

**B.    The Opinions of Mr. Pully and Mr. Van Meter Survive *Daubert* Scrutiny.**

8.    The Joint Motion's authority related to the substance of HMIT's experts is similarly inapposite. Far from exercising a *Daubert* analysis—a pre-trial motion practice under the Federal Rules of Civil Procedure—this Court is making a colorability determination under Rule 9014 contested proceeding, which expressly excludes disclosures regarding experts. HMIT produced the resumes and testifying history for its experts; neither of whom have ever been precluded from testifying. Both are abundantly qualified. HMIT also produced exhibits that in detail explained the experts' forensic analysis and methodology of their computations, which are well within their focused expertise.

9.    Mr. Van Meter has served as bankruptcy trustee and is very familiar with claims trading. He has not only worked as a post-confirmation trustee himself (a role he currently holds), he also has worked with other post-confirmation trustees, has dealt with claims traders, and in over 30 years of experience in bankruptcy matters is highly qualified to express the his opinions.

10.    As to his compensation analysis, Mr. Van Meter's opinions similarly are based on knowledge of post-confirmation trustee compensation as that provided to Mr. Seery. He also has personal experience as post confirm trustee and as an attorney and financial advisor. He has been involved in dozens of bankruptcy cases which have resulted in post-confirmation in which the compensation of the post-confirmation trustee

[6]

has to be resolved. Simply put, Mr. Van Meter is very familiar with post-confirmation compensation of a trustee.

11.     This is a bench hearing on colorability—not a trial where "junk science" is a concern. The *Daubert* standards and policies are not applicable. The policies and principles in the cases cited in the Joint Motion simply do not apply to this proceeding. Indeed, none of the cases cited in the Joint Motion is in a bankruptcy contested proceeding matter (much less involving a gatekeeping colorability determination). The Joint Motion takes a kitchen sink approach to criticize HMIT's expert opinions by throwing out abbreviated complaints which lack any valid reasoning or detail. In the unlikely event the Court finds the Joint Motion persuasive, then it can consider the kitchen-sink arguments in what weight to give the testimony.

WHEREFORE, Hunter Mountain Investment Trust respectfully requests this Court to deny the Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully and to grant HMIT all such other and further relief as is just and proper.

DATED: June 7, 2023

009442

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY
PLLC**

By:   /s/ *Sawnie A. McEntire*

      Sawnie A. McEntire
      State Bar No. 13590100
      smcentire@pmmlaw.com
      1700 Pacific Avenue, Suite 4400
      Dallas, Texas 75201
      Telephone: (214) 237-4300
      Facsimile: (214) 237-4340

      Roger L. McCleary
      State Bar No. 13393700
      rmccleary@pmmlaw.com
      One Riverway, Suite 1800
      Houston, Texas 77056
      Telephone: (713) 960-7315
      Facsimile: (713) 960-7347

      *Attorneys for Hunter Mountain
      Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on the 7th day of June 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire

009443

BTXN 119 (rev. 03/19)

# AUDIO / TRANSCRIPT ORDER

| 1. ORDER REQUEST:<br>☐ DUPLICATE OF AUDIO<br>☐ CD Recordings Only    ☒ TRANSCRIPT | 2. DATE OF ORDER:<br>6/9/2023 | FOR COURT USE ONLY<br>DUE DATE: |
|---|---|---|

| 3. NAME:<br>Melanie Holmes | 4. PHONE NUMBER:<br>972-755-7105 | 5. EMAIL ADDRESS:<br>mholmes@haywardfirm.com |
|---|---|---|

| 6. MAILING ADDRESS:<br>10501 N. Central Expy., Ste. 106 | 7. CITY:<br>Dallas | 8. STATE:<br>TX | 9. ZIP CODE:<br>75231 |
|---|---|---|---|

| 10. CASE NUMBER:<br>19-34054 | 11. CASE NAME:<br>Highland Capital | 12. JUDICIAL OFFICIAL:<br>Jernigan | 13. DATE OF PROCEEDING:<br>FROM:  06 / 08 / 23 |
|---|---|---|---|

| 14. ORDER FOR: | ☐ APPEAL | ☒ BANKRUPTCY | ☐ OTHER |
|---|---|---|---|

| 15. ORDER: | ORDINARY | 7 DAY EXPEDITED | DAILY | HOURLY |
|---|---|---|---|---|
| A. | ☐ | ☐ | ☐ | ☒ |
| | **14 DAY EXPEDITED** | **3 DAY EXPEDITED** | | |
| | ☐ | ☐ | | |

16. AUDIO/TRANSCRIPT REQUESTED  Specify portion(s) and date(s) of proceeding(s):

| PORTION(S) | PORTION(S) |
|---|---|
| ☒ ENTIRE HEARING | ☐ TESTIMONY (SPECIFY WITNESS) |
| ☐ OPENING STATEMENT (PLAINTIFF) | |
| ☐ OPENING STATEMENT (DEFENDANT) | |
| ☐ CLOSING ARGUMENT (PLAINTIFF) | ☐ VOIR DIRE |
| ☐ CLOSING ARGUMENT (DEFENDANT) | ☐ OTHER (SPECIFY) |
| ☐ COURT RULING ONLY | |

| CERTIFICATION | 17. SIGNATURE: /s/ Melanie Holmes |
|---|---|
| By signing 17. & 18, I certify that I will pay all charges (deposit plus additional as specified by the assigned transcriber). | 18. DATE:<br>6/9/2023 |

| COURT USE ONLY |
|---|

| A. PROCESSED BY: | B. TRANSCRIPT TO BE PREPARED BY: |
|---|---|
| PHONE NUMBER: | ADDRESS: |
| EMAIL ADDRESS: | TELEPHONE:<br>EMAIL ADDRESS: |

| C. PARTY RECEIVED AUDIO: | DATE: | BY: | $31 FEE PAID: |
|---|---|---|---|

**DISTRIBUTION:**            COURT COPY            ORDER RECEIPT            ORDER COPY

009444

BTXN 208 (rev. 07/09)

| IN RE: Highland Capital Management, L.P. | HMIT's Motion for Leave to file Verified Adversary Proceeding doc. #3699 | Case # 19−34054−sgj11 |
|---|---|---|

DEBTOR

## TYPE OF HEARING

| Hunter Mountain Investment Trust | *VS* | Re−Organized Debtor Highland Capital Management, L.P. |
|---|---|---|
| **PLAINTIFF / MOVANT** | | **DEFENDANT / RESPONDENT** |

| Sawnie A. McEntire & Roger L. McCleary | | John A. Morris |
|---|---|---|
| **ATTORNEY** | | **ATTORNEY** |

## EXHIBITS

SEE EXHIBIT LIST                                     SEE EXHIBIT LIST

VARIOUS EXHIBITS ADMITTED                VARIOUS EXHIBITS ADMITTED

| Michael Edmond | June 8, 2023 | Stacey G Jernigan |
|---|---|---|
| REPORTED BY | HEARING DATE | JUDGE PRESIDING |

009445

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris *(admitted pro hac vice)*
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

REED SMITH LLP
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for Highland Capital Management, L.P.,
and the Highland Claimant Trust*

*Counsel for James P. Seery, Jr.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

## HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND JAMES P. SEERY, JR.'S REPLY IN FURTHER SUPPORT OF THEIR JOINT MOTION TO EXCLUDE TESTIMONY AND DOCUMENTS OF <u>SCOTT VAN METER AND STEVE PULLY</u>

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

As discussed during the June 8, 2023 hearing ("Hearing"), the Highland Parties respectfully submit this Reply in Support of Their Joint Motion To Exclude Testimony And Documents of Scott Van Meter and Steve Pully ("Motion" or "Mot."; Dkt. No. 3820).[2]

1.      Contrary to HMIT's Response ("Resp."; Dkt. No. 3828) and HMIT's statements at the Hearing, the Purported Experts' testimony should not be admitted. As set forth below—and as further explained in the Highland Parties' Motion and at the Hearing—the Purported Experts should be excluded for at least four, independently sufficiently reasons:

- The Purported Experts were untimely proffered, particularly in light of this Court's multiple prior conferences and Orders setting the scope of the Hearing and associated discovery;

- HMIT's belated identification did not comply with Federal Rule of Civil Procedure 26(b)(4)(A) (which is incorporated by Federal Rule of Bankruptcy Procedure 9014);

- The Purported Experts' testimony cannot satisfy basic *Daubert* principles that, contrary to HMIT's contentions, apply to screen out "junk science" in this contested matter; and

- In any event, the Purported Experts will not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), but rather will serve only to introduce additional delay and expense.

2.      ***First***, HMIT's revelation that it sought to admit expert testimony came far too late. As HMIT acknowledged at the Hearing, it failed to raise its Purported Experts—or even the prospect of expert testimony—at any point during the five briefs and two conferences on HMIT's Motion for Leave. During the two conferences, this Court repeatedly asked HMIT "what you want

---

[2] Capitalized terms have the meanings as in the Motion unless otherwise indicated. All internal alterations, citations, and quotations omitted unless otherwise indicated.

009447

the Court to do" at the Hearing. (Mot. ¶ 13.) HMIT sought to conduct the Hearing "on the pleadings only" or, alternatively, to conduct an evidentiary Hearing after expedited discovery of documents, fact depositions, and corporate representative depositions. (*Id.*; Dkt. No. 3791.) HMIT made no mention of any experts. Only after this Court had ruled on HMIT's request for expedited discovery—and expressly limited the scope of discovery (*see* Mot. ¶ 14; Resp. ¶¶ 2–3)—did HMIT reveal its gambit when the parties' exchanged witness and exhibit lists three days before the Hearing (Dkt. No. 3818).

3.     At the Hearing, HMIT's counsel sought to justify this quintessential "trial by ambush" strategy by claiming that it was under no duty to disclose the existence or substance of expert testimony prior to exchange of witness lists, because Bankruptcy Rule 9014 does not incorporate Rule 26(a)(2)'s rules defining the content and timing for expert disclosures. But HMIT fails to acknowledge that Bankruptcy Rule 9014 provides that the exempted sections *may* apply if "the court directs otherwise." Having never once mentioned the possibility of calling experts— and thus depriving the Court of the opportunity to determine whether and on what terms to require expert disclosures—HMIT cannot hide behind the *default* presumption set forth in Bankruptcy Rule 9014.

4.     HMIT's suggestion that it simply had not "decided" whether to call experts until nearly midnight on Monday, June 5 rings hollow. Even if that were true (and there is no basis to believe that it is), that is no excuse for failing to advise the Court and the Highland Parties that it was considering such a move. The exchange of witness lists did not commit HMIT to *calling* its experts; HMIT could have reserved that decision until the close of its case at the Hearing. Accordingly, the purpose and effect of HMIT's belated disclosure was to disadvantage the Highland Parties' ability to challenge that evidence (or to submit competing expert testimony) *and*

009448

to hamstring this Court's prerogative to determine what expert disclosures would be appropriate to facilitate an orderly Hearing. Standing alone, HMIT's transparent gamesmanship is a more than sufficient basis to exclude the Proposed Experts. (*See* Mot. ¶¶ 18–19 (collecting cases).)

5.      ***Second***, contrary to HMIT's repeated statements at the Hearing that it had *exceeded* its disclosure obligations, HMIT's tactics did not comply with the Rules. As noted above, and as HMIT observes repeatedly, Bankruptcy Rule 9014 "excludes Rule 26(a)(2)(b) requirements regarding expert witness disclosures and reports." (Resp. ¶ 1.) But HMIT *ignores* that Bankruptcy Rule 9014 *includes* Rule 26(b)(4)(A), which provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial." *See* Fed. R. Bankr. P. 9014(b); Fed. R. Bankr. P. 7026. This Court had limited pre-Hearing discovery to "depositions of Mr. Dondero and/or Mr. Seery" (Resp. ¶ 4) in reliance on HMIT's representations, which omitted any reference to expert witnesses. HMIT then waited until roughly 60 hours before the Hearing to disclose the Purported Experts, which ensured that the Highland Parties did not have sufficient time to seek to modify this Court's Order, let alone take two expert depositions.

6.      In any event, during the Hearing, HMIT conceded that the Highland Parties should have the opportunity to depose the Purported Experts, which puts the lie to their assertions that their "expert witness disclosures were timely." (*Id.* ¶ 6.) What is more, HMIT's concession belies their contention that, because the Rule 26(a)(2) disclosure rules do not automatically apply in a contested matter, a party need not even mention the possibility of expert testimony prior to exchange of witness and exhibit lists. As HMIT would have it, the default rule in this Court is that, while an expert must be made available for deposition, the very existence of that (or any) expert can be revealed just two business days before the contested matter is heard. HMIT's position would make a mockery of this Court's rules and procedures.

7.    ***Third***, the Purported Experts could not plausibly pass basic *Daubert* standards. Astonishingly, HMIT claims that *Daubert* simply does not apply: "This is a bench hearing on colorability—not a trial where 'junk science' is a concern." (Resp. ¶ 11.) But HMIT cites no authority for this extraordinary position, nor could it. The Federal Rules of Evidence, including Rule 702 and *Daubert*, expressly "apply to proceedings before[] . . . United States **bankruptcy** and magistrate judges," and in all "civil cases and proceedings, including **bankruptcy**, admiralty, and maritime cases." Fed. R. Evid. 1101(a)–(b) (emphasis added). Courts in this District routinely exclude experts in contested matters based on *Daubert* challenges. *See, e.g.*, *In re Ondova Ltd. Co.*, 2012 WL 5879147, at *10 (Bankr. N.D. Tex. Nov. 21, 2012) (Jernigan, J.) ("After a *Daubert*-objection was lodged by the Receiver's counsel, the court did not let Dr. Lindenthal testify as to his opinion on the value of the Domain Names, because he could not share the methodology he used-it is proprietary information of Sedo, LLC.") (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); Fed. R. Evid. 702); *In re Vill. At Camp Bowie I, L.P.*, 454 B.R. 702, 706 n.6 (Bankr. N.D. Tex. 2011) ("Debtor originally designated Ben E. Dyess Jr. ("Dyess") of Ben Dyess & Associates as its appraiser, but the court sustained a challenge to Dyess's expert report based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, , 125 L.Ed.2d 469 (1993).").

8.    HMIT wants to evade the requirements of Rule 702 and *Daubert* because the Proposed Experts do not come close to satisfying them. For example, HMIT is unable to point to a single item in Van Meter's CV that qualifies him to opine about Seery's compensation, stating only that he is "familiar with post-confirmation compensation of a trustee." (Resp. ¶ 10.) "Familiarity is not expertise." *Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 2009 WL 2589514, at *2 (S.D. Fla. Aug. 18, 2009) (granting in part *Daubert* motion to exclude expert testimony). Nor does HMIT even try to show that the Purported Experts opinions are reliable or

009450

anything more than (bad) arithmetic and repackaged legal conclusions. (*See* Resp. ¶ 11; Mot. ¶¶ 23–26.)

9.      Indeed, the Purported Experts' arithmetic amounts to "junk science" on its face. For example, Pulley purports to calculate Stonehill and Farallon's internal rate of return ("IRR") on their purchase of Class 8 and Class 9 claims. (HMIT Ex. 48–52.) But Pulley's method for arriving at the supposed 8.4% internal rate of return (which is still more than the 6% IRR HMIT claimed without foundation at the Hearing) would make an elementary school math student blush. He simply *aggregated* all four of the Muck and Jessup trades, which occurred with four different counterparties (Redeemer, Acis, HarbourVest, and UBS) at four different times. That is, he treated all of those transactions as a single trade, and then plugged that nonsensical result into the XIRR function in Microsoft Excel to generate an 8.4% hypothetical rate of return over 24 months. (*Id.* Exs. 50, 52.) From that "data," he extrapolates the conclusion that hedge funds do not make investments in distressed assets with this expected return.

10.     As the Highland Parties explained during closing arguments at the Hearing, however, the allegations from HMIT's own complaint demonstrate that the Purported Experts' conclusions are "junk arithmetic" in the extreme. No particular "expertise" is required to understand that—even assuming that Highland met only the plan projection in the November 30, 2020, disclosure statement—Stonehill and Farallon expected to earn substantial rates of return on their respective purchases of the Redeemer, Acis, and HarbourVest claims. Nor is expert testimony necessary to appreciate that when Stonehill and Farallon purchased the UBS claim in August 2021, the sale of MGM had been publicly announced months earlier, such that the prior plan projections would have been obviously stale.

009451

| Claim Seller | Claim Purchaser | Class 8 | A Projected Proceeds[3] | B Alleged Purchase Price | C = A − B Expected Gain | D = C / B Expected Gain% | Hit Proj's IRR |
|---|---|---|---|---|---|---|---|
| Redeemer | Stonehill | $137.7 | $98.2 | $78.0 | $20.2 | 26.0% | 24.2% |
| Acis | Farallon | $23.0 | $16.4 | $8.0 | $8.4 | 105.1% | 98.6% |
| HarbourVest | Farallon | $45.0 | $32.1 | $27.0 | $5.1 | 18.9% | 17.5% |
| **Totals (weighted average)** | | $205.7 | $146.7 | $113.0 | $33.7 | 29.9% | 27.8% |
| **May 26th – MGM/Amazon Merger Announced** | | | | | | | |
| UBS | Stonehill & Farallon | $64.4 | $45.9 | $50.0 | ($4.1) | -8.2% | -9.8% |
| **Totals (weighted average)** | | $270.1 | $192.6 | $163.0 | $29.6 | 18.2% | **18.4%** |

No amount of so-called "expert" testimony can change the reality that—by HMIT's own allegations—these trades were anything but suspicious.

11. But the Purported Experts' analysis gets even worse. As the Highland Parties explained at the hearing, the "projected" returns set forth in HMIT's complaint ignores the significant potential upside the claims offered. There was, of course, a possibility that Class 8 interests would recover *more* than the projected 71.32%—which means there was an additional $77.41 million in potential recovery on those claims alone, plus an additional $95 million of Class 9 claims. Thus, even crediting HMIT's speculation that Stonehill and Farallon might only have "expected" 71.32% Class 8 recoveries as a base case, any purchaser would have ascribed some value to the potential upside scenarios, particularly when the UBS claims were purchased

---

[3] "Projected Proceeds" are derived by multiplying the Class 8 face amount by the projected recovery of 71.32% for that class. (Dkt. No. 1875.)

009452

after the MGM announcement (the UBS claim included the lion's share—$60 million—of the

purchased Class 9 claims).

| Claim Seller | Claim Purchaser | Class 8 | Class 9 | IRR – 100% On Class 8 | IRR – 100% On Class 8 + $25M Class 9 |
|---|---|---|---|---|---|
| Redeemer | Stonehill | $137.7 | $0.0 | 60.8% | 60.8% |
| Acis | Farallon | $23.0 | $0.0 | 144.7% | 144.7% |
| HarbourVest | Farallon | $45.0 | $35.0 | 52.8% | 85.0% |
| **Totals (weighted average)** | | $205.7 | $35.0 | 65.0% | 72.9% |
| **May 26th – MGM/Amazon Merger Announced** | | | | | |
| UBS | Stonehill & Farallon | $64.4 | $36.0 | 30.5% | 48.4% |
| **Totals (weighted average)** | | $270.1 | $71.0 | **56.9%** | **67.2%** |

12.    There was substantial reason to think upside scenarios were highly plausible when

the claims were purchased. The Plan Supplement did not include certain possible litigation

recoveries. (Dkt. No. 1875.) The November 30, 2020 valuation date upon which the projections

were based was among the darkest economic shadow following the onset of COVID. As explained

at the Hearing, asset values generally increased substantially during this time period: The S&P 500

Index rose 9.6% from November 30, 2020, to March 15, 2021, and rose *an additional* 11% by

August 1, 2021.[4] And, as noted above and HMIT concede at the Hearing, the MGM announcement

in May 2021 was further positive news for Highland claims purchasers. The failure of the

Purported Experts to account for these indisputably relevant inputs further demonstrates the

unreliability of their methodology. Indeed, their proffered conclusions are the classic illustration

---

[4] This Court "can, of course, take judicial notice of stock prices." *Schweitzer v. Invs. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 193 n.3 (5th Cir. 2020).

009453

of the maxim "garbage in, garbage out," and illustrate precisely what *Daubert* operates to weed out from the fact-finding exercise.

13.      ***Fourth*** and finally, the Purported Experts' testimony and documents are inadmissible because they will not "help the trier of fact under the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). During the Hearing, HMIT failed to present any evidence of any *quid pro quo* between Seery, on the one hand, and Stonehill and Farallon on the other. Specifically, HMIT presented no plausible evidence that Seery provided any material, nonpublic information to Stonehill or Farallon before they purchased claims; no evidence that Seery had any special relationship or any reason to provide such information; and no evidence that that anyone rubber-stamped Seery's compensation, which undisputed testimony established was the product of extensive arms'-length negotiations. "When," as here, "an expert's testimony is 'not based upon the facts in the record but on altered facts and speculation designed to bolster a party's position,' the trial court should exclude it." *Moore v. Int'l Paint L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (quoting *Guillory v. Domtar Indus, Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)).

14.      Moreover, Rule 702(a) by its terms requires the Court to determine whether the proffered testimony "will help the trier of fact." The fact-finder here is the Court, and the Court thus may decide whether the Purported Experts would help it analyze or understand an issue. The Court is well within its discretion to conclude that the Purported Experts cries of "red flags"— most of which are unidentified, and certain of which are contradicted by HMIT's own allegations and undisputed facts—do not advance the Courts analysis. Particularly after the lengthy Hearing proceedings, we respectfully submit that the Court has heard more than enough of HMIT's scattershot conclusory allegations. The Court should therefore exercise its discretion under

Rule 702(a) not to consume still further judicial resources, and allow HMIT to impose still more

costs and delays on the Respondents.

## CONCLUSION

15.    For the foregoing reasons, and those set forth in the Motion and at the Hearing, the

Highland Parties respectfully request that this Court exclude from the Hearing the Purported

Experts' testimony and HMIT's Exhibits 39 to 52.

Dated: June 12, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ John A. Morris*

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.,
and the Highland Claimant Trust*

**WILLKIE FARR & GALLAGHER LLP**

*/s/ Mark T. Stancil*

Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

-and-

**REED SMITH LLP**

Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for James P. Seery, Jr.*

009455

Brent R. McIlwain, TSB 24013140
David C. Schulte    TSB 24037456
Christopher Bailey TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
Tel.:    (214) 964-9500
Fax:    (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

COUNSEL TO MUCK HOLDINGS, LLC,
JESSUP HOLDINGS LLC,
FARALLON CAPITAL MANAGEMENT, L.L.C., AND
STONEHILL CAPITAL MANAGEMENT LLC

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Case No. 19-34054 (SGJ) |
| Highland Capital Management, L.P.[1] | Chapter 11 |
| Debtor. | (Jointly Administered) |

## CLAIM PURCHASERS' JOINDER TO HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND JAMES P. SEERY, JR.'S REPLY IN FURTHER SUPPORT OF THEIR JOINT MOTION TO EXCLUDE TESTIMONY AND <u>DOCUMENTS OF SCOTT VAN METER AND STEVE PULLY</u>

Muck Holdings, LLC ("<u>Muck</u>"), Jessup Holdings LLC ("<u>Jessup</u>"), Farallon Capital

Management, L.L.C. ("<u>Farallon</u>"), and Stonehill Capital Management LLC ("<u>Stonehill</u>", and

collectively, with Muck, Jessup, and Farallon, the "<u>Claims Purchasers</u>") join and adopt Highland

Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s *Reply in Further*

---

[1]    The last four digits of Debtor's taxpayer identification number are (6725). The headquarters and service address for Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

*Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully* [Dkt. No. 3841] (the "Reply").  For the reasons set forth in the Reply, the Claim Purchasers respectfully request the Court grant the *Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully* [Dkt. No. 3820] (the "Motion to Exclude").

WHEREFORE, the Claims Purchasers respectfully request that the Court grant the Motion to Exclude and grant the Claims Purchasers such other and further relief as is just and proper.

Dated:   June 12, 2023

HOLLAND & KNIGHT LLP

By: */s/ Christopher Bailey*
Brent R. McIlwain, TSB 24013140
David C. Schulte, TSB 24037456
Christopher Bailey, TSB 24104598
Holland & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
Tel.:   (214) 964-9500
Fax     (214) 964-9501
brent.mcilwain@hklaw.com
david.schulte@hklaw.com
chris.bailey@hklaw.com

COUNSEL TO MUCK HOLDINGS, LLC,
JESSUP HOLDINGS LLC, FARALLON
CAPITAL MANAGEMENT, L.L.C., AND
STONEHILL CAPITAL MANAGEMENT LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, and served upon all parties receiving notice pursuant to the CM/ECF system on this the 12th day of June, 2023.

*/s/ Christopher Bailey*
Christopher Bailey

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
| | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) June 8, 2023 |
| | ) 9:30 a.m. Docket |
| Reorganized Debtor. | ) |
| | ) HMIT'S MOTION FOR LEAVE TO |
| | ) FILE VERIFIED ADVERSARY |
| | ) PROCEEDING (3699) |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Reorganized          John A. Morris
Debtor:                      Gregory V. Demo
                             Hayley R. Winograd
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Reorganized          Jeffrey Nathan Pomerantz
Debtor:                      PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd., 13th
                               Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

For Hunter Mountain          Sawnie A. McEntire
Investment Trust:            Timothy J. Miller
                             PARSONS MCENTIRE MCCLEARY, PLLC
                             1700 Pacific Avenue, Suite 4400
                             Dallas, TX  75201
                             (214) 237-4303

For Hunter Mountain          Roger L. McCleary
Investment Trust:            PARSONS MCENTIRE MCCLEARY, PLLC
                             One Riverway, Suite 1800
                             Houston, TX  77056
                             (713) 960-7305

009458

2

```
1   APPEARANCES, cont'd.:

2   For Hunter Mountain          Deborah Deitsch-Perez
    Investment Trust:            STINSON
3                                2200 Ross Avenue, Suite 2900
                                 Dallas, TX  75201
4                                (214) 560-2218

5   For Muck Holdings, et al.:   Brent Ryan McIlwain
                                 HOLLAND & KNIGHT, LLP
6                                300 Crescent Court, Suite 1100
                                 Dallas, TX  75201
7                                (214) 964-9481

8   For James P. Seery, Jr.:     Mark Stancil
                                 Joshua Seth Levy
9                                WILLKIE FARR & GALLAGHER, LLP
                                 1875 K Street, NW
10                               Washington, DC  20006
                                 (202) 303-1133
11
    Recorded by:                 Michael F. Edmond, Sr.
12                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
13                               Dallas, TX  75242
                                 (214) 753-2062
14
    Transcribed by:              Kathy Rehling
15                               311 Paradise Cove
                                 Shady Shores, TX  76208
16                               (972) 786-3063

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
```

009459

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 11/07/23   Page 49 of 214   PageID 9163

3

<u>DALLAS, TEXAS - JUNE 8, 2023 - 9:42 A.M.</u>

1

2          THE CLERK:  All rise.  United States Bankruptcy Court

3    for the Northern District of Texas, Dallas Division, is now in

4    session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6    right.  We are here this morning for a setting in Highland.

7    This is on a motion of Hunter Mountain for leave to file an

8    adversary proceeding.  I will start out by getting appearances

9    from lawyers in the courtroom.

10         MR. MCENTIRE:  Yes, Your Honor.  Sawnie McEntire

11   along with my partner Roger McCleary and Tim Miller on behalf

12   of Hunter Mountain Investment Trust, Ltd.

13         THE COURT:  Thank you.

14         MR. MORRIS:  Good morning, Your Honor.  John Morris,

15   Pachulski Stang Ziehl & Jones, for the Reorganized Highland,

16   for the Highland Claimant Trust.  I'm joined by Mr. Pomerantz,

17   Mr. Demo, and Ms. Winograd.

18         THE COURT:  Good morning.

19         MR. STANCIL:  Good morning, Your Honor.  Mark Stancil

20   from Willkie Farr & Gallagher for Mr. Seery.  I'm joined by my

21   colleague Josh Levy.

22         THE COURT:  Good morning.

23         MR. MCILWAIN:  Good morning, Your Honor.  Brent

24   McIlwain from Holland & Knight here for Muck Holding, LLC,

25   Jessup Holdings, LLC, Farallon Capital Management, LLC, and

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40  Main Document   Filed 10/04/23   Page 50 of 214  Page 74 of 389   PageID 9164

4

 1   Stonehill Capital Management, LLC.

 2           THE COURT:  Thank you.  All right.  Is that all of

 3   our lawyer appearances?  I know we have observers on the

 4   WebEx, but I assume you are just observers.  We scheduled this

 5   to be a live hearing for participants.

 6       All right.  Well, we had some ground rules for how this

 7   would go forward today.  We, of course, have had two -- I call

 8   them hearings on what kind of hearing we're going to have.

 9   We've had two status conferences.  And so our ground rules

10   were set.  Three hours of total presentation time for each the

11   Movant and the aggregate Respondents.  We also had an order

12   regarding what discovery would or would not be allowed.

13       And to my surprise, there were a flurry of pleadings.

14   We're a few minutes late getting out here because we were

15   trying to digest what was filed late yesterday and into the

16   night.

17       So I understand we have a controversy about a couple of

18   expert witnesses who were listed on Monday on the Movants'

19   exhibit and witness list.  And I've seen a motion to exclude

20   the expert witnesses' testimony.  And I think we need to

21   address that right off the bat.  I don't want to take too much

22   time on this, because, again, we're going to finish today, and

23   I won't let this housekeeping matter eat into our three hours,

24   but I want to get going.  So I'll hear from Movant, Mr.

25   McEntire.

009461

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 10/05/23    Page 51 of 214    PageID 9165
Main Document    Page 51 of 59

5

1              MR. STANCIL:  Your Honor, may --

2              THE COURT:  Go ahead.

3              MR. STANCIL:  We moved to exclude, so I would propose

4     that my colleague, Mr. Levy, address this motion very briefly

5     if --

6              THE COURT:  Well, I guess --

7              MR. STANCIL:  Or I will do as --

8              THE COURT:  -- that actually makes sense.

9              MR. STANCIL:  Okay.

10             THE COURT:  I was thinking Mr. McEntire teed up the

11    issue, but I suppose you did with the motion to exclude.  So,

12    Counsel?

13             MR. LEVY:  Thank you, Your Honor.  Josh Levy on

14    behalf of Mr. Seery.

