**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| **Hunter Mountain Investment Trust** | | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P, et al** | § | **3:23-CV-2071-E** |
| Appellee | § | |

**[3904] Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders" Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding. Entered on 8/25/2023.**

# Volume 41

# APPELLANT RECORD

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Reorganized Debtor. | § | *INDEX* |

## APPELLANT HUNTER MOUNTAIN INVESTMENT TRUST'S
## SECOND SUPPLEMENTAL STATEMENT OF THE ISSUES AND
## DESIGNATION OF ITEMS FOR INCLUSION IN THE APPELLATE RECORD

COMES NOW Appellant/Movant Hunter Mountain Investment Trust, both in its individual capacity and derivatively on behalf of the Reorganized Debtor, Highland Capital Management, L.P., and the Highland Claimant Trust,[1] (collectively, "Appellant" or "HMIT"), and files this Second Supplemental[2] Statement of the Issues and Designation of Items for Inclusion in the Appellate Record pursuant to Federal Rule of Bankruptcy Procedure 8009(a)(1):

## I.
## STATEMENT OF THE ISSUES

A.   Did the bankruptcy court err in determining that the "colorable" claim analysis allowed the court to consider evidence and other non-pleading materials including, but not limited to, the court's reasoning that:

      1.   the colorability analysis is stricter than a non-evidentiary, Rule 12(b)(6)-type analysis;

      2.   the colorability analysis is "akin to the standards applied under the … *Barton* doctrine";

      3.   the colorability analysis requires a "hybrid" of the *Barton* doctrine and "what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place"; and/or,

---

[1] And in all capacities and alternative derivative capacities asserted in HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding [Dkt. Nos. 3699, 3815, and 3816] ("Emergency Motion"), the supplement to the Emergency Motion [Dkt. No. 3760], and the draft Complaint attached to the same [Dkt. No. 3760-1].

[2] Appellant files this Second Supplement pursuant to the Clerk's request at Docket #3949 and correspondence on 10/23/2023.

4.  "[t]here may be mixed questions of fact and law implicated by the Motion for Leave"?

[*See* Dkt. Nos. 3781, 3790, 3903-04].

B.   Did the bankruptcy court err in determining that Appellant lacked constitutional or prudential standing to bring its claims in its individual and derivative capacities?

[*See* Dkt. Nos. 3903-04].

C.   Did the bankruptcy court err in alternatively determining that, even under a non-evidentiary, Rule 12(b)(6)-type analysis, Appellant did not assert colorable claims including, but not limited to, determining that:

1.  Appellant's allegations are conclusory, speculative, or constitute "legal conclusions";

2.  Appellant's claims or allegations are not "plausible";

3.  Appellant's allegations pertaining to a *quid pro quo* are "pure speculation";

4.  Proposed Defendant James P. Seery ("Seery") owed no duty to Appellant in any capacity as a matter of law;

5.  Appellant failed "to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty";

6.  Appellant's allegations pertaining to its aiding and abetting and conspiracy claims are speculative and not plausible;

7.  The remedies of equitable disallowance and equitable subordination are not remedies "available" to Appellant as a matter of law;

8.  Appellant's unjust enrichment claim is invalid as a matter of law because "Seery's compensation is governed by express agreements";

9.  Appellant is not entitled to declaratory relief because it has no colorable claims; and/or

10. Appellant cannot recover punitive damages for its breach of fiduciary duty claim?

[*See* Dkt. Nos. 3903-04].

---

D.   Alternatively, even if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the court violate Appellant's due process rights by denying Appellant its requested discovery?

[*See* Dkt. Nos. 3800, 3853, 3903-04, June 8, 2023 Hearing].

E.   Alternatively, did the bankruptcy court err by denying Appellant's requested discovery including, but not limited to:

1.   ordering that Appellant could not request or obtain any discovery other than a deposition of Seery and James D. Dondero; and/or

2.   determining that state court "Rule 202" proceedings supported the denial of discovery?

[*See* Dkt. Nos. 3800 & June 8, 2023 Hearing; *see also* Dkt. Nos. 3903-04].

F.   Alternatively, did the bankruptcy court err by denying Appellant's alternative request for a continuance to obtain the requested discovery?

G.   Alternatively, did the bankruptcy court err by excluding Appellant's evidence, or admitting the same for only limited purposes, offered at the June 8, 2023 Hearing?

H.   Alternatively, did the bankruptcy court err by overruling Appellant's objections to Appellees' evidence offered at the June 8, 2023 Hearing?

I.   Alternatively, did the bankruptcy court err by excluding Appellant's experts' testimony?

[*See* Dkt. No. 3853; *see also* Dkt. Nos. 3903-04].

J.   Alternatively, did the bankruptcy court err by striking Appellant's proffer of its excluded experts' testimony from the record?

[*See* Dkt. No. 3869].

K.   Alternatively, if the bankruptcy court correctly determined that its "hybrid" *Barton* analysis controls, did the bankruptcy court err in determining that Appellant had not asserted colorable claims under that "hybrid" analysis including, but not limited to, its findings that:

1.   there is no evidence to support that Seery shared material non-public information with the Claims Purchasers;

2.   there is no evidence to support the alleged quid pro quo;

3.   the material shared was *public* information; and/or

4.   the Claims Purchasers had sufficient and lawful reasons to pay the amounts paid

for the purchased claims.

[*See* Dkt. Nos. 3903-04].

L.  Did the bankruptcy court err in finding that Appellant is controlled by Dondero, and, as such, Appellant "cannot show that it is pursuing the Proposed Claims for a proper purpose"?

M.  Alternatively, does sufficient evidence support the bankruptcy court's evidentiary findings made pursuant to its "hybrid" *Barton* analysis?

N.  Did the bankruptcy court err in denying an expedited hearing on Appellant's Motion for Leave?  [*See* Dkt. 3713].

O.  Does the bankruptcy court's use of a new "colorability" standard to determine if claims by non-debtors against other non-debtors may proceed violate *Stern v. Marshall* and its progeny?

P.  Did the bankruptcy court err in denying Appellant's Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or Alternatively, for New Trial under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 including, but not limited to by:

1.  declining to consider disclosures that demonstrated that Appellant is "in the money"—an issue pertinent to the court's erroneous standing decisions; and

2.  concluding that the disclosures failed to reinforce Appellant's standing to pursue the claims presented?

[Dkt. 3936].

## II.
## DESIGNATION OF ITEMS FOR INCLUSION
## IN THE APPELLATE RECORD

*VOL. 1*

1.  **Notice of Appeal**

*000001*  a.  Notice of Appeal **[Dkt. 3906]**;

*000276*  b.  Amended Notice of Appeal **[Dkt. 3908];** and

*000551*  c.  Second Amended Notice of Appeal **[Dkt. 3945]**

2.  **The judgment, order, or decree appealed from:**

a.  Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment

*000835*
*000940*

Trust's Emergency Motion for Leave to File Adversary Proceedings **[Dkts. 3903 & 3904]**; and

*001045*

**b.**  Order Denying Motion of Hunter Mountain Investment Trust Seeking Relief Pursuant to Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 **[Dkt. 3936]**.

**3.  Docket sheet.**

*001049*

a.  Bankruptcy Case No. 19-34054

**4.  Other Items to be included:**

a.  HMIT hereby designates the following items in the record on appeal from Cause No. 19-34054-sgj11:

*Vol. 2*

| FILE DATE | DOCKET NO. (INCLUDING ALL ATTACHMENTS AND APPENDICES) | DESCRIPTION |
|---|---|---|
| 01/22/2021 | 1808 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) |
| 02/22/2021 | 1943 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief |
| 09/09/2022 | 3503 | Motion to Conform Plan filed by Highland Capital Management, L.P. |
| 02/27/203 | 3671 | Memorandum Opinion and Order on Reorganized Debtor's Motion to Conform Plan |
| 03/28/2023 | 3699 (3699-1 — 3699-5) | HMIT Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 03/28/2023 | 3700 (3700-1) | HMIT Motion for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/30/2023 | 3704 | Farallon, Stonehill, Jessup and Muck Objection to Motion for Expedited Hearing |
| 03/30/2023 | 3705 | HMIT Amended Certificate of Conference |

*001594*
*001660*
*001821*
*001830*
*Vol. 3*
*001849*
*Thru  Vol. 4*
*Vol 4*
*002236*
*002243*
*002248*

Vol. 5
002251

002254

002262

002348

002355

002358

002391

002398

002400

Vol. 8
002826

Thru Vol. 7

Thru Vol. 9

Vol. 9
003257

003260

003270

003278

| | | | |
|---|---|---|---|
| 03/30/2023 | 3706 | | HMIT Amended Certificate of Conference |
| 03/30/2023 | 3707 | | Highland's Response in Opposition to Emergency Motion for Leave |
| 03/30/2023 | 3708 (3708-1 — 3708-8) | | Declaration of John Morris in Support of the Highland Parties' Objection to Hunter Mountain Investment Trust's Opposed Application for Expedited Hearing on Emergency Motion for Leave to File Verified Adversary Proceeding |
| 03/31/2023 | 3712 | | HMIT Reply in Support of Application for Expedited Hearing |
| 03/31/2023 | 3713 | | Order Denying Motion for Expedited Hearing |
| 04/04/2023 | 3718 (3718-1 — 3718-4) | | HMIT Motion for Leave to File Appeal |
| 04/04/2023 | 3719 (3719-1) | | HMIT Motion for Expedited Hearing on Motion for Leave to File Appeal |
| 04/05/2023 | 3720 | | Order Denying HMIT's Opposed Motion for Expedited Hearing |
| 04/05/2023 | 3721 (3721-1 — 3721-2) | | HMIT Notice of Appeal |
| 04/06/2023 | 3726 (3726-1) | | Certificate of Mailing regarding HMIT Notice of Appeal |
| 04/07/2023 | 3731 | | Notice of Docketing Transmittal of Notice of Appeal |
| 04/13/2023 | 3738 (3738-1) | | Highland's Opposed Emergency Motion to Modify and Fix a Briefing Schedule and Set a Hearing Date with Respect to HMIT's Emergency Motion for Leave |
| 04/13/2023 | 3739 | | Highland's Motion for Expedited Hearing |
| 04/13/2023 | 3740 | | Joinder to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date With Respect to Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon |

| | | | Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
|---|---|---|---|
| *Vol. 10* 003281 | 04/13/2023 | 3741 | Notice of Hearing for 04/24/2023 at 1:30 PM |
| 003286 | 04/13/2023 | 3742 | Amended Notice of Hearing for 04/24/2023 at 1:30 PM |
| 003291 | 04/13/2023 | 3745 | Notice of Appearance and Request for Notice by Omar Jesus Alaniz filed by James P. Seery Jr. |
| 003294 | 04/15/2023 | 3747 | Joinder by James P. Seery Jr. to Highland's Emergency Motion to Modify and Fix Briefing Schedule and Set Hearing Date with Respect to Hunter Mountain Investment Trusts Emergency Motion for Leave to File Verified Adversary Proceeding |
| 003296 | 04/17/2023 | 3748 | HMIT's Response and Reservation of Rights |
| 003299 | 04/19/2023 | 3751 | Notice of Status Conference |
| 003302 | 04/21/2023 | 3758 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability" |
| 003311 | 04/21/2023 | 3759 | HMIT's Notice of Rescheduling Hearing |
| 003314 | 04/21/2023 | 3761 | HMIT's Objection Regarding Evidentiary Hearing and Brief Concerning Gatekeeper Proceedings Relating to "Colorability"[3] |
| 003323 | 04/23/2023 | 3760 (3760-1) | HMIT's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding and Attached Verified Adversary Complaint |
| 003368 | 04/25/2023 | 3765 | Transcript of Hearing held on 04/24/2023 |
| 003430 | 05/11/2023 | 3780 | Objection to Hunter Mountain Investment Trust's (i) Emergency Motion for Leave to File Verified Adversary Proceeding; and (ii) Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck |

---

[3] A duplicate of Doc 3758.

*Vol. 10*

*003458*

*003463*

*Vol. 11*

*003537*

*Thru Vol. 16*

*Vol. 17*

*004665*

*004712*

*004714*

*004808*

*004813*

*004836*

*Vol. 18*

*004930*

*004931*

| | Date | Doc # | Description |
|---|---|---|---|
| | | | Holdings LLC, Stonehill Capital Management LLC |
| | 05/11/2023 | 3781 | Order Fixing Briefing Scheduling and Hearing Date with Respect to HMIT's Emergency Motion for Leave to File Verified Adversary Proceeding as Supplemented |
| | 05/11/2023 | 3783 | Highland and Seery's Joint Response to HMIT's Emergency Motion for Leave |
| | 05/11/2023 | 3784 (3784-1 — 3784-46) | Declaration of John Morris in Support of Highland Parties' Joint Response |
| | 05/18/2023 | 3785 | HMIT's Reply in Support of Emergency Motion for Leave to File Adversary Proceeding |
| | 05/22/2023 | 3787 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/24/2023 | 3788 (3788-1 — 3788-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/24/2023 | 3789 | HMIT's Application for Expedited Hearing |
| | 05/24/2023 | 3790 | Order Pertaining to the Hearing on Hunter Mountain Investment Trust's Motion for Leave to File Adversary Proceeding [DE##3699 & 3760] |
| | 05/25/2023 | 3791 (3791-1 — 3791-5) | HMIT's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing |
| | 05/25/2023 | 3792 | Order Setting Expedited Hearing |
| | 05/25/2023 | 3795 | Objection to Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of June 8, 2023 Hearing filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

Vol. 18

004939.

| | 05/25/2023 | 3798 (3798-1) | Highland Parties' Joint Response in Opposition to HMIT's Emergency Motion for Expedited Discovery |
|---|---|---|---|
| 004959 | 05/26/2023 | 3800 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004961 | 05/28/2023 | 3801 | Order Regarding Hunter Mountain Investment Trust's Emergency Motion for Expedited Discovery or, Alternatively, for Continuance of the June 8, 2023 Hearing |
| 004984 | 06/05/2023 | 3815 (3815-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005049 | 06/05/2023 | 3816 (3816-1) | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding |
| 005114  Thru Vol. 25 | 06/05/2023 | 3817 (3817-1 — 3817-5) | Highland Parties' Witness and Exhibit List with Respect to Evidentiary Hearing on June 8, 2023 |
| Vol. 26  006608  Thru Vol. 39 | 06/05/2023 | 3818 (3818-1 — 3818-9) | HMIT's Witness and Exhibit List in Connection with its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement |
| Vol. 39  009273 | 06/07/2023 | 3820 | Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009290 | 06/07/2023 | 3821 (3821-1 — 3821-3) | Declaration in Support of Highland Parties' Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 009416 | 06/07/2023 | 3822 (3822-1) | HMIT's Unopposed Motion to File Exhibit Under Seal [WITHDRAWN] |
| 009424 | 06/07/2023 | 3823 | Joinder to Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |

*Vol. 40*
*009426*

| Date | Doc | Description |
|---|---|---|
| 06/07/2023 | 3824 | HMIT's Objections to the Highland Parties' Exhibit and Witness List |
| 06/08/2023 | 3828 | HMIT's Response to Highland Claimant Trust and James P. Seery, Jr.'s Joint Motion to Exclude Testimony and Documents of Experts Scott Van Meter and Steve Pully |
| 06/09/2023 | 3837 | Request for transcript regarding hearing held on 06/08/2023 |
| 06/12/2023 | 3838 | Court admitted exhibits on hearing June 8, 2023 (*See* Docket Entry Nos. 3817 & 3818) |
| 06/12/2023 | 3841 | Highland Parties' Reply in Further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully |
| 06/12/2023 | 3842 (3842-1) | Claim Purchasers' Joinder to Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery Jr.'s Reply in Further Support of Their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully filed by Farallon Capital Management, LLC, Jessup Holdings LLC, Muck Holdings LLC, Stonehill Capital Management LLC |
| 06/13/2023 | 3843 | Transcript regarding Hearing Held 06/08/2023 |
| 06/13/2023 | 3844 | Transcript regarding Hearing Held 05/26/2023 |
| 06/13/2023 | 3845 | HMIT's Request for Oral Hearing or, Alternatively, a Schedule for Evidentiary Proffer |
| 06/13/2023 | 3846 | Response in Opposition to Hunter Mountain Investment Trust's Request for Oral Argument or, Alternatively, a Schedule for Evidentiary Proffer filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Creditor James P. Seery Jr. |
| 06/13/2023 | 3847 | HMIT's Reply to the Highland Parties' Response to Request for Oral Hearing |
| 06/16/2023 | 3853 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |

*009436, 009444, 009445, 009446, 009456, 009458, Vol. 41, 009841 Vol. 42, 009901, 009905, 009908, 009912, Thru Vol. 41*

Vol. 42

009928

009944

010013

010023

010025

010029

010035

010047

010059

Vol. 43

010062

| 06/16/2023 | 3854 | Memorandum Opinion and Order Granting Joint Motion to Exclude Expert Evidence |
| 06/19/2023 | 3858 (3858-1 — 3858-2) | Hunter Mountain Investment Trust's Evidentiary Proffer Pursuant to Rule 103(a)(2)[4] |
| 06/23/2023 | 3860 | The Highland Parties' Objections to and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 06/23/2023 | 3861 | Claim Purchasers' Joinder to the Highland Parties' Objections and Motion to Strike Hunter Mountain Investment Trust's Purported Proffer |
| 07/05/2023 | 3869 | Order Striking HMIT's Evidentiary Proffer Pursuant to Rule 103(a)(2) and Limiting Briefing |
| 07/06/2023 | 3872 | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust filed by Debtor Highland Capital Management, L.P. and the Highland Claimant Trust |
| 07/21/2023 | 3888 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by Highland Capital Management, L.P. |
| 07/21/2023 | 3889 | Post-Confirmation Report for Highland Capital Management, LP for the Quarter Ending June 30, 2023 filed by the Highland Claimant Trust |
| 08/17/2023 | 3901 | Withdrawal of HMIT's Unopposed Motion to File Exhibit Under Seal filed by Creditor Hunter Mountain Investment Trust |
| 09/08/2023 | 3905 (3905-1 — 3905-6) | Motion to Alter or Amend Order, to Amend or Make Additional Findings, for Relief from Order, or, Alternatively, for New Trial Under Federal Rules of Bankruptcy Procedure 7052, 9023, and 9024 and Incorporated Relief Filed by Creditor Hunter Mountain Investment Trust |

---

[4] HMIT understands that the Court struck this proffer in docket entry 3869. Because the proffer appears to remain on the record and to avoid any argument that HMIT has failed its burden to designate the record, HMIT designates this docket entry out of an abundance of caution.

Vol. 43
010135
010136

| 09/11/2023 | 3907 | Clerk's Correspondence regarding HMIT's Notice of Appeal |
| 09/22/2023 | 3928 | Notice Regarding Appeal and Pending Post-Judgment Motion filed by HMIT |

**B.     Exhibits.**

Further, the Parties submitted hearing exhibits. HMIT designates for inclusion in the record for appeal all the hearing exhibits submitted to the Court, which were all electronically filed and are in the Court's record and are a part of this Appellate Record. (Docs. 3817 and 3818). The following exhibits are submitted and included in the Court's record:

| **HMIT Exhibits** <br> **(Dkts. 3818, 3818-1, 3818-2, 3818-3, 3818-4, 3818-5. 3818-6, 3818-7, 3818-8, and 3818-9)** |
| HMIT Exhibits 1-4, 6-80 |
| **HCM Exhibits** <br> **(Dkts. 3817, 3817-1, 3817-2, 3817-3, 3817-4, 3817-5)** |
| HCM Exhibits 2-15, 25-34, 36, 38-42, 45-46, 51, 59-60, 100 |

Dated:  October 23, 2023

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: */s/ Sawnie. A. McEntire*
    Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347

*Attorneys for Hunter Mountain Investment
Trust*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served via ECF notification on October 23, 2023, on all parties receiving electronic notification.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-44   Main Document   Filed 03/07/23   Page 137 of 389   Page 15 of 235   PageID 9343

Dondero - Cross                                    169

 1   A    I don't know.

 2   Q    If you don't remember, that's fine.

 3   A    I don't remember, yeah.

 4           MR. MCENTIRE:  Your Honor, would he please give the

 5   witness an opportunity to answer?  He's interrupted three

 6   times in less than five seconds.  Give the witness an

 7   opportunity to respond.

 8           MR. MORRIS:  This is real easy stuff.

 9           THE COURT:  Okay.

10           MR. MORRIS:  I'm trying to cross him here.

11           MR. MCENTIRE:  Your Honor, with all due respect, he's

12   making it very difficult because he's being very aggressive --

13           MR. MORRIS:  Nah.

14           MR. MCENTIRE:  -- and he's interrupting the witness.

15           MR. MORRIS:  I would never.

16           THE COURT:  Okay.  I don't feel the need to do that

17   right now, but I will -- I will consider your request.

18           THE WITNESS:  Can I give a complete answer to his

19   last question, or one that I'd like to be my answer on the

20   record?

21           THE COURT:  Go ahead.

22           THE WITNESS:  The governing responsibility as a

23   registered investment advisor is you're not allowed to buy

24   back from investors fund interests or investments unless you

25   offer it to everybody else, in writing, in that fund first.

009626

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-44   Filed 01/17/23   Page 16 of 235   PageID 9344
Main Document   Page 17 of 382

Dondero - Cross                            170

```
 1    That's the Investment Advisers Act as I understand it, and
 2    that is what was improper in the HarbourVest transaction.  I
 3    mean, besides the fact that the pricing was wrong, they misled
 4    HarbourVest.  And I know HarbourVest hasn't complained, but
 5    just because your investors don't complain doesn't mean you
 6    can rip them off.
 7              MR. MORRIS:  I'd really move to strike the entirety
 8    of the answer, Your Honor.
 9              THE COURT:  Granted.
10    BY MR. MORRIS:
11    Q    Mr. Dondero, HC --
12    A    I'm not going to -- I'm not answering any more questions
13    unless I can answer that question with that answer, --
14    Q    Mr. Dondero, do you --
15    A    -- because I believe it's responsive.
16    Q    Do you remember that CLO Holdco withdrew their objection?
17    A    I --
18    Q    To the HarbourVest settlement?
19    A    I don't remember.
20    Q    Do you remember that's really when Grant Scott left the
21    scene?
22    A    I don't --
23    Q    He thought it was inappropriate for them to withdraw,
24    right?
25    A    I don't remember all the details.  I know they made some
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Filed 01/17/23   Page 17 of 235   PageID 9345
Main Document   Page 17 of 389

Dondero - Cross                                 171

 1    mistakes, and there's a tolling agreement against Kane's

 2    (phonetic) firm for making mistakes, and, you know, whatever.

 3    But I -- I don't remember all the details.

 4    Q   And a couple of months later, you conspired with Mr.

 5    Patrick to try to sue Mr. Seery in order to try to get that

 6    very same interest in HCLOF, right?

 7             MR. MCENTIRE:  Your Honor, I have to object.  There's

 8    no foundation and it's also highly argumentative and I move to

 9    object.  That's a -- that's a question asked in bad faith.

10             THE WITNESS:  I deny any conspiring.

11             MR. MORRIS:  Okay.

12             THE COURT:  Sustained.

13    BY MR. MORRIS:

14    Q   In April, Mr. Patrick filed a lawsuit on behalf of CLO

15    Holdco a couple of weeks after getting appointed as the head

16    of CLO Holdco and the DAF about the HarbourVest settlement.

17    Isn't that right?

18    A   I believe so.

19    Q   Okay.  And you worked with him on that, right?

20    A   I -- I did not work with him on that.  I was very just

21    tangentially aware.

22    Q   Okay.

23             MR. MORRIS:  I'm just going to refer the Court -- I'm

24    going to move for the admission into evidence of the second

25    contempt order.

009628

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-44   Filed 08/07/23   Page 18 of 235   PageID 9346
Main Document   Page 18 of 389

Dondero - Cross                                    172

1          THE COURT:  Exhibit what?

2          MR. MORRIS:  Just one moment, Your Honor.

3      (Pause.)

4          MR. MORRIS:  You know what, I don't know that I have

5  it on the list.  I'm just going to ask the Court to take

6  judicial notice.  We had a hearing two years ago to this day,

7  and the Court found in the order that it entered at the

8  conclusion of that hearing that Mr. Patrick had abdicated his

9  responsibility to Mr. Seery.  It's one of the reasons why Mr.

10  Seery wasn't held in contempt of Court.  And I'd like -- I'd

11  like Counsel to address it now.

12          MR. MCENTIRE:  Yeah, I'll -- you said Seery, didn't

13  you?

14          MR. MORRIS:  Oh, sorry.  I said Seery.  I meant

15  Dondero.

16          MR. MCENTIRE:  (faintly)  Also, I believe it's

17  entirely irrelevant.  Judicial -- taking judicial --

18          THE COURT:  Would you speak in the microphone,

19  please?

20          MR. MCENTIRE:  I'm sorry.  Taking judicial notice of

21  something that is utterly irrelevant is not necessary, not

22  appropriate.  What this Court did two years ago roughly to the

23  day -- and I assume he's correct -- has no bearing on anything

24  before the Court today.  Nothing.  This has zero connection,

25  nexus, under any analysis, any fair scrutiny, dealing with the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Page 19 of 235   Filed 01/17/23   Page 19 of 235   PageID 9347

Dondero - Cross                      173

```
 1   colorability of the claim that Hunter Mountain, who was not

 2   involved in those proceedings, is trying to advance here.  And

 3   it would be -- it would be improper for this Court to even

 4   take it under judicial notice.

 5              THE COURT:  Okay.  Response?

 6              MR. MORRIS:  Can I respond?

 7              THE COURT:  Uh-huh.

 8              MR. MORRIS:  Okay.  So, Your Honor, I'm going to move

 9   for the introduction into evidence of Exhibit 45.  It is the

10   Charitable DAF complaint that was filed in the federal

11   district court on April 12, 2021, under the direction of Mark

12   Patrick, who today stands here as the representative of Hunter

13   Mountain.

14       This was the complaint, if Your Honor will recall, that

15   they tried to amend and we had a hearing here about the

16   circumstances, because that amendment was going to name Mr.

