No. 3:23-cv-02071-E

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

In the Matter of Highland Capital Management, L.P.,

>       Debtor.

Hunter Mountain Investment Trust,

>       Appellant,

v.

Highland Capital Management, L.P., et al.

>       Appellees.

## ANSWERING BRIEF OF APPELLEES, THE HIGHLAND PARTIES

On Appeal from the United States Bankruptcy Court for the
Northern District of Texas, Case No. 19-34054-sgj,
Hon. Stacey G.C. Jernigan

| | |
|---|---|
| PACHULSKI STANG ZIEHL & JONES LLP | WILLKIE FARR & GALLAGHER LLP |
| Jeffrey N. Pomerantz | Mark T. Stancil |
| John A. Morris | Joshua S. Levy |
| Gregory V. Demo | 1875 K Street, N.W. |
| Hayley R. Winograd | Washington, D.C. 20006 |
| 10100 Santa Monica Blvd., 13th Floor | Tel: (202) 303-1000 |
| Los Angeles, CA 90067 | |
| Tel: (310) 277-6910 | |

HAYWARD PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100

*Counsel for Highland Capital
Management, L.P., and the Highland
Claimant Trust*

REED SMITH LLP
Omar J. Alaniz
Lindsey L. Robin
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
Tel: (469) 680-4292

*Counsel for James P. Seery, Jr.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................5

    A.    Background: The Highland Bankruptcy ..................................5

    B.    The Gatekeeper Provision Was Adopted To Prevent Frivolous Litigation ................................................................................7

    C.    HMIT's Motion For Leave..................................................9

    D.    HMIT's Motion Is Being Orchestrated By Dondero to Undermine the Plan ..........................................................10

    E.    HMIT's Motion Is Dondero's *Eighth Attempt* to Push His "Insider Trading" Allegations ..............................................11

    F.    The MGM E-Mail Was False And Served No Legitimate Purpose ..........................................................................13

    G.    The MGM E-Mail Did Not Contain MNPI........................18

    H.    No HCMLP Entity Traded Any MGM Securities ...............19

    I.    Neither HMIT nor the Estate Were Damaged by the Claims Purchasers' Acquisition of the Claims................................20

    J.    Sufficient Public Information Existed To Justify The Claims Purchases ....................................................................21

    K.    Seery's Compensation Was the Product of Arm's-Length Negotiations, so There Could Be No "*Quid Pro Quo*"........23

    L.    Dondero's Changing Recollections Prove That HMIT's Allegations Are Contrived ...............................................25

ARGUMENT ...............................................................................................27

    A.    The Bankruptcy Court Correctly Held that HMIT Lacks Standing Under Delaware Law to Assert Its Proposed Claims ..........27

        1.    HMIT Lacks Standing to Bring a Derivative Action...............27

        2.    HMIT Lacks Standing to Bring Direct Claims........................32

    B.    HMIT's *Stern v. Marshall* Argument Fails.........................34

C.     The Bankruptcy Court Correctly Held That HMIT Must Satisfy A *Barton* Doctrine-Like Standard That Is More Demanding Than Rule 12(b)(6) ............................................................................ 35

D.     The Bankruptcy Court Correctly Applied the *Barton* Doctrine Standard That HMIT's Claims Are "Without Foundation" ................ 41

     1.     The Record Overwhelmingly Demonstrated That HMIT Failed To Meet The *Prima Facie* Showing Under Barton ....... 41

     2.     HMIT's Miscellaneous Theories Fail ........................................ 44

     3.     The Bankruptcy Court Did Not Commit Clear Error In Finding That HMIT Was Doing Dondero's Bidding .............. 48

E.     HMIT Does Not Adequately Allege Any Breach of Fiduciary Duties (Count I) ............................................................................ 49

F.     HMIT's Theories of Secondary Liability Fail (Counts II and III) ...... 53

G.     The Bankruptcy Court Did Not Abuse Its Discretion in Its Discovery Rulings ................................................................................ 55

     1.     The Bankruptcy Court Properly Exercised Its Discretion To Limit Discovery ................................................................ 56

     2.     The Bankruptcy Court Properly Exercised Its Discretion by Excluding HMIT's Proffered Expert Testimony ................ 57

CONCLUSION ........................................................................................................ 59

## TABLE OF AUTHORITIES

**Page**

## CASES

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
    580 S.W.3d 136 (Tex. 2019) ........................................................................60

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................53

*Barton v. Barbour*,
    104 U.S. 126 (1881)............................................................................. passim

*Becker v. Noe*,
    2019 WL 1415483 (D. Md. Mar. 27, 2019) ...............................................42

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................54

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
    563 F.2d 692 (5th Cir. 1977) ......................................................................48

*Brooks v. United Dev. Funding III, L.P.*,
    2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ...........................................54

*Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*,
    539 B.R. 31 (S.D.N.Y. 2015) ....................................................................53

*Carter v. Rodgers*,
    220 F.3d 1249 (11th Cir. 2000) ..................................................................39

*Chua v. Ekonomou*,
    1 F.4th 948 (11th Cir. 2021) .......................................................................40

*Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*,
    915 F.2d 167 (5th Cir. 1990) ......................................................................52

*Crosby v. La. Health Serv. & Indem. Co.*,
    647 F.3d 258 (5th Cir. 2011) ......................................................................61

*El Paso Pipeline GP Co. v. Brinckerhoff*,
    152 A.3d 1248 (Del. 2016).........................................................................32

*English v. Narang*,
    2019 WL 1300855 (Del. Ch. Mar. 20, 2019) .............................................59

*Fortune Prod. Co. v. Conoco, Inc.*,
    52 S.W.3d 671 (Tex. 2000) .........................................................................51

*Foster v. Aurzada (In re Foster)*,
    2023 WL 20872 (5th Cir. Jan. 3, 2023)................................................. 38, 43

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006))...................................................................53

*Gilbert v. El Paso Co.*,
    1988 WL 124325 (Del. Ch. Nov. 21, 1988)....................................................55

*Gordon v. Nick*,
    1998 U.S. App. LEXIS 21519 (4th Cir. 1998).............................................39

*Green v. Wells Fargo Home Mtg.*,
    2016 WL 3746276 (S.D. Tex. June 7, 2016)................................................52

*Harbinger Cap'l Partners LLC v. Ergen (In re Lightsquared Inc.)*,
    504 B.R. 321 (Bankr. S.D.N.Y. 2013) ........................................................50

*Hargrove v. WMC Mortg. Corp.*,
    2008 WL 4056292 (S.D. Tex. Aug. 29, 2008).............................................61

*Hartsel v. Vanguard Grp., Inc.*,
    2011 WL 2421003 (Del. Ch. June 15, 2011) ...............................................28

*Hernandez v. Results Staffing, Inc.*,
    907 F.3d 354 (5th Cir. 2018)........................................................................62

*Highland Cap. Mgmt. Fund Adv., L.P. v. Highland Cap. Mgmt., L.P. (In re
    Highland Cap. Mgmt., L.P.)*,
    57 F.4th 494 (5th Cir. 2023)................................................................ passim

*Hill v. Keliher*,
    2022 WL 213978 (Tex. App. Jan. 25, 2022)................................................59

*Howell v. Adler (In re Grodsky)*,
    2019 WL 2006020 (Bankr. E.D. La. Apr. 11, 2019)....................................43

*In re Adelphia Communications Corp.*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ..........................................................49

*In re Bernard L. Madoff Inv. Sec. LLC*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................50

*In re Deepwater Horizon*,
    732 F.3d 326 (5th Cir. 2013) .......................................................................42

*In re Estate of Tigani*,
    2016 WL 593169 (Del. Ch. Feb. 12, 2016)..................................................30

*In re LATAM Airlines Grp. S.A.*,
    2022 Bankr. LEXIS 1178 (Bankr. S.D.N.Y. Apr. 29, 2022) .......................50

*In re Nat'l Coll. Student Loan Tr. Litig.*,
    251 A.3d 116 (Del. Ch. 2020) .....................................................................30

*In re Perry,*
    425 B.R. 323 (Bankr. S.D. Tex. 2010) ......................................................48

*In re Provider Meds, LP,*
    514 B.R. 473 (N.D. Tex. 2014) ................................................................40

*In re Swan Transp. Co.,*
    596 B.R. 127 (Bankr. D. Del. 2018) .........................................................38

*In re VistaCare Grp., LLC,*
    678 F.3d 218 (3d Cir. 2012) ...............................................................40, 42

*In re Winstar Commc'ns, Inc.,*
    554 F.3d 382 (3d Cir. 2009) ....................................................................48

*In re WorldCom, Inc.,*
    351 B.R. 130 (Bankr. S.D.N.Y. 2006) .....................................................33

*Johnson v. Thibodaux City,*
    8887 F.3d 726 (5th Cir. 2018) .................................................................64

*Joseph C. Bamford & Young Min Ban v. Penfold, L.P.,*
    2020 WL 967942 (Del. Ch. Feb. 28, 2020)..............................................54

*Klaassen v Allegro Dev. Corp.,*
    2013 WL 5967028 (Del. Ch. Nov. 7, 2013) .............................................55

*Klinek v. LuxeYard, Inc.,*
    596 S.W.3d 437 (Tex. App. 2020) ...........................................................59

*La. World Exposition v. Fed. Ins. Co.,*
    858 F.2d 233 (5th Cir. 1988) .............................................................32, 43

*Law v. Siegel,*
    571 U.S. 415 (2014)..........................................................................49, 51

*Lawrence v. Goldberg,*
    573 F.3d 1265 (11th Cir. 2009) ...............................................................39

*Lowenbraun v. Canary (In re Lowenbraun),*
    453 F.3d 314 (6th Cir. 2006) ...................................................................39

*McMillan v. Intercargo Corp.,*
    768 A.2d 492 (Del. Ch. 2000) .................................................................58

*Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., LLC),*
    912 F.3d 291 (5th Cir. 2019) ...................................................................34

*MF Glob. Holdings Ltd. v. Allied World Assurance Co. (In re MF Glob. Holdings Ltd.),*
    562 B.R. 866 (Bankr. S.D.N.Y. 2017) .....................................................38

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
   48 F.4th 419 (5th Cir. 2022) .............................................................................1

*Opioid Master Disbursement Tr. II v. Coviden Unlimited Co. (In re Mallinckrodt PLC)*,
   2024 Bankr. LEXIS 104 (D. Del. Jan. 18, 2024) .........................................50

*Pepper v. Lipton*,
   308 U.S. 295 (1939)................................................................................ 49, 51

*Pfeffer v. Redstone*,
   965 A.2d 676 (Del. 2009) ..............................................................................58

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) ........................................................................61

*Reed v. Linehan (In re Soporex, Inc.)*,
   463 B.R. 344 (Bankr. N.D. Tex. 2011) ........................................................56

*Richardson v. United States*,
   468 U.S. 317 (1984).......................................................................................42

*Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*,
   34 A.3d 1074 (Del. 2011) ..............................................................................32

*Scanlan v. Eisenberg*,
   669 F.3d 838 (7th Cir. 2012) ........................................................................34

*Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commc'n's, Inc.)*,
   2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011)......................................33

*SEC v. Cuban*,
   2013 WL 791405 (N.D. Tex. Mar. 5, 2013)..................................................57

*SEC v. Mayhew*,
   121 F.3d 44 (2d Cir. 1997) ...........................................................................57

*SED Holdings, LLC v. 3 Star Props.*, LLC,
   2019 WL 13192236 (S.D. Tex. Sept. 11, 2019)............................................48

*Sherer v. Sherer*,
   393 S.W.3d 480 (Tex. App. 2013) ................................................................51

