CASE NO. 3:23-cv-02071-E

---

IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

IN RE: HIGHLAND CAPITAL MANAGEMENT, L.P.,
*Debtor*

---

HUNTER MOUNTAIN INVESTMENT TRUST,
Appellant,

v.

HIGHLAND CAPITAL MANAGEMENT, L.P., et al

---

On Appeal from the United States Bankruptcy Court for the Northern
District of Texas, Case No. 19-34054-slg11
The Honorable Judge Jernigan, Presiding

---

APPELLANT'S REPLY BRIEF

---

Sawnie A. McEntire
State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
State Bar No. 13393700
rmccleary@pmmlaw.com

One Riverway, Suite 1800 Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Petitioner*

# I.    <u>TABLE OF CONTENTS</u>

I.    TABLE OF CONTENTS ................................................................i

II.   TABLE OF AUTHORITIES......................................................... iii

III.  Introduction...................................................................1

IV.   Argument & Authorities.........................................................3

    A.    HMIT has constitutional standing.........................................3

        1.    Appellees urge an erroneous standard of review ........................3

        2.    HMIT plausibly pleaded an imminent injury-in-fact.................4

        3.    HMIT alleged plausible, colorable facts supporting "traceability" ................................................................5

        4.    HMIT has asserted plausible, colorable remedies .....................6

    B.    HMIT has prudential standing to assert both its individual and derivative claims....................................................................8

        1.    Appellees again urge an erroneous standard of review .............9

        2.    Appellees fail to address HMIT's allegations that Seery purposefully delayed GUC Certification ...................................11

        3.    Appellees ignore legal authority rejecting a rigid analysis of standing where a defendant's conduct was undertaken to destroy standing ..................................................13

        4.    Delaware law confers prudential standing on HMIT under the "Prevention Doctrine".................................15

        5.    HMIT is a "beneficial owner" under the DSTA .......................17

        6.    HMIT's status as a beneficial owner has been "continuous"................................................................18

        7.    HMIT has individual injuries distinct from the Claimant Trust ................................................................20

    C.    HMIT is "in the money"......................................................20

        1.    HMIT has standing to seek declaratory relief..........................22

    D.    The bankruptcy court impermissibly extended the Barton

Doctrine ...........................................................................22

E.   HMIT has plead colorable and plausible claims ..................................28

F.   The Bankruptcy Court's Co-Opted Process is not Consistent with Fifth Circuit Precedent and Denied HMIT Due Process ............29

    1.   Seery was in possession of MNPI.............................................30

    2.   Seery's Compensation is Excessive and Never Approved by the Court...............................................................32

    3.   Public Information was insufficient to support Outside Purchasers' claims purchase .....................................35

    4.   Other mischaracterizations and merits based attacks ..............38

G.   The Bankruptcy Court Erred in Ignoring Stern v. Marshall ..............40

H.   HMIT's Proposed Claims are Brought for a Proper Purpose and With Foundation...................................................................41

I.   The notices under Bankruptcy Rule 3001 are irrelevant....................42

V.   CONCLUSION................................................................43

VI.   CERTIFICATE OF COMPLIANCE ...........................................44

## II.    TABLE OF AUTHORITIES

**Cases**

*Bamford v. Penfold, L.P.*, 2020 WL 967942, at *29-30 (Del. Ch. Feb. 28, 2020)..19

*Barton v. Barbour*, 104 U.S. 126 (1881) ...............................................................24

*Becker v. Noe*, No. CV ELH-18-00931, 2019 WL 1415483, at *18 (D. Md. Mar.
   27, 2019)...........................................................................................................23

*Blanchard 1986, Ltd. v. Park Plantation, LLC,* 553 F.3d 405, 409 (5th Cir. 2008) .9

*Carroll v. Abide,* 788 F.3d 502, 506 (5th Cir. 2015) ........................................ 24, 25

*Chandler v. Phoenix Servs.*, 419 F. Supp. 3d 972, 988 (N.D. Tex. 2019) ....... 29, 34

*Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) ...... 12, 13

*Estate of Cornell v. Johnson*, 367 P.3d 173, 178 (Idaho 2016)..............................16

*Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 31 (2014)..............................41

*Gen. Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) ..................................3

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795-805 & nn. 2, 41
   (5th Cir. 2011) ........................................................................................ 9, 10, 11

*In re AbbVie Inc. Stockholder Derivative Litig.*, No. 9983-VCG, 2015 WL
   4464505, at *4 (Del. Ch. July 21, 2015) ...........................................................15

*In re Allied Sys. Holdings, Inc.*, 524 B.R. 598 (Bankr. D. Del. 2015) ...................41

*In re Deepwater Horizon*, 732 F.3d 326, 340-41 (5th Cir. 2013) ............. 11, 23, 27

*In re Matter of Highland Capital Management, L.P.*, 48 F.4th 419 (5th Cir. 2022)
   ...................................................................................................... passim

*In re National Collegiate Student Loan Trusts Litigation*, 251 A.3d 116, 185-86
   (Del. Ch. 2020) ..................................................................................................13

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001).....................23

*In re Provider Meds, LP*, 514 B.R. 473, 476 (N.D. Tex. 2014)..............................25

*In the Matter of Mobile Steel Co*, 563 F.2d 692, 699 n.10 (5th Cir. 1977) ..............7

*Injective Labs Inc. v. Wang*, No. CV 22-943-WCB, 2023 WL 3318477, at *7 (D.
   Del. May 9, 2023).............................................................................................16

*King v. Baylor University*, 46 F.4th 344, 367 (5th Cir. 2022)...................................7

*Kirkman v. Wilmington Tr. Co.*, 61 F. Supp. 651, 654 (D. Del. 1945)....................22

*Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984).......................................................14

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ...................................... 3, 4, 10

*Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 478 (5th Cir. 2006)...30

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021)
   ...............................................................................................................3

*Miller v. Sam Houston State Univ.*, 986 F. 3d 880, 893 (5th Cir. 2021) ................43

*Morris v. Spectra Energy Partners (DE) GP, LP*, 246 A.3d 121, 136 (Del. 2021)
   ...................................................................................................... 10, 14

*Pepper v. Litton*, 308 U.S. 304-11 (1939) ...............................................................7

*Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, 647 F. Supp. 3d 508, 516 (W.D. La. 2022)..................................................................................... 30, 40

*Rende v. Rende*, No. 2021-0734-SEM, 2023 WL 2180572, at *11 (Del. Ch. Feb. 23, 2023)...............................................................................................................12

*Richardson v. United States*, 468 U.S. 317 (1984)........................................... 23, 27

*Scanlan v. Eisenberg*, 669 F.3d 838, 844 (7th Cir. 2012) ................................ 17, 18

*SDF Funding LLC v. Fry*, 2021 WL 4519599, at *2 (Del. Ch. Oct. 4, 2021).........14

*SEC v. Cuban*, 2013 WL 791405, at *33 (N.D. Tex. Mar. 5, 2013) .......................31

*Shaev v. Wyly*, 1998 WL 13858, at *4 (Del. Ch. Jan. 6, 1998) ....................... 15, 19

*Snow Phipps Group, LLC v. Kcake Acquisition, Inc.*, No. CV 2020-0282-KSJM, 2021 WL 1714202, at *1 (Del. Ch. Apr. 30, 2021) ...........................................16

*Stern v. Marshall,* 564 U.S. 462 (2011)............................................................. 40, 41

*Unit Trainship, Inc. v. Soo Line R. Co.*, 905 F.2d 160, 162-63 (7th Cir. 1990)......13

*United States v. Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012)..............................31

*W & G Seaford Associates, L.P. C. E. Shore Markets, Inc.*, 714 F. Supp. 1336, 1341 (D. Del. 1989)............................................................................................16

*Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) .........30

## Statutes

Bankruptcy Code 510(c) ...........................................................................................7

DEL. CODE. ANN. TIT. 12, § 3806(c)...........................................................................12

DTSA § 3809 .............................................................................................................12

Section 3801 .............................................................................................................17

Section 510(c) .............................................................................................................7

## Other Authorities

RESTATEMENT (SECOND) OF CONTRACTS, Section 245...........................................15

RESTATEMENT (THIRD) OF TRUSTS 94, cmt. B ........................................................17

## Rules

Federal Rule of Civil Procedure 12(b)(6) ...........................................................9, 43

### III.   Introduction[1]

HMIT's pleadings establish its constitutional and prudential standing to assert the colorable claims pleaded. HMIT alleged it is a vested beneficiary entitled to sue and asserted plausible tort claims against Appellees for dissipating trust assets to HMIT's and innocent beneficiaries' detriment. Rather than accept those pleadings as true, the bankruptcy court resolved HMIT's claims before it could pursue them—substituting an evidentiary analysis for the pleading-stage analysis the law required, while also denying HMIT any meaningful discovery. In doing so, the bankruptcy court erred as a matter of law.