15        So, we think our papers largely speak for themselves, but

16    two additional points we'd like to raise.  In the response

17    filed by Hunter Mountain this morning, and this is Docket

18    Entry 3828, in Paragraph 11, they argue that this is a bench

19    hearing on colorability, not a trial where junk science is a

20    concern.  But junk science is precisely what they're trying to

21    introduce here.  They have raised two expert witnesses, one

22    who purports to be an expert in compensation but has no

23    experience whatsoever in evaluating compensation, and they

24    provide no methodology for their conclusion.

25        For example, they claim to have identified red flags.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40 Filed 11/06/23    Page 52 of 214    PageID 9166
Main Document    Page 52 of 89

6

```
1   They never explain what those red flags are, why they are red

2   flags, or how they determined they were red flags.  This is

3   junk science, precisely what the Federal Rules are designed to

4   exclude.

5       But that shouldn't detract from the broader procedural

6   point that this is the first time we're hearing about expert

7   witnesses, at 10:00 p.m. three days before the hearing.  This

8   is a trial by ambush.  This motion was filed in March, we've

9   been litigating this motion for over two months now, and this

10  is the first time we're hearing about any expert witnesses.

11      As Your Honor noted, we've had multiple conferences.

12  We've had rules setting the ground rules for this hearing.

13  We've had orders setting the scope of discovery.  But now

14  Hunter Mountain is trying to pull a bait-and-switch.  After

15  never mentioning any experts, after obtaining orders limiting

16  the scope of discovery, they then wait until right before the

17  hearing to disclose their experts, ensuring that these experts

18  are insulated from any kind of discovery and can ambush us at

19  the hearing.

20      I'm happy to answer any other questions, but we believe

21  they should be excluded and the accompanying exhibits should

22  also be excluded.

23          THE COURT:  All right.  Thank you.  And the

24  accompanying exhibits, I don't review exhibits before a trial

25  or a hearing because I don't know what's going to be objected
```

 1   to and admitted.  So do you want to point out, were there

 2   expert reports in the proposed exhibits?

 3          MR. LEVY:  These were charts and analyses prepared by

 4   their experts, not actual expert reports.

 5          THE COURT:  Okay.

 6          MR. LEVY:  In their witness and exhibit list, Hunter

 7   Mountain included several paragraphs that I guess serves as

 8   what would be their expert reports.  And then it would be

 9   Exhibits 39 through 52, which consist of CVs, materials

10   reviewed, and then what they term "data charts" prepared by

11   their experts.

12          THE COURT:  39 through 52?  Oh, I'm looking at the

13   wrong exhibit notebook.  Oh.

14      (Pause.)

15          THE COURT:  Okay.  Here we go.  All right.  No

16   questions at this time.

17      Mr. McEntire?

18          MR. MCENTIRE:  Yes, Your Honor.  May I proceed?

19          THE COURT:  You may.

20          MR. MCENTIRE:  Again, my presentation and response is

21   subject to our objection concerning that any evidence is being

22   admitted for any purpose, other than what we believe is the

23   proper standard of review.  So my response and our offer of

24   these experts is subject to that objection.

25      With that said, Mr. Levy's argument he just presented to

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 12/07/23    Page 54 of 214    PageID 9168

8

```
 1   the Court presupposes that my client has a duty under 9014 to

 2   provide a report, which we do not; to provide detailed

 3   disclosures, which we do not, because 9014 is specifically

 4   exempted from the scope of Rule 26.  What we did, we didn't

 5   have to do.  What we did, and I made the decision to provide

 6   them some disclosure and identification of who they were,

 7   their backgrounds, and --

 8              THE COURT:  Well, let me stop you.

 9              MR. MCENTIRE:  Certainly.

10              THE COURT:  "What we did, we didn't have to do."  The

11   Local Rules, first of all, do require an exhibit and witness

12   list.  And --

13              MR. MCENTIRE:  We've provided that.

14              THE COURT:  I know.  I know.  But you -- I thought I

15   heard you --

16              MR. MCENTIRE:  No, no.

17              THE COURT:  -- saying you didn't have to do that.

18   You do have to do that.

19              MR. MCENTIRE:  No, no, no.

20              THE COURT:  But I guess what you're saying is --

21              MR. MCENTIRE:  What we provided was more than what

22   the Local Rules require.

23              THE COURT:  How so?

24              MR. MCENTIRE:  We provided CVs.  We provided their

25   backgrounds.  We disclosed in the actual witness description
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 55 of 214   PageID 9169

Main Document   Page 79 of 399

9

1   who they were and the key components of their opinions.  And

2   we refer to their data charts.  That is not something that the

3   Local Rule requires.

4          THE COURT:  Okay.  Well, let me back up.  We have our

5   Local Rules, but then we had our two status conferences --

6          MR. MCENTIRE:  Yes.

7          THE COURT:  -- on what the format of the hearing --

8          MR. MCENTIRE:  Yes.

9          THE COURT:  -- would be.

10          MR. MCENTIRE:  Yes.

11          THE COURT:  And, of course, there was extensive

12   discussion, evidence or no evidence?  What did the legal

13   standard, colorability, require?

14          MR. MCENTIRE:  Yes.

15          THE COURT:  And I came out in the end and said, if

16   people want to put on witnesses, they're entitled to put on

17   witnesses.  I think there may be a mixture of a fact question

18   and law question on colorability.  So, and then I set a three-

19   hour time limit and I said, if someone wants to depose Mr.

20   Seery and Mr. Dondero, they can, but no more discovery other

21   than that.  Okay?

22          MR. MCENTIRE:  I understand.

23          THE COURT:  Why then did you not say, well, wait,

24   Judge, if it's going to be evidence, we're just letting you

25   know, in full disclosure, we might call a couple of experts,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 56 of 214   PageID 9170
Main Document   Page 70 of 382

10

1  and this may impact your decision on what kind of discovery

2  can happen.  And this may impact your decision on whether

3  three hours each side is enough.

4         MR. MCENTIRE:  Well, Your Honor, in fairness, I don't

5  think we had made a final decision to actually designate any

6  experts.  And at the time, the focus was on other witnesses.

7  But there was no exclusion, there was no limitation at all on

8  my right to bring an expert.  And the Rules are very clear.

9  And the Court's --

10        THE COURT:  But I specifically limited discovery, and

11 it was on your motion.  It was on your motion we set the

12 hearing on --

13        MR. MCENTIRE:  Actually, --

14        THE COURT:  You know, did you need a continuance,

15 because if we were going to have evidence, maybe you needed a

16 continuance.  And then there was a discovery issue raised.

17        MR. MCENTIRE:  To be clear, Your Honor, I'm looking

18 at your orders.

19        THE COURT:  Got them in front of me.

20        MR. MCENTIRE:  Your order of May 26, 2023.  You said,

21 You can put on your witnesses and the Court is going to rule.

22 You made no limitations as to who the witnesses would be.

23 Your order did not limit the scope of witnesses to simply Mr.

24 Seery or Mr. Dondero.  In fact, any suggestion that you did

25 limit the witnesses is contrary --

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Main Document Filed 12/07/23    Page 57 of 214    Page 57 of 382    PageID 9171

11

```
 1              THE COURT:  Now, which order are you looking at?

 2              MR. MCENTIRE:  I'm looking at the May 26, 2023 order,

 3    Page 51, Lines 3 through 14.

 4              THE COURT:  Okay.

 5              MR. MCENTIRE:  You also stated --

 6              THE COURT:  I have -- have I entered three orders on

 7    this?  I've got a May 10th order.  I've got a May 22nd order.

 8              MR. MCENTIRE:  And I would also point out, Your

 9    Honor, --

10              THE COURT:  Could you answer my question?  I want to

11    look at what you're looking at.

12              MR. MCENTIRE:  Certainly.

13              THE COURT:  Here we -- this is the one.  Okay.  Aha.

14    Okay.  May 26.

15              MR. MCENTIRE:  Page 51, Lines 3 through 14.

16              THE COURT:  I've entered three orders on what kind of

17    hearing we're going to have.  Okay.  So you're looking where?

18              MR. MCENTIRE:  Page 51, Lines 3 through 14.  "You can

19    put on your witnesses."

20              THE COURT:  Page 51?

21              MR. MCENTIRE:  Yes, ma'am.

22              THE COURT:  Oh.  You're looking at a transcript, not

23    the order.

24              MR. MCENTIRE:  That's right.  I apologize.

25              THE COURT:  Okay.
```

009468

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Main Document   Filed 12/07/23   Page 1 of 384   Page 58 of 214   PageID 9172

12

1          MR. MCENTIRE:  Yeah, I'm looking at the transcript

2   from the hearing.

3          THE COURT:  Okay.  Well, I'm looking at my order.

4          MR. MCENTIRE:  And the order, the order also

5   specifies no limitation at all in connection with the -- the

6   --

7          THE COURT:  But my order was based on what was

8   discussed that day.

9          MR. MCENTIRE:  And what was --

10          THE COURT:  If you had said, hmm, Judge, if you're

11   going to allow evidence, we may call a couple of experts, then

12   there would have been a whole discussion about that and did I

13   need to limit the discovery, as I did.  And there would have

14   been a whole discussion of, well, three hours, three hours

15   each side, is that going to be enough if we have experts?

16          MR. MCENTIRE:  The discovery ruling that you made was

17   on my motion, and at the time I was not seeking to take any

18   expert depositions.  And you denied my request to take ample

19   discovery.  You limited my right to take only one deposition,

20   without documents.

21       The issue of taking expert discovery was not even on the

22   table.  However, you made it very --

23          THE COURT:  Well, that's my point precisely.  The

24   whole purpose of the hearing was, what kind of hearing are we

25   going to have on June 8th?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 11/07/23   Page 59 of 214   PageID 9173

13

1          MR. MCENTIRE:  I understand.  And our position --

2          THE COURT:  We had already had one status conference

3    on argument only versus evidence.  And I allowed you all to

4    file some briefing, which you did.  And then I issued an order

5    after the briefing, saying, I think I should allow evidence on

6    the colorability question.  I'm not forcing anyone to put on

7    evidence, but if you want to put on evidence, you can.

8        And then you filed your motions and we had the next status

9    conference on what kind of hearing we're going to have.  And

10   there was more argument:  We don't think the evidence is

11   appropriate, but if evidence is appropriate, we want you to

12   continue the hearing to allow all kinds of discovery.  I don't

13   know what.  And it was right before Memorial Day, and I hated

14   the fact that a bunch of subpoenas were going to go out and

15   ruin people's holidays.  But there was no discussion then of,

16   okay, but just so you know, since you have made the ruling

17   that evidence can come in, we're going to have a couple of

18   experts.

19          MR. MCENTIRE:  As I've already mentioned, Your Honor,

20   we had not made a decision to call experts at that time.  We

21   made a decision to call the experts shortly before we filed

22   our designations.

23       The point here is this.  The Rules do not require me to

24   provide any more disclosure than I have.  I have gone over and

25   above the Local Rules.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 60 of 214   PageID 9174
Main Document   Page 60 of 382

14

1      If the Court believes that it would have allowed more time

2  for this hearing, I would advise the Court that opposing

3  counsel vehemently opposed any type of postponement or

4  continuance.  The discovery that I was requesting was

5  discovery from fact witnesses.  Experts were not at issue at

6  that time.  Experts are --

7              THE COURT:  Because --

8              MR. MCENTIRE:  -- at issue now.

9              THE COURT:  -- nobody knew that experts might be

10  called.

11             MR. MCENTIRE:  I have a right to call experts, Your

12  --

13             THE COURT:  It changes the whole complexion.

14             MR. MCENTIRE:  But I have a right to call experts,

15  under the Rules.  I have a right, a fundamental due process --

16  let me -- may I finish, Your Honor?  A fundamental due process

17  right to call experts.  Their attempt to charge some type of

18  *Daubert* challenge is nothing but a shotgun blast on the wall,

19  having no meaning at all.  At a minimum, I have a right to put

20  the witnesses on the stand and we'll have a *Daubert* hearing.

21      If they want more time, they need to ask for it.  They

22  didn't ask for it.  Their solution is to strike my experts,

23  which is improper.  It would be improper for this Court to

24  strike my experts when they have been properly tendered under

25  the Local Rules.  They have not cited an alternative remedy.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 61 of 214    PageID 9175
Main Document    Page 73 of 392

15

1   If they want the alternative remedy, they need to ask the

2   Court.

3             THE COURT:  My next question is:  How do you propose

4   to get this all done in only three hours?

5             MR. MCENTIRE:  We intend to move quickly.

6             THE COURT:  But, see, now they, I'm guessing,

7   prepared their case assuming there weren't going to be

8   experts.  And they, if they're good lawyers, which I know you

9   all are, they have their script of the kind of things they

10  were going to ask the witnesses.

11            MR. MCENTIRE:  Well, did they have a --

12            THE COURT:  And now they've got to carve out time for

13  two last-minute experts?

14            MR. MCENTIRE:  They had an option.  And one of the

15  options was they could have called me up on Tuesday and asked

16  for their depositions and I probably would have agreed.

17            THE COURT:  I already said no depositions except

18  Seery and Dondero.

19            MR. MCENTIRE:  Then they could have come and filed a

20  different kind of motion with the Court.

21      Their only remedy that they're seeking is a draconian one.

22  There are other options that are more consistent with the

23  implementation of due process here, Your Honor, not striking

24  my experts, which were properly identified under the Local

25  Rules.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 62 of 214   PageID 9176
Main Document   Page 62 of 382

16

1      If the Court is going to strike my experts, note our

2    objection.  We are tendering our experts.  We will put -- like

3    to put a proffer on for the Fifth Circuit or for the appellate

4    process.  But if the Court is going to strike our experts,

5    then it needs to do so.  We object because we have done

6    everything correctly.

7            THE COURT:  Okay.  Here's another problem.  I have

8    not had time to process their motion to exclude.  Beyond the

9    procedural issues, they are saying junk science, that there's

10   inadequate expertise on the part of I guess at least one of

11   them regarding executive compensation.  I haven't had -- they

12   filed their motion to exclude at 4:00-something yesterday.

13   Okay?

14           MR. MCENTIRE:  I understand.

15           THE COURT:  Now, yeah, I could have stayed up all

16   night.  I stayed up pretty late anyway, by the way.  But --

17           MR. MCENTIRE:  Well, first of all, --

18           THE COURT:  -- I haven't even had the time to process

19   and intelligently rule on their motion --

20           MR. MCENTIRE:  I appreciate that, and I'll respect --

21           THE COURT:  -- as far as the --

22           MR. MCENTIRE:  I'll respect the Court's statement.

23           THE COURT:  -- junk science argument.

24           MR. MCENTIRE:  I'll respect the Court's statement.

25   Their process and the procedure they've adopted is improper,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 63 of 214   PageID 9177
Main Document   Page 17 of 38

17

1    because if you're going to have a *Daubert* hearing, that's a

2    live hearing.  Or they're going to have to have evidence to

3    support their challenge.  This is simply a conclusory shotgun

4    blast on the wall, Your Honor.

5         If you even want to consider a *Daubert* challenge, the

6    proper procedure is to put the witnesses on the stand and have

7    an opportunity to have a proffer of evidence and a cross-

8    examination.  That's the proper procedure.  Throwing something

9    and innuendo and rhetoric and conclusions is not a proper

10   *Daubert* motion at all.  The Court could deny their *Daubert*

11   motion just on those grounds.

12        THE COURT:  I'm not going to rule on a motion that

13   I've barely had a chance to read, not to mention your response

14   that was filed at 8:00-something this morning.

15        MR. MORRIS:  It was.

16        MR. MCENTIRE:  It was.  Well, then the option is you

17   need to continue the proceeding to allow the experts to take

18   the stand.

19        THE COURT:  Well, I know you have thought on that,

20   but here is something I'm contemplating doing.  We'll go

21   forward with the hearing in the manner my order said we would

22   go forward with it.  My, I guess, Order #3 of my three orders.

23   And at the end of the evidence, you can argue in closing, each

24   of you, why we should keep the evidence open to come back

25   another day on only the experts.  But time matters.  If you've

1    all already used your three hours on each side, then are we

2    going to come back for five minutes on each of them?  I mean,

3    I don't know.

4        And then, of course, I would have to, if I ruled in that

5    way, I believe I would have to give them a chance to depose

6    these people.

7            MR. MCENTIRE:  I think that would be reasonable.

8            THE COURT:  Okay.  But you think you can get all of

9    your evidence in, other than your experts, and your opening

10   statement, if any, your closing argument, if any, in three

11   hours?

12           MR. MCENTIRE:  I'll do my best.

13           THE COURT:  Well, if you -- it's not a matter of --

14   I'm just saying this may all be an academic argument, because

15   I'm not increasing this to more than three hours each.  We've

16   fully vetted that.

17           MR. MCENTIRE:  Well, what the Court is then doing by

18   virtue of your ruling is that you're making me actually

19   present my evidence in a shortened form today, two hours, two

20   and a half hours, not knowing how -- whether or not you are

21   actually going to allow experts.

22       So, without the certainty, I will have to abbreviate my

23   entire presentation, giving them the advantage of putting more

24   evidence on than I, in an effort to anticipate a positive

25   ruling, which you're not prepared to provide yet.  And so I'm

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 65 of 214    PageID 9179

19

 1    actually being penalized.

 2              THE COURT:  Counsel, we had two status conferences on

 3    what kind of hearing we were going to have.

 4              MR. MCENTIRE:  I understand.

 5              THE COURT:  Now, the fact that you had not decided

 6    your strategy for this hearing, that's not my fault.  Again,

 7    we had two hearings on what kind of hearing we were going to

 8    have today.  We could have fully vetted this.  I could have

 9    heard about the experts, I could have decided if we were going

10    to continue the hearing past June 8th, could have decided if

11    we were going to allow more depositions.

12              MR. MCENTIRE:  Your Honor, --

13              THE COURT:  I could have fully studied the merits of

14    the motion to exclude and decided if this is junk science or

15    not.

16              MR. MCENTIRE:  I would request a ruling at this time,

17    Your Honor, on the experts.  If you are not inclined to

18    provide a ruling to me on the experts at this time, I would

19    effectively be penalized on my time limits.  I will have to

20    set aside enough time to put the experts on, not knowing, not

21    knowing whether you're going to give me the opportunity to do

22    so until the end of the day.  And that would be -- that would

23    be punishment.

24              THE COURT:  Isn't this going to be just preparing

25    your case you would have -- I mean, going forward with your

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 10/20/23    Page 66 of 214    PageID 9180

20

1  case the way you would have?

2          MR. MCENTIRE:  No, I don't -- really don't think so.

3  I think there's --

4          THE COURT:  I mean, --

5          MR. MCENTIRE:  There's a difference.

6          THE COURT:  -- you did not prepare your witnesses and

7  your possible cross-examination with the expectation of I'll

8  get my two experts in?

9          MR. MCENTIRE:  My -- of course.  But the point is,

10  then I'm going to have to set aside a half an hour or maybe

11  even longer from my other witness preparations, not knowing

12  whether you'll even give me that time.

13          THE COURT:  Isn't the other side going to have to do

14  the very same thing?

15          MR. MCENTIRE:  No.

16          THE COURT:  Why not?  They don't know how I'm going

17  to rule.  I don't know how I'm going to rule.  I have not

18  studied the motion to exclude the way I should.

19          MR. MCENTIRE:  Okay.  Well, Your Honor, we request a

20  ruling now.  But if the Court is not inclined to do so, please

21  note our objection.

22          THE COURT:  All right.  I'll give the Movants the

23  last word.  And I say "Movants" plural.  I'm trying to

24  remember where I saw a joinder and when I did not.  Did I see

25  a joinder?  I can't remember.

009477

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 10/07/23   Page 67 of 214   PageID 9181
Main Document   Page 68 of 382

21

1          MR. MORRIS:  Can we just have a moment, Your Honor?

2          THE COURT:  Okay.  Okay.

3          MR. MCILWAIN:  Your Honor, my clients did file a

4    joinder, but --

5          THE COURT:  Okay.

6          MR. MCILWAIN:  -- I'm going to let them handle this.

7          THE COURT:  Okay.

8       (Pause.)

9          THE COURT:  Counsel?

10         MR. LEVY:  Thank you, Your Honor.  Two brief points

11   we'd like to make.  The first is on the Rules.  So, Hunter

12   Mountain is focused on Rule 26(a) regarding reports.  However,

13   Rule 26(b) applies to contested matters under Rule 9014.  And

14   as we explain in Paragraph -- we explain in our brief, that --

15   or, in Paragraph 19 of our brief, that under Rule 26(b) we're

16   entitled to depose the experts.

17      And so we agree with Your Honor's suggestion that if

18   there's going to be any sort of experts, then we need the

19   opportunity to depose them.  This is Rule 26(b)(4)(A), which

20   expressly does apply to contested matters under Bankruptcy

21   Rule 9014(b).

22      The second point is we agree with the approach Your Honor

23   has proposed.  We think, for today, both sides can put on

24   their full cases without expert witnesses.  Both sides can

25   have the full three hours, which should address Hunter

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 68 of 214    PageID 9182

22

1   Mountain's concern.  And if Your Honor decides at the

2   conclusion of the hearing that expert testimony would be

3   helpful, then we could take the opportunity to depose their

4   experts and then come back for an additional half-hour for

5   each side to address any expert testimony that Your Honor

6   believes would be helpful.

7           THE COURT:  Okay.  Is your proposal that you each

8   today would be limited to two and a half/two and a half?  Or

9   three/three, and then another hour, 30 minutes/30 minutes, if

10  I --

11          MR. LEVY:  Three/three.

12          THE COURT:  -- decide to allow any experts?

13          MR. LEVY:  Yeah.  Three.  Three and three for each

14  side, the hearing contemplated by Your Honor's orders, today.

15  And if Your Honor decides that expert testimony would be

16  helpful, we could come back for an hour, for half an hour on

17  each side, regarding experts.

18          THE COURT:  All right.  Mr. McEntire, what about

19  that?

20      Oh, I'm sorry, did you --

21          MR. STANCIL:  Oh, I'm sorry.  Just one additional

22  point, Your Honor.  We would ask that Your Honor's ruling on

23  the ultimate admissibility of this be limited to what they've

24  actually put in front of us.  The day for the hearing is

25  today, so I think I'd like -- I'd suspect Your Honor would

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 69 of 214   PageID 9183

23

 1   like to avoid another raft of submissions.  So we would just

 2   ask that they live or die with what they've said in the way of

 3   methodology, disclosures, and the like.

 4          THE COURT:  Okay.  Mr. McEntire, this seems like the

 5   best of all worlds, maybe.

 6          MR. MCENTIRE:  Well, it may be the best of the worlds

 7   in which we're operating.

 8       My first position is that the experts are admissible,

 9   period.  And the Rules do not require anything more than what

10   we've already done.  In fact, we've done more than we were

11   supposed to.

12          THE COURT:  What is your argument about 26(b)(4),

13   which --

14          MR. MCCLEARY:  If they want to take a deposition,

15   they could have called me up and asked for it.

16          MR. STANCIL:  Your Honor, I was --

17          THE COURT:  Wait a second.  They were under a court

18   order.  Okay?

19          MR. MCENTIRE:  They could have -- they could have

20   sought --

21          THE COURT:  They were under my order.  Okay?  They

22   would have been violating my order if they had done it.

23          MR. STANCIL:  I was also, Your Honor, I was in a --

24          THE COURT:  Not to mention that it was --

25          MR. STANCIL:  I was in an airplane from 9:00 a.m.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 70 of 214   PageID 9184
Main Document   Page 70 of 382

24

1   Tuesday until 9:00 p.m. Tuesday.

2            THE COURT:  I'm surprised a lot of you got here, with

3   the Martian atmosphere that I saw pictures of.

4        Yes.  That's not realistic, to think that you disclose an

5   expert on Monday for a Thursday hearing and they can call you

6   up and --

7            MR. MCENTIRE:  The other --

8            THE COURT:  -- quickly put together a deposition.

9   So, --

10           MR. MCENTIRE:  Sure.  The other option, --

11           THE COURT:  Uh-huh.

12           MR. MCENTIRE:  -- of course, Your Honor, as I

13  mentioned before, and I'm not going to repeat myself, is they

14  -- there's other forms of relief they could seek.  But under

15  the circumstances, and in light of your apparent leaning on

16  the issue, then this is the best under the circumstances that

17  they've suggested.  We'd like an hour each.

18       I would also point out that -- well, anyway, that's it,

19  Your Honor.  Thank you.

20           THE COURT:  All right.  So we are going to go forward

21  as planned, three hours/three hours.  No experts today.  In

22  making your closings -- well, this is kind of awkward.  I'm

23  trying to think if we really have closing arguments, when you

24  don't know if it's -- it doesn't seem to make sense.  Like, I

25  guess we could have closing arguments if you want, subject to

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Main Document   Filed 12/07/23   Page 71 of 214   Page 71 of 214   PageID 9185

25

1  supplementing your closing arguments if we come back a second

2  day with the experts.  Okay?

3      And I'm not making a ruling today on the motion to

4  exclude.  I'm going to hear what I hear.  And maybe what we'll

5  do is I'll give you a placeholder hearing if we're going to

6  come back on the experts.  Then I'll go back and read the

7  motion, the response, and make my ruling on are we coming back

8  for another day of experts.  Okay?  Got it?

9      And with regard to the comment about not adding to, I

10  think that's a fair point.  You can't add new exhibits that

11  the expert might talk about or that you might want me to

12  consider between now and whenever the tentative day two is.

13          MR. MCENTIRE:  Understand.  We agree with that.

14          THE COURT:  Okay.

15          MR. MCCLEARY:  Your Honor, there is one -- one

16  exhibit that has a small typo transcription of a number on it.

17  So we would like to substitute for that.  It's a minor detail.

18  But I'll provide opposing counsel with that.  But it's very

19  minor.

20          THE COURT:  You have it today, I presume?

21          MR. MCCLEARY:  Yes, we have it.

22          THE COURT:  Okay.  So as long as you hand it to them

23  today.

24          MR. STANCIL:  No objection, Your Honor.  We do -- I

25  think someone is back at the office working on a short reply

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 72 of 214    PageID 9186
Main Document    Page 72 of 388

26

1    on our motion, which I assume we could file in support of -- I

2    mean, we filed our motion.  They filed an opposition.  I

3    assume we would be entitled under the Rules to file a short

4    reply on the actual exclusion issue.

5         THE COURT:  That is fair, but let's talk about

6    timing.  You said someone is back at the office working on it.

7    Could you get it on file by Monday?

8         MR. STANCIL:  Yes, ma'am.

9         THE COURT:  Okay.  Then that'll be allowed if it's

10   filed by the end of the day Monday.

11        MR. MCCLEARY:  Your Honor, I'm providing a copy of

12   Exhibit 43 to opposing counsel, which is the substitute

13   exhibit.

14      And obviously, we'd like to have an opportunity to respond

15   to what their filing is on Monday.

16        THE COURT:  No.  I mean, motion, response, reply.

17   That's all our Rules permit.  Okay?  Motion, response, reply.

18   Okay.

19        MR. MCCLEARY:  Yes, Your Honor.

20        THE COURT:  All right.  Well, with that, do the

21   parties want to make opening statements?  If so, Mr. McEntire,

22   you go first.

23        MR. MCENTIRE:  Yes, Your Honor.  We have a PowerPoint

24   I would like to utilize, if I could.

25        THE COURT:  You may.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 73 of 214   PageID 9187

27

1          MR. MORRIS:  Your Honor, before we get to that, the

2     Plaintiff has objected to virtually every single exhibit that

3     we have.  Should we deal with the evidence first, because I

4     don't want to refer to documents or evidence in my opening

5     that they're objecting to.  They've literally objected to

6     every single exhibit except one, although I think they're

7     withdrawing certain of those objections.

8        I don't -- I don't know if the Court has had an

9     opportunity to see the objection that was filed to the

10    exhibits.

11         THE COURT:  That was what was filed like at 11:00

12    last night or so?

13         MR. MORRIS:  That's right.

14         THE COURT:  Okay.

15         MR. MORRIS:  And so at 2:00, 3:00, 4:00, 5:00 o'clock

16    this morning, I actually typed out a response that I'd like to

17    hand up to the Court.  But we've got to resolve the

18    evidentiary issues before we get to this.

19         THE COURT:  Okay.  Well, --

20         MR. MORRIS:  And I don't know what their position is

21    going to be --

22         THE COURT:  -- as a housekeeping matter, let's do

23    that first.  And let's start with the Movants' exhibits.  Do

24    we have any stipulations on admissibility of Movants'

25    exhibits?

009484

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 74 of 214    PageID 9188
Main Document    Page 228 of 382

28

 1                    MR. MORRIS:  So, if I understand correctly, Your

 2      Honor, you'd like to know if we object to any of their

 3      exhibits first?

 4                    THE COURT:  Yes.  And --

 5                    MR. MORRIS:  Okay.

 6                    THE COURT:  -- we'll hold --

 7                    MR. MORRIS:  Because we have very limited objections.

 8                    THE COURT:  Yes.  We're going to keep on hold for now

 9      your exhibits to the expert-related, --

10                    MR. MORRIS:  Yes.

11                    THE COURT:  -- your objections to the expert-related

12      ones.

13                    MR. MORRIS:  Right.  I think -- I think --

14                    THE COURT:  So let's not talk about, for this moment,

15      --

16                    MR. MORRIS:  39 --

17                    THE COURT:  -- 39 through 52.

18                    MR. MORRIS:  Okay.

19                    THE COURT:  But as for 1 through 38 or 53 through 80,

20      do the Respondents have objections?

21                    MR. LEVY:  Yes, Your Honor.  We have very limited

22      objections.

23                    THE COURT:  Okay.

24                    MR. LEVY:  So, the three to which we object in their

25      entirety are Exhibits 24, 25, and 76, all of which we object

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 75 of 214    PageID 9189
Main Document    Page 75 of 382

29

1    to on relevance grounds.

2         Exhibits 24 and 25 are email correspondence between

3    counsel in an unrelated state court matter where Mr. Seery is

4    responding to a third-party subpoena regarding the

5    preservation of his text messages on his iPhone.  This has

6    absolutely nothing to do with whether or not the Movants have

7    stated a colorable claim for breach of fiduciary duties.

8         What this appears to be is related to an entirely separate

9    motion raised by Dugaboy regarding the preservation of Mr.

10   Seery's iPhone.  So we object to Exhibits 24 and 25 because

11   they have simply nothing to do with the issues in this

12   hearing.

13        We also object to Exhibit 76, which is a filing from two

14   years ago in a different bankruptcy matter, from *Acis*,

15   regarding an injunction in place in that -- in that plan about

16   issues that -- that occurred before the bankruptcy was in

17   place.  So this is just an entirely different case from issues

18   that arose many, many years ago that, again, has nothing to do

19   with this case.

20             THE COURT:  This was whether the *Acis* plan injunction

21   barred some lawsuit?

22             MR. LEVY:  Exactly.

23             THE COURT:  Okay.  Okay.  Is that all?

24             MR. LEVY:  We also have limited objections to certain

25   exhibits that we think are admissible for the -- for the fact

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 11/09/23   Page 76 of 214   PageID 9190

30

1    they're said, but not the truth of the matter asserted.

2        For example, Exhibits 1 and 2 are complaints filed in

3    those actions.  We have no objection to those coming in, but

4    not for the truth of the matter asserted.  These are advocacy

5    pieces and pleadings.  They're not actually substantive

6    evidence.

7        And we would have similar -- similar objections to

8    Exhibits 4, 6, 11, --

9            THE COURT:  Wait.  4 is James Dondero Handwritten

10   Notes, May 2021.

11           MR. LEVY:  Yes.

12           THE COURT:  Okay.

13           MR. LEVY:  So, we have no objection to that coming

14   into evidence.

15           THE COURT:  Uh-huh.

16           MR. LEVY:  But there are -- those are hearsay.

17   They're not admissible standing by themselves for the truth of

18   the matter asserted.

19           THE COURT:  Okay.

20           MR. LEVY:  And Exhibit 6 are news articles.

21   Similarly, they're hearsay, but we have no objection to them

22   coming in.  They're admissible for the fact that they're

23   published, but not the truth of the matter asserted.

24           THE COURT:  Okay.

25           MR. LEVY:  Exhibit 11, which is a motion filed by the

009487

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 10/03/23   Page 77 of 214   PageID 9191
Main Document   Page 78 of 382

31

1    Debtor.  Similarly, it's for -- we have no objection to

2    anything on the docket coming in, but anything that's an

3    advocacy piece, like a motion as opposed to an order, we think

4    is not admissible for the truth of the matter asserted.

5        And that would be a similar objection, then, for Exhibit

6    58, which is a complaint.

7        Exhibits 59, 60, and 61 are -- are letters by counsel for

8    Mr. Dondero to the U.S. Trustee's Office.  We similarly have

9    no objection to that coming in, but not for the truth of the

10   matter asserted.

11       And Exhibits 62 and 63, Exhibit 62 is an attorney

12   declaration attaching, similarly, documents that are -- that

13   are advocacy pieces.

14       And Exhibit 63 appears to be an asset chart prepared by

15   counsel.  So it would be a similar objection.

16       And Exhibit 66 also is a declaration attaching documents.

17       No objections to those coming in, but not for the truth of

18   the matter asserted.

19       Exhibits 72, 73, and 74 are all -- well, 72 are press

20   articles.  73 and 74 are briefs.  We don't object to that

21   coming in, but we object to it being admitted for the truth

22   the matter asserted.

23       And similarly, Exhibit 80 is a pleading in an SDNY

24   bankruptcy.  We have no objection to that coming in, but not

25   for the truth of the matter asserted.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40 Filed 10/03/23   Page 78 of 214   PageID 9192

32

1    And finally, Exhibits 81, 82, 83 don't specify particular

2    documents.  They appear to largely be reservations of rights.

3    And so we would likewise reserve our right to object once we

4    see any specific documents --

5         THE COURT:  Okay.

6         MR. LEVY:  -- admitted under these exhibits.

7         THE COURT:  Okay.  Mr. --

8         MR. LEVY:  And I understand my colleague has an

9    objection to Exhibit 5.

10        MR. MORRIS:  Exhibit 5, which is the subject, I

11   believe, of an unopposed sealing motion.  That document has to

12   do with purported restrictions on certain securities.  Since

13   it's subject to a sealing motion, I don't want to say too much

14   more than that, other than that -- we don't think it should be

15   admitted, because you can just see from the information on the

16   document that it was created after the termination of a shared

17   services agreement.

18    However, I'm hopeful that we can resolve the issue by

19   simply stipulating that in December 2020 MGM was on a

20   restricted list.  What that means, what the consequences of

21   it, the rest of it can be the subject of discussion.  But if

22   they're trying to get that document in for that particular

23   fact, we would stipulate to it in order to resolve that

24   dispute.

25        THE COURT:  All right.  Well, that's lots to respond

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 79 of 214    PageID 9193

33

1    to, Mr. McCleary.  Why don't we start with the outright

2    objections:  24, 25.  It's apparently text messages related to

3    Mr. Seery's iPhone.  I know we've got another motion pending

4    out there that's not set today regarding Mr. Seery's iPhone.

5            MR. MCCLEARY:  Yes, Your Honor.  Well, as the Court

6    is aware, we've attempted to get discovery from Mr. Seery in

7    relation to the allegations in this lawsuit.  And by the way,

8    all of our exhibits that we're tendering are subject to our

9    objections that this should not be an evidentiary hearing.  I

10   just want to make that clear.

11           THE COURT:  Understood.

12           MR. MCCLEARY:  Okay.  Thank you.  So, we're not

13   waiving that.

14       The Exhibits 24 and 25 are relevant to the fact that he's

15   -- he's not preserving information that is relevant to the

16   claims in this lawsuit.  And that also is something that is a

17   factor in the colorability of our claims in this case.

18           THE COURT:  How?

19           MR. MCCLEARY:  Well, there is an effort, we believe,

20   underway to not have information available for us to discover.

21   And it reflects that they have been involved in providing --

22   we think supports -- providing material nonpublic information

23   to other people that would be in his phone.  And we want him

24   to preserve it.  And we think the fact that he is not is

25   evidence that supports the colorability of our claims.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 11/03/23    Page 80 of 214    PageID 9194

34

1          THE COURT:  So, --

2          MR. MCENTIRE:  Your Honor, this --

3          THE COURT:  No.  No.  I'm processing that.  You're

4   wanting the Court to receive into evidence a text that may say

5   something like, I delete messages periodically on my phone, to

6   support your claim that you have a colorable claim that some

7   sort of improper insider disclosure of information and insider

8   trading is going on?  He said he had an automatic delete

9   feature on his phone; therefore, he -- that must be evidence

10  of a colorable claim for insider trading.  That's the

11  argument?

12         MR. MCENTIRE:  May I add to it, supplement, Your

13  Honor?  Mr. Seery, in his deposition, indicated that he did

14  receive a text message that he had recently reviewed from

15  Stonehill in February of 2021.  To the extent, however, that

16  is inconsistent with the fact that he has an automatic delete

17  button, suggesting to me that certain text messages have been

18  selectively saved and some other messages have been not

19  selectively saved.

20         THE COURT:  We don't have that motion set today.

21         MR. MCENTIRE:  This is not -- that has nothing to do

22  with the motion.  It has to do with the fact that what is

23  being presented to the Court in response, the Respondents'

24  argument, is a selected window, a selected picture, that is --

25  distorts the reality of what we think has been destroyed

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 81 of 214   PageID 9195
Main Document   Page 82 of 382

35

1    evidence.

2         Mr. Seery can't save one message that may be helpful to

3    them and not save others that may not be.  And it is

4    inconsistent with the notion that this automatic delete button

5    was already in effect, so why does he have one favorable

6    message?  That's why it's relevant.

7              THE COURT:  Maybe he stopped using the automatic

8    delete after --

9              MR. MCENTIRE:  No, he didn't at this time, Your

10   Honor.

11             THE COURT:  Well, --

12             MR. MCENTIRE:  That's the relevance.

13             THE COURT:  So, --

14             MR. MCCLEARY:  And he should never have used it, Your

15   Honor, given his role and responsibilities.

16             THE COURT:  We don't have that motion set today.

17   What is the content of these emails?  February 16th, March

18   10th, 2023?  What is the content, for me to really zero in --

19             MR. LEVY:  I have --

20             THE COURT:  -- on relevance or not.

21             MR. LEVY:  -- copies of the emails, if that would be

22   helpful --

23             THE COURT:  Okay.

24             MR. LEVY:  -- to Your Honor.

25             THE COURT:  Well, you know, now I'm seeing them, so I

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/04/23   Page 82 of 214   PageID 9196
Main Document   Page 82 of 382

36

1    don't know what the big deal is if --

2              MR. LEVY:  As Your Honor can see, these are emails

3    between counsel regarding preservation, which has nothing to

4    do with whether there are colorable claims for fiduciary

5    duties.

6       I'll add that -- and to show that this has nothing to do

7    with this case and it is an attempt to generate a fishing

8    expedition for documents in an entirely unrelated motion, we

9    had a meet-and-confer where we represented to the counsel

10   bringing that motion that we have been able to recover the

11   text messages from the iCloud.

12      And so this is really just a sideshow.  It has nothing to

13   do with the issues of the colorability of claims for breach of

14   fiduciary duties.  It should not be introduced into evidence

15   in this hearing.

16             THE COURT:  All right.  I'm going to sustain the

17   objection, but this is without prejudice to you re-urging

18   admission of these messages at the hearing on the motion

19   regarding Mr. Seery's phone.  Okay?  Now, --

20             MR. MCCLEARY:  That's as to 24 and 25, Your Honor?

21             THE COURT:  Correct.  And let's go now to the other

22   one, the Exhibit 76, the *Acis*-related document, the relevance

23   of that.  Statement of Interested Party in Response to Motion

24   of NexPoint to Confirm Discharge or Plan Injunction Does Not

25   Bar Suit, or Alternatively, for Relief from All Applicable

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 10/03/23   Page 83 of 214   PageID 9197
Main Document   Page 83 of 385

37

1    Injunctions.

2        What is the relevance for today's matter?

3            MR. MCCLEARY:  Your Honor, this is background of

4    pleadings and just background information generally to support

5    the allegations made in the case and the background.

6            THE COURT:  What do you mean, background?

7            MR. MCCLEARY:  Kind of the history relative to the

8    claims trading and relative to the claims of the use of

9    insider information.

10           THE COURT:  Okay.  Be more specific, because I

11   certainly have a background education on *Acis* litigation.

12       (Pause.)

13           MR. MCCLEARY:  Yeah.  Your Honor, this is a data

14   point that is referred to in one of our experts' data charts,

15   I believe, so --

16           THE COURT:  All right.  So let's just carry that to

17   --

18           MR. MCCLEARY:  Yes.

19           THE COURT:  I'm just going to mark it as carried

20   along with 39 through 62, related to the experts.

21       (HMIT's Exhibits 39 through 62 and Exhibit 76 carried.)

22           THE COURT:  Okay.  What about all of these objections

23   that we don't object *per se* but we want it clear that the

24   documents are not being offered for the truth of the matter

25   asserted because there's hearsay?

1              MR. MCENTIRE:  Your Honor, I'll let Mr. McCleary

2    address all of those.

3        I want to point out one exception, and that is Exhibit #4,

4    which are handwritten notes from Mr. Jim Dondero.  Those are

5    not -- they are being offered for the truth of the matter

6    asserted because it's an admission of a party opponent in

7    these proceedings, and that's Farallon.  They reflect

8    significant statements and admissions by Farallon, which are

9    not hearsay.  It's an exception to the hearsay rule.  And

10   they're being offered for more -- they are being offered for

11   the truth of the matter asserted, because -- and it's

12   admissible in that format.

13             THE COURT:  But are you referring to hearsay within

14   hearsay?  Because there would be, I guess -- I guess the

15   handwritten notes of Mr. Dondero are his hearsay, and then

16   you're saying there's --

17             MR. MCENTIRE:  So, this is reflecting statements made

18   to Mr. Dondero that are admissions of a party opponent.

19             MR. LEVY:  None of that has been established.  These

20   are not notes from anybody at Farallon or Stonehill which

21   could potentially be a party admission.  These are notes by

22   Mr. Dondero about what was purportedly said by somebody else,

23   and there's no evidence that these were kept in the regular

24   course of business.

25       This is hearsay and hearsay within hearsay.  And this

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 11/03/23   Page 85 of 214   PageID 9199
Main Document   Page 85 of 382

39

1    could be established in testimony, but it can't be admitted --

2    the document can't be admitted to speak on behalf of a third

3    person who's not here.

4            MR. MCENTIRE:  Well, first of all, I agree, we'd need

5    to lay a foundation.  But that's not the purpose of this

6    discussion right now.  I am simply advising the Court that

7    once I lay a foundation, it comes in for all purposes.  It

8    comes in as an admission of a party opponent.

9            MR. LEVY:  It is not an admission of a party

10   opponent.  It is not notes or statements by any actual

11   defendant.  These are notes by Mr. Dondero being introduced

12   for his own benefit.  It is not a party admission.

13           THE COURT:  Okay.  I'm going to carry that one.  If

14   one of the witnesses that's on the witness stand -- well,

15   presumably Mr. Dondero will be called -- we can get context at

16   that time and decide if it's appropriate to let it in and let

17   you cross-examine him on them if that's going to come in.  All

18   right?  So we'll carry this one.

19       Anything else, though, unique, or can we consider as a

20   batch all these other objections to -- most of them being

21   pleadings, not all of them but a lot of them -- that the

22   Respondents just want it clear that they're not being offered

23   for the truth of the matter asserted?  Your response?

24           MR. MCCLEARY:  They're, again, largely data points

25   relied on by experts in the course of coming up with their

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/04/23   Page 86 of 214   PageID 9200
Main Document   Page 40 of 380

40

1    opinions and just setting the background and history of the

2    claims trading.

3           THE COURT:  Well, then which ones are data points?

4    Because I just need to carry those, right?  If they're not

5    being offered for any other reason.

6           MR. MCCLEARY:  Well, I would have to -- we would have

7    to refer to the charts of the experts, Your Honor, to

8    determine that on all of them.

9           MR. MCENTIRE:  In order to facilitate this, may I

10   make a suggestion, Your Honor?  We'll agree that if we're

11   going to offer anything that he's identified other than for

12   the purposes indicated, we will advise the Court.  Otherwise,

13   we'll accept the limitations imposed.  And as we go through,

14   if we offer an exhibit that is more than the truth -- if we

15   are offering it for the truth of the matter asserted, we will

16   advise the Court, and then we could take it up then.  I'm just

17   trying to get the ball rolling.

18          THE COURT:  Okay.  Well, that's still going to be a

19   time-consuming thing, maybe.  But, okay.  Just, when we start

20   the clock here -- very shortly, I hope -- I want people clear

21   that when you make objections, that counts against your three

22   hours.  Okay?  All right?

23          MR. LEVY:  Okay.  Understood, Your Honor.

24          MR. MCCLEARY:  Your Honor, we have certainly made

25   objection to some of their exhibits.

009497

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 11/04/23   Page 87 of 214   PageID 9201
Main Document   Page 87 of 382

41