17   Seery personally, in violation of the gatekeeper order.

18   Right?

19              THE COURT:  Uh-huh.

20              MR. MORRIS:  And so it is all tied together.  If you

21   go to Paragraph 77 of this exhibit, it says, HCLOF holds

22   equity in MGM Studio.  This is the exact same transaction,

23   right?  So, so Mr. Dondero says, I gave Mr. Seery inside

24   information, he violated all of these things in the

25   HarbourVest transaction, even though he didn't say a word
```

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 01/17/23    Page 20 of 235    PageID 9348

Dondero - Cross                                          174

1    then, and here, while it's still on the restricted list,

2    before the Amazon deal is announced, they're actually in court

3    saying that they should be entitled to acquire that same asset

4    that Mr. Seery supposedly acquired improperly.  He wants it

5    for himself.

6        I mean, are you kidding me?  It's not relevant?

7            THE COURT:  I overrule the relevance objection.  It's

8    admitted.

9            MR. MORRIS:  Thank you.  And 45 is admitted, Your

10   Honor?

11           THE COURT:  45 is admitted.

12           MR. MORRIS:  Okay.

13       (Debtors' Exhibit 45 is received into evidence.)

14           MR. MCENTIRE:  Just, Your Honor, I was identifying my

15   objection in connection with his original request that you

16   take something under --

17           THE COURT:  Would you speak in the microphone?

18   Again, we --

19           MR. MCENTIRE:  Yes.  My original objection was

20   addressing his request of you, Your Honor, to take something

21   under judicial notice.  I want to make sure my objection is

22   also lodged with regard to Exhibit 45, which I understand

23   you've overruled.

24           THE COURT:  Correct.

25           MR. MCENTIRE:  Okay.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 08/07/23    Page 21 of 235    PageID 9349
Main Document    Page 21 of 789

Dondero - Cross                              175

1          THE COURT:  It is so noted.

2          MR. MORRIS:  Okay.

3          THE COURT:  You've objected and I've admitted it.

4          MR. MORRIS:  And I think I've said this already, but

5   the reason that we're requesting the Court take judicial

6   notice of its order on the second contempt proceeding is

7   because it shows that Mr. Dondero and Mr. Patrick worked

8   together, in violation of the gatekeeper, to try to suit Mr.

9   Seery to obtain the interest in HCLOF that he is sitting here

10  today saying somehow that Mr. Seery wrongfully acquired, even

11  though he didn't say a word at the time.

12          THE COURT:  Okay.  So now we're talking about not

13  Exhibit 45 --

14          MR. MORRIS:  Yes.

15          THE COURT:  -- but the order that was entered --

16          MR. MORRIS:  Correct.

17          THE COURT:  -- regarding the filing of Exhibit 45?

18          MR. MORRIS:  Exactly.

19          THE COURT:  Someone is going to need to give me a

20  docket entry number before we're done here.

21          MR. MORRIS:  Okay.

22          THE COURT:  I can and will take judicial notice of

23  that, but I need to have it --

24          MR. MCENTIRE:  So I assume, for the record, my

25  objection is overruled?

009632

1          THE COURT:  Your objection is overruled.

2          MR. MCENTIRE:  Thank you.

3          MR. MORRIS:  All right.

4    BY MR. MORRIS:

5    Q    You mentioned something about, I think, was it NXDT or

6    NHF?

7    A    Yes.

8    Q    And just let me see if I can do it this way.  Right?  So

9    there used to be a fund known as the NexPoint Strategic

10   Opportunities Fund, right?

11   A    Yes.

12   Q    Okay.  And in 2020 that was a closed-in fund.  Correct?

13   A    Yes.

14   Q    And it traded under the ticker symbol NHF, correct?

15   A    Yes.

16   Q    And then late in 2021 the name of the fund was changed to

17   NexPoint Diversified Real Estate Trust, correct?

18   A    Yes.

19   Q    And the ticker symbol changed from NHF to NXDT, correct?

20   A    Yes.

21   Q    And then it became a REIT the following year, right?

22   A    Yes.

23   Q    And I'm just going to refer to these letters as the Fund;

24   is that fair?

25   A    That's fine.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 10/17/23    Page 23 of 235    PageID 9351
Main Document    Page 17 of 389

Dondero - Cross                                    177

1  Q    For purposes of these questions.  And you were the Fund's

2  portfolio manager, the president, the principal executive

3  officer, correct?

4  A    Yes.

5  Q    And another entity that you controlled, NexPoint Advisors,

6  provided advisory services to the Fund, correct?

7  A    Yes.

8  Q    And you controlled NexPoint Advisors at all times,

9  correct?

10 A    Yes.

11 Q    Okay.  And the Fund was publicly traded, right?

12 A    Yes.

13 Q    And the Fund owned shares of MGM at the end of 19 -- at

14 the end of 2020, correct?

15 A    Yes.

16 Q    In fact, as of December 2020, MGM was one of the Fund's

17 ten largest holdings, with -- valued at over $25 million.

18 Isn't that right?

19 A    Yes.

20 Q    And by the end of 2021, MGM was the Fund's fifth largest

21 holding, with assets -- with a value of over $40 million.

22 Correct?

23 A    Yes.

24 Q    And the Fund also held MGM common stock indirectly; isn't

25 that right?

1    A    Yes.

2    Q    In fact, when the Amazon deal closed at the -- in March of

3    2022, the Fund issued a press release disclosing that it stood

4    to receive over $125 million on the MGM shares that it held

5    directly and indirectly.  Correct?

6    A    We issued several press releases.  I don't remember --

7    Q    Okay.  Do you remember that, that as a result of the MGM

8    sale, the Fund was expected to receive approximately $126

9    million?

10   A    Yes.

11   Q    Okay.

12   A    Roughly.

13   Q    All right.  In October 2020, just a few weeks before you

14   sent your email, the Fund announced the commencement of a

15   tender offer to acquire outstanding shares at a certain price.

16   Correct?

17   A    Yeah, I believe so.

18   Q    And you authorized that, right?

19   A    Yes.

20   Q    And when a fund acquires shares and then retires them, the

21   shareholders who did not tender consequently own a larger

22   percentage of the fund than they did before the tender,

23   correct?

24   A    Yes.

25   Q    Okay.  And the tender was completed in January, in the

Dondero - Cross                              179

 1   first week of January 2001 [sic], correct?

 2   A    I don't remember when it was complete.

 3   Q    It started at the end of October 2020, and it ended

 4   sometime in January '21.  Is that fair?

 5   A    Okay.  I don't remember.  Okay.

 6   Q    Do you want me to refresh your recollection?

 7   A    I'm just saying I don't remember.

 8   Q    Yeah, okay.

 9   A    I'm not dis...

10   Q    Okay.

11   A    -- denying it.  I just don't remember the exact dates.

12        (Discussion.)

13            MR. MORRIS:  Your Honor, can I mark for

14   identification purposes Plaintiffs' Exhibit -- I'm just going

15   to call it 100, to see if it refreshes the witness's

16   recollection?

17            THE COURT:  You may mark it.

18            MR. MORRIS:  Okay.

19            THE COURT:  We'll see where it goes from there.

20        (Debtors' Exhibit 100 is marked for identification.)

21   BY MR. MORRIS:

22   Q    So, I've put --

23            MR. MCENTIRE:  Hold it.  Your Honor, I think we're

24   now marking exhibits that we haven't put on an exhibit list.

25            MR. MORRIS:  I'm trying to refresh his recollection.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-44   Filed 08/07/23   Page 26 of 235   PageID 9354
Main Document   Page 173 of 389

                        Dondero - Cross                        180

    1            MR. MCENTIRE:  Okay.

    2            MR. MORRIS:  Yeah.

    3            MR. MCENTIRE:  Well, --

    4            THE COURT:  Yes.

    5            MR. MORRIS:  Okay?  I haven't offered it in -- I

    6    haven't offered it --

    7            THE COURT:  I've not admitted -- I don't know what it

    8    is.  I haven't admitted it yet.  I'm waiting.

    9            MR. MORRIS:  I haven't offered it into evidence.  He

   10    said he doesn't remember, --

   11            THE COURT:  Okay.

   12            MR. MORRIS:  -- I've got an SEC document here, and

   13    I'm going to try and refresh his recollection.

   14            THE COURT:  Okay.

   15    BY MR. MORRIS:

   16    Q    You're familiar with these forms, right?

   17    A    Generally.

   18    Q    In fact, in fact, you sign them in your capacity as the

   19    fund portfolio manager, right?  Your signature is put on it,

   20    anyway?

   21    A    Generally.

   22    Q    Yeah.  And do you see that this is the Form N-CSR that was

   23    filed with the SEC at the end of 2001 [sic] on behalf of

   24    NexPoint Diversified Real Estate Trust?

   25    A    Yes.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Page 27 of 235   PageID 9355
Page 807 of 798   Page 27 of 235   PageID 9355

Dondero - Cross                          181

1   Q    Okay.  So if you just turn to Page 16.  And the numbers

2   are kind of at the bottom in the middle of the page.  You'll

3   see the notes to the consolidated financial statements.

4   A    Yes.

5   Q    Okay.  And Note 1 discusses the organization.  Do you see

6   that?

7   A    Yes.

8   Q    And at the bottom of the left-hand column, it says, On

9   January 8, 2021, the company announced the final result of its

10  exchange offer pursuant to which the company purchased the

11  company's outstanding -- the company's common shares in

12  exchange for certain consideration.

13       Do you see that?

14  A    Yes.

15  Q    That's a reference to the tender offer that you authorized

16  at the end of October, correct?

17  A    Yes.

18  Q    And then at the bottom it says, The company share --

19  company -- excuse me.  I strike that.  It says, quote, The

20  common shares at a price of $12 per common share, for an

21  aggregate purchase price of approximately $125 -- $105

22  million.  Upon retirement of the repurchased shares, the net

23  asset value was $152 million, or $17.41 million.

24       Do you see that?

25  A    Yes.

1  Q    Does that refresh your recollection that the tender offer

2  was completed at the beginning of January?

3  A    Yes.

4  Q    And that's with all of the MGM stock that the Fund still

5  owned at that time, right?

6  A    Yeah.  We -- we didn't -- we didn't violate --

7  Q    You didn't --

8  A    We didn't -- we didn't violate like Seery did.  We didn't

9  sell any shares or buy shares.

10 Q    Okay.

11          MR. MORRIS:  I'm going to move to strike that, Your

12 Honor.

13          THE COURT:  So granted.

14          MR. MCENTIRE:  Well, Your Honor, I've actually got a

15 response to his motion to strike.  This entire inquiry is

16 irrelevant.

17          MR. MORRIS:  Not --

18          MR. MCENTIRE:  This has no relevance at all in

19 connection with the allegations that we're making in this

20 case.

21          THE COURT:  Your response?

22          MR. MORRIS:  My response, Your Honor, if you ask me

23 -- let me just get a few more questions.  He personally owned

24 shares in the Fund.  The Fund owned shares in MGM.  And

25 notwithstanding the restricted material, this is the insider,

Dondero - Cross                          183

1   and he is benefiting from himself through the Fund's

2   repurchase of these shares in the tender offer, and he went

3   and he had substantial holdings.  I'll get to that in a

4   minute.

5        So he is actually doing something worse than what Mr.

6   Seery -- what he accuses Mr. Seery of, because he's buying

7   shares for his own personal benefit.  Right?  He's the

8   insider.  Right?  And the Fund owns the shares directly.

9   There's never going to be an allegation that HCLOF ever owned

10  any MGM stock.  Never.

11            THE COURT:  Okay.  I'm going to allow this.

12  Obviously, on redirect, you can further question on this --

13            MR. MCENTIRE:  Well, --

14            THE COURT:  -- to --

15            MR. MCENTIRE:  Well, first of all, his suggestions

16  and his accusations are purely argumentative.

17            THE COURT:  Would you please speak in the microphone?

18  We --

19            MR. MCENTIRE:  Well, he's standing in the way, Your

20  Honor.

21            THE COURT:  Well, --

22            MR. MCENTIRE:  It's irrelevant.

23            THE COURT:  There are two.  There's room for both of

24  you.

25        Continue.  Go ahead.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 24   Main Document   Filed 12/07/23   Page 30 of 235   PageID 9358

Dondero - Cross                                    184

| | |
|---|---|
| 1 | MR. MCENTIRE:  It's entirely irrelevant, and it's |
| 2 | argumentative. |
| 3 | THE COURT:  Okay.  Overruled.  You can continue. |
| 4 | BY MR. MORRIS: |
| 5 | Q    You did own an awful lot of the Fund's shares, didn't you? |
| 6 | A    I owned some. |
| 7 | Q    You owned some?  You owned millions, right? |
| 8 | A    Yes. |
| 9 | Q    Okay.  And as a result of the tender, you owned a greater |
| 10 | interest of the Fund, right? |
| 11 | A    Yes. |
| 12 | Q    And therefore you owned a greater number -- a greater |
| 13 | portion of the MGM stock, the $125 million of MGM stock that |
| 14 | was owned directly and indirectly by the Fund, correct? |
| 15 | A    You do know insiders weren't permitted to participate in |
| 16 | the tender, which would have kept my percentage the same. |
| 17 | Q    Sir, you benefitted -- you didn't stop the tender, right? |
| 18 | You didn't say, now I know what's going to happen, I should |
| 19 | stop it?  You benefitted from the tender.  Can we just agree |
| 20 | on that? |
| 21 | A    I did everything I was supposed to do, notifying |
| 22 | Compliance.  If they thought it was material, they would have |
| 23 | -- it was in their hands once I notified Compliance of the |
| 24 | material -- |
| 25 | Q    Okay. |

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 28-14    Filed 12/07/23    Page 31 of 235    PageID 9359
Main Document    Page 30 of 392

Dondero - Cross                    185

1   A    -- nonpublic information.

2   Q    I appreciate that.  I just want --

3   A    It wasn't my responsibility to do Compliance's job to call

4   you or call --

5   Q    Okay.

6   A    -- the SEC or call anybody else.

7   Q    But you will agree that, even though you had material

8   nonpublic inside information, you didn't take any steps to

9   stop the tender, correct?

10  A    The tender was for a relatively small amount of the stock.

11  But I did -- I would -- it would not be my responsibility to

12  change or adjust the tender --

13  Q    Okay.

14  A    -- or what was happening.

15  Q    Okay.  And then the last question is, you benefitted from

16  the tender because the Fund repurchased shares, which

17  increased your percentage ownership of the Fund, and therefore

18  your percentage ownership of the MGM shares that were held

19  directly and indirectly.  Is that fair?

20  A    Marginally, I guess.  Yes.

21  Q    Okay.  From the -- from the millions of shares, you would

22  describe it as marginal?  Okay.

23       Let me move on.  You've testified now that you spoke with

24  representatives of Farallon in the late spring, I guess

25  beginning on May 28th.  Right?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-44    Filed 12/07/23    Page 32 of 235    PageID 9360
Main Document    Page 1733 of 392

Dondero - Cross                                      186

 1   A    Yes.

 2   Q    And that was two days after the MGM deal was publicly

 3   announced, correct?

 4   A    Yes.

 5   Q    Okay.  And had you ever communicated with Mr. Patel before

 6   that phone call?

 7   A    I don't believe so.

 8   Q    And then you spoke with Mr. Linn shortly after?

 9   A    Yes.

10   Q    Had you ever spoken with Mr. Linn before that phone call

11   with Mr. Linn?

12   A    I don't believe so.

13   Q    So these phone calls were the very first time that you

14   ever spoke to either one of these gentlemen.  Is that right?

15   A    That I can remember.

16   Q    Okay.

17   A    If I ran into them at --

18   Q    Uh-huh.

19   A    -- a conference a decade ago, I don't know, but --

20   Q    And they told you that they bought the shares in the

21   February-March time frame, right?

22   A    Yes.

23   Q    And you have no reason to dispute that, correct?

24   A    Correct.

25   Q    Okay.  And you didn't know how much they had paid for the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Filed 10/07/23   Page 33 of 235   PageID 9361
Page 32 of 239

Dondero - Cross                                    187

1   claims as a result of these conversations, correct?

2   A    They did not admit a price.

3   Q    Okay.  And it's your testimony that there wasn't

4   sufficient information in the public for them to buy -- this

5   is your view -- that there wasn't sufficient information in

6   the public to justify their purchases.  Is that your view?

7   A    Correct.

8   Q    And even though you didn't think there was sufficient

9   information in the public, you were prepared to pay 30 percent

10  more than they did, right?

11  A    Yes.

12  Q    And is that because you were 30 percent more irrational

13  than them or because you had material nonpublic inside

14  information?

15          MR. MCENTIRE:  Objection.  Argumentative, Your Honor.

16          THE COURT:  Overruled.

17          THE WITNESS:  Even at a 30 percent premium, it was

18  less than I offered the UCC several months earlier, number

19  one.

20      Number two, I was still under the illusion there was a

21  desire to resolve the place, not burn it down.  You know,

22  there was -- all the original members were happy to sell at

23  $150 million.  It was a $500 or $600 million estate.  There

24  should be $400 or $500 million of residual value.  It

25  shouldn't all be going out the door to lawyers and others.

Dondero - Cross                              188

1   BY MR. MORRIS:

2   Q    You were willing to pay 30 percent more for an unknown

3   purchase price, 30 percent more of an unknown purchase price,

4   at a moment that you didn't believe there was sufficient

5   information to buy the claims, correct?

6   A    You have a couple misstatements in there.  The Grosvenor

7   piece was public.  The Grosvenor piece traded at $67 million.

8   So we knew that piece trade at around 50 cents.  We knew from

9   people in the marketplace the other pieces were trading right

10  around that level.

11        So I wasn't just offering 30 percent on any willy-nilly

12  number, 130 percent of any willy-nilly number.  I knew they

13  had paid around 50, 60 cents.  And so I was offering 30

14  percent more than that.  Thirty percent more than $150

15  million, call it $200 million.  I had offered $230 or $240

16  million to resolve the whole estate before the plan went

17  effective, and I got no response from the original UCC

18  members.

19  Q    So why didn't you just try to settle the case with them?

20  Why did you try to buy the claim?  Why, if you had these new

21  people, and your good intentions were to finally get to a

22  settlement of the case, why didn't you say, hey, guys, how do

23  we resolve the case?  Why did you want to buy the claims at a

24  30 percent premium over what they paid with no knowledge and

25  no diligence, according to you?  Can you explain that to Judge

Dondero - Cross                              189

 1 | Jernigan?

 2 | A    Because Seery told them to hold on, don't worry, they were

 3 | going to make $270 million.

 4 | Q    That doesn't answer my question.  Why didn't you try --

 5 | you had new owners.  Why didn't you try to settle with them?

 6 | A    When someone owns an asset, buying their asset is settling

 7 | with them.  What claim does Farallon have against us?  At that

 8 | point, they had no claims against us.

 9 | Q    It doesn't settle the case, does it?

10 | A    But if we owned all the claims, it would settle the case.

11 | Just like if Seery had objected to the claims trading that

12 | they were supposed to give written notice to the Court, he had

13 | enough cash on the balance sheet to buy and retire all the

14 | claims.

15 | Q    All right.  Let's go back, I apologize, to that Exhibit

16 | 11.  No, it's not Exhibit 11.  I think it's their Exhibit 4,

17 | your notes.

18 |            MR. MORRIS:  Your Honor, may I have -- just have one

19 | moment?

20 |            THE COURT:  You may.

21 |            MR. MORRIS:  Can you tell me how long I've been

22 | going?  That's really my question.

23 |            THE CLERK:  So, on cross, --

24 |            MR. MORRIS:  Yeah.

25 |            THE CLERK:  -- you've been going for 32 minutes.

009646

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 34-4    Filed 10/09/23    Page 36 of 235    PageID 9364
Main Document    Page 179 of 388

Dondero - Cross                                    190

1          MR. MORRIS:  Okay.  Trying to speed this up.

2   BY MR. MORRIS:

3   Q    All right.  So, do we have your handwritten notes, which

4   are Exhibit 4, in this binder?  Oh.

5          THE COURT:  Do you want to put it up again on the

6   screen?

7          MR. MORRIS:  Ms. Canty, if you're listening and you

8   can do that, that would be great.  If not, --

9       (Discussion.)

10         MS. CANTY:  One second, John.

11         MR. MORRIS:  All right.  He -- he's got it.

12         THE COURT:  Okay.

13  BY MR. MORRIS:

14  Q    Okay.  So, I just -- I just want to make -- you know,

15  follow up on a few questions I asked you earlier on *voir dire*.

16  So, these are your notes, right, and you said you write down

17  the important stuff.  Correct?

18  A    I write down, yeah, the stuff I thought I would need for

19  the next call.

20  Q    Okay.  And, you know, again, just so we have it all in one

21  spot, it doesn't say anything about MGM.  Correct?

22  A    It does not.

23  Q    It doesn't say anything about a *quid pro quo*, correct?

24  A    *Quid pro*?  Uh, no, it does not.

25  Q    It doesn't say anything at all about Mr. Seery's

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-44   Filed 12/01/23   Page 37 of 235   PageID 9365
Main Document   Page 1793 of 788

                    Dondero - Cross                    191

 1   compensation, correct?

 2   A    It does not.

 3   Q    It doesn't say anything about the sharing of material

 4   nonpublic inside information, correct?

 5   A    When I told them discovery was coming, that was my

 6   response to I knew they had traded on material nonpublic

 7   information.

 8   Q    Okay.  That -- you told them that?

 9   A    Yes.

10   Q    Is that what you're saying now?

11   A    Yes.

12   Q    Oh, so that's what you told them?  They didn't tell you

13   that; that's what you told them?

14   A    Yes.

15   Q    And that's why you wanted discovery, right?

16   A    I thought it would be a lot easier to get discovery on a

17   situation like this than it has been for the last two years,

18   yes.

19   Q    Okay.  Um, --

20   A    In fact, I told them that it would be coming in the next

21   few weeks.  And this has been a couple years.

22   Q    And that's exactly what you did, right?

23   A    Well, we've been trying for two years to get --

24   Q    Right.

25   A    -- discovery in this.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Page 38 of 235   PageID 9366
                    Page 37 of 234

                    Dondero - Cross                      192

 1   Q    Okay.  So you filed your Texas 202, right?

 2   A    I don't know who filed what.

 3   Q    That was the one by Mr. Sbaiti that was filed under your

 4   name?  Do you remember that?

 5   A    Generally.

 6   Q    Okay.  Let's take a quick look at that document.  It's #3

 7   in our binder.

 8   A    Binder #3?

 9        (Discussion.)

10            MR. MORRIS:  Okay.  I think #3 is in evidence, Your

11   Honor.

12            THE WITNESS:  Number 3 is in evidence.

13            THE COURT:  Yes.

14            MR. MORRIS:  Okay.

15            THE COURT:  It is.

16   BY MR. MORRIS:

17   Q    And if you can turn to the last page, Mr. Dondero.  Page

18   8.

19   A    Yes.

20   Q    Okay.  And that's your signature, right?

21   A    Yes.

22   Q    And you verified that this document was true and correct

23   within the best of your personal knowledge, correct?

24   A    Yes.

25   Q    Did you read it before you signed it?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-4 Filed 10/09/23   Page 39 of 235   PageID 9367
Main Document   Page 179 of 388

Dondero - Cross                                  193

```
 1   A    Probably.

 2   Q    You don't recall doing that?

 3   A    Not at this moment.

 4   Q    And you may not have.  Is that fair?

 5   A    No, I probably did.  Do you have a question?

 6   Q    I'm just wondering if you signed it or not.

 7   A    I did sign it.

 8   Q    Okay.  Good.  So, can you go to Paragraph 21?  Well, let's

 9   start at Paragraph 20.  It says that Mr. Seery, quote, has an

10   age-old connection to Farallon, and upon information and

11   belief, advised Farallon to purchase the claims.

12        Do you see that?

13   A    Yes.

14   Q    And then the next paragraph you refer to the telephone

15   call that you had with Michael Linn, right?

16   A    Yes.

17   Q    It doesn't refer to any phone call with Mr. Patel,

18   correct?

19   A    It does not.

20   Q    And the only reason that you swore under oath you were

21   told that Farallon purchased the claims was because of

22   Farallon's, quote, prior dealings with Mr. Seery.  Correct?

23   In Paragraph 21, it says, Relying entirely on Mr. Seery's

24   advice solely because of their prior dealings?

25   A    Yes.
```

009650

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 07/12/23    Page 40 of 235    PageID 9368
Main Document    Page 17923 of 389

Dondero - Cross                              194

1    Q    Okay.  You didn't -- you didn't swear under oath at that

2    time that you were told that they bought the claims because of

3    MGM.  Right?

4    A    If you're asking if this is -- it seems like it's not

5    complete, if that's what you're asking me.

6    Q    I'm not asking you that.  I'm asking you what -- I'm

7    asking you to confirm that you swore under oath to the Texas

8    state court, just weeks after you had these conversations,

9    about what you were told concerning Farallon's purchase of the

10    claims.

11        I'm focused on Paragraph 21.  The only reason that you

12    gave, that you told the Texas state court under oath, was that

13    Farallon told you they bought their claims because of their

14    prior dealings with Seery.  Right?

15    A    Yeah.  And that's true.  And that's consistent with what

16    I've said.

17    Q    Okay.  You didn't say anything about MGM, correct?

18    A    Correct.

19    Q    You didn't say anything about a *quid pro quo*, correct?

20    A    Correct.

21    Q    You didn't say anything about Mr. Seery's compensation.

22    Correct?

23    A    I did not.

24    Q    You didn't say anything about the sharing of material

25    nonpublic inside information, correct?

009651

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-44    Main Document Filed 03/07/23    Page 1793 of 389    Page 41 of 235    PageID 9369

Dondero - Cross                                    195

1    A    Different document, different purposes.

2    Q    Well, but that's now two documents.  You have your notes

3    and you had this document, neither one of which say any of

4    those things.  Fair?

5    A    Different documents, different purposes.  I don't know if

6    that's --

7    Q    Is it fair that neither one of those documents say any of

8    those things?

9    A    It's fair that they don't all match.

10   Q    Okay.  Okay.  Well, that's a fair statement.  Let's go to

11   the next one.  Do you remember the next year you filed an

12   amended petition?

13   A    What tab?

14   Q    That's -- I appreciate that.  It's Tab 4.  Do you see at

15   the last page you've again signed a verification?

16   A    Yep.

17   Q    And do you see this one's filed with the Texas state court

18   on May 2, 2022?

19   A    Yes.

20   Q    And you swore under oath that this statement was complete,

21   true, and accurate to the best of your knowledge, correct?

22   A    Yes.

23   Q    Okay.  Can you go to Page 5, please?

24   A    Yes.

25   Q    Directing your attention to Paragraph 23, do you see where

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-44   Filed 01/08/24   Page 42 of 235   PageID 9370
Main Document   Page 17793 of 382

Dondero - Cross                          196

1   you say now that Farallon was relying, quote, on Mr. Seery's

2   say-so because they had made so much money in the past when

3   Mr. Seery told them to purchase claims.

4       Do you see that?

5   A   Yes.

6   Q   Again, you don't say anything about MGM, correct?

7   A   Correct.

8   Q   Again, you don't say anything about material nonpublic

9   inside information, correct?

10  A   Well, on 24 it does.  Right?  Mr. Seery had inside

11  information on the price and value of claims.  So, you've got

12  to look at all of the bullet points.

13  Q   But that's not the paragraph where you're talking --

14  that's -- it says, in other words.  That's not the paragraph

15  where you're describing your conversation with Farallon.

16  That's your interpretation of it, correct, just as you just

17  said?

18  A   (no immediate response)

19  Q   You told -- I'm sorry.  I should let you finish the

20  answer.  That's your interpretation of it, correct?

21  A   Well, I'm reading all the bullets in aggregate, and it's

22  -- it's a picture of material information shared by Seery, not

23  just MGM or one particular investment, but on all the other

24  assets that aren't detailed in any of the public filings,

25  also.

009653

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Filed 02/07/23   Page 43 of 235   PageID 9371
Page 207923 of 389

Dondero - Cross                                197

```
 1   Q   The only -- the only point I want to make, I think we can
 2   agree on this --
 3   A   Okay.
 4   Q   -- is that you believed that Mr. Seery gave them material
 5   nonpublic inside information.  Farallon never told you that.
 6   Isn't that true?  That's why you wanted discovery?
 7   A   They said they relied on him and did no diligence of their
 8   own.  They were very express -- explicit about that.
 9   Q   Okay.  Can you answer my question now?
10   A   Which -- I thought -- that does, --
11   Q   You concluded --
12   A   -- yes.
13   Q   -- that Mr. Seery gave them material nonpublic inside
14   information.  They never told you that.  Fair?
15   A   They said they relied on -- solely on Seery, didn't buy it
16   for any other reason, and they did no due diligence of their
17   own.
18   Q   Okay.  Let's go to the next one.  Now, the no-due-
19   diligence part, that's not in any version we've seen, right?
20   That's something that you just --
21   A   No, no, --
22   Q   -- that you're just testifying to now?  That's not in your
23   notes, it's not in Version 1, and it's not in this version,
24   correct?
25   A   Well, let's go back to the Linn one, because when I was
```

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-44    Filed 07/19/23    Page 44 of 235    PageID 9372
Main Document    Page 44 of 239

Dondero - Cross                                198

1    going back and forth and he wouldn't give a price, he kept

2    saying, Seery told us it's worth a lot more.  And I kept

3    saying, you've got to look at the burn, you've got to look at

4    the professionals.  And --

5    Q    Okay.

6    A    -- that's --

7    Q    Shortly after this, you filed yet another declaration,

8    right?

9    A    Yes.

10   Q    Uh-huh.  Can you turn to #5?  And this is another version

11   of your recollection of what you were told, correct?  In

12   Paragraph 2?

13   A    These are all -- I don't know why you're saying they're

14   different.  They're all the same.  They're just slightly

15   different verbiage.  What's the major difference between any

16   of them?

17   Q    I'll ask, I'll ask you the question.  The question is, you

18   had never written in any of the prior versions that they

19   didn't do any due diligence; isn't that right?  You never --

20   you never talked about their due diligence in any prior

21   version, correct?

22   A    It's all -- it's all the same version.  I don't -- some

23   versions --

24   Q    Can you answer my question?

25   A    I don't know.  I don't know --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Filed 08/07/23   Page 45 of 235   PageID 9373   Page 1 of 793

Dondero - Cross                                199

1    Q    Which --

2    A    -- which ones included which -- I don't --

3    Q    We've just looked at them.  Do you want to look at them

4    again?

5    A    I just looked at one page in the other one and it was five

6    pages.  I just looked at the one page and I found two or three

7    things --

8    Q    Your notes --

9    A    -- it didn't include, but --

10        MR. MORRIS:  You know what.  I don't want to argue.

11   They say what they say, Your Honor, and I would ask the Court

12   to look carefully at our objection to the motion because we

13   lay all of this out.

14        Your Honor can -- here's the point, because I do want to

15   finish up right now.  There are five different versions of

16   this conversation.  They're laid out in the brief.  And the

17   question that you have to ask yourself, Your Honor, is, if you

18   allow this case to go forward, how do they make a colorable

19   claim when the story keeps changing?

20        And I'll just leave it at that, because, you know, the

21   last version says MGM for the first time.  Like, it comes out

22   of nowhere.  This -- his notes don't say it, he hasn't

23   testified that that's what he was told, but somehow that's in

24   his sworn statement.

25        So I'm just going to rest on the papers, because this is

Dondero - Cross                                  200

1   -- I don't want to be argumentative.

2          THE COURT:  Okay.

3          MR. MCENTIRE:  Well, I'll object to the argument of

4   counsel.  He's just doing another opening statement here, and

5   it's inappropriate and not proper.

6          THE COURT:  Okay.  I agree.  This is Q and A.

7          MR. MORRIS:  Okay.

8          THE COURT:  So, --

9   BY MR. MORRIS:

10  Q   Do you know -- do you have any knowledge or information as

11  to how Mr. Seery's compensation was established?

12  A   Uh, --

13  Q   Withdrawn.  I'm talking now not in his capacity as an

14  independent director or the CEO of the Debtor.  I'm only

15  talking about in his capacity as the CEO of the Reorganized

16  Debtor and the Claimant Trustee.  Do you have any personal

17  knowledge as to how his compensation was established?

18  A   The knowledge I have is that the Claimant Trust gives full

19  latitude to change it at almost any time they want.  Add more

20  to it, add more than that we've seen, double it in the future

21  if reserves are reversed.  It can do anything it wants.  And I

22  guess we've seen some redacted partial statements of his

23  compensation, but that's all I know.

24  Q   Okay.  You have no knowledge about how Mr. Seery's

25  compensation package was determined, correct?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-44    Filed 08/02/23    Page 47 of 235    PageID 9375
Main Document    Page 207 of 789

Dondero - Redirect                         201

1    A    I was not involved.

2    Q    Okay.  You've never -- I'll just leave it at that.

3              MR. MORRIS:  I have nothing further, Your Honor.

4              THE COURT:  Okay.  Pass the witness.  I'm sorry, I

5    guess I should ask, do any of the other responding parties

6    have examination?

7              MR. STANCIL:  No, Your Honor.

8              THE COURT:  No?  Okay.  Redirect?

9              MR. MCENTIRE:  Just very briefly, Your Honor.

10             THE COURT:  Okay.

11             MR. MCENTIRE:  Thank you, Your Honor.

12                        REDIRECT EXAMINATION

13   BY MR. MCENTIRE:

14   Q    Mr. Dondero, you remember the questions about Judge

15   Jernigan walking into the courtroom on June 8 two years ago

16   saying, MGM is sold, maybe we can settle this case?  Do you

17   recall those questions?

18   A    Yes.

19   Q    And do you remember Mr. Morris's dramatic suggestion that,

20   well, how did Judge Jernigan know, or to that effect?

21   A    Yes.

22   Q    Well, that had already been announced, had it not,

23   publicly?

24   A    Yes.

25   Q    Several weeks before?

009658

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Main Document    Filed 02/07/23    Page 48 of 235    Page 47 of 389    PageID 9376

                        Dondero - Redirect                        202

 1   A    Yes.

 2   Q    I'd like to direct your attention -- do you still have

 3   Exhibit 4 that he handed you?  Do you have Exhibit 4 there?

 4   A    Uh, --

 5   Q    His exhibit?

 6   A    Is that the notes?

 7   Q    No, it's -- Exhibit 4 is the verified amended petition to

 8   take deposition before suit -- take -- in the state court.  To

 9   -- deposition.

10   A    You've got to give me more of a clue.  I'm sorry.  There's

11   like six binders.

12          MR. MCENTIRE:  Mr. Morris, can you show us where the

13   exhibit --

14          MR. MORRIS:  Sure.  Which one is it?

15          MR. MCENTIRE:  It's Exhibit 4.  I'm going to talk to

16   him about Exhibit 4 (inaudible) that you've have used with

17   this witness.

18   BY MR. MCENTIRE:

19   Q    I assume -- Mr. Dondero, were you assuming from the tone

20   and the substantive content of his questions that Mr. Morris

21   is suggesting that your notes are not reliable?

22   A    He was trying to make it seem like the versions were

23   different.  They were all 90 percent the same.  Different --

24   it seemed like different emphasis for different purposes.  And

25   then you have to remember we learned more about Farallon and

 1  Stonehill over time.  Like, in the beginning, when I had --

 2  when I -- we didn't even know Stonehill was involved when I --

 3  Q    Sure.

 4  A    -- first talked to -- when --

 5  Q    Well, he made the big suggestion about you never talked

 6  about due diligence before.  Turn to Exhibit 4, Paragraph 23,

 7  which he did not address with you.  Can you turn to Paragraph

 8  23 of Exhibit 4?  Mr. Morris omitted to refer you to this

 9  particular paragraph.

10  A    23?  Go ahead.

11  Q    Would you read it into the record?

12  A    (reading)  On a telephone call between Petitioner and

13  Michael Linn, a representative of Farallon, Michael Linn

14  informed the Petitioner Farallon had purchased the claim

15  sight-unseen and with no due diligence, a hundred percent

16  relying on Mr. Seery's say-so, because they had made so much

17  in the past with Mr. -- when Mr. Seery had (overspoken).

18  Q    Now, since you've an opportunity to see other paragraphs

19  and other -- that he was otherwise not selecting, you did

20  refer to the -- to what Mr. Linn had told you about in May of

21  2021?

22  A    Yes.  I've been very consistent.  Listen, I believe

23  Farallon tapes all their conversations.  So, eventually, as

24  this goes further, I purposefully --

25  Q    Well, let's --

1        MR. MORRIS:  I move to strike, Your Honor.

2        THE WITNESS:  Okay.

3        THE COURT:  Sustained.

4   BY MR. MCENTIRE:

5   Q   He also did not direct your attention or the Court's

6   attention to Paragraph 27 of Exhibit 4, selecting --

7   presumably strategically selecting not to refer to that

8   paragraph.  Do you see Paragraph 27?

9   A   Yes.

10  Q   Could you read that into the record, please?

11  A   (reading)  However, Mr. Seery is privy to material

12  nonpublic information, inside information of many of the

13  securities that Highland deals in, as well as the funds that

14  Mr. Seery manages through Highland.  One of these assets was a

15  publicly-traded security that Highland was an insider of, and

16  therefore should not have traded, whether directly or

17  indirectly, given its possession of insider information.

18  Q   Isn't that paragraph just basically addressing MGM?

19  A   Yeah, that's the only major position we had that that

20  would apply to.

21  Q   So the suggestion that you're just making this MGM stuff

22  up is not true.  It's consistent with what you've (inaudible)

23  in other courts as well, correct?

24  A   Yes.  I believe it's disingenuous to say that there's

25  different versions of my story.

Dondero - Redirect                                    205

1   Q   Well, let's continue with Mr. Morris's strategy.  Go to

2   Exhibit 3, please.  Mr. Morris suggested that there's no

3   reference at all in any of these prior pleadings about Mr.

4   Seery's excess conversation.  Do you recall that series of

5   questions?

6   A   Yes.  Or his statements, yes.

7   Q   Yes.  And he did not direct your --

8          MR. MORRIS:  I move to strike.  I asked him if he had

9   any knowledge of the man's compensation package.  That's what

10  I asked him.

11         MR. MCENTIRE:  No, sir.  Your Honor, that's not what

12  he asked him.  That was one of the questions he asked.  The

13  other question was, there's nothing in here about

14  compensation.  That's what I'd like to address now.

15         MR. MORRIS:  Oh, go right ahead.

16         THE COURT:  Okay.

17  BY MR. MCENTIRE:

18  Q   Directing your attention --

19         THE COURT:  You can ask.  I'd have to go back and

20  check the record whether you had that second question you

21  mentioned.  I remember questions about does he have knowledge

22  of Seery's compensation.  I just can't remember if he asked,

23  --

24         MR. MCENTIRE:  Fair enough.

25         THE COURT:  -- were there references to it in the --

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 12/07/23    Page 52 of 235    PageID 9380

Dondero - Redirect                                206

```
 1              MR. MCENTIRE:  Well, --

 2              THE COURT:  -- prior pleadings.

 3              MR. MCENTIRE:  -- for the record, we'll make it clear

 4    that there is a reference.

 5    BY MR. MCENTIRE:

 6    Q   If I could direct your attention to Paragraph 23, Exhibit

 7    -- as to --

 8              MR. MORRIS:  What exhibit is it?

 9              MR. MCENTIRE:  It's Exhibit 3.

10              MR. MORRIS:  Hold on one second.

11              MS. MUSGRAVE:  Your exhibit.

12              THE COURT:  Highland's Exhibit 3.

13              MR. MORRIS:  Give me a moment.

14              THE COURT:  Page what?

15              MR. MCENTIRE:  It's Paragraph 22 on Page 5.

16              THE WITNESS:  I'm sorry.  My Exhibit 3?

17    BY MR. MCENTIRE:

18    Q   Could you read for me, please, Mr. --

19              MR. MORRIS:  Hold on one second.  It's my Exhibit 3

20    or your exhibit?

21              MR. MCENTIRE:  It's your exhibit.  This is Hunter

22    Mountain's binder.

23              MR. MORRIS:  Ah, I apologize.

24              MR. MCENTIRE:  You were just using it.

25              MR. MORRIS:  Okay.  All right.  Go ahead.  What
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document   Filed 08/07/23   Page 207 of 389   Page 53 of 235   PageID 9381

Dondero - Redirect                           207

1  paragraph were you?

2  BY MR. MCENTIRE:

3  Q    I'd direct your attention, Mr. Dondero, to Paragraph 22.

4           MR. MORRIS:   Yeah.

5  BY MR. MCENTIRE:

6  Q    Would you read -- would you read Paragraph 22 into the

7  record, please?

8  A    (reading)  Mr. Seery had much to gain by brokering a sale

9  of the claim suggested to Muck, mainly his knowledge that

10 Farallon as a friendly investor would allow him to remain as

11 Highland's CEO with virtually unfettered discretion to

12 administer Highland.  In addition, Mr. Seery's written

13 compensation package incentivized him to continue the

14 bankruptcy for as long as possible.

15 Q    There was also a series of questions to you about a

16 transaction involving NexPoint -- NexPoint Diversified Real

17 Estate Trust.  Do you recall those questions?

18 A    Yeah.  Let's talk about that.

19 Q    All right.  Tell me what the transaction was.

20 A    I'm sorry.  The tender that he was asking about or --

21 Q    Yes, the tender.

22 A    There was -- investors wanted some shares retired, and we

23 didn't have enough cash on the balance sheets.  So we tendered

24 in the form of giving them Preferred, which was like equity

25 but a better dividend or a more secured dividend, and 20

Dondero - Redirect                          208

1  percent cash.  And then insiders weren't allowed to

2  participate.  But the whole tender was only for eight or ten

3  percent of the nominal amount outstanding.  And again, you've

4  got a package of securities, so you didn't get any -- you

5  didn't cash.  And although it reduced the share count, it also

6  increased the Preferred or the claims against the company.  So

7  it was marginally accretive, I guess.

8  Q    All right.

9  A    But, again, as far as inside information is concerned,

10 Compliance is a separate party organization that reports up to

11 the SEC.  Has a dotted line to me.  Reports to the SEC.  They

12 make sure everything we do is compliant.

13 Q    Mr. Dondero, --

14 A    Yeah.  Can --

15 Q    -- you didn't participate in the transaction, did you?

16 A    No.  Insiders weren't allowed to participate in the

17 transaction.

18        MR. MCENTIRE:  Reserve the rest of my questions, Your

19 Honor.

20        THE COURT:  Any recross?

21                    RECROSS-EXAMINATION

22 BY MR. MORRIS:

23 Q    The reference to the compensation that we just looked at,

24 that was your own personal view, not something that anybody

25 from Farallon ever told you, correct?  You can go back and

Dondero - Recross                           209

 1   look.

 2   A    Yeah, that --

 3   Q    I mean, it's not a trick question.

 4   A    Yeah, that was my pleading.

 5   Q    Okay.  And that was your own speculation, if you will?  It

 6   had nothing to do with anything Farallon ever told you,

 7   correct?

 8   A    I never discussed Seery's compensation with Farallon.

 9   Q    Okay.  Thank you, sir, very much.  Just one last question.

10   The price of the tender --

11   A    Yes.

12   Q    -- was based in part on the value of the MGM stock,

13   correct?

14   A    The tender was based on market price --

15   Q    And --

16   A    -- of where the closed-in fund was trading.  It was

17   trading at a discount.  And the discount to NAV, the NAV

18   included MGM accurately marked at whatever time.

19   Q    I appreciate that.

20          MR. MORRIS:  No further questions, Your Honor.

21          THE COURT:  All right.  Mr. Dondero, that concludes

22   your testimony.

23          THE WITNESS:  Thank you.

24          THE COURT:  You are excused from the witness box.

25      (The witness steps down.)