*Silver v. City of San Antonio*,
   2020 WL 3903922 (W.D. Tex. July 7, 2020)................................................41

*Stern v. Marshall*,
   564 U.S. 462 (2011)................................................................................ 35, 37

*Taylor v. Trevino*,
   569 F. Supp. 3d 414 (N.D. Tex. 2021) .........................................................51

*Tilton v. Marshall*,
   925 S.W.2d 672 (Tex. 1996) ..................................................................59

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ..................................................................34

*Trippodo v. SP Plus Corp.*,
   2021 WL 2446204 (S.D. Tex. June 15, 2021) ....................................42

*Tufts v. Hay*,
   977 F.3d 1204 (11th Cir. 2020) ..........................................................39

*United Staters v. Sutton*,
   786 F.3d 1305 (5th Cir. 1986) ............................................................49

*United States v. Corp. Mgmt., Inc.*,
   78 F.4th 727 (5th Cir. 2023) ..............................................................61

*Villegas v. Schmidt*,
   788 F.3d 156 (5th Cir. 2015) ..............................................................37

*Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*,
   563 B.R. 614, 632 (Bankr. W.D. Tex. 2016) ....................................59

*Yowell v. Granite Operating Co.*,
   630 S.W.3d 566 (Tex. App. 2021) ......................................................51

## STATUTES

11 U.S.C. § 105(a) ......................................................................................49

11 U.S.C. § 510(c) ......................................................................................48

11 U.S.C. § 541(a)(1) ..................................................................................34

12 Del. C. § 3327 ........................................................................................30

12 Del. C. § 3801(a) ....................................................................................29

12 Del. C. § 3816(b) ....................................................................................28

6 Del. C. § 17-1002 ....................................................................................32

## OTHER AUTHORITIES

1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 1:13
   (4th ed. 2023) ......................................................................................59

1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 1:14
   (4th ed. 2023 ......................................................................................59

Restatement (Second) of Trusts § 199 ...................................................................34

## **RULES**

Fed. R. Civ. P. 12(b)(6)............................................................................................41

Fed. R. Civ. P. 26(b)(4)(A) ....................................................................................59

Fed. R. Evid. 103(a)(2) ..........................................................................................60

Highland Capital Management, L.P. ("HCMLP" or, as applicable, the "Debtor"), the reorganized debtor in the underlying bankruptcy case, the Highland Claimant Trust (the "Trust"; together with HCMLP, "Highland"), and James P. Seery, Jr., HCMLP's Chief Executive Officer and the Claimant Trustee of the Trust ("Seery"; together with Highland, the "Highland Parties"), by and through their undersigned counsel, hereby file this opposition (the "Opposition") to Hunter Mountain Investment Trust's appeal (Dkt. No. 29). In support of their Opposition, the Highland Parties state as follows:

## PRELIMINARY STATEMENT[1]

1.  This appeal is yet another collateral attack on HCMLP's confirmed Chapter 11 bankruptcy plan, which the Fifth Circuit affirmed in relevant part nearly two years ago. *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022). Every such challenge has been led by HCMLP's former CEO, James Dondero, or his affiliates. Every such challenge has failed. This latest iteration fits that mold, and it should meet the same fate.

---

[1] Capitalized terms not defined in this Preliminary Statement have the meanings ascribed to them below.

2.      The nominal Appellant here is Hunter Mountain Investment Trust ("HMIT"). The primary target of HMIT's appeal is the carefully tailored Gatekeeper Provision included in the Plan to ensure that Dondero's demonstrated affinity for wasteful, harassing litigation would not derail the success of the Plan. Specifically, the Gatekeeper Provision requires that certain specified enjoined parties (including HMIT) must seek leave of the Bankruptcy Court before bringing suit against certain protected parties (including each of the Appellees) for certain actions, including the ones at issue here, and show that the proposed claims are "colorable." The Fifth Circuit expressly approved the Gatekeeper Provision when affirming (in relevant part) the Confirmation Order. 48 F.4th at 435.

3.      This case demonstrates why the Gatekeeper Provision was properly adopted, was correctly affirmed, appropriately applied, and remains *essential* to the core objectives of HCMLP's Plan. For example, HMIT's lawsuit attempts to sidestep the crystal-clear terms of the Claimant Trust agreement declaring that holders of unvested, contingent interests (such as HMIT) have no rights and are owed no duties. Likewise, instead of seriously attempting to show that its proffered lawsuit was more than a belated and baseless attack on those responsible for implementing the Plan, HMIT seeks to render the "gatekeeping" function meaningless by urging the very same Rule 12(b)(6) standard that would have applied had the Gatekeeper Provision not existed. But these efforts ignore Fifth Circuit

precedent—including the specific holdings in this case—confirming bankruptcy courts' authority to impose and enforce gatekeeping provisions just as the Bankruptcy Court did here.

4.    The "colorability" standard adopted by the Bankruptcy Court here was reasonable and entirely consistent with the Fifth Circuit's stated purpose of the Gatekeeper Provision to "screen and prevent bad faith litigation." Under the standard adopted by the Bankruptcy Court, a movant (such as HMIT) need show only that its proposed claims "are **not without foundation**, are **not without merit**, and are **not being pursued for any improper purpose such as harassment**." *Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceedings* (ROA 000835-000939).  Thus, this standard is intended to permit good faith claims to proceed but stops Dondero and his affiliates from alleging preposterous theories and then using subsequent discovery as a fishing expedition in search of claims. When tested in this instance, HMIT's claims failed to meet this standard, and HMIT implicitly acknowledges as much.

5.    On appeal, HMIT concocts a blizzard of alleged procedural infirmities in the proceeding below to obscure HMIT's inability to substantiate the "colorability" of its underlying claims. Perhaps HMIT's most glaring failure below

was ***the concession by HMIT's sole representative, Mark Patrick, that neither he nor HMIT has actual personal knowledge of any fact supporting HMIT's proposed Complaint***. Nothing HMIT says in this appeal cures that fatal defect, and HMIT's cursory defense of its claims rests on the same speculation and internal contradiction painstakingly recounted by the Bankruptcy Court.

6.      The core theory of HMIT's proposed complaint was that Appellees engaged in an illicit *quid pro quo*.  HMIT alleged that Seery received material non-public information ("MNPI") from Dondero and used it to curry favor with parties that would later purchase claims in HCMLP's bankruptcy, ultimately control Seery's compensation, and return the favor by overpaying Seery. But as the Bankruptcy Court correctly recognized, HMIT's complaint was nonsensical under any standard. To highlight just a few such examples recounted by the Bankruptcy Court:

- There was no "*quid.*" The information Dondero delivered to Seery (unsolicited) was false and was not MNPI in any event. To the extent the information had any value at all, it was known to any reader of the *Wall Street Journal*.

- There was no "*pro.*" Neither HMIT (nor Dondero) offered any plausible allegation that Seery ever delivered the information to the Claims Purchasers, and Seery flatly denied the allegation.

- There was no "*quo.*" Seery's base salary was approved by the Bankruptcy Court (without objection), and his incentive compensation package was approved by the Claimant Oversight Board—including an independent member with no financial stake in the Trust's assets—after lengthy, arm's length negotiations reflected in Board minutes, contemporaneous emails, and numerous proposals and counterproposals.

7.     Were those failures not enough, HMIT's litigation tactics below underscored that its lawsuit lacked any good-faith basis. After attaching hundreds of pages of affidavits and purported evidentiary materials to its Motion for Leave, HMIT abruptly reversed course when confronted with Appellees' evidentiary response, claiming that the Bankruptcy Court could not consider any materials outside the four corners of its proposed Complaint. When that effort failed, HMIT attempted to spring belated "expert" testimony on the eve of the hearing, which tactic the Bankruptcy Court held violated its prior orders and was otherwise unnecessary and improper. Undeterred, HMIT sought to smuggle those same excluded materials into the record in a purported "evidentiary proffer" after the hearing. Simply put, it is difficult to imagine a more compelling illustration of why the Gatekeeper Provision is in place and was properly applied to block HMIT's bad-faith efforts to undermine the core tenets of the confirmed Plan.

## STATEMENT OF FACTS

### A.     Background: The Highland Bankruptcy

8.     HCMLP was an investment fund co-founded by James Dondero ("Dondero") in 1993. HCMLP invested in a variety of assets, including MGM stock, and Dondero sat on MGM's Board of Directors. In October 2019, Dondero caused HCMLP to file for bankruptcy. To avoid the appointment of a Chapter 11 trustee, Dondero ceded control of HCMLP to an independent board of directors (which

included Seery), but remained as an unpaid portfolio manager subject to the independent board's oversight. Seery was later appointed CEO of the Debtor and he and the independent board subsequently proposed and had confirmed (over Dondero's vociferous objections) an asset-monetization Plan with the support of nearly all creditors not affiliated with Dondero.[2] (*See generally* ROA at 841-46.)

9.      Pursuant to the Plan, on the August 11, 2021 effective date ("Effective Date"), the Highland Claimant Trust (the "Trust") was established to be overseen by a Claimant Oversight Board ("COB"), and Seery became the CEO of HCMLP (now, the reorganized debtor) and the Trustee of the Trust. (ROA at 006099-006138.)

10.     Between February 2021 (when the Plan was confirmed) and the Effective Date, three members of the Unsecured Creditors Committee (the "Committee"), and one other entity, sold all or portions of their bankruptcy claims (the sold claims, the "Claims") to affiliates of two investment funds, Farallon Capital Management, L.L.C. ("Farallon") and Stonehill Capital Management LLC ("Stonehill"; together with Farallon, the "Claims Purchasers").[3] Before being sold,

---

[2] References to the "Plan" are to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*. ROA 001594-001659. Citations to "ROA at ___" are to the *Transmittal and Certification of Record on Appeal* and the *Notice of Transmittal re: Transmittal and Certification of Record on Appeal*. *See* Docket Nos. 23 and 24, respectively.

[3] The Committee members who sold all or a part of their Claims were Redeemer Committee of Highland Crusader Fund ("Redeemer"), UBS Securities LLC and UBS AG London Branch ("UBS"), and Acis Capital Management, L.P. and Acis Capital Management GP, LLP ("Acis"). Another group of affiliated entities known as "HarbourVest" also sold its claims to the Claims Purchasers during this period. HarbourVest was not a Committee member. (HarbourVest, Redeemer, UBS, and Acis are collectively referred to as the "Sellers").

the Claims were "allowed" in fixed amounts pursuant to negotiated settlements that were approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019. In compliance with applicable rules, the Claims Purchasers gave timely and public notice of their acquisition of the Claims. (ROA 000862.)

11.     Following the Effective Date, the Claims were converted into vested interests in the Trust and the Claims Purchasers became "Claimant Trust Beneficiaries" and members of the COB. In contrast, HMIT never had an allowed claim against the Debtor and its former equity interest was converted into contingent interests in the Trust. Under the terms of the Trust, HMIT's contingent interests hold no rights and will not vest unless and until all senior claims (including those held by the Claims Purchasers) are paid in full, with interest, and all Trust obligations (including indemnity obligations) are paid in full, something that has yet to occur (and may never occur).

## B.     The Gatekeeper Provision Was Adopted To Prevent Frivolous Litigation

12.     The Plan contains a "gatekeeper" provision that required HMIT to obtain leave of the Bankruptcy Court before it could commence an action against, among others, Seery and members of the COB (the "Gatekeeper Provision"). (ROA at 001594-001659.)