Appellees raise numerous arguments to avoid this straightforward outcome but ignore the proper standard of review and HMIT's pleadings. For example, Appellees argue that HMIT lacks either constitutional or prudential standing because, purportedly, HMIT's interest under the CTA is "unvested." But HMIT specifically pleaded that it is a vested beneficiary with supporting facts; pleaded that all conditions precedent to suit had been satisfied; and even pleaded for a declaration acknowledging HMIT's vested status.  Those pleadings control, and Appellees have

---

[1] Appellant HMIT uses the same defined terms as used in its Opening Brief, Docket No. 29 ("HMIT Brief").  Appellant refers to the Answer Brief of Appellees, the Highland Parties, (Dkt. No. 35) as the "Highland Brief" and the Brief of Claim Purchaser Appellees (Dkt. No. 34) as the "OP Brief."  HMIT refers to Appellees collectively as "Appellees," unless indicated otherwise.

1

no answer for them.  As a matter of law, Appellees may not manipulate the standing analysis by refusing to acknowledge HMIT's vested status and HMIT's pleadings.

Appellees similarly misstep in arguing that HMIT's claims are not "colorable." At least the Outside Purchasers acknowledge that the proper analysis is ***not*** evidentiary [*See* OP Brief, pp.19-20,37]—and, if it were, the bankruptcy court's denial of meaningful discovery would be a problem. Rather, the Outside Purchasers allege that HMIT's pleadings are "speculative" or "conclusory" and therefore not "colorable." *Id.*, pp.21,43.    The Highland Parties diverge from the Outside Purchasers on the "evidence" issue, championing a full-blown evidentiary analysis even though HMIT had no meaningful discovery. No Appellee gets it right.

HMIT's pleadings are specific and robust—not bare-bones or formulaic that some courts deem conclusory. Nor are HMIT's pleadings speculative; instead, they allege sufficient factual detail to state plausible claims and allow reasonable inferences of liability. While Appellees may seek to rebut the allegations after discovery and with evidence at a later stage, the sole question now is whether HMIT pleaded colorable/plausible claims under the applicable standard, and HMIT has done so. As for the Highland Parties, they miss the mark entirely—offering an evidentiary-laden analysis perhaps appropriate for a *post-trial* appeal, but not a pre-suit inquiry on HMIT's right to sue at all.

Ultimately, Appellees fail to justify the error and patent unfairness of the bankruptcy court's rulings or its use of a heightened standard of "colorability" that is inappropriate at this early stage. The Court should reverse.

## IV.   Argument & Authorities

### A.   HMIT has constitutional standing

The OP Brief challenges constitutional standing as to HMIT's individual claims. Even then, the Outside Purchasers' constitutional standing challenges are incorrect because HMIT adequately pleaded the requisite injury-in-fact, traceability, and redressability.

### 1.   Appellees urge an erroneous standard of review

Initially, Appellees' arguments ignore the controlling legal standard. Constitutional standing at the pleading stage is determined on the pleadings—not evidence or the merits of the pleaded claims. *Gen. Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) Stated otherwise, standing arguments based on lack of evidence are *not appropriate at the pleadings stage*. *Lujan*, 504 U.S. at 561.

3

Despite these controlling authorities, Appellees masquerade merits challenges and fact disputes as constitutional standing challenges.  Because HMIT's pleadings control, those arguments are irrelevant.

### 2.  HMIT plausibly pleaded an imminent injury-in-fact

Under the *correct* pleading-centric analysis, HMIT sufficiently pleaded an imminent injury-in-fact because HMIT alleged "general factual allegations of injury" *and more. Lujan,* 504 U.S. at 561. HMIT alleged it suffered an injury-in-fact by the diminution of value of HMIT's interest in the Claimant Trust and because it has been deprived of its GUC Certification (and accompanying rights) evidencing its vested status.[2] Because HMIT effectively alleges it is in the money,[3] every dollar paid to Seery in excessive compensation is one dollar that will never flow (but should flow) to HMIT. No conjecture or speculation is required for the asserted injury, which is not only imminent, but immediate and ongoing.[4]

Moreover, HMIT's Motion to Modify (ROA.10062) sets forth new financial data not available until after the hearing—including previously withheld financial disclosures regarding the value of the estate's assets.[5] This data corroborates

---

[2] ROA.3339, 3362-67.

[3] ROA.3342.

[4] HMIT demonstrated why its allegations are not speculative or hypothetical, including identifying the *who, when* and *what* to satisfy relevant pleading requirements. HMIT Brief, pp.14,26-27.

[5] Appellees cite the bankruptcy court's ruling that these disclosures were "not materially different

HMIT's pleadings that it was in the money and should have been deemed vested. ROA.10064. This is also true of evidence at the hearing, which corroborated HMIT's pleadings. ROA. 009614-15 (testimony there was well over $100 million in assets available after payment of expenses and Classes 8 and 9 Claims). Appellees presented no contrary evidence.

### 3.    HMIT alleged plausible, colorable facts supporting "traceability"

The Outside Purchasers argue that the asserted injury is not *traceable* to their challenged conduct because they owed no duties and were not statutory insiders (OP Brief, p.27). Both arguments misconstrue HMIT's claims.

HMIT alleged that Seery and the Outside Purchasers agreed to a *quid pro quo* arrangement, including by accepting MNPI, rubber-stamping Seery's ongoing compensation, aiding and abetting Seery's breaches of fiduciary duty, and delaying payment of Classes 8 and 9, which injured the Claimant Trust and HMIT. That injury is directly tied and traceable to the misconduct alleged.

To avoid this outcome, the Outside Purchasers rely on cases addressing a purported lack of duties owed by claims purchasers to bankruptcy estates in general. (OP Brief, pp.28-29). Those authorities are irrelevant because they do not address

---

than information what was already on file in the bankruptcy." ROA.1046. The bankruptcy court was incorrect. The balance sheet attached to HMIT's Motion to Alter (ROA.10070) was not disclosed before the June 8 Hearing, and it included new financial disclosures for which HMIT was not allowed prior discovery or analysis. Regardless, if the disclosures were materially the same, each would only confirm that HMIT was "in the money" before the June 8 Hearing.

HMIT's core allegations, which include ongoing conduct, post-Effective Date, that damaged the Claimant Trust and HMIT.[6] This includes the Outside Purchasers' aiding and abetting breaches of fiduciary duty.[7]

A core element of HMIT's standing allegations is that Appellees' wrongful conduct directly injures the Claimant Trust by depleting its assets and directly injures HMIT because it delays HMIT's GUC Certification under the CTA.[8] The scheme to delay and prevent HMIT's GUC Certification and vesting as a "Claimant Trust Beneficiary" separately infringed on HMIT's rights under the CTA.[9] This Court need not look any further than the Appellees' briefs to evidence this injury—where Appellees urge this Court to find no standing, relying on Seery's bad faith refusal to perform a ministerial act he should have performed long ago.

### 4. HMIT has asserted plausible, colorable remedies

HMIT's proposed Complaint seeks viable remedies to redress the asserted injuries, some of which stem from the bankruptcy court's equitable powers of

---

[6] The bankruptcy court's Order Denying Leave mischaracterized HMIT's claims by focusing on general characterizations of claims trading as "highly unregulated." ROA.894. The bankruptcy court's determination that Outside Purchasers' "lack of due diligence in this context does not reasonably seem suspicious" is also not only an improper finding at the pre-pleading stage, but also non-sensical that Outside Purchasers would invest over $160 million without due diligence. ROA.9592-95, 9602-04.

[7] HMIT does not concede that the Outside Purchasers are not statutory insiders. But it is irrelevant to the outcome. The Outside Purchasers do admit they became fiduciaries after the Effective Date when HMIT's claims fully accrued. OP Brief, p.34.

[8] ROA.3335, 3339, 3341-42, 3357, 3359, 3363.

[9] *See* ROA.3335, 3339, 3362-63.

subordination and equitable disallowance. *In the Matter of Mobile Steel Co*, 563 F.2d 692, 699 n.10 (5th Cir. 1977); *accord Pepper v. Litton*, 308 U.S. 304-11 (1939). Others arise under common law.

The Outside Purchasers' argument that equitable subordination is unavailable under Bankruptcy Code 510(c) presumes HMIT has an equity interest. The Outside Purchasers admit, however, that "the Claims were exchanged for interests in the Claimant Trust." OP Brief, p.32. As a result, Section 510(c) and the Appellees' related authorities are inapplicable.[10]  Equitable disallowance is also not precluded as a viable remedy, as the Fifth Circuit suggested in *Mobile Steele*, 563 F.2d at 699 n.10.[11]

Imposition of a constructive trust and disgorgement remain viable remedies. The Fifth Circuit's decision in *King v. Baylor University*, 46 F.4th 344, 367 (5th Cir. 2022), establishes that a party may plead unjust enrichment as a quasi-contract cause of action. As the Fifth Circuit held, "[t]he district court erred by implying that unjust enrichment is a facially invalid theory. Its availability in this circumstance is narrow, ***but the claim exists***." *King*, 46 F.4th at 367 (emphasis added). Thus, Appellees' assertion that unjust enrichment is unavailable misstates the law. *See* OP Brief, p.35.