```
 1              THE COURT:  All right.  Well, shall we turn to those

 2   now?

 3              MR. MCCLEARY:  Yes, Your Honor.

 4              MR. MORRIS:  Your Honor, they objected to every

 5   single exhibit except one, so let's be clear.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  If they're withdrawing them, that's

 8   fine.

 9              MR. MCCLEARY:  Well, --

10              MR. MORRIS:  But let's be clear.

11              MR. MCCLEARY:  -- we are not withdrawing our general

12   objection to all the evidence, of course.  Just --

13              THE COURT:  Okay.  Let me just say for the record

14   right now, I understand and you are preserving for all

15   purposes your ability to argue on appeal that it was error for

16   the Court to consider any evidence.  Okay?  You have not

17   waived that argument by --

18              MR. MCCLEARY:  Thank you.

19              THE COURT:  -- now --

20              MR. MCCLEARY:  Thank you.  We can have --

21              THE COURT:  -- agreeing to the admission of anybody's

22   exhibit or offering your own exhibits.

23              MR. MCCLEARY:  And we could have a running objection

24   on that basis, on relevance to all the witnesses and the

25   evidence that they offer on that basis.  I would request that.
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/04/23   Page 88 of 214   PageID 9202

42

```
 1              THE COURT:  Well, okay, let me be clear.  Relevance.

 2    Your argument is that no evidence is relevant because the

 3    Court doesn't need to consider any evidence --

 4              MR. MCCLEARY:  Yes, Your Honor.

 5              THE COURT:  -- on the colorability issue.  You've got

 6    a running objection.  It's not destroyed for appeal purposes.

 7    Okay?

 8              MR. MCCLEARY:  Thank you, Your Honor.  Then, subject

 9    to that, in terms --

10              MR. MORRIS:  I'm sorry to interrupt, but --

11              MR. MCCLEARY:  Sure.

12              MR. MORRIS:  -- would it be helpful if I gave the

13    Court my list so she can see --

14              MR. MCCLEARY:  Sure.

15              MR. MORRIS:  -- what the --

16              MR. MCCLEARY:  Sure.

17              MR. MORRIS:  Okay.  May I approach, Your Honor?

18              THE COURT:  You may.  I'm not sure, if everything has

19    been objected to, I'm not sure how --

20              MR. MORRIS:  Because I've tried -- I've tried to

21    organize it in a way that would be helpful.

22              THE COURT:  Okay.

23         (Pause.)

24              MR. MCCLEARY:  Okay.  Your --

25              THE COURT:  I'm ready.
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-4   Filed 12/04/23   Page 89 of 214   PageID 9203

43

1        MR. MCCLEARY:  -- Honor, yes.

2        THE COURT:  Uh-huh.

3        MR. MCCLEARY:  So, we are withdrawing our objections,

4   other than the general objections to relevance based on the

5   evidentiary nature of the proceeding, to Exhibits 1 and 2.

6      With respect to 3, this is a verified petition to take

7   deposition for suit and seek documents filed on July 22, 2021.

8   We object on the grounds of relevance and hearsay to that.  Is

9   that --

10       THE COURT:  Well, --

11       MR. MORRIS:  I don't -- I don't understand this one.

12       THE COURT:  This --

13       MR. MCCLEARY:  Is that, I'm sorry, is that your #11?

14       MR. MORRIS:  Yeah.

15       MR. MCCLEARY:  All right.  We withdraw our objection

16   to #3, subject to our general objection.

17      On Exhibit 4, we object to relevance and hearsay on a

18   verified amended petition to take deposition before suit and

19   seek documents.

20       THE COURT:  Okay.  This is my time to hear your

21   argument.  And we're going to be here --

22       MR. MORRIS:  Can I -- can I do this here?  It's going

23   to be much quicker.

24       THE COURT:  What do you mean?  Do what here?

25       MR. MORRIS:  So, if you just follow the chart that I

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/04/23    Page 90 of 214    PageID 9204

44

 1    gave the Court, --

 2              THE COURT:  Uh-huh.

 3              MR. MORRIS:  -- Section A is a list of exhibits that

 4    they've objected to.  Those exhibits are in the right-hand

 5    column.

 6        At the same time, they are offering the exact same

 7    exhibits into evidence on their exhibit list.  I don't

 8    understand how they can offer their exhibits and object to

 9    ours.

10              MR. MCCLEARY:  Counsel.  I'm sorry.  We've already

11    told them that, subject to our general objection, we'll

12    withdraw the objections to those exhibits.

13              MR. MORRIS:  Right.  So can we agree that all

14    objections to Section A are withdrawn?

15              MR. MCCLEARY:  Subject to the general objection, yes.

16              MR. MORRIS:  Thank you.

17              THE COURT:  Okay.  So, --

18              MR. MORRIS:  That's going to be much quicker.

19              THE COURT:  -- 11, 34, 2, 46, 42, 38, 41, 39, 40,

20    and various attachments to Highland Exhibits 5 are withdrawn.

21    So, admitted by stipulation.

22         (Debtors' Exhibits 2, 11, 34, 38, 39, 40, 41, 42, 46 are

23    received into evidence.  Certain attachments to Debtors'

24    Exhibit 5 are received into evidence.)

25              MR. MORRIS:  And to make this easy, Your Honor, at

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/04/23    Page 91 of 214    PageID 9205
Main Document    Page 45 of 382

45

1    some point I hope later today, but perhaps tomorrow, we'll

2    slap a caption on this, we'll file it on the docket, so that,

3    you know, an appellate court, if necessary, can follow along.

4    But I think that we've just stipulated that all of the

5    exhibits identified in Section A of this document are -- the

6    objections have been withdrawn.

7              THE COURT:  Okay.

8              MR. MCCLEARY:  Subject to the general objections.

9              MR. MORRIS:  Right.  That gets us -- I'm going to

10   jump to Section C, because I think the same is true.  Section

11   C identifies all exhibits that each party has taken from the

12   docket.  And you can see from Footnote 4, the Court can take

13   judicial notice under Federal Rule of Evidence 201, we've just

14   had the discussion about whether or not any of them would be

15   limited for purposes of the truth of the matter asserted, but

16   all of the exhibits identified in Section C I think the Court

17   can take judicial notice of because they're on a docket.

18             THE COURT:  Response?

19             MR. MORRIS:  And so I would respectfully request that

20   they withdraw their objections to anything in Section C.

21             THE COURT:  Response, Mr. McCleary?

22             MR. MCCLEARY:  I understand the Court can take

23   judicial notice of those, Your Honor, but they do contain

24   irrelevant and hearsay information also.

25             MR. MORRIS:  The hearsay, I think that we just had

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/04/23    Page 92 of 214    PageID 9206

46

1    the discussion.  I mean, if there's something that he wants to

2    really point out at this point that I can respond to.  But we

3    would agree that advocacy pieces shouldn't be offered for the

4    truth of the matter asserted.  Court orders, on the other

5    hand, are law of the case.

6          THE COURT:  So, I mean, it's the very same situation

7    we just addressed with your own exhibits.  You have a lot of

8    court filings.  And they didn't have a problem with it, as

9    long as everyone knew advocacy was not being accepted for the

10   truth of the matter asserted.

11         MR. MCCLEARY:  Well, --

12         THE COURT:  Isn't this the same thing?

13         MR. MCCLEARY:  -- they're not offering it for the

14   truth of the matter asserted.  That's one thing.  And

15   certainly the Court can take judicial notice.  We do object to

16   the extent they're offering Exhibits 6 through 10 for the

17   truth of the matter asserted.

18         MR. MORRIS:  Well, let me check those.

19         THE COURT:  Well, --

20         MR. MCCLEARY:  I'm sorry.  6, 7, uh -- (pause).

21         THE COURT:  Those are orders of --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- courts.

24         MR. MORRIS:  Yeah.  They're orders of the Court.

25         MR. MCCLEARY:  The orders are not relevant, Your

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Main Document    Filed 12/04/23    Page 93 of 214    PageID 9207    Page 94 of 382

47

1    Honor.

2              THE COURT:  Explain.

3              MR. MCCLEARY:  Well, they have not demonstrated that

4    the orders that they seek to introduce are relevant.  They

5    have orders regarding, for example, the contempt proceedings

6    that are irrelevant to these proceedings.  And prejudicial

7    under 403.

8              THE COURT:  All right.  Shall I take a five- or ten-

9    minute break?  Let me -- I think I've been very generous by

10   not starting the clock yet on the three hours/three hours.

11             MR. MCCLEARY:  Appreciate that.

12             THE COURT:  But here's how we do things in bankruptcy

13   court.  And I don't mean to talk down to anyone.  I don't

14   know, you may appear in bankruptcy court every day of your

15   life.  But we expect counsel to get together ahead of time and

16   stipulate to the admissibility of as many exhibits as you can.

17   If there's a preservation of rights here and there, fine.  But

18   we --

19             MR. MCCLEARY:  Maybe if we take --

20             THE COURT:  You know, --

21             MR. MCCLEARY:  We can try to --

22             THE COURT:  -- helping everyone to understand, --

23             MR. MCCLEARY:  Sure.

24             THE COURT:  -- we have thousands of cases in our

25   court.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/04/23    Page 94 of 214    PageID 9208
Main Document    Page 74 of 382

48

1              MR. MCCLEARY:  Sure.

2              THE COURT:  And this is just something we have to do

3    to give all parties their day in court when they need time.

4    And so --

5              MR. MCCLEARY:  If you'd like us to take ten minutes

6    and try to narrow this, we certainly --

7              THE COURT:  Okay.  With everybody understanding you

8    should have taken the ten minutes before we got here.  But,

9    again, when I say three hours, --

10             MR. MORRIS:  Yeah.

11             THE COURT:  -- that's what I meant.  Okay?

12             MR. MCCLEARY:  Yes, Your Honor.

13             THE COURT:  So we'll take a ten-minute break.

14             THE CLERK:  All rise.

15        (A recess ensued from 10:42 a.m. until 10:54 a.m.)

16             THE CLERK:  All rise.

17             THE COURT:  All right.  Please be seated.  Have we

18   reached agreements on some of these exhibits?

19             MR. MCCLEARY:  Your Honor, we have agreed on the ones

20   that we can agree on, and we announced that to the Court with

21   respect to the Paragraph A items that the Court's already

22   ruled on.

23        I would like to point out to the Court that we just got

24   their objections handed to us right before the hearing.  We

25   filed ours last night.  So we didn't --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 11/04/23   Page 95 of 214   PageID 9209
Main Document   Page 94 of 383

49

1        THE COURT:  At 11:00-something, right?

2        MR. MCCLEARY:  Yes, Your Honor, but we did --

3        THE COURT:  Okay.  Well, okay.  So I guess your point

4   is you want to make sure I'm annoyed with everyone, not just

5   selective of you.

6        MR. MCCLEARY:  Well, --

7        THE COURT:  I mean, exhibit lists were filed Monday.

8   So I don't know why on Tuesday people were not on the phone

9   saying, you know, or Wednesday morning at the latest.

10        MR. MCCLEARY:  Sure.  And we haven't had much of an

11   opportunity, in fairness, to consider their objections and

12   respond because we just received them right at the time of the

13   hearing, just before the hearing started.

14        Your Honor, we would urge our objections to Exhibit #4.

15   We've objected to this petition to take deposition before suit

16   and seek documents on the basis of relevance and hearsay.

17   They have a number of pleadings in other matters that have

18   nothing to do with, frankly, the colorability standard in this

19   case.  And this is an example.

20        THE COURT:  Okay.  This is the time for me to hear

21   specific objections and what the basis is, and not just --

22        MR. MORRIS:  Can we go back --

23        THE COURT:  -- a category.

24        MR. MCCLEARY:  Yeah.

25        MR. MORRIS:  Can we go back to my way?  Because it's

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/05/23   Page 96 of 214   PageID 9210
Main Document   Page 50 of 382

50

```
 1    just going to be much faster.  It really will be.  Right?  We
 2    -- Category 1, A and C, we dealt with.  Category B, --
 3              THE COURT:  Well, we dealt with A.
 4              MR. MORRIS:  Right.  And --
 5              THE COURT:  All of those are withdrawn, and they are
 6    admitted by stipulation.
 7              MR. MORRIS:  Right.
 8              MR. MCCLEARY:  Subject to --
 9              THE COURT:  Category C, --
10              MR. MCCLEARY:  -- the general objections.
11              THE COURT:  -- I'm not sure we're to closure on.
12              MR. MORRIS:  Um, --
13              THE COURT:  Are we to closure on C?  Are you
14    stipulating?
15              MR. MCCLEARY:  No.  We are not stipulating on C.
16              MR. MORRIS:  Let's do them one at a time.
17              MR. MCCLEARY:  I have not had an opportunity to -- to
18    --
19              MR. MORRIS:  Let's do them one at a time.
20              MR. MCCLEARY:  Have not had an opportunity to look at
21    each and every one of these, Your Honor.  Because we did just
22    get these.
23              THE COURT:  Okay.
24              MR. MCCLEARY:  But generally --
25              THE COURT:  If we have not wrapped this up in 15
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/05/23   Page 97 of 214   PageID 9211
Main Document   Page 96 of 382

51

 1   minutes, we're just going to start, and you can object the

 2   old-fashioned way.  But I'm telling all lawyers here,

 3   objections count against your time.  Okay?

 4          MR. MORRIS:  And I'd move for the admission of all of

 5   our exhibits right now, then.

 6          THE COURT:  Okay.

 7          MR. MORRIS:  So let him -- let -- put him on the

 8   clock and let's go.

 9          THE COURT:  Okay.  So, 15 minutes.  Let start going

10   through everything except Category A.

11          MR. MORRIS:  Number 4?

12          MR. MCCLEARY:  Number 4, Your Honor, we object on the

13   basis of relevance and hearsay.

14          MR. MORRIS:  Okay.  My response to that, Your Honor,

15   and this will be my response -- this is in Section B of my

16   outline --

17          THE COURT:  Uh-huh.

18          MR. MORRIS:  Okay?  They object to Exhibits 3, 4, 5,

19   and 9.  These are Mr. Dondero's prior sworn statements.  You

20   just heard his lawyer stand here and tell the Court that

21   somehow his handwritten notes should be admissible as an

22   admission.  You know what he did?  He testified four different

23   times under oath.  That's Exhibits 3, 4, 5, and 9.  Sworn

24   statements.

25      They come into evidence not as hearsay but under Federal

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/05/23    Page 98 of 214    PageID 9212

52

1    Rule of Evidence 801(d)(1).  It's beyond -- the notion that

2    they can prove a colorable claim and that it's not relevant

3    that he's got diametrically different -- he's got four

4    different statements, now five with his notes, he's got five

5    different statements.  Doesn't that go to the colorability of

6    these claims?

7        We believe it does.  That's the basis for the introduction

8    of these documents into evidence.

9            THE COURT:  Okay.  Mr. McCleary, your response?

10           MR. MCCLEARY:  Well, it's a verified amended

11   petition, Your Honor, in another matter, to -- before suit to

12   seek documents.  Has nothing to do with the merits of this

13   case and our motion for leave.  So we object on the grounds of

14   relevance and hearsay.