210

```
1              THE COURT:  We probably should take a break, right?
2              MR. MORRIS:  Okay.
3              THE COURT:  Caroline, do you want to give them the
4    aggregate time used?
5              THE CLERK:  Yes.  The Defendants used 91 minutes
6    right now.  And the Respondents together, 86 minutes.
7              THE COURT:  Okay.  I thought it was going to be
8    higher than that.
9         (Laughter.)
10             MR. MCENTIRE:  That's what it feels like.
11             MR. MORRIS:  You were wishing.
12             THE COURT:  I was wishing.  Okay.  A ten-minute
13   break.
14             THE CLERK:  All rise.
15        (A recess ensued from 3:17 p.m. until 3:28 p.m.)
16             THE CLERK:  All rise.
17             THE COURT:  All right.  Please be seated.  We're back
18   on the record in the Highland matter.  Mr. McEntire, you may
19   call your next witness.
20             MR. MCENTIRE:  Your Honor, Hunter Mountain would call
21   Mr. Seery adversely.
22             MR. STANCIL:  Your Honor, we're waiting for Mr.
23   Morris for just 60 more seconds.  I think he's on his way back
24   to the courtroom.
25             THE COURT:  Okay.  I just noticed.
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Filed 02/07/23   Page 57 of 235   PageID 9385
Main Document   Page 57 of 389

Seery - Direct                                        211

1       Did I hear you say you're going to call him virtually?

2             MR. MCENTIRE:  Adversely.

3             THE COURT:  Oh, adversely?  Okay.  I'm so used to

4    hearing the word "virtually" the past few years.

5       Oh, and there he is.  Okay.

6             MR. SEERY:  I'm sorry, Your Honor.

7             THE COURT:  Mr. Seery, welcome.

8             MR. SEERY:  Good afternoon, Your Honor.

9             THE COURT:  Please raise your right hand.

10      (The witness is sworn.)

11            THE WITNESS:  I do.

12            THE COURT:  All right.  You may be seated.

13      JAMES P. SEERY, JR., HUNTER MOUNTAIN INVESTMENT TRUST'S

14                     ADVERSE WITNESS, SWORN

15                       DIRECT EXAMINATION

16   BY MR. MCENTIRE:

17   Q   Mr. Seery, would you please state your full name for the

18   record?

19   A   James P. Seery, Jr.

20   Q   And you and I met for the first time I believe it was last

21   Friday in your deposition; is that correct?

22   A   You were by video.

23   Q   I mean, --

24   A   We didn't actually meet.

25   Q   Correct.  You are currently the CEO of the Reorganized

Seery - Direct                                        212

 1   Debtor?

 2   A    That's correct.

 3   Q    Prior to your appointment as the CEO of the Reorganized

 4   Debtor, you've never served as a CEO of a reorganized debtor

 5   in the past, have you?

 6   A    I have not.

 7   Q    You previously served as the chief executive officer of

 8   Highland Capital as a Debtor-In-Possession.  Is that correct?

 9   A    That's correct.

10   Q    And that was the first time you'd ever served in a

11   position such as that; is that correct?

12   A    As the CEO of a debtor, yes.

13   Q    Right.  You also now currently serve as a Trustee for the

14   Highland Claimant Trust, which was put into effect after the

15   effective date of the plan, correct?

16   A    Yes, I'm the Claimant Trustee.

17   Q    All right.  That's the first time --

18            THE COURT:  Mr. McEntire, we usually require standing

19   at the podium.  I mean, do you need --

20            MR. MCENTIRE:  That's fine.  I'm totally fine.

21            THE COURT:  Okay.  That's --

22            MR. MCENTIRE:  I forgot.

23            THE COURT:  Okay.  Thank you.

24   BY MR. MCENTIRE:

25   Q    That was -- and your capacity as the Trustee for the

009669

 1   Claimant Trust, that's a first experience as well, correct?

 2   A    As the Claimant Trustee, yes.

 3   Q    All right.  And in these various capacities as a CEO of

 4   the Reorganized Debtor, do you consider yourself to be subject

 5   to the Investment Advisers Act?

 6   A    No, I don't I'm subject to the Investment Advisers Act.  I

 7   think Highland in certain capacities could be.

 8   Q    All right.  But do you have any duties that -- that you

 9   are required to fulfill under the Investment Advisers Act

10   accordingly?

11   A    Do I?

12   Q    Yes.

13   A    I believe Highland does.  I don't know that I have any

14   personal duties.

15   Q    All right, sir.  Let me now talk a little bit about your

16   duties that you did have at Highland.  You agree that when you

17   were at Highland you had fiduciary duties that you owed to the

18   estate?

19   A    Yes.

20   Q    What were those duties?

21   A    To generally treat the estate on an honest and fair

22   matter.

23   Q    Avoid conflicts of interest?

24   A    Yes.

25   Q    Not self-deal?

 1  A    Yes.

 2  Q    Do you agree with me that you would have a duty not to

 3  trade on material inside -- material nonpublic information?

 4  A    Generally, I would have a duty to not trade on material

 5  nonpublic information, yes.

 6  Q    Can you think of an exception?

 7  A    There may be.  I just don't think of any one off the top

 8  of my head.

 9  Q    So, today, you would agree, for purposes of these

10  proceedings, that you would have an obligation as the CEO of

11  the Debtor-In-Possession not to participate in a transaction

12  involving material nonpublic information?  Agreed?

13  A    It would depend.  So, for example, if I was trading with

14  someone else who had material nonpublic information, that

15  might be a permissible transaction.

16  Q    The HarbourVest transaction, you were involved in

17  negotiating the HarbourVest settlement?

18  A    Yes, I was.

19  Q    Did that involve any component related to MGM stock?

20  A    No, it did not.

21  Q    There was no involvement at all concerning the transfer of

22  MGM stock to any entity as a result of that transaction?

23  A    None whatsoever.

24  Q    Okay.  And does HCLOF not have a participation at this

25  time in MGM stock?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Filed 02/15/24   Page 61 of 235   PageID 9389
Main Document   Page 173 of 398

Seery - Direct                                    215

1   A   We call it H-C-L-O-F.

2   Q   Yes.

3   A   It does not own MGM stock, and as I far as I know, never

4   owned MGM stock.

5   Q   Okay.  You agree you received an email from Mr. Dondero in

6   December of 2020.  We've had it here before.  You've seen it

7   in the courtroom, correct?

8   A   Yes.

9   Q   Okay.  Did you ever send -- forward that email to anyone

10  else?

11  A   I'm sorry.  Could you repeat that?

12  Q   Did you forward that email on to anyone else?

13  A   I believe I did, yes.

14  Q   To whom?

15  A   I certainly discussed it with counsel.  I believe I

16  forwarded it to counsel, both the Pachulski firm and the

17  WilmerHale firm.  Thomas Surgent had gotten it.  He was on the

18  email.  And I also forwarded it, I believe -- certainly,

19  discussed it -- with the other independent directors.

20  Q   Okay.  I'm not going to talk about your conversations with

21  other lawyers in-house, okay, or your outside counsel.  Did

22  you take any steps yourself personally to make sure that MGM

23  stock was placed on a restricted list at Highland Capital

24  after you received that email?

25  A   No.  MGM was already on the restricted list at Highland

Seery - Direct                                216

1    Capital.

2    Q    Okay.  And is that because of Mr. Dondero's position on

3    the board of MGM?

4    A    It -- I believe that's the reason.  It was on before I got

5    to Highland.

6    Q    Okay.  And you agree, do you not, sir, that the email that

7    you received from Mr. Dondero also contained material

8    nonpublic information?

9    A    I don't think so, no.

10        MR. MCENTIRE:  Would you put up Exhibit -- our

11   Exhibit 4, please?

12        MR. MORRIS:  4?

13        MR. MCENTIRE:  4.

14   BY MR. MCENTIRE:

15   Q    Did H-C-L-O-F -- I'll refer to it as HCLOF, you refer to

16   it as H-C-L-O-F -- did that -- did HCLOF own any funds that

17   owned MGM stock?

18   A    HCLOF had interest in certain Highland-managed CLOs that

19   did own some.

20   Q    As a result of the Highland settlement -- excuse me, the

21   HarbourVest settlement, was there any impact on who owned some

22   of those CLO funds?

23   A    No.

24   Q    Okay.  How was the CLOs, the funds, handled, if at all, in

25   the -- in the HarbourVest settlement?

Seery - Direct                                    217

1    A    They didn't have any impact whatsoever on the HarbourVest

2    settlement.

3    Q    Looking at Exhibit 4 for a moment, please, did the

4    interests, did the interests in -- HarbourVest's interests in

5    any of those CLOs transfer?

6    A    No, they did not.

7    Q    Okay.  And did HCLOF acquire any interest in any of those

8    CLO's as a consequence of the HarbourVest settlement?

9    A    No, it did not.

10   Q    Looking at Exhibit 4.  Excuse me, Exhibit 3 is what I

11   meant to say.  Exhibit 3.

12           THE COURT:  Hunter Mountain Exhibit 3?

13           MR. MCENTIRE:  Yes, ma'am.

14           THE COURT:  Okay.

15           MR. MCENTIRE:  Yes, Your Honor.  Excuse me.

16   BY MR. MCENTIRE:

17   Q    This is the email that we were just referring to that you

18   received, correct?

19   A    Yes.

20   Q    And you don't think -- you knew that Mr. Dondero was on

21   the board of directors of MGM?

22   A    Yes.

23   Q    And he -- as a member of the board of directors, when you

24   received this, you see where he indicated that it was probably

25   a first-quarter event?  Do you see that?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Filed 12/07/23   Page 64 of 235   PageID 9392
Main Document   Page 217 of 389

Seery - Direct                                    218

1   A    I see what it says, yes.

2   Q    Okay.  And you did not think that that was material

3   nonpublic information?

4   A    No, I did not.

5   Q    When he indicated that Amazon and Apple were actively

6   diligencing -- are diligencing in the data room, both continue

7   to express material interest, coming from a member of the

8   board of directors of MGM, you did not think that was material

9   nonpublic information?

10  A    I did not, no.

11  Q    You know the difference between a newspaper article or a

12  media article that discusses rumors of a possible sale and the

13  difference between that and a member of the board of directors

14  saying that a sale is going to occur?  You understand the

15  difference between the two?

16  A    Between the two things you just outlined?

17  Q    Yes.

18  A    Yes.  One you said a sale is going to occur, and the other

19  you said a media report.  But it would depend on what's in the

20  media report.  Some media reports are pure speculation.

21  Others have a lot of detail, and they clearly came from an

22  inside source, and that's why the market moves on them.

23  Q    Okay.  So what you're suggesting to me, that there was

24  some indication in the media press before you received this

25  email suggesting that there was actually going to be a sale in

Seery - Direct                                219

1    the first quarter of 2021?

2    A    I don't know if it had a first-quarter event in it, but

3    certainly it was clear from the media reports and the actual

4    quotes from Kevin Ulrich of Anchorage, who was the chairman at

5    MGM, that a transaction had to take place very quickly.  And

6    in fact, the transaction did not take place in the first

7    quarter.

8    Q    Okay.  So you -- when you received this particular email,

9    you did not think that it was requiring any additional

10   protection at -- in any way?  Is that what you're suggesting

11   to this Court?

12   A    That the email required additional protection?

13   Q    That you didn't take additional steps to make sure that it

14   was maintained on the restricted list.

15   A    It was already on the restricted list, so there was no

16   change.

17   Q    Was it --

18   A    I --

19            MR. MORRIS:  Hold on.  Let him finish.

20   BY MR. MCENTIRE:

21   A    I was suspicious when I got the email, but I didn't think

22   I had to do anything else than the steps I told you I just

23   took.

24   Q    Yeah, I'm not asking whether you were suspicious or not.

25   My question's a little bit different.  You understand that MGM

Seery - Direct                                    220

1   was taken off your restricted list in April of 2021?

2   A    I understand that that's what you've recently shown me.  I

3   wasn't aware of that fact or I didn't have a recollection of

4   that fact, but certainly April of 2021 would be beyond the

5   first quarter.  Mr. Dondero was not an employee, an affiliate,

6   subject to a contractual relationship.  He had no duty to

7   Highland and Highland had no duty to him.  And in fact, it was

8   quite antagonistic by that time.  So it would be appropriate

9   to take MGM off the restricted list at the end of that time.

10  Q    Well, hopefully you won't take this as argumentative, but

11  I object as nonresponsive.  That really wasn't my question.

12  Okay?  My question --

13          THE COURT:  Sustained.

14  BY MR. MCENTIRE:

15  Q    -- is a little bit different.  As far as you were

16  concerned, MGM was on the restricted list and stayed on the

17  restricted list all the way until the public announcement in

18  May of 2021?

19  A    That's not true.

20  Q    When did you first become aware it was taken off the

21  restricted list?

22  A    I didn't -- I wasn't aware that it had come off the

23  restricted list.  I would have assumed it would have been off

24  the restricted list once Mr. Dondero had been severed from

25  Highland.

009677

Seery - Direct                                   221

 1  Q   I see.  Now, Mr. Dondero has relayed a conversation that
 2  he had with Mr. Patel and Mr. Linn, suggesting that they were
 3  particularly optimistic about MGM based upon what you told
 4  them.
 5  A   I --
 6  Q   Let me finish.  If that occurred, are you suggesting that
 7  that is a lie?
 8  A   Two things.  One is I don't think he actually testified to
 9  that.  I think he said he had a conversation with Mr. Patel.
10  Then he had a different conversation with Mr. Linn, and a
11  subsequent conversation with Mr. Linn.  So the way he laid it
12  out were multiple conversations.
13  Q   Agreed.
14  A   I don't -- I don't know which one you're talking about.
15  Q   Mr. Dondero testified that Mr. Patel was particularly
16  optimistic about the investment because of what he had learned
17  from Mr. -- from you about MGM.
18         MR. MORRIS:  I dispute that characterization.  Why
19  can't he just ask the question?
20         MR. MCENTIRE:  That is my question.  If that --
21         THE COURT:  What is the question?  I'm not sure I
22  hear the question.
23         MR. MCENTIRE:  I'm getting lost because I'm getting
24  interrupted.  I'll try to rephrase it again.
25         MR. MORRIS:  It's my first objection.

 1          MR. MCENTIRE:  And I --

 2          THE COURT:  Go ahead.

 3          MR. MCENTIRE:  I'm just going to rephrase, Your

 4  Honor.

 5          THE COURT:  Just rephrase your question.

 6          MR. MCENTIRE:  Thank you.

 7  BY MR. MCENTIRE:

 8  Q    Mr. Dondero has testified that Farallon advised him in May

 9  of 2021 that they were optimistic about MGM based upon what

10  you told them.  Assuming that to be the case, do you deny that

11  happened?

12  A    I do deny that happened.  Because I can't -- I don't know

13  what Farallon told him, but I never told Farallon anything.

14  And a conversation on May 28th, after the May 26th

15  announcement that MGM was going through, might make people

16  optimistic that it could go through, but there was a very

17  difficult FTC process that MGM would have to go through.

18  Q    And I'm referring to that.  If Farallon stated that they

19  were optimistic about MGM based upon what you had told them,

20  --

21  A    That would not be true.

22  Q    -- that would be false?

23  A    That would not be true.

24  Q    And is Mr. Dondero says that's what Farallon told them,

25  that would also be false?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 10/27/23    Page 69 of 235    PageID 9397
Main Document    Page 223 of 392

Seery - Direct                                      223

1    A    That's correct.

2    Q    So we have your statement, we have what may be Farallon's

3    statement, and we have what Mr. Dondero believes may have been

4    Farallon's statement, and you're saying the latter two are

5    just not true?

6    A    I didn't have a conversation with Farallon about MGM that

7    -- that I recall --

8    Q    Well, you're on the witness stand.

9    A    -- virtually at any time.

10    Q    You're on the witness stand.

11    A    Oh, I'm aware of where I am sitting.

12    Q    Yeah.  Good.  We've got that cleared up.  Now, are you

13    suggesting that -- that you may not specifically recall this

14    conversation?

15    A    No, I am not saying that at all.  After May 26th, when the

16    MGM announcement was made and it was public, I may have had

17    conversations with a number of people about MGM.

18    Q    Well, let's make sure the record is clear.  Did you call

19    Farallon on May 26th and say, hey, did you know that MGM just

20    sold?

21    A    No, I don't recall any such conversation, and I wouldn't

22    have had to, since it was in the paper.

23    Q    I'm not talking about what's in the paper.  I'm talking

24    about conversations between you and Farallon.

25    A    Yeah.  I don't recall having a conversation with Farallon

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-4   Filed 12/07/23   Page 70 of 235   PageID 9398

Seery - Direct                                      224

1   on May 26th.

2   Q    How about May 27th?

3   A    Not that I recall, no.

4   Q    How about May 28th?

5   A    Not that I recall off the top of my head.

6   Q    And we understand that that's the day that Mr. Dondero

7   actually had his conversation that he's reported, at least,

8   with Farallon.  Do you recall that?

9   A    That's what he claims, yes.

10  Q    You were with a company called River -- you're a lawyer,

11  correct?

12  A    I am.  I'm in retired status.

13  Q    Okay.  I wish I was.

14  A    It's simply retiring your license and not having to take

15  the CLE.

16  Q    Understood.  Now, you were with a company called River

17  Birch?

18  A    Yes.

19  Q    And from River Birch, you went to Guggenheim Securities?

20  A    That's correct.

21  Q    At Guggenheim Securities, did you go to Farallon and meet

22  with Mr. Patel in their offices in San Francisco?

23  A    I believe we did, yes.

24  Q    You call it a meet-and-greet?

25  A    I do, yes.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 12/07/23    Page 71 of 235    PageID 9399
Main Document    Page 71 of 235

Seery - Direct                                      225

1    Q    That was in 2017?

2    A    2017, 2018.  I'm not exactly sure when it was.

3    Q    And one of the purposes of meet-and-greet is to solicit

4    business or to see if a business opportunity -- see if it

5    exists?

6    A    That's not correct, no.

7    Q    What is a meet-and-greet for, then?

8    A    It's to meet the people at the fund and to greet the

9    people at the fund.  Introduce them to other people in your

10   firm.

11   Q    Just because it's going to be fun, or does it have a

12   business angle to it?

13   A    Oh, it hopefully will be fun, yes, but it's done in order

14   to build a relationship over time.  You're not in there

15   soliciting business.  If you do that, you won't do very well.

16   Q    Okay.  Fair enough.  So you're there trying to develop a

17   relationship with Farallon?

18   A    Guggenheim was, yes.

19   Q    And you were part of it?

20   A    That's correct.

21   Q    And what was your job at Guggenheim?

22   A    I was co-head of credit.

23   Q    Is that a fairly significant position at Guggenheim?

24   A    Not really, no.

25   Q    It's not significant at all?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 28-44   Filed 08/02/23   Page 72 of 235   PageID 9400
Main Document   Page 72 of 235

                           Seery - Direct                              226

```
 1    A    No.

 2    Q    All right.

 3    A    Which is why --

 4    Q    Well, you left --

 5    A    Which is why they don't have that business.

 6    Q    Okay.  So is that why you left Guggenheim?

 7    A    It -- I did, yeah.  It wasn't a good fit for either

 8    Guggenheim or for me, because it really wasn't something --

 9    Q    When did you --

10    A    -- that they were set up to do.

11    Q    -- leave Guggenheim?

12    A    In 2019.

13    Q    And then you went back to Farallon to meet with them

14    again, did you not?

15    A    I met with Farallon while I was in San Francisco with my

16    wife.

17    Q    Okay.  Did you call ahead to arrange the meeting, or was

18    it just a --

19    A    I --

20    Q    -- a blind call?

21    A    I did call ahead, yes.

22    Q    A cold call, I guess, is the word -- the phrase that they

23    use.  Okay.  So -- and was that a meet-and-greet?

24    A    That was again, yes.

25    Q    Again, what were you trying to do?  Develop a relationship
```

 1  with Farallon?

 2  A    I was trying to catch up with them after having met them

 3  previously.  And that was just Raj Patel.  And this one I also

 4  met Michael Linn.

 5  Q    Okay.  What kind of business were you in when you met with

 6  them the second time?

 7  A    I wasn't doing anything.

 8  Q    What were you hoping to do?

 9  A    I was hoping to get back into the investing side of the

10  business, from running a credit-type lending business at

11  Guggenheim, which is what they tried to do and it didn't work

12  out.  And I wanted to get back to what I was doing more at

13  River Birch, but I was looking at other opportunities,

14  whatever came along.

15  Q    Well, what were the different options that you were

16  looking at?

17  A    I was looking at potentially getting back into investing,

18  joining potentially a restructuring firm, any options like

19  that.  I was not looking to become a lawyer again.

20  Q    And why would meeting and greeting with Farallon fit in

21  within that scenario, the strategic scenarios that you've just

22  discussed?

23  A    They're a giant hedge fund.

24  Q    A giant hedge fund?

25  A    Yes.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Filed 12/07/23   Page 74 of 235   PageID 9402
Main Document   Page 72 of 238

Seery - Direct                                    228

1   Q    And so it would be good to have a relationship with a

2   giant hedge fund, wouldn't it?

3   A    And to know what their thinking of the markets, where the

4   opportunity set might be, who they are dealing with and

5   interacting with.  Those are -- those are valuable things to

6   know over time.

7   Q    And --

8   A    And you need to maintain those relationships in order to

9   be --

10  Q    Sure.

11  A    -- part of any business.

12  Q    Sure.  These meet-and-greets can actually evolve and

13  provide relationship benefits, correct?

14  A    I don't -- I'm not sure what you mean by relationship

15  benefits.

16  Q    Sloppy words for -- on my part.  They can evolve into

17  something that is a meaningful relationship?

18  A    They could over time, yes.

19  Q    And we know that after you became the CEO of Highland

20  Capital that you received a call from, was it Farallon, to

21  congratulate you on your appointment?

22  A    It was an email.

23  Q    And that was in the summer of 2020, shortly after your

24  meet-and-greet out in San Francisco?

25  A    Your calendar's a bit off, but it was in June of 2020, so

Seery - Direct                                      229

1  that would have been more than shortly after, but yes.

2  Q   Okay.  And who contacted you to congratulate you on your

3  appointment?

4  A   This was my appointment as an independent director.  I had

5  not yet been appointed as CEO or CRO.  This was in June of

6  2020, and it was Michael Linn.

7  Q   Michael Linn?  Was it a telephone call?

8  A   I think 30 seconds ago I said it was an email.

9  Q   Fair enough.  Do you still have that email?

10  A   I do, yes.

11  Q   Okay.  He contacted you again, "he" being Michael Linn, he

12  contacted you again in January of 2021, did he not?

13  A   That's correct, yes.

14  Q   He wanted to see if he could get involved somehow in the

15  Highland bankruptcy?

16  A   Well, he congratulated -- he didn't congratulate -- he

17  wished me a happy new year, and he basically said it looks

18  like you're -- again, he's following the case -- it looks like

19  you're doing good work.  Is there any way for us to get

20  involved?  We're interested in claims or buying assets.

21  Q   Okay.  And Stonehill.  Now, you know the founder of

22  Stonehill, do you not?

23  A   No, I don't know him.  I've met him several times.

24  Q   Doesn't he come by and stop in and talk with you when

25  you're in Stonehill's offices?  And that's happened recently?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 12/07/23    Page 76 of 235    PageID 9404
                            Main Document    Page 7303 of 338

                         Seery - Direct                              230

1   A    Your use of the plural is incorrect, and you know that

2   from the deposition.  I was in Stonehill's office one time,

3   and I was in a meeting with Mr. Stern.  We ended up having a

4   board meeting from Stonehill's office with the other

5   participants on video, and Mr. Motulsky came in and said

6   hello.

7   Q    All right.  And who's Mr. Motulsky?

8   A    He's the founder of Stonehill.

9   Q    I see.  And did you know Mr. Motulsky before that?

10  A    I'd interacted with Mr. Motulsky over the years at --

11  mostly at industry-type functions.

12  Q    Okay.  Now, Stonehill is also a hedge fund?

13  A    Yes.

14  Q    Are they different than Farallon in that regard, or

15  similar?

16  A    I don't know as much about what their business is.  They

17  certainly do a direct lending component, so I know that they

18  -- they will do some direct lending, which I don't think is

19  something Farallon really does.  Farallon is much bigger, as I

20  understand it, but I don't really know the size of Stonehill.

21  Q    Okay.

22  A    I know they're not a $50 billion fund like Farallon.

23  Q    And do you know Mr. Stern at Farallon?

24  A    I now know him, yes, because he was -- he's really the

25  representative on the -- no, he's not the representative on

Seery - Direct                            231

1    the board, but he is the one who manages the Stonehill and

2    Jessup positions for Stonehill.

3    Q    Well, we know that after you were CEO of Highland, you

4    also got a text message, correct, a text message from someone

5    at Stonehill, correct?

6    A    Mr. Stern sent me a text message reintroducing himself --

7    I don't know if it was re- or just introducing -- and sent me

8    his email and asked me to contact him about the case.  This

9    was at the end of February/beginning of March 2021, after the

10   confirmation order.

11   Q    Okay.  After the -- after the confirmation order?

12   A    Yes.

13   Q    I believe the confirmation order -- I may be wrong -- I

14   thought it was like the 21st, 22nd, somewhere in there.  Does

15   that sound right to you?

16   A    Yes.

17   Q    Okay.  So, shortly after confirmation, then, Farallon

18   calls you to congratulate you and wants to see how they can

19   get involved?

20   A    No.  There was no congratulations there.  Shortly after

21   the confirmation order, which I believe was at least a week to

22   ten days after confirmation, I got the communication from Mr.

23   Stern to try to connect about the case.

24   Q    All right.

25   A    He's at Stonehill, not Farallon.

009688

 1   Q    Correct.  Now, --

 2   A    You said Farallon.

 3   Q    I misspoke, then.  Thank you for correcting me.  Let's

 4   talk about -- you live in New York?

 5   A    I do.

 6   Q    You're involved with a charity called Team Rubicon?

 7   A    Yes.

 8   Q    And Team Rubicon is a -- is that a veterans-type charity?

 9   A    Yeah.  It's a veteran-led organization, and what it does

10   is connects veterans to disasters.  And mostly in the U.S.,

11   but also all over.  So if there's a flood, if there's a

12   hurricane, if there's an earthquake, veterans who have been

13   trained in -- by the military in ready response and really

14   being able to handle themselves when things are bad are

15   deployed to help the communities that are hit.  So I think

16   that Team Rubicon likes to think, you know, on your worst day

17   they're your best friend.

18   Q    So you're -- are you on the board?

19   A    No, I'm not.

20   Q    You're on the Host Committee?

21   A    I was on the Host Committee last year, and I'll be on the

22   Host Committee this year.

23   Q    Okay.  And you have charity events?

24   A    We have a charity event, yes.

25   Q    Okay.  And the purpose of the charity event is to raise a

1  bunch of money?

2  A    That's correct.

3  Q    Okay.  Have you been successful in the past?

4  A    I do my best.  Team Rubicon is a big organization.  It's

5  done very well raising money.  It doesn't have an endowment.

6  The founder's theory was that if people give us money, we're

7  supposed to spend it on helping other people.  And so each

8  year it has to raise more money.

9  Q    And Stonehill has been -- has contributed to your charity?

10 A    I believe Stonehill, one or two years, and I should know

11 this, and I didn't look it up after our deposition, gave

12 $10,000.

13 Q    Okay.  Maybe once, maybe twice?

14 A    Maybe twice.

15 Q    Okay.

16 A    I hope more.

17 Q    Okay.  And they also attend your -- your actual charity

18 events, do they not?

19 A    No.

20 Q    All right.  They just give money?

21 A    That's right.  And the Mike Stern who's on the board of

22 Team Rubicon is not the Mike Stern who is at Stonehill.  It's

23 an older gentleman who's in Texas who just happens to give a

24 lot of money to --

25 Q    All right.

009690

Seery - Direct                                234

```
 1    A    -- Team Rubicon.

 2    Q    You also represented Blockbuster.  Take that back.  Were

 3    you the lawyer or the attorney representing the Creditors

 4    Committee, the UCC, in the Blockbuster bankruptcy?

 5    A    No, I was not.

 6    Q    Tell me what your capacity was.

 7    A    I represented a group of bondholders, secured bondholders.

 8    So I represented the group.

 9    Q    And was Stonehill a member of that group?

10    A    Not that I recall, but your pleadings seem to indicate

11    that they were.  So if they were, they were a small

12    participant.  The largest participant was Carl Icahn, who

13    owned about 30 percent of it.  Then the others who were big

14    were DK, Davidson Kempner, Monarch, Owl Creek.  Those were the

15    big players.

16    Q    Well, --

17    A    When Carl Icahn is in your group, you remember that.

18    Q    Yeah, well, Carl Icahn is not here.  We're talking about

19    Stonehill right now.

20    A    And I said I don't remember them actually being a part of

21    it.  If they were, --

22    Q    Okay.  Well, let me -- let me give you what I'm going to

23    mark as Exhibit 80.  That's your name at the top, right?

24         (Hunter Mountain Investment Trust's Exhibit 80 is marked

25    for identification.)
```

1   A    That's correct, yes.

2   Q    You were at the time with Sidley & Austin?

3   A    That's correct, yes.

4   Q    This is *In re Blockbuster*.

5        MR. MCENTIRE:  Scroll down, please.

6   BY MR. MCENTIRE:

7   Q    And steering group of senior -- involves -- well, let's

8   count them.  Let's see.  One, two, three, four, five.  Five

9   entities comprising the backstop lenders.  Is that correct?

10  A    I think that's the steering group.  So, in order to

11  represent the group, you need to try to assemble a large-

12  enough group that it's material to the company.  And then the

13  company, if you're -- particularly if you're over 50 percent,

14  will pay the fees of the group.  And you don't represent any

15  individual member of the group.  I've never represented Carl

16  Icahn.  I represent the group.  And if folks want to stay in

17  the group, they can stay.  If they want to trade out of the

18  group, they do.  And the company will generally continue to

19  pay the fees, and you represent the group so long as you have

20  a controlling interest in the -- whatever the issue is.

21  Q    Well, that's interesting, because now what you're telling

22  me is that this group right here, this is kind of like the

23  executive committee of the group.

24  A    No, it's called the steering group, and it doesn't

25  necessarily --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-44   Filed 12/27/23   Page 82 of 235   PageID 9410
Main Document   Page 83 of 389

Seery - Direct                              236

1   Q    That's fine.

2   A    Well, it's not an executive committee.  It doesn't

3   necessarily include just the largest.  Some large holders

4   won't be on it.  The largest holders here by a long shot were

5   Icahn, who --

6   Q    I'm not talking about --

7   A    -- unloaded, as I say, over 30 percent.  Monarch, Owl

8   Creek, and I just don't recall Stonehill being a part of it.

9   Q    I'm not really interested in Carl Icahn.  I just want to

10  establish this is a steering group in which you were the lead

11  counsel and Blockbuster was on it.  Is that correct?

12  A    Yes.

13  Q    Excuse me.  Not Blockbuster.

14  A    I'm sorry.

15  Q    Stonehill.

16  A    No, it's the Blockbuster case in 2010, and Stonehill was

17  apparently on it, but I just don't have a recollection of

18  their involvement.

19  Q    All right.  So when Mr. -- who sent you the text message

20  in February of 2021 from Stonehill?

21  A    Michael Stern.

22  Q    And had you actually met him before?

23  A    I think I had, but we didn't know each --

24  Q    All right.

25  A    You know, we certainly didn't know each other, we'd never

1   worked on anything together, but I --

2   Q    Do you have all your text messages from that period of

3   time, that first quarter of 2021?

4   A    I believe I do, yes.

5   Q    They're saved?

6   A    Yes.

7   Q    Okay.  When did the automatic delete button on your cell

8   phone start?

9           MR. STANCIL:  Your Honor, objection.  We've covered

10  this this morning.  I believe this is a motion coming down the

11  pike, and I thought we had -- thought we had had tabled this

12  preservation issue.

13          MR. MCENTIRE:  This has a direct bearing on his

14  communications with Farallon and Stonehill in this period of

15  time, Your Honor.  We have one text message that he's

16  identified, and I have a right to examine whether there are

17  others.  Or if not, why not.

18          MR. STANCIL:  Your Honor, he's --

19          MR. MCENTIRE:  That's a legitimate -- I'm not

20  finished.  That's a legitimate area of inquiry in this

21  examination.

22          MR. STANCIL:  He's testified he has them all.  Your

23  Honor did not order document discovery.  I think that's it for

24  purposes of today's hearing, Your Honor.

25          THE COURT:  Okay.  I sustain the objection.

009694

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-44    Filed 12/07/23    Page 84 of 235    PageID 9412
Main Document    Page 83 of 189

                        Seery - Direct                        238

```
 1   BY MR. MCENTIRE:

 2   Q    After this text message that you received from Stonehill

 3   in February 2021, did you have any follow-up?

 4   A    Well, his text message, I don't recall what it said other

 5   than I was -- I do recall that he gave me his email address,

 6   because I didn't have it.  And we just didn't know each other

 7   well enough.  But we definitely had follow -up.  He wanted to

 8   talk to me, and at some point we talked.

 9   Q    And when did you talk?

10   A    I'm sorry?

11   Q    When did you talk?

12   A    When?  I -- it was at the, initially, end of February,

13   beginning of March.  So it would have been somewhere in that

14   -- in that time period.

15   Q    End of February, beginning of March?  And we also know

16   that you next talked to Farallon, according to your testimony,

17   and they advised you they had already purchased all their

18   claims as of March 15, correct?