13.     As the Bankruptcy Court explained in its order confirming the Plan, the Gatekeeper Provision was adopted as a direct result of Dondero's history of

harassing, costly litigation: "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation some of which had gone on for years and, in some cases, over a decade." (Confirmation Order, ROA 001714 ¶ 77.)[4] That pattern continued after the bankruptcy case commenced. "During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor." (*Id.*)

14.  The Bankruptcy Court further found that the "Dondero Post-Petition Litigation [as defined] was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn the place down.'" (*Id*. ¶ 78; *see also* ROA at 839–40 (describing Dondero-related post-confirmation litigation)); *see also Highland*, 48 F.4th at 435, 439.

15.  The Gatekeeper Provision is based on these findings of fact, all of which were left undisturbed by the Fifth Circuit on appeal. Relying on those facts, the Gatekeeper Provision was adopted to "***prevent baseless litigation*** designed merely to harass the post-confirmation entities" and to "***avoid abuse of the Court***

---

[4] ROA 001660-001820  (the "<u>Confirmation Order</u>").

*system and preempt abuse of judicial time*" that would be better spent on the meritorious claims of others. (*Id*. ¶ 79 (emphasis added).)[5]

## C.   HMIT's Motion For Leave

16.    On March 28, 2023, HMIT filed its *Emergency Motion for Leave to File Verified Adversary Complaint* (the "Motion for Leave"). (ROA 001849-002235.)  In support, HMIT attached a draft 28-page *Verified Adversary Complaint* ("Original Comp.") and more than 300 pages of other documents, including (a) two declarations executed by Dondero, which themselves attached voluminous documentation; and (b) an attorney's declaration that attached yet more documents, including pleadings and transcripts from Dondero's and HMIT's earlier, unsuccessful attempts to obtain discovery from Farallon in Texas state court.[6]

17.    HMIT's lawsuit alleges a *quid pro quo* whereby (a) Dondero allegedly gave Seery "material, non-public information regarding Amazon and Apple's interest in acquiring MGM"; (b) Seery allegedly conveyed that information to Claims Purchasers so they could buy claims on the cheap; and (c) the Claims Purchasers could later reward Seery by "rubber-stamp[ing]" an allegedly oversized

---

[5] *See also* ROA 000838 n.7; *Highland*, 48 F.4th at 427, 435 (explaining that the Gatekeeper Provision was specifically tailored to address Dondero's "continued litigiousness" by "screen[ing] and prevent[ing] bad faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness").

[6] After belatedly realizing that placing Dondero's declarations into the record exposed him to discovery under Bankruptcy Rule 9014(c), HMIT abruptly revised its Motion for Leave and tried to withdraw the declarations and delete the express references to them (while leaving the allegations based on Dondero's declarations intact). ROA 000854 n.55.

compensation package as members of the COB. (ROA 006622-006650.) (Original Comp.) ¶¶3, 4, 7, 33-34, 36, and 40; (ROA 001861, 001862.) (Motion for Leave) ¶¶ 22, 24; *see also* (ROA 006651-006688.) (Amended Comp.) ¶¶ 3–4, 16, 47, 54, 71, 77.

18.     As described below, the evidence established, and the Bankruptcy Court expressly found that (a) Dondero's December 17, 2023 email to Seery regarding MGM (discussed below) did not contain MNPI; (b) even if it did, the relevant information was in the marketplace within days and there was no evidence Seery ever conveyed the information to the Claims Purchasers; and (c) Seery's compensation was consistent with the terms of the Plan, was otherwise the product of extensive, arm's-length negotiations between Seery and the COB, including its independent member, and fully aligned his interests with the Claimant Trust Beneficiaries.

19.     In other words, there was no *quid pro quo*, and no amount of discovery or purported expert testimony will ever change that.

**D.     HMIT's Motion Is Being Orchestrated By Dondero to Undermine the Plan**

20.     The Bankruptcy Court correctly found the "Motion for Leave is just one more attempt by Dondero to press his conspiracy theory that he has pressed" unsuccessfully for years. ROA 000876.

21.     Perhaps most notably, HMIT's own legal representative admitted as much under oath. Mark Patrick, a long-time Dondero employee and HMIT's newly-appointed putative administrator, made numerous unequivocal admissions that this was a proceeding "of, by, and for Dondero." Those admissions included: (a) neither he nor HMIT has **any** knowledge concerning **any** fact relevant to the proposed claims,[7] (b) HMIT owes Dugaboy Investment Trust ("Dugaboy"), Dondero's family trust, more than $62 million (ROA 006470-006477), (c) HMIT has no operations or revenue and no assets other than its unvested, contingent interest in the Trust to satisfy its obligations to Dugaboy, and (d) Dugaboy is funding HMIT's legal expenses in this proceeding. (ROA 009761-009769; *see also* ROA 000836-000837.) In fact, HMIT called Dondero as a witness on its direct case, but not Patrick.  (ROA 000873-000874.)[8]

## E.     HMIT's Motion Is Dondero's *Eighth Attempt* to Push His "Insider Trading" Allegations

22.     The evidence established that Dondero, HMIT, and other related entities have tried to gain traction with their "insider trading" allegations at least

---

[7] Patrick expressly admitted that neither he nor HMIT (a) have ever spoken with any representative of Farallon or Stonehill, (b) have any personal knowledge concerning any alleged *quid pro quo*, (c) have any personal knowledge about how Seery's compensation package was determined, (d) had any substantive knowledge concerning Seery's compensation until Seery voluntarily disclosed it as part of this proceeding, or (e) have any personal knowledge about what due diligence the Claims Purchasers did before acquiring their claims. (ROA 009765-009769.)

[8] Further, after the Highland Parties called Patrick, HMIT's brief follow-up examination did not include a single question concerning HMIT's claims. (ROA 009770-009773.)

***eight times in four different venues***, none of which has been successful.  (ROA 000858-000861).

23.     Dondero's quest began in July 2021 when he sought pre-suit discovery from Farallon in Texas state court under Texas Rule 202. This was the first of ***three*** Rule 202 petitions filed by Dondero and HMIT over a 20-month period in which they sought evidence to support their speculative "insider trading" claims against Seery and Farallon. Each petition was based solely on Dondero's sworn statements. Each was dismissed. (ROA 005350-005549, ROA 005574-005602.)[9]

24.     Dondero also pressed his "insider trading" allegations with the Texas State Securities Board ("TSSB") by causing his affiliated entity, Charitable DAF Fund ("DAF"), to file a complaint against HCMLP. (ROA 009759-009760 (Patrick admits DAF filed the Complaint).) In its Motion for Leave, HMIT relied heavily on the TSSB's ongoing investigation as evidence that it had "colorable" claims. (*Id*.).[10] Undermining this HMIT-generated support for its own allegations, just before the

---

[9] HMIT speculates its Rule 202 Petition may have been dismissed because Farallon supposedly argued that the Bankruptcy Court could order discovery. That makes no sense because ***the Bankruptcy Court granted Dondero's motion to remand the Rule 202 proceeding to state court*** after Farallon removed it to the Bankruptcy Court. (ROA 005550-005573.)

[10] HMIT asserted that "[t]he Court should be aware that [the TSSB] opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. ***The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'***" (ROA 001869-001870.), Motion for Leave ¶37 (emphasis added).)

hearing on the Motion for Leave, the TSSB concluded its investigation and took no action against any of the Highland Parties.[11]

25.     Finally, beginning in October 2021, ***Dondero caused two lawyers to send three separate letters*** to the Executive Office for U.S. Trustees (the "EOUST") requesting that investigations be opened into the alleged "insider trading" and other wrongdoing alleged to have occurred during HCMLP's bankruptcy case. (ROA 008232-08314, ROA 008315.)   Like the Texas state courts and the TSSB, the EOUST has taken no action. (ROA 000859-000860).

### F.     The MGM E-Mail Was False And Served No Legitimate Purpose

26.     As discussed above, HMIT's claims are based on the allegation that Seery shared MNPI concerning MGM with Farallon and Stonehill so that they could purchase bankruptcy claims at a discount and reward Seery by "rubber-stamping" his compensation package.

27.     As a member of MGM's Board, Dondero was the source of the so-called MNPI. (ROA 001905.) ¶ 45.) On December 17, 2020, Dondero sent the

---

[11] Specifically, on May 9, 2023, the TSSB informed HCMLP's counsel in writing that "[t]he issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time." (ROA 005899-005900.) (the "No Action Letter"). Astonishingly, HMIT objected to the No Action Letter on relevance and other grounds even though HMIT's Motion for Leave had averred that the then-ongoing nature of the TSSB investigation "underscore[d]" the merits of its purported claims. (ROA 009780-009785.) (the Court reminded HMIT's counsel that he "filed a pleading under Rule 11 suggesting [the TSSB's investigation] was highly relevant"). HMIT's objection was overruled.

following email to Seery and others with the subject line "Trading Restriction re

MGM – material non public information" (the "MGM E-Mail"):

> Just got off a pre board call, board call at 3:00. Update is
> as follows: Amazon and Apple actively diligencing in
> Data Room. Both continue to express material interest.
> Probably first quarter event, will update as facts change.
> Note also any sales are subject to a shareholder
> agreement.[12]

28.     The MGM E-Mail was false, and Dondero knew it. (ROA 000851-

000852.) On cross, Dondero admitted that he knew that Amazon had already hit

MGM's "strike price" when he sent the MGM E-Mail and the suggested competition

between Amazon and Apple was, in fact, over. (ROA 009617-009623.) Rather than

tell Seery the truth, Dondero repackaged public information (as discussed below)

while trying to give it an air of authority as an MGM Board member in the hopes of

handcuffing Seery's ability to sell assets and undermine the Plan. (ROA 000852.)

29.     Further, the Bankruptcy Court found that Dondero sent the MGM E-

Mail while "engaged in what appeared to be attempts to thwart, impede, and

otherwise interfere with the Plan being proposed by the Independent Directors and

the Committee." (ROA 000846-000848.) The Bankruptcy Court relied on extensive,

irrefutable evidence that, from October 9 to December 17, Dondero became

---

[12] ROA 005603-005604.

increasingly desperate as the prospect of regaining control of HCMLP continued to elude him, ultimately culminating in the MGM E-Mail:

- October 9: Dondero is forced to resign from HCMLP for acting against its interests (ROA 005608-005610);

- October 16: Dondero and affiliates attempt to impede the Debtor's trading activities (ROA 005611-005613; ROA 005614-005669);

- November 24: HCMLP's Disclosure Statement is approved and the confirmation hearing is scheduled for January 13, 2021 (Bankr. Dkt. No. 1476.);

- November 24-27: Dondero personally interferes with certain trades (not involving MGM) ordered by Seery (ROA 005614-005669 at 30-36);

- November 30: the Debtor provides notice of termination of certain agreements with Dondero affiliates (Morris Dec. Ex. 17; ROA 009730);[13]

- December 3: the Debtor demands payment of over $60 million due under certain promissory notes issued to HCMLP by Dondero and his affiliates (Morris Dec. Exs. 18-21; ROA 009730);

- December 3: Dondero sends Seery a threatening text message, saying "***Be careful what you do – last warning***" (Morris Dec. Ex. 22; ROA 009730);

- December 10: Dondero's interference and threats cause HCMLP to seek and obtain a temporary restraining order ("TRO") against Dondero (Morris Ex. 23 (ROA 005759-005762.);

- December 16: the Bankruptcy Court dismisses as "frivolous" a motion by certain Dondero affiliates to temporarily restrict certain of the Debtor's asset sales (Morris Ex. 23 (ROA 005759-005762.); Morris Ex. 24 at 63:5-64:15 (ROA 005763-005829); and

---

[13] References to "Morris Dec. Ex. __" are to exhibits attached to the *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr's Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, executed on May 11, 2023, and filed at Bank. Dkt. No. 3784.