---

[10] Outside Purchasers cite *In re Perry*, 425 B.R. 323, 380 (Bankr. S.D. Tex. 2010) and *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 414 (3d Cir. 2009) to suggest that a claim many not be subordinated to an equity interest; however, these cases are inapposite because they are pre-Effective Date, pre-reorganization cases. Here, there are no longer "claims and "equity interests."

[11] *See* HMIT Brief, pp.37-38.

Here, a constructive trust is also appropriate because the Outside Purchasers and Seery agreed to a *quid pro quo* arrangement for their mutual benefit; no contract governs that agreement. Disgorgement and constructive trust are also appropriate to redress HMIT's injury caused by a breach of fiduciary duties and the aiding and abetting of those breaches. *See* HMIT Brief, p.39. Appellees cite no authority to support their argument that "without equitable disallowance or equitable subordination … there will be nothing to disgorge." OP Brief, p.35. Disgorgement, constructive trust, and unjust enrichment are available under Delaware law regardless of disallowance or subordination. HMIT has alleged that the Claims Purchasers should, at a minimum, "be forced to disgorge all distributions over and above their original investment" in the Disputed Claims. HMIT's Proposed Complaint, ¶¶ 91-93, ROA.3361.

**B.     HMIT has prudential standing to assert both its individual and derivative claims[12]**

---

[12] The OP Brief addresses the "person aggrieved" test, which is a species of standing applicable to appeals from bankruptcy court orders. OP Brief, p.23. This special bankruptcy appellate standing standard ensures that a party appealing a bankruptcy court order has a direct financial stake in it— and is not a mere bankruptcy participant that is only indirectly affected. ROA.899 (collecting cases). Here, the challenged order *directly* impacts HMIT; HMIT is the primary party harmed by the adverse order. Relatedly, the order "burdens" HMIT's "pocket," (OP Brief, p.37), because HMIT has alleged that it is in in the money—and the bankruptcy court's order allows depletion of further assets that should flow directly down to HMIT. Thus, HMIT's appellate standing is different from that of other former equity in other unrelated proceedings, which the bankruptcy court cited. ROA.899. HMIT asserted allegations that it has been directly and adversely affected pecuniarily. ROA.003335;ROA.003341,ROA.003357-67;ROA.001854-55;ROA.001880-82.

Appellees' next argument that HMIT is not a "beneficial owner" with prudential standing, either individually or derivatively, fails as a matter of both procedural and substantive Delaware law.

### 1.    Appellees again urge an erroneous standard of review

Appellees attack prudential standing by relying upon factual allegations outside the four corners of HMIT's proposed Verified Complaint. ROA.003331-3367. Because the *pleadings* control, Appellees' arguments, and the bankruptcy court's adoption of them, are erroneous. *See Blanchard 1986, Ltd. v. Park Plantation, LLC,* 553 F.3d 405, 409 (5th Cir. 2008) (dismissal for lack of standing should be determined under Rule 12 pleading standards). Indeed, when prudential standing is resolved "at the motion-to-dismiss stage," the challenge is appropriately raised under Federal Rule of Civil Procedure 12(b)(6), and a court's "inquiry is limited to whether the plaintiff's complaint plausibly states a non-speculative claim for damages." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795-805 & nn. 2, 41 (5th Cir. 2011).

Here, HMIT alleged that its interest under the CTA is fully vested as a "Claimant Trust Beneficiary." *See* Proposed Complaint, ¶24 [ROA.3342]. The proposed Complaint also included factual allegations that:

- HMIT's "vested" status derived from "the current value of the Claimant Trust Assets;" ¶24

9

- Seery unreasonably delayed recognition of HMIT's vesting; ¶15

- all conditions precedent had been satisfied; ¶102 and

- requested declaratory relief to acknowledge its individual and derivative standing. ¶99(f)

Each of these allegations sufficiently pleaded HMIT's prudential standing. *Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice…").  At this early stage, and particularly in the absence of meaningful discovery, HMIT's pleadings should have been taken as true.  *Harold*, 634 F.3d at 795-805 & nn.2, 41.

As a matter of law, HMIT's prudential standing also derives from its capacity as a "beneficial owner" under the Delaware Statutory Trust Act ("DSTA").  Its standing as a vested beneficiary under the CTA is separately based on well-pleaded factual allegations that it was in the money and a breach of Seery's duty of good faith.[13] These factual averments should have been accepted. *See Morris v. Spectra Energy Partners (DE) GP, LP*, 246 A.3d 121, 136 (Del. 2021).

But, here, the bankruptcy court disregarded Fifth Circuit precedent by imposing an erroneous burden in an improper evidentiary proceeding. *See In re*

---

[13] HMIT effectively pleaded Seery has breached his duties of good faith and fair dealing, including his scheme "to delay recognition of HMIT's vesting of its interests under the CTA," disclosing MNPI to the Outside Purchasers in order to receive excessive compensation, and attempting to prevent HMIT from asserting its rights as a beneficial owner and as a vested contingent beneficiary. ROA.3335, 3339, 3341, 3348-54; HMIT Brief, p. 45.

*Deepwater Horizon*, 732 F.3d 326, 340-41 (5th Cir. 2013) (a "colorable" claim is one with "some possible validity") (citation omitted), *Harold H. Huggins Realty.*, 634 F.3d at 795-805 & n. 41 ("inquiry is limited to whether the plaintiffs' complaint plausibly states a non-speculative claim for damages"); *see also* ROA.904-905. The result was reversible error.

Although HMIT alleged it was in the money (*i.e.,* its interest should be declared as vested), the bankruptcy court and Appellees ignored this and related allegations. Highland Brief, ¶¶61-62. Regardless, even if "evidence" is considered, Appellees offered no evidence rebutting HMIT's "math" placing it "in the money."[14] In sum, the bankruptcy court relied upon a record devoid of evidence that the estate's assets were insufficient to pay Classes 8 and 9 in full—when HMIT's pleadings claim otherwise and when the *only* information Appellees had disclosed showed more than sufficient assets.[15]

## 2. Appellees fail to address HMIT's allegations that Seery purposefully delayed GUC Certification

Even assuming the bankruptcy court could look beyond HMIT's pleadings (it could not), the bankruptcy court still erred when it denied HMIT's prudential standing. Appellees (and the bankruptcy court) rely on Section 1.1(h) of the CTA,

---

[14] *See* ROA.10065-66.

[15] ROA.10065-66.

arguing that because the "vesting" condition (issuance of the GUC certification), which they control, never occurred, then HMIT cannot have prudential standing. Highland Brief, p.28-29. But the foundation of this argument is illusory.

Seery, as Claimant Trustee, owed (and still owes) HMIT duties of good faith and fair dealing, which cannot be waived or disclaimed under the DSTA. DEL. CODE. ANN. TIT. 12, § 3806(c). Under binding Delaware law, Seery cannot unilaterally (and knowingly) prevent the occurrence of a condition precedent to insulate himself and deprive HMIT of expectancies under the CTA. *See Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). This legal principle applies with extra force here, where HMIT seeks a declaration that HMIT's interests under the CTA were fully vested and alleged that Seery is attempting to exhaust financial resources and delay recognition of HMIT's vesting.[16]

The Claimant Trustee is a proposed defendant, and he controls the ministerial act of issuing the GUC Certification triggering the CTA's vesting condition. But, as a trustee of a Delaware statutory trust, Seery has duties set forth in common law, including the duties of loyalty, good faith, and due care. *See* DTSA § 3809; *Rende v. Rende*, No. 2021-0734-SEM, 2023 WL 2180572, at *11 (Del. Ch. Feb. 23, 2023). Although a governing trust agreement (such as the CTA) may disclaim some of these

---

[16] *See* ROA.3335, 3339, 3362-63.

12

duties, Delaware law prohibits any disclaimer of the duty of good faith and fair dealing. *In re National Collegiate Student Loan Trusts Litigation*, 251 A.3d 116, 185-86 (Del. Ch. 2020) ("the DSTA forbids parties from eliminating the implied contractual covenant of good faith and fair dealing") (cleaned up) (citing DSTA § 3806(c)).