15           THE COURT:  Well, since they're prior sworn

16   statements of Mr. Dondero, --

17           MR. MCCLEARY:  Well, then they might -- if they want

18   to use it later to impeach, they can try to do that, but they

19   have to lay the foundation.

20           THE COURT:  What about 801(d)(1)?

21           MR. MCCLEARY:  Again, relevance, Your Honor.

22           THE COURT:  Okay.  I overrule.  Those are --

23           MR. MCCLEARY:  And Mr. --

24           MR. MORRIS:  Okay.

25           THE COURT:  Those are going to be admitted.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/05/23   Page 99 of 214   PageID 9213
Main Document   Page 53 of 382

53

1          MR. MCCLEARY:  By the way, on hearsay, Mr. Dondero is

2     not Hunter Mountain.  So when he argues that these are

3     admissions, they're not admissions by Hunter Mountain.

4          MR. MORRIS:  Your Honor, the only piece of evidence,

5     literally the only piece of evidence they have are the words

6     out of Mr. Dondero's mouth.  There is no evidence, there will

7     be no evidence of a *quid*, a *pro*, or a *quo*.  There will be no

8     evidence other than what Mr. Dondero testifies to --

9          MR. MCCLEARY:  Well, --

10          MR. MORRIS:  -- about what he was told.  There will

11     be no evidence that there was a meaningful relationship

12     between Mr. Seery and Ms. -- and Farallon and Stonehill.

13     There will be no evidence, none, that Farallon and Stonehill

14     rubber-stamped Mr. Seery's compensation package.  Nothing.

15     The only thing we have are going to be the words out of Mr.

16     Dondero's mouth and these notes that just showed up.  And

17     these statements --

18          MR. MCCLEARY:  Your Honor?

19          THE COURT:  Okay.  Counsel, I mean, it just feels

20     like --

21          MR. MORRIS:  It's --

22          THE COURT:  -- if notes get in, then sworn statements

23     of Mr. Dondero should get in.  Right?

24          MR. MCCLEARY:  Your Honor, he's making arguments,

25     closing arguments, opening arguments, trying to run out the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 100 of 214   PageID 9214
Main Document   Page 753 of 789

54

1      clock.  We objected to relevance, and we stand on our

2      objection.

3                THE COURT:  Okay.

4                MR. MCCLEARY:  And on hearsay.

5                THE COURT:  I'll admit 3, 4, 5, and 9.

6         (Debtors' Exhibits 3, 4, 5, and 9 are received into

7      evidence.)

8                MR. MORRIS:  Section E.

9                MR. MCCLEARY:  I'm sorry.  So our objections are

10     overruled?

11               THE COURT:  They are overruled.

12               MR. MCCLEARY:  On 3, 4, 5?

13               THE COURT:  And 9.

14               MR. MORRIS:  Section E of my outline.

15               MR. MCCLEARY:  What about 6?

16               THE COURT:  That's not --

17               MR. MORRIS:  Well, --

18               THE COURT:  Well, I don't --

19               MR. MORRIS:  -- it would -- it would --

20               THE COURT:  Let's go back to C.  I'm not clear if

21     we're to closure on Section C.

22               MR. MORRIS:  I'll let Counsel go through --

23               THE COURT:  And 6 is within Section C.

24               MR. MORRIS:  I'll let Counsel go through each one,

25     one at a time.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 101 of 214   PageID 9215
Main Document   Page 523 of 788

55

1          MR. MCCLEARY:  No.  That's all right.  If you want to

2     go through, you have them lumped in.  Yeah, I think it'd

3     probably be quickest if, frankly, we just go down the list,

4     Your Honor.  Frankly.

5          THE COURT:  Well, you've got ten minutes left.

6          MR. MCCLEARY:  Okay.  We object to #6, memorandum and

7     opinion order granting Dondero's motion to remand, on the

8     basis of relevance and hearsay.

9          THE COURT:  Overruled.  I can take judicial notice

10     under 201 of that.  So 6 is admitted.

11        (Debtors' Exhibit 6 is received into evidence.)

12          MR. MCCLEARY:   We object to Exhibits 7 and 8 on the

13     grounds of relevance.  7 on relevance and hearsay, and 8 on

14     relevance.

15          MR. MORRIS:  I'll take 7 first, Your Honor.

16          THE COURT:  Okay.

17          MR. MORRIS:  It's an order dismissing Mr. Dondero's

18     202 petition.  That 202 petition sought discovery on the basis

19     of the exact same so-called insider trading claims that Hunter

20     Mountain is asserting today.

21        I think it's not only relevant, it's almost dispositive

22     that a Texas state court heard the exact same -- or, actually,

23     not the exact same, because Mr. Dondero changed his story so

24     many times -- but heard a version, I think Versions 1, 2, and

25     3, of this insider trading and would not even give them

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/07/23   Page 102 of 214   PageID 9216
Main Document   Page 533 of 789

56

1    discovery.

2       So when the Court considers whether or not there's a

3    colorable claim here, I think it ought to think about what a

4    Texas state court decided on not whether or not they have

5    colorable claims, whether or not they're even entitled to

6    discovery.  I think it's very relevant.  Move for its

7    admission right now.

8            MR. MCCLEARY:  Your Honor, it's ironic, because at

9    that hearing counsel for the Respondents was arguing that it

10   ought to be this Court that considers what discovery is

11   appropriate.

12           THE COURT:  Okay.  Well, obviously, you can argue

13   about that, but, again, I think I can take judicial notice of

14   this.  Right?

15           MR. MCCLEARY:  Well, we argue that it's not relevant,

16   Your Honor, and it is the --

17           THE COURT:  Okay.

18           MR. MCCLEARY:  7 is not relevant and is hearsay.

19           THE COURT:  Okay.

20           MR. MORRIS:  Number 8, --

21           THE COURT:  Objection is overruled.

22           MR. MCCLEARY:  Overruled?

23           THE COURT:  And so 7 is admitted.

24       (Debtors' Exhibit 7 is received into evidence.)

25           MR. MCCLEARY:  8 is our verified petition.  And we

009513

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/05/23   Page 103 of 214   PageID 9217
Main Document   Page 103 of 389

57

1    object on the grounds of relevance.

2           MR. MORRIS:  You know, Your Honor, if I really had

3    the time and the patience to do this, I think I'd find this

4    document attached to Mr. McEntire's affidavit that's on their

5    exhibit list.

6       But to speed this up just a little bit, how could their

7    202 petition that sought discovery on the basis of the very

8    same insider trading allegation not be relevant?  It's a

9    judicial order.  You can take notice of it.  And it's

10   incredibly relevant that a second Texas state court heard the

11   same allegations that they're presenting to you as colorable

12   and said no, you're not getting discovery.

13          MR. MCCLEARY:  We don't know why they made that

14   order, Your Honor.  They could have simply accepted the

15   opposition's arguments that this Court had jurisdiction and

16   should consider what discovery ought to be done.

17          THE COURT:  Overruled.

18          MR. MCCLEARY:  It's not relevant to our --

19          THE COURT:  I admit 8.

20          MR. MORRIS:  Next?

21          MR. MCCLEARY:  Overruled?

22          THE COURT:  Yes.

23      (Debtors' Exhibit 8 is received into evidence.)

24          MR. MCCLEARY:  The declaration of James Dondero.  I

25   think we withdrew the Dondero --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 11/20/23   Page 104 of 214   PageID 9218

58

1          THE COURT:  Right.

2          MR. MCCLEARY:  -- declarations.  If it --

3          THE COURT:  It's --

4          MR. MCCLEARY:  Numbered -- I'm sorry, #9.

5          THE COURT:  9.  I've already checked it as admitted.

6          MR. MCCLEARY:  If you want to -- if you want to offer

7    #9, they can offer it.

8          THE COURT:  It's admitted.  I've already --

9          MR. MCCLEARY:  Okay.

10         THE COURT:  -- said.

11         MR. MCCLEARY:  Number 10.  It's an order denying our

12   second Rule 202 petition.  And we object to it on relevance,

13   Your Honor.

14         THE COURT:  Same objection.  It's overruled.  It's

15   admitted.

16      (Debtors' Exhibit 10 is received into evidence.)

17         MR. MCCLEARY:  Number 12, 13, and -- 12 and 13 are

18   correspondence regarding resignation letters.  We object on

19   grounds of relevance.

20         THE COURT:  Wait.  Did we skip 11 for a reason?

21         MR. MCCLEARY:  Pardon me?

22         THE COURT:  Did we skip 11 for a reason?

23         MR. MCCLEARY:  We only have it --

24         THE COURT:  Oh, wait.  It's already admitted by

25   stipulation.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 105 of 214   PageID 9219
Main Document   Page 523 of 789

59

 1                MR. MCCLEARY:  Yeah, and we have --

 2                MR. MORRIS:  That's the one --

 3                MR. MCCLEARY:  We have our general objection.

 4                MR. MORRIS:  That's the one exhibit that they didn't

 5       object to.

 6                THE COURT:  Okay.

 7                MR. MCCLEARY:  We only had our general objection with

 8       respect to that.

 9                THE COURT:  Okay.  Thank you.  Thank you.

10                MR. MCCLEARY:  On 12 --

11                THE COURT:  Uh-huh.

12                MR. MCCLEARY:  -- and 13, those are correspondence

13       regarding resignations.  We object on the grounds of

14       relevance.

15                MR. MORRIS:  So, the relevance of that, Your Honor,

16       is to show that when Mr. Dondero sent this email to Mr. Seery

17       in December 2020, he had absolutely no relationship to

18       Highland, had absolutely no duty to Highland, had absolutely

19       no reason to send this email to Highland.  He wasn't in

20       control of Highland.  He wasn't --

21           If they'll stipulate to this, that's fine.  He wasn't in

22       control.  He had no authority to do anything.  He couldn't

23       effectuate trades.  He wasn't there.  And that's what these

24       documents are intended to prove.

25                THE COURT:  Okay.  Why are we -- this is --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 106 of 214   PageID 9220
Main Document   Page 106 of 389

60

```
1              MR. MCCLEARY:  Because there are --

2              THE COURT:  Some of this stuff, I mean, --

3              MR. MCCLEARY:  There are other agreements.

4              THE COURT:  -- is no big deal.  Right?

5              MR. MCCLEARY:  Sub-advisory agreements, other

6    agreements that he had under which he had a responsibility to

7    make the communications regarding material nonpublic

8    information that he made.  So this is simply irrelevant, Your

9    Honor.

10             THE COURT:  I overrule.  I mean, again, I don't --

11             MR. MCCLEARY:  Okay.

12       (Debtors' Exhibits 12 and 13 are received into evidence.)

13             MR. MCCLEARY:  Number 14, --

14             THE COURT:  You're both giving me just a lot of

15   background that I already have, but of course a Court of

16   Appeals --

17             MR. MORRIS:  That's why we --

18             THE COURT:  -- isn't going to have it.

19             MR. MORRIS:  Yep.

20             MR. MCCLEARY:  Well, #14, Exhibit 14, we object on

21   the grounds of relevance and hearsay.

22             THE COURT:  Okay.  Wait a minute.  We skipped 13

23   because -- why?  Oh, wait, that was, I'm sorry, 12 and 13 --

24             MR. MORRIS:  Yes.

25             THE COURT:  -- where I've overruled the objection and
```

009517

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/27/23   Page 107 of 214   PageID 9221
Main Document   Page 763 of 788

61

1    admitted.

2         Okay.  Go ahead.

3         MR. MCCLEARY:  14, we object on the grounds of

4    relevance and hearsay, Your Honor.

5         MR. MORRIS:  I'm just going to make this real quick,

6    Your Honor.  Here's the thing.  This Court knows it.  It's

7    actually facts that cannot be disputed because they're subject

8    of court orders.

9         As the Court will recall, beginning in late November 2020

10   continuing through late December 2020, Mr. Dondero was engaged

11   in a continuous pattern of interference with Highland's

12   business and trading.  It was the subject of the TRO, which is

13   why the TRO is relevant.

14        Your Honor will recall that at the end of November Mr.

15   Dondero attempted to stop Mr. Seery from trading in Avaya

16   stock.  On December 3rd is when he sent this threatening

17   email, text message, to Mr. Dondero [sic].  It caused us to

18   get the TRO.

19        Your Honor will recall on December 16, 2020, that's when

20   we had the hearing on Mr. Dondero's motion to try to stop Mr.

21   Seery from trading in the CLOs that the Court dismissed as

22   frivolous and granted the directed verdict of Highland.

23        So, that's December 16.  He sends this email about MGM on

24   December 17th.  And what happens on December 18th?  More

25   interference with Highland's business.  It's a matter of --

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 40    Filed 10/02/23    Page 108 of 214    PageID 9222

Main Document    Page 107 of 382

62

1    beyond dispute.  It's law of the case at this point because

2    that's the subject of the contempt order.  And the Court found

3    that, after -- after hours, on December 18th, Hunter Covitz

4    told Mr. Dondero that Mr. Seery was again trying to trade in

5    Avaya stock, and within a day or two Mr. Dondero was again

6    interfering it, and that's what led to the second -- to the

7    first contempt order.

8        So all of these documents are relevant to show motive and

9    what was happening.  This email was not sent for any

10   legitimate purpose.  The evidence is just overwhelming.  And

11   it's not -- it's not like, oh, that's an argument we're

12   making.  Between the TRO and the contempt order, it's law of

13   the case.  He was interfering with Highland's business nonstop

14   for thirty days, including the day before he sent this email

15   and the day after he sent the email.

16           THE COURT:  Okay.

17           MR. MCCLEARY:  Your Honor, this is a lawsuit or an

18   effort to file a lawsuit on behalf of Hunter Mountain

19   Investment Trust, not James Dondero.  And as much as Counsel

20   wants to make this about Jim Dondero and attack him, this is a

21   different case.  So this exhibit has nothing to do with the

22   claims in this lawsuit.  It's not relevant.  And hearsay.

23           MR. MORRIS:  The only evidence is Mr. Dondero.  It's

24   -- could not be more relevant.

25           THE COURT:  Okay.  I overrule.  I'm admitting this.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 109 of 214   PageID 9223
Main Document   Page 723 of 789

63

```
 1   And so we're --

 2              MR. MCCLEARY:  Uh, --

 3              THE COURT:  It's 14.  It's -- how far?

 4              MR. MCCLEARY:  14.  Exhibit 15 is where we are, Your

 5   Honor.

 6              THE COURT:  Okay.

 7         (Debtors' Exhibit 14 is received into evidence.)

 8              THE COURT:  15.

 9              MR. MORRIS:  Oh, that's -- that's the contempt order.

10   And so these contain the judicial findings that are now beyond

11   dispute that Mr. Dondero was engaged in interfering with

12   Highland's business after the TRO was entered on December

13   10th.

14              THE COURT:  Okay.  Again, my own orders, --

15              MR. MCCLEARY:  Your Honor, it's not --

16              THE COURT:  -- I can take judicial notice of --

17              MR. MCCLEARY:  It's --

18              THE COURT:  -- under the Federal Rules of Evidence.

19              MR. MCCLEARY:  It's --

20              THE COURT:  201.

21              MR. MCCLEARY:  We simply object as not relevant.  We

22   object based on Federal Rule of Evidence 403.  Any possible

23   relevance is outweighed by the prejudice.  And we object on

24   the grounds of hearsay, Your Honor.

25              THE COURT:  Prejudice?  Prejudice?  They're orders I
```

009520

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 12/07/23    Page 110 of 214    PageID 9224

64

1    issued.  I'm going to be prejudiced by my own orders?

2            MR. MCCLEARY:  Uh, well, --

3            THE COURT:  I don't --

4            MR. MCCLEARY:  -- Hunter Mountain will be.

5            THE COURT:  Okay.  I'll overrule.

6        (Debtors' Exhibit 15 is received into evidence.)

7            THE COURT:  I'll tell you what.  We're out of our --

8    well, we've get probably 30 seconds left.  Anything that we

9    can maybe knock out to not have eat into your three hours?

10   Both of you?

11           MR. MCCLEARY:  Your Honor, we filed written

12   objections to all of these exhibits.  We urge those

13   objections.  16.

14           THE COURT:  I know, but this is your chance to argue

15   why your objections have merit.  I can -- we can just --

16           MR. MCCLEARY:  Because, well, obviously, we're

17   talking about pleadings and filings in other matters.  The

18   evidence that they're trying to use to impugn Jim Dondero,

19   which has nothing to do with the merits of HMIT's claims and

20   allegations of insider trades.

21           THE COURT:  Okay.  A lot of this is articles.

22   Articles, articles, articles about MGM.

23           MR. MCCLEARY:  On the articles, Your Honor, subject

24   to our general objection, we'll withdraw the objections to the

25   articles if they'll agree to the articles that we've offered.

Case 19-34054-sgj11 Doc 3843 Filed 06/13/23 Entered 06/13/23 10:25:56 Desc
Case 3:23-cv-02071-E Document 28-40 Main Document Filed 12/07/23 Page 111 of 214 Page 111 of 214 PageID 9225