19   A    On March 15th, they sent me an email that said they had

20   purchased an interest in claims, and --

21   Q    So -- go ahead.

22   A    I'm not finished.  And then at some point after that, we

23   arranged a quick discussion, because that was a curious --

24   Q    I want to assure you I will always let you finish.

25   A    Thank you very much.
```

Seery - Direct                                    239

1    Q    Unlike others.  So, with that said, Mr. Seery, can you

2    identify -- let me back up.  Was there a data room set up at

3    Highland Capital for claims investors to come in and look at

4    data?

5    A    No, there was not.

6    Q    Are you aware, sitting here today, that Farallon did any

7    due diligence in connection with its investment in the claims

8    it purchased that are at issue in this proceeding?

9    A    I have indication that they did some, yes.  I don't know

10   how much they did.

11   Q    What is the indication?

12   A    In the email in June of 2020, Mr. Linn said that he and

13   his associate were following the case, thought it was --

14   that's the one that congratulated me on being an independent

15   director, and that they were paying attention to the case.

16   And it -- I don't recall the exact other items in there, but

17   it was clear that they were following the Highland matter.

18   And then in the email in January 2021, he also indicated that

19   they'd been following the case further, and said, Looks like

20   you have things well in hand, or something to that effect.  So

21   --

22   Q    Do you have that email, too?  Have you saved that email?

23   A    They're all saved, yeah.

24   Q    Okay.  So let's talk about that.  But you had no data room

25   that would allow them to come in and actually investigate the

1   underlying assets.  Is that correct?

2   A    Not in respect of anybody trying to buy claims.  We did

3   have a data room with respect to financing.

4   Q    Please listen to my question.  I'll get to it.  Data room

5   for claims investors.  There was no data room set up on or

6   before March 15 to allow Farallon to come in and investigate

7   its investment in this claim?

8   A    That's correct.

9   Q    There was no data room set up prior to March 15 to allow

10  Stonehill to come in and investigate its investment in the

11  claims it purchased.  Is that correct?

12  A    That's correct.

13  Q    Can you identify any due diligence, sitting here today --

14  let me back up.  You heard Mr. Dondero's testimony about

15  portfolio companies, correct?

16  A    Yes.

17  Q    Portfolio companies are companies in which Highland

18  Capital has an interest that actually have separate and

19  distinct management.  Is that correct?

20  A    Generally.  And it -- I disagree with some of his

21  testimony, but generally that's correct, yes.

22  Q    Well, okay.  Let's just take on the part that you agree

23  with.  With regard to those portfolio companies, was there

24  anything that was disclosed in the Highland publicly-available

25  financials that would allowed a detailed analysis of

1   Highland's investments in each of those portfolio companies?

2   A    I don't know.  Certainly, in the four or five sets of

3   projections that were filed, there were financial projections.

4   I'm not sure exactly what was included in each one or in the

5   disclosure statement.

6   Q    Fair enough.  Well, I'll represent to you I don't think

7   there's detailed information on each individual portfolio

8   company.

9           MR. MORRIS:  Your Honor, he's not here to testify.  I

10  move to strike.

11          MR. MCENTIRE:  Okay.

12          THE COURT:  Sustained.

13  BY MR. MCENTIRE:

14  Q    In that regard, Mr. Seery, can you identify what Farallon

15  did to investigate the underlying asset value of any of these

16  portfolio companies?

17  A    I don't have any knowledge as to what Farallon did before

18  it bought claims.

19  Q    Can you identify what due diligence Stonehill did to

20  investigate the underlying asset value in any of these

21  portfolio companies?

22  A    I don't -- I mean, in connection with claims purchasing, I

23  have no idea what Stonehill did.

24  Q    Now, I understand that you solicited -- perhaps I don't

25  recall correctly.  Did you solicit both Farallon and Stonehill

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 03/07/23    Page 88 of 235    PageID 9416
Main Document    Page 87 of 389

Seery - Direct                                    242

1   to participate in a bid to provide exit financing?

2   A    I don't think that's fair.  I solicited Farallon because I

3   knew they already owned claims.  Stonehill reached out to me,

4   and that was one of the things they were interested in doing,

5   if there was financing needs.

6   Q    Okay.

7   A    And at the time they reached out, which was right after

8   confirmation -- right after confirmation and the confirmation

9   order, we didn't know what our needs would be.  We didn't

10  really, at the early stage, think we needed exit financing.

11  When we looked at some of the difficulty we were going to have

12  -- for example, collecting notes and realizing on assets -- we

13  realized that we were going to need some exit financing in

14  order to have enough money to support the enterprise to

15  monetize the assets.

16  Q    And I think you used the -- I think the phrase you used,

17  you are the straw man or a straw man bid?  Is that what you

18  called it the other day?

19  A    We did.  You set up a very typical competitive process to

20  do exit financing.

21  Q    And what was the --

22  A    And what -- well, I --

23  Q    -- suggest --

24  A    I was going to get to your straw man.  And one of the

25  things you do is you assess what the market's going to look

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Main Document Filed 03/04/23    Page 89 of 235    PageID 9417
Page 89 of 235

Seery - Direct                                    243

1    like, what you think the market looks like, what you think a

2    financing would be good for the enterprise, the flexibility

3    you need, how you'd structure it.  And then you put that out

4    to prospective lenders and say, Here's our straw man.  This is

5    what we'd like you to consider in terms of financing.  And

6    then they do their work and come back.  And they can either

7    say, that looks great, or we have a totally different idea of

8    what the financing might be, or some other combination of

9    those things.

10   Q   Mr. Seery, thank you for that answer, but I need to ask

11   you to do me a favor.  I'm on the clock, and so I'd just like

12   to get my questions out, if you'd try to respond.  Okay?

13   A   Uh-huh.

14   Q   Because your answers, as long as they may be, are

15   impacting me a little bit.

16       So let me ask this question.  In the straw man proposal

17   that you put out for bid, what was the suggested interest

18   rate?

19   A   You know, you asked me that the other day, and I think I

20   was slightly off.  So it -- and I -- but I did tell you that

21   it depended.  There was -- I don't recall what the rate was,

22   but it starts -- if everybody wants to put out money -- and I

23   apologize for the length of the answer -- they look and they

24   say, well, what if I get paid back in six months?  Nobody

25   wants to do that.  So, duration makes a difference.  So

<table>
<tr><td>1</td><td>there's an interest rate.  There's upfront fees.  There's</td></tr>
</table>

1  there's an interest rate.  There's upfront fees.  There's

2  often exit fees.  And sometimes there's other amounts.  So,

3  our -- my recollection is that our straw man was somewhere in

4  the low teens on the high end, and then closer to high single-

5  digits on the low end.  Something in that range.

6  Q   And Farallon indicated to you they were not interested,

7  correct?

8  A   No, not exactly.  What Farallon said was they didn't --

9  they signed an NDA because we invited them in.  We invited in

10  six folks.   Five signed NDAs.  Two of the -- I invited in

11  Farallon.  I invited in Stonehill.  Well, Stonehill called me.

12  I invited in Contrarian because they had bought claims.  And

13  then two lenders that I knew.  And Farallon did the work and

14  came back and said, this isn't really what we do.  And the

15  other guys, you're telling me, which I was, that other people

16  are more competitive.  And so it's not really what we do, we

17  don't think the returns are good enough, but if you need us,

18  because now they're already invested in the claims, call us.

19  Q   Okay.

20        MR. MCENTIRE:  And again, I'll object as

21  nonresponsive.  Your Honor, that was a very long answer

22  talking about a lot of other entities.  My only question was

23  what the interest rate was.

24        MR. MORRIS:  Your Honor, we oppose the motion to

25  strike.  I think it's --

Seery - Direct                                    245

1          MR. MCENTIRE:  No, I didn't strike it.  I said -- my

2     objection was nonresponsive.  I will now follow it up with a

3     motion to strike his answer.

4          THE COURT:  Overruled.  Okay.

5     BY MR. MCENTIRE:

6     Q    Mr. Seery, you just told us that the interest rate was in

7     the high single digits to in the 12 and 13 percent range.

8     A    No, I was giving you the all-in return for the lender.

9     That's a very different --

10    Q    All-in return?

11    A    -- thing for the -- than an interest rate.

12    Q    That's even better.

13    A    And it depended on the time.

14    Q    Fair enough.

15    Q    So if -- the shorter the duration, the higher the

16    effective return, because he's not getting the return for as

17    long a period of time.  If I have $100 million and I get 10

18    percent, I get just $10 million.  But if I have that out for

19    $3 million, I've earned $30 million.  So maybe that gets

20    squeezed in the longer it's out.

21    Q    And Farallon said that the interest rate or the return

22    rate was not what they were looking for?

23    A    They indicated two things.  I believe I've said this

24    several times.  One is they said, this isn't really what we

25    do, a $50-ish million dollar loan to do an exit.  But we're in

009702

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 08/07/23    Page 92 of 235    PageID 9420
Main Document    Page 92 of 199

Seery - Direct                          246

1   the case.  If you need us, call us.  Included in that was, it

2   doesn't look attractive enough to us because you're telling me

3   other guys are more competitive.

4   Q    Okay.  And do you know what kind of rate of return they

5   were going to get on the investment of the -- on the claims at

6   a 71 percent projected return rate?

7   A    If we only hit the plan, Farallon's two purchases, based

8   on the numbers you get -- you gave, over a two-year period,

9   would be 38.9 percent.

10  Q    Okay, but we're going to talk about that in a second.

11  Okay.  How much -- how much did Farallon actually invest?

12  A    I'd have to look back at your numbers.  They're in your

13  pleading.  I don't know what they actually paid.  I just have

14  it from your pleading.

15  Q    Okay.  And do you have paperwork that -- can you

16  (inaudible) calculation here?

17  A    I have a calculator that, when I looked at your numbers, I

18  ran that, and I --

19  Q    I see.  All right.

20  A    I'm able to remember certain things.

21  Q    So, so if it's projected that the internal rate of return

22  is only six percent, do you disagree with that?

23  A    A hundred percent disagree.  There's -- that's virtually

24  impossible.

25  Q    Okay.

009703

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 20-44    Filed 12/07/23    Page 93 of 235    PageID 9421
Main Document    Page 247 of 389

Seery - Direct                                          247

1    A    And that's, by the way, for hitting the plan.

2    Q    I'm sorry?

3    A    That's for hitting the 70 -- the 71-and-change percent.

4    Q    I want to ask you a question about that.  The 71-percent-

5    and-change --

6    A    Uh-huh.

7    Q    -- that came out of the plan for Class 8, --

8    A    Yes.

9    Q    -- that was for Class 8, correct?

10    A    Correct.

11    Q    There was zero expected return to Class 9, correct?

12    A    That's correct.  They would only get upside, and I think

13    it says in the projections, based upon our view at the time,

14    litigation that could ensue, and that was part of the plan.

15    Q    And as I understand it, that 71-and-some-change --

16    A    Uh-huh.

17    Q    -- projected return rate never changed from the date of

18    confirmation all the way up to the effective date.  Am I

19    correct?

20    A    The -- we didn't change the projections that we'd filed

21    with the plan because the plan was confirmed.  We didn't need

22    to change the projections that were filed with the plan.

23    Q    The NDAs, as you understand it, can you tell me

24    specifically when the NDAs were signed?

25    A    I know it's the first week of April to the second week of

Seery - Direct                    248

1   April.  Blue Torch may have signed -- who actually ended up

2   doing the financing -- they may have signed it a week or so

3   before.  They'd been around offering financing a number of

4   times in the past.

5   Q    Fair enough.  But we know that you understood as of March

6   15th that Farallon had already made their investments?  I

7   mean, claims?

8   A    That's what they told me in that email, yes.

9   Q    Okay.  When did Stonehill sign the NDA?

10  A    In and around the same time.

11  Q    But you don't know when Stonehill actually purchased their

12  claims?

13  A    I don't know exactly when.  I know generally that by the

14  end of April, early May, they were -- they were the holder of

15  the Redeemer claim.  And --

16       (Interruption.)

17  A    -- I can't remember whether it was from them or whether it

18  was from --

19  Q    Did you ever communicate with Stonehill during the time

20  that they were doing their due diligence on the exit

21  financing?

22  A    Yes.

23  Q    Okay.  Did they come to your offices?

24  A    I don't know if we were back yet.  I think we were back,

25  but I don't recall them coming to our offices.  I think it was

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Main Document Filed 08/07/23   Page 95 of 235   Page 93 of 388   PageID 9423

Seery - Direct                                    249

1   all virtual.  It's early '21, so there would have been

2   vaccines.  It would have been very -- very -- I don't recall

3   them coming to the offices at that time.

4   Q   But just to be clear, you don't know, you can't give the

5   Court a date when Stonehill actually completed their

6   investments in either Redeemer or HarbourVest?

7   A   No, I don't.  I don't know.  Did -- just --

8   Q   That was my question.

9   A   When you say Redeemer or HarbourVest, they never bought

10  HarbourVest.

11  Q   It was just Redeemer?

12  A   Correct.

13  Q   All right.  You understand that Muck is an entity, a

14  special-purpose entity created by Farallon?

15  A   That's my understanding, yes.

16  Q   And you understand Jessup is a special-purpose entity

17  created by Stonehill?

18  A   That's my understanding, yes.

19  Q   Muck and Jessup are both on the Oversight Committee?

20  A   They are.  They -- those entities are the --

21  Q   Is it the Oversight Committee or the Oversight Board?

22  A   Same thing.

23  Q   Fair enough.

24  A   I'll consider them the same.

25  Q   And there's a third member, too, correct?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 20-44   Filed 08/07/23   Page 96 of 235   PageID 9424
Main Document   Page 95 of 308

Seery - Direct                                    250

1   A    That's correct.

2   Q    Okay.

3   A    Independent member.

4   Q    Okay.  So you have a three-person board; is that right?

5   A    That's correct.

6   Q    And one of their jobs is to make decisions concerning your

7   compensation?

8   A    The structure of the Claimant Trust Agreement provides

9   that I'm to negotiate with the -- either the Committee or the

10  Oversight Board.  And the compensation in the Claimant Trust

11  Agreement is a base salary of $150,000, which is -- a month,

12  which is the same as the one in the case, plus severance, plus

13  a success fee.  And it's very specific that that will be

14  negotiated by the -- either the Committee or then the

15  Oversight Board.

16  Q    And Michael Linn, who Mr. Dondero has referred to, he's

17  actually on the Oversight Board, is he not?

18  A    He's the Muck representative on the Oversight Board.

19  Q    All right.

20  A    Yes.

21  Q    If I understand it correctly, you are currently receiving,

22  as the Trustee, $150,000 a month.  Is that correct?

23  A    That's incorrect.

24  Q    What are you receiving?

25  A    I receive $150,000 a month as the Trustee and the CEO of

1  Highland Capital.

2  Q    Well, --

3  A    So I have --

4  Q    -- fair enough.

5  A    I have both roles.  The Trustee, for example, doesn't

6  manage the team, they actually work for Highland Capital, and

7  I'm the CEO of Highland Capital.

8  Q    There was some suggestion that the $150,000 was something

9  that the Court had passed upon prior to the effective date or

10 part of the plan.  This is a separate negotiated item that you

11 -- that you allegedly negotiated that was awarded to you post-

12 effective date, correct?

13 A    That's false.

14 Q    Okay.  So the $150,000 had a discount that was supposed to

15 drop down to $75,000 after a period of time.  That never

16 happened, did it?

17 A    The -- you seem to be mixing concepts.  But the $150,000 a

18 month was set by the plan and the -- and the Claimant Trust

19 Agreement as the "base salary."  That wasn't going to move.

20 When we -- it never was supposed to move.

21     When I began negotiating with the Oversight Board for the

22 success fee, they pushed back and said, we would like that to

23 step down.  So in our -- I did not say, oh, that's a great

24 idea.  We ended up negotiating, and they included a provision

25 that we would renegotiate depending on the level of work.

1   That's one of the provisions.

2   Q    Okay.  But renegotiate down to $75,000 after a period of

3   time, but that never happened?

4   A    Initially, I believe it was supposed to step down to

5   $75,000 automatic, subject to renegotiation that it go back

6   up, not a structure that I particularly liked.  And since

7   then, we've negotiated on that point.

8   Q    So you currently are making $150,000 a month?

9   A    That's correct.

10  Q    How often do you come to Dallas?

11  A    Usually I'm here at least once a month.  Usually it's

12  between two and four days.

13  Q    Okay.  And you have a staff here in Dallas at Highland

14  Capital, correct?

15  A    Yes.

16  Q    How many people?

17  A    Eleven.

18  Q    Eleven people?

19  A    Uh-huh.

20  Q    Working full-time?

21  A    Yes.

22  Q    And you're still making $1.8 million a year?

23  A    Yes.

24  Q    You also have a bonus structure, correct?

25  A    That's correct.

Seery - Direct                          253

1   Q   And that's performance-based?

2   A   That's correct.

3        MR. MCENTIRE:  Can you pull up the agreement please?

4   Okay.

5      (Pause.)

6   BY MR. MCENTIRE:

7   Q   All right.  Do you see --

8        MR. MCENTIRE:  We're having technical difficulty

9   here.

10  BY MR. MCENTIRE:

11  Q   All right.  Can you identify this document?

12       MR. MCENTIRE:  What exhibit number is this?

13       MR. MILLER:  28.

14  BY MR. MCENTIRE:

15  Q   Exhibit 28.

16       MR. MCENTIRE:  I believe this is already in evidence.

17       THE COURT:  Hunter Mountain Exhibit 28?

18       MR. MCENTIRE:  Yes, Your Honor.

19       THE COURT:  Okay.

20  BY MR. MCENTIRE:

21  Q   This is the memorandum of agreement.  Do you see that?

22  A   Yes.

23  Q   On the third line, it says -- and your name is identified

24  here.  You're the Claimant Trustee, correct?

25  A   Claimant Trustee/CEO.

009710

1    Q    Engaged in robust, arm's length, and good-faith

2    negotiations regarding the incentive compensation program.

3         As part of this robust, arm's length, and good-faith

4    negotiation, did you personally conduct any independent search

5    in the marketplace?

6    A    I did -- what do you mean by search in the marketplace?

7    Q    Well, did you try to do a market study?  I asked that

8    question in your deposition.

9    A    I didn't know if you were asking a different question.

10   Q    Same question.

11   A    You mean market study on compensation?

12   Q    Yes.

13   A    No, I did not.

14   Q    Are you aware of whether or not any member of the

15   Oversight Board or Oversight Committee did a market study?

16   A    On compensation?

17   Q    On compensation.

18   A    I'm not aware that they did one, no.

19   Q    So this robust, arm's length, and good-faith negotiation,

20   as far as you know, is divorced from any market study database

21   or -- or methods.  Is that correct?

22   A    I don't believe that's correct, no.

23   Q    I see.  So did -- was any third-party consultant hired?

24   A    Not by me or Highland or the Trust, no.

25   Q    All right.

Seery - Direct                              255

1            MR. MCENTIRE:  Can you scroll down a little bit,

2    please?

3    BY MR. MCENTIRE:

4    Q    You signed this agreement, correct?

5    A    Yes.

6    Q    And we have Michael Linn signing on behalf of Muck, who

7    also is with Farallon, correct?

8    A    That's correct.

9            MR. MCENTIRE:  Scroll down.

10    BY MR. MCENTIRE:

11    Q    And by the way, this is a heavily-redacted document.  The

12    redactions deal with what?

13    A    The redactions deal with the portion that would go to the

14    team as opposed to going to me.

15    Q    Are we talking about the 11-member team?

16    A    Correct.

17            MR. MCENTIRE:  Can you scroll down?  Stop.  Go back.

18    BY MR. MCENTIRE:

19    Q    So we have the assumed allowed claim amounts under Section

20    D.  Do you see that?

21    A    Yes.

22    Q    Class 9, $98 million and some change.  Class 8, $295

23    million and some change.  Then we go into the incentive

24    payment tiers.  Do you see that?

25    A    Yes.

009712

1  Q    What's the purpose of the tiers?

2  A    The purpose of the tiers was to set additional

3  compensation so that, the more recovery, the higher the

4  compensation.  So, below Tier 1, there was really effectively

5  no bonus, is my recollection.  And then in each tier there

6  would be a percentage.

7       So the first tier is $10 million.  There would be a

8  percentage of that $10 million that could be allocated for

9  bonus.  Then in the next tier it would be $56 million.  A

10 portion of that would be allocated for bonus.  And it's

11 weighted more heavily to the higher-recovery tiers, meaning it

12 incentivizes both me and the team to try to reach deeper into

13 Class 8 and Class 9 and get higher recoveries.

14 Q    Okay.  So the idea is, the more difficult it is to get the

15 recoveries, the higher percentage you should get, because if

16 you're successful then you should be rewarded accordingly?  Is

17 that kind of how it works?

18 A    I'm not sure if difficult is the term, but it's a

19 combination of both expertise, difficulty, and time.

20       MR. MCENTIRE:  All right.  Can you scroll down,

21 please?  Next page.

22 BY MR. MCENTIRE:

23 Q    And here are your actual tier participations.  They go --

24 you said basically nothing Tier 1, up through 6 percent.  So

25 Tier 1 is the 71 percent, right?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 02/27/23    Page 103 of 235    PageID 9431
                                    Main Document    Page 273 of 388

Seery - Direct                    257

1   A    It's .72 percent, and it's of the -- that's the first

2   piece.  You have to get to Tier 1.  So if we had not -- I

3   believe it's structured is if we don't get to Tier 1, for

4   example, we don't hit the plan, right around the plan number

5   of 71-and-change cents, then there wouldn't -- there wouldn't

6   be upside.

7        So it was very much structured in a way that you had to

8   perform.  And then the better the performance, the bigger the

9   percentages of the tier.

10  Q    So, in theory, Mr. Seery, by the time you get down to Tier

11  4 and Tier 5, it's a little bit less certain that you're ever

12  going to get there.  Is that right?

13  A    Well, out of the gate, going deeper was uncertain.  It's a

14  question of being able to execute well on the assets and being

15  able to control the costs and being able to make

16  distributions.  It wasn't based on what we just got for the

17  assets.  It's actually based on actual distributions --

18  Q    I understand that.

19  A     -- to Class 8 and 9 claimants.

20  Q    I understand that.  And the idea is, is that it take a lot

21  more effort -- the theory was it might take a lot more effort

22  to get all the way to the bottom of Tier 5 to pay all the

23  Class 9 claims, right?

24  A    And maybe a little luck.

25  Q    Yeah.  And Class 10 is not even factored into this, is it?

009714

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/27/23    Page 104 of 235    PageID 9432
Main Document    Page 258 of 309

Seery - Direct                            258

1  A    No, it is not.

2  Q    And so you didn't consider Class 10.  You stopped at Tier

3  5?

4  A    That's correct.

5  Q    So your entitlement to a 6 percent return, or a 6 percent

6  bonus on the recoveries, you say it's there to incentivize

7  you.  You didn't expect that to actually happen, did you, when

8  you signed this?  Is that your testimony?

9          MR. STANCIL:  I object to the form of the question.

10  It mischaracterizes the agreement.

11  BY MR. MCENTIRE:

12  Q    You didn't expect it to happen, did you, sir?

13          THE WITNESS:  Well, the six --

14          THE COURT:  Wait.  I'm sorry.  Could you rephrase the

15  question?

16          MR. MCENTIRE:  Sure.

17  BY MR. MCENTIRE:

18  Q    Are you telling the judge that you really didn't expect

19  that to happen and that's why you were entitled to a higher

20  percentage?

21  A    No.  We didn't expect to reach Class 9 and go deep into

22  Class 9, but we certainly held out the possibility that we

23  could.  And it's not six percent.  It's six percent of the

24  increment.  These are cumulative.  So you get .72 of Tier 1.

25  You get 1.17 of Tier 2.  And you can add those, and you earn

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/25/23    Page 105 of 235    PageID 9433
Main Document    Page 258 of 389

Seery - Direct                               259

1    them when you've actually made the distribution, but you don't

2    get paid until you get all your distribution or we're

3    relatively done or there's a renegotiation.  Because the

4    Committee wanted to make sure that I didn't say, hey, I hit

5    Tier 3, time to go, I got a better job.

6    Q   So, Mr. Seery, if Farallon told Mr. Dondero that they

7    wouldn't sell basically at any price because you said it was

8    too valuable, and they rejected a 40 or 50 percent premium, if

9    they said that, is that -- is that a lie?

10   A   That I -- rephrase that, please.  I don't -- didn't quite

11   understand your question.

12   Q   Yeah.  You've heard the testimony that Farallon, Michael

13   Linn, told Mr. Dondero that they were not going to sell their

14   claim at any amount because you had told them it was too

15   valuable.  Is that a lie?

16   A   I think that's -- yeah, I don't think that's true.

17   Q   Okay.  And obviously, if they're not going to be willing

18   to sell at any amount, they must be pretty certain they're

19   going to hit Tier 5.  Would that just be a lie?

20   A   That -- that conversation was before this negotiation.

21   That -- there's no -- they could not have had any expectation,

22   either when they had that conversation in May or when we had

23   this discussion that I was going to hit Tier 5 and I hadn't

24   hit Tier 5.  And the idea that they wouldn't sell at any price

25   is complete utter nonsense, because they're capped on what

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 106 of 235    PageID 9434
Main Document    Page 260 of 368

Seery - Direct                                    260

1  they can get.

2  Q   So if -- sure.  Okay.  So, but if Farallon told --

3  A   But that's what you said.

4  Q   If Farallon told Mr. Dondero that they wouldn't even sell

5  at 130 percent of the purchase price because you told them it

6  would be too valuable, is that a lie?

7  A   I never told them it would be too valuable.  I don't -- I

8  don't know any of the other parts that you're saying, the 130

9  percent of an unknown number, some guess number that Mr.

10 Dondero had.  I never told them it would be too valuable.

11 That would be their own assessment of where we were at the end

12 of May 2021.

13 Q   If they said that you told them not to sell, that it was

14 too valuable, is that a lie?

15 A   That's untrue, yes.

16 Q   If they told him -- if they told him that he told you --

17 that you told them it was too valuable because of MGM, is that

18 a lie?

19 A   Yes.

20 Q   How many shares of stock did Highland Capital own?

21         MR. MCENTIRE:  Well, one second.  What is my time?

22 How much time do I have?

23         THE CLERK:  Right now you're at --

24         MR. MCENTIRE:  So I'm almost two and a half hours in?

25         THE CLERK:  Just about.  A little under.

009717

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Main Document  Page 107 of 235    Page 107 of 235    PageID 9435

Seery - Direct                              261

1    BY MR. MCENTIRE:

2    Q    I'm going to have to speed up here, Mr. Seery.

3          THE COURT:  A little under two and a half, you said.

4    BY MR. MCENTIRE:

5    Q    Mr. Seery, I want to make sure.  Highland Capital owns

6    interests in the CLOs.  What is the CLOs' stake in the MGM

7    stock, or what was it?

8    A    Highland Capital does not own any interest in any of the

9    CLOs it manages.  It has a fee stream, and it can have certain

10   deferred fees that it can get, but it didn't own any interest

11   in any of the CLOs that it managed.

12   Q    Fair enough.  How about the portfolio companies?

13   A    Did Highland Capital own interests in the portfolio

14   companies?

15   Q    Yes.

16   A    Some of the ones Mr. Dondero listed, but they weren't

17   portfolio companies.  So he said OmniMax, but we didn't have

18   any management of OmniMax.  We just had debt that converted to

19   equity, but we didn't control the -- the thing.  That was

20   during the case, the company.

21   Q    Did Multistrat have an interest in MGM?

22   A    Multistrat owned MGM, yes.

23   Q    Okay.  And did your company, Highland Capital -- your

24   company -- Highland Capital have an interest in Multistrat?

25   A    Highland Capital owns 57 percent of Multistrat, yes.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/22/23   Page 108 of 235   PageID 9436
Main Document   Page 263 of 336

Seery - Direct                          262

1   Q   And did Highland Capital have an interest in any other

2   portfolio companies that have an interest in -- had a stake in

3   MGM?

4   A   RCP.  Restoration Capital Partners.

5   Q   And do you recall what the value of that was?

6   A   It shifted over time.  I don't -- I don't know what time

7   you're talking about.

8   Q   And isn't it true that 90 percent of all the securities

9   that Highland Capital owned at the time that the sale went

10   public was roughly 90 percent of all of Highland Capital's

11   securities?

12        MR. STANCIL:  Objection, Your Honor.  I don't know

13   what that question is asking.

14        THE COURT:  I don't understand it, either.

15     Could you rephrase?

16        MR. MCENTIRE:  I'll try to.

17   BY MR. MCENTIRE:

18   Q   At the time that the announcement was made about Amazon

19   buying MGM in May of 2021, what percentage of all the

20   securities did MGM comprise of the securities that were owned

21   by Highland Capital?

22   A   Of the securities that were directly owned by Highland

23   Capital, it may have been -- I'm thinking of public or semi-

24   public securities, the 150,000 or 170,000 that we had that

25   were subject to the Frontier lien.  Might have been almost all

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 07/27/23   Page 109 of 235   PageID 9437
Main Document   Page 263 of 235

Seery - Direct                          263

1    of the securities that we owned.  It wasn't -- it was a good

2    position, but it wasn't a huge driver for the directly-owned

3    shares.  There was more value in the Multistrat and the RCP.

4    Q   What percent of shares of all --

5           MR. STANCIL:  Your Honor, I'm sorry, I'm having

6    trouble hearing the end of Mr. Seery's answers.  So I know

7    it's not his --

8           THE WITNESS:  I'm sorry.

9           THE COURT:  Okay.  If you could make sure you speak

10   into the mic.

11          THE WITNESS:  Yeah.  I'm sorry.

12          MR. STANCIL:  I'm having trouble with Mr. McEntire

13   talking over the end of Mr. Seery's answers.

14          THE COURT:  Ah.

15          MR. STANCIL:  I'm having trouble following.

16          THE COURT:  Okay.

17          MR. STANCIL:  I apologize.

18          THE COURT:  Okay.  Could you --

19          MR. MCENTIRE:  I didn't know I was doing that.

20          THE COURT:  Well, --

21          MR. MCENTIRE:  I'll try to do better.

22   BY MR. MCENTIRE:

23   Q   Mr. Seery, of all the stock that Highland Capital owned in

24   May of 2021, what percentage of that was (inaudible) stock?

25   A   Hopefully this is clear.  Highland Capital did not own a

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/20/24   Page 110 of 235   PageID 9438
Main Document   Page 263 of 389

Seery - Direct                          264

1    lot of stock.  Highland Capital did have a direct ownership

2    interest in MGM, so that might have been the vast majority of

3    the stock that Highland Capital owned.  It did own interest in

4    other entities, like its investment in RCP or its investment

5    in Multistrat.  But of the stock that it owned directly, that

6    was probably it, and that's the one that was liened up to

7    Frontier.

8    Q    Mr. Seery, did Highland Capital own approximately 170,000

9    shares of MGM stock in May of 2021?

10   A    Yes.  You -- I'm sorry.  You asked me what percentage, and

11   I think I said roughly that amount of stock liened up to

12   Frontier, and that that might have been almost all of the

13   stock we owned.

14   Q    Does Highland Capital own a direct interest in HCLOF?

15   A    In HC --

16   Q    HCLOF?

17   A    HCLOF?  Yes.  Highland Capital owns a small direct

18   interest, and a large indirect interest which we got through

19   the settlement with HarbourVest.

20   Q    And the entity in which you acquired the indirect

21   interest, what's the name of that entity?

22   A    I don't recall.  It's a -- it's a single-shell special-

23   purpose entity that we own all of it and it has no other

24   assets.

25   Q    And just to make sure that the record is clear, you deny

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/29/23    Page 111 of 235    PageID 9439
Main Document    Page 265 of 360

Seery - Direct                           265

```
 1  under oath that HCLOF has any interest -- or had any interest

 2  in MGM stock?

 3  A   HCLOF has never owned MGM stock and still doesn't own MGM

 4  stock.  It's never owned it.

 5  Q   Um, --

 6  A   At least -- at least, as long as I've been in this case.

 7          MR. MCENTIRE:  One second, Your Honor, please.

 8      (Pause.)

 9          MR. MCENTIRE:  I'm going to have to pass the witness

10  because of time sensitivities, Your Honor, so I'll pass the

11  witness at this time.

12          THE COURT:  Okay.  Cross?

13                      CROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q   Mr. Seery?

16  A   Yes, sir.

17  Q   You just covered a lot of what we would have covered, so I

18  want to be really, really quick here.  Okay?  We're not

19  covering old ground.  Let's just start with the HarbourVest

20  settlement.  Do you recall that Mr. Dondero sent the email to

21  you on December 17th?

22  A   Yes.

23  Q   Okay.  When did you reach the agreement with HarbourVest

24  on the settlement?

25  A   December 10th.
```

Seery - Cross                              266

1   Q    Okay.

2             MR. MCENTIRE:  Your Honor, I'd like to move into

3   evidence Exhibit 31.  Actually, let me lay a foundation first.

4        Can you give the witness --

5             MR. MCENTIRE:  Is this a new exhibit?

6             MR. MORRIS:  No.  It's Exhibit 31.

7             MR. MCENTIRE:  Can I see it, Tim, please?

8             MR. MORRIS:  It's in your box.

9             MR. MCENTIRE:  Give me a minute.

10            MR. MORRIS:  Uh-huh.

11            THE COURT:  Okay.  We're about to focus on Highland

12   Exhibit what?

13            MR. MORRIS:  31.

14            THE COURT:  Okay.

15            MR. MORRIS:  Do you have it, Your Honor?

16            THE COURT:  I do.

17   BY MR. MORRIS:

18   Q    Do you have it, Mr. Seery?

19   A    I do, yes.

20            MR. MORRIS:  Do you have it, sir?

21            MR. MCENTIRE:  I do.  Thank you.

22            MR. MORRIS:  Okay.

23   BY MR. MORRIS:

24   Q    Can you just tell the Court what this is?

25   A    This is an email chain.  It starts from me to the other

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/26/23    Page 113 of 235    PageID 9441
Main Document    Page 2613 of 835

Seery - Cross                                   267

1  independent directors, copying counsel, to outline the terms

2  of the HarbourVest settlement that I had just made the offer

3  to HarbourVest to settle on these terms on December 8th.  And

4  this was the product of a number of negotiations that had

5  taken place over the prior weeks, and this was the final offer

6  that I was making to them to settle.

7  Q    Directing your attention to the bottom of the first page,

8  the first email dated December 8, 2020 at 6:46 p.m., can you

9  just read the first sentence out loud.

10 A    I lost -- you lost me.

11 Q    That begins, "As discussed yesterday."

12 A    Oh.  "As discussed yesterday, after consultation with John

13 Morris" -- that would be you -- "regarding litigation risks,

14 this evening I made an offer" -- it says "and," but it should

15 have said "an" -- "offer to HarbourVest to settle their

16 claims.  The following are the proposed terms."

17 Q    Okay.  Just stop right there.  And you were -- this is the

18 report that you gave to the independent directors?

19 A    The other independent directors.

20 Q    Right.

21 A    I was also one.

22 Q    Right.  And did Mr. Dubel respond?

23 A    He did, yes.

24 Q    And can you just describe briefly what your understanding

25 was of his response?

009724

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/01/23   Page 114 of 235   PageID 9442
Main Document   Page 268 of 398

Seery - Cross                                        268

 1    A    Dubel responds a couple hours after I sent the original

 2    email:  "Jim, this basically looks like a $10 million -- net

 3    $10 million payment to HV." That's HarbourVest.  "Is that

 4    correct?  Does the 72-cent recovery include the $22-1/2

 5    million that we get from the transfer of HCLOF interests?

 6    Remind me again, post-effective date, who is managing HCLOF?"

 7         So I think my understanding was Mr. Dubel was querying me

 8    on some of the terms that I had set forth here, including that

 9    the value of the claim in our estimation was going to be about

10    $9.9 million, meaning they would have a $45 million senior

11    claim, a $35 million junior claim, and we thought, based on

12    the values we had then, it was going to pay out about $9.9

13    million.

14    Q    Okay.  And was this offer accepted?

15    A    Yes, it was.

16    Q    When was it accepted?

17    A    I think I just said.  On -- on December 10th.

18    Q    Okay.  And did the terms that you described for the other

19    independent directors on December 8th, did they change in any

20    way at all from that reflected in this email until the time we

21    got to the 9019 hearing?

22    A    Not at all, no.

23    Q    Okay.  I see that you mention in here that you -- it says,

24    quote, "The interests have a marked value of $22-1/2 million,

25    according to Hunter Covitz."  Do you see that?

Seery - Cross                     269

1    A    That's correct, yes.

2    Q    Who's Hunter Covitz?

3    A    Hunter Covitz was a Highland employee.  He ran the

4    structured products business.  So he was responsible for

5    making sure that the CLO we managed, which was AC7, was

6    compliant and was -- with the indentures.  He also was

7    responsible for monitoring the -- what we call the 1.0 CLOs,

8    even though they weren't really CLOs, they were more like

9    closed-in funds.  And he also kept track of the Acis -- CLOs

10   that HCLOF had an interest in that were managed by Acis.

11   Q    Okay.  And do you recall how he conveyed to you the NAV?

12   A    Well, I talked to him numerous times, so this wasn't our

13   -- I didn't just call him up at the end and say, what's the

14   NAV?  I had had discussions with him while I was negotiating

15   with HarbourVest.  And at some point, he or someone -- he told

16   me the amount, and at some point he gave me a NAV statement

17   that actually showed the NAV of HCLOF, which at 11/30 was

18   roughly $45 million.

19   Q    Okay.  Can you turn to Exhibit 31-A, the next document in

20   the binder?

21   A    Mine's completely blacked out.

22              THE COURT:  I'm sorry, what number?

23              MR. MORRIS:  31-A.

24              THE COURT:  Oh.

25              MR. MORRIS:  And the first two pages are redacted

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 116 of 235    PageID 9444
Main Document    Page 117 of 233

Seery - Cross                                    270

1    just because they're not relevant and they're business

2    information.

3    BY MR. MORRIS:

4    Q    But can you turn to the last page, sir?

5    A    Yes.

6    Q    Can you tell the judge what this is?

7    A    So this is a net asset value statement from HCLOF.  That's

8    Highland CLO Funding, Limited.  That's the Guernsey entity

9    that -- that held these interests.  And this is a net asset

10   amount, and it shows what the net -- what the net asset value

11   is as of this time on a carryforward basis of $45.191 million.

12   Q    Okay.  And where did you get this document?

13   A    I believe I got it from Covitz.  It's generated by an

14   entity called Elysium, which is the fund administrator for

15   HCLOF, and I believe they're out of Guernsey.

16   Q    And did you rely on this document in setting the proposal

17   to HarbourVest?

18   A    Well, both the conversations with Covitz and the document.

19   And frankly, HarbourVest got the same documents because they

20   were -- they held a membership interest in HCLOF.  So he --

21   Michael Pugatch knew what the NAV was.

22   Q    And would Mr. Dondero or entities controlled by him who

23   also have interests in HCLOF, is it your understanding that

24   they would have also had this document available?

25   A    All members would --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 08/27/23   Page 117 of 235   PageID 9445
Main Document   Page 272 of 589

Seery - Cross                                    271

1          MR. MCENTIRE:  Excuse me.  Excuse me.  I object to

2    that question, the question being "and the entities controlled

3    by Mr. Dondero."  There's no foundation for this witness to

4    answer a question like that.

5    BY MR. MORRIS:

6    Q    Who else owned --

7          THE COURT:  Sustained.

8    BY MR. MORRIS:

9    Q    -- an interest in HCLOF?

10         THE COURT:  Go ahead.

11         THE WITNESS:  It would have been DAF.

12   BY MR. MORRIS:

13   Q    The DAF?

14   A    Yeah.

15   Q    Okay.  Let's just ask this question.  Is it your

16   understanding that these NAV valuation reports were made to

17   all holders of interests in HCLOF?

18   A    Yes.  And that would include the DAF.  And I did leave off

19   that there were three former Highland employees long gone, or

20   at least not around at this point, who also owned very small

21   interests, and they would have gotten those statements as

22   well.

23   Q    And does HCLOF also produce audited financial statements?

24   A    It does, yes.

25   Q    Can you go to Exhibit 60, please?

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 118 of 235    PageID 9446
Main Document    Page 117 of 238

Seery - Cross                                272

1    A    Six zero?

2    Q    Yes, sir.  A couple of questions here.  Is this a document

3    that Highland would have received in the ordinary course of

4    business?

5    A    Yes, it is.

6    Q    Okay.  And what is the NAV depicted on this page as of the

7    end of the year 2020?

8    A    Well, you have to look through it, because this document

9    is actually dated 4/21/21, --

10    Q    Okay.

11    A    -- which you can see on Page 10 where it's signed.  And

12    that shows a net asset value of $50.4 million as of 12/31/21.

13    12/20.  I'm sorry.  And -- but it wasn't prepared until -- the

14    audits aren't done and we don't get this document until after

15    the directors sign off in April.

16    Q    Okay.

17            MR. MORRIS:  And Your Honor, I move for the admission

18    into evidence of these three HarbourVest-related documents,

19    30, 31-A, and 60.

20            MR. MCENTIRE:  No objection.

21            THE COURT:  They're admitted.

22            MR. MORRIS:  Okay.

23        (Debtors' Exhibits 30, 31-A, and 60 are received into

24    evidence.)

25    BY MR. MORRIS:

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/27/23    Page 119 of 235    PageID 9447
Main Document    Page 272 of 235

                          Seery - Cross                          273

1  Q    Okay.  Let me move on.  We've seen Mr. Dondero's email

2  today.  You've seen that before, correct?

3  A    Yes.

4  Q    Okay.  What was your reaction when you got it?

5  A    I was highly suspicious.

6  Q    Why is that?

7  A    Well, not to replow too much old ground, but this came

8  after he threatened me.  He threatened me in writing.  I'd

9  never been threatened in my career.  I've never heard of

10  anyone else in this business who's been threatened in their

11  career.  So anything I would get from him, I was going to be

12  highly suspicious.

13       It also followed the imposition of a TRO for interfering

14  with the business.  He knew what was in the TRO and he knew

15  what it applied to, and it restricted him from communicating

16  with me or any of the other independent directors without

17  Pachulski being on it.

18       Furthermore, Pachulski had advised Mr. Dondero's counsel

19  that not only could they not communicate with us, if they

20  wanted to communicate they had to prescreen the topics.

21       And how do we know that?  Because Dondero filed a motion

22  to modify the TRO.  And that was all before this email.

23       In addition, that followed the termination of the shared

24  service arrangements, the approval of the disclosure

25  statement, and the demand to collect on the demand notes that

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Main Document   Filed 09/07/23   Page 120 of 235   Page 120 of 235   PageID 9448

Seery - Cross                          274

1    Mr. Dondero and his entities were liable for.

2        So at that point, he'd been interfering with the business,

3    he had threatened me, he was subject to a TRO, and I got this

4    email and I was highly suspicious.

5    Q    Did you ever share this email with anybody at Farallon?

6    A    No.

7    Q    Did you ever share this email with anybody at Stonehill?

8    A    No.  And just to be clear, not just the email, the

9    contents.  Never discussed it with them.

10   Q    That was going to be my next question.  Did you ever share

11   any information about MGM with anybody?

12              MR. MCENTIRE:  Objection.  Leading.

13              MR. MORRIS:  I'm asking the question.

14              MR. MCENTIRE:  No, you're leading.

15              MR. MORRIS:  This is the whole --

16              MR. MCENTIRE:  You're leading the witness.

17              THE COURT:  Overruled.  Finish the question.

18   BY MR. MORRIS:

19   Q    Did you ever share any information concerning with MGM

20   with anybody at Stonehill before you learned that they had

21   purchased claims?

22              MR. MCENTIRE:  Objection.  Leading.

23              THE COURT:  Overruled.

24              THE WITNESS:  No.  No, I did not.

25   BY MR. MORRIS:

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/07/23   Page 121 of 235   PageID 9449
Main Document   Page 121 of 235

Seery - Cross                                        275

1    Q    Did you ever share any information with anybody at

2    Farallon concerning MGM before you learned that they purchased

3    their claims?

4              MR. MCENTIRE:  Objection.  Leading.

5              THE WITNESS:  No, I did not.

6              THE COURT:  Overruled.

7              THE WITNESS:  I'm sorry.

8         (Pause.)

9              THE WITNESS:  You know, you just asked me something

10   about Stonehill.

11             THE COURT:  No.

12             THE WITNESS:  I'm sorry.

13   BY MR. MORRIS:

14   Q    Yeah.  No question.

15   A    I wanted to clarify one.

16   Q    What did you want to clarify, sir?

17   A    Certainly didn't share anything about this email, any of

18   the contents of it.  I don't know if I ever -- I don't know

19   exactly when Stonehill bought their claims, and they were

20   subject to the NDA to do the financing process.  So I know

21   when Farallon told me they had bought their claims and I know

22   we never had any discussions at all before they acquired their

23   claims, and I don't know when Stonehill got those -- their

24   claims, so I don't know when -- what was in the data room or

25   what -- what might have been discussed about MGM while they

 1   were under an NDA.

 2   Q    Okay.

 3   A    But certainly nothing -- I never shared the contents of

 4   this email, the substance of this email, the email at all.

 5   That's what I wanted to clarify.

 6   Q    What data room are you talking about, sir?

 7   A    This was the data room related to the exit financing where

 8   we sought exit financing and ultimately got exit financing

 9   from Blue Torch Capital.

10   Q    And who put together the data room?

11   A    DSI, which was our financial consultants, and our finance

12   team.

13   Q    And why did you -- did you delegate responsibility for

14   creating the data room to DSI and the members of your team you

15   just identified?

16   A    Yeah, of course.

17   Q    How come?

18   A    I don't really know how to put together a data room.

19   Q    Did you -- did you direct them to put anything in the data

20   room?

21   A    Not specifically.  We had a deck that we -- that certainly

22   I worked on and commented on, which would have been a general

23   overview of the -- of the post-reorganized Highland and the --

24   and the -- and the Claimant Trust.  So I certainly commented

25   on that.  But the specific information in the data room, I

1    don't -- I never looked at it.  I don't know what it is.

2    Q    How many -- how many entities who were participating in

3    the exit facility process wound up making bids or offers?

4    A    There were five that signed NDAs.  Three provided

5    substantive proposals.  One was verbal.  That was Bardin Hill,

6    who'd been contacting me throughout the case, and they do this

7    kind of financing, and they submitted a competitive bid.

8    Stonehill in writing, and then amended, a more aggressive one,

9    in writing.  And Blue Torch probably three, and the most

10   aggressive.

11   Q    And did you give the -- did you give the opportunity to

12   your age-old friends at Stonehill?

13   A    They're not my age-old friends.  And no, they lost.  They

14   were second, they were close, it was a good real proposal, but

15   they didn't win.

16   Q    So, --

17   A    Blue Torch won.

18   Q    So is it fair to say that you -- did you pick the best

19   proposal that you thought provided the best value for the

20   company that you were managing?

21           MR. MCENTIRE:  Your Honor, again, for the last ten

22   minutes, we've had nothing but leading questions.  And it just

23   is --

24           MR. MORRIS:  Fine.  Happy to --

25           THE COURT:  Sustained.  Rephrase.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 21-41    Filed 12/07/23    Page 124 of 235    PageID 9452
Main Document    Page 272/23 of 388

Seery - Cross                                278

1   BY MR. MORRIS:

2   Q    Why did you pick Stone -- why did you pick Blue -- Blue-?

3   A    Blue Torch.

4   Q     Blue Torch, over the other bids?

5   A    It was the best bid.  So, structurally, it was the least

6   expensive, although they were extremely close.  I had a lot of

7   confidence in Blue Torch because this type of financing is

8   what they do.  And while you can never have a hundred percent

9   confidence that if somebody goes through the -- this is an

10  LOI, right, so this is a letter of intent.  When they go

11  further, they may -- they may not complete it.  But I had a

12  high degree of confidence that they would get there, because,

13  again, that's what they do.  And they were the -- they were

14  just the better bid.

15  Q    Okay.  Do you recall that in Mr. Dondero's notes he wrote

16  down that he was told that Farallon had purchased their claims

17  in February or March?

18  A    I saw that on what he claimed, yes.

19  Q    And is that consistent with what you were told by Farallon

20  in March?

21  A     They told me they acquired the claims -- they had acquired

22  the claims on March 15th, by email.  I don't know if they

23  acquired them in February or March.  Or even January.  I know

24  they said they had them on March 15.

25  Q    Did you ever speak with Farallon about anything having to

1    do with the purchase of their claims?

2              MR. MCENTIRE:  Objection.  Leading.

3              THE COURT:  Overruled.

4              THE WITNESS:  Not -- not before they sent me that

5    email.

6              MR. MORRIS:  I apologize.  Withdrawn.

7    BY MR. MORRIS:

8    Q    Before -- before learning of their purchase, had you had

9    any discussions with them about potential claim purchases?

10             MR. MCENTIRE:  Objection.

11             THE WITNESS:  No.

12             MR. MCENTIRE:   Leading.

13             THE WITNESS:  I'm sorry.

14             THE COURT:  Overruled.

15             THE WITNESS:  No, I didn't.

16   BY MR. MORRIS:

17   Q    Okay.  Before you learned that Stonehill had purchased

18   claims in the Highland bankruptcy, had you ever had any

19   conversation with them about the potential purchase of claims?

20             MR. MCENTIRE:  Objection.  Leading.

21             THE WITNESS:  No, I don't -- I don't --

22             THE COURT:  Overruled.

23             THE WITNESS:  I'm sorry.  I don't -- I don't believe

24   so, no.

25   BY MR. MORRIS:

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/20/24   Page 126 of 235   PageID 9454
Main Document   Page 280 of 283

Seery - Cross                                    280

1  Q   Do you have any knowledge at all as to how the sellers

2  went about selling their claims?

3  A   I have some knowledge now, post-effective date, that I

4  believe I have some understanding, but not a great one.

5  Q   Did you ever communicate with any of the sellers about the

6  potential sale of their claims prior to the time their claims

7  were sold?

8           MR. MCENTIRE:  Objection.  Leading.

9           THE COURT:  Overruled.

10          THE WITNESS:  I did have a conversation with Eric

11 Felton who was the Redeemer representative on the Creditors'

12 Committee.  And it came out of one of the emails I got.  I

13 think it indicated that --

14          MR. MCENTIRE:  Objection, hearsay, Your Honor.  I

15 mean, hearsay, Your Honor.

16          THE COURT:  Okay.

17          MR. MCENTIRE:  It's hearsay.

18          THE COURT:  Okay.  He's about to say something that's

19 hearsay is the objection.  Any response?

20          MR. MORRIS:  I'm not offering it for the truth of the

21 matter asserted.  I'm offering it for Mr. Seery's state of

22 mind and the extent of his communications.  How about that?

23          MR. MCENTIRE:  I don't see how you could offer it for

24 anything other than for the truth of the matter asserted.

25 It's coming from a third party, so I object to hearsay.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/20/23    Page 127 of 235    PageID 9455
Main Document    Page 223 of 308

Seery - Cross                                       281