- <u>December 17</u>: Dondero sends the unsolicited email concerning MGM to Seery in violation of the TRO (H. Ex. 11) (ROA 005603-005604.)

30.     The Bankruptcy Court cited even more evidence proving that Dondero did not send the MGM E-mail for a legitimate purpose (ROA 000849), including that:

- "Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor . . . having resigned from all roles at the Debtor" in October 2020;

- The MGM E-mail served *no* purpose because "MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this" (ROA 009672-009673, 009676); and

- If Dondero shared MNPI with a person to whom he owed no duty, then he "would have been violating his own fiduciary duties to MGM." (ROA 000849).

31.     More evidence exists that Dondero sent the MGM E-mail in a clumsy attempt to impede the early implementation of HCMLP's asset-monetization Plan, not for any legitimate purpose. HMIT has alleged that the MGM E-Mail should have caused the Debtor to cease settlement negotiations with HarbourVest because HarbourVest was to transfer its interest in HCLOF—which owned interests in many CLOs, some of which in turn owned some MGM stock among their varied portfolios of assets—to an affiliate of HCMLP as part of a proposed settlement of HarbourVest's bankruptcy claim.[14] Yet,

---

[14] HMIT has alleged that "[u]pon receipt of this material non-public information, Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in [the Bankruptcy] Court seeking approval of the Original Debtor's settlement with HarbourVest—resulting in a transfer to the Original Debtor of HarbourVest's interest in a Debtor-advised fund,

- despite being the self-described "tipper" of the MNPI, Dondero objected to the proposed HarbourVest settlement on the purported ground that ***HCMLP was allegedly <u>overpaying</u> HarbourVest, not because Seery was attempting to trade on MNPI***;[15]

- the investment arm of Dondero's DAF, CLO Holdco, objected to the proposed HarbourVest settlement on the ground that ***it had a contractual right to acquire HarbourVest's interest in HCLOF***;[16] and

- in April 2021, Mark Patrick—the Dondero employee then serving as the newly-minted DAF trustee—caused CLO Holdco to commence an action alleging that the Debtor and Seery violated its contractual right of first refusal by receiving HarbourVest's interest in HCLOF.[17]

32.    How can Patrick plausibly assert on behalf of CLO Holdco that it had the right to acquire HarbourVest's interest in HCLOF in December 2020 while simultaneously asserting on behalf of HMIT here that the Debtor could not do so? HMIT and Dondero will never be able to plausibly reconcile their contradictory positions.[18]

---

Highland CLO Funding, Ltd. ("<u>HCLOF</u>"), which held substantial MGM debt and equity." (ROA 006250, Original Comp. ¶35.)

[15] (ROA 005883-005898.) HMIT and Dondero will never be able to plausibly explain why Dondero said nothing about Seery's alleged misuse of the MNPI when objecting to the HarbourVest settlement.

[16] *See CLO Holdco Ltd.'s Objection to HarbourVest Settlement* [Bankr. Docket No. 1707].

[17] (ROA 006242-006268.)

[18] CLO Holdco's attempt to acquire HarbourVest's interest in HCLOF was not Dondero's only attempt to benefit from the actual MNPI he held as a member of the MGM Board. Dondero owned millions of shares in a fund, NXDT, that he managed and that directly owned shares in MGM. During the Hearing, Dondero admitted that in late 2020 and into January 2021, while indisputably in possession of MNPI, he authorized a tender offer by NXDT to his considerable personal benefit. (ROA 009633-009642.)  HMIT and Dondero will never be able to plausibly explain Dondero's conduct.

### G.   The MGM E-Mail Did Not Contain MNPI

33.   HMIT's claims are also not colorable because "the MGM Email did not disclose information to Seery that was not already made available to the public at the time it was sent." (ROA 000850.) "[N]o one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed 'material interest' in acquiring MGM." *Id*. at 851.

34.   The Bankruptcy Court quoted several published reports from 2020 that tightly tracked with the substance of the MGM E-Mail. (*Id*.) For example, the *Wall Street Journal* reported in October 2020—nearly two months before Dondero sent the MGM E-Mail—that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company. Anchorage was led by Kevin Ulrich, who also served as MGM's Chairman. The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and specifically identified Amazon and Apple as among four possible buyers. (*Id*. (citing ROA 005840-005846); s*ee also* ROA 005830-005839.)

35.   The Bankruptcy Court also found that qualitatively better information concerning MGM was "fully and publicly disclosed to the market in the days and weeks that followed" the MGM E-Mail. (ROA 000852.) For example, on December 21, 2020—just two business days after Dondero sent the MGM E-Mail—the *Wall*

*Street Journal* (a) reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process" and had "a market value of around $5.5 billion," and (b) reiterated that Anchorage was under pressure to sell and that "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers." (*Id.* at 000852-000853 (citing ROA 005847-005851.); *see also* ROA 005852-005854, ROA 005855-005858, ROA 005859-005875.) The December *Wall Street Journal* article thus contained better information than Dondero's MGM E-Mail.

36.    Based on extensive published reports, the Bankruptcy Court properly found that the MGM E-Mail did not contain MNPI—but that even if it did, even better information was disclosed promptly thereafter.

## H.    No HCMLP Entity Traded Any MGM Securities

37.    HMIT seeks to bring an "insider trading case" where no trading of MGM securities occurred.

38.    The MGM E-Mail was irrelevant to the HarbourVest settlement because the evidence adduced proves (a) the terms of the settlement of HarbourVest's bankruptcy claim were agreed upon before Dondero sent the MGM E-Mail;[19] (b) the value of HarbourVest's interest in HCLOF was determined by a November valuation based on outside third-party portfolio valuations and was later

---

[19] (ROA 009722-009725.)

validated by year-end independently audited financial statements;[20] and (c) HCLOF did not own any MGM securities.[21]

39.    Moreover, as the Bankruptcy Court found after questioning Seery, HCMLP "and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public, but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022." (ROA 000853, 009750-009756.)

## I.    Neither HMIT nor the Estate Were Damaged by the Claims Purchasers' Acquisition of the Claims

40.    HMIT refers to the claims purchased by Farallon and Stonehill as "Disputed Claims," but these bankruptcy claims were not disputed when the Claims Purchasers bought them. To the contrary, they had been previously allowed by the Bankruptcy Court in a fixed dollar amount: "the claims acquired by the Claims Purchasers were acquired by them after extensive litigation, mediation, and settlements were approved by the bankruptcy court and after the original claims-holders had voted on the Plan and after Plan confirmation." (ROA 000837; *see also Id.* at 000862.)[22]

---

[20] (ROA 009725-009729, ROA 005876-005878, ROA 005879-005882, ROA 006574-006621.)

[21] (ROA 009671-009672.)

[22] Even HMIT acknowledges that "Seery obtained bankruptcy court approval for settlements" that resulted in allowed claims for the Sellers. *See* HMIT Br. at 7-8.

41.     Consequently, the purchase and sale of the allowed Claims had no economic impact on the estate or on HMIT as the holder of unvested, contingent interests in the Trust. The estate will distribute the exact same amount to Farallon and Stonehill that it would have distributed had the Sellers retained the Claims for their own benefit.

## J.     Sufficient Public Information Existed To Justify The Claims Purchases

42.     HMIT falsely contends that "the only public information relating to the Debtor's financial condition was pessimistic, including that holders of Class 8 claims were projected to receive 71.32% on account of their claims and holders of Class 9 claims were projected to receive nothing," such that HMIT contends that Farallon's and Stonehill's decision to purchase the Claims could only be justified by their receipt of MNPI. HMIT Br. at 9-10.  HMIT's contentions did not withstand scrutiny.

43.     *First*, the "UBS claims were not acquired until August 2021, long after the alleged 'quid pro quo' was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021." (ROA 000864 n.95 (citing ROA 005901-005903)).  Since the Claims Purchasers bought the UBS claims after the MGM-Amazon deal was announced, the MGM-E-Mail could not have plausibly been a factor in their decision to do so.

44.     *Second*, because the Claims Purchasers bought the Claims at a steep discount relative to projected values, the Claims Purchasers stood to gain tens of

millions of dollars—or, as the Bankruptcy Court concluded, "nearly 30% on their investment"—if HCMLP merely met the projections.[23] Further, the "Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside." (*See* ROA 000863-000864.)

45.     ***Finally***, while HMIT insists that there was insufficient public information to justify Farallon's and Stonehill's purchases, Dondero also admits that he offered pay them a 30% premium over their purchase price. (ROA 009644-009665.) If the Claims Purchasers had no rational basis to buy the Claims, how will HMIT and Dondero ever plausibly explain Dondero's supposed decision to offer the Claims Purchasers a substantial premium over their purchase price?

---

[23] The Bankruptcy Court's math is simple.  As set forth in the following chart, the Claim Purchasers would have received a 30% gain on their investment based solely on the projected recovery of 71.32% for Class 8 claims disclosed in connection with Plan confirmation:

| Claim Seller | Claim Purchaser | Class 8 Claim Amount | Projected Proceeds* | Alleged Purchase Price | Expected Gain | Expected Gain % | IRR |
|---|---|---|---|---|---|---|---|
| Redeemer | Stonehill | $137.7 | $98.2 | $78.0 | $20.2 | 26.0% | 24.2% |
| Acis | Farallon | $23.0 | $16.4 | $8.0 | $8.4 | 105.1% | 98.6% |
| HarbourVest | Farallon | $45.0 | $32.1 | $27.0 | $5.1 | 18.9% | 17.5% |
| TOTALS (weighted average): | | $205.7 | $146.7 | $113.0 | $33.7 | 29.9% | 27.8% |

* "Projected Proceeds" is the projected recovery on Class 8 claims of 71.32% multiplied by the face amount of the claim.

Given the discounts, as a matter of arithmetic, the Claims Purchasers stood to profit, albeit more modestly, even if the reorganized Debtor fell well short of projections.

**K.** **Seery's Compensation Was the Product of Arm's-Length Negotiations, so There Could Be No "*Quid Pro Quo*"**

46.     HMIT's claims are not colorable because HMIT lacks *any* basis to allege that Seery was "able to plant friendly allies onto the Oversight Board to rubber stamp [his] compensation demands," the "*quo*" of the alleged "*quid pro quo*." [Original Motion ¶22); Proposed Amended Comp. ¶¶ 4, 16, 47, 54, 71, and 77]. In fact, the indisputable evidence adduced at trial established that Seery's incentive compensation plan is aligned with the interests of the Trust's beneficiaries and was the product of lengthy, arm's-length, good-faith negotiations.[24]

47.     ***First,*** Seery testified (and the Plan documents prove) that his "base salary" of $150,000 per month was fixed by the Plan and the Claimant Trust Agreement (and was exactly the same as the base salary that was approved without objection by the Bankruptcy Court in July 2020 when he was appointed CEO of the Debtor), not by the COB.  (ROA 009706-009709.)

48.     ***Second***, Patrick (on his own behalf and on behalf of HMIT) and Dondero admitted they had *no* information concerning Seery's compensation plan or how it was determined until the Highland Parties voluntarily disclosed it in

---

[24] To justify its causes of action, HMIT invented, from whole cloth, a long-standing relationship between Seery and Farallon's and Stonehill's principals.  One of the more egregious fabrications is HMIT's allegation that Stonehill's principal, Michael Stern, is on the board of Team Rubicon— a veteran's charity supported by Seery.  That is simply false.  While there is a Michael Stern on Team Rubicon's board, he is not the Michael Stern that works at Stonehill and has nothing whatsoever to do with Stonehill, HMIT, or the Highland Parties.

opposition to HMIT's Motion for Leave. (ROA 009657-009658, ROA 009766.) Thus, HMIT's claims concerning an alleged "*quid pro quo*" were admittedly based on rank speculation.