This duty of good faith is particularly important here, where HMIT's "vesting" status is purportedly dependent upon Seery's control. "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations omitted); *see Unit Trainship, Inc. v. Soo Line R. Co.*, 905 F.2d 160, 162-63 (7th Cir. 1990) ("[W]here a party's obligation is subject to a condition precedent, a duty of good faith and fair dealing is imposed upon that party to cooperate and to not hinder the occurrence of the condition.").

**3.    Appellees ignore legal authority rejecting a rigid analysis of standing where a defendant's conduct was undertaken to destroy standing**

The Delaware Supreme Court has held that a standing analysis should be more flexible when a defendant controls the facts giving rise to standing. By way of example, although standing to assert derivative claims in the context of mergers

typically requires equity ownership, there are exceptions. One of these exceptions includes when "the merger itself is the subject to a fraud claim, **perpetrated to deprive shareholders of their standing to bring or maintain a derivative action."** *Morris*, 246 A.3d at 129 (Del. 2021) (citing *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984)) (emphasis added); *SDF Funding LLC v. Fry*, 2021 WL 4519599, at *2 (Del. Ch. Oct. 4, 2021) ("equitable standing . . . dr[aws] upon the principle that equity attempts 'to ... ascertain, uphold, and enforce rights and duties which spring from the real relations of parties.'") (citation omitted). *Morris* stands for the proposition that strict adherence to formulaic standing must yield where the defendant's unfair conduct attempts to destroy standing.

Here, HMIT alleges Seery is attempting to "exhaust financial resources in an effort to delay recognition of the vesting of HMIT's interests." *See* Proposed Complaint at ¶¶ 4-5, 14-16, 24, 74, 99; ROA.3335, 3339-40, 3342, 3359, 3362-63. Every dollar improperly spent on Seery was one less dollar available for distribution to HMIT because Seery was causing delay. This injures HMIT, individually, separate and apart from injuries to the Claimant Trust. Specifically, HMIT alleged that "[a]s part of the scheme, Seery is attempting to delay recognition of HMIT's vesting of its interests under the CTA," and that Seery is continuing self-serving tactics to "exhaust financial resources in an effort to delay recognition of the vesting of HMIT's interests," Proposed Complaint, ROA.3335,3339,3363. *See Shaev v.*

14

*Wyly*, 1998 WL 13858, at *4 (Del. Ch. Jan. 6, 1998) (*equitable standing* allowed to challenge excessive compensation of directors because "to deny standing on these facts would insulate defendants from potential liability for their alleged misdeeds"), *aff'd*, 719 A.2d 490 (Del. 1998); *In re AbbVie Inc. Stockholder Derivative Litig.*, No. 9983-VCG, 2015 WL 4464505, at *4 (Del. Ch. July 21, 2015) (reaffirming *Shaev*'s view of equitable standing). If Appellees' arguments were indulged, then Appellees scheme to delay and intentionally prevent HMIT's GUC Certification could prevent HMIT from ever obtaining "standing." Delaware law and policy do not allow this because courts "will not countenance a wrong to stockholders by fiduciaries that is both egregious and irremediable." *In re AbbVie Inc.*, 2015 WL 4464505, at *5.

### 4. Delaware law confers prudential standing on HMIT under the "Prevention Doctrine"

Delaware law is clear that parties are not allowed to breach duties of good faith and fair dealing and then later harvest the benefits from those breaches. Such is the case here, where Seery refuses to certify HMIT's vested status despite a good faith duty to do so. This is known as the "prevention doctrine," which is derived from the RESTATEMENT (SECOND) OF CONTRACTS, Section 245, which provides:

> Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.

In *Snow Phipps Group, LLC v. Kcake Acquisition, Inc.*, No. CV 2020-0282-

KSJM, 2021 WL 1714202, at *1 (Del. Ch. Apr. 30, 2021) the Delaware Court of Chancery barred a contracting party from invoking the failure of a condition precedent as an excuse to kill an asset purchase agreement where that party (the buyer) manipulated financial data to prevent the occurrence of the condition precedent, *i.e.*, approval of lender financing. This holding was premised on the conclusion that there was an intent to sabotage the condition precedent. *Id.* at *56.

Here, Seery's failure, delay, and refusal to pay Classes 8 and 9 and issue the GUC Certification in a self-serving attempt to stall HMIT's vesting, is similar to the fact pattern in *Snow Phipps*. *Id.*; *see also Injective Labs Inc. v. Wang*, No. CV 22-943-WCB, 2023 WL 3318477, at *7 (D. Del. May 9, 2023). Here, HMIT has alleged that it is in the money and should be "vested,"[17] and, Appellees cannot alter this reality by parroting that the GUC Certification condition was not fulfilled. Delaware legal authorities are clear: "Delaware courts follow the principle that a party who wrongfully prevents a thing from being done cannot avail itself of the nonperformance it has occasioned." *W & G Seaford Associates, L.P. C. E. Shore Markets, Inc.*, 714 F. Supp. 1336, 1341 (D. Del. 1989). At a minimum, HMIT was entitled to seek declaratory relief on these issues.

Finally, although the pleadings are sufficient to support vested status under an

---

[17] *See Estate of Cornell v. Johnson*, 367 P.3d 173, 178 (Idaho 2016) ("[V]esting cannot be postponed by unreasonable delay in distributing an estate and [] when there is such delay, contingent interests vest at the time distribution should have been made." (emphasis added)).

appropriate standard of review, the uncontroverted evidence introduced by HMIT underscores this standing. *See, e.g.*, ROA. 009614-15 (testimony that there was approximately $150 million in assets available after payment of expenses and Class 8 and Class 9 Claims).

### 5. HMIT is a "beneficial owner" under the DSTA

Regardless, HMIT was and remains a "beneficial owner" under the Delaware Statutory Trust Act ("DSTA"). Section 3801 of the DSTA defines "beneficial owner" to mean "any owner of a beneficial interest in a statutory trust, the fact of ownership to be determined and evidenced … in conformity to the applicable provisions of the governing instrument of the statutory trust."   Here, the CTA specifically recognizes HMIT's initial contingent interest in the CTA.  CTA at 3, 27-28, ROA.7369,ROA.7393-94.  A "beneficial interest" includes both ***vested and contingent*** interests. HMIT Brief, pp.30-33; *see also Scanlan v. Eisenberg*, 669 F.3d 838, 844 (7th Cir. 2012) (". . . a contingent beneficiary can bring an action against the trustee—even though his interest is remote and contingent—to protect his possible eventual interest"); RESTATEMENT (THIRD) OF TRUSTS 94, cmt. B.

Appellees incorrectly argue otherwise. Highland Brief, p.28. Although the CTA addresses when HMIT should be deemed a "Claimant Trust Beneficiary," nowhere does the CTA limit the broad statutory term "beneficial interest."  Nor could it because the CTA specifically recognizes HMIT's "contingent" interests.

Section 5.1(c) states that, upon the Effective Date, "the Claimant Trust ***shall issue*** Contingent Interests to" HMIT (Emphasis added). Pursuant to Section 5.4 of the CTA, under the title "***Registry of Trust Interests***," the Claimant Trustee is required to keep "***a registry of*** the Claimant Trust Beneficiaries ***and the Equity Holders [HMIT]***." Thus, the language of the CTA, as the "governing document," is clear that HMIT was issued and maintains a "beneficial interest." Even if HMIT's interest is only "contingent," it is still a "beneficial interest." Accordingly, this Court should reject Appellees' argument that ignores controlling principles of contract and statutory construction.

If Delaware law was otherwise, Seery could refuse to recognize HMIT's vested status and breach his obligations of good faith with impunity. Indeed, if Appellees' argument were correct, Seery could improperly prolong the underlying bankruptcy, continue to collect exorbitant fees, and deplete assets that should be distributed to HMIT. "Essentially that rule, which the Appellees ask [this Court] to adopt, would insulate" Seery from bad faith actions that deteriorate the trust res until HMIT is left with nothing.  *See Scanlan*, 669 F.3d at 844.  No authority supports this self-serving suggestion, and HMIT's standing should not turn on whether Seery has declared HMIT a "Claimant Trust Beneficiary"—particularly when HMIT pleaded it is already vested and seeks a declaration to this effect.

**6.   HMIT's status as a beneficial owner has been "continuous"**

The Highland Brief, paragraph 59, argues that "only parties that are 'beneficial owners' of a trust continuously from 'the time of the transaction of which the plaintiff complains through the time of bringing the action' they sued derivatively on behalf of the trust." As previously discussed, HMIT's status as a "beneficial owner" has been continuous. HMIT Brief, p.30. The "transaction" at issue culminated post-Effective Date with the creation of the Claimant Trust. Pursuant to the Plan, as of the Effective Date, HMIT's status as a beneficial owner under Delaware law was complete and remains so today. Its status as a beneficial owner was never impacted by the vesting language in the CTA. That is because HMIT's "beneficial owner" status is derived from statute and includes both vested and contingent interests. *See infra* at 10-11.