65

```
 1              MR. MORRIS:  Your Honor, we didn't lodge an objection

 2   to their articles.

 3              MR. MCCLEARY:  Okay.

 4              MR. MORRIS:  And just so, if anybody is keeping track

 5   at home, this is Item B on the list that I created earlier

 6   this morning.

 7              THE COURT:  Okay.  So, 25 through 30 are articles.

 8   Those are admitted by stipulation.  Nothing is about the truth

 9   of the matter asserted.  They're just articles that were out

10   there for --

11              MR. MORRIS:  Right.  I would just --

12              MR. MCCLEARY:  Yes.

13              THE COURT:  -- the world.

14              MR. MORRIS:  Just so we're clear, it's Exhibits 25, 6

15   -- 25, 26, 27, 28, 29, and 30.

16              THE COURT:  Right.

17         (Debtors' Exhibits 25 through 30 are received into

18   evidence.)

19              MR. MORRIS:  And so, yes, those are all articles.

20   They have their articles.  Exhibit 72.

21              THE COURT:  Oh, and 34 is another one.  So that's

22   admitted as well.

23              MR. MORRIS:  Yes.

24              MR. MCCLEARY:  Yes, Your Honor.

25         (Debtors' Exhibit 34 is received into evidence.)
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40 enFiled 12/07/23 of 382ge 112 of 214   PageID 9226

66

1          THE COURT:  Okay.  Well, we're out of time, so as for

2     the others, they can offer them the old-fashioned way if they

3     want to, you can object the old-fashioned way, and it eats

4     into both of your three hours.

5          MR. MCCLEARY:  Yes, Your Honor.

6          THE COURT:  Okay.  Let's hear opening statements.

7       And by the way, before we wrap up today, I'm going to say

8     out loud everything I've admitted so we're all crystal clear

9     on what's in the record.  This has been a bit chaotic.

10         MR. MCCLEARY:  Okay.  Understood.

11         THE COURT:  So, Caroline is going to be the keeper of

12    our time over here.  And if the judge ever interrupts you,

13    she's going to stop the timer.  Okay?

14         MR. MCENTIRE:  Thank you.

15         THE COURT:  I hope I won't any more, but you may

16    proceed.

17         MR. MCENTIRE:  No, I appreciate it.  Thank you.  Can

18    you see it, Your Honor?

19         THE COURT:  I can, yes.  Thanks.

20         MR. MCENTIRE:  Can opposing counsel see it?

21         MR. MORRIS:  Yes, sir.

22         MR. MCENTIRE:  All right.

23         THE COURT:  And I'm just going to ask everyone who

24    has a PowerPoint today, can I get a hard copy --

25         MR. MCENTIRE:  Certainly.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Main Document   Filed 12/07/23   Page 113 of 214   PageID 9227   Page 673 of 789

67

1          THE COURT:  -- before we close?

2          MR. MCENTIRE:  Certainly.

3          THE COURT:  Okay.  Thank you.

4     OPENING STATEMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT

5                          TRUST

6          MR. MCENTIRE:  May it please the Court, Your Honor,

7     at this time I'll be providing the opening statement on behalf

8     of Hunter Mountain Investment Trust.  It is a Delaware trust.

9     Mark Patrick, who's in the courtroom, is the Administrator.

10    He will be one of the witnesses that you'll hear today.

11         Hunter Mountain Investment Trust is the former 99.5

12    percent equity holder, currently classified as a Class 10

13    contingent beneficiary under the Claimant Trust Agreement.  It

14    is active in supporting various entities that in turn support

15    charities throughout North Texas.

16         Your Honor, this is not an ordinary claims-trading case.

17    I know the Court made those references in one of the hearings,

18    and I wanted to more clearly respond.  This has different

19    indicia.  An ordinary claims-trading case is normally outside

20    the purview of the bankruptcy court.  What makes this

21    different is that we're involving, we believe and allege,

22    breaches of fiduciary duty of the Debtor-in-Possession's CEO

23    and the Trustee.

24         It involves also aiding and abetting by the entities that

25    actually acquired the claims.  And that falls into the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 114 of 214   PageID 9228
Main Document   Page 763 of 789

68

1   category of willful misconduct.

2       It also involves injury to the Reorganized Debtor and to

3   the Claimant Trust.  Ordinarily, a claims trade would not

4   involve injury to the estate or the reorganized debtor.  Here,

5   we have alleged that it has.  And the injury takes the form of

6   unearned excessive fees that Mr. Seery has garnered as a

7   result of his relationship and arrangements, as we have

8   alleged, with the Claims Purchasers.

9       During the course of my presentation today, I'll be

10   referring to the Claims Purchasers as the collective of

11   Farallon, Stonehill, Muck, and Jessup.

12       I would like to briefly discuss some of the issues that

13   have already been presented to the Court, just to make sure

14   that this record is clear.

15       Can you please continue?

16       We don't believe the *Barton* Doctrine is applicable.  I

17   believe that precedent is very clear that the *Barton* Doctrine

18   deals with proceedings in other courts, and the various

19   standards and requirements of *Barton* do not apply if in fact

20   we're coming to the Court and filing the proceeding in the

21   court where the Trustee was actually appointed.

22       And so I think that the law is clear.  And this is Judge

23   Houser here in the Northern District of Texas in the case *In*

24   *re Provider Meds*.  And she makes very clear that the standard

25   for granting leave to sue here is actually less stringent than

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 115 of 214   PageID 9229
Main Document   Page 7623 of 789

69

1    a 12(b)(6) plausibility standard.  So if there is any issue as

2    to what standard this Court should be applying to the -- to

3    this process, we believe it's a 12(b)(6) standard, confined to

4    the four corners of the document.

5        If the Court wishes to consult the documents that are

6    referred to in the four corners of the petition or complaint,

7    it may do so.

8        But the standard here is even more flexible than a

9    standard plausibility.  Our evidence, though, achieves the

10   standard of plausibility as well.

11       The *In re Deepwater Horizon* case is another important

12   case.  That's a Fifth Circuit case.  A plaintiff's claim is

13   colorable if it can allege standing and the elements necessary

14   to state a claim on which relief could be granted.  Defining a

15   colorable claim as one with some possible validity.  I don't

16   have to prove my case today.  I didn't have to prove my case

17   in the prior hearings.  I have to prove sufficient

18   allegations, not evidence, but sufficient allegations to show

19   that it has some possible basis of validity.

20       Possible basis of validity.  We're not here talking about

21   likelihoods.  We're not here talking about *prima facie*

22   evidence.  We're not here talking about probabilities.  We're

23   talking about something less than plausibility.  But, again,

24   we achieve plausibility.

25       A colorable claim is defined as one which is plausible or

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/27/23   Page 116 of 214   PageID 9230
Main Document   Page 72 of 188

70

1    not without merit.  These are various cases from around the

2    country.  The colorable claim requirement is met if a

3    committee has asserted claims for relief that, on appropriate

4    proof, would allow recovery.  On appropriate proof.  We're not

5    required to put on that proof today, Your Honor.

6         Courts have determined that a court need not conduct an

7    evidentiary hearing, but must ensure that the claims do not

8    lack any merit whatsoever.  We submit that our claims have

9    substantial merit and deserve the opportunity to initiate our

10   proceedings, have an opportunity to conduct discovery.  And if

11   they want to file a 12(b)(6) motion before this judge, before

12   you, they can do so.  If they want to file a motion for

13   summary judgment, they can do so.  But at this juncture, they

14   cannot, and at this juncture this Court should not consider

15   evidence in making its determination.

16        Standing under Delaware law.  The Funds have collectively

17   really hit the standing issue hard.  I think it's easily

18   resolved.  First of all, it's clear that a beneficial owner

19   has standing to bring a derivative action.  Under Delaware

20   law, a beneficial owner has a right to bring a derivative

21   action on behalf of the -- against the trustee.

22        So the issue is, am I a beneficial owner?  As a contingent

23   beneficiary in Class 10, and that's the Court's inquiry here,

24   do I qualify as a beneficial owner?  And I think that Delaware

25   law is clear that, by not limiting it to only vested

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 117 of 214   PageID 9231
Main Document   Page 72 of 388

71

1    interests, by not limiting it only to immediate beneficiaries,

2    they are not -- they are not extending the scope of the

3    statute to contingent beneficiaries.  And this is consistent

4    with the laws around the country, because even Texas

5    recognizes that an unvested contingent beneficiary has a

6    property right to protect.

7        Even Mr. Seery admitted in his deposition that a unvested

8    contingent interest is in the nature of a property right.  If

9    you have a property right, that property right can be abused.

10    If you have a property right, that property right, whether

11    it's inchoate or not, it can be abused, it can be

12    misappropriated, and you could become aggrieved.  And that is

13    the constitutional standard for standing:  Is Hunter Mountain

14    Investment Trust aggrieved?  And the answer is yes.

15        Contingent beneficiaries from around the country, in

16    addition to Mr. Seery's admission that we have a property

17    interest, contingent beneficiary has standing.  This is the

18    *Smith v. Clearwater* case on Slide 11.  Very clearly, they say

19    that even if it's subject to a future event.  Their argument

20    is that Mr. Seery has not certified Hunter Mountain as in the

21    money.  We believe we are in the money.  That's a different

22    issue.  We believe he should certify, in the discharge of his

23    duties.  That's a different issue.

24        But even assuming his case -- his argument for a moment,

25    their argument is that since he's not done that act, which we

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 118 of 214   PageID 9232
Main Document   Page 72 of 189

72

1    also challenge and criticize that he's not done that act, that

2    we can't qualify to bring this case.  Well, that's not what

3    the law is, that even an unvested interest, a contingent

4    interest, has a right.

5        Slide 12.  This is the State of Illinois.  Despite the

6    fact that interest is contingent and may not vest in

7    possession, you still have a right to protect what you have.

8    And you have standing to bring a cause of action.

9        The Claimant Trust Agreement, by the way, suggests that we

10   have no vested interest, and they'll likely argue that point.

11   But the point there is the law says that's irrelevant.  If

12   it's an inchoate interest, if it's potentially vested in the

13   future, that's what imbues you with standing.

14       And in any event, the Claimant Trust Agreement is subject

15   to Delaware trust law, and they can't get around that.  They

16   can say whatever they want to say in the agreement to try to

17   block us from participation, but it's still subject to

18   Delaware trust law, and Delaware trust law does not draw a

19   distinction between vested or unvested.

20       The State of Missouri:  There is no dispute in this case

21   that the future -- that future beneficiaries have standing to

22   bring an accounting action, whether they're vested or

23   contingent.  The *Bucksbaum* case.  Article III standing exists,

24   constitutional standing, including discretionary

25   beneficiaries, have long been permitted to bring suits to

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/27/23   Page 119 of 214   PageID 9233
Main Document   Page 119 of 382

73

1    redress trustees' breaches of trust.  This applies not only to

2    our standing as an individual plaintiff, which we've brought,

3    but also in our standing -- in our capacity seeking to bring a

4    derivative action to benefit the Claimant Trust of the

5    Reorganized Debtor.  Both are permitted under this law under

6    these cases.

7         An interest -- in the *Mayfield* case, an interest is any

8    interest, whether legal or equitable or both, vested,

9    contingent, defeasible, or indefeasible.  So the unilateral

10   self-serving wording of the Claimant Trust does not abrogate

11   our right to bring the claim.

12        I'd like to talk briefly about fiduciary duties.  We know

13   that Mr. Seery has fiduciary duties to the estate when he was

14   the CEO prior to the effective date.  We allege that he

15   breached those fiduciary duties, and that gives us standing to

16   bring the claim that we have brought for breaching fiduciary

17   duties, causing damages that are accruing post-effective date.

18        In the *Xtreme Power* case, again, the directors can either

19   appear on both sides of the transaction or expect to derive

20   any personal financial benefit.  We are alleging that Mr.

21   Seery engaged in self-dealing.  We allege that he engaged in

22   self-dealing by arriving at an understanding where he could

23   put business allies -- whether you call them friends, business

24   allies, close acquaintances -- on the committee, the Oversight

25   Board that would ultimately oversee his compensation, which,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/27/23   Page 120 of 214   PageID 9234
Main Document   Page 120 of 389

74

1    in the context of this case, makes no sense and it is

2    excessive.

3        Muck is a specially -- special-purpose entity of Farallon.

4    Farallon acquired the claims, created Muck to do the job.

5    Muck is now on the Oversight Board.

6        Jessup.  Jessup is a special-purpose entity, a shell

7    created by Stonehill.  Stonehill bought the claims, funneled

8    the money through Jessup.  Jessup is now on the Oversight

9    Board.  Jessup and Muck -- and by the way, the principals in

10   Farallon are actually the representatives from Muck on the

11   Oversight Board.  So there's no suggestion that there's really

12   a distinct corporate relationship here.

13       Michael Linn, who is a principal at Farallon.  You'll hear

14   his name today, throughout today.  He actually is a

15   representative of the Oversight Board, dealing with Mr. Seery

16   and negotiating Mr. -- I put negotiation in quotes --

17   negotiating Mr. Seery's compensation.

18       I'd like to talk very briefly about background.  We took

19   Mr. Seery's deposition.  I was unaware of this.  I now know

20   it.  Perhaps the Court was already aware of it.  This is Mr.

21   Seery's first job as a CEO of any debtor.  This is the first

22   time Mr. Seery has ever been a chief restructuring officer.

23   This is the first time Mr. Seery has ever been the CEO of a

24   reorganized debtor.  This is the first time that he's served

25   as a trustee post-effective date.  However, his compensation

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 121 of 214   PageID 9235
Main Document   Page 121 of 189

75

1    is excessive and not market-driven, and there's a reason for

2    that.  We believe and we allege that it's a *quid pro quo*

3    because of prior relationships with Farallon and Stonehill.

4         Farallon and Stonehill are hedge funds, Your Honor.  They

5    created their special-purpose entities on the eve of this

6    transaction simply to take the title to the claims, but the

7    money is going upstream.

8         Seery has a relationship with Farallon.  Do we know the

9    full extent of that relationship?  No.  We have been deprived

10   of discovery.  We attempted to get the discovery in the state

11   court 202 process.  We were denied for reasons not articulated

12   in the court's order.

13        We attempted to get the discovery here that the Court

14   refused under the last hearing about these relationships.

15        So what we do have begins to put the pieces of the puzzle

16   together.  And sufficient is more than plausible.  It is more

17   than colorable.

18        We know that Mr. Seery went on a meet-and-greet trip to

19   Farallon's offices in 2017.  Didn't have to.  He was trying to

20   cultivate a business relationship.  Farallon was important to

21   him.

22        We know that in 2019 he was no longer with Guggenheim

23   Securities.  He goes out to Farallon's offices for another

24   meet-and-greet and he specifically meets with the two

25   principals who are reflected in Mr. Dondero's notes, Raj Patel

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40enfFiledPa0g/e07/213 of 38age 122 of 214   PageID 9236

76

1  and Michael Linn.

2      We know that in June 2020 Farallon emailed Seery.  This is

3  after Mr. Seery becomes the CEO.  He says, "Congratulations.

4  We're monitoring what you're doing."

5      Seery's relationship with Stonehill.  These are all --

6  this is all before what we believe to be the events that are

7  at issue in this case.  We believe that -- represented

8  Stonehill in the *Blockbuster* bankruptcy proceeding.  There was

9  an objection to a document.  Mr. Seery was involved in the

10 *Blockbuster* proceedings.  Stonehill was one of his many

11 clients on the committee that he represented.

12     We know that Stonehill is actively involved in one of Mr.

13 Seery's charities in New York.  We know that he sent text

14 messages to Mr. Seery in February of 2021, wanting to know how

15 to get involved in this bankruptcy.

16     Farallon and Stonehill were strangers to this bankruptcy.

17 They weren't creditors.  They were encouraged and they came

18 into this process.

19     Farallon and Stonehill have not denied any of our

20 allegations.  They are not putting any evidence on today.  We

21 allege that these relationships was based and founded upon a

22 *quid pro quo*.  I'll scratch your back; you scratch mine.  You

23 give me some information; I want to evaluate these claims.

24 And, by the way, we're going to be on the Oversight Board, or

25 you're going to put us on the Oversight Board, or by default

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 123 of 214   PageID 9237
Main Document   Page 77 of 382

77

1    we'll be on the Oversight Board, and we'll work out your

2    compensation agreement.

3        Mr. Seery also has an established relationship with

4    Stonehill.

5        I like to have a timeline of certain events.  This is not

6    all of the relevant events, but this can give you a quick

7    picture.  We know that Mr. Dondero sent an email to Mr. Seery

8    in December of 2020 relating to MGM.  It is undisputed that

9    Mr. -- that Farallon emailed Seery, Mr. Seery, in January of

10   2021 if there was a path to get information regarding the

11   claims for sales.  Mr. Seery says he never responded to it,

12   but we know that this entity, Farallon, got deeply involved in

13   buying these claims shortly after this email.

14       We have the Claimant Trust Agreement suddenly being

15   amended to not have a base fee, but now we're going to

16   incorporate a success participation fee.  As part of a plan,

17   we're not criticizing that, but suddenly the vehicle for post-

18   effective date bonuses is being created.

19       The Debtors' analysis comes out in association with the

20   plan confirmation.  It projects a 71.32 percent recovery for

21   Class 8 and Class 9, and those are the principal classes we're

22   talking about.  95 percent -- 98 percent of all of the claims

23   here are in Class 8 and Class 9, until you get to us, Class

24   10.

25       71.32 percent of Class 8 means that Farallon and Stonehill

1  will get less than about a six percent internal rate return on

2  their $163 million investment, which they have never denied.

3  That is not a hedge fund investment goal.  Investment -- hedge

4  funds like these companies, they go for 38, 40, 50 percent of

5  returns.  Who would ever invest $163 million on a distressed

6  asset that's not collateralized with only an expectation of an

7  internal rate of turn of six percent?  But that's going to be

8  the evidence before the Court.  That does not make any

9  financial, rational wisdom at all.

10      The plan is confirmed.  It's undisputed that Stonehill

11  contacts Seery after the plan is confirmed to want to know how

12  to get involved.  They have phone calls after this text

13  message.  Muck is created on March 9.  We know from Mr.

14  Seery's deposition that Farallon told Seery that six days

15  later they bought the claims.  All the claims, by the way,

16  when I say bought the claims, it's everything except UBS.  To

17  our knowledge.  They may have negotiated the paperwork back

18  then, but the claims transfers did not occur until the summer.

19  All the other claims involved, the claims transfers were filed

20  with this Court in mid-April and at the end of April.

21      Tim Cournoyer removes MGM from the restricted list.  Tim

22  Cournoyer is an employee of Highland.  Well, it tells us that

23  MGM was on the restricted list and there should be no

24  discussion about MGM, but there was.  There was discussions

25  about MGM, and Mr. Dondero is going to testify to that.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 12/07/23    Page 125 of 214    PageID 9239
Main Document    Page 125 of 382

79

1          And we also know that the HarbourVest settlement was

2     consummated during this period of time.  If it had been on the

3     restricted list, as it was, that transaction should never have

4     occurred.  But it did occur.  This Court ordered it.  It

5     approved it.  And I'm not challenging -- we're not challenging

6     that settlement.  It is done.  That is done.  What we are

7     challenging is the fact that Mr. Seery is actively involved in

8     using inside material nonpublic information.

9          Jessup Holdings is created shortly thereafter, on April

10    8th.  We have claims settling on April 30th.  The Acis claim

11    is transferred to Muck -- that's Farallon -- on April 16.  The

12    Redeemer and Crusader are all transferred on April 30th.

13         Stonehill and Farallon never deny that they did no due --

14    that they failed to do due diligence.  We allege that there

15    was no due diligence.  And that relies in significant part

16    upon Mr. Dondero.  But now, because we have Mr. Seery's

17    deposition, it also relies upon Mr. Seery's admissions in

18    deposition, because he says he never opened up a data room, he

19    doesn't know what due diligence they did.  Farallon says the

20    only due diligence they did is they talked to Jim Seery.  And

21    how do you invest $163 million, or $10 million or $50 million,

22    whatever the part is, with an internal rate of return six

23    percent, only on the advice of Mr. Seery, who's never been a

24    trustee or a CEO before, unless there's something going on?

25         Your Honor, public announcement of MGM on May 26th.  On

009536

 1  May 28th, two days later, Mr. Dondero calls Farallon.  It took

 2  Mr. Dondero or his group a few days, a week or so, to even

 3  understand who -- that Farallon was involved, because the

 4  registrations for Muck and Jessup did not disclose their

 5  principals, did not even disclose addresses.  They were shell

 6  -- they were companies that came in in the last minute to buy

 7  these claims incognito, frankly.

 8      They found out that Farallon was involved.  They had a

 9  call initially with Raj Patel, who is the principal of

10  Farallon.  He has three conversations total:  One with Mr.

11  Patel and two with Michael Linn.  Michael Linn was the one

12  responsible for these claim purchases.  Patel admitted that

13  Farallon relied exclusively on Seery and did no due diligence.

14  Linn rejected the premium to sell.  The evidence you'll hear

15  today, that Mr. Linn rejected a premium up to 40 percent to

16  sell the claims.  He actually said he would not sell at all

17  because he was told by Mr. Seery that the claims were too

18  valuable.

19      That is evidence of insider trading.  Specifically, they

20  said they were very optimistic about MGM and they were

21  unwilling to sell because Seery said too valuable.

22      We have -- these are the purchases.  This is where the

23  Class 9 claims fall.  And keep in mind -- Tim, go back -- that

24  $95 million of this upside potential is being told, at least

25  to the publicly available information, that you're never going

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 10/23/23    Page 127 of 214    PageID 9241
Main Document    Page 127 of 214

81

1    to get there.  Yet 95 -- $95 million is allocated to this

2    category.  So Class 8 is $275 million.  Class 9 is 29 -- $95

3    million.

4         Next.

5         So we have the evidence that you'll hear today.  Farallon

6    admitted the timing.  No due diligence, never denied by the

7    Claim Purchasers.  Based upon material nonpublic information.

8    That's our allegation.  Purchased over $160 million.  This is

9    never denied by the Claims Purchasers.  They purchased claims

10   when the return on investment was highly doubtful.  Maximum

11   expected annual rate of return, assuming publicly-available

12   information, was approximately six percent, and that is

13   totally atypical of what a hedge fund would seek.

14        Insider information.  We're not talking about just MGM.

15   The Respondents want to narrow the Court's inquiry.  This is

16   much larger than MGM.  MGM is a part of it, it's a big part of

17   it, but it's not the only part of it.  It's other assets.

18   Portfolio companies.  Other invested assets.  There's a lot of

19   money out there, and it was never disclosed during the

20   ordinary course of the bankruptcy, for reasons that the Court

21   already knows, in terms of asset values.  How does someone

22   come in and purchase distressed assets, claims, without any

23   understanding of what assets are backing those claims, when

24   there's no publicly-available information there to do it and

25   there's no evidence, no indication, no statement that actually

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 128 of 214   PageID 9242
Main Document   Page 73 of 389

82

1   due diligence was done?

2       That right there, without anything else, makes our claims

3   plausible.  You don't have to prove insider trading by direct

4   evidence.  Nobody's going to admit that they did something

5   wrong.  You prove it circumstantially, and we've cited cases

6   and we'll give you cases to that effect.

7       Next.

8       We have material nonpublic information.  It is very clear

9   that Mr. Dondero on December 17th sent this email, not just to

10  Mr. Seery but to several other individuals, including lawyers.

11  It states that he'd just gotten off a board call.  A pre-board

12  call.  The update, he provides the update.  Active

13  diligencing.  It's probably a first-quarter event.  We can

14  scour all of the other media documents that are in evidence,

15  both from us and them, and you're not going to find any

16  indication anywhere that a board member has said, guys, gals,

17  it's going to be a probable first-quarter event.  That's

18  material nonpublic information.

19          THE COURT:  By the way, you all objected to this

20  exhibit.

21          MR. MCENTIRE:  No, this is my exhibit.

22          THE COURT:  We spent --

23          MR. MCENTIRE:  I did not.  They objected to this.

24          MR. MORRIS:  Your Honor, we didn't object to it, and

25  that is the one exhibit that they did not object to.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 129 of 214   PageID 9243
Main Document   Page 733 of 789

83

 1          THE COURT:  Oh, it is?

 2          MR. MORRIS:  Nobody objected to this exhibit.

 3          MR. MCENTIRE:  I'm not going to object to this

 4    exhibit, Your Honor.

 5          THE COURT:  Okay.  It's a different version.

 6          MR. MCENTIRE:  Fair enough.

 7          THE COURT:  Okay.  It was a different email around

 8    that same time frame.

 9          MR. MCENTIRE:  So just --

10          THE COURT:  Apologies.  We stopped the clock.

11          MR. MCENTIRE:  This -- my next exhibit is simply a

12    demonstrative, but I just want the Court to understand that

13    MGM is no small matter here and Mr. Seery did testify in

14    deposition that it probably made up $450 million.  He was

15    pretty close.

16          MR. MORRIS:  Your Honor, I object to this

17    demonstrative.  There is no evidence in the record.  It's not

18    cited to anything.  We're not just going to start putting up

19    stuff on the screen that we like.

20          MR. MCENTIRE:  Excuse me.  I'm not offering this

21    document into evidence.

22          MR. MORRIS:  I don't care.  The Court shouldn't be

23    seeing a demonstrative exhibit that contains matters that are

24    never going to be in the record.

25          THE COURT:  Okay.

009540

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 130 of 214   PageID 9244

84

1          MR. MCENTIRE:  I disagree.  I can put the data in the

2     record.

3        May I proceed?

4          MR. MORRIS:  But you didn't.

5          THE COURT:  Okay.  I'm not considering the truth of

6     this until and unless I get evidence of this.

7          MR. MCENTIRE:  Fair enough.  But the point is this,

8     Mr. Seery has conceded in deposition that between the

9     institutional funds and the CLOs, there's a lot of MGM

10    securities and stock.  We're talking a lot of money.  We're

11    not talking about just Highland Capital's investment.

12        You can skip the next slide.  Skip.

13        So, rumors versus material nonpublic information.  They

14    can talk all day long, and if they want to use their time

15    doing this, they can.  There's a difference between rumor and

16    actual material nonpublic information.  Rumor from

17    undocumented sources, lack of clarity, lack of timing.  There

18    is no -- there's no debate that a lot of people knew that

19    maybe MGM might be for sale.  Maybe they wouldn't.  Sometimes

20    it falls apart, you know.  But the point is a board member is

21    telling someone that there's a probable event in the first

22    quarter of 2021.  That is definite, specific, and it comes

23    from the highest authority.  That is -- if that's not material

24    and public information, I don't know what could be.

25        Classic indications of insider trading.  You have to have

Case 19-34054-sgj11  Doc 3843  Filed 06/13/23  Entered 06/13/23 10:25:56  Desc
Case 3:23-cv-02071-E  Document 28-40  Filed 12/07/23  Page 131 of 214  PageID 9245

85

1    a tipper with access to MNPI.  Here, we know that Mr. Seery,

2    if he's the tipper, we allege he's the tipper -- and these are

3    words of art out of case law, by the way -- he has access to

4    information about MGM.  He has access about asset values,

5    projected values.  He has a relationship.  We believe he has a

6    very strong relationship.  It's more than just social

7    acquaintances.  He's giving congratulatory emails.  He's

8    getting solicitations.  He's solicited.  Benefits received.

9    We know what the benefits are.  They get the opportunity to

10   invest money with huge upside.

11        There was a point mentioned some time ago that, well, only

12   -- only the sellers really have the grievance.  Well, Your

13   Honor, we have a right to start our lawsuit and do some

14   discovery, because, frankly, a lot of sellers have big-boy

15   agreements.  They say, you don't sue me if I have MNPI.  I

16   don't sue you if you have MNPI.  We have mutual releases.

17   Let's go by our way.  Everybody's happy.  We're not going to

18   come back and see each other ever again.

19        That's one of the things we're being deprived of here.

20   But otherwise, what we have here is a colorable plan.  We've

21   asked for the communications with the sellers.  We can't get

22   it.  We have here an email.

23        Next.

24        We have here an email.  This actually -- you'll hear Mr.

25   Dondero say this actually reflects three communications.  Raj

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 12/07/23    Page 132 of 214    PageID 9246
Main Document    Page 733 of 788

86

1    Patel, Farallon, bought it because of Seery.  Mr. Dondero

2    contacted Mr. Patel and says, Raj Patel bought it because of

3    Seery.  50 to 70 percent's not compelling.  Class 8.  50

4    percent, 70 percent.  Give you a 30 percent to 40 percent

5    premium.  Not compelling.  I ain't going to sell.  Ask what

6    would be compelling.  Nothing.  No offer.  Bought in February/

7    March.  We now know the time frame.  We know that Stonehill is

8    communicating with them and we know that Farallon has been

9    just communicating with Mr. Seery.  Bought assets with claims.

10   It's not just the MGM.  It's not just the portfolio companies

11   and other assets.  It's also the claims.

12        Well, what are the claims?  It's the claims against Mr.

13   Dondero.  Well, how would they know about all this if there's

14   no due diligence and there's no evidence of any due diligence

15   before you?  130 percent of costs, not compelling, no counter.

16   Mr. Dondero's angry.  Discovery is coming.

17        Atypical behaviors are also circumstantial evidence of

18   insider trading.  We have strange behaviors here, Judge.  We

19   have a vast majority of the claim value is acquired by only

20   two entities post-confirmation.  Most significant claims are

21   only owned by two entities who were strangers to the whole

22   process.

23        The removal of -- and Mr. Morris offered to stipulate.

24   The sudden removal of MGM from the compliance list in April of

25   2021 -- by the way, the removal doesn't cleanse the MNPI.  If

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 133 of 214   PageID 9247
Main Document   Page 87 of 388

87

1  you have material nonpublic information because you received

2  it from Mr. Dondero, the fact that Mr. Dondero's no longer

3  employed by Highland Capital or no longer directly or formally

4  affiliated doesn't cleanse the MNPI.

5      We have no due diligence, regardless of the significant

6  nine-digit numbers, and we have no rational explanation of why

7  this kind of money would be invested when they're projecting

8  an actual loss, if -- a modest return at best for Class 8 and

9  a loss for Class 9.

10     Insider trading can be proved by circumstantial evidence,

11  Your Honor.  No fraudster, no person who's done wrong is going

12  to admit to it, so you look for the classic -- you look for

13  the classic elements.  And that's what we had here.  And we

14  have alleged all of this in our pleadings.  Not in extraneous

15  evidence.  Within the four corners of our pleadings.  And

16  that's why we have a plausible claim.

17     You know, I believe it's Rule 8, Rule 9 of the Federal --

18  you have to require specificity in a fraud claim.  Well, this

19  is not a fraud claim.  This is a different claim.  But we have

20  provided specificity that passes the smell test of

21  colorability.  We have provided specificity that would satisfy

22  even more stringent requirements under 12(b)(6).

23     The plan analysis.  This is a, I think, a document

24  admitted by everyone.  Mr. Seery has testified that this

25  projection of 71.32 percent for Class 8 came out in February

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 12/07/23    Page 134 of 214    PageID 9248
Main Document    Page 133 of 388

88

1    of 2021 and never changed, all the way up to the effective

2    date.

3        So this is what the public believed.  This is what the

4    public knew.  And if this was all that Farallon and if is all

5    that Stonehill had access to, that means that they were going

6    to lose their entire investment on Class 9.  They bought UBS

7    at a loss to begin with.  And on the other three investments,

8    they were going to get a very, very modest, minor return, six

9    percent over three years, or even less.  That is not what

10    hedge funds do.

11        Seery's excessive post-effective date compensation.  We

12    have obtained no discovery from Farallon or Stonehill in this

13    regard, but we know that he had no prior experience.  We know

14    that the award that was given him was not market-based, even

15    though the self-serving documents that have been produced and

16    that are attached to their exhibit list suggests a robust

17    negotiation.  Well, they were robust without any kind of

18    reality check in the real world about whether it was market-

19    supported.  None.  Mr. Seery has admitted to that.

20        It was not lowered.  He's making $1.8 million a year right

21    now, with most -- a lot of the assets already sold, the

22    reorganization done.  All they're doing now is monetizing

23    assets.  He's getting $1.8 million.  He's got 11 people

24    working for him.  And then he has a bonus, a bonus that is --

25    increases significantly with his ability to recover for Muck,

Case 19-34054-sgj11 Doc 3843 Filed 06/13/23 Entered 06/13/23 10:25:56 Desc
Case 3:23-cv-02071-E Document 28-40 Filed 10/27/23 Page 135 of 214 PageID 9249

89

1    Jessup, Farallon, and Stonehill.

2         And in the absence of -- if we were really dealing with

3    uncertainty and risk, then that may be another issue, but here

4    we're dealing with entities that already know that they're

5    going to get a payday and they already have.  They've already

6    made about a $170 million return -- 170 percent return, excuse

7    me -- over and above the original investment, when they were

8    projected to actually lose money.

9         Just so you know, we have over $534 million of cash that

10   has been basically monetized, and out of that, $203 million in

11   total expenses -- $277 million to Class 8 and -- and -- 1

12   through 7, and Class 8 distributors.  Excuse me, creditors.

13   Even if you take -- if you take out the alleged obligations of

14   Mr. Dondero on the promissory note cases, that still leaves

15   over $100 million available, which puts us in the money.  Puts

16   us in the money.  And the fact that you have $203 million of

17   expenses in a case of this nature is part of our claim, is

18   that we have delay actions.  We have a situation where Mr.

19   Seery is continuing to receive $1.8 million a year on a slow

20   pace to monetize, paying other professionals, when this could

21   have been over a long time ago.  That's part of our

22   allegations.  It's not part of any valuation motion.  It's

23   actually in our allegations.

24       I'm going to reserve the rest.  I think that's my opening

25   statement, Your Honor.  I'm going to reserve the rest for my

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 08-40    Filed 12/07/23    Page 136 of 214    PageID 9250
Main Document    Page 923 of 788

90

```
1    closing.  And let me see.  Yes, that's right.  And thank you
2    for your time.
3              THE COURT:  All right.  Caroline, how much time was
4    that?
5              THE CLERK:  Thirty-four minutes and 27 seconds.
6              THE COURT:  Thirty-four minutes and 37 seconds.
7    Okay.
8              THE CLERK:  Twenty-seven.
9              THE COURT:  Oh, 27.  Okay.
10             MR. MCENTIRE:  Thirty-four minutes?
11             MR. MCCLEARY:  Thirty-four minutes.
12             MR. MORRIS:  Your Honor, I do have hard copies of my
13    short slide presentation.
14             THE COURT:  All right.  You may approach.
15         And Mr. McEntire, are you going to give me your PowerPoint
16    later, hard copies later?
17             MR. MCENTIRE:  Yes, Your Honor.  I found one typo and
18    I'd like to fix one typo and then we'll give it to you.
19             THE COURT:  Okay.
20              OPENING STATEMENT ON BEHALF OF THE DEBTORS
21             MR. MORRIS:  Good morning, Your Honor.  John Morris,
22    Pachulski Stang Ziehl & Jones, for Highland Capital Management
23    and the Claimant Trust.
24         I want to be fairly brief because I really want to focus
25    on the evidence.  I look forward to Your Honor hearing from
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 137 of 214   PageID 9251

91

1  Mr. Seery so that he could clear up a lot of the misleading

2  statements that were just made.

3     The Court is here today on a gatekeeper function, and

4  we're delighted that the gatekeeper exists.  We're delighted

5  that the Court will have an opportunity, after considering

6  evidence, to determine whether or not these claims are

7  actually colorable.

8     There's -- there were a lot of conclusory statements I

9  just heard.  There were a lot of assumptions that were made.

10 There were a lot of misleading statements that were made.  At

11 the end of the day, what the Court is going to be asked to do

12 is to decide whether, in light of the evidence, do these

13 claims stand up on their own?  And they do not.

14    And let me begin by saying that I made a mistake a couple

15 of weeks ago.  If we can go to Slide 1.  I told Your Honor

16 that you were the sixth body to consider these insider trading

17 claims.  Based on Hunter Mountain's exhibit list, there is

18 actually one more, and I'll get to that in a moment.  So

19 you're actually -- this is the seventh attempt to peddle these

20 claims to one body or another.

21    The first was Mr. Dondero's 202 petition.

22    Everything I have here, Your Honor, is footnoted to

23 evidence.  Okay?

24    So, Footnote 1, you can look in the paragraphs of Mr.

25 Dondero's petition, his amended petition, his declaration,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 10/07/23   Page 138 of 214   PageID 9252

92

1   where he makes the same allegations.  Again, I misspeak.  Not

2   the same allegations.  Different versions of the allegations

3   that are being presented today concerning insider trading.

4        He did it three times.  The Texas state court said no

5   discovery.  In October of 2021, Douglas Draper wrote an

6   extensive letter to the U.S. Trustee, setting forth the same

7   allegations.  You can find them at our Exhibit 5.  It's

8   attachment Exhibit A, Pages 6 through 11.  Compare them to the

9   allegations that are being made by Hunter Mountain today.  The

10  U.S. Trustee's Office took no action.

11       Mr. Rukavina followed up with the same thing to the same

12  body in November of 2021.  You can see where his allegations

13  of insider trading are made and *quid pro quo* and all the rest

14  of it.  Again, they took no action.

15       The one that I don't have on this chart because I didn't

16  -- I made the chart last week and then was unavailable.  Mr.

17  Rukavina sent a second letter.  And you can find that at

18  Plaintiffs' Exhibit 61.  And in Plaintiffs' Exhibit 61, you'll

19  see that Mr. Rukavina sent yet another letter to the U.S.

20  Trustee's Office on May 11, 2022.

21       And these are all really important, right?  The U.S.

22  Trustee's Office has oversight responsibility for matters

23  including claims trading.  That's their job.  They took three

24  different swings at this.  And these are pages of allegations.

25  6 to 11.  9 to 13.  We think it's very important that the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 139 of 214   PageID 9253

93

1    Court look at what was told to the U.S. Trustee's Office.  And

2    you're going to hear Mr. Seery testify that Highland has never

3    heard from the U.S. Trustee's Office concerning any of these

4    allegations or any of the other allegations that are set forth

5    in Mr. Rukavina and Mr. Draper's letter.  Never.  Declined to

6    even initiate an investigation.

7         Hunter Mountain filed its own 202 petition.  It boggles my

8    mind that they try to create distance with Mr. Dondero,

9    because the whole petition, like this whole complaint, is

10   based on Mr. Dondero.  He submitted a declaration alleging the

11   same insider trading case, and a second Texas state court said

12   I'm not even giving you discovery.  We know that's the result.

13        But the best is the Texas State Securities Board.  I think

14   we're going to hear testimony that Mr. Dondero or somebody

15   under his control is the one who filed the complaint with the

16   Texas State Securities Board.  Who would be the better body to

17   assess whether or not there's insider trading than a

18   securities board?  I can't imagine there's a better body.

19   They did an investigation.  Mr. Dondero could have told them

20   anything he wanted.  I'm sure he did.  And they wrote in their

21   motion in Paragraph 37 one of the reasons they have colorable

22   claims is the investigation is ongoing.

23        Much to their dismay, I'm sure, two days before our

24   opposition was due, the Texas State Securities Board said,

25   we've looked at the complaint, we've done our investigation,

009550

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 140 of 214   PageID 9254
Main Document   Page 793 of 782

94

1    and we're not taking any action.  You can find that, Your

2    Honor, Footnoted 5 at Exhibit 33.

3         You are now the seventh body who's being asked -- and

4    you're being asked to do substantially more than any of the

5    other prior bodies were.  The Texas state courts were being

6    asked, just let them have discovery.  They said no.  The U.S.

7    Trustee's Office, charged with the responsibility of looking

8    at claims trading, said, I'm not going to investigate.  I know

9    what you've told me.  No.  The Texas State Securities Board.

10   Insider trading, insider trading.  I'm not doing an

11   investigation.  I'm not doing anything.  And now they want to

12   come here and engage in, you know, in expensive, long

13   litigation over the same claims nobody else would touch.

14        Can we go to the next slide?

15        Mr. Dondero's email.  Good golly.  "Amazon and Apple are

16   in the data room."  There's a hundred articles out there that

17   they're putting into evidence that say that.  "Both continue

18   to express material interest."  There's a hundred articles out

19   there that say that.  "Probably a first-quarter event.  Will

20   update as facts change."

21        There will not be any evidence that he ever updated

22   anybody, because that wasn't the purpose of this, as Your

23   Honor will recall.  He had an axe to grind.

24        And I direct your -- I don't direct the Court to do

25   anything -- I ask the Court to take a look at our opposition

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 141 of 214   PageID 9255

95

1    to the motion, in Paragraphs 23 to 25, where we cite to

2    extensive evidence, all of which is now part of the record,

3    showing just what was happening, from the moment he got fired

4    on October 10th until the end of the year, with the

5    interference, with the interference, with the threats, with

6    the TRO.  It was nonstop.

7        Was this email sent in good faith by somebody who owed no

8    duty to anybody?  Or was it really just another attempt -- and

9    this is why the gatekeeper is so important, because I think

10   that's exactly what this Court is supposed to do:  Is this a

11   good-faith claim?  Is this a claim that's made in good faith?

12   It can't be.  And you know why?  You know what's -- you know

13   what's -- I'll just say it now.  I won't even save it for

14   cross.

15       Remember the HarbourVest settlement that they're making so

16   much, you know, about?  Mr. Dondero is the tipper.  According

17   to him, he gave Mr. Seery inside information.  According to

18   him, Mr. Seery abused it by engaging in the HarbourVest

19   transaction.  But Mr. Dondero filed an extensive objection to

20   the HarbourVest settlement and never said a word about this,

21   because that wasn't on his mind at the time.  The email was

22   sent in order to interfere.  And when that failed, he's trying

23   to play gotcha now.  It's ridiculous.

24       He owed no duty to Highland.  It would have been a breach

25   of his own duty to MGM to share that information at that

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 142 of 214   PageID 9256
Main Document   Page 96 of 389

96

1   period of time.

2       The shared services agreement.  They don't help him.  Mr.

3   Dondero has nothing to do with that.  Highland is providing

4   services.  He's not providing services to Highland.  Highland

5   was providing.  We had already given notice of termination.

6   We had already had our plan and disclosure -- we had already

7   had our disclosure statement approved.  We were weeks away

8   from confirmation.  Please.

9       And the *Wall Street Journal* article on December 21st at

10  Exhibit 27, that's not your garden-variety *Wall Street Journal*

11  article, because it specifically says that investment bankers

12  were engaged to start a formal process.  The investment

13  bankers are identified by name.  Something has changed.

14  Anybody could see that.

15      Yes, there were rumors for a long time.  Nobody had ever

16  said there was a formal process.  Nobody had ever said

17  investment bankers had ever been hired.  Nobody had ever

18  identified those investment bankers.  Right?  I mean, just the

19  world changed.

20      If you can go to the next slide.

21      You know, before I get to the next slide in too much

22  detail, *quid pro quo*.  We look at it as *quid*.  Did he -- is

23  there any evidence that he actually gave anybody material

24  nonpublic inside information?  The answer is going to be no.

25  The *quo* is the relationship.  And I'm not going to spend too

009553

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 143 of 214   PageID 9257
Main Document   Page 97 of 382

97

1    much time on that now.  But wait until you hear Mr. Seery

2    testify as to the actual facts about his relationship.