```
 1              MR. MORRIS:  Okay.  You know what?  We --
 2   BY MR. MORRIS:
 3   Q    Other than the one conversation --
 4              THE COURT:  Are you withdrawing the question or do I
 5   need --
 6              MR. MORRIS:  Yeah.  This is just --
 7              THE COURT:  Okay.  You're withdrawing the question.
 8              MR. MORRIS:  I'll withdraw the question.
 9              THE COURT:  Okay.
10   BY MR. MORRIS:
11   Q    Other than the one conversation with Mr. Felton, did you
12   ever have a conversation with any seller prior to the time you
13   learned that Farallon or Stonehill --
14              MR. MCENTIRE:  Objection.  Leading.
15   BY MR. MORRIS:
16   Q    -- purchased the claims?
17              THE COURT:  Overruled.
18              THE WITNESS:  No.
19   BY MR. MORRIS:
20   Q    Did you play any role in facilitating or recommending to
21   Farallon or Muck that it purchase claims?
22              MR. MCENTIRE:  Objection.  Leading.
23              THE COURT:  Overruled.
24              THE WITNESS:  No.  None whatsoever.
25   BY MR. MORRIS:
```

009738

Seery - Cross                                    282

1    Q    Did you play any role in facilitating or recommending that

2    Stonehill or Jessup purchase claims?

3    A    No.

4              MR. MCENTIRE:  Objection.  Leading.

5              THE COURT:  Overruled.

6              THE WITNESS:  I'm sorry.

7    BY MR. MORRIS:

8    Q    All right.  Let's just finish up with compensation.  Can

9    you go to Exhibit 41, please?  Can you just identify that

10   document for the Court?

11   A    This is the -- it's a memorandum agreement that sits on

12   top of an outline.  It is the December 2 incentive

13   compensation agreed terms for Highland Capital --

14   Q    Okay.

15   A     -- and the Trust.

16   Q    And when was this signed?

17   A    It would have been -- the date is December 6th.

18   Q    And --

19   A    2021.  I'm sorry.

20   Q    Okay.  And when did you and the Committee members begin

21   discussing your compensation package?

22   A    Shortly after the effective date, which was August 11,

23   2021.

24   Q    And were there any negotiations during that intervening

25   three- or four-month period?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/27/23   Page 129 of 235   PageID 9457
Main Document   Page 283 of 235

Seery - Cross                                283

1    A    Considerable negotiations during that period, yes.

2    Q    Can you go to the last page of Exhibit 41?  Can you

3    describe that for the Court?  I know it's hard to read, but --

4    A    I --

5    Q    -- the numbers don't matter so much as the infor... you

6    know, just, can you just describe --

7    A    Yeah.

8    Q    -- what's being conveyed?

9    A    So it's very hard to read, but it says -- because it's

10   small -- Seery Proposal 1, Oversight Counter 1, Seery Proposal

11   2, Oversight Counter 2, and then it continues down.  My

12   recollection is that we had four or five rounds of back-and-

13   forth that were meaningful.  But it -- but it even took a

14   detour in the middle, because it started with my proposal,

15   which was pretty robust, and their response to me that they

16   didn't like the structure or the amount, and so then we

17   started talking about that.  And then they -- after we were

18   kind of hitting numbers and structure at the same time, they

19   came back to me and said, stop, we've got to agree on the

20   structure before we agree on the amounts.

21         MR. MCENTIRE:  Your Honor, I'm going to object as

22   it's hearsay and move to strike.  This is -- he's not talking

23   about the document.  He's talking about something outside of

24   the four corners of the document.  I object to hearsay.

25         MR. MORRIS:  Hearsay?  There's no statement.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/20/23   Page 130 of 235   PageID 9458
Main Document   Page 228 of 335

Seery - Cross                        284

1        THE COURT:  There was --

2        MR. MORRIS:  It's a description of what happened.

3        MR. MCENTIRE:  But he's actually referring to

4    statements in his substantive comments.

5        THE COURT:  Overruled.  Okay.

6        MR. MORRIS:  I move for the admission into evidence

7    of Exhibit 41.

8        THE COURT:  Any objection?

9        MR. MCENTIRE:  That's the memorandum agreement, Mr.

10   Morris?  Is that it?

11       MR. MORRIS:  Yes, sir.

12       MR. MCENTIRE:  No objection.

13       THE COURT:  Admitted.

14     (Debtors' Exhibit 41 is received into evidence.)

15   BY MR. MORRIS:

16   Q   Can we go backwards to Exhibit 39, please?  Can you

17   describe for the Court what that is?

18   A   This is a redacted copy of minutes of the board meeting on

19   August 21 -- 26, 2021.

20   Q   And there's a lot of stuff redacted there.  Do you have an

21   understanding as to why there is redactions?

22   A   It would have nothing to do with these issues that we're

23   discussing or the alleged *quid pro quo*.

24   Q   Okay.  Can you just read out loud the last portion that's

25   unredacted on the second page, beginning with "Mr. Seery

009741

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/26/23   Page 131 of 235   PageID 9459
Main Document   Page 283 of 235

Seery - Cross                                    285

1    reviewed"?

2    A    It actually says, "Mr. Seery also presented the board with

3    an overview of his incentive compensation program proposal,

4    which would include not only Mr. Seery but the current HCMLP

5    team.  The terms and structure of the proposal had been

6    previewed with the board in prior operating models presented

7    by Mr. Seery.  Mr. Seery reviewed the proposal and stated his

8    view that the proposal was market-based and was designed to

9    align incentive between himself and the HCMLP team on the one

10   hand and the Claimant Trust beneficiaries on the other.  The

11   board asked questions regarding the proposal and determined

12   that it would consider the proposal and revert to Mr. Seery

13   with a counterproposal."

14   Q    All right.  When you were -- when you were shown one of

15   these documents before, you were asked to identify Mr. Linn,

16   but you weren't asked about the others.  Do you see Richard

17   Katz there?

18   A    Yes.

19   Q    Who's that?

20   A    He's the independent member.

21   Q    Did he play any role in the negotiation of your

22   compensation package?

23   A    Yes.  He was actively involved.

24   Q    Okay.  And how about Mr. Provost?  Who's he?

25   A    He is the Jessup person.  Jessup is the board member.

 1    He's their representative on the board.

 2    Q    Okay.

 3              MR. MORRIS:  And I move for admission into evidence

 4    of Exhibit 39.

 5              MR. MCENTIRE:  No objection, Your Honor.

 6              THE COURT:  Admitted.

 7         (Debtors' Exhibit 39 is received into evidence.)

 8    BY MR. MORRIS:

 9    Q    Let's go to Exhibit 40, please.  Can you just describe for

10    the Court what that is?

11    A    This is a subsequent board meeting minutes, August 30,

12    2021.

13    Q    And can you just read into the record -- why are there

14    redactions?

15    A    Again, they would -- if there are redactions, it would

16    have nothing to do with the issues that are being brought up

17    in this motion.

18    Q    And can you just read into the record the paragraph

19    beginning, "Mr. Katz"?

20    A    "Mr. Katz began the meeting by walking the Oversight Board

21    and Mr. Seery through the Oversight Board's counterproposal to

22    the HCMLP incentive compensation proposal, including the

23    review of the spreadsheet and summary of the counterproposal.

24    Discussion was joined by Mr. Linn and Mr. Stern.  Mr. Seery

25    asked numerous questions and received detailed responses from

1   the Oversight Board.  Mr. Seery and the Oversight Board agreed

2   to continue the discussion and negotiations regarding the

3   proposed incentive compensation plan for the Claimant Trustee

4   and the -- and the HCMLP."

5   Q    So they didn't accept your original proposal that you made

6   in the earlier document?

7   A    They did not.

8   Q    Okay.  And did negotiations continue?

9   A    They did, yes.

10        MR. MORRIS:  Before we go on, I move for admission

11  into evidence Exhibit 40.

12        THE COURT:  Any --

13        MR. MCENTIRE:  No objection.

14        THE COURT:  It's admitted.

15     (Debtors' Exhibit 40 is received into evidence.)

16  BY MR. MORRIS:

17  Q    Can you go to Exhibit 59, please?  Can you describe for

18  the Court what this is?

19  A    This is an email string between me and the Oversight Board

20  regarding the compensation proposal.

21  Q    Okay.  And directing your attention to the bottom, I

22  guess, of the second page, there is an email from Mr. Katz

23  dated October 26.  Do you see that?

24  A    At the bottom of the second -- oh, yes, yes.

25  Q    Okay.  Can you just read the sentence at the bottom of the

009744

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/20/23   Page 134 of 235   PageID 9462

Seery - Cross                    288

1    page beginning "We propose"?

2            MR. MCENTIRE:  Well, Your Honor, I would, first of

3    all, object to him just reading from the document until it's

4    been put into evidence.

5            THE COURT:  I'm sorry, say again?

6            MR. MCENTIRE:  I would object to Exhibit --

7            THE COURT:  We can't pick things up on the record

8    when you don't speak in a mic.

9            MR. MCENTIRE:  I object to him simply reading from

10   the document before the document is offered into evidence.

11           MR. MORRIS:  Okay.

12           MR. MCENTIRE:  Accepted into evidence.

13           MR. MORRIS:  Sure.  I'd move it into evidence.

14           MR. MCENTIRE:  I object as hearsay.

15           MR. MORRIS:  This is a present sense recollection --

16   recorded.  It's a clear business record.  It's a negotiation

17   that's happening over time.  Mr. Seery is here to answer any

18   questions about authenticity.

19           MR. MCENTIRE:  Well, first of all, it's an email

20   string involving communications with third parties.  That's

21   hearsay in and of itself.  And it's not been established that

22   this is a business record.  And Mr. Morris's statements to

23   that effect, frankly, don't carry his burden.  There's

24   internal hearsay contained throughout the document, Your

25   Honor, even if it is a business record.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/29/23    Page 135 of 235    PageID 9463
Main Document    Page 229 of 289

Seery - Cross                             289

 1          MR. MORRIS:  Your Honor, just to be clear, let me

 2   respond.

 3          THE COURT:  Uh-huh.

 4          MR. MORRIS:  Exceptions to hearsay rule.  803(1)

 5   present sense impression; (2) -- (3) existing mental

 6   impression, state of mind about motive, (5) recorded

 7   recollection, (6) records of regularly-conducted activity, or

 8   Federal Rule of Evidence 807, residual exception for

 9   trustworthy and probative evidence.  I'll take any of them.

10          MR. MCENTIRE:  None of them apply.

11          MR. MORRIS:  Okay.

12          THE COURT:  Okay.  Overruled.

13          MR. MORRIS:  Thank you.

14          THE COURT:  I admit it.  59's admitted.

15      (Debtors' Exhibit 59 is received into evidence.)

16   BY MR. MORRIS:

17   Q   Can you just read that last sentence at the bottom of that

18   page?

19   A   This is from Rich Katz to me.

20   Q   Uh-huh.

21   A   (reading)  We propose doing this in two stages.  First,

22   we'd like to come to agreement on structural, underscored,

23   elements of the ICP.

24      ICP means incentive compensation program or plan.

25      Only after we'd done that, when the board had greater

Seery - Cross                               290

1    understanding of what plan they were pricing, would we haggle

2    out the specific numbers, underscore, tier attachment points,

3    and percentage participation in each tier.

4    Q    Okay.  And going to the right-hand part of that, do you

5    see where it says, Salary J.S. Only?

6    A    Yes.

7    Q    Can you just, you know, generally describe for the Court

8    what the debate is or the negotiation that's happening on that

9    particular point?

10   A    Well, this was brought up earlier.  The salary was

11   $150,000 a month.  That was the same salary that I'd had

12   during the case that was approved by the Court.  It had been

13   approved by the Committee, approved by the other independent

14   members.  That was continuing.  It was also contained as an

15   actual base salary in the plan and the Claimant Trust

16   Agreement, and they were never amended.

17        The Committee came back to me and said, we'd like that to

18   step down.  And they'd like it to step down on a definitive

19   specific schedule, because they had a view that that would

20   incentivize me to work faster to make distributions before the

21   stepdown and that I wouldn't linger in the role.  And the

22   yellow --

23   Q    Can you just read the yellow out loud?

24   A    That's --

25   Q    Read the whole thing.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/26/23   Page 137 of 235   PageID 9465
Main Document   Page 292 of 389

Seery - Cross                          291

1    A    That's my response.

2    Q    Read the whole thing.

3    A    (reading)  Based on the required expertise, volume, and

4    personal risk of the work today, I do not think that any

5    formulaic reduction in base comp is appropriate.  With the

6    complexity and amount of issues that I have to manage on a

7    daily basis, I currently do not have capacity to take on

8    significant outside work.  Of course, things can change.  If

9    they do, I am open to discussing reduction in the base.  I

10   have no interest in sitting around doing nothing, having no

11   risk, and collecting the full base compensation.  We can

12   include prefatory language and an agreement to revisit our

13   terms, but I do not see an avenue to set parameters to lock in

14   an agreement for the future at this time.

15        And then there's another paragraph on severance.

16   Q    You can stop there.

17            MR. MORRIS:  I have no further questions.

18            THE COURT:  All right.  Pass the witness.

19            MR. MCENTIRE:  Do you have any questions?

20            A VOICE:  No.

21            MR. MCENTIRE:  Okay.  How much time do I have,

22   please?

23            THE CLERK:  So, the limit is at two hours and 32

24   minutes.

25            MR. MCENTIRE:  All right.

```
 1                      REDIRECT EXAMINATION
 2   BY MR. MCENTIRE:
 3   Q    Just a couple questions very quickly, Mr. Seery.  Highland
 4   Capital Management paid HarbourVest cash as part of the
 5   settlement, correct?
 6   A    That's incorrect.
 7   Q    There was no cash component at all?
 8   A    There was not.
 9   Q    And in connection with the HarbourVest settlement,
10   HarbourVest transferred an interest in HCLOF to Highland
11   Capital or an entity affiliated with Highland Capital; is that
12   not correct?
13   A    That's correct.
14   Q    And that -- that entity -- and HCLOF, and HCLOF had an
15   interest in various CLOs, correct?
16            MR. MORRIS:  Your Honor, I object.  This is beyond
17   the scope of my cross, or redirect, however you prefer.
18            MR. MCENTIRE:  Well, you spent a lot of time on
19   HarbourVest.  I'm just trying to clear it up.
20            MR. MORRIS:  I didn't say the word CLO.  I did not
21   say the word CLO.
22            THE COURT:  Overruled.  He can go there.
23        If you'd please move the mic towards your voice.
24   BY MR. MCENTIRE:
25   Q    And HCLOF had an interest in various CLOs, correct?
```

Seery - Redirect                    293

1    A    I believe it had an interest in five CLOs.  Oh, that's not

2    true.  It had an interest in five of the 1.0 CLOs.  It also

3    owned one hundred -- basically, somewhere between 87 and a

4    hundred percent of Acis 3, 4, 5, 6, and 7, which is about a

5    billion dollars of CLOs to 10 (inaudible) leveraged vehicles,

6    and they owned basically all the equity, so that was the

7    driver of the value.

8    Q    And various entities that were -- I mean, some of these

9    various CLOs had an interest in MGM stock, correct?

10   A    The 1. -- the Highland 1.0s did.  The value drivers I just

11   described -- Acis 3, 4, 5, 6, and 7 -- had no interest in MGM.

12   Q    But one of them did have an interest in MGM?

13   A    That's not correct.

14   Q    What did you just say?

15   A    3, 4, 5, 6, and 7 did not have any interest in MGM.

16   Q    Were there any CLOs that had an interest in MGM?

17   A    Some of the 1.0 CLOs did, --

18   Q    I see.

19   A     -- yes.

20           MR. MCENTIRE:  Pass the witness.

21           MR. MORRIS:  No further questions.

22           THE COURT:  Mr. Seery, I want to ask you one thing.

23           THE WITNESS:  Yes, Your Honor.

24                     EXAMINATION BY THE COURT

25           THE COURT:  We dance around it a lot.  The Highland

009750

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Main Document Filed 09/29/23    Page 140 of 235    Page 140 of 235    PageID 9468

Seery - Examination by the Court                    294

1   ownership of MGM stock.  If think -- if you could confirm I've

2   heard this correct -- you said Highland itself owned 170,000

3   shares that were subject to a Frontier Bank lien?

4              THE WITNESS:  Yes, Your Honor.  I believe that's the

5   right amount.  So, Highland directly owned about 170,000

6   shares.  Those were liened up to Frontier.  They were -- they

7   were never transferred.  Highland never sold any MGM stock.

8              THE COURT:  Okay.  So Frontier still holds it or

9   what?

10             THE WITNESS:  No.  In fact, post-effective -- I

11  believe it was post-effective date, and with cash generated,

12  we -- we paid off the Frontier loan, --

13             THE COURT:  Uh-huh.

14             THE WITNESS:  -- released that lien, and then we held

15  those shares in MGM until the merger was consummated.

16             THE COURT:  Okay.

17             THE WITNESS:  So we tendered our shares into the --

18  into the merger and got the merger consideration, which was

19  cash.

20             THE COURT:  Okay.  And so there was that.  But other

21  than that, you said Highland owned 50 percent of Multistrat,

22  which owned some MGM stock?

23             THE WITNESS:  Multistrat had a -- I don't recall the

24  amount, but a material amount of MGM stock.  That also -- so,

25  Highland owned 57 percent of Multistrat.  Is also the manager

009751

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/06/23   Page 141 of 235   PageID 9469
Main Document   Page 295 of 338

Seery - Examination by the Court                    295

1    of Multistrat.

2              THE COURT:  Uh-huh.

3              THE WITNESS:  Multistrat did not sell any MGM stock.

4    It also tendered them into the merger as well.

5              THE COURT:  Okay.  And then you said Highland owned

6    some percentage of Restoration --

7              THE WITNESS:  Restorations Capital Partners.

8              THE COURT:   -- Capital Partners, which owned some

9    MGM stock?

10             THE WITNESS:  Similarly, Highland is the manager of

11   what we call RCP.  RCP owned a material amount of MGM stock.

12   RCP did not sell any MGM stock.  However, in 2019, you'll

13   recall that Mr. Dondero sold $125 million of stock

14   postpetition out of RCP.  It was MGM stock.  He sold it back

15   to MGM.  We had a -- we had a hearing on it, because

16   subsequently the Independent Board learned about it, the

17   Committee learned about it, they had not -- it had not been

18   disclosed, but there was a -- what we thought was a binding

19   agreement with MGM, and MGM indicated that they were going to

20   hold us to it, and so we had a hearing about approving that

21   transaction.  The Committee was not happy.

22             THE COURT:  Okay.  I'm fuzzy on when that was.  You

23   said?

24             THE WITNESS:  That would have been in early 2020,

25   probably April-ish timeframe.

1          THE COURT:  Okay.

2          MR. MORRIS:  Your Honor?

3          THE WITNESS:  The transaction was in November, I

4    believe.

5          MR. MORRIS:  If it's helpful, Your Honor, you can

6    find it at Docket 487.

7          THE COURT:  Okay.

8          MR. MORRIS:  I think that's the objection from the

9    Committee where the issue was -- comes up at least at one

10   time.

11         THE COURT:  Okay.  And then I think this is the last

12   category I heard, that HCM and its specially-created sub owned

13   just over 50 percent of HCLOF, and it in turn owns interest in

14   a lot of CLOs, and a few of those, what you call the 1.0 CLOs,

15   did own some MGM stock?

16         THE WITNESS:  That's correct.  So if you look on the

17   audited financials that we had introduced into evidence,

18   you'll see actually every asset that HCLOF owns.  There's no

19   MGM in there.  It does own interest.  There were minority

20   interests in five or six of the 1.0 CLOs.  Grayson,

21   Greenbrier, Gleneagles, Brentwood, Liberty, and one other.

22   And it had interest in those, but it never owned any MGM stock

23   and it never traded any MGM stock.  It didn't own any.

24         THE COURT:  All right.  Did I cover the universe of

25   what MGM stock was owned by Highland or something Highland had

009753

Seery - Examination by the Court            297

1    an interest in?

2            THE WITNESS:  Yeah.  So, the ones that HCLOF had an

3    interest in that I just listed, those -- Jasper was the other

4    one.  I apologize.  The -- they owned -- they owned MGM stock

5    among their other -- they had a lot of other assets.   The

6    other CLOs, the 1.0 CLOs that Highland had, every one of them

7    owned MGM stock.  None of them sold or bought any stock.

8    Those all tendered into the merger as well.  Highland did not

9    own any interest in any of those entities.

10            THE COURT:  Uh-huh.

11            THE WITNESS:  It just managed them.

12            THE COURT:  Okay.  And this is my last question.

13    Someone brought up or it came up today that exactly two years

14    ago today -- I didn't remember we were on an anniversary of

15    that -- but was when we had a hearing, and I think it was a

16    contempt hearing, but I had, I guess, read in the media, like

17    many other human beings, an article about the MGM-Amazon

18    transaction, and I had said I had hope in my heart and brain

19    that this could be an impetus or a triggering event for maybe

20    a settlement.  And that was kind of quickly pooh-poohed, if

21    you will.

22        Remind me why I was quickly persuaded, oh well, I guess

23    that's not going to happen.  I just can't remember what I

24    heard that day.

25            THE WITNESS:  Well, it was widely known that

009754

Seery - Examination by the Court                298

 1    Highland, meaning not the 171,000 --

 2            THE COURT:  Uh-huh.

 3            THE WITNESS:  -- but the entities that Highland or

 4    related entities, including DAF, the other Dondero entities,

 5    controlled a lot of Highland stock, as even Mr. Dondero said

 6    between Anchorage --

 7            THE COURT:  You mean MGM?

 8            THE WITNESS:  MGM, I'm sorry.  Between -- there were

 9    only five major holders.  There was the two we just mentioned

10    and Davidson Kempner and Monarch and Owl Creek, and just a few

11    other big holders.

12        And so Your Honor would have learned it from the case, but

13    you also would have learned it from the paper, that any time a

14    holder is mentioned, it's first Anchorage, because they owned

15    the biggest piece, and Kevin Ulrich, who was the chairman of

16    Anchorage, was also the chairman of MGM.  And then Highland

17    was always mentioned.

18        The reason that it didn't have some great amount of

19    capital that went on to Highland, although there was money

20    from RCP and there was money from MGM, is Highland doesn't own

21    the stock that's -- or interests in the 1.0 CLOs that owned

22    all of it.  We just manage it.

23            THE COURT:  Uh-huh.

24            THE WITNESS:  And that goes to various other

25    entities, including, in large part, to Dondero entities.  So

009755

Seery - Examination by the Court                299

1    there wasn't a big windfall to Highland from that.

2        The possibility of some upside from HCLOF, because it

3    owned small interests in those five, there was some value in

4    that, but a lot of it got tied up in the litigation that other

5    entities, Dondero entities, are bringing against U.S. Bank and

6    Acis, which has tied up everything in that -- those

7    distributions.

8            THE COURT:  Okay.  All right.  Thank you.  You are

9    excused from the stand.

10           THE WITNESS:  Thank you, Your Honor.

11           MR. STANCIL:  I owe you a docket number, Your Honor.

12   You said don't let us leave before we give you a docket number

13   for that second contempt order.  We promised to come back.  It

14   was #2660.

15           THE COURT:  Okay.  Got it.

16           MR. STANCIL:  Which -- did we move that into

17   evidence?

18           MR. MORRIS:  No.  We asked the Court to take judicial

19   notice.

20           THE COURT:  I will take judicial notice of 2660, --

21           MR. STANCIL:  Thank you, Your Honor.

22           THE COURT:   -- I already said.  Thank you.

23           THE WITNESS:  Thank you, Your Honor.

24           THE COURT:  You're excused.

25       (The witness steps down.)

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 146 of 235   PageID 9474

300

1          THE COURT:  All right.  Are you going to have any

2      other evidence, Mr. McEntire?

3          MR. MCENTIRE:  Your Honor, as I respond to your

4      question, I think we have 30 -- approximately 30 minutes left.

5          THE CLERK:  Twenty-six, yes.

6          MR. MCENTIRE:  Twenty-six.  We do have another

7      witness.  We also have a closing final argument.  And we also

8      have an opportunity -- we want to reserve an opportunity for

9      our experts that is still under advisement.

10     So my first action would be to ask for an extension of

11     time, or we would like to add to our time limit.  Instead of

12     just three hours, we'd like to increase the time so we can

13     accomplish all these things.

14     I mean, if the Court is unwilling to give us additional

15     time, then I will be forced not to call another witness.  I

16     will move to a very short final argument.  I need to preserve

17     some time for my experts, should you allow them to testify.

18         THE COURT:  Well, --

19         MR. MORRIS:  May I respond?

20         THE COURT:  -- you don't have to preserve time.  I'm

21     either going to allow you to put on your experts, and we said

22     30 minutes/30 minutes, --

23         MR. MORRIS:  That was what I was going to say, Your

24     Honor.

25         THE COURT:  Okay.

009757

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 10/09/23    Page 147 of 235    PageID 9475
Main Document    Page 303 of 389

301

```
1              MR. MORRIS:  There's no prejudice here.  Nobody's

2    being harmed.  There's no appellate issue.  I thought we were

3    really clear.  Everybody gets their three hours today.  We

4    will file our reply brief on Monday.  The Court will determine

5    both whether it needs to hear expert testimony and whether or

6    not our motion should be sustained.  If the Court denies the

7    motion, we'll take a couple of depositions and each side will

8    get whatever period of time the Court orders.

9         But, you know, the attempts to create an appellate record

10   are just -- you know, that's not -- there's no issue here.  He

11   can -- he's got 26 minutes.  He can put on his witness, he can

12   make his closing in the 26 minutes that they've always had.

13             THE COURT:  All right.  Well, we have --

14             MR. MCENTIRE:  May I caucus?  May I caucus very

15   quickly, Your Honor?

16             THE COURT:  Okay.  Uh-huh.  And while you're

17   caucusing, we have our game plan on the experts.  We know how

18   that's going to happen.  And I'm not extending the three

19   hours.

20             MR. MORRIS:  (sotto voce)  We have 62 minutes?

21        (Pause.)

22             MR. MCENTIRE:  Your Honor, accordingly, I'll just --

23   we'll move into a final argument at this time.

24             THE COURT:  Okay.  So you rest?

25             MR. MCENTIRE:  I rest.
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/29/23   Page 148 of 235   PageID 9476
Main Document   Page 302 of 389

Patrick - Direct                                    302

1          THE COURT:  All right.

2          MR. MORRIS:  We call Mark Patrick.

3          THE COURT:  All right.  Mr. Patrick, you've been

4   called to the witness stand.

5          MR. MORRIS:  I just need to find my examination

6   notes.  Just give me one moment, please.

7          THE COURT:  All right.  Please raise your right hand.

8   Could you remain standing, please.

9       (The witness is sworn.)

10         THE COURT:  All right.  You may be seated.

11             MARK PATRICK, DEBTORS' WITNESS, SWORN

12                   DIRECT EXAMINATION

13  BY MR. MORRIS:

14  Q    Hi, Mr. Patrick.

15  A    Hello.

16  Q    Did you ever meet with anybody at the Texas State

17  Securities Board?

18  A    No.

19  Q    Do you know if -- do you know anybody who ever met with

20  anybody at the Texas State Securities Board concerning

21  Highland?

22  A    Yes.

23  Q    And who met with the Texas State Securities Board

24  concerning Highland?

25  A    Ronnie (phonetic) Patel.

009759

```
 1   Q    And is that a lawyer?

 2   A    Yes.

 3   Q    Do you know who retained Mr. -- that lawyer?

 4   A    Yes.

 5   Q    Who retained that lawyer?

 6   A    The DAF, the Charitable DAF Fund.  Or one of its entities.

 7   Q    Okay.  And is it your understanding that the DAF Fund or

 8   one of its charitable entities filed a complaint with the

 9   Texas State Securities Board?

10   A    Yes.

11   Q    Okay.  Thank you very much.  Does Hunter Mountain owe any

12   money to Mr. Dondero?

13   A    No.

14   Q    Is there a promissory note that's outstanding that Mr.

15   Dondero has pursuant to which Hunter Mountain owes him $60-

16   plus million?

17   A    No.

18   Q    Who created Hunter Mountain?

19   A    Well, I don't recall specifically.  I just recall the

20   facts that, when Hunter Mountain was created, Thomas Surgent,

21   the chief compliance officer of Highland Capital Management,

22   who was representing the Dugaboy Investment Trust as well as

23   Highland Capital legally with respect to that transaction,

24   requested to Rand that the Hunter Mountain Investment Trust be

25   created for purposes of Highland filing its ADV with the SEC.
```

```
 1    It was my understanding that when the ADV would be filed, sort
 2    of the ownership change would -- chain would stop at Hunter
 3    Mountain.
 4    Q    Okay.  Dugaboy is Mr. Dondero's family trust, correct?
 5    A    No.  But I'll help you along.  Just please use the full
 6    name of the trust.
 7    Q    If I refer to the Trust, will you know that that's -- is
 8    that for the Hunter Mountain Investment Trust, or do you want
 9    me to use trust --
10    A    There's no entity called Dugaboy.  Just Dugaboy.  There's
11    not.
12    Q    Okay.
13    A    It's a shorthand.  I'm --
14    Q    Okay.  I'll refer to Dugaboy then, okay?
15    A    What are we referring to?
16    Q    The trust known as Dugaboy.
17    A    Okay.  Fair enough.  Go ahead.
18    Q    Okay.  Did Dugaboy contribute a portion of its ownership
19    interest in Highland to the Highland -- to the Hunter Mountain
20    Investment Trust?
21    A    Contribute?  No.
22    Q    Did it transfer?
23    A    Yes.
24    Q    And did it receive in exchange a promissory note from
25    Hunter Mountain?
```

009761

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/03/23   Page 151 of 235   PageID 9479

Patrick - Direct                                    305

1    A    Yes, it did.

2    Q    Okay.  And Mr. Dondero is the lifetime beneficiary of

3    Dugaboy, correct?

4    A    Yes and no.  It's a placeholder -- a placeholder provision

5    that's never been used.