49.     ***Third***, Seery testified that the agreed-upon incentive compensation plan for him and HCMLP's remaining employees was the product of "considerable negotiations" between him and the COB—including the "active involve[ment]" of the COB's independent member, Richard Katz—spanning a nearly five-month period. Seery's testimony was corroborated by documentary evidence showing the exchange of multiple proposals and counterproposals concerning the structure and amount of the incentive compensation plan. (ROA 006139-006141, ROA 006144-006149, ROA 006568-006573.) (the "Documentary Compensation Evidence").)

50.     The Documentary Compensation Evidence includes Board minutes, contemporaneous e-mails between Seery and the COB (again, with the active participation of the independent member), and the final agreement. These documents directly contradict the existence of any "*quid pro quo*" or that Seery and the COB did anything but fulfill their duties by vigorously negotiating an incentive compensation plan that aligned the interests of Highland's employees (including Seery) with the Trust's beneficiaries.

## L.   **Dondero's Changing Recollections Prove That HMIT's Allegations Are Contrived**

51.     Dondero testified that he had three separate conversations with representatives of Farallon in May and June 2021 concerning their purchase of certain claims. Between that time and January 2023, Dondero created five different written versions of his recollections of those conversations (collectively, "Dondero's Statements"), four of which were statements submitted in connection with the Rule 202 proceedings. Read chronologically, Dondero's Statements reflect an evolving tale and demonstrate that HMIT's case is based on fabricated "facts" derived from Dondero's subjective speculation—exactly the type of litigation the Gatekeeper Provision was intended to prevent.

52.     Dondero's Statements include:

- Dondero's handwritten notes ("Dondero's Notes") allegedly taken of conversations he claims to have had with representatives of Farallon in May and June 2021 concerning their purchase of certain claims;

- Dondero's *Verified Petition to Take Deposition Before Suit and Seek Documents*, filed on July 22, 2021 (Cause No. DC-21-09534) (ROA 005350-005358.) ("Dondero's First Petition");

- Dondero's *Amended Verified Petition to Take Deposition Before Suit and Seek Documents*, filed on July 22, 2021 (Cause No. DC-21-09534) (ROA 005359-005372) ("Dondero's Amended Petition");

- *Declaration of James Dondero*, sworn to on May 31, 2022, and filed in support of Dondero's Amended Petition (ROA 005373-005549.) ("Dondero's First Declaration"); and

- *Declaration of James Dondero*, sworn to on February 15, 2023, and filed in support of HMIT's Rule 202 Petition (ROA 005595-005600.) ("Dondero's Second Declaration").

53.     Although Dondero's Notes were supposedly "intended to be a written record of the important points from the telephone conversations" between Dondero and Farallon, Dondero conceded that the Notes (a) ***do not*** mention MGM; (b) ***do not*** state that Farallon told Dondero that they were "optimistic about MGM"; (c) ***do not*** state that Seery shared MNPI with Farallon; (d) ***do not*** describe or refer to any *quid pro quo*; and (e) ***do not*** refer to Seery's compensation.  (ROA 000857.)

54.     Further, even though HMIT's claims are ***all*** premised on the alleged "*quid pro quo*," Dondero also admitted (a) he had no "personal knowledge as to how Seery's compensation package . . . was determined because he was 'not involved,'" (ROA 000857 (citing ROA 009657-009658, 009665-009666.)), and (b) the idea that Farallon traded on MNPI originated with him, not Farallon. (ROA 009648.) Taken together, these admissions prove that HMIT's claims are based on pure speculation, not evidence.

55.     A cursory review of the remainder of Dondero's Statements show how Dondero's speculative theories have now morphed into so-called "facts." For example, it was not until February 2023—more than 20 months after Dondero allegedly spoke with Farallon—that Dondero alleged for the first time that Farallon's

representatives "stated that they were particularly optimistic because of the expected sale of MGM." (ROA 000860 (citing ROA 005595-005600 ¶4).)

56. HMIT could not plausibly (a) explain why *it took five tries* before Dondero swore that he was told that Farallon purchased claims because of MGM, or (b) resolve the obvious conflict between that statement in Dondero's Second Declaration and (i) Dondero's admission that the idea that Farallon traded on MNPI originated with him and not Farallon, and (ii) the omission of any reference to "MGM" in Dondero's Notes.

57. In sum, the evidence at the Hearing, Dondero's own statements, and HMIT's own Complaint all demonstrate that HMIT's claims do not meet the "colorability" standard.

## ARGUMENT

### A. The Bankruptcy Court Correctly Held that HMIT Lacks Standing Under Delaware Law to Assert Its Proposed Claims[25]

#### 1. HMIT Lacks Standing to Bring a Derivative Action

58. HMIT acknowledges that Delaware law governs whether HMIT may proceed derivatively on behalf of the Trust, a Delaware trust, and the Debtor, a Delaware limited partnership. (HMIT Br. at 34.) The Bankruptcy Court applied

---

[25] The Bankruptcy Court held that HMIT lacks both constitutional and prudential standing. (ROA 000900-000917.) This Section addresses only prudential standing. To avoid duplication, the Highland Parties do not address constitutional standing, which is separately addressed by the Claims Purchasers.

Delaware law and correctly held that HMIT lacked standing to sue derivatively on behalf of either entity.

59.　　Under the Delaware Statutory Trust Act ("DSTA"), which governs the Trust, only parties that are "beneficial owners" of a trust continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action" may sue derivatively on behalf of the trust. 12 Del. C. § 3816(b); *see also Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012). The DSTA defines the phrase "beneficial owner" to mean "any owner of a beneficial interest in a statutory trust," with "the fact of ownership to be determined and evidenced . . . ***in conformity to the applicable provisions of the governing instrument of the statutory trust***." 12 Del. C. § 3801(a) (emphasis added). The Trust's "governing instrument"—the Claimant Trust Agreement ("CTA")—expressly states that the Trust's "sole beneficiaries" are the "Claimant Trust Beneficiaries," which are defined in the CTA and the Plan to include only holders of "Allowed General Unsecured Claims" (*i.e.*, "Class 8" claims) and holders of "Allowed Subordinated Claims" (*i.e.*, "Class 9" claims). (CTA §§ 2.8, 1.1(h); Plan Art. I.B.44.) HMIT does not hold any Class 8 or Class 9 claims and therefore is not a beneficial owner of the Trust. HMIT holds only contingent "Class 10" and "Class 11" claims, which cannot vest until "after Class 8 and Class 9 claims are paid in full with interest" (HMIT Br. at 8), and are expressly

excluded from the definition Claimant Trust Beneficiaries until that vesting occurs (CTA § 1.1(h); *id.* at Recitals n.2). Because the Class 8 and Class 9 claims indisputably have not been paid in full, HMIT is not a "beneficial owner" of the Trust and may not sue derivatively on its behalf.

60.     HMIT has no response to the CTA's and DSTA's clear definitions of ownership and pretends they do not exist. HMIT selectively quotes the DSTA to omit that ownership is determined "in conformity to the applicable provisions of the governing instrument of the statutory trust." (HMIT Br. at 30–31.) HMIT then falsely asserts that "beneficiary" is "not defin[ed]" in this context and uses non-statutory sources—such as Black's Law Dictionary, Restatement (Third) of Trusts, and a handful of cases that do not discuss derivative standing under the DSTA—to invent a new definition.   (*Id.* at 31–32.)[26] The Bankruptcy Court appropriately "follow[ed] the DSTA's direction that [it] determine the 'fact of ownership . . . in conformity to' the [Claimant] Trust Agreement" to hold that HMIT lacks standing to sue derivatively on behalf of the Trust. *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 190 (Del. Ch. 2020).

---

[26] For example, HMIT misleadingly claims that "Delaware courts recognize that **the statute** 'uses the general term beneficiary, without any language restricting the class of beneficiary to whom it refers.'"   (HMIT Br. at 31 (quoting *In re Estate of Tigani*, 2016 WL 593169, at *14 (Del. Ch. Feb. 12, 2016) (emphasis added)).   HMIT leaves out that "the statute" referenced in *Tigani* was not the DSTA; it was a statute governing the Chancery Court's power to remove officeholders. 2016 WL 593169, at *14 (citing 12 Del. C. § 3327).

61.   HMIT also argues, based on a selective mis-reading of certain financial disclosures, that Highland is "in the money," so HMIT's contingent interests should be deemed to have vested, which would give it derivative standing. (HMIT Br. at 27–29.)  This fails as a matter of fact and law.

62.   As a matter of fact, the Bankruptcy Court correctly found that HMIT ignores the "voluminous supplemental notes . . . that are integral to understanding the numbers" in the disclosures HMIT purports to rely upon. (ECF No, 3936 at 3). For example, one note explains that the Debtor's assets continue to be depleted by significant legal fees, administrative expenses, and indemnification obligations caused in considerable part by Dondero's relentless litigation tactics, and these substantial future costs are not accounted for in HMIT's speculative and self-serving calculations.  (*Id.*)

63.   As a matter of law, even if this Court accepted HMIT's bad math, the CTA unequivocally provides that HMIT's contingent claims do not vest until after the Class 8 and Class 9 claims have been paid in full, with interest. (CTA at Recitals n.2.) Because that indisputably has not happened, HMIT lacks standing. HMIT asks this Court to disregard the CTA's plain terms and treat HMIT as vested based vaguely on Seery's alleged "duties of good faith and fair dealing." (HMIT Br. at 34-37.)  But none of the authorities HMIT cites provide any precedent for the

extraordinary step of conferring derivative standing on a party that is expressly foreclosed from exercising such standing under governing law.

64.     The Bankruptcy Court also correctly held that HMIT lacked standing to sue derivatively on behalf of the Debtor, a Delaware limited partnership. (ROA 000913-00914.) To bring such derivative claims, Delaware law requires that HMIT "must be a partner or an assignee" continuously from "the time of the transaction of which [HMIT] complains" through "the time of bringing the action." 6 Del. C. § 17-1002.[27] HMIT indisputably was not a partner or assignee of the Debtor when it filed the Motion for Leave. HMIT admits that it "held a limited partnership interest" in the Debtor only "[p]rior to the Effective Date" on August 11, 2021. (HMIT Br. at 30.) "[A]fter the Effective Date, that interest was exchanged" for a contingent Class 10 claim in the Trust "under the CTA." (*Id.*) The Debtor and the Trust are separate legal entities, so HMIT's ownership in the Debtor was extinguished on the Effective Date and it "los[t] standing to continue a derivative suit" on behalf of the Debtor.[28]

---

[27] The Fifth Circuit's decision in *Louisiana World Expo. v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988), "does not apply to a party's right to sue, derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former bankruptcy estate," because "federal bankruptcy law does not confer standing **where the plaintiff otherwise lacks standing under applicable state law**." (ROA 000908-000909 (emphasis in original).) Even if *Louisiana World* applied, HMIT has not attempted to satisfy the additional requirement that the debtor must have "refused unjustifiably to pursue the claim," which requires courts to conduct a "cost-benefit analysis" as to whether the potential action is "valid and profitable." 858 F.2d at 253 n.20.

[28] Because HMIT lacks standing to sue on behalf of the Trust, HMIT cannot bring a "double derivative" action on behalf of the Debtor by acting through the Debtor's parent, the Trust. *See Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1079–81 (Del. 2011) ("parent level standing is required to enforce a subsidiary's claim derivatively").