In any event, Delaware law holds that the "continuous" ownership requirement is properly suspended when the continuity of ownership is prevented by the defendant's wrongful conduct. That is, a defendant should not be allowed to expediently manipulate the facts giving rise to standing to insulate itself from liability. *See Shaev,* 1998 WL 13858, at *4, *Supra,* p. 15, *see also Bamford v. Penfold, L.P.*, 2020 WL 967942, at *29-30 (Del. Ch. Feb. 28, 2020) ("the continuous ownership requirement is itself a judicially created doctrine" that is subject to "equitable exceptions," including "equitable exceptions to standing doctrines").

### 7.     HMIT has individual injuries distinct from the Claimant Trust

The Highland Brief, at p.33, challenges HMIT's individual standing with the misleading argument that HMIT's injury in fact is no different from the injury to the Claimant Trust. The OP Brief echoes this argument regarding a "particularized" and "concrete" injury. OP Brief, p.23. In doing so, Appellees ignore the fact that Appellees delayed the GUC certification which caused a unique, particularized harm directly to HMIT, and which did not otherwise impact the Claimant Trust or other interest holders.[18] This fact, alone, destroys their argument.

### C.     HMIT is "in the money"

Appellees argue that HMIT is not "in the money" because of HMIT's purported "selective misreading of certain financial disclosures." Highland Brief, p.30. This is ironic because Appellees presented no evidence that HMIT was wrong mathematically and, most important, Appellees previously declined to answer whether HMIT is in the money or not.[19]

Appellees' briefing also ignores the asset values that were disclosed, specifically that, as of July 2023 (and before), the Claimant Trust had $247 million

---

[18] The bankruptcy court also ignored HMIT's actual allegations and proposed pleadings by stating "HMIT can only point to Seery's excess compensation as injury." ROA.904. This simply is not true and ignores HMIT's well-pleaded allegations. ROA.3339 ("As part of the scheme, Seery is attempting to delay recognition of HMIT's vesting of its interests under the CTA.").

[19] *See* ROA.3396 (Highland Parties' Counsel: "Hunter Mountain…keep[s] telling the Court assets exceed liabilities. Assets exceed liabilities. And you know our position on that, Your Honor. ***They may; they may not***.") (emphasis added).

in assets and $139 million in remaining, unpaid Class 8 and 9 Claims.[20] Instead, Appellees then retreat to the bankruptcy court's incorrect reasoning that HMIT cannot be "in the money" because of "supplemental notes" purportedly "integral to understanding the numbers." Highland Brief, p.30; ROA.1047. However, these "supplemental notes" refer to non-specific financial information that has *not* been disclosed in the bankruptcy proceedings. It was thus impossible for the bankruptcy court to rely on the supposed "integral" but undisclosed data. This is particularly true because the only other evidence demonstrated that Seery expediently allocated approximately $125 million in "indemnity reserves," which will likely never be spent.[21] In effect, Seery took $125 million out of the cash pipeline to purportedly insulate himself from liability even though the Plan excludes his right to indemnification for "willful misconduct," which are the types of claims alleged in this case.[22]   The only fair inference drawn from this gamesmanship is that Seery seeks to fabricate reasons *not* to certify and vest HMIT according to the CTA.

But what remains clear is that the financial disclosures show well over $100 million in assets *remaining* after full payment of the Classes 8 and 9,[23] and that Seery is obligated under the CTA to (a) pay the remaining Class 8 and 9 claims in full, (b)

---

[20] ROA.010033-34.

[21] ROA.10065-65.

[22] ROA.6779-80.

[23] *See* ROA.10062-10134.

file the beneficiary certification, (c) vest the Class 10 and 11 Equity Interests, and (d) "not unduly prolong the duration of the Claimant Trust."[24]

### 1. HMIT has standing to seek declaratory relief

Appellees' argument that HMIT is not entitled to pursue declaratory relief is incorrect. Highland Brief, p.47. HMIT has standing to seek declaratory relief, specifically regarding its rights under the CTA, and "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.[25] At a minimum, there is a justiciable controversy and dispute and HMIT is entitled to seek declaratory relief concerning the vested status of its Contingent Interests under the CTA. *Kirkman v. Wilmington Tr. Co.*, 61 F. Supp. 651, 654 (D. Del. 1945).

### D. The bankruptcy court impermissibly extended the Barton Doctrine

The bankruptcy court also erred when misconstruing the appropriate "colorable" claim analysis. As drafters of the Plan and the Gatekeeper provisions,

---

[24] *See* ROA.007377-81.

[25] The Highland Brief, at p.48 argues that HMIT brings "claims for declaratory relief, but a request for declaratory relief is not an independent cause of action, [and] in the absence of any underlying viable claims such relief is unavailable." (citing *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016)). But *Green* is inapposite. There, the court dismissed a *pro se* plaintiff's complaint because plaintiff plead "the same hackneyed claims that were so popular among distressed mortgagors several years ago, but quickly debunked by the federal courts." *Id*. Despite acting *pro se*, the plaintiff sought a declaratory judgment and attorneys' fees. Here, the detailed factual allegations are supported by robust pleadings which form an actual controversy proper for declaratory relief, including a declaration that HMIT is a vested beneficiary.

the Highland Parties could easily have incorporated a *Barton* doctrine standard, but they did not do so. This choice must be construed as having consequence, particularly because the applied standard should be no more than what the Plan says: "*colorable.*" *In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) (noting the general rule that ambiguities in plans are interpreted against the drafters) *In re Deepwater Horizon*, 732 F.3d 326, 342 (5th Cir. 2013); *Richardson v. United States*, 468 U.S. 317 (1984); *Becker v. Noe*, No. CV ELH-18-00931, 2019 WL 1415483, at *18 (D. Md. Mar. 27, 2019). But the bankruptcy court, encouraged by Appellees, usurped the Plan it confirmed by straying from the "colorability" analysis.

The Gatekeeper Provision was previously appealed, but limited by the Fifth Circuit. *In re Matter of Highland Capital Management, L.P.*, 48 F.4th 419 (5th Cir. 2022) (holding that the Plan's non-debtor exculpation provision violated the Bankruptcy Code to the extent it extended beyond the debtor, unsecured creditors committee, and "Independent Directors"). But Appellees misstate the Fifth Circuit opinion by suggesting that the Court confirmed a broad Gatekeeper Provision on the basis of the *Barton* standard. At page 10 of their Brief, the Outside Purchasers state: "The Fifth Circuit rejected those arguments and found that the Gatekeeper Provision was "sound." *In re Highland Cap. Mgmt.*, 48 F.4th at 435, 439.

Although the Fifth Circuit confirmed that the *Barton* doctrine supports the power of a bankruptcy court to require a party to obtain leave before filing certain actions,[26] the Fifth Circuit also made clear that this requirement applied to any action ***in district court*** when the action is against the trustee or other court-appointed officer, ***for acts done in the actor's official capacity***. *Id*. at 438-39 (emphasis added). Here, at a minimum, the bankruptcy court misapplied the Fifth Circuit's holding by extending *Barton* to a proposed adversary proceeding in the bankruptcy court and not the district court.

The *Barton* doctrine is a limited doctrine, and its underlying policy reasons do not apply here. The doctrine is rooted in the "concern that if debtors could sue the trustee in a foreign jurisdiction, the foreign 'court would have the practical power to turn bankruptcy losers into bankruptcy winners.'" *Carroll v. Abide,* 788 F.3d 502, 506 (5th Cir. 2015) (citation omitted). Here, however, HMIT requested leave to file the proposed claim in the same bankruptcy court that administered the underlying claims. Thus, the Appellees encouraged the bankruptcy court to commit error when they urged a one-of-a kind extension of the *Barton* doctrine in the same court that entered the Gatekeeper Provision.[27] No Fifth Circuit case has ever applied the

---

[26] *Id.* at 439 (citing *Barton v. Barbour*, 104 U.S. 126 (1881)).

[27] *See* ROA.3430, ROA.3463. All of the cases the bankruptcy court relied upon were in the context of protecting a bankruptcy trustee in an action outside the bankruptcy court--facts which do not exist here.

*Barton* doctrine to cloak corporate officers with judicial immunity and exculpate them from entire categories of claims against them—when the matter is filed within the bankruptcy court. *See id.*; *In re Provider Meds, LP*, 514 B.R. 473, 476 (N.D. Tex. 2014).[28]

The bankruptcy court also ignored Fifth Circuit precedent by indulging Appellees' arguments to use the Plan as a weapon to impose a vexatious litigation injunction. The Fifth Circuit recognized that the bankruptcy court *could* "follow[] the procedures" to designate Dondero or others as "vexatious litigations"—but held that "***non-debtor exculpation within a reorganization plan is not a lawful means to impose vexatious litigant injunctions and sanctions***." *In re Matter of Highland Capital Management, L.P.*, 48 F.4th at 439 n.19 (emphasis added). Despite this, the bankruptcy court wielded the Plan in precisely the way the Fifth Circuit rejected – and without ever declaring HMIT (or anyone) a vexatious litigant or "following the procedures" for that serious label.