3    Because some of what we just heard is mind-boggling, that

4    little -- that little page from the *Blockbuster* case, like, 14

5    years ago, where Farallon was one of a group of people who Jim

6    Seery never met.  Like, the stretch, what they're trying to do

7    is beyond the pale.  But I'm delighted to have Mr. Seery sit

8    in the box and answer all the questions they want to ask him

9    about his relationship with Farallon and Stonehill.

10         But getting to the point, the *quid pro quo*.  The *quo* is

11   they fixed his compensation?  Are you kidding me?  They

12   rubber-stamped his compensation?  Highland and Mr. Seery and

13   the board are alleged to have negotiated?  There's nothing

14   alleged.  There are facts.  There is evidence.  It is beyond

15   dispute.  If you look, just for example, right, they take

16   issue with his salary?  The salary was fixed by this Court in

17   2020.  Without objection.  He's getting the exact same salary

18   that he ever got.

19         You'll hear that it's a full-time job.  Your Honor knows

20   better than anybody in this courtroom, other than me, perhaps,

21   the litigation burden that's been placed on this man.  He has

22   no other income.  He doesn't do anything else.  This is a

23   full-time job.  It's the exact same job that he had when Your

24   Honor approved his compensation package three years ago,

25   without a raise.  They didn't give him a nickel more.  Not one

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-40   Filed 12/07/23   Page 144 of 214   PageID 9258

98

1    nickel.  It's outrageous.

2         The balance of his compensation, of which he has not yet

3    received a nickel, is exactly what this Court would want

4    somebody in Mr. Seery's position to do.  It aligns his

5    interests with his constituency.  Not with Stonehill.  Not

6    with Farallon.  With all creditors.  The greater the recovery,

7    the greater the bonus.  Outrageous, right?  Remarkable, isn't

8    it?  Only in their world.

9         If Your Honor can go back to Mr. Rukavina's letter,

10   because this is where it all -- that's where it all starts

11   from.  Like, excessive compensation.  Mr. Rukavina, I don't

12   know how he did this, why he did it, what it was based on.  He

13   actually told the U.S. Trustee's Office that they thought Mr.

14   Seery made $50 million.  It's in the letter.  $50 million,

15   they told the U.S. Trustee's Office he made.  It's footnoted,

16   so you can go find it.  It's right there, at Page 14.  Quote,

17   Seery's success fee could approximate $50 million.

18        $8.8 million is what he's making.  They think that's

19   excessive?  What do they think he should make?  Three?  Five?

20   We're not going to hear that.  But that's what this case is

21   about.  You just heard counsel in his opening statement.  He

22   literally said the only thing at issue is his compensation.

23   And that has to be the case, because if there was -- if there

24   was no claims trading, UBS and HarbourVest and Acis, right,

25   the Redeemer Committee, they would all still be holding these

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-40    Filed 12/07/23    Page 145 of 214    PageID 9259
Main Document    Page 793 of 788

99

1    claims today.

2         When Stonehill and Farallon acquired the claims, they were

3    all allowed.  There was no debate about what the claims were.

4    If they held the claims today, they would be worth the exact

5    same amount of money, only a different person would be

6    benefitting from it.

7         So the case actually is only about Mr. Seery's

8    compensation.  And they've moved the goalposts, as often

9    happens in this courtroom, from rubber-stamping -- I'll give

10   you what you want.  When I hear rubber-stamp, I hear, you make

11   a demand and I'll give it to you.  And now they realize, when

12   they see the negotiation -- because it's in evidence, it's

13   just the documents, you can see the board minutes -- what do

14   we, doctor the board minutes and they should get discovery

15   because we doctored the board minutes?  The board minutes show

16   a four-month negotiation with an Independent Board member

17   fully involved.  It's mind-boggling.  It's actually -- well,

18   I'll just leave it at that.

19        Next slide.  Last slide.  Let me finish up.  Three of the

20   four sellers were former Committee members.  Mr. Dondero

21   agreed that Committee members would have access to special

22   nonpublic inside information as part of the protocols, as part

23   of the corporate governance settlement.  He agreed to that.

24   These are the people who got abused?  These are the people who

25   didn't know what was happening?  Committee members and

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/03/23   Page 146 of 214   PageID 9260
Main Document   Page 100 of 214

100

1   HarbourVest, probably one of the biggest and most

2   sophisticated funds in the world, didn't know what was

3   happening?  They got abused?  Stonehill and Farallon took

4   advantage of them?

5        If you read their pleadings closely, they actually allege,

6   and I don't -- I don't know if there'll ever be any evidence

7   of this -- but they actually allege that -- I forget which --

8   oh, somebody is an investor in Stonehill and Farallon, and so

9   the theory is one of the sellers is an investor in Farallon.

10   So not only did they abuse, they abused one of their own

11   investors.  Like, this is not a colorable claim.  This is

12   ridiculous.

13        None of the claims sellers are here.  Sophisticated people

14   who -- who -- right?  Mr. Dondero could pick up the phone and

15   say, hey, guys, you got ripped off.  You sold your claims when

16   you shouldn't have.  They had an unfair advantage.

17        Nobody's here.  Where is anybody complaining?  They're not

18   going to because they cut a deal that they thought was good

19   for them at the time.  In hindsight, maybe they have regrets.

20   Right?  We all have regrets sometimes in hindsight.  But that

21   doesn't create a claim.

22        We've heard so much about what hedge funds would get and

23   how much and is this rational?  The fact of the matter is, at

24   the time Mr. Dondero had his phone call on May 28th, UBS had

25   not been purchased, although MGM had already been announced.

009557

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40 Filed 12/07/23 Page 147 of 214   PageID 9261
Main Document Page 147 of 214

101

1   So when they talk about MGM, maybe it's the fact -- and this

2   is in evidence -- maybe it's the fact that, two days before,

3   the MGM-Amazon deal actually was publicly announced.  It

4   actually was.  So maybe when they say, hey, yeah, we like MGM,

5   because, you know, that just -- that just got announced.

6   Maybe that happened.

7        But at the end of the day, the claims that they bought, if

8   you just look at the claims that were purchased at the time he

9   had the conversation, all Mr. Seery had to do was meet

10   projections and they were going to get $33 million in two

11   years.  A 30 percent return in two years.  I don't know.  That

12   doesn't -- that doesn't sound crazy to me.  Doesn't sound

13   crazy to me.  It certainly doesn't create a colorable claim,

14   just because they think that Farallon or Stonehill -- there's

15   not going to be any evidence of Farallon or Stonehill's risk

16   profile.  There's not going to be any evidence of Farallon or

17   Stonehill's, you know, expected returns.  There's not going to

18   be any evidence at all about what due diligence they did or

19   didn't do, other than what comes out of Mr. Dondero's mouth,

20   as usual.

21        Mr. Dondero -- and let's look at what's going to come out

22   of Mr. Dondero's mouth.  He has multiple sworn statements.

23   I'm going to take his notes and they're going to become mine.

24   I'll put him on notice right now.  Because those notes bear no

25   relationship to the evolution of his sworn statements over

1    time.

2        The first time he mentions MGM in a sworn statement is two

3    years after the fact in Version #5.  That's a colorable claim?

4    You want -- you want to oversee a litigation, or maybe it gets

5    removed to the district court, maybe I get lucky to be in

6    front of a jury, and I'll have Mr. Dondero explain how it took

7    him five tries before he could write down the letters MGM.

8    Not a colorable claim.  No evidence against Stonehill

9    whatsoever.  Zero.  Zero.  Never spoke to them.  There's no

10   colorable claim here, Your Honor.

11       I'm going to turn the podium over to Mr. Stancil to talk

12   about the law.

13           THE COURT:  Okay.

14        OPENING STATEMENT ON BEHALF OF JAMES P. SEERY, JR.

15           MR. STANCIL:  Thank you, Your Honor.  Mark Stancil,

16   counsel for Mr. Seery.  But I'm going to just very briefly

17   address a few legal points.  And I actually mean briefly.

18           THE COURT:  Okay.

19           MR. STANCIL:  I'll come back to a good bit of this in

20   closing as time permits.

21       I heard Mr. McEntire say *Barton* doesn't apply.  I would

22   encourage him to start with what the gatekeeping order

23   actually says.  Here it is.  This is in -- it's in the plan.

24   Your Honor has confirmed it.  The question we have in terms of

25   what standard applies is, what does this order mean?  Well, we

009559

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/23    Page 149 of 214    PageID 9263
Main Document    Page 149 of 214    Page 149 of 214

103

1    think that's going to be clear.  It's not what they think the

2    word "colorable" would mean in other contexts.  It's not what

3    they think they should have to satisfy now that they have a

4    theory.  It's, what does this mean?

5        And we'll get into some of the additional evidence from

6    Your Honor's order at the time, later in closing.

7        Next slide, please.

8        But let me just start to say I'm awfully surprised to hear

9    him say that he doesn't believe *Barton* applies, because the

10   order says that it does.  This is Paragraph 80 of the

11   confirmation order.  It says that the Court has statutory

12   authority to approve the gatekeeper provision under these

13   sections of the Bankruptcy Code.  The gatekeeper provision is

14   also within the spirit of the Supreme Court's *Barton* Doctrine.

15   The gatekeeper provision is also consistent with the notion of

16   a pre-filing injunction to deter vexatious litigants that has

17   been approved by the Fifth Circuit in such cases as *Baum v.*

18   *Blue Moon Ventures*.

19       So I think it is impossible, and respectfully, Your Honor,

20   it's law of the case.  This is what the order is based on.

21   The day for objecting to what's in the confirmation order is

22   long gone.

23       So let me come back, then -- first slide, please -- and

24   I'll just very briefly give you a little legal framework for

25   what we're going to be arguing to you later in closing.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 150 of 214   PageID 9264

104

1      So, *Barton* does require a *prima facie* showing.  That is

2      *Vistacare* and plenty of other cases.  That is more than a

3      12(b)(6) standard, Your Honor.  Numerous courts agree.  And in

4      fact, as you'll hear us discuss later, Judge Houser's opinion

5      is not to the contrary, because she said explicitly, I'm not

6      applying *Barton*.  So anything that they're relying on for what

7      *Barton* requires from that opinion is *dicta*.  But we can show

8      you case after case after case, and we will, to show that

9      *Barton* requires evidentiary hearings.

10     Here's a point, this third bullet here is something I have

11     not heard a single word in all of the briefing and ink that

12     has been spilled and in as long as we've been here this

13     morning, is what is a gatekeeping order doing if all it does

14     is reproduce a 12(b)(6) standard?  That's what they say.  In

15     fact, they're actually saying it's even lower.  Now I think I

16     heard them say it's even lower than a 12(b)(6) standard.

17     That makes no sense whatsoever.  We've just shown you that

18     this gatekeeping order was imposed consistent with *Barton* and

19     vexatious litigant principles.  Later I will walk Your Honor

20     through factual findings that you made detailing the vexatious

21     litigation, detailing the abuses.  The notion that the gate is

22     the same gate that every other litigant who hasn't

23     demonstrated that record of bad faith is absurd, and it serves

24     no purpose.

25     And as Mr. Morris described, Hunter Mountain woefully,

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-4    Main Document Filed 10/09/23    Page 151 of 214    PageID 9265    Page 105 of 839

105

```
 1    woefully violates any prima facie showing.  And we'll get into

 2    a little bit more exactly how that works.

 3        We are going to ask this Court, in addition to ruling that

 4    Barton applies and that they've failed it, we're going to ask

 5    this Court, respectfully, to please consider ruling on

 6    multiple independent grounds as well.  We know there's a

 7    penchant for appeals and appeals upon appeals.  So we will

 8    argue to Your Honor, although we will largely spare you

 9    another rehash of our briefs, but we will explain to Your

10    Honor why they do lack standing to bring this claim as a

11    matter of Delaware law.  And there was a lot of fuzzing up

12    about constitutional standing and Delaware law.  Not

13    necessary.

14        If -- we will be happy to rely on our pleadings here, but

15    on Page 27 of the Claimant Trust Agreement, that's what

16    defines their rights under Delaware law, and they were talking

17    about how beneficial owners under Delaware law have standing.

18    Well, are they beneficial owners?  They are not.  Equity

19    holders -- this is in Paragraph C, Page 27 of the Claimant

20    Trust Agreement -- Equity holders will only be deemed

21    beneficiaries under this agreement upon the filing of a

22    payment certification with the bankruptcy court, at which time

23    the contingent trust interests will vest and be deemed equity

24    trust interests.

25        They are not beneficial owners of squat.  That has not
```

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 152 of 214    PageID 9266
Main Document    Page 106 of 209

106

1    happened.

2         And last, Your Honor, we will -- and I will organize this

3    for Your Honor in closing as well -- we would ask you to rule

4    on a straight-up 12(b)(6) standard as an alternative, because

5    we know what's coming on appeal and we think their complaint

6    collapses under its own weight.  You heard Mr. Morris

7    detailing their own math shows significant returns.  You'll

8    also hear us describe how they have nothing but mere

9    conclusions and naked assertions upon information and belief

10   but unsupported.

11        *Iqbal* and *Twombly* would still apply under their 12(b)(6)

12   standard, especially, and perhaps even more with a heightened

13   standard under Rule 9(b), because they're essentially alleging

14   some version of fraud, it sounds like.

15        They're never going to get there, Your Honor.  All we

16   would ask is for a full record to take inevitably,

17   unfortunately, to the Court of Appeals.

18        And I think Mr. -- I'm not sure which of my colleagues

19   will be speaking briefly for Holland & Knight, but I'll just

20   turn it over to them.

21             THE COURT:  All right.  Mr. McIlwain?

22          OPENING STATEMENT ON BEHALF OF THE CLAIM PURCHASERS

23             MR. MCILWAIN:  Thank you, Your Honor.  I'll be even

24   briefer.  Brent McIlwain here for the Claim Purchasers.

25        Your Honor, Mr. McEntire stated to this Court that my

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40 Filed 10/27/23 Page 153 of 214   PageID 9267
Main Document   Page 107 of 208

107

1    clients have never denied any of this.  In fact, in his reply,

2    he says, The Claim Purchasers do not deny that they invested

3    over $163 million.  We do not deny that we did not due

4    diligence, we do not deny that we refused to sell our claims

5    at any price, and we do not deny that we invested the claims

6    at what is, at best, a low ROI.

7         We had no duty to answer to HMIT or Mr. McEntire.  We had

8    no duty when we bought these claims to -- we had no duties to

9    any creditor.  We had -- it was a bilateral agreement with a

10   third party.  And frankly, Your Honor, it's not Mr. Dondero's

11   or HMIT's business what due diligence we did and what

12   information that we obtained.

13        But I will tell you right now, Your Honor, we were very

14   careful in our pleadings to not bring issues of fact, because

15   this -- HMIT has been chasing my clients, obviously, based on

16   the notes that were presented in the initial PowerPoint, it

17   was a -- it's retribution.  It's retribution for not agreeing

18   to sell the claims to Mr. Dondero when he offered to purchase

19   at a 40 percent premium.

20        And Your Honor, when I look at that note, it's

21   interesting, because I hadn't seen the note, obviously, until

22   it showed up on the exhibit list.  When you look at that note,

23   I think it's -- I think it's very interesting.  To the extent

24   it was contemporaneous, I don't know.  But what it shows, it

25   shows that if you're a hammer, everything's a nail.  And Mr.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 154 of 214    PageID 9268
Main Document    Page 107 of 133

108

1    Dondero is a vexatious litigator.  And what did he write down?

2    Discovery to follow.

3        But my question is this.  Who was trying to trade on

4    inside information?  Mr. Dondero was offering a 40 percent

5    premium, allegedly, on the cost.  What information did he

6    have?  Certainly, he had inside information.

7        My client owed no duty to Mr. Dondero.  My client owed no

8    duty to anybody in this estate at the time of these claims

9    purchase.

10        And Your Honor, we talk a lot about -- or, it's been

11    talked a lot of insider trading.  These are claims trades.  I

12    think the Court honed in on this from the very get-go.  The

13    Court does not have a role in claims trades.  There's a 3001

14    notice that's filed post-claims trade, but there's no

15    requirement that there's Court approval.

16        And these aren't securities.  It's not as if we're trading

17    claims and it could benefit or hurt you based on some equity

18    position that you're going to obtain.  We obtained claims that

19    had been settled, they were litigated heavily, and the most

20    that we can obtain is the amount of the claim.  And that is,

21    as Mr. Morris stated, all that changed was the name of the

22    claimant.  That's all.  Because the claims didn't increase in

23    value based on the trade.

24        Your Honor, our pleadings, I think, speak for themselves

25    in terms of you really -- you really don't have to consider

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40 Filed 07/23 Page 155 of 214    PageID 9269
Main Document    Page 109 of 214

109

1    evidence, from our perspective, to determine that this

2    proposed complaint has no merit and is not plausible and

3    presents no colorable claims.

4        The gatekeeper provision, and we're going to talk a lot

5    about that today, obviously, right, requires that Mr. Dondero

6    establish a *prima facie* case that the claims have some

7    plausibility.  If you can simply write down allegations, file

8    a motion for leave and attach those allegations and say, Your

9    Honor, you have to take all these as true, the gatekeeper has

10   no meaning.  There's no point in having a gatekeeper

11   provision.

12       And in summary, Your Honor, what -- and I think Mr. Morris

13   honed in on this specifically -- this really comes down to

14   compensation.  Right?  Because this -- the allegation is that

15   my clients purchased claims, presumably at a discount, right,

16   based on some inside information, which we obviously deny, but

17   we don't have to put that at issue today.  For what purpose?

18   For what purpose?  So we got inside information from Mr. Seery

19   so that we could then scratch his back on compensation on the

20   back-end?

21       Your Honor, there is no reason that my clients need to be

22   involved in this litigation.  If HMIT thinks that this -- that

23   they have a claim against Mr. Seery for excessive

24   compensation, they can -- they could have brought such a

25   gatekeeper motion, or a motion for leave under the gatekeeper

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 156 of 214   PageID 9270

110

1    provision, without including my clients.  Why did they include

2    my clients?  They included my clients because my clients did

3    not sell to Mr. Dondero when he called, unsolicited, to try to

4    get information.  It's retribution.  And that's what a

5    vexatious litigator does, and that's why the gatekeeper

6    provision is in place.

7          I'll reserve the rest for closing, Your Honor.

8               THE COURT:  All right.  Caroline, what was the

9    collective time of the Respondents?

10              THE CLERK:  Twenty-eight minutes and 37 seconds.

11              THE COURT:  Twenty-eight minutes, 37 seconds.

12        All right.  Well, let's talk about should we take a lunch

13   break now?  I'm thinking we should, because any witness is

14   going to be, I'm sure, more than an hour.  So can you all get

15   by with 30 minutes, or do you need 45 minutes?  I'll go with

16   the majority vote on this.

17        (Counsel confer.)

18              MR. MCENTIRE:  1:00 o'clock.  45 minutes.

19              MR. MORRIS:  40 minutes, whatever.  1:00 o'clock?

20              THE COURT:  We'll come back at 1:00 o'clock.

21              MR. MORRIS:  Thank you, Your Honor.

22              THE COURT:  Okay.  Thank you.

23              THE CLERK:  All rise.

24        (A luncheon recess ensued from 12:19 p.m. until 1:05 p.m.)

25              THE CLERK:  All rise.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/23    Page 157 of 214    PageID 9271
Main Document    Page 157 of 214

111

1          THE COURT:  All right.  Please be seated.  We're

2    going back on the record in the Highland matter, the Hunter

3    Mountain motion for leave to file lawsuit.

4          I'll just let you know that at 1:30 we're going to take

5    probably what will be a five-minute break, maybe ten minutes

6    at the most, because I have a 1:30 motion to lift stay docket.

7    Just looking at the pleadings, I really think maybe one is

8    going to be resolved and it won't be more than five or ten

9    minutes.  So whoever is on witness stand can either just stay

10   there, because I think we won't be finished, or you can take a

11   bathroom break or whatever.  All right?  So, it's video, the

12   1:30 docket.

13         All right.  So, Mr. McEntire, are you ready to call your

14   first witness?

15              MR. MCENTIRE:  I am, Your Honor.

16              THE COURT:  Okay.

17              MR. MCENTIRE:  May I proceed?

18              THE COURT:  You may.

19              MR. MCENTIRE:  At this time, Hunter Mountain calls

20   Mr. James Dondero.

21              THE COURT:  All right.  Mr. Dondero, welcome.  If you

22   could find your way to the witness box, I will swear you in

23   once you're there.  It looks like you've got lots of notebooks

24   there.  Please raise your right hand.

25         (The witness is sworn.)

009568

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 09/07/23   Page 158 of 214   PageID 9272
Main Document   Page 157 of 213

Dondero - Direct                                    112

 1          THE COURT:  All right.  Thank you.  You may be

 2   seated.

 3          MR. MCENTIRE:  I'm not familiar with your procedure.

 4   Should I approach the -- here to --

 5          THE COURT:  If you would, unless you're having --

 6          MR. MCENTIRE:  That's fine.

 7          THE COURT:  -- any kind of --

 8          MR. MCENTIRE:  That's fine.  I'm not.

 9          THE COURT:  -- knee issues or, you know, sometimes

10   people want to stay seated for that reason.

11          MR. MCENTIRE:  Your Honor, again, my tender of Mr.

12   Dondero as a witness is subject to our running objection on

13   the evidentiary format.

14          THE COURT:  Understood.

15      JAMES DAVID DONDERO, HUNTER MOUNTAIN INVESTMENT TRUST'S

16                        WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. MCENTIRE:

19   Q   Mr. Dondero, would you state your full name for the

20   record, please?

21   A   James David Dondero.

22   Q   With whom are you currently -- what company are you

23   currently affiliated with?

24   A   Founder and president of NexPoint.

25   Q   All right.  And I think the Court is well aware, but would

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 09/11/23   Page 159 of 214   PageID 9273
Main Document   Page 107 of 139

Dondero - Direct                                    113

1   you just briefly describe your prior affiliation with -- was

2   it Highland Capital?

3   A    Yes.

4   Q    What was that affiliation?

5   A    President and founder for 30 years, and then to facilitate

6   an expeditious resolution of the estate I handed the reins to

7   three Independent Board members and I became a portfolio

8   manager until October of -- I was an unpaid portfolio manager

9   until October of '20.

10  Q    Thank you, sir.  Do you have any current official position

11  with Hunter Mountain Investment Trust?

12  A    No.

13  Q    Can you describe for us, sir, any actual or control you

14  attempt to exercise on the business affairs of Hunter Mountain

15  Investment Trust?

16  A    None.

17  Q    Are you -- do you have any official legal relationship

18  with Hunter Mountain Investment Trust where you can attempt to

19  exercise either direct or indirect control over Hunter

20  Mountain Investment Trust?

21  A    I do not.

22  Q    Did you participate -- personally participate in the

23  decision of whether or not to file the proceedings that are

24  currently pending before Judge Jernigan?

25  A    I did not.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 11/07/23   Page 160 of 214   PageID 9274
Main Document   Page 72 of 86

Dondero - Direct                                    114

1   Q    As the former CEO of Highland Capital, are you familiar

2   with the types of assets that Highland Capital owned?  On the

3   petition date?

4   A    Yes.

5   Q    And have you been monitoring these proceedings and the

6   disclosures in these proceedings since the petition date?

7   A    Yes.

8   Q    Okay.  Can you describe generally for me the types of

9   assets on the petition date that Highland Capital owned?  The

10   types of assets?  Describe the types of assets -- companies,

11   stocks, securities, whatever, whatever you -- however you

12   would describe it.

13   A    There were some securities, but it was primarily

14   investments in private equity companies and interests in

15   funds.

16   Q    Okay.  I've heard the term portfolio company.  What is a

17   portfolio company?

18   A    A portfolio company would be a private equity company that

19   we controlled a majority of the equity and appointed and held

20   accountable the management teams.

21   Q    Would there be separate management, separate boards, for

22   those portfolio companies?

23   A    Yes.

24   Q    All right.  How many portfolio companies were there on the

25   petition date, if you're aware?  If you recall?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/25/23    Page 161 of 214    PageID 9275
Main Document    Page 71 of 89

Dondero - Direct                          115

1    A    Half a dozen, of different sizes.

2    Q    Can you identify the names, if you recall?

3    A    Yes.

4    Q    What are those names?

5    A    Trussway, Cornerstone, some small -- Carey International,

6    CFA, SSP Holdings.  Yeah, to a lesser extent, OmniCare.

7    Q    All right.

8    A    Or, um, --

9    Q    In addition to the portfolio --

10   A    Sorry.

11   Q    -- of companies in which Highland Capital would own

12   interests, did Highland also have interests in various funds?

13   A    Yes.  I said OmniCare.  I meant OmniMax, I think was the

14   name.

15   Q    What type of funds?

16   A    I'm sorry.  The funds were usually funds that we were

17   invested in or seeded or managed.  So they're things like

18   Multistrat, Restoration, a Korea fund, PetroCap.

19   Q    Are these managed funds by Highland Capital?  Or were

20   they?

21   A    Yes.  Pretty much, with the exception of PetroCap.  We

22   were a minority -- a minority -- a large -- a large minority

23   investor with a sub-advisor.

24   Q    Did Highland Capital Management on the petition date own

25   an interest, a direct security interest in MGM?

009572

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/23/23   Page 162 of 214   PageID 9276
                          Main Document   Page 97 of 118

                              Dondero - Direct                    116

1    A    Yes.  And I -- yes.

2    Q    Did the various portfolio companies that you've

3    identified, did one or more of those portfolio companies also

4    own MGM stock?

5    A    Yes.

6    Q    Did the various funds that you've identified, did one or

7    more of those funds also own MGM stock?

8    A    Yes.  Between -- yes.  Between the CLOs, the funds,

9    Highland directly, it was about $500 million that eventually

10   got taken out for about a billion dollars.

11   Q    Okay.  $500 million is what you said?

12   A    Approximately.  Depending on what mark, what time frame.

13   But ultimately they got taken out for about a billion dollars.

14   Q    Okay.  And as a consequence of these investments,

15   significant investment -- first of all, how would you describe

16   that magnitude of investments?  Is that a significant

17   investment from the perspective of MGM?

18   A    Yes.

19   Q    As a consequence, what role, if any, did you play in terms

20   of MGM's governance?  Were you -- did you become a member of

21   the board of directors?

22   A    Yes.  I was a board member for approximately ten years,

23   and myself and the president of Anchorage, between our two

24   entities, we had a majority of the equity in MGM.

25   Q    Okay.  If there was a third party, not familiar with the

009573

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/27/23    Page 163 of 214    PageID 9277
Main Document    Page 117 of 138

Dondero - Direct                    117

 1    management of Highland Capital, who had been monitoring these

 2    bankruptcy proceedings as you have, was there any way that a

 3    third-party stranger to this bankruptcy proceeding could, from

 4    your perspective, actually appreciate or identify the -- all

 5    the details of the investments that Highland Capital had?

 6              MR. MORRIS:  Objection to the form of the question.

 7    It calls for speculation.  He's not here as an expert today.

 8    He shouldn't be allowed to testify what a third party would or

 9    wouldn't have thought or known.

10              MR. MCENTIRE:  Well, I'll --

11              THE COURT:  I'll overrule.

12    BY MR. MCENTIRE:

13    Q    Mr. Dondero?

14    A    The disclosures in the Highland bankruptcy were scant.  I

15    think there was six or eight line items listed, the

16    descriptions of which were limited.  But it didn't include --

17    it didn't include a broad listing of all the funds, and it

18    didn't include subsidiaries or any net value or any offsetting

19    liabilities or risks of any of the underlying companies or

20    investments, either.

21              MR. MCENTIRE:  Would you put up Exhibit 3, please?

22    BY MR. MCENTIRE:

23    Q    Mr. Dondero, we're going to -- do you have a screen in

24    front of you as well?

25    A    Yes.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 164 of 214   PageID 9278
Main Document   Page 117 of 138

Dondero - Direct                        118

1   Q   We're going to put up Exhibit 3, and I'm going to ask you

2   some questions about it.  First of all, would you identify

3   Exhibit 3?

4   A   It didn't come up on my screen yet.

5   Q   Still not up there?

6   A   Yes.  Now it is.

7   Q   Can you identify Exhibit 3, please?

8       (Discussion.)

9   Q   There we go.  Mr. Dondero, would you identify Exhibit 3,

10  please?

11  A   This was an email I sent to Compliance and relevant people

12  to put -- to put MGM on the restricted list.

13  Q   It indicates it was on December 17, 2020.  Did you

14  personally author this email?

15  A   Yes.

16  Q   You sent it to multiple individuals, including Mr.

17  Surgent.  Was Mr. Surgent an attorney at Highland Capital at

18  the time?

19  A   He was head of compliance for both organizations.

20  Q   Scott Ellington?  Is he an attorney?  Was he an attorney

21  at the time?

22  A   He's the general counsel of Highland.

23  Q   You also sent it to someone at NexPoint Advisors, Jason

24  Post.  Who is Mr. Post?

25  A   Mr. Post was head of compliance at NexPoint Advisors and a

009575

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 165 of 214   PageID 9279
Main Document   Page 179 of 214

Dondero - Direct                                119

1  subordinate of Thomas Surgent's.

2  Q   Jim Seery.  Mr. Seery, of course.  You also addressed it

3  to Mr. Seery?

4  A   Yes.

5  Q   It says, Trading Restrictions Re: MGM Material Nonpublic

6  Information.  What did you mean by the term "material

7  nonpublic information"?

8  A   Material nonpublic information is when you have material

9  nonpublic information that the public does not have, and it

10  essentially makes you an insider and restricts you from

11  trading.

12  Q   All right.  It says, Just got off a pre-board call.

13      First of all, you generated this in the ordinary course of

14  your business, did you not?

15  A   Um, --

16  Q   This email.

17  A   Yes.

18  Q   Okay.

19  A   Yes.

20  Q   And --

21  A   Any restricted list.  Restricted list items happen all the

22  time in the normal course of business.

23  Q   And you've maintained a copy of this email as well, have

24  you not?