6              MR. MCCLEARY:  Your Honor, pardon me.  Pardon me.

7    Objection, relevance, Your Honor.

8              THE COURT:  Relevance?

9              MR. MORRIS:  This is -- we've been told so many times

10   that Mr. Dondero has no interest in this case, he has nothing

11   to do with Hunter Mountain.  He's the lifetime beneficiary of

12   Dugaboy.  And if I --

13             THE WITNESS:  That provision has never been invoked.

14   He's received no money through that provision.

15             THE COURT:  Okay.  Just wait.  We're resolving --

16             MR. MORRIS:  Right.

17             THE COURT:   -- an objection at the moment.

18   BY MR. MORRIS:

19   Q    Can we turn to Exhibit 51?

20             THE COURT:  I'm still working on the objection.

21             MR. MORRIS:  I'm going to try and lay a foundation.

22   Okay?

23             THE COURT:  Okay.  So he's withdrawing the question.

24             MR. MCCLEARY:  He's withdrawing the question?  Okay.

25             THE COURT:  Okay.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/29/23   Page 152 of 235   PageID 9480
Main Document   Page 306 of 389

                    Patrick - Direct                          306

 1  BY MR. MORRIS:

 2  Q   You have a binder in front of you, sir.  Can you go to

 3  Exhibit 51?

 4          THE COURT:  And this is Highland's Exhibit 51?

 5          MR. MORRIS:  Yeah.

 6          THE COURT:  Okay.

 7  BY MR. MORRIS:

 8  Q   And is that a promissory note that was made --

 9  A   Yes, it is.

10  Q   -- that was made by Hunter Mountain in favor of Dugaboy

11  back in 2015?

12          MR. MCCLEARY:  Objection, relevance, Your Honor.

13          MR. MORRIS:  I'm trying to connect Mr. Dondero to

14  Hunter Mountain.

15          THE COURT:  Okay.  Overruled.

16          THE WITNESS:  Yeah.  It's a secured promissory note

17  with the amount of approximately $62.6 million signed by

18  Beacon Mountain, LLC, --

19          MR. MORRIS:  Uh-huh.

20          THE WITNESS:  -- as administrator for Hunter Mountain

21  Investment Trust.

22  BY MR. MORRIS:

23  Q   Okay.  And as the -- what's your role with Hunter Mountain

24  today?

25  A   And it's in favor, just to answer your question, it's in

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/29/23    Page 153 of 235    PageID 9481
Main Document    Page 3028 of 896

Patrick - Direct                                         307

```
 1    favor of the Dugaboy Investment Trust.  That's where I was

 2    just being a little stickler --

 3  Q    I appreciate that.

 4  A     -- previously.  Sorry.

 5  Q    I do.

 6  A    Okay.  What is your question?

 7  Q    What's your role with Hunter Mountain today?

 8  A    I am the administrator.

 9  Q    When did you become the administrator?

10  A    On or about August of 2022.

11  Q    Okay.  How did you become the administrator?

12  A    Through the acquisition of Rand Advisors.

13  Q    And does Hunter Mountain have any employees?

14  A    No.

15  Q    Does it have any operations?

16  A    No.

17  Q    Does it generate any revenue?

18  A    Not -- not currently.

19  Q    Okay.  Did it generate any revenue in 2022?

20  A    No.

21  Q    Does it own any assets?

22  A    Yes.

23  Q    What does it own?

24  A    It has -- it's my understanding it has a contingent

25    beneficiary interest in the Claimants Trust.
```

 1  Q   And that's the only asset it has, right?

 2  A   Correct.

 3  Q   So that if it -- if that interest has no value, then

 4  Hunter Mountain has no ability to pay the Dugaboy note.  Fair?

 5  A   (sotto voce) If that interest has no value?

 6      That is correct.

 7  Q   Okay.

 8          MR. MORRIS:  I move Exhibit 51 into evidence.

 9          MR. MCCLEARY:  Your Honor, relevance.  Objection.

10          THE COURT:  Your response?

11          MR. MORRIS:  Mr. Dondero desperately needs Hunter

12  Mountain to win in this lawsuit because otherwise his family

13  trust will get nothing on this $63 million note.

14          THE COURT:  Okay.  Overrule the objection.  It's

15  admitted.

16      (Debtors' Exhibit 51 is received into evidence.)

17  BY MR. MORRIS:

18  Q   Neither you or any representative of Hunter Mountain has

19  ever spoken with any representative of Farallon, correct?

20  A   Correct.

21  Q   Neither you nor any representative of Hunter Mountain has

22  ever spoken with anybody at Stonehill, correct?

23  A   Correct.

24  Q   You have -- neither you nor Hunter Mountain have any

25  personal knowledge about a *quid pro quo*, correct?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/09/23   Page 155 of 235   PageID 9483
Main Document   Page 309 of 398

Patrick - Direct                                    309

1    A    (sotto voce)  Nor Hunter Mountain have any personal

2    knowledge about a *quid pro quo*.

3         Correct.

4    Q    Neither you nor anybody at Hunter Mountain have any

5    personal knowledge about how Mr. Seery's compensation package

6    was determined, correct?

7    A    Correct.

8    Q    Neither you nor anybody at Hunter Mountain had any

9    knowledge about the terms of Mr. Seery's compensation package

10   until the Highland parties voluntarily disclosed that in

11   opposition to the Hunter Mountain motion, correct?

12   A    No.  I --

13            MR. STANCIL:  Objection, relevance, Your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  No.  I seem to -- I seem to have an

16   awareness that the performance fee was amended at a certain

17   time post-confirmation, or, you know, around the confirmation

18   time period.  And so that's with respect to the compensation.

19   I -- just myself.

20   BY MR. MORRIS:

21   Q    Can you tell Judge Jernigan everything you know or

22   everything you knew before receiving Highland's opposition to

23   this motion about Mr. Seery's compensation as the CEO of the

24   Reorganized Debtor at the Claimant Trustee?

25            MR. MCCLEARY:  Objection, Your Honor.  That's

1    overboard and an unclear question.

2              THE COURT:  Overruled.  He's gone through some

3    specific things now.  I guess he's just trying to encompass

4    anything we haven't covered.

5              THE WITNESS:  Yeah.  I had a -- I personally had a

6    general understanding that Mr. Seery's compensation changed

7    after the claims trading to put in a performance-based-type

8    measure.  But I do recall that it was always very -- it was

9    unclear exactly the terms.

10   BY MR. MORRIS:

11   Q    Okay.  Did you learn anything else?

12   A    Such as?

13   Q    Just, did you ever learn anything else about Mr. Seery's

14   compensation package that you haven't testified to yet?

15             MR. STANCIL:  Your Honor, objection.  Vague.

16             THE COURT:  Overruled.

17             THE WITNESS:  No.

18   BY MR. MORRIS:

19   Q    Okay.  Neither you nor Hunter Mountain has any personal

20   knowledge whatsoever about any due diligence that Stonehill

21   did in connection with the purchase of claims, correct?

22             MR. MCCLEARY:  Your Honor, he's getting into

23   allegations in the complaint which involve attorney work

24   product, so we object on the basis of invading the attorney

25   work product.

Patrick - Direct                                              311

1              THE COURT:  Overruled.

2              THE WITNESS:  Can you restate the question again?

3       BY MR. MORRIS:

4       Q   Yes, sir.  Neither you nor Hunter Mountain have any

5       personal knowledge as to what due diligence Stonehill did

6       before purchasing its claims in this case, correct?

7              MR. MCCLEARY:  Objection.  Attorney work product.

8       Invasion of that.  Could I --

9              THE COURT:  I just ruled.

10             MR. MCCLEARY:  I understand.

11             THE COURT:  I just --

12             MR. MCCLEARY:  Could I have a running objection to

13      this line of questioning on that basis, Your Honor, invasion

14      of attorney work product?

15             THE COURT:  Why don't you explain why it's attorney

16      work product.  I'm missing --

17             MR. MCCLEARY:  Because they might -- he would have

18      knowledge from the efforts and investigation through attorneys

19      in the case.  I assume he's not asking -- you can't separate

20      that, potentially.  So he's getting into attorney work

21      product.

22             MR. MORRIS:  I'm asking for facts.

23             THE COURT:  He's asking for facts.  I overrule.

24      BY MR. MORRIS:

25      Q   Can you answer the question, sir?

009768

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 07/27/23    Page 158 of 235    PageID 9486
Main Document    Page 312 of 389

Patrick - Direct                          312

1    A    Yeah.  I'm not aware -- I'm not personally aware of how

2    much work Farallon did, or Stonehill.

3    Q    You have no knowledge whatsoever about the diligence

4    Stonehill did before purchasing its claims, correct?

5    A    Well, I would generalize now is that they did nothing.

6    Q    And that's on the basis of Mr. Dondero's testimony,

7    correct?

8    A    I would just call it on a basis of our general inquiry,

9    which would be including, in part, Mr. Dondero's testimony.

10    Q    What else are you relying upon for your conclusion that

11    you just described other than Mr. Dondero's?  What other

12    facts?

13    A    Yeah, we -- yeah, we have not uncovered any facts that

14    indicated that they did conduct any due diligence of any sort.

15    Q    Okay.  And are you -- do you have any personal knowledge

16    as to what Farallon did in connection with its due diligence

17    prior to buying its claim?

18    A    Yeah.  We have not been able to find any facts that would

19    suggest that Farallon conducted any due diligence of any kind.

20    Q    Okay.

21        MR. MORRIS:  One second, Your Honor.

22    (Pause.)

23    BY MR. MORRIS:

24    Q    Who's paying Hunter Mountain's legal fees?

25    A    Hunter Mountain is paying -- is legally obligated and

Patrick - Direct                         313

```
 1   paying its own legal fees.

 2   Q    If it generates no income and its only assets is the

 3   interest in Highland, where is it getting the funds to pay

 4   legal fees?

 5           MR. MCCLEARY:  Objection, Your Honor.  This is

 6   irrelevant and invades the attorney-client privilege.

 7           MR. STANCIL:  Your Honor, I'm happy to read a Fifth

 8   Circuit case that says the identity of a third-party payer of

 9   attorneys' fees is not privileged.  I would refer them to In

10   re Grand Jury Subpoena, 913 F.2d 1118, a 1990 Fifth Circuit

11   case.  I can read from Judge Jones' opinion, but you tell me

12   how much you want to hear on this.

13           THE COURT:  Okay.  I overrule your objection.  He can

14   answer.

15           THE WITNESS:  There is a settlement agreement by

16   Hunter Mountain Investment Trust as well as the Dugaboy

17   Investment Trust that provides for the payment of attorney

18   fees.

19           MR. MORRIS:  No further questions, Your Honor.

20           THE COURT:  Okay.  Cross?

21           MR. MCCLEARY:  Yes, Your Honor, briefly.

22                      CROSS-EXAMINATION

23   BY MR. MCCLEARY:

24   Q    Mr. Patrick, how would you describe Mr. Dondero's

25   relationship with Hunter Mountain Investment Trust today?
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/07/23   Page 160 of 235   PageID 9488
Main Document   Page 3/23 of 398

Patrick - Cross                                    314

 1   A    None.

 2   Q    You were asked some -- let me ask you about litigation,

 3   and litigation involving the sub-trust.  Has Hunter Mountain

 4   been involved in litigation with Mr. Kirschner?

 5   A    Yes.

 6   Q    Okay.  And what is your understanding of Mr. Kirschner's

 7   role?

 8            MR. MORRIS:  Your Honor, while I would love for them

 9   to continue --

10            MR. MCCLEARY:  He's the --

11            MR. MORRIS:   -- to use their time, I object that

12   it's beyond the scope of my examination.  They passed on the

13   witness.  They rested their case.  He should be limited to the

14   scope of my inquiry.

15            THE COURT:  Okay.  How does this tie to direct?

16            MR. MCCLEARY:  Your Honor, it -- just very generally.

17   This is --

18            THE COURT:  Okay.  I need to know how it ties to the

19   direct.

20            MR. MCCLEARY:  This doesn't tie directly to the

21   direct, Your Honor.

22            THE COURT:  Then it's beyond the scope, you

23   acknowledge?

24            MR. MCCLEARY:  Yes, Your Honor.

25            THE COURT:  Okay.  Sustained, then.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/27/23    Page 161 of 235    PageID 9489
Main Document    Page 1 of 235

                          Patrick - Cross                          315

```
 1            MR. MCCLEARY:  Okay.

 2   BY MR. MCCLEARY:

 3   Q    Mr. Patrick, has Hunter Mountain Investment filed any

 4   litigation as a plaintiff other than its efforts to be a

 5   plaintiff in this lawsuit and its action as a petitioner in

 6   the Rule 201 matter earlier this year in Dallas state court?

 7   A    The 202.

 8   Q    202, yes.

 9   A    No, it has not.

10   Q    All right.  And then it's -- has it been a party, then, to

11   any other litigation other than the efforts to file this

12   action, the Rule 202 action, and has it been a defendant in

13   any lawsuits?

14   A    To my understanding, no.

15   Q    Is it involved as a defendant in the Kirschner litigation?

16   A    Yes.

17   Q    Mr. Kirschner is suing Hunter Mountain; is that correct?

18   A    That is correct.

19   Q    Okay.  So, is Hunter Mountain a vexatious litigant?

20            MR. MORRIS:  Objection, Your Honor.  This is now

21   really beyond the scope.  We're not doing -- this is -- we're

22   not doing it.  I'm not letting -- because there's a vexatious

23   litigant motion pending now in the district court right now

24   before Judge Starr.  This has nothing to do with anything I

25   asked.
```

1          THE COURT:  Okay.

2          MR. MCCLEARY:  They're trying to draw --

3          THE COURT:  You've already asked him is it a party in

4     any other litigation besides the 202 and this attempted one,

5     so where are we going with this?

6          MR. MCCLEARY:  Well, they're just trying to draw Mr.

7     Dondero into this and -- this vexatious litigant argument, and

8     we're just developing the fact that obviously Hunter Mountain

9     has only filed -- attempting to file this action and a Rule

10    202 proceeding.  So they're not involved in a lot of

11    litigation and they're not a vexatious litigant.

12         THE COURT:  Okay.  I think I'll sustain that and we

13    can just move on.

14         MR. MCCLEARY:  Okay.  Then I'll pass the witness.

15    Thank you, Your Honor.

16         THE COURT:  Okay.  Any redirect?

17         MR. MORRIS:  No, thank you, Your Honor.

18         THE COURT:  All right.  You are excused, Mr. Patrick.

19       (The witness steps down.)

20         THE COURT:  Anything else?

21         MR. MORRIS:  Just a time check for both sides and

22    let's get to closings.

23         THE COURT:  Okay.  Caroline?

24         THE CLERK:  Movant has 23 minutes left and the

25    Respondents have 47.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 163 of 235   PageID 9491

317

1              THE COURT:  23 and 47.  Any other evidence from the

2     Respondents?

3              MR. MORRIS:  That is a fair question.

4         (Discussion.)

5              MR. MCCLEARY:  Your Honor, I just want to confirm

6     that all the exhibits that they did not object to have been

7     admitted into evidence.

8              THE COURT:  All right.  Well, let me --

9              MR. MCCLEARY:  We do offer them.

10             MR. MORRIS:  Oh.

11             THE COURT:  Hang on.

12             MR. MORRIS:  Did I get Exhibit 45, Your Honor?

13             THE COURT:  Just a moment.  I'm doing two things at

14    once here.  45 is in.

15             MR. MORRIS:  Okay.

16             THE COURT:  All right.  On HMIT's exhibits, okay,

17    first, as we all know, 29 through 52 are carried until -- if

18    we have another hearing with the experts.

19        (HMIT's Exhibits 29 through 52 carried.)

20             THE COURT:  I'm showing we have -- and speak up if

21    anyone questions this -- I show that we have Hunter Mountain

22    Exhibits 3 and 4, and then 7 through 10, 12 through 23, and 26

23    through 38, and 53 through 57, 64, 65, and then 67 through

24    seventy --

25        (HMIT's Exhibits 3, 4, 7-10, 12-23, 26-38, 53-57, 64, 65,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/25/23   Page 164 of 235   PageID 9492

318

 1   67-70 are received into evidence.)

 2           MR. MCCLEARY:  Your Honor, I apologize.  From 36 --

 3   26 to 32 are in?

 4           THE COURT:  I believe that was part of the

 5   stipulation, Mr. Morris, right?

 6           MR. MCCLEARY:  Yes.

 7           MR. MORRIS:  I think that's right.

 8           THE COURT:  Okay.

 9           MR. MORRIS:  We really didn't object to very many.

10           THE COURT:  Yes.

11           MR. MCCLEARY:  That would be 25, too.  That would

12   include 25?

13           MR. STANCIL:  No.  Objection.  25 is not --

14           THE COURT:  It's not admitted.

15           MR. STANCIL:  It's not in evidence.

16           THE COURT:  25 and 24 were not admitted.

17           MR. MORRIS:  Correct.  Those are my emails.

18           THE COURT:  Okay.  So --

19           MR. MCCLEARY:  25 is an article.

20           THE COURT:  Your 25 was John Morris Email Re: Text

21   Messages dated March 10, 2023.

22           MR. MCCLEARY:  Okay.

23           THE COURT:  Okay.  I can't remember where I left off.

24   I think I left off -- I'll just repeat after the expert

25   exhibits that are carried.  I've admitted 53 through 57.  I

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/07/23   Page 165 of 235   PageID 9493

319

1  have admitted 64, 65, 67 through 71.

2       (HMIT's Exhibit 71 is received into evidence.)

3       Now, I'm not sure if I ended up admitting 72.  That was

4  the articles.  I can't remember if you stipulated on that

5  finally.

6            MR. MORRIS:  I said they --

7            MR. MCCLEARY:  They had no objection.

8            MR. MORRIS:   -- they come in --

9            THE COURT:  Not for the truth of the matter asserted.

10           MR. MORRIS:  -- self -- exactly.

11           THE COURT:  Okay.

12           MR. MORRIS:  Self-authenticating.

13           THE COURT:  So 72 is in.

14           MR. MCCLEARY:  Okay.

15      (HMIT's Exhibit 72 is received into evidence.)

16           THE COURT:  Then we had some pleadings.  I think 73,

17  74, 75 are in, but again, not for the truth of the matter

18  asserted in any advocacy on 73 and 74.  And then 77, 78, 79

19  are in.  And that's it.

20      (HMIT's Exhibits 73, 74, 75, 77, 78, and 79 are received

21  into evidence.)

22           MS. DEITSCH-PEREZ:  Your Honor, I didn't make an

23  appearance, but I was taking notes (inaudible).

24           MR. MCCLEARY:  Your Honor, I believe 80 should be in.

25           MR. MORRIS:  No objection to 80.  It's on our -- it's

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/09/23   Page 166 of 235   PageID 9494
Main Document   Page 320 of 389

320

1    part of our Exhibit 5.

2             THE COURT:  Okay.  80 is in.  Admitted.

3        (HMIT's exhibit 80 is received into evidence.)

4             MR. MORRIS:  Yeah.  That's really Section A of that

5    thing that I gave you this morning.

6             THE COURT:   If Ms. Deitsch-Perez wants to consult

7    with the Hunter Mountain lawyers, she can.  I don't know --

8             MR. MORRIS:  Can I go through quickly mine, Your

9    Honor?  Because we actually never had the opportunity to put

10   our exhibits in.

11            THE COURT:  Okay.  Let's make sure we're to --

12            MR. MORRIS:  Okay.  I'm sorry.  I'm sorry.

13            THE COURT:   -- closure on the Hunter Mountain

14   exhibits.

15            MR. MORRIS:  I'm sorry.

16            THE COURT:  Anything I said that you disagree with?

17   I don't think --

18       (Pause.)

19            THE COURT:  Okay.  Let's hurry up.  What is the

20   controversy?

21            A VOICE:  Roger?  The Court's addressing you.

22            MR. MCCLEARY:  Oh.  Excuse me, Your Honor.  So, just

23   a little unclear of whether you have Exhibits 21 through 25

24   admitted.

25            THE COURT:  I have 21, 22, and 23.  Not 24.  Not 25.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 322 of 838   Page 167 of 235   PageID 9495

321

 1   Okay.  Anything else?

 2              MR. MCCLEARY:  Okay.  Then we do offer 24 and 25.

 3              THE COURT:  You offered them.  I did not admit them.

 4              MR. MCCLEARY:  Okay.  76.  I believe -- was that --

 5   you're carrying?

 6              MS. DEITSCH-PEREZ:  Carried.

 7              MR. MCCLEARY:  You're carrying that?

 8              THE COURT:  Okay.  I carried that and --

 9              MR. MCCLEARY:  It's part of the expert issue.

10              THE COURT:  Okay.  Yes, part of the expert.  So it's

11   carried.

12         (HMIT's Exhibit 76 is carried.)

13         (Pause.)

14              MR. MCCLEARY:  I understand you've admitted 53

15   through 83, although some of them have now not been approved.

16              THE COURT:  All right.  Well, we need to clarify.  58

17   through 63, you think you offered them and I admitted them,

18   but not for the truth?  I remember that being discussed for 58

19   through 63.  Are you actually offering them?

20              MR. MCCLEARY:  Yes.  58 through 63.

21              THE COURT:  All right.  And Mr. Morris, you

22   ultimately agreed that yes, but not for the truth of the

23   matter asserted?

24              MR. MORRIS:  That's right, Your Honor.

25              THE COURT:  Okay.  So they are admitted.  Okay.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 168 of 235   PageID 9496
Main Document   Page 322 of 389

322

1          (HMIT's Exhibits 58 through 63 are received into

2     evidence.)

3          THE COURT:  And then there was an objection to the

4     Mark Patrick declaration for the same thing, not for the truth

5     of the matter asserted.

6          MR. MORRIS:  Exactly.

7          THE COURT:  But you agree as long as it's --

8          MR. MORRIS:  Correct.

9          THE COURT:  Okay.  So what that means is, to recap,

10    53 through 75 are admitted, although some of those are only --

11    they're not for the truth of the matter asserted.  And then 77

12    through 80 are admitted.  Okay?

13         MR. MCCLEARY:  And 76?  We offered 76.

14         THE COURT:  That's -- we carried it.  We carried it.

15    It relates to the expert.

16         MR. MCCLEARY:  Carried it.

17                        (Pause.)

18         MR. MCCLEARY:  Thank you, Your Honor.

19         THE COURT:  Okay.  Now let's straighten out

20    Highland's exhibits.  So, I'm showing 1 through 16 have been

21    admitted, and then 25 through 31-A?

22         MR. MORRIS:  25 through 31-A?

23         THE COURT:  I'm sorry.  Yes.  25 through 31-A.

24         MR. MORRIS:  Okay.

25         THE COURT:  And then 34.  And then 39, 40, 41, and

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 02/09/23    Page 169 of 235    PageID 9497
Main Document    Page 8223 of 335

323

 1  then 45.  51, 59, and 60.

 2          MR. MORRIS:  Okay.  So I'm going to do my best not to

 3  burden the Court.  I'm trying to focus.  We move for the

 4  admission into evidence of Exhibit 32, which is Mr. Dondero's

 5  objection to the HarbourVest settlement.  And the reason that

 6  we're offering it is because he made no mention of any concern

 7  at all that the settlement implicated material nonpublic

 8  inside information.

 9          THE COURT:  All right.  Any objection?

10          MR. MCCLEARY:  32?

11          THE COURT:  Uh-huh.

12          MR. MCCLEARY:  Yes, Your Honor.  Relevance and

13  hearsay.

14          THE COURT:  Overruled.  And I can take judicial

15  notice of it in any event.

16      (Debtors' Exhibit 32 is received into evidence.)

17          MR. MORRIS:  We move for the admission into evidence

18  of Exhibit 33, which is the recent letter from the Texas State

19  Securities Board declining to take any action after conducting

20  an investigation of the Dugaboy complaint.

21          THE COURT:  Okay.  Any objection?

22          MR. MCCLEARY:  We object on the grounds of relevance,

23  403, hearsay, and authenticity, Your Honor.

24      And I also, I think it's important that the decision by a

25  regulatory body has no bearing on this cause of action or the

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/22/23    Page 170 of 235    PageID 9498
Main Document    Page 324 of 335

324

1    colorability of this claim, and the Texas State Securities

2    Board will tell you that.  This is completely and utterly

3    irrelevant to your inquiry, Your Honor.

4            THE COURT:  Okay.  I overrule the relevance

5    objection.  Certainly, it goes to colorability.  It's some

6    evidence.  It's some evidence.  A regulatory body did not

7    choose to go forward --

8            MR. MCCLEARY:  But that could be for --

9            THE COURT:   -- on the complaint.

10           MR. MCCLEARY:  That could be for reasons entirely

11   unrelated.

12           THE COURT:  True, true.  It's some evidence.

13           MR. MORRIS:  That's speculation.

14           MR. MCCLEARY:  Not for this.

15           THE COURT:  But what is the authenticity objection?

16           MR. MCCLEARY:  Well, there's no demonstration.  I

17   don't believe they sponsored that with anyone.

18           THE COURT:  Pardon?  Say again?

19           MR. MCCLEARY:  They didn't sponsor that with anyone.

20           MR. MORRIS:  Your Honor, I actually -- if they really

21   put me to it, because I was reading the Rules of Evidence in

22   the wee hours of the morning, I am certain that there's an

23   exception for government documents and government statements

24   and government decisions.

25           MR. STANCIL:  Your Honor, as to its authenticity, I

325

1    could produce a witness from Highland who said they got it, if

2    that's really what we're doing.  That it's the letter, they

3    got it from the TSSB, if we're really doing authenticity.

4              MR. MCENTIRE:  Well, first of all, it's hearsay and

5    there is no authenticity issue and it's irrelevant.  I

6    understand --

7              MR. STANCIL:  What is the authenticity issue, Mr.

8    McEntire?

9              THE COURT:  I'm trying to understand the authenticity

10   issue.  You think this is a --

11             MR. STANCIL:  Do you think it's a real letter or a

12   fake letter?

13             MR. MCENTIRE:  Well, first of all, I'm going to

14   address the Court and not you, okay?

15        Your Honor, --

16             THE COURT:  Well, address by speaking in a --

17             MR. MCENTIRE:  Yeah.  Thank you.

18             THE COURT:  Okay.  I'm just saving the court reporter

19   from grief, okay?

20             MR. MCENTIRE:  It is hearsay, and it is hearsay that

21   is calculated to be misrepresented or mischaracterized because

22   it's utter speculation as to the basis for their decision.

23   And if it's -- utter speculation is the basis of your

24   decision, it has no reason to come in.  There's no --

25             THE COURT:  What you're telling me, it goes to the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/09/23   Page 172 of 235   PageID 9500

326

 1  weight of the evidence.  Okay?

 2          MR. MCENTIRE:  Your Honor, --

 3          THE COURT:  Okay.  You're not telling me it's

 4  inadmissible hearsay.

 5          MR. MCENTIRE:  Well, it is inadmissible hearsay.

 6          MR. MORRIS:  Can I just, for one second?

 7          THE COURT:  Please.

 8          MR. MORRIS:  Paragraph 34 of their motion, Your

 9  Honor.  Quote, "The Court also should be aware that the Texas

10  State Securities Board opened an investigation into the

11  subject matter of the insider tradings at issue, and this

12  investigation has not been closed.  The continuing nature of

13  this investigation underscores HMIT's position that the claims

14  described in the attached adversary proceeding are plausible

15  and certainly far more than merely colorable."

16      They used the investigation to try to convince you that

17  their claims are colorable, and now we have a letter saying

18  there's nothing.

19          THE COURT:  Okay.  You want to explain that to me?

20          MR. MCENTIRE:  Well, we put no evidence in, in this

21  proceeding --

22          THE COURT:  You put what?

23          MR. MCENTIRE:  We have put no evidence in, in this

24  proceeding, --

25          THE COURT:  You filed a pleading under Rule 11

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 173 of 235   PageID 9501

327

1  suggesting this was highly relevant, right?

2          MR. MCENTIRE:  We filed a motion.  Yes, we did.

3          THE COURT:  Under Rule 11.

4          MR. MCENTIRE:  Yes.  Of course we did.

5          THE COURT:  Okay.

6          MR. MCENTIRE:  Of course we did.

7          THE COURT:  Suggesting this Texas State Securities

8  Board complaint and investigation was highly relevant.

9          MR. MCENTIRE:  The fact that it had opened an

10  investigation and was conducting an investigation is

11  irrelevant.  Its decision to stop the investigation without

12  further elaboration or clarification, this is why it calls for

13  utter speculation.

14          MR. MORRIS:  Your --

15          THE COURT:  Okay.  Do you have the hearsay exception

16  that applies?  I'm looking at my evidence rules right now for

17  the government record or public record.  Is it 803(8) that we

18  need to have addressed here?

19          MR. STANCIL:  803(8), Your Honor.

20          A VOICE:  Yeah, public records.

21          THE COURT:  Okay.

22          MR. STANCIL:  Public record.  Sets out --

23          THE COURT:  Public records, 803(8), hearsay

24  exception.  Moreover, you pled allegations suggesting this

25  investigation was really relevant.  So I overrule your

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/09/23   Page 174 of 235   PageID 9502

328

1    objection, and so that means 33 is admitted.

2          (Debtors' Exhibit 33 is received into evidence.)

3                MR. MORRIS:  Thank you, Your Honor.  I continue.

4    Exhibit 36 --

5                MR. MCENTIRE:  Which one was that?

6                MR. MORRIS:  That was 33.

7          So now we're up to 36, Your Honor.  I'm going to skip some

8    of these.

9                THE COURT:  Okay.

10               MR. MORRIS:  But this is just the Court's order

11   approving Mr. Seery's original --

12               THE COURT:  I'm waiting for any objection for the

13   record.  Do we have an objection, Mr. McCleary?

14               MR. MCCLEARY:  36, relevance, Your Honor.

15               MR. MORRIS:  The relevance is that this Court

16   approved without objection Mr. Seery's compensation package in

17   an amount that included a base salary of $150,000, which the

18   Claimant Purchasers and the independent director saw fit to

19   continue.

20               THE COURT:  Objection overruled.  It's admitted.

21         (Debtors' Exhibit 36 is received into evidence.)

22               MR. MORRIS:  I think 38 may be on their list.  Yeah,

23   38 is in as their 26, right?  So that should be admitted.

24               THE COURT:  Admitted.

25         (Debtors' Exhibit 38 is received into evidence.)

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/29/23    Page 175 of 235    PageID 9503

329

```
1              MR. MCCLEARY:  If it's on our list, we agree.

2              THE COURT:  Okay.  It's admitted.

3              MR. MORRIS:  That's it, Your Honor.

4              THE COURT:  Okay.  Do you all need a five-minute

5   break before we do closing arguments?

6              MR. MORRIS:  I'd be grateful.

7              THE COURT:  Okay.

8              MR. MCCLEARY:  Yes, Your Honor.  Thank you.

9              THE COURT:  Will do.

10             THE CLERK:  All rise

11        (A recess ensued from 5:49 p.m. to 5:57 p.m.)

12             THE CLERK:  All rise.

13             THE COURT:  All right.  Please be seated.

14        We're back on the record in the Highland matter.  Closing

15   arguments.  Just for everyone's benefit, time -- you said 47

16   minutes and 23 minutes back several minutes ago, and then we

17   had all the housekeeping stuff.  So I'm not sure if that's

18   where we are right now or if --

19             MR. MCENTIRE:  I'm waiting for my monitor guy to be

20   here.

21             THE COURT:  Okay.  Okay.

22        So Caroline, is it still 47 and 23?

23             THE CLERK:  Yes.

24             THE COURT:  That's when we started the housekeeping

25   stuff.
```

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/03/23    Page 176 of 235    PageID 9504

330

1              MR. MCENTIRE:  So 27 minutes?

2              THE COURT:  Twenty-three.

3              THE CLERK:  Twenty-three.

4              MR. MCENTIRE:  Twenty-three?  Can I get a five-minute

5    warning, please?  Would you pull up the PowerPoint?  And let's

6    go to Slide 39.

7         May I proceed, Your Honor?

8              THE COURT:  You may.

9    CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT TRUST

10             MR. MCENTIRE:  So, before I go to the PowerPoint, I'd

11   like to kind of give a high-altitude overview of the situation

12   as I see it from the evidence perspective.  We don't believe

13   this should have been an evidentiary hearing.  Evidence has

14   been allowed.

15        We had a situation where, if you believe Mr. Dondero's

16   testimony as contrasted with Mr. Seery's testimony, you have a

17   credibility issue.  So the Court is now conducting an inquiry

18   presumably on the basis in part on the credibility of

19   witnesses.  And if you engage -- and if you want to indulge

20   that type of inquiry, the credibility of witnesses, without

21   allowing the Plaintiff in this case or the Movant in this case

22   to conduct some level of meaningful discovery, I would suggest

23   we have been deprived of due process, because without

24   documents to test Mr. Seery's statements, we are being

25   deprived of something that's basically very fundamental in our

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 07/28/23    Page 177 of 235    PageID 9505
Main Document    Page 177 of 235

331

1    judicial process.

2        And therefore, it underscores our argument and our

3    rationale why this shouldn't be an evidentiary hearing,

4    because I don't believe the Court can consider credibility

5    issues.

6        We have, on the one hand, unequivocal notes from Mr.

7    Dondero prepared contemporaneously that would suggest that

8    someone admitted to him and stated to him that they did in

9    fact obtain material nonpublic information.  Mr. Seery says

10    that didn't happen.  I specifically said, is that a lie?  Yes,

11    it's not true.  Well, that's a real problem, because that's

12    not the criteria that this Court should use for determining

13    whether we have a colorable claim.  A colorable claim is

14    whether there is some possibility.  It's something less, even

15    less stringent than a 12(b)(6) standard, plausibility.  We

16    have that.

17        If you look at our pleadings, we have set forth all of the

18    facts we need, all the elements we need to establish a trade

19    on material inside information, nonpublic information.  We

20    have evidence -- we have allegations that there was no due

21    diligence.  And Farallon's lawyer stood up here -- well, I'm

22    not going to really address that today.  But if there was any

23    day to address it, it was today.  We have no evidence to

24    suggest they did do due diligence.  Even Mr. Seery said, I

25    don't know what due diligence they did.  We have evidence to

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 178 of 235    PageID 9506

332

1    suggest that the only due diligence they did was to talk to

2    Mr. Seery, who has told -- who told them that this is very

3    valuable, don't -- this is a really good -- a good investment

4    here, it's a lot better than the 71 percent that's on our

5    disclosures.

6        And Judge, that evidence supports the colorability of the

7    claim.  And if you go down the pathway of saying, well, I'm

8    not sure about Mr. Dondero because he had been held in

9    contempt two years ago, that's a real problem.  That's a

10   problem for this Court.  And I'm going to suggest that's why

11   this should have been a four-corners deliberation.  Even

12   Farallon and Stonehill suggest this should be a four-corners

13   deliberation.

14       We have evidence now of no due diligence.  We have

15   evidence before you that suggests that they did learn about

16   MGM before the announcement date.  We have evidence that Mr.

17   Seery did trade on -- did -- was aware and received

18   information of material nonpublic information.  And for him, a

19   CEO of his reputed stature, to sit here and say that was not

20   material and that was nonpublic defies common sense.  It

21   defies reasonableness.  That goes to credibility.

22       Mr. Dondero's notes speak volumes.  The trades themselves

23   speak volumes.  Mr. Dondero established that the interest --

24   return of interest here is to be less than one -- it's in the

25   one digits, and hedge funds trade in the 30, 40, 50 percent

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 10/09/23    Page 179 of 235    PageID 9507
Main Document    Page 333 of 393

333

1    range.  Well, if that's the case, we have Farallon walking

2    away from a return on the exit financing of 13 percent, and

3    that wasn't good enough for him.  How could six percent be

4    good enough for him?  There's something missing here.  There's

5    something not right.

6         And we're entitled to get our lawsuit on file and do some

7    discovery.  And if they want to do a 12(b)(6), they do a

8    12(b)(6).  If they want to do a Rule 56 after discovery, they

9    could do a Rule 56, all in this Court.  But to address this

10   threshold issue now based upon this, what happened here today,

11   is a fundamental denial of due process.

12        I'd like to go to my pleadings.

13        Can you go to Slide 39, please?

14        First of all, let there be no doubt -- 39.  Slide 39.  38.

15   38, please.

16        We can plead on information and belief.  We have a right

17   to plead on information and belief.  And the Fifth Circuit --

18   that is an acknowledged procedural practice in the Fifth

19   Circuit.  And if some of our allegations are based upon

20   information and belief, so be it.  The test here is not at

21   this stage.  The test here is whether I have sufficient

22   factual allegations, whether on information and belief or

23   otherwise, to satisfy at most a plausibility standard.  That's

24   it.

25        And if they want to challenge us at a later date, they

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 180 of 235   PageID 9508
Main Document   Page 334 of 389

334

1    can.  Rule 56.  12(b)(6).  Or standing.  But we have standing.

2    We have standing.  We have standing under Delaware law.  We're

3    a contingent beneficial interest that has standing under

4    Delaware law and all other law.  All -- even Texas agrees that

5    a contingent interest has standing, an inchoate interest as

6    Mr. Seery described.  A property interest.  You have property

7    interest, you have standing.

8              THE COURT:  Let me ask you.

9         And Caroline, turn the clock off when the Court

10   interrupts.

11        Just so you know, I mean, my analysis here is standing

12   first.  Does your client have standing?  Because we all know

13   that's a subject matter jurisdiction inquiry and I have to

14   explore that first.  And then I've said many times the legal

15   standard question for colorability.  That's kind of the second

16   place I go --

17             MR. MCENTIRE:  Sure.

18             THE COURT:  -- if I find there's standing.  But can

19   you tell me, have there been appellate decisions that are

20   relevant today on standing?  Contrary to what people may

21   expect, I don't follow every appellate decision from every

22   appeal in the Highland case.  Okay?  I wait until I get a

23   mandate --

24             MR. MCENTIRE:  Sure.

25             THE COURT:  -- to where I have to act on something.

009791

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/23/23   Page 181 of 235   PageID 9509

335

1          MR. MCENTIRE:  Sure.

2          THE COURT:  So I feel like I've learned at some point

3     that some either district judge or Fifth Circuit said some

4     party didn't have standing.  And I don't know if it was Hunter

5     Mountain or some other trust.

6          MR. MCENTIRE:  Not --

7          THE COURT:  And is there anything they said that, if

8     it wasn't Hunter Mountain, could be relevant here?

9          MR. MCENTIRE:  I hope somebody kicks me if I'm wrong,

10    what I'm about to say.  I'm not aware of any such issue --

11         THE COURT:  Okay.

12         MR. MCENTIRE:  -- dealing with Hunter Mountain

13    Investment Trust.  I am not.

14         THE COURT:  But any other party that might somehow

15    bear on this case?

16         MR. MORRIS:  I apologize, Your Honor, I was

17    distracted.  For which issue?

18         THE COURT:  Standing.  Because I was saying my first

19    thing I've got to tackle in ruling on this is standing of

20    Hunter Mountain.  And I seem to remember learning that either

21    the district court on an appeal or the Fifth Circuit on some

22    appeal from Highland --

23         MR. MORRIS:  Correct.

24         THE COURT:   -- said some party didn't have standing.

25         MR. MORRIS:  Correct.

009792

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/23/23   Page 182 of 235   PageID 9510

336

```
 1              THE COURT:  And I don't know if it was --

 2              MR. MORRIS:  Dugaboy on the 2015.3, for sure, was a

 3    Fifth Circuit standing decision.

 4              THE COURT:  Okay.

 5              MR. MORRIS:  I think there was a district court order

 6    that preceded that.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  That was the subject of the appeal.