*El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016); *see also Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commcn's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation") (cleaned up).[29]

### 2. HMIT Lacks Standing to Bring Direct Claims

65.    The Bankruptcy Court correctly held that HMIT's proposed claims are derivative, and not direct, so HMIT lacks standing to pursue its claims directly. (ROA 000914-000916.) Under Delaware law, a claim is direct, rather than derivative, only if a plaintiff's "claimed direct injury [is] independent of any alleged injury to the corporation" and the plaintiff "demonstrate[s] that the duty breached was owed to the [plaintiff] and that he or she can prevail without showing an injury to the corporation." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).[30]

---

[29] HMIT mistakenly asserts that the "bankruptcy court cited no authority holding that a plaintiff fails the 'continuous ownership requirement' when" the plaintiff was a holder of prepetition equity in a debtor; the Bankruptcy Court cited *Schmermerhorn* and *WorldCom*. (ROA 000913 n.222,)

[30] Similarly, in the bankruptcy context, "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate." *Meridian*

66.     HMIT's conclusory assertion it seeks to bring "claims against the trustee of a trust for harms the trustee inflicted specifically upon HMIT" (HMIT Br. at 34) does not convert its derivative claims into direct claims.  To the contrary, HMIT admits that "every dollar lost due to Seery's collusion is a dollar lost ***to the Claimant Trust and HMIT***" (*id.* at 28 (emphasis added)), so HMIT's claimed injury is entirely dependent on an injury to the Trust. HMIT also asserts that "a beneficial owner has standing and a right to assert individual claims against a trustee for misconduct and mismanagement," but the authorities HMIT cites to support this broad proposition do not even mention, let alone analyze, the distinction between direct and derivative claims. *See* Restatement (Second) of Trusts § 199 (discussing equitable remedies for trust beneficiaries); *Scanlan v. Eisenberg*, 669 F.3d 838 (7th Cir. 2012) (addressing whether trust beneficiary's claim constituted "injury in fact" for constitutional standing). In any event, as discussed above, HMIT is not a "beneficial owner" within the meaning of the DSTA and the CTA.  (*See supra* at ROA 000842) In short, HMIT offers no support for its bald assertion that its proposed claims—the same proposed claims it insists it can pursue derivatively—are direct claims of HMIT.

---

*Cap. CIS Fund v. Burton (In re Buccaneer Res., LLC)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

**B.**   **HMIT's *Stern v. Marshall* Argument Fails**

67.   HMIT cursorily contends that, under *Stern v. Marshall*, 564 U.S. 462 (2011), the Gatekeeper Provision impermissibly allows the Bankruptcy Court to exercise jurisdiction over "non-core" matters. (HMIT Br. at 53.) HMIT is wrong.

68.   For starters, HMIT's objection comes far too late. The Gatekeeper Provision was an express feature of the Plan, which the Fifth Circuit has already affirmed in relevant part. Indeed, the Fifth Circuit explicitly endorsed these provisions, holding that the "gatekeeping provisions are sound." *Highland Cap.*, 48 F. 4th at 435. Having failed to timely raise this argument at confirmation, HMIT is barred from raising it now.

69.   In any event, HMIT fundamentally misapprehends the Gatekeeper Provision and *Stern*. Contrary to HMIT's contention that the Gatekeeper Provision "do[es] not invoke substantive rights provided by title 11" (HMIT Br. 52), the Gatekeeper Provision is part and parcel of the Plan itself. As the Bankruptcy Court concluded in confirming the Plan—and the Fifth Circuit has affirmed—establishment and enforcement of the Gatekeeper Provision was necessary to allow the Debtor to emerge from Chapter 11 in the first place. (Confirmation Order at 58.) The bogus allegations advanced by HMIT's Motion for Leave demonstrate the wisdom and necessity of such provisions—no rational person would be willing to assume duties for fulfilling the Claimant Trust's objectives without protection from

baseless litigation that HMIT (and other affiliates and allies of James Dondero) have proven all-too-willing to deploy. (*Id*. 57.)

70.     Moreover, HMIT's putative lawsuit does not, as HMIT suggests, present mere garden-variety "state law" claims. (HMIT Br. at 52.) Rather, the lawsuit directly challenges actions purportedly taken in connection with implementation of the Plan and the Claimant Trust. The logical conclusion of HMIT's position is that a bankruptcy court lacks "core" jurisdiction to interpret and enforce its own orders and the terms of a confirmed plan, such that the court can offer no protection to even the limited universe of persons directly responsible for execution of their duties under the plan. *Stern* does not support such a sweeping proposition, nor does any other authority.[31]

## C.     **The Bankruptcy Court Correctly Held That HMIT Must Satisfy A *Barton* Doctrine-Like Standard That Is More Demanding Than Rule 12(b)(6)**

71.     The Bankruptcy Court approved the Gatekeeper Provision, based on factual findings after an evidentiary hearing, on three grounds: (1) "the Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))"; (2) "the notion of a prefiling injunction to deter vexatious litigants[] that has been approved

---

[31] Moreover, as the Fifth Circuit has held, whether a bankruptcy court has jurisdiction to adjudicate the underlying action is irrelevant to whether the bankruptcy court may act as a gatekeeper. *See Villegas v. Schmidt,* 788 F.3d 156 (5th Cir. 2015); *Highland*, 48 F.4th at 439.

by Fifth Circuit," because "Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation"; and (3) "the effective and efficient administration, implementation and consummation of the Plan." (Confirmation Order ¶¶ 76–81).

72.   The Fifth Circuit affirmed that the Gatekeeper is sound under "the '*Barton* doctrine,'" because they "screen and prevent bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness." *Highland*, 48 F.4th at 435, 439. The Fifth Circuit expressly "disagree[d]" that "*Barton* has no application here" where "Highland Capital is neither a receiver nor a trustee." *Id.* at 439 n.17. This Circuit, consistent with the majority of Circuits that have addressed the issue, has held that the *Barton* doctrine continues to apply post-confirmation, *see Foster v. Aurzada (In re Foster)*, 2023 WL 20872 (5th Cir. Jan. 3, 2023), and courts routinely apply the *Barton* doctrine to post-confirmation administrators and trustees. *See, e.g.*, *MF Glob. Holdings Ltd. v. Allied World Assurance Co. (In re MF Glob. Holdings Ltd.)*, 562 B.R. 866 (Bankr. S.D.N.Y. 2017) (applying the *Barton* doctrine to post-confirmation administrator); *In re Swan Transp. Co.*, 596 B.R. 127 (Bankr. D. Del. 2018) (post-confirmation trustees). Thus, HMIT's assertion that applying the *Barton* doctrine to the Gatekeeper Provision is an "impermissible extension of the *Barton* doctrine," which

"is limited to protect court-appointed trustees" (HMIT Br. at 41–42 (capitalization omitted)), is foreclosed by Fifth Circuit precedent.[32]

73.    In light of the Fifth Circuit's decision, the Bankruptcy Court correctly applied the *Barton* doctrine standard to HMIT's Motion for Leave to assess whether its claims were "colorable" under the Gatekeeper Provision. (ROA 000919-000925.) Specifically, the Bankruptcy Court adopted the widely cited Third Circuit formulation that:

> [U]nder the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," . . . [which] "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."

(ROA 000922 (quoting *In re VistaCare Grp., LLC*, 678 F.3d 218, 232–33 (3d Cir. 2012)); *see also id.* at 89 n.258 (citing nine Circuit Courts applying the *VistaCare*

---

[32] Courts around the country apply the *Barton* doctrine to more than just "court-appointed trustees." *See, e.g.*, *Tufts v. Hay*, 977 F.3d 1204, 1209–10 (11th Cir. 2020) (applying *Barton* doctrine to attorneys); *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (same); *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (applying *Barton* doctrine to employees); *Carter v. Rodgers*, 220 F.3d 1249, 1252 & n.4 (11th Cir. 2000) (applying *Barton* doctrine to officers and directors); *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (applying *Barton* doctrine to general partners).

standard)).[33] Thus, as HMIT acknowledges, a showing of "colorability" requires only that its proposed claims have some "foundation, are not without merit, and are not being pursued for any improper purpose such as harassment." (HMIT Br. at 2, 20, 40 (quoting ROA.000925).) And, HMIT's repeated assertions and selective quotations that the Bankruptcy Court "fabricated a one-off standard" for "this bankruptcy case" (*id.* at 40; *see also id.* at 6, 41) are simply not true.

74.     The Bankruptcy Court also referenced (but did not apply) the "vexatious litigant context," which was another basis for the Gatekeeper Provision. (ROA 000924.)   While HMIT has not (yet) "been deemed a vexatious litigant" (HMIT Br. at 41), the context is instructive because, much like the Gatekeeper Provision, vexatious litigants must "seek leave to pursue claims" (ROA 000924.) However, the Bankruptcy Court did not treat HMIT like a vexatious litigant who must "show that the claims sought to be asserted have sufficient merit" and that "the proposed filing is both procedural[ly] and legally sound."  (ROA 000924 (quoting *Silver v. City of San Antonio*, 2020 WL 3903922, at *1 (W.D. Tex. July 7, 2020))). Rather, as HMIT admits, the Bankruptcy Court applied "the *prima facie* proof

---

[33] HMIT's authority about the applicability of the *Barton* doctrine in the bankruptcy court (*see* Br. at 42–43 (citing *In re Provider Meds, LP*, 514 B.R. 473, 476 (N.D. Tex. 2014); *Chua v. Ekonomou*, 1 F.4th 948, 954 (11th Cir. 2021))) is irrelevant. The Bankruptcy Court applied the Gatekeeper Provision in light of the *Barton* doctrine and "acknowledge[d] that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the 'appointing' court of Seery." (ROA 000922 n.250).

standard under the *Barton* doctrine" to assess whether HMIT's claims are "not without foundation." (HMIT Br. at 40–41 (cleaned up).)

75.    The "*prima facie* case standard" must require "more than" "mere notice-pleading standards." (ROA 000922 (cleaned up; collecting cases)). All claims in federal court are subject to a "the plausibility standards under Fed. R. Civ. P. 12(b)(6)." (HMIT Br. at 44; *see also id.* at 6, 15). If the Bankruptcy Court applied the same standards to a motion for leave, "the leave requirement would become meaningless," which "would eviscerate the protections of the Gatekeeper Provision and Gatekeeper Orders." (ROA 000923 (cleaned up; collecting cases)). HMIT offers no response to the Bankruptcy Court's sound reasoning and no explanation for why the Dondero Entities objected to and appealed the Gatekeeper Provision if, as HMIT contends, it does not require additional review. Instead, HMIT repeats "a bevy of cases" in unrelated contexts that use the word "colorable"—"none of which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the court in the Plan as justifications for the gatekeeping provisions." (ROA 000923 & n.247 (distinguishing cases)); *see, e.g.*, *In re Deepwater Horizon*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly

interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards).[34]

76.    Courts "regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation." (ROA 000923.). HMIT asserts that "the bankruptcy court should not have required an evidentiary hearing" (HMIT Br. at 44), but "whether to hold a hearing is within the sound discretion of the bankruptcy court." (ROA 000923 (quoting *VistaCare*, 678 F.3d at 232 n.12) (cleaned up)). The Fifth Circuit has never held that "no evidentiary hearing was necessary to determine 'colorability.'" (HMIT Br. at 44 (citing *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988))).  In *Louisiana World*, the Fifth Circuit held only that an "evidentiary hearing was unnecessary ***under the circumstances" of that case***, because the company's officers and directors "neither refuted any of the [Creditor] Committee's claims nor objected to them." 858 F.2d at 247 n.15 (emphasis added). In "the context of applying a *Barton* doctrine analysis as to a proposed lawsuit," the Fifth Circuit has repeatedly "affirmed a bankruptcy court's conducting of an evidentiary hearing" without "any

---

[34] *See also Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Becker v. Noe*, 2019 WL 1415483, at *18 (D. Md. Mar. 27, 2019) (assessing whether plaintiffs "asserted a 'colorable' RICO claim" to "establish *in personam* jurisdiction").

concern that the inquiry was somehow improper." (ROA 000924 (citing *Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019), *aff'd*, 799 F. App'x 271 (5th Cir. 2020))); *see also Foster*, 2023 WL 20872, at *1 (affirming dismissal of an action to sue a trustee under *Barton* "[a]fter a hearing [by] the bankruptcy court").