---

[28] The Appellees mischaracterize the bankruptcy court's order when they suggest that evidentiary hearings under *Barton* are routinely conducted on motions for leave. This is not true as they are conducted (if at all) when a proposed case would be filed outside the bankruptcy court. Furthermore, Appellees' argument that an elevated standard of review is necessary to assure that the Gatekeeper Provision offers protection beyond Rule 12(b)(6) proceedings (and is not neutered) is also misleading. The Gatekeeper Provision still has utility. Among other functions, it allows the bankruptcy court to make preliminary determinations of colorability, bringing to the equation a generalized knowledge of bankruptcy processes and proceedings. It also ensures that the colorability determinations are consistent with prior bankruptcy rulings. *See Carroll*, 788 F.3d at 506.

Instead of following Fifth Circuit precedent, the bankruptcy court co-opted the entire process and imposed its own version of "colorability" to include an unprecedented evidentiary hearing. Appellees cite no case where a court has applied such a standard or imposed such a proceeding, and there is none. Besides co-opting the process, the bankruptcy court also imposed its own definition of "colorability" by relying on vexatious litigation precedent—a standard not supported in the Fifth Circuit or *Barton*. And, as noted, neither the bankruptcy court nor any other court has ever found HMIT to be vexatious—as Appellees admit. *See* Highland Brief, p.38.

Nor would the bankruptcy court have any basis to declare HMIT vexatious. While Appellees attempt to lump all so-called "Dondero Entities" together, the evidence conclusively shows that Mr. Dondero was not in control of or even consulted about HMIT's proposed Complaint.[29] Regardless, there has been (and can be) no vexatious litigation finding against HMIT based upon the record before the bankruptcy court and this appellate record. The bankruptcy court nevertheless punished HMIT by imposing an unauthorized, inflated standard. On the other hand,

---

[29] The bankruptcy court's statement that Dondero controls HMIT because he was the first witness at the hearing is an unreasonable inference without any foundation. Dondero stated he had never seen a draft of HMIT's proposed Complaint and Mark Patrick testified he was not involved in the decision making.  ROA.9617 Likewise, the bankruptcy court's reference to other proceedings concerning other entities, not including HMIT (ROA.876)—are irrelevant to HMIT and these proceedings.

26

a colorable claim is one with "*some possible validity*" based on allegations and not merits-based proof. *See In re Deepwater Horizon*, 732 F.3d 326, 340-41 (5th Cir. 2013) (quoting *Richardson*, 468 U.S. at 326 n. 6)). Appellees satisfied that standard, and the bankruptcy court's refusal to follow it is reversible error.

The bankruptcy court also committed reversible error in how it applied its new arbitrary standard—by ordering that only two depositions would be allowed, no document discovery would be allowed, and no expert analysis would be considered. Once the bankruptcy court made its determination that the hearing would be evidentiary, full discovery and testimony was the only possible way to afford due process to HMIT – but HMIT was deprived of this right.[30] Because the bankruptcy court allowed evidence over HMIT's objection, the issue turned from whether the proposed Complaint presented colorable claims to whether HMIT would ultimately be successful in the prosecution of its asserted claims—all with extremely limited discovery where HMIT was denied any documentary discovery, and denied deposition testimony from the Outside Purchasers. ROA.4960.

The Outside Purchasers argue that HMIT is required "to show its claims are colorable *before* it is entitled to discovery." OP Brief, p.19. But this places the

---

[30] *Compare* ROA.4960 (holding "[n]one of the parties shall be entitled to any other discovery, including the production of documents…"), *with* ROA.6139, 6144, and 6568 (the purported "Documentary Compensation Evidence," which the bankruptcy court allowed the Highland Parties to cherry-pick and redact, despite denying HMIT related documentary evidence).

proverbial "cart before the horse" because the bankruptcy court considered evidence, and conducted a trial, without allowing any discovery, which turns due process on its head.   The bankruptcy court then entered a 105-page opinion (filled with footnotes) weighing the credibility of witnesses and evidence, including findings of fact and considering evidence of events that were not presented at the hearing. *See, e.g.*, ROA.873-74. This also turned the judicial process upside down.

In this regard, the Highland Brief is a testament to the bankruptcy court's error. It is chock-full of self-serving characterizations of the "evidence" from the June 8 Hearing, and argues that the bankruptcy court "relied upon extensive and irrefutable evidence" to deny leave. Highland Brief, pp.14-15.  Indeed, a majority of the Highland Brief fact section mischaracterized "evidence" that should never have been considered at this juncture.[31] To be sure, HMIT disputes the Highland Parties' characterizations. But, the fact that the bankruptcy court considered evidence providing Appellees with a platform to make self-serving arguments makes this entire proceeding (and Order) error.

**E.    HMIT has plead colorable and plausible claims**

---

[31] By way of example, the Highland Parties mischaracterize Jim Dondero's "changing recollection" (Highland Brief, pp.25-27) that the so-called "Dondero Email" was false (pp. 13-17) and that it did not contain MNPI (pp.18-19), that compensation negotiations with Seery were purportedly "arm's length" (p.24), and that there was no *quid pro quo*. (p.4). Incredibly, the Highland Parties argue that HMIT actually attempted to "smuggle" evidence into the proceedings through its expert proffer. (p. 5). None of these are supported by the record.

Under any fair analysis, HMIT has plead colorable and plausible claims which are also supported by evidence. HMIT Brief, p.45. Appellees' argument that HMIT failed to allege facts supporting its claims for declaratory relief and breach of fiduciary duty is incorrect. HMIT Brief, pp.45-52. Appellees also ignore their unique control of relevant information, which allows more flexibility in a plaintiff's pleading. *See Chandler v. Phoenix Servs.*, 419 F. Supp. 3d 972, 988 (N.D. Tex. 2019) ("information and belief" pleadings permissible when the information is more accessible to the defendant).

As stated in HMIT's Opening Brief, p.45, HMIT alleged plausible and colorable claims that Seery breached his fiduciary duties and duties of good faith and fair dealing,[32] which include, but are not limited to avoiding delay of the distributions to Class 8 and 9 and distributing the assets in accordance with the CTA. HMIT's pleadings set forth plausible factual allegations that Seery breached these duties and HMIT's interest should be deemed vested.[33]

## F.     The Bankruptcy Court's Co-Opted Process is not Consistent with Fifth Circuit Precedent and Denied HMIT Due Process

The Order Denying Leave relies upon numerous "fact findings" and credibility determinations inappropriate in a pre-pleading stage. These types of

---

[32] *See also* Supra, FN 13.

[33] HMIT Brief at pp.44-52, *see also*, ROA.003335-57, ROA.010062-10134.

29

determinations are inappropriate even at the summary judgment stage. *Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, 647 F. Supp. 3d 508, 516 (W.D. La. 2022) (citing *Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 478 (5th Cir. 2006)).

As such, the bankruptcy court erred when it required HMIT to participate in a merits-based mini-trial, and then compounded this error when it ignored HMIT's uncontroverted evidence and excluded HMIT's expert witnesses. *See Reese*, 647 F. Supp. 3d at 516; *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) ("weighing the evidence, assessing its probative value, or resolving any factual disputes" inappropriate before trial). Appellees' briefs seek, but fail, to justify the bankruptcy court's many erroneous fact findings, credibility determinations, and assessments of the probative value of evidence.

### 1.   Seery was in possession of MNPI

Appellees' briefs attack the credibility of Mr. Dondero when discussing the so-called "Dondero Email,"[34] and whether this email contains MNPI. Highland Brief, p.51. An email from an active member of MGM's Board of Directors concerning the *probable* sale of MGM is more than, and qualitatively different from, rumor, media speculation, and the varying news articles Appellees reference. *See*

---

[34] ROA.6691.

*United States v. Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012) (emphasis added).[35] Despite this, the bankruptcy court resolved this fact dispute by attacking Mr. Dondero's credibility, akin to a factfinder at trial. But determination of the Motion for Leave should not have been based on a trial standard, much less on a mutated, unfair trial standard without meaningful discovery.[36]

Appellees also regurgitate the bankruptcy court's mischaracterization of Mr. Dondero's testimony that he allegedly "admitted" he did not communicate MNPI. Highland Brief, p.14; OP Brief, p.21; ROA.852. This is a gross mischaracterization. Dondero testified that his duty was to relay as little information as possible and any purported additional information that was not expressly in his email, such as "Amazon hit the price," was irrelevant and Mr. Dondero only "agreed" this information was not there because "***it doesn't have to and it's not supposed to [be***

---

[35] Appellees cite *SEC v. Cuban*, 2013 WL 791405, at *33 (N.D. Tex. Mar. 5, 2013) to suggest information is not MNPI when it is "disclosed to achieve a broad dissemination to the investing public." Highland Brief, p.51. This case is inapposite because it does not address the differences between rumor and "public dissemination," and, significantly, considered the information "publicly disseminated" upon a public announcement of a "private investment in public equity" offering by the company—not rumored reports of potential sales. *See id.* at *1.