25  A   I'm sure we have one.  I don't have it personally.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-4    Filed 07/23/23    Page 166 of 214    PageID 9280
Main Document    Page 97/23 of 88

Dondero - Direct                              120

1  Q    Fair enough.  But you're -- you have -- you have access

2  and custody over emails, correct?

3  A    Not any of my Highland emails.

4  Q    But those were left.  Right?

5  A    Yes.  Yes.

6         MR. MORRIS:  Your Honor, I mean, he's leading the

7  witness at this point, so I'm just --

8         MR. MCENTIRE:  That's fine.

9         MR. MORRIS:  I'm just --

10        THE COURT:  Okay.  Sustained.

11        MR. MORRIS:  -- going to be sensitive to it.

12        THE COURT:  Sustained.

13  BY MR. MCENTIRE:

14  Q    Mr. -- this is a true and accurate copy of the email that

15  you sent, is it not?

16  A    It appears to be.

17        MR. MCENTIRE:  At this time, I would offer Exhibit 3

18  into evidence, Your Honor.

19        THE COURT:  Okay.  I'm looking through what we

20  admitted earlier.  Did we not --

21        MR. MCENTIRE:  This already may be in evidence.

22        THE COURT:  Yes.  I'm --

23        MR. MCENTIRE:  I don't --

24        THE COURT:  Was there any objection?

25        MR. MORRIS:  There wasn't.  I mean, --

009577

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/23   Page 167 of 214   PageID 9281
Main Document   Page 072 of 86

Dondero - Direct                                  121

```
 1              THE COURT:  I think there was an objection that I
 2    overruled.
 3              MR. MORRIS:  No.  There wasn't.  I mean,
 4    unfortunately, we've gotten the short end of the stick here,
 5    because all of their documents are in evidence, and I got
 6    caught short because I'm going to have to do it the old-
 7    fashioned way.  But yes, this is in evidence.
 8              MR. MCENTIRE:  Okay.  Fair enough.
 9              MR. MORRIS:  Because -- actually got through all of
10    their documents.
11              MR. MCENTIRE:  Fair enough.
12              THE COURT:  Okay.  All right.
13    BY MR. MCENTIRE:
14    Q   So, Mr. --
15              THE COURT:  So it's in evidence.
16    BY MR. MCENTIRE:
17    Q   -- Dondero, going back to Exhibit 3, it says, Just got off
18    a pre-board call.
19        Is that the MGM board, a pre-board call?
20    A   Yes.
21    Q   What is a pre-board call?
22    A   It's a pre-board call that usually sets the agenda.  And,
23    again, myself and the Anchorage guys, we would move in
24    locksteps, in a coordinated fashion, generally, in terms of
25    agenda and company policy.
```

009578

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/23    Page 168 of 214    PageID 9282
Main Document    Page 97 of 88

Dondero - Direct                                    122

1   Q   It says, Update is as follows.  Amazon and Apple actively

2  diligencing in the data room.

3     What was your understanding of -- of -- what was your

4  intent in conveying that information to the recipients?

5  A   The intent was really in the last sentence, or second-to-

6  last sentence, that the transaction was likely to close.

7  Amazon had come back.  We had turned Amazon away earlier in

8  the year at $120 a share, and they said they wouldn't be

9  willing to pay more.  And --

10       THE COURT:  Is there an objection?

11       MR. MORRIS:  There is an objection.  None of this was

12  shared with Mr. Seery, all of this background that we're --

13  that we're doing.  He -- I would request that we stick with

14  the -- only the information that was given to Mr. Seery, like

15  -- like he's talking about his intent.  Like, who cares at

16  this point?

17       MR. MCENTIRE:  Well, --

18       MR. MORRIS:  This is what Mr. Seery got.

19       THE COURT:  Okay.  What is your response to that?

20       MR. MCENTIRE:  I have a response to -- well, they've

21  -- they've questioned his intent in sending this in his

22  opening statement.

23       MR. MORRIS:  Ah.

24       MR. MCENTIRE:  And I'm trying to make it clear what

25  his intent was.

1          MR. MORRIS:  So, you know what, Your Honor?  *Quid pro*

2    *quo*.  Now we're going to do a real *quid pro quo*.  He can ask

3    him about his intent, and then he can't object to all of the

4    other documents and exhibits that I say prove that this was

5    here only to interfere with Mr. Seery's trading activity.

6    I'll do that *quid pro quo*.

7          MR. MCENTIRE:  May I proceed, Your Honor?

8          THE COURT:  You may.  Objection is overruled.

9    BY MR. MCENTIRE:

10   Q    Mr. Dondero, what was your intent in communicating --

11   A    Okay.

12   Q    -- that probably a first-quarter event?  What was your

13   understanding?

14   A    After 30 years of compliance education:  Taint one, taint

15   all.  We were all sitting together.  I -- the trading desk was

16   right outside my desk.  All the employees of Highland that

17   would eventually move to NexPoint, all the ones that would

18   eventually move to Skyview, all the ones that eventually moved

19   to Jim Seery, were all within 30 feet of my desk.

20   Q    What do you mean by "Taint one, taint all"?

21   A    That's a compliance concept that, as a professional, you

22   have a responsibility, when you are in possession of material

23   nonpublic information, to put something on the restricted list

24   so that it's not traded.  Okay?  And you can't -- one person

25   can't sit in their cube and say they know something and not

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/28/23   Page 170 of 214   PageID 9284
Main Document   Page 124 of 214

Dondero - Direct                                    124

 1    tell anybody else, such that the rest of the organization

 2    trades.  That's not the way compliance works.

 3    Q    It says also no -- also, any sales are subject to a

 4    shareholder agreement.

 5         What was the meaning of that or the intent of that?

 6    A    There was a stringent shareholder agreement, particularly

 7    among the board members, that no shares could be bought or

 8    sold without approval of the company.

 9    Q    The company here being MGM?

10    A    MGM, yes.

11    Q    What is a restricted list?

12    A    A restricted list is when you believe as an investment

13    professional that you have material nonpublic information, you

14    notify Compliance, and then Compliance notifies the entire

15    organization and prevents any trading in that security.

16    Q    You mentioned the doctrine taint one, taint all.  If an

17    individual or -- if an individual within a company setting is

18    found to have traded on material nonpublic information, what

19    is the potential consequence or sanction?

20              MR. MORRIS:  Objection, Your Honor.  This is like a

21    legal conclusion.  He's not a law enforcement officer.  He's

22    not a securities officer.  What are we doing?

23              MR. MCENTIRE:  I can rephrase.

24              THE COURT:  Okay.  He's going to rephrase.

25    BY MR. MCENTIRE:

009581

1    Q    Based upon your years -- based upon your years of

2    experience as a board member of MGM, based upon your years of

3    experience as a CEO of Highland Capital and an executive that

4    trades in securities and has sold securities, what is your

5    understanding, from a non-legal perspective, of what the risks

6    are associated with trading on material nonpublic information?

7    A    You could be -- you would be fired from the organization

8    if you did.  You could be banned from the securities industry.

9    The industry can shut down the -- or, the SEC can shut down

10   the advisor or they can fine the advisor.

11   Q    Do you know what a compliance log is?

12   A    Yes.

13   Q    Should MGM have been placed on a compliance log at

14   NexPoint?

15   A    Throughout the organization -- throughout the

16   organization, it should -- it should and it was on all -- at

17   all organizations, yes.

18   Q    Should it have been placed on a -- on a compliance log to

19   Highland Capital, from your perspective?

20   A    Yes.

21   Q    Can you give us any explanation of why, to your knowledge,

22   why MGM would be taken off the restricted list in April of

23   2021 at Highland Capital?

24   A    When an investment professional puts something on the

25   restricted list, in order for it to come off the restricted

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/26/23    Page 172 of 214    PageID 9286
Main Document    Page 171 of 213

Dondero - Direct                           126

1  list, the material nonpublic information has to be public.  So

2  there has to be a cleansing that occurs by the company.

3  Q    To the extent that you were no longer affiliated with

4  Highland Capital in the early portion, the first quarter of

5  2021, does that somehow cleanse the material nonpublic

6  information that you identified?

7  A    It does not.

8  Q    Why not?

9  A    Because the -- it -- the company hasn't -- the company

10 didn't come out and make public the information that we knew

11 from a private perspective that the transaction was about to

12 go through.

13 Q    You sat here during opening statements when Mr. Morris

14 referred to the various news coverage and media coverage

15 concerning MGM and the fact that people had expressed interest

16 in buying in the past?

17 A    Yes.  And at the board level, we had entertained numerous

18 ones.  There were rumors that had no basis in fact, and there

19 were negotiations we had with people that were never in the

20 news.  But none of them got to this degree of certainty where

21 it was going to close within a couple months.

22 Q    From your perspective as an investment professional, with

23 the years of experience that you described for the Court, what

24 is the difference between receiving an email from a board

25 member such as yourself and rumors or suggestions of possible

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 173 of 214    PageID 9287
Main Document    Page 172 of 214

Dondero - Direct                               127

1  sale in the media?

2  A    I knew with certainty from the board level that Amazon had

3  hit our price, agreed to hit our price, and it was going to

4  close in the next couple months.

5  Q    That's not rumor or innuendo; that's hard information from

6  a member of the MGM board?

7  A    Correct.

8           MR. MCENTIRE:  All right.  You can take that down,

9  please, Tim.

10  BY MR. MCENTIRE:

11  Q    I want to talk a little bit about due diligence.  When you

12  were the chief executive officer of Highland Capital, --

13  A    Yes.

14  Q    -- can you tell us whether Highland Capital ever involved

15  itself in the acquisition of distressed assets?

16  A    Yes.  We did a fair amount of investing in distressed

17  assets.

18  Q    What is a distressed asset?

19  A    It's something that trades at a discount, where the

20  certainty and the timing of realizations or contractual

21  obligations is uncertain.

22  Q    Is a -- well, let me back up.  Has Highland -- did

23  Highland Capital ever invest in unsecured claims in connection

24  with bankruptcy proceedings?

25  A    Yes.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40 Filed 02/07/23 Page 174 of 214    PageID 9288
Main Document    Page 174 of 214

Dondero - Direct                          128

1  Q   And in terms of the -- on the spectrum of risk, where does

2  an unsecured creditor claim in a bankruptcy proceeding kind of

3  rank in terms of the uncertainties or risk, from your

4  perspective?

5  A   It's high risk.  It's a -- yeah, it would be highly-

6  distressed, generally.

7  Q   Explain to us -- I know the Court is very familiar with

8  claims trading.  Explain to us from your perspective as an

9  investment -- a seasoned investment expert or executive what

10 those risks are.  What types of risk are associated with such

11 an investment?

12 A   You have to evaluate the assets tied to the claim

13 specifically.  Or if it's an unsecured in general, the assets

14 in general in the estate.

15     You have to handicap the realization that a distressed

16 seller might not get full value for something.  You have to

17 handicap the likelihood around that.  And then you have to

18 handicap the timing, and then you have to handicap the

19 expenses and the other obligations of the estate, and then

20 handicap risk items that aren't known or that are difficult if

21 not impossible to underwrite, like unknown litigation or last-

22 minute litigation or claims or something.

23 Q   And all these handicapping, this handicapping process, how

24 does that impact the price or the investment that you're

25 willing to make?  Generally?

009585

Dondero - Direct                            129

1   A    Generally, you put a much higher discount rate.  You know,

2   like if you would do debt at 10 percent and a normal public

3   equity at a 15 percent return, you would do distressed or

4   private equity investing at a 20, 25 percent return

5   expectation to offset the risk and the unknowns.

6   Q    In order to handicap an investment in an unsecured

7   creditor's claim appropriately to reach an informed decision,

8   what type of data would you need to have access to?

9         MR. MORRIS:  Objection to the form of the question.

10  He's not here as an expert.  He's here as a fact witness.  He

11  should -- he should limit himself to that instead of talking

12  about what investors should be doing.

13        MR. MCENTIRE:  Well, Your Honor, with all due

14  respect, he's here as the former CEO of Highland Capital.  He

15  has experience, firsthand knowledge experience, and he also

16  has expertise because of his education, his career, and

17  training.

18        And again, there's no limitation here under the Rules

19  about what type of information I can elicit from him in this

20  proceeding.  This is, whether you call it expert testimony, I

21  call it personal knowledge, but it has some expert aspects to

22  it, but I think that's fair and appropriate.

23        THE COURT:  Well, I think you can ask what kind of

24  data would you rely on, would Highland Capital or entities

25  he's been in charge of rely on, --

009586

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/20/23   Page 176 of 214   PageID 9290
Main Document   Page 175 of 213

Dondero - Direct                                    130

1          MR. MCENTIRE:  I understand.

2          THE COURT:  -- but not what would people rely on.  So

3   I sustain the objection partially.

4          MR. MCENTIRE:  All right.

5   BY MR. MCENTIRE:

6   Q   Mr. Dondero, I'll rephrase the question.  When you were

7   the chief executive officer of Highland Capital before Mr.

8   Seery took the reins, and you, your company, Highland Capital,

9   was investing in an unsecured creditor's claims, what due

10  diligence, what type of information would you expect your team

11  to explore and investigate?

12  A   Sure.  Distressed investment in a trade claim would be

13  among our thickest folders, it would be among our most

14  diligenced items, because you have those three buckets, the

15  value of the assets, again, and the ability and timing of

16  monetization of those as a not strong -- as a weak seller, and

17  then you would have the litigation or claims against those,

18  and then you would have to also have a third section of

19  analysis for the litigation risk of the estate overall.

20  Q   What type of legal analysis or legal due diligence would

21  you have required as the CEO of Highland Capital?

22  A   At Highland, we would have had third-party law firms, in

23  addition to our own legal staff, in addition to our own

24  business professionals, reviewing all the analysis and the

25  assumptions.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 177 of 214    PageID 9291
Main Document    Page 177 of 214

Dondero - Direct                              131

1    Q    With regard to a financial analysis, what types of

2    financial due diligence would you have required?

3    A    It would have been a detailed -- a detailed analysis of

4    all the cash flows on the particular underlying investments,

5    and an evaluation and valuation of what those companies or

6    investments were worth.

7    Q    Why is it important to look at the underlying value of the

8    asset?

9    A    Because that -- those are what will be monetized in order

10   to give you a return on the claims or securities that you buy

11   in a distressed situation.

12            MR. MCENTIRE:  Tim, would you please put up Exhibit

13   4?

14            MR. MORRIS:  Your Honor, I don't mean to be

15   monitoring your time, but we're at the 1:30 --

16            THE COURT:  I was just checking the clock here.

17   Let's do take a break.  So, --

18            MR. MCENTIRE:  All right.

19            MR. MORRIS:  Your Honor, can we have an instruction

20   to the witness not to --

21            THE COURT:  Yes.

22            MR. MORRIS:  -- look at his phone and not to confer

23   with anybody?  Because we had that incident once before.

24            THE COURT:  Okay.  Well, I don't --

25            THE WITNESS:  I don't have my phone.

009588

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/27/23    Page 178 of 214    PageID 9292
Main Document    Page 177 of 213

Dondero - Direct                    132

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  My phone's at the front desk.

 3              THE COURT:  So, no discussions with your lawyers or

 4    -- I guess he doesn't have his phone -- during this break.

 5              MR. MORRIS:  Thank you, Your Honor.

 6              THE COURT:  All right.  So, I really think this will

 7    take five minutes, so don't go far.

 8        (Off the record, 1:33 p.m. to 1:47 p.m.)

 9              THE COURT:  Okay.  We will go back on the record,

10    then, in the Highland matter.

11              MR. MCENTIRE:  I'm just going to grab him right now.

12              THE COURT:  Okay.  We are, for the record, waiting on

13    Mr. Dondero to take his place again on the witness stand.

14        (Pause.)

15              THE COURT:  All right, Mr. Dondero.  We're ready for

16    you to resume your testimony.

17        All right.  Mr. McEntire, you may proceed.

18              MR. MCENTIRE:  Thank you, Your Honor.

19                   DIRECT EXAMINATION, RESUMED

20    BY MR. MCENTIRE:

21    Q   Mr. Dondero, when we left off, I was just putting up what

22    I requested as Exhibit 4.

23              MR. MCENTIRE:  And Tim, if you can put that back up,

24    please.

25    BY MR. MCENTIRE:
```

009589

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 179 of 214    PageID 9293
Main Document    Page 178 of 213

Dondero - Direct                          133

1   Q    Mr. Dondero, can you identify Exhibit #4, please?

2   A    Yes.  These are notes I took contemporaneous with three

3   conversations with guys at Farallon.

4   Q    I didn't quite hear you.  Did you say contemporaneous?

5   A    Yes.

6   Q    So, you say with three conversations.  Who were the

7   conversations with?

8   A    One was with Raj Patel that was fairly short, and he

9   deflected me to Mike Linn, who was the portfolio manager in

10  charge and had done the transactions.

11  Q    Which transactions?

12  A    The buying of the claim, the Highland claims.

13  Q    All right.  And what was your purpose in making these

14  notes?

15  A    We'd been trying nonstop to settle the case for two-plus

16  years.  We'd been counseled that it was a Kabuki dance that

17  would just, you know, all settle at the end, and it never

18  quite happened that way.  And when we heard the claims traded,

19  we realized there were new parties to potentially negotiate to

20  resolve the case.

21      The ownership was initially hidden, but we were able to

22  find out pretty quickly that Farallon was Muck.  So I reached

23  out the Farallon guys.

24  Q    All right.  And were you ever able at that time to

25  determine who was affiliated with Jessup, the other special-

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 180 of 214    PageID 9294

                    Dondero - Direct                    134

 1  purpose entity?

 2  A    We -- initially, we thought Farallon was all of the

 3  entities.  We didn't find out about Stonehill -- it was more

 4  difficult and they had taken more efforts to hide the

 5  ownership in Stonehill.  We didn't find out for two more

 6  months.

 7  Q    So your first conversation was with Mr. Patel?

 8  A    Yes.

 9  Q    And did you call him?

10  A    Yes.

11  Q    Your first entry, there's a 28 on the left-hand side.

12  What does that 28 refer to, if you recall?

13  A    That was the date, I believe.

14  Q    Do you believe it was May 28th?

15  A    Yes.

16  Q    What makes you believe that?

17  A    That's what it says.

18  Q    Okay.  Raj Patel --

19          THE COURT:  Is there a way you can show the words

20  that are cut off?

21          MR. MCENTIRE:  On this particular one, I can't, Your

22  Honor.  We tried, but we can't.  No.

23          THE COURT:  If I look in the notebook, can I see it?

24          MR. MCENTIRE:  I don't think so.  I think this is --

25  what you see is exactly what's in the notebook.  It's the same

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/25/23   Page 181 of 214   PageID 9295

Dondero - Direct                          135

1    document.  This is how -- how we -- this is how we have it.

2    BY MR. MCENTIRE:

3    Q    Mr. Patel.  Who is Mr. Patel?

4    A    He's Mike Linn's boss.  He's head of -- I believe head of

5    credit at Farallon.

6    Q    Okay.  And Farallon is based where, if you know?

7    A    San Francisco.

8    Q    And what kind of company is Farallon, if you know?

9    A    They -- they look a lot like Highland.  Well, they do real

10   estate.  They do hedge funds.  They do -- they don't do as

11   many 40 Act or retail funds, but they're -- they're an

12   investor.

13   Q    Mr. Patel.  What did he tell you during this phone call?

14   A    That he bought it because Seery told him to buy it and

15   they had made money with Seery before.

16   Q    All right.  And how long did the call last?

17   A    Not long.

18   Q    Okay.  You said he referred you to Mr. -- who was the

19   person?

20   A    To Mike Linn.

21   Q    Who is Mike Linn?

22   A    Mike Linn is a portfolio manager that works for Mr. Patel.

23   Q    And did you call Mr. Linn?

24   A    Yes.

25   Q    All right.  The notes here, do these reflect several

009592

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/26/23    Page 182 of 214    PageID 9296
Main Document    Page 176 of 208

Dondero - Direct                                    136

1    conversations?

2    A    The first one reflects a conversation with Raj Patel, and

3    then the rest of it reflects two conversations with Mike Linn.

4    Q    All right.  Where does the first conversation with Mike

5    Linn start and where does it end?

6    A    It ends -- it begins at the 50, 70 cents.  We knew that

7    they had -- that the claims had traded around 50 cents.  And I

8    said we'd be willing to pay 70 cents.  We'd like to prevent

9    the $5 million-a-month burn.  We'd like to buy your claims.

10    Q    Why 70 cents?  What was -- what was that all about?

11    A    I was trying to give them a compelling premium that was

12    still less than I had offered the UCC three months earlier.

13    Q    And so you have:  Not compelling, Class 8.  What does that

14    mean?

15    A    He said that was -- he just said 70 cents wasn't

16    compelling.

17    Q    There's a reference to:  Asked what would be compelling.

18    Was that a question you asked him?

19    A    Yes.

20    Q    And what was his response?

21    A    He said he had no offer.  And he -- we had heard he paid

22    50 cents and I offered him 70 cents and then -- but he was

23    clear to me that he wouldn't tell me what he paid.  And so the

24    next time I called him I -- I -- instead of just making it

25    cents on the dollar, I said I'd pay 130 percent of whatever he

009593

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 09/07/23   Page 183 of 214   PageID 9297
Main Document   Page 137 of 209

Dondero - Direct                    137

1   did pay.  You don't have to tell me what you paid, but I'll

2   pay you 30 percent more than you paid, you know, a couple

3   months ago.  And -- or we thought they notified the Court when

4   they just bought it, but they had actually negotiated buying

5   it back in February.  January or February.  So --

6   Q   Who told you that they bought it in February or March time

7   frame?

8   A   He did.

9   Q   Okay.  Was this during the first or the second phone --

10         MR. MORRIS:  I apologize for interrupting.  Who's the

11  "he"?

12         MR. MCENTIRE:  Mike Linn.

13         THE WITNESS:  Mike Linn.

14         MR. MORRIS:  Thank you so much.

15         MR. MCENTIRE:  I'll make sure the record --

16  BY MR. MCENTIRE:

17  Q   Mike Linn --

18  A   Yes.

19  Q   -- told you that Farallon had bought their interest in the

20  claims back in the February or March time frame?

21  A   Yes.

22  Q   All right.  Bought assets with claims.  What does that

23  refer to?

24  A   He said it wasn't compelling because he said Seery told

25  him it would be worth a lot more.  He -- he confirmed what Raj

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Main Document   Filed 10/07/23   Page 184 of 214   Page 9298
Page 184 of 214

Dondero - Direct                    138