 9              THE COURT:  The Dugaboy --

10              MR. MORRIS:  2015.3.

11              THE COURT:  -- motion to require those --

12              MR. MORRIS:  Yeah.

13              THE COURT:  -- 2015.3 statements.  Okay.

14              MR. MCENTIRE:  So what we have here -- we can go back

15    on the clock if you'd like.

16              THE COURT:  Yes, please.

17              MR. MCENTIRE:  How much time do I have?

18              THE CLERK:  You have just under 16 minutes.

19              MR. MCENTIRE:  Sixteen?  Okay.  Give me a two-minute

20    warning.  Sorry.

21         Your Honor, what we have here --

22              THE COURT:  I don't think the U.S. Supreme Court

23    justices will give you a two-minute warning, but maybe I'm

24    wrong.

25              MR. MCENTIRE:  Would you give me a two-minute
```

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/27/23   Page 183 of 235   PageID 9511

337

1    warning, please?

2              THE COURT:  And I'm sure not a Supreme Court justice.

3              MR. MCENTIRE:  What we have here is we have a 99.5

4    percent equity interest that has now been relegated to a

5    category of contingent interest, which we don't believe we

6    should be, and that's part of our declaratory judgment relief

7    we're asking for, which we have standing to do that at a

8    minimum because we want to be treated like a Class 9.

9         If they want to treat us like a Class 10, I have an

10   argument for that, and it's more than colorable.  It's

11   persuasive.  It's -- it is a winning argument.  And that is we

12   do have standing in our individual capacity, and we have given

13   you a whole bunch of cases in our PowerPoint, or we will give

14   you a whole bunch of cases in our PowerPoint and in our

15   briefing to support that.

16        We also have given you Delaware case law that says we have

17   standing under Delaware trust law to bring a derivative action

18   against the Trustee.  We have done everything appropriate

19   here.

20        We have the -- a demand upon Seery obviously would be

21   futile to prosecute the claim.  A demand upon the Oversight

22   Board would be futile to make a demand on Muck and Jessup,

23   because they're Defendants and they're SPEs of Farallon and

24   Stonehill.  And a demand upon Mr. Kirschner would be futile.

25   They suggest that there's an assignment of some sort, but that

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/29/23   Page 184 of 235   PageID 9512
Main Document   Page 633 of 898

338

1   would be a modification -- of the claims over to the

2   Litigation Trust, but that would be a modification of the

3   plan.

4          There's been no assignment of this claim, or these claims,

5   to the Litigation Trust Trustee.  But even if there had been,

6   we pled that in the alternative as well.  And it would be

7   futile to make a demand on Mr. Kirschner because he's suing

8   Hunter Mountain.

9          So we are an appropriate party.  The only, then, issue

10  becomes whether or not we have standing under Delaware law to

11  bring a derivative action.  And we have briefed that and we --

12  and that's included in our PowerPoint.  The answer is yes.

13         I'd like to go briefly to Page -- next slide.

14         In our factual section, we set forth why this investment

15  would defy any kind of rational economic sense in the absence

16  of material nonpublic information as a factual allegation

17  supported by data, supported by dates, supported by time.

18         Based upon that, we also have allegations that are framed

19  around the admissions that Mr. Michael Linn provided.  We have

20  allegations that he turned down a 30 or 40 percent premium in

21  our petition.  We have allegations that they admitted that

22  they did no due diligence.  We have allegations that they

23  admitted that they got material -- basically information about

24  MGM.

25         And again, it's not all about MGM.  It's about the values

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 185 of 235   PageID 9513

339

1    of all the portfolio companies.  They want to make it about

2    MGM.  If they do, we win.  But it's much broader than that.

3        And we have standing to bring this claim because if we're

4    right Mr. Seery will have to return excess compensation and

5    the Claims Purchasers will have to disgorge.  And that's going

6    to help not just Hunter Mountain.  That's going to help other

7    creditors who haven't been paid yet.

8        So this is not exclusively -- Hunter Mountain would

9    substantially benefit.  I'm not suggesting otherwise.  But it

10   also benefits innocent stakeholders other than Hunter

11   Mountain.  And that's why we are an appropriate party.  We

12   don't have a conflict of interest to bring this.  Everybody on

13   their side of the table does.  There's no one else who could

14   bring this.

15       Your Honor, it's very clear when the trades took place.

16   We give dates and times.  It's very clear that -- next slide,

17   40.  It's very clear that their investment was over $160

18   million.  If it isn't, I don't see any denials.  All we got

19   today was a lame statement from the lawyer saying we're not

20   here today to deny this.

21           MR. MORRIS:  I'm offended.

22           THE COURT:  He's offended by being called lame.

23           MR. MCENTIRE:  Not you lame personally.

24           MR. MORRIS:  Oh, thanks for the clarification.

25           THE COURT:  Okay.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/01/23    Page 186 of 235    PageID 9514

340

1          MR. MCENTIRE:  A lame statement by you.  In fact, it

2    wasn't even you, so --

3          In any event, Your Honor, --

4          MR. MORRIS:  I've been called worse.

5          MR. MCENTIRE:  -- the point being is that there was

6    no -- there's not -- never been an attempt to deny the factual

7    allegations in our pleadings dealing with Farallon and

8    Stonehill.  None at all.

9          And so -- not that that's ultimately relevant, because

10   that's an evidentiary issue outside of the four corners of our

11   pleading, but it does -- it just stands out and screams.  It

12   screams.  And it screams volumes.

13         So right, now based upon our pleadings -- we even plead in

14   Paragraph 42, Paragraph 42, exactly what they invested.  This

15   is what you have before you.  No one has disputed it.  It's in

16   the four corners of our pleading.  We've got dates, times,

17   amounts.  We have admissions to Mr. -- well, we have

18   admissions from Michael Linn, Paragraph 47.  We have -- we do

19   plead upon information and belief the *quid pro quo* on

20   compensation.  And frankly, the evidence here today is that

21   the compensation is excessive.  And the experts will further

22   confirm that it is excessive.  $1.8 million with a bonus

23   program in place to pay him another $8, $9, $10 million, when

24   in fact the risks don't exist and there's no uncertainty and

25   therefore the percentages make no sense.  That's --

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 187 of 235    PageID 9515
Main Document    Page 342 of 390

341

1          THE COURT:  What do you mean, the risks don't exist

2    and there is no uncertainty?

3          MR. MCENTIRE:  If Mr. Seery is telling Farallon and

4    Stonehill don't sell, this could be really valuable, it's

5    inconsistent with the notion that the schedule and the

6    performance -- performance schedule in the compensation

7    agreement is rationally justified.  Because if it's really

8    certain or it's likely you're going to make a lot of money,

9    there's no reason to give him six percent to incentivize him

10   because it's already a done deal.

11        And the whole point here is that I scratch your back, you

12   scratch mine.  They make a lot of money on their deal and he

13   gets a lot of money on the backside post-effective date.

14   Post-effective date.

15        Next slide, 49.

16        It would have been impossible, based upon the publicly-

17   available information in Paragraph 49, impossible for

18   Stonehill and Farallon, in the absence of inside information,

19   to forecast any significant profit when they made their

20   investments.  It's not possible.  Because given the amount of

21   the Claim 8 and Claim 9 claims -- they actually invested in

22   Claim 9 with a zero return.  It's projected to be a negative

23   result.  On Claim 8, even if you allocate their entire

24   purchase price to Claim 8, they're going to get something less

25   than a 10 percent return paid out over a couple years.  Nobody

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 10/27/23    Page 188 of 235    PageID 9516
Main Document    Page 342 of 535

342

1    invests that kind of money in an unsecured creditor asset that

2    hasn't been collateralized.  There's something wrong here.

3        And we have a right to have our day in court to show that.

4    We have our right to take a true deposition of Mr. Seery with

5    documents.  We have a right to take Farallon and Stonehill's

6    deposition with documents.  And we have tried to get

7    information and we have been turned down at every turn.  We

8    have a right to have our day in court, Your Honor.

9        We have allegations of excessive compensation.  I know Mr.

10   Morris suggested the other day that we didn't have any such

11   allegations.  They're here.  The whole idea here is that Mr.

12   Seery would really profit on the backside.  And, you know, he

13   actually testified, I believe -- I won't do that because

14   that's outside the four corners of our pleading.  But the --

15   there is a *quid pro quo*.  We allege there's a *quid pro quo*

16   upon information and belief.  And we also allege willfully and

17   knowingly, we allege conduct that falls clearly within the

18   exceptions.

19       None of this -- none of these claims were released.  Mr.

20   Seery's not an exculpated party in the context of how we --

21   proposing to sue him here.  None of the protected parties, to

22   the extent that Muck and Jessup claim to be protected parties,

23   they're not protected here, because all of the claims we're

24   making are on the basis of willful misconduct and bad faith,

25   which are the standards that they used and incorporated in the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 189 of 235   PageID 9517

343

1   plan and in the gatekeeper provisions.

2        How much time do I have?

3            THE CLERK:  Right now you have --

4            MR. MCENTIRE:  Thirty seconds?

5            THE CLERK:  -- seven minutes left.

6            MR. MCENTIRE:  Okay.  Next slide, please.

7        Mr. Seery has admitted that he has a duty to avoid self-

8   dealing.  We allege that he did self-deal.  There is clearly a

9   relationship.  We have a right to explore the depths of that

10  relationship.  Well, already we know there is a relationship.

11  We have investments in charities, contributions to charities,

12  meet-and-greets, congratulatory emails.  It's not as if

13  Farallon and Stonehill are strangers, or Mr. Seery's a

14  stranger to them.  It's not like that at all.  They contacted

15  him to get involved.

16        And by placing -- by acquiring these claims -- and by the

17  way, this is the most significant trading activity in your

18  bankruptcy, in this bankruptcy proceeding.  Post-confirmation.

19  Post-confirmation.  By acquiring these claims, they were

20  guaranteed to be put onto the Oversight Board.  By acquiring

21  these claims, they were guaranteed to be put in a position --

22  into a position where they would adjust, monitor, compensate

23  Mr. Seery.  That's the terms of the Claimant Trust.  Those are

24  the terms.

25        And it's interesting, because one of the amendments that's

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 190 of 235   PageID 9518

344

1    in evidence to the plan, I think it's either the third or the

2    fourth amendment, that came out of nowhere right before

3    confirmation, they changed the structure of the Claimant Trust

4    to go off a standard base pay and added in a bonus structure

5    at the last minute.  That's evidence.

6        Mr. Seery has acknowledged, we have alleged he had duties

7    to avoid self-dealing, to always look out for the best

8    interests of the estate, to avoid conflicts of interest.

9    Well, here, to the extent that there is a *quid pro quo*, he is

10   self-dealing and he has injured the Reorganized Debtor and

11   he's injured the Claimant Trust, because that's just less

12   money.

13       And we also allege, Your Honor, it's also an allegation

14   that --

15             THE COURT:  And let me ask, the sole injury here is

16   compensation was more than it would have been if not for the

17   sale of the claims to Farallon and Stonehill --

18             MR. MCENTIRE:  That's one of the injuries.

19             THE COURT:  -- and therefore less money at the end of

20   the day for creditors and ultimately Hunter Mountain?

21             MR. MCENTIRE:  Yes.  And we also allege that, as part

22   of this arrangement, conspiracy, as we allege conspiracy, we

23   have seen over $200 million flow out of the coffers of this

24   estate in the form of --

25             THE COURT:  What do you mean, as a result of the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 31-41   Filed 09/27/23   Page 191 of 235   PageID 9519

345

1    alleged conspiracy?  What do you mean?

2              MR. MCENTIRE:  A delay, a postponement, making long-

3    term payouts, keeping the litigation alive.  They actually

4    suggested to Mr. Linn, don't settle these claims, don't sell

5    out, because this is asset-backed, and we also have claims.

6    And so --

7              THE COURT:  Wait, what?  Say again?

8              MR. MCENTIRE:  One of the things that Mr. Linn told

9    Mr. Dondero, according to Mr. Dondero's notes, is we have --

10   this is very valuable, we're buying assets and we're buying

11   into claims, the litigation claims that are being asserted in

12   this bankruptcy proceeding.

13             THE COURT:  Yes.  Got it.

14             MR. MCENTIRE:  Yeah.  And so the whole idea here is,

15   is that people are funneling money in and taking money out of

16   the coffers of this estate to fuel future litigation in order

17   to have a bigger payday at the end for Class 8 and Class 9.

18   That's exactly what those notes suggest.

19             THE COURT:  I don't understand the correlation.  What

20   correlation are you making?  Because of the claims being

21   purchased, what?

22             MR. MCENTIRE:  The claims being purchased allow Muck

23   and Jessup to be in a position to award compensation.  We've

24   talked about that.

25             THE COURT:  I got that.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/07/23   Page 192 of 235   PageID 9520

346

1          MR. MCENTIRE:  That's one type of injury.  The other

2     injury is, and we have alleged it, is the fact that these

3     claims become very valuable not only because they're asset-

4     backed but because also the litigation claims that Mr.

5     Kirschner is prosecuting.

6          THE COURT:  But how does the purchase of the claims

7     impact that?  They were allowed claims at certain amounts

8     before, and after the purchase they're still allowed claims.

9          MR. MCENTIRE:  Mr. Seery is telling them that,

10    basically, this is our plan, this is what we're doing, this is

11    --

12         THE COURT:  That was the plan of reorganization that

13    was confirmed by the Court.  I don't get how something

14    changed.  I'm trying to get to what are the injuries that your

15    client has suffered.  And I get the compensation argument

16    you're making, but I don't get the rest of it.

17         MR. MCENTIRE:  If Mr. Dondero had been in a position,

18    or one of his entities had been in a position, or even Hunter

19    Mountain, and I'm not sure why Hunter Mountain -- be in a

20    position to have acquired the claims, then we would -- this

21    bankruptcy wouldn't even be in existence anymore.  It'd be

22    over.  All creditors would be paid.  It would be done.  Be

23    over.  And that is an allegation we have made --

24         THE COURT:  How do I know that?

25         MR. MCENTIRE:  Because all the creditors would have

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/07/24   Page 193 of 235   PageID 9521

347

1  been paid off.

2          THE COURT:  How do I know, if he would have purchased

3  the claims, that's what would have happened?

4          MR. MCENTIRE:  Well, that's what he testified to

5  today here.  I don't want to get off on a rabbit trail.

6          THE COURT:  I'm trying to understand the injury, --

7          MR. MCENTIRE:  Sure.  I understand.

8          THE COURT:  -- because that's part of my analysis

9  here.

10          MR. MCENTIRE:  The focus, the focus is on the

11  compensation.  And once they aid and abet, once they aid and

12  abet a breach of fiduciary duties, they are subject to

13  disgorgement, and disgorgement of all of their ill-gotten

14  gains.  And the ill-gotten gains are now well over --

15  approaching over $100,000 million.

16          THE COURT:  How do you get to that number?

17          MR. MCENTIRE:  Easily.  We know how much they

18  purchased, which has never been denied.  We know how much has

19  been distributed to Class 8.  And we know what percentage of

20  Class 8 they own.  They own about 95 percent of all Class 8

21  claims.  So if $270,000 million has been distributed to Class

22  8, they got 90 percent of that, 95 percent of it has already

23  gone to them, Farallon and Stonehill.

24          THE COURT:  But it would have gone to the sellers of

25  the claims as well.  I'm trying to make the connection.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 194 of 235   PageID 9522

348

1          MR. MCENTIRE:  That's not the injury.  The injury is

2     what -- that is a consequence of their conduct.  The injury is

3     the compensation.  All right?  That's a distinct injury.  They

4     are subject to disgorgement as a consequence because they have

5     done wrong, and the law should not tolerate -- should not

6     tolerate and allow wrongdoers to get away.  And that's where

7     the unjust enrichment and disgorge --

8          THE COURT:  And what are your best cases for that,

9     that they would have to disgorge --

10          MR. MCENTIRE:  We have cited --

11          THE COURT:   -- the Purchasers would have to disgorge

12     --

13          MR. MCENTIRE:  We have cited cases in our brief.

14          THE COURT:  I'm asking you now to --

15          MR. MCENTIRE:  I don't have them in front of me right

16     this second.  But an aider and abettor --

17          THE COURT:  The *CVC* case, is that your best case?

18          MR. MCENTIRE:  I don't have the cases in front of me.

19     I can say this, that the case law is robust, and I can supply

20     you --

21          THE COURT:  It is not robust.  That's why I'm asking

22     you to zero in.  I read your *CVC* case from the Third Circuit,

23     and I'm wondering, is that your strongest case?

24          MR. MCENTIRE:  No.  I think we -- I think we have a

25     lot of strong cases.  I'm not sure that it is the strongest.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/05/24   Page 195 of 235   PageID 9523

349

1          THE COURT:  Tell me which ones, so I --

2          MR. MCENTIRE:  Ma'am, I just said I don't have it in

3    front of me.  If you'll look --

4          THE COURT:  Okay.  Well, this is closing argument

5    where you present law in support of your position.

6          MR. MCENTIRE:  Well, actually, I'm arguing facts

7    right now.  But Your Honor, what I want to tell you is if

8    you'd like me to submit a letter brief on that, I will.

9          THE COURT:  No.

10         MR. MCENTIRE:  Okay.  Then I won't.  It's in my

11   brief.  All of our authorities are in the brief.

12      In conclusion, --

13         THE COURT:  Okay.  So that was the *CVC* case from the

14   Third Circuit which dealt with an insider who purchased

15   claims, statutory insider, a board member, a 28-percent equity

16   owner, who purchased claims during the case to be in a

17   position to file a competing plan and didn't disclose to the

18   board or file a 3001(e) notice.  Okay.  There was -- claims

19   shouldn't be allowed at more than what the purchaser paid for

20   it.

21         MR. MCENTIRE:  Okay.

22         THE COURT:  Okay.  I'm asking you, is that your best

23   case?  Because you also cited *Adelphia*, which seemed kind of

24   factually off the mark.  And so I really --

25         MR. MCENTIRE:  I -- I'm sorry, --

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/09/23   Page 196 of 235   PageID 9524

350

1        THE COURT:  I need to know, because I've made clear

2   from the beginning, --

3        MR. MCENTIRE:  Yes.

4        THE COURT:   -- I'm struggling with how is there a

5   cause of action related to claims trading.

6        MR. MCENTIRE:  (chuckles)

7        THE COURT:  I don't know why you're giggling.  This

8   is --

9        MR. MCENTIRE:  No, I'm not.  But --

10        THE COURT:   -- serious stuff.  Okay?

11        MR. MCENTIRE:  Agreed.  Agreed.

12        THE COURT:  A bankruptcy estate is being charged ka-

13   ching, ka-ching -- not bankruptcy estate -- the post-

14   confirmation trust.  Ka-ching, ka-ching, ka-ching.  So this is

15   serious stuff.

16        MR. MCENTIRE:  Agreed.

17        THE COURT:  I need to, you know, colorable claim.

18        MR. MCENTIRE:  Agreed.

19        THE COURT:   Colorable claim.

20        MR. MCENTIRE:  Agreed.

21        THE COURT:  Even if plausibility is the standard,

22   which I've expressed my doubt about that, how do you have a

23   plausible claim?  What is your best case?

24        MR. MCENTIRE:  Okay.  This --

25        THE COURT:  Just to recap what I'm focused on,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/22/23   Page 197 of 235   PageID 9525
Main Document   Page 252 of 235

351

1   purchaser and seller, okay?  I can see where breach of

2   contract, maybe some sort of torts between those two.  Okay.

3   I can see where the U.S. Trustee, the SEC, I don't know, the

4   Texas State Securities Board, they might get concerned about

5   allegations of insider trading and there might be a regulatory

6   action.  But the estate?  Again, the post-confirmation trust

7   --

8           MR. MCENTIRE:  Okay.

9           THE COURT:  -- and a contingent beneficiary.  I'm

10  trying to understand what is the best legal authority that

11  might support a colorable claim.  And we talked about the *CVC*

12  case and *Adelphia*.  I'm trying to figure out what are other

13  cases you think I should really hone in on to understand this.

14          MR. MCENTIRE:  All right.  At the very beginning this

15  morning, during my opening statement, I had said this is not

16  your typical claims-handling case, because I recall from our

17  last conference you asked that question a couple of times.

18  This is not your typical claims-handling case.  And it's not a

19  typical claims-handling case because we have a fiduciary that

20  we claim breached his duties that were owed to the estate.

21  And he self-dealt.  And he -- this has nothing to do with the

22  plan.  This has something to do with what Mr. Seery did

23  outside the corners of the plan.  Perhaps he used the plan

24  expediently.  He self-dealt.

25      That's why this is not just between a seller and a buyer

Case 19-34054-sgj11 Doc 3843 Filed 06/13/23 Entered 06/13/23 10:25:56 Desc
Case 3:23-cv-02071-E Document 23-41 Filed 09/27/23 Page 198 of 235 PageID 9526

352

1   of a claim.  That's number one.

2       We have been denied an opportunity to discover the

3   communications between the sellers and the buyers, and my

4   guess is we have big boy agreements that prevent the sellers

5   from ever coming back at anybody for fraud.  My expectation,

6   that's the case.  We should have a right to go explore that.

7   So that's why they're not here.

8           THE COURT:  Why?  I mean, what would that tell you?

9   What would that tell you?

10          MR. MCENTIRE:  That --

11          THE COURT:  If there's a big boy agreement, if

12  there's not, what --

13          MR. MCENTIRE:  It would tell us --

14          THE COURT:   -- consequence would that have for this

15  --

16          MR. MCENTIRE:  It would tell us --

17          THE COURT:   -- proposed lawsuit?

18          MR. MCENTIRE:  It would answer Mr. Morris's question

19  that he's raised several times, this is the seller's issue,

20  this is not -- this is not the Hunter Mountain's issue.  It is

21  Hunter Mountain's issue.  Hunter Mountain as an equity

22  interest-holder should be in a position to be certified as a

23  Class 9 beneficiary now pursuant to our declaratory judgment

24  action.  That's number one.

25      Number two.  As a contingent beneficiary, it is entitled

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/29/23    Page 199 of 235    PageID 9527

353

1    to protect its interests and bring suits if it sees that

2    something has happened that is incorrect and is a tort

3    involving the Reorganized Debtor and the Claimant Trust.  That

4    is the nature and the essence of our claim.

5         And as a consequence, the aiders and abettors should not

6    be allowed to walk away unharmed.  They should be required to

7    disgorge their ill-gotten profits.  And that calculation is

8    easily done, as I've just demonstrated.

9         Your Honor, that's all I have.  Thank you very much.

10             THE COURT:  Thank you.

11             MR. MCENTIRE:  And we talked -- we'd need an

12    opportunity to argue on the issue of experts, because --

13    whether you're just going to take it under advisement, I'm not

14    sure how you're going to handle that.

15             THE COURT:  I'm going to read the pleadings and then

16    I'm going to let you all know are we coming back for another

17    day.

18             MR. MCENTIRE:  Thank you.

19             THE COURT:  All right.  Who is making the closing

20    argument -- do we have three closing arguments?

21             MR. STANCIL:  Yes.

22             MR. MCILWAIN:  We're going to do it in reverse order.

23             MR. MORRIS:  Reverse order in.

24             THE COURT:  Okay.  Reverse order of --

25             MR. STANCIL:  Keep it interesting.

```
 1              MR. MORRIS:  I think I was last on the opening.

 2              THE COURT:   -- importance?

 3         (Laughter.)

 4              THE COURT:  No.  Just kidding.  Just kidding.

 5              MR. MORRIS:  We're assuming you remember what the

 6    original order was.

 7              MR. STANCIL:  Yeah, right, right.

 8              MR. MORRIS:  It was so many hours ago.

 9              THE COURT:  Okay.  Oh, so many hours ago.

10              MR. MCILWAIN:  I think I was referred to earlier as

11    the lame lawyer.

12              THE COURT:  Oh, you were.  I think --

13              MR. MCILWAIN:  So I'll start.  I think --

14              THE COURT:  I think you --

15              MR. MCILWAIN:  Or maybe it was the lame argument,

16    whatever.  Whatever.

17              THE COURT:  I think you were the lame one.

18         CLOSING ARGUMENT ON BEHALF OF THE CLAIM PURCHASERS

19              MR. MCILWAIN:  Your Honor, Brent McIlwain here for

20    the Claim Purchasers.

21         Let me start, I guess, by saying I understand now why

22    Hunter Mountain did not want to put on evidence, because the

23    evidence that they put on, frankly, made their case much

24    worse.