## D.    The Bankruptcy Court Correctly Applied the *Barton* Doctrine Standard That HMIT's Claims Are "Without Foundation"

### 1.    The Record Overwhelmingly Demonstrated That HMIT Failed To Meet The *Prima Facie* Showing Under Barton

77.    The Bankruptcy Court correctly exercised its gatekeeping function by denying HMIT's complaint for failure to satisfy the colorability standard, which required HMIT to make a *prima facie* showing that its proposed claims are "not without foundation, are not without merit, and are not being pursued for any improper purpose such as harassment." (ROA 000925.) The Bankruptcy Court, "after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties," found that HMIT could not satisfy this standard, and that HMIT's proposed claims fails under any standard. (*Id.*) The Bankruptcy Court's findings are overwhelmingly supported by the record.

78.    ***First***, HMIT alleges Seery breached his fiduciary duty to HMIT (which does not exist) by (i) "disclosing material non-public information to Stonehill and

Farallon" before they purchased the Claims and (ii) receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021." (ROA 000926-00927 (citations omitted).)  But, as set forth above and as found by the Bankruptcy Court, Seery did not disclose MNPI to any party, and HMIT's allegations to the contrary are "purely speculative [and] devoid of factual support." (ROA 000928-000930).  HMIT also wholly failed to show (or even allege) that Seery received excessive compensation in exchange for the delivery of such information (which, again, he did not deliver).  As the Documentary Compensation Evidence proves, Seery's compensation was the product of arm's length negotiations with the COB and complied with various Bankruptcy Court orders, including the explicit provisions of the Plan and Claimant Trust Agreement. (*See supra* ¶¶ 46-50).  Thus, as the Bankruptcy Court properly found, HMIT's allegations that Seery's compensation was "excessive" and not "arm's-length" were "completely speculative, without any foundation whatsoever, and lack merit" and "are also simply not plausible." (ROA 000930.)

79.    HMIT's allegations of breach of fiduciary duty also fail as a matter of law.  (*See infra* ¶¶ 91-96)

80.    ***Second***, because HMIT cannot support its allegation of breach of fiduciary duty, its secondary theories of liability fail as a matter of law.  (*See infra* ¶¶ 97-99)

81.     ***Third***, HMIT's allegations of "civil conspiracy" against Seery and the Claims Purchasers also fail. HMIT's allegations of civil conspiracy are premised on the alleged *quid pro quo* pursuant to which Seery is alleged to have provided MNPI in exchange for excessive compensation. In other words, HMIT's allegations are, again, "based entirely on Dondero's speculation and unsupported inferences" and are not colorable. (ROA 00931.) As discussed above, there was no disclosure of MNPI or any *quid pro quo*. (*See supra* ¶¶ 33-36; 46-50).

82.     To avoid the facts, HMIT alleges there *must* have been a conspiracy because otherwise "[i]t made no sense for the [Claims] purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk." (ROA 000932.) (citations omitted). HMIT's allegations about potential profit are wholly speculative and contradicted by actual facts and basic arithmetic.  As found by the Bankruptcy Court, the Claims Purchasers would have realized an approximately 30% return on their investment based on the projected recoveries to Class 8 creditors disclosed in connection with confirmation of the Plan.  *See supra* ¶¶ 33-36; (ROA 000932-000934.) *Highland Parties' Reply in further Support of their Joint Motion to Exclude Testimony and Documents of Scott Van Meter and Steve Pully* (ROA 009446-009455.)  Moreover, if the Claims Purchasers factored in the potential upside from the MGM sale (which information was publicly available *prior* to the acquisition of

any claims by the Claims Purchasers (*see supra* ¶¶ 33-36), their potential returns would have been even greater.

83. HMIT's allegations about Farallon and Stonehill's due diligence process are also controverted by the clear factual record. HMIT's allegations "that **Farallon** 'conducted no due diligence,' are based on Dondero's speculation" and are "contradicted by the testimony of Seery." (ROA 000933-000934.) (emphasis in original).) "[T]here are no allegations" regarding "whether Stonehill conducted due diligence," and "Patrick testified that neither he nor HMIT had any personal knowledge of how much diligence Farallon or Stonehill did prior to acquiring the Purchase Claims." (*Id.*) HMIT's allegations about an alleged civil conspiracy are completely speculative, unfounded, and not colorable.

## 2. **HMIT's Miscellaneous Theories Fail**

84. HMIT argues it has constitutional standing because it has viable equitable remedies under theories of (i) equitable disallowance, (ii) unjust enrichment, (iii) declaratory relief, (iv) disgorgement and constructive trust, and (v) punitive damages.[35] HMIT incorrectly pleaded a number of these "remedies" as causes of action. Regardless, none of these remedies are available under applicable law.

---

[35] In the Bankruptcy Court, HMIT also alleged equitable tolling. HMIT has not raised that issue in this appeal and has therefore waived it. *Highland Cap. Mgmt. Fund Adv., L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 57 F.4th 494, 500-01 (5th Cir. 2023).

85. **Equitable Disallowance**. Equitable disallowance, like equitable subordination,[36] is contingent on Seery having a bankruptcy claim, but Seery—an independent with no connection to the Debtor before he was appointed as an independent director—has no such claim. (Complaint ¶¶ 82-87). In any event, the Fifth Circuit has expressly rejected equitable disallowance as a remedy available under the Bankruptcy Code. *See Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 (5th Cir. 1977) ("[E]quitable considerations can justify only the subordination of claims, not their disallowance");[37] *SED Holdings, LLC v. 3 Star Props.*, LLC, 2019 WL 13192236, at *5 (S.D. Tex. Sept. 11, 2019) ("[T]he claim may only be subordinated, but not disallowed").

86. HMIT cites *Pepper v. Litton*, 308 U.S. 295 (1939), and *In re Adelphia Communications Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007), to support its

---

[36] If equitable subordination were relevant—and it is not—it is black letter law that a court may not subordinate a claim to an equity interest.  *See, e.g.*, *In re Perry*, 425 B.R. 323, 380 (Bankr. S.D. Tex. 2010) ("Under the express language of 11 U.S.C. § 510(c), the Court may not subordinate a claim to an equity interest; it may only subordinate one claim to another claim and one equity interest to another equity interest."); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 414 (3d Cir. 2009) ("Finally, Lucent contends that the Bankruptcy Court's equitable subordination holding was inconsistent with the Bankruptcy Code because § 510(c) does not permit the subordination of debt to equity. We agree.").

[37] HMIT argues *In re Mobile Steel Co*., did not foreclose equitable disallowance if the facts warrant it. HMIT Br. at 38. HMIT misquotes *Mobile Steel*. The full quotation from *Mobile Steel* is: "If the claimant's inequitable conduct is directed against the creditors, they are fully protected by subordination. If the misconduct directed against the bankruptcy is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankruptcy possesses a clear defense against it …. ***Thus, where the bankrupt is the victim it has an adequate remedy at law. It follows that disallowance of a wrongdoer's claim on nonstatutory grounds would be an inappropriate form of equitable relief.***" *Mobile Steel*, 563 F.2d at 699 n.10. (emphasis added).

equitable disallowance claim. HMIT's citations are inapposite. *First*, and as set forth above, Fifth Circuit case law is crystal clear and precludes equitable disallowance. *Second*, in 2014, the Supreme Court in *Law v. Siegel* confirmed that a Bankruptcy Court's equitable powers are limited, holding a bankruptcy court cannot, through equity, "contravene specific statutory provisions." 571 U.S. 415, 421 (2014); *see also United Staters v. Sutton*, 786 F.3d 1305, 1308 (5th Cir. 1986) (finding 11 U.S.C. § 105(a) does not create a "roving commission" for a bankruptcy court "to do equity"). To the extent *Adelphia* was ever good law, following *Law*, it has effectively been overturned by the Southern District of New York. *See, e.g.*, *In re LATAM Airlines Grp. S.A.*, 2022 Bankr. LEXIS 1178, at *28 n.25 (Bankr. S.D.N.Y. Apr. 29, 2022) ("[S]ection 502(b) specifically enumerates the bases upon which the Court may disallow a claim and thus limits the Court to those bases when adjudicating an objection to a claim. The conduct of a creditor is not among those bases"); *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 157 (Bankr. S.D.N.Y. 2014) (a court "cannot disallow an otherwise valid claim based on general principles of equity"); *Harbinger Cap'l Partners LLC v. Ergen (In re Lightsquared Inc.)*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("[T]his Court holds that the Bankruptcy Code … does not permit equitable disallowance of claims that are otherwise allowable under section 502(b) of the Bankruptcy Code"); *see also Opioid Master Disbursement Tr. II v. Coviden Unlimited Co. (In re Mallinckrodt PLC)*, 2024 Bankr. LEXIS 104, at

\*176-80 (D. Del. Jan. 18, 2024) ("[T]he Trust points to a series of cases that begin with *Pepper v. Litton* … [that] conclude that equitable disallowance remains a viable remedy …. But the vast majority of [those] cases … predate [*Law*] …. [After *Law*,] it [is] sufficiently clear that equitable disallowance is no longer permissible").

87.    **Unjust Enrichment; Disgorgement; Constructive Trust**. Under Texas law, "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasicontractual obligation to repay." *Taylor v. Trevino*, 569 F. Supp. 3d 414 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).[38] Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)). Here, and as found by the Bankruptcy Court, Seery's compensation is governed by express agreements (*see supra* ¶¶ 78–79), so unjust enrichment is unavailable as a theory of recovery. Because unjust enrichment

---

[38] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

is unavailable, the remedies of disgorgement and constructive trust are also unavailable.

88.     **Declaratory Relief.** HMIT brings "claims for declaratory relief, but a request for declaratory relief is not an independent cause of action, [and] in the absence of any underlying viable claims such relief is unavailable." *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)). Here, as correctly found by the Bankruptcy Court and discussed above (*see supra* ¶¶ 59-63), the CTA is clear that HMIT is not a "Claimant Trust Beneficiary" and will not be a Claimant Trust Beneficiary unless and until it has vested under the CTA.

89.     **Punitive Damages**. HMIT has no basis to seek punitive damages. HMIT abandoned its fraud claim, so its sole claim for primary liability is breach of fiduciary duty. As a matter of Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action." *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing G*esoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

### 3.     The Bankruptcy Court Did Not Commit Clear Error In Finding That HMIT Was Doing Dondero's Bidding

90.     Because HMIT's factual allegations are contradicted, in their entirety, by the factual record (*see* ¶¶ 26-57 *supra*), and because HMIT lacks standing, there

is no reason to reach the merits of HMIT's proposed Adversary Complaint. However, HMIT failed to adequately allege its claims under any standard. HMIT's claims are not colorable because they lack foundation, and HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" fail to "[]cross the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

### E.   HMIT Does Not Adequately Allege Any Breach of Fiduciary Duties (Count I)

91.   HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon" before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [Trust Agreement] since the Effective Date of the Plan in August 2021." (Compl. ¶¶ 64–67). Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'" *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *91 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)). HMIT fails to plausibly allege either element.