[36] For example, the bankruptcy court relied on an October 2020 article reporting "mounting pressure to sell" and referenced Kevin Ulrich and reports that he is "working toward a deal." *See* ROA.851. But neither Kevin Ulrich nor anyone else is a named source for this purported information—thus implicating the exact "source unknown" article the Second Circuit contemplated in *Contorinis*. *See* ROA.5840. In fact, the article specifically states that none of Mr. Ulrich or representatives for Apple, ComCast, Amazon, or Facebook responded to requests for information. ROA.5841-42. Regardless, the bankruptcy court should not be weighing the credibility of news articles and determining the probative value of disputed facts.

*included]*."[37]

Appellees also argue that the fact that the UBS claims were purchased later than the other Disputed Claims somehow undercuts HMIT's claims. OP Brief, p.21. However, this is a "red herring" because it continues to ignore that MGM was ***not the only MNPI*** as part of the *quid pro quo* trade. HMIT Brief, p. 12-13.[38] The Appellees also ignore Mr. Dondero's testimony that one of the Outside Purchasers expressly relied on conversations with Mr. Seery to the effect they would never sell their newly-acquired claims because the claims were too valuable (per Seery).[39] So, even setting aside the Dondero Email, HMIT presented plausible (colorable) allegations, as well as supporting evidence, that Seery provided other MNPI to the Outside Purchasers. The bankruptcy court erred by disregarding these other factual averments.

### 2.    Seery's Compensation is Excessive and Never Approved by the Court

Appellees argue that Seery's compensation was the product of "arms-length"

---

[37] ROA. 9619 (emphasis added).

[38] The Outside Purchasers also attempt to ratify their behavior by alleging that the "Claims Sellers sold their claims and put their involvement behind them." OP Brief, p.24. However, there is no evidence of the negotiations, terms, waivers, or further involvement by the sellers in the record. Of course, this is because the bankruptcy court denied HMIT any document or deposition discovery, which was calculated to seek discovery concerning the terms and conditions that are not unusual in claims selling, including MNPI waivers, "Big Boy" letters, or further involvement from the claims sellers. *See* ROA.4696 n.18.

[39] ROA.9594-96, 9602-04; *see also* ROA.3349-50.

negotiations purportedly "fixed by the Plan and the Claimant Trust Agreement" Highland Brief, p.23, OP Brief, p.10. This is incorrect on both counts. Furthermore, whether the negotiations were "arm's length" was a merits-based defense, and the bankruptcy court's role was not to serve as a trial judge.

Seery's current compensation of $150,000 per month ($1.8 million annually), plus bonuses, was never approved by the bankruptcy court for post-Effective Date activities. Instead, Seery's compensation (as Trustee) was to be revisited after the Effective Date,[40] but this *never happened.*[41] Seery's compensation was also supposed to be reduced in 2022, but this also *never happened.*[42] Although these facts alone reinforce the colorability of HMIT's claims, there is even more.

Seery admitted he had no prior experience as a bankruptcy claimant trustee,[43] he did not conduct any market study to support the reasonableness of his compensation,[44] and he was not aware whether the Outside Purchasers (who control the Oversight Board and his financial package) conducted any market studies.[45] In short, there was no oversight or support for Seery's compensation as Trustee, post-

---

[40] Section 3.13(a)(i) of CTA. ROA.7385, Order Confirming Plan. ROA.1693.

[41] *See* ROA.9709 (Seery still making $150,000 salary per month).

[42] ROA.9708-9709.

[43] ROA.9669-70.

[44] ROA.9711.

[45] ROA.9711.

Effective Date. These facts demonstrate that his compensation was inconsistent with the Plan which stated that Claimant Trustee compensation shall be "consistent with that of similar functionaries in similar types of bankruptcy cases." OP Brief, p.10. Also, Seery's job responsibilities as Claimant Trustee following the Effective Date were substantially diminished. Now, nearly three years after the Effective Date, Seery's duties remain reduced—but he continues to receive significant compensation despite refusing to conduct his limited remaining obligations and monetize all the assets to pay Claim 8 and Claim 9 Claimants.[46]

Appellees' briefs seek to bolster the bankruptcy court's "rulings" concerning Seery's compensation by arguing that HMIT had no "personal knowledge" of Seery's actual compensation. But HMIT is entitled to rely on circumstantial evidence, and—regardless, at this stage—HMIT is entitled to plead upon "information and belief" because the direct evidence is uniquely within the hands of Appellees. *See Chandler*, 419 F. Supp. at 988.

Lastly, the bankruptcy court allowed Seery to "cherry pick" and redact "Documentary Compensation Evidence" to bolster the Appellees' "arm's length" defense, but unfairly excluded HMIT's expert testimony that contradicted it.

---

[46] *See* ROA.3332-3367; HMIT Opening Br., pp. 28-29 ("Seery's duties under the CTA also have not been fulfilled, and these breaches further support standing. Seery is obligated to: (a) pay the remaining Class 8 and 9 claims in full, (b) file the beneficiary certification, (c) vest the Class 10 and 11 Equity Interests, and (d) 'not unduly prolong the duration of the Claimant Trust.'").

Highland Brief, p.24. Curiously, the so-called "arms-length" negotiations resulted in *no change* to Seery's compensation despite his diminished responsibilities.

The bankruptcy court's double standard was clearly unfair. The bankruptcy court excluded HMIT's experts as "unhelpful"—on the basis that the bankruptcy court had prior experience with claims negotiation. Yet a court may have personal experience with lots of things, but that does not negate a party's right to adduce an expert who holds a different view; after all, a court is required to rely on the record, not its extra-record personal experiences. Here, the bankruptcy court's reasoning is made even more unsound by the fact that it (1) credited Seery's testimony on the matter, (2) did not conduct a *Daubert* inquiry, (3) never heard HMIT's experts' opinions, and (4) struck HMIT's offer of proof.[47] Each of these errors destroyed HMIT's right to due process.

### 3. Public Information was insufficient to support Outside Purchasers' claims purchase

Appellees also challenge the significance of the pre-sale public information. Highland Brief, p.21. Each of the Disputed Purchases occurred prior to the Effective Date when HMIT still owned a 99.5% equity stake in HCM.[48] At that time, the only publicly available information was derived from the Debtor's Disclosure Statements,

---

[47] ROA.10025.

[48] ROA.001855, ROA.001864-65.

which publicly projected payment of only 71.32% for Class 8 claims and nothing for Class 9 claims.[49] Mr. Dondero separately testified that the Debtor's public disclosures were scant, and did not provide meaningful details concerning the Debtor's assets at that time.[50] He also testified there was no way third-party strangers to the bankruptcy, such as the Outside Purchasers, could actually appreciate the details of the Debtor's investments without substantial due diligence, but there was none.[51]

The uncontroverted evidence is that the Outside Purchasers invested over $160 million to buy[52] the Disputed Claims without conducting due diligence.[53] Seery (the Debtor's CEO) himself testified that there was no data room to allow due diligence.[54] Dondero separately testified that due diligence on such risky investments typically would involve the Debtor's legal staff, its business professionals, and third-party financial analysts and law firms.[55] But Appellees

---

[49] ROA.001866.

[50] ROA.9574.

[51] ROA. 9573-74.

[52] The Highland Parties' claim that these allegations were based on "rank speculation" (Highland Brief, p.24) is misplaced. HMIT is entitled to plead on information and belief. *Supra.* The Highland Parties cannot hide information and then proclaim a pleading is baseless—particularly here where evidence produced three days before the hearing proved that pleadings were accurate.

[53] ROA.001866; ROA 009698.

[54] ROA.009696-97.

[55] ROA.009586-87

presented no evidence that any of this happened.

As well-pled in HMIT's Complaint, and corroborated by Dondero's testimony, Farallon rejected selling its claims for a significant premium (40%) above what it initially paid *just a few weeks before.* [56] While Dondero was understandably incentivized to regain control of the company he founded, the Outside Purchasers relied on Seery's promise that the newly acquired claims would be *even more valuable.* [57] This was never controverted by the Outside Purchasers.