```
 1   said, that -- I said, do you realize the estate is spending $5
 2   million a month on legal fees?  That, you know, you should
 3   want to sell this thing.  And he said Seery told him it was
 4   worth a lot more and there were claims and litigation beyond
 5   the asset value.
 6   Q   You offered him 40 to 50 percent premium.  What is that?
 7   A   That's what the 70 cents on the 50 cents represents.  And
 8   then I changed the dialogue to I'll pay you 130 percent of
 9   whatever your cost was.  And he said, not compelling.  And
10   then I, both -- both calls, I pressed him, what price would he
11   offer at?  And he said he had no offer, he wasn't willing to
12   sell.
13   Q   The 130 percent of cost, not compelling, was that in the
14   second or the third call with Mr. Linn?
15   A   It was at my third and final call with Farallon.  My
16   second call with Mike Linn was the 130 percent of cost.
17   Q   And he said not compelling?  You put it in quotation
18   marks?
19   A   Yep.
20   Q   And then you said, no counter.  What does that mean?
21   A   He wouldn't -- he wouldn't give an offer, he wouldn't give
22   a price at which he would sell.
23   Q   What did Mike Linn tell you, in effect, with regard to his
24   due diligence that Farallon had undertaken?
25   A   When I -- when I told him about the risks and the
```

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/07/23    Page 185 of 214    PageID 9299
Main Document    Page 185 of 214

Dondero - Direct                           139

1   litigation and the burn, he said he wasn't following the case,

2   he wasn't aware of it, he was depending on Jim Seery.

3   Q    What, if anything, did Michael Linn tell you about MGM?

4   A    That was more the initial Raj Patel call, where he said we

5   bought it because he was very optimistic regarding MGM.

6   Q    Okay.  Did you have any understanding when he first got

7   his optimism about MGM?

8   A    No.  He just said that's why they had bought it initially,

9   they were very optimistic about MGM.

10  Q    That's why they had bought it initially?

11  A    Yes.

12  Q    And they had bought it initially in the February-March

13  time frame?

14  A    Yes.

15  Q    And that -- would you -- does that predate the public

16  disclosure of the MGM sale to Amazon?

17  A    Yes.

18  Q    Substantially by a couple of months?

19  A    Yes.

20  Q    I'd like to turn your attention now to a different topic.

21          MR. MCENTIRE:  And Tim, if you could pull up Exhibit

22  8, please.

23      I believe this document is already in evidence, Your

24  Honor.

25          THE COURT:  8 is?

009596

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/10/23    Page 186 of 214    PageID 9300
Main Document    Page 107 of 213

Dondero - Direct                                    140

1          MR. MCENTIRE:  Oh, by the way, I offer Exhibit 4 into

2     evidence.

3     BY MR. MCENTIRE:

4     Q   Let me ask you a couple quick questions.

5          THE COURT:  Is there an objection?

6          MR. MORRIS:  Nope.

7          THE COURT:  Okay.  4 is admitted.

8       (Hunter Mountain Investment Trust's Exhibit 4 is received

9     into evidence.)

10    BY MR. MCENTIRE:

11    Q   Exhibit 8.

12         MR. MORRIS:  I apologize, Your Honor.  Just one

13    caveat.  It's not for the truth of the matter asserted; it's

14    for what his impressions were at the time.

15         MR. MCENTIRE:  Well, --

16         MR. MORRIS:  This is what he wrote down.  I don't --

17         MR. MCENTIRE:  I'm offering it for the truth of the

18    matter asserted.

19         MR. MORRIS:  Okay.  And I object to that extent.

20    This --

21         MR. MCENTIRE:  Let me --

22         MR. MORRIS:  Can I *voir dire*?  Can I *voir dire*?  May

23    I do --

24         MR. MCENTIRE:  May I finish my statement that I was

25    --

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/14/23    Page 187 of 214    PageID 9301
Main Document    Page 71 of 214

Dondero - Direct                    141

1          THE COURT:  Let him finish, and then --

2          MR. MCENTIRE:  Thank you.

3          THE COURT:  -- you can.

4          MR. MCENTIRE:  I am offering it for the truth of the

5    matter asserted because these are documents that were prepared

6    contemporaneously, it's an exception to the hearsay rule and

7    reflects admissions of a -- of an adverse party.  Admissions

8    that are adverse to their interests.  Declarations of interest

9    adverse to their interest and admissions of an adverse party

10   contemporaneously recorded.  And so that's why I'm offering

11   it.

12         MR. MORRIS:  For all purposes?

13         THE COURT:  Okay.  Let me have you point me to the

14   exact hearsay exception.  I understand this hearsay exception

15   you're arguing for the hearsay within the hearsay, the party

16   opponent exception.  But it's technically hearsay of Mr.

17   Dondero, even though he's here on the stand.

18         MR. MCENTIRE:  Well, I could lay a foundation, then.

19   BY MR. MCENTIRE:

20   Q   Mr. Dondero, --

21         THE COURT:  Well, no.  I'm asking for what your --

22         MR. MCENTIRE:  It's --

23         THE COURT:  -- rule reference is.

24         MR. MCENTIRE:  I don't have the Rules with me right

25   this second.  It's 803(1) --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Main Document Filed 12/07/23   Page 188 of 214   Page 7/23 of 388   PageID 9302

Dondero - Direct                         142

| | |
|---|---|
| 1 | (Discussion.) |
| 2 | MR. MCENTIRE:  All right.  Well, it's -- it's |
| 3 | admissible under several categories.  It's not hearsay because |
| 4 | it's an admission of a party opponent.  It's also an admission |
| 5 | under 803(1), present sense impression.  It's also admissible |
| 6 | -- |
| 7 | THE COURT:  So you say it's Mr. Dondero's statement |
| 8 | describing or explaining an event -- |
| 9 | MR. MCENTIRE:  Yes. |
| 10 | THE COURT:  -- or admission made while or immediately |
| 11 | after the declarant perceived it? |
| 12 | MR. MCENTIRE:  Yes.  It's also a record of a |
| 13 | regularly-conducted activity, which is 803(6).  And I think |
| 14 | it's also not technically hearsay because it's also an |
| 15 | admission of a party.  So, this -- |
| 16 | THE COURT:  Well, that's the hearsay within the |
| 17 | hearsay. |
| 18 | MR. MORRIS:  Yeah. |
| 19 | THE COURT:  But I'm -- I'm -- |
| 20 | MR. MORRIS:  That can't possibly be right.  I can't |
| 21 | go back to my hotel right now and write down that he told me |
| 22 | that he did a bad thing and come in here tomorrow and say he |
| 23 | admitted he did a bad thing because it's in my notes. |
| 24 | MR. MCENTIRE:  Well, -- |
| 25 | MR. MORRIS:  That's can't possibly be the law. |

009599

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/13/23    Page 189 of 214    PageID 9303
Main Document    Page 197 of 218

Dondero - Direct                                    143

 1              MR. MCENTIRE:  Well, --

 2              MR. MORRIS:  That's not the law.

 3              MR. MCENTIRE:  There are two hearsay issues here.

 4    One is whether this is a business record or otherwise

 5    qualifies as an exception to the hearsay rule, and then

 6    there's an internal hearsay issue of whether or not what Mr.

 7    Patel and Mr. --

 8              THE COURT:  You haven't established the business

 9    record exception.  Okay?

10              MR. MCENTIRE:  I'm prepared to lay the foundation

11    right this second.  At this moment.

12              THE COURT:  You may proceed.

13    BY MR. MCENTIRE:

14    Q    Mr. Dondero, is this a document that was generated by you

15    in the ordinary course of your business?

16    A    Yes.

17    Q    Did you have personal knowledge when you recorded this

18    document?

19    A    Yes.

20    Q    You personally recorded this document, correct?

21    A    Yes.

22    Q    And you have had custody of this document.  Correct?

23    A    Yes.

24    Q    And this is --

25              MR. MCENTIRE:  That's a -- that's a business record,

1    Your Honor.

2              MR. MORRIS:  May I, Your Honor?

3              THE COURT:  You may.

4              MR. MORRIS:  Okay.

5                        VOIR DIRE EXAMINATION

6    BY MR. MORRIS:

7    Q    Where's the document now?  How come it's -- how come it's

8    cut off?

9    A    I don't know.

10   Q    Do you have the document today?  How come we're looking at

11   a document that's cut off?

12   A    I'm sure we have it somewhere.  I don't have it.

13             MR. MORRIS:  So, number one, Your Honor, we don't

14   have the actual document.  We have a partial document.

15        Number two, let's talk about it for a second.

16   BY MR. MORRIS:

17   Q    You say that you do this in the ordinary course of

18   business.  What's the purpose of taking these notes?

19   A    When I'm starting negotiation with somebody new on

20   something complicated and I don't know what their concerns or

21   rationale is going to be, I take little notes like this.

22   Q    And is it -- is it the purpose of it to capture the

23   important things that are going on in the conversation?

24   A    So I know next time how to address it differently, you

25   know.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/28/23    Page 191 of 214    PageID 9305
Main Document    Page 191 of 214

Dondero - Voir Dire                              145

1    Q    That's not my question.  My question is, is the purpose of

2    taking notes so that you have a written record of the

3    important points that you discussed?

4    A    Yes, so I know how to address it the next time.

5    Q    Okay.  And among the important points that you never put

6    down on these notes was the letters MGM.  Is that correct?

7    A    Correct.

8    Q    Okay.  And you never put down here that Michael Linn told

9    you he wasn't following the case, correct?

10   A    No, I did not.

11   Q    Okay.

12   A    But it was --

13   Q    And --

14   A    Yeah.  But I --

15   Q    That --

16           MR. MORRIS:  Your Honor, if this is --

17           MR. MCENTIRE:  (faintly)  This is *voir dire* of the

18   witness for a business record exception.

19           MR. MORRIS:  No, because --

20           THE COURT:  Overruled.

21           MR. MORRIS:  Thank you.

22   BY MR. MORRIS:

23   Q    Mr. Patel wouldn't tell you how much he paid and that's

24   why you didn't write it down, right?

25   A    Mr. Patel told me he bought it because of Seery.  My

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/13/23    Page 192 of 214    PageID 9306
Main Document    Page 746 of 889

Dondero - Voir Dire                          146

1    conversation was very short with him.  That was one of the few

2    things he said.  Linn said he wouldn't sell it because he

3    didn't find it compelling.

4    Q    Okay.

5    A    And Linn was the one who wouldn't tell me --

6    Q    Okay.

7    A    -- the price.

8    Q    But -- but even though you took these notes to write down

9    things that you thought were important, you didn't write down

10   MGM.  Correct?

11   A    Yes.

12   Q    And you didn't write down that anybody was very optimistic

13   about MGM.  Correct?

14   A    No, I did not.

15   Q    And you didn't write down that Mr. Linn told you he wasn't

16   following the case.  Correct?

17   A    Well, he said the same thing Patel said about he bought it

18   because of Seery.  He did confirm that.  I didn't see any

19   reason to write that again.

20   Q    You didn't -- you never wrote it down.  Not once.  Not --

21   there's nothing about again, right.  You never wrote down that

22   --

23   A    No, I did write --

24   Q    -- anybody ever told you they weren't following the case.

25   Correct?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Main Document   Filed 07/23   Page 197 of 228   Page 193 of 214   PageID 9307

Dondero - Voir Dire                    147

1   A     Correct.

2   Q     Okay.

3   A     But I wrote down that he bought it because of Seery.

4   Q     Okay.

5         MR. MORRIS:  Your Honor, no objection.  It can go in.

6         MR. MCENTIRE:  Okay.

7         THE COURT:  Wait.  Did you just say no objections?

8         MR. MORRIS:  Except -- except for the hearsay on

9   hearsay.  It can't possibly be an admission.  It's his -- it's

10  his notes.  This is what he wrote.  It can come in for that

11  purpose.  It's -- it's a -- that's what he's testified to, and

12  I can't object to that.  But it can't possibly come in as an

13  admission against Farallon.

14        MR. MCENTIRE:  Well, I disagree.

15        MR. MORRIS:  That's the point.

16        MR. MCENTIRE:  Well, first of all, I disagree.  This

17  is otherwise admissible, and it can come.  I think that's

18  really, Your Honor, that's really the weight it's going to be

19  given.  It comes in.  He's not making an objection to its

20  admissibility.  And if he wants to argue the weight of the

21  document, that's a different issue.

22        MR. STANCIL:  Your Honor, if I may.

23        THE COURT:  You may.

24        MR. STANCIL:  The second layer of hearsay goes to

25  whether this is a statement by Farallon.  It is a statement by

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 01/07/23   Page 194 of 214   PageID 9308

Dondero - Direct                    148

1   Mr. Dondero of what he heard, what he says he heard Farallon

2   say.  801(d) refers to, when they're talking about an opposing

3   party statement, made by the party, not made by a listener who

4   says he heard the party.  This is classic hearsay within

5   hearsay.  It's not admissible for that purpose.

6           THE COURT:  Okay.  I sustain the objection, and --

7   but I'm still struggling to understand what the Respondents

8   have agreed to.  Because --

9           MR. MORRIS:  That -- that this is what he claims to

10  have written down.  I mean, right?  So, so --

11          THE COURT:  Okay.

12          MR. MORRIS:  -- a present sense impression.

13          THE COURT:  So, it is admitted as Mr. Dondero's

14  present sense impression, but it's not admitted as to the

15  truth of anything that Claims Purchasers may have said.

16          MR. MORRIS:  And -- and the --

17          THE COURT:  That's what you're saying?

18          MR. MORRIS:  Yes.  And the most important thing is

19  that he's testified that the purpose of the notes was to

20  capture the things that were important that he was told.  And

21  we've established what he wasn't told.

22          MR. MCENTIRE:  Okay.  I believe the document is in

23  evidence, Your Honor.

24          THE COURT:  Exhibit 4 is in evidence.  But, again,

25  there's no admission in here as to what Claims Purchasers

009605

Dondero - Direct                    149

1   testified as to.

2           MR. MCENTIRE:  Well, they haven't testified yet

3   because --

4           THE COURT:  This is what he --

5           THE DEFENDANT:  I understand.  I understand.

6           THE COURT:  -- he says he remembers.

7           MR. MCENTIRE:  Okay.  So, --

8           THE COURT:  It's sort of an --

9           MR. STANCIL:  Your Honor, just so we're clear for our

10  record, this is not admitted for the truth of what Farallon is

11  purported to have said.

12          MR. MCENTIRE:  Correct.

13          THE COURT:  Correct.

14          MR. MCENTIRE:  This --

15          MR. STANCIL:  Thank you.

16          MR. MCENTIRE:  This is offered for the truth of what

17  Mr. -- Mr. Dondero recalls them saying.

18          THE COURT:  Okay.

19          MR. MCENTIRE:  In part.

20          THE COURT:  I think -- I think we're on the same page

21  now.  I think.  I think.

22      (Hunter Mountain Investment Trust's Exhibit 4 is received

23  into evidence.)

24          MR. MCENTIRE:  All right.  May I proceed, Your Honor?

25          THE COURT:  You may.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/13/23    Page 196 of 214    PageID 9310
Main Document    Page 750 of 838

Dondero - Direct                                    150

1          MR. MCENTIRE:  Can you please put up Exhibit 8,

2    please?  And I believe this document has been put into

3    evidence --

4          THE COURT:  It is.

5          MR. MCENTIRE:  Thank you.

6    BY MR. MCENTIRE:

7    Q    Mr. Dondero, this document is a -- part of a -- the

8    Court's docket.  It was filed on February 1, 2021, if you

9    could go to the top upper banner.  It's Debtors' Notice of

10   Filing of Plan Supplement of the Fifth Amended Plan of

11   Reorganization of Highland Capital Management, as Modified.

12        Do you see that?

13   A    Yes.

14   Q    I'll direct your attention, --

15          MR. MCENTIRE:  If you could go to Page 4, please, for

16   me, Tim.

17   BY MR. MCENTIRE:

18   Q    Page 4 has a schedule, a plan analysis and a liquidation

19   analysis.  Do you see that?

20   A    Yes.

21   Q    All right.  For Class 8, what does it identify that is

22   being projected for distributions to the general unsecured

23   claims for Class 8?

24   A    71.3 percent.

25   Q    What percentage is being identified that will be

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 07/15/23   Page 197 of 214   PageID 9311
Main Document   Page 752 of 898

Dondero - Direct                         151

1    distributed to Class 9?

2    A    9, no distribution.

3    Q    No distribution?  All right.  Mr. Dondero, in Paragraph --

4    I'm going to give you a piece of paper.

5         MR. MCENTIRE:  Can you just give me a piece of paper

6    real quick?

7    BY MR. MCENTIRE:

8    Q    I'm handing you a piece of paper and I'm --

9    A    Okay.  Thank you.

10   Q    Mr. Dondero, in our complaint in this case, the proposed

11   complaint in this case, we allege that Class 8 had a total of

12   $270 million, the claims that were purchased by Farallon and

13   Stonehill had a face value in Class 8 of $270 million.  Would

14   you write that number down?

15        And assuming that this was public information that was

16   available in February of 2021 at 71.32 percent, --

17        MR. MORRIS:  Objection, Your Honor.  That's an

18   assumption not in evidence.  He hasn't laid a foundation for

19   what was available in February in 2021.

20   BY MR. MCENTIRE:

21   Q    Mr. Dondero, according to --

22        THE COURT:  Wait.  Are you going to respond, or are

23   you just going to --

24        MR. MCENTIRE:  I'll rephrase the question.

25        THE COURT:  -- rephrase?  Okay.

009608

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-46   Filed 07/17/23   Page 198 of 214   PageID 9312
Main Document   Page 197 of 213

Dondero - Direct                            152

 1  BY MR. MCENTIRE:

 2  Q    According to the document that is identified as Exhibit #8

 3  that says that 71.32 percent is the anticipated projected

 4  payout on Class 8 claims, what is 71.32 percent of the face

 5  value of the claims that were purchased?

 6  A    About $192 million.

 7  Q    $192 million?  And assuming for a moment that, as alleged

 8  by Hunter Mountain in this case, that $163 million was

 9  actually used to purchase the Class 8 claims, what is the

10  difference?

11  A    About $30 million.

12  Q    A little less than that, isn't it?  Or is the number --

13  A    Yeah.  $28 million or whatever.

14  Q    $28 million?  And based upon your years of experience in

15  running Highland Capital, being involved in the purchase of

16  unsecured claims, being involved in investigating and

17  acquiring distressed assets, that return over a two-year

18  period, is that the kind of return that a hedge fund would

19  typically -- you would expect to receive?

20          MR. MORRIS:  I just want to make sure that -- because

21  the question changed a little bit in the middle.  If he wants

22  to ask him if he would have made the investment, that's fine.

23  But he should not be permitted to testify as to what any other

24  investor, including the ones who purchased these claims, would

25  have done.  Every -- there's different risk profiles.  He can

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 09/17/23   Page 199 of 214   PageID 9313
Main Document   Page 753 of 839

Dondero - Direct                    153

1  testify to whatever he wants about himself.

2          THE COURT:  Sustained.

3  BY MR. MCENTIRE:

4  Q   Go ahead.  Based upon your experience at Highland Capital,

5  would Highland Capital have ever acquired those claims based

6  upon that kind of return over two years?  For a distressed

7  asset such as this?

8  A   No.

9  Q   Why not?

10 A   It's below a debt level return that you could get on high-

11 rated assets with certainty.  It's --

12 Q   What do you mean by it's below -- below a debt return that

13 you could get on collateralized assets?  What do you mean by

14 that?

15 A   I think in this case the debt that the Debtor put in place

16 paid 12, 13 percent and was triple secured or whatever.  So no

17 one would buy the residual claims for an 8 percent compounded,

18 whatever that $28 million works out to.

19         MR. MORRIS:  I move to strike, Your Honor.  He

20 shouldn't be talking about or testifying to what other people

21 might do.

22         THE WITNESS:  Well, we --

23         THE COURT:  This is --

24         THE WITNESS:  We would never have done that.

25         THE COURT:  This is --

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 09/07/23    Page 200 of 214    PageID 9314
Main Document    Page 153 of 214

Dondero - Direct                                  154

 1          MR. MCENTIRE:  He would not have.

 2          THE COURT:  -- Highland, not nobody.  Okay.

 3  BY MR. MCENTIRE:

 4  Q   Mr. Dondero, and what is it about the fact that these

 5  claims are not collateralized that impacts the decision-

 6  makers, from your perspective?

 7  A   You have all the risk that the $205 million of expenses

 8  this estate has currently paid grows to $300 or $400 million.

 9  You know, you have the risk that other litigation regarding

10  Seery violating the Advisers Act --

11          MR. MORRIS:  I move to strike, Your Honor.

12          THE WITNESS:  -- results in --

13          THE COURT:  Sustained.

14          THE WITNESS:  -- expenses.

15  BY MR. MCENTIRE:

16  Q   Just respond to my question, sir.  What does the fact

17  about not being collateralized, how does that impact the

18  decision-maker's --

19  A   Well, I was trying to answer it.  You just have all kinds

20  of residual risk of bad acts that have happened at the estate

21  or expenses increasing or whatever.

22          MR. MORRIS:  I move to strike the phrase "bad acts,"

23  Your Honor.

24          THE COURT:  Overruled.

25  BY MR. MCENTIRE:

009611

Dondero - Direct                    155

1   Q   What did you mean by that?  What did you mean by "bad

2   acts"?

3   A   We've highlighted it in a lot of complaints.  There's been

4   several violations of the Advisers Act.

5           MR. MORRIS:  Move to strike, Your Honor.  It's a

6   legal conclusion.

7           THE COURT:  Sustained.

8   BY MR. MCENTIRE:

9   Q   Mr. Dondero, are you familiar with an entity known as NHF?

10  A   Yes.

11  Q   What is NHF?

12  A   A NexPoint hedge fund.  It was a closed-in fund that we

13  manage still to this day at NexPoint.  The name has changed to

14  NXDT.

15  Q   Was NHF publicly traded?

16  A   It -- yeah, it's a publicly-traded equity.  It's a closed-

17  in fund, technically, but it's a publicly-traded security.

18  Q   What -- what is your affiliation with NHF?

19  A   I'm the portfolio manager.

20  Q   And, again, what are your responsibilities as the

21  portfolio manager?

22  A   To optimize the portfolio and hopefully exceed investor

23  expectations.

24  Q   Have you become aware that Stonehill was purchasing MGM

25  stock in the first quarter of 2021?  And NHF?

009612

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 09/07/23    Page 202 of 214    PageID 9316

Dondero - Direct                        156

1    A    Yes.  We believe -- we're able to demonstrate from

2    Bloomberg records, on the Bloomberg terminal, they show up as

3    holders and purchasers in the -- in the first few months of

4    2021.

5    Q    What magnitude?

6    A    I think it was one of their top equity positions.  It was

7    about six million bucks.

8            MR. MCENTIRE:  Can you put up the chart?  This is for

9    demonstrative purposes only.

10        I'm not offering this chart into evidence, Your Honor.

11    It's simply a demonstration.  Or a demonstrative.

12            MR. MORRIS:  Your Honor, there's no such thing.

13            MR. MCENTIRE:  There is.

14            MR. MORRIS:  A demonstrative has to be based on

15    evidence.  A demonstrative is supposed to summarize evidence.

16    You don't put up a demonstrative until --

17            THE COURT:  All right.  What's your response to that?

18            MR. MCENTIRE:  That I'm about to walk through some

19    points where he can establish as a point of evidence, and then

20    we can talk about it.  Demonstratives, demonstratives are used

21    all the time, Your Honor.

22            MR. MORRIS:  It's to --

23            THE COURT:  Well, they summarize evidence.

24            MR. MORRIS:  It's to summarize evidence.

25            THE COURT:  Yes.  So, --

009613

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 09/25/23   Page 203 of 214   PageID 9317
Main Document   Page 157 of 198

Dondero - Direct                    157

1          MR. MCENTIRE:  Well, this is --

2          THE COURT:  -- you can elicit the evidence, and then

3     if this chart seems to summarize whatever he testifies as to,

4     then --

5          MR. MCENTIRE:  All right.

6          THE COURT:  -- then I think maybe you can put it up.

7          MR. MCENTIRE:  Mr. -- you can take it down, Tim.

8     BY MR. MCENTIRE:

9     Q   Mr. Dondero, do you have an understanding of how much

10    total distributions have been paid to date in the Highland

11    bankruptcy?

12    A   I believe the Class 8 -- the 1 through 7 was only about

13    $10 million.  I believe Class 8 got $260 or $270 million so

14    far.

15    Q   All right.  And do you have an understanding of what the

16    total amount of expenses are?

17    A   Total expenses paid to date was $203 million.  $205

18    million.

19    Q   So the -- the -- there's a rough approximation between the

20    professional expenses and the actual all proofs of claim; is

21    that correct?

22    A   There is, yeah, a ratio, and -- yes.

23    Q   The total cash flow, if you add those two together, what

24    are they?  What are they approximately?

25    A   $470 million.

Dondero - Direct                    158

1   Q    $470 million?  And do you understand that the -- that the

2   Reorganized Debtor and the Claimant Trust would have more than

3   sufficient assets to reach Class 10 where Hunter Mountain is

4   currently located, even setting aside the claims against you?

5   A    Correct.  There's $57 million of cash on the balance

6   sheet, net of a couple million today, I guess.  And then

7   there's $100 million of other assets.

8           MR. MCENTIRE:  Reserve the rest of my questions.

9   Reserve the rest of my questions, Your Honor.

10          THE COURT:  Okay.  Pass the witness.

11          MR. MCENTIRE:  Could I have my time estimate?

12          THE COURT:  Yes.  Caroline?

13          THE CLERK:  (faintly)  As of right now, we are at 81

14  minutes, so --

15          MR. MCENTIRE:  Thank you.

16          THE COURT:  That was 81 minutes total?

17          THE CLERK:  Yes.

18          THE COURT:  Okay.

19          MR. MORRIS:  May I proceed, Your Honor?

20          THE COURT:  You may.

21                     CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    Good afternoon, Mr. Dondero.

24  A    Good to see you.

25  Q    My pleasure.  Do you know an attorney named Ronak

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 12/07/23    Page 205 of 214    PageID 9319
Main Document    Page 205 of 398

Dondero - Cross                                      159

1  (phonetic) Patel?

2  A    Is that Rakhee that they call --

3  Q    Could be.  Do you know an attorney named Rakhee Patel?

4  A    There was a Rakhee Patel, I believe, early in the *Acis*

5  case.

6  Q    Let me try --

7  A    I'm not -- I've never met her.

8  Q    Let me try this differently.

9  A    Okay.

10  Q    Did you ever meet with the Texas State Securities Board?

11  A    No.

12  Q    Did anybody acting on your behalf ever file a complaint

13  with the Texas State Securities Board?

14  A    No.

15  Q    Do you know if anybody's filed a complaint with the Texas

16  State Securities Board?  About Highland?

17  A    I believe you covered it earlier.  Mark Patrick.

18  Q    Mark Patrick what?

19  A    I guess he did, or Hunter Mountain did, or the DAF did.  I

20  don't -- I don't know.

21  Q    Did you ever speak with Mark Patrick about a TSSB

22  investigation of Highland?

23  A    No.

24  Q    Okay.  Why do you think Mark Patrick knows about the TSSB

25  investigation of Highland?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-46    Filed 10/07/23    Page 206 of 214    PageID 9320
Main Document    Page 206 of 238

Dondero - Cross                                160

1          MR. MCENTIRE:  Objection to form.  Calls for

2    speculation.  He's just established that he's never --

3          THE WITNESS:  I don't know.

4          MR. MCENTIRE:  -- talked to Mark Patrick.

5          MR. MORRIS:  Okay.

6          THE COURT:  Okay.  Sustained.

7          MR. MORRIS:  Okay.

8    BY MR. MORRIS:

9    Q    Have you ever seen the draft Hunter Mountain complaint in

10   this case?

11   A    No.

12   Q    Okay.  I think you testified a moment ago that Amazon had

13   hit MGM's price by December 17th.  Do I have that right?

14   A    Yes.

15   Q    Okay.  Then how come you didn't say that in your email to

16   Mr. Seery?

17   A    Your best practices and typical practices, when you put it

18   on the restricted list, is to just give as little information

19   as possible so that the inside information isn't promulgated

20   specifically throughout the organization and leaked --

21   Q    So, --

22   A    -- throughout the organization.

23   Q    So, even though your intent was to convey information to

24   Mr. Seery, you didn't actually tell him the truth, right?  You

25   didn't tell him that Amazon had actually hit the stock price.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Filed 12/07/23   Page 207 of 214   PageID 9321
Main Document   Page 763 of 808

Dondero - Cross                           161

 1    Right?

 2    A    I wouldn't characterize it that way.

 3    Q    Okay.  In fact, all you told him was that they were

 4    interested.  Isn't that right?

 5    A    I wasn't telling him anything.  I was telling Compliance,

 6    as an investment professional, that it needed to be on the

 7    restricted list because we were in possession of material

 8    nonpublic information regarding a merger that was going to go

 9    through shortly.  Or in the next few months.

10    Q    Is it your testimony that, as of December 17th, Amazon had

11    made an offer that was acceptable to MGM?

12    A    Yeah, we were going into -- that's what the board meeting

13    was.  We were going into exclusive negotiations to culminate

14    the merger with them.

15    Q    Okay.  I think you have a binder there of our exhibits.

16    If you can go to #11.

17    A    Which one?

18              MR. MORRIS:  May I approach?

19              THE WITNESS:  Sure.

20        (Pause.)

21    BY MR. MORRIS:

22    Q    That's your email, sir, right?

23    A    Yes.

24    Q    Okay.  It doesn't say anything about Amazon hitting the

25    price, right?

009618

Dondero - Cross                                  162

1   A   It doesn't need to.

2   Q   In fact, it still mentions Apple, doesn't it?  Why did you

3   feel the need to mention Apple if Amazon had already hit the

4   price?

5   A   The only way you generally get something done at

6   attractive levels in business is if two people are interested.

7   Q   But why weren't you -- why were you creating a story for

8   the Compliance Department when the whole idea was to be

9   transparent so they would understand what was happening?  Why

10  would you create a story that differed from the facts?

11  A   It didn't differ from the facts, and it's not a story.

12  It's a, we have material nonpublic information.  Please put

13  this on the restricted list.  And --

14  Q   But that -- but you said Amazon and Apple are actively

15  diligencing and they're in the data room.  Do you see that?

16  A   That's true.

17  Q   So, even though -- you know what, I'll move on.  But this

18  -- this doesn't say what you testified to earlier, that Apple

19  hit the -- that Amazon hit the price.  Right?  Can we just

20  agree on that?

21  A   Well, agree that it doesn't have to and it's not supposed

22  to.

23          MR. MORRIS:  I move to strike.  I just want --

24          THE COURT:  Sustained.

25  BY MR. MORRIS:

009619

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 07/23    Page 209 of 214    PageID 9323
Main Document    Page 7 of 8

Dondero - Cross                              163

1    Q   -- you to -- I want you to just work with me here.  You

2    did not tell the Compliance Department that Apple -- that

3    Amazon had hit the strike price.  Right?  Isn't that correct?

4    That's not what this email says?

5    A   The -- you can pull up a hundred of these type emails.

6    They're not specific.

7            MR. MORRIS:  I'm going to move to strike and I'm just

8    going to ask you, --

9            THE COURT:  Sustained.

10   BY MR. MORRIS:

11   Q   -- because you testified to one thing, and I just want to

12   make clear that you told the Compliance Department something

13   different.  Can we just agree on that?

14           MR. MCENTIRE:  Well, Your Honor, may I respond to his

15   motions to strike?  I think he's becoming argumentative.

16           THE COURT:  Could you speak into the mic, --

17           MR. MCENTIRE:  I can.

18           THE COURT:  -- please.

19           THE COURT:  He's becoming argumentative.  And I think

20   it's very clear that, if he asks a question, the witness has a

21   right to respond.  I think his answers are totally responsive.

22   And I don't think anything should be struck.

23           THE COURT:  Okay.  Your question was you didn't put

24   in there anything about it hit the strike price --

25           MR. MORRIS:  He didn't --

009620

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Main Document    Filed 07/24/23    Page 210 of 214    Page 210 of 214    PageID 9324

Dondero - Cross                           164

1        THE COURT:  -- or whatever?

2        MR. MORRIS:  He didn't -- he didn't tell the

3   Compliance Department what he just testified to.  In fact, he

4   told the Compliance Department something very different.

5   That's all I'm asking.

6        THE COURT:  And I think that's just a yes or no.

7        MR. MORRIS:  Okay.

8   BY MR. MORRIS:

9   Q    Yes or no?  You told the Compliance Department something

10  different than what was actually happening?

11  A    That's not true.

12  Q    Oh.

13  A    Exactly what was here, what was happening.  I didn't give

14  more detail, which is more hearsay.

15  Q    Okay.  If somebody was filing -- following the Highland

16  bankruptcy, they would have known that MGM was very important,

17  right?

18  A    You'd have to show me where.  I don't -- I don't see it in

19  any of the bankruptcy --

20  Q    You don't think that that's true?

21  A    I didn't see it in any of the public filings.

22  Q    Do you remember we were here two years ago on this very

23  day, June 8, 2021, for the second contempt hearing?  You sat

24  in that very witness box during the second contempt hearing?

25  Remember that?  That was two years ago.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Main Document    Filed 09/07/23    Page 211 of 214    PageID 9325    Page 165 of 214

Dondero - Cross                          165

1    A    I remember sitting in the box.  What are you asking?

2    Q    And do you remember that that was just a few days after

3    MGM had announced its deal with Amazon?

4    A    I -- I don't remember -- I -- was that the day the judge

5    was hopeful that would lead to a resolution of the case?

6    Q    Exactly.  So, --

7    A    Okay.

8    Q    -- Judge Jernigan certainly knew that MGM was important.

9    Right?

10   A    Yes.

11   Q    And she's a bankruptcy judge, right?

12   A    Yes.

13   Q    And she was overseeing the bankruptcy case, right?

14   Correct?

15   A    Yes.

16   Q    And the very first thing when she walked in the door two

17   years ago on this day was, oh my goodness, MGM, they have a

18   deal, maybe we can finally get to a settlement.  Right?

19   A    And I wish she had pushed on that.

20   Q    Do you --

21   A    And I remember you guys dismissing it.

22   Q    Do you think she had material nonpublic inside

23   information?

24   A    No, I don't think so.

25   Q    She probably learned it in the bankruptcy case, right?

1    A    Yeah.

2    Q    Okay.  Do you believe Mr. Seery sold any MGM securities

3    between the day you sent your email and the day the Amazon

4    deal was announced on May 26th?

5    A    I don't know.

6    Q    Do you -- so you have no knowledge?  Let's do this a

7    different way.  You have no basis to say that Mr. Seery sold

8    any MGM securities between the moment you sent this email on

9    December 17th and the day the Amazon deal was announced on May

10   26th.  Correct?

11   A    I'm sorry.  Just to clarify, you're saying sold, not

12   bought, right?  You're not asking me if --

13   Q    I'll do either way.

14   A    Okay.

15   Q    Fair point.

16   A    Sure.

17   Q    Very fair point.

18   A    Okay.

19   Q    Do you believe that Mr. Seery engaged in any transactions

20   of MGM securities between those two relevant data points?

21   A    Yes.

22   Q    Okay.  What do you think he did?

23   A    The HarbourVest transaction.

24   Q    Okay.  So, you learned about the HarbourVest transaction

25   when?

009623

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-40   Main Document   Filed 07/07/23   Page 213 of 214   PageID 9327
                                                                    Page 213 of 214

                            Dondero - Cross                    167

 1   A    When it was filed.

 2   Q    And that was on December 23rd.  Do you remember that?

 3   A    Yes.

 4   Q    It was just less than a week after you sent your email,

 5   right?

 6   A    Yes.

 7   Q    And do you remember that you filed an objection to the

 8   HarbourVest settlement?

 9   A    Yes.

10   Q    And you're the one who gave Mr. Seery this material

11   nonpublic inside information, right?

12   A    Yes.

13   Q    Did you object to the HarbourVest settlement on the basis

14   that Mr. Seery was engaging in insider trading?

15   A    Not then, I don't think.  I believe --

16   Q    You didn't, right?  Even though it was happening at the

17   exact same moment, the very -- within a week of you giving him

18   this information.  He's announcing that he's doing this

19   settlement and you don't say a word.  Isn't that right?

20   A    Because I delegated the responsibility to Compliance by

21   notifying them of material nonpublic information, and

22   Compliance should hold the organization accountable.

23   Compliance is separate and discrete from management.

24   Compliance reports to the SEC.

25   Q    You filed a 15-page objection to the settlement, didn't

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-40    Filed 04/07/23    Page 214 of 214    PageID 9328
Main Document    Page 7653 of 808

Dondero - Cross                                    168

1   you?

2   A    I don't -- I don't know.

3   Q    Did you tell Judge Jernigan that Mr. Seery was doing bad?

4   A    Not then.  I think a month later, two months later.

5   Q    Even though you knew what was happening, you didn't say

6   anything, right?

7   A    I -- I'm not responsible for all the filings.  I --

8   Q    Even though it's under your name?

9   A    Correct.

10  Q    How about -- how about CLO Holdco?  Did CLO Holdco file an

11  objection to the HarbourVest settlement?

12  A    I -- I don't know which entities did, but it -- whatever

13  entities that were in control that could did, eventually, when

14  they found out, you know, and -- but did -- did they, within a

15  week or contemporaneously?  No.  It was right around the

16  holidays.  A lot of people weren't paying attention.  You guys

17  were trying to rush the HarbourVest thing through.

18  Q    Sir, CLO Holdco filed an objection, claiming that it was

19  entitled to purchase the HarbourVest interests in HCLOF

20  because it had a right of first refusal, right?  Isn't that

21  right?

22  A    Okay.  I -- what ultimately governs the --

23  Q    Isn't that right?

24  A    I don't -- okay.

25  Q    It's really just yes or no.

009625