25         As we argued or we stated in the opening statement, our
```

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 201 of 235    PageID 9529
Main Document    Page 355 of 368

355

1    position is that you can look within the four corners of this

2    document and determine that there is no plausible or colorable

3    claim.  What the evidence showed is that Mr. Dondero allegedly

4    had a call with one -- with Farallon, not with Stonehill, with

5    Farallon, Farallon wouldn't tell him what they paid, Farallon

6    did not accept an offer of 130 or 140 percent of whatever they

7    paid for the claim, and he thinks they did no due diligence,

8    right?  He had nothing in his notes about MGM.  So he can say

9    that he thought that they were positive because of MGM, but

10   it's certainly not -- I don't think the Court should take that

11   evidence with any credibility.

12       But interestingly, what Mr. Dondero says is, well, how do

13   you know how much they paid for these claims?  He goes, well,

14   there was a market for the claims, right?  They were all

15   trading at 50 or 60 cents.  But yet no one would ever buy

16   these claims without any due diligence because the projections

17   in the plan indicate that they wouldn't -- they wouldn't get a

18   return.

19       Well, if there's a market for the claims and he's willing

20   to pay 30 or 40 percent more than whatever someone purchased,

21   certainly there is a market for the claims.  And he is the

22   only one, frankly, that had inside information.  That's why he

23   was willing to maybe pay more.

24       Or, alternatively, the case that you were describing

25   before, Mr. Dondero maybe wanted to buy the claims so he could

1   control the case, right, so he could dismiss any litigation

2   that was pending against himself so he could avoid the ire of

3   the estate that is aimed at him.

4       It also -- the Court's inquiry as to what the injury is I

5   think is precisely on point.  The only injury offered at this

6   point really is that somehow my client's agreed-to higher

7   compensation that is reasonable or appropriate in return for

8   some inside information on claims that were allegedly trading

9   at 50 or 60 cents in any instance.  And what the evidence

10  showed is that, one, Mr. Dondero never had any information

11  about that, about the compensation that Seery is receiving

12  when this complaint was filed, when this motion for leave was

13  filed.

14      And so if you judge the complaint within the four corners,

15  there is no -- there is no *quid pro quo*, right?  Because he

16  says, well, there's obviously something up here because they

17  wouldn't have bought these claims without due diligence, and

18  they must have agreed to higher compensation, and that's why

19  it all happened.  And if we throw all this out here, then

20  we'll get to do the discovery that we wanted to do.

21      Importantly, if you look at his notes, right, the first

22  thing that's written down is discovery to follow, because

23  that's how he operates.  That's how a serial litigator

24  operates.  Discovery to follow so that I can pay you back for

25  not selling your claim to me.  Right?  So I can't control the

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/30/23   Page 203 of 235   PageID 9531

357

1    world, so I can't control this case, you're going to pay.  And

2    we're all paying.  Every one of us here.  Right?  There's 15

3    lawyers in the courtroom and probably 10 on the phone, right?

4    We're all paying.

5        And so when Mr. McEntire says I'm not getting my day in

6    court, we've had an entire day in court.  We've had three

7    hearings to decide what this hearing is going to be.  And he's

8    gotten more than his day in court for, frankly, what is word

9    salad.  This complaint doesn't pass any test, whether it's

10   12(b)(6) or under the *Barton* Doctrine.  It's simply

11   allegations that are thrown out there, and they're saying, so

12   that we can do more discovery to determine if we actually have

13   allegations.  Because they want to continue to harass people,

14   they want to continue to be a thorn in everyone's side, so

15   that perhaps they can avoid further litigation against Mr.

16   Dondero or they can convince somebody to settle with Mr.

17   Dondero.

18       It doesn't make any sense, Your Honor, and this is exactly

19   why there is a gatekeeper provision, right.  That's why the

20   Court imposed this.

21       And you ask yourself, why would someone sell these claims?

22   Obviously, the sellers of the claims have not shown up.

23   Whether they're big boy, it doesn't matter, because the Court

24   and this estate had nothing to do with those sales.  But they

25   haven't shown back up.  I can -- I can venture a guess why, if

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/20/23   Page 204 of 235   PageID 9532
Main Document   Page 358 of 388

358

1    I was involved with Mr. Dondero, I would sell my claim, right?

2    Because I wouldn't have to be here.  And that's exactly why

3    the Court should not authorize this complaint to be filed and

4    the gatekeeper provision of the order should prevent it.  And

5    frankly, this should be shut down and we should not have to

6    have continued litigation over experts, or anything else, for

7    that matter.  And frankly, we should just be able to go on and

8    let Mr. Seery do his job.

9        Because I think the evidence was pretty clear that his

10   compensation is reasonable and it was in line, frankly, with

11   what he was making before.  And candidly -- and maybe it's

12   because Mr. McEntire is not involved in bankruptcy cases, but

13   this is similar compensation that I see in numerous cases, and

14   it's tiered to incentivize Mr. Seery to do his job, and he's

15   doing his job.

16       So, with that, Your Honor, I'll cede the rest of the time

17   to the other parties.

18            THE COURT:  Okay.  Thank you.

19          CLOSING ARGUMENT ON BEHALF OF JAMES P. SEERY, JR.

20            MR. STANCIL:  Thank you, Your Honor.  I'm going to

21   focus -- and I'm going to put my little clock up so Mr. Morris

22   doesn't, you know, give me the hook here.

23            THE COURT:  Okay.

24            MR. STANCIL:  But first --

25            THE COURT:  Next time we're all here, maybe I'll have

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/02/23   Page 205 of 235   PageID 9533

359

 1   one of those red, what do you call them, the buzzer.

 2          MR. STANCIL:  Oh, the big light?

 3          THE COURT:  The red light.

 4          MR. STANCIL:  We used to joke that the judge I

 5   clerked for wished he had a trapdoor and he could just pull

 6   the lever when it was done.

 7          THE COURT:  Okay.

 8       (Laughter.)

 9          MR. STANCIL:  Maybe I shouldn't have put that in your

10   head.

11          THE COURT:  Who was that?  Are we going to say who

12   that was?

13          MR. STANCIL:  So Your Honor, I'm going to try to set

14   the legal framework.  I'm going to ask you -- and I think we

15   have our -- we have the deck.  It's the little -- if we could

16   put that up and start on Slide 2.

17       I'd like to address what standard applies, and then I'd

18   like to spend a few minutes asking Your Honor again not only

19   to rule on multiple alternative grounds, but also I'd like to

20   walk through what if you did this on a pure 12(b)(6), because

21   it's going to collapse.

22       So, well, we'll just jump in.  I said at the beginning

23   that we know that the question here is not what does the word

24   colorable mean in isolation.  We wouldn't do that in any

25   context.  We would always look and see what the operative

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/09/23   Page 206 of 235   PageID 9534

360

1   language here is in the Court's confirmation order.  So the

2   question is, what did the Court mean, it must represent a

3   colorable claim?

4       So we mentioned before Paragraph 80 of the confirmation

5   order.  That cites *Barton*.  It cites the vexatious litigant

6   cases.  I've not heard one word from Mr. McEntire answering

7   how it can be that we're here on a sub-12(b)(6) standard he

8   now says when the Court articulated this legal authority and

9   this legal basis in the confirmation order.  If he believed

10  that, the time to make that argument was on the confirmation

11  appeal, and that's over.

12      But let me then say, how did we get, how did the Court get

13  to Paragraph 80?  Well, that came after a series of factual

14  findings in the confirmation order -- in fact, actually, Josh,

15  do you have the hard copy of this?

16          MR. LEVY:  Yeah.

17          MR. STANCIL:  If I could hand that to the Court.

18      May I approach, Your Honor?

19          THE COURT:  You may.  Thanks.

20          MR. STANCIL:  And I don't propose to go through every

21  slide, Your Honor.

22          THE COURT:  Okay.

23          MR. STANCIL:  But if you could turn to Slide #5.

24  This is Paragraph 77 of the Court's confirmation order.

25  Factual support for gatekeeper provision.

009817

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 207 of 235   PageID 9535

361

1          MR. MCENTIRE:  Excuse me.  May I have a copy?  I

2    can't see it.

3          THE COURT:  Oh.

4          MR. LEVY:  Oh, yeah, sure, sure.

5          MR. STANCIL:  And can we get a copy of yours as well,

6    --

7          MR. MCENTIRE:  Sure.

8          MR. STANCIL:  -- while we're at it?  Thanks.

9      The facts supporting the need for the gatekeeper provision

10   are as follows.  I will not read them all, but if you scroll

11   about eight lines down, it says, During the last several

12   months, Mr. Dondero and the Dondero-related entities have

13   harassed the Debtor, which has resulted in further

14   substantial, costly, and time-consuming litigation for the

15   Debtor.  And then there are six separate enumerated examples

16   of that.

17     Paragraph 78 on the next slide.  Findings regarding

18   Dondero postpetition litigation.  The Bankruptcy Court finds

19   that the Dondero postpetition litigation was a result of Mr.

20   Dondero failing to obtain creditor support for his plan

21   proposal and consistent with his comments, as set forth in Mr.

22   Seery's credible testimony, that if Mr. Dondero's plan

23   proposal was not accepted he would, quote, burn down the

24   place.

25     Next slide.  This is Paragraph 79.  Necessity of the

1    gatekeeper provision.  If you would just skim to the bottom of

2    that first column, it says, Approval of the gatekeeper

3    provision will prevent baseless litigation designed merely to

4    harass the post-confirmation entities charged with monetizing

5    the Debtors' assets for the benefit of its economic

6    constituents, will avoid abuse of the court system and preempt

7    the use of judicial time that properly could be used to

8    consider the meritorious claims of other litigants.

9        And then came Paragraph 80, which we've just discussed.

10   With respect, Your Honor, the question is, what is the meaning

11   of Paragraph 80?  And in context, following those paragraphs

12   regarding vexatious litigation and abuse of litigation, it is

13   simply implausible to suggest that colorability is a sub-

14   12(b)(6) standard.

15       And that is Mr. McEntire's contention today, that the

16   gatekeeping order is actually lower than the threshold that

17   every other litigant faces.  Everyone else has to file a

18   claim, pass a 12(b)(6), and on they go to get to discovery.

19   Mr. McEntire believes that the gatekeeping order imposes less

20   than that on him, and then he's treated just like everybody

21   else.  It makes no sense whatsoever.

22       So I'll skip Slides 8 and 9, Your Honor, but that's where

23   the Fifth Circuit described the gatekeeping orders, affirmed

24   them in relevant part, citing *Barton*.  There is no mystery

25   here.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 10/30/23    Page 209 of 235    PageID 9537

363

1      If you could flip, Your Honor, to Slide 10 very briefly.

2   We've talked about this case a little bit in one of our status

3   hearings, *In re Vistacare Group*.  This is the leading case

4   that describes what it is that one does under a *Barton*

5   analysis, and it says that the trustee must make a -- pardon

6   me -- a party seeking leave to sue a trustee must make a *prima*

7   *facie* case against the trustee, showing that its claim is not

8   without foundation.  A *prima facie* case is more than a

9   12(b)(6).

10      And I would direct Your Honor to the language in the third

11   bullet.  It involves a greater degree of flexibility than a

12   Rule 12(b)(6) motion to dismiss because the bankruptcy court,

13   which, given its familiarity with the underlying facts and the

14   parties, is uniquely situated to determine whether a claim

15   against the trustee has merit.  Boy howdy, are we -- I'm

16   sorry.  My kids are going to tease me for that.

17      But this -- no case has ever proved the wisdom of that

18   statement, Your Honor.  We are here, and the Court is all too

19   familiar with the facts and the parties of this case.  And

20   we're not here on an adversary proceeding.  We're here on a

21   contested matter.  And Your Honor has the authority on any

22   contested matter to take evidence, and a broad, broad

23   discretion as to what evidence is appropriate to meet that

24   standard.

25      So we have laid out briefly in Slide 11 what -- why we

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/29/24   Page 210 of 235   PageID 9538

364

1    believe that -- or how we believe that the *prima facie* showing

2    would work.  And in short -- and maybe this will help us going

3    forward -- we believe that if they make -- if a party seeking

4    relief under the gatekeeping order says things, we have the

5    right to rebut them, like in a burden-shifting or a burden of

6    production -- pardon me -- analysis.  So you can say that the

7    sun rises in the west, but we can bring in evidence to say it

8    doesn't, it rises in the east.  And that's the plausibility

9    threshold.

10       And here, and if Your Honor would flip to the next slide,

11   I'm not sure it's entirely fair to say, even after they have

12   purported to withdraw their evidence, that they've really done

13   so.  And we disagreed with Mr. McEntire, and advised him of

14   such leading up to this hearing, that we do not agree that his

15   redactions fully excise all of the evidentiary assertions from

16   his motion.

17       And I'll just pick one example here on Slide 12.  On the

18   left is Paragraph 32 of the motion for leave prior to the

19   purported withdrawal.  On the right is Paragraph 32 after the

20   withdrawal.  Your Honor will see all they've withdrawn are the

21   citations.  It's verbatim.  It's the same allegations.  And

22   they have argued various facts and put them in evidence.  So

23   even if it were true, and it's not, but even if it were true

24   that all you get here is a 12(b)(6) ruling in the ordinary

25   case if you put no evidence in dispute, they forfeited that

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/27/23   Page 211 of 235   PageID 9539
Main Document   Page 3 of 235

365

1    right by putting these facts and evidence in dispute in their

2    motion.

3        The fact that they have withdrawn evidentiary support for

4    their evidentiary assertions does not relieve them of the

5    reality that they have made all sorts of factual arguments in

6    their motion for leave, and as a contested matter we have the

7    right to address it.

8        I'm proposing, Your Honor, unless you have questions on

9    the cases on 13, 14, those are the cases where we have

10   described the hearings that have been held under *Vistacare* and

11   *Foster*, and I know more about the down-in-the-weeds of *Foster*

12   than I ever cared to, but I don't want to repeat what's in our

13   briefs.

14       If Your Honor is willing to flip to Page 15, this is an

15   argument I've alluded to briefly, but boy, we don't hear -- we

16   have not heard a single thing as to what function the

17   gatekeeper serves, particularly in context of Your Honor's

18   factual findings in the confirmation order, if all it means is

19   12(b)(6) or lower.  It just, it's an unanswerable point that

20   they just persist in ignoring.

21       But I'd like to address very briefly that third bullet,

22   because at various times and in their brief they have cited,

23   Hunter Mountain has cited, down here we call it *Louisiana*

24   *World*, I think in the Second Circuit we call it *STN*, but this

25   UCC derivative standing.  There are, in fact, two elements one

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/29/23    Page 212 of 235    PageID 9540
Main Document    Page 365 of 389

366

1    has to pass for that, and that's a different context.  The

2    first is colorability as it's used in that context, and that

3    is often a 12(b)(6) standard in that context.  But still to

4    have standing, to bring that claim on behalf of the estate,

5    you have to show a cost-benefit analysis.  As we've heard

6    today, we've probably spent more in legal fees today, or over

7    the last three months, than the purportedly excessive

8    compensation to Mr. Seery.  And so I would respectfully

9    submit, if we were here on a *Louisiana World* or *STN* hearing,

10   this would be an open-and-shut case just as well.

11        So if I could, Your Honor, if you are willing to jump

12   ahead to Slide 17, I'd like to ask you -- and I do want to

13   address the standing jurisdictional question a little bit.

14             THE COURT:  Okay.

15             MR. STANCIL:  Not to get into the weeds of standing,

16   because I think we have briefed that out the wazoo in our

17   papers, and I read this morning -- I think it was this morning

18   -- from the Claimant Trust Agreement, which says they're not a

19   beneficial interest.

20        But my understanding is that Article III standing, whether

21   there is a theoretical injury in any way, that is -- that goes

22   to Your Honor's subject matter jurisdiction under Article III,

23   but that is not true of statutory standing under Delaware law

24   or prudential standing.  Those are -- those go to basically

25   whether they state a claim.

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 213 of 235   PageID 9541

367

1      So, Your Honor, I believe, can -- and I've confessed to my

2   colleague that the only way I remember this is I screwed it up

3   really, really badly when I was clerking years ago -- but I

4   believe Your Honor can, and in this case should, rule on the

5   standing ground in the alternative.  Not on the Article III.

6   Article III is binary.  They either have it or they don't.

7   But on the statutory standing, you can say -- I think you can

8   hold that they do not have standing under Delaware law to

9   pursue the claim, but even if they do have standing, and then

10   reach the remainder.

11      And we know we're headed for appeal.  We've heard --

12   pretty much two-thirds of the time this morning has been

13   laying the groundwork for an appeal.  And we would only like

14   -- we would like to make sure that we give the Fifth Circuit a

15   fulsome record.

16      So I would like to ask Your Honor to flip to Page 19.  And

17   this is really the end of, I think, what we need to do.  So,

18   Your Honor, what if we were here just on 12(b)(6)?  So we've

19   got a *quid*, we've got a *pro*, we've got a *quo*.  They fail at

20   each turn.  Let me spend most of my time on the *quid*.  I'll

21   let the documents of which the Court can take judicial notice

22   speak for themselves.  I will let the bare-bones nature of the

23   assertion -- and it's okay to put in a complaint something on

24   information and belief, but you still have to pass *Iqbal* and

25   *Twombly*.  I can't say upon information and belief that I was

009824

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 3.41   Filed 01/09/23   Page 214 of 235   PageID 9542

368

1    denied a starting position on the Knicks, right?  I would like

2    to believe that's the case, but it still has to be a plausible

3    allegation.

4        Let's look at this chart.  And this chart is taken right

5    out of our brief.  These are their numbers.  This is at the

6    bottom.  And I want to -- I would like to take head-on this

7    proposition that this is not a rational investment on their

8    numbers.

9        So let's take the Stonehill purchase of Redeemer.  They

10    paid $78 million to earn a projected profit, according to the

11    November 30 disclosure statement, of $19.71 million.  By my

12    arithmetic, that is a return of 25.27 percent.  Even by Mr.

13    Dondero's lights, that's a pretty good return.

14        I'm going to come back to why that's not the end of the

15    return, but let's look at the Farallon purchase of Acis.

16    Spent $8 million.  Projected profit, $8.4 million.  I'll take

17    105 percent return any day.

18        Let's look at the Farallon purchase of HarbourVest.

19    Purchase price, $27 million.  Projected profit, $5.09 million.

20    That is -- oh, I can't read my own writing anymore -- I think

21    that is 18.85 percent.  I would again gladly take that every

22    day of the week, whether it's a distressed asset or otherwise.

23        But let me make one really important point that Mr.

24    Dondero obfuscated, Mr. McEntire does not acknowledge, and it

25    is just a fact.  These are projected profits if all Mr. Seery

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 215 of 235   PageID 9543

369

1  does is hit the plan.  November 30, 2021.  If he does no

2  better than what he thought these assets were worth then, this

3  is the expected return.  So for those trades that we've talked

4  about, that's a slam dunk even on that.

5      But let's look about -- we'll talk about upside.  Because,

6  as Your Honor knows from doing bankruptcy cases, upside, it's

7  all about upside for people who are purchasing claims.  So it

8  isn't just that their returns were capped at these already-

9  ample percentages.  If Class 8, for example, of Redeemer paid

10  out in full, they would be making not -- oh, gosh, I'm not

11  sure I should do this on the fly -- but they'd be recovering

12  $137 million on the Class 8 claim, not the $97.71 million.  So

13  there's another $40 million of upside.

14      Even if it's a low-probability event, that's a -- hedge

15  funds do that all day every day.

16      Same here with Acis.  Paid $8 million, expected $16.4

17  million, but they could get up to $23 million.

18      Now, we've heard so much about how Class 9 was worthless,

19  worthless, worthless.  No, it's not.  There's always the

20  potential for upside.  Paid $27 million.  Could recover $45

21  million just on Class 8.  Could recover another $35 million on

22  Class 9.  They could recover $80 million on a $27 million

23  purchase.  Now, the probability of that is complicated, but

24  it's not zero.  We know that it's not zero.  All we've heard

25  from them today is that Mr. Seery is -- could pay off 8 and 9

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 12/07/23   Page 216 of 235   PageID 9544

370

1    in full.  So I don't think that is even remotely plausible.

2         Let's talk briefly about UBS.  They like to talk about UBS

3    for the projected profit of $3.61 million in loss.  But that

4    was -- that's in August, and that claim trades.

5         So a couple of things that happened between the November

6    30 disclosure statement setting that projected value and the

7    purchase of the UBS claim in August.  Number one is we are

8    nine, ten months past the worst of COVID.  And Your Honor

9    could take judicial notice of massive market movements just if

10   you do nothing.

11        We don't need to get to that, because we talked all

12   morning about MGM.  May 26th, it's announced publicly.  May

13   26, 2021.

14        So the notion that a purchaser of a UBS claim in the

15   summer of 2021, after this MGM transaction is announced, would

16   think, you know what, I think these claims are only worth what

17   they were worth back in November, is not plausible.

18        And so this is why the comparisons to the debt, the exit

19   financing, well, 12 percent.  That's a 12 percent capped

20   return.  We're talking here about returns of 25 percent, 105

21   percent, 18.85 percent, just based on projections at the --

22   sort of in the darkest days post-COVID.

23        So it's not plausible.  If a court were looking at this

24   just under the 12(b)(6) standard, we would be -- we'd be

25   dismissing this claim as well.  And we really -- respectfully,

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 217 of 235   PageID 9545

371

1    Your Honor, we need that ruling.  We think we need that ruling

2    so that whatever the -- whatever they may say the standard is

3    in the Fifth Circuit, we only have to go one time.  And we

4    really believe that we're entitled to that.

5         I'll let Your Honor -- I will just stand on the deck and

6    our briefs on the *pro* and the *quo*.  But meet-and-greets, these

7    are just conclusory allegations in the complaint.  He says

8    they worked -- that he worked for them 10 or 15 years ago,

9    which some of that's not even true, but even if it were all

10   true, if I were beholden to every client I've met at a

11   schmooze fest or everybody I worked for in a group 20 years

12   ago or 15 years ago, you know, I would be incapable of

13   operating without a conflict of interest.  And it's just not

14   plausible.  This is something that needs to go.

15        Unless the Court has questions, I will cede the remainder

16   of our time to Mr. Morris.

17             THE COURT:  No questions.  Thank you.

18        CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

19             MR. MORRIS:  Thank you so much, Your Honor, for your

20   patience.  It's been a very long day.  I am very grateful that

21   we're going to finish today.

22        As I said at the beginning, I believe this exercise, as

23   difficult as it may have been, is so important and so vital,

24   preserving this estate and what's left of it.

25        The gatekeeper exists for very important reasons.  Your

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 218 of 235    PageID 9546
Main Document    Page 2 of 3

372

1    Honor made those findings in her order that has been upheld on

2    appeal.  And we're here to make sure that frivolous litigation

3    is not commenced against my clients, or, frankly, against

4    Stonehill and Farallon, given their capacity as Claimant

5    Oversight Board members.

6        Hunter Mountain confuses argument with facts.  There's no

7    facts here to support anything, and that's what the gatekeeper

8    is about.  The gatekeeper is making sure that there's a good-

9    faith basis to pursue claims.  And as Mr. Stancil points out,

10   it is certainly acceptable to state things upon information

11   and belief.  But the point of the gatekeeper is if somebody

12   says -- not somebody says -- somebody offers proof that those

13   beliefs are wrong, you no longer have a plausible claim.  And

14   that's why we thought it was so important to go through this

15   exercise today.  Because the facts show that their beliefs are

16   simply wrong, and the entire complaint is based on their

17   beliefs.

18       There is zero evidence concerning the compensation other

19   than their belief that the compensation is excessive.  The

20   case is over.  Like, you could stop there.  I'm going to go

21   through a bunch of things that -- you could stop there.

22       I want to actually begin backwards, though, in time, with

23   the HarbourVest settlement.  Right?  After two years of

24   litigation and re-litigation and re-litigation of the

25   HarbourVest settlement, the claims of insider trading, finally

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 219 of 235    PageID 9547

373

1    the Court has before it admissible indisputable evidence that

2    Mr. Seery negotiated the terms of the HarbourVest settlement

3    before he ever got this notorious email from Mr. Dondero.

4    That should be a finding of fact in Your Honor's order and it

5    should never be -- nobody should ever make that allegation

6    again.  It's over.  You have the documents.  You have the

7    email from Mr. Seery to the board, here are the terms, and

8    those are the terms Your Honor approved.

9        And there's more.  Because this is so important for us,

10    because we're tired of being accused of wrongdoing.  We're

11    tired of being falsely accused of wrongdoing.

12        $22-1/2 million.  That's the valuation Mr. Seery put on

13    it.  You can see that he's doing it to his Independent Board

14    colleagues, copying his lawyers.  He's telling them where he

15    got it, from Hunter Covitz.  The evidence is now in the

16    record.  It came from a regularly-published NAV report from

17    November 30th.  It was seven days old.  It can never be

18    disputed again that $22.5 million was a fair value, not based

19    on some subjective view of Mr. Seery but based on the person

20    who gave him the report that everybody relies upon that Mr.

21    Dondero got.

22        And it was ratified yet again in the audited financial

23    statements that came out, and it shows for the period ending

24    -- this is Exhibit 60, I believe -- for the period ending

25    December 31, 2020, $50 million.  Okay, so it went up a few

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/27/23    Page 220 of 235    PageID 9548
Main Document    Page 220 of 235

374

1   million dollars in December.

2        This is their case?  This is the case?  Your Honor I know

3   is still working on the motion to dismiss.  That's Mark

4   Patrick, right?  That's the complaint that he brought.  That's

5   what this is about.  I don't mean to confuse the issue, but

6   it's time to put this stuff to rest, because it's wrong.  Mr.

7   Dondero has lost and he's got to get over it at some point.

8        But here's the best piece of evidence about this whole

9   shenanigans about MGM being inside information.  Mr. Dondero

10  filed a 15-page objection to the HarbourVest settlement and

11  didn't say a word about it.  How is that possible?  Six days

12  before the settlement, he sends this email.  Two weeks later,

13  in January, he files a 15-page objection and doesn't mention

14  anything about insider trading, MGM, or any wrongdoing by Mr.

15  Seery.  In fact, he argues the exact opposite, that Mr. Seery

16  cut a bad deal.  How is that possible?  This is a plausible

17  claim?

18        It gets better, or worse, depending on your point of view.

19  CLO Holdco filed an objection and they said they're entitled

20  to buy the asset.  This is Mr. Dondero's, you know, operating

21  arm of the DAF.  They lost -- they actually had an honorable

22  person who concluded, I don't really have that right.  But

23  these are the claims that Mr. Patrick is asserting, and he

24  asserted them on April -- in April, before the MGM deal was

25  announced.  Right?  And Your Honor found, and that's why it

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 02/02/23    Page 221 of 235    PageID 9549
Main Document    Page 375 of 385

375

1    was so important for the Court to take judicial notice of the

2    second contempt order, because Mr. Dondero was intimately

3    involved in bringing those claims and in bringing those claims

4    against -- or trying to bring those claims against Mr. Seery,

5    in violating of the gatekeeper.  This is all tied together.

6        I have to tell you, I don't know why we're not doing Rule

7    11.  Forget about colorable claims.  This is a fraud on the

8    Court.  It really is.  And I don't know when it's going to

9    stop.  I'd love to move on with my life, to be honest with

10   you.

11       The tender offer.  He's out there doing a tender offer

12   benefitting as the fund that he manages acquires more shares

13   and his interest goes up and the value goes up with all these

14   MGM holdings.  Really?  And he's going to accuse Mr. Seery of

15   wrongdoing?

16       There was one point of Mr. Dondero's testimony that made

17   my heart skip a beat.  It's when he referred to the need to

18   get discovery.  And why did it skip a beat?  Because he

19   actually had a moment of candor where he admitted that the

20   notion that Mr. Seery gave them material nonpublic inside

21   information was his thought.  It's not anything that Farallon

22   ever told him.  And then it spins and it spins and it spins,

23   and finally when he gets to the fifth version of his sworn

24   statement MGM suddenly appears.  It's not right.  Colorable

25   claims?  Fraudulent claims.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/20/23    Page 222 of 235    PageID 9550

376

1      What's the undisputed evidence right now?  I'll take Mr.

2  Dondero at his word that Mr. Patel told him that Farallon

3  bought the claims in February or March.  How did they

4  reconcile that with the undisputed testimony that Mr. Seery

5  thereafter invited Farallon to participate in the exit

6  financing?  And they signed an NDA in early April.  Why would

7  you sign an NDA if you already got inside information?  Who

8  would do that?  What would be the purpose of that?

9      How do you reconcile the fact that, according to Mr.

10  Dondero, the claims were already in Farallon's pocket when

11  they signed an NDA to get information for an exit facility.

12  Is that plausible?

13      We've heard Mr. McEntire say a bunch of times it's much

14  broader than MGM.  Not only not a scintilla of evidence, but

15  no substantive allegation.  Again, confusing argument with

16  facts.  Because he had -- yes, Mr. Seery had access to inside

17  information relative to Highland.  He's the CEO.  But where is

18  the evidence that he shared anything with anybody?  There is

19  nothing.

20      Mr. Dondero admitted in his motion -- in a moment of

21  candor, he said that's what he concluded based on the fact

22  that Mr. Patel supposedly told him, I bought because Seery

23  told me to.  He made the inference.  No evidence.  Nothing.

24      They're bringing this case for the benefit of innocent

25  parties?  These people have told you time and again that

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 223 of 235   PageID 9551

377

1     assets exceed liabilities.  What innocent parties?  Where are

2     they and how come they're not -- let's get to that point, too.

3     Because they're saying, oh, Mr. Seery is, like, just not

4     declaring the end of this.  Seriously?  How much do they think

5     Mr. Seery should reserve for indemnification claims as we do

6     trials like this with a mountain of lawyers billing $800,

7     $1,500 an hour?  Seriously?  Mr. Seery is somehow acting in

8     bad faith by not declaring the end of this case?  How much is

9     he supposed to reserve?  They keep skipping over that.  We'll

10    talk about that in the mediation motion.  We'll talk about

11    that in the Hunter Mountain motion in July.  Who's prosecuting

12    that?  Mr. Dondero's lawyer.  I know there's a really big

13    separation between Hunter Mountain and Mr. Dondero, but

14    Stinson is prosecuting that claim on behalf of Hunter Mountain

15    when they're seeking information.

16         And they complain about the legal fees?  We've put our

17    pens down.  Kirschner put his pens down.  We put down the

18    claim objection.  What we're doing is defense at this point.

19         We're awaiting the ruling on the notes litigation, and we

20    will very much prosecute the vexatious litigant motion if

21    Judge Starr grants the pending motion to exceed the page limit

22    that's been out there for months.  I'm not sure what's

23    happening there.  We'll do that for sure.  But otherwise,

24    we're just playing defense.

25         We're here today because they've made a motion, a motion

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/27/23   Page 224 of 235   PageID 9552

378

1   that lacks any good-faith basis whatsoever.  And that's why

2   today was so important, so the Court could hear the witnesses.

3   They could -- the Court -- I mean, think about it.  Texas

4   State Securities Board.  The audacity of saying that somehow a

5   letter from the Texas State Securities Board saying they're

6   taking no action after conducting an investigation of

7   Dugaboy's claim of insider trading is irrelevant?  Like, what?

8      I've told you before, all we do is play Whack-A-Mole.

9   Whack-A-Mole.  They make an argument, we prove it's frivolous,

10   so they just make a new argument.  Their pleading says their

11   claims are colorable because there's an open investigation.

12   Now there's no investigation and they say that's irrelevant.

13   How can they say that with a straight face?  I couldn't.

14      I want to talk about Mr. Seery.  I want to finish with my

15   Mr. Seery.  I may not use all my time.  We can go home early.

16      (Laughter.)

17         THE COURT:  It's past early.

18         MR. MORRIS:  But this guy has worked doggedly, Your

19   Honor, and I will defend him until the end of time.  He's a

20   man who has so far exceeded expectations.  And they're saying

21   he's not -- he's overpaid?  The guy is overpaid?  When he's

22   into Class 9?  When he's being pursued with these frivolous

23   claims?  Every day he's being attacked.  How much do they

24   think he should be paid?  I would have loved to -- I hope --

25   no, I don't hope.  I don't think there's any reason to hear

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 02/20/23   Page 225 of 235   PageID 9553

379

1    expert testimony.  I think Your Honor should exercise -- the

2    Court should exercise its discretion and say there's no need,

3    the Court doesn't need to hear expert testimony.

4        But if we do, I'll be delighted to hear their expert's

5    view on what Mr. Seery -- if it's not $8.8 million for all

6    these years, what should it be, after he takes an estate from

7    71 percent on the 8s to, according to them, assets exceed

8    liabilities, 9s are paid in full?

9        You know what?  If they put their pens down, maybe there

10   would be a conversation.  But as long as we keep doing this

11   ridiculous, baseless, frivolous litigation, Mr. Seery is going

12   to conserve resources, because he's got to pay people like me

13   to defend him and to defend the estate.  This is a preview of

14   what we'll talk about at the mediation motion.  He's doing a

15   great job.  He's devoting his life to it.  He has no other

16   income.  He's got no other job.  It's wrong.

17       The claims are not only not colorable, they are frivolous.

18   I ask the Court to stop this in its tracks right now.

19       Thank you very much.

20           THE COURT:  Thank you.

21       All right.  Is there any time for the Movant to have the

22   last word, which we usually give the Movant the last word.

23           THE CLERK:  The Movant, I think, has a little under

24   -- maybe about a minute left.

25           THE COURT:  Anything you want to say in a minute?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 09/28/23   Page 226 of 235   PageID 9554
Main Document   Page 380 of 389

380

1          MR. MCENTIRE:  Yes, just I'll take 30 seconds.  How

2     is that?

3          THE COURT:  Okay.

4      REBUTTAL CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN

5          MR. MCENTIRE:  I just want to direct your attention

6     to our reply brief, specific paragraphs that address your

7     question about authorities.  We do cite several cases on Page

8     41, 40 and 41, dealing with the issue of unjust enrichment.

9     That's it.

10         Thank you, Your Honor, very much.

11         THE COURT:  Okay.  Thank you.  Unjust enrichment?

12         MR. MCENTIRE:  Disgorgement.

13         THE COURT:  Okay.  But I was really, you know, claims

14    trading in the bankruptcy context, just your best --

15         MR. MCENTIRE:  Well, I think the cases that you

16    identified were our best cases.  The --

17         THE COURT:  Okay.

18         MR. MCENTIRE:  -- *Adelphia* and the other cases.

19         THE COURT:  All right.  Well, --

20         MR. MCENTIRE:  There are other cases, Your Honor, in

21    different contexts.  There's also the *Washington Mutual* case

22    dealing with equitable disallowance.  There's also the *Mobile*

23    *Steel* case, a Fifth Circuit --

24         THE COURT:  *Mobile Steel*?  Oh, my goodness.  Okay.

25         MR. MCENTIRE:  Okay.  All right.

381

```
 1              THE COURT:  1968?  Or no.  That doesn't mean it isn't

 2     still quoted often, but --

 3              MR. MCENTIRE:  Those would also be relevant.

 4              THE COURT:  Equitable subordination --

 5              MR. MCENTIRE:  Yes, ma'am.

 6              THE COURT:   -- when there's bad acts.

 7              MR. MCENTIRE:  And Footnote #10 in the Mobile Steel

 8     case.  That is relevant, too.  Just, --

 9              THE COURT:  Okay.

10              MR. MCENTIRE:  Thank you.

11              THE COURT:  All right.  So I gave a deadline of

12     Monday, right, --

13              MR. STANCIL:  Yes.

14              THE COURT:   -- to reply to the response to the

15     motion in limine?

16              MR. STANCIL:  Yes, Your Honor.  Do you want time

17     before you leave for the day?  I mean, it's not going to be

18     that long, so 4:00 o'clock Monday?  Does that work for you?

19              THE COURT:  I don't care.  I probably won't start

20     looking at it until the next day.

21              MR. STANCIL:  But I will -- I'll just reserve and so

22     I don't have my associates --

23              THE COURT:  Yes.  I think these days midnight, 11:59

24     p.m., is what lawyers tend to want.

25              MR. STANCIL:  Oh, not this lawyer.
```

009838

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/07/23    Page 228 of 235    PageID 9556
Main Document    Page 383 of 390

382

1          THE COURT:  Oh, well, okay.  Okay.  So I'll just have

2     to look at this, and probably by Friday of next week I will

3     reach out through Traci and let you know what my decision is

4     on whether we're going to have another day of just 30 minutes,

5     30 minutes of experts.

6          MR. MCENTIRE:  Your Honor, another housekeeping

7     matter.  You'd wanted a copy of our PowerPoint, --

8          THE COURT:  Yes.

9          MR. MCENTIRE:  -- which I'm pleased to give you.  We

10    found a typo that we can correct electronically on the version

11    I showed.

12         THE COURT:  Uh-huh.

13         MR. MCENTIRE:  I likely will send that to you and I

14    can copy opposing counsel.  Is that --

15         THE COURT:  Okay.  Send it to Traci Ellison, my

16    courtroom deputy.

17         MR. MCENTIRE:  All right.

18         THE COURT:  And she'll --

19         MR. MCENTIRE:  We'll do that first thing in the

20    morning.

21         THE COURT:  Okay.

22         MR. MCENTIRE:  So you'll have a copy --

23         MR. STANCIL:  Can we get the hard copy that -- from

24    today, though?

25         MR. MCENTIRE:  No, that had a typo on it.  I really

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 12/04/23    Page 229 of 235    PageID 9557

383

 1   don't want to share it.  We fixed it.

 2            THE COURT:  What?  I'm sorry, what?

 3            MR. MORRIS:  That's fine.

 4            MR. STANCIL:  Never mind.

 5            THE COURT:  Do I not need to know?

 6            MR. STANCIL:  Let's all go home.

 7            THE COURT:  Okay.  And then my last question is --

 8   and there was a mention of the CLO Holdco lawsuit, where

 9   there's a pending motion to dismiss.  There's an opinion I'm

10   writing well underway.  I just keep getting sidetracked by

11   other things.  Imagine that.  So I know that people are

12   wanting to get an answer to that.  So, trust me, it's going to

13   get done here pretty soon.

14       You mentioned Brantley Starr.  I mean, it is not my role

15   to pick up the phone and call him and say hey, --

16            MR. MCENTIRE:  No, I wasn't suggesting that.

17            THE COURT:   -- District Judge, get busy on that.

18            MR. MCENTIRE:  Yeah.

19            THE COURT:  But I'll at least tell you, I know the

20   man seems to have more jury trials than any judge I've seen in

21   this building, so I suspect he's working late hours trying to

22   get things done.

23            MR. MCENTIRE:  Yeah.

24            THE COURT:  What do we have upcoming?  We have what

25   you called the mediation motion.  When is that set?

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 23-41   Filed 10/05/23   Page 230 of 235   PageID 9558

384

1          MR. MORRIS:  June 26.

2          THE COURT:  June 26th.  Be here before we know it.

3          MR. MORRIS:  Yeah.  And just to keep the Court

4    informed, the Movant's reply was due today.  We gave them a

5    week extension.  They asked earlier today.  I saw in my email

6    we gave them.  So I think you should expect the reply on the

7    15th.  The hearing is the 26th, and that's not in person.

8          THE COURT:  Okay.  Well, I'm very interested to dive

9    into those pleadings.  I knew the motion was coming because

10   one of the lawyers said at a prior hearing it would be coming.

11   So I haven't read any of those pleadings, but, well, I'm just

12   very interested to hear how this plays out.  I mean, I've said

13   it before.

14         MR. MORRIS:  Uh-huh.

15         THE COURT:  We had global mediation in summer of

16   2020.  We had two very fine mediators.  We had a heck of a lot

17   settled, to my amazement.  But we're now way down the road and

18   whole lot of money has been eaten up fighting lots of stuff.

19   I mean, it would have to be pens down.  There's an enormous

20   amount out there that would have to be part of it, and I just

21   don't know if everyone is fully appreciating that.  I hope

22   they are.  Anyone listening.  We're really, really far down

23   the road now, and there's just how many appeals?  Someone at

24   one time told me there were 26.  I bet it's more than that by

25   now.

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 09/08/23    Page 231 of 235    PageID 9559
Main Document    Page 385 of 385

385

1          MR. MORRIS:  I think that's right.  I think we argued

2     on Monday, what is it, the sixth of nine appeals in the Fifth

3     Circuit.  And we've got, you know, a cert petition that we're

4     waiting to hear from on the Supreme Court.  And yeah, there's

5     still a couple dozen matters in the district court.

6          THE COURT:  Okay.

7          MR. MORRIS:  Not one of them, not one of them we're

8     prosecuting, with the exception of waiting on the Court to

9     rule on the Report and Recommendation on the notes litigation

10    and vexatious litigant.  We are not the plaintiff, movant, in

11    anything.

12         THE COURT:  We've got adversaries.  The Reports and

13    Recommendations.  That's just made everything go a lot slower.

14    But all right.  So we have that.  And anything else coming up?

15         MR. MORRIS:  I think on July 11th maybe there is a

16    hearing scheduled on Hunter Mountain.  If you recall, Hunter

17    Mountain had that valuation motion last year that you denied

18    on the grounds that they didn't have a legal right to

19    valuation information.  They made a motion earlier this year

20    for leave to file an adversary proceeding to assert an

21    equitable claim and some other declaratory relief, is my

22    recollection.

23         While we filed an opposition, we didn't oppose the relief

24    requested, so that motion got resolved.  They have filed an

25    adversary proceeding.  And I think, if I remember correctly,

Case 19-34054-sgj11    Doc 3843    Filed 06/13/23    Entered 06/13/23 10:25:56    Desc
Case 3:23-cv-02071-E    Document 23-41    Filed 10/30/23    Page 232 of 235    PageID 9560
Main Document    Page 386 of 389

386

1    our response to the complaint, maybe that's what due.  Oh, the

2    11th is a status conference.  It could be a status conference,

3    maybe to set a scheduling order.

4            THE COURT:  Okay.

5            MR. MORRIS:  But that's it.  I think that's the only

6    thing on the calendar.

7            THE COURT:  That's a lot.

8            MR. MCENTIRE:  Thank you.

9            THE COURT:  Anything else?  Okay.

10           MR. STANCIL:  Thank you, Your Honor.

11           MR. MORRIS:  Thank you, Your Honor.

12           THE CLERK:  All rise.

13       (Proceedings concluded at 7:18 p.m.)

14                       --oOo--

15

16

17

18

19                      CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    /s/ Kathy Rehling                      06/12/2023

23   _____     _____

24   Kathy Rehling, CETD-444                           Date
     Certified Electronic Court Transcriber

25

                                              009843

Case 19-34054-sgj11   Doc 3843   Filed 06/13/23   Entered 06/13/23 10:25:56   Desc
Case 3:23-cv-02071-E   Document 31-1 Filed 12/06/23   Page 233 of 235   PageID 9561

387

```
                              INDEX

 1

     PROCEEDINGS                                           3
 2

     OPENING STATEMENTS
 3

     - By Mr. McEntire                                    67
 4   - By Mr. Morris                                      90
     - By Mr. Stancil                                    102
 5   - By Mr. McIlwain                                   106

 6
     WITNESSES
 7

     Hunter Mountain Investment Trust's Witnesses
 8

     James David Dondero
 9   - Direct Examination by Mr. McEntire                112
       Voir Dire Examination by Mr. Morris               144
10   - Cross-Examination by Mr. Morris                   158
     - Redirect Examination by Mr. McEntire              201
11   - Recross-Examination by Mr. Morris                 208

12
     James P. Seery
13   - Direct Examination by Mr. McEntire                211
     - Cross-Examination by Mr. Morris                   265
14   - Redirect Examination by Mr. McEntire              292
     - Examination by the Court                          293
15

16   Debtors' Witnesses

17   Mark Patrick
     - Direct Examination by Mr. Morris                  302
18   - Cross-Examination by Mr. McCleary                 313

19   EXHIBITS

20   HMIT's Exhibits

21   Certain Exhibits                          Received 33-40

22   HMIT's Exhibit 3                             Received 317
     HMIT's Exhibit 4                             Received 317
23   HMIT's Exhibit 4                         Received 140/149
     HMIT's Exhibits 7-10                         Received 317
24   HMIT's Exhibits 12-23                        Received 317
     HMIT's Exhibits 26-38                        Received 317
25   HMIT's Exhibits 29-52                         Carried 317
```

009844

388

```
 1                              INDEX
                               Page 2
 2

 3   HMIT'S Exhibits, cont'd.

 4   HMIT's Exhibits 39-62                        Carried 37
     HMIT's Exhibits 53-57                       Received 317
 5   HMIT's Exhibits 58-63                       Received 321
     HMIT's Exhibit 64                           Received 317
 6   HMIT's Exhibit 65                           Received 317
     HMIT's Exhibits 67-70                       Received 317
 7   HMIT's Exhibit 71                           Received 318
     HMIT's Exhibit 72                           Received 319
 8   HMIT's Exhibit 73                           Received 319
     HMIT's Exhibit 74                           Received 319
 9   HMIT's Exhibit 75                           Received 319
     HMIT's Exhibit 76                        Carried 37/321
10   HMIT's Exhibit 77                           Received 319
     HMIT's Exhibit 78                           Received 319
11   HMIT's Exhibit 79                           Received 319
     HMIT's Exhibit 80              Marked 234 Received 320
12

13   Debtors' Exhibits

14   Debtors' Exhibit 2                           Received  44
     Debtors' Exhibit 3                           Received  54
15   Debtors' Exhibit 4                           Received  54
     Debtors' Exhibit 5                           Received  54
16   Debtors' Exhibit 6                           Received  55
     Debtors' Exhibit 7                           Received  56
17   Debtors' Exhibit 8                           Received  57
     Debtors' Exhibit 9                           Received  54
18   Debtors' Exhibit 10                          Received  58
     Debtors' Exhibit 11                          Received  44
19   Debtors' Exhibit 12                          Received  60
     Debtors' Exhibit 13                          Received  60
20   Debtors' Exhibit 14                          Received  63
     Debtors' Exhibit 15                          Received  64
21   Debtors' Exhibits 25-30                      Received  65
     Debtors' Exhibit 30                          Received 272
22   Debtors' Exhibit 31-A                        Received 272
     Debtors' Exhibit 32                          Received 323
23   Debtors' Exhibit 33                          Received 327
     Debtors' Exhibit 34                       Received 44/65
24   Debtors' Exhibit 36                          Received 328

25
```

009845

389

```
 1                               INDEX
                                Page 3
 2

 3    Debtors' Exhibits, cont'd.

 4    Debtors' Exhibit 38                    Received  44/328
      Debtors' Exhibit 39                    Received  44/286
 5    Debtors' Exhibit 40                    Received  44/287
      Debtors' Exhibit 41                    Received  44/284
 6    Debtors' Exhibit 42                        Received  44
      Debtors' Exhibit 45                        Received 174
 7    Debtors' Exhibit 46                        Received  44
      Debtors' Exhibit 51                        Received 308
 8    Debtors' Exhibit 59                        Received 289
      Debtors' Exhibit 60                        Received 272
 9    Debtors' Exhibit 100                         Marked 179

10    Judicial Notice to be Taken                          175

11
      CLOSING ARGUMENTS
12
      - By Mr. McEntire                                    329
13    - By Mr. McIlwain                                    354
      - By Mr. Stancil                                     358
14    - By Mr. Morris                                      371
      - By Mr. McEntire                                    379
15
      RULINGS
16
      HMIT's Motion for Leave to File Verified Adversary   382
17    Proceeding (3699) - Taken Under Advisement

18    END OF PROCEEDINGS                                   386

19    INDEX                                            387-389

20

21

22

23

24

25
```