92.   ***First***, HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate" (Compl. ¶ 63) "do[es] not suffice"

to plausibly allege the existence of any actionable fiduciary relationship. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders. *See Gilbert v. El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d 1131 (Del. 1990) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups"); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same). Because Seery did not owe any "duty" to HMIT directly and individually, the Complaint fails to state a claim for breach of fiduciary duty to HMIT.

93.     ***Second***, to the extent Seery owed any fiduciary duties to the Debtor, he did not breach them by allegedly communicating with Farallon and Stonehill (which he did not). (*See* Compl. ¶ 64). As the Bankruptcy Court held, "What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing.… [Claims trading] ***is mostly a matter of private contract between buyer and seller***." (emphasis in original)). In fact, the Bankruptcy Court correctly recognized that a court only addresses a claims transfer if the seller objects. (CITE (citing Federal Rule of Bankruptcy Procedure 3001(e)(2)). Because none of the Sellers objected to the Claims trades at issue, Seery's alleged actions in connection with them cannot constitute a breach of any fiduciary duties.

94.     ***Third***, HMIT's "conclusory allegations" and "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief." *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 384 (Bankr. N.D. Tex. 2011) (cleaned up). As to Seery's discussions with Farallon and Stonehill, HMIT asserts that Seery "disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits." (ROA 001890-001906 (Comp.) ¶¶ 3, 64; *see also id*. ¶¶ 13–14, 40, 47, 50.) HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, or what "assurances" he made. The few facts HMIT provides contradict its own allegations (and are repeatedly contradicted by the record). The only purportedly "material non-public information" identified in the Complaint is the MGM E-Mail Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." (ROA 001905 (Comp.) ¶ 45). This information was widely reported in the financial press at the time (*see supra* ¶¶ 30–37), so it cannot constitute MNPI as a matter of law. *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *33 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)). HMIT asserts Farallon's and Stonehill's purchases

"made no sense" without access to "material non-public information." (Compl. ¶¶ 3, 50). But HMIT admits that Farallon and Stonehill purchased Highland claims at discounts of 43% to 65% to their allowed amounts, so they were therefore projected to make significant returns based on publicly available estimates in Highland's court-approved Disclosure Statement. (*Id.* ¶¶ 3, 37, 42).

95.    As to Seery's compensation, HMIT asserts that it was "excessive" and speculates that compensation negotiations between Seery and the COB "were not arm's-length." (Compl. ¶¶ 4, 13, 54, 74). But those assertions are directly contradicted by the Documentary Compensation Evidence and HMIT (through Patrick) unconditionally admitted it has no information to rebut it. Further, the structure of Seery's post-effective date compensation, which includes a "Base Salary," "success fee," and "severance," was fully disclosed in the Claimant Trust Agreement, which was publicly filed in advance of the Plan confirmation hearing and approved by the Bankruptcy Court and the Fifth Circuit as part of the Plan (*see* ¶¶ 49-50 *supra*).

96.    Thus, HMIT fails to allege facts that, even if true (and they are not), support a reasonable inference that Seery breached any purported fiduciary duty to HMIT (of which there is none) or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty. *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of

duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation").

## F.   HMIT's Theories of Secondary Liability Fail (Counts II and III)

97.    HMIT seeks to hold the putative defendants secondarily liable for Seery's alleged breach of fiduciaries duties on an aid/abet theory (Compl. ¶¶ 69–74) and conspiracy theory of liability (*id.* ¶¶ 75–81). As a threshold matter, HMIT has not plausibly alleged any primary breach of fiduciary duties, so it cannot pursue secondary liability for the same alleged wrongdoing. *See English v. Narang*, 2019 WL 1300855, at *36 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *28 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold

at least one of the named defendants liable") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).[39]

98.    Even if HMIT could pursue secondary liability, it has not plausibly alleged any civil conspiracy (nor could it—HMIT's factual allegations are contradicted by the record and unsupportable). Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.* at 141 (cleaned up)

99.    HMIT has not plausibly alleged any "meeting of the minds." HMIT asserts that "Defendants conspired with each other to unlawfully breach fiduciary duties" (Compl. ¶ 76), which is precisely the sort of "legal conclusion" the Supreme Court held is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66). HMIT repeats four times that Seery provided information to Farallon and Stonehill as a "as a quid pro quo" for "additional

---

[39] Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aid/abet theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas); by contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

compensation" (Compl. ¶ 77; see also id ¶¶ 4, 47, 74), but never provides "nonconclusory factual allegations" in support. *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 565–66). Instead, all HMIT can do is vaguely allege, "upon information and belief," that Seery "did business with Farallon" and "served on [a] creditors committee" with Stonehill. (Compl. ¶ 48). HMIT also asserts "[u]pon information and belief" that Farallon "conducted no due diligence but relied on Seery's profit guarantees." (*Id.* ¶ 40). These allegations "upon information belief" are "wholly speculative and conclusory," and therefore do "not satisfy the pleading requirements under Rule 8(a)." *Hargrove v. WMC Mortg. Corp.*, 2008 WL 4056292, at *7-8 (S.D. Tex. Aug. 29, 2008) (citing *Twombly*, 550 U.S. at 555).

## G.   The Bankruptcy Court Did Not Abuse Its Discretion in Its Discovery Rulings

100.    HMIT recognizes that the Bankruptcy Court has "discretion regarding what discovery will be allowed" and the "admissibility of expert evidence," which "are reviewed for abuse of discretion." (HMIT Br. at 3–4, 49 (citing *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002)).) Courts "apply a highly deferential standard of review to discovery matters." *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 750 (5th Cir. 2023) (collecting cases). The Bankruptcy Court correctly exercised its discretion to address HMIT's "gamesmanship and deception" and efforts to "hide[]

the ball" throughout fact and expert discovery. *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 363 (5th Cir. 2018) (cleaned up).

### 1.    The Bankruptcy Court Properly Exercised Its Discretion To Limit Discovery

101.    As discussed above (*see supra* ¶¶ 12-15), the purpose of the Gatekeeper Provision is to protect covered parties from harassing and costly litigation. Accordingly, on HMIT's Motion for Leave, the Bankruptcy Court properly exercised its discretion by granting reciprocal but limited discovery by permitting each side to depose the other's primary witness (*i.e.*, Seery and Dondero).[40] (Dkt. No. 3800.) In doing so, the Bankruptcy Court properly rejected HMIT's attempt to use its Motion for Leave to engage in a wide-ranging fishing expedition reflected in 45 documents requests (including subparts) served on each party and multiple corporate representative depositions covering 30 topics each (Dkt. No. 3788 ¶¶ 7–8 Exs. A–E), massive pre-suit discovery that would have turned the Gatekeeper Provision on its head. The Bankruptcy Court explained that this was "a cart-before-the-horse situation," because it is HMIT's burden to demonstrate that has "a colorable claim or claims in [its] proposed complaints," at which point "normal discovery rules will apply." (May 26, 2023 Conf. Tr. at 46:25–47:4, 52:10–17.)[41]

---

[40] While HMIT took the opportunity to depose Seery, Appellees did not depose Dondero.

[41] HMIT's authority (*see* HMIT Br. at 49–50) is irrelevant because it arises under the "normal discovery rules," not a gatekeeper or similar provision.

This in no way was a "blanket denial of discovery" preventing "discovery of any kind." (HMIT Br. at 49–50 (cleaned up).)

## 2. The Bankruptcy Court Properly Exercised Its Discretion by Excluding HMIT's Proffered Expert Testimony

102.   The Bankruptcy Court correctly rejected HMIT's attempt to ambush the parties with two previously undisclosed "experts" "roughly 60 hours before the hearing." (June 16, 2023 Order at 14, Dkt. No. 3853.) The Bankruptcy Court recounted "two-and-a half months of activity regarding what type of hearing the bankruptcy court would hold and when," during which "HMIT never raised even the prospect of expert testimony." (Order at 8–10, 12–13.) HMIT acknowledges that "Bankruptcy Rule of Procedure 9014 governs this contested matter" (HMIT Br. at 54), and "FRCP 9014 does include FRCP 26(b)(4)(A)," which "provides that '[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial.'" (Order at 13 (quoting Fed. R. Civ. P. 26(b)(4)(A)).) But, in "reliance on HMIT's representations, which omitted any reference to expert witnesses," the Bankruptcy Court "limited pre-hearing discovery" to two fact depositions (*Id.* at 13–14). By strategically waiting "to disclose the Proposed Experts" until right before the Hearing, HMIT ensured that Highland and Seery did not have "sufficient time to seek to modify the court's prior status/scheduling orders, let alone take two expert depositions." (*Id.* at 14.) Thus, "HMIT's expert evidence was not 'appropriately and timely disclosed,'" and HMIT's assertion that "the

bankruptcy court does not cite any rule or order with which HMIT did not comply" is demonstrably false. (HMIT Br. at 54.)

103.    HMIT next claims that the Bankruptcy Court "was required to perform a *Daubert* inquiry," with "a hearing" before excluding its proposed experts. (HMIT Br. at 54–55, 57 (cleaned up).) That is not the law. Under Fifth Circuit precedent, "a district court is not always required to hold a formal *Daubert* hearing; often, it must only articulate its basis for admitting expert testimony." *Johnson v. Thibodaux City*, 887 F.3d 726, 736 n.11 (5th Cir. 2018) (cleaned up).

104.    In effort to end-run the Bankruptcy Court's Orders, HMIT filed expert declarations *after* the Hearing in a purported "evidentiary proffer under Rule 103(a)(2)," which HMIT now admits was a strategic effort to paper the record "for purposes of appellate review." (HMIT Br. at 55.) But an "offer of proof" must be "made in ***pretrial*** hearing" or during trial so the "***trial judge*** can reevaluate h[er] decision." 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence §§ 1:13–14 (4th ed. 2023) (emphasis added; collecting cases).  In any event, Rule 103(a)(2) does apply because "the substance" of the excluded evidence "was apparent from the context."  Fed. R. Evid. 103(a)(2).  HMIT effectively admitted that the excluded evidence "was apparent from the context," because it attached the same exhibits to its offer of proof that it sought to introduce into evidence at the Hearing, which the Bankruptcy Court reviewed and excluded.

## <u>CONCLUSION</u>

For the foregoing reasons, the Bankruptcy Court's orders should be affirmed in their entirety.

Dated:  March 6, 2024          **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

/s/ *Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Highland Capital Management, L.P.
and the Highland Claimant Trust*

**WILLKIE FARR & GALLAGHER LLP**
Mark T. Stancil (admitted pro hac vice)
Joshua S. Levy (admitted pro hac vice)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

**REED SMITH LLP**
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for James P. Seery, Jr.*

## CERTIFICATE OF COMPLIANCE WITH RULE 8015

This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i), as extended to 14,500 words pursuant to this Court's Order dated January 23, 2024, because, according to Microsoft Word, it contains 14,497 words, excluding the portions of the document exempted by FED. R. BANKR. P. 8015(g).

By: */s/ Zachery Z. Annable*
Zachery Z. Annable

## CERTIFICATE OF SERVICE

I hereby certify that, on March 6, 2024, a true and correct copy of the foregoing document was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

*/s/ Zachery Z. Annable*
Zachery Z. Annable