While Appellees and the bankruptcy court rely on mere projections in their analysis,[58] the real math is telling. The Outside Purchasers invested an estimated $160 million to acquire unsecured claims when the Debtor's public disclosures indicated a $0 return for Class 9 claims and, a substantial risk that the par value of the Class 8 claims would never be recouped.[59] The huge risks of the investment could never rationally justify the meager return projected from publicly available information – and absent the MNPI disclosed by Seery. Again, the bankruptcy court erroneously excluded HMIT's experts on this issue finding them "unhelpful."

Dondero also testified that distressed investments are typically the most "diligenced" items due to lower asset value, the reduced ability to and timing of

---

[56] ROA. 006693-95; ROA.009589-96.

[57] ROA.9594-96;ROA.3349.

[58] Highland Brief, p. 22.

[59] ROA.001866.

monetization of the assets, and associated litigation risks.[60] But, even within this context, the Outside Purchasers *never* explained how they justified their investments with the attendant economic risks and without due diligence, despite their fiduciary duties to their own investors to do so.[61]

### 4. Other mischaracterizations and merits based attacks

The Highland Brief, p.11, erroneously argues that the bankruptcy court properly denied leave because it was Dondero's "eighth" attempt to assert "insider trading" allegations. Not only is this statement false, it speculates concerning the undisclosed conclusions of two state court judges in unrelated proceedings that have no preclusive effect.

The purported "three Rule 202 petitions" to which the Highland Parties[62] refer actually involved only two separate proceedings, and only one involved HMIT. In that instance, the state court's general order did not state its reasoning, and the denial was without prejudice. That "without prejudice" denial makes sense because the Outside Purchasers' repeatedly argued to the state court that the bankruptcy court was a more efficient forum to address discovery issues. *See* ROA.002191-92. But when HMIT got to the bankruptcy court and requested virtually identical discovery,

---

[60] ROA.009587

[61] ROA.003334.

[62] Appellees mischaracterize these proceedings by suggesting that "Dondero filed" HMIT's prior Rule 202 Petition. OP Brief, p.12. This is not true.

the Outside Purchasers successfully opposed it. ROA.004959; *see* ROA.009884. The state court proceedings, therefore, offer Appellees no support and, instead, reflect the disingenuousness of their arguments.

The Highland Parties next argue that the closing of other investigations—such as the investigation by the Texas State Securities Board ("TSSB")—suggests that HMIT's Motion for Leave was meritless. Highland Brief, p.12. Although investigations such as that conducted by the TSSB may have some probative value, it is only one piece of a much larger mosaic. This is because the investigating agency's motivations are different. Moreover, the TSSB *opened* an investigation, which suggests that the allegations are, at least, colorable.

The Highland Parties next argue (Highland Brief, p.25) that Mr. Dondero's "changing recollections" somehow prove that HMIT's allegations are contrived. But they mischaracterize Mr. Dondero's testimony, and nothing in Dondero's contemporaneous notes, his Declarations, or his testimony, was rebutted by the Outside Purchasers. HMIT Brief, pp.18-19, 59. The Outside Purchasers' silence is deafening.[63]

The Highland Parties' attacks on Mr. Dondero's testimony are predicated, in part, on the notion that his notes do not mention every detail of his conversations.

---

[63] ROA.9564.

39

Highland Brief, p.26. In essence, the Highland Parties argue that Mr. Dondero should not be believed because he failed to transcribe his telephone conversations verbatim as a court reporter. But the fact that Appellees make this argument underscores the inherent error in the proceedings. Mr. Dondero's credibility—and Appellees' mischaracterizations about an earlier declaration Mr. Dondero had signed—should not have been at issue at this pre-pleading stage. *See Reese*, 647 F. Supp. 3d at 516 (credibility determinations, assessments of probative value of evidence and court's inferences drawn are not be considered before factfinding at trial).

## G.     The Bankruptcy Court Erred in Ignoring *Stern v. Marshall*

Appellees' citation-less arguments concerning *Stern v. Marshall,* 564 U.S. 462 (2011), miss the point. Highland Brief, pp.34-35. Appellees argue that HMIT's *Stern v. Marshall* objection "comes far too late" but they ignore that the bankruptcy court's hybrid "additional level of review" procedure is far outside the scope of the Gatekeeper Provision the Fifth Circuit actually considered. *See Highland Cap.*, 48 F. 4th at 435. By straying afield of the Gatekeeper Provision, and redefining "gatekeeper" to mean "trial judge," the bankruptcy court effectively "enter[ed] final judgment on claims that derive from state law and do not invoke substantive rights provided by title 11." *Stern v. Marshall*, 564 U.S. 462 (2011).

Appellees cannot avoid the simple truth that the Gatekeeper Provision does not allow the bankruptcy court to do what it did. It lacks constitutional authority to enter final orders or judgments in non-core claims. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 31 (2014). As stated in HMIT's Opening Brief, p.52, HMIT's proposed claims for breach of fiduciary duty, aiding and abetting, conspiracy, and unjust enrichment are state law claims outside the bankruptcy court's jurisdiction. *See In re Allied Sys. Holdings, Inc.*, 524 B.R. 598 (Bankr. D. Del. 2015). HMIT's proposed claims do not challenge actions "in connection with implementation of the Plan and the Claimant Trust." As HMIT has made clear, HMIT's proposed claims focus on the abuses that occurred outside of the bankruptcy court—and its *Stern v. Marshall* challenge is therefore preserved and dispositive.

## H.    HMIT's Proposed Claims are Brought for a Proper Purpose and With Foundation

The Highland Brief, p.56, alleges that the "purpose" of the Gatekeeper Provision is to protect protected parties from harassing litigation, and that it is based on findings of fact which were "left undisturbed by the Fifth Circuit." Highland Brief, p.8. But as discussed, the Fifth Circuit expressly admonished that the Gatekeeper Provision, "is not a lawful means to impose vexatious litigant injunctions and sanctions." *In re Matter of Highland Capital Management, L.P.*, 48 F.4th at 439 n.19. Here, as applied, the bankruptcy court ignored the Fifth Circuit's admonition

and elevated the standard of review to include a standard intended for vexatious litigants. *See* ROA.922 ("[T]he court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the 'colorability' standard under gatekeeping provisions in a plan—as more informative on how to approach 'colorability.'")

As discussed, HMIT is not—and has never been deemed—a vexatious litigant. *Supra*. Moreover, the record conclusively establishes that HMIT's Motion for Leave was filed for a proper purpose, and with foundation. Mr. Dondero also testified he has no legal control over HMIT, and he had never seen a draft of HMIT's proposed Complaint.[64] No evidence supports that HMIT is an "alter ego" of Mr. Dondero.[65] The bankruptcy court's claim that "Dondero is the driving force behind HMIT's Motion for Leave" is error and relies on unsupported speculation. *See* Order Denying Leave, p.42. By urging otherwise, Appellees invited reversible error. OP Brief, p.5 (noting that "Dondero or his [undefined] affiliated entities objected to settlements negotiated by the Debtor"). Simply put, the bankruptcy court ignored the conclusive evidence to fashion new "findings" based on incorrect, irrelevant and unrelated matters outside the record and not involving HMIT.

## I.   The notices under Bankruptcy Rule 3001 are irrelevant

---

[64] ROA.9570-71;ROA.9617.

[65] ROA.9570-71.

The Outside Purchasers' claim that there was no objection filed to the claims transfer notices under Federal Rule of Bankruptcy Procedure 3001 is another red herring. OP Brief, p.5. HMIT did not have knowledge at that time that the trades were part of a larger *quid pro quo* arrangement to exchange MNPI for an excessive compensation package for Seery. HMIT timely brought its Motion for Leave to address its tort claims which are separate and distinct from any generic claims trading objection.

## V.    CONCLUSION

Appellant, Hunter Mountain Investment Trust ("HMIT"), respectfully requests that the Court reverse the Order Denying Leave, reverse the Order Denying Further Relief, render a decision granting HMIT leave to bring its claims individually and derivatively and, based upon the appellate record before this Court, reassign this matter to a new bankruptcy court for further disposition upon remand. *See Miller v. Sam Houston State Univ.*, 986 F. 3d 880, 893 (5th Cir. 2021). Alternatively, to the extent necessary, in the unlikely event the Court determines that HMIT's factual allegations do not satisfy Rule 12(b)(6) pleading requirements, that the Court make its finding without prejudice and permit HMIT the opportunity to replead, consistent with the Federal Rules of Civil Procedure and Bankruptcy Rules of Procedure. HMIT also seeks such other and further relief, special or general, to which HMIT is justly entitled.

## VI.   <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of FED. R. BANKR. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by FED. R. BANKR. P. 8015(g), this document contains 10,204 words; and

This document complies with the typeface requirements of FED. R. BANKR. P. 8015(a)(5) and the type-style requirements of FED. R. BANKR. P. 8015(a)(6) because: this document has been prepared in a proportionally spaced typeface Microsoft Word in size 14 font, Times New Roman.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
